UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ──────────────── x | | |
| DENIS MARC AUDET, MICHAEL PFEIFFER, DEAN ALLEN SHINNERS, and JASON VARGAS, Individually and on Behalf of All Others Similarly Situated, | : : : : | No. 16-940<br><br>ECF Case<br><br><u>CLASS ACTION</u> |
| Plaintiffs, | : : | |
| vs. | : : | **COMPLAINT** |
| HOMERO JOSHUA GARZA, STUART A. FRASER, GAW MINERS, LLC, and ZENMINER, LLC, (d/b/a ZEN CLOUD), | : : : : | <u>DEMAND FOR JURY TRIAL</u> |
| Defendants. | : : | June 15, 2016 |
| ──────────────── x | | |

## COMPLAINT

Plaintiffs Denis Marc Audet, Michael Pfeiffer, Dean Allen Shinners, and Jason Vargas ("plaintiffs"), individually and on behalf of a class of all others similarly situated, bring this action for damages and relief against defendants Homero Joshua Garza ("Garza"), Stuart A. Fraser ("Fraser"), GAW Miners, LLC ("GAW Miners"), and ZenMiner, LLC (d/b/a ZenCloud) ("ZenMiner"), for violations of the federal securities laws and Connecticut state laws. Based on counsel's investigation, research and review of publicly available documents, plaintiffs' personal knowledge, and upon information and belief, plaintiffs allege as follows:

## SUMMARY OF THE ACTION

1.     Defendants used the lure of quick riches from a twenty-first century payment system known as virtual currency to defraud investors. Though cloaked in technological sophistication and jargon, defendants' fraud was simple at its core—defendants sold what they did not own and misrepresented the nature of what they were selling.

2.     From approximately March 2014 through December 2014, defendants sold a progressive array of products and investment contracts to over 10,000 investors that defendants claimed would yield profits from mining or otherwise investments in virtual currency.

3.     Defendants' initial foray into the virtual currency space was selling virtual currency mining equipment. In March 2014, GAW Miners began selling physical mining equipment to customers who would use its computing power to "mine" for virtual currency. "Mining" for virtual currency means applying computer power in an attempt to solve complex equations that verify a group of transactions in that virtual currency. The first computer (or collection of computers) to solve an equation is awarded new units of that virtual currency. This process is known as "mining," and the people and computer equipment used in this process are known as "miners."

4.    Defendants quickly grew dissatisfied with the low returns on selling physical equipment, and shifted their business to offering hardware-hosted mining in June 2014 with the creation of ZenMiner (remote management software). Customers who purchased hardware-hosted mining were told that they purchased specific pieces of physical mining equipment that were stored and maintained by GAW Miners, for daily maintenance fees, but allegedly controlled by customers.

5.    In order to give customers the option to engage in hosted mining without ZenMiner, and instead via a website, defendants soon began offering Cloud-Hosted Mining. The defendants represented that Cloud-Hosted Mining would allow customers to control their mining hardware through a website, instead of through the remote management software (ZenMiner) used with Hardware-Hosted Mining.

6.    Although both Hardware- and Cloud-Hosted Mining customers were informed they could request that their physical mining equipment be shipped to them at any time, in reality, GAW Miners never had sufficient designated equipment to support the hosted mining services they sold to customers or to ship to customers upon request.

7.    In yet another shift in their scheme to defraud investors, Defendants next sold shares in the returns from their purported mining operations, via investment contracts that they named "Hashlets." Hashlet contracts entitled their purchasers to a share of the profits from defendants' purported "hashing power," or the computing power (measured in megahash per second), that defendants purportedly devoted to virtual currency mining. In reality, defendants sold far more Hashlets worth of computing power than they actually had in their computing centers. There was no computer equipment to back up the vast majority of Hashlets that

defendants sold. Defendants collected roughly $19 million in revenue from their sales of Hashlets.

8.     When the Hashlets scheme began to unravel, defendants pivoted yet again by announcing the launch of "Paycoin," a new form of virtual currency. Before it launched Paycoin, GAW Miners began selling "Hashpoints," which were convertible promissory notes that could be converted into Paycoin. Defendants then introduced HashStakers, which were digital wallets that could lock up Paycoin for 30, 90 or 180-day terms and generate fixed returns. Defendants launched Paycoin by promoting a $20 price floor and its wide acceptance by well-known merchants—neither of which held true. Once Paycoin's trading price began to plummet, GAW Miners' customers watched the value of their investments fall with no recourse because defendants had sold them HashStakers for the purpose of locking up Paycoins. All the while, defendants sold millions of Paycoins and reaped the benefits.

9.     Defendants made many false and misleading statements to potential and actual investors about GAW Miners' virtual currency mining operations. For example, defendants misrepresented:

a.     that Hardware-Hosted Mining and Cloud-Hosted Mining customers could request shipment of the physical mining equipment they purportedly owned;

b.     that Hardware-Hosted Mining and Cloud-Hosted Mining customers could control the pools in which their mining equipment operated;

c.     that all of the Hashlets of computing power purchased by investors would be pooled together to engage in virtual currency mining, and that investors' returns, or "payouts," would be calculated based on the success of those collective virtual currency mining operations;

d.     that buying a Hashlet would allow investors to mine virtual currency without the expense and expertise that would be required to purchase and maintain their own virtual currency mining equipment;

e.     the profitability and life-span of Hashlets;

3

     f.      how the payouts for Hashlets were derived;

     g.      the value of Hashpoints and the conversion to Paycoin;

     h.      the expected value of Paycoin and the existence of agreements with merchants to accept it;

     i.      the utility of Paybase as a GAW Miners-owned exchange for Paycoin;

     j.      the continued existence of defendants' pre-mined Paycoin and defendants' sales of that Paycoin without customer knowledge;

     k.      the expected returns generated by HashStakers;

     l.      the extent of GAW Miners' mining activities; and

     m.      the extent of GAW Miners' virtual currency trading activities.

Defendants knew that each of these statements was false or misleading at the time it was made.

10.     Defendants' activities had the hallmarks of a Ponzi scheme. Because defendants sold far more computing power than they owned and dedicated to virtual currency mining (with respect to hosted mining services and Hashlets), they owed investors a return that was larger than any actual return they were making on their limited mining operations. Investors were simply paid back gradually over time, as "returns," the money that they and others had invested in GAW Miners' products and paid to GAW Miners for purported "maintenance" fees.

11.     Through the activities alleged in this Complaint, defendants Garza, GAW Miners and ZenMiner have engaged in common law fraud and fraud in connection with the purchase or sale of securities, in violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), various subparts of Rule 10b-5 thereunder, and sections 36b-29(a)(2) and 36b-4 of the Connecticut Uniform Securities Act ("CUSA"). Defendants Garza, GAW Miners and ZenMiner have also engaged in the offer and sale of unregistered securities, in violation of section 36b-29(a)(1) of CUSA. Fraser functioned as a controlling person of GAW Miners and ZenMiner and is liable for Garza, GAW Miners' and ZenMiner's primary violations of federal

and state securities laws pursuant to section 20(a) of the 1934 Act and section 36b-29(c) of CUSA, and is liable for aiding and abetting defendants' common law fraud.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over the subject matter of this action under the Exchange Act, 15 U.S.C.A. § 78aa and 28 U.S.C.A. § 1331. The claims asserted arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder by the SEC, including Rule 10b-5, 17 CFR § 240.10b-5. The Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over all remaining state law-based claims asserted herein.

13.     The defendants' products and services detailed in this Complaint and purchased or acquired by plaintiffs during the Class Period constitute investment contracts and are securities pursuant to Section 3(a)(10) of the Exchange Act, 15 U.S.C.A. § 78c, because they constitute investments in common ventures premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because, at all relevant times, GAW Miners and ZenMiner maintained offices in Connecticut and conducted business in Connecticut; and Homero Joshua Garza lived in Connecticut. Garza and GAW Miners made offers to sell, and sold, securities from Connecticut.

15.     In connection with the conduct described in this Complaint, defendants directly or indirectly made use of the mails or the means or instruments of transportation or communication in interstate commerce.

16.     Defendants' conduct involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements, and resulted in substantial loss, or significant risk of substantial loss, to other persons.

## PARTIES

17.     Defendant Garza, age 30, lives in Friendswood, Texas, although he lived in Somers, Connecticut during 2014. During all of 2014, he was the founder and CEO of GAW Miners, and he owned and controlled ZenMiner. In those positions, which he held since those companies were founded, he directed their strategy, their financial decisions, and had ultimate control over their day-to-day operations.

18.     Defendant Fraser, age 55, lives in Armonk, New York. Fraser has served as Vice Chairman at Cantor Fitzgerald, L.P., and he invested in GAW Miners and ZenMiner in 2014. Fraser has served as a mentor and business associate of Garza for over a decade. Through Fraser's ownership of GAW Miners and ZenMiner and his longstanding personal and business relationship with Garza, Fraser had the power to direct or cause the direction of the management and policies of Garza, GAW Miners and ZenMiner. Fraser was a culpable participant in Garza, GAW Miners and ZenMiner's violations of federal and state securities laws.

19.     Defendant GAW Miners is a Delaware limited liability company whose principal place of business is in Bloomfield, Connecticut. GAW Miners was formed in May 2014. Garza is the Managing Member of GAW Miners and Garza and Fraser each owned and controlled 41% of the equity in GAW Miners, with the remaining 18% reserved for investors. During all relevant times, Garza and Fraser have controlled GAW Miners and directed its day-to-day activities.

20.     Defendant ZenMiner is a Delaware limited liability company, which shares a principal place of business with GAW Miners in Bloomfield, Connecticut, and was formed in July 2014. ZenMiner also does business under the name ZenCloud, and utilized the website www.zencloud.com. Garza is the Managing Member and majority owner of ZenMiner. Fraser is an investor in ZenMiner and related entities. During all relevant times, Garza and Fraser have controlled ZenMiner and directed its day-to-day activities.

21.     Plaintiff Denis Marc Audet lives in Hamden, Connecticut. During the class period, Mr. Audet purchased Hashlets from GAW Miners. Defendants fraudulently induced Mr. Audet to use his Hashlets to mine Hashpoints, which the defendants converted into Paycoin.

22.     Plaintiff Michael Pfeiffer lives in Narberth, Pennsylvania. During the class period, Mr. Pfeiffer purchased Hashlets and HashStakers from GAW Miners and purchased Cloud-Hosted mining from third-parties. Defendants fraudulently induced Mr. Pfeiffer to use his Hashlets to mine Hashpoints, which the defendants converted into Paycoin.

23.     Plaintiff Dean Allen Shinners lives in Lancaster, Ohio. During the class period, Mr. Shinners purchased Hashlets and HashStakers from GAW Miners. Defendants fraudulently induced Mr. Shinners to use his Hashlets to mine Hashpoints, which the defendants converted into Paycoin.

24.     Plaintiff Jason Vargas lives in Pine Bush, New York. During the class period, Mr. Vargas purchased Hashlets and HashStakers from GAW Miners. Defendants fraudulently induced Mr. Vargas to use his Hashlets to mine Hashpoints, which the defendants converted into Paycoin.

## STATEMENT OF FACTS

**Background on Virtual Currency and "Mining"**

25.     "Virtual currency" is a digital representation of value that can be traded and functions as a medium of exchange; a unit of account; and/or a store of value, but does not have legal tender status (i.e., when tendered to a creditor, is a valid and legal offer of payment) in any jurisdiction. Virtual currency generally is not issued or guaranteed by any jurisdiction or government, and its value is decided by consensus within the community of users of the virtual currency. The most widely adopted virtual currency is bitcoin, although there are many other virtual currencies used today, known as "altcoins." Virtual currency is distinct from fiat

currency, which is the money designated by a country as its legal tender. An example of fiat currency is the United States dollar. Virtual currencies may be traded on online exchanges for fiat currencies, including the United States dollar, or used to purchase goods and services.

26.     Bitcoin and other virtual currencies can be "mined." A virtual currency "miner" is an individual or entity, and her or its computer equipment, which uses special computer software to solve complex algorithms that validate groups of transactions in that virtual currency.

27.     Each unit of virtual currency has a "blockchain," which is an electronic public ledger of all transactions in that currency.

28.     Certain virtual currencies, including bitcoin, self-generate units of the currency by rewarding miners with newly created coins when they are the first to solve the algorithms that validate transactions in the currency. Using bitcoin as an example, the bitcoin network collects all transactions made during a set time period, usually around ten minutes, into a list called a "block." Bitcoin miners compete to be the first to confirm the transactions in the block and write them into the blockchain. The first miner to solve the algorithm that confirms a transaction is rewarded with a preset amount of newly-issued bitcoins by the bitcoin protocol. This process of solving equations to confirm transactions and to earn new coins is known as "mining."

29.     As interest in bitcoin, and competition among miners, increased, more computer processing power became required in order for a miner to have a chance of solving blocks, and thus obtain the rewards of mining. The processing power of computers used to confirm virtual currency transactions is measured by their "hash rate," or the number of calculations they can perform per second (e.g., a computer with a hash rate of 10 megahash can make 10 million calculations per second). The greater a computer's hash rate, the greater that computer's chance

to solve the equation that confirms transactions, and the more virtual currency coins the miner can earn.

30.    Given the increasing competition to solve the equations that confirm blockchain transactions, miners frequently combine their computing power into mining "pools." As a general rule, the more computing power directed to a particular mining pool, the better the chance that pool will be the first to confirm a block of transactions and receive the payout for mining. Typically, pool participants' shares of the mining reward depend upon the proportional amount of computing power each contributes to the pool.

31.    From June 2014, when defendants first offered virtual currency investment contracts for sale, to the present, the exchange rate of U.S. dollars to bitcoins has fluctuated between a low of approximately $177 per bitcoin and a high of approximately $650 per bitcoin.

**Garza and Fraser's Business and Personal Relationship**

32.    Garza and Fraser have had a business and personal relationship since at least 2006, when they applied for two patents together (along with a third individual) for technology that would embed internet-based advertising in websites. This relationship has included several business ventures, many of which have ended poorly for customers and investors.

33.    In 2002, Garza began a business in Vermont called Optima Computers, which offered new computer systems for sale, as well as service and repair of existing computer systems. Upon information and belief, Fraser was an investor in Optima Computers, which went out of business after a few years.

34.    Garza and Fraser's next venture was Great Auk Wireless High Speed Internet (later known as GAW High Speed Internet or GAW-HSI). This high-speed Internet service company received a grant to expand Internet access to a region of Vermont that was underserved

by service providers, but it failed to deliver. The State collected the grant money back from GAW-HIS after several customers complained to the Vermont Attorney General's Office and it became clear that GAW-HIS was not going to provide the wireless service it had promised.

35.     Fraser ultimately owned at least 80% of GAW-HIS. Garza transferred ownership of GAW High Speed Internet to Fraser after the partners reshuffled their pool of investments and debts. In a July 2013 email to Fraser, Garza suggested they discuss how to handle their business arrangements, which had not been "revised for years." Garza proposed that they split every system and company in half, with the exception of GAW High Speed Internet, of which Fraser would own 80%. Garza suggested creating an "equal partnership (50/50) in our holding company 'Geniuses At Work Corporation,'" with Fraser holding the voting power. Garza would contribute his stake or control over certain systems or companies, as well as patents to be created, and Fraser would: provide a $10,000 per month investment that would serve as Garza's salary, forgive a $230,000 personal debt, allow Garza "to live down the investment [Fraser] made in GAW in the past" and Garza will try to "recoup [Fraser's] losses," contribute a $150,000 cash infusion, and help with "Howard on CP"—referring to Howard Lutnick, the head of Cantor Fitzgerald. Garza expressed his gratitude for Fraser's help and said he was "proud of everything we have done this year." Garza also conveyed his gratitude to Fraser for Fraser's ongoing mentorship: "I cant tell you how important it was for me to feel like I could 'do it.'!"

36.     Garza and Fraser's relationship went beyond an ordinary business relationship. Garza expressed his gratitude at one point by giving Fraser a Tesla (an expensive car). Fraser and Garza regularly went to one another's homes, spent time with one another's families and friends, and engaged in social activities together. Garza and Fraser also regularly sent each other text messages, often about social subjects and often including pictures of themselves.

37.     Garza and Fraser's partnership continued and expanded with GAW Miners and their entry into the virtual currency world. In March 2014, Garza incorporated GAW Miners. Fraser represented via email that "we" (he and Garza) "started GAW.com and GAWMiners.com," and that GAW Miners is "a very big player in the Virtual Coinage Business/Bitcoin." Fraser further wrote that "we" are one of the "largest sellers of Mining Power" and that "GAWMiners is totally above board and we only want to do it 'Right.'"

38.     Fraser and Garza each owned and controlled 41% of the equity in GAW Miners; the remaining 18% was reserved for sale to future investors. This arrangement between Garza and Fraser was formalized by David McLain, a lawyer and longtime friend of Fraser who was also Fraser's partner in one of Fraser's other companies, as well as a legal representative of GAW Miners.

39.     Garza and Fraser thus possessed equal control over GAW Miners and Garza regularly referred to Fraser as his "partner." For example, in December 2014 a writer for a cryptocurrency blog asked Garza, "How directly is Stuart Fraser involved with GAW [Miners]? I know that his profile on Cantor Fitzgerald's website states that he has a stake in Great Auk Wireless, his LinkedIn Profile mentions both Great Auk Wireless and GAW Labs, and you included a quote from him in a Press Release. Does he know the details of GAW's internal operations? Is he actually an active partner? Or, is he more of a silent investor?" Garza responded that Fraser "is a partner, just like me."

40.     Fraser was involved in GAW Miners' operations and strategic decision-making, and regularly advised Garza on GAW Miners business. For example, in January 2015, Fraser sent an email to Garza asking "why can't we sell Paycoins from our site?" and advised "we need to find a way for people to buy them. it's easier to sell them then buy them and that's why your

getting killed." In another email about Paycoin, Fraser asked Garza "how do I buy coins through paybase? How can we hold cash, like paypal? Do we need to buy a bank?" In June 2014, Fraser asked Garza whether he had "googled 'bitcoin mining controller'" and recommended that Garza "do a little advertising for ZenMiner on these quieries [sic] via the search engines."

41.     In addition to making cash investments in GAW Miners, Fraser involved Cantor Fitzgerald in GAW Miners company business. Fraser used his contacts at Cantor Fitzgerald—a well-known investment bank where he was Vice Chairman—to introduce potential investors to Garza and GAW Miners. For example, in December 2014, Fraser emailed Garza asking "how do you want me to let my buddies know about Paycoin? Is there something to either send them (email, FB, Linkedin, etc…) or direct them to"? Fraser also told Garza that he wanted "to do it at the right time."

42.     Fraser also utilized Cantor Fitzgerald personnel to respond to media inquiries about GAW Miners, to provide administrative support, and to handle accounting or legal issues related to GAW Miners. For example, in late 2014, the CEO of GoCoin sent Garza a Note Purchase Agreement and the Note itself for GAW Miners' investment in GoCoin. Garza forwarded the documents to Fraser and asked him to fill them out. Fraser responded by asking who was "on the hook to pay them $2mm? Me?"  Fraser followed up by stating that he didn't "know who to send [the documents] to at Cantor? Acct or Legal. How do I explain this to the Cantor guys?"

43.     Garza and Fraser represented that Fraser was involved with GAW Miners, and Fraser (as well as Garza) made representations about GAW Miners and its offerings. In late 2014, Fraser spoke with a public relations firm that was preparing a press release about GAW Miners and the launch of Paycoin, and provided a quote about cryptocurrency to include in the

release, attributable to "Stuart Fraser, Vice Chairman and partner, Cantor Fitzgerald L.P." In emails discussing the press release with Garza, Fraser suggested that he should be identified in it as a "founding investor …. Stuart Fraser, co-founder/early investor and Vice Chairman …."

44.     Because Fraser and Garza represented GAW Miners as a joint venture, individuals interested in investing in GAW Miners' products, or in working with GAW Miners, knew they could contact Fraser or Garza to discuss the business. Fraser was able to talk about GAW Miners and its products and services because he was kept apprised of the company's status by Garza—including, for example, how many customers had bought which products, what revenue was being generated, and plans for introducing new offerings.

45.     For example, before an interview with the Wall Street Journal, Fraser asked Garza "any questions I need to be ahead of?" Garza responded saying "in case you need numbers" we "are adding over 10k customers a day" and "Our annualized income is 120mm" and "We have collected over a million addresses for the ICO [initial coin offering] invite."

46.     In another email, Fraser told Garza "Whenever you have some accounting numbers . . . It would be nice to see how we're doing." Fraser further explained "I would also like to have a clear idea how to deal with GAW and what they're doing, etc… Considering that's my concern now."

47.     Fraser also had his own access to GAW Miners' sales information. In August 2014, Fraser sent Garza an email titled "Ac[c]ess to GAWMiners Sales" asking "do you have a new login for me to see what's going on?"

48.     Fraser's deep involvement with Garza and GAW Miners also included allowing Garza and GAW Miners to use Fraser's credit line at Bank of America and his American Express Plum card for GAW Miners company business. After Garza fell behind on his payments for the

American Express Plum Card, Fraser and Garza conducted a cash swap to keep their dealings secret from Fraser's wife. In May 2014, Fraser sent Garza an email offering to "give Gawminers a revolving loan of 200k" and in June 2014 Fraser transferred $200,000 to a GAW Miners account from his Chase Premier Platinum account.

49.     Fraser was involved with Garza and GAW Miners on many levels, professional and personal, and Fraser had the power to direct or cause the direction of the management and policies of Garza, GAW Miners and ZenMiner, both through his 41% ownership stake in GAW Miners (Garza also held 41%) and through his personal relationship with Garza.

**Hardware- and Cloud-Hosted Mining**

50.     Garza and Fraser initially founded GAW Miners to purchase virtual currency mining equipment from its overseas manufacturers and to resell it to customers. Until approximately May or June of 2014, GAW Miners' primary business was to sell virtual currency mining equipment.

51.     In short order, defendants became dissatisfied with the low profit margins on selling physical equipment, and shifted their business to offering first Hardware-Hosted Mining, and then Cloud-Hosted Mining. Both offerings allowed customers to purchase physical mining equipment that GAW Miners would host and maintain, but that customers were told they could control. Customers were also informed that they could request their physical equipment be delivered to them at any time.

52.     In June 2014, GAW Miners began offering its customers Hardware-Hosted Mining. Instead of shipping to its customers the computer hardware they ordered, GAW Miners claimed that it would host the computer hardware in its own datacenter. Customers paid GAW Miners a fee to cover the expenses that GAW Miners allegedly incurred to operate the hardware,

such as maintenance, electricity, cooling, and Internet connectivity. Customers accessed and allegedly controlled their mining equipment via remote management software offered by ZenMiner.

53.     ZenMiner was a company Garza created in May 2014; it was formally incorporated in July 2014. Though he persuaded other individuals to represent to customers and the public that ZenMiner was an independent company, Garza and Fraser owned and controlled ZenMiner at all times. ZenMiner provided the remote management software that Hardware-Hosted Mining customers used to access and control the mining equipment that they were told they owned.

54.     In order to give customers the option to engage in hosted mining without the ZenMiner software, and instead via a website, defendants began offering Cloud-Hosted Mining in July 2014. Cloud Hosted Mining was marketed as a partnership between ZenMiner and GAW Miners. GAW Miners offered customers the ability to purchase their mining hardware from it, and then house their equipment in ZenMiner's datacenters for a fee. Customers were told they could control their mining equipment through the Internet by logging on to the accounts they established on ZenMiner's website interface called ZenCloud. ZenCloud promised customers that "you don't pay for shipping, cooling, or electricity" and that "by running your miner in Zen's datacenter, you have guaranteed 99.9% uptime, which is only a pipedream for miners hashing at home."

55.     Customers who switched from GAW Miners' Hardware-Hosted Mining service to Cloud-Hosted Mining through ZenCloud lost some of the control they thought they had over how they used their equipment to engage in mining. ZenCloud users could only "direct" their

equipment to engage in mining through one of the handful of mining pools offered on the ZenCloud website.

56.     As with Hardware-Hosted Mining customers, GAW Miners told Cloud-Hosted Mining customers that they could end their hosted service at any time and receive their physical equipment in the mail from GAW Miners. In reality, GAW never had sufficient designated equipment to return to customers.

57.     Hardware-Hosted Mining and Cloud-Hosted Mining were fraudulent schemes in at least two respects.

58.     First, even though Garza and Fraser fully controlled ZenMiner, Garza marketed it to the public as a business entity that was distinct from GAW Miners. ZenMiner was described as being owned by Thomas Fraser, a relative of defendant Fraser.

59.     For example, on or about May 23, 2014, Garza participated in an interview with a reporter for Cryptocoinsnews.com, during which he convinced Thomas Fraser to pretend that ZenMiner was his company and idea. At the time of the interview, Garza expected that the reporter would publish a story containing the misrepresentations that ZenMiner was an entity separate from GAW Miners. That story was published on or about May 23, 2014.

60.     This charade continued when, on or about August 24, 2014, GAW Miners issued a press release announcing that its parent company (which was also owned and controlled by Garza and Fraser), had purchased a controlling stake in ZenMiner for $8 million, and that ZenMiner had become a division of GAW Miners. This statement was false; no such transaction occurred because Garza and (defendant) Fraser had always owned and controlled ZenMiner. Garza authorized and approved the issuance of GAW Miners' false press release. The purported

ZenMiner transaction was marketed as proof that GAW Miners was a leader in the virtual currency industry by bridging the gap between hardware sellers and hosted mining services.

61.     Second, contrary to its stated reason for existence, no mining actually occurred through ZenMiner's ZenCloud interface. Though customers paid for equipment that they believed they were directing to mine in various pools available through the ZenCloud interface, and also paid for hosting services, very few pieces of the mining equipment purchased by customers actually existed in a ZenMiner datacenter. Most customers paid for a phantom piece of equipment that neither GAW Miners nor ZenMiner owned. Neither GAW Miners nor ZenMiner was directing customers' computing power to any pools at all, much less the ones customers believed they were choosing.

62.     Instead, GAW Miners and ZenMiner, controlled by Garza and Fraser, operated as a classic Ponzi scheme. They signed up new customers for hosted mining services and used the incoming funds and the daily maintenance fees to pay existing customers the "returns" generated from mining activities. Although customers thought they had purchased physical equipment and had control over it and the profits it generated, in reality customers could not exercise their rights to receive the physical mining equipment and they did not have control over their miners or any profits they yielded. What customers really acquired was a share in defendants' scheme, and the right to profits that defendants alone elected to share.

63.     Soon after GAW Miners' Cloud-Hosting Mining service launched, customers began to complain that they could not see the increase in power in the mining pools they believed they had chosen to mine through ZenCloud. These complaints were made public through message boards dedicated to virtual currency mining. Facing potential mass customer demands that their equipment be shipped—equipment that didn't exist—GAW Miners and

ZenMiner again changed business models. GAW Miners offered all of its customers the opportunity to convert their ZenCloud Cloud-Hosted machines to "Hashlets."

**The Shift to "Hashlets"**

64.     Beginning in August 2014, GAW Miners and ZenMiner decided to sell "Hashlets" to the public. Customers buying Hashlets purchased computational power from GAW Miners' and ZenMiner's data center. Thus, buying a Hashlet entitled an investor to a share of the profits that GAW Miners and/or ZenMiner would purportedly earn by mining virtual currencies using the computers that were maintained in their data centers. Hashlets were purported to earn a return based on the number of virtual currency units generated when the pools to which their computing power was directed succeeded in processing and confirming virtual currency transactions. As ZenMiner's terms of service stated, a Hashlet was "a divisible and assignable allocation of hashing power from GAW-owned and hosted mining hardware."

65.     Hashlet customers believed they were buying computational power from GAW Miners' and ZenMiner's data center, but without rights to acquire a specific piece of mining equipment on a specific shelf (unlike Hardware- and Cloud-Hosted Mining Customers). Effectively, Hashlet customers were purchasing the rights to profit from a slice of the computing power owned by GAW Miners and/or ZenMiner (by then, purportedly, a division of GAW Miners).

66.     Hashlet investors were required to do very little to purportedly mine virtual currency. Investors only needed to log into their ZenCloud accounts and click-and-drag their Hashlet icons over to the icons of the mining pools the Hashlets were designated to mine. From there, investors relied solely on the efforts of GAW Miners and/or ZenMiner to generate Hashlets' expected profits by owning, housing, operating, maintaining, and connecting the

computer hardware that would engage in mining. If GAW Miners had received payouts from its purported mining activities, Hashlet investors' shares of those payouts would have been calculated and deposited by GAW Miners into investors' ZenCloud accounts.

67.     The majority of investors bought Hashlets through a web-based shopping portal by paying with U.S. currency or with bitcoin. Some investors who were Cloud Hosted Mining customers also bought Hashlets through their existing ZenCloud accounts, in part by converting the value of their Cloud Hosted Mining equipment. Once an investor owned one Hashlet, she could also buy additional Hashlets through her ZenCloud account, including by reinvesting the purported "payouts" from her existing Hashlets into additional Hashlets.

68.     Investors were told that they could log on to their ZenCloud accounts, activate their Hashlets using a code that was provided at the time of purchase, and then direct their Hashlets to engage in mining in one of the mining pools available through ZenCloud. GAW Miners represented that it personally owned and operated ZenPool—one of the mining pools purportedly available through ZenCloud—and that ZenPool was the "most profitable pool."

69.     Investors' shares of the profits that they purportedly earned as a result of their Hashlets' mining in pools were posted to their ZenCloud accounts daily. Investors were also charged maintenance fees to pay for purported physical upkeep of the equipment behind the Hashlets. Those maintenance fees were deducted from investors' ZenCloud accounts daily. Investors could request a withdrawal, in bitcoin, from their ZenCloud accounts.

70.     GAW Miners' press releases and website, and Garza's posts on the company's message board, described Hashlets as "the world's first digital cloud miner" and as "designed from the start to be the easiest, most convenient miner to own." GAW Miners and Garza marketed Hashlets specifically to non-technical people interested in virtual currency mining,

touting a Hashlet as "so easy to use that it is 'Grandma approved,'" and claiming that "[i]f you can open an email, you can setup and operate a Hashlet."

71.     GAW Miners began selling Hashlets in mid-August 2014. GAW Miners' press releases dated August 24 and August 26, 2014 claimed that "thousands of units per second" were sold during their first day, and millions of dollars of Hashlets were sold during their first week, of availability.

72.     There were two basic types of Hashlets—those that were purportedly able to mine for bitcoin and those that were purportedly able to mine for altcoin. Bitcoin mining required computers to solve a different algorithm than that used to mine for altcoin.

73.     Prices for Hashlets ranged between about $10 and $50 per unit, depending on their features, including which pools they were able to mine. A "unit" of a Hashlet was a measurement of its hashing power, or the number of calculations it could perform per second. Hashlets that mined bitcoin were sold in multiples of 1 gigahash per second units, and Hashlets that mined altcoin were sold in multiples of 1 megahash per second units.

74.     During their first week of availability alone, GAW Miners and ZenMiner oversold—between triple and quadruple—the number of Hashlets for which they had the supporting computing power. Yet, their sales continued.

75.     By October 2014, GAW Miners had oversold altcoin-mining Hashlets by at least 100 times its computing capacity, and bitcoin-mining Hashlets by at least about 5 times its computing capacity. These sales took place before GAW Miners had even completed setting up the datacenter in Mississippi where the mining equipment was purportedly stored. Mississippi Power, the electrical provider for the data center, alleged in a complaint filed against GAW Miners that it did not begin providing power to the data center until mid-October 2014. Before

that time, GAW Miners did not even have the ability to use the mining equipment and computational power in which customers believed they had invested.

76.    Between mid-August and December 2014, GAW Miners and ZenMiner sold at least $19 million of Hashlets to more than 10,000 investors.

77.    From the time that Hashlets went on sale in August 2014, and throughout the entire period during which they were sold, Garza and Fraser were provided information about how many units of Hashlets were sold. Garza and Fraser knew or were reckless or negligent in not knowing that GAW Miners and ZenMiner did not have the computing capacity to support the units of Hashlets that they sold.

78.    Garza and Fraser were responsible for GAW Miners' and ZenMiner's decision to continue selling Hashlets despite their knowledge (or reckless or negligent disregard) that the companies lacked the computing power they purported to be selling to investors.

79.    As a result of dramatically overselling their computing capacity, GAW Miners and ZenMiner did not engage in mining with even close to the amount of computing power they had sold in Hashlets. As a further result, GAW Miners' and ZenMiner's revenues from mining bitcoin were minimal, and their revenues from mining altcoin were virtually nonexistent.

80.    Between August and December 2014, GAW Miners created several types of Hashlets with different features. Garza approved the creation of these Hashlet varieties, and frequently announced their availability on GAW Miners' website and through posts on the company's message board.

81.    For example, on or about September 11, 2014, GAW Miners announced the creation of the limited edition "Remember" Hashlet with the logo of "9/11" to commemorate those who lost their lives in the terrorist attacks of September 11, 2001. Garza announced that

21

GAW Miners would only sell 500 Remember Hashlets, and would donate all of the proceeds (approximately $10,000) to "the 9/11 memorial fund." He specified that "GAW will in no way be profiting from any sales related to the cause." After selling approximately 2,290 Remember Hashlets for a total of approximately $48,000, GAW Miners donated only $10,000 to a 9/11 related charity.

82.     Garza and Fraser knew or were reckless or negligent in not knowing that GAW Miners actually profited from the sale of Remember Hashlets, contrary to Garza's representations. Fraser's role in the Remember Hashlets scheme is particularly egregious given Fraser's (and his firm Cantor Fitzgerald's) prominent role in the 9/11 memorial fund.

83.     Garza directed many of GAW Miners' publicity efforts for its Hashlet offerings. Garza had ultimate authority and control over GAW Miners' promotional materials, including the company's website, and posts he made on the company's message board, but Garza frequently confirmed the company's message with Fraser. Garza also frequently spoke to reporters for publications covering the virtual currency industry, and posted information about GAW Miners and its products on social media outlets.

84.     GAW Miners and Garza made three basic types of misrepresentations to Hashlet investors. First, they falsely and misleadingly claimed that Hashlets would be always profitable and never obsolete, when they had no reasonable basis to support those claims. Second, they falsely and misleadingly claimed that Hashlets were engaged in mining for virtual currency through pools available in ZenCloud, when they knew that few Hashlets were supported by actual mining activity. Third, they falsely and misleadingly claimed that ZenPool engaged in mining, when they knew that it never did.

85.     First, from approximately August through December 2014, GAW Miners'
website, and other promotional materials, described Hashlets as always profitable and never
obsolete. GAW Miners' website misrepresented that Hashlets were "obsolete proof" and would
"Adjust[ ] to always remain profitable & never break[ ] down." Garza also claimed on numerous
occasions, including in a Hashtalk.org post in August 2014, words to the effect that "there will
never be a time a Hashlet cost[s] more to run than you make, and they will always make money."
GAW Miners also claimed, on its website, that Hashlets would never break down or expire and
this "guarantees your investment is protected and secure, so you can enjoy many years of owning
the world's most advanced miner."

86.     At the time GAW Miners, Garza, and Fraser made or authorized these statements,
Garza and Fraser knew or were reckless or negligent in not knowing that the statements were
false or misleading. They knew or were reckless or negligent in not knowing that the profitability
of virtual currency mining depended on many unforeseeable factors, including the market price
of those virtual currencies, the cost of the electricity and maintenance of the equipment, and the
extent to which the speed of developments in computing technology made any equipment they
owned obsolete. Moreover, Garza and Fraser knew or were reckless or negligent in not knowing
that GAW Miners had never acquired sufficient mining power to meet Hashlet demand and
profit expectations. GAW Miners and Garza thus had no reasonable basis for these statements at
the time they made or authorized them.

87.     GAW Miners' and Garza's statements about profitability and longevity were
material to Hashlet investors. GAW Miners conducted a marketing survey of hundreds of people
who purchased Hashlets during their first week of availability. Approximately 70 percent of
investors identified the Hashlets' promised return on investment as the most important, or one of

the most important, factors in their decision to purchase a Hashlet. Garza reviewed the results of this survey and thus knew that these factors were material.

88.     By November 2014, Hashlets became unprofitable. That is, the Hashlets' daily maintenance fees exceeded their purported mining payouts. And by January 2015, Hashlets were obsolete. GAW Miners announced the termination of its purported Hashlet mining operations in mid-February 2015, stating that "GAW and ZenCloud mining operations have been indefinitely put on hold, effective immediately." GAW Miners terminated the power to the datacenter on or about January 27, 2015, almost a month before announcing the end of Hashlet mining operations.

89.     Second, despite marketing Hashlets as capable of mining in the various pools available through ZenCloud, and pricing Hashlets based on which pools they were purportedly able to mine, Hashlets did not mine in those pools.

90.     The operators of the pools that were purportedly available through ZenCloud confirmed that GAW Miners did not establish accounts with those pools, and did not direct any of its computing power towards those pools. Thus, GAW Miners was not receiving any mining payouts from those pools.

91.     After numerous customer questions about where their hashing power was being used, Garza admitted in a Hashtalk.org post in early October 2014, that GAW Miners was not sending its computing power to the pools Hashlet investors selected. Instead, Garza and GAW Miners claimed it was "sending our hashing power to our own private pools, but keeping your payouts 100% based on the pool you select." This representation was also false and misleading. At the time, as Garza, Fraser and GAW Miners knew or were reckless or negligent in not knowing that the company had nowhere near the amount of computing power that would support

the units of hashing power that had been sold through Hashlets. As a result, GAW Miners engaged in minimal bitcoin mining—in private pools or elsewhere—and effectively no altcoin mining. At the time Garza made this statement, he and Fraser knew or were reckless or negligent in not knowing that GAW Miners could not, and did not, fund its daily payouts to investors with the revenue from its mining activities.

92.     In order to conceal from investors that the mining activity associated with Hashlets did not produce sufficient revenues to fund the payouts that had been promised to investors, GAW Miners used revenues from ongoing Hashlet sales to fund payouts to investors. Thus, Hashlets operated as a Ponzi scheme, in which investors' returns were mostly paid by using the money invested by others.

93.     In September and October 2014, GAW Miners did not always have enough investors purchasing Hashlets with bitcoin to cover its daily bitcoin payout obligations to existing Hashlet owners. As a result, GAW Miners, at Garza's direction, converted some of the United States dollars the company had received as revenue from Hashlet sales into bitcoin. GAW Miners then used the bitcoin it had purchased to make daily payouts to existing Hashlet investors. In September and October 2014 alone, GAW Miners, at Garza's direction, converted over $1.5 million in cash to bitcoin to make mining payouts and thus perpetuate their fraud.

94.     Third, ZenPool was a purported mining pool created and operated by GAW Miners exclusively for certain Hashlet owners. GAW Miners claimed on its website that ZenPool was the "most advanced multi-pool ever conceived" and had the "highest and most reliable payout of any multipool in the world." A multipool is a pool that mines both bitcoin and altcoin, depending on the profitability of each coin at the time.

95.     GAW Miners and Garza advertised ZenPool as an enticement for investors to pay more for "Zen Hashlets" and "Prime Hashlets," the only two types of Hashlets capable of mining in ZenPool. These two types of Hashlets were significantly more expensive than other types of Hashlets that did not allow investors to access ZenPool.

96.     Contrary to GAW Miners' and Garza's representations, there was no ZenPool. GAW Miners did not operate a pool that engaged in mining. GAW Miners did not direct the hashing power represented by its sales of Zen Hashlets or Prime Hashlets to a pool it owned and operated for investors' benefit.

97.     Instead, GAW Miners determined what the daily payout from ZenPool would be by examining the publicly-available payouts of other pools that were mining that day, and picking a higher number.

98.     When GAW Miners and Garza made false and misleading statements about ZenPool, they knew or were reckless or negligent in not knowing that there was no such pool engaged in mining.

99.     During the fall of 2014, mining for virtual currency became less profitable as the value of many virtual currencies fell and the technological difficulty of mining increased. Faced with a drop in their revenue stream from selling Hashlets, and faced with the fact that Hashlets were no longer profitable by November 2014, GAW Miners and Garza solicited many investors to redeem their Hashlets for new investment opportunities.

100.     Garza and Fraser made the decision that GAW Miners would offer and sell first Hardware- and Cloud-Hosted Mining and then Hashlets. They jointly controlled GAW Miners' strategic direction, and the content of GAW Miners' advertising for these investment offerings.

101.    In offering Hashlets to Hardware- and Cloud-Hosted Mining investors, GAW Miners, Garza and Fraser attempted to prolong their scheme and prevent the collapse of GAW Miners—a trend they continued by offering Hashpoints to Hashlets customers, and one that caused increasingly more damages to GAW Miners' customers.

**The Move to Hashpoints, Paycoin and Paybase**

102.    In November 2014, GAW Miners announced that it was planning to launch a new form of virtual currency, called "Paycoin" (initially called "Hashcoin"). In advance of Paycoin's launch, GAW Miners began offering "Hashpoints" to its customers. Hashpoints were convertible promissory notes that could be purchased or mined and exchanged for Paycoin once Paycoin launched. Defendants' main motivation in offering Hashpoints was to shift customers' mining focus from bitcoin and altcoin to Hashpoints and Paycoin and to stave off bitcoin payments to Hashlet-holders that GAW Miners could not make.

103.    The best way to avoid making bitcoin payments to Hashlet customers was to convince miners to switch from mining altcoin and bitcoin, to mining Hashpoints, which could be exchanged for Paycoin. The mining of Hashpoints was extended twice prior to the actual Paycoin conversion date.

104.    The majority of GAW Miners' customers switched to Hashpoints completely, with a small percentage remaining behind to continue mining bitcoin (those who held Genesis Hashlets predominantly). Garza devised a schedule of dates that specific Hashlets could switch over to Hashpoint mining, starting with Prime Hashlets, then ZenHashlets, then later, Multi-Hashlets, Clever-Hashlets, WaffleHashlets and Genesis Hashlets. The choice to convert was constrained to a short period of time for each class of Hashlet. At this point, Garza's Paycoin marketing machine was in full-swing, representing that the value proposition was excellent and

creating a sense of urgency for customers to convert their Hashlets or miss out on the opportunity.

105.     Specifically, GAW Miners and Garza convinced customers to acquire Hashpoints by misrepresenting in an Initial Coin Offering ("ICO") flowchart that Paycoin would have an estimated value of $80-$100 per coin. Garza and Fraser knew or were reckless or negligent in not knowing that this representation was highly speculative at best, and more likely downright incorrect. Their subsequent act of taking down this flowchart and altering it only by removing the $80-$100 coin value estimate confirms that they understood the representation was false and misleading.

106.     In marketing Paycoin, GAW Miners and Garza alluded that banks and investment firms were standing in line to support Paycoin and were financially backing it. At one point, Garza and GAW Miners represented that Paycoin had $240 million in financial support (outside investors). Garza and GAW Miners promoted Paycoin as having the following features: Proof of Reserve (a central bank of sorts, supporting the market price of the coin); Miner Rewards (additional data center resources, accessible by miners at cost or near-cost); Coin Adoption Fund (funding set aside to promote Paycoin adoption around the world); Hybrid Flex (Paycoin would use a new type of extremely secure blockchain); Hypass Card (PayCoin was "specifically built to work with legacy credit card hardware with merchants who accept it"); and Merchant Adoption ("Paycoin launches with more merchant acceptance than any other cryptocurrency").

107.     Merchant adoption was the main marketing push to entice miners to switch from bitcoin or altcoin mining to Hashpoints (and therefore Paycoin) mining. Merchant acceptance was touted under well-known retailer names, such as Amazon, Wal-Mart and Target. Garza said he had agreements with these companies to accept Paycoin at $20 per coin due to Garza's

promised $20 pricing floor support. In a January 2015 Hashtalk.org post, Garza represented that "I'm saying that over 10,000 merchants worldwide will suddenly accept Paycoin."

108.    Proclaiming a $20 floor for Paycoin was defendants' way of appealing to retailers (and appealing to customers who believed retailers were on board) by limiting the volatility of Paycoin as compared to existing virtual currencies like bitcoin. At the time of Paycoin's conception, bitcoin was varying up to 40% in price on the markets, making it difficult for retailers to hold bitcoin for any length of time.

109.    Garza's claims about widespread merchant adoption of Paycoin garnered attention in the virtual currency world, and interested persons reached out to the relevant retailers to ask about the arrangements Garza claimed were in place. These retailers responded that they knew nothing of Garza, GAW Miners or Paycoin, and there were no agreements in place to accept any cryptocurrency for goods sold on their retail platforms. When pressured for physical, documented proof of these agreements with the major retailers named, Garza declined, citing that he was under a nondisclosure agreement—although this never stopped Garza from publicly representing that GAW Miners had entered into such agreements.

110.    Garza and Fraser knew that no major retailers had entered into agreements to accept Paycoin, and they knew or were reckless or negligent in not knowing that customers acquiring Hashpoints would rely on Garza and GAW Miner's representations that Paycoin was launching with more merchant acceptance than any other cryptocurrency in history.

111.    Customers who purchased Hashpoints received Paycoins when GAW Miners processed the conversion in December 2014. The exchange rate was 400 to 1. However, unbeknownst to customers, Garza had engaged in a secret pre-mine of Paycoin, yielding a block

of over 12 million Paycoins that Garza ultimately sold in the market, manipulating the price of Paycoin and harming GAW Miners' customers who were holding the new virtual currency.

112.    In order to gain maximum profit from the pre-mined coins, Garza took steps to ensure that GAW Miners' customers holding Hashpoints and Paycoin could not actively sell Paycoin and depress the market price. To achieve this goal, Garza and GAW Miners introduced HashStakers.

**The Final Push: HashStakers**

113.    Initially, Paycoins were placed into customers' Zencloud account wallets. GAW Miners then offered for sale new digital wallets designed to hold Paycoin, called HashStakers. GAW Miners sold HashStakers to new customers, and also offered existing Hashlet investors the chance to "upgrade" their Hashlets to HashStakers. By mid to late December in 2014, HashStakers, and subsequently Prime Controllers, became the primary focus for GAW Miners' customers. Paycoins deposited in HashStakers had an inherent lockup period of 30, 90 or 180 days. A large percentage of HashStakers were 180-day HashStakers. The price of a HashStaker was based on the number of Paycoins that could be deposited in the HashStaker, at $19.95 per Paycoin depositable.

114.    HashStakers acted like fixed-rate investment vehicles and they yielded a daily payout. These investment contracts were given a fixed interest rate of return determined by GAW Miners alone. The interest rate would be retargeted every six months and applied to any Prime Controllers or HashStakers activated on or after the date of the newly retargeted interest rate. Leading up to HashStakers' availability, GAW Miners refused to specify the inherent rate of return for HashStakers, but the purchase price of HashStakers was based on the "targeted" Paycoin value (the $20 floor) and the expected Paycoin percentage yield of the HashStaker.

115.    The $20 floor that customers relied on in deciding to acquire Paycoin (via Hashpoints or otherwise) was a myth. GAW Miners and Garza had developed a central, GAW Miners-owned exchange, payment gateway and marketplace for Paycoin, called Paybase, to control Paycoin trading and manipulate its value. But Paybase was not prepared when Paycoin became active. This resulted in other virtual currency exchanges, including Coin-swap and Cryptsy, creating their own Paycoin exchanges. With Paycoin trading outside of GAW Miner's control, defendants were unable to manipulate the value of the coin in order to maintain a price floor. Instead, outsiders could purchase Paycoin on other exchanges, transfer them to Paybase (once it became active), and take direct advantage of any price manipulation occurring on GAW Miners' market. This led to an increased need to get the Paybase exchange up and running—which resulted in the purchase of Coin-swap.

116.    With Paycoin trading on Cryptsy, another outside exchange, the price of Paycoin began to fall below the $20 proclaimed floor. GAW Miners led customers to believe that, once the Paybase exchange came online, GAW would take actions to support the $20 floor. In what was deemed to be a test, Garza publicly stated that GAW Miners was "about to move the market." Following this statement—and Garza and GAW Miners' use of $35,000 to trade Paycoin on Cryptsy in order to get things started—the value of Paycoin transacted higher than the $20 GAW Miners' stated "floor."

117.    However, once Paybase actually opened, it bore little resemblance to the all-inclusive exchange Garza represented in the announcements touting the future abilities of the platform. Instead, Paybase opened only as an online Paycoin wallet, without an exchange, and without any retailers from which to purchase goods, features Garza and GAW Miners had promised. GAW Miners' competency in developing Paycoin was showing to be severely lacking,

and Garza's claims regarding retailer participation in Paycoin were becoming increasingly suspect.

118.   With Paybase failing to measure up, and other non-GAW Miners' owned exchanges continuing to trade Paycoin, the price of the coin dropped precipitously. GAW Miners' customers then began to realize that not only were the purchased HashStakers too expensive, compared to the current price of Paycoin on the exchanges, but their locked Paycoins were losing value with a negative net-effective rate of return. Customers ultimately could receive less than what they invested in HashStakers, even with the daily payouts.

119.   The design of the HashStakers was intentional; Garza and Fraser wanted their customers' Paycoins to be locked up for the longest period of time possible, and Garza stated that the whole purpose of HashStakers was to limit exchange activity. Once Paycoins were locked in interest-bearing investment wallets, the coins could not be dumped on the exchanges, depressing the market price of Paycoin. Because Garza ensured that GAW Miners' customers' Paycoins were locked in 30, 90 or 180-day HashStakers, the defendants were able to dump the more than 12 million Paycoins they secretly pre-mined—and falsely claimed to have destroyed—and reap the benefits of artificially inflated prices for Paycoin while GAW Miners' customers watched the value of their own Paycoins and HashStakers plummet.

120.   Garza and Fraser made the decision that GAW Miners would offer and sell HashStakers and launch PayCoin. They jointly controlled GAW Miners' strategic direction and the content of the advertising that GAW Miners did for these new offerings. In offering HashStakers to Hashlet investors, GAW Miners, Garza and Fraser attempted to prolong their scheme and prevent the collapse of GAW Miners and Paycoin.

121.    In March 2015, a large volume of defendants' documents and communications were publicly disclosed on the Internet. The allegations in this Complaint are based on those documents and communications, and other publicly available information.

## CLASS ALLEGATIONS

122.    Plaintiffs bring this action as a class action under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves **and others similarly situated.** The "Class" is defined as:

> All persons or entities who, between June 1, 2014, and the present purchased or acquired Hardware-Hosted Mining, Cloud-Hosted Mining, Hashlets, Hashpoints, HashStakers, and Paycoin from GAW Miners and ZenMiner. Excluded from the Class are defendants, any parent, subsidiary, affiliate, agent or employee of any defendant, any co-conspirator and any governmental entity.

123.    The Class is so numerous that joinder of all members is impracticable. While the exact number of Class Members is unknown to Plaintiffs at this time, Plaintiffs are informed and believe that at least 10,000 persons or entities invested in GAW Miners and ZenMiner's relevant offerings.

124.    Plaintiffs' claims are typical of the claims of the other members of the Class. Plaintiffs and members of the Class sustained damages arising out of defendants' common course of conduct in violation of federal and state securities laws as complained herein. The injuries and damages of each member of the Class were directly caused by defendants' unlawful conduct as alleged herein.

125.    Plaintiffs will fairly and adequately protect the interests of the members of the Class, have no interests which are adverse to the interests of absent Class Members and have retained counsel who are competent and experienced in class action litigation, including securities litigation.

126.    Common questions of law and fact exist as to all members of the Class that predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

a.    whether defendants offered to sell, or sold, securities in violation of Section 10(b) of the 1934 Act and various subparts of Rule 10b-5 thereunder;

b.    whether defendants offered to sell, or sold, securities in violation of Sections 36b-29(a)(2) and 36b-4 of CUSA;

c.    whether defendants offered to sell, or sold, securities by means of any untrue statement of material fact or any omission to state a material fact;

d.    whether defendants offered to sell, or sold, unregistered securities in violation of the Section 36b-29(a)(1) of CUSA;

e.    whether defendants knew or were reckless or negligent in not knowing that representations regarding GAW Miners and ZenMiner's computational power were false and misleading;

f.    whether Fraser had control over GAW Miners and ZenMiner, and the power to influence or control these entities' conduct and is liable pursuant to Section 20(a) of the 1934 Act and Section 36b-29(c) of CUSA;

g.    whether defendants were unjustly enriched at the expense of plaintiffs and members of the Class; and

h.    the appropriate measure of damages sustained by plaintiffs and other members of the Class as a result of defendants' unlawful activities.

127.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable. The

prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

128.    The interest of members of the Class in individually controlling the prosecution of separate actions is theoretical rather than practical. The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable. The amounts at stake for Class Members, while substantial in the aggregate, are not great enough individually to enable them to maintain separate suits against Defendants. Plaintiffs do not anticipate any difficulty in the management of this action as a class action.

## FIRST CLAIM FOR RELIEF

**Fraud in the Purchase or Sale of Securities in Violation of
Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder
(against Garza, GAW Miners and ZenMiner)**

129.    Plaintiffs repeat and incorporate by reference the preceding allegations of this Complaint as if set forth fully herein.

130.    Hardware-Hosted Mining, Cloud-Hosted Mining, Hashlets, Hashpoints, HashStakers, and Paycoin constitute investment contracts, and thus "securities" under Section 3(a)(10), 15 U.S.C. §78c(a)(10), of the Exchange Act.

131.    Defendants Garza, GAW Miners and ZenMiner engaged in a fraudulent course of conduct by which they oversold the investment returns from their virtual currency mining operation and misrepresented the nature and profitability of the investments they were selling.

132.   By engaging in the conduct described above, these defendants, directly or indirectly, acting intentionally, knowingly or recklessly, by the use of means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities have employed or are employing devices, schemes or artifices to defraud; and have engaged or are engaging in acts, practices or courses of business which operate as a fraud or deceit upon certain persons.

133.   By engaging in the conduct described above, defendants directly or indirectly, acting intentionally, knowingly or recklessly, by the use of means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities, have made or are making untrue statements of material fact or have omitted or are omitting to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading.

134.   By engaging in the conduct described above, defendants knowingly conspired to bring securities onto the market that were not entitled to be marketed and which, absent the fraud, would not have been marketable at any price. Plaintiffs relied on, among other things, the securities' availability in the market as an indication of their apparent genuineness and suffered damages as a result.

135.   As a result, Garza, GAW Miners and ZenMiner have violated Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §240.10b-5.

**SECOND CLAIM FOR RELIEF**

**Controlling Person Liability Pursuant to
Section 20(a) of the Exchange Act
(against Fraser)**

136.   Plaintiffs repeat and incorporate by reference the preceding allegations of this Complaint as if set forth fully herein.

137.    Fraser, by virtue of his personal and business relationship with Garza and his investment in GAW Miners and ZenMiner, was a controlling person of GAW Miners and ZenMiner, within the meaning of Section 20(a) of the Exchange Act.

138.    Fraser possessed the power to direct or cause the direction of the management and policies of GAW Miners and ZenMiner through his 41% ownership interest in these entities and his longstanding relationship with Garza.

139.    Fraser was a culpable participant in Garza, GAW Miners and Zen Miner's fraudulent scheme, because he knew or was reckless in not knowing that Garza and GAW Miners' representations regarding virtual currency investment offerings were false and misleading by virtue of his status as an owner of the business entities, and his involvement in GAW Miners' business decisions and activities, including supplying Garza and GAW Miners with regular infusions of cash and access to Fraser's personal credit cards. Fraser had the power to control or influence the statements and omissions giving rise to the securities violations as alleged herein, and exercised the same.

140.    As a direct and proximate result of Fraser's conduct, plaintiffs suffered damages.

### THIRD CLAIM FOR RELIEF

**Fraud in the Purchase or Sale of Securities in Violation of
Sections 36b-29(a)(2) and 36b-4 of the Connecticut Uniform Securities Act
(against Garza, GAW Miners and ZenMiner)**

141.    Plaintiffs repeat and incorporate by reference the preceding allegations of this Complaint as if set forth fully herein.

142.    Hardware-Hosted Mining, Cloud-Hosted Mining, Hashlets, Hashpoints, HashStakers, and Paycoin constitute investment contracts, and thus "securities" under Section § 36b-3 of the Connecticut General Statutes.

143.    Defendants Garza, GAW Miners and ZenMiner engaged in a fraudulent course of conduct by which they oversold the investment returns from their virtual currency mining operation. In addition, GAW Miners and Garza's fraudulent course of conduct included their misrepresentations to investors about the nature and profitability of the investments they were selling.

144.    By engaging in the conduct described above, these defendants, directly or indirectly, acting intentionally, knowingly or recklessly, by the use of means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities have employed or are employing devices, schemes or artifices to defraud; and have engaged or are engaging in acts, practices or courses of business which operate as a fraud or deceit upon certain persons.

145.    By engaging in the conduct described above, GAW Miners and Garza directly or indirectly, acting intentionally, knowingly or recklessly, by the use of means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities, have made or are making untrue statements of material fact or have omitted or are omitting to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading.

146.    Defendants knew or were unreasonable in not knowing of the untruths or omissions.

147.    As a result, Garza, GAW Miners and ZenMiner have violated Sections 36b-29(a)(2) and 36b-4 of CUSA.

### FOURTH CLAIM FOR RELIEF

**Offer to Sell or Sale of Securities in Violation of
Sections 36b-29(a)(1) of the Connecticut Uniform Securities Act
(against Garza, GAW Miners and ZenMiner)**

148.    Plaintiffs repeat and incorporate by reference the preceding allegations of this Complaint as if set forth fully herein.

149.    Hardware-Hosted Mining, Cloud-Hosted Mining, Hashlets, Hashpoints, HashStakers, and Paycoin constitute investment contracts, and thus "securities" under Section § 36b-3 of the Connecticut General Statutes.

150.    These securities were offered for sale or sold in violation of Section 36b-16 of the Connecticut Uniform Securities Act, because no registration statement was filed with respect to any of the investment products listed above that were offered for sale or sold by Garza, GAW Miners or ZenMiner, no exemption from registration was available for these securities, and these were not covered securities.

151.    As a result, Garza, GAW Miners and ZenMiner have violated Section 36b-29(a)(1) of the CUSA.

### FIFTH CLAIM FOR RELIEF

**Controlling Person Liability Pursuant to
Section 36b-29(c) of the Connecticut Uniform Securities Act
(against Fraser)**

152.    Plaintiffs repeat and incorporate by reference the preceding allegations of this Complaint as if set forth fully herein.

153.    Fraser, by virtue of his personal and business relationship with Garza and his investment in GAW Miners and ZenMiner as a partner, was a controlling person of GAW Miners and ZenMiner, within the meaning of Section 36b-29(c) of CUSA.

154.    Fraser had the power to influence and control, and did influence and control, directly or indirectly, the decision making and conduct of GAW Miners and ZenMiner as Garza's partner holding a 41% ownership interest in these entities. Fraser knew or was reckless or negligent in not knowing that GAW Miners did not register the securities it sold and that Garza and GAW Miners' representations regarding its investment offerings were false and misleading by virtue of his status as an owner of the company and his involvement in GAW Miners' business activities. Fraser had the power to control or influence the statements and omissions giving rise to the securities violations as alleged herein, and exercised the same.

155.    As a direct and proximate result of Fraser's conduct, plaintiffs suffered damages.

### SIXTH CLAIM FOR RELIEF

**Common Law Fraud**
**(against Garza, GAW Miners and ZenMiner)**

156.    Plaintiffs repeat and incorporate by reference the preceding allegations of this Complaint as if set forth fully herein.

157.    Defendants Garza, GAW Miners, and ZenMiner engaged in a fraudulent scheme in which they made the false statements of material fact described above to induce customers to purchase Hardware-Hosted Mining, Cloud-Hosted Mining, Hashlets, Hashpoints, HashStakers, and Paycoin.

158.    The defendants knew or were reckless in not knowing that the statements were false when the statements were made.

159.    Plaintiffs relied on defendants' false statements in deciding to purchase Hardware-Hosted Mining, Cloud-Hosted Mining, Hashlets, Hashpoints, HashStakers, and Paycoin and suffered damages as a result.

## SEVENTH CLAIM FOR RELIEF

### Aiding and Abetting Common Law Fraud
### (against Fraser)

160.    Plaintiffs repeat and incorporate by reference the preceding allegations of this Complaint as if set forth fully herein.

161.    Fraser aided and abetted Garza, GAW Miners and ZenMiner's fraudulent scheme to sell Hardware-Hosted Mining, Cloud-Hosted Mining, Hashlets, Hashpoints, HashStakers, and Paycoin by making false statements of fact about the quality and nature of the investments.

162.    Fraser was an owner of GAW Miners and ZenMiner, was kept apprised of the companies' status, and had the power to direct and control the policies and management of the companies.

163.    Fraser knew or was reckless in not knowing that Garza, GAW Miners' and ZenMiner's statements were false, and he knowingly provided substantial assistance to Garza, GAW Miners, and ZenMiner in order to perpetuate the fraudulent scheme.

## PRAYER FOR RELIEF

164.    Plaintiffs demand relief as follows:

A.      That the Court certify this lawsuit as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, that plaintiffs be designated as class representatives, and that plaintiffs' counsel be appointed as Co-Lead Class Counsel for the Class;

B.      That the unlawful conduct alleged above be adjudged and decreed to violate Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and various subparts of Rule 10b-5 thereunder;

41

C.      That the unlawful conduct alleged above be adjudged and decreed to violate Sections 36b-29(a)(1), 36b-29(a)(2), 36b-4 and 36b-29(c) of the Connecticut Uniform Securities Act.

D.      That the unlawful conduct alleged above be adjudged and decreed to constitute common law fraud and aiding and abetting fraud.

E.       That the Court award plaintiffs and the Class damages against Defendants for their violations of federal and state securities laws and state common law;

F.      That the Court award plaintiffs and the Class their costs of suit, including reasonable attorneys' fees and expenses, as provided by law; and

G.      That the Court direct such further relief as it deems just and proper.

## DEMAND FOR JURY TRIAL

165.    Pursuant to Federal Rule of Civil Procedure 38(b) and otherwise, Plaintiffs respectfully demand a trial by jury.

Dated:  June 15, 2016                                    Respectfully submitted,

                                                         *s/ Mark P. Kindall*

                                                         Mark P. Kindall (ct13797)
                                                         E-mail: mkindall@izardnobel.com
                                                         Robert A. Izard
                                                         E-mail: rizard@izardnobel.com
                                                         IZARD NOBEL LLP
                                                         29 S. Main St., Suite 305
                                                         West Hartford, CT 06107
                                                         Tel: (860) 493-6292
                                                         Fax: (860) 493-6290

                                                         Marc Seltzer (*pro hac vice to be filed*)
                                                         E-mail: mseltzer@susmangodfrey.com
                                                         California Bar No. 54534
                                                         Kathryn Hoek (*pro hac vice to be filed*)
                                                         E-mail: khoek@susmangodfrey.com
                                                         California Bar No. 219247
                                                         SUSMAN GODFREY L.L.P.

1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067
Tel: (310) 789-3100
Fax: (310) 789-3150

Seth Ard (*pro hac vice to be filed*)
E-mail: sard@susmangodfrey.com
New York Bar No. 4773982
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019-6022
Tel: (212) 336-8330
Fax: (212) 336-8340

Matthew Allen (*pro hac vice to be filed*)
E-mail: mallen@susmangodfrey.com
Texas Bar No. 24073841
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, TX  77002
Tel: (713) 651-9366
Fax: (713) 654-3367

*Counsel for Plaintiffs*