EXHIBIT C

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

_____
                                        )
SECURITIES AND EXCHANGE COMMISSION,     )
                                        )
                 Plaintiff,             )
                                        )
        v.                              )    Case No.
                                        )
HOMERO JOSHUA GARZA,                    )
GAW MINERS, LLC, and                    )
ZENMINER, LLC (d/b/a ZEN CLOUD),        )    JURY TRIAL DEMANDED
                                        )
                 Defendants.            )
_____ )

## COMPLAINT

Plaintiff United States Securities and Exchange Commission ("the Commission") alleges

the following against Defendants Homero Joshua Garza ("Garza"), GAW Miners, LLC ("GAW

Miners"), and ZenMiner, LLC (d/b/a ZenCloud) ("ZenMiner"), and hereby demands a jury trial:

## SUMMARY OF THE ACTION

1.      Defendants used the lure of quick riches from a twenty-first century payment

system known as virtual currency to defraud investors. Though cloaked in technological

sophistication and jargon, defendants' fraud was simple at its core – defendants sold what they

did not own, and misrepresented the nature of what they were selling.

2.      From approximately August 2014 through December 2014, defendants sold – to

over 10,000 investors – investment contracts representing shares in the profits they claimed

would be generated from using their purported computing power to "mine" for virtual currency.

"Mining" for virtual currency means applying computer power to try to solve complex equations

that verify a group of transactions in that virtual currency. The first computer (or collection of

computers) to solve such an equation is awarded new units of that virtual currency. This process is known as "mining," and the computer equipment used in this process, and the humans who own it, are known as "miners."

3. Defendants sold shares in the returns from their purported mining operations, via investment contracts that they named "Hashlets." Hashlet contracts entitled their purchasers to a share of the profits from defendants' purported "hashing power," or the computing power (measured in megahash per second), that defendants purportedly devoted to virtual currency mining. In reality, defendants sold far more Hashlets worth of computing power than they actually had in their computing centers. There was no computer equipment to back up the vast majority of Hashlets that defendants sold.

4. Defendants earned about $19 million in revenue from their sales of Hashlets.

5. Defendants Garza and GAW Miners made many false and misleading statements about GAW Miners' virtual currency mining operations to potential and actual investors. For example, they misrepresented:

    a. that all of the Hashlets of computing power purchased by investors would be pooled together to engage in virtual currency mining, and that investors' returns, or "payouts," would be calculated based on the success of those collective virtual currency mining operations;

    b. that buying a Hashlet would allow investors to mine virtual currency without the expense and expertise that would be required to purchase and maintain their own virtual currency mining equipment;

    c. the profitability and life-span of Hashlets;

    d. the extent of GAW Miners' mining activities; and

2

      e.   how the payouts for Hashlets were derived.

Garza and GAW Miners knew that each of these statements was false at the time it was made.

6.      Defendants' Hashlet sales had many of the hallmarks of a Ponzi scheme. Because defendants sold far more computing power than they owned and dedicated to virtual currency mining, they owed investors a daily return that was larger than any actual return they were making on their limited mining operations. Instead, investors were simply paid back gradually over time, as "returns," the money that they, and others, had invested. As a result, some investors' funds were used to make payments to other investors. Most Hashlet investors never recovered the full amount of their investments, and few made a profit.

7.      Through the activities alleged in this Complaint, defendants have engaged in fraud in connection with the purchase or sale of securities, in violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and various subparts of Rule 10b-5 thereunder; and fraud in the offer or sale of securities, in violation of various subparts of Section 17(a) of the Securities Act of 1933 ("Securities Act"). Defendants have also engaged in the offer and sale of unregistered securities, in violation of Sections 5(a) and 5(c) of the Securities Act.

8.      Based on these violations, the Commission seeks:

      a.   the entry of a permanent injunction prohibiting defendants from further violations of the relevant provisions of the federal securities laws;

      b.   disgorgement of defendants' ill-gotten gains, plus pre-judgment interest; and

      c.   the imposition of civil penalties due to the egregious nature of defendants' violations.

## JURISDICTION AND VENUE

9.      The Commission seeks a permanent injunction and disgorgement pursuant to Section 20(b) of the Securities Act [15 U.S.C. §77t(b)], and Section 21(d)(1) of the Exchange Act [15 U.S.C. §78u(d)(1)].  The Commission seeks the imposition of a civil penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)], and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)].

10.     The Court has jurisdiction over this action pursuant to Sections 20(d) and 22(a) of the Securities Act [15 U.S.C. §§77t(d), 77v(a)], and Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§78u(d), 78u(e), 78aa].

11.     Venue is proper in this District because, at all relevant times, GAW Miners, LLC, and ZenMiner, LLC maintained offices in Connecticut and conducted business in Connecticut; and Homero Joshua Garza lived in Connecticut.  A substantial part of the actions that give rise to the Commission's claims occurred in Connecticut.

12.     In connection with the conduct described in this Complaint, defendants directly or indirectly made use of the mails or the means or instruments of transportation or communication in interstate commerce.

13.     Defendants' conduct involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements, and resulted in substantial loss, or significant risk of substantial loss, to other persons.

## DEFENDANTS

14.     **Homero Joshua Garza** ("Garza"), age 30, presently lives in Brattleboro, Vermont, though he lived in Somers, Connecticut during 2014.  During all of 2014, he was the

4

founder and CEO of GAW Miners, LLC, and he owned and controlled ZenMiner. In those positions, which he held since those companies were founded, he directed their strategy, their financial decisions, and had ultimate control over their day-to-day operations.

15. **GAW Miners, LLC** ("GAW Miners") is a Delaware limited liability company whose principal place of business is in Bloomfield, Connecticut. GAW Miners was formed in May 2014. Garza is the Managing Member and majority owner of GAW Miners. During all relevant times, Garza has controlled GAW Miners and directed its day-to-day activities.

16. **ZenMiner, LLC** ("ZenMiner") is a Delaware limited liability company, which shares a principal place of business with GAW Miners in Bloomfield, Connecticut, and was formed in July 2014. ZenMiner also does business under the name ZenCloud, and utilized the website www.zencloud.com. Garza is the Managing Member and majority owner of ZenMiner. During all relevant times, Garza controlled ZenMiner and directed its day-to-day activities.

## STATEMENT OF FACTS

**Background on Virtual Currency and Its "Mining"**

17. "Virtual currency" is a digital representation of value that can be traded and functions as a medium of exchange; a unit of account; and/or a store of value, but does not have legal tender status (i.e., when tendered to a creditor, is a valid and legal offer of payment) in any jurisdiction. Virtual currency generally is not issued or guaranteed by any jurisdiction or government, and its value is decided by consensus within the community of users of the virtual currency. The most widely adopted virtual currency is bitcoin, although there are many other virtual currencies used today, known as "altcoins." Virtual currency is distinct from fiat currency, which is the money designated by a country as its legal tender. An example of fiat

currency is the United States dollar.  Virtual currencies may be traded on online exchanges for

fiat currencies, including the United States dollar, or used to purchase goods and services.

18.     Bitcoin, and some other virtual currencies, can be "mined."  A virtual currency

"miner" is an individual or entity, and her or its computer equipment, that runs special computer

software to solve complex algorithms that validate groups of transactions in that virtual currency.

19.     Each unit of virtual currency has a "blockchain," which is an electronic public

ledger of all transactions in that currency.

20.     Certain virtual currencies, including bitcoin, self-generate units of the currency by

rewarding miners with newly created coins when they are the first to solve the algorithms that

validate transactions in the currency.  Using bitcoin as an example, the bitcoin network collects

all transactions made during a set time period, usually around ten minutes, into a list called a

"block."  Bitcoin miners compete to be the first to confirm the transactions in the block and write

them into the blockchain.  The first miner to solve the algorithm that confirms a transaction is

rewarded with a preset amount of newly-issued bitcoins by the bitcoin protocol.  This process of

solving equations to confirm transactions and to earn new coins is known as "mining" that

currency.

21.     As interest in bitcoin, and corresponding competition among miners, increased,

more computer processing power became required in order for a miner to have a chance of

solving blocks, and thus obtain the rewards of mining.  The processing power of computers used

to confirm virtual currency transactions is measured by their "hash rate," or the number of

calculations they can perform per second (*e.g.*, a computer with a hash rate of 10 megahash can

make 10 million calculations per second).  The greater a computer's hash rate, the greater that

6

computer's chance to solve the equation that confirms transactions, and the more virtual currency coins the miner may earn.

22.     Given the increasing competition to solve the equations that confirm blockchain transactions, miners frequently combine their computing power into mining "pools."  As a general rule, the more computing power directed to a particular mining pool, the better the chance that pool will be the first to confirm a block of transactions and receive the payout for mining.  Generally, pool participants' shares of the mining reward depend upon the proportional amount of computing power each contributes to the pool.

23.     From August 2014, when defendants first offered Hashlets for sale, to the present, the exchange rate of U.S. dollars to bitcoins has fluctuated between a low of approximately $177 per bitcoin and a high of approximately $600 per bitcoin.

**GAW Miners and ZenMiner's Rapidly Evolving Businesses**

24.      In approximately March 2014, Garza began operating a business to purchase virtual currency mining equipment from its overseas manufacturers and to resell it to customers. He founded GAW Miners in May 2014, and thereafter conducted his hardware resale business under the GAW Miners name.  Until approximately May or June of 2014, GAW Miners' primary business was to sell virtual currency mining equipment.

25.     In the spring of 2014, GAW Miners began offering its customers a new service called Hardware Hosted Mining.  Instead of shipping to its customers the computer hardware they ordered from GAW Miners, GAW Miners offered to host the computer hardware that the customers purchased in its own datacenter.  Customers paid GAW Miners a fee to cover the expenses that GAW Miners incurred to operate their hardware, such as maintenance, electricity, cooling, and Internet connectivity.  While the customers' mining equipment physically resided in

7

GAW Miners' datacenter in Connecticut, customers maintained complete and direct control over how they used their equipment to engage in mining, by accessing their equipment remotely through their personal computers over the Internet.

26.     Within weeks of beginning to offer Hardware Hosted Mining, in approximately June 2014, GAW Miners again changed the focus of its business.  It began encouraging its customers to switch from Hardware Hosted Mining to a new service called Cloud Hosted Mining.

27.     In May 2014, Garza created a company named ZenMiner, which was formally incorporated in July 2014.  Though he persuaded other individuals to represent to customers and the public that ZenMiner was an independent company, Garza owned and controlled ZenMiner at all times.  On information and belief, Garza perpetuated this deception because he believed that GAW Miners could not offer cloud-based hosted mining services without alienating its original hardware-purchasing customers.

28.     Cloud Hosted Mining was marketed as a partnership between ZenMiner and GAW Miners.  GAW Miners offered customers the ability to purchase their mining hardware from it, and then house their equipment in ZenMiner's datacenters for a fee.  Customers could control their mining equipment through the Internet by logging on to the accounts they established on ZenMiner's website interface called ZenCloud.  ZenCloud promised customers that "you don't pay for shipping, cooling, or electricity.  Let us cover all of that for you."

29.     Customers who switched from GAW Miners' Hardware Hosted Mining service to Cloud Hosted Mining through ZenCloud lost some control over how they used their equipment to engage in mining.  ZenCloud users could only direct their equipment to engage in mining through one of the handful of mining pools offered on the ZenCloud website.

8

30. GAW Miners gave their Cloud Hosted Mining customers the option to end their ZenCloud hosted service at any time and receive their physical equipment in the mail from GAW Miners.

31. Cloud Hosted Mining was a fraudulent scheme in at least two respects.

32. First, even though Garza fully controlled ZenMiner, he marketed it to the public as a business entity that was distinct from GAW Miners.

33. For example, on or about May 23, 2014, Garza participated in an interview with a reporter for Cryptocoinsnews.com, during which he convinced a family member of a GAW Miners' investor to pretend that ZenMiner was that person's company and idea. At the time of the interview, Garza expected that the reporter would publish a story containing the misrepresentations that ZenMiner was an entity separate from GAW Miners. That story was published on or about May 23, 2014.

34. This charade continued when, on or about August 24, 2014, GAW Miners issued a press release announcing that its parent company (which was also owned and controlled by Garza), had purchased a controlling stake in ZenMiner for $8 million, and that ZenMiner had become a division of GAW Miners. This statement was false; no such transaction occurred because Garza had always owned and controlled ZenMiner. Garza authorized and approved the issuance of GAW Miners' false press release. The purported ZenMiner transaction was marketed as proof that GAW Miners was a leader in the virtual currency industry by bridging the gap between hardware sellers and hosted mining services.

35. Second, contrary to its stated reason for existence, no mining actually occurred through ZenMiner's ZenCloud interface. Though customers paid for equipment that they believed they were directing to mine in various pools available through the ZenCloud interface,

and also paid for hosting services, very few pieces of the mining equipment purchased by customers actually existed in a ZenMiner datacenter. Most customers paid for a phantom piece of equipment that neither GAW Miners nor ZenMiner owned. Neither GAW Miners nor ZenMiner was directing customers' computing power to any pools at all, much less the ones customers believed they were choosing.

36.     Soon after GAW Miners' Cloud Hosting Mining service launched, customers began to complain that they could not see the increase in power in the mining pools they believed they had chosen to mine through ZenCloud. These complaints were made public through message boards dedicated to virtual currency mining.

37.     Cloud Hosted Mining customers were entitled to request that the computer equipment they had purportedly purchased be sent to them, but neither GAW Miners nor ZenMiner owned that equipment to ship. Facing potential mass customer demands that their equipment be shipped, GAW Miners and ZenMiner again changed business models. GAW Miners offered all of its customers the opportunity to convert their ZenCloud Cloud Hosted machines to "Hashlets."

**GAW Miners and ZenMiner Create and Offer Investments in Hashlets**

   **a.     What Are Hashlets?**

38.     Beginning in August 2014, GAW Miners and ZenMiner decided to sell "Hashlets" to the public. Buying a Hashlet entitled an investor to a share of the profits that GAW Miners and/or ZenMiner would purportedly earn by mining virtual currencies using the computers that were maintained in their data centers. Hashlets were purported to earn a return based on the number of virtual currency units generated when the pools to which their computing power was directed succeeded in processing and confirming virtual currency transactions. As

10

ZenMiner's terms of service stated, a Hashlet was "a divisible and assignable allocation of hashing power from GAW-owned and hosted mining hardware."

39.     Unlike Cloud Hosted Mining customers, Hashlet customers were not buying computer hardware. Hashlet customers had no right to receive any piece of computer hardware at the end of their Hashlet contract. Instead, Hashlet customers were buying the rights to profit from a slice of the computing power owned by GAW Miners and/or ZenMiner (by then, purportedly, a division of GAW Miners).

40.     Hashlet investors were required to do very little to purportedly mine virtual currency. Investors only needed to log into their ZenCloud accounts and click-and-drag their Hashlet icons over to the icons of the mining pools in which they wished their Hashlets to mine. From there, investors relied solely on the efforts of GAW Miners and/or ZenMiner to generate Hashlets' expected profits by owning, housing, operating, maintaining, and connecting the computer hardware that would engage in mining. If GAW Miners had received payouts from its purported mining activities, Hashlet investors' shares of those payouts would have been calculated and deposited by GAW Miners into investors' ZenCloud accounts.

41.     The majority of investors bought Hashlets through a web-based shopping portal by paying with U.S. currency or with bitcoin. Some investors who were Cloud Hosted Mining customers also bought Hashlets through their existing ZenCloud accounts, in part by converting the value of their Cloud Hosted Mining equipment. Once an investor owned one Hashlet, she could also buy additional Hashlets through her ZenCloud account, including by reinvesting the "payouts" from her existing Hashlets into additional Hashlets.

42.     Investors were told that they could log on to their ZenCloud accounts, activate their Hashlets using a code that was provided at the time of purchase, and then direct their

11

Hashlets to engage in mining in one of the mining pools available through ZenCloud. One of the mining pools, ZenPool, was purportedly operated by GAW Miners and/or ZenMiner and was advertised as the "most profitable pool."

43.     Investors' shares of the profits that they purportedly earned as a result of their Hashlets' mining in pools were posted to their ZenCloud accounts daily. Investors were also charged maintenance fees to pay for the purported physical upkeep of the equipment behind the Hashlets. Those maintenance fees were deducted from investors' ZenCloud accounts daily. Investors could request a withdrawal, in bitcoin, from their ZenCloud accounts.

44.     GAW Miners' press releases and website, and Garza's posts on the company's message board variously described Hashlets as "the world's first digital cloud miner" and as "designed from the start to be the easiest, most convenient miner to own." GAW Miners and Garza marketed Hashlets specifically to non-technical people interested in virtual currency mining, touting a Hashlet as being "so easy to use that it is 'Grandma approved'", and claiming that "[i]f you can open an email, you can setup and operate a Hashlet."

**b.     GAW Miners and ZenMiner Oversold Hashlets**

45.     GAW Miners began selling Hashlets in mid-August 2014. GAW Miners' press releases dated August 24 and August 26, 2014 claimed that "thousands of units per second" were sold during their first day, and millions of dollars of Hashlets were sold during their first week, of availability.

46.     There were two basic types of Hashlets – those that were purportedly able to mine for bitcoin and those that were purportedly able to mine for altcoin. Bitcoin mining required computers to solve a different algorithm than that used to mine for altcoin.

47.     Prices for Hashlets ranged between about $10 and $50 per unit, depending on their features, including which pools they were able to mine.  A "unit" of a Hashlet was a measurement of its hashing power, or the number of calculations it could perform per second.  Hashlets that mined bitcoin were sold in multiples of 1 gigahash per second units, and Hashlets that mined altcoin were sold in multiples of 1 megahash per second units.

48.     During their first week of availability alone, GAW Miners and ZenMiner oversold -- between triple and quadruple -- the number of Hashlets for which they had the supporting computing power.  Yet, their sales continued.

49.     By October 2014, GAW Miners had oversold Hashlets to an even more extreme degree.  It had oversold altcoin-mining Hashlets by at least about 100 times its computing capacity, and bitcoin-mining Hashlets by at least about 5 times its computing capacity.

50.     Though GAW Miners built a data center that, by November 2014, contained significant computing capacity for mining bitcoin, it made no increases to its computing capacity for mining altcoin.

51.     Throughout the time that Hashlets were sold, from mid-August 2014 through December 2014, GAW Miners and ZenMiner sold at least $19 million of Hashlets, to more than 10,000 investors.

52.     From the time that Hashlets went on sale in August 2014, and throughout the entire time they were sold, Garza was provided information about how many units of Hashlets were sold.  Garza knew or should have known, from August 2014 onward, that GAW Miners and ZenMiner did not have the computing capacity to support the units of Hashlets that they sold.

13

53.     Garza was responsible for GAW Miners' and ZenMiner's decision to keep selling Hashlets despite his knowledge (or reckless or negligent disregard) that the companies lacked the computing power they purported to be selling to investors.

54.     As a result of dramatically overselling their computing capacity, GAW Miners and ZenMiner did not engage in mining with even approximately the amount of computing power they had sold in Hashlets.  As a further result, GAW Miners' and ZenMiner's revenues from mining bitcoin were minimal, and their revenues from mining altcoin were virtually nonexistent.

55.     Between August and December 2014, GAW Miners created several types of Hashlets with different features.  Garza approved the creation of these Hashlet varieties, and frequently announced their availability on GAW Miners' website and through posts on the company's message board.

56.     For example, on or about September 11, 2014, GAW Miners announced the creation of the limited edition "Remember" Hashlet with the logo of "9/11" to commemorate those whose lives were lost in the terrorist attacks of September 11, 2001.  Garza announced that GAW Miners would only sell 500 Remember Hashlets, and would donate all of the proceeds (approximately $10,000) to "the 9/11 memorial fund."  He specified that "GAW will in no way be profiting from any sales related to the cause."  After selling approximately 2,290 Remember Hashlets for a total of approximately $48,000, GAW Miners donated only $10,000 to a 9/11 related charity.  Garza knew or should have known that GAW Miners actually profited from the sale of Remember Hashlets, contrary to his representations.

    **c.      GAW Miners and Garza Misrepresented Critical Aspects of Hashlets**

57.     Garza directed many of GAW Miners' publicity efforts for its Hashlet offerings.

14

Garza had ultimate authority and control over GAW Miners' promotional materials, including the company's website, and posts he made on the company's message board. Garza also frequently spoke to reporters for publications covering the virtual currency industry, and posted information about GAW Miners and its products on social media outlets.

58.     GAW Miners and Garza made three basic types of misrepresentations to Hashlet investors. First, they misleadingly claimed that Hashlets would be always profitable and never obsolete, when they had no reasonable basis to support those claims. Second, they misleadingly claimed that Hashlets were engaged in mining for virtual currency through pools available in ZenCloud, when they knew that few Hashlets were supported by actual mining activity. Third, they misleadingly claimed that ZenPool engaged in mining, when they knew that it never did.

59.     First, from approximately August through December 2014, GAW Miners' website, and other promotional materials, described Hashlets as always profitable and never obsolete. Garza also claimed on numerous occasions, including in a Hashtalk.org post in August 2014, words to the effect that "there will never be a time a Hashlet cost[s] more to run than you make, and they will always make money." GAW Miners also claimed, on its website, that Hashlets would never break down or expire and this "guarantees your investment is protected and secure, so you can enjoy many years of owning the world's most advanced miner."

60.     At the time GAW Miners and Garza made, or Garza authorized, these statements, they knew or should have known that these statements were untrue. They knew or should have known that the profitability of virtual currency mining depended on many unforeseeable factors, including the market price of those virtual currencies, the cost of the electricity and cooling for the equipment, and the extent to which the speed of developments in computing technology made any equipment they owned obsolete. GAW Miners and Garza thus had no reasonable basis

for these statements at the time they made or authorized them.

61.     GAW Miners' and Garza's statements about profitability and longevity were material to Hashlet investors.  GAW Miners conducted a marketing survey of hundreds of people who purchased Hashlets during their first week of availability. Approximately 70 percent of investors identified the Hashlets' promised return on investment as the most important, or one of the most important, factors in their decision to purchase a Hashlet.  Garza reviewed the results of this survey and thus knew that these factors were material.

62.     By November 2014, Hashlets became unprofitable.  That is, the Hashlets' daily maintenance fees exceeded their purported mining payouts.

63.     By January 2015, Hashlets were obsolete.  GAW Miners announced the termination of its purported Hashlet mining operations at the end of January 2015, stating that "GAW and ZenCloud mining operations have been indefinitely put on hold, effective immediately."

64.     Second, despite marketing Hashlets as capable of mining in the various pools available through ZenCloud, and pricing different types of Hashlets differently based on which pools they were purportedly able to mine, Hashlets did not mine in those pools.

65.     The operators of the pools purportedly available through ZenCloud confirmed that GAW Miners did not establish accounts with those pools, and did not direct any of its computing power towards those pools.  Thus, GAW Miners was not receiving any mining payouts from those pools.

66.     After numerous customer questions about where their hashing power was being used, Garza admitted, in early October 2014, that GAW Miners was not sending its computing power to the pools Hashlet investors selected.  Instead, Garza and GAW Miners claimed, it was

16

"sending our hashing power to our own private pools, but keeping your payouts 100% based on the pool you select." This representation too, was false. At the time, as Garza and GAW Miners knew or should have known, the company had nowhere near the amount of computing power that would support the units of hashing power that had been sold through Hashlets. As a result, GAW Miners engaged in minimal bitcoin mining – in private pools or elsewhere – and effectively no altcoin mining. At the time Garza made this statement, he knew or should have known that GAW Miners could not, and did not, fund its daily payouts to investors with the revenue from its mining activities.

67.     In order to conceal from investors that the mining activity associated with Hashlets did not produce sufficient revenues to fund the payouts that had been promised to investors, GAW Miners used revenues from ongoing Hashlet sales to fund payouts to investors. Thus, Hashlets operated as a Ponzi scheme, in which investors' returns were mostly paid by using the money invested by others.

68.     In September and October 2014, GAW Miners did not always have enough investors purchasing Hashlets with bitcoin to cover its daily bitcoin payout obligations to existing Hashlet owners. As a result, GAW Miners, at Garza's direction, converted some of the United States dollars the company had received as revenue from Hashlet sales into bitcoin. GAW Miners then used the bitcoin it had purchased to make daily payouts to existing Hashlet investors. In September and October 2014 alone, GAW Miners, at Garza's direction, converted over $1.5 million in cash to bitcoin to make mining payouts and thus perpetuate their fraud.

69.     Third, ZenPool was a purported mining pool created and operated by GAW Miners exclusively for certain Hashlet owners. GAW Miners claimed that ZenPool had the "highest and most reliable payout of any multipool in the world." A multipool is a pool that

17

mines both bitcoin and altcoin, depending on the profitability of each coin at the time.

70.     GAW Miners and Garza advertised ZenPool as an enticement for investors to pay more for "Zen Hashlets" and "Prime Hashlets," the only two types of Hashlet capable of mining in ZenPool.  These two types of Hashlets were significantly more expensive than other types of Hashlets that did not allow investors to access ZenPool.

71.     Contrary to GAW Miners' and Garza's representations, there was no ZenPool. GAW Miners did not operate a pool that engaged in mining.  GAW Miners did not direct the hashing power represented by its sales of Zen Hashlets or Prime Hashlets to a pool it owned and operated for investors' benefit.

72.     Instead, GAW Miners determined what the daily payout from ZenPool would be by examining the publicly-available payouts of other pools that were mining that day, and picking a higher number.

73.     When GAW Miners and Garza made false and misleading statements about ZenPool, they knew or should have known that there was no such pool engaged in mining.

**d.     The Hashlet Scheme Unraveled and the Next Scheme Began**

74.     During the fall of 2014, mining for virtual currency became less profitable as the value of many virtual currencies fell and the technological difficulty of mining increased.  Faced with a drop in their revenue stream from selling Hashlets, and faced with the fact that Hashlets were no longer profitable by November 2014, GAW Miners and Garza solicited many investors to redeem their Hashlets for new investment opportunities.

75.     GAW Miners announced, in November 2014, that it was planning to launch a new form of virtual currency, called PayCoin, and it offered for sale new digital wallets designed to hold PayCoin, called HashStakers.  GAW Miners sold HashStakers to new customers, and also

18

offered existing Hashlet investors the chance to "upgrade" their Hashlets to HashStakers.

76.     Garza made the decision that GAW Miners would offer and sell HashStakers, and launch PayCoin. He controlled GAW Miners' strategic direction, and the content of the advertising that GAW Miners did for these new offerings.

77.     In offering HashStakers to Hashlet investors, GAW Miners and Garza attempted to prolong their scheme and prevent the collapse of GAW Miners.

## FIRST CLAIM FOR RELIEF

### Fraud in the Purchase or Sale of Securities in Violation of
### Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

78.     The Commission repeats and incorporates by reference the allegations in paragraphs 1-77 above as if set forth fully herein.

79.     Hashlets constitute investment contracts, and thus "securities" under Section 3(a)(10) [15 U.S.C. §78c(a)(10)] of the Exchange Act.

80.     All defendants engaged in a fraudulent course of conduct by which they oversold the investment returns from their virtual currency mining operation. In addition, GAW Miners and Garza's fraudulent course of conduct included their misrepresentations to investors about the nature and profitability of the investment they were selling.

81.     By engaging in the conduct described above, all defendants, directly or indirectly, acting intentionally, knowingly or recklessly, by the use of means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities: have employed or are employing devices, schemes or artifices to defraud; and have engaged or are engaging in acts, practices or courses of business which operate as a fraud or deceit upon certain persons.

82. By engaging in the conduct described above, GAW Miners and Garza, directly or indirectly, acting intentionally, knowingly or recklessly, by the use of means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities, have made or are making untrue statements of material fact or have omitted or are omitting to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading.

83. As a result, defendants have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5].

## SECOND CLAIM FOR RELIEF
### Fraud in the Offer or Sale of Securities in
### Violation of Section 17(a) of the Securities Act

84. The Commission repeats and incorporates by reference the allegations in paragraphs 1-77 above as if set forth fully herein.

85. Hashlets constitute investment contracts, and thus "securities" under Section 2(a)(1) [15 U.S.C. §77b(1)] of the Securities Act.

86. All defendants engaged in a fraudulent course of conduct by which they oversold the investment returns from their virtual currency mining operation. In addition, GAW Miners and Garza's fraudulent course of conduct included their misrepresentations to investors about the nature and profitability of the investment they were selling.

87. By engaging in the conduct described above, all defendants, directly and indirectly, acting intentionally, knowingly or recklessly, in the offer or sale of securities by the use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails: have employed or are employing devices, schemes or artifices to defraud; or

have engaged or are engaging in transactions, practices or courses of business which operate as a fraud or deceit upon purchasers of the securities.

88.     By engaging in the conduct described above, GAW Miners and Garza, directly and indirectly, acting intentionally, knowingly or recklessly, in the offer or sale of securities by the use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails, have obtained or are obtaining money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

89.     As a result, defendants have violated and, unless enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. §77q(a)].

### THIRD CLAIM FOR RELIEF
**Offer and Sale of Unregistered Securities**
**Violation of Sections 5(a) and 5(c) of the Securities Act**

90.     The Commission repeats and incorporates by reference the allegations in paragraphs 1-77 above as if set forth fully herein.

91.     Hashlets constitute investment contracts, and thus "securities" under Section 2(a)(1) [15 U.S.C. §77b(1)] of the Securities Act.

92.     No registration statement was filed with respect to the Hashlets sold by defendants, and no exemption from registration was available for these securities.

93.     By engaging in the conduct described above, defendants, directly or indirectly: (a) have made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been in effect and for which no exemption from registration has been available; and/or (b) have made use of the means or instruments of

transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been filed and for which no exemption from registration has been available.

94.     As a result, defendants have violated and, unless enjoined, will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C §77e(a), (c)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission requests that this Court:

A.      Enter a permanent injunction restraining defendants and each of their agents, servants, employees and attorneys and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, including facsimile transmission or overnight delivery service, from directly or indirectly engaging in the conduct described above, or in conduct of similar purport and effect, in violation of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5]; and Sections 5(a) and 5(c), and 17(a) of the Securities Act [15 U.S.C. §§77e(a), (c), 77q(a)].

B.      Require defendants to disgorge their ill-gotten gains, plus pre-judgment interest;

C.      Require defendants to pay an appropriate civil monetary penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)], and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)];

D.      Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered;

E.      Award such other and further relief as the Court deems just and proper.

22

Respectfully submitted,

SECURITIES AND EXCHANGE COMMISSION
By its attorneys,

/s/ Kathleen B. Shields
Kathleen B. Shields (Mass. Bar No. 637438,
phv 04710)
Gretchen Lundgren (Mass. Bar No. 644742)
Michele Perillo (Mass. Bar No. 629343)
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
33 Arch Street, 23rd Floor
Boston, MA  02110
(617) 573-8904 (Shields direct)
(617) 573-4590 (fax)
shieldska@sec.gov (Shields email)

Local Counsel:


/s/ John B. Hughes
John B. Hughes (Fed. Bar No. CT 05289)
Assistant United States Attorney
Chief, Civil Division
United States Attorney's Office
Connecticut Financial Center
157 Church St., 23rd Floor
New Haven, CT  06510
Phone: (203) 821-3700
Fax: (203) 773-5373

DATED: December 1, 2015