UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| DENIS MARC AUDET, MICHAEL PFEIFFER, DEAN ALLEN SHINNERS, and JASON VARGAS, Individually and on Behalf of All Others Similarly Situated,<br><br>      Plaintiffs,<br><br>      vs.<br><br>STUART A. FRASER, GAW MINERS, LLC, and ZENMINER, LLC, (d/b/a ZEN CLOUD),<br><br>      Defendants. | Case 3:16-cv-00940<br><br>Hon. Michael P. Shea<br>Courtroom 2<br><br>ECF Case<br><br><u>CLASS ACTION</u><br><br>MARCH 1, 2017<br><br>MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND DEFAULT JUDGMENT |

### TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................. ii

INTRODUCTION ...............................................................................................................1

FACTS .................................................................................................................................2

    I.      Cryptocurrencies. ..............................................................................................2

    II.     Hardware-Hosted and Cloud-Hosted Mining. ........................................................3

    III.    Hashlets. ..............................................................................................................4

    IV.    Hashpoints, Paycoin, and HashStakers. ...............................................................5

PROCEDURAL HISTORY .................................................................................................8

ARGUMENT .......................................................................................................................9

    I.      The Court should lift the PSLRA stay if the Court concludes the
           PSLRA prevents Plaintiffs from seeking certification of a default
           judgment class. .....................................................................................................9

    II.     The Court should certify a Default Judgment Class. ..........................................10

           A.      Joining all class members would be impracticable. ................................12

           B.      Questions of law and fact are common to the Class. ...............................12

           C.      Plaintiffs' claims are typical. ...................................................................14

           D.      Plaintiffs will adequately protect the interests of the Class. ...................15

           E.      Rule 23(b)(3) is satisfied. ........................................................................16

                  a.      Common questions of law or fact predominate. ...........................16

                  b.      A class action is superior to other methods of
                        adjudication. ..................................................................................19

    III.    The Court should enter a default judgment. ........................................................20

    IV.    The Court should approve Susman Godfrey LLP as class counsel for
           the Default Judgment Class. ................................................................................21

CONCLUSION ..................................................................................................................22

TABLE OF AUTHORITIES

Cases

*Abramovitz v. Ahern*, 96 F.R.D. 208 (D. Conn. 1982)................................................. 19

*Amchem Prods, Inc. v. Windsor*, 521 U.S. 591 (1997)..................................... 11, 15, 16

*Amgen Inc. v. Ct. Ret. Plans & Trust Funds*, 133 S. Ct. 1184 (2013) .......................... 12

*Bermudez v. Reid*, 733 F.2d 18 (2d Cir. 1984) ........................................................... 20

*Cashman v. Dolce Int'l/Hartford, Inc.*, 225 F.R.D. 73 (2004) .................................... 13

*Cohen v. J.P. Morgan Chase & Co.*, 262 F.R.D. 153 (E.D.N.Y. 2009)........................ 17

*Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473 (2d Cir. 1995) .............. 12

*Ctr. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, LLC*, 504 F.3d 229 (2d Cir. 2007).................................................................................... 12

*Davis v. Hutchins*, 321 F.3d 641 (7th Cir. 2003) ........................................................ 10

*Dietrich v. Bauer*, 192 F.R.D. 119 (S.D.N.Y. 2000)................................................... 13

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176 (2d Cir. 1990) ...................................................................................................... 11

*Ge Dandong v. Pinnacle Performance Ltd.*, 2013 WL 5658790 (S.D.N.Y. Oct. 17, 2013) ........ 18

*In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d 229 (2d. Cir. 2012)............................. 16

*In re Boardwalk Marketplace Sec. Litig.*, 122 F.R.D. 4 (D. Conn. 1988).................... 17

*In re Colonial Partnership Litig.*, 1993 WL 306526 (D. Conn. 1993)......................... 13

*In re Crude Oil Commodity Futures Litig.*, 2012 WL 569195 (S.D.N.Y. Feb. 14, 2012)...... 16, 22

*In re Flag Telecom Holdings, Ltd. Secs. Litig.*, 574 F.3d 29 (2d Cir. 2009) ............... 14

*In re La Branche Sec. Litig.*, 333 F. Supp. 2d 178 (S.D.N.Y. 2004)............................ 10

*In re Oxford Health Plans, Inc.*, 191 F.R.D. 369 (S.D.N.Y. 2000) ............................. 14

*In re PE Corp. Sec. Litig.*, 228 F.R.D. 102 (D. Conn. 2005)..................... 11, 13, 15, 19

*In re Priceline.com, Inc.*, 236 F.R.D. 89 (D. Conn. 2006) .......................................... 20

*In re Scor Holding (Switz.) A.G. Litig.*, 537 F. Supp. 2d 556 (S.D.N.Y. 2008) ........... 13

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prod. Liab. Litig.*,
    2012 WL 6733023 (C.D. Cal. Dec. 28, 2012) .................................................................. 22

*In re ValuJet, Inc.*, 984 F. Supp. 1472 (N.D. Ga. 1997) ................................................. 9

*In re Vivendi Universal S.A. Sec. Litig.*, 2003 WL 21035383 (S.D.N.Y. May 5, 2003) ............. 10

*In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516 (3d Cir. 2004) ........................................ 19

*In re Worldcom, Inc. Sec. Litig.*, 219 F.R.D. 267 (S.D.N.Y. 2003) ......................................... 11

*Kelleher v. Advo, Inc.*, 2009 WL 2413362 (D. Conn. Mar. 30, 2009) ................................... 14, 15

*McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008) ................................................ 18

*Menkes v. Stolt-Nielsen S.A.*, 270 F.R.D. 80 (D. Conn. 2010) ......................................... 11, 12, 14

*Montcalm Pub. Corp. v. Ryan*, 807 F. Supp. 975 (S.D.N.Y. 1992) ............................................ 21

*Phillips Petroleum v. Shutts*, 472 U.S. 797 (1985) ........................................................... 11

*Robidoux v. Celani*, 987 F.2d 931 (2d Cir. 1993) ............................................................. 12

*Rodsongs v. D & S Enter., LLC*, 2005 WL 589321 (D. Conn. Mar. 11, 2005) ............................ 20

*Saggese v. Beazley Co. Realtors*, 155 Conn. App. 734 (Conn. App. Ct. 2015) ........................... 17

*Semple v. Morganstern*, 116 A. 906 (Conn. 1922) .......................................................... 21

*Steginsky v. Xcelera, Inc.*, 2015 WL 1036985 (D. Conn. Mar. 10, 2015) ................................... 16

*Taddeo v. Am. Invsco Corp.*, 2011 WL 2531141 (D. Nev. June 24, 2011) ................................ 10

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196 (2d Cir.
    2008) .............................................................................................................. 12

*Wagner v. Barrick Gold Corp.*, 251 F.R.D. 112 (S.D.N.Y. 2008) ............................................ 14

*Winn v. Symons Int'l Grp., Inc.*, 2001 WL 278113 (S.D. Ind. Mar. 21, 2001) ............................. 9

<u>Statutes</u>

15 U.S.C. § 78j ................................................................................................... 9

15 U.S.C. § 78t ................................................................................................ 9, 21

15 U.S.C. § 78u-4 ......................................................................................... 9, 10, 15

C.G.S. § 36b-16 .................................................................................................. 19

C.G.S. § 36b-29 ................................................................................................... 17, 19, 21

C.G.S. § 36b-4 ........................................................................................................ 17, 18

<u>Rules</u>

Federal Rule of Civil Procedure 23 .................................................................... passim

Federal Rule of Civil Procedure 55 ..................................................................... 1, 10

## INTRODUCTION

Pursuant to Federal Rule of Civil Procedure ("FRCP") 23 and FRCP 55(b)(2), Plaintiffs respectfully submit this memorandum of law in support their Motion for Class Certification and Default Judgment against GAW Miners, LLC ("GAW Miners") and ZenMiner, LLC ("ZenMiner") (together, "Default Defendants"). Plaintiffs file this motion only for the purposes of complying with the Court's January 30, 2017 order requiring Plaintiffs to file a motion for a default judgment by March 1, 2017.[1]

As detailed more fully in Plaintiffs' Motion for Entry of Default on First Amended Complaint and For Extension of Deadline to File Motion for Default Judgment (the "Entry of Default Motion"),[2] filed on February 23, 2017, Plaintiffs believe the Court may not be able to grant a default judgment until a new default under FRCP 55(a) has been entered for Default Defendants' default in responding to the First Amended Complaint (the current default relates only the Original Complaint, which is no longer the operative pleading). As a result, Plaintiffs requested that a new FRCP 55(a) default be entered due to Default Defendants failure to respond to the Amended Complaint, and for the Court to extend the deadline for Plaintiffs to file this motion until one week after the new default is entered.[3] If the Court agrees and grants that motion, Plaintiffs will (a) withdraw this motion; and (2) file a new motion for a default judgment within a week of the Court granting that motion.

This motion demonstrates that, if this motion were considered now, default judgment is appropriate against the Default Defendants, and that a default judgment class should be certified for the purposes of entering the default judgment.

---

[1] Dkt. 65.
[2] *See* Dkt. 68 & 68-1.
[3] *See* Dkt. 68 & 68-1.

FACTS

This case is about a twenty-first century implementation of an age-old get-rich-quick scheme: GAW Miners, LLC ("GAW Miners") and ZenMiner, LLC ("ZenMiner") (together, "Default Defendants"), Homero Joshua Garza ("Garza"), and Stuart Fraser ("Fraser") sold investors what they did not own and misrepresented what they were selling.

I.   Cryptocurrencies.

Default Defendants used an ever-shifting array of cryptocurrency based investment contracts to defraud investors.[4] A cryptocurrency (*e.g.*, Bitcoin) is "a digital representation of value that can be traded and functions as a medium of exchange, a unit of account, and/or a store of value."[5] Unlike the U.S. dollar or the Japanese yen, cryptocurrencies lack legal tender status, and no central authority guarantees the value of a cryptocurrency.[6] Each unit of cryptocurrency has an electronic public ledger known as a "blockchain."[7] The blockchain verifies that a transferor in fact transferred the amount of cryptocurrency received by a transferee.

Users of cryptocurrencies generate new cryptocurrency through a process known as "mining."[8] Mining involves using computing power to solve complex algorithms that, among other things, verify blockchains.[9] The first "miner," *i.e.*, the individual or entity and his, her, or its computer equipment, to solve the equation receives cryptocurrency in exchange for completing the calculations.[10]

---

[4] Amended Complaint (Dkt. 57) at ¶ 25.
[5] Amended Complaint (Dkt. 57) at ¶ 25.
[6] Amended Complaint (Dkt. 57) at ¶ 25.
[7] Amended Complaint (Dkt. 57) at ¶ 27.
[8] Amended Complaint (Dkt. 57) at ¶ 28.
[9] Amended Complaint (Dkt. 57) at ¶ 28.
[10] Amended Complaint (Dkt. 57) at ¶¶ 26, 28.

As interest in cryptocurrencies grew, competition among miners increased.[11] Miners in turn required more computer processing power to have a chance of solving algorithms first and to receive cryptocurrency as a reward.[12] Given the increasing competition to solve the equations that confirm blockchain transactions, miners frequently combine their computing power into mining "pools."[13] Generally, the more computing power directed to a particular mining pool, the better the chance that pool will be the first to confirm a block of transactions and receive the payout for mining.[14] Typically, pool participants' shares of the mining reward depend upon the proportional amount of computing power each contributes to the pool.[15]

II.   Hardware-Hosted and Cloud-Hosted Mining.

GAW Miners' business initially involved buying and selling hardware for mining cryptocurrency.[16] In June 2014, Default Defendants began offering their customers Hardware-Hosted Mining.[17] Instead of shipping hardware to customers, Default Defendants claimed that they would host the hardware in their own datacenter for a fee.[18] In exchange, Default Defendants claimed to operate the hardware and pay the associated costs.[19] Customers accessed and allegedly controlled their mining equipment via remote management software offered by ZenMiner.

Default Defendants began offering Cloud-Hosted Mining in July 2014.[20] Cloud-Hosted

---

[11] Amended Complaint (Dkt. 57) at ¶ 29.
[12] Amended Complaint (Dkt. 57) at ¶ 29.
[13] Amended Complaint (Dkt. 57) at ¶ 30.
[14] Amended Complaint (Dkt. 57) at ¶ 30.
[15] Amended Complaint (Dkt. 57) at ¶ 30.
[16] Amended Complaint (Dkt. 57) at ¶ 75.
[17] Amended Complaint (Dkt. 57) at ¶ 77.
[18] Amended Complaint (Dkt. 57) at ¶ 77.
[19] Amended Complaint (Dkt. 57) at ¶ 77.
[20] Amended Complaint (Dkt. 57) at ¶ 79.

Mining operated over the Internet, as opposed to via software. Customers were told they could control their mining equipment through the Internet by logging on to the accounts they established on ZenMiner's website interface called ZenCloud.[21] Through ZenCloud, investors could direct their miners to the pool of their choice.

In reality, little mining actually occurred.[22] Most customers paid for a phantom piece of equipment that Default Defendants did not own.[23] Default Defendants did not direct customers' computing power to any pools at all, much less the ones customers believed they were choosing.[24] Default Defendants thus operated as a classic Ponzi scheme. They signed up new customers for hosted mining services and used the incoming funds and the daily maintenance fees to pay existing customers the "returns" generated from mining activities.[25] Investors lacked control over their miners or any profits they yielded. In reality, they acquired only a share in Default Defendants' scheme and the right to profits that Default Defendants alone elected to share.[26]

III.   Hashlets.

Beginning in August 2014, GAW Miners and ZenMiner decided to sell "Hashlets" to the public.[27] Customers buying Hashlets purchased computational power from GAW Miners' and ZenMiner's data center.[28] Hashlets were purported to earn a return based on the number of cryptocurrency units generated when the pools to which their computing power was directed

---

[21] Amended Complaint (Dkt. 57) at ¶ 79.
[22]  Amended Complaint (Dkt. 57) at ¶¶ 81 89–90, 94. Defendants also misrepresented their relationship with one another by posing as independent entities. *See id.* ¶¶ 79, 83–88.
[23] Amended Complaint (Dkt. 57) at ¶ 89.
[24] Amended Complaint (Dkt. 57) at ¶ 89.
[25] Amended Complaint (Dkt. 57) at ¶ 90.
[26] Amended Complaint (Dkt. 57) at ¶ 90.
[27] Amended Complaint (Dkt. 57) at ¶ 95.
[28] Amended Complaint (Dkt. 57) at ¶ 95.

succeeded in processing and confirming cryptocurrency transactions.[29] As ZenMiner's terms of service stated, a Hashlet was "a divisible and assignable allocation of hashing power from GAW-owned and hosted mining hardware."[30] Effectively, Hashlet customers purchased the rights to profit from a slice of computing power owned by Default Defendants, less certain fees.[31]

Hashlet investors were required to do very little to purportedly mine cryptocurrency. Investors only needed to log into their ZenCloud accounts and click-and-drag their Hashlet icons over to the icons of the mining pools the Hashlets were designated to mine.[32] From there, investors relied solely on the efforts of Default Defendants to generate Hashlets' expected profits by owning, housing, operating, maintaining, and connecting the computer hardware that would engage in mining.[33] If Default Defendants had received payouts from its purported mining activities, Default Defendants would calculate and deposit those profits into investors' ZenCloud account.

In reality, Default Defendants dramatically oversold Hashlets. Default Defendants lacked anything close to the computing capacity that they would need to conduct mining activities commensurate with the number of Hashlets they sold.[34] Default Defendants thus misrepresented the fact that Hashlets were not associated with actual mining activities.[35] As with Defendants hosted-mining services, Hashlets operated as a classic Ponzi scheme.

IV.    Hashpoints, Paycoin, and HashStakers.

---

[29] Amended Complaint (Dkt. 57) at ¶ 95.
[30] Amended Complaint (Dkt. 57) at ¶ 95.
[31] Amended Complaint (Dkt. 57) at ¶¶ 95, 97 101.
[32] Amended Complaint (Dkt. 57) at ¶ 98.
[33] Amended Complaint (Dkt. 57) at ¶ 98.
[34] Amended Complaint (Dkt. 57) at ¶¶ 107–08, 112.
[35] Amended Complaint (Dkt. 57) at ¶ 117. Defendants made several other misrepresentations in connection with Hashlets. *See id.* at ¶¶ 117–121; 129–132.

In November 2014, Default Defendants announced that they planned to launch a new form of cryptocurrency, called "Paycoin."[36] In advance of Paycoin's launch, Default Defendants offered "Hashpoints" to investors.[37] Hashpoints were convertible promissory notes that investors could purchase or mine and exchange for Paycoin once Paycoin launched.[38] Default Defendants' main motivation in offering Hashpoints was to shift customers' mining focus from bitcoin and other cryptocurrencies to Hashpoints and Paycoin and to stave off bitcoin payments to Hashlet-holders that GAW Miners could not make.[39]

Default Defendants convinced customers to acquire Hashpoints by misrepresenting in an Initial Coin Offering ("ICO") flowchart that Paycoin would have an estimated value of $80-$100 per coin and that Paycoin would have a $20 floor.[40]

Customers who purchased Hashpoints received Paycoins when GAW Miners processed the conversion in December 2014.[41] The exchange rate was 400 to 1.[42] However, unbeknownst to customers, Garza had engaged in a secret pre-mine of Paycoin, yielding a block of over 12 million Paycoins that Garza ultimately sold in the market, manipulating the price of Paycoin and harming Default Defendants' customers who were holding the new cryptocurrency.[43]

Initially, Paycoins were placed into customers' ZenCloud account wallets.[44] Default Defendants then offered new digital wallets to hold Paycoin called HashStakers.[45] Default

---

[36] Amended Complaint (Dkt. 57) at ¶ 136.
[37] Amended Complaint (Dkt. 57) at ¶ 136.
[38] Amended Complaint (Dkt. 57) at ¶ 136.
[39] Amended Complaint (Dkt. 57) at ¶ 136.
[40] Amended Complaint (Dkt. 57) at ¶¶ 139, 141, 153. Default Defendants represented that Paycoin had other features it did not. *See id.* at ¶¶ 140–41.
[41] Amended Complaint (Dkt. 57) at ¶ 149.
[42] Amended Complaint (Dkt. 57) at ¶ 149.
[43] Amended Complaint (Dkt. 57) at ¶ 149.
[44] Amended Complaint (Dkt. 57) at ¶ 151.
[45] Amended Complaint (Dkt. 57) at ¶ 151.

Defendants sold HashStakers to new customers, and also offered existing Hashlet investors the chance to "upgrade" their Hashlets to HashStakers.[46] Paycoins deposited in HashStakers had an inherent lockup period of 30, 90 or 180 days.[47] A large percentage of HashStakers were 180-day HashStakers.

HashStakers acted like fixed-rate investment vehicles and they yielded a daily payout.[48] HashStakers had a fixed interest rate of return determined by Default Defendants alone.[49] The interest rate would be retargeted every six months and applied to any HashStakers activated on or after the date of the newly retargeted interest rate.[50] Leading up to HashStakers' availability, Default Defendants refused to specify the inherent rate of return for HashStakers, but the purchase price of HashStakers was based on the "targeted" Paycoin value (the $20 floor) and the expected Paycoin percentage yield of the HashStaker.[51]

The $20 floor was a myth. Once Paycoin launched, it began trading on outside cryptocurrency exchanges.[52] The price of Paycoin dropped precipitously, well below the $20 floor.[53] Customers then began to realize that not only were the purchased HashStakers too expensive, compared to the current price of Paycoin on the exchanges, but their locked Paycoins were losing value with a negative net effective rate of return.[54] Customers ultimately could receive less than what they invested in HashStakers, even with the daily payouts.[55]

---

[46] Amended Complaint (Dkt. 57) at ¶ 151.
[47] Amended Complaint (Dkt. 57) at ¶ 151.
[48] Amended Complaint (Dkt. 57) at ¶ 152.
[49] Amended Complaint (Dkt. 57) at ¶ 152.
[50] Amended Complaint (Dkt. 57) at ¶ 152.
[51] Amended Complaint (Dkt. 57) at ¶ 152.
[52] Amended Complaint (Dkt. 57) at ¶¶ 153–54.
[53] Amended Complaint (Dkt. 57) at ¶ 156.
[54] Amended Complaint (Dkt. 57) at ¶ 156.
[55] Amended Complaint (Dkt. 57) at ¶ 156.

PROCEDURAL HISTORY

In June 2016, Plaintiffs filed a class action against Default Defendants, Garza, and Fraser. Plaintiffs served GAW Miners on September 8, 2016.[56] Plaintiffs served ZenMiner on September 9, 2016.[57] Default Defendants failed to answer or otherwise defend.[58]

Plaintiffs dismissed their claims against Garza without prejudice on October 24, 2016.[59] On November 4, 2016, Plaintiffs filed a First Amended Complaint (the "Amended Complaint").[60] The Amended Complaint contained additional facts, and asserted one additional secondary liability theory against Fraser. It did not assert any new claims against Default Defendants.[61] Fraser filed a motion to dismiss the Amended Complaint under FRCP 12(b)(6) on December 6, 2016.[62] Plaintiffs filed an opposition on January 9, 2017,[63] and Fraser filed a reply on January 23, 2017.[64]

Plaintiffs moved for entry of a default pursuant to FRCP 55(a) on November 11, 2016.[65] The Court entered the default on January 30, 2017.[66] Plaintiffs filed a motion requesting that the Court a new default be entered on February 23, 2017.[67]

---

[56] Dkt. 62-2 at ¶ 4.
[57] Dkt. 62-2 at ¶ 5.
[58] Dkt. 62-2 at ¶ 7.
[59] Dkt. 52.
[60] Dkt. 57.
[61] *See generally* Dkt. 57.
[62] Dkt. 61.
[63] Dkt. 63.
[64] Dkt. 64.
[65] Dkt. 59.
[66] Dkt. 65.
[67] Dkt. 68.

ARGUMENT

I.   The Court should lift the PSLRA stay if the Court concludes the PSLRA prevents Plaintiffs from seeking certification of a default judgment class.

Because of the PSLRA's automatic stay while the motion to dismiss is pending, Plaintiffs arguably cannot seek class certification until the stay is lifted. Plaintiffs brought claims against Default Defendants under Section 10(b) of the Securities Exchange Act of 1934 and against Fraser under Section 20(a).[68] Fraser has filed a motion to dismiss.[69] After a defendant files a motion to dismiss in a private securities action, the PSLRA stays "all discovery and all other proceedings." 15 U.S.C. § 78u-4(b)(3) (emphasis added). Class certification may thus constitute a "proceeding" subject to the PSLRA's mandatory stay. Cases outside the context of a request for class certification solely for the purposes of obtaining a default judgment have concluded that the PSLRA stay applies to a motion under FRCP 23. *See Winn v. Symons Int'l Grp., Inc.*, 2001 WL 278113, at *2 (S.D. Ind. Mar. 21, 2001) ("Courts generally do not regard class certification proceedings as one of the exceptions [to the PSLRA's mandatory stay]."); *In re ValuJet, Inc.*, 984 F. Supp. 1472, 1481–82 (N.D. Ga. 1997) ("The PSLRA provides that all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss. 15 U.S.C. § 78u–4(b)(3)(B). Thus, the Motion for Class Certification was stayed pending the resolution of the Motion to Dismiss.").

Plaintiffs do not believe the PSLRA stay should apply in this context. Certifying a class against defendants who have willfully failed to appear will not impose any burden on Defendant Fraser or otherwise alter the theories currently alleged against him. "The legislative history of the PSLRA indicates that Congress enacted the discovery stay to prevent plaintiffs from filing

---

[68] Dkt. 59.
[69] Dkt. 62.

securities class actions with the intent of using the discovery process to force a coercive settlement" and to "prevent plaintiffs from filing securities fraud lawsuits 'as a vehicle in order to conduct discovery in the hopes of finding a sustainable claims not alleged in the complaint.'" *In re La Branche Sec. Litig.*, 333 F. Supp. 2d 178, 181 (S.D.N.Y. 2004) (quoting *In re Vivendi Universal S.A. Sec. Litig.*, 2003 WL 21035383, at *1 (S.D.N.Y. May 5, 2003)).

If the Court does conclude the PSLRA stay applies, Plaintiffs request that the Court lift it for purposes of certifying the class. *See* 15 U.S.C. § 78u-4(b)(3)(B). Unless a class is certified, a default judgment may be only effective as to Plaintiffs, and Plaintiffs may not be able to obtain class damages. "Class damages cannot be awarded if no class is certified." *Davis v. Hutchins*, 321 F.3d 641, 648 (7th Cir. 2003). In *Mihelis v. Network Comm. Serv., Inc.*, 2014 WL 4828875, at *4 (E.D.N.Y. Aug. 8, 2014), the court held that named plaintiffs in a putative class action could not obtain class damages because they moved for a default judgment under FRCP 55(b) before seeking class certification.

To the extent the Court concludes that the PSLRA stay applies, Plaintiffs respectfully request that the Court exercise its authority to lift the PSLRA stay to allow them to certify the Default Judgment Class. *See Taddeo v. Am. Invsco Corp.*, 2011 WL 2531141, at *2 (D. Nev. June 24, 2011) (lifting PSLRA stay "for the limited purpose of allowing the Court to conduct the required analysis on the issue of class certification.").

II.     The Court should certify a Default Judgment Class.

Plaintiffs seek certification of the following class (the "Default Judgment Class") solely for purposes of entering a default judgement against Default Defendants:

> All persons or entities who, between June 1, 2014, and the present purchased or acquired Hardware-Hosted Mining, Cloud-Hosted Mining, Hashlets, Hashpoints, HashStakers, and Paycoin from GAW Miners and ZenMiner. Excluded from the Class are any defendants,

any parent, subsidiary, affiliate, agent or employee of any defendant, any co-conspirator and any governmental entity.

The requirements for certification of a putative class under FRCP 23 are (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. *Amchem Prods, Inc. v. Windsor*, 521 U.S. 591, 613 (1997). The Court must also determine whether the action is maintainable under FRCP 23 (b)(1), (2) or (3). *Id.* at 614.

Class actions promote judicial economy by aggregating small claims into one lawsuit. "Class actions . . . permit the plaintiffs to pool claims which would be uneconomical to litigate individually. [M]ost of the plaintiffs would have no realistic day in court if a class action were not available." *Phillips Petroleum v. Shutts*, 472 U.S. 797, 808–09 (1985); *In re Worldcom, Inc. Sec. Litig.*, 219 F.R.D. 267, 304 (S.D.N.Y. 2003) (finding that, absent class certification, the burden and expense on individual investors of litigating independent actions against well financed defendants would leave most investors "without any recourse"). The Second Circuit construes the FRCP 23 factors "liberally" due to "the importance of the class action device in securities fraud suits." *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 179 (2d Cir. 1990); *see also In re PE Corp. Sec. Litig.*, 228 F.R.D. 102, 107 (D. Conn. 2005) ("It is well recognized that class actions are a particularly appropriate means for resolving securities fraud actions.")

The Court should accept allegations in the Complaint as true in determining whether class certification is appropriate. *PE Corp.*, 228 F.R.D. at 106. A movant can also offer evidence outside the pleadings. *Id.* "The preponderance of the evidence standard applies to evidence proffered to establish Rule 23's requirements." *Menkes v. Stolt-Nielsen S.A.*, 270 F.R.D. 80, 89–90 (D. Conn. 2010) (quoting *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier,*

*Inc.*, 546 F.3d 196, 202 (2d Cir. 2008)).

Even though Plaintiffs seek a default judgment, the Court must still determine whether class certification is proper under FRCP 23:  as "[t]he Supreme Court has made clear[,] . . . a class may only be certified if the trial court is satisfied, after rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied, and actual, not presumed, conformance with Rule 23(a) remains . . . indispensable." *Mihelis*, 2014 WL 4828875, at *4. While the Rule 23 inquiry may overlap with that of the merits, courts may not engage in "free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Ct. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1195 (2013).

A. <u>Joining all class members would be impracticable.</u>

Rule 23(a)(1) requires that the class be so numerous that joinder of all members would be "impracticable."  Impracticable does not mean impossible, but "only that the difficulty or inconvenience of joining all members of the class make use of the class action appropriate." *Ctr. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, LLC*, 504 F.3d 229, 244-45 (2d Cir. 2007). "[N]umerosity is presumed at a level of 40 members." *Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995). Here, the putative class is all "persons or entities" who purchased Defendants' investment products. Plaintiffs estimate that well over 10,000 individuals invested in Default Defendants' products.[70] *See Menkes*, 270 F.R.D. at 90 (finding numerosity requirement met where 1,208 investors purchased the relevant securities). "Courts have not required evidence of exact class size or identity of class members to satisfy the numerosity requirement." *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993).

B. <u>Questions of law and fact are common to the Class.</u>

---

[70] Amended Complaint (Dkt. 57) at ¶ 161.

The FRCP 23(a)(2) requirement that "there are questions of law or fact common to the class" is a low hurdle: "Courts have commented that 'the test for commonality is not demanding' and is met so long as there is at least one issue common to the class." *PE Corp.*, 228 F.R.D. at 108 (quoting *Cashman v. Dolce Int'l/Hartford, Inc.*, 225 F.R.D. 73, 91 (2004)); *see also Dietrich v. Baue*r, 192 F.R.D. 119, 124 (S.D.N.Y. 2000) (commonality requirement "has been applied permissively by courts in the context of securities fraud litigation"). There are numerous common issues prevalent in this case, including:

- whether Default Defendants offered to sell, or sold, securities in violation of Section 10(b) of the Securities Exchange Act of 1934 and various subparts of Rule 10b-5 thereunder;

- whether Default Defendants offered to sell, or sold, securities in violation of C.G.S. §§ 36b-29(a)(2) and 36b-4;

- whether Default Defendants offered to sell, or sold, securities by means of any untrue statement of material fact or any omission to state a material fact;

- whether Default Defendants offered to sell, or sold, unregistered securities in violation of Section C.G.S. § 36b-29(a)(1);

- whether Default Defendants sold unregistered securities in violation of C.G.S. § 36b-16, and thus violated C.G.S. § 36b-29(a)(1).

- whether Default Defendants knew or were reckless in not knowing that representations regarding GAW Miners and ZenMiner's computational power were false and misleading;

- whether the members of the Default Judgment Class have sustained damages and, if so, what is the proper measure of damages.

In comparable situations, courts have consistently found the commonality requirement to have been satisfied. *See In re Colonial Partnership Litig.*, 1993 WL 306526, at *3 (D. Conn. 1993) (allegations of misrepresentations affecting class presented common question); *In re Scor Holding (Switz.) A.G. Litig.*, 537 F. Supp. 2d 556, 571 (S.D.N.Y. 2008) (common questions as to whether "Defendants' public statements, discussed above, contained material misrepresentations

or omissions in violation of Section 10(b), and whether Defendants acted with scienter); *Wagner v. Barrick Gold Corp.*, 251 F.R.D. 112, 116 (S.D.N.Y. 2008) (common legal and factual questions included whether Defendants violated the federal securities laws" and "whether statements made by Defendants to the investing public . . . misrepresented or omitted to disclose material facts about the business and operations of Barrick.").

C.   Plaintiffs' claims are typical.

"The court may certify a class only if the plaintiffs have shown that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." *Colonial*, 1993 WL 306526, at *4 (quoting FRCP 23(a)(3)) "Typicality does not require that the situations of the named representatives and the class members be identical." *In re Oxford Health Plans, Inc.*, 191 F.R.D. 369, 375 (S.D.N.Y. 2000) (citation omitted). A plaintiff's claim is typical if it arises from "the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *In re Flag Telecom Holdings, Ltd. Secs. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009). Plaintiffs' claims are typical because they (1) purchased Defendants' investment contracts during the Class Period; (2) were adversely affected by defendants' alleged false and misleading statements; and (3) suffered damages thereby. Further, Plaintiffs' injuries arose from the same course of conduct as the other members of the putative class, their legal theories are the same as those of the members of the putative Class, and Plaintiffs' claims are not subject to any unique defenses. *See Kelleher v. Advo, Inc.*, 2009 WL 2413362, at *3 (D. Conn. Mar. 30, 2009) (Plaintiffs claims were typical because "Kelleher and all of the proposed class members allegedly suffered damages as a result of purchasing Advo stock in reliance on the false statements made by the defendants."); *Menkes*, 270 F.R.D. at 92 ("As alleged, each class member's claim arises from the same general course of events, and each class member would

14

present similar legal arguments to prove the defendants' liability.").

The Court appointed Plaintiffs as Lead Plaintiffs under the PSLRA, see 15 U.S.C. § 78u-4(a)(3)(B), based in part on a finding that Plaintiffs claims met Rule 23's typicality requirements.[71] The Court should affirm that order in finding Plaintiffs claims typical.

D.  Plaintiffs will adequately protect the interests of the Class.

The adequacy of representation requirement of Rule 23(a) calls for the court to resolve: "(1) [whether the] plaintiff's interests are antagonistic to the interest of other members of the class, and (2) [whether the] plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *Kelleher*, 2009 WL 2413362, at *3. "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem*, 521 U.S. at 625.

Plaintiffs' interests are aligned with the interests of the putative class. Like the members of the putative class, Plaintiffs lost money by purchasing Default Defendants' products. *See PE Corp.*, 228 F.R.D. at 109 ("The named plaintiffs' interests are directly aligned with those of the absent class members: they are purchasers of Celera common stock who suffered significant losses as a result of the investments."). The Court so concluded when it appointed Plaintiffs as Lead Plaintiffs.[72] It should affirm that order.

Plaintiffs have chosen qualified, experienced attorneys. Marc M. Selzter of Susman Godfrey LLP possesses extensive experience in the area of securities litigation and has successfully prosecuted numerous securities fraud class actions on behalf of injured investors.[73]

---

[71] *See* Dkt. 46.
[72] *See* Dkt. 46.
[73] *See* Declaration of Colin M. Watterson in Support of Plaintiffs' Motion for Class Certification and Default Judgment ("Watterson Decl."), Exs. 1 and 2.

Susman Godfrey has served as class counsel in numerous cases. *See In re Crude Oil Commodity Futures Litig.*, 2012 WL 569195, at *2 (S.D.N.Y. Feb. 14, 2012) (For its part, Susman Godfrey has served as lead counsel in hundreds of class actions, . . .”). Susman Godfrey has vigorously pursued the Class's interests in opposing Defendant Stuart Fraser's motion to dismiss and in attempting to obtain a default judgment.

      E.      Rule 23(b)(3) is satisfied.

To qualify for certification under Rule 23(b)(3), a class must meet two requirements beyond the Rule 23(a) prerequisites: Common questions must “predominate over any questions affecting only individual members”; and class resolution must be “superior to other available methods for the fair and efficient adjudication of the controversy.” *Amchem*, 521 U.S. at 615. Those requirements are satisfied here.

      a.      Common questions of law or fact predominate.

“The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.”*Amchem*, 521 U.S. at 623. Predominance is satisfied ‘if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof.’” *Steginsky v. Xcelera, Inc.*, 2015 WL 1036985, at *8 (D. Conn. Mar. 10, 2015) (quoting *In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d 229, 240 (2d. Cir. 2012)) “Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws.” *Amchem*, 521 U.S. at 625. Here, Plaintiffs claim that Default Defendants' cryptocurrency products amounted to a high-tech Ponzi scheme. Plaintiffs' claims are thus susceptible to generalized proof because their claims will focus on a common course of fraudulent conduct. *See Cohen v. J.P. Morgan*

*Chase & Co.*, 262 F.R.D. 153, 159 (E.D.N.Y. 2009) ("The predominance requirement is met when the defendant's wrongful acts involve common practices . . . .").

At this time, Plaintiffs only seek to obtain certification to obtain a default judgment. All facts in the Amended Complaint will be presumed true, and determining liability will be straightforward.

Plaintiffs' 10b-5, C.G.S. § 36b-4(a)(1), C.G.S. § 36b-29(a)(2), and common-law fraud claims can all be proven on a common basis.[74] The elements of a 10b-5 claim are:

> a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.

*Amgen*, 133 S. Ct. at 1192. A claim under C.G.S. § 36b-4(a)(1) is similar to a 10b-5 claim. C.G.S. § 36b-29(a)(2) imposes liability against any person who:

> offers or sells . . . a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, who knew or in the exercise of reasonable care should have known of the untruth or omission, the buyer not knowing of the untruth or omission, and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission . . . ."

Under Connecticut law, a plaintiff alleging common-law fraud must prove "(1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon that false representation to his injury." *Saggese v. Beazley Co. Realtors*, 155 Conn. App. 734, 752 (Conn. App. Ct. 2015).

---

[74] The Court should certify Plaintiffs' state-law claims because: "where, as here, the plaintiffs common law claims arise out of the same allegedly fraudulent scheme and involve the same misrepresentations and omissions as the federal causes of action, they should be certified as well." *In re Boardwalk Marketplace Sec. Litig.*, 122 F.R.D. 4, 8 (D. Conn. 1988).

Plaintiffs can offer generalized proof to show that Default Defendants made a variety of misleading statements. Plaintiffs can also use generalized proof to demonstrate Defendants' state of mind, and damages.

Plaintiffs can establish reliance in this case in several ways, including through circumstantial evidence that plaintiffs would not have purchased a product but for a defendant's uniform misrepresentations and omissions about that product." *Ge Dandong v. Pinnacle Performance Ltd.*, 2013 WL 5658790, at *9 (S.D.N.Y. Oct. 17, 2013) (certifying a common law fraud class and quoting *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 225 (2d Cir. 2008)). Defendants misrepresented that their investment products provided returns based on computing power directed at mining cryptocurrency, but in reality Defendants never had enough computing power to generate the funds they paid out and their businesses operated as a classic Ponzi scheme. No investors would have paid for Defendants' products had they known Defendants were operating a Ponzi scheme, and that simple fact alone is ample circumstantial evidence to prove reliance at trial and for purposes of class certification. *See id.*

Plaintiffs C.G.S. § 36b-4(a)(2), (3), and 36b-4(b) claims focus on Defendants' conduct, as opposed to the actions of the individual plaintiffs, and are thus are susceptible to generalized proof:

- C.G.S. § 36b-4(a)(2) provides that: "No person shall . . . make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading."

- C.G.S. § 36b-4(a)(3) provides that: "No person shall . . . engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." It also prohibits a person from "in connection with the offer, sale or purchase of any security, directly or indirectly engage in any dishonest or unethical practice."

- C.G.S. § 36b-4(b) provides that: "No person shall, in connection with the offer, sale or purchase of any security, directly or indirectly engage in any dishonest or unethical

practice."

Likewise, Plaintiffs' C.G.S. § 36b-29(a) claim focuses on Default Defendants' actions. Default Defendants are liable under C.G.S. § 36b-29(a) because they violated C.G.S. § 36b-16, which prohibits the sale of unregistered securities.

Even if the Court concluded that some individual issues do exist, that does not preclude class certification. "[A]ctions for securities fraud which customarily allege a conspiracy or common course of conduct intended to defraud a group of investors have been frequently certified as class actions notwithstanding the existence of the individual issues of misrepresentation and reliance." *Abramovitz v. Ahern*, 96 F.R.D. 208, 216 (D. Conn. 1982).

b.      A class action is superior to other methods of adjudication.

FRCP 23(b)(3) requires that a class action be superior to other methods of handling litigation. "The superiority requirement 'asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication.'" *PE Corp.*, 228 F.R.D. at 111 (quoting *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 534 (3d Cir. 2004)). Relevant factors include:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

FRCP 23(b)(3). "Given the complexities of a securities litigation case, the interest of individual stockholders in controlling the prosecution of separate actions is low." *PE Corp.*, 228 F.R.D. at 111. There are likely hundreds, if not several thousand class members here. Given the complexity of securities litigation and the size of the claims of individual class members, it would not make sense for class members to proceed individually. *See Menkes*, 270 F.R.D. at 100

("The claims of each individual class member are likely too small to warrant the costs of litigating individually, and it is therefore in the interest of all class members to proceed as a class."); *In re Priceline.com, Inc.*, 236 F.R.D. 89, 101–02 (D. Conn. 2006) ("This is the quintessential securities fraud class action. An enormous group of potential plaintiffs, with losses ranging from millions of dollars to tens of dollars, seek to recover damages arising from one entity's actions. The focus of this litigation is upon the propriety defendants' conduct, and any issues pertaining to individual class members only pale in comparison to the importance of defendants' potential liability.").

Given that the Default Defendants operated in Connecticut and the relevant misrepresentations occurred here, proceeding with this litigation in Connecticut is appropriate. There is no reason to expect any difficulties in the management of this case as a class action.

III.   The Court should enter a default judgment.

"'[W]here a party fails to respond, after notice the court is ordinarily justified in entering a judgment against the defaulting party.'" *Rodsongs v. D & S Enter., LLC*, 2005 WL 589321, at *1 (D. Conn. Mar. 11, 2005) (quoting *Bermudez v. Reid*, 733 F.2d 18, 21 (2d Cir. 1984). Here, Plaintiffs served GAW Miners on September 9, 2016 and ZenMiner on September 8, 2016. Default Defendants never responded. Default Defendants failure to appear was clearly willful. Plaintiffs sued Garza and Fraser, the individuals who controlled Default Defendants. Garza and Fraser were clearly aware that Default Defendants had been sued, and they could have caused Default Defendants to appear and defend themselves. Thus, for the reasons provided in the Amended Complaint, Plaintiffs respectfully request that the Court enter a default judgment.

Entering a default judgment now is not premature and will not prejudice Defendant Fraser because Plaintiffs seek to hold Default Defendants and Fraser jointly and severally liable. "In a case such as this, where plaintiff seeks joint and several liability against several defendants,

20

the court may enter a default judgment against any defendants who default by failing to appear." *Montcalm Pub. Corp. v. Ryan*, 807 F. Supp. 975, 978 (S.D.N.Y. 1992). Section 20(a) of the Exchange Act imposes joint and several liability on control persons. *See* 15 U.S.C. § 78t. The secondary liability provisions of CUSA also impose joint and several liability. *See* C.G.S. 36b-29(c) ("Every person who directly or indirectly controls a person liable under subsections (a) and (b) of this section, every partner, officer or director of such a person, every person occupying a similar status or performing similar functions, . . . are also liable jointly and severally with and to the same extent as such person . . . ."). Finally, Fraser is jointly and severally liable for aiding and abetting Defendants' common law fraud. *See Semple v. Morganstern*, 116 A. 906, 907 (Conn. 1922) ("All who actively participate in any manner in the commission of a tort, or who command, direct, advise, encourage, aid or abet its commission, are jointly and severally liable therefore.") (quoting Cooley (3d Ed.) p. 244))

While it is appropriate to enter a default judgment against Default Defendants now, this Court may wait until trial to assess damages against Default Defendants. *See Montcalm*, 807 F. Supp. at 978 (quoting 6 Moore's Federal Practice ¶ 55.06 at 55–42 n. 17 (2d ed. 1988)). Plaintiffs therefore request that the Court enter judgment as to Default Defendants' liability only at this time and defer the question of damages until trial. *See id.* (entering default judgment on liability only).

IV.   The Court should approve Susman Godfrey LLP as class counsel for the Default Judgment Class.

Rule 23(g)(1)(A) sets out the factors a court must consider in appointing Class Counsel, including:

> (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources counsel will commit to representing the class.

As described above, Marc Seltzer and Susman Godfrey have substantial experience representing class members, including in securities cases.[75] Courts recognize that experience. *See, e.g.*, *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prod. Liab. Litig.*, 2012 WL 6733023, at *2 (C.D. Cal. Dec. 28, 2012) (Finding that "the Class Representatives have retained experienced counsel to represent them and the Class— . . . Marc M. Seltzer of Susman Godfrey L.L.P. . . . whom the Court finds have satisfied the requirements of Fed.R.Civ.P. 23(a)(4) and 23(g)); *Crude Oil*, 2012 WL 569195, at *2 (For its part, Susman Godfrey has served as lead counsel in hundreds of class actions, . . .").

CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court (i) certify the Default Judgment Class; (ii) enter a default judgment as to Default Defendants; and (iii) approve Susman Godfrey as class counsel.

Respectfully submitted,

/s/     Mark P. Kindall
Mark P. Kindall (ct13797)
E-mail: mkindall@ikrlaw.com
Robert A. Izard
E-mail: rizard@ikrlaw.com
IZARD, KINDALL & RAABE, LLP
29 S. Main St., Suite 305
West Hartford, CT 06107
Tel: (860) 493-6292
Fax: (860) 493-6290

---

[75] *See also* Watterson Decl., Exs. 1 & 2.

Marc Seltzer (*pro hac vice*)
E-mail:mseltzer@susmangodfrey.com
California Bar No. 54534
Kathryn Hoek (*pro hac vice*)
E-mail: khoek@susmangodfrey.com
California Bar No. 219247
SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067
Tel: (310) 789-3100
Fax: (310) 789-3150

Seth Ard (*pro hac vice*)
E-mail: sard@susmangodfrey.com
New York Bar No. 4773982
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019-6022
Tel: (212) 336-8330
Fax: (212) 336-8340

Matthew Allen (*pro hac vice*)
E-mail: mallen@susmangodfrey.com
Texas Bar No. 24073841
Colin Watterson (*pro hac vice*)
Email:  cwatterson@susmangodfrey.com
Texas Bar No. 2409330
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, TX  77002
Tel: (713) 651-9366
Fax: (713) 654-3367

*Counsel for Plaintiffs*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 1, 2017, a copy of foregoing document was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing  system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

/s/            Mark P. Kindall