**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| DENIS MARC AUDET, et. al.<br>        Plaintiff,<br><br>v.<br><br>STUART A. FRASER, et. al.<br>        Defendants. | No. 3:16-CV-940 (MPS) |

## Ruling on Motion to Dismiss

### I.    Introduction

Plaintiffs Denis Marc Audet, Michael Pfeiffer, Dean Allen Shinners, and Jason Vargas (the "Plaintiffs"), individually and on behalf of a class of all others similarly situated, have filed suit against defendants Stuart A. Fraser ("Fraser"), GAW Miners, LLC ("GAW Miners"), and ZenMiner, LLC ("ZenMiner" together with GAW Miners, the "Companies") alleging violations of both federal and state securities law.  Fraser has moved to dismiss all counts against him.  For the reasons set forth below, his motion to dismiss is **DENIED**.

### II.    The Amended Complaint

This case involves an alleged  scheme to defraud customers and investors in a series of business ventures related to "virtual currency mining," which the amended complaint describes as the "appli[cation] of computer power in an attempt to solve complex equations that verify a group of transactions in [a] virtual currency [such as Bitcoin].  The first computer (or collection of computers) to solve an equation is awarded new units of that virtual currency."  (ECF No. 57 at ¶ 3.)  The "people and computer equipment used in this process are known as miners."  (*Id*.) The following facts are taken from the amended complaint and are accepted as true for the purpose of deciding Fraser's motion to dismiss.

### A. Factual Allegations

#### 1. Garza and Fraser Meet and Form Several Business Ventures

Fraser, the vice-chairman of Cantor Fitzgerald, an investment bank, and Homero Joshua Garza ("Garza") first met in 2003 when Garza was in high school. (ECF No. 57 at ¶ 33.) [1] Fraser had hired Garza to install internet service at his vacation home in Vermont. (*Id*.) Following this meeting, "[t]he two quickly developed a close business and personal relationship" with Garza looking to Fraser for "business advice, direction, and mentorship." (*Id*.) Over the next decade, Fraser "served as a mentor and business associate of Garza." (*Id*. at ¶ 18.) They formed several businesses together, including Great Auk Wireless High Speed Internet (later known as GAW High Speed Internet or GAW-HSI). (*Id*. at ¶ 36.) Although they "rarely formalized their business relationships," they had an understanding that Garza "would serve as CEO of their respective companies, and Fraser would serve as the 'Board.'" (*Id*. ¶ 34.) In their respective roles, the two frequently discussed, and made decisions concerning, the day-to-day operations of their businesses. (*Id*. ¶ 19-20.) Fraser also served as a financial investor in the companies. (*Id*. at ¶ 40.) "Unlike a traditional investor," Fraser "kept Garza on a tight least by doling out investments in piecemeal installments" and would withhold additional funding until Garza had reported back to him. (*Id*.)

In July 2013, Garza emailed Fraser to discuss their business relationship, which "had not been revised for years." (*Id*. at ¶ 37.) "Garza proposed that they split every system and company in half with the exception of GAW High Speed Internet, of which Fraser would own 80%." (*Id*.)

---

[1] The original complaint also named Garza as a defendant. Plaintiffs later dismissed their claims against Garza (ECF No. 52); according to Fraser, this was done after Garza agreed to provide them with information "in the hope that" such new information "could cure the deficiencies in [Plaintiffs'] claims against Fraser" in the original complaint. (ECF No. 62 at 5.)

Garza also suggested that they create "an equal partnership (50/50) in [their] holding company[,] Geniuses at Work Corporation, with Fraser holding the voting power." (*Id*.) Under Garza's proposal, he "would contribute his stake or control over certain systems or companies, as well as patents to be created." (*Id*.) For his part, Fraser would: (i) "provide a $10,000 per month investment that would serve as Garza's salary," (ii) "forgive a $230,000 personal debt," (iii) "allow Garza to live down the investment Fraser made in GAW in the past," (iv) "contribute a $150,000 cash infusion," and (v) assist in obtaining the support of Howard Lutnick, the head of Cantor Fitzgerald. (*Id*.) Fraser agreed to Garza's proposal, and the two also agreed that their agreement "providing for 50-50 ownership would apply prospectively to new companies they created." (*Id*. at ¶ 38.)

### 2. GAW Miners and ZenMiner

In March 2014, Garza incorporated GAW Miners to sell virtual currency mining equipment. (*Id*. at ¶¶ 46, 75.) Fraser and Garza each owned half of GAW Miners consistent with their 2013 agreement. (*Id*. at ¶ 48.) In this new venture, as with their prior ones, Garza served as GAW Miners' CEO while Fraser "served as a de facto Board" and financial investor. (*Id*. at ¶¶ 46-47.) Fraser invested $135,000 in GAW Miners, which he supplemented a few months later in the summer of 2014 with three loans of $200,000 each. (*Id*. at ¶ 47.) At its inception, GAW Miners' primary business was the sale of virtual currency mining equipment. (*Id*. at ¶ 75.) GAW Miners expanded its business to include: (i) hardware-hosted mining, whose customers were told that they had purchased specific pieces of physical mining equipment that were stored and maintained by GAW Miners for daily maintenance fees, but allegedly controlled by customers; (ii) cloud-hosted mining, which purportedly allowed customers "to control their mining hardware through a website;" (iii) investment contracts called Hashlets that paid returns

on GAW Miners' virtual currency mining; (iv) GAW Miners' own virtual currency, Paycoin; and (v) investment contracts called HashStakers that held Paycoins and paid holders a fixed return. (*Id*. at ¶¶ 4-8.) According to the amended complaint, each of these services was fraudulent, largely because GAW Miners did not own all the computer hardware and associated computing power it marketed to its customers. (*Id*.) The allegations of the complaint describing each of these products are set forth in more detail below.

i. Hardware-Hosted Mining

Due to low profit margins on selling physical equipment, in June 2014, GAW Miners began offering its customers Hardware-Hosted Mining. (*Id*. at ¶ 77.) This service provided that, in exchange for a fee paid by customers to cover maintenance expenses, GAW Miners would host customers' mining equipment at its own datacenter. (*Id*.) GAW Miners told its customers they could access and control their mining equipment via remote management software offered by ZenMiner, a company co-owned by Fraser and Garza. (*Id*. at ¶¶ 38, 77-78, 85.) GAW Miners also represented to its customers that, at the customers' request, GAW Miners would terminate the hosted mining services and ship to them the physical mining equipment. (*Id*. at ¶ 81.) But GAW Miners "never had sufficient designated equipment to return to customers." (*Id*.)

ii. Cloud-Hosted Mining

In July 2014, GAW Miners began offering Cloud-Hosted Mining. (*Id*. at ¶ 79.) Cloud-Hosted Mining gave customers "the option to engage in hosted mining without the ZenMiner software." (*Id*.) The service allowed customers to purchase mining hardware from GAW Miners and then house that equipment at ZenMiner's datacenters for a fee. (*Id*.) Customers could then control their purchased mining equipment by "logging on to accounts they established on ZenMiner's website interface called ZenCloud." (*Id*.) ZenCloud users could only mine in

one of the pools offered on ZenCloud's website.  (*Id*. at ¶ 80.)  Further, under this service, GAW

Miners represented that customers could terminate their "hosted services at any time and receive

their physical equipment in the mail from GAW Miners." (*Id*. at ¶ 81.)  But "no mining actually

occurred through ZenMiner's ZenCloud interface" and "very few pieces of mining equipment

purchased by customers actually existed" at ZenMiner.  (*Id*. at ¶ 89.)

### iii.  Hashlets

In August 2014, GAW Miners and ZenMiner decided to sell Hashlets, a concept that

Fraser had initially proposed to Garza in May 2014.  (*Id*.at ¶ 95-96.)  A hashlet "entitled an

investor to a share of the profits that GAW Miners and/or ZenMiner would purportedly earn by

mining virtual currencies that were maintained in their data centers."  (*Id*. at ¶ 95.)  Unlike

customers of Hardware- and Cloud-Hosted Mining, Hashlet customers did not acquire rights in a

specific piece of mining equipment.  (*Id*. at ¶ 97.)  "Hashlets were purported to earn a return

based on the number of virtual currency units generated when the pools to which their computing

power was directed succeeded in processing and confirming virtual currency transactions." (*Id*.

at ¶ 95.)  GAW Miners told Hashlet customers that "they could log on to their ZenCloud

accounts, activate their Hashlets using a code that was provided at the time of purchase, and then

direct their Hashlets to engage in mining in one of the mining pools available through

ZenCloud."  (*Id*. at ¶ 100.)

"During their first week of availability alone, GAW Miners and ZenMiners oversold—

between triple and quadruple—the number of hashlets for which they had the supporting

computing power."  (*Id*. at ¶ 107.)  "By October 2014, GAW Miners had oversold altcoin-mining

Hashlets by at least 100 times its computing capacity, and bitcoin-mining Hashlets by at least

about 5 times its computing capacity."  (*Id*. at ¶ 108.)  "These sales took place before GAW

Miners had even completed setting up the datacenter in Mississippi where the mining equipment was purportedly stored." (*Id*.) Between "mid-August and December 2014, GAW Miners and ZenMiner sold at least $19 million of Hashlets to more than 10,000 investors." (*Id*. at ¶ 109.)

iv. Paycoin

In November 2014, GAW Miners announced its plans to launch a new form of virtual currency called "Paycoin." (*Id*. at ¶ 136.) In advance of the launch of Paycoin, GAW Miners offered customers Hashpoints, which "were convertible promissory notes that could be purchased or mined and exchanged for Paycoin once Paycoin launched." (*Id*. at ¶ 136.) GAW Miners and Garza represented to customers that "Paycoin would have an estimated value of $80-$100 per coin" and that Paycoin's price would not fall below a $20 price floor. (*Id*. at ¶¶ 139, 142.) They also represented that "banks and investment firms were standing in line to support Paycoin and were financially backing it" and that merchants were widely adopting it. (*Id*. at ¶¶ 140, 141.)

v. HashStakers

HashStakers were digital wallets designed to hold Paycoin. (*Id*. at ¶ 151.) Paycoins deposited in HashStakers "had an inherent lockup period of 30, 90, or 180 days." (*Id*.) They functioned as "fixed-rate investment vehicles and they yielded a daily payout." (*Id*. at ¶152) Their purchase price was based in part on the $20 Paycoin floor. (*Id*. at ¶ 153.) Paycoin, however, traded below that price floor because it was traded on other virtual currency exchanges, not just Paybase, the virtual currency exchange that GAW Miners and Garza had developed to "control trading and manipulate" the value of Paycoin. (*Id*.) The fact that it was traded on other exchanges and that Paybase did not become operational until much later than originally anticipated led the price of Paycoin to drop "precipitously." (*Id*. at ¶ 156.) GAW Miners'

customers "began to realize that not only were the purchased HashStakers too expensive, compared to the current price of Paycoin on the exchanges, but their locked Paycoins were losing value with a negative net-effective rate of return." (*Id.*)

According to the amended complaint, "[t]he design of HashStakers was intentional; Garza and Fraser wanted their customers' Paycoins to be locked up for the longest period of time possible… Once Paycoins were locked in interest-bearing investment wallets, the coins could not be dumped on the exchanges, depressing the market price of Paycoin." (*Id.* at ¶ 157.) Further, "[b]ecause Garza ensured that GAW Miners' customers' Paycoins were locked in 30, 90, or 180-day HashStakers, the defendants were able to dump the more than 12 million Paycoins they secretly pre-mined—and falsely claimed to have destroyed—and reap the benefits of artificially inflated prices for Paycoin while GAW Miners' customers watched the value of their own Paycoins and HashStakers plummet." (*Id.*)

3. Alleged Misrepresentations

The amended complaint provides the following examples of misrepresentations allegedly made by the "defendants":

i. "that Hardware-Hosted Mining and Cloud-Hosted Mining customers could request shipment of the physical mining equipment they purportedly owned";

ii. "that Hardware-Hosted Mining and Cloud-Hosted Mining customers could control the pools in which their mining equipment operated";

iii. "that all of the Hashlets of computing power purchased by investors would be pooled together to engage in virtual currency mining, and that investors' returns, or 'payouts,' would be calculated based on the success of those collective virtual currency mining operations";

iv. "that buying a Hashlet would allow investors to mine virtual currency without the expense and expertise that would be required to purchase and maintain their own virtual currency mining equipment";

v. "the profitability and life-span of Hashlets";

vi. "how the payouts for Hashlets were derived";

vii. "the value of Hashpoints and the conversion to Paycoin";

viii. "the expected value of Paycoin and the existence of agreements with merchants to accept it";

ix. "the utility of Paybase as a GAW Miners-owned exchange for Paycoin";

x. "the continued existence of defendants' pre-mined Paycoin and defendants' sales of that Paycoin without customer knowledge";

xi. "the expected returns generated by HashStakers";

xii. "the extent of GAW Miners' mining activities"; and

xiii. "the extent of GAW Miners' virtual currency trading activities."

(ECF No. 57 at ¶ 9.)

4. Fraser's Role

Fraser had a "deep involvement with Garza and GAW Miners." (*Id*. at ¶ 72.) Fraser participated in "in GAW Miners' operations and strategic decision-making, and regularly provided direction to Garza concerning GAW Miners' business." (*Id*. at ¶ 50.) For example, he advised Garza on (i) GAW Miners' exchange rate risk, (ii) potential retail platforms to market GAW Miners' products, and (iii) potential acquisitions. (*Id*.) Fraser also served as a contact for potential investors interested in either purchasing GAW Miners' products, or working with GAW Miners. (*Id*. at ¶ 62.) Fraser could play that role because Garza kept him apprised of GAW Miners' status and granted him access to GAW Miners' business records. (*Id*. at ¶¶ 62-63, 70.) He also negotiated with third parties on GAW Miners' behalf. (*Id*. at ¶ 51.) On one such occasion, in April 2014, GAW Miners was negotiating with Zeus Miner, a manufacturer of equipment for cryptocurrency mining, and "Fraser negotiated directly with the CEO of Zeus Miner on behalf of GAW Miners." (*Id*.) Furthermore, Fraser "participated in the management and direction of GAW Miners' advertising strategy." (*Id*. at ¶ 52.) In that capacity, Fraser

created a Twitter account to market and promote GAW Miners' business and products. (*Id*. at ¶ 54.) He also allowed "Garza and GAW Miners to use [his] credit line at Bank of America and his American Express Plum card for GAW Miners['] company business." (*Id*. at ¶ 72.)

Fraser also leveraged his resources at Cantor Fitzgerald for GAW Miners. He used Cantor Fitzgerald personnel in any array of capacities including "respond[ing] to media inquiries about GAW Miners, [] provid[ing] administrative support, and [] handl[ing] accounting or legal issues related to GAW Miners." (*Id*. at ¶ 59.) He also "used his contacts at Cantor Fitzgerald" to "introduce potential investors to Garza and GAW Miners." (*Id*. at ¶ 55.)

******

Additional factual allegations are recounted as necessary below.

**B. Legal Claims**

Plaintiffs make the following claims in their amended complaint.

1. GAW Miners and ZenMiner

Plaintiffs sue GAW Miners and ZenMiner for (i) violation of Section 10(b) of the Securities and Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5 (count one), (ii) violations of Sections 36b-29(a)(2) and 36b-4 of the Connecticut Uniform Securities Act ("CUSA") (count three), (iii) violation of Section 36b-29(a)(1) of CUSA (count five), and (iv) common law fraud (count seven).

2. Fraser

Plaintiffs sue Fraser for: (i) controlling person liability under Section 20(a) of the Exchange Act (count two), (ii) aiding and abetting fraud in violation of Section 36b-29(a)(2) of CUSA (count four), (iii) controlling person liability under of Section 36b-29(c) of CUSA (count six), and (iv) aiding and abetting common law fraud (count eight).

### III.    Applicable Legal Standards

### A.  Fed. R. Civ. P. 12(b)(6)

In deciding a motion to dismiss under Fed. R. Civ. P. 12(b)(6), I must determine if the Plaintiffs have alleged "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the pleaded content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)(internal quotation marks and citations omitted).  At this stage, a court construes the complaint liberally, "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)(internal quotation marks and citations omitted).  "[A] formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. 544, 555.

### B.  The Private Securities Litigation Reform Act

"Any complaint alleging securities fraud must satisfy the heightened pleading standards of the [Private Securities Litigation Reform Act ("PSLRA")] and Fed. R. Civ. P. 9(b) by stating with particularity the circumstances constituting fraud." *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. J.P. Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009)(internal quotation marks and citations omitted).  "Under the PSLRA, the complaint must specify each statement alleged to have been misleading, and the reason or reasons why the statement is misleading and state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  *Id*. (internal quotation marks, alterations, and citations omitted).  "To determine whether the plaintiff has alleged facts that give rise to the requisite strong inference of scienter, a court must consider, plausible, nonculpable explanations for the defendant's conduct,

as well as inferences favoring the plaintiff." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007)(internal quotation marks and citations omitted). While reasonable inferences are normally drawn in favor of the non-movant on a motion to dismiss, "the PSLRA establishes a more stringent rule for inferences involving scienter because the PSLRA requires particular allegations giving rise to a strong inference of scienter." *ECA, Local 134 IBEW*, 553 F.3d at 196 (internal quotation marks and citations omitted). And the particularity requirement of Rule 9(b)"requires that a plaintiff set forth the who, what, when, where and how of the alleged fraud." *U.S. ex rel. Polansky v. Pfizer, Inc.,* 04-CV-0704 (ERK), 2009 WL 1456582, at *4 (E.D.N.Y. May 22, 2009)(internal quotation marks and citations omitted).

## IV. Discussion

### A. The Control Person Liability Claim under Section 20(a) (Count Two)

Section 20(a) of the Exchange Act provides that:

[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t. "To state a claim of control person liability under §20(a), a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014)(internal quotation marks and citations omitted). Because the parties do not dispute the first element for purposes of the motion to dismiss, I examine whether amended complaint sufficiently alleges the remaining two elements below.

1.   Control

The Second Circuit has adopted the definition of control promulgated by the U.S.

Securities and Exchange Commission ("SEC"): Control is "'the power to direct or cause the

direction of the management and policies of [the primary violators,] *whether through [the*

*ownership of voting securities, by contract, or otherwise*.'"  *SEC v. First Jersey Sec., Inc.*, 101

F.3d 1450, 1472-73 (2d Cir. 1996)(quoting 17 C.F.R. § 240.12b-2; emphasis added).  "The test

of whether an individual is a controlling person for the purposes of § 20(a) is not a categorical

one that turns solely on the individual's status as an officer or director.  Rather, the inquiry is a

functional one, as SEC regulations indicate."  *In re Complete Management Inc., Sec. Litig.*, 153

F. Supp. 2d 314, 331 (S.D.N.Y. 2001)(internal quotation marks and citations omitted); *see also*

*Patriot Exploration, LLC v. SandRidge Energy, Inc.*, 951 F. Supp. 2d 331, 362 (D. Conn.

2013)("A person's status as an officer, director, or shareholder, absent more, is not enough to

trigger liability under [section 20(a)]…")(internal quotation marks and citations omitted).  Thus,

control is adequately pled when there are factual allegations that "support a reasonable inference

that defendants had the potential power to influence and direct the activities of the primary

violator."  *Id*. (internal quotation marks and citations omitted).  Those allegations need not

satisfy the PSLRA.  *Poptech, L.P.*, *v. Stewardship Credit Arbitrage Fund, LLC*, 792 F. Supp. 2d

328, 334 (D. Conn 2011)("With regard to the control element,…[the] [c]omplaint need only

satisfy the requirements of Rule 8(a).")(internal quotation marks and citations omitted).  Because

control "a fact-intensive inquiry," it "generally should not be resolved on a motion to dismiss."

*Patriot Exploration*, 951 F. Supp. 2d at 362 (internal quotation marks and citations omitted).

The amended complaint plausibly pleads that Fraser controlled the Companies and Garza.

It does so first by alleging that Fraser owned half of the equity in each of the Companies – a well

recognized indicator of control. (ECF No. 57 at ¶ 48)("…Fraser and Garza each owned half of GAW Miners and ZenMiner."); *see Szulik v. Tagliaferri*, 966 F. Supp. 2d 339, 369 (S.D.N.Y. 2013)(finding control in part based on allegations that "each [defendant] held 50% interest"). To be sure, the amended complaint also alleges that Garza and Fraser "agreed to set aside 18% of the equity" for investors or employees (ECF No. 57 at ¶ 48), but as Plaintiffs point out, it does not say they actually did so. Nowhere does the amended complaint allege that the 18% was actually assigned to any other investor, and the right to reserve implies in any event control over the issuance of the stock. (ECF No. 63 at 17.) But even if Fraser was a minority owner, the amended complaint contains other allegations sufficient to plead Fraser's control.

First, the amended complaint alleges that Fraser was involved in directing both the Companies' major strategic decisions and their daily operations. (ECF No. 57 at ¶ 135)("Garza and Fraser made the decision that GAW Miners would offer and sell first Hardware- and Cloud-Hosted Mining and then Hashlets"); (*Id*. at ¶ 158)(alleging that Fraser and Garza made the decision that GAW Miners would offer and sell HashStakers and launch Paycoin); (*Id*. at ¶¶ 87-88)(alleging that "Fraser came up with the idea of GAW Miners acquiring ZenMiner, first proposed the plan to Garza in or around June 2014, and the two jointly made the decision for GAW Miners to acquire ZenMiner"); (*Id*. at ¶¶ 19-20)("…Garza and Fraser have controlled GAW Miners and directed its day-to-day activities….[They have also] controlled ZenMiner and directed its day-to-day activities."); (*Id*. at ¶ 50)(alleging Fraser's involvement at the Companies ranged from advising on potential acquisitions targets to recommending the use of e-commerce as a platform for the Companies' products to directing Garza to "look into []the [Companies'] exchange rate risk" posed by their foreign operations); (*Id*. at ¶ 51)("Fraser negotiated directly with the CEO of Zeus Miner on behalf of GAW Miners on at least one occasion and invited the

CEO of Zeus Miner to visit with Fraser about GAW Miners businesses in New York."); (*Id*. at ¶ 62)(alleging Fraser served as a one of the points of contacts at the Companies for parties seeking to purchase the Companies' products or to explore potential partnership opportunities)  That Fraser allegedly not only had the ability to exercise control but actually exercised it goes beyond what is necessary to plead control.  *Cf. In re Parmalat Sec. Litig.*, 594 F. Supp. 2d 444, 456 (S.D.N.Y. 2001)("[O]nly the ability to direct the actions of the controlled person, and not the active exercise thereof is required to establish control.")(internal quotation marks and citations omitted).

Second, the amended complaint alleges that Fraser and Garza had a close personal relationship, with Fraser as mentor and Garza as mentee.  Together with the other allegations, this makes it plausible that Fraser, from whom Garza sought "advice and approval" before "making decisions concerning the management and policies of their businesses," had the potential to influence and direct the Companies.  (ECF No. 57 at ¶ 34); *see also* (*Id*. at ¶ 33)("Garza and Fraser have had a business and personal relationship since approximately 2003….The two quickly developed a close business and personal relationship."); (*Id*. at ¶ 39)("Garza and Fraser's relationship went beyond an ordinary business relationship. Garza expressed his gratitude at one point by giving Fraser a Tesla (an expensive car). Fraser and Garza regularly went to one another's homes, spent time with one another's families and friends, and engaged in social activities together. Garza and Fraser also regularly sent each other text messages, often about social subjects and often include[ed] pictures of themselves…"); (*Id*. at ¶ 41)("Garza relied on Fraser for personal financial support."); *see In re MTC Electronic Technologies Shareholder Litig.*, 898 F. Supp. 974, 984 (E.D.N.Y. 1995)("Plaintiffs have clearly alleged that Alan Leung had controlling status [] because of his family relationships with the two

co-founders of MTC…")(internal quotation marks and citations omitted), *vacated in part on other grounds at* 993 F. Supp. 160 (E.D.N.Y. 1997); *see also Drobbin v. Nicolet Instrument Corp.*, 631 F, Supp. 860, 885 (S.D.N.Y. 1986)(observing that fact that defendant was "personal attorney and long-time friend" weighed in favor of finding of control).

Third, Fraser appears to have been a major – and the amended complaint suggests the leading – creditor of GAW Miners and Garza, and one who used his financial leverage to oversee Garza.  (ECF No. 57 at ¶ 37 (Fraser would provide $10,000 per month investment that would serve as Garza's salary, forgive a $230,000 personal debt from Garza, and contribute a $150,000 cash infusion); *Id.* at ¶ 40 ("…Fraser required Garza to report back to Fraser and receive his blessing before receiving additional financing.")); *see Technology Exchange Corporation of America, Inc. v. Grant County State Bank*, 646 F. Supp. 179, 183 (D. Colo. 1986)(finding control in part based on allegation that lender "only disburs[ed] loan proceeds for those expenditures it approved"); *see also Szulik*, 966 F. Supp. 2d at 369 (finding control in part based on allegation that defendant threatened to cut off funding to entity that was part of fraudulent scheme).

Fraser argues that the complaint merely alleges that he offered "suggestions" to Garza, but that Garza was "the ultimate decision-maker, actor and authority on the Companies, their products and their marketing."  (ECF No. 62 at 12-13.)  But this ignores the allegations of 50/50 ownership and joint control discussed above, and some allegations suggesting that it was Fraser who was the ultimate decision maker.  *See* (ECF No. 57 at ¶ 34)("…Garza continued to seek advice and approval from Fraser *before* making decisions concerning the management and policies of their business.")(emphasis added); *see also* (*Id.* at ¶ 74)(Concerning the purchase of a domain name, Fraser allegedly wrote Garza: "Do what you want. Seems like a huge waste of

money to me. Sorry I don't just rubber stamp everything that comes out [] [sic] your mouth").

Fraser also argues that his access to information alone does not establish control. (ECF No. 62 at 14.) But I consider the allegations of access together with the allegations of other indicia of control to assess their combined impact. *Patriot Exploration*, 951 F. Supp. 2d at 362 (A "court must consider the total effect of various indicia of control in combination, rather than examining any one [indicator] in isolation.")(internal quotation marks and citations omitted). Collectively, the allegations in the amended complaint are sufficient to plead control "through ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 240.12b-2.

### 2. Culpable Participation

Culpable participation -- though a longstanding requirement of a Section 20(a) prima facie claim -- has been left undefined by the Court of Appeals. *In re Initial Public Offering*, 241 F. Supp. 2d 281, 394 (S.D.N.Y. 2003)("[T]he Court of Appeals [has]…never addressed the meaning of culpable participation")(internal quotation marks and citations omitted). In that void, two approaches have emerged – one that views culpable participation as a state of mind requirement and thus subject to the PSLRA and one that does not. *Poptech, L.P.*, 792 F. Supp. 2d at 335 ("While some district courts have concluded that the culpable participation requirement is not a state of mind requirement, and thus need not comply with PSLRA, this Court respectfully disagrees.")(internal quotation marks and citations omitted). The former requires the plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with recklessness" – which may be demonstrated by pleading that the "controlling person knew or should have known that the primary violator was engaging in fraudulent conduct" or "ignored obvious signs of fraud." *See, e.g., In re Alstom SA*, 406 F. Supp. 2d 433, 491 (S.D.N.Y. 2005)(internal quotation marks and citations omitted). The latter requires

the plaintiff to allege only control.  *See In re EZ Corp., Inc. Sec. Litig.*, 181 F. Supp. 3d 197, 212 (S.D.N.Y. 2016)(describing that under that standard "naked allegations of control will typically suffice")(internal quotation marks, alterations, and citations omitted).  I need not resolve which approach governs this case because the amended complaint satisfies both.

The amended complaint pleads facts that Fraser was a culpable participant in GAW Miners' and Garza's fraud because he was aware of information that contradicted GAW Miners' public statements about its services.  It alleges that, in May 2014, Garza met with GAW Miners' CFO, Shiraz Moosajee.  (ECF No. 57 at ¶ 91.)  The two "discussed the ZenCloud business model in detail, including the fact that there would be a mismatch between the Companies' mining capacity and customer orders and how customers would be paid" (*Id.*)(internal quotation marks omitted) – a fact that, based on other allegations that GAW Miners was selling more mining capacity than it actually owned and paying new customers with the fees paid by earlier customers rather than with the proceeds of mining activity, was a clear indicator of fraud. Following that meeting, Garza "took the materials from his meeting with Moosajee" and met Fraser at Fraser's home in Armonk, New York.  (*Id.*)  At that meeting, Garza "presented the same information he discussed with Moosajee," including the "fact there would be a mismatch between the companies' mining capacity and customer orders and how customers would be paid."  (*Id.*)  The amended complaint pleads that Fraser blessed the fraud after being presented with this information at the meeting at his home in Armonk: "Fraser told Garza that the ZenCloud looked great."  (*Id.*)  While knowledge of the fraud may not be the only possible inference that might be drawn from these allegations, it is difficult to conjure other "*plausible*, nonculpabale explanations," *Tellabs*, 551 U.S. at 324 (emphasis added), for Fraser's blessing of

the "mismatch" between mining capacity and customer orders, given the allegations about his overall understanding of the business model and how it was being advertised.

The amended complaint further alleges that in a June 10, 2014 email, Moosajee explained to Fraser and Garza that GAW Miners had "no operational system" for "[i]nventory accounting" and therefore "without supply chain operational controls, i.e.[,] purchases [sic] orders, goods received and dispatched notes & inventory, no reliance should be placed on any financial statements." (*Id*. at ¶ 66.) On October 10, 2014, according to the complaint, Fraser was copied on another email highlighting GAW Miners' inventory issues: in that email Garza allegedly wrote, "I cannot[sic] run the business like this. I need that million in order to buy the hardware necessary to fulfill the orders. This has taken too long, with unacceptable results." (*Id*. at ¶ 126.) These allegations are specific and, taken as true, give rise to the requisite "strong inference" that Fraser acted at least with recklessness. Together with the allegations about the meeting at Fraser's home in Armonk, these allegations show that Fraser was aware that "GAW Miners never had sufficient designated equipment to support the hosted mining services they sold to customers or to ship to customers upon request" (*Id*. at ¶ 6) and, therefore, was aware of information that contradicted GAW Miners' public statements. This is enough for culpable participation in the alleged fraud. *See In re Bristol Myers*, 586 F. Supp. 2d at 172 (Defendants "both were aware of information which contradicted the Company's public statements that it would vigorously pursue the Apotex litigation and that a generic launch was at risk. These allegations…more than satisfy the requirement that the control person was a culpable participant in the fraud in some meaningful sense.")(internal quotation marks and citations omitted).

The amended complaint also pleads that Fraser was a culpable participant because he allegedly "personally orchestrated" aspects of the fraud.  (ECF No. 57 at ¶ 12.)  For example, Fraser allegedly was the architect behind the phony acquisition of ZenMiner by GAW Miners.  (*Id*. at ¶ 88)("Fraser came up with the idea of GAW Miners' acquiring ZenMiner…")  He also allegedly participated in the daily operations of the Companies and controlled "GAW Miners' strategic direction, and the content" of the transactions at issue.  *Compare* (*Id*. at ¶¶ 135, 158); *with In re Pfizer Inc. Sec. Litig.*, 584 F. Supp. 2d 621, 641 (S.D.N.Y. 2008)("Plaintiffs' allegation that McKinnell, LaMattina, and Katen participated directly in the day-to-day management of Pfizer and made strategic decisions is sufficient to meet Plaintiffs' pleading obligation as to culpable participation.")(internal quotation marks and citations omitted), *abrogated on other grounds by* 817 F.3d 393, 405 (2d Cir. 2016).

The allegations in the amended complaint, when accepted as true and taken collectively, are enough to create a strong inference that Fraser was at least reckless with respect to the Companies' and Garza's fraud.  *Tellabs*, 551 U.S. at 326 ("In sum, the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?")(internal quotation marks and citations omitted).  While some allegations in the complaint may raise other inferences, the inference concerning Fraser's recklessness "need not be irrefutable, *i.e.*., of the smoking-gun genre, or even the most plausible of competing inferences."  *Id*. at 324 (internal quotation marks, citations, and alterations omitted).  It need only be "strong in light of other explanations," *id*. (internal quotation marks and citations omitted), and it is in this case.

**B. State Law Claims**

 1. CUSA Aiding and Abetting Claim (Count Four)

Plaintiffs also sue Fraser under Conn. Gen. Stat. § 36b-29(a)(2).  The statute imposes

liability on:

> (a) Any person who:…(2) offers or sells or materially assists any person who offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, who knew or in the exercise of reasonable care should have known of the untruth or omission, the buyer not knowing of the untruth or omission, and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission, is liable to the person buying the security,

Conn. Gen. Stat. § 36b–29(a)(2).  To show a violation of the statute, a plaintiff must allege  "in addition to…[a] primary violation,…that the aider and abettor…materially assist[ed] the primary violator in the offer or sale of the securities and in the violation by which the primary violator accomplished the offer or sale…"  *Connecticut Nat. Bank v. Giacomi*, 242 Conn. 17, 53 (1997)(internal quotation marks and citations omitted).

Here the Plaintiffs allege that Fraser "materially assisted Garza and defendants GAW Miners and ZenMiner [to] engage in their fraudulent course of conduct by: (1) providing capitalization and financing and business advice and direction; (2) proposing and directing that his son, Thomas Fraser, pose as the CEO of ZenMiner and that GAW Miners purport to purchase ZenMiner; (3) soliciting potential investors into the companies, informing potential investors about GAW Miners' investment products, and promoting GAW Miners' investment products; (4) providing resources from Cantor Fitzgerald and allowing Garza and the [C]ompanies to associate with the Cantor Fitzgerald brand; and (5) helping create the ZenCloud business model." (ECF No. 57 at ¶ 189.)

Citing *Pearsall Holdings, LP v. Mountain High Funding, LLC*, 2014 WL 7270334, at * 6 (D. Conn. Dec. 18, 2014), Fraser argues that those allegations are insufficient to state a claim under the statute because Plaintiffs do not plead that Fraser made any untrue statement or omission and thus he cannot have materially assisted Garza and the Companies. (ECF No. 62 at 18.) While *Pearsall* does suggest that the making of an untrue statement is required to "materially assist" a primary violator, applicable Connecticut Supreme Court precedent makes clear that it is not. In *Connecticut National Bank v. Giacomi*, 242 Conn. 17 (1997), the Supreme Court held that, under Conn. Gen. Stat. § 36b–29(a)(2), "material assistance" consists of assistance that "has a natural tendency to influence, or was capable of influencing, the decision of the purchaser [of the security]." 242 Conn. at 52-53 (internal quotation marks and citations omitted). The court made clear that true statements – and even conduct unaccompanied by any statement – may satisfy this definition. *See id.* at 53 ("[a] seemingly innocuous oral communication not containing affirmative misrepresentations" may suffice "if it is used to emphasize, or induce reliance on, some other representation that is false or misleading"); *id*. at 54-55 (bank's conduct in giving investor fully endorsed note to sign showed bank's confidence in underlying investment scheme that was to be funded by investors' borrowing of purchase price of investments from bank). Accordingly, Fraser's argument that the amended complaint failed to plead a violation of Section 36b-29(a)(2) because it fails to allege an untrue statement by Fraser misapprehends the applicable law. And, as shown above, the amended complaint pleads numerous facts suggesting that Fraser's public involvement with GAW Miners and Garza, together with Fraser's own position as a senior officer of a major investment bank, "ha[d] a natural tendency to influence, or was capable of influencing, the decision of the purchasers." *Giacomi*, 242 Conn. at 52-53.

2. CUSA Control Person Claim (Count Six)

Plaintiffs also sue Fraser under Conn. Gen. Stat. § 36b–29(c). The statute imposes

liability on:

> (c) Every person who directly or indirectly controls a person liable under subsections (a) and (b) of this section, every partner, officer or director of such a person, every person occupying a similar status or performing similar functions, every employee of such a person who materially aids in the act or transaction constituting the violation and every broker-dealer or agent who materially aids in the act or transaction constituting the violation are also liable jointly and severally with and to the same extent as such person, unless the person who is so liable sustains the burden of proof that he did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist. There shall be contribution as in cases of contract among the several persons so liable.

Conn. Gen. Stat. § 36b–29(c). Plaintiffs assert that Fraser is liable under the statute as a person

who controls a primary violator, including a person "occupying a similar status or similar

functions" as a director of the Companies, by virtue of his status as a both a partner and a *de facto*

board member of the Companies. (ECF No. 63 at 41.) In *Giacomi*, the Connecticut Supreme

Court explained that in assessing whether a person is liable as "a person occupying a similar status

or performing similar functions" within the meaning of Conn. Gen. Stat. § 36b–29(c), the "proper

inquiry is whether a person occupies a status or performs functions similar to the status and

function of a partner, officer, or director." 242 Conn. at 58 (internal quotation marks and citations

omitted); *see also id.* at 61 (explaining that under Conn. Gen. Stat. § 36b–29(c), "a party must

occupy a status or perform a function similar to that of a general partner, or officer, or director in

order to be held liable….)(internal quotation marks and citations omitted). Allegations of material

assistance are not required for this theory. *Id.* (noting that CUSA "expressly creates two types of

secondary liability for securities fraud: control person liability; and aiding and abetting liability.

Control persons such as partners, officers and directors logically fall under the control person

heading. Employees, agents, and broker-dealers logically fall under the aider and abettor heading because of the additional requirement in those sections that one materially aid in the act or transaction that constitutes the violation")(internal quotation marks and citations omitted). The amended complaint's allegations plainly support a claim under Conn. Gen. Stat. § 36b–29(c). The amended complaint pleads not only that Fraser was a partner in the Companies and a *de facto* board member, it also alleges, as discussed above, that he was a culpable participant. Those allegations are more than sufficient to allege that Fraser was "a person [who] occupie[d] a status or perform[ed] functions similar to the status and function of a partner, officer, or director." *Giacomi*, 242 Conn. at 58 (internal quotation marks and citations omitted).

### 3. Common Law Aiding and Abetting (Count Eight)

Fraser also seeks to dismiss Plaintiffs' claim against him for aiding and abetting the Companies and Garza in common law fraud. To state an aiding and abetting common law fraud, "a plaintiff must allege with particularity that: (1) the party aided by the defendant performed a wrongful act; (2) the defendant generally was aware of his role as part of an illegal or tortious activity at the time he provided the assistance; and (3) the defendant knowingly and substantially assisted the principal violation." *In re Colonial Ltd. Partn. Litig.*, 854 F. Supp. 64, 102–03 (D. Conn. 1994)(internal quotation marks and citations omitted). Fraser argues that the amended complaint's allegations do not show he knew or substantially assisted in the alleged fraud by Garza and the Companies. I disagree. The allegations discussed above showing that Fraser was a culpable participant for purposes of Section 20(a) of the Exchange Act are also sufficient to state a claim for aiding and abetting under the common law.

**V.    Conclusion**

For the reasons set forth above, the motion to dismiss is **DENIED**.

IT IS SO ORDERED.

/s/_____
Michael P. Shea, U.S.D.J.

Dated:          Hartford, Connecticut
                October 11, 2017