# EXHIBIT B

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| DENIS MARC AUDET, MICHAEL PFEIFFER, and DEAN ALLEN SHINNERS, Individually and on Behalf of All Others Similarly Situated,<br><br>      Plaintiffs,<br><br>vs.<br><br>HOMERO JOSHUA GARZA, STUART A. FRASER, GAW MINERS, LLC, and ZENMINER, LLC, (d/b/a ZEN CLOUD),<br>      Defendants. | Case 3:16-cv-00940<br><br>Hon. Michael P. Shea<br>Courtroom 2<br><br>ECF Case<br><br><u>CLASS ACTION</u><br><br>**DECLARATION OF ARVIND NARAYANAN IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**<br><br><u>DEMAND FOR JURY TRIAL</u> |

I, Arvind Narayanan, declare as follows:

1.  I have been retained by Susman Godfrey, counsel for the Plaintiffs in this case, as an expert to support Plaintiffs' motion for class certification. In particular, I have been asked to provide an explanation of cryptocurrency mining and describe a few specific products offered by GAW Miners.

2.  I am an associate Professor of Computer Science at Princeton University. I earned a PhD in computer science from the University of Texas at Austin. I have been researching cryptocurrency technology since 2013 and have authored numerous peer-reviewed publications in this field. I have taught courses on cryptocurrencies and blockchains since 2014. I am the lead author of a textbook on the topic that has been used in over a hundred courses around the country and worldwide. A copy of my Curriculum Vitae is attached hereto as Exhibit 1.

3.     In preparing this Declaration, I have relied on my general knowledge, training, experience, and expertise, as well as the documents cited herein

## CRYPTOCURRENCIES

4.     Cryptocurrencies such as bitcoin are digital assets used as a medium of exchange. Each cryptocurrency has an electronic public ledger known as a "blockchain" associated with it. Transfers of cryptocurrency units are recorded on this blockchain, which is designed to resist modification through the use of cryptographic protocols – hence the name cryptocurrency.

5.     Many cryptocurrencies, including bitcoin, use a process known as "mining" to verify transactions and ensure the integrity of the blockchain. Miners are entities that operate software to review proposed transactions and aggregate them into blocks to be added to the blockchain. In addition to verifying the legitimacy of the individual transactions included in a proposed block, miners must solve computational puzzles requiring repeated calculations known as hashes. Each block that becomes part of the blockchain includes a fixed number of new bitcoins (currently 12.5) which are allocated to the miner as a reward for its contribution to the blockchain. This process enables cryptocurrencies to operate with no central issuing authority.

6.     Bitcoin's code is designed to automatically increase the difficulty of the computational puzzles as the amount of computing power devoted to mining increases. As bitcoins become more valuable, it entices miners to dedicate more computing capacity to mining (in order to generate the increasingly valuable rewards). As a result, the difficulty of solving the computational puzzles also increases. When bitcoin was first launched, the difficulty of the puzzles was such that hobbyists could successfully mine with a home laptop. By 2014, when the events giving rise to this case occurred, bitcoin mining was performed almost exclusively by specially-designed and fully-dedicated computers. An individual mining device's hashing power

is denominated in terms of millions of hashing calculations, or "megahashes," performed per second.

7.      Bitcoin's code specifies that new blocks be generated at a rate that averages to one every ten minutes. Thus, an individual miner, depending on his mining power, may be able to win a reward only once in several days or months. When he does win, however, the reward is substantial – at the current price of bitcoin, it is worth over 75,000 U.S. Dollars. This is somewhat analogous to buying lottery tickets. To minimize unpredictability and ensure a steady revenue stream, miners frequently combine their computing power into mining "pools." Generally, the more computing power directed to a particular mining pool, the better the chance that pool will be the first to confirm a block of transactions and receive the reward. Typically, pool participants' shares of the mining reward depend upon the proportional amount of computing power each contributes to the pool.

8.      For most of bitcoin's existence, the difficulty of mining puzzles (measured by computational effort required) has grown at a rapid clip. For example, over the course of year 2014 it grew about 30-fold. Due to this growth in difficulty, a given piece of mining equipment, even if it represents the newest and most efficient technology when it is purchased, will rapidly erode in value. For the same reason, a fixed number of megahashes per second will earn fewer and fewer cryptocurrency units per day as time passes.

9.      Cloud mining is the use of shared mining capacity housed in warehouses called data centers. The data center operator owns and operates mining machines, and allows customers lease either machines or a certain quantity of megahashes per second. Customers benefit from the operator's knowhow of operating mining machines. The operator is insulated to some degree

from the financial risks of mining such as cryptocurrency exchange rate fluctuation and increases in mining difficulty.

10. Anyone may attempt to launch a new cryptocurrency by publishing open-source software that specifies the rules of its operation. The cryptocurrency is generally considered to exist if two conditions are met: its blockchain is maintained through mining or another process, and the cryptocurrency is traded on exchanges. The value of a unit of cryptocurrency is simply what someone is willing to pay for it, and is determined by observing trades on cryptocurrency exchanges.

## ANALYSIS OF CLOUD MINING PRODUCTS

11. In 2014, GAW Miners began offering Cloud Hosted Mining. Customers buying a Cloud Hosted Mining device were told they could control their mining equipment through the Internet by logging on to the accounts they established on ZenMiner's website interface called ZenCloud. Through ZenCloud, investors could direct their miners to the pool of their choice. However, the companies soon changed their operating procedure so that mining power was not in fact directed to the customer's pool-of-choice; rather, they simply paid customers based on what those pools would have generated. *See Deposition of J. Mordica,* June 28, 2018, at pp. 32-52 (attached as Exhibit 2).

12. Later, in August 2014, the companies began selling a product known as "Hashlets." Rather than paying for control of a mining device, customers paid for control of a specific quantity of mining power, in units of megahashes per second. Customers paid a fixed up-front cost to acquire a Hashlet and a daily maintenance fee to operate it. Hashlets supposedly earned a return based on the amount of cryptocurrency rewards generated when the pools to which the Hashlets' computing power was directed succeeded solving computational puzzles and

adding blocks to the blockchain. Effectively, Hashlet customers purchased the rights to profit from a slice of computing power owned by GAW.

13.     However, the remote management software for Hashlets that was offered to customers did not interact with any mining hardware; Hashlets were not backed by physical mining. The companies lacked the equipment to make payments to customers based on actual mining. Instead, Hashlet payouts were made based on the daily, average returns from a particular mining pool. *See Deposition of M. Eden*, June 26, 2018 at pp. 47-48 (attached as Exhibit 3); *Deposition of J. Mordica*, June 28, 2018 at 57-59, 63-65 (Exhibit 2).

14.     GAW Miners' website and marketing materials (currently available through Archive.org) described Hashlets as always profitable because of declining maintenance costs over time. However, in my opinion Defendants had no reasonable basis for making these statements. Even if the maintenance fee charged to customers were to drop to zero, Hashlets might become unprofitable based solely on the up-front fee paid by customers, due to factors outside GAW Miners' control, such as the increasing difficulty of mining.

## ANALYSIS OF CRYPTOCURRENCY LAUNCHED BY DEFENDANTS

15.     In November 2014, the companies announced plans to launch a new cryptocurrency called "Paycoin." In advance of Paycoin's launch, the companies began transitioning the payout structure for Hashlets. Instead of mining cryptocurrency, a customer's Hashlets would generate "Hashpoints", a new product introduced by the companies. Hashpoints were convertible promissory notes that investors could later exchange for Paycoin once Paycoin launched. *See Deposition of M. Eden*, June 26, 2018, at pp. 62-63 (Exhibit 3). A major promised feature of Paycoin was a $20 price floor. This minimum value would be maintained, according to the companies, through a $100,000,000 "Coin Adoption Fund" which would be used to buy

Paycoin as necessary. *See Deposition of M. Pfeiffer*, July 19, 2018, at p. 121 (Exhibit 4); *Plea agreement of Joshua Garza,* July 20, 2017, at p. 10 (Exhibit 5).

16.     When Paycoin was introduced, its price never reached $20 on outside cryptocurrency exchanges: according to data from coinmarketcap.com, Paycoin traded at between $6 and $16 on non-GAW exchanges until December 31, 2014. It traded at a high of $15 per coin on December 31, 2014; the price quickly fell from that high and never recovered. I have seen no evidence that a $100,000,000 Coin Adoption Fund existed. When the companies released their Paybase payment platform, it lacked the promised features, including negotiability with major retailers. After this, the Paycoin price fell even more rapidly.

Dated: 09 / 12 / 2018

Arvind Narayanan

# EXHIBIT 1

# Curriculum Vitae for Arvind Narayanan

arvindn@cs.princeton.edu
609-258-9302

http://randomwalker.info/
@random_walker

Associate Professor, Department of Computer Science, Princeton University.

Affiliate Faculty member, Center for Information Technology Policy, Princeton University.

Affiliate Faculty member, Bendheim Center for Finance, Princeton University.

Affiliate Scholar, Center for Internet and Society, Stanford Law School.

## 1. *Education and work history*

- Associate Professor, Department of Computer Science, Princeton University, Jul 2018 – present.
- Assistant Professor, Department of Computer Science, Princeton University, Sep 2012 – Jun 2018.
- Postdoctoral fellow, Department of Computer Science, Stanford University, Jun 2009 – Aug 2012. Advisor: Dan Boneh.
- Ph.D., Computer Science, The University of Texas at Austin, Aug 2004 – May 2009. Advisor: Vitaly Shmatikov.
- Summer internship. SRI International, Palo Alto CA 2007.
- Summer internship. Microsoft Research, Mountain View CA 2006.
- M.Tech, Computer Science, Indian Institute of Technology, Madras, India. Dual degree, 1999-2004.
- B. Tech, Computer Science, Indian Institute of Technology, Madras, India. Dual degree, 1999-2004.

## 2. *Research advisees*

- Gunes Acar, CITP postdoctoral fellow, 2017 –
- Malte Möser, Ph.D., 2016 –
- Claudia Roberts, MSE, 2016 –
- Aylin Caliskan, CITP postdoctoral fellow, 2015 – 2018
- Miles Carlsten, MSE, 2014 – 2016.
- Paul Ellenbogen, Ph.D., 2014 –
- Harry Kalodner, Ph.D., 2014 –
- Solon Barocas, CITP postdoctoral fellow, 2014 -- 2016.
- Joseph Bonneau, CITP postdoctoral fellow, 2014 – 2015.
- Steven Englehardt. Ph.D., 2013 – 2018.
- Steven Goldfeder. Ph.D., 2013 – 2018.
- Peter Zimmerman. MSE, 2013 – 2015.
- Christian G. Eubank. MSE, 2012 – 2014.

## 3. *Publications*

### Books, book chapters

- <u>Arvind Narayanan</u>, Dillon Reisman.
  *The Princeton Web Transparency and Accountability Project.*
  In "Transparent data mining for Big and Small Data". Editors: Tania Cerquitelli, Daniele Quercia, and Frank Pasquale. Springer 2017.
- <u>Arvind Narayanan</u>, Joseph Bonneau, Edward W. Felten, Andrew Miller, Steven Goldfeder.
  *Bitcoin and Cryptocurrency Technologies: A Comprehensive Introduction.*
  Princeton University Press 2016.
  **Runner up for the 2017 PROSE Award in Computing and Information Sciences, Association of American Publishers.**
- <u>Arvind Narayanan</u>, Vitaly Shmatikov.
  *Uncircumventable Enforcement of Privacy Policies via Cryptographic Obfuscation.*
  In "Digital Privacy: Theory, Technologies and Practices". Editors: A. Acquisti, S. Di Vimercati, S. Gritzalis, and C. Lambrinoudakis. Auerbach Publications 2007.

### Refereed articles in journals, conferences, law reviews, workshops

- Arunesh Mathur, Jessica Vitak, <u>Arvind Narayanan</u>, Marshini Chetty.
  *Characterizing the Use of Browser-Based Blocking Extensions To Prevent Online Tracking.*
  Symposium on Usable Privacy and Security (SOUPS) 2018.
- Gunes Acar, Danny Yuxing Huang, Frank Li, <u>Arvind Narayanan</u>, Nick Feamster.
  Web-based Attacks to Discover and Control Local IoT Devices.
  ACM SIGCOMM Workshop on IoT Security and Privacy, 2018.
- Steven Goldfeder, Harry Kalodner, Dillon Reisman, <u>Arvind Narayanan</u>.
  *When the cookie meets the blockchain: Privacy risks of web payments via cryptocurrencies.*
  Proceedings on Privacy Enhancing Technologies (PoPETs) 2018.
- Arunesh Mathur, <u>Arvind Narayanan</u>, Marshini Chetty.
  *An Empirical Study of Affiliate Marketing Disclosures on YouTube and Pinterest.*
  ACM Conference on Computer-Supported Cooperative Work and Social Computing (CSCW) 2018.
- Malte Möser, Kyle Soska, Ethan Heilman, Kevin Lee, Henry Heffan, Shashvat Srivastava, Kyle Hogan, Jason Hennessey, Andrew Miller, <u>Arvind Narayanan</u>, Nicolas Christin.
  *An Empirical Analysis of Linkability in the Monero Blockchain.*
  Proceedings on Privacy Enhancing Technologies (PoPETs) 2018.
- Aylin Caliskan-Islam, Fabian Yamaguchi, Edwin Dauber, Richard Harang, Konrad Rieck, Rachel Greenstadt, <u>Arvind Narayanan</u>.
  *When coding style survives compilation: De-anonymizing programmers from executable binaries.*
  Network and Distributed Systems Security Symposium (NDSS) 2018.
- Steven Englehardt, Jeffrey Han, <u>Arvind Narayanan</u>.
  *I never signed up for this! Privacy implications of email tracking.*
  Proceedings of the Privacy Enhancing Technologies Symposium (PETS) 2018.

- Aylin Caliskan, Joanna J. Bryson, <u>Arvind Narayanan</u>.
  *Semantics derived automatically from language corpora contain human-like biases.*
  Science 2017.
- Lukasz Olejnik, Steven Englehardt, <u>Arvind Narayanan</u>.
  *Battery Status Not Included: Assessing Privacy in Web Standards.*
  International Workshop on Privacy Engineering 2017.
  **Best paper award.**
- Steven Goldfeder, Joseph Bonneau, Rosario Gennaro, <u>Arvind Narayanan</u>.
  *Escrow protocols for cryptocurrencies: How to buy physical goods using Bitcoin.*
  Financial Cryptography and Data Security 2017.
- Matthew Zook, Solon Barocas, danah boyd, Kate Crawford, Emily Keller, Seeta Peña Gangadharan,
  Alyssa Goodman, Rachelle Hollander, Barbara A. Koenig, Jacob Metcalf, <u>Arvind Narayanan</u>, Alondra
  Nelson, Frank Pasquale.
  *Ten simple rules for responsible big data research.*
  PLoS Computational Biology 2017.
- Jessica Su, Ansh Shukla, Sharad Goel, <u>Arvind Narayanan</u>.
  *De-anonymizing Web Browsing Data with Social Networks.*
  International World Wide Web Conference (WWW) 2017.
- Steven Goldfeder, Joseph Bonneau, Rosario Gennaro, <u>Arvind Narayanan</u>.
  *Escrow protocols for cryptocurrencies: How to buy physical goods using Bitcoin.*
  Financial Cryptography 2017.
- Steven Englehardt, <u>Arvind Narayanan</u>.
  *Online tracking: A 1-million-site measurement and analysis.*
  ACM Conference on Computer and Communications Security 2016.
  **Future of Privacy Forum Privacy Papers for Policy Makers Award.**
- Miles Carlsten, Harry Kalodner, S. Matthew Weinberg, <u>Arvind Narayanan</u>.
  *On the instability of Bitcoin without the block reward.*
  ACM Conference on Computer and Communications Security 2016.
- Rosario Gennaro, Steven Goldfeder, <u>Arvind Narayanan</u>.
  *Threshold-optimal DSA/ECDSA signatures and an application to Bitcoin wallet security.*
  Applied Cryptography and Network Security 2016.
- Aylin Caliskan-Islam, Richard Harang, Andrew Liu, <u>Arvind Narayanan</u>, Clare Voss, Fabian Yamaguchi,
  Rachel Greenstadt.
  *De-anonymizing Programmers via Code Stylometry.*
  Usenix Security Symposium 2015.
- Harry Kalodner, Miles Carlsten, Paul Ellenbogen, Joseph Bonneau, <u>Arvind Narayanan</u>.
  *An empirical study of Namecoin and lessons for decentralized namespace design.*
  Workshop on the Economics of Information Security (WEIS) 2015.
- <u>Arvind Narayanan</u>, Bendert Zevenbergen.
  *No Encore for Encore? Ethical Questions for Web-Based Censorship Measurement.*
  Technology Science 2015.

- Joseph Bonneau, Andrew Miller, Jeremy Clark, Joshua Kroll, Edward W. Felten, Arvind Narayanan.
  *Research Perspectives and Challenges for Bitcoin and Cryptocurrencies.*
  IEEE Security & Privacy 2015.

- Arvind Narayanan, Joanna Huey, Edward Felten.
  *A Precautionary Approach to Big Data Privacy.*
  Computers, Privacy & Data Protection 2015.
  **Future of Privacy Forum Privacy Papers for Policy Makers Award.**

- Steven Englehardt, Dillon Reisman, Christian Eubank, Peter Zimmerman, Jonathan Mayer, Edward Felten, Arvind Narayanan.
  *Cookies that give you away: The surveillance implications of web tracking.*
  International World Wide Web Conference (WWW) 2015.

- Gunes Acar, Christian Eubank, Steven Englehardt, Marc Juarez, Arvind Narayanan, Claudia Diaz.
  *The Web never forgets: Persistent tracking mechanisms in the wild.*
  ACM Conference on Computer and Communications Security (CCS) 2014.

- Yaniv Erlich, Arvind Narayanan.
  *Routes for breaching and protecting genetic privacy.*
  Nature Reviews Genetics, 2014.

- Jeremy Clark, Joseph Bonneau, Edward W. Felten, Joshua Kroll, Andrew Miller, Arvind Narayanan.
  *On Decentralizing Prediction Markets and Order Books.*
  Workshop on the Economics of Information Security (WEIS) 2014.

- Joseph Bonneau, Arvind Narayanan, Andrew Miller, Jeremy Clark, Joshua Kroll, Edward W. Felten.
  *Mixcoin: Anonymity for Bitcoin with accountable mixes.*
  Financial Cryptography 2014.

- Arvind Narayanan.
  *Privacy technologies: An annotated syllabus.*
  HotPETS 2013.

- Jonathan Mayer, Arvind Narayanan.
  *Privacy Substitutes.*
  66 Stanford Law Review Online 89. 2013.

- Christian Eubank, Marcela Melara, Diego Perez-Botero, Arvind Narayanan.
  *Shining the Floodlights on Mobile Web Tracking — A Privacy Survey.*
  Web 2.0 Security & Privacy (W2SP) 2013.

- Suman Jana, Arvind Narayanan, Vitaly Shmatikov.
  *A Scanner Darkly: Protecting User Privacy from Perceptual Applications.*
  In IEEE Security and Privacy 2013.
  **2014 Privacy Enhancing Technologies Award.**

- Arvind Narayanan, Vincent Toubiana, Solon Barocas, Helen Nissenbaum, Dan Boneh.
  *A Critical Look at Decentralized Personal Data Architectures.*
  Data Usage Management on the Web (DUMW) workshop 2012.

- Arvind Narayanan, Hristo Paskov, Neil Gong, John Bethencourt, Richard Shin, Emil Stefanov, Dawn Song.

*On the Feasibility of Internet-scale Author Identification.*
IEEE Security & Privacy 2012.

- <u>Arvind Narayanan</u>, Elaine Shi, Benjamin I. P. Rubinstein.
*Link Prediction by De-anonymization: How We Won the Kaggle Social Network Challenge.*
International Joint Conference on Neural Networks (IJCNN) 2011.

- Joseph A. Calandrino, <u>Arvind Narayanan</u>, Ann Kilzer, Edward W. Felten, Vitaly Shmatikov.
*You Might Also Like: Privacy Risks of Collaborative Filtering.*
IEEE Security & Privacy 2011.

- <u>Arvind Narayanan</u>, Narendran Thiagarajan, Mugdha Lakhani, Mike Hamburg, Dan Boneh.
*Location Privacy via Private Proximity Testing.*
Network and Distributed Systems Security Symposium (NDSS) 2011.
**Distinguished paper award.**

- <u>Arvind Narayanan</u>, Vincent Toubiana, Dan Boneh, Helen Nissenbaum and Solon Barocas.
*Adnostic: Privacy Preserving Targeted Advertising.*
Network and Distributed Systems Security Symposium (NDSS) 2010.

- <u>Arvind Narayanan</u>, Vitaly Shmatikov.
*De-anonymizing Social Networks.*
IEEE Security & Privacy 2009.

- <u>Arvind Narayanan</u>, Vitaly Shmatikov.
*Robust De-anonymization of Large Sparse Datasets.*
IEEE Security & Privacy 2008.
**2008 Privacy Enhancing Technologies Award.**

- <u>Arvind Narayanan</u>, Vitaly Shmatikov.
*Obfuscated Databases and Group Privacy.*
ACM Conference on Computer and Communications Security (CCS) 2005.

- <u>Arvind Narayanan</u>, Vitaly Shmatikov.
*Fast Dictionary Attacks on Passwords Using Time-Space Tradeoff.*
ACM Conference on Computer and Communications Security (CCS) 2005.

- Kannan Srinathan, <u>Arvind Narayanan</u>, C. Pandu Rangan.
*Optimal Perfectly Secure Message Transmission.*
Advances in Cryptology – CRYPTO 2004.

- Vinod Vaikuntanathan, <u>Arvind Narayanan</u>, Kannan Srinathan, C. Pandu Rangan, Kwangjo Kim.
*On the power of Computational Secret Sharing.*
Indocrypt 2003.

- <u>Arvind Narayanan</u>, C. Pandu Rangan, Kwangjo Kim.
*Practical Pay TV Schemes.*
Australasian Conference on Information Security and Privacy (ACISP) 2003.

# Invited articles, magazine articles, surveys, essays

- <u>Arvind Narayanan</u>, Jeremy Clark.
*Bitcoin's academic pedigree.*
Communications of the ACM, 2017.

- Arvind Narayanan, Jeremy Clark.
  *Bitcoin's academic pedigree.*
  ACM Queue, 2017.
- Andrew Miller, Arvind Narayanan.
  *Research for Practice: Cryptocurrencies, Blockchains, and Smart Contracts.*
  ACM Queue, 2016.
- Arvind Narayanan, Shannon Vallor.
  *Why software engineering courses should include ethics coverage.*
  Communications of the ACM, 2014.
- Solon Barocas, Seda Guerses, Arvind Narayanan, Vincent Toubiana.
  *Unlikely Outcomes? A Distributed Discussion on the Prospects and Promise of Decentralized Personal Data Architectures.*
  Institute of Network Cultures Reader series 2013.
- Arvind Narayanan.
  *What Happened to the Crypto Dream?*
  IEEE Security and Privacy Magazine 2013.
- Arvind Narayanan, Vitaly Shmatikov.
  *Myths and Fallacies of Personally Identifiable Information.*
  Communications of the ACM, June 2010.
- Arvind Narayanan, Kannan Srinathan, C. Pandu Rangan.
  *Perfectly Reliable Message Transmission.*
  Information Processing Letters 100:1, pages 23–28, 2006.

## Other: Unrefereed articles, tech reports, expert reports, PhD theses

- Ian Lundberg, Arvind Narayanan, Karen E. C. Levy, Matthew J. Salganik.
  *Privacy, ethics, and high-dimensional social science data: A case study of the Fragile Families Challenge.*
  Northeast Privacy Scholars Workshop 2017.
- Arvind Narayanan, Malte Möser.
  *Obfuscation in Bitcoin: Techniques and Politics.*
  International Workshop on Obfuscation: Science, Technology, and Theory, 2017.
- Harry Kalodner, Steven Goldfeder, Alishah Chator, Malte Möser, Arvind Narayanan.
  *BlockSci: Design and applications of a blockchain analysis platform.* 2017.
- Noah Apthorpe, Dillon Reisman, Srikanth Sundaresan, Arvind Narayanan, and Nick Feamster.
  *Spying on the Smart Home: Privacy Attacks and Defenses on Encrypted IoT Traffic.* 2017.
- Grant Storey, Dillon Reisman, Jonathan Mayer, Arvind Narayanan.
  *The future of ad blocking: An analytical framework and new techniques.* 2017.
- Steven Englehardt, Christian Eubank, Peter Zimmerman, Dillon Reisman, Arvind Narayanan.
  *Web Privacy Measurement: Scientific principles, engineering platform, and new results.* 2014.
- Arvind Narayanan, Edward W. Felten.
  *No silver bullet: De-identification still doesn't work.* 2014.

- Claude Castellucia, <u>Arvind Narayanan</u>.
  *Privacy considerations of online behavioural tracking.*
  European Network and Information Security Agency (ENISA) special report 2012.
- Jonathan Mayer, <u>Arvind Narayanan</u>, Sid Stamm.
  *Do Not Track: A Universal Third-Party Web Tracking Opt Out.*
  IETF Internet Draft. 2011.
- <u>Arvind Narayanan</u>.
  *Data Privacy: The Non-Interactive Setting.*
  University of Texas at Austin Dissertation Series. Proquest, UMI Dissertation Publishing, 2009.
- <u>Arvind Narayanan</u>, Ilya Mironov.
  *Domain Extensions for Random Oracles: Beyond the Birthday-paradox Bound.*
  Proceedings of the ECRYPT Hash Workshop 2007.

## 4. *Teaching*

- Fall 2017.
  COS 597E: Advanced Topics in Computer Science: Fairness in Machine Learning.
- Spring 2017.
  Independent work seminar: Measuring the societal impact of technology.
- Fall 2016.
  Independent work seminar: Bitcoin, Blockchains, and Smart Contracts.
- Spring 2016.
  COS 226: Data Structures and Algorithms.
- Fall 2015 – present.
  Bitcoin and cryptocurrency technologies *(Coursera)*.
  Number enrolled: 75,000.
- Fall 2015-16.
  COS 432: Information Security.
- Fall 2014-15.
  COS 597E. Advanced Topics in Computer Science: Bitcoin and cryptocurrency technologies.
- Spring 2014.
  COS 598B. Advanced Topics in Computer Science: Privacy Technologies.
- Fall 2013-14.
  COS 432: Information Security.
- Spring 2013.
  COS 226: Data Structures and Algorithms. Co-taught with Dr. Josh Hug.
- Fall 2012-13.
  COS 597D. Advanced Topics in Computer Science: Privacy Technologies.
  FRS 125. Freshman Seminar: Friending, Following, Finding. Co-taught with Prof. Andrea LaPaugh.

## 5. Research grants

- NSF Award IIS-1704444.
  *Pervasive Data Ethics for Computational Research.* 2017-2021.
- Keys / Emerson Electric Junior Faculty Award, 2017.
- NSF Award CNS-1651938.
  *CAREER: Measurement, Analysis, and Novel Applications of Blockchains.* 2017-2022.
- Mozilla Research Grant, 2016.
- NSF Award CNS-1526353.
  *Online tracking: Threat Detection, Measurement and Response.* 2015-2018.
- Data Transparency Lab Research Grant, 2015.
- Google Faculty Research Award, 2015.
- NSF Award CNS-1421689.
  *Addressing the challenges of cryptocurrencies: Security, anonymity, stability.* 2014-2018.

## 6. Program Committees

- USENIX Enigma 2019.
- Conference on Fairness, Accountability, and Transparency (FAT*) 2019.
- Privacy Enhancing Technologies Symposium (PETS) 2019.
- Northeast Privacy Scholars Workshop 2018.
- Workshop on Technology and Consumer Protection (ConPro) 2018 (co-chair).
- Workshop on the Economics of Information Security (WEIS) 2018.
- IEEE S&P (Oakland) 2018.
- Privacy Enhancing Technologies Symposium (PETS) 2018.
- Northeast Privacy Scholars Workshop 2017.
- Fairness, Accountability, and Transparency in Machine Learning (FAT-ML) 2017
- CVPR workshop on Privacy and Security 2017.
- Workshop on Technology and Consumer Protection (ConPro) 2017 (co-chair).
- Financial Cryptography 2017.
- Workshop on the Economics of Information Security (WEIS) 2017.
- Privacy Enhancing Technologies Symposium (PETS) 2017.
- Workshop on Data and Algorithmic Transparency 2016 (co-chair).
- Usenix Security Symposium 2016.
- ACM Conference on Computer and Communications Security (CCS) 2016.
- Workshop on Bitcoin and Blockchain Research 2016.
- Workshop on the Economics of Information Security (WEIS) 2016.
- ACM Conference on Computer and Communications Security (CCS) 2015.
- Workshop on Privacy and Inference 2015.
- IEEE Security & Privacy (Oakland) 2015.
- Privacy Enhancing Technologies Symposium (PETS) 2014.
- Workshop on the Economics of Information Security (WEIS) 2014.

- Financial Cryptography 2014.
- Hot Topics in Privacy Enhancing Technologies (HotPETs) 2013.
- World Wide Web Conference (Security, Privacy, Trust, and Abuse) 2013.
- IEEE Security & Privacy (Oakland) 2013.
- W3C "Do Not Track and Beyond" Workshop 2012.
- IEEE Security & Privacy (Oakland) 2012.
- Security and Social Networking (SESOC) workshop 2012.
- Privacy Enhancing Technologies Symposium (PETS) 2012.
- Workshop on Artificial Intelligence and Security (AISEC) 2011.
- ACM Conference on Computer and Communications Security (CCS) 2011.
- USENIX Workshop on Health Security and Privacy (HealthSec) 2011.
- Privacy Enhancing Technologies Symposium (PETS) 2011.

## 7. *Conferences organized*

- Workshop on Technology and Consumer Protection (ConPro). San Jose, May 2018.
  Co-organizer: Joseph Calandrino.
- CITP Conference on Ethics of Computer Science Research. Princeton University, May 2017.
  Co-organizer: Ben Zevenbergen.
- Dagstuhl Seminar 17162: Online Privacy and Web Transparency. Saarland, Germany, April 2017.
  Co-organizers: Nataliia Bielova, Nikolaos Laoutaris, Nick Nikiforakis.
- Workshop on Technology and Consumer Protection (ConPro). San Jose, May 2017.
  Co-organizer: Joseph Calandrino.
- Workshop on Data and Algorithmic Transparency. New York City, Nov 2016.
  Co-organizer: Alan Mislove.
- Web Transparency and Accountability Conference. Princeton University, March 2014.
  Co-organizer: Solon Barocas.
- Bitcoin and Cryptocurrency Research Conference. Princeton University, March 2014.
  Co-organizer: Edward Felten.
- "Accelerate Genomic Research with Privacy Protections" workshop. Banbury Center, Dec 2013.
  Co-organizers: Yaniv Erlich, Bob Kain.

## 8. *Advisory boards, Editorial boards, Award committees, Steering committees*

- Conference on Fairness, Accountability, and Transparency Steering Committee 2017 – 2019.
- USACM public policy council, ongoing.
- Acceptable Ads Committee, ongoing.
- Fragile Families Challenge Advisory Board, 2017.
- Journal of Technology Science Editorial Board, 2015 – 2017.
- Data Transparency Lab Grants Program Research Committee, 2015.

- Council for Big Data, Ethics and Society.
  (Advisory council for NSF Big Data projects, funded by an NSF EAGER.)
- Privacy Enhancing Technologies Award Committee, 2014.
- Stanford Cookie Clearinghouse Advisory Board.
- Heritage Health Prize Advisory Board.
  ($3MM machine-learning prize for improving healthcare predictions.)
- NIH Distinguished Advisory Board for Silent Spring Institute–Harvard–Brown grant (R01 ES021726): "Data Sharing and Privacy Protection in Digital-Age Environmental Health Studies."

## 9. *Selected press*

- *Cryptocurrencies Come to Campus*
  New York Times, Feb 08, 2018
- *Exercise App Shows Why Anonymous Data Can Still Be Dangerous*
  CBC Radio, Feb 02, 2018
- *More Than 480 Web Firms Record 'Every Keystroke'.*
  BBC News, Nov 21, 2017.
- *AI programs exhibit racial and gender biases, research reveals.*
  The Guardian, Apr 13, 2017.
- *Online Trackers Follow Our Digital Shadow by 'Fingerprinting' Browsers, Devices.*
  All Things Considered (NPR), Sep 26, 2016.
- *Browser 'Fingerprints' Help Track Users.*
  BBC News, Jul 22, 2014.
- *Meet the Online Tracking Device That Is Virtually Impossible to Block.*
  ProPublica, Jul 21, 2014.
- *Arvind Narayanan Isn't Anonymous, and Neither Are You.*
  WIRED, Jun 18, 2012.
- *The End of Anonymous Commenting.*
  On the Media (NPR), Mar 02, 2012.
- *The Privacy Challenge in Online Prize Contests.*
  NYTimes Bits blog, May 21, 2011.
- *Do Not Track Me Online, Please.*
  CBC News, Mar 22, 2011.
- *How Privacy Vanishes Online, a Bit at a Time.*
  New York Times, Mar 17, 2010.
- *Social Sites Dent Privacy Efforts.*
  BBC News, Mar 27, 2009.

# EXHIBIT 2

1         JOE MORDICA - JUNE 28, 2018

2         UNITED STATES DISTRICT COURT

3         DISTRICT OF CONNECTICUT

4

5  DENIS MARC AUDET, MICHAEL

    PFEIFFER, DEAN ALLEN SHINNERS,

6  and JASON VARGAS, Individually and

    on Behalf of All Others Similarly

7  Situated,

8      Plaintiffs,

9  VERSUS          CASE NO. 3:16-cv-00940,

10  STUART A. FRASER, GAW MINERS,

    LLC, and ZENMINER, LLC, (d/b/a

11  ZENCLOUD),

12      Defendants.

13  HONORABLE MICHAEL P. SHEA, COURTROOM 2

14  ECF CASE

15  CLASS ACTION

16

17

18

19     VIDEOTAPED DEPOSITION OF JOE MORDICA

20    Taken at the La Quinta Inn & Suites

21  Hattiesburg, 109 Lundy Lane, Hattiesburg, Mississippi,

22  on Thursday, June 28, 2018, beginning at 9:14 a.m.

23

24

25  Job No. 142900

```
 1            JOE MORDICA - JUNE 28, 2018
 2                   APPEARANCES
 3
 4      EDGAR SARGENT, ESQUIRE
        Susman Godfrey
 5      1201 Third Avenue
        Seattle, Washington 98101
 6
 7
 8
              COUNSEL FOR PLAINTIFFS
 9
10
        SARA ECHENIQUE, ESQUIRE
11      SARAH CAVE, ESQUIRE
        Hughes Hubbard & Reed
12      One Battery Park Plaza
        New York, New York 10004
13
14
15
        COUNSEL FOR DEFENDANT, STUART A. FRASER
16
17
18
19      REPORTED BY:
20      CONNIE CHASTAIN, RMR, CSR #1025
21      VIDEOTAPED BY:
22      EDDIE NABORS
23
24
25
```

JOE MORDICA - JUNE 28, 2018

2  helped package up and ship to miners.

3        What other kind of responsibilities did you

4  have for GAW Miners when it was -- during this

5  equipment phase?

6    A.   Yeah, just to continue building out the

7  technology behind the website that fulfilled orders,

8  to further optimize that process to become more

9  efficient, generating UPS tracking numbers

10  automatically whenever orders would be fulfilled

11  because the person that was managing that would have

12  to go and, like, log into the UPS account and do a

13  bunch of stuff and it'd take, like, an hour to ship

14  one package.

15        So I was doing stuff like just automating

16  that process so it was instant and really shaving off

17  a lot of time from purchase to shipment, that

18  workflow; right.  So continuing to optimize that

19  workflow to be able to take in more equipment and send

20  out more equipment in a more efficient manner, using

21  technology and software to do that.

22    Q.   So how did GAW Miners' business change after

23  the equipment -- after selling the equipment?

24    A.   Well, I think -- so Josh had a bunch of

25  equipment sitting in his house from inventory or

JOE MORDICA - JUNE 28, 2018

1

2    whatever and he had the idea to take the equipment and

3    hook it up and let it -- let the equipment mine

4    bitcoin or other cryptocurrencies while it was sitting

5    there and waiting to be shipped; right.  Like, there

6    was, you know, just random inventory.

7          So then he had the idea to instead of just

8    taking the revenue from the -- from the rewards that

9    the miners would get from mining bitcoin, you know, he

10   said why don't we set up a system so that other people

11   can rent this gear and, you know, we'll just run it

12   wherever we have power right now, you know, and see if

13   that's an interest to people.

14         So that kind of introduced the cloud mining

15   idea where a person would go online and they would

16   rent -- they would pay a certain price, rent a

17   Gridseed ASIC miner; right, or five or ten.

18     Q.    All right.

19     A.    And they would -- that -- we would allocate

20   that specific, you know, piece of equipment to an

21   account that they create online and they would specify

22   a mining pool for that machine to mine; they would

23   simply rent the hardware from GAW Miners.

24     Q.    When you say Gridseed, is that two words?

25     A.    Gridseed, one word.

1        JOE MORDICA - JUNE 28, 2018

2       Q.    How do you spell it?

3       A.    G-R-I-D-S-E-E-D.

4       Q.    What does that mean?

5       A.    It's a Chinese manufacturer.

6       Q.    Oh, okay.

7       A.    Yeah.

8       Q.    It's a brand?

9       A.    Yeah, yeah, it's a Chinese brand.  Coming up

10   with all kinds of crazy names.

11      Q.    So is this what -- this is what was called

12   cloud-hosted mining; is that right?

13      A.    Yeah, yeah.

14      Q.    And a customer would lease, you described it

15   as, lease a particular miner?

16      A.    Either purchase or lease, I can't remember

17   exactly.  But they would submit a financial

18   transaction online to acquire this miner virtually;

19   right.  Like, you would rent a server from AWS or

20   Google or whatever to host your website on; right.

21      Q.    Was the lease or sale of a particular

22   machine --

23      A.    Uh-huh.

24      Q.    -- or just of a certain, you know, mining

25   capacity?

JOE MORDICA - JUNE 28, 2018

1

2     A.    Yeah, it was a specific machine at that

3     point.  Yep.

4     Q.    And at that point in GAW, as far as you know,

5     were specific machines actually identified to each of

6     those accounts?

7     A.    Oh, yeah, yeah, yeah.  Yeah, we had a couple

8     of guys that would go into the -- either Josh's house

9     or wherever, I still lived here so I couldn't do any

10    of this, but I had -- you know, there were guys,

11    basically feet on the ground, that would go in and tag

12    these machines for certain customers.

13          And then we had a software developer at the

14    time, Jeff Parker, who wrote this first application

15    primarily.  And he would assign these machines to

16    users' accounts that had purchased this hardware.

17          So here's how it'd work.  We would take an

18    order from the website.

19    Q.    Uh-huh.

20    A.    Say we had 50 orders for various amounts of

21    ASIC miners for that day; right --

22    Q.    Uh-huh.

23    A.    -- so Jeff, at the end of the day, would take

24    our pool of miners, our Gridseed ASIC miners, and he

25    would work that order list and fulfill those orders

1             JOE MORDICA - JUNE 28, 2018

2 from the website manually in his portal that he built.

3         He would basically drag and drop these miners

4 to individual accounts and then, you know, when we

5 would get down to a certain amount of miners, we would

6 take them offline.

7     Q.   I don't understand what you mean by when you

8 get down to a certain number of miners you'd take them

9 off?

10     A.   Yeah.  So whenever we got low on inventory,

11 basically, we would take the -- we would limit the

12 amount that you could buy in the shopping cart on the

13 website to keep from running out.

14     Q.   So you wouldn't oversell?

15     A.   Yep.

16     Q.   So do you have a -- did it remain true

17 throughout the time GAW Miners was selling

18 cloud-hosted mining that there was a physical miner

19 that could be identified to each --

20     A.   Oh, yeah, yeah.  Yeah.  At that time,

21 absolutely.

22     Q.   Well, throughout the time that -- I don't

23 know what you mean by at that time, but throughout the

24 time that GAW miners was selling cloud-hosted mining

25 was that true?

JOE MORDICA - JUNE 28, 2018

1

2      A.    No, not the whole time.  The process in which

3  someone would purchase a miner and that miner would

4  get allocated changed during a time at GAW Miners.

5      Q.    How did it change?

6      A.    Well, okay, so you understand the way that

7  this model works; right.  Like, somebody buys it on a

8  shopping cart and then someone -- Jeff would go and

9  fulfill the order by allocating a specific ASIC to

10  someone's account; right.  So, like, that -- that was

11  one model.

12          What was the next question?

13      Q.    Well, what I'm trying to get at is whether --

14      A.    Sorry.

15      Q.    No, no, this is important, there's a lot of

16  detail here and I want you to be clear.

17          You testified that at least when the

18  cloud-hosted mining business began and the process you

19  just described, there was an actual physical ASIC

20  miner?

21      A.    Yeah.

22      Q.    In -- I guess in Connecticut?

23      A.    Yep.

24      Q.    That could be identified and was identified

25  within GAW Miners' database to a particular customer

1
2    account who had purchased it?

3        A.    Correct.

4        Q.    Or leased that miner?

5        A.    Yeah, and that was the only way we knew how

6    to do it.  You know, that was the only way to do it.

7        Q.    But at some point cloud-hosted mining --

8        A.    Uh-huh.

9        Q.    -- people were purchasing or leasing mining

10   equipment that actually didn't exist, at least an

11   individual machine?

12       A.    Yeah.

13       Q.    Is that right?

14       A.    Yeah.

15       Q.    How did that change happen?

16       A.    Yeah.  So after some time went on, I don't

17   know exactly how much time, but no one was getting any

18   sleep at this time.  That's why I can't remember, you

19   know, all these dates and stuff.  I mean, nobody is

20   sleeping.  Like, it's all just work, work.

21       Q.    On GAW Miners?

22       A.    Well, on both companies but primarily GAW

23   Miners.  You know, when -- you know, I had a good bit

24   of responsibility because I was trying to run both --

25   the technology for both companies and, you know, it

JOE MORDICA - JUNE 28, 2018

1

2 was very stressful time.

3 So whenever it transitioned, the way that it

4 transitioned, ZenMiner was introduced, okay. So

5 ZenMiner was a -- okay. So some people wanted their

6 miners, their Gridseed ASICs, hosted by GAW Miners and

7 they wanted to -- they wanted them allocated that way.

8 But some people wanted to purchase a miner,

9 host it in their home and manage it themselves and

10 stuff like that. And they were still doing that with

11 the GAW Miners company; right.

12 But Jeff and I figured out a pretty cool way

13 for these customers that were purchasing these ASIC

14 miners to have them in their house but also add them

15 to their GAW Miners' cloud portal so that they could

16 manage all of their miners from there, whether the

17 miner is at their house or the -- or in the data

18 center; right.

19 So that's what we called ZenMiner.

20 Q. Okay.

21 A. Is that part of this or -- is that -- is

22 that -- okay. So I'm not to the cloud hosting yet,

23 I'm kind of evolving to the different model of the way

24 that cloud hosting got -- or changed; right.

25 Q. Okay.

JOE MORDICA - JUNE 28, 2018

1

2      A.    So ZenMiner kind of solved the problem where

3  if you bought a miner traditionally and put it in your

4  house, if you were just a layman and didn't -- you

5  wouldn't have any idea how to log into the miner and

6  make it generate revenue for you.

7      Q.    Uh-huh.

8      A.    Like, it was a very complicated process.  So

9  by introducing ZenMiner, which is just basically a

10 software application that lives on the miner --

11     Q.    Uh-huh.

12     A.    -- you could purchase a miner from GAW

13 Miners, have this miner in your house, and as soon as

14 you plug it up to the internet, you could allocate

15 this device to your GAW Miners' cloud miner account,

16 and we call that ZenMiner.

17          So that's when GAW Miners cloud mining turned

18 into ZenMiner.  So now it was this ZenMiner host

19 software suite that lived in the cloud that you could

20 now manage your cloud-hosted -- your GAW-hosted miner

21 or your self-hosted miner simultaneously --

22     Q.    Uh-huh.

23     A.    -- in the same account without having to mess

24 with all the technical details to get up and running.

25 And that's when GAW Miners really started selling a

JOE MORDICA - JUNE 28, 2018

1
2  bunch of hardware.

3        I believe Josh made some pretty large
4  financial commitments to some Chinese manufacturers
5  based on our increase of sales and our increase of
6  revenue and started to get better prices and better
7  products.

8        And then GAW Miners started to brand their
9  own miners, come out with different brands and
10 different styles and different, you know, boxes and
11 shapes or whatever, just marketing basically.

12     Q.   Do you remember the names of some of those?

13     A.   Yeah, it's, like, a Black Widow and a Falcon
14 and a --

15     Q.   So I just wanted a couple of examples, that's
16 good.

17     A.   Yeah.

18     Q.   So I could buy a Black Widow and have GAW
19 ship it to me and run it from my house?

20     A.   Uh-huh.

21     Q.   I would use the ZenMiner sort of --

22     A.   Yeah.

23     Q.   -- controller --

24     A.   Yeah.

25     Q.   -- in order to link it back up through the

1        JOE MORDICA - JUNE 28, 2018

2    cloud to my -- to my controller that also controlled

3    miners elsewhere?

4        A.    Yeah, uh-huh.  Yeah.

5        Q.    And I could also buy or lease a cloud-hosted

6    Black Widow which would be housed presumably in

7    Connecticut?

8        A.    Yeah.

9        Q.    But you could also run that through the same

10   web interface?

11       A.    Yeah, yeah, exactly.  So Jeff and I's, like,

12   goal in this effort was to provide a much easier way

13   for the laymen to mine cryptocurrency because everyone

14   else is left out; right.  Like, only the very

15   technical people understand how to set up a miner and

16   make it generate, you know, rewards for them, coins,

17   revenue, whatever you want to call it.

18            So our effort kind of funneled new customers

19   into our platform because of the ease of use; right.

20   It became much easier for anyone to kind of place an

21   order, order a miner, get it in their home and quickly

22   be generating revenue without having to learn

23   anything.

24            So this is -- that was one thing that I

25   was -- you know, that Jeff and I were pretty excited

JOE MORDICA - JUNE 28, 2018

about being able to do and bring more people into

the -- introduce more people, you know, normal

nontechnical minds into the industry and provide them

an additional source of revenue, basically.  Pretty --

pretty cool idea.

So after that we -- we -- script mining,

which was primarily the Gridseed ASICs and stuff like

that, started to fall off a little bit and bitcoin

mining became more profitable.

So Josh started purchasing these larger

bitcoin miners that were, like, big tower computers,

probably like this, and started to deploy these into

his house and business and he had a small data center

there in New England that he put these in.

And we started to develop a different

platform for these specific miners because they had

different software, they had different capabilities.

They had different ways of managing them and stuff

like that.

So we started -- and at this time people were

kind of getting away from script mining because it was

starting to become less profitable.  So we built

software around managing these bitcoin miners and Josh

said we need to look for data center space in your

1       JOE MORDICA - JUNE 28, 2018
2   area because power is cheaper there.  I was like,
3   okay, that's a great idea.
4           So we found a warehouse here, a pretty small
5   warehouse, about 10,000 square foot, 5,000 square foot
6   maybe, something like that, in Hattiesburg next to
7   Camp Shelby.  We started to put mining hardware in
8   there and started to sell -- started to basically
9   sell/lease these bitcoin miners in a different
10  platform, in a different piece of software with the
11  same business model as before where we would basically
12  tie an individual piece of hardware to a customer's
13  account.
14          But -- so after we started to build this
15  platform up, it's called -- this is called ZenCloud
16  now, so we introduced ZenCloud whenever we started
17  building -- we started adding bitcoin miners into the
18  business model.
19      Q.    Yeah.
20      A.    ZenCloud was born kind of in this data center
21  next to Camp Shelby here in Hattiesburg and we filled
22  it up with bitcoin miners and started allocating those
23  individual miners to customers' accounts.
24      Q.    Let me ask you, when you said allocated an
25  individual miner to a customer's account, would an

1       JOE MORDICA - JUNE 28, 2018

2    entire miner go to just one account or could a miner

3    be split up among multiple?

4        A.    So after we -- after we figured out that we

5    could take this -- the software inside these machines

6    and basically split up the hashing power between

7    multiple accounts and multiple users, that no longer

8    limited the user from having to purchase a whole,

9    let's say, 500 megahash, the whole miner itself.

10       Q.    Uh-huh.

11       A.    They could then purchase 20 megahash; right.

12       Q.    Yeah.

13       A.    And we could take and split that 20 megahash

14   into their account and allow them to point that 20

15   megahash to their own mining pool.  So that's -- so

16   ZenCloud evolved into that model where we were

17   basically setting up machines in the warehouse.

18            Let's say we had, you know, a terahash of

19   compute power in its totality --

20       Q.    Uh-huh.

21       A.    -- we could take orders and fulfill any

22   increment of hashing power towards someone's account.

23   Someone -- a user would log in to their account and

24   the first thing we would ask them for is a mining --

25   is a mining pool address.

JOE MORDICA - JUNE 28, 2018

1        They would put their mining pool address in

2 and then we would on our back end take that hashing

3 power and send it to their pool that they entered.  So

4 we were out of the kind of financial transaction at

5 that point.  That's where ZenCloud started.

6        And then the operation became bigger, we

7 rented another warehouse in Purvis, which was Central

8 Industrial Row in Purvis, Mississippi, and Josh began

9 to order a ton of these S4s at the time.  They were

10 AntMiner Bitmain S4s at the time.

11        And so as we built our hashing power up to a

12 point it became -- you know, it just became difficult

13 to kind of manage that much hashing power in that way.

14 You know, that model doesn't scale very well where you

15 take 20 megahash, point it here and you take 40

16 megahash and you point it here because then you have

17 some machines where you're wasting some hashing power

18 and all that.

19        And a few times, you know, Josh would call me

20 and say, you know, what's our mining capacity, what's

21 our -- and I would tell him, you know, we're at X

22 amount.  And I even had a dashboard to where he could

23 see, you know, what it was so I could stop answering

24 his phone all the time.

1     JOE MORDICA - JUNE 28, 2018

2          But as that evolved, he realized that we were

3     kind of wasting hashing power in certain machines

4     because of the way that we were having to separate the

5     hashing power out and give it to this customer, give

6     30 megahash to this customer, give 40 megahash to this

7     customer.  In some cases you're left with probably 10

8     or 20 megahash per machine that's not being

9     efficiently used on a given pool.  So you have -- you

10    know, it's called overhead.

11         And, you know, that was much better than us

12    having to sell an individual miner to a customer

13    because some customers wouldn't pay for that, so this

14    business model of being able to separate the megahash

15    into multiple accounts was a much better model but

16    there was some still ways.  So he --

17    Q.   Is this hashlets that you're talking about

18    now?

19    A.   No, no, this is not hashlets yet.  I'm almost

20    there.

21    Q.   This is still on cloud-hosted mining?

22    A.   Yeah, yeah, but this is ZenCloud.  This is

23    ZenCloud.

24    Q.   Cloud-hosted mining through ZenCloud, some of

25    the mining capability that was being sold was not sold

JOE MORDICA - JUNE 28, 2018

1

2    as an interest in an individual machine but as a sort

3    of fraction of that --

4    A.   A shared interest.

5    Q.   -- machine's hashing power?

6    A.   Yeah, yeah.

7    Q.   Okay.

8    A.   But not in the way that ZenCloud evolved to

9    be, which I'll get into that in just a second.

10    But this was -- let's say you had a machine

11    with 100 megahash, you could split it up 10 different

12    ways to where 10 customers would get 10 megahash a

13    piece; right.

14    Q.   Uh-huh.

15    A.   You could split it up three different ways to

16    where -- or, you know, five different ways.

17    Q.   So you had software that would allow you to

18    take the hashing capacity of an individual chip --

19    A.   Uh-huh.

20    Q.   -- and allocate it to different pools?

21    A.   Yeah, yeah, absolutely.

22    Q.   Okay.

23    A.   And we were the only ones that we knew of

24    that were able to do that at the time.

25    Q.   What about LeaseRig?

JOE MORDICA - JUNE 28, 2018

1
2      A.    So LeaseRig -- so Matt and I actually worked
3      together to get LeaseRig to the point where it could
4      do that, as well.
5      Q.    Matt Eaton?
6      A.    Yeah, yeah, yeah.  So that's actually how we
7      connected at the time and we -- I think because, you
8      know, he obviously knew about our business and then we
9      knew about his business because we were putting some
10     of our mining equipment on there to get better
11     profitability and stuff.
12           And, you know, after talking a bit we worked
13     together on his software to, you know, to where he
14     could develop the same kind of technology that we were
15     implementing in our back end systems.
16     Q.    Okay.  So go back to the story.  As I
17     understood the sequence, let me just make sure I have
18     the chronology right and you can use that as a jumping
19     off point.  Mr. Garza wanted to start buying much
20     larger bitcoin mining machines.
21           Say at about that time you -- he asked you to
22     open up a data center or two down in Mississippi where
23     you could house these machines and you started
24     implementing through ZenCloud this ability to allocate
25     hashing power from a single machine to multiple

JOE MORDICA - JUNE 28, 2018

1
2    accounts?

3        A.    Uh-huh.

4        Q.    But they were still being sold as

5    cloud-hosted mining?

6        A.    Well, yeah, yeah, yeah.  They were being sold

7    as cloud-hosted mining at the time so -- but we had a

8    pretty strict record from a software perspective of

9    the hashing power that was going to the individual

10   customer at that time.

11       Q.    Yeah.

12       A.    And we had built other algorithms in our back

13   end to further optimize that hashing power so that you

14   didn't have this waste on certain machines; right.  So

15   we would move customers from -- that had 20 megahash

16   on this machine and we would fumble the whole system

17   in order to stack customers on specific machines that

18   would work more efficiently so that you had whole

19   machines that were not acquired at all by any

20   customers.

21             And we would run this algorithm about once a

22   day to re-initialize or re-fumble this system that we

23   used to allocate hashing power to customers.

24       Q.    Okay.

25       A.    Because sometimes we'd have, like, one or two

JOE MORDICA - JUNE 28, 2018

1

2  customers on this one machine and it wasn't efficient

3  to do that.  And so we'd want to get those customers

4  off of that machine and put them on other machines to

5  share the hashing power more accurately.

6      Q.   And at this point are you confident that GAW

7  Miners had the actual mining capacity that it was

8  selling?

9      A.   Yeah, they had to have -- they had to have at

10  this point because if they didn't, customers would

11  call or open a ticket and say I'm not getting any

12  hashing power or I'm not getting enough hashing power

13  because --

14      Q.   How would they know?

15      A.   Because the network -- because they put in

16  their own pool at the time.  So they put in -- so when

17  they log into their -- they would put in their own

18  pool so they could log into their personal mining pool

19  and see the actual hashing power going to that pool.

20      Q.   One thing Ms. Eaton testified about a couple

21  days ago was at least at some point that stopped

22  happening?

23      A.   Yes.

24      Q.   You were not able to -- you could add --

25      A.   Absolutely.

JOE MORDICA - JUNE 28, 2018

Q.    Supposedly point a miner through GAW --

A.    Yeah.

Q.    Let me just finish.

A.    Okay.

Q.    Through GAW at a particular pool and then
look and the mining capacity of the pool would change.
So is that --

A.    Yeah.

Q.    Do things change at some point?  Is that --

A.    Oh, yeah.

Q.    -- what you were getting to?

A.    Oh, yeah, for sure.

Q.    Okay.  Keep going.  We're down in
Mississippi, we've got the big bitcoin miners being
allocated out through ZenCloud.  What's next?

A.    So what's next is Josh discovered that a lot
of the mining capacity was not being utilized in its
most efficient way possible, which everyone, you know,
on my -- on the technology end kind of knew that, but
we couldn't do anything about it because, you know, we
wouldn't be able to give the customer what they're --
what they're paying for if, you know, we did it any
other way.

So he had the idea to instead of allowing a

1      JOE MORDICA - JUNE 28, 2018

2    project that he brought in from a marketing

3    perspective to help build this new hashing product

4    called Hashlets.

5         Q.   What was the idea behind Hashlets?

6         A.   More and better marketing and --

7         Q.   How are they supposed to be different from

8    cloud-hosted mining?

9         A.   Completely virtual, on demand, instant

10   activation.  You didn't have to wait for an order to

11   be fulfilled, you didn't have to -- I mean, that was

12   the big thing.

13        Q.   As I understood cloud-hosted mining, and

14   correct me if this is wrong, when a customer required

15   cloud-hosted mining in his purchase release, they were

16   told that they were being sold a particular machine,

17   they could actually order that machine if they decided

18   that wanted to take it so it wasn't cloud-hosted

19   anymore?

20        A.   Uh-huh.

21        Q.   Is that right?

22        A.   Yeah.

23        Q.   Hashlets is when it started allocating

24   hashing power from one machine among different

25   customers?

JOE MORDICA - JUNE 28, 2018

A.    That's right.  So when Hashlets was

introduced, Josh gave the ability to the users that

were on the cloud-hosted environment to have their

machine shipped to them because we were no longer

going to service their machines in that -- with that

business model.

          So the introduction of Hashlets, we were

taking customers that wanted to on board their hashing

power and turn them into hashlets.  So taking their

hashing power off of their account, de-allocating that

hashing power, allocating that hashing power to a pool

that Josh picked, basically, and spending up a hashlet

for that person inside ZenCloud, which was -- a

hashlet was basically just a payout number at the end

of the day.

Q.    What do you mean by saying that a hashlet was

just a payout number?

A.    Yeah, so if you purchased 20 megahash -- it

was just a computed dollar amount at the end of the

day.  So it was a -- it was a -- looked like a little,

you know, icon on the screen that you would -- that

you would see.  And it had a -- it had a hashing power

label on it, say 20 megahash or 30 megahash or

whatever so you knew what you had in your account.

JOE MORDICA - JUNE 28, 2018

And on the back end we just had to say this
20 megahash pointed to this pool at the end of the day
is going to generate $2.13 in revenue.  So that's how
the ZenCloud system would deposit that amount, that
bitcoin amount, into the individual's account at the
end of the day.

Q.  So that was a manual calculation that was
done based on the return of a particular pool;
correct?

A.  Yeah.

Q.  It wasn't a return that actually came from a
computer doing hashing?

A.  Doing work on the pool; correct.  It was --
it was a calculation that was made based on the
24-hour payout of that pool at the end of the day.
And no one knew what that pool's average payout was
going to be at the end of the day until we reached the
end of the day.  But however much it was, that's what
was going to be allocated to that person's account.

Q.  Okay.  Before we go any deeper into hashlets,
I still need to tie up a few things about the
cloud-hosted mining.

A.  Yeah.

Q.  So towards the end, at least, cloud-hosted

JOE MORDICA - JUNE 28, 2018

1

2      A.    Yeah.

3      Q.    -- to fill all the orders?

4      A.    Yeah, oh, yeah, absolutely.

5      Q.    And that was not true with hashlets?

6      A.    No.  No.  So when -- well, I mean, do you

7  want --

8      Q.    Yeah, tell me how it happened that the

9  hashing power being sold through hashlets exceeded the

10  actual mining capacity of the business.

11      A.    Yeah, I remember getting to a point where

12  this introduction of hashlets was going to put Evan

13  and I behind and not be able to keep up with the

14  demand on the back end of the system as far as

15  allocating the hashing power.

16      Q.    Before you go on, who is Evan?

17      A.    My lead software developer.

18      Q.    What's his last name?

19      A.    Evan Lucas.

20      Q.    Was he here in Hattiesburg?

21      A.    He was, yeah.

22      Q.    Okay.  Go ahead.

23      A.    So we -- so we -- I had a call with Josh and

24  it's like, look, we're close to the amount of hashing

25  capacity.  I mean, Josh already knew this because he

1          JOE MORDICA - JUNE 28, 2018

2    had access to the same dashboard that we did.

3          But Josh's idea, from what he told me after

4    having -- while having that conversation with him on

5    the phone about getting close to our maximum amount of

6    hashing power, was that if we -- he said I'm banking

7    on, you know, the price kind of continuing to fall a

8    little bit in cryptocurrency, which you don't ever do

9    that.

10         So I'm thinking that I can sell a certain

11   amount of hashlets to raise enough money to

12   purchase -- to make a larger financial commitment to

13   Bitmain so that I can get more mining capacity for

14   cheaper, you know.

15         You know, so his words were I think -- I

16   think for a short period of time I can sustain payouts

17   for long enough with the revenue that we have to

18   purchase, you know, enough hardware to put in the data

19   center to get it for cheaper than what we're buying it

20   for now so that, you know, we can kind of get ahead in

21   this cloud mining industry.  That was his plan to --

22   Q.   Let me see if I understand.  His idea was to

23   raise money by selling hashlets for which there may

24   not be underlying hashing power as a way of having

25   enough resources to be able to do a large purchase of

JOE MORDICA - JUNE 28, 2018

2  mining equipment on a -- at a lower price?

3     A.   Yeah.

4     Q.   And then increase the capacity?

5     A.   Correct.  Because I'm assuming that -- well,

6  I mean, I don't want to assume, but I'm guessing that,

7  you know, he's thinking he's got enough money in the

8  bank account to cover, you know, these payouts for a

9  certain period of time.

10          I don't know what kind of calculations he's

11  running or numbers or talking to other, you know,

12  investors about or whatever, I don't know what he's --

13  you know, I don't know where he's coming up with this

14  thought that he can -- that he can do this.

15          So anyway --

16     Q.   At some point did you get concerned because

17  the sales of hashing power through hashlets --

18     A.   Oh, I was concerned before -- before we

19  started selling hashlets because I knew that his

20  mind -- I knew that if his mindset was to

21  over-leverage the mining capacity to bring in more

22  revenue, that that was not going to be sustainable for

23  long, plus it's illegal, I believe.  It's a Ponzi

24  scheme.

25     Q.   And you saw that -- you were concerned that

EXHIBIT 3

1  UNITED STATES DISTRICT COURT
   DISTRICT OF CONNECTICUT
2

   DENIS MARC AUDET, MICHAEL   §
3  PFEIFFER, DEAN ALLEN        §
   SHINNERS, AND JASON         §   CASE 3:16-CV-00940
4  VARGAS, INDIVIDUALLY AND    §
   ON BEHALF OF ALL OTHER      §
5  SIMILARLY SITUATED,         §
                               §
6      PLAINTIFFS,             §
                               §
7  VS.                         §
                               §
8  STUART A. FRASER, GAW       §
   MINERS, LLC, AND            §
9  ZENMINER, LLC (D/B/A ZEN    §
   CLOUD),                     §
10                             §
       DEFENDANTS.             §
11
12
13
14
15          ORAL AND VIDEOTAPED DEPOSITION OF
                     MADELINE EDEN
16                   JUNE 26, 2018
17
18          ORAL AND VIDEOTAPED DEPOSITION OF MADELINE
   EDEN, produced as a witness at the instance of the
19 Plaintiffs and duly sworn, was taken in the above
   styled and numbered cause on Tuesday, June 26, 2018,
20 from 9:42 a.m. to 2:52 p.m., before TAMARA CHAPMAN,
   CSR, CRR, RPR in and for the State of Texas,
21 reported by computerized stenotype machine, at the
   offices of Regus, 106 E. Sixth Street, Austin,
22 Texas, pursuant to the Federal Rules of Civil
   Procedure and any provisions stated on the record
23 herein.
24
25 Job No. 143277

```
1              A P P E A R A N C E S
2
3    FOR THE PLAINTIFFS:
         Edgar Sargent, Esq.
4        SUSMAN GODFREY
         1201 Third Avenue
5        Seattle, Washington 98101
6
7
8     FOR THE DEFENDANT STUART FRASER:
         Sara Echenique, Esq.
9        Anna Schuler, Esq.
         HUGHES HUBBARD & REED
10       One Battery Park Plaza
         New York, New York 10004
11
12
13
14
15
16
17
     ALSO PRESENT:
18       Sam Swain, Videographer
19
20
21
22
23
24
25
```

M. EDEN - 6/26/18

A. All right.

Q. I think that's a good amount. We can clean it up later.

A. A thousand terahash is -- yeah, a thousand gigahash, and a thousand gigahash is a thousand -- you know, one gig- -- tera -- a single terahash is a thousand gigahash, and a single gigahash is a thousand megahash, and it's very similar to how computer memory works.

Q. The count there is the number of hash calculations that can be performed in a second?

A. Correct.

Q. So was sufficient hashing power acquired to support the outstanding Hashlets at some point?

A. No.

Q. Do you have an estimate for what portion of the outstanding Hashlets were actually supported and connected to miners --

A. I --

Q. -- at the maximum?

A. I'm sorry. What -- could you --

Q. At the -- like at what point in time -- I mean, at some point in time I assume there was -- you said there was less than 10 percent -- way less than

M. EDEN - 6/26/18

1
2 10 percent of the outstanding Hashlets were actually
3 supported by the mining power that you saw in
4 Mississippi.  Is that right?
5      A.  Correct.
6      Q.  Did I understand that correctly?  Did that
7 10 percent go up because some additional hashing
8 power was acquired?  Did it ever increase or...
9      A.  No.  We never actually connected any kind
10 of back-end mining to ZenCloud directly.  That just
11 never happened, and --
12      Q.  Can you explain the relationship between
13 ZenCloud and Hashlets?
14      A.  The Hashlets were hosted on ZenCloud's
15 service.
16      Q.  So any Hashlet that had been sold would be
17 running through ZenCloud to -- supposedly to mining
18 power behind it?
19      A.  Correct.
20      Q.  And it's that ZenCloud that needed to be
21 connected to mining power for that to operate the way
22 it was presented to the public?
23      A.  Correct.
24      Q.  I'm going to hand you Exhibit 2, if I can
25 find it.

                        M. EDEN - 6/26/18

        A.   HashPoints and HashPool was a bad idea.

        Q.   And HashPoints being the sort of bridge to
Paycoin that you could mine through Hashlets.   Is
that fair?

        A.   Yeah.

        Q.   Was the process of mining HashPoints, did
that cause your Hashlet to expire or become
HashPoints somehow or was it just --

        A.   No, that caused your Hashlet to stop
paying out Bitcoins and instead pay out HashCoins.

        Q.   But you would still have the Hashlet at
the end of the day.   You would just keep using it to
generate more and more HashPoints?

        A.   Correct.

        Q.   And could you convert it back to a Bitcoin
Hashlet, at least in theory, if you wanted to?

        A.   I don't recall.   I don't know if -- I'm
assuming at first it was probably that way, yeah, or
I don't know if it stuck -- was stuck doing
HashPoints afterwards or not.   I don't remember.
They changed the specifications and the requirements
every day.

             But, effectively, it was a good way to
minimize the amount of Bitcoin that was going out of

M. EDEN - 6/26/18

1
2      the system and also limit the amount of hashing
3      power, I guess, that was required on the back end
4      to -- I mean, support the amount of hashing power
5      that had been sold.  I don't remember when we
6      deployed all of the S4s into -- and S3s into the data
7      center, but --
8          Q.  So --
9          A.  But, yeah, it was right before the advent
10     of actual Paycoin.
11         Q.  At the time of Exhibit 3, the HashPoints
12     program was obviously already in place.  Does that
13     mean that -- that at that point the plan for
14     launching a new cryptocurrency was also in place or
15     was there a period when HashPoints were just not
16     associated with this idea of -- of a new
17     cryptocurrency?
18         A.  I don't know about a plan being already in
19     place.  All I know is that it came down the chain
20     that this is how it was going to be very quickly and
21     creating a new pool and a new form of, you know -- a
22     new coin to pay out with was -- was not something
23     that took a very long time to do.
24         Q.  So -- which you knew when -- when the
25     HashPoints program was implemented that they were

# EXHIBIT 4

1

2                 UNITED STATES DISTRICT COURT
                  DISTRICT OF CONNECTICUT
3                 CASE NO.:  3:16-cv-00940
4    ----------------------------------x
     DENIS MARC AUDET, MICHAEL
5    PFEIFFER, DEAN ALLEN
     SHINNERS, and JASON VARGAS,
6    Individually and on Behalf
     of All Others Similarly
7    Situated,
8                         Plaintiff(s),
9           vs.
10   STUART A. FRASER, GAW
     MINERS, LLC, and ZENMINER,
11   LLC, (d/b/a) ZENCLOUD),
12                        Defendant(s).
     ----------------------------------x
13

14

15      VIDEOTAPED DEPOSITION OF DR. MICHAEL PFEIFFER
16                 New York, New York
17              Thursday, July 19, 2018
18

19

20

21

22   Reported by:
23   Corinne J. Blair, CRR, CCR, RPR, CLR
24   JOB NO.: 144959
25

1

2

3

4                              July 19, 2018

5                              8:58, a.m.

6

7

8

9       Deposition of MICHAEL PFEIFFER, held at the

10   offices of SUSMAN GODFREY, 1301 Avenue of the

11   Americas, New York, New York, before Corinne J.

12   Blair, a Certified Realtime Reporter, Certified

13   Court Reporter, Registered Professional

14   Reporter, Certified Livenote Reporter, and

15   Notary Public of the states of New York and New

16   Jersey.

17

18

19

20

21

22

23

24

25

1                    Michael Pfeiffer

2      the whim of the company.

3          Q     So when the hashlets morphed into

4      this other product that you just described,

5      what did you understand you were buying then?

6          A     The website explained that -- let me

7      rephrase that.

8                So what I -- what I understood at

9      that time was that hashpoints would be

10     converted into Paycoin.  And that Paycoin

11     would be a cryptocurrency that had a $20

12     value that GAW Miners would sustain as a

13     minimum floor.  And at times Garza

14     represented it as something that would be

15     likely to go up to $25, at least.  And the

16     documentation indicated that the -- that

17     Paycoin had a Paycoin foundation.  And the

18     Paycoin foundation had a $100 million

19     adoption fund.  And that that would be used,

20     in part, to maintain the $20 floor of the

21     Paycoin currency.

22         Q     A moment ago you referred to

23     hashpoints being converted to Paycoin.

24               What did you understand would cause

25     that conversion to happen?

# EXHIBIT 5





**U.S. Department of Justice**

*United States Attorney*
*District of Connecticut*

---

*Connecticut Financial Center*          *(203)821-3700*
*157 Church Street, 25ᵗʰ Floor*          *Fax (203) 773-5376*
*New Haven, Connecticut 06510*          *www.justice.gov/usao/ct*

**July 20, 2017**

Marjorie Peerce
Ballard Spahr LLP
919 Third Ave, 37th Floor
New York, NY 10022

   Re: United States v. Joshua Garza
     Case No. 3:17CR158(RNC)

Dear Ms. Peerce:

  This letter confirms the plea agreement between your client, Homero Joshua Garza (the "defendant"), and the United States Attorney's Office for the District of Connecticut (the "Government") concerning the referenced criminal matter.

## THE PLEA AND OFFENSE

  The defendant agrees to waive his right to be indicted and to plead guilty to a one-count information charging him with wire fraud, in violation of 18 U.S.C. § 1343.

  The defendant understands that, to be guilty of this offense, the following essential elements of the offense must be satisfied:

1. First, that there was a scheme or artifice to defraud or to obtain money or property by materially false and fraudulent pretenses, representations or promises;

2. Second, that the defendant knowingly and willfully participated in the scheme or artifice to defraud, with knowledge of its fraudulent nature and with specific intent to defraud; and

3. Third, that in execution of that scheme, the defendant used or caused the use interstate wires.



**EXHIBIT**

*19*

## THE PENALTIES

This offense carries a maximum penalty of 20 years of imprisonment and a $250,000 fine. In addition, under 18 U.S.C. § 3583, the Court may impose a term of supervised release of not more than three years to begin after imprisonment. The defendant understands that, should he violate any condition of the supervised release, he may be required to serve a further term of imprisonment of up to two years with no credit for time already spent on supervised release.

The defendant is also subject to the alternative fine provision of 18 U.S.C. § 3571. Under this section, the maximum fine that may be imposed on the defendant is the greatest of the following amounts: (1) twice the gross gain to the defendant resulting from the offense; (2) twice the gross loss resulting from the offense; or (3) $250,000.

In addition, the defendant is obligated by 18 U.S.C. § 3013 to pay a special assessment of $100 on each count of conviction. The defendant agrees to pay the special assessment to the Clerk of the Court on the day the guilty plea is accepted.

The defendant is also subject to restitution, as discussed below. Unless otherwise ordered, should the Court impose a fine or restitution of more than $2,500 as part of the sentence, interest will be charged on the unpaid balance of the fine or restitution not paid within 15 days after the judgment date. 18 U.S.C. § 3612(f). Other penalties and fines may be assessed on the unpaid balance of a fine or restitution pursuant to 18 U.S.C. § 3572 (h), (i) and § 3612(g).

### Restitution

In addition to the other penalties provided by law, the Court must also order that the defendant make restitution under 18 U.S.C. § 3663A, and the Government reserves its right to seek restitution on behalf of victims consistent with the provisions of § 3663A. The scope and effect of the order of restitution are set forth in the attached Rider Concerning Restitution. Restitution is payable immediately unless otherwise ordered by the Court.

Regardless of restitution that may be ordered by the Court noted above, the defendant agrees to make restitution in the amount of $9,182,000. The defendant agrees to make such restitution as ordered by the Court.

The defendant agrees that by virtue of his plea of guilty he waives any rights or cause of action to claim that he is a "substantially prevailing party" for the purpose of recovery of attorney fees and other litigation costs.

## COLLECTION OF FINANCIAL OBLIGATIONS

In order to facilitate the collection of financial obligations to be imposed in connection with this prosecution, the defendant agrees fully to disclose all assets in which he has any interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, nominee, or other third party, including but not limited to:

1.      The defendant will promptly submit a completed financial statement to the U.S. Attorney's Office, in a form it provides and as it directs. The defendant understands and agrees that his financial statement and disclosures will be complete, accurate, and truthful.

2.      The defendant expressly authorizes the U.S. Attorney's Office to obtain a credit report on him in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.

## THE SENTENCING GUIDELINES

### Applicability

The defendant understands that the Court is required to consider any applicable Sentencing Guidelines as well as other factors enumerated in 18 U.S.C. § 3553(a) to tailor an appropriate sentence in this case and is not bound by this plea agreement. The defendant agrees that the Sentencing Guideline determinations will be made by the Court, by a preponderance of the evidence, based upon input from the defendant, the Government, and the United States Probation Office. The defendant further understands that he has no right to withdraw his guilty plea if his sentence or the Guideline application is other than he anticipated, including if the sentence is outside any of the ranges set forth in this agreement.

### Acceptance of Responsibility

At this time, the Government agrees to recommend that the Court reduce by two levels the defendant's adjusted offense level under § 3E1.1(a) of the Sentencing Guidelines, based on the defendant's prompt recognition and affirmative acceptance of personal responsibility for the offense. Moreover, should the defendant qualify for a decrease under § 3E1.1(a) and his offense level determined prior to the operation of subsection (a) is level 16 or greater, the Government will file a motion with the Court pursuant to § 3E1.1(b) which recommends that the Court reduce the defendant's Adjusted Offense Level by one additional level based on his prompt notification of his intention to enter a plea of guilty. The defendant understands that the Court is not obligated to accept the Government's recommendations on the reductions.

The above-listed recommendations are conditioned upon the defendant's affirmative demonstration of acceptance of responsibility, by (1) truthfully admitting the conduct comprising the offense(s) of conviction and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable under § 1B1.3 of the Sentencing Guidelines, and (2) truthfully disclosing to the United States Attorney's Office and the United States Probation Office personal information requested, including the submission of a complete and truthful financial statement detailing the defendant's financial condition.

In addition, the Government expressly reserves the right to seek denial of the adjustment for acceptance of responsibility if the defendant engages in any acts, unknown to the Government at the time of the signing of this agreement, which (1) indicate that the defendant has not terminated or withdrawn from criminal conduct or associations (§ 3E1.1 of the Sentencing Guidelines); (2) could provide a basis for an adjustment for obstructing or impeding

the administration of justice (§ 3C1.1 of the Sentencing Guidelines); or (3) constitute a violation of any condition of release. Moreover, the Government reserves the right to seek denial of the adjustment for acceptance of responsibility if the defendant seeks to withdraw his guilty plea or takes a position at sentencing, or otherwise, which, in the Government's assessment, is inconsistent with affirmative acceptance of personal responsibility. The defendant understands that he may not withdraw his plea of guilty if, for the reasons explained above, the Government does not make one or both of the recommendations or seeks denial of the adjustment for acceptance of responsibility.

### Stipulation

Pursuant to § 6B1.4 of the Sentencing Guidelines, the defendant and the Government have entered into the attached stipulation, which is a part of this plea agreement. The defendant understands that this stipulation does not set forth all of the relevant conduct and characteristics that may be considered by the Court for purposes of sentencing. The defendant understands that this stipulation is not binding on the Court. The defendant also understands that the Government and the United States Probation Office are obligated to advise the Court of any additional relevant facts that subsequently come to their attention.

### Guideline Stipulation

The parties agree as follows:

The Guidelines Manual in effect on the date of sentencing is used to determine the applicable Guidelines range.

The defendant's base offense level under U.S.S.G. § 2B1.1(a) is 7. That level is increased by 18 levels, because the agreed-upon loss is over $3,500,000 but less than $9,500,000 per U.S.S.G. § 2B1.1(b)(1). That level is increased by 2 levels because the offense involved 10 or more victims per U.S.S.G. § 2B1.1(b)(2). That level is further increased by 2 levels because the defendant was an organizer, leader, manager or supervisor in the charged criminal activity per U.S.S.G. § 3B1.1(c). 3 levels are subtracted under U.S.S.G. § 3E1.1 for acceptance of responsibility, as noted above, resulting in a total offense level of 26.

Based on an initial assessment, the parties agree that the defendant falls within Criminal History Category 1. The parties reserve the right to recalculate the defendant's Criminal History Category and corresponding sentencing ranges if this initial assessment proves inaccurate.

A total offense level 26, assuming a Criminal History Category 1, would result in a range of 63 to 78 months of imprisonment (sentencing table) and a fine range of $25,000 to $250,000, U.S.S.G. § 5E1.2(c)(3). The defendant is also subject to a supervised release term of 1 to 3 years. U.S.S.G. § 5D1.2.

The Government and the defendant reserve their rights to seek a departure or a non-Guidelines sentence, and both sides reserve their right to object to a departure or a non-Guidelines sentence.

The defendant understands that the Court is not bound by this agreement on the Guideline ranges specified above. The defendant further understands that he will not be permitted to withdraw the guilty plea if the Court imposes a sentence outside any of the ranges set forth in this agreement.

In the event the United States Probation Office or the Court contemplates any sentencing calculations different from those stipulated by the parties, the parties reserve the right to respond to any inquiries and make appropriate legal arguments regarding the proposed alternate calculations. Moreover, the parties reserve the right to defend any sentencing determination, even if it differs from that stipulated by the parties, in any post-sentencing proceeding.

### Waiver of Right to Appeal or Collaterally Attack Conviction and Sentence

The defendant acknowledges that under certain circumstances he is entitled to challenge his conviction and sentence. The defendant agrees not to appeal or collaterally attack his conviction in any proceeding, including but not limited to a motion under 28 U.S.C. § 2255 and/or § 2241. Nor will he pursue such an appeal or collateral attack to challenge the sentence imposed by the Court if that sentence does not exceed 78 months of imprisonment, a 3-year term of supervised release, a $100 special assessment, a restitution order of $9,182,000, and a $20,000,000 fine, even if the Court imposes such a sentence based on an analysis different from that specified above. The Government and the defendant agree that this waiver applies regardless of whether the term of imprisonment is imposed to run consecutively to or concurrently with, in whole or in part, the undischarged portion of any other sentence that has been imposed on the defendant at the time of sentencing in this case. The defendant acknowledges that he is knowingly and intelligently waiving these rights. Furthermore, the parties agree that any challenge to the defendant's sentence that is not foreclosed by this provision will be limited to that portion of the sentence that is inconsistent with (or not addressed by) this waiver. Nothing in the foregoing waiver of appellate and collateral review rights shall preclude the defendant from raising a claim of ineffective assistance of counsel in an appropriate forum.

### Information to the Court

The Government reserves its right to address the Court with respect to an appropriate sentence to be imposed in this case. Moreover, the Government will discuss the facts of this case, including information regarding the defendant's background and character, 18 U.S.C. § 3661, with the United States Probation Office and will provide the Probation Officer with access to material in its file, with the exception of grand jury material.

## WAIVER OF RIGHTS

### Waiver of Right to Indictment

The defendant understands that he has the right to have the facts of this case presented to a federal grand jury, consisting of between sixteen and twenty-three citizens, twelve of whom would have to find probable cause to believe that he committed the offense set forth in the information before an indictment could be returned. The defendant acknowledges that he is

knowingly and intelligently waiving his right to be
indicted.

### Waiver of Trial Rights and Consequences of Guilty Plea

The defendant understands that he has the right to be represented by an attorney at every
stage of the proceeding and, if necessary, one will be appointed to represent him.

The defendant understands that he has the right to plead not guilty or to persist in that
plea if it has already been made, the right to a public trial, the right to be tried by a jury with the
assistance of counsel, the right to confront and cross-examine the witnesses against him, the right
not to be compelled to incriminate himself, the right to testify and present evidence, and the right
to compel the attendance of witnesses to testify in his defense. The defendant understands that
by pleading guilty he waives those rights and that, if the plea of guilty is accepted by the Court,
there will not be a further trial of any kind.

The defendant understands that, if he pleads guilty, the Court may ask him questions
about each offense to which he pleads guilty, and if he answers those questions falsely under
oath, on the record, and in the presence of counsel, his answers may later be used against him in
a prosecution for perjury or making false statements.

### Waiver of Statute of Limitations

The defendant agrees that, should the conviction following defendant's guilty plea be
vacated for any reason, then any prosecution that is not time-barred by the applicable statute of
limitations on the date of the signing of this plea agreement (including any indictment or counts
the Government has agreed to dismiss at sentencing pursuant to this plea agreement) may be
commenced or reinstated against the defendant, notwithstanding the expiration of the statute of
limitations between the signing of this plea agreement and the commencement or reinstatement
of such prosecution. The defendant agrees to waive all defenses based on the statute of
limitations with respect to any prosecution that is not time-barred on the date the plea agreement
is signed.

## ACKNOWLEDGMENT OF GUILT AND VOLUNTARINESS OF PLEA

The defendant acknowledges that he is entering into this agreement and is pleading guilty
freely and voluntarily because he is guilty. The defendant further acknowledges that he is
entering into this agreement without reliance upon any discussions between the Government and
him (other than those described in the plea agreement letter), without promise of benefit of any
kind (other than the concessions contained in the plea agreement letter), and without threats,
force, intimidation, or coercion of any kind. The defendant further acknowledges his
understanding of the nature of the offense to which he is pleading guilty, including the penalties
provided by law. The defendant also acknowledges his complete satisfaction with the
representation and advice received from his undersigned attorney. The defendant and his
undersigned counsel are unaware of any conflict of interest concerning counsel's representation
of the defendant in the case.

## SCOPE OF THE AGREEMENT

The defendant acknowledges that this agreement is limited to the undersigned parties and cannot bind any other federal authority, or any state or local authority. The defendant acknowledges that no representations have been made to him with respect to any civil or administrative consequences that may result from this plea of guilty because such matters are solely within the province and discretion of the specific administrative or governmental entity involved. Finally, the defendant acknowledges that this agreement has been reached without regard to any civil tax matters that may be pending or which may arise involving him.

## COLLATERAL CONSEQUENCES

The defendant understands that he will be adjudicated guilty of each offense to which he has pleaded guilty and will be deprived of certain rights, such as the right to hold public office, to serve on a jury, to possess firearms and ammunition, and in some states, the right to vote. Further, the defendant understands that if he is not a citizen of the United States, a plea of guilty may result in removal from the United States, denial of citizenship, and denial of admission to the United States in the future. The defendant understands that pursuant to section 203(b) of the Justice For All Act, the Federal Bureau of Prisons or the United States Probation Office will collect a DNA sample from the defendant for analysis and indexing. Finally, the defendant understands that the Government reserves the right to notify any state or federal agency by which he is licensed, or with which he does business, as well as any current or future employer of the fact of his conviction.

## SATISFACTION OF FEDERAL CRIMINAL LIABILITY; BREACH

The defendant's guilty plea, if accepted by the Court, will satisfy the federal criminal liability of the defendant in the District of Connecticut as a result of his participation in a fraudulent scheme related to virtual currency and his conduct in the crypto currency business, including but not limited to work with voice-over internet protocols, GAW, GAW Miners, ZenMiner, ZenCloud and Paycoin, which forms the basis of the information in this case.

The defendant understands that if, before sentencing, he violates any term or condition of this agreement, engages in any criminal activity, or fails to appear for sentencing, the Government may void all or part of this agreement. If the agreement is voided in whole or in part, defendant will not be permitted to withdraw his guilty plea.

*July 20, 2017 Letter to Marjorie Peerce, Esq.*
*Page 8*

## NO OTHER PROMISES

The defendant acknowledges that no other promises, agreements, or conditions have been entered into other than those set forth in this plea agreement, and none will be entered into unless set forth in writing, signed by all the parties.

This letter shall be presented to the Court, in open court, and filed in this case.

Very truly yours,

DEIRDRE M. DALY
UNITED STATES ATTORNEY

JOHN T. PIERPONT, JR.
ASSISTANT UNITED STATES ATTORNEY

The defendant certifies that he has read this plea agreement letter and its attachment(s) or has had it read or translated to him, that he has had ample time to discuss this agreement and its attachment(s) with counsel and that he fully understands and accepts its terms.

Homero Garza                                    7/20/17
Homero Joshua Garza                             Date
The Defendant

I have thoroughly read, reviewed and explained this plea agreement and its attachment(s) to my client who advises me that he understands and accepts its terms.

MARJORIE PEERCE, ESQ.                           7/20/17
Attorney for the Defendant                      Date

## STIPULATION OF OFFENSE CONDUCT

The defendant and the Government stipulate to the following offense conduct that gives rise to the defendant's agreement to plead guilty to the information:

1. From approximately May 2014 through January 2015, the defendant operated a scheme to defraud victims out of money in connection with the procurement of virtual currency on their behalf.

2. "Virtual currency" is a digital representation of a value that can be traded and functions as a medium of exchange. Virtual currency generally is not issued or guaranteed by any jurisdiction or government, and its value is decided by consensus within the community of users of the virtual currency. A virtual currency generally self-generates units of currency through a process called "mining." A virtual currency "miner" is computer hardware that runs special computer software to solve complex algorithms that validate groups of transactions in that virtual currency. Once a complex algorithm is solved, a unit of currency, such as a bitcoin, is awarded to the individual operating the miner. This process is known as "mining."

3. The defendant founded multiple companies that were used in connection with this scheme to defraud related to virtual currency, including, among others, GAW, GAW Miners, ZenMiner, ZenCloud.

4. The defendants' companies sold miners, access to miners, the right to purchase a virtual currency called "paycoin," as well as "hashlets." A hashlet entitled an investor to a share of the profits that GAW Miners and/or or ZenMiner would purportedly earn by mining virtual currencies using the computers that were maintained in their data centers. In other words, hashlet customers, or investors, were buying the rights to profit from a slice of the computing power owned by GAW Miners and ZenMiner.

5. To generate business as well as attract customers and investors, the defendant made multiple statements related to the scheme, including, among others:

| Statement | Truth |
| --- | --- |
| GAW Miners' parent company purchased a controlling stake in ZenMiner for $8 million and that ZenMiner became a division of GAW Miners. | There was no transaction in which GAW Miners' parent company purchased a controlling stake in ZenMiner. |
| The hashlets the defendant's companies sold engaged in the mining of virtual currency. | The defendant's companies sold more hashlets than were supported by the computing power maintained in their data centers. Stated differently, the defendant's companies sold the customers the right to more virtual currency than the companies' computing power could generate. |

| Statement | Truth |
|---|---|
| The market value of a single paycoin would not fall below $20 per unit because the defendant's companies had a reserve of $100 million that the companies would use to purchase paycoins to drive up its price. | The defendant's companies did not have a reserve of $100 million and could not therefore drive up the value of paycoin. |

6. The defendant along with others, acting through his companies, applied money his companies had made from new hashlet investors and used it to pay older hashlet investors money that the companies owed them based on the purported mining GAW Miners and ZenMiner had done on the investors' behalf.

7. The reasonably foreseeable loss attributable to the defendant from the scheme was $9,182,000.

8. In furtherance of the scheme the defendant used interstate wires, including by sending, among others, one email dated August 8, 2014, from the email address Josh@genuisesatwork.com to the email address Josh@genuisesatwork.com, in which the defendant discussed GAW Miners' parent company purportedly purchasing a controlling stake in ZenMiner for $8 million, when, in fact, there was no such sale.

This written stipulation is part of the plea agreement. The defendant and the Government reserve their right to present additional offense conduct and relevant conduct to the Court in connection with sentencing.

HOMERO JOSHUA GARZA
The Defendant

JOHN T. PIERPONT, JR.
ASSISTANT UNITED STATES ATTORNEY

MARJORIE PEERCE, ESQ.
Attorney for the Defendant

## RIDER CONCERNING RESTITUTION

The Court shall order that the defendant make restitution under 18 U.S.C. § 3663A. The order of restitution may include:

1. If the offense resulted in damage to or loss or destruction of property of a victim of the offense, the order of restitution shall require the defendant to:

   A. Return the property to the owner of the property or someone designated by the owner; or

   B. If return of the property is impossible, impracticable, or inadequate, pay an amount equal to:

      The greater of -
      (I) the value of the property on the date of the damage, loss, or destruction; or

      (II) the value of the property on the date of sentencing, less the value as of the date the property is returned.

2. In the case of an offense resulting in bodily injury to a victim --

   A. Pay an amount equal to the costs of necessary medical and related professional services and devices related to physical, psychiatric, and psychological care; including non-medical care and treatment rendered in accordance with a method of healing recognized by the law of the place of treatment;

   B. Pay an amount equal to the cost of necessary physical and occupational therapy and rehabilitation; and

   C. Reimburse the victim for income lost by such victim as a result of such offense;

3. In the case of an offense resulting in bodily injury that results in the death of the victim, pay an amount equal to the cost of necessary funeral and related services; and

4. In any case, reimburse the victim for lost income and necessary child care, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense.

The order of restitution has the effect of a civil judgment against the defendant. In addition to the court-ordered restitution, the court may order that the conditions of its order of restitution be made a condition of probation or supervised release. Failure to make restitution as ordered may result in a revocation of probation, or a modification of the conditions of supervised release, or in the defendant being held in contempt under 18 U.S.C. § 3583(e). Failure to pay restitution may also result in the defendant's re-sentencing to any sentence which might originally have been imposed by the Court. *See* 18 U.S.C. §§ 3614, 3613A. The Court may also order that the defendant give notice to any victim(s) of his offense under 18 U.S.C. § 3555.