# EXHIBIT D

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| DENIS MARC AUDET, MICHAEL PFEIFFER, DEAN ALLEN SHINNERS, and JASON VARGAS, Individually and on Behalf of All Others Similarly Situated,<br><br>                         Plaintiffs,<br><br>     vs.<br><br>HOMERO JOSHUA GARZA, STUART A. FRASER, GAW MINERS, LLC, and ZENMINER, LLC, (d/b/a ZEN CLOUD),<br><br>                       Defendants. | Case 3:16-cv-00940<br><br>Hon. Michael P. Shea<br>Courtroom 2<br><br>ECF Case<br><br><u>CLASS ACTION</u><br><br>**DECLARATION OF LOU KERNER IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**<br><br><u>DEMAND FOR JURY TRIAL</u> |

I, Lou Kerner, declare as follows:

1.      I have been retained by the Law Offices of Susman Godfrey L.L.P., the Plaintiffs' lawyer in this case, as an expert to review the facts of the case and offer my analysis of some of the investments sold by GAW Miners and some of the representations GAW made about those investments.

2.      I am currently a Managing Partner at CryptoOracle LLC, a Venture Capital and Advisory Firm focused on investing in, and advising, crypto-related companies. As part of my work at CryptoOracle, I am an active blogger on cryptocurrency related topics.

3.      I attended U.C.L.A., where I got a B.A. in Economics in 1984.  I then worked as a consultant at Bain and Company, after which I attended Stanford University, where I received an M.B.A.  Thereafter, I worked as an equity analyst on Wall Street following media companies.  I was first at Merrill Lynch (1994–1996), and then at Goldman Sachs (1996–2000).  After

Goldman, I became CEO of The .tv Corporation, a start-up which commercialized the top-level-domain .tv (licensed from the tiny island nation of Tuvalu).  That was followed by three years as President of Bolt.com, an early social network. I then held CFO roles at ROO Group and Perimeter Security.  After Perimeter, I joined Wedbush Securities in 2010 as an equity analyst following private companies.  In addition to writing research I held conference calls with industry experts.  In 2012, in partnership with National Securities, we launched The Social Internet Fund (TSIF) to invest in private companies.

4.     It was while running TSIF that I began researching and writing about Bitcoin. During 2013 to 2014 I held three conference calls with Bitcoin industry experts, TSIF invested in ChangeTip (which specialized in online micropayments using Bitcoin), and I purchased the domain name BitcoinWallet.com (for $25,000).  In 2013 I was highlighted in a Wall Street Journal article as Wall Street's Bitcoin expert.

5.     From 2015–2017, I was a partner at Flight Ventures, where I invested in tech companies founded by Israelis.  While at Flight Ventures, on June 29, 2017, I held a conference on Initial Coin Offerings (ICOs).

6.     Since June 29th, I have largely focused my time on crypto-related issues. I began writing about crypto on the blogging platform Medium.  A complete list of my 61 crypto posts on Medium can be found in Appendix A.   On October 8, 2017, I published a thought piece titled "7 Thoughts On Crypto After Three Months Down The Rabbit Hole".  It was my first post that reached #1 on Medium's list of the most read Bitcoin posts.  After three days as the most read piece, I was ranked by Medium as the third most influential Bitcoin blogger on the Medium platform.  I have subsequently been invited to speak at industry events, advise crypto companies on their ICOs, and share thoughts with the press on crypto topics (e.g. CNBC).

7.      In December, 2017, I co-founded CryptoOracle LLC to invest in and advise crypto companies.

8.      Since December, in addition to investing and advising in crypto, I've continued to actively write on Medium, with my ranking ranging from #3–#7 in term of influential Bitcoin bloggers on the platform.  I've spoken at countless industry functions, including events in France and Israel.  In addition, I'm globally known in the industry for starting CryptoMondays, the largest crypto related Meetup in the world, with over 9,500 members across 20+ cities and 10+ countries.

9.      In preparing this declaration, I have relied on my general knowledge of finance and crypto as well as the materials cited herein.

## HOSTED CRYPTOCURRENCY MINING

10.     Cryptocurrency mining is predicated on the use of blockchain, a distributed and replicated ledger containing entries for cryptocurrency transactions. The blockchain is publicly available but secured through cryptography. Blockchain protocols are specific sets of rules drafted in computer programming code. The "blocks" in the blockchain are collections of digital data. The blockchain uses cryptographic hash functions when recording and storing data, rather than simple unencoded transaction information, as a means of protecting the integrity of the data.

11.     The Bitcoin blockchain, like many other cryptocurrency blockchains, is distributed to computers around the world. Bitcoin has no centralized governing authority, no central intermediary, and no central point of failure. As a result, there is a need for members of the Bitcoin community to serve functions normally handled by central intermediaries like banks, including reviewing and verifying transactions to be added to the blockchain.

12.     The community members who provide computing power to the network are referred to as "miners." Miners build and manage the blockchain and receive cryptocurrency

and/or transaction fees as an incentive to mine. For most blockchains, including Bitcoin, mining

is a critical function served by individuals, collections of individuals (a.k.a. pools), or companies,

who validate transactions and reach consensus with respect to which transactions should be

added to the blockchain.

13.     Mining is accomplished by passively running software on computers—people are

not actively involved in transaction validation or other aspects of mining. These computers,

referred to as "nodes," are network connection points that receive, create, store, and send data

along the network routes. The human element of cryptocurrency mining lies primarily in setting

up and maintaining the computer hardware and software and ensuring that the machines are

functioning and connected to the network.

14.     An incentive is required to attract miners to serve such functions. The incentive is

generally a reward of cryptocurrency and/or transaction fees, which are paid to the miners who

create the blocks. Bitcoin provides successful miners with both a reward of new bitcoins and

transaction fees.

15.      The two primary methods for reaching consensus and mining or processing

transactions of blockchain cryptocurrencies are "proof of work" and "proof of stake." Both

methods are computational rules that govern how transactions are processed and validated. The

"proof of work" algorithm used in Bitcoin requires proof that the miner has successfully solved a

complex calculation problem. This work exists to protect the integrity of the blockchain and

deter bad actors from manipulating the blockchain.

16.     "Proof of stake" systems for mining require a miner to hold some of the

cryptocurrency managed by the blockchain. Generally, the large the miner's "stake", the greater

the chances that the miner will succeed in creating a block and receive the associated reward or transaction fees.

17.     The start-up costs and complexity of successful cryptocurrency mining are a major deterrent for prospective miners. Most mining today is carried out by specialized computers driven by "application specific integrated circuit" (or "ASIC") processors which have been specially designed and built to solve the equations used in mining a particular cryptocurrency. In addition, the technology used to mine can evolve rapidly given significant rewards, such as the increases in value of Bitcoin since it was launched in 2009, requiring frequent upgrades to hardware and/or software. Mining equipment also requires significant expenses for power, both to operate the miners themselves and to cool the environment where they are maintained. Cooling expenses can be very costly given the heat generated from mining.

18.     As the price of cryptocurrency rises, the value of the mining rewards increases, which leads to more competition among miners, which, in turn, requires greater hashing power to win the rewards. The Bitcoin proof-of-work algorithm is constructed to increase the difficulty of creating a block as the amount of computing power dedicated to mining increases. All of these factors increase the difficulty and expense of mining over time.

19.     The rapidly increasing expenses and complexity of successful mining has led to mining oligopoly, with the eight largest mining pools controlling more than 89% of the total proof-of-work hash power devoted to Bitcoin mining today (per Blockchain.com). There are also barriers to entry into proof-of-stake mining.

20.     For prospective miners who may not be able to mine directly, whether because of cost or other reasons, a solution exists: hire someone else to mine for you. In such an

arrangement, the prospective miner/customer receives the block rewards and/or transactions fees from mining without having to manage the hardware and node software.

21.     There are a variety of structures to accomplish this type of arrangement for proof-of-work mining protocols, such as (i) the customer rents an ASIC miner (or a fraction of an ASIC miner) that is managed, serviced, and operated by someone else and receives the cryptocurrency and or/transaction fees (or a fraction thereof) generated by such ASIC miner; (ii) the customer buys the right to receive the cryptocurrency and/or transaction fees mined from a fixed hash rate (i.e., rents the hashing power); (iii) less transparent arrangements where the customer purchases interests that entitle such purchaser to a share of the cryptocurrency mining reward and/or transaction fees that a cloud mining venture generates.

22.     For proof-of-stake cloud mining, relatively small amounts of cryptocurrency received from each customer are pooled together. By aggregating several small shares of cryptocurrency into a pool, the chance to mine is higher than if it is done separately for each share, and the profit is divided among all pool members pro rata in accordance with their individual contribution of cryptocurrency. The persons or entities that operate the hosted mining business receive a fixed or variable fee for their mining management services and to cover expenses. It's a classic example of "economies of scale."

23.     Those who buy hosted mining services seek the cryptocurrency and transaction fees generated therefrom. The customers contribute money and rely on the expertise of the hosted mining company to manage, operate, repair, and replace the mining equipment. Whether customers are told that they receive rights to specific hardware, energy, hashing power, or simply a pro rata share of the cryptocurrency and/or transaction fees generated from mining depends on the specific mining service.

## ALTCOINS

24.     Bitcoin is seen by many as the original cryptocurrency.  The first Bitcoin was mined in 2009.

25.      Litecoin, a fork of Bitcoin, was released in October, 2011, and was the first alternative cryptocurrency to Bitcoin, or the first "Altcoin".

26.     Today CoinMarketCap tracks 1,926 cryptocurrencies, including Bitcoin and 1,925 Altcoins.  While some small percentage of these Altcoins are trying to be alternatives to currency, most are simply using cryptocurrency as a way to incentivize users to engage in new business processes, attempting to disrupt incumbents across a wide variety of different industries.

27.     Today, per CoinMarketCap, Bitcoin accounts for over 55% of the total market cap of the 1,926 coins it tracks.  Today, Altcoins are worth a total of about $85 billion, down from a peak of about $545 billion in January, 2018.

### GAW USED FALSE STATEMENTS TO SELL MINING AND ALTCOIN INVESTMENTS

28.     GAW Miners initially started by selling and shipping mining machines to customers for operation by the customer.  But starting In June, 2014, GAW Miners switched focus to selling hardware-hosted mining and agreeing to host and power at GAW's data center miners purchased by customers.[1]  Under this arrangement, customers could manage their miners via software owned by ZenMiner, an affiliate of GAW Miners (although GAW Miners CEO Josh Garza admitted to having falsely claimed that ZenMiner was an independent company).[2]

---

[1] *See* GAW Miners webpage from June 25, 2014 stored on Archive.org listing "Hosted Miners" for sale. Available at https://web.archive.org/web/20140627131545/http://www.gawminers.com:80/categories/products/hosted-miners.html
[2] *See* Exhibit 1, Letter agreement dated July 20, 2017 ("Garza Plea Agreement"), at p. 9.

29.     In July, 2014, GAW Miners shifted again and began offering cloud-hosted mining, which allowed customers to manage their miners (hosted by GAW) via the Internet.[3] Cloud-hosted mining used an interface referred to as ZenCloud, instead of being managed by the customer via ZenMiner's software.

30.     Starting in August of 2014, GAW sold shares in the profits from their mining operations, via a new product named "Hashlets." As Zen Miners terms of service stated, Hashlets were contracts providing customers "a divisible and assignable allocation of hashing power from GAW-owned and hosted mining hardware," entitling the customers to a share of the profits from that hashing power deployed.[4]

31.     Each Hashlet sold by GAW Miners was represented as having a precise amount of hashing power measured in megahash per second (a "megahash" is one million hashing calculations).[5] Supposedly, this hashing power was enabling its owner to earn a return based on the amount of cryptocurrency generated when the pools to which the Hashlet was directed succeeded in processing and confirming cryptocurrency transactions.

32.     In reality, there was no hashing power, and no actual mining hardware, supporting the majority of the Hashlets sold by GAW Miners. As GAW's CEO Josh Garza has acknowledged, GAW Miners sold more Hashlets worth of computing power than they had in their data centers.[6] In fact, according to testimony from GAW employee Madeline Eden, GAW had less than 10% of the mining power needed to support the Hashlets it sold.[7] Or, in the words

---

[3] *See* GAW Miners webpage from August 09, 2014 stored on Archive.org listing "ZenCloud Hosting Service" for various miners. Available at https://web.archive.org/web/20140809020446/http://www.gawminers.com/.
[4] Quoted in "Statement of Facts" section of *SEC v. Garza et al*, case no. 3:15-cv-01760, Filed 12/01/15  at p. 11 (attached as Exhibit 2).
[5] *See* GAW Miners webpage from September 22, 2014 stored on Archive.org describing different types of Hashlets and offering pricing for each on a per megahash basis. Available on archive.org at :
https://web.archive.org/web/20140922192453/http://gawminers.com/pages/hashlet
[6] *See* Exhibit 1, Garza Plea Agreement, at p. 9.
[7] *See* Exhibit 3, Deposition of Madeline Eden, June 26, 2018, at pp. 47-48.

of another GAW employee, a Hashlet was basically just a "payout number" at the end of the day.[8]

33.     Because GAW Miners sold more hashing power than they owned or operated, the company owed investors more money than was generated by the actual mining operations. Thus the money that customers received was not profits based on mining, rather the money was simply the return of the capital invested. In fact, GAW Miners employees purchased bitcoin from Coinbase that was transferred to Hashlet customers.[9]  Using capital from current investors to make payments to previous investors is a nothing more than a classic Ponzi scheme.

34.     In November 2014, apparently pressured by the lack of funds needed to pay Hashlet customers, GAW announced that it would launch Paycoin, a new cryptocurrency or altcoin.[10] Prior to the launch of Paycoin, GAW started selling "Hashpoints", which were convertible promissory notes that customers could exchange for Paycoins at a later date when the new cryptocurrency would eventually be released.[11] GAW stated that Hashpoints were "mined" by Hashlets.[12] I have seen no evidence that any actual mining occurred. Rather, GAW was using cryptocurrency terminology to encourage Hashlet owners to convert to Hashpoints and ultimately PayCoin. This conversion enabled GAW to stop the cash drain of paying Hashlet investors.

35.     GAW represented that Paycoin would be "backed by a fiat-based reserve of USD that shields early adopters from risk and increases acceptance by large institutions."[13] In addition, Paycoin's Whitepaper introduced the concept of a Coin Adoption Fund (CAF) to

---

[8] *See* Exhibit 4, Deposition of Joe Mordica, June 28, 2018, at pp. 57-59.
[9] *See* Exhibit 3, Deposition of Madeline Eden, June 26, 2018, at pp. 38-41.
[10] *See* Exhibit 4, Deposition of Joe Mordica, June 28, 2018, at p. 79.
[11] *See* Exhibit 3, Deposition of Madeline Eden, June 26, 2018, at pp. 62-63.
[12] *See* Exhibit 3, Deposition of Madeline Eden, June 26, 2018, at pp. 57-58.
[13] *See* GAW Miners webpage describing PayCoin from December 20, 2014, available at:
https://web.archive.org/web/20141220123942/http://www.paycoin.com/

support the rollout of Paycoin.[14] According to public statements made by GAW, the CAF would include $100,000,000 in reserves that would be used to support a floor of $20 per Paycoin. For example, in an interview with the Wall Street Journal blog Moneybeat, Garza stated that Paycoin would launch with an anticipated market capitalization of $250 million and the company will partly back that with store of fiat currency worth around $100 million.[15] I believe that all of these statements were false. Indeed, Garza acknowledged that the $20 price floor and $100 million reserve were false statements in his plea agreement for wire fraud.[16] I have seen no evidence that GAW Miners had any meaningful cash reserves available to prop up the price of PayCoin, or that it intended to do so.

36.     Concurrently, GAW introduced "Hashstakers", a new type of wallet that would lockup the deposited Paycoins for an agreed upon period of time, during which they would generate a fixed return per "proof-of-stake" blockchain models.[17]  Hashtakers once again enabled GAW to slow the drain of capital necessary to finance the ongoing Ponzi scheme.

37.     GAW sold PayCoins to customers for $20 and also provided to existing customers in exchange for Hashlets or Hashpoints.[18] Hashstaker wallets were sold for an additional amount typically $11.95 per Paycoin held in the wallet.[19]

---

[14] *See* Exhibit 5, "Paycoin, A Cryptocurrency for world adoption" at p. 7.
[15] *See* Exhibit 6, Casey, Michael J., "Bitbeat: GAW Miners to Launch Bitcion Challenger, Paycoin," Moneybeat, November 25, 2014.
[16] *See* Exhibit 1, Garza Plea Agreement, at p. 10.
[17] *See* Exhibit 4, Deposition of Joe Mordica, June 28, 2018, at p. 87; *see also* GAW Miners webpage describing Hashstakers from December 20, 2014, available at:
https://web.archive.org/web/20141229105322/http://www.gawminers.com:80/pages/hashstaker
[18] *See* GAW Miners December 20, 2014 webpage offering Paycoins for sale for $20 each, available at:
https://web.archive.org/web/20141220123942/http://www.paycoin.com/.
[19] *See* GAW Miners webpage for purchasing Hashstakers, December 29, 2014, available at:
https://web.archive.org/web/20141229105506/http://www.gawminers.com:80/pages/buy-hashstaker.

38.     Given the $100 million reserve never existed, GAW was inevitably unable to maintain the promised $20 floor for Paycoin and the price dropped quickly after the coin began to be traded on exchanges which were not controlled by GAW.[20]

39.     It is my belief that any investor would have considered the misrepresentations about Hashlets to be material to their investment. No rational investor would have purchased Hashlets if they knew the truth: that there was insufficient mining equipment with far less hashing power than GAW Miners was selling. GAW Miners' false statements about Hashlets were so fundamental to what the investment represented that it is difficult even to imagine what an "accurate" description of Hashlets would be.

40.     GAW Miners also concealed material information about Hashlets from investors. In particular, GAW never disclosed the actual source of the payouts received by Hashlet investors. In truth, those payouts were apparently coming from later investors or other revenue sources. Apparently little or none of the payouts were actually generated through mining activity. No rational investor would have purchased Hashlets if they knew that the bitcoin they were paid as a return weren't earned via mining, but were purchased on a public exchange like Coinbase using funds from non-mining sources.

41.     Paycoin and the related Hashpoints and Hashstakers products were also sold based on fundamental representations that proved to be false. In particular, GAW's claim that it had a massive $100 million reserve that it would use to buy PayCoin for a minimum of $20 was a false statement. No rational investor would have purchased Paycoins if they knew that the $100 million reserve was a fraudulent claim. The reserve and the price floor were investment parameters that defined one fundamental aspect of the new cyptocurrency—the minimum future

___

[20] According to data at coinmarketcap.com, PayCoin's price in U.S. dollars peaked at just under $16 on December 22, 2014, and the price dropped to below $2 by the end of January, 2015.

value of the investment. Setting a bound on possible losses this way is particularly significant for investors in a new cryptocurrency such as PayCoin. Any rational investor understands that such an investment is high-risk and it would be a very significant mitigation on that risk if the issuer of the currency promised to stand behind it with a large reserve fund. Unlike many new cryptocurrencies which are subject to market-based pricing from the outset, GAW initially sold PayCoin for a fixed price of $20. In that context, it would have been especially important to any rational investor that GAW was claiming to stand behind that price with its own fund.

DATE: 9 | 12 | 18            Lou Kerner

EXHIBIT 1





**U.S. Department of Justice**

*United States Attorney*
*District of Connecticut*

FILED

2017 JUL 20  P 12: 38

US DISTRICT COURT
[illegible] CT

---

*Connecticut Financial Center*
*157 Church Street, 25ᵗʰ Floor*
*New Haven, Connecticut 06510*

*(203)821-3700*
*Fax (203) 773-5376*
*www.justice.gov/usao/ct*


**July 20, 2017**

Marjorie Peerce
Ballard Spahr LLP
919 Third Ave, 37th Floor
New York, NY 10022

      Re:   United States v. Joshua Garza
          Case No. 3:17CR158(RNC)

Dear Ms. Peerce:

      This letter confirms the plea agreement between your client, Homero Joshua Garza (the "defendant"), and the United States Attorney's Office for the District of Connecticut (the "Government") concerning the referenced criminal matter.

**THE PLEA AND OFFENSE**

      The defendant agrees to waive his right to be indicted and to plead guilty to a one-count information charging him with wire fraud, in violation of 18 U.S.C. § 1343.

      The defendant understands that, to be guilty of this offense, the following essential elements of the offense must be satisfied:

1. First, that there was a scheme or artifice to defraud or to obtain money or property by materially false and fraudulent pretenses, representations or promises;

2. Second, that the defendant knowingly and willfully participated in the scheme or artifice to defraud, with knowledge of its fraudulent nature and with specific intent to defraud; and

3. Third, that in execution of that scheme, the defendant used or caused the use interstate wires.



EXHIBIT

19

*July 20, 2017 Letter to Marjorie Peerce, Esq.*
*Page 2*

## THE PENALTIES

This offense carries a maximum penalty of 20 years of imprisonment and a $250,000 fine. In addition, under 18 U.S.C. § 3583, the Court may impose a term of supervised release of not more than three years to begin after imprisonment. The defendant understands that, should he violate any condition of the supervised release, he may be required to serve a further term of imprisonment of up to two years with no credit for time already spent on supervised release.

The defendant is also subject to the alternative fine provision of 18 U.S.C. § 3571. Under this section, the maximum fine that may be imposed on the defendant is the greatest of the following amounts: (1) twice the gross gain to the defendant resulting from the offense; (2) twice the gross loss resulting from the offense; or (3) $250,000.

In addition, the defendant is obligated by 18 U.S.C. § 3013 to pay a special assessment of $100 on each count of conviction. The defendant agrees to pay the special assessment to the Clerk of the Court on the day the guilty plea is accepted.

The defendant is also subject to restitution, as discussed below. Unless otherwise ordered, should the Court impose a fine or restitution of more than $2,500 as part of the sentence, interest will be charged on the unpaid balance of the fine or restitution not paid within 15 days after the judgment date. 18 U.S.C. § 3612(f). Other penalties and fines may be assessed on the unpaid balance of a fine or restitution pursuant to 18 U.S.C. § 3572 (h), (i) and § 3612(g).

### Restitution

In addition to the other penalties provided by law, the Court must also order that the defendant make restitution under 18 U.S.C. § 3663A, and the Government reserves its right to seek restitution on behalf of victims consistent with the provisions of § 3663A. The scope and effect of the order of restitution are set forth in the attached Rider Concerning Restitution. Restitution is payable immediately unless otherwise ordered by the Court.

Regardless of restitution that may be ordered by the Court noted above, the defendant agrees to make restitution in the amount of $9,182,000. The defendant agrees to make such restitution as ordered by the Court.

The defendant agrees that by virtue of his plea of guilty he waives any rights or cause of action to claim that he is a "substantially prevailing party" for the purpose of recovery of attorney fees and other litigation costs.

## COLLECTION OF FINANCIAL OBLIGATIONS

In order to facilitate the collection of financial obligations to be imposed in connection with this prosecution, the defendant agrees fully to disclose all assets in which he has any interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, nominee, or other third party, including but not limited to:

*July 20, 2017 Letter to Marjorie Peerce, Esq.*
*Page 3*

　　1.　　The defendant will promptly submit a completed financial statement to the U.S. Attorney's Office, in a form it provides and as it directs. The defendant understands and agrees that his financial statement and disclosures will be complete, accurate, and truthful.

　　2.　　The defendant expressly authorizes the U.S. Attorney's Office to obtain a credit report on him in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.

## THE SENTENCING GUIDELINES

### Applicability

The defendant understands that the Court is required to consider any applicable Sentencing Guidelines as well as other factors enumerated in 18 U.S.C. § 3553(a) to tailor an appropriate sentence in this case and is not bound by this plea agreement. The defendant agrees that the Sentencing Guideline determinations will be made by the Court, by a preponderance of the evidence, based upon input from the defendant, the Government, and the United States Probation Office. The defendant further understands that he has no right to withdraw his guilty plea if his sentence or the Guideline application is other than he anticipated, including if the sentence is outside any of the ranges set forth in this agreement.

### Acceptance of Responsibility

At this time, the Government agrees to recommend that the Court reduce by two levels the defendant's adjusted offense level under § 3E1.1(a) of the Sentencing Guidelines, based on the defendant's prompt recognition and affirmative acceptance of personal responsibility for the offense. Moreover, should the defendant qualify for a decrease under § 3E1.1(a) and his offense level determined prior to the operation of subsection (a) is level 16 or greater, the Government will file a motion with the Court pursuant to § 3E1.1(b) which recommends that the Court reduce the defendant's Adjusted Offense Level by one additional level based on his prompt notification of his intention to enter a plea of guilty. The defendant understands that the Court is not obligated to accept the Government's recommendations on the reductions.

The above-listed recommendations are conditioned upon the defendant's affirmative demonstration of acceptance of responsibility, by (1) truthfully admitting the conduct comprising the offense(s) of conviction and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable under § 1B1.3 of the Sentencing Guidelines, and (2) truthfully disclosing to the United States Attorney's Office and the United States Probation Office personal information requested, including the submission of a complete and truthful financial statement detailing the defendant's financial condition.

In addition, the Government expressly reserves the right to seek denial of the adjustment for acceptance of responsibility if the defendant engages in any acts, unknown to the Government at the time of the signing of this agreement, which (1) indicate that the defendant has not terminated or withdrawn from criminal conduct or associations (§ 3E1.1 of the Sentencing Guidelines); (2) could provide a basis for an adjustment for obstructing or impeding

*July 20, 2017 Letter to Marjorie Peerce, Esq.*
*Page 4*

the administration of justice (§ 3C1.1 of the Sentencing Guidelines); or (3) constitute a violation of any condition of release. Moreover, the Government reserves the right to seek denial of the adjustment for acceptance of responsibility if the defendant seeks to withdraw his guilty plea or takes a position at sentencing, or otherwise, which, in the Government's assessment, is inconsistent with affirmative acceptance of personal responsibility. The defendant understands that he may not withdraw his plea of guilty if, for the reasons explained above, the Government does not make one or both of the recommendations or seeks denial of the adjustment for acceptance of responsibility.

> ### Stipulation

Pursuant to § 6B1.4 of the Sentencing Guidelines, the defendant and the Government have entered into the attached stipulation, which is a part of this plea agreement. The defendant understands that this stipulation does not set forth all of the relevant conduct and characteristics that may be considered by the Court for purposes of sentencing. The defendant understands that this stipulation is not binding on the Court. The defendant also understands that the Government and the United States Probation Office are obligated to advise the Court of any additional relevant facts that subsequently come to their attention.

> ### Guideline Stipulation

The parties agree as follows:

The Guidelines Manual in effect on the date of sentencing is used to determine the applicable Guidelines range.

The defendant's base offense level under U.S.S.G. § 2B1.1(a) is 7. That level is increased by 18 levels, because the agreed-upon loss is over $3,500,000 but less than $9,500,000 per U.S.S.G. § 2B1.1(b)(1). That level is increased by 2 levels because the offense involved 10 or more victims per U.S.S.G. § 2B1.1(b)(2). That level is further increased by 2 levels because the defendant was an organizer, leader, manager or supervisor in the charged criminal activity per U.S.S.G. § 3B1.1(c). 3 levels are subtracted under U.S.S.G. § 3E1.1 for acceptance of responsibility, as noted above, resulting in a total offense level of 26.

Based on an initial assessment, the parties agree that the defendant falls within Criminal History Category 1. The parties reserve the right to recalculate the defendant's Criminal History Category and corresponding sentencing ranges if this initial assessment proves inaccurate.

A total offense level 26, assuming a Criminal History Category 1, would result in a range of 63 to 78 months of imprisonment (sentencing table) and a fine range of $25,000 to $250,000, U.S.S.G. § 5E1.2(c)(3). The defendant is also subject to a supervised release term of 1 to 3 years. U.S.S.G. § 5D1.2.

The Government and the defendant reserve their rights to seek a departure or a non-Guidelines sentence, and both sides reserve their right to object to a departure or a non-Guidelines sentence.

*July 20, 2017 Letter to Marjorie Peerce, Esq.*
*Page 5*

The defendant understands that the Court is not bound by this agreement on the Guideline ranges specified above. The defendant further understands that he will not be permitted to withdraw the guilty plea if the Court imposes a sentence outside any of the ranges set forth in this agreement.

In the event the United States Probation Office or the Court contemplates any sentencing calculations different from those stipulated by the parties, the parties reserve the right to respond to any inquiries and make appropriate legal arguments regarding the proposed alternate calculations. Moreover, the parties reserve the right to defend any sentencing determination, even if it differs from that stipulated by the parties, in any post-sentencing proceeding.

<u>Waiver of Right to Appeal or Collaterally Attack Conviction and Sentence</u>

The defendant acknowledges that under certain circumstances he is entitled to challenge his conviction and sentence. The defendant agrees not to appeal or collaterally attack his conviction in any proceeding, including but not limited to a motion under 28 U.S.C. § 2255 and/or § 2241. Nor will he pursue such an appeal or collateral attack to challenge the sentence imposed by the Court if that sentence does not exceed 78 months of imprisonment, a 3-year term of supervised release, a $100 special assessment, a restitution order of $9,182,000, and a $20,000,000 fine, even if the Court imposes such a sentence based on an analysis different from that specified above. The Government and the defendant agree that this waiver applies regardless of whether the term of imprisonment is imposed to run consecutively to or concurrently with, in whole or in part, the undischarged portion of any other sentence that has been imposed on the defendant at the time of sentencing in this case. The defendant acknowledges that he is knowingly and intelligently waiving these rights. Furthermore, the parties agree that any challenge to the defendant's sentence that is not foreclosed by this provision will be limited to that portion of the sentence that is inconsistent with (or not addressed by) this waiver. Nothing in the foregoing waiver of appellate and collateral review rights shall preclude the defendant from raising a claim of ineffective assistance of counsel in an appropriate forum.

Information to the Court

The Government reserves its right to address the Court with respect to an appropriate sentence to be imposed in this case. Moreover, the Government will discuss the facts of this case, including information regarding the defendant's background and character, 18 U.S.C. § 3661, with the United States Probation Office and will provide the Probation Officer with access to material in its file, with the exception of grand jury material.

**WAIVER OF RIGHTS**

Waiver of Right to Indictment

The defendant understands that he has the right to have the facts of this case presented to a federal grand jury, consisting of between sixteen and twenty-three citizens, twelve of whom would have to find probable cause to believe that he committed the offense set forth in the information before an indictment could be returned. The defendant acknowledges that he is

*July 20, 2017 Letter to Marjorie Peerce, Esq.*
*Page 6*

knowingly and intelligently waiving his right to be
indicted.

### Waiver of Trial Rights and Consequences of Guilty Plea

The defendant understands that he has the right to be represented by an attorney at every
stage of the proceeding and, if necessary, one will be appointed to represent him.

The defendant understands that he has the right to plead not guilty or to persist in that
plea if it has already been made, the right to a public trial, the right to be tried by a jury with the
assistance of counsel, the right to confront and cross-examine the witnesses against him, the right
not to be compelled to incriminate himself, the right to testify and present evidence, and the right
to compel the attendance of witnesses to testify in his defense. The defendant understands that
by pleading guilty he waives those rights and that, if the plea of guilty is accepted by the Court,
there will not be a further trial of any kind.

The defendant understands that, if he pleads guilty, the Court may ask him questions
about each offense to which he pleads guilty, and if he answers those questions falsely under
oath, on the record, and in the presence of counsel, his answers may later be used against him in
a prosecution for perjury or making false statements.

### Waiver of Statute of Limitations

The defendant agrees that, should the conviction following defendant's guilty plea be
vacated for any reason, then any prosecution that is not time-barred by the applicable statute of
limitations on the date of the signing of this plea agreement (including any indictment or counts
the Government has agreed to dismiss at sentencing pursuant to this plea agreement) may be
commenced or reinstated against the defendant, notwithstanding the expiration of the statute of
limitations between the signing of this plea agreement and the commencement or reinstatement
of such prosecution. The defendant agrees to waive all defenses based on the statute of
limitations with respect to any prosecution that is not time-barred on the date the plea agreement
is signed.

## ACKNOWLEDGMENT OF GUILT AND VOLUNTARINESS OF PLEA

The defendant acknowledges that he is entering into this agreement and is pleading guilty
freely and voluntarily because he is guilty. The defendant further acknowledges that he is
entering into this agreement without reliance upon any discussions between the Government and
him (other than those described in the plea agreement letter), without promise of benefit of any
kind (other than the concessions contained in the plea agreement letter), and without threats,
force, intimidation, or coercion of any kind. The defendant further acknowledges his
understanding of the nature of the offense to which he is pleading guilty, including the penalties
provided by law. The defendant also acknowledges his complete satisfaction with the
representation and advice received from his undersigned attorney. The defendant and his
undersigned counsel are unaware of any conflict of interest concerning counsel's representation
of the defendant in the case.

*July 20, 2017 Letter to Marjorie Peerce, Esq.*
*Page 7*

## SCOPE OF THE AGREEMENT

The defendant acknowledges that this agreement is limited to the undersigned parties and cannot bind any other federal authority, or any state or local authority.  The defendant acknowledges that no representations have been made to him with respect to any civil or administrative consequences that may result from this plea of guilty because such matters are solely within the province and discretion of the specific administrative or governmental entity involved.  Finally, the defendant acknowledges that this agreement has been reached without regard to any civil tax matters that may be pending or which may arise involving him.

## COLLATERAL CONSEQUENCES

The defendant understands that he will be adjudicated guilty of each offense to which he has pleaded guilty and will be deprived of certain rights, such as the right to hold public office, to serve on a jury, to possess firearms and ammunition, and in some states, the right to vote. Further, the defendant understands that if he is not a citizen of the United States, a plea of guilty may result in removal from the United States, denial of citizenship, and denial of admission to the United States in the future.  The defendant understands that pursuant to section 203(b) of the Justice For All Act, the Federal Bureau of Prisons or the United States Probation Office will collect a DNA sample from the defendant for analysis and indexing. Finally, the defendant understands that the Government reserves the right to notify any state or federal agency by which he is licensed, or with which he does business, as well as any current or future employer of the fact of his conviction.

## SATISFACTION OF FEDERAL CRIMINAL LIABILITY; BREACH

The defendant's guilty plea, if accepted by the Court, will satisfy the federal criminal liability of the defendant in the District of Connecticut as a result of his participation in a fraudulent scheme related to virtual currency and his conduct in the crypto currency business, including but not limited to work with voice-over internet protocols, GAW, GAW Miners, ZenMiner, ZenCloud and Paycoin, which forms the basis of the information in this case.

The defendant understands that if, before sentencing, he violates any term or condition of this agreement, engages in any criminal activity, or fails to appear for sentencing, the Government may void all or part of this agreement.  If the agreement is voided in whole or in part, defendant will not be permitted to withdraw his guilty plea.

*July 20, 2017 Letter to Marjorie Peerce, Esq.*
*Page 8*

## NO OTHER PROMISES

The defendant acknowledges that no other promises, agreements, or conditions have been entered into other than those set forth in this plea agreement, and none will be entered into unless set forth in writing, signed by all the parties.

This letter shall be presented to the Court, in open court, and filed in this case.

Very truly yours,

DEIRDRE M. DALY
UNITED STATES ATTORNEY


JOHN T. PIERPONT, JR.
ASSISTANT UNITED STATES ATTORNEY


The defendant certifies that he has read this plea agreement letter and its attachment(s) or has had it read or translated to him, that he has had ample time to discuss this agreement and its attachment(s) with counsel and that he fully understands and accepts its terms.

_____          7/20/17
Homero Joshua Garza                       Date
The Defendant


I have thoroughly read, reviewed and explained this plea agreement and its attachment(s) to my client who advises me that he understands and accepts its terms.


_____          7/20/17
MARJORIE PEERCE, ESQ.                      Date
Attorney for the Defendant

*July 20, 2017 Letter to Marjorie Peerce, Esq.*
*Page 9*

## STIPULATION OF OFFENSE CONDUCT

The defendant and the Government stipulate to the following offense conduct that gives rise to the defendant's agreement to plead guilty to the information:

1. From approximately May 2014 through January 2015, the defendant operated a scheme to defraud victims out of money in connection with the procurement of virtual currency on their behalf.

2. "Virtual currency" is a digital representation of a value that can be traded and functions as a medium of exchange. Virtual currency generally is not issued or guaranteed by any jurisdiction or government, and its value is decided by consensus within the community of users of the virtual currency. A virtual currency generally self-generates units of currency through a process called "mining." A virtual currency "miner" is computer hardware that runs special computer software to solve complex algorithms that validate groups of transactions in that virtual currency. Once a complex algorithm is solved, a unit of currency, such as a bitcoin, is awarded to the individual operating the miner. This process is known as "mining."

3. The defendant founded multiple companies that were used in connection with this scheme to defraud related to virtual currency, including, among others, GAW, GAW Miners, ZenMiner, ZenCloud.

4. The defendants' companies sold miners, access to miners, the right to purchase a virtual currency called "paycoin," as well as "hashlets." A hashlet entitled an investor to a share of the profits that GAW Miners and/or or ZenMiner would purportedly earn by mining virtual currencies using the computers that were maintained in their data centers. In other words, hashlet customers, or investors, were buying the rights to profit from a slice of the computing power owned by GAW Miners and ZenMiner.

5. To generate business as well as attract customers and investors, the defendant made multiple statements related to the scheme, including, among others:

| Statement | Truth |
|---|---|
| GAW Miners' parent company purchased a controlling stake in ZenMiner for $8 million and that ZenMiner became a division of GAW Miners. | There was no transaction in which GAW Miners' parent company purchased a controlling stake in ZenMiner. |
| The hashlets the defendant's companies sold engaged in the mining of virtual currency. | The defendant's companies sold more hashlets than were supported by the computing power maintained in their data centers. Stated differently, the defendant's companies sold the customers the right to more virtual currency than the companies' computing power could generate. |

*July 20, 2017 Letter to Marjorie Peerce, Esq.*
*Page 10*

| Statement | Truth |
|---|---|
| The market value of a single paycoin would not fall below $20 per unit because the defendant's companies had a reserve of $100 million that the companies would use to purchase paycoins to drive up its price. | The defendant's companies did not have a reserve of $100 million and could not therefore drive up the value of paycoin. |

6.  The defendant along with others, acting through his companies, applied money his companies had made from new hashlet investors and used it to pay older hashlet investors money that the companies owed them based on the purported mining GAW Miners and ZenMiner had done on the investors' behalf.

7.  The reasonably foreseeable loss attributable to the defendant from the scheme was $9,182,000.

8.  In furtherance of the scheme the defendant used interstate wires, including by sending, among others, one email dated August 8, 2014, from the email address Josh@genuisesatwork.com to the email address Josh@genuisesatwork.com, in which the defendant discussed GAW Miners' parent company purportedly purchasing a controlling stake in ZenMiner for $8 million, when, in fact, there was no such sale.

This written stipulation is part of the plea agreement.  The defendant and the Government reserve their right to present additional offense conduct and relevant conduct to the Court in connection with sentencing.

_____              _____
HOMERO JOSHUA GARZA                  JOHN T. PIERPONT, JR.
The Defendant                                    ASSISTANT UNITED STATES ATTORNEY


_____
MARJORIE PEERCE, ESQ.
Attorney for the Defendant

*July 20, 2017 Letter to Marjorie Peerce, Esq.*
*Page 11*

### RIDER CONCERNING RESTITUTION

      The Court shall order that the defendant make restitution under 18 U.S.C. § 3663A.  The order of restitution may include:

1.  If the offense resulted in damage to or loss or destruction of property of a victim of the offense, the order of restitution shall require the defendant to:

    A.   Return the property to the owner of the property or someone designated by the owner; or

    B.   If return of the property is impossible, impracticable, or inadequate, pay an amount equal to:

        The greater of –
        (I)  the value of the property on the date of the damage, loss, or destruction; or

        (II) the value of the property on the date of sentencing, less the value as of the date the property is returned.

2.  In the case of an offense resulting in bodily injury to a victim –

    A.  Pay an amount equal to the costs of necessary medical and related professional services and devices related to physical, psychiatric, and psychological care; including non-medical care and treatment rendered in accordance with a method of healing recognized by the law of the place of treatment;

    B.  Pay an amount equal to the cost of necessary physical and occupational therapy and rehabilitation; and

    C.  Reimburse the victim for income lost by such victim as a result of such offense;

3.  In the case of an offense resulting in bodily injury that results in the death of the victim, pay an amount equal to the cost of necessary funeral and related services; and

4.  In any case, reimburse the victim for lost income and necessary child care, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense.

      The order of restitution has the effect of a civil judgment against the defendant.  In addition to the court-ordered restitution, the court may order that the conditions of its order of restitution be made a condition of probation or supervised release.  Failure to make restitution as ordered may result in a revocation of probation, or a modification of the conditions of supervised release, or in the defendant being held in contempt under 18 U.S.C. § 3583(e).  Failure to pay restitution may also result in the defendant's re-sentencing to any sentence which might originally have been imposed by the Court.  *See* 18 U.S.C. §§ 3614, 3613A. The Court may also order that the defendant give notice to any victim(s) of his offense under 18 U.S.C. § 3555.

EXHIBIT 2

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

_____
                                               )
SECURITIES AND EXCHANGE COMMISSION,            )
                                               )
                    Plaintiff,                 )
                                               )
        v.                                     )        Case No.
                                               )
HOMERO JOSHUA GARZA,                           )
GAW MINERS, LLC, and                           )
ZENMINER, LLC (d/b/a ZEN CLOUD),               )        JURY TRIAL DEMANDED
                                               )
                    Defendants.                )
_____)

## COMPLAINT

Plaintiff United States Securities and Exchange Commission ("the Commission") alleges

the following against Defendants Homero Joshua Garza ("Garza"), GAW Miners, LLC ("GAW

Miners"), and ZenMiner, LLC (d/b/a ZenCloud) ("ZenMiner"), and hereby demands a jury trial:

## SUMMARY OF THE ACTION

1.      Defendants used the lure of quick riches from a twenty-first century payment

system known as virtual currency to defraud investors.  Though cloaked in technological

sophistication and jargon, defendants' fraud was simple at its core – defendants sold what they

did not own, and misrepresented the nature of what they were selling.

2.      From approximately August 2014 through December 2014, defendants sold – to

over 10,000 investors – investment contracts representing shares in the profits they claimed

would be generated from using their purported computing power to "mine" for virtual currency.

"Mining" for virtual currency means applying computer power to try to solve complex equations

that verify a group of transactions in that virtual currency.  The first computer (or collection of

computers) to solve such an equation is awarded new units of that virtual currency. This process is known as "mining," and the computer equipment used in this process, and the humans who own it, are known as "miners."

3.      Defendants sold shares in the returns from their purported mining operations, via investment contracts that they named "Hashlets."  Hashlet contracts entitled their purchasers to a share of the profits from defendants' purported "hashing power," or the computing power (measured in megahash per second), that defendants purportedly devoted to virtual currency mining.  In reality, defendants sold far more Hashlets worth of computing power than they actually had in their computing centers.  There was no computer equipment to back up the vast majority of Hashlets that defendants sold.

4.      Defendants earned about $19 million in revenue from their sales of Hashlets.

5.      Defendants Garza and GAW Miners made many false and misleading statements about GAW Miners' virtual currency mining operations to potential and actual investors.  For example, they misrepresented:

        a.   that all of the Hashlets of computing power purchased by investors would be pooled together to engage in virtual currency mining, and that investors' returns, or "payouts," would be calculated based on the success of those collective virtual currency mining operations;

        b.   that buying a Hashlet would allow investors to mine virtual currency without the expense and expertise that would be required to purchase and maintain their own virtual currency mining equipment;

        c.   the profitability and life-span of Hashlets;

        d.   the extent of GAW Miners' mining activities; and

      e.   how the payouts for Hashlets were derived.

Garza and GAW Miners knew that each of these statements was false at the time it was made.

     6.    Defendants' Hashlet sales had many of the hallmarks of a Ponzi scheme. Because defendants sold far more computing power than they owned and dedicated to virtual currency mining, they owed investors a daily return that was larger than any actual return they were making on their limited mining operations. Instead, investors were simply paid back gradually over time, as "returns," the money that they, and others, had invested. As a result, some investors' funds were used to make payments to other investors. Most Hashlet investors never recovered the full amount of their investments, and few made a profit.

     7.    Through the activities alleged in this Complaint, defendants have engaged in fraud in connection with the purchase or sale of securities, in violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and various subparts of Rule 10b-5 thereunder; and fraud in the offer or sale of securities, in violation of various subparts of Section 17(a) of the Securities Act of 1933 ("Securities Act"). Defendants have also engaged in the offer and sale of unregistered securities, in violation of Sections 5(a) and 5(c) of the Securities Act.

     8.    Based on these violations, the Commission seeks:

      a.   the entry of a permanent injunction prohibiting defendants from further violations of the relevant provisions of the federal securities laws;

      b.   disgorgement of defendants' ill-gotten gains, plus pre-judgment interest; and

      c.   the imposition of civil penalties due to the egregious nature of defendants' violations.

## JURISDICTION AND VENUE

9.      The Commission seeks a permanent injunction and disgorgement pursuant to

Section 20(b) of the Securities Act [15 U.S.C. §77t(b)], and Section 21(d)(1) of the Exchange

Act [15 U.S.C. §78u(d)(1)].  The Commission seeks the imposition of a civil penalty pursuant to

Section 20(d) of the Securities Act [15 U.S.C. §77t(d)], and Section 21(d)(3) of the Exchange

Act [15 U.S.C. §78u(d)(3)].

10.      The Court has jurisdiction over this action pursuant to Sections 20(d) and 22(a) of

the Securities Act [15 U.S.C. §§77t(d), 77v(a)], and Sections 21(d), 21(e) and 27 of the

Exchange Act [15 U.S.C. §§78u(d), 78u(e), 78aa].

11.      Venue is proper in this District because, at all relevant times, GAW Miners, LLC,

and ZenMiner, LLC maintained offices in Connecticut and conducted business in Connecticut;

and Homero Joshua Garza lived in Connecticut.  A substantial part of the actions that give rise to

the Commission's claims occurred in Connecticut.

12.      In connection with the conduct described in this Complaint, defendants directly or

indirectly made use of the mails or the means or instruments of transportation or communication

in interstate commerce.

13.      Defendants' conduct involved fraud, deceit, or deliberate or reckless disregard of

regulatory requirements, and resulted in substantial loss, or significant risk of substantial loss, to

other persons.

## DEFENDANTS

14.      **Homero Joshua Garza** ("Garza"), age 30, presently lives in Brattleboro,

Vermont, though he lived in Somers, Connecticut during 2014.  During all of 2014, he was the

founder and CEO of GAW Miners, LLC, and he owned and controlled ZenMiner.  In those

positions, which he held since those companies were founded, he directed their strategy, their

financial decisions, and had ultimate control over their day-to-day operations.

15.     **GAW Miners, LLC** ("GAW Miners") is a Delaware limited liability company

whose principal place of business is in Bloomfield, Connecticut.  GAW Miners was formed in

May 2014.  Garza is the Managing Member and majority owner of GAW Miners.  During all

relevant times, Garza has controlled GAW Miners and directed its day-to-day activities.

16.     **ZenMiner, LLC** ("ZenMiner") is a Delaware limited liability company, which

shares a principal place of business with GAW Miners in Bloomfield, Connecticut, and was

formed in July 2014.  ZenMiner also does business under the name ZenCloud, and utilized the

website www.zencloud.com.  Garza is the Managing Member and majority owner of ZenMiner.

During all relevant times, Garza controlled ZenMiner and directed its day-to-day activities.

## STATEMENT OF FACTS

**Background on Virtual Currency and Its "Mining"**

17.     "Virtual currency" is a digital representation of value that can be traded and

functions as a medium of exchange; a unit of account; and/or a store of value, but does not have

legal tender status (i.e., when tendered to a creditor, is a valid and legal offer of payment) in any

jurisdiction.  Virtual currency generally is not issued or guaranteed by any jurisdiction or

government, and its value is decided by consensus within the community of users of the virtual

currency.  The most widely adopted virtual currency is bitcoin, although there are many other

virtual currencies used today, known as "altcoins."  Virtual currency is distinct from fiat

currency, which is the money designated by a country as its legal tender.  An example of fiat

currency is the United States dollar.  Virtual currencies may be traded on online exchanges for fiat currencies, including the United States dollar, or used to purchase goods and services.

18.     Bitcoin, and some other virtual currencies, can be "mined."  A virtual currency "miner" is an individual or entity, and her or its computer equipment, that runs special computer software to solve complex algorithms that validate groups of transactions in that virtual currency.

19.     Each unit of virtual currency has a "blockchain," which is an electronic public ledger of all transactions in that currency.

20.     Certain virtual currencies, including bitcoin, self-generate units of the currency by rewarding miners with newly created coins when they are the first to solve the algorithms that validate transactions in the currency.  Using bitcoin as an example, the bitcoin network collects all transactions made during a set time period, usually around ten minutes, into a list called a "block."  Bitcoin miners compete to be the first to confirm the transactions in the block and write them into the blockchain.  The first miner to solve the algorithm that confirms a transaction is rewarded with a preset amount of newly-issued bitcoins by the bitcoin protocol.  This process of solving equations to confirm transactions and to earn new coins is known as "mining" that currency.

21.     As interest in bitcoin, and corresponding competition among miners, increased, more computer processing power became required in order for a miner to have a chance of solving blocks, and thus obtain the rewards of mining.  The processing power of computers used to confirm virtual currency transactions is measured by their "hash rate," or the number of calculations they can perform per second (*e.g.*, a computer with a hash rate of 10 megahash can make 10 million calculations per second).  The greater a computer's hash rate, the greater that

computer's chance to solve the equation that confirms transactions, and the more virtual currency coins the miner may earn.

22.     Given the increasing competition to solve the equations that confirm blockchain transactions, miners frequently combine their computing power into mining "pools."  As a general rule, the more computing power directed to a particular mining pool, the better the chance that pool will be the first to confirm a block of transactions and receive the payout for mining.  Generally, pool participants' shares of the mining reward depend upon the proportional amount of computing power each contributes to the pool.

23.     From August 2014, when defendants first offered Hashlets for sale, to the present, the exchange rate of U.S. dollars to bitcoins has fluctuated between a low of approximately $177 per bitcoin and a high of approximately $600 per bitcoin.

**GAW Miners and ZenMiner's Rapidly Evolving Businesses**

24.      In approximately March 2014, Garza began operating a business to purchase virtual currency mining equipment from its overseas manufacturers and to resell it to customers. He founded GAW Miners in May 2014, and thereafter conducted his hardware resale business under the GAW Miners name.  Until approximately May or June of 2014, GAW Miners' primary business was to sell virtual currency mining equipment.

25.     In the spring of 2014, GAW Miners began offering its customers a new service called Hardware Hosted Mining.  Instead of shipping to its customers the computer hardware they ordered from GAW Miners, GAW Miners offered to host the computer hardware that the customers purchased in its own datacenter.  Customers paid GAW Miners a fee to cover the expenses that GAW Miners incurred to operate their hardware, such as maintenance, electricity, cooling, and Internet connectivity.  While the customers' mining equipment physically resided in

GAW Miners' datacenter in Connecticut, customers maintained complete and direct control over how they used their equipment to engage in mining, by accessing their equipment remotely through their personal computers over the Internet.

26. Within weeks of beginning to offer Hardware Hosted Mining, in approximately June 2014, GAW Miners again changed the focus of its business. It began encouraging its customers to switch from Hardware Hosted Mining to a new service called Cloud Hosted Mining.

27. In May 2014, Garza created a company named ZenMiner, which was formally incorporated in July 2014. Though he persuaded other individuals to represent to customers and the public that ZenMiner was an independent company, Garza owned and controlled ZenMiner at all times. On information and belief, Garza perpetuated this deception because he believed that GAW Miners could not offer cloud-based hosted mining services without alienating its original hardware-purchasing customers.

28. Cloud Hosted Mining was marketed as a partnership between ZenMiner and GAW Miners. GAW Miners offered customers the ability to purchase their mining hardware from it, and then house their equipment in ZenMiner's datacenters for a fee. Customers could control their mining equipment through the Internet by logging on to the accounts they established on ZenMiner's website interface called ZenCloud. ZenCloud promised customers that "you don't pay for shipping, cooling, or electricity. Let us cover all of that for you."

29. Customers who switched from GAW Miners' Hardware Hosted Mining service to Cloud Hosted Mining through ZenCloud lost some control over how they used their equipment to engage in mining. ZenCloud users could only direct their equipment to engage in mining through one of the handful of mining pools offered on the ZenCloud website.

8

30.     GAW Miners gave their Cloud Hosted Mining customers the option to end their ZenCloud hosted service at any time and receive their physical equipment in the mail from GAW Miners.

31.     Cloud Hosted Mining was a fraudulent scheme in at least two respects.

32.     First, even though Garza fully controlled ZenMiner, he marketed it to the public as a business entity that was distinct from GAW Miners.

33.     For example, on or about May 23, 2014, Garza participated in an interview with a reporter for Cryptocoinsnews.com, during which he convinced a family member of a GAW Miners' investor to pretend that ZenMiner was that person's company and idea.  At the time of the interview, Garza expected that the reporter would publish a story containing the misrepresentations that ZenMiner was an entity separate from GAW Miners.  That story was published on or about May 23, 2014.

34.     This charade continued when, on or about August 24, 2014, GAW Miners issued a press release announcing that its parent company (which was also owned and controlled by Garza), had purchased a controlling stake in ZenMiner for $8 million, and that ZenMiner had become a division of GAW Miners.  This statement was false; no such transaction occurred because Garza had always owned and controlled ZenMiner.  Garza authorized and approved the issuance of GAW Miners' false press release.  The purported ZenMiner transaction was marketed as proof that GAW Miners was a leader in the virtual currency industry by bridging the gap between hardware sellers and hosted mining services.

35.     Second, contrary to its stated reason for existence, no mining actually occurred through ZenMiner's ZenCloud interface.  Though customers paid for equipment that they believed they were directing to mine in various pools available through the ZenCloud interface,

and also paid for hosting services, very few pieces of the mining equipment purchased by customers actually existed in a ZenMiner datacenter. Most customers paid for a phantom piece of equipment that neither GAW Miners nor ZenMiner owned. Neither GAW Miners nor ZenMiner was directing customers' computing power to any pools at all, much less the ones customers believed they were choosing.

36. Soon after GAW Miners' Cloud Hosting Mining service launched, customers began to complain that they could not see the increase in power in the mining pools they believed they had chosen to mine through ZenCloud. These complaints were made public through message boards dedicated to virtual currency mining.

37. Cloud Hosted Mining customers were entitled to request that the computer equipment they had purportedly purchased be sent to them, but neither GAW Miners nor ZenMiner owned that equipment to ship. Facing potential mass customer demands that their equipment be shipped, GAW Miners and ZenMiner again changed business models. GAW Miners offered all of its customers the opportunity to convert their ZenCloud Cloud Hosted machines to "Hashlets."

**GAW Miners and ZenMiner Create and Offer Investments in Hashlets**

      **a.    What Are Hashlets?**

38. Beginning in August 2014, GAW Miners and ZenMiner decided to sell "Hashlets" to the public. Buying a Hashlet entitled an investor to a share of the profits that GAW Miners and/or ZenMiner would purportedly earn by mining virtual currencies using the computers that were maintained in their data centers. Hashlets were purported to earn a return based on the number of virtual currency units generated when the pools to which their computing power was directed succeeded in processing and confirming virtual currency transactions. As

10

ZenMiner's terms of service stated, a Hashlet was "a divisible and assignable allocation of hashing power from GAW-owned and hosted mining hardware."

39.     Unlike Cloud Hosted Mining customers, Hashlet customers were not buying computer hardware.  Hashlet customers had no right to receive any piece of computer hardware at the end of their Hashlet contract.  Instead, Hashlet customers were buying the rights to profit from a slice of the computing power owned by GAW Miners and/or ZenMiner (by then, purportedly, a division of GAW Miners).

40.     Hashlet investors were required to do very little to purportedly mine virtual currency.  Investors only needed to log into their ZenCloud accounts and click-and-drag their Hashlet icons over to the icons of the mining pools in which they wished their Hashlets to mine.  From there, investors relied solely on the efforts of GAW Miners and/or ZenMiner to generate Hashlets' expected profits by owning, housing, operating, maintaining, and connecting the computer hardware that would engage in mining.  If GAW Miners had received payouts from its purported mining activities, Hashlet investors' shares of those payouts would have been calculated and deposited by GAW Miners into investors' ZenCloud accounts.

41.     The majority of investors bought Hashlets through a web-based shopping portal by paying with U.S. currency or with bitcoin.  Some investors who were Cloud Hosted Mining customers also bought Hashlets through their existing ZenCloud accounts, in part by converting the value of their Cloud Hosted Mining equipment.  Once an investor owned one Hashlet, she could also buy additional Hashlets through her ZenCloud account, including by reinvesting the "payouts" from her existing Hashlets into additional Hashlets.

42.     Investors were told that they could log on to their ZenCloud accounts, activate their Hashlets using a code that was provided at the time of purchase, and then direct their

Hashlets to engage in mining in one of the mining pools available through ZenCloud.  One of the mining pools, ZenPool, was purportedly operated by GAW Miners and/or ZenMiner and was advertised as the "most profitable pool."

43.     Investors' shares of the profits that they purportedly earned as a result of their Hashlets' mining in pools were posted to their ZenCloud accounts daily.  Investors were also charged maintenance fees to pay for the purported physical upkeep of the equipment behind the Hashlets.  Those maintenance fees were deducted from investors' ZenCloud accounts daily.  Investors could request a withdrawal, in bitcoin, from their ZenCloud accounts.

44.     GAW Miners' press releases and website, and Garza's posts on the company's message board variously described Hashlets as "the world's first digital cloud miner" and as "designed from the start to be the easiest, most convenient miner to own."  GAW Miners and Garza marketed Hashlets specifically to non-technical people interested in virtual currency mining, touting a Hashlet as being "so easy to use that it is 'Grandma approved'", and claiming that "[i]f you can open an email, you can setup and operate a Hashlet."

**b.      GAW Miners and ZenMiner Oversold Hashlets**

45.     GAW Miners began selling Hashlets in mid-August 2014.  GAW Miners' press releases dated August 24 and August 26, 2014 claimed that "thousands of units per second" were sold during their first day, and millions of dollars of Hashlets were sold during their first week, of availability.

46.     There were two basic types of Hashlets – those that were purportedly able to mine for bitcoin and those that were purportedly able to mine for altcoin.  Bitcoin mining required computers to solve a different algorithm than that used to mine for altcoin.

12

47.     Prices for Hashlets ranged between about $10 and $50 per unit, depending on their features, including which pools they were able to mine.  A "unit" of a Hashlet was a measurement of its hashing power, or the number of calculations it could perform per second. Hashlets that mined bitcoin were sold in multiples of 1 gigahash per second units, and Hashlets that mined altcoin were sold in multiples of 1 megahash per second units.

48.     During their first week of availability alone, GAW Miners and ZenMiner oversold -- between triple and quadruple -- the number of Hashlets for which they had the supporting computing power.  Yet, their sales continued.

49.     By October 2014, GAW Miners had oversold Hashlets to an even more extreme degree.  It had oversold altcoin-mining Hashlets by at least about 100 times its computing capacity, and bitcoin-mining Hashlets by at least about 5 times its computing capacity.

50.     Though GAW Miners built a data center that, by November 2014, contained significant computing capacity for mining bitcoin, it made no increases to its computing capacity for mining altcoin.

51.     Throughout the time that Hashlets were sold, from mid-August 2014 through December 2014, GAW Miners and ZenMiner sold at least $19 million of Hashlets, to more than 10,000 investors.

52.     From the time that Hashlets went on sale in August 2014, and throughout the entire time they were sold, Garza was provided information about how many units of Hashlets were sold.  Garza knew or should have known, from August 2014 onward, that GAW Miners and ZenMiner did not have the computing capacity to support the units of Hashlets that they sold.

13

53.     Garza was responsible for GAW Miners' and ZenMiner's decision to keep selling Hashlets despite his knowledge (or reckless or negligent disregard) that the companies lacked the computing power they purported to be selling to investors.

54.     As a result of dramatically overselling their computing capacity, GAW Miners and ZenMiner did not engage in mining with even approximately the amount of computing power they had sold in Hashlets.  As a further result, GAW Miners' and ZenMiner's revenues from mining bitcoin were minimal, and their revenues from mining altcoin were virtually nonexistent.

55.     Between August and December 2014, GAW Miners created several types of Hashlets with different features.  Garza approved the creation of these Hashlet varieties, and frequently announced their availability on GAW Miners' website and through posts on the company's message board.

56.     For example, on or about September 11, 2014, GAW Miners announced the creation of the limited edition "Remember" Hashlet with the logo of "9/11" to commemorate those whose lives were lost in the terrorist attacks of September 11, 2001.  Garza announced that GAW Miners would only sell 500 Remember Hashlets, and would donate all of the proceeds (approximately $10,000) to "the 9/11 memorial fund."  He specified that "GAW will in no way be profiting from any sales related to the cause."  After selling approximately 2,290 Remember Hashlets for a total of approximately $48,000, GAW Miners donated only $10,000 to a 9/11 related charity.  Garza knew or should have known that GAW Miners actually profited from the sale of Remember Hashlets, contrary to his representations.

     **c.**     **GAW Miners and Garza Misrepresented Critical Aspects of Hashlets**

57.     Garza directed many of GAW Miners' publicity efforts for its Hashlet offerings.

14

Garza had ultimate authority and control over GAW Miners' promotional materials, including the company's website, and posts he made on the company's message board. Garza also frequently spoke to reporters for publications covering the virtual currency industry, and posted information about GAW Miners and its products on social media outlets.

58.     GAW Miners and Garza made three basic types of misrepresentations to Hashlet investors. First, they misleadingly claimed that Hashlets would be always profitable and never obsolete, when they had no reasonable basis to support those claims. Second, they misleadingly claimed that Hashlets were engaged in mining for virtual currency through pools available in ZenCloud, when they knew that few Hashlets were supported by actual mining activity. Third, they misleadingly claimed that ZenPool engaged in mining, when they knew that it never did.

59.     First, from approximately August through December 2014, GAW Miners' website, and other promotional materials, described Hashlets as always profitable and never obsolete. Garza also claimed on numerous occasions, including in a Hashtalk.org post in August 2014, words to the effect that "there will never be a time a Hashlet cost[s] more to run than you make, and they will always make money." GAW Miners also claimed, on its website, that Hashlets would never break down or expire and this "guarantees your investment is protected and secure, so you can enjoy many years of owning the world's most advanced miner."

60.     At the time GAW Miners and Garza made, or Garza authorized, these statements, they knew or should have known that these statements were untrue. They knew or should have known that the profitability of virtual currency mining depended on many unforeseeable factors, including the market price of those virtual currencies, the cost of the electricity and cooling for the equipment, and the extent to which the speed of developments in computing technology made any equipment they owned obsolete. GAW Miners and Garza thus had no reasonable basis

15

for these statements at the time they made or authorized them.

61.     GAW Miners' and Garza's statements about profitability and longevity were material to Hashlet investors.  GAW Miners conducted a marketing survey of hundreds of people who purchased Hashlets during their first week of availability. Approximately 70 percent of investors identified the Hashlets' promised return on investment as the most important, or one of the most important, factors in their decision to purchase a Hashlet.  Garza reviewed the results of this survey and thus knew that these factors were material.

62.     By November 2014, Hashlets became unprofitable.  That is, the Hashlets' daily maintenance fees exceeded their purported mining payouts.

63.     By January 2015, Hashlets were obsolete.  GAW Miners announced the termination of its purported Hashlet mining operations at the end of January 2015, stating that "GAW and ZenCloud mining operations have been indefinitely put on hold, effective immediately."

64.     Second, despite marketing Hashlets as capable of mining in the various pools available through ZenCloud, and pricing different types of Hashlets differently based on which pools they were purportedly able to mine, Hashlets did not mine in those pools.

65.     The operators of the pools purportedly available through ZenCloud confirmed that GAW Miners did not establish accounts with those pools, and did not direct any of its computing power towards those pools.  Thus, GAW Miners was not receiving any mining payouts from those pools.

66.     After numerous customer questions about where their hashing power was being used, Garza admitted, in early October 2014, that GAW Miners was not sending its computing power to the pools Hashlet investors selected.  Instead, Garza and GAW Miners claimed, it was

16

"sending our hashing power to our own private pools, but keeping your payouts 100% based on the pool you select." This representation too, was false. At the time, as Garza and GAW Miners knew or should have known, the company had nowhere near the amount of computing power that would support the units of hashing power that had been sold through Hashlets. As a result, GAW Miners engaged in minimal bitcoin mining – in private pools or elsewhere – and effectively no altcoin mining. At the time Garza made this statement, he knew or should have known that GAW Miners could not, and did not, fund its daily payouts to investors with the revenue from its mining activities.

67.     In order to conceal from investors that the mining activity associated with Hashlets did not produce sufficient revenues to fund the payouts that had been promised to investors, GAW Miners used revenues from ongoing Hashlet sales to fund payouts to investors. Thus, Hashlets operated as a Ponzi scheme, in which investors' returns were mostly paid by using the money invested by others.

68.     In September and October 2014, GAW Miners did not always have enough investors purchasing Hashlets with bitcoin to cover its daily bitcoin payout obligations to existing Hashlet owners. As a result, GAW Miners, at Garza's direction, converted some of the United States dollars the company had received as revenue from Hashlet sales into bitcoin. GAW Miners then used the bitcoin it had purchased to make daily payouts to existing Hashlet investors. In September and October 2014 alone, GAW Miners, at Garza's direction, converted over $1.5 million in cash to bitcoin to make mining payouts and thus perpetuate their fraud.

69.     Third, ZenPool was a purported mining pool created and operated by GAW Miners exclusively for certain Hashlet owners. GAW Miners claimed that ZenPool had the "highest and most reliable payout of any multipool in the world." A multipool is a pool that

17

mines both bitcoin and altcoin, depending on the profitability of each coin at the time.

70.     GAW Miners and Garza advertised ZenPool as an enticement for investors to pay more for "Zen Hashlets" and "Prime Hashlets," the only two types of Hashlet capable of mining in ZenPool.  These two types of Hashlets were significantly more expensive than other types of Hashlets that did not allow investors to access ZenPool.

71.     Contrary to GAW Miners' and Garza's representations, there was no ZenPool. GAW Miners did not operate a pool that engaged in mining.  GAW Miners did not direct the hashing power represented by its sales of Zen Hashlets or Prime Hashlets to a pool it owned and operated for investors' benefit.

72.     Instead, GAW Miners determined what the daily payout from ZenPool would be by examining the publicly-available payouts of other pools that were mining that day, and picking a higher number.

73.     When GAW Miners and Garza made false and misleading statements about ZenPool, they knew or should have known that there was no such pool engaged in mining.

**d.     The Hashlet Scheme Unraveled and the Next Scheme Began**

74.     During the fall of 2014, mining for virtual currency became less profitable as the value of many virtual currencies fell and the technological difficulty of mining increased.  Faced with a drop in their revenue stream from selling Hashlets, and faced with the fact that Hashlets were no longer profitable by November 2014, GAW Miners and Garza solicited many investors to redeem their Hashlets for new investment opportunities.

75.     GAW Miners announced, in November 2014, that it was planning to launch a new form of virtual currency, called PayCoin, and it offered for sale new digital wallets designed to hold PayCoin, called HashStakers.  GAW Miners sold HashStakers to new customers, and also

offered existing Hashlet investors the chance to "upgrade" their Hashlets to HashStakers.

76.     Garza made the decision that GAW Miners would offer and sell HashStakers, and launch PayCoin. He controlled GAW Miners' strategic direction, and the content of the advertising that GAW Miners did for these new offerings.

77.     In offering HashStakers to Hashlet investors, GAW Miners and Garza attempted to prolong their scheme and prevent the collapse of GAW Miners.

**FIRST CLAIM FOR RELIEF**

**Fraud in the Purchase or Sale of Securities in Violation of
Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**

78.     The Commission repeats and incorporates by reference the allegations in paragraphs 1-77 above as if set forth fully herein.

79.     Hashlets constitute investment contracts, and thus "securities" under Section 3(a)(10) [15 U.S.C. §78c(a)(10)] of the Exchange Act.

80.     All defendants engaged in a fraudulent course of conduct by which they oversold the investment returns from their virtual currency mining operation. In addition, GAW Miners and Garza's fraudulent course of conduct included their misrepresentations to investors about the nature and profitability of the investment they were selling.

81.     By engaging in the conduct described above, all defendants, directly or indirectly, acting intentionally, knowingly or recklessly, by the use of means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities: have employed or are employing devices, schemes or artifices to defraud; and have engaged or are engaging in acts, practices or courses of business which operate as a fraud or deceit upon certain persons.

19

82. By engaging in the conduct described above, GAW Miners and Garza, directly or indirectly, acting intentionally, knowingly or recklessly, by the use of means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities, have made or are making untrue statements of material fact or have omitted or are omitting to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading.

83. As a result, defendants have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5].

## SECOND CLAIM FOR RELIEF
### Fraud in the Offer or Sale of Securities in
### Violation of Section 17(a) of the Securities Act

84. The Commission repeats and incorporates by reference the allegations in paragraphs 1-77 above as if set forth fully herein.

85. Hashlets constitute investment contracts, and thus "securities" under Section 2(a)(1) [15 U.S.C. §77b(1)] of the Securities Act.

86. All defendants engaged in a fraudulent course of conduct by which they oversold the investment returns from their virtual currency mining operation. In addition, GAW Miners and Garza's fraudulent course of conduct included their misrepresentations to investors about the nature and profitability of the investment they were selling.

87. By engaging in the conduct described above, all defendants, directly and indirectly, acting intentionally, knowingly or recklessly, in the offer or sale of securities by the use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails: have employed or are employing devices, schemes or artifices to defraud; or

20

have engaged or are engaging in transactions, practices or courses of business which operate as a

fraud or deceit upon purchasers of the securities.

88.     By engaging in the conduct described above, GAW Miners and Garza, directly

and indirectly, acting intentionally, knowingly or recklessly, in the offer or sale of securities by

the use of the means or instruments of transportation or communication in interstate commerce

or by the use of the mails, have obtained or are obtaining money or property by means of untrue

statements of material fact or omissions to state material facts necessary in order to make the

statements made, in the light of the circumstances under which they were made, not misleading.

89.     As a result, defendants have violated and, unless enjoined, will continue to violate

Section 17(a) of the Securities Act [15 U.S.C. §77q(a)].

**THIRD CLAIM FOR RELIEF**
**Offer and Sale of Unregistered Securities**
**Violation of Sections 5(a) and 5(c) of the Securities Act**

90.     The Commission repeats and incorporates by reference the allegations in

paragraphs 1-77 above as if set forth fully herein.

91.     Hashlets constitute investment contracts, and thus "securities" under Section

2(a)(1) [15 U.S.C. §77b(1)] of the Securities Act.

92.     No registration statement was filed with respect to the Hashlets sold by

defendants, and no exemption from registration was available for these securities.

93.     By engaging in the conduct described above, defendants, directly or indirectly: (a)

have made use of the means or instruments of transportation or communication in interstate

commerce or of the mails to sell, through the use or medium of a prospectus or otherwise,

securities as to which no registration statement has been in effect and for which no exemption

from registration has been available; and/or (b) have made use of the means or instruments of

transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been filed and for which no exemption from registration has been available.

94.     As a result, defendants have violated and, unless enjoined, will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C §77e(a), (c)].

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission requests that this Court:

A.     Enter a permanent injunction restraining defendants and each of their agents, servants, employees and attorneys and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, including facsimile transmission or overnight delivery service, from directly or indirectly engaging in the conduct described above, or in conduct of similar purport and effect, in violation of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5]; and Sections 5(a) and 5(c), and 17(a) of the Securities Act [15 U.S.C. §§77e(a), (c), 77q(a)].

B.     Require defendants to disgorge their ill-gotten gains, plus pre-judgment interest;

C.     Require defendants to pay an appropriate civil monetary penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)], and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)];

D.     Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered;

E.     Award such other and further relief as the Court deems just and proper.

Respectfully submitted,

SECURITIES AND EXCHANGE COMMISSION
By its attorneys,

/s/ Kathleen B. Shields
Kathleen B. Shields (Mass. Bar No. 637438,
phv 04710)
Gretchen Lundgren (Mass. Bar No. 644742)
Michele Perillo (Mass. Bar No. 629343)
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
33 Arch Street, 23rd Floor
Boston, MA 02110
(617) 573-8904 (Shields direct)
(617) 573-4590 (fax)
shieldska@sec.gov (Shields email)

Local Counsel:


/s/ John B. Hughes
John B. Hughes (Fed. Bar No. CT 05289)
Assistant United States Attorney
Chief, Civil Division
United States Attorney's Office
Connecticut Financial Center
157 Church St., 23rd Floor
New Haven, CT 06510
Phone: (203) 821-3700
Fax: (203) 773-5373

DATED: December 1, 2015

EXHIBIT 3

1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF CONNECTICUT
2
     DENIS MARC AUDET, MICHAEL    §
3    PFEIFFER, DEAN ALLEN         §
     SHINNERS, AND JASON          §   CASE 3:16-CV-00940
4    VARGAS, INDIVIDUALLY AND     §
     ON BEHALF OF ALL OTHER       §
5    SIMILARLY SITUATED,          §
                                  §
6         PLAINTIFFS,             §
                                  §
7    VS.                          §
                                  §
8    STUART A. FRASER, GAW        §
     MINERS, LLC, AND             §
9    ZENMINER, LLC (D/B/A ZEN     §
     CLOUD),                      §
10                                §
          DEFENDANTS.             §
11
12
13
14
15            ORAL AND VIDEOTAPED DEPOSITION OF
                       MADELINE EDEN
16                    JUNE 26, 2018
17
18        ORAL AND VIDEOTAPED DEPOSITION OF MADELINE
     EDEN, produced as a witness at the instance of the
19   Plaintiffs and duly sworn, was taken in the above
     styled and numbered cause on Tuesday, June 26, 2018,
20   from 9:42 a.m. to 2:52 p.m., before TAMARA CHAPMAN,
     CSR, CRR, RPR in and for the State of Texas,
21   reported by computerized stenotype machine, at the
     offices of Regus, 106 E. Sixth Street, Austin,
22   Texas, pursuant to the Federal Rules of Civil
     Procedure and any provisions stated on the record
23   herein.
24
25   Job No. 143277

1                 A P P E A R A N C E S

2

3    FOR THE PLAINTIFFS:
          Edgar Sargent, Esq.
4         SUSMAN GODFREY
          1201 Third Avenue
5         Seattle, Washington 98101

6

7

8     FOR THE DEFENDANT STUART FRASER:
          Sara Echenique, Esq.
9         Anna Schuler, Esq.
          HUGHES HUBBARD & REED
10        One Battery Park Plaza
          New York, New York 10004

11

12

13

14

15

16

17

      ALSO PRESENT:
18        Sam Swain, Videographer

19

20

21

22

23

24

25

1            M. EDEN - 6/26/18

2    need me to purchase, you know, $100,000 of the

3    Bitcoin from Coinbase."  And there was a whole e-mail

4    chain for that that -- where Josh finally was -- you

5    know, told me, "oh, no, I've -- I've done this before

6    for lots of people and there's a way you can claim it

7    on your taxes and it doesn't matter" and -- and at

8    any rate, I ended up buying $100,000 of Bitcoin

9    because I couldn't -- I didn't really want to send it

10   back on my bank account at that point.  But like a

11   week after I did that, he put another $100,000 into

12   my bank account, at which point I just said, "okay,

13   sent it back" and I told my bank to kick it back

14   because it was kind of out of hand and I didn't -- I

15   didn't feel comfortable doing it.  And after talking

16   with a lot of the other developers who were working

17   there and a lot of the other people who were working

18   there, they had all done that as well.  Most of --

19   most, if not all of them, had had their coin --

20   Coinbase accounts closed down from purchasing too

21   much Bitcoin.  So it was --

22          Q.  Did you have any understanding of how

23   Mr. Garza or GAW were using this Bitcoin that they

24   were purchasing through your account?

25          A.  Absolutely.  It was going directly to the

Page 39

1                    M. EDEN - 6/26/18

2      payouts.

3              Q.  "Payouts," what does that mean?

4              A.  To the Hashlet payouts.  So if you owned a

5      Hashlet, you would receive a daily payout from the

6      mining of the Hashlet.  And so the first time I

7      bought it, I was under the impression that it was

8      needed for something else, not necessarily that,

9      but -- but it did end up all going directly into the

10     payouts wallets that were on ZenCloud.

11             Q.  And, ultimately, you learned that was

12     because there wasn't any actual mining being done

13     to -- under -- you know, to support the Hashlets?

14             A.  There may have been a limit.  Well, it

15     depends on when.  So after the -- after that, I was a

16     little upset and so I did -- I started asking a lot

17     of questions and I started talking a lot more with

18     Jonah, who had -- was in the process of moving up to

19     Connecticut so that he could work for GAW.

20             Q.  When was this, about?  October?

21             A.  I would imagine probably.  I don't really

22     recall the exact dates.  I know he spent a lot of

23     time in Connecticut before he actually got a house

24     there.

25             Q.  Okay.

1                     M. EDEN - 6/26/18

2           A.   So that aside, yeah, it was -- it was kind

3    of a big mess because all of the Bitcoin that I

4    bought on Coinbase went to -- was supposed to go over

5    to -- I guess -- when I first started working there,

6    I mean, literally the first time I visited, the

7    reason that we ended up working on the wallets was

8    because they had trans- -- they were transitioning

9    off of their own hosted wall- -- their own wallets

10   that they were managing themselves, paper wallets,

11   like they were in safe deposit boxes and they were

12   transitioning the operational stuff over to BitGo

13   wallets, which was a third-party service

14   wallet-hosting thing that allowed, you know, for like

15   commercial usage and tracking of -- of Bitcoin.

16           And a large portion of the coin that --

17   that I purchased from Coinbase never went into the

18   BitGo wallet.  It went straight into the operational

19   wallet management system that we built for GAW when I

20   got there.

21           Q.   So the Las Vegas trip was in between your

22   first and second trips to Mississippi, as you

23   remember it?

24           A.   As I remember it, yes.

25           Q.   And so have you explained what you learned

M. EDEN - 6/26/18

1

2   in Las Vegas related to the Hashlets issues or is

3   there more to be said?

4        A.  Well, aside from the -- the need for

5   purchasing large amounts of Bitcoin from outside

6   sources, I mean, that was pretty key to me as far as

7   indicating that they didn't have the hashing power on

8   the back end, because if they had, they wouldn't have

9   needed to purchase Bitcoin from outside sources.

10        Q.  I think you testified earlier that on the

11   second visit to Mississippi, you learned something

12   else or something more about Hashlets.  What was

13   that?  What do you remember about that trip?

14        A.  On that trip, I was -- I had done -- I was

15   doing a lot more work with the developers on the

16   actual website and implementing validation processes,

17   QA processes, continuous integration processes for

18   the build and deployment of the website.  And this is

19   technical, I guess, in nature, but it was all

20   systems.  And I got to spend a lot more time with

21   the -- the lead developer, Evan Lucas, and, you know,

22   I got -- I was able to ascertain that there was --

23   that the ZenCloud system, as it was, was not

24   connected to any sort of back end directly.

25        Q.  When you say "back end," what do you mean?

1                    M. EDEN - 6/26/18

2          A.  All right.

3          Q.  I think that's a good amount.  We can

4     clean it up later.

5          A.  A thousand terahash is -- yeah, a thousand

6     gigahash, and a thousand gigahash is a thousand --

7     you know, one gig- -- tera -- a single terahash is a

8     thousand gigahash, and a single gigahash is a

9     thousand megahash, and it's very similar to how

10    computer memory works.

11         Q.  The count there is the number of hash

12    calculations that can be performed in a second?

13         A.  Correct.

14         Q.  So was sufficient hashing power acquired

15    to support the outstanding Hashlets at some point?

16         A.  No.

17         Q.  Do you have an estimate for what portion

18    of the outstanding Hashlets were actually supported

19    and connected to miners --

20         A.  I --

21         Q.  -- at the maximum?

22         A.  I'm sorry.  What -- could you --

23         Q.  At the -- like at what point in time -- I

24    mean, at some point in time I assume there was -- you

25    said there was less than 10 percent -- way less than

1                    M. EDEN - 6/26/18

2    10 percent of the outstanding Hashlets were actually

3    supported by the mining power that you saw in

4    Mississippi.  Is that right?

5          A.  Correct.

6          Q.  Did I understand that correctly?  Did that

7    10 percent go up because some additional hashing

8    power was acquired?  Did it ever increase or...

9          A.  No.  We never actually connected any kind

10   of back-end mining to ZenCloud directly.  That just

11   never happened, and --

12         Q.  Can you explain the relationship between

13   ZenCloud and Hashlets?

14         A.  The Hashlets were hosted on ZenCloud's

15   service.

16         Q.  So any Hashlet that had been sold would be

17   running through ZenCloud to -- supposedly to mining

18   power behind it?

19         A.  Correct.

20         Q.  And it's that ZenCloud that needed to be

21   connected to mining power for that to operate the way

22   it was presented to the public?

23         A.  Correct.

24         Q.  I'm going to hand you Exhibit 2, if I can

25   find it.

1              M. EDEN - 6/26/18

2     translated into payments in the system?

3          A.   Yeah.

4          Q.   Am I understanding you correctly?

5          A.   Yes.

6          Q.   So, and you're not sure, looking at this

7     chain, what, like, if we go three-fourths of the way

8     down the first page, there's a message from Joe

9     Mordica that says the "fixes have rolled out

10    tonight."  "No other payout issues.  Only the ones I

11    talked about today that are fixed."

12              You don't know what payout issues

13    specifically he's talking about there?

14         A.   Not off the top of my head, no.  Like I

15    said, the payout issues were a regular thing.  That

16    was probably like half of the people that worked

17    support there were dealing with payout issues.

18         Q.   You mentioned hash -- another hash product

19    or item that was on the second or third page.

20         A.   HashPoints.

21         Q.   What are HashPoints?

22         A.   HashPoints were -- if I remember

23    correctly, they were effectively a tertiary mining

24    pool that was created so that people could point

25    their Hashlets at the HashPool and mine HashPoints

1                           M. EDEN - 6/26/18

2      that would later be able to -- you would later be

3      able to convert into Paycoin, I think.  I could be

4      wrong, but I'm pretty sure.

5           Q.  What work would the miners be doing at

6      that point to mine HashPoints?  Is there a -- was

7      there a hash algorithm or calculation that needed to

8      be done --

9           A.  No.  We weren't doing anything.  It was

10     just sitting there and the pictures were running, you

11     know.  It was basically like a visual representation

12     of a -- of a, you know -- of a miner.  It wasn't

13     really doing anything.  It was just the same thing as

14     the Hashlets.

15          Q.  Well, if I understand things correctly

16     with Bitcoin mining, Bitcoin miners are performing

17     complex hashing calculations as part of the system

18     that's used to verify Bitcoin transactions.  Is that

19     correct?

20          A.  Yes.

21          Q.  And what equivalent work was being done by

22     Hashlets that were pointed -- that were being used to

23     mine HashPoints?

24          A.  To begin with, the Hashlets weren't doing

25     any mining at all.  I mean, there wasn't any mining

1                    M. EDEN - 6/26/18

2          A.   HashPoints and HashPool was a bad idea.

3          Q.   And HashPoints being the sort of bridge to

4     Paycoin that you could mine through Hashlets.  Is

5     that fair?

6          A.   Yeah.

7          Q.   Was the process of mining HashPoints, did

8     that cause your Hashlet to expire or become

9     HashPoints somehow or was it just --

10         A.   No, that caused your Hashlet to stop

11    paying out Bitcoins and instead pay out HashCoins.

12         Q.   But you would still have the Hashlet at

13    the end of the day.  You would just keep using it to

14    generate more and more HashPoints?

15         A.   Correct.

16         Q.   And could you convert it back to a Bitcoin

17    Hashlet, at least in theory, if you wanted to?

18         A.   I don't recall.  I don't know if -- I'm

19    assuming at first it was probably that way, yeah, or

20    I don't know if it stuck -- was stuck doing

21    HashPoints afterwards or not.  I don't remember.

22    They changed the specifications and the requirements

23    every day.

24              But, effectively, it was a good way to

25    minimize the amount of Bitcoin that was going out of

Page 63

                    M. EDEN - 6/26/18

1

2   the system and also limit the amount of hashing

3   power, I guess, that was required on the back end

4   to -- I mean, support the amount of hashing power

5   that had been sold.  I don't remember when we

6   deployed all of the S4s into -- and S3s into the data

7   center, but --

8        Q.  So --

9        A.  But, yeah, it was right before the advent

10  of actual Paycoin.

11       Q.  At the time of Exhibit 3, the HashPoints

12  program was obviously already in place.  Does that

13  mean that -- that at that point the plan for

14  launching a new cryptocurrency was also in place or

15  was there a period when HashPoints were just not

16  associated with this idea of -- of a new

17  cryptocurrency?

18       A.  I don't know about a plan being already in

19  place.  All I know is that it came down the chain

20  that this is how it was going to be very quickly and

21  creating a new pool and a new form of, you know -- a

22  new coin to pay out with was -- was not something

23  that took a very long time to do.

24       Q.  So -- which you knew when -- when the

25  HashPoints program was implemented that they were

EXHIBIT 4

1              JOE MORDICA - JUNE 28, 2018

2           UNITED STATES DISTRICT COURT

3            DISTRICT OF CONNECTICUT

4

5   DENIS MARC AUDET, MICHAEL

     PFEIFFER, DEAN ALLEN SHINNERS,

6   and JASON VARGAS, Individually and

     on Behalf of All Others Similarly

7   Situated,

8        Plaintiffs,

9   VERSUS             CASE NO. 3:16-cv-00940,

10  STUART A. FRASER, GAW MINERS,

     LLC, and ZENMINER, LLC, (d/b/a

11  ZENCLOUD),

12       Defendants.

13  HONORABLE MICHAEL P. SHEA, COURTROOM 2

14  ECF CASE

15  CLASS ACTION

16

17

18

19      VIDEOTAPED DEPOSITION OF JOE MORDICA

20     Taken at the La Quinta Inn & Suites

21  Hattiesburg, 109 Lundy Lane, Hattiesburg, Mississippi,

22  on Thursday, June 28, 2018, beginning at 9:14 a.m.

23

24

25  Job No. 142900

```
 1              JOE MORDICA - JUNE 28, 2018
 2                    APPEARANCES
 3
 4      EDGAR SARGENT, ESQUIRE
        Susman Godfrey
 5      1201 Third Avenue
        Seattle, Washington 98101
 6
 7
 8
             COUNSEL FOR PLAINTIFFS
 9
10
        SARA ECHENIQUE, ESQUIRE
11      SARAH CAVE, ESQUIRE
        Hughes Hubbard & Reed
12      One Battery Park Plaza
        New York, New York 10004
13
14
15
             COUNSEL FOR DEFENDANT, STUART A. FRASER
16
17
18
19   REPORTED BY:
20   CONNIE CHASTAIN, RMR, CSR #1025
21   VIDEOTAPED BY:
22   EDDIE NABORS
23
24
25
```

Page 57

1                JOE MORDICA - JUNE 28, 2018

2      project that he brought in from a marketing

3      perspective to help build this new hashing product

4      called Hashlets.

5          Q.   What was the idea behind Hashlets?

6          A.   More and better marketing and --

7          Q.   How are they supposed to be different from

8      cloud-hosted mining?

9          A.   Completely virtual, on demand, instant

10     activation.  You didn't have to wait for an order to

11     be fulfilled, you didn't have to -- I mean, that was

12     the big thing.

13         Q.   As I understood cloud-hosted mining, and

14     correct me if this is wrong, when a customer required

15     cloud-hosted mining in his purchase release, they were

16     told that they were being sold a particular machine,

17     they could actually order that machine if they decided

18     that wanted to take it so it wasn't cloud-hosted

19     anymore?

20         A.   Uh-huh.

21         Q.   Is that right?

22         A.   Yeah.

23         Q.   Hashlets is when it started allocating

24     hashing power from one machine among different

25     customers?

1        JOE MORDICA - JUNE 28, 2018

2      A.    That's right.  So when Hashlets was

3    introduced, Josh gave the ability to the users that

4    were on the cloud-hosted environment to have their

5    machine shipped to them because we were no longer

6    going to service their machines in that -- with that

7    business model.

8            So the introduction of Hashlets, we were

9    taking customers that wanted to on board their hashing

10   power and turn them into hashlets.  So taking their

11   hashing power off of their account, de-allocating that

12   hashing power, allocating that hashing power to a pool

13   that Josh picked, basically, and spending up a hashlet

14   for that person inside ZenCloud, which was -- a

15   hashlet was basically just a payout number at the end

16   of the day.

17     Q.    What do you mean by saying that a hashlet was

18   just a payout number?

19     A.    Yeah, so if you purchased 20 megahash -- it

20   was just a computed dollar amount at the end of the

21   day.  So it was a -- it was a -- looked like a little,

22   you know, icon on the screen that you would -- that

23   you would see.  And it had a -- it had a hashing power

24   label on it, say 20 megahash or 30 megahash or

25   whatever so you knew what you had in your account.

1          JOE MORDICA - JUNE 28, 2018

2          And on the back end we just had to say this

3     20 megahash pointed to this pool at the end of the day

4     is going to generate $2.13 in revenue.   So that's how

5     the ZenCloud system would deposit that amount, that

6     bitcoin amount, into the individual's account at the

7     end of the day.

8          Q.   So that was a manual calculation that was

9     done based on the return of a particular pool;

10    correct?

11         A.   Yeah.

12         Q.   It wasn't a return that actually came from a

13    computer doing hashing?

14         A.   Doing work on the pool; correct.   It was --

15    it was a calculation that was made based on the

16    24-hour payout of that pool at the end of the day.

17    And no one knew what that pool's average payout was

18    going to be at the end of the day until we reached the

19    end of the day.   But however much it was, that's what

20    was going to be allocated to that person's account.

21         Q.   Okay.   Before we go any deeper into hashlets,

22    I still need to tie up a few things about the

23    cloud-hosted mining.

24         A.   Yeah.

25         Q.   So towards the end, at least, cloud-hosted

                    JOE MORDICA - JUNE 28, 2018

1

2      Q.    Were you involved with Paycoin?

3      A.    Uh-huh.

4      Q.    Tell me how that started.

5      A.    Yeah, Paycoin started when -- from what I

6   remember, Josh is coming up with more ideas to --

7                    THE WITNESS:   Okay.   You got a time out?

8                    MR. SARGENT:   Yeah.

9                    THE WITNESS:   Okay.

10                   VIDEOGRAPHER:   Off record.

11                        (Off the record.)

12                   VIDEOGRAPHER:   Back on record.

13   MR. SARGENT:

14     Q.    So you were going to tell us about Paycoin.

15     A.    Yeah.

16     Q.    How did it start?   When did you first hear

17   about Paycoin?

18     A.    It started when Josh came up with the idea to

19   build an additional source of revenue to help offset

20   some of the mining equipment that he was not able to

21   purchase because of whatever reason, you know, he

22   didn't have enough money or whatever.

23          So he literally -- I believe he came up with

24   Paycoin to raise more money in a seed round in a ICO,

25   initial coin offering, where it's a little bit

JOE MORDICA - JUNE 28, 2018

1
2      just to get other people more involved in transacting
3      with Paycoin, you know.
4          Q.   And did Paycoin -- Paycoin had a wallet
5      called HashStaker; is that right?
6          A.   A wallet called HashStaker, I remember this
7      wallet.  I don't think it was a wallet, it was a
8      miner, though.  Yeah, yeah, yeah, yeah.  It was a
9      miner.  It was, like, a -- it was a virtual miner or
10     something that generated -- yeah, it was a staking
11     miner.  It was, like, a staking -- I guess it was a
12     staking wallet.  You would call it a staking wallet.
13         Q.   Well, you would put coins in it and they
14     would be locked up for a certain period --
15         A.   Yeah.
16         Q.   -- and they would generate interest?
17         A.   Yeah.
18         Q.   So I understood that to be a wallet.
19         A.   Yeah, yeah, that's a wallet, it's not a
20     miner.
21         Q.   Okay.
22         A.   Yeah, yeah.
23         Q.   And did that ever work?  I mean, was the code
24     released so it functioned for users?
25         A.   I believe so, yeah.  I think I remember it

EXHIBIT 5



# Paycoin

## A Cryptocurrency fit for world adoption

White Paper





# Abstract

*This paper examines Paycoin™, from a technical and practical perspectives as a new cryptocurrency designed to facilitate mass adoption and long-term valuation stability. While cryptocurrency is not a new industry, existing cryptocurrencies have failed to achieve widespread adoption, largely due to their inability to provide a stable network for participants as well as a stable source of value for adopters. The current cryptocurrency environment requires mining participants to invest in hardware that is quick to obsolescence. This environment creates an arms race of computational power investments as mining participants are in constant haste to remain relevant and cost-effective in their mining efforts. Paycoin™ employs a "Smart Proof-of-Stake" protocol preventing this phenomenon while promoting long-term sustainable price stability. Moreover, Paycoin™ introduces Prime Controllers™, distributed high-staking transactional processing nodes that can be acquired temporarily via an algorithmic bidding system. Prime Controllers™ automatically adjust the creation rate of Paycoins™ in response to real market demand, creating long-term stable valuations, dramatically lowered transaction times over legacy cryptocurrencies, all while also creating a lucrative environment for market-maker investments in the currency.*

*Paycoin™ is the first cryptocurrency to employ a HybridFlex blockchain, expanding on the work of Satoshi Nakamoto, in order to produce a light, efficient, highly-secure blockchain, accessible to nearly all internet connected devices. The HybridFlex model produces a cryptocurrency that offers ease of consumer adoption and use, ease of infrastructure support, while also facilitating large-scale investor entry into the cryptocurrency industry; Augmenting the creation, management and deployment of a competitive global payments and commerce system.*



# Table of Contents

1. What is cryptocurrency?

2. What is Proof-of-Work (PoW)?

3. What is Proof-of-Stake (PoS)?

4. Why release a new coin?

5. Technical specs Coin

  5.1 PoW

    5.1.2 Growth-Protected Reward Scheduling

  5.2 POS

  5.3 Transaction Fees

  5.4 Blockchain features

    5.4.1 HybridFlex Blockchain

    5.4.2 Immutable Transactions

    5.4.3 FundSafe

    5.4.4 Extensible Blockchain (EBC)

      5.4.4.1 Proof of Concept Claims

      5.4.4.2 Time based contracts

      5.4.4.3 Smart Property

      5.4.4.4 Advertising Micro Payment System

    5.4.5 Voting System

    5.4.6 Proxy Voting system

    5.4.7 Built in escrow

6. Controller Types

  6.1 Orion Controllers™

    6.1.1 Initial Orion Controller™ Distribution

  6.2 Prime Controllers™

    6.2.1 The Hard Problem of Quantity Theory

    6.2.2 Prime Controller™ Functions

    6.2.3 Prime Controller™ Eligibility Requirements

    6.2.4 Prime Controller™ Availability

    6.2.5 Prime Controller™ Consensus

    6.2.6 Prime Controller™ Bidding Process

      6.2.6.1 Leveraging Inter-Blockchain FundSafe

        6.2.6.1.1 Incumbents and tie-breaking

    6.2.7 Prime Controller™ Scaling

7. Conclusion



# 1 What is Cryptocurrency?

Cryptocurrency is a digital monetary unit (coin) that utilizes public key cryptography to secure and perform anti-counterfeiting functions embedded within the currency unit. Public and private keys are used as entries to form a public ledger, called a "blockchain," in order to prevent simultaneous ownership, or spending, of a monetary unit by one or more individuals.

Cryptocurrency's network cryptography techniques are cited as the first solution to the "double spending problem" in computer science.

As an achievement in both technology and commerce, units of cryptocurrency represent scarce digital resources. Unit valuations are determined by semi-consensual supply and demand forces within marketplaces, rather than valuations backed by other commodities, such as silver or gold bullion. Moreover, since cryptocurrencies are neither created nor controlled by external central bank authorities, these external authorities are equally unable to influence their valuations. Monetary policy of cryptocurrency — forces that promote inflationary or deflationary effects on money supply — are controlled by algorithmic functions, rather than by the judgment of individuals.



# 2 What is Proof of Work?

Proof of Work (PoW) is a protocol used to secure transactions and issue newly created digital coins to individuals.

Cryptocurrency relies on a distributed network of nodes reaching consensus on the legitimacy of individual transactions. A coin can only belong to one address (wallet) at any given time. To enforce this, the network creates what is called a "blockchain" public ledger recorded on each node on the network. The blockchain tracks transfers of cryptocoins to and from wallets in order to prevent counterfeiting and double spending. Transactions are executed only when the network agrees that the transferred coins are legitimately and singularly owned by the transactors and that the sending party was the last recorded recipient of said coins. This is performed by validating digital signatures against the blockchain by participants in the network.

To prevent third parties from creating false transactions, the network employs a roadblock called "Proof-of-Work" (PoW), wherein nodes on the network must find solutions to difficult mathematical equations before earning permission to edit the blockchain. This, along with the fact that each transaction must reach agreement from the majority of the other nodes on the network means that manipulation of the blockchain requires resources greater than half of the active nodes on the network.

Proof-of-work requires time and energy to perform. What incentivizes individuals to connect their nodes to the network and perform this work of validating transactions are that new cryptocoins are issued to these nodes based on the number of mathematical solutions they solve. This compensation is called the "block reward." The more work a node performs, the more transactions it verifies, and thus, the more coins awarded.



# 3 What is Proof of Stake (PoS)?

Proof-of-Stake (PoS) is an alternative protocol to Proof-of-Work (PoW) for securing transactions and issuing new coin rewards to individuals.

Rather than the ability to contribute to the blockchain being granted by supplying to computational power, access to the blockchain is granted by ownership of the cryptocurrency itself; using open wallets connected to the cryptocurrency's network. Anyone with an ownership "stake" in the cryptocurrency has the ability to connect to the network and contribute to securing and processing transactions, while earning newly-issued currency based on this participation.

Proof-of-Stake is considered, by many, as a superior protocol to Proof-of-Work in that it is more environmentally friendly, requiring far less energy and computational power than proof-of-work. This application adds incentive to hold cryptocurrency, greatly encouraging price stability, while also rendering the observed hashing power "arms race," in PoW models, potentially obsolete. This protocol also increases individual participation in the transaction securing process.

The concept of "stake" creates a barrier to entry for bad actors, who may try to attack the payment system. In order to participate in the processing and rewards of a proof-of-stake currency, an individual must hold a portion of the currency.  This, by its very nature, makes attacks more expensive as coins are not reusable for other purposes, whereas in a Proof-of-Work coin, resources could be used in a self-serving manner, being redirected towards multiple coins and tasks.  HashCoin™ leverages this "skin-in-the-game" concept with its tiered controller network and exclusive barrier to entry for "Primary Node" operators.



# 4 Why release a New Coin?

Cryptocurrency is shifting the economic paradigm. By introducing blockchain technology, and proving that digital scarcity is possible, cryptocurrencies, and the networks that process them, have formed a proof-of-concept that, decentralized digital money can provide a value proposition that has never before been contemplated in global commerce.

However, as legacy cryptocurrencies age, it becomes increasingly clear that these coins' networks face enormous challenges in promoting price stability, maintaining decentralization, and ensuring ease of use, all of which severely hinder adoption.

*To date, all cryptocurrencies have failed to achieve mainstream adoption due to their inherent shortcomings.*

Paycoin™ changes this for the first time. It carries with it the most compelling features of existing cryptocurrencies, while making key advancements necessary to produce a coin network that is fast-trans-acting, safe and secure, decentralized, and favors price stability over speculation; a currency highly suitable for global adoption.

Paycoin™ is unique among cryptocurren-cies in that its Initial Coin Offering (ICO) creates the world's first Coin Adoption Fund (CAF), a multi-tier, organized strategy for increasing global adoption. The CAF is divided into three equally sized budgets; (1) funds for promoting adoption with APIs, plugins, and apps; (2) funds for maintaining a fiat exchange, providing the necessary liquidity for merchant adoption, and; (3) funds for developing proprietary hardware to distribute to miners at cost.

In addition, Paycoin™ also introduces Prime Controllers™, which incentivize large



# 4 Why release a New Coin? *(cont.)*

investment interests to participate actively in the Paycoin™ network, removing bad actors or non-performing peers, promoting long-term price stability, and dramatically increasing transaction speed over legacy cryptocoins.

The rationale behind the creation of a new coin is simple: Existing cryptocurrencies use legacy platforms which are currently facing increasing problems in the areas of price stability and adoption. A new coin that solves these issues is poised to bring the benefits of cryptocurrency to the global marketplace; that is what Paycoin™ achieves.



# 5 Technical Coin Specifications

## 5.1 PoW

### 5.1.1 Proof of Work Time Period

The Paycoin™ PoW mining phase will last until the initial allotment of coins needed, are mined.  In this proof-of-work phase, any miners wishing to participate in mining Paycoin™, will be allowed to commence mining.

During the proof-of-work phase the "thermodynamic, reverse corollary, difficulty algorithm" will dictate a 12.5 million coin mintage limit[i].  Of the initial 12.5 million coins minted an allotment of approximately 5.5 million coins will be distributed to the Initial Prime owners and those who participated in an initial Paycoin™ acquisition program. As the difficulty rises, the reward will inversely correlate, seeking an equilibrium between the amount of work accomplished to process transactions, and the reward structure accomplishing the work.  Difficulty retargets every block, with a block time of 1 minute. In this phase the initial 50 Prime Controllers™ will be deployed .  The Paycoin™ network will utilize a five-network-confirmation protocol, versus a 51% consensus of the Prime Controllers™, to generate new coins, while the network of Prime Controllers™ is deployed in preparation of the Proof-of-Stake phase.

[i] As several Prime Controllers™ have already been reserved a portion of coins equal to those reserved will be allocated to the first set of Controllers™ coming online prior to the first network auction.



### 5.1.2 Growth-Protected Reward Scheduling

One of the complications of a fixed-supply, closed-currency system, with a declining block reward schedule, utilized by other cryptocurrencies, is the eventuality of predictable mining network disruptions and distortions, during each mining profitability modification that occurs instantaneously.

Paycoin™ provides a solution to this sudden block reward halving: A "Growth-Protection" reward scheduling system, derived from thermodynamic, closed systems, exchange of energy. This equation establishes a leading and trailing baseline, from which a gradually declining block reward can ensure a consistent supply of currency, being introduced into the closed system.

This Growth-Protection block reward schedule system protects against the rapid deflationary effect (block halving) on the currency, that occurs over the duration of the coin's life. The miner who mines the final block, will receive a proportional block reward that is derived over the existence of the Proof-of-Work stage, in relation to difficulty of the mined block.



## 5.2 PoS

Coin holders who maintain an online node and continiously participate in the Paycoin™ network by verify transactions and enabling advanced blockchain features are rewarded with Staking.

For a coin to be eligible for staking, it must exist in a single, active wallet node for 30 days or longer. This is determined by a variable that records time a coin exists within a wallet. Once a coin is transferred from one wallet to another, this variable resets. Coins that have matured to 30 days generate a stake of approximately 0.4%[2] each month[3].



Figure 5.2.1 - Paycoin Staking

## 5.3 Transaction fees

Paycoin™ transaction fees are based on the type, amount and size of the transaction being sent. Both one-to-one and many-to-one transactions will have an associated fee deducted from the receiver. For one-to-many and many-to-many transactions, the fee will be paid by the sender. This reduces end user confusion, while supporting consumer to merchant spending activities, with a known and understandable transactions model. Transaction fees will initially be distributed to all of the Orion Controllers[iv] exclusively (See Section "Orion Controllers™"). Fees are designed to be negligible, but sufficient to, prevent blockchain spamming and attacks. Transactions which send an amount less than the fee amount will be rejected as invalid, and returned to the sender[4].

---

[2] Tthe overall node stake is equivalent to 5% APY with monthly stake periods.
[3] Month is relative to a normalized number of days not to a calendar month. The number of days in each staking period is ~ 30.4375 calculated as 365.25 days divided into 12 equal periods.
[4] As an additional measure to prevent network abuse addresses sending many micro transactions smaller than the network fee will be declined processing by the network and destroyed.



## 5.4 Blockchain Features

### 5.4.1 Hybrid Flex Blockchain

With current implementations of crypto-currencies, in order to create near-instant verification of transactions a system must lower the block generation time, having the effect of greatly increasing the number of orphaned blocks, and therefore decreasing the overall stability of the blockchain. Paycoin™ provides a new solution to this block time versus stability dilemma, with a network of highly connected and capable Prime Controllers™, while also reducing blockchain bloat with the new HybridFlex Blockchain.

HybridFlex Blockchain provides archival and final confirmation of all balances, enabling new Paycoin™ nodes to partici-pating on the network, immediate access to the current HybridFlex Lite Blockchain Ledger. New nodes are able to download the "lite chain" containing only the period's most recent balances and transactions; updating new transactions as they appear. The HybridFlex Blockchain also enables transactional messages and an extensible blockchain API.

During each consolidation, or Flex interval, a list of ledger balances is written to a new ledger that contains only current balances and recent transactions. All blockchain history is maintained in the full chain on Prime and Orion Controllers™. Wallets, Mobile Apps and Merchants can download the smaller Flex Blockchain preventing wait times during the process of synchronizing balances.



**5.4.2 Immutable Transactions**

Since their introduction, inherent design flaws have hampered their adoption and usability. To complete a transaction, all parties in the agreement must wait for outside confirmation, through a blockchain, for the validity of the transaction to be accepted. This vital step, in the exchange of monetary units, can take between 10 and 30 minutes to complete with today's merchant-accepted cryptocurrencies.

Paycoin™ solves this inherent flaw by introducing Transactional Immutability into the backbone of the currency. Paycoin™ Transactional Immutability places a transactional lock on a transaction, which is broadcast immediately, network-wide, to gain consensus before being packaged into a block for later confirmation.  This allows the Paycoin™ network to process a transaction within seconds.

*One-to-One Payments (Transactions) Process*

1)   A Node (wallet or merchant) broadcasts a transaction on the network
2)   The closest Prime Controller™ verifies transaction validity
   a)   If the transaction is not verified by this Prime Controller™ the transaction is rejected and a rejection message is broadcast.
3)   The processing Prime node temporarily locks the transaction and broadcasts a verification request to it's adjoining nodes who verify and do the same.
4)   Transaction balance is verified by a majority consensus of the Prime nodes.
   a)   Response is sent (TX Success/TX Denied)
   b)   Nodes spread TX to gain consensus
5)   Upon consensus all nodes write the transaction into the current block being solved.



### 5.4.2 Immutable Transactions *(cont.)*

*Pseudo Proof of Concept Code:*

```
PrimeController::TI_Sent_Transaction() {
      TI1 = POWHash (nBlockHeight ~ Proof-of-Transactional-Viability(nth) );
      TI2 = SHA256( TI1 ) * Difficulty(n);
      TI3 = Return ( TI2 - PrimeController( directive ) );
      return TI3;
}


PrimeController::TI_Locked_Transaction() {
      TILT = PrimeController.TI_Sent_Transaction();
      if ( TILT = PrimeController(Verified_Transaction( mrch ) ) {
      BlockConfirmation = true;
            }
      }
}
```

This immediacy of transactional verification enables Paycoin™ to maintain a streamlined and efficient blockchain with periodic self-reconciliation and archival capabilities while not sacrificing transaction speed, transparency, stability or size of the full blockchain.



### 5.4.3 FundSafe

MultiSig (Multiple signature) wallets are becoming more and more common, while being the needed defacto standard. Paycoin™ adds to this security measure by introducing FundSafe on chain wallet locking. Web services can be built upon the blockchain locking system, allowing for users to lock and unlock wallet addresses using additional authentication mechanisms.   User friendly locking systems can then be used, such as two factor authentication (2FA), utilizing temporal tokens, mobile devices, or biometric signatures, making off-chain cold storage obsolete.

### 5.4.4 Extensible Blockchain (EBC)

Paycoin™ features an "Extensible Blockchain" with "HashCodes" allowing for any number of extended capabilities, services and products to be built on top of the Paycoin™ network.  The HashCode message space contains a one-way algorithmic hash of a message, file or receipt.  Merchants can easily build upon this capability and send daily batch messages, which are one-to-many transactions, containing hashed copies of customer receipts.  This allows merchants to build websites that interact with the Paycoin™ blockchain, to display verifiable receipts and purchase histories to customers. Customers can view, through trusted applications, the compared value of a receipt and it's HashCode to verify it is unchanged.  This also applies for on-chain smart contracts, advertising Pay-Per-Impression and Pay-Per-Click micropayments, Remote Peer-to-Peer Sensor networks with verifiable metrics and return payments, Proof-of-Concept claims, as well as many currently undeveloped services and uses for the additional message space.   While this is inherently similar to that of other cryptocurrencies, we have structured the HashCode system to work in a scalable and future-ready implementation of the HybridFlex blockchain technology.



### 5.4.4 Extensible Blockchain (cont.)

#### 5.4.4.1 Proof of Concept Claims

Allows for sending a transaction of an arbitrary amount containing a HashCode message to record an idea or text, marking the original date and time of the idea in the archival blockchain. This is a novel idea within other blockchains, however the current implementations are not user-friendly. API's can be built to query the Paycoin™ Network to allow websites to interact with the blockchains Proof-of-Concept database.

#### 5.4.4.2 Time based contracts

Using the hash message space, FundSafe and FundSwap, with expiring dates' contracts and agreements, can be written between multiple parties with escrows, signing and timed funds release with backup fund return for contract cancellations.

#### 5.4.4.3 Smart Property

Tying a physical device's UID to a hashed message within the blockchain.

Physical property can be tagged to an owner and ownership can be transferred via the blockchain, so a true owner of an asset can be cryptographically verified.

#### 5.4.4.4 Advertising Micro Payment System

Using the message space of the HashCoin™ blockchain, one can send a payment to apply as a provider, on an advertising network, enclosing a copy of the unique referral code. Providers can send back payments on a regular basis for clicks, impressions, conversions, affiliates, signups or any other measure.

#### 5.4.4.5 Crowdfunding

Crowdfunding companies can use the block-chain to remove relance on "trusted" third-parties. Donors/Backers would be able to verify the recipients of all funds sent on the platform. The funds could also be returned if funding targets are not met. In effect, crowd-funding failures could be eliminated on a blockchain platform using Time Based Con-tracts.



### 5.4.1 Voting System

Votable items theoretically could be anything from contract negotiations to code changes in the codebase for Paycoin™. Additional architecture may be needed to accomplish a custom voting system. A Vote passes when a majority of Prime Controllers™ cast an affirming vote within the established voting time-frame. Moreover, Orion Controllers™ can vote on specified changes or override ties in Prime Controller™ voting. Each Orion Controller™ casts a vote equal to their wallet balance (coin stake). The total votes are counted, and a two thirds majority wins. If an actor does not vote, the network disqualifies the candidate and the null vote is removed.

### 5.4.6 Proxy Voting system

Prime Controllers™ wishing to assign proxy votes may do so by allowing their proxies to send a small transaction, assigning their vote in the transaction to another, single Prime Controller™. The Prime Controller™ will then package all the votes into one transaction and submit all the votes at once with multiple hashes being in the URI.

### 5.4.7 Built in escrow

Trustless transactions are not always ideal for users wishing to remain anonymous or geographically diverse. Leveraging the Prime Controller™ bidding system, Paycoin™ introduces on-chain blockchain escrow for time-based escrows.  Two parties can, with the aid of a mutually trusted third-party, send a transaction, with escrow require-ments, to initiate a time-based escrow contract.  At any time, prior to the expira-tion of the contract, the third-party can release the funds to the sender or recipi-ent of the contract.



### 5.4.7 Built-in Escrow *(cont.)*

To set up an escrow transaction, users will send a payment to the network containing a flag for escrow, which will also contain a fixed amount of escrow data. When setting up an escrow transaction on the blockchain, the Paycoin™ network will use the following variables:

- Senders' address
- Expiration Date in unix time
- Second signing key required to release funds
- Recipients' address

To release escrowed transactions either the timer on the escrow must expire releasing the funds back to the sender or the escrow key holder must send a release transaction to the original escrow address.



# 6 Controller Types

## 6.1 Orion Controllers

Orion Controllers™ are unpromoted Prime Controllers™ who are willing to dedicate more time in securing the network than standard or lite nodes.  They will still receive the normal stake of 5%[5] as does the rest of the Paycoin™ network.  However, these elevated operators will be privy to some new privileges and benefits.  In order to be an Orion Controller™ you must dedicate more effort than the average Paycoin™ node.  In this regard, an Orion Controller™ is similar to other tiered-node concepts.  However, Orion Controller™ managers are incentivized beyond the network stake rate for participating in several responsibilities, including:

- Performance of network confirmations and communications;
- Routing system verification;
- Participatation in tiebreaker voting;
- Storing a copy of the full HashCoin™ blockchain (i.e.  non-HybridFlex block chain);
- Performing as partial Prime Controllers™ when needed in the unlikely event case of a shortage;
- Acting as a gateway for off-chain API's and services, and;
- Acting as a backbone for third party services utilizing the Paycoin™ block chain.

---

[5] Orion Controllers™ stake at the standard 5% APY rate on monthly stake periods see (3) for additional technical details on stake rates and time definitions



## 6.1 Orion Controllers *(cont.)*

In exchange for performing the above responsibilities, Orion Controllers™ are incentivized in the following ways[6]:

- All Orion Controllers™ will receive a proportional share[7] of transaction fees;
- All Orion Controllers™ will receive a proportional share of the bid fees during each Prime Controller™ bid period and;
- All Orion Controllers™ will receive a proportional share of payments and fees sent for advanced blockchain features, such as Escrow, Wallet Locking, HashCode messaging.

Orion Controllers™ have the exclusive right to bid on open Prime Controller™ slots and be promoted to Prime Controllers™ if they win.

### 6.1.1 Initial Orion Controller™ Distribution

Upon launch, any qualified node will be able to operate as an Orion Controller™.

---

[6] Fee distribution to Orion Controllers™ may shift at times when new coin production is limited.

[7] The per Controller™ share is determined based on network participation and total coin stake owned.



## 6.2 Prime Controllers

Prime Controllers™ on the Paycoin™ network are the backbone of the system, which enable Transactional Immutability to occur and be confirmed, within a near-instantaneous response timeframe. Controllers exist in the peer-to-peer network to supply the computing power needed for transactional locking that occurs as part of the Transactional Immutability capabilities of Paycoin™. These Controllers interact with Paycoin™ Orion Controllers™ for consensus and verification of transactional blocks.

### 6.2.1 The Hard Problem of Quantity Theory

For a currency to achieve stable prices, relative to other goods, the supply of currency must increase as demand for the currency increases. Achieving a dynamic relationship between supply of coins and demand of coins has been an unsolved problem in cryptocurrency.

Existing cryptocurrency algorithms define currency creation rates globally by arbitrary parameters irrespective of demand. Economic Quantity Theory deems that, for a currency to achieve long-term price stability, the creation rate of currency must adapt to real-time demand for the currency. In short, if demand for a currency remains constant, then increasing the supply of currency rapidly will result in a reduction of value in the currency. However, if demand for a currency increases the supply of that currency must also increase proportionately, to ensure a stable value.

Prime Controllers™ employ an algorithmic



### 6.2.1 The Hard Problem of Quantity Theory *(cont)*

process that quantifies demand and allows the supply rate of Paycoins™ to adapt to changes in demand. Prime Controller™ wallets stake at a much higher rate than other wallets. As demand for HashCoin™ increases, it follows that demand for Prime Controllers™ will increase in response. This demand is measured by increasing bids for Prime Controllers™, during their bidding phases, as they become available. As Prime Controller™ bids increase, the number of Paycoins™ entering higher staking wallets increases. This means more coins stake at a higher level and thus the creation rate of Paycoins™ increases in response to the increase in demand. The opposite holds true as well, for times when demand decreases.

Prime Controllers™ are a mechanism that allows a cryptocurrency's creation rate to adapt to market demand in real-time, in order to produce self-stabilizing currency value.



### 6.2.2 Prime Controller™ Functions

The Prime Controller™ serves multiple purposes in its goal of protecting the integrity of Paycoin's™ network including:

- Performing the archiving functions on the HybridFlex Blockchain;
- Providing reconciliation instructions for the blockchain to Orion Controllers™;
- Performing as the first entry point of a transaction into the network (border security, if you will), thereby verifying that no illicit transactions hit the open network, (i.e. double spend checking);
- Participate in voting on any code changes and/or possible forks to the blockchain, and;
- Prime Controllers™ have the exclusive right to perform inter-blockchain cold storage functions[8].

In exchange for performing the above responsibilities, Prime Controllers™ are incentivized by the following:

- Stake rate of 5% on all funds locked in the winning bid address[9];
- Ability to participate in an aggregate stake;
- Voting rights to proposed changes in the codebase, and;
- Receive a proportional share[10] of all advanced blockchain feature payments including FundLock, Bidding, HashCode Messaging and Escrow when coin creation becomes limited.

---

[8] Inter-blockchain cold storage is
[9] Prime Controller™ stake rate is 5% of all locked bid funds as a six month yield with the stake paid daily.
[10] Proportional share is a weighted value based on network participation and total coin stake.



### 6.2.3 Prime Controller™ Eligibility Requirements

Prime Controllers™ are the backbone and core of the Paycoin™ network. To keep the network as an open peer-to-peer network while maintaining the integrity of the backbone, Prime Controllers™ require a strong commitment to the coins success. The amount of network stake, required to promote an Orion Controller™ to a Prime Controller™, will provide a disincentive to any illicit party, acting alone or in conjunction with others, to affect a negative impact on the Paycoin™ network. This unique stake requirement adjusts dynamically as the network scales up or down, creating a globally scalable, near-real-time commerce network.

In addition to the exclusivity and strong a large stake in the coin, Prime Controllers™ are required to meet certain minimum standards. Orion Controllers™ must meet the following overall requirements to bid on a promotion to Prime Controller™:

- Passing a Transaction Per Second test which consists of
    - Random Connected Node latency,
    - Disk throughput requirements,
    - Minimum number of processed transactions processed,
    - Minimum # of Connected Nodes,
    - Maximum time since last broadcast received.
- Hold a funded wallet on the Orion Controller™ meeting the current minimum bid amount for a Prime Controller™[11].

---

[11] The minimum initial bid to promote an Orion Controller™ is equal to one half of total number of coins in existence divided by the total number of Prime Controllers™ required by the network.



### 6.2.4 Prime Controller Availability

The network continuously analyzes transactions per second, and aggregate node performance to dynamically adjust the required and available number of Prime Controllers™.  There are two instances whereby Orion Controllers™ may bid to be promoted to a Prime Controller™:

- During the Prime expiration window, which initially occurs every 6 months, all Prime Controllers™ positions will be available for bid;
- At any time the Paycoin™ network ejects a bad actor, individual Prime Controller™ slots will be available for bid:
  - When needed a vote can be initiated by any Prime Controller™ on the network to reject a Prime Controller™ from the network for illicit acts or under performance.
  - The network can automatically reject and demote underperforming Prime Controllers™ (See the section titled "Prime Controller™ Scaling for details).

### 6.2.5 Prime Controller™ Consensus

Prime Controllers™ must be able to reach an expedient majority consensus regarding transactions that are submitted to the network.  The communications protocol between Prime Controller™ nodes will include a linearly growing signed package until a majority of votes is reached. At the instant of majority consensus, the transaction will then be written to the blockchain, and signed using a hash of the consensus vote signatures.

### 6.2.6 Prime Controller™ Bidding Process

When Prime Controller™ positions become available, the bidding opens automatically by broadcasting the number of open slots, a bid address and an expiration date. Bidding is performed by making a bid payment to the blockchain from a wallet stored on an Orion Controller™.  This "bid packet" will contain the "Controller's Transactions Per Second (Eligibility) Report," and will be sent as a payment of 50 Paycoins™ from an address containing the users bid amount. The amount must match the minimum required bid[11] after deducting the bid payment.  At



### 6.2.6 Prime Controller Bidding *(cont)*

any time during the open bid period, the bidder may increase the locked wallet balance in order to increase their bid.

At the end of the bidding period the number of Prime slots available are awarded each based on the highest bids. When multiple Prime Controller™ positions are available bids are calculated using the following method:

- Each bidder sends a bid fee[12] equal to the current bid fee , initially 50 Paycoin™, to the bid address mul tiplied by the number of prime con trollers™ requested;
- Perform 2 rounds of bid assignment to determine the winners,
  - Round 1: Assign by total bid and drop any non-winning bids,
  - Round 2: Starting from the highest total bid, recursively split controller bids into [totalBid/(requestedPositions-n)] amounts until each multi-bid is greater the lowest winning bid.

All remaining bid addresses are unlocked. All bid fees paid are distributed amongst existing Orion Controllers™.

#### 6.2.6.1 Leveraging Inter-Blockchain FundSafe

The auction process leverages HashCoin™s built into a FundSafe mechanism authorized by the Prime Controllers™. Funds are locked in a non-spendable state for the duration of ownership of the Prime Controller™, thereby protecting the integrity of the controller, even if private keys are compromised.

---

[12] The bid fee is 2,500 Paycoin™ divided by the total number of prime controllers required by the network.



### 6.2.6.2 Incumbents and tie breaking

As with any vote or auction, there are chances for a voting deadlocks to occur, when Orion Controllers™ bid for a slot to become a Prime Controller™. In order to resolve these ties automatically, the following tie-breaker rules will apply:

- Where an existing Prime Controller™ and an Orion Controller™, the incumbent Prime Controller™ will win;
- In the event of any tie, where the bid amounts are equal, the bid confirmed earliest on the network will win, and;
- In the event of a voting deadlock, neither bidder will win, and the Prime Controller™ slot will be removed.

### 6.2.7 Prime Controller Scaling

In the event of a network failure or slowdown, the Paycoin™ network will increase the required number of Prime Controller™ slots for the next round. During each round of scaling, certain Prime Controllers™ may be automatically removed from active status and blocked from becoming a Controller again. Features of the mid-term and end term scaling include:

- Automated Prime Controller™ ejection for downtime and lag;
- Transaction per second measurements and network requirements, and;
- Network average transactions per second and low-performer rejection.



# 7 Conclusion

Cryptocurrency is a young, disruptive technology that offers easier, faster, and more secure transacting between individuals and merchants than any payment technology to date. However, all existing cryptocurrencies have failed to achieve an adoption path leading to mainstream use. Even the most popular cryptocurrencies are accepted by fewer than 1% of all global merchants.

Conventional online payment solutions such as credit cards don't just put consumers at risk of identity theft and merchants at risk of fraud - they are costly even when used under ideal conditions. These payment systems cost consumers and merchants between 2% and 10% per transaction. Cryptocurrency offers merchants an alternative to these methods which eliminates these fees, potentially saving merchants across the globe tens of billions of dollars, annually.

*Withso much potential upside, many find it difficult to understand why merchants have been slow to accept legacy cryptocurrency payments.*

The answer largely is price instability, which threatens business' profitability. Daily price fluctuations of existing cryptocurrencies exceed the transaction fees for conventional payment systems, inhibiting cryptocurrency's benefits over these systems.

Paycoin™ improves upon existing coins by producing an decentralized network structured to promote price stability, fast transaction times, and rich features for merchants and consumers. Prime Controller™ Hybrid-Flex Blockchain, and Transaction Immutability incorporate the latest in cryptography and economic theory to produce a digital currency aims to bring cryptocurrency use to a global audience.

EXHIBIT 6

News, Quotes, Companies, Videos     SEARCH

Log In



| **MARKETS & FINANCE** | **$12 FOR 12 WEEKS** | SUBSCRIBE NOW |



MARKETS
Morning MoneyBeat:
Heightened Equities
Volatility in 2015?



HEDGE FUNDS
Five Notable Activist
Fights of 2014

| MARKETS | DEALS | BANKS | PRIVATE EQUITY | HEDGE FUNDS | BANKRUPTCY |

HOT TOPICS: EMERGING MARKETS

SELECT A REGION: GLOBAL

3:37 pm ET
Nov 25, 2014     FOREX

# BitBeat: GAW Miners to Launch
# Bitcoin Challenger, Paycoin

SEARCH MONEYBEAT    [ GO ]

  

| ARTICLE | COMMENTS (191) |

BITBEAT   BITCOIN   CRYPTO-CURRENCY   DERIVATIVES

[ Email ] [ Print ]   [f] [v] [g+] [in]

By MICHAEL J. CASEY



Recommended post

S&P 500 Blew the
Top Off Wall Street's
Expectations in 2014

Ramin Talaie for The Wall Street Journal

*Welcome to BitBeat, your daily dose of crypto-current events, written by Paul Vigne and
Michael J. Casey.*

**Bitcoin Latest Price:** $378.84/ up 0.96% (via CoinDesk)

## Crossing Our Desk:

**Josh Garza, who has built what may be the world's fastest growing bitcoin mining
operation, is setting his sights on something even bigger: "the cryptocurrency of
the future."**

That's the claim made in a press statement Monday to mark the launch of the ICO (initial
coin offering) of Paycoin, a digital currency that Mr. Garza's GAW Miners company says
will address "all the inherent shortcomings that have prevented bitcoin from achieving
mainstream adoption."

### Popular Now

What's This?

**1**  What We Know
About Inequality (in
14 Charts)



**2**  Dershowitz: 'I'm an
Innocent Victim of an
Extortion...



**3**  Snapchat Cracks Top
10 Largest U.S.
Venture-Capital
Deals



**4**  5 Things to Read
This Weekend



**5**  Lawsuit Threat Helps
Textbook Price-
Comparison Tool
Go...



Show 5 More

1/3

The core technology underlying Paycoin, which was previously codenamed "Hashcoin," is modeled on bitcoin and its public ledger, known as the blockchain. However, Paycoin's blockchain is independent of bitcoin's and, unlike the better known digital currency, will involve an additional layer of "mining" computers beyond the base level of miners employed to routinely confirm the validity of transactions and to maintain the ledger. Those higher-level "controller" miners will perform the special task of compressing data to make Paycoin transactions more streamlined. The controllers will periodically bid for the right to perform this task, for which they will be rewarded in paycoins. In theory, their contributions to computing efficiency should allow Paycoin transactions to be confirmed and settled much faster than the 10-minute minimum that applies to bitcoin.

When the coin opens to the public on Jan. 2 with what Mr. Garza says will be an anticipated market capitalization of $250 million, the company will partly back that with a store of fiat currency worth around $100 million. While those funds won't function as a 100% reserve, they will combine with added features within the Paycoin protocol, including a supply schedule that fluctuates depending on the level of miner demand, to reduce exchange-rate volatility and thus seek to resolve one of bitcoin's biggest barriers to mass adoption.

In a move that could assuage cryptocurrency enthusiasts that might accuse it of "centralization," the company itself won't sell "pre-mined" Paycoins for its own account but will from the outset join other miners in bidding for "controller" mining contracts.

Backing Mr. Garza is Stuart Fraser, Vice Chairman and Partner at Wall Street inter-dealer broker Cantor Fitzgerald LP, a long-time backer of Mr. Garza's projects, including his first big venture, the Great Auk Wireless company, which sold broadband services to remote New England villagers.

Whether Mr. Garza can replicate his past success in this project remains to be seen. But Paycoin is poised to benefit from having one of the biggest mining operations behind it. It will also tap a passionate community of GAW clients, many of whom have purchased early rights to mine Paycoin and who debate and discuss the launch on a very active online forum run by the company.

According to Mr. Garza, his Bloomfield, Conn.-based company's cloud mining operation is run out of a 180,000-foot Mississippi warehouse with 15MW electricity capacity. From there, it sells small "hashlet" cloud mining contracts to customers. The hashlets are differentiated and structured in such a way that clients can trade them on an exchange, where the price fluctuates depending the market's view of mining-profitability variables such as the bitcoin exchange rate, electricity prices and the rate at which competition for bitcoins is increasing within the network.

The service, which offered guarantees to overcome some of the customer relations problems of the delay- and lawsuit-prone bitcoin mining industry, now accounts for a whopping 50% of all new mining capacity coming online, he said. After starting operations in the summer, GAW is on track to finish the year with $120 million in sales, he said.

–UPDATE: An earlier version of this blog post incorrectly stated that Paycoin's software would function as a separate layer on top of the existing bitcoin blockchain. Paycoin will be comprised of its own, separate blockchain.

**–The array of new trading instruments for taking investment bets on bitcoin continues to expand.**

Today, the North American Derivatives Exchange, or Nadex, announced that it planned to launch bitcoin binary options contracts in early December. A binary option is a derivative trading option for which there are two possible outcomes – typically, that a call or put option pays out a certain amount or that it pays nothing, depending on where an underlying asset's price trades within a given time frame.

Nadex's bitcoin option contracts, which are pending approval by the Commodities Futures Exchange Commission, will be priced on the basis of TeraExchange's Bitcoin Price Index, which it described as "the global benchmark for USD/XBT contracts." ("XBT" is that currency code that many platforms are now using to signify bitcoin.) TeraExchange launched a CFTC-approved bitcoin derivatives trading platform in September.

In a press release, Nadex said it had "seen strong demand from retail traders looking for new ways to trade bitcoin."

Contacts: paul.vigna@wsj.com, @paulvigna / michael.casey@wsj.com, @mikejcasey

**MONEYBEAT HOME PAGE**



## Investment Banking Scorecard
Updated January 4, 2015

The Dealogic and WSJ scorecard breaks down the investment banking industry by region, product, bank and sector.

Below shows year-on-year global volume and top 10 banks in $ billions and global investment banking revenue and top 10 banks in $ millions:

**NO DATA AVAILABLE**

ECM   DCM   IB

### ECM Bookrunner Ranking



Source: Dealogic

See More Data » (http://graphics.wsj.com/investment-banking-scorecard/)

## The MoneyBeat Team


Stephen Grocer
Editor


Phillipa Leighton-Jones
European Editor


Erik Holm
Deputy Editor


Maureen Farrell
Reporter
New York


Paul Vigna
Reporter
New York


David Cottle
Reporter
London

## MoneyBeat Columnists


Ronald Barusch
Dealpolitik


Francesco Guerrera
Current Account

Alen Mattich
Investor

Jason Zweig
The Intelligent