UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| DENIS MARC AUDET, MICHAEL PFEIFFER, and DEAN ALLEN SHINNERS, Individually and on Behalf of All Others Similarly Situated, | Case 3:16-cv-00940 |
| | Hon. Michael P. Shea Courtroom 2 |
| Plaintiffs, | ECF Case |
| vs. | <u>CLASS ACTION</u> |
| STUART A. FRASER, GAW MINERS, LLC, and ZENMINER, LLC, (d/b/a ZEN CLOUD), | SEPTEMBER 13, 2018 |
| Defendants. | MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION |

## TABLE OF CONTENTS

BACKGROUND FACTS ..................................................................................................2

    A.    Cryptocurrency ...............................................................................................2

    B.    Hardware- and Cloud-Hosted Mining ..................................................3

    C.    The Shift to "Hashlets" ..............................................................................5

    D.    The Move to Hashpoints, Paycoin, Paybase and HashStakers. .............................7

ARGUMENT ...............................................................................................................11

    A.    Standard for Certification ...........................................................................11

    B.    Rule 23(a) is Satisfied. ................................................................................13

        1.    The Class includes thousands of persons ....................................13

        2.    Questions of law and fact are common to the Class. ...................14

        3.    Plaintiffs' claims are typical of the Class. ...................................16

        4.    Plaintiffs will adequately protect the interests of the Class. .....................17

        5.    The Court can ascertain Class members objectively. ................18

    C.    Rule 23(b)(3) is satisfied. ...........................................................................19

        1.    Common questions of law or fact predominate. ........................19

            a.    Claim for violation of under CUSA § 36b-29(a)(1) for sale of unregistered securities in violation of CUSA § 26b-16. .................................................................................20

            b.    Claim under CUSA § 36b-4-(a)(1) and § 36b-29(a)(2). ...............20

            c.    Claim for control person liability under § 36b-29(c)....................21

            d.    Claim for aiding and abetting securities fraud under CUSA § 36b-29(a)(2). ...................................................22

            e.    Claim under § 10(b) of the Securities Exchange Act of 1934........................................................................................23

            f.    Claim under §20 of the Securities Exchange Act of 1934........................................................................................33

g.      Claim for common law fraud..........................................................34

h.      Aiding and abetting common law fraud..........................................34

2.      A class action is superior to other methods of adjudication. ....................35

CONCLUSION.......................................................................................................................36

# TABLE OF AUTHORITIES

## Cases

*Abramovitz v. Ahern*,
  96 F.R.D. 208 (D. Conn. 1982)........................................................................ 20

*Acticon AG v. China N.E. Petroleum Holdings Ltd.*,
  692 F.3d 34 (2d Cir. 2012)............................................................................... 32

*Amchem Prods, Inc. v. Windsor*,
  521 U.S. 591 (1997)........................................................................... 11, 18, 19

*Amgen Inc. v. Ct. Ret. Plans & Trust Funds*,
  133 S. Ct. 1184 (2013)..................................................................... 12, 23, 24

*Anwar v. Fairfield Greenwich Ltd.*,
  306 F.R.D. 134 (S.D.N.Y. 2015) ................................................................ 26, 27

*Aranaz v. Catalyst Pharm. Partners Inc.*,
  302 F.R.D. 657 (S.D. Fla. 2014)...................................................................... 34

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2011)................................................................................ 34

*Brecher v. Rep. of Argentina*,
  806 F.3d 22 (2d Cir. 2015)................................................................................ 18

*Brunette v. Bristol Savings Bank*,
  1994 WL 468448 (Conn. Super. Ct. Aug. 22, 1994)..................................... 35

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*,
  750 F.3d 227 (2d Cir. 2014)............................................................................. 31

*CFTC v. McDonnell*,
  287 F. Supp. 3d. 213 (E.D.N.Y. 2018) .............................................................. 2

*City of Livonia Employees' Retirement Sys. v. Wyeth*,
  284 F.R.D. 173 (S.D.N.Y. 2012) ...................................................................... 31

*Cohen v. J.P. Morgan Chase & Co.*,
  262 F.R.D. 153 (E.D.N.Y. 2009) ...................................................................... 19

*Connecticut Nat'l Bank v. Giacomi*,
  699 A.2d 101 (Conn. 1997) ................................................................. 1, 22, 23

*Consolidated Rail Corp. v. Town of Hyde Park*,
  47 F.3d 473 (2d Cir. 1995)................................................................................ 13

*Ctr. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, LLC,*
    504 F.3d 229 (2d Cir. 2007)................................................................................. 13

*Dodona I, LLC v. Goldman, Sachs & Co.,*
    296 F.R.D. 261 (S.D.N.Y. 2014) ....................................................................... 33

*Eberhard v. Marcu,*
    530 F.3d 122 (2d. Cir. 2008)............................................................................... 32

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
    903 F.2d 176 (2d Cir. 1990)............................................................................... 12

*GE Dandong v. Pinnacle Performance, Ltd.,*
    2013 WL 5658790 (S.D.N.Y. October 17, 2013)...................................... 26, 31

*Gen. Tel. Co. of S.W. v. Falcon,*
    457 U.S. 147 (1982).......................................................................................... 14

*In re Am. Int'l Grp., Inc. Sec. Litig.,*
    689 F.3d 229 (2d. Cir. 2012)............................................................................. 19

*In re Barrick Gold Sec. Litig.,*
    314 F.R.D. 91 (S.D.N.Y. 2016) ........................................................................ 11

*In re Beacon Assocs. Litig.,*
    282 F.R.D. 315 (S.D.N.Y. 2012) ...................................................................... 34

*In re Boardwalk Marketplace Sec. Litig.,*
    122 F.R.D. 4 (D. Conn. 1988)........................................................................... 23

*In re Colonial Partnership Litig.,*
    1993 WL 306526 (D. Conn. Feb. 10, 1993) ..................................................... 16

*In re Crude Oil Commodity Futures Litig.,*
    2012 WL 569195 (S.D.N.Y. Feb. 14, 2012)..................................................... 18

*In re Facebook, Inc., IPO Sec. & Derivative Litig.,*
    312 F.R.D. 332 (S.D.N.Y. 2015) ...................................................................... 19

*In re Flag Telecom Holdings, Ltd. Secs. Litig.,*
    574 F.3d 29 (2d Cir. 2009)................................................................................. 16

*In re MF Global Holdings Ltd. Investment Litigation,*
    310 F.R.D. 230 (S.D.N.Y. 2015) ...................................................................... 17

*In re Omnicom Grp, Inc. Sec. Litig.,*
    597 F.3d 501, 511 (2d Cir. 2010)...................................................................... 31

*In re Oxford Health Plans, Inc.*,
    191 F.R.D. 369 (S.D.N.Y. 2000) ................................................................. 16

*In re PE Corp. Sec. Litig.*,
    228 F.R.D. 102 (D. Conn. 2005).................................................... 12, 18, 35, 36

*In re Priceline.com, Inc.*,
    236 F.R.D. 89 (D. Conn. 2006)..................................................................... 36

*In re Strum, Ruger, & Co., Inc. Sec. Litig.*,
    2012 WL 3589610 (D. Conn. Aug. 20, 2012) ................................................ 14

*In re U.S. Foodservice Inc. Pricing Litigation*,
    729 F.3d 108 (2nd Cir. 2013)......................................................... 24, 25, 31

*In re Warfarin Sodium Antitrust Litig.*,
    391 F.3d 516 (3d Cir. 2004)......................................................................... 35

*In re Worldcom, Inc. Sec. Litig.*,
    219 F.R.D. 267 (S.D.N.Y. 2003) ................................................................. 12

*Jenson v. Continental Fin. Corp.*,
    404 F. Supp. 806 (D. Minn. 1975)................................................................ 20

*Johnson v. Nextel Commc'ns Inc.*,
    780 F. 3d 128 (2d Cir. 2015)....................................................................... 14

*Kaplan v. S.A.C. Capital Advisors, L.P.*,
    311 F.R.D. 373 (S.D.N.Y. 2015) ................................................................. 35

*Kelleher v. Advo, Inc.*,
    2009 WL 2413362 (D. Conn. Mar. 30, 2009) ........................................ 16, 17

*Klay v. Humana, Inc.*,
    382 F.3d 1241 (11th Cir. 2004) ................................................................... 25

*Local 1522 of Council 4 v. Bridgeport Health Care Ctr., Inc.*,
    2018 WL 1419792 (D. Conn. Mar. 21, 2018) ............................................... 14

*Menkes v. Stolt-Nielsen S.A.*,
    270 F.R.D. 80 (D. Conn. 2010)................................................... 12, 14, 17, 36

*Negrete v. Allianz Life Insurance Company of North America*,
    238 F.R.D. 482 (C.D. Cal. 2006)............................................................ 27, 28

*Phillips Petroleum v. Shutts*,
    472 U.S. 797 (1985).................................................................................... 12

*Poptech, L.P. v. Stewardship Credit Arbitrage Fund, LLC*,
    792 F. Supp. 2d 328 (D. Conn. 2011) ............................................................. 34

*Poulos v. Caesars World, Inc.*,
    379 F.3d 654 (9th Cir. 2004) ........................................................................... 28

*Pub. Employees' Retirement Sys. of Miss. v. Merrill Lynch & Co., Inc.*,
    277 F.R.D. 97 (S.D.N.Y. 2011) ...................................................................... 15

*Robidoux v. Celani*,
    987 F.2d 931 (2d Cir. 1993) ............................................................................ 13

*Ross v. Abercrombie & Fitch Co.*,
    257 F.R.D. 435 (S.D. Ohio 2009) ................................................................... 24

*Saggese v. Beazley Co. Realtors*,
    155 Conn. App. 734 (Conn. App. Ct. 2015) ................................................... 34

*Spenser v. Hartford Financial Services Group, Inc.*,
    256 F.R.D. 284 (D. Conn. 2009) ..................................................................... 25

*Steginsky v. Xcelera, Inc.*,
    2015 WL 1036985 (D. Conn. Mar. 10, 2015) ................................................ 19

*Stougo v. Barclays PLC*,
    312 F.R.D. 307 (S.D.N.Y. 2016) .................................................................... 31

*Torres v. S.G.E. Management, L.L.C.*,
    838 F.3d 629 (5th Cir. 2016) ..................................................................... 2, 27

*Wallace v. IntraLinks*,
    302 F.R.D. 310 (S.D.N.Y. 2014) .................................................................... 32

*Wal-Mart Stores v. Dukes*,
    564 U.S. 338 (2011) ......................................................................................... 14

*Willis v. Big Lots, Inc.*,
    2017 WL 1063479 (S.D. Ohio 2017) .............................................................. 23

*Wood v. Prudential Ret. Ins. & Annuity Co.*,
    2017 WL 3381007 *2 (D. Conn. Aug. 4, 2017) ............................................. 12

<u>Statutes</u>

Connecticut Uniform Securities Act § 26b-16.......................................................... 1

Connecticut Uniform Securities Act § 36b-4 ................................................... 15, 20

Connecticut Uniform Securities Act 36b-29 ........................................... 1, 15, 20, 21

Securities and Exchange Act of 1934 § 10(b) ........................................................................ 15, 23

Securities and Exchange Act of 1934 § 20(a) ............................................................................ 15

Other Authorities

1966 Advisory Committee Note to Rule 23 ................................................................................ 32

S.E.C., *Fast Answers: Ponzi Schemes*, https://www.sec.gov/fast-answers/answersponzihtm.html
........................................................................................................................................ 27

Rules

Federal Rule of Civil Procedure 23 .................................................................................... passim

Pursuant to Federal Rule of Civil Procedure 23, plaintiffs respectfully request that the Court certify a class of investors who bought financial products from defendants GAW Miners, LLC ("GAW") and ZenMiner, LLC ("ZenMiner") (together "the Companies").[1]

This case might sound complicated. Though cloaked in technological sophistication and jargon, defendants' fraud was simple at its core—defendants sold what they did not own and misrepresented the nature of what they were selling.  Plaintiffs' First Amended Complaint ("FAC") (ECF No. 57) ¶1.  The Companies were required to register these products as securities under the Connecticut Uniform Securities Act ("CUSA"). They didn't. Under the applicable Connecticut laws governing the illegal sales of securities, plaintiffs need not prove that they relied on any misrepresentations or omissions, that defendants acted with scienter, or their losses were caused by the violation. *See* CUSA § 26b-16 & 36b-29(a)(1). Defendant Stuart Fraser ("Fraser")—as a business partner of the Homero Joshua Garza ("Garza"), the Companies' CEO, and as an owner of the Companies who played an active role in their management—is liable for these violations. *See Connecticut Nat'l Bank v. Giacomi*, 699 A.2d 101, 124 (Conn. 1997) (control person liability established if "a person occupies a status or performs functions similar to the status and function of a partner, officer, or director."). This controlling person claim focuses solely on the conduct of Fraser, Garza and the Companies and is a prototypical example of a claim where class treatment is appropriate.

The case also involves claims of fraud under the state and federal securities laws and the common law against the Companies and for secondary liability against Fraser as a controlling person under the federal securities laws and for aiding and abetting that fraud. The claims are

---

[1]  The Companies failed to respond to plaintiffs' complaint and on March 24, 2017 the Court entered their defaults. *See* ECF No. 71.

especially appropriate for class treatment because the sales in question were made pursuant to a Ponzi scheme. Courts have readily concluded that class treatment is appropriate in similar cases. *See, e.g.*, *Torres v. S.G.E. Management, L.L.C.*, 838 F.3d 629 (5th Cir. 2016) (*en banc*). (reliance is presumed in cases involving an illegal pyramid scheme because no rational person would invest in such an enterprise if they knew the truth).

## BACKGROUND FACTS

A. Cryptocurrency

Cryptocurrencies "are generally defined as digital assets used as a medium of exchange."[2] *CFTC v. McDonnell*, 287 F. Supp. 3d. 213, 218 (E.D.N.Y. 2018). Each unit of cryptocurrency has an electronic public ledger known as a "blockchain." *Id.*[3] "They are often described as "cryptocurrencies" because they use "cryptographic protocols to secure transactions . . . recorded on publicly available decentralized ledgers," called "blockchains." *Id.*

Many cryptocurrencies, use a process known as "mining" to verify transactions.[4] Miners are computers that create nodes on the network that review proposed transactions and bundle them into blocks to be added to the blockchain. In addition to verifying the legitimacy of the individual Bitcoin transactions included in a proposed block, a miner must solve a computational puzzle known as a hash calculation.[5] Each block that becomes part of the blockchain includes a fixed number of new units which are allocated to the miner as a reward for its contribution to the blockchain.[6]

---

[2] *See also* ECF No. 57 at ¶ 25; Ex. B (A. Narayanan Decl.) at ¶ 4; Ex. D (L. Kerner Decl.) at ¶ 10.
[3] ECF No. 57 at ¶ 27; Ex. B (A. Narayanan Decl.) at ¶ 4; Ex. D (L. Kerner Decl.) at ¶ 10.
[4] ECF No. 57 at ¶ 28; Ex. B (A. Narayanan Decl.) at ¶ 5; Ex. D (L. Kerner Decl.) at ¶ 11.
[5] ECF No. 57 at ¶ 28; Ex. B (A. Narayanan Decl.) at ¶ 5.
[6] ECF No. 57 at ¶ 28; Ex. B (A. Narayanan Decl.) at ¶ 5; Ex. D (L. Kerner Decl.) at ¶¶ 12, 14.

One such cryptocurrency is Bitcoin. Bitcoin's code is written to increase the difficulty of the hashing calculation as the amount of computing power devoted to mining increases. Thus, as Bitcoins become more valuable and more powerful computers are dedicated to mining (in order to generate the increasingly valuable rewards for their owners), the difficulty of solving the hash calculation also increases.[7] When Bitcoin was first launched the difficulty of the hash calculation was such that hobbyists could successfully mine with a home laptop. However, by 2014, when the sales giving rise to this case commenced, Bitcoin mining was performed almost exclusively by specially-designed and fully-dedicated computers known as "miners."[8] An individual miner's hashing power is denominated in terms of millions of hashing calculations performed per second, or "megahash."[9]

Given the increasing competition and difficulty of solving the hashing calculations that are required to generate a Bitcoin block, miners frequently combine their computing power into mining "pools."[10] Generally, the more computing power directed to a particular mining pool, the better the chance that the pool will be the first to confirm a block of transactions and receive the reward.[11] Typically, pool participants' shares of the mining reward depend upon the proportional amount of computing power each contributes to the pool.[12]

B.    Hardware- and Cloud-Hosted Mining

GAW Miners' business initially involved buying and selling miners.[13] In mid-2014, GAW Miners began offering its customers "Hardware-Hosted Mining."[14] Instead of shipping

---

[7] ECF No. 57 at ¶ 29.
[8] Ex. B (A. Narayanan Decl.) at ¶ 6.
[9] ECF No. 57 at ¶ 29; Ex. B (A. Narayanan Decl.) at ¶ 6.
[10] ECF No. 57 at ¶ 30; Ex. B (A. Narayanan Decl.) at ¶ 7.
[11] ECF No. 57 at ¶ 30.
[12] ECF No. 57 at ¶ 30; Ex. B (A. Narayanan Decl.) at ¶ 7.
[13] Ex. A-1 (J. Mordica Depo. Tr.) at 27:3-10; 28:4-19; 29:22-24; ECF No. 57 at ¶ 57; ECF No. 72 at 4; Ex. D (L.

hardware to customers, GAW Miners claimed it would host the hardware in its datacenter for a fee.[15] In exchange, the Companies would operate the hardware and pay the associated costs.[16] Customers accessed and allegedly controlled their mining equipment via remote management software offered by ZenMiner.[17]

In July 2014, the Companies added a new option, called "Cloud-Hosted Mining."[18] Customers buying a Cloud-Hosted Miner were told they could control their mining equipment through the Internet by logging on to the accounts they established on ZenMiner's website interface called ZenCloud.[19] Through ZenCloud, investors could direct their miners to the pool of their choice.[20] However, the Companies did not in fact direct mining power to the customer's pool-of-choice; rather, they simply paid customers based on what those pools supposedly would have generated.[21]

---

Kerner Decl.) at ¶ 28.

[14] Ex. A-2 (June 27, 2014 version of gawminers.com/categories/products/hosted-miners); ECF No. 57 at ¶¶ 76–77; ECF No. 72 at 4; Ex. D (L. Kerner Decl.) at ¶ 28.

[15] *See* Ex. A-3 (6/26/14 version of gawminers.com/categories/products/hosted-pre-order-batch-1-the-vaultbreaker-500-mh-s-asic-scrypt-miner/) ("We will host your miners for a flat rate of $0.10/Kwh + a 10% of your total hosted electricity costs. This small fee will cover all your hosting, power, and internet fees); Ex. A-4 (6/26/14 version of gawminers.com/categories/products/hosted-pre-order-batch-1-the-vaultbreaker-mini-250-mh-s-asic-scrypt-miner/); Ex. A-5 (6/26/14 version of gawminers.com/categories/products/hosted-pre-order-batch-2-the-vaultbreaker-500-mh-s-asic-scrypt-miner/); Ex. A-6 (6/26/14 version of gawminers.com/categories/products/hosted-pre-order-batch-2-the-vaultbreaker-mini-250-mh-s-asic-scrypt-miner/); Ex. A-7 (6/26/14 version of gawminers.com/categories/products/13-mh-s-hosted-the-black-widow-by-gaw-miners-asic-scrypt-miner-week-6/); Ex. A-8 (6/26/14 version of gawminers.com/categories/products/27-mh-s-hosted-the-faclon-by-gaw-miners-asic-scrypt-miner-week-6/); Ex. A-9 (6/26/14 version of gawminers.com/categories/products/54-mh-s-hosted-the-war-machine-by-gaw-miners-asic-scrypt-miner-week-6/); ECF No. 57 at ¶ 77; ECF No. 72 at 4.

[16] *See infra* fn. 15.

[17] Ex. A-1 (J. Mordica Depo. Tr.) at 41:21-42:17.

[18] Ex. A-1 (J. Mordica Depo. Tr.) at 32:22-33:17; Ex. A-10 (06/25/14 version of Zenminer.com); Ex. A-11 (10/3/14 version of Zenminer.com/cloud); ECF No. 56 at ¶ 79; ECF No. 72 at 4.

[19] Ex. A-1 (J. Mordica Depo. Tr.) at 39:3-41:1; ECF No. 57 at ¶ 79; ECF No. 72 at 4; Ex. B (A. Narayanan Decl.) at ¶ 11.

[20] Ex. A-1 (J. Mordica Depo. Tr.) at 46:2-6; ECF No. 57 at ¶ 80; Ex. B (A. Narayanan Decl.) at ¶ 11.

[21] Ex. A-1 (J. Mordica Depo. Tr.) at 52:14-54:22l; ECF No. 57 at ¶ 89; ECF No. 72 at 4–5; Ex. B (A. Narayanan Decl.) at ¶ 11.

C.      The Shift to "Hashlets"

Beginning in August 2014, the Companies began selling a product known as "Hashlets."[22] Hashlets were supposed to represent fractional interests in mining equipment owned by GAW Miners.[23] Hashlets would supposedly earn a return based on the number of cryptocurrency units generated when the pools to which the Hashlets' computing power was directed succeeded in processing and confirming cryptocurrency transactions.[24] Effectively, Hashlet customers purchased the rights to profit from a slice of computing power owned by GAW Miners, less certain fees.[25]

The Companies characterized Hashlets as "physical miners." One of the taglines for Hashlets was "Hardware evolved."[26] The GAW Miners website stated that owning a Hashlet would allow a user to "become a miner."[27] The website further represented that Hashlets were "perfectly optimized to thrive in large, controlled datacenters and achieve massive economies of scale" and that "Hashlets are hosted in the most robust mining data center in the world and come with a 99.9% uptime guarantee."[28] The Companies even created images depicting a piece of hardware as an advertising tool.[29] Investors were told they were purchasing interests in hardware because of the way the Companies sold the product.[30] The Companies sold hashlets in units of

---

[22] Ex. A-12 (8/19/14 version of gawminers.com/hashlet); Ex. A-13 (9/7/14 version of gawminers.com/pages/hashlet-genesis); Ex. A-14 (9/7/14 version of gawminers.com/pages/hashlet-solo); Ex. A-15 (9/7/14 version of gawminers.com/pages/hashlet-prime); Ex. A-16 (9/7/14 version of gawminers.com/pages/hashlet); ECF No. 57 at ¶ 95; Ex. B (A. Narayanan Decl.) at ¶ 12; Ex. D (L. Kerner Decl.) at ¶ 30.
[23] Ex. A-16 (M. Eden Depo. Tr.) at 25:4–26:13; Ex. A-1 (J. Mordica Depo. Tr.) at 57:23-58:16; ECF No. 57 at ¶ 95; ECF No. 72 at 5; Ex. D (L. Kerner Decl.) at ¶ 30.
[24] Ex. A-18 (M. Pfeiffer Depo. Tr.) at 99:13-19; ECF No. 57 at ¶ 95; ECF No. 72 at 5; Ex. B (A. Narayanan Decl.) at ¶ 12.
[25] ECF No. 57 at ¶ 97; ECF No. 72 at 5; Ex. B (A. Narayanan Decl.) at ¶ 12; Ex. D (L. Kerner Decl.) at ¶¶ 31–32.
[26] Ex. A-12 (8/19/14 version of gawminers.com/hashlet).
[27] Ex. A-12 (8/19/14 version of gawminers.com/hashlet).
[28] Ex. A-12 (8/19/14 version of gawminers.com/hashlet).
[29] Ex. A-12 (8/19/14 version of gawminers.com/hashlet).
[30] ECF No. 57 at ¶ 97.

megahash-per-second.[31] As such, customers were told they were purchasing hardware capable of producing a certain number of calculations per second.

In reality, the sale of Hashlets was made pursuant to a Ponzi scheme. According to Madeline Eden, one of the former employees of the Company familiar with the Hashlet software: "Hashlets were basically effectively the equivalent . . . of a JPEG image or a GIF. There was no virtual physical API or interaction with any sort of miner on the backend."[32] According to another former employee, "a [H]ashlet was basically just a payout number at the end of the day."[33] In other words, there was no physical mining backing up Hashlets.[34] Payouts were made based on the daily, average returns from a particular pool of cryptocurrency, but not based on mining conducted by actual computers.[35] Instead, the Companies used payments they received from new investors to make payouts to older investors.[36] The Companies lacked the equipment to make payments to customers based on actual mining.[37] As former GAW Miners employee Joe Mordica testified in this case: "I knew that if his mindset was to over-leverage the mining capacity to bring in more revenue, that that was not going to be sustainable for long, plus it's illegal, I believe. It's a Ponzi scheme."[38]

---

[31] Ex. A-12 (8/19/14 version of gawminers.com/hashlet).; (slider showing price of a Hashlet increasing with mining power); Ex. A-17 (M. Eden Depo. Tr.) at 25:4-22; Ex. D (L. Kerner Decl.) at ¶ 31.

[32] Ex. A-17 (M. Eden Depo. Tr.) at 24:3-9. Exhibit A-19 shows a screenshot from the ZenCloud interface showing this image of an investor's Hashlets. Each image showed a mining speed, which indicated that the Hashlet was in fact engaged in mining activity. Exhibit A-20 shows a screen shot from the ZenCloud interface that shows the maintenance fees for Hashlets. The maintenance fees supposedly covered "hosting," "electricity," and "repair." These fees likewise indicated that Hashlets were engaged in mining activity.

[33] Ex. A-1 (J. Mordica Depo. Tr.) at 58:14-16.

[34] Ex. A-17 (M. Eden Depo. Tr.) at 26:21-29:11; 41:10-42:4; ECF No. 72 at 5–6; Ex. B (A. Narayanan Decl.) at ¶ 13.

[35] Ex. A-17 (M. Eden Depo. Tr.) at 56:14-57:5; Ex. A-1 (J. Mordica Depo. Tr.) at 58:17-59:20; ECF No. 57 at ¶ 127; Ex. B (A. Narayanan Decl.) at ¶ 13.

[36] Ex. A-17 (M. Eden Depo. Tr.) at 36:20-39:10; Ex. D (L. Kerner Decl.) at ¶ 33.

[37] Ex. A-1 (J. Mordica Depo. Tr.) at 63:8-64:21; id. at 90:16-91:13.

[38] Ex. A-1 (J. Mordica Depo. Tr.) at 65:20-24.

Garza —the CEO of GAW Miners—knew the Companies lacked adequate mining capacity to support the sales made to investors.[39] Garza has admitted as much when he pled guilty to wire fraud.[40] In his plea agreement, Garza admitted that he made public statements representing that "The Hashlets the defendant's companies sold engaged in the mining of virtual currency."[41] Garza admitted that this was a lie and that in reality the "companies sold more hashlets than were supported by their computing power maintained in their data centers."[42] Garza further admitted that the Companies "applied money his companies had made from new hashlet investors and used it to pay older hashlet investors' money that the Companies owed them based on the purported mining GAW Miners and ZenMiner had done on the investors' behalf."[43]

D.     The Move to Hashpoints, Paycoin, Paybase and HashStakers.

In November 2014, the Companies announced that they planned to launch a new form of cryptocurrency called "Paycoin."[44] In advance of Paycoin's launch, the Companies began offering "Hashpoints" to investors.[45] Hashpoints were convertible promissory notes that investors could later exchange for Paycoin once Paycoin launched.[46] Hashpoints were "mined" by Hashlets.[47] So, instead of mining for cryptocurrency (which wasn't actually happening in reality), an investor's Hashlets would generate Hashpoints.[48] The Companies offered Hashpoints in an effort to shift customers away from Bitcoin and other cryptocurrencies to Hashpoints and

---

[39] Ex. A-1 (J. Mordica Depo Tr.) at 65:16-66:9; 68:2-17; ECF No. 57 at ¶¶ 115–16.
[40] Ex. A-21 (Plea Agreement).
[41] Ex. A-21 (Plea Agreement).
[42] Ex. A-21 (Plea Agreement).
[43] Ex. A-21 (Plea Agreement).
[44] Ex. A-22 (11/6/14 version of Hashcoin.com). The Companies initially referred to Paycoin as "Hashcoin." *See also* ECF No. 57 at ¶ 136; ECF No. 72 at 6; Ex. B (A. Narayanan Decl.) at ¶ 15.
[45] Ex. A-18 (M. Pfeiffer Depo. Tr.) at 120:4-121:2; ECF No. 57 at ¶ 136; Ex. B (A. Narayanan Decl.) at ¶ 15; Ex. D (L. Kerner Decl.) at ¶ 34.
[46] Ex. A-18 (M. Pfeiffer Depo. Tr.) at 121:3-10; ECF No. 57 at ¶ 136; Ex. D (L. Kerner Decl.) at ¶ 34.
[47] Ex. A-18 (M. Pfeiffer Depo. Tr.) at 120:4-21; ECF No. 57 at ¶ 136.
[48] Ex. A-17 (M. Eden Depo. Tr.) at 57:18-58:14; Ex. A-18 (M. Pfeiffer Depo. Tr.) at 120:4-121:2; ECF No. 57 at ¶ 136.

Paycoin and to avoid making payments in Bitcoins to Hashlet-holders that the Companies could not make.[49]

The Companies and Garza represented that Paycoin would be backed by a "coin adoption fund."[50] According to the Companies, Paycoin was "backed by a fiat-based reserve of USD that shields early adopters from risk and increases acceptance by large institutions."[51] The website the Companies established for Paycoin further represented that Paycoin would include "the world's first Adoption Fund—a fund whose sole mandate is to grow the cryptocurrency by spreading adoption world-wide."[52] The Paycoin Whitepaper—a document describing Paycoin's features that was released by the Companies—elaborated on the stated purpose of the adoption fund:

> Paycoin is unique among cryptocurrencies in that its Initial Coin Offering (ICO) creates the world's first Coin Adoption Fund (CAF), a multi-tier, organized strategy for increasing global adoption. The CAF is divided into three equally sized budgets; (1) funds for promoting adoption with APIs, plugins, and apps; (2) funds for maintaining a fiat exchange, providing the necessary liquidity for merchant adoption; and; (3) funds for developing proprietary hardware to distribute to mines at cost.[53]

According to false public statements made by Garza and the Companies, this reserve would be composed of $100,000,000.[54] This fund would, in turn, purportedly be used to ensure that a minimum price of $20 per Paycoin would be maintained.[55] In an interview with the *Wall Street Journal*, Garza stated that Paycoin would launch with an "anticipated market

---

[49] Ex. A-17 (M. Eden Depo. Tr.) at 62:24-63:5 ("it was a good way to minimize the amount of Bitcoins that was going out of the system and also limit the amount of hashing power . . . that was required on the back end to . . . support the amount of hashing power that had been sold."); Ex. A-1 (J. Mordica Depo. Tr.) at 79:18-22 ("It [Paycoin] started when Josh came up with the idea to build an additional source of revenue to help offset some of the mining equipment that he was not able to purchase because of whatever reason, you know, he didn't have enough money or whatever."); ECF No. 57 at ¶¶ 136–37; Ex. D (L. Kerner Decl.) at ¶ 34.

[50] ECF No. 57 at ¶ 140.

[51] Ex. A-23 (12/14/14 version of Paycoin.com)

[52] Ex. A-23 (12/14/14 version of Paycoin.com)

[53] Ex. A-24 (Whitepaper)

[54] Ex. A-25 (M. Casey Article); Ex. A-18 (M. Pfeiffer Depo. Tr.) at 121:3-21; Ex. B (A. Narayanan Decl.) at ¶ 15.

[55] Ex. A-1 (J. Mordica Depo. Tr.) at 88:23-89:5; *id.* 93:6-94:6; Ex. A-18 (M. Pfeiffer Depo. Tr.) at 121:3-21; Exs. A-25–A-34; ECF No. 57 at ¶¶ 141–42; ECF No. 72 at 6; Ex. D (L. Kerner Decl.) at ¶ 35.

capitalization of $250 million," and "the company will partly back that with a store of fiat currency worth around $100 million."[56]

Garza and the Companies repeatedly reiterated that Paycoin would have a $20 per coin floor that would be maintained through a platform known as "Paybase."[57] Paybase was advertised as a currency exchange that would allow Paycoin holders to acquire other types of cryptocurrency,[58] fiat currency, and make purchases at major retailers like Amazon and Target.[59]

At the same time, the Companies introduced a new product known as "Hashstakers."[60] Initially, Paycoins were deposited into customers' ZenCloud account wallets.[61] Hashstakers were supposed to be a new type of wallet that acted like a Paycoin-based certificate of deposit.[62] Users would deposit a certain number of Paycoins into each Hashstaker.[63] The Paycoins would be locked into the wallet for a given period of time, during which they would generate a fixed return.[64] According to the GAW Miners website: "Your HashStaker stakes every day, giving you daily Paycoin payouts based on the number of Paycoins inside your HashStaker wallet."[65] Customers were in essence forced to "upgrade" their Hashlets to HashStakers.[66] According to a former Company employee, Joe Mordica, the Companies used this device to enable "GAW to

---

[56] Ex. A-35 (M. Casey Article).
[57] ECF No. 57 at ¶ 153.
[58] Ex. A-1 (J. Mordica Depo. Tr.) at 109:7-9.
[59] Ex. A-25 (A. Shinners Depo. Tr.) at 319:6-14; Ex. A-36 (1/1/15 version of Paybase.com); ECF No. 57 at ¶ 141; ECF No. 72 at 6.
[60] ECF No. 57 at ¶ 151.
[61] ECF No. 57 at ¶ 151.
[62] Ex. A-18 (M. Pfeiffer Depo. Tr.) at 175:25-178:25; ECF No. 57 at ¶ 152.
[63] Ex. A-1 (J. Mordica Depo. Tr.) at 85:7-86:7; 87:13-22; ECF No. 57 at ¶ 151.
[64] Ex. A-37 (12/29/14 version of gawminers.com/pages/buy-hashstaker); Ex. A-38 (12/29/14 version of gawminers.com/pages/buy-hashstaker#preparation); ECF No. 57 at ¶ 151.
[65] Ex. A-37 (12/29/14 version of gawminers.com/pages/buy-hashstaker); Ex. A-38 (12/29/14 version of gawminers.com/pages/buy-hashstaker#preparation).
[66] Ex. A-18 (M. Pfeiffer Depo. Tr.) at 137:4-11.

avoid its financial commitment to the hashlets in order to convert these hashlets over to hashstakers."[67]

After Paycoin launched, it became clear that the promised $20 floor was not going to be maintained and that the existence of the coin adoption fund was a fabrication.[68] When it was first introduced, Paycoin briefly traded at around $20 per coin, but the price quickly fell on cryptocurrency exchanges.[69] When the Companies released Paybase, the platform lacked the promised features, including negotiability with major retailers causing the Paycoin price to fall even more rapidly.[70]

Garza knew the representations about a $20 floor and the coin adoption fund were false. In an internal email, Garza admitted that the Companies would need to hold huge amounts of cash to guarantee the $20 price and "the entire model is flawed."[71] Garza admitted that "this entire currency was sold under the idea that [there] would be a floor. To change that idea, would be to change the core concept thus making the entire community reject it."[72] Garza reiterated: "Take the floor away and the whole coin collapses. Moreover, I do not think I could be involved after that. There is no greater definition of a bait and switch. This [investment] community would burn us at the stake."[73]

In his plea agreement, Garza admitted that he represented that "The market value of a single paycoin would not fall below $20 per unit because defendant's companies had a reserve of $100 million that the Companies would use to purchase paycoins to drive up its price." Garza

---

[67] Ex. A-1 (J. Mordica Depo. Tr.) at 88:8-9.
[68] ECF No. 57 at ¶¶ 153–54; Ex. D (L. Kerner Decl.) at ¶ 38.
[69] Ex. B (A. Narayanan Decl.) at ¶ 16; *see also* ECF No. 57 at ¶¶ 153–54.
[70] Ex. 25 (A. Shinners Depo. Tr.) at 191:6-16; ECF No. 57 at ¶ 155; Ex. B (A. Narayanan Decl.) at ¶ 16.
[71] Ex. A-39 (12/19/14 email thread).
[72] Ex. A-39 (12/19/14 email thread).
[73] Ex. A-39 (12/19/14 email thread).

stipulated that "[T]he defendant's companies did not have a reserve of $100 million and could not therefore drive up the value of paycoin."[74]

## **ARGUMENT**

A.  Standard for Certification

Plaintiffs seek certification of the following Class:

All persons or entities who, between August 1, 2014, and December 1, 2015 purchased or acquired Hashlets, Hashpoints, HashStakers, and Paycoin from GAW Miners and ZenMiner. Excluded from the Class are any defendants, any parent, subsidiary, affiliate, agent or employee of any defendant, any co-conspirator and any governmental entity.

The requirements for certification of a class under Rule 23(a) are (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. *Amchem Prods, Inc. v. Windsor*, 521 U.S. 591, 613 (1997). "In addition to the express requirements of Rule 23(a), the Second Circuit recognizes an 'implied requirement of ascertainability.'" *In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 99 (S.D.N.Y. 2016). The Court must also determine whether the action is maintainable under Rule 23(b)(1), (2) or (3). *Amchem*, 521 U.S. at 614.

To qualify for certification under Rule 23(b)(3), a class must meet two requirements beyond the Rule 23(a) prerequisites: (1) Common questions must "predominate over any questions affecting only individual members"; and (2) class resolution must be "superior to other available methods for the fair and efficient adjudication of the controversy." *Amchem*, 521 U.S. at 615. Those requirements are satisfied here.

Class actions promote judicial economy by aggregating small claims into one lawsuit. "Class actions . . . permit the plaintiffs to pool claims which would be uneconomical to litigate individually. [M]ost of the plaintiffs would have no realistic day in court if a class action were

---

[74] Ex. A-21 (Plea Agreement).

not available." *Phillips Petroleum v. Shutts*, 472 U.S. 797, 808–09 (1985); *In re Worldcom, Inc. Sec. Litig.*, 219 F.R.D. 267, 304 (S.D.N.Y. 2003) (finding that, absent class certification, the burden and expense on individual investors of litigating independent actions against well financed defendants would leave most investors "without any recourse"). The Second Circuit construes the Rule 23 factors "liberally" due to "the importance of the class action device in securities fraud suits." *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 179 (2d Cir. 1990); *see also In re PE Corp. Sec. Litig.*, 228 F.R.D. 102, 107 (D. Conn. 2005) ("It is well recognized that class actions are a particularly appropriate means for resolving securities fraud actions.").

"In ruling on a motion for class certification, the Court generally accepts the factual allegations of the Complaint as true." *Wood v. Prudential Ret. Ins. & Annuity Co.*, 2017 WL 3381007, at *2 (D. Conn. Aug. 4, 2017). "However, it may also consider evidence that a plaintiff has submitted in support of her motion for class certification." *Id.* "The preponderance of the evidence standard applies to evidence proffered to establish Rule 23's requirements." *Menkes v. Stolt-Nielsen S.A.*, 270 F.R.D. 80, 89–90 (D. Conn. 2010) (quoting *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 202 (2d Cir. 2008)). While the Rule 23 inquiry may overlap with that of the merits, courts may not engage in "free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Ct. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1195 (2013). In this case, plaintiffs rely on the allegations of their complaint and the evidence submitted in connection with this motion.

B.  Rule 23(a) is Satisfied.

1.      The Class includes thousands of persons

Rule 23(a)(1) requires that the class be so numerous that joinder of all members would be "impracticable." Impracticable does not mean impossible, but "only that the difficulty or inconvenience of joining all members of the class make use of the class action appropriate." *Ctr. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, LLC*, 504 F.3d 229, 244-45 (2d Cir. 2007). "[N]umerosity is presumed at a level of 40 members." *Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995). "Courts have not required evidence of exact class size or identity of class members to satisfy the numerosity requirement." *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993).

Here, the Class is comprised of all persons or entities who purchased the specified products sold by the Companies. The Class easily satisfies the numerosity requirement. One of plaintiffs' experts—Robert Mills—has analyzed two databases from the Companies. The first database contains the transactional data from ZenCloud, *i.e.*, the platform users could use to manage and trade their Hashlets. According to this data, 212,455 users had a transaction associated with their account and over 33 million transactions took place.[75] The second database contains the transactional data from PayBase, *i.e.*, the platform users could use to buy and sell Paycoins. According to this data, 9,646 users had PayBase accounts. Finally, internal documents from the Companies indicate that the Companies made $28.7 million in sales online through the GAW Miner's Shopify database to over 15,000 different users.[76] Likewise, an internal analysis from the Companies indicates that 7,862 customers purchased Hashlets and did not receive

---

[75] Ex. B (Mills Decl.)
[76] Ex. A-40 (Shopify Spreadsheet). The exhibit was modified to hide personally identifiable information.

enough payouts to offset the purchase price they paid for the Hashlets.[77] However one looks at it, the case meets the numerosity requirement. *See Menkes*, 270 F.R.D. at 90 (finding numerosity requirement met where 1,208 investors purchased the relevant securities); and *In re Strum, Ruger, & Co., Inc. Sec. Litig.*, 2012 WL 3589610, at *9 (D. Conn. Aug. 20, 2012) (finding numerosity where there were "hundreds of shareholders").

>    2.    Questions of law and fact are common to the Class.

Rule 23(a)(2) is satisfied if "there are questions of law and fact common to the class." "To satisfy the commonality requirement, the 'claims must depend upon a common contention. . . . That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Local 1522 of Council 4 v. Bridgeport Health Care Ctr., Inc.*, 2018 WL 1419792, at *5 (D. Conn. Mar. 21, 2018) (quoting *Wal-Mart Stores v. Dukes*, 564 U.S. 338, 350– 51 (2011)). To satisfy the commonality requirement, the plaintiff must "demonstrate that the class members 'have suffered the same injury.'" *Dukes*, 564 U.S. at 351 (quoting *Gen. Tel. Co. of S.W. v. Falcon*, 457 U.S. 147, 157 (1982)). "For purposes of Rule 23(a)(2) even a single common question will do." *Dukes*, 564 U.S. at 359 (internal marks omitted). "The Commonality Requirement has been characterized as a 'low hurdle.'" *Kaplan v. S.A.C. Capital Advisors, L.P.*, 311 F.R.D. 373, 378 (S.D.N.Y. 2015) (quoting *McIntire v. China Media Express Holdings, Inc.*, 38 F. Supp. 3d 415, 424 (S.D.N.Y. 2014)). Furthermore, "is not the law" that "a common question must be common to every class member." *Johnson v. Nextel Commc'ns Inc.*, 780 F. 3d 128, 137 (2d Cir. 2015).

---

[77] Ex. A-41 (2/5/2015 R. Mottley Email). The exhibit was modified to hide personally identifiable information.

Plaintiffs have brought the following federal and state law claims:[78]

| Count | Cause of Action | Defendant(s) |
|-------|-----------------|--------------|
| 5 | A claim under CUSA § 36b-29(a)(1) for sale of unregistered securities in violation of CUSA § 36b-16 | GAW Miners & ZenMiner |
| 6 | A claim for controlling person liability under CUSA § 36b-29(c) based on the Companies' violation § 36b-29(a) | Stuart Fraser |
| 2 | A claim for controlling person liability under § 20(a) of the Securities and Exchange Act of 1934 | Stuart Fraser |
| 4 | A claim for aiding and abetting securities fraud under CUSA § 36b-29(a)(2) | Stuart Fraser |
| 1 | A claim for violation of § 10(b) of the Securities and Exchange Act of 1934 and Rule 10b-5 | GAW Miners & ZenMiner |
| 3 | A claim for securities fraud in violation of § 36b-29(a)(2) & 36b-4 of the CUSA Act | GAW Miners & ZenMiner |
| 7 | State law claim for common law fraud | GAW Miners & ZenMiner |
| 8 | State law claim for aiding and abetting the Companies' common law fraud | Stuart Fraser |

The central issue in the illegal sale of securities claim will be whether the Companies' products were "securities" under state law and whether any applicable exemptions to registration apply. For the fraud claims, the central issue is whether the Companies misrepresented or omitted material facts about those products, including whether Hashlets constituted an interest in an actual cryptocurrency miner and that Paycoin would have a $20 floor supported by a coin adoption fund. In comparable situations, courts have found the commonality requirement to have been satisfied. *See*, *e.g.*, *Pub. Employees' Retirement Sys. of Miss. v. Merrill Lynch & Co., Inc.*, 277 F.R.D. 97 (S.D.N.Y. 2011) (commonality satisfied when common questions included "whether Defendants made materially false and misleading statements in the Offering Documents in any or all of the ways alleged in the Amended

---

[78] In denying Fraser's 12(b)(6) motion to dismiss, the Court engaged in an extensive analysis of plaintiffs' claims for relief and concluded that these claims were each validly pled, *see* ECF No. 72.

Complaint."). The common issue in the claims against Fraser include his control over the Companies and his assistance in perpetrating a fraud and knowledge or reckless disregard of the underlying fraud. Common issues across all claims will include whether Class members sustained damages and the measure of those damages.

### 3. Plaintiffs' claims are typical of the Class.

"The court may certify a class only if the plaintiffs have shown that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." *In re Colonial Partnership Litig.*, 1993 WL 306526, at *4 (D. Conn. Feb. 10, 1993) (quoting Rule 23(a)(3)) "Typicality does not require that the situations of the named representatives and the class members be identical." *In re Oxford Health Plans, Inc.*, 191 F.R.D. 369, 375 (S.D.N.Y. 2000) (citation omitted). A plaintiff's claim is typical if it arises from "the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *In re Flag Telecom Holdings, Ltd. Secs. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009). Plaintiffs' claims are typical because they each (1) purchased interrelated financial products sold by the Companies during the Class Period; (2) were adversely affected by defendants' fraudulent scheme; and (3) suffered damages. Further, Plaintiffs' injuries arose from the same course of conduct as the other members of the Class, their legal theories are the same as those of the members of the Class, and plaintiffs' claims are not subject to any unique defenses. *See Kelleher v. Advo, Inc.*, 2009 WL 2413362, at *3 (D. Conn. Mar. 30, 2009) (Plaintiffs claims were typical because "Kelleher and all of the proposed class members allegedly suffered damages as a result of purchasing Advo stock in reliance on the false statements made by the defendants."); and *Menkes*, 270 F.R.D. at

92 ("As alleged, each class member's claim arises from the same general course of events, and each class member would present similar legal arguments to prove the defendants' liability.").[79]

Fraser may argue that one of the plaintiffs, Allen Shinners, is subject to a unique defense because he received non-public information from the Companies. While Shinners testified that he occasionally saw Company documents before they were released to the public, he never saw any information that revealed the falsity of the representations at issue in this case, including any indication that Hashlets were not supported by actual miners or that the Companies lacked a coin adoption fund that would be used to maintain the $20 price floor of Paycoin. As such, there is no risk of a unique defense becoming the focus of the litigation. For example, *In re MF Global Holdings Ltd. Investment Litigation*, 310 F.R.D. 230, 236 (S.D.N.Y. 2015), the defendants argued that a plaintiff was subject to a unique defense because the plaintiff's "investment manager, Franklin Tempelton, had access to and relied on nonpublic information in a conference call with MF Global executives prior to the Senior Notes Offering." The Court nevertheless concluded that this defense would not become the focus of trial, and so it didn't preclude class certification. Here, Shinners never learned any information that would reveal the fraud and so there is no risk the defense will become a focus as to him at trial.

4.      Plaintiffs will adequately protect the interests of the Class.

The adequacy of representation requirement of Rule 23(a) calls for the Court to resolve: "(1) [whether the] plaintiff's interests are antagonistic to the interest of other members of the class, and (2) [whether the] plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *Kelleher*, 2009 WL 2413362, at *3. "The adequacy inquiry under

---

[79] The Court previously appointed plaintiffs as Lead Plaintiffs under the PSLRA, see 15 U.S.C. § 78u-4(a)(3)(B), based in part on a finding that plaintiffs claims met Rule 23's typicality requirements. *See* ECF No. 46.

Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem*, 521 U.S. at 625.

Plaintiffs' interests are aligned with the interests of the Class. Like the members of the putative class, Plaintiffs all lost money by purchasing the Companies' products. *See PE Corp.*, 228 F.R.D. at 109 ("The named plaintiffs' interests are directly aligned with those of the absent class members: they are purchasers of Celera common stock who suffered significant losses as a result of the investments."). The Court so concluded when it appointed Plaintiffs as Lead Plaintiffs.[80] Plaintiffs have also sat for depositions and provided discovery during the case.

Plaintiffs have chosen qualified, experienced attorneys, including Marc M. Seltzer of Susman Godfrey L.L.P. ("Susman Godfrey"). He and the firm possess extensive experience in successfully prosecuting numerous securities fraud class actions on behalf of injured investors.[81] *See In re Crude Oil Commodity Futures Litig.*, 2012 WL 569195, at *2 (S.D.N.Y. Feb. 14, 2012) ("For its part, Susman Godfrey has served as lead counsel in hundreds of class actions, . . ."). Susman Godfrey and Izard, Kindall & Raabe, LLP have vigorously pursued the Class's interests in opposing Fraser's Rule 12(b)(6) motion and various discovery motions filed by Fraser and by conducting extensive discovery, including taking several depositions.

5.      The Court can ascertain Class members objectively.

"[T]he touchstone of ascertainability is whether the class is 'sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." *Brecher v. Rep. of Argentina*, 806 F.3d 22, 24 (2d Cir. 2015). Ascertainability typically is not a barrier to certification in a securities fraud case because membership in the class is almost always based on ownership of the security. That is the case here: membership in

---

[80] *See*, ECF No. 46.
[81] *See* Ex. A-42 (Susman Godfrey L.L.P. firm resume); Ex. A-43 (profile of Marc M. Seltzer).

the class turns on whether a person purchased securities sold by the Companies. Ownership can be verified by investor records or transactional data from the Companies that show when customers purchased what products. *See, e.g.*, *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 312 F.R.D. 332, 353 (S.D.N.Y. 2015) ("Given that the subclasses may be ascertained with reference to investor records, it is administratively feasible to determine whether an investor is a member of the institutional investor subclass, the retail investor subclass, or no subclass at all.").

      C.      Rule 23(b)(3) is satisfied.

           1.      Common questions of law or fact predominate.

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. Predominance is satisfied 'if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof.'" *Steginsky v. Xcelera, Inc.*, 2015 WL 1036985, at *8 (D. Conn. Mar. 10, 2015) (quoting *In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d 229, 240 (2d. Cir. 2012)). "Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws." *Amchem*, 521 U.S. at 625. Here, plaintiffs claim that defendants' cryptocurrency products amounted to a high-tech Ponzi scheme. Plaintiffs' claims are thus susceptible to generalized proof because their claims will focus on a common course of fraudulent conduct. *See Cohen v. J.P. Morgan Chase & Co.*, 262 F.R.D. 153, 159 (E.D.N.Y. 2009) ("The predominance requirement is met when the defendant's wrongful acts involve common practices . . . .").

     Even if the Court concludes that some individual issues do exist, that would not preclude class certification. "[A]ctions for securities fraud which customarily allege a conspiracy or

common course of conduct intended to defraud a group of investors have been frequently certified as class actions notwithstanding the existence of the individual issues of misrepresentation and reliance." *Abramovitz v. Ahern*, 96 F.R.D. 208, 216 (D. Conn. 1982).

> a.   Claim for violation of under CUSA § 36b-29(a)(1) for sale of
> unregistered securities in violation of CUSA § 26b-16.

CUSA § 36b-29(a)(1) creates a private cause of action against "[a]ny person who: (1) [o]ffers or sells a security in violation of subsection (a) of section . . . 36b-16 . . . ." CUSA § 36b-16 provides that:

> No person shall offer or sell any security in this state unless (1) it is registered under sections 36b-2 to 36b-34, inclusive, (2) the security or transaction is exempted under section 36b-21, or (3) the security is a covered security provided such person complies with any applicable requirements in subsections (c), (d) and (e) of section 36b-21.

This claim can be established by generalized proof because it solely concerns the conduct of the Companies. The claim contains no element of reliance, loss causation, or scienter. Plaintiffs need only prove that the Companies illegally sold unregistered securities and that none of the applicable exemptions or exceptions apply. Common issues will plainly predominate. *See, e.g.*, *Jenson v. Continental Fin. Corp.*, 404 F. Supp. 806, 812 (D. Minn. 1975) (violation of federal statute prohibiting sale of unregistered securities "presents questions of law and fact common to all members of the class" and "these common questions predominate over individual issues."). Further, a statutory measure of damages applies to this claim, making the computation of damages a purely mechanical task.

> b.   Claim under CUSA § 36b-4-(a)(1) and § 36b-29(a)(2).

A claim under CUSA § 36b-4(a)(1) is similar to a Rule 10b-5 claim, except in one important respect: Negligence suffices to make out a claim. For the reasons discussed below, common issues will predominate over individual issues as to that claim.

Common issues will also predominate as to plaintiffs' CUSA § 36b-29(a)(2) claim. A defendant is liable under CUSA § 36b-29(a)(2) if it:

> offers or sells . . . a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, who knew or in the exercise of reasonable care should have known of the untruth or omission, the buyer not knowing of the untruth or omission, and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission . . . ."

A CUSA § 36b-29(a)(2) claim thus has two elements: (1) "an offer to sell a security by means of an untrue statement" and (2) "the buyer of the securities must not know of the untruth or omission complained of." *Giacomi*, 699 A.2d at 120–21.

It is plain that common issues will predominate as to the first element because it relates solely to the Companies' misrepresentations. The second element—the buyer's knowledge—is similar to the element of reliance in plaintiffs' 10b-5 claim and can be proven by common evidence. As described below, the Companies made fundamental misrepresentations concerning Hashlets and Paycoins. No reasonable investor would have purchased the products if they knew the truth about defendants' fraudulent scheme. The fact that investors paid for the products indicates they were unaware of the falsehoods.

c.    <u>Claim for control person liability under § 36b-29(c).</u>

CUSA § 36b-29(c) imposes liability on control persons for underlying violations of CUSA § 36b-29(a) or (b) (*i.e.,* sale of unregistered securities in violation of CUSA § 36b-29(a)(1) and securities fraud under 36b-29(a)(2)).[82] CUSA § 36b-29(c) provides that a control person is

> Every person who directly or indirectly controls a person . . . , every partner, officer or director of such a person, every person occupying a similar status or performing similar

---

[82] Underlying violations of CUSA 36b-29(a)(2) securities fraud are discussed above.

functions, every employee of such a person who materially aids in the act or transaction constituting the violation and every broker-dealer or agent who materially aids in the act or transaction constituting the violation are also liable jointly and severally with and to the same extent as such person, unless the person who is so liable sustains the burden of proof that he did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.

Control person liability exists if "a person occupies a status or performs functions similar to the status and function of a partner, officer, or director." *Giacomi*, 699 A.2d at 124. Common issues will predominate because the control person claim will focus on Fraser's role at the Companies and his defenses of lack of knowledge or negligence.

CUSA § 36b-29(a)(2) applies to a person who "materially assists" a person who commits securities fraud. Establishing an aiding and abetting claim requires proof of a primary violation and proof "that the aider and abettor . . . materially assist[ed] the primary violator in the offer or sale of the securities and in the violation by which the primary violator accomplished the offer or sale." *Connecticut Nat'l Bank v. Giacomi*, 699 A.2d 101, 121 (Conn. 1997).

> [T]he buyer must also meet a burden of production concerning the issue of whether the aider and abettor knew or should have known of the untruth or omission.  If the buyer meets this burden of production, the burden of proof on this issue shifts, so that the aider and abettor then bears the burden of persuading the fact finder that it did not know, and in the exercise of reasonable care could not have known, of the untruth or omission.

*Id.* Again, this claim can be established by generalized proof. Each element relates to Fraser's conduct or knowledge, as to which <u>he</u> bears the burden of proof, and so the same proof will be applicable across-the-board to the Class as a whole.

        d.    <u>Claim for aiding and abetting securities fraud under CUSA § 36b-29(a)(2).</u>

CUSA § 36b-29(a)(2) also applies to a person who "materially assists" a person who commits securities fraud. Establishing an aiding and abetting claim requires proof of a primary violation and proof "that the aider and abettor . . . materially assist[ed] the primary violator in the

offer or sale of the securities and in the violation by which the primary violator accomplished the

offer or sale." *Connecticut Nat'l Bank v. Giacomi*, 699 A.2d 101, 121 (Conn. 1997).

> [T]he buyer must also meet a burden of production concerning the issue of whether the aider and abettor knew or should have known of the untruth or omission.  If the buyer meets this burden of production, the burden of proof on this issue shifts, so that the aider and abettor then bears the burden of persuading the fact finder that it did not know, and in the exercise of reasonable care could not have known, of the untruth or omission.

*Id.* Again, this claim can be established by generalized proof. Each element relates to Fraser's

conduct or knowledge, as to which he bears the ultimate burden of proof, and so the same proof

will be applicable across-the-board to the Class as a whole.

e.       Claim under § 10(b) of the Securities Exchange Act of 1934.

Plaintiffs' 10b-5 claim is also susceptible to class-wide proof.[83] The elements of a 10(b)

claim are:

> (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.

*Amgen*, 133 S. Ct. at 1192.

It should be beyond dispute that common issues will predominate as to the first three

elements. *See, e.g.*, *Willis v. Big Lots, Inc.*, 2017 WL 1063479, at *4 (S.D. Ohio 2017) ("Indeed,

'[q]uestions of misrepresentation, materiality, and scienter are the paradigmatic common

question[s] of law in a securities fraud class action.' To that end, courts have repeatedly found

this requirement satisfied in securities actions.") (quoting *Ross v. Abecrombie & Fitch Co.*, 257

F.R.D. 435, 443 (S.D. Ohio 2009)). The first element will is satisfied because the Companies

---

[83] While this motion discusses the claims separately, the Court should find that predominance is satisfied as to all the claims at issue because: "where, as here, the plaintiffs common law claims arise out of the same allegedly fraudulent scheme and involve the same misrepresentations and omissions as the federal causes of action, they should be certified as well." *In re Boardwalk Marketplace Sec. Litig.*, 122 F.R.D. 4, 8 (D. Conn. 1988).

made several misrepresentations concerning Hashlets and Paycoin that Garza admitted were false. The materiality of these misrepresentations "is judged according to an objective standard" and so "the materiality of [the defendant's] alleged misrepresentations and omissions is a question common to all members of the class." *Amgen*, 568 U.S. at 459–60.

Common evidence will be used to satisfy scienter because it focuses on the Companies' and Garza's mental state. Plaintiffs can show that the Companies and Garza knew their claims were false when made and that they were made in an effort to sell more products (in the case of Hashlets) and to prolong the fraud (in the case of Paycoin).

Common evidence can be used to show transaction causation. To satisfy the element, plaintiffs must demonstrate their own reliance on the false statements or omissions. However, the need to prove plaintiffs' reliance in a fraud claim does not defeat class certification. Courts have repeatedly held that in a case of fraud, reliance can be established by classwide proof through circumstantial evidence. Here, no rational investor would have purchased the Companies' products if they knew the underlying business model was fundamentally fraudulent. The fact that investors nevertheless purchased financial products from the Companies is circumstantial evidence of reliance.

Many courts have reached similar conclusions. In 2013, the Second Circuit upheld class certification of fraud-based RICO claims over the defendant's objection that reliance would require individualized proof. [84] *In re U.S. Foodservice Inc. Pricing Litigation*, 729 F.3d 108, 122 (2nd Cir. 2013). The plaintiffs in that case were customers of a large food distributor and they alleged that the defendant consistently inflated its bills through phony promotional charges

---

[84] In *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008), the Supreme Court held that causation, not first-party reliance, is an element of a RICO claim. But first-party reliance is a traditional means of proving causation and in other contexts a plaintiff may be required to prove first-party reliance to establish causation. That was the case in *Foodservice*. 729 F.3d at 119 n.6. As such, the case is similar to the fraud claims at issue here.

and other means. *Id.* at 113–14. Emphasizing that misrepresentations in the inflated invoices were uniform and resulted in overcharges paid by the plaintiffs, the Court held that reliance could be established "through legitimate inferences based on the nature of the alleged misrepresentations at issue." *Id.* at 120 (quoting *Klay v. Humana, Inc.*, 382 F.3d 1241, 1259 (11th Cir. 2004)). While specific misrepresentations and omissions are alleged in this action, they are all part and parcel of an overreaching a Ponzi scheme. As such common issues regarding defendants' conduct will dominate the trial of this case, not questions affecting only individual Class members.

Judge Hall of this Court reached the same conclusion in a class action alleging common law fraud and RICO claims. *Spenser v. Hartford Financial Services Group, Inc.*, 256 F.R.D. 284, 303 (D. Conn. 2009). The insurance company defendants in *Hartford* were alleged to have misrepresented the value of structured settlements and also the amounts being used to fund structured settlement annuities. *Id.* at 288. In granting the motion to certify the class, the court noted that the false representations made by the defendants were not necessarily uniform. *Id.* at 303. Despite the variations in the specific misrepresentations made to different claimants, the court found that classwide proof of reliance was viable. *Id.* The court emphasized that the representations concerned basic financial facts, including cost and price. *Id.* In these circumstances, Judge Hall found that "it is equally clear that every plaintiff to whom a total dollar figure was represented relied on that dollar figure when deciding whether to make the settlement." *Id.*

In a recent case, the Southern District of New York found that a class of plaintiffs asserting a common law fraud claim could establish reliance with classwide proof. *GE Dandong v. Pinnacle Performance, Ltd.*, 2013 WL 5658790, at *11 (S.D.N.Y. October 17, 2013). *GE*

*Dandong* concerned notes issued by special purpose vehicles created by the defendants. *Id.* at *1. The defendants concealed or actively misrepresented the degree to which the notes would be collateralized by high-risk synthetic collateralized debt obligations ("CDOs"), and also failed to disclose that at least some defendants were making their own investments based on expectations that those CDOs would underperform, creating financial incentives contrary to those of the investor plaintiffs. *Id.* at *2. In ruling on the viability of classwide proof of reliance, the Court considered expert testimony from an investor experienced in the structured finance industry who testified that the misstatements and omissions concerning the nature of the collateral would be vital to any purchaser of the notes. *Id.* at *14. The court also observed that, unlike the "personal idiosyncratic choice" involved with consumer purchases, financial investments are uniformly motivated by the desire to profit and that, as a result, "payment alone may constitute proof of reliance upon a financial representation." *Id.* at *9. The court concluded that "the alleged misrepresentations and omissions here were so fundamental to the value of the Notes that it is hard to imagine a reasonable investor purchasing them if the Offering Documents had revealed their true nature." *Id.* at *10. As a result, classwide proof of reliance was viable and the court certified the class. *Id.* at *11.

Relying on *GE Dandong*, the court in *Anwar v. Fairfield Greenwich Ltd.*, 306 F.R.D. 134 (S.D.N.Y. 2015), also concluded that circumstantial evidence could be used to establish reliance on a classwide basis. *Anwar* was a securities fraud case brought by investors in "feeder" funds that invested primarily in Bernard Madoff's Ponzi scheme. *Id.* at 137. The court concluded that circumstantial evidence could be used to establish reliance on misrepresentations by PWC concerning a "claim that the audit reports misrepresented the value of the Funds' assets and that PWC had verified these facts through proper auditing processes." *Id.* at 144. The court reasoned

that reliance could be established classwide because no reasonable investor would make an investment in a fund without an audit opinion. *Id.* at 145. However, investors nevertheless purchased products, which was circumstantial evidence that they relied on the misrepresentations. *Id.*

In *Torres v. S.G.E. Management, L.L.C.*, 838 F.3d 629 (5th Cir. 2016) (*en banc*), the Fifth Circuit affirmed certification of a class in a RICO case involving a fraudulent pyramid scheme because the fraud was baked into the scheme: The "fraud lies in the concealment of the inevitable collapse that results from the scheme's structure" that occurs "when participants run out of individuals to recruit and there are no more new recruits to pay those higher up the pyramid." *Id.* at 639.

> Turning to the facts of this case, we conclude that if the Plaintiffs prove that Ignite is a fraudulent pyramid scheme, they may use a common inference of reliance to prove proximate causation under RICO. A jury may reasonably infer that, in deciding to pay to become [Independent Associates], the Plaintiffs relied on Ignite's implicit representation that it is a legal multi-level marketing program, when it is in fact a fraudulent pyramid scheme.

*Id.* at 643.

A Ponzi scheme is similar: "Ponzi schemes require a consistent flow of money from new investors to continue. Ponzi schemes tend to collapse when it becomes difficult to recruit new investors or when a large number of investors ask to cash out." *See* S.E.C., *Fast Answers: Ponzi Schemes*, https://www.sec.gov/fast-answers/answersponzihtm.html. Similarly, in *Negrete v. Allianz Life Insurance Company of North America*, 238 F.R.D. 482 (C.D. Cal. 2006), the court concluded that reliance could be established on a classwide basis because when a misrepresentation is so fundamental that no reasonable purchaser would buy the product if he or she knew the truth, reliance on the misrepresentation is the "'common sense' or 'logical

explanation' for the behavior of plaintiffs and members of the class." *Id.* at 491–92 (quoting *Poulos v. Caesars World, Inc.*, 379 F.3d 654, 667 (9th Cir. 2004)).

Like those cases, this case involves fundamental misrepresentations about a financial product acquired as an investment. The Companies' products were sold to the public based on false descriptions of the assets they represented and the means through which the investment would generate a return. Because no reasonable investor would have purchased either these products if the Companies disclosed the fact they were being sold as part of a Ponzi scheme, the element of reliance may be established on a classwide basis.

i.      Hashlets were sales of miners that did not exist.

Hashlets were nothing more than a Ponzi scheme dressed up in a high-tech sales pitch. According to GAW Miners' website, a Hashlet was a "digital Cloud Miner," which would be hosted and operated by GAW Miners.[85] According to GAW Miners, owning a Hashlet would allow an investor to get the benefits of cryptocurrency mining while "cutting power costs in half, maximizing uptime, and save you from having noisy miners in your home."[86] Hashlets were supposedly "perfectly optimized to thrive in large, controlled datacenters and achieve massive economies of scale." Promising superiority to mining hardware actually possessed and operated by the investor, GAW Miners described Hashlets as, "Never obsolete – Adjusts to always remain profitable & never breaks down."[87]

All of these statements about Hashlets were false because the cryptocurrency miners GAW Miners sold as Hashlets did not, in fact, exist. Rather than generate a return by mining cryptocurrency and then passing that return on to Hashlet investors as GAW Miners promised,

---

[85] Ex. A-12 (8/19/14 version of gawminers.com/hashlet)
[86] Ex. A-12 (8/19/14 version of gawminers.com/hashlet)
[87] Ex. A-12 (8/19/14 version of gawminers.com/hashlet)

GAW Miners simply paid old investors with money received from new investors. Garza admitted in his plea agreement that GAW Miners did not have hashing power sufficient to support the Hashlets it sold.[88] Former GAW Miners employees confirmed and expounded on this admission at their depositions. Joe Mordica, GAW Miners' Chief Technical Officer, testified that the practice of selling Hashlets with no underlying mining hardware began as soon as Hashlets were sold.[89] And former head of Quality Assurance, Madeline Eden, testified that GAW Miners had employees check the daily returns on various mining pools so that the Company could manually allocate cryptocurrency to Hashlet investors based on the pools that they believed they had joined through their Hashlets.[90]

The false claim that Hashlets represented an interest in actual mining hardware was so fundamental that any reasonable investor would have relied on it. Hashlets were uniformly described as a form of hosted miner that would generate returns based on the mining conducted by that hardware. In support of this motion, plaintiffs are submitting a declaration from Lou Kerner, an investor with many years of experience investing in cryptocurrency and mining related projects.[91] Mr. Kerner explains that anyone acquiring an interest in a mining operation would be relying on the fact that miners are actually being operated to support that operation.[92] Disclosure of the truth would have required describing that past investors were being paid with proceeds received from later investors, not from mining operations.[93] No reasonable investor who had this information would have paid to invest in a Ponzi scheme.

---

[88] *See infra* fn. 36.
[89] *See infra* fn. 33-36 .
[90] *See infra* fn. 34.
[91] *See* Ex. D (L. Kerner Decl.) at ¶¶ 4–8.
[92] *See* Ex. D (L. Kerner Decl.) at ¶ 39.
[93] Ex. D (L. Kerner Decl.) at ¶ 40.

ii.   The Companies made additional fundamental
misrepresentations regarding Paycoin.

GAW Miners followed Hashlets with PayCoin, a new form of cryptocurrency. According to GAW Miners employees, Garza introduced PayCoin at least in part to encourage Hashlet investors to roll their investments into PayCoin as a way of reducing payouts required by the Hashlet Ponzi scheme.[94] Like Hashlets, however, PayCoin was sold on the basis of fundamental misrepresentations about the product.

As described above, GAW Miners represented it would maintain a floor price for PayCoin of $20 and that the Company had a hundred-million dollar reserve fund that it would use to buy coins at that price.[95] In fact, there was no reserve fund and no means to maintain price support for PayCoin. In his guilty plea, Garza acknowledged the falsity of GAW Miners' claims about a price floor and reserve fund.[96] And, at the time PayCoin was launched, Garza admitted in internal GAW Miners email that the promise of a $20 price floor was so significant that if the company withdrew that promise "the whole coin collapses."[97]

The Companies also represented that thousands of merchants, including Amazon.com, had agreed to accept PayCoin.[98] In fact, no such agreements had been made with Amazon or any other significant retailer. This promise was particularly significant because widespread commercial adoption had not been achieved by any other cryptocurrency and was considered crucial for long-term value.[99]

The Companies thus made fundamental misrepresentations that went directly to the expected return and overall value of the products they sold. The representations were made on

---

[94] *See infra* fn.49
[95] *See infra* fn. 51-56.
[96] *See infra* fn. 74.
[97] *See infra* fn. 71-73; Ex. D. (L. Kerner Decl.) at ¶ 41.
[98] *See infra* fn. 59; ECF No. 57 at 141–42.
[99] Ex. D. (L. Kerner Decl.).

Company websites or other widely distributed marketing materials and hence were essentially uniform for all plaintiffs, and are subject to classwide proof. *See In re U.S. Foodservice,* 729 F.3d at 120. And because the false statements clearly impact the value of a financial investment, plaintiffs can demonstrate reliance through the circumstantial evidence. *GE Dandong*, 2013 WL 5658790 at *9.

Loss causation can be shown by either "(a) 'the existence of cause-in-fact on the ground that the market reacted negatively to a corrective disclosure of the fraud;' or (b) that 'that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement.'" *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232–33 (2d Cir. 2014) (quoting *In re Omnicom Grp, Inc. Sec. Litig.*, 597 F.3d 501, 511, 513 (2d Cir. 2010)). The Supreme Court has held that loss causation is separate from reliance, see *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 813 (2011). As such, loss causation is usually not an issue during class certification. *Stougo v. Barclays PLC*, 312 F.R.D. 307, 327 (S.D.N.Y. 2016); *City of Livonia Employees' Retirement Sys. v. Wyeth*, 284 F.R.D. 173, 182–83 (S.D.N.Y. 2012).

Plaintiffs can prove loss causation through generalized proof. Here, the Companies and Garza concealed the fact that Hashlets were not backed by adequate mining power and that payouts to earlier investors were being made with funds received from later investors. A Ponzi scheme only works if the fraudsters can maintain their promises to earlier investors. *See Eberhard v. Marcu*, 530 F.3d 122, 132 n.7 (2d. Cir. 2008) ("A 'Ponzi scheme' typically describes a pyramid scheme where earlier investors are paid from the investments of more recent investors, rather than from any underlying business concern, until the scheme ceases to attract new investors and the pyramid collapse."). It was foreseeable that Hashlets would fail

and the Companies would collapse because the Companies lacked the computing power to maintain them. And, that is exactly why Hashlets did fail: Garza and the Companies lacked the mining power to back up the products they sold. As described above, the Companies and Garza also lied about having a store of fiat currency to maintain the price of Paycoin.

Finally, plaintiffs need to prove that they suffered an economic loss. However, "[i]ndividualized calculations of damages do not generally defeat the predominance requirement." *Wallace v. IntraLinks*, 302 F.R.D. 310, 319 (S.D.N.Y. 2014); *see also* 1966 Advisory Committee Note to Rule 23 ("a fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by individuals within the class.").

Plaintiffs plan to calculate the Class's out-of-pocket damages, *i.e.*, the difference between the purchase price and what the investor actually received. *See Acticon AG v. China N.E. Petroleum Holdings Ltd.*, 692 F.3d 34, 38 (2d Cir. 2012).[100] This calculation will be based on the price investors paid for the applicable securities plus various service fees the companies charged less any payouts or other value the investor received from the securities.

Plaintiffs can calculate the Class's damages on a classwide basis because they have transactional data from the Companies. Specifically, plaintiffs have obtained copies of the ZenCloud and PayBase databases that contain information about purchases, payouts, maintenance fees, sales, and other transactions concerning the Companies' products. As

---

[100] The state Blue-Sky claims provide for what is—in essence—a recessionary measure of damages, plus interest and attorney's fees. *See* CUSA § 36b-29 (investors may recover "consideration paid for the security, together with interest at eight per cent per year from the date of payment, costs and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security.").

discussed in the accompanying declaration of Robert Mills, this data can be linked with the individual transactions of each class member.[101] Customers have a unique identifying number (a UserID) associated with their accounts. Each transaction on the database is in turn associated with a given UserID. As such, it is possible to determine the service fees a user was charged, the payouts a user received, etc. While each class member's damages will necessarily involve unique inputs (*e.g.*, the purchase price of the products), that is not a barrier to class certification. *See Dodona I, LLC v. Goldman, Sachs & Co.*, 296 F.R.D. 261, 270–71 (S.D.N.Y. 2014) ("[I]n light of the class-wide methodology for calculation of damages, any necessary individual inquiries are a far cry from the scope of individualized issues of proof that would defeat a finding of predominance under Rule 23(b)(3).").

### f.    Claim under §20 of the Securities Exchange Act of 1934.

There should be no dispute that plaintiffs' claims against Fraser under § 20 of the Exchange Act can be established by generalized proof. To establish control-person liability, a plaintiff must show: "'(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud.'"[102] *Poptech, L.P. v. Stewardship Credit Arbitrage Fund, LLC*, 792 F. Supp. 2d 328, 331 (D. Conn. 2011) (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2011)).

Plaintiffs can establish the underlying violation for the reasons discussed above. The second and third factors both concern Fraser's conduct and his state of mind, and thus can be

---

[101] Ex. C (R. Mills Decl.)

[102] As plaintiffs noted in their opposition to Fraser's motion to dismiss, and as the Court noted in its decision denying Fraser's motion to dismiss, there is a split in this Circuit over what is required to prove culpable participation. *See* ECF No. 63 at 18–21, and ECF No. 72 at 16-17. Plaintiffs do not waive any arguments they may have regarding what is required to prove controlling person liability.

established with the same proof for each class member. *See, e.g.*, *In re Beacon Assocs. Litig.*, 282 F.R.D. 315, 333 (S.D.N.Y. 2012) ("Questions of the individual control and culpability of the Ivy and Jeanneret Defendants will apply class-wide . . . ."); *Aranaz v. Catalyst Pharm. Partners Inc.*, 302 F.R.D. 657, 667 (S.D. Fla. 2014) ("This claim only presents questions related to the extent and nature of Patrick McEnany's control over Catalyst, which are plainly issues subject to generalized proof.").

        g.    <u>Claim for common law fraud.</u>

Under Connecticut law, a plaintiff alleging common-law fraud must prove "(1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon that false representation to his injury." *Saggese v. Beazley Co. Realtors*, 155 Conn. App. 734, 752 (Conn. App. Ct. 2015). The first three elements concern the conduct and state of mind of Garza and the Companies. The final element can be proven with common proof as discussed above.

        h.    <u>Aiding and abetting common law fraud.</u>

A claim for aiding and abetting common law fraud can be established if the plaintiff shows:

> (1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of [its] role as part of an overall illegal or tortious activity at the time [it] provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation.

*Brunette v. Bristol Savings Bank*, 1994 WL 468448, at *2 (Conn. Super. Ct. Aug. 22, 1994). Each element of this claim concerns Fraser's conduct and state of mind and so the elements can be established with generalized proof.

2.      A class action is superior to other methods of adjudication.

Rule 23(b)(3) requires that a class action be superior to other methods of handling litigation. "The superiority requirement 'asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication.'" *PE Corp.*, 228 F.R.D. at 111 (quoting *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 534 (3d Cir. 2004)). Relevant factors include:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Rule 23(b)(3). In securities class actions, defendants frequently do not contest superiority. *See, e.g.*, *Kaplan v. S.A.C. Capital Advisors, L.P.*, 311 F.R.D. 373, 383 (S.D.N.Y. 2015) ("[Defendant] does not argue that . . . Plaintiffs have failed to satisfy the Superiority Requirement.").

Absent Class members have little or no interest in controlling the prosecution of this case. "Given the complexities of a securities litigation case, the interest of individual stockholders in controlling the prosecution of separate actions is low." *PE Corp.*, 228 F.R.D. at 111. There are several thousand class members here. Given the complexity of securities litigation and the size of the claims of individual Class members, it would not make sense for Class members to proceed individually. *See Menkes*, 270 F.R.D. at 100 ("The claims of each individual class member are likely too small to warrant the costs of litigating individually, and it is therefore in the interest of all class members to proceed as a class."); *In re Priceline.com, Inc.*, 236 F.R.D. 89, 101–02 (D. Conn. 2006) ("This is the quintessential securities fraud class action. An enormous group of potential plaintiffs, with losses ranging from millions of dollars to tens of dollars, seek to recover damages arising from one entity's actions. The focus of this litigation is upon the propriety

defendants' conduct, and any issues pertaining to individual class members only pale in comparison to the importance of defendants' potential liability.").

Plaintiffs are unaware of any other litigation commenced by or against the members of the Class. *See Menkes*, 270 F.R.D. at 100 ("The Court is unaware of any existing parallel litigation which might counsel against certification of the class"). Given that Garza and the Companies operated in Connecticut and the relevant misrepresentations occurred here, proceeding with this litigation in Connecticut is appropriate. There is no reason to expect any difficulties in the management of this case as a class action. Class actions with a multitude of disputed liability facts are frequently certified.

## CONCLUSION

For the foregoing reasons and authorities, plaintiffs request that the Court grant their motion to certify the class.


DATED: September 13, 2018

                                        Respectfully submitted,

                                        /s/ Mark P. Kindall
                                        Mark P. Kindall (ct13797)
                                        mkindall@ikrlaw.com
                                          Robert A. Izard
                                        rizard@ikrlaw.com
                                        IZARD, KINDALL & RAABE, LLP
                                        29 S. Main St., Suite 305
                                        West Hartford, CT 06107
                                        Tel: (860) 493-6292
                                        Fax: (860) 493-6290

                                        Marc Seltzer (*pro hac vice*)
                                        mseltzer@susmangodfrey.com
                                        California Bar No. 54534
                                        Kathryn Hoek (*pro hac vice*)
                                        khoek@susmangodfrey.com

California Bar No. 219247
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Tel: (310) 789-3100
Fax: (310) 789-3150

Seth Ard (*pro hac vice*)
sard@susmangodfrey.com
New York Bar No. 4773982
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019-6022
Tel: (212) 336-8330
Fax: (212) 336-8340

Edgar Sargent (*pro hac vice*)
esargent@susmangodfrey.com
Washington Bar No. 28283
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Tel: (202) 516-3880
Fax: (310) 789-3150

Colin Watterson (*pro hac vice*)
cwatterson@susmangodfrey.com
Texas Bar No. 2409330
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, TX  77002
Tel: (713) 651-9366
Fax: (713) 654-3367

*Counsel for Plaintiffs*

<u>Certificate of Service</u>

I hereby certify that on September 13, 2018, I served the foregoing via electronic

mail on the following counsel of record:

Daniel H. Weiner
Sarah L. Cave
Sara E. Echenique
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, NY  10004-1482

Sean M. Fisher (ct23087)
BRENNER, SALTZMAN & WALLMAN LLP
271 Whitney Avenue
New Haven, CT  06511

/s/ Colin Watterson
Colin Watterson
