## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| DENIS MARC AUDET, *et al*.,<br><br>               Plaintiffs,<br><br>v.<br><br>STUART A. FRASER, GAW MINERS,<br>LLC, and ZENMINER, LLC,<br><br>               Defendants. | Case No. 3:16-CV-00940-MPS<br><br>Hon. Michael P. Shea<br>ECF Case<br><br><br>November 19, 2018 |

## DEFENDANT STUART A. FRASER'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Daniel H. Weiner (ct12180)
Sarah L. Cave (phv08437)
Sara E. Echenique (phv08436)
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, NY  10004-1482
Tel.: (212) 837-6000
Fax: (212) 422-4726
Email: Sarah.cave@hugheshubbard.com

David R. Schaefer (ct04334)
Sean M. Fisher (ct23087)
Brenner, Saltzman & Wallman LLP
271 Whitney Avenue
New Haven, CT  06511
Tel.: (203) 772-2600
Fax: (203) 562-2098
Email: Sfisher@bswlaw.com

*Attorneys for Defendant Stuart A. Fraser*

TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...................................................................................1

ARGUMENT .............................................................................................................3

I.      PLAINTIFFS BEAR THE BURDEN OF PROVING THE REQUIREMENTS
        FOR CLASS CERTIFICATION. ....................................................................3

II.     THE PROPOSED CLASS CANNOT BE CERTIFIED BECAUSE IT INCLUDES
        MEMBERS WHO LACK STANDING. .............................................................4

III.    THE PROPOSED CLASS DOES NOT SATISFY RULE 23(B)(3)'S PREDOMINANCE
        REQUIREMENT .......................................................................................6

        A.      Individual Issues Regarding Reliance Will Predominate. .......................6

                1.      Evidence that the alleged misrepresentations were not "so
                        fundamental" that no purchaser would have purchased the products
                        with knowledge of the truth precludes an inference of class-wide
                        reliance. ...................................................................................8

                2.      Lack of uniformity precludes an inference of class-wide reliance. ...........12

                        a.      The alleged misrepresentations were not uniform. ........................14

                        b.      The Companies' customers had varying degrees of
                                sophistication, engaged in varying due diligence and
                                learned the truth at different times. .............................................15

        B.      Individual Issues Regarding Loss Causation Will Predominate...........................18

        C.      Individual Issues Involved in Ascertaining Members of the Class Will
                Predominate. ...........................................................................................19

                1.      Determining which putative class members have standing would
                        require individual inquiries. .....................................................................19

                        a.      The "transactional data" Plaintiffs cite is unreliable,
                                incomplete and insufficient. ..........................................................20

                        b.      "Investor records" cannot confirm membership in the class. ........25

                2.      Determining exclusions for affiliates, agents, employees or co-
                        conspirators of the Companies would require individual inquiries. ..........27

        D.      Individual Issues Regarding Damages Will Predominate. ...................................29

        E.      Individual Issues Regarding Defenses Will Predominate.....................................31

IV.     PLAINTIFFS HAVE NOT SATISFIED THE SUPERIORITY REQUIREMENT..........32

TABLE OF CONTENTS
(Continued)

Page

V.   THE PROPOSED CLASS DOES NOT SATISFY THE REQUIREMENTS OF RULE 23(a). ....................................................................................................34

A.   Plaintiffs Are Not Typical And Will Not Adequately Protect The Interests Of The Proposed Class...............................................................................34

1.   None of the Plaintiffs has standing to sue on behalf of purchasers of Paycoin. ...........................................................................35

2.   Plaintiff Shinners is subject to unique defenses and would be an inadequate class representative. ................................................36

3.   Plaintiff Pfeiffer is subject to unique defenses. ........................................38

B.   Plaintiffs Fail To Sustain Their Numerosity Burden. ..........................................40

CONCLUSION.....................................................................................................40

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abu Dhabi Comm'l Bank v. Morgan Stanley & Co. Inc.*, 269 F.R.D. 252
(S.D.N.Y. 2010) ............................................................................................. *passim*

*Adkins v. Morgan Stanley*, 307 F.R.D. 119 (S.D.N.Y. 2015) ........................................6

*Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) ...........................7

*In re Alstom SA Sec. Litig.*, 253 F.R.D. 266 (S.D.N.Y. 2008) ......................................33

*Amchem Prod., Inc. v. Windsor*, 521 U.S. 591 (1997)..............................................6, 34

*Ansari v. New York Univ.*, 179 F.R.D. 112 (S.D.N.Y. 1998) .......................................33

*Anwar v. Fairfield Greenwich Ltd.*, 306 F.R.D. 134 (S.D.N.Y. 2015)...........................9

*Aviles v. Paybase LLC*, No. HHD-CV15-5039903 (Conn. Super. Ct. May 16,
2016) .......................................................................................................................34

*Baffa v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 222 F.3d 52 (2d Cir. 2000) .........35

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988)............................................................7, 12

*Brecher v. Republic of Argentina*, 806 F.3d 22 (2d Cir. 2015)..................................3, 27

*Calvo v. City of New York*, No. 14-CV-7246 (VEC), 2017 WL 4231431 (S.D.N.Y.
Sept. 21, 2017) .........................................................................................................5

*Calvo v. City of New York*, No. 14-CV-7246 (VEC), 2018 WL 1633565 (S.D.N.Y.
Apr. 2, 2018) ...........................................................................................19, 26, 27

*Cleveland v. Caplaw Enterprises*, 448 F.3d 518 (2d Cir. 2006)...................................28

*Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) ......................................................3, 29

*Cont'l Orthopedic Appliances, Inc. v. Health Ins. Plan of Greater New York, Inc.*,
198 F.R.D. 41 (E.D.N.Y. 2000) ..............................................................................31

*Couldock & Bohan, Inc. v. Société Generale Sec. Corp.*, 93 F. Supp. 2d 220 (D.
Conn. 2000)..............................................................................................................32

*Denney v. Deutsche Bank AG*, 443 F.3d 253 (2d Cir. 2006) ........................................3, 4

*In re Digital Music Antitrust Litig.*, 321 F.R.D. 64 (S.D.N.Y. 2017)............................31

TABLE OF AUTHORITIES
(Continued)

Page

*Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005)........................................................18

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 312 F.R.D. 332 (S.D.N.Y. 2015) ................................................................................................................................26

*Ge Dandong v. Pinnacle Performance Ltd.*, No. 10 Civ. 8086 (JMF), 2013 WL 5658790 (S.D.N.Y. Oct. 17, 2013) ................................................................................9, 13

*Goodman v. Genworth Fin'l Wealth Mgmt., Inc.*, 300 F.R.D. 90 (E.D.N.Y. 2014).................7, 12

*Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398 (2014) ............................................3

*Harsco Corp. v. Segui*, 91 F.3d 337 (2d Cir. 1996)..........................................................6

*Hughes v. The Ester C Co.*, 317 F.R.D. 333 (E.D.N.Y. 2016) ......................................25

*Jeffries v. Pension Tr. Fund of Pension, Hospitalization & Benefit Plan of Elec. Indus.*, 172 F. Supp. 2d 389 (S.D.N.Y. 2001)........................................................40

*Kapiti v. Kelly*, No. 07 Civ. 3782(RMB)(KNF), 2008 WL 3874310 (S.D.N.Y. Aug. 18, 2008) ................................................................................................................40

*Kempner v. Town of Greenwich*, 249 F.R.D. 15 (D. Conn. 2008)............................................4, 40

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430 (S.D.N.Y. 2018) ................................................................................................................35

*In re Livent, Inc. Noteholders Secs. Litig.*, 211 F.R.D. 219 (S.D.N.Y. 2002) ........................14, 18

*MacPeg Ross O'Connell & Goldhaber, Inc. v. Castello*, 686 F. Supp. 397 (E.D.N.Y. 1988)................................................................................................................31

*In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480 (S.D.N.Y. 2011) ............................................6, 7

*Moore v. PaineWebber, Inc.*, 306 F.3d 1247 (2d Cir. 2002) ..................................................12, 13

*New Jersey Carpenters Health Fund v. Residential Capital, LLC*, 272 F.R.D. 160 (S.D.N.Y. 2011) ................................................................................................................18

*Newman v. RCN Telecom Servs., Inc.*, 238 F.R.D. 57 (S.D.N.Y. 2006) ......................................35

*Royal Park Invs. SA/NV v. U.S. Bank Nat'l Ass'n*, 324 F. Supp. 3d 387 (S.D.N.Y. 2018) ................................................................................................................19, 26, 27

TABLE OF AUTHORITIES
(Continued)

Page

*Royal Park Invs. SA/NV v. Wells Fargo Bank, N.A.*, No. 14 Civ. 9764 (KPF) (SN), 2018 WL 1831850 (S.D.N.Y. Apr. 17, 2018)..........................................................29

*Samele v. Zucker*, 324 F. Supp. 3d 313 (E.D.N.Y. 2018).................................................5

*In re Satyam Comput. Servs. Ltd. Sec. Litig.*, 915 F. Supp. 2d 450 (S.D.N.Y. 2013) ........................................................................................................................4

*Spencer v. Hartford Fin. Servs. Grp., Inc.*, 256 F.R.D. 284 (D. Conn. 2009)...............13

*Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016) .............................................................4

*Steginsky v. Xcelera, Inc.*, No. 3:12-cv-188 (SRU), 2015 WL 1036985 (D. Conn. Mar. 10, 2015).....................................................................................................5, 17

*Steinmetz v. Bache & Co.*, 71 F.R.D. 202 (S.D.N.Y. 1976) .........................................34

*Torres v. S.G.E. Mgmt., L.L.C.*, 838 F.3d 629 (5th Cir. 2016) ......................................9

*In re U.S. Foodservice Inc. Pricing Litigation,* 729 F.3d 108 (2d Cir. 2013) ..........8, 13

*In re Vivendi Universal, S.A.*, 242 F.R.D. 76 (S.D.N.Y. 2007) ....................................33

*Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ........................................3, 7, 32

*Zemel Family Tr. v. Philips Int'l Realty Corp.*, 205 F.R.D. 434 (S.D.N.Y. 2002).......36

**Statutes and Rules**

15 U.S.C. ¶ 78j(b) ...........................................................................................................6

Conn. Gen. Stat. § 36b-29(a) ...............................................................................4, 6, 30

Conn. Gen. Stat. § 36b-16...............................................................................................32

Fed. R. Civ. P. 23 ................................................................................................. *passim*

Defendant Stuart A. Fraser ("Fraser") submits this memorandum of law and accompanying declarations and exhibits in opposition to the motion for class certification filed by Plaintiffs Denis Marc Audet, Michael Pfeiffer and Allen Shinners ("Plaintiffs").[1]

## PRELIMINARY STATEMENT

Plaintiffs are purchasers of products related to the "mining" of virtual currency, a speculative, high-risk online investment vehicle.[2]  They allege that former lead defendant Homero Josh Garza ("Garza") and the companies he founded, Defendant GAW Miners, LLC ("GAW Miners") and Defendant ZenMiner, LLC ("ZenMiner," together with GAW Miners, the "Companies"), violated federal and state securities laws and committed common law fraud. Plaintiffs entered into a deal with Garza in which they dropped their claims against him in exchange for his provision of information against Fraser, a minority investor in the Companies, who, Plaintiffs admit, lost approximately $12 million as a result of his investments in Garza's businesses.[3]  The Companies defaulted in this action, leaving Fraser as the sole remaining defendant, facing secondary liability claims.[4]

Plaintiffs ask the Court to certify a broad class of "persons or entities" who "purchased or acquired" various cryptocurrency-related products "from GAW Miners, LLC or ZenMiner, LLC" between August 1, 2014 and December 1, 2015.[5]  Yet this case is riddled with issues that

---

1.  In connection with Fraser's opposition to Plaintiffs' motion for class certification, Fraser is simultaneously filing a motion to exclude the declarations (and testimony) of Plaintiffs' proffered experts Robert Mills and Lou Kerner, which Plaintiffs submitted in support of their motion for class certification.

2.  Declaration of Sarah L. Cave dated Nov. 19, 2018 ("Cave Decl.") Ex. A-1 (Audet Dep. Tr.) at 123:10-23; Pls.' Ex. D (Decl. of Lou Kerner in Supp. of Mot. for Class Certification ("Kerner Decl.") ¶ 41 (describing investments in the Companies' products as "high-risk").

3.  Ex. A-2 (Plaintiffs' computation of Fraser's losses).

4.  Garza pled guilty to wire fraud and in September 2018 was sentenced to 21 months in prison and ordered to pay restitution of $9.1 million.  (*See* Ex. A-3 (Garza Sentencing Hearing Tr., ECF No. 49, *United States v. Garza*, 17-cr-00158-RNC-1, at 83:11-14, 85:3-6 (S.D.N.Y. 2018)).)  The SEC settled its civil case against Garza.  (*See* Ex. A-4 (Or. Granting Mot. For Settlement Approval, ECF No. 45, *SEC v. Garza*, 15 Civ. 01760 (JAM) (D. Conn. 2017).)  Neither the U.S. Attorney's Office nor the SEC ever charged Fraser or suggested that he had engaged in any wrongdoing.  (*See* Cave Decl. ¶ 3.)

5.  Memorandum of Law in Support of Motion to Certify Class (ECF No. 97) ("Pls.' Br.") at 11.

preclude class certification.  First, the proposed class includes individuals who lack standing because they (a) suffered no injury in connection with their investments in the relevant cryptocurrency-related products, and/or (b) did not purchase or sell the products at issue. Second, Plaintiffs cannot prove reliance and loss causation on a class-wide basis because undisputed evidence shows that some putative class members did not rely on alleged misrepresentations made by Garza or the Companies, and the alleged misrepresentations, due diligence efforts, sophistication levels, and information available to putative class members were not uniform.  Third, determining who meets the proposed class definition involves individual inquiries that predominate over common questions because, as explained below and in the accompanying Declaration of Bruce Strombom, Ph.D., there is no reliable and complete data source from which to ascertain class members.  Fourth, Plaintiffs offer no viable method or data source from which to calculate their purported damages on a class-wide basis.  Fifth, determining whether various defenses apply requires individualized inquiries into each putative class member's conduct and relationship with the Companies.  Sixth, Plaintiffs have not demonstrated that the home countries of foreign members of the putative class would recognize a judgment in this case.  Seventh, the three remaining Plaintiffs[6] are not typical of the class and cannot fairly and adequately represent the class as a whole because none of them purchased Paycoin and two of the three Plaintiffs were company insiders.  Finally, Plaintiffs have not carried their burden with respect to numerosity.  For these reasons, the Court should deny Plaintiffs' motion for class certification.

---

6.    Former Plaintiff Jason Vargas has withdrawn from this case.  *See* ECF No. 95.

**ARGUMENT**

**I.     PLAINTIFFS BEAR THE BURDEN OF PROVING THE REQUIREMENTS
        FOR CLASS CERTIFICATION.**

A class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quotation omitted). "To come within the exception, a party seeking to maintain a class action must affirmatively demonstrate his compliance with Rule 23." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quotation omitted). First, pursuant to Federal Rule of Civil Procedure 23(a), Plaintiffs must demonstrate that "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." *Wal-Mart*, 564 U.S. at 345 (quoting Rule 23(a)). Second, to qualify for class certification under Rule 23(b)(3), Plaintiffs must also demonstrate that (1) common questions of law and fact predominate over questions affecting individuals, and (2) class resolution is superior to other methods of adjudicating the controversy. *Id.* at 362.

Plaintiffs seeking class certification "must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23 . . . ." *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2412 (2014). Certification is improper unless, after a "rigorous analysis," the trial court is satisfied that the prerequisites of Rule 23 have been satisfied. *Wal-Mart*, 564 U.S. at 350–51 (quotation omitted). Plaintiffs must also demonstrate that the members of the proposed class are ascertainable, *Brecher v. Republic of Argentina*, 806 F.3d 22, 24 (2d Cir. 2015), and "no class may be certified that contains members lacking Article III standing." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006).

3

## II.     THE PROPOSED CLASS CANNOT BE CERTIFIED BECAUSE IT INCLUDES MEMBERS WHO LACK STANDING.

A threshold issue is whether the proposed class includes members who lack standing under Article III of the Constitution.  *Kempner v. Town of Greenwich*, 249 F.R.D. 15, 17 (D. Conn. 2008).  "[N]o class may be certified that contains members lacking Article III standing . . . . The class must therefore be defined in such a way that anyone within it would have standing."  *Denney*, 443 F.3d at 264.  To have Article III standing, "a plaintiff must have suffered an injury in fact that is distinct and palpable; the injury must be fairly traceable to the challenged action; and the injury must be likely redressable by a favorable decision."  *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).  Where federal securities fraud is alleged, "[t]he cardinal rule of section 10(b) standing" is that a plaintiff "must be either a purchaser or seller of the securities at issue."  *In re Satyam Comput. Servs. Ltd. Sec. Litig.*, 915 F. Supp. 2d 450, 470 (S.D.N.Y. 2013).  Similarly, only "the person buying the security" can sue for violations of the Connecticut Uniform Securities Act ("CUSA").  Conn. Gen. Stat. § 36b-29(a).

Here, the proposed class fails both of these requirements.  First, the definition does not specify any injury required for membership in the class.  (*See* Pls.' Br. at 11.)  If certified, the class would by definition include members who suffered no injury traceable to Defendants' alleged misconduct and thus lack Article III standing.  For instance, many customers broke even or profited from their investments in the Companies' products.[7]  Others received them for free.[8]

---

7.     Ex. A-5 (Sept. 23, 2014 report listing "all devices that have received ROI [*i.e.*, return on investment]," to which Garza replies, "Am I reading this wrong? Or does this not mean a crap ton of people have ROI?"); Ex. A-6 (Nov. 13, 2014 HashTalk.org post titled, "ROI – the day my invest returned"); Ex. A-7 (Sept. 4, 2014 HashTalk.org post) ("[t]oday I reached ROI on 1 of the 5 100 Mhs Prime Hashlets I bought . . . ."); Ex. A-8 (Sept. 9, 2014 HashTalk.org post) ("My first batch of primes literally went past their ROI yesterday and my other Hashlets (including my older and new ones) are now.").

8.     Ex. A-9 (Eden Dep. Tr.) at 61:4-13; Ex. A-10 (Oct. 29, 2014 customer support ticket) ("Free Hashlet"); Ex. A-11 (Dec. 5, 2014 email from Garza to Mordica); Ex. A-12 (Excel attachment to Feb. 11, 2015 email, "HashPoint Credits"); Ex. A-13 (Mordica Dep. Tr.) at 124:17-125:19.

Those individuals have not suffered any injury traceable to Defendants' alleged misconduct, but are nonetheless subsumed in Plaintiffs' proposed class definition.  Because the proposed class includes individuals who did not suffer any injury traceable to the challenged conduct, the proposed class cannot be certified.  *See Samele v. Zucker*, 324 F. Supp. 3d 313, 334 (E.D.N.Y. 2018) (denying class certification because "the Plaintiffs' proposed class includes individuals who do not have standing, and it is overly broad."); *Calvo v. City of New York*, No. 14-CV-7246 (VEC), 2017 WL 4231431, at *3 (S.D.N.Y. Sept. 21, 2017) ("*Calvo I*") (denying class certification because the plaintiffs "failed to propose a class that is defined in such a way that everyone within it has standing."); *see also Steginsky v. Xcelera, Inc.*, No. 3:12-cv-188 (SRU), 2015 WL 1036985, at *9-11 (D. Conn. Mar. 10, 2015) (refusing to certify class and finding the plaintiff lacked standing).

Second, because Plaintiffs' proposed definition includes those who "acquired" the products at issue even though they may not have purchased or sold them (*see* Pls.' Br. at 11), it also fails to satisfy the standing requirement.  Among the ways to "acquire" the Companies' products without purchasing them were stealing or exploiting flaws in the Companies' systems[9]; receiving free products through promotions[10]; "mining" products, such as Hashpoints[11]; and converting "Hashpoints" to the Companies' cryptocurrency known as Paycoin.[12]  Because the proposed class includes individuals who lack standing because they are neither purchasers nor sellers of the Companies' products, it cannot be certified.

---

9.    *See, e.g.,* Ex. A-9 (Eden Dep. Tr.) at 99:11-20, 142:8-12, 180:3-13; Ex. A-14 (E. Capuano Dep. Tr.) at 129:13-130:9.
10.   *See, e.g.,* Ex. A-9 (Eden Dep. Tr.) at 179:18-180:13); Ex. A-13 (Mordica Dep. Tr.) at 124:17-125:19; *see infra* note 86
11.   Ex. A-9 (Eden Dep. Tr.) at 57:21-58:14; Ex. A-15 (Pfeiffer Dep. Tr.) at 120:4-21.
12.   ECF No. 1-1 (Plaintiffs' Certifications).

### III.     THE PROPOSED CLASS DOES NOT SATISFY RULE 23(B)(3)'S PREDOMINANCE REQUIREMENT.

Plaintiffs also fail to meet their burden of demonstrating that common questions predominate over questions affecting individual members.  *See* Fed. R. Civ. P. 23(b)(3).  The "predominance criterion is far more demanding" than the "commonality" requirement under Rule 23(a).  *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 623–24 (1997).  "If, in order to prove causation or liability, a trial will need to address the facts of each individual claim, then the Plaintiffs have not carried their burden."  *Adkins v. Morgan Stanley*, 307 F.R.D. 119, 142 (S.D.N.Y. 2015), *aff'd*, 656 F. App'x 555 (2d Cir. 2016).

The Court should reject Plaintiffs' argument that common questions of law or fact predominate here.  (Pls.' Br. 19-36.)  Adjudicating Plaintiffs' claims will require individual inquiries that predominate over common questions, including inquiries into each putative class member's (1) actual and reasonable reliance on the alleged misrepresentations, (2) loss causation, (3) standing, (4) eligibility (*i.e.*, whether each was an agent, affiliate or employee of the Companies), (5) damages, and (6) vulnerability to available defenses.

### A.     Individual Issues Regarding Reliance Will Predominate.

Reliance is an essential element of Plaintiffs' fraud claims against Garza (as a former defendant) and the Companies (Counts 1, 3 and 7).[13]  *See In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 488 (S.D.N.Y. 2011).  To succeed on their fraud claims, Plaintiffs must demonstrate that they actually and reasonably relied on the alleged misrepresentations.  *Harsco Corp. v.*

---

13.   Plaintiffs acknowledge that the reliance element of their common law fraud claim and the buyer's knowledge element of their claim under CUSA § 36b-29(a)(2) are similar to the element of reliance required to prove their federal securities fraud claim.  (*See* Pls.' Br. at 21, 34.)  Thus, individual issues will predominate with respect to the reliance or buyer's knowledge element of all of Plaintiffs' fraud claims.  To succeed on their control person and aiding and abetting claims against Fraser in connection with their underlying fraud claims (Counts 1, 3 and 7), Plaintiffs must prove primary common law fraud, and state and federal securities fraud violations under CUSA § 36b-29(a)(2) and Section 10(b) (15 U.S.C. ¶ 78j(b)), respectively.

*Segui*, 91 F.3d 337, 342 (2d Cir. 1996).  For the proposed class to be certified, Plaintiffs "must demonstrate a common method of proving reliance."  *Goodman v. Genworth Fin'l Wealth Mgmt., Inc.*, 300 F.R.D. 90, 102 (E.D.N.Y. 2014).  Plaintiffs fail to carry this burden.

Ordinarily, in a securities fraud case, plaintiffs cannot demonstrate reliance on a class-wide basis unless one of two rebuttable presumptions applies:  the fraud-on-the-market presumption under *Basic Inc. v. Levinson*, 485 U.S. 224, 242 (1988), or the presumption under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153-54 (1972).  Where neither presumption applies, class certification is generally denied.  *See Wal-Mart*, 564 U.S. at 351 n.6 (absent a presumption of reliance, individual issues generally pose an "insuperable barrier" to class certification in a securities fraud action, "since each of the individual investors would have to prove reliance on the alleged misrepresentation"); *In re Moody's*, 274 F.R.D. at 494 ("Without either the *Basic* or *Affiliated Ute* presumptions, Plaintiffs are unable to satisfy their burden of proving that common questions of reliance predominate and class certification must be denied.").

Here, Plaintiffs do not invoke either presumption.  Rather, Plaintiffs argue that the Court should infer class-wide reliance based on circumstantial evidence that "no rational investor would have purchased the Companies' products if they knew the underlying business model was fundamentally fraudulent."  (Pls.' Br. at 24.)  Setting aside the indisputable fact that some investors in the Companies' products profited from their investments,[14] Plaintiffs do not identify any instance in which the Second Circuit has applied this standard in the securities fraud context.  *See Goodman*, 300 F.R.D. at 107 (noting that none of the cases in which the Second Circuit has allowed circumstantial evidence of reliance to establish class certification involved securities fraud).  In each of the cases Plaintiffs cite as involving class-wide reliance based on

---

14.    Ex. A-5 (Sept. 23, 2014 report listing "all devices that have received ROI"); *see supra*, note 6.

circumstantial evidence (Pls.' Br. 24-28), the courts required that the inference of reliance "be almost inescapable in order to support class certification of a fraud case under Rule 23(b)(3)." *Id.* There can be no such inference here, let alone an "inescapable" one, because (1) some of the Companies' customers did not rely on the alleged misrepresentations and therefore, they were not so fundamental that no customer would have purchased the relevant products despite knowing the truth (see Section III.A.1, *infra*), and (2) the alleged misrepresentations, sophistication levels among purchasers, due diligence efforts, additional information available to customers, and products were not uniform (Section III.A.2, *infra*). These factors preclude an inference of class-wide reliance using the "circumstantial evidence" approach.

> **1. Evidence that the alleged misrepresentations were not "so fundamental" that no purchaser would have purchased the products with knowledge of the truth precludes an inference of class-wide reliance.**

The few cases in which courts inferred class-wide reliance based on circumstantial evidence involved misrepresentations that were so fundamental that no investor would have invested without relying on them, and there was no evidence of non-reliance by putative class members. The record demonstrates the opposite here.

In *In re U.S. Foodservice Inc. Pricing Litigation*, the Second Circuit limited its holding that circumstantial evidence could be used to show class-wide reliance to "cases involving fraudulent overbilling." *See* 729 F.3d 108, 120 (2d Cir. 2013). There, the plaintiffs alleged that the defendant inflated its bills, and the court held that the customers' payment of the inflated invoices demonstrated reliance on those inflated invoices—the plaintiffs must have relied on the inflated invoices or they would not have paid the specific inflated amounts listed on those invoices. *Id.* There was no evidence that customers considered any other factors in deciding how much to pay the defendant for each invoice, and no evidence that any customer suspected fraudulent conduct but still paid the invoice. *Id.* at 120-21.

Similarly, in *Anwar v. Fairfield Greenwich Ltd.*, the court concluded that circumstantial evidence could be used to establish the reliance element of the plaintiffs' negligence claims that the defendant auditors' report "misrepresented the value of the Fund's assets and that [the auditor] had verified these facts through proper auditing processes." 306 F.R.D. 134, 144 (S.D.N.Y. 2015). The court did so only because (a) the audit reports were so fundamental that no reasonable investor would have invested in the fund without relying on its audit report, and (b) there was no evidence that any customers had invested despite knowing the truth. *Id.*

The same is true of *Ge Dandong v. Pinnacle Performance Ltd.*, No. 10 Civ. 8086 (JMF), 2013 WL 5658790, (S.D.N.Y. Oct. 17, 2013). The court there allowed an inference of class-wide reliance based on circumstantial evidence only because (a) the uniform misrepresentations and omissions "were so fundamental . . . that it is hard to imagine a reasonable investor purchasing [the notes at issue] if the Offering Documents had revealed their true nature," and (b) there was no evidence that any investor joined despite knowledge of the fraud. *Id.* at *10-11.[15]

Here, in contrast, the evidence reveals that the alleged misrepresentations were not so fundamental that no customer would have purchased the Companies' cryptocurrency-related products without relying on them. To the contrary, there are multiple examples of customers who purchased the Companies' products (as well as other similar cloud-mining products and services) despite knowledge or information that the alleged misrepresentations—including that "Hashlets represented an interest in actual mining hardware," (Pls.' Br. at 29), and that Paycoin

---

15. *Torres v. S.G.E. Mgmt., L.L.C.*, 838 F.3d 629, 646 (5th Cir. 2016), *cert. denied*, 138 S. Ct. 76 (2017), is similarly distinguishable because the court determined that the plaintiffs could rely on circumstantial evidence to presume class-wide reliance only because (a) it found the misrepresentation to be so fundamental that no reasonable purchaser would buy the product if he or she were on notice of the truth, and (b) the record did not contain any evidence that purchasers did not rely on those misrepresentations.

would trade at a $20 price floor, was supported by a reserve fund, and would be accepted by merchants (*id.* at 30)—were not true.

Certain customers of the Companies simply did not care how the Companies generated their Hashlet payouts[16]; others knew or suspected that GAW Miners was a Ponzi scheme and deliberately sought to profit from it.[17]  One GAW Miners customer, for instance, wrote the following post to explain her Hashlet investment strategy:

> I'm also convinced that GAWminers [sic] is a scam but I still invested a lot of bitcoins in hashlets.  I'm confident I'll ROI [*i.e.*, return on investment] before they shutdown. . . . I don't care if hashlets aren't real.  . . . I truly believe this Ponzi is going to last for a while.[18]

GAW Miners' customer "Bubbamark" wrote on GAW Miners' online discussion forum, Hashtalk, "[T]ell the guys at work [GAW] is probably the worlds [sic] biggest PONZI scheme.  However whilst it is legal I will keep mining!"[19]  Jonah Dorman explained that, when he was a GAW Miners customer in summer 2014, before he became an employee, "everyone knew" that Garza and his Companies were not "technically mining."[20]  Statements made by the Companies' customers about other similar cloud-mining services reinforce that many customers were indifferent to the source of their payouts, and demonstrate that they did not rely on the Companies' statements that "Hashlets represented an interest in actual mining hardware."[21]

Other evidence demonstrates that some putative class members did not rely on alleged misrepresentations that Paycoin would trade at a minimum of $20 per coin following its public launch, that the price of Paycoin would be supported by a large fiat reserve fund, or that Paycoin

---

16.   *See, e.g.*, Ex. A-16 (August 21, 2014 HashTalk.org post) ("And agreed…I don't care of [sic] these hashlets are magical drug addicted unicorns as long as my BTC [*i.e.*, Bitcoin] shows in my account.").
17.   *See* Cave Decl. ¶¶ 19-21, 24-25 (Exhibits Showing Non-Reliance Regarding the Companies).
18.   Ex. A-17 (Abridged86 Reddit Post).
19.   Ex. A-18 (July 20, 2014 HashTalk.org post).
20.   Ex. A-19 (Dorman Dep. Tr.) at 13:6-16; *see also* Ex. A-20 (Nov. 20, 2014 Bitcointalk.org Post).
21.   Ex. A-21 (Nov. 18, 2014 HashTalk.org post) ("It is a ponzi.  Yes, they are paying, others and I have made a nice profit but it could all end any day.").

would be accepted by major retailers.  Some disbelieved the alleged misrepresentations about Paycoin.[22]  Others sought to profit from what they understood to be a Ponzi scheme.[23]  For example, one customer explained that he or she bought the Companies' products even though "I believe it is a scam, but early in and early out on a Ponzi and you can make money. . . . I did all this while telling everyone I know I was investing in a Ponzi scheme."[24]

Other putative class members, including Plaintiff Pfeiffer, purchased the Companies' products *after* Paybase (the trading platform for Paycoin) launched on or around December 31, 2014, at which point, Plaintiffs admit (Pls.' Br. at 10), it became immediately clear that Paybase and Paycoin lacked the allegedly promised features.[25]  None of these putative class members could then have relied on the alleged misrepresentations about a $20 floor, a reserve fund, or widespread merchant adoption of Paycoin.[26]

Because some putative class members (a) purchased Hashlets without relying on the alleged misrepresentation "that Hashlets represented an interest in actual mining hardware," and (b) purchased Paycoin and related products without relying on alleged misrepresentations about a $20 floor, fiat reserve fund, or merchant negotiability, Plaintiffs cannot benefit from an inference of class-wide reliance based on the theory that *all* putative class members *must have* relied on those alleged misrepresentations.  *See Abu Dhabi Comm'l Bank v. Morgan Stanley & Co.*, 269 F.R.D. 252, 265 (S.D.N.Y. 2010) (denying class certification where some investors "chose not to

---

22.     Asked whether Paycoin would trade at or above $20 on launch, customer "DiCE1904," among others, said no.  *See* Ex. A-22 (Jan. 1, 2015 BetMoose.com Survey); *see also* Ex. A-23 (Nov. 5, 2014 Bitcointalk.org post) ("There are no coins, there are no first round investors, there are no banks, no stores, no nothing. Zilch."); Ex. A-24 (Dec. 24, 2014 Bitcointalk.org post) ("Just remember what you were told as a kid: If it sounds too good to be true, it probably is. Then remember what you probably weren't told as an adult in relation to investing: Pigs get slaughtered.").
23.     Cave Decl. ¶¶ 19-21, 24-25 (Exhibits Showing Non-Reliance Regarding the Companies).
24.     Ex. A-25 (Jan. 2, 2015 Bitcointalk.org Post).
25.     ECF No. 1-1 (Plaintiffs' Certifications) at 24-27; Ex. B (Decl. of B. Strombom) ¶ 83.
26.     *See* Ex. B (Decl. of B. Strombom) ¶ 83.

rely—or relied only minimally" on the alleged misrepresentations), *aff'd sub nom. Penn. Pub. Sch. Employees' Ret. Sys. v. Morgan Stanley & Co.*, 772 F.3d 111 (2d Cir. 2014); *Goodman*, 300 F.R.D. at 108 (denying class certification where it was "reasonable to infer that at least some members of the putative class invested . . . for other reasons"); *see also Basic*, 485 U.S. 224, 252 (1988) (White, J., concurring in part and dissenting in part) ("allowing recovery in the face of affirmative evidence of nonreliance . . . would effectively convert Rule 10b–5 into a scheme of investor's insurance").

That some customers profited from their investments,[27] and that other cryptocurrencies without price floors, fiat reserve funds, and widespread merchant adoption nonetheless attract many customers,[28] further demonstrate that the alleged misrepresentations were not "so fundamental" that no customers would have purchased the products had they known the truth.

### 2.   Lack of uniformity precludes an inference of class-wide reliance.

To succeed on their fraud claims, Plaintiffs must demonstrate that each of the putative class members received and relied on the alleged misrepresentations in deciding to purchase the Companies' cryptocurrency-related products.  *See Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1253 (2d Cir. 2002).  But where, like here, "there are material variations in the nature of the misrepresentations made to each member of the proposed class, however, class certification is improper because plaintiffs will need to submit proof of the statements made to each plaintiff, the nature of the varying material misrepresentations, and the reliance of each plaintiff upon those misrepresentations in order to sustain their claims."  *Id.*  In the few cases where courts have

---

27.   Ex. A-26 (Nov. 17, 2014 Bitcointalk.org post) ("The investment was worth it and I had great returns."); *see* notes 14, 21, *supra*; *and see* note 113 *infra*.28. Ex. A-27 (Kerner Dep. Tr. at 95:3-11) ("Q. Which is more common, Altcoins that have a reserve fund or Altcoins that do not? A. Altcoins that do not. Q. So Altcoins that have market-based pricing then are more common? A. Correct.").

28.   Ex. A-27 (Kerner Dep. Tr. at 95:3-11) ("Q. Which is more common, Altcoins that have a reserve fund or Altcoins that do not? A. Altcoins that do not. Q. So Altcoins that have market-based pricing then are more common? A. Correct.").

allowed an inference of class-wide reliance based on circumstantial evidence, all putative class members were uniformly exposed to the same alleged misrepresentations. *See, e.g.*, *In re U.S. Foodservice*, 729 F.3d at 119–20 (only uniform misrepresentations are subject to generalized proof); *Ge Dandong*, 2013 WL 5658790, at *10 (sales brochures "contained the same allegedly misleading language across all seven series [of securities], were provided to all class members, and were reviewed by each of the Plaintiffs making their purchasing decisions") (internal citations omitted); *Spencer v. Hartford Fin. Servs. Grp., Inc.*, 256 F.R.D. 284, 290 (D. Conn. 2009) (uniform deduction applied to plaintiffs' insurance claims).

In contrast, the court in *Abu Dhabi* found that the misrepresentations "varied between the different notes" and "were modified over time," and there were "material differences among investors with regard to their decision making processes, investment guidelines, due diligence inquiries, and communications with those involved in selling" the products at issue. 269 F.R.D. at 262-63. The need to present individualized proof therefore prevented class certification. *Id.*; *see also Moore*, 306 F.3d at 155-56 (affirming denial of class certification where misrepresentations were not "materially uniform").

As in *Abu Dhabi* and *Moore*, the lack of uniformity of the information the Companies' customers relied on—depending on which products they purchased, when they purchased, how they purchased, the Internet discussion forums they read, with whom they communicated, and the due diligence efforts they undertook[29]—precludes an inference of class-wide reliance based on circumstantial evidence. *See also Penn. Pub. Sch. Emps.' Ret. Sys.*, 772 F.3d at 121 (no class-wide inference of reliance where the record was "replete with significant differences in the investment decision processes of the various putative class members, a variance compounded by

---

29.   *See* Ex. B (Decl. of B. Strombom) Section VII.D ("All Proposed Class Members Could Not have Relied on the Same Set of Alleged Misrepresentations at All Times.")

the differences between the three types of notes offered"); *In re Livent, Inc. Noteholders Secs.*

*Litig.*, 211 F.R.D. 219, 223-24 (S.D.N.Y. 2002) (no class-wide inference of reliance where some

of the plaintiffs spent no time investigating, whereas others conducted substantial diligence).

### a.    The alleged misrepresentations were not uniform.

Here, the alleged misrepresentations involve different products and were made at

different times in different formulations through different channels.[30]  Moreover, they

were not uniformly misleading.  Plaintiffs incorrectly assert that "Hashlets were

uniformly described as a form of hosted miner that would generate returns based on the

mining conducted by that hardware."  (*See* Pls.' Br. at 29.)  The September 2, 2014

version of the ZenCloud Terms of Service required customers to acknowledge that

Hashlets were merely "virtual software,"[31] not "physical miners" or "interests in

hardware,"[32] and that customers would "receive Payouts according to the Pool with [sic]

the Hashlet is associated" even though "selecting a Pool does not imply physically or

electronically mining" that Pool.[33]  Customers who viewed these Terms of Service knew

that Hashlets were merely virtual.[34]

Another example of a lack of uniformity is the December 13, 2014 version of the

ZenMiner Terms of Service, which represented that Paycoin might "have no value" and might

"never be completed or released"—let alone trade at a minimum floor of $20—and that the

---

30.    *Id.*; *see* Compl. ¶¶ 9, 95-159.
31.    Ex. A-28 (Sept. 2, 2014 ZenCloud Terms of Service).
32.    Pls.' Br. at 5.
33.    Ex. A-28 (Sept. 2, 2014 ZenCloud Terms of Service); *see also* Ex. A-29 (Dec. 13, 2014 GAW Miners Terms of Service) (using same language).
34.    *See, e.g.*, Ex. A-30 (Oct. 16, 2014 HashTalk.org post); Ex. A-31 (Feb. 2, 2015 HashTalk.org Post).  *See also* Ex. A-32 (Narayanan Dep. Tr.) at 47:18-48:9 (defining virtual mining as "any form of mining that does not require a large amount of computational resources" and stating that "one major purpose of virtual mining" is "to remove the step of spending money on power and equipment").

14

"value of a stake, in Paycoins, from a HashStaker may also be zero."[35]  These terms, which appeared on the Companies' ZenCloud website and the Hashtalk forum, and were discussed on Bitcointalk.org before Paycoin launched,[36] contradict the misrepresentations about Paycoin on which Plaintiffs base their claims.  Any putative class member who read these Terms of Service could not have justifiably relied on the alleged misrepresentations about Paycoin.  The varying and contradictory statements about Hashlets and Paycoin over the course of the class period thus preclude an inference of class-wide reliance.[37]

> **b.    The Companies' customers had varying degrees of sophistication, engaged in varying due diligence and learned the truth at different times.**

Putative class members here vary substantially in terms of their financial and technical degrees of sophistication at the time they purchased the products at issue.  Some customers (such as Plaintiff Shinners), already owned cryptocurrency-mining hardware and had engaged in mining prior to purchasing from the Companies.[38]  Others (such as Plaintiff Audet) had never before purchased any mining hardware, cryptocurrency or digital cloud-mining services.[39]  Some customers were teenagers,[40] whereas other customers (such as Plaintiff Audet) were sophisticated investors with financial planners.[41]

---

35.    Ex. A-33 (Dec. 13, 2014 ZenMiner Terms of Service) Sections 4.3, 4.4.
36.    Ex. A-34 (Oct. 16, 2014 Hashtalk.org post reacting to the Terms of Service); Ex. A-35 (Dec. 12, 2014 Bitcointalk.org post).
37.    Variation among interpretations of the alleged misrepresentations among putative class members also precludes an inference of class-wide reliance.  Key terms in the Companies' public statements, such as "virtual mining," were subject to multiple interpretations during the proposed class period.  For example, Plaintiffs' First Amended Complaint describes "virtual currency mining" as the "application of computer power in an attempt to solve complex equations that verify a group of transactions in [a] virtual currency [such as Bitcoin]," Compl. ¶ 3, whereas Plaintiffs' purported cryptocurrency expert used the term "virtual mining" to refer to "any form of mining that does not require a large amount of computational resources." Ex. A-32 (Narayanan Dep.) at 47:18-48:4.
38.    Ex. A-36 (Shinners Dep. Tr.) at 225:8-226:12.
39.    Ex. A-1 (Audet Dep. Tr.) at 20:12-19.
40.    Ex. A-3 (Garza Sentencing Tr.) at 22:1-16.
41.    Ex. A-1 (Audet Dep. Tr.) at 43:16-18.

The due diligence efforts of the Companies' customers were also not uniform.  Some

(such as Plaintiff Pfeiffer) conducted significant research:  after learning about GAW Miners

when searching for cloud-mining services online, Plaintiff Pfeiffer "reviewed their website" and

"read about other people's experiences with GAW Miners and other companies that were

offering comparable or similar services."[42]  By his first Hashlet purchase, Plaintiff Pfeiffer had

already purchased two cloud-mining contracts from another cloud-mining company called

Zoomhash.[43]  Others conducted no diligence:  Plaintiffs' purported cryptocurrency community

expert referred to cryptocurrency as the "World's First Global Casino" because many people

"gamble" on cryptocurrency-related products by investing without doing any research.[44]

This is also not a case where a single corrective disclosure made all customers aware of

the truth at the same time.  Rather, Garza's fraud through the Companies—gradually leaked onto

the marketplace.  From the moment the Companies began selling Hashlets (the first of the

products included in Plaintiffs' proposed class definition) in August 2014, some of the

Companies' customers knew or suspected that Hashlets were not supported by a physical mining

operation.[45]  Others noted the differing definition of Hashlets and the source of Hashlet

payouts.[46]  The Companies described Hashlets in a variety of ways over time[47] and continually

---

42.    Ex. A-15 (Pfeiffer Dep.) at 98:15-99:8.
43.    Ex. A-15 (Pfeiffer Dep.) at 87:15-89:18; ECF No. 1-1 (Plaintiffs' Certifications) at 12.
44.    Ex. A-27 (Kerner Dep. Tr.) at 116: 9--117:7; *see also* Ex. A-37 (Dec. 9, 2014 article titled "Why GAW
       Miners Is a Scam") ("There is a way to make money through mining but it requires risk and is a gamble").
45.    Ex. A-19 (Dorman Dep. Tr.) at 13:8-14 ("Everyone knew that [Garza] wasn't technically mining. . . [he was]
       using a calculated method versus an actual method); Ex. A-9 (Eden Dep. Tr.) at 44:19-45:5 ("A:  Online there
       was a lot of speculation as to whether or not GAW had the hashing power and mining capacity that they had
       advertised. . . . Q:  And what specifically were they saying?  Just to be clear on the record here.  A. That
       GAW did not have the mining capacity that it was advertising.").
46.    Ex. A-38 (Sept. 6, 2014 Bitcointalk.com Post) ("Q: Does the hashlet exist? A: Yes and no. The hashlet almost
       certainly does not exist as a hardware device depicted on GAW's website. It may exist as a slice of a larger
       hardware device.  It does exist as an investment vehicle that produces daily payouts, however the source of
       these payouts is not fully known")).
47.    Ex. A-38 (Sept. 6, 2014 Bitcointalk.com Post); *see also* Section III.A.2.a, *supra* (describing variations in the
       Companies' Terms of Service).

refused requests to provide information (such as a Bitcoin address) that would verify that Hashlet payouts were supported by a physical mining operation.[48]  Over the Companies' brief existence, the number of posts and articles expressing skepticism about the source of Hashlet payouts, and later the veracity of Garza's statements about Paycoin, increased.[49]  By November 22, 2014, Amazon, Walmart and Target had confirmed that they had no agreements or plans to partner with Garza or his Companies or to accept Paycoin.[50]  By the time Paybase launched on or around December 31, 2014, it was clear that Paybase lacked features such as widespread merchant negotiability, the price of Paycoin was nowhere near $20, and there was no reserve fund capable of supporting a $20 price floor.[51]  By mid-January 2015, the SEC investigation of GAW Miners was publicly confirmed.[52]  By March 2015, when the Companies' internal communications were leaked onto the Internet, no one could have been justifiably relying on the alleged misrepresentations.[53]  *See Steginsky*, 2015 WL 1036985, at *7 ("Courts do not presume reliance where a plaintiff voluntarily transacts with her deceivers after detecting the alleged fraud.")

The lack of uniformity described above demonstrates that Plaintiffs' claims require individualized inquiries into whether and when each putative class member relied on the alleged

---

48.   *See, e.g.*, Ex. A-39 (Oct. 28, 2014 Bitcointalk.com Post) (noting that, unlike other cloud mining services, the Companies had never posted their Bitcoin address or demonstrated proof that they were physically mining).
49.   *See, e.g.*, Ex. A-23 (Nov. 5, 2014 Bitcointalk thread); Ex. A-37 (Dec. 9, 2014 article titled "Why GAW Miners Is a Scam") ("Another great point made by a fellow redditor is the following: The issue here isn't that the ROI makes them suspect – or even that their Paycoin's ICO is a bad sign.  It's that they don't actually sell you anything – The Hashlet you purchase isn't a 'share in a mining farm' – as their own T&Cs state it uses no electricity.  Its [sic] a 'virtual miner' – in that its [sic] a concept that acts as if its [sic] mining (at least to the end user)"); Ex. A-40 (Dec. 11, 2014 HashTalk.org post) ("gaw ceo said he wasnt [sic] selling securitys [sic] yet he also said zenpool payouts come from day tradeing [sic] and a multitude of different factors"); Ex. A-35 (Dec. 12, 2014 Bitcointalk.org Post) (in reaction to the Companies' Terms of Service, one user wrote "Really? Ponzi Complete.").
50.   Ex. A-41 (Nov. 22, 2014 Coinfire article, "Is GAW Miners Lying about Partnerships?").
51.   Declaration of Plaintiff Shinners (ECF No. 106-1) ¶ 2 ("GAW Miners promised that Paybase would have many features that were not included when Paybase launched."). *See also* (ECF No. 57) ¶¶ 155-56.
52.   Ex. A-42 (Jan. 19, 2015 Coinfire article, "SEC Investigation of GAW Miners Underway"); Ex. A-43 (Jan. 21, 2015 email from Google Alerts to Rami@geinusesatwork.com) (articles regarding SEC investigation of GAW Miners and Garza); *see also* Declaration of Plaintiff Shinners (ECF No. 106-1) ¶ 3.
53.   ECF No. 57 ¶ 159.

misrepresentations and whether that reliance was reasonable, such that class certification is

inappropriate.  *See McLaughlin*, 522 F.3d at 226 ("differences in plaintiffs' knowledge and levels

of awareness" precluded a finding of class-wide reliance); *Penn. Pub. Sch. Emps.' Ret. Sys.*, 772

F.3d at 121 (requiring individualized proof of reliance where the record revealed "significant

differences in the investment decision processes of the various putative class members, a

variance compounded by the differences between the three types of notes offered"); *In re Livent*,

211 F.R.D. at 223-24 (finding differences in reliance where some of the plaintiffs spent no time

investigating, whereas others conducted substantial diligence); *New Jersey Carpenters Health

Fund v. Residential Capital, LLC*, 272 F.R.D. 160, 168 (S.D.N.Y. 2011) (denying class

certification "different putative class members have different levels of knowledge regarding the

underwriting guidelines and practices based on their respective levels of sophistication and time

of purchase"), *aff'd sub nom. New Jersey Carpenters Health Fund v. Rali Series 2006-QO1 Tr.*,

477 F. App'x 809 (2d Cir. 2012).

      **B.**      **Individual Issues Regarding Loss Causation Will Predominate.**

      To succeed on their federal securities fraud claims, Plaintiffs must demonstrate that their

purported reliance on the alleged misrepresentations was the proximate cause of the losses they

claim.  *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 343-46 (2005).  Where, as here, putative

class members may have relied on varied misrepresentations at different times and to varying

degrees, loss causation cannot be resolved by way of generalized proof.  *See McLaughlin*, 522

F.3d at 226 ("[T]he issue of loss causation, much like the issue of reliance, cannot be resolved by

way of generalized proof."); *Abu Dhabi*, 269 F.R.D. at 265 ("[L]oss causation cannot be resolved

by way of generalized proof.").  Thus, individual customer-by-customer inquiries would be

required to determine the degree to which each putative class member relied on the alleged

misrepresentations (if at all) and the impact of that reliance (if any) on that putative class member's claimed losses.

### C.  Individual Issues Involved in Ascertaining Members of the Class Will Predominate.

There is another reason that this cryptocurrency case differs from a garden-variety federal securities fraud action.  Here, because of an absence of complete and reliable data sufficient to demonstrate the relevant transactions of each putative class member, individual issues will predominate with respect to determining (1) which putative class members have standing, and (2) which putative class members otherwise meet the proposed class definition.  *See Royal Park Invs. SA/NV v. U.S. Bank Nat'l Ass'n*, 324 F. Supp. 3d 387, 398 (S.D.N.Y. 2018) (denying class certification where individual issues of standing of putative class members would predominate); *Calvo v. City of New York*, No. 14-CV-7246 (VEC), 2018 WL 1633565, at *8 (S.D.N.Y. Apr. 2, 2018) ("*Calvo II*") (declining to certify class where proving membership in the class would be "far from simple").  Thus, class certification is improper.

#### 1.  Determining which putative class members have standing would require individual inquiries.

Determining which putative class members were injured—and therefore have standing—would require individualized inquiries into the consideration paid versus value received with respect to each putative class member.[54]  *See Royal Park Invs.*, 324 F. Supp. 3d at 398 (declining to certify class where individualized standing inquiries predominated).  Because there is no complete and reliable source from which to determine the consideration paid and value received by each putative class member, standing determinations would require individual inquiries that would overwhelm common questions.

---

54.   Ex. B (Decl. of B. Strombom) ¶¶ 38, 42, 50, 54-55, 56, 58, 60, 65, 66, 67, 71, 74.

19

a.     The "transactional data" Plaintiffs cite is unreliable,
        incomplete and insufficient.

Plaintiffs claim they can ascertain the members of the proposed class because "membership in the class turns on whether a person purchased securities sold by the Companies" (Pls.' Br. at 19-20), and "[o]wnership can be verified by investor records or transactional data from the Companies that show when customers purchased what products." (*Id.* at 19.)  Plaintiffs fail to define "transactional data from the Companies," but they appear to refer to data contained in the ZenCloud and Paybase databases, which they discuss in the damages portion of their Brief, and on which their damages expert based his report.[55]  However, as explained below and in the Strombom Declaration, this data is defective and does not provide complete or reliable transaction histories for each putative class member.[56]  Thus, it is an insufficient data source from which to ascertain members of the class.

The data is unreliable:  Former employees of the Companies testified that the ZenCloud database is defective due to repeated hacks, security flaws, software vulnerabilities, human error and fraudulent activity on the part of GAW Miners' customers.  One former employee observed that, "the database was a giant mess,"[57] noting that "there had been hacks on the database,"[58] including at least one "internal hack where large portions of the database had been changed and modified and ledgers had been altered and [] accounts had been credited.  And there was weird stuff going on."[59]  She also testified that there were "issues with Hashlets that had been split and/or destroyed on accident," and cautioned that, "in order to actually know what was happening at any given point in time, I mean, you can't really review just the database, because –

---

55.    Pls.' Br. at 32-33; Pls.' Ex. C (Decl. of R. Mills in Supp. of Mot. for Class Certification).
56.    *See generally* Ex. B (Decl. of B. Strombom).
57.    Ex. A-9 (Eden Dep. Tr.) at 142:8-12.
58.    *Id*.
59.    *Id.* at 99:11-20.

well, data got changed."[60]  Another former employee described how customers "would somehow

end up with things they did not buy."[61]  Referring to the ZenCloud database, he testified that "it

was a huge mess," no one fully understood "how things, sort of, worked in that platform," and

things "didn't work the way that they should . . . It became obvious when you'd look at things

and go, like, there's things in this account that aren't – aren't even in the ledger here"[62]  He also

described one "major security issue" with the Companies' systems that allowed users "to

basically withdraw funds twice."[63]

　　　　Uncertainty regarding the source of the transactional data to which Plaintiffs refer calls

into substantial question its reliability.  Plaintiffs obtained the copies of the databases on which

they intend to rely from Adam Matlack,[64] the leader of Team Paycoin,[65] who was also listed on

Hashtalk as a "GAW Founder,"[66] later became a business partner of Plaintiff Shinners,[67] and co-

wrote the "white paper"—the primary document outlining the parameters of a

cryptocurrency[68]—for Ion Coin with Plaintiff Pfeiffer.[69]  There is no evidence as to how or when

Matlack obtained these database copies, how they were prepared, how Matlack maintained or

manipulated them, or who handled them prior to Matlack.[70]

---

60.　*Id.* at 197:8-11.
61.　Ex. A-14 (E. Capuano Dep. Tr.) at 129:13-130:9-18
62.　*Id.* at 129:13-130:18.
63.　*Id.* at 110:23-111:2
64.　Ex. A-44 (Mills Dep. Tr.) at 26:10-24.
65.　Team Paycoin was an affiliate of the Companies that launched in late 2014 to "mobilize and empower people who are passionate about Paycoin to assist in its global adoption."  Ex. A-45 (Dec. 26, 2014 Team Paycoin website); Ex. A-46 (HashTalk.org post listing Team Paycoin as an "Affiliate Compan[y]")
66.　Ex. A-47 (Apr. 14, 2015 HashTalk post).
67.　Ex. A-48 (Shinners' business website identifying Adam Matlack as a "partner"); Ex. A-36 (Shinners Dep. Tr.) at 112:11-12.
68.　Ex. A-15 (Pfeiffer Dep. Tr.) at 11:15-19.
69.　Ex. A-49 (Ion Coin white paper).
70.　According to former employee Madeline Eden, "the databases that were formerly with GAW were probably not the same databases by the time" Plaintiff Shinners began organizing this lawsuit.  Ex. A-9 (Eden Dep. Tr.) at 197:3-5.

In addition, the evidence indicates that Plaintiffs' copies of the ZenCloud and Paybase databases may differ significantly from other known existing copies of those databases, including the copies obtained by the SEC and relied on by federal prosecutors in determining the amount of restitution Garza is required to pay.[71]

Finally, the unreliability of the transactional data on which Plaintiffs rely is demonstrated by Plaintiff Audet's testimony regarding his own transaction history, which differs from the transaction history reflected in the ZenCloud database.  At his deposition, Mr. Audet testified that he never withdrew from his ZenCloud account, contrary to an excerpt of the ZenCloud database showing two withdrawals by him, neither of which he was able to explain.[72]  This example illustrates the difficulty the Court would face in identifying the members of the putative class.[73]

The databases are incomplete and fail to reflect relevant transactions:  The Companies' customers, including Plaintiff Pfeiffer, engaged in private, peer-to-peer sales of cryptocurrency-related products in their accounts by exchanging the passwords to their accounts—sometimes using an escrow agent to execute such transactions.[74]  These transactions were not uniformly recorded in the Companies' database.[75]  Because such transactions are not uniformly reflected in the ZenCloud and Paybase databases, those records provide only an incomplete picture of the transaction history of any given user.[76]

---

71.   Ex. B (Decl. of B. Strombom) ¶ 9(iii)(c).
72.   Ex. A-1 (Audet Dep. Tr.) at 82:17-83:14; 85:22-24.
73.   *See also* Ex. B (Decl. of B. Strombom) Section VII.C (explaining the ways in which the ZenCloud and Paybase databases are unreliable).
74.   Ex. A-50 (Sept. 13, 2014 email between Pfeiffer and John Shaw Miller).
75.   *See, e.g.*, Ex. A-36 (Shinners Dep. Tr.) at 190:8-13; *see also* Ex. B (Decl. of B. Strombom) ¶¶ 36-39.
76.   Ex. B (Decl. of B. Strombom) ¶¶ 9(iii)(a), 34, 36-39, 45, 59-61, 63. To the extent private transactions are reflected in the databases, they complicate identification of original and/or subsequent purchasers.  Relying on the database alone, transactions in the accounts that took place prior to Plaintiff Pfeiffer's purchases of those accounts would be misattributed to him.  *Id.*

The databases also lack information regarding credit card chargebacks.[77]  A substantial number of the Companies' customers engaged in fraudulent behavior whereby they would make purchases and then seek and receive credit-card chargebacks for those same purchases, even though they had already been able to withdraw funds based on their initial purchases.[78]  In addition, many customers later sought and received credit card chargebacks, resulting in at least partial recovery of their losses.[79]  (Plaintiff Shinners received chargebacks for all but two of his credit card purchases, substantially reducing his claimed losses.[80])  Although chargebacks indisputably constitute "value received" and would offset any consideration paid by a particular customer in assessing that customer's standing (and damages, if any),[81] they do not appear in the Companies' transactional databases and would require individual inquiries to uncover.[82]

There is evidence that a third database containing relevant transactions exists but is missing.  In a public post about organizing this lawsuit, Plaintiff Shinners explained that he would "validate" each member's claim "through copies of the Paybase, ZenCloud and possibly GAWminers [sic] databases,"[83] noting that "[t]wo of these databases are already available through another party.  The third, may not, in which case each member will be responsible for providing the missing information through email confirmations received from their transactions on GAWminers.com."[84]  To the extent a third database exists but has not been produced in this

---

77.  *See* Ex. B (Decl. of B. Strombom) ¶¶ 76-77.
78.  Ex. A-14 (E. Capuano Dep. Tr.) at 126:7-127:3.
79.  *See, e.g.*, Ex. A-51 (Shinners Victim Impact Statement).
80.  Ex. A-51 (Shinners Victim Impact Statement) at GAW01022854.
81.  *Compare* Pls.' Ex. C (Decl. of R. Mills in Supp. of Mot. for Class Certification) at ¶ 8 (Plaintiff Shinners' "purchases" total "approximately 36 Bitcoins worth of products") *with* Ex. A-51 (Shinners Victim Impact Statement) (calculating Plaintiff Shinners' own total loss at approximately 30 Bitcoins).  Plaintiffs' damages expert acknowledged that money collected through the credit card chargeback process would need to be reviewed for each Plaintiff.  Ex. A-44 (Mills Dep. Tr.) at 87:6-88:25.
82.  *See* Ex. B (Decl. of B. Strombom) ¶¶ 76-77.
83.  Ex. A-52 (April 10, 2015, BitcoinNewsMagazine.com, "Potential Class Action Lawsuit Against GAWMiners") at 4.
84.  *Id.*

action, there is no way to know whether the transactional data on which Plaintiffs' expert purports to rely is sufficiently comprehensive.

The data is insufficient.  The ZenCloud and Paybase databases do not indicate the identities of the customers underlying each account, and therefore cannot establish the consideration paid and value received by each putative class member.  The transactional data exist only on a user-by-user basis, not on a customer-by-customer basis.  Plaintiffs inaccurately assert that "[c]ustomers have a unique identifying number (a UserID) associated with their accounts."  (Pls.' Br. at 33.)  Although each "user" has a unique identifying number (a UserID) associated with its account, customers often controlled multiple user accounts.  Plaintiff Pfeiffer claimed to control at least ten accounts, and the databases revealed several additional accounts attributable to him.[85]  One former employee explained that one customer set up "10,000 little accounts" using "automated bots" to acquire "free hashlets".[86]  Accordingly, simply associating transactions with a UserID is insufficient to determine the total consideration each customer paid and the total value each customer received.  Because the databases do not reveal the customers with whom each user account is associated, customers could affirmatively claim only the accounts in which they had losses without acknowledging their accounts that show offsetting profits.[87]  Similarly, although the proposed class only includes those who purchased the relevant products "from GAW Miners and ZenMiner" (Pls.' Br. at 11), Plaintiffs fail to identify which

---

85.  Ex. A-53 (Pfeiffer Oct. 11, 2015 Letter of Authorization for the Release of ZenCloud and Paybase Account Details); Ex. B (Decl. of B. Strombom) ¶ 56, Ex. B-9 (identifying additional, unreported accounts held by Pfeiffer, according to the ZenCloud and Paybase databases).

86.  Ex. A-13 (Mordica Dep. Tr.) at 125:20-126:11; *see also* Ex. A-9 (Eden Dep. Tr.) 180:3-13 (discussing "fake accounts" created by people from "all over the world" and "a number of fake accounts that were created by somebody on the system who had access to them").

87.  Ex. B (Decl. of B. Strombom) ¶ 54.

purchases were "from GAW Miners and ZenMiner" as opposed to other sellers of those products.[88]  Thus, the databases are insufficient to prove standing on a class-wide basis.

For similar reasons, the federal prosecutors in Garza's criminal case could not determine the number of individuals entitled to restitution, despite having access to versions of the Companies' databases.[89]

> **b.     "Investor records" cannot confirm membership in the class.**

Plaintiffs refer to unspecified "investor records" as a basis to determine membership in the proposed class.  (Pls.' Br. at 19.)  But relying on unspecified and unverified investor records of putative class members to determine membership in the class is insufficient for several reasons.  First, there is no reason to believe that putative class members possess any records—let alone reliable records—of all transactions relating to the products at issue.  That alone makes reliance on investor records as a data source from which to ascertain the class insufficient.  *See Hughes v. The Ester C Co.*, 317 F.R.D. 333, 349 (E.D.N.Y. 2016) (ascertainability requirement not met where the plaintiffs offered "no basis to find that putative class members" would have "concrete documentation of their purchases").

Second, to the extent "investor records" are simply excerpts of the transactional records of the Companies,[90] they are just as unreliable as the Companies' transactional records in their totality for the reasons discussed.  (*See* Section III.A, *supra*.)

Third, to the extent individual putative class members' records contain information apart from extracts from the Companies' databases, there is no way to verify the accuracy or

---

88.   Ex. B (Decl. of B. Strombom) ¶ 34.
89.   *See* Ex. A-3 (Garza Sentencing Tr.) at 13:3-15:1; 38:16-39:15 ("the government hesitates to put a specific number on" the number of customers entitled to restitution).
90.   *See, e.g.*, Ex. A-53 (Pfeiffer Oct. 11, 2015 Letter of Authorization for the Release of ZenCloud and Paybase Account Details) (authorizing release of "account transaction history data from [Pfeiffer's] ZenCloud and Paybase accounts"). 91.     *See, e.g.*, Ex. A-14 (E. Capuano Dep. Tr.) at 117:16-118:3; Ex. A-13 (Mordica Dep. Tr.) at 119:24-120:18, 121:20:122:12.

comprehensiveness of those records.  There would be no obstacle to a putative class member

submitting a claim that omits evidence that he received a credit card chargeback or sold his

account, because that information is absent from the Companies' databases.  (*See* Section

III.C.1.a, *supra*.)  The Court is not required to "wade through possibly fraudulent and forged

documents" to determine whether each putative class member belongs in the class.  *Calvo II*,

2018 WL 1633565, at *8.

Plaintiffs rely on *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 312 F.R.D. 332, 353

(S.D.N.Y. 2015) (Pls.' Br. At 19), to support their argument that investor records can be used for

purposes of ascertainability here.  However, that case involved a proposed class of investors who

purchased Facebook stock on the NASDAQ stock exchange, for which reliable trading records

existed, and the only question was whether certain class members were "institutional investors"

for sub-class purposes.  *Facebook*, 312 F.R.D at 338.  The Court agreed that determining the

"odd few institutional investors" not listed on Facebook's "Final Allocant List" could be

ascertained by reference to "investor records."  *Id.* at 353.

Here, in contrast, Plaintiffs offer no details about the "investor records" they claim could

be used to determine membership in the class, nor have they identified any objective, reliable

and comprehensive source of trading records that could be used to verify them.  (*See* Pls.' Br. at

18-19.)  This case is instead similar to *Royal Park Investments*, where the court denied class

certification.  324 F. Supp. 3d at 397.  There, the court concluded that "identifying all of the

current and past owners would be problematic" in part because the trust certificates in question

lacked unique identifiers that could be used to tie them to the beneficial owners and in part

because the certificates were traded "in an active secondary market with no central clearinghouse

tracking ownership."  *Id.*  Likewise, in *Brecher*, the class was not ascertainable in part because

"all bonds from the same series have the same trading number identifier . . . making it practically impossible to trace purchases and sales of a particular beneficial interest."  806 F.3d at 26.  As in *Royal Park* and *Brecher*, there is no reliable central clearinghouse where all relevant transactions were recorded nor a means to verify records putative class members might have.

### 2.  Determining exclusions for affiliates, agents, employees or co-conspirators of the Companies would require individual inquiries.

Plaintiffs' proposed class by definition excludes any "affiliate, agent, employee, or co-conspirator" of the Companies.  (Pls.' Br. at 11.)  That is far easier said than done:  the Companies had numerous affiliates, agents and employees, whose identities remain largely unknown.[91]  Therefore, determining who is or is not eligible to participate in the class would require an individual, fact-intensive inquiry into each customer's relationship with the Companies.[92]  These individual inquiries would predominate over common questions.  *See, e.g.*, *Calvo II*, 2018 WL 1633565, at *8.

The Companies also had numerous affiliates, including participants in the "affiliate program" through which individuals and entities could sign up to be "business partners."[93]  The GAW Miners website stated that "[t]he purpose of the affiliate program" was "to drive new traffic to GAWMiners.com and earn money as a business partner . . . ."[94]  Members of the affiliate program earned commissions on purchases of GAW Miners' products traceable to their promotional efforts on behalf of the Companies.[95]  GAW Miners also had a "Value Added

---

91.  *See, e.g.*, Ex. A-14 (E. Capuano Dep. Tr.) at 117:16-118:3; Ex. A-13 (Mordica Dep. Tr.) at 119:24-120:18, 121:20:122:12.
92.  Ex. A-44 (Mills Dep. Tr.) at 96:12-98:23.
93.  Ex. A-54 (Affiliate Program FAQ).
94.  *Id.*
95.  *Id.*; Ex. A-55 (Affiliate Program Guide).

Reseller" program, through which individuals and entities who signed up could buy in bulk at a discount and resell GAW Miners' products to end users.[96]

The Companies also had many agents other than its own employees.[97]  For instance, the Companies maintained "an army" of moderators who "carried out [Garza's] bidding . . . ."[98] Garza tasked them with posting on and moderating the Hashtalk forum on the Internet on his behalf.[99]  Plaintiff Pfeiffer (username: "Hashling") was designated as a moderator.[100] Determining whether each putative class member acted as a moderator—and therefore was an agent—would require a fact-intensive inquiry into each individual's relationship with the Companies.

The Companies also used a "bug bounty" service called CrowdCurity through which individuals acted as "freelance penetration testers" to break into the Companies' systems and identify possible security flaws.[101]  These CrowdCurity "pen-testers" acted as agents of the Companies, and yet their actual identities were never known to employees of the Companies and remain unknown.[102]  In addition to the team of "pen-testers" from CrowdCurity, the Companies maintained their own in-house team of "pen-testers."[103]  These individuals were also agents of the Companies and yet their identities remain unknown.  In addition to "pen-testers," the

---

96.  Ex. A-56 (Sept. 5, 2014 email from Carlos Garza to casey@softline.com.au and others) (attaching reseller application); Ex. A-54 (Affiliate Program FAQ) (outlining minimum resale requirements to participate in reseller program); Ex. A-57 (Sept. 16, 2014 email from Denis Kondrashov to Carlos Garza) (discussing affiliate and reseller program).

97.  Agency is a "highly factual" inquiry that requires: (1) the manifestation by the principal that the agent shall act for him; (2) the agent's acceptance of the undertaking; and (3) the understanding of the parties that the principal is to be in control of the undertaking.  *Cleveland v. Caplaw Enterprises*, 448 F.3d 518, 522 (2d Cir. 2006) (citations omitted).

98.  Ex. A-14 (E. Capuano Dep. Tr.) at 137:4-16.

99.  *Id.* at 136:19-137:16.

100.  Ex. A-58 (May 1, 2015 HashTalk post listing "Hashling" as one of seven moderators); Ex. A-59 (Michael Pfeiffer's Responses and Objections to Defendant's First Interrogatories to Plaintiffs) at 3 (identifying "hashling" as Pfeiffer's Hashtalk username).

101.  Ex. A-14 (E. Capuano Dep. Tr.) at 116:3-22.

102.  *Id.* at 117:16-118:3.

103.  *See Id.* at 118:16-119:17.

Companies also maintained a team of "around 20 to 50 beta testers" at any given time.[104]  Rather than testing for security flaws, beta testers were responsible for testing issues with the Companies' user interface.[105]  Finally, GAW Miners engaged the services of a variety of freelance developers to build products and software on its behalf.[106]

All of these individuals acted as affiliates or agents of the Companies and therefore must be excluded from the proposed class.  (Pls.' Br. at 11.)  Yet, determining which of GAW Miners' customers acted in any of these roles would require fact-intensive, individual inquiries.

### D.      Individual Issues Regarding Damages Will Predominate.

Under Rule 23(b)(3), the Court must conduct a rigorous analysis to determine whether a plaintiff seeking class certification has proven that damages are susceptible to measurement on a class-wide basis.  *Comcast*, 569 U.S. at 34; *see also Royal Park Invs. SA/NV v. Wells Fargo Bank, N.A.*, No. 14 Civ. 9764 (KPF) (SN), 2018 WL 1831850, at *5 (S.D.N.Y. Apr. 17, 2018) (holding that individual issues predominated over class issues in part because "individualized inquiries necessary to distribute damages among investors . . . would dwarf the only common question identified in this case"), *leave to appeal denied*, No. 18-1293, 2018 WL 5733601 (2d Cir. Aug. 7, 2018).

Here, Plaintiffs fail to offer a viable method of calculating damages for each of their claims on a class-wide basis.  Although Plaintiffs propose a formula for calculating damages (Pls.' Br. at 32), they fail to demonstrate how they will determine the inputs required to calculate damages using that formula on a class-wide basis.[107]

---

104.   *See* Ex. A-13 (Mordica Dep. Tr.) at 119:24-120:18.
105.   *See* Ex. A-14 (E. Capuano Dep. Tr.) at 122:3-6.
106.   *See* Ex. A-60 (Dec. 30, 2014 email from Garza to Dorman and E. Capuano) (instructing the payment of Paycoin to a widget developer).
107.   *See* Memorandum of Law in Support of Stuart A. Fraser's Motion to Exclude Declarations and Expert Testimony of Robert Mills and Lou Kerner, filed concurrently with this brief.

With respect to their federal securities fraud claim, Plaintiffs concede that they have not determined damages, either individually or in the aggregate, but rather "plan to calculate the Class's out-of-pocket damages, *i.e.*, the difference between the purchase price and what the investor actually received." (Pls.' Br. at 32.) They posit that "[t]his calculation will be based on the price investors paid for the applicable securities plus various service fees the companies charged less any payouts or other value the investor received from the securities." (*Id.*)[108]

Yet determining these inputs will require individual inquiries that will overwhelm common issues. Although Plaintiffs state that they will rely on "copies of the ZenCloud and PayBase databases," Pls.' Br. at 32, those databases are insufficient to provide the consideration paid and value received by each customer—information necessary to perform a damages analysis using Plaintiffs' formula—for all the reasons detailed above. (*See* Section III.C.1.a.)

Accordingly, Plaintiffs fail to carry their burden to demonstrate a viable method to calculate damages on a class-wide basis. Instead, it will be necessary to individually assess each putative class member's transactions—including those that occurred within the Companies' system and those, such as credit card chargebacks and private sales, that occurred outside of the Companies' system—to determine the total amount each putative class member (not "user") paid and the total value each putative class member (not "user") received. Accordingly, individual issues with respect to damages calculations will predominate.

---

108.   The damages formula Plaintiffs articulate largely mirrors the damages formula set forth by Connecticut's Blue Sky Laws, which state allows recovery of "consideration paid for the security, together with interest at eight per cent per year from the date of payment, costs and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security." *See* CUSA § 36b-29.

### E.   Individual Issues Regarding Defenses Will Predominate.

"In determining whether common issues of law or fact predominate, the Court cannot ignore the issues of fact which are likely to arise in defense of the class claims." *Cont'l Orthopedic Appliances, Inc. v. Health Ins. Plan of Greater New York, Inc.*, 198 F.R.D. 41, 47 (E.D.N.Y. 2000); *In re Digital Music Antitrust Litig.*, 321 F.R.D. 64, 95 (S.D.N.Y. 2017) (holding that individual inquiry regarding applicability to each putative class member of the defendants' unclean hands defense would overwhelm common questions). A defendant need not show at the certification stage that a defense will prevail, "only that it is meritorious enough to require the plaintiff to devote considerable time to rebut" it. *In re Digital Music Antitrust Litig.*, 321 F.R.D. 64, 97 (S.D.N.Y. 2017) (citations omitted).

Here, determining whether each putative class member is subject to any of several available defenses would necessitate individual inquiries, which would overwhelm common questions. First, to the extent putative class members themselves engaged in fraudulent activity, they are not eligible to recover under Connecticut's Blue Sky law. *See MacPeg Ross O'Connell & Goldhaber, Inc. v. Castello*, 686 F. Supp. 397, 399 (E.D.N.Y. 1988). The record demonstrates that numerous customers of the Companies engaged in fraud in connection with their transactions. There is evidence of widespread credit card fraud.[109] The databases containing the Companies' transactional records were repeatedly hacked and altered.[110] Some of the Companies' customers sought to take advantage of what they believed to be a Ponzi scheme by investing early and encouraging others to invest, in order to earn commissions on referrals and/or

---

109.   Ex. A-14 (E. Capuano Dep. Tr.) at 126:7-127:3 ("[W]e had a lot of issues with that, a lot of, like, credit card fraud, where they would just buy as much as they could, and then by the time the charge-back came it was too late, because they already had the currency or whatever.").

110.   Ex. A-61 (Mar. 4, 2015 email from Dorman to Garza and others) (discussing a database hack); Ex. A-62 (Feb. 28, 2015 email from Dorman to Garza and others) (discussing damage to records resulting from hack); Ex. A-9 (Eden Dep. Tr.) at 99:11-20, 142:8-12.

a profit on their investments.[111]  Plaintiff Shinners admitted that "[t]here is more fraud than

honest lending going on in the crypto world" and "[i]t is just not a good enough environment to

conduct commerce in really."[112]  Determining whether a putative class member engaged in fraud

in connection with his or her transactions, thus precluding recovery under Plaintiffs' Connecticut

statutory claims, would require individual inquiries that would overwhelm common questions.

Similarly, to the extent putative class members were *in pari delicto* with the Companies,

those putative class members are ineligible to recover under Connecticut's Blue Sky Laws or the

Exchange Act.  *See Couldock & Bohan, Inc. v. Société Generale Sec. Corp.*, 93 F. Supp. 2d 220,

233 (D. Conn. 2000).  For example, to the extent the Companies' sale of Hashlets, HashStakers

and Paycoin violates CUSA § 36b-16, putative class members who sold or promoted these

products may be equally at fault such that they cannot recover.  Some putative class members,

including two of the three Plaintiffs, sold Hashlets and HashStakers.[113]  Others sold Paycoin.[114]

Because of the inadequacy of the transactional data available, as discussed above, determining

which putative class members sold the relevant products and under what circumstances would

require individual inquiries that would overwhelm common questions.[115]

## IV.    **PLAINTIFFS HAVE NOT SATISFIED THE SUPERIORITY REQUIREMENT.**

Under Rule 23(b)(3), Plaintiffs must demonstrate that a class action is superior to other

methods of adjudicating the controversy.  *Wal-Mart*, 564 U.S. at 362.  Here, the number of

foreign putative class members weighs against superiority of class adjudication.  "Where

---

111.   Ex. A-54 (Affiliate Program FAQ); *see* Cave Decl. ¶¶ 19-21, 24-25 (Exhibits Showing Non-Reliance
       Regarding the Companies).
112.   Ex. A-63 (Hashclub.org Shinners post).
113.   *See* ECF No. 1-1 (Plaintiffs' Certifications) at 30-53; 62-64; Ex. A-64 (Private Marketplace Post).
114.   *E.g.*, Ex. A-65 (Reddit.com post) ("I have made profit because I sold my XPY on the first day at 13$").
115.   In addition, to the extent putative class members waived their rights to sue for the sale of unregistered
       securities under Connecticut's Blue Sky Laws by purchasing the relevant products knowing they were not
       registered or reselling them despite knowing they were not registered, they cannot recover damages pursuant
       to that statute.  *See* Ex. A-66 (Reddit.com post by Shinners).

plaintiffs are unable to show that foreign court recognition is more likely than not, this factor weighs against a finding of superiority and, taken in consideration with other factors, may lead to the exclusion of foreign claimants from the class." *In re Vivendi Universal, S.A.*, 242 F.R.D. 76, 95 (S.D.N.Y. 2007), *aff'd sub nom. In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016).

Foreign nationals held a large number of user accounts in the Companies' databases.[116]  Of Paybase and ZenCloud users for whom country information is available, 58 percent of users in the Paybase database and 14 percent of users in the ZenCloud database are foreign.[117]  Nearly 70 percent of users are missing country information in both the Paybase and ZenCloud databases.[118]  Determining the nationalities of putative class members would thus require individual inquiries.[119]

Plaintiffs do not acknowledge the foreign members of the putative class, let alone establish that courts in each of the many foreign jurisdictions where customers of the Companies reside would recognize the validity and binding effect of a final determination in a class action in the United States.  Accordingly, a class action is not a superior means of adjudicating claims of foreign nationals who purchased or acquired the Companies' products.  *See In re Alstom SA Sec. Litig.*, 253 F.R.D. 266 (S.D.N.Y. 2008) (superiority not met because French law would likely not recognize judgment); *In re Vivendi Universal, S.A.*, 242 F.R.D. at 76 (superiority not met for German and Austrian plaintiffs whose laws would likely not recognize judgment); *Ansari v. New York Univ.*, 179 F.R.D. 112, 116–17 (S.D.N.Y. 1998) (denying certification of class for members

---

116.  *See, e.g.*, Ex. A-3 (Garza Sentencing Tr.) at 23:2-10; Ex. B (Decl. of B. Strombom) ¶ 36.
117.  Ex. B (Decl. of B. Strombom) ¶ 35.
118.  *Id.*
119.  *Id*.

from eleven countries where parties had "not submitted any affidavits on what preclusive effect, if any" a class judgment would have in those countries).[120]

## V.   THE PROPOSED CLASS DOES NOT SATISFY THE REQUIREMENTS OF RULE 23(a).

Under Rule 23(a), the Court must assess whether Plaintiffs have sufficiently demonstrated that "(1) the class is so numerous that joinder of all members is impracticable;(2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Here, Plaintiffs fail to demonstrate that they are typical of the proposed class or adequate to represent that class as a whole, and fail to sustain their burden of showing numerosity. (*See* Pls.' Br. at 13-18.)

### A.   Plaintiffs Are Not Typical And Will Not Adequately Protect The Interests Of The Proposed Class.

The Court may not certify a class unless Plaintiffs have proven that "the claims or defenses of the representative parties are typical of the claims or defenses of the class," Fed. R. Civ. P. 23(a)(3), and that the named parties are "will fairly and adequately protect the interests of the class," Fed. R. Civ. P. 23(a)(4); *Amchem Prods.*, 521 U.S. at 625.

To establish typicality under Rule 23(a)(3), "the party seeking certification must show that each class member's claim arises from the same course of events and each class member

---

120. Although Plaintiffs assert in their brief that they are "unaware of any other litigation commenced by or against the members of the Class," (Pls.' Br. at 36), at Garza's sentencing hearing, Plaintiff Shinners informed the court of a Dubai lawsuit brought by customers of the Companies. *See* Ex. A-3 (Garza Sentencing Tr.) at 27:2-10. Two other customers obtained a judgment against GAW Miners and Paybase LLC in Connecticut state court. *See Aviles v. Paybase LLC*, No. HHD-CV15-5039903 (Conn. Super. Ct. May 16, 2016) (Judgment against Paybase LLC and GAW Miners LLC) available at http://civilinquiry.jud.ct.gov/CaseDetail/PublicCaseDetail.aspx?DocketNo=HHDCV155039903S. These parallel proceedings weigh against finding superiority. *See Steinmetz v. Bache & Co.*, 71 F.R.D. 202, 205 (S.D.N.Y. 1976) (refusing to certify class where class members had already filed related individual actions); Fed. R. Civ. P. 23(b)(3)(B).

makes similar legal arguments to prove the defendant's liability." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 460 (S.D.N.Y. 2018) (citation omitted). Courts in this Circuit have found typicality absent where the named plaintiff failed to demonstrate that the alleged harm he suffered "is the same harm the proposed class is alleged to have suffered." *Newman v. RCN Telecom Servs., Inc.*, 238 F.R.D. 57, 64 (S.D.N.Y. 2006). It is well-established that "class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." *Baffa v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 222 F.3d 52, 59 (2d Cir. 2000) (citation omitted). A defendant "need not show at the certification stage that [a] unique defense will prevail, only that it is meritorious enough to require the plaintiff to devote considerable time to rebut the unique defense." *Id.* at 97. The adequacy and typicality requirements overlap. *See In re LIBOR-Based Fin. Instr. Antitrust Litig.*, 299 F. Supp. 3d at 461. Here, Plaintiffs are not typical of the proposed class nor would they fairly and adequately protect the interests of the class as a whole.

> ### 1. None of the Plaintiffs has standing to sue on behalf of purchasers of Paycoin.

Plaintiffs' certifications show that none of them paid for Paycoin.[121] Rather, the Plaintiffs only obtained Paycoin when the Hashpoints generated by Plaintiffs' Hashlets automatically converted to Paycoin in connection with system-wide conversions.[122] Because none of the Plaintiffs purchased Paycoin, they are differently situated from and cannot adequately represent a class that includes purchasers of Paycoin. *Abu Dhabi*, 651 F. Supp. 2d at 175 ("[While plaintiffs] may be deemed adequate class representatives for claims based on securities they did not purchase, one of the Plaintiffs must have purchased those securities.").

---

121.   ECF No. 1-1 (Plaintiffs' Certifications) at 9, 53-54, 64.
122.   *Id.*

pilgrim

Not having purchased Paycoin, Plaintiffs also do not have the same reliance arguments available to the Companies' customers who purchased Paycoin. Plaintiffs' purported expert Lou Kerner noted in this regard that, "[u]nlike many new cryptocurrencies which are subject to market-based pricing from the outset, GAW [Miners] initially sold PayCoin for a fixed price of $20. In that context, it would have been especially important to any rational investor that GAW [Miners] was claiming to stand behind that price with its own fund."[123] Yet none of the Plaintiffs actually purchased PayCoin for $20 (or any other price). Therefore, the argument that a customer who paid $20 for PayCoin must have relied on the promise of a $20 floor does not apply to any of the Plaintiffs, illustrating how their claims are different from other members of the proposed class. *See Abu Dhabi*, 651 F. Supp. 2d at 175 (at least one named Plaintiff must have purchased each relevant security).

### 2.   Plaintiff Shinners is subject to unique defenses and would be an inadequate class representative.

Plaintiff Shinners—the organizer of this lawsuit[124]—is subject to many unique defenses that make him an inappropriate class representative, including that he (a) was an agent of GAW Miners and therefore does not meet the class definition on its face, (b) violated securities law by selling the very same unregistered securities that are the subject of this action,[125] (c) did not rely on statements that Hashlet payout rates resulted from actual mining, (d) did not rely on public information in crafting his investment strategy, (e) was *in pari delicto* with the Companies, and (f) waived his right to sue under the Connecticut Blue Sky statute by encouraging Garza to circumvent securities laws.

---

123. Pls.' Ex. D (Decl. of Lou Kerner in Supp. of Mot. for Class Certification) ¶ 41.
124. *See, e.g.,* Ex. A-53 (Pfeiffer Oct. 11, 2015 Letter of Authorization for the Release of ZenCloud and Paybase Account Details); Ex. A-51 (Shinners Victim Impact Statement) at GAW01022854.
125. *See Zemel Family Tr. v. Philips Int'l Realty Corp.*, 205 F.R.D. 434, 436 (S.D.N.Y. 2002) (proposed class representative's involvement with unregistered tender made him "uniquely susceptible to defenses that may not be asserted against other class members."); ECF No. 1-1 (Plaintiffs' Certifications) at 62-64.

Shinners was an integral member of the GAW Miners team and had a close relationship with Garza.  Shinners applied for a job at GAW Miners and was in the process of negotiating the details of his position when GAW Miners began to unravel.[126]  In the meantime, at the request of Garza and other employees of the Companies, Shinners regularly provided substantive business advice[127] and feedback on the Companies' documents before Garza and the Companies released them to the public.[128]  In particular, Shinners drafted and revised portions of the Paycoin White Paper (Pls.' Ex A-24), which Plaintiffs allege included some of the misrepresentations at issue.[129]  (E.g., ECF No. 57 ¶¶ 146-47.)  Shinners provided Garza business advice concerning Paycoin's development,[130] edited Garza's posts on Gawminers.com[131] and Hashtalk,[132] and responded to customer questions about Paycoin.[133]  One former employee testified that Shinners "was in heavy contact with Josh [Garza] throughout the whole ordeal,"[134] that Shinners "was one of the few that Josh would extend an ear to," and that Shinners "kind of saw things coming."[135]

---

126.  Ex. A-67 (Nov. 11, 2014 email from Shinners to Garza) ("Still working on the resume to send"); Ex. A-68 (Dec. 7, 2014 email from Shinners to Dan Kelley with subject "Allen's Position Offered"); Ex. A-69 (Dec. 31, 2014 email from Shinners to Garza negotiating his job offer) ("I am definitely game for the challenge/position").

127.  Ex. A-70 (Nov. 30, 2014 email from Shinners to Garza providing business advice).

128.  Ex. A-71 (Jan. 3, 2015 email from Shinners to Garza) ("We will have to use 'coin aging' as part of the qualification for trading. . . This also forces people into either Hashbase or Paybase to hold balances longer to be able to trade them.  You will need a trading quantity ceiling with a time block assignment. . . . This is not my complete list. I am just sending additional ideas along as I figure this all out."); Ex. A-72 (Nov. 25, 2014 email from Shinners to Garza) ("I have rewritten section paragraphs in their entirety"); Ex. A-73 (Nov. 16, 2014 email from Shinners to Dorman (Shinners has "[r]e-written a chunk of the 'abstract'"); Ex. A-74 (Dec. 16, 2014 email from Shinners to Garza); Ex. A-75 (Dec. 16, 2014 email from Shinners to Garza).

129.  Ex. A-72 (Nov. 25, 2014 email from Shinners to Garza) ("I have rewritten section paragraphs in their entirety"); Ex. A-73 (Nov. 16, 2014 email from Shinners to Dorman (Shinners has "re-written a chunk of the abstract").

130.  Ex. A-71 (Jan. 3, 2015 email from Shinners to Garza); Ex. A-70 (Nov. 30, 2014 email from Shinners to Garza) ("We need to get away from these other cryptos, as least for a while. If we have all miners focusing on Paycoin, the liquidity is more within reach.").

131.  E.g., Ex. A-76 (Nov. 28, 2014 email from Shinners to Garza) ("I just finished working the Shopify edits").

132.  Ex. A-67 (Nov. 11, 2014 email from Shinners to Garza) ("I edited your post.").

133.  Ex. A-77 (Dec. 18, 2014 email from Garza to Shinners); Ex. A-78 (Hashtalk.org post) ("[Shinners] will be putting all this together soon"); Ex. A-79 (Nov. 21, 2014 invitation from Dorman to Shinners to edit "Paycoin Community Questions").

134.  Ex. A-14 (E. Capuano Dep. Tr.) at 156:19-20.

135.  Ex. A-14 (E. Capuano Dep. Tr.) at 157:4-15.

Shinners had non-public information.  In connection with his work for the Companies, Shinners signed a nondisclosure agreement with GAW Miners,[136] revised internal company documents, and participated in internal company meetings.[137]  When Garza wrote to Shinners that he could move the market for less than half the Bitcoin he had in reserve, Shinners replied that he would be "very blissful to take advantage of other people's ignorance."[138]

Shinners knew Hashlet payouts were not generated from physical mining.  Plaintiffs wrongly assert that Shinners "never saw any information that revealed the falsity of the representations at issue in this case, including any indication that Hashlets were not supported by actual miners[.]"  (Pls.' Br. at 17.).  Yet Shinners stated that he "always knew" that "pools [were] representative of outside pool rates," and therefore not the result of physical mining.[139]

Shinners may have violated securities regulations by re-selling HashStakers.[140]  Shinners actively encouraged Garza to circumvent securities regulations by moving the Companies offshore[141] and "applaud[ed]" Garza for "bypass[ing] all of the stock requirements."[142]

### 3.    Plaintiff Pfeiffer is subject to unique defenses.

Plaintiff Pfeiffer is also subject to multiple unique defenses, including that he (a) acted as an agent of the Companies, (b) may have violated securities laws, (c) received inside information

---

136.  Ex. A-80 (Nov. 26, 2014 email from Shinners to Garza) ("I know too much about all of this from the collaboration on the Q&A.").
137.  Ex. A-13 (Mordica Dep. Tr.) at 133:2-11.
138.  Ex. A-81 (Dec. 29, 2014 email exchange between Shinners and Garza).
139.  Ex. A-82 (Nov. 30, 2014 email from Shinners to Garza and Mordica) ("I understand that the pools are representative of outside pool rates. I always knew that.").
140.  ECF No. 1-1 (Plaintiffs' Certifications) at 62-64
141.  Ex. A-74 (Dec. 16, 2014 email from Shinners to Garza) ("OMG I told you to move this offshore!"); Ex. A-75 (Dec. 16, 2014 email from Shinners to Garza) ("There are other methods of exchanging cryptos that do not require an American entity.  . . . This [KYC] requirement for cryptos is the next step for killing it, if they choose.  It only takes one subpoena from the government and the entire database of clients is in their possession.").
142.  Ex. A-83 (Reddit.com post by Shinners).

on which he relied, and (d) continued purchasing the Companies' products long after Paycoin and Paybase launched without their allegedly promised features.[143]

       <u>Pfeiffer was an agent of GAW Miners</u>.  Pfeiffer was a moderator of the Hashtalk forum.[144]  As such, Pfeiffer was an agent of the Companies,[145] rendering him ineligible to participate in the class—let alone represent the class as a whole.  (*See* Pls.' Br. at 11.)

       <u>Pfeiffer may have violated securities laws.</u>[146]  Not only did Pfeiffer resell the cryptocurrency-related products at issue here, but he also co-wrote the "White Paper" for Ion Coin, the successor to Paycoin,[147] which was also not registered but offered for sale.[148]

       <u>Pfeiffer received inside information.</u>  Pfeiffer conducted many of his GAW Miners transactions through an escrow agent from whom he received non-public information about the Companies[149] on which he relied in his purchasing decisions.[150]

       <u>Pfeiffer continued purchasing long after truth was known.</u>  As discussed above, Pfeiffer continued purchasing the Companies' products for months after it became clear that Paycoin and Paybase did not possess the allegedly promised features and the SEC investigation of the Companies had been publicly confirmed.[151]

---

143.  ECF 1-1 at 24-27; *see also* Section III.A.
144.  Ex. A-58 (May 1, 2015 HashTalk post listing "Hashling" as a moderator).
145.  *See* Section III.C.1.b.2, *supra*, describing the role of moderators.
146.  ECF No. 1-1 (Plaintiffs' Certifications) at 30-53.
147.  In April 2016, Team Paycoin, led by Matlack, allowed holders of Paycoin (including Plaintiff Audet) to convert their Paycoin to Ion Coin, whose parameters were outlined jointly by Pfeiffer and Matlack.  Ex. A-84 (April 2016 GetHashing.com post); Ex. A-1 (Audet Dep. Tr.) at 86:12-25.
148.  Ex. A-15 (Pfeiffer Dep. Tr.) at 11:3-14; 28:19-22; Ex. A-49 (Ion Coin white paper).
149.  Ex. A-85 (Sept. 26, 2014 email between Pfeiffer, John Shaw Miller (escrow agent, username: "AnimoEsto") and a seller); Ex. A-50 (Sept. 13, 2014 email between Pfeiffer and John Shaw Miller); Ex. A-86 (Sept. 12, 2014 email between Pfeiffer and John Shaw Miller) ("[j]ust be aware that they may pull the plug on 'private marketplace' tonight"); Ex. A-87 (Sept. 24, 2014 email from Pfeiffer to John Shaw Miller); Ex. A-88 (Sept. 26, 2014 email between Pfeiffer and John Shaw Miller) (("I didnt [sic] tell you this – theres [sic] a marketplace coming tonight . . . you will be able to trade without using escrow" Mr. Pfeiffer replies, "I understand that this is between you and me . . .").
150.  Ex. A-89 (Sept. 26, 2014 email between Pfeiffer and John Shaw Miller) ("I'm inclined to follow your advice and hold of[f] on this transaction.").
151.  ECF No. 1-1 (Plaintiffs' Certifications); *see* Section III.A, *supra*.

### B.     <u>Plaintiffs Fail To Sustain Their Numerosity Burden</u>.

To satisfy the numerosity requirement, Plaintiffs must prove that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Although Plaintiffs need not identify the exact size of the proposed class to demonstrate numerosity, they must at least provide an estimate of class size that takes into account all aspects of the class definition. *See Kempner*, 249 F.R.D. at 18. Simply offering "a large pool of persons within which a class may or may not exist" is insufficient. *Kapiti v. Kelly*, No. 07 Civ. 3782 (RMB)(KNF), 2008 WL 3874310, at *4 (S.D.N.Y. Aug. 18, 2008); *Jeffries v. Pension Tr. Fund of Pension, Hospitalization & Benefit Plan of Elec. Indus.*, 172 F. Supp. 2d 389, 394 (S.D.N.Y. 2001). Plaintiffs fail to provide the Court with evidence regarding the size of the putative class that takes into account all aspects of the proposed class definition—let alone a class definition that would ensure that all class members have standing. (*See* Pls.' Br. at 13-14.) Thus, Plaintiffs fail to sustain their numerosity burden.

**CONCLUSION**

For the foregoing reasons, Fraser respectfully requests that the Court deny Plaintiffs' motion for class certification.

Dated:  November 19, 2018

                                        HUGHES HUBBARD & REED LLP
                                      By:   <u>/s/ Sarah L. Cave</u>

                                        Daniel H. Weiner (ct12180)
                                        Sarah L. Cave (phv08437)
                                        Sara E. Echenique (phv08436)
                                        Hughes Hubbard & Reed LLP
                                        One Battery Park Plaza
                                        New York, NY  10004-1482
                                        Tel.: (212) 837-6000
                                        Fax: (212) 422-4726
                                        Email: Sarah.cave@hugheshubbard.com

                                        David R. Schaefer (ct04334)

40

Sean M. Fisher (ct23087)
Brenner, Saltzman & Wallman LLP
271 Whitney Avenue
New Haven, CT  06511
Tel.: (203) 772-2600
Fax: (203) 562-2098
Email: Sfisher@bswlaw.com

*Attorneys for Defendant Stuart A. Fraser*

41