# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

DENIS MARC AUDET, *et al.,*

                          Plaintiffs,

              vs.

STUART A. FRASER, GAW MINERS,
LLC, and ZENMINER, LLC,

                          Defendants.

Civil Action No. 3:16-cv-00940

Honorable Michael P. Shea

ECF Case

November 19, 2018

## DEFENDANT STUART A. FRASER'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO EXCLUDE DECLARATIONS AND TESTIMONY OF ROBERT MILLS AND LOU KERNER

HUGHES HUBBARD & REED LLP

Daniel H. Weiner (ct12180)
Sarah L. Cave (phv08437)
Sara E. Echenique (phv08436)
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, NY  10004-1482
Tel.: (212) 837-6000
Fax: (212) 422-4726
Email: Sarah.cave@hugheshubbard.com

David R. Schaefer (ct04334)
Sean M. Fisher (ct23087)
Brenner, Saltzman & Wallman LLP
271 Whitney Avenue
New Haven, CT  06511
Tel.: (203) 772-2600
Fax: (203) 562-2098
Email: Sfisher@bswlaw.com
*Attorneys for Defendant Stuart A. Fraser*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................1

    A.    Robert Mills ....................................................................................1

    B.    Lou Kerner ......................................................................................2

LEGAL STANDARD ....................................................................................................4

ARGUMENT ................................................................................................................6

I.      MILLS' DECLARATION AND TESTIMONY SHOULD BE EXCLUDED. ..................6

    A.    The Data On Which Mills Purports To Base His Opinions Is Unreliable. .............6

        1.    The databases Mills used are unreliable ....................................................7

        2.    The databases on which Mills based his opinions are incomplete.............10

        3.    The databases are insufficient to determine membership in the class or calculate damages ........................................................11

    B.    The Mills Declaration Lacks A Coherent Description Of The Principles Or Methods Informing His Opinions. ..........................................................13

        1.    Mills did not use a reliable principle or method to analyze the contents of the databases............................................................13

        2.    Mills has not identified any principle or method capable of measuring class-wide damages ................................................15

    C.    Mills Has Not Applied Any Reliable Methodology To The Facts To Demonstrate That He Can Measure Class-Wide Damages. ...............................16

II.    KERNER'S DECLARATION AND TESTIMONY SHOULD BE EXCLUDED...........18

    A.    Kerner Does Not Possess Specialized Knowledge Helpful To Evaluate Class Certification.................................................................18

        1.    Kerner is unqualified to offer expert testimony in cryptocurrency or cryptocurrency mining..........................................................19

        2.    Kerner is unqualified to offer expert opinions on the investment strategies or decisions of cryptocurrency miners or investors ..................20

**TABLE OF CONTENTS**
**Continued**

**Page**

B.   Kerner Has Not Reliably Applied Any Principle Or Methodology To The
Facts Of This Case. .............................................................................................21

  1.   Kerner did not apply a reliable methodology ............................................21

  2.   Kerner ignored key facts in the record.......................................................22

III.   CONCLUSION..................................................................................................25

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Amorgianos v. Nat'l R.R. Passenger Corp.,* 303 F.3d 256 (2d Cir. 2002) ...................................17

*Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18 (2d Cir. 1996)......................................................14

*Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) ...............................................................................15

*Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) ................................. *passim*

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997) ...................................................................................5

*Hilaire v. Dewalt Indus. Tool Co.*, 54 F. Supp. 3d 223 (E.D.N.Y. 2014)..............................16, 22

*Johnson v. Walden Univ., Inc.*, No. 3:08 Civ. 00045, slip. op. (DJS)
   (D. Conn. June 8, 2012) ................................................................................................................6

*Karavitis v. Makita U.S.A., Inc.*, 243 F. Supp. 3d 235 (D. Conn. 2017) ................................16, 22

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ................................................................5, 18

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430
   (S.D.N.Y. 2018) .............................................................................................................................4

*Nimely v. City of New York*, 414, F.3d. 381 (2d Cir. 2005) .....................................................13, 21

*In re NYSE Specialists Sec. Litig.,* 260 F.R.D. 55 (S.D.N.Y. 2009) ...............................................4

*In re Puda Coal Inc. Secs. Litig.*, 30 F. Supp. 3d 230 (2014) (S.D.N.Y. 2014) ........................6, 20

*Raskin v. Wyatt Co.*, 125 F.3d 55 (2d Cir. 1997) .............................................................................14

*Restivo v. Hessemann*, 846 F.3d 547 (2d Cir. 2017)....................................................................5, 14

*Royal Park Investments SA/NV v. Deutsche Bank Nat'l Tr. Co.*, No. 14-CV-4394
   (AJN), 2018 WL 1750595 (S.D.N.Y. Apr. 11, 2018).............................................4, 16, 17, 24

*Russo v. Keough's Turn of River Hardware, LLC*, 529 F. App'x 52 (2d Cir. 2013)
   (Summary Order) .......................................................................................................................6, 15

*SLSJ, LLC v. Kleban*, 277 F. Supp. 3d 258 (D. Conn. 2017) ..........................................................6

*United States v. Amuso*, 21 F.3d 1251, 1263 (2d Cir. 1994) ..........................................................20

# TABLE OF AUTHORITIES
## Continued

**Page(s)**

*United States v. Romano*, 794 F.3d 317 (2d Cir. 2015) ......................................................5, 6, 21

*United States v. Tin Yat Chin*, 371 F.3d 31 (2d Cir. 2004) ...........................................................18

*United States v. Williams*, 506 F.3d 151 (2d Cir. 2007) .............................................................4, 5

*Waggoner v. Barclays PLC*, 875 F.3d 79 (2d Cir. 2017).............................................................15

*Water Pollution Control Auth. of City of Norwalk v. Flowserve US Inc.*, No. 3:14
    Civ. 00549 (VLB), 2018 WL 1525709 (D. Conn. Mar. 28, 2018) .........................................16

**Statutes and Rules**

Fed. R. Civ. P. 23 ........................................................................................................... *passim*

Fed. R. Evid. 702 ............................................................................................................ *passim*

**Treatises**

1 *McLaughlin on Class Actions* § 3:14 (14th ed.) (2017) ..............................................................4

Defendant Stuart A. Fraser ("Fraser") submits this memorandum of law in support of his motion to exclude the Declarations and testimony of the experts Robert Mills and Lou Kerner whom Plaintiffs proffer in support of their motion for class certification.

## PRELIMINARY STATEMENT

In arguing for class certification, Plaintiffs rely on the Declarations of proffered experts Robert Mills ("Mills") and Lou Kerner ("Kerner").  Yet, the Declarations are not based on sufficient facts or data, are not the product of reliable principles and methods, and do not result from the reliable application of principles and methods to the facts of the case.  Because both proffered experts fail to meet the minimum standards of Federal Rule of Evidence 702 and *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), for the admissibility of expert evidence, the Court should therefore exclude their Declarations and testimony from its analysis of class certification under Federal Rule of Civil Procedure 23.

A.     Robert Mills

Mills is an economist.[1]  Plaintiffs rely on the Mills Declaration to support their contention that information contained in the backup files of two databases maintained by Defendants GAW Miners, LLC, and ZenMiner, LLC, (together, the "Companies") is sufficient to ascertain those eligible to participate in the proposed class and to calculate damages on a class-wide basis.  (Plaintiffs' Memorandum of Law in Support of Motion to Certify Class (ECF No. 97) ("Pls. Br.") at 13, 32–33.)

The Mills Declaration provides a summary of the number of "users" Mills was able to identify in certain tables in each database and his conclusion that "it is possible" to link "users"

---

1.   Declaration of Robert Mills re: Class Certification dated Sept. 11, 2018 ("Mills Decl.") ¶ 2 (Ex. C to Plaintiffs' Motion for Class Certification dated Sept. 12, 2018 (ECF No. 96–3)).

with certain "transactions" recorded in each database.  (Mills Decl. ¶¶ 1–6.)  He further opines that he "anticipate[s] calculating class-wide damages" using a "uniform methodology" that he expects to base on "transactional information associated" with putative class members' UserIDs. (Mills Decl. ¶ 7.)  The Mills Declaration does not, however, include any description of the "uniform methodology" he "anticipate[s]" using in the future to calculate class-wide damages, nor does he describe the methodology he used to review the databases on which he purports to base his opinions.  Mills has not conducted an analysis sufficient to determine whether the databases contain sufficient information to identify members of the proposed class or to calculate damages.  They do not.

According to Mills, he has not been asked to calculate class-wide damages, and is vague as to how he intends to calculate those damages.  At his deposition, he admitted that he would need to calculate out-of-pocket damages at the "UserID" level, an approach that is inherently individualized and not suitable for calculating damages on a class-wide basis.

Mills has not committed to a particular uniform methodology, has not thoroughly analyzed the available data, and has not undertaken to determine whether it would be possible to calculate class-wide damages.  His Declaration is inherently unreliable and therefore inadmissible on class certification.

B.      Lou Kerner

Kerner is a partner in a venture capital fund and a blogger on cryptocurrency-related topics.[2]  He has never testified as an expert before, and has never engaged in cryptocurrency "mining."  (Declaration of Sarah L. Cave dated Nov. 19, 2018 ("Cave Decl.") Ex. A-1

---

2.   Declaration of Lou Kerner ("Kerner Decl.") ¶ 2 (Ex. D to Plaintiffs' Motion for Class Certification dated Sept. 12, 2018 (ECF No. 96–4)).

(Deposition Transcript of Lou Kerner dated Nov. 8, 2018 ("Kerner Dep. Tr.")) at 69:24–70:15,

71:14–22.)  For this case, he gained the majority of his understanding of cryptocurrency mining

through reading articles and blogs on the internet.  Kerner has never traded cryptocurrency

personally, has never formally studied cryptocurrencies or investment strategies of

cryptocurrency traders, and admitted that he cannot opine on the investment strategies in the

cryptocurrency trading community.  (*Id.* at 119:16–120:23, 122:15–123:12.)  In addition, Kerner

has no specialized training, knowledge or experience in behavioral economics or the operation of

Ponzi schemes.  (*Id.* at 86:8–23, 87:16–17.)

Despite his minimal experience, Kerner's Declaration includes a lengthy discussion of

hosted cryptocurrency mining and a recitation of fact witness testimony and other evidence in the

record.  (Kerner Decl. ¶¶ 10–38.)  This factual summary contains no specialized or technical

analysis; it is simply a restatement of factual information Plaintiffs' counsel provided him.  On

this, Kerner's maiden voyage as a proffered expert in a litigation, he offers three opinions:

(1) that "no rational investor" would have purchased Hashlets if they knew that there was

insufficient mining equipment with far less hashing power than GAW Miners was selling;

(2) that "no rational investor" would have purchased Hashlets if they knew that the Bitcoin they

were paid as a return were not earned via mining, but were purchased on a public exchange using

funds from non-mining sources; and (3) that "no rational investor" would have purchased

Paycoin if they knew that the $100 million reserve was a fraudulent claim.  (*Id.* ¶¶ 39–41.)

Kerner is not qualified to opine on these topics, applied no methodology in reaching his

opinions, ignored key facts, and conceded his opinions are based solely on his "common sense"

beliefs.  (Cave Decl. Ex. A-1 (Kerner Dep. Tr.) at 87:6–17, 87:24–88:15.)  Because his opinions

are *per se* not expert testimony, and not helpful to the Court concerning class certification, the Court should exclude them.

**LEGAL STANDARD**

The Court analyzes expert evidence submitted at the class certification stage under the standard set forth in *Daubert v. Merrill Dow*, 509 U.S. 579 (1993).  *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 470 (S.D.N.Y. 2018).  Applying the *Daubert* standard to experts proffered at the class certification stage "is consonant with a class certification standard that requires a determination by a preponderance of the evidence that each Rule 23 requirement has been met."  *Id.* at 471 (quoting 1 *McLaughlin on Class Actions* § 3:14 (14th ed.) (2017) (internal citation omitted).  The *Daubert* standard applies to a motion to exclude expert testimony at the class certification stage, but the inquiry is "limited to whether or not the [expert reports] are admissible to establish the requirements of Rule 23."  *In re NYSE Specialists Sec. Litig.,* 260 F.R.D. 55, 66 (S.D.N.Y. 2009).  The expert "needs to show that his methods are reliably applied to a class*." Royal Park Inv. SA/NV v. Deutsche Bank Natl Tr. Co.*, No. 14-CV-4394 (AJN), 2018 WL 1750595, at *8 (S.D.N.Y. Apr. 11, 2018).

The party proffering the "testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied."  *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007).  Federal Rule of Evidence 702 allows the admission of expert testimony only if:

      (a)     the expert's scientific, technical, or other knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

      (b)     the testimony is based on sufficient facts or data;

      (c)     the testimony is the product of reliable principles and methods; and

(d)    the expert has reliably applied the principles and methods to the facts of the case.

To satisfy this standard, expert testimony must be "not only relevant, but reliable." *Daubert*, 509 U.S. at 589; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) (courts must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice in the relevant field").

The Court must function as a gatekeeper, so "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597.  Courts evaluate expert testimony in relation to its reliability and relevance as defined in relation to the Rule 702 factors. *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007).  Neither *Daubert* nor the Federal Rules of Evidence expect a district court to consider, in analyzing class certification, "opinion evidence which is only connected to existing data by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see also Restivo v. Hessemann*, 846 F.3d 547, 577 (2d Cir. 2017).

Determining whether an expert's testimony is admissible involves evaluation of "the theory's testability, the extent to which it has been subjected to peer review and publication, the extent to which a technique is subject to standards controlling the technique's operation, the known or potential rate of error, and the degree of acceptance within the relevant scientific community." *United States v. Romano*, 794 F.3d 317, 330 (2d Cir. 2015) (*quoting Daubert*, 509 U.S. at 593–94 (internal quotation omitted)).  Among the factors to be considered when evaluating whether expert testimony is "sufficiently reliable" is "whether the expert has adequately accounted for obvious alternative explanations."  Fed. R. Evid. 702 Adv. Comm.

Note (2000).  Expert testimony is inadmissible when it fails to provide a coherent description of

the methods informing the expert opinion, *Romano*, 794 F.3d at 333, lacks an adequate basis in

facts or data for the expert opinions proffered, *Russo v. Keough's Turn of River Hardware, LLC*,

529 F. App'x 52 (2d Cir. 2013) (Summary Order), or is speculative or conjectural.  *In re Puda*

*Coal Inc. Secs. Litig.*, 30 F. Supp. 3d 230, 251, 254–55 (2014) (S.D.N.Y. 2014).

## ARGUMENT

## I.   MILLS' DECLARATION AND TESTIMONY SHOULD BE EXCLUDED.

Mills opines that he "anticipate[s] calculating class-wide damages for Plaintiffs in this

case based upon a uniform methodology."  (Mills Decl. ¶ 7.)  Mills provides no description of

the methodology he intends to use for his calculations, but asserts that he "anticipates being able

to calculate damages for each class member based on the transactional information associated

with that member's UserID."  (*Id.*)  Mills' cursory, three-plus-page Declaration is not based on

sufficient facts or data, fails to identify a coherent methodology for determining class-wide

damages, and does not reflect a reliable application of a methodology to the facts of this case.

*See* Fed. R. Evid. 702.    Therefore, it is inadmissible and this Court should not consider it in

determining whether Plaintiffs have sustained their burden to justify class certification.

### A.   The Data On Which Mills Purports To Base His Opinions Is Unreliable.

To be admissible, expert testimony must be based on defined, reliable data.  Fed. R. Evid.

702(b); *SLSJ, LLC v. Kleban*, 277 F. Supp. 3d 258, 280 (D. Conn. 2017) ("[T]he reliability or

status of the evidence upon which [an expert] bases his opinion must be clear. . . . He must state

with complete clarity the status of the 'facts'").  If the testimony is not based on defined, reliable

data, the testimony must be excluded.  *Johnson v. Walden Univ., Inc.*, No. 3:08 Civ. 00045, slip.

op. at 8–9 (DJS) (D. Conn. June 8, 2012).

The Mills Declaration and his testimony must be excluded because the databases on which he relied are: (1) unreliable; (2) inaccurate and incomplete; and (3) insufficient to determine membership in the proposed class.

### 1.   **The databases Mills used are unreliable**.

Mills noted that he was retained to analyze the Zencloud and Paybase databases provided by Plaintiffs' counsel and to calculate damages.  (Mills Decl. ¶¶ 1, 7; Cave Decl. Ex. A-2 (Deposition Transcript of Robert Mills dated Oct. 30, 2018, ("Mills Dep. Tr.")) at 25:14–21.) Mills claims to have reconstituted those two databases from "backup files" he received from Plaintiffs counsel.  (*Id.* at 26:25–27:6.)  At his deposition, however, Mills was not able to identify the chain of custody of the files before he received them from Plaintiffs' counsel.  (*Id.* at 28:8–18.)  He believes the files were provided to Plaintiffs' counsel by Adam Matlack, who received the files from an unidentified former employee of Defendant GAW Miners.  (*Id.* at 26:18–21.)[3]  Mills does not know whether Matlack did any processing of the databases before they were provided to him.  (*Id.* at 27:14–28:7.)  Despite the unclear provenance of the backup files, Mills did not make any effort to determine whether the back-up files had been altered, and conceded that he has no way of verifying that the data he used is accurate.  (*Id.* at 104:1–18.)

Using the back-up files he was provided, Mills claims to have reconstructed the databases using "MariaDB," an open-source software program.  (*Id.* at 27:7–13, 29:11–16.)  Mills admitted he had never used the MariaDB software before and only learned how to use it by watching tutorials he found on the Internet.  (*Id.* at 30:15–19, 31:23–32:5.)  In neither his Declaration nor

---

3.   Matlack is a business partner of Plaintiff Allen Shinners and co-wrote with Plaintiff Michael Pfeiffer a white paper for another cryptocurrency.  (Cave Decl. Ex. A-3 (Oct. 15, 2015 Screenshot of Shinners' company website listing Adam Matlack as Partner); Cave Decl. Ex. A-4 (Apr. 9, 2016 ION white Paper); Cave Decl. Ex. A-5 (Deposition Transcript of Michael Pfeiffer dated July 19, 2018) at 11:5–19.)

his deposition does Mills explain how the software program that he used reconstituted the databases, how he evaluated whether the reconstitution process was done accurately, or how he discerned that particular users could be accurately linked to specific transactions. It is therefore impossible to evaluate whether the methods employed by Mills to extract the data from the databases meet the standards for expert testimony under *Daubert*.

In addition, Mills was not able to identify when the backup files were created. (*Id.* at 32:14–15, 43:16–20.) He also has not made any effort to confirm the date of the databases he purportedly reconstructed using available metadata to determine whether they cover the proposed class period, which is essential for both the class certification analysis and the damages calculation. (*Id.* at 43:21–25.) Despite acknowledging the importance of having complete and final transactional data to calculate damages, Mills concedes that he cannot confirm that he has the most complete and correct version of the databases. (*Id.* at 44:10–45:4.)

Although Mills was made aware that other copies of the ZenCloud and Paybase databases exist, he made no effort to analyze them or to confirm that he is using the most complete available version. He acknowledged receiving copies of those databases provided by Madeline Eden, a former employee of GAW Miners, but he has not analyzed or opened them. (*Id.* at 48:1–14.) He is also aware that the U.S. Securities and Exchange Commission ("SEC") and federal prosecutors in criminal proceeding against the Companies' chief executive officer, Homero Joshua Garza, analyzed versions of the ZenCloud and Paybase databases. (*Id.* at 89:3–6, 110:13–18.) The SEC indicated that the ZenCloud database it obtained "contains the most reliable and complete data about the defendants' sales of Hashlets." (*Id.* at 91:11–20; Cave Decl. Ex. A-6 (Declaration of Trevor T. Donelan dated Feb. 12, 2016).) Yet Mills undertook no effort

to determine whether the databases produced to the SEC are the same as those that he has been using, and stated that he has no intention of doing so.  (Mills Dep. Tr. at 90:2–10, 93:24–94:2.)

Moreover, the record is replete with evidence that the databases are inaccurate.  Former employees of GAW Miners consistently stated that the ZenCloud database was contaminated as a result of numerous defects.  For example, Madeline Eden testified, "[T]he database was a giant mess.  But at this point there had been hacks on the database.  I mean, there had been issues with Hashlets that had been split and/or destroyed on accident, or I mean, any number of different things."  (Cave Decl. Ex. A-7 (Deposition Transcript of Madeline Eden dated June 26, 2018, ("Eden Dep. Tr.")) at 142:8–17.)  She also identified "an internal hack where large portions of the database had been changed and modified and ledgers had been altered [and] accounts had been credited.  And there was weird stuff going on … It was a complete mess."  (*Id.* at 99:11–20.)  The fact that hackers compromised the databases is undisputed.  (*See* Cave Decl. Ex. A-8 (March 4, 2015 email from Jonah Dorman to Garza and Eden ("Do not publish anything acknowledging or disavowing a potential hack to all of our wallets"); Cave Decl. Ex. A-9 (Feb. 28, 2015 email between Garza, Dorman and Eden (referring to damage from hacking incident).)

Eden also acknowledged that "you can't really review the database, because – well, data got changed."  (Cave Decl. Ex. A-7 (Eden Dep. Tr.) at 197:6–18.)  Another former GAW Miners employee, Eric Capuano, described "customers ending up with things that they didn't buy."  (Cave Decl. Ex. A-10 (Deposition Transcript of Eric Capuano dated July 9, 2018, ("E. Capuano Dep. Tr.") at 129:13–21).)  He recalled observing entries in customers' accounts that were not "even in the ledger here."  (*Id.* at 130:7–16.)  He also identified a "major security issue" and a "software vulnerability that allowed a user to basically withdraw funds twice."  (*Id.* at 110:21–112:8).  These employees, who built and worked with the databases regularly, confirmed that the

ZenCloud and Paybase databases do not accurately reflect the Plaintiffs' transactions in the Companies' products. Yet Mills appeared unaware that the databases may have been compromised and took no steps to assess what impact that could have on his analysis. (Cave Decl. Ex. A-2 (Mills Dep. Tr.) at 105:11–21).

The unreliability of the databases on which Mills relies is further demonstrated by the testimony of Plaintiff Denis Marc Audet. Audet's transaction history differs significantly from the transaction history reflected in the ZenCloud database. According to this database, Audet made two withdrawals of $575.02 and $10,000.02, respectively. (Cave Decl. Ex. A-11 (Database excerpt, marked as Ex. 207); Ex. A-12 (Deposition of Denis Marc Audet dated Aug. 10, 2018, ("Audet Dep. Tr.")) at 52).) Asked at his deposition about the $10,000 withdrawal associated with his UserID, Audet testified that he never withdrew $10,000 or any amount from his accounts. (Cave Decl. Ex. A-12 (Audet Dep. Tr.) at 82:17–83:16, 85:19–24.)

2. **The databases on which Mills based his opinions are incomplete**.

Mills purports to be able to calculate class-wide damages based on the transactional information in the Zencloud and Paybase databases. (Mills Decl. ¶ 7.) Those databases, however, are fundamentally flawed and do not provide a complete account of the transaction histories of the Companies' customers in the relevant products. Therefore, they are not reliable for the purpose of performing a class-wide damages calculation.

First, the databases do not include records of credit card chargebacks. On multiple occasions, customers fraudulently purchased GAW Miners' products and then sought and received credit card chargebacks for those products despite having also withdrawn funds associated with the purchase. (Cave Decl. Ex. A-10 (E. Capuano Dep. Tr.) at 126:7–127:3.) In addition, after the SEC announced its investigation of the Companies, customers, including Plaintiff Shinners, sought and received credit card chargebacks to reimburse their losses. (Cave

10

Decl. Ex. A-13 (Shinners Victim Impact Statement).)  Mills acknowledged that he has not

considered the impact of credit card chargebacks and would need to look into it further to

determine if they would need to be included in his analysis.  (Cave Decl. Ex. A-2 (Mills Dep.

Tr.) at 86:16–88:14.)

     Mills acknowledged that he has not analyzed the data to determine whether it is

complete.  (*Id.* at 46:7–8.)  He did not review the depositions of Eden, Capuano, or Audet.  (*Id.* at

33:1–3.)  Although he acknowledged that his analysis could be affected if the databases had been

compromised, Mills offered no methodology as to how he would identify and assess

compromised entries in the databases.  (*Id.* at 105:11–21.)  When alerted to the fact that some

customers bought or sold their accounts in private, peer-to-peer sales, Mills conceded that he

does not know whether he would be able to identify those customers in the databases or how

such private sales would factor into his damages methodology.  (*Id.* at 69:9–70:6, 106:15–

107:12.)  Mills admitted that he had not seen any information related to the amount that

customers received in credit card chargebacks, and does not know if the databases reflect the

chargeback process.  (*Id.* at 88:10–19.)

     Given Mills' concessions about the incomplete information in the databases—and the

absence of any description of a methodology that he would use to address these issues—his

opinions are not based on reliable data.

### 3. The databases are insufficient to determine membership in the class or calculate damages.

     Mills opined that the ZenCloud database contains 277,323 UserIDs, that 212,455 UserIDs

"have at least one associated completed transaction," and that the Paybase database contains

8,679 UserIDs.  (Mills Decl. ¶¶ 2–5.)  None of these numbers is relevant to assessing who is a

member of the putative class or calculating class-wide damages.

Mills admitted that he does not know whether each unique UserID represents a unique customer, nor does he know whether he would be able to calculate damages if "a particular customer had two user IDs." (Cave Decl. Ex. A-2 (Mills Dep. Tr.) at 35:18–36:9.)  Here, the record confirms that many customers owned multiple UserIDs, including Plaintiff Pfeiffer, who maintained at least ten unique UserIDs. (*See* Cave Decl. Ex. A-14 (Account Release of Michael Pfeiffer dated October 11, 2015).)  Thus, the number of UserIDs in the databases does not indicate the number of customers or putative class members.

The number of users with associated transactions is also irrelevant because Mills defines "transactions" broadly to include, among other things, credits. (Mills Decl. ¶¶ 3, 6.)  Thus, users who have one associated completed "transaction" are not necessarily purchasers of the relevant products (let alone purchasers who suffered losses) and would not necessarily be eligible to qualify for the proposed class.

Likewise, although Mills suggests that he will be able to calculate damages by reviewing all "transactions" in the databases associated with a given "UserID," (*Id.*) that methodology is insufficient to calculate damages because it does not account for the fact that many customers held multiple UserIDs.  Mills admitted he had not seen any indicator of which UserIDs correspond to which customers. (Cave Decl. Ex. A-2 (Mills Dep. Tr.) at 83:13–84:4.)  Thus, Mills would be unable to calculate the total consideration paid versus the total value received by each customer.

Moreover, Mills is not able to determine whether the databases contain sufficient information to determine which customers should be excluded from the class.  He does not know whether the databases identify those customers who were agents or employees of Defendants. (*Id.* at 97:4–14.)  He does not know whether the databases contain information sufficient to

determine whether any given purchase was "from GAW Miners or ZenMiner," (*id.* at 79:12-21), as required to meet the proposed class definition. (*See* Pls. Br. at 11.) He has also not undertaken to determine whether there are customers in the databases from outside the United States. (Cave Decl. Ex. A- 2 (Mills Dep. Tr.) at 107:23–108:1.)

Mills' fundamental inability to explain how he would determine the members of the class or calculate damages, in light of the information gaps described above, renders any opinions that he may give unreliable and of no use to the Court in its class certification analysis.

**B.**     **The Mills Declaration Lacks A Coherent Description Of The Principles Or Methods Informing His Opinions.**

Evaluating the admissibility of expert testimony "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid, and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93. An expert's opinion must be "the product of reliable principles and methods" and capable of being objectively tested or otherwise subject to objective standards. Fed. R. Evid. 702(c); *see also Nimely,* 414 F.3d. at 396.

In at least two respects, the Mills Declaration is not supported by a reliable, admissible methodology and therefore must be excluded: (1) Mills did not use a reliable principle or method to analyze the contents of the Zencloud and Paybase databases, and (2) Mills has not identified any principle or methodology capable of calculating class-wide damages.

**1.**     **Mills did not use a reliable principle or method to analyze the contents of the databases**.

Although Plaintiffs' Brief cites various numbers of putative class members based on Mills' calculations (Pls. Br. at 13–14), the Mills Declaration does not describe how he arrived at those numbers. Therefore, their validity cannot be independently confirmed. Moreover, although Mills asserts that he "conducted an analysis" to draw conclusions about "users," he

13

does not describe any of the analytical techniques that he purportedly used in that analysis or report any of the descriptive or summary results of those analyses.  (Mills Decl. ¶ 4.)  He merely states that "users" had some kind of "transaction."  (*Id.* ¶¶ 2–6.)  Plaintiffs rely on this testimony to support their assertion that it is possible to ascertain "all persons or entities" who "purchased the specified products" sold "by the Companies."  (Pls. Br. at 13.)

Mills even suspected that the "transactions" table did not contain all the transactions that he would need to calculate damages, but he admitted that he was uncertain because he has not performed that analysis.  (Cave Decl. Ex. A-2 (Mills Dep. Tr.) at 52:18–23.)  He identified other tables in the databases that might be needed, but he has not analyzed whether those other tables "key off of the user number in the user table," which would be necessary to allow them to be linked.  (*Id.* at 52:24–54:11.)  Mills also admitted that he was not certain whether he could even perform a damages calculation if he was unable to link all of the transactions to their corresponding UserIDs.  (*Id.* at 54:18–24.)

Courts routinely exclude proposed expert testimony where it is based on insufficient, or poorly conducted, statistical analyses.  For example, the Second Circuit in *Restivo* affirmed the exclusion of testimony from an expert who failed to conduct an original statistical analysis on readily available data 846 F.3d at 579; *see also Raskin v. Wyatt Co.*, 125 F.3d 55, 67 (2d Cir. 1997) (expert report inadmissible when the proffered statistical analyses failed to account for significant alternative explanations beyond those put forward by the plaintiff).

Mills provides no coherent description of the methods supposedly informing his opinion, nor does he explain the basis for the opinions offered, and therefore fails to qualify under Rule 702.  *See Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21–22 (2d Cir. 1996) (excluding expert testimony as speculative when it was based on unrealistic assumptions).  Having failed to

14

describe any calculations, accepted principles or methodology, or any other analysis that he has performed relevant to any of the elements of class certification, Mills' Declaration and testimony should be excluded.  *See Russo*, 529 F. App'x at 52 (affirming exclusion of testimony from expert witness who provided no basis for his opinion).

### 2.  Mills has not identified any principle or methodology capable of measuring class-wide damages.

The Second Circuit requires "that a model for determining class-wide damages relied upon to certify a class under Rule 23(b)(3) must actually measure damages that result from the class's asserted theory of injury."  *Waggoner v. Barclays PLC*, 875 F.3d 79, 105–06 (2d Cir. 2017) (internal citations omitted), *cert. denied*, 138 S. Ct. 1702 (2018).  In his Declaration, Mills does not identify any methodology for calculating damages on a class-wide basis.

When pressed at his deposition, Mills was reluctant to commit to a particular methodology for measuring class-wide damages.  (Cave Decl. Ex. A-2 (Mills Dep. Tr.) at 34:13– 35:17.)  While he identified two potential measures of damages (out-of-pocket and rescissionary) he conceded that, because he has not attempted to calculate any damages, he does not know whether these measures would require different calculations.  (*Id.* at 35:6–17.)

Mills acknowledged he would need to calculate individual out-of-pocket damages at the UserID level.  (*Id.* at 66:15–68:16, 108:17–109:20.)  That approach is inherently individualized and not suitable for calculating damages on a class-wide basis, as required under Rule 23.  *See Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013) (holding that, under Rule 23(b)(3), a district court must conduct a rigorous analysis to determine whether the plaintiff has introduced admissible evidence to show that the case is susceptible to awarding damages on a class-wide basis).

The individual inquiries required for Mills' approach include:

- determining which UserIDs correspond to which putative class member, (Cave Decl. Ex. A-2 (Mills Dep. Tr.) at 35:21–36:9);

- locating and quantifying private transactions that are not recorded in the database, but which "would be relevant to that calculation," (*Id*. at 69:21–70:20);

- identifying and excluding UserIDs that correspond with agents, affiliates or employees of the Companies.  (*Id*. at 98:6–23.)

Because Mills has not begun to calculate damages—despite having been involved in this litigation for over three months—and cannot explain how he would overcome numerous obstacles to his anticipated damages calculations, Mills is unable to assist the Court in determining whether calculation of class-wide damages is possible for purposes of evaluating the requirements of Rule 23.  The Court should therefore exclude his Declaration and testimony.

### C.    Mills Has Not Applied Any Reliable Methodology To The Facts To Demonstrate That He Can Measure Class-Wide Damages.

The report of a proffered expert is unreliable and therefore inadmissible when it "fails to adequately explain how he arrived at his conclusions" or "does not explain how he applied those principles in reaching the conclusions" in his report.  *Hilaire v. Dewalt Indus. Tool Co.*, 54 F. Supp. 3d 223, 244 (E.D.N.Y. 2014) (excluding expert testimony); *accord Karavitis v. Makita U.S.A., Inc.*, 243 F. Supp. 3d 235, 247 (D. Conn. 2017) (excluding expert testimony that included neither description nor analysis explaining conclusions), *aff'd*, 722 F. App'x 53 (2d Cir. 2018). An expert's "failure to disclose the calculations and data on which her opinions are based renders her opinions inadmissible."  *Water Pollution Control Auth. of City of Norwalk v. Flowserve US Inc.*, No. 3:14 Civ. 00549 (VLB), 2018 WL 1525709, at *17 (D. Conn. Mar. 28, 2018).

According to Mills, although Plaintiffs retained him to calculate damages, he has not started or attempted those calculations.  (Cave Decl. Ex. A-2 (Mills Dep. Tr.) at 25:16–26:4.) Nor does he intend to start those calculations unless and until asked.  (*Id.* at 36:10–12.) Throughout his deposition, Mills acknowledged numerous significant issues that could prevent

him from being able to calculate class-wide damages, but for which he could not account because he had not yet begun the analysis, including whether:

- the databases cover the duration of the proposed class period (*id.* at 43:16–44:20);

- each UserID represents an individual customer (*id.* at 35:21–25);

- all of the tables in the databases needed to calculate damages can be linked to UserIDs (*id.* at 53:23–11);

- the databases "include all the transactions that took place in the Cryptocurrency products that are at issue" (*id* at. 37:19–38:8); and

- discrepancies exist between various versions of the database.  (*Id.* at 40:21–41:3.)

Mills has not applied his approach to the available facts in this case or demonstrated that it would be possible to do so.  He does not calculate damages or describe the specific methods that he would use to calculate class-wide damages.  (Cave Decl. Ex. A-2 (Mills Dep. Tr.) 33:20–34:2.)  Mills merely asserts that he expects that, in the future, he will be able to do so.  (*Id.* at 52:18–53:12.)  Although he refers to named Plaintiff Shinners as an "example," he does not even use Shinners' information to suggest how his approach could be an acceptable, reliable method for calculating damages on a class-wide basis.  (Mills Decl. ¶ 8.)  He also admitted that he learned that Shinners' username was Allen1980s from Plaintiffs' counsel, not from the databases themselves.  (Cave Decl. Ex. A-2 (Mills Dep. Tr.) 75:21-76:1.)

<div align="center">*        *        *</div>

A "rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand," *Amorgianos v. Nat'l R.R. Passenger Corp.,* 303 F.3d 256, 267 (2d Cir. 2002), demonstrates that the Mills Declaration is not reliable, and Plaintiffs have not met their burden of showing his Declaration and testimony are admissible for purposes of the Court's class certification analysis.

<div align="center">17</div>

II.    **KERNER'S DECLARATION AND TESTIMONY SHOULD BE EXCLUDED**.

Plaintiffs' proposed cryptocurrency expert, Lou Kerner, fails to satisfy the threshold of "intellectual rigor that characterizes the practice of an expert in the relevant field" and does not meet the criteria to qualify as an expert in this case. *Kumho Tire*, 526 U.S. at 152. Kerner does not have "superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004). Kerner is not qualified by "knowledge, skill, experience, training, or education" to provide expert testimony with respect to the topics of cryptocurrency mining or trading, or the determinants of investor behavior related to cryptocurrency as required by Rule 702. As such, Kerner does not possess the requisite specialized expertise to help the Court determine issues relevant to class certification, and he has not reliably applied an appropriate principle or methodology to the facts of this case.

A.    **Kerner Does Not Possess Specialized Knowledge Helpful To Evaluate Class Certification.**

The objective of *Daubert*'s "gatekeeping" requirement "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152. In neither his Declaration nor his deposition testimony did Kerner show that he has employed, or can employ, the "intellectual rigor" the Court requires to consider him an expert in support of Plaintiffs' motion for class certification. Kerner does not have the requisite "knowledge, skill, experience, training, or education" to be qualified to offer expert testimony on any of the issues the Court must evaluate under the Rule 23 class certification analysis.

1.    Kerner is unqualified to offer expert testimony
in cryptocurrency or cryptocurrency mining.

Kerner does not hold any degrees in cryptocurrency-related issues and has not taken any courses or attended any lectures on that topic.  (Cave Decl. Ex. A-1 (Kerner Dep. Tr.) at 61:14–18.)  He has never engaged in any type of cryptocurrency mining.  (*Id.* at 70:11–15.)  The majority of his knowledge regarding how mining works is based on his perusal of blogs on the Internet, conference calls, and the preparation of his own blog posts, which he publishes on Medium.com, an online blogging platform.  (*Id.* at 71:14–19.)  Kerner never traded cryptocurrencies and testified that he is not equipped to describe the investment strategies of the cryptocurrency trading community.  (*Id.* at 119:17–120:23, 122:15–123:12.)  He admitted that he has never testified as an expert before, a fact he omitted from the Declaration Plaintiffs filed with the Court.  (*Id.* at 6:13–15.)

Kerner admitted that his experience in "crypto" did not begin in earnest until June 2017, more than two years after the Companies stopped selling their products.  (Kerner Decl. ¶¶ 4–8; Cave Decl. Ex. A-1 (Kerner Dep. Tr.) at 45:5–47:23, 60:6–18; Cave Decl. Ex. A-15 (March 3, 2015 chat transcript between a representative of GAW Miners and a customer.)  Before that time, his experience in "crypto" was limited to organizing three conference calls with Bitcoin industry experts, of which he acknowledged he was not one.  (Cave Decl. Ex. A-1 (Kerner Dep. Tr.) at 44:23–47:2, 52:21–23.)

Despite his admitted lack of experience related to cryptocurrency mining and trading, Kerner's Declaration focuses primarily on those topics.  (Kerner Decl. ¶¶ 10–27.)  In the remaining paragraphs, Kerner simply lists his supposed qualifications and recites fact witness testimony and other evidence contained in the record related to the Companies' products without contributing any additional analysis based on specialized knowledge.  (*Id.* ¶¶ 28–38.)  The

testimony in these paragraphs is impermissibly cumulative of evidence offered by fact witnesses

and documentary evidence in this case, does not require specialized knowledge or expertise to

understand, and is therefore inadmissible.  *See United States v. Amuso*, 21 F.3d 1251, 1263 (2d

Cir. 1994) (noting that a "court may commit manifest error by admitting expert testimony where

the evidence impermissibly mirrors the testimony offered by fact witnesses, or the subject matter

of the expert's testimony is not beyond the ken of the average juror."); *In re Puda Coal*, 30 F.

Supp. 3d at 254–55 (excluding proffered expert who lacked expertise in relevant standard of

care).

> 2.     Kerner is unqualified to offer expert opinions on the investment
>         <u>strategies or decisions of cryptocurrency miners or investors</u>.

Although robust scientific literature examining investor behavior and behavioral

economics exists,[4] Kerner admitted that he is not an expert in this area.  (Cave Decl. Ex. A-1

(Kerner Dep. Tr.) 86:8–23.)  Nor has he engaged in any recognized or comprehensive studies in

investor behavior relevant to this case, such as:

- studying the investment strategies of cryptocurrency traders, (*id.* at 119:17–120:23, 122:15–123:12);

- taking any courses or published any studies in behavioral economics, (id. at 86:8–23); or

- studying apparent Ponzi schemes.  (*Id.* at 87:16–22.)

Simply put, Kerner does not possess any "scientific, technical, or other specialized knowledge

that will help the trier of fact" with respect to the behavior or decisions of "rational investors" in

cryptocurrency or cryptocurrency mining products.  *See* Fed. R. Evid. 702(a).

---

4.   *See, e.g.,* Richard Thaler, *From Homo Economicus To Homo Sapiens*, 14 J. OF ECON. PERSPECTIVES 133–141 (2000); Daniel Kahneman, *Maps Of Bounded Rationality: Psychology For Behavioral Economics*. 93 AM. ECON. REV., 1449–1475 (2003) (describing the work of two experts who have won the Nobel Prize in economics for their contributions to understanding behavioral economics and investor behavior).

**B.      Kerner Has Not Reliably Applied Any**
**        Principle Or Method To The Facts Of This Case.**

Expert testimony is only admissible if it "is the product of reliable principles and methods" and if "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. "[R]eliability within the meaning of Rule 702 requires a sufficiently rigorous analytical connection between that methodology and the expert's conclusions." *Nimely*, 414 F. 3d at 396.

Because Kerner did not apply a reliable methodology, ignored key facts in the record, and relied on nothing more than his "common sense," the opinions he offers are unreliable and inadmissible.

        1.      Kerner did not apply a reliable methodology.

In his Declaration, Kerner offers three opinions regarding what a "rational investor" in the Companies' products would do if he or she had been aware of certain information.  (Kerner Decl.  ¶¶ 39–41.)  Kerner's opinions regarding the behavior of rational investors generally, and GAW Miners and ZenMiners customers specifically, are not the product of reliable principles and methods.  *See* Fed. R. Evid. 702(c–d).  Kerner fails to describe any methodology that he used or analysis that he performed to reach his opinions, much less a methodology that meets established reliability standards, such as testability, peer review and publication, known rate of error, or acceptance within the relevant community of experts on rational investor behavior.  *See Romano*, 794 F.3d at 330.

For instance, when asked to describe the analysis that he purportedly performed "to reach [his] conclusion in Paragraph 39 about rational investors," Kerner responded, "You know just the belief that rational investors wouldn't invest in Ponzi schemes, and my sense that since they weren't fully—didn't have the computing power and weren't generating income, rather they

were paying people back with money that was invested by you know, new investors."  (Cave Decl. Ex. A-1 (Kerner Dep. Tr.) at 87:4–19.)  When pressed whether he applied any methodology "aside from [his] belief," he replied that it was "clear on its face" and "just common sense."  (*Id.* at 89:9–20.)  He further described the basis for his conclusions in paragraphs 40 and 41 of his Declaration as based on "common sense" and provided no additional description of his analysis or methodology in reaching those either of those conclusions.  (*Id.* at 89:20–90:24, 91:8–92:6.)  An opinion based on "common sense" is of no use to the Court in conducting its class certification analysis and should be excluded.  *Hilaire v. Dewalt Indus. Tool Co.*, 54 F. Supp. 3d 223, 244 (E.D.N.Y. 2014); *accord Karavitis v. Makita U.S.A., Inc.*, 243 F. Supp. 3d 235, 247 (D. Conn. 2017), *aff'd*, 722 F. App'x 53 (2d Cir. 2018).

<div align="center">2.    <u>Kerner ignored key facts in the record</u>.</div>

Kerner proffers three opinions that "no rational investor" would have purchased the Companies' products, if they had been aware of certain facts.  (Kerner Decl. ¶¶ 39–41.)  Yet Kerner provides no factual foundation for his conclusions and ignores significant evidence that members of the proposed class varied greatly in their knowledge of the products, tolerance for risk, and investment strategies.

According to Kerner, "Crypto has evolved in to the world's first global casino."  (*See* Cave Decl. Ex. A-16 (Lou Kerner, *Three Thoughts Relevant to Crypto (A.K.A. The World's First Global Casino)*, Jan. 7, 2018.)  Kerner acknowledged that the fundamental difference between investing and gambling is research, and that "many 'investors' think investing in the stock market, or Crypto, is like walking into a casino."  (*Id.*)  He conceded that he does not know whether putative class members did research before making their purchases of the Companies' products.  (Cave Decl. Ex. A-1 (Kerner Dep. Tr.) at 117:5–12.)

Kerner recognized that the level of sophistication of the "crypto" community is "across the spectrum," and that investors may employ a variety of different investment strategies.  (*Id.* at 120:20–23, 121:7–10.)  He also conceded that the level of risk tolerance in the "crypto" community is above average and that cryptocurrency investors are willing to take on higher risks than the general population.  (*Id.* at 120:24–121:6.)  He acknowledged the prevalence of "pump and dump" scams, where traders promote a cryptocurrency to inflate its value before selling it to someone else.  (*Id.* at 124:7–125:2.)

Kerner also fails to account for evidence that many of the putative class members continued to purchase the Companies' products even after problems with those products became manifest.  Thus, Kerner claims no rational investor would have purchased Hashlets if they knew "that there was insufficient mining equipment with far less hashing power than GAW Miners was selling" and "that the bitcoin they were paid as a return weren't earned via mining."  (Kerner Decl. ¶¶ 39–40.)  The record, however, contains many examples of customers who understood or believed that Hashlet payouts were not earned via mining.  Jonah Dorman, a former GAW Miners employee, explained that, before he joined the company, "everyone knew that [Garza] wasn't technically mining" and was likely "using a calculated method versus an actual method" to calculate payouts.  (Cave Decl. Ex. A-17 (Deposition Transcript of Jonah Dorman dated Aug. 1, 2018), at 13:6–16.)  Similarly, Plaintiff Shinners acknowledged that he "always knew" that the payouts from Hashlets were merely "representative of outside pool rates" and not the result of actual mining, but purchased Hashlets regardless.  (Cave Decl. Ex. A-18 (Nov. 30, 2014 email from Shinners to Garza and Joe Mordica)).  Kerner did not attempt to determine "whether any Hashlet purchasers purchased them knowing that they weren't earned via mining."  (Cave Decl.

Ex. A-1 (Kerner Dep. Tr.) at 91:4–7.)  Kerner fails to account for any of this evidence in reaching his "no rational investor" conclusion.

Kerner also claimed that no rational investor would have purchased PayCoin if they knew that the $100 million reserve fund that was purported to create a minimum $20 price floor did not exist.  (Kerner Decl. ¶ 41.)  Kerner conceded, however, that most cryptocurrencies do not have reserve funds.  (Cave Decl. Ex. A-1 (Kerner Dep. Tr.) at 95:3–11.)  In fact, PayCoin never achieved the $20 price floor on any public exchange, indicating that the reserve fund was not operative, and it continued to trade at lower prices.  (Kerner Decl. ¶ 38.)

Rather than applying a reliable methodology for ascertaining investor knowledge and reliance, Kerner's opinions rest solely on his "common sense" belief that GAW Miners was a Ponzi scheme and that no one would invest in a Ponzi scheme.  (Cave Decl. Ex. A-1 (Kerner Dep. Tr.) at 88:10–15, 89:3–20.)  He made this assertion notwithstanding his admission that he has not studied Ponzi schemes and made no effort to determine whether any of the purchasers of the Companies' products may have made their purchases in spite of their belief that it was a Ponzi scheme.  (*Id.* at 87:16–17, 88:22–89:2.)  In fact, the record here contains numerous examples of individual customers who purchased the Companies' products despite suspecting fraud or believing that the Companies were operating a Ponzi scheme, including some who bought specifically for that reason:

- "This again.  It is a ponzi.  Yes, they are paying, others and I have made a nice profit but it could all end any day.  Never, ever get 'verified' by credit card.  Of course they can release Ips, I'm calling bullsh*t on this.  Again, there is nothing wrong playing the HYIPs.  But treat it that way.  Buy the cheapest contracts with [Bitcoin], take your profit while it lasts.  Rinse and repeat.  Don't get tempted buying bigger contracts.  You'll win some, you'll lose some.  Play HYIPs for fun and pocket change."  (*See* Cave Decl. Ex. A-19 (Nov. 18, 2014 HashTalk.org post).)

- "I'm also convinced that GAWminers [sic] is a scam but I still invested a lot of bitcoins in hashlets. . . I don't care if hashlets aren't real. . . I truly believe this Ponzi is going to last for a while.  Josh is in it for the long run and I'll ride along." (*See* Cave Decl. Ex. A-20 (Reddit post by Abridged86).)

- "[T]ell the guys at work it is probably the world's biggest PONZI scheme. However whilst it is legal I will keep mining!  That is until such time the Australian Government starts taxing it."  (*See* Cave Decl. Ex. A-21 (July 20, 2014 HashTalk.org post).)

The record therefore refutes Kerner's "common sense" opinion that "it is clear on its face" that no one would have purchased Hashlets or PayCoin if they suspected that it may have been a Ponzi scheme.  (Cave Decl. Ex. A-1 (Kerner Dep. Tr.) at 89:9–20.)  Kerner simply ignores this evidence.

Kerner's "common sense" opinions regarding the decision-making of all "rational investors" do not meet the rigorous standard for admissible expert testimony under Rule 702 and *Daubert*, and therefore should be excluded.

## III.   CONCLUSION

For the forgoing reasons, Fraser respectfully requests that the Court exclude the Declaration and all testimony of Robert Mills and Lou Kerner.

Dated:  November 19, 2018

<div style="margin-left:40%">

HUGHES HUBBARD & REED LLP
 By: s/  Sarah. L. Cave/

Daniel H. Weiner (ct12180)
Sarah L. Cave (phv08437)
Sara E. Echenique (phv08436)
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, NY  10004-1482
Tel.: (212) 837-6000
Fax: (212) 422-4726
Email: Sarah.cave@hugheshubbard.com

</div>

David R. Schaefer (ct04334)
Sean M. Fisher (ct23087)
Brenner, Saltzman & Wallman LLP
271 Whitney Avenue
New Haven, CT  06511
Tel.: (203) 772-2600
Fax: (203) 562-2098
Email: Sfisher@bswlaw.com

*Attorneys for Defendant Stuart A. Fraser*

26