Page 38

DEAN ALLEN SHINNERS

A.  They would not have heard my views on cryptocurrency. They would have seen or hard me refer to something relating to mining, actually.

Q.  And in what forum or fora have they heard you make those comments --

A.  Restaurants, Facebook.
That's pretty much it, actually.

Q.  Okay. And -- and you've expressed your views on -- on chat rooms and blogs and posts on cryptocurrency. Is that right?

A.  In the past or currently?

Q.  In the past. In the past.

A.  In the past, when I was wrapped up in the GAW situation, there were several forms of individuals that also had been burned or hurt by the GAW implosion. So yes, at that time, yes.
But otherwise, I'm -- I'm not in chat rooms.

Q.  The four named plaintiffs in this case, who among you in your view has the most expertise in the cryptocurrency world?

A.  I couldn't answer that question. I wouldn't know. I don't know.

Q.  And have you ever discussed the

Page 39

DEAN ALLEN SHINNERS

subject with your fellow plaintiffs?

A.  I have never discussed how much they would know about cryptocurrency, no.

Q.  Did you select the other three plaintiffs?

A.  I had a -- I compiled a long list of people based off of the amount of losses, where their geographic locations were, whether I had spoken to them on Hash Talk before.
They're -- basically, I wanted to get a short list of individuals that I felt comfortable with and who warranted, you know, this kind of position.
You have to be able to -- to dedicate yourself to this until -- you know, 'til the end, and if people are too busy, then they would make very bad plaintiffs in a case like this. So there were a lot of factors that I took into consideration.

Q.  And in the end, you winnowed it down to you and your three other plaintiffs, right?

A.  Yes.

Q.  Okay. What were the factors that made you feel, in your words, comfortable with the

Page 40

DEAN ALLEN SHINNERS

three other plaintiffs in this case?

A.  Their level -- like I just stated as my answer to the previous question, their ability to fulfill their obligations as lead plaintiffs in a -- in a prospective class action lawsuit, their geographic location, and how much their losses were, so that there's self-motivation.
And I mean, that's pretty much it, really, the main ones.

Q.  And -- and through what method did you determine the answers to these questions, these factors?
Did you talk to them?

A.  Eventually, yes.

Q.  Okay. Did you ask them questions?

A.  Not really, not like that.
My -- like I said in the previous two questions, they had to have meaningful losses. They had to have geographic location, in other words, they couldn't be located in Russia or China or -- they had to be in the United States.
Yeah, just as I stated in the previous two questions, they had to have the ability to fulfill their obligations as lead plaintiffs in

Page 41

DEAN ALLEN SHINNERS

a -- in a prospective class action lawsuit.

Q.  And where did you come up with these criteria that you've just listed for us?
How did you figure out what -- what factors the fellow plaintiffs needed to have before you would choose them as fellow plaintiffs?

A.  Probably a couple of years ago is when, you know, I had a short list of -- of things that I wanted to see, and I just listed those.

Q.  Okay. So in that -- I think you answered my question.
These -- this is a list that you came up with?
These are things --

A.  Yes.

Q.  These are things that you wanted to see in your fellow plaintiffs?

A.  Yes.

Q.  Okay. And -- and you took kind of a survey of the people that are out there and came up with the three fellow plaintiffs that you have, right?

A.  I didn't project a survey to anybody, no. I had my own list of characteristics that I

Page 42

1   DEAN ALLEN SHINNERS
2   was looking for.
3          Obviously, I did not want a convicted
4   felon as a lead plaintiff in a lawsuit.  So there
5   were some, you know, personal questions, nothing
6   extraordinary, just normal run-of-the-mill
7   personal questions and, of course, the other three
8   items, mostly, which was geographic proximity, you
9   know, how much were their losses, and like I said.
10      Q.   And were there any questions about how
11  much these fellow plaintiffs knew about the
12  cryptocurrency world?
13      A.   No, I didn't have any questions.
14  It -- it didn't seem relevant to me, actually.
15  Otherwise, it would have been one of the qualifier
16  characteristics, but it never really dawned on me
17  to ask them about their -- how extensive their
18  knowledge was of the cryptocurrency industry.
19      Q.   When it comes to GAW Miners and
20  ZenMiner, what were the source or sources of your
21  information as to what was going on?
22           MR. WATTERSON:  Object to the form.
23           You can answer.
24      A.   What -- at what point in time?
25      Q.   From the beginning when you started

Page 43

1   DEAN ALLEN SHINNERS
2   buying --
3       A.   Okay.
4       Q.   -- to the end when you stopped and
5   were selling, what -- where did you get your
6   information from?
7       A.   There wasn't a lot of information to
8   be had.  If you're talking about -- I guess it --
9   it seems to broad of a question to me, because at
10  what point in time are you asking, you know, what
11  information did I -- you know, did I come across
12  or did --
13      Q.   I can break it down.
14      A.   Yeah, I'd have to -- please.
15      Q.   Let's take 2014.  That's -- is that --
16  that's when you first got involved with GAW
17  Miners?
18      A.   In August of -- of 2014, yes.
19      Q.   Okay.  And you're -- again, we talked
20  about it before, you're a person who likes to do
21  their research, correct?
22      A.   Yes.
23      Q.   Okay.  So what research sources did
24  you go to before you plunged into the GAW Miners
25  world?

Page 44

1   DEAN ALLEN SHINNERS
2       A.   Before, okay.  Before is the question
3   part I was looking for.
4            There was not a lot out there.  The
5   only research that could be done was of, you know,
6   like businesses, and there really was only one,
7   which was Genesis Mining.
8            Most people at that -- at that time,
9   from what I could see, most people were familiar
10  with Genesis Mining and the mining contracts, and
11  what GAW was offering out there was similar to
12  this with some minor differences -- well,
13  actually, not so minor.  They were kind of major
14  differences.
15           But I had looked into Genesis Mining
16  for many months, actually.  I never purchased a
17  contract from them, but that was because of the
18  research.
19           So when -- once the GAW Miners thing,
20  the hash listing appeared in the marketplace, or
21  out there as advertisements, I had already done a
22  lot of research on Genesis Mining, so I understood
23  the concept to a great degree.
24      Q.   And -- and the research that you done
25  on Genesis Mining was that all Internet research?

Page 45

1   DEAN ALLEN SHINNERS
2       A.   Yeah, it was -- it's the only place
3   really to do it, you know.
4       Q.   And once you got involved with GAW
5   Miners in August of 2014, and let's take it to the
6   end of 2014 -- do you have that time frame in
7   mind?
8       A.   Yes, I do.
9       Q.   Okay.  Did you have any additional
10  sources of information about what GAW Miners was
11  up to?
12      A.   I guess I want to have to ask you to
13  clarify that, because what GAW Miners was up to,
14  do you mean behind the scenes, in front, out in
15  the public realm?
16           I -- you know, I don't understand your
17  question.
18      Q.   Fair enough.
19           First start with behind the scenes,
20  did you have any insight into that during any of
21  2014 through direct communications with GAW
22  Miners' people or otherwise?
23      A.   I had direct communications with Josh
24  Garza a -- a few times, but it wasn't in the
25  beginning.  I had some communications with a -- a

Page 166

1      DEAN ALLEN SHINNERS
2  litigation, this case, would assert his rights
3  under the Fifth Amendment and not answer
4  questions?
5      A.   I already knew that that was either
6  the case with the SEC, which was also a civil
7  case.
8          As far as the FBI, I didn't -- from
9  what I understood, I didn't see that as ever
10 happening, as being an option, because I believe
11 the end result of this is there's a plea deal.
12 They've done a plea deal with him, so I'm not -- I
13 don't have a written detail of that.  So I don't
14 know exactly the context of the plea deal.
15         So they're claiming the Fifth.  I -- I
16 really don't believe that was ever -- you would
17 have to -- you have to really expect to go to a
18 jury trial for that, and they had him too much
19 dead to rights on too many felonies as it was that
20 didn't really require much of a jury trial.  So he
21 didn't really have an option there to -- to use --
22 you know, plead, you know, the Fifth Amendment
23 rights at that point.
24         With the SEC, I believe he just didn't
25 just show up in the end, so...

Page 167

1      DEAN ALLEN SHINNERS
2      Q.   Now, the over 100 telephone calls you
3  had with employees of the FBI was that in part to
4  help them build their criminal case against
5  Mr. Garza?
6      A.   Absolutely.
7      Q.   And how did you help them?
8      A.   They have everything that I have given
9  the law firm.  They have every document, every bit
10 of research, anything that I had come across or
11 had obtained during the process here and for the
12 last three-plus years, they have everything.
13     Q.   Did you ever prepare for them any kind
14 of summary or brief or report which kind of tried
15 to aggregate that information at an executive
16 level?
17     A.   No, I did not.  I did not.  I've never
18 done a brief for anybody on this or where it's
19 been compiled down or boiled down to just, you
20 know, bullet lines or bullet points.  I've never
21 done that.
22     Q.   Did you talk them through your
23 understanding of what had happened and what the
24 evidence meant and how you viewed this situation?
25     A.   Repeat that first part?

Page 168

1      DEAN ALLEN SHINNERS
2      Q.   If you didn't do it in writing, did
3  you summarize with the FBI what your view of the
4  evidence was against Mr. Garza and his companies?
5      A.   They never asked me for my view on it.
6  They asked what I had, and, you know, we would be
7  going back and forth, back and forth, and they
8  would ask for clarity on some items.
9          And -- and some of them required some
10 clarity, and some of them were even technical
11 where some of the M boxes -- the e-mail boxes
12 would not decompress themselves.  They would not
13 unzip themselves, and there was reasons for this
14 that I ended up figuring out.
15         So I would help them along those lines
16 as well.  So documentary proof, you know, any
17 evidence, and some technical help with some issues
18 with the -- the documentation and some
19 clarification on content.
20     Q.   Did the FBI, Mr. Shinners, consult you
21 at all before signing the plea deal with
22 Mr. Garza?
23     A.   The plea -- oh, you mean for the --
24 this litigation?  Did they consult with me or --
25     Q.   There's -- you said there's a plea

Page 169

1      DEAN ALLEN SHINNERS
2  agreement with Mr. Garza in the criminal case
3  where he's agreed to plead guilty and he's
4  awaiting sentence, right?
5      A.   Right.
6      Q.   Did the FBI say to you, hey, Allen,
7  we're going to do a deal with them.  We just
8  wanted to let you know about it or wanted your
9  input?
10     A.   A deal with whom?
11     Q.   Mr. Garza.
12     A.   So we're not talking about this
13 litigation.
14     Q.   Right.
15     A.   We're talking about the criminal --
16     Q.   Right.
17     A.   Okay.  Did they talk to me before the
18 plea deal?
19         Of course.  For a year and a half,
20 they talked to me.
21     Q.   Specifically about the plea deal?
22     A.   No.
23     Q.   Did they let you know it was going to
24 happen?  Did they ask your consent, approval,
25 input, or advice?

Page 358

1            DEAN ALLEN SHINNERS
2  daily yield is the following day or the following
3  two days.
4       Q.   And to be pointed toward a particular
5  pool, is that a coding decision that's made or is
6  that something that you direct?
7       A.   I direct that.  It -- it -- you direct
8  your mining -- miners to the pool that you're
9  basically subscribing to, and so all other miners
10 that are also pointing to that pool, their -- all
11 their computer -- their computational power, their
12 computing power, is summed together in most cases
13 and directed at the most profitable coin that
14 second, or some of them will be directed to this
15 coin, some of them will be directed over here, and
16 they use a blending factor to average the -- when
17 it comes time to cash in these coins and convert
18 them to what you're receiving, which may be
19 Bitcoin, it could be Dash, it could be anything.
20      Q.   So you need to -- the mining occurs,
21 and then there's a conversion to another form of
22 currency then --
23      A.   If that's what you choose.
24      Q.   Okay.  But otherwise, it sort of rolls
25 over until you elect to convert it at some point?

Page 359

1            DEAN ALLEN SHINNERS
2       A.   No.  You can choose to take payment --
3  for instance, like I can point my miners at the
4  pool that I generally use and mine -- and select
5  to mine only Litecoin and get paid only in
6  Litecoin.
7            But there's still a pooling effect of
8  other mining hardware -- you know, other mining
9  hardware out there that's being directed and --
10 you know, toward that mining pool.
11           Or you can direct your hashing power,
12 your -- your megahash, gigahash, whatever, you can
13 direct it to the pool and let them -- it's a
14 multi-pool function, so they can point the
15 combined hashing power of everybody's mining
16 hardware to whatever is the most profitable coin
17 to mine at that very second or minute or hour or
18 day, or whatever.
19           And then they -- you know, because
20 they're choosing different coins, nobody wants to
21 get 50 different coins paid -- paid to them.  You
22 select -- when you're doing multi-pool function,
23 you select what your payout will be.
24           So if I wanted it paid back to me, the
25 value equivalency, in Litecoin, that's what

Page 360

1            DEAN ALLEN SHINNERS
2  they'll do.  If it's Bitcoin I choose, they will
3  do it to Bitcoin.
4            But there's usually a very small
5  number of choices in that area.
6            MS. CAVE:  Okay.  Very good.  Thank
7  you.
8            So, Mr. Shinners, we have no further
9  questions for you today.  What I would say
10 on the record is that we have a couple of
11 document disputes with your counsel,
12 including relating to the Garza notes and
13 some issues with documents on the privilege
14 log, and so subject to resolution of those
15 disputes, we'll -- we reserve our right to
16 seek to ask you more questions and -- and
17 reopen your deposition.
18           But thank you for today.
19           THE WITNESS:  Thank you.
20           MR. WATTERSON:  I disagree with all of
21 that, but I'm not going to clutter up the
22 record, but we consider this deposition
23 over, and I'll reserve my questions to --
24 'til trial.
25           MS. CAVE:  And we reserve all of

Page 361

1
2  our -- Mr. Fraser's rights as well.
3            MR. WATTERSON:  We agree to disagree.
4            MS. CAVE:  Okay.
5            Thank you.
6            VIDEOGRAPHER:  The time is 4:48 p m.
7  We're off the record.
8            (Whereupon the proceedings were
9  concluded at 4:48 p m.)
10                   oOo
11           I, DEAN ALLEN SHINNERS, the witness
12 herein, do hereby certify that the foregoing
13 testimony of the pages of this deposition to
14 be a true and correct transcript, subject to
15 the corrections, if any, shown on the
16 attached page.
17                 _____
18                 DEAN ALLEN SHINNERS
19
20 Subscribed and sworn to before me this
21 _____ day of _____, 2018.
22
23 _____
24 (Notary Public)   MY COMMISSION EXPIRES:_____
25