UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| DENIS MARC AUDET, MICHAEL PFEIFFER, DEAN ALLEN SHINNERS, and JASON VARGAS, Individually and on Behalf of All Others Similarly Situated,<br><br>    Plaintiffs,<br><br>    vs.<br><br>STUART A. FRASER, GAW MINERS, LLC, and ZENMINER, LLC, (d/b/a ZEN CLOUD),<br><br>    Defendants. | Case 3:16-cv-00940<br><br>Hon. Michael P. Shea<br>Courtroom 2<br><br>ECF Case<br><br><u>CLASS ACTION</u><br><br>DECEMBER 21, 2018<br><br>DECLARATION OF COLIN M. WATTERSON RE: PLAINTIFFS' CLASS CERTIFICATION REPLY BRIEF |

I declare under penalty of perjury as follows:

1. My name is Colin Watterson. I am an attorney licensed to practice law in the State of Texas and am an associate with the law firm Susman Godfrey LLP. I have personal knowledge of the facts in this declaration.

2. I serve as counsel for plaintiffs in the above captioned action. I am admitted *pro hac vice* in the above captioned action.

3. <u>Exhibit A-44</u> is a true and correct of excerpts from the transcript of the deposition of Homero Joshua Garza taken on December 14, 2018 in the above captioned case.

4. <u>Exhibit A-45</u> is a true and correct of excerpts from the transcript of the deposition of Stuart Fraser taken on August 7, 2018 in the above captioned case.

5. <u>Exhibit A-46</u> is a true and correct copy of the complaint filed by the SEC against Homero Joshua Garza and the Companies as docket entry 1 in Case No. 3:15-cv-01760 on December 1, 2015 in this District.

6.      Exhibit A-47 is a true and correct copy of a consent decree filed as docket entry 44-2 in Case No. 3:15-cv-01760 on October 3, 2017 in this District.

7.      Exhibit A-48 is a true and correct copy of a final judgment filed as docket entry 45 in Case No. 3:15-cv-01760 on October 4, 2017 in this District.

8.      Exhibit A-49 is a true and correct copy of a judgment filed as docket entry 46 in Case No. 3:17-cr-00158 on September 21, 2018 in this District.

9.      Exhibit A-50 is a true and correct copy of excerpts from the transcript of the deposition of Denis Marc Audet taken on August 10, 2018 in the above captioned case.

10.     Exhibit A-51 is a true and correct copy of excerpts from the transcript of the deposition of Jonah Dorman taken on August 1, 2018 in the above captioned case.

11.     Exhibit A-52 is a true and correct copy of excerpts from the transcript of the deposition of Madeline Eden taken on June 26, 2018 in the above captioned case.

12.     Exhibit A-53 is a true and correct copy of excerpts from the transcript of the deposition of Robert Mills taken on October 30, 2018 in the above captioned case.

13.     Exhibit A-54 is a true and correct copy of emails to Mr. Shinners confirming his purchase of relevant securities or his purchase of cryptocurrency he used to purchase relevant securities.

14.     Exhibit A-55 is a true and correct copy of emails to Mr. Pfeiffer confirming his purchase of relevant securities or his purchase of cryptocurrency he used to purchase relevant securities.

15.     Exhibit A-56 is a true and correct copy of emails to Mr. Audet confirming his purchase of relevant securities or his purchase of cryptocurrency he used to purchase relevant securities.

16.     Exhibit A-57 is a true and correct copy of an Affidavit of Certification signed by Dimitrios Anastasakis that was produced in this Litigation.

17.     Exhibit A-58 is a true and correct copy of excerpts from the transcript of the deposition of Dean Allen Shinners taken on July 25, 2018 in the above captioned case.

18.     The documents produced in this litigation include a spreadsheet entitled "Sales Transactions via Internet Payment Processors." The spreadsheet includes records of over 42,000 credit card transactions and specifies whether the transaction was a credit or debit, and specifies whether the transaction was disputed. The spreadsheet is voluminous and contains personally identifiable information, but could be provided to the court in excel format.

19.     Plaintiffs have subpoenaed data related to chargebacks from the Companies' payment processor, which is a subsidiary of Paypal.

20.     Exhibit A-59 is a true and correct copy of excerpts from the transcript of the deposition of Dr. Michael Pfeiffer taken on July 19, 2018 in the above captioned case.

21.     Exhibit A-60 is a true and correct copy of a default judgment entered against GAW Miners, LLC and ZenMiner, LLC as docket entry 39 in Case No. 3:15-cv-01760 on May 29, 2017 in this District. The judgment finds GAW Miners, LLC and ZenMiner, LLC liable of federal securities law violations, and concludes that $10,078,331 approximates the profits causally connected to the Companies' violations of the securities laws.

I declare under penalty of perjury that the above statements are true and correct to the best of my knowledge.


Dated: December 21, 2018

                                            _Colin M. Watterson_____
                                            Colin M. Watterson

EXHIBIT A-44

1

2                    IN THE UNITED STATES DISTRICT COURT

3                          OF CONNECTICUT

4

DENIS MARC AUDET, MICHAEL ) Case 3:16-cv-00940
5  PFEIFFER, DEAN ALLEN      )
SHINNERS, and JASON         ) Hon. Michael P. Shea
6  VARGAS, Individually and  ) Courtroom 2
on Behalf of All Others     )
7  Similarly Situated,       ) ECF Case
                             )
8       Plaintiffs,          ) CLASS ACTION
                             )
9  vs.                       )
                             )
10  STUART A. FRASER,        )
GAW MINERS, LLC, AND        )
11  ZENMINER, LLC, (d/b/a    )
ZEN CLOUD),                 )
12                           )
        Defendants.          )
13

                 *******************************
14                ORAL VIDEOTAPED DEPOSITION
15                  HOMERO JOSHUA GARZA
16                   December 14, 2018
17               *******************************
18      ORAL VIDEOTAPED DEPOSITION OF HOMERO JOSHUA GARZA,
19  produced as a witness at the instance of the Plaintiffs
20  and duly sworn, was taken in the above-styled and
21  numbered cause on the 14th day of December, 2018, from
22  10:13 a.m. to 6:44 p.m., before April Balcombe-Anderson,
23  Certified Shorthand Reporter in and for the State of
24  Texas, reported by computerized stenotype machine at the
25  Job No. 152595

## Page 6

Homero Joshua Garza

P-R-O-C-E-E-D-I-N-G-S

THE VIDEOGRAPHER:  Today's date is December 14th, 2018, and the time is approximately 10:13 a.m.  We are on the record beginning the deposition of Homero Joshua Garza.

Would all counsels please introduce themselves and whom they represent.

MR. WATTERSON:  Colin Watterson with Susman Godfrey for the plaintiffs.

MS. CAVE:  Sarah Cave from Hughes Hubbard & Reed for defendant, Stuart Fraser.  And with me is Hannah Miller.

THE VIDEOGRAPHER:  The deponent may now be sworn in.

(Witness sworn.)

HOMERO JOSHUA GARZA, having been first duly sworn, testified as follows:

EXAMINATION

QUESTIONS BY MR. WATTERSON:

Q.  Good morning, Mr. Garza.  Can you give your full name for the record?

A.  It's Homero Joshua Garza.

Q.  Okay.  And have you ever been deposed before?

A.  Yes, sir.

## Page 7

Homero Joshua Garza

Q.  Okay.  When?

A.  It was a few years back.

Q.  Okay.  And what was the -- the case?

A.  The SEC.

Q.  Okay.  Do you have a copy of your transcript anywhere?

A.  I do not recall.

Q.  Okay.  And it was the SEC in connection with GAW Miners, correct?

A.  Yes, sir.

Q.  Okay.  All right.  So I'm sure you know the rules, but I'm just going to go over them briefly.  You are under oath, so you have to give truthful answers.  Okay?

A.  Sure.

Q.  The court reporter is taking down what we say, so we should try not to talk over one another.  Make sense?

A.  Yes, sir.

Q.  Okay.  Try not to speak too quickly.  The court reporter will appreciate that because it's harder for her to get everything you say.  Okay?

A.  Yes, sir.

Q.  Verbal responses, you have to say "yes" or

## Page 8

Homero Joshua Garza

"no."  You can't shake your head or nod your head.  Make sense?

A.  Yes, sir.

Q.  Okay.  You can take a break whenever you want to.  Just nod when there's a question pending, so if you want to take a break, finish answering a question, and then we're free to take a break.  Okay?

A.  Yes, sir.

Q.  All right.  Let me know if I ask a question that is unclear or you don't understand.  Okay?

A.  Yes, sir.

Q.  And Ms. Cave might object to some of the questions that I ask, and it's kind of a placeholder because there's no judge to rule on whether my question is proper.  So if she objects, you still have to answer the question.

A.  Yes, sir.

Q.  Does that make sense?

A.  Yes, sir.

Q.  Okay.  We have met before, correct?

A.  Yes, sir.

Q.  Okay.  And I asked you some questions about GAW Miners and Stuart Fraser.  Does that sound right?

A.  That's correct.

## Page 9

Homero Joshua Garza

Q.  And we have corresponded about this deposition over e-mail, correct?

A.  Yes, sir.

Q.  And -- but we haven't discussed the substance of the deposition; is that fair?

A.  Yes, sir.

Q.  So I haven't told you what questions I'm going to ask you and you haven't given me answers you're going to give or anything like that, right?

A.  Yes, sir.

Q.  Okay.  So, Mr. Garza, where are you from?

A.  Can you clarify that question, please.

Q.  Sure.  Where did you grow up?

A.  Outside the Houston area.

Q.  Okay.  And at some point, did you move to the northeast?

A.  Yes, sir.

Q.  Okay.  To Vermont?

A.  Yes, sir.

Q.  Okay.  And how old were you when you moved to Vermont?

A.  I believe 17.

Q.  Okay.  And so did you attend high school in Vermont?

Homero Joshua Garza

1
2  A.  Yes, sir.
3  Q.  Okay.  And did you graduate high school?
4  A.  Yes, sir.
5  Q.  Did you go to college?
6  A.  No, sir.
7  Q.  Do you have any professional certifications?
8  A.  Can you clarify?
9  Q.  Sure.
10          Licenses.
11  A.  At that time?
12  Q.  At all.
13  A.  I have various technical certifications.
14  Q.  Okay.  Can you tell me what they are?
15  A.  I would -- I do not recall what all of them
16  are.
17  Q.  Do you remember any of them?
18  A.  They are specific to technical manufacturers,
19  so I do -- but I'd rather not speculate.  It's been a
20  long time.
21  Q.  Okay.  Is it anything having to do with
22  programming, anything like that?
23  A.  Pri- -- they're primarily IT and technical in
24  na- -- in nature.
25  Q.  Okay.  Software development kinds of

Homero Joshua Garza

1
2  certifications; is that what we're talking about?
3  A.  Primarily networking certifications.
4  Q.  Okay.  What does -- what does that mean,
5  "networking certifications"?
6  A.  Networking, building, you know, systems that
7  allow computers and servers and things to communicate
8  with each other.
9  Q.  Okay.  And after you graduated high school,
10  what did you do for work?
11  A.  I started a company called Optima Computers.
12  Q.  Okay.  So what was GAW Miners?
13  A.  Can you clarify that question?
14  Q.  Sure.
15          It's -- well, what was GAW Miners'
16  business?
17  A.  Can you clarify that a little bit more?
18  Q.  Sure.  What did GAW Miners do?
19  A.  GAW Miners sold mining hardware and cloud-based
20  mining software.
21  Q.  Okay.  And who is Stuart Fraser?
22  A.  Stuart Fraser -- can you clarify that, please?
23  Q.  Sure.
24          What was -- what's -- well, let's put
25  it -- how about this.  In 2014, what was your

Homero Joshua Garza

1
2  relationship with Stuart Fraser?
3  A.  A business partner and friend.
4  Q.  Okay.  And GAW Miners, it -- it sold a product
5  called hashlets, correct?
6  A.  Correct.
7  Q.  And did it sell a product called PayCoins?
8  A.  Yes, sir.
9  Q.  And did it sell a product called HashPoints?
10  A.  Yes, sir.
11  Q.  Okay.  And did it sell a product -- well,
12  strike that.
13          Did GAW Miners sell a product called
14  HashStakers?
15  A.  Yes, sir.
16  Q.  Okay.  Did GAW Miners register any of those
17  products as securities?
18  A.  Not to my knowledge.
19  Q.  Okay.  Currently do you know anything about the
20  rules regarding registration of securities?
21  A.  A small amount.
22  Q.  Tell me what you know.
23  A.  There are certain types of products that
24  given -- there are certain kinds of products that need
25  to be registered as securities.  I'm not sure I can

Homero Joshua Garza

1
2  elaborate much more.
3  Q.  Okay.  Do you know whether -- okay.  Strike
4  that.
5          Do you know whether Mr. Fraser was aware
6  of the rules regarding registration of securities in
7  2014?
8          MS. CAVE:  Objection to the form.
9  A.  I can't -- cannot speculate whether he was or
10  wasn't.
11  Q.  (BY MR. WATTERSON)  Okay.  Do you think that he
12  should have been aware of the rules regarding
13  registration of securities?
14          MS. CAVE:  Objection to the form.
15  A.  Again, I prefer not to speculate.
16  Q.  (BY MR. WATTERSON)  I'm just asking you if you
17  think he should have been aware?
18          MS. CAVE:  Objection to the form.
19  A.  Yes, I believe he should have been aware.
20  Q.  (BY MR. WATTERSON)  Okay.  How did you meet
21  Mr. Fraser?
22  A.  Through -- through fulfilling a -- a need, you
23  know, that he had, you know, as an IT consultant.
24  Q.  Okay.  And was that through Optima Computers?
25  A.  Yes, sir.

Page 14

Homero Joshua Garza

2    Q.  Okay.  And what need did Mr. Fraser have that
3  you fulfilled?
4    A.  Initially, he was looking to create a
5  wireless -- or an outdoor Wi-Fi-based network for his --
6  one of -- his campground.
7    Q.  Okay.  And approximately -- well, strike that.
8      So you had helped set up a wireless
9  network for the campground; is that right?
10   A.  Yes, sir.
11   Q.  Okay.  And approximately when was that?
12   A.  I do not recall.
13   Q.  Okay.  Was it -- well, it was after you
14  graduated high school, right?
15   A.  Yes, sir.
16   Q.  But would you have been younger than 25?
17   A.  Yes, sir.
18   Q.  Okay.  About 20, does that sound right?
19   A.  That sounds accurate.
20   Q.  Okay.  And how would you describe your
21  relationship with Mr. Fraser when you first met?
22   A.  Can you clarify that question?
23   Q.  How would you characterize your relationship
24  with Mr. Fraser when you initially met him?
25   A.  Pleasant.

Page 15

Homero Joshua Garza

2    Q.  Okay.  And did your relationship with
3  Mr. Fraser change over time?
4    A.  Yes, sir.
5    Q.  How did it change?
6    A.  We went from a pleasant, you know, business
7  relationship that -- where I was performing work for him
8  to becoming good friends --
9    Q.  Okay.
10   A.  -- and business partners.
11   Q.  Okay.  And did that relationship -- has that
12  relationship changed since then?
13   A.  Can you clarify, please?
14   A.  Well, yeah, it's a little unclear.
15     So I take it you're no longer business
16  partners with Mr. Fraser?
17   A.  That's correct.
18   Q.  And when did that business-partner relationship
19  end?
20   A.  I do not recall the date, but it was somewhere
21  around the time the SEC started to make inquiries into
22  GAW Miners.
23   Q.  Okay.  Does February 2015 sound right?
24   A.  That sounds about right.
25   Q.  And do you still consider yourself friends with

Page 16

Homero Joshua Garza

2  Mr. Fraser?
3    A.  No.
4    Q.  So before the SEC inquiry, did you consider
5  Fraser to be a mentor?
6    A.  Absolutely.
7    Q.  Did you consider him to be a sort of father
8  figure?
9    A.  Yes, sir.
10   Q.  And would you describe Mr. Fraser as a typical
11  investor?
12   A.  No, sir.
13     MS. CAVE:  Objection to the form.
14   Q.  (BY MR. WATTERSON)  Okay.  Why wasn't
15  Mr. Fraser a typical investor?
16   A.  A typical investor primarily bases -- the basis
17  of the relationship is typically financial.
18   Q.  Uh-huh.
19   A.  Performance and things of that nature are, you
20  know, financial.  And that was not the basis of
21  measuring performance or the basis of, you know, the way
22  investments were made.
23   Q.  So what was the basis of measuring performance
24  with Mr. Fraser?
25     MS. CAVE:  Objection to the form.

Page 17

Homero Joshua Garza

2    A.  His personal perspective or feeling about what
3  was happening at that time.
4    Q.  (BY MR. WATTERSON)  Can you give me an example?
5    A.  So, for example, if funds were allocated to
6  provide Internet to a town, a typical investor
7  relationship, the success or failure of the way those --
8  you know, that -- you know, that initiative and the way
9  those funds were used would be primarily based on the
10  completion of that objective.
11     In Mr. Fraser's case, it was based on how
12  much he enjoyed discussing it, talking about, you know,
13  the process.  It, you know, was really more -- a lot
14  more based around -- really, you know, he just
15  personally enjoyed what we were doing and what was going
16  on regardless of the -- most of the time regardless of
17  the outcome -- the financial outcome of a situation.
18     We'd spend, you know, hours almost every
19  day, you know, discussing things of that nature.  So
20  does that accurately answer the question?
21   Q.  Thank you.
22     So when you say you would discuss business
23  operations, would you be discussing -- well, strike
24  that.  It's a bad question.
25     When you would talk on the phone with

Page 22

Homero Joshua Garza

1
2     Q.  Okay.  Would it have been before GAW Miners?
3     A.  Yes, sir.
4     Q.  And did you ever pay back the -- the note to
5  Mr. Fraser?
6     A.  No, sir.
7     Q.  Okay.  Have you spoken to Mr. Fraser since the
8  SEC began looking into GAW Miners?
9     A.  Not to my knowledge or memory.
10    Q.  Have you attempted to communicate with him
11 since the SEC's subpoena?
12    A.  I believe so.
13    Q.  By e-mail?
14    A.  E-mail and phone, I believe.
15    Q.  Okay.  Have -- who's Dave McLain?
16        THE REPORTER:  David who?
17        MR. WATTERSON:  Dave McLain.
18    A.  Dave was a friend of Stuart's.  Similar to me,
19 he was in Stuart's book, I believe, and so he was a
20 close friend.  And I believe he did legal work for
21 Stuart.
22    Q.  (BY MR. WATTERSON) Okay.  Did -- have you
23 attempted to talk -- strike that.
24        Have you attempted to communicate to
25 Mr. Fraser through Dave McLain?

Page 23

Homero Joshua Garza

1
2     A.  Yes, sir.
3     Q.  How many times?
4     A.  I would not be able to remember.
5     Q.  Okay.  What did you attempt to communicate --
6  strike that.
7        Since the SEC's subpoena, what have you
8  attempted to communicate to Mr. Fraser?
9     A.  To the best of my knowledge, because -- because
10 of Stuart -- the nature of how regularly we
11 communicated, I noticed that, you know, that
12 communication stopped when the SEC situation started.
13 So after not hearing back from him for a little while, I
14 believe that I had asked David, you know, if he knew,
15 you know, if there was a reason.  And I believe that he
16 had told me that he -- he wanted to communicate through
17 David versus communicating directly.
18    Q.  Okay.  So did Mr. McLain communicate anything
19 back to you from Mr. Fraser after the SEC started
20 looking into GAW?
21    A.  It's likely, but I do not remember.
22    Q.  Okay.  Would those communications have occurred
23 over the phone?
24    A.  I do not recall.
25    Q.  Would they have -- do you remember if they

Page 24

Homero Joshua Garza

1
2  would have occurred by e-mail?
3     A.  E-mail would be the more likely way.
4     Q.  Okay.  Would you have any of those e-mails --
5  well, strike that.
6        Do you know if you have any of those
7  e-mails?
8     A.  It's possible.
9     Q.  Okay.  Would you be willing to check?
10    A.  Would I be willing to check?
11    Q.  Yes.
12    A.  Yes, sir.
13    Q.  Okay.  I think a little bit earlier you
14 mentioned that, prior to the SEC looking to GAW Miners,
15 you had communicated regularly with Mr. Fraser; is that
16 fair?
17    A.  Absolutely.
18    Q.  Okay.  And did you communicate regularly with
19 him in 2014?
20    A.  Yes, sir.
21    Q.  Okay.  And was it typically by phone?
22    A.  Yes, sir.
23    Q.  Okay.  Did you ever meet in person in 2014?
24    A.  Yes, sir.
25    Q.  Do you know approximately how many times?

Page 25

Homero Joshua Garza

1
2     A.  Two to three times.
3     Q.  Okay.  Where -- where do you remember meeting
4  Mr. Fraser?
5     A.  Primarily at his house.
6     Q.  Okay.  When you say "house" -- strike that.
7        Does Mr. Fraser have more than one house?
8     A.  Yes, he does.  I'd have to clarify, his house
9  in Armonk.
10    Q.  Okay.  What do you remember about --
11        THE REPORTER:  His house in where?
12        THE WITNESS:  Armonk, New York.
13        THE REPORTER:  Thanks.
14    Q.  (BY MR. WATTERSON)  Sure.  Can you tell me
15 about what you remember from those meetings?
16    A.  I remember discussing the nature of -- you
17 know, general discussion about cryptocurrency, you know,
18 plans for GAW Miners, his involvement, things of that
19 nature.
20    Q.  What do you remember about discussions about
21 Mr. Fraser's involvement --
22        MS. CAVE:  Objection to the form.
23    Q.  (BY MR. WATTERSON)  -- in GAW Miners?
24        MS. CAVE:  Objection to the form.
25    A.  Can you repeat that question?

Page 26

Homero Joshua Garza

Q. (BY MR. WATTERSON)  Sure.  You had said that you remember discussing Mr. Fraser's involvement in GAW Miners; is that fair?

A. Yes, sir.

Q. Okay.  What do you remember about those discussions?

A. Everything from him providing, you know, investments, loans to the company, seeking advice, things of that nature.

Q. When you say -- strike that.

When you say "seeking advice," you mean you were seeking advice from Mr. Fraser?

A. Yes, sir.

Q. And what kind of advice were you seeking from him?

A. Primarily how to -- how -- how to best position, you know, the cryptocurrency products that we were selling.  I assumed, based on his background, that he was a good resource to know because it evolved over time.  As I learned that it was less of a technical product and more it was a financial product, then I, you know, sought his advice about, you know, how it should be sold and ideas I had about how it should be sold, things like that.

Page 27

Homero Joshua Garza

I'm asking him to, you know -- him to ask Cantor for help and things of that nature.

Q. So you -- can you describe what you meant by the products involving -- evolving from a technological product to a financial product?

A. Sure.  As I first -- when we started the company, we primarily sold hardware.  Over time, we sold -- the hardware evolved into selling -- you know, selling -- it's been worded a bunch of different ways, but I guess selling a hashlet, okay, as you said earlier, a --

THE REPORTER:  Selling a?

THE WITNESS:  A hashlet.

THE REPORTER:  Thanks.

A. -- and that that generated amounts of cryptocurrency to people that purchased it, and so -- so -- so it evolved from hardware and became a lot more financial based.

So I remember, let's say, meeting with him about how we should go about, you know, selling it, you know, were we breaking rules in the way we were doing it.

I believe that's when he recommended Dave McLain getting involved.  And that was primarily when I

Page 28

Homero Joshua Garza

had asked him to, you know, reach out to people he knew at Cantor to provide advice to us as well.

Q. (BY MR. WATTERSON)  Okay.  Can you remember anything more specific about the advice you sought from Mr. Fraser regarding selling these financial products?

MS. CAVE:  Objection to the form.

Q. (BY MR. WATTERSON)  Well, hold on.  Let me reask it.

So earlier you -- you said that you sought advice from Mr. Fraser about -- well, strike that.

Is it fair to say that you sought advice from Mr. Fraser about selling hashlets?

A. Many times, yes.

Q. Okay.  Can you tell me what specific advice you sought from him?

A. It ranged from pricing to the, you know, origin of hashlets, the concept of oversubscribing, you know, the amount of people that purchased hashlets relative to the amount of mining power and whether or not we were, you know, legally able to do that or not.

Q. Can you explain what you mean by "the concept of oversubscribing"?

A. Sure.

As the product evolved from hardware to

Page 29

Homero Joshua Garza

becoming software, a hashlet represented a unit of power, mining power, cryptocurrency, you know, capacity, so it was relative --

MS. CAVE:  Please mute the line.

A. It was relative to consider, as the hashlets were being sold, how we would handle the hardware that supported the payouts of those hashlets; and when the concept of hashlets was first discussed, I became aware that, because it was no longer hardware and it was software, it would become possible for those to no longer match each other.

Q. (BY MR. WATTERSON)  So -- oh, go ahead.

A. And -- and so I didn't know whether or not that was going to be a problem if they matched each other or not.

Q. So you discussed that with Mr. Fraser?

A. Yes, sir.

Q. Okay.  And you -- you mentioned that Mr. Fraser suggested that Dave McLain get involved; is that correct?

A. Yes, sir.

Q. Did you discuss this oversubscribing issue with Mr. McLain?

A. Yes, sir.

Page 30

Homero Joshua Garza

Q. Was -- was Mr. Fraser present during those discussions with Mr. McLain?

A. I do not recall.

Q. Okay. Can you describe your discussion with Mr. McLain?

A. Can you clarify, please?

Q. Sure.

With respect to the oversubscribing issue, can you describe your conversations with Mr. McLain on that issue?

A. I believe that we first met about it at our -- our offices in Connecticut. And I was asked to take Dave, Mr. McLain, through, you know, just everything about the business, everything as far as it led up to the point that we were at, to include, you know, hashlets and the way that they were being sold.

Q. Okay. Earlier we were talking about the kind of advice you sought from Mr. Fraser. Is it fair to say that you asked for advice about potential regulatory issues?

MS. CAVE: Objection to the form.

Q. (BY MR. WATTERSON) Strike that. Let me -- let me ask it a different way.

Did you seek advice from Mr. Fraser about

Page 31

Homero Joshua Garza

regulatory issues that might affect hashlets?

MS. CAVE: Objection to the form.

A. Yes, sir.

Q. (BY MR. WATTERSON) Okay. And what kind of advice did you seek from Mr. Fraser?

A. I asked him whether or not -- you know, whether or not we were dealing with what could be considered securities and whether or not we'd have to register those security -- you know, if it was a security, whether or not we'd have to register it as a security. Whether or not -- if we created our own cryptocurrency, whether or not a trading system could be created for it because of Mr. Fraser's experience with eSpeed. So it was regulatory -- and, generally, if he was able to get help or advice for things that he didn't know from resources at Cantor.

Q. And you mentioned eSpeed. What is eSpeed?

A. ESpeed, as I understand it, is a type of trading system that I think became BGCP.

Q. And Mr. Fraser had some involvement with eSpeed; is that right?

A. My understanding is he led the creation of eSpeed.

Q. So you considered him someone that would be

Page 32

Homero Joshua Garza

knowledgeable about exchanges; is that fair?

A. Highly.

Q. Okay. Did you discuss -- strike that.

Do you remember any specific discussions you had with Mr. Fraser about creating a cryptocurrency exchange?

A. Yes, sir.

Q. Can you describe those conversations?

A. It would be difficult to describe because there were so many. But we discussed them to the extent of me visiting his offices in New York and meeting with Cantor Fitzgerald staff about, you know, the thing -- you know, that was one of the topics of discussion.

Q. Okay. So let's -- let's talk about that. You visited Cantor Fitzgerald's staff sometime in 2014; is that right?

A. Yes, sir.

Q. Do you remember when?

A. It was towards the end of the year.

Q. Okay. And was that a meeting that Mr. Fraser facilitated?

A. Yes, sir.

Q. Okay. And do you remember who you met with at Cantor Fitzgerald?

Page 33

Homero Joshua Garza

A. I do not re- -- the only person I specifically remember is briefly meeting with Howard.

Q. Okay. And who is Howard?

A. Howard is Stuart -- I believe Stuart's business partner.

Q. Okay.

A. And he, you know, gave us advice while we were there.

Q. And earlier you had mentioned a meeting of someone at Mr. Fraser's 50th birthday party. Were you referring to --

A. Howard, yes, sir.

Q. Okay. And is his name Howard Lutnick?

A. Yes, sir.

Q. Okay.

THE REPORTER: Howard?

THE WITNESS: Lutnick, I think L-U-T-N-I-K.

MS. CAVE: C-K.

THE WITNESS: C-K.

Q. (BY MR. WATTERSON) Okay. And you mentioned that you received some advice from Mr. Lutnick; is that right?

A. Yes, sir.

Page 46

Homero Joshua Garza

1
2  doing business, put him in a position that allowed him
3  to retain the title of vice chairman but not have any,
4  you know, role inside the company.  And I believe that
5  Howard made that decision for him.
6      Q.  (BY MR. WATTERSON)  And that's based on
7  discussions you had with Mr. Fraser?
8      A.  Yes, sir.
9      Q.  Okay.  And you said because of the nature of
10 going about doing business that Mr. Fraser had.  What do
11 you mean by that?
12     A.  So it sort of pertains to the question you
13 asked me earlier about a typical investor.  Stuart often
14 did things for -- in my -- my interpretation, he often
15 did things for entertainment because he liked the -- you
16 know, sort of the drama or the, you know, feeling of
17 relevancy versus following, you know, rigorous business
18 objectives.
19         So it would often be in situations where
20 we'd be off task or doing something completely different
21 or things like that, and so what I mean by that is that
22 over time, as we became closer, I started to notice
23 that -- that those sorts of things had existed prior to
24 my relationship with him and -- started, you know, at
25 Cantor.

Page 47

Homero Joshua Garza

1
2         And, you know, when I -- indicated to me
3  that he was, you know, for a set position where he --
4  you know, Howard took over and Howard made it to where
5  he got to keep the title of vice chairman but -- you
6  know, but that he didn't really have an active role in
7  that company.
8         So -- so while he never, you know,
9  directly said, "Well, it's because of, you know, this,"
10 I mean, it was pretty easy, you know, again in my
11 opinion, to deduce that, you know, the reasons were
12 because of, you know, the way that he operates in a
13 business environment.
14     Q.  Did you consider Mr. Fraser to be knowledgeable
15 about financial products?
16         MS. CAVE:  Objection to the form.
17     A.  Very.  He would often, even prior to GAW
18 Miners, explain and tell me things that I never even got
19 close to understanding.  He was extremely knowledgeable
20 about it.
21     Q.  (BY MR. WATTERSON)  Things about financial
22 products?
23     A.  Yes, sir.
24     Q.  Did you consider Mr. Fraser to be knowledgeable
25 about securities?

Page 48

Homero Joshua Garza

1
2      A.  Within the context of the time, not really
3  knowing what securities were but just knowing that they
4  were financial based and he knew a lot about financial
5  products, then that would -- you know, that would have
6  been how I would have...
7         In other words, you know, I didn't
8  immediately know we were dealing with a security and
9  then say, "Oh, Stuart knows about securities."  I
10 assumed that it was a financial -- you know, there was a
11 financial component to what we were doing.  Later I
12 found it was a security, but I believe that, you know,
13 Stuart knew the ins and outs of that.
14     Q.  Okay.  So earlier we discussed Optima
15 Computers.  Did Mr. Fraser have any role in Optima?
16     A.  Can you clarify?
17     Q.  Sure.
18         Was he involved in any way other than as a
19 customer?
20     A.  He became an investor into Optima.
21         THE REPORTER:  An investor?
22         THE WITNESS:  An investor into Optima.
23         THE REPORTER:  Thanks.
24         THE WITNESS:  I'm sorry.
25         MR. WATTERSON:  Let's mark this as 240.

Page 49

Homero Joshua Garza

1
2         (Exhibit 240 marked.)
3      Q.  (BY MR. WATTERSON)  Exhibit 240 is an e-mail
4  from you to Mr. Fraser, and it's forwarding a document
5  called ManagementProfiles.doc.  Do you see that?
6      A.  Yes, sir.
7      Q.  And I gather that this document is related to
8  Optima; is that right?
9      A.  Yes, sir.
10     Q.  And under the management profiles, it says that
11 Stuart Fraser is board chairman of Optima Computers and
12 its subsidiary organizations.  Do you see that?
13     A.  Yes, sir.
14     Q.  Was Mr. Fraser the board chairman of Optima
15 Computers?
16     A.  Well, we didn't, you know, really have a board
17 at Optima, you know, in the nature of like what an
18 actual board is, you know, so this title was chosen
19 because Stuart was -- Stuart was in charge of, you know,
20 like, you know, all things.  So the most appropriate
21 title that Adrian thought of that encompassed, you know,
22 the amount of control and power Stuart had was chairman
23 of the board.
24     Q.  And --
25     A.  In other words, if I may clarify, for example,

Page 50

Homero Joshua Garza

1  typical investor in a business, there are limitations
2  to -- generally, there are limitations to the control
3  that they have.
4       In Stuart's case, he -- you know, that
5  control extended, you know, across everything to who he
6  hired, how he hired, everything, so...
7       Q.  First of all, who -- who's Adrian?
8       A.  Adrian was an employee of Optima Computers.
9       Q.  Do you know Adrian's last name?
10      A.  Eames.
11           Adrian Eames.  It's on the first page.
12      Q.  Sorry, which page?
13      A.  Page 1.
14      Q.  Ah, Adrian Eames.  Okay.
15           And you said that Mr. Fraser had control
16  over Optima; is that right?
17      A.  Over everything we did together.
18      Q.  Including GAW Miners?
19      A.  Yes, just not in the traditional sense, if you
20  ask me to clarify.
21      Q.  In what sense did Mr. Fraser have control of
22  GAW Miners?
23      A.  Between Stuart and I, never really -- things
24  were never really bound always to, you know, what was

Page 51

Homero Joshua Garza

1  written on a piece of paper, you know, because Stuart
2  became such a strong mentor and, you know, kind of
3  father figure, and I was fully financially reliant, you
4  know, on him, he -- he had, you know control because
5  he -- over everything we did because he had full control
6  over me.
7       So what I mean by "not in a traditional
8  sense" is that, you know, if he wanted something to work
9  a certain way, it was -- you know, it was possible and I
10  think a few times inferred, that, you know, he could
11  make decisions that, you know, would, you know, affect
12  me personally.
13      Q.  You said that he had full control over you.
14           What do you mean by that?
15      A.  If -- if it were Saturday and Stuart called me,
16  the first thing he would ask me in all -- in almost
17  every call is, "What are you doing?"  And if I didn't
18  say something work-related, he would, you know, sigh and
19  be upset and then pause and wait for me to tell him
20  something that I'm about to go do that has something to
21  do with work.
22           I remember him being upset that we had one
23  of -- I can't remember -- I think it was our first
24  child, but I remember him being upset that we chose to

Page 52

Homero Joshua Garza

1  have a child because it might interfere with my work.
2       I remember him literally being upset
3  because we decided to get a dog, and he thought that
4  would impact my work, and that he told me that I, you
5  know, shouldn't do that.  So...
6       Q.  Why didn't you just tell him no?
7       A.  Because at that point, you know, all -- the
8  whole company, all of staff, myself and everything were
9  fully financially relying on him.
10      I mean, and it's fair to say, I mean, I
11  also felt like because of our role, you know, like he
12  was kind of like a father figure, like I didn't
13  really -- you know, it wasn't always -- it wouldn't be
14  fair to say it was always because I made the decision
15  based on whether or not he would, you know, give us our
16  next -- you know, that was always sort of in the back of
17  my mind, but I always felt like I would disappoint or
18  let him down or he'd be upset with me if -- if I didn't
19  do, you know, what he was asking.
20      It's hard to describe.  I mean, it's --
21  the only way you can describe it is like a parent, you
22  know, like even if you're a grown adult and your mother
23  says to do something like --
24      Q.  I understand.

Page 53

Homero Joshua Garza

1       A.  Yeah.
2       Q.  You had said -- I think when you were -- you
3  mentioned something about "giving us our next."  What
4  did you mean by that?
5       A.  Our next, you know, investment into the
6  company.  Because a lot of the activities that we were
7  involved in, you know, required continuous --
8  Stuart's -- Stuart's -- one way Stuart maintained
9  control is that he would never give the company like --
10 so in a -- a traditional investor would -- you would go
11 to them and say, "I'm going to do X, Y, and Z
12 initiative.  Here's the financial model for it.  Here's
13 how much it would cost.  Do you want to invest in that?
14 And I'd say it's $100,000."
15      Stuart's case, Stuart would say -- this is
16 an example.  He would say, "Okay.  We'll do it, but I'll
17 give you $10,000 right now, and then you need to come
18 back and ask me for the next 10,000."  So Stuart
19 maintained control because he -- we always -- like we
20 only ever had enough money until the next time I had to
21 ask him again, and he -- I, you know, argued many times
22 against that, but he liked it that way because, you
23 know, it made it to where I had to come back and ask him
24 every time.

Page 54

Homero Joshua Garza

And -- and to just clarify, I know this to
be because one day he told me that, that that was his
way of maintaining control -- it was when I was working
at a company called Smart Tech -- that his way of
maintaining control was because he, you know, wasn't
willing to lose control by providing, you know, the
investing we needed once and just allow us to perform,
that I needed to come back and ask each time.

Q.   What was Smart Tech?

A.   Smart Tech was just a business -- a business
initiative that I -- I decided -- you know,
originally -- I started originally as an initiative
that I was hoping, you know, that I could sort of have
on my own.  And then after a few months, then Stuart
became involved in that as well, did IT services, phone
services, stuff like that.

Q.   Okay.  Can you tell me anything more about this
conversation you referenced with Mr. Fraser?

A.   Which conversation?

Q.   Sorry.

The conversations about sort of, I guess,
giving you payments in installments to maintain control,
can you tell me more about that conversation?

A.   In that specific conversation, by the time --

Page 55

Homero Joshua Garza

enough time had passed that I started to suspect that
there was something unnatural about the way that -- that
things financially worked like -- so I started to look
at other, you know, examples and ways and -- and learned
that that's, like, not how people normally invest into
things.

So I, you know, made a point to, like, say
some -- like, I'm like, "This -- these are the reasons
why, like, investing in this way is a problem.  You
know, no one knows if they're going to have a job
next -- like, no one -- like it scares everyone."  And
that's -- so that was the instigator of him telling me
that he -- okay, so I remember he specifically told me
that in the past, he had given other companies full
amounts of money they were asking for, and it didn't go
as planned and so -- I don't remember what they were,
whatever.

I just remember him telling me that, and
that it was his perspective that the way -- you know,
the appropriate amount of control to -- you know, that
needed to be maintained was to -- is that every time,
you know, the money he had given was exhausted, that I
would need to come back and ask him again.

Q.   So I'll hand you this document, which was

Page 56

Homero Joshua Garza

previously marked as 160, and this is something that you
haven't seen before, I assume, but I'll represent to you
what this document is is -- in this litigation, there
were a number of financial records produced by
Mr. Fraser.

So what we did is we looked at all of
those records and tried to compile them into one
spreadsheet, and so this represents bank statements,
buyer, confirmations, things like that.

But essentially they're payments from
Mr. Fraser to either you or, you know, companies that
you and Mr. Fraser operated together.  So that's what
this document is.

But I guess I just wanted to ask you, it
seems like there are many transactions here; is that
fair?

A.   Right.  I mean, basically, like the -- I mean,
so, A, you're correct, I've never seen this.  And, B,
you can see the exact thing I was just describing in
this because not only can you see the amount of
transactions, but you can even see, like, how odd each
amount is.  Like they're just -- because they're -- like
that's the -- they're all different because it was
always enough money to the next time.

Page 57

Homero Joshua Garza

You know, that's why there's no
consistent- -- you know, there's little consistency in
the total amounts.  One's 25, one's 30, one's 10, and
one's -- you know, then it jumps up to 25.  These all
represent, you know, the requests that I made.

Q.   And so let me ask this:  When I was going
through these financial records, I would see that
sometimes it would look like the transfer was made to
you directly.  For example, I have one on 4/20/2006 on
the first page, where I -- I saw the recipient looked
like it was you as opposed to a company.

Do you see where I'm talking about on this
first page?

A.   I'm sorry, what was the number?

Q.   It's on April 20th, 2006, on the first page.

A.   Yes, sir.

Q.   Would -- so did Mr. Fraser ever send you money,
like a personal bank account?

A.   Yes, sir.

Q.   And would that be for your -- if he did that --
strike that.

If Mr. Fraser sent you money to a personal
bank account, would that mean the money was for your
personal use?

Page 70

Homero Joshua Garza

2  A.  Yes, sir.
3  Q.  Okay.  What -- I think we -- we mentioned Smart
4  Tech earlier.  I believe you said that Mr. Fraser,
5  eventually, became involved in Smart Tech; is that
6  right?
7  A.  Yes.
8  Q.  What was his involvement in Smart Tech?
9  A.  At first, it was -- it started out as just, you
10  know, sort of the same mentorship advice and then it
11  became financial.
12  Q.  So he invested in Smart Tech as well?
13  A.  Yes, sir.
14  Q.  Do you know approximately how much?
15  A.  No, sir.
16  Q.  Did Smart Tech have its own bank account?
17  A.  I do not recall.  I feel like it did, but I do
18  not recall.
19  Q.  Okay.
20  A.  They got pretty convoluted then, having so many
21  companies at once, so...
22  Q.  I'm glad it's convoluted for you too.
23      There was also a company called
24  VoiceProdigy.  Does that sound right?
25  A.  Yes, sir.

Page 71

Homero Joshua Garza

2  Q.  What was VoiceProdigy?
3  A.  I think VoiceProdigy and Smart Tech were the
4  same thing.  Maybe that's-- maybe that's how it was
5  named because VoiceProdigy was the product that Smart
6  Tech primarily sold.
7  Q.  Okay.  And what was the product again?
8  A.  It was a Voice over IP-based system.
9  Q.  Okay.  What does "Voice over IP" mean?
10  A.  It's just -- it's likely being used now.  It's
11  just basically a way to have voice without using, you
12  know, PSD or land -- landlines.  It's IP-based.
13  Q.  What was GAW Labs?
14  A.  I believe GAW Labs was an attempt to start
15  structuring the businesses under -- that might have been
16  a different company.  I -- unfortunately, it -- I'd be
17  guessing.
18      I believe that it was an attempt to
19  structure -- you know, structure the businesses under
20  one company as well as use for funding initiatives that
21  were -- you know, things that were outside of -- outside
22  of just normal business operations, like, you know,
23  ideas, maybe things that might have involved patents,
24  things of that nature, to the best of my memory.
25  Q.  Okay.  And did Mr. Fraser have any involvement

Page 72

Homero Joshua Garza

2  in GAW Labs?
3  A.  To the best of my memory, it would have been
4  the same as all the other companies.
5  Q.  Okay.  And you and Mr. Fraser are both
6  inventors on a patent; correct?
7  A.  Yes, sir.
8  Q.  And can you tell me what the invention is?
9  A.  The basic idea is to inject advertisement into
10  web traffic from a web server.  So as you browse the
11  Internet, then we can inject advertisement into
12  different parts of your web browser.
13  Q.  Sounds terrible.
14  A.  To some people, yes.  To most people, yes.
15  Q.  And so what was Mr. Fraser's role in inventing
16  this injection system?
17  A.  He prime -- so he thought of a lot of really
18  good ideas for it.  He funded it and then, you know,
19  sort of helped work through the patent process.
20  Q.  Was the patent ever licensed?
21  A.  Not to my knowledge.
22  Q.  Is it -- do you know whether the patent is
23  still in force?
24  A.  Not to my knowledge.
25  Q.  Do you believe it's not -- no longer in force?

Page 73

Homero Joshua Garza

2  A.  My guess is it's no longer in force.
3  Q.  Do you know why?
4  A.  My guess is it would be expired by now.
5  Q.  Was it -- when was it -- when was the invention
6  patented; do you remember?
7  A.  No, sir.  I just -- the only reason that's my
8  guess is because I feel like I remember seeing in an
9  e-mail that we had to do something or pay something or
10  something like that to renew it or re-up it or
11  something, and I don't believe that whatever that was
12  was done, so...
13  Q.  Okay.  So tell me about how you got involved in
14  cryptocurrency.
15  A.  I got involved in cryptocurrency because --
16  well, I don't remember exactly how I found out about it.
17  Somehow I found out about it and then I found out about
18  mining, and so I purchased, you know, personally, my own
19  miner, and my interest just grew from there.
20  Q.  Okay.  Before we keep going, I want to ask
21  other than the companies that have to do with
22  cryptocurrency, were you and Mr. Fraser involved in any
23  other companies that I haven't talked about already?
24  A.  Not that I can recall.
25  Q.  Okay.  So you bought a miner and your interest

Page 74

Homero Joshua Garza

started -- your interest in cryptocurrency started to
grow.  What's the genesis of GAW Miners?

A.  Well, as I, you know, became more interested in
buying miners, then, you know, I initially found that I
could, you know, at scale, buy them, you know, for less
money, then retail them.  So, you know, one dot
connected to the other, and it seemed to make sense
to -- you know, to buy from that scale to -- and then
sell them in an online store.  And so we talked about it
and decided that it was a good idea and decided to do
it.

Q.  When you said "we decided to do it," who was
the "we"?

A.  I figured you were going to ask that.  The we's
that I can recall would be Dan Pease, a gentleman by the
name -- I can't remember his last name, but first name
was Rami, and Stuart, and possibly others, but those are
the ones I can remember.

Q.  Okay.  And so -- so initially -- well, strike
that.

Is it fair to say that essentially GAW
Miners at first was a reseller of hardware?

A.  Oh, yes, sir.

Q.  Okay.  And did the business change --

Page 75

Homero Joshua Garza

A.  Yes, sir.

Q.  -- in any way?

How did it change?

A.  Well, it changed from selling hardware to then,
you know, hosting hardware for people, and then it
changed from hosting hardware to hashlets.

Q.  Okay.  So can you explain what it means to host
hardware for people?

A.  Sure.

So it was basically, rather than shipping
someone a hardware miner, instead the hardware miner
would be plugged into, you know, a location that the
company, you know, facilitated, and then the user that
owned the hardware miner would have remote access to it.

Q.  How would the user have remote access to the
miner?

A.  We had -- we developed some kind of way -- some
kind of software.  Contrary to popular belief, there
were a lot more people involved in this than, so
some -- I can't remember who it was, but someone in
their company had developed a whole system, which became
ZenMiner, but the original -- you know, initial version
of it just software that, you know, people could use to
access their miner.

Page 76

Homero Joshua Garza

Q.  Okay.  And you said the initial version was
ZenMiner.  What was ZenMiner?

A.  ZenMiner was the -- you know, evolved to become
a piece of software.  The goal of it was to be able to
become an operating system that could manage multiple
kinds of miners, all different kinds of miners, so it
was a cloud-based piece of software that could remotely
manage many miners.

Q.  Okay.  I'll come back to ZenMiner.  So you said
you went to hosted -- hosting miners and then to
hashlets.  What were hashlets?

A.  Essentially, hashlets were -- well, I guess at
first they were just -- we thought of them as just a
piece of software, like a -- like a license to software,
I guess, that represented a specific unit of power, of
mining power.

Q.  It -- and I guess it -- it sounds like you --
your conception of hashlets changed at some point; is
that right?

A.  Yes, sir.

Q.  How did it change?

A.  It changed because -- so internally in the
company, when this concept of hashlets was first
discussed with Shiraz and Stuart, it was --

Page 77

Homero Joshua Garza

THE REPORTER:  Who?

THE WITNESS:  Shiraz, S-H-A-R-I-Z [sic].

A.  -- it was thought of as just like a unit of
power that could be represented by software.

And then over time, as I grew more
concerned that it really wasn't software, that what we
were dealing with was far more than sophisticated, that
it was a financial product, there was a lot more to it;
and I did a lot of my own research and asked, you know,
my opinions outside of, like, Stuart and Dave.  And I
found that it really wasn't software, that it really was
more of a financial product and needed to be treated as
such.

So generally that was how the perspective
changed.

Q.  (BY MR. WATTERSON)  Okay.  And why did you
conclude that it was more of a financial product?

A.  To be honest, just clues from -- you know, we
went to a conference and, you know, I was approached by
different people and they told -- I mean, it was just
different outside input, because by -- we were far
enough into the company that, you know, I believe that
it -- if it was purely a financial product, like, we
would have treated it as such, because that's, you know,

Homero Joshua Garza

Stuart's main business, but we didn't really at that
time think of it like that.

But after -- after I heard, you know, sort
of just -- it's hard to explain, but just like gathered
enough input from reading the news to talking to people,
it just started to seem like it was more of a financial
product.

Q.   Okay.  And you mentioned Shiraz.  Who's Shiraz?

A.   Shiraz was a business adviser to -- well, he
was a business adviser to multiple companies, but in
that capacity, he was a business adviser to GAW Miners.

Q.   Okay.  And what -- at some point -- well,
strike that.

What were HashPoints?

A.   HashPoints?

Q.   Yes.

A.   HashPoints was basically a -- almost like a --
so it was a way that people could earn, like, almost
like in-store credit, like sort of like an internal
value within GAW Miners to then eventually use to
purchase PayCoin.

Q.   Okay.  Let's say that I wanted to -- strike
that.

In order to use a hashlet, would I have to

Homero Joshua Garza

go onto Zen Cloud?

A.   Yes, sir.

Q.   And so is it -- would it be correct to say that
a hashlet only existed in Zen Cloud?

A.   Yes, sir.

Q.   And is it fair to say that a hashlet is not
representative of actual any hardware?

A.   At first it was.  Then it wasn't.  Then it was.

Q.   Can you explain that?

A.   Sure.  At first, it was, you know, thought of
the -- since it was represented as a unit of power, you
know, mining power, then the natural conclusion was
that, you know, there needed to be mining hardware for
that mining power.  And then after discussing it, first
with Shiraz and then with Stuart, then -- I don't
remember exactly how it happened, but it just kind of
evolved into it being viewed more as software.

And, I don't know, somehow this -- it was
awhile ago, but somehow just the software and the
hardware just got disconnected from each other.

And, you know, I remember specifically
talking to Dave McLain about that, and everyone, you
know, seemed to be on board with that.  And then that
went on for some amount of time.

Homero Joshua Garza

And then I found another attorney, like,
non-Dave, and -- who told me that we couldn't do it that
way, and so I went out and started buying hardware
miners so I could try to match the amount of hashlets
that had been sold to the amount of hardware that we
had.  So that's what I mean by it wasn't, then it was,
then it wasn't.

Q.   And when you said everybody was on board, what
do you remember?

A.   Shiraz, Stuart, Dave McLain, Joe Mordica.
That's the list that comes to mind.

Q.   Okay.  I want to go back to Zen Cloud.  On Zen
Cloud, a user would see an image of a hashlet, correct?

A.   Yes, sir.

Q.   What did they look like?

A.   They would look like these little square
metallic-looking things.

Q.   So did they look like a device sort of?

A.   Yeah, they looked kind of like almost like a
processer or a little computer or something like that.

Q.   Okay.  And each hashlet -- well, strike that.

Is it correct to say that each hashlet had
an associated unit of mining power?

A.   Yes, sir.

Homero Joshua Garza

Q.   And when you logged onto Zen Cloud, would --
would that mine power be reflected in Zen Cloud?

A.   I don't specifically recall, but it would be
likely that it would be.

Q.   Okay.  And did the hashlets' price correspond
to its associated mining power?

A.   To an extent.  You know, it correlated to the
mark- -- yes, I mean, I guess, it correlated to the, you
know, sort of open market value of what that power was
worth, so, yes.  I mean...

Q.   How did -- how did you make the determination
of how much mining power was worth on the open market?

A.   We just looked -- you know, generally, knew
what, you know, our competitors in similar products, you
know, were being -- charging and, you know, just priced
accordingly.

Q.   And so a hashlet could be directed at a pool;
is that correct?

A.   Yes, sir.

Q.   What does a "pool" mean in this context?

A.   So in this context, it means rather than a
person mining -- it's been awhile -- but there's some --
there's some kind of downside to mining on your own.  I
can't remember what it is.

## Page 82

Homero Joshua Garza

But rather than mining on your own and dealing with that downside, then you mine with a massive pool of people, and that downside is eliminated or is less of a problem, and so it sort of creates an efficiency by having everyone mine together.

Q. So if a user selected a particular pool, does that mean that actual mining power was directed to that pool?

A. No, what -- what generally happened was that the mining capacity the company did have was pointed to various pools at times. Sometimes it might be pointed to the most profitable pool. But, you know, it didn't -- in other words, like, if you selected a pool, there wasn't, like, a little machine that, like -- a thing or -- you know, it -- it was just software basically.

Q. But the user would be paid out based on --

A. Correct.

Q. -- the -- well, hold on.

A. What the value of that pool was at that time.

Q. Okay. How did you determine what the value of the pool would be?

A. Again, it's been awhile, but I think that it was done like a certain time of day, maybe towards the

## Page 83

Homero Joshua Garza

end of the day. And then I don't know if it was maybe an average or where that pool ended up. It's something to that effect, a number was derived from that pool, and that's how, I guess, it would be paid out.

Q. I want to go back to HashPoints real quick.

So HashPoints were eventually converted into PayCoin; is that right?

A. Yes, sir.

Q. What was the -- do you know what the exchange rate was?

A. I believe, to the best of my memory, that it was, I think, 400 HashPoints to one PayCoin.

Q. Okay. And how else -- well, strike that.

So somebody could -- well, strike that.

When -- do you remember when PayCoin launched?

A. I think it was -- I mean, it was definitely at the end of the year. I feel like it was some -- maybe it was in December, like I said, it would have been.

Q. So -- and is it true that somebody -- well, strike that.

So somebody could acquire PayCoin by exchanging HashPoints, correct?

A. Yes, sir.

## Page 84

Homero Joshua Garza

Q. And at some point, somebody could also mine PayCoin; is that correct?

A. Yes, sir.

Q. And was that -- that was only for a limited amount of time that you could mine for PayCoin?

A. Yes, sir.

Q. Okay. And then prior to the launch of PayCoin, was there any other way to acquire it?

A. I believe that individuals, you know, that had been identified as, you know, having large purchasing ability were offered to buy PayCoins directly at, I guess, a discounted price.

Q. Was there any other way to acquire it?

A. So HashPoints, just buy it directly from the company and mine it. Well, eventually, once it became live, it became exchanges, but, no, I can't recall any way before it was live.

Q. Okay. And there were plans for an ICO, correct?

A. Yes, sir.

Q. And ICO means initial coin offering?

A. Yes, sir.

Q. And what is an ICO?

A. Generally, an ICO is when coin -- like a

## Page 85

Homero Joshua Garza

cryptocurrency coin is presold at a specific amount or a dynamic amount before it actually goes live.

Q. Okay. But there wasn't actually a PayCoin ICO; is that right?

A. Not in a traditional sense.

Q. In what sense was there an ICO?

A. Well, I mean, as I mentioned earlier, different individuals were able to purchase PayCoin because you could obtain HashPoints, and that was sort of another -- yeah, so it was just -- you know, if the essence of an ICO is like, you know, to exchange something in exchange for cryptocurrency value before it actually becomes public, then there are a couple of ways that can be done so it wasn't in the traditional sense.

Q. Okay. And what were HashStakers?

A. So after -- or, actually, right before PayCoin was made publically available, HashStakers were like digital wallets that -- because PayCoin was -- was a proof of -- man, it's been awhile.

Okay. There's like two ways you can have cryptocoin -- or many more, but two ways I know of are -- one is where it's primarily done through, like, physical miners.

And then there's another way where it's

Page 98

Homero Joshua Garza

1
2  was -- it was likely 50/50 or 51/49.
3      And so when I proposed this, he -- like it
4  was in -- it was in conflict with that discussion, and
5  that's why he -- it was a point of tension in conflict
6  because it was in conflict with what we had already
7  agreed on.
8      Q.  So -- so your understanding is that this was
9  a -- a proposal that was, I guess, different than the
10  agreement that actually applied to GAW Miners; is that
11  right?
12      A.  Correct, correct.  Like Stuart felt like
13  that -- so when we agreed that we would split, you know,
14  all our existing and future ventures a certain way, that
15  he felt like -- that because GAW Miners was financially
16  gaining momentum, that I was trying to change that deal.
17      And so, like, when he asked earlier about,
18  like, my opinion about what he -- like, that's how I
19  know that when he finally said, like, yes, like, it
20  really was -- because he was -- he was really angry
21  that -- like, he thought I was, like, changing the deal
22  because GAW Miners was worth more money.
23      And so I proposed this and it created a
24  lot of conflict and tension between us, and so that's
25  sort of why there was some steam gained, and then it

Page 99

Homero Joshua Garza

1
2  sort of stopped because -- and it -- it's one of those
3  things where we -- I kind of think we -- I remember Dave
4  McLain telling me that if I force that issue, like, if I
5  force that -- if I was proposing here, if I kept forcing
6  it, that Stuart and I would -- could potentially end up
7  in a legal conflict, so we just -- the best of my
8  knowledge, we just left it alone.
9      Q.  Okay.  Let's -- if you don't mind, could we go
10  back to Exhibit 65 and just take a look at that org
11  chart again?
12      A.  Yes, sir.
13      Q.  With respect to PayCoin, LLC; PayBase, LLC,
14  Business Technology for Cryptocurrency Ventures, LLC;
15  XPY Investments, LLC; and Business Technology for
16  Cryptocurrency, LLC, all of those companies, did they
17  have separate office space?
18      A.  Not that I'm aware of.
19      Q.  Did they have separate employees?
20      A.  I believe, because you asked earlier about
21  ZenMiner's, I believe ZenMiner had some kind of a
22  separate payroll structure.  But outside of that, I
23  don't think that they had any kind of like separate -- I
24  think this was just like a concept of how it was going
25  to work.

Page 100

Homero Joshua Garza

1
2      Q.  Okay.  So no separate office space?
3      A.  Generally, for this line, I don't believe so.
4      Q.  Okay.  Would any of -- if I say "these
5  companies" for the next few questions, will you
6  understand that I'm referring to these com- -- the
7  companies other than GAW Miners or ZenMiner?
8      MS. CAVE:  Objection to the form.
9      A.  Okay.  Can you rephrase?
10      Q.  (BY MR. WATTERSON)  I'm just trying not to...
11      So PayCoin, LLC; PayBase, LLC; Business
12  Technology for Cryptocurrency Ventures, LLC; XPY
13  Investments, LLC; Business Technology for
14  Cryptocurrency, LLC, those companies were all formed
15  after GAW Miners and ZenMiner, right?
16      A.  I believe so, yes.
17      Q.  So if I refer to those companies as the new
18  companies, will you understand which companies I'm
19  referring to?
20      A.  Yes, sir.
21      Q.  All right.  So did the new companies have their
22  own phone numbers?
23      A.  I do not recall.
24      Q.  Okay.  Did the new companies have their own
25  equipment?

Page 101

Homero Joshua Garza

1
2      A.  Not that I can recall.
3      Q.  Okay.  And I might have already asked this, so
4  I apologize, but did the new companies have their own
5  bank accounts?
6      A.  It's possible, but I don't specifically
7  remember which account -- by that point, I wasn't
8  heavily involved in how that was set up, so...
9      Q.  Okay.
10      THE REPORTER:  You were heavily?
11      THE WITNESS:  I wasn't heavily involved in
12  how the bank accounts were set up.
13      Q.  (BY MR. WATTERSON)  Did the new companies have
14  any corporate resolutions, to the best of your
15  knowledge?
16      A.  To the best of my knowledge, I do not believe
17  so.
18      Q.  Okay.  Thanks.
19      I am going to hand you a document that was
20  previously marked as Exhibit 19.
21      What is Exhibit 19?
22      A.  You're asking me that, what is Exhibit 19?
23      Q.  Yes.
24      A.  (Witness reviews documents.)
25      I think this was the -- I guess -- maybe

Page 102

Homero Joshua Garza

1  I'm wording it wrong, but I believe it's our plea
2  agreement between myself and the Attorney General, if
3  I'm saying that correct.
4      Q.  So you were charged with wire fraud in
5  connection with GAW Miners; is that right?
6      A.  Yes, sir.
7      Q.  And you pled guilty?
8      A.  Yes, sir.
9      Q.  Okay.  Can you turn to -- you see at the top,
10  there's something called file stamp, and it shows the
11  document's 11 pages.  Can you turn to page 9 of 11?
12      A.  Nine of eleven?
13      Q.  Yes.
14          And this is Stipulation of Offense
15  Conduct, which is basically an agreement between you and
16  the Government that this is what you did, fair?
17      A.  Yes, sir.
18      Q.  Okay.  So I wanted to direct you to
19  paragraph 4.  Paragraph 4 describes hashlets and I think
20  it also describes PayCoin as well.  Do you see that?
21      A.  Yes, sir.
22      Q.  Does paragraph 4 accurately describe what a
23  hashlet was?
24      A.  Yes, sir.

Page 103

Homero Joshua Garza

1      Q.  Okay.  And if you take a look at paragraph 5,
2  there's a chart, and it says -- on the -- essentially,
3  on the left, it describes a statement that you made, and
4  then on the right, it describes what the truth is.  Do
5  you see that?
6      A.  Yes, sir.
7      Q.  Okay.  So it says that -- on the right-hand --
8  lower right-hand corner, it says, "The defendant's
9  companies sold more hashlets than were supported by the
10  computing power maintained in their data centers.
11  Stated differently, the defendant's companies sold the
12  customers the right to more virtual currency than the
13  companies' computing power could generate."
14          Do you see that?
15      A.  Yes, sir.
16      Q.  Is that accurate?
17      A.  Yes, sir.
18      Q.  Okay.  And then if you look at the top row,
19  there's a statement, "GAW Miners' parent company
20  purchased a controlling stake in ZenMiner for $8 million
21  and that ZenMiner became a division of GAW Miners."
22          Do you see that?
23      A.  Yes, sir.
24      Q.  Is that a statement that you made?

Page 104

Homero Joshua Garza

1      A.  The com- -- I mean, yes, I was a part of that
2  statement.
3      Q.  Who else was a part of that statement?
4      A.  I would be speculating on all of the
5  individuals involved, so...
6      Q.  Do you remember any without speculating?
7      A.  I believe Joe and Stuart are the ones that I
8  have a high level of confidence in.
9      Q.  Why do you believe Mr. Fraser was involved in
10  this statement?
11          MS. CAVE:  Objection to the form.
12      A.  Because we discussed -- we -- this concept, the
13  idea of ZenMiner being purchased by GAW Miners, came
14  from the concept that you talked about earlier when
15  Great Auk Wireless and GAW Miners are GAW High-Speed,
16  like, when those companies came together, that's where
17  this concept was born from.
18          And Stuart was the one who, you know, came
19  up with that original idea of one -- you know, start
20  spinning up a new company and then having that company
21  buy the assets of another company.  So I talked to
22  Stuart and said basically, "Can we do the same thing?"
23      Q.  (BY MR. WATTERSON)  So if I understand your
24  testimony, Mr. Fraser came up with the concept of GAW

Page 105

Homero Joshua Garza

1  Miners' parent company purchasing a stake in ZenMiner,
2  LLC?
3      A.  No.
4          MS. CAVE:  Objection to the form.
5      A.  Stuart came up with the concept of Great Auk
6  Wireless and GAW Miner -- or, I'm getting the names
7  mixed up, Great Auk Wireless and GAW High-Speed
8  Internet -- remember how, like, one was Vermont and
9  one's Massachusetts?
10      Q.  (BY MR. WATTERSON)  Uh-huh.
11      A.  He came up with the concept of how, like, to
12  get the company out of Vermont, bring it to
13  Massachusetts so, essentially, have two companies that
14  we both have a vested interest in, like, one buys the
15  assets of another.
16          So I remembered that and I brought up to
17  him, "Can we do the same thing with those companies,"
18  and that's how we -- you know, that was how this --
19  like, the whole concept, that's where it came from.
20          So to be clear, he didn't approach me, I
21  approached him to ask him if that would work here.
22      Q.  But is it fair to say that you discussed the
23  statement in this top, left box with Mr. Fraser before
24  the statement was made?

Homero Joshua Garza

1
2    MS. CAVE:  Objection to the form.
3    A.  Yes, I -- what I am not as sure about is the --
4    the figure, total amount.  But the concept of having one
5    company buy another, yes, we did discuss that.
6    MR. WATTERSON:  Let's mark this as
7    Exhibit 241.
8    (Exhibit 241 marked.)
9    Q.  (BY MR. WATTERSON)  Here you go.
10    And Exhibit 241 is something I pulled off
11    the Internet, but my understanding is that this is,
12    essentially, a different website republishing a press
13    release that was made about ZenMiner.
14    Does this look like the press release that
15    was made regarding Geniuses at Work acquiring equity in
16    ZenMiner?
17    A.  Yes, sir.
18    Q.  Okay.  So -- so did you discuss the concepts in
19    this press release with Mr. Fraser before the press
20    release was issued?
21    MS. CAVE:  Objection to the form.
22    A.  Yes.  Yes, sir.
23    Q.  (BY MR. WATTERSON)  Tell me about those
24    discussions.
25    A.  Well, essentially -- and I can't be specific on

Homero Joshua Garza

1
2    exact dates, but at some point, I concluded -- because
3    ZenMiner was truly meant to be a separate company.  In
4    fact, we even interviewed for CEOs.
5    When it became clear that it wasn't in the
6    best interest of the company to make them that way, that
7    it would be, in fact, in the best interest of the
8    company to combine them together, that's when I asked
9    Stuart -- you know, and I'm just being high level, but,
10    essentially, that's when we had the conversation about
11    could we do, like, the same thing here as we did with
12    GAW High-Speed, and that's when I related the two ideas
13    together, and so that's how we discussed it, so...
14    Q.  And what did Mr. Fraser tell you about --
15    strike that.
16    What did Mr. Fraser tell you in this
17    conversation?
18    A.  Well, I don't recall more than him agreeing to
19    the idea.
20    THE REPORTER:  What -- I got it.  Thanks.
21    A.  We had a conversation extensively about,
22    generally, how he, like, brought prior experience about,
23    like, one company buying out another, like I remember, I
24    was talking about --
25    I don't know if that was part of this

Homero Joshua Garza

1
2    specific discussion, so -- but I know it gave me the
3    idea for this, and then that -- you know, that, along
4    with the way we handled Great Auk Wireless, is why I
5    presented that concept, so...
6    Q.  (BY MR. WATTERSON) Do you remember, was this a
7    discussion over the phone?
8    A.  Most likely it's possible that we met in person
9    about it, but I think it was over the phone.
10    Q.  Do you know approximately when you had this
11    conversation with Mr. Fraser?
12    A.  It wouldn't have been long before this
13    happened.
14    Q.  Okay.  I want to switch back to Exhibit 19, the
15    fee agreement.
16    A.  Okay.
17    Q.  And so it says in the left-hand box, a
18    statement, "The market value of a single PayCoin would
19    not fall below $20 per unit because the defendant's
20    companies had a reserve of $100 million that the
21    companies would use to purchase PayCoins to drive up its
22    price."
23    Do you see that?
24    A.  Yes, sir.
25    Q.  And does that reflect a statement that you

Homero Joshua Garza

1
2    made?
3    A.  Yes, sir.
4    Q.  Okay.  I guess it's fair to say that the
5    companies -- GAW Miners made this statement as well; is
6    that right?
7    MS. CAVE:  Objection to the form.
8    A.  Yes.
9    Q.  (BY MR. WATTERSON)  Is it fair to say that GAW
10    Miners made this statement in this left-hand box?
11    MS. CAVE:  Objection to the form.
12    Q.  (BY MR. WATTERSON) Okay.  Strike that.  Hold on
13    a second.
14    Okay.  Let me try to -- I will try to fix
15    it.
16    So the -- do you see the statement in the
17    left-hand box?
18    A.  Yes, sir.
19    Q.  Did GAW Miners make that statement?
20    A.  I believe that the first instance that this
21    statement was made was in a Wall Street Journal article
22    that referenced this $100 million figure that was
23    generated from an interview that I did and Stuart and I
24    did.  I believe that was the first instance where that
25    was made.

Page 114

Homero Joshua Garza

1  finish up with this exhibit.
2  THE REPORTER: Okay.
3  A. (Witness reviewing document.)
4  Okay. I remember.
5  Q. (BY MR. WATTERSON) Okay. So you wrote, "Our
6  entire PayBase and XPY model is flawed." What did you
7  mean by that?
8  A. What I was talking about is that up, until this
9  point, I had genuinely not considered the fact that
10  PayCoin could be -- would -- like could be -- like could
11  be gained in the way I describe it here, that people
12  would, you know, intentionally buy it and just keep
13  selling it over and over.
14  Because what this document doesn't
15  completely go into is that where the $100-million figure
16  came from was -- it equaled the amount of PayCoins that
17  we had left -- the like the white paper outlined a plan
18  where a certain amount of PayCoins were to be owned by
19  the company.
20  And if you took those amount of PayCoins
21  and you multiplied them times 20, then -- so, in other
22  words, the company intended to generate the money that
23  it would need to help increase the floor by selling the
24  PayCoins that the company had on hand.

Page 115

Homero Joshua Garza

1  So that's where the $100 million came
2  from, because we took 20 and multiplied it times the
3  amount the company had on reserves, and you'd have
4  $100 million.
5  So what I was saying here is that because
6  someone can constantly gain the system, and it would
7  keep requiring us to sell PayCoins to sustain that gain,
8  that eventually it would dilute the market where that
9  would no longer be sustainable.
10  Q. Okay. And then let's turn to the first page.
11  You write, "The -- "The fundamental issue is this entire
12  currency was sold under the idea that there would be a
13  floor."
14  A. Uh-huh.
15  Q. And so what did you mean by that?
16  A. Well, that -- so that's what I'm saying, is
17  that the idea was that we could maintain stability in
18  the price of PayCoin, you know, by leveraging the
19  reserve PayCoins the company had; selling them to
20  generate, you know, capital to then help sustain the
21  price of the coin.
22  So -- so the whole idea was that when
23  my -- like, that's what I mean by -- like, when I said,
24  like, the models fall. It's been that way. You know,

Page 116

Homero Joshua Garza

1  the crazy thing is no one has brought it up.
2  Q. Uh-huh.
3  A. -- like, that's what I meant by that, like --
4  because that was the entire plan to begin with, that the
5  reserve PayCoins would help sustain what was in the
6  market; but as you sold more PayCoins, it would create
7  more instability in the market.
8  So what I was saying here is that, you
9  know, we, initially, stated or advertised, however you
10  want to look at it is, you know, one of its values being
11  that it would have a floor.
12  And the floor is the issue because the
13  floor can't be maintained or sustained if the company is
14  constantly selling, you know, PayCoins to help maintain
15  it.
16  Q. Okay. But -- but you write here that the -- is
17  it right to say that you -- you are writing that the
18  floor was a core concept?
19  A. Yes, sir.
20  Q. And was the core concept for the entire
21  community?
22  A. Yes, sir, to -- I believe so.
23  Q. Okay. And you say that if you were to remove
24  the floor, that entire community would -- community

Page 117

Homero Joshua Garza

1  would reject it. Do you see that?
2  A. Yes, sir.
3  Q. Why did you believe that?
4  A. Well, because we essentially got stuck. You
5  know, we had -- you know, collectively, not just me on
6  our own, collectively, all had this idea of subsidizing,
7  you know, the consistency of the value of the coin with,
8  you know, inventory we had on hand, and that would, you
9  know, thus create a floor, and that was the whole reason
10  the community liked the idea of PayCoin to begin with.
11  So if we take that away, it's like --
12  well, I was really about to say like a bait and switch,
13  but I wrote it here like it would be the equivalent of a
14  bait and switch.
15  Q. And you write that "the community would burn us
16  at the stake"?
17  A. Burn us at the stake, yes.
18  THE REPORTER: Burst the?
19  MR. WATTERSON: Would burn us at the
20  stake.
21  Q. (BY MR. WATTERSON) And is it correct that the
22  community figuratively did burn you at the stake?
23  A. Yes, sir.
24  MR. WATTERSON: Okay. Take a break for

Homero Joshua Garza

1
2  lunch.
3        THE VIDEOGRAPHER:  Off the record at 1:23.
4        (Lunch recess from 1:23 p.m. to 2:08 p.m.)
5        THE VIDEOGRAPHER:  On the record at 2:08.
6    Q.  (BY MR. WATTERSON)  Mr. Garza, I'm handing you
7  a document that was previously marked as Exhibit
8  Number 69.  And this is -- I guess it's an article about
9  ZenMiner, and it suggests in the first sentence that
10 ZenMiner partnered with GAW Miners to bring a new miner
11 operating system, controlling unit, and ecosystem to the
12 marketplace.  Do you see that?
13   A.  Yes.
14   Q.  And was it accurate that ZenMiner had partnered
15 with GAW Miners?
16   A.  Not -- no, sir.
17   Q.  Okay.  And it discusses a phone conversation
18 with you, Thomas Fraser, and Rami Abramov.
19        Do you see that?
20   A.  Yes, sir.
21   Q.  Do you remember that phone conversation?
22   A.  Yes, sir.
23   Q.  Can you tell me what you remember about it?
24   A.  This is in reference to the phone conversation
25 that the -- that Scott Fargo conducted.

Homero Joshua Garza

1
2    Q.  Okay.  And who's Scott Fargo?
3    A.  He's the reporter that wrote this.
4    Q.  Okay.  And what did you discuss with Mr. Fargo
5  on this phone conversation?
6    A.  Well, basically, this article would be a result
7  of this discussion.
8    Q.  Sorry.  Go ahead.
9    A.  No, you go ahead.
10   Q.  Okay.  It says that Thomas -- in the first --
11 second full paragraph, where it says, "I spoke on the
12 phone," it refers to Thomas Fraser as Thomas Fraser of
13 ZenMiner.  Do you see that?
14   A.  Yes, sir.
15   Q.  And Thomas Fraser wasn't actually associated
16 with ZenMiner; is that true?
17   A.  No, sir, not up until probably the same day.
18 You know, prior to this interview being asked, I asked
19 Stuart if, you know, Thomas could represent ZenMiners.
20 Otherwise, there would be interview with no one, so
21 Tommy conducted this interview as if he was part of
22 ZenMiners.
23   Q.  Why did you choose, I guess, Thomas Fraser?
24   A.  Because prior to this article being written,
25 Stuart had asked me to -- to reach out to Tommy to see

Homero Joshua Garza

1
2  if -- to -- to get -- you know, get him involved in the
3  business, see if there are -- to look for an opportunity
4  for him to contribute in some way.
5        So when this was brought up, Tommy and I
6  had already had a previous discussion, you know, about,
7  you know, the -- sort of what was generally happening at
8  the company, so, you know, it just -- it made the most
9  sense to talk to him, so -- so I probably should have
10 ran it through Stuart first and then talked to Tommy.
11   Q.  Can you describe your conversation with
12 Mr. Fraser with respect to Thomas Fraser participating
13 in this interview?
14   A.  To the best of my memory, I just essentially
15 told him that, you know, we are having an interview that
16 was going to be performed and, you know, thought that
17 maybe, you know, Tommy could, you know, represent
18 ZenMiners, and that's up to the extent of what I can
19 recall.
20   Q.  Why -- I guess, why have -- have somebody not
21 associated with ZenMiner represent the company?
22   A.  Because the companies weren't -- and while it
23 was created as a separate LLC, they weren't truly two,
24 you know, different companies in the respect that they
25 shared too many resources.

Homero Joshua Garza

1
2    Q.  So why did it matter that they shared
3  resources?
4        THE REPORTER:  They shared --
5        MR. WATTERSON:  Resources.
6        THE REPORTER:  -- resources?  Thanks.
7    A.  That mattered, as well as the fact that, you
8  know, Stuart and I were both in control of both
9  companies, so -- and at the time this was written, the
10 only people that were under the ZenMiner umbrella were
11 developers and things like that.  So, in other words,
12 there would be no way to have this interview because
13 there was no one else to talk to.
14   Q.  (BY MR. WATTERSON)  But why not just say, you
15 know, "I represent a company called GAW Miners and a
16 company called ZenMiner, and here's what we're doing"?
17 I guess why -- what was the point of suggesting there
18 was separation?
19   A.  When ZenMiner was launched, we came, you know,
20 to the conclusion that it would -- that there were
21 benefits of separating the companies, ZenMiner and GAW
22 Miners.  The primary benefits that made the decision
23 were that GAW Miners worked with very specific vendors,
24 and ZenMiners was made to be an agnostic operating
25 system, and there was a concern that there was going to

Page 122

Homero Joshua Garza

1
2  be a conflict of interest between the two companies.  So
3  while, you know, they shared resources to launch and to
4  set up, it was, initially, you know, planned as being
5  two separate companies.
6      Q.  And I think you said that "we made that
7  decision."  Who is the "we" you're referring to?
8      A.  Stuart and Shiraz.
9      Q.  Okay.  Did you discuss this article that
10 Mr. Fargo wrote with Mr. Fraser?
11     A.  Yes, sir.  I think as soon as it was
12 published -- well, in addition to, you know, discussing
13 that it be done, you know, to make sure Tommy could do
14 it, I believe that we spoke on the phone afterwards.
15 And then when the article was published, we -- you know,
16 I sent him a link to it and we discussed it.
17     Q.  Okay.  Can you tell me about the discussion
18 after you sent him the link?
19     A.  To the best of my memory, you know, we were,
20 you know, just pleased that there was -- you know, that
21 there was press exposure and -- and, you know -- you
22 know, Stuart, I remember, "It was a good -- you know,
23 good job," and that was -- I mean, I don't remember, you
24 know, anything beyond just, you know, he was happy with
25 the way that the conversation went, the content of the

Page 123

Homero Joshua Garza

1
2  conver-" -- you know, of the article, and that we got
3  press exposure.
4      Q.  So you don't -- you don't remember Mr. Fraser
5  being upset with this article?
6      A.  Not that I can remember.
7      Q.  Would -- would Mr. Fraser have known there
8  was -- strike that.
9          Do you know whether Mr. Fraser knew GAW
10 Miners and ZenMiner were two separate legal entities?
11     A.  To the best of my knowledge, I believe so.  But
12 I can't, you know, remember definitive -- you know, a
13 specific discussion about it, but it would fall in the
14 purview of something that, you know, we would have
15 discussed, but I...
16     Q.  Okay.  Do you recall whether Mr. Fraser would
17 have known that there was shared resources between GAW
18 Miners and ZenMiners?
19     A.  Yes, sir.
20         MS. CAVE:  Objection to the form.
21     A.  Yes, sir.
22     Q.  (BY MR. WATTERSON)  Okay.
23     A.  There was far too many shared resources.
24     Q.  So in the first sentence in Exhibit 69, it
25 says, "GAW Miner has partnered with ZenMiners to bring a

Page 124

Homero Joshua Garza

1
2  new mining -- new miner operating system, controlling
3  unit, and ecosystem to the marketplace," so would --
4  Mr. Fraser knew that there was no such partnership,
5  correct?
6      A.  Definitely.
7          MS. CAVE:  Objection to the form.
8      Q.  (BY MR. WATTERSON)  and how do you know that he
9  knew that?
10     A.  Because -- a few reasons.  One is that
11 ZenMiners fell into the sort of bucket of discussions
12 about how equity could be set up, that we had some
13 discussions about.
14         We, you know, generally talked about the
15 development of the operating system.  The assembly of
16 the controller for ZenMiners was done out of one of our
17 offices, so, you know, we talked about that.  And then,
18 obviously, you know, post-article, Tommy goes into great
19 detail about him, his background and so forth, so, you
20 know, that was -- obviously, would not have been
21 something that we would have done if, you know, his dad
22 wasn't on board with that.
23         Like I say, that's more speculation, but,
24 you know, between all those, you know, different things,
25 specifically the discussion we had about equity and

Page 125

Homero Joshua Garza

1
2  finding a CEO to eventually, you know, run the company,
3  were things him and I discussed.
4      Q.  So let me -- let me ask this:  Do you know
5  whether -- well, strike that.
6          It seems like you testified that Thomas
7  Fraser and Stuart Fraser had a discussion about this
8  article.  Did I get that right?
9          MS. CAVE:  Objection to the form.
10     A.  That they had discussion between each other?
11     Q.  (BY MR. WATTERSON)  Right.
12     A.  To the best of my knowledge.  I can't, you
13 know, say for certain because obviously it happened, you
14 know, without me.  You know, but I knew Stuart for
15 eight, ten years and knew Tommy for quite a while, and,
16 you know, there's -- Stuart would not have let him be
17 involved in the company without those two -- so, you
18 know, I just knew the family dynamic at the time, so...
19     Q.  But, you know --
20     A.  But I didn't hear them talking with each other.
21     Q.  One of them didn't tell you, "Hey, I had this
22 discussion with, you know, my dad," something like that?
23     A.  I believe post this article coming out, Tommy
24 and I had spoken a week or two after this, and I
25 remember we -- I was talking about, you know -- you

## Page 290

ERRATA SHEET

1
2  Case Name:
3  Deposition Date:
4  Deponent:
5  Pg.  No. Now Reads    Should Read  Reason
6  ____  ____  _____  _____  _____
7  ____  ____  _____  _____  _____
8  ____  ____  _____  _____  _____
9  ____  ____  _____  _____  _____
10  ____  ____  _____  _____  _____
11  ____  ____  _____  _____  _____
12  ____  ____  _____  _____  _____
13  ____  ____  _____  _____  _____
14  ____  ____  _____  _____  _____
15  ____  ____  _____  _____  _____
16  ____  ____  _____  _____  _____
17  ____  ____  _____  _____  _____
18  ____  ____  _____  _____  _____
19  ____  ____  _____  _____  _____
20  ____  ____  _____  _____  _____
21             Signature of Deponent
22  SUBSCRIBED AND SWORN BEFORE ME
23  THIS ____ DAY OF _____, 2018.
24  _____
25  (Notary Public)  MY COMMISSION EXPIRES:_____

## Page 291

1         Homero Joshua Garza
2      I, HOMERO JOSHUA GARZA, have read the foregoing
3  deposition and hereby affix my signature that same is
4  true and correct, except as noted above.
5
6         _____
7         HOMERO JOSHUA GARZA
8  THE STATE OF _____)
9  COUNTY OF _____)
10
11  Before me, _____, on this
12  day personally appeared HOMERO JOSHUA GARZA, known to me
13  or proved to me on the oath of _____ or
14  through _____(description of
15  identity card or other document) to be the person whose
16  name is subscribed to the foregoing instrument and
17  acknowledged to me that he/she executed the same for the
18  purpose and consideration therein expressed.
19  Given under my hand and seal of office on this
20  _____ day of _____, _____.
21
22         _____
23         NOTARY PUBLIC IN AND FOR
24         THE STATE OF _____
25  My Commission Expires: _____

## Page 292

1         Homero Joshua Garza
2      IN THE UNITED STATES DISTRICT COURT
3         OF CONNECTICUT
4
5  DENIS MARC AUDET, MICHAEL )  Case 3:16-cv-00940
   PFEIFFER, DEAN ALLEN    )
6  SHINNERS, and JASON      )  Hon. Michael P. Shea
   VARGAS, Individually and )  Courtroom 2
7  on Behalf of All Others  )
   Similarly Situated,      )  ECF Case
8                           )
   Plaintiffs,      )  CLASS ACTION
9                           )
   vs.                      )
10                          )
   STUART A. FRASER,      )
11  GAW MINERS, LLC, AND    )
   ZENMINER, LLC, (d/b/a   )
12  ZEN CLOUD),             )
                            )
13  Defendants.      )
14  ********************************
15  REPORTER'S CERTIFICATE
16  ORAL VIDEOTAPED DEPOSITION OF HOMERO JOSHUA GARZA
17  December 14, 2018
18  ********************************
19  I, April Balcombe-Anderson, Certified Shorthand
20  Reporter in and for the State of Texas, hereby certify
21  to the following:
22  That the witness, HOMERO JOSHUA GARZA, was duly
23  sworn and that the transcript of the deposition is a
24  true record of the testimony given by the witness;

## Page 293

1         Homero Joshua Garza
2
3      That the original deposition was delivered to
4  Ms. Cave; the Custodial Attorney;
5
6      I further certify pursuant to FRCP Rule 30(f)(1)
7  that the signature of the deponent:
8      ___ was requested by the deponent or a party before
9  the completion of the deposition and that the signature
10  is to be before any notary public and returned within 30
11  days (or ___ days per agreement of counsel) from the
12  date of receipt of the transcript.
13      If returned, the attached Changes and Signature
14  Page contains any changes and the reasons therefore:
15      ___ was not requested by the deponent or a party
16  before the completion of the deposition.
17      That the amount of time used by each party at the
18  time of the deposition is as follows:
19      Mr. Watterson (4h6m)
          Attorney for Plaintiffs
20
21      Ms. Cave (3h3m)
          Attorney for Defendant
22
23      That pursuant to information given to the
24  deposition officer at the time said testimony was taken,
25  the following includes counsel for all parties of



Page 294

1          Homero Joshua Garza
2    record:
3    FOR PLAINTIFFS:
4        MR. COLIN WATTERSON, ESQ.
         Susman Godfrey
5        1000 Louisiana
         Houston, TX 77002
6
7
8    FOR DEFENDANTS, STUART A. FRASER, GAW MINERS, LLC AND
     ZENMINER, LLC, (D/B/A ZEN CLOUD):
9
         MS. SARAH CAVE, ESQ.
10       MS. HANNAH MILLER, ESQ.
         MS. SARA ECHENIQUE (via LiveLitigation and
11       teleconference)
         MS. ANNA SCHULER (via LiveLitigation and
12       teleconference)
         Hughes Hubbard & Reed
13       One Battery Park Plaza
         New York, New York 10004
14
15
16
17       That $_____ is the deposition officer's charges
18   to the Plaintiffs for preparing the original deposition
19   and any copies of exhibits;
20       I further certify that I am neither counsel for,
21   related to, nor employed by any of the parties in the
22   action in which this proceeding was taken, and further
23   that I am not financially or otherwise interested in the
24   outcome of this action.
25

Page 295

1          Homero Joshua Garza
2        Certified to by me on this 19th day of
3    December, 2018.
4
5
6        _____
7        April Balcombe, CSR, CRR, CRC
         Texas CSR 5752
8        Expiration:  12/31/2019
         TSG Reporting Worlwide
9        977.702.9580
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

# EXHIBIT A-45

1

2                    UNITED STATES DISTRICT COURT

3                 FOR THE DISTRICT OF CONNECTICUT

4                      CASE 3:16-CV-00940

5       ---------------------------------------------x

6       DENIS MARC AUDET, MICHAEL PFEIFFER, DEAN ALLEN

7       SHINNERS, and JASON VARGAS, INDIVIDUALLY and on

8       Behalf of All Others Similarly Situated,

9                              Plaintiffs,

10          v.

11      STUART A. FRASER, GAW MINERS, LLC, and ZENMINER,

12      LLC, (d/b/a ZEN CLOUD),

13                             Defendants.

14      ---------------------------------------------x

15

16         VIDEOTAPED DEPOSITION OF STUART A. FRASER

17                    New York, New York

18                  Tuesday, August 7, 2018

19

20

21      Reported by:

22      Amy A. Rivera, CSR, RPR, CLR

23      JOB NO. 145943

24

25

STUART FRASER

1  STUART FRASER
2  had no role in ZenMiner, correct?
3      A.  Not that I was aware of.
4      Q.  Did your son -- did your son actually
5  participate in an -- in an interview?
6          So was there actually an -- was
7  actually an interview with a reporter, Mr. Garza,
8  and your son.
9      A.  I -- I assume there was, but I don't
10  know.  I didn't hear it.
11      Q.  Did you discuss this -- this May
12  interview with your son?
13      A.  Yes.
14      Q.  And did you ask him whether an
15  interview actually took place?
16      A.  No.
17      Q.  Okay.  Tell me about your discussion
18  with your son concerning this interview.
19      A.  After I read the release and all that,
20  I was upset, and I told my son to never get
21  involved like that again.
22      Q.  And just to be clear, this -- in this
23  interview, your son, I guess, represented that he
24  was an employee of ZenMiner, correct?
25      A.  I don't know what my son, you know,

STUART FRASER

1  STUART FRASER
2  suggested, but, yeah, the article suggested that
3  he was a ZenMiner guy.
4      Q.  Okay.  And the article also suggested
5  that ZenMiner was a separate company from GAW
6  Miners, correct?
7      A.  That's correct.
8      Q.  That wasn't true?
9      MS. CAVE:  Objection to the form.
10  Asked and answered.
11      You can answer.
12      A.  I didn't hear a question.  But --
13      Q.  I -- I was just asking was it true --
14  it -- it was false that ZenMiner was a separate
15  company from GAW Miners, right?
16      MS. CAVE:  Objection to the form.
17      A.  That's --
18      MS. CAVE:  You can answer.
19      A.  That's what I understood, yes.
20      Q.  Okay.  And these false statements were
21  made as a part of GAW Miners' efforts to publicize
22  its business, correct?
23      MS. CAVE:  Objection to the form.
24      A.  Josh was -- Mr. Garza was using it to
25  promote his business, yeah.

STUART FRASER

1  STUART FRASER
2      Q.  And you knew the statements were false
3  at the time, correct?
4      MS. CAVE:  Objection to the form.
5      A.  When I heard the statements, I knew
6  they were false.
7      Q.  When you read the article, you knew
8  they were false?
9      A.  Yeah, after the fact.
10      Q.  And the statements, they pissed you
11  off, right?
12      MS. CAVE:  Objection to the form.
13      A.  I was upset.
14      Q.  Did you tell the SEC the statements
15  pissed you off?
16      A.  Yes.
17      Q.  And did you tell the SEC that after
18  reading these statements, you started dealing with
19  Mr. Garza less?
20      A.  That's correct.
21      Q.  Did you?
22      A.  I did.
23      Q.  It drove you two apart?
24      A.  He played my son.
25      Q.  Did it drive you apart?

STUART FRASER

1  STUART FRASER
2      A.  Yes.
3      Q.  After you learned that Mr. Garza made
4  this false representation, why did you continue to
5  loan him money?
6      MS. CAVE:  Objection to the form.
7      MR. WATTERSON:  Well, strike that.
8      Q.  Did you loan Mr. Garza any money for
9  GAW Miners after May 23, 2014?
10      A.  I may have.  I either lent him like
11  one more tranche or about that time was the last
12  one.
13          I know I was paid back by July, so
14  I -- I could have loaned him a little more.
15      Q.  Did you continue to discuss GAW
16  Miners' business with Mr. Garza after May 23,
17  2014?
18      A.  Yes.
19      Q.  And you helped set up a meeting with
20  Cantor Fitzgerald concerning GAW Miners after
21  May 23, 2014?
22      A.  I believe so, yes.
23      Q.  Okay.  Did you participate in an
24  interview with the Wall Street Journal concerning
25  GAW Miners after May 23, 2014?

STUART FRASER

1
2    A.   If that's when that interview
3  happened, yes.
4    Q.   Do you remember when the interview
5  with the Wall Street Journal happened?
6    A.   I don't remember the date, no.
7    Q.   Do you believe it was after May of
8  2014?
9    A.   Yes.
10    Q.   Okay.  And Josh made false statements
11  to the public concerning ZenMiner in August,
12  correct?
13    A.   Correct.
14    Q.   And this was actually in a press
15  release this time?
16    A.   I believe so.
17    Q.   Okay.  And you saw the press release?
18    A.   Yes.
19    Q.   And the claim was that GAW Miners was
20  purchasing ZenMiner for $8 million?
21    A.   Correct.
22    Q.   You knew that was false?
23    A.   Yes.
24    Q.   You knew that GAW and ZenMiner were
25  not separate companies, right?

STUART FRASER

1
2    MS. CAVE:  Objection to the form.
3      I think this is the third time we've
4      had that question.
5    A.   I didn't know what -- I mean, I didn't
6  know the relationship, but I knew it wasn't what
7  Josh -- Mr. Garza was portraying.
8    Q.   You knew that the $8 million was made
9  up at least, correct?
10    A.   Yes.
11    Q.   It's effectively the same lie he told
12  in May, right?
13    MS. CAVE:  Objection to the form.
14    A.   I mean --
15    Q.   Do you understand my question?
16    A.   No.  Sorry.
17    Q.   Well, again, in this August press
18  release, Mr. Garza was suggesting that somehow
19  ZenMiner was this independently controlled
20  company, right?
21    A.   Yes.
22    Q.   So that's essentially the same lie
23  that Mr. Garza told in May of 2014, right?
24    A.   About what?
25    Q.   Regarding the association of GAW

STUART FRASER

1
2  Miners and Zen Miners.
3    A.   I guess so, yes.
4    Q.   Okay.  Why didn't you just cut
5  yourself off completely from Mr. Garza?
6    A.   I didn't want to -- I didn't want to
7  lose the Internet -- the -- the Wi-Fi business.  I
8  knew that -- you know, that that would be a
9  problem, and that I would have no ability to
10  recoup anything if it was possible to recoup
11  anything.
12      But I -- you know, so that's where
13  I -- that's what I did.
14    Q.   So you wanted the opportunity to
15  recoup your investments?
16    MS. CAVE:  Objection to the form.
17    A.   Well, I was hoping that the -- the
18  high-speed Internet business could survive.  I was
19  hoping that something would come out of it at some
20  point, and at the same time, I was -- was working
21  with my lawyer, Dave, to reduce my exposure to
22  Mr. Garza.
23    Q.   Did you believe that you had exposure
24  to Mr. Garza in August of 2014?
25    A.   I felt that he -- he was losing my

STUART FRASER

1
2  trust, and I was very uncomfortable with what
3  happened with my son, and things started to add up
4  to me that I probably would be better off without
5  Josh Garza in my life, particularly in
6  investments.
7    Q.   And so you mentioned that you brought
8  Mr. McLean in to do what again?
9    A.   To find out where we were.  I mean, I
10  had no paperwork on any of our -- any agreements
11  we had.  I've never seen anything and I -- I
12  wasn't even positive that any of these companies
13  were properly registered or real.
14      So I asked Dave to find out what's
15  going on and to help me negotiate an out.
16    Q.   Did you ask Mr. McLean to look for any
17  signs of unethical business practices?
18    MS. CAVE:  Objection to the form.
19    A.   I -- ask my lawyer.  I thought that
20  was inherent in what he was working for me to do.
21    Q.   Did he ever tell you, Mr. Garza is
22  doing something unethical?
23    A.   I don't remember anything distinctly.
24      But, you know, he was a bragger,
25  Mr. Garza.  So, I mean, a lot of people felt

STUART FRASER

1
2  unease around him sometimes.
3       Q.   Why?  Because if I bragged, he might
4  say something that's untrue?
5       A.   Well, Dave was aware -- Dave was aware
6  of my -- of the situation with my son, if not
7  directly, indirectly through me.  And people that
8  bragged like that and stretched what -- stretched
9  things in their -- the direction they want it to
10  be stretched, you probably should always look
11  twice at.
12       Q.   Was Mr. Garza a bragger when you first
13  met him?
14       A.   No.
15       Q.   That changed?
16       A.   Yes.
17       Q.   When did you start to consider him a
18  bragger?
19       A.   When he would show up with a new car
20  every other month.  Say things -- you know, say
21  things that I felt were unlikely to be true.
22       Q.   And when did Mr. Garza start showing
23  up with a new car every other month?
24       A.   Probably 2008.
25            I mean, he always liked cars, but

STUART FRASER

1
2  suddenly, like, you know, I don't know where these
3  cars came from and -- and it only got worse.
4       Q.   So I -- I gather these weren't Toyota
5  Camrys, exactly, right?
6       A.   No.  One of the last ones I remember
7  was a BW -- BMW, a 9I or 3I or -- like the new one
8  with the gold wings, he told me it was given to
9  him by BMW for doing a endorsement.
10       Q.   And that was a lie?
11       A.   I've seen no proof of that.
12       Q.   What were some of Mr. Garza's other
13  cars?
14       A.   He had a Mustang.  He had a truck.  He
15  had a Tesla.  He had -- I don't know what else, a
16  number of different cars.
17       Q.   Do you know how Mr. Garza could afford
18  all of these different cars?
19       A.   No.
20       MS. CAVE:  Is this a good time for a
21  break?
22       MR. WATTERSON:  Sure.
23       MS. CAVE:  Why don't we take lunch.
24  You should have lunch in 10F.
25       VIDEOGRAPHER:  The time is 12:38 p.m.

STUART FRASER

1
2  We're off the record.
3       (Luncheon recess.)

STUART FRASER

1
2  A F T E R N O O N   S E S S I O N
3       VIDEOGRAPHER:  The time is 1:16 p.m.
4  We're on the record.
5  BY MR. WATTERSON:
6       Q.   Mr. Fraser, before lunch we were
7  talking about ZenMiner, LLC.
8            Did you ever believe you owned half of
9  ZenMiner, LLC?
10       A.   I -- I really don't know.
11       Q.   Did you tell the SEC that you owned
12  half of ZenMiner, LLC?
13       A.   I don't recall what I told them.
14       Q.   Can you turn to page 148 of --
15       A.   Sure.
16       Q.   -- your interview transcript?
17            And if you turn to line 21, page 148,
18  it says: "Did you have any ownership interest in
19  ZenMiner?"
20            And you responded: "Only in the big
21  picture."
22            Do you see that?
23       A.   Yes.
24       Q.   And then the question was: "So in the
25  big picture was it one of the GAW businesses that

Page 146

STUART FRASER

1
2  prior to -- later in 2014 that you owned half of?"
3        And your answer was:  "To my
4  understanding, yes."
5        So did you tell the SEC that you owned
6  half of ZenMiner?
7        MS. CAVE:  Objection to the form.
8     A.  It looks that way, yes.
9     Q.  Was that your belief?
10    A.  Yes.
11    Q.  By the way, we were discussing
12  Paycoin, LLC earlier today.
13        Do you recall that?
14    A.  Yes.
15    Q.  You told the SEC that you were not
16  aware of the existence of Paycoin, LLC, correct?
17        MS. CAVE:  Objection to the form.
18    A.  I stand by my testimony, so if that's
19  the case, yes.
20    Q.  Okay.  So just in -- before your
21  interview with the SEC, you were not aware of the
22  existence of Paycoin, LLC, correct?
23    A.  Correct.
24    Q.  Okay.
25        MR. WATTERSON:  And I might come back

Page 147

STUART FRASER

1
2  to the transcript, but you can put it aside
3  for now.
4        THE WITNESS:  Okay.  Keep it close.
5        MR. WATTERSON:  Can we mark this as
6  Exhibit 156?
7        (Exhibit 156, e-mail, was marked for
8  identification at this time.)
9  BY MR. WATTERSON:
10    Q.  So, Mr. Fraser, this is an e-mail that
11  you sent to Mr. Garza, correct?
12    A.  Yes.
13    Q.  And you sent this e-mail after you
14  read the article concerning ZenMiner in the
15  interview with your son, correct?
16        MS. CAVE:  Objection to the form.
17    A.  I -- I couldn't say for sure.
18        MR. WATTERSON:  Could we mark this as
19  157?
20        We previously marked something similar
21  to this, but I think this is a little
22  different.  Let me see.
23        (Exhibit 157, e-mail chain with
24  attachment, was marked for identification at
25  this time.)

Page 148

STUART FRASER

1
2  BY MR. WATTERSON:
3     Q.  Okay.  So Exhibit 157 is an e-mail
4  thread between you and Mr. Garza and your son
5  Thomas Fraser, correct?
6     A.  Yes.
7     Q.  Okay.  And then paper clipped to it is
8  a copy of the article we were discussing
9  concerning the -- the interview, correct?
10    A.  Yes.
11    Q.  Okay.  So the top e-mail, which is the
12  first e-mail that was sent, Mr. Garza sent you a
13  link to the article, correct?
14    A.  This one?
15    Q.  Yes.
16    A.  Yes.
17    Q.  And he sends it at 11:57 a.m. on
18  May 23, 2014, correct?
19    A.  Correct.
20    Q.  Okay.  And if you flip back to
21  Exhibit 156, that's an e-mail that you sent at
22  6:10 p.m. on May 23, 2014, correct?
23    A.  Yes.
24    Q.  Okay.  So you sent Exhibit 56 to
25  Mr. Garza after you read this article concerning

Page 149

STUART FRASER

1
2  the interview with your son --
3        MS. CAVE:  Objection to the form.
4     Q.  -- correct?
5     A.  Probably, yes.
6     Q.  Okay.  So is it fair to say that this
7  e-mail, Exhibit 156, is about ZenMiner?
8     A.  Well, yeah, it is about ZenMiner.
9     Q.  The subject is ZenMiner?
10        And you write:  "Love the name."
11    A.  Yes.
12    Q.  So you love the name "ZenMiner"?
13    A.  I thought it was interesting, the
14  "Zen."  I thought people would like that.
15    Q.  You also write:  "Great idea."
16        Do you see that?
17    A.  Yes.
18    Q.  So you thought that ZenMiner was a
19  great idea?
20    A.  Yes.
21    Q.  Okay.  And you also write:  "Are you
22  able to make it real ASAP?"
23        Do you see that?
24    A.  Yes.
25    Q.  Why did you write "are you able to

Page 150

STUART FRASER

1
2 make it real ASAP?"
3      A.   Because the site was still static, as
4 I said in the next sentence.
5      I mean, the site wasn't working, so
6 like what's the point of announcing something
7 unless it works.
8      Q.   So the site being zenminer.com?
9      A.   I guess so.  I believe so.  I don't
10 allude to it in this sentence, but it would make
11 sense.
12      Q.   So even though Mr. Garza told a lie
13 concerning ZenMiner, you still thought that the
14 concept was a good idea?
15         MS. CAVE:  Objection to the form.
16      A.   I thought it was a good idea, a good
17 concept, yes.  And I thought he made a mistake the
18 way he announced it.
19      Q.   And did you say anything to Mr. Garza
20 about this mistake in writing?
21         MS. CAVE:  Objection to the form.
22      A.   A mistake in writing?
23      Q.   Oh, sorry, I guess that's confusing.
24      You -- you mentioned that Garza --
25 Mr. Garza made a mistake about how he announced

Page 151

STUART FRASER

1
2 ZenMiner?
3      A.   Yes.
4      Q.   Did you tell him that in writing?
5      A.   Not -- not that I'm aware.
6      Q.   Did you tell him over the phone?
7      A.   Yes.
8      Q.   When did you call him?
9      A.   Soon after I found out about it.
10         MR. WATTERSON:  You can put 156 and
11 157 aside.
12         Mark this as 158.
13         (Exhibit 158, e-mail chain, was marked
14 for identification at this time.)
15 BY MR. WATTERSON:
16      Q.   So this is an e-mail thread between
17 you and -- you and your son Thomas Fraser,
18 correct?
19      A.   Yes.
20      Q.   Okay.  And the first message in the
21 thread is an e-mail where you forward a link to
22 the press release concerning the acquisition of
23 ZenMiner by GAW Miners, correct?
24      A.   Yes.
25      Q.   Okay.  And your son writes:  "I saw

Page 152

STUART FRASER

1
2 this from Josh.  What's my cut?  Ha, ha."
3      Do you see that?
4      A.   Yes.
5      Q.   And you say:  "That's what I was
6 thinking," right?
7      A.   Yes.
8      Q.   And so I take it this is a -- sort of
9 a joke between you and your son?
10      A.   Correct.
11      Q.   And I guess the reason being that your
12 son didn't actually own any interest in
13 ZenMiner --
14         MS. CAVE:  Objection to the form.
15      Q.   -- right?
16      A.   Yes.
17      Q.   So you don't seem all that upset by
18 this press release in this e-mail.  Is that fair?
19         MS. CAVE:  Objection to the form.
20      A.   I saw -- I saw no reason to make my
21 son feel worse about it than he already did.
22      Q.   Did he feel bad about participating in
23 this interview?
24      A.   I thought he did.
25      Q.   How often -- how many times did you

Page 153

STUART FRASER

1
2 discuss your son's participation in this interview
3 with him?
4      A.   This was the only time.
5      Q.   How long did you -- was the
6 conversation?
7         MS. CAVE:  Objection to the form.
8         You can answer.
9      A.   Enough to say, "Don't do that again.
10 Don't get involved."
11      Q.   So even though you were joking around
12 with your son about this press release, you were
13 still mad at -- at Mr. Garza?
14      A.   Absolutely.
15      Q.   And did you -- did you call him
16 after -- after this press release was issued?
17         MS. CAVE:  Objection to the form.
18      Q.   Strike that.
19         Did you call him after this press
20 release was issued to discuss the false statements
21 in the press release?
22         MS. CAVE:  Objection to the form.
23         You can answer.
24      A.   I called him as soon as I heard -- as
25 soon as I heard about the -- the way this was

STUART FRASER

1
2  portrayed to the public.
3        I don't know when that was exactly.
4     Q.   Well, it was -- was it after August --
5  9:35 a.m. on August 14th?
6     MS. CAVE:  Objection to the form.
7     A.   Was it after?
8     Q.   Well, I just -- I see that you forward
9  the press release to your son at 9:35 a.m.
10    A.   Right.
11    Q.   So I'm wondering if you called
12  Mr. Garza after 9:35 a.m., sometime after that?
13    A.   I don't recall exactly when I called
14 him or if I did on that date.
15    Q.   So you might have called him
16 afterwards -- strike that.  That's --
17    MR. WATTERSON:  Okay.  You can put
18 that one aside.
19    Q.   Did you consider yourself to be a
20 co-founder of GAW Miners?
21    A.   I considered myself to be a co-founder
22 of everything -- almost everything that was
23 developed.
24    Q.   Including GAW Miners?
25    A.   Including GAW Miners.

STUART FRASER

1
2     Q.   Okay.
3        And did you consider yourself to be
4  Josh Garza's partner?
5     MS. CAVE:  Objection to the form.
6     A.   In which -- in -- in what entities?
7     Q.   Well, let's start in any entities.
8     A.   Yeah, I -- I -- I saw myself as pretty
9  much Josh's partner in almost every entity that
10 we've created while I was there.
11    Q.   Okay.  Including GAW Miners?
12    A.   Including GAW Miners.
13    Q.   And you invested in GAW Miners,
14 correct?
15    MS. CAVE:  Objection to the form.
16    A.   I think I explained earlier, I -- I --
17 however you want to call it, I -- I invested in
18 the businesses before that, and I loaned money to
19 GAW Miners to buy more equipment -- physical
20 equipment.
21    Q.   Did you tell the SEC that you invested
22 in GAW Miners?
23    MS. CAVE:  Objection to the form.
24    It's a big transcript, Colin.  If you
25    want to point him to a page, that's fine.

STUART FRASER

1
2     Q.   I'm just asking if you remember if you
3  told the SEC that you invested in GAW Miners?
4     A.   I hope I would have portrayed it the
5  same way that I just did to you, that I -- I
6  invested in the businesses before GAW Miners that
7  GAW Miners was created in a way using funds for,
8  and I -- I loaned money after -- directly to GAW
9  Miners to facilitate the purchase of product.
10    Q.   Can you take a look at page 72 of
11 Exhibit 44, which is the interview transcript?
12    And I'm looking at line 18.
13    A.   Okay.
14    Q.   So you were asked:  "Did you invest
15 money into GAW Miners?"
16    And your answer was:  "Yes."
17    Is that true?
18    A.   Yes.
19    Q.   Okay.  And you said that you invested
20 between 150 and 185?
21    A.   Correct.
22    Q.   And that's 150,000 and 185,000,
23 correct?
24    A.   Yes.
25    Q.   And you said that that was a one-time

STUART FRASER

1
2  investment, correct?
3     A.   Yes.
4     Q.   By that you mean a capital
5  contribution --
6     MS. CAVE:  Objection to the form.
7     Q.   -- correct?
8     A.   I believe so.
9     Q.   So you believe that you made a capital
10 contribution to GAW Miners?
11    MS. CAVE:  Objection to the form.
12    A.   I made a -- a cash contribution to
13 agree to a deal where I had 41 percent of the
14 businesses, and within that was that money.  If he
15 used it for GAW Miners, I guess so, yes.
16    Q.   Okay.  And just -- just to be clear,
17 there was an investment generally, and Josh had
18 the option of using that money for any of the
19 businesses?  Is that accurately describing the
20 deal?
21    MS. CAVE:  Objection to the form.
22    But you can answer.
23    A.   Yeah.  Yes.
24    You know, except for the cases where I
25 loaned money specifically for, you know --

Page 158

STUART FRASER

1
2    Q.   Sure.  And --
3    A.   -- the product.
4    Q.   We'll get to that.
5    A.   No problem, just want to be clear.
6        MR. WATTERSON:  Let's mark this as
7    159.
8        (Exhibit 159, e-mail chain, was marked
9    for identification at this time.)
10   BY MR. WATTERSON:
11   Q.   So Exhibit 159 is an e-mail thread
12   between you and Mr. Garza, correct?
13   A.   I'm sorry?  I was reading.
14   Q.   This is an e-mail thread between you
15   and Mr. Garza, correct?
16   A.   Okay.  Yes.
17   Q.   Okay.  And Mr. Garza asks you:  "Of
18   the 155K you have put up for GAW Miners, how much
19   would you like back in the next six months."
20       Do you see that?
21   A.   Yes, I do.
22   Q.   So did you put up, I guess, 155,000
23   for GAW Miners specifically or was it for all of
24   the entities?
25       MS. CAVE:  Objection to the form.

Page 159

STUART FRASER

1
2    A.   I guess, from his point of view, it
3    looks like GAW Miners.
4    Q.   But from your point of view, it was
5    for any of the entities?
6    A.   Yes.  I mean, but it was to solidify
7    our -- our understanding of the ownership, I
8    believe, of the underlying businesses.
9        So it was about GAW Miners, but I
10   didn't necessarily see it directly.  It was -- it
11   was more like settling up.
12   Q.   Okay.  Mr. Garza also asks -- asks
13   you:  "What are your intentions on participating
14   in helping raise funds from your connections."
15       Do you see that?
16       And --
17   A.   Yes.  I'm sorry.
18   Q.   And in response, you have four bullet
19   points, and you write:  "I have reached out to one
20   guy and working on some others."
21       Do you see that?
22   A.   Yes.
23   Q.   Who did you reach out to regarding
24   helping raising fund -- funds from your
25   connections?

Page 160

STUART FRASER

1
2    A.   I don't know.
3    Q.   Do you remember reaching out to
4    anyone?
5    A.   Not directly, no.
6    Q.   So the -- what you say next to bullet
7    point No. 1 here isn't accurate?
8        MS. CAVE:  Objection to the form.
9    A.   No.  I could have reached out to
10   somebody and they didn't respond.
11   Q.   Okay.  Did you ever reach out to
12   anybody regarding investments in GAW Miners?
13   A.   Not directly.
14   Q.   And what do you mean by "not
15   directly"?
16   A.   I had met a guy playing golf who he --
17   he raised money -- he was in the business.  He
18   kind of worked for a bank.  I don't know if it was
19   a real -- you know, like it was a real business.
20   And he would raise, like, money for businesses.
21       So, you know, like, I guess -- I don't
22   know if they call it a "tombstone" anymore, but it
23   would be like, you know, $60,000 raised for
24   Consolidated Packaging, some guy in Yonkers, and
25   I'm sure they would get a piece of it, but they

Page 161

STUART FRASER

1
2    would help.
3        And so I -- I did reach out to a guy
4    like that to find out how the process worked.
5    Q.   Can you turn to the second page of
6    Exhibit 159?
7    A.   Yes.
8    Q.   And take a look at -- there's an
9    e-mail that was sent at 1:41 p.m.  And I'm looking
10   at the second paragraph.  Mr. Garza writes:  "I
11   very much appreciate all you have done, not just
12   the money but the years of training and
13   mentorship."
14       Do you see that?
15   A.   Yes.
16   Q.   What kind of training did you provide
17   to Mr. Garza?
18   A.   None.
19   Q.   Do you know what he's talking about
20   in -- by this statement?
21   A.   Just sucking up.
22   Q.   Why would he suck up?
23   A.   Because I'm the only one that gives
24   him money.
25   Q.   Did you provide mentorship to

Page 282

CERTIFICATE

1
2          I, AMY A. RIVERA, a Certified Shorthand
3   Reporter, Registered Professional Reporter,
4   Certified LiveNote Reporter, and Notary Public of
5   the State of New York, do hereby certify that prior
6   to the commencement of the examination STUART A.
7   FRASER, was duly sworn by me to testify the truth,
8   the whole truth and nothing but the truth.
9          I DO FURTHER CERTIFY that the foregoing is
10  a true and accurate transcript of the testimony as
11  taken stenographically by and before me at the time,
12  place and on the date hereinbefore set forth.
13         I DO FURTHER CERTIFY that I am neither a
14  relative nor employee nor attorney nor counsel of
15  any of the parties to this action, and that I am
16  neither a relative nor employee of such attorney or
17  counsel, and that I am not financially interested in
18  the action. Dated:  August 16, 2018
19
20
21  _____
22  AMY A. RIVERA
23  Notary Public of the State of New York
24  My commission expires December 6, 2021
25  License No. XI00939

Page 283

INDEX

WITNESS                          PAGE
STUART A. FRASER
By Mr. Watterson                 5

EXHIBITS

NUMBER          DESCRIPTION          PAGE
Exhibit 154     E-mail               179
Exhibit 155     Answers to           123
                interrogatories
Exhibit 156     E-mail               147
Exhibit 157     E-mail chain with    147
                attachment
Exhibit 158     E-mail chain         151
Exhibit 159     E-mail chain         158
Exhibit 160     Document             167
Exhibit 161     Bank statements      171
Exhibit 162     Printout from the Plum   174
                Card website
Exhibit 163     E-mail, dated July 22,   176
                2014
Exhibit 164     E-mail, June 5, 2014    180
Exhibit 165     Text messages        181
Exhibit 166     E-mail               183

Page 284

EXHIBITS (Continued)

NUMBER          DESCRIPTION          PAGE
Exhibit 167     E-mail chain         184
Exhibit 168     E-mail               189
Exhibit 169     Press release        196
Exhibit 170     Document             198
Exhibit 171     E-mail               199
Exhibit 172     E-mail chain, dated    200
                December 7, 2014
Exhibit 173     E-mail chain         202
Exhibit 174     E-mail               206
Exhibit 175     E-mail chain         210
Exhibit 176     E-mail chain         212
Exhibit 177     E-mail chain         213
Exhibit 178     E-mail chain         214
Exhibit 179     E-mail chain         216
Exhibit 180     Text messages        218
Exhibit 181     E-mail chain         220
Exhibit 182     E-mail chain         223
Exhibit 183     E-mail               228
Exhibit 184     Text messages        232
Exhibit 185     Text messages        233
Exhibit 186     E-mail chain         234
Exhibit 187     E-mail chain         237

Page 285

EXHIBITS (Continued)

NUMBER          DESCRIPTION          PAGE
Exhibit 188     E-mail chain         240
Exhibit 189     Text message         246
Exhibit 190     E-mail chain         251
Exhibit 191     Text message sent on    253
                December 24, 2014
Exhibit 192     E-mail chain         255
Exhibit 193     E-mail chain         256
Exhibit 194     E-mail chain         258
Exhibit 195     E-mail chain         259
Exhibit 196     E-mail               260
Exhibit 197     E-mail               261
Exhibit 198     E-mail               263
Exhibit 199     E-mail               265
Exhibit 200     Text messages        268
Exhibit 201     E-mail               270
Exhibit 202     E-mail               272
Exhibit 203     E-mail chain         273
Exhibit 204     Text message         275

Page 286

```
 1
 2            EXHIBITS (Continued)
 3     NUMBER            DESCRIPTION         PAGE
 4     Exhibit 44        SEC interview        133
 5                       transcript
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 287

```
 1     NAME OF CASE:
 2     DATE OF DEPOSITION:
 3     NAME OF WITNESS:
 4     Reason Codes:
 5         1. To clarify the record.
 6         2. To conform to the facts.
 7         3. To correct transcription errors.
 8     Page _____ Line _____ Reason _____
 9     From _____ to _____
10     Page _____ Line _____ Reason _____
11     From _____ to _____
12     Page _____ Line _____ Reason _____
13     From _____ to _____
14     Page _____ Line _____ Reason _____
15     From _____ to _____
16     Page _____ Line _____ Reason _____
17     From _____ to _____
18     Page _____ Line _____ Reason _____
19     From _____ to _____
20     Page _____ Line _____ Reason _____
21     From _____ to _____
22     Page _____ Line _____ Reason _____
23     From _____ to _____
24
25            _____
```

EXHIBIT A-46

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

_____
                                              )
SECURITIES AND EXCHANGE COMMISSION,           )
                                              )
                    Plaintiff,                )
                                              )
              v.                              )      Case No.
                                              )
HOMERO JOSHUA GARZA,                          )
GAW MINERS, LLC, and                          )
ZENMINER, LLC (d/b/a ZEN CLOUD),              )      JURY TRIAL DEMANDED
                                              )
                    Defendants.               )
_____         )

## COMPLAINT

Plaintiff United States Securities and Exchange Commission ("the Commission") alleges the following against Defendants Homero Joshua Garza ("Garza"), GAW Miners, LLC ("GAW Miners"), and ZenMiner, LLC (d/b/a ZenCloud) ("ZenMiner"), and hereby demands a jury trial:

## SUMMARY OF THE ACTION

1.      Defendants used the lure of quick riches from a twenty-first century payment system known as virtual currency to defraud investors. Though cloaked in technological sophistication and jargon, defendants' fraud was simple at its core – defendants sold what they did not own, and misrepresented the nature of what they were selling.

2.      From approximately August 2014 through December 2014, defendants sold – to over 10,000 investors – investment contracts representing shares in the profits they claimed would be generated from using their purported computing power to "mine" for virtual currency. "Mining" for virtual currency means applying computer power to try to solve complex equations that verify a group of transactions in that virtual currency. The first computer (or collection of

computers) to solve such an equation is awarded new units of that virtual currency. This process is known as "mining," and the computer equipment used in this process, and the humans who own it, are known as "miners."

3. Defendants sold shares in the returns from their purported mining operations, via investment contracts that they named "Hashlets." Hashlet contracts entitled their purchasers to a share of the profits from defendants' purported "hashing power," or the computing power (measured in megahash per second), that defendants purportedly devoted to virtual currency mining. In reality, defendants sold far more Hashlets worth of computing power than they actually had in their computing centers. There was no computer equipment to back up the vast majority of Hashlets that defendants sold.

4. Defendants earned about $19 million in revenue from their sales of Hashlets.

5. Defendants Garza and GAW Miners made many false and misleading statements about GAW Miners' virtual currency mining operations to potential and actual investors. For example, they misrepresented:

    a. that all of the Hashlets of computing power purchased by investors would be pooled together to engage in virtual currency mining, and that investors' returns, or "payouts," would be calculated based on the success of those collective virtual currency mining operations;

    b. that buying a Hashlet would allow investors to mine virtual currency without the expense and expertise that would be required to purchase and maintain their own virtual currency mining equipment;

    c. the profitability and life-span of Hashlets;

    d. the extent of GAW Miners' mining activities; and

     e.   how the payouts for Hashlets were derived.

Garza and GAW Miners knew that each of these statements was false at the time it was made.

6.    Defendants' Hashlet sales had many of the hallmarks of a Ponzi scheme. Because defendants sold far more computing power than they owned and dedicated to virtual currency mining, they owed investors a daily return that was larger than any actual return they were making on their limited mining operations. Instead, investors were simply paid back gradually over time, as "returns," the money that they, and others, had invested. As a result, some investors' funds were used to make payments to other investors. Most Hashlet investors never recovered the full amount of their investments, and few made a profit.

7.    Through the activities alleged in this Complaint, defendants have engaged in fraud in connection with the purchase or sale of securities, in violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and various subparts of Rule 10b-5 thereunder; and fraud in the offer or sale of securities, in violation of various subparts of Section 17(a) of the Securities Act of 1933 ("Securities Act"). Defendants have also engaged in the offer and sale of unregistered securities, in violation of Sections 5(a) and 5(c) of the Securities Act.

8.    Based on these violations, the Commission seeks:

      a.   the entry of a permanent injunction prohibiting defendants from further violations of the relevant provisions of the federal securities laws;

      b.   disgorgement of defendants' ill-gotten gains, plus pre-judgment interest; and

      c.   the imposition of civil penalties due to the egregious nature of defendants' violations.

## JURISDICTION AND VENUE

9.      The Commission seeks a permanent injunction and disgorgement pursuant to

Section 20(b) of the Securities Act [15 U.S.C. §77t(b)], and Section 21(d)(1) of the Exchange

Act [15 U.S.C. §78u(d)(1)].  The Commission seeks the imposition of a civil penalty pursuant to

Section 20(d) of the Securities Act [15 U.S.C. §77t(d)], and Section 21(d)(3) of the Exchange

Act [15 U.S.C. §78u(d)(3)].

10.      The Court has jurisdiction over this action pursuant to Sections 20(d) and 22(a) of

the Securities Act [15 U.S.C. §§77t(d), 77v(a)], and Sections 21(d), 21(e) and 27 of the

Exchange Act [15 U.S.C. §§78u(d), 78u(e), 78aa].

11.      Venue is proper in this District because, at all relevant times, GAW Miners, LLC,

and ZenMiner, LLC maintained offices in Connecticut and conducted business in Connecticut;

and Homero Joshua Garza lived in Connecticut.  A substantial part of the actions that give rise to

the Commission's claims occurred in Connecticut.

12.      In connection with the conduct described in this Complaint, defendants directly or

indirectly made use of the mails or the means or instruments of transportation or communication

in interstate commerce.

13.      Defendants' conduct involved fraud, deceit, or deliberate or reckless disregard of

regulatory requirements, and resulted in substantial loss, or significant risk of substantial loss, to

other persons.

## DEFENDANTS

14.      **Homero Joshua Garza** ("Garza"), age 30, presently lives in Brattleboro,

Vermont, though he lived in Somers, Connecticut during 2014.  During all of 2014, he was the

4

founder and CEO of GAW Miners, LLC, and he owned and controlled ZenMiner.  In those positions, which he held since those companies were founded, he directed their strategy, their financial decisions, and had ultimate control over their day-to-day operations.

15.     **GAW Miners, LLC** ("GAW Miners") is a Delaware limited liability company whose principal place of business is in Bloomfield, Connecticut.  GAW Miners was formed in May 2014.  Garza is the Managing Member and majority owner of GAW Miners.  During all relevant times, Garza has controlled GAW Miners and directed its day-to-day activities.

16.     **ZenMiner, LLC** ("ZenMiner") is a Delaware limited liability company, which shares a principal place of business with GAW Miners in Bloomfield, Connecticut, and was formed in July 2014.  ZenMiner also does business under the name ZenCloud, and utilized the website www.zencloud.com.  Garza is the Managing Member and majority owner of ZenMiner.  During all relevant times, Garza controlled ZenMiner and directed its day-to-day activities.

## STATEMENT OF FACTS

**Background on Virtual Currency and Its "Mining"**

17.     "Virtual currency" is a digital representation of value that can be traded and functions as a medium of exchange; a unit of account; and/or a store of value, but does not have legal tender status (i.e., when tendered to a creditor, is a valid and legal offer of payment) in any jurisdiction.  Virtual currency generally is not issued or guaranteed by any jurisdiction or government, and its value is decided by consensus within the community of users of the virtual currency.  The most widely adopted virtual currency is bitcoin, although there are many other virtual currencies used today, known as "altcoins."  Virtual currency is distinct from fiat currency, which is the money designated by a country as its legal tender.  An example of fiat

currency is the United States dollar.  Virtual currencies may be traded on online exchanges for fiat currencies, including the United States dollar, or used to purchase goods and services.

18.     Bitcoin, and some other virtual currencies, can be "mined."  A virtual currency "miner" is an individual or entity, and her or its computer equipment, that runs special computer software to solve complex algorithms that validate groups of transactions in that virtual currency.

19.     Each unit of virtual currency has a "blockchain," which is an electronic public ledger of all transactions in that currency.

20.     Certain virtual currencies, including bitcoin, self-generate units of the currency by rewarding miners with newly created coins when they are the first to solve the algorithms that validate transactions in the currency.  Using bitcoin as an example, the bitcoin network collects all transactions made during a set time period, usually around ten minutes, into a list called a "block."  Bitcoin miners compete to be the first to confirm the transactions in the block and write them into the blockchain.  The first miner to solve the algorithm that confirms a transaction is rewarded with a preset amount of newly-issued bitcoins by the bitcoin protocol.  This process of solving equations to confirm transactions and to earn new coins is known as "mining" that currency.

21.     As interest in bitcoin, and corresponding competition among miners, increased, more computer processing power became required in order for a miner to have a chance of solving blocks, and thus obtain the rewards of mining.  The processing power of computers used to confirm virtual currency transactions is measured by their "hash rate," or the number of calculations they can perform per second (*e.g.*, a computer with a hash rate of 10 megahash can make 10 million calculations per second).  The greater a computer's hash rate, the greater that

computer's chance to solve the equation that confirms transactions, and the more virtual currency coins the miner may earn.

22.     Given the increasing competition to solve the equations that confirm blockchain transactions, miners frequently combine their computing power into mining "pools."  As a general rule, the more computing power directed to a particular mining pool, the better the chance that pool will be the first to confirm a block of transactions and receive the payout for mining.  Generally, pool participants' shares of the mining reward depend upon the proportional amount of computing power each contributes to the pool.

23.     From August 2014, when defendants first offered Hashlets for sale, to the present, the exchange rate of U.S. dollars to bitcoins has fluctuated between a low of approximately $177 per bitcoin and a high of approximately $600 per bitcoin.

**GAW Miners and ZenMiner's Rapidly Evolving Businesses**

24.      In approximately March 2014, Garza began operating a business to purchase virtual currency mining equipment from its overseas manufacturers and to resell it to customers. He founded GAW Miners in May 2014, and thereafter conducted his hardware resale business under the GAW Miners name.  Until approximately May or June of 2014, GAW Miners' primary business was to sell virtual currency mining equipment.

25.     In the spring of 2014, GAW Miners began offering its customers a new service called Hardware Hosted Mining.  Instead of shipping to its customers the computer hardware they ordered from GAW Miners, GAW Miners offered to host the computer hardware that the customers purchased in its own datacenter.  Customers paid GAW Miners a fee to cover the expenses that GAW Miners incurred to operate their hardware, such as maintenance, electricity, cooling, and Internet connectivity.  While the customers' mining equipment physically resided in

GAW Miners' datacenter in Connecticut, customers maintained complete and direct control over how they used their equipment to engage in mining, by accessing their equipment remotely through their personal computers over the Internet.

26.     Within weeks of beginning to offer Hardware Hosted Mining, in approximately June 2014, GAW Miners again changed the focus of its business.  It began encouraging its customers to switch from Hardware Hosted Mining to a new service called Cloud Hosted Mining.

27.     In May 2014, Garza created a company named ZenMiner, which was formally incorporated in July 2014.  Though he persuaded other individuals to represent to customers and the public that ZenMiner was an independent company, Garza owned and controlled ZenMiner at all times.  On information and belief, Garza perpetuated this deception because he believed that GAW Miners could not offer cloud-based hosted mining services without alienating its original hardware-purchasing customers.

28.     Cloud Hosted Mining was marketed as a partnership between ZenMiner and GAW Miners.  GAW Miners offered customers the ability to purchase their mining hardware from it, and then house their equipment in ZenMiner's datacenters for a fee.  Customers could control their mining equipment through the Internet by logging on to the accounts they established on ZenMiner's website interface called ZenCloud.  ZenCloud promised customers that "you don't pay for shipping, cooling, or electricity.  Let us cover all of that for you."

29.     Customers who switched from GAW Miners' Hardware Hosted Mining service to Cloud Hosted Mining through ZenCloud lost some control over how they used their equipment to engage in mining.  ZenCloud users could only direct their equipment to engage in mining through one of the handful of mining pools offered on the ZenCloud website.

30.     GAW Miners gave their Cloud Hosted Mining customers the option to end their ZenCloud hosted service at any time and receive their physical equipment in the mail from GAW Miners.

31.     Cloud Hosted Mining was a fraudulent scheme in at least two respects.

32.     First, even though Garza fully controlled ZenMiner, he marketed it to the public as a business entity that was distinct from GAW Miners.

33.     For example, on or about May 23, 2014, Garza participated in an interview with a reporter for Cryptocoinsnews.com, during which he convinced a family member of a GAW Miners' investor to pretend that ZenMiner was that person's company and idea.  At the time of the interview, Garza expected that the reporter would publish a story containing the misrepresentations that ZenMiner was an entity separate from GAW Miners.  That story was published on or about May 23, 2014.

34.     This charade continued when, on or about August 24, 2014, GAW Miners issued a press release announcing that its parent company (which was also owned and controlled by Garza), had purchased a controlling stake in ZenMiner for $8 million, and that ZenMiner had become a division of GAW Miners.  This statement was false; no such transaction occurred because Garza had always owned and controlled ZenMiner.  Garza authorized and approved the issuance of GAW Miners' false press release.  The purported ZenMiner transaction was marketed as proof that GAW Miners was a leader in the virtual currency industry by bridging the gap between hardware sellers and hosted mining services.

35.     Second, contrary to its stated reason for existence, no mining actually occurred through ZenMiner's ZenCloud interface.  Though customers paid for equipment that they believed they were directing to mine in various pools available through the ZenCloud interface,

and also paid for hosting services, very few pieces of the mining equipment purchased by customers actually existed in a ZenMiner datacenter. Most customers paid for a phantom piece of equipment that neither GAW Miners nor ZenMiner owned. Neither GAW Miners nor ZenMiner was directing customers' computing power to any pools at all, much less the ones customers believed they were choosing.

36.     Soon after GAW Miners' Cloud Hosting Mining service launched, customers began to complain that they could not see the increase in power in the mining pools they believed they had chosen to mine through ZenCloud. These complaints were made public through message boards dedicated to virtual currency mining.

37.     Cloud Hosted Mining customers were entitled to request that the computer equipment they had purportedly purchased be sent to them, but neither GAW Miners nor ZenMiner owned that equipment to ship. Facing potential mass customer demands that their equipment be shipped, GAW Miners and ZenMiner again changed business models. GAW Miners offered all of its customers the opportunity to convert their ZenCloud Cloud Hosted machines to "Hashlets."

**GAW Miners and ZenMiner Create and Offer Investments in Hashlets**

     **a.     What Are Hashlets?**

38.     Beginning in August 2014, GAW Miners and ZenMiner decided to sell "Hashlets" to the public. Buying a Hashlet entitled an investor to a share of the profits that GAW Miners and/or ZenMiner would purportedly earn by mining virtual currencies using the computers that were maintained in their data centers. Hashlets were purported to earn a return based on the number of virtual currency units generated when the pools to which their computing power was directed succeeded in processing and confirming virtual currency transactions. As

ZenMiner's terms of service stated, a Hashlet was "a divisible and assignable allocation of hashing power from GAW-owned and hosted mining hardware."

39.     Unlike Cloud Hosted Mining customers, Hashlet customers were not buying computer hardware.  Hashlet customers had no right to receive any piece of computer hardware at the end of their Hashlet contract.  Instead, Hashlet customers were buying the rights to profit from a slice of the computing power owned by GAW Miners and/or ZenMiner (by then, purportedly, a division of GAW Miners).

40.     Hashlet investors were required to do very little to purportedly mine virtual currency.  Investors only needed to log into their ZenCloud accounts and click-and-drag their Hashlet icons over to the icons of the mining pools in which they wished their Hashlets to mine. From there, investors relied solely on the efforts of GAW Miners and/or ZenMiner to generate Hashlets' expected profits by owning, housing, operating, maintaining, and connecting the computer hardware that would engage in mining.  If GAW Miners had received payouts from its purported mining activities, Hashlet investors' shares of those payouts would have been calculated and deposited by GAW Miners into investors' ZenCloud accounts.

41.     The majority of investors bought Hashlets through a web-based shopping portal by paying with U.S. currency or with bitcoin.  Some investors who were Cloud Hosted Mining customers also bought Hashlets through their existing ZenCloud accounts, in part by converting the value of their Cloud Hosted Mining equipment.  Once an investor owned one Hashlet, she could also buy additional Hashlets through her ZenCloud account, including by reinvesting the "payouts" from her existing Hashlets into additional Hashlets.

42.     Investors were told that they could log on to their ZenCloud accounts, activate their Hashlets using a code that was provided at the time of purchase, and then direct their

Hashlets to engage in mining in one of the mining pools available through ZenCloud. One of the mining pools, ZenPool, was purportedly operated by GAW Miners and/or ZenMiner and was advertised as the "most profitable pool."

43. Investors' shares of the profits that they purportedly earned as a result of their Hashlets' mining in pools were posted to their ZenCloud accounts daily. Investors were also charged maintenance fees to pay for the purported physical upkeep of the equipment behind the Hashlets. Those maintenance fees were deducted from investors' ZenCloud accounts daily. Investors could request a withdrawal, in bitcoin, from their ZenCloud accounts.

44. GAW Miners' press releases and website, and Garza's posts on the company's message board variously described Hashlets as "the world's first digital cloud miner" and as "designed from the start to be the easiest, most convenient miner to own." GAW Miners and Garza marketed Hashlets specifically to non-technical people interested in virtual currency mining, touting a Hashlet as being "so easy to use that it is 'Grandma approved'", and claiming that "[i]f you can open an email, you can setup and operate a Hashlet."

**b.      GAW Miners and ZenMiner Oversold Hashlets**

45. GAW Miners began selling Hashlets in mid-August 2014. GAW Miners' press releases dated August 24 and August 26, 2014 claimed that "thousands of units per second" were sold during their first day, and millions of dollars of Hashlets were sold during their first week, of availability.

46. There were two basic types of Hashlets – those that were purportedly able to mine for bitcoin and those that were purportedly able to mine for altcoin. Bitcoin mining required computers to solve a different algorithm than that used to mine for altcoin.

47.     Prices for Hashlets ranged between about $10 and $50 per unit, depending on their features, including which pools they were able to mine. A "unit" of a Hashlet was a measurement of its hashing power, or the number of calculations it could perform per second. Hashlets that mined bitcoin were sold in multiples of 1 gigahash per second units, and Hashlets that mined altcoin were sold in multiples of 1 megahash per second units.

48.     During their first week of availability alone, GAW Miners and ZenMiner oversold -- between triple and quadruple -- the number of Hashlets for which they had the supporting computing power. Yet, their sales continued.

49.     By October 2014, GAW Miners had oversold Hashlets to an even more extreme degree. It had oversold altcoin-mining Hashlets by at least about 100 times its computing capacity, and bitcoin-mining Hashlets by at least about 5 times its computing capacity.

50.     Though GAW Miners built a data center that, by November 2014, contained significant computing capacity for mining bitcoin, it made no increases to its computing capacity for mining altcoin.

51.     Throughout the time that Hashlets were sold, from mid-August 2014 through December 2014, GAW Miners and ZenMiner sold at least $19 million of Hashlets, to more than 10,000 investors.

52.     From the time that Hashlets went on sale in August 2014, and throughout the entire time they were sold, Garza was provided information about how many units of Hashlets were sold. Garza knew or should have known, from August 2014 onward, that GAW Miners and ZenMiner did not have the computing capacity to support the units of Hashlets that they sold.

13

53.     Garza was responsible for GAW Miners' and ZenMiner's decision to keep selling Hashlets despite his knowledge (or reckless or negligent disregard) that the companies lacked the computing power they purported to be selling to investors.

54.     As a result of dramatically overselling their computing capacity, GAW Miners and ZenMiner did not engage in mining with even approximately the amount of computing power they had sold in Hashlets.  As a further result, GAW Miners' and ZenMiner's revenues from mining bitcoin were minimal, and their revenues from mining altcoin were virtually nonexistent.

55.     Between August and December 2014, GAW Miners created several types of Hashlets with different features.  Garza approved the creation of these Hashlet varieties, and frequently announced their availability on GAW Miners' website and through posts on the company's message board.

56.     For example, on or about September 11, 2014, GAW Miners announced the creation of the limited edition "Remember" Hashlet with the logo of "9/11" to commemorate those whose lives were lost in the terrorist attacks of September 11, 2001.  Garza announced that GAW Miners would only sell 500 Remember Hashlets, and would donate all of the proceeds (approximately $10,000) to "the 9/11 memorial fund."  He specified that "GAW will in no way be profiting from any sales related to the cause."  After selling approximately 2,290 Remember Hashlets for a total of approximately $48,000, GAW Miners donated only $10,000 to a 9/11 related charity.  Garza knew or should have known that GAW Miners actually profited from the sale of Remember Hashlets, contrary to his representations.

**c.      GAW Miners and Garza Misrepresented Critical Aspects of Hashlets**

57.     Garza directed many of GAW Miners' publicity efforts for its Hashlet offerings.

14

Garza had ultimate authority and control over GAW Miners' promotional materials, including the company's website, and posts he made on the company's message board. Garza also frequently spoke to reporters for publications covering the virtual currency industry, and posted information about GAW Miners and its products on social media outlets.

58.     GAW Miners and Garza made three basic types of misrepresentations to Hashlet investors. First, they misleadingly claimed that Hashlets would be always profitable and never obsolete, when they had no reasonable basis to support those claims. Second, they misleadingly claimed that Hashlets were engaged in mining for virtual currency through pools available in ZenCloud, when they knew that few Hashlets were supported by actual mining activity. Third, they misleadingly claimed that ZenPool engaged in mining, when they knew that it never did.

59.     First, from approximately August through December 2014, GAW Miners' website, and other promotional materials, described Hashlets as always profitable and never obsolete. Garza also claimed on numerous occasions, including in a Hashtalk.org post in August 2014, words to the effect that "there will never be a time a Hashlet cost[s] more to run than you make, and they will always make money." GAW Miners also claimed, on its website, that Hashlets would never break down or expire and this "guarantees your investment is protected and secure, so you can enjoy many years of owning the world's most advanced miner."

60.     At the time GAW Miners and Garza made, or Garza authorized, these statements, they knew or should have known that these statements were untrue. They knew or should have known that the profitability of virtual currency mining depended on many unforeseeable factors, including the market price of those virtual currencies, the cost of the electricity and cooling for the equipment, and the extent to which the speed of developments in computing technology made any equipment they owned obsolete. GAW Miners and Garza thus had no reasonable basis

15

for these statements at the time they made or authorized them.

61.     GAW Miners' and Garza's statements about profitability and longevity were material to Hashlet investors.  GAW Miners conducted a marketing survey of hundreds of people who purchased Hashlets during their first week of availability. Approximately 70 percent of investors identified the Hashlets' promised return on investment as the most important, or one of the most important, factors in their decision to purchase a Hashlet.  Garza reviewed the results of this survey and thus knew that these factors were material.

62.     By November 2014, Hashlets became unprofitable.  That is, the Hashlets' daily maintenance fees exceeded their purported mining payouts.

63.     By January 2015, Hashlets were obsolete.  GAW Miners announced the termination of its purported Hashlet mining operations at the end of January 2015, stating that "GAW and ZenCloud mining operations have been indefinitely put on hold, effective immediately."

64.     Second, despite marketing Hashlets as capable of mining in the various pools available through ZenCloud, and pricing different types of Hashlets differently based on which pools they were purportedly able to mine, Hashlets did not mine in those pools.

65.     The operators of the pools purportedly available through ZenCloud confirmed that GAW Miners did not establish accounts with those pools, and did not direct any of its computing power towards those pools.  Thus, GAW Miners was not receiving any mining payouts from those pools.

66.     After numerous customer questions about where their hashing power was being used, Garza admitted, in early October 2014, that GAW Miners was not sending its computing power to the pools Hashlet investors selected.  Instead, Garza and GAW Miners claimed, it was

16

"sending our hashing power to our own private pools, but keeping your payouts 100% based on the pool you select." This representation too, was false. At the time, as Garza and GAW Miners knew or should have known, the company had nowhere near the amount of computing power that would support the units of hashing power that had been sold through Hashlets. As a result, GAW Miners engaged in minimal bitcoin mining – in private pools or elsewhere – and effectively no altcoin mining. At the time Garza made this statement, he knew or should have known that GAW Miners could not, and did not, fund its daily payouts to investors with the revenue from its mining activities.

67.    In order to conceal from investors that the mining activity associated with Hashlets did not produce sufficient revenues to fund the payouts that had been promised to investors, GAW Miners used revenues from ongoing Hashlet sales to fund payouts to investors. Thus, Hashlets operated as a Ponzi scheme, in which investors' returns were mostly paid by using the money invested by others.

68.    In September and October 2014, GAW Miners did not always have enough investors purchasing Hashlets with bitcoin to cover its daily bitcoin payout obligations to existing Hashlet owners. As a result, GAW Miners, at Garza's direction, converted some of the United States dollars the company had received as revenue from Hashlet sales into bitcoin. GAW Miners then used the bitcoin it had purchased to make daily payouts to existing Hashlet investors. In September and October 2014 alone, GAW Miners, at Garza's direction, converted over $1.5 million in cash to bitcoin to make mining payouts and thus perpetuate their fraud.

69.    Third, ZenPool was a purported mining pool created and operated by GAW Miners exclusively for certain Hashlet owners. GAW Miners claimed that ZenPool had the "highest and most reliable payout of any multipool in the world." A multipool is a pool that

17

mines both bitcoin and altcoin, depending on the profitability of each coin at the time.

70.     GAW Miners and Garza advertised ZenPool as an enticement for investors to pay more for "Zen Hashlets" and "Prime Hashlets," the only two types of Hashlet capable of mining in ZenPool.  These two types of Hashlets were significantly more expensive than other types of Hashlets that did not allow investors to access ZenPool.

71.     Contrary to GAW Miners' and Garza's representations, there was no ZenPool. GAW Miners did not operate a pool that engaged in mining.  GAW Miners did not direct the hashing power represented by its sales of Zen Hashlets or Prime Hashlets to a pool it owned and operated for investors' benefit.

72.     Instead, GAW Miners determined what the daily payout from ZenPool would be by examining the publicly-available payouts of other pools that were mining that day, and picking a higher number.

73.     When GAW Miners and Garza made false and misleading statements about ZenPool, they knew or should have known that there was no such pool engaged in mining.

**d.     The Hashlet Scheme Unraveled and the Next Scheme Began**

74.     During the fall of 2014, mining for virtual currency became less profitable as the value of many virtual currencies fell and the technological difficulty of mining increased.  Faced with a drop in their revenue stream from selling Hashlets, and faced with the fact that Hashlets were no longer profitable by November 2014, GAW Miners and Garza solicited many investors to redeem their Hashlets for new investment opportunities.

75.     GAW Miners announced, in November 2014, that it was planning to launch a new form of virtual currency, called PayCoin, and it offered for sale new digital wallets designed to hold PayCoin, called HashStakers.  GAW Miners sold HashStakers to new customers, and also

offered existing Hashlet investors the chance to "upgrade" their Hashlets to HashStakers.

76.     Garza made the decision that GAW Miners would offer and sell HashStakers, and launch PayCoin.  He controlled GAW Miners' strategic direction, and the content of the advertising that GAW Miners did for these new offerings.

77.     In offering HashStakers to Hashlet investors, GAW Miners and Garza attempted to prolong their scheme and prevent the collapse of GAW Miners.

### FIRST CLAIM FOR RELIEF

**Fraud in the Purchase or Sale of Securities in Violation of
Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**

78.     The Commission repeats and incorporates by reference the allegations in paragraphs 1-77 above as if set forth fully herein.

79.     Hashlets constitute investment contracts, and thus "securities" under Section 3(a)(10) [15 U.S.C. §78c(a)(10)] of the Exchange Act.

80.      All defendants engaged in a fraudulent course of conduct by which they oversold the investment returns from their virtual currency mining operation.  In addition, GAW Miners and Garza's fraudulent course of conduct included their misrepresentations to investors about the nature and profitability of the investment they were selling.

81.     By engaging in the conduct described above, all defendants, directly or indirectly, acting intentionally, knowingly or recklessly, by the use of means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities: have employed or are employing devices, schemes or artifices to defraud; and have engaged or are engaging in acts, practices or courses of business which operate as a fraud or deceit upon certain persons.

82.     By engaging in the conduct described above, GAW Miners and Garza, directly or indirectly, acting intentionally, knowingly or recklessly, by the use of means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities, have made or are making untrue statements of material fact or have omitted or are omitting to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading.

83.     As a result, defendants have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5].

**SECOND CLAIM FOR RELIEF**
**Fraud in the Offer or Sale of Securities in**
**Violation of Section 17(a) of the Securities Act**

84.     The Commission repeats and incorporates by reference the allegations in paragraphs 1-77 above as if set forth fully herein.

85.     Hashlets constitute investment contracts, and thus "securities" under Section 2(a)(1) [15 U.S.C. §77b(1)] of the Securities Act.

86.     All defendants engaged in a fraudulent course of conduct by which they oversold the investment returns from their virtual currency mining operation.  In addition, GAW Miners and Garza's fraudulent course of conduct included their misrepresentations to investors about the nature and profitability of the investment they were selling.

87.     By engaging in the conduct described above, all defendants, directly and indirectly, acting intentionally, knowingly or recklessly, in the offer or sale of securities by the use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails: have employed or are employing devices, schemes or artifices to defraud; or

have engaged or are engaging in transactions, practices or courses of business which operate as a fraud or deceit upon purchasers of the securities.

88.     By engaging in the conduct described above, GAW Miners and Garza, directly and indirectly, acting intentionally, knowingly or recklessly, in the offer or sale of securities by the use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails, have obtained or are obtaining money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

89.     As a result, defendants have violated and, unless enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. §77q(a)].

### THIRD CLAIM FOR RELIEF
**Offer and Sale of Unregistered Securities**
**Violation of Sections 5(a) and 5(c) of the Securities Act**

90.     The Commission repeats and incorporates by reference the allegations in paragraphs 1-77 above as if set forth fully herein.

91.     Hashlets constitute investment contracts, and thus "securities" under Section 2(a)(1) [15 U.S.C. §77b(1)] of the Securities Act.

92.     No registration statement was filed with respect to the Hashlets sold by defendants, and no exemption from registration was available for these securities.

93.     By engaging in the conduct described above, defendants, directly or indirectly: (a) have made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been in effect and for which no exemption from registration has been available; and/or (b) have made use of the means or instruments of

transportation or communication in interstate commerce or of the mails to offer to sell, through

the use or medium of a prospectus or otherwise, securities as to which no registration statement

has been filed and for which no exemption from registration has been available.

94.     As a result, defendants have violated and, unless enjoined, will continue to

violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C §77e(a), (c)].


## PRAYER FOR RELIEF

WHEREFORE, the Commission requests that this Court:

A.      Enter a permanent injunction restraining defendants and each of their agents,

servants, employees and attorneys and those persons in active concert or participation with them

who receive actual notice of the injunction by personal service or otherwise, including facsimile

transmission or overnight delivery service, from directly or indirectly engaging in the conduct

described above, or in conduct of similar purport and effect, in violation of Section 10(b) of the

Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5]; and

Sections 5(a) and 5(c), and 17(a) of the Securities Act [15 U.S.C. §§77e(a), (c), 77q(a)].

B.      Require defendants to disgorge their ill-gotten gains, plus pre-judgment interest;

C.      Require defendants to pay an appropriate civil monetary penalty pursuant to

Section 20(d) of the Securities Act [15 U.S.C. §77t(d)], and Section 21(d)(3) of the Exchange

Act [15 U.S.C. §78u(d)(3)];

D.      Retain jurisdiction over this action to implement and carry out the terms of all

orders and decrees that may be entered;

E.      Award such other and further relief as the Court deems just and proper.

Respectfully submitted,

SECURITIES AND EXCHANGE COMMISSION
By its attorneys,

/s/ Kathleen B. Shields
Kathleen B. Shields (Mass. Bar No. 637438,
phv 04710)
Gretchen Lundgren (Mass. Bar No. 644742)
Michele Perillo (Mass. Bar No. 629343)
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
33 Arch Street, 23rd Floor
Boston, MA  02110
(617) 573-8904 (Shields direct)
(617) 573-4590 (fax)
shieldska@sec.gov (Shields email)

Local Counsel:


/s/ John B. Hughes
John B. Hughes (Fed. Bar No. CT 05289)
Assistant United States Attorney
Chief, Civil Division
United States Attorney's Office
Connecticut Financial Center
157 Church St., 23rd Floor
New Haven, CT  06510
Phone: (203) 821-3700
Fax: (203) 773-5373

DATED: December 1, 2015

EXHIBIT A-47

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 3:15-CV-1760-JAM |
| ) | |
| HOMERO JOSHUA GARZA, ) | |
| GAW MINERS, LLC, and ) | |
| ZENMINER, LLC (d/b/a ZEN CLOUD), ) | |
| ) | |
| Defendants. ) | |
| ) | |

## CONSENT OF DEFENDANT HOMERO JOSHUA GARZA

1.      Defendant Homero Joshua Garza ("Defendant") acknowledges having been

served with the complaint in this action, enters a general appearance, and admits the Court's

jurisdiction over Defendant and over the subject matter of this action.

2.      Defendant has pled guilty to criminal conduct relating to certain matters alleged in

the complaint in this action. Specifically, in *United States v. Homero Joshua Garza*, Crim. No.

17-cr-158-RNC (D. Conn.), Defendant pled guilty to wire fraud in violation of 18 U.S.C. §1343.

In connection with that plea, Defendant admitted the facts set out in the plea agreement that is

attached as Exhibit A to this Consent. This Consent shall remain in full force and effect

regardless of the existence or outcome of any further proceedings in *United States v. Homero

Joshua Garza*.

3.      Defendant hereby consents to the entry of the final Judgment in the form attached

hereto (the "Final Judgment") and incorporated by reference herein, which, among other things:

(a) permanently restrains and enjoins Defendant from violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5], and Sections 5(a), 5(c) and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§77e(a), (c), 77q(a)];

(b) permanently restrains and enjoins Defendant, and any entity he owns or controls, from directly or indirectly participating in the issuance, offer, or sale of any security, provided however that such an injunction shall not prevent Defendant from purchasing or selling securities solely for his own account or the accounts of his spouse or minor children;

(c) orders Defendant to pay disgorgement in the amount of $9,182,000, plus prejudgment interest thereon in the amount of $742,774, which payment of disgorgement will be deemed satisfied by the order of restitution to be entered when he is sentenced in the related criminal case, *United States v. Homero Joshua Garza*, Crim. No. 17-cr-158-RN C (D. Conn.); and

(d) forgoes the assessment of a civil penalty against Defendant.

4. Defendant waives the entry of findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

5. Defendant waives the right, if any, to a jury trial and to appeal from the entry of the Final Judgment.

6. Defendant enters into this Consent voluntarily and represents that no threats, offers, promises, or inducements of any kind have been made by the Commission or any

member, officer, employee, agent, or representative of the Commission to induce Defendant to enter into this Consent.

7.      Defendant agrees that this Consent shall be incorporated into the Final Judgment with the same force and effect as if fully set forth therein.

8.      Defendant will not oppose the enforcement of the Final Judgment on the ground, if any exists, that it fails to comply with Rule 65(d) of the Federal Rules of Civil Procedure, and hereby waives any objection based thereon.

9.      Defendant waives service of the Final Judgment and agrees that entry of the Final Judgment by the Court and filing with the Clerk of the Court will constitute notice to Defendant of its terms and conditions. Defendant further agrees to provide counsel for the Commission, within thirty days after the Final Judgment is filed with the Clerk of the Court, with an affidavit or declaration stating that Defendant has received and read a copy of the Final Judgment.

10.      Consistent with 17 C.F.R. 202.5(f), this Consent resolves only the claims asserted against Defendant in this civil proceeding. Defendant acknowledges that no promise or representation has been made by the Commission or any member, officer, employee, agent, or representative of the Commission with regard to any criminal liability that may have arisen or may arise from the facts underlying this action or immunity from any such criminal liability. Defendant waives any claim of Double Jeopardy based upon the settlement of this proceeding, including the imposition of any remedy or civil penalty herein. Defendant further acknowledges that the Court's entry of a permanent injunction may have collateral consequences under federal or state law and the rules and regulations of self-regulatory organizations, licensing boards, and other regulatory organizations. Such collateral consequences include, but are not limited to, a statutory disqualification with respect to membership or participation in, or association with a

member of, a self-regulatory organization. This statutory disqualification has consequences that are separate from any sanction imposed in an administrative proceeding. In addition, in any disciplinary proceeding before the Commission based on the entry of the injunction in this action, Defendant understands that he shall not be permitted to contest the factual allegations of the complaint in this action.

11. Defendant understands and agrees to comply with the terms of 17 C.F.R. § 202.5(e), which provides in part that it is the Commission's policy "not to permit a defendant or respondent to consent to a judgment or order that imposes a sanction while denying the allegations in the complaint or order for proceedings." As part of Defendant's agreement to comply with the terms of Section 202.5(e), Defendant acknowledges his guilty plea for related conduct described in paragraph 2 above, and: (i) will not take any action or make or permit to be made any public statement denying, directly or indirectly, any allegation in the complaint or creating the impression that the complaint is without factual basis; (ii) will not make or permit to be made any public statement to the effect that Defendant does not admit the allegations of the complaint, or that this Consent contains no admission of the allegations; (iii) upon the filing of this Consent, Defendant hereby withdraws any papers filed in this action to the extent that they deny any allegation in the complaint; and (iv) stipulates solely for purposes of exceptions to discharge set forth in Section 523 of the Bankruptcy Code, 11 U.S.C. §523, that the allegations in the complaint are true, and further, that any debt for disgorgement, prejudgment interest, civil penalty or other amounts due by Defendant under the Final Judgment or any other judgment, order, consent order, decree or settlement agreement entered in connection with this proceeding, is a debt for the violation by Defendant of the federal securities laws or any regulation or order issued under such laws, as set forth in Section 523(a)(19) of the Bankruptcy Code, 11 U.S.C.

§523(a)(19). If Defendant breaches this agreement, the Commission may petition the Court to vacate the Final Judgment and restore this action to its active docket. Nothing in this paragraph affects Defendant's: (i) testimonial obligations; or (ii) right to take legal or factual positions in litigation or other legal proceedings in which the Commission is not a party.

12.     Defendant hereby waives any rights under the Equal Access to Justice Act, the Small Business Regulatory Enforcement Fairness Act of 1996, or any other provision of law to seek from the United States, or any agency, or any official of the United States acting in his or her official capacity, directly or indirectly, reimbursement of attorney's fees or other fees, expenses, or costs expended by Defendant to defend against this action. For these purposes, Defendant agrees that Defendant is not the prevailing party in this action since the parties have reached a good faith settlement.

13.     Defendant agrees that the Commission may present the Final Judgment to the Court for signature and entry without further notice.

14.     Defendant agrees that this Court shall retain jurisdiction over this matter for the purpose of enforcing the terms of the Final Judgment.

Dated: 9/14/17

_____
Homero Joshua Garza

On September 14, 2017, Homero J. Garza, a person known to me, personally appeared before me and acknowledged executing the foregoing Consent.

_____
Notary Public
Commission expires: September 25, 2019

SAVANNAH HAILEY
Notary Public, State of Texas
Comm. Expires 09-25-2019
Notary ID 130384378

Approved as to form:

Marjorie J. Peerce
919 Third Avenue
New York, NY 10022
Tel: 212-223-0200
Fax: 212-223-1942
peercem@ballardspahr.com

Attorney for Defendant

EXHIBIT A-48

Case 3:15-cv-01760-JAM Document 43-1 Filed 10/04/19 Page 70 of 347

## UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

_____
                                                    )
SECURITIES AND EXCHANGE COMMISSION,                 )
                                                    )
              Plaintiff,                             )
                                                    )
       v.                                           )     Case No. 3:15-CV-1760-JAM
                                                    )
HOMERO JOSHUA GARZA,                                )
GAW MINERS, LLC, and                                )
ZENMINER, LLC (d/b/a ZEN CLOUD),                    )
                                                    )
              Defendants.                            )
_____     )

## FINAL JUDGMENT AS TO DEFENDANT HOMERO JOSHUA GARZA

The Securities and Exchange Commission having filed a Complaint and Defendant

Homero Joshua Garza ("Garza" or "Defendant") having entered a general appearance; consented

to the Court's jurisdiction over Defendant and the subject matter of this action; consented to

entry of this Final Judgment; pled guilty to wire fraud in the related criminal case *United States

v. Homero Joshua Garza*, Crim. No. 17-cr-158-RNC, waived findings of fact and conclusions of

law; and waived any right to appeal from this Final Judgment:

### I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant is

permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the

Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5

promulgated thereunder [17 C.F.R. § 240.10b-5], by using any means or instrumentality of

interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:

(a)     to employ any device, scheme, or artifice to defraud;

(b)     to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(c)     to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Final Judgment by personal service or otherwise:  (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

## II.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)] in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

(a)     to employ any device, scheme, or artifice to defraud;

(b)     to obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements

2

made, in light of the circumstances under which they were made, not misleading; or

(c) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Final Judgment by personal service or otherwise:  (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

## III.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating Section 5 of the Securities Act [15 U.S.C. § 77e] by, directly or indirectly, in the absence of any applicable exemption:

(a) Unless a registration statement is in effect as to a security, making use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise;

(b) Unless a registration statement is in effect as to a security, carrying or causing to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale; or

(c) Making use of any means or instruments of transportation or communication in

interstate commerce or of the mails to offer to sell or offer to buy through the use

or medium of any prospectus or otherwise any security, unless a registration

statement has been filed with the Commission as to such security, or while the

registration statement is the subject of a refusal order or stop order or (prior to the

effective date of the registration statement) any public proceeding or examination

under Section 8 of the Securities Act [15 U.S.C. § 77h].

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in

Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who

receive actual notice of this Final Judgment by personal service or otherwise:  (a) Defendant's

officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or

participation with Defendant or with anyone described in (a).

## IV.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant

and any entity he owns or controls, are permanently restrained and enjoined from directly or

indirectly participating in the issuance, offer, or sale of any security, provided however that such

an injunction shall not prevent Defendant from purchasing or selling securities solely for his own

account or the accounts of his spouse or minor children.

## V.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant

is liable for disgorgement of $9,182,000, representing sums gained as a result of the conduct

alleged in the Complaint, together with prejudgment interest thereon in the amount of $742,774,.

Defendant's payment of disgorgement is deemed satisfied by the order of restitution that will be

entered against him when he is sentenced in the related criminal case *United States v. Homero Joshua Garza*, Crim. No. 17-cr-158-RNC (D. Conn.).

Defendant shall satisfy his obligation to pay prejudgment interest by paying $742,774 to the Securities and Exchange Commission within six months after entry of this Final Judgment. Defendant may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request.   Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm. Defendant may also pay by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

 and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; Garza as a defendant in this action; and specifying that payment is made pursuant to this Final Judgment.

Defendant shall simultaneously transmit photocopies of evidence of payment and case identifying information to the Commission's counsel in this action.  By making this payment, Defendant relinquishes all legal and equitable right, title, and interest in such funds and no part of the funds shall be returned to Defendant.

The Commission shall hold the funds (collectively, the "Fund") and may propose a plan to distribute the Fund subject to the Court's approval, including a plan to remit the funds to the United States Attorney's Office for payment to the victims identified in the order of restitution that will be entered against defendant when he is sentenced in *United States v. Homero Joshua*

*Garza*.  The Court shall retain jurisdiction over the administration of any distribution of the

Fund.  If the Commission staff determines that the Fund will not be distributed, the Commission

shall send the funds paid pursuant to this Final Judgment to the United States Treasury.

The Commission may enforce the Court's judgment for disgorgement and prejudgment

interest by moving for civil contempt (and/or through other collection procedures authorized by

law) at any time after 14 days following the due date of Defendant's payments pursuant to this

Final Judgment.  Defendant shall pay post judgment interest on any delinquent amounts pursuant

to 28 U.S.C. §1961.

VI.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, solely for purposes of

exceptions to discharge set forth in Section 523 of the Bankruptcy Code, 11 U.S.C. §523, the

allegations in the complaint are true and admitted by Defendant, and further, any debt for

disgorgement, prejudgment interest, civil penalty or other amounts due by Defendant under this

Final Judgment or any other judgment, order, consent order, decree or settlement agreement

entered in connection with this proceeding, is a debt for the violation by Defendant of the federal

securities laws or any regulation or order issued under such laws, as set forth in Section

523(a)(19) of the Bankruptcy Code, 11 U.S.C. §523(a)(19).

VII.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court shall retain

jurisdiction of this matter for the purposes of enforcing the terms of this Final Judgment.

VIII.

There being no just reason for delay, pursuant to Rule 54(b) of the Federal Rules of Civil

6

Procedure, the Clerk is ordered to enter this Final Judgment forthwith and without further notice.

Dated at New Haven this 4th day of October, 2017.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge

EXHIBIT A-49

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES | **JUDGMENT** ~~FILED~~ |
| V. | CASE NO. 3:17-cr-00158-RNC-1 |
| | USM: N/A |
| HOMERO JOSHUA GARZA | US DISTRICT COURT |
| | Government's Counsel: |
| | John Trowbridge Pierpont |
| | Assistant U. S. Attorney |
| | 157 Church Street, 25th Floor |
| | New Haven, CT 06510 |
| | |
| | Defendant's Counsel: |
| | Marjorie J. Peerce |
| | 919 Third Avenue |
| | New York, NY 10022 |

The defendant pleaded guilty to Count One of the Information. Accordingly, the defendant is adjudicated guilty of the following offense:

| Title & Section | Nature of Offense | Offense Concluded | Count |
|---|---|---|---|
| 18 U.S.C. § 1343 | Wire Fraud | January 2015 | One |

The following sentence is imposed pursuant to the Sentencing Reform Act of 1984. The Court departs based on a combination of factors, including the defendant's remorse, family ties and responsibilities, and his desire to make restitution.

**IMPRISONMENT**

The defendant is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 21 months. The defendant will self-surrender directly to the facility designated by the Federal Bureau of Prisons no later than 2:00 p.m. on January 4, 2019, under his own power and at his own expense. In the event the defendant does not receive a designation by the Bureau of Prisons prior to that date, the defendant will self-surrender to a BOP facility as directed by the United States Marshal.

**RECOMMENDATIONS TO THE BUREAU OF PRISONS**

The Court recommends to the Bureau of Prisons that the defendant be designated to serve his term of incarceration at FPC Pensacola to facilitate family visits.

**SUPERVISED RELEASE**

The defendant will be on supervised release for a term of three years subject to the mandatory and standard conditions of supervised release set forth below. In addition, the following special conditions are imposed:

1. The defendant will serve the first six months of supervised release on home confinement. The defendant will be confined to his home at all times except that he may leave the home to work, obtain medical treatment for himself or his family, participate in religious services, perform community service, and at such other times as are approved in advance by the United States Probation Office.

2. The defendant will pay the restitution imposed by this judgment in a lump sum immediately. If he is unable to pay the full balance in a lump sum, any remaining balance will be paid at a rate of not less than $1,000 per month. The monthly payment schedule may be adjusted based on the defendant's ability to pay as determined by the United States Probation Office and approved by the Court.

3. The defendant will not maintain a credit card account for personal use without the prior approval of the United States Probation Office and, if such approval is given, he will not incur any credit card charge of a personal nature in excess of $500 without the prior approval of the Probation Office. This $500 limitation does not apply to a credit card account maintained for business use.

4. The defendant will provide the United States Probation Office with access to any requested financial information and authorize third parties to release financial information to the Probation Office.

## RESTITUTION

The defendant will pay restitution in the total amount of $9,182,000. An order listing the names of the persons to whom restitution is owed, and the amount owed to each one, will be entered by the Court

## MONETARY PENALTIES

The defendant will pay a special assessment of $100.

It is further ordered that the defendant will notify the United States Attorney for this District within 30 days of any change of name, residence or mailing address until the restitution imposed by this judgment is paid.

**DATE:  9/13/2018**
Date of Imposition of Sentence

/s/ Honorable Robert N. Chatigny

Robert N. Chatigny, United States District Judge
Date: 9/21/2018

## CONDITIONS OF SUPERVISED RELEASE

**In addition to the Standard Conditions listed below, the following indicated (■) Mandatory Conditions are imposed:**

### MANDATORY CONDITIONS

(1) You must not commit another federal, state or local crime.

(2) You must not unlawfully possess a controlled substance.

(3) You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

 ■ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*

(4) ■ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*

(5) ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*

(6) ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

(7) ☐ You must make restitution in accordance with 18 U.S.C.§§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable*

### STANDARD CONDITIONS

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

(1) You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.

(2) After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.

(3) You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.

(4) You must answer truthfully the questions asked by your probation officer.

(5) You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.

(6) You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.

(7) You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.

(8) You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.

(9) If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.

(10) You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).

(11) You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.

(12) You must follow the instructions of the probation officer related to the conditions of supervision.

Upon a finding of a violation of supervised release, I understand that the court may (1) revoke supervision <u>and impose a term of imprisonment,</u> (2) extend the term of supervision, and/or (3) modify the conditions of supervision.

These conditions have been read to me. I fully understand the conditions and have been provided a copy of them.

(Signed) _____     _____
          Defendant                                                                                      Date

_____     _____
U.S. Probation Officer/Designated Witness                                      Date

**CERTIFIED AS A TRUE COPY ON THIS DATE:** _____

By: _____
    Deputy Clerk

**RETURN**

I have executed this judgment as follows:

Defendant delivered on _____ to _____ a _____, with a certified copy of this judgment.

_____
              Brian Taylor
       Acting United States Marshal

By     _____
              Deputy Marshal

EXHIBIT A-50

Page 1

1

　　UNITED STATES DISTRICT COURT

2　　DISTRICT OF CONNECTICUT

　　------------------------------------------

3　　DENIS MARC AUDET, MICHAEL PFEIFFER,

4　　DEAN ALLEN SHINNERS, and JASON VARGAS,

　　Individually and on Behalf of All Others

5　　Similarly Situated,

6　　　　　　　　　　　　　　Plaintiffs,

7

8　　　　　　　vs.　　　　No. 16-940

9

10　　HOMERO JOSHUA GARZA, STUART A. FRASER,

　　GAW MINERS, LLC, and ZENMINER, LLC,

11　　(d/b/a ZEN CLOUD),

12　　　　　　　　　　　　　　Defendants.

13　　------------------------------------------

14

15　　　　** CONTAINS CONFIDENTIAL PORTIONS **

16

17　　　VIDEOTAPED DEPOSITION OF DENIS MARC AUDET

18

19

20　　　　　　　　Friday, August 10, 2018

21　　　　　　　　　　11:00 a.m.

22

23　　Reported by:

24　　Joan Ferrara, RPR, RMR, CRR

25　　Job No. 144961

Contains Confidential Portions

D. Audet

1
2     Q    The third column from the right
3  on the devices table, there is a column
4  called fee.
5     A    Uh-huh.
6     Q    What kind of fees did you pay?
7     A    I didn't pay a fee, per se.
8  What I did pay was the cost of the Hashlet,
9  and I think my guess is that the fee here
10 is an internal documentation by GAW to say
11 this is what we're charging this Hashlet,
12 you know, this customer, this Hashlet.
13 This is based on the fee they're collecting
14 to run your device for a period of time.
15    Q    So was the fee taken out of your
16 payout?
17    A    I think it was, yes.
18    Q    Did those fees change over time?
19    A    I don't know.
20    Q    When you received your payout,
21 you couldn't tell if the fee had been taken
22 out of it?
23    A    I knew there was a fee applied
24 to it, but we were just given the payout
25 post fee.

D. Audet

1
2     Q    So you didn't know if the fee
3  was 10 percent one day and then 50 percent
4  another day?
5     A    I don't recall, no.  I think the
6  fee was a fixed cost thing based on the
7  cost of electricity and running, you know,
8  the -- to run the establishment -- no --
9  the server farm where all these machines
10 were being used or stored and run.
11       So it was sort of like a fixed
12 cost.  So the percentage doesn't -- you
13 know, one day if you had a big payout, the
14 fee was relatively small.  If you had a
15 small payout, then it was large.
16       But GAW always took their fee
17 out first and then anything left over was
18 your payout.  I don't remember if they
19 actually published the fee.  I think they
20 just gave you your payout.
21    Q    Did the fees vary based on the
22 different types of Hashlets or Hashstakers
23 or GAW products?
24    A    I don't know.  I don't know how
25 they priced it.

D. Audet

1
2     Q    Moving on to the next table
3  labeled PayCoins, why are these
4  transactions not reflected on your
5  certification?
6     A    I don't actually know.  Let's
7  see, these are PayCoin transactions?
8     Q    It looks like these are PayCoin
9  transactions.
10    A    Well, the two that are obvious
11 to me are the -- where it says notes,
12 convert HP to XPY.
13    Q    Right.
14    A    That one, I recognize.  Then the
15 one above 80 percent down the page, the
16 94.94, that's another conversion.
17    Q    Right.  So I see those two
18 conversions listed on your certification.
19    A    Right.
20    Q    But I don't see any of the other
21 transactions on here listed on your
22 certification.
23    A    Like the payouts, for example?
24    Q    The payouts, the stakes, the
25 withdrawals.  I don't know, I don't --

D. Audet

1
2     A    Those would be all internal to
3  what GAW was doing.  I would have never
4  seen these.  I never saw these except for
5  the ones, for example, the ones that say
6  complete -- the ones that say stake, those
7  look like when I put in -- those look like
8  when I bought the actual Hashstakers.  The
9  numbers seem to be recognizable.  The
10 rest -- they all look like internal
11 accounting numbers.
12    Q    So it looks like the stake
13 records on this first page were created on
14 December 21, 2014, but it looks like you
15 bought your Hashstakers on December 1,
16 2014?
17    A    Right.
18    Q    Do you know why --
19    A    I think --
20    Q    -- there is a difference?
21    A    No, I don't know why.  I don't
22 know.  See, there's a create date here, but
23 I'm not sure what that refers to.  It may
24 have nothing to do with the rest of the
25 columns.  It all depends.  I mean to be

Contains Confidential Portions

Page 82

D. Audet

1
2  geeky about it, it all depends who sat at
3  the database and what they were actually
4  monitoring.
5          This could have been a column --
6  I'm speculating -- this could have been a
7  table set up at some point to do the entire
8  conversion, you know, transfer from the
9  world of Hashlets to the world of Paybase.
10 So this could have been created after we
11 actually purchased the Hashstakers.
12         Again, I'm speculating.  I
13 don't -- I didn't create this.
14     Q   Toward the bottom of the first
15 page, there are two records that say
16 withdraw in the type column.
17     A   Hold on.  I'm looking for them.
18 Oh, right, the one with ID 41678 and
19 938006, yes.
20     Q   Correct?
21     A   Correct.
22     Q   Do you know what those are
23 referring to?  It looks like you withdrew
24 $10,000 --
25     A   I don't know what those are

Page 83

D. Audet

1
2  referring to.  I think those were, again,
3  those are -- the fact that one says 500
4  PayCoin, I think it might have been --
5  again, I think this is all related to the
6  conversion from Hashpoints to -- I don't
7  actually know what this means.
8      Q   Do you remember withdrawing
9  $10,000 from your account?
10     A   No, I do not.
11     Q   You did not withdraw $10,000?
12     A   I did not withdraw $10,000 from
13 my account.
14     Q   Okay.
15         Did you withdraw 500 PayCoin?
16     A   No, I did not.
17     Q   So you don't know what this
18 transaction labeled 93006 is referring to?
19     A   No, I don't.  I'm just skimming
20 through this.  It looks -- I don't actually
21 know what -- see, this history goes all the
22 way through April 2015.
23     Q   Uh-huh.
24     A   I don't actually know where this
25 was being recorded from.  Some of it looks

Page 84

D. Audet

1
2  like the Hashstakers were doing payouts.
3  That's what's being recorded basically from
4  the second page onward.
5      Q   When did you stop monitoring
6  your payouts?
7      A   I think, essentially, I was
8  monitoring the payouts all the way through,
9  you know, when they closed the website
10 down.  At that point, someone else had
11 taken over the PayCoin ecosystem.  I forget
12 who that was, but.
13     Q   So you monitored your payouts
14 until you could no longer monitor your
15 payouts on the GAW website?
16     A   Uh-huh.  Some of these payouts
17 are very granular.  They could have been --
18 without actually knowing the details of how
19 they actually monitor the individual
20 Hashlets or -- I just don't know exactly
21 what they were doing.  So I'm sorry, I
22 can't tell you much more on that.
23     Q   Have you ever calculated your
24 damages, total damages, in this case?
25     A   Specifically -- total damages,

Page 85

D. Audet

1
2  I -- you know, without being -- I only know
3  the amount of money I put into GAW
4  products.  I don't -- the damages would be,
5  you know, you know, that's a whole
6  eco-accounting definition of what we call a
7  damage.  So I -- you know, the only thing I
8  know for sure is how much money I spent on
9  GAW products.
10     Q   Okay.
11         How much was that?
12     A   Specifically, it was
13 approximately between 30 and $35,000 U.S.
14 dollars.
15     Q   That's how much you spent on GAW
16 products, correct?
17     A   Right, to buy the Hashlets and
18 things, yes.
19     Q   Did you take into account ever
20 the total amount that you received from GAW
21 products?
22     A   Yes.  I didn't receive any money
23 from the GAW -- I never took money out of
24 the GAW ecosystem, so.
25     Q   So when you received these

Contains Confidential Portions

Page 86

D. Audet

1 payouts, did you reinvest?
2      A    Yes, the payouts were basically
3 credit -- for example, the Hashstakers
4 would give you payouts in PayCoins.  So
5 those would just accumulate in your wallet,
6 so.
7      Q    And you never took any money out
8 of the GAW ecosystem?
9      A    No, I did not.
10      Q    Why not?
11      A    Initially, there was no need to
12 because the whole Paybase PayCoin thing
13 seemed to be working.  And towards the end,
14 like towards April of 2015 when the Paycoin
15 market was basically falling to zero, at
16 that point someone else had taken over the
17 PayCoin block chain and there were promises
18 that, you know, they were going to try to
19 do something with it.  So I was just
20 waiting to see what happened with the new
21 people who took over.  And then eventually
22 those Paycoins got converted to something
23 else called ION.  So I never sold anything.
24 I just waited to see what would happen.

Page 87

D. Audet

1      Q    So did you convert your PayCoins
2 to ION?
3      A    Those were done automatically
4 for me.
5      Q    Do you still hold those ION --
6      A    Yes, I do.
7      Q    Do you know who the person was
8 who took over Paycoin?
9      A    I don't remember the person's
10 name, no.
11      Q    Was it Adam Matlack?
12      A    I can't remember.  The name
13 sounds familiar.  He might have been
14 involved, but I can't remember.
15      Q    Do you remember the term Team
16 PayCoin?
17      A    Yes, I do, yeah.
18      Q    Do you know what that is?
19      A    I just remember the name.  I
20 read some of the stuff on -- I read some of
21 their material on their website.  Like I
22 said, it's 4 years ago, so it's vague now.
23      Q    Did you ever consider selling
24 your whole account?

Page 88

D. Audet

1      A    No.
2      Q    Moving on to the next table
3 labeled Hashpoints, you'll see a column
4 called type.
5      A    Uh-huh.
6      Q    And in it, it looks like there
7 is something called a hash payout and
8 something called a payout.
9      A    Uh-huh.
10      Q    Can you tell me the difference
11 between those two things?
12      A    I'd be guessing.  I don't know.
13 Let me look at the dates for a moment.
14      I don't know.  They all look the
15 same.  I can't tell you, sorry.
16      Q    When you monitored your payouts,
17 was there ever any differentiation
18 between --
19      A    No --
20      Q    -- different types of payouts?
21      A    No.  They're just payouts.  They
22 just appear in your account.  We always saw
23 them as higher Hashpoints or eventually pay
24 points.

Page 89

D. Audet

1      These would have been the
2 Hashpoints.  So this would have been the
3 pre-pay point conversion.  All we saw were
4 Hashpoints coming into our wallet, so.
5      Q    And when were Hashpoints
6 initiated?
7      A    About the time they shut down
8 the Hashlet -- by the time -- it would have
9 been maybe beginning/mid August 2014,
10 around the time that they decided that
11 mining Bitcoins was not profitable.
12      Q    Moving on to the table labeled
13 sale items -- it's not the next one, but
14 the next tab after that.
15      A    Uh-huh.
16      Q    So you mentioned earlier that
17 you never sold any GAW products?
18      A    That's right, yeah.
19      Q    And yet, it looks like these
20 were sales by you, is that right?
21      A    I don't know what this table
22 means.  More likely -- actually, it looks
23 more like these might have been things I
24 bought actually.  See, there's no time

Contains Confidential Portions

## Page 90

D. Audet

stamp on this, so it's hard to correlate
it.

Q    The second column from the
right, there is the column labeled sale
fee.

A    Uh-huh.

Q    Was that a separate fee from the
fee that was taken out of your payouts?

A    No.  I think this table -- again
I'm guessing -- I think this is a table for
the secondary market where I purchased
various items.

I think the sale fee was the fee
that GAW took because they enabled -- you
know, it's like Amazon Prime -- or no --
it's like when you sell on Amazon or eBay,
they take a little fee.  This is what they
were taking.

So I think this was actually the
sale of the secondary market.  Again,
without a time stamp, I can't be sure.

Q    So did you ever open a Paybase
account?

A    Just to confirm, I think, my

## Page 91

D. Audet

guess is that this refers to secondary
market.  It's not anything I did myself,
except buy the things, so.  Again, I can't
be sure.  I didn't create the database.

Q    I'll ask my question again.

A    Yeah.

Q    Did you open a Paybase account?

A    I think I did.  I think I'm
pretty sure I did as part of the
transition.

(Whereupon, Exhibit 208, Data
excerpts, was marked for
Identification, as of this date.)

BY MS. MILLER:

Q    This is an excerpt of data we
received from your counsel.

A    Uh-huh.

Q    That we understand to be from
Paybase.

A    Uh-huh.

Q    Does this comport with your
recollection of your activity on Paybase?

I'll clarify that the first two
pages are a continuation of the same rows.

## Page 92

D. Audet

A    Right, yeah.

Q    So they should be sort of
side-by-side.

A    Yes, I understand that.

I think what was happening is
we -- I think these were transfers of
PayCoins from the Paybase wallet to my
wallet that I had on my computer.  So these
were all PayCoin to PayCoin transfers.

Q    When you say wallet you had on
your computer, what was that?

A    The way these crypto currencies,
you can actually keep the digital
information, which is the coin itself, on
your computer.  You basically transfer a
file from say one wallet which, for
example, GAW would have had all these big
wallets on their system, and you could
actually -- and you would have it, I guess
you could call it, you would have your own
wallet on their server and you could
actually transfer your coins from one
wallet on the servers to your personal
wallet on your personal computer.

## Page 93

D. Audet

And these were, I think these
were transactions, I think -- I don't
remember exactly what happened.  It looks
like I transferred 200 PayCoins into the
Paybase and then this would have been at
the end of December.  Then I withdrew it,
it looks like at the end of February.  I
think at that point they were shutting
down.  I think I funded Paybase and then
they eventually announced it was shut down
or -- a lot of things happened in those 2
months.  I think at that point we were just
told take the stuff out of it.  So I just
cleared the wallet.

Q    Just to clarify, you said the
end of February, but it looks like it says
February 4th, is that right?

A    That's right, correct, 4th of
February 2015.

Q    So when you transferred PayCoin
from Paybase to your wallet on your
computer --

A    Right.

Q    -- was that still in the GAW

Contains Confidential Portions

Page 170

1          D. Audet
2     Q    Okay.  Understood.
3          A couple of more questions.
4          What is your current salary?
5          MR. WATTERSON:  Designate it as
6     confidential.  You can answer.
7     BY MS. MILLER:
8     Q    That means it remain
9     confidential, so only participants in this
10    lawsuit can --
11    A    Mine or my household?
12    Q    Yours.
13    A    Mine.  When?
14    Q    Your current salary on an annual
15    basis.
16    A    $96,000 per annum.
17    Q    And what is your net worth?
18    A    This is confidential again?
19         MR. WATTERSON:  Yes.  Designate
20    all of this confidential.  I'll let
21    you know when we can stop.  Go ahead.
22    You can answer.
23    A    $1.4 million.
24         MS. MILLER:  Okay.  No further
25    questions.

Page 171

1          D. Audet
2     MR. WATTERSON:  We'll reserve
3     our questions for trial and obviously
4     you can stop designating confidential.
5     Thank you.
6
7          (Continued on next page to
8     include signature and jurat.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 172

1          D. Audet
2     (Continued in non-confidential
3     portion of the transcript.
4          THE VIDEOGRAPHER:  The time is
5     3:45 p.m. and we're going off the
6     record.
7          (Time noted 3:45 p.m.)
8
9
10
11    _____
12         DENIS MARC AUDET
13
14
15
16    Subscribed and sworn to
17    before me this      day
18    of          , 2018.
19
20    _____
21    NOTARY PUBLIC
22
23
24
25

Page 173

1          D. Audet
2     ---------------- I N D E X ----------------
3
4     WITNESS        EXAMINATION BY        PAGE
5     M. AUDET       MS. MILLER            5
6
7
8     ------ EXHIBITS FOR IDENTIFICATION ------
9
10    EXHIBIT 205   Linked-In profile       9
11
12    EXHIBIT 206   Online web bio         16
13
14    EXHIBIT 207   Data excerpts          65
15
16    EXHIBIT 208   Data excerpts          91
17
18    EXHIBIT 209   Document               96
19
20    EXHIBIT 210   HTML document         100
21
22    EXHIBIT 211   Interrogatories       158
23
24
25

Contains Confidential Portions

Page 174

```
1              D. Audet
2         C E R T I F I C A T E
3   STATE OF NEW YORK )
4                    : ss
5   COUNTY OF QUEENS  )
6
7       I, Joan Ferrara, a Notary Public within
8   and the State of New York, do hereby
9   certify:
10      That DENIS MARC AUDET, the witness whose
11  deposition is hereinbefore set forth, was
12  duly sworn by me and that such deposition is
13  a true record of the testimony given by the
14  witness.
15      I further certify that I am not related
16  to any of the parties to this action by
17  blood or marriage, and that I am in no
18  way interested in the outcome of this
19  matter.
20      IN WITNESS WHEREOF, I have hereunto set
21  my hand this 21st day of August, 2018.
22
23
24        _____
25           JOAN FERRARA, RMR
```

Page 176

```
1              D. Audet
2      DEPOSITION ERRATA SHEET
3   Page No. _____ Line No. _____ Change to: _____
4   _____
5   Reason for change: _____
6   Page No. _____ Line No. _____ Change to: _____
7   _____
8   Reason for change: _____
9   Page No. _____ Line No. _____ Change to: _____
10  _____
11  Reason for change: _____
12  Page No. _____ Line No. _____ Change to: _____
13  _____
14  Reason for change: _____
15  Page No. _____ Line No. _____ Change to: _____
16  _____
17  Reason for change: _____
18  Page No. _____ Line No. _____ Change to: _____
19  _____
20  Reason for change: _____
21  Page No. _____ Line No. _____ Change to: _____
22  _____
23  Reason for change: _____
24  SIGNATURE: _____ DATE: _____
25           DENIS MARC AUDET
```

Page 175

```
1              D. Audet
2       DEPOSITION ERRATA SHEET
3   Case Caption:  Denis Marc Audet, et al. vs.
4   Homero Joshua Garza, et al.
5
6      DECLARATION UNDER PENALTY OF PERJURY
7       I declare under penalty of perjury
8   that I have read the entire transcript of my
9   deposition taken in the captioned matter or
10  the same has been read to me, and the same
11  is true and accurate, save and except for
12  changes and/or corrections, if any, as
13  indicated by me on the DEPOSITION ERRATA
14  SHEET hereof, with the understanding that I
15  offer these changes as if still under oath.
16
17
18      _____
19          DENIS MARC AUDET
20
21  Subscribed and sworn to on the _____ day of
22  _____, 2018 before me,
23  _____
24  Notary Public,
25  in and for the State of _____
```

EXHIBIT A-51

1                     JONAH DORMAN

2             UNITED STATES DISTRICT COURT

3              DISTRICT OF CONNECTICUT

4

5  DENIS MARC AUDET, MICHAEL PFEIFFER,

6  DEAN ALLEN SHINNERS, AND JASON

7  VARGAS, INDIVIDUALLY AND ON BEHALF

8  OF ALL OTHER SIMILARLY SITUATED,

9               Plaintiffs,

10    vs.            Case No. 3:16-CV-00940

11

12  STUART A. FRASER, GAW MINERS, LLC,

13  AND ZENMINER, LLC (D/B/A ZEN CLOUD),

14             Defendants.

15  _____/

16

17

18     The Videotaped Deposition of JONAH DORMAN,

19     Taken at 99 Monroe Avenue NW, Suite 975,

20     Grand Rapids, Michigan,

21     Commencing at 9:22 a.m.,

22     Wednesday, August 1, 2018,

23     Before Cheri L. Poplin, CSR-5132, RPR, CRR.

24

25  Job No. 145641

Page 10

JONAH DORMAN

1                   JONAH DORMAN
2    know enough about it.
3    Q.  So -- so your responsibilities in the army had to do
4       with working on computer systems?
5    A.  My responsibilities were working directly with
6       computer systems, but in order to actually be able to
7       do that and do the training, I helped the civilian
8       idiots repair the computers is how I put it.
9    Q.  What years were you in the army?
10   A.  2001 to 2005.
11   Q.  And what did you do after you left?
12   A.  After I left -- these are difficult history questions
13      here.  I didn't bring a resume with me.
14   Q.  Well, do the best you can.
15   A.  I ran another consulting firm doing computer repair,
16      business computer repair.  I ran an indoor paintball
17      shop as well.  Don't ask me how the two tied together,
18      but it worked out pretty well, so . . .
19   Q.  There you go.  And at some point you ended up with --
20      involved with a company called Lease Rig; is that
21      correct?
22   A.  Yes.  That was after I moved to Florida.  I was
23      working for an international training company that
24      deals primarily in oil and gas, and while I was there
25      I was doing the IT.  I was the director of IT, so I

Page 11

JONAH DORMAN

1                   JONAH DORMAN
2    had a small inhouse data center.  And when
3    cryptocurrencies first came out, when Bitcoin first
4    came out, I started getting into mining, and I used
5    the free power and space that I had to put miners in
6    and realized that I could get an insurance policy on
7    these miners by buying two, using one for myself and
8    selling the other one with hosting so that I basically
9    did not pay for Bitcoin miners, and I made money and
10   the people purchasing from me made money, and that
11   turned into a company called Lease Rig.
12   Q.  And when was this?
13   A.  2013, '14.  Somewhere in that time frame.
14   Q.  And was that -- was -- initially was the company Lease
15      Rig just you?
16   A.  No.  It was myself and my business partner, Matthew
17      Eden.
18   Q.  And how did you meet Mr. Eden?
19   A.  There was some new equipment that came out that I did
20      a full dissection of, so I did a full teardown of it,
21      took pictures, posted all the details about it.
22      Nobody else had done it because if you take it apart,
23      obviously it doesn't make you any money, and back then
24      time was definitely money.  And people kept contacting
25      me about it and asking questions, various technical

Page 12

JONAH DORMAN

1                   JONAH DORMAN
2    questions about the equipment.
3    Q.  This was a miner that you took apart?
4    A.  Yes.  Matthew was one of them and that got us into
5      talking and I said, you know what, I'm really looking
6      for somebody that can do front end development, back
7      end development to make this leasing thing that I have
8      into more than a spreadsheet, and so Matt was kind of
9      the one that bridged the gap and made it into
10      originally Unicorn Hashers and then Lease Rig.
11   Q.  And this was I think you said around 2013?
12   A.  Around then, yes.  I'll let you know, for the record,
13      I am terrible with dates, including years.
14   Q.  Well, I think the record's fairly clear that you first
15      became involved with GAW Miners in 2014 if that helps.
16   A.  Okay.
17   Q.  That will put a post in there.  So tell me how you
18      transitioned from Lease Rig to GAW Miners.
19   A.  Well, it's fairly easy.  I harassed Josh Garza online,
20      and by harassed I just mean I was basically, online
21      it's called trolling, so whenever he would post things
22      or his company would post things I would make fun of
23      them and tell them they weren't telling the truth, and
24      after a while he ended up calling and saying, you
25      know, we might want to work this out because it's all

Page 13

JONAH DORMAN

1                   JONAH DORMAN
2    legitimate, and I said great, you can prove it, I'll
3    come work for you.  I'm not sure if that's exactly how
4    the conversation happened, but that was kind of the
5    end result.
6    Q.  Okay.  What kinds of things was he posting online that
7      you thought were potentially not accurate or not true?
8    A.  Everyone knew that he wasn't technically mining.  He
9      had the four pools that he said he was mining to.  We
10      were in contact with all the pool owners, and when
11      people would shift a lot of equipment over, the pools
12      would not show it, which normally means that
13      somebody's just using a calculated method versus an
14      actual method, which is kind of common in similar
15      industries.  You aggregate equipment and then you feed
16      the results that someone picks.
17   Q.  So explain the difference if you can between
18      calculating and actual mining.
19   A.  Sure.  So if you -- if you have an investment that
20      pays out five percent, they're going to take and
21      they're going to put your money into whatever they
22      want.  They're going to pay you five percent.  As
23      opposed to if you have an investment in a certain
24      industry, stock sector, they're going to pay you
25      whatever the actual return is.  So if you're

Page 14

JONAH DORMAN

calculating it, you're just taking what it would
actually make and paying that out.  If you're doing
actual, then you would actually be either invested in
that or say mining to that pool.

Q.  And do you remember -- at this time you were what you
described as trolling Mr. Garza.  What product was he
selling or products?

A.  That would have been when he was originally selling
miners.  He had bought out the Chinese supplier of I
believe they were called Gridseeds and he was working
with another company.

Q.  So he was just selling hardware?

A.  Yes.

Q.  And what was -- what was he misrepresenting about the
hardware?

A.  They started hosting the hardware, and when they were
hosting the hardware they had the mining pools, and
that was when they were not mining to the actual
pools.  The pool operators kept contacting us because
we ran a similar service.

Q.  So hosted mining was you would buy a miner from
Mr. Garza's company, GAW, and Mr. Garza's company
would -- would host that miner, power the miner, and
just provide you with some portion of the returns?

Page 15

JONAH DORMAN

Was that the -- what was being sold?

A.  Yes.  It was very -- it was -- the model was described
to be the same as Lease Rig's model, which was I would
buy a miner, put it in the data center, and you could
choose where it would mine to and it would
automatically mine there.  The difference was mine was
actual; his was calculated.

Q.  Okay.  Did --

A.  Based on the pool operators.

Q.  Did he let his customers know that it was calculated?

A.  I don't know.

Q.  Okay.  But you were pointing out that it had to be
calculated in some of these online posts?

A.  I was the one making fun of him for it.

Q.  Okay.

A.  What I was saying wasn't necessarily a hundred percent
factual.  You gotta remember the pool operators and
everybody back at that time was just not trusting
anyone.

Q.  Okay.

A.  So there's no way for me to see the stats from the
pools and know whether they're telling the truth
either.

Q.  Okay.  I want to know a little bit more about Lease

Page 16

JONAH DORMAN

Rig's business before we go on to GAW.  So you were
selling miners and then hosting them and then
providing people with the returns?  Is that a fair
description of your business?

A.  No.

Q.  How would you describe it?

A.  When I moved from -- it was seriously called Unicorn
Hasher, great company name -- moved from Unicorn
Hasher to Lease Rig, the idea was that anyone could
put their hash power onto a marketplace and anyone
else could come in and purchase that hour by hour and
they would choose where the funds went and where it
mined to so the money went directly to them, and then
the people who were providing the service, the people
with the miners, our system would automatically pay
out every hour.

Q.  So you were just a middleman?  You didn't actually own
the miners?

A.  Correct.  Unicorn Hasher owned miners, but I moved
that, all that equipment I moved into Lease Rig, so I
was one of the providers on Lease Rig.

Q.  So if I'm understanding you right, Lease Rig was sort
of a marketplace that would connect someone with a
miner with hashing power, connect that person to

Page 17

JONAH DORMAN

somebody who wanted to acquire hashing power, and then
the person who acquired that hashing power could
choose to use that however they wanted on a sort of
hour-by-hour rental basis from the other -- from the
seller?

A.  Yes.  Airbnb for Bitcoin money.

Q.  And did -- did Lease Rig itself have miners that it
was leasing out or selling through this marketplace
that it provided?

A.  No.  We never did any physical hardware, and the
initial equipment was from my other company that was
just hosted, so my other company was basically a
provider.

Q.  Okay.  And so the other company, Unicorn, that stayed
a separate business and some of its miners were leased
through the Lease Rig system?

A.  Yes.

Q.  Did Lease Rig have the ability to allocate the
processing power of a single miner to different pools
at the same time?

A.  Different pools at the same time?

Q.  Yeah.  Like so if you had 500 mega hash, is that a
proper term, 500 mega hash of mining power, could you
allocate 200 of it to one pool and 300 of it to

Page 18

JONAH DORMAN

another pool?

A.  Yes.

Q.  Yes, you could?

A.  Yes.

Q.  And at the same time?

A.  There was -- I don't recall the specific
technicalities of it.  I do know that we worked on
something very similar to that, and I believe we had
it working at some point.  Most of the time when
someone is renting hash power, they're renting more
than one miner, so they're renting an amount of hash
power that's more than one miner.  I do recall at
least building a system that does exactly what you're
talking about where you can slice a miner up into
multiple pieces and move to multiple pools.  I don't
know right now and I don't recall if that was ever
implemented.

Q.  Was that implemented at GAW Miners; do you know?

A.  I don't recall that either.

Q.  Was it -- do you know what hashlets are?

A.  Yes.

Q.  And my understanding is that hashlets were selling a
fraction of the mining -- processing power of a single
processor or single miner to different individuals.

Page 19

JONAH DORMAN

Is that accurate?

A.  My current understanding is that they were supposed to
represent a portion of a miner based on the number of
mega hash, yes.

Q.  And is that something that GAW Miners had -- had the
ability to do, to allocate the processing power of a
single miner to different hashlets?

A.  Through the acquisition of Lease Rig they would have
had the intellectual property that would have allowed
them to do that, yes.

Q.  They didn't have it -- they didn't develop it
independently?

A.  Correct.

Q.  Okay.  Do you know if they ever -- well, who -- who at
GAW Miners would have been responsible for
implementing, you know, that kind of software; do you
know?

A.  That would have been between Matthew and Joe Mordica.

Q.  And do you -- do you know if they ever did, in fact,
implement that functionality for hashlets?

A.  I don't recall.

Q.  Okay.  You do recall that that's what hashlets were
sold as, though?

A.  They were -- I don't remember the marketing either.

Page 20

JONAH DORMAN

Your description sounds accurate, from my
recollection.

Q.  Okay.  You're just not sure?

A.  Correct.

Q.  So tell me -- so you were I think you said trolling
Josh Garza and his business.  That led him to contact
you, you know, and say why are you doing this or cut
that out or something?

A.  Yes.  There was one specific instance of I had bought
some equipment from him and it had never arrived,
something went wrong, and that was one of the things
that I was going after him about consistently.

Q.  And at that point he was selling cloud hosted mining?

A.  This was actually about a physical miner, and I
believe he had started selling cloud hosting -- hosted
mining at that time.

Q.  And then he -- what happened to convince you to come
join GAW Miners?

A.  My business partner made a really good argument.  I'm
not sure what it was or why it worked.  I don't think
it would today.

Q.  This is Matt Eden?

A.  Yes.

Q.  And he persuaded you to join GAW?

Page 21

JONAH DORMAN

A.  Yes.

Q.  Where were you living at the time?

A.  In Florida.

Q.  Okay.  Did you stay in Florida or did you move as part
of switching to GAW Miners?

A.  I moved as part of switching to GAW Miners.

Q.  Where did you move to?

A.  Bloomfield, Connecticut.  I actually moved to Canton,
Connecticut.

Q.  Okay.  And what -- when you went to work for GAW, do
you remember when that was?  I know you said you
weren't great with dates.  It was sometime in 2014 if
that's helpful.

A.  Yeah.  You said earlier it was 2014, so that sounds
right.  I'm going to say August, September time frame,
but that's --

Q.  Okay.

A.  -- just a guess.  That's not . . .

Q.  What -- and did -- did Matt Eden join GAW Miners at
the same time?

A.  Yes.  He joined and he stayed in Texas.

Q.  What happened with Lease Rig when you joined GAW
Miners?

A.  A part of the conversation was acquiring the

JONAH DORMAN

1  
2   11:26 a.m.
3           (Recess taken at 11:26 a.m.)
4           (Back on the record at 11:34 a.m.)
5           VIDEO TECHNICIAN:  We are back on the
6   record at 11:34 a.m.
7           MS. CAVE:  For Mr. Fraser we have no more
8   questions today.  Thank you very much for your time.
9           MR. SARGENT:  I have one follow-up or one
10  or two.
11          RE-EXAMINATION
12  BY MR. SARGENT:
13  Q.  Can you take a look at Exhibit 139 that opposing
14      counsel handed you?  It's an email from Dan Pease
15      dated Tuesday, February 3rd.  And at the end of the
16      third paragraph he says, "small Staff . . . to develop
17      a working system of blockchain technology that will be
18      able to be integrated into a company like Cantor."  Do
19      you see where I'm reading?
20  A.  Yes.
21  Q.  And do you know what he means by Cantor?
22  A.  He would be referring to Cantor Fitzgerald.
23  Q.  Do you recall discussions about integrating blockchain
24      technology into Cantor Fitzgerald --
25  A.  Yes.

JONAH DORMAN

1  
2   Q.  -- about this time?  What -- what did those
3       discussions entail?
4   A.  I don't recall the specifics.  I recall the overall
5       idea of Cantor being involved in an exchange like
6       system.  I would say nowadays the most similar thing
7       is the Gemini exchange from the Winklevoss twins.
8   Q.  Did -- was anyone from Cantor Fitzgerald itself
9       actually involved in those discussions?
10  A.  I was not involved in any of the discussions with
11      anyone from Cantor.  However, I had heard of
12      conversations and meeting notes from meetings with
13      Stuart and possibly advisors of Cantor.
14  Q.  When you say Stuart --
15  A.  Fraser.
16  Q.  Stuart Fraser.  And what's -- did you have an
17      understanding about Mr. Fraser's relationship with
18      Cantor Fitzgerald at the time?
19  A.  Yes.  I was told that he was one of the principals
20      there.
21  Q.  Okay.  Did you have any discussions with Mr. Fraser
22      present about Cantor's involvement in any blockchain
23      project?
24  A.  No.
25          MR. SARGENT:  All the questions I have.

JONAH DORMAN

1  
2           MS. CAVE:  Nothing further.
3           VIDEO TECHNICIAN:  This concludes today's
4   videotaped deposition.  The time is 11:36 a.m.  We are
5   now off the record.
6           (Deposition concluded at 11:36 a.m.
7           Signature of the witness was requested.)
8  
9  
10  
11  
12  
13  
14  
15  
16  
17  
18  
19  
20  
21  
22  
23  
24  
25  

JONAH DORMAN

1  
2   DENIS MARC AUDET, MICHAEL PFEIFFER,
3   DEAN ALLEN SHINNERS, AND JASON
4   VARGAS, INDIVIDUALLY AND ON BEHALF
5   OF ALL OTHER SIMILARLY SITUATED,
6           Plaintiffs,
7       vs.     Case No. 3:16-CV-00940
8  
9   STUART A. FRASER, GAW MINERS, LLC,
10  AND ZENMINER, LLC (D/B/A ZEN CLOUD),
11          Defendants.
12  _____/
13  
14          VERIFICATION OF DEPONENT
15  
16          I, having read the foregoing deposition
17  consisting of my testimony at the aforementioned time
18  and place, do hereby attest to the correctness and
19  truthfulness of the transcript.
20  
21  
22          _____
23          JONAH DORMAN
24          Dated:
25

Page 106

JONAH DORMAN

1  UNITED STATES DISTRICT COURT        )
2
3  FOR THE DISTRICT OF CONNECTICUT     )
4          I, Cheri L. Poplin, CSR-5132, Certified
5  Shorthand Reporter, certify:
6          That the foregoing proceedings were taken before
7  me at the time and place therein set forth, at which time
8  the witness was put under oath by me;
9          That the testimony of the witness, the questions
10  propounded, and all objections and statements made at the
11  time of the examination were recorded stenographically by me
12  and were thereafter transcribed;
13          That a review of the transcript by the deponent
14  was requested;
15          That the foregoing is a true and correct
16  transcript of my shorthand notes so taken.
17          I further certify that I am not a relative or
18  employee of any attorney of the parties, nor financially
19  interested in the action.
20          I declare under penalty of perjury under the
21  laws of Michigan that the foregoing is true and correct.
22          Dated this 10th day of August, 2018.
23
24  _____
25  Cheri L. Poplin, CSR 5132, RPR, CRR

Page 107

1          ERRATA SHEET
2  Case Name:
3  Deposition Date:
4  Deponent:
5  Pg.  No. Now Reads   Should Read  Reason
6  ___ ___ _____   _____   _____
7  ___ ___ _____   _____   _____
8  ___ ___ _____   _____   _____
9  ___ ___ _____   _____   _____
10  ___ ___ _____   _____   _____
11  ___ ___ _____   _____   _____
12  ___ ___ _____   _____   _____
13  ___ ___ _____   _____   _____
14  ___ ___ _____   _____   _____
15  ___ ___ _____   _____   _____
16  ___ ___ _____   _____   _____
17  ___ ___ _____   _____   _____
18  ___ ___ _____   _____   _____
19  ___ ___ _____   _____   _____
20
21          _____
          Signature of Deponent
22  SUBSCRIBED AND SWORN BEFORE ME
23  THIS ____ DAY OF _____, 2018.
24  _____
25  (Notary Public)  MY COMMISSION EXPIRES:_____

EXHIBIT A-52

```
 1            UNITED STATES DISTRICT COURT
                 DISTRICT OF CONNECTICUT
 2
    DENIS MARC AUDET, MICHAEL   §
 3  PFEIFFER, DEAN ALLEN        §
    SHINNERS, AND JASON         §   CASE 3:16-CV-00940
 4  VARGAS, INDIVIDUALLY AND    §
    ON BEHALF OF ALL OTHER      §
 5  SIMILARLY SITUATED,         §
                                §
 6       PLAINTIFFS,            §
                                §
 7  VS.                         §
                                §
 8  STUART A. FRASER, GAW       §
    MINERS, LLC, AND            §
 9  ZENMINER, LLC (D/B/A ZEN    §
    CLOUD),                     §
10                              §
         DEFENDANTS.            §
11
12
13
14
15          ORAL AND VIDEOTAPED DEPOSITION OF
                     MADELINE EDEN
16                   JUNE 26, 2018
17
18       ORAL AND VIDEOTAPED DEPOSITION OF MADELINE
    EDEN, produced as a witness at the instance of the
19  Plaintiffs and duly sworn, was taken in the above
    styled and numbered cause on Tuesday, June 26, 2018,
20  from 9:42 a.m. to 2:52 p.m., before TAMARA CHAPMAN,
    CSR, CRR, RPR in and for the State of Texas,
21  reported by computerized stenotype machine, at the
    offices of Regus, 106 E. Sixth Street, Austin,
22  Texas, pursuant to the Federal Rules of Civil
    Procedure and any provisions stated on the record
23  herein.
24
25  Job No. 143277
```

M. EDEN - 6/26/18

1
2      A.  I don't -- I don't remember when the prime
3  controllers actually started working properly, but
4  they were pretty well locked down when they were --
5  and we didn't have a prime wallet set up like that.
6  It was -- they were a little more CPU-intensive than
7  the other wallets.  And the individual wallets
8  weren't staking that way.  I mean, we -- yeah.
9      Q.  Were payouts directly linked to the stake
10  rate of prime controllers?
11      A.  I don't believe they were, like I said
12  before.  I mean, it can be verified as to whether or
13  not they were, but I don't -- as best as I remember
14  it, I thought we were staking it much higher than we
15  were actually.
16      Q.  Paying out?
17      A.  Yes.  If I recall correctly.  I think the
18  stake rate -- the initial stake rate that they
19  implemented on the prime nodes I thought was
20  250 percent.  I could be wrong.  I don't know that we
21  were ever paying out HashStakers at that rate.
22  Again, I mean, I could be wrong.  I just don't think
23  they were.
24          Yeah.  And I don't remember why this
25  wasn't implemented entirely or even mostly, but I do

M. EDEN - 6/26/18

1
2  know there were technical issues with -- with wanting
3  to do it this way.
4      Q.  Were -- were you intending in your comment
5  when you forwarded this e-mail to be serious that we
6  should implement this stuff now?  For some reason, I
7  feel like we should start implementing a lot of this.
8      A.  Yeah.  I don't know.  We were so
9  backlogged.  I mean -- I don't remember why I would
10  have said it like that, but --
11      Q.  Is there certain sarcasm in that comment?
12      A.  Probably, yeah.
13          Like I said, this -- it was --
14      (Pause.)
15          I don't remember why it said it that way.
16  But, yeah, that's obvious that's my sarcasm for sure.
17  I mean, a lot of this did get implemented, though.
18      Q.  Did it at some point?
19      A.  Yes.
20      Q.  Which part was implemented?
21      A.  Like the prime controllers in the
22  sweepers -- yeah.  See, this is -- this is the
23  problem right there.  This is not the feature
24  request.  This is what was sold and what will be
25  delivered to customers.

M. EDEN - 6/26/18

1
2      Q.  Is that true?
3      A.  Yeah.  I mean, you know, that's --
4      Q.  Are the features being described in the
5  e-mail above that line what were sold to customers?
6      A.  Yeah.  I'm pretty sure if Jonah said that
7  that's what was sold to customers, then that's what
8  was sold to -- then that's what was sold to
9  customers.
10      Q.  But that's not what the system was doing,
11  at least not at this time, February 4th, 2015?
12      A.  Huh-uh.
13      Q.  Some of these may have been implemented
14  later.
15      A.  Or partially at this point.  Some of it
16  was, right?  Like sweeping I'm pretty sure was -- was
17  implemented.
18      Q.  What does sweeping mean?
19      A.  When prime nodes were generating a stake,
20  the excess coins that were on the prime node would
21  get swept off to a different wallet elsewhere.
22      Q.  So they could be paid out to HashStakers
23  or --
24      A.  Right.  And into the -- you know, the
25  operational wallets that contained most of the coins.

M. EDEN - 6/26/18

1
2  I mean, the prime nodes were really only supposed to
3  contain the coins that the prime nodes needed to
4  contain.
5      Q.  Otherwise, would they start staking it
6  like compound interest because of the -- the newly
7  staked --
8      A.  Yeah.
9      Q.  -- would also stake?
10      A.  You got it.
11      Q.  Okay.
12      A.  Which -- yeah.  That was -- that might
13  have actually been why we couldn't do it that way now
14  that I'm thinking about it.
15      Q.  What do you mean, somebody wanted it that
16  way?
17      A.  No.  I mean, I don't think that that part
18  was ever really intentional.  If that was what was
19  happening, then I don't think that that would have been
20  something that had been done intentionally.  I think
21  it would have just been done accidently.  I mean, I
22  do remember that we had to release an update for
23  Paycoin that would limit the number of coins that
24  we're staking so it would basically kick the ones
25  that were excess off of that.  Otherwise, it would

M. EDEN - 6/26/18

compound it.  So -- but, yeah, it was -- which is
why -- because there was no way to meet -- yeah, it
just wasn't -- some of this wasn't feasible with the
way the Paycoin -- that the prime controllers had
been working, adding more coins into a specific
address, removing and sending coins from a prime
node, that kind of defeats the purpose of having the
coins locked up in the first place.  Right.  So --
and the prime nodes have to maintain a large balance
of coins and no more than that, generally.  I mean,
it didn't necessarily compound, but you couldn't add
and remove those coins from the prime node, right,
while it's running or else it would be staking at
that rate once it went below the threshold.  So, you
know, the idea that you would put users' wallets on a
prime node and have them be able to send and remove
coins from it at will is -- and take the staking for
the entire thing is just kind of counterintuitive.
At that point, it stops staking for everyone who's
got a wallet on there and -- yeah, it's not -- not
really a feasible thing.
     Q.  But was that what was sold to customers?
     A.  Yeah, I believe -- yeah, like I said, it
says here that that's what was sold to customers,

M. EDEN - 6/26/18

then, yeah, that's -- then, I mean, generally, it was
kind of like the janitor at that point.  So
identifying what was sold to customers and whether or
not it could be delivered was, you know, part of what
he was trying to fix.  Establishing the feasibility
of it was a completely different issue and this
was -- and what they sold and what was actually
happening was kind of a mess.  But it was -- I mean,
honestly, that was kind of par for the course.
Right.  It was -- that whole -- the whole idea of
them selling something that they couldn't actually
deliver was not a new concept.
     (Exhibit 9 was marked.)
     A.  Oh, dear.
     Q.  No. 9.  Do you recognize the names?
     A.  I don't recognize that just looking at the
names on here.
     Q.  What you mean, the Adam Lucas or the names
of the different Hashlets?
     A.  The names of the different Hashlets.
     Q.  What do the -- what do the numbers
represent on here, do you know?
     A.  Yeah, I believe these...
     (Pause.)

M. EDEN - 6/26/18

     Yeah, I believe these are actually
capacities, if I'm not mistaken.
     Q.  What do you mean by capacity in this
context?
     A.  Yeah, I don't know which capacity
specifically, but, overall, like the amount of
capacity, like what's -- users owned on the system.
     Q.  So would that mean that -- let's look at
the CleverHashlet, the first item.
     A.  Oh, no, my bad.  These are, yeah, the
number of those Hashlets.
     Q.  What -- no --
     A.  Sorry.  What is the -- yeah, so what is
the count of each type of Hashlet that's left in
ZenCloud.
     Q.  You mean that there were 4,089
CleverHashlets?
     A.  Yeah.
     Q.  What does "MH" mean?
     A.  Those are megahash Hashlets.  Those were
pointed at -- I think there might have been a clever
pool or something like that.
     Q.  So for CleverHashlet, it says 4089.000
megahash.

M. EDEN - 6/26/18

     A.  Yeah.
     Q.  So does that mean there were 4,089
CleverHashlets sold or does that mean that the
CleverHashlets were sold to a level of hashing power
of 4,089 megahash?
     A.  For the -- if it says megahash, that's
probably what it was.
     Q.  Okay.
     A.  Maybe.  I guess.
     Q.  Do you know --
     A.  It's hard to say with those.
     Q.  You mentioned earlier, I think off the
record, some databases that the company maintained.
Do you know what database this would have come out
of?
     A.  That data would have come out of the SQL
database.
     Q.  What's tracked in the SQL database?
     A.  Everything.
     Q.  Including, for example?
     A.  Ownership of Hashlets, how many there
were.
     Q.  Okay.  Hashing power?
     A.  Hashing power.  The amount -- well, no.

Page 142

M. EDEN - 6/26/18

1
2    Q. No?
3    A. Not physical hashing power.
4    Q. Not true hashing power, but a hashing
5    power that was sold to the customer?
6    A. Well, yeah, sort of.
7    Q. Why do you say "yeah, sort of"?
8    A. Because the database was a giant mess.
9    But at this point there had been hacks on the
10   database. I mean, there had been issues with
11   Hashlets that had been split and/or destroyed on
12   accident, or I mean, any number of different things.
13   Q. Would it track a number that was at
14   least -- prior to any corruption in the database or
15   problems with it, it was attempting to track a number
16   that represented the hashing power that was sold in
17   association with a particular Hashlet?
18   A. Right. And I don't remember what the
19   hashing power of some of these were. Like, I mean,
20   they -- like the Hashlet Genesis, I could be wrong, I
21   thought that was like a 10 gigahash Hashlet. I
22   think. I'm pretty sure those were the three Hashlets
23   that were given away.
24   Q. Okay. So the fact that there's --
25   A. 1.68 million.

Page 143

M. EDEN - 6/26/18

1
2    Q. -- over a million --
3    A. Right.
4    Q. -- suggests that they were -- that's the
5    number of Hashlets?
6    A. Yeah. Yeah. Which means you would take
7    the 1.69 million and then multiply it by 10, and then
8    that would be -- I think -- or I don't remember if
9    they were 10 mega -- 10 gigahash Hashlets or 100
10   giga -- I thought it was 10 gigahash, but you
11   multiply by 10 and that would be the total amount of
12   hashing power that was available for that Hashlet,
13   I'm pretty sure.
14   Q. Did the SQL database track sales of
15   HashStakers?
16   A. Yes, most of them.
17   Q. Why do you say "most"?
18   A. Because there were so many different
19   places that purchases came in through.
20   Q. So purchases through most sources would go
21   to the SQL database? What sources would not go to
22   the SQL database?
23   A. Well, it would all eventually go to the
24   SQL database. Right? So, I mean, technically, yes,
25   but you wouldn't know -- some of them came in as

Page 144

M. EDEN - 6/26/18

1
2    redeemable codes. So you wouldn't necessarily know
3    the source, where it came from, whether it came from
4    Shopify, or whether it came from a credit card
5    purchase, or a wire transfer, or whatever. Or from,
6    you know, a Bitcoin transaction.
7    Q. Okay.
8    A. So, yeah, but, I mean, eventually it was
9    supposed to show, you know, a complete path of
10   ownership. But some of these guys used the system
11   and just generated -- because you can -- if you
12   bought -- you know, if somebody sold one, they could
13   just go into the system, right, and -- and create it
14   at will, because it's just like, you know...
15   Q. Create what? You mean a Hashlet?
16   A. Yeah.
17   Q. Meaning that they didn't have to identify
18   it to any particular underlying hashing power or
19   computer or anything?
20   A. Correct, yes.
21   Q. You just create an entry in the SQL
22   database and magically a Hashlet would appear?
23   A. Yes.
24   Q. Regardless of the hashing power that was
25   available?

Page 145

M. EDEN - 6/26/18

1
2    A. Correct.
3    Q. It also tracked sale of HashStakers in the
4    SQL database?
5    A. Yes.
6    Q. What about -- sales of Paycoin and
7    ownership of Paycoin would be tracked in the Paycoin
8    block chain. Correct?
9    A. No. It's also in the SQL database.
10   Q. So a Paycoin block chain doesn't identify
11   a particular Paycoin to an address?
12   A. Not on the system.
13   Q. Well, separate from this system does it
14   identify an address that owns a particular Paycoin?
15   A. Yes, absolutely.
16   Q. But then you separately also tracked
17   ownership of at least sales of Paycoin in the SQL
18   database. Right?
19   A. Yes.
20   Q. But if a customer bought a Paycoin from
21   you, and that was recorded in the SQL database, that
22   customer later sold that Paycoin or used it to buy
23   something, the SQL database wouldn't necessarily
24   track that, but the Paycoin block chain would?
25   A. No. If the customer bought a Paycoin,

Page 146

M. EDEN - 6/26/18

1
2  and -- it bought it and it was on the system, then it
3  would --
4      Q. Wait. Let me stop you. The "system"
5  meaning SQL?
6      A. Yes. ZenCloud, PayBase, take your pick.
7  If a customer bought Paycoin and it was on that
8  system, then it wouldn't be tracked on the Paycoin
9  bought chain necessarily, right, because it would
10  basically just be in the big chunk of Paycoin that
11  GAW had in the operational wallet.
12      Q. So there wouldn't have to be a transfer at
13  that point on the block chain?
14      A. Correct.
15      Q. The ownership of the Paycoin could be
16  tracked in SQL?
17      A. It was tracked in SQL. Now, if the
18  customer withdrew the coin from ZenCloud or PayBase,
19  then -- you know, then it would create a transaction
20  on the block chain when it sent it to the external
21  address that they wanted to send it to.
22      Q. Right. And at that point it wouldn't be
23  tracked in SQL anymore?
24      A. Correct. Yeah. That was where the --
25  that's when it would disconnect and it -- yeah.

Page 147

M. EDEN - 6/26/18

1
2      Q. So what other databases in addition to the
3  SQL database did GAW maintain, that you're aware of?
4      A. Well, there was the cloud mining database
5  that was separate, and there was a Mongo database
6  that we transitioned off of at some point in 2014,
7  so -- because the database that they were using, I
8  guess, when we -- when I first got there didn't
9  scale, and especially -- yeah. It didn't scale.
10      So we had to basically use something that
11  was more efficient for managing this type of data,
12  and they were using a -- you know, a MongoDB, which
13  is kind of not very efficient for large -- you know,
14  a very large system.
15      Q. So that -- is a Mongo database what was
16  transitioned to SQL?
17      A. Yeah.
18      Q. Okay. What was in the cloud mining
19  database?
20      A. I would imagine all of the cloud-hosted
21  miners.
22      Q. So sales of cloud-hosted miners, as far as
23  you know, weren't being tracked in Mongo or later
24  SQL?
25      A. No. No. Because at a point, right,

Page 148

M. EDEN - 6/26/18

1
2  people were ordering cloud-hosted miners, but not
3  receiving miners. So, like, for instance, the
4  Volcano is the best example I can think of this. And
5  it was this giant Litecoin miner that was supposed to
6  have been released by Zeus Mining and then re-branded
7  by GAW, but the miner was never released but there
8  was still a ton of them sold.
9      Q. It was called -- it was sold by GAW as the
10  Volcano miner?
11      A. I believe so.
12      Q. "Cloud-hosted" to be hosted by GAW?
13      A. Right.
14      Q. Got it.
15      A. And so then --
16      Q. But it never existed?
17      A. It never existed. And it was transitioned
18  into ZenCloud instead of cloud mining and yeah, that
19  was --
20      Q. Well, "transitioned into ZenCloud." Does
21  that mean it became --
22      A. Basically --
23      Q. -- a Hashlet?
24      A. Uh-huh. Yeah.
25         (Discussion off the written record.)

Page 149

M. EDEN - 6/26/18

1
2      THE VIDEOGRAPHER: Off the record
3  at 12:59.
4         (Break.)
5      THE VIDEOGRAPHER: Back on the
6  record at 1:16. This begins Tape No. 2.
7      Q. On a break you were starting to say
8  something about the numbers on Exhibit 9 not being
9  right. Do you want to just go ahead and explain?
10      A. I mean, I don't -- I don't know exactly
11  what the -- the numbers are representing in terms of
12  hash power. But I mean, I recognize some of these
13  Hashlets. And there were a lot more of those
14  Hashlets than is listed here. Like the Vegas
15  Hashlets, it says "20.0000." And I know there were a
16  lot more Vegas Hashlets than that, I know there were
17  a lot more HauntedHashlets than that, the
18  Legendary -- yeah. There were a lot more of these
19  than is in this e-mail. I mean, and you could verify
20  that in the database, but...
21      Q. I was going to say, you said you
22  remembered something about "this," about generating
23  this list or about this e-mail?
24      A. Yeah. Sorry. I do remember.
25      Q. What do you -- how do you remember?

Page 202

M. EDEN - 6/26/18

Jason Vargas, another plaintiff in this case?

A. That I don't -- I don't know.  I don't think so.

Q. Okay.

A. No, I don't believe so.  But possibly.  I mean -- if I did, it wasn't like anything that stuck out.

Q. Have you ever met or communicated with Marc Audet, Audet (pronouncing)?  I'm not sure how you say his name.  A-U-D-E-T.  Another plaintiff in this case.

A. Not directly, I don't believe.

(Discussion off the written record.)

A. If he was a GAW customer there's a chance I probably would have communicated with him at some point in time or another, or he might have been on one of those calls, but never really directly in a way that I would -- I can recall.

Q. Okay.  All of the correspondence that we've reviewed today, Stuart Fraser wasn't included on any of it.  Correct?

A. No, I don't believe.

MR. SARGENT:  We'll stipulate to that.  You don't need to look.

---

Page 203

M. EDEN - 6/26/18

MS. ECHENIQUE:  Okay.  Give me one moment.  Oh, wait, let me take off my --

MR. SARGENT:  Do you want to take a break for just a second?

MS. ECHENIQUE:  Sure, actually.  Yeah.

THE VIDEOGRAPHER:  Off the record at 2:46.

(Break.)

THE VIDEOGRAPHER:  We're back on the record at 2:51.

MS. ECHENIQUE:  We have no further questions, but we're going to reserve our rights to seek the documents that you referenced throughout our conversation today, including the databases.  And if we decide to seek them, we'll be in touch.

THE WITNESS:  Cool.

MR. SARGENT:  I don't have any further questions either.  Thanks.

THE VIDEOGRAPHER:  Off the record at 2:52.

(Deposition concluded at 2:52 p.m.)

---

Page 204

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

DENIS MARC AUDET, MICHAEL    §
PFEIFFER, DEAN ALLEN         §
SHINNERS, AND JASON          § CASE 3:16-CV-00940
VARGAS, INDIVIDUALLY AND     §
ON BEHALF OF ALL OTHER       §
SIMILARLY SITUATED,          §
                             §
    PLAINTIFFS,              §
                             §
VS.                          §
                             §
STUART A. FRASER, GAW        §
MINERS, LLC, AND             §
ZENMINER, LLC (D/B/A ZEN     §
CLOUD),                      §
                             §
    DEFENDANTS.              §

REPORTER'S CERTIFICATION
DEPOSITION OF MADELINE EDEN
TAKEN JUNE 26, 2018

I, TAMARA CHAPMAN, Certified Shorthand Reporter and Notary Public in and for the State of Texas, hereby certify to the following:

That the witness, MADELINE EDEN, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the original deposition was delivered to EDGAR G. SARGENT;

That a copy of this certificate was served on all parties and/or the witness shown herein on _____.

---

Page 205

I further certify that pursuant to FRCP No. 30(f)(i) that the signature of the deponent:

_____ was requested by the deponent or a party before the completion of the deposition and that the signature is to be returned within 30 days from date of receipt of the transcript.  If returned, the attached Changes and Signature Page contains any changes and the reasons therefor;

__X__ was not requested by the deponent or a party before the completion of the deposition.

I further certify that I am neither counsel for, related to, nor employed by any of the parties in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this 6th day of July, 2018.

_____
Tamara Chapman, CSR, CRR, RPR
CSR NO. 7248; Expiration Date: 12-31-18
TSG Reporting, Inc.

Page 206

1          ERRATA SHEET
2    Case Name:
3    Deposition Date:
4    Deponent:
5    Pg.  No. Now Reads    Should Read  Reason
6    ___ ___ _____    _____  _____
7    ___ ___ _____    _____  _____
8    ___ ___ _____    _____  _____
9    ___ ___ _____    _____  _____
10   ___ ___ _____    _____  _____
11   ___ ___ _____    _____  _____
12   ___ ___ _____    _____  _____
13   ___ ___ _____    _____  _____
14   ___ ___ _____    _____  _____
15   ___ ___ _____    _____  _____
16   ___ ___ _____    _____  _____
17   ___ ___ _____    _____  _____
18   ___ ___ _____    _____  _____
19   ___ ___ _____    _____  _____
20

                _____
21              Signature of Deponent
22   SUBSCRIBED AND SWORN BEFORE ME
23   THIS ____ DAY OF _____, 2018.
24   _____
25   (Notary Public)  MY COMMISSION EXPIRES:_____

EXHIBIT A-53

Page 1

1                    UNITED STATES DISTRICT COURT

2                       DISTRICT OF CONNECTICUT

3

4   DENIS MARC AUDET, MICHAEL    )
    PFEIFFER, D. ALLEN SHINNERS, )
5   and JASON VARGAS,            )
    Individually and on Behalf   )
6   of All Others Similarly      )   No. 16-940
    Situated,                    )
7                                )
                    Plaintiffs,  )
8                                )
            VS.                  )
9                                )
    HOMERO JOSHUA GARZA, STUART  )
10  A. FRASER, GAW MINERS, LLC,  )
    and ZENMINER, LLC, (d/b/a    )
11  ZENCLOUD),                   )
                                 )
12                  Defendants.  )
    _____)
13

14

15

16         VIDEOTAPED DEPOSITION OF ROBERT MILLS

17               Los Angeles, California

18             Tuesday, October 30, 2018

19

20

21

22

23  Job No. 149295

24  Reported by:  NIKKI ROY

25                CSR No. 3052

Page 34

1  provide some statistics regarding the number of users
2  with transactions.
3      Q.  Okay.  How did you go about determining
4  whether transactions could be associated with users?
5      A.  I examined the databases.  I looked at the
6  structure of the databases, came to understand
7  something about how the keys in the databases work,
8  which are ways that tables are linked together.  And
9  it became apparent that you could in fact look at
10  transaction tables and associate specific data
11  entries to specific users.
12      Q.  So why is it relevant to -- strike that.
13          In terms of associating specific data
14  entries to specific users, how does that tie to
15  calculating damages in this case?
16      A.  Well, as I understand it, one of the
17  measures of damages in this case would be the value
18  that -- the value of the consideration paid less the
19  value received.  And so these transactions are a way
20  of getting at understanding what has been paid and
21  what has been received.
22      Q.  So you said that that was one of the
23  measures of damages in this case.  Is that one of the
24  measures that you came up with or is that a measure
25  that someone else told you to use?

Page 35

1      A.  Well, it's an understanding of the law, so
2  it's a legal issue as far as I'm concerned.  So it's
3  an understanding that I was asked to take based on
4  the remedies that are available for the causes of
5  action at issue in this case.
6      Q.  Okay.  And you said again that's one of the
7  measures of damages.  Is there another measure of
8  damages you're planning to use?
9      A.  Well, as I understand it, there are --
10  depending on the cause of action, there may be
11  different terms for the measure of damages that are
12  applicable, like out-of-pocket, for example, versus
13  recessionary damages.  But from a practical
14  standpoint I don't know that there will be any
15  meaningful difference between the way damages are
16  computed.  But again, I haven't actually done the
17  computation yet, so I can't be certain as I sit here.
18      Q.  Do you assume that each user represents a
19  unique customer?
20      A.  I haven't assumed that thus far, no.
21      Q.  Okay.  Does -- would -- does it impact the
22  measure of damages whether each user represents an
23  individual customer?
24      A.  I'm not certain without actually doing the
25  analysis, but I don't know that it necessarily would.

Page 36

1      Q.  Why would it not?
2      A.  Well, if damages were computed at the user
3  level, the user ID level, for example, and a
4  particular user had -- or particular customer had two
5  user IDs, it may be possible to calculate damages for
6  each of the user IDs and then simply combine them to
7  get the damages for the user or for the customer.
8  But again, I haven't done the analysis, so I'm not
9  certain on that.
10      Q.  Okay.  And that's an analysis that you won't
11  do anything until somebody asks you?
12      A.  Right, I won't do, that's true.
13      Q.  You mentioned a moment ago out-of-pocket
14  versus recessionary damages.  What's the difference
15  between out-of-pocket damages and recessionary
16  damages?
17      A.  Well, I think in this case there might not
18  be much of a difference.  But again, I haven't done
19  the analysis, so I'm not certain.
20      Q.  Okay.  Just at a sort of general level --
21  generic level, what's the difference between
22  out-of-pocket and recessionary damages?
23      A.  Well, these are legal concepts, so I'm
24  not -- and I'm not an expert in the law.  I can give
25  you my understanding --

Page 37

1      Q.  Sure.  That's fine.
2      A.  -- but I'm not offering opinions about the
3  law.
4          So out-of-pocket, as I understand it, would
5  be the difference between the value paid and the
6  value received.  And recessionary damages, as I
7  understand it, would be basically an attempt to
8  compensate as though the transaction was rescinded.
9      Q.  Okay.  Why might there not be any difference
10  between those -- with the understanding that you
11  haven't done the analysis, yet why might there not be
12  any difference between out-of-pocket and recessionary
13  damages in this case?
14      A.  Well, when I think about those two damages
15  concepts in a case like this, they seem like they
16  would be, if not identical, at least very close
17  because they're both getting at the consideration
18  paid versus the value received.
19      Q.  Do you assume for purposes of calculating
20  damages in this case that the databases that you
21  looked at include all the transactions that took
22  place in the Cryptocurrency products that are at
23  issue here?
24      A.  I haven't made that assumption thus far, but
25  at some point I may have to make that assumption to

Page 38

1   actually calculate damages.
2      Q.  Do you need to take steps to verify whether
3   that's true or -- in order to do your damages
4   calculation?
5      A.  I would expect to have additional
6   conversations with people that are knowledgeable
7   about the database, so I think that's about as far as
8   I can go given what I've done thus far.
9      Q.  Okay.  And the people knowledgeable about
10  the database would be who?
11     A.  I spoke with Evan Lucas.  I might speak with
12  him again.
13     Q.  And Evan Lucas is who?
14     A.  As I understand it, he's a former employee.
15     Q.  Okay.  When did you speak with Evan Lucas?
16     A.  I don't recall the date.  I think it was
17  probably in September of this year.
18     Q.  And what did he tell you about the
19  databases?
20       Sorry.  Let me just clarify.  Did you speak
21  to him about ZenCloud or Paybase or both?
22     A.  I think both, but we primarily talked about
23  ZenCloud --
24     Q.  Okay.
25     A.  -- on that call.

Page 39

1      Q.  And so it just -- this was a phone call?
2     A.  It was.
3     Q.  Okay.  And how long did the phone call last?
4     A.  Approximately an hour.
5     Q.  Okay.
6     A.  It was also -- counsel was also on the call.
7     Q.  And what did Evan Lucas tell you about the
8   databases?
9     A.  I don't recall with -- as I sit here what he
10  told me.  I mean, we had conversations about various
11  tables in the database and various fields within
12  those tables.  I took some notes, but I don't have
13  that committed to memory.
14     Q.  Okay.  Do you still have your notes of that
15  conversation?
16     A.  I suspect so, yes.
17     Q.  Okay.  Did you ask Evan Lucas whether he was
18  aware if there are any other versions of the
19  databases?
20     A.  I don't know that I asked that question.
21     Q.  Did he say that?
22     A.  Yes.
23     Q.  He -- so he said that there are other forms
24  of the databases?
25     A.  He told me, if memory serves me correctly,

Page 40

1   that initially a different database software had been
2   used by GAW Miners and that that database was moved
3   over to the current database.
4     Q.  What was the prior version of the software
5   that was used?
6     A.  He didn't tell me, but my understanding is
7   that it's Mongo DB.
8     Q.  Okay.  And when the move happened from the
9   Mongo DB to the current form of the database, were
10  all of the trans -- was all of the transactional
11  information moved over to the new database?
12     A.  I can't be certain.  I mean, I don't know.
13     Q.  Did Evan Lucas tell you that that occurred?
14     A.  I don't recall him saying those words.  My
15  understanding is that a copy of that older database,
16  the Mongo database, has been produced.  I haven't
17  looked at it yet, but my understanding is that is
18  available, so it's something I can perhaps look into.
19     Q.  Do you plan to do that?
20     A.  If asked I will.
21     Q.  It's not important -- on your own it's not
22  important to check whether there's any differences
23  between the earlier version and later version of the
24  database?
25     A.  I think I would like to try do that assuming

Page 41

1   that I can.
2     Q.  Okay.  And why might you not be able to?
3     A.  I haven't tried, so I'm not certain.
4     Q.  Are you aware whether there -- how many
5   versions of the Mongo DB database are there?
6     A.  I'm not sure what that means.
7     Q.  Okay.  Well, you said that Evan Lucas
8   referred to the fact there was a Mongo DB that
9   was database that was the earlier version, right?
10     A.  No, that's not that I said.
11     Q.  Okay.
12     A.  He didn't tell me it was the Mongo DB.  I
13  testified to that.  My understanding it was Mongo DB
14  but he did not tell me.
15     Q.  Do you know whether the earlier version of
16  the database, do you know whether there is more than
17  one version of that database?
18     A.  So it's not clear to me what do you mean by
19  "more than one version."  So that can mean different
20  things.  So I'm not sure exactly what you're asking.
21     Q.  Are there different copies -- different
22  nonidentical copies of the earlier database that you
23  discussed with Evan Lucas?
24     A.  Well, I didn't discuss copies of the
25  database with Evan Lucas, so I'm not sure that's what

Page 42

1  you're asking, but from the question it could be
2  interpreted that way.
3      Q.  I'll rephrase the question.
4          The version of the databases that existed
5  prior to the Maria DB format, are there different
6  versions of that database?
7      A.  So I'm not entirely sure what you mean by
8  "versions."
9          Let me see if I can help.  So you could have
10 a database that has an upgrade to a new version of
11 the database, and now that -- you know, like you
12 update your Excel or something to a new version of
13 Excel.  That doesn't change the underlying data.
14 It's just a new version of Excel.  So I'm not sure --
15     Q.  Okay.
16     A.  -- if that's what you're seeking or
17 something else.
18     Q.  No.  What I'm trying to get at is whether
19 there -- substantive differences -- setting aside the
20 software version, are there substantive differences
21 between the earlier database that might have
22 different sets of transactional data in it?
23     A.  I would expect so, yes, because the earlier
24 database, as I understand it, was -- they stopped
25 using it at a point in time, and then they moved to a

Page 43

1  new database.  And so that new database should have
2  more transactions than the first database.
3      Q.  When did they stop using -- what point in
4  time did they stop using the database and move to a
5  new database?
6      A.  I don't recall.  I may have -- he may
7  have -- Evan may have told me that, but I don't know
8  if he did.
9      Q.  The Maria DB version of the database that
10 you've been using, do you know when that was created?
11     A.  I don't remember the date that I created it,
12 but it was spring, early summer, something like of
13 that, this year.
14     Q.  Of this year?
15     A.  Yeah.
16     Q.  But the underlying -- before you touched it,
17 what was the date of the backup on the underlying
18 data?
19     A.  I don't know.  It may be possible to
20 determine that, but I don't know as I sit here.
21     Q.  Would that be in the metadata that you have?
22     A.  I'm not certain.  It's possible.  In fact, I
23 think it's likely, but I'm not certain.
24     Q.  Okay.  It's not something you've checked?
25     A.  No.

Page 44

1      Q.  Is that relevant to you, the date of the
2  data that's in the database you're relying on?
3      A.  Hasn't been relevant thus far, but it may
4  become relevant at some point.
5      Q.  Why is it not relevant?
6      A.  Because I was asked to analyze these two
7  databases and determine certain information from
8  them, and I've done that.  So it wasn't relevant to
9  what I've been asked to do thus far.
10     Q.  Well, but if you -- if your -- if damages
11 need to be calculated on a class-wide basis, isn't
12 it -- would it be important to have what is the
13 complete and final set of transactional data?
14     A.  I think that would be ideal, yes.
15     Q.  Okay.  So are you going to undertake to find
16 out whether what you have is the complete and final
17 set of transactional data?
18     A.  I would expect to try to determine, to the
19 extent that I can, whether this is the most complete
20 data available.
21     Q.  But so far the two databases that you've
22 looked at, you haven't undertaken to confirm whether
23 those are the complete and final versions of the
24 transactional data?
25     A.  Well, I mean, that's not something that I

Page 45

1  can confirm independently.  I can't look at a
2  database and independently confirm that this is the
3  most recent version of the database, so that's just
4  not something that's possible to do.
5      Q.  Why not?
6      A.  Well, somebody doesn't type into the
7  database "this is the final and complete version of
8  the database and we'll never alter it from here."
9      Q.  Okay.
10     A.  That's just not the way a database works.
11     Q.  Right.
12     A.  So I can look at a snapshot of the database,
13 and that's what I have, but it's virtually impossible
14 for me to look at the database and say that this is
15 the latest snapshot that's ever been taken of the
16 database.  That's not something you can do.
17     Q.  But for purposes of calculating all of the
18 consideration that was paid less the value that the
19 members of the processed class received, would you
20 need to know the final date of any transaction that
21 occurred?
22     A.  That would be ideal, yes.
23     Q.  Can you calculate damages on a class-wide
24 basis if you don't have that?
25     A.  Possibly, yes.  I mean, there might be a

Page 122

1    Q.  Okay.  You mentioned yesterday that
2  Mr. Seltzer stopped by your meeting with
3  Mr. Watterson.  Had you met Mr. Seltzer before
4  yesterday?
5    A.  I have met him before, yes.
6    Q.  Have you worked with him on an engagement
7  before?
8    A.  I've worked on an engagement -- at least one
9  engagement where he was involved as a -- not somebody
10  that I talked with --
11    Q.  Okay.
12    A.  -- on a day-to-day basis.
13    MS. CAVE:  Okay.  We have no further
14  questions today.
15    We reserve the right to, if you put in a
16  rebuttal declaration or report, to seek an
17  opportunity to ask you more questions, but for today
18  that's all we have.  Thank you.
19    THE WITNESS:  Thank you.
20    MS. CAVE:  Okay.
21    MR. WATTERSON:  We'll reserve our questions.
22    MS. CAVE:  Okay.
23    THE VIDEOGRAPHER:  This concludes today's
24  deposition.  Off video at 1:44 p.m.
25    (Witness excused, 1:44 p.m.)

Page 123

1  STATE OF CALIFORNIA      )
                           ) ss.
2  COUNTY OF LOS ANGELES  )
3
4    I, NIKKI ROY, Certified Shorthand Reporter,
5  certificate number 3052, for the State of California,
6  hereby certify:
7    The foregoing proceedings were taken before me
8  at the time and place therein set forth, at which time
9  the deponent was placed under oath by me;
10    The testimony of the deponent and all
11  objections at the time of the examination were recorded
12  stenographically by me and were thereafter transcribed;
13    The foregoing transcript is a true and correct
14  transcript of my shorthand notes so taken;
15    I further certify that I am neither counsel for
16  nor related to any party to said action nor in any way
17  interested in the outcome thereof.
18    In witness whereof I have hereunto subscribed
19  my name this 2nd day of November, 2018.
20
21    _____
22    NIKKI ROY
23
24
25

Page 124

1    ERRATA SHEET FOR THE TRANSCRIPT OF:
2  Case Name:  Denis Marc Audet v. Stuart A. Fraser
3  Dep. Date:  October 30, 2018
4  Deponent:  ROBERT MILLS
5    CORRECTIONS:
6  Pg. Ln.  Now Reads    Should Read    Reason
7  ___ _____  _____   _____
8  ___ _____  _____   _____
9  ___ _____  _____   _____
10  ___ _____  _____   _____
11  ___ _____  _____   _____
12  ___ _____  _____   _____
13  ___ _____  _____   _____
14  ___ _____  _____   _____
15  ___ _____  _____   _____
16  ___ _____  _____   _____
17  ___ _____  _____   _____
18  ___ _____  _____   _____
19  ___ _____  _____   _____
20  _____
21    Signature of Deponent
22  SUBSCRIBED AND SWORN BEFORE ME
23  THIS _____DAY OF _____ 2018.
24
25

EXHIBIT A-54

| | |
|---|---|
| **From:** | GAW Miners |
| **To:** | ashinner@columbus.rr.com |
| **Subject:** | Order confirmation for order #24586 |
| **Date:** | Sunday, August 17, 2014 3:39:55 PM |

Thank you for placing your order with GAW Miners!

This email is to confirm your recent order.

Date 08/17/2014

Billing address
 D. Allen Shinners
 546 East King Street
 Lancaster, Ohio  43130
 United States

1x Hashlet 100 - Hashlet 100 for $1,599.99 each

Subtotal : $1,599.99 USD
Total     : $1,599.99 USD

| | |
|---|---|
| **From:** | GAW Miners |
| **To:** | ashinner@columbus.rr.com |
| **Subject:** | Order confirmation for order #38590 |
| **Date:** | Monday, September 08, 2014 6:56:56 PM |

---

Thank you for placing your order with GAW Miners!

This email is to confirm your recent order.

 Date 09/08/2014

 Billing address
  D. Allen Shinners
  546 East King Street
  Lancaster, Ohio  43130
  United States

1x Hashlet Prime 50 - HashletPrime 50 for $2,497.50 each


Discount (code: SL7YZBIKP5LPHL): $-20.00 USD
Subtotal  : $2,477.50 USD
Total     : $2,477.50 USD

| From: | GAW Miners |
|---|---|
| To: | ashinner@columbus.rr.com |
| Subject: | Order confirmation for order #39197 |
| Date: | Tuesday, September 09, 2014 2:41:08 PM |

Thank you for placing your order with GAW Miners!

This email is to confirm your recent order.

Date 09/09/2014

Billing address
D. Allen Shinners
546 East King Street
Lancaster, Ohio  43130
United States

1x Zen Hashlet 5 for $104.75 each


Discount (code: SLE14WM8VBV3UN): $-100.00 USD
Subtotal  : $4.75 USD
Total     : $4.75 USD

| From: | GAW Miners |
|---|---|
| To: | ashinner@columbus.rr.com |
| Subject: | Order confirmation for order #39201 |
| Date: | Tuesday, September 09, 2014 2:41:09 PM |

Thank you for placing your order with GAW Miners!

This email is to confirm your recent order.

Date 09/09/2014

Billing address
D. Allen Shinners
546 East King Street
Lancaster, Ohio  43130
United States

1x Zen Hashlet 1 for $20.95 each


Discount (code: SLI9ELM99TWMWT): $-20.00 USD
Subtotal  : $0.95 USD
Total      : $0.95 USD

| | |
|---|---|
| **From:** | GAW Miners |
| **To:** | ashinner@columbus.rr.com |
| **Subject:** | Order confirmation for order #39920 |
| **Date:** | Wednesday, September 10, 2014 3:25:11 PM |

Thank you for placing your order with GAW Miners!

This email is to confirm your recent order.

Date 09/10/2014

Billing address
  D. Allen Shinners
  546 East King Street
  Lancaster, Ohio  43130
  United States

1x Zen Hashlet 50 for $1,047.50 each

Subtotal  : $1,047.50 USD
Total      : $1,047.50 USD

| | |
|---|---|
| **From:** | GAW Miners |
| **To:** | ashinner@columbus.rr.com |
| **Subject:** | Order confirmation for order #41410 |
| **Date:** | Saturday, September 13, 2014 12:55:12 AM |

---

Thank you for placing your order with GAW Miners!

This email is to confirm your recent order.

 Date 09/13/2014

 Billing address
  D. Allen Shinners
  546 East King Street
  Lancaster, Ohio  43130
  United States

1x Zen Hashlet 1 for $20.95 each

Discount (code: SLO21ZTKI34D8M): $-20.00 USD
Subtotal  : $0.95 USD
Total    : $0.95 USD

| From: | GAW Miners |
|-------|------------|
| To: | ashinner@columbus.rr.com |
| Subject: | Order confirmation for order #50952 |
| Date: | Wednesday, October 01, 2014 11:26:04 PM |

Thank you for placing your order with GAW Miners!

This email is to confirm your recent order.

Date 10/02/2014

Billing address
D. Allen Shinners
546 East King Street
Lancaster, Ohio  43130
United States

1x Zen Hashlet 25 for $523.75 each

Subtotal : $523.75 USD
Total    : $523.75 USD

| | |
|---|---|
| **From:** | GAW Miners |
| **To:** | ashinner@columbus.rr.com |
| **Subject:** | Order confirmation for order #54776 |
| **Date:** | Monday, October 13, 2014 8:42:27 PM |

Thank you for placing your order with GAW Miners!

This email is to confirm your recent order.

Date 10/13/2014

Billing address
D. Allen Shinners
546 East King Street
Lancaster, Ohio  43130
United States

1x Hashlet Prime 15 - HashletPrime 15 for $749.25 each

Subtotal  : $749.25 USD
Total     : $749.25 USD

| | |
|---|---|
| **From:** | GAW Miners |
| **To:** | ashinner@columbus.rr.com |
| **Subject:** | Order confirmation for order #54786 |
| **Date:** | Monday, October 13, 2014 8:47:17 PM |

Thank you for placing your order with GAW Miners!

This email is to confirm your recent order.

Date 10/13/2014

Billing address
  D. Allen Shinners
  546 East King Street
  Lancaster, Ohio  43130
  United States

2x Hashlet Prime 5 - HashletPrime 5 for $249.75 each


Discount (code: SLWI2L7VBTCN5S): $-20.00 USD
Subtotal  : $479.50 USD
Total     : $479.50 USD

| | |
|---|---|
| **From:** | GAW Miners |
| **To:** | ashinner@columbus.rr.com |
| **Subject:** | Order confirmation for order #54804 |
| **Date:** | Monday, October 13, 2014 8:59:05 PM |

Thank you for placing your order with GAW Miners!

This email is to confirm your recent order.

  Date 10/13/2014

  Billing address
   D. Allen Shinners
   546 East King Street
   Lancaster, Ohio  43130
   United States

1x Zen Hashlet 1 for $20.95 each


Discount (code: SLA339IF3EEK8X): $-20.00 USD
Subtotal  : $0.95 USD
Total     : $0.95 USD

| From: | GAW Miners |
|---|---|
| To: | ashinner@columbus.rr.com |
| Subject: | Order confirmation for order #54807 |
| Date: | Monday, October 13, 2014 9:01:33 PM |

Thank you for placing your order with GAW Miners!

This email is to confirm your recent order.

Date 10/13/2014

Billing address
D. Allen Shinners
546 East King Street
Lancaster, Ohio  43130
United States

1x Zen Hashlet 1 for $20.95 each

Discount (code: SL344EG31D4W1L): $-10.00 USD
Subtotal  : $10.95 USD
Total     : $10.95 USD

| | |
|---|---|
| **From:** | GAW Miners |
| **To:** | ashinner@columbus.rr.com |
| **Subject:** | Order confirmation for order #65373 |
| **Date:** | Monday, December 08, 2014 1:38:01 AM |

Thank you for placing your order with GAW Miners!

This email is to confirm your recent order.

Date 12/08/2014

Billing address
  D. Allen Shinners
  546 East King Street
  Lancaster, Ohio  43130
  United States

1x HashStaker 50 - 6 Month Container for $997.50 each

Subtotal  : $997.50 USD
Total     : $997.50 USD

| | |
|---|---|
| **From:** | GAW Miners |
| **To:** | ashinner@columbus.rr.com |
| **Subject:** | Order confirmation for order #65374 |
| **Date:** | Monday, December 08, 2014 1:42:26 AM |

Thank you for placing your order with GAW Miners!

This email is to confirm your recent order.

 Date 12/08/2014

 Billing address
  D. Allen Shinners
  546 East King Street
  Lancaster, Ohio  43130
  United States

2x HashStaker 25 - 6 Month Container for $498.75 each

Subtotal  : $997.50 USD
Total     : $997.50 USD

| | |
|---|---|
| **From:** | GAW Miners |
| **To:** | ashinner@columbus.rr.com |
| **Subject:** | Order confirmation for order #65375 |
| **Date:** | Monday, December 08, 2014 1:50:17 AM |

---

Thank you for placing your order with GAW Miners!

This email is to confirm your recent order.

Date 12/08/2014

Billing address
  D. Allen Shinners
  546 East King Street
  Lancaster, Ohio  43130
  United States

1x HashStaker 50 - 6 Month Container for $997.50 each

Subtotal : $997.50 USD
Total     : $997.50 USD

| | |
|---|---|
| **From:** | contact@coinbase.com on behalf of Coinbase |
| **To:** | ashinner@columbus.rr.com |
| **Subject:** | You just sent 0.25 BTC to 1KMKtQMhQEK5gfxniN3FLWeaRE8tGYmRm |
| **Date:** | Friday, December 05, 2014 10:05:48 PM |



Hi Dean Allen Shinners,

You just sent **0.25** BTC (worth $93.46 USD) to **1KMKtQMhQEK5gfxniN3FLWeaRE8tGYmRm**.

Attached message:

Allen1980s

You can view this transaction at any time from your account.

Kind regards,
The Coinbase Team

Earn free bitcoin by inviting your friends to Coinbase.

| From: | contact@coinbase.com on behalf of Coinbase |
| --- | --- |
| To: | ashinner@columbus.rr.com |
| Subject: | You just sent 0.60 BTC to 1KMKtQMhQEK5gfxniN3FLWeaRE8tGYmRm |
| Date: | Friday, December 12, 2014 2:51:28 PM |



Hi **Dean Allen Shinners**,

You just sent **0.60** BTC (worth $214.20 USD) to **1KMKtQMhQEK5gfxniN3FLWeaRE8tGYmRm**.

Attached message:

        Allen1980s

You can view this transaction at any time from your account.

Kind regards,
The Coinbase Team

Earn free bitcoin by inviting your friends to Coinbase.

| From: | contact@coinbase.com on behalf of Coinbase |
|---|---|
| To: | ashinner@columbus.rr.com |
| Subject: | You just sent 1.70 BTC to 1KMKtQMhQEK5gfxniN3FLWeaRE8tGYmRm |
| Date: | Tuesday, November 18, 2014 7:04:38 PM |



Hi **Dean Allen Shinners**,

You just sent **1.70** BTC (worth $645.14 USD) to **1KMKtQMhQEK5gfxniN3FLWeaRE8tGYmRm**.

Attached message:

   Allen1980s

You can view this transaction at any time from your account.

Kind regards,
The Coinbase Team

© Coinbase 2014

**From:**                contact@coinbase.com on behalf of Coinbase
**To:**                    ashinner@columbus.rr.com
**Subject:**       You just sent 1.70 BTC to 1KMKtQMhQEK5gfxniN3FLWeaRE8tGYmRm
**Date:**             Friday, October 31, 2014 8:12:02 PM



Hi **Dean Allen Shinners**,

You just sent **1.70** BTC (worth $576.35 USD) to
**1KMKtQMhQEK5gfxniN3FLWeaRE8tGYmRm**.

Attached message:

      Allen1980s

You can view this transaction at any time from your
account.

Kind regards,
The Coinbase Team

© Coinbase 2014

**From:**               contact@coinbase.com on behalf of Coinbase
**To:**                   ashinner@columbus.rr.com
**Subject:**        You just sent 1.501688 BTC to 1KMKtQMhQEK5gfxniN3FLWeaRE8tGYmRm
**Date:**              Tuesday, October 28, 2014 7:08:50 PM



Hi **Dean Allen Shinners**,

You just sent **1.501688** BTC (worth $534.17 USD) to **1KMKtQMhQEK5gfxniN3FLWeaRE8tGYmRm**.

Attached message:

    Allen1980s

You can view this transaction at any time from your account.

Kind regards,
The Coinbase Team

© Coinbase 2014

| | |
|---|---|
| **From:** | contact@coinbase.com on behalf of Coinbase |
| **To:** | ashinner@columbus.rr.com |
| **Subject:** | You just sent 2.001 BTC to 1KMKtQMhQEK5gfxniN3FLWeaRE8tGYmRm |
| **Date:** | Friday, October 10, 2014 10:35:30 PM |



Hi **Dean Allen Shinners**,

You just sent **2.001** BTC (worth $719.90 USD) to **1KMKtQMhQEK5gfxniN3FLWeaRE8tGYmRm**.

You can view this transaction at any time from your account.

Kind regards,
The Coinbase Team

© Coinbase 2014

| From: | contact@coinbase.com on behalf of Coinbase |
|---|---|
| To: | ashinner@columbus.rr.com |
| Subject: | You just sent 2.15 BTC to 1KMKtQMhQEK5gfxniN3FLWeaRE8tGYmRm |
| Date: | Wednesday, December 03, 2014 6:29:50 PM |



Hi **Dean Allen Shinners,**

You just sent **2.15** BTC (worth $809.32 USD) to **1KMKtQMhQEK5gfxniN3FLWeaRE8tGYmRm**.

Attached message:

Allen1980s

You can view this transaction at any time from your account.

Kind regards,
The Coinbase Team

Earn free bitcoin by inviting your friends to Coinbase.

| | |
|---|---|
| **From:** | contact@coinbase.com on behalf of Coinbase |
| **To:** | ashinner@columbus.rr.com |
| **Subject:** | You just sent 2.25 BTC to 1KMKtQMhQEK5gfxniN3FLWeaRE8tGYmRm |
| **Date:** | Wednesday, December 10, 2014 11:21:23 AM |



Hi **Dean Allen Shinners,**

You just sent **2.25** BTC (worth $790.90 USD) to
**1KMKtQMhQEK5gfxniN3FLWeaRE8tGYmRm.**

Attached message:

    Allen1980s

You can view this transaction at any time from your
account.

Kind regards,
The Coinbase Team

Earn free bitcoin by inviting your friends to Coinbase.

| | |
|---|---|
| **From:** | Coinbase |
| **To:** | ashinner@columbus.rr.com |
| **Subject:** | You just sent 2.50 BTC to 1KMKtQMhQEK5gfxniN3FLWeaRE8tGYmRm |
| **Date:** | Friday, October 03, 2014 4:44:46 PM |



Hi Dean Allen Shinners,

You just sent **2.50** BTC (worth $897.38 USD) to
**1KMKtQMhQEK5gfxniN3FLWeaRE8tGYmRm**.

You can view this transaction at any time from your
account.

Kind regards,
The Coinbase Team

© Coinbase 2014

**From:**  contact@coinbase.com on behalf of Coinbase
**To:**  ashinner@columbus.rr.com
**Subject:**  You just sent 2.60 BTC to 1KMKtQMhQEK5gfxniN3FLWeaRE8tGYmRm
**Date:**  Saturday, November 22, 2014 10:38:06 PM



Hi **Dean Allen Shinners**,

You just sent **2.60** BTC (worth $926.52 USD) to
**1KMKtQMhQEK5gfxniN3FLWeaRE8tGYmRm**.

Attached message:

    Allen19809s

You can view this transaction at any time from your
account.

Kind regards,
The Coinbase Team

© Coinbase 2014

| | |
|---|---|
| **From:** | contact@coinbase.com on behalf of Coinbase |
| **To:** | ashinner@columbus.rr.com |
| **Subject:** | You just sent 2.75 BTC to 1KMKtQMhQEK5gfxniN3FLWeaRE8tGYmRm |
| **Date:** | Sunday, November 09, 2014 11:58:33 AM |



Hi **Dean Allen Shinners**,

You just sent **2.75** BTC (worth $980.55 USD) to
**1KMKtQMhQEK5gfxniN3FLWeaRE8tGYmRm**.

Attached message:

> Allen1980s

You can view this transaction at any time from your
account.

Kind regards,
The Coinbase Team

© Coinbase 2014

| | |
|---|---|
| **From:** | Circle |
| **To:** | ashinner@columbus.rr.com |
| **Subject:** | You sent $125.00 (0.35329697 BTC) to 1JZVrjYRdta333junMzxWsNkjn3URnqcEY. |
| **Date:** | Sunday, December 14, 2014 3:17:28 AM |
| **Attachments:** | Untitled attachment 00010.png |
| | Untitled attachment 00013.png |
| | Untitled attachment 00016.png |
| | Untitled attachment 00019.png |
| | Untitled attachment 00022.png |

Hi Dean,

You have successfully sent $125.00 (0.35329697 BTC) to 1JZVrjYRdta333junMzxWsNkjn3URnqcEY.

Message to 1JZVrjYRdta333junMzxWsNkjn3URnqcEY:

ashinner@columbus.rr.com

To check your remaining balance, visit your Circle account.

Thanks,
Team Circle

© 2014 Circle Internet Financial Inc.

PO Box 52235 • Boston, MA 02210

User Agreement      Privacy

| | |
|---|---|
| **From:** | Circle |
| **To:** | ashinner@columbus.rr.com |
| **Subject:** | You sent $249.99 (0.69651465 BTC) to 1KMKtQMhQEK5gfxniN3FLWeaRE8tGYmRm. |
| **Date:** | Monday, October 27, 2014 2:05:14 PM |
| **Attachments:** | header-gradient.png |
| | logo.png |
| | fb.png |
| | twitter.png |
| | linkedin.png |



Hi Dean,

You have successfully sent $249.99 (0.69651465 BTC) to 1KMKtQMhQEK5gfxniN3FLWeaRE8tGYmRm.

Message to 1KMKtQMhQEK5gfxniN3FLWeaRE8tGYmRm:

Allen1980s

To check your remaining balance, visit your Circle account.

Thanks,
Team Circle

© 2014 Circle Internet Financial Inc.

PO Box 52235 • Boston, MA 02210

User Agreement      Privacy

| From: | Circle |
|---|---|
| To: | ashinner@columbus.rr.com |
| Subject: | You sent $374.98 (1.16869761 BTC) to 1G4dhK4KcE1gMFSfprUL5JBPHBE5jATnK7. |
| Date: | Friday, December 19, 2014 5:50:37 PM |
| Attachments: | Untitled attachment 00098.png |
| | Untitled attachment 00101.png |
| | Untitled attachment 00104.png |
| | Untitled attachment 00107.png |
| | Untitled attachment 00110.png |

Hi Dean,

You have successfully sent $374.98 (1.16869761 BTC) to 1G4dhK4KcE1gMFSfprUL5JBPHBE5jATnK7.

Message to 1G4dhK4KcE1gMFSfprUL5JBPHBE5jATnK7:

Allen1980s

To check your remaining balance, visit your Circle account.

Thanks,
Team Circle

© 2014 Circle Internet Financial Inc.

PO Box 52235 • Boston, MA 02210

User Agreement          Privacy

| | |
|---|---|
| **From:** | Circle |
| **To:** | ashinner@columbus.rr.com |
| **Subject:** | You sent $451.25 (1.20708155 BTC) to 1KMKtQMhQEK5gfxniN3FLWeaRE8tGYmRm. |
| **Date:** | Monday, November 10, 2014 11:04:34 PM |
| **Attachments:** | header-gradient.png |
| | logo.png |
| | fb.png |
| | twitter.png |
| | linkedin.png |



Hi Dean,

You have successfully sent $451.25 (1.20708155 BTC) to 1KMKtQMhQEK5gfxniN3FLWeaRE8tGYmRm.

Message to 1KMKtQMhQEK5gfxniN3FLWeaRE8tGYmRm:

Allen1980s

To check your remaining balance, visit your Circle account.

Thanks,
Team Circle

© 2014 Circle Internet Financial Inc.

PO Box 52235 ▪ Boston, MA 02210

User Agreement      Privacy

| From: | Circle |
|---|---|
| To: | ashinner@columbus.rr.com |
| Subject: | You sent $499.95 (1.49916048 BTC) to 1G4dhK4KcE1gMFSfprUL5JBPHBE5jATnK7. |
| Date: | Friday, December 26, 2014 5:49:11 PM |
| Attachments: | Untitled attachment 00037.png |
| | Untitled attachment 00040.png |
| | Untitled attachment 00043.png |
| | Untitled attachment 00046.png |
| | Untitled attachment 00049.png |

Hi Dean,

You have successfully sent $499.95 (1.49916048 BTC) to 1G4dhK4KcE1gMFSfprUL5JBPHBE5jATnK7.

To check your remaining balance, visit your Circle account.

Thanks,
Team Circle

© 2014 Circle Internet Financial Inc.

PO Box 52235 • Boston, MA 02210

User Agreement          Privacy

| | |
|---|---|
| **From:** | Circle |
| **To:** | ashinner@columbus.rr.com |
| **Subject:** | You sent $500.17 (1.34909072 BTC) to 1KMKtQMhQEK5gfxniN3FLWeaRE8tGYmRm. |
| **Date:** | Friday, November 28, 2014 9:48:49 AM |
| **Attachments:** | header-gradient.png |
| | logo.png |
| | fb.png |
| | twitter.png |
| | linkedin.png |



Hi Dean,

You have successfully sent $500.17 (1.34909072 BTC) to 1KMKtQMhQEK5gfxniN3FLWeaRE8tGYmRm.

Message to 1KMKtQMhQEK5gfxniN3FLWeaRE8tGYmRm:

Allen1980s

To check your remaining balance, visit your Circle account.

Thanks,
Team Circle

© 2014 Circle Internet Financial Inc.

PO Box 52235 • Boston, MA 02210

User Agreement      Privacy

EXHIBIT A-55



Michael Pfeiffer <michael@mpfeiffer.com>

# BTCrow Transaction - Payment Received
1 message

**btc-asia.com** <noreply@btcrow.com>                                      Tue, Aug 26, 2014 at 1:00 PM
Reply-To: info@btcrow.com
To: michael@mpfeiffer.com

### Bitcoins received for transaction #qgJZdJjHr653fc3c100db80

Thank you, we have received your payment for btcrow.com transaction #qgJZdJjHr653fc3c100db80.

The seller has been notified to ship the item(s).

To view the status of this transaction please use this link:
https://btcrow.com/view_transaction.php?id=qgJZdJjHr653fc3c100db80

Regards,
btcrow.com
btcrow.com@gmail.com



Michael Pfeiffer <michael@mpfeiffer.com>

## DEAL2

**AnimoEsto** <me@animoesto.co.uk>                                    Sat, Sep 6, 2014 at 1:37 PM
To: Michael Pfeiffer <michael@mpfeiffer.com>
Cc: "sserhan2@gmail.com" <sserhan2@gmail.com>

I can confirm I now have the funds in my possession J

Please proceed with the transfer.

**From:** Michael Pfeiffer [mailto:michael@mpfeiffer.com]
**Sent:** 06 September 2014 17:30
**To:** AnimoEsto
**Subject:** Re: DEAL2

Thank you, John,

I have initiated the funding of the account.

You should receive confirmations shortly.

How many confirmations do you usually require?

@Samer_Serhan, the transfer can be tracked on blockchain.info by entering the wallet address provided above

https://blockchain.info/address/17hep4hFGfd8mZRQNndSToHokVSoCNDsdC

Best,

Michael

On Sat, Sep 6, 2014 at 12:18 PM, AnimoEsto <me@animoesto.co.uk> wrote:

Hello Folks,

How we will do the deal is this

1)   The BTC Will be sent to 17hep4hFGfd8mZRQNndSToHokVSoCNDsdC – this is an OFFLINE WALLET

2)   You will then start the procedure (Copying me in at all times) that is described here
https://hashtalk.org/topic/3270/announcement-regarding-transferring-zencloud-hosted-miners

3)   Once I have confirmation that BOTH of you are happy with the transaction I will release the BTC to a nominated Bitcoin Address of Samer Serhan J (AKA – Micheal has the Hardware and Samer has done the transfer via GAWMiners)

4)   That's it – quite simple really

If either of you wish to make a donation for escrow that is upto you – but please wait until the transaction is finished.

Thanks

John

**From:** Michael Pfeiffer [mailto:michael@mpfeiffer.com]
**Sent:** 06 September 2014 17:11
**To:** AnimoEsto; sserhan2@gmail.com
**Subject:** DEAL2

Dear @AnimoEsto

Thank you for offering to provide escrow to protect our transaction.

I, Michael Pfeiffer, am the buyer. @Samer_Serhan is the seller. The terms of the agreement are that I will pay 1.36 BTC in exchange for transfer of ownership to me of @Samer_Serhan 's 2 hosted Bitmain Antminer 478Gh/s units. They can be transfered to my zenminers account "miningThailand" associated with miningthailand@mpfeiffer.com. His email is: sserhan2@gmail.com.

With sserhan2@gmail.com's agreement, I will fund the wallet you indicate.

With gratitude.

Michael



Michael Pfeiffer <michael@mpfeiffer.com>

## DEAL2

**AnimoEsto** <me@animoesto.co.uk>                                          Sat, Sep 6, 2014 at 1:37 PM
To: Michael Pfeiffer <michael@mpfeiffer.com>
Cc: "sserhan2@gmail.com" <sserhan2@gmail.com>

I can confirm I now have the funds in my possession J

Please proceed with the transfer.

**From:** Michael Pfeiffer [mailto:michael@mpfeiffer.com]
**Sent:** 06 September 2014 17:30
**To:** AnimoEsto
**Subject:** Re: DEAL2

Thank you, John,

I have initiated the funding of the account.

You should receive confirmations shortly.

How many confirmations do you usually require?

@Samer_Serhan, the transfer can be tracked on blockchain.info by entering the wallet address provided above

https://blockchain.info/address/17hep4hFGfd8mZRQNndSToHokVSoCNDsdC

Best,

Michael

On Sat, Sep 6, 2014 at 12:18 PM, AnimoEsto <me@animoesto.co.uk> wrote:

> Hello Folks,

How we will do the deal is this

1)   The BTC Will be sent to 17hep4hFGfd8mZRQNndSToHokVSoCNDsdC – this is an OFFLINE WALLET

2)   You will then start the procedure (Copying me in at all times) that is described here
https://hashtalk.org/topic/3270/announcement-regarding-transferring-zencloud-hosted-miners

3)   Once I have confirmation that BOTH of you are happy with the transaction I will release the BTC to a
nominated Bitcoin Address of Samer Serhan J (AKA – Micheal has the Hardware and Samer has done the
transfer via GAWMiners)

4)   That's it – quite simple really

If either of you wish to make a donation for escrow that is upto you – but please wait until the transaction is
finished.

Thanks

John

**From:** Michael Pfeiffer [mailto:michael@mpfeiffer.com]
**Sent:** 06 September 2014 17:11
**To:** AnimoEsto; sserhan2@gmail.com
**Subject:** DEAL2

Dear @AnimoEsto

Thank you for offering to provide escrow to protect our transaction.

I, Michael Pfeiffer, am the buyer. @Samer_Serhan is the seller. The terms of the agreement are that I will pay 1.36
BTC in exchange for transfer of ownership to me of @Samer_Serhan 's 2 hosted Bitmain Antminer 478Gh/s units.
They can be transfered to my zenminers account "miningThailand" associated with miningthailand@mpfeiffer.com.
His email is: sserhan2@gmail.com.

With sserhan2@gmail.com's agreement, I will fund the wallet you indicate.

With gratitude.

Michael



Michael Pfeiffer <michael@mpfeiffer.com>

## Exploring escrow

**Michael Pfeiffer** <michael@mpfeiffer.com>                                  Fri, Sep 12, 2014 at 5:02 PM
To: AnimoEsto <me@animoesto.co.uk>, dsevilla00@hotmail.com

Dear John,

SDRebel  (dsevilla00@hotmail.com) and I are attempting to secure escrow services to protect a sale of a full account.

He wrote with a question:
So we'll use both animoesto and Dr. Paul or just one? Tthey mentioned in another thread that for stuff like this that they'd prefer to use a 2-person escrow. In paulogaspar's thread, see if you can find it.

Could you advise?

Thanks,
Michael



Michael Pfeiffer <michael@mpfeiffer.com>

# Item(s) Sent - Transaction #4TcXKK8Tbe54219779f0c30
1 message

**btc-asia.com** <noreply@btcrow.com>                                    Tue, Sep 23, 2014 at 2:30 PM
Reply-To: info@btcrow.com
To: michael@mpfeiffer.com

### Item(s) sent for transaction #4TcXKK8Tbe54219779f0c30

The seller marked item(s) for btcrow.com transaction #4TcXKK8Tbe54219779f0c30 as sent.

**Tracking Code:**     N/A
**Inspection Period:** N/A
**Delivery Period:**   1day

When you receive these items please click here to confirm you have received these items.

If you discover a serious issue with the item(s) please click here to start a dispute.

https://btcrow.com/dispute.php?id=e9lfCCOBCG5421977a74bfb

If you would like to release funds before the inspection period is finished click here (**Note: Do not give this link out or forward this email**).

https://btcrow.com/releasefunds.php?id=LjM7fdHN25421977a0182c

To view the status of this transaction please use this link:
https://btcrow.com/view_transaction.php?id=4TcXKK8Tbe54219779f0c30

Regards,
btcrow.com
btcrow.com@gmail.com



Michael Pfeiffer <michael@mpfeiffer.com>

# Order confirmation for order #27900
1 message

**GAW Miners** <orders@gawminers.com>                                    Sat, Aug 23, 2014 at 2:26 AM
To: gawminers@mpfeiffer.com

Thank you for placing your order with GAW Miners!

This email is to confirm your recent order.

Date 08/23/2014

Billing address
Michael Pfeiffer
120 Conway Avenue
Narberth, Pennsylvania  19072-2202
United States

1x Hashlet 50 - Hashlet 50 for $799.99 each


Discount (code: WELCOMETOGAW): $-10.00 USD
Subtotal  : $789.99 USD
Total      : $789.99 USD



Michael Pfeiffer <michael@mpfeiffer.com>

## Order confirmation for order #28253

1 message

**GAW Miners** <orders@gawminers.com>                                    Sat, Aug 23, 2014 at 4:15 PM
To: mineral@bodyclaim.com

   Thank you for placing your order with GAW Miners!

   This email is to confirm your recent order.

   Date 08/23/2014

   Billing address
   Mike Pfeiffer
   120 Conway Ave
   Narberth, Pennsylvania  19072
   United States

10x Hashlet 1 - Hashlet 1 for $15.99 each


   Discount (code: WELCOMETOGAW): $-10.00 USD
   Subtotal  : $149.90 USD
   Total     : $149.90 USD



# Order confirmation for order #28284
1 message

**GAW Miners** <orders@gawminers.com>                          Sat, Aug 23, 2014 at 5:13 PM
To: animal@alchemy.identicloak.com

Thank you for placing your order with GAW Miners!

This email is to confirm your recent order.

Date 08/23/2014

Billing address
Michael Pfeiffer
120 Conway Avenue
Narberth, Pennsylvania  19072
United States

2x Hashlet 5 - Hashlet 5 for $79.99 each


Discount (code: WELCOMETOGAW): $-10.00 USD
Subtotal  : $149.98 USD
Total     : $149.98 USD



Michael Pfeiffer <michael@mpfeiffer.com>

## Order confirmation for order #28932

1 message

**GAW Miners** <orders@gawminers.com>                                          Sun, Aug 24, 2014 at 1:57 PM
To: mpfeiffe@brynmawr.edu

Thank you for placing your order with GAW Miners!

This email is to confirm your recent order.

Date 08/24/2014

Billing address
Michael Pfeiffer
120 Conway Avenue
Narberth, Pennsylvania  19072
United States

2x Hashlet 5 - Hashlet 5 for $79.99 each

Subtotal  : $159.98 USD
Total     : $159.98 USD



Michael Pfeiffer <michael@mpfeiffer.com>

## Order confirmation for order #29081
1 message

**GAW Miners** <orders@gawminers.com>                    Sun, Aug 24, 2014 at 7:52 PM
To: mineral@bodyclaim.com

Thank you for placing your order with GAW Miners!

This email is to confirm your recent order.

Date 08/24/2014

Billing address
Michael Pfeiffer
120 Conway Avenue
Narberth, Pennsylvania  19072
United States

10x Hashlet 1 - Hashlet 1 for $19.99 each

Subtotal  : $199.90 USD
Total      : $199.90 USD



Michael Pfeiffer <michael@mpfeiffer.com>

# Order confirmation for order #29509
1 message

**GAW Miners** <orders@gawminers.com>                                    Mon, Aug 25, 2014 at 1:39 PM
To: gawminers@mpfeiffer.com

Thank you for placing your order with GAW Miners!

This email is to confirm your recent order.

Date 08/25/2014

Billing address
Michael Pfeiffer
120 Conway Avenue
Narberth, Pennsylvania  19072-2202
United States

1x Hashlet 1 - Hashlet 1 for $19.99 each

Discount (code: SL70W13GU7ZUFD): $-19.99 USD
Subtotal  : $0.00 USD
Total     : $0.00 USD



Michael Pfeiffer <michael@mpfeiffer.com>

# Order confirmation for order #29570
1 message

**GAW Miners** <orders@gawminers.com>                    Mon, Aug 25, 2014 at 3:13 PM
To: gawminers@mpfeiffer.com

Thank you for placing your order with GAW Miners!

This email is to confirm your recent order.

Date 08/25/2014

Billing address
Michael Pfeiffer
120 Conway Avenue
Narberth, Pennsylvania  19072-2202
United States

1x Hashlet 5 - Hashlet 5 for $99.99 each

3x Hashlet 1 - Hashlet 1 for $19.99 each

Discount (code: WELCOMETOGAW): $-10.00 USD
Subtotal  : $149.96 USD
Total      : $149.96 USD



Michael Pfeiffer <michael@mpfeiffer.com>

# Order confirmation for order #30220
1 message

**GAW Miners** <orders@gawminers.com>                          Tue, Aug 26, 2014 at 12:40 PM
To: mineral@bodyclaim.com

Thank you for placing your order with GAW Miners!

This email is to confirm your recent order.

Date 08/26/2014

Billing address
Michael Pfeiffer
120 Conway Avenue
Narberth, Pennsylvania  19072
United States

3x Hashlet 1 - Hashlet 1 for $19.99 each

1x Hashlet 5 - Hashlet 5 for $99.99 each

Subtotal  : $159.96 USD
Total     : $159.96 USD



Michael Pfeiffer <michael@mpfeiffer.com>

## Order confirmation for order #30844
1 message

**GAW Miners** <orders@gawminers.com>                    Wed, Aug 27, 2014 at 1:06 PM
To: mineral@bodyclaim.com

Thank you for placing your order with GAW Miners!

This email is to confirm your recent order.

Date 08/27/2014

Billing address
Michael Pfeiffer
120 Conway Avenue
Narberth, Pennsylvania  19072
United States

1x Hashlet 5 - Hashlet 5 for $124.99 each

Subtotal  : $124.99 USD
Total     : $124.99 USD



Michael Pfeiffer <michael@mpfeiffer.com>

# Order confirmation for order #30848
1 message

**GAW Miners** <orders@gawminers.com>                                   Wed, Aug 27, 2014 at 1:14 PM
To: gawminers@mpfeiffer.com

Thank you for placing your order with GAW Miners!

This email is to confirm your recent order.

Date 08/27/2014

Billing address
Michael Pfeiffer
120 Conway Avenue
Narberth, Pennsylvania  19072-2202
United States

1x Hashlet 5 - Hashlet 5 for $124.99 each

Subtotal  : $124.99 USD
Total     : $124.99 USD



# Order confirmation for order #31045
1 message

**GAW Miners** <orders@gawminers.com>                      Wed, Aug 27, 2014 at 7:17 PM
To: miningthailand@mpfeiffer.com

Thank you for placing your order with GAW Miners!

This email is to confirm your recent order.

Date 08/27/2014

Billing address
Michael Pfeiffer
120 Conway Avenue
Narberth, Pennsylvania  19072
United States

1x Hashlet 1 - Hashlet 1 for $24.99 each

Subtotal  : $24.99 USD
Total     : $24.99 USD



<span style="color:gray">Michael Pfeiffer &lt;michael@mpfeiffer.com&gt;</span>

## Order confirmation for order #34227
1 message

**GAW Miners** &lt;orders@gawminers.com&gt;                                                     Tue, Sep 2, 2014 at 9:20 PM
To: miningthailand@mpfeiffer.com

Thank you for placing your order with GAW Miners!

This email is to confirm your recent order.

Date 09/02/2014

Billing address
Michael Pfeiffer
120 Conway Avenue
Narberth, Pennsylvania  19072
United States

1x HashletPrime 5 - HashletPrime 5 for $199.75 each

1x Hashlet Prime 1 - Prime Hashlet 1 for $39.95 each


Discount (code: SLWGIOK7SPO0FT): $-225.00 USD
Subtotal  : $14.70 USD
Total     : $14.70 USD



Michael Pfeiffer <michael@mpfeiffer.com>

# Order confirmation for order #36387
1 message

**GAW Miners** <orders@gawminers.com>                                          Sat, Sep 6, 2014 at 3:02 AM
To: miningthailand@mpfeiffer.com

Thank you for placing your order with GAW Miners!

This email is to confirm your recent order.

Date 09/06/2014

Billing address
Michael Pfeiffer
120 Conway Avenue
Narberth, Pennsylvania  19072
United States

1x Hashlet Genesis 50 for $49.95 each

Subtotal  : $49.95 USD
Total     : $49.95 USD



Michael Pfeiffer <michael@mpfeiffer.com>

## Order confirmation for order #37022
1 message

**GAW Miners** <orders@gawminers.com>                                      Sat, Sep 6, 2014 at 5:14 PM
To: mineral@bodyclaim.com

Thank you for placing your order with GAW Miners!

This email is to confirm your recent order.

Date 09/06/2014

Billing address
 Michael Pfeiffer
 120 Conway Avenue
 Narberth, Pennsylvania  19072
 United States

10x Hashlet Genesis 50 for $49.95 each


Subtotal  : $499.50 USD
Total     : $499.50 USD

Case 3:16-cv-00940-MPS   Document 113-1   Filed 12/21/18   Page 184 of 347



Michael Pfeiffer <michael@mpfeiffer.com>

# Order confirmation for order #38148
1 message

**GAW Miners** <orders@gawminers.com>                    Mon, Sep 8, 2014 at 10:07 AM
To: mineral@bodyclaim.com

Thank you for placing your order with GAW Miners!

This email is to confirm your recent order.

Date 09/08/2014

Billing address
Michael Pfeiffer
120 Conway Avenue
Narberth, Pennsylvania  19072
United States

5x Hashlet Prime 1 - Prime Hashlet 1 for $49.95 each

Subtotal  : $249.75 USD
Total      : $249.75 USD



Michael Pfeiffer <michael@mpfeiffer.com>

# Order confirmation for order #38690
1 message

**GAW Miners** <orders@gawminers.com>                                          Mon, Sep 8, 2014 at 10:41 PM
To: mineral@bodyclaim.com

Thank you for placing your order with GAW Miners!

This email is to confirm your recent order.

Date 09/08/2014

Billing address
Michael Pfeiffer
120 Conway Avenue
Narberth, Pennsylvania  19072
United States

1x Hashlet Genesis 500 for $497.95 each

Subtotal  : $497.95 USD
Total      : $497.95 USD



# Order confirmation for order #39558
1 message

**GAW Miners** <orders@gawminers.com>                                    Wed, Sep 10, 2014 at 3:12 AM
To: mineral@bodyclaim.com

Thank you for placing your order with GAW Miners!

This email is to confirm your recent order.

Date 09/10/2014

Billing address
Michael Pfeiffer
120 Conway Avenue
Narberth, Pennsylvania  19072
United States

1x Hashlet Genesis 500 for $497.95 each


Subtotal  : $497.95 USD
Total     : $497.95 USD



Michael Pfeiffer <michael@mpfeiffer.com>

# Order confirmation for order #42436
1 message

**GAW Miners** <orders@gawminers.com>                    Sun, Sep 14, 2014 at 5:01 PM
To: mineral@bodyclaim.com

    Thank you for placing your order with GAW Miners!

    This email is to confirm your recent order.

    Date 09/14/2014

    Billing address
    Michael Pfeiffer
    120 Conway Avenue
    Narberth, Pennsylvania  19072
    United States

10x Zen Hashlet 1 for $20.95 each

Subtotal  : $209.50 USD
Total     : $209.50 USD



Michael Pfeiffer <michael@mpfeiffer.com>

## Order confirmation for order #42446

1 message

**GAW Miners** <orders@gawminers.com>        Sun, Sep 14, 2014 at 5:11 PM
To: mineral@bodyclaim.com

Thank you for placing your order with GAW Miners!

This email is to confirm your recent order.

Date 09/14/2014

Billing address
Michael Pfeiffer
120 Conway Avenue
Narberth, Pennsylvania  19072
United States

1x Zen Hashlet 1 for $20.95 each

Subtotal  : $20.95 USD
Total     : $20.95 USD



Michael Pfeiffer <michael@mpfeiffer.com>

## Order confirmation for order #42454
1 message

**GAW Miners** <orders@gawminers.com>                                       Sun, Sep 14, 2014 at 5:17 PM
To: mineral@bodyclaim.com

Thank you for placing your order with GAW Miners!

This email is to confirm your recent order.

Date 09/14/2014

Billing address
Michael Pfeiffer
120 Conway Avenue
Narberth, Pennsylvania  19072
United States

1x Hashlet Genesis 10 for $9.95 each

1x Hashlet Genesis 100 for $99.95 each


Discount (code: SLUQP9C8X8KHKX): $-100.00 USD
Subtotal  : $9.90 USD
Total     : $9.90 USD



Michael Pfeiffer <michael@mpfeiffer.com>

## Order confirmation for order #46614
1 message

**GAW Miners** <orders@gawminers.com>                    Tue, Sep 23, 2014 at 11:25 AM
To: miningthailand@mpfeiffer.com

Thank you for placing your order with GAW Miners!

This email is to confirm your recent order.

Date 09/23/2014

Billing address
Michael Pfeiffer
120 Conway Avenue
Narberth, Pennsylvania  19072
United States

1x Zen Hashlet 1 for $20.95 each

Subtotal  : $20.95 USD
Total      : $20.95 USD



Michael Pfeiffer <michael@mpfeiffer.com>

# Order confirmation for order #46615
1 message

**GAW Miners** <orders@gawminers.com>                    Tue, Sep 23, 2014 at 11:27 AM
To: miningthailand@mpfeiffer.com

Thank you for placing your order with GAW Miners!

This email is to confirm your recent order.

Date 09/23/2014

Billing address
Michael Pfeiffer
120 Conway Avenue
Narberth, Pennsylvania  19072
United States

1x Hashlet Genesis 10 for $9.95 each


Discount (code: SL2VBPT098ESLE): $-9.95 USD
Subtotal  : $0.00 USD
Total     : $0.00 USD



Michael Pfeiffer <michael@mpfeiffer.com>

# Order confirmation for order #63789

1 message

**GAW Miners** <orders@gawminers.com>                                          Fri, Nov 28, 2014 at 2:20 PM
To: fierce@mpfeiffer.com

Thank you for placing your order with GAW Miners!

This email is to confirm your recent order.

Date 11/28/2014

Billing address
Michael Pfeiffer
120 Conway Avenue
Narberth, Pennsylvania  19072
United States

1x HashStaker 1 - 6 Month Container for $17.95 each


Discount (code: SLMYLON0IMUKCA): $-10.00 USD
Subtotal  : $7.95 USD
Total     : $7.95 USD



Michael Pfeiffer <michael@mpfeiffer.com>

# Order confirmation for order #63809
1 message

**GAW Miners** <orders@gawminers.com>                                    Fri, Nov 28, 2014 at 2:31 PM
To: fierce@mpfeiffer.com

Thank you for placing your order with GAW Miners!

This email is to confirm your recent order.

Date 11/28/2014

Billing address
Michael Pfeiffer
120 Conway Avenue
Narberth, Pennsylvania  19072
United States

1x HashStaker 1 - 6 Month Container for $17.95 each

Discount (code: SLNCE0ES12W5Y2): $-10.00 USD
Subtotal  : $7.95 USD
Total      : $7.95 USD



Michael Pfeiffer <michael@mpfeiffer.com>

# Order confirmation for order #63824
1 message

**GAW Miners** <orders@gawminers.com>                    Fri, Nov 28, 2014 at 2:40 PM
To: fierce@mpfeiffer.com

Thank you for placing your order with GAW Miners!

This email is to confirm your recent order.

Date 11/28/2014

Billing address
Michael Pfeiffer
120 Conway Avenue
Narberth, Pennsylvania  19072
United States

1x HashStaker 1 - 6 Month Container for $17.95 each


Discount (code: SLXW3QHILGWB7K): $-10.00 USD
Subtotal  : $7.95 USD
Total      : $7.95 USD



Michael Pfeiffer <michael@mpfeiffer.com>

## Please confirm transaction #4TcXKK8Tbe54219779f0c30

1 message

**btc-asia.com** <noreply@btcrow.com>                                    Tue, Sep 23, 2014 at 11:54 AM
Reply-To: info@btcrow.com
To: michael@mpfeiffer.com

### Confirm btcrow transaction #4TcXKK8Tbe54219779f0c30

Please **click here** to confirm your email address and start the transaction.

https://btcrow.com/confirmemail.php?id=dFmYCt5Qga54219779f3b0f&t=b

**NOTE: FUNDS HAVE NOT YET BEEN RECEIVED FOR THIS ESCROW.**

Your email was entered as the buyer for btcrow.com transaction #4TcXKK8Tbe54219779f0c30. Please check the escrow details below:

| | |
|---|---|
| **Description:** | zen+gawminer accts 24Primes 2x911 23zen 160gh gen |
| **Escrow Amount:** | 3.43000000 |
| **Buyer Email:** | michael@mpfeiffer.com |
| **Seller Email:** | fjschiller@gmail.com |
| **Escrow Fee:** | 0.05316500 |
| **Fee Payable by Buyer:** | 0.02658250 |
| **Fee Payable by Seller:** | 0.02658250 |
| **Total Payable by Buyer:** | 3.4565825 |
| **Seller will Receive:** | 3.4034175 |
| **Tracking:** | Not Required |
| **Maximum Shipping Time:** | 1 day |
| **Inspection Period:** | 2 days |

**Take Notice:**

- We do not recommend exchanging PayPal for Bitcoins due to chargeback fraud
- We will **NOT** send the escrow's payment address in an email. It can only be obtained via a secure link to btcrow.com

Regards,
btcrow.com
btcrow.com@gmail.com



Michael Pfeiffer <michael@mpfeiffer.com>

# Please confirm transaction #PCVzdN4YQ55425eb972d613

1 message

**btc-asia.com** <noreply@btcrow.com>                                    Fri, Sep 26, 2014 at 6:42 PM
Reply-To: info@btcrow.com
To: michael@mpfeiffer.com

### Confirm btcrow transaction #PCVzdN4YQ55425eb972d613

Please **click here** to confirm your email address and start the transaction.

https://btcrow.com/confirmemail.php?id=aZXQrAHaIV5425eb972e5a7&t=b

**NOTE: FUNDS HAVE NOT YET BEEN RECEIVED FOR THIS ESCROW.**

Your email was entered as the buyer for btcrow.com transaction #PCVzdN4YQ55425eb972d613. Please check the escrow details below:

| | |
|---|---|
| **Description:** | Zen+Gaw:67Zen18Multi2Prime10Gen3x9/11 |
| **Escrow Amount:** | 3.40000000 |
| **Buyer Email:** | michael@mpfeiffer.com |
| **Seller Email:** | couchlife.co.nz@gmail.com |
| **Escrow Fee:** | 0.05270000 |
| **Fee Payable by Buyer:** | 0.05270000 |
| **Fee Payable by Seller:** | 0.00000000 |
| **Total Payable by Buyer:** | 3.4527 |
| **Seller will Receive:** | 3.4 |
| **Tracking:** | Not Required |
| **Maximum Shipping Time:** | 1 day |
| **Inspection Period:** | 2 days |

**Take Notice:**

- We do not recommend exchanging PayPal for Bitcoins due to chargeback fraud
- We will **NOT** send the escrow's payment address in an email. It can only be obtained via a secure link to btcrow.com

Regards,
btcrow.com
btcrow.com@gmail.com



Michael Pfeiffer <michael@mpfeiffer.com>

# Please confirm transaction #qgJZdJjHr653fc3c100db80

1 message

**btc-asia.com** <noreply@btcrow.com>                                    Tue, Aug 26, 2014 at 3:50 AM
Reply-To: info@btcrow.com
To: michael@mpfeiffer.com

### Confirm btcrow transaction #qgJZdJjHr653fc3c100db80

Please **click here** to confirm your email address and start the transaction.

https://btcrow.com/confirmemail.php?id=qCPl8Cx1ft53fc3c100eb27&t=b

**NOTE: FUNDS HAVE NOT YET BEEN RECEIVED FOR THIS ESCROW.**

Your email was entered as the buyer for btcrow.com transaction #qgJZdJjHr653fc3c100db80. Please check the escrow details below:

| | |
|---|---|
| **Description:** | Title to ZenMiner miningThailand 113 Hashlets acct |
| **Escrow Amount:** | 4.10000000 |
| **Buyer Email:** | michael@mpfeiffer.com |
| **Seller Email:** | breuster@gmail.com |
| **Escrow Fee:** | 0.06355000 |
| **Fee Payable by Buyer:** | 0.03177500 |
| **Fee Payable by Seller:** | 0.03177500 |
| **Total Payable by Buyer:** | 4.131775 |
| **Seller will Receive:** | 4.068225 |
| **Tracking:** | Not Required |
| **Maximum Shipping Time:** | 1 day |
| **Inspection Period:** | 2 days |

**Take Notice:**

- We do not recommend exchanging PayPal for Bitcoins due to chargeback fraud
- We will **NOT** send the escrow's payment address in an email. It can only be obtained via a secure link to btcrow.com

Regards,
btcrow.com
btcrow.com@gmail.com



Michael Pfeiffer <michael@mpfeiffer.com>

## Exploring escrow

**Michael Pfeiffer** <michael@mpfeiffer.com>                    Fri, Sep 12, 2014 at 6:29 PM
To: AnimoEsto <me@animoesto.co.uk>
Cc: david sevilla <dsevilla00@hotmail.com>

BTC sent.

Also:

We will also need to specify the detail and the understanding associated with this transaction which I have copied and pasted below.

I will pay 7 BTC in exchange for your (dsevilla00@hotmail.com) zenminer account and gawminers account. The reason I ask for both is that I have learned it's good to have full documentation and proof of purchase in case there are any questions later. This is especially important with converted miners.

I will consider the sale complete after you transfer both your zenminer account and your gawminers account. The sale will be considered complete when I and only I have password access to the accounts. gawminers does not store any credit card information with the account because they use a third party, shopify.com, to handle that end. You could remove your contact information and I could replace it with mine.

The contents of the account include:

Note: all hardware miners have been converted:
1 blackwidow - no hosting/maintenance fees until 7/16/15    =13 mh/s
2 falcons - no hosting/maintenance fees until 10/16/2014)  27 x 2 = 54 mh/s
1 15Mh hashlet -no free hosting   15 mh/s
2 black widows (no hosting/maintenance fees until 09/13/2014)  2x13 = 26 mh/s
1 hashlet (fury)  = 1.3 mh/s
4 prime hashlets   =4 mh/s
1 clever solo = 1mh/s
1 100Gh genesis
1 10Gh genesis

These should total to:

113.3 Mh primes
110 Ghs genesis
1 clever hashlet

If all of this is acceptable to you, you may just want to forward this email to me@animoesto.co.uk. You should copy me on all relevant correspondence.

And there are a few riders I've agreed to which should also be in this email thread.

Michael
[Quoted text hidden]



Michael Pfeiffer <michael@mpfeiffer.com>

## Escrow for Zen account transfer

**AnimoEsto** <me@animoesto.co.uk>                               Thu, Sep 11, 2014 at 5:44 PM
To: Michael Pfeiffer <michael@mpfeiffer.com>
Cc: Billy Winter <tripppn@hotmail.com>

All

IT IS UPTO THE BUYER AND SELLER TO DO APPROPRIATE DUE DILLIGENCE AS REGARDS TO HOW THE
ITEMS WERE PURCHASED IN THE EVENT OF POSSIBLE CHARGEBACKS

1). Buyer sends funds (including network fees) to

15RdbBhH9PFPZeHsV8xMGzCFuM6yCnqKa1

2) I will confirm receipt of funds

3) Seller will disable two factor authentication and send only me the details for the account

4) I will verify the goods as noted below are correct

5) The password and email will be reset to something I choose (two factor authentication will be enabled to force all
sessions to logout)

6) the account details are sent to the buyer for confirmation

7) When the buyer is happy I will release the funds

8) If anyone wants to tip me they can

John
[Quoted text hidden]



Michael Pfeiffer <michael@mpfeiffer.com>

## request for escrow: account with 19 primes (@José-Jalapeño)

**John Shaw-Miller** <ukanimoesto@gmail.com>                                                    Sat, Sep 27, 2014 at 3:17 PM
To: Michael Pfeiffer <michael@mpfeiffer.com>
Cc: warbigold@gmail.com

Good Evening Gents :)


IT IS UPTO THE BUYER AND SELLER TO DO APPROPRIATE DUE DILLIGENCE AS REGARDS TO HOW THE
ITEMS WERE PURCHASED IN THE EVENT OF POSSIBLE CHARGEBACKS.

PLEASE NOTE I USE GMT AND I RESPOND AT WEIRD TIMES ;)

Seller : warbigold@gmail.com

Buyer : hashling

Amount : 1.7 BTC (1.72BTC with fees)

Items : 19 Primes

1). Buyer sends funds (including network fees) to

1QDFtGTLdWhq1W8jhCBrjBiHL7Ryk6UCHr

2) I will confirm receipt of funds

3) Seller will disable two factor authentication and send only me the details for the account (At this point seller is
welcome to send me the GAW/Zen Receipts and any other evidence they have to show that this was paid by BTC)

4) I will verify the goods as noted are correct

5) I will email the seller asking if they wish to proceed with the escrow and any findings they should be made aware of

6) If they still wish to proceed the password and email will be reset to something I choose (two factor authentication
will be enabled to force all sessions to logout)

7) The funds are released to the seller.

Donations for this service are welcome to 1D9NmQtsuLy2PMwcbdiAyZt68pq8k4L6Xa

[Quoted text hidden]



Michael Pfeiffer <michael@mpfeiffer.com>

## You just sent 3.4527 BTC to 16AGS1XpQAVd3zV5ny2htUPv8dA7aWJPDm

1 message

**Coinbase** <contact@coinbase.com>
To: "Pfeiffer, Michael D." <MPfeiffer@wcupa.edu>

Fri, Sep 26, 2014 at 6:54 PM

Hi mpfeiffer,

You just sent **3.4527** BTC (worth $1,405.70 USD) to
**16AGS1XpQAVd3zV5ny2htUPv8dA7aWJPDm**.

You can view this transaction at any time from your
account.

Kind regards,
The Coinbase Team

© Coinbase 2014

Case 3:16-cv-00940-MPS   Document 113-1   Filed 12/21/18   Page 202 of 347



Michael Pfeiffer <michael@mpfeiffer.com>

---

## You just sent 3.4565825 BTC to 171hZ2R5UmASrVwg2xaQSdkS4Qz9gumZrQ
1 message

---

**Coinbase** <contact@coinbase.com>                          Tue, Sep 23, 2014 at 12:50 PM
To: "Pfeiffer, Michael D." <MPfeiffer@wcupa.edu>



---

Hi mpfeiffer,

You just sent **3.4565825** BTC (worth $1,369.01 USD) to
**171hZ2R5UmASrVwg2xaQSdkS4Qz9gumZrQ**.

You can view this transaction at any time from your
account.

Kind regards,
The Coinbase Team

© Coinbase 2014



Michael Pfeiffer <michael@mpfeiffer.com>

## You just sent 5.0775 BTC to 13tZkXrUy7vjSbWN7jojEEPdWJWnqAvJjw

1 message

**Coinbase** <contact@coinbase.com>                                                      Thu, Sep 4, 2014 at 12:56 PM
To: "Pfeiffer, Michael D." <MPfeiffer@wcupa.edu>



Hi mpfeiffer,

You just sent **5.0775** BTC (worth $2,498.02 USD) to
**13tZkXrUy7vjSbWN7jojEEPdWJWnqAvJjw**.

Attached message:

> Seller zerocylinders@yahoo.com will transfer
> two units of 25-28+ Mh/s (converted
> Gridseed G-Black) and one of 54-55+ Mh/s
> (converted GAW War Machine). All of these
> must arrive in my zenminers.com account
> miningThailand in the form of digital miners
> (Hashlet Primes with their specified GH/s
> ratings).

You can view this transaction at any time from your
account.

Kind regards,
The Coinbase Team

© Coinbase 2014

EXHIBIT A-56

From:    GAW Miners
Sent:    Tue 10/07/2014 11:44 AM (GMT-04:00)
To:      <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: Customer Account confirmation

Dear Marc Audet,

This is to confirm that your account for the shop GAW Miners is now active.

The next time you shop at GAW Miners, you can save time at checkout by logging into your account. This will prefill your address information at the checkout.

Thank you,

GAW Miners

From:    GAW Miners
Sent:    Tue 10/07/2014 12:05 PM (GMT-04:00)
To:      <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: Order confirmation for order #52615


Thank you for placing your order with GAW Miners!

This email is to confirm your recent order.

Date 10/07/2014

Billing address
Denis Marc Audet
210 Treadwell Street Unit 312
Hamden, Connecticut 06517
United States

2x Hashlet Prime 1 - Prime Hashlet 1 for $49.95 each



Subtotal : $99.90 USD
Total : $99.90 USD

From:    GAW Miners
Sent:    Tue 10/07/2014 12:06 PM (GMT-04:00)
To:      <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: Shipping confirmation for order #52615

Dear Denis Marc Audet,

All of the items from order #52615 have now been shipped:
2x Hashlet Prime 1 - Prime Hashlet 1 for $0.00 each (sku: 1334)

Thank you for ordering from GAW Miners!

From:    GAW Miners
Sent:    Tue 10/07/2014 1:53 PM (GMT-04:00)
To:      <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: GAW Miners user activation

Hi Marc Audet,

A new GAW Miners account has been created for you.

Click the url below to activate your account and select a password!

https://gawminers.freshdesk.com/register/pAF2ime26VbIQeVmd9w1

If the above URL does not work try copying and pasting it into your browser. If you
continue to have problems, please feel free to contact us.

Regards,
GAW Miners

From:     GAW Miners
Sent:     Wed 10/08/2014 2:26 PM (GMT-04:00)
To:       <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: Shipping confirmation for order #52995


Dear Denis Marc Audet,

All of the items from order #52995 have now been shipped:
1x Hashlet Genesis 100 for $0.00 each (sku: )

Thank you for ordering from GAW Miners!

From:    GAW Miners
Sent:    Wed 10/08/2014 2:26 PM (GMT-04:00)
To:      <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: Order confirmation for order #52995


Thank you for placing your order with GAW Miners!

This email is to confirm your recent order.

Date 10/08/2014

Billing address
Denis Marc Audet
210 Treadwell Street Unit 312
Hamden, Connecticut 06517
United States

1x Hashlet Genesis 100 for $89.50 each


Subtotal : $89.50 USD
Total : $89.50 USD

From:    Coinbase
Sent:    Thu 10/09/2014 6:18 PM (GMT-04:00)
To:      <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: A purchase for 1.00 BTC has been initiated

Hi Denis Marc Audet,

This email is to confirm that you initiated a purchase of 1.00 BTC for $365.29 on Oct 9, 2014 at 03:17 pm to be paid for with Webster Bank ********1320.

Your bitcoin will arrive by the end of day on Thursday Oct 16, 2014.

Thank you for the purchase.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:     Coinbase
Sent:     Thu 10/09/2014 6:18 PM (GMT-04:00)
To:       <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: Coinbase just sent you 0.002768 BTC

Hi Denis Marc Audet,

**Coinbase** just sent you **0.002768** BTC (worth $0.99 USD) using Coinbase.

Attached message:

> You just received $1.00 worth of free bitcoin for completing your Coinbase account!

Click here to sign in and view this transaction

Kind regards,
The Coinbase Team

© Coinbase 2014

From:    GAW Miners
Sent:    Mon 10/13/2014 10:15 PM (GMT-04:00)
To:      <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: Order confirmation for order #54827


Thank you for placing your order with GAW Miners!

This email is to confirm your recent order.

Date 10/13/2014

Billing address
Denis Marc Audet
210 Treadwell Street Unit 312
Hamden, Connecticut 06517
United States

1x Hashlet Prime 15 - HashletPrime 15 for $749.25 each



Subtotal : $749.25 USD
Total : $749.25 USD

From:    GAW Miners
Sent:    Mon 10/13/2014 10:19 PM (GMT-04:00)
To:      <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: Shipping confirmation for order #54827

Dear Denis Marc Audet,

All of the items from order #54827 have now been shipped:
1x Hashlet Prime 15 - HashletPrime 15 for $0.00 each (sku: 1274)

Thank you for ordering from GAW Miners!

From:    GAW Miners
Sent:    Tue 10/14/2014 7:53 AM (GMT-04:00)
To:      <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: Order confirmation for order #54981


Thank you for placing your order with GAW Miners!

This email is to confirm your recent order.

Date 10/14/2014

Billing address
Denis Marc Audet
210 Treadwell Street Unit 312
Hamden, Connecticut 06517
United States


1x Hashlet Genesis 30 for $26.85 each


Discount (code: SLETY86IGTS94N): $-20.00 USD
Subtotal : $6.85 USD
Total : $6.85 USD

From:    GAW Miners
Sent:    Tue 10/14/2014 7:53 AM (GMT-04:00)
To:      <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: Shipping confirmation for order #54981


Dear Denis Marc Audet,

All of the items from order #54981 have now been shipped:
1x Hashlet Genesis 30 for $0.00 each (sku: )

Thank you for ordering from GAW Miners!

From:     <contact@coinbase.com> on behalf of Coinbase
Sent:     Thu 10/16/2014 3:23 PM (GMT-04:00)
To:       <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: The 1.00 BTC you purchased are now available in your account

Hi Denis Marc Audet,

On Oct 9, 2014 you purchased 1.00 BTC for $365.29 from
Webster Bank ********1320.

Those bitcoins are now available in your My Wallet account!

Thank you for the purchase.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:      www.gawminers.com
Sent:      Thu 10/23/2014 8:26 AM (GMT-04:00)
To:        <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: Please review your recent purchases at www.gawminers.com

If this email is not displaying correctly, please click here to fill out the form.

Hi Marc Audet,

You recently purchased the Hashlet Prime 15 from us! What do you think about it?

○ ★   ○ ★ ★   ○ ★ ★ ★   ○ ★ ★ ★ ★   ◉ ★ ★ ★ ★ ★

Write your review here *

Post

Our Top Rated Products

Hashlet Prime 5            Hashlet Prime 50            Hashlet Prime 100
★ ★ ★ ★ ★ (20)          ★ ★ ★ ★ ★ (4)            ★ ★ ★ ★ ★ (2)

We really appreciate your feedback and hope to see you again soon.

Thank you from www.gawminers.com
Too soon? If you have not received the product yet click here

To unsubscribe click here

**POWERED BY YOTPO**

From:     <contact@coinbase.com> on behalf of Coinbase
Sent:     Thu 10/23/2014 12:17 PM (GMT-04:00)
To:       <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: The 0.25 BTC you purchased are now available in your account

Hi Denis Marc Audet,

On Oct 23, 2014 you purchased 0.25 BTC for $90.98 from
Webster Bank ********1320.

Those bitcoins are now available in your My Wallet account!

Thank you for the purchase.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:    <contact@coinbase.com> on behalf of Coinbase
Sent:    Thu 10/23/2014 12:20 PM (GMT-04:00)
To:      <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: A purchase for 0.25 BTC has been initiated

Hi Denis Marc Audet,

This email is to confirm that you initiated a purchase of 0.25 BTC for $91.06 on Oct 23, 2014 at 09:20 am to be paid for with Webster Bank ********1320.

Your bitcoin will arrive by the end of day on Wednesday Oct 29, 2014.

Thank you for the purchase.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:    <contact@coinbase.com> on behalf of Coinbase
Sent:    Thu 10/23/2014 12:37 PM (GMT-04:00)
To:      <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: You just sent 0.2785 BTC to 1J8iEdTUBGhbPCJNHJu2q78JeLFuUmZxrX

Hi Denis Marc Audet,

You just sent **0.2785** BTC (worth $100.41 USD) to
**1J8iEdTUBGhbPCJNHJu2q78JeLFuUmZxrX**.

Attached message:

    Fund account

You can view this transaction at any time from your account.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:     <contact@coinbase.com> on behalf of Coinbase
Sent:     Thu 10/23/2014 6:20 PM (GMT-04:00)
To:       <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: A purchase for 0.50 BTC has been initiated

Hi Denis Marc Audet,

This email is to confirm that you initiated a purchase of 0.50
BTC for $181.21 on Oct 23, 2014 at 03:20 pm to be paid for
with Webster Bank ********1320.

Your bitcoin will arrive by the end of day on Wednesday Oct
29, 2014.

Thank you for the purchase.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:     <contact@coinbase.com> on behalf of Coinbase
Sent:     Fri 10/24/2014 7:50 AM (GMT-04:00)
To:       <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: You just sent 0.5618 BTC to 1J8iEdTUBGhbPCJNHJu2q78JeLFuUmZxrX

Hi Denis Marc Audet,

You just sent **0.5618** BTC (worth $199.85 USD) to
**1J8iEdTUBGhbPCJNHJu2q78JeLFuUmZxrX**.

Attached message:

　　　Fund GAW account

You can view this transaction at any time from your account.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:     <contact@coinbase.com> on behalf of Coinbase
Sent:     Sat 10/25/2014 9:12 AM (GMT-04:00)
To:       <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: A purchase for 1.00 BTC has been initiated

Hi Denis Marc Audet,

This email is to confirm that you initiated a purchase of 1.00 BTC for $348.24 on Oct 25, 2014 at 06:12 am to be paid for with Webster Bank ********1320.

Your bitcoin will arrive by the end of day on Friday Oct 31, 2014.

Thank you for the purchase.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:    www.gawminers.com
Sent:    Tue 10/28/2014 1:32 PM (GMT-04:00)
To:      <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: Please review your recent purchases at www.gawminers.com



POWERED BY YOTPO

From:     <contact@coinbase.com> on behalf of Coinbase
Sent:     Wed 10/29/2014 9:28 AM (GMT-04:00)
To:       <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: The 0.25 BTC you purchased are now available in your account

Hi Denis Marc Audet,

On Oct 23, 2014 you purchased 0.25 BTC for $91.06 from
Webster Bank ********1320.

Those bitcoins are now available in your My Wallet account!

Thank you for the purchase.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:      <contact@coinbase.com> on behalf of Coinbase
Sent:      Wed 10/29/2014 3:23 PM (GMT-04:00)
To:        <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: The 0.50 BTC you purchased are now available in your account

Hi Denis Marc Audet,

On Oct 23, 2014 you purchased 0.50 BTC for $181.21 from
Webster Bank ********1320.

Those bitcoins are now available in your My Wallet account!

Thank you for the purchase.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:     <contact@coinbase.com> on behalf of Coinbase
Sent:     Wed 10/29/2014 5:08 PM (GMT-04:00)
To:       <marc@audetwebdesign.com>
Cc:
Bcc:
Subject:  You just sent 0.5882 BTC to 1J8iEdTUBGhbPCJNHJu2q78JeLFuUmZxrX

Hi Denis Marc Audet,

You just sent **0.5882** BTC (worth $199.99 USD) to
**1J8iEdTUBGhbPCJNHJu2q78JeLFuUmZxrX**.

Attached message:

> Fund GAW account

You can view this transaction at any time from your account.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:    <contact@coinbase.com> on behalf of Coinbase
Sent:    Thu 10/30/2014 9:41 AM (GMT-04:00)
To:      <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: You just sent 0.4469 BTC to 1J8iEdTUBGhbPCJNHJu2q78JeLFuUmZxrX

Hi Denis Marc Audet,

You just sent **0.4469** BTC (worth $150.10 USD) to
**1J8iEdTUBGhbPCJNHJu2q78JeLFuUmZxrX**.

Attached message:

    Fund GAW account

You can view this transaction at any time from your account.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:    <contact@coinbase.com> on behalf of Coinbase
Sent:    Fri 10/31/2014 6:25 AM (GMT-04:00)
To:      <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: The 1.00 BTC you purchased are now available in your account

Hi Denis Marc Audet,

On Oct 25, 2014 you purchased 1.00 BTC for $348.24 from
Webster Bank ********1320.

Those bitcoins are now available in your My Wallet account!

Thank you for the purchase.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:     <contact@coinbase.com> on behalf of Coinbase
Sent:     Fri 10/31/2014 7:47 AM (GMT-04:00)
To:       <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: You just sent 1.00 BTC to 1J8iEdTUBGhbPCJNHJu2q78JeLFuUmZxrX

Hi Denis Marc Audet,

You just sent **1.00** BTC (worth $337.97 USD) to
**1J8iEdTUBGhbPCJNHJu2q78JeLFuUmZxrX**.

You can <u>view this transaction</u> at any time from your account.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:      &lt;contact@coinbase.com&gt; on behalf of Coinbase
Sent:      Wed 11/05/2014 9:49 PM (GMT-05:00)
To:        &lt;marc@audetwebdesign.com&gt;
Cc:
Bcc:
Subject: A purchase for 1.00 BTC has been initiated

Hi Denis Marc Audet,

This email is to confirm that you initiated a purchase of 1.00
BTC for $343.58 on Nov 5, 2014 at 06:48 pm to be paid for
with Webster Bank ********1320.

Your bitcoin will arrive by the end of day on Wednesday Nov
12, 2014.

Thank you for the purchase.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:     <contact@coinbase.com> on behalf of Coinbase
Sent:     Thu 11/06/2014 7:13 AM (GMT-05:00)
To:       <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: A purchase for 1.00 BTC has been initiated

Hi Denis Marc Audet,

This email is to confirm that you initiated a purchase of 1.00 BTC for $343.42 on Nov 6, 2014 at 04:13 am to be paid for with Webster Bank ********1320.

Your bitcoin will arrive by the end of day on Thursday Nov 13, 2014.

Thank you for the purchase.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:    <contact@coinbase.com> on behalf of Coinbase
Sent:    Thu 11/06/2014 8:06 AM (GMT-05:00)
To:      <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: A purchase for 1.00 BTC has been initiated

Hi Denis Marc Audet,

This email is to confirm that you initiated a purchase of 1.00
BTC for $342.57 on Nov 6, 2014 at 05:04 am to be paid for
with Webster Bank ********1320.

Your bitcoin will arrive by the end of day on Thursday Nov 13,
2014.

Thank you for the purchase.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:    <contact@coinbase.com> on behalf of Coinbase
Sent:    Fri 11/07/2014 9:25 AM (GMT-05:00)
To:      <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: A purchase for 8.00 BTC has been initiated

Hi Denis Marc Audet,

This email is to confirm that you initiated a purchase of 8.00 BTC for $2,790.58 on Nov 7, 2014 at 06:25 am to be paid for with Webster Bank ********1320.

Your bitcoin will arrive by the end of day on Friday Nov 14, 2014.

Thank you for the purchase.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:     <contact@coinbase.com> on behalf of Coinbase
Sent:     Fri 11/07/2014 6:18 PM (GMT-05:00)
To:       <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: The 1.00 BTC you purchased are now available in your account

Hi Denis Marc Audet,

On Nov 5, 2014 you purchased 1.00 BTC for $343.58 from
Webster Bank ********1320.

Those bitcoins are now available in your My Wallet account!

Thank you for the purchase.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:    <contact@coinbase.com> on behalf of Coinbase
Sent:    Fri 11/07/2014 6:18 PM (GMT-05:00)
To:      <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: The 1.00 BTC you purchased are now available in your account

Hi Denis Marc Audet,

On Nov 6, 2014 you purchased 1.00 BTC for $343.42 from
Webster Bank ********1320.

Those bitcoins are now available in your My Wallet account!

Thank you for the purchase.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:     <contact@coinbase.com> on behalf of Coinbase
Sent:     Fri 11/07/2014 8:54 PM (GMT-05:00)
To:       <marc@audetwebdesign.com>
Cc:
Bcc:
Subject:  You just sent 2.00 BTC to 1J8iEdTUBGhbPCJNHJu2q78JeLFuUmZxrX

Hi Denis Marc Audet,

You just sent **2.00** BTC (worth $684.22 USD) to
**1J8iEdTUBGhbPCJNHJu2q78JeLFuUmZxrX**.

Attached message:

        Fund GAW account

You can view this transaction at any time from your account.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:     <contact@coinbase.com> on behalf of Coinbase
Sent:     Sat 11/08/2014 3:39 PM (GMT-05:00)
To:       <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: The 1.00 BTC you purchased are now available in your account

Hi Denis Marc Audet,

On Nov 8, 2014 you purchased 1.00 BTC for $347.86 from
Webster Bank ********1320.

Those bitcoins are now available in your My Wallet account!

Thank you for the purchase.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:    <contact@coinbase.com> on behalf of Coinbase
Sent:    Sat 11/08/2014 3:41 PM (GMT-05:00)
To:      <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: You just sent 1.00 BTC to 1J8iEdTUBGhbPCJNHJu2q78JeLFuUmZxrX

Hi Denis Marc Audet,

You just sent **1.00** BTC (worth $344.22 USD) to
**1J8iEdTUBGhbPCJNHJu2q78JeLFuUmZxrX**.

Attached message:

    Fund GAW account

You can view this transaction at any time from your account.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:     <contact@coinbase.com> on behalf of Coinbase
Sent:     Sun 11/09/2014 9:01 PM (GMT-05:00)
To:       <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: The 0.72 BTC you purchased are now available in your account

Hi Denis Marc Audet,

On Nov 9, 2014 you purchased 0.72 BTC for $261.12 from
Webster Bank ********1320.

Those bitcoins are now available in your My Wallet account!

Thank you for the purchase.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:     <contact@coinbase.com> on behalf of Coinbase
Sent:     Sun 11/09/2014 9:04 PM (GMT-05:00)
To:       <marc@audetwebdesign.com>
Cc:
Bcc:
Subject:  You just sent 0.5586 BTC to 1J8iEdTUBGhbPCJNHJu2q78JeLFuUmZxrX

Hi Denis Marc Audet,

You just sent **0.5586** BTC (worth $200.46 USD) to
**1J8iEdTUBGhbPCJNHJu2q78JeLFuUmZxrX**.

Attached message:

         Fund GAW account

You can view this transaction at any time from your account.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:    <contact@coinbase.com> on behalf of Coinbase
Sent:    Wed 11/12/2014 8:43 PM (GMT-05:00)
To:      <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: The 1.00 BTC you purchased are now available in your account

Hi Denis Marc Audet,

On Nov 12, 2014 you purchased 1.00 BTC for $432.36 from
Webster Bank ********1320.

Those bitcoins are now available in your My Wallet account!

Thank you for the purchase.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:    <contact@coinbase.com> on behalf of Coinbase
Sent:    Wed 11/12/2014 8:50 PM (GMT-05:00)
To:      <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: You just sent 1.00 BTC to 1J8iEdTUBGhbPCJNHJu2q78JeLFuUmZxrX

Hi Denis Marc Audet,

You just sent **1.00** BTC (worth $428.54 USD) to
**1J8iEdTUBGhbPCJNHJu2q78JeLFuUmZxrX**.

Attached message:

        Fund GAW account

You can view this transaction at any time from your account.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:     <contact@coinbase.com> on behalf of Coinbase
Sent:     Thu 11/13/2014 5:21 AM (GMT-05:00)
To:       <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: The 1.00 BTC you purchased are now available in your account

Hi Denis Marc Audet,

On Nov 6, 2014 you purchased 1.00 BTC for $342.57 from
Webster Bank ********1320.

Those bitcoins are now available in your My Wallet account!

Thank you for the purchase.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:     <contact@coinbase.com> on behalf of Coinbase
Sent:     Thu 11/13/2014 7:47 AM (GMT-05:00)
To:       <marc@audetwebdesign.com>
Cc:
Bcc:
Subject:  You just sent 1.00 BTC to 1J8iEdTUBGhbPCJNHJu2q78JeLFuUmZxrX

Hi Denis Marc Audet,

You just sent **1.00** BTC (worth $432.04 USD) to
**1J8iEdTUBGhbPCJNHJu2q78JeLFuUmZxrX**.

Attached message:

    Fund GAW account

You can view this transaction at any time from your account.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:     <contact@coinbase.com> on behalf of Coinbase
Sent:     Thu 11/13/2014 9:11 AM (GMT-05:00)
To:       <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: You just sent 0.2333 BTC to 1J8iEdTUBGhbPCJNHJu2q78JeLFuUmZxrX

Hi Denis Marc Audet,

You just sent **0.2333** BTC (worth $99.31 USD) to
**1J8iEdTUBGhbPCJNHJu2q78JeLFuUmZxrX**.

Attached message:

        Fund GAW account

You can view this transaction at any time from your account.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:    <contact@coinbase.com> on behalf of Coinbase
Sent:    Thu 11/13/2014 1:20 PM (GMT-05:00)
To:      <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: A purchase for 2.00 BTC has been initiated

Hi Denis Marc Audet,

This email is to confirm that you initiated a purchase of 2.00 BTC for $823.30 on Nov 13, 2014 at 10:20 am to be paid for with Webster Bank ********1320.

Your bitcoin will arrive by the end of day on Wednesday Nov 19, 2014.

Thank you for the purchase.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:    <contact@coinbase.com> on behalf of Coinbase
Sent:    Thu 11/13/2014 1:38 PM (GMT-05:00)
To:      <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: A purchase for 2.00 BTC has been initiated

Hi Denis Marc Audet,

This email is to confirm that you initiated a purchase of 2.00 BTC for $812.01 on Nov 13, 2014 at 10:38 am to be paid for with Webster Bank ********1320.

Your bitcoin will arrive by the end of day on Wednesday Nov 19, 2014.

Thank you for the purchase.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:     <contact@coinbase.com> on behalf of Coinbase
Sent:     Thu 11/13/2014 2:02 PM (GMT-05:00)
To:       <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: A purchase for 2.00 BTC has been initiated

Hi Denis Marc Audet,

This email is to confirm that you initiated a purchase of 2.00
BTC for $782.39 on Nov 13, 2014 at 11:02 am to be paid for
with Webster Bank ********1320.

Your bitcoin will arrive by the end of day on Wednesday Nov
19, 2014.

Thank you for the purchase.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:     <contact@coinbase.com> on behalf of Coinbase
Sent:     Thu 11/13/2014 4:55 PM (GMT-05:00)
To:       <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: A purchase for 2.00 BTC has been initiated

Hi Denis Marc Audet,

This email is to confirm that you initiated a purchase of 2.00
BTC for $820.17 on Nov 13, 2014 at 01:55 pm to be paid for
with Webster Bank ********1320.

Your bitcoin will arrive by the end of day on Wednesday Nov
19, 2014.

Thank you for the purchase.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:     <contact@coinbase.com> on behalf of Coinbase
Sent:     Thu 11/13/2014 9:48 PM (GMT-05:00)
To:       <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: A purchase for 2.00 BTC has been initiated

Hi Denis Marc Audet,

This email is to confirm that you initiated a purchase of 2.00
BTC for $804.94 on Nov 13, 2014 at 06:47 pm to be paid for
with Webster Bank ********1320.

Your bitcoin will arrive by the end of day on Wednesday Nov
19, 2014.

Thank you for the purchase.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:     <contact@coinbase.com> on behalf of Coinbase
Sent:     Fri 11/14/2014 7:25 AM (GMT-05:00)
To:       <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: The 8.00 BTC you purchased are now available in your account

Hi Denis Marc Audet,

On Nov 7, 2014 you purchased 8.00 BTC for $2,790.58 from
Webster Bank ********1320.

Those bitcoins are now available in your My Wallet account!

Thank you for the purchase.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:    <contact@coinbase.com> on behalf of Coinbase
Sent:    Fri 11/14/2014 7:41 AM (GMT-05:00)
To:      <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: You just sent 8.00 BTC to 1J8iEdTUBGhbPCJNHJu2q78JeLFuUmZxrX

Hi Denis Marc Audet,

You just sent **8.00** BTC (worth $3,220.88 USD) to
**1J8iEdTUBGhbPCJNHJu2q78JeLFuUmZxrX**.

Attached message:

    Fund GAW account

You can view this transaction at any time from your account.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:     <contact@coinbase.com> on behalf of Coinbase
Sent:     Fri 11/14/2014 9:34 AM (GMT-05:00)
To:       <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: A purchase for 2.00 BTC has been initiated

Hi Denis Marc Audet,

This email is to confirm that you initiated a purchase of 2.00 BTC for $807.65 on Nov 14, 2014 at 06:34 am to be paid for with Webster Bank ********1320.

Your bitcoin will arrive by the end of day on Thursday Nov 20, 2014.

Thank you for the purchase.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:     <contact@coinbase.com> on behalf of Coinbase
Sent:     Fri 11/14/2014 12:14 PM (GMT-05:00)
To:       <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: A purchase for 2.00 BTC has been initiated

Hi Denis Marc Audet,

This email is to confirm that you initiated a purchase of 2.00 BTC for $798.17 on Nov 14, 2014 at 09:13 am to be paid for with Webster Bank ********1320.

Your bitcoin will arrive by the end of day on Thursday Nov 20, 2014.

Thank you for the purchase.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:      <contact@coinbase.com> on behalf of Coinbase
Sent:      Fri 11/14/2014 12:24 PM (GMT-05:00)
To:        <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: The 0.59 BTC you purchased are now available in your account

Hi Denis Marc Audet,

On Nov 14, 2014 you purchased 0.59 BTC for $236.12 from
Webster Bank ********1320.

Those bitcoins are now available in your My Wallet account!

Thank you for the purchase.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:     <contact@coinbase.com> on behalf of Coinbase
Sent:     Fri 11/14/2014 12:28 PM (GMT-05:00)
To:       <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: You just sent 0.5934 BTC to 1J8iEdTUBGhbPCJNHJu2q78JeLFuUmZxrX

Hi Denis Marc Audet,

You just sent **0.5934** BTC (worth $234.99 USD) to
**1J8iEdTUBGhbPCJNHJu2q78JeLFuUmZxrX**.

Attached message:

        Fund GAW account

You can view this transaction at any time from your account.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:    <contact@coinbase.com> on behalf of Coinbase
Sent:    Sat 11/15/2014 9:41 AM (GMT-05:00)
To:      <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: A purchase for 1.00 BTC has been initiated

Hi Denis Marc Audet,

This email is to confirm that you initiated a purchase of 1.00 BTC for $382.26 on Nov 15, 2014 at 06:41 am to be paid for with Webster Bank ********1320.

Your bitcoin will arrive by the end of day on Friday Nov 21, 2014.

Thank you for the purchase.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:      <contact@coinbase.com> on behalf of Coinbase
Sent:      Sat 11/15/2014 12:12 PM (GMT-05:00)
To:        <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: A purchase for 1.00 BTC has been initiated

Hi Denis Marc Audet,

This email is to confirm that you initiated a purchase of 1.00
BTC for $375.91 on Nov 15, 2014 at 09:11 am to be paid for
with Webster Bank ********1320.

Your bitcoin will arrive by the end of day on Friday Nov 21,
2014.

Thank you for the purchase.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:     <contact@coinbase.com> on behalf of Coinbase
Sent:     Mon 11/17/2014 9:19 AM (GMT-05:00)
To:       <marc@audetwebdesign.com>
Cc:
Bcc:
Subject:  The 1.00 BTC you purchased are now available in your account

Hi Denis Marc Audet,

On Nov 17, 2014 you purchased 1.00 BTC for $409.94 from
Webster Bank ********1320.

Those bitcoins are now available in your My Wallet account!

Thank you for the purchase.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:     <contact@coinbase.com> on behalf of Coinbase
Sent:     Mon 11/17/2014 9:22 AM (GMT-05:00)
To:       <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: You just sent 1.00 BTC to 1J8iEdTUBGhbPCJNHJu2q78JeLFuUmZxrX

Hi Denis Marc Audet,

You just sent **1.00** BTC (worth $401.48 USD) to
**1J8iEdTUBGhbPCJNHJu2q78JeLFuUmZxrX**.

Attached message:

    Fund GAW account

You can view this transaction at any time from your account.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:    <contact@coinbase.com> on behalf of Coinbase
Sent:    Wed 11/19/2014 10:31 AM (GMT-05:00)
To:      <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: The 2.00 BTC you purchased are now available in your account

Hi Denis Marc Audet,

On Nov 13, 2014 you purchased 2.00 BTC for $823.30 from
Webster Bank ********1320.

Those bitcoins are now available in your My Wallet account!

Thank you for the purchase.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:     <contact@coinbase.com> on behalf of Coinbase
Sent:     Wed 11/19/2014 11:23 AM (GMT-05:00)
To:       <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: The 2.00 BTC you purchased are now available in your account

Hi Denis Marc Audet,

On Nov 13, 2014 you purchased 2.00 BTC for $782.39 from
Webster Bank ********1320.

Those bitcoins are now available in your My Wallet account!

Thank you for the purchase.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:     <contact@coinbase.com> on behalf of Coinbase
Sent:     Wed 11/19/2014 11:24 AM (GMT-05:00)
To:       <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: The 2.00 BTC you purchased are now available in your account

Hi Denis Marc Audet,

On Nov 13, 2014 you purchased 2.00 BTC for $812.01 from
Webster Bank ********1320.

Those bitcoins are now available in your My Wallet account!

Thank you for the purchase.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:    <contact@coinbase.com> on behalf of Coinbase
Sent:    Wed 11/19/2014 11:35 AM (GMT-05:00)
To:      <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: You just sent 4.00 BTC to 1J8iEdTUBGhbPCJNHJu2q78JeLFuUmZxrX

Hi Denis Marc Audet,

You just sent **4.00** BTC (worth $1,516.55 USD) to
**1J8iEdTUBGhbPCJNHJu2q78JeLFuUmZxrX**.

Attached message:

      Fund GAW account

You can view this transaction at any time from your account.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:     <contact@coinbase.com> on behalf of Coinbase
Sent:     Wed 11/19/2014 2:22 PM (GMT-05:00)
To:       <marc@audetwebdesign.com>
Cc:
Bcc:
Subject:  The 2.00 BTC you purchased are now available in your account

Hi Denis Marc Audet,

On Nov 13, 2014 you purchased 2.00 BTC for $820.17 from Webster Bank ********1320.

Those bitcoins are now available in your My Wallet account!

Thank you for the purchase.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:    <contact@coinbase.com> on behalf of Coinbase
Sent:    Wed 11/19/2014 7:23 PM (GMT-05:00)
To:      <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: The 2.00 BTC you purchased are now available in your account

Hi Denis Marc Audet,

On Nov 13, 2014 you purchased 2.00 BTC for $804.94 from
Webster Bank ********1320.

Those bitcoins are now available in your My Wallet account!

Thank you for the purchase.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:    <contact@coinbase.com> on behalf of Coinbase
Sent:    Thu 11/20/2014 6:57 AM (GMT-05:00)
To:      <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: A purchase for 2.00 BTC has been initiated

Hi Denis Marc Audet,

This email is to confirm that you initiated a purchase of 2.00
BTC for $724.02 on Nov 20, 2014 at 03:57 am to be paid for
with Webster Bank ********1320.

Your bitcoin will arrive by the end of day on Wednesday Nov
26, 2014.

Thank you for the purchase.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:     <contact@coinbase.com> on behalf of Coinbase
Sent:     Thu 11/20/2014 7:22 AM (GMT-05:00)
To:       <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: The 2.00 BTC you purchased are now available in your account

Hi Denis Marc Audet,

On Nov 14, 2014 you purchased 2.00 BTC for $807.65 from
Webster Bank ********1320.

Those bitcoins are now available in your My Wallet account!

Thank you for the purchase.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:     <contact@coinbase.com> on behalf of Coinbase
Sent:     Thu 11/20/2014 9:24 AM (GMT-05:00)
To:       <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: The 2.00 BTC you purchased are now available in your account

Hi Denis Marc Audet,

On Nov 14, 2014 you purchased 2.00 BTC for $798.17 from
Webster Bank ********1320.

Those bitcoins are now available in your My Wallet account!

Thank you for the purchase.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:      <contact@coinbase.com> on behalf of Coinbase
Sent:      Thu 11/20/2014 9:46 AM (GMT-05:00)
To:        <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: You just sent 10.00 BTC to 1J8iEdTUBGhbPCJNHJu2q78JeLFuUmZxrX

Hi Denis Marc Audet,

You just sent **10.00** BTC (worth $3,594.45 USD) to
**1J8iEdTUBGhbPCJNHJu2q78JeLFuUmZxrX**.

Attached message:

>     Fund GAW account

You can view this transaction at any time from your account.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:    <contact@coinbase.com> on behalf of Coinbase
Sent:    Fri 11/21/2014 7:24 AM (GMT-05:00)
To:      <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: The 1.00 BTC you purchased are now available in your account

Hi Denis Marc Audet,

On Nov 15, 2014 you purchased 1.00 BTC for $382.26 from
Webster Bank ********1320.

Those bitcoins are now available in your My Wallet account!

Thank you for the purchase.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:     <contact@coinbase.com> on behalf of Coinbase
Sent:     Fri 11/21/2014 9:25 AM (GMT-05:00)
To:       <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: The 1.00 BTC you purchased are now available in your account

Hi Denis Marc Audet,

On Nov 15, 2014 you purchased 1.00 BTC for $375.91 from
Webster Bank ********1320.

Those bitcoins are now available in your My Wallet account!

Thank you for the purchase.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:    <contact@coinbase.com> on behalf of Coinbase
Sent:    Fri 11/21/2014 11:09 AM (GMT-05:00)
To:      <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: The 1.00 BTC you purchased are now available in your account

Hi Denis Marc Audet,

On Nov 21, 2014 you purchased 1.00 BTC for $360.12 from
Webster Bank ********1320.

Those bitcoins are now available in your My Wallet account!

Thank you for the purchase.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:    <contact@coinbase.com> on behalf of Coinbase
Sent:    Fri 11/21/2014 11:29 AM (GMT-05:00)
To:      <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: You just sent 3.00 BTC to 1J8iEdTUBGhbPCJNHJu2q78JeLFuUmZxrX

Hi Denis Marc Audet,

You just sent **3.00** BTC (worth $1,066.06 USD) to
**1J8iEdTUBGhbPCJNHJu2q78JeLFuUmZxrX**.

Attached message:

     Fund GAW account

You can view this transaction at any time from your account.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:    <contact@coinbase.com> on behalf of Coinbase
Sent:    Sat 11/22/2014 11:48 AM (GMT-05:00)
To:      <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: The 1.00 BTC you purchased are now available in your account

Hi Denis Marc Audet,

On Nov 22, 2014 you purchased 1.00 BTC for $361.91 from
Webster Bank ********1320.

Those bitcoins are now available in your My Wallet account!

Thank you for the purchase.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:     <contact@coinbase.com> on behalf of Coinbase
Sent:     Mon 11/24/2014 6:45 AM (GMT-05:00)
To:       <marc@audetwebdesign.com>
Cc:
Bcc:
Subject:  You just sent 1.00 BTC to 1J8iEdTUBGhbPCJNHJu2q78JeLFuUmZxrX

Hi Denis Marc Audet,

You just sent **1.00** BTC (worth $371.98 USD) to
**1J8iEdTUBGhbPCJNHJu2q78JeLFuUmZxrX**.

Attached message:

    Fund GAW account

You can view this transaction at any time from your account.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:     <contact@coinbase.com> on behalf of Coinbase
Sent:     Mon 11/24/2014 3:07 PM (GMT-05:00)
To:       <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: The 0.80 BTC you purchased are now available in your account

Hi Denis Marc Audet,

On Nov 24, 2014 you purchased 0.80 BTC for $311.77 from
Webster Bank ********1320.

Those bitcoins are now available in your My Wallet account!

Thank you for the purchase.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:     <contact@coinbase.com> on behalf of Coinbase
Sent:     Mon 11/24/2014 3:09 PM (GMT-05:00)
To:       <marc@audetwebdesign.com>
Cc:
Bcc:
Subject:  You just sent 0.80 BTC to 1J8iEdTUBGhbPCJNHJu2q78JeLFuUmZxrX

Hi Denis Marc Audet,

You just sent **0.80** BTC (worth $308.55 USD) to
**1J8iEdTUBGhbPCJNHJu2q78JeLFuUmZxrX**.

Attached message:

> Fund GAW account

You can view this transaction at any time from your account.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:    <contact@coinbase.com> on behalf of Coinbase
Sent:    Wed 11/26/2014 4:22 AM (GMT-05:00)
To:      <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: The 2.00 BTC you purchased are now available in your account

Hi Denis Marc Audet,

On Nov 20, 2014 you purchased 2.00 BTC for $724.02 from
Webster Bank ********1320.

Those bitcoins are now available in your My Wallet account!

Thank you for the purchase.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:    <contact@coinbase.com> on behalf of Coinbase
Sent:    Wed 11/26/2014 8:28 AM (GMT-05:00)
To:      <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: You just sent 2.00 BTC to 1J8iEdTUBGhbPCJNHJu2q78JeLFuUmZxrX

Hi Denis Marc Audet,

You just sent **2.00** BTC (worth $745.55 USD) to
**1J8iEdTUBGhbPCJNHJu2q78JeLFuUmZxrX**.

Attached message:

    Fund GAW account

You can view this transaction at any time from your account.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:     <contact@coinbase.com> on behalf of Coinbase
Sent:     Thu 11/27/2014 6:36 AM (GMT-05:00)
To:       <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: The 1.00 BTC you purchased are now available in your account

Hi Denis Marc Audet,

On Nov 27, 2014 you purchased 1.00 BTC for $376.49 from
Webster Bank ********1320.

Those bitcoins are now available in your My Wallet account!

Thank you for the purchase.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:    <contact@coinbase.com> on behalf of Coinbase
Sent:    Thu 11/27/2014 6:38 AM (GMT-05:00)
To:      <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: You just sent 1.00 BTC to 1J8iEdTUBGhbPCJNHJu2q78JeLFuUmZxrX

Hi Denis Marc Audet,

You just sent **1.00** BTC (worth $372.73 USD) to
**1J8iEdTUBGhbPCJNHJu2q78JeLFuUmZxrX**.

Attached message:

      Fund GAW account

You can view this transaction at any time from your account.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:     <contact@coinbase.com> on behalf of Coinbase
Sent:     Sun 11/30/2014 3:39 PM (GMT-05:00)
To:       <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: The 1.00 BTC you purchased are now available in your account

Hi Denis Marc Audet,

On Nov 30, 2014 you purchased 1.00 BTC for $379.18 from
Webster Bank ********1320.

Those bitcoins are now available in your My Wallet account!

Thank you for the purchase.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:    <contact@coinbase.com> on behalf of Coinbase
Sent:    Sun 11/30/2014 4:09 PM (GMT-05:00)
To:      <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: You just sent 1.00 BTC to 1J8iEdTUBGhbPCJNHJu2q78JeLFuUmZxrX

Hi Denis Marc Audet,

You just sent **1.00** BTC (worth $375.53 USD) to
**1J8iEdTUBGhbPCJNHJu2q78JeLFuUmZxrX**.

Attached message:

    Fund GAW account

You can view this transaction at any time from your account.

Kind regards,
The Coinbase Team

© Coinbase 2014

From:    GAW Miners
Sent:    Mon 12/01/2014 7:06 AM (GMT-05:00)
To:      <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: Order confirmation for order #64744

Thank you for placing your order with GAW Miners!

This email is to confirm your recent order.

Date 12/01/2014

Billing address
Denis Marc Audet
210 Treadwell Street Unit 312
Hamden, Connecticut 06517
United States

20x HashStaker 25 - 6 Month Container for $448.75 each

Subtotal : $8,975.00 USD
Total : $8,975.00 USD

From:    GAW Miners
Sent:    Mon 12/01/2014 7:15 AM (GMT-05:00)
To:      <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: Shipping confirmation for order #64744

Dear Denis Marc Audet,

All of the items from order #64744 have now been shipped:
20x HashStaker 25 - 6 Month Container for $0.00 each (sku: )

Thank you for ordering from GAW Miners!

From:    <contact@coinbase.com> on behalf of Coinbase
Sent:    Mon 12/01/2014 11:45 AM (GMT-05:00)
To:      <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: The 0.39 BTC you purchased are now available in your account

Hi Denis Marc Audet,

On Dec 1, 2014 you purchased 0.39 BTC for $149.96 from
Webster Bank ********1320.

Those bitcoins are now available in your My Wallet account!

Thank you for the purchase.

Kind regards,
The Coinbase Team

Earn free bitcoin by inviting your friends to Coinbase

From:    <contact@coinbase.com> on behalf of Coinbase
Sent:    Mon 12/01/2014 11:49 AM (GMT-05:00)
To:      <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: You just sent 0.39405 BTC to 1J8iEdTUBGhbPCJNHJu2q78JeLFuUmZxrX

Hi Denis Marc Audet,

You just sent **0.39405** BTC (worth $150.02 USD) to
**1J8iEdTUBGhbPCJNHJu2q78JeLFuUmZxrX**.

Attached message:

     Fund GAW account

You can view this transaction at any time from your account.

Kind regards,
The Coinbase Team

Earn free bitcoin by inviting your friends to Coinbase.

From:     <contact@coinbase.com> on behalf of Coinbase
Sent:     Wed 12/03/2014 10:09 PM (GMT-05:00)
To:       <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: The 1.00 BTC you purchased are now available in your account

Hi Denis Marc Audet,

On Dec 3, 2014 you purchased 1.00 BTC for $381.73 from
Webster Bank ********1320.

Those bitcoins are now available in your My Wallet account!

Thank you for the purchase.

Kind regards,
The Coinbase Team

Earn free bitcoin by inviting your friends to Coinbase.

From:    <contact@coinbase.com> on behalf of Coinbase
Sent:    Wed 12/03/2014 10:14 PM (GMT-05:00)
To:      <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: You just sent 1.00 BTC to 1J8iEdTUBGhbPCJNHJu2q78JeLFuUmZxrX

Hi Denis Marc Audet,

You just sent **1.00** BTC (worth $377.82 USD) to
**1J8iEdTUBGhbPCJNHJu2q78JeLFuUmZxrX**.

Attached message:

    Fund GAW account

You can view this transaction at any time from your account.

Kind regards,
The Coinbase Team

Earn free bitcoin by inviting your friends to Coinbase.

From:     <contact@coinbase.com> on behalf of Coinbase
Sent:     Fri 12/05/2014 11:40 AM (GMT-05:00)
To:       <marc@audetwebdesign.com>
Cc:
Bcc:
Subject:  The 0.70 BTC you purchased are now available in your account

Hi Denis Marc Audet,

On Dec 5, 2014 you purchased 0.70 BTC for $263.73 from
Webster Bank ********1320.

Those bitcoins are now available in your My Wallet account!

Thank you for the purchase.

Kind regards,
The Coinbase Team

Earn free bitcoin by inviting your friends to Coinbase.

From:    <contact@coinbase.com> on behalf of Coinbase
Sent:    Fri 12/05/2014 11:41 AM (GMT-05:00)
To:      <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: You just sent 0.70 BTC to 1J8iEdTUBGhbPCJNHJu2q78JeLFuUmZxrX



Hi Denis Marc Audet,

You just sent **0.70** BTC (worth $261.11 USD) to **1J8iEdTUBGhbPCJNHJu2q78JeLFuUmZxrX**.

Attached message:

   Fund GAW account

You can view this transaction at any time from your account.

Kind regards,
The Coinbase Team

Earn free bitcoin by inviting your friends to Coinbase.

From:    <contact@coinbase.com> on behalf of Coinbase
Sent:    Sat 12/06/2014 9:26 PM (GMT-05:00)
To:      <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: The 0.52771751 BTC you purchased are now available in your account

Hi Denis Marc Audet,

On Dec 6, 2014 you purchased 0.52771751 BTC for $200.00
from Webster Bank ********1320.

Those bitcoins are now available in your My Wallet account!

Thank you for the purchase.

Kind regards,
The Coinbase Team

Earn free bitcoin by inviting your friends to Coinbase.

From:    <contact@coinbase.com> on behalf of Coinbase
Sent:    Sat 12/06/2014 9:28 PM (GMT-05:00)
To:      <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: You just sent 0.5332 BTC to 1J8iEdTUBGhbPCJNHJu2q78JeLFuUmZxrX

Hi Denis Marc Audet,

You just sent **0.5332** BTC (worth $199.96 USD) to
**1J8iEdTUBGhbPCJNHJu2q78JeLFuUmZxrX**.

Attached message:

        Fund GAW account

You can view this transaction at any time from your account.

Kind regards,
The Coinbase Team

Earn free bitcoin by inviting your friends to Coinbase.

From:    <contact@coinbase.com> on behalf of Coinbase
Sent:    Tue 12/09/2014 7:13 AM (GMT-05:00)
To:      <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: The 0.70212162 BTC you purchased are now available in your account

Hi Denis Marc Audet,

On Dec 9, 2014 you purchased 0.70212162 BTC for $250.00 from Webster Bank ********1320.

Those bitcoins are now available in your My Wallet account!

Thank you for the purchase.

Kind regards,
The Coinbase Team

Earn free bitcoin by inviting your friends to Coinbase.

From:    <contact@coinbase.com> on behalf of Coinbase
Sent:    Tue 12/09/2014 7:14 AM (GMT-05:00)
To:      <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: You just sent 0.70925 BTC to 1J8iEdTUBGhbPCJNHJu2q78JeLFuUmZxrX

Hi Denis Marc Audet,

You just sent **0.70925** BTC (worth $250.03 USD) to
**1J8iEdTUBGhbPCJNHJu2q78JeLFuUmZxrX**.

Attached message:

         Fund GAW account

You can view this transaction at any time from your account.

Kind regards,
The Coinbase Team

Earn free bitcoin by inviting your friends to Coinbase.

From:     <contact@coinbase.com> on behalf of Coinbase
Sent:     Wed 12/10/2014 9:29 AM (GMT-05:00)
To:       <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: The 0.70297481 BTC you purchased are now available in your account

Hi Denis Marc Audet,

On Dec 10, 2014 you purchased 0.70297481 BTC for $250.00
from Webster Bank ********1320.

Those bitcoins are now available in your My Wallet account!

Thank you for the purchase.

Kind regards,
The Coinbase Team

Earn free bitcoin by inviting your friends to Coinbase.

From:     <contact@coinbase.com> on behalf of Coinbase
Sent:     Wed 12/10/2014 9:32 AM (GMT-05:00)
To:       <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: You just sent 0.735558 BTC to 1J8iEdTUBGhbPCJNHJu2q78JeLFuUmZxrX

Hi Denis Marc Audet,

You just sent **0.735558** BTC (worth $258.93 USD) to
**1J8iEdTUBGhbPCJNHJu2q78JeLFuUmZxrX**.

Attached message:

    Fund GAW account

You can view this transaction at any time from your account.

Kind regards,
The Coinbase Team

Earn free bitcoin by inviting your friends to Coinbase.

From:     <contact@coinbase.com> on behalf of Coinbase
Sent:     Sat 12/13/2014 2:27 PM (GMT-05:00)
To:       <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: The 1.30851149 BTC you purchased are now available in your account

Hi Denis Marc Audet,

On Dec 13, 2014 you purchased 1.30851149 BTC for $460.00 from Webster Bank ********1320.

Those bitcoins are now available in your My Wallet account!

Thank you for the purchase.

Kind regards,
The Coinbase Team

Earn free bitcoin by inviting your friends to Coinbase

From:    <contact@coinbase.com> on behalf of Coinbase
Sent:    Sat 12/13/2014 2:29 PM (GMT-05:00)
To:      <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: You just sent 1.30 BTC to 1J8iEdTUBGhbPCJNHJu2q78JeLFuUmZxrX

Hi Denis Marc Audet,

You just sent **1.30** BTC (worth $452.43 USD) to
**1J8iEdTUBGhbPCJNHJu2q78JeLFuUmZxrX.**

Attached message:

    Fund GAW account

You can view this transaction at any time from your account.

Kind regards,
The Coinbase Team

Earn free bitcoin by inviting your friends to Coinbase.

From:    <contact@coinbase.com> on behalf of Coinbase
Sent:    Sat 12/13/2014 5:44 PM (GMT-05:00)
To:      <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: The 0.05640944 BTC you purchased are now available in your account

Hi Denis Marc Audet,

On Dec 13, 2014 you purchased 0.05640944 BTC for $20.00
from Webster Bank ********1320.

Those bitcoins are now available in your My Wallet account!

Thank you for the purchase.

Kind regards,
The Coinbase Team

Earn free bitcoin by inviting your friends to Coinbase.

From:    <contact@coinbase.com> on behalf of Coinbase
Sent:    Sat 12/13/2014 5:45 PM (GMT-05:00)
To:      <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: You just sent 0.05698 BTC to 1J8iEdTUBGhbPCJNHJu2q78JeLFuUmZxrX

Hi Denis Marc Audet,

You just sent **0.05698** BTC (worth $19.99 USD) to
**1J8iEdTUBGhbPCJNHJu2q78JeLFuUmZxrX**.

Attached message:

        Fund GAW account

You can view this transaction at any time from your account.

Kind regards,
The Coinbase Team

Earn free bitcoin by inviting your friends to Coinbase.

From:      <contact@coinbase.com> on behalf of Coinbase
Sent:      Sun 12/14/2014 9:06 PM (GMT-05:00)
To:        <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: The 0.06997943 BTC you purchased are now available in your account

Hi Denis Marc Audet,

On Dec 14, 2014 you purchased 0.06997943 BTC for $25.00
from Webster Bank ********1320.

Those bitcoins are now available in your My Wallet account!

Thank you for the purchase.

Kind regards,
The Coinbase Team

Earn free bitcoin by inviting your friends to Coinbase.

From:     <contact@coinbase.com> on behalf of Coinbase
Sent:     Sun 12/14/2014 9:08 PM (GMT-05:00)
To:       <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: You just sent 0.070775 BTC to 1HrMh8kqM3Lw2DRsnLJv4KaNPa4cCXfBDz

Hi Denis Marc Audet,

You just sent **0.070775** BTC (worth $24.93 USD) to
**1HrMh8kqM3Lw2DRsnLJv4KaNPa4cCXfBDz**.

Attached message:

        Fund Paycoin

You can view this transaction at any time from your account.

Kind regards,
The Coinbase Team

Earn free bitcoin by inviting your friends to Coinbase.

From:     <contact@coinbase.com> on behalf of Coinbase
Sent:     Mon 12/15/2014 11:41 AM (GMT-05:00)
To:       <marc@audetwebdesign.com>
Cc:
Bcc:
Subject:  The 0.28059209 BTC you purchased are now available in your account

Hi Denis Marc Audet,

On Dec 15, 2014 you purchased 0.28059209 BTC for $100.00
from Webster Bank ********1320.

Those bitcoins are now available in your My Wallet account!

Thank you for the purchase.

Kind regards,
The Coinbase Team

Earn free bitcoin by inviting your friends to Coinbase.

From:     <contact@coinbase.com> on behalf of Coinbase
Sent:     Mon 12/15/2014 11:43 AM (GMT-05:00)
To:       <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: You just sent 0.2833 BTC to 14MwnnsL6FVs9Ehi4ypyEXqET3bX3bTFWy

Hi Denis Marc Audet,

You just sent **0.2833** BTC (worth $99.79 USD) to
**14MwnnsL6FVs9Ehi4ypyEXqET3bX3bTFWy**.

Attached message:

        Fund Mining Rig

You can view this transaction at any time from your account.

Kind regards,
The Coinbase Team

Earn free bitcoin by inviting your friends to Coinbase.

From:    <contact@coinbase.com> on behalf of Coinbase
Sent:    Tue 12/16/2014 7:50 AM (GMT-05:00)
To:      <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: The 0.70155989 BTC you purchased are now available in your account

Hi Denis Marc Audet,

On Dec 16, 2014 you purchased 0.70155989 BTC for $240.00
from Webster Bank ********1320.

Those bitcoins are now available in your My Wallet account!

Thank you for the purchase.

Kind regards,
The Coinbase Team

Earn free bitcoin by inviting your friends to Coinbase.

From:    <contact@coinbase.com> on behalf of Coinbase
Sent:    Tue 12/16/2014 8:01 AM (GMT-05:00)
To:      <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: You just sent 0.705 BTC to 1HrMh8kqM3Lw2DRsnLJv4KaNPa4cCXfBDz

Hi Denis Marc Audet,

You just sent **0.705** BTC (worth $238.13 USD) to
**1HrMh8kqM3Lw2DRsnLJv4KaNPa4cCXfBDz**.

Attached message:

        Fund Coin Swap

You can view this transaction at any time from your account.

Kind regards,
The Coinbase Team

Earn free bitcoin by inviting your friends to Coinbase.

From:     <contact@coinbase.com> on behalf of Coinbase
Sent:     Wed 12/17/2014 12:55 PM (GMT-05:00)
To:       <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: The 0.30945044 BTC you purchased are now available in your account

Hi Denis Marc Audet,

On Dec 17, 2014 you purchased 0.30945044 BTC for $100.00
from Webster Bank ********1320.

Those bitcoins are now available in your My Wallet account!

Thank you for the purchase.

Kind regards,
The Coinbase Team

Earn free bitcoin by inviting your friends to Coinbase.

From:    <contact@coinbase.com> on behalf of Coinbase
Sent:    Wed 12/17/2014 12:56 PM (GMT-05:00)
To:      <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: You just sent 0.3125 BTC to 14MwnnsL6FVs9Ehi4ypyEXqET3bX3bTFWy

Hi Denis Marc Audet,

You just sent **0.3125** BTC (worth $99.60 USD) to
**14MwnnsL6FVs9Ehi4ypyEXqET3bX3bTFWy**.

Attached message:

    Fund Miner Rig Rental

You can view this transaction at any time from your account.

Kind regards,
The Coinbase Team

Earn free bitcoin by inviting your friends to Coinbase

From:     <contact@coinbase.com> on behalf of Coinbase
Sent:     Thu 12/18/2014 9:31 PM (GMT-05:00)
To:       <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: The 0.82602947 BTC you purchased are now available in your account

Hi Denis Marc Audet,

On Dec 18, 2014 you purchased 0.82602947 BTC for $260.00 from Webster Bank ********1320.

Those bitcoins are now available in your My Wallet account!

Thank you for the purchase.

Kind regards,
The Coinbase Team

Earn free bitcoin by inviting your friends to Coinbase.

From:     <contact@coinbase.com> on behalf of Coinbase
Sent:     Thu 12/18/2014 9:32 PM (GMT-05:00)
To:       <marc@audetwebdesign.com>
Cc:
Bcc:
Subject:  You just sent 0.80225 BTC to 1HrMh8kqM3Lw2DRsnLJv4KaNPa4cCXfBDz

Hi Denis Marc Audet,

You just sent **0.80225** BTC (worth $250.01 USD) to
**1HrMh8kqM3Lw2DRsnLJv4KaNPa4cCXfBDz**.

Attached message:

    Fund Coin Swap

You can view this transaction at any time from your account.

Kind regards,
The Coinbase Team

Earn free bitcoin by inviting your friends to Coinbase

From:     <contact@coinbase.com> on behalf of Coinbase
Sent:     Sat 12/20/2014 5:56 PM (GMT-05:00)
To:       <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: The 0.81023819 BTC you purchased are now available in your account

Hi Denis Marc Audet,

On Dec 20, 2014 you purchased 0.81023819 BTC for $270.00 from Webster Bank ********1320.

Those bitcoins are now available in your My Wallet account!

Thank you for the purchase.

Kind regards,
The Coinbase Team

Earn free bitcoin by inviting your friends to Coinbase.

From:     <contact@coinbase.com> on behalf of Coinbase
Sent:     Sat 12/20/2014 5:58 PM (GMT-05:00)
To:       <marc@audetwebdesign.com>
Cc:
Bcc:
Subject:  You just sent 0.83478938 BTC to 19vREWakpcqcxMUTso5GbuqikHcSaji5Qk

Hi Denis Marc Audet,

You just sent **0.83478938** BTC (worth $275.14 USD) to
**19vREWakpcqcxMUTso5GbuqikHcSaji5Qk**.

Attached message:

    Fund Bittrex

You can view this transaction at any time from your account.

Kind regards,
The Coinbase Team

Earn free bitcoin by inviting your friends to Coinbase.

From:     <contact@coinbase.com> on behalf of Coinbase
Sent:     Mon 12/22/2014 6:51 AM (GMT-05:00)
To:       <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: The 0.67710746 BTC you purchased are now available in your account

Hi Denis Marc Audet,

On Dec 22, 2014 you purchased 0.67710746 BTC for $225.00
from Webster Bank ********1320.

Those bitcoins are now available in your My Wallet account!

Thank you for the purchase.

Kind regards,
The Coinbase Team

Earn free bitcoin by inviting your friends to Coinbase.

From:     <contact@coinbase.com> on behalf of Coinbase
Sent:     Mon 12/22/2014 6:55 AM (GMT-05:00)
To:       <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: You just sent 0.67710746 BTC to 19vREWakpcqcxMUTso5GbuqikHcSaji5Qk



Hi Denis Marc Audet,

You just sent **0.67710746** BTC (worth $223.05 USD) to
**19vREWakpcqcxMUTso5GbuqikHcSaji5Qk**.

Attached message:

      Fund Bittrex

You can <u>view this transaction</u> at any time from your account.

Kind regards,
The Coinbase Team

Earn free bitcoin by inviting your friends to Coinbase

From:     <contact@coinbase.com> on behalf of Coinbase
Sent:     Mon 12/22/2014 12:10 PM (GMT-05:00)
To:       <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: The 0.05961823 BTC you purchased are now available in your account

Hi Denis Marc Audet,

On Dec 22, 2014 you purchased 0.05961823 BTC for $20.00 from Webster Bank ********1320.

Those bitcoins are now available in your My Wallet account!

Thank you for the purchase.

Kind regards,
The Coinbase Team

Earn free bitcoin by inviting your friends to Coinbase

From:      <contact@coinbase.com> on behalf of Coinbase
Sent:      Mon 12/22/2014 12:11 PM (GMT-05:00)
To:        <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: You just sent 0.03003 BTC to 1J8iEdTUBGhbPCJNHJu2q78JeLFuUmZxrX

Hi Denis Marc Audet,

You just sent **0.03003** BTC (worth $9.97 USD) to
**1J8iEdTUBGhbPCJNHJu2q78JeLFuUmZxrX.**

Attached message:

    Fund GAW account

You can view this transaction at any time from your account.

Kind regards,
The Coinbase Team

Earn free bitcoin by inviting your friends to Coinbase.

From:     <contact@coinbase.com> on behalf of Coinbase
Sent:     Fri 12/26/2014 11:53 AM (GMT-05:00)
To:       <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: The 1.5323545 BTC you purchased are now available in your account

Hi Denis Marc Audet,

On December 26, 2014 you purchased 1.5323545 BTC for $500.00 from Webster Bank ********1320.

Those bitcoins are now available in your My Wallet account!

Thank you for the purchase.

Kind regards,
The Coinbase Team

Earn free bitcoin by inviting your friends to Coinbase.

From:     <contact@coinbase.com> on behalf of Coinbase
Sent:     Fri 12/26/2014 11:55 AM (GMT-05:00)
To:       <marc@audetwebdesign.com>
Cc:
Bcc:
Subject: You just sent 1.548 BTC to 19vREWakpcqcxMUTso5GbuqikHcSaji5Qk



Hi Denis Marc Audet,

You just sent **1.548** BTC (worth $500.05 USD) to
**19vREWakpcqcxMUTso5GbuqikHcSaji5Qk**.

Attached message:

        Fund Bittrex.com account

You can view this transaction at any time from your account.

Kind regards,
The Coinbase Team

Earn free bitcoin by inviting your friends to Coinbase.

EXHIBIT A-57

# AFFIDAVIT OF CERTIFICATION

*This form must be digitally signed for each claimant upon which damages or loss is claimed*

**A MATERIAL OR FALSE STATEMENT OR OMISSION MADE IN CONNECTION WITH THIS APPLICATION IS SUFFICIENT CAUSE FOR DENIAL OF CLAIM CERTIFICATION, REVOCATION OF A PRIOR ACCEPTANCE, AND MAY SUBJECT THE PERSON AND/OR ENTITY MAKING THE FALSE STATEMENT TO ANY AND ALL CIVIL AND CRIMINAL PENALTIES AVAILABLE PURSUANT TO APPLICABLE TO U.S. FEDERAL AND STATE LAW. YOU MAY ALSO BE SUBJECT TO CRIMINAL PROSECUTION, IN YOUR COUNTRY OF RESIDENCE, FOR THE WILFUL PERPETRATION OF CRIMINAL INTENT TO DEFRAUD.**

I __Dimitrios Anastasakis__ (full name printed), swear or affirm under penalty of law that the information I have submitted in this application and its attachments and supporting documents are true and correct to the best of my knowledge, and that all responses to the questions are full and complete, omitting no material information. The responses include all material information necessary to fully and accurately identify and explain my claim of loss and pertinent account and purchase histories necessary to fully support my claim(s) in a U.S. court of law.

**I recognize that the information submitted in this application is for the purpose of civil litigation against GAWminers, its affiliates, owners, officers and representatives to pursue financial damage compensation. I understand that a federal court, officer of the court, its appointee or designate, or litigant group leadership may, by means it deems appropriate, determine the accuracy and truth of the statements in this application, and I authorize such entities to investigate the claims made, for the purpose of verifying the information supplied and determining the claimant's eligibility to participate in any lawsuit or settlement in pursuit of financial damage awards or compensation.**

I agree to submit to third-party and government audit, examination and review of documents and files, in whatever form they exist, and to permit written or oral interviews required of me. I acknowledge and agree that, in the case of electronic written correspondence, return remittance shall be within a reasonable allotment of time, herein deemed seven (7) calendar days of electronic receipt for e-mail based correspondence. I understand that refusal to permit such inquiries, or failure to comply with these terms, may be grounds for denial of admission to the litigant group.

**I agree to provide written notice of any material change in the information contained in the original application within fifteen (15) calendar days of such change (e.g., purchase receipts, address, telephone number, etc.).**

I acknowledge and agree that any misrepresentations in this application or in records submitted may be grounds for denial of admittance into the litigant group and lawsuit; denial of any future compensation or financial award resulting from a successful litigation; and for initiating action under federal and/or state law concerning false statement, fraud or other applicable offenses, including in the country of claimant's residence.

**I declare under penalty of perjury that the information provided in this application and supporting documents is true and correct.**

Executed on __09/22/2015__(Date)

Signature __Dimitrios Anastasakis__  Digitally signed by Dimitrios Anastasakis
Date: 2015.09.22 21:39:49 -04'00'

(Applicant and Claimant)

EXHIBIT A-58

Page 1

1

2              UNITED STATES DISTRICT COURT

3            FOR THE DISTRICT OF CONNECTICUT

4                 CASE 3:16-CV-00940

5    ---------------------------------------------x

6    DENIS MARC AUDET, MICHAEL PFEIFFER, DEAN ALLEN

7    SHINNERS, and JASON VARGAS, INDIVIDUALLY and on

8    Behalf of All Others Similarly Situated,

9                          Plaintiffs,

10         v.

11   STUART A. FRASER, GAW MINERS, LLC, and ZENMINER,

12   LLC, (d/b/a ZEN CLOUD),

13                          Defendants.

14   ---------------------------------------------x

15

16    VIDEOTAPED DEPOSITION OF DEAN ALLEN SHINNERS

17              New York, New York

18             Wednesday, July 25, 2018

19

20

21   Reported by:

22   Amy A. Rivera, CSR, RPR, CLR

23   JOB NO. 144960

24

25

Page 46

DEAN ALLEN SHINNERS

1
2  few of the other employees.  Again, it wasn't in
3  the beginning.  It wasn't until late in 20 --
4  2014 -- it wasn't 'til late 2014 that I started
5  having really these direct-line communications
6  with these individuals within GAW, including Dan
7  Kelley and -- I'm trying to think of -- well,
8  that's pretty much it, actually.
9      Q.  Okay.  And taking, again, this -- this
10 time period from August of 2014 'til the end of
11 2014, is it fair to say that in that time period,
12 in addition to continuing Internet research, you
13 also had direct communications with people at GAW
14 Miners, Josh Garza, and some of the other people
15 you named, as a way of learning what was going on
16 behind the scenes?
17     MR. WATTERSON:  Object to the form.
18     You can answer.
19     A.  Again, you have to -- you have to
20 separate beginning, middle, end here, because in
21 the beginning I had no conversations with anybody
22 at GAW.  I would say the vast majority of the
23 people that were customers of -- of GAW were
24 reliant almost completely and exclusively on Hash
25 Talk, the company-owned forum.

Page 47

DEAN ALLEN SHINNERS

1
2      So the information -- any information
3  would have filtered through Hash Talk.  It was not
4  until later -- you got to remember, this is from
5  August to basically January, so we're not even
6  talking six months here.
7      So we have to look at this as this is
8  the history.  Now, what month are you referring
9  to, August, September, October, November,
10 December?  Because things changed very quickly in
11 that environment with GAW Miners.
12     So the primary information flow was
13 coming from Hash Talk at the time, in the very
14 beginning, up until, basically, November, when
15 there were some conversations, you know, with Josh
16 Garza, and mostly by private messaging on Hash
17 Talk.
18     Q.  And -- and those are communications or
19 conversations that you had with Mr. Garza?
20     A.  Yes.
21     Q.  Okay.  And you had private
22 communications with others at GAW Miners later in
23 that period, November, December of 2014.  Is that
24 right?
25     A.  One each before the implosion, before

Page 48

DEAN ALLEN SHINNERS

1
2  GAW imploded, and I was pretty much parted ways
3  with GAW.
4      Eric Capuano, but it had nothing to do
5  with, you know, insight activity.  It had to do
6  with an issue with payouts.
7      The other one, Joe Mordica, there was
8  a -- a few things that he was involved with that
9  they asked me to help with, and mostly with
10 English.
11     Q.  And -- and Mr. Mordica and
12 Mr. Capuano, who -- they worked for GAW Miners?
13     A.  They worked for GAW Miners at the
14 time, I believe.
15     Q.  And now, let me bring you back to
16 my -- the -- the question about sources of
17 information.
18     We've talked about you did Internet
19 research on GAW Miners, right?
20     A.  Yes.
21     Q.  Okay.  And then at the beginning, you
22 relied on the forum "Hash Talk" to get information
23 in addition to --
24     A.  Yes.
25     Q.  -- general information?

Page 49

DEAN ALLEN SHINNERS

1
2      And then at some point, you had direct
3  communications with people at GAW, correct?
4      A.  Yes.
5      Q.  Okay.  In addition to those three
6  sources of information, general Internet research,
7  the Hash Talk forum, direct conversations with
8  Mr. Garza and others at GAW Miners, did you have
9  any other sources of information as to what was
10 going on at GAW Miners and ZenMiner?
11     A.  Not until the data breach, which would
12 have been in 2015.
13     Q.  Okay.  And when you refer to the "data
14 breach," tell us what you mean by that?
15     A.  The data breach was a -- a sizable
16 amount of corporate documents and e-mail boxes
17 were released out onto the Internet, and a small
18 group of people -- don't ask me, I have no idea
19 who these people were, I mean, that they had
20 access to this at the same time.
21     But I was tipped off that this data
22 breach existed, and I attempted to -- to download
23 it.  And got halfway through, and I ended up
24 having to get the entire download from someone
25 else who had a faster Internet connection than I

Page 50

DEAN ALLEN SHINNERS

1
2  did.
3       So that's the data breach.  And it
4  contained a lot of internal documents, corporate
5  documents.  It contained a large number of
6  internal and external e-mails inside of GAW,
7  outside of GAW, between other entities, between
8  Stuart Fraser and Cantor Fitzgerald, between a
9  number of different vendors around the world.  It
10 was quite extensive.
11     Q.   And -- and when in -- in 2015 did you
12 start to get access to this trove of information?
13     A.   Well, it was a one-time access and it
14 was only really available for about 5 to 10
15 minutes on the Internet.  After that, it was --
16 the -- the access point was closed.  So --
17     Q.   What month?
18     A.   Pardon me?
19     Q.   What month?
20     A.   March, I believe.  I can't -- I can't
21 really tell you specifically what date it was, but
22 I believe it was in March.
23     Q.   Were you still trading in GAW Miners
24 or Zen Cloud products at that time?
25     A.   Trading?

Page 51

DEAN ALLEN SHINNERS

1
2      Q.   Buying or selling --
3      A.   I don't think you could at the time,
4  actually.
5           I had stopped my activity with them
6  pretty much in the beginning of January.  There
7  were some periods of time where it looked like
8  they were changing what they planned to do to
9  resolve some pretty prominent issues, and was what
10 piqued my interest, but I had already burned the
11 bridge, as it were, with Garza and GAW Miners
12 regardless.
13          So, you know, my hope was to be
14 finished with it.  So I was stuck with the
15 products I had.  What I couldn't sell, I was stuck
16 with.
17     Q.   Now, there was a period in 2014 where
18 you sought employment with GAW Miners, correct?
19     A.   There was -- actually, it was the
20 other way around.  Garza had asked -- because of
21 my post -- my posting habits and the help with the
22 English and grammar issues, Garza had asked if I
23 had a resume and if I would send it, and I did.
24     Q.   When -- when you say it was because of
25 your posting habits, tell me what you mean by

Page 52

DEAN ALLEN SHINNERS

1
2  that?
3      A.   Posting habits meaning I was -- I
4  posted a lot.  I was very active with the
5  community that was on Hash Talk.
6           So because there were a lot of
7  subject -- there was a lot of subject -- subject
8  matter that interested me, and mostly in the
9  entrepreneur area -- entrepreneurship area, small
10 business development, and such.
11          So I was very active.  Whenever I saw
12 that kind of a thread appear on the company's
13 forum, I would definitely be -- you would see me
14 active there.
15     Q.   Am I right that on some occasions, you
16 edited posts from the company before they went on
17 the Hash Talk forum?
18     A.   Once there was a post -- I -- not for
19 the Hash Talk forum, but once, Garza had sent me a
20 post he wanted to make, and the person that he
21 normally used for that, to edit the English, she
22 was not available.  He couldn't get ahold of her.
23 So he asked me to go through it and fix the
24 English and grammar and everything.
25     Q.   And that's before the post went

Page 53

DEAN ALLEN SHINNERS

1
2  public --
3      A.   That's --
4      Q.   -- correct?
5      A.   He would have posted it immediately
6  afterward, I believe.  I'm not really sure when it
7  was posted.
8      Q.   After you did the editing that he
9  requested, then he would have posted it?
10     A.   Maybe.  It's -- it's -- it's hard to
11 say.
12          It -- I think the one that I can
13 recall was -- it was posted immediately after it
14 was edited.
15     Q.   How did Mr. Garza know to reach out to
16 you out there somewhere in the Internet ether to
17 help him edit a post before he put it on the forum
18 that the company had about its cryptocurrency
19 products?
20     A.   It was -- it was a pet peeve of mine
21 because the community were having very difficult
22 times understanding his posts, and when they
23 uploaded documents and such that were supposed to
24 be official from the company, they were fraught
25 with English and grammar errors, and 60-plus

Page 54

DEAN ALLEN SHINNERS

1
2  percent of the clients or customers of GAW were
3  not native English speakers.
4          So it was a pet peeve of mine.  So I
5  did communicate with them on many occasions
6  stating that they needed to clean up how they
7  presented the information for the sake of clarity
8  because it was causing too much confusion.
9      Q.   Where did you come by the information
10  that 60 percent or so of GAW Miners' clients or
11  customers were not English speaking?
12     A.   I had posted a poll.
13     Q.   On the Hash Talk forum?
14     A.   On the Hash Talk forum.
15     Q.   Okay.  And why were you interested in
16  that subject?
17     A.   Because I'm -- I have an international
18  background, and I was only really interested in
19  the groups out there that -- from other countries
20  outside the United States.
21          I was not really concerned so much
22  about the -- the customers inside the United
23  States because they could understand the language
24  and the technology a little bit better.  But there
25  were a lot of new people that were coming in from

Page 55

DEAN ALLEN SHINNERS

1
2  other countries as a result of marketing who did
3  not really understand all of this very well, and
4  the English wasn't helping them.
5      Q.   And what was your goal in trying to
6  communicate with these new people?
7      A.   I didn't have a goal, really, at all.
8      Q.   What was your interest?  What --
9      A.   That was it, it was my interest.
10     Q.   And for what reason?
11     A.   It's I have a long history with
12  entrepreneurship and small business development.
13  It's my focus.  It was -- it's always been my
14  focus with my college education.
15     Q.   Okay.  And -- and was part of your
16  focus with GAW Miners to try and improve the
17  communications that GAW Miners had with its
18  clients and potential customers?
19     A.   Was it a goal?
20     Q.   Yes.
21     A.   I wouldn't say it was a goal.  It was
22  a -- an intent, yes.  More so trying to assist the
23  others who did not really have a -- a good command
24  of the English language, actually.
25          It was obvious that there was a lot of

Page 56

DEAN ALLEN SHINNERS

1
2  misunderstandings when these posts were put out
3  there, and too many people were asking for
4  clarification, and mostly because they did not --
5  English was not their primary language.
6      Q.   And -- and am I right that part of
7  your focus was to assist those folks who didn't
8  have English as their primary language, correct?
9      A.   It was to help them -- help get some
10  clarity from GAW to them in the public realm, yes.
11     Q.   Okay.  And part of the focus in -- in
12  that effort was to help GAW Miners communicate
13  with those potential customers or clients?
14     A.   It was more so a request that they
15  clean their English up and -- and think about how
16  they're writing or composing these posts.
17          This is how, you know, I stuck out,
18  like -- like a few others, who also did some, you
19  know, editing of, you know, posts, or whatever
20  work was coming out from GAW.
21     Q.   And back to the -- the job opportunity
22  that we discussed earlier, where Mr. Garza reached
23  out to you and asked for your resume, did -- did
24  you provide a resume?
25     A.   I sent a resume, yes.

Page 57

DEAN ALLEN SHINNERS

1
2      Q.   And you sent a job description as
3  well?
4      A.   Sent a job description?
5          I guess you have to rephrase that
6  question because I'm not really -- I -- he asked
7  for my resume.
8      Q.   And -- and you sent him your
9  background, and you also sent him your request for
10  salary and for location and for travel expenses,
11  correct?
12     A.   That was later, yes.
13     Q.   Okay.  And what was the reason that
14  you were having that dialogue with him about a
15  possible employment with GAW Miners?
16     A.   Dan Kelley eventually had called me,
17  and the original statement from Josh Garza was
18  about the CFO position that they wanted -- they
19  needed to fill the CFO position.  Apparently, it
20  had been vacated.  And so that was my
21  understanding, is that this would be the position
22  that they would, you know, be considering me for.
23          However, when Dan Kelley finally
24  contacted me, it was not about the CFO position.
25  It was about a number of other positions, but they

Page 282

DEAN ALLEN SHINNERS

1
2     So there will be a lot of very unhappy
3   people if they find out something after the final
4   version of the white paper's release.
5       Whether it's "we," the working group,
6   "we," Daffy and I, it could be anybody.  It could
7   be -- well, I'm -- to be honest, it's in reference
8   to the working group that's working on the paper.
9       Q.   All right.  And that's the working
10  group that we've seen in all of the e-mails
11  before, which you said was all of GAW Miners'
12  people except for you --
13      A.   And --
14      Q.   -- and BitJane?
15      A.   -- BitJane.
16      Q.   Is that right?
17      A.   Well, Daffy was involved at -- at some
18  point.  And what his name is, I can't even recall
19  what his name is.  But he is not a native English
20  speaker, so he bowed out pretty much immediately.
21      MR. WEINER:  Let's mark as
22  Exhibit 121.
23      MR. WATTERSON:  We've been going for
24  about an hour and 15, you want to take a
25  break?

Page 283

DEAN ALLEN SHINNERS

1
2       MR. WEINER:  Yeah, we'll take a break.
3   We'll -- we'll maybe mark this and then
4   we'll --
5       MR. WATTERSON:  Sure.
6       MR. WEINER:  -- we can go off.
7       VIDEOGRAPHER:  The time is 2:43 p.m.
8   This is the end of Media No. 4.  We are off
9   the record.
10      (Exhibit 121, e-mail chain, dated
11  November 26, 2014, was marked for
12  identification at this time.)
13      (Recess.)
14      VIDEOGRAPHER:  The time is 3:00 p.m.
15  This is the start of Media No. 5.  We're on
16  the record.
17  BY MR. WEINER:
18      Q.   Mr. Shinners, you're familiar, I think
19  you told us, that the ticker symbol "BTC" stands
20  for Bitcoin.  Is that right?
21      A.   That's Bitcoin.
22      Q.   You're familiar with the symbol "XPY"?
23      A.   Yes.
24      Q.   And what's that stand for?
25      A.   Paycoin.

Page 284

DEAN ALLEN SHINNERS

1
2       Q.   Okay.  And that's GAW Miners' Paycoin,
3   right?
4       A.   Correct.
5       Q.   What was the ticker symbol for the old
6   Paycoin you referred to?
7       A.   Well, I think it was PYC.  I -- I
8   reference it here in this Exhibit 121.
9       Q.   All right.  And that's the -- that's
10  the PYC?
11      A.   I believe so, yes.
12      Q.   Exhibit 121, which we put in front of
13  you, is an e-mail chain that starts on
14  November 26th, 2014, goes to November 28th, 2014.
15      Do you have Exhibit 121 in front of
16  you?
17      A.   Yes.
18      Q.   Now, the first e-mail in the chain --
19  which, again, is back to front -- you write on
20  November 26th, 2014, you write Josh.
21      That's to Mr. Garza.  Is that right?
22      Josh is Mr. Garza?
23      A.   Yes.
24      Q.   Okay.  And you write:
25      "I do not think I can post to the

Page 285

DEAN ALLEN SHINNERS

1
2   bounty contest.  I know too much about all of this
3   from the collaboration on the Q&A.  Nobody knows
4   anything about Primes switching to HashStakers and
5   HashStakers hosting a wallet on Prime
6   controllers."
7       Do you see that?
8       A.   Yes, I do.
9       Q.   Okay.  Then you write:  "It's too much
10  of an advantage."
11      What -- what were you referring to?
12      A.   Well, the front part of this is:  "I
13  do not think I can post to the bounty contest.  I
14  know too much about all of this from the
15  collaboration on the Q&A."
16      The Q&A was a public function, a
17  public occurrence, which are the questions and the
18  answers that the community put forward for the
19  white paper.
20      So, obviously, there were -- I
21  shouldn't say it's obvious.
22      There were a lot of half answers from
23  GAW on a lot of the questions that were technical
24  in nature, especially when it was dealing with
25  hyper flex blockchain, which no one ever got a --

DEAN ALLEN SHINNERS

1  
2  or no one ever got an explanation of that.
3      Okay.  So nobody knows anything about
4  Prime switching to HashStakers, and I'm assuming
5  that, you know, the Primes would become
6  HashStakers, that this was not public knowledge
7  yet.
8      And HashStakers hosting a wallet on
9  Prime controllers, this was in the -- the -- I
10  think the final version of the white paper?  I'm
11  not really sure what we're -- what we're at here,
12  the 28th of November.  But the thing is is this
13  never came to fruition anyway.
14      It's -- it's too much of an advantage,
15  I think -- yes, it was too much of an advantage.
16  And, also, Garza was bouncing some of the business
17  ideas that were being posted for the bounty.  He
18  was commenting to me about a lot of the details to
19  some of these and what I thought of them.
20      So obviously, I couldn't compete in
21  the bounty contest if I was made privy to a number
22  of the ideas that had already been sent in.
23      Q.  And actually, what my question was was
24  since you were privy to things like Prime
25  switching to HashStaker and HashStakers hosting a

DEAN ALLEN SHINNERS

1  
2  wallet on Prime controllers, and you were privy to
3  things that, as you say, were not public
4  knowledge, you felt that it wouldn't be
5  appropriate for you to participate in the bounty
6  contest?
7      A.  In that specific instance, there were
8  suggestions being made or business models being
9  developed around something that I knew was no
10  longer going to be the case, so there was no sense
11  in me trying to compete when I would be given
12  basically a little bit more insight than anybody
13  else.
14      Q.  Okay.  And then you say:  I can -- "I
15  can post on everything else that has nothing to do
16  with the NDA we have between us, but really not
17  much more than that."
18      Do you see that?
19      A.  Yes, I see it.
20      Q.  "NDA" is nondisclosure agreement,
21  correct?
22      A.  That's correct.
23      Q.  Do you have a nondisclosure agreement,
24  or did you back --
25      A.  I do not have a nondisclosure

DEAN ALLEN SHINNERS

1  
2  agreement.
3      Q.  Let me finish my question.
4      Did you have one, a nondisclosure
5  agreement, back in November of 2014?
6      A.  I did not have a nondisclosure
7  agreement.
8      Q.  Okay.  Then why did you refer to
9  something to the -- the -- "the NDA we have
10  between us" if you didn't have such an NDA?
11      A.  Because I executed the NDA, but it was
12  never duly executed.  In other words, nobody could
13  find it, nobody executed it and sent a duly signed
14  copy back, so it was never executed.  It just
15  disappeared somewhere.  I have no idea where.
16      Q.  And I -- and I heard you say, "I
17  executed the NDA," and then two lines later, you
18  said, "Nobody executed it."
19      So I'm going to give you a chance --
20      A.  Nobody on the other side executed
21  this.
22      Q.  Okay.  So you executed a nondisclosure
23  agreement, right?
24      A.  I executed --
25      Q.  Right.

DEAN ALLEN SHINNERS

1  
2      A.  -- the nondisclosure agreement.
3      Q.  And that was with GAW Miners, right?
4      A.  That was with Josh Garza.
5      Q.  Okay.  Having to do with the GAW
6  Miners and ZenMiner business, right?
7      A.  It wasn't that specific.
8      Q.  Okay.  So you -- when did you get this
9  nondisclosure agreement that you executed?
10      A.  I can't answer that.  I don't know.
11      Q.  What month?
12      A.  I don't know.
13      Q.  What year?
14      A.  What -- what year?  In 2014.
15      Q.  Okay.  And what was the purpose of you
16  getting a nondisclosure agreement that you
17  executed?
18      A.  He asked to send me a nondisclosure
19  agreement, and he sent the nondisclosure agreement
20  to me.  I executed it and then sent it back.
21      That was the end of it.
22      Q.  But what was your understanding as to
23  why you were given an agreement whereby I assume
24  you agreed not to disclose certain things that
25  were not public knowledge about Mr. Garza's

DEAN ALLEN SHINNERS

1
2  business.
3      A.   I believe it was more proprietary
4  information than anything else, but what was my
5  understanding of this?
6      Q.   Yeah, why -- why was Mr. Garza asking
7  you to sign a nondisclosure agreement?
8      A.   I don't know.  I can't speak for
9  Mr. Garza.
10         I know that he may have had plans to
11  use me in the future, possibly.  I did send him my
12  resume.  So obviously, there was -- what his
13  intentions were in the long term, I can't speak to
14  that.
15      Q.   Did you have an understanding,
16  yourself, as to why you were being asked to and
17  did agree to and did execute an NDA, a
18  nondisclosure agreement?
19      A.   I understood that there was some --
20  possibly some information from the company that I
21  might be made privy to that they did not want in
22  the outside realm, yes.
23      Q.   Okay.  And does that include things
24  like what you referred to here in Exhibit 121, for
25  example, "Nobody knows anything about Prime

DEAN ALLEN SHINNERS

1
2  switching to HashStakers and HashStakers hosting a
3  wallet of Prime controllers," is that an example
4  of things that you would know that wouldn't be
5  public information?
6      A.   I -- I suppose at the time that might
7  be something that was not out in the public realm,
8  and I said it has nothing -- but it says -- it
9  follows that it says:  "It is too much of an
10  advantage.  I can post on everything else that has
11  nothing to do with the NDA we have between us."
12         So whether this would technically fall
13  under the NDA or not, that was his decision and
14  not mine.  So I would assume that I made that
15  comment -- both comments as relational, yes.
16      Q.   Is that because you would -- you --
17  you didn't feel comfortable participating in a
18  contest or doing something where you would have a
19  leg up on other people?
20      A.   Where I could have a leg up on
21  other -- especially when I knew these were not
22  public posts.  These business ideas were going to,
23  I assume, directly to Josh Garza, and -- and he
24  was discussing these with me.
25         So I couldn't very well be part of a

DEAN ALLEN SHINNERS

1
2  competition where I knew where the competition --
3  what the competition was submitting and why they
4  would never be accepted by GAW.  So that was the
5  bulkhead of the -- I have to recuse myself from
6  this -- this competition because it would be
7  completely unfair under the circumstances.
8      Q.   Do you recall anything about -- well,
9  what was -- what was the bounty contest?
10      A.   What they were looking for -- it's
11  like asking the community to give you your next
12  business idea, and that's exactly what it was.
13         So he was going to -- I don't remember
14  the -- how many Bitcoin it was.  There was a -- a
15  financial bounty involved in this.  So the -- the
16  No. 1 best idea would receive, you know, 5
17  Bitcoin, or something.  It was -- actually, at the
18  time, it was a pretty decent amount to pay for an
19  unrefined business, you know, notion or idea.
20      Q.   And you go on and say -- in the next
21  e-mail, on November 26th, 2014, you say:
22         "I want to make sure that miners here
23  do not think that only a select few get all the
24  benefits and such.  I want them to keep what trust
25  they have intact."

DEAN ALLEN SHINNERS

1
2  That's in the middle of the --
3      A.   Oh, there we go.
4         Yes, that makes perfect sense.
5      Q.   Now -- now -- and I think you may have
6  touched upon this in a prior answer, but in -- the
7  nondisclosure agreement that Mr. Garza sent you
8  and that you signed, you don't have a copy of it?
9      A.   I don't have a copy of it.
10      Q.   Okay.  And do you know anyone who has
11  a copy of it?
12      A.   I know that nobody has a copy of it,
13  because Eric Capuano and Joe Mordica and Amber
14  Messer, which would be Eric Capuano, none of these
15  people ever found this document before.  They
16  never saw it.  It never -- like it never showed up
17  on the other end, which explained why nobody ever
18  responded to the e-mail when I sent it to them.
19      Q.   Okay.
20      A.   So I assume it -- it got filtered out
21  or -- or maybe just deleted the e-mail.  I can't
22  say what happened on the other end, but I know
23  that it didn't exist on their end.
24      Q.   And, you know, on -- you strike me as
25  a relatively careful person.  Don't you usually

## Page 362

```
1
2                    CERTIFICATE
3          I, AMY A. RIVERA, a Certified Shorthand
4    Reporter, Registered Professional Reporter,
5    Certified LiveNote Reporter, and Notary Public of
6    the State of New York, do hereby certify that prior
7    to the commencement of the examination DEAN ALLEN
8    SHINNERS, was duly sworn by me to testify the truth,
9    the whole truth and nothing but the truth.
10         I DO FURTHER CERTIFY that the foregoing is
11   a true and accurate transcript of the testimony as
12   taken stenographically by and before me at the time,
13   place and on the date hereinbefore set forth.
14         I DO FURTHER CERTIFY that I am neither a
15   relative nor employee nor attorney nor counsel of
16   any of the parties to this action, and that I am
17   neither a relative nor employee of such attorney or
18   counsel, and that I am not financially interested in
19   the action.  Dated:  August 6th, 2018
20
21   _____
22   AMY A. RIVERA
23   Notary Public of the State of New York
24   My commission expires December 6, 2021
25   License No. XI00939
```

## Page 363

```
1
2                     INDEX
3    WITNESS                           PAGE
4    DEAN ALLEN SHINNERS
5    By Mr. Weiner                      5
6    By Ms. Cave                       325
7
8                   EXHIBITS
9    NUMBER          DESCRIPTION        PAGE
10   Exhibit 106       Curriculum vitae    63
11   Exhibit 107       Allen Shinners'     90
12                     Responses and
13                     Objections to
14                     Defendants' First
15                     Interrogatories to
16                     Plaintiffs
17   Exhibit 108       E-mail, with       191
18                     attachment, dated
19                     December 20, 2017,
20                     bearing Bates Nos.
21                     GAW1022853 through
22                     GAW10228757
23   Exhibit 109       E-mail chain, dated  219
24                     December 18, 2014
25   Exhibit 110       Table              223
```

## Page 364

```
1
2              EXHIBITS (Continued)
3    NUMBER          DESCRIPTION        PAGE
4    Exhibit 111       E-mail, with      228
5                      attachment, dated
6                      November 11, 2014
7    Exhibit 112       E-mail chain, dated  238
8                      November 15, 2014
9    Exhibit 113       E-mail chain, dated  245
10                     November 16, 2014
11   Exhibit 114       E-mail chain, bearing  248
12                     Bates Nos. GAW36861
13                     through GAW36863
14   Exhibit 115       E-mail chain, dated  252
15                     November 17, 2014,
16                     bearing Bates Nos.
17                     GAW92570 through
18                     GAW92572
19   Exhibit 116       E-mail chain, dated  259
20                     November 17, 2014,
21                     bearing Bates Nos.
22                     GAW92631 through
23                     GAW92633
24
25
```

## Page 365

```
1
2              EXHIBITS (Continued)
3    NUMBER          DESCRIPTION        PAGE
4    Exhibit 117       E-mail chain, dated  263
5                      November 18, 2014,
6                      bearing Bates Nos.
7                      GAW194075 through
8                      GAW194077
9    Exhibit 118       E-mail chain, dated  270
10                     November 23, 2014,
11                     bearing Bates Nos.
12                     GAW1987 through GAW1989
13   Exhibit 119       E-mail chain, dated  275
14                     November 24, 2014,
15                     bearing Bates Nos.
16                     GAW40685 through
17                     GAW40725
18   Exhibit 120       E-mail, dated November  278
19                     25, 2014, bearing Bates
20                     No. GAW92142
21   Exhibit 121       E-mail chain, dated  283
22                     November 26, 2014
23   Exhibit 122       E-mail, dated December  304
24                     7, 2014, bearing Bates
25                     No. GAW130178
```

Page 366

```
 1
 2            EXHIBITS (Continued)
 3    NUMBER          DESCRIPTION          PAGE
 4    Exhibit 123      E-mail chain, dated    307
 5                  December 17, 2014,
 6                  bearing Bates Nos.
 7                  GAW152310 through
 8                  GAW152320
 9    Exhibit 124      E-mail chain, dated    309
10                  December 29, 2014,
11                  bearing Bates No.
12                  GAW64282
13    Exhibit 125      E-mail chain, dated    311
14                  December 29, 2014,
15                  bearing Bates Nos.
16                  GAW93032 through
17                  GAW93038
18    Exhibit 126      E-mail chain, dated    314
19                  January 3, 2015,
20                  bearing Bates Nos.
21                  GAW62266 through
22                  GAW62268
23
24
25
```

Page 367

```
 1
 2            EXHIBITS (Continued)
 3    NUMBER          DESCRIPTION          PAGE
 4    Exhibit 127      E-mail chain, dated    320
 5                  January 12, 2015,
 6                  bearing Bates Nos.
 7                  GAW146191 through
 8                  GAW146193
 9    Exhibit 128      Document              338
10    Exhibit 129      Complaint             345
11
12        PREVIOUSLY MARKED EXHIBITS
13    NUMBER          DESCRIPTION          PAGE
14    Exhibit 96      Plaintiffs'             325
15                  certifications
16
17
18
19
20
21
22
23
24
25
```

Page 368

```
 1    NAME OF CASE:
 2    DATE OF DEPOSITION:
 3    NAME OF WITNESS:
 4    Reason Codes:
 5        1. To clarify the record.
 6        2. To conform to the facts.
 7        3. To correct transcription errors.
 8    Page _____ Line _____ Reason _____
 9    From _____ to _____
10    Page _____ Line _____ Reason _____
11    From _____ to _____
12    Page _____ Line _____ Reason _____
13    From _____ to _____
14    Page _____ Line _____ Reason _____
15    From _____ to _____
16    Page _____ Line _____ Reason _____
17    From _____ to _____
18    Page _____ Line _____ Reason _____
19    From _____ to _____
20    Page _____ Line _____ Reason _____
21    From _____ to _____
22    Page _____ Line _____ Reason _____
23    From _____ to _____
24
25        _____
```

EXHIBIT A-59

1

2                UNITED STATES DISTRICT COURT

                  DISTRICT OF CONNECTICUT

3                CASE NO.:  3:16-cv-00940

4      ----------------------------------x

    DENIS MARC AUDET, MICHAEL

5   PFEIFFER, DEAN ALLEN

    SHINNERS, and JASON VARGAS,

6   Individually and on Behalf

    of All Others Similarly

7   Situated,

8                          Plaintiff(s),

9            vs.

10  STUART A. FRASER, GAW

    MINERS, LLC, and ZENMINER,

11  LLC, (d/b/a) ZENCLOUD),

12                        Defendant(s).

    ----------------------------------x

13

14

15     VIDEOTAPED DEPOSITION OF DR. MICHAEL PFEIFFER

16                New York, New York

17               Thursday, July 19, 2018

18

19

20

21

22  Reported by:

23  Corinne J. Blair, CRR, CCR, RPR, CLR

24  JOB NO.: 144959

25

Michael Pfeiffer

1
2   -- according to the e-mail, it says, "Josh
3   Garza is requesting access to a spreadsheet."
4        So is -- what is this representing?
5        A   So we had discussed earlier that
6   Josh Garza had requested that I gather some
7   data and put it into a spreadsheet of the
8   applicants for some kind of, maybe contest,
9   or something that he was offering about
10  funding cryptocurrency proposals for a
11  kick-starter.  And I believe that I put it
12  into a spreadsheet form, and he was probably
13  requesting access to review that form.
14       Q   Okay.  We haven't been able to
15  access that spreadsheet.
16       Do you have that?
17       A   It hadn't occurred to me to look for
18  it.  I may have that, but I don't know.  It
19  didn't occur to me to look for it.
20       Q   Okay.  We'll put a note to ourselves
21  and we'll follow-up with your counsel, but if
22  that spreadsheet still exists, I think we'll
23  ask you to take a look for that and give it to
24  your counsel so we can try get that from you.
25       Thank you.

Michael Pfeiffer

1
2        So just the -- what we -- what you
3   were just referring to is an exhibit, the
4   chat messaging between yourself and
5   Mr. Garza, which is Exhibit 86.
6        So you're saying the spreadsheet
7   that's referred to here is the one you were
8   preparing in response to this chat?
9        A   I believe that is correct.
10       Q   Okay.  Great.  Thank you.
11       I'll show you what we'll mark as
12  Exhibit 91.
13       (Defendant's Exhibit 91,
14       E-mail, September 24, 2014, was
15       marked for identification at this
16       time.)
17       THE WITNESS:  Okay.
18  BY MS. CAVE:
19       Q   Do you recall sending this e-mail,
20  which is dated September 24th, 2014 to
21  BTCrow.com?
22       A   Yes.
23       Q   And what is BTCrow.com?
24       A   I believe it is an escrow service
25  that one can pay for in cryptocurrency.  You

Michael Pfeiffer

1
2   pay the service fee in cryptocurrency, and
3   transmit the funds in cryptocurrency.
4        Q   Okay.  And who is Paul?
5        A   I believe Paul was the operator of
6   the BTCrow.com website.
7        Q   Okay.  And what's the reason for
8   using an escrow for these transactions?
9        A   Well, when you're making an exchange
10  of digital goods for digital goods, it's not
11  -- you could rely on trust, but then there's
12  no enforcement if somebody doesn't follow
13  through.  So who sends first.  And so this is
14  a way to have a trusted third-party be a
15  mediator of an exchange.
16       Q   And how did you find BT Crow to be
17  someone that you could trust for escrow
18  purposes?
19       A   I had researched that on the web and
20  found other people who had used that service
21  and -- and endorsed its a trustworthy
22  service.
23       Q   And did you find that to be the
24  case?
25       A   I did.  And, in fact, in this case,

Michael Pfeiffer

1
2   the dispute eventually resolved and the funds
3   were not released to the seller, I believe,
4   because the seller didn't provide what -- the
5   other part of the exchange.
6        Q   So what were you buying from the
7   seller here?
8        A   It was an account, Gaw Miners
9   account.  So this person was in possession of
10  an account that had -- it looks like hashlets
11  that were purchased from Gaw Miners.  So it
12  would have been the account credentials.
13       Q   So you were seeking to buy the whole
14  account in its entirety?
15       A   I believe yes, yes.
16       Q   In the middle of the page, you say,
17  "Josh Garza, COO, and GAW Miners and Zenminers
18  is aware of the situation."
19       So did you make Mr. Garza aware of
20  this situation?
21       A   I actually don't know.  Okay.  I
22  think this is what happened:  I think I was
23  in touch with another person who also
24  provided escrow services in the -- it was
25  widely known in the -- on the HashTalk forum

Michael Pfeiffer

1 
2 for providing those services.  And his name,
3 I believe, is John Shaw.  And he went by the
4 name of Animoesto.  That was his handle on
5 HashTalk.  And I believe that I corresponded
6 with him.  And he told me, in turn, I
7 believe, that Josh Garza was aware of the
8 situation, or that somebody in the company
9 was aware of the situation.
10        So I don't know if, actually, Josh
11 Garza was.  I think he was under the
12 impression that he was.
13    Q    Understood.
14        And so a couple of places you were,
15 -- use the word "scam" here.
16        So what was the scam exactly that
17 you were perceiving to be occurring?
18    A    I can't remember exactly how it
19 worked, but I believe that the seller or the
20 person who was supposed to be the seller,
21 said that he sent me the product and
22 requested that I release the escrow funds and
23 -- because I hadn't received the product, I
24 didn't release the escrow funds.  And he made
25 a complaint to, I guess, Paul, at the BT

Michael Pfeiffer

1 
2 Escrow, and -- asking the service provider,
3 the escrow service provider, to release my
4 funds even though the sale had not been
5 completed.
6    Q    Had this sort of situation occurred
7 to you -- happen to you before?
8    A    Never.
9    Q    Did it happen to you after this?
10    A    No.
11    Q    Okay.  Do you know whether -- did
12 you ever hear of this type of circumstance
13 arising in other -- for other GAW Miners --
14    A    Not that I know of, no.
15    Q    Okay.  Thank you.  You can set that
16 to the side.
17    A    I guess my observation about that is
18 the escrow service was valuable in that it
19 worked.
20    Q    Okay.  Good.  Because you got a
21 refund?
22    A    Yes.
23    Q    Okay.  About how much was its stake
24 in that transaction?
25    A    I don't have a record here.  I

Michael Pfeiffer

1 
2 couldn't tell you.
3    Q    Was this the first time that you had
4 tried to buy another GAW Miners account?
5    A    No.
6    Q    So you successfully purchased other
7 GAW Miners accounts prior to that?
8    A    Yes.
9    Q    And did you after that?
10    A    Yes.  I believe so, yes.
11    Q    Okay.  We've talked a little bit
12 about HashTalk, and you mentioned that was one
13 of the first places that you began to learn
14 about GAW Miners.
15        Did you have moderator privileges
16 for --
17    A    Never.
18    Q    -- HashTalk?
19    A    No.  I never had moderator
20 privileges.
21    Q    Okay.  If you could flip back to 85,
22 Exhibit 85, in the stack that you have there.
23    A    At least I should say, I don't
24 recall having moderator privileges.
25    Q    Okay.

Michael Pfeiffer

1 
2    A    Here we go.
3    Q    If you turn to the third page --
4 this is an e-mail that we've looked at before.
5 And if you focus on the e-mail from yourself
6 to Mr. Garza, at 6:26 a.m., the second
7 paragraph, it says, "I also noticed that my
8 account was banned just after you assigned
9 moderator privileges."
10        Does that refresh your recollection?
11    A    Oh.  So maybe, actually, he may
12 have, but I think that almost as soon as I
13 may have been assigned them, the entire
14 system was crashed.  So I never had really a
15 chance to exercise them.
16    Q    Okay.
17    A    Essentially, a non-factor.
18    Q    Okay.  So you were given the
19 privileges, but you never exercised them?
20    A    It seems that's the case.
21    Q    What was -- do you know what
22 moderator privileges entitled you to do?
23    A    I believe moderator privileges
24 allowed you to -- I think you could -- I
25 think that you could ban other users, maybe,

Michael Pfeiffer

1
2  or -- I'm not really sure how they work,
3  because I didn't have that privilege.  But I
4  think that when there was disputes, maybe you
5  could help settle them.  But I don't know
6  really how that worked.
7      Q   Do you know how many moderators
8  there were, or how many people had moderator
9  privileges?
10     A   I don't know.
11     Q   Do you know anybody who did have
12 moderator privileges?
13     A   I don't know who had moderator
14 privileges.  I remember -- sometimes you
15 would see that -- you would see disputes
16 being addressed to moderators, but I don't
17 remember who those people were.
18     Q   And what types of disputes are you
19 talking about?
20     A   Well, sometimes people would use a
21 piece of language.  It's the internet.  So,
22 in a -- in a forum, people can say things
23 that are -- get heated, so sometimes people
24 will be like temporarily -- I can't remember
25 what the word was.  I mean, I think sometimes

Michael Pfeiffer

1
2  people were -- people were muted or something
3  like that.
4      I believe -- and I've heard that
5  there were times when Josh Garza actually
6  deleted content of people who were his
7  critics, or said things that he didn't agree
8  with.  That's what I've heard since then.
9  That -- that although this appeared to be an
10 open forum, it was actually sufficiently
11 moderated that other people were silenced.
12     Q   Okay.  How many times a day would
13 you say you went on the HashTalk forum?
14     A   I have no idea.
15     Q   More than once a day?
16     A   Some days it may have been more than
17 once a day.  But it's also the kind of thing
18 where a forum can be in a web page that you
19 have open with other tabs in your browsers,
20 so you can just leave it open and see if you
21 get a notice that somebody has, you know,
22 liked or, you know, up-voted your comment.
23 You might say, like, Oh, who did that?  Like
24 what's their response?
25     So there's a way to monitor

Michael Pfeiffer

1
2  conversations and engagements there.
3      Q   And did you get any mail or a text
4  when there was some response to one of your
5  posts?
6      A   I think it might have made a beep on
7  the computer or something like that when you
8  got one or it showed up as -- like a red
9  number, an alert when you move back to that
10 tab.  So if you were -- if you had a number
11 of tabs open, you would cycle through that
12 one and you would see another one.
13     MS. CAVE:  Okay.  Let's do -- we'll
14 mark as Exhibit 92.
15     (Defendant's Exhibit 92,
16 E-mail, March 7, 2015, was marked
17 for identification at this time.)
18 BY MS. CAVE:
19     Q   Take a moment to look at that,
20 please.
21     A   Mm-hmm.  Okay.
22     Q   Okay.  So this is Exhibit 92.  It's
23 an e-mail from you to Mike at Coinfire.IO,
24 dated March 7th, 2015; is that correct?
25     A   That's correct.

Michael Pfeiffer

1
2      Q   Do you recall sending this e-mail?
3      A   Yes.
4      Q   And who's Mike at Coinfire?
5      A   I believe that Mike was a journalist
6  who published -- I believe Coinfire.IO must
7  have been a website where people could
8  publish articles.
9      Q   Okay.  And had you visited the
10 Coinfire website before this?
11     A   I don't recall how I came into
12 contact with his writing on Coinfire.  It
13 might have been referenced in a link on
14 HashTalk or I may have found it
15 independently.  I'm not sure.
16     Q   Okay.  So the subject of -- subject
17 line of this e-mail says, "Thanks for coming
18 to HashTalk, dash, fourth estate in the wild
19 west."
20     What did you mean by "fourth estate
21 in the wild west"?
22     A   In the text of the document, I -- I
23 reference the idea that the fourth estate is
24 one way that the -- that journalism has been
25 referred to as sort of a checks and balances,

Page 234

```
 1              Michael Pfeiffer
 2       Q   Do you know Dan Kelley?
 3       A   I don't know Dan Kelley.
 4       Q   What about Carlos Garza?
 5       A   I don't know Carlos.
 6       Q   Do you know who he is?
 7       A   I've heard that he's the brother of
 8   Josh Garza.
 9       Q   But you don't have contact with him?
10       A   I've never had contact with him.
11       Q   I think I asked you this before, but
12   you never met Josh Garza in-person?
13       A   I never met Josh Garza in-person.
14       Q   Did you ever do a Google Hangout or
15   video chat with him?
16       A   I never did.
17       Q   Okay.  Did you receive any free GAW
18   cryptocurrency products?
19       A   I may have received a hashlet at
20   some point.  I don't know.  So not that I can
21   recall.
22       Q   What about any rewards, from any of
23   the regards programs; did you receive any of
24   those?
25       A   I think they might have -- I can't
```

Page 235

```
 1              Michael Pfeiffer
 2   remember if there were incentives for if you
 3   bought more.  There might have been like
 4   incentives to buy more or something like
 5   that.
 6       Q   Okay.
 7       MS. CAVE:  I don't think I have
 8   anything further at this time.
 9       MR. WATTERSON:  We'll reserve our
10   questioning for trial.
11       MS. CAVE:  Thank you, Mr. Pfeiffer.
12       THE WITNESS:  Thank you.
13       THE VIDEOGRAPHER:  Time is
14   3:18 p.m., and this concludes tape
15   number 3, as well as the videotaped
16   deposition of Mr. Michael Pfeiffer.
17       (Time Noted: 3:18 p.m.)
18
19
20          ---------------------
             MICHAEL PFEIFFER
21
22
23   Subscribed and sworn to before me
24   this    day of         2018.
25
```

Page 236

```
 1              Michael Pfeiffer
 2   ----------------------------------------
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 237

```
 1
 2              I N D E X
 3   WITNESS       EXAMINATION BY      PAGE
 4   MICHAEL PFEIFFER
 5       MS. CAVE          6
 6
 7           E X H I B I T S
 8       (Exhibits attached to transcript.)
 9   DEFENDANT'S                  PAGE
10   Exhibit 84              55
       Responses and Objections to
11     Defendant's First interrogatories to
       Plaintiffs
12
       Exhibit 85              64
13     E-mail, April 30, 2015,
       Bates-stamped GAW00691045 -
14     GAW00691048
15   Exhibit 86              71
       Message chain between Mr. Pfeiffer
16     and Mr. Garza, April 28, 2015
17   Exhibit 87              83
       E-mail, July 17, 2018, with
18     attachment
19   Exhibit 88              92
       E-mail, September 25, 2014
20
       Exhibit 89              96
21     E-mail, December 8, 2014
22   Exhibit 90              105
       E-mail, April 28, 2015
23
       Exhibit 91              107
24     E-mail, September 24, 2014
25   Exhibit 92              116
       E-mail, March 7, 2015
```

## Page 238

```
1
2              E X H I B I T S
3        (Exhibits attached to transcript.)
4    DEFENDANT'S                    PAGE
     Exhibit 93         143
5      Bit Beat article from The Wall
       Street Journal, November 25, 2014
6
     Exhibit 94              151
7      E-mail, April 15, 2015, with
       attachment
8
     Exhibit 77              155
9      Article or post on Cryptocoin's News
10   Exhibit 95              155
       E-mail chain; top e-mail, September
11     26, 2014
12   Exhibit 96              164
       Plaintiffs' Certifications
13
     Exhibit 97              184
14     E-mail, March 3, 2015
15   Exhibit 98              185
       Letter of Authorization, signed
16     October 11, 2015
17   Exhibit 99              191
       Spreadsheet, attached to Exhibit 90
18
19   Exhibit 100             196
       Screen-shot of spreadsheet
20   Exhibit 101             205
       Spreadsheet
21
     Exhibit 102             206
22     Michael Pfeiffer Account Summary
23   Exhibit 103             215
       E-mail, May 10, 2015
24
     Exhibit 104             216
25     E-mail, November 22, 2014
```

## Page 239

```
1
2
3              E X H I B I T S
4        (Exhibits attached to transcript.)
5    DEFENDANT'S                    PAGE
6    Exhibit 105              227
       E-mail, May 1, 2015
7
8        REQUESTS FOR DOCUMENTS
9    PAGE LINE
10   106  25
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 240

```
1
2              C E R T I F I C A T E
3
4    STATE OF NEW YORK   )
5                        ) ss.:
6    COUNTY OF NEW YORK  )
7
8         I, CORINNE J. BLAIR, a Notary
9    Public within and for the State of New
10   York, do hereby certify:
11        That MICHAEL PFEIFFER, the
12   witness whose deposition is hereinbefore
13   set forth, was duly sworn by me and that
14   such deposition is a true record of
15   the testimony given by such witness.
16        I further certify that I am not
17   related to any of the parties to this
18   action by blood or marriage; and that
19   I am in no way interested in the
20   outcome of this matter.
21        IN WITNESS WHEREOF, I have
22   hereunto set my hand this 30th day of
23   July, 2018.
24
25        -----------------------------------
```

## Page 241

```
1
2       ERRATA SHEET FOR THE TRANSCRIPT OF:
3    Case Name:  Audet, et al. vs. Fraser, et al.
4    Dep. Date:  July 19, 2018
5    Deponent:  Michael Pfeiffer
6            CORRECTIONS:
7    Pg. Ln.      Now reads Should Read   Reason
8    ___ ___    _____  _____  _____
9    ___ ___    _____  _____  _____
10   ___ ___    _____  _____  _____
11   ___ ___    _____  _____  _____
12   ___ ___    _____  _____  _____
13   ___ ___    _____  _____  _____
14   ___ ___    _____  _____  _____
15   ___ ___    _____  _____  _____
16   ___ ___    _____  _____  _____
17   ___ ___    _____  _____  _____
18   ___ ___    _____  _____  _____
19
20   _____
     Signature of Deponent
21
22   SUBSCRIBED AND SWORN BEFORE ME
23   THIS____ DAY OF_____ 2018.
24   _____
25   (Notary Public)  MY COMMISSION EXPIRES:_____
```

EXHIBIT A-60

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

SECURITIES AND EXCHANGE
COMMISSION,
   *Plaintiff*,

  v.

HOMERO JOSHUA GARZA, GAW
MINERS, LLC, and ZENMINER, LLC (d/b/a
ZEN CLOUD),
   *Defendants*.

No. 3:15-cv-01760 (JAM)

## ORDER FOR ENTRY OF DEFAULT JUDGMENT

  Defendants GAW Miners, LLC and ZenMiner, LLC have failed to plead or otherwise

defend in this action, and their default was entered on January 27, 2016 (Doc. #13). Plaintiff

Securities and Exchange Commission has applied for default judgment under Fed. R. Civ. P.

55(b) and has submitted an affidavit in support therefor (Doc. #15). I conclude on the basis of

my review of the complaint, affidavit, and other supporting materials that there is a reasonable

and satisfactory factual basis for default judgment and that a further hearing is not warranted. I

find that plaintiff has established liability as to both defendants, and that plaintiff has adequately

supported its requests for permanent injunctive relief pursuant to 15 U.S.C. § 77t(b) and 15

U.S.C. § 78u(d)(1); disgorgement; and third-tier civil penalties pursuant to 15 U.S.C.

§ 77t(d)(2)(C) and 15 U.S.C. § 78u(d)(3)(B)(iii), as follows.

  *Injunctive Relief*. I find that defendants engaged in, and are engaged in or are about to

engage in acts that constitute violations of the Exchange Act and the Securities Act, and that a

reasonable likelihood exists that violations will occur in the future. I therefore grant plaintiff's

request for permanent injunctive relief restraining defendants from committing future violations

of Section 10(b) of the Exchange Act, and Sections 5 and 17(a) of the Securities Act.

*Disgorgement*. I find that $10,078,331 reasonably approximates the profits causally connected to the defendants' violations of the Exchange Act and the Securities Act. I also conclude that pre-judgment interest in the requested amount of $305,768 is appropriate in order to deprive the defendants of the time value of money, and that the IRS underpayment rate is an appropriate level of interest. Because I find that defendants collaborated and did not maintain separate accounts, I find them jointly and severally liable for the disgorgement amount plus prejudgment interest.

*Civil Penalties.* After considering the facts and circumstances of this case, *see S.E.C. v. Milligan*, 436 Fed. Appx. 1, 3 (2d Cir. 2011), I conclude that civil penalties are warranted. I have found that a sufficient factual basis exists to show that at least one violation has occurred; that the violation(s) involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement; and that the violation(s) directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons. *See* 15 U.S.C. § 77t(d)(2)(C); 15 U.S.C. § 78u(d)(3)(B)(iii). Because I have concluded that a third-tier penalty is appropriate, any penalty I impose may not exceed the gross amount of pecuniary gain to the defendants.

I agree with plaintiff that defendants' violations were serious, repeated, and large-scale. But I have little information about defendants' ability to pay, except for plaintiff's representations that defendants "presently may not have the funds to pay a judgment." Doc. #15-1 at 29. After considering the facts and circumstances of this case, and all relevant factors, I conclude that a civil penalty of $1,000,000 is appropriate as to each defendant. While I recognize that I may not impose civil penalties jointly and severally against multiple defendants, *see S.E.C. v. Pentagon Capital Management PLC*, 725 F.3d 279, 287–88 (2d Cir. 2013), I nevertheless

conclude that these defendants have each benefitted from the same dollar of gain and that the penalties assessed against each defendant will be identical. *See S.E.C. v. Cole*, 661 F. App'x. 52, (2d Cir. 2016). Therefore, it is hereby:

ORDERED, ADJUDGED, AND DECREED that defendants GAW Miners, LLC and ZenMiner, LLC are jointly and severally liable for disgorgement of $10,078,331 plus $305,768 prejudgment interest. Due to the passage of time since plaintiff's filing of the default motion, plaintiff may file a supplemental motion if it wishes to update the amount that should be paid in prejudgment interest. In addition, defendant GAW Miners, LLC shall pay a civil penalty in the amount of $1,000,000, and defendant ZenMiner, LLC shall pay a civil penalty in the amount of $1,000,000. Plaintiff may also recover post-judgment interest as provided by law.

Dated at New Haven, Connecticut this 29th day of May 2017.

*/s/ Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge