UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| DENIS MARC AUDET, MICHAEL PFEIFFER, DEAN ALLEN SHINNERS, and JASON VARGAS, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>vs.<br><br>STUART A. FRASER, GAW MINERS, LLC, and ZENMINER, LLC, (d/b/a ZEN CLOUD),<br><br>Defendants. | Case 3:16-cv-00940<br><br>Hon. Michael P. Shea<br>Courtroom 2<br><br>ECF Case<br><br><u>CLASS ACTION</u><br><br>December 21, 2018<br><br>PLAINTIFFS' OPPOSITION TO DEFENDANT STUART A FRASER'S MOTION TO EXCLUDE DECLARATIONS AND TESTIMONY OF ROBERT MILLS AND LOU KERNER |

## Table of Contents

Table of Contents ........................................................................................................................ i

Table of Authorities ................................................................................................................... ii

I.     The legal standard. ..........................................................................................................1

II.    The Court should not exclude Robert Mills. ...................................................................3

      A.     The Databases ........................................................................................................3

      B.     The Court should not exclude Mills for relying on the databases. ..........................5

            1.     There is no reason to exclude Mills based on the information in the databases. .................................................................................................6

            2.     There is no reason to exclude Mills because the databases do not include information about credit card chargebacks. .............................9

            3.     There is no reason to exclude Mills because of the biographical information in the databases. ..................................................................10

      C.     Mills used a reliable methodology ........................................................................14

            1.     Mills employed a reliable analysis of the databases. ................................15

            2.     Fraser's argument in § II.B.2 is incomprehensible. ...................................16

      D.     Mills adequately articulated a methodology for calculating classwide damages. ................................................................................................................16

III.    The Court should not exclude Lou Kerner's declaration. .................................................19

IV.    Conclusion ....................................................................................................................23

Table of Authorities

Page(s)

Cases

*Adesina v. Aladan Corp.*,
438 F. Supp. 2d 329 (S.D.N.Y. 2006)..........................................................................5

*Adkins v. Morgan Stanley*,
307 F.R.D. 119 (S.D.N.Y. 2015) ................................................................................1

*Am. Honda Motor Co. v. Allen*,
600 F.3d 813 (7th Cir. 2010) ......................................................................................1

*Argent Classic Convertible Arbitrage Fund L.P. v. Rite Aid Corp.*,
315 F. Supp. 2d 666 (E.D. Pa. 2004) ........................................................................12

*Bigelow v. RKO Radio Pictures*,
327 U.S. 251 (1946)..................................................................................................8, 9

*Board of Trustees of AFTRA Ret. Fund v. JPMorgan Chase Bank*,
2011 WL 6288415 (S.D.N.Y. Dec. 15, 2011) ..........................................................20

*Casper Sleep, Inc. v. Mitcham*,
204 F. Supp. 3d 632 (S.D.N.Y. 2016)........................................................................13

*Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.*,
769 F. Supp. 2d 269 (S.D.N.Y. 2011)..........................................................................5

*Chen-Oster v. Goldman, Sachs & Co.*,
114 F. Supp. 3d 110 (S.D.N.Y. 2015)..........................................................................2

*Comcast v. Behrend*,
569 U.S. 27 (2013)......................................................................................................17

*Cornelius v. Bodybuilding.com*,
2011 WL 2160358 (D. Id. June 1, 2011) ...................................................................14

*Daubert v. Merrill Dow*,
509 U.S. 579 (1993)............................................................................................ *passim*

*Deutsch v. Novartis Pharm. Corp.*,
786 F. Supp. 2d 420 (E.D.N.Y. 2011) .........................................................................5

*EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro S.A.*,
246 F. Supp. 3d 52 (D.D.C. 2017), aff'd, 894 F.3d 339 (D.C. Cir. 2018)...............14

ii

*Flores v. Anjost Corp.*,
284 F.R.D. 112 (S.D.N.Y. 2012) ..................................................................1

*Ge Dandong v. Pinnacle Performance, Ltd.*,
2013 WL 5658790 (S.D.N.Y. Oct. 17, 2013) ....................................20, 22

*Hilaire v. Dewalt Indus. Tool Co.*,
54 F. Supp. 3d 223 (E.D.N.Y. 2014) ...........................................................22

*In re Blech Sec. Litig.*,
2003 WL 1610775 (S.D.N.Y. 2003)..........................................................7, 12

*In re Libor-Based Fin. Instruments Antitrust Litig.*,
299 F. Supp. 3d 430 (S.D.N.Y. 2018)........................................................1, 3

*In re MF Global Holdings Ltd. Inv. Litig.*,
2015 WL 4610874 (S.D.N.Y. 2015).............................................................17

*In re U.S. Foodservice, Inc. Pricing Litig.*,
729 F.3d 108 (2d Cir. 2013)...........................................................................1

*In re Zurn Pex Plumbing Prods. Liab. Litig.*,
644 F.3d 604 (8th Cir. 2011) ....................................................................1, 2

*Karavitis v. Makita U.S.A., Inc.*,
243 F. Supp. 3d 235 (D. Conn. 2017) (both cited in Br. ) .......................22

*Learning Care Grp. v. Armetta*,
2016 WL 3248178 (D. Conn. 2016) ..............................................................2

*Lemanik, S.A. v. McKinley Allsopp, Inc.*,
125 F.R.D. 602 (S.D.N.Y. 1989) ...................................................................9

*Menaldi v. Och-Ziff Capital Mgmt. Group LLC*,
2018 WL 4378445 (S.D.N.Y. Sept. 14, 2018).............................................18

*Merryman v. Citigroup*,
2018 WL 1621495 (S.D.N.Y. 2018)...........................................................1, 3

*Randall v. Loftsgaarden*,
478 U.S. 647 (1986)........................................................................................9

*Roach v. T.L. Cannon Corp.*,
778 F.3d 401 (2d Cir. 2015).........................................................................17

*Sali v. Corona Regional Med. Ctr.*,
909 F.3d 996 (9th Cir. 2018) .........................................................................1

*Sir Speedy, Inc. v. L & P Graphics, Inc.*,
    957 F.2d 1033 (2d Cir. 1992)...................................................................................................9

*Tyler v. Union Oil Co. of Cal.*,
    304 F.3d 379 (5th Cir. 2002) .................................................................................................6

<u>Statutes</u>

Conn. Rev. Stat. § 33-840(1) .....................................................................................................13

In connection with his opposition to plaintiffs' motion for class certification, defendant Stuart Fraser filed a motion to strike the declarations of Robert Mills (Dkt. 96-3) and Lou Kerner (96-4). The Court should deny Fraser's motion.

## I.     The legal standard.

At 4, Fraser says that the standard in *Daubert v. Merrill Dow*, 509 U.S. 579 (1993) applies to expert evidence submitted in support of a motion for class certification. The law is not as settled as Fraser suggests: "Neither the Supreme Court nor the Second Circuit has definitely decided whether the *Daubert* standard governs the admissibility of expert evidence submitted at the class certification stage." *Merryman v. Citigroup*, 2018 WL 1621495, at *19 (S.D.N.Y. 2018) (quoting *Adkins v. Morgan Stanley*, 307 F.R.D. 119, 148 (S.D.N.Y. 2015)); *see also In re U.S. Foodservice, Inc. Pricing Litig.*, 729 F.3d 108, 130 (2d Cir. 2013) (declining to decide whether *Daubert* applies to expert evidence submitted to support class certification).

Rather, there is a widely recognized circuit split on this issue. Some circuits apply the *Daubert* standard. *See Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 815-16 (7th Cir. 2010). Some circuits apply a modified *Daubert* inquiry. *See In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 610 (8th Cir. 2011). Some circuits hold that evidence that supports class certification need not be admissible at all (which, by implication, means that *Daubert* does not apply). *See Sali v. Corona Regional Med. Ctr.*, 909 F.3d 996 (9th Cir. 2018). Plaintiffs could not find a decision in this District addressing whether *Daubert* applies to expert evidence submitted to support a motion for class certification.

It is true that federal courts in New York have applied *Daubert* at the class certification stage. However, "the issue remains unsettled nationally and in this district." *In re Libor-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 470 (S.D.N.Y. 2018); *see also Flores v.*

*Anjost Corp.*, 284 F.R.D. 112, 124 n.3 (S.D.N.Y. 2012) ("While there has not been any direct attention on this issue from the circuit courts of appeals, most district courts addressing this question have held that evidence need not be admissible under the Federal Rules of Evidence— or that the rules should not be applied strictly—on a motion for class certification.").

Given that there is no clear precedent in this District, from the Second Circuit, or the Supreme Court, this Court is free to decide whether to apply *Daubert* or not. Respectfully, plaintiffs contend that the Court need not apply *Daubert* at this stage (or apply the modified analysis favored by the Eighth Circuit). The purpose of *Daubert* is to "ensure that expert testimony presented to juries is reliable and relevant." *Learning Care Grp. v. Armetta*, 2016 WL 3248178, at *6 (D. Conn. 2016). As such, it makes little sense for the Court to exercise its gatekeeping role when it alone sits on the other side of the gate. *See Zurn*, 644 F.3d at 613 ("The main purpose of *Daubert* exclusion is to protect juries from being swayed by dubious scientific testimony. That interest is not implicated at the class certification stage where the judge is the decision maker."). Because only the Court is considering the evidence, the general approach is to consider evidentiary contentions "in connection with [the evidence's] weight rather than its admissibility, since class certification issues are heard by the court rather than by a jury." *Chen-Oster v. Goldman, Sachs & Co.*, 114 F. Supp. 3d 110, 130 (S.D.N.Y. 2015), objections overruled, 325 F.R.D. 55 (S.D.N.Y. 2018). There is no principled reason to elevate Rule 702 above any of the other Federal Rules of Evidence.

However, if the Court does choose to apply *Daubert*, it should not exclude Mills or Kerner based on issues that go to the weight of their testimony. "[C]ourts in this circuit have found that while 'flaws in expert testimony proffered at class certification do not warrant that testimony's exclusion by the Court as gatekeeper under *Daubert* at the threshold, those flaws

may nonetheless be considered in the Rule 23 analysis undertaken by the Court as trier of fact.'"

*Merryman*, 2018 WL 1621495, at *19 (quoting *Libor*, 299 F. Supp. 3d at 471).

II.    <u>The Court should not exclude Robert Mills.</u>

Fraser's arguments to exclude the Mills Declaration are class certification and merits arguments in *Daubert* clothing. Robert Mills is an economist with substantial experience quantifying economic damages in connection with commercial litigation. Dkt. 96-3, X-1. Fraser does not dispute Mills' qualifications.

The truth is that Mills offered entirely non-controversial opinions. In his declaration, Mills explains the following:

- He analyzed two SQL databases that contain transactional data from the Companies: ZenCloud and Paybase. Dkt. 96-3 at ¶ 1.

- Both databases contain a table of "users." *Id.* at ¶¶ 2, 5.

- The information in the "users" tables in both databases can be associated with transactional data in the databases (*e.g.*, credits, debits, payouts, purchases, sales fees, etc.). *Id.* at ¶¶ 3, 6.

- The ZenCloud database includes 212,455 "UserIDs" that have at least one completed transaction in the "transactions" table. *Id.* at ¶ 4.

- The Paybase database contains 8,679 user identification numbers. *Id.* at ¶ 5.

- He anticipates being able to calculate damages on a classwide basis because "the transactions in the database can be associated with individual UserIDs" and so he believes he can calculate damages "based on the transactional information associated with that member's UserID." *Id.* at ¶ 7.

- He provides an example showing that he can identify the "purchase" transactions made by defendant Allen Shinners. *Id.* at ¶ 8.

During his deposition, Fraser's expert Dr. Bruce Strombom acknowledged that he agreed with most of Mills' analysis. X-1 (Strombom) at 61:2-65:13.

A.    <u>The Databases</u>

Mills' analysis—and thus all of Fraser's arguments—relate to two "relational" databases

3

known as ZenCloud and Paybase that were produced in this litigation. Dkt. 96-3 at ¶ 1. Relational databases comprise tables of data that are structured in a specific way to facilitate efficient management, access, and analysis of the underlying data. Each table in a relational database is organized into a number of columns and rows. The columns in each table of data represent an attribute while each row represents an observation of that attribute. A table of customer data, for example, might include attributes such as the customer name, address, and email address. Each of these attributes corresponds to a column in the table. Each row in the table provides data concerning these attributes for a specific customer. Each row in a relational database also includes a unique key that can be used to link the row to one or more rows of data in another table of data. X-1 (Strombom) at 14:22-15:7.

Relational databases are created using a computer language known as structured query language ("SQL"). SQL also is used to perform tasks such as adding data to a relational database and retrieving data of interest from a relational database.

The databases at issue are known as ZenCloud and Paybase. Dkt. 96-3 at ¶ 1. They are relational databases. X-1 at 15:12-14. According to a former employee, the Companies tracked "Everything" through these SQL databases. X-2 at 141:19-20. The Companies tracked "[o]wnership of Hashlets," including "how many there were" through the databases. *Id.* at 141:21-23. The Companies tracked Hashstakers through the databases. *Id.* at 143:14-144:6 (Hashstakers "eventually" went to the SQL database). Sales of Paycoin were reflected in the databases. *Id.* at 145:6-146:21. The Companies' products—which were represented as devices engaged in cryptocurrency mining—were in reality simple entries in these databases. *Id.* at 144:21-145:1 (Q. You just create an entry in the SQL database and magically a Hashlet would appear? A. Yes. Q. Regardless of the hashing power that was available? A. Correct.). The

databases at issue here contain dozens of tables and millions of rows of data.

B.    The Court should not exclude Mills for relying on the databases.

At 7-10, Fraser claims that the databases are unreliable and so the Court should exclude Mills. It should be undisputed that they have relevant information. After all, the companies tracked "Everything" through the databases. X-2 (M. Eden) at 141:19-20. A judge in this District has already sanctioned ZenCloud as an appropriate basis for calculating damages. In *Securities and Exchange Commission v. Garza*, 3:15-cv-01760, Judge Meyer granted a default judgment in the SEC's favor based in part on an analysis of ZenCloud. Dkt. 15-1, 15-3 & 39. Fraser's expert could not identify a better source of data, X-1 (Strombom) at 125:14-16, and plaintiffs are unaware of one. Any notion that plaintiffs or Mills are barking up the wrong by using the databases is simply wrong.

Fraser specifically identifies several issues that supposedly make the database unreliable. He claims hackers might have altered the data. He cites evidence that class members might have engaged in transactions outside of the database that are relevant to damages. He notes that the databases lack certain identifying information about class members.

Even if all of that was true (and as explained below it is not) those are not reasons to exclude Mills. The underlying factual basis for an expert's opinion goes to the weight of the testimony, not its admissibility. *See, e.g.*, *Deutsch v. Novartis Pharm. Corp.*, 786 F. Supp. 2d 420, 432-33 (E.D.N.Y. 2011) (expert's reliance on studies that did not control for confounding factors went to weight rather than admissibility of testimony); *Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.*, 769 F. Supp. 2d 269, 285 (S.D.N.Y. 2011) ("Questions over whether there is a sufficient factual basis for an expert's testimony may 'go to weight, not admissibility.'" (quoting *Adesina v. Aladan Corp.*, 438 F. Supp. 2d 329, 343 (S.D.N.Y. 2006))). For example, in *Tyler v. Union Oil Co. of Cal.*, 304 F.3d 379, 392 (5th Cir. 2002), a defendant

moved to exclude an expert in part because the expert "created his own database" based on documents provided during discovery. *Id.* at 392-93. The defendant argued that underlying data was itself unreliable. The court rejected the argument as going to "probative weight rather than admissibility" and an issue that the defendant "could-and did-raise in cross examination." *Id.* Arguments about the integrity or completeness of the databases go to weight, not admissibility.

    1.   <u>There is no reason to exclude Mills based on the information in the databases.</u>

Fraser's first argument is that Mills "was not able to identify the chain of custody" for the files. But, Mills did testify that he received the files from counsel, who received them from an individual named Adam Matlack, who in turn received them from a former employee. X-3 (26:16-23; 27:14-21). The former employee was Madeline Eden.

At 7, Fraser speculates that Matlack altered the data, but offers no evidence that he did so.

At 7-8, Fraser makes some vague swipes about the process Mills used to reconstruct the data and says it is "impossible to evaluate whether the methods employed by Mills to extract the data from the databases for expert testimony under *Daubert*." During his deposition, Mills testified that he used a "program called Maria DB" (the software the Companies used) in order to reconstruct the database from the backup files. X-3 at 27:7-13. Mills confirmed that the reconstruction process "worked smoothly," that he "didn't notice any kind of errors that occurred through that process," and that there "were a number of tables that seemed to be structured properly after I reconstructed the data." *Id.* at 28:19-29:5. Fraser takes umbrage with the fact that Mills never previously used Maria DB, but his reason for choosing the program is eminently reasonable: "I believe that was the software that was used to back up the database, so I think that's the database software that was being used to maintain the database, so it was a natural fit to use to reconstruct it." *Id.* at 30:22-31:1.

At 8, Fraser faults Mills for failing to use "available metadata to determine whether they cover the proposed class period." That is a non-sequitur. Just because the data does not cover the entire class period does not mean the data contained in the database is somehow tainted. And, Fraser's own expert confirms that the ZenCloud database contains transactions beginning in July 2014 and ending in April 2015 and that Paybase contains transactions from late December 2014 through late March 2015. Dkt. 107-2 at B-3. That makes sense. Hashlets did not launch until August 2014, Dkt 96-1 at A-12, and Paybase did not launch until the very end of 2014. X-4, X-5. The end dates make sense too. In early 2015, the Companies received a subpoena from the SEC and their fake mining operations were "indefinitely put on hold." X-6; X-7. The Companies fell into disarray and went into wind-down mode shortly thereafter. X-8.

Fraser also suggests—but cites no actual evidence—that a more complete version of the database might exist. He notes that Mills received copies of the database from Madeline Eden. But the version Mills did analyze was also from Ms. Eden. Fraser cites no evidence to suggest the versions are different. Fraser also cites a declaration from an accountant at the SEC who analyzed the ZenCloud database and stated that the version the accountant used was the most reliable version and suggests that the version Mills analyzed might be different. But other than innuendo, Fraser offers no evidence to suggest the evidence is unreliable here.

At 8-9, Fraser cites evidence suggesting that the ZenCloud database was attacked by a hacker, resulting in a withdrawal of 70 Bitcoins. Dkt. 108-2 at A-9. This argument is identical to one of his arguments in his class certification opposition. Dkt. 107 at 20. The argument fails; it is a merits argument that should be addressed at trial; at most, it goes to the weight of the evidence. *See, e.g. In re Blech Sec. Litig.*, 2003 WL 1610775, at *13 (S.D.N.Y. 2003) (concluding that expert's extrapolation of damages was not improper because "Bear Stearns' database did not

include all trading volume in Blech Securities" and that the extrapolation was "an issue that can be explored further at trial."). In fact, the same internal documents cited by Fraser indicate that there were "very few instances of modified data from January [2015] back, which is a really good thing." X-9. Almost all relevant transactions occurred in 2014, and so it is unclear how the supposed hack affected the relevant data. The documents cited by Fraser also suggest efforts to verify and restore any damaged data. *Id.*

At 10, Fraser says that his evidence of data manipulation is confirmed because plaintiff Denis Marc Audet's "transaction history differs significantly from the transaction history reflected in the ZenCloud database." His evidence is not nearly so convincing. During Audet's deposition, Fraser identified two transactions labeled as "withdraw" that appear in the "paycoins" table. Dkt. 108-2 at A-11. Audet testified that he never made any withdrawals. Dkt. 108-2 at A-12 at 83:8-16. But, that does not necessarily mean anything sinister occurred. Indeed, as Mr. Audet testified, the date of the withdrawal corresponds to one of the dates Audet's hashpoints were converted into Paycoins. Dkt 108-2 at A-12 at 82:25-83:7; Dkt 1-1.

Perhaps more to the point, evidence of data manipulation in a fraud case is neither surprising nor is it a reason to punish the victims of the fraud. Fraser is free to argue about the reliability of the data in a case where the Companies broke the law, went defunct, never appeared in this lawsuit, no longer maintain their records, and failed to protect their customers' data. Of course, that argument will fail. "The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 265 (1946).

> Where a defendant's own misconduct has prevented a more precise computation of damages,
>
>> the jury may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly. In such circumstances 'juries are allowed

to act upon probable and inferential, as well as direct and positive proof.' . . . Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim.

*Sir Speedy, Inc. v. L & P Graphics, Inc.*, 957 F.2d 1033, 1038 (2d Cir. 1992) (quoting *Bigelow*, 327 U.S. at 264).

    2.  <u>There is no reason to exclude Mills because the databases do not include information about credit card chargebacks.</u>

In another homage to his class certification opposition (Dkt. 107 at 22-23), Fraser argues at 10-11, that the Court should exclude Mills because the databases are "incomplete." In support of this claim, Fraser states—but does not cite any evidence—that the databases "do not include records of credit card chargebacks."

For one thing, Fraser fails to explain why chargebacks are relevant to damages. Offsetting damages due to value received from chargebacks is analogous to reducing recovery because an investor receives a tax benefit. It is well settled that damages are not off-set by tax benefits if an investor pursues a recessionary measure of damages, even if recovery of damages and receipt of those tax benefits "may place a § 10(b) plaintiff in a better position than he would have been absent the fraud." *See Randall v. Loftsgaarden*, 478 U.S. 647, 663 (1986). The same as true under an out-of-pocket measure of damages. *See Lemanik, S.A. v. McKinley Allsopp, Inc.*, 125 F.R.D. 602, 609 (S.D.N.Y. 1989) (refusing to permit discovery into tax returns because "the tax consequences of these transactions are not in issue, even if Lemanik elects the out-of-pocket, rather than the recessionary, measure of damages in computing its loss under Rule 10b-5.").

Fraser is also incorrect as a factual matter. The "auditlogs" table in Zencloud does contain information about credit card chargebacks. The table identifies UserID numbers and

contains a comment explaining why certain actions were taken with respect to a user's account. Some comments identify users that sought chargebacks. For example, the auditlogs table shows that a withdrawal hold was placed on the account of UserID 175468 because of a "Braintree Fraud chargeback."[1]

It is true that the databases do not appear to contain information about whether an individual received a "credit" from her credit card company. That is unsurprising and says nothing about the completeness of databases. Fraser also ignores the fact that some credit card transactional data outside of Zencloud has been produced in this lawsuit. The data includes records of 40,058 credit card transactions processed through Braintree Payment Solutions, and 1,985 credit card transactions processed through Stripe. Watterson Decl. re Class Cert. Reply at ¶ 18. The data specifies whether the transaction was a credit or debit, and the PayPal date specifies whether the transaction was disputed. *Id*. Finally, plaintiffs have served a subpoena for data from PayPal—a subsidiary of which was the principal payments processer for the Companies—to ensure that they have all relevant data. *Id.* at ¶ 19.

3. <u>There is no reason to exclude Mills because of the biographical information in the databases.</u>

At 11-13, Fraser recasts more of his class certification arguments as reasons for excluding Mills:

| Mtn. to Exclude (Dkt. 108-1) | Opp'n to Class Certification (107) |
|---|---|
| P. 12: "the record confirms that many customers owned multiple UserIDs . . . [t]hus, the number of UserIDs in the databases do not indicate the number of customers or putative class members." | P. 24: plaintiff Pfeiffer had multiple accounts and so "the databases do not reveal the customers with whom each user account is associated" |

_____

[1] Braintree refers to Braintree Payment Solutions, a subsidiary of PayPal that provided payment processing services to the Companies.

| Mtn. to Exclude (Dkt. 108-1) | Opp'n to Class Certification (107) |
|---|---|
| P. 12: "users who have one associated completed 'transaction' are not necessarily purchasers of the relevant products (let alone purchasers who suffered losses)." | P: 4-5: "the class would by definition include no injury traceable to Defendants' alleged misconduct" and "proposed definition includes those who 'acquired' the products at issue even though they may not have purchased or sold them." |
| P. 12-13: "Mills is not able to determine whether the databases contain sufficient information to determine which customers should be excluded from the class." | P. 27-29: "Plaintiffs' proposed class by definition excludes any 'affiliate, agent, employee, or co-conspirator' of the Companies" and "determining which of GAW Miners' customers acted in any of these roles would require fact-intensive, individual inquiries. |

In his declaration, Mills concluded that the ZenCloud databases contains 212,455 accounts with at least one associated transaction. Dkt. 96-3 at ¶ 1. Fraser's expert testified that he did not verify this calculation or disagree with the methodology Mills used to arrive at this calculation. X-1 (Strombom) at 61:16-62:8.[2]

At 12, Fraser argues that Mills' calculation is "irrelevant" because "the record confirms that *many* customers owned multiple UserIDs." The record does not confirm that. The evidence Fraser cites shows that *one* customer—plaintiff Michael Pfeiffer—owned multiple accounts. That is no barrier to class certification and no reason to exclude Mills.

Fraser's multiple-accounts argument fails as a legal matter. Fraser's argument is that an individual might own multiple accounts, and that some accounts might experience losses while others experience gains. That only matters if an individual must off-set her losses with her gains from other transactions. Fraser cites no authority suggesting that such an off-set is required. It isn't. In *Argent Classic Convertible Arbitrage Fund L.P. v. Rite Aid Corp.*, 315 F.

---

[2] Strombom's testimony refers to ¶ 12 of Mills' report, which is substantively similar to ¶ 4 of Mills' declaration. X-_ (Strombom) at 8:5-15.

Supp. 2d 666, 680 (E.D. Pa. 2004), the court explained that there are two approaches to addressing claims involving multiple transactions: "We could use a 'cumulative' methodology that includes offsetting gains in its loss calculation, but, for the reasons that follow, we prefer a 'transaction-based' methodology that allows claims for unprofitable transactions . . . without offsetting the recoverable loss with gains from profitable transactions." The *Argent* court explained that the language of Section 10(b) and 10b-5 use "the singular nouns 'purchase' or 'sale,'" which indicates a "focus on each transaction individually." *Id.* "Neither the statute nor the Rule authorize any sort of aggregation of purchases or sales that could sanction the cumulative approach." *Id.*; *see also In re Blech Sec. Litig.*, 2003 WL 1610775, at *26 (S.D.N.Y. 2003) ("Defendants are not entitled to an offset, factoring in any gains made by these traders.").

Even if aggregation was required, plaintiffs can do so. During his deposition, Mills testified that the databases contain "information provided about that customer. . . . There's an email address. There's a user ID. There's other information for some . . . of the user IDs. There's not a Social Security or something like that, but there is information concerning the users." X-3 at 83:21-84:4. The "users" table in ZenCloud contains 45 different fields. Dkt. 107-2, Ex. B-4. Each User ID has an associated "username," email address, password information, and information about the creation dates. *Id*; *id.* at 60:2-6; Dkt. 96-3 at ¶ 2. Some User IDs contain additional information including the user's name, address, phone number, or addresses for transferring cryptocurrency. Dkt. 107-2, Ex. B-4. The Paybase database contains similar information. Dkt. 96-3 at ¶ 5.

Fraser's expert confirmed that this information can be used to identify individuals with

multiple accounts. Dr. Strombom queried the ZenCloud database and identified "potentially overlapping UserIDs by comparing physical addresses and phone numbers across UserIDs. I found that in the ZenCloud database, around 16,000 UserIDs shared a physical address or phone number with at least one other UserID." Dtk. 107-2 at ¶ 51. Dr. Strombom also identified "over 9,000 UserIDs [that] share near-identical email addresses with at least one other user." *Id.* at ¶ 52. The ZenCloud database contains passwords and cryptocurrency wallet addresses that might be used to identify overlapping accounts.

This same data can address Fraser's argument at 12-13 that Mills cannot identify persons excluded from the class. The only realistic class of people that must be excluded are employees of the companies. But as Fraser's expert demonstrates, they can be identified by their name and email address. Dkt. 107-2 at ¶ 32; X-1 at 149:10-15.

In his class certification opposition, Fraser identifies categories of people that plainly do not fall within the exclusions in plaintiffs' proposed definition. Fraser says that members of the Companies' "affiliate program" were "affiliates." These were simple affiliate links[3] that paid commissions to website owners that drove Internet traffic to the Companies' websites. Fraser also suggests that individuals participating in an alleged reseller program somehow qualify as affiliates. Both arguments are silly. Plaintiffs are using the usual legal definition of affiliate: "a person that directly through one or more intermediaries, controls, or is controlled by, or is under common control with, a specified person." Conn. Rev. Stat. § 33-840(1).

Fraser also suggests that Mills cannot identify forum moderators, "pen testers," beta-testers, and software developers, which he claims are agents of the Companies. Fraser offers no

---

[3] *See Casper Sleep, Inc. v. Mitcham*, 204 F. Supp. 3d 632, 635 n.1 (S.D.N.Y. 2016) (quoting a complaint that accurately describes an affiliate link as "a unique URL leading to a retailer's website that contains an identifier associated with the affiliate. When a customer arrives at the retailer's website by clicking the URL link, any resulting purchases are tracked and the affiliate receives a commission on each purchase."

evidence that even hints at the fact that these categories of people that acted for the Companies such that they are agents. The Court in *Cornelius v. Bodybuilding.com*, 2011 WL 2160358, at *5 (D. Id. June 1, 2011), concluded that forum moderators lacked actual or apparent authority to speak for a bodybuilding website even though the moderators had "express authority to delete posts of forum users and to ban forum users for violations of the terms and conditions of forum use." *Id.* Whether Mills can identify these individuals or not is irrelevant because they are not agents. But even if they were, Fraser offers no evidence that any of these agents invested in the Companies' products, or suggests that Mills could not identify them by their names or email addresses.

At 11, Fraser argues that Mills' identification of UserIDs with at least one associated transaction is insufficient because some users may not have purchased products. This argument is the flip side of Fraser's class certification argument that plaintiffs' proposed class definition includes individuals that lack standing. Fraser is simply wrong as to Article III standing: "it is well established that a plaintiff suffers legal injury at the moment she makes her investment, not when she suffers actual losses." *EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro S.A.*, 246 F. Supp. 3d 52, 69 (D.D.C. 2017), aff'd, 894 F.3d 339 (D.C. Cir. 2018).

But if the Court agrees with Fraser and concludes that plaintiffs' proposed class is too broad because it uses the term "acquired" instead of "purchased," the class definition can easily be fixed. In that case, Mills can use the same methodology, but limit it to users that purchased products. Mills demonstrated that he can do so in his Reply Declaration. Fraser's expert employed a similar methodology in identifying users with purchases from the "transactions" and "orders" tables in Exhibit B-15 to his declaration. Dkt. 107-2.

C.     Mills used a reliable methodology

At 13-16, Fraser says the Court should exclude Mills because he did not use a reliable

principle to analyze the database or identify a methodology for calculating damages. Both arguments fail.

      1.    <u>Mills employed a reliable analysis of the databases.</u>

Fraser's argument at 13-14 is essentially that Mills did not describe his analysis of the databases in enough detail. Not true. Mills' declaration explains that the "Users" table contains a UserID, "a username, an associated email address, and other information" for each user. Dkt. 96-3 at ¶ 2. The declaration proceeds to explain that the "transactions" table includes a number of different transaction types, and that each transaction can be associated with a UserID. *Id.* at ¶ 3. The declaration provides an example that demonstrates how the two tables can be associated to determine that a particular user incurred a specific type of transaction. *Id.* Finally, the declaration explains that Mills determined how many UserIDs had at least one associated transaction. *Id.* at ¶ 4.

Fraser's complaint seems to be that the declaration says that Mills conducted "an analysis" to determine which UserIDs have associated transactions without further explanation of the analysis. But Mills' analysis is self-evident from the prior discussion: he queried the database to determine which UserIDs had an associated transaction in the transactions table. In any event, Mills explained his analysis in further detail during his deposition. When asked how he arrived at the number Mills explained:

> I linked the transaction table to the user table to determine the number of transactions per user and the number of completed transactions per user. So I tallied that number counted how many had at least one transaction, completed transaction.

X-3 at 62:15-24.

Fraser also seems to complain that Mills' declaration does not expressly state how he can identify individuals that "purchased" the Companies' products. The Declaration sets out the general methodology: linking UserIDs with transactions. Dkt. 96-3 at 7. It even provides a

specific example: it shows how Mills can determine the "purchase" transactions in the "transactions" table that plaintiff Shinners made. *Id.* at ¶ 8. To the extent any of this was actually a problem, Mills included the specific SQL queries he used in his Reply Declaration, something Fraser's expert did not include in his declaration.

        2.        <u>Fraser's argument in § II.B.2 is incomprehensible.</u>

It is unclear what Fraser is arguing at 15-16. He first says that Mills did not identify a methodology for calculating damages. (Wrong, but even if Fraser was right, it is unclear why he is asking the Court to exclude an opinion that he says does not exist). Fraser then says that Mills *did* identify an approach for calculating damages, but that the "approach is inherently individualized." (Also wrong, but not a reason for excluding an expert). He then makes an argument that rather neatly sums up his motion: "a district court must conduct a rigorous analysis to determine whether the plaintiff has introduced admissible evidence to show that the case is susceptible to awarding damages on a class-wide basis" and proceeds to cite three supposed individual inquiries that were discussed above. (Wrong again. And definitely not the standard applicable to Fraser's *Daubert* motion).

The purpose of the *Daubert* motion Fraser chose to file is not to determine whether plaintiffs introduced admissible evidence that damages can be calculated on a classwide basis. The purpose of this motion is to determine whether Mills' declaration is admissible evidence. Even if Fraser was correct that Mills' declaration fails to establish that plaintiffs can calculate damages on a classwide basis (and he is not correct), that is not a reason for excluding the declaration. Other than the conclusory statement that "Mills is unable to assist the Court," nothing in § II.B.2 even touches on a proper argument for excluding an expert.

D.        <u>Mills adequately articulated a methodology for calculating classwide damages.</u>

        At 16-17, Fraser strikes a variation of his prior argument and complains that Mills does

not identify a specific damages model. Even if that was true (it isn't), that argument is not a basis for excluding Mills' testimony; it is an argument about whether class certification is appropriate. In fact, Fraser makes this precise argument in his class certification opposition. *See* Dkt. 107 at 30 ("Plaintiffs fail to carry their burden to demonstrate a viable method to calculate damages on a class-wide basis."). In this section, Fraser does not claim Mills lacks sufficient specialized knowledge; he does not claim that Mills' declaration is based on insufficient data; he does not claim Mills failed to follow reliable principles and methods; and he does not claim that Mills failed to apply the principles and methods to the facts of the case. Rather, Fraser's argument is that Mills failed to offer an opinion that plaintiffs needed him to offer in order to obtain class certification. Maybe. Maybe not. But certainly not a reason to exclude an opinion altogether.

Fraser is first wrong on the law. In *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 407 (2d Cir. 2015), the Second Circuit discussed the Supreme Court's decision in *Comcast v. Behrend*, 569 U.S. 27 (2013). The Second Circuit explained that *Comcast* "did not hold that proponents of class certification must rely upon a classwide damages model to demonstrate predominance." *Roach*, 778 F.3d at 407. *See also In re MF Global Holdings Ltd. Inv. Litig.*, 2015 WL 4610874, at *7 (S.D.N.Y. 2015) (rejecting argument that "Customers did not provide a working class-wide damages methodology" as basis for denying certification).

Fraser is also wrong on the substance of his argument. According to Mills, he plans to calculate damages based on "the value of the consideration paid for the products at issue and compare that to the value received and use that as a measure of damages." X-3 at 66:20-23. For consideration paid, Mills expects "to use the transactions database and various records with - or various tables within the database that I've analyzed to determine purchases and other outlays

of cash." X-3 at 67:8-12. As far as consideration received, "One way in which I think that can be accomplished is to understand how much was - the value of what was withdrawn from the user accounts. So the value that was received would be the value that was actually taken out of the accounts by the users." X-3 at 68:11-16. Mills' declaration shows that it is possible to associate transactions documented in the databases with specific User IDs. The transactions in the database are themselves the outlays of cash and withdrawal of value. That model is consistent with plaintiffs' theory that the Companies engaged in a Ponzi scheme and that their securities were essentially worthless. That is sufficient at the class certification stage. *See, e.g.*, *Menaldi v. Och-Ziff Capital Mgmt. Group LLC*, 2018 WL 4378445, at *10 (S.D.N.Y. Sept. 14, 2018) (granting class certification based on method "which computes damages as the differential between the pre-disclosure and post-disclosure stock prices.").

Mills' method of calculating damages is so non-controversial that Fraser's expert used it in paragraphs 82 and 83 of his declaration. Dkt. 107-2. In paragraph 82, Dr. Strombom cites a November 4, 2014 announcement about PayCoin and explains that certain customers bought products only before that date and certain customers bought products only after that date. Dr. Strombom's point—which is neither here nor there for the purposes of this motion—is that customers who purchased before the announcement could not have relied on misrepresentations regarding PayCoin. But what is relevant to this motion is that Dr. Strombom was able to determine that "the ZenCloud database contains records of 146,614 purchases of Hashlets and other products, with a total transaction amount of over $24 million, prior to November 4, 2014." He was likewise able to determine there were $8,773,810 in purchases prior to November 4, 2014. Dkt. 107-2 at B-15. Dr. Strombom did so by looking to "purchase" transactions in two tables. *Id.* While Mills' ultimate calculations will include more than just

"purchase" transactions, Exhibit B-15 is illustrative: it shows that data can be used to calculate consideration paid. During his deposition, Dr. Strombom agreed it was possible to associate the purchase transactions he aggregated in Exhibit B-15 with individual accounts. X-1 (Strombom) at 141:23-142:8.

Dr. Strombom also used Mills' methodology in Exhibit B-8. As his declaration explains, Dr. Strombom used the ZenCloud database to aggregate "all the Bitcoin inflow (*i.e.*, funding transactions) and outflow (*i.e.*, withdrawals) transactions to measure the net Bitcoin flows for these accounts based on the 'transactions' table." Dkt 107-2 at ¶ 53 & B-8. Dr. Strombom could assign the net inflow to particular accounts. The fact that Dr. Strombom was able to calculate inflows and outflows is again instructive.

The Court should deny Fraser's motion to exclude Mills' declaration.

III.    <u>The Court should not exclude Lou Kerner's declaration.</u>

Plaintiffs' motion for class certification is supported by an expert declaration from Lou Kerner. As set out in his declaration, Kerner has decades of experience as an investment analyst and has focused his work since June 2017 on investments related to digital tokens and cryptocurrency. Based on this experience, Kerner offers opinions concerning the nature of cryptocurrency investments generally and also concerning the significance to investors of the misrepresentations made by the Companies. Equivalent expert testimony has been admitted and expressly relied upon by courts considering class certification of securities fraud claims. For example, Judge Furman rejected a *Daubert* challenge to an investment expert in a securities fraud class action, finding that the proffered testimony "speaks to whether and how investors would have reacted differently if Defendants had provided the omitted information or not made the allegedly misleading statements." *Ge Dandong v. Pinnacle Performance, Ltd.*, 2013 WL

5658790 at *14 (S.D.N.Y. Oct. 17, 2013); *see also Board of Trustees of AFTRA Ret. Fund v. JPMorgan Chase Bank*, 2011 WL 6288415, at *3-14 (S.D.N.Y. Dec. 15, 2011) (rejecting *Daubert* challenges to investment experts offered by both the plaintiff and defendant on several issues including reasonableness of investment.)

Fraser challenges the relevance and reliability of Kerner's testimony on a number of grounds, none of them persuasive. First, at 19-20, Fraser argues that Kerner lacks specialized education in cryptocurrency mining. This argument fails for the obvious reason that Kerner offers no opinions about the technical aspects of cryptocurrency, blockchain, or mining.[4] His report discusses his understanding of these topics solely as they inform his investment analysis and opinions, just as he regularly discusses those same topics on his Medium.com blog posts. Notably, Fraser raises no challenge to the accuracy of any statements concerning mining or cryptocurrency made by Mr. Kerner in his report or at his deposition.

Fraser's argument at 20 that Kerner disclaims any experience or expertise concerning cryptocurrency *trading* simply misstates Kerner's testimony. Asked at his deposition a series of exceedingly general questions about the "cryptocurrency community", Mr. Kerner testified that he spends a "significant percentage of my time" meeting with cryptocurrency investors both on line and in person X-10 at 120:14-19; that, as a general matter, cryptocurrency investors have a higher risk tolerance than the average individual but that the level of sophistication among cryptocurrency investors varies widely *id.* at 120:20-121:6, and that he is aware of many cryptocurrency investment strategies but that such investors tend to focus on technical details of the trading market, such as volume and volatility, and less on "company fundamentals", as conventional equity analysts would *id.* at 121:122:14. Nothing in this testimony supports

---

[4] Plaintiffs offered testimony from a different expert, Princeton computer science professor Arvind Narayanan, addressing more technical aspects of cryptocurrency and mining.

Fraser's claim at 19 that Mr. Kerner is "not equipped to describe the investment strategies of the cryptocurrency community." Quite the opposite—in attempting to respond to Fraser's counsel's extremely broad and general questions, Mr. Kerner demonstrated the experience and specialized knowledge necessary to support the opinions he offers in this case.

Reversing the typical criticism of an expert as a "professional mouthpiece", Fraser also claims at 19 that Mr. Kerner lacks qualifications because he has not previously served as an expert witness in litigation. Fraser's insinuation that Kerner was trying to pull one over on the Court by omitting the absence of prior expert witness work from his declaration makes no sense. The Federal Rules require disclosure of prior testimony, not disclosure of the lack of such testimony. More importantly, Kerner's credibility should, if anything, be enhanced by the fact that he makes his living as a cryptocurrency investor and commentator, not an expert witness.

More substantively, Fraser argues at 21-22 that Mr. Kerner failed to apply a "reliable methodology" to develop his opinions. Again, Fraser misrepresents the nature of Kerner's opinions and the work he did to support them. As discussed in his declaration and his deposition, Kerner applied the knowledge he has developed from years of investment analysis, including analysis exclusively of cryptocurrency-related investments over the past year-and-a-half, to the facts of this case. These facts include a detailed understanding of the investment products GAW claimed to be selling and the subsequently-disclosed truth of how GAW operated. His declaration does not simply offer a bare opinion that investors knowing the truth would not have purchased GAW products, rather he explains why no reasonable cryptocurrency investor would have made such a purchase. *See* Dkt. 964 at ¶¶ 39-41 (further supported by the detailed discussion of the history of GAW's products and interactions with its investors at ¶¶ 28-38.) At his deposition, Mr. Kerner acknowledged that his opinion that no rational cryptocurrency

investor would buy into a Ponzi scheme was "common sense" X-10 at 90:10-24, but that testimony simply reflects how fundamental GAW's misrepresentations were, and how egregious its fraud.

Fraser relies on two cases involving the same expert testifying about allegedly defective table saws to support the challenge to Mr. Kerner's opinion. *Hilaire v. Dewalt Indus. Tool Co.,* 54 F. Supp. 3d 223, 244 (E.D.N.Y. 2014); and *Karavitis v. Makita U.S.A., Inc.*, 243 F. Supp. 3d 235, 247 (D. Conn. 2017) (both cited in Br. at 22). In both cases, the plaintiffs proffered Lewis Barbe as an expert in "safety design" and Mr. Barbe offered conclusory opinions that the power tools at issue could have been made safer with the addition of a blade guard or warning labels. *Hilaire* at 244; *Karavitis* at 244-246. Mr. Barbe's opinion was found inadmissible under *Daubert* in both cases because he failed to explain his analysis or support his conclusions with data or industry-based standards. *See, e.g., Hilaire* at 244; *Karavitis* at 246. The *Hilaire* Court criticized Mr. Barbe's opinion that safety guards make table saws less dangerous as "self-evident" and "based solely on common sense." *Id.* By contrast, Mr. Kerner's analysis in this case is expressly based on his experience as an investor and his analysis of the products offered by GAW, both as they were sold to the public and as they actually existed. *See e.g.* Dkt. 96-4 (discussing the significance of GAW's misrepresentations concerning PayCoin in the market for a newly-launched cryptocurrency). Other courts have relied on testimony from expert investors to support the conclusion that misrepresentations were so fundamental that all investors would have relied. *See, e.g., Ge Dandong¸* 2013 WL 5658790 at *14 (rejecting defendants' *Daubert* argument that an investment expert's opinion was purely "subjective" and not based on any "verifiable methodology"). Mr. Kerner's opinion should be admitted for the same purposes here.

IV.    <u>Conclusion</u>

The Court should deny Fraser's motion.

DATED: December 21, 2018

Respectfully submitted,

*/s/ Colin M. Watterson*

Colin M. Watterson (*pro hac vice*)
E-mail:  cwatterson@susmangodfrey.com
Texas Bar No. 2409330
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, TX  77002
Tel: (713) 651-9366
Fax: (713) 654-3367

Marc Seltzer (*pro hac vice*)
E-mail:mseltzer@susmangodfrey.com
California Bar No. 54534
Kathryn Hoek (*pro hac vice*)
E-mail: khoek@susmangodfrey.com
California Bar No. 219247
SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067
Tel: (310) 789-3100
Fax: (310) 789-3150

Seth Ard (*pro hac vice*)
E-mail: sard@susmangodfrey.com
New York Bar No. 4773982
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019-6022
Tel: (212) 336-8330
Fax: (212) 336-8340

Edgar Sargent (*pro hac vice*)
Email: esargent@susmangodfrey.com
Washington Bar No. 28283
Susman Godfrey L.L.P.
1201 Third Avenue, Suite 3800
Tel: (202) 516-3880
Fax: (310) 789-3150

*Counsel for Plaintiffs*

Mark P. Kindall (ct13797)
E-mail: mkindall@ikrlaw.com
Robert A. Izard
E-mail: rizard@ikrlaw.com
IZARD, KINDALL & RAABE, LLP
29 S. Main St., Suite 305
West Hartford, CT 06107
Tel: (860) 493-6292
Fax: (860) 493-6290

Certificate of Service

I hereby certify that on December 21, 2018, I served the foregoing via electronic mail

on the following:

Daniel H. Weiner
Sarah L. Cave
Sara E. Echenique
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, NY  10004-1482

Sean M. Fisher (ct23087)
Brenner, Saltzman & Wallman LLP
271 Whitney Avenue
New Haven, CT  06511

*/s/ Colin M. Watterson*
Colin M Watterson