UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| DENIS MARC AUDET, MICHAEL PFEIFFER, DEAN ALLEN SHINNERS, and JASON VARGAS, Individually and on Behalf of All Others Similarly Situated,<br><br>　　　Plaintiffs,<br><br>　　vs.<br><br>STUART A. FRASER, GAW MINERS, LLC, and ZENMINER, LLC, (d/b/a ZEN CLOUD),<br><br>　　　Defendants. | Case 3:16-cv-00940<br><br>Hon. Michael P. Shea<br>Courtroom 2<br><br>ECF Case<br><br><u>CLASS ACTION</u><br><br>DECEMBER 21, 2018<br><br>DECLARATION OF COLIN M. WATTERSON RE: PLAINTIFFS' OPPOSITION TO MOTION TO EXCLUDE |

I declare under penalty of perjury as follows:

1.　　My name is Colin Watterson. I am an attorney licensed to practice law in the State of Texas and am an associate with the law firm Susman Godfrey LLP. I have personal knowledge of the facts in this declaration.

2.　　I serve as counsel for plaintiffs in the above captioned action. I am admitted *pro hac vice* in the above captioned action.

3.　　<u>Exhibit 1</u> contains true and correct excerpts from the deposition transcript of Bruce Strombom, Ph.D., taken on December 5, 2018 in the above-captioned case.

4.　　<u>Exhibit 2</u> contains true and correct excerpts from the deposition transcript of Madeline Eden, taken on June 26, 2018 in the above-captioned case.

5.　　<u>Exhibit 3</u> contains true and correct excerpts from the deposition transcript of Robert Mills, taken on October 30, 2018 in the above-captioned case.

6.     Exhibit 4 is a true and correct copy of a December 28, 2014 email from Paybase to Homero Joshua Garza that was produced in this litigation.

7.     Exhibit 5 is a true and correct copy of a December 28, 2014 email from Paybase to Matthew Eden that was produced in this litigation. The email also includes the .html version of the email for the purposes of showing the images that appear in the email.

8.     Exhibit 6 is a true and correct copy of a February 6, 2015 subpoena from the United States Securities and Exchange Commission to GAW Miners, LLC.

9.     Exhibit 7 is a true and correct copy a January 29, 2015 email from Jonah Dorman to Matthew Eden and Evan Lucas that was produced in this litigation.

10.     Exhibit 8 is a true and correct copy of a February 25, 2015 email from Jonah Dorman to Homero Joshua Garza and Dan Pease that was produced in this litigation.

11.     Exhibit 9 is a true and correct copy of a March 3, 2015 email from Jonah Dorman to Homero Joshua Garza that was produced in this litigation.

12.     Exhibit 10 contains true and correct excerpts from the deposition transcript of Lou Kerner, taken on November 8, 2018 in the above-captioned case.

I declare under penalty of perjury that the above statements are true and correct to the best of my knowledge.


Dated: December 21, 2018

                                        _Colin M. Watterson_
                                        Colin M. Watterson

EXHIBIT 1

1                UNITED STATES DISTRICT COURT

2                  DISTRICT OF CONNECTICUT

3

4   DENIS MARC AUDET, MICHAEL        )
    PFEIFFER, D. ALLEN SHINNERS, and )
5   JASON VARGAS, Individually and on)
    Behalf of All Others Similarly   )
6   Situated,                        )
                                     )
7              Plaintiffs,           )
                                     )
8        vs.                         )  No. 3:16-cv-00940
                                     )  Pages 1 - 182
9   HOMERO JOSHUA GARZA, STUART A.   )
    FRASER, GAW MINERS, LLC, and     )
10  ZENMINER, LLC, (d/b/a ZENCLOUD),,)
                                     )
11             Defendants.           )
    _____ )
12

13

14

15      VIDEOTAPED DEPOSITION OF BRUCE STROMBOM, Ph.D.

16              LOS ANGELES, CALIFORNIA

17            WEDNESDAY, DECEMBER 5, 2018

18

19

20

21

22  REPORTED BY:
    LESLIE L. WHITE
23  CSR NO. 4148
    JOB NO.:  152140

24

25

Page 2

```
 1
 2
 3
 4              Wednesday, December 5, 2018
 5                    9:34 a.m.
 6
 7
 8        Videotaped deposition of BRUCE
 9   STROMBOM, Ph.D., held at 1999 Avenue of the
10   Stars, Suite 900, Los Angeles, California,
11   before Leslie L. White, CSR No. 4148.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1                 I N D E X
 2   WITNESS:       EXAMINATION      PAGE
 3   BRUCE STROMBOM, Ph.D.  BY MR. WATTERSON    6, 176
                            BY MS. CAVE      174
 4
 5
 6
                   E X H I B I T S
 7   PLAINTIFFS'                       PAGE
 8   Exhibit 236    Declaration of Bruce Strombom    7
 9   Exhibit 237    Expert Report of Robert Mills    7
10
11
12
          QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER
13                    (NONE)
14
15
16
17          INFORMATION REQUESTED
                    (NONE)
18
19
20
21          REQUESTED TO BE MARKED
                    (NONE)
22
23
24
25
```

Page 3

```
 1            A P P E A R A N C E S :
 2
 3        SUSMAN GODFREY
 4        Attorneys for Plaintiffs
 5          1000 Louisiana Street
 6          Houston, Texas 77002
 7        BY:  COLIN WATTERSON, ESQ.
 8
 9        HUGHES HUBBARD & REED
10        Attorneys for Defendants
11          One Battery Park Plaza
12          New York, New York 10004
13        BY:  SARAH CAVE, ESQ.
14            HANNAH MILLER, ESQ.
15
16        Also Present:
17          BRENT JORDAN, Videographer
18
19
20
21
22
23
24
25
```

Page 5

```
 1      LOS ANGELES, CALIFORNIA; WEDNESDAY, DECEMBER 5, 2018
 2            9:34 a.m.
 3              -o0o-
 4        THE VIDEOGRAPHER:  This is the start of
 5   DVD labeled No. 1, the videotaped deposition of
 6   Dr. Bruce Strombom, taken in the matter of Denis
 7   Marc Audet, et~al. v. Homero Joshua Garza, et al.
 8   filed in the United States District Court, District
 9   of Connecticut, Case No. 3:16-cv-00940.
10        This deposition is being held at 1999
11   Avenue of the Stars, Los Angeles, California, on
12   December 5th, 2018, at approximately 9:34 a.m.
13        My name is Brent Jordan.  I am the legal
14   video specialist with TSG Reporting, Inc.  The court
15   reporter is Leslie White, in association with TSG
16   Reporting.
17        Will counsel present please identify
18   yourselves for the record.
19        MR. WATTERSON:  Colin Watterson with
20   Susman Godfrey for the plaintiffs.
21        MS. CAVE:  Sarah Cave from Hughes Hubbard
22   & Reed, for Defendant Stuart A. Fraser, and with me
23   is Hannah Miller.
24        THE VIDEOGRAPHER:  Will the court reporter
25   please swear in the witness.
```

Page 6

```
 1              BRUCE STROMBOM, Ph.D.,
 2        the witness herein, having been
 3        first duly sworn, was examined
 4        and testified as follows:
 5                    -o0o-
 6              EXAMINATION
 7    BY MR. WATTERSON:
 8        Q    Good morning, Dr. Strombom.  How are you?
 9        A    Good, thank you.  I'm great.
10        Q    My name is Colin Watterson, and I
11    represent the plaintiffs in this case, which is
12    essentially a securities fraud claim involving
13    cryptocurrency.
14             I gather you have been deposed before?
15        A    I have.
16        Q    I'm still going to go ahead and do the
17    standard admonitions.  So you understand that you
18    are testifying under oath; correct?
19        A    Yes.
20        Q    And is there any reason today why you
21    can't be fully truthful?
22        A    No.
23        Q    You understand you have to give audible
24    answers?
25        A    Yes.
```

Page 7

```
 1        Q    And I know the court reporter will
 2    appreciate it if we don't talk over each other.  So
 3    I'll try to let you finish; you try to let me
 4    finish.  Fair?
 5        A    Fair.
 6        Q    Will you let me know if you don't
 7    understand any of my questions or my questions are
 8    unclear?
 9        A    I'll let you know, yes.
10        Q    Okay.  And, you know, don't guess.  Okay?
11        A    Okay.
12        Q    And your attorney might object.  You still
13    have to answer my questions, unless she tells you
14    not to answer.  Understand?
15        A    I do.
16        Q    Okay.  And let's just go ahead and mark
17    this as 236.
18             (Exhibit 236 was marked for
19             identification by the reporter.)
20        MR. WATTERSON:  And this as 237.
21             (Exhibit 237 was marked for
22             identification by the reporter.)
23    BY MR. WATTERSON:
24        Q    Okay.  And do you recognize this document,
25    Exhibit 236?
```

Page 8

```
 1        A    I do.
 2        Q    And this is your declaration that you have
 3    provided in this case; correct?
 4        A    That's correct.
 5        Q    Okay.  And do you recognize Exhibit 237?
 6        A    Yes.
 7        Q    Okay.  And that's a report that Robert
 8    Mills provided in this case; correct?
 9        A    That's right.
10        Q    And Dr. -- Mr. Mills also provided a
11    declaration.  Have you seen document that before?
12        A    Yes.
13        Q    And it's substantively similar to the
14    report.  Fair?
15        A    Yes.
16        Q    So when were you first contacted about
17    this case?
18        A    I believe it was in October of this year.
19        Q    Okay.  And who first contacted you?
20        A    I think it was a partner of mine who
21    contacted me initially.
22        Q    Okay.  And what did they tell you about
23    why you were being contacted?
24        A    That there was a case involving
25    cryptocurrency, and that someone might be needed to
```

Page 9

```
 1    testify on issues related to Class certification,
 2    and as that is something I had done previously they
 3    thought I should talk to the client and see if I was
 4    potentially the right person.
 5        Q    Okay.  And do you know at the time whether
 6    it would be -- is it for the Class certification or
 7    opposing Class certification?
 8        A    I understood it to be opposing Class
 9    certification.
10        Q    And when were you actually retained?
11        A    I believe it was at the end of October of
12    this year.
13        Q    And it is -- so it fair to say you were
14    retained at least in part as a rebuttal expert?
15        A    Yes, I think in my report I identify my
16    assignment, and it involved reviewing Mr. Mills'
17    report.  And so that would be I think defined as a
18    rebuttal role.
19        Q    Okay.  And basically, if I understand it,
20    your assignment was to provide comments on what --
21    the work that Mr. Mills performed; is that fair?
22        A    That's part of what I was asked to do.
23    Basically to evaluate whether liability, loss
24    causation and damages could be evaluated on a
25    Class-wide basis, and also as part of that
```

Page 10

1  assignment to review what Mr. Mills had done and
2  comment upon that.
3      Q   Did you form any opinions about whether
4  liability could be established on a Class-wide
5  basis?
6      A   No, I don't believe so.
7      Q   Okay.  And do you know whether Mr. Mills
8  is taking the position that he's going to assume
9  that liability is established in this case?
10        MS. CAVE:  Objection to the form, but you
11 can answer.
12        THE WITNESS:  I don't recall specifically
13 his assumption with respect to that.
14 BY MR. WATTERSON:
15     Q   Okay, but is that something pretty
16 standard for damages experts to do?
17     A   I think so, yes.
18     Q   Okay.  And you are being paid, is it $750
19 an hour for your time -- strike that.
20        Your firm is being paid $750 an hour for
21 your time; correct?
22     A   That's correct.
23     Q   And does that include I guess folks that
24 are working under your supervisor?
25     A   Well, folks that work under my supervisor

Page 11

1  have their own hourly billing rates, and the idea is
2  that we'd be compensated for any work they do on the
3  case as well.
4      Q   Okay.  But they --
5        (Reporter clarification.)
6  BY MR. WATTERSON:
7      Q   So those folks may not be billed out at
8  $750 an hour?
9      A   They are not billed out at $750 an hour.
10     Q   Okay.  How would you describe your
11 assignment?
12     A   Just as I did.  To review the facts of the
13 case, and address economic issues related to Class
14 certification, and as part of that to review and
15 comment upon the report of Mr. Mills and his
16 opinions.
17     Q   Okay.  Can you tell me about all the
18 discussions you had regarding your assignment.
19        MS. CAVE:  Objection to any
20 communications -- any conversations with counsel,
21 but other than that, please go ahead.
22        THE WITNESS:  Well, I had several
23 conversations by phone that included members of my
24 firm and counsel, and then I had several internal
25 conversations with members of my case team as I

Page 12

1  directed their work.
2  BY MR. WATTERSON:
3      Q   Okay.  Were you given any factual
4  assumptions?
5      A   Not by the attorneys.  I reviewed the
6  record, but I wasn't asked to make any particular
7  assumptions.
8      Q   I guess -- so you qualified that.  Did you
9  make some factual assumptions based on the record?
10     A   I don't think I have made any factual
11 assumptions.  I mean, I have read the record, and I
12 interpret it to mean what I interpret it to mean.
13        I don't think those are -- I wouldn't
14 qualify those assumptions.  But so I think, as I sit
15 here, I can't think of any factual assumptions that
16 I have made.
17     Q   Okay.  In Exhibit 236 your CV is attached
18 as Exhibit B-1; correct?
19     A   Yes.
20     Q   And is there anything missing from your CV
21 that you're aware of?
22     A   No.
23     Q   Is there anything just inaccurate in any
24 way about it, as far as you know?
25     A   No.

Page 13

1      Q   I know that it lists some articles that
2  you have written.  Does it list all them?
3      A   It certainly lists all of the published
4  articles that I have written.
5      Q   Do you have any experience in database
6  administration?
7      A   Well, I worked -- I wouldn't say
8  administration.  I worked as a general manager for a
9  systems integration company where my job was to
10 supervise people who designed and implemented
11 database systems.  And I also did that type of work
12 when I was at Pricewaterhouse for two years.
13        So I have familiarity with SQL and other
14 types of databases, relational database structures,
15 the design, documentation, implementation of those
16 systems.
17        And I certainly, in my years at Analysis
18 Group, just about every case I work on involves some
19 sort of data sets.  Some of them are very huge and
20 complex, and some are simpler.  I have never been a
21 database administrator per se.
22     Q   Okay, but you have experience working with
23 databases, though; is that fair?
24     A   Yes.
25     Q   And was there -- strike that.

4  (Pages 10 to 13)

## Page 14

1  Was there -- do you have any experience,
2 other than what you described in response to my
3 previous question?
4  MS. CAVE:  Objection to the form, but you
5 can answer.
6  THE WITNESS:  I have lots of experience.
7 Yeah, I have done lots of things.  I don't
8 understand your question.
9 BY MR. WATTERSON:
10  Q  You summarized some of your experience
11 with databases.
12  A  Yes.
13  Q  I'm just -- I'm just asking is there any
14 additional experience that you have that you didn't
15 describe?
16  A  I think everything that I have done fits
17 into one of those categories.  I mean, I have worked
18 with dozens, if not hundreds of relational
19 databases.  I could go through each one of those,
20 but I think they would all fall within that general
21 category.
22  Q  Can you explain what a relational database
23 is.
24  A  Relational database is a set of data that
25 are comprised of a number of different typically

## Page 15

1 tables.  There are relationships between the data
2 elements in those tables, and relationships between
3 the tables themselves, such that the data can be
4 stored in different locations.
5  And all the data have some relation to the
6 other data in the data set, and that's generally why
7 it is called a relational database.
8  Q  Okay.  And you have reviewed, I guess,
9 copies of the Zen Cloud and PayBase databases in
10 this case; right?
11  A  Yes.
12  Q  Would you consider those databases to be
13 relational databases?
14  A  I would.
15  Q  Okay.  And I take it that you, or someone
16 at your firm, must have written some SQL queries in
17 analyzing these databases; is that fair?
18  A  Yes.
19  Q  Did you do that, or did someone else at
20 the firm do it?
21  A  Someone else did that, at my direction.
22  Q  Okay.
23  A  I should say we also actually did our
24 analysis in SAS, rather than in SQL.  SAS is a more
25 powerful tool for analyzing the data.

## Page 16

1  So we actually took the data from SQL,
2 downloaded it, executed our queries in SAS, and got
3 our results.  We subsequently went back and executed
4 the same types of queries in SQL, just to confirm
5 that we would get the same answer under both
6 softwares.
7  Q  And is SAS a programming language, or what
8 is it exactly?
9  A  It's -- I would consider it a programming
10 language.  It used to stand for statistical analysis
11 software.  It has been truncated to "SAS," but it's
12 a programming tool, among other things.
13  Q  Okay.  And would you make queries in SAS
14 similar to how you would make queries in SQL?
15  A  Yes.
16  Q  And just to confirm, you got the same
17 results in SQL as you did in SAS; correct?
18  A  We did.
19  Q  Okay.  I might have asked this.  I mean,
20 do you know how to write queries in SAS?
21  A  Yes.
22  Q  Okay.  You just didn't do it in this case?
23  A  I didn't do it, and that's generally not
24 what I do.  I haven't written any SAS code of any
25 significance in probably 15 years.  We have

## Page 17

1 specialist data scientists that perform the queries,
2 at my direction.
3  Q  Are you able to recall any of the specific
4 queries that were run on these databases?
5  A  No, not as I sit here.
6  Q  Is that documented somewhere?
7  A  We have maintained all the code that we
8 executed.
9  Q  Okay.  How is it maintained?
10  A  It's on our computer systems.
11  Q  Okay.  And in your case assignments, I saw
12 that you were involved in a case involving Mt. Gox.
13  A  Yes.
14  Q  Can you tell me about that case.
15  A  That's a good question.  I am not certain
16 if I can tell you about it.  I mean, it has been
17 adjudicated, and the Class was not certified.  And
18 I'll tell in a high sense that I have summarized it
19 in my CV.
20  I looked at -- I was retained to address
21 Class certification, determine if it was possible to
22 identify Class members and calculate damages based
23 on the available data, and so I analyzed the
24 available data and the Class definitions and had
25 opinions relating to what could and could not be

Page 18

```
 1    done with the available data with respect to Class
 2    certification.
 3        Q   Can you -- are you allowed to tell me
 4    about what the available data was?
 5        A   I don't believe so.  I don't think my
 6    report is public, to my knowledge.  And our standard
 7    engagement letter includes nondisclosure language.
 8        So I don't -- I am not comfortable
 9    providing you with further detail about, you know,
10    about the case basically beyond a general
11    description of what it is I did.
12        Q   Is it fair to say that you offered a
13    similar opinion in the Mt. Gox case as to the
14    opinion you provided in this case?
15        MS. CAVE:  Objection to the form, but you
16    can answer.
17        THE WITNESS:  Well, there are similar
18    elements to the two opinions.
19    BY MR. WATTERSON:
20        Q   For example, that you can't ascertain the
21    members of the Class?
22        A   I don't recall, frankly, whether that was
23    one of my conclusions in Mt. Gox or not.
24        The one thing that is common is that
25    because of the nature of cryptocurrency, there are
```

Page 19

```
 1    many transactions that occur that for which there is
 2    not any evidence in the record.
 3        So Class members who purchase a
 4    cryptocurrency or cryptocurrency-related product can
 5    liquidate that position, receive bit coin, fiat
 6    currency or other valuable consideration, and there
 7    is no record of that in the data.
 8        So that's the main similarity that I see
 9    between the prior case for Mt. Gox or involving
10    Mt. Gox, and this case is that feature.
11        Q   If someone liquidates cryptocurrency
12    wouldn't you be able to see that on the block chain?
13        A   Well, certainly in this case there has
14    been no -- as far as Mr. Mills, in terms of his
15    methodology, which has been the focus of my
16    analysis, there has been no suggestion, proposal or
17    methodology about how that information might be
18    incorporated.
19        So it is nothing that I have considered
20    for this case because it hasn't been -- it isn't
21    part of the methodology that has been proposed by
22    Mr. Mills.
23        Q   But as a general matter you agree that
24    when someone transfers cryptocurrency you can see
25    that on the block chain; right?
```

Page 20

```
 1        A   Well, I don't know what you mean by "see
 2    that."  You can't see -- there are certain things
 3    that you can see on the block chain.
 4        Others including the anonymity of the
 5    receiving party is -- there are things that you
 6    can't see from the block chain or make a
 7    determination about.  I am not really an expert in
 8    block chain or cryptocurrency, so I don't -- you
 9    know, I don't think I'm the right person to answer
10    detailed questions about that.
11        And as I say, it is certainly isn't
12    anything that Mr. Mills has proposed, or it is not
13    part of the methodology that has been proposed in
14    this case.
15        Q   So you're not an expert in cryptocurrency?
16        A   I wouldn't consider myself to be an expert
17    in cryptocurrency.  I have exposure to it from cases
18    that I worked on, and just from general research
19    that I have done, but I wouldn't hold myself out as
20    an expert.
21        Q   Okay.  Do you understand that -- do you
22    understand what a -- strike that.
23        Do you have an understanding about what a
24    Bitcoin address, what that would refer to?
25        A   In general terms, yes.
```

Page 21

```
 1        Q   Can you explain what that would mean.
 2        A   It's a code that is -- that is essentially
 3    used as part of the process of transferring or using
 4    Bitcoin.
 5        Q   Okay.  And if someone transfers Bitcoin
 6    from one address to another you can see that on the
 7    block chain; right?
 8        A   I believe so.
 9        Q   Okay.
10        A   You can see that a transfer has occurred,
11    but that doesn't give you insight into all the
12    details of the transaction, is my understanding as a
13    nonexpert.
14        Q   Sure.  What details can't you see?
15        A   I don't know.
16        Q   Okay.  You mentioned that, I
17    believe -- strike that.
18        I believe you mentioned that you had some
19    experience in crypto from some other cases, which I
20    gather are other than Mt. Gox.  Can you tell me
21    about that.
22        A   No, I haven't worked on any other
23    cryptocurrency-related cases besides the Mt. Gox
24    case and this case.  And I know that you mentioned that
25        Q   Okay.  And I know that you mentioned that
```

6 (Pages 18 to 21)

Page 54

1  posts in this thread -- well, strike that.
2          Do you understand what I mean if I say
3  "post in a thread"?
4      A   I think so, yes.
5      Q   For example, on the next page from the
6  beginning of the exhibit there is a post from user
7  suchmoon.
8          Do you see that?
9      A   Yes.
10     Q   This is an example of people communicating
11 on the Internet via their handles; fair?
12     A   If you're taking those names to be
13 handles, yeah, I think that's fair.
14     Q   If you turn to the next page there is
15 Gava, and do you understand that to be a handle?
16     A   That's what I assume it is.
17     Q   But this is an example of people
18 communicating on the Internet through these sort of
19 an anonymous user IDs; is that fair?
20     A   That's what I believe this to be, yes.
21     Q   Okay.  Going back to the database do you
22 agree that each user ID in the Transactions table is
23 associated with an e-mail address?
24     A   Yes, I believe that's true.
25     Q   What about in the Orders tab, do you agree

Page 55

1  that each of the I guess observations has an e-mail
2  address in that tab?
3      A   I don't know as I sit here.
4      Q   Do you know what the Orders tab
5  represents?
6      A   No, I don't.  Mr. Mills doesn't describe
7  that, and I haven't seen any documentation about
8  what that is.  I do believe that -- I believe
9  Mr. Shinners uses information from the Orders tab in
10 his purported damage calculation, and I reference
11 that in my report here, if I can find that.  I
12 believe it's the Orders table of Zen Cloud.
13     Q   Maybe let's -- well, take your time, but
14 maybe try page 204 of 401.  And then -- did I say
15 "204"?
16     A   You did.
17         MS. CAVE:  Yeah.
18 BY MR. WATTERSON:
19     Q   Let's try 24 of 401.  Do you see that the
20 last sentence in paragraph 46, which carries over
21 from the previous page, that discusses the Orders
22 tab or table.
23         Does this help you with what the Orders
24 tab represents?
25     A   Well, I'll say that it is based upon our

Page 56

1  observations in the database that the Orders tab
2  appears to represent or include at least some
3  records related to Hashlet purchases that can be
4  found in Zen Cloud.
5          And I guess we make the observation that
6  the data that Mr. Mills relied upon was only the
7  Transaction tab and the Users tab within the Zen
8  Cloud database.
9          And so he didn't do anything with the
10 Orders tab, which are purchases which presumably
11 would be important in a damages calculation.
12     Q   But do you know what kind of purchases the
13 Orders tab represents?
14     A   Well, they record Hashlet purchases -- at
15 least some Hashlet purchases is my understanding.
16 There may be other purchases in there as well.
17     Q   Do you know whether the -- do you recall
18 whether the Orders tab represents -- strike that.
19         Do you recall whether the Orders tab has
20 any transactions in Bitcoin included in it?
21     A   By "transactions in Bitcoin," do you
22 mean -- I need a little finer point on that
23 question.  Meaning that the acquisition that the
24 consumer paid Bitcoin, or that the transaction
25 includes a variable called Bitcoin?

Page 57

1      Q   Does it appear that there were any
2  transactions denominated in Bitcoin in the Orders
3  table?
4      A   I believe there were, but I don't recall,
5  frankly, as I sit here, but I think that's true.
6      Q   I already asked -- forgive me if I already
7  asked you, but do you recall whether there are
8  e-mail addresses associated with each observation in
9  the Orders tab?
10     A   No, I don't recall.
11     Q   Okay.  So in paragraph 29 in your
12 declaration, which is on file stamped page 15 of
13 401, you write that -- you describe the e-mail
14 addresses as inherently anonymous.
15         Do you see that?
16     A   Yes.
17     Q   Can you explain what you mean by that.
18     A   Well, I mean that by looking at the e-mail
19 address you can't determine the identity of a
20 proposed Class member.
21     Q   You couldn't determine the identity of a
22 proposed Class member from a mailing address;
23 correct?
24     A   No, that's true.  A mailing address is a
25 mailing address.  It doesn't identify the person,

## Page 58

1  unless there is a name associated with it.
2      Q   You couldn't identify a proposed Class
3  member from a phone number; correct?
4      A   And I guess to my prior question, a
5  complete mailing address would typically include a
6  name as well.  So in that sense an address actually
7  would identify, at least to the extent that you can
8  identify somebody if you have their name.
9          And I should say that's not a great way to
10  identify people in itself because lots of people
11  have the same name.
12         So even the name itself is not necessarily
13  an unambiguous method of identifying someone.
14         That was to your prior question.  So your
15  current question, I'm sorry?
16     Q   Let me just go back to that.  And I guess
17  people can change their names too; right?
18     A   True.  There is usually a legal record of
19  people changing their names, though, is my
20  understanding.
21     Q   People can give out nicknames; is that
22  true?
23     A   Sure.  People can have nicknames.
24     Q   And so I think my previous question was
25  that is it fair to say that you can identify a

## Page 59

1  proposed Class member from a phone number?
2      A   Not alone.  You know, typically that's how
3  people are identified, by either a unique -- I mean,
4  in database systems that I have seen they are
5  identified either with a unique identifier that is
6  one for one, so there is a unique identifying
7  number, and an individual.  They attach, and they
8  don't split up.
9          One-to-one identification is the best way
10  to identify people.  So that would be either a
11  Social Security number, driver's license number,
12  passport number is an example of a one-to-one
13  identifier.
14         Absent a one-to-one identifier in most be
15  database applications there is multiple fields or
16  multiple information that you try and match on.
17         So John Smith is not sufficient to
18  identify the customer.  You also usually use
19  John Smith, and either a physical address and/or an
20  e-mail address and/or some system identification
21  number that is assigned to the individual and
22  remains with the individual.
23         I think the point, with respect to user
24  IDs, is that -- and e-mail addresses in this system
25  is that they don't attach to an individual and

## Page 60

1  necessarily remain with an individual.
2      Q   They do attach to a user ID, though; is
3  that fair?
4      A   Well, each user ID has a unique e-mail
5  address associated with it in the Users table in Zen
6  Cloud.  But the problem is that it is not always the
7  same person that is attached to that e-mail address
8  and/or user ID.
9          That, in combination with the fact that
10  other identifying information in the database, like
11  address and telephone number, is missing 70 percent
12  of the time, approximately.
13         That's the problem with identification and
14  why user ID and e-mail address is, in my view, not
15  sufficient to identify Class member.
16     THE REPORTER:  Counsel, when it's
17  convenient, I would love a restroom break.
18     MR. WATTERSON:  Good for a break?
19     MS. CAVE:  Sure.
20     THE WITNESS:  Yeah.
21     THE VIDEOGRAPHER:  Off video at 10:56 a.m.
22     (A recess was taken from
23     10:56 a.m. to 11:11 a.m.)
24     THE VIDEOGRAPHER:  Back on video at
25  11:11 a.m.

## Page 61

1  BY MR. WATTERSON:
2      Q   So is it fair to say that it's possible to
3  associate the transactions in the Transaction tab
4  with a given e-mail and user name?
5      A   I think they have user IDs.  So if you
6  link those two tables I think that's true.  That may
7  not be sufficient to identify who the individual is,
8  but I think you can link those variables in the
9  database.
10     Q   Okay.  Can you take a look at paragraph 12
11  of Mr. Mills' report.
12         Do you disagree with anything in
13  paragraph 12?
14     A   No, I don't think any of those statements
15  are factually incorrect.
16     Q   What about paragraph 13, do you disagree
17  with anything in paragraph 13?
18     A   I didn't confirm that calculation, so I
19  don't know if it is true, but I don't have any
20  reason to object to it.
21     Q   Do you believe that it would be
22  theoretically possible to associate -- to identify
23  all user IDs that have at least one completed
24  transaction.
25     A   Well, I'll say one completed transaction

Page 62

1   in the Transaction table, which is not all the
2   transactions.  I mean, there are lots of
3   transactions that we see that take place on
4   third-party exchanges and other places for which we
5   don't know who was involved with those.
6           But strictly speaking, the records in the
7   Transaction table to my knowledge can be associated
8   with a user ID.
9       Q   And is that true of the Orders table and
10  an e-mail address as well?
11      A   So can you spell it out for me?  I am not
12  sure what --
13      Q   Sure.  Can you associate completed
14  transactions in the Orders table with an e-mail
15  address?
16      A   I believe so, yeah.
17      Q   Okay.  Can you take a look at paragraph
18  14, which is about the PayBase database.  Do you
19  disagree with anything in paragraph 14?
20      A   Well, I can read the second sentence in a
21  manner that I would disagree with it.  It says:
22          "The user table contains, among
23          other things, an identification
24          number for each user and associated
25          e-mail address, and other

Page 63

1           information."
2           If we mean for each user, if we're talking
3   about an individual, I think there are -- there is
4   evidence that there are multiple individuals that
5   may be associated with the user ID.  So it wouldn't
6   be a unique individual.  So under that reading I
7   would disagree.
8       Q   So if you -- if you said user ID --
9           (Reporter clarification.)
10  BY MR. WATTERSON:
11      Q   Let me just ask it a different way.  If in
12  the -- in paragraph 14, if instead of "user," it
13  read "user ID," would you agree with everything in
14  paragraph 14?
15      A   You're talking about the second "user"?
16      Q   Yes.
17          MS. CAVE:  Objection to the form, but you
18  can answer.
19          THE WITNESS:  So just to be clear, you're
20  proposing that the sentence be changed to read, "The
21  user table contains, among other things, an
22  identification number for each user ID and
23  associated e-mail address and other information"?
24  BY MR. WATTERSON:
25      Q   Correct.  Do you agree with that?

Page 64

1       A   Well, I think the identification number
2   they are referring to here is the user ID.  So I
3   don't know that it would make sense, as I just
4   restated it.
5       Q   So is it fair to say that -- well, let's
6   look at Exhibit B-4B.
7       A   Page 79 of 401?
8       Q   Correct.  Is it fair to say that you can,
9   in the PayBase database, associate a user ID with an
10  e-mail?
11      A   Yes.
12      Q   And is it fair to say that you can
13  associate a user ID with transactions in the
14  PayCoin's table?
15      A   I believe that's true.
16      Q   So do you agree with what Mr. Mills writes
17  in paragraph 15 of his report?
18      A   Yeah, I wouldn't disagree with that
19  paragraph.  It doesn't get around the problems, but
20  I wouldn't disagree with it.
21      Q   Okay.  I take it you disagree with
22  paragraph 16, but let's look at paragraph 17.  Do
23  you disagree with anything in paragraph 17?
24      A   Well, I would say that the language is
25  kind of loose in the last sentence.  It says:

Page 65

1           "User ID 13250 in turn has 1,388
2           associated completed transactions,
3           including purchases of
4           approximately 36 Bitcoins worth of
5           products."
6           Mr. Mills only looked at four tables in
7   the database.  There is databases there are over 50
8   tables in the databases.
9           So that may be true with respect to the
10  tables that he looked at, but he didn't look at all
11  the tables.  So I don't think he can -- I don't
12  think he can actually make that statement.  It may
13  be true, but it may not be true.
14      Q   Do you know which tables, other than the
15  transaction tables reflect purchases in Bitcoin?
16      A   Purchases denominated in Bitcoin?
17      Q   Yes.
18      A   Well, I think there can be, as we talked
19  about in the Orders table, and I think the Devices
20  table in Zen Cloud, and there may be others too.
21      Q   What does the Devices table represent?
22      A   I am not sure.  Mr. Mills didn't address
23  what the Devices table includes, and there is no
24  system documentation for the Devices table.  I
25  believe it includes some purchases, however, of

17 (Pages 62 to 65)

1    Hashlets, of at least of Hashlets.
2        Q   Do you know whether the Devices table is
3    duplicative of the information in the Orders and
4    Transactions table with respect to purchases?
5        A   I do not. I know that there are
6    transactions in the Orders table that aren't in the
7    Transactions table.
8            That's one of the problems with Mr. Mills'
9    analysis, is that he doesn't include those
10   transactions, but I don't know about the Devices
11   table.
12       Q   Okay. So is it fair to say that you used
13   a methodology similar to Mr. Mills to identify some
14   transactions involving Mr. Pfeiffer in the database?
15       A   I don't know what you mean by that.
16       Q   Let's look at Exhibit B-10. Can you
17   explain what Exhibit B-10 represents.
18       A   Yes. Exhibit B-10 looks at 10 e-mail
19   addresses that Mr. Pfeiffer self-identified as being
20   associated with him.
21           And it reports various statistics from the
22   Transactions table in the far right-hand columns,
23   the three far right-hand columns, and gives various
24   statistics, including the number of transactions.
25           As we learned, or we think we have

1    learned, these are actually not all of the user IDs
2    and e-mail addresses associated with Mr. Pfeiffer,
3    but these are the ones that he identified.
4        Q   Okay. Is it fair to say you are able to
5    associate transactions in the Transactions table
6    with these different IDs that are listed in Exhibit
7    B-10?
8        A   Yes, we're able to do that. It's not
9    sufficient for calculating damages or identifying
10   all the activity of Mr. Pfeiffer, but we were able
11   to do that.
12       Q   Have you looked at any documentation
13   regarding credit card transactions involving GAW
14   Miners?
15       A   I have looked at e-mail chains and social
16   media forum exchanges dealing with that topic. I
17   don't recall seeing anything that I would
18   characterize as documentation from GAW Miners on the
19   topic. If you have something in mind I'd be happy
20   to look at it, but nothing jumps to mind that I
21   would consider to be documentation from GAW Miners
22   on that topic.
23       Q   I mean, have you seen a spreadsheet
24   listing credit card transactions involving GAW
25   Miners?

1        A   I don't recall as I sit here.
2        Q   Okay. So if there was information
3    involving credit card transactions that had legal
4    names, addresses, phone numbers, e-mail addresses,
5    et cetera, could you use that to help identify some
6    of these individuals with user IDs in the Zen Cloud
7    database?
8            MS. CAVE:  Objection to the form, but you
9    can answer.
10           THE WITNESS:  Well, there is nothing that
11   Mr. Mills talked about using, and he hasn't proposed
12   a methodology for doing that.
13           I wouldn't rule out that you might be able
14   to do some sort of inquiry in that vein, that, you
15   know, could help solve some of the problems. But I
16   haven't seen such a list. I haven't attempted to do
17   it, and neither has Mr. Mills, and certainly I
18   assume that not all transactions are of that type.
19   BY MR. WATTERSON:
20       Q   So if there was data involving customer
21   e-mail, billing address, billing city, billing
22   state, ZIP Code, country for all the credit card
23   transactions, would that -- could that help identify
24   individuals in the Zen Cloud database?
25           MS. CAVE:  Objection to the form, but you

1    can answer.
2            THE WITNESS:  Well, I couldn't rule out
3    that you might be able to use that information for
4    whatever fraction of the transactions were by credit
5    card. But I haven't seen that information, and
6    Mr. Mills hasn't proposed any methodology for
7    accommodating that or estimated to what degree that
8    kind of enterprise would solve the problems of
9    identifying Class members. I couldn't rule it out.
10   BY MR. WATTERSON:
11       Q   Do you know whether it's possible to
12   determine whether a particular table in the -- well,
13   strike that.
14           Do you know whether a particular table in
15   the Zen Cloud database represents credit card
16   purchases in transactions?
17       A   It's nothing Mr. Mills addressed, and I am
18   not aware of that.
19       Q   Okay. So let's move on to, in your
20   declaration, paragraphs 32 through 33. And
21   essentially, I'll try to summarize, but your opinion
22   here is that Mr. Mills hasn't identified
23   or -- strike that.
24           Mr. Mills hasn't proposed a way to
25   identify affiliates of GAW Miners and ZenMiner or

1 results of mining activity, or the payouts of a
2 cryptocurrency, then we could see price fluctuations
3 that aren't driven by sort of a fundamental
4 component like the cryptocurrency to which the
5 Hashlet entitled the owner.
6     Q   Okay.  Well, would that be true, given the
7 assumption I asked you to make that in the "but for"
8 world the customers would be aware of the fact that
9 Hashlets were not deriving Bitcoin based on actual
10 mining activities?
11     A   Well, I want to recall that in the record
12 there is evidence that some people who bought, were
13 involved in, were aware that the payouts were not,
14 you know, were based on a kind of a, at least for
15 some period were based on an analogy of what pools
16 were actually paying.  So I am not sure how that
17 factors into the answer.
18     Q   Well, I'm just asking you to accept my
19 assumption.
20     A   Okay.
21     Q   And so in my assumption people would not
22 have been aware of that.  Okay?
23     A   Yes.
24     Q   So other than the payouts in Bitcoin that
25 they received, what value did they derive from a

1 Hashlet?
2     A   Well, as I said, the price -- the value of
3 the Hashlet could fluctuate.  So people could buy it
4 as a speculative investment, as well as their
5 interest in holding it to realize the Bitcoin that
6 would result from the ownership.
7     Q   But wouldn't the -- but if you knew the
8 value that -- because even in the "but for" world --
9 strike that.
10     Even in the "but for" world we would know
11 how much in payouts each Hashlet actually generated;
12 right?
13     A   Well, after the fact.  But the value of
14 the Hashlet would be presumably a function of the
15 expected future value to which there could be, you
16 know, a range of opinions.  And it could also be
17 driven by just speculation about movements in the
18 Hashlet price.
19     So, you know, we only know what was
20 generated after the fact.  You don't know -- it's
21 like any financial investment, you have an
22 expectation about what that investment is going to
23 yield in the future.  Different people can have
24 different expectations, and the corresponding value
25 can be different, depending on our view of the

1 world.
2     Q   So you are saying that there could be a
3 value -- a speculative value based on what
4 cryptocurrency it might generate?
5     A   Based on -- more simply than that, just
6 based on potential fluctuations in the value of the
7 Hashlet.
8     Q   But can you explain to me how the value of
9 the Hashlet would be derived from something other
10 than the cryptocurrency it generates?
11     A   By the supply and demand for the Hashlet
12 itself, which isn't necessarily tied to the
13 expectation of the ultimate payoff from owning the
14 Hashlet.
15     People buy cryptocurrency -- let's just
16 say cryptocurrency is a good example -- because they
17 know that there is a high volatility in the value of
18 the cryptocurrency, not because they have any belief
19 about the underlying economic payoff that may result
20 from it.
21     And so they are using it as a way to,
22 essentially to gamble, to bet that the volatility
23 will put them in a position to make a profit.
24     And that's just what I mean by speculating
25 on the value of a Hashlet.  If the value of the

1 Hashlet can be determined in market transaction then
2 there is a possibility for profit from speculation.
3     Q   So does a Hashlet represent an ownership
4 interest in anything?
5     A   I am not sure how I would interpret that.
6 I mean, I think ownership is kind of a legal
7 concept.  My understanding is that a Hashlet
8 entitled the owner to a portion of these future
9 payouts.
10     Q   So I'm just trying to get whether you have
11 an understanding of whether a Hashlet I guess
12 entitled an owner to anything other than
13 cryptocurrency payouts.
14     Do you have any such understanding?
15     A   I'm really not aware of that.
16     Q   Okay.  Can't we determine the value of
17 PayCoin in the "but for" world, based on some of
18 the -- strike that.
19     Can't we determine the value of PayCoin in
20 the "but for" world, based on some of the data you
21 cited from CoinMarketCap?
22     A   I don't know whether you could or
23 couldn't.  That's nothing that I have attempted to
24 determine.
25     Q   Well, I mean, are you aware that the price

Page 122

1    of PayCoin decreased pretty substantially from its
2    launch date.
3        A    I think it actually went up after its
4    launch date.  At least those are the data that I
5    have seen, and then it declined.  It fluctuated,
6    actually, for some period of time.
7        Q    But you could look at the price of PayCoin
8    on those outside exchanges after various
9    misrepresentations came to light; is that fair?
10       A    Well, if you knew what the information set
11   was that all the market participants were
12   transacting on, then there could be some information
13   there.
14           But, I mean, that's a big -- that's a
15   difficult thing, and nothing that I have
16   attempted to do.
17       Q    But let's say that I was to -- strike
18   that.
19       A    Certainly some of the information, the
20   alleged misrepresentations were known during the
21   trading period.  For example, right after the middle
22   of December it was obvious that a minimum price was
23   not $20 because people were trading it for less than
24   $20.
25           So that's an example of a

Page 123

1    misrepresentation that could have been known or
2    presumably was known, to the extent it was a
3    misrepresentation to market participants, and yet
4    there was value to the coin.  It was transacting at
5    a, you know, at a nonzero price.
6        Q    Well, did -- strike that.
7            Tell me about your understanding of the
8    misrepresentations regarding the $20 floor.
9        A    Well, in general, that there was
10   represented that the coin -- at some points in time
11   it was represented that PayCoin would have a minimum
12   price of $20, based upon a fund that was going to be
13   established, presumably to make sure that the price
14   didn't drop below 20.
15           That is the extent of my understanding,
16   and I don't know what time period that
17   representation applies to, or when it was generally
18   not known, except that when -- generally known not
19   to be true, except that after the trading began, and
20   the price was below 20, it would have been obvious
21   to anyone that that was a misrepresentation, or at
22   least that it wasn't realized.
23       Q    Do you know whether the $20 floor
24   misrepresentation had anything to do with PayBase?
25           MS. CAVE:  Objection to the form.  You can

Page 124

1    answer.
2            THE WITNESS:  I don't.  I'm not even sure
3    what that question means, "had anything to do with
4    PayBase."  I don't know.
5    BY MR. WATTERSON:
6        Q    Okay.  Well, was a misrepresentation that
7    GAW Miners would use PayBase to support a $20, do
8    you have any understanding of that?
9        A    No.
10       Q    Let's -- what is your understanding of
11   what a Hash point was?
12       A    Just what I described in my report, that
13   it is like a promissory note that tied up capital
14   for some period of time, and it was ultimately to
15   pay off in PayCoin.
16       Q    And could a Hash coin -- strike that.
17           Could a Hash point be used for anything
18   other than obtaining PayCoin at some later date?
19       A    Anything other?  I don't know.  I don't
20   know.
21       Q    Let's take a look at paragraphs 45 through
22   47.  Can you just summarize your opinions in these
23   paragraphs, generally.
24       A    Well, I think this is, you know, the
25   general point in this section is that Mr. Mills has

Page 125

1    not done anything with the -- well, has not done
2    anything other than count the number of records in a
3    couple of tables to determine whether the data that
4    he plans to rely on is going to allow him to do what
5    he needs to do in order to calculate damages.  I
6    think that's sort of the bottom line.
7            He hasn't demonstrated that the data that
8    he intends to rely on will allow him to calculate
9    damages in the fashion, you know, that he proposes.
10           And that is something I would expect, and
11   I have seen in other plaintiff methodologies that
12   are being proposed for the Class certification
13   phase, and I don't see it here.
14       Q    Are you aware of a more complete set of
15   data regarding transactions on Zen Cloud?
16       A    No, I am not, and I think that's part of
17   the problem, is that the data that he plans to rely
18   on is not sufficient for his purposes, and he hasn't
19   identified any other sources to fill the gaps.
20           In addition to which he clearly doesn't
21   understand this relational database enough to say
22   what he says it can do.
23       Q    What --
24       A    Nor do I, should I add.
25       Q    So what is your basis for your claim that

1  Mr. Mills doesn't understand the relational
2  database?
3      A   Well, he -- I mean, first of all, he only
4  looks at two tables in the Zen Cloud database, and
5  two tables in the PayBase database.
6          And asked at his deposition what kind of,
7  you know, analysis he's done, he claimed only to
8  have, as he said, I think, a high-level
9  understanding of the other tables, none of which he
10 mentions in his expert report.
11         And so he just hasn't demonstrated, as I
12 say in the heading of this section, he hasn't
13 demonstrated that he has any understanding of the
14 database, or at least an understanding sufficient to
15 allow him to opine that he'll be able to calculate
16 the quantities that he claims to need to calculate
17 for purposes of Class-wide damages.
18     Q   Well, he's talked with a former employee
19 about the relational databases; right?
20     A   I don't think he did that before he issued
21 his expert report.
22     Q   Well, he's done it now.
23     A   Apparently, but I don't know to what
24 extent that changes any of his opinions in the
25 report.

1      Q   What does the Activities table in Zen
2  Cloud represent?
3      A   I am not sure.  I mean, I haven't seen any
4  system documentation.  Mr. Mills doesn't describe
5  what it is.
6          I do see that it is used by Mr. Shinners
7  in his damages calculation, but I'd be speculating
8  if I were to speculate about what the Activities
9  table does and what it captures.
10     Q   Do you think it's fair to expect Mr. Mills
11 to have I guess more than a high -- well, strike
12 that.
13         Do you think it's fair for Mr. Mills to be
14 able to testify at anything other than a high level,
15 if he wasn't provided the databases to look at
16 during his deposition?
17     A   Yes, absolutely.  I think if you're
18 proposing a damages methodology that is a Class-wide
19 methodology based upon specific databases, then I
20 think in order to opine about that you need to know
21 those databases and have confirmed that you can
22 perform the calculations that you have to perform to
23 calculate the two elements needed for out-of-pocket
24 damages.
25         And if you do your homework you should be

1  able to understand that, testify about it, certainly
2  not just from a memory test, but you should have a
3  high-level understanding of what tables are
4  implicated, what transactions are not included in
5  the data set, and how you propose to accommodate
6  that.
7          So I think any competent expert should be
8  able to describe in detail the methodology that they
9  propose to use at this stage, or they haven't done
10 their job.
11     Q   You -- in paragraph 45 you refer to
12 "integrity checks."  What do you mean by that?
13     A   Well, any database there are various
14 checks that can be performed in order to determine
15 if there is internal integrity within the data.
16         So, you know, that can be a range of
17 things:  Running totals, record counts, looking for
18 entries in one table to correspond to entries in
19 another table.  You know, various types of checks
20 that can be performed to identify if the data lacked
21 internal integrity.
22     Q   And have you done any of these integrity
23 checks?
24     A   I have done some, yeah.  I talked about
25 some in my report.  So I identify, for example, a

1  count activity for user IDs payouts before Hashlets
2  were issued, which suggests that there is something
3  amiss with the data, that perhaps those payouts were
4  associated with mining activity, Cloud-hosted mining
5  activity, or that there is just, you know, data
6  entry errors or other things.
7          Because you wouldn't expect to see that,
8  that I'm earning payouts before I actually own --
9  own the Hashlet.  So that would be an example of an
10 integrity check.
11     Q   Sorry, I didn't mean to cut you off.
12         Well, I guess my question is, I mean, did
13 you examine whether those payouts before purchase of
14 a Hashlet were associated with Cloud-hosted mining?
15     A   I couldn't make determination.  So, you
16 know, data integrity checks are often sort of
17 iterative processes where you see something in the
18 data that you don't expect to see, and then based
19 upon documentation, or, you know, other information,
20 you attempt to decide:  Well, is this actually an
21 error, or is there a good reason why, you know,
22 you're seeing what you're seeing.  I didn't have any
23 other basis for tracking that apparent error down.
24         It's plausible there may be a reasonable
25 explanation for it, but it certainly isn't something

1  understated for those individuals?
2      A   Well, if you could make that
3  determination, yeah.  But the point is that, in
4  fact, they may have withdrawn twice.
5          The question is how is that reflected in
6  the data?  Is it reflected as a single withdrawal,
7  as no withdrawals, as two withdrawals?
8          Without tracking it down you don't -- I
9  don't think you can come to any conclusion about
10  what would be reflected in the data, and whether
11  Mr. Mills, if you want to call it a methodology, his
12  methodology would capture that.
13      Q   So you don't know either way whether these
14  double withdrawals are reflected or not reflected in
15  the data?
16      A   No, Mr. Mills doesn't discuss that.
17      Q   Did you look?
18      A   I looked, and I couldn't find any way to
19  track them or identify them.
20      Q   How did you try to identify them?
21      A   Well, let's see, I frankly don't recall
22  how -- how we tried to identify them.  I recall
23  asking the question can we identify them, but I
24  frankly don't recall what specifically was done to
25  attempt to identify them.

1      Q   You in paragraph 73 you have a discussion
2  of some manual credits that aren't reflected in the
3  database.  Where did you look to see whether these
4  credits were recorded in the database?
5      A   I believe we see credits in the
6  Transactions table or at least there is a variable
7  or transaction type called "Credit," so I know we
8  looked in the Transactions table.  I don't know if
9  we looked anywhere else.
10          But of course the Transaction table is the
11  only table that Mr. Mills identifies, apart from the
12  Users table in the Zen Cloud database.
13      Q   Did you consider looking in the Audit Logs
14  table?
15      A   I did not.
16      Q   Okay.  Do you know whether the Audit Logs
17  table has any information about manual credits that
18  were made to users' counts?
19      A   I do not.  Mr. Mills didn't discuss that.
20      Q   Let's turn -- you actually mention it in
21  paragraph 70, the Mongo DB database.
22          Do you see that?
23      A   Yes.
24      Q   What do you know about -- well, strike
25  that.

1          Have you conducted any analysis of this
2  Mongo DB version of Zen Cloud?
3      A   No.
4      Q   Do you know when that database was
5  produced in the litigation?
6      A   Let me . . . I am not sure it was.  I,
7  frankly, don't know what this distinction is or the
8  implications of it, other than that Mr. Mills talked
9  about it.
10      Q   Well, so you write that Mr. Mills
11  testifies that Evan Lucas said that GAW Miners
12  transitioned from Mongo to the Maria system; right?
13      A   Yes.
14      Q   So other than that, you don't know
15  anything about the Mongo database?
16      A   No.
17      Q   Do you know -- do you know whether you
18  could relate tables in the Mongo database to the
19  Maria version of the database that we have been
20  discussing?
21      A   I mean, I don't know anything about the
22  structure of either of those per se, so no.
23      Q   Let me ask it a different way.  Do you
24  know whether you can relate the data in the Mongo
25  version of the database to the version that we have

1  been discussing in this deposition?
2      A   No, I don't know anything about the Mongo
3  database.
4      Q   Okay.  Is it possible that the Mongo
5  database could be used to verify some of the
6  information in the database we have been discussing?
7      A   I have no idea.
8      Q   So let's turn to paragraph 48 through 57,
9  which -- and that starts on file stamp 24 of 401.
10  Can you just summarize your opinion for me in these
11  paragraphs.
12      A   This section just deals with the idea, the
13  fact that one individual can have multiple user IDs,
14  as evidenced by Mr. Pfeiffer and lots of other
15  people in the system.
16          So there is not a one-to-one
17  correspondence between the user ID and an
18  individual.  It actually can go in both directions.
19  One user ID may be owned by different people at
20  different times, and an individual can own multiple
21  user IDs.
22          And this section discusses that.  And
23  importantly, from a damages standpoint, makes the
24  point that in order to calculate or determine if a
25  Class member was harmed and to quantify damages you

1    need to be able to identify all the user IDs that
2    were associated with that individual.  And that is
3    not something that is in general doable in the
4    database system.
5         Q   Well, you could look to e-mail address is
6    one way to do it; right?
7         A   Well, per the example of Mr. Pfeiffer, we
8    list the various accounts we think might be
9    affiliated with him, those that he identified, as
10   well as other accounts.
11        It is not -- they don't all have the same
12   e-mail address.  In fact, I think they all have
13   different e-mail addresses.
14        Q   Don't they all have the same domain,
15   though?
16        A   I don't think so.  I mean, we can look at
17   the exhibit.  This would be Exhibit 9-B [sic].  I
18   see some that have the mpfeiffer.com, others are
19   Yahoo.  I see a Gmail.  Then I see a bodyclaim.com,
20   alchemy.identicloak.com.  More bodyclaim.  So no,
21   they don't have the same domain names.
22        Q   Okay.  But you were able to associate
23   them, I guess all but this No. 10, the Samer e-mail
24   address, by the address?
25        A   Well, no.  What I would say here is what

1    these, apart from the ones that he specifically,
2    through an individualized inquiry identified, we
3    have identified what I would consider suspects.
4    Some of them have information that is similar to the
5    information in some of the other records that
6    he's -- or user IDs that he's identified.  Some of
7    that information is different.
8         So I don't consider this table to be
9    conclusive at all, with respect to which accounts
10   Mr. Pfeiffer owned, or is it necessarily even
11   complete.  It is just an attempt, based on the
12   information that is available, to say:  These look
13   like these are also Mr. Pfeiffer's user IDs.
14        So it's actually a pretty ambiguous
15   process to identify which IDs are associated with
16   which individuals.  And that's really the nature of
17   the problem.  I mean, it's an individualized
18   inquiry, with respect to each one of these accounts
19   here in the bottom half of Exhibit B-9.
20        Q   Well, you could run a query that looks for
21   similar e-mail addresses, for example; right?
22        A   You're asking me if it's possible to run a
23   query?
24        Q   Sure.
25        A   Similar?  Sure.  I mean, you could do

1    that, but what would the result be?
2         You know, Mr. Pfeiffer's wife may have
3    used that same domain name, his children may, and as
4    we see there is lots of e-mails that don't really
5    have any connection at all with Pfeiffer.  So it's
6    nothing that I'd want to rely upon in a damage
7    calculation.
8         Q   Well, you could -- strike that.
9         You could run a query to find out whether
10   there are similar phone numbers as well; right?
11        A   Yeah, you could.  But there is no
12   guarantee that, in fact, as we see there is phone
13   numbers that differ across these records from the
14   ones that are on accounts associated with Pfeiffer.
15        So, I mean, I am not sure what that would
16   do for you.  It's not a solution to the problem, let
17   me just put it that way.
18        Q   And the same is true of mailing addresses;
19   right?
20        A   "The same" being that you could identify
21   if any other user IDs had the same mailing address?
22        Q   Correct.  You could do that?
23        A   Well, 70 percent of the records don't have
24   mailing addresses.  So for that group that wouldn't
25   help much.  But you could see if there were any

1    matches, yeah.
2         Q   Can you turn to -- can you turn to
3    Exhibit B-15, which is file stamped page 101 of 401.
4    Can you explain to me what this exhibit is.
5         A   This exhibit just counts the number of
6    observations or transactions in the Transactions and
7    Orders table that either predated November 4th,
8    2014, or occurred on or after November 4th, 2014.
9         And the conclusion is that 49 percent of
10   the transactions, and 74 percent of the value of
11   those transactions, as measured by dollars in these
12   tables, occurred prior to November 4th, 2014.
13        Q   Okay  and so this is, on the Value
14   columns that's only looking at purchase
15   transactions; is that fair?
16        A   Let's see.  I describe in footnotes B and
17   C the criteria that we used to select the records
18   here.  And so those criteria are what they are.  I
19   can read them to you, but they are there.
20        Q   Okay, fair enough.  And you could take
21   these aggregated purchases and break that out by
22   user ID; right -- strike that.
23        With respect to the Transactions table,
24   you could take those purchase transactions and break
25   them out by user ID?

Page 142

```
1      A   We could take the transactions that appear
2   in this table and break them out by user ID, yes.
3      Q   And the same would be true, you could
4   break out the purchase transactions in the Orders
5   table by e-mail address; correct?
6      A   I don't recall whether it is e-mail
7   address or user ID, but I think one of the two of
8   those exist in that table, so yes.
9      Q   If you look at footnote D, it says:
10         "Purchasers are identified by
11         e-mail address in the Orders table.
12         Number of users calculated as the
13         unique e-mail addresses from both
14         tables."
15         Do you see that?
16     A   Yes, I do.
17     Q   Can you just explain what that means.
18     A   Well, in the Orders table we -- this note
19   does clarify that we use the e-mail address as the
20   identifier.  And we counted a unique e-mail
21   address -- each unique e-mail address as one,
22   quote-unquote, "user."
23     Q   And so that's how you got the users who
24   only purchased prior to/after announcement figures
25   that are listed?
```

Page 143

```
1      A   Yes.
2      Q   Okay.  So is it fair to say that this
3   table shows that there were 5,655 users who made
4   purchases prior to November 4, 2014?
5      A   Who only purchased prior to that date.
6      Q   And there is 8,230 users who only
7   purchased after November 4, 2014?
8      A   Yes, based on that definition of purchase.
9      Q   Okay.  And so this doesn't account for
10   people that purchased both before and after?
11     A   That's correct.
12     Q   Okay.
13     A   I guess maybe I should also say that based
14   on that note, I think there are purchases in the
15   Transactions table.  It is just not all purchases in
16   the Transaction table.
17         Before lunch we were talking about, you
18   know, where do -- I think we didn't call them
19   purchases, we called them, what, fundings or
20   inflows, or I don't know what we called it.
21         But just to clarify, I think there are
22   some, quote-unquote, "purchases" in the Transactions
23   table, but there are also purchases in the Devices
24   table, in the sense of -- purchases in the sense of
25   someone supplying either fiat currency or Bitcoin in
```

Page 144

```
1   exchange for -- well, in exchange for a Hashlet or
2   some other related at-issue product.  So . . .
3      Q   Thank you for that clarification.
4         Can you take a look at paragraph 54, which
5   is page 27 of 401 on the file stamp.  So you write:
6         "From an economic perspective,
7         relying on individuals to
8         self-disclose all their user IDs is
9         not a reliable option because there
10         is an incentive for proposed Class
11         members to exclude user IDs
12         associated with economic gains and
13         selectively disclose user IDs
14         associated with economic losses in
15         order to maximize their claimed
16         damages."
17         Do you see that?
18     A   Yes.
19     Q   When what you're saying is that people
20   will lie about which accounts are associated --
21   which are their accounts?
22     A   Well, I think Mr. Pfeiffer is an example.
23   Whether they are lying or just don't remember or
24   disclose them, I am not going to, you know, suggest
25   a motive for Mr. Pfeiffer in not identifying those
```

Page 145

```
1   other accounts that we just looked at that appear to
2   be his accounts that he didn't identify.
3         So that's one thing.  There is just lack
4   of identification because:  Gee, I forgot I had
5   a third account.  I only remembered the two.
6         But I think when someone is making an
7   economic claim for, and they are aware of how the
8   system works, I don't think it is prudent to ignore
9   the fact that any particular claimant can
10   selectively remember accounts in order to maximize
11   the benefit to them.  So, you know, any
12   particular -- whether any particular individual
13   would do that I hope not, but it certainly is a
14   possibility.  There is an economic incentive for
15   them to do that.  That's the observation there.
16     Q   I mean, isn't that same incentive there
17   whether you make an individualized inquiry or not?
18     A   Well, I think the incentive is there.  The
19   point is that to -- to determine whether all of the
20   accounts that may be associated with a particular
21   individual are included in the damage calculation
22   requires an individualized inquiry.
23         Just as that table we were looking at for
24   Mr. Pfeiffer includes a lot of accounts where his
25   ownership is either ambiguous or just -- it doesn't
```

37 (Pages 142 to 145)

Page 146

1  even appear that it is his account. You know, to
2  understand those accounts two things had to happen.
3  One is Mr. Pfeiffer raised his hand and said: Here
4  are 10 accounts that belong to me -- I think it is
5  10 or 12, I can't remember.
6      And then we did further investigation and
7  found other accounts. So that whole process is
8  something that I would consider individualized
9  inquiry. And presumably, to the extent that
10 individuals own multiple accounts, that same process
11 would have to be repeated for other Class members.
12     Q  I guess my question was, you know, let's
13 say that, you know, you're right and Class isn't
14 certified, and we have a bunch of individual trials
15 and damages. I mean, doesn't someone still have
16 this economic incentive to maximize their claimed
17 damages by withholding accounts where they made
18 gains?
19     A  Well, I think they have -- they still have
20 that economic incentive, but in an individualized
21 trial you can hire guys like me and other data
22 processing folks to go through and say: Well, let's
23 run all these permutations, see if we can identify a
24 bunch of accounts that have the same phone number
25 and/or have the same e-mail domain name and put

Page 147

1  together a list of suspects, and then look through
2  the data and say: Yeah, no, this one belongs to
3  somebody else. This might belong to the plaintiff.
4      So in an individualized trial, or whether
5  it is just through individualized inquiry, those,
6  you know, issues can be resolved.
7      They can't be resolved on a Class-wide
8  basis in any sort of administratively feasible
9  fashion without individualized inquiry.
10     Q  Well, someone like you could look for
11 these suspect accounts, as you put it, on a
12 Class-wide basis; right?
13     A  You could look for them, but given that
14 70 percent of the records in the -- in the User
15 table don't have a phone number, physical address,
16 you know, your chances of identifying all those
17 records is small. And once you identify them they
18 are only -- it is only an ambiguous indication about
19 whether that account actually owned -- is owned by
20 the individual.
21     It is not definitive. And, therefore, it
22 requires judgment, further analysis, investigation,
23 even after you have identified a list of suspect
24 accounts.
25     Q  And each account has an e-mail address

Page 148

1  associated with -- you could employ a similar type
2  of process; correct?
3      A  You could, but as we have seen, the e-mail
4  addresses in Mr. Pfeiffer's accounts, many of them
5  give no clue that that account is owned by
6  Mr. Pfeiffer.
7      Q  Right. You had to look at --
8      (Reporter clarification.)
9  BY MR. WATTERSON:
10     Q  You had to look at other data in the
11 database to make that determination?
12     A  I wouldn't even call it a determination.
13 I would say to give further evidence that that user
14 account might be owned by Mr. Pfeiffer.
15     Q  But that's an analysis that you can and
16 did perform?
17     A  And the analysis that we performed is an
18 individualized investigation.
19     Q  Why do you say that?
20     A  Well, because these -- the list that we
21 have identified here is not a list that I would hold
22 up, as I have said, and say: These are Michael
23 Pfeiffer's accounts, and we're going to calculate
24 damages based on these accounts.
25     It is not -- it is not resolved, even at

Page 149

1  this stage for Pfeiffer, because presumably we'd
2  want to sit down and ask him: Is this your account?
3  Is that your account? Is the other one your
4  account? Some of them may be his account, some of
5  them may not be.
6      So, I mean, the work that we have done is
7  not complete with respect to identifying his
8  accounts, only identifying suspect accounts.
9      Q  Okay. My -- strike that.
10     You could analyze this biographical
11 information: E-mail, phone number, address, and
12 look for similarities, and you could do that on a
13 Class-wide basis; correct?
14     A  You could do that, but that's not all you
15 would need to do.
16     Q  Okay. Let's go to paragraph 65, which is
17 about reseller transactions.
18     A  65? I'm sorry.
19     Q  Paragraph 65. It's on file stamp page 32
20 of 401.
21     A  So before we go, I should point out one
22 typographical error in paragraph 66.
23     Q  Sure.
24     A  On the fourth line down it begins,
25 "August 9, 2014 to August 27th, 2015." That should

38 (Pages 146 to 149)

Page 150

1  be actually be August 27th, 2014.
2      Q   Fair enough.  Thank you.
3          So can you -- what data did you rely on to
4  reach your opinion about these reseller
5  transactions?
6      A   Well, these are with respect to the Zen
7  Cloud Orders table and the Transactions table are
8  the two tables that we relied on here within the SQL
9  databases.
10     Q   Okay.
11     A   And the other -- the documentary evidence
12  that we cite that talks about resellers, and what
13  they did, and what the requirements were.  It's the
14  footnotes to this section.
15     Q   Okay.  Any other evidence that you relied
16  on to form your opinions in paragraph 65 through 66?
17     A   Well, I would just say that I think those,
18  what I relied on for this is referenced in footnote
19  78 through 83.
20     Q   Okay.  I was just asking if there was
21  anything else.
22     A   No, not that I'm aware of.
23     Q   Okay.  And can you explain to me how these
24  reseller transactions worked.
25     A   Well, I mean, the descriptions that we

Page 151

1  have read basically explain that resellers were
2  purchasing Bitcoin -- excuse me, were purchasing,
3  let's say the products, Hashlets, and I guess other
4  products as well, but I know Hashlets, from GAW
5  Miners, were then frequently at least, I don't
6  know if it's exclusively, but were frequently going
7  outside to places like eBay and selling these to
8  individuals that wanted to buy them.
9          So the reseller basically served as a sort
10  of a, you know, this function of taking a big block
11  of inventory, purchasing it at a discount, moving
12  out, and then selling it to individuals, often
13  outside of the GAW environment, but sometimes
14  apparently within the GAW environment too.
15     Q   I guess my question is how do you sell a
16  Hashlet on eBay?
17     A   That's a good question.  You know, I don't
18  know the mechanics of it.  This person that we
19  identify in paragraph 66, though, explains that
20  they -- most of their sales took place on eBay.
21          So it's a party-to-party transaction
22  outside of the GAW environment.  So that's about the
23  extent of my knowledge of it.
24     Q   But I guess -- these people, they
25  couldn't -- well, strike that.

Page 152

1          They couldn't obtain the Hashlets from GAW
2  Miners and ship them to people; right?
3      A   Well, it's not a physical asset, so . . .
4      Q   Right.  I guess I'm just confused about
5  how this would even be possible, then.
6      A   Well, we see -- I mean, you see lots of --
7  well, in the case of PayCoin you see a lot of
8  PayCoin transactions that are happening outside in
9  other exchanges outside of the GAW exchange.  You
10  see transactions between GAW users that aren't
11  recorded on the GAW database that are just
12  individual-to-individual transactions with no record
13  in the SQL databases.
14          So it's just a, you know, it's just an
15  analogous transaction that happens outside of the
16  GAW environment for Hashlets.
17          And the mechanics of that I don't,
18  frankly, know about, other than the documentary
19  evidence indicates that it happens.
20     Q   Okay.  Well, I mean, with respect to
21  PayCoin, it's a cryptocurrency, so transfers occur
22  on the block chain; right?
23     A   Yeah, they are recorded on the block
24  chain, that's true.  And they generally occur on
25  exchanges.

Page 153

1      Q   And what is your -- strike that.
2          Forgive me if I already asked you this,
3  but what is your understanding of how Michael
4  Pfeiffer completed these private transactions?
5      A   Well, there is some discussion that I read
6  that describes the use of some other individual as
7  an escrow agent.
8          So presumably there is a transfer of cash
9  or something of value, Bitcoin, cash, whatever, to
10  the escrow agent.  There is the transfer of the key
11  or the identifying information about the Hashlet to
12  the escrow agent, and then they transfer those to
13  other individuals.
14          That is the flavor I got from what I read,
15  but I haven't really investigated the mechanics
16  precisely how those transactions happened.  But
17  that's my general understanding.
18     Q   Could the mechanics of how those
19  transactions occurred be relevant to determining
20  whether you can identify those transactions in the
21  SQL database?
22     A   Well, I guess I couldn't rule out that
23  they could be pertinent to identifying them.  The
24  way that we tried to identify them was to actually
25  look at Michael Pfeiffer's user IDs, first of all,

39 (Pages 150 to 153)

Page 178

1    true.  But that's not what is pertinent for this
2    analysis because these are unique.
3            Regardless of how your e-mail provider may
4    identify these, within the SQL database these are
5    unique because the SQL database does distinguish
6    where the period is.
7            And that's what I mean when I say that
8    each user ID is associated with a unique e-mail
9    address.
10           What Gmail or AOL or anybody else, how
11   they interpret an e-mail address is -- I am not
12   opining about that.
13       Q   Well, I guess my question is just that if,
14   you know, this individual here, regardless of which
15   user ID is associated with his e-mail, he would get
16   all of the e-mails associated with all three of
17   these user IDs at the same address; right?
18       A   I don't know.  That wasn't pertinent to my
19   analysis.
20       Q   Okay.  Do you believe it's possible that
21   these would all go to the same address?
22       A   I certainly couldn't rule that out.  I
23   have no basis to know, or at least I don't know.
24           MR. WATTERSON:  Okay.  That's all I have.
25           MS. CAVE:  Nothing further.

Page 179

1            THE VIDEOGRAPHER:  This concludes today's
2    deposition.
3            Off video at 3:27 p.m.
4            (The deposition was concluded
5            at 3:27 p.m.)
6
7
8                    *   *   *
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24   ///
25   ///

Page 180

1                    *  *  *
2
3
4    I, DECLARE UNDER PENALTY OF PERJURY THAT THE
5    FOREGOING IS AN ACCURATE TRANSCRIPTION OF MY
6    TESTIMONY UNDER THE LAWS OF THE STATE OF CALIFORNIA,
7    EXECUTED ON THE _____ DAY OF _____,
8    _____.
9
10
11           _____
12           BRUCE STROMBOM, Ph.D.
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 181

1            REPORTER'S CERTIFICATE
2                    OF
3            CERTIFIED SHORTHAND REPORTER
4
5                 *  *  *  *  *  *  *
6
7
8    I, THE UNDERSIGNED CERTIFIED SHORTHAND REPORTER, IN
9    AND FOR THE STATE OF CALIFORNIA, DO HEREBY CERTIFY:
10   THAT THE FOREGOING PROCEEDINGS WERE TAKEN BEFORE ME
11   AT THE TIME AND PLACE THEREIN SET FORTH, AT WHICH
12   TIME THE WITNESS WAS PUT UNDER OATH BY ME; THAT THE
13   TESTIMONY OF THE WITNESS AND ALL OBJECTIONS AT THE
14   TIME OF THE PROCEEDINGS WERE RECORDED
15   STENOGRAPHICALLY BY ME AND WERE THEREAFTER
16   TRANSCRIBED UNDER MY DIRECTION; THAT THE FOREGOING
17   IS A TRUE RECORD OF THE TESTIMONY AND OF ALL
18   OBJECTIONS MADE AT THE TIME OF THE PROCEEDINGS.
19
20
21   IN WITNESS WHEREOF, I HAVE SUBSCRIBED MY NAME ON:
22   DATE: December 10, 2018.
23
24           _____
25           LESLIE L. WHITE, CSR NO. 4148

46 (Pages 178 to 181)

Page 182

```
 1              ERRATA SHEET
 2     Case Name:
 3     Deposition Date:
 4     Deponent:
 5     Pg. No. Now Reads    Should Read  Reason
 6     ___ ___ _____    _____    _____
 7     ___ ___ _____    _____    _____
 8     ___ ___ _____    _____    _____
 9     ___ ___ _____    _____    _____
10     ___ ___ _____    _____    _____
11     ___ ___ _____    _____    _____
12     ___ ___ _____    _____    _____
13     ___ ___ _____    _____    _____
14     ___ ___ _____    _____    _____
15     ___ ___ _____    _____    _____
16     ___ ___ _____    _____    _____
17     ___ ___ _____    _____    _____
18     ___ ___ _____    _____    _____
19     ___ ___ _____    _____    _____
20
                          _____
21                         Signature of Deponent
22     SUBSCRIBED AND SWORN BEFORE ME
23     THIS ____ DAY OF _____, 2018.
24     _____
25     (Notary Public)  MY COMMISSION EXPIRES:_____
```

47 (Page 182)

EXHIBIT 2

```
1              UNITED STATES DISTRICT COURT
                DISTRICT OF CONNECTICUT
2
   DENIS MARC AUDET, MICHAEL   §
3  PFEIFFER, DEAN ALLEN        §
   SHINNERS, AND JASON         §  CASE 3:16-CV-00940
4  VARGAS, INDIVIDUALLY AND    §
   ON BEHALF OF ALL OTHER      §
5  SIMILARLY SITUATED,         §
                               §
6       PLAINTIFFS,            §
                               §
7  VS.                         §
                               §
8  STUART A. FRASER, GAW       §
   MINERS, LLC, AND            §
9  ZENMINER, LLC (D/B/A ZEN    §
   CLOUD),                     §
10                             §
        DEFENDANTS.            §
11
12
13
14
15          ORAL AND VIDEOTAPED DEPOSITION OF
                      MADELINE EDEN
16                   JUNE 26, 2018
17
18      ORAL AND VIDEOTAPED DEPOSITION OF MADELINE
   EDEN, produced as a witness at the instance of the
19 Plaintiffs and duly sworn, was taken in the above
   styled and numbered cause on Tuesday, June 26, 2018,
20 from 9:42 a.m. to 2:52 p.m., before TAMARA CHAPMAN,
   CSR, CRR, RPR in and for the State of Texas,
21 reported by computerized stenotype machine, at the
   offices of Regus, 106 E. Sixth Street, Austin,
22 Texas, pursuant to the Federal Rules of Civil
   Procedure and any provisions stated on the record
23 herein.
24
25 Job No. 143277
```

Page 134

M. EDEN - 6/26/18

1
2     A. I don't -- I don't remember when the prime
3  controllers actually started working properly, but
4  they were pretty well locked down when they were --
5  and we didn't have a prime wallet set up like that.
6  It was -- they were a little more CPU-intensive than
7  the other wallets.  And the individual wallets
8  weren't staking that way.  I mean, we -- yeah.
9     Q. Were payouts directly linked to the stake
10 rate of prime controllers?
11    A. I don't believe they were, like I said
12 before.  I mean, it can be verified as to whether or
13 not they were, but I don't -- as best as I remember
14 it, I thought we were staking it much higher than we
15 were actually.
16    Q. Paying out?
17    A. Yes.  If I recall correctly.  I think the
18 stake rate -- the initial stake rate that they
19 implemented on the prime nodes I thought was
20 250 percent.  I could be wrong.  I don't know that we
21 were ever paying out HashStakers at that rate.
22 Again, I mean, I could be wrong.  I just don't think
23 they were.
24     Yeah.  And I don't remember why this
25 wasn't implemented entirely or even mostly, but I do

Page 135

M. EDEN - 6/26/18

1
2  know there were technical issues with -- with wanting
3  to do it this way.
4     Q. Were -- were you intending in your comment
5  when you forwarded this e-mail to be serious that we
6  should implement this stuff now?  For some reason, I
7  feel like we should start implementing a lot of this.
8     A. Yeah.  I don't know.  We were so
9  backlogged.  I mean -- I don't remember why I would
10 have said it like that, but --
11    Q. Is there certain sarcasm in that comment?
12    A. Probably, yeah.
13     Like I said, this -- it was --
14     (Pause.)
15     I don't remember why it said it that way.
16 But, yeah, that's obvious that's my sarcasm for sure.
17 I mean, a lot of this did get implemented, though.
18    Q. Did it at some point?
19    A. Yes.
20    Q. Which part was implemented?
21    A. Like the prime controllers in the
22 sweepers -- yeah.  See, this is -- this is the
23 problem right there.  This is not the feature
24 request.  This is what was sold and what will be
25 delivered to customers.

Page 136

M. EDEN - 6/26/18

1
2     Q. Is that true?
3     A. Yeah.  I mean, you know, that's --
4     Q. Are the features being described in the
5  e-mail above that line what were sold to customers?
6     A. Yeah.  I'm pretty sure if Jonah said that
7  that's what was sold to customers, then that's what
8  was sold to -- then that's what was sold to
9  customers.
10    Q. But that's not what the system was doing,
11 at least not at this time, February 4th, 2015?
12    A. Huh-uh.
13    Q. Some of these may have been implemented
14 later.
15    A. Or partially at this point.  Some of it
16 was, right?  Like sweeping I'm pretty sure was -- was
17 implemented.
18    Q. What does sweeping mean?
19    A. When prime nodes were generating a stake,
20 the excess coins that were on the prime node would
21 get swept off to a different wallet elsewhere.
22    Q. So they could be paid out to HashStakers
23 or --
24    A. Right.  And into the -- you know, the
25 operational wallets that contained most of the coins.

Page 137

M. EDEN - 6/26/18

1
2  I mean, the prime nodes were really only supposed to
3  contain the coins that the prime nodes needed to
4  contain.
5     Q. Otherwise, would they start staking it
6  like compound interest because of the -- the newly
7  staked --
8     A. Yeah.
9     Q. -- would also stake?
10    A. You got it.
11    Q. Okay.
12    A. Which -- yeah.  That was -- that might
13 have actually been why we couldn't do it that way now
14 that I'm thinking about it.
15    Q. What do you mean, somebody wanted it that
16 way?
17    A. No.  I mean, I don't think that that part
18 was ever really intentional.  If that was what was
19 happening, then I don't think that would have been
20 something that had been done intentionally.  I think
21 it would have just been done accidently.  I mean, I
22 do remember that we had to release an update for
23 Paycoin that would limit the number of coins that
24 we're staking so it would basically kick the ones
25 that were excess off of that.  Otherwise, it would

Page 138

M. EDEN - 6/26/18

1
2  compound it.  So -- but, yeah, it was -- which is
3  why -- because there was no way to meet -- yeah, it
4  just wasn't -- some of this wasn't feasible with the
5  way the Paycoin -- that the prime controllers had
6  been working, adding more coins into a specific
7  address, removing and sending coins from a prime
8  node, that kind of defeats the purpose of having the
9  coins locked up in the first place.  Right.  So --
10  and the prime nodes have to maintain a large balance
11  of coins and no more than that, generally.  I mean,
12  it didn't necessarily compound, but you couldn't add
13  and remove those coins from the prime node, right,
14  while it's running or else it would be staking at
15  that rate once it went below the threshold.  So, you
16  know, the idea that you would put users' wallets on a
17  prime node and have them be able to send and remove
18  coins from it at will is -- and take the staking for
19  the entire thing is just kind of counterintuitive.
20  At that point, it stops staking for everyone who's
21  got a wallet on there and -- yeah, it's not -- not
22  really a feasible thing.
23      Q.  But was that what was sold to customers?
24      A.  Yeah, I believe -- yeah, like I said, it
25  says here that that's what was sold to customers,

Page 139

M. EDEN - 6/26/18

1
2  then, yeah, that's -- then, I mean, generally, it was
3  kind of like the janitor at that point.  So
4  identifying what was sold to customers and whether or
5  not it could be delivered was, you know, part of what
6  he was trying to fix.  Establishing the feasibility
7  of it was a completely different issue and this
8  was -- and what they sold and what was actually
9  happening was kind of a mess.  But it was -- I mean,
10  honestly, that was kind of par for the course.
11  Right.  It was -- that whole -- the whole idea of
12  them selling something that they couldn't actually
13  deliver was not a new concept.
14      (Exhibit 9 was marked.)
15      A.  Oh, dear.
16      Q.  No. 9.  Do you recognize the names?
17      A.  I don't recognize that just looking at the
18  names on here.
19      Q.  What you mean, the Adam Lucas or the names
20  of the different Hashlets?
21      A.  The names of the different Hashlets.
22      Q.  What do the -- what do the numbers
23  represent on here, do you know?
24      A.  Yeah, I believe these...
25      (Pause.)

Page 140

M. EDEN - 6/26/18

1
2      Yeah, I believe these are actually
3  capacities, if I'm not mistaken.
4      Q.  What do you mean by capacity in this
5  context?
6      A.  Yeah, I don't know which capacity
7  specifically, but, overall, like the amount of
8  capacity, like what's -- users owned on the system.
9      Q.  So would that mean that -- let's look at
10  the CleverHashlet, the first item.
11      A.  Oh, no, my bad.  These are, yeah, the
12  number of those Hashlets.
13      Q.  What -- no --
14      A.  Sorry.  What is the -- yeah, so what is
15  the count of each type of Hashlet that's left in
16  ZenCloud.
17      Q.  You mean that there were 4,089
18  CleverHashlets?
19      A.  Yeah.
20      Q.  What does "MH" mean?
21      A.  Those are megahash Hashlets.  Those were
22  pointed at -- I think there might have been a clever
23  pool or something like that.
24      Q.  So for CleverHashlet, it says 4089.000
25  megahash.

Page 141

M. EDEN - 6/26/18

1
2      A.  Yeah.
3      Q.  So does that mean there were 4,089
4  CleverHashlets sold or does that mean that the
5  CleverHashlets were sold to a level of hashing power
6  of 4,089 megahash?
7      A.  For the -- if it says megahash, that's
8  probably what it was.
9      Q.  Okay.
10      A.  Maybe.  I guess.
11      Q.  Do you know --
12      A.  It's hard to say with those.
13      Q.  You mentioned earlier, I think off the
14  record, some databases that the company maintained.
15  Do you know what database this would have come out
16  of?
17      A.  That data would have come out of the SQL
18  database.
19      Q.  What's tracked in the SQL database?
20      A.  Everything.
21      Q.  Including, for example?
22      A.  Ownership of Hashlets, how many there
23  were.
24      Q.  Okay.  Hashing power?
25      A.  Hashing power.  The amount -- well, no.

Page 142

M. EDEN - 6/26/18

1
2    Q.  No?
3    A.  Not physical hashing power.
4    Q.  Not true hashing power, but a hashing
5 power that was sold to the customer?
6    A.  Well, yeah, sort of.
7    Q.  Why do you say "yeah, sort of"?
8    A.  Because the database was a giant mess.
9 But at this point there had been hacks on the
10 database.  I mean, there had been issues with
11 Hashlets that had been split and/or destroyed on
12 accident, or I mean, any number of different things.
13    Q.  Would it track a number that was at
14 least -- prior to any corruption in the database or
15 problems with it, it was attempting to track a number
16 that represented the hashing power that was sold in
17 association with a particular Hashlet?
18    A.  Right.  And I don't remember what the
19 hashing power of some of these were.  Like, I mean,
20 they -- like the Hashlet Genesis, I could be wrong, I
21 thought that was like a 10 gigahash Hashlet.  I
22 think.  I'm pretty sure those were the three Hashlets
23 that were given away.
24    Q.  Okay.  So the fact that there's --
25    A.  1.68 million.

Page 143

M. EDEN - 6/26/18

1
2    Q.  -- over a million --
3    A.  Right.
4    Q.  -- suggests that they were -- that's the
5 number of Hashlets?
6    A.  Yeah.  Yeah.  Which means you would take
7 the 1.69 million and then multiply it by 10, and then
8 that would be -- I think -- or I don't remember if
9 they were 10 mega -- 10 gigahash Hashlets or 100
10 giga -- I thought it was 10 gigahash, but you
11 multiply by 10 and that would be the total amount of
12 hashing power that was available for that Hashlet,
13 I'm pretty sure.
14    Q.  Did the SQL database track sales of
15 HashStakers?
16    A.  Yes, most of them.
17    Q.  Why do you say "most"?
18    A.  Because there were so many different
19 places that purchases came in through.
20    Q.  So purchases through most sources would go
21 to the SQL database?  What sources would not go to
22 the SQL database?
23    A.  Well, it would all eventually go to the
24 SQL database.  Right?  So, I mean, technically, yes,
25 but you wouldn't know -- some of them came in as

Page 144

M. EDEN - 6/26/18

1
2 redeemable codes.  So you wouldn't necessarily know
3 the source, where it came from, whether it came from
4 Shopify, or whether it came from a credit card
5 purchase, or a wire transfer, or whatever.  Or from,
6 you know, a Bitcoin transaction.
7    Q.  Okay.
8    A.  So, yeah, but, I mean, eventually it was
9 supposed to show, you know, a complete path of
10 ownership.  But some of these guys used the system
11 and just generated -- because you can -- if you
12 bought -- you know, if somebody sold one, they could
13 just go into the system, right, and -- and create it
14 at will, because it's just like, you know...
15    Q.  Create what?  You mean a Hashlet?
16    A.  Yeah.
17    Q.  Meaning that they didn't have to identify
18 it to any particular underlying hashing power or
19 computer or anything?
20    A.  Correct, yes.
21    Q.  You just create an entry in the SQL
22 database and magically a Hashlet would appear?
23    A.  Yes.
24    Q.  Regardless of the hashing power that was
25 available?

Page 145

M. EDEN - 6/26/18

1
2    A.  Correct.
3    Q.  It also tracked sale of HashStakers in the
4 SQL database?
5    A.  Yes.
6    Q.  What about -- sales of Paycoin and
7 ownership of Paycoin would be tracked in the Paycoin
8 block chain.  Correct?
9    A.  No.  It's also in the SQL database.
10    Q.  So a Paycoin block chain doesn't identify
11 a particular Paycoin to an address?
12    A.  Not on the system.
13    Q.  Well, separate from this system does it
14 identify an address that owns a particular Paycoin?
15    A.  Yes, absolutely.
16    Q.  But then you separately also tracked
17 ownership of at least sales of Paycoin in the SQL
18 database.  Right?
19    A.  Yes.
20    Q.  But if a customer bought a Paycoin from
21 you, and that was recorded in the SQL database, that
22 customer later sold that Paycoin or used it to buy
23 something, the SQL database wouldn't necessarily
24 track that, but the Paycoin block chain would?
25    A.  No.  If the customer bought a Paycoin,

Page 146

M. EDEN - 6/26/18
1
2    and -- it bought it and it was on the system, then it
3    would --
4        Q.  Wait.  Let me stop you.  The "system"
5    meaning SQL?
6        A.  Yes.  ZenCloud, PayBase, take your pick.
7    If a customer bought Paycoin and it was on that
8    system, then it wouldn't be tracked on the Paycoin
9    bought chain necessarily, right, because it would
10   basically just be in the big chunk of Paycoin that
11   GAW had in the operational wallet.
12       Q.  So there wouldn't have to be a transfer at
13   that point on the block chain?
14       A.  Correct.
15       Q.  The ownership of the Paycoin could be
16   tracked in SQL?
17       A.  It was tracked in SQL.  Now, if the
18   customer withdrew the coin from ZenCloud or PayBase,
19   then -- you know, then it would create a transaction
20   on the block chain when it sent it to the external
21   address that they wanted to send it to.
22       Q.  Right.  And at that point it wouldn't be
23   tracked in SQL anymore?
24       A.  Correct.  Yeah.  That was where the --
25   that's when it would disconnect and it -- yeah.

Page 147

M. EDEN - 6/26/18
1
2        Q.  So what other databases in addition to the
3    SQL database did GAW maintain, that you're aware of?
4        A.  Well, there was the cloud mining database
5    that was separate, and there was a Mongo database
6    that we transitioned off of at some point in 2014,
7    so -- because the database that they were using, I
8    guess, when we -- when I first got there didn't
9    scale, and especially -- yeah.  It didn't scale.
10       So we had to basically use something that
11   was more efficient for managing this type of data,
12   and they were using a -- you know, a MongoDB, which
13   is kind of not very efficient for large -- you know,
14   a very large system.
15       Q.  So that -- is a Mongo database what was
16   transitioned to SQL?
17       A.  Yeah.
18       Q.  Okay.  What was in the cloud mining
19   database?
20       A.  I would imagine all of the cloud-hosted
21   miners.
22       Q.  So sales of cloud-hosted miners, as far as
23   you know, weren't being tracked in Mongo or later
24   SQL?
25       A.  No.  No.  Because at a point, right,

Page 148

M. EDEN - 6/26/18
1
2    people were ordering cloud-hosted miners, but not
3    receiving miners.  So, like, for instance, the
4    Volcano is the best example I can think of this.  And
5    it was this giant Litecoin miner that was supposed to
6    have been released by Zeus Mining and then re-branded
7    by GAW, but the miner was never released but there
8    was still a ton of them sold.
9        Q.  It was called -- it was sold by GAW as the
10   Volcano miner?
11       A.  I believe so.
12       Q.  "Cloud-hosted" to be hosted by GAW?
13       A.  Right.
14       Q.  Got it.
15       A.  And so then --
16       Q.  But it never existed?
17       A.  It never existed.  And it was transitioned
18   into ZenCloud instead of cloud mining and yeah, that
19   was --
20       Q.  Well, "transitioned into ZenCloud."  Does
21   that mean it became --
22       A.  Basically --
23       Q.  -- a Hashlet?
24       A.  Uh-huh.  Yeah.
25          (Discussion off the written record.)

Page 149

M. EDEN - 6/26/18
1
2          THE VIDEOGRAPHER:  Off the record
3    at 12:59.
4          (Break.)
5          THE VIDEOGRAPHER:  Back on the
6    record at 1:16.  This begins Tape No. 2.
7        Q.  On a break you were starting to say
8    something about the numbers on Exhibit 9 not being
9    right.  Do you want to just go ahead and explain?
10       A.  I mean, I don't -- I don't know exactly
11   what the -- the numbers are representing in terms of
12   hash power.  But I mean, I recognize some of these
13   Hashlets.  And there were a lot more of those
14   Hashlets than is listed here.  Like the Vegas
15   Hashlets, it says "20.0000."  And I know there were a
16   lot more Vegas Hashlets than that, I know there were
17   a lot more HauntedHashlets than that, the
18   Legendary -- yeah.  There were a lot more of these
19   than is in this e-mail.  I mean, and you could verify
20   that in the database, but...
21       Q.  I was going to say, you said you
22   remembered something about "this," about generating
23   this list or about this e-mail?
24       A.  Yeah.  Sorry.  I do remember.
25       Q.  What do you -- how do you remember?

Page 150

M. EDEN - 6/26/18
1
2    A.  When Evan was generating this list, and
3    there was a lot of -- when I look at this list, I
4    didn't think that the numbers were right, so we went
5    back to the system is where we started to identify a
6    lot of the inconsistencies in the data, especially as
7    it pertained to the amount of hashing power that was
8    represented on the system, so...
9         Q.  Was that ever corrected?
10        A.  No.  No, it's just still really difficult
11   when you go through there because there was so many
12   issues that occurred over time with devices being
13   deleted and -- and reinitialized there were -- it was
14   just a whole development process issue that -- how
15   they managed the devices and how they deleted them
16   that made some of them more difficult to track in the
17   database than -- than others based off, you know, the
18   number of times it had been split or deleted or
19   changed.
20        Yeah, so determining how much hashing
21   power was actually on there was -- was difficult,
22   but -- and that's the other thing.  I think this was
23   after the conversion as well, so...
24        Q.  Which conversion?
25        A.  The Hashlet to HashStaker conversion.

Page 151

M. EDEN - 6/26/18
1
2    Right?  And also after the cloud mining conversion.
3    Because there was a point when all of the people who
4    had cloud miners that were hosted through GAW cloud
5    mining were forcibly converted over to Hashlets.
6         Q.  And then was there a point when the
7    Hashlets were forcibly converted to something else?
8         A.  I don't recall.  I know there was a point
9    when the Hashlets -- when you had the opportunity to
10   convert your Hashlet into a HashStaker.  Right?  I
11   mean, that was even referenced in some of these
12   e-mails back here.  But I don't remember that we ever
13   actually forcibly converted the HashStakers -- or the
14   Hashlets into HashStakers, but I do know that there
15   was a point when the value of the coin dropped so low
16   by then that it was no longer profitable to mine, and
17   the Hashlets basically weren't doing anything anyway.
18        So if you had a Hashlet and you didn't
19   convert it to a HashStaker, you were -- basically it
20   was just sitting there doing nothing, so...
21        Q.  Do you know why this data was assembled
22   that's in this e-mail?
23        A.  No, I don't remember why.  I think it's
24   because Josh asked for it, but...
25        (Exhibit 10 was marked.)

Page 152

M. EDEN - 6/26/18
1
2         Q.  I'm handing you Exhibit 10.
3         A.  Oh, gosh.  Wow.
4         Q.  This is a copy of what I think is known as
5    the Paycoin White Paper.  Do you recognize it?
6         A.  I do.
7         Q.  Do you remember this being available
8    through the GAW Miners website?
9         A.  Yeah.
10        Q.  I just have a -- we've already covered a
11   lot of the material in here, but I have a couple of
12   questions.  Unfortunately there's no page numbers.
13        A.  Yeah.
14        Q.  Turn to the ninth page, which has a
15   caption at the top that says "5 Technical Coin
16   Specifications."
17        A.  Yes, sir.
18        Q.  And do you see this is a discussion of
19   the -- we talked about this earlier, the initial
20   proof-of-work period for Paycoin?
21        A.  (Nods.)
22        Q.  And you said there was a proof-of-work
23   period for Paycoin?
24        A.  Yes, there was.
25        Q.  And you see in the second paragraph, it

Page 153

M. EDEN - 6/26/18
1
2    says "During the proof-of-work phase the
3    'thermodynamic, reverse corollary, difficulty
4    algorithm' will dictate a $12.5 million coin mintage
5    limit."  Is that true?
6         A.  Yeah, I don't know.
7         Q.  Do you know if there was a thermodynamic,
8    reverse corollary, difficulty algorithm associated
9    with Paycoin?
10        A.  You know, I'm sure that you could
11   interpret.
12        Q.  What does that mean?
13        A.  I have no idea.  I didn't write that.
14        Q.  Well, do you think it means anything?  Is
15   there such a thing as a thermodynamic, reverse
16   corollary, difficulty algorithm?
17        A.  Apparently there is.  I don't know that it
18   was ever developed, but maybe it's only a theoretical
19   algorithm.
20        Q.  Do you know -- so you don't know one way
21   or the other if anyone at GAW Miners developed a
22   thermodynamic, reverse corollary, difficulty
23   algorithm?
24        A.  Yeah, I don't believe so.
25        Q.  You don't believe they did?

1       M. EDEN - 6/26/18
2  Jason Vargas, another plaintiff in this case?
3       A.  That I don't -- I don't know.  I don't
4  think so.
5       Q.  Okay.
6       A.  No, I don't believe so.  But possibly.  I
7  mean -- if I did, it wasn't like anything that stuck
8  out.
9       Q.  Have you ever met or communicated with
10  Marc Audet, Audet (pronouncing)?  I'm not sure how
11  you say his name.  A-U-D-E-T.  Another plaintiff in
12  this case.
13       A.  Not directly, I don't believe.
14       (Discussion off the written record.)
15       A.  If he was a GAW customer there's a chance
16  I probably would have communicated with him at some
17  point in time or another, or he might have been on
18  one of those calls, but never really directly in a
19  way that I would -- I can recall.
20       Q.  Okay.  All of the correspondence that
21  we've reviewed today, Stuart Fraser wasn't included
22  on any of it.  Correct?
23       A.  No, I don't believe.
24       MR. SARGENT:  We'll stipulate to
25  that.  You don't need to look.

1       M. EDEN - 6/26/18
2       MS. ECHENIQUE:  Okay.  Give me one
3  moment.  Oh, wait, let me take off my --
4       MR. SARGENT:  Do you want to take
5  a break for just a second?
6       MS. ECHENIQUE:  Sure, actually.
7  Yeah.
8       THE VIDEOGRAPHER:  Off the record
9  at 2:46.
10       (Break.)
11       THE VIDEOGRAPHER:  We're back on
12  the record at 2:51.
13       MS. ECHENIQUE:  We have no further
14  questions, but we're going to reserve our rights
15  to seek the documents that you referenced
16  throughout our conversation today, including the
17  databases.  And if we decide to seek them, we'll
18  be in touch.
19       THE WITNESS:  Cool.
20       MR. SARGENT:  I don't have any
21  further questions either.  Thanks.
22       THE VIDEOGRAPHER:  Off the record
23  at 2:52.
24       (Deposition concluded at 2:52 p.m.)
25

1           UNITED STATES DISTRICT COURT
            DISTRICT OF CONNECTICUT
2
   DENIS MARC AUDET, MICHAEL  §
3  PFEIFFER, DEAN ALLEN       §
   SHINNERS, AND JASON        § CASE 3:16-CV-00940
4  VARGAS, INDIVIDUALLY AND   §
   ON BEHALF OF ALL OTHER     §
5  SIMILARLY SITUATED,        §
                              §
6      PLAINTIFFS,            §
                              §
7  VS.                        §
                              §
8  STUART A. FRASER, GAW      §
   MINERS, LLC, AND           §
9  ZENMINER, LLC (D/B/A ZEN   §
   CLOUD),                    §
10                            §
       DEFENDANTS.            §
11
12       REPORTER'S CERTIFICATION
         DEPOSITION OF MADELINE EDEN
13         TAKEN JUNE 26, 2018
14
15  I, TAMARA CHAPMAN, Certified Shorthand Reporter
   and Notary Public in and for the State of Texas,
16  hereby certify to the following:
17  That the witness, MADELINE EDEN, was duly sworn
18  by the officer and that the transcript of the oral
19  deposition is a true record of the testimony given
20  by the witness;
21  That the original deposition was delivered to
22  EDGAR G. SARGENT;
23  That a copy of this certificate was served on
24  all parties and/or the witness shown herein on
25  _____.

1       I further certify that pursuant to FRCP No.
2  30(f)(i) that the signature of the deponent:
3       _____ was requested by the deponent or a party
4  before the completion of the deposition and that the
5  signature is to be returned within 30 days from date
6  of receipt of the transcript.  If returned, the
7  attached Changes and Signature Page contains any
8  changes and the reasons therefor;
9       __X_ was not requested by the deponent or a
10  party before the completion of the deposition.
11       I further certify that I am neither counsel
12  for, related to, nor employed by any of the parties
13  in the action in which this proceeding was taken,
14  and further that I am not financially or otherwise
15  interested in the outcome of the action.
16       Certified to by me this 6th day of July, 2018.
17
18
   _____
19  Tamara Chapman, CSR, CRR, RPR
   CSR NO. 7248; Expiration Date: 12-31-18
20  TSG Reporting, Inc.
21
22
23
24
25

Page 206

```
 1              ERRATA SHEET
 2    Case Name:
 3    Deposition Date:
 4    Deponent:
 5    Pg.  No. Now Reads    Should Read  Reason
 6    ___  ___  _____    _____   _____
 7    ___  ___  _____    _____   _____
 8    ___  ___  _____    _____   _____
 9    ___  ___  _____    _____   _____
10    ___  ___  _____    _____   _____
11    ___  ___  _____    _____   _____
12    ___  ___  _____    _____   _____
13    ___  ___  _____    _____   _____
14    ___  ___  _____    _____   _____
15    ___  ___  _____    _____   _____
16    ___  ___  _____    _____   _____
17    ___  ___  _____    _____   _____
18    ___  ___  _____    _____   _____
19    ___  ___  _____    _____   _____
20
                   _____
21                 Signature of Deponent
22    SUBSCRIBED AND SWORN BEFORE ME
23    THIS ____ DAY OF _____, 2018.
24    _____
25    (Notary Public)  MY COMMISSION EXPIRES:_____
```

# EXHIBIT 3

1                  UNITED STATES DISTRICT COURT

2                     DISTRICT OF CONNECTICUT

3

4    DENIS MARC AUDET, MICHAEL    )
     PFEIFFER, D. ALLEN SHINNERS, )
5    and JASON VARGAS,            )
     Individually and on Behalf   )
6    of All Others Similarly      )  No. 16-940
     Situated,                    )
7                                 )
                     Plaintiffs,  )
8                                 )
          VS.                     )
9                                 )
     HOMERO JOSHUA GARZA, STUART  )
10   A. FRASER, GAW MINERS, LLC,  )
     and ZENMINER, LLC, (d/b/a    )
11   ZENCLOUD),                   )
                                  )
12                   Defendants.  )
     _____)

13

14

15

16        VIDEOTAPED DEPOSITION OF ROBERT MILLS

17             Los Angeles, California

18            Tuesday, October 30, 2018

19

20

21

22

23   Job No. 149295

24   Reported by:  NIKKI ROY

25             CSR No. 3052

Page 22

1     A.  This is going back almost 20 years, so I
2  don't recall.
3     Q.  Just in general, was it -- for example, was
4  it the Justice Department that supplied it?  Was it
5  one of the companies that was involved in the merger?
6  Someone else?
7     A.  It was data that we obtained from an analyst
8  firm that tracked sales of products.
9     Q.  Okay.  So it was sort of a third-party
10 analyst firm that provided the data?
11    A.  Yes.
12    Q.  Okay.  Do you recall -- again, mindful that
13 this is going back almost 20 years -- was there
14 anything that you did to get comfort that the data
15 you were being provided was reliable and had
16 integrity?
17    A.  I don't recall as I sit here what --
18    Q.  Okay.
19    A.  -- steps I took.  It's been almost 20 years.
20    Q.  Is that something that you would do in the
21 ordinary course when you're given a set of data to
22 analyze to take steps to get comfort that the data is
23 reliable and has integrity?
24    A.  It would depend on the circumstances under
25 which I got the data.

Page 23

1     Q.  Okay.  Are there circumstances under which
2  you wouldn't need to take any steps to get
3  comfortable about the reliability of the data?
4     A.  Well, there may be instances where I'm asked
5  to analyze particular data that's provided to me, and
6  so I wouldn't necessarily take any steps to determine
7  its reliability if I'm asked to analyze it.
8     Q.  Okay.  You can set Exhibit 213 to the side
9  for the moment.
10       This case as know involves certain
11 Cryptocurrency products that were offered by GAW
12 Miners and ZenMiner during the alleged class period.
13       Prior to this case, what is your
14 professional experience with Cryptocurrency?
15    A.  I have no professional experience with it.
16 I mean, I see news articles about it from time to
17 time, but it's not something that I've studied on a
18 professional level.
19    Q.  Okay.  So prior to this, you didn't have any
20 engagement that involved Cryptocurrency?
21    A.  Not that I can recall.
22    Q.  Okay.  So then fair to say you didn't have
23 any experience prior to this case quantifying damages
24 with respect to Cryptocurrency products?
25    A.  That's true.

Page 24

1     Q.  Have you ever mined Cryptocurrency yourself?
2     A.  I have not.
3     Q.  Have you ever purchased Cryptocurrency,
4  Bitcoin, any other alt coin?
5     A.  No.
6        (Reporter clarification.)
7        MS. CAVE:  Alt coin.  Sorry.
8  BY MS. CAVE:
9     Q.  So when you were engaged to work on this
10 case, is there any research that you did to get
11 yourself familiar with Cryptocurrency?
12    A.  I may have looked at an article or something
13 like that online, but I don't recall specifically
14 looking at anything.  I mean, it really wasn't my
15 role to explain what Cryptocurrency is or how it
16 works, so that's not something I concerned myself
17 with too much.
18    Q.  Okay.  But are there any differences -- so
19 Cryptocurrency -- strike that.
20       Are there any differences between
21 Cryptocurrency and other asset classes that might
22 affect how you calculate your damages calculate
23 damages in this case?
24    A.  I'm not sure I understand the question.
25    Q.  Did you undertake to gain an understanding

Page 25

1  as to whether there are any unique characteristics of
2  Cryptocurrency that might impact the damages
3  methodology that you would need to use in this case?
4     A.  Not that I can recall.
5     Q.  Okay.  What's your understanding of the
6  plaintiffs' allegations in this case?
7     A.  My understanding is that the plaintiffs
8  allege that GAW Miners and ZenMiner sold unregistered
9  securities, that the defendants were involved in
10 securities fraud and -- both at federal claims and
11 state claims in Connecticut, and that there are also
12 allegations of state law fraud, common law fraud, I
13 guess.
14    Q.  Okay.  And what were you asked to do in this
15 case?
16    A.  Well, I've been retained to calculate
17 damages.  I haven't done that yet, but that's what I
18 was retained do.  And then I also was retained to
19 analyze a couple of databases that were provided by
20 counsel, and I've explained in the declaration my
21 analysis of those databases to date.
22    Q.  You said you haven't -- you were retained to
23 calculate damages, but you haven't done that yet.
24 When do you plan to do that?
25    A.  When I'm asked.  I haven't been asked to do

Page 26

1  that yet. My understanding is that there's some
2  schedule that's been worked out by the court. And I
3  would expect to work towards that schedule, but I
4  haven't been asked to start the damages analysis yet.
5      Q. Okay. So you mentioned the two -- that
6  there were two databases you were asked to look at.
7  If you could turn back to Exhibit 212 and turn your
8  attention to page 2, paragraph 1.
9      A. Yes.
10     Q. Okay. And there it says (reading):
11          "I have analyzed two .sql
12          databases."
13         Are those the two databases that you were
14  referring to?
15     A. Yes.
16     Q. Okay. And you indicate there "they were
17  provided to me by counsel."
18         Do you know where your -- where plaintiffs'
19  counsel got those databases?
20     A. My understanding is that they were provided
21  to counsel by a gentleman named Adam MacLack.
22     Q. Okay. Would that be Matlack? Is that --
23     A. Oh, Matlack, perhaps.
24     Q. Ok. M-a-t-l-a-c-k.
25         In what format -- did you receive the

Page 27

1  databases in the .sql format?
2      A. I received the databases in a format -- I
3  don't recall the extension on the files that I
4  received, but essentially they were backups of two
5  databases, and I reconstituted or reconstructed the
6  databases from the backup files that were provided.
7      Q. And what did you do to reconstitute the
8  databases?
9      A. I downloaded a program called Maria DB,
10  which is the program that they had used for the
11  database. And a series of commands -- I used a
12  series of commands that reconstructed the database
13  from the backup files.
14     Q. Do you know where Adam Matlack got the
15  databases from?
16     A. I don't have personal knowledge of that, but
17  my understanding is that he received the databases
18  from a former employee of GAW Miners, but I don't
19  know more than that.
20     Q. And what's the basis for that understanding?
21     A. Just a conversation with counsel.
22     Q. Okay. Do you know the name of the former
23  employee who provided Mr. Matlack with the databases?
24     A. I don't.
25     Q. Okay. Did you ever know that or do you just

Page 28

1  not know today?
2      A. I don't think I ever knew that, but I can't
3  be 100 percent certain.
4      Q. Okay. Do you know if Mr. Matlack did any
5  processing or reconstruction of the databases before
6  you received them?
7      A. I don't know.
8      Q. Okay. In between when -- so just to follow
9  the chain of custody. The former employee provided
10  them to Mr. Matlack. Mr. Matlack provided them to
11  plaintiffs' counsel. Plaintiff's counsel provided
12  them to you. Is that the right sequence?
13     A. Well, I mean, the sequence I know of is that
14  I received them from counsel. Everything beyond that
15  is not something I have personal knowledge of.
16     Q. Okay.
17     A. My personal knowledge is me receiving the
18  files from counsel.
19     Q. Okay. Did you undertake to do anything to
20  get comfort about the data that you were going to be
21  using for purposes of your damages analysis?
22     A. Yes, in a sense. I mean, I reconstructed
23  the databases from the backup files. That process
24  appeared to be -- to have worked smoothly. I didn't
25  notice any kind of errors that occurred through that

Page 29

1  process.
2         There were a number of tables that seemed to
3  be structured properly after I reconstructed the
4  data, so it appeared to me to be a functioning
5  database at that point.
6      Q. Okay. And the Maria -- is it Maria capital
7  D capital B? Is that the name of the program?
8      A. I don't recall if it's capitalized, but
9  Maria DB is the name.
10     Q. Maria DB. Okay.
11         And is that a commercially available or is
12  that a proprietary software?
13     A. It's open source.
14     Q. Okay. And did you do the reconstruction
15  yourself or did you have a colleague do it?
16     A. I did it myself.
17     Q. How long did it take?
18     A. I don't recall. I mean, I'm fairly certain
19  I did it within a day.
20     Q. Okay.
21     A. But I don't recall how much of the day it
22  took.
23     Q. Okay. How many -- and just to be clear,
24  when we're talking about the ZenCloud and the Paybase
25  databases that you refer to in paragraph 1.

Page 30

1            (Reporter clarification.)
2 BY MS. CAVE:
3      Q. -- databases that you reference in paragraph
4 1 of your declaration, correct?
5      A. Yes.
6      Q. Okay. Do you know how many tables were in
7 the ZenCloud database?
8      A. I haven't committed it to memory. I mean, I
9 have the database on my computer. I could look it up
10 if I was at my computer, but I don't recall as I sit
11 here. I think it was -- this is a very rough guess,
12 but maybe 20.
13      Q. Okay.
14      A. 20 to 30. Something like that.
15      Q. Okay. And is Marie DB a software that you'd
16 worked with before? Was this the first time you'd
17 used it?
18      A. This is the first time I've used that
19 particular piece of software.
20      Q. And you how did you decide to use the Maria
21 DB software?
22      A. I believe that was the software that was
23 used to back up the database, so I think that's the
24 database software that was being used to maintain the
25 database, so it was a natural fit to use to

Page 31

1 reconstruct it.
2      Q. Okay. When you say that that was the
3 software that was being used to back up the database,
4 who was using -- who are you referring to?
5      A. Well, I looked at the meta -- some metadata
6 that was available based on the files that were
7 provided, and I could tell that it was a Maria
8 database. Or at least it appeared to me to be a
9 Maria DB database, so that's what I -- I found that
10 software. It was available open source, so I
11 downloaded it and used it to reconstruct the data.
12      Q. Okay. Do you know if that metadata was
13 metadata that was created during the time that the
14 companies were operating or is it some metadata that
15 arose afterwards?
16      A. I'm not certain.
17      Q. Okay. From the metadata that you looked at,
18 does it give you any indication of who was the person
19 who started using the Maria DB software on the
20 database?
21      A. I don't recall. I didn't look for that, so
22 I'm not certain.
23      Q. Since this was the first time you were using
24 the Maria DB software, is there anything you did to
25 familiarize yourself with the way it works?

Page 32

1      A. Yes. There's a website for the open source
2 group that publishes it, and they have some
3 tutorials, you know, on how to reconstruct the
4 database, for example, and I remembered looking at
5 some of those.
6      Q. Okay. When you say "reconstruct," what does
7 the process of reconstructing the data do?
8      A. Well, it's a backup as I understand it of a
9 database.
10      Q. Okay.
11      A. And so what I'm doing is taking that backup
12 file and restoring the database to the state it was
13 when it was backed up.
14      Q. Do you know when the backup occurred?
15      A. I don't off hand. I mean, I may be able to
16 tell based on some of the records in the database,
17 but I don't have that committed to memory.
18      Q. Okay. Yeah. Going back to your declaration
19 for a moment, you refer to the two databases. Are
20 there any other documents or evidence that you relied
21 on to prepare the declaration that you submitted?
22      A. I think I probably saw the complaint, so I
23 had sort of an understanding of what the allegations
24 were. I don't recall reviewing any other documents
25 as I sit here.

Page 33

1      Q. Okay. Did you review any deposition
2 transcripts from the case?
3      A. No, I don't believe so.
4      Q. What about the documents that the parties
5 have produced in this case, did you review any of
6 those?
7      A. I don't recall doing so.
8      Q. Okay. Did you have access to that, the
9 parties' document productions?
10      A. What do you mean by "access"?
11      Q. Were you given access to a database that had
12 the parties' production in it?
13      A. No.
14      Q. Did you ask for that?
15      A. No.
16      Q. Why not?
17      A. I don't think it was -- I didn't think it
18 was necessary for what I was asked to do for this
19 declaration which was fairly limited in scope.
20      Q. And when you say "limited in scope," you
21 mean just to calculate damages?
22      A. Well, I wasn't asked for purposes of this
23 declaration to calculate damages. I was asked to
24 analyze these databases and determine whether
25 transactions could be associated with users and

1  provide some statistics regarding the number of users
2  with transactions.
3      Q.  Okay.  How did you go about determining
4  whether transactions could be associated with users?
5      A.  I examined the databases.  I looked at the
6  structure of the databases, came to understand
7  something about how the keys in the databases work,
8  which are ways that tables are linked together.  And
9  it became apparent that you could in fact look at
10  transaction tables and associate specific data
11  entries to specific users.
12      Q.  So why is it relevant to -- strike that.
13          In terms of associating specific data
14  entries to specific users, how does that tie to
15  calculating damages in this case?
16      A.  Well, as I understand it, one of the
17  measures of damages in this case would be the value
18  that -- the value of the consideration paid less the
19  value received.  And so these transactions are a way
20  of getting at understanding what has been paid and
21  what has been received.
22      Q.  So you said that that was one of the
23  measures of damages in this case.  Is that one of the
24  measures that you came up with or is that a measure
25  that someone else told you to use?

1      A.  Well, it's an understanding of the law, so
2  it's a legal issue as far as I'm concerned.  So it's
3  an understanding that I was asked to take based on
4  the remedies that are available for the causes of
5  action at issue in this case.
6      Q.  Okay.  And you said again that's one of the
7  measures of damages.  Is there another measure of
8  damages you're planning to use?
9      A.  Well, as I understand it, there are --
10  depending on the cause of action, there may be
11  different terms for the measure of damages that are
12  applicable, like out-of-pocket, for example, versus
13  recessionary damages.  But from a practical
14  standpoint I don't know that there will be any
15  meaningful difference between the way damages are
16  computed.  But again, I haven't actually done the
17  computation yet, so I can't be certain as I sit here.
18      Q.  Do you assume that each user represents a
19  unique customer?
20      A.  I haven't assumed that thus far, no.
21      Q.  Okay.  Does -- would -- does it impact the
22  measure of damages whether each user represents an
23  individual customer?
24      A.  I'm not certain without actually doing the
25  analysis, but I don't know that it necessarily would.

1      Q.  Why would it not?
2      A.  Well, if damages were computed at the user
3  level, the user ID level, for example, and a
4  particular user had -- or particular customer had two
5  user IDs, it may be possible to calculate damages for
6  each of the user IDs and then simply combine them to
7  get the damages for the user or for the customer.
8  But again, I haven't done the analysis, so I'm not
9  certain on that.
10      Q.  Okay.  And that's an analysis that you won't
11  do anything until somebody asks you?
12      A.  Right, I won't do, that's true.
13      Q.  You mentioned a moment ago out-of-pocket
14  versus recessionary damages.  What's the difference
15  between out-of-pocket damages and recessionary
16  damages?
17      A.  Well, I think in this case there might not
18  be much of a difference.  But again, I haven't done
19  the analysis, so I'm not certain.
20      Q.  Okay.  Just at a sort of general level --
21  generic level, what's the difference between
22  out-of-pocket and recessionary damages?
23      A.  Well, these are legal concepts, so I'm
24  not -- and I'm not an expert in the law.  I can give
25  you my understanding --

1      Q.  Sure.  That's fine.
2      A.  -- but I'm not offering opinions about the
3  law.
4          So out-of-pocket, as I understand it, would
5  be the difference between the value paid and the
6  value received.  And recessionary damages, as I
7  understand it, would be basically an attempt to
8  compensate as though the transaction was rescinded.
9      Q.  Okay.  Why might there not be any difference
10  between those -- with the understanding that you
11  haven't done the analysis, yet why might there not be
12  any difference between out-of-pocket and recessionary
13  damages in this case?
14      A.  Well, when I think about those two damages
15  concepts in a case like this, they seem like they
16  would be, if not identical, at least very close
17  because they're both getting at the consideration
18  paid versus the value received.
19      Q.  Do you assume for purposes of calculating
20  damages in this case that the databases that you
21  looked at include all the transactions that took
22  place in the Cryptocurrency products that are at
23  issue here?
24      A.  I haven't made that assumption thus far, but
25  at some point I may have to make that assumption to

Page 58

1    in a different format to be able to manipulate it?
2        A.   It's -- it's not entirely -- that's
3    not entirely accurate.  It's not really cutting and
4    pasting, but it's extracting the raw data from the
5    database into a format that can be read into Excel.
6        Q.   Okay.  You list here in paragraph 3 of your
7    declaration a number of different types of
8    transactions.  I'd just like to go through those and
9    make sure that I understand what each of them are.
10            What is a credit transaction in the ZenCloud
11   database?
12       A.   Well, I think it depends on the entry.  I
13   mean, we have -- when there are credits and debits,
14   they're usually explanations of what those mean so
15   we'd have to sort of look through the records.
16       Q.   Okay.  So a credit might mean one thing in
17   one context and something else in another context?
18       A.   I think it could be, yeah.  I'd have to look
19   at the records to tell you, but...
20       Q.   Is that the same -- the same is true for
21   debit?
22       A.   I think so, yes.
23       Q.   Okay.  Do you know what "fund" refers to?
24       A.   I think it depends on the record.  I mean,
25   we'd have to -- I'd have to look at the records to be

Page 59

1    certain and try to look at how they link to other
2    tables in the database to understand exactly what
3    that means in a given -- for a given record.
4        Q.   Okay.  And would your answer be the same for
5    each of the other types of transactions listed here,
6    payout, purchase, revert, buyback, sale, service fee
7    and withdraw, that you'd need to look at them
8    individually and see how they link to other tables in
9    the database to understand exactly what they mean?
10       A.   I think that's likely true, yes.  I mean,
11   without actually looking at the database, at the
12   moment I can't tell you that that's true, but I think
13   that's likely true.
14       Q.   Okay.  So for each user you would have to go
15   through and look at each of these individually?
16       A.   I may have to link a transaction record to
17   another file to understand what it is that's being
18   transacted.  I'm not absolutely certain that that's
19   true, but that's something that I may have to do.
20       Q.   Okay.  And you might have to do that for
21   each user?
22       A.   Well, for each record, so yeah, for each
23   user.
24       Q.   Okay.  And each user has multiple
25   transactional records presumably or could?

Page 60

1        A.   That's actually not true.  They could, yes.
2        Q.   There may be some users have no
3    transactions?
4        A.   Yes, there are users that have no
5    transactions in the transaction table, yes.
6        Q.   And actually, I think you identify that.  In
7    the next paragraph you say that there are a number of
8    user IDs that have no associated completed
9    transactions?
10       A.   That's correct.
11       Q.   Is that what you mean?
12       A.   Yes.
13       Q.   Okay.  And by "completed transactions," what
14   do you mean?
15       A.   There's a column in the transaction table
16   that indicates whether the transaction is completed
17   or not.
18       Q.   Okay.
19       A.   And so I filtered it to include only the
20   completed transactions in answering that question.
21       Q.   Okay.  So in paragraph 3 then you refer to
22   the example of a user named Bitoris; is that right?
23       A.   Yes.
24       Q.   So what analysis did you do with respect to
25   Bitoris?

Page 61

1        A.   So I looked at transaction with
2    identification number 1, so the first transaction,
3    and I looked at the user ID and then linked that to
4    the user table and determined that the user name for
5    that particular transaction was Bitoris.
6        Q.   Okay.  Is Bitoris a member of the class as
7    it's being proposed here?
8            MR. WATTERSON:  Object to the form.
9            THE WITNESS:  I don't know as I sit here.
10   I'd have to look at the data to see when transactions
11   occurred.
12   BY MS. CAVE:
13       Q.   Okay.  So is it just the dates of the
14   transactions that would be relevant to that
15   determination?
16           MR. WATTERSON:  Object to the form.
17           THE WITNESS:  It might also depend on the
18   type of transaction, I think.
19   BY MS. CAVE:
20       Q.   Okay.  Which types of transactions would you
21   look at to make that determination?
22       A.   Well, as I understand it -- I mean, I guess
23   it depends on what class is certified, assuming a
24   class is certified.  But as I understand it the class
25   that plaintiffs are trying to certify is a class of

Page 62

1    individuals that purchased certain products within a
2    certain time period.
3        Q.   Uh-huh.  So if Bitoris didn't -- however the
4    class is defined, if Bitoris didn't purchase any of
5    those products in the time period as defined in the
6    class definition, he or she wouldn't be a member of
7    the class?
8        MR. WATTERSON:  Object to the form.
9        THE WITNESS:  Well, presumably if you don't
10   meet the definition of the class, then you wouldn't
11   be in the class, but I mean --
12   BY MS. CAVE:
13       Q.   Okay.
14       A.   -- that seems self-evident.
15       Q.   Okay.  In paragraph 4 you refer an analysis
16   to conclude that 212,455 user IDs have at least one
17   associated completed transaction.
18           What analysis did you do there?
19       A.   So there I linked the transaction table to
20   the user table to determine the number of
21   transactions per user and the number of completed
22   transactions per user.  So I tallied that number and
23   counted how many had at least one transaction,
24   completed transaction.
25       Q.   Okay.  I'm sorry.  A moment ago you referred

Page 63

1    to "completed transaction."  Is that in another table
2    outside of the user table and the transaction table?
3        A.   That's part of the transaction table.
4        Q.   Okay.  It's one of the columns in the
5    transaction table?
6        A.   It is, yes.
7        Q.   Okay.  So the difference between the total
8    number of user IDs and the user IDs with at least one
9    associated completed transaction is roughly about
10   55,000, if I'm doing the math right.  Whatever the
11   delta is between 277,323 and 212,455.
12       A.   Yeah, I think it's about 65 --
13       Q.   65.
14       A.   -- thousand, yes.
15       Q.   And so do you know why there are so many
16   user IDs with no associated completed transactions?
17       A.   No.
18       Q.   Okay.  In paragraph 5 you refer to the
19   Paybase database users table.  Is the users table the
20   only one that you've consulted so far in the Paybase
21   database?
22       A.   No.  I've looked at the other tables in the
23   database --
24       Q.   Okay.
25       A.   -- to ensure that it looked like they

Page 64

1    imported properly, and when I reconstructed the file
2    from the backup.  So I'm familiar with some of those
3    tables, at least at a high level, but the user table
4    is the one that I focused on for purposes of this
5    declaration.
6        Q.   And you say here that the table contains
7    8,679 user identification numbers.  How did you
8    arrive at that number?
9        A.   I queried the database, and then I also
10   extracted the user table into a format that could be
11   read by Excel.
12       Q.   And are the user IDs in the Paybase database
13   the same as in the ZenCloud database or are they
14   unique?
15       A.   Well, the numbers are -- I mean, they're
16   typically sequential.
17       Q.   Right.
18       A.   So let's start with 1 --
19       Q.   Okay.
20       A.   -- and go all the way to 8,679.  They may
21   skip some but --
22       Q.   Okay.
23       A.   -- they should be unique.  So those same
24   numbers will appear in the other database --
25       Q.   Okay.

Page 65

1        A.   -- or many of them anyway.
2        Q.   Okay.
3        A.   But that doesn't mean that they're the same
4    user --
5        Q.   Okay.
6        A.   -- because they're separate databases.
7        Q.   Understood.  So someone's user ID in
8    ZenCloud is not the same as their user ID in Paybase?
9        MR. WATTERSON:  Object to the form.
10       THE WITNESS:  Yeah, I think theoretically
11   that could be true that they're the same, but I
12   don't -- I think that would be not a necessary
13   condition.
14   BY MS. CAVE:
15       Q.   Okay.  Is there any conversion table between
16   ZenCloud and Paybase to tell you one particular
17   individual what their user ID is in each database?
18       A.   I'm not certain.
19       Q.   Okay.  Is that anything you've seen?
20       A.   I don't recall seeing something like that.
21       Q.   Okay.
22       A.   But it could potentially be in the database
23   somewhere.
24       Q.   Okay.  Okay.  In paragraph 6 of your
25   declaration you list a number of different types of

Page 66

1 transactions starting with "fund." Do you know what
2 each of those are or would you need to do further
3 analysis to determine what those mean with respect to
4 a particular user?
5    A.  To see what's actually being transacted, I
6 think I might have to look beyond the table, but I'm
7 not certain as I sit here.
8    Q.  What beyond the table, would you need to
9 look?
10    A.  Well, I'd look at other tables in the
11 database to see how they link together. That may or
12 may not be necessary for purposes of calculating
13 damages, I don't know, because I haven't done that
14 yet.
15    Q.  Okay.  All right.  In paragraph 7 you say
16 that you anticipate calculating class-wide damages
17 for the plaintiffs in this case based on a uniform
18 methodology.
19       What methodology are you planning to use?
20    A.  I'm planning to look at the value of the
21 consideration paid for the products at issue and
22 compare that to the value received and use that as a
23 measure of damages.
24    Q.  Do you plan to use any other methods?
25       MR. WATTERSON:  Object to the form.

Page 67

1       THE WITNESS:  If I'm asked I may look at it
2 from other perspectives, but as I sit here I'm not
3 certain that I will be.
4 BY MS. CAVE:
5    Q.  And what is the source of information that
6 you plan to use to -- for purposes of calculating the
7 value of the consideration paid?
8    A.  Well, I would expect to use the
9 transactional database and various records with -- or
10 various tables within the databases that I've
11 analyzed to determine purchases and other outlays of
12 cash.
13    Q.  Do you anticipate using any -- needing --
14 strike that.
15       Do you anticipate using any information
16 outside of the databases to calculate the value of
17 the consideration paid?
18       MR. WATTERSON:  Object to the form.
19       THE WITNESS:  It's possible I may use other
20 information, but nothing comes to mind as I sit here.
21 BY MS. CAVE:
22    Q.  Okay.
23    A.  I think the purpose of these databases is to
24 show -- to record the transactions of users, so this
25 is the data I would expect to use.

Page 68

1    Q.  Okay.  So again, that assumes that all the
2 transactions are in the database?
3       MR. WATTERSON:  Object to the form.
4       THE WITNESS:  Well, I don't know that it
5 assumes that.  I mean, in order for me to analyze the
6 transaction it will have to be in some database, but
7 that's all I can say, I think.
8 BY MS. CAVE:
9    Q.  How do you anticipate calculating the value
10 received?
11    A.  One way in which I think that can be
12 accomplished is to understand how much was -- the
13 value of what was withdrawn from the user accounts.
14 So the value that was received would be the value
15 that was actually taken out of the accounts by the
16 users.
17    Q.  In your prior experience calculating
18 damages, have you ever employed this methodology
19 before?
20    A.  Yes, at a high level.  I mean, you know, the
21 specifics of every case are different, but at a high
22 level I have looked at out-of-pocket damages and
23 similar forms of damages that look at the value paid
24 versus the value received.
25    Q.  Are you aware that there are some users --

Page 69

1 some customers of GAW Miners and Zenminers who
2 engaged in private purchases of Cryptocurrency
3 products?
4       MR. WATTERSON:  Object to the form.
5       THE WITNESS:  By "Cryptocurrency products,"
6 do you mean Cryptocurrencies or you mean something
7 else?
8 BY MS. CAVE:
9    Q.  I mean the products that were offered by GAW
10 Miners and Zenminers, that there are some
11 customers -- some of the proposed members of the
12 class who purchased those products in private sales.
13    A.  Well, my understanding based on the
14 databases that -- and speaking with Mr. Lucas is that
15 there were -- there was some ability for buying and
16 selling certain products, and I think we have some
17 transactional data concerning sales like that.
18    Q.  So the databases record all of the private
19 sales?
20    A.  Well, I can't attest to that.
21    Q.  Okay.  So there may be private sales that
22 are not recorded in the databases that you have?
23    A.  That seems like a theoretical possibility.
24 I mean, I can't attest to what -- that the database
25 includes every single transaction.  I mean, there are

1     millions and millions of transactions, so I can't
2     attest to that. I have to -- I mean, I'm keeping
3     the database and relying on it, at least for purposes
4     of the declaration and -- but I can't say that it
5     captures every single transaction that's ever
6     occurred.
7       Q.  Are the gains or losses on those private
8     sales something that the plaintiffs are claiming
9     here?
10       Let me rephrase that.
11       Are any losses that the plaintiffs may have
12     sustained on a private sale something that will be
13     included in your damages calculation here?
14       MR. WATTERSON:  Object to the form.
15       THE WITNESS:  Well, what I'm envisioning is
16     a damages calculation that looks at the consideration
17     paid and compares that to the value received, and so
18     if a transaction results in value received that's
19     ultimately withdrawn from the account, then I think
20     it would be relevant to that calculation.
21 BY MS. CAVE:
22       Q.  And how do you anticipate getting the
23     information about those private sales?
24       A.  Well, I suspect the database contains those
25     records.

1       Q.  The database contains the records of the
2     private sales?
3       A.  Well, it does contain sales data.  As I
4     said, I can't attest that it includes every
5     transaction.  That would be -- I don't think anybody
6     could attest to that.  But my understanding is it
7     does contain information about private sales, and you
8     know, we have information about transactions that
9     occur within customer accounts, and so I would expect
10     to be able to identify that.
11       Q.  Which transactions are in -- let me rephrase
12     that.
13       What's the difference between the
14     transactions that are recorded in the ZenCloud
15     database and the transactions that are recorded in
16     the Paybase database?
17       A.  My recollection is that looking -- in
18     looking at the Paybase database it appeared to be
19     transactions related to PayCoin.
20       Q.  Uh-huh.
21       A.  And the ZenCloud database appeared to be
22     transactions related to Hashlets, Hashpoints, and
23     perhaps Hashstakers.
24       Q.  Okay.  So they're -- your understanding is
25     that they're mutually exclusive as far as the types

1     of products that were -- the transactions and the
2     types of products that were recorded in each?
3       MR. WATTERSON:  Object to the form.
4       THE WITNESS:  And I'd have to look at every
5     table to be certain that they're mutually exclusive.
6     But my recollection is that the transaction table
7     that -- within the Paybase database appeared to be
8     capturing different information.
9       MS. CAVE:  Just give us a moment.
10     We'll mark Exhibit 216.
11       (Exhibit 216 Memorandum of Law in
12       Support of Plaintiffs' Motion for
13       Class Certification, marked for
14       identification as of this date.)
15       THE WITNESS:  Thank you.
16 BY MS. CAVE:
17       Q.  So Exhibit 216 is the plaintiffs' memorandum
18     of law in support of their motion for class
19     certification in this case.
20       Is this something that you've reviewed
21     before?
22       A.  Yes.
23       Q.  Okay.  Did you review it before it was filed
24     or after it was filed?
25       A.  I don't recall reviewing it before, so I

1     think it was after.
2       Q.  Okay.  If I could turn your attention to
3     page 32.  Okay.  And the second full paragraph says
4     (reading):
5         "Plaintiffs plan to calculate the
6         class's out-of-pocket damages, i.e.,
7         the difference between the purchase
8         price and what the investor actually
9         received."
10       That's the same damages methodology that you
11     described a few minutes ago?
12       A.  Yeah, I think that's a fair
13     characterization.
14       Q.  Okay.  After the citation there it says
15     (reading):
16         "The calculation will be based on
17         the price investors paid for the
18         applicable securities, plus various
19         service fees the companies charged,
20         less any payouts or other value the
21         investor received from the
22         securities."
23       What is the source of the information you'll
24     use to calculate the service fees component of that
25     calculation?

Page 78

1    just his purchases but purchases of others as well,
2    so it has to be filtered and so that we're only
3    looking at completed transactions that are purchases
4    that are associated with his user ID.
5        Q.   Correct.  I'm sorry.  I meant specific to
6    him.
7             In other words, the 36 Bitcoins is not some
8    conversion -- currency conversion that you've
9    calculated.  It's just purely a summation of the
10   Bitcoin column from the table for the transactions
11   specific to Mr. Shinners?
12       A.   That's correct.
13       Q.   Okay.  Were there any transactions that you
14   excluded from the 1,000 -- from the -- sorry.
15            In your analysis, were there any
16   transactions that you excluded?
17       A.   In my analysis of arriving at the 1,388
18   figure?
19       Q.   Correct.
20       A.   Well, it's -- yes, because I'm only
21   including completed transactions that are
22   transaction-type purchases, so I'm excluding anything
23   that doesn't meet those criteria.
24       Q.   Okay.  So any free Hashlets that he might
25   have gotten, for example, did you exclude those from

Page 79

1    your analysis?
2        A.   Well, if they were free, they wouldn't
3    presumably have a Bitcoin amount in the Bitcoin
4    column, so I think they would be excluded.
5        Q.   Did you in fact exclude those from your
6    analysis?
7        A.   Well, I've only included purchases, so
8    anything outside of purchases is excluded from this
9    particular computation.  I'm reporting a value here
10   for a very specific type of transaction, a completed
11   transaction that involves a purchase.
12       Q.   Okay.  Does this total include transactions
13   that Mr. Shinners has engaged in with sellers other
14   than GAW Miners?
15       A.   I'm not certain.  I'd have to look at each
16   transaction and try to look at other tables to see
17   how -- what the linkage is.
18       Q.   Okay.  So you have to go through each of
19   Mr. Shinners' transactions to ascertain that?
20       A.   Yes.  I mean, you could either do it by hand
21   or you could run queries that do that, but yes.
22       Q.   Okay.  But for each user you would need to
23   do that either by hand or by running a query?
24       A.   Well, if we're talking about each user, then
25   I wouldn't be doing it by hand because that would

Page 80

1    take longer than we have.
2        Q.   I could imagine.  Life is short.  Okay.
3             Okay.  I'm going to mark Exhibit 217 -- oh,
4    sorry.  It's already marked.
5             Exhibit 96.  Just give us a second.  We'll
6    show you that.
7        A.   Oh, okay.
8        Q.   It was already marked at a prior deposition.
9        A.   Thank you.
10       Q.   Exhibit 96 is the plaintiffs' certifications
11   dated June 15, 2016, and it was previously marked at
12   another deposition as Exhibit 96.
13            I'll draw your attention to Exhibit 3 that
14   starts on page 55 of the printout that you have
15   there.  And if you turn to the next page it reports
16   that it's the sworn verification of Dean Allen
17   Shinners.
18            Do you see that?
19       A.   I do.
20       Q.   Is this a document that you've seen before
21   today?
22       A.   I can't be certain, although I think I may
23   have seen a portion of this yesterday.
24       Q.   Okay.  By the way, back in June 2016 were
25   you engaged already to work on this case?

Page 81

1        A.   I don't recall.  I'd have to look back at
2    the retention letter --
3        Q.   Okay.
4        A.   -- to see when we were retained.
5        Q.   Did you have any role in preparing what
6    starts on the next page as Exhibit A?
7        A.   No.
8        Q.   Okay.  So to save time we've already added
9    up here, and I'll represent to you that there are 212
10   purchases by Mr. Shinners shown on this table and 61
11   sales.  So 212 purchases and 61 sales.
12            Do you have any information to suggest that
13   Mr. Shinners engaged in any other purchases or sales
14   that are not listed here?
15       A.   I've never tried to compare this to the
16   database, so I don't know.
17       Q.   Okay.  So you never looked at this along
18   side the information that you analyzed with respect
19   to Mr. Shinners?
20       A.   I have not done that, no.
21       Q.   Okay.
22       A.   No.  The analyzed -- the analysis I've done
23   for Mr. Shinners is just what I've recorded in the
24   declaration.
25       Q.   Okay.  Is that something that you plan to do

Page 82

1  at any point?
2      A.  I haven't thought about it.  I may.
3      Q.  Do you understand that this is Mr. Shinners'
4  representation of all of the purchases and sales of
5  GAW Miners and Zenminers Cryptocurrency that he's
6  claiming to recover in this case?
7      A.  I don't know, but I can look at the
8  certification if you like.
9      Q.  Yeah, I'll draw your attention to
10  paragraph 4.
11      A.  Okay.  I see what he says.  Yes.
12      Q.  Okay.  Okay.  So again, you haven't done any
13  analysis with respect to Mr. Shinners' certification
14  here?
15      A.  No.
16      Q.  Okay.  Have you done it with respect to --
17  I'll represent to you that there are other
18  certifications by each of the other putative class
19  representatives.
20          Have you looked at any of those or done any
21  analysis with respect to any of those?
22      MR. WATTERSON:  Object to the form.
23      THE WITNESS:  I haven't analyzed the
24  certifications.
25      MS. CAVE:  Okay.  Thank you.  You can set

Page 83

1  that to the side.
2      Why don't we take a short break.
3      MR. WATTERSON:  Sure.
4      THE VIDEOGRAPHER:  Off video at 11:32.
5      (Recess held 11:32 a.m. to 11:50 a.m.)
6      THE VIDEOGRAPHER:  Back on video at
7  11:50 a.m.
8  BY MS. CAVE:
9      Q.  Mr. Mills, is it possible from the ZenCloud
10  and Paybase databases that you've looked at to
11  identify which user name pertains to which customer?
12      A.  I'm not sure I understand the question.
13      Q.  Is there sufficient information in the
14  databases that you've looked at to identify which
15  customer is behind each user name?
16      A.  Well, there's some information like an email
17  address, for example, and a user name.
18      Q.  Sorry.  Let me correct my question.
19          For each user ID is it possible to identify
20  who the customer is that connects to that user ID?
21      A.  I mean, there's information provided about
22  that customer, but I'm not sure what you mean by
23  identify that customer.  There's an email address.
24  There's a user ID.  There's other information for
25  some --

Page 84

1      Q.  Uh-huh.
2      A.  -- some of the user IDs.  There's not a
3  Social Security or something like that, but there is
4  information concerning the users.
5      MS. CAVE:  I'm going to show you what we've
6  marked as Exhibit 217.
7      (Exhibit 217 Letter from D. Allen
8      Shinners to Judge Robert Chatigny,
9      marked for identification as of this
10      date.)
11  BY MS. CAVE:
12      Q.  Exhibit 217 is a letter from D. Allen
13  Shinners to Judge Robert Chatigny, and it says that
14  it's a victim's impact statement by Mr. Shinners.
15          Do you see that?
16      A.  Yes.
17      Q.  Okay.  Is this something you've seen before
18  today?
19      A.  I don't believe so.
20      Q.  Okay.  If I could turn your attention to the
21  second page of the -- certainly take as much time as
22  you like to review it, but I'll draw your attention
23  to the second page in particular.
24      A.  Okay.
25      Q.  Okay.  And the second full paragraph down

Page 85

1  Mr. Shinners says (reading):
2      "I started a drive to help many
3      investors recover some of their
4      losses through the credit card
5      chargeback process.  I recovered
6      almost all of my credit card charges
7      save two."
8      Do you understand what Mr. Shinners is
9  referring to by the credit card chargeback process?
10      A.  I mean, I think so --
11      Q.  Okay.
12      A.  -- but I'm not absolutely certain.
13      Q.  And he goes on to say (reading):
14      "The rest of my losses,
15      approximately 18,000, remained from
16      Bitcoin purchases and using that
17      Bitcoin to purchase GAW Miners
18      Hashlets and Hashstakers."
19      Do you see that?
20      A.  Yes.
21      Q.  Okay.  And he says then (reading):
22      "These investments were not
23      recoverable, roughly 30 Bitcoins in
24      total."
25      Do you see that?

Page 86

1   A.  Yes.
2   Q.  And so that number that he has, 30 Bitcoins,
3   is different than the number that's in your
4   paragraph 8 of your declaration, which is 36
5   Bitcoins, correct?
6   A.  Well, 30 is not 36, that's correct.
7   Q.  Okay.
8   A.  But I don't know that these are necessarily
9   trying to measure the same thing.
10   Q.  Okay.  What do you mean by that?
11   A.  Well, he's referring to a portion of his
12   investment not being recoverable, and I'm referring
13   to purchases -- completed purchases in a transaction
14   table.  So I'm not sure that those line up -- those
15   are the same thing.
16   Q.  Okay.  If assuming Mr. Shinners is correct
17   here that he recovered some of his losses through the
18   credit card chargeback process, is that something
19   that you would include in the value received
20   component of the damages methodology that you spoke
21   about with respect to paragraph 7 of your
22   declaration?
23   A.  I think I'd have to have a conversation with
24   counsel about that to understand, from a legal
25   standpoint, what that means for damages.  It may be

Page 87

1   something I'd want to something.  I mean, it's
2   something I'd want to consider, but it may be
3   something I'd have to actually utilize in my
4   analysis, but I'd want to speak with counsel about
5   that and understand the legal aspects of it.
6   Q.  Okay.  But if Mr. Shinners got money back
7   through the credit card chargeback process, that's
8   value received, correct?
9   MR. WATTERSON:  Object to the form.
10   THE WITNESS:  It may well be, but I'd want
11   to know, you know, more, whether that's an offset
12   that's legitimate under the law and whether -- I
13   mean, there might be costs associated with that
14   chargeback as well, but...
15   BY MS. CAVE:
16   Q.  He doesn't say that there are any costs
17   associated with the chargeback, though, here, does
18   he?
19   A.  No, he doesn't address -- as far as I can
20   tell in this paragraph anyway, he doesn't address
21   costs at all, but...
22   Q.  And in any event, that's something that
23   you'd have to look into individually?
24   A.  Well, to understand the costs, that may be
25   true, yes.

Page 88

1   Q.  Mr. Shinners says here he -- that he helped
2   many investors recover some of their losses through
3   credit card chargeback.  So in addition to
4   Mr. Shinners, there are other investors that you
5   would need to look at to assess whether this is
6   something you need to take into account in your
7   damages analysis -- methodology, right?
8   A.  Perhaps, yeah.  I'd want to talk to counsel
9   about this and understand the implications.
10   Q.  Okay.  Are there any tables in the databases
11   that you've looked at that reflect recovery through
12   the credit card chargeback process?
13   A.  I don't know.  I haven't looked specifically
14   for that, so I'm not certain.
15   Q.  Okay.  Is there any other information that
16   you've seen in this case that shows you the amounts
17   that investors recovered through the chargeback --
18   credit card chargeback process?
19   A.  No.
20   Q.  Okay.  Is that something that you would want
21   to see?
22   A.  Perhaps I'll have to have a conversation
23   with counsel to understand the ramifications of this
24   from a legal standpoint to see whether it's relevant,
25   but perhaps.

Page 89

1   Q.  Okay.  Okay.  You can set that to the side,
2   Mr. Mills.  Thank you.
3   Are you aware, Mr. Mills, that the SEC has
4   undertaken an analysis of versions of the ZenCloud
5   and Paybase databases?
6   A.  I have heard that's true, yes.
7   MS. CAVE:  Okay.  So I'm going to show you
8   what we'll mark as Exhibit 218.
9   (Exhibit 218 Email from Allen Shinners
10   to Mark E. Munster, March 1, 2016,
11   attaches declaration of Trevor T.
12   Donelan, marked for identification as
13   of this date.)
14   BY MS. CAVE:
15   Q.  And Exhibit 218 is an email from
16   Mr. Shinners to Mark E. Munster dated March 1, 2016
17   and it attaches the declaration of Trevor T. Donelan.
18   Is this anything you've seen before?
19   A.  No.
20   Q.  Okay.  And if you could turn to the --
21   certainly take as much time as you'd like to review
22   it, Mr. Mills, but I'll draw your attention to
23   paragraph 6 in particular.
24   A.  Okay.  I'm at paragraph 6.
25   Q.  Okay.  And so here Mr. Donelan says that

Page 122

1    Q.  Okay.  You mentioned yesterday that
2    Mr. Seltzer stopped by your meeting with
3    Mr. Watterson.  Had you met Mr. Seltzer before
4    yesterday?
5        A.  I have met him before, yes.
6        Q.  Have you worked with him on an engagement
7    before?
8        A.  I've worked on an engagement -- at least one
9    engagement where he was involved as a -- not somebody
10   that I talked with --
11       Q.  Okay.
12       A.  -- on a day-to-day basis.
13       MS. CAVE:  Okay.  We have no further
14   questions today.
15           We reserve the right to, if you put in a
16   rebuttal declaration or report, to seek an
17   opportunity to ask you more questions, but for today
18   that's all we have.  Thank you.
19       THE WITNESS:  Thank you.
20       MS. CAVE:  Okay.
21       MR. WATTERSON:  We'll reserve our questions.
22       MS. CAVE:  Okay.
23       THE VIDEOGRAPHER:  This concludes today's
24   deposition.  Off video at 1:44 p.m.
25           (Witness excused, 1:44 p.m.)

Page 123

1    STATE OF CALIFORNIA          )
                                  ) ss.
2    COUNTY OF LOS ANGELES  )
3
4        I, NIKKI ROY, Certified Shorthand Reporter,
5    certificate number 3052, for the State of California,
6    hereby certify:
7        The foregoing proceedings were taken before me
8    at the time and place therein set forth, at which time
9    the deponent was placed under oath by me;
10       The testimony of the deponent and all
11   objections at the time of the examination were recorded
12   stenographically by me and were thereafter transcribed;
13       The foregoing transcript is a true and correct
14   transcript of my shorthand notes so taken;
15       I further certify that I am neither counsel for
16   nor related to any party to said action nor in any way
17   interested in the outcome thereof.
18       In witness whereof I have hereunto subscribed
19   my name this 2nd day of November, 2018.
20
21   _____
22       NIKKI ROY
23
24
25

Page 124

1    ERRATA SHEET FOR THE TRANSCRIPT OF:
2    Case Name:  Denis Marc Audet v. Stuart A. Fraser
3    Dep. Date:  October 30, 2018
4    Deponent:  ROBERT MILLS
5            CORRECTIONS:
6    Pg. Ln.  Now Reads    Should Read    Reason
7    ___ _____ _____ _____
8    ___ _____ _____ _____
9    ___ _____ _____ _____
10   ___ _____ _____ _____
11   ___ _____ _____ _____
12   ___ _____ _____ _____
13   ___ _____ _____ _____
14   ___ _____ _____ _____
15   ___ _____ _____ _____
16   ___ _____ _____ _____
17   ___ _____ _____ _____
18   ___ _____ _____ _____
19   ___ _____ _____ _____
20   _____
21       Signature of Deponent
22   SUBSCRIBED AND SWORN BEFORE ME
23   THIS _____DAY OF _____ 2018.
24
25

EXHIBIT 4

| From: | support=paybase.com@cloud.zenminer.com on behalf of Paybase |
| To: | josh@gaw.com |
| Subject: | Thanks for signing up for paybase! |
| Date: | Sunday, December 28, 2014 10:41:07 AM |

Hello

We would like to welcome you to paybase!

Before you can use your account, you will need to activate it. This can be done by clicking the button below!

<div style="background:#008B8B;color:#fff;text-align:center;padding:2em;font-size:1.5em;font-weight:bold">Activate Account</div>

Please note that this link will expire in 5 days.

If you did not sign up for paybase, please ignore this email.

Thanks,
paybase

If you have any questions you can contact us at support@paybase.com

# EXHIBIT 5

| | |
|---|---|
| **From:** | Paybase |
| **To:** | Matthew |
| **Subject:** | You"re Invited to PayBase |
| **Date:** | Sunday, December 28, 2014 11:26:14 PM |

Paybase is here.                                                    View this email in your browser



# Welcome to PayBase

You've been invited to join the grand opening of PayBase.

Tomorrow, you'll be able to signup to PayBase and make your Paycoins more powerful by being able to use them in your everyday life. Early invites enjoy 10% off online orders with Amazon, Walmart, Target and more on orders made though PaySave. And to sweeten the deal even more, soon PayBase will let you track your finances, split bills, give tips, and retrieve the best prices from multiple online retailers. All while saving you money and protecting your identity.

Welcome to the future of online payments.

**Prepare for Paybase**

---

## Join the PayBase Movement

**Merchant Approved**
You shouldn't be limited by cryptocurrency. That's why PayBase allows you to buy from Amazon, Walmart, Target, and more. Your Paycoins are more powerful with PayBase, letting you buy from the

stores you already love.

### Avoid Network Fees

PayBase allows you to send and receive payments without owning or using a credit card. That means you bypass costly credit card networks and save money on every transaction you make.



### Air-Tight Security

PayBase accounts are protected by the same level of encryption used by the CIA. This lets you send and spend your money without

### Identity Guard

Personal information loses it's meaning when you are required to share it every day. PayBase changes that. PayBase transactions never reveal any of your sensitive personal information, like credit card numbers, name, or billing address. Share only the information you're comfortable with.

Share    Tweet    Forward to Friend

*Copyright © 2014 Paybase, All rights reserved.*
We send special offers to customers who opted in at www.gawminers.com

**Mailing address:**
GAW Miners
34 E Dudley Town Rd

Bloomfield, CT 06002

Add us to your address book

Do not reply to this email. The reply address is not monitored.

unsubscribe from this list   update subscription preferences

12/21/2018
Case 3:16-cv-00940-MPS    Document 114-1    Filed 12/21/18    Page 55 of 109
You're Invited to PayBase!

Tra

Paybase is here.

View this email in your browser





# Welcome to PayBase

You've been invited to join the grand opening of PayBase.

Tomorrow, you'll be able to signup to PayBase and make your Paycoins more powerful by being able to use them in your everyday life. Early invites enjoy 10% off online orders with Amazon, Walmart, Target and more on orders made though PaySave. And to sweeten the deal even more, soon PayBase will let you track your finances, split bills, give tips, and retrieve the best prices from multiple online retailers. All while saving you money and protecting your identity.

Welcome to the future of online payments.

Prepare for Paybase

---

## Join the PayBase Movement



### Merchant Approved

You shouldn't be limited by cryptocurrency. That's why PayBase allows you to buy from Amazon, Walmart, Target, and more. Your Paycoins are more powerful with PayBase, letting you buy from the stores you already love.

### Avoid Network Fees

PayBase allows you to send and receive payments without owning or using a credit card. That means you bypass costly credit card networks and save money on every transaction you make.





### Air-Tight Security

PayBase accounts are protected by the same level of encryption used by the CIA. This lets you send and spend your money without

### Identity Guard

Personal information loses it's meaning when you are required to share it every day. PayBase changes that. PayBase transactions never reveal any of your sensitive personal information, like credit card numbers, name, or billing address. Share only the information you're comfortable with.



  

*Copyright © 2014 Paybase, All rights reserved.*

Do not reply to this email. The reply address is not monitored.
unsubscribe from this list    update subscription preferences

EXHIBIT 6



# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Boston Regional Office
33 Arch Street, 23rd Floor
Boston, Massachusetts 02110

**DIVISION OF ENFORCEMENT**

Gretchen Lundgren
Counsel, Division of Enforcement
617-573-4578

February 6, 2015

**Via UPS**
GAW Miners, LLC
34 E. Dudley Town Road
Bloomfield, CT 06002

   Re:  <u>In the Matter of GAW Miners, LLC (B-02979)</u>

Dear GAW Miners, LLC,

  The staff of the Boston Regional Office of the United States Securities and Exchange Commission is conducting an investigation in the matter identified above.  The enclosed subpoena has been issued to you as part of this investigation.  The subpoena requires you provide us documents.

  Please read the subpoena and this letter carefully.  This letter answers some questions you may have about the subpoena.  You should also read the enclosed SEC Form 1662.  You must comply with the subpoena.  You may be subject to a fine and/or imprisonment if you do not.

## Producing Documents

*What materials do I have to produce?*

  The subpoena requires you to provide us the documents described in the attachment to the subpoena.  You must provide these documents by February 27, 2015.  The attachment to the subpoena defines some terms (such as "Document") before listing what you must provide.

  You should produce each and every document in your possession, custody, or control, including any documents that are not in your immediate possession but that you have the ability to obtain.  All responsive documents shall be produced as they are kept in the usual course of business, and shall be organized and labeled to correspond with the numbered paragraphs in the subpoena attachment.  In that regard, documents should be produced in a unitized manner, *i.e.*, delineated with staples or paper clips to identify the document boundaries.

  Documents responsive to this subpoena may be in electronic or paper form.  Electronic documents such as email should be produced in accordance with the attached document entitled SEC Data Delivery Standards (the "Standards").  If you have any questions concerning the production of documents in an electronic format, please contact me as soon as possible but in any event before producing documents.  **All electronic documents responsive to the document subpoena, including all metadata, must also be secured and retained in their native software format and stored in a safe place.**  The staff may later request or require that you produce the native format.

GAW Miners, LLC
February 6, 2015
Page 2

For documents in paper format, you may send the originals, or, if you prefer, you may send copies of the originals. The Commission cannot reimburse you for the copying costs. If you are sending copies, the staff requests that you scan (rather than photocopy) hard copy documents and produce them in an electronic format consistent with the Standards. Alternatively, you may send us photocopies of the documents in paper format. **If you choose to send copies, you <u>must</u> secure and retain the originals and store them in a safe place.** The staff may later request or require that you produce the originals.

Whether you scan or photocopy documents, the copies must be identical to the originals, including even faint marks or print. Also, please note that if copies of a document differ in any way, they are considered separate documents and you must send each one. For example, if you have two copies of the same letter, but only one of them has handwritten notes on it, you must send both the clean copy and the one with notes.

If you <u>do</u> send us scanned or photocopied documents, please put an identifying notation on each page of each document to indicate that you produced it, and number the pages of all the documents submitted. (For example, if Jane Doe sends documents to the staff, she may number the pages JD-1, JD-2, JD-3, etc., in a blank corner of the documents.) Please make sure the notation and number do not conceal any writing or marking on the document. If you send us originals, please do not add any identifying notations.

In producing a photocopy of an original document that contains post-it(s), notation flag(s), or other removable markings or attachments which may conceal all or a portion of the markings contained in the original document, photocopies of the original document both with and without the relevant post-it(s), notation flag(s), or removable markings or attachments should be produced.

*Do I need to send anything else?*

You should enclose a list briefly describing each item you send. The list should state to which numbered paragraph(s) in the subpoena attachment each item responds.

Please include a cover letter stating whether you believe you have met your obligations under the subpoena by searching carefully and thoroughly for everything called for by the subpoena, and sending it all to us.

Please also provide a narrative description describing what you did to identify and collect documents responsive to the subpoena. At a minimum, the narrative should describe:

- who searched for documents;

- who reviewed documents found to determine whether they were responsive;

- what sources were searched (e.g., computer files, CDs, DVDs, thumb drives, flash drives, online storage media, hard copy files, diaries, datebooks, planners, filing cabinets, home office, work office, voice mails, home email, webmail, work email, backup tapes or other media);

- what third parties, if any, were contacted to obtain responsive documents (e.g., phone companies for phone records, brokerage firms for brokerage records); and

- where the original electronic and hardcopy documents are maintained and by whom.

GAW Miners, LLC
February 6, 2015
Page 3

*What if I do not send everything described in the attachment to the subpoena?*

The subpoena requires you to send <u>all</u> the materials described in it. If, for any reason – including a claim of attorney-client privilege – you do not produce something called for by the subpoena, you should submit a list of what you are not producing. The list should describe each item separately, noting:

- its author(s);

- its date;

- its subject matter;

- the name of the person who has the item now, or the last person known to have it;

- the names of everyone who ever had the item or a copy of it, and the names of everyone who was told the item's contents;

- the reason you did not produce the item; and

- the specific request in the subpoena to which the document relates.

If you withhold anything on the basis of a claim of attorney-client privilege or attorney work product protection, you should identify the attorney and client involved. If you withhold anything on the basis of the work product doctrine, you should also identify the litigation in anticipation of which the document was prepared.

If documents responsive to this subpoena no longer exist because they have been lost, discarded, or otherwise destroyed, you should identify such documents and give the date on which they were lost, discarded or destroyed.

*Where should I send the materials?*

> Gretchen Lundgren, <u>Attn</u>: Jason Farrell
> U.S. Securities and Exchange Commission
> Boston Regional Office
> 33 Arch Street, 23rd Floor
> Boston, Massachusetts 02110

## **Other Important Information**

*May I have a lawyer help me respond to the subpoena?*

Yes. You have the right to consult with and be represented by your own lawyer in this matter. Your lawyer may also advise and accompany you when you testify. We cannot give you legal advice.

*What will the Commission do with the materials I send and/or the testimony I provide?*

The enclosed SEC Form 1662 includes a List of Routine Uses of information provided to the Commission. This form has other important information for you. Please read it carefully.

GAW Miners, LLC
February 6, 2015
Page 4

*Has the Commission determined that anyone has done anything wrong?*

This investigation is a non-public, fact-finding inquiry.  We are trying to determine whether there have been any violations of the federal securities laws.  The investigation and the subpoena do not mean that we have concluded that you or anyone else has broken the law.  Also, the investigation does not mean that we have a negative opinion of any person, entity or security.

*Important Policy Concerning Settlements*

Please note that, in any matter in which enforcement action is ultimately deemed to be warranted, the Division of Enforcement will not recommend any settlement to the Commission unless the party wishing to settle certifies, under penalty of perjury, that all documents responsive to Commission subpoenas and formal and informal document requests in this matter have been produced.

*I have read this letter, the subpoena, and the SEC Form 1662, but I still have questions.  What should I do?*

If you have any other questions, you may call me at 617-573-4578.  If you are represented by a lawyer, you should have your lawyer contact me.

Sincerely,

Gretchen Lundgren
Counsel, Division of Enforcement

Enclosures:    Subpoena and Attachment
SEC Data Delivery Standards
SEC Form 1662
Business Records Certification



## SUBPOENA

# UNITED STATES OF AMERICA
## SECURITIES AND EXCHANGE COMMISSION

**In the Matter of GAW Miners, LLC (B-02979)**

To:     GAW Miners, LLC
        34 E. Dudley Town Road
        Bloomfield, CT 06002

☒     **YOU MUST PRODUCE** everything specified in the Attachment to this subpoena to officers of the
        Securities and Exchange Commission, at the place, date and time specified below:

        U.S. Securities and Exchange Commission, Boston Regional Office, 33 Arch Street, 23rd
        Floor, Boston, Massachusetts 02110 no later than February 27, 2015 at 9:30 a.m.

        **FEDERAL LAW REQUIRES YOU TO COMPLY WITH THIS SUBPOENA**.
            Failure to comply may subject you to a fine and/or imprisonment.

By: _____          Date:   2·6·15
        Gretchen Lundgren, Counsel, Division of Enforcement
        U.S. Securities and Exchange Commission
        33 Arch Street, 23rd Floor
        Boston, Massachusetts  02110

I am an officer of the U.S. Securities and Exchange Commission authorized to issue subpoenas in this
matter.  The Securities and Exchange Commission has issued a formal order authorizing this investigation
under: Section 20(a) of the Securities Act of 1933 and Section 21(a) of the Securities Exchange Act of 1934.

NOTICE TO WITNESS:          If you claim a witness fee or mileage, submit this subpoena with the claim voucher.

**SUBPOENA ATTACHMENT FOR GAW MINERS, LLC**
**February 6, 2015**
In the Matter of GAW Miners, LLC (B-02979)

## A.     Definitions

As used in this subpoena, the words and phrases listed below shall have the following meanings:

1.     "GAW Miners, LLC" ("GAW") means the entity doing business under the name "GAW Miners, LLC" or "GAW Miners" including parents, subsidiaries, affiliates, predecessors, successors, officers, directors, employees, agents, general partners, limited partners, partnerships and aliases, code names, or trade or business names used by any of the foregoing, including, without limitation, Josh Garza, PayBase, PayCoin and ZenMiner.

2.     "Initial Coin Offering" means the period in which PayCoins were offered for sale for a predetermined price prior to the public launch of PayCoin.

3.     "Coin Adoption Fund" means the multi-tier, organized strategy for increasing global adoption of PayCoin, as described in the PayCoin White Paper.

4.     "Hashstaker" means the cloud staking wallet offered by GAW, as described in the "Official Hashstakers Announcement" on the website www.gawminers.com.

5.     "Person" means a natural person, firm, association, organization, partnership, business, trust, corporation, bank or any other private or public entity.

6.     A "Representative" of a Person means any present or former family members, officers, executives, partners, joint-venturers, directors, trustees, employees, consultants, accountants, attorneys, agents, or any other representative acting or purporting to act on behalf of the Person.

7.     "Document" shall include, but is not limited to, any written, printed, or typed matter including, but not limited to all drafts and copies bearing notations or marks not found in the original, letters and correspondence, interoffice communications, slips, tickets, records, worksheets, financial records, accounting documents, bookkeeping documents, memoranda, reports, manuals, telephone logs, telegrams, facsimiles, messages of any type, telephone messages, voice mails, tape recordings, notices, instructions, minutes, summaries, notes of meetings, file folder markings, and any other organizational indicia, purchase orders, information

recorded by photographic process, including microfilm and microfiche, computer printouts, spreadsheets, and other electronically stored information, including but not limited to writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations that are stored in any medium from which information can be retrieved, obtained, manipulated, or translated.

8.    "Communication" means any correspondence, contact, discussion, e-mail, instant message, or any other kind of oral or written exchange or transmission of information (in the form of facts, ideas, inquiries, or otherwise) and any response thereto between two or more Persons or entities, including, without limitation, all telephone conversations, face-to-face meetings or conversations, internal or external discussions, or exchanges of a Document or Documents.

9.    "Concerning" means directly or indirectly, in whole or in part, describing, constituting, evidencing, recording, evaluating, substantiating, concerning, referring to, alluding to, in connection with, commenting on, relating to, regarding, discussing, showing, describing, analyzing or reflecting.

10.   An "Agreement" means any actual or contemplated (i) written or oral Agreement; (ii) term or provision of such Agreement; or (iii) amendment of any nature or termination of such Agreement.  A request for any Agreement among or between specified parties includes a request for all Documents Concerning (i) any actual or contemplated Agreement among or between such parties, whether or not such Agreement included any other Person; (ii) the drafting or negotiation of any such Agreement; (iii) any actual or contemplated demand, request or application for any such Agreement, and any response thereto; and (iv) any actual or contemplated objection or refusal to enter into any such Agreement, and any response thereto.

11.   The terms "Reviewed" means examined, assessed, considered, analyzed or evaluated.

12.   The term "you" and "your" means the Person or entity to whom this subpoena was issued.

13.   To the extent necessary to bring within the scope of this subpoena any information or Documents that might otherwise be construed to be outside its scope:

    a.    the word "or" means "and/or";
    b.    the word "and" means "and/or";
    c.    the functional words "each," "every" "any" and "all" shall each be deemed to include each of the other functional words;

     d.     the masculine gender includes the female gender and the female gender includes the masculine gender; and

     e.     the singular includes the plural and the plural includes the singular.

**B.**     <u>Instructions</u>

1.     Unless otherwise specified, the subpoena calls for production of the original Documents and all copies and drafts of same. Documents responsive to this subpoena may be in electronic or paper form. Electronic Documents such as email should be produced in accordance with the attached Document entitled SEC Data Delivery Standards. All electronic Documents responsive to the Document subpoena, including all metadata, should also be produced in their native software format.

2.     For Documents in paper format, you may send the originals, or, if you prefer, you may send copies of the originals. The Commission cannot reimburse you for the copying costs. If you are sending copies, the staff requests that you scan (rather than photocopy) hard copy Documents and produce them in an electronic format consistent with the SEC Data Delivery Standards. Alternatively, you may send us photocopies of the Documents in paper format. If you choose to send copies, you <u>must</u> secure and retain the originals and store them in a safe place. The staff may later request or require that you produce the originals.

3.     Whether you scan or photocopy Documents, the copies must be identical to the originals, including even faint marks or print. Also, please note that if copies of a Document differ in any way, they are considered separate Documents and you must send each one. For example, if you have two copies of the same letter, but only one of them has handwritten notes on it, you must send both the clean copy and the one with notes.

4.     In producing a photocopy of an original Document that contains post-it(s), notation flag(s), or other removable markings or attachments which may conceal all or a portion of the markings contained in the original Document, photocopies of the original Document both with and without the relevant post-it(s), notation flag(s), or removable markings or attachments should be produced.

5.     Documents should be produced as they are kept in the ordinary course of business or be organized and labeled to correspond with the categories in this request. In that regard, Documents should be produced in a unitized manner, *i.e.*, delineated with staples or paper clips to identify the Document boundaries.

6.     Documents should be labeled with sequential numbering (bates-stamped).

7.   You must produce all Documents created during, or Concerning, the period January 1, 2014 to the present, unless otherwise specified.

8.   The scope of any given request should not be limited or narrowed based on the fact that it calls for Documents that are responsive to another request.

9.   You are not required to produce exact duplicates of any Documents that have been previously produced to the Securities and Exchange Commission staff **in connection with this matter**. If you are not producing Documents based upon a prior production, please identify the responsive Documents that were previously produced.

10.  For any Documents that qualify as records of regularly conducted activities under Federal Rule of Evidence 902(11), please complete a business records certification (a sample of which is enclosed) and return it with the Document production.

11.  This subpoena covers all Documents in or subject to your possession, custody or control, including all Documents that are not in your immediate possession but that you have the effective ability to obtain, that are responsive, in whole or in part, to any of the individual requests set forth below. If, for any reason – including a claim of attorney-client privilege – you do not produce something called for by the request, you should submit a list of what it is not producing. The list should describe each item separately, noting:

     a.   its author(s);
     b.   its date;
     c.   its subject matter;
     d.   the name of the Person who has the item now, or the last Person known to have it;
     e.   the names of everyone who ever had the item or a copy of it, and the names of everyone who was told the item's contents;
     f.   the basis upon which you are not producing the responsive Document;
     g.   the specific request in the subpoena to which the Document relates;
     h.   the attorney(s) and the client(s) involved; and
     i.   in the case of the work product doctrine, the litigation for which the Document was prepared in anticipation.

12.  If Documents responsive to this subpoena no longer exist because they have been lost, discarded, or otherwise destroyed, you should identify such Documents and give the date on which they were lost, discarded or destroyed.

C.   **Documents to be Produced**

1.   Documents sufficient to disclose the corporate structure of GAW, including, without limitation, the date and place of establishment, organization, and, if applicable, incorporation.

2.   Documents sufficient to disclose the corporate structure of Paybase, LLC, including, without limitation, the date and place of establishment, organization, and, if applicable, incorporation.

3.   Documents sufficient to disclose the corporate structure of Paycoin, LLC, including, without limitation, the date and place of establishment, organization, and, if applicable, incorporation.

4.   Documents sufficient to disclose the corporate structure of ZenMiner, including, without limitation, the date and place of establishment, organization, and, if applicable, incorporation.

5.   Documents sufficient to identify all current and former officers, directors, principals, owners, shareholders, employees, and all Representatives of GAW, and Documents sufficient to disclose, for each individual identified in response to this Item:
   a. title;
   b. dates of affiliation with GAW;
   c. current or last known personal address and phone number;
   d. mobile phone number;
   e. current or last known employment address and phone number; and
   f. salary or other compensation from January 1, 2014 to present.

6.   Documents sufficient to disclose all domestic and foreign bank, brokerage, or other financial accounts, including bitcoin or Paycoin wallets, held by or on behalf of GAW from January 1, 2014 to present.

7.   Documents sufficient to disclose all other assets held by or on behalf of GAW, including, without limitation, crypto-currency mining equipment.

8.   Documents sufficient to identify all GAW investors by name.  For each Person identified, provide the personal address, work address, email address, phone number(s), and/or any other form of identifying information.

9.   For each investor identified in response to Item 8 above, Documents sufficient to disclose:
   a. the amount invested;
   b. the type of currency used to invest;

    c.  the date(s) of investments; and

    d.  whether, when, and how much of each investors' principal has been returned to them.

10.    For each investor identified in response to Item 8 above, all Documents Concerning Agreements or contracts between GAW and the investor.

11.    For each investor identified in response to Item 8 above, all Documents Concerning the investment of (or other use of) those funds by GAW, the terms of the investments, and the current location of investor funds.

12.    For each investor identified in response to Item 8 above, all periodic or other account statements.

13.    Documents sufficient to identify all individuals or entities who were solicited as potential investors but did not ultimately invest in GAW.

14.    All Documents Concerning Communications between GAW and investors or potential investors in GAW.

15.    All Documents and Communications relating to the Initial Coin Offering, including, without limitation, any solicitations, offering memoranda, prospectuses, and public filings.

16.    Documents sufficient to identify all Persons who purchased PayCoin from GAW during the Initial Coin Offering, including, without limitation, Private Investors, HashPoint Investors, and Early Public Investors, as those terms are used in GAW's diagram depicting the funding and launch of the coin, starting with the $2 offering to Private Investors and ending with the estimated value of $80-100 per coin. For all Persons, provide Documents sufficient to show each Person's name, screen-name, on-line wallet address, Hashstaker address, email address, phone number(s), business address, personal address, number of PayCoins purchased, and the price at which the PayCoins were purchased.

17.    All Documents and Communications relating to the public launch of PayCoin, including, without limitation, any offering solicitations, memoranda, prospectuses, and public filings.

18.    Documents sufficient to identify all Persons who purchased PayCoin from GAW after the public launch of the coin.  For all Persons, provide Documents sufficient to show each Person's name, screen-name, on-line wallet address, Hashstaker address, email address, phone number(s), business address, personal address, number of PayCoins purchased, and the price at which PayCoins were purchased.

19.    All Communications with purchasers and potential purchasers of PayCoin.

20.　　All Documents reflecting an accounting of the proceeds obtained from selling PayCoin.

21.　　All Documents reflecting an accounting of the Coin Adoption Fund.

22.　　Documents sufficient to identify all Persons who purchased one or more Hashstakers from GAW.  For all Persons, provide Documents sufficient to show each Person's name, screen-name, Hashstaker address, email address, phone number(s), business address, personal address, number of Hashstakers purchased, price at which the Hashstakers were purchased, the staking duration, number of PayCoins purchased for the Hashstaker, and the reported staking rate.



**U.S. Securities and Exchange Commission**

## Data Delivery Standards

This document describes the technical requirements for paper and electronic document productions to the U.S. Securities and Exchange Commission (SEC).   ***Any proposed file formats other than those described below must be discussed with the legal and technical staff of the SEC Division of Enforcement prior to submission.***

General Instructions ................................................................................................................................1

Delivery Formats .....................................................................................................................................2

   I.   *Concordance*® Imaged Productions..............................................................................................2

      1.  Images ............................................................................................................................2

      2.  *Concordance Image*® or Opticon Cross-Reference File ...............................................2

      3.  *Concordance*® Data File................................................................................................3

      4.  Text ................................................................................................................................3

      5.  Linked Native Files ........................................................................................................3

   II.   Native File Productions without loadfiles..................................................................................3

   III.   Adobe PDF File Productions……………………..............................................................3

   IV.  Audio Files ................................................................................................................................4

   V.  Video Files.................................................................................................................................4

   VI.  Electronic Trade and Bank Records ..........................................................................................4

   VII.  Electronic Phone Records...........................................................................................................4

**General Instructions**

Electronic files must be produced in their native format, i.e., the format in which they are ordinarily used and maintained during the normal course of business. For example, an MS Excel file must be produced as an MS Excel file rather than an image of a spreadsheet. *(Note: An Adobe PDF file is **not** considered a native file unless the document was initially created as a PDF.)*

In the event produced files require the use of proprietary software not commonly found in the workplace, the SEC will explore other format options with the producing party.

The proposed use of file de-duplication methodologies or *computer-assisted review* or *technology-assisted review* (TAR) during the processing of documents must be discussed with and approved by the legal and technical staff of the Division of Enforcement (ENF). If your production will be de-duplicated it is vital that you 1) preserve any unique metadata associated with the duplicate files, for example, custodian name, and, 2) make that unique metadata part of your production to the SEC.

Rev 10/2014

General requirements for **ALL** document productions are:

1. A cover letter should be included with each production and include the following:
   a. A list of each piece of media included in the production with its unique production volume number
   b. A list of custodians, identifying the Bates range for each custodian.
   c. The time zone in which the emails were standardized during conversion.
2. Data can be produced on CD, DVD, thumb drive, etc., using the media requiring the least number of deliverables and labeled with the following:
   a. Case number
   b. Production date
   c. Producing party
   d. Bates range
3. All submissions must be organized by **custodian** unless otherwise instructed.
4. All document family groups, i.e. email attachments, embedded files, etc., should be produced together and children files should follow parent files sequentially in the Bates numbering.
5. All load-ready collections should include only one data load file and one image pointer file.
6. All load-ready text must be produced as separate text files.
7. All load-ready collections should account for custodians in the custodian field.
8. Audio files should be separated from data files if both are included in the production.
9. Only alphanumeric characters and the underscore character are permitted in file names and **folder names**. Special characters are not permitted.
10. All data productions must be produced using industry standard self-extracting encryption software.
11. Passwords for documents, files, compressed archives and encrypted media must be provided separately either via email or in a separate cover letter from the media.
12. All productions should be produced free of computer viruses.
13. Additional technical descriptions can be found in the addendum to this document.

   *Please note that productions that come via United States Postal Service are subject to Mail Irradiation, as a result electronic productions may be damaged.*

**Delivery Formats**

**I.   *Concordance®* Imaged Productions**
   The SEC prefers that all documents and data be produced in a structured format prepared for Concordance. All scanned paper electronic file collections should be converted to TIFF files, Bates numbered, and include fully searchable text files.

   **1.   Images**
      a. Black and white images must be 300 DPI Group IV single-page TIFF files.
      b. Color images must be produced in JPEG format.
      c. File names cannot contain embedded spaces or special characters (including the comma).
      d. Folder names cannot contain embedded spaces or special characters (including the comma).
      d. All TIFF image files must have a unique file name, i.e. Bates number.
      e. Images must be endorsed with sequential Bates numbers in the lower right corner of each image.
      f. The number of TIFF files per folder should not exceed 500 files.
      g. Excel spreadsheets should have a placeholder image named by the Bates number of the file.
      h. AUTOCAD/photograph files should be produced as a single page JPEG file.

Rev 10/2014

U.S. Securities and Exchange Commission
Data Delivery Standards

2. **Concordance Image® OR Opticon Cross-Reference File**

The image cross-reference file to link the images to the database should be a comma- delimited file consisting of seven fields per line with a line in the cross-reference file for every image in the database with the following format:

*ImageID,VolumeLabel,ImageFilePath,DocumentBreak,FolderBreak,BoxBreak,Pag*

3. ***Concordance® Data File***

The data file (.DAT) contains all of the fielded information that will be loaded into the *Concordance®* database.

   a. The first line of the .DAT file must be a header row identifying the field names.
   b. The .DAT file must use the following *Concordance®* default delimiters:
      Comma ¶ ASCII character (020)
      Quote þ ASCII character (254)
   c. Date fields should be provided in the format: mm/dd/yyyy
   d. Date and time fields must be two separate fields.
   e. If the production includes imaged emails and attachments, the attachment fields must be included to preserve the parent/child relationship between an email and its attachments.
   f. An OCRPATH field must be included to provide the file path and name of the extracted text file on the produced storage media. The text file must be named after the FIRSTBATES. Do not include the text in the .DAT file.
   g. For production with native files, a NATIVELINK field must be included to provide the file path and name of the native file on the produced storage media.
   h. BEGATT and ENDATT fields must be two separate fields.
   i. A complete list of metadata fields is available in **Addendum A** to this document.

4. **Text**

Text must be produced as separate text files, not as fields within the .DAT file. The full path to the text file (OCRPATH) should be included in the .DAT file. We require document level ANSI text files, named per the FIRSTBATES/Image Key. (Please note in the cover letter if any non-ANSI text files are included in the production.) Extracted text must be in a separate folder, one text file per document. The number of files per folder should not exceed 500 files. There should be no special characters (including commas in the folder names). For redacted documents, provide the full text for the redacted version.

5. **Linked Native Files**

Copies of original email and native file documents/attachments must be included for all electronic productions.
   a. Native file documents must be named per the FIRSTBATES number.
   b. The full path of the native file must be provided in the .DAT file for the LINK field.
   c. The number of native files per folder should not exceed 500 files.

II. **Native File Production without Loadfiles**

With prior approval, native files may be produced without loadfiles. The files must be produced as they are maintained in the normal course of business and organized by custodian-named file folders. When approved, Outlook (.PST) and Lotus Notes (.NSF) email files may be produced in native file format. A separate folder should be provided for each custodian.

III. **Adobe PDF File Production**

With prior approval, Adobe PDF files may be produced in native file format.
   1. PDF files should be produced in separate folders named by the custodian. The folders should not contain any special characters (including commas).
   2. All PDFs must be unitized at the document level, i.e., each PDF should represent a discrete document.
   3. All PDF files must contain embedded text that includes all discernible words within the document, not selected text or image only. This requires all layers of the PDF to be flattened first.
   4. If PDF files are Bates endorsed, the PDF files must be named by the Bates range.

Rev 10/2014

IV.  **Audio Files**

Audio files from telephone recording systems must be produced in a format that is playable using Microsoft Windows Media Player™. Additionally, the call information (metadata) related to each audio recording MUST be provided. The metadata file must be produced in a delimited text format. Field names must be included in the first row of the text file. The metadata must include, at a minimum, the following fields:

    1) Caller Name:        Caller's name or account/identification number
    2) Originating Number:  Caller's phone number
    3) Called Party Name:   Called party's name
    4) Terminating Number: Called party's phone number
    5) Date:               Date of call
    6) Time:               Time of call
    7) Filename:          Filename of audio file

V.  **Video Files**

Video files must be produced in a format that is playable using Microsoft Windows Media Player™.

VI.  **Electronic Trade and Bank Records**

When producing electronic trade and bank records, provide the files in one of the following formats:

1.  MS Excel spreadsheet with header information detailing the field structure. If any special codes exist in the dataset, a separate document must be provided that details all such codes. If details of the field structure do not fit in the header, a separate document must be provided that includes such details.

2.  Delimited text file with header information detailing the field structure. The preferred delimiter is a vertical bar "|". If any special codes exist in the dataset, a separate document must be provided that details all such codes. If details of the field structure do not fit in the header, a separate document must be provided that includes such details.

VII.  **Electronic Phone Records**

When producing electronic phone records, provide the files in the following format:

1.  MS Excel spreadsheet with header information detailing the field structure. If any special codes exist in the dataset, a separate document must be provided that details all such codes. If details of the field structure do not fit in the header, a separate document must be provided that includes such details.  Data must be formatted in its native format (i.e. dates in a date format, numbers in an appropriate numerical format, and numbers with leading zeroes as text).

    a.  The metadata that must be included is outline in **Addendum B** of this document. Each field of data must be loaded into a separate column.  For example, Date and Start_Time must be produced in separate columns and not combined into a single column containing both pieces of information.  Any fields of data that are provided in addition to those listed in **Addendum B** must also be loaded into separate columns.

## ADDENDUM A

The metadata of electronic document collections should be extracted and provided in a .DAT file using the field definition and formatting described below:

| Field Name | Sample Data | Description |
|---|---|---|
| FIRSTBATES | EDC0000001 | First Bates number of native file document/email |
| LASTBATES | EDC0000001 | Last Bates number of native file document/email<br>**The LASTBATES field should be populated for single page documents/emails. |
| ATTACHRANGE | EDC0000001 - EDC0000015 | Bates number of the first page of the parent document to the Bates number of the last page of the last attachment "child" document |
| BEGATTACH | EDC0000001 | First Bates number of attachment range |
| ENDATTACH | EDC0000015 | Last Bates number of attachment range |
| PARENT_BATES | EDC0000001 | First Bates number of parent document/Email<br>**This PARENT_BATES field should be populated in each record representing an attachment "child" document |
| CHILD_BATES | EDC0000002; EDC0000014 | First Bates number of "child" attachment(s); can be more than one Bates number listed depending on the number of attachments<br>**The CHILD_BATES field should be populated in each record representing a "parent" document |
| CUSTODIAN | Smith, John | Email:  mailbox where the email resided<br>Native: Individual from whom the document originated |
| FROM | John Smith | Email:  Sender<br>Native: Author(s) of document<br>**semi-colon should be used to separate multiple entries |
| TO | Coffman, Janice; LeeW [mailto:LeeW@MSN.com] | Recipient(s)<br>**semi-colon should be used to separate multiple entries |
| CC | Frank Thompson [mailto: frank_Thompson@cdt.com] | Carbon copy recipient(s)<br>**semi-colon should be used to separate multiple entries |
| BCC | John Cain | Blind carbon copy recipient(s)<br>**semi-colon should be used to separate multiple entries |
| SUBJECT | Board Meeting Minutes | Email: Subject line of the email<br>Native: Title of document (if available) |
| DATE_SENT | 10/12/2010 | Email:  Date the email was sent<br>Native: (empty) |
| TIME_SENT/TIME_ZONE | 07:05 PM GMT | Email: Time the email was sent/ Time zone in which the emails were standardized during conversion.<br>Native: (empty)<br>**This data must be a separate field and cannot be combined with the DATE_SENT field; |
| TIME_ZONE | GMT | The time zone in which the emails were standardized during conversion.<br>Email: Time zone<br>Native: (empty) |

Rev 10/2014

| LINK | D:\001\EDC0000001.msg | Hyperlink to the email or native file document **The linked file must be named per the FIRSTBATES number |
| MIME_TYPE | MSG | The content type of an Email or native file document as identified/extracted from the header |
| FILE_EXTEN | MSG | The file type extension representing the Email or native file document; will vary depending on the email format |
| AUTHOR | John Smith | Email: (empty) Native: Author of the document |
| DATE_CREATED | 10/10/2010 | Email: (empty) Native: Date the document was created |
| TIME_CREATED | 10:25 AM | Email: (empty) Native: Time the document was created **This data must be a separate field and cannot be combined with the DATE_CREATED field |
| DATE_MOD | 10/12/2010 | Email: (empty) Native: Date the document was last modified |
| TIME_MOD | 07:00 PM | Email: (empty) Native: Time the document was last modified **This data must be a separate field and cannot be combined with the DATE_MOD field |
| DATE_ACCESSD | 10/12/2010 | Email: (empty) Native: Date the document was last accessed |
| TIME_ACCESSD | 07:00 PM | Email: (empty) Native: Time the document was last accessed **This data must be a separate field and cannot be combined with the DATE_ACCESSD field |
| PRINTED_DATE | 10/12/2010 | Email: (empty) Native: Date the document was last printed |
| FILE_SIZE | 5,952 | Size of native file document/email in KB |
| PGCOUNT | 1 | Number of pages in native file document/email |
| PATH | J:\Shared\SmithJ\October Agenda.doc | Email: (empty) Native: Path where native file document was stored including original file name. |
| INTFILEPATH | Personal Folders\Deleted Items\Board Meeting Minutes.msg | Email: original location of email including original file name. Native: (empty) |
| INTMSGID | <000805c2c71b$75977050$cb 8306d1@MSN> | Email: Unique Message ID Native: (empty) |
| MD5HASH | d131dd02c5e6eec4693d9a069 8aff95c 2fcab58712467eab4004583eb 8fb7f89 | MD5 Hash value of the document. |
| OCRPATH | TEXT/001/EDC0000001.txt | Path to extracted text of the native file |

Sample Image Loadfile:

```
IMG0000001,,E:\001\IMG0000001.TIF,Y,,,
IMG0000002,,E:\001\IMG0000002.TIF,,,,
IMG0000003,,E:\001\IMG0000003.TIF,,,,
IMG0000004,,E:\001\IMG0000003.TIF,Y,,,
IMG0000005,,E:\001\IMG0000003.TIF,Y,,,
IMG0000006,,E:\001\IMG0000003.TIF,,,,
```

Rev 10/2014

## ADDENDUM B

For Electronic Phone Records, include the following fields in separate columns:

For Calls:

1) Account Number
2) Connection Date – Date the call was received or made
3) Connection Time – Time call was received or made
4) Seizure Time – Time it took for the call to be placed in seconds
5) Originating Number – Phone that placed the call
6) Terminating Number – Phone that received the call
7) Elapsed Time – The length of time the call lasted, preferably in seconds
8) End Time – The time the call ended
9) Number Dialed – Actual number dialed
10) IMEI Originating – Unique id to phone used to make call
11) IMEI Terminating– Unique id to phone used to receive call
12) IMSI Originating – Unique id to phone used to make call
13) IMSI Terminating- Unique id to phone used to receive call
14) Call Codes – Identify call direction or other routing information
15) Time Zone – Time Zone in which the call was received or placed, if applicable

For Text messages:

1) Account Number
2) Connection Date – Date the text was received or made
3) Connection Time – Time text was received or made
4) Originating Number – Who placed the text
5) Terminating Number – Who received the text
6) IMEI Originating – Unique id to phone used to make text
7) IMEI Terminating– Unique id to phone used to receive text
8) IMSI Originating - Unique id to phone used to make text
9) IMSI Terminating- Unique id to phone used to receive text
10) Text Code – Identify text direction, or other text routing information
11) Text Type Code – Type of text message (sent SMS, MMS, or other)
12) Time Zone – Time Zone in which the call was received or placed, if applicable

For Mobile Data Usage:

1) Account Number
2) Connection Date – Date the data was received or made
3) Connection Time – Time data was received or made
4) Originating number – Number that used data
5) IMEI Originating – Unique id of phone that used data
6) IMSI Originating - Unique id of phone that used data
7) Data or Data codes – Identify data direction, or other data routing information
8) Time Zone – Time Zone in which the call was received or placed, if applicable

Rev 10/2014

## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## Supplemental Information for Persons Requested to Supply
## Information Voluntarily or Directed to Supply Information
## Pursuant to a Commission Subpoena

**A. False Statements and Documents**

Section 1001 of Title 18 of the United States Code provides as follows:

> [W]hoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the
> Government of the United States, knowingly and willfully--
>    (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
>    (2) makes any materially false, fictitious, or fraudulent statement or representation; or
>    (3) makes or uses any false writing or document knowing the same to contain any materially false,
>    fictitious, or fraudulent statement or entry;
> shall be fined under this title, imprisoned not more than 5 years . . . or both.

**B. Testimony**

If your testimony is taken, you should be aware of the following:

1.  *Record.* Your testimony will be transcribed by a reporter. If you desire to go off the record, please indicate this to
    the Commission employee taking your testimony, who will determine whether to grant your request. The reporter
    will not go off the record at your, or your counsel's, direction.

2.  *Counsel.* You have the right to be accompanied, represented and advised by counsel of your choice. Your
    counsel may advise you before, during and after your testimony; question you briefly at the conclusion of your
    testimony to clarify any of the answers you give during testimony; and make summary notes during your
    testimony solely for your use. If you are accompanied by counsel, you may consult privately.

    If you are not accompanied by counsel, please advise the Commission employee taking your testimony if, during the
    testimony, you desire to be accompanied, represented and advised by counsel. Your testimony will be adjourned
    once to afford you the opportunity to arrange to be so accompanied, represented or advised.

    You may be represented by counsel who also represents other persons involved in the Commission's investigation.
    This multiple representation, however, presents a potential conflict of interest if one client's interests are or may be
    adverse to another's. If you are represented by counsel who also represents other persons involved in the
    investigation, the Commission will assume that you and counsel have discussed and resolved all issues concerning
    possible conflicts of interest. The choice of counsel, and the responsibility for that choice, is yours.

3.  *Transcript Availability.* Rule 6 of the Commission's Rules Relating to Investigations, 17 CFR 203.6, states:

    > A person who has submitted documentary evidence or testimony in a formal investigative proceeding
    > shall be entitled, upon written request, to procure a copy of his documentary evidence or a transcript of
    > his testimony on payment of the appropriate fees: *Provided, however,* That in a nonpublic formal
    > investigative proceeding the Commission may for good cause deny such request. In any event, any
    > witness, upon proper identification, shall have the right to inspect the official transcript of the witness'
    > own testimony.

    If you wish to purchase a copy of the transcript of your testimony, the reporter will provide you with a copy of the
    appropriate form. Persons requested to supply information voluntarily will be allowed the rights provided by this rule.

4.  *Perjury.* Section 1621 of Title 18 of the United States Code provides as follows:

    > Whoever--
    >    (1) having taken an oath before a competent tribunal, officer, or person, in any case in which a law of
    >    the United States authorizes an oath to be administered, that he will testify, declare, depose, or certify
    >    truly, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true,
    >    willfully and contrary to such oath states or subscribes any material matter which he does not believe to
    >    be true; or

(2) in any declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, United States Code, willfully subscribes as true any material matter which he does not believe to be true;

is guilty of perjury and shall, except as otherwise expressly provided by law, be fined under this title or imprisoned not more than five years, or both.

5.  *Fifth Amendment and Voluntary Testimony.* Information you give may be used against you in any federal, state, local or foreign administrative, civil or criminal proceeding brought by the Commission or any other agency.

You may refuse, in accordance with the rights guaranteed to you by the Fifth Amendment to the Constitution of the United States, to give any information that may tend to incriminate you.

If your testimony is not pursuant to subpoena, your appearance to testify is voluntary, you need not answer any question, and you may leave whenever you wish. Your cooperation is, however, appreciated.

6.  *Formal Order Availability.* If the Commission has issued a formal order of investigation, it will be shown to you during your testimony, at your request. If you desire a copy of the formal order, please make your request in writing.

## C.  Submissions and Settlements

Rule 5(c) of the Commission's Rules on Informal and Other Procedures, 17 CFR 202.5(c), states:

> Persons who become involved in . . . investigations may, on their own initiative, submit a written statement to the Commission setting forth their interests and position in regard to the subject matter of the investigation. Upon request, the staff, in its discretion, may advise such persons of the general nature of the investigation, including the indicated violations as they pertain to them, and the amount of time that may be available for preparing and submitting a statement prior to the presentation of a staff recommendation to the Commission for the commencement of an administrative or injunction proceeding. Submissions by interested persons should be forwarded to the appropriate Division Director or Regional Director with a copy to the staff members conducting the investigation and should be clearly referenced to the specific investigation to which they relate. In the event a recommendation for the commencement of an enforcement proceeding is presented by the staff, any submissions by interested persons will be forwarded to the Commission in conjunction with the staff memorandum.

The staff of the Commission routinely seeks to introduce submissions made pursuant to Rule 5(c) as evidence in Commission enforcement proceedings, when the staff deems appropriate.

Rule 5(f) of the Commission's Rules on Informal and Other Procedures, 17 CFR 202.5(f), states:

> In the course of the Commission's investigations, civil lawsuits, and administrative proceedings, the staff, with appropriate authorization, may discuss with persons involved the disposition of such matters by consent, by settlement, or in some other manner. It is the policy of the Commission, however, that the disposition of any such matter may not, expressly or impliedly, extend to any criminal charges that have been, or may be, brought against any such person or any recommendation with respect thereto. Accordingly, any person involved in an enforcement matter before the Commission who consents, or agrees to consent, to any judgment or order does so solely for the purpose of resolving the claims against him in that investigative, civil, or administrative matter and not for the purpose of resolving any criminal charges that have been, or might be, brought against him. This policy reflects the fact that neither the Commission nor its staff has the authority or responsibility for instituting, conducting, settling, or otherwise disposing of criminal proceedings. That authority and responsibility are vested in the Attorney General and representatives of the Department of Justice.

## D.  Freedom of Information Act

The Freedom of Information Act, 5 U.S.C. 552 (the "FOIA"), generally provides for disclosure of information to the public. Rule 83 of the Commission's Rules on Information and Requests, 17 CFR 200.83, provides a procedure by which a person can make a written request that information submitted to the Commission not be disclosed under the FOIA. That rule states that no determination as to the validity of such a request will be made until a request for disclosure of the information under the FOIA is received. Accordingly, no response to a request that information not be disclosed under the FOIA is necessary or will be given until a request for disclosure under the FOIA is received. If you desire an acknowledgment of receipt of your written request that information not be disclosed under the FOIA, please provide a duplicate request, together with a stamped, self-addressed envelope.

### E. Authority for Solicitation of Information

*Persons Directed to Supply Information Pursuant to Subpoena*. The authority for requiring production of information is set forth in the subpoena. Disclosure of the information to the Commission is mandatory, subject to the valid assertion of any legal right or privilege you might have.

*Persons Requested to Supply Information Voluntarily*. One or more of the following provisions authorizes the Commission to solicit the information requested: Sections 19 and/or 20 of the Securities Act of 1933; Section 21 of the Securities Exchange Act of 1934; Section 321 of the Trust Indenture Act of 1939; Section 42 of the Investment Company Act of 1940; Section 209 of the Investment Advisers Act of 1940; and 17 CFR 202.5. Disclosure of the requested information to the Commission is voluntary on your part.

### F. Effect of Not Supplying Information

*Persons Directed to Supply Information Pursuant to Subpoena*. If you fail to comply with the subpoena, the Commission may seek a court order requiring you to do so. If such an order is obtained and you thereafter fail to supply the information, you may be subject to civil and/or criminal sanctions for contempt of court. In addition, if the subpoena was issued pursuant to the Securities Exchange Act of 1934, the Investment Company Act of 1940, and/or the Investment Advisers Act of 1940, and if you, without just cause, fail or refuse to attend and testify, or to answer any lawful inquiry, or to produce books, papers, correspondence, memoranda, and other records in compliance with the subpoena, you may be found guilty of a misdemeanor and fined not more than $1,000 or imprisoned for a term of not more than one year, or both.

*Persons Requested to Supply Information Voluntarily*. There are no direct sanctions and thus no direct effects for failing to provide all or any part of the requested information.

### G. Principal Uses of Information

The Commission's principal purpose in soliciting the information is to gather facts in order to determine whether any person has violated, is violating, or is about to violate any provision of the federal securities laws or rules for which the Commission has enforcement authority, such as rules of securities exchanges and the rules of the Municipal Securities Rulemaking Board. Facts developed may, however, constitute violations of other laws or rules. Information provided may be used in Commission and other agency enforcement proceedings. Unless the Commission or its staff explicitly agrees to the contrary in writing, you should not assume that the Commission or its staff acquiesces in, accedes to, or concurs or agrees with, any position, condition, request, reservation of right, understanding, or any other statement that purports, or may be deemed, to be or to reflect a limitation upon the Commission's receipt, use, disposition, transfer, or retention, in accordance with applicable law, of information provided.

### H. Routine Uses of Information

The Commission often makes its files available to other governmental agencies, particularly United States Attorneys and state prosecutors. There is a likelihood that information supplied by you will be made available to such agencies where appropriate. Whether or not the Commission makes its files available to other governmental agencies is, in general, a confidential matter between the Commission and such other governmental agencies.

Set forth below is a list of the routine uses which may be made of the information furnished.

1. To appropriate agencies, entities, and persons when (a) it is suspected or confirmed that the security or confidentiality of information in the system of records has been compromised; (b) the SEC has determined that, as a result of the suspected or confirmed compromise, there is a risk of harm to economic or property interests, identity theft or fraud, or harm to the security or integrity of this system or other systems or programs (whether maintained by the SEC or another agency or entity) that rely upon the compromised information; and (c) the disclosure made to such agencies, entities, and persons is reasonably necessary to assist in connection with the SEC's efforts to respond to the suspected or confirmed compromise and prevent, minimize, or remedy such harm.

2. To other federal, state, local, or foreign law enforcement agencies; securities self-regulatory organizations; and foreign financial regulatory authorities to assist in or coordinate regulatory or law enforcement activities with the SEC.

3. To national securities exchanges and national securities associations that are registered with the SEC, the Municipal Securities Rulemaking Board; the Securities Investor Protection Corporation; the Public Company Accounting Oversight Board; the federal banking authorities, including, but not limited to, the Board of Governors of the Federal Reserve System, the Comptroller of the Currency, and the Federal Deposit Insurance Corporation; state securities regulatory agencies or organizations; or regulatory authorities of a foreign government in connection with their regulatory or enforcement responsibilities.

4.  By SEC personnel for purposes of investigating possible violations of, or to conduct investigations authorized by, the federal securities laws.

5.  In any proceeding where the federal securities laws are in issue or in which the Commission, or past or present members of its staff, is a party or otherwise involved in an official capacity.

6.  In connection with proceedings by the Commission pursuant to Rule 102(e) of its Rules of Practice, 17 CFR 201.102(e).

7.  To a bar association, state accountancy board, or other federal, state, local, or foreign licensing or oversight authority; or professional association or self-regulatory authority to the extent that it performs similar functions (including the Public Company Accounting Oversight Board) for investigations or possible disciplinary action.

8.  To a federal, state, local, tribal, foreign, or international agency, if necessary to obtain information relevant to the SEC's decision concerning the hiring or retention of an employee; the issuance of a security clearance; the letting of a contract; or the issuance of a license, grant, or other benefit.

9.  To a federal, state, local, tribal, foreign, or international agency in response to its request for information concerning the hiring or retention of an employee; the issuance of a security clearance; the reporting of an investigation of an employee; the letting of a contract; or the issuance of a license, grant, or other benefit by the requesting agency, to the extent that the information is relevant and necessary to the requesting agency's decision on the matter.

10.  To produce summary descriptive statistics and analytical studies, as a data source for management information, in support of the function for which the records are collected and maintained or for related personnel management functions or manpower studies; may also be used to respond to general requests for statistical information (without personal identification of individuals) under the Freedom of Information Act.

11.  To any trustee, receiver, master, special counsel, or other individual or entity that is appointed by a court of competent jurisdiction, or as a result of an agreement between the parties in connection with litigation or administrative proceedings involving allegations of violations of the federal securities laws (as defined in section 3(a)(47) of the Securities Exchange Act of 1934, 15 U.S.C. 78c(a)(47)) or pursuant to the Commission's Rules of Practice, 17 CFR 201.100 – 900 or the Commission's Rules of Fair Fund and Disgorgement Plans, 17 CFR 201.1100-1106, or otherwise, where such trustee, receiver, master, special counsel, or other individual or entity is specifically designated to perform particular functions with respect to, or as a result of, the pending action or proceeding or in connection with the administration and enforcement by the Commission of the federal securities laws or the Commission's Rules of Practice or the Rules of Fair Fund and Disgorgement Plans.

12.  To any persons during the course of any inquiry, examination, or investigation conducted by the SEC's staff, or in connection with civil litigation, if the staff has reason to believe that the person to whom the record is disclosed may have further information about the matters related therein, and those matters appeared to be relevant at the time to the subject matter of the inquiry.

13.  To interns, grantees, experts, contractors, and others who have been engaged by the Commission to assist in the performance of a service related to this system of records and who need access to the records for the purpose of assisting the Commission in the efficient administration of its programs, including by performing clerical, stenographic, or data analysis functions, or by reproduction of records by electronic or other means. Recipients of these records shall be required to comply with the requirements of the Privacy Act of 1974, as amended, 5 U.S.C. 552a.

14.  In reports published by the Commission pursuant to authority granted in the federal securities laws (as such term is defined in section 3(a)(47) of the Securities Exchange Act of 1934, 15 U.S.C. 78c(a)(47)), which authority shall include, but not be limited to, section 21(a) of the Securities Exchange Act of 1934, 15 U.S.C. 78u(a)).

15.  To members of advisory committees that are created by the Commission or by Congress to render advice and recommendations to the Commission or to Congress, to be used solely in connection with their official designated functions.

16.  To any person who is or has agreed to be subject to the Commission's Rules of Conduct, 17 CFR 200.735-1 to 200.735-18, and who assists in the investigation by the Commission of possible violations of the federal securities laws (as such term is defined in section 3(a)(47) of the Securities Exchange Act of 1934, 15 U.S.C. 78c(a)(47)), in the preparation or conduct of enforcement actions brought by the Commission for such violations, or otherwise in connection with the Commission's enforcement or regulatory functions under the federal securities laws.

17.  To a Congressional office from the record of an individual in response to an inquiry from the Congressional office made at the request of that individual.

18.  To members of Congress, the press, and the public in response to inquiries relating to particular Registrants and their activities, and other matters under the Commission's jurisdiction.

19.  To prepare and publish information relating to violations of the federal securities laws as provided in 15 U.S.C. 78c(a)(47)), as amended.

20.  To respond to subpoenas in any litigation or other proceeding.

21.  To a trustee in bankruptcy.

22.  To any governmental agency, governmental or private collection agent, consumer reporting agency or commercial reporting agency, governmental or private employer of a debtor, or any other person, for collection, including collection by administrative offset, federal salary offset, tax refund offset, or administrative wage garnishment, of amounts owed as a result of Commission civil or administrative proceedings.

\* \* \* \* \*

*Small Business Owners*: The SEC always welcomes comments on how it can better assist small businesses. If you would like more information, or have questions or comments about federal securities regulations as they affect small businesses, please contact the Office of Small Business Policy, in the SEC's Division of Corporation Finance, at 202-551-3460. If you would prefer to comment to someone outside of the SEC, you can contact the Small Business Regulatory Enforcement Ombudsman at http://www.sba.gov/ombudsman or toll free at 888-REG-FAIR. The Ombudsman's office receives comments from small businesses and annually evaluates federal agency enforcement activities for their responsiveness to the special needs of small business.

## DECLARATION CERTIFYING RECORDS
## OF REGULARLY CONDUCTED BUSINESS ACTIVITY

I, the undersigned, _____, pursuant to 28 U.S.C. § 1746, declare that:

1. I am employed by GAW Miners, LLC as _____ and by reason of my position am authorized and qualified to make this declaration.

2. I further certify that the documents submitted herewith and stamped _____ are true copies of records that were:

   (a) made at or near the time of the occurrence of the matters set forth therein, by, or from information transmitted by, a person with knowledge of those matters;

   (b) kept in the course of regularly conducted business activity; and

   (c) made by the regularly conducted business activity as a regular practice.

I declare under penalty of perjury that the foregoing is true and correct. Executed on

_____

_____
Signature

# EXHIBIT 7

| From: | Jonah Dorman |
|---|---|
| To: | Matthew Eden; Evan Lucas |
| Subject: | Fwd: Mining Operations |
| Date: | Thursday, January 29, 2015 4:18:58 PM |

Login notice on Zenminer:

As a result of unstable market conditions, diminishing bitcoin value and the unbalanced-cost of maintenance and power, GAW and Zen Cloud mining operations have been indefinitely put on hold, effectively immediately. At this time, we can no longer support mining services that place our customers' value and mining efforts at risk. As the bitcoin value and market evolve, GAW and Zen Cloud mining operations will strategically adjust to meet those market conditions.

---------- Forwarded message ----------
From: **Jonah Dorman** <jonah@geniusesatwork.com>
Date: Thu, Jan 29, 2015 at 5:18 PM
Subject: Re: Mining Operations
To: John Caceres <john@geniusesatwork.com>
Cc: Rami Abramov <rami@btc.com>, Josh Garza <josh@gaw.com>, Dan Kelley <dan@btc.com>

Intercom, we will have to ammend that announcement to indicate more details will follow. We will then have to announce the "end of life" of the hashlet program.

I'll forward this to development to see if we can put out a notice on the ZenMiner website.

Thanks John.

On Thu, Jan 29, 2015 at 4:50 PM, John Caceres <john@geniusesatwork.com> wrote:
> https://www.intercom.io/ - ?

On Thu, Jan 29, 2015 at 3:51 PM, Rami Abramov <rami@btc.com> wrote:

We dont really have that for gawminers like we do for paybase.

Jonah, should we post that through intercom?

On Jan 29, 2015 3:46 PM, "John Caceres" <john@geniusesatwork.com> wrote:
Rami:

Please post the following to the mining operations blogs / website(s) as soon as is possible.

As a result of unstable market conditions, diminishing bitcoin value and the unbalanced-cost of maintenance and power, GAW and Zen Cloud mining operations have been indefinitely put on hold, effectively immediately. At this time, we can no longer support mining services that place our customers' value and mining efforts at risk. As the bitcoin value and market evolve, GAW and Zen Cloud mining operations will strategically adjust to meet those market conditions.

Thanks, Rami.

John

EXHIBIT 8

| | |
|---|---|
| **From:** | Jonah Dorman |
| **To:** | Josh Garza |
| **Cc:** | Dan Pease |
| **Subject:** | Re: Winding Down |
| **Date:** | Wednesday, February 25, 2015 11:26:39 AM |
| **Attachments:** | unnamed.png |

I will be sending you a proposal today regarding this.   The companies will each need to be wound down cleanly and it will take some time to do so while mitigating loss and risk.

I believe we can remove a lot of not all of the current tension if we structure this wind down correctly.


--
**Jonah Dorman**
**Interim CEO**
Business Technology for Cryptocurrency
O: (860) 222-2631
C: (727) 386-6825



On Tue, Feb 24, 2015 at 10:42 AM, Josh Garza <Josh@gaw.com> wrote:

Hey,

As I understand it, you guys talked about winding things down?

There are a number of things we need to do to clean up.

Here is why I see


- Sell ZenCloud- still waiting on the basic info I asked for
- Migrate people off of Paybase
- Make a layoff plan, we do not need everyone here through the whole transition?
- Where are we with HashBase?
- Turn off all our services
- Make sure customers take all their BTC out
- Give Prime Controllers to team paycoin (GAW will manage its through their new I)
- Give coin dev to team paycoin

What else?

EXHIBIT 9

| | |
|---|---|
| From: | Jonah Dorman |
| To: | Josh Garza |
| Subject: | Re: whats up? |
| Date: | Tuesday, March 03, 2015 1:23:17 PM |
| Attachments: | unnamed.png |

That agreement had two components and became a part of my accepting the Interim CEO position.    The portion which has not been filled is the payment via crypto of 54.53 BTC (Value at the time of the agreement) as discussed.  Feel free to use: 1JkiQHqiXmmrNS8HRSVEz7Boj7An1X6AQ8

On Mon, Mar 2, 2015 at 10:02 AM, Josh Garza <josh@gaw.com> wrote:

To respond to the dozen or so emails. Some are getting close to two weeks.

On Mon, Mar 2, 2015, 4:02 PM Jonah Dorman <jonah@geniusesatwork.com> wrote:
There has never been an outage like this.   Communications protocols for internal breaches are vastly different than for outages or external breaches.

I am uncertain what I promised which I am not following through with?

On Sun, Mar 1, 2015 at 8:20 PM, Josh Garza <admin@gaw.com> wrote:
This is the second weekend in a row you have not followed through on the communication you promised. Or the communication you promised when there is a outage like this.

Yet, you seem to be able to selectively choose to send message like this.

What gives? Why the sudden change in the way you handle things?

On Mon, Mar 2, 2015 at 1:54 AM, Jonah Dorman <jonah@geniusesatwork.com> wrote:
You know who attacked us?

Please share.

http://puu.sh/giC5V/46a5911d02.png



On Sun, Mar 1, 2015 at 4:33 PM, Josh Garza <admin@gaw.com> wrote:
Jonah, I think everyone appreciates the work being done. I think the key is to try and appreciate everyone else in the company. To include those that are the front line dealing with customers and are not getting any updates/responses. I do not feel bringing up compensation in this setting is very appropriate. Everyone here wants the same thing.

Additionally, the severity of the issue is separate from keeping everyone on the same page and following the outage protocol, which is not being done.

Matt, is most accurate time frame next week? I ask because your previous email made it seem good progress was being made.

Please let me know.

On Sun, Mar 1, 2015 at 10:26 PM Jonah Dorman <jonah@geniusesatwork.com> wrote:
Clearly no one else appreciates the fact that Matt Evan and the dev team are working unpaid over the weekend to prevent this issue from taking us completely offline and out of business.

Thank You Matt and Evan.

Since the ETA is late next week.  Every status update should be "we are still working to verify the integrity of the database."  Unless something new is found.

On Sun, Mar 1, 2015 at 3:40 PM, Matthew Eden <mk@btc.com> wrote:
John,

In the last 1.5 months we've lost: our IT Manager, Chief Information Security Officer, and Chief Technology Officer (otherwise known as the individuals who created/configured/secured 90% of our infrastructure, and are also the registered account holders for these services).  We've also lost the majority of our development/engineering staff (most of whom were very familiar with the inner workings of all our systems).  Very few of these contributors left on good terms, and none provided any warning or time to prepare prior to their exodus.

With this type of breach, we're lucky to still have a platform that can be brought back online.  So while I definitely appreciate your concern in that regard, I honestly think our time may be better spent resolving this debacle.  As you can plainly see, the problems we're facing are not entirely of a technical nature.  Due to that fact, the complexity of what must be done has been exponentially increased.  It's also why I cannot reasonably promise a 100% secure environment when we come back online (very specific people could still regain access to the systems even after I remove it).  Sadly, the best I can offer is valid security against potential attackers not associated with our organization; and also should this happen again, the means by which to identify any individuals responsible for attacking us internally.

To accomplish something similar to 100% security, we'd need an additional week at least.  It would essentially require us to distribute/replicate our existing servers and services out to new cloud hosting providers (with new registered account owners).  We would have to rebuild our internal network, dns, databases, etc. in order to accommodate for those moves.  Additionally, we would have to add new safeties and code to the ZC & PB platforms to assist with alerting and preventing future exploitation of the internal systems' logic (especially by someone who knew the systems intimately).

Please let me know if that's something you would like for us to pursue.

Best regards,

**Matthew K. Eden**
GAW Miners LLC
C: (512) 718-6128



On Sun, Mar 1, 2015 at 1:39 PM, John Caceres <john@geniusesatwork.com> wrote:
"A LOT more secure"? Sorry, but this is disturbing to me. Why not totally secure? I am stupid

in asking this as maybe I don't understand the technical aspects of it.

After this breach, we need to ensure that we are bullet proof, totally secure and can communicate that our customers. The implications of this are huge. As we are trying to get {mainstream} people to adopt PayCoin as well as other altcoins, this type of thing does not help. I know we are not alone in this given what happened to Bitcoin a year ago (?) February...but this is our...and it matters a lot.

Though I am glad to see in later communications that "...property and PayCoins are safe...").

John

John C. Caceres
Chief Marketing Officer
Business Technology for Cryptocurrency
34 East Dudley Town Road
Bloomfield CT. 06002
john@btc.com
917.882.0900 - Mobile
802.359.7569 - VT Office

On Sat, Feb 28, 2015 at 8:38 PM, Matthew Eden <mk@btc.com> wrote:
We're still processing of comparing the current data we have to the last two months of database backups (this is being done to ensure that nothing has been modified).  We've found very few instances of modified data from January back, which is a really good thing.  However, most of the modified data we located initially came from February, so it's really nothing we can base an assumption of "OK" on just yet.  Because the breach was executed by an unknown internal source, every backup is being reviewed by at least two developers (and two of the three developers we have left were at a wedding all day).  The sheer size of the data files makes the entire process slower than slow (40GB per file).  We've gone through most of the January backups we had tagged for comparison, and will be moving onto the February backups tomorrow.  We won't know how much more time this database validation will take until we're further along into the February data.

At the same time we are securing the 60+ servers hosted at Rackspace (to prevent this from happening a second time).  We're looking at another day max before the servers are finished (please note that is ONLY the servers).  They're already A LOT more secure, and less accessible to old employees/contractors than they were previously (so that's somewhat encouraging).  In retrospect though (after 3 days of this), it may have been faster to just rebuild our entire infrastructure from scratch.

**Matthew K. Eden**
GAW Miners LLC
C: (512) 718-6128



On Sat, Feb 28, 2015 at 6:02 PM, Josh Garza <Josh@gaw.com> wrote:
This is why communication is important. Because this is not the sense I got when I spoke to Matt.

Matt, can you chime in?

On Sun, Mar 1, 2015 at 12:54 AM, Jonah Dorman <jonah@geniusesatwork.com> wrote:
More important question for Matt/Evan is this recoverable?

If so, is the scope even known at this point?

If so, is there a way to estimate the recovery time?

From what I've heard so far it will be several days to two weeks.

On Sat, Feb 28, 2015 at 6:20 PM, Josh Garza <Josh@gaw.com> wrote:
You have stated what has to happen a few times.

What is the status? How much has been done? Whats the percentage of completion? And do we have any time frame?

On Sun, Mar 1, 2015 at 12:14 AM, Jonah Dorman <jonah@geniusesatwork.com> wrote:

This will not be resolved in a few hours.

The entire set of all records for all platforms has to be validated.

--
Jonah Dorman
General Manager
GAW Miners LLC
O: (860) 222-2631
C: (727) 386-6825

On Feb 28, 2015 5:12 PM, "Josh Garza" <Josh@gaw.com> wrote:

Jonah, you mentioned a few emails back about why the outage procedure was not originally followed, why is it still not being followed?

I have not heard from anyone outside this email from Matt (thank you) that was as a result of two request for updates.

You made mentioned, to John, a few emails about habit being professional. How is this professional? Communication is almost non existence.  This is not a responsible way to treat our customers.

Can someone please provide continual updates on this matter?

On Feb 28, 2015 6:42 PM, "Matthew Eden" <mk@btc.com> wrote:
Sorry.  Fell asleep while working sometime early this morning (didn't get a whole lot of sleep last night).

We have multiple developers still working on analyzing the data, which I am doing as well.  At the same time I am cleaning out the Rackspace cloud, and removing every possible backdoor left open by Eric/Joe/Devs.  I've found more open holes on our 60+ cloud servers in the last two days than I can even begin to list here.

Probably goes without saying that we're still working on it, and we're not yet to a point where this won't happen again when we turn it back on.  :-/

**Matthew K. Eden**
GAW Miners LLC
C: (512) 718-6128



On Sat, Feb 28, 2015 at 11:09 AM, Josh Garza <<ins>Josh@gaw.com</ins>> wrote:

Guys, it's mid day. Can at least one person respond?

On Feb 28, 2015 3:31 AM, "Josh Garza" <<ins>Josh@gaw.com</ins>> wrote:

Any update?

On Feb 27, 2015 9:25 PM, "Matthew Eden" <<ins>mk@btc.com</ins>> wrote:
Just wanted to elaborate on that one a little more.  It's farther reaching
than just the transaction data.  We're also having to validate ownership
data for hashlets/stakers, all user data, and all trade related data.  Most
everything in both the Paybase and Zencloud databases that could be
manipulated directly.

**Matthew K. Eden**
GAW Miners LLC
C: (512) 718-6128



On Fri, Feb 27, 2015 at 2:12 PM, Jonah Dorman
<<ins>jonah@geniusesatwork.com</ins>> wrote:
All of the data for all of our platforms is currently considered to be
invalid.

We will have to manually and systematically repair, test, compare and
then restore all transactional data on our platforms.

On Fri, Feb 27, 2015 at 1:32 PM, John Caceres
<<ins>john@geniusesatwork.com</ins>> wrote:
I need to understand what the implications are about all of this both
from a security and breach perspective as well as financial
perspective internally. the more information I have the better
equipped I am able to put something together that makes sense  and
mitigates any other issues.

On Friday, February 27, 2015, Josh Garza <<ins>Josh@gaw.com</ins>> wrote:

What does this effect?

On Feb 27, 2015 7:28 PM, "Jonah Dorman"
<jonah@geniusesatwork.com> wrote:

We will have to reassemble and asses the current state of the database compared to backups.  The process will be time consuming and will help to determine the extend of the breach. After that time we can begin making decisions regarding bringing systems back online.


On Fri, Feb 27, 2015 at 1:14 PM, Josh Garza <Josh@gaw.com> wrote:

> Hey guys, do we have an update?

> On Feb 27, 2015 6:32 PM, "John Caceres" <john@geniusesatwork.com> wrote:
>> Jonah: the last message I received from you was at ~2:40ish about healthcare pricing, nothing about this.

>> John

>> On Friday, February 27, 2015, Jonah Dorman <jonah@geniusesatwork.com> wrote:
>>> John I sent you a message at 9:38PM and am awaiting a reply to come up with public statements.

>>> Josh due to the nature of the current breach there could be no announcements made or statements made until the integrity and security of the platform was assured.

>>> Someone has performed an extremely sophisticated attack against the zencloud database directly.  The precision of this breach is such that anyone finding out we are aware could compromise the data collection surrounding the breach.

>>> At this time we have preserved data showing that an attacker has injected records directly into the zencloud database in order to credit themselves and others bitcoin and paycoin.

>>> The attacker has withdrawn around 70 BTC over the course of the last few weeks.

>>> All withdraws have been below our withdraw hold thresholds and the records which have been inserted were pre-dated.  Meaning the attacker manipulated our database directly in order to give credits ranging from December to February and then withdraw those credits recently.

>>> All wallets are being migrated and protected and all data surrounding the breach including records of how the system was manipulated are now stored encrypted in areas where the attacker will not have access to cover their tracks or delete any evidence of the attack.

>>> Any announcement of this breach prior to having those records sound would have opened a severe risk of an attacker covering their tracks or worse compromising the entire system including wallets and data.

On Fri, Feb 27, 2015 at 11:54 AM, Josh Garza
<Josh@gaw.com> wrote:

Guys, can we get an update please?

On Feb 27, 2015 2:17 PM, "John Caceres"
<john@geniusesatwork.com> wrote:
What is going on?? And why am I not be kept in this
loop to the extent that we are just putting stuff up
without consultation as to how to comunicate? How is
it that we are being compromised...again. Who is in
charge of this stuff? WTF?!!

any and all outbound communications need to go
through my office including CSR scripts/messaging,
announcements, outages...anything. We have had too
many issues with the media and unfriendlies and their
reaction to things that can be easily twisted.

I don't understand why we are addressing this nearly 12
hours later.

John

John C. Caceres
Chief Marketing Officer
Business Technology for Cryptocurrency
34 East Dudley Town Road
Bloomfield CT. 06002
john@btc.com
917.882.0900 - Mobile
802.359.7569 - VT Office

On Fri, Feb 27, 2015 at 8:06 AM, Josh Garza
<Josh@gaw.com> wrote:

Hey guys, what is happening here?

Jonah, why didn't we use the outage policy we placed
a while back?

Customers are getting upset

On Feb 27, 2015 1:58 PM, "Josh Garza"
<Josh@gaw.com> wrote:

Hey guys, what is happening here?

On Feb 27, 2015 2:55 AM, "Jonah Dorman"
<jonah@geniusesatwork.com> wrote:
I can make a generic announcement that the
platforms are down for unscheduled
maintenance.  Just not yet.

On Thu, Feb 26, 2015 at 8:53 PM, Jonah Dorman
<jonah@geniusesatwork.com> wrote:

This is not something that should be announced or discussed with anyone.  ANYONE outside of the company and should not be discussed inside the company.

On Thu, Feb 26, 2015 at 8:51 PM, Matthew Eden <mk@btc.com> wrote:
> We have everything shut down atm.  The databases for Paybase and Zencloud have been compromised, and we are attempting to ascertain the severity of the breach.
>
> This nature of the breach is very convoluted though, and every bit of data we have is currently suspect.  It's very possible that the markets and withdrawals for both platforms will be offline until sometime tomorrow afternoon.
>
> **-MK**
>
> On Thu, Feb 26, 2015 at 5:09 PM, Josh Garza <Josh@gaw.com> wrote:
>> https://hashtalk.org/topic/32700/hashmarket-offline-again

"The information contained in this email message may be confidential. If you are not the intended recipient any use, distribution, disclosure or copying of this information is prohibited. If you receive this email in error, please tell us by return email and destroy this communication and any attachments from your system."

"The information contained in this email message may be confidential. If you are not the intended recipient any use, distribution, disclosure or copying of this information is prohibited. If you receive this email in error, please tell us by return email and destroy this communication and any attachments from your system."

--
John C. Caceres
Chief Marketing Officer
Business Technology for Cryptocurrency



34 East Dudley Town Road
Bloomfield CT. 06002
john@btc.com
917.882.0900 - Mobile
802.359.7569 - VT Office

"The information contained in this email message may be
confidential. If you are not the intended recipient any use,
distribution, disclosure or copying of this information is
prohibited. If you receive this email in error, please tell us by
return email and destroy this communication and any
attachments from your system."

"The information contained in this email message may be
confidential. If you are not the intended recipient any use,
distribution, disclosure or copying of this information is
prohibited. If you receive this email in error, please tell us by
return email and destroy this communication and any attachments
from your system."

--
John C. Caceres
Chief Marketing Officer
Business Technology for Cryptocurrency
34 East Dudley Town Road
Bloomfield CT. 06002
john@btc.com
917.882.0900 - Mobile
802.359.7569 - VT Office

"The information contained in this email message may be confidential. If
you are not the intended recipient any use, distribution, disclosure or
copying of this information is prohibited. If you receive this email in
error, please tell us by return email and destroy this communication and
any attachments from your system."

"The information contained in this email message may be confidential. If you
are not the intended recipient any use, distribution, disclosure or copying of this
information is prohibited. If you receive this email in error, please tell us by
return email and destroy this communication and any attachments from your
system."

"The information contained in this email message may be confidential. If you are
not the intended recipient any use, distribution, disclosure or copying of this
information is prohibited. If you receive this email in error, please tell us by return

email and destroy this communication and any attachments from your system."

"The information contained in this email message may be confidential. If you are not the intended recipient any use, distribution, disclosure or copying of this information is prohibited. If you receive this email in error, please tell us by return email and destroy this communication and any attachments from your system."

"The information contained in this email message may be confidential. If you are not the intended recipient any use, distribution, disclosure or copying of this information is prohibited. If you receive this email in error, please tell us by return email and destroy this communication and any attachments from your system."

"The information contained in this email message may be confidential. If you are not the intended recipient any use, distribution, disclosure or copying of this information is prohibited. If you receive this email in error, please tell us by return email and destroy this communication and any attachments from your system."

"The information contained in this email message may be confidential. If you are not the intended recipient any use, distribution, disclosure or copying of this information is prohibited. If you receive this email in error, please tell us by return email and destroy this communication and any attachments from your system."

EXHIBIT 10

Page 1

1                    LOU KERNER

2    UNITED STATES DISTRICT COURT

3    DISTRICT OF CONNECTICUT

     ----------------------------------------x

4    DENIS MARC AUDET, MICHAEL PFEIFFER,

     DEAN ALLEN SHINNERS, and JASON VARGAS,

5    Individually and on Behalf of All Others

     Similarly Situated,

6

                     Plaintiffs,

7

             vs.                        3:16-cv-00940

8

     HOMERO JOSHUA GARZA, STUART A. FRASER,

9    GAW MINERS, LLC, and ZENMINER, LLC,

10                   Defendants.

     ------------------------------------x

11

12        VIDEOTAPED DEPOSITION OF LOU KERNER

13              New York, New York

14              November 8, 2018

15

16

17

18

19

20

21

22

23    Reported by:

24    KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25    JOB NO. 149297

Page 86

LOU KERNER

dollar back.

Q.   How does Tether make money doing that?

A.   They can -- well, to begin with, they can make money on the interest.

Q.   Okay.

A.   If it's sitting in a bank account.

Q.   Have you ever studied behavioral economics?

A.   I'm not sure what you mean by "studied." I'm familiar with behavioral economics and the works of Daniel Kahneman and others.

Q.   By "studied" I mean have you taken any courses?

A.   No.

Q.   Have you written anything on behavioral economics?

A.   I don't recall if I have. I'm certainly, you know, I'm a big fan of, again, the work of Daniel Kahneman and have referred to it and I might have written about some of the things previously.

Q.   So turning to paragraph 39 of your declaration, you say that, "No rational investor

Page 87

LOU KERNER

would have purchased Hashlets if they knew the truth; that there was insufficient mining equipment with far less hashing power than GAW Miners was selling."

What's your basis for your assertion that -- about -- your assertion that no rational investor would have purchased the Hashlets under those circumstances?

A.   If they weren't taking the money and buying computers that were then generating an income and they were simply using the capital and to pay off previous investors, that kind of seems to me to be the kind of description of a Ponzi scheme.

Q.   Have you studied Ponzi schemes?

A.   No, I have not studied Ponzi schemes.

Q.   Have you ever found yourself in the circumstances of a Ponzi scheme?

A.   I don't think so.

Q.   Hopefully not.

In terms of rational investor behavior for cryptocurrency -- well, let me strike that.

What analysis did you do to reach your conclusion in paragraph 39 about rational

Page 88

LOU KERNER

investors?

A.   You know, just the belief that rational investors wouldn't invest in Ponzi schemes and my sense that, since they weren't actually -- didn't actually have the competing power and weren't generating the income, rather they were paying people back with money that was invested by, you know, new investors.

Q.   And what's the basis for your belief that rational investors wouldn't invest in Ponzi schemes?

A.   That, you know, Ponzi schemes, essentially, eventually the music stops playing and the last people in lose everything.

Q.   Did you undertake to determine in this case whether there were any investors that purchased GAW Miners' products even though they believed it was a Ponzi scheme?

A.   I'm sorry, can you repeat the question?

Q.   Did you undertake to determine in this case whether there were any investors that purchased GAW Miners products even though they believed it was a Ponzi scheme?

Page 89

LOU KERNER

A.   No.

Q.   And was there, aside from your belief, was there any other methodology or analysis that you did to reach the conclusion that you set forth in paragraph 39?

A.   Again, I'm sorry, I don't understand the question.

Q.   Earlier you said that the basis for your assertion in paragraph 39 was your belief. I'm just trying to get at what was -- whether there was any analysis or methodology that led you to that belief?

A.   That led me to the belief that people don't want to invest in Ponzi schemes?

Q.   Uh-huh.

A.   No. I mean, I think it's clear on its face.

Q.   Is it just common sense?

A.   I think so.

Q.   Okay. In paragraph 40 in the -- I think it's the third sentence, you say "the payouts were coming from later investors or other revenue sources."

What other revenue sources are you

Page 90

LOU KERNER

1  referring to there?
2      A.  I don't know.  I'm saying if they were
3  paying them out, if they weren't doing mining at
4  the -- at the scale that they said that they
5  were doing it and they were paying people off,
6  then they either had to take it out from money
7  that came in from subsequent investors or from
8  other sources.
9      Q.  Okay.  And then you go on to say, "No
10  rational investor would have purchased Hashlets
11  if they knew that the Bitcoin they were paid as
12  a return weren't earned via mining, but were
13  purchased on a public exchange like CoinBase
14  using funds from non-mining sources."
15          What's the basis for that conclusion?
16      A.  Again, I mean, I think that's common
17  sense if you're investing in something and
18  people aren't doing what they say they're, you
19  know, that they're doing with the money, you
20  know, I think on common sense it's not, you
21  know, if you're told invest and I'll do X, and
22  they don't do X, you probably wouldn't invest if
23  they weren't doing X.
24      Q.  Did you undertake to determine whether

Page 91

LOU KERNER

1  any of the investors in the GAW Miners -- strike
2  that.
3          Did you undertake to ascertain whether
4  any Hashlet purchasers purchased them knowing
5  that they weren't earned via mining?
6      A.  No.
7      Q.  In paragraph 41, you say that, "No
8  rational investor would have purchased PayCoins
9  if they knew that the $100 million reserve was a
10  fraudulent claim."
11          What's the basis for that conclusion?
12      A.  You know, I think the basis is that
13  people buy these things because they believe
14  that there is a reserve to pay back if they want
15  to sell the coin or, you know, and if not a
16  hundred percent, that there's at least a
17  significant percentage.  And so if they knew
18  that there was -- if the percentage was zero,
19  that's -- you know, and that was the basis why
20  they were buying, I don't think people would buy
21  it.
22      Q.  And what's the basis for your -- what
23  you just described as people's buying behavior?
24      A.  Well, I say, on top of common sense,

Page 92

LOU KERNER

1  we can look at Tether.  When there were rumors
2  with regards to its -- whether in fact the money
3  is in the bank or not, when there are rumors
4  about that, you know, we have seen the price
5  fall, you know, well below a dollar.
6      Q.  Okay.  And when did Tether start?
7      A.  When did Tether start?
8      Q.  Yes.
9      A.  That's a good question.  Certainly
10  I've known about it probably for a year or more.
11      Q.  Okay.  So sometime in the last year or
12  so Tether existed?  Tether came into existence?
13      A.  Or two years.  Or at least started
14  being actively used."
15      Q.  Do all Altcoins advertise that they
16  have reserve funds?
17      A.  No.
18      Q.  So some do, some don't; it's not a
19  universal feature of Altcoins to have a reserve
20  fund?
21      A.  Correct.
22      Q.  Going on to the rest of paragraph 41,
23  you say that any -- so if you flip over to the
24  next page of your declaration, it says that,

Page 93

LOU KERNER

1  "Any rational investor understands that such an
2  investment" -- and I assume you're referring to
3  a new cryptocurrency -- "is high risk, and it
4  would be a very significant mitigation on that
5  risk if the issuer of the currency promised to
6  stand behind it with a large reserve fund."
7          Is it your understanding that new
8  cryptocurrencies are higher risk?
9      A.  I think what I'm -- what I'm trying to
10  state here is that there are -- that different
11  coins are trying to do different things.
12          What, you know, what this coin was
13  trying to do was to be a stable coin that had a
14  floor, and -- and it's a very small niche of the
15  broad cryptocurrency market, and so those --
16  those companies that are trying to be a stable
17  coin generally have in either a full reserve or
18  a partial reserve is generally an element of
19  stable coins.
20      Q.  And the other companies that have a
21  full reserve, what disclosures or information do
22  they make available about the source of that
23  reserve?
24      A.  You know, Tether has made statements

24  (Pages 90 to 93)

Page 94

LOU KERNER

1 and have -- you know, the bank at which it
2 deposits the monies has, you know, made
3 statements relative -- you know, and they have
4 accountants who have made statements relative to
5 the, you know, to the banking reserves.
6    Q.   You go on to talk about other new
7 cryptocurrencies that are subject to
8 market-based pricing from the outset.
9         What do you mean by "market-based
10 pricing" there?
11    A.   Well, if you don't have a reserve, you
12 don't have something backing that people feel
13 comfortable, then it's generally driven by just,
14 you know, simple supply/demand economics.
15         So when you have a stable coin and
16 people can take that coin and, you know, in
17 Tether's case, actually take the coin and buy it
18 and return it for a dollar, you know, that
19 generally sets a -- a floor to it.  It generally
20 doesn't deviate unless, you know, does the
21 market lose faith that they will be able to do
22 that.
23         So, outside of the reserve, then,
24 you're much more at the whim of the market

Page 95

LOU KERNER

1 dynamics.
2    Q.   Which is more common, Altcoins that
3 have a reserve fund or Altcoins that do not?
4    A.   Altcoins that do not.
5    Q.   So Altcoins that have market-based
6 pricing then are more common?
7    A.   Correct.  As I said, stable coins are
8 a very small percentage.  Stable coins being a
9 subset of Altcoins are a very small percentage
10 of Altcoins.
11    Q.   Okay.  And are there any stable
12 coins -- is Tether the only stable coin that's
13 in existence now, or are there others?
14    A.   There are others.
15         MS. CAVE:  Okay.  Okay.  Why don't we
16 take a short break.  Five or ten minutes.
17         MR. SARGENT:  Objection.
18         THE VIDEOGRAPHER:  We're going off the
19 record.  It is 11:24 a.m.
20         (Recess.)
21         THE VIDEOGRAPHER:  We're back on the
22 record.  It is 11:40 a.m.
23 BY MS. CAVE:
24    Q.   Mr. Kerner, attached as Exhibit 3 to

Page 96

LOU KERNER

1 your declaration is excerpts from the deposition
2 of Madeline Eden.
3         Did you read the whole transcript or
4 just these pages?
5    A.   I'm sorry.
6    Q.   Exhibit 3, which starts at page 50 of
7 the pdf.
8    A.   What was the question?
9    Q.   So the question is what's attached
10 here is just certain pages from her deposition.
11         Did you read the whole thing or just
12 these pages?
13    A.   I'm not sure.
14    Q.   Same question with respect to Exhibit
15 4, which is some pages from the deposition of
16 Joe Mordica.
17         Did you read the whole transcript or
18 just these pages?
19    A.   Again, I'm not sure.
20    Q.   Were there any other transcripts that
21 you read from this case aside from the pages
22 that are attached here?
23    A.   I read quite a bit of materials, so
24 I'm, you know, I would assume that I read --

Page 97

LOU KERNER

1 that I have read others, but I couldn't recall
2 exactly which ones.
3    Q.   Do you know any of the plaintiffs
4 here, Mr. Shinners, Mr. Pfeiffer, or Mr. Audet?
5    A.   No.
6    Q.   Have you corresponded with any of
7 them?
8    A.   No.
9    Q.   Did you read their deposition
10 transcripts?
11    A.   I have read -- I believe I have read a
12 number of different ones that were here, but I
13 don't recall specifically if they were those.
14    Q.   Attached as Exhibit 5 is a version of
15 the PayCoin white paper?
16    A.   Uh-huh.
17    Q.   Is this anything you had -- is this
18 particular PayCoin white paper something that
19 you had seen before this case?
20    A.   Before this case?
21    Q.   Yes.
22    A.   No.
23    Q.   Had you seen other white papers for
24 other crypto companies outside of this case?

LOU KERNER

1
2    A.   It's a -- it's a good question.  It's
3  just a complexity to it that, you know, I've
4  never seen.  It's -- it's difficult for most
5  people to grasp, including myself.  I mean, I
6  described my time in 2013-2014 as I looked at
7  the light, I looked at the light, but did not
8  see it.
9         I think it was dimmer then than it is
10 today, but, you know, it's, again, difficult for
11 people to be able to see, again, including
12 myself, how all these different pieces come
13 together to be this new competing platform.
14    Q.   So is it fair to say your
15 understanding of crypto today is greater than it
16 was in 2013 and 2014?
17    A.   Yes.
18    Q.   On the next page, you say, "There's
19 nothing constant but change."
20         What do you mean by that?
21    A.   That things don't stay constant; that
22 they change.
23    Q.   Is that true of crypto?
24    A.   Yes.
25    Q.   And is it still true today that you --

LOU KERNER

1
2  do you continue to believe that crypto is the
3  biggest thing to happen in the history of
4  humanity?
5    A.   Yes.
6    Q.   Sorry.  Just one more thing on this
7  before we move on.
8         On the second page, you say, "The time
9  I have spent learning about crypto has had the
10 highest ROI of any time I've ever spent on
11 anything in my entire life."
12         What do you mean by "ROI" there?
13    A.   Return on investment.
14    Q.   And how has the time you have spent
15 been the highest return on investment for you?
16    A.   You know, after the three months I had
17 emerged as a, you know, as a global crypto
18 thought leader, and I was able to raise money
19 for a company and, you know, and benefit
20 financially.
21    Q.   Okay.  You can set that to the side
22 and then we'll mark another exhibit.
23         (Defendant's Exhibit 234, Lou Kerner
24         Post dated January 7, 2018, marked for
25         identification, as of this date.)

LOU KERNER

1
2  BY MS. CAVE:
3    Q.   So we're showing you what has been
4  marked as Exhibit 234, and this is another post
5  of yours on Medium dated January 7.
6         Is that 2017?
7    A.   I think that would be 2018.
8    Q.   Sorry.  2018.  Okay.
9         And is that correct; this is a post
10 you wrote yourself and posted on Medium?
11    A.   Yes.
12    Q.   And the title of this is "Three
13 Thoughts Relevant to Crypto (A.K.A. The World's
14 First Global Casino)."
15         Why do you call crypto the world's
16 first global casino?
17    A.   I think the point of the story is to
18 help people appreciate the difference between
19 researching and investing on one hand and
20 gambling on the other, and the difference in my
21 view is, you know, if you do research and try to
22 understand actually what's going on, then you're
23 doing investing.  You don't necessary have to be
24 good at it to research or do investing, and if
25 you're putting money into something because, you

LOU KERNER

1
2  know, your cab driver told you or, you know, or
3  you're just doing it without doing any research,
4  then you're gambling.
5    Q.   So the difference between investing
6  and gambling is the research component?
7    A.   Yes.
8    Q.   Do you know whether all of the GAW
9  Miners -- all of the people who purchased GAW
10 Miners projects did research before they
11 invested?
12    A.   I don't.
13    Q.   Do you do any gambling yourself?
14    A.   I'm sorry?
15    Q.   Do you do any gambling yourself?
16    A.   Not very much.
17    Q.   Do you -- on the bottom of page 3, you
18 say, "Many investors think investing in the
19 stock market or crypto is like walking into a
20 casino."
21         Do you know -- do you believe that's
22 true about the people who invested in the GAW
23 Miners products?
24    A.   I'm sorry?
25    Q.   You say that, "Many investors think

LOU KERNER

1
2  investing in the stock market or crypto is like
3  walking into a casino."
4          Do you share that belief as to the
5  people who bought any GAW Miners products?
6      A.   So, I apologize, do I think?
7      Q.   Do you think any GAW Miners -- any of
8  the people who bought GAW Miners thought that it
9  was like walking into a casino?
10         MR. SARGENT:  I'm going to object to
11  the form of that question, but go ahead and
12  answer it if you can.
13         THE WITNESS:  Yeah, I guess I -- I
14  don't know since I don't know any of the
15  investors.
16         MS. CAVE:  Okay.  Okay.  You can set
17  that to the side.  Thank you.
18         (Defendant's Exhibit 235, Lou Kerner
19  Post dated March 26, 2018, marked for
20  identification, as of this date.)
21  BY MS. CAVE:
22      Q.   Handing you what we're marking as
23  Exhibit 235, and is this a post on Medium that
24  you did on March 26, 2018?
25      A.   Yes.

LOU KERNER

1
2      Q.   Okay.  And on page 2, one of the
3  thoughts that you share here is that nobody
4  knows anything.
5          Do you believe that to be true as to
6  crypto?
7      A.   That's, I guess, hy- -- you know,
8  hyperbole.  I think what I'm trying to convey is
9  that, you know, it's very early, and I think,
10  you know, one of the only things I know is that
11  whatever it's going to be is something different
12  than what anybody thinks it's going to be.
13     Q.   So it's fair to say that crypto is
14  always changing, would you agree with that?
15     A.   Yes.
16     Q.   You can set that to the side.
17         Have you ever heard of ION?
18     A.   In what context?
19     Q.   In the context of crypto.
20     A.   I'm -- I'm not sure.
21     Q.   Okay.
22     A.   It's not familiar.
23     Q.   What about ION coin?  No?
24     A.   I don't think so.  It's not ringing a
25  bell.

LOU KERNER

1
2      Q.   How much contact do you have with the
3  cryptocurrency community?
4      A.   I'm not sure.
5      Q.   Do you spend much time on any
6  cryptocurrency blogs or forums or bulletin
7  boards, anything like that?
8      A.   Well, Medium is a blog, so I spend a
9  lot of time on Medium.  Telegram, you can
10  consider that, I guess, a kind of bulletin board
11  where I belong to different groups on Telegram
12  that talk about crypto.
13     Q.   Okay.
14     A.   You know, I myself have a lot of
15  different meetup groups, most notably
16  CryptoMonday, where I go and spend time with
17  other people in the crypto community.  I mean,
18  I'm pretty much doing crypto with the
19  significant percentage of my time.
20     Q.   Okay.  What would you say the level of
21  sophistication is within that community?
22     A.   You know, I would say it's across a
23  spectrum.
24     Q.   What about the level of risk tolerance
25  in the community?

LOU KERNER

1
2      A.   I'd say above average.
3      Q.   "Above average" meaning people are
4  willing to take on higher risk?
5      A.   Than you generally see in the general
6  population, yes.
7      Q.   And what about investment strategies
8  in that community, are there -- is there one or
9  are there many?
10     A.   I think there are many.
11     Q.   What are some of the investment
12  strategies that you have seen in the crypto
13  community?
14     A.   You know, I think that, as opposed to
15  the equity markets where I came from and my work
16  as an equity analyst, that work was
17  fundamentally based, you know, on the
18  fundamentals of companies.
19         Kind of given the nascent stage of the
20  crypto market, it's very difficult to do
21  fundamental analysis, and so kind of in that
22  vacuum, what you see is most of the strategy
23  being chart-driven.
24     Q.   Chart-driven.  What do you mean?  What
25  charts are you referring to?

31 (Pages 118 to 121)

Page 122

LOU KERNER

1
2     A.   Looking at technical analysis.
3     Q.   Technical analysis of what factors?
4     A.   Of -- of, you know, all the different
5  factors that you can look at in trading,
6  generally, price and volume, volatility.
7     Q.   Any other factors?
8     A.   You know, I'm not a trader, so, you
9  know, it's not an area where I have a lot of
10 depth.  You know, the majority of investing
11 dollars that have gone into crypto at this point
12 are, you know, on the investing side, have gone
13 in on the -- kind of on the hedge fund trading
14 side of things.
15    Q.   Okay.  And the -- do you invest in any
16 companies that are involved in trading?
17    A.   No.
18    Q.   Is there a reason for that?  Is that
19 intentional or is that just --
20    A.   No.  Well, we -- we set out with
21 CryptoOracle to do -- to raise a VC fund via
22 security tokens, and we have not been successful
23 in doing that security for both legal and
24 technical reasons.  So we haven't raised a fund
25 to do investments.

Page 123

LOU KERNER

1
2     Q.   Okay.  What are the legal reasons that
3  you have not been successful?
4     A.   We have not been able to get a legal
5  opinion, a favorable legal opinion as it relates
6  to a tax-efficient structure for a tokenized VC.
7     Q.   And what are the technical reasons
8  that you have not been able to be successful?
9     A.   Well, even if we had been able to get
10 that, there is not yet the, you know, in our
11 view, the -- the tools there yet to be able to
12 trade the tokens in a compliant fashion.
13    Q.   And "compliant," you mean regulatory
14 compliant?
15    A.   Yes.
16    Q.   Are you aware of whether any of the
17 GAW Miners customers made money on their
18 transactions in Hashlets, Hashpoints,
19 HashStakers or PayCoin?
20    A.   No.
21    Q.   Is it fair to say that the
22 cryptocurrency community -- strike that.
23         Is it fair to say that the crypto
24 community has a negative view of government
25 regulation?

Page 124

LOU KERNER

1
2     A.   Again, can you restate the question?
3     Q.   Uh-huh.  Would you agree that the
4  crypto community has a negative view of
5  government regulation?
6     A.   No, I wouldn't agree with that.
7     Q.   I assume that you have heard of
8  pump-and-dump scams before?
9     A.   Yes.
10    Q.   What's your understanding of
11 pump-and-dump scams?
12    A.   My understanding is that they involve
13 the dissemination of information to prop up the
14 price of a coin such that you can then sell
15 those coins at inflated prices and dump them on
16 the market.  So you pump it up and then you sell
17 it.
18    Q.   And have you observed any of that
19 phenomenon in the crypto community?
20    A.   You know, as I said before, I'm not a
21 trader, so that's not really a world where I
22 spend a lot of time.  I'm certainly familiar
23 with the term, and -- and my understanding is
24 it's something that, you know, that, you know,
25 has been prevalent and continues to be

Page 125

LOU KERNER

1
2  prevalent.
3     Q.   Have you heard of Adam Matlack?
4     A.   It's not ringing a bell.
5         MS. CAVE:  Why don't we take a break.
6         MR. SARGENT:  Okay.  Lunch is here.
7         THE VIDEOGRAPHER:  We're going off the
8  record.  It's 12:16 p.m.
9         (Luncheon recess.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

32  (Pages 122 to 125)

Page 126

1          LOU KERNER
2     AFTERNOON SESSION
3          THE VIDEOGRAPHER:  We're back on the
4     record.  It's 12:56 p.m.
5     LOU KERNER, resumed and
6          testified further as follows:
7     EXAMINATION BY (Cont'd.)
8     MS. CAVE:
9          Q.   Mr. Kerner, do you hold any
10    professional licenses?
11         A.   I don't believe so.
12         Q.   Okay.  Did you, at the time you were
13    an analyst, hold a Series 7 or any SEC --
14         A.   Yes.
15         Q.   -- licenses?
16              Okay.  Which ones, do you remember?
17         A.   I can't think.  I think it was the 7.
18    I held three.  The 63.
19         Q.   Okay.  Those have expired at this
20    point?
21         A.   Yes.
22         Q.   You don't keep them active?
23         A.   Yes.
24         Q.   Earlier this morning, we spoke about
25    the Wedbush matter that was before -- in a FINRA

Page 127

1          LOU KERNER
2     proceeding?
3          A.   Yes.
4          Q.   Do you recall that?
5               Have you been involved in any other
6     FINRA proceedings?
7          A.   Yes.
8          Q.   Okay.  And how many?
9          A.   One.
10         Q.   And were you a subject of that or a
11    person with knowledge?
12         A.   A subject of it.
13         Q.   And what was the nature of that
14    matter?
15         A.   The nature of the matter was
16    appearances on CNBC where I was discussing
17    Facebook, and it wasn't communicated that I was
18    a Facebook shareholder.
19         Q.   And what was the outcome of that
20    proceeding?
21         A.   I was asked to make sure that I stated
22    that I was a Facebook shareholder in future
23    appearances.
24         Q.   Okay.  Was there any finding or order
25    of FINRA --

Page 128

1          LOU KERNER
2          A.   No.
3          Q.   -- at that point?
4               What about any SEC proceedings, have
5     you been party to any SEC proceedings?
6          A.   No.
7          Q.   Any other regulatory proceedings that
8     you have been a party to?
9          A.   No.
10         Q.   Have you ever heard of cryptocurrency
11    referred to as the "Wild West"?
12         A.   Yes.
13         Q.   In what context?  What's your
14    understanding of the meaning "Wild West" with
15    respect to cryptocurrency?
16         A.   That the, you know, the uncertain
17    regulatory environment, you know, both here and
18    outside the United States, is, you know, led to
19    all kinds of different activity you wouldn't see
20    in a -- in a regulated market.
21         Q.   Is that a term that you have used,
22    "Wild West," with respect to cryptocurrency?
23         A.   I certainly could have.
24         Q.   Are there any Altcoins that are now
25    registered with the SEC, to your knowledge?

Page 129

1          LOU KERNER
2          A.   Again, the term "Altcoin" I think
3     is -- is not clearly defined.  Defined as other
4     than Bitcoin, yes.
5          Q.   Okay.  So other than Bitcoin -- so
6     Bitcoin is not registered with the SEC; is that
7     fair to say?
8          A.   Yes.  Correct.
9          Q.   But there are other Altcoins that are
10    registered with the SEC?
11         A.   Yes.
12         Q.   Okay.
13         A.   Well, again, "Altcoins" is defined as
14    coins that aren't Bitcoin.
15         Q.   Okay.  So let's be more specific.
16    Which coins are registered with the SEC, to your
17    knowledge?
18         A.   I think all security tokens are
19    registered with SEC, and defined as tokens that
20    aren't Bitcoin, you can define those as
21    Altcoins.
22         Q.   Do you know as of what point in time
23    those coins became registered with the SEC?
24         A.   I think they're generally registered
25    at time of issuance, and, you know, I think the

33 (Pages 126 to 129)

Page 138

```
 1              LOU KERNER
 2   questions I have.
 3         MS. CAVE:  No further questions.
 4      Thank you, Mr. Kerner.
 5      THE WITNESS:  Thank you.
 6      THE VIDEOGRAPHER:  This marks the end
 7   of the deposition.  We're going off the
 8   record at 1:08 p.m.
 9         (Whereupon, the deposition
10   concluded.)
11              oOo
12
13
14
15
16
17
18
     _____
19           LOU KERNER
20   Subscribed and sworn to
     before me this _____ day
21   of _____, 2018.
22
23   _____
        NOTARY PUBLIC
24
25
```

Page 139

```
 1              LOU KERNER
 2
 3           CERTIFICATE
 4   STATE OF NEW YORK )
                        : ss
 5   COUNTY OF NEW YORK)
 6      I, Kathy S. Klepfer, a Registered
 7   Merit Reporter and Notary Public within and
 8   for the State of New York, do hereby
 9   certify:
10      That LOU KERNER, the witness whose
11   deposition is herein before set forth, was
12   duly sworn by me and that such deposition is
13   a true record of the testimony given by such
14   witness.
15      I further certify that I am not
16   related to any of the parties to this action
17   by blood or marriage and that I am in no way
18   interested in the outcome of this matter.
19      In witness whereof, I have hereunto
20   set my hand this 12th day of November, 2018.
21
22   _____
        KATHY S. KLEPFER, RPR, RMR, CRR, CLR
23
24
25
```

Page 140

```
 1              LOU KERNER
 2              INDEX
 3   EXAMINATION OF L. KERNER:            PAGE
 4   Examination by Ms. Cave          6
 5   Examination by Mr. Sargent       136
 6
 7
 8   DEFENDANTS' EXHIBITS:               PAGE
 9   Exhibit 228, Declaration of Lou Kerner in    7
     Support of Motion for Class Certification
10
     Exhibit 229, Expert Report of Lou Kerner     98
11
     Exhibit 230, article from MoneyBeat          106
12
     Exhibit 231, Assembly of Online Posts        108
13
     Exhibit 232, an e-mail chain bearing Bates Nos.  109
14   GAW00128713 through 715
15   Exhibit 233, Lou Kerner Post dated December 2,   110
     2017
16
     Exhibit 234, Lou Kerner Post dated January 7,    116
17   2018
18   Exhibit 235, Lou Kerner Post dated March 26,     118
     2018
19
20   INSTRUCTION NOT TO ANSWER:
21   Page 99, Line 16
22
23
24
25
```

Page 141

```
 1              LOU KERNER
 2   NAME OF CASE:  Audet, et al. v. Fraser, et al.
 3   DATE OF DEPOSITION:  November 8, 2018
 4   NAME OF WITNESS:  Lou Kerner
 5   Reason Codes:
 6      1. To clarify the record.
        2. To conform to the facts.
 7      3. To correct transcription errors.
 8   Page _____ Line _____ Reason _____
 9   From _____ to _____
10   Page _____ Line _____ Reason _____
11   From _____ to _____
     Page _____ Line _____ Reason _____
12   From _____ to _____
13   Page _____ Line _____ Reason _____
14   From _____ to _____
     Page _____ Line _____ Reason _____
15   From _____ to _____
16   Page _____ Line _____ Reason _____
17   From _____ to _____
     Page _____ Line _____ Reason _____
18   From _____ to _____
19   Page _____ Line _____ Reason _____
20   From _____ to _____
     Page _____ Line _____ Reason _____
21   From _____ to _____
22   Page _____ Line _____ Reason _____
23   From _____ to _____
     Page _____ Line _____ Reason _____
24   From _____ to _____
25      _____
```

36 (Pages 138 to 141)