

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Office:+1 (212) 837-6000
Fax: +1 (212) 422-4726
hugheshubbard.com

January 16, 2019

<u>VIA ECF</u>

Honorable Michael P. Shea
United States District Court, District of Connecticut
Abraham A. Ribicoff Federal Building
450 Main Street, Room 217
Hartford, CT 06103

      Re:    *Audet v. Fraser, et al.*, No. 16-cv-00940 (D. Conn):
            <u>Plaintiffs' Violation of Scheduling Order</u>

Dear Judge Shea:

On behalf of defendant Stuart A. Fraser ("Fraser"), we write regarding the untimely subpoena Plaintiffs served on non-party PayPal Holdings, Inc. ("PayPal") dated November 9, 2018, of which Plaintiffs notified Fraser on November 13, 2018 (the "Subpoena," attached as Ex. A).  After speaking with the Court's representative on November 26, 2018, the parties conferred further without resolution and agreed to submit letters by 5:00 pm on January 16, 2019.  To the extent Plaintiffs ask the Court to clarify its order granting the parties' motion for an extension of fact discovery to take the deposition of Homero Joshua Garza ("Garza"), Fraser does not oppose such clarification.  (*See* ECF No. 101, 102.)  To the extent Plaintiffs now seek leave to serve the Subpoena, Fraser opposes that request because the Subpoena is untimely, having been served on PayPal three months after the fact discovery deadline, and Plaintiffs cannot show good cause for their delay.  Accordingly, the Court should quash the Subpoena.

First, the Court ordered completion of fact discovery by August 10, 2018 (ECF. No. 83), but Plaintiffs failed to subpoena PayPal by that deadline.  Instead, they waited 13 weeks after that deadline to serve the Subpoena.  Court scheduling deadlines "are not advisory" or "to be ignored at the parties' discretion."  *Woodley v. Bryant*, No. 07 Civ. 1399(BSJ) (MHD), 2008 WL 1752248, at *1 (S.D.N.Y. Apr. 15, 2008); *see also* Fed. R. Civ. P. 16(b)(1), (b)(3)(A).  Subpoenas to third parties are "not exempt from discovery deadlines in scheduling orders." *Whitserve, LLC v. GoDaddy.com, Inc.*, No. 3:11–CV–948 (JCH), 2013 WL 1442449, at *3 (D. Conn. Apr. 9, 2013).  Although the parties jointly moved for three discovery extensions solely to take the deposition of Garza, which the Court granted,[1] in none of those requests did Plaintiffs

---

1.  *See* ECF No. 91 (first joint motion), 92 (order granting first limited extension), 101 (second joint motion requesting a "limited extension of the fact discovery deadline for purposes of taking" Garza's deposition), 102 (order granting second limited extension), 110 (third joint motion), 115 (order granting third extension "for the limited purpose of allowing the parties to take" Garza's deposition).

seek an extension to serve any third-party subpoenas (and if they had, Fraser would have opposed).  Plaintiffs *sua sponte* served the Subpoena in November 2018, months past the deadline.  The Subpoena is therefore untimely.

Second, Plaintiffs were "aware of the existence of documents or other information" relating to credit card chargebacks — the reversal of outbound transfers of funds from customers' accounts that are the subject of the Subpoena — long ago, but failed to issue the Subpoena before the deadline.  *Gucci Am., Inc. v. Guess?, Inc.*, 790 F.Supp.2d 136, 140 (S.D.N.Y. 2011) (late requests "should be denied").  Plaintiffs' own documents refer to chargebacks, about which the parties questioned fact witnesses.[2]  Plaintiff Dean Allen Shinners also knew about and discussed chargebacks as early as April 2015.[3]  Plaintiffs' conduct in failing to act timely to issue the Subpoena before the August 10, 2018 deadline "is not diligent."  *In re Application of Barnet*, No. 13 Misc. 214(RMB), 2014 WL 7409524, at *1, *3 (S.D.N.Y. Dec. 30, 2014) (denying motion to extend discovery).  (*See* Exs. B-G.)  Thus, Plaintiffs cannot show good cause for an extension of time to serve the Subpoena.  *Grochowski, v. Phoenix Const.*, 318 F.3d 80, 86 (2d Cir. 2003) ("A finding of good cause depends on the diligence of the moving party."); *see also Dag Enterprises Inc. v. Exxon Mobil Corp.*, 226 F.R.D. 95, 108, 112 (D.D.C. 2005) (denying motion to compel production of subpoenaed information and granting motion for protective order regarding untimely subpoena).

Finally, allowing Plaintiffs to serve the Subpoena now unfairly prejudices Fraser, who "would be limited in [his] ability to pursue [his] own relevant discovery on the issue[.]" *Whitserve*, 2013 WL 1442449, at *2.  Fraser opposes the reopening of fact discovery or the further extension of the discovery deadline given the significant time that has passed and the fact that the Parties have now completed briefing on class certification.

Accordingly, the Subpoena is not timely, Plaintiffs are not entitled to an extension of time to serve the Subpoena, and the Court should quash it.

<div align="right">
Respectfully submitted,

Sarah L. Cave
</div>

cc:   Colin Waterson, Esq. (via ECF and email)
      Sean Fisher, Esq. (via ECF and email)

---

2.  *See* Email, Jan. 2, 2015, GAW00663554, attached as Ex. B; Bank Notice to Michael Pfeiffer, June 2, 2015, GAW00363521, attached as Ex. C; Capuano Dep. Tr., July 9, 2018 at 126:7-127:3, attached as Ex. D (testifying regarding chargebacks).

3.  *See* "How to Chargeback GAWMiners Hashlets," BitcoinNews, April 17, 2015, available at https://bitcoinnewsmagazine.com/how-to-chargeback-gawminers-hashlets/ (Shinners providing instructions for chargebacks) (attached as Ex. E); *see also*  "GAW Braintree Payments account," July 17, 2015, at 9-10 available at https://web.archive.org/web/20180326173436/http://gawsuit.com:80/ (post on site managed by Shinners regarding Braintree, the PayPal entity at issue in the Subpoena) (attached as Ex. F); *Id.*, "Charge-backs and VARs", July 17, 2015, at 11; Sentence Hearing Tr., *US v. Garza*, No. 3:17CR158(RNC) (D. Conn. Sept. 13, 2018) at 23:19-24:24, attached as Ex. G (Shinners discusses chargeback process).

# Exhibit A

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| DENIS MARC AUDET, MICHAEL PFEIFFER, DEAN ALLEN SHINNERS, and JASON VARGAS, Individually and on Behalf of All Others Similarly Situated,<br><br>           Plaintiffs,<br><br>   vs.<br><br>STUART A. FRASER, GAW MINERS, LLC, and ZENMINER, LLC, (d/b/a ZEN CLOUD),<br><br>           Defendants. | Case 3:16-cv-00940<br><br>ECF Case<br><br><u>CLASS ACTION</u><br><br>**PLAINTIFFS' NOTICE OF SUBPOENA TO PAYPAL HOLDINGS, INC.**<br><br><u>DEMAND FOR JURY TRIAL</u> |

Please take notice that, per FRCP 45, plaintiffs Denis Marc Audet, Michael Pfeiffer, and Dean Allen Shinners, and Jason Vargas, by and through their attorneys of record, Susman Godfrey LLP and Izard, Kindall, and Raabe, LLP have served the subpoena attached as Exhibit 1 on PayPal Holdings, Inc.

DATED: November 13, 2018

Respectfully submitted,

<u>s/ Colin M. Watterson</u>
Colin Watterson (*pro hac vice*)
cwatterson@susmangodfrey.com
Texas Bar No. 2409330
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, TX  77002
Tel: (713) 651-9366

Marc Seltzer (*pro hac vice*)
mseltzer@susmangodfrey.com

1

California Bar No. 54534
Kathryn Hoek (*pro hac vice*)
khoek@susmangodfrey.com
California Bar No. 219247
SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067
Tel: (310) 789-3100

Seth Ard (*pro hac vice*)
sard@susmangodfrey.com
New York Bar No. 4773982
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019-6022
Tel: (212) 336-8330

Edgar G. Sargent (*pro hac vice*)
esargent@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, Washington 98101
Telephone: (206) 516-3896

Mark P. Kindall (ct13797)
mkindall@ikrlaw.com
Robert A. Izard
rizard@ikrlaw.com
IZARD, KINDALL & RAABE, LLP
29 S. Main St., Suite 305
West Hartford, CT 06107
Tel: (860) 493-6292

*Counsel for Plaintiffs*

2

<u>Certificate of Service</u>

I hereby certify that on November 13, 2018, I served the foregoing via electronic mail on the following:

Daniel H. Weiner
Sarah L. Cave
Sara E. Echenique
HUGHES HUBBARD & REED LLP
daniel.weiner@hugheshubbard.com
sarah.cave@hugheshubbard.com
sara.echenique@hugheshubbard.com

Sean M. Fisher
David R. Schaefer
BRENNER, SALTZMAN & WALLMAN LLP
sfisher@bswlaw.com
dschaefer@bswlaw.com

*s/ Colin M. Watterson*
Colin M. Watterson

3

# EXHIBIT 1

AO 88B  (Rev. 12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
District of Connecticut

| | |
|---|---|
| Denis Marc Audet, Michael Pfeiffer, et al. | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No.   3:16-cv-00940 |
| Stuart A. Fraser, GAW Miners, LLC, and Zenminer, LLC (d/b/a Zen Cloud) | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:   PayPal Holdings, Inc., through its regis. agent CT Corp. System,818 West 7th St.,Ste 930 Los Angeles,CA 90017

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Attachment A.

| Place:  580 California Street, 12th Floor<br>San Francisco, CA<br>94104 | Date and Time:<br><br>11/30/2018 9:00 am |
|---|---|

❑ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   11/09/2018

*CLERK OF COURT*

OR

_____          /s/ Colin M. Watterson
*Signature of Clerk or Deputy Clerk*               *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   Denis Marc Audet, Michael Pfeiffer, et al. _____ , who issues or requests this subpoena, are:

Colin Watterson

## Notice to the person who issues or requests this subpoena
A notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed.  Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.   3:16-cv-00940

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❒ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

❒ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____                    _____

                                                                    *Server's signature*

                                                             _____

                                                                    *Printed name and title*

                                                             _____

                                                                    *Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# EXHIBIT A

<u>Exhibit A</u>

Pursuant to FRCP 26, 34, and 45, plaintiffs Denis Marc Audet, Michael Pfeiffer, and Dean Allen Shinners ("Plaintiffs") request that PayPal Holdings, Inc. produce the documents requested below at 9:00 a.m. on November 30, 2018.

The following definitions and instructions apply to these requests:

<div align="center">I.<br><u>Definitions</u></div>

1.      "Communication(s)" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise).

2.       "Document(s)" is synonymous in meaning and equal in scope to the usage of this term in Federal Rule of Civil Procedure 34(a). A draft or nonidentical copy is a separate document within the meaning of this term. A request for production of 'documents' shall encompass, and the response shall include, electronically stored information, as included in Federal Rule of Civil Procedure 34, unless otherwise specified by the requesting party. "Document" includes messages sent through chat programs or applications (e.g., Google Hangout, Groupme, Whatsapp, etc.), or through social media platforms (e.g., Linkedin, Twitter, Facebook, etc.).

3.      "Discussing" means discussing, communicating about, referring to, or mentioning.

4.      "Identify," when referring to a person, to 'identify' means to provide, to the extent known, the person's full name, present or last known address, and when referring to a natural person, additionally, the present or last known place of employment. Once a person has been identified in accordance with this subparagraph, only the name of that person need be listed in response to subsequent discovery requesting the identification of that person. When referring to

documents or electronically stored information, to 'identify' means to provide, to the extent known, information about the (i) type of document or electronically stored information; (ii) its general subject matter; (iii) the date of the document or electronically stored information; and (iv) author(s), addressee(s) and recipient(s).

5.     "Including" means including but not limited to.

6.     "Person" means any natural person or any business, legal or governmental entity or association.

7.     "Relating to" means discussing, describing, referring to, pertaining to, containing, analyzing, studying, reporting on, commenting on, evidencing, constituting, setting forth, considering, recommending, concerning, or pertaining to, in whole or in part.

8.     The terms "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside its scope.

9.     The terms 'all' and 'each' shall both be construed as all and each.

10.     The use of the singular form of any word includes the plural and vice versa.

11.     The terms "you," "your," and "PayPal" means PayPal Holdings, Inc. and affiliates, officers, directors, employees, agents, attorneys, consultants, or other representatives, and any person acting or authorized to act on behalf of PayPal Holdings, Inc.

12.     The terms "Fraser" means Stuart Fraser and any attorneys, associates, agents, or any other person performing any service for him.

13.     "GAW Miners" means GAW Miners, LLC including its affiliates, officers, directors, employees, agents, attorneys, consultants, or other representatives, and any person acting or authorized to act on behalf of GAW Miners, LLC.

14.     "ZenMiner" means ZenMiner, LLC including its affiliates, officers, directors, employees, agents, attorneys, consultants, or other representatives, and any person acting or authorized to act on behalf of ZenMiner., LLC.

15.     "Cantor Fitzgerald" means Cantor Fitzgerald, L.P. including its affiliates, officers, directors, employees, agents, attorneys, consultants, or other representatives, and any person acting or authorized to act on behalf of Cantor Fitzgerald, L.P.

16.     "BGC Partners" means BGC Partners, Inc. including its affiliates, officers, directors, employees, agents, attorneys, consultants, or other representatives, and any person acting or authorized to act on behalf of BGC Partners.

17.     "Cryptocurrency" means any  digital or virtual currency that uses cryptography for security.

18.     "Geniuses at Work" means Geniuses at Work Corporation including its affiliates, officers, directors, employees, agents, attorneys, consultants, or other representatives, and any person acting or authorized to act on behalf of Geniuses at Work Corporation.

19.     "Optima" means Optima Computers LLC including its affiliates, officers, directors, employees, agents, attorneys, consultants, or other representatives, and any person acting or authorized to act on behalf of Optima Computers LLC.

20.     "'651 Patent" means U.S. Patent No. 8,504,651.

21.     "'049 Patent" means U.S. Patent No. 8,656,049.

22.     "GAW-HSI" means GAW High-Speed Internet, Inc. including its affiliates, officers, directors, employees, agents, attorneys, consultants, or other representatives, and any person acting or authorized to act on behalf of GAW High-Speed Internet, Inc.

23.     "GAW Wireless" means Great Auk Wireless LLC including its affiliates, officers,

directors, employees, agents, attorneys, consultants, or other representatives, and any person acting or authorized to act on behalf of GAW Wireless LLC.

24.     "GAW Labs" means GAW Labs LLC including its affiliates, officers, directors, employees, agents, attorneys, consultants, or other representatives, and any person acting or authorized to act on behalf of GAW Labs LLC.

25.     "Gaser" means Gaser, Inc. including its affiliates, officers, directors, employees, agents, attorneys, consultants, or other representatives, and any person acting or authorized to act on behalf of Gaser, Inc.

26.     "RF" means RF Reality Networks, Inc. including its affiliates, officers, directors, employees, agents, attorneys, consultants, or other representatives, and any person acting or authorized to act on behalf of RF Reality Networks, Inc.

27.     "Little Auk" means Little Auk Inc. including its affiliates, officers, directors, employees, agents, attorneys, consultants, or other representatives, and any person acting or authorized to act on behalf of Little Auk Inc.

28.     "Auk Redoubt" means Auk Redoubt, LLC including its affiliates, officers, directors, employees, agents, attorneys, consultants, or other representatives, and any person acting or authorized to act on behalf of Auk Redoubt, LLC.

29.     "Voice Prodigy" means any person involved in the business of providing telecommunications services known as Voice Prodigy.

30.     "GAW Entities" means GAW Miners, ZenMiner, Geniuses at Work, GAW-HSI, GAW Wireless, GAW Labs, Gaser, RF, Little Auk, Auk Redoubt, Voice Prodigy, and/or any other entity with which Garza was affiliated.

31.     "Hardware-Hosted Mining" has the meaning ascribed to it the First Amended

Complaint (Dkt. 57). The First Amended Complaint is attached hereto as Exhibit A-1.

32.  "Cloud-Hosted Mining" "Hardware-Hosted Mining" has the meaning ascribed to it the First Amended Complaint (Dkt. 57). The First Amended Complaint is attached hereto as Exhibit A-1.

33.  "Hashlets" has the meaning ascribed to it in the First Amended Complaint (Dkt. 57). The First Amended Complaint is attached hereto as Exhibit A-1.

34.  "Hashpoints" has the has the meaning ascribed to it the First Amended Complaint (Dkt. 57). The First Amended Complaint is attached hereto as Exhibit A-1.

35.  "HashStakers" has the meaning ascribed to it the First Amended Complaint (Dkt. 57). The First Amended Complaint is attached hereto as Exhibit A-1.

36.  "Paycoin" has the meaning ascribed to it the First Amended Complaint (Dkt. 57). The First Amended Complaint is attached hereto as Exhibit A-1.

37.  "GAW Cryptocurrency Products" means Hardware-Hosted Mining, Cloud-Hosted Mining, Hashlets, Hashpoints, HashStaker, Paycoin, and/or any other product or service offered by GAW Miners or ZenMine.

38.  "Putative Class Members" has the meaning ascribed to the term "Class" in paragraph 160 in the First Amended Complaint (Dkt. 57). The First Amended Complaint is attached hereto as Exhibit A-1.

39.  "Action" means Case No. 3:16-cv-00940-MPS pending in the United States District Court for the District of Connecticut.

II.
Instructions

1.  Except where otherwise indicated, each request covers the time period beginning June 1, 2014 and continuing to the present and throughout this litigation because there is a

continuing duty to supplement responses and to make supplemental productions of Documents pursuant to FRCP 26(e).

2.       Produce all responsive Documents prepared, sent, or received, in whole or in part, during the time period described above.

3.       You are to produce all Documents that are in the possession, custody or control of you, or in the possession, custody or control of any attorney or agent for you. Without limiting the terms, "possession, custody, or control" of an item means that you either have physical possession of the item or have a right to possession of the item that is equal or superior to the person who has physical possession of the item.

4.       You are under a duty to supplement your responses to these discovery requests pursuant to FRCP 26(e).  If after you produce any of the discovery requested below you discover or receive additional Documents or information responsive to the discovery requests below, you should promptly produce such additional Documents or information to the full extent required by these rules.

5.       Please serve a response to these Requests that complies with FRCP 34(b). If you object or claim privilege in response to any of the items set forth below, please produce a privilege log that complies with Local Rule 26(e).

6.       The Documents requested below should be produced in the manner that they are kept in the usual course of business. Documents should be produced with the label or labels from any file folder, binder, file drawer, file box, notebook, computer disk or other container in which the Document was found. Electronically stored information, including electronic mail and corresponding attachments, should be produced in native format.

7.      All duplicates or copies of Documents are to be provided to the extent they have handwriting, additions, or deletions of any kind different from the original Document being produced.

8.      All Documents which cannot be legibly copied should be produced in their original form.

9.      If any Documents requested herein have been lost, discarded or destroyed, they should be identified as completely as possible, including the following information: (a) the date of disposal; (b) the manner of disposal; (c) the reason for disposal; (d) the person authorizing disposal; and (e) the person disposing of the Document.

10.     Exhibit A-2 is a copy of the Standing Protective Order entered in this Action. If you contend the Standing Protective Order is insufficient to protect any confidential information, then please forward a proposed stipulation without delay.

11.     If you or your lawyers find any of these requests vague, confusing, hard to understand, or if they just want to talk through some issues relating to these requests, please call Colin Watterson at (713) 653-7844.  Please do not wait and object instead of attempting to resolve the issue with a telephone call.  Thank you.

### III.
### Requests

1.      Please produce all documents relating to transactions you processed on behalf of GAW Miners.

2.      Please produce all documents relating to transactions you processed on behalf of ZenMiner.

3.      Please produce all documents relating to transactions you processed on behalf of the GAW Entities.

4.      Please produce all documents relating to chargebacks in connection with transactions you processed on behalf of GAW Miners.

5.      Please produce all documents relating to chargebacks in connection with transactions you processed on behalf of ZenMiner.

6.      Please produce all documents relating to chargebacks in connection with transactions you processed on behalf of the GAW Entities.

# EXHIBIT A-1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| DENIS MARC AUDET, MICHAEL PFEIFFER, DEAN ALLEN SHINNERS, and JASON VARGAS, Individually and on Behalf of All Others Similarly Situated, | Case 3:16-cv-00940<br><br>Hon. Michael P. Shea<br>Courtroom 2<br><br>ECF Case |
| Plaintiffs, | CLASS ACTION |
| vs. | NOVEMBER 4, 2016 |
| STUART A. FRASER, GAW MINERS, LLC, and ZENMINER, LLC, (d/b/a ZEN CLOUD), | **FIRST AMENDED COMPLAINT** |
| Defendants. | DEMAND FOR JURY TRIAL |

### FIRST AMENDED COMPLAINT

Plaintiffs Denis Marc Audet, Michael Pfeiffer, Dean Allen Shinners, and Jason Vargas ("plaintiffs"), individually and on behalf of a class of all others similarly situated, bring this action for damages and relief against defendants Stuart A. Fraser ("Fraser"), GAW Miners, LLC ("GAW Miners"), and ZenMiner, LLC (d/b/a ZenCloud) ("ZenMiner"), for violations of the federal securities laws and Connecticut state laws. Based on counsel's investigation, research and review of publicly available documents, plaintiffs' personal knowledge, discussions with Homero Joshua Garza ("Garza"), and upon information and belief, plaintiffs allege as follows:

### SUMMARY OF THE ACTION[1]

1.      Defendants used the lure of quick riches from a twenty-first century payment system known as virtual currency to defraud investors. Though cloaked in technological sophistication and jargon, defendants' fraud was simple at its core—defendants sold what they did not own and misrepresented the nature of what they were selling.

2.      From approximately March 2014 through December 2014, defendants sold a progressive array of products and investment contracts to over 10,000 investors that defendants claimed would yield profits from mining or otherwise investments in virtual currency.

3.      Defendants' initial foray into the virtual currency space was selling virtual currency mining equipment. In March 2014, GAW Miners began selling physical mining equipment to customers who would use its computing power to "mine" for virtual currency. "Mining" for virtual currency means applying computer power in an attempt to solve complex equations that verify a group of transactions in that virtual currency. The first computer (or collection of computers) to solve an equation is awarded new units of that virtual currency. This process is known as "mining," and the people and computer equipment used in this process are known as "miners."

---

[1] The following summary allegations are not meant to be exclusive of allegations made elsewhere in the Complaint.

4.      Defendants quickly grew dissatisfied with the low returns on selling physical equipment, and shifted their business to offering hardware-hosted mining in June 2014 with the creation of ZenMiner (remote management software). Customers who purchased hardware-hosted mining were told that they purchased specific pieces of physical mining equipment that were stored and maintained by GAW Miners, for daily maintenance fees, but allegedly controlled by customers.

5.      In order to give customers the option to engage in hosted mining without ZenMiner, and instead via a website, defendants soon began offering Cloud-Hosted Mining. The defendants represented that Cloud-Hosted Mining would allow customers to control their mining hardware through a website, instead of through the remote management software (ZenMiner) used with Hardware-Hosted Mining.

6.      Although both Hardware- and Cloud-Hosted Mining customers were informed they could request that their physical mining equipment be shipped to them at any time, in reality, GAW Miners never had sufficient designated equipment to support the hosted mining services they sold to customers or to ship to customers upon request.

7.      In yet another shift in their scheme to defraud investors, Defendants next sold shares in the returns from their purported mining operations, via investment contracts that they named "Hashlets." Hashlet contracts entitled their purchasers to a share of the profits from defendants' purported "hashing power," or the computing power (measured in megahash per second), that defendants purportedly devoted to virtual currency mining. In reality, defendants sold far more Hashlets worth of computing power than they actually had in their computing centers. There was no computer equipment to back up the vast majority of Hashlets that defendants sold. Defendants collected at least $19 million in revenue from their sales of Hashlets.

8.      When the Hashlets scheme began to unravel, defendants pivoted yet again by announcing the launch of "Paycoin," a new form of virtual currency. Before it launched Paycoin, GAW Miners began selling "Hashpoints," which were convertible promissory notes that could be converted into Paycoin. Defendants then introduced HashStakers, which were digital wallets that could lock up Paycoin for 30, 90 or 180-day terms and generate fixed returns. Defendants launched Paycoin by promoting a $20 price floor

3

and its wide acceptance by well-known merchants—neither of which held true. Once Paycoin's trading price began to plummet, GAW Miners' customers watched the value of their investments fall with no recourse because defendants had sold them HashStakers for the purpose of locking up Paycoins. All the while, defendants sold millions of Paycoins and reaped the benefits.

9.      Defendants made many false and misleading statements to potential and actual investors about GAW Miners' virtual currency mining operations. For example, defendants misrepresented:

   a.      that Hardware-Hosted Mining and Cloud-Hosted Mining customers could request shipment of the physical mining equipment they purportedly owned;

   b.      that Hardware-Hosted Mining and Cloud-Hosted Mining customers could control the pools in which their mining equipment operated;

   c.      that all of the Hashlets of computing power purchased by investors would be pooled together to engage in virtual currency mining, and that investors' returns, or "payouts," would be calculated based on the success of those collective virtual currency mining operations;

   d.      that buying a Hashlet would allow investors to mine virtual currency without the expense and expertise that would be required to purchase and maintain their own virtual currency mining equipment;

   e.      the profitability and life-span of Hashlets;

   f.      how the payouts for Hashlets were derived;

   g.      the value of Hashpoints and the conversion to Paycoin;

   h.      the expected value of Paycoin and the existence of agreements with merchants to accept it;

   i.      the utility of Paybase as a GAW Miners-owned exchange for Paycoin;

   j.      the continued existence of defendants' pre-mined Paycoin and defendants' sales of that Paycoin without customer knowledge;

   k.      the expected returns generated by HashStakers;

   l.      the extent of GAW Miners' mining activities; and

   m.      the extent of GAW Miners' virtual currency trading activities.

Defendants knew that each of these statements was false or misleading at the time it was made.

4

10.     Defendants' activities had the hallmarks of a Ponzi scheme. Because defendants sold far more computing power than they owned and dedicated to virtual currency mining (with respect to hosted mining services and Hashlets), they owed investors a return that was larger than any actual return they were making on their limited mining operations. Investors were simply paid back gradually over time, as "returns," the money that they and others had invested in GAW Miners' products and paid to GAW Miners for purported "maintenance" fees.

11.     Through the activities alleged in this Complaint, Garza and defendants GAW Miners and ZenMiner have engaged in common law fraud and fraud in connection with the purchase or sale of securities, in violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), various subparts of Rule 10b-5 thereunder, and sections 36b-29(a)(2) and 36b-4 of the Connecticut Uniform Securities Act ("CUSA"). Defendants GAW Miners and ZenMiner have also engaged in the offer and sale of unregistered securities, in violation of section 36b-29(a)(1) of CUSA. Fraser functioned as a controlling person of GAW Miners, ZenMiner, and Homero Joshua Garza ("Garza").[2] Fraser is liable for Garza, GAW Miners' and ZenMiner's primary violations of federal and state securities laws pursuant to section 20(a) of the 1934 Act and section 36b-29(c), is liable for aiding and abetting their violations of state securities laws under 36b-29(a) of CUSA, and is liable for aiding and abetting their common law fraud.

12.     Fraser was a culpable participant in the fraudulent conduct of Garza and defendants GAW Miners and ZenMiner. Fraser knew about or recklessly disregarded Garza's and the companies' false and misleading statements concerning GAW Miners' and ZenMiner's investment products. Garza kept Fraser fully apprised about GAW Miners' and ZenMiner's business, and the two regularly discussed and made joint decisions concerning the companies' management and policies. Fraser came up with the idea for ZenMiner, and personally orchestrated other aspects of the defendants' fraud.

---

[2] Plaintiffs originally sued Garza for violations of the federal and state securities laws, and for common law fraud. See Docket Entry ("Dkt.") 1. Claims against Garza have since been dismissed without prejudice. See Dkt. 52. However, defendant Fraser may still be held liable as a controlling person of Garza and for aiding and abetting his wrongdoing.

5

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over the subject matter of this action under the Exchange Act, 15 U.S.C.A. § 78aa and 28 U.S.C.A. § 1331. The claims asserted arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder by the SEC, including Rule 10b-5, 17 CFR § 240.10b-5. The Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over all remaining state law-based claims asserted herein.

14.     The defendants' products and services detailed in this Complaint and purchased or acquired by plaintiffs during the Class Period constitute investment contracts and are securities pursuant to Section 3(a)(10) of the Exchange Act, 15 U.S.C.A. § 78c, because they constitute investments in common ventures premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others.

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because, at all relevant times, GAW Miners and ZenMiner maintained offices in Connecticut and conducted business in Connecticut; and GAW Miners made offers to sell, and sold, securities from Connecticut.

16.     In connection with the conduct described in this Complaint, defendants directly or indirectly made use of the mails or the means or instruments of transportation or communication in interstate commerce.

17.     Defendants' conduct involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements, and resulted in substantial loss, or significant risk of substantial loss, to other persons.

## PARTIES

18.     Defendant Fraser, age 55, lives in Armonk, New York. Fraser has served as Vice Chairman at Cantor Fitzgerald, L.P., and he invested in GAW Miners and ZenMiner in 2014. Fraser has served as a mentor and business associate of Garza for over a decade. Through Fraser's ownership of GAW Miners and ZenMiner and his longstanding personal and business relationship with Garza, Fraser had the power to direct or cause the direction of the management and policies of GAW Miners and

ZenMiner, and Fraser had the ability and power to direct Garza's decisions with respect to GAW Miners and ZenMiner. Fraser was a culpable participant in Garza, GAW Miners and ZenMiner's violations of federal and state securities laws.

19.     Defendant GAW Miners is a Delaware limited liability company whose principal place of business is in Bloomfield, Connecticut. GAW Miners was formed in May 2014. Garza is the Managing Member of GAW Miners and Garza and Fraser each owned and controlled 41% of the equity in GAW Miners, with the remaining 18% reserved for investors. During all relevant times, Garza and Fraser have controlled GAW Miners and directed its day-to-day activities.

20.     Defendant ZenMiner is a Delaware limited liability company, which shares a principal place of business with GAW Miners in Bloomfield, Connecticut, and was formed in July 2014. ZenMiner also does business under the name ZenCloud, and utilized the website www.zencloud.com. Garza is the Managing Member. Fraser is an investor in ZenMiner and related entities. During all relevant times, Garza and Fraser have controlled ZenMiner and directed its day-to-day activities.

21.     Plaintiff Denis Marc Audet lives in Hamden, Connecticut. During the class period, Mr. Audet purchased Hashlets from GAW Miners. Defendants fraudulently induced Mr. Audet to use his Hashlets to mine Hashpoints, which the defendants converted into Paycoin.

22.     Plaintiff Michael Pfeiffer lives in Narberth, Pennsylvania. During the class period, Mr. Pfeiffer purchased Hashlets and HashStakers from GAW Miners and purchased Cloud-Hosted mining from third-parties. Defendants fraudulently induced Mr. Pfeiffer to use his Hashlets to mine Hashpoints, which the defendants converted into Paycoin.

23.     Plaintiff Dean Allen Shinners lives in Lancaster, Ohio. During the class period, Mr. Shinners purchased Hashlets and HashStakers from GAW Miners. Defendants fraudulently induced Mr. Shinners to use his Hashlets to mine Hashpoints, which the defendants converted into Paycoin.

24.     Plaintiff Jason Vargas lives in Pine Bush, New York. During the class period, Mr. Vargas purchased Hashlets and HashStakers from GAW Miners. Defendants fraudulently induced Mr. Vargas to use his Hashlets to mine Hashpoints, which the defendants converted into Paycoin.

7

**STATEMENT OF FACTS**

**Background on Virtual Currency and "Mining"**

25.     "Virtual currency" is a digital representation of value that can be traded and functions as a medium of exchange; a unit of account; and/or a store of value, but does not have legal tender status (i.e., when tendered to a creditor, is a valid and legal offer of payment) in any jurisdiction. Virtual currency generally is not issued or guaranteed by any jurisdiction or government, and its value is decided by consensus within the community of users of the virtual currency. The most widely adopted virtual currency is bitcoin, although there are many other virtual currencies used today, known as "altcoins." Virtual currency is distinct from fiat currency, which is the money designated by a country as its legal tender. An example of fiat currency is the United States dollar. Virtual currencies may be traded on online exchanges for fiat currencies, including the United States dollar, or used to purchase goods and services.

26.     Bitcoin and other virtual currencies can be "mined." A virtual currency "miner" is an individual or entity, and her or its computer equipment, which uses special computer software to solve complex algorithms that validate groups of transactions in that virtual currency.

27.     Each unit of virtual currency has a "blockchain," which is an electronic public ledger of all transactions in that currency.

28.     Certain virtual currencies, including bitcoin, self-generate units of the currency by rewarding miners with newly created coins when they are the first to solve the algorithms that validate transactions in the currency. Using bitcoin as an example, the bitcoin network collects all transactions made during a set time period, usually around ten minutes, into a list called a "block." Bitcoin miners compete to be the first to confirm the transactions in the block and write them into the blockchain. The first miner to solve the algorithm that confirms a transaction is rewarded with a preset amount of newly-issued bitcoins by the bitcoin protocol. This process of solving equations to confirm transactions and to earn new coins is known as "mining."

29.     As interest in bitcoin, and competition among miners, increased, more computer processing power became required in order for a miner to have a chance of solving blocks, and thus

8

obtain the rewards of mining. The processing power of computers used to confirm virtual currency transactions is measured by their "hash rate," or the number of calculations they can perform per second (e.g., a computer with a hash rate of 10 megahash can make 10 million calculations per second). The greater a computer's hash rate, the greater that computer's chance to solve the equation that confirms transactions, and the more virtual currency coins the miner can earn.

30.     Given the increasing competition to solve the equations that confirm blockchain transactions, miners frequently combine their computing power into mining "pools." As a general rule, the more computing power directed to a particular mining pool, the better the chance that pool will be the first to confirm a block of transactions and receive the payout for mining. Typically, pool participants' shares of the mining reward depend upon the proportional amount of computing power each contributes to the pool.

31.     From June 2014, when defendants first offered virtual currency investment contracts for sale, to the present, the exchange rate of U.S. dollars to bitcoins has fluctuated between a low of approximately $177 per bitcoin and a high of approximately $650 per bitcoin.

**Garza and Fraser's Business and Personal Relationship**

32.     Garza was the co-founder and CEO of GAW Miners, and he co-owned ZenMiner. In those positions, which he held since those companies were founded, he could direct their strategy, their financial decisions, and had control over their day-to-day operations.

33.     Garza and Fraser have had a business and personal relationship since approximately 2003. During high school, Garza began a business in Vermont called Optima Computers. Optima Computers offered new computer systems for sale, as well as service and repair of existing computer systems. Garza met Fraser when Garza installed Internet at Fraser's waterhouse on Lake Dunmore, Vermont. The two quickly developed a close business and personal relationship. Then-high school aged Garza quickly began looking to Fraser, the Vice-Chairman of the prominent investment bank Cantor Fitzgerald, for business advice, direction, and mentorship. Fraser invested in Optima Computers, and helped Garza manage the company.

9

34.     As Garza and Fraser's business ventures multiplied, Garza continued to seek advice and approval from Fraser before making decisions concerning the management and policies of their businesses. While Garza and Fraser rarely formalized their business relationships, they had an understanding that Garza would serve as CEO of their respective companies, and Fraser would serve as "the Board." Nevertheless, Fraser and Garza frequently discussed, and Fraser frequently made decisions concerning, the day-to-day operations of their various ventures.

35.     In 2006, Garza and Fraser applied for two patents together (along with a third individual) for technology that would embed Internet-based advertising in websites.

36.     Garza and Fraser's next venture was Great Auk Wireless High Speed Internet (later known as GAW High Speed Internet or GAW-HSI). This high-speed Internet service company received a grant to expand Internet access to a region of Vermont that was underserved by service providers, but it failed to deliver. The State collected the grant money back from GAW-HSI after several customers complained to the Vermont Attorney General's Office and it became clear that GAW-HSI was not going to provide the wireless service it had promised.

37.     Fraser ultimately owned at least 80% of GAW-HSI. Garza transferred ownership of GAW High Speed Internet to Fraser after the partners reshuffled their pool of investments and debts. In a July 2013 email to Fraser, Garza suggested they discuss how to handle their business arrangements, which had not been "revised for years." Garza proposed that they split every system and company in half, with the exception of GAW High Speed Internet, of which Fraser would own 80%. Garza suggested creating an "equal partnership (50/50) in our holding company 'Geniuses At Work Corporation,'" with Fraser holding the voting power. Garza would contribute his stake or control over certain systems or companies, as well as patents to be created, and Fraser would: provide a $10,000 per month investment that would serve as Garza's salary, forgive a $230,000 personal debt, allow Garza "to live down the investment [Fraser] made in GAW in the past" and Garza will try to "recoup [Fraser's] losses," contribute a $150,000 cash infusion, and help with "Howard on CP"—referring to Howard Lutnick, the head of Cantor Fitzgerald. Garza expressed his gratitude for Fraser's help and said he was "proud of everything

we have done this year." Garza also conveyed his gratitude to Fraser for Fraser's ongoing mentorship: "I can't tell you how important it was for me to feel like I could 'do it.'!"

38.     Garza and Fraser agreed that their "arrangement" providing for 50-50 ownership would apply prospectively to new companies that they created. This arrangement ultimately applied to GAW Miners and ZenMiner.

39.     Garza and Fraser's relationship went beyond an ordinary business relationship. Garza expressed his gratitude at one point by giving Fraser a Tesla (an expensive car). Fraser and Garza regularly went to one another's homes, spent time with one another's families and friends, and engaged in social activities together. Garza and Fraser also regularly sent each other text messages, often about social subjects and often including pictures of themselves. Fraser's wife made him a book that listed the four people Fraser was closest to for Fraser's 50th birthday. The book listed Garza as one of those individuals. In another instance, Garza told Fraser he was having a child. Fraser expressed anger and concern over Garza's decision and questioned whether Garza would continue to devote adequate time to their business ventures.

40.     Garza and Fraser's relationship differed from a typical investor relationship in the way Fraser chose to finance their ventures. Unlike a traditional investor, Fraser kept Garza on a "tight leash" by doling out investments in piecemeal installments. Each time Garza needed additional funding, Fraser required Garza to report back to Fraser and receive his blessing before receiving additional financing. This investment practice kept Garza beholden to Fraser and gave Fraser the ability to direct the management and policies of their companies, and gave Fraser the ability and power to direct Garza's decisions with respect to their companies.

41.     Garza relied on Fraser for personal financial support. As described above, Fraser paid Garza's salary. Fraser represented to Garza that Fraser would always "take care" of Garza and that Garza did not need to worry about money. Reliance on Fraser for personal financial support gave Fraser the ability to direct the management and policies of their companies, and gave Fraser the ability and power to direct Garza's decisions with respect to their companies.

42.     Garza relied on Fraser's direction because of Fraser's status as a prominent businessman. When Garza met Fraser, Garza was in high school, and Fraser was a powerful investment banker. Garza sought approval and validation from Fraser, and deferred to Fraser's decisions because of Fraser's substantial business experience. Garza's deference to Fraser gave Fraser the ability to direct the management and policies of their companies, and gave Fraser the ability and power to direct Garza's decisions with respect to their companies.

43.     Garza and Fraser frequently discussed the strategic direction of their various business ventures, including GAW Miners, by phone and in-person conversations at Fraser's houses. For example, in an April 2014 Google Hangout with Joe Mordica, Garza, referencing a call from Fraser, wrote "its Stuart always have to answer."

44.     As another example of the types of communications Garza and Fraser frequently had with one another, in June 2014, Garza asked GAW Miners Manager Dan Pease to "run through anything that's important to you" in advance of a call with Fraser.

45.     In one email memorializing such a phone call about the strategic direction of GAW Miners, Fraser wrote:

going to bed, good talking ….

maybe you should just charge both the buyer and sell commission, vs one side. If your commission was 2 for the seller, you could charge each side 1.5 and make 3… Also then there is no issue with commission affecting price.

46.     Garza and Fraser's partnership continued and expanded with GAW Miners and their entry into the virtual currency world. In March 2014, Garza incorporated GAW Miners. As with their previous ventures, Garza was CEO of GAW Miners, and Fraser served as a de facto "Board." Fraser represented via email that "we" (he and Garza) "started GAW.com and GAWMiners.com," and that GAW Miners is "a very big player in the Virtual Coinage Business/Bitcoin." Fraser further wrote that "we" are one of the "largest sellers of Mining Power" and that "GAWMiners is totally above board and we only want to do it 'Right.'"

12

47.     Fraser provided GAW Miners' only capitalization: when the company started, Fraser invested approximately $135,000 into GAW Miners. Fraser also provided three loans of $200,000 each to GAW Miners in or around the summer of 2014. Fraser also provided short-term loans to GAW Miners or to Garza for GAW Miners business. Fraser's provision of capital and financing to GAW Miners and ZenMiner gave Fraser the ability to direct the management and policies of GAW Miners and ZenMiner, and gave Fraser the ability and power to direct Garza's decisions with respect to GAW Miners and ZenMiner.

48.     Pursuant to their 2013 "agreement" concerning the ownership of GAW-HSI and their other ventures, Fraser and Garza each owned half of GAW Miners and ZenMiner. Garza and Fraser ultimately agreed to set aside 18% of the equity in GAW Miners for investors or employees. This arrangement between Garza and Fraser was formalized by David McLain, a lawyer and longtime friend of Fraser who was also Fraser's partner in one of Fraser's other companies, as well as a legal representative of GAW Miners.

49.     Garza and Fraser thus possessed equal control over GAW Miners and ZenMiner, and Garza regularly referred to Fraser as his "partner." For example, in December 2014 a writer for a cryptocurrency blog asked Garza, "How directly is Stuart Fraser involved with GAW [Miners]? I know that his profile on Cantor Fitzgerald's website states that he has a stake in Great Auk Wireless, his LinkedIn Profile mentions both Great Auk Wireless and GAW Labs, and you included a quote from him in a Press Release. Does he know the details of GAW's internal operations? Is he actually an active partner? Or, is he more of a silent investor?" Garza responded that Fraser "is a partner, just like me." Fraser's status as Garza's partner and Fraser and Garza's ownership of equal portions of GAW Miners and ZenMiner gave Fraser the ability to direct the management and policies of GAW Miners and ZenMiner.

50.     Fraser was involved in GAW Miners' operations and strategic decision-making, and regularly provided direction to Garza concerning GAW Miners' business. For example, in January 2015, Fraser sent an email to Garza asking "why can't we sell Paycoins from our site?" and advised "we need to

13

find a way for people to buy them. it's easier to sell them then buy them and that's why you're getting killed." In another email about Paycoin, Fraser asked Garza "how do I buy coins through paybase? How can we hold cash, like paypal? Do we need to buy a bank?" In May 2014, Fraser sent Garza an email entitled "hosting" and asked Garza whether he had "an answer." In response, Garza wrote: "We are working on it. Just hired to new coders." In April 2014, Fraser cautioned Garza not to forget "to look into our exchange rate 'risk', etc . . . on doing business with foreign countries, i.e. China." On May 5, 2014, Fraser suggested that GAW Miners sell on Amazon.com. On May 20, 2014, Fraser told Garza, "you need to make $25k to $50k machines, people will buy it!" In another instance in May 2014, Garza forwarded an email conversation between himself and the CEO of a competitor of GAW Miners to Shiraz Moosajee and Fraser and wrote "I think it's time we buy him out." In response, Fraser asked "what about their history/garbage? What's the benefit of this, personnel? Anything beyond killing a competitor?"

51.     Fraser participated in negotiations with third parties on GAW Miners' behalf. For example, in April 2014, GAW Miners entered into discussions with Zeus Miner, a company that manufactures equipment for cryptocurrency mining. Fraser negotiated directly with the CEO of Zeus Miner on behalf of GAW Miners on at least one occasion and invited the CEO of Zeus Miner to visit with Fraser about GAW Miners business in New York.

52.     Fraser participated in the management and direction of GAW Miners' advertising strategy. For example, in an email entitled "advertising GAWMiners," Fraser wrote: "The others are using, How to Mine and other pages to get people to notice them. Google, How to make a bitcoin, etc… you might want to try to get infront of them, not sure how….." On May 5, 2014, Fraser asked Garza whether he had contacted CoinDesk, a cryptocurrency news website, "about a story" and asked "or is there another/better site on mining?" In June 2014, Fraser asked Garza whether he had "googled 'bitcoin mining controller'" and recommended that GAW Miners "do a little advertising for ZenMiner on these quieries [sic] via the search engines."

53.     Fraser also participated in interviews concerning GAW Miners, including at least one with the Wall Street Journal.

14

54.     On information and belief, Fraser created a Twitter account that he used to send messages promoting GAW Miners' business and products.

55.     In addition to making cash investments in GAW Miners, Fraser involved Cantor Fitzgerald in GAW Miners company business. Fraser used his contacts at Cantor Fitzgerald—a well-known investment bank where he was Vice Chairman—to introduce potential investors to Garza and GAW Miners. For example, in December 2014, Fraser emailed Garza asking "how do you want me to let my buddies know about Paycoin? Is there something to either send them (email, FB, Linkedin, etc…) or direct them to"? Fraser also told Garza that he wanted "to do it at the right time." In an April 10, 2014 email, Garza asked Fraser what his intentions were "in helping raise funds from your connections." Fraser responded that he had already "reached out to 1 guy and working on some others."

56.     Fraser used Cantor Fitzgerald resources to advise GAW Miners. On information and belief, Fraser set up a meeting between Garza, other GAW Miners employees, and Jim Ficarro and Gary Distell of Cantor Fitzgerald in or around November 2014. According to an email from Fraser to Ficarro, the purpose of the meeting was to advise GAW Miners on:

> how to move forward [sic] Financials, Settlements/Clearing, Rules and Regs and maybe someone at the SEC we [sic] can have an 'open [sic] dialogue with, as we figure out the best way forward.
>
> GAWMiners is totally above board and we only want to do it 'Right'. We have plans for a[n] ICO and need to make sure we're set up right before it gets too crazy!

During that meeting, Cantor Fitzgerald advised GAW Miners on obtaining legal representation from a prominent New York law firm and a lobbyist.

57.     On information and belief, Fraser approached Howard Lutnick, the CEO of Cantor Fitzgerald, about investing in GAW Miners. But, according to an October 31, 2014 message written by Fraser, "Howard is supportive. Only wants us to make a shitload. But not be involved."

58.     Garza used his relationship with Fraser to represent that GAW Miners had support from Cantor Fitzgerald. In a November 2014, email concerning investment in a company called FreshPay, Garza wrote: "My main interest is equity. Between my relationship with cantor Fitzgerald and access to hash, we could be a good partner. Thoughts?"

15

In a December 2014, Garza wrote: "Well, I have been working on something with cator [sic] and I found out last night it is going to move forward. . . . Cantor is helping launch the first public exchange for crypto! And they are going to use **both** [Bitcoin] and [Paycoin] for the base currencies to do trading!!!!! . . . My partner Stuart says that Howard (Chairman) is being told his guys that [Paycoin] is going to raise in value to match [Bitcoin]."

59.     Fraser utilized Cantor Fitzgerald personnel to respond to media inquiries about GAW Miners, to provide administrative support, and to handle accounting or legal issues related to GAW Miners. For example, in late 2014, the CEO of GoCoin sent Garza a Note Purchase Agreement and the Note itself for GAW Miners' investment in GoCoin. Garza forwarded the documents to Fraser and asked him to fill them out. Fraser responded by asking who was "on the hook to pay them $2mm? Me?" Fraser followed up by stating that he didn't "know who to send [the documents] to at Cantor? Acct or Legal. How do I explain this to the Cantor guys?" Fraser's relationship with Cantor Fitzgerald provided the companies with resources, potential investors, and enhanced the companies' prestige. Fraser's control over Garza and GAW Miners' relationship with Cantor Fitzgerald in turn gave Fraser at least indirect power to influence and direct the management and policies of GAW Miners and ZenMiner, and gave Fraser the ability and power to influence and direct Garza's decisions with respect to GAW Miners and ZenMiner.

60.     Garza and Fraser represented that Fraser was involved with GAW Miners, and Fraser (as well as Garza) made representations about GAW Miners and its offerings. In late 2014, Fraser spoke with a public relations firm that was preparing a press release about GAW Miners and the launch of Paycoin, and provided a quote about cryptocurrency to include in the release, attributable to "Stuart Fraser, Vice Chairman and partner, Cantor Fitzgerald L.P." In emails discussing the press release with Garza, Fraser suggested that he should be identified in it as a "founding investor …. Stuart Fraser, co-founder/early investor and Vice Chairman …."

61.     In a November 14, 2014 email to a colleague at Cantor Fitzgerald, Fraser wrote "I have been working with my friend Josh Garza for the last several years on Internet related business. Currently,

we're [sic] started GAW.com and GAWMiners.com, whole [sic] is a very big player in the Virtual Coinage Business/Bitcoin."

62.     Because Fraser and Garza represented GAW Miners as a joint venture, individuals interested in investing in GAW Miners' products, or in working with GAW Miners, knew they could contact Fraser or Garza to discuss the business. For example, on December 16, 2014, Fraser received a LinkedIn message from an individual named Chris Marcilla about expanding certain GAW Miners business to Europe.

63.     Fraser was able to talk about GAW Miners and its products and services because he was kept apprised of the company's status by Garza and because he had access to company records— including, for example, how many customers had bought which products, what revenue was being generated, and plans for introducing new offerings. For example, in a June 13, 2014 text message, Fraser wrote "Hey! Looks like a better sales day," demonstrating his access to GAW Miners financial records.

64.     In another instance, before an interview with the Wall Street Journal, Fraser asked Garza "any questions I need to be ahead of?" Garza responded saying "in case you need numbers" we "are adding over 10k customers a day" and "Our annualized income is 120mm" and "We have collected over a million addresses for the ICO [initial coin offering] invite."

65.     In another email, Fraser told Garza "Whenever you have some accounting numbers . . . It would be nice to see how we're doing." Fraser further explained "I would also like to have a clear idea how to deal with GAW and what they're doing, etc... Considering that's my concern now."

66.     In a June 10, 2014 email, Garza copied Fraser and asked GAW Miners' CFO, Shiraz Moosajee, about what "the timing look[s] like to have the Financials prepared." Moosajee sent Fraser and Garza a copy of draft financial statements. Garza also responded to Fraser and Garza and wrote:

Dear Stuart and Josh,

. . .

To elaborate, the key element is Inventory accounting for which no operational system exists and which none appears planned for the change over to the new front end Magenta system. Assuming this can be implemented operationally, concurrent with the new warehouse occupation in July /

17

August, then picking up the accounting back and getting stock reconciliation's etc done here and in Hong Kong, and cleaned up by September month end is a trough [sic] schedule but realistic. It's worth restating that without supply chain operational controls i.e. purchases [sic] orders, goods received and dispatched notes & inventory, <u>no reliance</u> should be placed on any financial statements."

. . .

The accruals problem is a good window into some of the organizational challenges and can best be seen through the hosting product. The accounting here requires that revenue be recognized over the course of the hosting period (12 months) along with costs. Additionally, we would capitalize and amortize fixed costs in setting up the data center and accrue for operational ones. To do this as a regular and normal activity, requires the company have the people, operational processes and policies capable of this level of sophistication. We don't.

To elaborate further, we have great people, highly motivated but with limited business and financial management experience, particularly for what is now appropriate for a company of some size and aspirations to be something much bigger. Similar, our processes and policies are fine for what existed but do not scale. There is much to be done in terms of education, training and management development.

3. Normal Financial Management: Financial Control, Budgets, Variance Reporting Accountability etc. All of this needs to happen but I cannot see this in place till 2015, the critical path being dictated by the availability of good numbers per [financial statements]. Otherwise its Garbage In / Garbage Out.

. . .

These are issues that have to be addressed both strategically and tactically and require your input and direction.

This email demonstrates that GAW Miners had no financial controls in place.

67.     In fact, rather than account for its various sources of revenue, GAW Miners simply deposited its incoming revenue into a single wallet. Similarly, GAW Miners made outgoing payments to customers from the same wallet, the hallmark of a Ponzi scheme.

68.     This email also demonstrates that GAW Miners had no ability to track its inventory of miners. Without the ability to keep track of its hardware, GAW Miners had no ability to ensure that it was providing computing power commensurate with the power its customers believed they were purchasing.

69.     Finally, this email demonstrates that Moosajee looked to both Garza and Fraser for "direction" concerning management and polies of GAW Miners.

70.     Fraser also had his own access to GAW Miners' sales information. In April 2014, Garza provided Fraser with access to the administrative page of gawminers.com so Fraser could keep track of GAW Miner's sales.

71.     In August 2014, Fraser sent Garza an email titled "Ac[c]ess to GAWMiners Sales" asking "do you have a new login for me to see what's going on?"

72.     Fraser's deep involvement with Garza and GAW Miners also included allowing Garza and GAW Miners to use Fraser's credit line at Bank of America and his American Express Plum card for GAW Miners company business. After Garza fell behind on his payments for the American Express Plum Card, Fraser and Garza conducted a cash swap to keep their dealings secret from Fraser's wife. In May 2014, Fraser sent Garza an email offering to "give Gawminers a revolving loan of 200k" and in June 2014 Fraser transferred $200,000 to a GAW Miners account from his Chase Premier Platinum account.

73.     Fraser was involved with Garza and GAW Miners on many levels, professional and personal, and Fraser had the power to direct or cause the direction of the management and policies of GAW Miners and ZenMiner and the ability and power to direct Garza's decisions with respect to GAW Miners and ZenMiner, both through his ownership stake in GAW Miners and through his personal relationship with Garza.

74.     As just one additional example of Fraser's ability to control Garza, GAW Miners, and ZenMiner, in an August 1, 2014 email, Garza and Fraser discussed the purchase of the domain name "BTC.com." The company selling the domain name offered to sell it for $1.5 million. Garza forwarded the offer to Fraser, and the following exchange took place:

> Garza: It's actually not bad, I might buy this.
>
> Fraser: I want to throw up.
>
> Garza: Yea, a domain name that can increase our business 5 times, and we make that profit in a week. Terrible!
>
> Fraser: Do what you want. Seems like a huge waste of money to me. Sorry I don't just rubber stamp everything that comes out is [sic] your mouth.

**Hardware- and Cloud-Hosted Mining**

75.     Garza and Fraser initially founded GAW Miners to purchase virtual currency mining equipment from its overseas manufacturers and to resell it to customers. Until approximately May or June of 2014, GAW Miners' primary business was to sell virtual currency mining equipment.

76.     In short order, defendants became dissatisfied with the low profit margins on selling physical equipment, and shifted their business to offering first Hardware-Hosted Mining, and then Cloud-Hosted Mining. Both offerings allowed customers to purchase physical mining equipment that GAW Miners would host and maintain, but that customers were told they could control. Customers were also informed that they could request their physical equipment be delivered to them at any time.

77.     In June 2014, GAW Miners began offering its customers Hardware-Hosted Mining. Instead of shipping to its customers the computer hardware they ordered, GAW Miners claimed that it would host the computer hardware in its own datacenter. Customers paid GAW Miners a fee to cover the expenses that GAW Miners allegedly incurred to operate the hardware, such as maintenance, electricity, cooling, and Internet connectivity. Customers accessed and allegedly controlled their mining equipment via remote management software offered by ZenMiner.

78.     ZenMiner was a company Garza created in May 2014; it was formally incorporated in July 2014. Though he persuaded other individuals to represent to customers and the public that ZenMiner was an independent company, Garza and Fraser owned and controlled ZenMiner at all times. ZenMiner provided the remote management software that Hardware-Hosted Mining customers used to access and control the mining equipment that they were told they owned.

79.     In order to give customers the option to engage in hosted mining without the ZenMiner software, and instead via a website, defendants began offering Cloud-Hosted Mining in July 2014. Cloud Hosted Mining was marketed as a partnership between ZenMiner and GAW Miners. GAW Miners offered customers the ability to purchase their mining hardware from it, and then house their equipment in ZenMiner's datacenters for a fee. Customers were told they could control their mining equipment through the Internet by logging on to the accounts they established on ZenMiner's website interface called

ZenCloud. ZenCloud promised customers that "you don't pay for shipping, cooling, or electricity" and that "by running your miner in Zen's datacenter, you have guaranteed 99.9% uptime, which is only a pipedream for miners hashing at home."

80.     Customers who switched from GAW Miners' Hardware-Hosted Mining service to Cloud-Hosted Mining through ZenCloud lost some of the control they thought they had over how they used their equipment to engage in mining. ZenCloud users could only "direct" their equipment to engage in mining through one of the handful of mining pools offered on the ZenCloud website.

81.     As with Hardware-Hosted Mining customers, GAW Miners told Cloud-Hosted Mining customers that they could end their hosted service at any time and receive their physical equipment in the mail from GAW Miners. In reality, GAW never had sufficient designated equipment to return to customers.

82.     Hardware-Hosted Mining and Cloud-Hosted Mining were fraudulent schemes in at least two respects.

83.     First, even though Garza and Fraser fully controlled ZenMiner, Garza marketed it to the public as a business entity that was distinct from GAW Miners. ZenMiner was described as being owned by Thomas Fraser, Fraser's son.

84.     For example, on or about May 23, 2014, Garza participated in an interview with a reporter for Cryptocoinsnews.com, during which he convinced Thomas Fraser to pretend that ZenMiner was his company and idea. At the time of the interview, Garza expected that the reporter would publish a story containing the misrepresentations that ZenMiner was an entity separate from GAW Miners. That story was published on or about May 23, 2014.

85.     But, Fraser and Garza conceived of the ZenMiner business model long before the May 23, 2014 interview. Fraser helped Garza develop the ZenMiner business model. Fraser was aware that the ZenMiner remote mining model had originated with GAW Miners, not with his son or ZenMiner. Fraser and Garza conceived of the ZenMiner business model long before the May 23, 2014 press release. For example, in a series of text messages sent on May 2, 2014, Fraser wrote "What about selling %'s of

hosted machines? Different levels for guys to combine to make more than they would make alone? $100k deal at a time." This message describes Hashlets, which were ultimately sold through ZenCloud. On May 18, 2014, five days before the press release, Fraser wrote to Garza that Fraser would "do everything I can to help develop this concept to delivery, but we also need to keep the 'store' going to support our efforts while we get there."

86.     Fraser knew that his son, an analyst at Cantor Fitzgerald, had no previous involvement in ZenMiner and that ZenMiner was not a company separate from GAW Miners. Rather, Fraser had urged Garza to involve Thomas Fraser in GAW Miners. Fraser came up with the idea of associating his son with ZenMiner and ZenCloud, proposed the plan to Garza before the May 23, 2014 interview. Thomas Fraser was named the "CEO" of ZenMiner at Fraser's direction.

87.     This charade continued when, on or about August 24, 2014, GAW Miners issued a press release announcing that its parent company (which was also owned and controlled by Garza and Fraser), had purchased a controlling stake in ZenMiner for $8 million, and that ZenMiner had become a division of GAW Miners. This statement was false; no such transaction occurred because Garza and (defendant) Fraser had always owned and controlled ZenMiner. Garza authorized and approved the issuance of GAW Miners' false press release. The purported ZenMiner transaction was marketed as proof that GAW Miners was a leader in the virtual currency industry by bridging the gap between hardware sellers and hosted mining services.

88.     Fraser came up with the idea of GAW Miners "acquiring" ZenMiner, first proposed the plan to Garza in or around June 2014, and the two jointly made the decision for GAW Miners to "acquire" ZenMiner.

89.     Second, contrary to its stated reason for existence, no mining actually occurred through ZenMiner's ZenCloud interface. Though customers paid for equipment that they believed they were directing to mine in various pools available through the ZenCloud interface, and also paid for hosting services, very few pieces of the mining equipment purchased by customers actually existed in a ZenMiner datacenter. Most customers paid for a phantom piece of equipment that neither GAW Miners nor

22

ZenMiner owned. Neither GAW Miners nor ZenMiner was directing customers' computing power to any pools at all, much less the ones customers believed they were choosing.

90.     Instead, GAW Miners and ZenMiner, controlled by Garza and Fraser, operated as a classic Ponzi scheme. They signed up new customers for hosted mining services and used the incoming funds and the daily maintenance fees to pay existing customers the "returns" generated from mining activities. Although customers thought they had purchased physical equipment and had control over it and the profits it generated, in reality customers could not exercise their rights to receive the physical mining equipment and they did not have control over their miners or any profits they yielded. What customers really acquired was a share in defendants' scheme, and the right to profits that defendants alone elected to share.

91.     Fraser knew or should have known that mining did not occur through the Zencloud interface and that customers were paid through incoming funds and maintenance fees rather than based on mining activity. In or around May 2014, Garza held a meeting with Shiraz Moosajee at the GAW Miners' offices. During the meeting, Moosajee and Garza discussed the Zencloud business model in detail, including the fact that there would be a "mismatch" between the Companies' mining capacity and customer orders and how customers would be paid. Afterwards, Garza took the materials from his meeting with Moosajee to Fraser's home in Armonk, New York. Garza presented the same information he discussed with Moosajee to Fraser. Garza explained the ZenCloud business model with Fraser, including the fact that there would be a "mismatch" between the companies' mining capacity and customer orders and how customers would be paid. Fraser told Garza that ZenCloud looked "great."

92.     On May 4, 2014, Garza forwarded Fraser an email thread involving a dispute between GAW Miners and Bezenet Consulting, LLC over GAW Miners' hosting services. During their discussion, Garza wrote to Fraser: Great day yesterday. Our biggest Saturday yet. Nothing better than making even more money, and not having to ship anything for weeks." This email demonstrates Fraser's awareness of GAW Miners' capacity mismatch.

23

93.     On May 5, 2014, Garza forwarded GAW Miners marketing materials to Fraser. The materials described GAW Miners' Cloud-Hosted services as follows: "You can control your hosted miners directly from your computer to point them to the pools you want at any time!" These communications demonstrate Fraser's awareness of the representations GAW Miners and Garza made concerning hosted services.

94.     Soon after GAW Miners' Cloud-Hosting Mining service launched, customers began to complain that they could not see the increase in power in the mining pools they believed they had chosen to mine through ZenCloud. These complaints were made public through message boards dedicated to virtual currency mining. Facing potential mass customer demands that their equipment be shipped—equipment that didn't exist—GAW Miners and ZenMiner again changed business models. GAW Miners offered all of its customers the opportunity to convert their ZenCloud Cloud-Hosted machines to "Hashlets."

**The Shift to "Hashlets"**

95.     Beginning in August 2014, GAW Miners and ZenMiner decided to sell "Hashlets" to the public. Customers buying Hashlets purchased computational power from GAW Miners' and ZenMiner's data center. Thus, buying a Hashlet entitled an investor to a share of the profits that GAW Miners and/or ZenMiner would purportedly earn by mining virtual currencies using the computers that were maintained in their data centers. Hashlets were purported to earn a return based on the number of virtual currency units generated when the pools to which their computing power was directed succeeded in processing and confirming virtual currency transactions. As ZenMiner's terms of service stated, a Hashlet was "a divisible and assignable allocation of hashing power from GAW-owned and hosted mining hardware."

96.     As discussed above, Fraser proposed the Hashlet concept to Garza in May 2014.

97.     Hashlet customers believed they were buying computational power from GAW Miners' and ZenMiner's data center, but <u>without</u> rights to acquire a specific piece of mining equipment on a specific shelf (unlike Hardware- and Cloud-Hosted Mining Customers). Effectively, Hashlet customers

were purchasing the rights to profit from a slice of the computing power owned by GAW Miners and/or ZenMiner (by then, purportedly, a division of GAW Miners).

98. Hashlet investors were required to do very little to purportedly mine virtual currency. Investors only needed to log into their ZenCloud accounts and click-and-drag their Hashlet icons over to the icons of the mining pools the Hashlets were designated to mine. From there, investors relied solely on the efforts of GAW Miners and/or ZenMiner to generate Hashlets' expected profits by owning, housing, operating, maintaining, and connecting the computer hardware that would engage in mining. If GAW Miners had received payouts from its purported mining activities, Hashlet investors' shares of those payouts would have been calculated and deposited by GAW Miners into investors' ZenCloud accounts.

99. The majority of investors bought Hashlets through a web-based shopping portal by paying with U.S. currency or with bitcoin. Some investors who were Cloud Hosted Mining customers also bought Hashlets through their existing ZenCloud accounts, in part by converting the value of their Cloud Hosted Mining equipment. Once an investor owned one Hashlet, she could also buy additional Hashlets through her ZenCloud account, including by reinvesting the purported "payouts" from her existing Hashlets into additional Hashlets.

100. Investors were told that they could log on to their ZenCloud accounts, activate their Hashlets using a code that was provided at the time of purchase, and then direct their Hashlets to engage in mining in one of the mining pools available through ZenCloud. GAW Miners represented that it personally owned and operated ZenPool—one of the mining pools purportedly available through ZenCloud—and that ZenPool was the "most profitable pool."

101. Investors' shares of the profits that they purportedly earned as a result of their Hashlets' mining in pools were posted to their ZenCloud accounts daily. Investors were also charged maintenance fees to pay for purported physical upkeep of the equipment behind the Hashlets. Those maintenance fees were deducted from investors' ZenCloud accounts daily. Investors could request a withdrawal, in bitcoin, from their ZenCloud accounts.

102.    Fraser had access to the backend of Zencloud. Zencloud's backend contained administrative tools that could be used to view reports regarding the number of Zencloud customers, transaction volume, sales figures, etc.

103.    GAW Miners' press releases and website, and Garza's posts on the company's message board, described Hashlets as "the world's first digital cloud miner" and as "designed from the start to be the easiest, most convenient miner to own." GAW Miners and Garza marketed Hashlets specifically to non-technical people interested in virtual currency mining, touting a Hashlet as "so easy to use that it is 'Grandma approved,'" and claiming that "[i]f you can open an email, you can setup and operate a Hashlet."

104.    GAW Miners began selling Hashlets in mid-August 2014. GAW Miners' press releases dated August 24 and August 26, 2014 claimed that "thousands of units per second" were sold during their first day, and millions of dollars of Hashlets were sold during their first week, of availability.

105.    There were two basic types of Hashlets—those that were purportedly able to mine for bitcoin and those that were purportedly able to mine for altcoin. Bitcoin mining required computers to solve a different algorithm than that used to mine for altcoin.

106.    Prices for Hashlets ranged between about $10 and $50 per unit, depending on their features, including which pools they were able to mine. A "unit" of a Hashlet was a measurement of its hashing power, or the number of calculations it could perform per second. Hashlets that mined bitcoin were sold in multiples of 1 gigahash per second units, and Hashlets that mined altcoin were sold in multiples of 1 megahash per second units.

107.    During their first week of availability alone, GAW Miners and ZenMiner oversold— between triple and quadruple—the number of Hashlets for which they had the supporting computing power. Yet, their sales continued.

108.    By October 2014, GAW Miners had oversold altcoin-mining Hashlets by at least 100 times its computing capacity, and bitcoin-mining Hashlets by at least about 5 times its computing capacity. These sales took place before GAW Miners had even completed setting up the datacenter in

26

Mississippi where the mining equipment was purportedly stored. Mississippi Power, the electrical provider for the data center, alleged in a complaint filed against GAW Miners that it did not begin providing power to the data center until mid-October 2014. Before that time, GAW Miners did not even have the ability to use the mining equipment and computational power in which customers believed they had invested.

109.    Between mid-August and December 2014, GAW Miners and ZenMiner sold at least $19 million of Hashlets to more than 10,000 investors.

110.    From the time that Hashlets went on sale in August 2014, and throughout the entire period during which they were sold, Fraser had access to information about how many units of Hashlets were sold, including through the backend of ZenCloud. Fraser knew or was reckless in not knowing that GAW Miners and ZenMiner did not have the computing capacity to support the units of Hashlets that they sold.

111.    Garza and Fraser were responsible for GAW Miners' and ZenMiner's decision to continue selling Hashlets despite their knowledge (or reckless or negligent disregard) that the companies lacked the computing power they purported to be selling to investors.

112.    As a result of dramatically overselling their computing capacity, GAW Miners and ZenMiner did not engage in mining with even close to the amount of computing power they had sold in Hashlets. As a further result, GAW Miners' and ZenMiner's revenues from mining bitcoin were minimal, and their revenues from mining altcoin were virtually nonexistent.

113.    Between August and December 2014, GAW Miners created several types of Hashlets with different features. Garza approved the creation of these Hashlet varieties, and frequently announced their availability on GAW Miners' website and through posts on the company's message board.

114.    For example, on or about September 11, 2014, GAW Miners announced the creation of the limited edition "Remember" Hashlet with the logo of "9/11" to commemorate those who lost their lives in the terrorist attacks of September 11, 2001. Garza announced that GAW Miners would only sell 500 Remember Hashlets, and would donate all of the proceeds (approximately $10,000) to "the 9/11

27

memorial fund." He specified that "GAW will in no way be profiting from any sales related to the cause." After selling approximately 2,290 Remember Hashlets for a total of approximately $48,000, GAW Miners donated only $10,000 to a 9/11 related charity.

115.    Garza and Fraser knew or were reckless or negligent in not knowing that GAW Miners actually profited from the sale of Remember Hashlets, contrary to Garza's representations. Fraser's role in the Remember Hashlets scheme is particularly egregious given Fraser's (and his firm Cantor Fitzgerald's) prominent role in the 9/11 memorial fund.

116.    Garza directed many of GAW Miners' publicity efforts for its Hashlet offerings. Garza had ultimate authority and control over GAW Miners' promotional materials, including the company's website, and posts he made on the company's message board, but Garza frequently confirmed the company's message with Fraser. Garza also frequently spoke to reporters for publications covering the virtual currency industry, and posted information about GAW Miners and its products on social media outlets.

117.    GAW Miners and Garza made three basic types of misrepresentations to Hashlet investors. First, they falsely and misleadingly claimed that Hashlets would be always profitable and never obsolete, when they had no reasonable basis to support those claims. Second, they falsely and misleadingly claimed that Hashlets were engaged in mining for virtual currency through pools available in ZenCloud, when they knew that few Hashlets were supported by actual mining activity. Third, they falsely and misleadingly claimed that ZenPool engaged in mining, when they knew that it never did.

118.    First, from approximately August through December 2014, GAW Miners' website, and other promotional materials, described Hashlets as always profitable and never obsolete. GAW Miners' website misrepresented that Hashlets were "obsolete proof" and would "Adjust[ ] to always remain profitable & never break[ ] down." Garza also claimed on numerous occasions, including in a Hashtalk.org post in August 2014, words to the effect that "there will never be a time a Hashlet cost[s] more to run than you make, and they will always make money." GAW Miners also claimed, on its

website, that Hashlets would never break down or expire and this "guarantees your investment is protected and secure, so you can enjoy many years of owning the world's most advanced miner."

119. At the time GAW Miners, Garza, and Fraser made or authorized these statements, Garza and Fraser knew or were reckless or negligent in not knowing that the statements were false or misleading. They knew or were reckless or negligent in not knowing that the profitability of virtual currency mining depended on many unforeseeable factors, including the market price of those virtual currencies, the cost of the electricity and maintenance of the equipment, and the extent to which the speed of developments in computing technology made any equipment they owned obsolete. Moreover, Garza and Fraser knew or were reckless or negligent in not knowing that GAW Miners had never acquired sufficient mining power to meet Hashlet demand and profit expectations. GAW Miners and Garza thus had no reasonable basis for these statements at the time they made or authorized them.

120. GAW Miners' and Garza's statements about profitability and longevity were material to Hashlet investors. GAW Miners conducted a marketing survey of hundreds of people who purchased Hashlets during their first week of availability. Approximately 70 percent of investors identified the Hashlets' promised return on investment as the most important, or one of the most important, factors in their decision to purchase a Hashlet. Garza reviewed the results of this survey and thus knew that these factors were material.

121. By November 2014, Hashlets became unprofitable. That is, the Hashlets' daily maintenance fees exceeded their purported mining payouts. And by January 2015, Hashlets were obsolete. GAW Miners announced the termination of its purported Hashlet mining operations in mid-February 2015, stating that "GAW and ZenCloud mining operations have been indefinitely put on hold, effective immediately." GAW Miners terminated the power to the datacenter on or about January 27, 2015, almost a month before announcing the end of Hashlet mining operations.

122. Second, despite marketing Hashlets as capable of mining in the various pools available through ZenCloud, and pricing Hashlets based on which pools they were purportedly able to mine, Hashlets did not mine in those pools.

123.    The operators of the pools that were purportedly available through ZenCloud confirmed that GAW Miners did not establish accounts with those pools, and did not direct any of its computing power towards those pools. Thus, GAW Miners was not receiving any mining payouts from those pools.

124.    After numerous customer questions about where their hashing power was being used, Garza admitted in a Hashtalk.org post in early October 2014, that GAW Miners was not sending its computing power to the pools Hashlet investors selected. Instead, Garza and GAW Miners claimed it was "sending our hashing power to our own private pools, but keeping your payouts 100% based on the pool you select." This representation was also false and misleading. At the time, as Garza, Fraser and GAW Miners knew or were reckless or negligent in not knowing that the company had nowhere near the amount of computing power that would support the units of hashing power that had been sold through Hashlets. As a result, GAW Miners engaged in minimal bitcoin mining—in private pools or elsewhere— and effectively no altcoin mining. At the time Garza made this statement, he and Fraser knew or were reckless or negligent in not knowing that GAW Miners could not, and did not, fund its daily payouts to investors with the revenue from its mining activities.

125.    In order to conceal from investors that the mining activity associated with Hashlets did not produce sufficient revenues to fund the payouts that had been promised to investors, GAW Miners used revenues from ongoing Hashlet sales to fund payouts to investors. Thus, Hashlets operated as a Ponzi scheme, in which investors' returns were mostly paid by using the money invested by others.

126.    On October 10, 2014, Fraser was copied on an email discussion between Garza and GAW Miners Manager Dan Pease concerning GAW Miners' access to capital. Garza wrote: "Dan, does not work. And I can not run the business like this. I need that million in order to buy the hardware necessary to fulfill the orders. This has taken too long, with unacceptable results." This email demonstrates Fraser's awareness of GAW Miners' lack of mining hardware and the resulting capacity mismatch between its mining power and customer orders.

127.    In September and October 2014, GAW Miners did not always have enough investors purchasing Hashlets with bitcoin to cover its daily bitcoin payout obligations to existing Hashlet owners.

As a result, GAW Miners, at Garza's direction, converted some of the United States dollars the company had received as revenue from Hashlet sales into bitcoin. GAW Miners then used the bitcoin it had purchased to make daily payouts to existing Hashlet investors. In September and October 2014 alone, GAW Miners, at Garza's direction, converted over $1.5 million in cash to bitcoin to make mining payouts and thus perpetuate their fraud.

128.     Fraser knew or should have known that mining did not occur through the Zencloud interface and that customers were paid through incoming funds and maintenance fees. In or around May 2014, Garza held a meeting with Shiraz Moosajee at the GAW Miners' offices. During the meeting, Moosajee and Garza discussed the Zencloud business model in detail, including the fact that there would be a "mismatch" between the companies' mining capacity and customer orders and how customers would be paid. Afterwards, Garza took the materials from his meeting with Moosajee to Fraser's home in Armonk, New York. Garza presented the same information he discussed with Moosajee to Fraser. Garza explained the ZenCloud business model with Fraser, including the fact that there would be a "mismatch" between the companies' mining capacity and customer orders. Fraser told Garza that ZenCloud looked "great."

129.     Third, ZenPool was a purported mining pool created and operated by GAW Miners exclusively for certain Hashlet owners. GAW Miners claimed on its website that ZenPool was the "most advanced multi-pool ever conceived" and had the "highest and most reliable payout of any multipool in the world." A multipool is a pool that mines both bitcoin and altcoin, depending on the profitability of each coin at the time.

130.     GAW Miners and Garza advertised ZenPool as an enticement for investors to pay more for "Zen Hashlets" and "Prime Hashlets," the only two types of Hashlets capable of mining in ZenPool. These two types of Hashlets were significantly more expensive than other types of Hashlets that did not allow investors to access ZenPool.

131.     Contrary to GAW Miners' and Garza's representations, there was no ZenPool. GAW Miners did not operate a pool that engaged in mining. GAW Miners did not direct the hashing power

represented by its sales of Zen Hashlets or Prime Hashlets to a pool it owned and operated for investors' benefit.

132.    Instead, GAW Miners determined what the daily payout from ZenPool would be by examining the publicly-available payouts of other pools that were mining that day, and picking a higher number.

133.    When GAW Miners and Garza made false and misleading statements about ZenPool, they knew or were reckless or negligent in not knowing that there was no such pool engaged in mining.

134.    During the fall of 2014, mining for virtual currency became less profitable as the value of many virtual currencies fell and the technological difficulty of mining increased. Faced with a drop in their revenue stream from selling Hashlets, and faced with the fact that Hashlets were no longer profitable by November 2014, GAW Miners and Garza solicited many investors to redeem their Hashlets for new investment opportunities.

135.    Garza and Fraser made the decision that GAW Miners would offer and sell first Hardware- and Cloud-Hosted Mining and then Hashlets. They jointly controlled GAW Miners' strategic direction, and the content of GAW Miners' advertising for these investment offerings. Garza and Fraser jointly discussed and made decisions concerning GAW Miners' Hardware- and Cloud-Hosted Mining services and Hashlets. In offering Hashlets to Hardware- and Cloud-Hosted Mining investors, GAW Miners, Garza and Fraser attempted to prolong their scheme and prevent the collapse of GAW Miners—a trend they continued by offering Hashpoints to Hashlets customers, and one that caused increasingly more damages to GAW Miners' customers.

**The Move to Hashpoints, Paycoin and Paybase**

136.    In November 2014, GAW Miners announced that it was planning to launch a new form of virtual currency, called "Paycoin" (initially called "Hashcoin"). In advance of Paycoin's launch, GAW Miners began offering "Hashpoints" to its customers. Hashpoints were convertible promissory notes that could be purchased or mined and exchanged for Paycoin once Paycoin launched. Defendants' main motivation in offering Hashpoints was to shift customers' mining focus from bitcoin and altcoin to

32

Hashpoints and Paycoin and to stave off bitcoin payments to Hashlet-holders that GAW Miners could not make.

137.    The best way to avoid making bitcoin payments to Hashlet customers was to convince miners to switch from mining altcoin and bitcoin, to mining Hashpoints, which could be exchanged for Paycoin. The mining of Hashpoints was extended twice prior to the actual Paycoin conversion date.

138.    The majority of GAW Miners' customers switched to Hashpoints completely, with a small percentage remaining behind to continue mining bitcoin (those who held Genesis Hashlets predominantly). Garza devised a schedule of dates that specific Hashlets could switch over to Hashpoint mining, starting with Prime Hashlets, then ZenHashlets, then later, Multi-Hashlets, Clever-Hashlets, WaffleHashlets and Genesis Hashlets. The choice to convert was constrained to a short period of time for each class of Hashlet. At this point, Garza's Paycoin marketing machine was in full-swing, representing that the value proposition was excellent and creating a sense of urgency for customers to convert their Hashlets or miss out on the opportunity.

139.    Specifically, GAW Miners and Garza convinced customers to acquire Hashpoints by misrepresenting in an Initial Coin Offering ("ICO") flowchart that Paycoin would have an estimated value of $80-$100 per coin. Garza and Fraser knew or were reckless or negligent in not knowing that this representation was highly speculative at best, and more likely downright incorrect. Their subsequent act of taking down this flowchart and altering it only by removing the $80-$100 coin value estimate confirms that they understood the representation was false and misleading.

140.    In marketing Paycoin, GAW Miners and Garza alluded that banks and investment firms were standing in line to support Paycoin and were financially backing it. At one point, Garza and GAW Miners represented that Paycoin had $240 million in financial support (outside investors). Garza and GAW Miners promoted Paycoin as having the following features: Proof of Reserve (a central bank of sorts, supporting the market price of the coin); Miner Rewards (additional data center resources, accessible by miners at cost or near-cost); Coin Adoption Fund (funding set aside to promote Paycoin adoption around the world); Hybrid Flex (Paycoin would use a new type of extremely secure blockchain);

33

Hypass Card (PayCoin was "specifically built to work with legacy credit card hardware with merchants who accept it"); and Merchant Adoption ("Paycoin launches with more merchant acceptance than any other cryptocurrency").

141. Merchant adoption was the main marketing push to entice miners to switch from bitcoin or altcoin mining to Hashpoints (and therefore Paycoin) mining. Merchant acceptance was touted under well-known retailer names, such as Amazon, Wal-Mart and Target. Garza said he had agreements with these companies to accept Paycoin at $20 per coin due to Garza's promised $20 pricing floor support. In a January 2015 Hashtalk.org post, Garza represented that "I'm saying that over 10,000 merchants worldwide will suddenly accept Paycoin."

142. Proclaiming a $20 floor for Paycoin was defendants' way of appealing to retailers (and appealing to customers who believed retailers were on board) by limiting the volatility of Paycoin as compared to existing virtual currencies like bitcoin. At the time of Paycoin's conception, bitcoin was varying up to 40% in price on the markets, making it difficult for retailers to hold bitcoin for any length of time.

143. Garza's claims about widespread merchant adoption of Paycoin garnered attention in the virtual currency world, and interested persons reached out to the relevant retailers to ask about the arrangements Garza claimed were in place. These retailers responded that they knew nothing of Garza, GAW Miners or Paycoin, and there were no agreements in place to accept any cryptocurrency for goods sold on their retail platforms. When pressured for physical, documented proof of these agreements with the major retailers named, Garza declined, citing that he was under a nondisclosure agreement—although this never stopped Garza from publicly representing that GAW Miners had entered into such agreements.

144. Garza and Fraser knew that no major retailers had entered into agreements to accept Paycoin, and they knew or were reckless or negligent in not knowing that customers acquiring Hashpoints would rely on Garza and GAW Miner's representations that Paycoin was launching with more merchant acceptance than any other cryptocurrency in history.

34

145.     Fraser and Garza regularly discussed the strategic direction of Paycoin. Fraser understood the details of Paycoin's business model through these discussions. Garza and Fraser also regularly discussed Paycoin's price and where Paycoin was trading on the various cryptocurrency exchanges. For example, one exchange read:

> Fraser: Heading to Howard's for dinner. What the price? Hope you're not too stressed.
>
> Garza: price move down, taking a beating from all the dumpers. about 10 bucks, still puts us at 140 million
>
> Garza: chainz.cryptoid.info
>
> Garza: moved up :)
>
> Garza: market cap is stable at around 150m

146.     On November 17, 2014, Fraser requested that Cantor Fitzgerald advise GAW Miners on regulatory issues in connection with the Paycoin ICO. The next day, Garza's personal assistant sent a copy of a "Hash Coin White Paper"[3] to Fraser and other individuals at Cantor Fitzgerald. The White Paper provided details about the Paycoin business model and Paycoin's features.

147.     As the Vice-Chairman of a prominent investment bank with substantial experience in the financial industry, Fraser knew or should have known that GAW Miners' representations concerning Paycoin were fraudulent and violated the securities laws.

148.     In December 2014, Garza sent Fraser a promotional video for Paycoin and represented that users of Paycoin could "Pay without Borders," "Pay without Fees," and "Pay without Limits." In response, Fraser wrote: "very cool. it just has to work that way."

149.     Customers who purchased Hashpoints received Paycoins when GAW Miners processed the conversion in December 2014. The exchange rate was 400 to 1. However, unbeknownst to customers, Garza had engaged in a secret pre-mine of Paycoin, yielding a block of over 12 million Paycoins that Garza ultimately sold in the market, manipulating the price of Paycoin and harming GAW Miners' customers who were holding the new virtual currency.

---

[3] Hash Coin was an early name for Paycoin.

150.     In order to gain maximum profit from the pre-mined coins, Garza took steps to ensure that GAW Miners' customers holding Hashpoints and Paycoin could not actively sell Paycoin and depress the market price. To achieve this goal, Garza and GAW Miners introduced HashStakers.

**The Final Push: HashStakers**

151.     Initially, Paycoins were placed into customers' Zencloud account wallets. GAW Miners then offered for sale new digital wallets designed to hold Paycoin, called HashStakers. GAW Miners sold HashStakers to new customers, and also offered existing Hashlet investors the chance to "upgrade" their Hashlets to HashStakers. By mid to late December in 2014, HashStakers, and subsequently Prime Controllers, became the primary focus for GAW Miners' customers. Paycoins deposited in HashStakers had an inherent lockup period of 30, 90 or 180 days. A large percentage of HashStakers were 180-day HashStakers. The price of a HashStaker was based on the number of Paycoins that could be deposited in the HashStaker, at $19.95 per Paycoin depositable.

152.     HashStakers acted like fixed-rate investment vehicles and they yielded a daily payout. These investment contracts were given a fixed interest rate of return determined by GAW Miners alone. The interest rate would be retargeted every six months and applied to any Prime Controllers or HashStakers activated on or after the date of the newly retargeted interest rate. Leading up to HashStakers' availability, GAW Miners refused to specify the inherent rate of return for HashStakers, but the purchase price of HashStakers was based on the "targeted" Paycoin value (the $20 floor) and the expected Paycoin percentage yield of the HashStaker.

153.     The $20 floor that customers relied on in deciding to acquire Paycoin (via Hashpoints or otherwise) was a myth. GAW Miners and Garza had developed a central, GAW Miners-owned exchange, payment gateway and marketplace for Paycoin, called Paybase, to control Paycoin trading and manipulate its value. But Paybase was not prepared when Paycoin became active. This resulted in other virtual currency exchanges, including Coin-swap and Cryptsy, creating their own Paycoin exchanges. With Paycoin trading outside of GAW Miner's control, defendants were unable to manipulate the value of the coin in order to maintain a price floor. Instead, outsiders could purchase Paycoin on other exchanges,

36

transfer them to Paybase (once it became active), and take direct advantage of any price manipulation occurring on GAW Miners' market. This led to an increased need to get the Paybase exchange up and running—which resulted in the purchase of Coin-swap.

154.    With Paycoin trading on Cryptsy, another outside exchange, the price of Paycoin began to fall below the $20 proclaimed floor. GAW Miners led customers to believe that, once the Paybase exchange came online, GAW would take actions to support the $20 floor. In what was deemed to be a test, Garza publicly stated that GAW Miners was "about to move the market." Following this statement—and Garza and GAW Miners' use of $35,000 to trade Paycoin on Cryptsy in order to get things started—the value of Paycoin transacted higher than the $20 GAW Miners' stated "floor."

155.    However, once Paybase actually opened, it bore little resemblance to the all-inclusive exchange Garza represented in the announcements touting the future abilities of the platform. Instead, Paybase opened only as an online Paycoin wallet, without an exchange, and without any retailers from which to purchase goods, features Garza and GAW Miners had promised. GAW Miners' competency in developing Paycoin was showing to be severely lacking, and Garza's claims regarding retailer participation in Paycoin were becoming increasingly suspect.

156.    With Paybase failing to measure up, and other non-GAW Miners' owned exchanges continuing to trade Paycoin, the price of the coin dropped precipitously. GAW Miners' customers then began to realize that not only were the purchased HashStakers too expensive, compared to the current price of Paycoin on the exchanges, but their locked Paycoins were losing value with a negative net-effective rate of return. Customers ultimately could receive less than what they invested in HashStakers, even with the daily payouts.

157.    The design of the HashStakers was intentional; Garza and Fraser wanted their customers' Paycoins to be locked up for the longest period of time possible, and Garza stated that the whole purpose of HashStakers was to limit exchange activity. Once Paycoins were locked in interest-bearing investment wallets, the coins could not be dumped on the exchanges, depressing the market price of Paycoin. Because Garza ensured that GAW Miners' customers' Paycoins were locked in 30, 90 or 180-day

37

HashStakers, the defendants were able to dump the more than 12 million Paycoins they secretly pre-mined—and falsely claimed to have destroyed—and reap the benefits of artificially inflated prices for Paycoin while GAW Miners' customers watched the value of their own Paycoins and HashStakers plummet.

158.     Garza and Fraser made the decision that GAW Miners would offer and sell HashStakers and launch PayCoin. They jointly controlled GAW Miners' strategic direction and the content of the advertising that GAW Miners did for these new offerings. Garza and Fraser made joint decisions concerning HashStakers and PayCoin. In offering HashStakers to Hashlet investors, GAW Miners, Garza and Fraser attempted to prolong their scheme and prevent the collapse of GAW Miners and Paycoin.

159.     In March 2015, a large volume of defendants' documents and communications were publicly disclosed on the Internet. The allegations in this Complaint are based on those documents and communications, conversations with Garza, and other publicly available information.

## CLASS ALLEGATIONS

160.     Plaintiffs bring this action as a class action under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves **and others similarly situated.** The "Class" is defined as:

> All persons or entities who, between June 1, 2014, and the present purchased or acquired Hardware-Hosted Mining, Cloud-Hosted Mining, Hashlets, Hashpoints, HashStakers, and Paycoin from GAW Miners and ZenMiner. Excluded from the Class are defendants, any parent, subsidiary, affiliate, agent or employee of any defendant, any co-conspirator and any governmental entity.

161.     The Class is so numerous that joinder of all members is impracticable. While the exact number of Class Members is unknown to Plaintiffs at this time, Plaintiffs are informed and believe that at least 10,000 persons or entities invested in GAW Miners and ZenMiner's relevant offerings.

162.     Plaintiffs' claims are typical of the claims of the other members of the Class. Plaintiffs and members of the Class sustained damages arising out of defendants' common course of conduct in violation of federal and state securities laws as complained herein. The injuries and damages of each member of the Class were directly caused by defendants' unlawful conduct as alleged herein.

Case 3:16-cv-00940-MPS   Document 121   Filed 01/06/18   Page 59 of 115

163.     Plaintiffs will fairly and adequately protect the interests of the members of the Class, have no interests which are adverse to the interests of absent Class Members and have retained counsel who are competent and experienced in class action litigation, including securities litigation.

164.     Common questions of law and fact exist as to all members of the Class that predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

a.     whether defendants offered to sell, or sold, securities in violation of Section 10(b) of the 1934 Act and various subparts of Rule 10b-5 thereunder;

b.     whether defendants offered to sell, or sold, securities in violation of Sections 36b-29(a)(2) and 36b-4 of CUSA;

c.     whether defendants offered to sell, or sold, securities by means of any untrue statement of material fact or any omission to state a material fact;

d.     whether defendants offered to sell, or sold, unregistered securities in violation of the Section 36b-29(a)(1) of CUSA;

e.     whether defendants knew or were reckless or negligent in not knowing that representations regarding GAW Miners and ZenMiner's computational power were false and misleading;

f.     whether Fraser had control over GAW Miners and ZenMiner, and the power to influence or control these entities' conduct and is liable pursuant to Section 20(a) of the 1934 Act and Sections 36b-29(a) and (c) of CUSA;

g.     whether defendants were unjustly enriched at the expense of plaintiffs and members of the Class; and

h.     the appropriate measure of damages sustained by plaintiffs and other members of the Class as a result of defendants' unlawful activities.

165.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and defendants,

and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

166.    The interest of members of the Class in individually controlling the prosecution of separate actions is theoretical rather than practical. The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable. The amounts at stake for Class Members, while substantial in the aggregate, are not great enough individually to enable them to maintain separate suits against Defendants. Plaintiffs do not anticipate any difficulty in the management of this action as a class action.

**FIRST CLAIM FOR RELIEF**

**Fraud in the Purchase or Sale of Securities in Violation of
Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder
(against GAW Miners and ZenMiner)**

167.    Plaintiffs repeat and incorporate by reference the preceding allegations of this Complaint as if set forth fully herein.

168.    Hardware-Hosted Mining, Cloud-Hosted Mining, Hashlets, Hashpoints, HashStakers, and Paycoin constitute investment contracts, and thus "securities" under Section 3(a)(10), 15 U.S.C. §78c(a)(10), of the Exchange Act.

169.    Garza and defendants GAW Miners and ZenMiner engaged in a fraudulent course of conduct by which they oversold the investment returns from their virtual currency mining operation and misrepresented the nature and profitability of the investments they were selling.

170.    By engaging in the conduct described above, Garza and these defendants, directly or indirectly, acting intentionally, knowingly or recklessly, by the use of means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities have employed or are employing devices, schemes or artifices to defraud; and have engaged or are engaging in acts, practices or courses of business which operate as a fraud or deceit upon certain persons.

171.    By engaging in the conduct described above, Garza and defendants directly or indirectly, acting intentionally, knowingly or recklessly, by the use of means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities, have made or are making untrue statements of material fact or have omitted or are omitting to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading.

172.    By engaging in the conduct described above, Garza and defendants knowingly conspired to bring securities onto the market that were not entitled to be marketed and which, absent the fraud, would not have been marketable at any price. Plaintiffs relied on, among other things, the securities' availability in the market as an indication of their apparent genuineness and suffered damages as a result.

173.    As a result, GAW Miners and ZenMiner have violated Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §240.10b-5.

## SECOND CLAIM FOR RELIEF

### Controlling Person Liability Pursuant to
### Section 20(a) of the Exchange Act
### (against Fraser)

174.    Plaintiffs repeat and incorporate by reference the preceding allegations of this Complaint as if set forth fully herein.

175.    Fraser, by virtue of his personal and business relationship with Garza and his investment in GAW Miners and ZenMiner, was a controlling person of Garza, GAW Miners and ZenMiner, within the meaning of Section 20(a) of the Exchange Act.

176.    Fraser possessed the power to direct or cause the direction of the management and policies of GAW Miners and ZenMiner and the power to direct Garza's decisions with respect to GAW Miners and ZenMiner through his ownership interest in these entities and his longstanding relationship with Garza.

177.    Fraser was a culpable participant in Garza, GAW Miners and Zen Miner's fraudulent scheme, because he knew or was reckless in not knowing that Garza and GAW Miners' representations regarding virtual currency investment offerings were false and misleading by virtue of his status as an

owner of the business entities, and his involvement in GAW Miners' business decisions and activities, including supplying Garza and GAW Miners with regular infusions of cash and access to Fraser's personal credit cards. Fraser had the power to control or influence the statements and omissions giving rise to the securities violations as alleged herein, and exercised the same.

178.    As a direct and proximate result of Fraser's conduct, plaintiffs suffered damages.

## **THIRD CLAIM FOR RELIEF**

### **Fraud in the Purchase or Sale of Securities in Violation of Sections 36b-29(a)(2) and 36b-4 of the Connecticut Uniform Securities Act (against GAW Miners and ZenMiner)**

179.    Plaintiffs repeat and incorporate by reference the preceding allegations of this Complaint as if set forth fully herein.

180.    Hardware-Hosted Mining, Cloud-Hosted Mining, Hashlets, Hashpoints, HashStakers, and Paycoin constitute investment contracts, and thus "securities" under Section § 36b-3 of the Connecticut General Statutes.

181.    Garza and defendants GAW Miners and ZenMiner engaged in a fraudulent course of conduct by which they oversold the investment returns from their virtual currency mining operation. In addition, Garza, GAW Miners, and ZenMiner's fraudulent course of conduct included their misrepresentations to investors about the nature and profitability of the investments they were selling.

182.    By engaging in the conduct described above, Garza and these defendants, directly or indirectly, acting intentionally, knowingly or recklessly, by the use of means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities have employed or are employing devices, schemes or artifices to defraud; and have engaged or are engaging in acts, practices or courses of business which operate as a fraud or deceit upon certain persons.

183.    By engaging in the conduct described above, Garza and these defendants directly or indirectly, acting intentionally, knowingly or recklessly, by the use of means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities, have made or are making untrue statements of material fact or have omitted or are omitting to state material facts

necessary to make the statements made, in the light of the circumstances under which they were made, not misleading.

184.    Garza and these defendants knew or were unreasonable in not knowing of the untruths or omissions.

185.    Plaintiffs had no knowledge of Garza's, GAW Miners', and ZenMiner's misrepresentations and omissions.

186.    As a result, GAW Miners and ZenMiner have violated Sections 36b-29(a)(2) and 36b-4 of CUSA.

## FOURTH CLAIM FOR RELIEF

### Aiding and Abetting Fraud in the Sale of Securities in Violation of
### Section 36b-29(a)(2) of the Connecticut Uniform Securities Act
### (against Fraser)

187.    Plaintiffs repeat and incorporate by reference the preceding allegations of this Complaint as if set forth herein.

188.    Garza, and defendants GAW Miners and Zen Miner committed primary violations of § 36b-29(a)(2) of CUSA by making misrepresentations to investors about the nature and profitability of Hardware-Hosted Mining, Cloud-Hosted Mining, Hashlets, Hashpoints, HashStakers, and Paycoin in connection with sales and offers to sell those investments.

189.    Fraser materially assisted Garza and defendants GAW Miners and ZenMiner engage in their fraudulent course of conduct by: (1) providing capitalization and financing and business advice and direction; (2) proposing and directing that his son, Thomas Fraser, pose as the CEO of ZenMiner and that GAW Miners purport to purchase ZenMiner; (3) soliciting potential investors into the companies, informing potential investors about GAW Miners' investment products, and promoting GAW Miners' investment products; (4) providing resources from Cantor Fitzgerald and allowing Garza and the companies to associate with the Cantor Fitzgerald brand; and (5) helping create the ZenCloud business model. Each of these actions had a natural tendency to influence, or was capable of influencing, the

43

decisions of purchasers of Hardware-Hosted Mining, Cloud-Hosted Mining, Hashlets, Hashpoints, HashStakers, and Paycoin.

190.    Fraser knew or should have known about the primary violations of Garza, GAW Miners, and ZenMiner through his management and direction of GAW Miners and ZenMiner and through communications with Garza.

191.    As a result, Fraser has violated Section 36b-29(a)(2) of CUSA.

### FIFTH CLAIM FOR RELIEF

**Offer to Sell or Sale of Securities in Violation of
Sections 36b-29(a)(1) of the Connecticut Uniform Securities Act
(against GAW Miners and ZenMiner)**

192.    Plaintiffs repeat and incorporate by reference the preceding allegations of this Complaint as if set forth fully herein.

193.    Hardware-Hosted Mining, Cloud-Hosted Mining, Hashlets, Hashpoints, HashStakers, and Paycoin constitute investment contracts, and thus "securities" under Section § 36b-3 of the Connecticut General Statutes.

194.    These securities were offered for sale or sold in violation of Section 36b-16 of the Connecticut Uniform Securities Act, because no registration statement was filed with respect to any of the investment products listed above that were offered for sale or sold GAW Miners or ZenMiner, no exemption from registration was available for these securities, and these were not covered securities.

195.    As a result, GAW Miners and ZenMiner have violated Section 36b-29(a)(1) of the CUSA.

### SIXTH CLAIM FOR RELIEF

**Controlling Person Liability Pursuant to
Section 36b-29(c) of the Connecticut Uniform Securities Act
(against Fraser)**

196.    Plaintiffs repeat and incorporate by reference the preceding allegations of this Complaint as if set forth fully herein.

197.    Fraser, by virtue of his personal and business relationship with Garza and his investment in GAW Miners and ZenMiner as a partner and his status as a functional director of GAW Miners and ZenMiner, was a controlling person of Garza, GAW Miners and ZenMiner, within the meaning of Section 36b-29(c) of CUSA.

198.    Fraser had the power to influence and control, and did influence and control, directly or indirectly, the decision making and conduct of Garza, GAW Miners and ZenMiner as Garza's partner and based on Fraser's ownership interest in these entities. Fraser knew or was reckless or negligent in not knowing that GAW Miners did not register the securities it sold[4] and that Garza and GAW Miners' representations regarding its investment offerings were false and misleading by virtue of his status as an owner of the company and his involvement in GAW Miners' business activities. Fraser had the power to control or influence the statements and omissions giving rise to the securities violations as alleged herein, and exercised the same.

199.    As a direct and proximate result of Fraser's conduct, plaintiffs suffered damages.

## SEVENTH CLAIM FOR RELIEF

### Common Law Fraud
### (against GAW Miners and ZenMiner)

200.    Plaintiffs repeat and incorporate by reference the preceding allegations of this Complaint as if set forth fully herein.

201.    Defendants GAW Miners, and ZenMiner engaged in a fraudulent scheme in which they made the false statements of material fact described above to induce customers to purchase Hardware-Hosted Mining, Cloud-Hosted Mining, Hashlets, Hashpoints, HashStakers, and Paycoin.

202.    The defendants knew or were reckless in not knowing that the statements were false when the statements were made.

---

[4] Plaintiffs do not concede that pleading or proof of scienter is necessary to establish controlling person liability with respect to the illegal sale of unregistered securities.

203.    Plaintiffs relied on defendants' false statements in deciding to purchase Hardware-Hosted Mining, Cloud-Hosted Mining, Hashlets, Hashpoints, HashStakers, and Paycoin and suffered damages as a result.

## EIGHTH CLAIM FOR RELIEF

### Aiding and Abetting Common Law Fraud
### (against Fraser)

204.    Plaintiffs repeat and incorporate by reference the preceding allegations of this Complaint as if set forth fully herein.

205.    Fraser aided and abetted Garza, GAW Miners and ZenMiner's fraudulent scheme to sell Hardware-Hosted Mining, Cloud-Hosted Mining, Hashlets, Hashpoints, HashStakers, and Paycoin by making false statements of fact about the quality and nature of the investments.

206.    Fraser was an owner of GAW Miners and ZenMiner, was kept apprised of the companies' status, had the power to direct and control the policies and management of the companies, and had the power to direct Garza's decisions with respect to GAW Miners and ZenMiner.

207.    Fraser knew or was reckless in not knowing that Garza, GAW Miners' and ZenMiner's statements were false, and he knowingly provided substantial assistance to Garza, GAW Miners, and ZenMiner in order to perpetuate the fraudulent scheme.

## PRAYER FOR RELIEF

208.    Plaintiffs demand relief as follows:

A.    That the Court certify this lawsuit as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, that plaintiffs be designated as class representatives, and that plaintiffs' counsel be appointed as Co-Lead Class Counsel for the Class;

B.    That the unlawful conduct alleged above be adjudged and decreed to violate Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and various subparts of Rule 10b-5 thereunder;

C.    That the unlawful conduct alleged above be adjudged and decreed to violate Sections 36b-29(a)(1), 36b-29(a)(2), 36b-4 and 36b-29(c) of the Connecticut Uniform Securities

Act.

D.       That the unlawful conduct alleged above be adjudged and decreed to constitute

common law fraud and aiding and abetting fraud.

E.       That the Court award plaintiffs and the Class damages against Defendants for

their violations of federal and state securities laws and state common law;

F.       That the Court award plaintiffs and the Class their costs of suit, including

reasonable attorneys' fees and expenses, as provided by law; and

G.       That the Court direct such further relief as it deems just and proper.

## **DEMAND FOR JURY TRIAL**

209.    Pursuant to Federal Rule of Civil Procedure 38(b) and otherwise, Plaintiffs respectfully

demand a trial by jury.

<div style="margin-left:40%">

Respectfully submitted,

/s/ Mark P. Kindall
_____
Mark P. Kindall (ct13797)
E-mail: mkindall@ikrlaw.com
Robert A. Izard
E-mail: rizard@ikrlaw.com
IZARD, KINDALL & RAABE, LLP
29 S. Main St., Suite 305
West Hartford, CT 06107
Tel: (860) 493-6292
Fax: (860) 493-6290

Marc Seltzer (*pro hac vice*)
E-mail:mseltzer@susmangodfrey.com
California Bar No. 54534
Kathryn Hoek (*pro hac vice*)
E-mail: khoek@susmangodfrey.com
California Bar No. 219247
SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067
Tel: (310) 789-3100
Fax: (310) 789-3150

</div>

Seth Ard (*pro hac vice*)
E-mail: sard@susmangodfrey.com
New York Bar No. 4773982
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas, 32nd
Floor
New York, NY 10019-6022
Tel: (212) 336-8330
Fax: (212) 336-8340

Matthew Allen (*pro hac vice*)
E-mail: mallen@susmangodfrey.com
Texas Bar No. 24073841
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, TX  77002
Tel: (713) 651-9366
Fax: (713) 654-3367

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on November 4, 2016, a copy of foregoing document was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing  system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

Respectfully submitted,

/s/ Mark P. Kindall
Mark P. Kindall (ct13797)

# EXHIBIT A-2

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

**STANDING PROTECTIVE ORDER**

1.      It is hereby ordered by the Court that the following shall apply to information, documents, excerpts from documents, and other materials produced in this action pursuant to Federal and Local Rules of Civil Procedure governing disclosure and discovery.

2.      Information, documents and other materials may be designated by the producing party in the manner permitted ("the Designating Person").  All such information, documents, excerpts from documents, and other materials will constitute "Designated Material" under this Order.  The designation shall be either (a) "CONFIDENTIAL" or (b) CONFIDENTIAL-ATTORNEYS' EYES ONLY."  This Order shall apply to Designated Material produced by any party or third-party in this action.

3.      "CONFIDENTIAL" information means information, documents, or things that have not been made public by the disclosing party and that the disclosing party reasonably and in good faith believes contains or comprises (a) trade secrets, (b) proprietary business information, or (c) information implicating an individual's legitimate expectation of privacy.

4.      "CONFIDENTIAL-ATTORNEY'S EYES ONLY" means CONFIDENTIAL information that the disclosing party reasonably and in good faith believes is so highly sensitive that its disclosure to a competitor could result in significant competitive or commercial disadvantage to the designating party.

5.      Designated Material shall not be used or disclosed for any purpose other than the litigation of this action and may be disclosed only as follows:

   a. *Parties:* Material designated "CONFIDENTIAL" may be disclosed to parties to this action or directors, officers and employees of parties to this action, who have a legitimate need to see the information in connection with their responsibilities for overseeing the litigation or assisting counsel in preparing the action for trial or settlement.  Before Designated Material is disclosed for this purpose, each such person must agree to be bound by this Order by signing a document substantially in the form of Exhibit A.

b. *Witnesses or Prospective Witnesses:* Designated Material, including material designated "CONFIDENTIAL-ATTORNEYS' EYES ONLY," may be disclosed to a witness or prospective witness in this action, but only for purposes of testimony or preparation of testimony in this case, whether at trial, hearing, or deposition, but it may not be retained by the witness or prospective witness. Before Designated Material is disclosed for this purpose, each such person must agree to be bound by this Order, by signing a document substantially in the form of Exhibit A.

c. *Outside Experts:* Designated Material, including material designated "CONFIDENTIAL-ATTORNEYS' EYES ONLY," may be disclosed to an outside expert for the purpose of obtaining the expert's assistance in the litigation. Before Designated Material is disclosed for this purpose, each such person must agree to be bound by this Order, by signing a document substantially in the form of Exhibit A.

d. *Counsel:* Designated Material, including material designated "CONFIDENTIAL-ATTORNEYS' EYES ONLY," may be disclosed to counsel of record and in-house counsel for parties to this action and their associates, paralegals, and regularly employed office staff.

e. *Other Persons:* Designated Material may be provided as necessary to copying services, translators, and litigation support firms. Before Designated Material is disclosed to such third parties, each such person must agree to be bound by this Order by signing a document substantially in the form of Exhibit A.

6. Prior to disclosing or displaying any Designated Material to any person, counsel shall:

a. Inform the person of the confidential nature of the Designated Material; and

b. Inform the person that this Court has enjoined the use of the Designated Material by him/her for any purpose other than this litigation and has enjoined the disclosure of that information or documents to any other person.

7. The confidential information may be displayed to and discussed with the persons identified in Paragraphs 5(b) and (c) only on the condition that, prior to any such display or discussion, each such person shall be asked to sign an agreement to be bound by this Order in the form attached hereto as Exhibit A. In the event such person refuses to

sign an agreement in substantially the form attached as Exhibit A, the party desiring to disclose the confidential information may seek appropriate relief from the Court.

8.      A person having custody of Designated Material shall maintain it in a manner that limits access to the Designated Material to persons permitted such access under this Order.

9.      Counsel shall maintain a collection of all signed documents by which persons have agreed to be bound by this Order.

10.     Documents shall be designated by stamping or otherwise marking the documents with the words "CONFIDENTIAL" or "CONFIDENTIAL-FOR ATTORNEYS' EYES ONLY" thus  clearly identifying the category of Designated Material for which protection is sought under the terms of this Order.  Designated Material not reduced to documentary form shall be designated by the producing party in a reasonably equivalent way.

11.     The parties will use reasonable care to avoid designating as confidential documents or information that does not need to be designated as such.

12.     A party may submit a request in writing to the party who produced Designated Material that the designation be modified or withdrawn.  If the Designating Person does not agree to the redesignation within fifteen business days, the objecting party may apply to the Court for relief.  Upon any such application, the burden shall be on the Designating Person to show why the designation is proper.  Before serving a written challenge, the objecting party must attempt in good faith to meet and confer with the Designating Person in an effort to resolve the matter.  The Court may award sanctions if it finds that a party's position was taken without substantial justification.

13.     Deposition transcripts or portions thereof may be designated either (a) when the testimony is recorded, or (b) by written notice to all counsel of record, given within ten business days after the Designating Person's receipt of the transcript in which case all counsel receiving such notice shall be responsible for marking the copies of the designated transcript or portion thereof in their possession or control as directed by the Designating Person.  Pending expiration of the ten business days, the deposition transcript shall be treated as designated.  When testimony is designated at a deposition, the Designating Person may exclude from the deposition all persons other than those to whom the Designated Material may be disclosed under paragraph 5 of this Order.  Any party may mark Designated Material as a deposition exhibit, provided the deposition witness is one to whom the exhibit may be disclosed under paragraph 5 of this Order

and the exhibit and related transcript pages receive the same confidentiality designation
as the original Designated Material.

14.    Any Designated Material which becomes part of an official judicial proceeding or
which is filed with the Court is public. Such Designated Material will be sealed by the
Court only upon motion and in accordance with applicable law, including Rule 5(e) of
the Local Rules of this Court. This Protective Order does not provide for the automatic
sealing of such Designated Material. If it becomes necessary to file Designated
Material with the Court, a party must comply with Local Civil Rule 5 by moving to file the
Designated Material under seal. Any filing under seal must also comply with the Court's
Instructions Regarding Confidentiality and Sealing Documents, which is available on the
Court website.

15.    Filing pleadings or other papers disclosing or containing Designated Material
does not waive the designated status of the material. The Court will determine how
Designated Material will be treated during trial and other proceedings as it deems
appropriate.

16.    Upon final termination of this action, all Designated Material and copies thereof
shall be returned promptly (and in no event later than forty-five (45) days after entry of
final judgment), returned to the producing party, or certified as destroyed to counsel of
record for the party that produced the Designated Material, or, in the case of deposition
testimony regarding designated exhibits, counsel of record for the Designating Person.
Alternatively, the receiving party shall provide to the Designating Person a certification
that all such materials have been destroyed.

17.    Inadvertent production of confidential material prior to its designation as such in
accordance with this Order shall not be deemed a waiver of a claim of confidentiality.
Any such error shall be corrected within a reasonable time.

18.    Nothing in this Order shall require disclosure of information protected by the
attorney-client privilege, or other privilege or immunity, and the inadvertent production of
such information shall not operate as a waiver. If a Designating Party becomes aware
that it has inadvertently produced information protected by the attorney-client privilege,
or other privilege or immunity, the Designating Party will promptly notify each receiving
party in writing of the inadvertent production. When a party receives notice of such
inadvertent production, it shall return all copies of inadvertently produced material within
three business days. Any notes or summaries referring or relating to any such
inadvertently produced material subject to claim of privilege or immunity shall be
destroyed forthwith. Nothing herein shall prevent the receiving party from challenging

the propriety of the attorney-client privilege or work product immunity or other applicable privilege designation by submitting a challenge to the Court. The Designating Party bears the burden of establishing the privileged nature of any inadvertently produced information or material. Each receiving party shall refrain from distributing or otherwise using the inadvertently disclosed information or material for any purpose until any issue of privilege is resolved by agreement of the parties or by the Court. Notwithstanding the foregoing, a receiving party may use the inadvertently produced information or materials to respond to a motion by the Designating Party seeking return or destruction of such information or materials. If a receiving party becomes aware that it is in receipt of information or materials which it knows or reasonably should know is privileged, Counsel for the receiving party shall immediately take steps to (i) stop reading such information or materials, (ii) notify Counsel for the Designating Party of such information or materials, (iii) collect all copies of such information or materials, (iv) return such information or materials to the Designating Party, and (v) otherwise comport themselves with the applicable provisions of the Rules of Professional Conduct.

19.    The foregoing is entirely without prejudice to the right of any party to apply to the Court for any further Protective Order relating to Designated Material; or to object to the production of Designated Material; or to apply to the Court for an order compelling production of Designated Material; or for modification of this Order; or to seek any other relief from the Court.

20.    The restrictions imposed by this Order may be modified or terminated only by further order of the Court.

IT IS SO ORDERED,


_____/s/ Michael P. Shea_____
Michael P. Shea
United States District Judge

Case 3:16-cv-00940-MPS Document 121-5 Filed 06/15/18 Page 75 of 115

**EXHIBIT A**

   I have been informed by counsel that certain documents or information to be disclosed to me in connection with the matter entitled_____
_____have been designated as confidential.  I have been informed that any such documents or information labeled "CONFIDENTIAL PRODUCED PURSUANT TO PROTECTIVE ORDER" are confidential by Order of the Court.

   I hereby agree that I will not disclose any information contained in such documents to any other person.  I further agree not to use any such information for any purpose other than this litigation.

_____DATED:_____

Signed in the presence of:

_____(Attorney)

# Exhibit B

| | |
|---|---|
| From: | Jonah Dorman |
| Sent: | Friday, January 2, 2015 8:45 AM PST |
| To: | Eric Capuano |
| CC: | Luke Rusten; Amanda Veilleux; Josh Garza |
| Subject: | Re: pls check |

We have someone who has attempted more than one chargeback?

Who is it?

Let's go over the order history and costs of closure.

--
**Jonah Dorman**
**General Manager**
GAW Miners LLC
O: (860) 222-2631
C: (727) 386-6825



On Thu, Jan 1, 2015 at 1:57 PM, Eric Capuano <eric@btc.com> wrote:
> So the guy is a scammer who's trying to pressure us into unlocking his account. Keep researching his claims, request GAW Miners receipts showing proof of purchase with order number.
>
> If you can't find it, he didn't buy it. shut him down and close the account.

On Thursday, January 1, 2015, Luke Rusten <lrusten@gawminers.com> wrote:
> Also just to add to this, he attempted a charge back on another order (we won) and he has also changed his email address on Zencloud (in my opinion to try to game the system).

On Thu, Jan 1, 2015 at 11:28 AM, Amanda Veilleux <amanda@gawminers.com> wrote:
> Hi Jonah and Eric,
>
> This ticket has come in question a few times now and the customer has posted on HashTalk. I have recorded the information I was asked for on the ticket. Can you please tell me where we stand or provide instructions on what action you would like me to take?

https://gawminers.freshdesk.com/helpdesk/tickets/45892

TL;DR - This customer's account is on withdrawal hold due to non payment of an order. I searched Braintree and was unable to find any captured funds yet the customer claims we have the money. Receipts / screenshots attached to my note on the ticket.

Thank you!
Amanda


---------- Forwarded message ----------
From: **Josh Garza** <josh@gaw.com>
Date: Wed, Dec 31, 2014 at 11:33 PM
Subject: pls check
To: Luke Rusten <lrusten@gawminers.com>, Amanda Veilleux <amanda@gawminers.com>


https://hashtalk.org/topic/26300/45892-btc-account-hold-not-resolved-what-are-you-doing-gaw


**Josh Garza**
**CEO**- GAW Corp




--
**Luke Rusten**
**TS Manager**
GAW Miners LLC
**O**: (866) 554-5861 x300
**C**: (802) 275-8932




--
**Eric Capuano**

**Information Security Officer**
Geniuses at Work, Corp.
O: (860) 237-3298
C: (860) 800-6123
PGP Public Key



# Exhibit C

USAA Federal Savings Bank
10750 McDermott Freeway
San Antonio, TX 78288-0544

E206

MICHAEL DAVID PFEIFFER                10297

June 2, 2015

᛫ᛁᛂᚱᛂᚱᚢᛁᛁᛁᛁᚤᛁᛁᛁᛁᛁᛁᛁᛁᚤᚱᚱᚢᛁᛁᚤᛁᛁᚤᚤᛁᛁ

Reference: Credit Card Dispute Resolved; Credit Posted to Account

Dear Michael David Pfeiffer,

We've completed our investigation of the following credit card transaction dispute:

**Card # ending in:** 6771
**Merchant:** Gaw Miners
**Transaction amount:** $24.99
**Transaction date:** August 28, 2014

Based on our research, we've concluded that you're entitled to a permanent credit of $24.99, which will appear on your next billing statement. You can also view the credit on usaa.com, mobile.usaa.com or your USAA Mobile App within two business days.

Thank you for trusting us with your financial needs. No further action on your part is needed. If you have questions, please call us at 210-531-USAA (8722), our mobile shortcut #8722 or 800-531-8722.

Thank you,
USAA Federal Savings Bank

Credit Cards are issued by USAA Savings Bank and are serviced by USAA Federal Savings Bank.

 

105989-0714

# Exhibit D

Page 1

1                          E. CAPUANO
2                 UNITED STATES DISTRICT COURT
                     DISTRICT OF CONNECTICUT
3
4
5    DENIS MARC AUDET,           )
     MICHAEL PFEIFFER, DEAN      )
6    ALLEN SHINNERS, and         )   Case 3:16-cv-00940
     JASON VARGAS,               )
7    Individually and on         )
     Behalf of All Others        )
8    Similarly Situated,         )
                                 )
9              Plaintiffs,        )
                                 )
10   VS.                          )
                                 )
11   STUART A. FRASER, GAW        )
     MINERS, LLC, and            )
12   ZENMINER, LLC (d/b/a        )
     ZEN CLOUD),                 )
13                                )
               Defendants.        )
14                                )
15
16
17             ORAL AND VIDEOTAPED DEPOSITION OF
                        ERIC CAPUANO
18                      JULY 9, 2018
19
20
21
22
23
24   Job No. 143278
25

Page 2

```
 1              E. CAPUANO
 2
 3
 4
 5      ORAL DEPOSITION OF ERIC CAPUANO, produced
 6  as a witness at the instance of the Plaintiff
 7  and duly sworn, was taken in the above styled
 8  and numbered cause on July 9, 2018, from 9:33
 9  a.m. to 12:39 p.m., before KATERI A.
10  FLOT-DAVIS, CSR, CCR in and for the State of
11  Texas, reported by machine shorthand, at the
12  offices of Regus Office Suites, 106 East 6th
13  Street, Ste. 900, Austin, Texas, pursuant to
14  the Federal Rules of Civil Procedure and the
15  provisions stated on the record herein.
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1          E. CAPUANO
 2          A P P E A R A N C E S
 3
 4
 5  FOR THE PLAINTIFF:
 6  EDGAR SARGENT, ESQ.
    Susman Godfrey
 7  1201 Third Avenue
    Seattle, Washington 98101
 8
 9
10
11  FOR THE DEFENDANTS:
12  HANNAH MILLER, ESQ.
    ANNA SCHULER, ESQ.
    Hughes Hubbard & Reed
13  One Battery Park Plaza
    New York, New York 10004
14
15
16
    Also Present:
17
    Jordan Mummert, Videographer
18
19
20
21
22
23
24
25
```

Page 4

```
 1              E. CAPUANO
 2
 3              INDEX
 4                          PAGE
 5
 6
    Appearances.....................    3
 7
 8
    ERIC CAPUANO
 9
10  Examination by Mr. Sargent.........    9
11
    Examination by Ms. Miller..........  107
12
13
14
    Signature and Changes.............  162
15
    Reporter's Certificate............  164
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1              E. CAPUANO
 2
 3              EXHIBITS
 4  NO.      DESCRIPTION        PAGE
 5
 6  Exhibit 27   E-mail string from Josh
                 Garza to Eric Capuano,
 7               Dated 6/18/2014, Subject:
                 RE:Fwd: Issue
 8               Resolution.        52
 9
10  Exhibit 28   E-mail string from Dan
                 Kelley to Joe Mordica,
11               Et al., dated 12/26/2014,
                 Subject: RE: PayBase/
12               PayCoin questions -
                 IMPORTANT.............   93
13
14
15  Exhibit 29   E-mail from Eric Capuano
                 To Joe Mordica and Dan
16               Kelley, dated 1/13/2015,
                 Subject: Turnover-Eric's
17               Departure...............  109
18
19  Exhibit 30   E-mail from Jonah Dorman
                 To Carlos Garza and Eric
20               Capuano, dated 1/6/2015,
                 Subject: Re: Wire.......  122
21
22  Exhibit 31   E-mail string from Jonah
                 Dorman to Eric Capuano,
23               Dated January 2, 2015,
                 Subject: Re: Pls Check..  126
24
25
```

---

Page 126

E. CAPUANO

2  (Exhibit No. 31 Marked)
3  Q.  (BY MS. MILLER)  All right.  I'm
4  handing you now what has been marked as
5  Exhibit 31.
6  A.  (Reviewing exhibit.)  Oh, wow.
7  This was the other terrible, terrible
8  decision, that we were taking credit card
9  payments for cryptocurrency, right?  So you're
10  taking a credit card, which can be reversed,
11  to sell currency which cannot be reversed.
12  So we saw -- we had a lot of issues
13  with that, a lot of, like, credit card fraud,
14  where they would just buy as much as they
15  could, and then by the time the charge-back
16  came it was too late, because they already had
17  the currency or whatever.  I'm guessing that's
18  what this probably was.
19  Q.  Right.
20  So was it possible for somebody to
21  purchase cryptocurrency on a credit card,
22  effect a successful charge-back, and still
23  retain the cryptocurrency?
24  A.  It was 100 possible.  As a matter
25  of fact, it's the nature of cryptocurrency

---

Page 127

E. CAPUANO

1  that makes that possible, because it's an
2  irreversible transaction.
3  Q.  Right.
4  A.  If -- if -- if you give me $100 in
5  cash and I give you $100 in Bitcoin -- well,
6  technically, cash is almost just the same,
7  irreversible.
8  But if you used a credit card, and
9  you get the charge-back, the bank might give
10  you your $100 back, but I can't take that
11  Bitcoin back from you.  Like, that's
12  irreversible.
13  So, yeah, that was a -- I mean, in
14  hindsight, you know, you would think -- just
15  five minutes of thought would have said that's
16  not a good idea.
17  Q.  And was it possible for people to
18  falsify receipts, like, receipts of purchase?
19  Or was that an issue at all?
20  A.  Not that I recall.
21  Q.  Okay.
22  A.  I'm not going to say it wasn't an
23  issue.  I don't remember that being an issue.
24  Q.  So when somebody made a purchase,

---

Page 128

E. CAPUANO

1  did they get an e-mail confirmation?
2  Or what kind of receipt did they
3  receive?
4  A.  Yeah.  So, this was interesting
5  because I do remember there being some
6  confusion around -- okay, if you placed an
7  order, you know, you would get, you know, like
8  a confirmation e-mail.  Then you would get a
9  follow-on e-mail.
10  And so I think there was some
11  confusion over, "Hey, look, here's my
12  confirmation e-mail."
13  But this is too muddy a territory
14  for me to really say.
15  Q.  Okay.
16  So here where you say -- it looks
17  like you're encouraging GAW employees to
18  request GAW Miners receipts showing proof of
19  purchase, with order numbers.
20  Would you say that would have been
21  the best way, at the time, to verify a
22  transaction?
23  A.  To the best of my knowledge.  I
24  mean, it's been a while since -- obviously,

---

Page 129

E. CAPUANO

1  back in these days, I was very heavily
2  embedded into this process of figuring out if
3  something is legitimate activity.
4  I would imagine what I was probably
5  doing, or what I was -- the customer service
6  reps was -- were doing, was going back and
7  looking at the history on the account, seeing,
8  okay, what does he have, and going back to
9  that -- that customer's account -- or history
10  in the storefront and saying, "What did he
11  buy?  Does he have what he bought?"
12  Because what we would find is they
13  would somehow end up with things that they did
14  not buy.
15  And -- and that was another -- that
16  was another one of the issues that I brought
17  up as it pertains to the hashing power cap,
18  right?
19  We have customers ending up with
20  things that they didn't buy, right?
21  Like, how are we keeping tabs on
22  what is out there?  You know.  So it was -- it
23  was a huge mess.
24  I don't think anyone really fully

---

# Exhibit E

MINING

**BITCOIN NEWS MAGAZINE**

Home      Mining      Cloud Mining

## HOW TO CHARGEBACK GAWMINERS HASHLETS

allegro101     04/17/2015     Cloud Mining     1 Comment     8148

How to Chargeback GAWMiners Hashlets









BTC
$3,640.63
High: 3709.01 3663.94 Powered by [CoinGecko]

Bitcoin News Magazine
696 likes
[Like Page]   [Liked]

MONERO  Secure, untraceable
Created with Raphaël
2.0.1
USD $ 45.87 ▲ 6.43%
24hr low $ 42.01    24hr high $ 46.30  Learn more
Bitcoin $ 3666.50

[Fear & Greed Index]
Multifactorial Crypto Market Sentiment Analysis

Now:
Extreme Fear

Last updated: Jan 14, 2019

alternative.me                                                16

69€





TREZOR

1
SHARES

If you purchased "always profitable" Hashlets from GAWMiners using a credit card you may still be able to reverse the charge through a chargeback. Many thanks and a tip of the hat to Allen1980s from the GetHashing community forum for publishing this guide in his thread GAW Legal, Credit and Consumer Protection Rights.



Allen1980s ♥ Show me the numbers                                                2d

Hi Everyone,

I just got off of the phone with PNC Bank, to get clarification as to how you should approach your charge backs.

This pertains to Visas issued by banks:

Visa has a 120 day charge back window for "normal" charge backs. This particular GAW transaction has been classified non-standard. Under Visa's guidelines, non-standard charge backs have extension periods which are not fixed. In the case of fraud or failure to deliver the service as described, an extension period is fairly open to the credit card issuing bank's determination.

Approximately 4-5 weeks ago many of the banks were receiving charge back requests for GAW Miners. PNC began investigating the company and after finding the website gone, they began to dig deeper, including contacting the SEC on the status of the investigation, since this one of the main statements made by contesting card users.

According to PNC, Visa does NOT cover losses relating to INVESTMENTS. The main contention of the SEC is that Hashlets/Stakers are unregistered INVESTMENTS. However, since GAW is claiming that Hashlets/Stakers are not investments, consumers were purchasing another service unrelated to investments.

The banks are apparently pursuing this line to force charge backs with the processors (GAW side). When you call to charge back a GAW transaction, make sure you stay completely away from the word INVESTMENT. Most of the customer service reps are already aware of what is happening with GAW, since there has been a tsunami of recent activity and effort to charge back these transactions.

As others have already stated, you must state that it is GAW Miners and that they are under a FORMAL investigation by the SEC in order to connect the dots with your card issuing bank

I cannot yet speak to Mastercard and Discover Card. I am calling Citibank next to get their position or the approach they have taken. Thus far, it appears that all of this has been well documented by the major credit card issuing banks.

**Cheat Sheet:**

1. Purchased a product from GAW Miners.
2. Confirmed, under a formal SEC investigation
3. Product/Service has been stopped
4. Company has stated that the service is being terminated or EOLed
5. Did not receive the service as stated at the time of the sales process.

These are the top issues at hand. Do not go into anything further than this, as it only complicates the process. If they ask questions, think before you answer.

PNC indicated that they will not be sending any documentation for me to fill out, as they already have a "crib sheet" version they are using to support the charge backs. More than likely, your credit card issuing bank will have something similar.

For those who may have received rejection notices, you do have the right to appeal the decision. If you need a copy of the formal SEC subpoena, obviously all you have to do is ask here in the forums. Someone ( @suchmoon ) will be able to either upload it for you or send you a link to a copy.

Hopefully, this helps everyone through this process.

5 Replies ▾

23 people liked this

More information is being added regularly to the thread at the GetHashing forum so check back for updates concerning exact procedures for other credit cards.



chargeback    GAWMiners    Hashlets    josh garza

**1 Comment    Bitcoin News Magazine**

☐ **Login** ▾

☐ Recommend    **t Tweet**   **f Share**

Sort by Newest ▾

Join the discussion…

**allegro101** Mod • 4 years ago
Please visit this thread at PayCoinTalk for latest information on how to chargeback against GAWMiners.
☐ | ☐ • Reply • Share ›



How to Chargeback GA WMiners Hashlets

Subscribe    d   Add Disqus to your site    Disqus' Privacy Policy

DISQUS

Home    Copyright ◆ 2015, 2016    About    Privacy Policy    Terms and Conditions    Cookies

# Exhibit F



gawsuit

**News & Updates**    Contact

AUG
**14**

## GAWsuit Update August 13, 2016

By GawSuit | Uncategorized | No Comments

**Hello Everyone.**

GAWsuit is progressing through the court system here in the United States, and I wanted to post a more recent update.

Both defendants were served successfully with their respective summons. The time clock is now ticking for the defendants to respond to the allegations levied in the lawsuit that was filed.

As of Friday, a motion for the lawsuit to be certified as a "class status" was filed. The court will now determine whether the conditions are in place for the lawsuit to be certified as a class action lawsuit.

I do not know the time frame for the court to make the decision on class action status, but from the flurry of activity in the past month, I do not expect the certification to take too long. Meanwhile there has been a stay of the lawsuit itself, pending the court's reclassification of the lawsuit (certification) as a class action lawsuit. I have attached the PDF of the Mtion for Class Action Certification. If you have created a PACER account, here in the U.S., you can also view the other documents available from the lawsuit. There are now 18 items in the lawsuit file list.

Motion for Class Action Certification

**Best regards,**

**Allen**

---

JUN
**16**

## The Lawsuit Complaint Has Been Filed With The Court

By GawSuit | Uncategorized | No Comments

Hello Everyone.



**News & Updates**   **Contact**

was filed in the District Court of Connecticut today as case # 3:16-cv-00940.

If you have access to the electronic case filing system, you can find the filing here:

https://ecf.ctd.uscourts.gov/cgi-bin/DktRpt.pl?6295529302171-L_1_0-1

**What will happen next**?

The case has to be accepted and certified as a class action by the court. Once the case has been accepted and certified as a class action, then an initial discovery period will commence. As you all know, I have been gathering archival evidence since before March of 2015, prior to announcing that I was considering forming a lawsuit on April 17th, 2015. I will not go into details of what evidence we have, but it is quite extensive. I will add that GAW's activities, through the various forums and websites, were probably the most and best chronicled in the Crypto Industry, through online archiving websites such as WayBackMachine, Archive.is and Bitcointalk. There are quite literally tens of thousands of "snapshots" of posts and such permanently archived.

To address some of the questions I am anticipating to be posed, I have included a basic Q&A below.

**Question:**  How long of a process will this be?

**Answer:**  There is no way to know how long this will take.

**Question:**  What kind of class action lawsuit is this?

**Answer:**  To the best of my knowledge, this will be an "opt-out" class action, should it be certified as a class action lawsuit by the court. An "opt-out" class action lawsuit allows anyone to withdraw from the "class" or group to pursue their own separate litigation against the defendant(s). If you choose to remain in the class, the final result of the litigation (win or lose), will be final and you will not be able to pursue any subsequent legal action(s) relating to the charges and or allegations listed in the class action lawsuit.

You can read about class action lawsuits (U.S. version) here:

https://www.law.duke.edu/grouplit/papers/classactionalexander.pdf

**Question:**  When can I expect to see compensation?



**News & Updates**  **Contact**

Please check back to GAWsuit.com for any updates in the future. If you have ECF access to the court system case documents, you can follow everything there as well. Although this will be a long process, I will endeavor to post whatever the law firms request, as well as post a few lines to keep everyone up to date on any developments which occur.

---

FEB
**13**

## GAWsuit Update

By GawSuit | Uncategorized | No Comments

**Hello Everyone,**

I have been receiving a lot of emails about the lawsuit of late. I was waiting for the law firm to prepare a proper announcement, but it has been too long since I posted an update. Therefore, I decided I will post a new update on the status today, versus keeping everyone in the dark.

Most, if not all, future announcements will invariably emanate from the law firm directly. I will post them here as they are made available.

**The Search**

As you all know, I had been in conversations with a number of lawyers and law firms since April 2015. After a number of negative experiences, we were finally put in touch with a highly prestigious law firm, with over 100 attorneys, and multiple offices around the United States. We started the dialogue in August of 2015.

We have had many conference calls, and exchanged many documents with attorneys of the firm. The lawsuit was accepted by the firm on December 30th, 2015.

**The Discovery Process**

As you all know, I have been gathering evidence and copy since early 2015. We are gathering and sorting the information needed to present as evidence to the court, once the "complaint" is filed, and the court certifies



represented, on all levels of the group, both small and large losses, by solid individuals. All of the lead plaintiffs are from the United States, at this juncture, due to the possible requirement for lead plaintiffs to be present during some of court hearings or, during settlement discussions. Should we need additional plaintiffs, representing the internationally-based victims, I will address such a need at that time.

**Lead Plaintiffs**

I cannot list who was chosen as lead plaintiffs in the case at this time, as that will be disclosed at the time of the filing of the complaint, in the court that will be hearing the case.

**What is a Class Action Lawsuit**

For those of you who are outside the United States, a class action lawsuit differs from a normal litigation against an individual or company. In this case, the lawsuit is for the benefit of all victims, the class, where proof exists to substantiate each member's claims of loss or damages.

During the final stage of the lawsuit registration process, we asked registrants to upload their supporting documents to GAWsuit.com. Out of the 501 initial registrants, 171 victims completed the process by uploading their proof of loss documents. These individuals have supported their claims that they lost money from the GAW scheme. In a U.S. court of law, the judge will consider such "complaints" for class status, starting at 21 plaintiffs (or when there are 40 or more with supporting evidence). Since 171 people have uploaded their supporting documents, in support of this lawsuit as was requested, we have well above the required 40 or more to substantiate class certification of the lawsuit. For those who did support their claims, by uploading your support documents, you can congratulate yourselves now, as without the supporting documents, we would have had a snowball's chance in Hades reaching class certification. Now, we have more than enough to justify class certification.

Links to explanations of what Class Action Lawsuits entail:

Class Action Lawsuit — Legal Definitions

How A Class Action Lawsuit Works — Alllaw

Frequently Asked Questions — Class Action Lawsuit

Any law firm linked to the pages above, is not representing us in the lawsuit.



<span style="color:red">News & Updates</span>    Contact

be directly part of the decision whether an award or settlement amount is acceptable to the class hence, the vetting process being undertaken to interview all lead plaintiffs who I have put forward for this lawsuit representation, including myself.

**When Will I See Money Coming Back?**

Obviously, we have to win the lawsuit, or agree to a settlement, before this question can be answered. Please do not send me emails asking how much or when you will receive money. I cannot answer this question at this moment in time.

**Who is the Firm Representing Us?**

It is the privilege of the law firm to announce their actions on behalf of the class action, at a time of their own choosing.  Invariably, once the "complaint" is filed in court, everyone will know who they are, by default, unless they choose to announce before the "complaint" is filed, on their own website, or through us on GAWsuit.com.

**Can I Contact the Law Firm After They Have Filed the Complaint?**

Again, this is up to the law firm, but once the complaint is filed, and the "class is certified" by the court, there will be no need for anyone to contact the law firm, as I "assume" the entire class action will be "opt-out." Anyone opting out of the class action would do so to file their own, separate lawsuit (see definition below). No one will be able to remain in the class action then, after winning the class action, proceed to file their own lawsuit, unless their lawsuit is for a different reason than that represented by the class action lawsuit.

<span style="color:red">What Does It Mean to Opt-out of a Class Action</span>

Other Sundries:

The SEC's Case

As many are aware, the Securities and Exchange Commission (SEC) has already filed their case against GAW Miners, Zenminer/Zencloud and Garza. As of February 12th, the SEC has filed for a default judgment against GAW Miners and Zenminer/Zencloud, for failure to respond. This will have no direct affect on anything, since we all know that GAW Miners and Zencloud/Zenminer were completely depleted of their funds prior to Garza's



**News & Updates**    **Contact**

Why is the SEC Only Seeking $10 Million in Reimbursement?

Opinion:

The SEC is only targeting Hashlets in their case, as unregistered securities. However, the SEC failed, in my opinion, to study directly-sold Hashpoints (unregistered, "convertible" securities), HashStakers (time deposits with a stamped yield and lock-up period) and directly-sold Paycoin (again, as a guaranteed, unregistered security with a stated minimum value, or floor). If you study the definition of "securities" in the SEC complaint, the aforementioned items fit these conditions as well. I am "assuming" that the SEC did not understand how sold Hashpoints, HashStakers and Paycoin were transacted. Maybe the FBI's case will address these shortcomings in the future, should they file. Moreover, during the course of the SEC case, it may be revealed that Garza never claimed the windfall from GAW on his personal tax return to the IRS, which is highly likely. This should precipitate action on their part as well. Garza will eventually have to address multiple litigation actions against him, probably for years to come.

Future Posts

At this point, the law firm is now in charge of the lawsuit. I will be supporting them in the successful litigation of this suit. I will reach out to individuals privately, should any specific information be needed to support the case, but I am fairly certain we have more than an abundance of supporting documents, and such, to bring the litigation to a successful conclusion. As stated previously, any information that the law firm wishes to convey will be done by them directly, through their own means, and mimicked here, by me. Once the complaint has been filed, I will provide a link that will give others access to the filing. More than likely, Coindesk (Stan Higgins) will already have reported the complaint being filed; he seems to be well on top of things as it is.

Best regards,

Allen

---

OCT

**Phishing Attempt**



**News & Updates**   **Contact**

Hello Everyone.

There was an attempt (albeit a feeble one) to get people to send 0.30 BTC to a Bitcoin address in an email originating from, what appears to be, a Team Paycoin subdomain address. DO NOT SEND ANY COIN TO THAT ADDRESS !!!  All correspondence covering the lawsuit will originate from gaw.lawsuit.allen1980s@gmail.com AND NO OTHER EMAIL ADDRESS. The person sending the hoax email obviously knows nothing about how lawsuits are conducted (probably some uneducated teen).

Best regards,

Allen

---

AUG
**21**

## News and Updates

By GawSuit | Uncategorized | No Comments



September, 21st, 2015

Hello Everyone.

Welcome to the new website!



## News & Updates    Contact

More news coming soon.

Best regards,

Allen

---

**July 17th, 2015  Original Newsletter**



## Dear GAWsuit Members,

First, I would like to apologize for the lateness in updating the group about the forming GAW lawsuit (GAWsuit). It has been a very time consuming project, with new members arriving daily. As most of you know, I am involved in a lot of different projects, aside of the lawsuit. I also own a company, and the business of the company keeps me highly active. I would like to thank everyone for his or her patience in this matter. Following, you will find all of the latest developments and issues.

**The Members**

At present, our group members come from 47 countries, on all seven continents. The reach of the alleged GAW fraud was extensive. Daily, we receive at least 3 to 4 new applicants to the group, also from around the world. Our membership represents a vast number of different cultures, languages and ethnicities. It represents one of the most diverse private groups in the world today, with nearly every major language class being represented.

**Change of representation**



they wanted as a retainer, and they indicated they wanted to bring other law firms into the group, which went against the initial discussions. We felt that their motivations were not in a successful litigation outcome.

Through the assistance of one of the members of the group, Coollegaljobs, we believe we have a more experienced attorney who will represent the group properly. We should have final details in the upcoming week, ending in a contract with the firm, hopefully.

**Evidence is voluminous, and growing**

As many of you have seen, through the various posts I have made in the forums, we are in possession of an immense amount of intelligence and evidence, which makes this case very clearly that of an alleged fraud. Garza's flight to Dubai ended in another catastrophe, forcing him to be returned to the United States.  Some of you may have seen the bits and pieces of information on the internet, about Garza's stay in Dubai. In effect, he was sued by a small group of GAW customers there, initially winning a million dollar plus judgment. Financial fraud and financial irresponsibility is a felony in the U.A.E., leaving Garza with a very real probability of being imprisoned. Unfortunately, Garza's defense attorney was successful in having the initial award overturned, based on the argument that the crime occurred in the United States, where the case should have been litigated. Garza has since returned to the United States, in complete embarrassment, failure and shame. Regardless of claims he has made publicly, he did not return at the request of the government. He had nowhere else to go.

**Recent lawsuits against GAW**

In the interim period, Mississippi Power successfully sued for $300,000 in defaulted payments and damages. The case resulted in a default judgment. Additionally, another case, by two past customers of GAW, resulted in a default judgment as well.  The amount of the judgment was $205,000.

**GAW Braintree Payments account.**

Braintree Payments had frozen the GAW credit processing account late in 2014. At the time, we believe, through various confirmations from past employees, that the account contained over $1.4 million. Through a little intelligence gathering, we were able to determine that the Braintree account contains slightly over $500,000 currently. The two successful judgments will certainly reduce most, if not all of that balance. Do not worry, as these assets are not the only assets Garza is believed to have at present. At this moment, Garza has two residential properties for sale in Massachusetts and Vermont. The total value of these properties is 1.2 million USD. We will be ensuring full use of the courts in properly identifying and seizing assets 'wherever we believe they lie.' As I have stated in the past, I will not rest until we have identified, seized, or encumbered (garnished) every dollar's worth of assets Garza has stashed away. If we are even half-successful, we will have ruined his



**News & Updates**    **Contact**

I have seen some conversations, on other forums, about Garza being able to discharge all judgments through a bankruptcy court. Most of these have been posted on Bitcointalk. These statements are highly generalized, far from representing all of the facts. The following:

" *There are still other types of debts that may be excepted from discharge, if the creditor files an objection. The creditor must file an adversary proceeding in bankruptcy court, requesting that the court decide that the particular debt is nondischargeable. If the judgment creditor files an objection to your discharge and proves the underlying debt to be any of the following types, it may not be dischargeable:*

·    *Injury caused by a willful or malicious act, such as assault;*
·    *Fraud used to obtain money, goods or services, such as lying on a credit application, or;*
·    *Fraud committed while in a position of trust, such as embezzlement while acting as a trustee or guardian.* "

As you can see, we will have to be highly diligent in preserving any judgments against Garza in the future. We intend to continue the pursuit of this goal until most, if not all, of any potential judgment is paid. It can be argued that: Garza was a trustee of consumer funds; misrepresented the status, liquidity and capabilities of GAW; redirected consumer funds to private accounts, while also effectively piercing the corporate veil, and; mixed personal and corporate finances together, on a regular basis. We have hard evidence of these activities, as does most of the membership in the group.

**Severe, damaging repercussions from the alleged GAW fraud**

The actions of GAW and Garza have resulted in numerous breakups of households, as well as several known individuals losing some, most, or all of their possessions, as well as jobs; all as a result of the overwhelming alleged fraud. In one instance, an individual was explicitly told to hold on to their GAW investments, even after losing over 50% of the value. This was the advice of the CEO (Garza) to the investor, who lost 98% of the total value of their investment to date. The investment was being made to help the investor's family cope with the investor's terminal illness. Garza was made cognizant of the situation, and still insisted the investor not sell out of his position with GAW.

This is not the only severe case of repercussions from investor losses. Due to the immense integrity and efforts of Adam Matlack, as well as a number of generous benefactors from the community, some of these individuals have received financial support and assistance; mitigating some of the severe damages, they have incurred. I personally know of two people whose investments, and subsequent losses, have made them homeless.



**News & Updates**    **Contact**

slowly wither away from undelivered products enhancements, unfulfilled product deliverables, irrationally over-hyped promises of grandiose commercial relationships and business developments, as well as from false statements of corporate financial status and fictitious outside investors and support funds. In essence, the CEO was responsible for the destruction of tens of millions of dollars of investor wealth, while pumping promises that would not, nor could ever, be delivered.

**We have already lost one group member**

In the short time that the group has been formed, we have already lost one member to an unexpected death (Goroz: Grant Honeycutt). He was only 34 years old, and his health was assumed to be in top form. Regardless of his untimely passing, any award recoveries due to him, will be forwarded to his surviving parents. We want everyone to understand that we take this lawsuit and its success very seriously, and ensure that each member will receive their portion of any awards, but also their surviving heirs, should any member suffer an untimely passing, or become incapacitated. It is for this reason that we ask that all members ensure that there is an a family member who is kept abreast of this lawsuit and our contact information.

**Charge-backs and VARs**

We want to be very clear about this. If you have successfully obtained charge-backs through your bank, you **MUST** reduce the claim you have made for the lawsuit. I also want to ensure everyone understands that we are in contact with the **VARs (Value Added Resellers)** to ensure that there is **NO DOUBLE-DIPPING** occurring. I have made it clear in the forums, that charging back VARs, although the highest likelihood of receiving some of your money back, also leaves these individuals with no avenue to recover their money from GAW. If you have charged back any of the VARs, and have not adjusted your claim with this group, immediately upon a successful VAR charge-back, we will know about it, and we will have to remove you from the group. You will no longer be part of the lawsuit. You will be on your own. You are effectively taking money from others in the group who have, in good faith, claimed actual losses they have not recovered. When you **double-dip**, you are enriching yourself with other members' prospective recoveries, without just cause.  We will be discussing the VAR situation with the attorneys. We wish to determine whether we can include them in the lawsuit, in some capacity.

**A new website in development moving forward**

In the coming week(s), another website will be online where registrants can upload the following documents and details, supporting their loss positions, while also legally identifying themselves for the court. We are contemplating the creation of separate accounts for registrants, using the email address entered on the first web form. You will be asked to create a password to secure your account on the new website. All data will

 **News & Updates**    Contact

1)    Full Name.

2)    Full Address;

3)    Postal code;

4)    Country of Residence;

5)    Copy of a government-issued picture ID (taken next to the individual's face);

6)    Telephone Number;

7)    All Zencloud Account User ID(s), **"NOT"** passcodes;

8)    Real primary email address that is not at Gmail, Yahoo, Hotmail, MSN or other email service providers (explained later). Mail Chimp will not add emails starting with "info@," "Admin@," or other general info email addresses, such as "support@;"

9)    Amount of Hashpoints mined, converted to Paycoin;

10)  Amount of Hashpoints purchased from GAW directly;

11)  Amount of Paycoins purchase from Paybase direct (not the exchange) and Paycoin.com;

12)  Signature on "Release of Zencloud and Paybase Account Histories and Data," imaged and returned via e-mail;

13)  Signature on "Group Litigation Agreement," imaged and returned via e-mail;;

14)  Signature on "Testimony on Validity of Claim," ," imaged and returned via e-mail, and;

15)  FBI submission checkbox, "yes" or "no."

The three primary documents required will be created in Adobe PDF as forms. You will need Adobe Acrobat to view, fill in, print and sign to email back to us. You can fill these documents and scan to email to return them to us here in the U.S. The email address will be the same: gaw.lawsuit.Allen1980s@gmail.com

**Uploads:**

A)  Complete Zencloud account history from beginning to present (instructions follow);

B)  Copies of any and all sales receipts for hosted hardware, Hashlets, Stakers, and Paycoin (through Paybase);

C)  Copies of receipts or contracts purchasing Hashpoints from GAW (Josh Garza or Carlos Garza);

D)  Copies of Bitcoin transactions with GAW, Paybase, or Zencloud, and the addresses the Bitcoins were sent to (This was at the FBI's request), and;

E)  Copies of Bitcoin transactions coming from GAW for refunds.

**Software**



**News & Updates**    **Contact**

**Your email address is important for the lawsuit. Your responses are required**

Many of you have normal, personal email addresses you use on a daily basis, while some of you depend on Gmail, Yahoo, Hotmail, GMX, and other third party email service providers with which to communicate. We want to make it very clear that, should you have a personal email not from a third party provider, you should disclose this in the new form, as a secondary, backup email address. If you use any of the other providers, as your primary email service, continue to use that email address in the new form. As most of you are aware, we are spending a sizeable amount of our personal time on this lawsuit. Allen has replied to a number of claim forms requesting additional clarification with absolutely NO responses. This means that people are registering email addresses that they never check, under some form of paranoia.

If anyone fails to respond to any requests for additional information, we have sent to a registered email address, we will have to remove that person from the group within 14 days of receiving no response.  By not responding, a person is abusing valuable time and effort, as well as hindering the group's efforts in negotiations, or the courts. The group cannot be held captive by people who are not taking the lawsuit seriously. This is not a lottery, it is a lawsuit that requires a lot of time from a small number of people. We cannot be sympathetic to a person's claimed losses, if they are unsympathetic to our direct requests for additional information or clarification of supplied information. This is a complex process, it is crypto-based, the alleged GAW fraud is complicated, and the courts have little understanding of these issues, making this process ten times worse than a typical fraud case. There is a lot of verification on the horizon involving a lot of accounting. If some members do not cooperate fully, it will increase the workload astronomically, push the lawsuit further out from completion, and potentially damage any prospective settlement or judgment efforts.

Our time is being used to further the group's common goal: seeking recoveries of lost investments, as well as punitive damages. We do not have time to send five or ten unanswered emails to addresses which go completely ignored. Our time is uncompensated in this effort, we are not GAW, and the liabilities to any of the damaged consumers of GAW, really rests with GAW, hence the litigation. Therefore, if you choose to ignore our email requests, we cannot adequately support your claim. If you decide to go on vacation, you must contact us, via email, to indicate the dates you will be gone, and the date you will be available again. The address is again: gaw.lawsuit.allen1980s@gmail.com. This email is directly forwarded to Allen's primary email address. As most of you already know, Allen responds to many emails directly, and within a time that is achievable by Allen.

**Zencloud Instructions**

As stated earlier, and across all of the applicable forums, you need to download your complete account history in each of your Zencloud accounts.



**News & Updates**　**Contact**

increments of no more than 30 days. If you have access to Google Docs, you can check the output by uploading the resultant spreadsheet output to Google Docs, opening the spreadsheet there to manipulate the export date range accordingly. You may also combine your output files in Google Docs.

**Step by step:**

Log into your Zencloud account. On the left sidebar, choose "Latest Activity."



Next, your screen will fill with the most recent list of account activities, like this:





<span style="color:red">**News & Updates**</span>     **Contact**

Now you will see the date range box.



Choose the date "Start Date" as the first date of your account opening. Chose the "End Date" for 30 days later. I chose 45 days, because the output was less than 1,000 rows of data, like this:



Click "Download." Save the file with your account user ID like SkippyCowboy Part 1. Work your way up until the current date, capturing all of your account history, including the Hashpoint mining period, and staking outputs.

When you open the spreadsheet, the output looks like this:



News & Updates    Contact

**More heavy points**

Do not inflate your loss claims. Someone stated they lost over $10 million. On further inspection, that loss was less than $50,000. The highest, legitimate, verifiable loss is presently $1.4 million. Additionally, you cannot claim the amount of damages you demand to receive with your claim. It is a "group" lawsuit, not 500 individual lawsuits. Any punitive damages or awards are divided amongst the entire group membership, proportionate to member's percentage contribution to the total group losses. If you represent 1% of the total loss of the group, you will receive 1% of any "collected" award from judgments that are recoverable.  We will endeavour to submit all judgments to every credit bureau in the U.S., until paid in full, ensuring that Garza's liability is made publicly known to every future business, bank, or future individual investor and consumer, pulling a credit bureau background check.

Anyone failing to upload supporting documents will either receive a substantially lesser amount, based on what information we can retrieve, or will be completely removed from the group. We cannot present the court with guesses about the value of each account's loss. We have to have supporting documents and, a rather massive spreadsheet will need to be created, calculating amounts from which we derive the total claim of the group. If we cannot substantiate any or only part of your losses, and you upload no documentation to support your claim, either we will have to re-rate the account at the lower sum we have information to make an assessment from, or the claim will have to be withdrawn.

We are joining forces to present a powerful, influential group that will carry significant weight at the negotiation table, and in the courts. As individuals, we stand little chance in succeeding in the courts, as it requires knowing where the assets are, how to get to them, and a lot of money in the form of attorney's fees and retainers. As a group, each person's share of the costs will be relatively small compared to individual lawsuits. That was one of the main purposes in our forming the group. Together, everyone stands a chance at winning some or all of their losses back, possibly more. As individuals, there is little chance of that.



primary group loss calculation. It is important that you identify these exactly on the next form (new website). Hashpoints mined prior to the distribution, are valued at 400 Hashpoints per Paycoin, or $4.00 per Paycoin. Paycoins purchased directly through Paybase, not the exchange, are valued at the rate you paid. You will need your receipts for these transactions.

To bring things into perspective, there are presently over 16 million Paycoins in circulation to date. At that volume, GAW would be liable for $320 million in lost value to all people who purchased or mined them. I can guarantee that neither GAW, Josh, nor the other defendants, presently possess, combined, $320 million in addition to the losses from investments in Vaultbreakers, Hashlets, Stakers, or other hosted hardware. We have to apportion valuations where they are realistic and where they have the most benefit to the suit. Where real cash, credit or Bitcoin was transferred to GAW directly, through the Zencloud marketplace, or through Paybase direct sales, that is where we define losses. Fantastical valuations based on one man's lies is not going to be well received by a court of law, but it will be well-received as coercive marketing that leads to punitive damages.

**Purchased other members' accounts or separate products**

If you purchased other investors' whole accounts, privately, the amount you paid is your loss, less receipts from a further sale, not the actual retail value of the Hashlets, Stakers, or hosted hardware.

If you sold your account to someone else, through the Zencloud marketplace, your loss is the amount you paid for everything in the account, plus commissions to GAW (5%), less earnings, and less the amount you sold the account or assets for.  Do not use retail values to determine your losses, unless you purchased retail and never sold anything from your account. In such cases, your investment, less revenue, equals you base loss. Lost future revenues, although legitimate, are a basis for punitive damages, not base losses.

**Group leadership**

There will be a small group of members who will be chosen to represent the group in its entirety. These people are selected based on a number of different parameters, one of which will be the amount of their verifiable, personal loss in the alleged GAW fraud. Another, will be their availability and willingness to represent the group in court hearings, should the need arise.  Obviously, members losing less than $10,000 will have little incentive to represent the group as leaders, considering the cost they will bear to attend any court hearings representing the group. Moreover, there are other leader requirements which will be called upon, from time to time.

This small group of leaders will represent all members of the group by proxy. This same group will be empowered to make decisions, collectively, on behalf of the entire group. Should funds be recovered through negotiations, this group of leaders will decide whether to accept or decline any negotiated settlement, on behalf



decisions agreed to by the group leaders; the decision is irrevocable. This form and contract will be on the upcoming website. The agreement will be part of the account creation, and will be digitally signed by the members, prior to moving on to document uploading.

Under United States law, no defendant can be tried twice for the same crime or complaint, by the same individual(s). As members of this group, all decisions by the court(s), after all appeals have been adjudicated, will end any and all claims by any of the members of the group. It is important that the correct leaders are chosen to represent the group decision-making process. I will attempt to select nine people as leaders of the group. By choosing an odd number, we avoid all indecisions where equal numbers of the leaders choose opposing paths for the group; creating a deadlock. I will be contacting members who I feel would best represent the group's interest. These people will be disclosed on the group contract, including the amount of investment lost to GAW, as transparency to the membership.

**Further communications**

Mail Chimp did not work out so well on the first run. Many of the email addresses resulted in bounces, via spam filters.

**If you are in receipt of this email, you are registered with the group.**

**If anyone has any questions, please feel free to contact Allen1980s.**

Best regards,

Allen

Gaw.Lawsuit.Allen1980s@gmail.com

Forums:

https://forum.gethashing.com/  @Allen1980s
https://paycointalk.org/  @Allen1980s

Slack Channels:

gawsuit



## News & Updates    Contact

Search...                               Search

**RECENT POSTS**

GAWsuit Update August 13, 2016

The Lawsuit Complaint Has Been Filed With The Court

GAWsuit Update

Phishing Attempt

News and Updates

**ARCHIVES**

August 2016

June 2016

February 2016

October 2015

August 2015

**CATEGORIES**

Uncategorized

**META**

gawsuit

**News & Updates**    **Contact**

WordPress.org

© 2018 gawsuit.

# Exhibit G

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x
                                :
UNITED STATES OF AMERICA        :   No.  3:17CR158(RNC)
                                :
          vs.                   :
                                :
HOMERO JOSHUA GARZA,            :
                                :   HARTFORD, CONNECTICUT
                Defendant.      :   SEPTEMBER 13, 2018
                                :
- - - - - - - - - - - - - - - - x


SENTENCING


     BEFORE:

          HON. ROBERT N. CHATIGNY, U.S.D.J.



APPEARANCES:


     FOR THE GOVERNMENT:

          U.S. ATTORNEY'S OFFICE
          157 Church Street
          P.O. Box 1824; 23rd Floor
          New Haven, Connecticut 06510
          BY:  JOHN TROWBRIDGE PIERPONT, AUSA


     FOR THE DEFENDANT:

          BALLARD SPAHR, LLP-NYC
          919 Third Avenue
          New York, New York 10022
          BY:  MARJORIE J. PEERCE, ESQ.


                              Darlene A. Warner, RDR-CRR
                              Official Court Reporter

1    money is easily recoverable or can be built back up

2    through, you know, business or something.  We have to look

3    outside the United States as well and we have to look at

4    how a hundred dollars is a lot of money to people in, say,

5    Northern India or Malaysia or Vietnam or China even today.

6         So with that, I had correspondence with a person

7    named Endra, I'm not sure if it's a male or female to be

8    honest, who states the loss of $800 to GAW is kind of a

9    lot of money in Malaysia, I assume where this person lives

10    in Malaysia.

11         So, in essence, what I did glean from the data

12    mining, the data harvesting, was we had basically victims

13    with as little as $100 and as much as $1.3 million.

14         We had two Wall Streeters who each lost about

15    $900,000 in this.

16         We had a decent number of individuals in the

17    $100,000 plus range, but short of a million, and we had a

18    lot of people in the 20, 25, 30, 35,000 dollar loss range;

19    and what we did in the beginning to try to help people to

20    recover what they could, through the charge back process,

21    a lot of people used credit cards.  It was not the success

22    I thought it would be.

23         I was a recipient of some intelligence that

24    indicated that Braintree, the PayPal processor, had about

25    $900,000 that they had still held back from previous

1   transactions, held back, and so there was a bit of a group

2   effort to try to get everybody through, that used credit

3   cards, to get everybody through the charge back process,

4   which turned out to be far more difficult than people

5   realized.

6        A lot of these credit card agreements give you a

7   90 day window to charge anything back with good reason, of

8   course.  And I think the problem we had for most people

9   was that their charges or what they purchased was already

10  past the 90 days.  And also some banks didn't -- they

11  looked at these as investments at the time, which we know

12  now are -- they were fundamentally investments, like

13  securities, like bonds, like whatever, you know, in the

14  financial world, and a lot of the banks did look at these

15  things and said this is not a product sitting in your

16  living room, it's sitting in some ubiquitous warehouse

17  somewhere that's no longer functioning, and that's the way

18  they looked at it.

19       So a lot of people did not get their charge

20  backs fulfilled, but we tried to get as many people

21  through that process to drain the Braintree fund as much

22  as possible to try to recoup losses as much as possible

23  for everybody that was still around looking for help, you

24  know, to do this.

25       I wanted to address this one part, and it may be