# EXHIBIT A

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

DENIS MARC AUDET, *et al.*,

                           Plaintiffs,

              vs.

STUART A. FRASER, GAW MINERS,
LLC, and ZENMINER, LLC,

                        Defendants.

Civil Action No. 3:16-cv-00940

Honorable Michael P. Shea

Magistrate Judge Donna F. Martinez

(ECF Case)

January 22, 2019

**REPLY AFFIRMATION OF SARAH L. CAVE IN FURTHER SUPPORT OF
DEFENDANT STUART A. FRASER'S MOTION TO EXCLUDE THE DECLARATIONS
AND TESTIMONY OF ROBERT MILLS AND LOU KERNER**

      1.      I am a partner at the law firm Hughes Hubbard & Reed LLP, counsel of record for

Defendant Stuart A. Fraser ("Fraser") in this action, and I am fully familiar with the facts and

circumstances in this case.  I submit this affirmation in support of the accompanying reply

brief in support of Fraser's motion to exclude the declarations and testimony of Robert Mills

and Lou Kerner.

      2.      Exhibit A-1 a true and correct copy of excerpts from the transcript of the

deposition of Robert Mills taken on October 30, 2018 in this action.

      3.      Exhibit A-2 is a true and correct copy of an email dated March 6, 2015 that

Plaintiffs produced in this case without a Bates stamp or number.

      4.      Exhibit A-3 is a true and correct copy of Letters of Authorization for the Release

of Zencloud and Paybase Account Details that Plaintiffs produced in this case without Bates

stamping, but with the following electronic Bates numbers: GAW00364484, GAW00362834,

GAW00362067, GAW00362098, GAW00362124, GAW00364060, GAW00364989,

GAW00364075, GAW00362568, GAW00362540, GAW00363286, GAW00362507, GAW00362381.

5.     Exhibit A-4 is a true and correct copy of an excerpt from the transcript of the deposition of Plaintiff Allen Shinners taken on July 25, 2018 in this action.

6.     Exhibit A-5 is a true and correct copy of a posted entitled Hashtalk Escrow Services & Community Standards Practices that Plaintiffs produced in this action with electronic Bates number GAW00208948.

7.     Exhibit A-6 is a true and correct copy of the September 26, 2014 GAW Miners Affiliate FAQ available at https://web.archive.org/web/20140926203444/http://gawminers.com:80/pages/affiliate-faq.

8.     Exhibit A-7 is true and correct copy of a document titled GAWMiners Value Added Reseller Program that Plaintiffs produced in this case with electronic Bates number GAW00630281.

9.     Exhibit A-8 is a true and correct copy of a November 11, 2014 email from Carlos Garza to Adam Matlack that Plaintiffs produced in this case with electronic Bates number GAW00630597.

10.     Exhibit A-9 is a true and correct copy of a March 26, 2018 version of gawsuit.com that includes a July 17, 2015 post by Plaintiff Allen Shinners addressed to "GAWsuit Members" available at https://web.archive.org/web/20180326173436/http://gawsuit.com:80/.

11.     Exhibit A-10 is a true and correct copy of a January 17, 2019 version of the PayPal web page titled "Chargeback FAQ" available at https://www.paypal.com/my/webapps/mpp/security/sell-chargebackfaq#goto7.

3

12.     Exhibit A-11 is a true and correct copy of an excerpt from the transcript of the deposition of Dr. Bruce Strombom taken on December 5, 2018 in this action.

13. Exhibit A-12 is a true and correct copy of an excerpt from the transcript of the deposition of Lou Kerner taken on November 8, 2018 in this action.

I, Sarah L. Cave, hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: January 22, 2019

Respectfully submitted,

By: /s/ Sarah L. Cave

Sarah L. Cave (phv08437)
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, NY 10004-1482
Tel.: (212) 837-6000
Fax: (212) 422-4726
Email: sarah.cave@hugheshubbard.com

*Attorney for Defendant Stuart A. Fraser*

# EXHIBIT A-1

Page 1

1              UNITED STATES DISTRICT COURT

2                 DISTRICT OF CONNECTICUT

3

4    DENIS MARC AUDET, MICHAEL      )
     PFEIFFER, D. ALLEN SHINNERS,   )
5    and JASON VARGAS,              )
     Individually and on Behalf     )
6    of All Others Similarly        )   No. 16-940
     Situated,                      )
7                                   )
                      Plaintiffs,   )
8                                   )
          VS.                       )
9                                   )
     HOMERO JOSHUA GARZA, STUART    )
10   A. FRASER, GAW MINERS, LLC,    )
     and ZENMINER, LLC, (d/b/a      )
11   ZENCLOUD),                     )
                                    )
12                    Defendants.   )
     _____ )
13

14

15

16        VIDEOTAPED DEPOSITION OF ROBERT MILLS

17             Los Angeles, California

18           Tuesday, October 30, 2018

19

20

21

22

23   Job No. 149295

24   Reported by:  NIKKI ROY

25             CSR No. 3052

## Page 2

1    Videotaped deposition of ROBERT MILLS, taken on
2  behalf of the Defendants, at 1900 Avenue of the
3  Stars, Los Angeles, California, on Tuesday,
4  October 30, 2018 at 9:38 a.m., before NIKKI ROY, CSR
5  No. 3052.

## Page 3

1  APPEARANCES OF COUNSEL:
2
3  FOR PLAINTIFFS:
4      SUSMAN GODFREY
5      COLIN WATTERSON, Attorney at Law
6      1000 Louisiana Street
7      Houston, Texas 77002
8
9  FOR DEFENDANTS:
10      HUGHES HUBBARD & REED
11      SARAH CAVE, Attorney at Law
12      HANNAH MILLER, Attorney at Law
13      One Battery Park Plaza
14      New York, New York 10004
15
16  VIDEOGRAPHER:
17      BRENT JORDAN

## Page 4

1         I N D E X
2
3  WITNESS    EXAMINATION         PAGE
4  ROBERT MILLS
5         MS. CAVE        8, 120
6
7         E X H I B I T S
8
9
10  NUMBER      DESCRIPTION      PAGE
11  Exhibit 212  Declaration of Robert Mills    8
              re: Class Certification
12
    Exhibit 213  Printout from Micronomics      17
13               website
14  Exhibit 214  Printout of user table from     49
                 ZenCloud database for Marc
15               Audet
16  Exhibit 215  Printout of ZenCloud database    55
                 table held_withdrawals for
17               user ID 14201
18  Exhibit 216  Memorandum of Law in Support    72
                 of Plaintiffs' Motion for
19               Class Certification
20  Exhibit 217  Letter from D. Allen Shinners    84
                 to Judge Robert Chatigny
21
    Exhibit 218  Email from Allen Shinners to     89
22               Mark E. Munster, March 1,
                 2016, attaches declaration of
23               Trevor T. Donelan
24  Exhibit 219  Plaintiffs' Motion for Class     94
                 Certification
25

## Page 5

1         I N D E X (CONTINUED):
2
3         EXHIBITS (CONTINUED):
4  NUMBER      DESCRIPTION      PAGE
5  Exhibit 220  First Amended Complaint    100
6
7  (Include previously marked Exhibit 96)

Page 30

1    (Reporter clarification.)
2  BY MS. CAVE:
3    Q.  -- databases that you reference in paragraph
4  1 of your declaration, correct?
5    A.  Yes.
6    Q.  Okay.  Do you know how many tables were in
7  the ZenCloud database?
8    A.  I haven't committed it to memory.  I mean, I
9  have the database on my computer.  I could look it up
10  if I was at my computer, but I don't recall as I sit
11  here.  I think it was -- this is a very rough guess,
12  but maybe 20.
13    Q.  Okay.
14    A.  20 to 30.  Something like that.
15    Q.  Okay.  And is Marie DB a software that you'd
16  worked with before?  Was this the first time you'd
17  used it?
18    A.  This is the first time I've used that
19  particular piece of software.
20    Q.  And you how did you decide to use the Maria
21  DB software?
22    A.  I believe that was the software that was
23  used to back up the database, so I think that's the
24  database software that was being used to maintain the
25  database, so it was a natural fit to use to

Page 31

1  reconstruct it.
2    Q.  Okay.  When you say that that was the
3  software that was being used to back up the database,
4  who was using -- who are you referring to?
5    A.  Well, I looked at the meta -- some metadata
6  that was available based on the files that were
7  provided, and I could tell that it was a Maria
8  database.  Or at least it appeared to me to be a
9  Maria DB database, so that's what I -- I found that
10  software.  It was available open source, so I
11  downloaded it and used it to reconstruct the data.
12    Q.  Okay.  Do you know if that metadata was
13  metadata that was created during the time that the
14  companies were operating or is it some metadata that
15  arose afterwards?
16    A.  I'm not certain.
17    Q.  Okay.  From the metadata that you looked at,
18  does it give you any indication of who was the person
19  who started using the Maria DB software on the
20  database?
21    A.  I don't recall.  I didn't look for that, so
22  I'm not certain.
23    Q.  Since this was the first time you were using
24  the Maria DB software, is there anything you did to
25  familiarize yourself with the way it works?

Page 32

1    A.  Yes.  There's a website for the open source
2  group that publishes it, and they have some
3  tutorials, you know, on how to reconstruct the
4  database, for example, and I remembered looking at
5  some of those.
6    Q.  Okay.  When you say "reconstruct," what does
7  the process of reconstructing the data do?
8    A.  Well, it's a backup as I understand it of a
9  database.
10    Q.  Okay.
11    A.  And so what I'm doing is taking that backup
12  file and restoring the database to the state it was
13  when it was backed up.
14    Q.  Do you know when the backup occurred?
15    A.  I don't off hand.  I mean, I may be able to
16  tell based on some of the records in the database,
17  but I don't have that committed to memory.
18    Q.  Okay.  Yeah.  Going back to your declaration
19  for a moment, you refer to the two databases.  Are
20  there any other documents or evidence that you relied
21  on to prepare the declaration that you submitted?
22    A.  I think I probably saw the complaint, so I
23  had sort of an understanding of what the allegations
24  were.  I don't recall reviewing any other documents
25  as I sit here.

Page 33

1    Q.  Okay.  Did you review any deposition
2  transcripts from the case?
3    A.  No, I don't believe so.
4    Q.  What about the documents that the parties
5  have produced in this case, did you review any of
6  those?
7    A.  I don't recall doing so.
8    Q.  Okay.  Did you have access to that, the
9  parties' document productions?
10    A.  What do you mean by "access"?
11    Q.  Were you given access to a database that had
12  the parties' production in it?
13    A.  No.
14    Q.  Did you ask for that?
15    A.  No.
16    Q.  Why not?
17    A.  I don't think it was -- I didn't think it
18  was necessary for what I was asked to do for this
19  declaration which was fairly limited in scope.
20    Q.  And when you say "limited in scope," you
21  mean just to calculate damages?
22    A.  Well, I wasn't asked for purposes of this
23  declaration to calculate damages.  I was asked to
24  analyze these databases and determine whether
25  transactions could be associated with users and

Page 34

1   provide some statistics regarding the number of users
2   with transactions.
3       Q.  Okay.  How did you go about determining
4   whether transactions could be associated with users?
5       A.  I examined the databases.  I looked at the
6   structure of the databases, came to understand
7   something about how the keys in the databases work,
8   which are ways that tables are linked together.  And
9   it became apparent that you could in fact look at
10  transaction tables and associate specific data
11  entries to specific users.
12      Q.  So why is it relevant to -- strike that.
13          In terms of associating specific data
14  entries to specific users, how does that tie to
15  calculating damages in this case?
16      A.  Well, as I understand it, one of the
17  measures of damages in this case would be the value
18  that -- the value of the consideration paid less the
19  value received.  And so these transactions are a way
20  of getting at understanding what has been paid and
21  what has been received.
22      Q.  So you said that that was one of the
23  measures of damages in this case.  Is that one of the
24  measures that you came up with or is that a measure
25  that someone else told you to use?

Page 35

1       A.  Well, it's an understanding of the law, so
2   it's a legal issue as far as I'm concerned.  So it's
3   an understanding that I was asked to take based on
4   the remedies that are available for the causes of
5   action at issue in this case.
6       Q.  Okay.  And you said again that's one of the
7   measures of damages.  Is there another measure of
8   damages you're planning to use?
9       A.  Well, as I understand it, there are --
10  depending on the cause of action, there may be
11  different terms for the measure of damages that are
12  applicable, like out-of-pocket, for example, versus
13  recessionary damages.  But from a practical
14  standpoint I don't know that there will be any
15  meaningful difference between the way damages are
16  computed.  But again, I haven't actually done the
17  computation yet, so I can't be certain as I sit here.
18      Q.  Do you assume that each user represents a
19  unique customer?
20      A.  I haven't assumed that thus far, no.
21      Q.  Okay.  Does -- would -- does it impact the
22  measure of damages whether each user represents an
23  individual customer?
24      A.  I'm not certain without actually doing the
25  analysis, but I don't know that it necessarily would.

Page 36

1       Q.  Why would it not?
2       A.  Well, if damages were computed at the user
3   level, the user ID level, for example, and a
4   particular user had -- or particular customer had two
5   user IDs, it may be possible to calculate damages for
6   each of the user IDs and then simply combine them to
7   get the damages for the user or for the customer.
8   But again, I haven't done the analysis, so I'm not
9   certain on that.
10      Q.  Okay.  And that's an analysis that you won't
11  do anything until somebody asks you?
12      A.  Right, I won't do, that's true.
13      Q.  You mentioned a moment ago out-of-pocket
14  versus recessionary damages.  What's the difference
15  between out-of-pocket damages and recessionary
16  damages?
17      A.  Well, I think in this case there might not
18  be much of a difference.  But again, I haven't done
19  the analysis, so I'm not certain.
20      Q.  Okay.  Just at a sort of general level --
21  generic level, what's the difference between
22  out-of-pocket and recessionary damages?
23      A.  Well, these are legal concepts, so I'm
24  not -- and I'm not an expert in the law.  I can give
25  you my understanding --

Page 37

1       Q.  Sure.  That's fine.
2       A.  -- but I'm not offering opinions about the
3   law.
4           So out-of-pocket, as I understand it, would
5   be the difference between the value paid and the
6   value received.  And recessionary damages, as I
7   understand it, would be basically an attempt to
8   compensate as though the transaction was rescinded.
9       Q.  Okay.  Why might there not be any difference
10  between those -- with the understanding that you
11  haven't done the analysis, yet why might there not be
12  any difference between out-of-pocket and recessionary
13  damages in this case?
14      A.  Well, when I think about those two damages
15  concepts in a case like this, they seem like they
16  would be, if not identical, at least very close
17  because they're both getting at the consideration
18  paid versus the value received.
19      Q.  Do you assume for purposes of calculating
20  damages in this case that the databases that you
21  looked at include all the transactions that took
22  place in the Cryptocurrency products that are at
23  issue here?
24      A.  I haven't made that assumption thus far, but
25  at some point I may have to make that assumption to

Page 38

1   actually calculate damages.
2       Q.  Do you need to take steps to verify whether
3   that's true or -- in order to do your damages
4   calculation?
5       A.  I would expect to have additional
6   conversations with people that are knowledgeable
7   about the database, so I think that's about as far as
8   I can go given what I've done thus far.
9       Q.  Okay.  And the people knowledgeable about
10  the database would be who?
11      A.  I spoke with Evan Lucas.  I might speak with
12  him again.
13      Q.  And Evan Lucas is who?
14      A.  As I understand it, he's a former employee.
15      Q.  Okay.  When did you speak with Evan Lucas?
16      A.  I don't recall the date.  I think it was
17  probably in September of this year.
18      Q.  And what did he tell you about the
19  databases?
20          Sorry.  Let me just clarify.  Did you speak
21  to him about ZenCloud or Paybase or both?
22      A.  I think both, but we primarily talked about
23  ZenCloud --
24      Q.  Okay.
25      A.  -- on that call.

Page 39

1       Q.  And so it just -- this was a phone call?
2       A.  It was.
3       Q.  Okay.  And how long did the phone call last?
4       A.  Approximately an hour.
5       Q.  Okay.
6       A.  It was also -- counsel was also on the call.
7       Q.  And what did Evan Lucas tell you about the
8   databases?
9       A.  I don't recall with -- as I sit here what he
10  told me.  I mean, we had conversations about various
11  tables in the database and various fields within
12  those tables.  I took some notes, but I don't have
13  that committed to memory.
14      Q.  Okay.  Do you still have your notes of that
15  conversation?
16      A.  I suspect so, yes.
17      Q.  Okay.  Did you ask Evan Lucas whether he was
18  aware if there are any other versions of the
19  databases?
20      A.  I don't know that I asked that question.
21      Q.  Did he say that?
22      A.  Yes.
23      Q.  He -- so he said that there are other forms
24  of the databases?
25      A.  He told me, if memory serves me correctly,

Page 40

1   that initially a different database software had been
2   used by GAW Miners and that that database was moved
3   over to the current database.
4       Q.  What was the prior version of the software
5   that was used?
6       A.  He didn't tell me, but my understanding is
7   that it's Mongo DB.
8       Q.  Okay.  And when the move happened from the
9   Mongo DB to the current form of the database, were
10  all of the trans -- was all of the transactional
11  information moved over to the new database?
12      A.  I can't be certain.  I mean, I don't know.
13      Q.  Did Evan Lucas tell you that that occurred?
14      A.  I don't recall him saying those words.  My
15  understanding is that a copy of that older database,
16  the Mongo database, has been produced.  I haven't
17  looked at it yet, but my understanding is that is
18  available, so it's something I can perhaps look into.
19      Q.  Do you plan to do that?
20      A.  If asked I will.
21      Q.  It's not important -- on your own it's not
22  important to check whether there's any differences
23  between the earlier version and later version of the
24  database?
25      A.  I think I would like to try do that assuming

Page 41

1   that I can.
2       Q.  Okay.  And why might you not be able to?
3       A.  I haven't tried, so I'm not certain.
4       Q.  Are you aware whether there -- how many
5   versions of the Mongo DB database are there?
6       A.  I'm not sure what that means.
7       Q.  Okay.  Well, you said that Evan Lucas
8   referred to the fact there was a Mongo DB that
9   was database that was the earlier version, right?
10      A.  No, that's not that I said.
11      Q.  Okay.
12      A.  He didn't tell me it was the Mongo DB.  I
13  testified to that.  My understanding it was Mongo DB
14  but he did not tell me that.
15      Q.  Do you know whether the earlier version of
16  the database, do you know whether there is more than
17  one version of that database?
18      A.  So it's not clear to me what do you mean by
19  "more than one version."  So that can mean different
20  things.  So I'm not sure exactly what you're asking.
21      Q.  Are there different copies -- different
22  nonidentical copies of the earlier database that you
23  discussed with Evan Lucas?
24      A.  Well, I didn't discuss copies of the
25  database with Evan Lucas, so I'm not sure that's what

Page 42

1  you're asking, but from the question it could be
2  interpreted that way.
3      Q.  I'll rephrase the question.
4      The version of the databases that existed
5  prior to the Maria DB format, are there different
6  versions of that database?
7      A.  So I'm not entirely sure what you mean by
8  "versions."
9      Let me see if I can help.  So you could have
10 a database that has an upgrade to a new version of
11 the database, and now that -- you know, like you
12 update your Excel or something to a new version of
13 Excel.  That doesn't change the underlying data.
14 It's just a new version of Excel.  So I'm not sure --
15     Q.  Okay.
16     A.  -- if that's what you're seeking or
17 something else.
18     Q.  No.  What I'm trying to get at is whether
19 there -- substantive differences -- setting aside the
20 software version, are there substantive differences
21 between the earlier database that might have
22 different sets of transactional data in it?
23     A.  I would expect so, yes, because the earlier
24 database, as I understand it, was -- they stopped
25 using it at a point in time, and then they moved to a

Page 43

1  new database.  And so that new database should have
2  more transactions than the first database.
3      Q.  When did they stop using -- what point in
4  time did they stop using the database and move to a
5  new database?
6      A.  I don't recall.  I may have -- he may
7  have -- Evan may have told me that, but I don't know
8  if he did.
9      Q.  The Maria DB version of the database that
10 you've been using, do you know when that was created?
11     A.  I don't remember the date that I created it,
12 but it was spring, early summer, something like of
13 that, this year.
14     Q.  Of this year?
15     A.  Yeah.
16     Q.  But the underlying -- before you touched it,
17 what was the date of the backup on the underlying
18 data?
19     A.  I don't know.  It may be possible to
20 determine that, but I don't know as I sit here.
21     Q.  Would that be in the metadata that you have?
22     A.  I'm not certain.  It's possible.  In fact, I
23 think it's likely, but I'm not certain.
24     Q.  Okay.  It's not something you've checked?
25     A.  No.

Page 44

1      Q.  Is that relevant to you, the date of the
2  data that's in the database you're relying on?
3      A.  Hasn't been relevant thus far, but it may
4  become relevant at some point.
5      Q.  Why is it not relevant?
6      A.  Because I was asked to analyze these two
7  databases and determine certain information from
8  them, and I've done that.  So it wasn't relevant to
9  what I've been asked to do thus far.
10     Q.  Well, but if you -- if your -- if damages
11 need to be calculated on a class-wide basis, isn't
12 it -- would it be important to have what is the
13 complete and final set of transactional data?
14     A.  I think that would be ideal, yes.
15     Q.  Okay.  So are you going to undertake to find
16 out whether what you have is the complete and final
17 set of transactional data?
18     A.  I would expect to try to determine, to the
19 extent that I can, whether this is the most complete
20 data available.
21     Q.  But so far the two databases that you've
22 looked at, you haven't undertaken to confirm whether
23 those are the complete and final versions of the
24 transactional data?
25     A.  Well, I mean, that's not something that I

Page 45

1  can confirm independently.  I can't look at a
2  database and independently confirm that this is the
3  most recent version of the database, so that's just
4  not something that's possible to do.
5      Q.  Why not?
6      A.  Well, somebody doesn't type into the
7  database "this is the final and complete version of
8  the database and we'll never alter it from here."
9      Q.  Okay.
10     A.  That's just not the way a database works.
11     Q.  Right.
12     A.  So I can look at a snapshot of the database,
13 and that's what I have, but it's virtually impossible
14 for me to look at the database and say that this is
15 the latest snapshot that's ever been taken of the
16 database.  That's not something you can do.
17     Q.  But for purposes of calculating all of the
18 consideration that was paid less the value that the
19 members of the processed class received, would you
20 need to know the final date of any transaction that
21 occurred?
22     A.  That would be ideal, yes.
23     Q.  Can you calculate damages on a class-wide
24 basis if you don't have that?
25     A.  Possibly, yes.  I mean, there might be a

Page 50

1  Which columns in the user tables are the
2  columns that you need for purposes of any damages
3  analysis you would do in this case?
4  MR. WATTERSON:  Object to the form.
5  THE WITNESS:  I haven't determined that at
6  this point.  I haven't done the analysis, so I
7  haven't determined that.
8  BY MS. CAVE:
9  Q.  Okay.
10  A.  But I can say that the ID column, which is
11  column 1 --
12  Q.  Uh-huh.
13  A.  -- is an ID that's unique and ties to a user
14  name.
15  Q.  Okay.
16  A.  And that ID can also be used in the
17  transaction table, for example, to link transactions
18  to a user.  So I have analyzed that, but I have not
19  analyzed damages at this point or calculated damages,
20  so I'm not certain precisely which columns I'll use.
21  Q.  Okay.  What's the difference between -- so
22  the far left column is "id," and the column just to
23  the right of it is "_id."  Do you know what the
24  difference is between those two?
25  A.  Not with certainty.  The "_id" looks to me

Page 51

1  like it could be a hash of the ID, and it might be
2  used internally by the database to link records, but
3  I'm not certain.
4  Q.  Okay.  If you turn to the next page, page 2
5  of Exhibit 214, the third column from the left is
6  called "salt."  Do you know what "salt" refers to?
7  A.  I don't know what this specifically means in
8  this table, but my understanding is that that would
9  typically be used in connection with a hashing
10  algorithm to hash something like a password.
11  Q.  Okay.  And the column just to the right of
12  that is "gravatarHash."  What does that refer to?
13  A.  I'm not certain.
14  Q.  And if you turn to the third page of
15  Exhibit 214, the third column in from the right is
16  "balance."  Do you know what that refers to?
17  A.  Not as I sit here without looking back at
18  some of the other tables to see how that might be
19  linked.
20  Q.  Okay.  And what about "balanceXPY"?
21  A.  I don't specifically know.  I mean, XPY, as
22  I understand it, is a symbol for PayCoin.
23  Q.  Okay.  You mentioned a moment ago linking
24  the user's table to the transaction table.  Is that
25  something you've done so far in your analysis?

Page 52

1  A.  I've demonstrated to myself that that is
2  possible and expressed that in the declaration.
3  Q.  Okay.
4  A.  I haven't linked every single transaction to
5  every user and done an analysis like that, but I have
6  demonstrated for myself that it's possible to do
7  that.
8  Q.  Okay.  And how many users did you do that
9  analysis for?
10  A.  Well, I've counted the number of
11  transactions for each user by linking the
12  transactions from the transaction table to the user
13  table, but I haven't, you know, prepared some
14  spreadsheet that shows all those transactions.
15  Q.  Okay.  And does the transactions table show
16  all of the transactions that occurred for any
17  particular user -- let me rephrase that.
18  Does the transactions table show all of the
19  transactions that you need to look at for purposes of
20  calculating damages in this case for any particular
21  user?
22  A.  I'm not certain at this point.  I suspect
23  not, but I'm not certain.
24  Q.  So there may be other tables that you need
25  to look at in order to make that calculation?

Page 53

1  A.  There may well be, yeah.  There are other
2  tables in the database that appear to be
3  transactional data.
4  Q.  Okay.  So how will you determine which other
5  tables you need to look at?
6  A.  I have to link through various transactions
7  and associate transactions from various tables with
8  users and understand what those transactions entail.
9  Q.  Okay.  But you haven't done that yet?
10  A.  I have not.  At this point I've demonstrated
11  to myself that the transactions can be linked to
12  users.
13  Q.  The transactions in the transactions table
14  can be linked to users?
15  A.  Yes.  And there are other tables that can
16  also be linked to users, but the transactional data
17  tables certainly can.
18  Q.  Which other tables can be linked to users?
19  A.  I don't recall offhand all the tables that
20  have a user ID column, but if they have a user ID
21  column, that would key off of the user number in the
22  user table.
23  Q.  Okay.  But if there's a table that doesn't
24  have user IDs in it, is there any way to link it to
25  the user's table?

Page 54

1    A.  I don't know.  It depends on the table and
2 type of record.  So you might be able to link it
3 through a device, for example, and device ID which
4 then might be able to be linked to a user.  I haven't
5 done that, so I can't sit here, you know, and testify
6 under oath that that is possible, but I think that's
7 conceivably possible.
8    Q.  Okay.  But you don't know -- you haven't
9 done that, so you don't know for sure?
10    A.  That's right.  I haven't done the analysis,
11 the damages calculation yet, so I'm not certain.
12    Q.  If you can't do that, would you still be
13 able to perform a damages calculation?
14       MR. WATTERSON:  Object to the form.
15       THE WITNESS:  I guess I'm not sure what you
16 mean by if I can't do that.  What is the "that"?
17 BY MS. CAVE:
18    Q.  If you're unable to link all of the
19 transactions to users to the corresponding users,
20 will you be able to perform a damages calculation in
21 this case?
22    A.  I think that depends on what I'm not able to
23 link, assuming I wasn't able to link something.  So
24 I'm not certain how to answer that in the abstract.
25       MS. CAVE:  Okay.  I'll show you what we'll

Page 55

1 mark as Exhibit 215.
2       (Exhibit 215 Printout of ZenCloud
3       database table held_withdrawals for
4       user ID 14201, marked for
5       identification as of this date.)
6 BY MS. CAVE:
7    Q.  I'll represent to you that Exhibit 215 is a
8 printout of the ZenCloud database table
9 held_withdrawals for user ID 14201.  Okay?
10    A.  Okay.
11    Q.  Do you recognize that?
12    A.  I haven't committed all the columns to
13 memory because there are a lot of tables, but I do
14 remember there being a table that had a name of held
15 withdrawals or something very similar.
16    Q.  Do you know what held withdrawals are?
17    A.  I don't recall with certainty.  I think I
18 discussed this table with Mr. Lucas, but I don't
19 recall with certainty as I sit here.
20    Q.  Did Mr. Lucas tell you anything about the
21 held withdrawals table?
22    A.  I think we discussed it, but I don't recall
23 as I sit here what he told me.
24    Q.  Is this a table that you need to look to for
25 any damages calculation you do in this case?

Page 56

1       MR. WATTERSON:  Object to the form.
2       THE WITNESS:  I'm not certain as I sit here
3 given that I haven't done the calculation yet.
4 BY MS. CAVE:
5    Q.  Okay.  You can set that to the side.  Thank
6 you, Mr. Mills.
7       In paragraph 2 of your declaration you say
8 that the user table in the ZenCloud contains 277,323
9 user IDs.
10       How did you tabulate that number?
11    A.  A couple of ways.  I think one I did a query
12 on the database as a first step to understand how
13 many different user IDs are in that table.  And the
14 user ID is a unique -- a unique field within the
15 table --
16    Q.  Okay.
17    A.  -- the way it's constructed.  So that was
18 one way I looked at it.  Another way was I did
19 ultimately extract that data from that table into a
20 what's called a CSV file and then loaded that into
21 Excel and looked at it in Excel as well.
22    Q.  When you say that the user ID is a unique
23 field within the table, what do you mean by that?
24    A.  Meaning that each record should have a
25 unique user ID, so each row in the database should be

Page 57

1 a unique ID.
2    Q.  Okay.  And the 277,323 user IDs, are
3 those -- is that a deduplicated number or is that a
4 gross number?
5    A.  That's a number of user IDs.  So that's --
6 there's no -- given that they're unique, there's no
7 deduplication to occur.  It's just the number of
8 user IDs that are in the user table.
9    Q.  Okay.  But a customer of GAW Miners and
10 ZenMiner might have more than one user ID, right?
11    A.  I guess it's conceivable, yes, but I mean,
12 I'm not certain.
13    Q.  Do you know whether that occurred?
14    A.  No, not off hand.
15    Q.  In paragraph 3 of your declaration -- so you
16 can -- yeah, paragraph 3 of your declaration, you say
17 that the ZenCloud database includes a table of
18 transactions containing over 35 million entries.
19       How did you arrive at that number, 35
20 million?
21    A.  I did a query on the database to determine
22 how many records were in that table.  I also have
23 extracted that table from the database and looked at
24 it in what's called a Power Pivot in Excel.
25    Q.  So you've cut and pasted the data and put it

Page 66

1 transactions starting with "fund." Do you know what
2 each of those are or would you need to do further
3 analysis to determine what those mean with respect to
4 a particular user?
5 A. To see what's actually being transacted, I
6 think I might have to look beyond the table, but I'm
7 not certain as I sit here.
8 Q. What beyond the table, would you need to
9 look?
10 A. Well, I'd look at other tables in the
11 database to see how they link together. That may or
12 may not be necessary for purposes of calculating
13 damages, I don't know, because I haven't done that
14 yet.
15 Q. Okay. All right. In paragraph 7 you say
16 that you anticipate calculating class-wide damages
17 for the plaintiffs in this case based on a uniform
18 methodology.
19 What methodology are you planning to use?
20 A. I'm planning to look at the value of the
21 consideration paid for the products at issue and
22 compare that to the value received and use that as a
23 measure of damages.
24 Q. Do you plan to use any other methods?
25 MR. WATTERSON: Object to the form.

Page 67

1 THE WITNESS: If I'm asked I may look at it
2 from other perspectives, but as I sit here I'm not
3 certain that I will be.
4 BY MS. CAVE:
5 Q. And what is the source of information that
6 you plan to use to -- for purposes of calculating the
7 value of the consideration paid?
8 A. Well, I would expect to use the
9 transactional database and various records with -- or
10 various tables within the databases that I've
11 analyzed to determine purchases and other outlays of
12 cash.
13 Q. Do you anticipate using any -- needing --
14 strike that.
15 Do you anticipate using any information
16 outside of the databases to calculate the value of
17 the consideration paid?
18 MR. WATTERSON: Object to the form.
19 THE WITNESS: It's possible I may use other
20 information, but nothing comes to mind as I sit here.
21 BY MS. CAVE:
22 Q. Okay.
23 A. I think the purpose of these databases is to
24 show -- to record the transactions of users, so this
25 is the data I would expect to use.

Page 68

1 Q. Okay. So again, that assumes that all the
2 transactions are in the database?
3 MR. WATTERSON: Object to the form.
4 THE WITNESS: Well, I don't know that it
5 assumes that. I mean, in order for me to analyze the
6 transaction it will have to be in some database, but
7 that's all I can say, I think.
8 BY MS. CAVE:
9 Q. How do you anticipate calculating the value
10 received?
11 A. One way in which I think that can be
12 accomplished is to understand how much was -- the
13 value of what was withdrawn from the user accounts.
14 So the value that was received would be the value
15 that was actually taken out of the accounts by the
16 users.
17 Q. In your prior experience calculating
18 damages, have you ever employed this methodology
19 before?
20 A. Yes, at a high level. I mean, you know, the
21 specifics of every case are different, but at a high
22 level I have looked at out-of-pocket damages and
23 similar forms of damages that look at the value paid
24 versus the value received.
25 Q. Are you aware that there are some users --

Page 69

1 some customers of GAW Miners and Zenminers who
2 engaged in private purchases of Cryptocurrency
3 products?
4 MR. WATTERSON: Object to the form.
5 THE WITNESS: By "Cryptocurrency products,"
6 do you mean Cryptocurrencies or you mean something
7 else?
8 BY MS. CAVE:
9 Q. I mean the products that were offered by GAW
10 Miners and Zenminers, that there are some
11 customers -- some of the proposed members of the
12 class who purchased those products in private sales.
13 A. Well, my understanding based on the
14 databases that -- and speaking with Mr. Lucas is that
15 there were -- there was some ability for buying and
16 selling certain products, and I think we have some
17 transactional data concerning sales like that.
18 Q. So the databases record all of the private
19 sales?
20 A. Well, I can't attest to that.
21 Q. Okay. So there may be private sales that
22 are not recorded in the databases that you have?
23 A. That seems like a theoretical possibility.
24 I mean, I can't attest to what -- that the database
25 includes every single transaction. I mean, there are

Page 70

1  millions and millions of transactions, so I can't
2  attest to that.  I have to -- I mean, I'm accepting
3  the database and relying on it, at least for purposes
4  of the declaration and -- but I can't say that it
5  captures every single transaction that's ever
6  occurred.
7       Q.  Are the gains or losses on those private
8  sales something that the plaintiffs are claiming
9  here?
10       Let me rephrase that.
11       Are any losses that the plaintiffs may have
12  sustained on a private sale something that will be
13  included in your damages calculation here?
14       MR. WATTERSON:  Object to the form.
15       THE WITNESS:  Well, what I'm envisioning is
16  a damages calculation that looks at the consideration
17  paid and compares that to the value received, and so
18  if a transaction results in value received that's
19  ultimately withdrawn from the account, then I think
20  it would be relevant to that calculation.
21  BY MS. CAVE:
22       Q.  And how do you anticipate getting the
23  information about those private sales?
24       A.  Well, I suspect the database contains those
25  records.

Page 71

1       Q.  The database contains the records of the
2  private sales?
3       A.  Well, it does contain sales data.  As I
4  said, I can't attest that it includes every
5  transaction.  That would be -- I don't think anybody
6  could attest to that.  But my understanding is it
7  does contain information about private sales, and you
8  know, we have information about transactions that
9  occur within customer accounts, and so I would expect
10  to be able to identify that.
11       Q.  Which transactions are in -- let me rephrase
12  that.
13       What's the difference between the
14  transactions that are recorded in the ZenCloud
15  database and the transactions that are recorded in
16  the Paybase database?
17       A.  My recollection is that looking -- in
18  looking at the Paybase database it appeared to be
19  transactions related to PayCoin.
20       Q.  Uh-huh.
21       A.  And the ZenCloud database appeared to be
22  transactions related to Hashlets, Hashpoints, and
23  perhaps Hashstakers.
24       Q.  Okay.  So they're -- your understanding is
25  that they're mutually exclusive as far as the types

Page 72

1  of products that were -- the transactions and the
2  types of products that were recorded in each?
3       MR. WATTERSON:  Object to the form.
4       THE WITNESS:  And I'd have to look at every
5  table to be certain that they're mutually exclusive.
6  But my recollection is that the transaction table
7  that -- within the Paybase database appeared to be
8  capturing different information.
9       MS. CAVE:  Just give us a moment.
10  We'll mark Exhibit 216.
11       (Exhibit 216 Memorandum of Law in
12       Support of Plaintiffs' Motion for
13       Class Certification, marked for
14       identification as of this date.)
15       THE WITNESS:  Thank you.
16  BY MS. CAVE:
17       Q.  So Exhibit 216 is the plaintiffs' memorandum
18  of law in support of their motion for class
19  certification in this case.
20       Is this something that you've reviewed
21  before?
22       A.  Yes.
23       Q.  Okay.  Did you review it before it was filed
24  or after it was filed?
25       A.  I don't recall reviewing it before, so I

Page 73

1  think it was after.
2       Q.  Okay.  If I could turn your attention to
3  page 32.  Okay.  And the second full paragraph says
4  (reading):
5            "Plaintiffs plan to calculate the
6            class's out-of-pocket damages, i.e.,
7            the difference between the purchase
8            price and what the investor actually
9            received."
10       That's the same damages methodology that you
11  described a few minutes ago?
12       A.  Yeah, I think that's a fair
13  characterization.
14       Q.  Okay.  After the citation there it says
15  (reading):
16            "The calculation will be based on
17            the price investors paid for the
18            applicable securities, plus various
19            service fees the companies charged,
20            less any payouts or other value the
21            investor received from the
22            securities."
23       What is the source of the information you'll
24  use to calculate the service fees component of that
25  calculation?

Page 74

1    A.  The transaction table, for example, in the
2 ZenCloud database has service fee entries.
3    Q.  Okay.  And you also -- you then say "less
4 any payouts or other value."
5       How do you -- what source of information
6 will you use to calculate the other value component
7 of that calculation?
8       MR. WATTERSON:  Object to the form.
9       THE WITNESS:  To be clear, I didn't say
10 this.  I mean, these are not my words.
11 BY MS. CAVE:
12    Q.  Okay.
13    A.  This is, I think, counsel's words I suspect,
14 but so let me look at this.
15    Q.  Sure.
16    A.  Well, I mean, what I would envision is
17 looking at what customers have actually taken out of
18 their accounts.  So the value that they've received
19 and actually taken out of their accounts.
20    Q.  Okay.  Are there any other amounts that you
21 would take into account to determine whether a
22 customer got other value for their securities?
23       MR. WATTERSON:  Object to the form.
24       THE WITNESS:  It's possible I may have to
25 look at the value of PayCoin, for example, on

Page 75

1 specific dates if PayCoin were taken out of the
2 accounts.
3 BY MS. CAVE:
4    Q.  Okay.
5    A.  That's one example.
6    Q.  What if a customer recovered value from
7 another source?  Would you need to take that into
8 account?
9       MR. WATTERSON:  Object to the form.
10       THE WITNESS:  I'm not certain, you know,
11 what other source you have in mind that's -- so I'm
12 not certain.
13 BY MS. CAVE:
14    Q.  Okay.  I'll show you an example in a little
15 bit.
16       Okay.  You can set that to the side,
17 Mr. Mills.  Thank you.
18       Turning back to your declaration if, you
19 could look at paragraph 8, please.
20    A.  Yes.
21    Q.  And you say (reading):
22       "I understand that the user name
23       of named plaintiff Allen Shinners was
24       Allen1980s."
25       How did you gain that understanding?

Page 76

1    A.  From counsel.
2    Q.  What analysis have you done with respect to
3 Mr. Shinners' user ID?
4    A.  I linked his user ID to the transactions
5 table to determine the number of completed
6 transactions.  I've also linked his email address to
7 another table that includes orders.
8    Q.  And what are orders?
9    A.  I don't recall as I sit here, but my
10 recollection is that they would be perhaps purchases
11 made online.
12    Q.  Okay.  And by "online," what do you mean?
13    A.  Through a website.
14    Q.  Is that through the GAW Miners website or a
15 different website?
16    A.  Well, I don't know what the URL is, but I
17 think it's the company's website.
18    Q.  Do you know whether Mr. Shinners had any
19 transactions that he executed not through the website
20 maintained by the companies?
21    A.  I'm sorry.  Can you say it again?
22    Q.  Yeah.
23    A.  Thanks.
24    Q.  Do you know if Mr. Shinners made any
25 purchases through a third-party website?

Page 77

1    A.  Purchases of what?
2    Q.  The GAW Miners or ZenMiner Cryptocurrency
3 products.
4    A.  So like Hashlets, for example?
5    Q.  Right.
6    A.  I'm not certain.
7    Q.  Have you spoken to Mr. Shinners?
8    A.  I have not.
9    Q.  Have you corresponded with him?
10    A.  No.
11    Q.  You say in paragraph 8 that he had --
12 Mr. Shinners had purchases of approximately 36
13 Bitcoins worth products.
14       How did you calculate that total of
15 purchases?
16    A.  So I associated the transactions to his
17 user ID.  I filtered that to capture only completed
18 transactions, and then I filtered that to include
19 only transaction type equal to purchases, and then I
20 summed the number of Bitcoins that are reflected in
21 the Bitcoin amount column.
22    Q.  Okay.  So the total -- the 36 Bitcoins worth
23 of products here is just a summation of the Bitcoin
24 column in the database?
25    A.  Well, no, because that would include not

Page 78

1   just his purchases but purchases of others as well,
2   so it has to be filtered and so that we're only
3   looking at completed transactions that are purchases
4   that are associated with his user ID.
5       Q.  Correct.  I'm sorry.  I meant specific to
6   him.
7           In other words, the 36 Bitcoins is not some
8   conversion -- currency conversion that you've
9   calculated.  It's just purely a summation of the
10  Bitcoin column from the table for the transactions
11  specific to Mr. Shinners?
12      A.  That's correct.
13      Q.  Okay.  Were there any transactions that you
14  excluded from the 1,000 -- from the -- sorry.
15          In your analysis, were there any
16  transactions that you excluded?
17      A.  In my analysis of arriving at the 1,388
18  figure?
19      Q.  Correct.
20      A.  Well, it's -- yes, because I'm only
21  including completed transactions that are
22  transaction-type purchases, so I'm excluding anything
23  that doesn't meet those criteria.
24      Q.  Okay.  So any free Hashlets that he might
25  have gotten, for example, did you exclude those from

Page 79

1   your analysis?
2       A.  Well, if they were free, they wouldn't
3   presumably have a Bitcoin amount in the Bitcoin
4   column, so I think they would be excluded.
5       Q.  Did you in fact exclude those from your
6   analysis?
7       A.  Well, I've only included purchases, so
8   anything outside of purchases is excluded from this
9   particular computation.  I'm reporting a value here
10  for a very specific type of transaction, a completed
11  transaction that involves a purchase.
12      Q.  Okay.  Does this total include transactions
13  that Mr. Shinners has engaged in with sellers other
14  than GAW Miners?
15      A.  I'm not certain.  I'd have to look at each
16  transaction and try to look at other tables to see
17  how -- what the linkage is.
18      Q.  Okay.  So you have to go through each of
19  Mr. Shinners' transactions to ascertain that?
20      A.  Yes.  I mean, you could either do it by hand
21  or you could run queries that do that, but yes.
22      Q.  Okay.  But for each user you would need to
23  do that either by hand or by running a query?
24      A.  Well, if we're talking about each user, then
25  I wouldn't be doing it by hand because that would

Page 80

1   take longer than we have.
2       Q.  I could imagine.  Life is short.  Okay.
3           Okay.  I'm going to mark Exhibit 217 -- oh,
4   sorry.  It's already marked.
5           Exhibit 96.  Just give us a second.  We'll
6   show you that.
7       A.  Oh, okay.
8       Q.  It was already marked at a prior deposition.
9       A.  Thank you.
10      Q.  Exhibit 96 is the plaintiffs' certifications
11  dated June 15, 2016, and it was previously marked at
12  another deposition as Exhibit 96.
13          I'll draw your attention to Exhibit 3 that
14  starts on page 55 of the printout that you have
15  there.  And if you turn to the next page it reports
16  that it's the sworn verification of Dean Allen
17  Shinners.
18          Do you see that?
19      A.  I do.
20      Q.  Is this a document that you've seen before
21  today?
22      A.  I can't be certain, although I think I may
23  have seen a portion of this yesterday.
24      Q.  Okay.  By the way, back in June 2016 were
25  you engaged already to work on this case?

Page 81

1       A.  I don't recall.  I'd have to look back at
2   the retention letter --
3       Q.  Okay.
4       A.  -- to see when we were retained.
5       Q.  Did you have any role in preparing what
6   starts on the next page as Exhibit A?
7       A.  No.
8       Q.  Okay.  So to save time we've already added
9   up here, and I'll represent to you that there are 212
10  purchases by Mr. Shinners shown on this table and 61
11  sales.  So 212 purchases and 61 sales.
12          Do you have any information to suggest that
13  Mr. Shinners engaged in any other purchases or sales
14  that are not listed here?
15      A.  I've never tried to compare this to the
16  database, so I don't know.
17      Q.  Okay.  So you never looked at this along
18  side the information that you analyzed with respect
19  to Mr. Shinners?
20      A.  I have not done that, no.
21      Q.  Okay.
22      A.  No.  The analyzed -- the analysis I've done
23  for Mr. Shinners is just what I've recorded in the
24  declaration.
25      Q.  Okay.  Is that something that you plan to do

Page 86

1    A.  Yes.
2    Q.  And so that number that he has, 30 Bitcoins,
3  is different than the number that's in your
4  paragraph 8 of your declaration, which is 36
5  Bitcoins, correct?
6    A.  Well, 30 is not 36, that's correct.
7    Q.  Okay.
8    A.  But I don't know that these are necessarily
9  trying to measure the same thing.
10    Q.  Okay.  What do you mean by that?
11    A.  Well, he's referring to a portion of his
12  investment not being recoverable, and I'm referring
13  to purchases -- completed purchases in a transaction
14  table.  So I'm not sure that those line up -- those
15  are the same thing.
16    Q.  Okay.  If assuming Mr. Shinners is correct
17  here that he recovered some of his losses through the
18  credit card chargeback process, is that something
19  that you would include in the value received
20  component of the damages methodology that you spoke
21  about with respect to paragraph 7 of your
22  declaration?
23    A.  I think I'd have to have a conversation with
24  counsel about that to understand, from a legal
25  standpoint, what that means for damages.  It may be

Page 87

1  something I'd want to something.  I mean, it's
2  something I'd want to consider, but it may be
3  something I'd have to actually utilize in my
4  analysis, but I'd want to speak with counsel about
5  that and understand the legal aspects of it.
6    Q.  Okay.  But if Mr. Shinners got money back
7  through the credit card chargeback process, that's
8  value received, correct?
9      MR. WATTERSON:  Object to the form.
10      THE WITNESS:  It may well be, but I'd want
11  to know, you know, more, whether that's an offset
12  that's legitimate under the law and whether -- I
13  mean, there might be costs associated with that
14  chargeback as well, but...
15  BY MS. CAVE:
16    Q.  He doesn't say that there are any costs
17  associated with the chargeback, though, here, does
18  he?
19    A.  No, he doesn't address -- as far as I can
20  tell in this paragraph anyway, he doesn't address
21  costs at all, but...
22    Q.  And in any event, that's something that
23  you'd have to look into individually?
24    A.  Well, to understand the costs, that may be
25  true, yes.

Page 88

1    Q.  Mr. Shinners says here he -- that he helped
2  many investors recover some of their losses through
3  credit card chargeback.  So in addition to
4  Mr. Shinners, there are other investors that you
5  would need to look at to assess whether this is
6  something you need to take into account in your
7  damages analysis -- methodology, right?
8    A.  Perhaps, yeah.  I'd want to talk to counsel
9  about this and understand the implications.
10    Q.  Okay.  Are there any tables in the databases
11  that you've looked at that reflect recovery through
12  the credit card chargeback process?
13    A.  I don't know.  I haven't looked specifically
14  for that, so I'm not certain.
15    Q.  Okay.  Is there any other information that
16  you've seen in this case that shows you the amounts
17  that investors recovered through the chargeback --
18  credit card chargeback process?
19    A.  No.
20    Q.  Okay.  Is that something that you would want
21  to see?
22    A.  Perhaps I'll have to have a conversation
23  with counsel to understand the ramifications of this
24  from a legal standpoint to see whether it's relevant,
25  but perhaps.

Page 89

1    Q.  Okay.  Okay.  You can set that to the side,
2  Mr. Mills.  Thank you.
3      Are you aware, Mr. Mills, that the SEC has
4  undertaken an analysis of versions of the ZenCloud
5  and Paybase databases?
6    A.  I have heard that's true, yes.
7      MS. CAVE:  Okay.  So I'm going to show you
8  what we'll mark as Exhibit 218.
9      (Exhibit 218 Email from Allen Shinners
10      to Mark E. Munster, March 1, 2016,
11      attaches declaration of Trevor T.
12      Donelan, marked for identification as
13      of this date.)
14  BY MS. CAVE:
15    Q.  And Exhibit 218 is an email from
16  Mr. Shinners to Mark E. Munster dated March 1, 2016
17  and it attaches the declaration of Trevor T. Donelan.
18      Is this anything you've seen before?
19    A.  No.
20    Q.  Okay.  And if you could turn to the --
21  certainly take as much time as you'd like to review
22  it, Mr. Mills, but I'll draw your attention to
23  paragraph 6 in particular.
24    A.  Okay.  I'm at paragraph 6.
25    Q.  Okay.  And so here Mr. Donelan says that

Page 90

1  (reading):
2      "A copy of the database that GAW
3      Miners and Zenminers used to operate
4      the ZenCloud website was produced to
5      the commission."
6      Do you know whether the copy of the ZenCloud
7  database that was produced to the commission is the
8  same as the database that you've been using so far in
9  this case?
10     A.  No, I would have no way of knowing that.
11     Q.  Okay.  Have you seen the copy of the
12  ZenCloud database that the SEC has?
13     A.  I'm not certain.
14     Q.  Okay.  So you don't know whether the one
15  that you have is the same or different from the one
16  that the SEC has?
17     A.  I don't know.
18     Q.  Okay.  If you turn to paragraph 9, please,
19  it says (reading):
20     "The ZenCloud database produced
21     to the commission is very large.  It
22     consists of 29 tables containing
23     approximately 45 million records."
24     And I think your declaration says in
25  paragraph 3 that the ZenCloud database you've

Page 91

1  reviewed has 35 million entries.  So does this
2  suggest to you that what the SEC reviewed and what
3  you reviewed are different?
4      MR. WATTERSON:  Object to the form.
5      THE WITNESS:  No, not necessarily.  When I
6  said 35 million entries, I'm referring to one table
7  in the database, the transactions table, and this
8  doesn't seem to be limited to the transactions table
9  in this declaration.  It doesn't say that anyway.
10  BY MS. CAVE:
11     Q.  Okay.  Above that in paragraph 8
12  Mr. Donelan says (reading):
13     "The ZenCloud database obtained
14     by the commission contains the most
15     reliable and complete data about
16     defendants sales of Hashlets."
17     And then it goes on to list some other
18  categories.
19     Do you see that?
20     A.  Uh-huh, yes.
21     Q.  Okay.  So based on the SEC's --
22  Mr. Donelan's representation here that this -- the
23  ZenCloud database that the SEC has is the most
24  reliable and complete, is that something that
25  you would -- is that ZenCloud database something you

Page 92

1  would want to make sure that you saw for purposes of
2  your damages calculation here?
3      A.  I don't see him to be representing that in
4  this declaration.  He's expressing an understanding,
5  but I don't think he's representing that as far as I
6  can tell.  I mean, I guess we'd have to ask him, but
7  I wouldn't read this to mean that he's representing
8  that this is in fact true.
9      Q.  Well, do you see on the last page 5 of the
10  declaration, he says (reading):
11     "I declare under penalty of
12     perjury that the foregoing is true
13     and correct."
14     A.  Yes, yes.  So he's expressing an
15  understanding, but that doesn't mean that he's
16  attesting to it to be true, right?  I mean, I don't
17  know.  I'd have to ask him, but I wouldn't infer that
18  this is his representation other than it's his
19  representation that it's his understanding.
20     Q.  If there's a more reliable and complete set
21  of -- if there's a more reliable and complete version
22  of the ZenCloud database, would you want to have it
23  for purposes of your damages calculation?
24     A.  Yes, if by "more reliable and more complete"
25  meant that the transactions that I'm expecting to

Page 93

1  analyze would be more reliable and complete, then
2  yes.
3      I mean, now if there were some subsidiary
4  information that wasn't relevant that was more
5  complete, that might not be a concern.  But if there
6  were more reliable and more complete transaction
7  data, then yes, I would want to see those.
8      Q.  Okay.  So are you planning to undertake to
9  see if the version of the ZenCloud database that the
10  SEC has is the same as the one that you have for
11  purposes of your damages calculation?
12     A.  I don't know how I would be able to do that
13  as a private citizen.  So no, I don't have any
14  anticipation of doing that.  I don't know how I could
15  do that.
16     Q.  Well, you're a private citizen who's engaged
17  by counsel for the plaintiffs in this case, right?
18     A.  Yes, but I don't have any standing with the
19  commission to obtain a database from them that's
20  confidential in nature I'm sure.  So I don't know how
21  I would do that.  I mean, perhaps counsel could, but
22  I don't know how I can obtain that database
23  independent of counsel and make that analysis.
24     Q.  Do you plan to ask counsel if they can get
25  the database for you?

Page 94

1    A.  I don't have any plans either way at the
2  moment.
3        MS. CAVE:  Okay.  Okay.  You can set that to
4  the side.
5        Show you what we'll mark as Exhibit 219.
6        (Exhibit 219 Plaintiffs' Motion for
7        Class Certification, marked for
8        identification as of this date.)
9        THE WITNESS:  Thank you.
10  BY MS. CAVE:
11    Q.  Okay.  And Exhibit 219 is the plaintiffs'
12  motion for class certification which contains in the
13  indented paragraph the proposed class definition that
14  the plaintiffs have advanced here.
15        Do you see that?
16    A.  Yes.
17    Q.  Okay.  Did you have any input into the
18  definition of the class that the plaintiffs are
19  proposing here?
20    A.  No direct input.  I mean, I provided a
21  declaration, so I don't know whether that was used as
22  an input or not.  I just -- I don't know, but I
23  didn't offer a suggestion or recommendation about the
24  definition of class.
25    Q.  Okay.  The wording per se isn't anything

Page 95

1  that you specifically commented or critiqued or
2  anything?
3    A.  No.
4    Q.  Okay.  Did you have any -- the proposed date
5  range for the class is August 1, 2014 to December 1,
6  2015.
7        Do you see that?
8    A.  I do.
9    Q.  What is your understanding of the
10  significance of those two dates?  Aside from the fact
11  that they're the beginning and the end of the class,
12  do you know what those dates represent in terms of
13  the facts of this case?
14    A.  My understanding is that August 2014 is
15  about the time period that Hashlets began to be sold.
16  So I'm not certain that that's why August 1, 2014 is
17  the period identified in the class definition, but I
18  happen to have an understanding that that's about
19  when the Hashlets began to be sold.  I'm not certain
20  about December 1, 2015.
21    Q.  Okay.  And so the first sentence of the
22  definition is (reading):
23        "All persons or entities who,
24        between August 1, 2014 and
25        December 1, 2015 purchased or

Page 96

1        acquired Hashlets, Hashpoints,
2        Hashstakers and PayCoin from GAW
3        Miners and Zenminers."
4        Is that your understanding of the persons
5  and the date range and the purchase or acquisition of
6  those products from GAW Miners and Zenminers would be
7  included in the class?
8    A.  I think you read that sentence accurately,
9  so that would be my understanding --
10    Q.  Okay.
11    A.  -- but...
12    Q.  And the next sentence says (reading):
13        "Excluded from the class are any
14        defendants, any parent, subsidiary
15        affiliate, agent, or employee of any
16        defendant any co-conspirator, and any
17        governmental entity."
18        Is it your understanding that those are all
19  the categories that are excluded from the definition
20  of the class, right?
21    A.  I think you read the sentence accurately, so
22  I suspect that's true.
23    Q.  Okay.  So employees are specifically
24  excluded from the class as well, right?
25    A.  It appears that employees of any defendant

Page 97

1  are, yes.
2    Q.  Okay.  So how -- for purposes of your
3  damages -- well, strike that.
4        If this is the definition that's adopted for
5  the class, if the court grants class certification,
6  how will you go about determining for purposes of
7  your damages methodology who was an agent of any
8  defendant, co-conspirator, or governmental entity who
9  needs to be excluded from the class?
10        MR. WATTERSON:  Object to the form.
11        THE WITNESS:  I'm not certain as I sit here.
12  I'd have to speak with counsel to see if he could
13  identify those individuals, but I'm not certain as I
14  sit here.
15  BY MS. CAVE:
16    Q.  Is there any information in the tables in
17  either of the databases who tells you who an agent
18  is?
19    A.  I haven't looked for that, so I'm not
20  certain.
21    Q.  What about employees?  Is there anything
22  that is reflected in the tables that allows you to
23  determine who is an employee and therefore needs to
24  be excluded?
25    A.  Not that I've seen, but I haven't look for

# EXHIBIT A-2

| | |
|---|---|
| **From:** | Jonah Dorman |
| **Sent:** | Friday, March 6, 2015 5:44 PM EST |
| **To:** | Dave McLain; Matthew Eden |
| **Subject:** | Fwd: Specific Information Regarding the Breach |

---------- Forwarded message ----------
From: **Matthew Eden** <mk@btc.com>
Date: Fri, Mar 6, 2015 at 5:41 PM
Subject: Specific Information Regarding the Breach
To: Jonah Dorman <jonah@geniusesatwork.com>, Josh Garza <josh@gaw.com>, Dan Pease
<dpease@btc.com>, Dan Kelley <dan@geniusesatwork.com>, David McLain
<dave@geniusesatwork.com>

Three Accounts on Zencloud with hacked funds:
41.3209 BTC to account niel.bruc201@yandex.com - Authy User Id - 5592762
11.6002 BTC to account jwinzer98@gmail.com  - Authy User Id - 5520045
6.3 BTC to account jmordica@gmail.com - Authy User Id - 2586531 but was most likely
spoofed using Authy User Id - 5451983

One Account used on Paybase with hacked funds:
9.7903 BTC to account shnider2016@yandex.com 3 withdrawals on 2/14, 2/15, 2/18 -
Authy User Id - 5592693

We've also identified a method by which an attacker could have drained multiple customer
wallets without any way for the attack to be identified afterwards.  I will detail below:

1. Attacker registers a new authy account with authy, and retrieves the authy user ID.
2. Attacker modifies the database record for a user account, changing the authyUserId and
   email address for the user.
3. Attacker logs in to the user account using the new authy ID, and performs a withdrawal using
   the new authy user ID.
4. Attacker updates the user record, and changes back the authyUserId and email fields
   (effectively making the attack invisible).

The initial breach of the system occurred on Feb. 2 2015, using the attack specified above against
the jmordica@gmail.com user account.  Essentially this means that any number of additional
user accounts could have been infiltrated/emptied between the dates of 2/2 - 2/27.

Best regards,

**Matthew K. Eden**
GAW Miners LLC

C: (512) 718-6128



"The information contained in this email message may be confidential. If you are not the intended recipient any use, distribution, disclosure or copying of this information is prohibited. If you receive this email in error, please tell us by return email and destroy this communication and any attachments from your system."

# EXHIBIT A-3

**Release of Zencloud and Paybase Account Details**

## LETTER OF AUTHORIZATION

I, _____Teresa S. Crivello_____ (Account Holder) authorize D. Allen Shinners (Third Party Administrator) to receive complete account transaction history data from my Zencloud and Paybase accounts, as third party verifier for the pending GAW litigation, under the account holder Account User Name(s) and associated Registered Email Address(es) for the following:

**In Zencloud:**

Account #1: TT67                          Email #1: tminer67@hotmail.com

Account #2: gcminer55@hotmail.com         Email #2: gcminer55@hotmail.com

Account #3: gminer84@hotmail.com          Email #3: gminer84@hotmail.com

Account #4: mcminer97@hotmail.com         Email #4: mcminer97@hotmail.com

Account #5: csminer99@hotmail.com         Email #5: csminer99@hotmail.com

Account #6: _____              Email #6: _____

Account #7: _____              Email #7: _____

Account #8: _____              Email #8: _____

Account #9: _____              Email #9: _____

Account #10: _____             Email #10: _____

**In Paybase:**

Account #1: tminer67@hotmail.com          Email #1: tminer67@hotmail.com

Account #2: _____              Email #2: _____

Account #3: _____              Email #3: _____

Account #4: _____              Email #4: _____

By my signature below, I hereby attest to the accuracy and validity of the information entered above. I hereby authorize access to and transmission of my account information from BCI (Matthew Eden, Owner, and or Ryan Mottley, Representative) to D. Allen Shinners, at the following email address, or by any mutually agreed upon, suitable electronic conveyance or transmission: gaw.lawsuit.allen1980s@gmail.com . I hereby indemnify and hold harmless BCI (Matthew Eden, Owner, and or Ryan Mottley, Representative) from any adverse actions, which may inadvertently arise from the digital transmission of my personal, confidential account(s) data to D. Allen Shinners.

Signed on this day: 11/7/2015

Printed Name: Teresa S. Crivello

Signature: Teresa Crivello  Digitally signed by Teresa Crivello
Date: 2015.11.07 15:25:20 -08'00'

Telephone Number: 310-286-7649

Government Issued Identification Number: 461178261       United States

Type of Identification Document: Passport       (Passport, Driver's License, Official ID)

**Release of Zencloud and Paybase Account Details**

## LETTER OF AUTHORIZATION

I, _____John L. Tuberosi_____ (Account Holder) authorize D. Allen Shinners (Third Party Administrator) to receive complete account transaction history data from my Zencloud and Paybase accounts, as third party verifier for the pending GAW litigation, under the account holder Account User Name(s) and associated Registered Email Address(es) for the following:

**In Zencloud:**

| | | | |
|---|---|---|---|
| Account #1: | 114373 | Email #1: | pumist1965@hotmail.com |
| Account #2: | 38027 | Email #2: | yoyolivia2@hotmail.com |
| Account #3: | 17272 | Email #3: | otuberosi@hotmail.com |
| Account #4: | 13998 | Email #4: | vercors65@gmail.com |
| Account #5: | 14467 | Email #5: | gang1110@hotmail.com |
| Account #6: | 139155 | Email #6: | marinalaboratto70@gmail.com |
| Account #7: | 95954 | Email #7: | claboratto1@gmail.com |
| Account #8: | 277630 | Email #8: | teresaguarnieri@outlook.com |
| Account #9: | | Email #9: | |
| Account #10: | | Email #10: | |

**In Paybase:**

| | | | |
|---|---|---|---|
| Account #1: | | Email #1: | |
| Account #2: | | Email #2: | |
| Account #3: | | Email #3: | |
| Account #4: | | Email #4: | |

By my signature below, I hereby attest to the accuracy and validity of the information entered above. I hereby authorize access to and transmission of my account information from BCI (Matthew Eden, Owner, and or Ryan Mottley, Representative) to D. Allen Shinners, at the following email address, or by any mutually agreed upon, suitable electronic conveyance or transmission: gaw.lawsuit.allen1980s@gmail.com . I hereby indemnify and hold harmless BCI (Matthew Eden, Owner, and or Ryan Mottley, Representative) from any adverse actions, which may inadvertently arise from the digital transmission of my personal, confidential account(s) data to D. Allen Shinners.

Signed on this day: _____10/1/2015_____

Printed Name: _____John L.Tuberosi_____

Signature: _____John L. Tuberosi_____   Digitally signed by John L. Tuberosi DN: cn=John L. Tuberosi, o, ou, email=johnnytuberosi@hotmail.com, c=US Date: 2015.10.01 11:07:11 -0700'

Telephone Number: _____310-221-1514_____

Government Issued Identification Number: _____C4176610_____   | Type Country of Issue Here |

Type of Identification Document: _____Driver's License_____ (Passport, Driver's License, Official ID)

Release of Zencloud and Paybase Account Details

## LETTER OF AUTHORIZATION

I, _____ Daniel Simpson _____ (Account Holder) authorize D. Allen Shinners (Third Party Administrator) to receive complete account transaction history data from my Zencloud and Paybase accounts, as third party verifier for the pending GAW litigation, under the account holder Account User Name(s) and associated Registered Email Address(es) for the following:

**In Zencloud:**

| | | | |
|---|---|---|---|
| Account #1: | buckrogers | Email #1: | lennyfiler@yahoo.com |
| Account #2: | daffy | Email #2: | groovyds@gmail.com |
| Account #3: | easyminer | Email #3: | lennyfiler@gmail.com |
| Account #4: | thebox | Email #4: | electricsoul350@yahoo.com |
| Account #5: | killdemon | Email #5: | ronaldojbones@gmail.com |
| Account #6: | | Email #6: | |
| Account #7: | | Email #7: | |
| Account #8: | | Email #8: | |
| Account #9: | | Email #9: | |
| Account #10: | | Email #10: | |

**In Paybase:**

| | | | |
|---|---|---|---|
| Account #1: | buckrogers or lennyfiler@yahoo.com | Email #1: | lennyfiler@yahoo.com |
| Account #2: | | Email #2: | |
| Account #3: | | Email #3: | |
| Account #4: | | Email #4: | |

By my signature below, I hereby attest to the accuracy and validity of the information entered above. I hereby authorize access to and transmission of my account information from BCI (Matthew Eden, Owner, and or Ryan Mottley, Representative) to D. Allen Shinners, at the following email address, or by any mutually agreed upon, suitable electronic conveyance or transmission: gaw.lawsuit.allen1980s@gmail.com . I hereby indemnify and hold harmless BCI (Matthew Eden, Owner, and or Ryan Mottley, Representative) from any adverse actions, which may inadvertently arise from the digital transmission of my personal, confidential account(s) data to D. Allen Shinners.

Signed on this day: _____ 11/2/2015 _____

Printed Name: _____ Daniel Simpson _____

Signature: _____ Daniel Simpson _____
Digitally signed by Daniel Simpson
DN: cn=Daniel Simpson, o, ou, email=danielsimpson36@gmail.com, c=US
Date: 2015.11.02 15:25:21 -05'00'

Telephone Number: _____ 917-513-2074 _____

Government Issued Identification Number: _____ 700704094 _____ | USA |

Type of Identification Document: _____ Driver's License _____ (Passport, Driver's License, Official ID)

**Release of Zencloud and Paybase Account Details**

## LETTER OF AUTHORIZATION

I, **David Miles Shepherd** (Account Holder) authorize D. Allen Shinners (Third Party Administrator) to receive complete account transaction history data from my Zencloud and Paybase accounts, as third party verifier for the pending GAW litigation, under the account holder Account User Name(s) and associated Registered Email Address(es) for the following:

**In Zencloud:**

| | | | |
|---|---|---|---|
| Account #1: | donkiddick | Email #1: | david@depart-travel.co.uk |
| Account #2: | southelmsalltravel | Email #2: | shep732001@yahoo.co.uk |
| Account #3: | borisjohnson | Email #3: | charlieshepherd123456789@gmail.com |
| Account #4: | jaspershepherd | Email #4: | cateshepherd@hotmail.co.uk |
| Account #5: | maisieshepherd | Email #5: | maisie260@gmail.com |
| Account #6: | | Email #6: | |
| Account #7: | | Email #7: | |
| Account #8: | | Email #8: | |
| Account #9: | | Email #9: | |
| Account #10: | | Email #10: | |

**In Paybase:**

| | | | |
|---|---|---|---|
| Account #1: | donkiddick | Email #1: | david@depart-travel.co.uk |
| Account #2: | southelmsalltravel | Email #2: | shep732001@yahoo.co.uk |
| Account #3: | | Email #3: | |
| Account #4: | | Email #4: | |

By my signature below, I hereby attest to the accuracy and validity of the information entered above. I hereby authorize access to and transmission of my account information from BCI (Matthew Eden, Owner, and or Ryan Mottley, Representative) to D. Allen Shinners, at the following email address, or by any mutually agreed upon, suitable electronic conveyance or transmission: gaw.lawsuit.allen1980s@gmail.com . I hereby indemnify and hold harmless BCI (Matthew Eden, Owner, and or Ryan Mottley, Representative) from any adverse actions, which may inadvertently arise from the digital transmission of my personal, confidential account(s) data to D. Allen Shinners.

Signed on this day: **27th September 2015**

Printed Name: **David Miles Shepherd**

Signature: **David Miles Shepherd** Digitally signed by David Miles Shepherd Date: 2015.09.27 08:44:55 +01'00'

Telephone Number: **+44 1977 791478**

Government Issued Identification Number: **507106769** | United Kingdom of Great Britain |

Type of Identification Document: **Passport** (Passport, Driver's License, Official ID)

**Release of Zencloud and Paybase Account Details**

## LETTER OF AUTHORIZATION

I, __David Mah Yee Sheng__ (Account Holder) authorize D. Allen Shinners (Third Party Administrator) to receive complete account transaction history data from my Zencloud and Paybase accounts, as third party verifier for the pending GAW litigation, under the account holder Account User Name(s) and associated Registered Email Address(es) for the following:

**In Zencloud:**

| | | | |
|---|---|---|---|
| Account #1: | gentamicin | Email #1: | yeesheng@gmail.com |
| Account #2: | limburatorul | Email #2: | yeesheng0001@gmail.com |
| Account #3: | nacer | Email #3: | lympkin.ebay@gmail.com |
| Account #4: | dsihotel | Email #4: | david_mah@hotmail.cmo |
| Account #5: | | Email #5: | |
| Account #6: | | Email #6: | |
| Account #7: | | Email #7: | |
| Account #8: | | Email #8: | |
| Account #9: | | Email #9: | |
| Account #10: | | Email #10: | |

**In Paybase:**

| | | | |
|---|---|---|---|
| Account #1: | | Email #1: | yeesheng@gmail.com |
| Account #2: | | Email #2: | |
| Account #3: | | Email #3: | |
| Account #4: | | Email #4: | |

By my signature below, I hereby attest to the accuracy and validity of the information entered above. I hereby authorize access to and transmission of my account information from BCI (Matthew Eden, Owner, and or Ryan Mottley, Representative) to D. Allen Shinners, at the following email address, or by any mutually agreed upon, suitable electronic conveyance or transmission: gaw.lawsuit.allen1980s@gmail.com . I hereby indemnify and hold harmless BCI (Matthew Eden, Owner, and or Ryan Mottley, Representative) from any adverse actions, which may inadvertently arise from the digital transmission of my personal, confidential account(s) data to D. Allen Shinners.

Signed on this day: __11/16/2015__

Printed Name: __David Mah Yee Sheng__

Signature: __David Mah__   Digitally signed by David Mah
Date: 2015.11.16 00:18:58 +10'30'

Telephone Number: __+61433932675__

Government Issued Identification Number: __CB0556__   | South Australia, Australia |

Type of Identification Document: __Driver's License__ (Passport, Driver's License, Official ID)

Release of Zencloud and Paybase Account Details

## LETTER OF AUTHORIZATION

I, __Robert de Wilde__ (Account Holder) authorize D. Allen Shinners (Third Party Administrator) to receive complete account transaction history data from my Zencloud and Paybase accounts, as third party verifier for the pending GAW litigation, under the account holder Account User Name(s) and associated Registered Email Address(es) for the following:

**In Zencloud:**

| | | | |
|---|---|---|---|
| Account #1: | rdewilde | Email #1: | email@robertdewilde.nl |
| Account #2: | Rdw | Email #2: | rdewildenl@gmail.com |
| Account #3: | Robert | Email #3: | sssjoukje@hotmail.com |
| Account #4: | RdwNL | Email #4: | mining@robertdewilde.nl |
| Account #5: | johnzen | Email #5: | johan@robertdewilde.nl |
| Account #6: | tdcoin | Email #6: | jgwilde1953@kpnmail.nl |
| Account #7: | | Email #7: | |
| Account #8: | | Email #8: | |
| Account #9: | | Email #9: | |
| Account #10: | | Email #10: | |

**In Paybase:**

| | | | |
|---|---|---|---|
| Account #1: | rdewilde | Email #1: | email@robertdewilde.nl |
| Account #2: | | Email #2: | |
| Account #3: | | Email #3: | |
| Account #4: | | Email #4: | |

By my signature below, I hereby attest to the accuracy and validity of the information entered above. I hereby authorize access to and transmission of my account information from BCI (Matthew Eden, Owner, and or Ryan Mottley, Representative) to D. Allen Shinners, at the following email address, or by any mutually agreed upon, suitable electronic conveyance or transmission: gaw.lawsuit.allen1980s@gmail.com . I hereby indemnify and hold harmless BCI (Matthew Eden, Owner, and or Ryan Mottley, Representative) from any adverse actions, which may inadvertently arise from the digital transmission of my personal, confidential account(s) data to D. Allen Shinners.

Signed on this day: __19 oct 2015__

Printed Name: __Robert de Wilde__

Signature: __Robert de Wilde__   Digitaal ondertekend door Robert de Wilde
DN: cn=Robert de Wilde, o=NA, ou=NA, email=email@robertdewilde.nl, c=NL
Datum: 2015.10.19 14:05:02 +02'00'

Telephone Number: __0031625563236__

Government Issued Identification Number: __194671628__    | Netherlands |

Type of Identification Document: __Passport__ (Passport, Driver's License, Official ID)

**Release of Zencloud and Paybase Account Details**

## LETTER OF AUTHORIZATION

I, _____Ian MacPhee_____ (Account Holder) authorize D. Allen Shinners (Third Party Administrator) to receive complete account transaction history data from my Zencloud and Paybase accounts, as third party verifier for the pending GAW litigation, under the account holder Account User Name(s) and associated Registered Email Address(es) for the following:

**In Zencloud:**

| | | | |
|---|---|---|---|
| Account #1: | Techman34 | Email #1: | ismacphee@gmail.com |
| Account #2: | NewManagement | Email #2: | jlvprop@gmail.com |
| Account #3: | NewOwner | Email #3: | ian@mobixia.com |
| Account #4: | NewManagement | Email #4: | apps@mobixia.com |
| Account #5: | cigar | Email #5: | zenm1@mobixia.com |
| Account #6: | Minkgx1 | Email #6: | zenm2@mobixia.com |
| Account #7: | NewOwner | Email #7: | zenm3@mobixia.com |
| Account #8: | NewOwner | Email #8: | zence@mobixia.com |
| Account #9: | | Email #9: | |
| Account #10: | | Email #10: | |

**In Paybase:**

| | | | |
|---|---|---|---|
| Account #1: | Techman34 | Email #1: | ismacphee@gmail.com |
| Account #2: | | Email #2: | |
| Account #3: | | Email #3: | |
| Account #4: | | Email #4: | |

By my signature below, I hereby attest to the accuracy and validity of the information entered above. I hereby authorize access to and transmission of my account information from BCI (Matthew Eden, Owner, and or Ryan Mottley, Representative) to D. Allen Shinners, at the following email address, or by any mutually agreed upon, suitable electronic conveyance or transmission: gaw.lawsuit.allen1980s@gmail.com . I hereby indemnify and hold harmless BCI (Matthew Eden, Owner, and or Ryan Mottley, Representative) from any adverse actions, which may inadvertently arise from the digital transmission of my personal, confidential account(s) data to D. Allen Shinners.

Signed on this day: _____9/29/2015_____

Printed Name: _____Ian MacPhee_____

Signature: _____MacPhee, Ian_____ Digitally signed by MacPhee, Ian
Date: 2015.09.29 11:30:10 -04'00'

Telephone Number: _____704-674-8910_____

Government Issued Identification Number: _____5255217_____ | North Carolina Driver License # |

Type of Identification Document: _____Driver's License_____ (Passport, Driver's License, Official ID)

Release of Zencloud and Paybase Account Details

## LETTER OF AUTHORIZATION

I, ___Robert Puckett___ (Account Holder) authorize D. Allen Shinners (Third Party Administrator) to receive complete account transaction history data from my Zencloud and Paybase accounts, as third party verifier for the pending GAW litigation, under the account holder Account User Name(s) and associated Registered Email Address(es) for the following:

**In Zencloud:**

| | | | |
|---|---|---|---|
| Account #1: | trixster67 | Email #1: | trixster67@live.com |
| Account #2: | hnat18 | Email #2: | robert_lea@frontier.com |
| Account #3: | mharter | Email #3: | rpuckett.wow@frontier.com |
| Account #4: | | Email #4: | |
| Account #5: | | Email #5: | |
| Account #6: | | Email #6: | |
| Account #7: | | Email #7: | |
| Account #8: | | Email #8: | |
| Account #9: | | Email #9: | |
| Account #10: | | Email #10: | |

**In Paybase:**

| | | | |
|---|---|---|---|
| Account #1: | | Email #1: | |
| Account #2: | | Email #2: | |
| Account #3: | | Email #3: | |
| Account #4: | | Email #4: | |

By my signature below, I hereby attest to the accuracy and validity of the information entered above. I hereby authorize access to and transmission of my account information from BCI (Matthew Eden, Owner, and or Ryan Mottley, Representative) to D. Allen Shinners, at the following email address, or by any mutually agreed upon, suitable electronic conveyance or transmission: gaw.lawsuit.allen1980s@gmail.com . I hereby indemnify and hold harmless BCI (Matthew Eden, Owner, and or Ryan Mottley, Representative) from any adverse actions, which may inadvertently arise from the digital transmission of my personal, confidential account(s) data to D. Allen Shinners.

Signed on this day: ___10/28/2015___

Printed Name: ___Robert Puckett___

Signature: Digitally signed by Robert Puckett
DN: cn=Robert Puckett, o, ou, email=robert_lea@frontier.com, c=US
Date: 2015.10.28 20:39:50 -07'00'
_____

Telephone Number: ___503-327-3761___

Government Issued Identification Number: ___4334683___   | USA - ODL |

Type of Identification Document: ___Driver's License___ (Passport, Driver's License, Official ID)

**Release of Zencloud and Paybase Account Details**

## LETTER OF AUTHORIZATION

I, _____Jason Poole_____ (Account Holder) authorize D. Allen Shinners (Third Party Administrator) to receive complete account transaction history data from my Zencloud and Paybase accounts, as third party verifier for the pending GAW litigation, under the account holder Account User Name(s) and associated Registered Email Address(es) for the following:

**In Zencloud:**

| Account #1: | Handwnpants | Email #1: | _____ |
| Account #2: | Bodyworker | Email #2: | _____ |
| Account #3: | _____ | Email #3: | _____ |
| Account #4: | _____ | Email #4: | _____ |
| Account #5: | _____ | Email #5: | _____ |
| Account #6: | _____ | Email #6: | _____ |
| Account #7: | _____ | Email #7: | _____ |
| Account #8: | _____ | Email #8: | _____ |
| Account #9: | _____ | Email #9: | _____ |
| Account #10: | _____ | Email #10: | _____ |

**In Paybase:**

| Account #1: | Handwnpants | Email #1: | _____ |
| Account #2: | _____ | Email #2: | _____ |
| Account #3: | _____ | Email #3: | _____ |
| Account #4: | _____ | Email #4: | _____ |

By my signature below, I hereby attest to the accuracy and validity of the information entered above. I hereby authorize access to and transmission of my account information from BCI (Matthew Eden, Owner, and or Ryan Mottley, Representative) to D. Allen Shinners, at the following email address, or by any mutually agreed upon, suitable electronic conveyance or transmission: gaw.lawsuit.allen1980s@gmail.com . I hereby indemnify and hold harmless BCI (Matthew Eden, Owner, and or Ryan Mottley, Representative) from any adverse actions, which may inadvertently arise from the digital transmission of my personal, confidential account(s) data to D. Allen Shinners.

Signed on this day: _____01/10/15_____

Printed Name: _____Jason Poole_____

Signature: _____Jason Poole_____ Digitally signed by Jason Poole
Date: 2015.10.01 18:05:38 +10'00'

Telephone Number: _____0737113444_____

Government Issued Identification Number: _____081569872_____   | Australia |

Type of Identification Document: _____Driver's License_____ (Passport, Driver's License, Official ID)

Release of Zencloud and Paybase Account Details

## LETTER OF AUTHORIZATION

I, _____Jan De Smet_____ (Account Holder) authorize D. Allen Shinners (Third Party Administrator) to receive complete account transaction history data from my Zencloud and Paybase accounts, as third party verifier for the pending GAW litigation, under the account holder Account User Name(s) and associated Registered Email Address(es) for the following:

**In Zencloud:**

| | | | |
|---|---|---|---|
| Account #1: | JackTheShipper | Email #1: | focusndcomposure@gmail.com |
| Account #2: | k317x | Email #2: | jacktheshippertv@gmail.com |
| Account #3: | | Email #3: | |
| Account #4: | | Email #4: | |
| Account #5: | | Email #5: | |
| Account #6: | | Email #6: | |
| Account #7: | | Email #7: | |
| Account #8: | | Email #8: | |
| Account #9: | | Email #9: | |
| Account #10: | | Email #10: | |

**In Paybase:**

| | | | |
|---|---|---|---|
| Account #1: | | Email #1: | focusndcomposure@gmail.com |
| Account #2: | | Email #2: | |
| Account #3: | | Email #3: | |
| Account #4: | | Email #4: | |

By my signature below, I hereby attest to the accuracy and validity of the information entered above. I hereby authorize access to and transmission of my account information from BCI (Matthew Eden, Owner, and or Ryan Mottley, Representative) to D. Allen Shinners, at the following email address, or by any mutually agreed upon, suitable electronic conveyance or transmission: gaw.lawsuit.allen1980s@gmail.com . I hereby indemnify and hold harmless BCI (Matthew Eden, Owner, and or Ryan Mottley, Representative) from any adverse actions, which may inadvertently arise from the digital transmission of my personal, confidential account(s) data to D. Allen Shinners.

Signed on this day: ____October 13th, 2015____

Printed Name: ____Jan De Smet____

Signature: ____Jan De Smet____    Digitaal ondertekend door Jan De Smet
DN: cn=Jan De Smet, o, ou,
email=focusndcomposure@gmail.com, c=BE
Datum: 2015.10.13 19:14:59 +02'00'

Telephone Number: ____+32472672913____

Government Issued Identification Number: ____90.08.07-243.38____   | Belgium |

Type of Identification Document: ____Government Issued ID____ (Passport, Driver's License, Official ID)

**Release of Zencloud and Paybase Account Details**

## LETTER OF AUTHORIZATION

I, _Martin Daniel Fenske_ (Account Holder) authorize D. Allen Shinners (Third Party Administrator) to receive complete account transaction history data from my Zencloud and Paybase accounts, as third party verifier for the pending GAW litigation, under the account holder Account User Name(s) and associated Registered Email Address(es) for the following:

**In Zencloud:**

Account #1: badfrog              Email #1: badfrog@gmx.de

Account #2: h.fenske             Email #2: badfrog88@gmx.de

Account #3: _____      Email #3: _____

Account #4: _____      Email #4: _____

Account #5: _____      Email #5: _____

Account #6: _____      Email #6: _____

Account #7: _____      Email #7: _____

Account #8: _____      Email #8: _____

Account #9: _____      Email #9: _____

Account #10: _____     Email #10: _____

**In Paybase:**

Account #1: badfrog              Email #1: badfrog@gmx.de

Account #2: _____      Email #2: _____

Account #3: _____      Email #3: _____

Account #4: _____      Email #4: _____

By my signature below, I hereby attest to the accuracy and validity of the information entered above. I hereby authorize access to and transmission of my account information from BCI (Matthew Eden, Owner, and or Ryan Mottley, Representative) to D. Allen Shinners, at the following email address, or by any mutually agreed upon, suitable electronic conveyance or transmission: gaw.lawsuit.allen1980s@gmail.com . I hereby indemnify and hold harmless BCI (Matthew Eden, Owner, and or Ryan Mottley, Representative) from any adverse actions, which may inadvertently arise from the digital transmission of my personal, confidential account(s) data to D. Allen Shinners.

Signed on this day: _19.10.2015_

Printed Name: _Martin Daniel Fenske_

Signature: _Martin Daniel Fenske_   Digital unterschrieben von Martin Daniel Fenske
Datum: 2015.10.19 13:49:18 +02'00'

Telephone Number: _004915229535624_

Government Issued Identification Number: _I153A1BH252_   | Germany |

Type of Identification Document: _Driver's License_ (Passport, Driver's License, Official ID)

Release of Zencloud and Paybase Account Details

## LETTER OF AUTHORIZATION

I, **jaime martin** (Account Holder) authorize D. Allen Shinners (Third Party Administrator) to receive complete account transaction history data from my Zencloud and Paybase accounts, as third party verifier for the pending GAW litigation, under the account holder Account User Name(s) and associated Registered Email Address(es) for the following:

**In Zencloud:**

| | | | |
|---|---|---|---|
| Account #1: | eoakland | Email #1: | jaime1700@yahoo.com |
| Account #2: | vach | Email #2: | jaimem1700@gmail.com |
| Account #3: | pringers | Email #3: | itguy1700@gmail.com |
| Account #4: | | Email #4: | |
| Account #5: | | Email #5: | |
| Account #6: | | Email #6: | |
| Account #7: | | Email #7: | |
| Account #8: | | Email #8: | |
| Account #9: | | Email #9: | |
| Account #10: | | Email #10: | |

**In Paybase:**

| | | | |
|---|---|---|---|
| Account #1: | | Email #1: | |
| Account #2: | | Email #2: | |
| Account #3: | | Email #3: | |
| Account #4: | | Email #4: | |

By my signature below, I hereby attest to the accuracy and validity of the information entered above. I hereby authorize access to and transmission of my account information from BCI (Matthew Eden, Owner, and or Ryan Mottley, Representative) to D. Allen Shinners, at the following email address, or by any mutually agreed upon, suitable electronic conveyance or transmission: gaw.lawsuit.allen1980s@gmail.com . I hereby indemnify and hold harmless BCI (Matthew Eden, Owner, and or Ryan Mottley, Representative) from any adverse actions, which may inadvertently arise from the digital transmission of my personal, confidential account(s) data to D. Allen Shinners.

Signed on this day: 11/17/2015

Printed Name: jaime martin

Signature: **jaime martin**
Digitally signed by jaime martin
DN: cn=jaime martin, o, ou,
email=jaime1700@yahoo.com, c=US
Date: 2015.11.17 07:05:15 -08'00'

Telephone Number: 408.375.7743

Government Issued Identification Number: B3062947          USA

Type of Identification Document: Driver's License (Passport, Driver's License, Official ID)

Release of Zencloud and Paybase Account Details

## LETTER OF AUTHORIZATION

I, _____Hilary Kinckner Jr_____ (Account Holder) authorize D. Allen Shinners (Third Party Administrator) to receive complete account transaction history data from my Zencloud and Paybase accounts, as third party verifier for the pending GAW litigation, under the account holder Account User Name(s) and associated Registered Email Address(es) for the following:

**In Zencloud:**

| | | | |
|---|---|---|---|
| Account #1: | hilzminer | Email #1: | programmerdmx@yahoo.com |
| Account #2: | hjminers | Email #2: | hjminers@gmail.com |
| Account #3: | | Email #3: | |
| Account #4: | | Email #4: | |
| Account #5: | | Email #5: | |
| Account #6: | | Email #6: | |
| Account #7: | | Email #7: | |
| Account #8: | | Email #8: | |
| Account #9: | | Email #9: | |
| Account #10: | | Email #10: | |

**In Paybase:**

| | | | |
|---|---|---|---|
| Account #1: | hilzminer | Email #1: | programmerdmx@yahoo.com |
| Account #2: | | Email #2: | |
| Account #3: | | Email #3: | |
| Account #4: | | Email #4: | |

By my signature below, I hereby attest to the accuracy and validity of the information entered above. I hereby authorize access to and transmission of my account information from BCI (Matthew Eden, Owner, and or Ryan Mottley, Representative) to D. Allen Shinners, at the following email address, or by any mutually agreed upon, suitable electronic conveyance or transmission: gaw.lawsuit.allen1980s@gmail.com . I hereby indemnify and hold harmless BCI (Matthew Eden, Owner, and or Ryan Mottley, Representative) from any adverse actions, which may inadvertently arise from the digital transmission of my personal, confidential account(s) data to D. Allen Shinners.

Signed on this day: _____11/19/2015_____

Printed Name: _____Hilary D Kinckner Jr_____

Signature: _____ Digitally signed by Hilary Kinckner Jr Date: 2015.11.19 12:25:59 -05'00'

Telephone Number: _____717-606-6622_____

Government Issued Identification Number: _____431008197_____   United States of America

Type of Identification Document: _____Passport_____ (Passport, Driver's License, Official ID)

# EXHIBIT A-4

1

2          UNITED STATES DISTRICT COURT

3        FOR THE DISTRICT OF CONNECTICUT

4          CASE 3:16-CV-00940

5  --------------------------------------------x

6  DENIS MARC AUDET, MICHAEL PFEIFFER, DEAN ALLEN

7  SHINNERS, and JASON VARGAS, INDIVIDUALLY and on

8  Behalf of All Others Similarly Situated,

9                   Plaintiffs,

10      v.

11  STUART A. FRASER, GAW MINERS, LLC, and ZENMINER,

12  LLC, (d/b/a ZEN CLOUD),

13                 Defendants.

14  --------------------------------------------x

15

16   VIDEOTAPED DEPOSITION OF DEAN ALLEN SHINNERS

17          New York, New York

18         Wednesday, July 25, 2018

19

20

21  Reported by:

22  Amy A. Rivera, CSR, RPR, CLR

23  JOB NO. 144960

24

25

Page 2

```
 1
 2                    July 25, 2018
 3                     9:00 a.m.
 4
 5          Videotaped deposition of DEAN ALLEN
 6   SHINNERS held at the office of SUSMAN GODFREY,
 7   L.L.P., 1301 Avenue of the Americas, Floor 32, New
 8   York, New York, pursuant to Notice, before Amy A.
 9   Rivera, Certified Shorthand Reporter, Registered
10   Professional Reporter, Certified LiveNote Reporter,
11   and a Notary Public of the States of New York, New
12   Jersey and Delaware.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2     A P P E A R A N C E S :
 3   SUSMAN GODFREY
 4   Attorneys for Plaintiffs and the Witness
 5       1000 Louisiana
 6       Houston, Texas  77002
 7   BY:  COLIN WATTERSON, ESQ.
 8
 9   HUGHES HUBBARD & REED
10   Attorneys for Defendant Stuart A. Fraser
11       One Battery Park Plaza
12       New York, New York  10004
13   BY:  DANIEL WEINER, ESQ.
14       SARAH CAVE, ESQ.
15       ANNA SCHULER, ESQ.
16
17     A L S O   P R E S E N T :
18       Robert Rinkewich, Legal Video Specialist
19
20
21
22
23
24
25
```

Page 4

```
 1           DEAN ALLEN SHINNERS
 2       VIDEOGRAPHER:  This the start of media
 3   labeled No. 1 of the video-recorded
 4   deposition of Allen Shinners, in the matter
 5   of Dennis Marc Audet, et al., versus Stuart
 6   A. Fraser, et al., in the United States
 7   District Court for the District of
 8   Connecticut, Case No. 3:16-cv-00940.
 9       This deposition is being held at 1301
10   Avenue of the Americas, New York, New York,
11   on July 25th, 2018, at approximately
12   9:00 a.m.
13       My name is Robert Rinkewich.  I'm the
14   legal video specialist from TSG Reporting,
15   Inc., headquartered at 747 Third Avenue, New
16   York, New York
17       The court reporter is Amy Rivera in
18   association with TSG Reporting.
19       Counsel, please introduce yourselves.
20       MR. WEINER:  Daniel Weiner, Hughes,
21   Hubbard & Reed, for defendant Stuart Fraser.
22       MS. SCHULER:  Anna Schuler, Hughes,
23   Hubbard & Reed, for defendant Stuart A.
24   Fraser.
25       MR. WATTERSON:  Colin Watterson with
```

Page 5

```
 1           DEAN ALLEN SHINNERS
 2   Susman Godfrey for the plaintiffs and the
 3   witness.
 4       VIDEOGRAPHER:  Will the court reporter
 5   please swear in the witness.
 6   Dean Allen Shinners, having been duly sworn,
 7   testified as follows:
 8   EXAMINATION
 9   BY MR. WEINER:
10       Q.  Good morning, Mr. Shinners.
11       A.  Good morning.
12       Q.  Why did the plaintiffs drop Josh Garza
13   as a defendant in this case?
14       A.  Josh Garza was originally one of the
15   two.  They were both were on --
16       MR. WATTERSON:  Hold on one second.
17   You can answer this to the extent it
18   doesn't involve conversations with the
19   lawyers.
20       THE WITNESS:  Okay.
21       A.  Why he was dropped --
22       Q.  Why did you and your fellow plaintiffs
23   drop him as the lead defendant in this case?
24       MR. WATTERSON:  Same instruction.
25       A.  Okay.  So I have to think about that
```

DEAN ALLEN SHINNERS

1
2  of the marketplace, their -- the commission
3  structure had changed.
4          So you couldn't -- there was a point
5  in time -- after people were certain that
6  something bad was about to happen, there was a
7  point in time when the market wasn't even open.
8  So you couldn't even sell anything, and people
9  started going privately.  They tried to do it
10  privately, but GAW Miners back in October of 2014
11  had stated that they would no longer support
12  private sales, private sales between two
13  individuals, where before they had.
14          So people really had no avenue at that
15  time.
16      Q.   Your -- your last purchase of a GAW
17  Miners product was in early December 2014, and
18  your first -- beginning of your unloading was
19  in -- in February of 2015?
20          MR. WATTERSON:  Object to the form.
21          You can answer.
22      Q.   Does that seem right to you?
23      A.   No.
24      Q.   We can --
25      A.   No, not at all, actually.  That's all

DEAN ALLEN SHINNERS

1
2  messed up.
3      Q.   All right.  We can look at the
4  document a little bit later on.
5      A.   Yeah.
6      Q.   And -- and what was the -- what was
7  the event, if any, that finally made you say,
8  look, I've hung around holding these products long
9  enough, I'm going to start selling out?
10      A.   What was the event?
11          Late December, after the first of the
12  year in January of 2015, so late December 2014,
13  early January of 2015, when PayBase was unveiled
14  and it turned out to be nothing more than an
15  online wallet.  That was the main -- that was the
16  main catalyst.
17          MR. WEINER:  Let's mark as the next
18  exhibit, it's 108, a document --
19      Q.   We covered the pages in the e-mail
20  from you dated December 20, 2017, to Ines
21  Cenatiempo and Mark Munster of the FBI.
22          Why don't you take a look at it.
23          MR. WEINER:  And attached is something
24  described as a "Victim's Impact Statement."
25          (Exhibit 108, e-mail, with attachment,

DEAN ALLEN SHINNERS

1
2  dated December 20, 2017, bearing Bates Nos.
3  GAW1022853 through GAW10228757, was marked
4  for identification at this time.)
5  BY MR. WEINER:
6      Q.   My first question is about the cover
7  note to 108 -- the cover e-mail from you on
8  December 20th, 2017.
9          Who -- who is Ines Cenatiempo?
10      A.   I'm not even going to try to pronounce
11  the name.
12      Q.   I'm sure I'm mispronouncing it.
13      A.   It's Ines -- or Ines, Ines, actually,
14  and Mark Munster is the FBI.  She is the -- well,
15  it's the -- she's either with the DOJ or the -- or
16  the FBI.
17          I'm not sure where the victims'
18  advocates actually are.  I never really asked.
19          So what -- what was the question?
20      Q.   So my next -- that was -- that was the
21  question.
22      A.   That was the question.
23      Q.   My next question is:  Is this victim's
24  impact statement that's attached as the pages
25  of -- of 108 is that something that you were asked

DEAN ALLEN SHINNERS

1
2  to provide or you volunteered to provide?
3      A.   Everybody was asked to provide one.
4  Anybody that -- that came off of my list where
5  they were contactable of -- meaning my
6  spreadsheet.
7      Q.   Okay.  And -- and am I right that --
8  that the victim's impact statement that appears
9  as -- now, I'm looking at the production numbers
10  in the lower right-hand corner -- GAW1022853
11  through 10228757, that's something that you wrote?
12      A.   It would be -- yes, it's definitely
13  something that I had written, provided this has
14  not been changed.  And this seems to be an
15  appendix to this.
16      Q.   All right.  When you --
17      A.   Oh, yeah, this is mine.
18      Q.   Your cover note says, there are three
19  things, and I'm asking -- asking about the -- the
20  one that's headed:  "Your Honor, I'm writing this
21  victim's impact statement in reference to the
22  sentencing of Homero Joshua Garza."
23          Do you see that?
24      A.   What page are you on?
25      Q.   It's page GAW1022853.

# EXHIBIT A-5

- [Recent](#)
- [Tags](#)
- [Popular](#)
- [Users](#)
- [Search](#)

- [Register](#)
- [Login](#)

- Search
  **Search**

- 

- Enter index

Your browser does not seem to support JavaScript. As a result, your viewing experience will be diminished, and you have been placed in **read-only mode**.

Please download a browser that supports JavaScript, or enable it if it's disabled (i.e. NoScript).

1. [Home](#)
2. [Private Marketplace](#)
3. HashTalk Escrow Services FAQ

- PCfan
  PCfan
  [Paycoin Innovator](#)

### HashTalk Escrow Services FAQ

---

# HashTalk Escrow Services & Community Standards Practices

*GAW NOTICE: [Official Warning Regarding Private Account Sales](#)

*ATTENTION! [Beware High Value Account Chat SCAMS!](#)

---

While they are many facets to every deal made through escrow agents we have tried to consolidate the most important features to these transactions for you here.

There are some important aspects to cover when doing transactions involving 3 parties in "Escrows"

- Never do a 2 party transaction with someone you don't know.
- Safety, protection, and reputation are paramount to maintain trust levels within the community.
- Always follow things according to the plan your escrow agent and you decide on.
- Known & Trusted Escrow Agents List Compiled by Animoesto Known Escrows And Account Sales *Post is below for reference.*
- Escrow Agent Example-Private Marketplace semiofficial guide

---

# FAQ:

**Q. What is there to protect us from Escrow Agents, if the Agent runs away with the BTC or the whole account?**
A. That's very easy. You need to select an escrow you have confidence in. If you think that you can't trust the escrow then please don't use them. Trust your "due diligence" and your gut feeling if you don't like it don't do it.

**Q. How do you know you can trust an escrow agent?**
A. The HT Community has grown over time and certain individuals have gained prestige for escrow services both Large and small. They are Trusted by the community with many past consumer/member reviews in public for all to see.

***Please see:*** Known & Trusted Escrow Agents List Compiled by Animoesto Known Escrows And Account Sales

---

Cutting fraud is important for us as a community to survive and thrive. For the community to feel safe in what they do. The below Escrow Procedure proposition is presented with the intent that it may guide and also have the ability to ensure
safeguards for forum members going forward with es-crowed deals small or large.

---

# Standard Escrow Procedures

*~If your under $10,000 in total account value, this will probably be the method of Escrow you will opt for and use.*

**Initiating the Sale / Escrow:**

- First step for a prospective account buyer,once they see an account they would like to buy they should research Escrow Agents and contact Escrow Agent of choice then have that Agent Contact the seller of the account to set up escrow.
- Always ask a seller to escrow with the agent you have chosen from the trusted escrow list.
- When buying an account.An interested buyer needs to have the seller contact escrow before anything else happens.
- After the deal goes to escrow all communication should go through the Escrow Agent.
- Once the Escrow goes live and begins,the buyer and seller, really should not be talking to each other.until the deal is done

---

**The Process:**

- Buyer Will send BTC to Escrow Agent, Seller will provide and give the accounts detailed information.
- Escrow Agent logs in to the account and will change the email address & reset the password & enable 2fa.
- The Escrow Agent Must then verify the sellers (Hashing power/hashlets) Are in correct number and order.
- Only when the Escrow Agent is satisfied, Does the Agent ask the buyer for the email address He will be using on the account.
- The Escrow Agent will then set that email in the account and give full control of the account to the buyer.
- Escrow Agents will usually remind a buyer to immediately reset all security features available on an account once an escrow has finished.
- After All of the above is done the Escrow agent will send the BTC to the seller in the amount requested minus any fees for the escrow agents services (not all them charge the same)

## Two-party Escrow using Blockchain technology and BlackHalo

*~High value accounts and amounts might want to consider utilizing blockchain chain technology to create an unbreakable two-party double deposit smart contract. *

**@cyberlizard said:**
I keep saying on this forum that the use of the middle man (escrow) is in fact going to become history. Once the members of this community wake up and do some research on escrow & how to use the blockchain technology to create smart contracts such as an unbreakable smart contract between two parties "with a double deposit escrows" as many do now.

- The inherent problems of these archaic escrow deals will become non existant.
- Unfortunately the majority of HashTalk memebers here still prefer the more traditional variant of using a 3rd person for their escrowed deals instead.
- Create a joint account
- Each member of the joint account has their own set of private key and public key
- A smart contract agreement is made were "both parties to a contract" in the deal agree to deposit the amount to be exchanged onto the blockchain in the form of a double deposit.
- Once A payment has cleared/verified deposited on the block chain, then You can send them their value-coin-account-etc
- After that both parties will release the double deposit on the blockchain by terminating the smart contract and receive their initial escrow / double deposit security back.
- At no time either one of the parties can gain control over the address making the transaction fraud proof.

The only bitcoin / blackcoin client that (currently) supports smart contracts and two-party double deposit escrows through smart contracts is BlackHalo.

## ATTENTION! Spoofed Escrow Emails

Everyone please be aware that there is people going around spoofing email replies on account sales so they appear to come from the man in the middle, the Escrow Agent!

This is one reason why you should have your Escrow in Skype or any other chat and always make sure that the last email reply to an escrow in progress does in fact come from the Escrow's email address.

**Double check with your Escrow via chat before releasing or turning anything over!**

---

# From The Desk Of AnimoEsto

All,
Given the recent postings about people and escrow services, I have decided to post known Escrows.

These Escrows are either well known around the forums or have proven to be extremely reliable when performing their duties - they are noted here for reference only, and for you being able to easily find a list of known escrows, this is not an endorsement or approval by GAW or Zen, it is just to avoid a reoccurrence of an issue that was experienced recently.

If you provide Escrow Services and I have NOT mentioned your name here, don't be alarmed or upset, its simply that I dont know you do the service - contact me and I will update the list after checking you out
Known Escrows

---

# Know Escrow Agents

[@taylan](#) (Accepts tips)
[@rootdude](#) (Charges a Small Fee)
[@cyberlizard](#) (High Volume Sales Only)
[@AnimoEsto](#) (Accepts tips)

**Escrows not currently offering this service**

[@DrPaul](#)
As Always - If you are going to sell your entire account, please be aware that this is not supported and you should understand any risks involved, its entirely your decision however, but we would ALWAYS urge you to protect both the buyer and the seller and use an Escrow.

**A list of active members offering Escrow services is being maintained here:**
[Known Escrows And Account Sales](#)

---

# Example Escrow Agent From [@Taylan](#)

Hey Guys!
As many of you know I work with dozens of users on a daily basis for escrows, and get asked tons of questions.

**Here are some Tips/Advice for our Marketplace here:**

When making a post to transact a product, use

- **[WTS]** for products you wish to sell
- **[WTB]** for products that you are requesting to buy, and
- **[WTT]** for products you would like to request to trade for another selected product.**

Try to post your price in $ and once a buyer is found willing to pay that $ amount, agree upon a way to find a fair

price to convert $ to BTC (either through preev.com or btcvert.com or a selected exchange)

When selling accounts, it is VITAL that you turn off 2Factor Authentication through Authy before selling because when logging in, the buyer will be essentially locked out from the account they just bought. For this reason, it is also important that all escrow providers verify contents and user info found on the account

Refer to @AnimoEsto post for current escrow providers on *Please see:* Known & Trusted Escrow Agents List Compiled by Animoesto Known Escrows And Account Sales

Remember that this category is *SPECIFICALLY* for private marketplace transactions, not BTC price analysis, complaints, or about anything that would fit better in any other category found on HashTalk.

**Always add a screenshot of your miners page to your listing**

Once you've sold your account, please update the threads title from [WTS] to [SOLD]. A Moderator will review the thread and lock it.

---

We all want the community to feel safe in what they do around here, lets set and follow some guidelines so we can focus on what we really want to be talking about, Hashlets!

*pictures coming soon*

**https://fastxpy.com |XPY BLOCK CHAIN|https://btclend.cloudapp.net | Paycoin.com is here| https://twitter.com/gawceo**

**PCfan** posted , last edited by **cyberlizard**
- Watch
- Favourite 0
-
- Share this Post
-  Facebook
-  Twitter
-  Google+
-
- • 8
- private market5 escrow17 faq11 | Posts **1** | Views **459** • browsing
  Reply

private market5 escrow17 faq11 | Posts **1** | Views **459** • browsing
Reply



# Move Topic

Loading Categories

Disabled Categories are greyed out



**Fork Topic**

Title [Enter new thread title]

Click the posts you want to fork



**Move Post**

Topic ID [Enter topic ID]



# Upload picture

Upload a picture   Choose File   No file selected

You may only upload PNG, JPG, or GIF files (max. kbs.)

Success



# EXHIBIT A-6

http://gawminers.com:80/pages/affiliate-faq          Go          AUG   SEP   OCT

1 capture                                                          ◄   26   ►
26 Sep 2014                                                       2013  2014  2015


About this capture

f   twitter   ✉   (866) 554-5861          Free U.S. Shipping on orders over $300          🏠   🔍   Login ⌄   Cart 🛒 0



HOME      HASHLET      MINERS      ACCESSORIES      WHOLESALE      BLOG      COMPANY

HOME   »   AFFILIATE FAQ

**How can I receive my commission earnings?**

**What forms of payment are available?**

**Can I make social media pages to promote GAW Miners and use my affiliate link?**

**Can I make purchases with my own affiliate link?**

**How long does the tracking cookie last?**

**Does my commission % increase?**

**Why was my commission rejected?**

**Am I allowed to purchase traffic from traffic generation sites/exchanges?**

**Can I create a similar site to copy the original GAW Miners website?**

**Are there any places where I can't advertise?**

**Can I have a personal banner or a coupon created for me?**

**If I would like to become a reseller, what should I do?**

**Q. How can I receive my commission earnings?**

Payouts are completed upon request. Please email your account manager to request your commission. The minimum payout threshold is USD $50. You are permitted up to 4 payouts per month.

**Q. What forms of payment are available?**

Forms of payment are **Bitcoins**, **Bank Wire Transfer** or **Store Credit** at 110% of your earned commissions.

**Q. Can I make social media pages to promote GAW Miners and use my affiliate link?**

You may not create social media pages that in any way imply that it is owned or run by GAW Miners.

You may not use images from the GAW Miners website unless those images are provided in the **Creatives** section of your offer.

If you are found to be impersonating, copying or reproducing the GAW Miners brand in any way, this is a direct violation of our policy and your account will be closed without warning.

All commissions generated from these methods will be rejected.

**Q. Can I make purchases with my own affiliate link?**

http://gawminers.com:80/pages/affiliate-faq    Go    AUG **SEP** OCT

1 capture

26 Sep 2014

◀ **26** ▶

2013 **2014** 2015

About this capture

**Q. How long does the tracking cookie last?**

Our tracking cookies expire after two weeks. Our system works by 'last click', meaning the last referrer is used to determine who receives the commission.

**Q. Does my commission % increase?**

If your account reaches $25,000 of revenue for the month, we will increase your commission rate to 5%. When an affiliate reaches $75,000 for the month, we increase it to 6%. Account commission % is automatically changed based on the current month's revenue.

**Q. Why was my commission rejected?**

A commission may be rejected for one of the following reasons:

- The order was not paid and is in pending status
- The order has not been fulfilled (most commonly due to pre-orders)
- The order was canceled
- The order was made by the affiliate (for affiliates who signed up for this sole purpose)

**Q. Am I allowed to purchase traffic from traffic generation sites/exchanges?**

Absolutely not. We will give you one warning to cease all fake traffic generation. The second time your account will be terminated.

**Q. Can I create a similar site to copy the original GAW Miners website?**

You may not white label our site (copy directly) or pretend to be GAW Miners in any way whatsoever. Your account will be terminated immediately if you are found to be white labeling. You may not use domains that imply you are in any way GAW Miners (e.g. gawminers.de).

A rule of thumb: if a visitor comes to your site and thinks it is GAW Miners, owned by GAW Miners or assumes you are a reseller due to the way the site delivers information, you are violating our policy and will be terminated with or without warning.

**Q. Are there any places where I can't advertise?**

You **MAY NOT** use Google AdWords, Bing Ads or similar ad delivery networks to directly advertise your GAW Miners affiliate link.

You **may** use ad networks to drive traffic to your own website.

If you are found to be using an ad network for directly advertising your affiliate links, your account will be closed immediately. It is a violation of our affiliate policy as well as ad networks like Google and Bing (redirects are not permitted).

We don't allow traffic buys. We don't allow advertising on auction sites such as eBay.

**Q. Can I have a personal banner or a coupon created for me?**

Please email your affiliate manager for any personal requests and they will be more than happy to help with your campaign if possible.

*Please note: at this current time, we will not provide coupons or discounts for ALL Hashlet products.*

http://gawminers.com:80/pages/affiliate-faq    Go    AUG  SEP  OCT    ◉

1 capture                                       ◀  26  ▶
26 Sep 2014                                  2013  2014  2015    ▼ About this capture

Reseller Applicant Guidelines

- Minimum of $25,000 monthly sales to qualify as a reseller
- Resellers are forbidden to sell to another reseller
- Must adhere to or above MSRP (privileges will be revoked immediately if caught selling below)
- No promotion can be applied in addition to Reseller discount

You may inquire by emailing reseller@gawminers.com.

*Please note: each application is manually reviewed.*

  

© 2014 GAW Miners - a Geniuses at Work Company

# EXHIBIT A-7



## GAWMiners Value Added Reseller Program

### Objectives
- Provide new and strategic methods of introducing cryptocurrency to the everyday consumer
- Become the leader in BTC awareness and hardware/cloud mining sales in respective countries/territories
- Step outside the current market of consumers

### Benefits
- Sell the most innovative and profitable products in the cryptocurrency industry

### Expectations of a value added reseller
- Maintain brand integrity
  a. Quality and timely product delivery
  b. Professionalism
  c. Fraud Protection
  d.  Innovation

### Expectations from GAWMiners
- Consistent Communication, Updates, and Support
  a. Direction of the Company
  b. New customer stats and resources
  c. Logo package
    -Educational tools & Videos
    -Marketing supplies
- Incentives
  a. Growth Rebates/Volume Incentive Rebates/Mixed Rebates
  b. Sales growth competitions
    -Specifically new customer growth
    -Sales volume increase
    -Innovation

**\*As per Reseller Terms & Conditions**

- Each accepted order will be interpreted as a single agreement, independent of any other orders
- You must follow MAP(minimum advertised pricing). This can be found at gawminers.com
- You shall not market or resell products to other GAWMiners resellers
- Any domain name or other marketing material having to do with GAWMiners and or it's products must be approved prior to use.
- You must very clearly state that you are an Authorized Reseller on your website page and/or GAWMiners product page.
- Resellers are not eligible for GAWMiner reward points.
- Resellers cannot be in the affiliate program.
- In the event a GAWMiners reseller is issued a chargeback due to a fraudulent purchase, the reseller will be held responsible both for the chargeback fees and for any amount of BTC payout issued by zenMiner/GAWMiners.

**Order Process-**

1. Register your reseller email address on gawminers.com and send it to reseller@gawminers.com
2. Include the specific products and quantities you are interested in purchasing within your opening order, and your method of payment.
3. A reply will be sent confirming your order with approved discount percentage.
4. Once negotiation is complete, a discounted link will be sent for purchase.
5. As soon as funds have been received you will be issued a set of codes unique to your reseller email address that can be tracked through activation
6. Please send any and all questions to reseller@gawminers.com or call (413)342-5380

# EXHIBIT A-8

| | |
|---|---|
| **From:** | Carlos Garza |
| **Sent:** | Tuesday, November 11, 2014 10:17 AM PST |
| **To:** | Adam Matlack |
| **Subject:** | Get Ready Future White Label Partners |

Hello Future Partners,

Thank you for your interest and support in the GAWMiners reseller program.

With the launch of HashCoin, and an addition to the Hashlet product line in the coming weeks, I am extremely confident that together we will take our respective businesses to unforeseen heights.

Currently the program is being put through quality assurance and will be ready for you **Friday, November 14** for integration. And we will launch on **Monday, November 17**.

The reseller package will include:

-White Label Terms and Conditions
-Expectations of a reseller
-Logo Package
-Reseller Hipchat Invite
-HasOffers login information (This will be your resource to see daily sales, commission, and customer information.)

What will the purchase process look like for my customer?
-The customer will shop your personalized web-store, add Hashlets to their cart, and at checkout they will be directed to a generic Hashlet page. Payment will be made through our portal and codes delivered by zenMiner.

Can I sell at my own price? Am I allowed to offer discounts?
-You are required to adhere to GAWMiners minimum advertised pricing found at gawminers.com.
-Discounts for bulk purchases start at $15,000USD and the tier will be provided in the terms and conditions. Discounts will be deducted out of your commission at the end of the month.

How will I make money?
-You will be paid a commission at the end of the month based on your amount of sales. The payment commission increases with sales volume.

How can I prepare for the program?
-Develop a website unique to your territory and marketing strategy. (We recommend WordPress but most web-builder templates will work fine.)
-Prepare to embed the Hashlet code which will simply be pasting HTML into your site.

-Develop a marketing strategy and value you have to offer your customers.

--
Best Regards,

**Carlos Garza**
**Channel Manager, Value Added Resales**
GAW Miners LLC
O: (413)342-5380



# EXHIBIT A-9

http://gawsuit.com:80/                                    Go
32 captures
5 Sep 2015 - 8 Aug 2018

FEB   **MAR**   APR
◀   **26**   ▶
2016   **2018**   2019

About this capture

**AUG**
**14**

♥ 35

## GAWsuit Update August 13, 2016

By GawSuit | Uncategorized | No Comments

Hello Everyone.

GAWsuit is progressing through the court system here in the United States, and I wanted to post a more recent update.

Both defendants were served successfully with their respective summons. The time clock is now ticking for the defendants to respond to the allegations levied in the lawsuit that was filed.

As of Friday, a motion for the lawsuit to be certified as a "class status" was filed. The court will now determine whether the conditions are in place for the lawsuit to be certified as a class action lawsuit.

I do not know the time frame for the court to make the decision on class action status, but from the flurry of activity in the past month, I do not expect the certification to take too long. Meanwhile there has been a stay of the lawsuit itself, pending the court's reclassification of the lawsuit (certification) as a class action lawsuit. I have attached the PDF of the Mtion for Class Action Certification. If you have created a PACER account, here in the U.S., you can also view the other documents available from the lawsuit. There are now 18 items in the lawsuit file list.

Motion for Class Action Certification

Best regards,

Allen

---

**JUN**
**16**

## The Lawsuit Complaint Has Been Filed With The Court

http://gawsuit.com:80/                                    Go

32 captures
5 Sep 2015 - 8 Aug 2018

FEB    MAR    APR

◀    **26**    ▶

2016    **2018**    2019

▼ About this capture

announcement only.

Today marks the first major milestone of a long process we embarked upon over a year ago: The successful filing of a class action lawsuit by the law firms Susman and Godfrey L.L.P. and Izard Nobel L.L.P. The complaint was filed in the District Court of Connecticut today as case # 3:16-cv-00940.

If you have access to the electronic case filing system, you can find the filing here:

https://ecf.ctd.uscourts.gov/cgi-bin/DktRpt.pl?6295529302171-L_1_0-1

**What will happen next**?

The case has to be accepted and certified as a class action by the court. Once the case has been accepted and certified as a class action, then an initial discovery period will commence. As you all know, I have been gathering archival evidence since before March of 2015, prior to announcing that I was considering forming a lawsuit on April 17th, 2015. I will not go into details of what evidence we have, but it is quite extensive. I will add that GAW's activities, through the various forums and websites, were probably the most and best chronicled in the Crypto Industry, through online archiving websites such as WayBackMachine, Archive.is and Bitcointalk. There are quite literally tens of thousands of "snapshots" of posts and such permanently archived.

To address some of the questions I am anticipating to be posed, I have included a basic Q&A below.

**Question:**  How long of a process will this be?

**Answer:**  There is no way to know how long this will take.

**Question:**  What kind of class action lawsuit is this?

**Answer:**  To the best of my knowledge, this will be an "opt-out" class action, should it be certified as a class action lawsuit by the court. An "opt-out" class action lawsuit allows anyone to withdraw from the "class" or group to pursue their own separate litigation against the defendant(s). If you choose to remain in the class, the final result of the litigation (win or lose), will be final and you will not be able to pursue any subsequent legal action(s) relating to the charges and or allegations listed in the class action lawsuit.

You can read about class action lawsuits (U.S. version) here:

http://gawsuit.com:80/    Go

**32 captures**
5 Sep 2015 - 8 Aug 2018

FEB   **MAR**   APR
◀ **26** ▶
2016 **2018** 2019

About this capture

my knowledge, the jury will determine the amount of the award and any amount for damages. The attorney fees are determined by the court in such matters, but "typically" are around 30% of the value of the award. The attorney fees are withheld from collected award amounts.

Please check back to GAWsuit.com for any updates in the future. If you have ECF access to the court system case documents, you can follow everything there as well. Although this will be a long process, I will endeavor to post whatever the law firms request, as well as post a few lines to keep everyone up to date on any developments which occur.

---

FEB
**13**

 16

## GAWsuit Update

By GawSuit | Uncategorized | No Comments

Hello Everyone,

I have been receiving a lot of emails about the lawsuit of late. I was waiting for the law firm to prepare a proper announcement, but it has been too long since I posted an update. Therefore, I decided I will post a new update on the status today, versus keeping everyone in the dark.

Most, if not all, future announcements will invariably emanate from the law firm directly. I will post them here as they are made available.

**The Search**

As you all know, I had been in conversations with a number of lawyers and law firms since April 2015. After a number of negative experiences, we were finally put in touch with a highly prestigious law firm, with over 100 attorneys, and multiple offices around the United States. We started the dialogue in August of 2015.

We have had many conference calls, and exchanged many documents with attorneys of the firm. The lawsuit was accepted by the firm on December 30th, 2015.

**The Discovery Process**

http://gawsuit.com:80/    [Go]

32 captures
5 Sep 2015 - 8 Aug 2018

FEB    MAR    APR
◀ 26 ▶
2016    2018    2019

About this capture

A short list of prospective plaintiffs was put forward for review by the law firm. Those individuals are awaiting their interviews to be completed. The criteria was extensive and we needed to ensure that the class was well-represented, on all levels of the group, both small and large losses, by solid individuals. All of the lead plaintiffs are from the United States, at this juncture, due to the possible requirement for lead plaintiffs to be present during some of court hearings or, during settlement discussions. Should we need additional plaintiffs, representing the internationally-based victims, I will address such a need at that time.

**Lead Plaintiffs**

I cannot list who was chosen as lead plaintiffs in the case at this time, as that will be disclosed at the time of the filing of the complaint, in the court that will be hearing the case.

**What is a Class Action Lawsuit**

For those of you who are outside the United States, a class action lawsuit differs from a normal litigation against an individual or company. In this case, the lawsuit is for the benefit of all victims, the class, where proof exists to substantiate each member's claims of loss or damages.

During the final stage of the lawsuit registration process, we asked registrants to upload their supporting documents to GAWsuit.com. Out of the 501 initial registrants, 171 victims completed the process by uploading their proof of loss documents. These individuals have supported their claims that they lost money from the GAW scheme. In a U.S. court of law, the judge will consider such "complaints" for class status, starting at 21 plaintiffs (or when there are 40 or more with supporting evidence). Since 171 people have uploaded their supporting documents, in support of this lawsuit as was requested, we have well above the required 40 or more to substantiate class certification of the lawsuit. For those who did support their claims, by uploading your support documents, you can congratulate yourselves now, as without the supporting documents, we would have had a snowball's chance in Hades reaching class certification. Now, we have more than enough to justify class certification.

Links to explanations of what Class Action Lawsuits entail:

Class Action Lawsuit — Legal Definitions

How A Class Action Lawsuit Works — Alllaw

Frequently Asked Questions — Class Action Lawsuit

http://gawsuit.com:80/          Go       FEB   MAR   APR

32 captures                                                  ◀   **26**   ▶
5 Sep 2015 - 8 Aug 2018                                     2016 **2018** 2019

                                                            ▼ About this capture

There are no fees associated with this lawsuit, due from the membership. The law firm is taking the entire lawsuit on a contingency fee basis. The judge decides what that fee will be, after an award has been granted or, a settlement has been reached. The law firm's fee comes from the award or settlement. The lead plaintiffs will be directly part of the decision whether an award or settlement amount is acceptable to the class hence, the vetting process being undertaken to interview all lead plaintiffs who I have put forward for this lawsuit representation, including myself.

**When Will I See Money Coming Back?**

Obviously, we have to win the lawsuit, or agree to a settlement, before this question can be answered. Please do not send me emails asking how much or when you will receive money. I cannot answer this question at this moment in time.

**Who is the Firm Representing Us?**

It is the privilege of the law firm to announce their actions on behalf of the class action, at a time of their own choosing.  Invariably, once the "complaint" is filed in court, everyone will know who they are, by default, unless they choose to announce before the "complaint" is filed, on their own website, or through us on GAWsuit.com.

**Can I Contact the Law Firm After They Have Filed the Complaint?**

Again, this is up to the law firm, but once the complaint is filed, and the "class is certified" by the court, there will be no need for anyone to contact the law firm, as I "assume" the entire class action will be "opt-out." Anyone opting out of the class action would do so to file their own, separate lawsuit (see definition below). No one will be able to remain in the class action then, after winning the class action, proceed to file their own lawsuit, unless their lawsuit is for a different reason than that represented by the class action lawsuit.

What Does It Mean to Opt-out of a Class Action

Other Sundries:

The SEC's Case

As many are aware, the Securities and Exchange Commission (SEC) has already filed their case against GAW Miners, Zenminer/Zencloud and Garza. As of February 12th, the SEC has filed for a default judgment against

http://www.coindesk.com/sec-seeks-10-million-default-judgment-against-gaw-miners/

Why is the SEC Only Seeking $10 Million in Reimbursement?

Opinion:

The SEC is only targeting Hashlets in their case, as unregistered securities. However, the SEC failed, in my opinion, to study directly-sold Hashpoints (unregistered, "convertible" securities), HashStakers (time deposits with a stamped yield and lock-up period) and directly-sold Paycoin (again, as a guaranteed, unregistered security with a stated minimum value, or floor). If you study the definition of "securities" in the SEC complaint, the aforementioned items fit these conditions as well. I am "assuming" that the SEC did not understand how sold Hashpoints, HashStakers and Paycoin were transacted. Maybe the FBI's case will address these shortcomings in the future, should they file. Moreover, during the course of the SEC case, it may be revealed that Garza never claimed the windfall from GAW on his personal tax return to the IRS, which is highly likely. This should precipitate action on their part as well. Garza will eventually have to address multiple litigation actions against him, probably for years to come.

Future Posts

At this point, the law firm is now in charge of the lawsuit. I will be supporting them in the successful litigation of this suit. I will reach out to individuals privately, should any specific information be needed to support the case, but I am fairly certain we have more than an abundance of supporting documents, and such, to bring the litigation to a successful conclusion. As stated previously, any information that the law firm wishes to convey will be done by them directly, through their own means, and mimicked here, by me. Once the complaint has been filed, I will provide a link that will give others access to the filing. More than likely, Coindesk (Stan Higgins) will already have reported the complaint being filed; he seems to be well on top of things as it is.

Best regards,

Allen



http://gawsuit.com:80/    Go    FEB    MAR    APR

32 captures    ◀    26    ▶
5 Sep 2015 - 8 Aug 2018    2016    2018    2019

About this capture

ALERT! Hoax Email Circulating !

Hello Everyone.

There was an attempt (albeit a feeble one) to get people to send 0.30 BTC to a Bitcoin address in an email originating from, what appears to be, a Team Paycoin subdomain address. DO NOT SEND ANY COIN TO THAT ADDRESS !!! All correspondence covering the lawsuit will originate from gaw.lawsuit.allen1980s@gmail.com AND NO OTHER EMAIL ADDRESS. The person sending the hoax email obviously knows nothing about how lawsuits are conducted (probably some uneducated teen).

Best regards,

Allen

---

AUG
**21**

 3

## News and Updates

By GawSuit | Uncategorized | No Comments



September, 21st, 2015

Hello Everyone.

Welcome to the new website!

http://gawsuit.com:80/          Go

32 captures
5 Sep 2015 - 8 Aug 2018

FEB   **MAR**   APR
◀  **26**  ▶
2016  **2018**  2019

About this capture

More news coming soon.

Best regards,

Allen

---

July 17th, 2015  Original Newsletter



## Dear GAWsuit Members,

First, I would like to apologize for the lateness in updating the group about the forming GAW lawsuit (GAWsuit). It has been a very time consuming project, with new members arriving daily. As most of you know, I am involved in a lot of different projects, aside of the lawsuit. I also own a company, and the business of the company keeps me highly active. I would like to thank everyone for his or her patience in this matter. Following, you will find all of the latest developments and issues.

**The Members**

At present, our group members come from 47 countries, on all seven continents. The reach of the alleged GAW fraud was extensive. Daily, we receive at least 3 to 4 new applicants to the group, also from around the world. Our membership represents a vast number of different cultures, languages and ethnicities. It represents one of the most diverse private groups in the world today, with nearly every major language class being represented.

**Change of representation**

http://gawsuit.com:80/    Go    FEB  MAR  APR

32 captures    ◀ 26 ▶
5 Sep 2015 - 8 Aug 2018    2016  2018  2019    ▼ About this capture

they wanted as a retainer, and they indicated they wanted to bring other law firms into the group, which went against the initial discussions. We felt that their motivations were not in a successful litigation outcome.

Through the assistance of one of the members of the group, Coollegaljobs, we believe we have a more experienced attorney who will represent the group properly. We should have final details in the upcoming week, ending in a contract with the firm, hopefully.

**Evidence is voluminous, and growing**

As many of you have seen, through the various posts I have made in the forums, we are in possession of an immense amount of intelligence and evidence, which makes this case very clearly that of an alleged fraud. Garza's flight to Dubai ended in another catastrophe, forcing him to be returned to the United States.  Some of you may have seen the bits and pieces of information on the internet, about Garza's stay in Dubai. In effect, he was sued by a small group of GAW customers there, initially winning a million dollar plus judgment. Financial fraud and financial irresponsibility is a felony in the U.A.E., leaving Garza with a very real probability of being imprisoned. Unfortunately, Garza's defense attorney was successful in having the initial award overturned, based on the argument that the crime occurred in the United States, where the case should have been litigated. Garza has since returned to the United States, in complete embarrassment, failure and shame. Regardless of claims he has made publicly, he did not return at the request of the government. He had nowhere else to go.

**Recent lawsuits against GAW**

In the interim period, Mississippi Power successfully sued for $300,000 in defaulted payments and damages. The case resulted in a default judgment. Additionally, another case, by two past customers of GAW, resulted in a default judgment as well.  The amount of the judgment was $205,000.

**GAW Braintree Payments account.**

Braintree Payments had frozen the GAW credit processing account late in 2014. At the time, we believe, through various confirmations from past employees, that the account contained over $1.4 million. Through a little intelligence gathering, we were able to determine that the Braintree account contains slightly over $500,000 currently. The two successful judgments will certainly reduce most, if not all of that balance. Do not worry, as these assets are not the only assets Garza is believed to have at present. At this moment, Garza has two residential properties for sale in Massachusetts and Vermont. The total value of these properties is 1.2 million USD. We will be ensuring full use of the courts in properly identifying and seizing assets 'wherever we believe they lie.' As I have stated in the past, I will not rest until we have identified, seized, or encumbered (garnished) every dollar's worth of assets Garza has stashed away. If we are even half-successful, we will have ruined his

http://gawsuit.com:80/          Go      FEB  MAR  APR

32 captures                              ◀  26  ▶
5 Sep 2015 - 8 Aug 2018                  2016 2018 2019       About this capture

I have seen some conversations, on other forums, about Garza being able to discharge all judgments through a bankruptcy court. Most of these have been posted on Bitcointalk. These statements are highly generalized, far from representing all of the facts. The following:

" *There are still other types of debts that may be excepted from discharge, if the creditor files an objection. The creditor must file an adversary proceeding in bankruptcy court, requesting that the court decide that the particular debt is nondischargeable. If the judgment creditor files an objection to your discharge and proves the underlying debt to be any of the following types, it may not be dischargeable:*

·    *Injury caused by a willful or malicious act, such as assault;*
·    *Fraud used to obtain money, goods or services, such as lying on a credit application, or;*
·    *Fraud committed while in a position of trust, such as embezzlement while acting as a trustee or guardian.* "

As you can see, we will have to be highly diligent in preserving any judgments against Garza in the future. We intend to continue the pursuit of this goal until most, if not all, of any potential judgment is paid. It can be argued that: Garza was a trustee of consumer funds; misrepresented the status, liquidity and capabilities of GAW; redirected consumer funds to private accounts, while also effectively piercing the corporate veil, and; mixed personal and corporate finances together, on a regular basis. We have hard evidence of these activities, as does most of the membership in the group.

**Severe, damaging repercussions from the alleged GAW fraud**

The actions of GAW and Garza have resulted in numerous breakups of households, as well as several known individuals losing some, most, or all of their possessions, as well as jobs; all as a result of the overwhelming alleged fraud. In one instance, an individual was explicitly told to hold on to their GAW investments, even after losing over 50% of the value. This was the advice of the CEO (Garza) to the investor, who lost 98% of the total value of their investment to date. The investment was being made to help the investor's family cope with the investor's terminal illness. Garza was made cognizant of the situation, and still insisted the investor not sell out of his position with GAW.

This is not the only severe case of repercussions from investor losses.  Due to the immense integrity and efforts of Adam Matlack, as well as a number of generous benefactors from the community, some of these individuals have received financial support and assistance; mitigating some of the severe damages, they have incurred. I personally know of two people whose investments, and subsequent losses, have made them homeless.

slowly wither away from undelivered products enhancements, unfulfilled product deliverables, irrationally over-hyped promises of grandiose commercial relationships and business developments, as well as from false statements of corporate financial status and fictitious outside investors and support funds. In essence, the CEO was responsible for the destruction of tens of millions of dollars of investor wealth, while pumping promises that would not, nor could ever, be delivered.

**We have already lost one group member**

In the short time that the group has been formed, we have already lost one member to an unexpected death (Goroz: Grant Honeycutt). He was only 34 years old, and his health was assumed to be in top form. Regardless of his untimely passing, any award recoveries due to him, will be forwarded to his surviving parents. We want everyone to understand that we take this lawsuit and its success very seriously, and ensure that each member will receive their portion of any awards, but also their surviving heirs, should any member suffer an untimely passing, or become incapacitated. It is for this reason that we ask that all members ensure that there is an a family member who is kept abreast of this lawsuit and our contact information.

**Charge-backs and VARs**

We want to be very clear about this. If you have successfully obtained charge-backs through your bank, you **MUST** reduce the claim you have made for the lawsuit. I also want to ensure everyone understands that we are in contact with the **VARs (Value Added Resellers)** to ensure that there is **NO DOUBLE-DIPPING** occurring. I have made it clear in the forums, that charging back VARs, although the highest likelihood of receiving some of your money back, also leaves these individuals with no avenue to recover their money from GAW. If you have charged back any of the VARs, and have not adjusted your claim with this group, immediately upon a successful VAR charge-back, we will know about it, and we will have to remove you from the group. You will no longer be part of the lawsuit. You will be on your own. You are effectively taking money from others in the group who have, in good faith, claimed actual losses they have not recovered. When you **double-dip**, you are enriching yourself with other members' prospective recoveries, without just cause.  We will be discussing the VAR situation with the attorneys. We wish to determine whether we can include them in the lawsuit, in some capacity.

**A new website in development moving forward**

In the coming week(s), another website will be online where registrants can upload the following documents and details, supporting their loss positions, while also legally identifying themselves for the court. We are contemplating the creation of separate accounts for registrants, using the email address entered on the first web form. You will be asked to create a password to secure your account on the new website. All data will

http://gawsuit.com:80/                                    Go    FEB  MAR  APR

**32 captures**                                                                    ◄   **26**   ►
5 Sep 2015 - 8 Aug 2018                                                           2016 **2018** 2019                    ▼ About this capture

1)   Full Name.

2)   Full Address;

3)   Postal code;

4)   Country of Residence;

5)   Copy of a government-issued picture ID (taken next to the individual's face);

6)   Telephone Number;

7)   All Zencloud Account User ID(s), **"NOT"** passcodes;

8)   Real primary email address that is not at Gmail, Yahoo, Hotmail, MSN or other email service providers (explained later). Mail Chimp will not add emails starting with "info@," "Admin@," or other general info email addresses, such as "support@;"

9)   Amount of Hashpoints mined, converted to Paycoin;

10)  Amount of Hashpoints purchased from GAW directly;

11)  Amount of Paycoins purchase from Paybase direct (not the exchange) and Paycoin.com;

12)  Signature on "Release of Zencloud and Paybase Account Histories and Data," imaged and returned via e-mail;

13)  Signature on "Group Litigation Agreement," imaged and returned via e-mail;;

14)  Signature on "Testimony on Validity of Claim," ," imaged and returned via e-mail, and;

15)  FBI submission checkbox, "yes" or "no."

The three primary documents required will be created in Adobe PDF as forms. You will need Adobe Acrobat to view, fill in, print and sign to email back to us. You can fill these documents and scan to email to return them to us here in the U.S. The email address will be the same: gaw.lawsuit.Allen1980s@gmail.com

**Uploads:**

A)  Complete Zencloud account history from beginning to present (instructions follow);

B)  Copies of any and all sales receipts for hosted hardware, Hashlets, Stakers, and Paycoin (through Paybase);

C)  Copies of receipts or contracts purchasing Hashpoints from GAW (Josh Garza or Carlos Garza);

D)  Copies of Bitcoin transactions with GAW, Paybase, or Zencloud, and the addresses the Bitcoins were sent to (This was at the FBI's request), and;

E)  Copies of Bitcoin transactions coming from GAW for refunds.

**Software**

http://gawsuit.com:80/ Go

32 captures
5 Sep 2015 - 8 Aug 2018

FEB　MAR　APR
◀ 26 ▶
2016 **2018** 2019

About this capture

**Your email address is important for the lawsuit. Your responses are required**

Many of you have normal, personal email addresses you use on a daily basis, while some of you depend on Gmail, Yahoo, Hotmail, GMX, and other third party email service providers with which to communicate. We want to make it very clear that, should you have a personal email not from a third party provider, you should disclose this in the new form, as a secondary, backup email address. If you use any of the other providers, as your primary email service, continue to use that email address in the new form. As most of you are aware, we are spending a sizeable amount of our personal time on this lawsuit. Allen has replied to a number of claim forms requesting additional clarification with absolutely NO responses. This means that people are registering email addresses that they never check, under some form of paranoia.

If anyone fails to respond to any requests for additional information, we have sent to a registered email address, we will have to remove that person from the group within 14 days of receiving no response.  By not responding, a person is abusing valuable time and effort, as well as hindering the group's efforts in negotiations, or the courts. The group cannot be held captive by people who are not taking the lawsuit seriously. This is not a lottery, it is a lawsuit that requires a lot of time from a small number of people. We cannot be sympathetic to a person's claimed losses, if they are unsympathetic to our direct requests for additional information or clarification of supplied information. This is a complex process, it is crypto-based, the alleged GAW fraud is complicated, and the courts have little understanding of these issues, making this process ten times worse than a typical fraud case. There is a lot of verification on the horizon involving a lot of accounting. If some members do not cooperate fully, it will increase the workload astronomically, push the lawsuit further out from completion, and potentially damage any prospective settlement or judgment efforts.

Our time is being used to further the group's common goal: seeking recoveries of lost investments, as well as punitive damages. We do not have time to send five or ten unanswered emails to addresses which go completely ignored. Our time is uncompensated in this effort, we are not GAW, and the liabilities to any of the damaged consumers of GAW, really rests with GAW, hence the litigation. Therefore, if you choose to ignore our email requests, we cannot adequately support your claim. If you decide to go on vacation, you must contact us, via email, to indicate the dates you will be gone, and the date you will be available again. The address is again: gaw.lawsuit.allen1980s@gmail.com. This email is directly forwarded to Allen's primary email address. As most of you already know, Allen responds to many emails directly, and within a time that is achievable by Allen.

**Zencloud Instructions**

As stated earlier, and across all of the applicable forums, you need to download your complete account history in each of your Zencloud accounts.



increments of no more than 30 days. If you have access to Google Docs, you can check the output by uploading the resultant spreadsheet output to Google Docs, opening the spreadsheet there to manipulate the export date range accordingly. You may also combine your output files in Google Docs.

**Step by step:**

Log into your Zencloud account. On the left sidebar, choose "Latest Activity."



Next, your screen will fill with the most recent list of account activities, like this:





Now you will see the date range box.



Choose the date "Start Date" as the first date of your account opening. Chose the "End Date" for 30 days later. I chose 45 days, because the output was less than 1,000 rows of data, like this:



Click "Download." Save the file with your account user ID like SkippyCowboy Part 1. Work your way up until the current date, capturing all of your account history, including the Hashpoint mining period, and staking outputs.

When you open the spreadsheet, the output looks like this:



http://gawsuit.com:80/                                    Go     FEB  MAR  APR

32 captures                                              ◀ 26 ▶
5 Sep 2015 - 8 Aug 2018                              2016  2018  2019    ▼ About this capture

**More heavy points**

Do not inflate your loss claims. Someone stated they lost over $10 million. On further inspection, that loss was less than $50,000. The highest, legitimate, verifiable loss is presently $1.4 million. Additionally, you cannot claim the amount of damages you demand to receive with your claim. It is a "group" lawsuit, not 500 individual lawsuits. Any punitive damages or awards are divided amongst the entire group membership, proportionate to member's percentage contribution to the total group losses. If you represent 1% of the total loss of the group, you will receive 1% of any "collected" award from judgments that are recoverable.  We will endeavour to submit all judgments to every credit bureau in the U.S., until paid in full, ensuring that Garza's liability is made publicly known to every future business, bank, or future individual investor and consumer, pulling a credit bureau background check.

Anyone failing to upload supporting documents will either receive a substantially lesser amount, based on what information we can retrieve, or will be completely removed from the group. We cannot present the court with guesses about the value of each account's loss. We have to have supporting documents and, a rather massive spreadsheet will need to be created, calculating amounts from which we derive the total claim of the group. If we cannot substantiate any or only part of your losses, and you upload no documentation to support your claim, either we will have to re-rate the account at the lower sum we have information to make an assessment from, or the claim will have to be withdrawn.

We are joining forces to present a powerful, influential group that will carry significant weight at the negotiation table, and in the courts. As individuals, we stand little chance in succeeding in the courts, as it requires knowing where the assets are, how to get to them, and a lot of money in the form of attorney's fees and retainers. As a group, each person's share of the costs will be relatively small compared to individual lawsuits. That was one of the main purposes in our forming the group. Together, everyone stands a chance at winning some or all of their losses back, possibly more. As individuals, there is little chance of that.

http://gawsuit.com:80/    Go

32 captures
5 Sep 2015 - 8 Aug 2018

FEB  MAR  APR

◀ **26** ▶

2016  **2018**  2019

About this capture

primary group loss calculation. It is important that you identify these exactly on the next form (new website). Hashpoints mined prior to the distribution, are valued at 400 Hashpoints per Paycoin, or $4.00 per Paycoin. Paycoins purchased directly through Paybase, not the exchange, are valued at the rate you paid. You will need your receipts for these transactions.

To bring things into perspective, there are presently over 16 million Paycoins in circulation to date. At that volume, GAW would be liable for $320 million in lost value to all people who purchased or mined them. I can guarantee that neither GAW, Josh, nor the other defendants, presently possess, combined, $320 million in addition to the losses from investments in Vaultbreakers, Hashlets, Stakers, or other hosted hardware. We have to apportion valuations where they are realistic and where they have the most benefit to the suit. Where real cash, credit or Bitcoin was transferred to GAW directly, through the Zencloud marketplace, or through Paybase direct sales, that is where we define losses. Fantastical valuations based on one man's lies is not going to be well received by a court of law, but it will be well-received as coercive marketing that leads to punitive damages.

**Purchased other members' accounts or separate products**

If you purchased other investors' whole accounts, privately, the amount you paid is your loss, less receipts from a further sale, not the actual retail value of the Hashlets, Stakers, or hosted hardware.

If you sold your account to someone else, through the Zencloud marketplace, your loss is the amount you paid for everything in the account, plus commissions to GAW (5%), less earnings, and less the amount you sold the account or assets for.  Do not use retail values to determine your losses, unless you purchased retail and never sold anything from your account. In such cases, your investment, less revenue, equals you base loss. Lost future revenues, although legitimate, are a basis for punitive damages, not base losses.

**Group leadership**

There will be a small group of members who will be chosen to represent the group in its entirety. These people are selected based on a number of different parameters, one of which will be the amount of their verifiable, personal loss in the alleged GAW fraud. Another, will be their availability and willingness to represent the group in court hearings, should the need arise.  Obviously, members losing less than $10,000 will have little incentive to represent the group as leaders, considering the cost they will bear to attend any court hearings representing the group. Moreover, there are other leader requirements which will be called upon, from time to time.

This small group of leaders will represent all members of the group by proxy. This same group will be empowered to make decisions, collectively, on behalf of the entire group. Should funds be recovered through negotiations, this group of leaders will decide whether to accept or decline any negotiated settlement, on behalf

http://gawsuit.com:80/    Go    FEB **MAR** APR

**32 captures**    ◀ **26** ▶

5 Sep 2015 - 8 Aug 2018    2016 **2018** 2019    ▾ About this capture

decisions agreed to by the group leaders; the decision is irrevocable. This form and contract will be on the upcoming website. The agreement will be part of the account creation, and will be digitally signed by the members, prior to moving on to document uploading.

Under United States law, no defendant can be tried twice for the same crime or complaint, by the same individual(s). As members of this group, all decisions by the court(s), after all appeals have been adjudicated, will end any and all claims by any of the members of the group. It is important that the correct leaders are chosen to represent the group decision-making process. I will attempt to select nine people as leaders of the group. By choosing an odd number, we avoid all indecisions where equal numbers of the leaders choose opposing paths for the group; creating a deadlock. I will be contacting members who I feel would best represent the group's interest. These people will be disclosed on the group contract, including the amount of investment lost to GAW, as transparency to the membership.

**Further communications**

Mail Chimp did not work out so well on the first run. Many of the email addresses resulted in bounces, via spam filters.

**If you are in receipt of this email, you are registered with the group.**

**If anyone has any questions, please feel free to contact Allen1980s.**

Best regards,

Allen

Gaw.Lawsuit.Allen1980s@gmail.com

Forums:

https://forum.gethashing.com/ @Allen1980s
https://paycointalk.org/ @Allen1980s

Slack Channels:

http://gawsuit.com:80/    Go

**32 captures**

5 Sep 2015 - 8 Aug 2018

FEB   **MAR**   APR

◀   **26**   ▶

2016   **2018**   2019

About this capture

Search...      Search

**RECENT POSTS**

GAWsuit Update August 13, 2016

The Lawsuit Complaint Has Been Filed With The Court

GAWsuit Update

Phishing Attempt

News and Updates

**ARCHIVES**

August 2016

June 2016

February 2016

October 2015

August 2015

**CATEGORIES**

Uncategorized

**META**



WordPress.org

© 2018 gawsuit.

# EXHIBIT A-10

Chargeback FAQ | PayPal

Buy    Sell    Send    Business        Log In    Sign Up

**Security Center**

**Buying Safely**

**Selling Safely**

**How We Help Protect Sellers**

**Tips to Sell Securely**

Chargeback FAQ

**Chargeback Guide**

**Seller Testimonials**

**Resolving Issues for Sellers**

**Funds Availability for eBay Sales**

**Online Safety Essentials**



**PayPal. Privacy is built in.**

Report a problem
LEARN MORE

**Report fake (phishing) email**

**Report fake (spoof) websites**

**File a transaction dispute**

**Start an unauthorized transaction claim**

**Cancel an existing credit card claim**

**Other issues**

**Resources**

**Resolution Center**

**Help Center**

**Privacy Policies**

## Chargeback FAQ

### Overview

**What is a chargeback?**

**What is the difference between a chargeback and a PayPal dispute?**

**What is the difference between a chargeback and a PayPal claim?**

**What are some best practices for avoiding a chargeback?**

**Why do some chargebacks occur so long after payment has been received?**

### Chargebacks and Sellers

**How does PayPal notify a seller when a chargeback is filed against that seller?**

**What happens to the seller's funds when a chargeback is received?**

**Does receiving a chargeback affect a seller's eBay feedback?**

### Disputing Chargebacks

**How can a seller recover funds when a chargeback occurs?**

**What information can a seller provide to increase the chances of winning a chargeback dispute?**

**If a seller amicably resolves a PayPal dispute or wins a claim, is the seller covered against chargebacks?**

**Does PayPal dispute every chargeback with the buyer's credit card company?**

### More Information

**Where can I get more information about chargebacks?**

**Where can I find out more about selling safely online?**

Overview

### What is a chargeback?

A chargeback, also known as a reversal, occurs when a buyer asks a credit card company to reverse a transaction that has already cleared. A buyer may file a chargeback with his/her card issuer based on credit card association regulations and timeframes.

Although a chargeback may appear similar to a PayPal claim, it's actually a process that is granted to a cardholder by their credit card company and initiated outside of PayPal. In a dispute over a chargeback, the decision is ultimately made by the credit card company and PayPal can't control the outcome.

Two common reasons for reversals or chargebacks are:

> A buyer's credit card number is stolen and used fraudulently.
>
> A buyer makes a purchase, but believes that the seller failed to fulfill their side of the agreement (for example, they did not ship the item, shipped an item that was very different from the seller's description, or the item was damaged when the buyer received it).

All sellers who accept credit card payments run the risk of being liable for chargebacks. Chargebacks are among the unfortunate costs of doing business. Many sellers factor this cost into their business risk model.

**Back to top**

∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙

### What is the difference between a chargeback and a PayPal dispute?

A chargeback occurs when a buyer asks their credit card company to reverse a transaction that has already cleared. A buyer may file a chargeback with their card issuer based on credit card association regulations and timeframes.

A PayPal dispute is the first step in the PayPal buyer complaint process. This is when buyers and sellers can post messages to each other in the PayPal Resolution Center and try to find a mutually acceptable resolution to the problem.

**Back to top**

### What is the difference between a chargeback and a PayPal claim?

A chargeback occurs when a buyer asks their credit card company to reverse a transaction that has already cleared. A buyer may file a chargeback with their card issuer based on credit card association regulations and timeframes.

Although a chargeback may appear to be similar to a PayPal claim, it's actually a process initiated outside PayPal, which is granted to a cardholder by their credit card company.

A PayPal claim is typically an action taken by a buyer on the PayPal site against a seller, when the buyer has purchased an item and it either: didn't arrive or did arrive, but was significantly different from the item description. Claims require PayPal customer support to render a decision either for or against the seller based on evidence collected from both parties. A claim can only be filed after going through PayPal Dispute Resolution in the PayPal Resolution Center.

**Back to top**

### What are some best practices for avoiding chargebacks?

Describe the item that you are selling in as much detail as possible and as accurately as possible. Include pictures, measurements (if applicable), and other relevant specifics.

Make every effort to know your customer and to respond promptly to any customer service requests.

Keep as much information as you can about the transaction and your customer, including email or other correspondence.

Publish your return policy in your auction listings or on your website. Also include your return policy in email correspondence with your customer. Please note that certain laws and credit card issuer policies provide that buyers may have chargeback rights for merchandise that is not delivered or is defective, even if your policy indicates that all sales are final and that you do not allow returns.

Ship to the buyer's address listed on the Transaction Details page and retain proof of delivery that can be tracked online.

Use this helpful checklist for typical decision points when considering whether or not to accept payment.

You can find more Best Practices to avoid chargebacks in **Security Tips for Sellers**, **Communication Tips**, and **Chargeback Guide Part 2: Minimizing Chargebacks**.

| Decision Point | Consideration |
|---|---|
| Price of Item | The higher the price, the lower your tolerance for risk. |
| New Buyer | There could be higher risk in dealing with a new buyer. |
| Confirmed Address | You may lower your risk when you know you're shipping to a confirmed address. |
| Auction or eBay | To assess risk, use feedback scores and comments as well as checking that shipping information is highly visible to the buyer. |

| Decision Point | Consideration |
|---|---|
| Questionable Behavior | Rush shipments at any cost, sending partial payment from different PayPal accounts, or not making full payments should be cause for concern. If you're asked to send a high-priced item to a location in one country but billed to another, there could be a higher risk and you should use your best judgment. |

**Back to top**

...........................................................................................................

### Why do some chargebacks occur so long after payment has been received?

Certain laws and credit card issuer policies usually allow buyers to file chargebacks weeks or sometimes months after the initial transaction occurs.

**Back to top**

...........................................................................................................

#### Chargebacks and Sellers

### How does PayPal notify a seller when a chargeback has been filed against them?

When a buyer files a chargeback, the buyer's credit card company notifies PayPal's merchant bank. Our merchant bank informs us of the chargeback, and we immediately email the seller. The seller can then log in to their PayPal account and go to the **Resolution Center** to monitor the status of the case and provide information to help resolve the matter.

**Back to top**

...........................................................................................................

### What happens to the seller's funds when a chargeback is received?

A chargeback sets in motion a chain reaction. The buyer's bank pulls the funds from PayPal's merchant bank. PayPal's merchant bank pulls the funds from PayPal. And we, in turn, pull the funds from the Seller.

Had PayPal's merchant bank not pulled the funds for that chargeback, PayPal would not have needed to pull the seller's funds. Note that if the dispute is found in favor of the seller, PayPal will credit the Seller's account with the disputed funds.

**Back to top**

...........................................................................................................

### Does receiving a chargeback affect a seller's eBay feedback?

No. When a seller receives a chargeback, it will not negatively impact the seller's eBay feedback rating.

The chargeback system is provided by third-party credit card companies and is independent from eBay feedback. Filing a chargeback does not prevent a buyer from leaving feedback for a seller. Nor does leaving feedback – whether positive, negative, or neutral – limit the buyer from filing a chargeback against the seller.

**Back to top**

...........................................................................................................

#### Disputing Chargebacks

### How can a seller recover funds when a chargeback occurs?

In many cases, when a chargeback occurs, the money that is subject to the chargeback is deducted from PayPal. In turn, PayPal places a temporary hold on the same amount in the seller's PayPal balance (the funds are frozen).

The seller and PayPal can work together to dispute the chargeback with the buyer's credit card company. While the chargeback is being disputed, PayPal will

debit the seller's account for the amount in question. If PayPal and the seller ultimately win the chargeback dispute, the credit card company will reimburse PayPal for the chargeback, and PayPal will transfer the recovered funds back to the seller. Depending on the credit card company involved, the process may take up to 75 days.

In cases where the Seller has either resolved a dispute amicably with the Buyer through PayPal Dispute Resolution or won a PayPal claim, the Seller will be protected against any chargeback the buyer's credit card company later files for that transaction.

To be covered, however, the seller must honor agreements made with the buyer during the dispute resolution process. And, if the chargeback comes in before the dispute or claim is resolved, the seller will not be covered.

**Back to top**

### What information can a seller provide to increase the chances of winning a chargeback dispute?

The following types of information can increase the chances of a chargeback dispute being ruled in favor of the seller:

- Proof of delivery, such as online tracking numbers.
- Copies of the original item description or auction description, including any photos.
- Proof that the buyer was already refunded.
- Proof that the buyer was provided with a replacement product.
- Correspondence with the buyer or feedback from the buyer.
- Any agreements signed or accepted by the buyer at time of purchase.
- Any return policy that was communicated to the buyer.

**Back to top**

### If a seller amicably resolves a PayPal dispute or wins a claim, is the seller covered against chargebacks?

Yes, if a seller amicably resolves a dispute through PayPal Dispute Resolution or wins a claim, the seller is protected against any chargeback the buyer's credit card company later files for that transaction.

To be covered, however, the seller must honor agreements made with the buyer during the dispute resolution process. And, if the chargeback comes in before the dispute or claim is resolved, the seller will not be covered.

**Back to top**

### Does PayPal dispute every chargeback with the buyer's credit card company?

PayPal reserves the right not to dispute a chargeback even if the seller has provided some evidence, particularly if PayPal believes the dispute is not likely to be successful.

**Back to top**

### Where can I get more information about chargebacks?

To help you through the chargeback process, take a look at PayPal's **Chargeback Guide**.

A step-by-step Guide on how to Respond to a Chargeback Filed with a Credit Card Company is available at the **PayPal Resolution Center**.

**Back to top**

### Where can I find out more about selling safely online?

To learn more about **Selling Safely**, go to:
- **How We Help Protect Sellers**. How PayPal helps keep your transactions safe.
- **Tips to Sell Securely**. How you can ensure that a transaction goes smoothly.
- **Resolving Issues for Sellers**. How to respond to buyer disputes, claims, and chargebacks.

**Help**    **Contact**    **Fees**    **Security**    **Apps**    **Shop**    **Refunded Returns**

About    Blog    Jobs    Sitemap    Developers    Partners                    © 1999–2019    Privacy    Legal    Feedback

Consumer advisory - PayPal Pte. Ltd. the holder of PayPal's stored value facility, does not require the approval of the Monetary Authority of Singapore. Users are advised to read the terms and conditions carefully.

When you visit or interact with our sites, services, applications, tools or messaging, we or our authorised service providers may use cookies, web beacons, and other similar technologies for storing information to help provide you with a better, faster and safer experience and for advertising purposes. Learn more here.

# EXHIBIT A-11

Page 1

1                  UNITED STATES DISTRICT COURT

2                    DISTRICT OF CONNECTICUT

3

4   DENIS MARC AUDET, MICHAEL        )
    PFEIFFER, D. ALLEN SHINNERS, and )
5   JASON VARGAS, Individually and on)
    Behalf of All Others Similarly   )
6   Situated,                        )
                                     )
7              Plaintiffs,           )
                                     )
8        vs.                         )  No. 3:16-cv-00940
                                     )  Pages 1 - 182
9   HOMERO JOSHUA GARZA, STUART A.   )
    FRASER, GAW MINERS, LLC, and     )
10  ZENMINER, LLC, (d/b/a ZENCLOUD),,)
                                     )
11             Defendants.           )
    _____ )

12

13

14

15      VIDEOTAPED DEPOSITION OF BRUCE STROMBOM, Ph.D.

16              LOS ANGELES, CALIFORNIA

17           WEDNESDAY, DECEMBER 5, 2018

18

19

20

21

22  REPORTED BY:
    LESLIE L. WHITE
23  CSR NO. 4148
    JOB NO.:  152140

24

25

Page 2

1
2
3
4              Wednesday, December 5, 2018
5                      9:34 a.m.
6
7
8         Videotaped deposition of BRUCE
9    STROMBOM, Ph.D., held at 1999 Avenue of the
10   Stars, Suite 900, Los Angeles, California,
11   before Leslie L. White, CSR No. 4148.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1              A P P E A R A N C E S :
2
3         SUSMAN GODFREY
4         Attorneys for Plaintiffs
5           1000 Louisiana Street
6           Houston, Texas 77002
7         BY:  COLIN WATTERSON, ESQ.
8
9         HUGHES HUBBARD & REED
10        Attorneys for Defendants
11          One Battery Park Plaza
12          New York, New York 10004
13        BY:  SARAH CAVE, ESQ.
14            HANNAH MILLER, ESQ.
15
16      Also Present:
17        BRENT JORDAN, Videographer
18
19
20
21
22
23
24
25

Page 4

1              I N D E X
2    WITNESS:      EXAMINATION      PAGE
3    BRUCE STROMBOM, Ph.D.  BY MR. WATTERSON    6, 176
                BY MS. CAVE      174
4
5
6
              E X H I B I T S
7    PLAINTIFFS'                PAGE
8    Exhibit 236   Declaration of Bruce Strombom    7
9    Exhibit 237   Expert Report of Robert Mills    7
10
11
12
        QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER
13                  (NONE)
14
15
16
17        INFORMATION REQUESTED
                  (NONE)
18
19
20
21        REQUESTED TO BE MARKED
                  (NONE)
22
23
24
25

Page 5

1      LOS ANGELES, CALIFORNIA; WEDNESDAY, DECEMBER 5, 2018
2            9:34 a.m.
3               -o0o-
4         THE VIDEOGRAPHER:  This is the start of
5    DVD labeled No. 1, the videotaped deposition of
6    Dr. Bruce Strombom, taken in the matter of Denis
7    Marc Audet, et~al. v. Homero Joshua Garza, et al.
8    filed in the United States District Court, District
9    of Connecticut, Case No. 3:16-cv-00940.
10        This deposition is being held at 1999
11   Avenue of the Stars, Los Angeles, California, on
12   December 5th, 2018, at approximately 9:34 a.m.
13        My name is Brent Jordan.  I am the legal
14   video specialist with TSG Reporting, Inc.  The court
15   reporter is Leslie White, in association with TSG
16   Reporting.
17        Will counsel present please identify
18   yourselves for the record.
19        MR. WATTERSON:  Colin Watterson with
20   Susman Godfrey for the plaintiffs.
21        MS. CAVE:  Sarah Cave from Hughes Hubbard
22   & Reed, for Defendant Stuart A. Fraser, and with me
23   is Hannah Miller.
24        THE VIDEOGRAPHER:  Will the court reporter
25   please swear in the witness.

2  (Pages 2 to 5)

Page 82

1  these private transactions, resellers or PayCoin
2  transactions on outside databases; is that right?
3      A   Yes.
4      Q   Okay.  And I'll get to the third-party
5  sources and resellers in a second.  I just want to
6  focus on -- let me go back.
7          And your opinion is essentially that these
8  databases don't reflect these three types of
9  transactions; is that fair?
10     A   Well, specifically it's that you can't
11  tell who the purchasers are in these transactions
12  with respect to this paragraph here.
13     Q   So why would products that weren't
14  acquired from GAW Miners or ZenMiner directly appear
15  in the database?
16     A   I'm sorry, can I have that question again.
17     Q   Why would products that were not acquired
18  directly from GAW Miners or ZenMiner appear in these
19  databases?
20     A   Well, oftentimes, they don't.  I mean,
21  that's the point.
22     Q   Well, so if someone -- let me give you an
23  example.  Someone buys PayCoin on a third-party
24  exchange.  That wouldn't appear in the database;
25  right?

Page 83

1      A   No, and that's the problem.  People that
2  sell that data -- those coins, including potential
3  Class members, on a third-party exchange, there is
4  no record of the benefit that they received from
5  selling those.  And, similarly, we don't know who
6  they sold them to.  So the buyer also is not
7  identified in the GAW database.
8      Q   I mean, would the buyer be a part of the
9  Class, as you understand it?
10     A   No, I don't think the buyer would be, and
11  so they should be excluded from the Class.  Whether
12  they do that on a third-party exchange, or whether
13  they do that in, according to my understanding, the
14  definition of the Class, or whether the data are
15  reflected in the GAW database for that kind of a
16  transaction.
17     Q   So I don't understand why it would matter
18  if information about the -- a buyer on a third-party
19  exchange is reflected in this data set if they are
20  excluded from the Class?
21     A   Well, if they are a purchaser on a
22  third-party exchange from an entity, other than the
23  two defendants, GAW and Zen Cloud -- or ZenMiners,
24  then I think they would not be part of the Class.
25  So the -- their identity, that is the identity of

Page 84

1  the buyer in that transaction would not be
2  important, unless that information is reflected in
3  the GAW database in some way, which in general it is
4  not.
5      Q   So why can't you determine the value a
6  seller on a third party received based on the value
7  they received when they withdrew PayCoin from one of
8  the databases?
9          MS. CAVE:  Objection to the form, but you
10  can answer.
11         THE WITNESS:  Because they didn't receive
12  value when they withdrew it.  The withdrawal is not
13  a transaction.
14         You can withdraw PayCoin and put it in
15  your wallet for a day or a month or forever and
16  never sell it.  Or you can sell it any time
17  afterwards on a third-party exchange, and there is
18  no -- there will be no record of that in the SQL
19  databases in general.
20  BY MR. WATTERSON:
21     Q   Well, there is a record of the withdrawal;
22  right?
23     A   There is a record of the withdrawal, but
24  that's not a record of what the Class member
25  received for their PayCoin.  They withdraw a

Page 85

1  PayCoin -- they have a PayCoin.  They put it in a
2  private wallet.  You don't know how that -- what
3  they receive in value for that PayCoin.
4          That's the problem with -- that's one of
5  the problems with the proposed I guess definition,
6  and the fact that it can't really be operationalized
7  with the data that -- the definition of damages
8  proposed by Mr. Mills that cannot be operationalized
9  with the data that we have available.
10     Q   Well, if I withdraw -- strike that.
11         Let's say that I sell some securities in
12  my brokerage account, and -- I take the proceeds and
13  withdraw them.  Don't you know how much value I
14  received when I withdrew those proceeds?
15     A   That's not analogous to what is going on
16  in these transactions.
17     Q   Why not?
18     A   An analogous transaction would be that you
19  took the stock certificates from your broker and put
20  them in your pocket, and now we're looking at the
21  broker's records to say:  What was the value that
22  you received for your stock certificates?
23         They don't know because they don't have
24  insight into what you do with those stock
25  certificates.  You could sell those in 10 days and

Page 86

1  double your money.  You could hold them until they
2  become worthless and lose all your money.  But the
3  broker wouldn't know that.
4        And that's the analogous position that we
5  are in when we're looking at the databases that
6  Mr. Mills proposes to use in order to calculate the
7  damages on a Class-wide basis.
8    Q   Well, don't we know the value of PayCoin
9  at the time it was withdrawn?
10   A   Well, that's a question in itself.  The
11 value fluctuates day to day, you know, more than day
12 to day.  It fluctuates -- can fluctuate minute to
13 minute.
14       So there is -- that's a question in
15 itself, what the actual value of the PayCoin was
16 when it was withdrawn.
17       But that's not the pertinent question for
18 determining damages.  The question is what is the
19 value that you ultimately realized from that
20 PayCoin.  Because you didn't realize any value when
21 you withdrew it.  It is still PayCoin.  You still
22 own a PayCoin when you withdraw it.
23   Q   But you agree -- do you agree that there
24 is data that we could use to determine the value of
25 PayCoin at the time it was withdrawn with some level

Page 87

1  of granularity?
2        MS. CAVE:  Objection to the form.
3        THE WITNESS:  Well, Mr. Mills doesn't
4  describe any similar approach.  I don't know what he
5  would propose be done.
6        In the data you can identify the day of
7  the withdrawal, at least for some of these
8  transactions.  But as I say, that's not the
9  pertinent value, for the reasons I have just
10 described.
11 BY MR. WATTERSON:
12   Q   So, I mean, you cited some data from
13 CoinMarketCap; correct?
14   A   Yes.
15   Q   And at least that data set provides what
16 is a low, a high, and an average price per day, I
17 think; is that right?
18   A   I believe that's right.
19   Q   Could you use that data to approximate the
20 value of PayCoin at the time it was withdrawn from
21 an account?
22   A   That wouldn't be a measure of damages,
23 but, you know, you could identify the day it was
24 withdrawn, identify the high and low on the -- on
25 that day from that data source.

Page 88

1        But that's going to be irrelevant to the
2  measure of damages.  If it traded -- for example, if
3  I withdrew it on a particular day, and it was
4  trading for $10, and I held it for three days, and
5  it is trading for $14, and I sold it for $14, then I
6  would make money, relative to the value on the day
7  it was withdrawn.  Alternately, if I withdrew it,
8  and I, unfortunately, held it until it became worth,
9  you know, 5 cents, then the value would be that much
10 lower.
11       So the value on the date of withdrawal
12 doesn't have any economic significance to
13 calculating damages.  And the problem is that
14 nowhere in the database are you able to determine
15 what the ultimate value was that was realized by the
16 Class member for that in this example PayCoin.
17       And Mr. Mills admits that the value
18 received has to be deducted from the amount of the
19 investment in order to arrive at damages.  And it is
20 that second component, the value of received, that
21 we can't determine from the available data, and
22 Mr. Mills provides no methodology for making that
23 determination.
24   Q   We could determine the value received if
25 someone traded PayCoin on PayBase, though; correct?

Page 89

1    A   Mr. Mills hasn't identified how to do
2  that.  So I assume you can, but I don't know that
3  for a fact, and certainly that's nothing Mr. Mills
4  in his methodology has described about how to do.
5  Because he hasn't described the methodology for
6  calculating damages or determining if a Class member
7  was harmed.
8    Q   Well, does PayBase have records of
9  purchases and sales of PayCoin?
10   A   It has some records of those.  It also has
11 records of withdrawals for which it, you know, it
12 obviously doesn't have information about what that
13 PayCoin was ultimately sold for by proposed Class
14 members.
15   Q   And going back to paragraph 34, did you --
16 did you rely on any evidence, I guess other than
17 Mr. Mills' report, declaration and deposition
18 testimony to arrive at this opinion?
19   A   Well, I think this is really based upon my
20 totality of my understanding of the databases, how
21 cryptocurrency transactions occur, you know, off the
22 GAW exchange, and in particular the lack of
23 visibility into those transactions, based upon what
24 Mr. Mills has proposed.
25   Q   Let's -- strike that.

23  (Pages 86 to 89)

# EXHIBIT A-12

1              LOU KERNER

2  UNITED STATES DISTRICT COURT

3  DISTRICT OF CONNECTICUT

   ----------------------------------------x

4  DENIS MARC AUDET, MICHAEL PFEIFFER,

   DEAN ALLEN SHINNERS, and JASON VARGAS,

5  Individually and on Behalf of All Others

   Similarly Situated,

6

                    Plaintiffs,

7

          vs.                        3:16-cv-00940

8

   HOMERO JOSHUA GARZA, STUART A. FRASER,

9  GAW MINERS, LLC, and ZENMINER, LLC,

10               Defendants.

   -----------------------------------x

11

12      VIDEOTAPED DEPOSITION OF LOU KERNER

13            New York, New York

14            November 8, 2018

15

16

17

18

19

20

21

22

23  Reported by:

24  KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25  JOB NO. 149297

Page 2

LOU KERNER

November 8, 2018

Videotaped deposition of LOU KERNER,
held at Susman Godfrey, LLP, 1301 Avenue
of the Americas, New York, New York, before
Kathy S. Klepfer, a Registered Professional
Reporter, Registered Merit Reporter,
Certified Realtime Reporter, Certified
Livenote Reporter, and Notary Public
of the State of New York.

Page 3

LOU KERNER

A P P E A R A N C E S:

SUSMAN GODFREY
Attorneys for Plaintiffs
    1201 Third Avenue
    Seattle, Washington  98101
BY:  EDGAR SARGENT, ESQ.

HUGHES HUBBARD & REED
Attorneys for Defendants
    One Battery Park Plaza
    New York, New York  10004
BY:  SARAH CAVE, ESQ.
    HANNAH MILLER, ESQ.

ALSO PRESENT:
    MATTHEW CHIN-QUEE, Videographer

Page 4

LOU KERNER

    IT IS HEREBY STIPULATED AND
AGREED, by and between the attorneys for
the respective parties herein, that the
filing and sealing be and the same are
hereby waived.
    IT IS FURTHER STIPULATED AND
AGREED that all objections, except as to
the form of the question, shall be
reserved to the time of the trial.
    IT IS FURTHER STIPULATED AND
AGREED that the within deposition may be
sworn to and signed before any officer
authorized to administer an oath, with
the same force and effect as if signed
and sworn to before the Court.

Page 5

LOU KERNER
    THE VIDEOGRAPHER:  This is the start
of tape labeled number 1 in the videotaped
deposition of Lou Kerner in the matter Denis
Marc Audet, et al. v. Stuart A. Fraser, GAW
Miners, LLC, et al. in the United States
District Court, District of Connecticut,
Number 16-940.
    This deposition is being held at 1301
Avenue of the Americas, New York, New York,
on November 8, 2018 at approximately 9:34
a.m.
    My name is Matthew Chin-Quee from TSG
Reporting Inc., and I'm the legal video
specialist.  The court reporter is Kathy
Klepfer, in association with TSG Reporting.
    Will the counsel please introduce
yourself.
    MS. CAVE:  Sarah Cave from Hughes
Hubbard & Reed for defendant Stuart Fraser,
and along with me is Hannah Miller.
    MR. SARGENT:  Edgar Sargent from
Susman Godfrey on behalf of the plaintiffs.
    THE VIDEOGRAPHER:  Will the court
reporter please swear the witness.

2 (Pages 2 to 5)

Page 10

LOU KERNER

1
2    A.   No.
3    Q.   In paragraph 2, you say that you're
4 the managing partner of CryptoOracle LLC.
5        What's CryptoOracle LLC?
6    A.   I described CryptoOracle, LLC is a
7 community-first crypto VC accelerator incubator,
8 and we also -- yeah.
9    Q.   What do you mean by "community first"?
10   A.   We believe that the biggest difference
11 between crypto and everything that came before
12 it is the importance of community to the success
13 and failure of projects.
14   Q.   And by "crypto," what technologies are
15 you referring to?
16   A.   I'm referring to blockchain,
17 cryptocurrency, smart contracts, and
18 zero-knowledge proof are the foundational
19 technologies that we believe comprise crypto.
20   Q.   And is that -- grouping those four
21 technologies under crypto, is that your
22 convention or is that a convention that's sort
23 of widely used?
24   A.   I'd say that's our convention at
25 CryptoOracle.  Very early on in any new

Page 11

LOU KERNER

1
2 industry, kind of the words we use can mean
3 different things to different people.
4    Q.   And when was CryptoOracle founded?
5    A.   November 2017.
6    Q.   And you're the managing partner.  Are
7 there other partners?
8    A.   There's one other partner.
9    Q.   And who is that?
10   A.   James Haft.
11   Q.   And had you worked with Mr. Haft
12 before?
13   A.   No.
14   Q.   Are there any other owners or interest
15 holders in CryptoOracle other than you and Mr.
16 Haft?
17   A.   We have a general partnership, a fund
18 manager that -- and that has shareholders.
19   Q.   Okay.  How many shareholders?
20   A.   I think 27.
21   Q.   Is it --
22   A.   I believe.  Around.
23   Q.   Okay.  Is it a publicly held
24 company --
25   A.   No.

Page 12

LOU KERNER

1
2    Q.   -- or private?  Okay.
3        And in paragraph 2, one of the things
4 that you mentioned that CryptoOracle does is
5 invest and advise in crypto-related companies.
6        At this point in time, how many
7 crypto-related companies does CryptoOracle
8 invest in?
9    A.   Right now, we've invested in one
10 company.
11   Q.   And are you able to say the name of
12 that company?
13   A.   Hedera Hashgraph.
14   Q.   And what does that company do?
15   A.   They have a permission blockchain to
16 enable high-volume number of transactions over
17 the blockchain.
18   Q.   What type of transactions?
19   A.   They're initially focused on micro
20 payments.
21   Q.   And when did that investment occur?
22   A.   In January.
23   Q.   Of 2018?
24   A.   Yes.
25   Q.   So just that one company.  Any other

Page 13

LOU KERNER

1
2 companies?
3    A.   No.  The -- no.
4    Q.   Okay.  You also say here that
5 CryptoOracle advises crypto-related companies.
6        How many companies are you advising?
7    A.   At present?
8    Q.   Uh-huh.
9    A.   Probably around five.
10   Q.   Okay.  And are any of those
11 cryptocurrency companies?
12   A.   How are you defining cryptocurrencies?
13   Q.   Well, how would you define it?
14   A.   Well, as crypto companies, they're all
15 crypto companies.  That's all that we do, is
16 advise on companies that are in what we
17 described as and earlier discussed as crypto.
18   Q.   So the four technologies you define
19 under crypto.  I was focusing specifically on
20 cryptocurrency companies.
21        How many are you advising right now?
22   A.   And again, I'm going to just come
23 back.  Again, "cryptocurrencies" is one of those
24 words that can mean different things to
25 different people.

4 (Pages 10 to 13)

Page 14

LOU KERNER

1
2    Q.   Okay.
3    A.   So I'm just trying to understand what
4  you mean by "cryptocurrency."
5    Q.   A cryptocurrency company that would be
6  one that involved financial transactions or...
7        Would you accept that definition?
8    A.   I -- well, look, I think, you know,
9  I'll define it as crypto because, again, I'm not
10 sure what you -- what you mean by
11 "cryptocurrency."
12   Q.   Well, you listed cryptocurrency as one
13 of the four technologies under the umbrella of
14 crypto, and so I'm trying to understand what you
15 mean by "cryptocurrency" in your --
16   A.   Sure.
17   Q.   -- under the umbrella of "crypto" --
18   A.   Sure.
19   Q.   -- what you mean by "cryptocurrency."
20   A.   What -- what we define
21 "cryptocurrency" as any kind of tokenized
22 incentive.
23   Q.   And what to you mean by "tokenized
24 incentive"?
25   A.   That there is a digital representation

Page 15

LOU KERNER

1
2  of the value accruing to the people being
3  incentivized.
4    Q.   So, using that definition, how many
5  companies is CryptoOracle advising right now?
6    A.   That are going to be using that
7  technology?  Given the regulatory environment in
8  the United States, potentially none of them or
9  all of them, depending on the regulatory
10 environment and what their lawyers believe is
11 best.
12   Q.   And by "regulatory environment," what
13 do you mean?
14   A.   Largely around the classification of
15 utility tokens as securities.
16   Q.   Okay.  And are there -- which U.S.
17 regulators currently regulate cryptocurrency
18 companies?
19   A.   There are -- every government agency
20 believes that they have oversight, so ranging
21 from the SEC to the CFTC to the White House to
22 senators and Congressmen and states and cities
23 and...
24   Q.   Okay.  You also say that you're an
25 active blogger on cryptocurrency-related topics.

Page 16

LOU KERNER

1
2        Where do you currently blog on
3  cryptocurrency-related topics?
4    A.   On Medium.com.
5    Q.   Is that the only place right now?
6    A.   For the most part, yes.
7    Q.   Okay.  And what's Medium.com?
8    A.   It's a blogging platform.
9    Q.   And do you have any ownership or
10 operational role in Medium.com?
11   A.   No.
12   Q.   Is that a website where you pay to
13 post blogs, or is it free?
14   A.   It's free to post.
15   Q.   Do you have a contract or written
16 agreement with them for your blogs?
17   A.   I assume I probably accepted some, you
18 know, when you go to any website it says, "Do
19 you agree to these terms?"  And I'm also a
20 paying member, so on the -- to read, some people
21 put their posts behind a pay wall.  So I'm a
22 member and, I guess, have terms and agreement
23 with that membership.
24   Q.   I see.
25       So you -- you attended UCLA as an

Page 17

LOU KERNER

1
2  undergrad?
3    A.   Yes.
4    Q.   Is that where you attended all four
5  years of college?
6    A.   Four and a quarter.
7    Q.   Four and a quarter.  Okay.
8        And your degree was a bachelor in
9  economics?
10   A.   Yes.
11   Q.   Did you have a specialty within your
12 bachelors?
13   A.   No.
14   Q.   Did you do a written thesis your
15 senior year or anything like that?
16   A.   No.
17   Q.   Did you concentrate in any particular
18 area of economics courses?
19   A.   No.
20   Q.   Your first job out of college was at
21 Bain & Company?
22   A.   Yes.
23   Q.   And what did you do for Bain &
24 Company?
25   A.   I was an associate consultant helping,

5 (Pages 14 to 17)

Page 18

LOU KERNER

you know, more senior consultants on different projects.

Q.   Was there any particular industry or subject that you concentrated in?

A.   Probably the biggest industry I concentrated on was healthcare.

Q.   And where did you -- which office of Bain & Company did you work out of, geographically?

A.   Boston.

Q.   And sorry, you said healthcare was your area of --

A.   Hospitals.

Q.   Okay.  How long did you work another Bain & Company?

A.   Two years.

Q.   And where did you go after that?

A.   Stanford Business School.

Q.   And that's where you received your MBA?

A.   Yes.

Q.   And were you there for one year or more than one year?

A.   Two years.

Page 19

LOU KERNER

Q.   Two years.

And did you concentrate or have any specialty at -- in your MBA degree?

A.   No.

Q.   And what year did you receive your MBA?

A.   1988.

Q.   And then after you received your MBA, what position did you hold?

A.   I became a -- I forget the exact title of the role, but with Lowe Development, a real estate company in Los Angeles.

Q.   How do you spell that?

A.   Lowe.  I think it's L-O-W-E.

Q.   Okay.  And what was your position -- what was your position with Lowe Development?

A.   Both running financial models as well as helping in the leasing of office space in several of their developments.

Q.   And by "financial models," what do you mean?

A.   They were developers, and so they were looking at developing on different properties, and so they would have me assist in the

Page 20

LOU KERNER

development of the financial models relative to the different real estate projects.

Q.   And how long did you work at Lowe Development?

A.   One year.

Q.   And did you have a position after that?

A.   I started a -- my own consulting company.

Q.   Okay.  And what was the name of your consulting company?

A.   It was just Lou Kerner.

Q.   Okay.

A.   Kerner Associates, something like that.

Q.   What type of consulting were you doing?

A.   Largely financial modeling for the -- in the entertainment industry.

Q.   And how does financial modeling work in the entertainment industry?

A.   At that time, it was -- there was a lot of Japanese capital coming into the industry, and the transactions were often

Page 21

LOU KERNER

facilitated by lawyers who didn't actually have any capabilities within their own firms to do the financial modeling necessary in those types of transactions.

Q.   I'm shocked to hear that.

Okay.  And so then how long were you working for your own consulting company?

A.   About two to three years.

Q.   And what did you do after that?

A.   I bought a company called Deforest Research that did legal and factual research on film and television scripts.

Q.   And was that de Forest or Deforce?

A.   De Forest, D-E-F-O-R-E-S-T.

Q.   And you said you bought that company?  Did it already exist?

A.   It already existed and it was in the bankruptcy court.

Q.   Okay.  So you bought that entity out of bankruptcy?

A.   That's right.

Q.   And were you the -- the CEO or --

A.   Yes.

Q.   And were there people working for you

LOU KERNER

1
2     Q.   And you were at Goldman Sachs for
3  about four years?
4     A.   Yes.
5     Q.   And what caused you to leave Goldman
6  Sachs?
7     A.   I got the opportunity to be CEO of an
8  Internet company that I thought, you know, had
9  great promise.
10    Q.   And which Internet company was that?
11    A.   The dotTV Corporation.
12    Q.   And what's the dotTV Corporation?
13    A.   Every country has their own lop-level
14  domain, and there's a tiny island nation of
15  South Pacific called Tuvalu, who was blessed
16  with the top-level domain dotTV and we licensed
17  it from them and commercialized it.
18    Q.   How did you find out about that
19  opportunity?
20    A.   I got a phone call from Bill Gross,
21  who was the founder of IDEA Labs, an Internet
22  incubator, and the founder of dotTV.
23    Q.   Okay.  And were you at Goldman Sachs
24  when you heard about that opportunity or had you
25  left?

LOU KERNER

1
2     A.   I was at Goldman Sachs.
3     Q.   Okay.  And how big was the dotTV
4  Corporation?
5     A.   It -- at the time that I joined, it
6  had -- all -- all it had, the only asset it had
7  was the right to, you know, was -- was the
8  top-level domain.
9     Q.   Okay.  So were you the only employee?
10    A.   I was the first employee.
11    Q.   And did you subsequently hire other
12  employees?
13    A.   Yes.
14    Q.   And so the dotTV domain was licensed
15  from the government of Tuvalu?
16    A.   Yes.
17    Q.   And who holds the -- does the dotTV
18  Corporation still hold that license?
19    A.   The dotTV Corporation was acquired by
20  Verisign, which continues to hold that license.
21    Q.   Did you ever go there?
22    A.   Yes.
23    Q.   The pictures are beautiful.
24    A.   Three times.  The airstrip is a
25  quarter of the land mass.

LOU KERNER

1
2     Q.   And so, I'm sorry, you said Verisign
3  still owns that?
4     A.   Verisign, yes.
5     Q.   And did you have any position or role
6  at Verisign?
7     A.   For a short time.
8     Q.   And what position did you have?
9     A.   Just running dotTV.
10    Q.   And at some point you left dotTV?
11    A.   Yes.
12    Q.   And what did you do next?
13    A.   I worked as a portfolio -- or, as an
14  analyst, I guess, at Mark Asset Management.
15    Q.   And Mark, M-A-R-K?
16    A.   Yes.
17    Q.   And what's Mark Asset Management?
18    A.   It was an investor of -- the focus on
19  media assets.
20    Q.   And how long did you work there?
21    A.   Six months.
22    Q.   And what was your position?
23    A.   Analyst.
24    Q.   What did you do there as an analyst?
25    A.   Analyzed different, you know,

LOU KERNER

1
2  different media and tech-related investment
3  opportunities.
4     Q.   And you left after six months?
5     A.   Yes.
6     Q.   What did you do next?
7     A.   I acquired a company called Bolt
8  Media, which was a social network for teens.
9     Q.   Okay.  And how did you find out about
10  that opportunity?
11    A.   The founder of the company was a
12  friend of a friend who I had known for a number
13  of years.
14    Q.   Okay.  And so you purchased that
15  yourself or with others?
16    A.   I purchased it with the founder.
17    Q.   The founder of Bolt?
18    A.   Right.  The -- there had been over $60
19  million of equity invested in the company, and
20  so we bought out the existing shareholders.
21    Q.   And is that a -- at the time, was that
22  a public company or a private company?
23    A.   Private.
24    Q.   Private.
25         And as president, what was your --

LOU KERNER

1  what were your roles?
2
3      A.   I mean, it was a pretty small company.
4  We probably had about 20 employees when we
5  bought it and, you know, we from focused on --
6  my focus was largely on growing the reach of
7  the -- of the property.
8      Q.   And how long did you -- were you
9  president of Bolt.com?
10     A.   Three years.
11     Q.   And what happened next?
12     A.   I was CFO of a company called ROO
13  Group.
14     Q.   What's ROO Group?
15     A.   It was a publicly traded provider of
16  enabling technologies for enterprises to stream
17  video.
18     Q.   You said "publicly traded," so it was
19  registered with the SEC?
20     A.   Yes.
21     Q.   And what exchange was it traded on?
22     A.   Nasdaq.
23     Q.   And what does it -- what does it mean,
24  "enabling technologies for enterprises to stream
25  video"?

LOU KERNER

1
2      A.   Enterprises, generally media
3  companies, had large quantities of video that
4  needed to be encoded and, you know, put into
5  some kind of content management system and then
6  streamed to Internet users, and ROO had an
7  intense solution for that.
8      Q.   Do you have a CPA?
9      A.   No.
10     Q.   How long were you the CFO at ROO
11  Group?
12     A.   One year.
13     Q.   And why did you leave ROO Group?
14     A.   As the CFO, I had to sign that there
15  was no fraud happening at the company, and
16  because of the activities of the COO of the
17  company, I was uncomfortable signing.
18     Q.   Did you suspect that there was fraud
19  going on at the company?
20     A.   I didn't know whether there was or
21  not, but I wasn't provided the information to
22  enable me to make that decision, and I told the
23  board of directors that I was, as a result,
24  uncomfortable signing.
25     Q.   Do you know if ROO Group was ever

LOU KERNER

1
2  investigated or sued for fraud?
3      A.   Yes, it was.
4      Q.   And did you report your concerns to
5  anybody other than the board?
6      A.   No.
7      Q.   Did the board do an internal
8  investigation?
9      A.   I don't know.  The board fired me.
10     Q.   Okay.  And what happened to -- sorry,
11  ROO Group was -- was it charged by the SEC?
12     A.   I didn't follow it that closely.  My
13  understanding what happened was it was acquired
14  by another company that was -- and the person
15  who ran that company I think was ultimately
16  action was taken against him.  I'm not sure.  I
17  think he fled the country.  I'm not sure if he
18  was ever brought to justice or not.
19     Q.   And what information was it that you
20  were not able to gather was withheld from you
21  that you weren't comfortable with?
22     A.   There were -- he had check -- the COO
23  had check-writing authority, and he had written
24  large checks and hadn't provided any backup
25  information with regards to what they were for.

LOU KERNER

1
2      Q.   Were there any other areas of
3  information that you couldn't get and that made
4  you uncomfortable?
5      A.   No.
6      Q.   What did you do next after your CFO
7  position at ROO Group?
8      A.   I became CFO of Perimeter Security.
9      Q.   And what's Perimeter Security?
10     A.   They provided security technologies
11  largely for community banks.
12     Q.   And by "security technologies," you
13  mean --
14     A.   For their Web -- for cyber security.
15     Q.   Okay.  And how long were you at
16  Perimeter Security?
17     A.   One year.
18     Q.   And why did you leave Perimeter?
19     A.   I was fired.
20     Q.   Okay.  And was there a reason?
21     A.   I -- it was -- the company was run by
22  a friend, a guy I had known for a long time, and
23  we had very -- ended up having very different
24  styles.
25     Q.   Styles of what?

Page 46

LOU KERNER

1  do when I want to learn about something is I'll
2  hold a conference call on the topic, and I'll
3  get global thought leaders to come on the call
4  and effectively teach me.  And they come on the
5  call because I'll also get, you know, oftentimes
6  hundreds of other people on the call, and they
7  get access to those -- to those people.
8      Q.   So when was the first conference call
9  that you had?
10     A.   Sometime around mid 2013.
11     Q.   And who was on the first conference
12 call that you had?
13     A.   It's -- I did end up doing three calls
14 over the course of the year, so it's kind of a
15 little bit of a mush on who was on the different
16 calls.
17     Q.   Okay.  Just, categorically, who were
18 the people that you had join you on those calls?
19     A.   Sure.  I mean, they tended to be
20 people who were leaders in the industry at that
21 time.  So different people who were on the calls
22 were like Barry Silbert from TCG, Marco Santori
23 from Cooley, Chris Larson from Ripple.  Those
24 were some of the people who were on the calls.

Page 47

LOU KERNER

1  James Altucher.
2      Q.   And how did you find those individuals
3  to participate on the calls?
4      A.   Internet.
5      Q.   And were those calls transcribed or
6  recorded?
7      A.   Yeah, they were -- they were recorded.
8      Q.   Do you still have those?
9      A.   No.
10     Q.   When did -- did you purchase any
11 Bitcoin at that time?
12     A.   No.
13     Q.   Have you ever purchased Bitcoin?
14     A.   Yes.
15     Q.   How much Bitcoin have you purchased?
16     A.   A very small amount.
17     Q.   Are there any other Altcoins that you
18 have purchased?
19     A.   A small amount of Ethereum.
20     Q.   And when did you first purchase
21 Bitcoin?
22     A.   2017.
23     Q.   Approximately when?
24     A.   Probably something like September.

Page 48

LOU KERNER

1      Q.   And why did you purchase Bitcoin then?
2      A.   Just to see what it was like to
3  purchase it.
4      Q.   And you said also Ethereum?
5      A.   Yes.
6      Q.   And when did you purchase Ethereum?
7      A.   Same time.
8      Q.   Same time.
9           And do you still hold both of those?
10     A.   Yes.
11     Q.   Approximately how much -- how much
12 Bitcoin would you say you have?
13     A.   $100.
14     Q.   And Ethereum?
15     A.   $100.
16     Q.   Just getting back to your declaration,
17 you mentioned a company called ChangeTip.
18          What's ChangeTip?
19     A.   So, during the 2013-14 timeframe when
20 I was spending some time trying to understand
21 Bitcoin, I started looking at investment
22 opportunities, and ChangeTip was a San
23 Francisco-based company that enabled micro
24 payments, largely tipping, via Bitcoin.

Page 49

LOU KERNER

1      Q.   And what involvement did you have with
2  ChangeTip then?
3      A.   I was an investor.  Didn't have any
4  other formal role with the company.
5      Q.   And how did you hear about ChangeTip?
6      A.   I don't recall.
7      Q.   Are you still invested in ChangeTip?
8      A.   Change -- well, it was through the
9  Social Internet Fund, and since that time,
10 ChangeTip has ceased operations.
11     Q.   And why did they cease operations?
12     A.   They ran out of money.
13     Q.   Was there any fraud or --
14     A.   No.
15     Q.   -- wrongdoing?
16          And why did they run out of money?
17     A.   I think they were simply early.  I
18 mean, it's still early.
19     Q.   What do you mean by "early"?
20     A.   That there wasn't mass adoption of the
21 technology yet, so they -- you know, the thought
22 was that this was a coming technology and that,
23 you know, lots of people would start using it,
24 and that didn't happen.

13  (Pages 46 to 49)

Page 50

LOU KERNER

1
2    Q.   Do you have any view as to why that
3  people weren't adopting it?
4    A.   I think it, at the time, it was very
5  complex to buy and use Bitcoin.
6    Q.   In paragraph 4, you also mention
7  Bitcoin Wallet.  What's Bitcoin Wallet?
8    A.   It's a domain name.
9    Q.   And what does it syndicate?
10   A.   It's -- well, it probably -- it
11 indicates to me that there's something Bitcoin
12 Wallet related there.  Bitcoin Wallet as it
13 relates to Bitcoin.
14   Q.   I'll ask you a better question.
15       Does it -- is it -- is Bitcoin Wallet
16 a company?
17   A.   BitcoinWallet.com is a domain name
18 that I purchased.
19   Q.   Okay.  So is there anything behind it
20 other than the domain name?
21   A.   No.
22   Q.   It's just a domain name that exists?
23   A.   Yes.
24   Q.   And you bought that for $25,000?
25   A.   Yes.

Page 51

LOU KERNER

1
2    Q.   Do you still own that today?
3    A.   No.
4    Q.   Why not?
5    A.   I bought it with a partner, and we
6  sold it.
7    Q.   How much did you sell it for?
8    A.   $250,000.
9    Q.   To whom did you sell it?
10   A.   A Texas-based company.
11   Q.   Okay.  Are there -- during this
12 2013-2014 time period, were there any writings
13 that you did on Bitcoin?
14   A.   Yeah, I mean, I would -- I would
15 generally write up the conference calls that we
16 did.
17   Q.   Okay.  And where are those written up?
18   A.   I'm trying to think of the blogging
19 platform I was -- I was using then because
20 Medium wasn't around yet, so it might have been
21 on Tumbler or might have been during the period
22 where I wasn't writing them up.  I don't recall.
23   Q.   Okay.  What's your Tumbler handle or
24 user name?
25   A.   Lou -- just my name.  Lou Kerner.

Page 52

LOU KERNER

1
2    Q.   Lou Kerner.
3        Do you have a Twitter handle?
4    A.   Lou Kerner.
5    Q.   And are you active tweeting?
6    A.   Yes.
7    Q.   What about Reddit, do you have a user
8  name?
9    A.   No, I mean, I assume I probably have
10 an account, but I'm not active.
11   Q.   What about any other crypto forms or
12 online forms or platforms?
13   A.   Telegram.
14   Q.   Telegram.  And what's your user name
15 there?
16   A.   Lou Kerner.
17   Q.   Any others?
18   A.   I guess I post on LinkedIn.  You know,
19 it's generally just pointing to my Medium posts.
20   Q.   Aside from any -- aside from writing
21 of the conference calls, were there any other
22 publications in which you appeared in the
23 2013-2014 time period?
24   A.   Not -- not that I can recall.
25   Q.   Actually --

Page 53

LOU KERNER

1
2    A.   I was -- I was employed by, you know,
3  by National Securities at the time, and so now
4  that they -- there were pretty significant
5  restrictions, I was licensed at the time on what
6  I could write or get approved by compliance.
7    Q.   In your declaration in paragraph --
8        (External noise interruption.)
9  BY MS. CAVE:
10   Q.   Sorry for the distraction.
11       In paragraph 4 of your declaration,
12 you say you were highlighted in a Wall Street
13 Journal article.
14       When was that?  Do you know the date
15 of that article?
16   A.   I don't.  It was -- they live blogged
17 one of my conference calls that I did, and at
18 the start of a live blog of that call they said,
19 "We're on conference call being held by Lou
20 Kerner, Wall Street's Bitcoin expert."
21   Q.   Did you tell them that you were a
22 Bitcoin expert?
23   A.   No.
24   Q.   Do you know if that's available online
25 anywhere?

14 (Pages 50 to 53)

LOU KERNER

A. I don't.
Q. Do you have a copy of it?
A. I don't.
Q. Do you know who the Wall Street Journal reporter or connection -- the name of the person who was involved in that?
A. No, I don't.
MS. CAVE: Why don't we take a short break.
THE VIDEOGRAPHER: We're going off the record at 10:22 a.m.
(Recess.)
THE VIDEOGRAPHER: We're back on the record at 10:34 a.m.
BY MS. CAVE:
Q. Mr. Kerner, just focusing again on paragraph 4 in your declaration and the three conference calls in 2013 and 2014.
Do you remember approximately which months in 2013 and 2014 those conference calls occurred?
A. I don't really.
Q. Okay. And then in paragraph 5, you talk about becoming a partner in Flight Ventures



LOU KERNER

in 2015; is that right?
A. I think so.
Q. And when in 2015, do you recall?
A. Probably in the early part of the year.
Q. Okay. So what would you say in the period of kind of mid 2014 to early 2015, what were you -- what were you doing during that time?
A. I was employed by the Social Internet Fund.
Q. Okay.
A. And the work that I was doing at Flight Ventures wasn't paid outside of carry that I got on those deals, but it was, you know, related to the work I was doing at National Securities --
Q. Okay.
A. -- and the Social Internet Fund.
Q. Understood.
So, basically, researching companies and investing kind of during that time period?
A. Yes.
Q. Is that fair to say?



LOU KERNER

And when I say "by that time period," I'm talking about mid 2014 through early 2015?
A. Yes, I'm -- for the Social Internet Fund.
Q. Got it.
And how many -- I'm sorry if I asked you this already. How many partners are there in Flight Ventures?
A. I don't know how many partners there are. There is one gentleman really running it, and so I mostly interacted with him.
Q. Okay. And are you a general partner? A limited partner?
A. I mean, it's a -- it's a -- when I'm -- a partner would be the Israel Founder Syndicate.
Q. Okay.
A. We say that they're a member of Flight Ventures, but I'm not paid by Flight Ventures. I don't have an ownership interest in Flight Ventures.
Q. And is the syndicate a separate entity or it's a component?
A. The syndicate is an entity that does



LOU KERNER

each -- each deal is a one-off transaction.
Q. Okay.
A. And so in that transaction, you know, I personally get part of the carry and Flight Venture gets part of that carry.
Q. And in paragraph 5, you refer to a June 29, 2017 conference call on initial coin offerings.
Is that a conference call that you organized?
A. Yes.
Q. And who participated in that conference call?
A. Eyal Hertzog from Bancorp, Kathleen Breitman from Tezos, and Olaf Carlson-Wee from Polychain Capital, and I think there was a fourth one. I can't remember now.
Q. And was that conference call transcribed or memorialized somewhere?
A. I believe I wrote a blog post on it.
Q. On which --
A. On the conference call on Medium.
Q. And what was the purpose of that conference call?

Page 70

LOU KERNER

1 different people had to say. I'm not sure the
2 location of the forums, whether it was on Reddit
3 or, you know, other forums like that.
4     Q.   Was that something you reviewed?
5     A.   Yes.
6     Q.   What about any e-mails, did you review
7 any e-mails in this case?
8     A.   Yes, there were a number of e-mails
9 that were provided.
10     Q.   Have you ever engaged in hardware
11 mining?
12     A.   No.
13     Q.   What about cloud mining?
14     A.   No.
15     Q.   And why haven't -- have you -- why
16 haven't you done that?
17     A.   I think by the time that, you know, in
18 June that I saw the crypto light and it became
19 devalued, it had by that time become very much
20 of a -- a scale game.
21     Q.   What do you mean "scale game"?
22     A.   That, you know, when it first started
23 in 2000 -- mining started in 2010, you could
24 mine off a single computer.  I'm not saying even

Page 71

LOU KERNER

1 I would have the technical expertise to do that,
2 but could have gotten somebody to, you know,
3 could have figured it out or got somebody to
4 help me.  But by 2017, the majority of mining
5 was being done by operations that were, you
6 know, had a large number of computers mining at
7 the same time.
8     Q.   So, effectively, by 2017, mining was
9 obsolete?
10     A.   No, it was complex, needing both, you
11 know, generally, a significant amount of capital
12 and technical expertise.
13     Q.   Okay.  But did you -- did you seek to
14 have an understanding of how mining worked?
15     A.   Yes.
16     Q.   Okay.  And how did you do that?
17     A.   Generally, just reading, the majority
18 of it, generally, on Medium.
19     Q.   And that was in 2017?
20     A.   I mean, I got a basic understanding of
21 it in 2013.
22     Q.   Okay.
23     A.   And continued to deepen the
24 understanding in, you know, '17.

Page 72

LOU KERNER

1     Q.   And the basic understanding that you
2 got in 2013, was that hardware mining?
3     A.   Yeah.  I mean, at that time, it was
4 largely being done, you know, by individuals on
5 computers.
6     Q.   Are there any cloud mining services
7 that exist today that allow you to buy a portion
8 of a mining option?
9     A.   There could be.
10     Q.   You don't know for sure?
11     A.   If there are, and again, when you use
12 words, you know, there are -- there are
13 certainly other mining as a service companies
14 that you operate over the Internet.  Whether you
15 consider that a cloud-based hosted mining or
16 not...
17     Q.   And by cloud-based, in comparison to
18 hardware-based?
19     A.   Yeah.
20     Q.   Okay.  So getting back to your
21 declaration, in paragraph 11, you say, "Bitcoin
22 has no centralized governing authority."
23     What do you mean by that?
24     A.   Well, generally, in -- in most

Page 73

LOU KERNER

1 organizations, be them companies or government,
2 there is somebody in the middle who's making a
3 decision, and there is no person in the middle
4 of Bitcoin making the decisions.
5     Q.   You also say there's no central point
6 of failure.
7     What does that mean?
8     A.   That means the -- the Bitcoin ledger
9 is distributed.  So it doesn't matter if you
10 knock out any of those computers, you know, it's
11 broadly distributed so it doesn't have any
12 single point of failure.
13     Q.   In the absence of those -- in the
14 absence of a governing authority, a central
15 intermediary, or a central point of failure, how
16 does Bitcoin sustain itself?
17     A.   Well, Bitcoin -- I mean, there are
18 different aspects of it, so but at the core, as
19 I think of it, it is they incentivize people to
20 power the network by providing incentives in the
21 form of Bitcoins itself that you get by
22 successfully mining Bitcoin coins.
23     Q.   You go on to say that there's a need
24 for members of the Bitcoin community to serve

Page 86

LOU KERNER

1 dollar back.
2      Q.   How does Tether make money doing that?
3      A.   They can -- well, to begin with, they
4 can make money on the interest.
5      Q.   Okay.
6      A.   If it's sitting in a bank account.
7      Q.   Have you ever studied behavioral
8 economics?
9      A.   I'm not sure what you mean by
10 "studied." I'm familiar with behavioral
11 economics and the works of Daniel Kahneman and
12 others.
13      Q.   By "studied" I mean have you taken any
14 courses?
15      A.   No.
16      Q.   Have you written anything on
17 behavioral economics?
18      A.   I don't recall if I have. I'm
19 certainly, you know, I'm a big fan of, again,
20 the work of Daniel Kahneman and have referred to
21 it and I might have written about some of the
22 things previously.
23      Q.   So turning to paragraph 39 of your
24 declaration, you say that, "No rational investor

Page 87

LOU KERNER

1 would have purchased Hashlets if they knew the
2 truth; that there was insufficient mining
3 equipment with far less hashing power than GAW
4 Miners was selling."
5      What's your basis for your assertion
6 that -- about -- your assertion that no rational
7 investor would have purchased the Hashlets under
8 those circumstances?
9      A.   If they weren't taking the money and
10 buying computers that were then generating an
11 income and they were simply using the capital
12 and to pay off previous investors, that kind of
13 seems to me to be the kind of description of a
14 Ponzi scheme.
15      Q.   Have you studied Ponzi schemes?
16      A.   No, I have not studied Ponzi schemes.
17      Q.   Have you ever found yourself in the
18 circumstances of a Ponzi scheme?
19      A.   I don't think so.
20      Q.   Hopefully not.
21      In terms of rational investor behavior
22 for cryptocurrency -- well, let me strike that.
23      What analysis did you do to reach your
24 conclusion in paragraph 39 about rational

Page 88

LOU KERNER

1 investors?
2      A.   You know, just the belief that
3 rational investors wouldn't invest in Ponzi
4 schemes and my sense that, since they weren't
5 actually -- didn't actually have the competing
6 power and weren't generating the income, rather
7 they were paying people back with money that was
8 invested by, you know, new investors.
9      Q.   And what's the basis for your belief
10 that rational investors wouldn't invest in Ponzi
11 schemes?
12      A.   That, you know, Ponzi schemes,
13 essentially, the music stops playing
14 and the last people in lose everything.
15      Q.   Did you undertake to determine in this
16 case whether there were any investors that
17 purchased GAW Miners' products even though they
18 believed it was a Ponzi scheme?
19      A.   I'm sorry, can you repeat the
20 question?
21      Q.   Did you undertake to determine in this
22 case whether any investors that
23 purchased GAW Miners products even though they
24 believed it was a Ponzi scheme?

Page 89

LOU KERNER

1      A.   No.
2      Q.   And was there, aside from your belief,
3 was there any other methodology or analysis that
4 you did to reach the conclusion that you set
5 forth in paragraph 39?
6      A.   Again, I'm sorry, I don't understand
7 the question.
8      Q.   Earlier you said that the basis for
9 your assertion in paragraph 39 was your belief.
10 I'm just trying to get at what was -- whether
11 there was any analysis or methodology that led
12 you to that belief?
13      A.   That led me to the belief that people
14 don't want to invest in Ponzi schemes?
15      Q.   Uh-huh.
16      A.   No. I mean, I think it's clear on its
17 face.
18      Q.   Is it just common sense?
19      A.   I think so.
20      Q.   Okay. In paragraph 40 in the -- I
21 think it's the third sentence, you say "the
22 payouts were coming from later investors or
23 other revenue sources."
24      What other revenue sources are you

Page 90

LOU KERNER

1  referring to there?
2     A.  I don't know.  I'm saying if they were
3  paying them out, if they weren't doing mining at
4  the -- at the scale that they said that they
5  were doing it and they were paying people off,
6  then they either had to take it out from money
7  that came in from subsequent investors or from
8  other sources.
9     Q.  Okay.  And then you go on to say, "No
10 rational investor would have purchased Hashlets
11 if they knew that the Bitcoin they were paid as
12 a return weren't earned via mining, but were
13 purchased on a public exchange like CoinBase
14 using funds from non-mining sources."
15        What's the basis for that conclusion?
16    A.  Again, I mean, I think that's common
17 sense if you're investing in something and
18 people aren't doing what they say they're, you
19 know, that they're doing with the money, you
20 know, I think on common sense it's not, you
21 know, if you're told invest and I'll do X, and
22 they don't do X, you probably wouldn't invest if
23 they weren't doing X.
24    Q.  Did you undertake to determine whether

Page 91

LOU KERNER

1  any of the investors in the GAW Miners -- strike
2  that.
3        Did you undertake to ascertain whether
4  any Hashlet purchasers purchased them knowing
5  that they weren't earned via mining?
6     A.  No.
7     Q.  In paragraph 41, you say that, "No
8  rational investor would have purchased PayCoins
9  if they knew that the $100 million reserve was a
10 fraudulent claim."
11        What's the basis for that conclusion?
12    A.  You know, I think the basis is that
13 people buy these things because they believe
14 that there is a reserve to pay back if they want
15 to sell the coin or, you know, and if not a
16 hundred percent, that there's at least a
17 significant percentage.  And so if they knew
18 that there was -- if the percentage was zero,
19 that's -- you know, and that was the basis why
20 they were buying, I don't think people would buy
21 it.
22    Q.  And what's the basis for your -- what
23 you just described as people's buying behavior?
24    A.  Well, I say, on top of common sense,

Page 92

LOU KERNER

1  we can look at Tether.  When there were rumors
2  with regards to its -- whether in fact the money
3  is in the bank or not, when there are rumors
4  about that, you know, we have seen the price
5  fall, you know, well below a dollar.
6     Q.  Okay.  And when did Tether start?
7     A.  When did Tether start?
8     Q.  Yes.
9     A.  That's a good question.  Certainly
10 I've known about it probably for a year or more.
11    Q.  Okay.  So sometime in the last year or
12 so Tether existed?  Tether came into existence?
13    A.  Or two years.  Or at least started
14 being actively used.
15    Q.  Do all Altcoins advertise that they
16 have reserve funds?
17    A.  No.
18    Q.  So some do, some don't; it's not a
19 universal feature of Altcoins to have a reserve
20 fund?
21    A.  Correct.
22    Q.  Going on to the rest of paragraph 41,
23 you say that any -- so if you flip over to the
24 next page of your declaration, it says that,

Page 93

LOU KERNER

1  "Any rational investor understands that such an
2  investment" -- and I assume you're referring to
3  a new cryptocurrency -- "is high risk, and it
4  would be a very significant mitigation on that
5  risk if the issuer of the currency promised to
6  stand behind it with a large reserve fund."
7        Is it your understanding that new
8  cryptocurrencies are higher risk?
9     A.  I think what I'm -- what I'm trying to
10 state here is that there are -- that different
11 coins are trying to do different things.
12        What, you know, what this coin was
13 trying to do was to be a stable coin that had a
14 floor, and -- and it's a very small niche of the
15 broad cryptocurrency market, and so those --
16 those companies that are trying to be a stable
17 coin generally have in either a full reserve or
18 a partial reserve is generally an element of
19 stable coins.
20    Q.  And the other companies that have a
21 full reserve, what disclosures or information do
22 they make available about the source of that
23 reserve?
24    A.  You know, Tether has made statements

24  (Pages 90 to 93)

LOU KERNER

1
2   done?
3       A.   I spent I think the first period of
4   time reading different materials and doing some
5   research on my own, and then the majority of the
6   rest of the time was spent writing the original
7   draft and then editing post original draft.
8       Q.   Have you spent any time speaking with
9   any former GAW Miners or Zenminer employees?
10      A.   No.
11      Q.   What about Professor Mills, have you
12  spoken to him?
13      A.   No.
14      Q.   Robert Mills, sorry?
15      A.   No.
16      Q.   What about Professor Narayanan, is
17  that anybody that you have spoken to?
18      A.   I don't believe so.
19      Q.   Aside from Mr. Sargent and his
20  colleagues, is there anybody else that you have
21  spoken to about this case?
22      A.   I mentioned it to co-workers.
23      Q.   And what did you say to your
24  co-workers?
25      A.   Just there was something that I was

LOU KERNER

1
2   spending time on.
3       Q.   Okay.  And if you turn to Appendix A
4   of your report, which is Exhibit 229.  So the
5   report, not the declaration.
6           That one.  Correct.
7           It's not numbered, so I can't tell you
8   the page number, but it starts with Appendix A
9   about halfway in.
10          There you go.
11      A.   Okay.
12      Q.   So this list of -- it's a list of your
13  crypto posts on Medium, and it's in -- looks
14  like it's in reverse chronological order.
15          So take your time, but I just wanted
16  to confirm was whether June 2017 was the first
17  crypto post that you had on Medium?
18      A.   Yeah, I believe so.
19      Q.   Were there any crypto posts that you
20  had on any other online forum prior to June
21  2017?
22      A.   I, you know, as I mentioned, the three
23  conference calls that I had run before, and I'm
24  trying to remember if I wrote posts following
25  those.  They might have just been in newsletter

LOU KERNER

1
2   form because I have been sending out newsletters
3   as well.
4       Q.   And how did you send those newsletters
5   out?
6       A.   Via e-mail.
7       Q.   Do you have those e-mails?
8       A.   No; those e-mails would have been
9   associated with the National Securities.
10      Q.   Do you have access to your National
11  Securities domain anymore?
12      A.   No.
13      Q.   Did you keep a copy of those e-mails
14  anywhere else?
15      A.   No.
16      Q.   So then, aside from the -- any writing
17  of those three conference calls, there's nothing
18  prior to June 2017 that you have in writing
19  about crypto?
20      A.   Not -- not that I recall.
21      Q.   Okay.  And then the next list is,
22  again, it looks like in reverse chronological
23  order of non-crypto posts that you have had on
24  Medium; is that right?
25      A.   Yes.

LOU KERNER

1
2       Q.   And by "non-crypto," what do you mean?
3   Just any other topic generally?
4       A.   Correct.
5       Q.   And so the first one you had was May
6   2015, it looks like?
7       A.   Yeah, I believe that's what I started
8   writing on Medium.
9       Q.   Okay.  And then you have a list there
10  of your posts on Tumbler, and all of those are
11  non-crypto posts; is that correct?
12      A.   Yes.
13      Q.   Okay.  And then Appendix B, if you
14  flip to the next page, is a list of the
15  materials that you considered for purposes of
16  preparing your report?
17      A.   Yes.
18      Q.   Okay.  And is there anything listed --
19  anything else that you considered that's not
20  listed here?
21      A.   So, I'm sorry, again, the question?
22      Q.   Just as you look down this list, is
23  there anything else that you considered that's
24  not listed here?
25      A.   You know, well, I think, you know,

Page 122

LOU KERNER

1
2   A.   Looking at technical analysis.
3   Q.   Technical analysis of what factors?
4   A.   Of -- of, you know, all the different
5   factors that you can look at in trading,
6   generally, price and volume, volatility.
7   Q.   Any other factors?
8   A.   You know, I'm not a trader, so, you
9   know, it's not an area where I have a lot of
10  depth.  You know, the majority of investing
11  dollars that have gone into crypto at this point
12  are, you know, on the investing side, have gone
13  in on the -- kind of on the hedge fund trading
14  side of things.
15  Q.   Okay.  And the -- do you invest in any
16  companies that are involved in trading?
17  A.   No.
18  Q.   Is there a reason for that?  Is that
19  intentional or is that just --
20  A.   No.  Well, we -- we set out with
21  CryptoOracle to do -- to raise a VC fund via
22  security tokens, and we have not been successful
23  in doing that security for both legal and
24  technical reasons.  So we haven't raised a fund
25  to do investments.

Page 123

LOU KERNER

1
2   Q.   Okay.  What are the legal reasons that
3   you have not been successful?
4   A.   We have not been able to get a legal
5   opinion, a favorable legal opinion as it relates
6   to a tax-efficient structure for a tokenized VC.
7   Q.   And what are the technical reasons
8   that you have not been able to be successful?
9   A.   Well, even if we had been able to get
10  that, there is not yet the, you know, in our
11  view, the -- the tools there yet to be able to
12  trade the tokens in a compliant fashion.
13  Q.   And "compliant," you mean regulatory
14  compliant?
15  A.   Yes.
16  Q.   Are you aware of whether any of the
17  GAW Miners customers made money on their
18  transactions in Hashlets, Hashpoints,
19  HashStakers or PayCoin?
20  A.   No.
21  Q.   Is it fair to say that the
22  cryptocurrency community -- strike that.
23       Is it fair to say that the crypto
24  community has a negative view of government
25  regulation?

Page 124

LOU KERNER

1
2   A.   Again, can you restate the question?
3   Q.   Uh-huh.  Would you agree that the
4   crypto community has a negative view of
5   government regulation?
6   A.   No, I wouldn't agree with that.
7   Q.   I assume that you have heard of
8   pump-and-dump scams before?
9   A.   Yes.
10  Q.   What's your understanding of
11  pump-and-dump scams?
12  A.   My understanding is that they involve
13  the dissemination of information to prop up the
14  price of a coin such that you can then sell
15  those coins at inflated prices and dump them on
16  the market.  So you pump it up and then you sell
17  it.
18  Q.   And have you observed any of that
19  phenomenon in the crypto community?
20  A.   You know, as I said before, I'm not a
21  trader, so that's not really a world where I
22  spend a lot of time.  I'm certainly familiar
23  with the term, and -- and my understanding is
24  it's something that, you know, that, you know,
25  has been prevalent and continues to be

Page 125

LOU KERNER

1
2   prevalent.
3   Q.   Have you heard of Adam Matlack?
4   A.   It's not ringing a bell.
5       MS. CAVE:  Why don't we take a break.
6       MR. SARGENT:  Okay.  Lunch is here.
7       THE VIDEOGRAPHER:  We're going off the
8   record.  It's 12:16 p.m.
9       (Luncheon recess.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

32 (Pages 122 to 125)