```
1                   UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF CONNECTICUT
2
   - - - - - - - - - - - - - - - - x
3                                    No. 3:16-CV-00940 (MPS)
   DENIS MARC AUDET, MICHAEL
4  PFEIFFER, and DEAN ALLEN            APRIL 12, 2019
   SHINNERS, Individually and on
5  Behalf of All Others Similarly      10:02 a.m.
   Situated
6                                      HEARING
   vs.
7
   STUART A. FRASER, GAW MINERS,
8  LLC, and ZENMINER, LLC, (d/b/a
   ZEN CLOUD)
9
   - - - - - - - - - - - - - - - - x
10
11                       450 Main Street
                       Hartford, Connecticut
12
13        BEFORE:  THE HONORABLE MICHAEL P. SHEA, U.S.D.J.
14
15  APPEARANCES:
16  FOR THE PLAINTIFFS:
17          SUSMAN GODFREY, L.L.P.
                1000 Louisiana Street, Suite 5100
18              Houston, Texas 77002
            BY:  COLIN M. WATTERSON, ESQUIRE
19
            SUSMAN GODFREY, L.L.P.
20              1301 Avenue of the Americas, 32nd Floor
                New York, New York 10019
21          BY:  SETH D. ARD, ESQUIRE
22          IZARD, KINDALL & RAABE, LLP
                29 South Main Street, Suite 305
23              West Hartford, Connecticut 06107
            BY:  CHRISTOPHER M. BARRETT, ESQUIRE
24
                               (continued ...)
25
```

```
1   FOR THE DEFENDANTS:

2           HUGHES, HUBBARD & REED L.L.P.
                One Battery Park Plaza, 12th Floor
3               New York, New York 10004-1482
            BY:  SARAH L. CAVE, ESQUIRE
4                DANIEL H. WEINER, ESQUIRE
                 HANNAH MILLER, ESQUIRE
5
            BRENNER, SALTZMAN & WALLMAN
6               271 Whitney Avenue
                New Haven, Connecticut 06511-1746
7           BY:  SEAN M. FISHER, ESQUIRE

8

9   COURT REPORTER:  Julie L. Monette, RMR, CRR, CCP
                        (860) 212-6937
10
    Proceedings recorded by mechanical stenography, transcript
11  produced by computer.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE COURT:  All right.  Let's begin with appearances

2     for counsel.  We're here for argument on classification and

3     related motions in Audet versus Fraser, et al.  The case is

4     16-CV-940, if counsel could state appearances, please.

5          MR. WATTERSON:  Good morning, Your Honor.  Colin

6     Watterson, Susman Godfrey.

7          MR. ARD:  Morning, Your Honor.  Seth Ard, Susman

8     Godfrey.

9          MR. BARRETT:  Morning, Your Honor.  Christopher

10    Barrett of Izard, Kindall & Raabe.

11         MS. CAVE:  Morning, Your Honor, Sarah Cave from

12    Hughes, Hubbard & Reed for defendant Stuart Fraser.  With me is

13    Hannah Miller from Hughes Hubbard as well as Dan Weiner from

14    Hughes Hubbard.

15         THE COURT:  I don't see Mr. Weiner, but I see Mr.

16    Fisher.  Oh, Mr. Weiner's there.  Very good.

17       Mr. Fisher, nice to see you.

18         MR. FISHER:  Good morning, Your Honor.  Sean Fisher,

19    Brennan, Saltzman & Wallman for defendant Fraser.

20         THE COURT:  Welcome everybody to Hartford.  So I have

21    gone through the papers, which are extensive, and I've looked

22    at the exhibits.  I've looked at the affidavits of the experts

23    and the like.  I suppose I can't swear on a stack of Bibles

24    that I've looked at every single page, but I've looked at every

25    single page you've cited from the extensive record.  So I'm

 1    reasonably well prepared, I hope, today.

 2         And what I'd like to do is kind of focus on a few separate

 3    areas where I'll do the questioning.  Then certainly we'll take

 4    a break, if not more than one, and then, you know, towards the

 5    end, if you think I've prevented you from saying something

 6    important, I'll certainly let you say your piece.  Okay?

 7         So let's begin with the standing issue, and I have a couple

 8    questions.

 9         Mr. Watterson, are you going to be arguing for the

10    plaintiff?

11              MR. WATTERSON:  Yes, Your Honor.

12              THE COURT:  All right.  So as I understand it, there's

13    some testimony in the record -- I think Ms. Eden, for example,

14    said that at some point Mr. Garza decided to give out -- threw

15    out a number like a couple hundred thousand free Hashlets, and

16    this created a problem, new accounts, etc.  So I guess what I'm

17    wondering is:  If you just received free Hashlets, would you

18    have standing?

19              MR. WATTERSON:  Sure, Your Honor.  I think if somebody

20    only received a free Hashlet, they likely would not have

21    standing.  Um, the statutory definition of "purchase" is broad.

22              THE COURT:  Right.

23              MR. WATTERSON:  And so I think it could conceivably

24    cover a free Hashlet, but I mean the issue here is that in the

25    definition --

1           THE COURT:  But even if the statutory definition

2    covers it, that wouldn't give you Article III standing.

3           MR. WATTERSON:  Correct, Your Honor, and I think that

4    you're right on that point, that somebody that just received a

5    free Hashlet likely would not have standing.  And so --

6           THE COURT:  Okay.

7           MR. WATTERSON:  -- when we included the definition --

8    the word "acquired" in the definition, we didn't intend to

9    include people that solely received free securities or people

10   that stole securities.  You know, we included "acquired" so

11   that we could make sure that we wrapped in rollovers or

12   exchanges --

13          THE COURT:  Right.

14          MR. WATTERSON:  -- or securities.

15          THE COURT:  So that actually brings me to the class

16   definition; so I'll jump to that for a minute.  I don't really

17   understand Hashpoints -- well, let's start with Hashpoints.

18   Why is Hashpoints included in the class definition?

19          MR. WATTERSON:  Sure.  So what happened, Your Honor,

20   was that initially when investors obtained Hashlets, they paid

21   out cryptocurrency.

22          THE COURT:  Bitcoin, yeah.

23          MR. WATTERSON:  And when GAW Miners announced that

24   they were releasing Paycoin, they essentially required

25   investors to start taking out Hashpoints instead of bitcoin.

1        THE COURT:  Well, so that was a question I had.  So

2    you said essentially required.  So that was one question I had

3    today, which is at some point, as I understand it, you're

4    buying Hashlets and you're getting these returns, which are

5    bitcoin.  And at some point the company says, now -- and the

6    words in the papers are "offered."  But the company offers you,

7    "Hey, we got this great new thing.  Instead of getting your

8    returns in bitcoin, you're going to get them in Hashpoints."

9      I guess I have a couple questions about that.  One, when

10   does that announcement occur; and, two, is it an offer or are

11   you required?

12        MR. WATTERSON:  So to answer the first question, it

13   was in November of 2014.  I don't recall exactly when the

14   announcement was, but I believe it was towards the middle of

15   the month.

16        THE COURT:  And do you believe also that it was

17   made -- that announcement was made in connection with the

18   announcement that the company would be launching Paycoin?

19        MR. WATTERSON:  Correct.  I think they came out at

20   around the same time.

21        THE COURT:  And it was clear that these Hashpoints

22   were really something that could be ultimately converted to

23   Paycoin when it was originally announced?

24        MR. WATTERSON:  Correct, Your Honor.  To the best of

25   my understanding, that was the only function a Hashpoint ever

1    had.

2            THE COURT:  Okay.  And was it -- so now gets to the

3    question of, Was it voluntary?

4            MR. WATTERSON:  So this is my understanding -- and I

5    apologize because this may not be in our papers.  But my

6    understanding was that at that time the payouts that you would

7    be receiving from the Hashlet in terms of bitcoin --

8            THE COURT:  Yeah.

9            MR. WATTERSON:  -- was essentially the same as the

10   maintenance fees GAW was charging.  So you weren't making

11   really much in crypto at all.  So investors I think had a

12   choice, but the way that GAW was providing these payouts in

13   terms of bitcoins, you know, they were certainly pushed in the

14   direction of --

15           THE COURT:  But I thought there was some evidence the

16   defendant pointed to that there's like over 7,000 people -- no,

17   that's not right.  It was vague, but there was a group of

18   people who had achieved ROI, which I took to be a profit.

19           MR. WATTERSON:  So, Your Honor, Mr. Fraser does cite

20   some documents about ROI.  You know, however, those documents,

21   I don't think, are all that relevant because, you know,

22   investors in a Ponzi scheme always think they have an ROI on

23   paper.  And so, you know, the fact that people believe that

24   they were making money here doesn't mean that they really were.

25           THE COURT:  But there are some posts saying -- people

1 saying, "I achieved ROI."  They're anonymous and the like, I

2 get that.  But I mean there is some evidence in the record from

3 which a juror could infer that some people actually came out

4 ahead.  No?

5        MR. WATTERSON:  Sure.  It's certainly true that there

6 is evidence in the record that some -- these people on these

7 anonymous message boards were saying they made ROI.  That

8 doesn't mean that these people actually withdrew funds from

9 their account though.  You know, in some of these documents,

10 these posters actually saying, "Well I made ROI, but I'm

11 continuing to reinvest."  So they take the bitcoin that they've

12 made in their account, and they buy more Hashlets.

13    And so, you know, a person may have achieved ROI in the

14 sense that they receive more bitcoin than one Hashlet

15 originally cost, but that doesn't mean that they ended up with

16 any money in their pocket.

17        THE COURT:  Okay.  Let's get back to the Hashpoints.

18 I started us on that tangent.  Let's get back to the

19 Hashpoints.  You were telling me -- I asked you if it was

20 voluntary, and you said, well, it may not -- you may not --

21 this is how I understood your answer:  It may not have been

22 required, but as a practical matter, since, in your view, no

23 one was really making any money because your maintenance fees

24 essentially equaled your bitcoin payout, you might as well.  Is

25 that the idea?

1          MR. WATTERSON:  Correct, Your Honor.

2          THE COURT:  All right.  So what you're saying is so

3    people -- in effect, most people?  Do we have numbers on who,

4    in fact, said, yeah, I'll take Hashpoints instead of bitcoin?

5    Do we have numbers?  Do we know anything about that?

6          MR. WATTERSON:  I know anecdotally, from talking with

7    the plaintiffs about that, that they believed it was most

8    people.  Um, you know, we have a data base where there's

9    transactional information.  I know that's been much disputed.

10          THE COURT:  Right.

11          MR. WATTERSON:  But we haven't specifically analyzed

12    that question.  However, I do think there is data on that.  So

13    information --

14          THE COURT:  But in any event, so some group of people

15    moves over and starts getting the Hashpoints.  Now, I guess the

16    first question I have about that -- so this -- where we started

17    was, why are Hashpoints in the class?  And I guess what I'm

18    wondering about that is, was that conversion from getting

19    bitcoin on your Hashlets to getting Hashpoints on your

20    Hashlets, was that made after a relevant representation

21    concerning Paycoin?

22          MR. WATTERSON:  I don't believe so, Your Honor.

23          THE COURT:  So then why are they in the class?

24          MR. WATTERSON:  Well --

25          THE COURT:  Why is Hashpoints in the class at all?

1           MR. WATTERSON:  Well, Hashpoints are just a

2  continuation of the Ponzi scheme.  I mean our view is that --

3           THE COURT:  I get that.  I mean I understand that.

4  But I guess I don't understand why there's independent

5  significance such that that term should be included in the

6  class definition.  I get that, yes, that was sort of the road

7  to Paycoin.  I do -- I think I understand the general story.

8  But I don't get why you have a claim merely because you, at

9  some point, converted to Hashpoints.

10          MR. WATTERSON:  Well, and I may have answered your

11  question incorrectly, Your Honor --

12          THE COURT:  Okay.

13          MR. WATTERSON:  -- about whether or not there was a

14  misrepresentation afterwards.  I mean I think that it's true

15  that before the conversion date happened, which was in late

16  December of 2014, I mean these --

17          THE COURT:  Wait.  Wait.  Wait.  Wait.  Let me make

18  sure I've got this right.  I thought you told me.  No, that

19  can't be right because my understanding from the certifications

20  is that, in fact, the conversion from Hashpoints to Paycoin

21  took place in -- on two dates, December 18th and December 22nd,

22  2014, but I'm not asking about that conversion yet.  I'm asking

23  about what I take to be the earlier conversion from having

24  Hashlets that earned bitcoin to having Hashlets that earned

25  Hashpoints.  When did that conversion occur?

1          MR. WATTERSON:  It would have happened sometime in

2     November is my understanding, Your Honor.  I don't know

3     specifically.

4          THE COURT:  So my question about timing of

5     representations related to that conversion.  Just so we're

6     clear, my question again was:  Did that conversion take place

7     after some representation concerning Paycoin?

8          MR. WATTERSON:  Well, so and I think I may have

9     answered that incorrectly, Your Honor.  So I think the

10    representations concerning, you know, the fact that there would

11    be this reserve fund, that was all put out around the time that

12    Paycoin was announced.

13         THE COURT:  Right.  My -- and speaking of when Paycoin

14    was announced, the earliest I saw -- although my law clerk

15    pointed to me something earlier that I think I missed.  I know

16    there's this Wall Street Journal article, November 25th, 2014,

17    where he's interviewed, Garza's interviewed, and he says a

18    hundred million dollars and $20 dollar pay floor.  Is that the

19    first time, or is there something before that?

20         MR. WATTERSON:  It was a little earlier than that,

21    Your Honor.

22         THE COURT:  Okay.

23         MR. WATTERSON:  And I think that there's something

24    cited in -- I believe it's actually attached to Mr. Strombom's

25    declaration, but I think it's something like November 12th or

1    thereabouts.

2          THE COURT:  Okay.  So is it your position that this

3    first conversion, in other words, going from Hashlet slash

4    bitcoin to Hashlet slash Hashpoint, takes place after November

5    12th?

6          MR. WATTERSON:  I think that's right.  And, you know,

7    I think it was something that, you know, people were allowed to

8    make the conversions, so -- and, again, I don't recall when the

9    actual announcement about when, you know, you're now allowed to

10   take your Hashlets and start --

11         THE COURT:  But let me cut to the chase.  Suppose we

12   just drop Hashpoints from the class definition altogether.

13   Putting aside all the other issues, suppose we just drop it.

14   What do you lose?  That's my point.  In other words, if you

15   say, look, we're suing on behalf of people who purchased

16   Hashlets or effectively we're suing on behalf of people who

17   purchased Paycoin, but we want "purchase" to be understood

18   broadly to include this conversion process.  That's your group;

19   right?

20         MR. WATTERSON:  Correct.  And, you know, the

21   HashStakers as well.

22         THE COURT:  Right, the HashStakers.  Let me get to

23   that in a minute.  But the HashStakers is this wallet, this CD

24   kind of thing; right?

25         MR. WATTERSON:  Correct, Your Honor.

1            THE COURT:  And that -- those purchases were made also

2     at some time -- I mean what were the relevant

3     misrepresentations concerning HashStakers?

4            MR. WATTERSON:  The HashStaker representations --

5     HashStakers were essentially just a vehicle to generate more

6     Paycoin.  So the representations concerning Paycoin I think

7     would apply equally to HashStakers.

8            THE COURT:  Let me put it this way:  Is there anybody

9     who purchased HashStakers who did not purchase Paycoin?

10           MR. WATTERSON:  In order for a HashStaker to function,

11    you had to essentially assert Paycoin into it.

12           THE COURT:  Yeah, that's what I thought.

13           MR. WATTERSON:  So you had to have Paycoin.

14           THE COURT:  That's why I'm wondering why that has

15    independent significance too for purposes of a class

16    definition.  Who would be left out if the class was defined as

17    all those who purchased Hashlets at a relevant time and all

18    those who purchased Paycoin at a relevant time?  "Purchased"

19    being understood -- and this could have been mapped out in the

20    definition.  "Purchase" being understood to include this

21    conversion process.  Who would be left out in the current

22    definition?

23           MR. WATTERSON:  Well, if the Hashstaker purchasers

24    were left out, I mean somebody had to buy HashStakers with

25    cash.  So, you know, it seems to me that if they were left out,

1   they wouldn't be able to recover for what consideration they

2   paid.

3          THE COURT:  In other words, that was a separate

4   purchase.  You didn't just get that with Paycoin.

5          MR. WATTERSON:  Correct, yeah.  So you had to -- once

6   you had your Paycoin, you could keep it or you could buy --

7          THE COURT:  Although you've told me already that every

8   single one of those people also purchased Paycoin.  And that's

9   where their injury comes from; right?  There's no real

10  independent injury from purchasing HashStakers.  The injury

11  comes from the fact you were arguably lied to in connection

12  with purchasing Paycoin.

13         MR. WATTERSON:  I disagree, Your Honor.

14         THE COURT:  You have damages that may exceed those who

15  simply purchased Paycoin, but you don't have an independent

16  injury, do you?

17         MR. WATTERSON:  I mean I disagree, Your Honor.

18         THE COURT:  Okay.

19         MR. WATTERSON:  If you purchase a Hashstaker, you're

20  doing so based on the representation that I'm going to be

21  generating this cryptocurrency that is worth $20 a coin.  You

22  know, nobody would have bought these HashStakers if they knew

23  that they were going to cost 35, $50 and they would generate a

24  cryptocurrency worth a fraction of a cent.  So I do think that

25  there --

1          THE COURT:  But there's nobody -- I guess what I'm
2     wondering is, just in terms of -- there's nobody left out of
3     the class if you do it the way that I described; right?
4     They're just going to -- those people are going to come in and
5     say, Well, we have even more damages.  We also purchased
6     HashStakers.  Right?
7          MR. WATTERSON:  So I think it's true, Your Honor, that
8     there's -- only people that would have acquired Paycoin would
9     be the ones that purchases HashStakers, but, you know, it's
10    possible that you obtain Paycoin from, you know, from this
11    Hashpoint conversion.  So you didn't go and --
12          THE COURT:  But that would be covered under my sort of
13    what I'm floating as a possible definition.  I agree with that.
14    In other words, I agree that you have people who are arguably
15    injured here who got -- like your main plaintiff, the defense
16    points none of them actually bought Paycoin.  They got it
17    through the conversions.  So I agree, that that was arguably an
18    injury.
19       So I'm not suggesting those people are out.  To the
20    contrary, I'm suggesting they're in.  But I just don't see what
21    adding the Hashstaker purchases gets you as a practical matter
22    in defining the core injuries.  I don't want to spend too much
23    time on that because it's not important.
24       Let me ask defense counsel a couple questions about this.
25          MS. CAVE:  Sure.

```
 1              THE COURT:  So on this standing point, just slightly
 2     back, is it really the law that -- you suggest in your brief
 3     that if you buy security based on a false representation and
 4     you later get a payout that either equals or exceeds the value
 5     of your investment, you lack an injury for Article III
 6     purposes?
 7              MS. CAVE:  That's correct, Your Honor.  The point is
 8     that if you have not been injured, if you've received back what
 9     you paid, then you have not been --
10              THE COURT:  So suppose I buy a security based on a
11     false representation on day one.  I pay a hundred dollars for
12     it.  And then over time, through dividends, by the six-month I
13     get back a hundred dollars.  Now, on day two, I could have
14     sued.  I had standing to sue.  But I lost standing because at
15     the sixth month I got, you know, the hundredth dollar back?
16              MS. CAVE:  Well, Your Honor, for purposes, for
17     focusing on the 10b claim, the federal securities fraud
18     claims --
19              THE COURT:  I'm just asking about Article III right
20     now.
21              MS. CAVE:  Okay.
22              THE COURT:  So I don't see how one can have standing
23     in this way and then lose it because over time you get your
24     money back.
25              MS. CAVE:  Right.  Well, I don't think, Your Honor,
```

1    we're suggesting that --

2           THE COURT:  Okay.

3           MS. CAVE:  -- that you lose it.  I think, Your

4    Honor --

5           THE COURT:  What you're saying is that really this is

6    a 10b-5 problem.

7           MS. CAVE:  Exactly.  And that definition is quite

8    strict in terms of the purchaser/seller concept.

9           THE COURT:  But is that because as part of a 10b-5,

10   you have to show damages or loss?

11          MS. CAVE:  Correct, that's one of the key elements.

12          THE COURT:  Okay.  I think I understand your position

13   on that.

14      While you're standing --

15          MS. CAVE:  Yes.

16          THE COURT:  -- let's go to the issue of

17   ascertainability.

18          MS. CAVE:  Yes.

19          THE COURT:  Okay.  So in 2017 the -- and this case is

20   mentioned in a couple of the briefs, but it isn't really

21   focused on as much as I thought it would be.  Second Circuit

22   decided a case called Petrobra.  It's 862 F3d.  And I don't

23   remember the page cite, but there's a couple page cites, 264.

24   And as I read that case -- I'll say it diplomatically -- it

25   very much clarified the law that district judges understood to

1    be ascertainability.  I always thought of ascertainability

2    before as something that was administratively feasible.  Would

3    you be able to really have -- identify these people in the

4    class and all that?  That case is very strong language saying

5    that's just not what ascertainability means.

6        The quote is, "The ascertainability doctrine that governs

7    in this circuit requires only that a class be defined using

8    objective criteria that establish a membership with definite

9    boundaries."  And then later it says, "This modest threshold

10   requirement will only preclude certification if a proposed

11   class definition is indeterminate in some fundamental way.  If

12   there is no focused target for litigation, the class itself

13   cannot coalesce, rendering the class action inappropriate

14   mechanism," etc.

15       Then it goes on to say, "Ascertainability does not directly

16   concern itself with the plaintiff's ability to offer proof of

17   membership under a given class definition, an issue that is

18   already accounted for in Rule 23."

19       So, you know, putting aside the debate I was having with

20   Mr. Watterson about the class definition, are you saying that

21   the class definition, as it sits now, is not objectively and

22   definitively described?

23           MS. CAVE:  I think, Your Honor, what we're saying --

24   and I absolutely agree with you that you've honed in on exactly

25   the very helpful point, the helpful language in Petrobra that

1    clarified.  We're not talking about an additional element or

2    additional requirement.  What our argument about

3    ascertainability, Your Honor, is just to the points that you

4    were raising, which is there are so many questions about who's

5    in, who's out, whether there's sufficient information to

6    clarify exactly who they are and when they bought and what

7    their damages are, that it's essentially --

8              THE COURT:  It's really a predominance issue.

9              MS. CAVE:  It ties into the predominance issue.  The

10   way we've -- we've tried to describe it in our papers, and I

11   think the way Your Honor read the quote that Your Honor just

12   read, it's another way of looking at the predominance issue, in

13   other words.

14             THE COURT:  Okay.  All right.  So I think -- I think

15   that sounds right to me, that, if anything, it's a predominance

16   issue or perhaps a superiority issue, management issue.

17             MS. CAVE:  Yes.

18             THE COURT:  Okay.  Why don't we jump in, then, to what

19   I view as kind of the heart of the dispute -- I don't know if

20   you guys agree -- which is the predominance issue here.  I

21   think that's sort of the big issue.

22        So I'm going to ask some questions for Mr. Watterson, then

23   for Attorney Cave.  So I did want to ask some timing questions

24   and then some factual questions first.

25        So when does -- Paycoin launches, as I understand it, on --

1    I'm sorry.  I'm sorry.  I misspoke.  Paybase launches on
2    December 30th, 2014.  Is that right so far?
3              MR. WATTERSON:  I believe it was January 1st, 2015.
4              THE COURT:  Oh.  Oh, okay.  And then the briefs are a
5    little vague on this, although maybe you pointed to something
6    that I didn't see.  They seem to say for a short time Paycoin,
7    when it first launched, traded at around $20, and then it never
8    did again.  That's how I kind of read it.  In any event, I
9    guess what I would like to know is:  When does Paycoin first
10   trade below $20, and after it dipped below $20, does it ever
11   come back above $20?
12             MR. WATTERSON:  So Paycoin first sort of enters the
13   ecosystem because there was a period of time where you could
14   mine it.  So somebody could take their cryptocurrency computers
15   and just go in and mine Paycoin like any other cryptocurrency.
16   So that's why there is some Paycoin out in the -- in these
17   public exchanges prior to launch of Paybase and prior to the
18   date when these Hashpoint conversions occurred.
19       And the -- it trades at a volatile price, but it gets
20   probably close to $20 at that time, but it never actually hits
21   $20, you know, $15, something like that.
22             THE COURT:  So this is time frame like
23   November/December?
24             MR. WATTERSON:  It would be in December.  This is sort
25   of middle of December time frame.

1          THE COURT:  Okay.

2          MR. WATTERSON:  And so after Paybase launches, the

3     price goes up again.  It, again, gets close to $20, but it does

4     not ever hit $20 to the best of my understanding.  And this is

5     based on -- largely on these websites that aggregate what is

6     going on on outside exchanges.  I'm not sure about in the

7     Paybase exchange itself.  That's just not something we've --

8          THE COURT:  But at some point it -- you know, my

9     understanding, at some point it's well below $20.  I mean it's

10    like in 5 and 6 area; right?

11         MR. WATTERSON:  That's --

12         THE COURT:  When does that start?

13         MR. WATTERSON:  You know, as I recall, it would have

14    been early in January, second week of January, third week of

15    January.

16         THE COURT:  So it's really very short lived, like a

17    week or two, that it's anywhere near $20.  Then after that,

18    it's well below 20.

19         MR. WATTERSON:  Correct.

20         THE COURT:  Now, you have people in the class that

21    purchased all the way up until December 1st, 2015; right?

22         MR. WATTERSON:  We -- the reason that we chose

23    December 2015 is because that is about when the SEC filed its

24    lawsuit.  So our view was that given the fact that the company

25    sort of went defunct, there was just never any definitive

 1   announcement about, you know, revealing that this was a Ponzi

 2   scheme.  When the SEC filed, I think fairly you can say that,

 3   yes, everybody would have known by then.

 4          THE COURT:  Right.  But the -- you know, one of the

 5   misrepresentations you're relying on is we're going to have $20

 6   price for.  That statement is made, as I recall, November --

 7   late November 2014 by Mr. Garza, who was speaking to The Wall

 8   Street Journal.  So if I bought Paycoin between November 25th,

 9   2014, and January, say January 5th or something like that, and

10   then it plummets, sounds like I may have a good claim here.

11   But what about if for folks who bought after that first or

12   second week in January, at that point they can't rely any more

13   really, can they, on the representation that we're going to

14   support this with a $20 price?  I mean obviously proven false

15   at that point.  No?

16          MR. WATTERSON:  So, Your Honor, this is something that

17   we did not go into in our papers.  But I just want to tell you

18   about it --

19          THE COURT:  Okay.

20          MR. WATTERSON:  -- to the extent you believe it's

21   relevant.  In that early January time period, GAW Miners

22   announced something called the Honors Program, and the notion

23   was, look, we made this promise, and we are going to honor it

24   by buying your Paycoins at $20.  We may not be able to do it

25   right now.  It may be something where we have to pay you over

1    time, but it's something that we're going to do.

2        And so that was in January or February time frame.  You

3    know, I think it became clear that GAW was not going to live up

4    to that promise.

5            THE COURT:  Is that in the complaint?

6            MR. WATTERSON:  Sorry, Your Honor?

7            THE COURT:  Is that in the complaint, what you just

8    described?

9            MR. WATTERSON:  I have to go back and check, Your

10   Honor.  I don't remember.

11           THE COURT:  Because I think -- if it is, maybe that's

12   because the last time I looked at the complaint was quite some

13   time ago.  But I don't remember it.  So sounds like -- I mean

14   that's not something mentioned in your papers.  I'm kind of

15   curious as to why.

16           MR. WATTERSON:  You know, honestly, Your Honor, it --

17   you know, really what we're focusing on was the fact that this

18   was all a Ponzi scheme.  This seemed like not quite important

19   of the representation.  But, you know, it's true that we didn't

20   mention this in our papers.

21           THE COURT:  Well, let me ask this question, though:

22   After this announcement -- where is this Honors Program

23   announced?  On their website or something like that?

24           MR. WATTERSON:  The website and the forums primarily.

25           THE COURT:  Speaking of the forums, is one of the

1    forums HashTalk?

2            MR. WATTERSON:  Correct.

3            THE COURT:  And that's a company-sponsored forum?

4            MR. WATTERSON:  Correct.

5            THE COURT:  We'll get back to that.  So they make this

6    announcement.  Does that boost the price of Paycoin?  It sounds

7    like it doesn't based on what you told me before.

8            MR. WATTERSON:  I have to go back and look.  I don't

9    think it does.

10           THE COURT:  Okay, so if that's the case, then that is,

11   by itself -- in other words, the price doesn't move.  That is

12   by itself some evidence that a lot of people didn't believe it;

13   right?

14           MR. WATTERSON:  You know, so one of the reasons, Your

15   Honor, is that we don't have -- we'll get this way.  We're not

16   proceeding on fraud in the market.  The theory is these are not

17   particularly efficient markets we're talking about.

18           THE COURT:  Right.

19           MR. WATTERSON:  I think you're probably right that

20   that's some evidence, but, you know, the fact that people were

21   purchasing this stuff in that time period I think is also some

22   evidence that, you know, people -- you know, if people believe

23   that this really was worthless, no rational investor would have

24   made these purchases.  So I don't agree that it's quite that

25   clear.

1          THE COURT:  Okay.  But do you agree that the person

2     who purchases between November 25th, 2014, and, say, January

3     5th, 2015, has a stronger claim for securities fraud, with

4     respect to the Paycoin transactions, than somebody who

5     purchases in, say, June of 2015?

6          MR. WATTERSON:  You know, I think that the person that

7     purchases in June of 2015, I think it's probably true that they

8     have a weaker claim than these earlier purchasers.  If you're

9     talking about March, that time frame, you know, I might quibble

10    with that a little more.

11         THE COURT:  Why?  I mean was -- I had the impression,

12    by the way, that there were rumblings -- although, again, this

13    is very vague, but I thought I saw something about rumblings of

14    an SEC investigation early in 2015.  I could be completely

15    wrong about that.

16         MR. WATTERSON:  You're right about that, Your Honor.

17    There was an announcement from one of these cryptocurrency news

18    websites essentially I believe it was leaking a subpoena or, if

19    not leaking the entire subpoena, discussing the fact that a

20    subpoena existed.  And it's true, this happened, I want to say,

21    January 16th, but it was that time frame.

22         THE COURT:  Of 2015.

23         MR. WATTERSON:  2015.

24         THE COURT:  And they said what?  Garza's being

25    investigated by the SEC?

1          MR. WATTERSON:  GAW Miners are being investigated by
2     the SEC for securities violations.
3          THE COURT:  Which, in fact, was accurate.
4          MR. WATTERSON:  That's true, yes.
5          THE COURT:  So now we're kind of cutting to the core
6     of this.  You know, you said just a moment ago that, look, you
7     know, for those who purchased in 2015, the fact that they
8     purchased itself is some evidence of reliance.  And this comes
9     from like U.S. Food Service and cases like that.
10         Now, I think the challenge, though, for you in those cases,
11    as I see it, is that in U.S. Food Service, in the Fifth Circuit
12    case that you rely on, and I think in Judge Furman's case as
13    well, the Court, in each of those cases, apparently made a
14    point of looking at the record and saying, We see no evidence
15    that anybody knew this was a fraud.  That's my understanding,
16    that they actually parsed the record in U.S. Food Service.
17    They tried to make -- the U.S. Food Service tried to make
18    the -- I actually worked on that case a long time ago.  But
19    anyway, the U.S. Food Service tried to make the argument
20    there's some evidence.  And in each case Judge Livingston
21    addressed it and said, No, that's no evidence -- there's no
22    evidence anyone knew of fraud.
23         Now here we have these posts, which the defendant has
24    provided.  Let me go there.
25         All right.  So we have these posts.  Now, some of them are

1    on Reddit and I actually want to talk about that one first.

2              MR. WATTERSON:  Sure.

3              THE COURT:  This is A17 of -- to Ms. Cave's

4    declaration, and it's a Reddit post.  The date isn't a hundred

5    percent clear to me, and that could be important.  But there's

6    definitely -- there's actually the whole post is, Is it a Ponzi

7    scheme? basically.  And you've got people saying, I don't care

8    if Hashlets aren't real.  I truly believe this is a Ponzi

9    scheme.

10        And then there's a post from Allen 1980s.  Now, that's Mr.

11   Shinners; right?

12             MR. WATTERSON:  Correct.

13             THE COURT:  Okay.  And he says, "Although I understand

14   that people may think this to be a Ponzi scheme, knowing the

15   past performance of GAW leads me to believe they have

16   implemented a business model that all of the other hardware

17   vendors have already been using.  Only this time they are

18   letting outsiders buy into the model."  Then it goes on.  But

19   the next page is cut off; so I don't have it.

20        So I guess what I'm wondering about that is two things:

21   One, Mr. Kerner says, You can't take these seriously.  They're

22   all anonymous.

23        Well, your named plaintiff is on this forum.  And -- but

24   more importantly, they're debating this; right?  They're saying

25   some people are saying it's a Ponzi.  Some people are saying,

1     I've looked at it.  I've considered whether it's a Ponzi.  I

2     don't think it's a Ponzi.

3          And so doesn't that suggest that we're going to have

4     individualized issues?

5               MR. WATTERSON:  So, Your Honor, I think that it is

6     possible that the fact that somebody says "I believe this is a

7     Ponzi scheme," it could create an individualized issue with

8     respect to that person.  But I mean this happens all the time

9     in class cases.

10         We cited the animators case, which was -- you know, it was

11    a case about fraudulent concealment.  And so the entire class

12    had to prove that, you know, they didn't know about this

13    collusive handshake agreement.  And so the defendants in that

14    case cited 40 e-mail -- or e-mails to about 40 different class

15    members that referenced the agreement.

16         And so what the Court said is, Okay, yes, this may be an

17    individualized issue for these particular -- these particular

18    plaintiffs, but we can put that off to the side, and we can do

19    a separate proceeding to address them and, you know, perhaps

20    that, you know, the defense will prevent its evidence and

21    perhaps, you know, their claims will fail.  But as to the other

22    approximately 10,000 members of the class, you know, there's no

23    evidence that these individuals --

24              THE COURT:  But here's one difference between that

25    situation and this one:  Now, I just went on Reddit before

 1   coming down here.  I went to the bitcoin thing.  My

 2   understanding, it's publicly accessible.  You don't need a code

 3   or anything like that.  So first of all, it's publicly

 4   accessible.

 5       Secondly, so it's not just -- the significance of this is

 6   not limited to the writer of the post.  These were for aware

 7   apparently the kinds of people who purchased bitcoin, who

 8   purchased Paycoin, who were, you know, GAW followers, however

 9   you want to call it, they frequented these sites.  And, so --

10   am I right about that so far?

11           MR. WATTERSON:  I mean I'm not -- it's certainly like

12   when you go on Reddit, you can see there are lots of posts.  I

13   have no idea, you know, how many people would have seen any

14   particular one of these posts.  I don't know there's a way to

15   know that.

16           THE COURT:  Well, that's probably true, that there's

17   no way to know how many, but can we agree it's a bit more

18   public than an e-mail?

19           MR. WATTERSON:  That's true, Your Honor.

20           THE COURT:  And the main plaintiff was on there, the

21   guy who, you know, from earlier e-mails I reviewed worked very

22   hard to kind of organize a group to bring this case.  And so I

23   mean I guess the point is simply that it isn't simply that

24   these posts exist.  It's where they exist.  They're in a public

25   place.  They're not -- it's not a letter sent from one person

1   to the other.

2       The other place that you have some of these posts is this

3   HashTalk -- right? -- which, as you said before, was a

4   company-sponsored forum.  Now, how do I get -- if that -- you

5   know, if that was still around, what would I do?  I'd go to

6   their website and they'd say, Hey, you want to be on HashTalk?

7   And I just click on it?  Is that how it worked?

8           MR. WATTERSON:  So I'm not sure whether it was

9   publicly available like Reddit was.  Just based on my own

10  personal experience with these type of forums, sometimes you

11  have to make a user name and a password and log in.  I don't

12  know how it worked.  It might have worked either way.

13      Just back to your point about the Reddit post, you know,

14  there is no evidence in the record that some class member saw

15  some post and then, you know, decided, based on that post, you

16  know what?  I think that GAW is a Ponzi scheme, and I'm going

17  to invest anyways.

18      So I think that's significant just because of the fact --

19          THE COURT:  Well, don't you have folks saying, I don't

20  think it's a Ponzi, but I'm going to keep going because my

21  account's really good?  Don't you have people saying things

22  like that?

23          MR. WATTERSON:  And I agree, Your Honor, it may be as

24  to that person it's possible that you could raise a defense as

25  to nonreliance as to that individual.  I guess what my point

1    is, there's no evidence that, for example, any of the named

2    plaintiffs stumbled across one of these posts and, you know,

3    thought, Oh, well, this is a Ponzi scheme, but you know what?

4    I'm going to go ahead and invest.

5            THE COURT:  I agree with that.  In fact, the post that

6    I just read to you suggests precisely the contrary, that Mr.

7    Shinners didn't think it was a Ponzi.  But that's the point;

8    right?  In other words, that's the defendant's point, which is

9    everybody may have had a different view about the thing.

10   They're debating it.  Mr. Shinners apparently believed, No, I

11   think this is real.  I don't think it's a Ponzi.  But other

12   people are saying, "It's a Ponzi."

13       So I guess what I'm wondering -- let's put it this way:

14   I'll be honest with you.  So all of the cases, as I understand

15   it, that -- where, you know, the Judge Furman formulation is

16   fundamental to -- was a misrepresentation fundamental to the

17   value -- was it so obvious? -- none of those cases, apart from

18   U.S. Food Service and the McLaughlin case, are circuit cases.

19   And the circuit cases are not securities cases.

20       So -- and, you know, I admit this thought occurred to me

21   when I read Judge Bianco's opinion.  I can't remember the case,

22   but it's cited by the defendants.  So, you know, in securities

23   cases, you have these kind of presumptions that come in, basic

24   when there's an efficient market that's affiliated, whatever

25   the case.  There are other cases just about omissions.

1      But now we're talking about creating what amounts to

2  another type of presumption; right?  We're really talking

3  about, you know, U.S. Food Service in Judge Furman's case, what

4  I read them to be saying is, look, it's just so obvious in this

5  situation that no one is going to pay an inflated invoice.  So

6  from payment you can infer -- or one way to say it would be "we

7  can presume" -- that there's reliance.

8      But then they go and they say, But we want to check to make

9  sure that's a valid inference or a decent presumption; so we're

10  going to check to see if there's anything in the record to

11  suggest the fact people didn't lie.  We don't see anything.

12      I have a different set of facts in front of me than those

13  folks.  And you're asking me, in a securities case, to do

14  something that says, yeah, but we can still infer reliance or

15  we can have a presumption because this was a Ponzi scheme.  And

16  what I guess I'm wondering is, if I do that, why would anybody

17  need to worry about basic and affiliated intake?  Because you'd

18  always be able to say, well, of course in 20/20 hindsight,

19  nobody would have bought the security if they knew that was the

20  case; right?  So that concerns me here about kind of

21  essentially rendering those presumptions -- I don't know what

22  the right word is -- unnecessary, immaterial.  Why bother

23  trying to qualify for basic and affiliated when you can use the

24  fundamental value presumption?

25          MR. WATTERSON:  Well, I think, Your Honor, we would

1    not be creating new law at all.  There are plenty of Ponzi

2    scheme cases where courts go ahead and certify classes, you

3    know, not relying on these presumptions.  And the reason --

4             THE COURT:  The Fifth Circuit case, for example.

5             MR. WATTERSON:  Excuse me, Your Honor?

6             THE COURT:  The Fifth Circuit case.

7             MR. WATTERSON:  Correct.  This is a pyramid scheme,

8    but for all intents and purposes, it's the same scheme.  It's a

9    scheme that's essentially fraudulent.  Joshua Garza admitted

10   this was a Ponzi scheme.  This is from his plea agreement.  The

11   defendant, along with others acting through his companies,

12   applied money his companies had made from new Hashlet investors

13   and used it to pay older Hashlet investors money owed them.  So

14   this is just a case where you have fundamentally fraudulent

15   misrepresentations.

16       In the Goodman case that Mr. Fraser cited, you know, that

17   case was -- it was essentially about a -- the participation of

18   a sort of noted stock picker in this mutual fund company.  And

19   so the misrepresentations were about whether or not he was

20   picking the stocks.  And, you know, the Court said, No, this

21   isn't one of those fundamental types of misrepresentations.

22       But the facts here are completely different just because

23   it's so widely recognized that a Ponzi scheme is in of itself a

24   fraud.  So I think it's important to note what we need to prove

25   is that, you know, this is a material misrepresentation.  And

1    so it's something that a rational investor would have taken
2    into the mix of information.
3        You know, no rational investor would have invested in a
4    Ponzi scheme knowing that it was a fraud.  It's just -- you
5    know, it's something that the jury, I think, would be entitled
6    to completely discount.
7            THE COURT:  With the exceptions of those folks, if we
8    take their posts seriously.
9            MR. WATTERSON:  No, I think that even as to those
10   people the jury could say, no, I don't think this is a rational
11   investor.  You know, no rational investor would do this if they
12   had really known that the bitcoin that I am getting actually
13   came from somebody else's pockets.  It's just so fundamental.
14   So, you know, I don't think that you would be expanding the law
15   at all.
16       And, you know, if even to the argument you were, this is a
17   case where these claims should be certified.  I mean, you know,
18   what we're going to be focusing on here is, you know, not so
19   much the underlying fraud.  I mean the underlying fraud here is
20   admitted.  I mean Joshua Garza admitted it in his plea
21   agreement.  He admitted it during his deposition.  You know,
22   this is -- so the focus of this case even isn't going to be
23   necessarily on the underlying fraud.  You know, the focus is
24   going to be on Stuart Fraser and, you know, whether or not he's
25   secondarily liable.  And it's undisputed that all of those

1    elements we'll need to prove.

2              THE COURT:  Although Mr. Fraser hasn't conceded

3    liability as to the substantive 10b-5 claims; right?

4              MR. WATTERSON:  That's true, Your Honor, but, you

5    know, I think that at trial the focus is not going to be on

6    those claims because, I mean, we have statements from the

7    president CEO that this was a Ponzi scheme.  So I can't imagine

8    how the trial would proceed.

9        And, you know, Your Honor, one thing -- and we can do this

10   now or we can do this later.  But, you know, I want to go

11   through and actually talk about some of those documents that

12   Mr. Fraser has, you know, attached to his opposition, because,

13   you know, I disagree that, you know, many of these actually

14   stand for sort of what he claims.

15             THE COURT:  You mean the posts that I was going

16   through just now?

17             MR. WATTERSON:  Correct, Your Honor.

18             THE COURT:  Okay.  Go ahead.

19             MR. WATTERSON:  Can I approach?  I have a little

20   PowerPoint.

21             THE COURT:  Oh, you want to do a PowerPoint.  Before

22   we do that PowerPoint, let me hear from Ms. Cave as to some of

23   these issues.

24       I guess, you know, I'm sure you'd like to say you agree

25   with some of those things I was suggesting, but let me ask you

1    the flip side of it a little bit.

2        So the -- you know, it is kind of hard to imagine.  I have

3    to admit, I'm risk adverse.  I wouldn't invest in

4    cryptocurrency if you paid me to.  So maybe I'm not capable of

5    imagining.  But I guess it is hard to imagine that someone

6    would knowingly buy into a Ponzi scheme; right?  I mean maybe

7    there are these idiosyncratic people who think, I'm going to

8    get in and get out and I'm going to get lucky.

9        But do we have -- is it reasonable to infer that that's a

10   material group, or should we just, you know -- shouldn't I just

11   say, well, look, these are some cranks out there, you know,

12   and -- because Mr. Watterson's point is no rational investor

13   would do this.  Why is that wrong?

14           MS. CAVE:  Well, I hesitate to call Your Honor wrong,

15   but I will disagree with the statement, Your Honor.

16           THE COURT:  Okay.

17           MS. CAVE:  Because obviously we've taken issue with

18   Mr. Kerner and his qualifications as an expert, but if you just

19   look at the things attached to what he submitted, basically

20   this cryptocurrency is called a global casino.  And I think you

21   could say some of the same things apply to -- some of the same

22   mentalities that apply to investing in cryptocurrency apply to

23   gambling.  And I'm guessing Your Honor is not much of a gambler

24   either.

25           THE COURT:  That would be correct.

1          MS. CAVE:  It's hard to envision that mindset.  But we

2     have -- as Your Honor noted, we pointed out several places in

3     the record where there are people who say, almost because it's

4     a Ponzi, they want to invest in it.  And that may or may not be

5     rational, but that's a fact.  That is -- there's proof of that

6     in the record.

7          And so Mr. Watterson is dismissive of that number, but it

8     does create individual questions.  And when we're talking about

9     potentially -- I know that the plaintiffs say that this is a

10    class of potentially thousands of people.  But if you look at

11    what the Government did in Mr. Garza's sentencing, it's more

12    like less than 200.  So even if -- it could be a material

13    number, Your Honor, based on what we've seen.

14         THE COURT:  Why -- what was the Government -- do you

15    have any sense of what the Government's rationale for focusing

16    on less than 200 was?

17         MS. CAVE:  That was what my understanding from -- and,

18    again, Mr. Fraser was obviously not part, at all part of that

19    proceeding, but just from what we've read from the sentencing

20    transcript --

21         THE COURT:  This is concerning restitution.

22         MS. CAVE:  Concerning restitution, that it sounds like

23    Mr. Shinners was involved in that process and there was

24    outreach to people that he knew and publications that he was

25    making on the -- on various websites to try to kind of recruit

1    people.  And there was some kind of a verification process.  We

2    don't know what that entailed.

3           THE COURT:  Are you suggesting the Government is

4    somehow screening out people who thought this was a Ponzi?

5           MS. CAVE:  No, I'm not suggesting that at all.  I'm

6    suggesting the Government undertook some kind of a verification

7    process and got to a number that was less than 200 of purchases

8    that sort of, quote, unquote, could be verified.  But the

9    Government even admitted there are statements in this

10    sentencing transcript that we submitted that they didn't commit

11    to -- they say -- I think they say we didn't reach a conclusion

12    on that number, and we're still working on it.  And this is

13    after months and months and months, if not years, of trying to

14    see who should be entitled to restitution from Mr. Garza.

15           THE COURT:  That's sort of a different issue.

16           MS. CAVE:  It is a different issue.  All I'm saying,

17    when Your Honor was asking about is this a material number --

18           THE COURT:  Oh.

19           MS. CAVE:  -- I think given the number of examples

20    that we've seen, it does raise -- it does raise questions.

21     If I --

22           THE COURT:  So your position is, look, this is just a

23    different species of people, frankly.  I mean I shouldn't --

24           MS. CAVE:  I don't mean to say that, Your Honor.

25           THE COURT:  But these are not the ordinary investors

1    one sees in, you know, cases coming out of the Southern

2    District and places like that, you know, with publicly traded

3    securities and things like that.  This is a group of people

4    that, you know, understands what they're doing is gambling,

5    and, you know, they're okay with investing in a Ponzi.  Or

6    there are some significant number of them that are like that.

7         MS. CAVE:  I think that question, Your Honor, as to --

8    I don't mean to suggest that that's universal.

9         THE COURT:  Right.

10        MS. CAVE:  But the fact that there are some people

11   makes this an individual -- makes it an individualized inquiry

12   such that some kind of a new presumption.  And I think Your

13   Honor is entirely correct, that this would be breaking new

14   ground.  As Judge Bianco pointed out in the Goodman case that

15   you were referring to earlier, Your Honor, the inference of

16   reliance has to be, he used the quote, almost inescapable.  And

17   given the evidence that we've put forward here, that conclusion

18   is not possible.

19        THE COURT:  What is your view on the timing questions

20   I was discussing with Mr. Watterson?

21        MS. CAVE:  Yes, if I could just answer a couple of the

22   timing questions --

23        THE COURT:  Sure.

24        MS. CAVE:  -- that you raised earlier.  January 19th

25   was the announcement about the SEC investigation.

1          THE COURT:  So announcement on this cryptocurrency

2    trader publication?

3          MS. CAVE:  Yes.  I forget the exact name.

4          THE COURT:  And how specific -- is that in the record?

5          MS. CAVE:  It is in the record, and I can find it for

6    you in a moment, Your Honor.

7          THE COURT:  Okay.

8          MS. CAVE:  But the -- it's -- it's pretty specific.

9          THE COURT:  They talk about a subpoena and all that?

10         MS. CAVE:  Yes, yes.

11         THE COURT:  Okay.

12         MS. CAVE:  That's January 19th.  And then the other

13   timing point that I would raise, Your Honor, and I will need to

14   find a cite for this, but I believe it's in the plaintiff's

15   brief, that they say on December 31st is when Paybase launched.

16   And on that date it was clear to the plaintiffs, it was clear

17   to the GAW Miners community, that Paycoin and Paybase did not

18   manifest the promised features that they were supposed to have.

19         THE COURT:  But wouldn't you need more than a day to

20   figure that out?  I mean prices kind of move and then they

21   stabilize.  Wouldn't you need more than a day to figure out

22   that the -- go ahead.

23         MS. CAVE:  That's possible.  I'm just saying that's

24   what they say.  I think it's in their brief, and I'll find a

25   cite.

1    THE COURT:  No.  You're saying they launched it on

2    December 31st.  But are you now saying that it was immediately

3    apparent to everybody the promises were false?

4    MS. CAVE:  That's what they have said, that it was

5    immediately clear that they were not functioning and not doing

6    what was promised.  And there's evidence in what we've

7    submitted and additional evidence in the record that there were

8    a ton of problems in those first few days in early 2015.

9    THE COURT:  And so what's your view about the

10   hypothetical person who purchased in March or June of 2015,

11   that that person has no claim as a matter of law or what?

12   MS. CAVE:  Well, a couple of other important timing --

13   THE COURT:  Yup.

14   MS. CAVE:  -- features, Your Honor, there are e-mails

15   that we've submitted between company employees in February 2015

16   that the companies essentially were in wind-down mode at that

17   point, that they were trying to wrap up business.  They were

18   trying to figure out what to do with systems and those sort of

19   things, and that's around mid February.

20   March 2015 is when the big leak of the company's -- a lot

21   of the company's e-mails and other documents went onto the

22   internet somehow.  We don't exactly know how that happened, but

23   that was where there was sort of a burst of much internal

24   information about the way the companies had been functioning,

25   what Mr. Garza was doing.

1          THE COURT:  Okay.

2          MS. CAVE:  And that was in about March.  And then

3   April 2015 is the last records of any transactions in ZenCloud

4   or Paybase.  So how there could be any argument, um, you know,

5   that this sort of trickle of releases over time in the early

6   part of 2015 I think goes to Your Honor's point about why there

7   should -- why the class goes all the way to December 2015 even

8   if a class was going to be certified.

9          THE COURT:  I guess, though, so what you're saying is

10  the data base, about which there's much debate, that ends in

11  April 2015.

12         MS. CAVE:  The last record that we've seen in those

13  data bases, the ZenCloud and the Paybase data bases is April

14  2015.  I don't recall the exact date.

15         THE COURT:  Okay.  And so does that -- what follows

16  from that for class certification purposes with regard to

17  people who purchased Paycoin and, you know, after January 10,

18  2015?

19         MS. CAVE:  You can still buy Paycoin today, Your

20  Honor.

21         THE COURT:  Oh, I didn't know about that.

22         MS. CAVE:  Just goes to show about the rationality of

23  this.  Why anybody would buy Paycoin at this point.

24      But in any event, what that shows, these points that we're

25  raising is -- is twofold.  First of all, in terms of reliance,

1    I don't think you could say that anybody was -- there was
2    anybody who had any doubt that this was a fraud, that this
3    wasn't a fraud by that point.
4           THE COURT:  So their claim fails as a matter of law.
5           MS. CAVE:  I think as a matter of law.
6           THE COURT:  So that's not a class certification
7    problem but class definition problem.
8           MS. CAVE:  Exactly.
9           THE COURT:  What you're saying is really you wouldn't
10   concede this, but that, from your perspective, it's at least
11   clear that people who purchased, say, after a certain time in
12   January 2015 are out entirely.
13          MS. CAVE:  Exactly.  Exactly.  And that it does go to
14   the class question a little bit, Your Honor, because it raises
15   a question of, again, this individual level -- the
16   individual --
17          THE COURT:  That's what I was getting.  And it sounds
18   like your view is it's kind of all or nothing, and it's a
19   nothing for these people.  That is to say, you wouldn't need to
20   hold hearings because they don't have claims.
21          MS. CAVE:  Exactly.
22          THE COURT:  Okay.
23          MS. CAVE:  But if -- to Your Honor's point, I'm
24   certainly not conceding that, but if at any point in time if
25   the class definition were to go at any point in time later, we

1   think in particular individualized inquiries about reliance

2   during that period of time would also be pronounced.  We think

3   that they are earlier for all the reasons that we stated in our

4   papers, but in particular, given all of these disclosures about

5   obviously the significance.

6           THE COURT:  What information do you have about who had

7   access to HashTalk or Reddit or how widespread -- how much it

8   was used, how much it was seen by people in this community?  In

9   asking the question, I recognize that it may just be impossible

10  to get evidence about that kind of thing.  But if there is any,

11  you should tell me.

12          MS. CAVE:  I don't know, Your Honor.  I've not been on

13  either other than the examples that we've put in the record.

14  My understanding of HashTalk is that it's similar to kind of a

15  Facebook where you can get likes and points for, you know, more

16  posts and more views of your posts, that kind of thing.

17          THE COURT:  But that's company sponsored.

18          MS. CAVE:  That's the company-sponsored one, correct,

19  correct.  And the general sense is it's sort of referred to as

20  the community or the ecosystem, this HashTalk forum, and so

21  that, you know, obviously as Mr. Watterson said, we're not

22  talking about an efficient market here.  But to the extent

23  there was sort of a central depository of information from --

24  to and from the company, that's arguably one place that it

25  went.  We think it goes much broader than that.  It includes

1    Reddit and a lot of other websites and a lot of other places

2    people share information.  People were talking to Mr. Garza

3    directly or texting him directly.

4              THE COURT:  Which you could do on this HashTalk

5    thing.

6              MS. CAVE:  You could do it on that forum.  There were

7    YouTube videos.  There's just about every kind of format for

8    communicating that you could imagine, and different people did

9    different things.

10             THE COURT:  But you've never undertaken any effort to

11   count how many people were on that?

12             MS. CAVE:  I have not personally.  We've only just,

13   you know, had discovery as to the named plaintiffs, but both --

14   at least Mr. Shinners was a very frequent poster on the

15   HashTalk forum.  Mr. Pfeiffer may be a little bit less so and

16   fewer traces of Mr. Audet.  But just those examples show -- but

17   just because somebody wasn't posting doesn't mean they weren't

18   viewing it and seeing what information was on there.

19             THE COURT:  Very well.  All right.  So I will let Mr.

20   Watterson -- we're not done; so we've got plenty of time --

21   show me his PowerPoint.  I assume you've shown it to Attorney

22   Cave?

23             MR. WATTERSON:  I have a copy.

24             THE COURT:  You didn't shown it to her before today?

25             MR. WATTERSON:  I have not.

```
1              THE COURT:  Why don't you let her look at it now.  I
2     have some questions for you.
3         Let's talk about the terms and conditions a little bit.  So
4     the ones that -- so the December 2014 terms and conditions say,
5     Risk that Paycoin may never be completed or released.
6     Purchaser understands that while the company will make
7     reasonable efforts to complete the Paycoin -- I think it's
8     software -- I'm not sure -- it is possible that an official --
9     an official completed version of Paycoin may not be released,
10    and there may never be something Paycoin prime controller or
11    HashStaker.
12        Then the next one is:  "Paycoins may have no value.
13    Paycoins is a new cryptocurrency, and its value is determined
14    by supply and demand.  At any point after its release, it is
15    possible that the market price of a Paycoin may be zero.
16    Because the value of Paycoin may be zero, the value of a stake
17    in Paycoins from a HashStaker may also be zero."
18        So why doesn't that also create a problem of individualized
19    determinations?  In other words, some -- of some significance
20    to know if anybody actually read those terms.  These are like,
21    you know, click -- right? -- with your mouse?  I haven't done a
22    study.  Probably most people don't read those.  But some people
23    might, people like me.  And so don't we need to have hearings
24    to figure out, did you read those terms and conditions or not?
25             MR. WATTERSON:  No, I don't think so, Your Honor,
```

1    because, again, the fundamental misrepresentation here was GAW
2    Miners was not operating a legitimate business.
3            THE COURT:  Well, but no one ever said that.  No one
4    ever said -- those aren't the misrepresentations you pointed to
5    in your brief.  You pointed to specific misrepresentations
6    about Hashlets and Paycoin that people purchased.  No one ever
7    said, you know -- I mean there were these debates, but I didn't
8    see anything by Garza, you know, GAW Miners is a legitimate
9    business.  Is there someplace you can point me to for that?
10           MR. WATTERSON:  Well, I think it's implicit, and
11   that's what the Fifth Circuit cited about the pyramid scheme
12   that we cited.  You know, it's implicit that when you --
13           THE COURT:  So you don't even have to prove a
14   misrepresentation?  You just prove that the thing was
15   fraudulent and it doesn't matter if there was a
16   misrepresentation?
17           MR. WATTERSON:  I mean we can prove that it was a
18   Ponzi scheme; so, you know, I think that we would have to offer
19   that proof.
20           THE COURT:  But you don't have to prove any actual
21   misrepresentation?
22           MR. WATTERSON:  I mean the notion that is in these
23   cases that we've cited is that there is an implicit
24   misrepresentation about the legitimacy of a business when it's
25   operating a Ponzi scheme.  So, you know, I think that is a

1    misrepresentation.  Yes, we would have --

2          THE COURT:  So that would basically eliminate the

3    requirement of proof of misrepresentation and the requirement

4    of proof of reliance in any case you had a Ponzi scheme where

5    people invest in.

6          MR. WATTERSON:  No, I don't think it would eliminate

7    that.  In, for example, these -- the multi-level marketing

8    case, my understanding is they vigorously disputed whether or

9    not this was actually, you know, a pyramid scheme as opposed to

10   a legitimate multi-level marketing company.

11         THE COURT:  Right.

12         MR. WATTERSON:  It just so happens in this case there

13   is no dispute.  So I don't think this would be some big change

14   in the law.  This just happens to be a case about a

15   fundamentally fraudulent business.  So in this case I think it

16   would be easy for us to prove there was a misrepresentation

17   because there's admissions by --

18         THE COURT:  I guess at the end of the day, you've got

19   to prove that somebody purchased securities based on a

20   misrepresentation or omission that was material.  If all your

21   people had made money, none of them would be here, even if it

22   was an illegal business.  It can't be enough that you simply

23   buy an interest in an illegal business or buy something that an

24   illegal business sells, or fraudulent business, a Ponzi scheme

25   even, and you lose money and suddenly you don't have to satisfy

1    the requirements of the securities laws.  And that's not the
2    way you've briefed this either.  You've briefed this by
3    pointing to specific misrepresentations; right?
4           MR. WATTERSON:  It's true that we pointed to specific
5    misrepresentations, but, you know, we also did spend, I think,
6    a substantial amount of time talking about the whole Ponzi
7    scheme aspect of this.
8           THE COURT:  Yeah.
9           MR. WATTERSON:  And so, yes, it's true there are
10   specific misrepresentations --
11          THE COURT:  But you never suggested -- I'm not aware
12   in your brief you suggested you actually didn't have to point
13   to affirmative misrepresentations just because the whole thing
14   is implicit.  That's a new argument as far as I can see.
15          MR. WATTERSON:  I think we did make the point that
16   when you have a business that is fundamentally fraudulent, you
17   know, that that is a kind of misrepresentation that courts look
18   at.  It is exactly what the Fifth Circuit looked at in that on
19   Bank and Van Torres.  We cited that case and talked about it at
20   some length, and, you know, we cited some other Ponzi schemes
21   as well.  And, you know, that's what these cases -- cases hold.
22          So, you know, I do think that we made that argument.  And,
23   you know, I think that it is, you know, the most important
24   aspect of, you know, this fraud.  Yes, it's true --
25          THE COURT:  Remind me, that was a 10b-5 case?

1          MR. WATTERSON:  It's a RICO case.

2          THE COURT:  That's right, it's a RICO case.

3          MR. WATTERSON:  Yeah, it's a RICO case.  But, again,

4     they looked at how to prove reliance on a class-wide basis in

5     the context of a RICO case, and, you know, I just --

6          THE COURT:  But you didn't have -- in a RICO case, you

7     wouldn't have to show a misrepresentation; right?

8          MR. WATTERSON:  I think that may be true, Your Honor,

9     but I mean -- actually, I'm not sure about that.  But, you

10    know, in any event, I think we have shown that there was a

11    misrepresentation.  You know, the notion --

12         THE COURT:  Which misrepresentation?  The

13    misrepresentation that Paycoin will -- you know, we're going to

14    support Paycoin with $20 Paybase and that we'll have a hundred

15    thousand -- a hundred million dollar fund, those

16    misrepresentations you've pointed to.

17         MR. WATTERSON:  Sure, and then the notion --

18         THE COURT:  So that's why I asked about these terms

19    and conditions, because the terms and conditions don't say

20    that; right?

21         MR. WATTERSON:  That's true.  This term and condition

22    doesn't say anything about the notion that GAW Miners was going

23    to be supporting Paycoin with this, um --

24         THE COURT:  Paybase.

25         MR. WATTERSON:  Paybase rather, correct, Your Honor.

 1    But they had this reserve of U.S. dollars that it was going to

 2    use to support the price.  Um, so, you know, I don't think that

 3    it tells you anything there.  Um, and, you know, I am not --

 4    there's no evidence --

 5            THE COURT:  Right.  So in other words, what you're

 6    saying is, well, maybe it's inconsistent with the $20 floor,

 7    but it's not necessarily inconsistent with the hundred million

 8    dollar fund.

 9            MR. WATTERSON:  That is one point I'm making, Your

10    Honor, you know, but I also think -- I just want to make this

11    point briefly.  This is something that sort of applies to all

12    of this evidence that Mr. Fraser has cited.  You know, there's

13    no evidence in the record that anybody will come to trial and

14    testify, You know what?  I saw the terms and conditions.  And

15    you know what?  I decided to buy this anyways.

16        You know, there is just the fact of this terms and

17    conditions.  I think there are some posts where even the terms

18    and conditions are discussed, but, you know, there's no

19    testimony from anybody that they actually, you know, knew about

20    this stuff and made a decision to buy anyways.

21        And, you know, that's why I think it's so -- you know, it's

22    problematic to really put any stock in this evidence at all.  I

23    mean these are anonymous people on the internet.  We cited a

24    couple cases about how --

25            THE COURT:  Well, except for your client who you're

1    able to identify.

2            MR. WATTERSON:  That's true, Your Honor, but I

3    think -- I don't think that except with respect to one e-mail,

4    um, to Joshua Garza, I don't think that Mr. Fraser at all takes

5    the position that, you know, Mr. Shinners knew this was a Ponzi

6    scheme.

7            THE COURT:  I wasn't suggesting that at all.  I was

8    actually saying the opposite.  He actually was aware it was

9    being called a Ponzi scheme by others, but he didn't agree.

10   That was, I think, the gist of that e-mail.

11           MR. WATTERSON:  Yes, Your Honor.

12           THE COURT:  I'm sorry, post.  I misspoke.

13           MR. WATTERSON:  Correct, Your Honor.  I agree.  But,

14   you know, we cited just cases about, you know, this is -- not

15   only is it hearsay, but I mean it's the worst --

16           THE COURT:  It's not hearsay because it's not offered

17   to prove the truth; right?  There's no dispute, as you pointed

18   out, that it was a Ponzi scheme.

19           MR. WATTERSON:  Well, people are saying, I went ahead

20   and invested and made money off this stuff even though I knew

21   it was a Ponzi scheme.  So I do think it's being offered for

22   the truth of the matter.

23           THE COURT:  Well, I mean it's really being offered to

24   show whether people -- what people's state of mind was --

25   right? -- whether they understood -- what they understood about

1       the nature of the enterprise.  And, so -- but there's no
2       dispute about what the nature of the enterprise was, as you
3       pointed out.
4              MR. WATTERSON:  Right.  But, you know, these are posts
5       where people, you know, had made their purchases and they're
6       looking back.  And, you know, on the internet people brag and
7       boast and do all that sort of thing.  So, you know, I just -- I
8       don't see --
9              THE COURT:  You're saying they're not reliable.
10             MR. WATTERSON:  At all.  And, you know, we cited a
11      case out of -- it was a District of Hawaii case, and they were
12      talking about anonymous comments that people that post on the
13      comment section of news stories.  And, you know, they mentioned
14      that, you know, people will say outrageous, outlandish,
15      nonsensical things on the internet.
16             THE COURT:  But these ones happen to be correct
17      basically.  The ones who were saying it was a Ponzi scheme,
18      they were correct.  They were proven correct.
19             MR. WATTERSON:  Right, it's true it was a Ponzi
20      scheme, and that was correct.  But it's nonsensical for someone
21      to say, You know what?  I knew it was a Ponzi scheme, but I
22      bought in anyways.
23         And, you know, they don't have any --
24             THE COURT:  Well, it isn't quite.  I agree with you
25      that it's strange.  I'm not sure I agree that it's nonsensical.

1    There is a logic that is expressed there.  It strikes me as the

2    logic by which people play Russian roulette, which is, oh, I'll

3    get in and then I'll get out and get my money.

4        I think we're all in agreement that that sounds like a

5    pretty unwise thing to do.  But is it -- I'm not sure if I'd go

6    so far to agree it's nonsensical.  There's a logic there.  It's

7    just questionable judgment I suppose.

8              MR. WATTERSON:  Well, the notion that people invested

9    with Bernie Madoff knowing the truth, um, behind what he was

10   doing, you know, I think that a jury would be fully entitled to

11   discount that completely.  And, you know, if -- again, there's

12   no deposition testimony.  We don't even actually know who these

13   people are.  We don't know if, um, you know, these people are

14   investors.  It's just something that we don't know because

15   these are anonymous posts on the internet.  And so I just -- if

16   it is of any evidentiary value, it is only the slightest.

17             THE COURT:  Now, what do you have to say about --

18   let's go to the timing point again.

19             MR. WATTERSON:  Sure.

20             THE COURT:  Return to it.  So Attorney Cave's position

21   is you get to -- her position is greater than this, if you

22   will.  But one of her positions is you got till January of

23   2015, and you're buying after that.  How could you possibly

24   show reliance on these statements that you've pointed to at

25   that point?  And she says you can buy Paycoin today.

1        MR. WATTERSON:  That's true.

2        THE COURT:  But that would be outside the class.

3        MR. WATTERSON:  Correct.

4        THE COURT:  So I guess you're saying is, no, basically

5   you could still have believed the company's statements up until

6   December 1st, 2015.

7        MR. WATTERSON:  You know, we chose December 1st, 2015,

8   just because that was -- you know, there was never some clear

9   disclosure from the company, this was all a Ponzi scheme.

10  There was never any $20 floor.  And there was nothing like that

11  definitive.  So we chose that just because when the SEC filed

12  the lawsuit, that seemed like something definitive.

13     You know, I don't know that it's necessary, but one option

14  the Court has is, you know, it could shorten the class period,

15  you know.  But I still think that people were investing and

16  especially given the fact that the company had some viability

17  into the spring of 2015.

18       THE COURT:  Why do you say it had some viability?

19  Because the doors were still open?

20       MR. WATTERSON:  Well, the doors were still open, and

21  they were making these representations about, We're going to

22  honor the $20 floor.

23       THE COURT:  But there's no evidence you're aware of

24  that anybody took that seriously because the price never went

25  up; right?  I mean you're saying, well, it's not an efficient

1    market.

2            MR. WATTERSON:  Well, I think that Mr. Pfeiffer, in

3    his deposition, you know, he testified that, well, you know, he

4    still made some of these purchases in there.  I can't recall

5    whether or not --

6            THE COURT:  He made purchases in the spring of 2015?

7            MR. WATTERSON:  Yeah, correct, Your Honor.  And I

8    can't recall, you know, whether it was specifically mentioned

9    the $20 floor, but, you know, he thought there was still, you

10   know, some opportunity to -- you know, he was down a lot.  And

11   so he thought, well, maybe there's some way to make things

12   back.  You know, so there's evidence of that, that Mr. Pfeiffer

13   did that.  But, you know, I think it's true that after a

14   certain point in time, yeah, we don't have evidence of people,

15   you know, making these purchases.

16           THE COURT:  And Attorney Cave mentioned that there's

17   no -- as she reads the data base, there's no entries after

18   April 2015.  Is that accurate?

19           MR. WATTERSON:  Correct.  The company essentially shut

20   its doors.  So that would be consistent I think, that there

21   would be no entries after that time.

22           THE COURT:  In other words, you don't have proof of

23   purchases after April 2015.

24           MR. WATTERSON:  No.  The only way we could -- I think

25   the purchases out there, they would all be on these outside

1   cryptocurrency exchanges.  So that's the only -- I think that
2   would be the only source of these purchases.
3          THE COURT:  Which are effectively -- well, we wouldn't
4   know if they were a secondary market.  Well, would those all be
5   secondary markets?
6          MR. WATTERSON:  Those would be a secondary market.  So
7   let me think about it, but I think that would be the only place
8   you would be able to get these products.  It may be that the --
9   I think that's right.
10         THE COURT:  All right.  Have you had a chance to look
11  at his pictures?
12         MS. CAVE:  I did, Your Honor.  They appear to be
13  excerpts from cases and the documents in the record; so I take
14  Mr. Watterson at his word that these are accurate.
15         THE COURT:  All right, Mr. Watterson.
16         MR. WATTERSON:  May I approach?
17         THE COURT:  Let the show begin.  You may approach.
18     Thank you.
19         MR. WATTERSON:  So I wanted to direct Your Honor --
20  this goes into some of the -- all the different --
21         THE COURT:  Do you have an extra copy for my law
22  clerk, by any chance?
23         MR. WATTERSON:  I believe I do.
24         THE COURT:  Thank you.  Go ahead.  Sorry.
25         MR. WATTERSON:  So I wanted to jump to -- there's page

1    numbers in the bottom --

2              THE COURT:  Okay.

3              MR. WATTERSON:  -- right-hand corner.  And so this is

4    page 15, and it talks about Exhibit A16.  And it also cites an

5    excerpt from a document that we didn't put in the record.  Just

6    to be up front about it, this was something I was looking at

7    preparing for the hearing, and I found this document.  And I

8    thought it was interesting; so I included it.

9              THE COURT:  Well, page 15 I've seen before.

10             MR. WATTERSON:  Sorry, Your Honor, the top image.

11             THE COURT:  Yeah.

12             MR. WATTERSON:  That's from Plaintiff's Exhibit -- or

13   Mr. Fraser's Exhibit 16.

14             THE COURT:  Right.

15             MR. WATTERSON:  The little bit below that.

16             THE COURT:  Oh.

17             MR. WATTERSON:  That is the Bates number there, and

18   that was in the record.

19             THE COURT:  The sort of gibberish or "Did you see

20   Leo's post?," that's something that --

21             MR. WATTERSON:  Was out of the record.  And, again, I

22   found it and I thought it was an interesting point, but, you

23   know, I just wanted to point that out.

24             THE COURT:  All right.

25             MR. WATTERSON:  So, you know, I think the point I

1    wanted to make is that this is a -- this sort of gibberish
2    here, it's a chat transcript where people are talking about
3    this post on Reddit.  And you can see that quoted there is the
4    same language of this poster where he writes, you know, "I
5    don't care if these are magical drug addicted uniforms."  And,
6    you know, again, we've never deposed this person or anything
7    like that.  But there's a sort of ha ha ha.  So it seems that
8    this person, you know, finds it funny or thinks it's a joke.
9        So I bring that up -- and I think I've kind of made this
10   point before.  But when these are anonymous people on the
11   internet, you have no idea what they believe.  And, you know,
12   on its face, this document would seem like, you know, perhaps
13   this person doesn't care what Hashlets are.  But, you know, if
14   you look at this, well, maybe they don't.  There's no evidence
15   of this person -- we don't even know who this person is; so
16   there's no evidence what he or she, you know, actually thinks.
17       The next page is Exhibit A17.
18           THE COURT:  Okay.
19           MR. WATTERSON:  And, you know, what I wanted to point
20   out is that, you know, this person cites the fact that GAW has
21   been -- this is in the first paragraph.  GAW has been way more
22   transparent with their mining.
23           THE COURT:  Right.
24           MR. WATTERSON:  Showing pictures of data centers, um,
25   etc.  You know, what we've learned since then is that GAW

1    Miners wasn't doing nearly sufficient amount of mining to -- to

2    support all these Hashlets they were selling.

3        The other point that I wanted to make is that I looked up

4    this person on Reddit.  And, you know, what I found was they

5    joined the site the same day they made this post, and they only

6    ever made one post on Reddit.

7            THE COURT:  This is the only post you could find?

8            MR. WATTERSON:  By this user, this Abridged 86.  So,

9    again, I've never deposed this person.  I don't know what he or

10   she believes.  Um, but what that tells me is this person

11   specifically came on to Reddit, made an anonymous user name to

12   post this one comment, and, you know, I think that people do

13   that on these kind of sites when they want to be -- you know,

14   when they don't want people to know who they are.  You know,

15   people have user names on these forums.

16           THE COURT:  You know, you folks are security source;

17   so you will know this better than I do.  I'm sorry.  It's a bit

18   of a tangent, but it made me think of it.  I'll look it up, but

19   there's a concept in -- I think it relates to the statute of

20   limitations in tolling in securities cases called storm

21   warnings.

22       And I know that like, for example, there would be an

23   argument here that the article about the SEC investigation in

24   January was a storm warning for statute of limitations

25   purposes, now, obviously not directly pertinent to our

1    situation.  I'm not suggesting otherwise.  But it does suggest
2    kind of a notice concept; right?  Because the idea is, well, if
3    you've got that storm warning, you couldn't sit on your rights
4    anymore.  You had to go to court and sue.  By that time you're
5    on notice that, uh-oh, there's a fraud going on.
6        It does make you kind of wonder, though, when you see these
7    posts, taking all your points about how it's anonymous, it's
8    not reliable, several posts in 2014 going back to August about
9    a Ponzi scheme, and so I think I know what your answer would
10   be.  It just doesn't mean that the company's insulated from a
11   fraud claim.  But anyway, keep going.  That was just a thought
12   I had.
13            MR. WATTERSON:  Sure.  And, no, I think the important
14   point, Your Honor, with respect to this post, you know, this
15   user, even if you take it at face value, you know, they're not
16   saying that this is a Ponzi scheme.  It's not speculating that
17   people were being paid out, you know, old investors were being
18   paid by new investors.
19            THE COURT:  He does say in the last sentences,
20   "Because of all those reasons I've pointed out above, I do
21   believe this Ponzi is going to last for a while.  Josh is in it
22   for the long run, and I'll run along."
23            MR. WATTERSON:  Sure, but this person also believes
24   GAW Miners is doing legitimate -- I mean taking it at face
25   value, they're talking about mining activities.  So, you know,

1    again, the best I can tell, this person believes that there's

2    mining going on, which, you know, is part of the fraud that was

3    at issue here.

4              THE COURT:  Okay.

5              MR. WATTERSON:  With respect to Exhibit A18, which is

6    on page 17, you know, this -- so some of these, just to explain

7    why this document looks like this, Your Honor.

8              THE COURT:  Yeah.

9              MR. WATTERSON:  These -- the only records of HashTalk

10   we have left are in HTML format.  So it's essentially computer

11   code how it would look on the website; so that's why it looks

12   kind of strange.

13       But the point I wanted to make about this document is that

14   the post was made in July of 2014.

15             THE COURT:  Where do you see that?

16             MR. WATTERSON:  So if you look at the top, there's --

17             THE COURT:  Oh, I see it, yeah, 7/2014, 7/20/2014.

18             MR. WATTERSON:  So this would have been before

19   Hashlets were launched.

20             THE COURT:  Right.

21             MR. WATTERSON:  So I guess what they're speculating

22   about is the notion that, you know, the other activities GAW

23   did.

24             THE COURT:  Which it was at that point just

25   Cloud-hosted mining or GAW-hosted mining?

1          MR. WATTERSON:  Hardware sales.

2          THE COURT:  Okay.

3          MR. WATTERSON:  In any event, I don't think that this

4     one is relevant at all.  It's before any of the products that

5     are issue in the class were -- were offered.

6        The next page is Exhibit A19 --

7          THE COURT:  Well, wait a minute though.  I guess I'm

8     not following your logic there.  There's information -- I get

9     your attack on, you know, anonymous reliability.  Those are all

10    points well taken.

11       But the fact that there's information in the market that

12    precedes by what, about a month or two, Hashlets, why is the

13    fact that it comes out before -- a month or two before Hashlets

14    is launched irrelevant if someone's saying it's a Ponzi scheme?

15    In other words, that would be a piece of information that, if I

16    were the investor, I would be like, "But somebody called it a

17    Ponzi scheme a month ago.  I think I should check on that" --

18    right? -- before I put my money down.

19          MR. WATTERSON:  It's a completely different product.

20          THE COURT:  Well, they don't specify a product here.

21          MR. WATTERSON:  We know it's a different product

22    because it was before Hashlets were released, so --

23          THE COURT:  Yeah, except I mean when it says, "It is

24    probably the world's biggest Ponzi scheme," I mean one could

25    read that as referring to the company; right?

1      MR. WATTERSON:  You know, again, we don't know what

2  these individuals think, but my point is simply that this was a

3  document talking about something prior to Hashlets being

4  offered.

5      THE COURT:  Okay.

6      MR. WATTERSON:  You know, there is this testimony from

7  Jonah Dorman, who is -- this is on page 18.

8      THE COURT:  Yup.

9      MR. WATTERSON:  Exhibit A19.  And, you know, he -- on

10  page 13 of his deposition, it's line 8, the highlighted point,

11  everyone knew he wasn't technically mining.  But if you go to

12  the next page, it's clear again that what he's talking about is

13  that this is the time period where he was selling the mining

14  hardware and presumably Cloud-hosted mining as well.  So it's a

15  similar point to the last document.  This testimony doesn't

16  relate to Hashlets.  It's something earlier.

17      THE COURT:  Well, actually, though, I don't want to

18  debate you too much on this because I think I agree with you on

19  this -- Ms. Cave can speak to this -- for a different reason,

20  which is that what he actually describes is what the employees

21  describe about how Hashlets was -- how the employees, before

22  they -- before the veil was pulled off, thought Hashlets was

23  working, namely, that it was a, quote, calculated method versus

24  an actual method.

25      But I don't want to pick too much of a fight with you on

1   that, because I actually don't think, even if one understood

2   that, one could said to have not been not relying on false

3   statements about a Ponzi scheme.  It's one thing to say, well,

4   I knew that Hashlets wasn't attached to a particular piece of

5   hardware, but it's another to say, I knew that Hashlets wasn't

6   attached to anything at all.

7        So as I read Mr. Dorman, he's saying the former, not the

8   latter.  So that's how I take that.  But I will certainly hear

9   from Ms. Cave on that later.

10           MR. WATTERSON:  Sure.  I just wanted to jump to page

11  24, which is Exhibit A25.  I just wanted to point out that this

12  is a, you know -- this exhibit is talking about HashStakers.

13           THE COURT:  By the way, what's XPY?

14           MR. WATTERSON:  XPY was what they referred to --

15  that's what the sort of trading symbol, I guess, for lack of a

16  better word, for Paycoin.

17           THE COURT:  Paycoin.

18           MR. WATTERSON:  So whenever you see XPY, they're

19  referring to Paycoin.

20           MR. WATTERSON:  I just wanted to point out that this

21  document is talking about HashStakers.  And it's -- you know,

22  it's something that happened relatively late, and it's in

23  January.  So --

24           THE COURT:  Okay.

25           MR. WATTERSON:  But, you know --

1          THE COURT:  Relatively late but still 11 months before

2     the close of the class definition; right?  I mean I'm sorry to

3     laugh about that, but I got to be honest.  I think anybody --

4     my own sense, anybody who purchased in 2015, to be blunt,

5     deserved what they got, to be blunt with you.  I mean come on.

6     You really had to have been a gambler to purchase in 2015 I

7     think.

8        I'll go back to the record.  I'll be careful with it and

9     all that.  But, wow, if you're buying in 2015 after there's

10    announcement of SEC investigation and after posts like this,

11    after the thing isn't anywhere near $20, um, for a long time,

12    you know, you might as well believe in magical unicorns if you

13    think the thing's going to go up to $20.  So anyway, go ahead.

14         MR. WATTERSON:  Sure.  And, Your Honor, I don't know

15    we need to belabor all of this, but I guess the point of

16    showing you this is just that this is what their evidence is.

17    There's no testimony from anybody that actually, you know, made

18    these purchases.  You know, we don't know if these people are

19    even class members.  So, you know, that's their main evidence

20    of nonreliance, and, you know, our principal point is it just

21    doesn't hold any water.

22         THE COURT:  Okay.

23         MR. WATTERSON:  So I don't think we need to belabor

24    going through the whole slide show.

25         THE COURT:  Okay.

```
1              MR. WATTERSON:  But that's the point I wanted to make.
2              THE COURT:  All right.  Let me give Attorney Cave a
3     chance to respond, and then we'll move on to a different topic.
4     Maybe we'll take a break and then move on to a different
5     topic.
6              MS. CAVE:  Thank you, Your Honor.  I think I only need
7     to make two quick comments.  The first point is a general point
8     about this no discovery and no testimony from anybody else.
9     Well, we've only had testimony from the three named plaintiffs.
10    The absent class members are not parties, and I venture to
11    guess, if I had come in here and said, I want subpoenas for a
12    hundred different potential members of the class, they would
13    have been jumping up and down yelling and screaming, saying,
14    You're not entitled to that.
15        And the only examples we've been able to find -- first of
16    all, discovery as to absent class members, even when it is
17    granted, it's extremely rare.
18             THE COURT:  Let me ask you a question about that
19    though.  Doesn't that -- so you're both aware of case law, and
20    the Second Circuit says essentially -- I'm probably misstating
21    this, but -- first of all, we view -- we review more
22    deferentially a decision certifying a class than a decision
23    not -- denying class certification.  And secondly -- and the
24    rationale for that, the circuit is stating -- this is what I
25    was going to get to -- is that, well, kind of when it's a close
```

1    call, you should certify because you can always then allow

2    class discovery and then a motion for decertification or a

3    motion for a modification of the class definition, etc.

4        So doesn't that point kind of argue in favor, if it is a

5    close call, of saying, well, I'll certify, but I'm going to be

6    generous with discovery and I'll certainly entertain a motion

7    to decertify the class if you're able to depose some of these

8    people and they come forward and say, "Yes, I'm just as crazy

9    as I sound," that kind of thing?

10           MS. CAVE:  Well, class certification is the exception

11   to the rule.  The default rule is that if you have a claim, you

12   have to come into court and prove it individually.  And so it's

13   the plaintiff's burden to come forward and say, This is an

14   exception.  All of the requirements of Rule 23 are met, and

15   this case should proceed as a class and we should get all the

16   benefits of proceeding as a class.

17       They haven't done that here.  Your Honor has raised many,

18   many questions that demonstrate that they have not met that

19   burden in here.

20       Now, as far as further discovery, you know, again, it gets

21   back to the point of we're not saying people don't have claims.

22   It doesn't -- there may be people like Mr. Shinners or Mr.

23   Pfeiffer or Mr. Audet and maybe others who have claims.  They

24   should come in here and prove the elements of their case.

25   That's the different -- that's the distinction that we're

1    making here.

2        And if I could just make one other point, Your Honor.

3            THE COURT:  Sure.

4            MS. CAVE:  Just about Exhibit A17, which is on page 16

5    of Mr. Watterson's slides, you know, he makes the point that

6    according to his research, he hasn't found another post by

7    Abridged 86.  Well, unlike DNA or fingerprints, an online user

8    name is not distinctive or individualized necessarily.  And so

9    I don't know.  Abridged 86, do they appear as something else on

10   other days, or do they have a different name on a HashTalk

11   forum?  So all I'm arguing is that's not conclusive, Your

12   Honor.

13           THE COURT:  All right.  So one question before we take

14   a break.  Just sort of, you know -- and this is for Attorney

15   Cave.  Your brief doesn't really challenge class certification

16   as to the claims concerning selling unregistered securities

17   except to the extent that you challenge the data base and some

18   standing things and the like.  And that I take it -- first of

19   all, do I have that right?

20       And secondly -- let me be clearer.  I'm not saying you've

21   conceded that a class should be certified for that claim, but I

22   didn't really see anything in the brief specifically addressing

23   that claim.  I assume that's because reliance and loss

24   causation aren't requirements of that claim.

25           MS. CAVE:  It is true that reliance and loss causation

1     aren't elements of those claims.  I wouldn't go so far as to

2     say we're conceding it.  We are in a very awkward position

3     here.  Mr. Fraser is the only person in court.  Mr. Garza has

4     been dismissed because he had to deal with the plaintiffs.  The

5     companies have defaulted and no longer exist.

6         We haven't been able to find another case to point Your

7     Honor to as to what to do in this situation, where there is no

8     one on the primary liability claims and you just have sort of

9     the controlling aiding and abetting situation.  So that's --

10    it's an awkward position for us to be in because, you know, to

11    the extent that those claims are predicative of one of the

12    claims against Mr. Fraser, I think we do have to deal with that

13    issue.

14            THE COURT:  But I guess I'm not following.  In other

15    words, the difficult issues here to me seem to be really mostly

16    the predominance issue.  There's some issue about the data base

17    you want to talk about too.  But -- and those issues don't

18    affect the claim for sale of unregistered securities; right?

19            MS. CAVE:  I think that's right, Your Honor, but I

20    think it's putting the cart before the horse.  It's sort of

21    having the state claims wag the tail on a federal dog or vice

22    versa.  I'm not sure I'm getting my imagery quite right.  But

23    the point is Your Honor has original jurisdiction in this case

24    because there have been federal securities claims asserted.  If

25    those claims go forward under 1367(a)(4) --

1          THE COURT:  Yes.

2          MS. CAVE:  -- then there's discretionary jurisdiction

3    over the state claims.  So I don't think it's right to certify

4    a class on the state claims and sort of deal with the federal

5    claims second.

6          THE COURT:  I see where you're going.  Okay, very

7    well.  So why don't we take about 15 minutes, and then we'll

8    come back.  I'll have some questions for you on -- well,

9    actually, one more question before we go.

10       Does anybody think we need an evidentiary hearing?

11         MS. CAVE:  Well, our position, Your Honor, is there

12   are certainly more than enough in the papers that we've let out

13   and the exhibits, and the questions that Your Honor has asked

14   today indicate that you've really grasped the issues that we've

15   raised.  Our position is if there's any doubt in your mind and

16   you're leaning toward granting certification, that's something

17   that we would raise -- we would probably seek to take it to the

18   Circuit and say that a fuller evidentiary record --

19         THE COURT:  But what would we explore?  It seems to me

20   there are a lot of facts in the record, and the parties are

21   very much disputing what inferences the Court should draw from

22   those facts.  That's very much in dispute.  But I'm not seeing

23   how that would be illuminated by an evidentiary hearing where

24   we have the experts testify.

25         MS. CAVE:  I think that would really be the primary

 1   thing we would do in an evidentiary hearing.  I don't mean to

 2   speak for Mr. Watterson, but yeah, having the experts testify

 3   and -- but if Your Honor wanted to see the entire depositions,

 4   they're videotaped.  We could make those available to you.  I

 5   don't mean that as a threat, Your Honor.

 6         THE COURT:  Yeah.

 7         MS. CAVE:  But if you wanted to see those or overview

 8   more of the transcripts or, you know, see fuller versions of

 9   the documents that are in the record, we could certainly do

10   that.  I tend to think Your Honor's right, that it wouldn't

11   necessarily add much.  Our only point is if in the event of

12   appellate review whether or not that might be more helpful.

13         THE COURT:  I understand.  Mr. Watterson.

14         MR. WATTERSON:  We agree in the sense that we don't

15   think that evidentiary hearing's necessary.

16         THE COURT:  That's what I thought.  Good.  Let's take

17   a short recess, about 15 minutes.

18      (Recess from 11:37 a.m. to 11:57 a.m.)

19         THE COURT:  Okay.  So I had a couple follow-up

20   questions on our earlier discussion.  Then we can talk about

21   the data bases.

22      So my first question has to do with the Paycoin, and one of

23   the representations about Paycoin that's identified is that

24   Amazon and Target and others were adopting -- they were going

25   to adopt it.  I guess my first question is:  I take it at some

 1   point it would have been apparent to people that Amazon and
 2   Target were not adopting Paycoin.  I don't know if there's any
 3   evidence in the record about that though, when that become
 4   apparent to people.  So Mr. Watterson, then I'll ask Attorney
 5   Cave to respond.
 6           MR. WATTERSON:  Sure.  I think it's the case that when
 7   Paybase launched, it was certainly true that people got on it
 8   and saw that, you know, there was no ability to go and get
 9   things from Amazon or Target.
10           THE COURT:  I see.  So that just shows I don't
11   understand what Paybase is.  Paybase was like a website that
12   you got onto and you could see what was available and where you
13   could link to, that kind of thing?
14           MR. WATTERSON:  When they launched it, it was really
15   essentially an exchange.
16           THE COURT:  Okay.
17           MR. WATTERSON:  It was advertised having more features
18   than that.  Um, you know, I'll just go ahead and I think
19   anticipate what Ms. Cave is going to say.  There were some
20   articles that came out as well talking about people called out
21   Amazon and asked, Hey, are you going to accept Paycoin?  And,
22   you know, so there was some articles about --
23           THE COURT:  And they said no.
24           MR. WATTERSON:  And they said no.  So I think those
25   articles came out, I think, sometime before Paybase.

1            THE COURT:  Oh, really.  So sometime in December 2014?

2            MR. WATTERSON:  I'm sure Ms. Cave will correct me.  I

3     don't remember.

4            THE COURT:  Okay.  But Paybase was launched

5     12/31/14.

6            MR. WATTERSON:  Correct.  But I think the point,

7     though, people thought it was going to be through Paybase that

8     this happened.  So once it's actually launched and I see that,

9     you know, its functionality is there, you know, they know.  And

10    now GAW made some representations that, well, we're rolling out

11    functionality, etc., etc.  But, yeah, I think it's true that

12    once it launched, people could see you can shop on Amazon.

13           THE COURT:  I got it.  Attorney Cave.

14           MS. CAVE:  Yes, I agree with that, Your Honor.  And,

15    unfortunately, I can't immediately find the cite either.  But

16    it is in the record, and we can check that.

17           THE COURT:  The cite being that there were some

18    articles where people called Amazon.

19           MS. CAVE:  Correct.

20           THE COURT:  And you think that was before 12/31.

21           MS. CAVE:  I believe it was.

22           THE COURT:  Okay.  Must have been sometime after --

23    well, when did they first represent that Amazon and Target were

24    going to be --

25           MS. CAVE:  I don't know off the top of my head, Your

 1    Honor.

 2            THE COURT:  Okay.

 3            MS. CAVE:  The other cite I agreed to look for, Your

 4    Honor, was for the point that I made earlier about that the

 5    plaintiff stated in their brief that once Paybase launched and

 6    basically immediately people knew it didn't have the

 7    functionality, as Mr. Watterson just said.  And that's on page

 8    10 of their brief and the materials that they cite in Footnote

 9    70, which includes Mr. Shinners' deposition, the complaint, and

10    the declaration of Mr. Narayanan.

11            THE COURT:  And the point there is that your view is

12    plaintiffs have largely conceded that as of the time it

13    launched, it was apparent that there was no $20 floor, there

14    was no Amazon and Target; right?

15            MS. CAVE:  Correct, yes.  So from that moment you

16    couldn't be relying on any of those representations.

17            THE COURT:  Got it.  Okay, next question, this is for

18    Attorney Cave.  So -- well, actually, before I do that, I have

19    a question for both of you.  Is there any information in the

20    record about the price at which Paycoin traded at in 2015, like

21    first six months, first eight months?  Is there anything in the

22    record?

23            MR. WATTERSON:  I believe that there is data from a

24    website called Coinbase that sort of looks at what the

25    outside -- these outside exchanges, where it would, um, where

1    it would trade.  So I think what you have is a daily high and

2    low price.

3            THE COURT:  But that's not in the record here; right?

4            MR. WATTERSON:  I believe that it is, Your Honor.

5            THE COURT:  Oh, okay.  Where?  Where do I find that?

6            MR. WATTERSON:  I will look for the citation.

7            THE COURT:  Please do.

8            MR. WATTERSON:  I'm not sure.

9            MS. CAVE:  Your Honor, I can point you to just through

10   December, but this doesn't quite answer your question.

11           THE COURT:  Right.

12           MS. CAVE:  But through December, if you look at Mr.

13   Strombom's declaration, Exhibit B12 has the chart that refers

14   to the price fluctuation that Mr. Watterson was describing

15   earlier where, as Your Honor pointed out, it basically never

16   gets to 20 through December.

17           THE COURT:  You think there is something that extends

18   it beyond December?

19           MR. WATTERSON:  With respect to the data?

20           THE COURT:  Yeah, just showing the prices.

21           MR. WATTERSON:  I believe the data goes until the end

22   of the class period.

23           THE COURT:  Great.  You're going to hopefully find a

24   citation.

25           MR. WATTERSON:  I believe that what Ms. Cave is

1    referencing is what I'm referring to.

2           THE COURT:  Oh.

3           MR. WATTERSON:  I think we might have provided the

4    data as well.

5           THE COURT:  B12 you think goes to the end of the class

6    period.

7           MS. CAVE:  I have B12 here, and I can tell you it only

8    goes to December 29, 2014.  So it doesn't go to the point Your

9    Honor was making, to the extent Your Honor is looking at price

10   information.

11          THE COURT:  I'm more interested in 2015.

12          MR. WATTERSON:  I think that we might have put in this

13   information too.  I need to go back and check though.

14          THE COURT:  All right.

15          MS. CAVE:  Your Honor, before you get to your next

16   question, just to follow up on one point that we ended on

17   before the break, and that was Your Honor's question about if

18   this is a close call, shouldn't you certify because you can

19   always decertify at some point.

20          THE COURT:  Right.

21          MS. CAVE:  And I would just reiterate this is an

22   individual who's the defendant here.  We're not talking about

23   IBM.  That's a very expensive process you're talking about,

24   going through with additional discovery to the named plaintiffs

25   and moving to decertify.  So we just ask Your Honor to keep

1    that in mind.

2            THE COURT:  I understand.  Thank you.

3        So the next question is:  With regard to the Honors Program

4    that Mr. Watterson described, I take it there's nothing in the

5    record about this; is that right?

6            MS. CAVE:  We checked, Your Honor.  It's not referred

7    to in the complaint, in the amended complaint.

8            THE COURT:  Okay.

9            MR. WATTERSON:  Your Honor, can I ask something about

10   that?

11           THE COURT:  Yeah.

12           MR. WATTERSON:  It may be in the complaint, but I

13   think it's sort of part and parcel of these representations

14   about the $20 price floor.

15           THE COURT:  But the point, is there anything in this

16   record that references it?

17           MR. WATTERSON:  Sorry.  I don't believe there is, Your

18   Honor.

19           THE COURT:  All right.  Thank you.  Okay.  Let's now

20   talk about the data bases.

21       Okay.  I guess my first question is for Attorney Cave on

22   this.  So the plaintiffs have included with their papers -- I

23   think it's with their reply papers -- a series of e-mails with

24   respect to the three named plaintiffs.  They appear to be

25   e-mails from GAW Miner saying, "Thank you for your purchase

1    from GAW Miner."  It's a pretty long set of them.

2        And the plaintiffs point out that some courts have said,

3    look, when you have like a digital music case, when you have

4    basically proof of purchase like that, that can be sufficient

5    to show membership of the class in a uniform way, because the

6    purchase names look more or less the same.  So why doesn't that

7    point, if you will, get around any problems in the data base?

8            MS. CAVE:  Sure.  It doesn't get around the problems

9    with the data bases because what's implicit in the cases Your

10   Honor is describing is that there -- what the plaintiffs in

11   those cases submit is then compared to an objective control set

12   of data.  So in other words, it's not just what the plaintiffs'

13   proof of purchase is.  There's -- and I'm more familiar with

14   the securities setting, Your Honor, than the music industry.

15   But in a typical securities case, if a class is certified,

16   there is then discovery to the banks on the street that held

17   that particular security.  So when the plaintiffs submit their

18   proof of claim and whatever additional documentation, it's then

19   compared to the control set of data that's received from the

20   other custodians of that security.  We don't have confidence in

21   the control set of data here, and we've pointed out a few

22   examples.

23       So, for example, Mr. Audet has -- I can give you two

24   examples.  He made two withdrawals of about a hundred thousand

25   dollars.  He said he never -- those are shown in the data

1    bases.  He said, "I never withdrew any money."  So that's one

2    obvious.

3             THE COURT:  We'll talk about the data base in a

4    minute.  But I didn't read digital music -- or let's take a

5    step back here as to why we're even discussing this issue.  My

6    understanding -- I hope somebody will correct me if you

7    disagree -- is the significance of these e-mails, the data

8    base, really is, I think, twofold:  One, does showing

9    membership in the class create individual issues,

10   individualized issues that will ultimately predominate over the

11   common issues because it's so complicated because everything is

12   so different, etc., or because the data base is so flawed?

13   And, two, for superiority purposes, does, you know, the -- do

14   the management difficulties that will come along with that, in

15   comparison to allowing individual claims, counsel against

16   certifying?  Those seem to me to be the two areas of

17   significance that this whole data base debate has.

18             MS. CAVE:  Exactly, yes.

19             THE COURT:  Mr. Watterson, do you agree?

20             MR. WATTERSON:  Well, I don't agree that there are any

21   issues.

22             THE COURT:  I get that.

23             MR. WATTERSON:  But I agree with your framing of the

24   issues.

25             THE COURT:  In other words, this is the legal

1    relevance of this discussion; is that right?

2              MR. WATTERSON:  You know, I think it was framed in

3    terms of ascertainability.  You know, I agree that we discussed

4    that earlier.

5              THE COURT:  Yeah.

6              MR. WATTERSON:  I don't think there was much relevance

7    there, but I agree with your framing of issues.

8              THE COURT:  Very well.  So it may well be that in many

9    securities cases, there's this control set, but there's

10   certainly no requirement of predominance or superiority that --

11   that there be such a setting.  In other words, if the e-mails

12   all look more or less the same -- now, I only have three sets,

13   but they did look more or less the same -- that means there's

14   some uniformity.

15       And so the issue is whether that membership in the class

16   can be established through common proof.  And if the e-mails

17   all look the same and they're sort of standardized, that

18   suggests that, in fact, can be established -- membership of the

19   class can be established through common proof.  No?

20             MS. CAVE:  There could be some pieces of common proof,

21   but we don't know whether everybody has those e-mails, whether

22   those e-mails were sent to anyone.

23             THE COURT:  Well, right.  But we do know that -- my

24   understanding from Shinners' affidavit is that approximately

25   170 individuals uploaded documents through gawsuit.com that

1     related to their purchases, activities, and subsequent losses.

2     Now, I have assumed, don't know if this is right, but that

3     figure of 170 the documents he's discussed are documents like

4     those e-mails.  That's what I've assumed.

5             MS. CAVE:  I don't know with respect to all 172.

6             THE COURT:  But my understanding from the plaintiff's

7     brief is that they did produce those materials.

8             MS. CAVE:  They did.  I confess I don't know across

9     the board if everybody had the identical set of e-mails, but

10    what I can say is even with those e-mails --

11            THE COURT:  Yeah.

12            MS. CAVE:  -- we have -- we have identified a number

13    of -- even just with respect to these three plaintiffs, there

14    are purchases that they say they made that don't show up in the

15    data base or transactions that show up in the data base that

16    they don't have.

17            THE COURT:  Maybe that's because the data base is

18    screwed up, because it was hacked.

19            MS. CAVE:  Right.

20            THE COURT:  But they've got the e-mails.  So they can

21    show that they, you know, purchased the stuff.

22            MS. CAVE:  Well --

23            THE COURT:  I mean you can't have it both ways.

24            MS. CAVE:  Right.

25            THE COURT:  If the data base is so flawed the Court

1    shouldn't rely on it, the solution is to throw the data base

2    and rely on the e-mails.  And so but then we have some

3    uniformity.

4            MS. CAVE:  If everyone has those e-mails.  What if

5    someone doesn't have, you know, the e-mail?

6            THE COURT:  Well, if that's the way we were

7    proceeding, they wouldn't be able to prove their membership in

8    the class.

9            MS. CAVE:  Again, it goes to membership in the class

10   and how we're going to have some uniform way of administering

11   that.  So I think that gets to a fundamental question.  We

12   raised a number of other issues aside from this one.

13           THE COURT:  Yes.  So now let's get into the data base

14   issues.  Am I right -- I hope this won't be a really dumb

15   question and I missed something big.  But I didn't actually see

16   printouts from the data base itself.  Or did I miss those?  I

17   saw the Shopify.  I saw some other spreadsheets.  I saw the

18   affidavits.  But maybe I missed it.  Is there actually

19   printouts from the data base itself that are in the record?

20           MS. CAVE:  I think there are a few other examples of

21   certain views, Your Honor.

22           THE COURT:  And they're attached to?

23           MS. CAVE:  I think Mr. Strombom attached a couple, and

24   I can get those cites for you.

25           THE COURT:  I know where his affidavit is.

1    MS. CAVE:  I think he -- so as both he and Mr. Mills

2    talk about, there are different tables.  So I think there are

3    examples of different tables --

4    THE COURT:  Okay.

5    MS. CAVE:  -- and different views.  But I don't

6    believe -- and Mr. Watterson can correct me -- I don't believe

7    there's an example of sort of one view of kind of all the

8    information.

9    THE COURT:  Okay.  So now, my understanding is two --

10   there are two data bases, the Zen and the GAW.

11   MS. CAVE:  ZenCloud and Paybase.

12   THE COURT:  ZenCloud and Paybase, okay.  That's

13   different -- those two are different from the Shopify.

14   MS. CAVE:  Correct.

15   THE COURT:  Now, I did look at the Shopify data base.

16   Now, that data base lists orders, I think dollar amounts, and

17   names.  And I think I got the impression from the way the

18   plaintiffs described it that, in fact, what I'm seeing is not

19   all the information that was there.  They redacted e-mail

20   addresses for specific identifying information?

21   MR. WATTERSON:  Right.  We redacted all of the

22   personally identifiable information.  If it would be helpful,

23   we could submit --

24   THE COURT:  Before I do that, let me ask some

25   questions about it.  So as I understand it, there were about

1    15,000 names in that data base.  When I say "that data base," I

2    mean the Shopify.

3              MS. CAVE:  Yes.

4              THE COURT:  Why isn't that a basis to identify class

5    members?

6              MS. CAVE:  Well, the Shopify data base, as I

7    understand it, was sort of a third-party set of information.

8    And so the --

9              THE COURT:  Who was the third party?  It wasn't

10   maintained by GAW?

11             MS. CAVE:  I don't believe so.  Mr. Watterson can

12   correct me.  I don't believe that it was.  And at some point

13   there was a download of information or some sort of exchange of

14   information from the Shopify data base, and I don't know at

15   what point.

16             THE COURT:  Let me ask Mr. Watterson.  So this isn't

17   ordinary course material?  This was created after?  Was is the

18   Shopify?

19             MR. WATTERSON:  So Shopify is, Your Honor, if you're

20   familiar with when you go onto a website and there's sort of a

21   shopping cart, you can put things in it.

22             THE COURT:  Yeah.

23             MR. WATTERSON:  Shopify was what service GAW used for

24   their shopping cart.  So when you ordered something through the

25   website as opposed to on ZenCloud, you would do it through

1    Shopify.

2              THE COURT:  Okay.  All right.  But we don't have any

3    reason, Attorney Cave, to think that the Shopify data base was

4    stolen or hacked.

5              MS. CAVE:  There's no evidence it was hacked or

6    stolen.  It's sort of maintained by a, you know, third party,

7    and at some point it was sort of uploaded or --

8              THE COURT:  So what's wrong with using that?

9              MS. CAVE:  Well, so we -- Your Honor looked at the

10   data base, but we sorted it a few different ways.  And if you

11   just pull up -- if you put it in alphabetical order, for

12   example, and you look at just the first two entries, there's an

13   e-mail address but the name is A.  That tells you nothing.

14             THE COURT:  Okay.

15             MS. CAVE:  And the other thing that it tells you, just

16   incidentally to another point that we've raised, is just on the

17   first page that we pulled up, again, if you alphabetize them,

18   there are eight different countries represented by the domain

19   names here, which gets to our problem about foreign plaintiffs.

20             THE COURT:  But there are -- am I correct there are

21   identifiable plaintiffs -- excuse me -- class members in that

22   data?  There were full names I can see.

23             MS. CAVE:  Some are full; some are not.  Some are

24   e-mail addresses.  And as I said, the first two it's just the

25   letter A.  One has the name "Stuff."  One has the name J.  So,

1    again, I think it's the same problem that we've pointed out

2    with some of the information in the two company data bases as

3    well.

4          THE COURT:  Okay.  Okay.  Mr. Watterson, I have a

5    couple questions for you.  So with regard to the data base that

6    Mr. Mills -- is that his name?

7          MR. WATTERSON:  Correct.

8          THE COURT:  Yeah, is relying on.  So at her

9    deposition, Ms. Eden testified about a hack -- I know you're

10   aware of this, but just to frame the debate, it was basically

11   an internal hack where large portions of the data base had been

12   changed and modified and ledgers had been altered and there was

13   weird stuff going on.  And then -- she says it was a complete

14   mess, and then later in the deposition she says, "Because the

15   data base was a giant mess, but at this point there had been

16   hacks plural on the data base, I mean there had been issues

17   with Hashlets that had been split and/or destroyed on accident

18   or I mean any number of different things."

19       So let me ask you this question:  So I try criminal cases

20   too, you know, and when the Government comes in, they are

21   meticulous about showing chain of custody because they're

22   worried the defense lawyer is going to poke holes in.  We don't

23   know where that was.  We don't know where that's been.

24       Now, that's a higher standard of proof, I get that.  But I

25   can tell you what my reaction to seeing this was:  I know the

1    Government would never put into evidence a data base where

2    there was this testimony about it.  So tell me why -- why I

3    should draw a different conclusions here, that, in fact, there

4    is integrity with this data base.

5         MR. WATTERSON:  Well, first of all, Your Honor, we're

6    not aware of a better source of information internal to the

7    company.  So this isn't a case, like Ms. Cave said, where

8    there's banks that are going to maintain these meticulous

9    records.  I mean what I understand Ms. Eden's testimony to be

10   is that GAW Miners was internally altering some of their

11   records.  Um, you know, that's kind of part and parcel of them

12   being a fraudster.

13      And, you know, I think we cited some case law about the

14   fact that when it comes to calculation of damages, if there's

15   an inability to do so because of the fault of the wrongdoer,

16   well, we're entitled to make some reasonable --

17        THE COURT:  Right, but it doesn't follow from that

18   that we use the data base.  For the reasons I've indicated

19   about the e-mails, there may be another way to go here.  But

20   just because the wrongdoer shouldn't benefit doesn't mean we

21   should use the wrongdoer's information that has testified to be

22   internally flawed to calculate damages.  I mean that doesn't

23   seem like it follows, does it?

24      I'm familiar with the quote from RKO.  It's used by every

25   plaintiff who has trouble proving damages, let's be honest.

1    But how does it follow from that that the Court should treat

2    these data bases as a reliable basis to identify class members?

3          MR. WATTERSON:  Well, the SEC, in the lawsuit against

4    GAW Miners and Zenminer, used the ZenCloud data base.  So, um,

5    you know --

6          THE COURT:  So that's clear?  There's no debate about

7    that, that we know which data base the SEC used?

8          MR. WATTERSON:  We know they used the ZenCloud data

9    base.  There has been insinuations that there's a different

10   version of it out there.  I haven't seen any evidence that

11   that's the case.

12         THE COURT:  Well, the SEC case was settled; right?

13         MR. WATTERSON:  Correct.

14         THE COURT:  So I can't remember the last time I had an

15   SEC settlement.  I'm not sure if I have had one.  I do know in

16   criminal cases, when talking about restitution, which I know is

17   different than here, just because when there's -- well, first

18   of all, statutorily, restitution is determined by a far more

19   relaxed standard than civil damages would be.  The standard

20   actually says if it's too complicated, the Court doesn't have

21   to award restitution at all.  So that's the first point.

22        And the second point is, you know, you've got cases that

23   settle these issues were never really litigated.  There wasn't

24   a need at the end of the day to test the data base.  So I'm not

25   sure -- even if it's exactly the same data base, the fact that

1    SEC relied on it, I suppose it says something, but I wonder why

2    the SEC would have said about this testimony.

3          MR. WATTERSON:  You know, I do want to make one point,

4    Your Honor.

5          THE COURT:  Yup.

6          MR. WATTERSON:  There was a settlement as to Joshua

7    Garza.

8          THE COURT:  Yeah.

9          MR. WATTERSON:  There was a default entered as to GAW

10   Miners and Zenminers, and so in order to prove out the damages,

11   the SEC did submit an affidavit.  So there was evidence.  It's

12   true that -- um, so, you know, I think that the Court can look

13   to that.

14         THE COURT:  Yeah, I mean I have to do that all the

15   time, and, you know, we do our best.  But it's, in effect, an

16   ex parte proceeding.  It's by definition an ex parte

17   proceeding; right?  And so you're never as confident in a

18   result when it hasn't been tested through the adversarial

19   process.  I hear what you're saying.

20      Do you happen to know what the SEC's view on this testimony

21   was?  I mean did they say, "We're not worried about that" or --

22         MR. WATTERSON:  I don't know if -- I don't know.

23         THE COURT:  You do.

24         MS. CAVE:  I don't.  I know what Mr. Shinners thought

25   about it.  Exhibit A6 to my declaration on the motion to

1    exclude, Your Honor, attaches the declaration that we were just
2    referring to, Mr. Donnellan, and the cover to that is an e-mail
3    from Mr. Shinners pointing out what he thinks are a lot of
4    problems with the analysis by the SEC account.  Now, Mr.
5    Shinners argues that those discrepancies mean the number should
6    be higher, and we take issue with that.  But the point is even
7    Mr. Shinners admits that there are problems with the way the
8    SEC analyzed data.
9             MR. WATTERSON:  Can I respond to that?
10            THE COURT:  Yes, you can.
11            MR. WATTERSON:  I think what Mr. Shinners is saying,
12   the SEC is limited to Hashlet; so there are these other
13   products that are at issue here.  So I don't really think he
14   was criticizing this.
15            THE COURT:  So the SEC part of that -- I haven't
16   reviewed the SEC complaint in a long time.  That complaint
17   didn't involve Paycoin?
18            MR. WATTERSON:  Their complaint discussed all of the
19   products, but I think what the actual calculation of damages
20   was was for Hashlets.
21            THE COURT:  I see.  I see.  And am I correct that your
22   view is these e-mails that were submitted, which you just
23   submitted a few samples, that those are -- that you, in fact,
24   produced a set which consists of those 170 that Mr. Shinners
25   was referring to, or is it more than that or less?

1          MR. WATTERSON:  So essentially what happened was that

2     Mr. Shinners had this website where you could upload documents.

3          THE COURT:  Right.

4          MR. WATTERSON:  So whatever was uploaded is what was

5     produced.  So I don't know off the top of my head if all 170

6     people provided --

7          THE COURT:  That's what he says, I think, I think,

8     unless I misread it.  Hold on.

9        Yeah, he says approximately 500 individuals initially

10    expressed interest in the lawsuit, and approximately 170

11    individuals uploaded documents through Gawsuit.com that related

12    to their purchases, activities, and subsequent losses.

13         MR. WATTERSON:  My point is I'm not sure if those

14    documents are all e-mails.  That's my only, you know.

15         THE COURT:  Well, I guess I do need to know something

16    about those documents though.  Because if I were to reach the

17    conclusion that, you know what?  Data base doesn't really

18    matter because -- for today it doesn't matter because, you

19    know, I'm going to go sort of this route of relying on uniform

20    proof of purchase and the e-mails all look the same, I think I

21    might need to know a little bit more about those documents.  I

22    mean all I've got is three individuals.

23      Are you able to tell me anything about what those documents

24    look like or --

25         MR. WATTERSON:  Can I make a sort of more fundamental

1    point, Your Honor?

2         THE COURT:  You may.

3         MR. WATTERSON:  You know, classes are certified.  They

4    involve consumer products that, you know, people are unlikely

5    to have saved their receipts.  And the reason that they're

6    certified is that people can offer proof of purchase in the

7    claims administration process.  So, you know, just because

8    there is some --

9         THE COURT:  Yeah, except that this case involves sort

10   of a sequence of events that's more complicated than buying a

11   razor.  I mean this case involves a group of people who

12   purchased a series of products over -- the way you've got it is

13   over about 14 months or longer.  So, you know, there's all

14   kinds of nuances in there.  Did you purchase this but not that?

15   Did you -- when did you purchase?

16      So it's not clear to me that that all can be resolved

17   through the claims process.  I mean maybe it can be.  I just

18   don't think it's as straightforward as you're suggesting

19   though.

20        MR. WATTERSON:  Well, Your Honor, I will say so those

21   e-mails that we were referencing --

22        THE COURT:  Yeah.

23        MR. WATTERSON:  -- those -- at least it's the way I

24   understand it, when you purchase something from the GAW Miners

25   website, those are sort of automated e-mails.

1          THE COURT:  Right, that was my impression.

2          MR. WATTERSON:  So I would surmise that, you know,

3     these -- you know, these documents would have gone to everybody

4     that made these purchases to the website.

5          THE COURT:  And apparently there's some evidence of

6     that, although you're not giving me lots of confidence about

7     that right now.

8          MR. WATTERSON:  You know, Your Honor, I don't want to

9     misrepresent anything.  I just don't -- I cannot remember what

10    all 170 --

11         THE COURT:  Well, maybe I should ask for a sample of

12    those documents.  If we're talking about the same thing, which

13    is you refer specifically -- I think we are -- specifically to

14    e-mail, I saw Mr. Shinners' e-mails, "Thank you for purchasing

15    from GAW Miners."  Maybe I should see, you know, 20 e-mails and

16    the parties can come up with a, you know, a way of picking them

17    at random or something, because I actually think this is

18    important.

19        Because, honestly, if the data base was hacked in the way

20    Ms. Eden described -- and she did not describe this as a minor

21    event -- the impression she was creating was this was a mess,

22    which is -- does not give me confidence that this is a good

23    thing to rely on in a court.

24        If that's where we are, then I do at least have to think

25    about how the process is going to work in this sort of strange

```
 1    investment world of cryptocurrency where everybody's anonymous
 2    and that's how they do things, people proving yes, I actually
 3    bought something.  I think I need to actually address that in
 4    this ruling.  So -- not the least because it's been raised.  So
 5    I do think it matters what those documents look like, honestly.
 6        Ms. Cave.
 7            MS. CAVE:  I just wanted to clarify what Your Honor
 8    was thinking about doing because, as I understand it, I think
 9    what you mean is 20 examples.
10            THE COURT:  Yeah, well, I got three in the record.
11            MS. CAVE:  So there may be people -- because I don't
12    want them to just pick the 20.
13            THE COURT:  That's why I said I would have you folks
14    come up with a sampling technique together.
15            MS. CAVE:  We did this with the e-mails.
16            THE COURT:  The discovery, right?  Because, as I say,
17    I mean I haven't made a final decision yet, but yeah.  Maybe
18    you'll tell me, "Judge, use the Shopify data base," which
19    you're welcome to tell me that, but you haven't said that
20    yet.
21            MR. WATTERSON:  Your Honor, I want to make a couple
22    points.  One is that the reliability of this data base, this is
23    a class-wide issue; so, you know, whether it's reliable or not,
24    that's something that will need to be determined.
25            THE COURT:  But that's kind of beside the point;
```

1    right?  The point is, at the end of the day, if the -- that

2    issue were to be decided against you, then we're going to have

3    individualized issues; right?  Unless there's some other reason

4    that we don't, apart from the data base.  The individualized

5    issues would be:  How do you prove you're a member of this

6    class?

7        Now, you say, well, you can do that in the claims process.

8    I suggested that maybe it's not that simple.  So the fact that

9    the data base, the integrity of the data base is a class-wide

10   issue with respect is neither here nor there for this

11   discussion.

12       MR. WATTERSON:  Your Honor, respectfully, I mean it

13   seems to me that this is something that could be handled in the

14   claims administration process.

15       THE COURT:  Assume I disagree.  How are you going

16   to -- I thought in your brief you were making this argument

17   about these e-mails are an alternative way to make a finding

18   that this can be done through uniform proof.  Are you now

19   retreating from that position?

20       MR. WATTERSON:  No.  We are absolutely making that

21   argument.  We are arguing you can determine these individuals

22   from the data base.  You know, the analysis that Mr. Mills did

23   was he looked at the Paybase data base, the ZenCloud data base,

24   and Shopify data base and cross-reference --

25       THE COURT:  Did he speak to Ms. Eden what she meant

1    when she said the whole thing was hacked and a big mess?

2              MR. WATTERSON:  He did not speak with Ms. Eden.  But,

3    Your Honor, I guess my point is I think you can determine class

4    membership based on the data bases, but in the alternative we

5    can look at these other kinds of documents like e-mails.  But

6    in the alternative to that, there is the claims administration

7    process for determining membership.

8         And so, you know, I made my point about the, you know,

9    misbranded vitamins and all of that, but these sort of things,

10   I mean membership is determined in the claims administration

11   process, um, for products where people aren't going to have any

12   data at all.

13             THE COURT:  Well, the Second Circuit has said proof of

14   membership in the class is something the Court has to consider

15   under superiority.  So it's part of the -- it's part of the

16   Rule 23(b)(3) analysis.  So it can't be that it's always okay

17   under all circumstances to do it through -- that it never has

18   anything to do with whether the Court certifies the class.  It

19   just can't be.  Otherwise, I don't understand why they would

20   mention that in Petrobra.

21             MR. WATTERSON:  Well, I think that it's true that

22   you're required to consider that.  But, you know, here where we

23   have data bases, we have e-mails and then, you know, we can

24   also handle it in the claims administration process; so I think

25   that there is --

1          THE COURT:  Right.  I only need to pick one.  So let

2    me ask you this question:  I guess what about this Shopify data

3    base?  You haven't really talked about that.  Is there some

4    reason you would not want to use the Shopify data base, for

5    example, because it's not as comprehensive as you like it to

6    be?  Tell me.

7        The Shopify data base that I saw now, Attorney Cave gave

8    some examples where, well, it really doesn't have very much

9    information.  I saw a whole bunch of last names.  It went on

10   and on.  I assume from the redacted information, at least some

11   of those names also had e-mail addresses.  There doesn't seem

12   to be the same integrity problems with that data base.  Is that

13   a basis that you choose to rely on or not?

14         MR. WATTERSON:  I think it's true that the Shopify

15   data base, um, is more complete.  But, you know, I want to

16   point you to Mr. Mills' reply declaration where what he did is

17   he sort of cross-referenced everything and got sort of a more

18   complete set of data when he looked at all -- the information

19   across all of these data bases.  Um, and, you know, what he

20   concluded was that when you look at the -- at these accounts in

21   the data base where there were purchases or there were

22   transactions where there was money funded or withdrawn, you

23   know, you can get sort of biographical information for a, you

24   know, a pretty sizable percentage of those transactions.

25         THE COURT:  But if the data base was hacked, it

1    doesn't matter what it shows now; right?  I mean she's saying

2    HashStakers were split.  She's basically saying the data base

3    was unreliable.  That's just one employee.  I don't know she's

4    wrong.  But I guess I'm sort of stuck with -- you're stuck with

5    that; right?  I mean there's evidence in the record from which

6    a reasonable juror could find they shouldn't rely on the data

7    base at all, based on her testimony.

8        Now, you may disagree, but tell me why.  Why from that

9    testimony should anybody rely on the data base?

10           MR. WATTERSON:  Well, I don't think that she is saying

11   that anybody changed, you know, people's address, addresses or

12   names or something like that.

13           THE COURT:  She talked about splitting HashStaker.

14   She talked about an internal hack.  It was a big mess.  It's a

15   little bit general, but you didn't put in an affidavit from her

16   to say, no, no, no, I didn't mean that people were changing

17   addresses.  You could have done that; right?

18           MR. WATTERSON:  We could have done that, Your Honor.

19   It seems to me what she was talking about was essentially

20   people withdrawing cryptocurrency from, you know, individuals'

21   accounts.  So, you know, it's not that this is something

22   where --

23           THE COURT:  Where are you getting that from from what

24   I read?

25           MR. WATTERSON:  There's, I think, the first part that

1    you read about the internal -- the internal hack, you know, it

2    seemed to me that that --

3            THE COURT:  What about Hashlets that had been split

4    and/or destroyed?  I'm just reading from page 61 or ECF

5    107-61.

6            MR. WATTERSON:  The splitting is a reference to one

7    thing that you should do with these Hashlets, they were sold in

8    units of power; so if you had a 10-mega Hashlet, you could

9    split it into ten 1-mega Hash Hashlets.  I think that's what

10   the reference to splitting is.

11           THE COURT:  What about the reference to destroyed?

12           MR. WATTERSON:  I'm not sure what she means.

13           THE COURT:  This is the point.  We don't know what she

14   meant.  You could have gone out and interviewed her.  My point

15   is simply I just -- in light of that testimony, it's really

16   hard for the Court to conclude that in a ruling on class

17   certification, or for that matter anything else, it should rely

18   on the data base.  I mean this is -- so that's kind of where I

19   am on that.  So that's why I was asking you about other things.

20      And do you not want to do this sampling thing?  Is there

21   some reason you don't want to do that?

22           MR. WATTERSON:  No, Your Honor.  My position is that

23   it's not necessary.

24           THE COURT:  Again --

25           MR. WATTERSON:  But obviously, if that would bring the

1    Court more confidence, we will do that.

2          THE COURT:  All right.  And then the Shopify data

3    base, again, you haven't really told me -- I feel like I'm not

4    getting the full picture.  You haven't -- from what I know, if

5    I were in your position, I would be jumping on the Shopify data

6    base.  "Judge, it's good.  That's all good."  But that's not

7    the case for some reason.

8          MR. WATTERSON:  What I think Ms. -- the point is the

9    Shopify data base, what we have, is from a certain period of

10   time, and it wouldn't --

11         THE COURT:  It wouldn't cover as much as you want.

12         MR. WATTERSON:  And so --

13         THE COURT:  Yes?  Correct?

14         MR. WATTERSON:  That's correct.  And so that's why Mr.

15   Mills went ahead and tried to cross-reference with the data

16   base.  And, you know, I think the fact that he found that there

17   is similar e-mails, there's similar phone numbers, there's

18   similar addresses across these data bases does indicate at

19   least this information about membership is reliable.  And so

20   that's why he went ahead and did that analysis.

21         THE COURT:  Okay.  All right.  So, yeah, I think I am

22   going to want some kind of a sampling procedure, and what I'll

23   ask the parties to do, then, is to just come up with a method.

24   I hope you can.  I really don't want to have to do that.

25   Whether it be alphabetical, you take every other name, I don't

1    really care.

2        I think that 20 is a good number.  If you want to file all

3    of them -- I guess what I would say is the filings on behalf of

4    the three are quite extensive.  I'm not really sure I need all

5    that material.  What I'm most interested in is seeing whether

6    or not the e-mails look like the e-mails that Mr. Shinners, Mr.

7    Audet, and Mr. Pfeiffer -- Pfeiffer?

8            MR. WATTERSON:  Correct, Pfeiffer.

9            THE COURT:  -- Pfeiffer had that say, "Thank you for

10   purchasing from GAW Miners."  That's what I'm most interested

11   in.

12       Now, I don't want to define the task in a way that by

13   definition prejudices the defendant.  So maybe what we do is --

14   and I don't want 2,000 pages on the docket.  So I think maybe

15   what we do is you pick 20 people and you come up with the

16   method, and then you each pick, let's say, 10 pages from that

17   person.  So we're limited then to 400 pages, which is plenty.

18       And then you might as well just file them on the docket so

19   you have a good record and all that.  You can break it up into

20   pieces, if you want.  But -- and something -- at least some

21   declaration from counsel would be helpful just so I'm sure I

22   know what I have.  Okay?  Are there any questions about that?

23           MS. CAVE:  If I could raise two things about that,

24   Your Honor, I guess.  Mr. Watterson and I have a very good

25   working relationship.  I have no doubt we'll be able to work

1    this out.  If for some reason we can't, I assume we can come

2    back --

3            THE COURT:  You can.

4            MS. CAVE:  -- or if what Your Honor's requesting does

5    not work.

6            THE COURT:  Yes, just file a motion for a status

7    conference.

8            MS. CAVE:  In addition to that, if we could have

9    permission to submit a very short brief or something like that

10   that explains --

11           THE COURT:  Your position.

12           MS. CAVE:  -- what our position is?

13           THE COURT:  Five pages each.  Five pages each, at the

14   same time you file this.  Can you do this within the next 21

15   days?

16           MS. CAVE:  Yes.

17           MR. WATTERSON:  Yes.

18           THE COURT:  21 days.  So let's set a date.

19           MS. CAVE:  Then the last thing I would say, I'm not

20   sure that's going to solve all the other problems that we've

21   raised, including charge-backs and other things, but we can

22   address that once we look at this.

23           THE COURT:  So May 3rd.  All right.  Does everybody

24   understand what I want on May 3rd?

25           MR. WATTERSON:  Yes, Your Honor.

1          MS. CAVE:  Yes.

2          THE COURT:  Now, let's see if I have any other

3     questions.

4      Did you find anything more in the record about the price of

5     Paycoin in 2015?

6          MR. WATTERSON:  I'm sorry, Your Honor.  If we take

7     another recess, I can do that.

8          THE COURT:  I might do that.  Yeah.

9          MS. CAVE:  Just one cite that I found while we were

10    looking.  You were asking -- the Court was asking about the

11    Amazon articles.

12         THE COURT:  Yeah.

13         MS. CAVE:  I believe it's A41 to I think it's my Cave

14    class certification.

15         THE COURT:  A41?

16         MS. CAVE:  I believe so, yes.

17         THE COURT:  Why don't we -- why don't -- we'll just do

18    five minutes, and then what we'll do is if you have a cite for

19    me, great.  And then if you folks want to say anything to wrap

20    up, we'll do it.

21         MS. CAVE:  Thank you, Your Honor.

22         MR. WATTERSON:  Thank you.

23      (A recess was taken from 12:40 p.m. to 12:49 p.m.)

24         THE COURT:  So, Mr. Watterson, do you have that cite

25    for me?

1          MR. WATTERSON:  I went back and looked, Your Honor.  I
2   was mistaken.  It's data that Mr. Strombom relied on.
3          THE COURT:  Okay.
4          MR. WATTERSON:  But it's only up until 2014, so --
5          THE COURT:  Okay, fair enough.  And then the other
6   thing I wanted to ask about, before you tell me anything you
7   think I've missed today or else you want to talk about, is
8   charge-backs.  Why don't you tell me again what your argument
9   is about charge-backs and how they worked, how prevalent they
10  were, what classification issues you think the charge-backs
11  affect.  Then I'll hear from Mr. Watterson.
12         MS. CAVE:  Thank you, Your Honor.  In terms -- so
13  charge-backs represent amounts that customers got back from a
14  third-party source, whether it's a credit card company or some
15  other funding mechanism, that restored or reduced the amount of
16  potential damages that they may have sustained.  And the big
17  problem with that is that there's no central source of that
18  information.
19      In terms of how pervasive it is, we know that Mr.
20  Shinners -- we've only had disclosure to three plaintiffs, as
21  you said.  We know Mr. Shinners got money back.  He's admitted
22  that.  Mr. Pfeiffer, albeit only $25, but he also got back
23  money from his credit card company.  So two out of three, Your
24  Honor, of the discovery that we've seen shows that there are
25  charge-backs.

1       And then we also know that Mr. Shinners, in his process of

2    collecting information from individual customers, told people

3    that if they got money back from credit card companies or

4    another source, that they needed to reduce the amount of their

5    claim.  So the inference to draw from that, it was significant

6    enough for him to tell people to do that on a broad basis.

7            THE COURT:  Okay.  So this would go to damages

8    obviously.  But what -- but usually differences in damages

9    don't defeat a finding of predominance.  So what significance

10   does it have to the classification notion?

11           MS. CAVE:  That is true, differences in individual

12   calculations of damages doesn't necessarily.  But the problem

13   is that this is another individualized issue that the Court

14   would need to look at.  So Mr. Shinners --

15           THE COURT:  Apart from damages though?

16           MS. CAVE:  Apart -- I don't think -- it doesn't affect

17   membership or -- but I think it does go to superiority in terms

18   of administration of this process.

19           THE COURT:  Well, Courts do certify classes except as

20   to damages sometime.  They say, well, the rule allows for

21   issues of certification, and the Court will say sometimes,

22   look, as to liability, the Court is going to certify class but

23   not as to damages.  Is that the argument you're making with

24   respect to charge-backs?

25           MS. CAVE:  I don't think we're arguing that, Your

1    Honor.

2              THE COURT:  Okay.

3              MS. CAVE:  It's the larger point of this being another

4    individualized process.

5              THE COURT:  So another individualized process to throw

6    into the whole mix.

7              MS. CAVE:  The whole mix.  And I think the cases that

8    Your Honor is referring to where the courts say individualized

9    damages don't defeat it, the courts do say it's still something

10   you have to consider.  It's just that if all you have is at the

11   end of the day you have to go take the tie through each

12   plaintiff, that doesn't defeat, but if the way you have to do

13   it is so individualized.  And here that's the case because we

14   don't have -- Mr. Mills hasn't suggested, the plaintiffs

15   haven't suggested any way to deal with this on an

16   across-the-board basis, and we suggest that it's pervasive

17   enough.

18             THE COURT:  Let me make sure I understand, for

19   example, the evidence you got about these chargebacks from Mr.

20   Shinners and Mr. Pfeiffer.  So the situation is they purchased,

21   say, Hashlets on a credit card, and they, at some point, say,

22   "Oh, my gosh, this was a big fraud," and call their credit card

23   company and say, "I want to reverse that transaction."

24       Now, I'm not familiar enough with the way those phone calls

25   work to know, for example, if there's some time limit on that

1   or -- what evidence did you obtain about that from Mr.

2   Shinners?

3            MS. CAVE:  There are two different things shown in the

4   record, Your Honor.

5            THE COURT:  Okay.

6            MS. CAVE:  And the first is what Your Honor is

7   describing with respect to Mr. Shinners, and I don't know if it

8   was contemporaneous or sometime in spring of 2015 that he

9   called his credit card company and was able to get his money

10  back.  There's also evidence in the record that people were

11  doing it simultaneously with their purchases.  In other words,

12  these were people sort of perpetrating a fraud on the company

13  by using this chargeback mechanism.  You know, they would buy

14  something, maybe buy some Hashlets, then immediately -- on

15  their credit card -- then immediately call the credit card

16  company and cancel it.  And then they get the best of, you

17  know, both worlds.

18           THE COURT:  Oh.  I guess I -- I see.  So they get the

19  Hashlets, and then they call a credit card company and say,

20  "I've been defrauded."  The credit card company says, "No

21  problem.  We'll reverse the transaction.  It's on us"

22  basically.

23           MS. CAVE:  Exactly.

24           THE COURT:  What's the evidence in that in the record?

25           MS. CAVE:  I can get you a couple cites of that.  I

1   think some of the former employees' testimony, deposition

2   testimony, there are some references to that, and I think there

3   are some other references among employees about this being a

4   problem.

5          THE COURT:  Of course, if the company was aware of

6   that, then presumably how would they know that unless they had

7   some record or data base?

8          MS. CAVE:  I don't know.  I don't know that the

9   employees were.

10         THE COURT:  So was that testimony based on personal

11  knowledge or this is what we're hearing in the marketplace?

12         MS. CAVE:  I think so.  I'm not going to speculate.  I

13  will get the direct references to Your Honor and submit it.

14         THE COURT:  Okay.  Let me just see if I have any other

15  questions about that.  No, I think I didn't.

16    Mr. Watterson, you want to respond?

17         MR. WATTERSON:  Sure, Your Honor.  Just, you know, as

18  you noted, the chargeback issue is purely a damages issue, and

19  so it can be rolled into a calculation, a formula that applies

20  class-wide.  And because it's a damages issue, this is the sort

21  of thing that is regularly handled in the class -- in the class

22  administration process.  So this could be something on a proof

23  of claim form.

24         THE COURT:  Yeah, I mean I guess on -- I was thinking

25  about that too.  You know, you could require them to swear to

1  the truth of it, but, you know, at the end of the day, if

2  you're in Mr. Fraser's position, you're probably saying to

3  yourself, Well, that's not enough for me.  I mean I'd like to

4  go and take these people's depositions and, you know, get them

5  to produce documents.  You know, if, for example, this group

6  that was essentially cheating the company as well, um, you

7  know, I'm not going to trust them to sign some affidavit and

8  say, "Oh, yeah, I didn't get a chargeback."

9       So, you know, it could be a class -- one possibility is a

10  claims process.  The other possibility is just to have a class

11  trial on liability and say, look, there's going to have to be

12  separate trials on damages.  Go ahead.

13          MR. WATTERSON:  I don't think that's necessary, Your

14  Honor.  You know, I think this is an issue that, you know, can

15  be handled in the proof of claim form.

16          THE COURT:  But in light of what I said, why?  I mean

17  suppose you were in Mr. Fraser's position.  In light of what

18  you've learned about the way that some of these investors

19  behaved, would you trust an affidavit that they put in that

20  said, "I didn't get a chargeback" or "I only got $20 as a

21  chargeback"?  Wouldn't you say to yourself, Gee, I'd really

22  like to explore that further?

23          MR. WATTERSON:  Well, Your Honor, I mean I think that,

24  you know, a chargeback is something where there are going to be

25  records; so I think people would be able to go to their credit

1    card and say here's --

2         THE COURT:  But the way the claims process worked, you

3    don't show up and get deposed.  You just fill out a form.

4    Maybe you do it under oath.  You don't actually always do it

5    under oath.  But suppose you did.  Suppose somehow it had to be

6    under oath.  The -- and you sit down -- I don't have any

7    records.  I don't have any chargebacks.  Check box,

8    chargebacks?  Yes, no.  I check no.  You wouldn't have to

9    submit any records if the answer was no.

10        MR. WATTERSON:  Well, Your Honor, I don't know that,

11   you know, there's, you know, really any specific evidence, you

12   know, other than, you know, as to these, you know, Mr. Shinners

13   and Mr. Pfeiffer did, you know, have these chargebacks, right.

14   But, you know, it's not something that, you know, we know that

15   happened, you know, widely.

16        THE COURT:  Well, two out of three named plaintiffs;

17   right?

18        MR. WATTERSON:  That's true.  This is something Mr.

19   Shinners -- Mr. Shinners did have a reasonably sized

20   chargeback, and Mr. Pfeiffer's was a pretty small.

21        THE COURT:  Yeah.

22        MR. WATTERSON:  But, you know, again, it seems that if

23   these -- you know, if they need to be under oath, then that's

24   something that could be done and obviously --

25        THE COURT:  What about this other evidence that I was

1    talking about with Attorney Cave concerning the folks who were

2    basically cheating the company?  What does that evidence

3    consist of?

4              MR. WATTERSON:  Well, so, you know, there is --

5    there's no concrete examples.  So some person went ahead and

6    did these fraudulent chargebacks.  You know, the most that

7    there was, there was this sort of general testimony in these

8    depositions.  Um, but, you know, Your Honor --

9              THE COURT:  The former employees depositions?

10             MR. WATTERSON:  Correct.  This is something that

11   happens with every company that sells things online.  Um, so,

12   you know, it's not, I think, all that unusual of an issue.

13   People have something shipped to them and then dispute it and

14   go through their credit card.  You know, online merchants deal

15   with this.  So this doesn't seem like anything out of the

16   ordinary, you know, from typical companies that sell things

17   online.  So, you know, I don't, you know, think that this is as

18   much of an issue as how Ms. Cave frames it.

19             THE COURT:  Okay.  All right.  So, folks, I've been

20   doing all the talking, or a lot of the talking, and you've been

21   answering my questions.  If there's anything that -- you know,

22   if there's an essential point that you wanted to make today and

23   haven't had a chance to make, now's the time.  I'll let Mr.

24   Watterson go first since it's his motion.  So Mr. Watterson.

25             MR. WATTERSON:  Sure, Your Honor.  Um, I just want to,

1    you know, point to the fact that, you know, we've cited to

2    these Ponzi scheme cases, and, you know, if you look at them,

3    it is very common for a class to be certified when there's a

4    Ponzi scheme.

5              THE COURT:  Just to be clear, we're talking about the

6    Fifth Circuit case.  We're talking about the -- was it the

7    Fairfield case, um, and what else?

8              MR. WATTERSON:  Sure.  There's a couple of cases.

9    There's Florida cases in our reply brief that we cite.  Um, I

10   also think that there is a case that Mr. Fraser cites.  Um,

11   it's a Bernie Madoff case, but it actually involves sort of

12   accounting issues.  It's -- it's not quite the same in the

13   sense that --

14             THE COURT:  What's the name of that one?

15             MR. WATTERSON:  It is -- I think it's the -- let me

16   look it up for you.

17             THE COURT:  Okay.

18             MR. WATTERSON:  But, you know, that case as well, it's

19   an interesting case because essentially the accounting firms

20   are charged with, you know, saying that they reviewed the books

21   of Mr. Madoff and, you know, representing this is what the --

22   what these funds were worth.  And actually, in that case,

23   there's some evidence that some people didn't even rely on the

24   auditor reports.  Um, and so the Court, nevertheless, goes

25   ahead and certifies, um --

```
 1              THE COURT:  That's Judge Marrero's case; right?
 2              MR. WATTERSON:  I don't recall, Your Honor.
 3              THE COURT:  I remember him in the audit reports,
 4    yeah.
 5              MR. WATTERSON:  So I think that's just, you know,
 6    going back to some of the earlier discussion about these
 7    e-mails, you know, that's one example.  When there's a Ponzi
 8    scheme involved, you know, these claims can still be certified.
 9    And, you know --
10              THE COURT:  Yeah, although there was no evidence in
11    that case -- right? -- of anybody saying they knew or any
12    evidence suggesting anybody knew.
13              MR. WATTERSON:  Well, the misrepresentations were the
14    audit reports, and there was evidence that people didn't read
15    them.  So, you know, based on that, you would -- you might
16    argue that, Well, okay, they didn't actually receive the
17    misrepresentation.
18              THE COURT:  Okay.
19              MR. WATTERSON:  And, you know, the other point that I
20    wanted to make -- and we talked about this a little bit
21    earlier, but the theory that we're advancing, you know, is not
22    something that would do away with, you know, the requirement
23    that we prove that there was a misrepresentation.  You know,
24    the misrepresentation we would have to prove is that this was a
25    Ponzi scheme.  And so, you know --
```

1          THE COURT:  Well, that's not a misrepresentation.

2     That's an accurate misrepresentation.  What's the

3     misrepresentation you would have to prove?

4          MR. WATTERSON:  Well, that GAW Miners was running a

5     legitimate business that was conducting cryptocurrency mining

6     operations and that, you know, investors were -- investors were

7     being paid funds based on, you know --

8          THE COURT:  Right, but just in terms of pointing to

9     something, I mean that -- I think that might be described as a

10    summary of the different representations, but you actually have

11    to point to a representation, don't you?

12         MR. WATTERSON:  Sure.  And we -- in our papers, we

13    cite --

14         THE COURT:  You do.  You cite actual statements.

15         MR. WATTERSON:  Right.  And these are to the notion

16    that, just as an example, these things are a data center

17    optimize, which implies that there is a data center that is

18    doing mining.

19         THE COURT:  Right.

20         MR. WATTERSON:  You know, when you -- when you go on

21    the website, you see that these things are depicted as little

22    sort of high-tech boxes.  It implies that they are actually

23    some kind of device where there's a device involved.

24         THE COURT:  No, I hear you on that.  I understand

25    that.  But that's where I started to have a problem with was

1   sort of getting away from the specifics.  But, yeah, those

2   are -- those appear to be misrepresentations, so --

3          MR. WATTERSON:  Right.  And, you know, so that's --

4   misrepresentations that I think were made and, you know, that's

5   why, you know, people wouldn't have believed this is a Ponzi

6   scheme, because they thought there was a legitimate mining

7   operation.  Thank you, Your Honor.

8          THE COURT:  Attorney Cave.

9          MS. CAVE:  Your Honor, there's -- as Your Honor

10  pointed out, there is no Ponzi scheme exception to Rule 23.  We

11  were just talking about the Anwar case.  I litigated that case.

12  I represented one of the defendants.  We went up to the Second

13  Circuit.  The plaintiffs had to move for class certification

14  twice because there were so many issues.  But those involved,

15  as you said, Your Honor, audit reports.  It was one alleged

16  misrepresentation.

17         THE COURT:  Did the Second Circuit issue a ruling in

18  that case?

19         MS. CAVE:  I believe there was.

20         THE COURT:  But it doesn't really --

21         MS. CAVE:  It doesn't affect the issues here.  The

22  issues dealt with were reliance, and it was essentially a

23  credit alliance type of analysis that was at issue there.  So

24  that analysis was different.

25     But my only point is the facts of that case don't --

1    essentially the Ponzi scheme was sort of a secondary question.

2    The issue was whether the representations in the audit report

3    about the financial viability of the funds in which people were

4    investing -- people in that case were not investing directly

5    with Madoff.  They were buying funds that were --

6              THE COURT:  Right.

7              MS. CAVE:  -- customers of Madoff.  So it's a very,

8    very different case, Your Honor, and the uniformity of the

9    misrepresentations, the static point in time in which they

10   happened is very, very different from this scenario.

11        The couple of other points I just wanted to make, Your

12   Honor, I appreciate that Your Honor's given us the opportunity

13   to go through this process of looking at what was submitted by

14   the 172 customers, but even -- we will go through that process.

15   And in good faith I still have reservations about whether it's

16   going to solve some of the other issues that we raised, not

17   just the chargeback issues, but also class membership.

18        We've raised, I think, in our papers the employee affiliate

19   issue, who or who was not an employee or an affiliate.  There

20   are a number of issues.  Just looking at what people have

21   submitted I don't think is going to resolve that question.

22        Another issue is the number of non-U.S. purchasers in this

23   case.  There's evidence that more than half of the potential

24   class is foreign investors, and the plaintiffs have made no

25   effort to explain to the Court how that issue can be dealt

1   with.

2          THE COURT:  And remind me -- I know it's in the

3   papers -- but the significance of that again.

4          MS. CAVE:  The significance of that is the

5   enforceability of the judgment in the customer's home country

6   and whether that opens Mr. Fraser up to potential exposure, in

7   other words, is that judgment enforceable elsewhere and whether

8   those people should be somehow carved out.

9          THE COURT:  Let me understand that.  So suppose this

10  case is certified as a class action and a class member from

11  France gets a judgment because they're in the class against Mr.

12  Fraser.  So ordinarily to enforce a judgment, you go where the

13  defendant's assets are.  I presume Mr. Fraser has some assets

14  in the United States; so the person would have to come here to

15  enforce the judgment.  What's the problem?

16         MS. CAVE:  Maybe I wasn't clear about that.  I guess

17  the question is:  Could that person bring -- in other words,

18  would Mr. Fraser be able to say, Well, I've already been held

19  liable to them here.  They can't sue me in France.

20     In other words, he's not opening -- he's not opened up to

21  liability because if France doesn't recognize the class

22  judgment, does that open him up to additional exposure?

23         THE COURT:  But that problem would exist regardless of

24  whether there was a class; right?

25         MS. CAVE:  It would.  But I guess the question is:

1    Are there people who are being included in the class?  In other
2    words, there are foreign plaintiffs.  The Anwar case is a great
3    example of this.  Judge Marrero went through -- there was a lot
4    of briefings in that case about all the many jurisdictions that
5    people lived in.  Judge Marrero ultimately carved out, I think
6    there was, three or four, if not more, jurisdictions where
7    plaintiffs -- purchasers from those jurisdictions could not be
8    part of the class because the judgment would not be
9    enforceable.
10            THE COURT:  Okay.
11            MS. CAVE:  And I'm not sure if that was the first
12   round or the second round, Your Honor, but that is in the
13   briefs in that case.
14       And the last thing I would say, Your Honor, this idea that
15   chargebacks or any of these other damages issues are de
16   minimis, every dollar we're talking about here comes out of Mr.
17   Fraser's pocket.  These issues are not de minimis.  And when
18   you add them all up together, they are very significant and the
19   number of individualized questions that this Court would have
20   to go through to just make it clear that this class is not
21   suited to be certified.
22            THE COURT:  All right, thank you.  Thank you both.  I
23   thought the argument was very, very well done.  So thank you
24   for being so prepared.
25       And so just in terms of what I need from you, we talked

1    about the filing on May 3rd.  Let me go over that again.  I

2    don't want lots of supplemental briefs, to be honest with you.

3    We've got plenty to read.

4        So there was -- Attorney Cave, you said something about

5    sending a letter to the Court.

6            MS. CAVE:  What we were talking about, Your Honor, you

7    were asking me for examples in the record of the two types of

8    chargeback issues, and I was giving you my best recollection.

9            THE COURT:  I can find that from the briefs.  I'm sure

10   you referred --

11           MS. CAVE:  Yeah, I believe we have.

12           THE COURT:  So no more briefs unless I want them.  I

13   did say you can each file something, five pages each.

14       Did you want to say something, sir?

15           MR. IZARD:  Yes, Seth Ard, Susman Godfrey.  Your Honor

16   had a rule that encourages young lawyers to argue issues.

17           THE COURT:  Indeed, indeed.  And these lawyers are

18   both very young.  But go ahead.

19           MR. IZARD:  This is a case where we have a junior

20   lawyer's associate that did the argument, and we wanted to

21   thank Your Honor for the rule.  We think it makes more

22   effective value, and it gives us a great opportunity to train

23   our lawyers.  We try to do it as a firm, but when there's a

24   rule encouraging the practice, it helps us do it.

25           THE COURT:  Sure.  I thought the argument was

1    extremely well presented by both sides.  Thank you.

2              MR. ARD:  Thank you, Your Honor.

3              THE COURT:  Very well.  We'll be in recess.

4         (The proceedings concluded at 1:10 p.m.)

1

2

3                         C E R T I F I C A T E

4

5

6

7                      I, Julie L. Monette, RMR, CRR, CRC, Official

8    Court Reporter for the United States District Court for the

9    District of Connecticut, do hereby certify that the foregoing

10   pages are a true and accurate transcription of my shorthand

11   notes taken in the aforementioned matter to the best of my

12   skill and ability.

13

14

15                      /S/ JULIE L. MONETTE

16                  _____
                    Julie L. Monette, RMR, CRR, CRC
17                       Official Court Reporter
                            450 Main Street
18                   Hartford, Connecticut 06103
                            (860) 212-6937

19

20

21

22

23

24

25