# UNITED STATES DISTRICT COURT

# DISTRICT OF CONNECTICUT

| |
|---|
| DENIS MARC AUDET, *et al.*, |
| *Plaintiffs*, |
| v. |
| STUART A. FRASER, GAW MINERS, LLC, and ZENMINER, LLC, |
| *Defendants*. |

No. 3:16-cv-0940 (MPS)

## RULING ON CLASS CERTIFICATION

This case comes from the brave new world of cryptocurrency. The Plaintiffs are

individuals who invested in products that ostensibly allowed them to share in the profits

generated by "mining" – or solving complex mathematical problems to clear transactions in –

digital currency. They are suing two companies that sold them these products and an individual

who allegedly controlled these companies, claiming they were defrauded in violation of federal

and state securities laws and the common law. I must decide whether the Plaintiffs may

represent a class of such investors under Rule 23 of the Federal Rules of Civil Procedure. I

conclude they may do so and thus grant their motion to certify the class, although I narrow the

proposed class to address valid objections raised by the individual Defendant, who is at this point

the only active Defendant in the case.[1] I deny the Defendant's motion to exclude the Plaintiffs'

expert declarations as moot because I do not rely on them to reach this conclusion.

---

[1] The Plaintiffs originally sued Homero Joshua Garza, Stuart A. Fraser, GAW Miners LLC, and
ZenMiner LLC, ECF No. 1 at ¶¶ 17-20, but later dropped all claims against Garza, ECF No. 52.
Fraser, the only active Defendant, states that the Plaintiffs agreed to dismiss all claims against
Garza in exchange for his cooperation and provision of information. ECF No. 62. The operative
complaint alleges four claims against Fraser and four claims against the Companies (GAW

## I. Garza and Fraser

In 2003, Homero Joshua Garza, who would later become the CEO of GAW Miners LLC ("GAW Miners") and ZenMiner LLC ("ZenMiner," together with GAW Miners, "the Companies"), first met Stuart A. Fraser, the remaining active Defendant in this case. ECF No. 57 at ¶ 33. Over the next several years, Fraser, who was the Vice-Chairman of an investment bank called Cantor Fitzgerald, invested in various computer-related business ventures that Garza managed. *Id*. at ¶¶ 34-37. Although they did not formalize all of their business relationships, they had an understanding that Garza would serve as CEO of their respective companies and Fraser would serve as "the Board." *Id*. at ¶ 34. They also had a close personal relationship. *Id*. at ¶¶ 39-42.

## II. The Companies

Garza incorporated GAW Miners in March 2014 and served as its CEO. *Id*. at ¶ 46. When the company first started, Fraser invested approximately $135,000 into the business; later that year, he provided the company with three loans of $200,000 each. *Id*. at ¶ 47. He also provided GAW Miners and Garza short-term loans. *Id*. Fraser served as "the Board," *id*. at ¶ 46, and he and Garza each owned half the company under an earlier agreement concerning ownership of their joint ventures, *id*. at ¶ 48. They ultimately agreed to set aside 18% of the

---

Miners LLC and ZenMiner LLC). ECF No. 57. The Companies did not appear and the Plaintiffs filed a motion for default entry under Federal Rule of Civil Procedure 55(a). ECF No. 68. The Court granted this motion. ECF No. 71. The Plaintiffs also filed a motion for default judgment as to the Companies under Federal Rule of Civil Procedure 55(b). ECF No. 69. The Court denied the motion without prejudice to its renewal after the Court enters judgment with respect to Fraser. ECF No. 71.

[2] These facts are drawn from the operative complaint, the parties' briefs on class certification, and the accompanying affidavits and exhibits, with the exception of Plaintiffs' expert declarations, which I do not rely on. The historical facts are largely undisputed; the inferences to be drawn from them are hotly disputed.

equity in GAW Miners for investors or employees. *Id.* A few months later, in July 2014, Garza incorporated ZenMiner. *Id.* at ¶¶ 20, 78. Garza and Fraser owned and controlled ZenMiner with Garza serving as the Managing Member. *Id.* at ¶¶ 20, 78.

## A.     Virtual Currency

The Companies offered various products and services related to virtual currency. Virtual currency is a digital representation of value that can be traded and functions as a medium of exchange. *Id.* at ¶ 25. Unlike fiat currency, which is money designated by a country as its legal tender, virtual currency does not have legal tender status in any jurisdiction. *Id.* The most widely adopted virtual currency is Bitcoin, but there are also other virtual currencies in use, known as "altcoins." *Id.* An individual can "mine" virtual currency by using software to solve complex algorithms that validate groups of transactions in that virtual currency. *Id.* at ¶¶ 26, 28. Each unit of virtual currency has a "blockchain" that serves as an electronic public ledger of all transactions in that currency. *Id.* at ¶ 27. The first miner to confirm the transactions in a particular block and write them into the blockchain is rewarded with newly-issued virtual currency. *Id.* at ¶ 28.

As competition among miners increases, more computer processing power becomes necessary to mine Bitcoin and other virtual currencies. *Id.* at ¶ 29. The processing power of a computer used to confirm virtual currency transactions is measured by its "hash rate," which represents the number of calculations it can perform per second. *Id.* Sometimes, miners combine their computing power into mining pools to increase their chances of receiving a payout. *Id.* at ¶ 30.

### B.     Hardware-Hosted Mining and Cloud-Hosted Mining

Garza and Fraser founded GAW Miners to purchase virtual currency mining equipment from overseas manufacturers and resell it to customers. *Id.* at ¶ 75. Later, in June 2014, GAW Miners began selling "Hardware-Hosted Mining." *Id.* at ¶ 77. Customers who purchased this product were told that GAW Miners would host computer hardware in its own datacenter, but allow customers to access and control their mining equipment via remote management software offered by ZenMiner. *Id.* at ¶ 77. GAW Miners then began offering "Cloud-Hosting Mining" in July 2014. *Id.* at ¶ 79. This was similar to Hardware-Hosted Mining, but customers were told they could control their mining equipment through a ZenCloud[3] account instead of through remote management software. *Id.* In addition, those who purchased Cloud-Hosted Mining could direct their equipment to engage in mining only through one of the handful of mining pools offered on the ZenCloud website. *Id.* at ¶ 80. Customers of both products were told that they could end their hosted service at any time and receive their physical equipment in the mail. *Id.* at ¶ 81.

The Plaintiffs allege that in reality, GAW Miners purchased very few pieces of mining equipment and did not have sufficient equipment to return to customers. *Id.* at ¶¶ 81, 89. They further allege that GAW Miners was not directing customers' computing power to any mining pools, but was instead operating a Ponzi scheme whereby it used incoming funds from new customers to pay existing customers the "returns" generated from mining activities. *Id.* at ¶¶ 89-91. Once customers began to complain that they could not see the increase in power in the mining pools they believed they had chosen to mine through ZenCloud, the Companies changed

---

[3] ZenMiner also did business under the name "ZenCloud." ECF No. 57 at ¶ 20.

business models and offered customers the opportunity to convert their Cloud-Hosted machines into another product, described in detail below, called Hashlets. *Id*. at ¶ 94.[4]

### C. Hashlets

The Companies began selling Hashlets in August 2014. *Id*. at ¶ 95. Hashlet customers believed they were buying the right to profit from a slice of the computing power owned by the Companies, but without the right to acquire a specific piece of mining equipment (unlike customers of Hardware- and Cloud-Hosted Mining). *Id*. at ¶ 97. They were told that they could direct their Hashlets to mine in one of the particular mining pools available through ZenCloud and that they would receive a share of the payout earned by that pool's mining activity. *Id*. at ¶¶ 98, 100. The majority of investors bought Hashlets with U.S. currency or Bitcoin, but others bought Hashlets by converting the value of their Cloud-Hosted Mining equipment. *Id*. at ¶ 99. Investors were charged maintenance fees to pay for the upkeep of the equipment purportedly behind the Hashlets and these fees were deducted from their ZenCloud accounts daily. *Id*. at ¶ 101. They could also request withdrawals, in Bitcoin, from their accounts. *Id*. at ¶ 101.

The Hashlets could mine for Bitcoin or Altcoin ("Bitcoin/Altcoin-Hashlets"). *Id*. at ¶ 105. But there were different types of Hashlets. *Id*. at ¶¶ 113-14. "Zen Hashlets" and "Prime Hashlets" were two of the most expensive types as they purportedly allowed investors exclusive access to ZenPool. *Id*. at ¶ 130. ZenPool was advertised as an advanced multi-pool—a pool that mines for both Bitcoin and Altcoin depending on the profitability of each coin—with the highest and most reliable payout. *Id*. at ¶ 129. The Plaintiffs allege that, contrary to these representations, there was no ZenPool. *Id*. at ¶ 131. Instead, they allege that GAW Miners determined the daily

---

[4] The Plaintiffs are not seeking to include purchasers of Hardware-Hosted Mining or Cloud-Hosted Mining in the class definition.

payout by examining the publicly-available payouts of other pools and picking a higher number. *Id*. at ¶ 132.

The Plaintiffs allege that the Companies dramatically oversold their computing capacity such that they did not engage in mining with even close to the amount of computing power that they sold in Hashlets. *Id*. at ¶¶ 108, 112. Specifically, they allege that the Companies falsely claimed that Hashlets were engaged in mining when they knew that few Hashlets were actually supported by mining activity. *Id*. at ¶¶ 117, 122. When customers inquired about where their hashing power was being used, Garza admitted that GAW Miners was not sending its computing power to the pools that investors had selected—he said that they were instead sending hashing power to the Companies' private pools, but assured customers that their payouts were still based on the pools they selected. *Id*. at ¶ 124. The Plaintiffs allege that this representation was also false as the Companies had nowhere near the amount of computing power required to support the units of hashing power that had been sold through Hashlets. *Id*. They allege that the Companies were running a Ponzi scheme by paying old investors primarily with funds from ongoing Hashlet sales. *Id*. at ¶ 125.

During the fall of 2014, the Companies experienced a drop in their revenue stream from selling Hashlets and announced new investment opportunities. *Id*. at ¶ 134.

### D. Hashpoints, Paycoin, Paybase, and HashStakers

In November 2014, GAW Miners announced that it was planning to launch a new type of virtual currency called "Paycoin." *Id*. at ¶ 136. Before launching Paycoin, GAW Miners offered its customers "Hashpoints," which were promissory notes that could be purchased or mined and then exchanged for Paycoin when Paycoin launched. *Id*. Customers could convert their Hashlets—which up until that point mined for Bitcoin and/or Altcoin—to mine for Hashpoints

instead ("Hashpoint-Hashlets"). *Id*. at ¶ 138. Customers exchanged their Hashpoints for Paycoin when GAW Miners processed the conversion in December 2014. *Id*. at ¶ 149.

The Plaintiffs allege that the Companies' "main motivation in offering Hashpoints was to shift customers' mining focus from bitcoin and altcoin to Hashpoints and Paycoin and to stave off bitcoin payments to Hashlet-holders that GAW Miners could not make." *Id*. at ¶ 136. In marketing Paycoin, the Companies represented that they would ensure that the price of Paycoin would not drop below a $20 per coin floor, *id*. at ¶ 141, that banks and investment firms were providing financial backing, *id*. at ¶ 140, that there was significant financial support from outside investors, *id*., and that well-known merchants like Amazon and Wal-Mart would accept Paycoin, *id*. at ¶¶ 141-42. The Plaintiffs allege that none of these representations was true. *Id*. at ¶¶ 144, 153; ECF No. 97 at 38-39.

Initially, Paycoin was placed into customers' ZenCloud account wallets. ECF No. 57 at ¶ 151. Then, GAW Miners introduced HashStakers, "digital wallets designed to hold Paycoin," which functioned as fixed-rate investment vehicles. *Id*. at ¶¶ 151-52. When customers deposited their Paycoin in HashStakers, the Paycoin would be "locked up" for 30, 90, or 180 days, and would yield a daily payout that was fixed by GAW Miners. *Id*. at ¶¶ 151-52. Customers could purchase HashStakers or "upgrade" their Hashlets to HashStakers. *Id*. at ¶ 151.

GAW Miners also developed a central exchange and marketplace for Paycoin called Paybase. *Id*. at ¶ 153. However, Paybase was not ready when Paycoin launched. *Id*. In the interim, other virtual currency exchanges created their own Paycoin exchanges. *Id*. The price of Paycoin on these exchanges began to fall below $20. *Id*. at ¶ 154. Garza then announced that GAW Miners would "move the market" and used $35,000 to trade Paycoin on an exchange called Cryptsy; Paycoin began trading above $20 per coin after this action. *Id*. GAW Miners also

led customers to believe that it would take action to support the $20 floor when Paybase launched. *Id.* However, when Paybase launched it lacked many of the promised features – such as merchant adoption of Paycoin – and the price of Paycoin dropped. *Id.* at ¶¶ 155-56.

### III.  SEC Investigation & Criminal Prosecution

The Securities and Exchange Commission began investigating Garza and GAW Miners. ECF No. 107-1 at 223-227 (Exhibit A-42). Although it is unclear when the investigation began, CoinFire (a news organization that publishes news related to Bitcoin and other cryptocurrencies) published an article about it on January 19, 2015. *Id.*

Then, on July 20, 2017, Garza pled guilty to wire fraud and stipulated to the following conduct:

> 1. From approximately May 2014 through January 2015, [Garza] operated a scheme to defraud victims out of money in connection with the procurement of virtual currency on their behalf.
>
> . . .
>
> 3. [Garza] founded multiple companies that were used in connection with this scheme to defraud related to virtual currency, including, among others, GAW, GAW Miners, ZenMiner, ZenCloud.
>
> 4. [Garza's] companies sold miners, access to miners, the right to purchase a virtual currency called "paycoin," as well as "hashlets." A hashlet entitled an investor to a share of the profits that GAW Miners and/or or ZenMiner would purportedly earn by mining virtual currencies using the computers that were maintained in their data centers. In other words, hashlet customers, or investors, were buying the rights to profit from a slice of the computing power owned by GAW Miners and ZenMiner.
>
> 5. To generate business as well as attract customers and investors, [Garza] made multiple statements related to the scheme, including, among others:

| Statement | Truth |
|---|---|
| . . . | . . . |
| The hashlets the defendant's companies sold engaged in the mining of virtual currency. | The defendant's companies sold more hashlets than were supported by the computing power maintained in their data |

| | centers. Stated differently, the defendant's companies sold the customers the right to more virtual currency than the companies' computing power could generate. |
|---|---|
| The market value of a single paycoin would not fall below $20 per unit because the defendant's companies had a reserve of $100 million that the companies would use to purchase paycoins to drive up its price. | The defendant's companies did not have a reserve of $100 million and could not therefore drive up the value of Paycoin. |

6. [Garza] along with others, acting through his companies, applied money his companies had made from new hashlet investors and used it to pay older hashlet investors money that the companies owed them based on the purported mining GAW Miners and ZenMiner had done on the investors' behalf. . . .

ECF No. 96-1 at 113-14 (Exhibit A-21).

## IV.    The Lawsuit

The Plaintiffs allege that the Companies (1) violated Section 10(b) of the Securities and Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5; (2) violated Sections 36b-29(a)(2) and 36b-4 of the Connecticut Uniform Securities Act; (3) violated Conn. Gen. Stat. § 36b-29(a)(1); and (4) engaged in common law fraud. ECF No. 57 at ¶¶ 167-173, 179-186, 192-195, 200-203. They allege that Fraser is liable as a control person or aider/abettor under (1) Section 20(a) of the Securities and Exchange Act, 15 U.S.C. § 78t(a); (2) Conn. Gen. Stat. § 36b-29(a)(2); (3) Conn. Gen. Stat. § 36b-29(c); and (4) common law fraud. ECF No. 57 at ¶¶ 174-178,  187-191, 196-199, 204-207. The Plaintiffs seek to certify the following class:

> All persons or entities who, between August 1, 2014, and December 1, 2015 purchased or acquired Hashlets, Hashpoints, HashStakers, and Paycoin from GAW Miners and ZenMiner. Excluded from the Class are any defendants, any parent, subsidiary, affiliate, agent or employee of any defendant, any co-conspirator and any governmental entity.

ECF No. 97 at 19. I held a hearing on the Plaintiffs' class certification motion on April 12, 2019.

ECF No. 137 (transcript of hearing). After the hearing, I received supplemental submissions

from the parties. *See* ECF Nos. 138-140.

For reasons explained below, I modify the class definition and GRANT the Plaintiffs'

motion to certify as to the following class:

> All persons or entities who, between August 1, 2014 and January 19, 2015, (1) purchased
> Hashlets, Hashpoints, HashStakers, or Paycoin; or (2) acquired Hashlets, Hashpoints,
> HashStakers, or Paycoin by converting, upgrading, or exchanging other products sold by
> the Companies. Excluded from the Class are any defendants, any parent, subsidiary,
> affiliate, or employee of any defendant, any co-conspirator, and any governmental
> agency.

Because the parties have not yet had a chance to comment on the modified class definition, they

may, by July 5, 2019, file briefs not exceeding 10 pages in which they address any *new* issues

raised by the modified class definition that the Court has not already addressed in this decision.

## LEGAL STANDARD

"A plaintiff seeking certification of a Rule 23(b)(3) class action bears the burden of

satisfying the requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy

of representation—as well as Rule 23(b)(3)'s requirements: (1) that 'the questions of law or fact

common to class members predominate over any questions affecting only individual members'

(the 'predominance' requirement); and (2) that 'a class action is superior to other available

methods for fairly and efficiently adjudicating the controversy' (the 'superiority' requirement)."

*In re Petrobras Securities*, 862 F.3d 250, 260 (2d Cir. 2017) (quoting Fed. R. Civ. P. 23(a),

(b)(3)). The Second Circuit "has also recognized an implied requirement of ascertainability in

Rule 23, which demands that a class be sufficiently definite so that it is administratively feasible

for the court to determine whether a particular individual is a member." *Id.* (internal quotation

marks and citation omitted).

The party seeking class certification bears the burden of establishing each of Rule 23's requirements by a preponderance of the evidence. *Amara v. CIGNA Corp.*, 775 F.3d 510, 519 (2d Cir. 2014). In determining whether a proposed class meets these requirements, the court must resolve any factual disputes and find any facts relevant to this determination. *In re Initial Public Offerings Securities Litigation*, 471 F.3d 24, 41 (2d Cir. 2006). The court's obligation to make such a determination "is not lessened by overlap between a Rule 23 requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement." *Id.*

"[I]n an alleged securities fraud case, when a court is in doubt as to whether or not to certify a class action, the court should err in favor of allowing the class to go forward." *In re Blech Securities Litig.*, 187 F.R.D. 97, 102 (S.D.N.Y. 1999); *see also Colozzi v. St. Joseph's Hosp. Health Ctr.*, 275 F.R.D. 75, 82 (N.D.N.Y. 2011) ("Doubts about whether Rule 23 has been satisfied should be resolved in favor of certification."). Accordingly, the Second Circuit "accord[s] greater deference to district court decisions granting class certification than to decisions declining to certify a class." *Johnson v. Nextel Commun. Inc.*, 780 F.3d 128, 137 (2d Cir. 2015).

Moreover, district courts have "the ability . . . to alter or modify the class, create subclasses, and decertify the class whenever warranted." *Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd.*, 262 F.3d 134, 139 (2d Cir. 2001); *see also* Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment."). Thus, "[i]f factual or legal underpinnings of the plaintiffs' successful class certification motion are undermined once they are tested [on the merits], a modification of the order, or perhaps decertification, might then be appropriate." *Taylor v. The Hous. Auth. of New*

*Haven*, 267 F.R.D. 36, 62 (D. Conn. 2010) (internal quotation marks omitted), *aff'd sub*

*nom. Taylor ex rel. Wazyluk v. Hous. Auth. of City of New Haven*, 645 F.3d 152 (2d Cir. 2011).

## DISCUSSION

### I.      Class Definition

Fraser argues that the proposed class includes members who lack Article III standing and

do not meet the requirements of Rule 10(b) or the Connecticut Uniform Securities Act

("CUSA"). ECF No. 107 at 10-11. With regard to Article III standing, he argues that "the class

would by definition include members who suffered no injury traceable to Defendants' alleged

misconduct," and points to those who broke even or profited from their purchases as well as

those who received them for free. *Id*. at 10. As to Rule 10(b), he  argues that a plaintiff must

either be a purchaser or seller of the securities at issue, and that the proposed class includes

individuals who are neither. *Id*. at 10-11. Similarly, with regard to CUSA, he argues that only

"the person buying the security" can bring suit. *Id*. As discussed below, I agree with some of

these arguments and have modified the class definition accordingly; the remaining arguments

raised by Fraser do not preclude class certification.

### A.      Article III Standing

In a class action, "only one of the named Plaintiffs is required to establish standing in

order to seek relief on behalf of the entire class." *C. States S.E. and S.W. Areas Health and

Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 241 (2d Cir. 2007). And

the court does "not require that each member of a class submit evidence of personal standing."

*Denney v. Deutsche Bank AG*, 443 F.3d 253, 263 (2d Cir. 2006). "At the same time, no class

may be certified that contains members lacking Article III standing" and a "class must therefore

be defined in such a way that anyone within it would have standing." *Id*. at 264.

Article III standing consists of three elements: (1) "an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). Here, Fraser argues that the first element is not satisfied because the class "would by definition include members who suffered no injury traceable to Defendants' alleged misconduct." ECF No. 107 at 10. More specifically, he argues that putative class members who "broke even or profited from their investments in the Companies' products," who "received them for free" through promotions, or who stole them as a result of "flaws in the Companies' systems," did not suffer any injury. ECF No. 107 at 10-11.

He is correct that any individuals who stole products or received them for free would not have been injured by the alleged fraud. At oral argument, Plaintiffs' counsel stated that his intent in including in the class definition persons who merely "acquired" but did not purchase the products was to capture "rollovers" or "exchanges," such as persons who agreed to convert their Hashlets from Bitcoin-earning to Hashpoint-earning and thereby "acquired" Hashpoints. ECF No. 137 at 5. Accordingly, I revised the Plaintiffs' proposed class definition to more closely track this intent.

I do not agree, however, that the class must also exclude those who "broke even or profited" from their investment as this concern goes to damages rather than standing. A plaintiff suffers an injury in a securities fraud case when she changes her position – such as by buying or selling – as a result of a material misrepresentation. *See, e.g.*, *CSI Inv. Partners II, L.P. v. Cendant Corp.*, 180 F. Supp. 2d 444, 458 (S.D.N.Y. 2001) ("In a securities fraud action, [the] cognizable injury occurs at the time an investor enters . . . a transaction as a result of material misrepresentations.") (quoting *Zola v. Gordon*, 685 F. Supp. 354, 363 n. 10 (S.D.N.Y. 1988));

*EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro S.A.*, 246 F. Supp. 3d 52, 69 (D.D.C. 2017)

(explaining that, for fraud claims brought under Rule 10b, "it is well established that a plaintiff

suffers legal injury at the moment she makes her investment, not when she suffers actual losses,"

and that there is "no reason for differentiating between when an injury arises for common law

fraud and for Rule 10b–5" as "standing to raise a Rule 10b–5 securities fraud claim . . . requires a

plaintiff to have met *both* constitutional and statutory standing requirements"), *aff'd*, 894 F.3d

339 (D.C. Cir. 2018).

## B.    Section 10(b)

Fraser also argues that the proposed class includes members who cannot satisfy Section

10(b)'s requirements of a "purchase" or "sale" of securities. Specifically, he argues that the

inclusion of those who acquired products by "'mining' products, such as Hashpoints," or

converting one product to another, such as "converting 'Hashpoints' to . . . Paycoin," prevents

certification of the class. ECF No. 107 at 11. I disagree. Section 10(b) states that it shall be

unlawful "[t]o use or employ, *in connection with the purchase or sale of any security* . . . any

manipulative or deceptive device or contrivance in contravention of such rules and regulations as

the Commission may prescribe . . . ." 15 U.S.C. § 78j(b) (emphasis added). Rule 10b-5 contains

similar language requiring a "connection with the purchase or sale of any security." 17 C.F.R. §

240.10b-5. When the Supreme Court "has sought to give meaning to the phrase ["in connection

with the purchase or sale"] in the context of § 10(b) and Rule 10b–5, it has espoused a broad

interpretation." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 (2006)

(emphasis omitted). "Under [its] precedents, it is enough that the fraud alleged 'coincide' with a

securities transaction—whether by the plaintiff or by someone else." *Id.* "The requisite showing,

in other words, is deception in connection with the purchase or sale of any security, not

deception of an identifiable purchaser or seller." *Id*. (internal quotation marks omitted). In addition, the Securities and Exchange Act defines the terms "purchase" and "sale" broadly:

> (13) The terms "buy" and "purchase" each include any contract to buy, purchase, or otherwise acquire. For security futures products, such term includes any contract, agreement, or transaction for future delivery. For security-based swaps, such terms include the execution, termination (prior to its scheduled maturity date), assignment, exchange, or similar transfer or conveyance of, or extinguishing of rights or obligations under, a security-based swap, as the context may require.

> (14) The terms "sale" and "sell" each include any contract to sell or otherwise dispose of. For security futures products, such term includes any contract, agreement, or transaction for future delivery. For security-based swaps, such terms include the execution, termination (prior to its scheduled maturity date), assignment, exchange, or similar transfer or conveyance of, or extinguishing of rights or obligations under, a security-based swap, as the context may require.

15 U.S.C. § 78c(a)(13) & (14). Thus, "purchase" includes a contract to "otherwise acquire" an item and "sale" includes any contract to "sell or otherwise dispose of" an item.

Individuals who mined for a product or converted one product to another fall within the broad definitions of "purchase" and "sale" set forth in the Act. Those who acquired Hashpoints by "mining" for them with a Hashpoints-Hashlet did so pursuant to a "contract to . . . otherwise acquire" them. 15 U.S.C. § 78c(a)(13). Similarly, those who converted Hashpoints to Paycoin did so pursuant to a "contract to . . . otherwise acquire" the Paycoin. *Id*. In addition, such transactions qualify as sales as they involve "contract[s] to . . . otherwise dispose of" Hashpoints and Paycoin. 15 U.S.C. § 78c(a)(14). Furthermore, treating such transactions as "in connection with the purchase or sale of any security" is consistent with the Supreme Court's directive to construe this phrase broadly, *see Merrill Lynch*, 547 U.S. at 85, and the purpose of the Act "to ensure the maintenance of fair and honest markets," 15 U.S.C. § 78b.

### C.    CUSA

Fraser argues that only "the person buying the security" can sue for violations of CUSA. ECF No. 107 at 10. CUSA provides that any person who "[o]ffers or sells a security in violation of [particular state securities laws] . . . is liable to the person buying the security." Conn. Gen. Stat. Ann. § 36b-29(a). Although the statute does not define "the person buying the security," it defines "offer" and "sell" broadly:

> (16) (A) "Sale" or "sell" includes every contract of sale of, contract to sell, or disposition of, a security or interest in a security for value. (B) "Offer" or "offer to sell" includes every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security for value. . . . (D) Nothing in this subdivision shall limit or diminish the full meaning of the terms "sale", "sell", "offer" or "offer to sell" as construed by the courts of this state.

Conn. Gen. Stat. Ann. § 36b-3(16). In describing the counterparty to a "sale," dictionary definitions of "buyer" and "purchaser" mirror this breadth. Black's Law Dictionary (11th ed. 2019) (defining "purchaser" as one "who obtains property for money or other valuable consideration" or "a buyer"; and defining "buyer" as one "who makes a purchase"). Therefore, the plain meaning of "the person buying the security," and one consistent with related terms in the same statute, is a person who exchanges something of value for the security. *See also Couldock & Bohan, Inc. v. Societe Generale Securities Corp.*, 93 F. Supp. 2d 220, 228 (D. Conn. 2000) (construing "buyer" broadly  in case involving claims under the Exchange Act and CUSA). Thus, when a person purchases a Bitcoin/Altcoin-Hashlet and then uses it to mine for Hashpoints, or purchases a Bitcoin/Altcoin-Hashlet and then converts it to a Hashpoint-Hashlet, that person has acquired an item by exchanging something of value for it. Accordingly, members of the proposed class, as modified, are buyers of securities under CUSA.

* * *

In sum, I find that the class is now defined in such a way that anyone within it has Article III standing and satisfies the "purchase and sale" and "buyer" requirements of Rule 10(b) and CUSA, respectively.

## II.     Rule 23(a)

### A.     Numerosity

"Numerosity is presumed for classes larger than forty members." *Pennsylvania Pub. Sch. Employees' Ret. System v. Morgan Stanley & Co., Inc.*, 772 F.3d 111, 120 (2d Cir. 2014), *as amended* (Nov. 12, 2014); *see also Hill v. City of New York*, 136 F. Supp. 3d 304, 353 (E.D.N.Y. 2015), *order amended and supplemented*, 2019 WL 1900503 (E.D.N.Y. Apr. 29, 2019) ("While there is no magic minimum number to establish numerosity, courts in the Second Circuit generally presume that a class consisting of 40 or more members is sufficiently numerous.") (internal quotation marks omitted).

Relying on databases from the Companies, the Plaintiffs argue that the class includes thousands of persons and, specifically, that one database reflects over 33 million transactions, including purchases of the Companies' products by over 212,000 users. ECF No. 97 at 21. Fraser challenges the accuracy and authenticity of these databases on multiple grounds, a challenge I discuss further below. For present purposes, however, I need not rely on the databases because purchase records submitted by the Plaintiffs show that there are well over forty class members.

According to Plaintiff Shinners, 173 putative class members uploaded documents related to their purchases, activities, and subsequent losses to a website he created. ECF No. 107-1 at 28. At the April 12, 2019 hearing, the Court directed the parties to submit a sample of documents from 20 randomly-selected members of this group along with a joint declaration explaining the method used to randomly select the individuals and the nature of the documents submitted. ECF

No. 136. The submitted records provide a reasonable basis to conclude that nearly all of the 20 randomly-selected individuals purchased the Companies' products and thus, given that the sample was randomly selected, that nearly all of the 173 individuals who submitted records did so too. *See* ECF No. 140-1 at ¶¶ 4-9 (Plaintiffs' counsel identified documents submitted by 17 of the 20 randomly-selected individuals; these documents included (1) confirmation emails from gawminers.com; (2) documents confirming transfers of Bitcoin from outside exchanges to GAW Miners; and (3) credit card data from Braintree and Stripe as well as personal credit card statements). Therefore, there is a reasonable basis to find that there are more than forty people in the proposed class. *See Fogarazzao v. Lehman Bros., Inc.*, 232 F.R.D. 176, 179 (S.D.N.Y. 2005) (explaining that "precise calculation of the number of class members is not required[] and it is permissible for the court to rely on reasonable inferences drawn from available facts").

Other factors relevant to numerosity, such as "geographic dispersion of class members," *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993), likewise support a finding that "the class is so numerous that joinder of all members is impracticable," Fed. R. Civ. P. 23. It is undisputed that purchasers of the Companies' products hail from all over the world, and the random sample of records submitted by purchasers reflects this. *See, e.g.*, ECF No. 140-9 at 14-15 (email confirmation sent from GAW Miners to Daniel Mondesire confirming the purchase of Hashlets and showing a billing address in Finland); *id.* at 22-29 (email confirmation sent from GAW Miners to Martin Horton confirming the purchase of Hashlets and showing a billing address in the United Kingdom); *id*. at 30-39 (email confirmation sent from GAW Miners to Michael Viklund confirming the purchase of Hashlets and showing a billing address in Sweden); *see also* ECF No. 107 at 39 (Defendant's brief, arguing that "[f]oreign nationals held a large number of user accounts in the Companies' databases").

Fraser argues that "offering 'a large pool of persons within which a class may or may not exist' is insufficient" to establish numerosity. ECF No. 107 at 46 (quoting *Kapiti v. Kelly*, 2008 WL 3874310, at *4 (S.D.N.Y. Aug. 18, 2008)). In *Kapiti*, however, the "Plaintiff offer[ed] no persuasive evidence" that any other individuals had similar claims. *Kapiti*, 2008 WL 3874310, at *4. And the *Kapiti* court explained that the "Plaintiff's belief that hundreds or thousands more lessees have had similar experiences is based on speculation." *Id*. In this case, by contrast, the Plaintiffs have provided persuasive evidence—including email confirmations, credit card statements, and bank statements reflecting purchases—that other individuals have the same claims. The numerosity requirement is therefore satisfied.

### B. Commonality

The commonality requirement is satisfied if "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Fraser does not contest commonality, and it is plain that there are a number of common questions in this case, including, (1) whether the Companies made misrepresentations or omissions of material facts (Counts One, Three, and Seven); (2) whether the Companies sold "securities" under state law and whether any exemptions or exceptions to registration apply (Count Five); and (3) whether Fraser is subject to control-person liability and/or aider and abettor liability (Counts Two, Four, Six, and Eight). The third issue in particular – the precise nature and extent of Fraser's involvement in the Companies and role in any fraud – is likely to play a central role in the litigation. It was a major focus of Fraser's motion to dismiss, and the Plaintiffs devoted significant portions of the complaint to allegations that Fraser exercised the requisite level of control. *See* ECF No. 57 at ¶¶ 18, 33-74; ECF No. 72 at 13-19. Indeed, because it will be difficult for Fraser to contest that the Companies and Garza made materially untrue representations in light of Garza's admissions when he pled guilty, *see,*

*e.g.*, *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 403 (8th Cir. 1995) (guilty plea

of employee admissible against employer), and because Fraser has not contested the existence or

falsity of the representations in his motion to dismiss or class certification briefs, it is likely that

the issue of Fraser's secondary liability for the alleged fraud will be the critical liability issue at

the trial. And based on the extensive factual allegations in the complaint regarding the details of

Fraser's participation in the management of the Companies, ECF No. 57 at ¶¶ 33-74, that

question will likely entail a lengthy evidentiary presentation and occupy the bulk of any trial.

Thus, I find that the commonality requirement is satisfied.

### C.    Typicality and Adequacy

I address the final two Rule 23(a) requirements together as the typicality and adequacy

requirements overlap. "Typicality requires that the claims of the class representatives be typical

of those of the class, and is satisfied when each class member's claim arises from the same

course of events, and each class member makes similar legal arguments to prove the defendant's

liability." *Robinson v. Metro-N. Commuter R.R. Co.*, 267 F.3d 147, 155 (2d Cir. 2001) (internal

quotation marks and citation omitted). Adequacy requires "inquiry as to whether: 1) plaintiff's

interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys

are qualified, experienced and able to conduct the litigation." *Baffa v. Donaldson, Lufkin &

Jenrette Securities Corp.*, 222 F.3d 52, 60 (2d Cir. 2000). Here, Fraser argues that the Plaintiffs

are neither typical nor adequate because (1) none of the named plaintiffs paid for Paycoin; and

(2) Plaintiffs Shinners and Pfeiffer are subject to unique defenses. ECF No. 107 at 40-45.

Fraser's first argument is unpersuasive because it makes no difference that the named

plaintiffs acquired Paycoin by converting Hashpoints while some members of the putative class

paid for Paycoin. As shown, conversions qualify as "purchases" under the securities laws and the

claims still arise from the same alleged misrepresentations about Paycoin. *See Robidoux v. Celani*, 987 F.2d 931, 936–37 (2d Cir. 1993) ("When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims."); *In re MF Glob. Holdings Ltd. Inv. Litig.*, 310 F.R.D. 230, 236 (S.D.N.Y. 2015) ("Typicality does not require factual identity between the named plaintiffs and the class members, only that the disputed issues of law or fact occupy essentially the same degree of centrality to the named plaintiff's claim as to that of other members of the proposed class.") (internal quotation marks omitted); *Marcus v. BMW*, 687 F.3d 583, 599 (3d Cir. 2012) ("When a class includes purchasers of a variety of different products, a named plaintiff that purchases only one type of product satisfies the typicality requirement if the alleged misrepresentations or omissions apply uniformly across the different product types."). Because the named plaintiffs and other members of the putative class are alleged to have acquired Paycoin based on the same misrepresentations, the named plaintiffs' claims are typical of the class. For the same reason, any differences in the way the named plaintiffs acquired Paycoin do not lessen their incentive to pursue claims on behalf of the entire class, and consequently do not defeat adequacy.

As to Fraser's second argument, "[t]he rule barring certification of plaintiffs subject to unique defenses is not rigidly applied in this Circuit; in fact, a representative may satisfy the typicality requirement even though that party may later be barred from recovery by a defense particular to him or her that would not impact other class members." *In re Frontier Ins. Group, Inc. Securities Litig.*, 172 F.R.D. 31, 41 (E.D.N.Y. 1997) (internal quotation marks, alterations, and citation omitted); *see also Trief v. Dun & Bradstreet Corp.*, 144 F.R.D. 193, 200–01

(S.D.N.Y. 1992) ("[I]t is beyond reasonable dispute that a representative may satisfy the typicality requirement even though that party may later be barred from recovery by a defense particular to him that would not impact other class members."). However, "class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." *Baffa*, 222 F.3d at 59 (citation omitted). In short, the existence of unique defenses is insufficient to defeat typicality unless the defenses threaten to become the focus of the litigation.

Fraser argues that Shinners is subject to unique defenses because he (1) was an agent of GAW Miners; (2) violated securities law by selling the same unregistered securities at issue in this action; (3) did not rely on statements that Hashlet payout rates resulted from actual mining; (4) did not rely on public information in crafting his investment strategy; (5) was *in pari delicto* with the Companies; and (6) encouraged Garza to circumvent securities laws. ECF No. 107 at 42. He argues that Pfeiffer is subject to unique defenses because he (1) acted as an agent of the Companies; (2) may have violated securities laws; (3) received inside information; and (4) continued purchasing the products after Paycoin and Paybase launched without the promised features. *Id.* at 44-45. I am not persuaded that any of these unique defenses would "threaten to become the focus of litigation."

Although Fraser argues that Shinners knew Hashlet payouts were not generated from mining and that both Shinners and Pfeiffer had non-public information, he points to no evidence suggesting that either of them actually knew that the Companies were engaged in fraud, *i.e.*, that Hashlet payouts were coming primarily from new investors' funds, that the Companies had no $100 million reserve fund to support Paycoin, or that no retailers had agreed to accept Paycoin. He first points out that Shinners signed a non-disclosure agreement with GAW Miners, revised

company documents, and participated in company meetings. ECF No. 107 at 44. But, as Plaintiffs note, Fraser "fails to explain how any [of] that resulted in Shinners learning anything material." ECF No. 113 at 20. Second, Fraser asserts that Shinners knew Hashlet payouts were not generated from physical mining because Shinners said, in an email, that he "always knew" that the "pools [were] representative of outside pool rates." ECF No. 107 at 44. Fraser extrapolates from this that Shinners knew Hashlet payouts were not the result of physical mining. *Id.* As Plaintiffs note, however, the email in question "refers to Shinners' suggestion that Hashlets be converted into Hashstakers based on their purchase price, and does not imply that Shinners knew about the fraud." ECF No. 113 at 20; *see also* ECF No. 113-4 at ¶¶ 2-3 (Exhibit G) (Shinners explaining that he was "discussing the GAW community's desire for Hashlets to be converted into Hashstakers" and his statement about pool rates was a reference to his understanding that a Hashlet's purchase price was "based on the associated pool in which [it] mined"). Third, Fraser argues that Pfeiffer conducted many of his GAW Miners transactions through an escrow agent from whom he received non-public information about the Companies. ECF No. 107 at 45. Plaintiffs assert that the cited emails do not show that the escrow agent provided Pfeiffer with non-public information. ECF No. 113 at 20. Moreover, the emails cited by Fraser, *see* ECF No. 107 at 45 n.149-150, do not concern the specific misrepresentations about Hashlets or Paycoin at issue here, and do not show that Pfeiffer was aware of the fraud.

In any event, access to nonpublic information by two of the named plaintiffs would not undermine the common claim that there were public, material misrepresentations and would not lessen the named plaintiffs' incentives to pursue such a claim. *See In re MF Glob. Holdings Ltd. Inv. Litig.*, 310 F.R.D. at 236 (rejecting defendants' typicality argument that the named plaintiff "had access to and relied on nonpublic information" because any unique defenses stemming

from this allegation would not "overshadow the common claim that the [defendants' documents] were materially misleading"). Similarly, "the fact that Defendants may attack the Plaintiffs' credibility and/or employ an 'unclean hands' defense at the damages stage of the litigation does not mean that any such defenses should overcome the common issues of fact and law in this [class certification] proceeding." *In re Nat. Gas Commodities Litig.*, 231 F.R.D. 171, 184 (S.D.N.Y. 2005). And finally, because the exclusion for agents has been removed from the class definition (discussed in further detail below), Fraser's argument that Shinners and Pfeiffer are agents is moot. In short, the "focus of the litigation" for Shinners and Pfeiffer will be the same as for the rest of the class, *i.e.*, proving that the defendants made untrue and material misrepresentations about the Companies' products and, especially, that Fraser is responsible for such misrepresentations as a "control person."

If, at some later stage in these proceedings, Fraser establishes that Shinners and Pfeiffer are not appropriate class representatives, the Court is prepared to use its authority under Rule 23(c)(1) to remove them as class representatives and proceed with Audet as the sole representative. Fraser has not argued that Audet's claims are atypical of the class or that Audet is an inadequate representative. *See Charron v. Pinnacle Group N.Y. LLC*, 269 F.R.D. 221, 233 (S.D.N.Y. 2010) ("[A] claim may be asserted on behalf of a class if at least one named plaintiff has suffered the injury that gives rise to that claim.") (internal quotation marks and citation omitted).

Accordingly, I find the typicality and adequacy requirements satisfied.

## III.    Ascertainability

The Second Circuit has "recognized an 'implied requirement of ascertainability' in Rule 23 of the Federal Rules of Civil Procedure." *Brecher v. Republic of Argentina*, 806 F.3d 22, 24

(2d Cir. 2015). The ascertainability doctrine "requires only that a class be defined using objective criteria that establish a membership with definite boundaries." *In Re Petrobras Sec.*, 862 F.3d at 264. The analysis is therefore "limited to [the] narrow[] question of whether those determinations are objectively *possible*," *id*. at 270 (emphasis in original), and "does not directly concern itself with the plaintiffs' ability to offer *proof of membership* under a given class definition," *id.* at 269 (emphasis in original). So, while members of the class must be identifiable, "ascertainability does not require a complete list of class members at the certification stage." *Id*. at 266 n.16 (internal quotation marks omitted). Thus, ascertainability is a "modest threshold requirement" that "will only preclude certification if a proposed class definition is indeterminate in some fundamental way." *Id*. at 269.

The Plaintiffs' proposed class definition – with and without the modification I adopt in this ruling – easily clears this "modest threshold." Indeed, Fraser does not contest ascertainability, properly understood.[5] And the criteria for class membership in this case— purchases of designated products during a specified timeframe by all persons or entities except governmental agencies and those with certain relationships to a defendant—are clearly objective. Indeed, in *Petrobras* itself, the Court found a class sufficiently ascertainable where it included "persons who acquired specific securities during a specific time period . . . in domestic

---

[5] Fraser argues that individual issues involved in ascertaining members of the class will *predominate* because (1) the data in the Companies' databases is unreliable, ECF No. 107 at 26-28, incomplete, *id*. at 28-30, and insufficient, *id*. at 30-31, (2) investor records may be unreliable or fraudulent, *id*. at 31-33, and (3) determining exclusions for affiliates, agents, employees or co-conspirators requires individual inquiries, *id*. at 33-35. As Fraser recognizes, these practical proof problems are properly considered under the rubric of "predominance," and I consider them in that context below. *In Re Petrobras Sec.*, 862 F.3d at 267-68 (noting that a Third Circuit requirement that there be a "reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition" "risks encroaching on territory belonging to the predominance requirement, such as classes that require highly individualized determinations of member eligibility").

transactions" because "[t]hese criteria—securities purchases identified by subject matter, timing, and location—[were] clearly objective." 862 F.3d at 269 (internal quotation marks omitted). The fact that "the *practicality* of making the domesticity determination for each putative class member" was contested did not require a different outcome. *Id*. at 270. Here too, Fraser's concerns about the feasibility of making membership determinations on a class-wide basis, *see* ECF No. 107 at 25-35, do not defeat ascertainability. Rather, those arguments go to predominance; I address them below.

## IV. Rule 23(b)(3)

### A. Predominance

The requirement that common questions predominate over individual ones is similar to, but more demanding than, the commonality prerequisite of Rule 23(a). *See Moore v. PaineWebber, Inc.,* 306 F.3d 1247, 1252 (2d Cir. 2002). The predominance inquiry asks "whether proposed classes are sufficiently cohesive to warrant adjudication by representation," *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 623 (1997), and is satisfied if "resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof," *In re U.S. Foodservice Inc. Pricing Litig.,* 729 F.3d 108, 118 (2d Cir. 2013) (quoting *UFCW Local 1776 v. Eli Lilly & Co.,* 620 F.3d 121, 131 (2d Cir. 2010)). For common questions to predominate over individual ones, a plaintiff seeking class certification does not need to prove that "each elemen[t] of [her] claim [is] susceptible to classwide proof," but rather that "common questions *predominate* over any questions affecting only individual [class] members." *Amgen Inc. v. Connecticut Ret. Plans and Tr. Funds*, 568 U.S. 455, 469 (2013) (internal quotation marks omitted).

As discussed in the context of the commonality requirement, Plaintiffs posit a number of questions that could be resolved with generalized proof if this case proceeded on a class-wide basis. Fraser counters that the predominance requirement is not satisfied because adjudicating Plaintiffs' claims will require individual inquiries "into each putative class member's (1) actual and reasonable reliance on the alleged misrepresentations, (2) loss causation, (3) standing, (4) eligibility (*i.e.*, whether each was an agent, affiliate or employee of the Companies), (5) damages, and (6) vulnerability to available defenses." ECF No. 107 at 12. I evaluate the predominance requirement with respect to these six issues, which each relate to one or more of the Plaintiffs' eight claims. First, I discuss standing and damages together as they raise similar concerns. I then address eligibility, defenses, reliance, and loss causation in turn.

### 1) Standing and Damages

Fraser's arguments concerning the need for individualized inquiries into each putative class member's standing and damages turn, in part, on the same issue – the alleged absence of a reliable database or central clearinghouse that would show who purchased or otherwise acquired the products, when they made the acquisitions, and the value they paid. *See* ECF No. 107 at 25-26 (arguing that "[d]etermining which putative class members were injured—and therefore have standing—would require individualized inquiries into the consideration paid versus value received with respect to each putative class member" and the databases are "insufficient data source[s] from which to ascertain members of the class")[6]; ECF No. 107 at 35-36 (arguing that although Plaintiffs propose a formula for calculating damages, "they fail to demonstrate how

---

[6] As I noted above, standing in this case only requires proof of purchase, not net loss as Fraser suggests here. Thus, the Court's analysis of whether common issues predominate with respect to standing focuses on whether proof of purchase requires individualized inquiries.

they will determine the inputs required to calculate damages" as the "databases are insufficient to provide the consideration paid and value received by each customer").

In support of this argument, Fraser points to testimony from GAW Miners employee, Madeline Eden, who explained that the ZenCloud database was not reliable due to hacking:

> A. Mostly it was in reference to a hack that had occurred on the system. But if I remember correctly, it was mostly because of the hacks that occurred on the system prior to Joe leaving. And it was – it was basically an internal hack where large portions of the database had been changed and modified and ledgers had been altered and – and accounts had been credited. And there was weird stuff going on. And there was no real way – I mean, it was a complete mess.

ECF No. 107-1 at 60.

> A. Because the database was a giant mess. But at this point there had been hacks on the database. I mean, there had been issues with Hashlets that had been split and/or destroyed on accident, or I mean, any number of different things.

ECF No. 107-1 at 61. Eden also suggested that Garza directed some changes to the databases:

> Q. Are these the same databases that you were referencing earlier?
>
> A. Absolutely. But like I said before, in order to actually know what was happening at any given point in time, I mean, you can't really review just the database, because – well, data got changed. So the raw ability of the data that was in the database was not always exactly 100 percent. There were people that were modifying the data in the production environment who were receiving direction from people that weren't involved with development – I mean that weren't involved with the development team or with the development leadership, so . . .
>
> Q. Are you referring to what you called earlier like a hacking or is this something else?
>
> A. Oh, yeah, no. It was specifically related to that. There were developers who were taking instruction from Josh Garza and – well, I don't know – modifying records and stuff. It was kind of difficult to ascertain specifically what had happened . . .

ECF No. 107-1 at 63. Fraser also argues that the databases are unreliable because some customers engaged in "private, peer-to-peer sales of cryptocurrency-related products in their accounts by exchanging the passwords to their accounts" and such transactions are not reflected in the ZenCloud and Paybase databases. ECF No. 107 at 28. Finally, he asserts that these two

databases do not indicate the identities of the customers underlying each account and that customers often controlled multiple user accounts; therefore, he argues, the databases cannot be used to establish the consideration paid and value received by each putative class member. ECF No. 107 at 30.

Plaintiffs assert that the databases can be used to identify purchasers, and argue that, in any event, Fraser and the Companies, as the alleged wrongdoers, must bear the risk of uncertainty caused by their own wrongdoing. ECF No. 113 at 14 n.3 ("The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created.") (quoting *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 265 (1946)). As to Fraser's argument that the databases do not reflect all relevant transactions, they argue that the "relevant securities existed only in companies' databases and are necessarily accounted for there." ECF No. 113 at 14. They note that customers were required to use ZenCloud and Paybase in order to activate, use, or mine for Hashlets, Hashstakers, and Paycoin. *Id*. at 14-15. As to Fraser's argument that customers often controlled multiple user accounts, Plaintiffs argue that their expert, Robert Mills, is able to use the biographical information in the databases to identify users with multiple accounts.[7] ECF No. 113 at 15 n.5. They state that Fraser's own expert, Dr. Strombom, confirmed that such information can be used to identify individuals with multiple accounts. ECF No. 114 at 17-18. Finally, the Plaintiffs note that Fraser's concerns about the reliability of the ZenCloud database are not applicable to third-party databases, like Braintree and Stripe—two third-party credit card processors that GAW Miners used to process credit card sales of its securities. ECF No. 140 at 6.

---

[7] I do not rely on Plaintiffs' experts in reaching my decision on class certification. I discuss the expert here only by way of summarizing Plaintiffs' arguments concerning the databases.

I need not resolve the issue of whether the ZenCloud and Paybase databases are reliable at this stage of litigation because, even if they are not reliable, the parties' May 3, 2019 joint submission demonstrates that there are other reasonably uniform records that can be relied upon during a claims process following a determination of liability to establish proof of purchase. As discussed above, 173 putative class members uploaded documents related to their purchases, activities, and subsequent losses to a website created by Plaintiff Shinners. The parties were directed to submit a sample of documents from 20 randomly-selected members of this group to the Court by May 3, 2019. ECF No. 136. After randomly selecting 20 individuals from the larger group, the Plaintiffs submitted documents from 17 of those people. ECF No. 138 at ¶¶ 3-5 (parties' joint declaration explaining how they randomly selected 20 individuals); ECF No. 140-1 at ¶¶ 4-9 (Plaintiffs' counsel identifying records submitted by 17 of the 20 individuals). Of the documents submitted, there are three main types of documents that are reasonably uniform and could be used during a claims process. First, a number of putative class members submitted copies of emails from gawminers.com that confirmed the purchase of a GAW Miners product; these emails have a uniform format. ECF No. 140 at 6; ECF No. 140-3 (Exhibit 4); ECF No. 140-1 at 2 ¶ 4. Second, some submitted documents confirming transfers of Bitcoin from outside exchanges to GAW Miners. ECF No. 140 at 7; ECF No. 140-7 (Exhibit 8); ECF No. 140-1 at 4 ¶ 8. These transfers can also be confirmed on the Bitcoin blockchain by searching for customers' wallet addresses; Plaintiffs explain that any public blockchain website can be used to locate and confirm such transactions. ECF No. 140 at 7; ECF No. 140-8 (Exhibit 9); ECF No. 140-1 at 4 ¶ 9. Finally, some putative class members submitted credit card data from Braintree and Stripe, ECF No. 140 at 6; ECF No. 140-1 at ¶ 5; ECF No. 104-4 (Exhibit 5), and personal credit card statements, ECF No. 140 at 6; ECF No. 140-1 at ¶ 7; ECF No 140-6 (Exhibit 7).

Fraser argues that these documents are insufficient "to establish membership in the class in a uniform way." ECF No. 139 at 1. But membership may be established by reference to more than one type of document, and as long as proposed class members can show proof of purchase by submitting such documentation during the claims stage, individual inquiries will not predominate.

District courts within this Circuit have relied on similar records to establish class membership and damages. In *In re Facebook, Inc., IPO Securities and Derivative Litigation*, the court certified an "institutional investor subclass" and a "retail investor subclass." 312 F.R.D. 332 (S.D.N.Y. 2015). It explained that because "the subclasses may be ascertained with reference to investor records, it is administratively feasible to determine whether an investor is a member of the institutional investor subclass, the retail investor subclass, or no subclass at all." *Id*. at 353. The court explained that it would make these determinations by taking three steps. *Id*. First, it would reference "Facebook's own Final Allocant List;" then there would be some individualized review of investors who could fall into either subclass; and finally it would determine the appropriate subclass for aftermarket purchasers by applying the Financial Industry Regulatory Authority definitions to those individuals. *Id*. It said that membership could be determined in this way because although "documentation may be required, mini-hearings on the merits of each investor's inclusion in the subclasses will not be." *Id*. Although the *In re Facebook* court included this discussion in its ascertainability analysis, the underlying principles that membership can be established by reference to "investor records," and that using such documentation would obviate the need for mini merits hearings, are equally applicable here.

In *In re Digital Music Antitrust Litigation*, the court concluded in its ascertainability analysis that it could identify class members because the plaintiffs "provided detailed

information related to class member purchases of Digital Music, including credit card payments, confirmatory emails, records kept by digital retailers, and the Digital Music product itself." 321 F.R.D. 64, 90 (S.D.N.Y. 2017). It further explained that, "[t]o the extent that proposed class members are unable to provide proofs of purchase or show the price paid for digital downloads . . . their recovery would be limited or reduced." *Id.* Although the court ultimately denied class certification on other grounds, it did not do so because of concerns about establishing class membership with such documentation.

As these two cases show, investor records of the kind available in this case are sufficient to establish membership in a class. And as long as the investor records are uniform, and do not require mini hearings for each investor, individual inquiries will not predominate. Plaintiffs have made a sufficient showing that proof of purchase may be established by common evidence of (1) confirmatory emails from GAW Miners; (2) records confirming transfers of Bitcoin from outside exchanges to GAW Miners; and/or (3) credit card records.[8]

I turn next to Fraser's predominance argument concerning damages, *i.e.*, whether the existence of "chargebacks" or other transactions by which class members reduced their losses or achieved net gains requires individualized inquiries that outweigh the common issues. *See* ECF No. 107 at 36 (Fraser arguing that "it will be necessary to individually assess each putative class member's transactions—including those that occurred within the Companies' system and those, such as credit card chargebacks and private sales, that occurred outside of the Companies'

---

[8] The Plaintiffs may argue for the use of one or more databases to establish membership at a later stage if they so choose. The Court notes that transaction information submitted by the randomly-selected proposed class members appears to tie closely to entries shown on the ZenCloud and Paybase database, *see* ECF No. 140 at 8; ECF No. 140-1 at ¶¶ 11-23, thereby bolstering Plaintiffs' claim that the databases are reliable. The Court also notes that whether particular databases are reliable itself presents a common issue.

system—to determine the total amount each putative class member . . . paid and the total value each putative class member . . . received"). These concerns do not preclude class certification for two reasons.

First, although Fraser is correct that the Court will need to determine the loss suffered by each member of the class (if the Plaintiffs' prove liability), that can be done through the claims process. The claims process can be structured so that all class members must submit documentation of chargebacks and other third-party transactions; moreover, these documents can be subject—as needed—to audits, verification procedures, and challenges. *See Mullins v. Direct Digital, LLC*, 795 F.3d 654, 669-70 (7th Cir. 2015) (explaining that, with regard to class membership, courts can "rely on self-identifying affidavits, subject as needed to audits and verification procedures and challenges, to identify class members" and "can tailor fair verification procedures to the particular case"). A defendant's rights are protected "so long as the defendant is given a fair opportunity to challenge the claim to class membership and to contest the amount owed each claimant during the claims administration process." *Id*. at 671.

Second, even if individual inquiries into chargebacks or sales to other parties were required, that would not defeat class certification. *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015) ("[T]he fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification under Rule 23(b)(3)") (internal quotation marks omitted); *see also Strougo v. Barclays PLC*, 312 F.R.D. 307, 313 (S.D.N.Y. 2016) ("Issues and facts surrounding damages have rarely been an obstacle to establishing predominance in section 10(b) cases."); *Mullins*, 795 F.3d at 671 ("It has long been recognized that the need for individual damages determinations at [a] later stage of the litigation does not itself justify the denial of certification."); *Carroll v. Stettler*, 2011 WL 5008349, at *4 (E.D. Pa. Oct. 19, 2011)

(explaining that although "the amount of each individual class member's net losses in the Ponzi scheme and, hence, the amount of recovery to which each member is entitled will vary," "the necessity for calculation of damages on an individual basis should not preclude class determination when the common issues which determine liability predominate") (internal quotation marks and citation omitted).

Nevertheless, the Court will permit Fraser to take post-certification discovery related to chargebacks or private transactions from class members. If that discovery shows that a material number of proposed class members have had chargebacks or other compensating gains that negate or reduce their losses as a result of transactions with third parties, and that such proof is highly individualized, Fraser can file a motion to decertify the class as to damages. *See* Fed. R. Civ. P. 23(c)(4) ("When appropriate, an action may be brought or maintained as a class action with respect to particular issues.")

Accordingly, individual issues regarding standing and damages do not predominate or preclude certification of the class.

### 2)     *Eligibility*

Plaintiffs' proposed class excludes "any defendants, any parent, subsidiary, affiliate, agent or employee of any defendant, any co-conspirator and any governmental entity." ECF No. 97 at 19. Fraser argues that individual inquiries will predominate over common questions in ascertaining class membership because determining exclusions for affiliates, agents, employees, and co-conspirators requires individual inquiries. ECF No. 107 at 33-35.

As for the exclusion for affiliates, the Plaintiffs assert that "[t]he term 'affiliate,' which has been used in the class definition in hundreds of class actions, is used here in its usual legal sense, *i.e.*, entities under common control with the Companies, and there is no evidence that such

entities acquired the relevant securities." ECF No. 113 at 16. I agree with this construction of the term "affiliate," because it fits with the placement of the term in the proposed class definition – immediately following "parent" and "subsidiary" – and with the Second Circuit's interpretations of the term in similar contexts. *See Rothstein v. Am. Intl. Group, Inc.*, 837 F.3d 195, 210 (2d Cir. 2016) (interpreting "affiliate" narrowly to be "one who controls, is controlled by, or is under common control with an issuer of securities" because when viewed "in the full context of the exclusion provision" the "exclusion of 'parents,' 'subsidiaries,' 'officers,' and 'directors' of AIG from the settlement class evinces an intent to exclude individuals who may have perpetrated or benefited from the alleged underlying securities violations"). Adopting the Plaintiffs' sensible construction of the term "affiliate," *i.e.*, entities under common control with the Companies, should render straightforward (and, according to Plaintiffs, unnecessary) any queries about who satisfies that term.

The term "agent" in the proposed class definition is not defined, and the parties contest its meaning. *Compare* ECF No. 107 at 34 (arguing that moderators of the Hashtalk forum are "agents"), *with* ECF No. 113 at 16 (arguing that forum moderators are not "agents"). Read in context – between "affiliate" and "employee" – the term appears to be aimed at excluding another category of persons who participated in or benefited from the alleged fraud. But it is not clear why the terms "employee" and "co-conspirator" – already in the class definition – would not adequately capture such persons. Fraser suggests that non-employees who moderated the blogs and online forums sponsored by the Companies should be excluded from class membership, and that determining the identity of these individuals presents an individualized issue. ECF No. 107 at 34. The deposition testimony he points to, however, does not suggest that the moderators participated in or benefitted from the alleged fraud and, indeed, that testimony

indicates that the witness "didn't actually oversee or coordinate with the moderators." ECF No. 107-1 at 93. There thus does not appear to be a reason to exclude "moderators" from the class. The same is true of the other "agents" Fraser identifies – software testers hired by the Companies to test the security and functionality of its software. ECF No. 107 at 34-35. The evidence he cites does not suggest that any of these individuals participated in or benefited from the alleged fraud. ECF No. 107-1 at 87-89. Accordingly, I remove "agents" from the exclusion provision of the class definition.

As to Fraser's argument that determining exclusions for employees requires individual inquiries, identifying individuals who fall into this category can be done through common evidence such as the Companies' employment and payroll records. *See Flores v. Anjost Corp.*, 284 F.R.D. 112, 123 (S.D.N.Y. 2012) (certifying a class of employees and explaining that the class was ascertainable as class members could be identified with "Defendants' employee payroll records and wage statements"); *Jankowski v. Castaldi*, 2006 WL 118973, at *5 (E.D.N.Y. Jan. 13, 2006) (certifying a class of employees and explaining that membership in the class "can be verified by reference to objective documentation, including employee payroll records and tax returns").

Finally, Fraser argues that determining exclusions for co-conspirators requires individual inquiries. ECF No. 107 at 33. However, he does not explain how many co-conspirators there were and does not set forth any basis to suggest there were more than a few such individuals. Because of the potential size of this class and the many common questions, a handful of individualized inquiries as to potential co-conspirators does not defeat predominance. *See In re Facebook, Inc., IPO Securities and Derivative Litig.*, 312 F.R.D. 332, 346 (S.D.N.Y. 2015) ("With these principles in mind, before proceeding to analyze the individualized questions in this

matter, it must again be noted that this case is of a staggering size, involving a very great number of potential claimants. The presence of common questions and answers is therefore an extremely heavy counterweight to any individualized questions.") (internal citation omitted).

Accordingly, there is no need to determine exclusions for agents, and the need to determine exclusions for affiliates, employees, and co-conspirators does not predominate over the common questions identified above.

### 3)    *Vulnerability to Available Defenses*

Fraser argues that individual issues regarding defenses will predominate. ECF No. 107 at 37. More specifically, he argues that individual inquiries are required to determine which putative class members engaged in independent fraudulent activity or were *in pari delicto* with the Companies. ECF No. 107 at 37-38.

Regarding fraudulent activity, Fraser argues that there "is evidence of widespread credit card fraud" and that the "databases containing the Companies' transactional records were repeatedly hacked and altered." ECF No. 107 at 37. As the Plaintiffs note, however, Fraser does not offer evidence that any proposed class member engaged in such fraud. ECF No. 113 at 17. Rather, he cites evidence to support the existence of general problems with credit card fraud, ECF No. 107 at 37 n.109 (citing testimony from Eric Capuano, a GAW Miners employee, that customers "would just buy as much as they could, and then by the time the charge-back came it was too late, because they already had the currency or whatever"), and database hacks, *id*. at 37 n.110 (citing emails and testimony about database hacks). If Fraser later identifies specific class members who engaged in such fraud, he may raise affirmative defenses as to those individuals. But given the common issues that the Court has identified in this case – and especially given the centrality to the litigation of common, fact-intensive questions about Fraser's role – any

individual issues related to potential affirmative defenses would not bar class certification. *See Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) ("When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.") (internal quotation marks omitted).

Fraser also argues that, "to the extent putative class members were *in pari delicto* with the Companies, those putative class members are ineligible to recover under Connecticut's Blue Sky Laws or the Exchange Act." ECF No. 107 at 38. However, the parties disagree about whether certain types of proposed class members were *in pari delicto* with the Companies. *Compare* ECF No. 107 at 38 (arguing that putative class members who sold or promoted Hashlets, HashStakers, or Paycoin "may be equally at fault such that they cannot recover"), *with* ECF No. 113 at 17-18 (arguing that those who resold unregistered securities are not "in equal fault" with the Companies). And to the extent that the Companies sold unregistered securities, whether proposed class members who resold such securities were *in pari delicto* presents a common question. Given the common issues central to this case, including this issue about application of the *in pari delicto* doctrine, individual issues would not bar certification even if the Court later determines that individual inquiries into the re-sale of unregistered securities are required. *See In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d at 118 ("The predominance requirement is satisfied if resolution of *some of the legal or factual questions* that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof.") (internal quotation marks omitted) (emphasis added).

Accordingly, individual issues regarding defenses do not defeat the predominance requirement.

### 4) *Reliance*

Reliance is an element of the fraud claims against the Companies brought under Section 10(b), CUSA § 36b-29(a)(2), and the common law.[9] And because the Section 20(a), CUSA § 36b-29(a)(2), and aiding and abetting common law fraud claims against Fraser all require a primary violation by the Companies, they too require a showing of reliance.[10] "[P]roof of reliance ensures that there is a proper connection between a defendant's misrepresentation and a plaintiff's injury." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011); *see also Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 159 (2008) ("[The reliance requirement] ensures that, for liability to arise, the requisite causal connection between a defendant's misrepresentation and a plaintiff's injury exists as a predicate for liability.") (internal quotation marks and citation omitted). "The traditional (and most direct) way for a plaintiff to

---

[9] First, regarding Section 10(b) and Rule 10b-5 claims, Plaintiffs must show that there was "reliance upon [a] misrepresentation or omission." *Amgen Inc. v. Connecticut Ret. Plans and Tr. Funds*, 568 U.S. 455, 461 (2013). Second, to establish a claim under CUSA § 36b-29(a)(2), Plaintiffs must prove that "the buyer of the securities . . . not know of the untruth or omission complained of." *Connecticut Nat. Bank v. Giacomi*, 242 Conn. 17, 51 (Conn. 1997). As the Plaintiffs recognize, this element—"the buyer's knowledge—is similar to the element of reliance in plaintiffs' 10b-5 claim." ECF No. 97 at 29. Third, one of the "elements of [a common law fraud] action" is that the Plaintiff "relied on the statement to his detriment." *McCann Real Equity Series XXII, LLC v. David McDermott Chevrolet, Inc.*, 93 Conn. App. 486, 518 (2006).
[10] First, to establish "a prima facie case of control person liability" under Section 20(a), a plaintiff must show "a primary violation by the controlled person." *ATSI Commun., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007). Second, to establish aider and abettor liability under CUSA § 36b-29(a)(2), the plaintiff must prove that "the aider or abettor materially assisted the primary violator . . . in the violation by which the primary violator accomplished the offer or sale." *Giacomi*, 242 Conn. at 47. And finally, to establish aider and abettor liability for common law fraud, the Plaintiffs must show that "the party whom the defendant aids . . . perform[ed] a wrongful act that cause[d] an injury." *Brunette v. Bristol Sav. Bank*, 1994 WL 468448, at *2 (Conn. Super. Aug. 22, 1994).

demonstrate reliance is by showing that he was aware of a company's statement and engaged in a relevant transaction . . . based on that specific misrepresentation." *Amgen Inc. v. Connecticut Ret. Plans and Tr. Funds*, 568 U.S. 455, 461 (2013) (internal quotation marks and citation omitted).

Fraser devotes a large chunk of his brief to an argument that individual issues regarding reliance will predominate. ECF No. 107 at 12-24. I disagree for two reasons. First, proof of reliance is not required as to two of Plaintiffs' CUSA claims, neither of which sounds in fraud. Second, as to those claims requiring proof of reliance, Plaintiffs can establish reliance on a class-wide basis through common evidence of uniform misrepresentations and common, circumstantial evidence that those misrepresentations were essential to the decisions of prospective class members to purchase the Companies' products.

a)      Claims Not Requiring Proof of Reliance

Proof of reliance is not required as to two of Plaintiffs' CUSA claims, namely Plaintiffs fifth and sixth claims for relief alleging violations of CUSA §§ 36b-29(a)(1) and 36b-29(c), respectively. Plaintiffs' fifth claim for relief alleges that the Companies violated Conn. Gen. Stat. § 36b-29(a)(1), which bars the sale of unregistered securities. ECF No. 57 at ¶¶ 192-95. This statute provides, in relevant part, that "[a]ny person who: (1) [o]ffers or sells a security in violation of subsection (a) of section . . . 36b-16 . . . is liable to the person buying the security." Conn. Gen. Stat. Ann. § 36b-29(a)(1). Conn. Gen. Stat. § 36b-16(a), in turn, provides that:

> No person shall offer or sell any security in this state unless (1) it is registered under sections 36b-2 to 36b-34, inclusive, (2) the security or transaction is exempted under section 36b-21, or (3) the security is a covered security provided such person complies with any applicable requirements in subsections (c), (d) and (e) of section 36b-21.

Conn. Gen. Stat. Ann. § 36b-16. There is no need to show reliance to establish a violation of this statute, and so any individualized inquiries about reliance would not be a basis to deny class certification as to this claim.

The Plaintiffs' sixth claim for relief alleges a violation of Conn. Gen. Stat. § 36b-29(c) against Fraser. ECF No. 57 at ¶¶ 196-99. This statute provides that:

> (c) Every person who directly or indirectly controls a person liable under subsections (a) and (b) of this section, . . . are also liable jointly and severally with and to the same extent as such person, unless the person who is so liable sustains the burden of proof that he did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.

Conn. Gen. Stat. Ann. § 36b-29(c). This claim asserts control person liability against Fraser for the violations alleged in Count 3, which alleges securities fraud in violation of CUSA against the Companies, and those alleged in Count 5, which alleges the sale of unregistered securities by the Companies. As noted, the claim in Count 5 does not require a showing of reliance, and so the portion of this claim based on Count 5 also does not require such a showing. Thus, reliance is not a barrier to class certification of the control person/sale of unregistered securities claim either.

b)      Claims Requiring Proof of Reliance

As to those claims requiring proof of reliance, Fraser argues that "in a securities fraud case, plaintiffs cannot demonstrate reliance on a class-wide basis unless one of two rebuttable presumptions applies: the fraud-on-the-market presumption under *Basic Inc. v. Levinson*, 485 U.S. 224, 242 (1988), or the presumption under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153-54 (1972)," and that "class certification is generally denied" when neither presumption applies. ECF No. 107 at 13.[11] But while the parties agree that neither presumption applies here, it does not follow that individual issues of reliance predominate as a matter of law.

---

[11] "The fraud-on-the-market premise is that the price of a security traded in an efficient market will reflect all publicly available information about a company; accordingly, a buyer of the security may be presumed to have relied on that information in purchasing the security." *Amgen, Inc.*, 568 U.S. at 458. *Affiliated Ute* involves a presumption of reliance for misleading omissions.

In addressing an analogous issue in a RICO case, the Second Circuit explained that simply because "class members will show causation by establishing reliance on a defendant's misrepresentations . . . does not place fraud-based claims entirely beyond the reach of Rule 23, provided that individualized issues will not predominate." *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 119 (2d Cir. 2013). And while the Supreme Court has observed in *dicta* that "[a]bsent the fraud-on-the-market theory, the requirement that Rule 10b-5 plaintiffs establish reliance would *ordinarily* preclude certification of a class action seeking money damages because individual reliance issues would overwhelm questions common to the class," *Amgen, Inc. v. Connecticut Retirement Plans and Trust Funds*, 568 U.S. 455, 462-63 (2013) (emphasis added), there remain cases in which the presumptions do not apply where "circumstantial proof of reliance" may be established on a class-wide basis through common evidence, *In Re U.S. Foodservice Inc.*, 792 F.3d at 120. The absence of a presumption simply means that the plaintiffs must prove actual reliance; it does not dictate the nature of that proof, *i.e.*, whether it is general and circumstantial or individualized and direct.[12] "The question, then, is whether Plaintiffs in

---

[12] *In Re U.S. Foodservice Inc.* was a RICO case alleging an inflated invoicing scheme, rather than a securities case, but a few district courts within the Second Circuit addressing class certification in securities cases have similarly found that, even absent the presumptions, reliance can be proved by common, circumstantial evidence. *See, e.g.*, *Ge Dandong*, 2013 WL 5658790, at *11 (certifying a class of investors where neither presumption applied because "common questions of law and fact with respect to Plaintiffs' fraud and fraudulent inducement claims will predominate over any individual issues of reliance that may exist"); *Anwar v. Fairfield Greenwich Ltd.*, 306 F.R.D. 134, 144 (S.D.N.Y. 2015) (certifying a class of investors "even absent a 'fraud created the market' theory or the *Affiliated Ute* presumption of reliance" because "common evidence can show reliance by the class on alleged misrepresentations by [the defendants]"); *but see Goodman v. Genworth Financial Wealth Management, Inc.*, 300 F.R.D. 90, 94 (2014) ("The Second Circuit has approved the use of circumstantial evidence to prove class-wide reliance in fraud cases (but never in a securities fraud case), but only where the inference of reliance is practically inescapable.").

this case can prove reliance on a class-wide basis through common, circumstantial evidence." *Ge Dandong v. Pinnacle Performance Ltd.*, 2013 WL 5658790, at *10 (S.D.N.Y. Oct. 17, 2013).

The Plaintiffs argue that they can establish reliance on a class-wide basis through common evidence of uniform misrepresentations and common, circumstantial evidence that those misrepresentations were essential to the decisions of prospective class members to purchase the Companies' products; Fraser disputes both points. I address each below.

> i.    *Whether Misrepresentations Were Uniform and Can Be*
>        *Proved Through Common Evidence*

As Plaintiffs point out, "fraud claims based on uniform misrepresentations made to all members of the class . . . are appropriate subjects for class certification because the standardized misrepresentations may be established by generalized proof." *Moore*, 306 F.3d at 1253; *see also In re U.S. Foodservice Inc.*, 729 F.3d at 118 ("[F]raud claims based on uniform misrepresentations to all members of a class are appropriate subjects for class certification because, unlike fraud claims in which there are material variations in the misrepresentations made to each class member, uniform misrepresentations create no need for a series of mini-trials.") (internal quotation marks omitted). Here, the Plaintiffs have presented evidence of the following uniform representations: (1) a Hashlet was a fractional interest in physical mining equipment that would generate returns for Hashlet-owners, ECF No. 97 at 13-15, 36-37; ECF No. 96-1 at 58-59, 100-103 (Exhibits A-12, A-19, A-20); (2) Paycoin was backed by a hundred-million-dollar reserve fund to shield early adopters from risk, ECF No 97 at 16-17, 38; ECF No. 96-1 at 118-122, 319-320 (Exhibits A-23, A-35); (3) GAW Miners would maintain a floor price of $20 for Paycoin, ECF No. 97 at 16-17, 38; ECF No. 96-1 at 162-317 (Exhibits A-26 to A-34); and (4) thousands of merchants, including Amazon and Target, agreed to accept Paycoin, ECF No. 97 at 17, 38; ECF No. 96-1 at 118-122, 321-323 (Exhibits A-23, A-36). These

43

representations were made publicly by the Companies and Garza, its CEO, to all prospective purchasers of its products – on the Companies' websites and in statements printed in widely read industry publications like the *Wall Street Journal*. *See, e.g.*, ECF No. 96-1 at 120-21 (Exhibit A-23) (Paycoin website stating that "[w]orldwide online retailers will accept PayCoin™ directly or through third party payment processors" and that it is "backed by a fiat-based reserve of USD"); ECF No. 96-1 at 162 (Exhibit A-26) (post from Garza asking "[w]ant to know how we will offer a $20 floor?" and explaining that "[t]he answer is easy" and GAW Miners "will move the market with [its] buying power"); ECF No. 96-1 at 319-320 (Exhibit A-35) (*Wall Street Journal* article reporting that GAW Miners stated it would back the Paycoin launch "with a store of fiat currency worth around $100 million").

Fraser nonetheless argues that the mix of information presented to investors was individualized, pointing to certain disclaimers in the September 2, 2014 ZenCloud Terms of Service ("TOS") and the December 13, 2014 ZenMiner TOS, and that individual inquiries about whether particular purchasers read and relied on statements in the TOS will be required to determine reliance. ECF No. 107 at 20. The September TOS described Hashlets as "virtual software" as opposed to "physical miners" or "interests in hardware." ECF No. 107 at 20. But even if this disclosure revealed that Hashlets were not interests in specific pieces of hardware, that did not negate the representation that payouts would still be based on actual mining. ECF No. 113 at 13; *see* ECF No. 96-1 at 103 (Exhibit A-20) (ZenMiner website listing electricity costs for Hashlets and thereby indicating that actual mining was taking place); ECF No. 96-1 at 59 (GAWMiners website stating that "Hardware has Evolved" and that "Hashlets are hosted in the most robust mining data center in the world"). In other words, the September TOS failed to

disclose that Hashlets were nothing more than payouts funded by new investors, *i.e.*, that the Companies were operating a Ponzi scheme.

Fraser also points to language in the December ZenMiner TOS stating that Paycoin might "have no value," might "never be completed or released," and the "value of a stake, in Paycoins, from a HashStaker may also be zero." ECF No. 107 at 20-21. This statement is inconsistent with the promise of a $20 floor, but not with the promise that Paycoin was backed by a hundred-million-dollar reserve fund to shield investors from risk or that thousands of merchants, including Amazon and Target, had agreed to accept Paycoin. Thus, even if the December TOS contravened one misrepresentation, it does not defeat a finding of predominance in light of the other misrepresentations. *See Anwar v. Fairfield Greenwich Ltd.*, 306 F.R.D. 134, 145 (S.D.N.Y. 2015) ("[E]ven if some individual plaintiffs . . . stated that they did not receive or read [the misleading statements], this does not preclude class certification, which requires that common issues *predominate* over individual issues" as the court can address any existing individual issues at a later stage.") (internal citations omitted).

Fraser also argues that reliance cannot be established on a class-wide basis because customers had varying degrees of sophistication and engaged in varying due diligence. ECF No. 107 at 18-22. He points out that some customers previously engaged in mining, some never purchased mining hardware or related services, some were teenagers, and others had financial planners. ECF No. 107 at 21. He further notes that some customers conducted online research before making any purchases while others "gambled" on cryptocurrency-related products without doing any research. ECF No. 107 at 22. He argues that these variations are akin to those in *Abu Dhabi Com. Bank v. Morgan Stanley & Co. Inc.*, 269 F.R.D. 252 (S.D.N.Y. 2010), where the court denied class certification because of material differences among investors with regard

to their decision-making processes, due diligence inquiries, and communications with sellers. ECF No. 107 at 19. In *Abu Dhabi*, the ratings assigned to certain Notes were alleged to be false and misleading. 269 F.R.D. at 254. In determining which Notes to purchase, some investors conducted their own independent credit assessments, at least one submitted a due diligence questionnaire that did not inquire about the rating despite including more than 100 questions, another developed its own credit model, and the defendants "prepared no less than fifty-six individualized memoranda to potential . . . investors answering questions and due diligence inquiries." *Id*. at 262-63. The individualized reliance issues presented in *Abu Dhabi* were therefore much greater than those presented in this case. Further, in *Abu Dhabi*, whether investors conducted independent credit assessments went to the heart of the alleged misrepresentation about ratings and the investors' reliance on that misrepresentation; in this case, by contrast, whether customers had experience with cryptocurrency mining or conducted online research would not have helped them debunk, for example, the Companies' representations that major retailers had agreed to accept Paycoin or that the new currency would be backed by a hundred-million-dollar reserve fund. *See Seekamp*, 2012 WL 860364, at *10 (certifying a class even though "each proposed class member may have opted to purchase the ATSD for different reasons" because "it is equally clear that every plaintiff would have relied on the implicit representation of the ATSD's legality and beneficialness in deciding whether to purchase it"); *Bruhl v. Price Waterhousecoopers Intern.*, 257 F.R.D. 684, 697 (S.D. Fla. 2008) ("While various putative class members may have had individualized motivations and investment strategies which figured into their decision either to invest, remain invested or redeem their interests in the Funds, the Court concludes that the alleged fraudulent NAV statements were a material consideration which affected their investment decisions.").

In sum, I find that the core alleged misrepresentations identified by Plaintiffs can be proved through common evidence, and the variations in the information mix and sophistication to which Fraser has pointed are insufficient to defeat a finding of predominance.

>            ii.    *Whether Misrepresentations Were Essential to Purchase Decision*

The Plaintiffs contend that the nature of the Companies' alleged misrepresentations supports an inference of reliance because a reasonable juror could conclude that, absent those misrepresentations, no rational investor would have purchased the Companies' products. This contention finds support in cases in which the Second Circuit and district courts within the Circuit have found that reliance can be shown on a class-wide basis where the nature of the misrepresentations permitted an inference that they were critical to the purchase decision.

In *In Re U.S. Foodservice*, a fraudulent overbilling case, the Second Circuit found that payment of the invoice "may constitute circumstantial proof of reliance based on the reasonable inference that customers who pay the amount specified in an inflated invoice would not have done so absent reliance upon the invoice's implicit representation that the invoiced amount was honestly owed." 729 F.3d at 120. The court thus held that "[f]raud claims of this type may . . . be appropriate for class certification because while each plaintiff must prove reliance, he or she may do so through common evidence (that is, through legitimate inferences based on the nature of the alleged misrepresentations at issue)." *Id.* In *Ge Dandong*, the plaintiffs were permitted to "prove reliance on a class-wide basis through common, circumstantial evidence" because a series of Notes were sold "pursuant to a set of documents . . . that failed to reveal the true nature of the financial arrangement." 2013 WL 5658790, at *2, 10. The court determined that "the alleged misrepresentations and omissions" were "fundamental to the value of the Notes" in part because the "Notes were not the type of product that individuals purchase for any number of reasons;

47

they were financial investments that Plaintiffs made in hopes that they would prove profitable." *Id.* (internal quotation marks and citation omitted). Similarly, in *Anwar*, the court found that common evidence could show reliance where audit reports misrepresented the value of the funds at issue and there was evidence that a rational investor would not invest money in a fund that did not have an audit opinion from a recognized accounting firm. 306 F.R.D. at 144-145.

I agree with the Plaintiffs that here, too, the nature of the alleged misrepresentations permits a common inference of reliance. The Companies' products were financial investments "that Plaintiffs made in hopes that they would prove profitable." *Ge Dandong*, 2013 WL 5658790, at *10. In addition, they were novel financial investments being sold by a start-up company with no established track record. It is thus reasonable to infer that the representations by the Companies that Paycoin would be supported by a hundred-million-dollar reserve fund and that major, established retailers like Amazon and Target had agreed to accept it were critical to any investor's decision to purchase such untested products. That inference is even stronger for the alleged misrepresentation that Hashlets were partial interests in physical mining equipment that would generate corresponding mining returns for Hashlet owners, for that statement allegedly masked the truth that Hashlets were simply payouts funded by new investors. I agree with the Plaintiffs that "no reasonable investor would have purchased [Hashlets] if the Companies disclosed the fact they were being sold as part of a Ponzi scheme." ECF No. 97 at 36. Other courts have similarly recognized class-wide inferences of reliance in Ponzi scheme cases. *Jenson v. Fiserv Tr. Co.*, 256 Fed. Appx. 924, 926 (9th Cir. 2007) (It is "not unreasonable . . . to infer reliance by all members" of a class where the defendant "allegedly communicated to each prospect that investors would get a high rate of return, liquidity, and redemption at maturity from their investments, whereas the truth was that their return, if any, would come from the

contributions of others"); *Torres v. S.G.E. Mgt., L.L.C.*, 838 F.3d 629, 643 (5th Cir. 2016 ) (en banc) ("[I]f the Plaintiffs prove that [a multi-level marketing program] is a fraudulent pyramid scheme, they may use a common inference of reliance to prove proximate causation under RICO. . . . [I]t is reasonable to infer that individuals do not knowingly join pyramid schemes . . . .").

Fraser resists the notion that the representations about Hashlets and Paycoin were "fundamental to their value," arguing that there is evidence that some investors knew that the Companies were perpetrating a fraud and thus that individual inquiries will be needed to ferret out actual reliance. ECF No. 107 at 15. He points to a handful of anonymous posts on online discussion boards, including the following: "I don't care [whether] these hashlets are magical drug addicted unicorns as long as my [Bitcoin] shows in my account," ECF No. 107 at 16; "There are no coins, there are no first round investors, there are no banks, no stores, no nothing. Zilch," ECF No. 107 at 17 n. 22; "I'm also convinced that GAWminers [sic] is a scam but I still invested a lot of bitcoins in hashlets . . . I truly believe this Ponzi is going to last for a while," ECF No. 107 at 16; and "[T]ell the guys at work [GAW] is probably the worlds [sic] biggest PONZI scheme. However whilst it is legal I will keep mining!," ECF No. 107 at 16. To the extent that these posts are offered to prove that the individuals who posted them invested in the Companies' products with the knowledge that the Companies were engaging in fraud, they are inadmissible hearsay. *Novak v. Tucows, Inc.*, 2007 WL 922306, at *5 (E.D.N.Y. Mar. 26, 2007) ("Where postings from internet websites are not statements made by declarants testifying at trial and are offered to prove the truth of the matter asserted, such postings generally constitute hearsay under Fed.R.Evid. 801."), *aff'd*, 330 Fed. Appx. 204 (2d Cir. 2009). To the extent that these posts are offered to prove that others may have seen them and learned about the possibility that the Companies were engaged in fraud, they show little: there is no evidence in the record of

who saw the posts, whether anyone who saw them actually credited them, and whether anyone purchased the products believing the information in the posts to be true.[13] Especially when weighed against representations by the Companies' CEO made through official channels and well-recognized media outlets, this evidence is insufficient to conclude that individualized inquiries will overwhelm the common proof of reliance. *See Seekamp v. It's Huge, Inc.*, 2012 WL 860364, at *10 (N.D.N.Y. Mar. 13, 2012) (certifying a class even though "each proposed class member may have opted to purchase the [product] for different reasons" because "it is equally clear that every plaintiff would have relied on the implicit representation of [its] legality and beneficialness in deciding whether to purchase it"); *Walco Investments, Inc. v. Thenen,* 168 F.R.D. 315, 333-34 (S.D. Fla. 1996) (certifying a class where neither the *Affiliated Ute* nor fraud-on-the-market presumption applied because there was evidence of a "common fraudulent scheme[]" and "a few questions of individual reliance [we]re *not* sufficient, on balance, to negate the predominance of common issues of fact and law") (emphasis in original).

Fraser also cites deposition testimony from Jonah Dorman, who was a GAW Miners customer before becoming a GAW Miners employee, to support his argument that some investors were aware of the truth behind the alleged misrepresentations. ECF No. 107 at 16. He points to Dorman's testimony that, when Dorman was a customer, "everyone knew" that Garza and his Companies were not "technically mining." *Id.* But as the Plaintiffs point out, read in context, the deposition testimony makes clear that Dorman was discussing hardware – not Hashlets. ECF No. 113 at 11.

> A. Everyone knew that [Garza] wasn't technically mining. . . .
> Q. And do you remember -- at this time you were what you described as trolling Mr. Garza. What product was he selling or products?

---

[13] There is evidence that named Plaintiff Shinners saw some of the posts and continued to believe that the Companies were *not* running a Ponzi scheme. *See* ECF No. 107-1 at 107.

A. That would have been when he was originally selling miners. . . .
Q. So he was just selling hardware?
A. Yes.
Q. And what was -- what was he misrepresenting about the hardware?
A. They started hosting the hardware, and when they were hosting the hardware they had the mining pools, and that was when they were not mining to the actual pools. . . .
Q. So hosted mining was you would buy a miner from Mr. Garza's company, GAW, and Mr. Garza's company would -- would host that miner, power the miner, and just provide you with some portion of the returns. . . .
A. Yes. . . .

ECF No. 113-1 at 92-93. In context, Dorman appears to be referring to the period before GAW Miners began selling Hashlets. Before that time, GAW Miners sold physical mining equipment and told customers they could operate that equipment through remote management software on ZenMiner and, later, through a website accessed through ZenCloud; the Companies called this Hardware-Hosted Mining and Cloud-Hosted Mining. ECF No. 57 at ¶¶ 76-81. Although the Plaintiffs initially sought to certify a class including individuals who purchased Hardware-Hosted Mining and Cloud-Hosted Mining, ECF No. 57 at ¶ 160, the motion presently before the Court does not seek to include such individuals in the class, ECF No. 97 at 19, and, in any case, the class certified by the Court does not include them. Dorman's testimony therefore does not undermine the Plaintiffs' arguments that customers relied on the alleged misrepresentations concerning Hashlets and Paycoin or that they can show such reliance through common evidence.

Fraser's final argument in this vein is that some investors purchased the Companies' products *after* Paybase launched, *i.e.*, after "it became . . . clear that Paybase and Paycoin lacked the allegedly promised features," ECF No. 107 at 17. On this point, I agree with Fraser. A class-wide inference of reliance on the alleged misrepresentations about Paycoin would not be reasonable after it became clear that there would not be a $20 floor, a hundred-million-dollar reserve fund, or adoption of Paycoin by any merchants. Once those facts were revealed, it can no longer be said with confidence that an investor would not have purchased Paycoin (or exchanged

Hashpoints for Paycoin) absent the Companies' alleged misrepresentations. But this calls for ending the class period earlier than Plaintiffs have proposed, rather than refusing to certify a class at all. The question is which date to choose as the endpoint, in lieu of the Plaintiffs' proposed endpoint of December 1, 2015.

Counsel represented at the hearing that Paybase launched on either December 31, 2014 or January 1, 2015. ECF No. 137 at 20, 40, 41. At that point, it may have been immediately clear that the representations about merchant adoption were false, but it would not have been immediately clear that there was no reserve fund or that the Companies would not maintain a $20 floor. At the hearing, Plaintiffs' counsel agreed (and Fraser's counsel did not dispute) that, by "the second week, third week" of January the price of Paycoin was consistently trading "well below $20 . . . like in 5 and 6 area" and remained at that low level. ECF No. 137 at 21.[14] In addition, the SEC's investigation of the Companies was announced on January 19, 2015. *See* ECF No. 107-1 at 223-227 (Exhibit A-42). While there were apparently some who purchased after these events, they could not reasonably have done so in primary reliance on the above-mentioned representations about Paycoin. Whatever their idiosyncratic reasons for doing so, proof of reliance as to such persons would be too individualized to satisfy the predominance requirement. For these reasons, I do not adopt the Plaintiffs' proposed class definition, but instead revise it to include only those individuals who purchased the products between August 1,

---

[14] Plaintiffs' counsel mentioned an "Honors Program" during the hearing. ECF No. 137 at 22. He explained that GAW Miners announced this program in early January and that, through the program, GAW Miners promised to honor the $20 Paycoin price. *Id*. at 22-23. Although the Plaintiffs included an exhibit referencing this program, *see* ECF No. 96-1 at 310, 314, this program is not mentioned in the complaint or the briefs. Moreover, at the hearing, Plaintiffs' counsel explained that he did not think the announcement of the program boosted the price of Paycoin. ECF No. 137 at 23-24.

2014 and January 19, 2015. Persons who purchased after that date may still, of course, bring individual claims.

* * *

I conclude that, while no presumption applies, for those who purchased the Companies' products between August 1, 2014, and January 19, 2015, the Plaintiffs may prove reliance through common evidence of the nature of the alleged Ponzi scheme and the alleged representations concerning Hashlets and Paycoin. Common issues will thus predominate with respect to reliance.

### 5) *Loss Causation*

Fraser next argues that individual issues regarding loss causation will predominate, but his argument on this point hinges on his arguments about reliance, which I have largely rejected for the reasons set forth above. *See* ECF No. 107 at 24 ("Where, as here, putative class members may have relied on varied representations at different times and to varying degrees, loss causation cannot be resolved by way of generalized proof."); *id.* at 24-25 ("Thus, individual customer-by-customer inquiries would be required to determine the degree to which each putative class member relied on the alleged misrepresentations (if at all) and the impact of that reliance (if any) on that putative class member's claimed losses.").

In any event, any individual inquiries regarding loss causation do not threaten to predominate over common issues. Plaintiffs can show loss causation by proving that "the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement." *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232-33 (2d Cir. 2014) (internal quotation marks omitted). "A misrepresentation is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk *concealed* by the

misrepresentations." *In re Omnicom Group, Inc. Securities Litig.*, 597 F.3d 501, 513 (2d Cir. 2010) (internal quotation marks and citation omitted). Here, as Plaintiffs argue, it was foreseeable for Hashlets to fail because the Companies lacked the computing power to maintain them. *See* ECF No. 97 at 39-40. Plaintiffs can and do argue, on a class-wide basis, that misrepresenting the computing power behind Hashlets was the proximate cause of the subsequent loss. *See id.* at 40. Similarly, Plaintiffs can establish on a class-wide basis that it was foreseeable for Paycoin to fail because it was not backed by a hundred-million-dollar fund, maintained at $20, or adopted by merchants.

### B. Superiority

The Plaintiffs must establish that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The Second Circuit has emphasized that the superiority analysis is "explicitly comparative in nature." *In Re Petrobras*, 862 F.3d at 268, that is, it calls for a comparison between a class action and "other available methods" of adjudication. In assessing superiority, the court considers "four factors— individual control of litigation, prior actions involving the parties, the desirability of the forum, and manageability." *Sykes v. Mel S. Harris and Associates LLC*, 780 F.3d 70, 82 (2d Cir. 2015). Of these factors, "manageability is, by the far, the most critical concern in determining whether a class action is a superior means of adjudication." *Id.* (internal quotation marks omitted).

Fraser argues that "the number of foreign putative class members weighs against superiority of class adjudication," ECF No. 107 at 38, because the Plaintiffs have not established "that courts in each of the many foreign jurisdictions where customers of the Companies reside would recognize the validity and binding effect of a final determination in a class action in the United States," *id.* at 39. At the April 12, 2019 hearing, Fraser's counsel explained that this

weighs against superiority because foreign members of the proposed class may seek to file suit against Fraser in jurisdictions that decline to recognize or enforce judgments by U.S. courts. ECF No. 137 at 117-119.

Fraser cites three cases in which courts within the Second Circuit excluded some foreign members from the class on account of this concern. In *In re Vivendi Universal*, the plaintiffs moved to certify a class including French, English, German, Austrian, and Dutch shareholders in a securities fraud case against a French corporation. 242 F.R.D. 76 (S.D.N.Y. 2007). After considering expert affidavits concerning foreign laws, the court found that a class action was a superior method of litigation management for the French, English, and Dutch shareholders, but that the plaintiffs fell short of establishing a probability that German and Austrian courts would give res judicata effect to any judgment or settlement issuing from the action. *Id*. at 105 ("Because lawsuits could be brought by Austrian and German nationals against defendants alleging the same wrongdoing that underlies the allegations of this case, the Court concludes that the adjudication of German and Austrian shareholders' claims in this class action is not necessarily superior."). In *In re Alstom SA Sec. Litig*., a group of investors including French, English, Dutch, and Canadian shareholders brought suit against a French LLC, its subsidiaries, and certain officers, for violations of federal securities laws. 253 F.R.D. 266 (S.D.N.Y. 2008). As to the French shareholders, the court determined that the plaintiffs did not sufficiently demonstrate "that French courts would more likely than not recognize and give preclusive effect to any judgment rendered," and excluded them from the class, in part because the corporation's organizational documents vested exclusive jurisdiction in a French court over disputes between shareholders and the corporation. *Id*. at 282-84. Finally, in the third case Fraser cites, *Ansari v. New York Univ.*, the plaintiff sought to certify a class of 35 foreign nationals in a suit against a

university, its college of dentistry, and various officials. 179 F.R.D. 112 (S.D.N.Y. 1998). The

court denied the motion to certify, in part because although all of the proposed class members

were foreign, the parties did not address "what preclusive effect, if any, a Rule 23(b)(3) class

action w[ould] have in the various countries of which the prospective class members are

citizens." *Id*. at 116-17.

The Plaintiffs argue that these three cases are distinguishable, and that this case is more

like *Marsden v. Select Medical Corp*, where the court certified a class including foreign

individuals because the claim was "based on alleged misrepresentations made in the U.S. by an

American company whose shares traded on an American stock exchange." 246 F.R.D. 480, 486

(E.D. Pa. 2007). The *Marsden* court distinguished *In re Vivendi*, and explained that the "mere

fact" that some members of the proposed class "hail[] from another country does not change the

fact that this action falls squarely under the securities laws of the United States." *Id*. It further

explained that "it is far from clear how an Austrian court would even have jurisdiction over a suit

arising from the alleged fraud here." *Id*.  I agree that *Marsden* is a better guide for this case.

This lawsuit is based on alleged misrepresentations by companies that have a principal

place of business in Connecticut and were allegedly controlled by individuals living in the

United States. ECF No. 57 at ¶¶ 18-20. Fraser has not explained how a foreign court would have

personal jurisdiction over him and neither the complaint nor any of the materials in the record

that the parties have pointed to suggest that any of Fraser's conduct described in the complaint

occurred outside the United States or that Fraser has any connection to any non-U.S.

jurisdictions. Fraser does point out that Plaintiff Shinners discussed a Dubai lawsuit during

Garza's sentencing hearing, but that suit, about which the parties have provided little

information, appears to have been brought against Garza, not Fraser. *See* ECF No. 107-1 at 31

("Mr. Garza . . . is in the United States right now because he needed the government to get him out of Dubai after a group of investors . . . tried to sue him in the Dubai court and won."). By itself, the existence of some foreign putative class members does not weigh against superiority as Fraser has not pointed to evidence or legal authority suggesting that any foreign courts would have jurisdiction over him or any other defendants. *See Marsden*, 246 F.R.D. at 486 ("[I]t is far from clear how an Austrian court would even have jurisdiction over a suit arising from the alleged fraud here, and Defendants offer no legal support for their insinuation that it would . . . Such a speculative argument is simply not sufficient to support the exclusion . . . of foreign investors, especially when they are otherwise entitled to sue in U.S. courts."). Fraser has pointed to no authority declining to certify a class on this basis in a case involving class members from inside and outside the United States and defendants whose conduct took place exclusively within the United States. While Plaintiffs bear the burden of establishing each element of Rule 23, they need not rebut objections to class certification that rest on speculative scenarios.

Accordingly, the existence of foreign putative class members does not weigh against the superiority of class adjudication, and the Plaintiffs have satisfied the superiority requirement.

## V.     The Admissibility of Expert Reports

As noted, Fraser has moved to strike the declarations of Plaintiffs' experts Robert Mills and Lou Kerner pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Because the Court did not consider either declaration in reaching a decision on the Plaintiffs' motion to certify, Fraser's motion to strike is DENIED AS MOOT.

## CONCLUSION

For the reasons set forth above, the Plaintiffs' motion for class certification is GRANTED to the extent set forth in this ruling and Fraser's motion to strike the declarations of Plaintiffs' experts is DENIED AS MOOT. As noted above, because the parties have not yet had a chance to comment on the modified class definition, they may, by July 5, 2019, file briefs not exceeding 10 pages in which they address any *new* issues raised by the modified class definition that the Court has not already addressed in this decision.

IT IS SO ORDERED.

/s/  MICHAEL P. SHEA
Michael P. Shea, U.S.D.J.

Dated:        Hartford, Connecticut
              June 21, 2019