# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| DENIS MARC AUDET, ET AL., | Civil Action No. |
| | 3:16-CV-00940-MPS |
| Plaintiffs, | |
| v. | |
| STUART A. FRASER, GAW MINERS, LLC, and ZENMINER, LLC, (d/b/a/ ZEN CLOUD, | December 23, 2019 |
| Defendants. | |

## DEFENDANT STUART A. FRASER'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION TO DECERTIFY THE CLASS AS TO DAMAGES

Daniel H. Weiner (ct12180)
Marc A. Weinstein (*pro hac vice*)
Hannah Miller (*pro hac vice*)
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, NY  10004-1482
Tel.: (212) 837-6000
Fax: (212) 422-4726
Email: daniel.weiner@hugheshubbard.com

David R. Schaefer (ct04334)
Sean M. Fisher (ct23087)
Brenner, Saltzman & Wallman LLP
271 Whitney Avenue
New Haven, CT  06511
Tel.: (203) 772-2600
Fax: (203) 562-2098
Email: sfisher@bswlaw.com

*Attorneys for Defendant Stuart A. Fraser*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................1

BACKGROUND ..........................................................................................................2

1.  Procedural History ..........................................................................................2

2.  Post-Certification Discovery............................................................................3

    a.  Credit Card Chargebacks ......................................................................4

    b.  Third-Party Sales ..................................................................................9

        i.  Reseller Sales ............................................................................9

        ii.  Paycoin Sales ..........................................................................11

        iii.  Paycoin-to-Ion Conversions....................................................12

        iv.  Escrow/Account Sales ..............................................................13

        v.  Sales to Third Parties on the GAW Miners Marketplace .........................13

ARGUMENT ............................................................................................................14

I.  The Court Should Decertify the Class as to Damages Because Determining Offsets Resulting From Chargebacks and Third-Party Sales Will Require Individualized Inquiries. ......................................................................................................16

II.  Post-Certification Discovery Supports Additional Reasons to Decertify the Class as to Damages..................................................................................................20

    A.  Plaintiffs Fail to Identify Any Methodology to Calculate Damages in Connection with Purchases of Hashpoints or Paycoin on a Class-Wide Basis.........................21

    B.  Offsetting Each Class Member's Aggregate Gains Against Losses Across Accounts Requires Individualized Inquiries.......................................................21

    C.  Post-Certification Discovery Casts Further Doubt on the Reliability of the ZenCloud Database and Reveals Discrepancies that Cannot Be Resolved by a Claims Administrator........................................................................................24

CONCLUSION...........................................................................................................26

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Jacob v. Duane Reade, Inc.*, 293 F.R.D. 578 (S.D.N.Y. 2013), *aff'd*, 602 F.
App'x 3 (2d Cir. 2015)..............................................................................................15

*Royal Park Investments SA/NV v. Wells Fargo Bank, N.A.*, No. 14-CV-09764
(KPF) (SN), 2018 WL 739580 (S.D.N.Y. Jan. 10, 2018), *leave to appeal
denied sub nom. Royal Park Investments SA/NA v. Wells Fargo Bank, N.A.*,
No. 18-1293, 2018 WL 5733601 (2d Cir. Aug. 7, 2018) .......................................15

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010) .......................18

*Taylor v. The Hous. Auth. of New Haven*, 267 F.R.D. 36 (D. Conn. 2010), *aff'd
sub nom. Taylor ex rel. Wazyluk v. Hous. Auth. of City of New Haven*, 645
F.3d 152 (2d Cir. 2011)........................................................................................14, 15

*Tomassini v. FCA US LLC*, 326 F.R.D. 375 (N.D.N.Y. 2018), *reconsideration
denied*, No. 314-CV-1226 (MAD) (DEP), 2018 WL 5842995 (N.D.N.Y. Nov.
8, 2018) ..................................................................................................................15

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ..................................................20

**Statutes and Rules**

Rules Enabling Act, 28 U.S.C.A. § 2072.................................................................18, 20

Fed. R. Civ. P. 23....................................................................................14, 15, 18, 20

Fed. R. Civ. P. 38..........................................................................................................18

## PRELIMINARY STATEMENT

Plaintiffs are purchasers of products related to the "mining" of virtual currency.  They allege that former lead defendant Homero Josh Garza ("Garza") and the companies he founded, Defendant GAW Miners, LLC ("GAW Miners") and Defendant ZenMiner, LLC ("ZenMiner," together with GAW Miners, the "Companies"), violated federal and state securities laws and committed common law fraud.  They also assert secondary liability claims against Defendant Stuart A. Fraser ("Fraser"), an investor in the Companies who, Plaintiffs admit, lost approximately $12 million as a result of his investments in Garza's businesses.[1]  Plaintiffs agreed to drop Garza from the complaint in exchange for his cooperation, and the Companies defaulted, leaving Fraser, in his personal capacity, as the sole remaining defendant in what is now a class action.

In certifying a class in this action, the Court permitted Fraser to engage in limited additional discovery to collect more information about the extent to which class members received damages offsets, and whether individualized inquiries would be required to prove damages.  That post-certification discovery confirms that a material number of class members received offsetting income resulting from credit card chargebacks or sales of relevant products to third parties, or both, and that the value received by class members as a result of those transactions cannot be ascertained on a class-wide basis.

Moreover, post-certification discovery reveals that individualized inquiries will be required to properly determine damages (on both an aggregate and individual basis) for at least three additional reasons.  First, Plaintiffs' damages expert now admits that there is no way to calculate damages in connection with purchases of Paycoin or Hashpoints on a class-wide

---

1.   *See* ECF No. 107-1 at Ex. A-2.

basis.  Accordingly, determining class members' purchases of those products—not just offsets—will require individualized inquiries.  Second, post-certification discovery confirms that properly offsetting each class member's individual accounts against each other, as would be required in the event the Court relies on the ZenCloud database to assess damages, will require individualized inquiries.  Third, a comparison of records in the ZenCloud database and investor records submitted by the class member deponents reveals discrepancies between those two data sources, further demonstrating that establishing damages will require individualized inquiries.

For all of these reasons, the Court should decertify the class as to damages.

## BACKGROUND

**1.**    **Procedural History**

On July 8, 2019, the Court certified the following class with respect to both liability and damages:

> All persons or entities who, between August 1, 2014, and January 19, 2015, (1) purchased Hashlets, Hashpoints, HashStakers, or Paycoin from GAW Miners, LLC and/or ZenMiner, LLC; or (2) acquired Hashlets, Hashpoints, HashStakers, or Paycoin from GAW Miners, LLC and/or ZenMiner, LLC, by converting, upgrading, or exchanging other products sold by GAW Miners, LLC and/or ZenMiner, LLC. Excluded from the Class are any defendants, any parent, subsidiary, affiliate, or employee of any defendant, any co-conspirator, and any governmental agency.

(ECF No. 144.)

However, in its Ruling on Class Certification, the Court authorized post-certification discovery related to "chargebacks" and "private transactions," and invited Fraser to seek decertification of the class as to damages if that post-certification discovery revealed "that a material number of proposed class members have had chargebacks or other compensating gains that negate or reduce their losses as a result of transactions with third parties, and that such proof is highly individualized."  (ECF No. 141 at 34.)

2

Specifically, the Court authorized Fraser to issue interrogatories and/or document requests to those 173 purported class members from whom Plaintiff Allen Shinners had previously collected information, and whose losses Shinners had previously verified.  (*See* ECF Nos. 149 & 150; *see also* ECF No. 107-1 at 23 of 604.)  The Court also permitted Fraser to (1) take depositions of up to ten class members with respect to "chargebacks or private transactions" (ECF No. 150), and (2) issue subpoenas to specific third parties that might have relevant information about those subjects (ECF Nos. 157 & 167).

## 2.      Post-Certification Discovery

In accordance with the Court's Order, Fraser issued interrogatories and document requests to the subset of 173 class members to obtain information about chargebacks and transactions with third parties in which they had participated.[2]  Plaintiffs' counsel responded and objected to Fraser's document requests but did not provide any written responses from class members to Fraser's interrogatories.[3]  Plaintiffs subsequently amended their responses and objections to Fraser's interrogatories and produced documents, but still did not provide any written responses from class members to Fraser's interrogatories.[4]

Upon conferring, the parties agreed that Plaintiffs' counsel would convey several specific follow-up questions to the 173 class members to facilitate collection of accurate responses to

---

2.   Ex. 1 (Defendant Stuart A. Fraser's Document Requests to Potential Class Members); Ex. 2 (Defendant Stuart A. Fraser's Interrogatories to Potential Class Members), both dated July 26, 2019.

3.   Ex. 4 (Class Members Responses and Objections to Defendant Stuart A. Fraser's Interrogatories to Plaintiffs); Ex. 3 (Class Members' Objections and Responses to Defendant Stuart A. Fraser's Document Requests to Class Members), both dated August 9, 2019.

4.   Ex. 5 (First Amended Class Members Responses and Objections to Defendant Stuart A. Fraser's Interrogatories to Plaintiffs, dated August 26, 2019).

Fraser's interrogatories.[5]  On December 9, 2019, Plaintiffs' counsel produced 111 unsigned written responses from class members to those follow-up questions (not Fraser's interrogatories).[6]  To date, Fraser has not received signed, written responses to Fraser's interrogatories from any of the 173 class members.[7]

In addition to issuing discovery requests, Fraser took the depositions of seven class members.[8]  Fraser also issued subpoenas to PayPal, Stripe, Visa, Mastercard, Discover, Capital One and Wells Fargo, but none of those third parties produced any documents in response.[9] Meanwhile, the parties engaged in further expert discovery related to damages.

Despite the limited new information Fraser was able to obtain from class members, post-certification discovery confirms that a material number of class members received credit card chargebacks or other compensating gains as a result of transactions with third parties, and that determining offsetting amounts received by class members will require in-depth individualized inquiries.

a.     Credit Card Chargebacks

Fraser's interrogatories and document requests specifically required the 173 class members to provide information about chargebacks.  Interrogatory 4 asked each of those class

---

5.    Declaration of Hannah L. Miller (filed concurrently with this Memorandum of Law) (hereinafter "Miller Decl.") ¶ 2.

6.    *Id.*

7.    *Id.*

8.    Over the course of the post-certification discovery period, Fraser sought the depositions of eleven different class members.  (Fraser requested the deposition of one additional class member after it became clear that one of the original set of class members whose depositions Fraser requested would no longer be eligible to be deposed. *See* note 19, *infra*.)

9.    Miller Decl. at ¶ 3.

members to "[i]dentify every chargeback or refund you received in connection with purchases of Hashlets, Hashpoints, HashStakers or Paycoin that you purchased from the Companies between and including August 1, 2014 and January 19, 2015, including the amount you received and the entity or entities from which you received it."[10]  Document Request 4 asked each of the 173 class members to "produce all Documents, including without limitation credit card statements, concerning all chargebacks or refunds you listed in response to Interrogatory 4."[11]

Plaintiffs objected to Interrogatory 4 "as overbroad, unduly burdensome, and disproportionate to the needs of the case to the extent it purports to require class members to identify 'every' chargeback."[12]  Plaintiffs also objected to that interrogatory "because the information it seeks can be derived from documents the class members already produced and plaintiffs are in the process of collecting."[13]  Plaintiffs objected on those same bases to Document Request 4.[14]  Subject to those objections, Plaintiffs agreed to "take reasonable efforts to obtain information about chargebacks from class members" and directed Fraser to what appeared to be all of the documents that had been provided by each of the 173 class members.[15] Plaintiffs' responses did not answer whether each of the persons to whom Fraser's interrogatories were directed had received any chargebacks or refunds.

---

10  Ex. 2 (Defendant Stuart A. Fraser's Interrogatories to Potential Class Members).

11.  Ex. 1 (Defendant Stuart A. Fraser's Document Requests to Potential Class Members).

12.  Ex. 5 (First Amended Class Members Responses and Objections to Defendant Stuart A. Fraser's Interrogatories to Plaintiffs).

13.  *Id*.

14.  Ex. 3 (Class Members' Objections and Responses to Defendant Stuart A. Fraser's Document Requests to Class Members).

15.  *Id.*; Ex. 5 (First Amended Class Members Responses and Objections to Defendant Stuart A. Fraser's Interrogatories to Plaintiffs).

Despite the lack of complete responses to Fraser's discovery requests, post-certification discovery confirms that many class members received credit card chargebacks.  At least three of the seven class members Fraser deposed following class certification (not including the named Plaintiffs, whom Fraser deposed prior to class certification) admitted to having received chargebacks.[16]  For instance, Teresa Crivello confirmed that she received approximately $100,000 in chargebacks,[17] and class member John Tuberosi admitted that he received chargebacks from all but two of the credit card companies he used to make purchases from the Companies.[18]  Another class member whose deposition Fraser requested (but never took) explained that he received chargebacks that almost completely negated his losses.[19]  As this Court previously noted, two of the three named Plaintiffs (Allen Shinners and Michael Pfeiffer) also admitted to receiving chargebacks.[20]  Other evidence in the record reflects widespread efforts by class members to recover their losses via credit card chargebacks.[21]

---

16.  *See* Ex. 7 (Tuberosi Dep. 44:1–5); Ex. 8 (Crivello Dep. 21:15–24); Ex. 9 (Simpson Dep. 43:18–25, 90:9–21).

17.  Ex. 8 (Crivello Dep. 21:15–24).

18.  Ex. 7 (Tuberosi Dep. 44:1–15).

19.  *See* Miller Decl. ¶ 4; Ex. 11 (emails Re: Michael Koerner); Ex. 83 (Koerner00000001–Koerner00000003) (emails showing that Mr. Koerner disputed credit card charges totaling $4,021.50, and declined to dispute certain other charges related to GAW Miners purchases).  Mr. Koerner requested that he not be deposed in light of the chargebacks he received; Fraser agreed to forego his deposition because his resulting damages fall below the $3,000 damages threshold the Court established for class member deponents.  Miller Decl. ¶ 4.

20.  Ex. 10 (Shinners' Victim Impact Statement (in which Shinners admitted that he recovered all but two of his credit card charges in connection with purchases from the Companies)); Ex. 6 (Pfeiffer Dep. 206:16–207:13).

21.  *See, e.g.*, *id.* (Shinners Victim Impact Statement) ("I started a drive to help many investors recover some of their losses through the credit card charge-back process."); Ex. 12 (April 2015 GAW Legal, Credit and Consumer Protection Rights Thread on Gethashing.com ("Most of the customer service reps are already aware of what is happening with GAW, since there has been a tsunami of recent activity and effort to charge back these transactions.")); *see also, e.g.*, Ex. 13 (GAW00363123 (describing chargebacks received by one class member)); Ex. 14 (GAW00365038 (same)); Ex. 15 (GAW00362419 (same)); Ex. 16 (Excerpt from GAW00361522 (indicating that class members Joshua Preston, Tony Berger, Craig Glaser, Daniel Watkins, and Christopher Montana recovered all of their losses via chargebacks)).

In addition to evidence regarding chargebacks that individuals received after the downfall of the Companies, there is also evidence that some customers of the Companies received chargebacks as a result of fraudulent behavior, which involved making purchases from the Companies, and then seeking and receiving credit card chargebacks for those purchases, despite having permanently withdrawn the proceeds from those purchases.[22]

Post-certification discovery also confirms that determinations as to the amount of money each class member received in chargebacks, if any, will require individualized inquiries.  For example, the Court cannot rely on the failure of class members to identify chargebacks in response to Fraser's written discovery requests, as three of the eleven class members whose depositions Fraser requested admitted to having received chargebacks only at their depositions or when faced with the prospect of a deposition.[23]  They had never previously produced any documents or provided any information related to their chargebacks, despite Fraser's document requests and interrogatories seeking that precise information.[24]

With respect to some of the other class members, conflicting evidence exists as to whether they received chargebacks.  For instance, class members' deposition testimony was often inconsistent with information the same class members provided to Allen Shinners in

---

22. *See, e.g.*, Ex. 17 (E. Capuano Dep. 126:7−127:13) ("we had a lot of issues with that, a lot of, like, credit card fraud, where they would just buy as much as they could, and then by the time the charge-back came it was too late, because they already had the currency or whatever."); Ex. 18 (GAW00674717 ("I froze him when he screwed us with a fraudulent chargeback")); Ex. 19 (GAW00650209 (August 14, 2014 email re: Fraud Alert, listing names to be banned from ordering due to fraud and noting "Shelton Charles keeps ordering and trying to dispute everything."); Ex. 20 (GAW00642242 (October 15, 2014 email re: "Possible CC fraud in Indonesia")); Ex. 21 (GAW00624239 (discussing widespread account sale fraud)).

23. *See* Ex. 7 (Tuberosi Dep. 44:1–5); Ex. 9 (Simpson Dep. 43:21–25; 88:7–12); Ex. 11 (Emails re: Michael Koerner Deposition).

24. *See* Ex. 1 (Defendant Stuart A. Fraser's Document Requests to Potential Class Members); Ex. 2 (Defendant Stuart A. Fraser's Interrogatories to Potential Class Members).

response to his request for damages information from potential class members in 2015.  One class member deponent denied at his deposition having received chargebacks, despite having informed Shinners that he "did reduce chargebacks received" in calculating his losses.[25]  Another class member stated at his deposition that he could not recall whether he received any chargebacks, but admitted having applied for a chargeback, and acknowledged telling Shinners in 2015 he had received refunds or chargebacks.[26]  While class member Teresa Crivello submitted documentation reflecting chargebacks—and admitted at her deposition that she received approximately $100,000 in chargebacks—she answered "no" in response to Shinners' 2015 information request.[27]

Evidence in the record suggests that other class members within the subset of 173 also received chargebacks or refunds, even though they produced no documents related to chargebacks or refunds, and indicated in their responses to written questions that the documents they provided "reflect all of [their] transactions involving GAW Miners" (which were explicitly defined to include chargebacks and refunds).  For instance, a spreadsheet prepared by Plaintiff Shinners using data collected from class members indicates that class member Hilary David Kinckner received $5,000 in refunds and/or chargebacks, and that class member Alexander Lukashevich "was issued a charge-back from Visa for 789.99 on 10_14_2015."[28]  However, neither of those class members produced documents revealing any refunds or chargebacks, nor

---

25.  *See* Ex. 22 (Grimes Dep. 25:16–26:9); Ex. 23 (excerpt GAW00361522).

26.  *See* Ex. 24 (Hughes Dep. 39:25–40:15).

27.  *See* Ex. 8 (Crivello Dep. 26:10–29:4).

28.  Ex. 25 (Excerpt from GAW00361522).

did they indicate that they received any refunds or chargebacks that are not reflected in the documents they produced in answer to Fraser's written questions.[29]

> b.   Third-Party Sales

Post-certification discovery also confirms that a material number of class members received offsetting value as a result of engaging in transactions with third parties, including sales of Hashlets and/or Hashstakers by resellers, sales of Paycoin on third-party exchanges, sales of entire accounts via escrow agents, exchanges of Paycoin for Ion coin, and sales of Hashlets or Hashstakers to third parties on the marketplace establish established by GAW Miners.  Each of the above-listed categories of transactions between purchasers of GAW Miners products and third parties is discussed in greater detail below.

> i.   Reseller Sales

Post-certification discovery confirms that certain class members received offsetting income as a result of sales of GAW Miners products through the Value Added Reseller ("VAR") program, and that the income they received as a result of such sales is not reflected in the ZenCloud database or otherwise ascertainable on a class-wide basis.  Value Added Resellers would buy products from the Companies at a discounted price, and then resell those products to customers and make money on the resales.[30]  Plaintiff Shinners has stated that "large blocks of Hashlets" were "sold through the VAR program."[31]

---

29.  Ex. 26 (Written Response of Alexander Lukashevich); Ex. 27 (Written Response of Hil Kinckner).

30.  Ex. 22 (Grimes Dep. 26:12–16).

31.  Ex. 28.

By way of example, one class member, Ryan Grimes, submitted information to Shinners in 2015 estimating losses of approximately $140,000 from his purchases of Hashlets.[32]  He provided no documentation of or information about any sales, despite Fraser having requested those materials from him.[33]  At his deposition, however, Grimes admitted that he was a reseller, and that his gross sales of Hashlets as a reseller on his own website were higher than his purchases, thereby completely offsetting any losses.[34]  In other words, a class member purported to have significant losses, but in fact the class member had *no losses* in light of his offsetting private sales.  He also testified that he does not have records of all of the Hashlet sales he made on his personal reseller website.[35]  Other class members who admitted being resellers similarly produced no evidence of their resales, despite Fraser's specific requests for that information.[36]

Moreover, there is no comprehensive and reliable list of all resellers, so even determining who was a reseller will require individualized inquiries.  For instance, class member John Tuberosi claimed at his deposition that he was never a reseller.[37]  Yet when class member Lawrence David Hughes was asked at his deposition whether he had ever purchased Hashlets from any reseller, he said he had; when asked which reseller, he identified John Tuberosi.[38]

---

32.  Ex. 22 (Grimes Dep. 25:7–27:2).

33.  *See* Exs. 1 & 2.

34.  Ex. 22 (Grimes Dep. 48:21–51:25).

35.  *Id.* (Grimes Dep. 18:5–19:2).

36.  *See, e.g.*, Miller Decl. ¶ 5; Ex. 1 (Defendant Stuart A. Fraser's Document Requests to Potential Class Members); Ex. 29 (Written Response of Trestin Harper); Ex. 30 (Written Response of Payton Peterson).

37.  Ex. 7 (Tuberosi Dep. 46:5–11).

38.  Ex. 24 (Hughes Dep. 22:10–14).

ii.    <u>Paycoin Sales</u>

Post-certification discovery also confirms that class members sold Paycoin to third parties, sometimes on public exchanges.[39]  Moreover, post-certification discovery reveals that class members may not have access to comprehensive records of their Paycoin sales.  For instance, class member Roman Gorodnev explained that he failed to produce any records relating to his Paycoin sales because "[t]here is no history for Paycoin deals at Bittrex exchange ive used that time . . . ."[40]  Another class member, Alec Kloss, explained that he "recall[ed] moving a large amount to Cryptsy," but that "many records were lost during the website takedown and the Cryptsy Scandal."[41]  Class member Christopher Alan Crane admitted that he "did not save every receipt at the time, and many of the websites I used to purchase, mine, store, or exchange Paycoin are now defunct and documentation is unavailable."[42]  And class member Keith Burrows acknowledged that he "did not take note of any Paycoin trades made" and that he "did not withdraw my funds in time before Cryptsy collapsed & disappeared with whatever funds I had accumulated."[43]  Unsurprisingly, therefore, although class member John Tuberosi testified at his deposition that he sold Paycoin on two exchanges, he did not produce any records in response to Fraser's requests showing sales of Paycoin.[44]  Nonetheless, he falsely answered "yes" in

---

39.  *See, e.g.*, Ex. 31 (Excerpt from GAW00361522 ("I believe I sold off the last of my paycoins and stakers (at a substantial loss) by early February."); Ex. 7 (Tuberosi Dep. 32:23–33:14); Ex. 32 (Expert Rebuttal Report of Bruce Strombom at ¶¶ 44–46).

40.  Ex. 33 (Written Response of Roman Gorodnev) at 1.

41.  Ex. 84 (Written Response of Alec Kloss).

42.  Ex. 85 (Written Response of Christopher Alan Crane).

43.  Ex. 86 (Written Response of Keith Burrows).

44.  Ex. 7 (Tuberosi Dep. 32:23–33:14).

response to Fraser's written question asking whether the documents he had produced reflect all of his GAW Miners transactions, including sales of Paycoin.[45]

iii.   <u>Paycoin-to-Ion Conversions</u>

Post-certification discovery also confirms that a material number of class members exchanged their Paycoin for Ion coin, a cryptocurrency not affiliated with the Companies.  Out of the 111 class members who submitted responses to written questions, twenty-two (19.8%) admitted exchanging their Paycoin for Ion coin,[46]  and another four (3.6%) indicated that they *may* have exchanged Paycoin for Ion coin.[47]  Plaintiff Audet also admitted to having received Ion coin in exchange for Paycoin (and Plaintiff Pfeiffer wrote the co-white paper for Ion coin, but did not indicate whether he exchanged any Paycoin for Ion coin).[48]  Ion coin has traded at a value as high as $8.18 per coin,[49] and many class members reported receiving thousands of Ion coins.[50]

---

45.  Ex. 34 (Written Response of John Tuberosi).

46.  Exs. 35–55; 61 (Written Responses of Simon Black, Martin Ammann, Leonardo Colucci, Pieter Clahsen, Jurgen Daems, Paul David Formosa, Robert Hoppenfeld, Kellen Jalbert, Eric Kraus, Thomas Le, Adam Lemm, Jeff Macfarlane, Tom Mueller, Dag Olsen, James Pass, Tezontl Rosario, David Shepherd, Helmut Siedl, Steve Smith, Alex Tolstykh, Jimmy Vespoli, Florian Winter).

47.  Exs. 30; 56–58 (Written Responses of Payton Peterson, Davis Tyner, Jeremy Schwartz, Ali Hussain).

48.  Ex. 59 (Audet Dep. 141:9–143:13); Ex. 6 (Pfeiffer Dep. 29:24–30:3).

49.  Ex. 60 (Coinmarketcap Screenshot).

50.  *See, e.g.*, Ex. 61 (Written Response of Pieter Clahsen (estimating that he received 12,000 Ion in exchange for his Paycoin)); Ex. 37 (Written Response of Leonardo Colucci (indicating that he received 10,488 Ion in exchange for his Paycoin)); Ex. 48 (Written Response of James Pass (indicating that he received 12,500 Ion in exchange for his Paycoin)); Ex. 47 (Written Response of Dag Olsen (indicating that he received approximately 14,657 Ion in exchange for Paycoin)).

None of the individuals who admit exchanging Paycoin for Ion coin provided any records of their conversions, despite Fraser's specific requests for that information.[51]  One class member, Adam Lemm, conceded that he "did swap Paycoin in exchange for Ion," but had "no record of how much [he] swapped / received."[52]  He further explained that records on the Ionomy.com website (where Ion was traded) had been expunged.[53]

iv.  Escrow/Account Sales

Evidence shows that class members also engaged in peer-to-peer sales of GAW Miners products or whole accounts by exchanging the passwords to their accounts—sometimes using an escrow agent to facilitate such transactions.[54]  For instance, Plaintiff Pfeiffer regularly used an escrow agent to purchase whole accounts.[55]  These account sales are not uniformly reflected in ZenCloud,[56] and class members provided no uniform records of those transactions.

v.  Sales to Third Parties on the GAW Miners Marketplace

Finally, post-certification discovery confirms that a material number of class members received income as a result of selling Hashlets and Hashstakers to third parties on the GAW

---

51.  Miller Decl. ¶ 6.

52.  *See* Ex. 44 (Written Response of Adam Lemm).

53.  *Id.*

54.  *See, e.g.*, Ex. 9 (Simpson Dep. 9:20–10:3); Ex. 62 (GAW00362226 (showing transfer of account via escrow from Martin Ruzek to Dimitrios Anastasakis for $29,000)); Ex. 63 (GAW00361886 (showing negotiations regarding transfer of account from Martin Ruzek to Bart Kant without using escrow)); Ex. 64 (Guillaume Barlier written response); Ex. 65 (GAW00362131 (showing transfer of account via escrow)); Ex. 66 (GAW00362129 (showing transfer of Hashlets via escrow)); Ex. 67 (GAW00364988 (indicating the purchase of 8 accounts via escrow by Ian MacPhee)); Ex. 68 (HashTalk Post by Eric Capuano Re: "Warning About Buying and Selling Accounts"); Ex. 69 (HashTalk Post Re: "Private Marketplace [Official Guide]").

55.  Ex. 70 (GAW00689788–GAW00689792); Ex. 71 (GAW00690778–GAW00690780); Ex. 6 (Pfeiffer Dep. at 107:23–109:15).

56.  ECF No. 107 at Ex. B (Decl. of B. Strombom) ¶¶ 9(iii)(a), 34, 36–39, 45, 59–61, 63.

Miners marketplace (or elsewhere).[57]  Class member Mahendra Phagu testified that "the marketplace was very active . . . ."[58]

Although peer-to-peer sales on GAW Miners marketplace were, in theory, tracked in the ZenCloud database, if the Court were to find that database unreliable (in light of evidence, including employee testimony, that the database is a "huge mess"[59]), there would be no alternative way to assess income received from third-party sales on the GAW Miners marketplace without individualized inquiries.  None of the 173 class members from whom Fraser collected information submitted any investor records documenting those sales apart from excerpts from the ZenCloud database itself,[60] and class members testified they did not have records of those sales aside from data they had exported from ZenCloud in connection with providing information for this lawsuit.[61]

## ARGUMENT

Federal Rule of Civil Procedure 23(c)(1)(C) provides that "[a]n order that grants or denies class certification may be altered or amended before final judgment."  Fed. R. Civ. P. 23(c)(1)(C).  Courts are "required to reassess their class rulings as the case develops." *Taylor v. The Hous. Auth. of New Haven*, 267 F.R.D. 36, 62 (D. Conn. 2010) (internal quotations omitted), *aff'd sub nom. Taylor ex rel. Wazyluk v. Hous. Auth. of City of New Haven*, 645 F.3d

---

57. *See, e.g.*, Ex. 22 (Grimes Dep. 14:18–15:8); Ex. 72 (Phagu Dep. 31:12–32:5); Ex. 73 (GAW00363528); Ex. 74 (GAW00365398); Ex. 75 (GAW00361858); Ex. 76 (9/25/2019 Expert Report of Robert Mills ("ZenCloud included an internal marketplace that allowed ZenCloud users to trade Hashlets with one another.")).  *See also* ECF No. 1-1 (Plaintiffs' Certifications) at 30–53 of 70 listing Plaintiff Pfeiffer's sales), 62–64 of 70 (listing Plaintiff Shinners' sales).

58. Ex. 72 (Phagu Dep. 31:20–21).

59. *See* ECF No. 107 at 26–28; *see also* Section II.C, *infra*.

60. *See, e.g.*, ECF No. 139 at Exs. G & H.

61. *See, e.g.*, Ex. 22 (Grimes Dep. 17:2–5); Ex. 72 (Phagu Dep. 32:17–33:2).

152 (2d Cir. 2011).  Where "factual or legal underpinnings of the plaintiffs' successful class

certification motion are undermined once they are tested [on the merits], a modification of the

order, or perhaps decertification, might then be appropriate." *Id.* (internal quotations omitted).

In particular, decertification as to damages is appropriate where individualized inquiries

predominate with respect to damages.  *See, e.g.*, *Jacob v. Duane Reade, Inc.*, 293 F.R.D. 578,

595 (S.D.N.Y. 2013), *aff'd*, 602 F. App'x 3 (2d Cir. 2015) ("Plaintiffs' class remains certified as

to liability, but is decertified for damages purposes, in light of the need for individualized proof

necessary to determine monies potentially owed each ASM"); *see also* Fed. R. Civ. P. 23(c)(4)

("When appropriate, an action may be brought or maintained as a class action with respect to

particular issues.").

That is the case here.  Post-certification discovery confirms that individual issues of proof

predominate with respect to the damages analysis that will be required in the event Plaintiffs

successfully prove liability.[62]  This is particularly true with respect to damages *offsets*.  As

discussed above, post-certification discovery confirms that a material number of class members

received chargebacks or other compensating gains that negate or reduce their losses, and that

such proof is highly individualized.  Accordingly, the Court should decertify the class as to

damages.[63]

---

62.  Fraser does not concede that common issues predominate as to liability, and reserves the right to appeal the
     Court's decision certifying the class on that issue.

63.  *See Royal Park Investments SA/NV v. Wells Fargo Bank, N.A.*, No. 14-CV-09764 (KPF) (SN), 2018 WL
     739580, at *15 (S.D.N.Y. Jan. 10, 2018) (declining to certify class as to damages (and liability) where "the
     'inputs' needed" to calculate damages using the expert's damages methodology required individualized
     determinations, including assessing how different "certificates were affected by losses to the common mortgage
     loan collateral"), *leave to appeal denied sub nom. Royal Park Investments SA/NA v. Wells Fargo Bank, N.A.*,
     No. 18-1293, 2018 WL 5733601 (2d Cir. Aug. 7, 2018); *Tomassini v. FCA US LLC*, 326 F.R.D. 375, 389
     (N.D.N.Y. 2018) (declining to certify a class as to damages (and liability) in part because "[n]ew car purchasers
     who resold their vehicles would be entitled to different amounts of damages depending on whether they
     replaced some or all of the original valve stems prior to selling their vehicle, and whether any repairs were

15

Moreover, post-certification discovery demonstrates three additional reasons why the Court should decertify the class as to damages.  First, post-certification discovery confirms that there is no way to calculate damages in connection with purchases of Paycoin or Hashpoints on a class-wide basis, even if the Court were to ultimately find the ZenCloud and Paybase databases reliable.  Second, post-certification discovery confirms that, for class members with multiple user accounts, individualized inquiries will be required to properly offset gains and losses across each of those class members' accounts.  Third, post-certification discovery reveals additional discrepancies between investor records and the ZenCloud database that further undermine the reliability of that database.  These issues illustrate how individualized inquiries will be required to prove not only offsets but purchases as well.

## I.     The Court Should Decertify the Class as to Damages Because Determining Offsets Resulting From Chargebacks and Third-Party Sales Will Require Individualized Inquiries.

As discussed above, a material number of class members received offsetting value as a result of chargebacks and/or sales to third parties.  *See* Section 2.a-b, *supra*.  Fifty percent of the class members deposed in this action admitted having received chargebacks, and there is evidence that many other class members did as well.  *See* Section 2,a, *supra*.  Approximately 20% of class members who responded to Fraser's written questions admitted to trading their Paycoin for Ion coin, and others admitting having sold Paycoin on public exchanges.  *See* Section 2.b.ii–iii, *supra*.  Evidence shows that sales of Hashlets, Hashstakers, and whole accounts by resellers and others also resulted in substantial offsetting income, sometimes

---

covered under warranty," damages for used car purchases would "depend on the number of original valve stems on the car at the time of purchase," and "some used car purchasers [may have been] aware of the valve stem issues and negotiated the vehicle's resale price accordingly"), *reconsideration denied*, No. 314-CV-1226 (MAD) (DEP), 2018 WL 5842995 (N.D.N.Y. Nov. 8, 2018).

negating the class member's purchases entirely.  *See* Section 2.b.i, iv–v, *supra*.  Because, as the

Parties agree, calculating damages in connection with each of the claims alleged in this action

requires evaluating value received,[64] the offsetting income resulting from chargebacks and third-

party sales will need to be taken into account to assess the total damages to be awarded to the

class (and the proper allocation of those damages) in the event Plaintiffs prove liability.

However, it will be impossible to determine the income class members received as a

result of those chargebacks and/or third-party sales without in-depth individualized inquiries.  As

discussed above, Fraser's subpoenas to third-party credit card companies and payment

processors yielded no results—let alone any data from which information regarding chargebacks

could be systematically incorporated into a class-wide damages analysis.  And Plaintiffs'

damages expert, Robert Mills, even admitted that determining the value received from

chargebacks and third-party sales would require individual inquiry.[65]

In an attempt to overcome the individualized nature of the inquiries required to prove

these offsets, Mills suggests that the Court require class members to submit information about

chargebacks or other income received from third-party sales as part of the claims administration

process.[66]  However, that suggestion is insufficient for at least two reasons:

First, the purpose of a claims administration process is to determine the proper allocation

of an aggregate damages award among individual claimants, not to evaluate or re-evaluate the

total amount of damages owed to the class as a whole; relegating determinations of damages

---

64.  Ex. 76 (9/25/2019 Expert Report of Robert Mills) ¶¶ 10, 74, 78; ECF No. 107 at 36 of 47.

65.  *See, e.g.*, Ex. 76 (9/25/2019 Expert Report of Robert Mills) ¶ 73; Ex. 77 (12/11/2019 Reply Expert Report of Robert Mills) ¶¶ 20-21; Ex. 78 (12/17/2019 Mills Dep. 131:23-134:11).

66.  *See, e.g.*, Ex. 77 (12/11/2019 Reply Expert Report of Robert Mills) ¶ 21; Ex. 76 (9/25/2019 Expert Report of Robert Mills) ¶ 92.

offsets to a claims administration process would violate the Rules Enabling Act.  The Rules

Enabling Act prevents class actions from "abridg [ing], enlarg[ing] or modify[ing] any

substantive right" that a defendant would have in an individual action.  28 U.S.C.A. § 2072.

Accordingly, an aggregate damages award should reflect the sum of the damages that the

defendant would owe had each of the individual class members brought individual lawsuits.[67]

Yet here, where a material number of class members received income that offsets their damages,

a class-wide damages award that systematically fails to account for that offsetting income would

be grossly inflated by design.  Such an inflated damages award would be entirely due to

proceeding as a class under Rule 23.  Along similar lines, relying on the claims administration

process to uncover any offsets to that inflated class-wide damages award would essentially shift

the burden of proving damages to Fraser, and unfairly limit his right to a jury trial with respect to

damages.  *See* Fed. R. Civ. P. 38.

Second, post-certification discovery confirms that determinations as to the amount of

money each class member received in chargebacks, if any, will require more searching

individualized inquiries than appropriate for a claims administration process, even if that process

could, under other circumstances, be an appropriate mechanism to assess damages offsets.

Moreover, post-certification discovery demonstrates that many class members may not have

access to all of the information required to sufficiently determine their damages offsets.

That several class members admitted to having received chargebacks only when faced

with a deposition, despite never having previously disclosed information about them, suggests

that this is not the type of information that can be reliably solicited in conjunction with a claim

---

67.  *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 408 (2010) (aggregate liability in a
class action is merely the sum of the damages if all class members were to bring individual lawsuits).

form.  Similarly, that several class members denied or could not remember having received

chargebacks or income from other offsetting sales despite evidence in the record that suggests

they did, *see* Section 2.a, *supra*, demonstrates that this is not a straightforward "yes or no"

question.

Furthermore, the lack of available documentation for those offsetting sales means it

would be impossible for an expert or claims administrator to calculate the complete offset to

each class member's losses based on investor records.  Although the Court previously noted that

"proof of purchase may be established by common evidence of (1) confirmatory emails from

GAW Miners; (2) records confirming transfers of Bitcoin from outside exchanges to GAW

Miners; and/or (3) credit card records,"[68] none of those types of investor records pertains to

offsetting income received as a result of sales to third parties.[69]  To the contrary, many class

members admitted having no records of various third-party sales.  *See* Section 2.b, *supra*.

Moreover, class members would have no incentive to expend extra effort to seek out difficult-to-

find information that would ultimately *reduce* their claims.[70]  Therefore, relying on individual

class members to provide information about offsets to their claims resulting from chargebacks or

---

68.  *See* ECF No. 141 at 32.

69.  Those records also do not show income received by class members from GAW Miners as a result of payouts
generated by Hashlets or Hashstakers.  *See* Ex. 76 (9/25/2019 Expert Report of Robert Mills) at Table 6 (total
Hashlet payouts from August 2014 through December 2014 amount to $15,336,090) & Table 8 (total
withdrawals by members of the class from August 2014 through April 2015 amount to over $15 million).

70.  *See* ECF No. 107 at Ex. B (Decl. of B. Strombom) ¶ 54 (describing class members' economic incentive to
selectively disclose information to maximize losses).

private sales that took place five years ago, and about which they may no longer have comprehensive records, raises due process concerns.[71]

Finally, although the Court previously suggested that documents provided in the claims process could be "subject—as needed—to audits, verification procedures, and challenges,"[72] a class member's statement that he or she received no income from chargebacks or third-party sales would be difficult, if not impossible, to effectively audit or challenge,[73] particularly given the lack of available records. *See* Section 2.b, *supra*.

For these reasons, calculating class-wide damages—and in particular offsetting amounts resulting from chargebacks and third-party sales—will require individualized inquiries beyond any that would be appropriate for a claims administrator.

## II.    Post-Certification Discovery Supports Additional Reasons to Decertify the Class as to Damages.

In addition to issues regarding offsetting amounts received from chargebacks and third-party sales, post-certification expert discovery and analysis demonstrate three additional issues that further justify decertifying the class as to damages.  First, post-certification discovery confirms that there is no way to calculate damages in connection with purchases of Paycoin or Hashpoints on a class-wide basis, even if the Court were to ultimately find the ZenCloud or Paybase databases reliable.  Second, post-certification discovery confirms that, for individuals with multiple accounts, individualized inquiries would be required to properly offset gains

---

71.  *Cf.*, *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 367 (2011) (denial of class certification was proper where proving class-wide damages using a "Trial by Formula" mechanism would abridge Wal-Mart's right to litigate its defenses to individual claims, and therefore violate the Rules Enabling Act, which "forbids interpreting Rule 23 to 'abridge, enlarge or modify any substantive right'").

72.  ECF No. 141 at 33.

73.  *See* Ex. 78 (12/17/2019 Mills Dep. 144:24-146:24).

against losses across their accounts.  Third, post-certification discovery reveals further discrepancies between investor records and the ZenCloud database that further undermine the reliability of that database and demonstrate the necessity of individualized inquiries.  Each of these issues is discussed in turn below.

A.     Plaintiffs Fail to Identify Any Methodology to Calculate Damages in Connection with Purchases of Hashpoints or Paycoin on a Class-Wide Basis.

In his September 25, 2019 expert report, Plaintiffs' damages expert Robert Mills admitted that he cannot calculate damages related to purchases of Hashpoints and Paycoin on a class-wide basis.[74]  Although he suggests that investor records could be used to establish purchases and sales of Paycoin and Hashpoints, he provides no examples of investor records—let alone uniform investor records— that contain such information, nor does he indicate any reason to believe that class members possess or have access to such records.[75]  To the contrary, as discussed above, statements by class members suggest that records of Paycoin transactions are frequently unavailable (see Section 2.b, supra).  Accordingly, Plaintiffs fail to demonstrate that they can prove damages in connection with purchases of Paycoin or Hashpoints on a class-wide basis, and in-depth individualized inquiries will be necessary to establish all transactions related to Paycoin and/or Hashpoints.

B.     Offsetting Each Class Member's Aggregate Gains Against Losses Across Accounts Requires Individualized Inquiries.

In his September 25, 2019 expert report, Mills proposed a methodology for calculating class-wide damages.  That methodology involves calculating damages by comparing purchases

---

74.  See Ex. 76 (Mills 9/25/19 Report ("My analysis excludes Hashpoints and Paycoin sold by the Companies to members of the class because I currently am not aware of a methodology that can be used to reliably identify such sales by reference to the databases.")).

75.  Id.

to withdrawals from the Zencloud database on an account-by-account basis,[76] and summing the resulting amounts.  However, in his analysis, he includes only those ZenCloud accounts where losses exceed gains, and excludes all ZenCloud accounts where gains exceed losses.[77]  Using the ZenCloud database, Mills estimates total purchases by members of the class of approximately $21.7 million and total withdrawals by members of the class of approximately $15.4 million.[78]  However, after eliminating ZenCloud accounts with net gains (where withdrawals exceed purchases), Mills' damages calculations include approximately $17.7 million in purchases by members of the class and around $5.4 million in total withdrawals by members of the class during the relevant period.[79]  That means Mills eliminated accounts with a total of approximately $4 million in purchases and approximately $10 million in withdrawals.[80]  In effect, therefore, Mr. Mills eliminated up to $6 million in gains that could theoretically offset class member losses.

Calculating damages on an account-by-account basis, and excluding from the analysis any accounts with net gains, is problematic because it allows a single class member with multiple accounts to recover damages even if that class member ultimately profited from the alleged fraud.[81]  Accordingly, even if the Court were to determine that the ZenCloud database could serve as a reliable source of data for purposes of calculating damages, all of a class member's

---

76. Ex. 76 (9/25/2019 Expert Report of Robert Mills) ¶ 66.

77. *Id.*; *see also* Ex. 32 (Expert Rebuttal Report of Bruce Strombom) ¶ 20; Ex. 78 (12/17/2019 Mills Dep. 123:10–17).

78. Ex. 76 (9/25/2019 Expert Report of Robert Mills) ¶¶ 45, 60.

79. Ex. 32 (Expert Rebuttal Report of Bruce Strombom) ¶¶ 23–34.

80. *Id.*

81. *See* ECF No. 107 at 30; ECF No. 126 at 9.

purchases would need to be netted against all of that class member's gains to determine that class member's damages (and therefore aggregate damage).[82]

However, properly offsetting each class member's gains against his or her losses requires identifying and tracing ownership of all the accounts ever held by each class member—a process that would necessarily require individualized inquiries, since the ZenCloud database lacks adequate identifying information.[83]

Moreover, requiring class members to list all of their accounts on a claim form is an insufficient way to ascertain all accounts held by any given class member. As with other offsetting information, class members might not be inclined to list the accounts from which they profited, and there would be no way to verify or audit class member responses. For instance, when submitting information to Plaintiff Shinners, Plaintiff Pfeiffer listed at least ten accounts that he controlled.[84] Yet an analysis of the ZenCloud database reveals several additional accounts that appear attributable to him.[85] Accordingly, properly determining which accounts should offset which other accounts will require probing, individualized inquiries.[86]

---

82. *See* ECF No. 126 at 9.

83. *See* Ex. 32 (Expert Rebuttal Report of Bruce Strombom) ¶¶ 25-28; *see also* Ex. 78 (12/17/2019 Mills Dep. 127:4–128:5).

84. Ex. 79 (Pfeiffer Oct. 11, 2015 Letter of Authorization for the Release of ZenCloud and Paybase Account Details).

85. ECF No. 107-2 (Decl. of B. Strombom) ¶ 56, Ex. B-9 (identifying additional, unreported accounts held by Pfeiffer, according to the ZenCloud and Paybase databases).

86. Along similar lines, excluding employees from any class-wide damages analysis would require individualized inquiries. Although Mills proposed a methodology for excluding employees on a class-wide basis, that methodology does not reliably exclude all employee accounts. *See* Ex. 78 (12/17/2019 Mills Dep. 113:10–117:18).

C.  Post-Certification Discovery Casts Further Doubt on the Reliability of the
ZenCloud Database and Reveals Discrepancies that Cannot Be Resolved by a
Claims Administrator.

Finally, post-certification discovery casts further doubt on the reliability of the ZenCloud

database.  Several employees (including Madeline Eden, who provided the database to Plaintiffs'

counsel via Adam Matlack) previously testified that the database is unreliable for various

reasons,[87] and Fraser previously demonstrated that the ZenCloud database is an unreliable source

from which to calculate damages.[88]

Comparison of the ZenCloud transaction histories and investor records of the seven class

members Fraser deposed following class certification reveals multiple discrepancies between the

deponents' documents and the ZenCloud database, further illustrating the need for individualized

inquiries to determine damages.[89]  For instance, John Tuberosi provided an email confirmation

for order number 57978 on October 27, 2014 reporting payments totaling $20,051.90 for his

Hashlet Prime purchases.[90]  However, that same order in ZenCloud reports payments totaling

$21,078.90, which is more than $1,000 greater than what his email confirmation indicates.[91]

Plaintiffs' damages expert could not explain that discrepancy at his deposition.[92]  Similarly,

Daniel Simpson submitted two email confirmations dated August 20, 2014 and September 20,

_____

87.  *Id.*

88.  *See* ECF No. 107 at 26–28 of 47.

89.  *See* Ex. 32 (Expert Rebuttal Report of Bruce Strombom) ¶¶ 12–14.

90.  Ex. 80 (GAW00362923).

91.  *See* Ex. 78 (12/17/2019 Mills Dep. 56:24–58:14).

92.  *Id*.

2014 showing purchases totaling $1,639.94,[93] but there are no corresponding orders found in the ZenCloud database.[94]  Although these are just examples based on a limited review of select ZenCloud histories and investor records, these inconsistencies lend credence to the employees' deposition testimony regarding the state of the ZenCloud data, and demonstrate that individualized inquiries will be required to resolve discrepancies between various data sources.

Although the Court previously suggested that damages could be calculated based on investor records instead of or in addition to relying on the ZenCloud database, the records the Court identified do not contain any information about any offsets, including payouts and sales that may have been captured in ZenCloud.[95]  Moreover, to the extent discrepancies between investor records and ZenCloud data exist, it is not clear which data source a claims administrator would rely on.  Accordingly, individualized inquiries would be required to establish both purchases and any offsetting income.

---

93. Exs. 81 & 82 (Simpson00000134 & Simpson00000137).

94. *See* Ex. 32 (Expert Rebuttal Report of Bruce Strombom) at ¶ 13.

95. They also do not definitively demonstrate purchases.  As Fraser previously noted, the "confirmatory emails from GAW Miners" do not necessarily correspond with actual purchases of Hashlets, Hashpoints, Hashstakers or Paycoins, because customers could receive a confirmation email from GAW Miners before they completed a purchase if they selected the "pay with Bitcoin" option on the GAW Miners website.  *See* ECF No. 139 at Exhibits K & L.  This was a known glitch in the system, and HashTalk forum moderators specifically discussed the fact that a confirmation email should not be treated "as if its [sic] a receipt" of a purchase.  *See* ECF No. 139 at Exhibit M.  Similarly, records showing the transfer of Bitcoin from outside exchanges to ZenCloud do not definitively demonstrate purchases.  Instead, they merely demonstrate that a customer had "funded" his or her ZenCloud account, just as one funds a brokerage account without having made a purchase.  *See, e.g.*, ECF No. 140-10 (Declaration of Allen Shinners Re: Plaintiffs' Supplemental Brief Re: Class Member Identification and Damages) at ¶ 3; ECF No. 140-7 (Exhibit 8 to Plaintiffs' Supplemental Brief Re: Class Member Identification and Damages).

## **CONCLUSION**

For the foregoing reasons, Fraser respectfully requests that the Court decertify the class as to damages.

Dated:  December 23, 2019

HUGHES HUBBARD & REED LLP

By:  /s/*Daniel H. Weiner*

Daniel H. Weiner (ct12180)
Marc A. Weinstein (*pro hac vice*)
Hannah Miller (*pro hac vice*)
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, NY  10004-1482
Tel.: (212) 837-6000
Fax: (212) 422-4726
Email: daniel.weiner@hugheshubbard.com

David R. Schaefer (ct04334)
Sean M. Fisher (ct23087)
Brenner, Saltzman & Wallman LLP
271 Whitney Avenue
New Haven, CT  06511
Tel.: (203) 772-2600
Fax: (203) 562-2098
Email: sfisher@bswlaw.com

*Attorneys for Defendant Stuart A. Fraser*