UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| DENIS MARC AUDET, MICHAEL PFEIFFER, DEAN ALLEN SHINNERS, and JASON VARGAS, Individually and on Behalf of All Others Similarly Situated,<br><br>                    Plaintiffs,<br><br>        vs.<br><br>STUART A. FRASER, GAW MINERS, LLC, and ZENMINER, LLC, (d/b/a ZEN CLOUD),<br><br>                    Defendants. | Case 3:16-cv-00940<br><br>Hon. Michael P. Shea<br>Courtroom 2<br><br>ECF Case<br><br><u>CLASS ACTION</u><br><br>January 22, 2020<br><br>PLAINTIFFS' OPPOSITION TO FRASER'S MOTION TO DECERTIFY THE CLASS AS TO DAMAGES |

<u>Table of Contents</u>

Table of Contents ................................................................................................................. i

Table of Authorities ........................................................................................................... iii

I.     Introduction ............................................................................................................. 1

II.    Procedural Background ............................................................................................ 2

III.   Counterstatement of Facts ....................................................................................... 4

       A.     Chargebacks ................................................................................................. 4

       B.     Sales ............................................................................................................. 9

              1.     Reseller Transactions ........................................................................ 9

              2.     Paycoin Sales .................................................................................. 11

              3.     Sales of Entire Accounts ................................................................. 13

              4.     Sales on the GAW Miners Marketplace .......................................... 14

       C.     Ion Conversion ........................................................................................... 14

IV.    Argument ............................................................................................................... 16

       A.     Nothing revealed in post-certification discovery undermines the
              Court's earlier conclusions about predominance and manageability. ................. 16

              1.     Fraser fails to show that a "material" number of class members
                     received chargebacks or compensating value, despite plenty of
                     opportunities to do so. ..................................................................... 16

              2.     Proof of offsetting value or compensating gains is not "highly
                     individualized." ............................................................................... 18

              3.     Fraser's concerns about the adequacy and manageability of the
                     claims administration process are speculative and easily
                     resolved. .......................................................................................... 19

              4.     Determining offsets during the claims administration process
                     will not violate Fraser's right to due process or the Rules
                     Enabling Act. ................................................................................... 22

       B.     A number of common damages issues predominate over individual
              issues and make class-wide trial of damages superior. ........................................ 23

C.    Fraser's miscellaneous other arguments do not counsel decertification as to damages. .........................................................................................24

    1.    Plaintiffs identify a methodology to calculate damages in connection with Hashpoints and Paycoin. .................................24

    2.    Offsetting for class members with multiple accounts, if warranted, can be handled through the claims administration process.........................................................................................26

    3.    If necessary, plaintiffs' expert can provide a methodology for addressing offsetting gains for individuals with multiple accounts........................................................................................27

    4.    Fraser's arguments relating to the ZenCloud database are no reason to decertify the class as to damages.................................28

V.    Conclusion ........................................................................................30

Table of Authorities

Page(s)

<u>Cases</u>

*Acticon AG v. China N. E. Petroleum Holdings Ltd.*,
  692 F.3d 34 (2d Cir. 2012)..................................................................21

*Allapattah Servs., Inc. v. Exxon Corp.*,
  157 F. Supp. 2d 1291 (S.D. Fla. 2001) ...............................................22

*Argent Classic Convertible Arbitrage Fund L.P. v. Rite Aid Corp.*,
  315 F. Supp. 2d 666 (E.D. Pa. 2004) ..................................................27

*Beaton v. SpeedyPC Software*,
  907 F.3d 1018 (7th Cir. 2018) ............................................................22

*Beaton v. SpeedyPC Software*,
  No. 13-CV-08389, 2017 WL 4740628 (N.D. Ill. Oct. 19, 2017) ...........20

*Brown v. Pro Football, Inc.*,
  146 F.R.D. 1 (D.D.C. 1992)..........................................................24, 30

*Gordon v. Sonar Capital Mgmt. LLC*,
  92 F. Supp. 3d 193 (S.D.N.Y. 2015).....................................................27

*Harris v. Am. Inv. Co.*,
  523 F.2d 220 (8th Cir.1975) ................................................................21

*Hurt v. Commerce Energy, Inc.*,
  No. 1:12-CV-00758, 2013 WL 4427255 (N.D. Ohio Aug. 15, 2013)....18

*Hurt v. Commerce Energy, Inc.*,
  No. 1:12-CV-00758, 2015 WL 1298674 (N.D. Ohio Mar. 23, 2015)............17, 27

*In re Cigna Corp. Sec. Litig.*,
  459 F. Supp. 2d 338 (E.D. Pa. 2006) ..................................................27

*In re IPO Secs. Litig.*,
  471 F.3d 24 (2d Cir. 2006)...................................................................19

*In re NASDAQ Market-Makers Antitrust Litig.*,
  169 F.R.D. 493 (S.D.N.Y. 1996) ...............................................19, 21, 22

*In re Visa Check/MasterMoney Antitrust Litig.*,
  280 F.3d 124 (2d Cir. 2001)..................................................................19

*In re Vivendi Universal, S.A. Sec. Litig.*,
   123 F. Supp. 3d 424 (S.D.N.Y. 2015).....................................................................19

*In re Vivendi Universal, S.A. Sec. Litig.*,
   284 F.R.D. 144 (S.D.N.Y. 2012) ...............................................................20, 22, 26

*In re WorldCom, Inc. Sec. Litig.*,
   No. 02 CIV. 3288DLC, 2005 WL 491397 (S.D.N.Y. Mar. 3, 2005) ....................22

*Mullins v. Direct Digital, LLC*,
   795 F.3d 654 (7th Cir. 2015) .............................................................19, 20, 21, 22

*Roach v. T.L. Cannon Corp.*,
   778 F.3d 401 (2d Cir. 2015)...................................................................................2

*Taylor v. The Hous. Auth. of New Haven*,
   267 F.R.D. 36 (D. Conn. 2010)............................................................................30

*United States v. City of New York*,
   276 F.R.D. 22 (E.D.N.Y. 2011)............................................................................24

*Waggoner v. Barclays PLC*,
   875 F.3d 79 (2d Cir. 2017)...................................................................................24

Statutes

28 U.S.C. § 1746..................................................................................................21

Rules

Fed. R. Civ. P. 23(b)(3).................................................................................19, 24

Other Authorities

Manual for Complex Litigation § 21.661 (4th Ed., 2019 update) .................................21

Newberg on Class Actions 12:2.............................................................................21

Schroeder & Moody, *Credit Card Fraud Losses: A Case Study on Credit Card
   Chargebacks*, 3 Fid. L. Ass'n. J. 23 (1997) ...............................................................4

I.        Introduction

In certifying this class, the Court granted Stuart Fraser the right to take broad discovery about whether (a) "a material number" of class members have received chargebacks or other compensating gains from transactions with third parties; and if so, (b) whether such proof is "highly individualized":

> The Court will permit Fraser to take post-certification discovery related to chargebacks or private transactions from class members. If that discovery shows that a material number of proposed class members have had chargebacks or other compensating gains that negate or reduce their losses as a result of transactions with third parties, and that such proof is highly individualized, Fraser can file a motion to decertify the class as to damages.[1]

Now, after extensive post-certification discovery, the answer to both questions is "no." If accurate, Fraser has identified a handful of class members who he claims present complex, individual issues regarding the computation of damages based on his arguments about chargebacks, offsets, or gains that will reduce their damages. Of those, two are named plaintiffs as to whom Fraser made the same arguments that were rejected by the Court when it certified the class. No new information has been provided about them that wasn't previously before the Court. The remaining class members were selected by Fraser from the 173 investors whose documents in large part were produced to Fraser long ago, before class certification briefing. They are thus a fraction of those investors and an immaterial slice of the thousands of other class members.

But even as to that handful of investors, and assuming that Fraser is right about the legal questions regarding offsets—which plaintiffs do not concede—the calculation of their individual damages isn't any more complicated than is usually the case in a class action. It's a simple matter to ask a class member to state on a claim form all of her transactions in the securities the Court deems relevant and then offset the gains against the losses. The determination of what

---

[1] Dkt. 141 at 34.

transactions are relevant for this purpose—along with myriad other damages questions in this case—will be a common issue. Each class member, of course, will have suffered a different loss. But as the Court has already recognized, the fact that "damages may have to be ascertained on an individual basis is not sufficient to defeat class certification."[2]

Fraser's other arguments are meritless. He incorrectly claims that plaintiffs have not identified a methodology for calculating damages from purchases of Hashpoints or Paycoin; he is wrong. Fraser points to class members with multiple accounts as an insuperable obstacle, but they're nothing of the sort; there are straightforward ways to identify multiple account holders and to offset gains and losses. And puzzlingly, he raises arguments about the ZenCloud database, which was never the basis for certifying the class as to damages in the first place, and which raises another *class-wide* issue that is clearly better adjudicated in a one proceeding rather than over and over in countless mini-trials. Further, even if ZenCloud ultimately proves to be unreliable, there are alternate records and methods available to establish damages.

Fraser's motion is little more than a rehash of arguments he raised or could have raised earlier. In any event, they have no merit. For that reason, the Court should deny the motion.

## II.   Procedural Background

The Court granted plaintiffs' motion for class certification on June 21, 2019. The Court's order provided that:

> The Court will permit Fraser to take post-certification discovery related to chargebacks or private transactions from class members. If that discovery shows that a material number of proposed class members have had chargebacks or other compensating gains that negate or reduce their losses as a result of transactions with third parties, and that such proof is highly individualized, Fraser can file a motion to decertify the class as to damages.[3]

---

[2] Dkt. 141 at 33 (quoting *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015)).
[3] Dkt. 141 at 34.

The Court allowed Fraser to issue document requests and interrogatories and to take the depositions of ten absent class members.[4]

Although the Court allowed Fraser to serve written discovery on any potential class members,[5] Fraser directed his document requests and interrogatories to only the 173[6] class members who had provided Plaintiff Allen Shinners documentation of their losses prior to the filing of this lawsuit.[7] Plaintiffs' counsel also produced any other documents he had solicited and received relating to absent class members' claims.[8] After several meet-and-confers about plaintiffs' responses to Fraser's interrogatories, the parties agreed on four questions.[9] Until his opening brief, Fraser had not raised any issues with the 111 written responses to those questions that plaintiffs have produced or with the documents the absent class members provided.[10]

Fraser also took the depositions of seven absent class members.[11] Fraser requested the depositions of several other class members who indicated they were willing to sit for a deposition, but had limited availability due to work and family commitments.[12] Plaintiffs suggested that Fraser identify alternative class members, but Fraser never did so.[13] The parties agreed that one other class member would answer written questions, but Fraser never sent any.[14]

---

[4] Dkt. 150.
[5] Dkt. 157 ("discovery about chargebacks and private transactions shall not be limited to the 173 individuals who submitted records to Plaintiff Shinners").
[6] Throughout this opposition, plaintiffs refer to these individuals as the 173 class members. However, plaintiffs only attempted to obtain documents and interrogatory responses from 171 individuals. Two individuals who initially provided records to Mr. Shinners are Named Plaintiffs Michael Pfeiffer and Marc Audet. Unfortunately, a third individual who provided records to Mr. Shinners is now deceased.
[7] *See* Dkt. 179-2, X-1 (Fraser's Document Requests to Potential Class Members); Dkt. 179-2, X-2 (Fraser's Interrogatories to Potential Class Members). In an effort to reduce the size of this filing, plaintiffs have cited to exhibits attached to Fraser's motion to decertify when possible.
[8] Declaration of Colin M. Watterson ("Watterson Decl.") at ¶ 3.
[9] Watterson Decl. at ¶ 4.
[10] Watterson Decl. at ¶ 4.
[11] Watterson Decl. at ¶ 5.
[12] Watterson Decl. at ¶ 5.
[13] Watterson Decl. at ¶ 5.
[14] Watterson Decl. at ¶ 6.

### III.   Counterstatement of Facts

Plaintiffs include the following counterstatement of facts to correct Fraser's mischaracterizations of the evidence, much of which is not even relevant to this motion, but all of which is set forth in Fraser's opening brief.

### A.   Chargebacks

A credit-card chargeback is a reversal of a charge on a consumer's credit card. Typically, a merchant who wants to accept credit cards from its customers enters into a credit card agreement with a bank. *See* Schroeder & Moody, *Credit Card Fraud Losses: A Case Study on Credit Card Chargebacks*, 3 Fid. L. Ass'n. J. 23, 25-26 (1997). The agreement will typically require the bank to credit the merchant's account for credit card receipts, less fees and reserves for chargebacks. *Id.* at 26. The bank will be part of a bank card system (*e.g.*, VISA), which provides rules for credit card transactions. *Id.* These rules allow credit card holders to obtain a chargeback in circumstances such as fraud. *Id.* at 26-27.

Fraser argues that a material number of class members received chargebacks that potentially offset their losses. Not true. Fraser points to evidence that ten class members—Allen Shinners, Michael Pfeiffer, Teresa Crivello, John Tuberosi, Ian MacPhee, Michael Koerner, Kellen Jalbert, John Jallade, Daniel Simpson, and Alexander Lukashevich—received chargebacks that might partially offset their losses. Ten out of thousands of class members is hardly a material number. Other evidence in Fraser's possession suggests around 40 class members received chargebacks or refunds of some sort—still immaterial in a class of thousands—but Fraser does not mention it, perhaps because it represents a small fraction of the nearly 500 people on that list.[15] In that vein, Fraser argues that three of the seven class members he deposed received chargebacks. The fact that three individuals from a small group of

---

[15] X-1 [GAW00361522].

4

individuals *chosen by Fraser* says nothing about whether a material portion of the class received chargebacks. It is safe to assume Fraser did not choose this group at random. For example, Fraser cites Michael Koerner as an example of a class member he asked to depose but did not because he "received chargebacks that almost completely negated his losses."[16] In reality, Mr. Koerner indicated to Allen Shinners that he received approximately $3,200 in chargebacks on a loss of approximately $7,000, and this documentation was produced in discovery.[17] Fraser was aware of that fact when he asked to depose Mr. Koerner.

Fraser also says that there is "conflicting evidence" about whether certain individuals received chargebacks. Wrong. Fraser's primary example is absent class member Teresa Crivello. Ms. Crivello unequivocally testified that she received almost $100,000 in chargebacks and provided documentation of the chargebacks.[18] She further testified that a spreadsheet prepared by Allen Shinners which indicated she received no refunds was inaccurate.[19] That is consistent evidence, not conflicting testimony. And the fact that she corrected the error on Mr. Shinners' spreadsheet—an error that may have increased her claim substantially—demonstrates the reliability of class members' testimony as well as the consistency of the evidence relating to her claim.

Fraser also argues that absent class member Ryan Grimes contradicted himself because at his deposition Mr. Grimes testified he did not receive any chargebacks, whereas he previously told Mr. Shinners that his estimated losses "[d]id reduce charge-backs received in this number."[20] When asked about his comment to Mr. Shinners at his deposition, Mr. Grimes

---

[16] Dkt. 179-1 at 6.
[17] X-1 [GAW00361522].
[18] X-2 (Crivello Depo. Tr.) at 21:15-24; X-3 [Crivello00000125]
[19] X-2 (Crivello Depo. Tr.) at 27:7-28:25. Crivello also pointed out to Fraser's counsel that the word "refund" was confusing because she received *chargeback* from her credit card companies, not a *refund* from GAW Miners.
[20] Dkt. 179-1 at 8 & n.25.

reiterated that he did not receive any chargebacks.[21] Mr. Grimes—who was a reseller—went on to explain that his estimated losses included chargebacks he incurred from *his own customers*.[22] That explanation—in conjunction with the fact that Mr. Grimes submitted documentation of his own customers' chargebacks[23]—explains Mr. Grimes' comment to Allen Shinners: his estimated losses included the chargebacks Mr. Grimes received from his own customers. There was no contradiction.

Finally, Fraser identifies two class members who he claims indicated to Allen Shinners that the class members received refunds, but who Fraser claims did not provide documentation of chargebacks or indicate on their interrogatory responses that they received chargebacks. Fraser's claim is false as to Hilary Kinckner. Mr. Kinckner provided a bank statement that shows he received approximately $4,500 in credits from GAW Miners for hardware he returned.[24] After reading Fraser's motion (because Fraser never raised the issue earlier during post-certification discovery), counsel for plaintiffs confirmed with Mr. Kinckner that his reference to a $5,000 refund referred to those two credits, not to any chargebacks.[25] And it is true that Alexander Lukashevich, the second of the absent class members with an alleged "refund," did not provide independent documentation of the $789.99 payment that he disclosed to Mr. Shinners. Counsel for plaintiffs confirmed with Mr. Lukashevich that he lacked documentation showing the refund, but that he indeed received the chargeback.[26] That is hardly anything sinister. The fact that Mr. Lukashevich disclosed this information to Mr. Shinners is simply evidence that class members can and will voluntarily disclose chargebacks when asked about their losses.

---

[21] X-4 (Grimes Depo. Tr.) at 25:24-26:9.
[22] X-4 (Grimes Depo. Tr.) at 27:3-7 (testifying that in order to estimate his loss, "we had totaled up what we had bought and totaled up what we had charged back to us *from our clients*"); 27:17-23.
[23] X-5 [Grimes00000003]; X-6 [Grimes00000006]; X-7 [Grimes00000014]; X-43 [Grimes00000027].
[24] X-8 [GAW00362383].
[25] Watterson Decl. at ¶ 7.
[26] Watterson Decl. at ¶ 8.

Despite this evidence, and without a hint of irony, Fraser insinuates that class members are liars and cheats and the Court cannot trust them to disclose their chargebacks.[27] Fraser's claim is entirely false. The relatively small number of class members who did receive chargebacks have voluntarily disclosed that fact. Starting in April 2015, class representative Allen Shinners began an online effort to inform other victims of GAW Miners about how to obtain chargebacks from their credit-card companies.[28] At the same time, Mr. Shinners also began to discuss a possible class action lawsuit against GAW Miners with other victims.[29] As a part of that effort, Mr. Shinners collected information about class members' potential losses and created a website called Gawsuit.com that allowed victims of GAW Miners' fraud to provide information and upload documents to substantiate their losses.[30] Plaintiffs produced this information to Fraser more than a year ago during the initial discovery period in this case.[31]

A number of victims informed Mr. Shinners that they received "refunds" related to GAW Miners. Based on information Mr. Shinners collected, approximately 40 victims out of 490 indicated that they received a refund or chargeback related to their GAW Miners purchases.[32] A few other individuals indicated they were in the process of trying to receive chargebacks.[33] Others indicated that they attempted to receive chargebacks, but were unsuccessful.[34] Some victims also provided Mr. Shinners with correspondence with their credit card companies[35] or

---

[27] Dkt. 179-1 at 7.

[28] *See* Dkt. 179-2, X-12 (thread from GetHashing forum describing procedures for receiving chargebacks).

[29] *See* Dkt. 140-10 at ¶ 4.

[30] Dkt. 140-10 at ¶ 5; X-1 [GAW00361522].

[31] Watterson Decl. at ¶ 9.

[32] X-1 [GAW00361522].

[33] For example, class member Jeff Macfarlane indicated that he was "in the process of trying to receive a portion of my losses if MasterCard will allow chargebacks." X-1 [GAW00361522]. Ted Dowding indicated that he had "lost a tremendous amount of money and have been challenging with my CC companies." X-1 [GAW00361522].

[34] For example, class member Jeff Naatz wrote that he "filed charge back recently but not approved . . . one (visa) denied." X-1 [GAW00361522].

[35] X-3 [Crivello00000125] (pp. 1-3); X-9 [GAW00365049]; X-10 [Tuberosi00000107] (correspondence denying chargeback).

credit card statements showing refunds or credits they received for chargebacks.[36] This documentation takes precisely the uniform format that the Court already said could be used for verification during the claims administration process.

Exhibit 16 to Fraser's motion is even more telling.[37] This document identifies five individuals who told Mr. Shinners they recovered *all* their losses through chargebacks. If these individuals were willing to provide this information voluntarily to Mr. Shinners, they will provide the same information on a claim form.

Fraser says that Ms. Crivello, Mr. Simpson, and Mr. Koerner are dishonest because they did not disclose their chargebacks prior to facing a deposition. Therefore, Fraser says the Court cannot "rely on the failure of class members to identify chargebacks in response to Fraser's written discovery requests" as evidence that these individuals lacked chargebacks. That argument makes no sense. Putting aside the fact that Fraser already knew or should have known Mr. Koerner received chargebacks, the simple fact of the matter is that Fraser has zero evidence that these three individuals did anything dishonest. Rather, when asked whether they received chargebacks, they honestly disclosed that fact.

The Court should reject out of hand Fraser's insinuation that he somehow received deficient discovery responses from the class members. As Fraser notes, plaintiffs objected to Fraser's discovery requests. The parties met and conferred several times, and ultimately reached a compromise and agreement on the precise language of four written question that plaintiffs would send to the absent class members.[38] Plaintiffs produced the documents and interrogatory responses they received.[39] If counsel for Fraser believed those responses were deficient, they

---

[36] X-3 [Crivello00000125] (pp. 4-5); X-11 [GAW01075691]; X-8 [GAW00362383].
[37] Dkt. 179-2, X-16.
[38] Watterson Decl. at ¶ 4.
[39] Watterson Decl. at ¶¶ 3-4.

should have pressed that issue through a meet-and-confer and, if needed, by filing a motion to compel. They never did. Counsel for plaintiffs also told counsel for Fraser they were willing to direct specific questions to individual class members. Fraser never took plaintiffs' counsel up on that offer.[40]

B.   Sales

Fraser argues that discovery shows a material number of class members entered into four different types of offsetting sale transactions. Fraser's claims are inaccurate and misleading.

1.   Reseller Transactions

First, Fraser emphasizes that some class members received income from selling GAW Miners products as resellers. It is true that a relatively small number of individuals worked with GAW Miners as resellers. A reseller would pay GAW Miners a predetermined, discounted price for securities.[41] In exchange, the reseller would receive codes from GAW Miners that could be used to activate a GAW Miners product on the ZenCloud website.[42] The reseller would then sell these codes to his or her customers. The customer would then take the code, input it in ZenCloud, and activate the security.[43]

Fraser relies on the testimony from two class members, Ryan Grimes and John Tuberosi, to argue that reselling activities render a class-wide determination of damages untenable. In reality, this testimony provides no support for decertification as to damages.

Fraser suggests that Mr. Grimes cannot document the sales he made as a reseller. Mr. Grimes testified that, while he was unsure whether he has maintained 100% of the transaction records, he has "Most of them."[44] In truth, the completeness and accuracy of Mr. Grimes'

---

[40] Watterson Decl. at ¶¶ 4-5.
[41] X-4 (Grimes Depo. Tr.) at 31:20-32:10.
[42] X-4 (Grimes Depo. Tr.) at 67:7-23.
[43] X-4 (Grimes Depo. Tr.) at 71:8-11.
[44] X-4 (Grimes Depo. Tr.) at 18:5-19.

records have never been tested in this case: Fraser's counsel stated they might "make a request through Counsel" to obtain those documents,[45] but never did so.[46]

Fraser then argues that there is no definitive list of resellers because class member John Tuberosi denied being a reseller despite acknowledging that he had helped class member Lawrence David Hughes purchase Hashlets.[47] Fraser's attempt to cast Mr. Tuberosi as a reseller underscores Fraser's lack of evidence of a material number of resllers. In his deposition, Mr. Tuberosi testified that he was not a reseller, that he never sold Hashlets directly to other customers, and specifically testified that Hughes was not "his customer."[48] Mr. Tuberosi did testify that he referred some of his family and friends to GAW Miners and transmitted their credit card numbers to GAW Miners on behalf of those friends and family.[49] Mr. Tuberosi also testified that he would transmit customer names, the products they wished to purchase, and their email addresses to GAW Miners. In exchange, GAW Miners would send a link Mr. Tuberosi would forward to the customer so the customer could make the purchase.[50] Mr. Tuberosi testified that he believed he facilitated purchases for Hughes in this manner.[51] Mr. Hughes' testimony was perfectly consistent with Mr. Tuberosi's.[52] There is zero evidence that these transactions could have a bearing on damages as an offset. Neither witness testified that Mr. Tuberosi bought Hashlets and resold them to Mr. Hughes at a higher (or at any) price. Both witnesses simply testified that Tuberosi helped transmit Mr. Hughes' orders to GAW Miners.

---

[45] X-4 (Grimes Depo. Tr.) at 19:6-8.
[46] Watterson Decl. at ¶ 5.
[47] Dkt. 179-1 at 10.
[48] X-12 (Tuberosi Depo. Tr.) at 46:8-9; 52:5-7; 63:12-16.
[49] X-12 (Tuberosi Depo. Tr.) at 53:17-24.
[50] X-12 (Tuberosi Depo. Tr.) at 58:12-25.
[51] X-12 (Tuberosi Depo. Tr.) at 65: 65:5-9.
[52] X-13 (Hughes Depo. Tr.) at 13:16 (testifying that he "would call him [Tuberosi], give him my information, and they would e-mail me the code").

Fraser ignores other evidence about resellers that was produced years ago. Several class members submitted receipts to Mr. Shinners indicating that they purchased GAW Miners products from resellers. These documents indicate that there were at least six such resellers: HoosierMiner (managed by Ryan Grimes);[53] CryptoCause (managed by an individual using the handle "Viturrex"),[54] ZigHash (which appears to have been managed by an individual with the first name "Eugene"),[55] Hash Pros,[56] PrimeHashlets.com,[57] and YouCanMine (which was managed by Adam Matlack).[58] Each of these resellers appears to have provided receipts with a uniform format similar to the confirmation emails from GAW Miners cited by the Court in its class certification order.[59]

Fraser all but ignores the written responses from the class members. One of the written questions Fraser submitted to class members explicitly asked whether class members were resellers. Of the 111 class members who have responded, 108 indicated they were not.[60] The 109th indicated that he had a "reseller account," but not that he had actually made any resales,[61] the 110th indicated that he "attempted" to act as a reseller,[62] and the 111th indicated that he applied to be a reseller but never actually resold anything.[63]

In short, while there is evidence that a small number of individuals or companies acted as resellers, this is not a material number and it presents no highly individualized issues.

2.    Paycoin Sales

---

[53] *E.g.*, X-14 [GAW00361866].
[54] *E.g.*, X-15 [GAW00363918].
[55] X-16 [GAW00363923]
[56] X-17 [GAW00364817]
[57] X-18 [GAW00364619]
[58] X-19 [GAW00364626]
[59] *E.g.*, X-16 [GAW00363923]; X-17 [GAW00364817]; X-18 [GAW00364619]; X-19 [GAW00364626]; *see also* Dkt. 141 at 30.
[60] Watterson Decl. at ¶ 12.
[61] X-20 (Preston ROG responses).
[62] X-21 (Trestin ROG responses).
[63] X-22 (Dimitri ROG responses).

Fraser argues that post-certification discovery indicates that class members sold Paycoin on third-party exchanges. To begin, several exhibits cited by Fraser do not, in fact, show that class members sold Paycoin. The actual evidence of Paycoin sales cited by Fraser does not suggest that a material number of class members sold their Paycoin. He identifies six class members—Kevin Calabrese, Roman Gorodnev, John Tuberosi, Alec Kloss, Christopher Alan Crane, and Keith Burrows—who, according to Fraser, indicated that they sold Paycoin on third-party exchanges. Six is hardly a significant portion of the absent class members. And, once again, the actual testimony from these class members fails to demonstrate that highly individualized inquiries regarding these sales will be necessary. Although John Tuberosi acknowledged selling some Paycoin, he testified that these sales amounted to only "[m]aybe two percent of my holdings."[64] Class member Roman Gorodnev indicated that he sold some Paycoin when its price was relatively high. Mr. Gorodnev explained that he lacked records of the sales, but provided estimated sales prices based on the average prices Paycoin was selling for the day he withdrew it.[65] By contrast, Kevin Calabrese sold his Paycoin at a "substantial loss" long after the price of Paycoin fell off a cliff.[66] The other evidence is marginal. For example, Mr. Kloss stated that he moved a large amount of Paycoin to a third-party exchange, but not that he sold any of it.[67]

Fraser also ignores the evidence suggesting that the overwhelming majority of absent class members did not sell their Paycoin. Five of the seven witnesses Fraser deposed testified that they did not sell Paycoin,[68] Far from offsetting his losses, the sixth witness—Mahendra

---

[64] X-12 (Tuberosi Depo. Tr.) at 33:24-34:3.
[65] X-33 (Gorodnev ROG responses)
[66] Dkt. 179-2, X-31 [GAW00361522]
[67] Dkt. 179-2 (Kloss ROG responses)
[68] X-4 (Grimes Depo. Tr.) at 13:10-11 (Q. Do you recall ever selling PayCoin? A. No.); X-2 (Crivello Depo. Tr.) 20:16-18 (Q. Did you ever withdraw any PayCoin from any of the accounts that you managed? A. No.); X-24 (Simpson Depo. Tr.) at 98:3-6 (Q. So you weren't able to withdraw PayCoin from Cryptsy? Q. I was unable to sell

Phagu—testified that he "doubled and tripled down" by buying Paycoin on an exchange and only sold it "for cents on the dollar" after PayCoin had become worthless.[69] One additional class member not identified by Fraser sold Paycoin. This individual provided a full log of his transactions from the relevant third-party exchange, however.[70]

Finally, Fraser cites the report of his damages expert. All Fraser's expert concludes is that the volume of Paycoin traded on third-party exchanges was multiple times larger than the volume of Paycoin withdrawn by damaged class members, from which he infers that substantial numbers of class members sold Paycoin on third-party exchanges. But the analysis of Fraser's expert says nothing about the volume of those particular transactions by absent class members. According to records provided by GAW Miners to the SEC, GAW Miners assigned 12 million pre-mined Paycoin to itself, which is almost four times as many coins as were assigned to class members.[71] GAW Miners' market power alone likely explains a substantial number of transactions cited by Fraser's expert.

There is no evidence that a material number of class members sold Paycoin or that calculating offsets based on those rare transactions would be unmanageable.

3.    Sales of Entire Accounts

Fraser argues that some class members sold or purchased entire ZenCloud accounts. The evidence he cites simply shows that class members who engaged in these transactions have

---

PayCoin into Bitcoin to—or any other currency."); *id.* at 99:19-23 (Q. Just to be clear, did you ever exchange PayCoin for any other cryptocurrency? A. If I did, it was very small amounts. But I—I don't recall being able to sell, yeah."); X-25 (Vargas Depo. Tr.) at 29:20-24 ("No. I didn't sell anything. I was part of the group that stayed on the long hold. It was essentially show integrity by staying here and believing in the product. So I held to the very end."); X-13 (Hughes Depo. Tr.) at 25:21:24 (Q. Okay. Do you recall ever selling any Paycoins? A. I believe I held all mine, to the best of my recollection.").

[69] X-26 (Phagu Depo. Tr.) at 26:-20-27:8-10; 30:5-23.
[70] X-27 [Amman0000002]
[71] X-28 [Paycoin Distributions.xls from McLain 3/1/15 email]. In fact, one reason the price of Paycoin ultimately plummeted was because GAW Miners dumped those 12 million pre-mined Paycoin onto the market. Dkt. 57 (First Amended Complaint) at ¶ 157.

records of those sales and are willing and able to provide them. Individuals who bought or sold ZenCloud accounts typically negotiated the sales through email; multiple class members submitted emails (which were produced in this litigation long ago) memorializing the terms of such transactions.[72] This documentation can be used to verify these transactions.

       4.    <u>Sales on the GAW Miners Marketplace</u>

It is also true that ZenCloud contained a "marketplace," controlled by GAW Miners, which allowed class members to trade Hashlets and Hashstakers with one another. As Fraser correctly notes, these transactions are all recorded on the ZenCloud database. While Fraser cites to vague testimony about the ZenCloud database being a "mess," he fails to cite anything that indicates these specific records—*i.e.*, records showing purchases and sales through the marketplace—have been hacked or altered. This data could be used to determine any offsets due to sale of products through the marketplace. The reliability of this database is, as the Court noted, a class-wide issue.[73]

**C.**    <u>Ion Conversion</u>

Fraser also argues that certain class members received a cryptocurrency called Ion in exchange for Paycoin. Ion was launched long after GAW Miners went out of business and has only the thinnest connection to GAW Miners. After it became clear that GAW Miners was a failed venture, another group known as xpy.io began trying to rehabilitate Paycoin and make it into a viable cryptocurrency.[74] As a part of that process, xpy.io started a website, which offered staking wallets for Paycoin.[75] The efforts to rehabilitate Paycoin ultimately failed.[76] The

---

[72] X-29 [Anastasakis0000012]; X-30 [GAW00362126]; X-31 [GAW00362127]; X-32 [GAW00362129]; Dkt. 179-2, X-65.
[73] Dkt. 141 at 32 n.8.
[74] Declaration of Richard Nelson ("Nelson Decl.") ¶ 3.
[75] Nelson Decl. at ¶ 3.
[76] Nelson Decl. at ¶ 4.

individuals behind xpy.io then decided to start a new cryptocurrency called Ion.[77] After Ion launched, individuals could sell Paycoin for Ion at a rate of 8:1.[78]

Even if Ion were somehow relevant, however, Fraser fails to show it would create an issue that makes calculating damages unmanageable. Fraser identifies 22 class members he says bought Ion. One class member—Helmut Siedel—indicated that he bought cheap Paycoins on an exchange so that they would be converted into Ion.[79] Such a transaction would not be relevant because the Paycoin was purchased after the class period. Of the remaining 21 class members, 16 identified either exactly or approximately how much Ion they received.[80] That is evidence that the class members can and would disclose this information on a claim form. Fraser identifies another four class members who he says do not know whether they received Ion. Plaintiffs disagree with that characterization as to three class members. Class member Payton Peterson indicated he could probably locate documents to verify how much Ion he received.[81] Fraser never requested that Peterson do so. Class member Ali Hussain wrote that he was contacted about obtaining Ion but has "no clue how many or what they are or where they are."[82] That indicates Mr. Hussain did not in fact receive Ion. Class member Davis Tyner indicated that he was unsure but thought he probably received approximately 100 Ion.[83] That statement clearly indicates Tyner believed he received approximately 100 Ion.

---

[77] Nelson Decl. at ¶ 4.
[78] Nelson Decl. at ¶ 5.
[79] Dkt. 179-2, X-51 (Siedl ROG responses).
[80] Dkt.179-2, X-41 (Black) (approximately 300 Ion); X-61 (Clahsen) (approximately 12,000 Ion); X-37 (Colucci) (10,488 Ion); X-38 (Daems) (less than 812 Ion); X-39 (Formosa) (approximately 150 Ion); X-33 (Gorodnev) (approximately 250 Ion); X-41 (Jalbert) (810 Ion); X-43 (Le) (approximately 2,000 Ion); X-45 (MacFarlane) (2,272 Ion); X-52 (Mueller) (10,310 Ion); X-47 (Olsen) (14,656 Ion); X-48 (Pass) (12.5 Ion); X-49 (Rosario) (approximately 1,000 Ion); X-50 (Shepherd) (approximately 2,000); X-52 (Smith) (approximately 2,800 Ion); X-53 (Tolstykh) (approximately 14,000 Ion); X-55 (Winter) (no more than 120.28 Ion).
[81] Dkt. 179-2, X-30 (Peterson ROG responses).
[82] Dkt. 179-2, X-58 (Hussain ROG responses).
[83] Dkt. 179-2, X-56 (Tyner ROG responses).

In short, the post-certification discovery indicates that class members who did receive Ion were willing and able to disclose both the fact that they received it and to at least approximate the amount they received.

IV.   <u>Argument</u>

A.   <u>Nothing revealed in post-certification discovery undermines the Court's earlier conclusions about predominance and manageability.</u>

The Court permitted Fraser to move to decertify the class as to damages if post-certification discovery revealed that "a material number of proposed class members have had chargebacks or other compensating gains that negate or reduce their losses as a result of transactions with third parties."[84] Discovery has yielded the opposite, rendering Fraser's motion a thinly-veiled request for reconsideration of the certification order.

1.   <u>Fraser fails to show that a "material" number of class members received chargebacks or compensating value, despite plenty of opportunities to do so.</u>

After seven depositions and hundreds of written responses shared with him during post-certification discovery, Fraser has documented the following:

- **Chargebacks or refunds.** Ten class members received a refund or chargeback relating to GAW Miners.

- **Resellers.** Six class members engaged in non-*de minimis* reselling.

- **Paycoin sales.** Six class members sold Paycoin.

- **Account sales.** Nine class members participated in account transfers.[85]

- **Sales on the GAW Miners Marketplace.** Six class members sold Hashlets or Hashstakers on the Marketplace.[86]

- **Paycoin-Ion conversions.** Twenty-six class members converted Paycoin to Ion.

*See supra* Section III.A, III.B.

---

[84] Dkt. 141 at 34.
[85] Dkt. 179-1 at 13 n.54.
[86] Dkt. 179-1 at 13-14 & n.57.

Fraser attempts to dress up these facts in his brief with dubious statistics like "[f]ifty percent of the class members deposed . . . admitted having received chargebacks," but the numbers speak for themselves. To begin, they overstate what Fraser has uncovered in post-certification discovery. Much of the evidence cited by Fraser is from documents produced before class certification.[87] For example, most of the evidence of account sales—including the names of seven of the nine class members specifically identified as engaging in these sales—is from material produced to Fraser in 2018.[88] Information relating to chargebacks for six or seven of the ten class members identified as having received them likewise dates to plaintiffs' 2018 production to Fraser. Other evidence cited by Fraser—like the deposition testimony supposedly about reselling—provides weak or no support for his claims. (While actual evidence of reselling has been in his possession for years.[89]) In short, Fraser's paltry offering from post-certification discovery, meant to "confirm" that chargebacks and offsetting transactions are widespread among class members, shows the opposite.

Nor can Fraser complain that he could not get the evidence he needed—he didn't even try. If he wanted more depositions; more interrogatories; or better or more compliance with written discovery demands, he should have sought them. But he never did.[90] What he musters is a handful of people, out of a class of thousands, who received chargebacks or gains from other transactions that may require offsetting. Such a number is not "material" and therefore could not possibly create individual damages issues that overwhelm the common ones in this case. *See, e.g.*, *Hurt v. Commerce Energy, Inc.*, No. 1:12-CV-00758, 2015 WL 1298674, at *3 (N.D. Ohio Mar. 23, 2015) (noting that a claims process involving a magistrate or special master to calculate

---

[87] *E.g.*, Dkt. 179-1 at 13 & n.54, 14 & n.57.
[88] Dkt. 179-1 at 13 & n.54.
[89] *See supra* Section III.B.1 & n.59.
[90] *See supra* Section II; Watterson Decl. ¶¶ 4-6.

overtime wages using proof-of-claim forms, "often used in large classes seeking damages," would be appropriate for a class with 2,540 members).[91]

    2.    <u>Proof of offsetting value or compensating gains is not "highly individualized."</u>

Beyond that, Fraser contends that establishing offsetting transactions during the claims process will require "in-depth individualized inquiries." It will not. At the outset, the Court's certification order asked a slightly different question: whether "proof of" offsetting transactions would be highly individualized, not the determinations themselves.[92] The answer to that is clearly no. For the small group of class members whom Fraser has established may have received chargebacks or offsetting gains, most will be able to submit a claim form, if needed, along with documents showing exactly how much value they received from third-party transactions. As laid out in Section III, this documentation includes letters and statements from credit card companies (chargebacks); receipts (reseller transactions); confirmation emails (account sales); and the ZenCloud database itself (GAW Miners Marketplace sales).[93]

While there are some variations in the format and style of these documents, they are basically all sales receipts. Moreover, the Court has already determined that several of these types of documents—specifically, credit card statements and standardized email confirmations—are reasonably uniform and amenable to use in a claims process.[94] Using this standard set of documents in conjunction with a class member's claim form, a claims administrator could easily identify the appropriate amount of value received by a class member and to subtract it from the amount that class member paid for her securities. There would be nothing unusual about it. *See*

---

[91] *See Hurt v. Commerce Energy, Inc.*, No. 1:12-CV-00758, 2013 WL 4427255, at *2 (N.D. Ohio Aug. 15, 2013) (specifying size of class).

[92] Dkt. 141 at 33-34 (following statement that the claims process could be structured to require "documentation of chargebacks and other third-party transactions").

[93] Fraser disputes that the ZenCloud database is reliable, but as the Court has noted, that is a question of fact common to the class. Dkt. 141 at 32 n.8.

[94] Dkt. 141 at 30.

*In re Vivendi Universal, S.A. Sec. Litig.*, 123 F. Supp. 3d 424, 435 (S.D.N.Y. 2015) ("[T]he parties worked with the Court-appointed claims administrator to implement a damage calculation methodology applicable to all class members, resulting in [their] approval of claim forms implementing [a] partial netting [approach].").

As the Court noted, the claims process can be structured so that "documentation of chargebacks and other third-party transactions" establishes offsets.[95] Post-certification discovery has merely confirmed that.

3.   Fraser's concerns about the adequacy and manageability of the claims administration process are speculative and easily resolved.

Fraser's real argument is *not* that the determination of offsetting value will be "highly individualized," but rather that the claims process is not equipped to deal with the dishonesty of class members or a lack of documentation for certain transactions. While Fraser frames these arguments around predominance, they really concern the "manageability" of the case under the superiority prong of Rule 23(b)(3). *See* Fed. R. Civ. P. 23(b)(3) (requiring consideration of "the difficulties likely to be encountered in the management of a class action"); *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 663, 667-68 (7th Cir. 2015) (describing "concerns about what are essentially claim administration issues," including fraudulent claims, as relating to superiority). "[D]ismissal for management reasons, in view of the public interest involved in class actions, should be the exception rather than the rule," *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 140 (2d Cir. 2001) (internal quotation marks and citations omitted),[96] and "[c]ourts are generally loath to deny class certification based on speculative problems with case management." *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 528 (S.D.N.Y. 1996).

---

[95] Dkt. 141 at 33.
[96] Abrogated on different grounds by *In re IPO Secs. Litig.*, 471 F.3d 24 (2d Cir. 2006).

First, Fraser argues that the parties will need to conduct time-consuming individualized inquiries because post-certification discovery shows that class members will omit offsetting transactions from the claims process in order to inflate their damages. Post-certification discovery shows no such thing. What Fraser's discovery confirms is that—when asked—class members have freely disclosed the fact that they received chargebacks. Fraser also says that some class members contradicted themselves about whether they received chargebacks or not. As explained in Section III.A, this is simply not borne out by the facts.

Even if there were some basis for Fraser's concerns, they are easily resolved—in fact, the Court has already addressed them. Proof of offsets could "be subject—as needed—to audits, verification procedures, and challenges."[97] As the Seventh Circuit has explained, in the context of ascertainability:

> [C]ourts are not without tools to combat this problem during the claims administration process. They can rely, as they have for decades, on claim administrators, various auditing processes, sampling for fraud detection, follow-up notices to explain the claims process, and other techniques tailored by the parties and the court to take into account the size of the claims, the cost of the techniques, and an empirical assessment of the likelihood of fraud or inaccuracy.

*Mullins*, 795 F.3d 654, 667 (7th Cir. 2015); *see also Beaton v. SpeedyPC Software*, No. 13-CV-08389, 2017 WL 4740628, at *7-*8 (N.D. Ill. Oct. 19, 2017) (observing that "the parties could utilize a form affidavit, with accompanying audit procedures, to address" claims questions, including whether a refund was issued to a class member), *aff'd*, 907 F.3d 1018 (7th Cir. 2018).

These or similar techniques could be used, if needed, to address the issues raised by Fraser, and indeed, such safeguards are routinely employed by courts. *See, e.g.*, *In re Vivendi Universal, S.A. Sec. Litig.*, 284 F.R.D. 144, 156-57 (S.D.N.Y. 2012) (adopting a two-phase process for claims administration in which a special master would "review any challenges by

---

[97] Dkt. 141 at 33.

defendants to the validity of the claims"). And simpler tools are available. A class member could be required to verify his or her responses under penalty of perjury.[98] The consequences of lying on such a claim form would be the same as if the class member lied in a deposition. *See* Newberg on Class Actions 12:2 (noting that "[c]laim forms sometimes also require '[v]erification of claims forms by oath or affirmation under 28 U.S.C. § 1746'") (quoting Manual for Complex Litigation § 21.661 (4th ed., 2019 update)).

Fraser also argues that class members may lack records of offsetting transactions. While it is not entirely clear which transactions he is referring to (Fraser cites to a portion of his brief that involves five different types),[99] it appears that he is referring to sales of Paycoin and conversions of Paycoin to Ion. At the outset, plaintiffs contend that offsets for Ion, an unrelated security acquired by a tiny smattering of class members years after the fraud was revealed, are inappropriate as a matter of law.[100] But even if such offsets were appropriate, it would be straightforward to calculate an estimated offset—again, for the tiny number of class members in question—based on the average trading price of Paycoin or Ion at the time the individual sold the product. That is essentially the approach taken by Fraser's damages expert.[101]

What Fraser raises are nothing more than "concerns about what are essentially claim administration issues," *Mullins*, 795 F.3d at 667-68. Neither those nor "speculative problems with case management," *In re NASDAQ*, 169 F.R.D. 493, 528 (S.D.N.Y. 1996), give any cause

---

[98] Fraser may argue that he included such an interrogatory directed at the Class Members. However, the parties ultimately agreed to ask class members to answer a somewhat different set of questions. *See supra* Section II. The first question was whether they had provided documentation of all their transactions (including chargebacks) to Mr. Shinners or to plaintiffs' counsel. The second question asked class members to describe any transactions that were not documented.

[99] Dkt. 179-1 at 9-14.

[100] *See, e.g.*, *Acticon AG v. China N. E. Petroleum Holdings Ltd.*, 692 F.3d 34, 41 (2d Cir. 2012) ("If we credit an unrelated gain against the plaintiff's recovery for the inflated purchase price, he has not been brought to the same position as a plaintiff who was not defrauded because he does not have the opportunity to profit (or suffer losses) from 'a second investment decision unrelated to his initial decision to purchase the stock.'") (quoting *Harris v. Am. Inv. Co.*, 523 F.2d 220, 228 (8th Cir.1975)).

[101] *See* Dkt. 179-2, X-32 (Strombom Report) at ¶¶ 47-51.

to decertify the class. The Court was right that these issues can be dealt with "through the claims process";[102] nothing revealed in discovery has changed that.

4. <u>Determining offsets during the claims administration process will not violate Fraser's right to due process or the Rules Enabling Act.</u>

For similar reasons, Fraser's arguments about due process are misplaced. As the Court noted in its certification order, "[a] defendant's rights are protected 'so long as the defendant is given a fair opportunity to challenge the claim to class membership and to contest the amount owed each claimant during the claims administration process.'"[103] *See Beaton v. SpeedyPC Software*, 907 F.3d 1018, 1030 (7th Cir. 2018), *cert. denied*, 139 S. Ct. 1465 (2019) (holding that "[d]efendants' due process rights [were] not harmed by . . . case-management tools" such as affidavits and audits as long as they had an opportunity to challenge the credibility of a "representative sample of the class members"); *Allapattah Servs., Inc. v. Exxon Corp.*, 157 F. Supp. 2d 1291, 1324 (S.D. Fla. 2001) (holding that due process afforded the defendant "the right to appear and participate" in the claims process, "including to object and oppose any unfounded or incorrect claim"), *aff'd*, 333 F.3d 1248 (11th Cir. 2003). Such procedures are ordinary in class actions. *See In re Vivendi Universal*, 284 F.R.D. at 156-57 (ordering a claims administration process that permitted the defendants to challenge the validity of claims). Here, as the Court expressly stated in certifying the class, Fraser will have the same rights to participate, if necessary.[104]

---

[102] Dkt. 141 at 33.

[103] Dkt. 141 at 33 (quoting *Mullins*, 795 F.3d at 671).

[104] Dkt. 141 at 33 (noting that claims documents will be "subject—as needed—to audits, verification procedures, and challenges"). Additionally, there is nothing inappropriate about using a claims administration process to resolve contested offset claims, *see Allapattah Servs.*, 157 F. Supp. 2d at 1322-24 (permitting set-off claims by the defendant to be asserted during claims administration and resolved by the special master), or in conjunction with aggregate damages, *see, e.g., In re NASDAQ*, 169 F.R.D. 493, 522 (S.D.N.Y. 1996); *In re WorldCom, Inc. Sec. Litig.*, No. 02 CIV. 3288DLC, 2005 WL 491397, at *3-*4 (S.D.N.Y. Mar. 3, 2005).

Nor is the Rules Enabling Act violated by leaving damages determinations to resolution through the claims process. While creative, Fraser's objection is again predicated on the misperception that there will be a "grossly inflated" class-wide damages award that will then be divvied up among class members.[105] For the reasons stated above and in the Court's certification order, no award will be "grossly inflated" both because (i) Fraser will be able to challenge particular damages claims and (ii) plaintiffs' damages model can incorporate legally appropriate offsets as needed.

In short, the claims process the Court envisions already addresses these concerns.

B.       A number of common damages issues predominate over individual issues and make class-wide trial of damages superior.

Even if all of Fraser's arguments were accepted, there would still be no reason to decertify as to damages because of all the common damages issue that would still need to be tried. There are a host of damages issues, legal and factual, that are common to every class member and susceptible of class-wide proof. To name but a few: the proper measure of damages prior to any offsets; what types of offsets, if any, apply; whether the availability of offsets depends on the type of third-party transaction and when it happened (e.g., sales on the GAW Miners Marketplace vs. the gratuitous receipt of Ion years after the fraud); whether it is appropriate to net gains and losses across a class member's accounts;[106] statutory damages and attorneys' fees; and, as the Court noted, "whether particular databases"[107] or types of documents are sufficiently reliable to establish purchases by class members (not to mention the offsetting transactions that Fraser insists are central to the damages analysis). Measured against the sporadic individual inquiries that may be required of some class members, these damages

---

[105] Dkt. 179-1 at 18.
[106] *See infra* n.118.
[107] Dkt. 141 at 32 n.8

issues—which are crucial to each member's claim—can be resolved "through generalized proof, and . . . are more substantial than the issues subject only to individualized proof." *Waggoner v. Barclays PLC*, 875 F.3d 79, 93 (2d Cir. 2017) (internal quotation marks and citations omitted).

Relitigating these same issue in mini-trials would be a huge waste of the court's and the parties' resources. *See Brown v. Pro Football, Inc.*, 146 F.R.D. 1, 5 (D.D.C. 1992) (declining to decertify a class following a finding of liability because "235 separate trials, each with the complete panoply of discovery, expert witnesses, and delay" was "not only unmanageable but an obvious waste of judicial resources"); *United States v. City of New York*, 276 F.R.D. 22, 50 (E.D.N.Y. 2011) (observing that using a special master for individual determinations of remedies for thousands of class members would render the action "more manageable," not less). Viewed in this light, class-wide treatment of damages is clearly "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P 23(b)(3).

C.    Fraser's miscellaneous other arguments do not counsel decertification as to damages.

Moving beyond the remit of the Court's certification order, Fraser raises three additional arguments "that further justify decertifying the class as to damages."[108] None does.

1.    Plaintiffs identify a methodology to calculate damages in connection with Hashpoints and Paycoin.

First, Fraser claims that plaintiffs failed to identify a methodology for calculating damages related to Hashpoints or Paycoin. He is incorrect. Fraser misleadingly says that plaintiffs' expert Mills "admitted he cannot calculate damages related to purchases of Hashpoints and Paycoin."[109] But as Fraser acknowledges—in a footnote, of course—what Mills actually wrote was that "I currently am not aware of a methodology that can be used to reliably identify

---

[108] Dkt. 179-1 at 20.
[109] Dkt. 21.

such [Paycoin and Hashpoint] sales *by reference to the databases*."[110] The second part of Mills'

report, however, *does* include a methodology for calculating damages. The report also notes

that—like the Court did in its class certification order—that class members could provide

documentation of such purchases along with their claim forms.[111]

Moreover, class members can provide documentation verifying their purchases of

Hashlets and Paycoin. As to Hashpoints, it is true that the evidence uncovered to date indicates

that purchases of Hashpoints were rare. Documents provided by GAW Miners to the SEC

indicate that class members purchased over $500,000 in Hashpoints.[112] But evidence exists to

document such purchases. For example, absent class member John Tuberosi—one of the class

members who provided documents to Allen Shinners—provided a copy of a wire statement

reflecting a payment for Hashpoints.[113]

As to Paycoins, similar transaction records exist. Class members could purchase Paycoins

from third-party cryptocurrency exchanges such as Cryptsy and have, in fact, provided records of

purchases from Cryptsy.[114] And, while relatively uncommon, there is also evidence that class

members purchased Paycoin directly from GAW Miners. For example, Viet-An Ly—one of the

class members who provided documents to Mr. Shinners—purchased 5,000 Paycoin directly

from GAW Miners by making a wire transfer to the companies. Mr. Ly provided a bank

statement showing a wire transfer to GAW Miners[115] and a receipt showing that he purchased

Paycoin.[116] Edward Hutchison—another class member who provided documents to Mr.

---

[110] *See* Dkt. 179-2, X-76 (Mills Report) at 18.
[111] Dkt. 179-2, X-76 (Mills Report) at 42; Dkt. 141 at 30.
[112] X-34 (Carlos Garza Spreadsheet).
[113] X-35 (J. Tuberosi Wire Confirmation).
[114] X-27 [Amman00000002].
[115] X-36 (Ly Bank Statement).
[116] X-37 (Ly Invoice).

Shinners—provided a receipt indicating he purchased 588 Paycoins.[117] Finally, a document provided by GAW Miners to the SEC indicates that class members—including Mr. Ly and Mr. Hutchison—made $153,250 in purchases of Paycoin directly from GAW Miners. There is no reason other class members who purchased Paycoin could not also provide receipts or wire transfer statements.

More fundamentally, Fraser fails to explain why a class member's failure to prove damages relating to Hashpoints or Paycoin would require decertification. If plaintiffs offer no evidence of damages relating to the purchase of Hashpoints or Paycoins (which they can, as explained above), why would that be a reason to decertify the class? The consequence would simply be that the plaintiffs will not recover damages relating to those products.

    2.    <u>Offsetting for class members with multiple accounts, if warranted, can be handled through the claims administration process.</u>

Fraser argues that for class members who had multiple accounts, those accounts' gains and losses will need to be netted (that is, offset) against one another, which will require individualized inquiries.

Here again, plaintiffs do not agree that netting accounts with gains against those with losses is legally warranted. Because "Rule 10b–5 and the PSLRA do not endorse any economic theory or methodology that should be used to quantify/demonstrate economic loss," courts have "considerable discretion in determining how best to calculate compensable losses," *In re Vivendi Universal*, 284 F.R.D. at 159, including to determine whether it is appropriate to net gains and losses over securities or groups of securities. *See id.* (adopting a "partial netting" approach);

---

[117] X-36 (Hutchison receipt).

*Argent Classic Convertible Arbitrage Fund L.P. v. Rite Aid Corp.*, 315 F. Supp. 2d 666, 680 (E.D. Pa. 2004) (finding a "transaction-based methodology"—*i.e.*, no netting—appropriate).[118]

In any event, Fraser's arguments on this point lack force. Assuming that such offsets are appropriate, the calculation is not hard: a class member's various accounts can simply be netted against one another. As to "identifying and tracing ownership," those facts could be established by class member affidavits. Requiring class members to identify multiple accounts on a claim form is no different from asking a class member to identify, for example, all of the fraudulent securities that she owned, or the number of overtime hours she worked, or the nature of her injuries (in a mass tort case). *See Hurt*, 2015 WL 1298674, at *3 & nn 23-25 (citing cases). Here, class members who answer "yes" to the question of whether they own multiple accounts could be required to submit an affidavit that specifically identifies all of the accounts.

In a familiar refrain, Fraser argues that class members will lie and hide their accounts with gains. Once again, this ignores the fact that a number of absent class members volunteered the fact that they had multiple accounts.[119] And, while Fraser argues that Michael Pfeiffer supposedly did not disclose certain of his accounts to Allen Shinners prior to the start of this lawsuit, that argument simply proves that Fraser's expert is capable of verifying the accounts disclosed by class members—defeating Fraser's supposition, made in the same breath, that "there would be no way to verify or audit class member responses."[120]

3.  <u>If necessary, plaintiffs' expert can provide a methodology for addressing offsetting gains for individuals with multiple accounts.</u>

---

[118] Whatever the approach, the inquiry is a "difficult" and fact-intensive (though class-wide) one that "may best be reserved until the time of trial." *Gordon v. Sonar Capital Mgmt. LLC*, 92 F. Supp. 3d 193, 202 (S.D.N.Y. 2015); *accord In re Cigna Corp. Sec. Litig.*, 459 F. Supp. 2d 338, 354 (E.D. Pa. 2006) ("The specific calculation of damages in this case should be resolved based on a trial record, rather than at the summary judgment stage.").
[119] X-39 (Florentino Letter of Authorization); X-40 (de Wilde Letter of Authorization); X-41 (Shepherd Letter of Authorization).
[120] Dkt. 179-1 at 23.

Plaintiffs believe that netting across accounts is not warranted, but assuming it is, the method described above would not require highly individualized inquiries. If the Court disagrees on both points, however, plaintiffs' damages model can determine offsets for class members with multiple accounts that requires no "probing" inquiry, or any inquiry at all, into who owns which accounts. By way of background, Robert Mills' primary methodology analyzes damages on an account-by-account basis. In this model, if an account's purchases exceed withdrawals, it is included in Mills' analysis. However, if withdrawals from the account exceed purchases, the account is excluded. Fraser's position (with which plaintiffs disagree) is that an individual's accounts with gains must offset losses any accounts that individual has that experienced losses.

While plaintiffs believe Fraser's position on netting across a class member's accounts is incorrect as a legal matter, Mills' Reply Report includes a methodology that nets accounts with gains against those with losses without the need to identify particular account owners. Under this approach, which plaintiffs do not believe is required or warranted, Mills calculated damages as though a single individual owned every single account. As Mills explains, this methodology is unduly conservative and understates the damages suffered by the class.[121] That is so because, under this approach, one individual's net gains are used to offset a *different* individual's net losses. While legally unnecessary, this methodology indisputably would address Fraser's concern.

It is entirely feasible to identify a user with multiple accounts and—should it prove necessary—net the user's gains and losses against one another. Accordingly, these class members' claims do not require such individualized inquiry as to warrant decertification.

    4.    <u>Fraser's arguments relating to the ZenCloud database are no reason to decertify the class as to damages.</u>

---

[121] Dkt. 179-2, X-77 (Mills Reply Report) at 12-13.

Fraser's final argument parrots the claims he previously made about the reliability of the ZenCloud database. Again: this is a class-wide damages issue. Further, this merely repeats arguments Fraser already made and which the Court has already rejected.[122] Given the Court's rationale, issues relating to the ZenCloud database are no reason to decertify the class. And in any event, Fraser's arguments lack merit. For example, Fraser points to two purported inconsistencies between the ZenCloud database and other documents class members submitted regarding transactions. Irrelevance aside, this is two transactions out of tens of thousands that occurred in the marketplace, and when netted together they *reduce* plaintiffs' damages claim by $600.[123]

By contrast, Fraser ignores evidence that the ZenCloud database was not "hacked" or otherwise altered. In particular, plaintiffs' counsel obtained a copy of an earlier version of the ZenCloud database used by the SEC, which contains data up through December 5, 2014.[124] Robert Mills compared the version plaintiffs have used and found that the data (up to December 5, 2014) was identical.[125] The upshot is that it is extremely unlikely that any of that data was altered by hackers as Fraser has claimed.

Finally, Fraser argues that it is unclear which data sources a claims administrator would use to calculate damages and making that determination would require individualized inquiries. This argument is, again, neither here nor there. The sources of data the claims administrator would use—*i.e.*, "whether particular databases are reliable"[126]—is a common question that applies to the entire class. Keeping the class certified as to damages makes sense precisely so issues like the reliability of the ZenCloud database can be determined once and only once. If

---

[122] Dkt. 141 at 30.
[123] Dkt. 179-2, X-77 at 3.
[124] X-42 (Mills Supplemental Report) at 2.
[125] X-42 (Mills Supplemental Report) at 2.
[126] Dkt. 141 at 32 n.8.

Fraser gets his way, the parties will presumably need to hold thousands of mini-trials about whether the ZenCloud database is a reliable source of data. That cannot be the right approach; such an enormous waste of time and money would be "waste of the type that class actions were designed to eliminate." *Brown*, 146 F.R.D. at 5.

## V.   Conclusion

Fraser has failed to demonstrate that the "factual or legal underpinnings of the plaintiffs' successful class certification motion [have been] undermined" now that they have been tested.[127] His speculation and casual treatment of the facts cannot obscure the overwhelmingly common issues of fact and law make this case ripe for class-wide treatment of damages. For these reasons, the Court should deny Fraser's motion.

---

[127] Dkt. 141 at 11 (quoting *Taylor v. The Hous. Auth. of New Haven*, 267 F.R.D. 36, 62 (D. Conn. 2010), *aff'd sub nom. Taylor ex rel. Wazyluk v. Hous. Auth. of City of New Haven*, 645 F.3d 152 (2d Cir. 2011)).

DATED: January 22, 2020

Respectfully submitted,

Mark P. Kindall (ct13797)
mkindall@ikrlaw.com
Robert A. Izard
rizard@ikrlaw.com
IZARD, KINDALL & RAABE, LLP
29 S. Main St., Suite 305
West Hartford, CT 06107
Tel: (860) 493-6292
Fax: (860) 493-6290

*/s/ Colin M. Watterson*
Colin M. Watterson (*pro hac vice*)
cwatterson@susmangodfrey.com
Texas Bar No. 2409330
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, TX  77002
Tel: (713) 651-9366
Fax: (713) 654-3367

Marc Seltzer (*pro hac vice*)
mseltzer@susmangodfrey.com
California Bar No. 54534
Kathryn Hoek (*pro hac vice*)
khoek@susmangodfrey.com
California Bar No. 219247
SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067
Tel: (310) 789-3100
Fax: (310) 789-3150

Seth Ard (*pro hac vice*)
sard@susmangodfrey.com
New York Bar No. 4773982
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019-6022
Tel: (212) 336-8330
Fax: (212) 336-8340

Edgar Sargent (*pro hac vice*)
esargent@susmangodfrey.com
Washington Bar No. 28283
Susman Godfrey L.L.P.
1201 Third Avenue, Suite 3800
Tel: (202) 516-3880
Fax: (310) 789-3150

*Counsel for Plaintiffs*

<u>Certificate of Service</u>

I hereby certify that on January 22, 2020, I served the foregoing via electronic mail

on the following:

Daniel H. Weiner
Sarah L. Cave
Sara E. Echenique
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, NY  10004-1482

Sean M. Fisher (ct23087)
Brenner, Saltzman & Wallman LLP
271 Whitney Avenue
New Haven, CT  06511

*/s/ Colin M. Watterson*
Colin M Watterson