# EXHIBIT 4

Page 1

```
               UNITED STATES DISTRICT COURT

                    OF CONNECTICUT

DENIS MARC AUDET, MICHAEL           )
PFEIFFER, DEAN ALLEN SHINNERS, and)
JASON VARGAS, Individually and on   )
Behalf of All Others Similarly      )
Situated,                           )Case No. 3:16-cv-00940
                                    )
              Plaintiffs,           )Hon. Michael P. Shea
                                    )Courtroom 2
     vs                             )
                                    )ECF Case
STUART A. FRASER, GAWMINERS, LLC,   )
and ZENMINER, LLC, d/b/a ZEN        )CLASS ACTION
CLOUD,                              )
                                    )
              Defendants.           )
------------------------------------)
       The Videotaped Deposition of RYAN GRIMES
       Date:      Tuesday, October 22, 2019
       Time:      12:50 p.m.
       Place:     Regus Center - Indianapolis
                  333 North Alabama Street, Suite 350
                  Indianapolis, Indiana 46240
```

1        RYAN GRIMES
2            far as you can recall?
3    A.   Can you say them again?
4    Q.   I'll do them individually.
5    A.   Okay.
6    Q.   Do you recall ever selling a HashPoint?
7    A.   No.
8    Q.   Do you recall ever selling a HashStaker?
9    A.   No.
10   Q.   <u>Do you recall ever selling PayCoin?</u>
11   <u>A.   No.</u>
12   Q.   Do you recall ever providing any of those products to
13       someone in exchange for something back in value?
14   A.   I don't recall that, no.
15   Q.   Okay.  So let's focus on Hashlets.
16   A.   Okay.
17   Q.   Do you have a ballpark sense of how many Hashlets you
18       owned during the period of time we discussed?
19   A.   No, not really.  I couldn't even begin to speculate
20       exactly what they were.
21   Q.   Do you yourself have any records that would reflect the
22       Hashlets that you owned?
23   A.   We had to provide a ZenCloud export.  So somewhere in
24       there, there's probably some information.
25   Q.   What do you mean when you say you had to provide a

1                          RYAN GRIMES
2    Q.  Were they typically below the price that you had purchased
3        them for?
4    A.  Yes.
5    Q.  With respect to the sales on the Hoosier Miner web store,
6        do you maintain records of the sales made on that website?
7    A.  I did.  I don't know if I have a hundred percent of the
8        records, but we had e-mails from -- with receipts from GAW
9        when we did our purchase, and then to the customer when we
10       sold it to them.
11   Q.  So for your purchase of those Hashlets, GAW would send you
12       an e-mail confirmation?
13   A.  Yes.
14   Q.  And for your sale to the next purchaser from the Hoosier
15       Miner web store, you would send them a confirm e-mail?
16   A.  Yes.
17   Q.  Do you still have the confirm e-mails that were sent?
18   A.  Most of them.  I don't know if I've got everything.  It's
19       been five years.
20   Q.  Do you know if that documentation was provided to
21       Mr. Shinners or anyone on his behalf?
22   A.  Yes, I was.  What I had at the time was provided to him.
23   Q.  Meaning, that the confirms that -- from your web store?
24   A.  Yes.  Actually, I'm sorry, I take that back.  I don't
25       know.  I'm trying to think of what was in that document.

1                       RYAN GRIMES
2       No, they were not.
3  Q.   Okay.  I would just ask that you preserve whatever you
4       still have on that.
5  A.   Yes.
6  Q.   We may make ask -- make a request through Counsel --
7  A.   Okay.
8  Q.   -- to get those.
9            The Hashlets that you had on your web store, did you
10      purchase them through one of the two accounts that you
11      identified earlier?
12 A.   I believe so, yes.
13 Q.   Okay.  So you didn't have a separate Hoosier Miner
14      corporate account with ZenMiners or GAWMiners?
15 A.   I don't think so.
16 Q.   Did you end up selling all of the Hashlets that you owned?
17 A.   I think I did, yes.
18 Q.   Okay.  I'm going to hand the court reporter a document
19      that will be marked Exhibit 256.
20           (Exhibit 256 marked for identification.)
21 Q.   Which has a Bates number GAW00364133.  Do you recognize
22      that document?
23 A.   It looks like my information in it, yes.
24 Q.   Okay.  Is this information that you provided to
25      Mr. Shinners around November 20 of 2015?

1                         RYAN GRIMES

2   Q.  How much were you seeking to charge back?

3   A.  About $25,000, I want to say.

4   Q.  Did you ever successfully receive any chargebacks from a

5       purchase from GAWMiners?

6   A.  No.

7   Q.  I'm going to hand you an exhibit to be marked Exhibit 258.

8              (Exhibit 258 marked for identification.)

9   Q.  This has a Bates number GAW00361522.  I believe this is an

10      excerpt from a larger spreadsheet, and the excerpt is just

11      specific to you and your account --

12  A.  Okay.

13  Q.  -- I take it.

14          Have you ever seen this before?

15  A.  No.

16  Q.  In this excerpt, there's a question, second from the last,

17      second from the end that says, "Refunds or chargebacks."

18  A.  Uh-huh.

19  Q.  And it says, "Yes."  Do you see that?

20  A.  Yes.

21  Q.  And then in the "Remarks" column, it states "haslets."  I

22      assume that's just misspelled for Hashlets.

23  A.  Uh-huh.

24  Q.  "Did reduce chargebacks received in this number.  Was also

25      a VAR."  When it says "did reduce chargebacks received in

```
1                        RYAN GRIMES
2        this number," do you know what that's referring to?
3    A.  No.  Are those my remarks, or is that my thing I put in
4        there or is that --
5    Q.  Do you know?
6    A.  No, I don't know.
7    Q.  Okay.  As far as you recall, you did not receive any
8        chargebacks?
9    A.  As far as I know, I did not.
10   Q.  It says, "Was also a VAR."  Do you know what that means?
11   A.  Value-added reseller is VAR.
12   Q.  What was a "value-added reseller"?
13   A.  Just a reseller.  Basically, we would buy from GAW at a
14       price that was less than what they were selling for, and
15       then we would be able to sell it for the same price they
16       were; and we would be able to make money on it.
17   Q.  Did you use a separate account at GAWMiners for reselling,
18       or was it the same account?
19   A.  No, the same ones.
20   Q.  Still in Exhibit 258, there's a column that says, "Total
21       estimated losses valued in U.S. dollars."  Do you see
22       that?
23   A.  Yes.
24   Q.  And the number in that column says $140,000.  Did you
25       provide that estimated loss number to Mr. Shinners?
```

1                       RYAN GRIMES
2   A.  I did, yes.
3   Q.  And is that -- well, how did you come up with that number?
4   A.  To the best of my recollection, we had totaled up what we
5       had bought and totaled up what we had charged back to us
6       from our clients and came up with that number. When I say
7       "we," I mean I.
8   Q.  So the total -- when you totaled up what you bought, are
9       you referring to the Hashlets that you purchased?
10  A.  Yes. From the store, not from ZenCloud.
11  Q.  Okay. So within this $140,000 number, as far as purchases
12      of Hashlets go, it's Hashlets that you purchased from the
13      GAWMiners store?
14  A.  Correct.
15  Q.  Any other purchases that went into that number?
16  A.  No.
17  Q.  You also mentioned money that you were charged back went
18      into that calculation.
19  A.  Yes.
20  Q.  Can you explain what you mean?
21  A.  Well, we were a reseller. And we were, as part of
22      reselling, when the entire thing collapsed, we had
23      chargebacks against us for stuff we had sold customers.
24  Q.  Okay. Do you have documentation of how you got to the
25      number for chargebacks?

1                    RYAN GRIMES
2     wouldn't give us our money back, and they wouldn't take
3     anything back; and we're left stuck with that.
4          And the other thing about the margins is the margins
5     got smaller as they went along.  When we started, it was
6     good margin.  And at the end, it was -- it was actually we
7     were losing money.  So that's why we all got out when we
8     did.
9  Q. When did you get out?
10 A. End of November or early December timeframe.  I don't know
11    exactly the dates, but that's about when it was -- we had
12    had enough.
13 Q. Who's the "we"?
14 A. My company.  I'm the company.  So, yes, me, I had had
15    enough.
16 Q. Okay.  You had mentioned, though, that "we all got out"
17    when this was happening.
18 A. Oh, sorry, the other resellers got out.  And the whole
19    thing collapsed anyway.  So it didn't matter.
20 Q. In that answer, I believe you said they would offer -- for
21    example, if you purchased $7,000, you'd get 7 percent.
22 A. Uh-huh.
23 Q. Was the 7 percent you were referring to a discount off of
24    whatever the purchase price otherwise was?
25 A. No, that was total discount off.  So if something was a

Page 32

1  RYAN GRIMES
2  thousand dollars, they would give us 7 percent off that.
3  Q. Okay.
4  A. But it would still cost the consumer a thousand dollars.
5     That was their margin we had to work with.
6  Q. Got it.  So if you purchase $7,000 worth, they would
7     reduce from the $7,000 number 7 percent?
8  A. Yes.
9  Q. That's your purchase price?
10 A. Yes.
11 Q. Understood.  I'm going to hand to you what will be marked
12    Exhibit 259.
13          (Exhibit 259 marked for identification.)
14 Q. This has Bates number GAW00628924.  So this looks to be an
15    e-mail exchange between you and Josh Garza; is that right?
16 A. Yes.
17 Q. So if you look at the bottom of the first page, you write,
18    "When I was with Zen as a reseller, I did 25K in a month."
19 A. Yes.
20 Q. "I don't see that stopping any time soon."  What's that
21    referring to?
22 A. So their product evolved.  GAW started out selling
23    hardware as a real product you could get shipped to your
24    house or your place of business.  Then they evolved to
25    ZenCloud, which is Zen.  And it was the same hardware in a

1                         RYAN GRIMES

2    A.   Nothing to do.  It wasn't even around then.

3    Q.   Okay.  In your role as a reseller of Hashlets, do you

4         believe you, ultimately, made money or lost money?

5    A.   Oh, we lost money.  My controller wanted to kill me when

6         we did our financials the next year because what I felt

7         was making money in the long run was losing money.

8    Q.   I'm just trying to find the exhibit number.  If you turn

9         back to --

10   A.   The same one?

11   Q.   No, no.  Exhibit 257.  This was the excerpt from HashTalk.

12        And if you turn to the seventh page, which we looked at

13        earlier --

14   A.   Uh-huh.

15   Q.   I think we established that the discussion is on

16        December 9th of 2014; is that right?

17   A.   Yes.

18   Q.   Okay.  And by that point, you had pulled out as a

19        reseller?

20   A.   Yes.

21   Q.   Okay.  So back to the bottom two lines, you wrote, "I'm

22        not upset.  I made good money from my Hashlets."  Did you

23        make good money from your Hashlets?

24   A.   From a business-owner standpoint that saw a lot of cash

25        flow coming into the business, yes.  As someone who did

RYAN GRIMES

1
2  the checks and balances at the end of the year for paying
3  taxes to the IRS, no. My controller was very upset with
4  me about this. Am I allowed to go into more of this or --
5  Q. Sure.
6  A. Okay. So I don't know which one it was. But when you're
7     talking about $25,000 and you're at 10 percent margin,
8     that's where Josh is talking about. So you got 10 percent
9     margin to work with. You take credit cards, there's three
10    percent gone.
11        You have a verified risk assessment on your web
12    store, there's another one-and-a-half percent gone. You
13    take -- what was the other things we had to do? You have
14    the plug-ins for running your web store, and your web
15    store; there's another one to two percent gone.
16        So that $25,000 at 10 percent sounds like $2,500.
17    But when you're done, you're making less than a thousand
18    dollars on $25,000. That's if you paid your credit cards
19    on time and you've managed your cash flow appropriately,
20    which as a small business is very difficult to do.
21 Q. Okay. Can I unpack that a little?
22 A. Yes.
23 Q. And slow it down, if I may?
24 A. I'm sorry about that.
25 Q. That's okay. I just to make sure I understood the numbers

1                        RYAN GRIMES
2        you talked about.
3              You said when Josh talks about $25,000 at 10 percent.
4        Are you referring to if you purchased $25,000 worth of
5        Hashlets as a reseller, he would give you a 10 percent
6        discount off of that purchase price?
7    A.  Yes.
8    Q.  And that margin is where you're supposed to make money
9        when you resell?
10   A.  Yes.
11   Q.  Okay. And then sounds like you're describing a whole
12       bunch of costs that come along with being a reseller?
13   A.  Yes.
14   Q.  Okay. One of which is if you sell, but through a credit
15       card, or if you buy through a credit -- I'm not sure which
16       credit card costs you were talking about there. As the
17       seller?
18   A.  When we take a credit card, we take a 2.7 or 3 percent
19       hit.
20   Q.  Okay. So part of the margin that you're losing off of --
21       if you make a sale and the purchaser uses a credit card?
22   A.  Uh-huh.
23   Q.  Because there's a fee associated?
24   A.  Yep.
25   Q.  Okay. And then you -- I think you mentioned a few other

RYAN GRIMES

2  items that sounded like costs to you as the seller.
3  A. Uh-huh.
4  Q. Some have to do with your website? I want to make sure
5     I've got them right.
6  A. The web store, to run a web store costs money.
7  Q. Okay.
8  A. To get the transactions analyzed for risk assessment to
9     take credit cards is an additional percentage or two.
10    This is a very volatile market, and they needed -- we
11    needed to make sure that the transactions were legit. So
12    we had to tack that cost on as well.
13        And just once you add up all the fees associated with
14    actually selling the product, you didn't end up making any
15    money.
16 Q. Right. Okay. And I know as a businessman, you may not
17    look at things this way. But if you were to just add up
18    the purchases of Hashlets as a reseller and compare those
19    to the sales that you made as a reseller, before you
20    factor in the various costs that you just identified,
21    which number would be higher, the purchases or the sales?
22 A. So you're asking me if I compared my purchases to my
23    sales, which one would be higher?
24 Q. Yes.
25 A. The sales would be higher.

Page 67

RYAN GRIMES

just because cash flow was so -- it was so fast. You couldn't keep up with it as a small business.

Q. And to be clear, were you paying through the GAWMiners' website?

A. Yes.

Q. Okay. And so after you paid, what happened next?

A. We would get e-mailed one of -- a confirmation e-mail. And then we would get an e-mail with a bunch of codes in it that we would use to populate the inventory in our store.

Q. So just let me take a step back. Were there two e-mails that you'd receive from GAWMiners, or was it one e-mail?

A. I thought it was one e-mail, but I'm seeing -- I swear it was one e-mail at one point, basically, "Thank you for your order. Here's your codes."

Q. Okay. Would that e-mail show the price that you paid as well as the codes?

A. Yes.

Q. Okay. So once you -- strike that.

    In any event, you would receive the codes from GAWMiners in e-mail form, correct?

A. Yes.

Q. And just to be clear, when we say "codes," what are you referring to?

1                         RYAN GRIMES

2        don't remember exactly what it was.  And it would say,
3        "Hashlet Prime 3," and then have three codes.
4    Q.  And those would -- the codes that Mr. Kant would receive,
5        those would be the codes that you receive from GAWMiners,
6        correct?
7    A.  Yes.
8    Q.  Okay.  And then what would Mr. Kant do next?
9    A.  He would take those codes and go to ZenCloud, and he would
10       add a Hashlet and paste in the codes, and then he would
11       get a one Zen Hashlet icon on his dashboard.
12   Q.  Okay.  And at that point, you don't know what Mr. Kant did
13       with the Hashlets; is that fair?
14   A.  No idea.
15   Q.  So if you look at Exhibit 268, you know, you sold Mr. --
16       it looks like you sold Mr. Kant the one Zen Hashlet for
17       $21.95.  Do you see that?
18   A.  Uh-huh.
19   Q.  And I see that there's a discount included there.  How is
20       that discount applied?  Strike that.
21            Was it a single percentage discount applied across
22       all of the Hashlets or would, for example, Hashlet Prime
23       receive a greater discount, or how did that work?
24   A.  It was just a general discount to get people to buy from
25       us.  We were competing with GAW, and we needed something

Page 72

1                           RYAN GRIMES
2       to drive people to our store versus theirs.  So we had to
3       compete with discounts.
4   Q.  So it would be, for example -- and I'm not saying this is
5       what the discount is.  But I guess we could do the math.
6       But it would be a flat two or three percent discount,
7       something like that?
8   A.  Yes.
9   Q.  So that would apply to the Zen Hashlet, and it would apply
10      to the Hashlet Primes; is that right?
11  A.  Yes.
12  Q.  Okay.  And if you -- even including the discount, you
13      would be selling these products for more -- strike that.
14          $21.95 was more than what you bought a Zen Hashlet
15      for from GAWMiners, right?
16  A.  Yes.
17  Q.  Okay.  And that would -- even including the discount, you
18      would only sell for more than what you paid GAWMiners,
19      right?
20  A.  Correct.
21  Q.  <u>Was that always true?</u>
22  A.  <u>At the end, we just tried to get our money back.  So we</u>
23      <u>were taking anything we could get for them.  So we were</u>
24      <u>selling everything at a loss, but better to take a loss on</u>
25      <u>some stuff than lose everything.</u>

```
 1
 2                        CERTIFICATE
 3
          I, Angela J. Galipeau, a Notary Public, in and for
 4   the County of Porter and State Of Indiana, do hereby
     certify:
 5
          That RYAN GRIMES appeared before me on Tuesday,
 6   October 22, 2019, and was duly sworn or affirmed to
     testify the truth, the whole truth, and nothing but the
 7   truth to questions propounded at the taking of the
     foregoing deposition in a cause now pending and
 8   undetermined in said court;
 9        That I further certify that I then and there
     reported stenographically the proceedings at the said time
10   and place; that the proceedings were then transcribed from
     my original shorthand notes; and that the foregoing
11   typewritten transcript is a true and correct record
     thereof;
12
          That I am not a relative or employee or attorney
13   or counsel, nor a relative or employee of such attorney or
     counsel for any of the parties hereto, nor am I interested
14   directly or indirectly in the outcome of this action;
15        IN WITNESS WHEREOF, I have hereunto set my hand
     and affixed my notarial seal this 1st day of November,
16   2019.
17
18
19                        _____
                          Angela J. Galipeau, RPR, CSR
20                        Notary Public, State of Indiana
                          Residence:  Porter County
21                        Commission Expires:  4-23-25
22
23
24
25
```