```
 1                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF CONNECTICUT
 2
     - - - - - - - - - - - - - - - - x
 3                                       No. 3:16-CV-00940 (MPS)
     DENIS MARC AUDET, MICHAEL
 4   PFEIFFER, and DEAN ALLEN            JULY 19, 2019
     SHINNERS, Individually and on
 5   Behalf of All Others Similarly      1:00 p.m.
     Situated
 6                                       TELEPHONIC STATUS CONFERENCE
     vs.
 7
     STUART A. FRASER, GAW MINERS,
 8   LLC, and ZENMINER, LLC, (d/b/a
     ZEN CLOUD)
 9
     - - - - - - - - - - - - - - - - x
10

11                        450 Main Street
                        Hartford, Connecticut
12

13        BEFORE:  THE HONORABLE MICHAEL P. SHEA, U.S.D.J.

14

15   APPEARANCES:

16   FOR THE PLAINTIFFS:

17           SUSMAN GODFREY, L.L.P.
                 1000 Louisiana Street, Suite 5100
18               Houston, Texas 77002
             BY:  COLIN M. WATTERSON, ESQUIRE
19
             SUSMAN GODFREY, L.L.P.
20               1301 Avenue of the Americas, 32nd Floor
                 New York, New York 10019
21           BY:  SETH D. ARD, ESQUIRE

22           IZARD, KINDALL & RAABE, LLP
                 29 South Main Street, Suite 305
23               West Hartford, Connecticut 06107
             BY:  CHRISTOPHER M. BARRETT, ESQUIRE
24
                              (continued ...)
25
```

```
1   FOR THE DEFENDANTS:

2           HUGHES, HUBBARD & REED L.L.P.
                  One Battery Park Plaza, 12th Floor
3                 New York, New York 10004-1482
            BY:   SARAH L. CAVE, ESQUIRE
4                 DANIEL H. WEINER, ESQUIRE
                  HANNAH MILLER, ESQUIRE
5
            BRENNER, SALTZMAN & WALLMAN
6                 271 Whitney Avenue
                  New Haven, Connecticut 06511-1746
7           BY:   SEAN M. FISHER, ESQUIRE

8

9   COURT REPORTER:  Julie L. Monette, RMR, CRR, CCP
                        (860) 212-6937
10

    Proceedings recorded by mechanical stenography, transcript
11  produced by computer.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE COURT:  Good afternoon.  This is Michael Shea.

2     We're on the record in Audet versus Fraser.  The case is

3     16-CV-940.  Let's begin with having counsel state appearances,

4     beginning with plaintiff's counsel.

5          MR. WATTERSON:  This is Colin Watterson with Susman

6     Godfrey for the plaintiff.

7          MR. ARD:  Seth Ard, Susman Godfrey for the

8     plaintiffs.

9          MR. BARRETT:  Christopher Barrett of Izard, Kindall &

10    Raabe for the plaintiffs.

11         THE COURT:  All right.  Can we hear from defense

12    counsel?

13         MR. WEINER:  Good afternoon, Judge Shea.  This is

14    Daniel Weiner from Hughes, Hubbard & Reed for defendant Stuart

15    Fraser.  I also have on the line with me Hannah Miller from my

16    office, and I believe Ms. Cave is somewhere out in hinterland,

17    but she may be able to dial in.

18         Sarah, are you there?

19         MS. CAVE:  Yes, this is Sarah Cave from Hughes

20    Hubbard.

21         THE COURT:  Okay, very good.

22         Oh, is Mr. Fisher on the line with us too?

23         MR. FISHER:  Sorry, Your Honor.  Sean Fisher, Brenner,

24    Saltzman & Wallman for the defendant Stuart Fraser.

25         THE COURT:  Welcome, everyone.

1          So the purpose of the call was indicated on the notice

2     that we posted.  I have the joint status report that the

3     parties filed with the proposed schedule.  Then I also asked

4     the parties to be prepared to discuss the issue of notice to

5     the class.

6          Let's start with the -- I guess we should start with

7     the issue of notice actually just in case it will affect the

8     schedule.

9          So, you know, the rule doesn't say exactly when notice

10    has to be made, but it seems to suggest that it should be made

11    around the time of class certification.  Some district courts

12    have kind of said that.  And we should talk about the issue of

13    the costs of the notice, the type of notice, how best to give

14    notice in this situation.

15         So let's begin, then, Mr. Watterson, I think with you,

16    and tell us your thoughts on that, please.

17         MR. WATTERSON:  Yes, Your Honor.  Our proposal would

18    be that we would try to reach an agreed form of notice with Mr.

19    Fraser.  I think that we would be able to send something over

20    to him in the next two weeks and hopefully be able to have

21    something out to provide to you for approval.  And we would

22    anticipate that after we have an approved form of notice, it

23    would take approximately 30 days to have the notice

24    distributed.

25         As far as how we would go about providing notice, we

1    have a pretty substantial grouping of e-mail addresses from the

2    ZenCloud and T based databases that could be used to provide

3    notice directly to class members, and that could also be

4    supplemented by advertising on websites.  Specifically we were

5    envisioning there are some popular cryptocurrency websites, so

6    purchasing ads there.  And so we would provide a short form

7    notice and then potentially have a website with a longer form

8    notice to provide additional information.

9            THE COURT:  Okay.  Attorney Weiner or Attorney Cave,

10   I'm not sure who's going to take the lead.  What are your

11   thoughts on that?

12           MR. WEINER:  This is Dan Weiner, Judge Shea.  And just

13   so you know, Attorney Cave is shortly going to make the

14   transition from bench to bar.

15           THE COURT:  So I understand.  And I was going to end

16   the call by congratulating her, but I'll do that now.  And so,

17   you know, at the time I said to myself they made an excellent

18   choice.  So anyway, but we can talk about that later.

19           MR. WEINER:  And that's the reason I am taking the

20   lead, because she won't be with us on our side much longer.

21           That's fine with us in terms of content, if they're

22   proposing sending us the content and reach agreement.  We have

23   worked fairly well together; so we hope we can achieve some

24   agreement on that and sounds fine.

25           In terms of distribution, I think we have to see more

1  concretely what websites they propose, but in concept that

2  makes sense.

3          THE COURT:  Okay, fine.  That makes sense to me too.

4          Mr. Watterson, you proposed to get them the notice in

5  two weeks, file it with the Court or file, you know, if the

6  parties want to file some kind of a joint document where they

7  indicate what they agree on, indicate what they don't agree on,

8  and, if necessary, we can have another call.  Can we do that in

9  21 days, that is to say, file the joint document in 21 days?

10          If it's, you know, jointly agreed notice, the

11  likelihood is I'm going to approve it and maybe not even need a

12  call.  If there are disputes, then I'll get you on the phone.

13  But two weeks -- you said you wanted two weeks to put together

14  something to send to them.  And then can we have a filing

15  deadline of 21 days for the joint proposal?

16          MR. WATTERSON:  That's fine with us, Your Honor.

17          MR. WEINER:  Fine with us.

18          THE COURT:  Okay, that's what we'll do then.  And

19  we'll put that on the order that we'll issue after the call; so

20  that's great.

21          Turning to the schedule, so let me kind of cut to the

22  chase.  Mr. Watterson, I'm inclined to agree with Mr. Fraser's

23  proposal.  I think we can talk about kind of cabinning it or

24  limiting it and perhaps ways to limit the burden and that kind

25  of thing.  But the bottom line is essentially I said they could

1    do this, and I meant it when I said it.

2           I think -- just rereading my opinion, I think that the

3    context in which this came up was the issue of whether

4    individual issues concerning damages would predominate over

5    common issues.  And I kind of walked through how, you know,

6    ordinarily the cases say that that's not enough, and then I

7    talked about how, you know, there's the claims process and

8    auditing can be used.

9           But at the end of the day, obviously, the arguments

10   that Mr. Fraser had made about chargebacks and the like had

11   enough hold on me that I said to myself, I think it was

12   warranted for -- to give them a chance to see, for example, if

13   they could move to decertify as to damages and that it would be

14   necessary to have trials as to damages.  Not every class can be

15   resolved through a claims process.  So that was sort of my

16   intent in writing the ruling.  I hope that was clear.

17          And I don't think, in light of that now, I'm persuaded

18   that I should go back on that.  It seems -- still seems correct

19   to me.  So I am going to allow them to take some discovery.  I

20   didn't think their proposal was unreasonable, but I did, you

21   know -- I don't know how many document requests they're going

22   to send out.

23          I did have a couple of thoughts on this, though, for

24   limiting things.  One thought would be that I do think it is

25   correct that the discovery should be limited to what I

1   described, which is to say chargebacks or private transactions.

2   As I said, this came up in the discussion of damages, and I

3   guess, ultimately, from my standpoint -- maybe I'm -- maybe I'm

4   not understanding what the parties have in mind, but from my

5   standpoint, the purpose of this discovery would be to determine

6   whether the damages issues, in light of chargebacks and other

7   private transactions that may reduce or eliminate any loss, are

8   complicated enough and individualized enough that it's

9   necessary to have trials about those issues as opposed to

10  simply doing a fairly -- a more simplified claims process.

11          To me that, I think, would be the purpose of that

12  discovery.  And so in light of that, I would be inclined to

13  limit it to those topics, namely, chargebacks or private

14  transactions from class members.

15          And further, I also would entertain limiting, say,

16  each deposition to three hours, although if the defendant said,

17  "Geez, Judge, this guy's produced, you know, a boxful of stuff

18  about credit card slips and the like and it's really hard to

19  decipher, we're going to have to go through it with him," yeah,

20  I would entertain a motion to deviate from sort of a

21  presumption of three hours in a particular case.

22          The other thought I'll throw out, and then I'll hear

23  from counsel, is whether it would make sense or not to limit

24  the depositions to folks with a fair amount of skin in the

25  game.  And what I mean by that is, you know, if you've got a

1    class member who's got -- who appears to have only a hundred

2    dollars in loss, and recognizing that you don't know what all

3    the gains might be or chargebacks in that situation, but at the

4    end of the day, it's just a hundred dollars, query whether it

5    really makes sense to put that person through a deposition.  On

6    the other hand, if you have somebody with $5,000, then it might

7    well make sense to put that person through a deposition.

8         And so query whether we should have kind of a loss

9    cutoff of -- I have no idea what would be a good one, but

10   something in the $3,000 range.  In other words, anyone below

11   $3,000 of losses would not -- I don't mean -- when I say

12   "losses," I don't mean net losses.  I mean the amounts that are

13   ascertainable without looking -- without taking these

14   depositions or getting documents from these folks.

15        And if we have that kind of a cutoff, then arguably

16   we'd be focusing depositions on the people who have more skin

17   in the game, and we wouldn't be, you know, chilling folks or

18   scaring away folks, if you will, who, you know, have legitimate

19   claims but for less dollar amounts.

20        Now, one possible problem with proceeding that way is

21   that it may well be that the defense wants to be able to argue

22   that they have a representative sample of folks who they're

23   deposing in order to present a motion for class decertification

24   or for decertification as to damages.  So there may be ways

25   around that, but those are the thoughts I had on this.

1          Let me start with Mr. Watterson.  Then I'll hear from

2     Mr. Weiner.

3          MR. WATTERSON:  Sure.  First, Your Honor, with respect

4     to depositions, it seems to me that given that the purpose of

5     discovery is to look at whether or not the claims

6     administration process would be too individualized, in that

7     process what happens would be submitting documentation and they

8     wouldn't be providing testimony.  So I mean it seems to me that

9     I just don't know that depositions seem -- that they would be

10    necessary.  You know, the question is maybe:  What are the

11    documentation going to look like?

12         THE COURT:  Yeah, but suppose that, you know, Mr.

13    Weiner gets a credit card statement for class member X and it

14    shows that they charge back, you know, $50 of this $100 loss.

15    But then, during the deposition, it turns out that there was

16    another private transaction that maybe they don't have paper

17    for or they didn't search hard enough because they didn't

18    produce their bank statements or the like.  And so the whole

19    idea here is to allow the defendant to probe to see if, in

20    fact, this is more complicated than just a single credit card

21    statement or a single statement.

22         In the end you may be right.  In the end maybe it's

23    not more complicated.  But I would think the depositions might

24    help show us that.

25         MR. WATTERSON:  I understand, Your Honor.

1          THE COURT:  Okay.

2          MR. WATTERSON:  The second point that I wanted to make

3     is that, you know, the proposal, as I understand it, is to

4     obtain discovery from 173 of these absent class members, and

5     that is going to take, I think, some significant time, effort,

6     and expense, and these are the individuals that already

7     gathered documents and provided them to Mr. Shinners.

8          And so I have some real concerns about people being

9     confused and not understanding, you know, why it is that they

10    have to provide information.  The way they're going to see it

11    is provide information again.

12         And, you know, that's especially true because there is

13    some documentation that's already been produced that has to do

14    with the chargebacks.  So as I see it, this information is

15    already in -- this information is in Mr. Fraser's hands, and it

16    wasn't sort of addressed, I guess, in the class certification

17    opposition.  And so given all the case law about absent class

18    members discovery being treated as necessary, I'm just

19    concerned about the burdens that this is going to impose on all

20    these folks and, frankly, just how long it's going to take

21    because --

22         THE COURT:  Well, a couple things about that, Mr.

23    Watterson.  Number one, you talked about 173 people.  To be

24    clear, I don't believe my ruling certified a class of 173

25    people.  I believe it relied on the people you discussed for

1   purposes of certainly the numerosity finding and also as to

2   some aspects -- I don't remember the details -- of establishing

3   membership in the class and the like.

4       But I think we also made clear -- I think there was a

5   footnote that your side wasn't prohibited from saying, "No, no,

6   no, Judge, the class is much broader.  It's everybody in this

7   data base" and that essentially I didn't ultimately take a

8   position on whether the databases were so flawed that we

9   couldn't possibly rely on them because I found this other route

10  that allowed me to make the findings that I had to make in

11  order to certify the class.

12      But in no way did I limit the class of those 173

13  people.  And I'm imagining that you -- if I asked you, "Do you

14  think I limited the class to 173 people?" you'd say, "No, no,

15  no, Judge.  You certainly let us continue to try to prove that

16  the class is much broader than that."  Am I right?

17      MR. WATTERSON:  That's absolutely right, Your Honor.

18  What I was referring to is that this is my understanding during

19  our meet and confer what Mr. Fraser was proposing who -- which

20  absent class members Mr. Fraser wants to take discovery from,

21  and that would be the 173 individuals.  But I agree with you

22  absolutely.

23      THE COURT:  I see.  All right.  Now, in terms of

24  burden, yeah, I get it that there's a burden.  On the other

25  hand, they are parties now.  You're right, they're kind of

1  special parties in the sense that they're absent.  But there

2  will be a notice going out eventually that will kind of make it

3  a little clearer what's going on to them.  And they can opt out

4  too.

5           But do you have any -- assuming I get past your

6  objections about whether to do this at all, do you have any

7  thoughts on the kinds of thresholds or hour limits that I

8  talked about?

9           MR. WATTERSON:  You know, Your Honor, I think that

10  it's certainly true -- I agree with both Your Honor's

11  limitations.  I do not think that it would be necessary to, you

12  know, spend more than an hour or two kind of asking someone

13  questions about their credit card statements.  I just can't

14  imagine that it's going to be all that complicated.  So, you

15  know, I think that these depositions, if there are any, they

16  should be limited to an hour or two at the most.

17          And, you know, with respect to other thresholds, you

18  know, I think that one thing that is said in the case law is

19  that long mandatory questionnaires is often an appropriate way

20  of taking discovery from absent class members.  So as an

21  alternative to interrogatories and document requests, I think

22  the Court should consider those questionnaires, because that's

23  a way to minimize the burden on these folks.

24          THE COURT:  All right.  Mr. Weiner?

25          MR. WEINER:  Thank you, Judge.  I think we're in

1   violent agreement with the proposal that Your Honor put

2   forward.  We don't have any problem with the limitations and

3   the subject matter because, after all, that's what your opinion

4   says.

5          The three-hour time limit sounds reasonable given the

6   subject matters to be covered.  A floor of $3,000 sounds

7   reasonable, you know, absent some good cause for us to go below

8   that floor, because that would capture people with skin in the

9   game.

10          The 173 members, I mean we were proposing that as a

11   reasonable compromise.  Your Honor is right that plaintiffs say

12   their class is thousands and thousands of people.  So the 173

13   are easier to identify because they've already responded to Mr.

14   Shinners' inquiries.  So I don't think very targeted document

15   request interrogatories on the limited subjects of chargeback

16   and third-party transactions, that won't be a problem.

17          To eliminate the confusion problem that Mr. Watterson

18   raises, I think we were thinking the best way to deal with

19   that -- and I recognize it's a possibility -- is to have, you

20   know, we gave our document requests and interrogatories to the

21   plaintiff's counsel, because they are counsel for these class

22   members, and have them get the information.  We don't have the

23   ability -- we don't have full names and addresses, as far as we

24   know, for most of the 173.

25          So the plaintiff's counsel could have an explanatory

1    note saying:  This is why we're back to you again for this

2    information.  The Court has directed it, and you have to do it

3    under oath.  And here's the information to kind of standardize

4    it.

5          But overall, I think it's a reasonable plan to have

6    this limited and targeted both in numbers and hours and subject

7    discovery.

8          THE COURT:  I tend to agree, Mr. Watterson.  Let me

9    ask you this:  Is there any problem with proceeding as -- I

10   know that you object to the whole concept, but putting --

11   assuming that objection's been overruled, is there any problem

12   with proceeding in the way he described in terms of him having

13   his team provide you with the discovery requests and have you

14   essentially transmit them?  That's what I understood your

15   proposal to be, Mr. Weiner.

16         MR. WEINER:  Correct, Your Honor.  That's exactly

17   right.

18         MR. WATTERSON:  No, Your Honor.  I think I'm fine with

19   that in context.  We, obviously, haven't seen the discovery

20   yet; so I suppose we may have some objections.  But as far as

21   us transmitting it, no, we don't have a problem with that.

22         THE COURT:  Okay.  Well, that's fine.  I'm then going

23   to adopt the defendant's -- the parties have a largely agreed

24   schedule.  I'm going to adopt that.

25         I'm also going to adopt the defendant's proposal with

1    regard to the timing of the document requests and

2    interrogatories; so 7 days after today they should be -- they

3    should be issued.  And then it says within 14 days of receipt,

4    the plaintiffs should respond.  And then they'll produce

5    responsive documents on behalf of the class within 30 days.

6         And then you can schedule the depositions accordingly.

7    It would be great if we could do the notices through counsel

8    like that too.  And then Mr. Fraser will notify the Court

9    within two weeks of the last deposition if he's going to move

10   to decertify.  I think all that sounds fine, and we will issue

11   an order to this effect.

12        MR. ARD:  Your Honor, Seth Ard from Susman Godfrey.

13   They hadn't raised these issues about serving these requests

14   through us, and so we haven't had time to think about it.  I

15   would say that it's not correct to say that we represent them

16   now because before they've had the opportunity to opt out from

17   the class, they're not bound by the class, and we don't

18   represent them formally.

19        My concern is we're not going to know where some of

20   these people are.  And normally it would be their burden to,

21   you know, if they want to serve a document request on somebody,

22   especially somebody who now is an absent class member and not

23   bound by the class and is really a third party, it would be

24   their burden to locate the person, serve the person, and the

25   like.  So --

1          THE COURT:  Well, part of that's a matter of timing;

2    right?  I mean the -- you know, we could extend this.  I'd

3    rather not, of course.

4          Let me just say this:  We could extend it so that the

5    first -- the premise of your point, which is that they're not

6    parties until after the notice has gone out and folks have had

7    a chance to opt out, would no longer be correct.

8          In other words, we could have you guys do the notice

9    first, have the -- in fact, the notice could say -- although we

10   need to talk about that because I don't want to chill anybody.

11   But the notice could say there may be a need to participate in

12   some discovery to come up with some documents, etc.  And we

13   could send it out and then wait for the opt-outs and then do

14   this.  I don't think that's very efficient, honestly.

15         But what -- and I get that you can't -- I mean what --

16   perhaps one of your concerns is you can't really be a guarantor

17   of where these people are.  All you have are e-mail addresses

18   in many cases; is that right?

19         MR. ARD:  Yeah, from several years ago.

20         THE COURT:  Mr. Weiner, do you have any thoughts on

21   that?

22         MR. WEINER:  Yes, Your Honor.  We have some of the

23   same information, but again, these people aren't our clients.

24   How would they like if we are serving them, contacting them,

25   and interviewing them?  These are the class members, and if

1  they want to wait until after people have opted out, I suppose

2  that's fine with us.

3        But it's easier for them to communicate with these

4  people, and I think they probably have a problem with us

5  communicating directly with them.

6        THE COURT:  I would think so too.  It's Mr. Ardon;

7  right?

8        MR. ARD:  Ard.

9        THE COURT:  Sorry.  I mispronounced it.

10        MR. ARD:  No problem.

11        THE COURT:  I would think so too.  I would think you

12  would not want Mr. Weiner's team to be calling up these folks

13  and interviewing them and taking statements privately, which

14  they could do, given your position.

15        So I mean I get you're sort of like, "Whoa, wait a

16  minute.  We don't know where exactly all these people are."

17  But, you know, you have what you have, and if you get the --

18  get the discovery requests, you know, what would prevent you

19  from sending them out?  Wouldn't it be more likely to result in

20  a cooperative process if you guys did the communicating?

21        MR. ARD:  Well, part of it depends on the timeline

22  that we're talking about.  Because this is raised for the first

23  time on this call, I think what makes most sense is for us to

24  talk to them, you know, about who they're -- you know, what

25  they're planning on serving and when they're planning on doing

1    it.  And, you know, if we're really going to be sort of

2    responding to 173 document requests, you know, I think the

3    timeline that they propose is maybe not realistic.

4            So I guess what I would propose is that we sort of

5    talk to them and try and make a joint submission to the Court.

6            THE COURT:  I thought that's what I already had.

7            MR. ARD:  What I've not heard before is that they

8    wanted us to go out and find all these people and serve them.

9            I have no problem in concept with being the party to

10   transmit this information to the other side.  My only concern

11   is I don't really know where they are.  And so I mean I guess

12   as long as it's not, you know, understood, as I think Your

13   Honor said, that we're the guarantor of their location, we can

14   certainly make our best effort to try to respond on their

15   behalf.

16           THE COURT:  Why don't we start with that.  I don't

17   really see much of an alternative, honestly, since you folks

18   have the information you have.  I imagine, given the quality,

19   the high quality of the lawyers on the phone and the enormous

20   resources that have been spent on this case, if there were

21   better ways to locate these people, you would have found them.

22   So I don't think it's going to get any better.  So my sense is

23   that let's at least start down this road and, you know, see how

24   it goes.

25           You know, if we end up with fights about, oh,

1    so-and-so didn't respond, we'll deal with it.

2              MR. ARD:  Okay.

3              THE COURT:  But I think that we have to start.

4              MR. ARD:  Yeah.  I mean just so it's clear, what I

5    thought was going to happen, I thought that they were going to

6    hire people to find out where these people were, who they

7    wanted to serve, and they would have to send us notice, of

8    course, before they served anybody, and we could represent

9    them.

10             But I did not realize that they wanted us to do that

11   work.  It could be significant work and significant expense to

12   locate people.  Of course, if they respond to the e-mail

13   address that we have, it's no problem.  I'm not quite sure

14   what's supposed to happen if they don't, but we can work that

15   out and proceed as we do.

16             THE COURT:  Mr. Weiner?

17             MR. WEINER:  Can I be heard briefly on this?

18             THE COURT:  Yes, yes.

19             MR. WEINER:  So the first point is I know Mr. Ard was

20   not on the meet and confer call, but this subject was raised

21   and discussed during that call, and Ms. Cave can speak to that

22   if you want to hear it.

23             On that point, the first bullet point in our joint

24   status report says, "Fraser will issue document requests and/or

25   interrogatories to plaintiffs."  So I don't know what Mr. Ard

1    thinks that means who the plaintiffs are.  That's what we said

2    on the conference in our meet and confer, and that's what we

3    said in our joint status conference.

4           The second point is the only alternative what we

5    proposed is the one Your Honor proposed.  If they want to wait

6    until people return and respond to the notice and get rid of

7    the opt-outs, they will have current information on those

8    people.  Then they won't have to spend so much time and effort

9    finding them.

10          THE COURT:  Mr. Ard, what about that?  Would you

11   rather proceed that way, to kind of do the notice process

12   first, kind of lock in, in a more formal way, who's out at

13   least?

14          MR. ARD:  Well --

15          THE COURT:  Go ahead.

16          MR. ARD:  Sorry.  I didn't mean to --

17          THE COURT:  No, no.  Go ahead.

18          MR. ARD:  You know, if the proposal is that that

19   process runs concurrently with the rest of the schedule --

20          THE COURT:  No, no.  What I'm asking is -- what I'm

21   asking is:  Would you prefer that we not run it concurrently,

22   that, in fact, we do the notice process first, kind of draw a

23   line in a more clear way about who your clients are, and then

24   proceed with this process?  Would that be a preference?  Do you

25   have a preference for that?

1          MR. ARD:  I guess I was trying to propose a third

2     option, which is that we could do that but also run the rest of

3     the schedule concurrently.  So the rest of the schedule would

4     proceed apace.  It wouldn't be delayed with extra reports and

5     all that kind of stuff and summary judgment and briefing.

6          THE COURT:  Yeah, although, presumably, if the notice

7     takes -- I don't know -- 60 days to kind of wrap up and then

8     the plaintiffs are -- sorry -- then the defense at that point

9     submits to you their requests, it may push out some of the

10    other deadlines.  No?

11         MR. ARD:  Well, I was thinking -- you know what, Your

12    Honor?  I think we're fine with what Your Honor proposed, which

13    is that we try this out.  But I just wanted to mark for the

14    record that we don't know where these people are necessarily,

15    and normally it would be the party serving the subpoena that

16    would have the burden and undertaking the expense to try to

17    find them.  But, you know, we will try to contact them with

18    whatever information we have.

19         THE COURT:  Which would presumably -- which would

20    presumably be the same information you would use to send them

21    the notice.

22         MR. ARD:  Well, yes and no.  I mean the notice, but

23    normally when we do a notice, we would have -- it would be

24    publicized on websites.

25         THE COURT:  Yes, fair enough.  Yes, you'd have

```
1    publication notice too.  That's true.  That's a fair point.
2           All right.  Well, let's proceed then with the
3    defendant's proposal.  We'll see how it goes, and if there's a
4    problem, I'm here.
5           So is there -- let me ask, on the notice, is there any
6    reason we can't move that along a little faster, Mr. Ard, Mr.
7    Watterson?  Can you get that proposal to the defendants in --
8    the defendant in 7 days and then have the joint filing with the
9    Court in 14 and then -- because I'd like to get that notice
10   out.  Any reason we can't?
11          MR. ARD:  I think, Your Honor --
12          THE COURT:  Go ahead.
13          MR. ARD:  Sorry.
14          THE COURT:  No.  Go ahead.
15          MR. ARD:  I think, Your Honor, that we can expedite
16   the notice on the back end in terms of, you know, we can get
17   the publication notice out as quickly as possible.  We can have
18   a 30-day opt-out period.
19          I do think that in terms of getting a competitive bid
20   together for the right notice administrator at the least cost
21   and working with them, I think that anything less than 14
22   days --
23          THE COURT:  Fair enough.  Fair enough.  You got me.
24          MR. ARD:  We can certainly try --
25          THE COURT:  No.  14 days is okay.  Good.
```

1            So anything else to discuss today?

2            MR. WEINER:  Not from the defendant side.

3            MR. ARD:  Nor from the plaintiffs.  Thank you, Your

4    Honor.

5        (The proceedings concluded at 1:31 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                        C E R T I F I C A T E

4

5

6

7                    I, Julie L. Monette, RMR, CRR, CRC, Official

8     Court Reporter for the United States District Court for the

9     District of Connecticut, do hereby certify that the foregoing

10    pages are a true and accurate transcription of my shorthand

11    notes taken in the aforementioned matter to the best of my

12    skill and ability.

13

14

15                        /S/ JULIE L. MONETTE
                 _____
16                Julie L. Monette, RMR, CRR, CRC
                          Official Court Reporter
17                         450 Main Street
                      Hartford, Connecticut 06103
18                          (860) 212-6937

19

20

21

22

23

24

25