1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF CONNECTICUT
2
- - - - - - - - - - - - - - - - x
3                                         No. 3:16-CV-00940 (MPS)
DENIS MARC AUDET, MICHAEL
4    PFEIFFER, and DEAN ALLEN               JULY 31, 2019
SHINNERS, Individually and on
5    Behalf of All Others Similarly         3:31 p.m.
Situated
6                                         TELEPHONIC STATUS CONFERENCE
vs.
7
STUART A. FRASER, GAW MINERS,
8    LLC, and ZENMINER, LLC, (d/b/a
ZEN CLOUD)
9
- - - - - - - - - - - - - - - - x
10
                           450 Main Street
11                       Hartford, Connecticut

12        BEFORE:  THE HONORABLE MICHAEL P. SHEA, U.S.D.J.

13   APPEARANCES:

14   FOR THE PLAINTIFFS:

15           SUSMAN GODFREY, L.L.P.
                 1000 Louisiana Street, Suite 5100
16               Houston, Texas 77002
             BY:  COLIN M. WATTERSON, ESQUIRE
17
             SUSMAN GODFREY, L.L.P.
18               1901 Avenue of the Stars, Suite 950
                 Los Angeles, California 90067
19           BY:  KATHRYN P. HOEK, ESQUIRE

20   FOR THE DEFENDANTS:

21           HUGHES, HUBBARD & REED L.L.P.
                 One Battery Park Plaza, 12th Floor
22               New York, New York 10004-1482
             BY:  SARAH L. CAVE, ESQUIRE
23               HANNAH MILLER, ESQUIRE

24   COURT REPORTER:  Julie L. Monette, RMR, CRR, CCP
                         (860) 212-6937
25
     Proceedings recorded by mechanical stenography, transcript

1    THE COURT:  Good afternoon.  This is Michael Shea.
2    We're on the record in Audet versus Fraser, 16-CV-940.  Let's
3    begin by having counsel state appearances, starting with
4    plaintiff's counsel.
5    MR. WATTERSON:  Good afternoon, Your Honor.  This is
6    Colin Watterson with Sussman Godfrey for the plaintiff.
7    MS. HOEK:  Good afternoon, Your Honor.  This is Kathy
8    Hoek also with Sussman Godfrey for the plaintiff.
9    THE COURT:  All right.
10   MS. CAVE:  Good afternoon, Your Honor.  This is Sarah
11   Cave from Hughes, Hubbard & Reed for defendant Stuart Fraser,
12   and with me also is Hannah Miller also from Hughes Hubbard.
13   THE COURT:  Okay.  Good afternoon.  So I have the
14   parties' letters.  I have Attorney Cave's letter dated July
15   24th, and I have Attorney Watterson's letter dated July 29th.
16   And as I understand it, there's a dispute about whether the
17   discovery that I've authorized of class members should be
18   limited to first PayPal and Stripe and, second, to the 173
19   absent class members that form the group that I relied on for
20   part of the ruling on class certification.
21   Am I understanding the disagreement or disagreements
22   correctly?
23   MS. CAVE:  Yes, Your Honor.
24   THE COURT:  Okay.
25   MR. WATTERSON:  Yes, Your Honor.

1          THE COURT:  So let me start with you, Attorney Cave.

2     So Mr. Watterson says that PayPal and Stripe were the only ones

3     who processed credit card orders for purchases of the products

4     involved here.  Given sort of the purpose of discovery, which

5     is to delve into transactions that might have reduced loss,

6     credit card chargebacks, and the like, why would you need to go

7     beyond those two entities to get that information?

8          MS. CAVE:  Thank you, Your Honor.  And we're only

9     asking to go beyond those two to make -- to go to four

10     additional third parties, and those are Visa, MasterCard,

11     Discover, and Capital One.

12          And the reason for that is we have seen evidence in

13     the record -- some of it was submitted in support of the class,

14     in connection with the class certification motion -- that

15     potential class members were getting, receiving chargebacks

16     directly from various banks and credit card companies.  And

17     that was -- many of those were during -- throughout 2015.  And

18     so after the companies had shut down and after they were no

19     longer processing payments directly themselves, that there's

20     evidence in the record showing that people were getting these

21     chargebacks directly from their banks and credit card

22     companies.

23          So that's why we're requesting to seek to provide --

24     to provide subpoenas, not just to PayPal and Stripe, but to the

25     four credit card members that I just mentioned.  And we think

1    that's reasonable because, as I mentioned, the record shows,

2    just as far as we were able to find in the last couple of days,

3    a dozen or more different banks that were giving chargebacks to

4    people throughout 2015.  So we think, you know, we could have

5    made a request to subpoena all of those banks that we've heard

6    of, but we're making it much narrower.

7         THE COURT:  Okay.  I think I get it.  So if I'm

8    understanding correctly then, what you're saying is that I

9    might have purchased a Paycoin from GAW Miners or a Hashlet

10   from GAW Miners in 2014, and that transaction, the purchase,

11   might have been reflected on PayPal and Stripe because they

12   process the transactions for GAW.

13        But when I learned about the SEC investigation in

14   2015, come February or March or even maybe later when the

15   company was essentially shut down, I then went to -- let's say

16   I did the purchase with Visa in 2014.  I then went to Visa and

17   said, "Hey, look, you have to help me out.  You have to charge

18   this back.  This was fraud" and, in fact, they did.

19        You're saying there are instances where Visa said,

20   "Okay, we'll let you charge back, you know, one or more

21   transactions."  Is that what you're saying?

22        MS. CAVE:  Yes.  You said it much more succinctly than

23   I did.

24        THE COURT:  All right.  So, Mr. Watterson, what about

25   that?  Given the purpose of discovery, that does seem to fall

1    in line with what I -- with what I authorized.

2            MR. WATTERSON:  So the reason we're suggesting

3    limiting this to PayPal and Stripe is that it is our

4    understanding that these companies would have the records.

5            Just briefly, here's my understanding of how these

6    chargeback transactions would work:  PayPal and Stripe were the

7    credit card processors.  They would hold back a certain amount

8    of money from every transaction.  And if there was a

9    chargeback, the bank would contact PayPal or Stripe, and they

10   would get the money from this sort of holdback fund and then

11   give it to the consumer.

12           So basically the way it would work, I, the consumer,

13   contact my credit cards.  My credit cards contact PayPal or

14   Stripe.  PayPal or Stripe gives the money to the credit card

15   company.  The credit card company gives it to.  And that's my

16   understanding of how these transactions work.  So we're

17   proposing limiting it to those two companies to simplify.

18           THE COURT:  How long does that holdback go on though?

19   I'm kind of surprised to learn that if I in, say, October of

20   2014 purchase $100 worth of Hashlets, that the Stripe or PayPal

21   would hold on to -- hold back some or all of that money for --

22   let's say the chargeback doesn't happen.  I don't go to my

23   credit card company until, say, May of 2015.  So six or seven

24   months before the money that I authorized from my credit card

25   in November, or whatever I said, October of 2014, to purchase

1    the Hashlet, the company GAW Miner didn't see that hundred

2    dollars back then, and they never actually got the whole

3    hundred dollars because some of it was held back for six

4    months?

5              MR. WATTERSON:  Your Honor, I'm not exactly -- so I

6    think you're correct that these holdbacks would only last a

7    temporary amount of time.  So I think that, yeah, it's possible

8    that if there was a transaction in June, that GAW Miners would

9    have received the entire hundred dollars by December.

10             But there is some e-mails that have been produced,

11   internal GAW Miners e-mails, that indicate sort of into 2015,

12   as the company was experiencing all of these issues, we're

13   trying to get PayPal to release this holdback money to try to

14   cover costs and the like.

15             And so I get from those e-mails that there was a

16   holdback into 2015.  So I do think that they did this for some

17   period of time.

18             THE COURT:  Yeah, but it doesn't sound like you can

19   tell me with confidence that getting the PayPal and the Stripe

20   documents or records would reflect, you know, the kinds of or

21   at least a substantial portion or most of the transactions that

22   Attorney Cave is talking about, being those in 2015.

23             MR. WATTERSON:  Well, I think, Your Honor, that

24   because all of the credit card companies would go to PayPal and

25   Stripe, I think it's possible that there would be a more

1    substantial portion.  I will agree that it's possible that

2    after some time period PayPal and Stripe may have given this

3    money back, but I know that this went into 2015.

4            THE COURT:  And do you -- Mr. Watterson, do you know

5    whether or not -- let's say -- so let's say I, same facts,

6    purchase in October 2014, reflected on Stripe or PayPal.

7    May/June 2015 I go to Visa.  I say, "Hey, you got to get this

8    back for me."  And let's say Visa goes to Stripe, and Stripe

9    says, "Well, you're too late.  We already released the

10   holdback."

11           Does Visa say no to me at that time?  Do you know one

12   way or the other?  Does Visa say, "Sorry, no charge.  We're not

13   going to help you out"?

14           MR. WATTERSON:  Your Honor, I looked into this a

15   little bit, and I think it will depend on the credit card

16   company.

17           THE COURT:  All right.

18           MR. WATTERSON:  I think that some of them have a

19   certain time period where you have to make these requests, but

20   I think it will vary.

21           THE COURT:  All right.  Well, I mean I think in

22   fairness then, I'm going to have to allow this to get a more

23   complete capture of the kinds of transactions that Attorney

24   Cave is talking about.

25           So, Attorney Cave, I think you said you're proposing

1   to limit it to Visa, MasterCard, Discover, and Capital One?

2       MS. CAVE:  Correct.

3       THE COURT:  All right.  I'll allow that.

4       Are you going to be able to accomplish that in the

5   time that I indicated in the order as long as -- that is to

6   say, the same time frame for the class members?

7       MS. CAVE:  I think, Your Honor, what Mr. Watterson and

8   I spoke before this call, and what he and I discussed, is, in

9   response to his second issue about allowing plaintiffs to take

10  third-party discovery, he and I would try to collaborate and

11  try to agree on the nature of the request.  So we would draft

12  them and share them with him and try to agree as quickly as

13  possible and get those out.

14      I realize Mr. Watterson is on vacation this week; so

15  we'll try to do that as quickly as possible --

16      THE COURT:  Okay.

17      MS. CAVE:  -- and get those right out and have them

18  be, you know, joint subpoenas from both parties to try to

19  minimize not only the burden on the Court but also the burden

20  on the third parties.

21      THE COURT:  Well, that sounds good to me.

22      I had a thought about that.  I can't remember what it

23  was.  But that sounds -- that sounds fine to me, to do it that

24  way.

25      And -- oh, I know what the thought was.  The thought

1  was you mentioned that the plaintiffs taking third-party

2  discovery too.  Of course, that's fine.  Obviously, the

3  plaintiff should be allowed to do what the defendants are

4  doing.  So to the same extent that Fraser's permitted to do so,

5  the plaintiffs are also, of course, permitted to take the same

6  type of discovery.  It would be limited to chargebacks and

7  private sale transactions just as we've discussed.

8          So I think the second issue was whether it should be

9  limited to the 173 folks mentioned in my ruling.  I guess I

10  have a couple questions about that.

11          So as you recall in the ruling, the order I issued the

12  last time after our last call, I'd said that this discovery

13  should be confined to class members who have at least $3,000 in

14  losses based on currently available documents.  I can't

15  remember whether it's the case.  I assume it's the case that

16  even using the databases -- and when I say the "databases," I

17  think I'm referring to the GAW database that was the subject of

18  much controversy in the briefing about how valid it was, which

19  I ultimately refrained from addressing.  Also I think there may

20  have been, I want to say, Stripe and PayPal databases, but some

21  other database.

22          I assume that it's correct that in those databases you

23  would be able to tell whether a particular individual had at

24  least $3,000 in losses, although, as I say that, I'm starting

25  to remember this a little better.  I'm not sure if that's

right.

In other words, what I'm getting at is:  Does the
restriction that I imposed, which I think is a valid one, in
other words, I think there is a good reason for it, of limiting
the discovery of class members who have at least $3,000 in
losses, does that complicate going beyond the group of 173
class members?

Let me direct that question first to Attorney Cave.

MS. CAVE:  Yes, Your Honor, and I'm not sure.  We've
tried to do that since Your Honor issued the order to try to
see if we can, again, with all the issues about the databases
that we have raised before, to just see whether it's possible,
and it's quite difficult.

I guess the other issue we have with the 173 is, you
know, mindful of the fact that we don't necessarily know how
PayPal and Stripe and the credit card companies keep their
data, our initial reaction is that it may be easier for the
third parties to search just by the merchant name, by GAW
Miners and ZenMiner or whatever moniker the companies used for
transactions for the two companies, as opposed to having to go
search individually 173 names and any potential aliases or
variations that may exist for each of those 173.  So just try
to minimize the burden on the third party if it's easier for
them to just search for the two names.

THE COURT:  So, Mr. Watterson, what about that point?

1          MR. WATTERSON:  Your Honor, I think, obviously, the

2    more people that are subject to discovery, the longer it's

3    going to take to go through all these materials and I think the

4    longer that it will take to get this from third parties.  And

5    so it just seems to me that limiting it to the same 173 will be

6    more efficient all around.

7          THE COURT:  But let me ask this though:  I mean

8    Attorney Cave made what sounds like a valid point to me.  I

9    have to tell you, I can't remember whether in practice I

10   ever -- I don't think I did ever issue a subpoena to a bank or

11   a credit card company -- I probably did to banks -- but to

12   credit card companies but asking for this type of information.

13          And I -- it does strike me as a little daunting if

14   you're on the receiving end of that subpoena to -- I guess I

15   don't know.  But I guess I -- her notion that it may be simpler

16   administratively, although, as you pointed out, it would

17   capture probably a much larger set of records, for them to just

18   type into their systems, you know, "GAW Miners," "transactions

19   cleared through GAW Miners," that might be simpler.  I don't

20   know actually if it's simpler.  But I could see where it might

21   be.

22          And so I guess maybe I'm not -- I do want to be clear.

23   It sounds like there may be a reason not to limit it to the 173

24   when you're talking about doing discovery of the third-party

25   banks, the four that were mentioned.  But we can talk about

1  separately whether the defendants should be allowed to seek

2  discovery directly from folks beyond the 173.

3          But let's -- for the moment, let's just talk about

4  this concept of the subpoenas to the four banks.  It seems to

5  me it might make sense to limit it to GAW Miners simply because

6  it's easier for the banks.  But I don't -- again, I don't know

7  if that's true.

8          But what do you think about that, Mr. Watterson?

9          MR. WATTERSON:  Your Honor, it seems to me that I

10 can't imagine a bank being particularly forthcoming with, you

11 know, a request that says, Give me all information with every

12 one of your customers that transacted with this counterparty.

13         It seems like there might be all sorts of privacy

14 issues there.  So I think that could create a whole mess for

15 the banks potentially.

16         THE COURT:  Ms. Cave, let me ask you this:  Mr.

17 Watterson might be correct.  I guess ultimately it depends on

18 how these credit card companies keep their records.  Do they

19 keep them by sort of the name of the cardholder?  Are they

20 searchable by every entity with which the cardholder did

21 business?  To me, I just don't know that, and I don't know how

22 easy it is.

23         I guess the other question is beyond that reason,

24 namely, assuming for a moment it may be administratively easier

25 to submit subpoenas to the banks saying "GAW Miners" as opposed

1    to the specific names, is there some other reason the defendant

2    thinks it wants to go or needs to go beyond the 173 folks?

3          MS. CAVE:  There are, Your Honor, because I think

4    this -- as you pointed out in allowing us to do this discovery,

5    the issue of chargebacks goes to the potential individualized

6    issues across the potential class members.  It could be the

7    case that this 173, for whatever reason, didn't do any

8    chargebacks.  But we know that chargebacks took place.

9          THE COURT:  Yeah.

10         MS. CAVE:  So you could envision -- and hopefully it's

11   an errant hypothetical -- but you could envision a scenario

12   where they search for these 173 names and don't find any.  And

13   yet we know -- and I don't think there's any dispute that there

14   were chargeback transactions.  So the risk is if you limit it

15   to the 173, that we might either miss them or certainly not

16   identify the potential individualized issues that Your Honor

17   allowed us to explore.

18         THE COURT:  I did wonder about that too.  You know, I

19   take it that, Mr. Watterson, the plaintiffs certainly are not

20   ready to concede that the class is limited to the 173

21   individuals.  I did not make a finding that it was so limited.

22   And I would be surprised if the plaintiffs would agree that it

23   should be.

24         And in light of that, I guess it wouldn't make -- it

25   really wouldn't be consistent with the purpose of allowing this

1   discovery to sort of arbitrary limit it to the 173, because

2   maybe that is not a representative group in terms of the

3   existence of chargebacks and private transactions.

4        I will say this:  I would encourage the parties to see

5   if there are -- I won't call them shortcuts, but ways to be

6   efficiencies here.  So, for example, let's say the plaintiff's

7   position is, look, there's 15,000 class members here, or

8   however many in the largest of the databases, or 200,000 class

9   members.  I can't remember what the numbers were from the

10  briefs.

11       If that's the case, then query whether the parties

12  could try to come up with some kind of sampling procedure a

13  little bit like we did, you know, when we did that

14  post-argument briefing on the class cert issue so that I don't

15  know if there's -- let's say there's 200,000 class members.  I

16  don't know.  Maybe you pick every thousandth name in some

17  randomized database that could be put together.

18       You folks know this stuff much better than I do.  So

19  I'm not telling you -- first of all, I'm not going to order

20  this.  And secondly -- but I am suggesting that you sort of

21  maybe be creative about ways that might make all of your lives

22  easier here, and certainly the lives of the recipients of the

23  discovery easier, in other words, to bother few of them --

24  fewer of them.  I would encourage that kind of thing.

25       I would think if you then had an agreement that, look,

1   this is a representative sample and every thousandth person got

2   a discovery request -- and this is just an illustration -- that

3   might be one way to kind of narrow the burden on any expense.

4          So but I don't think at this point I'm prepared to

5   issue an order limiting the defendant from going beyond the 173

6   class members just because I don't think it would be consistent

7   with the purpose for which I allowed the discovery in the first

8   place.

9          So I don't know if that's helpful.  I guess what I'm

10  saying is I'm not inclined -- I'm not going to limit the

11  discovery to PayPal and Stripe.  We'll allow also subpoenas to

12  the four entities:  Visa, MasterCard, Discover, and Capital One

13  that Attorney Cave mentioned.  And I'm not going to limit it to

14  the 173 class members.

15         However, I would encourage the parties to see if you

16  can come up with some agreements about that.  And if you need

17  to commit those agreements to writing, you want to file a

18  stipulation on the docket about it just so you feel like, okay,

19  well, we don't want someone going back on that later, that's

20  fine.

21         If for some reason I can help with that, that's fine.

22  But I'm not going to issue a limitation at this point.

23         MS. CAVE:  We appreciate that.  And hopefully the

24  recipients of the subpoena will be cooperative and forthcoming

25  so that we can work with them on what's the easiest way for

1    them to comply on an expedited basis, obviously given the time

2    frame.  So my hope would be that, especially since we're coming

3    to them jointly and want to make the searches narrow as -- or

4    as easy to execute for them as possible, Mr. Watterson and I

5    have worked together very well on this case over the years, and

6    so I have no reason to believe that we can't do that going

7    forward.  So we'll certainly take Your Honor's advice on

8    that.

9           One clarification I just wanted to ask, Your Honor, is

10   in terms of the subject matter of this discovery.  And Your

11   Honor's order of July 19th used the phrase, in quotes,

12   chargebacks or private transactions.

13          THE COURT:  Right.

14          MS. CAVE:  Mr. Watterson's letter added the word

15   "sale" to that, so limiting it to private sale transactions.

16   And we just wanted to reiterate the importance of sticking with

17   the more general term "private transactions," because first of

18   all, again, we're not exactly sure how these records are kept

19   by the third parties, and it may be simpler to just search for,

20   as I said before, just transactions generally.  And so we just

21   wanted to make sure that the discovery wasn't being limited to

22   just private sale transaction.

23          THE COURT:  All right.  Mr. Watterson, you haven't had

24   a chance to speak in a while, so go ahead.

25          MR. WATTERSON:  Sure.  And as to that point, Your

1   Honor, in your class certification order Docket 141 from July

2   21st, you allowed discovery -- the purpose of the discovery was

3   that a material number of proposed class members who've had

4   chargebacks or other compensating gains to negate or reduce

5   their losses as a result of transactions with third parties.

6   So I've always understood that order to be concerned with

7   transactions that would somehow put money into the class

8   members' pockets.

9           And what I don't want is, you know, it sounds like

10  there might be efforts to get discovery as to something else

11  beyond that.  And I don't think that that is what the order

12  anticipated, so --

13          THE COURT:  I think you've accurately characterized my

14  purpose.

15          Attorney Cave, let me ask you to speak to that.  Is

16  Mr. Watterson's characterization not sufficiently encompassing?

17  I think he's accurately stated what I had in mind.  The idea is

18  to see whether these folks were able to essentially cut their

19  losses through private transactions, whether they be with

20  credit card companies or with other persons.

21          But that's the concept, as he said, putting money in

22  their pocket, cutting their losses, whether it's actually money

23  in the pocket, I think -- I think I understood it to be cutting

24  their losses.  That's sort of -- that's not "sort of."  That is

25  what I had in mind.  Is there something else that you have in

1    mind?

2          MS. CAVE:  No.  Understood, Your Honor.  But, for

3    example, the purchase of entire accounts is something that we

4    know occurred.  Named plaintiff Mr. Pfeiffer is someone who

5    purchased private accounts, purchased whole accounts through

6    private transactions.  So if he then went on to sell those

7    accounts -- I don't remember if he did or not -- but without

8    understanding the purchase of that account, you don't know both

9    sides and can't calculate what his -- what he was able to

10   recoup for that.  So that was the concern.

11         THE COURT:  Help me understand what that means.

12   Buying an account and selling.  You mean the account of another

13   investor?

14         MS. CAVE:  Yes, yes.  So Mr. Pfeiffer, for example --

15   I don't remember the exact number.  It might be around eight or

16   ten.  Someone else opened the account or opened, you know, sort

17   of a user name with GAW Miners and purchases products through

18   that account.  And then Mr. Pfeiffer purchased that entire

19   account and its contents and sort of took it over and monitored

20   it in his name.

21         So if he then went on to sell that account to someone

22   else in a private transaction, which I think is the only way

23   you could buy and sell accounts, if you don't know how -- what

24   the opening was, what the purchase price was, what he sold it

25   at might not necessarily be an accurate assessment of his

1    damages.

2         THE COURT:  Well, let me ask about that.  So I'm

3    trying to mentally picture this.  So let's say, yeah, he buys

4    another account.  Now, that account presumably reflects

5    purchases of these products over time, perhaps gains, perhaps

6    losses.  Maybe that account also -- well, no, that account

7    wouldn't show -- the account itself -- when you say "account,"

8    do you mean -- is this an account on one of PayPal and Stripe?

9    Is that what you mean?

10        MS. CAVE:  No, no, sorry.  And maybe "account" is not

11   quite the right word.  But basically user ID --

12        THE COURT:  Ah.

13        MS. CAVE:  -- and the contents of that user ID's

14   whether it be wallet or however you want to refer to the

15   container in which the securities were held.

16        And I think the other thing that shows is

17   obviously Mr. -- using the example of Mr. Pfeiffer, he bought

18   that account from another user who is a potential member of the

19   class.  So that part of -- that purchase transaction, it's a

20   sale for the prior holder and it's a purchase for Mr. Pfeiffer.

21   So, again, linking all these together is important to

22   understand because that prior user would then have off-set any

23   gains or losses by the sale to Mr. Pfeiffer.

24        In other words, we're not trying to expand this overly

25   broadly, but in order to conduct the inquiry that Your Honor

has allowed us to do, I need private transactions, and both

sides of it is key to the ultimate assessment of potential

damages.

THE COURT:  Right.  So, Mr. Watterson, let me ask

about that.  I hadn't -- I mean I think there were purchases

mentioned in the brief.  I guess I hadn't thought of this.

If I'm understanding correctly, the idea -- and I'm

sure you understood, but I have to talk out loud as you folks

have probably learned by now.

So Mr. Pfeiffer buys my account.  My account shows a

series of purchases over time.  I sell to Mr. Pfeiffer, and Mr.

Pfeiffer then submits a claim in the class action.  And he

says, "Well, I'm damaged by everything that happened in both of

those accounts."

And in order for us to assess -- and then, of course,

there would also be whatever chargebacks he got.  In order to

assess his total damages picture, wouldn't we need to know

about his purchase of that second account?

MR. WATTERSON:  So we would need to know about his

purchase of the account, but this is, I think, something that

is relatively simple and straightforward to put onto a claim

form.  So I -- you know, this is -- this is not something

where, you know, Your Honor, I think you pointed out that some

of these transactions involved a lot of different products.

You know, this is I buy an account for a lump sum of

1    money.  So I don't think that this is something that is

2    particularly complicated or, you know, requires something more

3    than, look, we put onto a claims form.

4         I also want to point out that credit card companies

5    PayPal and Stripe, you know, they're going to have chargeback

6    information, but they're unlikely to have this.

7         THE COURT:  Right.  This information they would have

8    to get directly from the class members; right?

9         MS. CAVE:  Yes.  This is sort of independent of what

10   we've been discussing, Your Honor.  As to the credit card

11   companies, I'm not sure they will be able to see this.  But out

12   of an abundant of caution for purposes of what Your Honor will

13   put in the order, we just wanted to refrain from the potential

14   limitations to only sale transactions.

15        THE COURT:  Yeah, I think in the spirit of my order --

16   I hope this doesn't get any more complicated.  But in the

17   spirit of my order, Mr. Watterson, I think I am going to have

18   to allow that.

19        So, yeah, so I will say -- I will say private

20   transactions.  I think that is, in fact, what I'd said

21   previously.  But I now understand why there's some ambiguity

22   about that term, which I didn't previously.

23        So I will say it is my intent, then, to allow the

24   defendant to obtain discovery from class members of the type of

25   transaction that she just described of buying and selling

1    accounts.

2            Okay.  What else do we need to cover today?

3            MR. WATTERSON:  Nothing from us, Your Honor.

4            MS. CAVE:  Yeah, this has been very helpful, Your

5    Honor.  We really appreciate your time in helping us talk

6    through these issues.  We tried a couple of times to work

7    through them on our own, but it was helpful to get your

8    guidance.

9            THE COURT:  Okay.  Thank you both for calling in.

10           MS. CAVE:  Thank you, Your Honor.

11       (Proceedings concluded at 4:04 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                    C E R T I F I C A T E

4

5

6

7                I, Julie L. Monette, RMR, CRR, CRC, Official

8     Court Reporter for the United States District Court for the

9     District of Connecticut, do hereby certify that the foregoing

10    pages are a true and accurate transcription of my shorthand

11    notes taken in the aforementioned matter to the best of my

12    skill and ability.

13

14

15                    /S/ JULIE L. MONETTE
                 _____
16                Julie L. Monette, RMR, CRR, CRC
                       Official Court Reporter
17                       450 Main Street
                    Hartford, Connecticut 06103
18                       (860) 212-6937

19

20

21

22

23

24

25