# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| DENIS MARC AUDET, ET AL., | : | Civil Action No. |
|  | : | 3:16-CV-00940-MPS |
| Plaintiffs, | : |  |
|  | : |  |
| v. | : |  |
|  | : |  |
| STUART A. FRASER, GAW MINERS, LLC, and ZENMINER, LLC, (d/b/a/ ZEN CLOUD, | : |  |
|  | : |  |
|  | : | February 7, 2020 |
|  | : |  |
| Defendants. | : |  |
|  | : |  |

### DEFENDANT STUART A. FRASER'S REPLY
### MEMORANDUM OF LAW IN FURTHER SUPPORT OF HIS MOTION
### <u>TO DECERTIFY THE CLASS AS TO DAMAGES</u>

Daniel H. Weiner (ct12180)
Marc A. Weinstein (*pro hac vice*)
Hannah Miller (*pro hac vice*)
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, NY  10004-1482
Tel.: (212) 837-6000
Fax: (212) 422-4726
Email: daniel.weiner@hugheshubbard.com

David R. Schaefer (ct04334)
Sean M. Fisher (ct23087)
Brenner, Saltzman & Wallman LLP
271 Whitney Avenue
New Haven, CT  06511
Tel.: (203) 772-2600
Fax: (203) 562-2098
Email: sfisher@bswlaw.com

*Attorneys for Defendant Stuart A. Fraser*

**TABLE OF CONTENTS**

FACTS ABOUT THE POST-CERTIFICATION DISCOVERY PROCESS ................................1

ARGUMENT ..................................................................................................................................2

I.      The Evidence Shows That a Material Number of Class Members Received Offsets, and that Proof of Those Offsets Is Highly Individualized. ...............................................................2

II.     Relegating Determinations of Individual Damages to a Claims Administration Process Is Inappropriate Here. ..................................................................................................6

III.    Fraser's Concerns Relate to Both Predominance and Superiority. ........................................9

IV.    Plaintiffs Do Not Identify a Damages Methodology for Hashpoints or Paycoin. .................10

CONCLUSION.................................................................................................................................10

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Allapattah Servs., Inc. v. Exxon Corp.,* 157 F. Supp. 2d 1291 (S.D. Fla. 2001), *aff'd*, 333 F.3d 1248 (11th Cir. 2003), *aff'd sub nom. Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546 S. Ct. 2611, 162 L. Ed. 2d 502 (2005) ............................................................................................................................. 8

*In re Asacol Antitrust Litig.*, 907 F.3d 42 (1st Cir. 2018) .......................................................... 6, 7, 9

*Beaton v. Software*, 2017 WL 4740628 (N.D. Ill. Oct. 19, 2017), *aff'd sub nom. Beaton v. SpeedyPC Software*, 907 F.3d 1018 (7th Cir. 2018) ............................................. 7, 8

*Blyden v. Mancusi*, 186 F.3d 252 (2d Cir. 1999) .............................................................................. 9

*In re Cigna Corp. Sec. Litig.*, 459 F. Supp. 2d 338 (E.D. Pa. 2006) ................................................ 9

*Dasho v. Susquehanna Corp.*, 461 F.2d 11 (7th Cir. 1972) .............................................................. 9

*Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770 (7th Cir. 2013) ................................................ 7

*Jacob v. Duane Reade, Inc.*, 293 F.R.D. 578 (S.D.N.Y. 2013), *aff'd*, 602 F. App'x 3 (2d Cir. 2015) ................................................................................................................. 9

*McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008) ....................................................... 8

*In re NASDAQ Mkt.-Makers Antitrust Litig,* 169 F.R.D. 493 (S.D.N.Y. 1996) ............................... 8

*O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732 (5th Cir. 2003) .................................. 9

*Seijas v. Republic of Argentina*, 606 F.3d 53 (2d Cir. 2010) ........................................................... 8

*Serv. Grp. Inc. v. Essex Int'l Inc.*, 74 F.R.D. 379 (D. Del. 1977) ..................................................... 9

*In re Vivendi Universal, S.A. Sec. Litig.*, 284 F.R.D. 144 (S.D.N.Y. 2012) .................................... 7

*In re WorldCom, Inc. Sec. Litig.*, 2005 WL 491397 (S.D.N.Y. Mar. 3, 2005) ................................. 8

**Statutes and Rules**

28 U.S.C. § 2072(b) ................................................................................................................. 7, 8, 9

CUSA § 36b-29(a)(2) ........................................................................................................................ 6

Post-certification discovery revealed two critical flaws in Plaintiffs' request for class certification as to damages: (i) a material number of class members received offsetting income that would reduce or eliminate their damages, and (ii) obtaining proof of offsetting income will not be straightforward.  Thus, complex individualized inquiries will predominate the damages assessment.

## **FACTS ABOUT THE POST-CERTIFICATION DISCOVERY PROCESS**

As an initial matter, Plaintiffs' criticism that Fraser unnecessarily limited his discovery requests to the 173 identified class members (as opposed to the entire indeterminate class) (Dkt. 191 at 3) is unfounded.  Plaintiffs themselves recognized that Fraser's discovery of class members was limited to those 173 individuals.[1]  Fraser did not have access to, or the Court's approval to seek, discovery from the entire class, and thus Plaintiffs' comparisons of evidence obtained against thousands of purported class members are disingenuous.[2]

Plaintiffs also attempt to turn the class members' woefully inadequate response to the Court-ordered discovery on its head, blaming Fraser for failing to compel more fulsome responses.  Fraser can be faulted only for accepting Plaintiffs' counsel's representations that, despite their efforts, getting more information out of the proposed class members was a fruitless exercise.  In response to Fraser's July 26, 2019 discovery requests seeking detailed information about each class member's chargebacks and private sales, Plaintiffs' counsel served objections but declined to provide any narrative responses.  When Fraser objected to Plaintiffs' failure to respond to any interrogatories,[3] Plaintiffs' counsel insisted that most class members had no appetite to respond to written questions and merely referred to documents they provided to Plaintiff Shinners years ago.[4]  When Fraser asked for detailed information required by his interrogatories, Plaintiffs' counsel lamented that, if they had

---

1.  *See* Dkt. 154 ("If discovery from third parties is permitted, plaintiffs respectfully submit that it should be limited . . . to seeking information about chargeback or private sale transactions relating to *the 173 investors as to whom Fraser has been permitted to submit discovery requests*.") (emphasis added).  The Court's July 31, 2019 Order (Dkt. 157) (issued *after* the 7/26/2019 deadline to serve discovery demands on absent class members) related solely to the scope of *third-party* discovery—*i.e.*, that Fraser's inquiries of credit card companies were not limited to records of the 173 identified class members.  *See* Dkt. 194 (7/31/2019 Tr. at 15:11-14).
2.  *See* Dkt. 191 at 1, 4, 17.
3.  *See, e.g.*, Reply Declaration of Hannah L. Miller ("Reply Miller Decl.") ¶ 3, Ex. R1.
4.  Reply Miller Decl. ¶ 3.

to inquire of class members again, the class members would "lose patience."[5]  Thus, Fraser's agreement to seek answers to a more limited set of questions was based on representations from Plaintiffs' counsel, not any lack of diligence.  Plaintiffs' counsel dragged out the process for months, and did not provide any responses to the agreed-upon questions until December 9, 2019, long *after* the Court's October 30, 2019 deadline to depose absent class members had passed, and shortly before the deadline to file the decertification motion.[6]  Even at that late date, Plaintiffs failed to provide any responses from 62 of the 173 class members, and many responses proved inadequate.

## ARGUMENT

**I.      The Evidence Shows That a Material Number of Class Members Received Offsets, and that Proof of Those Offsets Is Highly Individualized.**

Viewed in the proper context of the limited scope of post-certification discovery, the evidence shows that a material number of class members received offsets from chargebacks and/or private sales.  More than 30% (at least 34 of the 111) individuals who provided written discovery responses acknowledged having received offsets,[7] and there is evidence that many others did as well.[8]  There is no mechanical way for a jury to calculate those offsets on a class-wide basis, and thus no way for a jury to determine class-wide damages.  Moreover, many who acknowledged receiving offsets either failed to provide documentation of those offsets,[9] provided documentation only upon Fraser's request for their depositions, despite previous requests for such information,[10] or acknowledged that documentation was not available to calculate those offsets.[11]  Accordingly, the

---

5.  *Id.*
6.  Dkt. 179-2 ¶ 2.
7.  Dkt. 179-2, Ex. 30, 33, 35-56, 61, 84-86; Ex. 15; Ex. 8; Ex. 9; Reply Miller Decl., Exs. R2-R4.  Unless otherwise specified, references to "Ex. X" are to exhibits at Dkt. 179-2, and references to "X-X" are to exhibits at Dkt. 191.
8.  *See* Dkt. 179-1 at 3-14; *see also infra* at I.A-B.
9.  *See, e.g.*, Dkt. 179-1 at 11-12, 13-14, 16-17.
10. *See, e.g.*, Dkt. 179-1 at 10 n.23 and associated text.
11. *See, e.g.*, Ex. 36 ("Exactly I can not remember, because I can not find any documents about it."); Ex. 38 ("I did receive Ion in exchange for Paycoin, but I cannot remember the amount. I've searched in my emails, but I'm unable to find anything. Nor can I get a history on the Ionomy platform, as this platform has evolved several times in the years."); Ex. 33 ("Paycoin is missing from my final calculations . . . There is no history for Paycoin deals at Bittrex exchange ive used that time (maybe Im wrong, but there was a special site for  exchanging XPY to BTC, in any case Im not able to provide exact sum of USD ive received for XPY)") Ex. 84 ("Yes, to my knowledge I provided everything I can as many records were lost during the website takedown and the Cryptsy Scandal."); Miller Reply

evidence establishes that individual inquiries are necessary to compute damages, and such individual inquiries will require more than a simple request for information from class members.

A material number of investors received chargebacks. Plaintiffs argue that chargebacks for ten class members out of purported thousands "is hardly a material number," (Dkt. 191 at 9) but that comparison is misleading: more than ten individuals received chargebacks,[12] and discovery was limited to a small subset of class members, not thousands. Given the limited scope of discovery, evidence that more than 50 individuals received chargebacks (many of which negated those class members' losses entirely) is certainly material.[13] Fraser also provided evidence indicating large-scale efforts by class members to obtain chargebacks, which suggest that more class members than Fraser was able to identify likely received such chargebacks.[14]

Even with individualized inquiry, proof of chargebacks and refunds will not be simple to obtain. Non-party discovery to credit card companies and payment processors generated nothing,[15] certain class members admitted they did not have documentation of their chargebacks (*see, e.g.*, Dkt. 191 at 11), several class members declined to provide information about chargebacks until faced with the prospect of a deposition,[16] and others did not respond at all to requests for information.[17] Fraser is by no means insinuating that class members are "liars and cheats";[18] rather, the demonstrated failure or inability of large numbers of class members to provide accurate information

---

    Decl. Ex. R4 (when asked whether he received Ion in exchange for Paycoin, "I believe so but it has been so long I honestly can't remember the details and have no such records."); Ex. 85 ("The documentation I have provided to Susman Godfrey in the file Crane_supporting_Materials.zip on August 7, 2019 is not reflective of absolutely every GAW transaction of mine. I did not save every receipt at the time, and many of the websites I used to purchase, mine, store, or exchange Paycoin are now defunct and documentation is unavailable.").

12. *See, e.g.*, Ex. 16; X-1; Dkt. 179-1 at Section I.
13. *See* Ex. 16; Dkt. 179-1 at 9 (citing evidence that Allen Shinners, Michael Pfeiffer, Teresa Crivello, John Tuberosi, Daniel Simpson, Joshua Preston, Tony Berger, Craig Glaser, Daniel Watkins, and Christopher Montana received chargebacks); Miller Reply Decl. Ex. R2 (Anastasakis Response). Plaintiffs acknowledge evidence that at least 40 of a subset of class members "received chargebacks or refunds of some sort," Dkt. 191 at 9.
14. *See* Dkt. 179-1 at 9. Plaintiffs also acknowledge that several specific absent class members *attempted* to obtain chargebacks (Dkt. 191 at 12) and it remains unknown if they received those chargebacks.
15. Dkt. 179-1 at 7.
16. Dkt. 179-1 at 10.
17. *See* Section I, *supra*.
18. Dkt. 191 at 12.

in response to the same types of discovery requests Plaintiffs propose to employ at a later stage[19] demonstrates the difficulty class members have recalling or substantiating their offsets.

On top of the substantial evidence of chargebacks, discovery showed a significant number of offsets from at least five categories of private transactions.[20] Plaintiffs' attempt to disaggregate these categories, and focus on the number of examples for each, misses the point. The standard is not whether a material number of class members received *each* type of offset, but rather whether a material number received *some* form of an offset. Here, that is the case. That offsets take different forms only illustrates the multiple gaps in the Plaintiffs' sole source of class-wide damages evidence—the fundamentally flawed ZenCloud database.

Plaintiffs do not dispute that resellers existed and sold large blocks of Hashlets, or that those sales are unaccounted for in ZenCloud. Yet no resellers produced the type of receipts Plaintiffs speculate can be used to calculate those sales.[21] Plaintiffs note that Grimes in fact possesses "most" of his transaction records,[22] but he never produced documents or other information about his numerous sales in response to Fraser's discovery demands.[23] There is no reason to believe he or other resellers would do so at a later date in response to a claim form.

The evidence also suggests that a significant number of Paycoin sales occurred and are not captured by any database available in this case.[24] As Plaintiffs acknowledge, "class member Roman Gorodnev indicated that he sold some Paycoin when its price was relatively high," but he failed to provide any documentation of those sales, or estimate the value he received.[25] That Kevin Calabrese sold his Paycoin at a loss (Dkt. 191 at 17) does not change the fact that he received unquantified

---

19. *See* Dkt. 179-1 at 10-11.
20. *See* Dkt. 179-1 at Section I.
21. Although certain class members submitted receipts *from* resellers as *proof of purchase* (to increase their claims), no resellers (like Grimes) produced any documentation of sales, which would reduce their claims.
22. Dkt. 191 at 14-15.
23. *See* Ex. 2 (asking class members for details of each sale, transfer or exchange of any Hashlets, Hashpoints, Hashstakers or Paycoin purchased or acquired from the Companies during the class period); Ex. 1 (requesting documents related to those transactions).
24. Dkt. 179-1 at 14-15.
25. Dkt. 191 at 17.

value in exchange for Paycoin. That John Tuberosi's sales on Cryptsy may have represented a small percentage of his holdings does not change the fact that he failed to identify or substantiate the amount he received from Paycoin sales and only acknowledged those sales at his deposition.[26] And Alex Kloss's written response that he moved a large amount of Paycoin to a third-party exchange but cannot access the records from that exchange suggests he likely sold some unknown amount of Paycoin on that exchange.[27] The failure of those class members to provide evidence of Paycoin sales in response to Shinners' request for documentation or Fraser's discovery demands underscores the danger of relying on a claim form to generate such information.

Moreover, data from third-party exchanges showing that the cumulative market volume of Paycoin trades was more than 30 times the cumulative volume of Paycoin withdrawn from GAW Miners[28] suggests that other class members failed to identify Paycoin sales. Plaintiffs offer no evidence to support their contention that Paycoin market activity can be attributed at all, much less entirely, to GAW Miners allegedly dumping 12 million Paycoin onto the market.[29]

Plaintiffs also acknowledge that some class members privately sold entire ZenCloud accounts, but argue that the evidence of account sales "simply shows that class members who engaged in these transactions have records of those sales and are willing and able to provide them."[30] The production by some select class members of non-uniform emails does not suggest any uniform way to obtain evidence of account sales across all class members.[31]

Plaintiffs' insistence that only "a tiny number of class members" traded Paycoin for Ion is belied by the written responses of *at least* 23 of the 111 responding class members who stated they

---

26. X-12 (Tuberosi Depo. Tr.) at 33:24-34:3; Ex. 7 at 33:7-23. Tuberosi never provided any written responses to Fraser's interrogatories or follow-up questions.
27. When asked whether the documentation he provided reflected all of his transactions including Paycoin sales, he answered "Yes, to my knowledge I provided everything I can as many records were lost during the website takedown and the Cryptsy Scandal," but did not actually answer whether the documents he provided reflected all of his transactions. Ex. 84.
28. Ex. 32 ¶¶ 44–46.
29. Dkt. 191 at 18 n.71 (relying only on the allegation in their own complaint).
30. Dkt. 191 at 18-19.
31. *See, e.g.*, X-30; X-31; X-32; X-29; Ex.65; Dkt. 179-1 at 16 n. 54 & n.55.

did so.[32] Plaintiffs note that 16 class members identified "exactly or approximately" how much they received (and thus presumably might do so on a claim form as well),[33] but none of those class members provided any records of such trades despite Fraser's requests for that information.[34] Plaintiffs' argument that "offsets for Ion" are inappropriate as a matter of law (Dkt. 191 at 26) has no merit. The case Plaintiffs cite does not involve Connecticut's Blue Sky law, which expressly limits a buyer's recovery to "the consideration paid for the security . . . less the amount of any income received on the security."[35] Moreover, Plaintiffs' own damages expert has explained that "members of the class are entitled to recover the amount they paid . . . less the actual value, if any, they received in connection with their purchases of these products." Ex. 76 at ¶ 22. There is no basis to exclude Ion from the "income" or "actual value" class members received.[36]

## II. Relegating Determinations of Individual Damages to a Claims Administration Process Is Inappropriate Here.

Relegating individual damages determinations to a claims administrator, as Plaintiffs suggest,[37] would violate Fraser's rights, leave a jury without the tools required to render a class-wide damages award, and require a multitude of evidentiary hearings and individualized discovery, thus undermining any efficiencies offered by the class action mechanism. Courts have repeatedly declined to employ a claims administration process when doing so would risk infringing the defendants' rights. In *In re Asacol Antitrust Litig.*, the First Circuit explained that class certification "provides no occasion for jettisoning the rules of evidence and procedure, the Seventh Amendment,

---

32. Dkt. 191 at 19-20; Dkt. 179-1 at 15. Plaintiffs' claim that Mr. Hussain definitively did not receive Ion ignores his statement that he was contacted "to ask if I want to receive ion coins and I said yes . . . ." Ex. 58.
33. Dkt. 191 at 19-20.
34. Plaintiffs claim that Fraser never requested that Peterson locate documents to verify how much Ion he received despite the fact that he indicated that he probably could locate such documents. Dkt. 191 at 20. However, Fraser's document requests directed to Peterson (and which were continuing in nature) did request those records. Ex. 1. Moreover, Peterson's written response was produced only after fact discovery had closed.
35. *See* CUSA § 36b-29(a)(2).
36. As for sales on the GAW Miners Marketplace, Plaintiffs miss the point entirely. Dkt. 191 at 19. There is no reason to believe that class members would provide reliable documentation of marketplace sales in a claims process, given that none did during discovery.
37. Dkt. 191 at 23-29, 30, 31-33.

Case 3:16-cv-00940-MPS   Document 198   Filed 02/07/20   Page 10 of 14

7

or the dictate of the Rules Enabling Act, 28 U.S.C. § 2072(b)."[38] Accordingly, "[a] claims administrator's review of contested forms completed by consumers concerning an element of their claims would fail to be protective of defendants' Seventh Amendment and due process rights."[39] Courts have similarly declined to rely on a claims administration process where determinations of damages are better suited for a trier of fact than a computer program.[40]

That is the case here, where: (1) determinations of Plaintiffs' alleged damages involve various forms of proof, (2) such proof is not standardized[41] (3) there is evidence that certain records cannot be obtained,[42] (4) class members have failed to provide relevant evidence,[43] (5) many years have passed since the relevant period, and (6) Fraser possesses no independent records against which he could readily audit or verify claimed offsets (or lack thereof). In light of these circumstances, it is difficult to imagine any class member claims for damages that Fraser would not wish to challenge.[44] Computation of damages here is not a mechanical task, and would likely result in numerous individual evidentiary hearings, some of which may result in unattainable damages calculations due to the dearth of documentation evidencing the various offsets described in Section I, above.[45]

The approach utilized in *In re Vivendi Universal, S.A. Sec. Litig.*, 284 F.R.D. 144, 156 (S.D.N.Y. 2012)—the use of interrogatories during a claims process—has already failed here, as Fraser's interrogatories to a subset of class members seeking information about offsets generated zero responses.[46] The use of a claims process in *Beaton v. SpeedyPC Software* to determine whether class

---

38. 907 F.3d 42, 53 (1st Cir. 2018).
39. *Id.* (also rejecting notion that inadmissible hearsay could be used to prove injury to each class member).
40. *See, e.g.*, *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 773 (7th Cir. 2013) ("[W]hen it appear[s] that the calculation of monetary relief will be mechanical, formulaic, a task not for a trier of fact but for a computer program . . . , the district court can award that relief without terminating the class action and leaving the class members to their own devices. Nothing like that is possible here.").
41. *See, e.g.*, Dkt. 179-1 at Section I; note 31, *supra*.
42. *See, e.g.*, Exs. 33, 44, 84.
43. *See, e.g.*, Dkt. 179-1 at Section I.
44. The Court previously expressed exactly this concern at the April 12, 2019 hearing. *See* Dkt. 137 at 109:24-111:9.
45. *See Espenscheid*, 705 F.3d at 773 (determining damages would "require 2,341 separate evidentiary hearings").
46. Dkt. 191 at 26 n.98. Plaintiffs excuse class members' failure to respond to Fraser's interrogatories by noting that the parties ultimately agreed on a different set of questions, but the only reason for those additional questions was because Plaintiffs' counsel insisted that class members would not respond to the interrogatories. *See* Section I, *supra*. Even then, over one-third of the 173 class members failed to respond to Fraser's more limited second set of questions.

members received refunds[47] similarly offers no solution here.  In *Beaton*, the defendant was the very party who implemented the refunds, and therefore was capable of auditing class member claims. Here, Fraser has no comparable method to audit class member claims (or lack thereof) regarding offsets, most of which resulted from sales to third parties or chargebacks from each class member's own credit card companies.

Nor would an award of aggregate damages[48] be appropriate here.  Permitting the jury to render an aggregate damages award, in the absence of information regarding various categories of offsets, would violate the Rules Enabling Act.[49]  Unlike in *In re NASDAQ Mkt.-Makers Antitrust Litig.*, here no verifiable records exist that contain necessary data for computation and distribution of damages to individual class members.[50]  As the Court held in *Allapattah Servs., Inc. v. Exxon Corp.*, "the Rules do not establish an independent legal basis for this Court to ministerially aggregate compensatory damages in a final judgment when the jury made no such findings in its Special Verdict, and where the adjustments required by the Court are beyond what are 'self-evident' mathematical calculations based on the jury's Special Verdict."[51]

Plaintiffs blithely dismiss Fraser's concerns about a grossly inflated damages award "because

---

47. Dkt. 191 at 25 (citing *Beaton v. Software*, 2017 WL 4740628, at *8 (N.D. Ill. Oct. 19, 2017), *aff'd sub nom. Beaton v. SpeedyPC Software*, 907 F.3d 1018 (7th Cir. 2018)).
48. Dkt. 191 at 27.
49. *Seijas v. Republic of Argentina*, 606 F.3d 53, 58 (2d Cir. 2010) (vacating aggregate damages award with orders to "consider alternative approaches that will set damages awards that more closely reflect the losses class members experienced."); *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 231 (2d Cir. 2008) ("such an aggregate determination is likely to result in an astronomical damages figure that does not accurately reflect the number of plaintiffs actually injured by defendants and that bears little or no relationship to the amount of economic harm actually caused by defendants. This kind of disconnect offends the Rules Enabling Act . . . .") ("Roughly estimating the gross damages to the class as a whole and only subsequently allowing for the processing of individual claims would inevitably alter defendants' substantive right to pay damages reflective of their actual liability.").
50. 169 F.R.D. 493, 524 (S.D.N.Y. 1996) ("Due to the nature of the Nasdaq market and the availability of computerized data, the aggregate damages of the Class as a whole may be susceptible to determination in a single trial along with the issue of liability.  Indeed, as a result of the computerized databases of the NASD, and of Defendants themselves, the data relevant to aggregate damages here may be susceptible to being assembled and organized in a relatively straightforward manner.").
51. 157 F. Supp. 2d 1291, 1299 (S.D. Fla. 2001), *aff'd*, 333 F.3d 1248 (11th Cir. 2003), *aff'd sub nom. Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 125 S. Ct. 2611, 162 L. Ed. 2d 502 (2005).  Although the Court in *In re WorldCom, Inc. Sec. Litig.*, 2005 WL 491397, at *4 (S.D.N.Y. Mar. 3, 2005) distinguished *Allpattah*, this case presents facts more closely aligned to those in *Allapattah* than in *WorldCom*, in light of the contested issues of fact involved in determining individualized damages.

(i) Fraser will be able to challenge particular damages claims and (ii) plaintiffs' damages model can incorporate legally appropriate offsets as needed."[52] Plaintiffs' conclusory statement ignores the practical issues Fraser raises. Kicking the can down the road does not resolve the violations of Fraser's rights under the Seventh Amendment, Due Process clause, or Rules Enabling Act that would result from a class-wide determination of damages or determinations of individual damages by a claims administrator.[53]

## III.     Fraser's Concerns Relate to Both Predominance and Superiority.

Fraser's arguments raise not only superiority issues (Dkt. 191 at 24), but predominance issues as well. It is undisputed that certification as to damages is inappropriate where individualized issues predominate the damage inquiry.[54] Here, although common questions related to damages may exist, individualized issues will predominate the inquiry. Plaintiffs' list of common damages questions (Dkt. 191 at 28) consists largely of legal questions not subject to generalized proof. The sole common question of fact related to damages is the reliability of the ZenCloud database, but the proof necessary to resolve that issue pales in comparison to the vast resources required to determine each individual class member's damages. Plaintiffs even illustrated the extensive time and resources that would be required to simply collect necessary information related to offsets from just a small

---

52. Dkt. 191 at 28.
53. *See Blyden v. Mancusi*, 186 F.3d 252, 268 (2d Cir. 1999) ("Rule 23(c)(4)(A) states that 'an action [when appropriate] may be brought or maintained as a class action with respect to particular issues . . . .' In all cases, however, the Seventh Amendment right to trial by jury must be observed."); *Dasho v. Susquehanna Corp.*, 461 F.2d 11, 27 (7th Cir. 1972) ("[P]laintiffs are entitled to have a jury decide the issues raised by their claim that the purchase [of shares] resulted in damage . . . ."); *Serv. Grp. Inc. v. Essex Int'l Inc.*, 74 F.R.D. 379, 382 (D. Del. 1977) (It is "appropriate to initially try to the jury the damage claim . . . based upon defendant's alleged violation of section 10(b) of the Securities Act."); *In re Cigna Corp. Sec. Litig.*, 459 F. Supp. 2d 338, 340 (E.D. Pa. 2006) ("[E]xisting principles of law for calculating damages in securities cases, as well as the fundamental Seventh Amendment constitutional right to have a jury determine damages, foreclose the possibility of summary judgment."); *In re Asacol Antitrust Litig.*, 907 F.3d at 52-56 (court has "no license to create a Rule 23(b)(3) class in every negative value case by either altering or reallocating substantive claims or departing from the rules of evidence").
54. *See Jacob v. Duane Reade, Inc.*, 293 F.R.D. 578, 588 (S.D.N.Y. 2013) ("Even if individualized issues (rather than common issues) were to predominate the damage inquiry, the more appropriate course of action would be to bifurcate a damages phase and/or decertify the class as to individualized damages determinations."), *aff'd*, 602 F. App'x 3 (2d Cir. 2015); *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 744–45 (5th Cir. 2003) ("Where the plaintiffs' damage claims focus almost entirely on facts and issues specific to individuals rather than the class as a whole, the potential exists that the class action may degenerate in practice into multiple lawsuits separately tried. In such cases, class certification is inappropriate." (internal quotations and citations omitted)).

subset of class members (without even considering live testimony or further discovery).[55]

## IV. Plaintiffs Do Not Identify a Damages Methodology for Hashpoints or Paycoin.

Although Plaintiffs claim that their damages expert does include a "methodology" for calculating damages related to Hashpoints or Paycoin, that "methodology" simply involves requiring class members to submit documentation of their purchases of Hashpoints and Paycoin. Dkt. 191 at 29-30. There is no reason to believe that class members can do so. Not a single one of the 173 identified class members who provided documentation to Shinners offered any evidence of purchases of Hashpoints,[56] and Plaintiffs point to only two examples of class members who provided any documentation of purchases of Paycoin from GAW Miners.[57]

## CONCLUSION

For the foregoing reasons, Fraser respectfully requests that the Court decertify the class as to damages.

Dated:  February 7, 2020

HUGHES HUBBARD & REED LLP

By:  /s/ *Daniel H. Weiner*

Daniel H. Weiner (ct12180)
Marc A. Weinstein (*pro hac vice*)
Hannah Miller (*pro hac vice*)
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, NY  10004-1482
Tel.: (212) 837-6000
Fax: (212) 422-4726
Email: daniel.weiner@hugheshubbard.com

David R. Schaefer (ct04334)
Sean M. Fisher (ct23087)
Brenner, Saltzman & Wallman LLP
271 Whitney Avenue

---

55. Dkt. 146 at 3 ("If over 170 class members are served with interrogatories and document requests and responding takes an average of five to ten hour to complete, then this discovery will require more than a thousand hours of total time to complete.  Completing the discovery could take months.")
56. Plaintiffs cite a single wire transfer from Tuberosi (Dkt. 191 at 30, X-35), but it does not indicate that it had anything to do with Hashpoints.
57. Evidence of purchases of Paycoin from third-party exchange Cryptsy are not purchases "from GAW Miners, LLC or ZenMiner, LLC" and are therefore irrelevant.  *See* Dkt. 144

New Haven, CT  06511  
Tel.: (203) 772-2600  
Fax: (203) 562-2098  
Email: sfisher@bswlaw.com

*Attorneys for Defendant Stuart A. Fraser*