```
 1                       UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF CONNECTICUT
 2
     - - - - - - - - - - - - - - - -x
 3
     DENIS MARC AUDET, MICHAEL          No. 3:16-CV-00940 (MPS)
 4   PFEIFFER, and DEAN ALLEN
     SHINNERS, Individually and on      APRIL 24, 2020
 5   Behalf of All Others Similarly
     Situated                          1:59 p.m.
 6
     vs.                                ORAL ARGUMENT VIA ZOOM
 7
     STUART A. FRASER, GAW MINERS,
 8   LLC, and ZENMINER, LLC, (d/b/a
     ZEN CLOUD)
 9
     - - - - - - - - - - - - - - - -x
10
11                        450 Main Street
                        Hartford, Connecticut
12
13        BEFORE:  THE HONORABLE MICHAEL P. SHEA, U.S.D.J.
14
15   APPEARANCES:
16   FOR THE PLAINTIFFS:
17            SUSMAN GODFREY, L.L.P.
                  1301 Avenue of the Americas, 32nd Floor
18                New York, New York 10019
              BY:  RUSSELL F. RENNIE, ESQUIRE
19            BY:  SETH D. ARD, ESQUIRE

20            SUSMAN GODFREY, L.L.P.
                  1000 Louisiana Street, Suite 5100
21                Houston, Texas 77002
              BY:  COLIN M. WATTERSON, ESQUIRE
22
              SUSMAN GODFREY, L.L.P.
23                1901 Avenue of the Stars, Suite 950
                  Los Angeles, California 90067
24            BY:  MARC M. SELTZER, ESQUIRE

25   (Appearances continue...)
```

```
1   APPEARANCES CONTINUED:

2           IZARD, KINDALL & RAABE, LLP
                29 South Main Street, Suite 305
3               West Hartford, Connecticut 06107
            BY:  CHRISTOPHER M. BARRETT, ESQUIRE
4

5   FOR THE DEFENDANTS:

6           HUGHES, HUBBARD & REED L.L.P.
                One Battery Park Plaza, 12th Floor
7               New York, New York 10004-1482
            BY:  MARC A. WEINSTEIN, ESQUIRE
8                DANIEL H. WEINER, ESQUIRE
                 HANNAH MILLER, ESQUIRE
9                AMINA HASSAN, ESQUIRE

10          BRENNER, SALTZMAN & WALLMAN
                271 Whitney Avenue
11              New Haven, Connecticut 06511-1746
            BY:  SEAN M. FISHER, ESQUIRE
12

13

14

15

16

17

18

19

20

21

22  COURT REPORTER:  Julie L. Monette, RMR, CRR, CCP
                        (860) 212-6937
23
    Proceedings recorded by mechanical stenography, transcript
24  produced by computer.

25
```

1          THE COURT:  All right.  Welcome everyone.  This is

2   Michael Shea.  We're here in Audet versus Fraser, which is

3   16-CV-940.  Let me just first verify that our court reporter,

4   Ms. Monette, is on the line and can hear what I'm saying, if

5   she could just respond.

6          THE COURT REPORTER:  Yes, I am.

7          THE COURT:  All right.  Very well.  Let me now ask

8   counsel to state appearances, starting with the plaintiff's

9   counsel.

10          MR. RENNIE:  This is Russell Rennie for the

11   plaintiffs.

12          MR. WATTERSON:  Colin Watterson for the plaintiffs.

13          THE COURT:  All right.

14          MR. BARRETT:  Chris Barrett of Izard, Kindall & Raabe

15   for the plaintiffs.

16          MR. SELTZER:  Mark Seltzer for the plaintiffs.

17          THE COURT:  Anybody else for the plaintiffs?  Hearing

18   none, let's hear from defense counsel.

19          MR. WEINSTEIN:  Good afternoon, Your Honor.  Marc

20   Weinstein from Hughes Hubbard.  I believe with us by video is

21   Dan Weiner, or he should be.  I don't think I've seen him yet.

22   And I believe we have two colleagues joining in just listening

23   in by phone, Your Honor, Amina Hassan and Hannah Miller.

24          And lastly, don't want anyone to be fooled.  I think

25   on the bottom of my video it's coming up as Stephanie Weinstein

1   because I'm using my wife's computer for the Zoom.

2           And I believe Sean Fisher, local counsel in

3   Connecticut, is on as well.

4           MR. FISHER:  Yes, Your Honor, this is Sean Fisher,

5   Brenner, Saltzman & Wallman LLP.  I'm on as well.

6           THE COURT:  Okay.  Welcome, everyone.

7           Can I understand from the -- and, Mr. Weinstein,

8   you're going to be speaking for the defendants today; is that

9   right?

10          MR. WEINSTEIN:  Yes, on the motion, yes, Your Honor.

11          THE COURT:  Okay.  And then who is going to be

12   speaking for the plaintiffs?

13          MR. RENNIE:  That will be me, Your Honor, Russell

14   Rennie.

15          THE COURT:  All right.  Very well.  So I'm going to

16   ask my law clerk, who is co-hosting, just to mute everyone

17   else, and if someone else wants to -- other counsel want to say

18   something -- obviously you have e-mail -- you can e-mail the

19   speaker.  But if there's something urgent that another counsel

20   needs to say in response to a question or something, we can

21   unmute you for that purpose.

22          I should also point out, just as a notice, I know that

23   we have some other folks who are dialing in, and they're all

24   welcome.

25          Just as a reminder, in federal court, broadcasting,

1    recording, streaming of proceedings is not allowed.  It's

2    prohibited by federal rules.  It's not my rule.  It's the rules

3    of the federal courts, actually set forth in the Federal Rules

4    of Civil Procedure.  And I don't believe this is necessary, but

5    I should point out that if anybody were to violate those rules,

6    they could be subject to sanctions by the Court.

7         So you're all welcome here.  If there are media,

8    you're welcome as well, but you need to take notes.  You're not

9    allowed to tape or photograph anything or stream it or anything

10   like that.  So we're going to begin.

11        We're here with regard to the defendant's motion to

12   decertify the class that I certified last year in this case as

13   to damages.  And so, Mr. Weinstein, I'm going to begin with you

14   then.

15        And what I propose to do, folks, especially given the

16   limitations of this format, is to begin with questions.  I have

17   a number of questions for both sides, and I'll start with Mr.

18   Weinstein, and then I'll go to Mr. Rennie.  And we'll go back

19   and forth.  And if you could certainly answer my questions, I'd

20   appreciate it.  And then I'll give the other side a chance to

21   respond to the answer.  And then at the end, after we finished

22   with my questions, which I think will take a while, if you

23   think there are other things, other points you want to make, I

24   will give you an opportunity to do that.

25        All right, Mr. Weinstein, I would like to start with

1    you.  And I want to begin with some procedural questions with

2    regard to post-certification discovery in this case.  I recall,

3    in a general way, the discussions that I had with counsel about

4    setting up that discovery and the purpose of that discovery.

5    And, so -- but I don't have all the specifics, and I don't have

6    perfect recall either.  So some of my questions may just

7    reflect that I need to be reminded of things.

8         But let's start with the question of the defendant's

9    attempt to get third-party discovery from the banks.  All the

10   briefs seem to say about that is that that was unsuccessful.

11   Can you tell me more about that and why it was unsuccessful?

12        MR. WEINSTEIN:  Your Honor, the -- we did serve

13   third-party subpoenas on the institutions that we had

14   identified, and the answers we got back, I believe, were just

15   that they didn't find any documents or that they -- it was

16   difficult -- it's a difficult thing to search, and they didn't

17   have documents.

18        THE COURT:  Really.  And so what information did you

19   provide to the banks to allow them to do searches?

20        MR. WEINSTEIN:  That's a good question, Your Honor.

21   And I was not involved at the time.  I'd need to --

22   unfortunately, I'd need to go back and look at the subpoenas.

23   And the reason I was trying to set this up using one computer

24   for Zoom and the other so I can have access to my files is not

25   working; so I don't have that at the ready.  I know Ms. Miller,

```
 1    I believe, is on the line; so I'm happy -- she wasn't planning
 2    to talk, but I think she has more insight on those third-party
 3    subpoenas, so happy to have her.
 4           THE COURT:  All right.  Maybe we can unmute Ms. Miller
 5    for purposes of these questions.  Go ahead.
 6           Go ahead, Ms. Miller.
 7           MS. MILLER:  Sure.  So we provided the names of the
 8    companies GAW Miners and ZenMiner, and we provided various
 9    other numbers that we thought might be tax ID numbers based on
10    the documents that we had -- that we have available in response
11    to the responses that we got from the institutions when they
12    said that they could not locate documents based on the name of
13    the companies alone.
14           THE COURT:  So I guess I want to understand this.  So
15    let's say I am -- I was an investor in GAW Miners.  I bought
16    Hashlets or whatever.  Let's say that I had a Bank of America
17    credit card and that I was able to reverse the charges or
18    charge back some of the product that I purchased.  And this
19    goes back, let's say, to 2014.
20           And you come along in 2019 to Bank of America with
21    your subpoena.  And does the subpoena say, "Look for Shea's
22    records"?  I mean did you have enough information that you were
23    able to provide individual names or not?  That's what I'm
24    trying to understand.
25           MS. MILLER:  No.  I believe -- I will double-check,
```

```
1   but I believe we asked for information based on the names of
2   the companies and not based on individual potential class
3   members because we did not know -- or I may be misremembering.
4   I think I should double-check that, but I know --
5              THE COURT:  All right.
6              MS. MILLER:  -- that we had concerns about how they
7   kept their records and we weren't sure if it would be possible
8   to get records based on the names of the companies alone or
9   whether we would need to provide individual names of class
10  members.  I can't recall if we -- if we did provide the list of
11  the 173 individual class members along with our subpoena or
12  not.  But I can check that.
13             THE COURT:  All right.  Mr. Rennie, do you have
14  anything to say on that point as to what actually happened?
15  And also, while you're at it, I have a question for you on the
16  discovery, which is:  Why is it that the 173 interrogatories
17  weren't answered?  I mean from the briefs, what I understand to
18  be the case is that the defendants propounded 173 sets of
19  interrogatories to the -- I believe it's to the folks who had
20  provided documents to Mr. Shinners and that, from what's
21  represented in the briefs, the plaintiff's counsel came back --
22  maybe it was Mr. Watterson; maybe it was you who came back and
23  said, Look, that's just not going to fly.  Why don't we do
24  this.  Why don't we come up with some perhaps simpler
25  questions, some other questions.
```

1        And that was agreed to.  Four questions were

2    propounded, and there were some just unsigned documents that

3    came back answering those questions in 111 of the 173 cases.

4    How come we weren't able to get sworn answers as to the 173

5    interrogatories?

6        MR. RENNIE:  Thank you, Your Honor.  Taking those

7    points in order, we don't -- plaintiffs don't know any more

8    about third-party discovery than you do.  We, obviously, note

9    that in the record there are examples of credit card

10   statements, and, you know, this happened in 2014 or 2015 when

11   electronic databases existed.  So we sort of expect that they

12   exist, but we don't know anything about the discovery,

13   third-party discovery process.

14       As to the question about the set of four

15   interrogatories, you're correct that it was not me who actually

16   propounded those on the class, the set of class members.  I do

17   believe that we communicated with all 173, but I would have to

18   pass the microphone to Mr. Watterson to understand a little bit

19   more about the sort of incompleteness of that production.

20       THE COURT:  Okay.  Let me hear from Mr. Watterson on

21   that point then.

22       MR. WATTERSON:  Sure.  Your Honor, we reached out to

23   the 173 class members with the contact information we had.

24   Initially we received some bounce back e-mails.  So for those

25   folks we followed up by phone numbers and physical mail because

1     we have their addresses.

2           We were able to get in contact with most of these

3     people, approximately 130 of them.  About 40 of them we just

4     never heard anything back, whether by e-mail, by phone, or by

5     physical letter that we sent.

6           So with respect to the interrogatories, that's

7     correct, Your Honor.  We -- we met -- we objected to the

8     initial interrogatories.  We met and conferred.  We agreed on

9     questions.  We -- so we prepared documents, sent them out to

10    the class members, and I was able to get back the 111

11    responses.

12          And, you know, reasons vary as to that delta of the

13    130 we were able to contact and the 20 or so that didn't get

14    back to us.

15          THE COURT:  Okay.  And there was some reason that

16    those were not provided under oath?

17          MR. WATTERSON:  You know, Your Honor, that's --

18    frankly, that's something that I, you know, I didn't even think

19    about.  I prepared a document that had the questions written

20    out that we agreed to.  I provided them to opposing counsel,

21    and, you know, I never heard anything about it until the

22    papers.

23          THE COURT:  Okay.  Mr. Watterson, while I have you,

24    I'm guessing you might be the right person to ask this too as

25    well, although Mr. Rennie can certainly speak to this if he

knows.

Am I understanding correctly that, first of all, let's pick that group of 173.  That's the group that provided documents like e-mails showing purchases from GAW Miners to Mr. Shinners before this lawsuit was ever started; is that right?

MR. WATTERSON:  Correct, Your Honor.

THE COURT:  Okay.  And then the next question is: What's the relationship between that group -- or maybe I should put it this way:  Is that group a subset of the group of 500 or -- excuse me -- 490 shown on Mr. Shinners' spreadsheet, which is an attachment to one of the briefs?

MR. WATTERSON:  Initially what Mr. Shinners did was he reached out through forums and other channels of communication and was just simply trying to gauge initial interest in people that would like to participate in a class action.  So he had them fill out a web form, and the information that you see in that spreadsheet is the information they provided.  So he created a website is sort of a second stage where they can upload documents.

So in large part the 173 is a subset of that 500, but there are some people that were not part of the initial 500 that got word and proceeded to upload documents.  So it's not a complete overlap.

THE COURT:  Thank you.  That's helpful.  I appreciate that.

1      All right.  Let's move on, then, from the procedural

2   issues back to Mr. Weinstein.  Let me ask you this:  So is it

3   Mr. Fraser's position that he has a right to a jury trial for

4   all damages determinations in this case such that even if I

5   determine that there can't really be aggregate damages in this

6   case -- and we haven't really discussed that yet -- but if I

7   were to make that determination, Mr. Fraser would have the

8   right to a jury trial as to each class member's damages should

9   he choose to pursue a jury trial with respect to that?

10      MR. WEINSTEIN:  Your Honor, I think the -- Mr. Fraser

11   has a right to a jury trial in order to at least determine, if

12   it's determinable, a damages award.  I understand that in a

13   claims process after the fact, once there's been a damages

14   award, there can be determinations as to how to allocate within

15   that awards and various claimants who put in claims forms.  But

16   I think the issue here is you can't get to that step because

17   the jury has -- they will have no ability on certain aspects of

18   damages to compute an overall aggregate damages award and that

19   he does have a jury right to make those determinations.

20      You know, having said that, I think, Your Honor --

21   we'll get to this a little later, but Your Honor's suggestion

22   not a potential bifurcation here, which we think is a good one,

23   and how certain aspects of damages can be dealt with if there's

24   a bifurcation, I think there may be some compromise in there.

25   But as a general matter, yes, Mr. Fraser has the right to have

1     a jury determine the damages putting aside how you can allocate

2     those.

3              And if I can, Your Honor, just before you go to

4     plaintiff's counsel on that point, I just -- two notes on the

5     factual questions Your Honor asked earlier.  You know, with

6     respect to the credit cards, whether or not we provided sort of

7     the GAW Miners' company names to the credit card companies or

8     individual names, you know, that was, to some extent, a

9     shot-in-the-dark approach because we don't know, you know, for

10    the class members -- many of the class members we wouldn't know

11    their names.  But even if we did, we certainly don't know who

12    they had their credit card through.  So you are really just

13    reaching out to a few larger institutions and hoping, you know,

14    they might have some records, but it's really not a way to have

15    a common set of data for the potential class members as to

16    chargebacks.

17             And, look, we do acknowledge that there are some

18    documents in the record, very few, but some.  Some of the class

19    members provided some credit card information about

20    chargebacks, but certainly not to the extent we know there were

21    chargebacks.

22             And even if every class member had such documents, it

23    still requires individualized inquiry to get those documents.

24    There is no way for an expert here or the jury to look at some

25    common set of data and decide the number of chargebacks.

1          THE COURT:  Let me follow up on that though.  So if

2     the Court were to say, look, in order to get any damages in

3     this case, each class member's going to have to submit proof of

4     purchase of the, you know, of the products, and if I purchased

5     products using a credit card -- and you could even say and you

6     have to do it -- you have to also, if you used a credit card,

7     you have to submit the credit card record.  That would tell you

8     which bank; right?

9          Because let's say I have three credit cards but I

10    purchased all my -- all my GAW Miners products using my

11    Citibank credit card.  If the claims process says, well, in

12    order to get the damages, I have to submit credit card records

13    for those purchases that were made through credit cards, then

14    at that point you would know which bank I had, and so you could

15    check.  I mean the claim form would also say, and you've got to

16    submit, you know, the records showing chargebacks or -- and

17    you've got to submit the record -- the credit card statements

18    from that bank for the next five, six months, whatever the

19    class period is or thereafter.

20          But you would, as the defendant, have the ability to

21    check up.  You would say, Oh, Shea purchased using Citibank,

22    and so we'll just issue a subpoena to Citibank and check to

23    make sure that he -- that he produced all the relevant records.

24    We'll be able to check on the chargebacks.

25          Wouldn't that work?

1          MR. WEINSTEIN:  So that would work, I agree with that.

2     That would work if what we're talking about is there's been no

3     overall damages award set yet as of that process, and then for

4     those people who want to put in claims forms showing how they

5     purchased the product, which would establish the purchase, you

6     know, how much they paid side of the damages calculation, that,

7     at least with respect to credit card purchases, would give us

8     an avenue to then determine if they have any offsets.

9          The problem -- and I agree that that's a way to

10    resolve that if damages are not calculated until --

11         THE COURT:  Right.

12         MR. WEINSTEIN:  -- both of those sides are done, which

13    is the person puts in how much they paid and evidence of how

14    much they might have gotten back or at least give us enough

15    information to try to track that down ourselves.

16         But if you do what I think the plaintiffs are asking,

17    which is, "Look, we have a fine set of data" -- I mean we

18    dispute that, you know, with respect to the database, but

19    different issue.  "We have a fine set of data for purchases;

20    right?  So we can come to some gross damages award with one

21    input, which is just how much was paid, and wait until later to

22    then see if people put in for offsets."  That would not be, you

23    know -- that would violate Mr. Fraser's rights.  Because now

24    you've set up -- and the Second Circuit has said this

25    clearly -- that you can't roughly estimate gross damages and

1    worry about netting off, you know, offsets later because he's

2    now on the hook for a number that really doesn't reflect his

3    liability.

4         THE COURT:  All right.  Mr. Rennie, let me hear from

5    you about that, about generally -- I mean I can ask the

6    question, but I'd be interested in your response to Mr.

7    Weinstein's comments.

8         First, I guess, is it your view that, yeah, the jury

9    can calculate aggregate damages here and then we can have a

10   clarity process where we kind of take account of the offsets?

11   And if so, how would the jury calculate aggregate damages and

12   how would such a manner of -- a sequencing of the proceeding

13   square with a McLaughlin case and the other cases that Mr.

14   Weinstein was likely referring to?

15        MR. RENNIE:  Sure thing, Your Honor.  So, first,

16   plaintiffs do believe that an aggregate damages award is

17   available or is one avenue that we could use to prove a class

18   file award to damages.  And we're aware of the case law in the

19   McLaughlin and Seijas case, but what those cases require and

20   what we think the Second Circuit has said clearly is a

21   reasonably accurate aggregation of individual class members

22   claims.

23        And we believe that the evidence offered by our

24   expert, Robert Mills, is reasonably accurate and sufficient to

25   meet that standard.  We note that his estimate for a number of

1  reasons is conservatively low.

2        We also point out that there's evidence of chargebacks

3  in the record and that Mr. Fraser's expert has provided some

4  evidence on the extent and dimension of the chargebacks

5  provided.

6        Now, majority could choose to believe or disbelieve

7  some of that evidence, but we believe that it would come within

8  the ambit of reasonably accurate.  The Second Circuit hasn't

9  required at class certification that aggregate damage models be

10  exact or that plaintiffs provide a method for perfectly

11  computing an aggregate damages award.  So for those reasons we

12  believe that is a viable method of going forward.

13        In the alternative, we agree that a claims process is

14  a different and equally viable way for plaintiffs to prove

15  damages on a class-wide basis.

16        THE COURT:  So taking the last point first, if I were

17  to -- if I were in -- and we'll get into this.  If I were to

18  decide, look, I think there's a material amount of chargebacks

19  here, at least there's the likely prospect of a material amount

20  of chargebacks and so I'm a little worried about the jury

21  calculating an aggregate number and then sort of subtracting it

22  in a joint class trial, if I were to reach that conclusion,

23  your view is:  That's okay.  We don't agree with that, but we

24  think you can.  But that's okay.  You don't have to decertify.

25  You can use a claims process to calculate the damages in some

1   kind of a subsequent proceeding which would take place after a

2   liability trial.

3       Is that -- do I understand you correctly?

4       MR. RENNIE:  Correct, Your Honor, we do think that

5   would be a viable way of proceeding.

6       THE COURT:  That's interesting.  But let me now come

7   back to the first proposition, which is whether or not, Mr.

8   Rennie, the jury really can calculate aggregate damages here.

9   So I'm kind of struggling to understand how that would actually

10  work.

11      As I understand it -- and I've read the expert

12  affidavits.  As I understand it, you start with the database,

13  and defendants could take shots at the database as they saw

14  fit.  And that would be a jury question, fine.

15      And -- but then, of course, there would be more work

16  to do because, as I understand it, the database does not

17  reflect sales or I should say sales by the investors of their

18  Paycoin, which they would withdraw and sell on their own on

19  some, you know, some third-party exchange.  And then in

20  addition, of course -- and that's true, I guess, of, I want to

21  say, Hashpoints as well, although it doesn't sound like there

22  was that much activity in the third-party sale of Hashpoints.

23      But then, of course, there's the issue of the offsets.

24  We've talked about chargebacks.  There's others, as you know,

25  discussed in the briefs.

1      Assuming that we would get into the issue, obviously,

2  of, well, which offsets are appropriate and which are not, and

3  some of those might be factual questions, but assuming that

4  ultimately the correct damages sort of formula, according to

5  the law, is that at least some of the offsets, let's start with

6  the chargebacks, are, in fact, proper offsets, how would, in

7  this joint trial where aggregate damages were being calculated,

8  how would the jury -- how would it actually work where it was

9  put into evidence what the chargebacks were and what the

10  Paycoin sales were to get to a damages calculation?

11      MR. RENNIE:  So, obviously, there would be a sort of

12  total sum that had been spent on securities, which, under a

13  variety of our claims, is the consideration paid for the

14  securities by the class?  Were the actual value paid by the

15  class? which is an ingredient in the Blue Sky law claim and in

16  the 10b-5 claims.

17      But there is substantial evidence already in the

18  record that a jury could hear and could either subtract

19  arithmetically from that number or alternatively could use as a

20  basis for an estimated offset for damages the entire class

21  based on sample.  That would sort of drive the aggregate figure

22  to a point where it reflected some of these offsets.

23      And we understand defense -- Mr. Fraser's expert has

24  also opined on certain corrections and sort of diminutions to

25  Mr. Mills', plaintiff's expert's, aggregate figure.  And they

1    would, obviously, be able to attack the figure in other ways.

2    But we think that based on the available evidence, you know,

3    they could hear about specific amounts of chargebacks or the

4    average number -- the average amount of a chargeback, an

5    estimated percentage of class members who received them.

6         Because, again, a damages figure doesn't have to be

7    one hundred percent accurate to the cent.  You know, it has to

8    be reasonably accurate.  And to the extent that Mr. Fraser is

9    worried about individual class members being overcompensated,

10   obviously, there would be a subsequent claims process whereby

11   no individual class member is going to be overcompensated.

12        THE COURT:  But I guess -- so as I understand it,

13   discovery's complete at this point.  And so where would Mr.

14   Fraser or where would you get the evidence to show what the

15   offsets would be?

16        I mean so we've got -- let's just take two examples.

17   We've got the chargebacks, and so far there's some discovery

18   of, as I understand it -- well, there's been discovery -- well,

19   if you count what happened as discovery, there's discovery of

20   173, which is clearly a much smaller number than as what I

21   understand people believe the class to be here.  And then we

22   have this spreadsheet from Mr. Shinners, which is about 500, a

23   larger number but still considerably smaller than what we

24   understand the class to be here.

25        In terms of calculating the chargebacks, are you

1  saying we would use -- the jury could use sort of the

2  information we have as kind of a representative sample?  And

3  why would that be -- why would it in fact -- what basis do we

4  have to believe that, in fact, what we know so far constitutes

5  a representative sample?

6         MR. RENNIE:  A few points, Your Honor.  One is that we

7  do believe that the jury is capable of doing some math on its

8  own.  The jury could hear about specific chargebacks and reduce

9  a damages award by that amount.  And we have no way of knowing

10 how representative a particular sample is, but as the numbers

11 get higher, you know, there is more integrity to the sort of

12 larger sample size, the 500 versus the 173.

13        But to reiterate, there are -- there are a number of

14 people who submitted information to Mr. Shinners who provided

15 the exact amounts of chargebacks that they received.  So it's

16 not as if the jury or the parties are working with no evidence

17 as to chargebacks in specific amounts.

18        THE COURT:  Although we do know of, I think, two

19 examples where we didn't really learn that there were

20 chargebacks up until the depositions; right?  I think -- I

21 forgot her name, Theresa Crivelli or Crivello and Mr. Simpson,

22 I think.  There might have been a third.

23        And so I think what the defendants would say is, look,

24 that spreadsheet's fine as far as it goes, but, first, there's

25 a disincentive to disclose chargebacks.

1          And, second, putting aside whether people are being

2     honest, there's just memory issues; right?  There's just people

3     don't have the records.  It's a long time ago, and, you know,

4     they're filling out this thing, this spreadsheet kind of.  We

5     don't know how much time they spent on it, not all of the 500

6     submitted records to Mr. Shinners.  So we just don't know.

7          What's your response to the notion, we just don't --

8     we can't really rely on the spreadsheet?

9          MR. RENNIE:  Those are fair points, Your Honor.  We

10    note that class members were sort of heavily invested in GAW

11    Miners and we think took time and effort in providing

12    information and providing documents to Mr. Shinners.  And we do

13    think that, based on the sort of earlier points I've made,

14    there are various ways in which a jury could take into account

15    these offsets.  But we want to reiterate this is only one

16    method of proceeding.  We also think it would be equally

17    appropriate to proceed in front of the jury with a class-wide

18    formula that would then be applied class member to class member

19    during a claims process.

20          THE COURT:  And that would look like what exactly?

21    What exactly would be presented to the jury in that scenario?

22          MR. RENNIE:  So there are various ingredients or

23    elements to the damages calculations for each of the different

24    claims, for instance, the 10b-5 claims using out-of-pocket

25    damage measure.  And that subtracts from the value paid the

1   actual value received by the class member on the date of the

2   purchase.

3          And it is the opinion of our expert that class members

4   receiving no value for their securities; that's paragraph 75 of

5   our expert's report.  Now, Mr. Fraser might disagree, but the

6   actual value of the securities on the day they were sold is an

7   issue that's common to the class and would need to be cited in

8   order for those awards to be made.  But it would only need to

9   be cited once, and it would apply to all class members equally.

10         There are a number of other common legal issues that I

11  think Your Honor has referred to, including the sort of

12  propriety or appropriateness of offsets for certain later

13  transactions.  But in short, we -- the jury would need to

14  decide a few elements of the damages formula before it went to

15  a claims process.

16         THE COURT:  Okay.  So, Mr. Weinstein, let me ask you

17  to respond to Mr. Rennie.  First I'd like to know your view on

18  his point, which I think is pretty well established in the case

19  law, that, you know, damages calculation is not a science and

20  we don't require mathematical precision from juries and a

21  reasonable estimate is sufficient and his point that, you know,

22  you do rough justice here when -- once liability's proven, you

23  do rough justice.  You take what we do know about the offsets

24  and you could extrapolate it across the class and ask the

25  experts to come up with an estimate, perhaps a range.  Why not

1    do it that way in an aggregate trial?

2          And then after that, let me hear your response to his

3    proposal that, Well, if you don't like that, Judge, we could

4    do -- we could have the jury decide common questions related to

5    the damages issues, a proper formula, which offsets are valid

6    offsets, which aren't, that kind of thing.

7          So let me hear your response on those two.

8          MR. WEINSTEIN:  Sure.  With respect to whether the

9    jury can make an aggregate damages calculation, the only thing

10   we can confirm from the Shinners spreadsheet and subsequent

11   discovery -- and limited discovery at that -- is that, in fact,

12   there were chargebacks and they may have been significant or

13   certainly material, but it doesn't give the jury any reasonable

14   basis to then extrapolate.

15         And there's a number of issues with the data, starting

16   with if you take the Shinners spreadsheet, which I think had

17   490 potential class members on it, between that and the

18   subsequent discovery of the more limited set, I believe there's

19   been identified approximately 49 people who have at least

20   acknowledged a chargeback of some sort.  And whether it's one

21   or two different than 49 is not really the issue.  But I

22   believe it's 49.

23         But the problem from there is that a few things.  One

24   is I think at least 13 of those acknowledge getting chargebacks

25   but without any dollar amount.  They don't remember.  They

1    don't have records.  So there's only so much you can do with

2    that information, very little other than to confirm it's an

3    issue.

4          And then for the others, you kind of have people all

5    over the map.  You have someone like Ms. Crivello, who had a

6    very substantial amount come back to her in chargebacks, I

7    believe a hundred thousand dollars.  You have other people who

8    had small amounts.

9          But because of that, there's no real consistency where

10   you can say, okay, we can at least see that from those who said

11   they got chargebacks, there's a relatively consistent level,

12   you know, let's say 40 percent, 50 percent and we can try to

13   extrapolate from that.  They're really all over the map on the

14   percentage they got back.

15         You have some of them saying they got something back

16   but only providing very little documentation of it.  So there's

17   really -- it's very difficult to confirm without the

18   documentation, in fact, how much they got back.

19         And you're missing -- and one other significant issue

20   with the Shinners spreadsheet is that according to the

21   plaintiffs, the reason why some people didn't even answer his

22   question correctly in the first place, so people who we

23   deposed, like a Ms. Crivello, who, at the deposition, said she

24   had chargebacks but had not answered that in connection with

25   his spreadsheet, is that they said his question was confusing,

1   that he asked people if they had, I think it was, refunds.  And

2   it's not clear what "refunds" meant, and, therefore, it's not

3   that they were lying at the time -- and we're not saying they

4   were lying.  But the issue is you can't even take the

5   spreadsheet responses and say, okay, of the 490, X amount had

6   chargebacks because we don't know that they even understood the

7   question.

8          I think they have the same issue with Mr. Grimes's

9   response and his deposition testimony about his responses to

10  the spreadsheet.  I don't recall if it's on the chargeback

11  issue, but it was -- I was confused by the question.  It's I

12  wasn't answering what, you know, we think he was answering.

13         So what is a jury to do with that?  And I think, Your

14  Honor, you need to look no further than their own expert's

15  report in this case as to why a jury cannot calculate aggregate

16  damages.  Because when you ask him -- and it's in his report as

17  well -- with respect to each of these offset issues, well, how

18  would you go about doing it? he doesn't propose a number at

19  all.  All he says is, You have to go ask the individual members

20  of the class for documentation.

21         Well, that's not something the jury can do.  They're

22  not going to have that information.  He's not going to be able

23  to provide that information to him.  Our expert can't do it.

24  Nobody has the data.

25         So in the cases that Your Honor I think is referring

1    to and the plaintiffs refer to where -- and I don't know that

2    rough justice is fair, but I get some kind of more estimated

3    process, at least in those cases the evidence is that there is

4    some common data set that at least can be used.  Every

5    plaintiff may be a little different.  So it might not be to the

6    T for each one, but there is at least a common set of data to

7    understand what kind of offsets there would be.

8         For example, I think in the NASDAQ case, in the cases

9    where you have big financial institution underwriters who

10   underwrote the securities at issue, the defendants themselves

11   have that data necessarily.  They're required to keep it.  This

12   is not that case.

13        Even the company, which isn't a defendant here,

14   wouldn't have that data.  It necessarily wouldn't have

15   chargeback data.  That's a private transaction.  It would not

16   have private sales.  So there is just no data to draw from for

17   a jury to make that determination.

18        THE COURT:  Now, what about with respect to the second

19   question I discussed with Mr. Rennie, the question of, well,

20   even if we don't have the jury determine aggregate damages, the

21   jury should be allowed, and it would make sense on a class-wide

22   basis, to determine damages-related issues like whether certain

23   offsets are, in fact, proper offsets, like -- so that was one.

24   I'm trying to remember the others that they talked about.  I

25   think there was -- well, let's start with that one.

1          MR. WEINSTEIN:  Yeah, I think what he mentioned was

2    the formula itself.

3          THE COURT:  Right, the formula, that's right.

4          MR. WEINSTEIN:  This is not a case where I think we're

5    arguing that the formula is so potentially complicated that

6    nobody can figure it out.  I mean it's not a tough formula.

7    You've got how much they paid versus how much value they got

8    back.  I mean the issue isn't the formula.  It's you don't have

9    the data for one substantial input, which is the value

10   received.

11         So can the jury say the way that a claims

12   administrator or a special master is going to deal with this is

13   to take the amount paid minus the value received?  I mean yes.

14   But as far as which of the potential offsets should be an

15   offset, I mean it's an interesting question whether the jury

16   should decide that.  I don't know that we've thought about it

17   for each of the offsets.  I think some of these may be legal

18   issues for Your Honor to determine --

19         THE COURT:  Yeah.

20         MR. WEINSTEIN:  -- as opposed to fact issues.

21         THE COURT:  Right.

22         MR. WEINSTEIN:  So -- and I think, you know, with

23   respect to each of those, because I don't think the issue is

24   whether people did get that value at some point in time and so

25   the question -- that may be a more nuanced question that I

1   don't know the answer to now.  But I guess conceptually we're

2   not opposed to the jury deciding certain factual issues on the

3   formula, but I don't think that's a real big area of dispute.

4           THE COURT:  Is it your view that, Mr. Weinstein, that

5   the plaintiff has the burden of proof with respect to each of

6   the offsets?  In other words, that in order to calculate

7   damages, purchase price is one thing.  But there's got to be

8   whatever subtracted, and the subtraction is just as much the

9   plaintiff's burden as coming up with the purchase price?  Or

10  does that question turn on the different types of offsets

11  involved?

12          So, for example, if it's -- I don't know -- a resale,

13  that that would be like a setoff that would ordinarily be like

14  an affirmative defense, or is it your view that, no, across the

15  board this is the plaintiff's burden?

16          MR. WEINSTEIN:  Yeah, Your Honor, our position is it's

17  the plaintiff's burden across the board in this case.  Setoffs,

18  as opposed to what we're saying offsets where you have an

19  affirmative counterclaim.

20          THE COURT:  Right.

21          MR. WEINSTEIN:  I think really gets into when a

22  defendant puts in a counterclaim saying, "Okay, we may, if

23  we're liable, owe the plaintiffs X amount of money," but in

24  fact they owe us X amount of money back for other reasons.

25  That's not this case.  I know they cited a few cases about

1    that, but that's not this case.  We're not saying plaintiffs

2    owe us money and, therefore, it's their burden to establish it.

3         They are trying to determine how much their -- that

4    Mr. Fraser may be liable for, how much they are entitled to.

5    It is their burden to establish that.  I think they need to put

6    forward to the jury a reasonable methodology that allows the

7    jury to take all the inputs and make a final determination, not

8    half the equation, which is the amount paid.

9         THE COURT:  All right.  Mr. Rennie, let me hear you on

10   the burden issue.

11        MR. RENNIE:  Plaintiffs don't agree that it's our

12   burden to prove offsets.  We think our burden is to prove to a

13   reasonably certain degree the amount of damages that the

14   plaintiff has suffered.  That is our burden for showing the

15   class members' damages.

16        We believe that in other domains it's the defendant's

17   burden to prove things like offsets or even a failure to

18   mitigate damages.  So --

19        THE COURT:  But let me ask, so here -- let's take

20   chargebacks.  So chargebacks essentially, although there's a

21   third party involved, the bank, as I understand it -- and I

22   don't pretend to be an expert in the world of chargebacks, but

23   as I understand it, effectively what's happening is the bank

24   gets the complaint from the buyer, saying I got -- you know, I

25   didn't get what I bargained for.  This is fraud, whatever, a

1    complaint.  And I want -- I want a refund in effect.

2          And then the bank goes to the company, and the company

3    says, "Look, this is what we're being told.  What's your

4    response?"

5          And the bank -- I don't know if "arbitrate" is too

6    strong a word, but the bank makes some determination of

7    essentially who's correct.  And then if the bank decides that

8    the buyer's correct, the bank, because it has an agreement with

9    the seller, sort of credits the buyer and deducts from the

10   seller and so that it effectively operates like a refund.

11         Feel free to correct that.  I may have the information

12   wrong as to how a chargeback works or worked in this case.  But

13   on that one, are you suggesting that, look, that's not our

14   burden.  We can go in and put up a number for the plaintiffs,

15   what the plaintiff purchased.  And, sure, defendant can come

16   along and they can say, oh, but they got a refund.  But that's

17   the defendant's burden to do.

18         Is that your view?

19         MR. RENNIE:  First of all, Your Honor, you described

20   the mechanism for chargebacks correctly, but we point out that

21   GAW Miners went out of business in this case; so it was a case

22   where it was the bank making the customer whole.

23         THE COURT:  Do we know the extent of that?

24         MR. RENNIE:  I don't know right now.  I can check.

25   But it's our understanding that a lot of the chargebacks were

1    not able to be recouped from the defendant.

2          But to your point, in a simpler case, we think that

3    the plaintiff would provide prima facie evidence of what they

4    had lost.  And if there's no contrary evidence of setoff,

5    offset, failure to mitigate or anything else, then the

6    plaintiff has sort of met their burden of showing that they're

7    entitled to damages.  So it's not clear why necessarily the

8    burden would somehow shift in a class action setting.

9          THE COURT:  Well, I guess -- I certainly understand

10   your point as a general way, but I guess I'm asking in this

11   specific situation -- let's take a clear example since I think

12   you agree with me it does more or less operate as a refund

13   except to the extent GAW Miners went out of business, and maybe

14   in some cases the bank was out of pocket.  I don't know.  But

15   in ordinary for folks who got lucky before GAW Miners ran out

16   of money, they were able to get their money direct from GAW

17   Miners.

18         So let's say I go to the store and I bought a lawn

19   mower and, you know, I pay $300 for it.  And the darn thing

20   doesn't work.  It doesn't work well, whatever, and, you know,

21   I'm able to establish that, in fact, it's only worth $50.

22   Maybe -- I don't know -- they bought it used and they sold it

23   to me as a new mower and the price they paid for it used was

24   $50.  Let's keep it simple.

25         So I sue the vendor, and I say, "I want my $300 back."

1    And, you know, I go to court.  I don't have the burden to show

2    that -- I can -- if the defendant -- I've met my burden of

3    proof as long as I show, look, I paid $300 for it?  I don't

4    have any obligation to put in the evidence that, in fact, the

5    lawn mower's worth $50?

6         MR. RENNIE:  I'm not sure I fully follow, but in this

7    case, during a claims process, somebody who came in and said, I

8    spent $300 on this lawn mower or 300 Bitcoin on these

9    securities or could be made to attest under penalty of perjury

10   that they had not received any chargebacks, which I think is

11   the equivalent of --

12        THE COURT:  No, I think we all understand that.  I

13   think what I'm kind of puzzling through is:  Whose burden was

14   it?  Maybe my example wasn't very articulate, but the basic

15   example is, I pay the price, which is 300.  The thing is

16   actually worth 50.  I sue because there were misrepresentations

17   made that it was a new lawn mower, and I say, "I'm entitled to

18   $300."

19        Have I -- it's clear everybody understands that the

20   lawn mower's worth $50.  Have I accurately stated -- have I met

21   my burden of proof by putting in, you know, the check that I

22   wrote for $300?

23        MR. RENNIE:  Leaving aside, I think, the measure of

24   damages that would apply here and sticking to your example, I

25   do.  If you paid $300 for the lawn mower and you're proving

1   your damages, then isn't your -- the evidence of your

2   payment -- it's hard to disentangle from the question of what

3   you're actually entitled to.

4          THE COURT:  Yeah, it's a bad example actually

5   because -- let's actually talk about this case because I think

6   it raises a good point about this case.

7          If plaintiffs were correct and this was a Ponzi scheme

8   from day one, or at least from the beginning of the class

9   period, query whether damages should properly be measured as

10  essentially fraudulent inducement damages.  In other words,

11  look, nobody in their right mind would invest in a Ponzi scheme

12  if they really knew that's what it was.  So if that's correct,

13  then isn't -- arguably, the traditional securities measure

14  doesn't really fit here.

15         I mean I don't know if there's any material

16  difference.  I don't know if the number comes out differently.

17  But one way to think about it is -- and this goes, for example,

18  to the debate about whether the accounts have to be netted.  So

19  multiple -- I own multiple accounts, whether they have to be

20  netted or not, the gains in one versus the losses in the other.

21         And as you've pointed out, there's cases.  There's the

22  Judge Scheindlin case.  She takes kind of a middle view.

23  There's the Eastern District of Pennsylvania case that says,

24  no, it's transaction specific.  There doesn't seem like there's

25  any real circuit law on this.

1           But I'm wondering if what really happened here is this

2    is a Ponzi scheme from day one and I never would have done this

3    had I known.  This is not like a case where I buy IBM.  It's a

4    good stock generally.  They make some puffery announcement, and

5    it goes up five bucks.  And then that fraud is revealed.

6           I might have still bought IBM in that scenario.  So

7    it's proper to think, well, what was it actually worth?

8           Versus here, as your expert agrees, this was

9    valueless.  This was a fraud.  Nobody in their right mind would

10   have invested.

11          So that kind of suggests, doesn't it, that to take the

12   example of the -- that basically everything has to be netted,

13   whether it's ION sales, whether it's Paycoin sales, whether

14   it's multiple gains and accounts, because the reason everything

15   has to be netted is that I never would have signed up in the

16   first place had I known.  And so to put me back in the position

17   where I was before I signed up, you have to take account of all

18   my gains and all my losses whenever they occurred, whichever

19   account they occurred in.

20          What's your view on that, Mr. Rennie?

21          MR. RENNIE:  Well, I think to your point about the

22   sort of strangeness of the case is that these, like Your Honor

23   says, are not our traditional securities.  Nevertheless,

24   plaintiffs allege they are securities.  But we've alleged both

25   common law fraud and securities fraud because plaintiffs think

1    these clients fall into both categories.  And we can make out a

2    cause of action under either theory.

3         For that reason, sticking close to the language of the

4    Connecticut Blue Sky laws and the securities laws, they refer

5    to the purchaser's security.  So we don't think that taking the

6    case law that has grown out of the close reading of those

7    statutes and discussing a transaction approach it's appropriate

8    to net the gain in an unrelated security or unrelated product

9    against the loss caused by the purchase of a predecessor

10   product or a totally different security.

11        So we don't -- we don't believe that that, sort of on

12   a global basis, any type of netting would be appropriate

13   because, you know, at the end of the day, we have -- we brought

14   this as a securities fraud action, and we don't believe it

15   would adhere to the language of the statutes or really serve

16   the deterrent purposes of the security fraud statutes to

17   proceed on a sort of global basis where all the gains are

18   netted against all the losses.

19        THE COURT:  And just while we're on this issue of the

20   netting, I'm trying to think about how that question would be

21   resolved.  And I guess what I'm wondering is:  Is the correct

22   way for the Court to resolve that question to listen to the

23   evidence in a joint -- in class trial, including evidence

24   pertaining to the holding of joint accounts and things like

25   that, and then to craft jury instructions, so then basically to

```
1    determine the issue as a legal matter after I've heard the
2    evidence in the jury instructions and say either to the jury,
3    either you net or you don't net or something in between, you
4    net certain things like Judge Scheindlin talked about.  Would
5    that be the way that would get resolved?
6            MR. RENNIE:  So the cases that plaintiffs have
7    encountered have taken various approaches.  There's a case from
8    the Eastern District of Pennsylvania we've uncovered where the
9    district judge denied summary judgment and said it would be
10   inappropriate for the jury to decide.
11           THE COURT:  Yeah, that's the CIGNA case; right?
12           MR. RENNIE:  Exactly.  We've also found another case
13   from the Southern District of New York that we didn't cite in
14   our brief where the propriety of an offset was actually part of
15   a jury instruction, and we're happy to provide that authority
16   to Your Honor if it would be helpful.
17           THE COURT:  What's the name of that -- what's the name
18   of that case?
19           MR. RENNIE:  If you would allow me one moment.  I
20   apologize.
21           THE COURT:  That's all right.
22           MR. RENNIE:  It is called -- well, let me read the
23   Westlaw number.  It's called BNE Swedbank, S-w-e-d-b-a-n-k, and
24   it's cited at 1993 Westlaw 152392.
25           THE COURT:  Great.  Thank you for that.
```

1          MR. RENNIE:  But I think, stepping back, we also cited

2     a few cases in our brief that suggested that deferring the

3     question until time of trial is one appropriate way to sort of

4     wait, even if the question is one matter of law to be decided

5     by the Court and not by the jury.  And regardless of -- I

6     apologize, Your Honor.

7          THE COURT:  No, go ahead.  Go ahead.

8          MR. RENNIE:  Regardless whether they're questions for

9     the Court or for the jury, ultimately plaintiffs would like to

10    underscore that all of these questions are common questions,

11    whether offsets are appropriate as to all or a substantial

12    subset of class members who own a particular set of security.

13         THE COURT:  Right.  Let me ask you this question:  So

14    earlier we were talking about a possible approach in a claims

15    process, recognizing that your first choice, I think I

16    understand it, is do it all in an aggregate trial, recognizing

17    that.

18         But then you talked about, well, in the alternative,

19    if we didn't get that, there could be this claims process.

20    That would -- that sounds like, at least as a second choice,

21    you would be okay with bifurcation.  Am I hearing you right?

22         MR. RENNIE:  If the liability trial were to be

23    followed by some type of claims administration process, however

24    that would look.  Your Honor listed a number of options for

25    structuring it.  We think that's a permissible way to proceed.

1          Obviously, it's not our preference that Your Honor

2    would decertify the class after a liability trial.  We think

3    that would not be warranted.  But otherwise, yes.

4          THE COURT:  So, Mr. Weinstein, let me go to you on

5    that, and not that I'm in the business of dodging difficult

6    issues, but do I really need to decide whether or not to

7    decertify today?  And I guess there's a couple thoughts on

8    that.

9          Number one, if I were to conclude that an aggregate

10   trial is not appropriate in this case for some of the reasons

11   you've provided, that would not answer the question necessarily

12   of whether, for example, individual issues predominate over

13   common issues with respect to damages.

14         It would answer the question about bifurcation; right?

15   It would say, well, we have to have a liability trial first,

16   and we can talk about whether there's some common damages type

17   issues that can be decided by the jury in the liability trial

18   along the lines we've been discussing.

19         But I could deny without prejudice or just reserve on

20   the motion to decertify, listen to the evidence in the

21   liability trial, at which point I would be, frankly, more up to

22   speed on the facts of the case.  And then you could renew that

23   motion; we could have a discussion about what's the best way to

24   decide damages in this case among some of the options that I

25   outlined in the notice filed on the docket should we -- that

1    one extreme we'd have decertification, but on a different side

2    we'd have a claims process.

3         And the claims process could involve a process whereby

4    the defendant challenged things using depositions, for example.

5    Somebody -- we could have a special master decide whether there

6    are genuine disputes of material fact.  And then we could

7    decide how those factual issues were resolved.

8         You know, if -- let me hear you on that.  And what I'm

9    trying to understand, to me, it doesn't sound like you're that

10   far apart on the plaintiff's alternative fall-back position, if

11   you will.

12        MR. WEINSTEIN:  So, no, I don't think Your Honor has

13   to decide the decertification today.  That's the short answer.

14   We think you can, that's for sure.  We also don't think putting

15   it off is going to fix the problem that the plaintiffs have,

16   which is with respect to a significant piece of the damages

17   calculation, there is no way to determine an aggregate

18   classified damages number.  But I don't think Your Honor has to

19   make that decision today.

20        I think where we're far apart from the plaintiffs is

21   let's assume Your Honor bifurcates the case.  If we're talking

22   about a claims administration process, the problem is:  What is

23   the starting point?  Is it that in order to establish damages,

24   every class member that says they were damaged is going to put

25   in some kind of claim form, says, "Here's how much I paid,

1  here's how much was damaged," and presumably answer some kind

2  of questions about the offsets?

3          If that's the starting point, which means the

4  potential damages award, the aggregate damages award is only

5  for those folks who actually put in something -- and I don't

6  think that's what the plaintiffs are suggesting -- then I think

7  we're closer to what should happen here.

8          The problem is -- and I think what the plaintiffs want

9  to happen, and I don't think they care whether it happens from

10  a jury trial or in a claims process, is they would like to say:

11  Take the database.  You can add up all the purchases in the

12  database and get X millions of dollars of purchases.  And

13  that's essentially the -- that's essentially the damages number

14  that Mr. Fraser is going to have to pay.

15          And what happens after that is just we'll take off

16  from that any offsets that can be established in the process,

17  which my guess is many of these people may not put in anything.

18  And so now we've got a damages award that is dramatically

19  higher than it should be because we just don't have the

20  information on the second half of the equation from many of the

21  class members.  I think that's what they're suggesting.

22          What we are suggesting, if you want to say we can

23  bridge the gap here, it would be whether you call it a claims

24  administration process, a special master, a trial by jury or in

25  front of the Court for damages, it would be:  Require

1    plaintiffs potential class members to put in submissions.

2    Here's what I paid.  That's the starting point.  Add all those

3    up.  The ones that came in on what was paid, that's the first

4    part of the equation.  And then here's the offsets.  And, of

5    course, we get to challenge that.

6          But whatever that comes out to be, you minus those and

7    you get to a damages award.  Then I think we're closer to what

8    has to happen in this case based on the facts that are

9    available.

10         THE COURT:  All right.  Mr. Rennie, let me hear your

11   response to that.  Which is, in fact, your alternative

12   proposal?  Is it the one that Mr. Weinstein thinks it is?  Is

13   it the one that I kind of thought it was, meaning the second

14   thing that he described, that you would put in the -- sort of

15   count each person's up individually and maybe use the database

16   as a check point?  Or is it something else?

17         MR. RENNIE:  We think it's closer to what Your Honor

18   had proposed is our alternative plan.

19         THE COURT:  Remind me.  What was that?

20         MR. RENNIE:  If we proceed, if we don't -- if

21   plaintiffs don't offer evidence of aggregate class-wide loss to

22   the jury and the class doesn't render an aggregate lump sum

23   verdict, then what we end up with is the jury rendering

24   something else like a formula.

25         Then during each claims administration process, each

1    class member on a retail basis says, I was injured in this

2    amount.  If necessary, here's documentation to say how much I

3    was injured.  I did or did not receive a chargeback.  You know,

4    if I received a chargeback, here's documentation to the extent

5    that I have it.

6              So that's sort of the alternative.

7              THE COURT:  How is that different from what Mr.

8    Weinstein described as the defendant's preferred version?

9              MR. RENNIE:  I was -- I was sort of working through

10   the first proposal, which seemed a little unfamiliar to me.  So

11   I'm not sure -- I don't know how much water is between us in

12   that type of proposal.  If we have, you know, end up following

13   a liability finding where the jury decides on some formula,

14   that is one way of proceeding through a claims process.

15             THE COURT:  And while I'm on the subject of

16   bifurcation, am I correct in understanding that there wouldn't

17   be -- I don't know what the right word is -- a significant

18   substantial overlap in proof between a liability trial and

19   whatever damages proceeding we came up with, even if it was

20   somehow a global trial?  There's just really -- I mean I guess

21   there would be -- you would want to call class members at a

22   liability trial to talk about what happened to them, their

23   experience and the like, and part of that would probably be,

24   "This is how I was harmed."

25             But beyond that, I mean, for example, your damages

1    experts wouldn't testify in the liability phase.  What do you

2    see as the overlap or not of the proof between two phases if

3    the Court were to bifurcate?

4         MR. RENNIE:  Plaintiffs have not fully considered the

5    reexamination clause issues that might be posed by a bifurcated

6    trial, but there are several -- first of all, we don't think

7    that there's significant overlap.  I might add, we do think

8    there are a few issues that could profitably be tried during

9    the class-wide trial that relate to damages.

10        In response to Your Honor's question in his order, one

11   of those is the reliability of the database or databases.

12   Another one is the actual value received on the date of the

13   purchase of the securities, which goes to the sort of formula

14   that we've been speaking about.  And the third, although as

15   we've discussed, some of these may be legal issues for the

16   Court and not jury issues, the permissibility if some offsets

17   or reductions and whether those are legally appropriate would

18   also perhaps more efficiently be determined in the run-up to

19   the first trial.

20        THE COURT:  So, Mr. Rennie, what do you see -- suppose

21   the Court were to bifurcate.  What do you see as the role of

22   the database in the second phase?

23        MR. RENNIE:  So, obviously, the reliability of the

24   database is something that has been contested between the

25   parties and, as the Court has recognized, is an issue of facts

1   to be decided on a class-wide basis.

2           If it's determined to be reliable for all purposes or

3   for some purposes, it stands as a source of information or data

4   to cross-check a number of elements of the damages claims here,

5   including, obviously, purchases, but also transactions between

6   class members on the GAW Miner's marketplace, which were

7   recorded in the -- in the ZenCloud database that we're talking

8   about.

9           And I would add that the database, although its

10  reliability is contested, has already served as a source of --

11          THE COURT:  I know, the SEC, yeah.

12          But let me just drill down on that a little bit.  When

13  you say it would serve -- assuming it was found to be reliable

14  by a jury in the first phase, you would say it would serve as a

15  cross-check.  I want to make sure that I have the same thing in

16  mind that you have in mind.

17          When I hear you say that, what I have in mind is, so

18  liability finding in the first phase.  Second phase we have

19  some kind of a claims process.  And individual class members

20  come forward.  They fill out the claims form.  Maybe there's an

21  audit or there's a deposition procedure or a challenge

22  procedure, whatever it is.

23          And one source of information for either the special

24  master or the Court to determine, gee, does this claim look

25  legit, is to look at the database and compare, well, what does

1    the database show about what this particular class member

2    bought?

3              Is that what you're talking about?

4              MR. RENNIE:  That's correct, Your Honor.  And

5    plaintiffs do believe that that data could be used to directly

6    substantiate a class member's claims.  Mr. Fraser has noted at

7    times the database is not, obviously, structured so that, if

8    you look under the hood, it says, this is how much individual X

9    purchased.

10             You know, the accounts are assigned UserIDs.  But we

11   think that the database, there are ways to tie the database to

12   particular class members.  And indeed in his motion to

13   decertify, Mr. Fraser and his expert, in fact, used the

14   database in such a fashion to sort of cross-check particular

15   numbers that had been provided on investor records.  So we do

16   think it's a viable, a viable way to sort of check, yes, that's

17   the amount that you, in fact, purchased.

18             THE COURT:  Okay.  All right.

19             I'm just looking at my list of questions.  We've done

20   a lot of them.

21             I guess I would be interested, Mr. Rennie, in

22   hearing -- well, actually, before I go to Mr. Rennie, Mr.

23   Weinstein, it sounds like to me, in fact, there isn't much

24   daylight between what Mr. Rennie has in mind as the, again,

25   alternative claims proposal and what you have in mind there.

1   May be individual disputes about how we should set up a claims

2   process, but if I -- I just want to make sure that you and I

3   are on the same page about that.  It sounds like the folks --

4   the two sides are pretty close, again, understanding this is

5   not the plaintiff's preference.

6           MR. WEINSTEIN:  Right.  And with every good

7   compromise, it's also not the defendant's preference; right?

8   Of course, we think Your Honor should decertify now.

9           THE COURT:  Right.  Right.  Okay.

10          MR. WEINSTEIN:  So perhaps Your Honor has done your

11  job already.

12          THE COURT:  Okay.  Well, go ahead.

13          MR. WEINSTEIN:  I think that's right.  If the setup is

14  that in a damages phase -- and, again, whether it's a special

15  master or a claims administrator, we'll get into that yet, but

16  that the -- essentially each class member will need to

17  establish his or her damages by coming forward with how much

18  they paid and evidence of what they might have received back.

19  We have some ability to challenge that and perhaps get

20  discovery on it.  And then from that set of facts and that set

21  of class members who submitted some information, you ultimately

22  get a damages award.  It sounds like we're not particularly far

23  apart.

24          THE COURT:  Okay.  And let me hear you on the overlap

25  question.  What's your view on whether the evidence in the two

1   phases, if you will, would overlap to some degree?  A great

2   deal?  What?

3          MR. WEINSTEIN:  I think there will be some overlap.  I

4   don't see it as being a huge amount of overlap because my

5   expectation would be the plaintiffs are not intending to put on

6   a wide swath of investor witnesses.  They may have some number.

7   I don't know.  I guess you can ask them.

8          So to the extent there's many more class members who

9   might have to come forward in a damages phase, there won't

10  really be overlap there.  There will be for some of them who do

11  testify at the first phase.

12         I think our experts -- if the reliability of the

13  database is at issue, our experts will probably both have to

14  take the stand on that issue but not have to go through the

15  calculations and formulas for each of the parts of the

16  calculations.  So I don't see it as a troubling amount of

17  overlap.

18         THE COURT:  Okay.  Okay.

19         Let's see here.  I think I've -- I mean I have other

20  questions, but I think we've sort of covered them.  I do want

21  to give the parties a chance to kind of present anything they

22  think we haven't covered that's important to them that's not

23  covered in the briefs or that, you know, points you want to

24  emphasize in the briefs because that may remind me of

25  additional questions.

1          So, Mr. Weinstein, it's your motion.  I'll let you go

2    first.

3          MR. WEINSTEIN:  I think the only thing -- I don't feel

4    like we need to repeat points, Your Honor.  The only thing I

5    would raise that hasn't been addressed yet are for two of the

6    four products, Hashpoints and Paycoin, the issue is even bigger

7    than it is for Hashlets and Hashstakers.

8          For those, the plaintiffs have essentially conceded

9    there is no ability to determine even on purchases on a

10   class-wide basis how much people purchased.  Their expert says

11   his analysis excludes Hashpoints and Paycoins sold by the

12   companies to members of the class because I currently am not

13   aware of a methodology that can be used to reliably identify

14   such sales in reference to the databases.

15         So there's not even an issue for the jury to

16   determine, for example, reliability of a database.  There

17   simply is -- they have put forth no basis to assess damages on

18   a class-wide basis for those two products.  So I think --

19         THE COURT:  Help me understand that a little bit.  I

20   think I understand the part with regard to Paycoin, and I'm

21   certainly going to give Mr. Rennie a chance to respond.  But I

22   think I understand the part with respect to Paycoin.

23         Once it's withdrawn from the ZenMiner account or

24   whatever the database account is called, you just don't know

25   what happened to it.  You don't know if it was sold that day.

1   You don't know if it was sold after the class.  You don't know

2   what happened to it; so you don't have the number you might use

3   to deduct, you know, the offset, if you want to call it that.

4         But when you say you don't even have the number for

5   the purchases, don't all of the Paycoin initially -- when I buy

6   Paycoin from the company or when my Hashlet kicks off Paycoin

7   or when something converts to Paycoin, doesn't that all end up,

8   at least in the first instance, in the ZenMiner account?

9         MR. WEINSTEIN:  Well, I think the issue we're

10  addressing, Your Honor, is to the extent that the class

11  definition includes people who purchased Paycoin or Hashpoints

12  in some fashion, there is just simply no ability to determine

13  who purchased it and for how much.

14        If there was an exchange, meaning they started with

15  Hashlets and it eventually got exchanged in different

16  iterations to Paycoin, that I don't think is as much an issue

17  because you've got the purchase -- the real purchase when they

18  were out their money is when they purchased the Hashlet.  I

19  mean it ultimately ended up as a Paycoin.

20        THE COURT:  Oh, so what you're saying is in the

21  scenario -- I don't know what that dinging is.  But anyway, in

22  the scenario where I buy Hashlets and they either kick off

23  Paycoin, in other words, as I get my payouts, they come out in

24  Paycoin or they convert to Paycoin -- and I can't remember

25  whether Hashlets convert to Paycoin -- you're saying, we just

1  don't know what that purchase price is for the Paycoin.  Is

2  that what you're saying?

3        MR. WEINSTEIN:  Yeah.  Well, I think what we're saying

4  is to the extent people just out and out purchase Paycoin as

5  opposed to it having come to them through an exchange of a

6  prior product.

7        THE COURT:  I see.  I see.  And that didn't -- that

8  didn't have to take place in a ZenMiner account when you first

9  purchased Paycoin?

10        MR. WEINSTEIN:  It's not in the ZenCloud database.  I

11  think to some extent it was supposed to be in a separate

12  database.  I think if you were to look at Mr. Mills', the

13  plaintiff's expert, original report in 2018 before he actually

14  did a lot of work on the case, he expected to be able to use

15  the databases for all of these products.  What he's come to

16  since in his 2019 reports is, I can use ZenCloud for Hashlets

17  and Hashstakers.  For Paycoin and I think

18  Hashpoints (inaudible) --

19        THE COURT:  Why don't you repeat that.

20        MR. WEINSTEIN:  Yes.  Plaintiff's expert, Mr. Mills,

21  back in 2018 I think class certifications started from an issue

22  a little bit more of the theoretical back then.  He had a

23  report that said, look, I'll be able to look in these databases

24  and make determinations through damages.

25        What has happened since is, once he dug in, he's now

1    determined that he thinks the ZenCloud databases were reliable

2    enough, but that only captures information for some of the

3    products, and the separate database -- I forget what it's

4    called at the moment, but it may be PayBase.

5              THE COURT:  I think, yeah.

6              MR. WEINSTEIN:  He has not relied on that, and all

7    he's done is concluded, as I was citing directly from his

8    report earlier, which is at paragraph 36 of -- this is Exhibit

9    76 to the Miller declaration.  It's Mr. Mills' September 25th,

10   2019, report at paragraph 36 where he says that for those two

11   products, Hashpoints and Paycoin, his analysis for damages

12   completely excludes those and not because we don't know how

13   they were sold by people, but because the sales from the

14   companies, GAW Miners, to the members of the class he is not

15   aware of a methodology that can be used to reliably identify

16   such sales.  And it says "sales," but it means purchases by the

17   class.

18             THE COURT:  Okay.

19             MR. WEINSTEIN:  By reference to the databases.

20             THE COURT:  Okay.  Okay.

21             MR. WEINSTEIN:  So our position is for those, that

22   they should be excluded from the class.  There should be at

23   least a decertification to those products, those two products.

24             THE COURT:  Mr. Rennie, let me hear from you first as

25   to that issue then.  Anything else you want to tell me?

1          MR. RENNIE:  Well, if I might, Your Honor, Mr.

2    Watterson is very well versed in the mechanics of Paycoin and

3    so --

4          THE COURT:  That's fine.  And he looks like he has

5    something to say.  So I'm going to give him a chance to speak.

6          Go ahead, Mr. Watterson.

7          MR. WATTERSON:  And I'll let Mr. Rennie finish, but

8    I'll just respond to the bit about Paycoin.

9          So what the database does show is when there were

10   certain rollover transactions.  So you can see that an owner of

11   a Hashlet would have received a Hashpoint, and the Hashpoint

12   was in turn exchanged for a Paycoin.  So the Court's order does

13   include rollover transactions.  So that type of information is

14   recorded in the database.

15         It is true that it was possible to obtain Paycoin

16   other places.  You could trade bitcoin for it on various

17   outside exchanges.  And some class members are going to have

18   records of that, but it is correct that we do not have access

19   to those databases.  So, you know, we're not going to have that

20   data sets.

21         Is that helpful, Your Honor?

22         THE COURT:  It is.  Thank you.

23         Do we have a set -- do you have a sense, is there

24   anything you can point to that provides a sense of what the

25   relative proportions of those two categories are?  In other

1    words, of all the Paycoin that was issued by the company,

2    again, do you have a sense of what percentage of it came about

3    in the first way, that is to say, through the conversions that

4    are in the ZenMiner database as opposed to purchasing Paycoin

5    outside, or is there nothing you can really point to that would

6    tell us that?

7          MR. WATTERSON:  So, Your Honor, I suspect that it's

8    possible to come up with an estimate, although I'll admit that

9    this analysis has not been done.  What does exist is there are

10   databases that keep track of trading volume that are publicly

11   available.

12         So I imagine that someone smarter than me would be

13   able to look at that data and compare what was publicly

14   available on volumes versus what was created through ZenCloud.

15   So that's the answer to that question.

16         THE COURT:  Okay.  All right.  Mr. Rennie?

17         MR. RENNIE:  I would just add one point about sales

18   Hashpoints.  There is evidence in the record at Exhibits 34 and

19   35 attached to the plaintiff's opposition.  Exhibit 34 is a

20   document that was produced by GAW Miners to the SEC showing

21   sales of Hashpoints.  And it reflects that sales of Hashpoints

22   were -- purchases of Hashpoints I think is better framed --

23   were fairly marginal compared to sales of other securities and

24   that there were something like five class members who purchased

25   Hashpoints directly.  So --

1      THE COURT:  What was the source of those data?

2  Meaning it must have come from the company or where?

3      MR. RENNIE:  I believe that Carlos Garza, who is --

4  who was an employee of GAW Miners, produced the information.

5      MR. WATTERSON:  If I may, Your Honor, I believe Mr.

6  Fraser submitted a subpoena on GAW Miners former law attorney,

7  and so he provided a number of documents, including some

8  information that had been provided to the SEC.  So I believe

9  that's the source of that document.

10      THE COURT:  Okay.  I think I saw it -- did I see

11  something in the briefs that said $500,000 maybe?

12      MR. RENNIE:  That's a rough estimate, but more or less

13  correct.

14      THE COURT:  All right.  Anything else you wanted to

15  tell me, Mr. Rennie?

16      MR. RENNIE:  No, Your Honor.

17      THE COURT:  All right.  Mr. Weinstein, anything else

18  you wanted to tell me?

19      MR. WEINSTEIN:  Your Honor, I'd only add that if Your

20  Honor does determine to bifurcate -- I know we've discussed

21  some issues back and forth about what damages-related issues a

22  jury might be able to decide, you know, one Your Honor raised

23  in the order the reliability of the database and what that

24  means, and then I've heard plaintiff say the formula.  I do

25  think that requires a little more consideration and perhaps

```
 1   briefing as to what we would be asking the jury to decide on
 2   those issues.
 3            THE COURT:  Okay.  That's fine.  That's a good idea
 4   actually, because I agree.  I didn't -- I wish the bifurcation
 5   issue had occurred to me earlier, but it didn't.  But -- and so
 6   that's why I -- so I will give the folks -- I think that's a
 7   good suggestion as to if I do bifurcate essentially what issues
 8   should the jury decide on top of liability, that would be
 9   valuable for me as well, so ...
10            All right.  Mr. Rennie, anything else?
11            MR. RENNIE:  Apologies, Your Honor.  Did you want to
12   discuss the trial date or any --
13            THE COURT:  Yes.  Thank you.  Thank you.  Let's do
14   that.
15            So let me give you a sense of what's going on here in
16   the District of Connecticut.  Currently all jury trials are
17   suspended through May 15th.  However, that date is going to be
18   extended through June 15th.  And we probably will continue to
19   do these 30-day wait-and-sees, and then, you know, as we get
20   sort of close to the date, two, three weeks away we'll actually
21   move the date 30 days.
22            I have, in fact, just yesterday I scheduled a trial
23   for your trial date in another civil case that -- your case is
24   older; so you guys would go first if we ended up picking two
25   juries that day.  As a reminder, that's currently scheduled for
```

1    August 5th.  And I realize that the JTM, joint trial

2    memorandum, is due July 1st, which is probably the parties'

3    biggest concern because the joint trial memorandum's a lot of

4    work.

5            You know, I'm happy to hear from you folks as to what

6    your preference is.  I've had kind of two approaches that

7    lawyers have taken about scheduling.  One is, "Judge, for our

8    sake, for our client's sake, we want a date certain so we can

9    plan, even if Your Honor thinks that it's probably going to get

10   moved."

11           We probably won't be able to have jurors into the

12   courthouse, and this is probably obvious to the folks on the

13   phone or on the line.  The last thing we will do in terms of

14   resuming normal in-court operations will be jury trials

15   because, you know, juries, they have to sit close together.

16   The jury rooms are not large.  People are in close quarters.

17   So just in terms of taking account of the risk of infection,

18   you know, we've all -- all the judges here agree that we may be

19   able to have in-court arguments or in-court sentencings or

20   in-court guilty pleas a good while before we can have in-court

21   jury trials.

22           Obviously, we want to start trying cases again, but

23   there are other things to consider.  And there's also the

24   important point to consider, which is, as you may know, it's

25   not easy to get jurors in ordinary times, and it's going to be

1    much harder to get them now.

2           So with all that said, I'm happy to hear from the

3    parties as to your suggestions.  What I did in the case

4    yesterday, for example, is I scheduled the case for August 5th,

5    and I think the JTM was due -- I don't know -- July 5th or 6th

6    or something like that.  But I said we'll have a telephone

7    conference two or three weeks before the joint trial memo is

8    due kind of to see where we are.

9           So I could do something like that here too.  I could

10   move your JTM back a few days.  I could say, well, I need it by

11   Monday the 6th.  In this case, having it less than 30 days

12   before the jury selection is, from my standpoint, probably not

13   a good idea.  I imagine you guys will raise a lot of issues I'm

14   going to have to decide.  We'll have to have probably at least

15   one pretrial conference, maybe more.  So we need to leave

16   ourselves some time.

17          But I could -- I could do -- I could give you a little

18   more time.  I could give you to July 6th, and then we could

19   have a telephonic status conference, say, on June 19th, June

20   18th or thereabouts, which is about two months from now.

21   Hopefully the picture will be clearer by then.  I say

22   "hopefully."  That's one way to proceed.

23          Another way to proceed is to say, look, until the

24   Court's ready to confidently say we can have people in the

25   courthouse to do jury trials, we should stay the case or we

1    should close the case administratively, whatever, and then, you

2    know, we can have a telephonic status conference in a couple

3    months, see where we are and reschedule things.

4         My preference, I guess, leans a little bit towards the

5    first one, but I'm not going to impose my preference on anybody

6    in this case, without hearing from you at least.

7         I recognize these are strange times.  These are times

8    that not only are difficult for everyone but for -- given --

9    for witnesses, for experts, for lawyers to make arrangements to

10   come to Connecticut and all that good stuff.  It's just a big

11   production, and I get that.

12        And so I'm -- let me hear first from Mr. Rennie about

13   that, and then I'll hear from Mr. Weinstein.

14        MR. RENNIE:  Thank you, Your Honor, for your

15   flexibility and thoughts on that.

16        I think that at the moment something like the first

17   choice would be our preference.  You know, we feel comfortable,

18   leaving aside to the extent possible the COVID situation, the

19   timeline.  So -- and you never know what will happen.  Your

20   Honor would never know what would happen, you know, if we have

21   to reschedule it.

22        I would ask or mention that one of my colleagues may

23   have a point to add here.

24        Seth, did you want to mention the -- your concern or

25   should we?

1         MR. ARD:  Well, Your Honor, Seth Ard here for --

2         THE COURT:  Right.  Hi, Seth.

3         MR. ARD:  Hi, Your Honor.  I'm hiding my appearance

4    because I'm not in my home, and I don't have a suit.

5         THE COURT:  That's all right.  I can hear you.

6         MR. ARD:  I am fine keeping that preference.  I just

7    want to alert the Court, my wife is a front-line health

8    responder.  We have three young kids.  I don't know at this

9    point whether I will be able to attend the current trial date,

10   but I'm happy to keep the date and see what happens.

11        Mr. Seltzer is also on the phone.  The two of us are

12   key members of the trial team.  He also is in California, and

13   travel restrictions may well prevent him from attending the

14   trial too.  But I just want to alert the Court to those issues

15   in case it factors into your decision.

16        THE COURT:  Sure.

17        MR. ARD:  The first option seems fine at least for

18   now.  We can update the Court, if you like, as things develop

19   on what our ability is, but I wanted to let the Court know.

20        THE COURT:  Appreciate that.

21        Mr. Weinstein.

22        MR. WEINSTEIN:  Your Honor, I just wanted to note one

23   additional difficulty with the jury in August, it's not just

24   the jury -- even assuming things open up, the jury's comfort

25   level in being in such close quarters, but I imagine many of

1  them have been out of work or at least away from work.  You

2  know, they might hear like, "Really?  I just got back to work

3  last week, and now you want me to sit in a trial?"

4          It's going to be a much different -- jurors always

5  have these excuses, but I think this one would be a little more

6  understandable that folks are not going to want to, once they

7  get out of the house, sit in a trial, or perhaps take vacation

8  because they've all been cooped up and they haven't been able

9  to.

10          THE COURT:  Right.

11          MR. WEINSTEIN:  Their family's home for the summer

12  unexpectedly.  I do see a lot of issues here.

13          You know, look, we leave it to Your Honor's decision

14  on that.  We don't have a strong preference.

15          But to add to the mix, we don't know for sure, but we

16  understand that Mr. Garza will likely be out of prison in the

17  fall.  And so to the extent he could be a key witness here, he

18  may actually be available if we do put this off for not too

19  long.  I think his release date is sometime September/October.

20          Ms. Miller, who's been part of this case for quite

21  some time, is about to go off on maternity leave any moment.

22          THE COURT:  Congratulations.

23          MR. WEINSTEIN:  She would likely be back in the fall.

24  But we can -- obviously, we can do the trial if she wasn't

25  around either.  But there's factors here that play in.

1          THE COURT:  Sure.  Well, I guess my sense is -- all

2    those are relevant facts.  I guess my sense is I would like you

3    folks to avoid to have to put in too much work on the joint

4    trial memo before we make a go/no-go decision.  And that -- at

5    least I'd like to try to do that.  I can't guarantee we can do

6    that.

7          So just for convenience sake, I think we'll leave the

8    date for now.  And it's a real date.  You know, if everything

9    goes well, we will try it on August 5th.  But I think we'll

10   move up this telephonic status conference to, say -- why don't

11   we say June 10th, let's say, at 10:00 a.m.  We'll do just a

12   dial-in or we could do this too -- it doesn't matter -- just to

13   kind of check on where we are.  It will be about two months

14   away, a little less than two months away at that point, and,

15   you know, we may be in a position to provide more clarity as to

16   whether we think we can go forward.

17         Obviously, if something comes up before that where

18   it's clearly, you know, for Mr. Ard's situation or others

19   where, you know, you can file some kind of a notice on the

20   docket about that, and we'll -- you know, we'll deal with it.

21         But why don't we plan to have a fairly early

22   telephonic status conference, June 10th at 2:00 p.m.  No, I

23   don't know what I said, but let's say June 10th at 2:00 p.m.,

24   6/10 at 2:00 p.m., and we'll leave the other dates in place for

25   now.  But hopefully by setting it that way -- and I'll move the

1    JTM date to July the 6th, which is -- actually, I'll make it

2    July the 7th so the entire Fourth of July weekend isn't killed.

3            So 7/7 for the JTM.  We'll leave the other dates in

4    place for now, and they'll be real dates, meaning it's not just

5    a placeholder if, you know, if things -- if the sun comes up

6    and the clouds clear much faster than I think we all have a

7    right to expect, then we will go on August 5th.  But, you know,

8    I don't have a crystal ball.  Nobody here does.

9            I think there's an excellent -- just my own sense is

10   there's an excellent chance we're not going to be able to go on

11   August 5th for all the reasons you've indicated but just also

12   basically the situation.

13           So let's leave it at that for now.  And I appreciate

14   everybody's input.  This was helpful.  And we're going to do

15   our best to get a ruling out promptly.

16       (Proceedings concluded at 3:35 p.m.)

17

18

19

20

21

22

23

24

25

1

2

3                         C E R T I F I C A T E

4

5

6

7                  I, Julie L. Monette, RMR, CRR, CRC, Official

8    Court Reporter for the United States District Court for the

9    District of Connecticut, do hereby certify that the foregoing

10   pages are a true and accurate transcription of my shorthand

11   notes taken in the aforementioned matter to the best of my

12   skill and ability.

13

14

15                       /S/ JULIE L. MONETTE
                  _____
16                Julie L. Monette, RMR, CRR, CRC
                         Official Court Reporter
17                         450 Main Street
                     Hartford, Connecticut 06103
18                         (860) 212-6937

19

20

21

22

23

24

25