UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DENIS MARC AUDET *et al.*, | : | Civil Action No. |
| | : | 3:16-CV-00940-MPS |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| STUART A. FRASER, GAW MINERS, LLC, and ZENMINER, LLC, (d/b/a/ ZEN CLOUD, | : | |
| | : | October 9, 2020 |
| | : | |
| Defendants. | : | |
| | : | |

**DECLARATION OF HANNAH L. MILLER IN SUPPORT OF DEFENDANT STUART A. FRASER'S RESPONSE TO PLAINTIFFS' SEPTEMBER 25, 2020 SUBMISSION**

I, Hannah L. Miller, declare under penalty of perjury as follows:

1. I am an associate with the law firm of Hughes Hubbard & Reed LLP, attorneys for Defendant Stuart A. Fraser in this action. I am an attorney licensed to practice law in the State of New York; and I have been admitted *pro hac vice* for purposes of representing Mr. Fraser in this action. This Declaration is based on my personal knowledge.

2. Attached as Exhibit A is a true and correct excerpt from the transcript of the December 17, 2019 deposition of Plaintiffs' damages expert, Robert Mills.

I declare under penalty of perjury that the above statements are true and correct.

                                                                                    /s/ Hannah L. Miller

# Exhibit A

Page 1

```
 1                UNITED STATES DISTRICT COURT

 2                  DISTRICT OF CONNECTICUT

 3

 4   DENIS MARC AUDET, MICHAEL        )
     PFEIFFER, DEAN ALLEN SHINNERS,   )
 5   and JASON VARGAS, Individually   )
     and on Behalf of All Others      )
 6   Similarly Situated,              )
                                      )
 7                  Plaintiffs,       )
                                      ) Case No. 3:16-cv-00940
 8            vs.                     )
                                      ) Volume I
 9   HOMERO JOSHUA GARZA, STUART A.   )
     FRASER, GAW MINERS, LLC, and     )
10   ZENMINER, LLC                    )
                                      ) Pages 1 to 250
11                  Defendants.       )
     _____)
12

13

14

15

16

17         VIDEOTAPED DEPOSITION OF ROBERT MILLS

18                  Los Angeles, California

19               Tuesday, December 17, 2019

20

21

22

23

24   Reported by:
     ELIZABETH BORRELLI, CSR No. 7844, CCRR, CLR
25   JOB NO. 173609
```

1
2
3
4
5
6
7
8      Videotaped Deposition of ROBERT MILLS,
9   Volume I, taken on behalf of the Defendants, at
10  1999 Avenue of the Stars, 9th Floor, Los
11  Angeles, California 90067, commencing at
12  9:40 a.m., Tuesday, December 17, 2019, before
13  Elizabeth Borrelli, a Certified Shorthand
14  Reporter in the State of California, License
15  No. 7844.
16                    * * *
17
18
19
20
21
22
23
24
25

```
 1   APPEARANCES OF COUNSEL:

 2


 3   For the Plaintiffs:

 4            SUSMAN GODFREY
              BY:  COLIN WATTERSON, ESQ.
 5            Attorney at Law
              1000 Louisiana Street
 6            Houston, TX 77002


 7


 8


 9   For the Defendants:

10            HUGHES HUBBARD & REEN
              BY:  MARC WEINSTEIN, ESQ.
11            Attorney at Law
              One Battery Park Plaza
12            New York, NY 10004


13

14      Also Present:

15          ALINE NAYER, Videographer

16          DUNCAN FUNG

17

18

19

20

21

22

23

24

25
```

1    Q.   And what accounts for the difference?

2    A.   Well, I'm not sure.  That's why I've done
3  it both ways, just to show that there are two
4  different ways I've determined tat it can be done.
5  I'm not sure why they're different, but they are
6  slightly different so I presented both numbers.

7    Q.   I think you noted -- well, withdrawn.
8         In paragraph 44 you note that the choice
9  of those -- of either approach does not materially
10 impact the results.

11        What would you consider to be a material
12 impact on your results?

13   A.   I don't have a threshold in mind, but when
14 I look at the results that I've calculated, they're
15 pretty close, in my view, so I don't think it's a
16 material difference.  But I don't have a threshold
17 in mind that would cross that boundary of what's
18 material.

19        If we're looking at purchases by members
20 of the class, I mean, the difference is -- it looks
21 like it's far less than 1 percent.

22   Q.   Do you agree that employees are to be
23 excluded from the class?

24   A.   Well, I don't have an opinion about that,
25 but that's my understanding.

Page 120

1   Q.   Okay.

2   A.   Yeah.

3   Q.   That would mean that if an employee
4  purchased a device, that purchase is supposed to be
5  excluded from your damages calculation; is that
6  right?

7   A.   Well, that's what I've endeavored to do,
8  yes.

9   Q.   Okay. Can you explain how you attempted
10  to do that?

11   A.   Yes. I looked to the "Auditlogs" table
12  that is part of the ZenCloud database, and that
13  table identifies a number of employee accounts,
14  because, at some point in time -- and I don't recall
15  the precise date as I sit here. I could look back
16  and tell you. But at some point in time, the
17  employee accounts of the companies were locked down,
18  and that table reflects those accounts.

19   Q.   In your report you noted that the lockdown
20  was reflected in the table in the "Notes" column?

21   A.   Yes.

22   Q.   Do you have an understanding of what it
23  means that the employee account was locked down?

24   A.   I don't recall as I sit here. I might --
25  the "Auditlogs" table might provide additional --

1        THE WITNESS:  The "Auditlogs" table might
2   provide additional details, but I don't recall as I
3   sit here.  I'd have to query that -- that table.
4        But, I guess, the point was that I was
5   using that table to identify employee accounts, and
6   that was really why I was looking at it.  Not so
7   much that the employee accounts were locked down,
8   but just to identify which accounts are employee
9   accounts.
10  BY MR. WEINSTEIN:
11       Q.   Do you know who determined which accounts
12  to identify as employee accounts for that purpose?
13       A.   I don't know the specific employee that
14  did that, but it's possible that the table could
15  tell me that, but I'm not sure as I sit here.  I
16  would have to look back.
17       Q.   Do you know how that employee made those
18  determinations?
19       A.   I don't know.
20       Q.   Do you know whether the notation that an
21  employee's account was locked down was inserted into
22  every employee's account?
23       A.   I don't have personal knowledge so I -- I
24  can't attest to that, but it seemed to me that the
25  entries suggested that they were attempting to lock

1  down all the employee accounts, so those accounts
2  were the accounts that I removed from my analysis.
3     Q.   Right.
4          So you've removed the ones that had the
5  notation?
6     A.   I've removed all the accounts that have
7  any kind of notation that would reference them as
8  being employee accounts, yes.
9     Q.   But you don't know if every employee
10 account that existed received that notation in the
11 auditlog?
12    A.   I can't attest to that, that's true, yeah.
13         Yeah, it seemed to me, based on the notes,
14 that that's what at least they were striving for is
15 to lock down the employee accounts, so I have no
16 reason to believe that there are additional employee
17 accounts that weren't identified in that table, but
18 I can't attest to that.
19    Q.   You're speculating as to whether that was
20 done?
21    A.   Well, I think the notes suggest that the
22 attempt was to lock down the employee accounts, and
23 that -- and that's pretty clear to me based on the
24 notes, but I can't attest -- I mean, I -- I can't
25 attest that they were 100 percent successful in

Page 123

1  identifying every employee account, and I guess
2  that's something that will be learned through -- it
3  could be learned through claims administration.
4      Q.   And you were able to extrapolate the
5  intent of the person who was doing it from the note
6  that says that employee accounts were locked down?
7           MR. WATTERSON:  Object to the form.
8           THE WITNESS:  What I can say is that it
9  suggested to me -- the note suggests to me that they
10 were attempting to lock down all the employee
11 accounts, and I can't say whether that was
12 successful or not with 100 percent certainty, but
13 that's my understanding of what the note suggests.
14 And so I've identified employee accounts from that
15 table.  If there are some additional employee
16 accounts, they can easily be removed from in my
17 analysis with one line of code.  So that's about all
18 I can say.
19 BY MR. WEINSTEIN:
20     Q.   How do you know the intent was to lock
21 down all employee accounts?
22     A.   I have to look back at the -- the language
23 to be, you know, certain, but my -- my sense from --
24 or my memory -- my recollection is that there was
25 some mandate from above to lock down the employee

1  accounts.
2      Q.   Do you know where you got that
3  information?
4      A.   Well, it's in the notes table -- I mean
5  the "Notes" column of the "Auditlogs" table.  I
6  don't remember if it was Mr. Garza or somebody else,
7  but there's some reference to somebody, I think,
8  with regard to these employee accounts.
9      Q.   And is it correct that the notes reflected
10 that the lockdown was done as of around early
11 March 2015?
12     A.   That sounds right, but I'd have to look
13 back at the table to be certain.  I mean, I can tell
14 you in a second if I query the table, but I -- I
15 don't have the date committed to memory.
16     Q.   Do you know whether that was intended to
17 capture employees who had accounts but who left GAW
18 Miners prior to March 7, 2015?
19     A.   I'm not certain.
20     Q.   You mentioned that if there are additional
21 employee accounts, that they can easily removed by
22 adjusting your query?
23     A.   Yeah, inserting one line.
24     Q.   How would one go about identifying such
25 employee accounts in order to create that query?

Case 3:16-cv-00940-MPS   Document 222-1   Filed 10/09/20   Page 12 of 12

Page 125

1    A.   Well, I mean, presumably, that could be
2  done as part of a claims administration proceeding.
3  I mean, I don't think that's unusual.
4    Q.   In paragraph 42, we looked at that
5  earlier, and I think that's a description of your
6  scenario 1 approach; is that right?
7    A.   Yes.
8    Q.   The last line of that paragraph says that
9  "This column can be used to identify devices
10 associated with ZenCloud employee accounts so that
11 purchases of these devices can be removed from the
12 analysis."
13       How does the approach in scenario 1 lead
14 you to the ZenCloud employee accounts?
15   A.   Well, what this allows me to do is use the
16 data from the "Auditlogs" table, which provides an
17 indication of certain accounts that are associated
18 with employees, and taking those user IDs from that
19 "Auditlog" table and remove devices that are
20 associated with those user IDs so that I'm not
21 capturing purchases of devices that are associated
22 with those user IDs.
23   Q.   Okay.  I just want to make -- well,
24 withdrawn.
25       That paragraph is not suggesting another