# EXHIBIT J

1

2                  IN THE UNITED STATES DISTRICT COURT

3                        OF CONNECTICUT

4

DENIS MARC AUDET, MICHAEL )  Case 3:16-cv-00940
5    PFEIFFER, DEAN ALLEN      )
SHINNERS, and JASON       )  Hon. Michael P. Shea
6    VARGAS, Individually and  )  Courtroom 2
on Behalf of All Others   )
7    Similarly Situated,       )  ECF Case
)
8        Plaintiffs,           )  CLASS ACTION
)
9    vs.                       )
)
10   STUART A. FRASER,         )
GAW MINERS, LLC, AND       )
11   ZENMINER, LLC, (d/b/a      )
ZEN CLOUD),                )
12                             )
Defendants.               )
13

            *******************************

14               ORAL VIDEOTAPED DEPOSITION

15                 HOMERO JOSHUA GARZA

16                  December 14, 2018

17             *******************************

18       ORAL VIDEOTAPED DEPOSITION OF HOMERO JOSHUA GARZA,

19   produced as a witness at the instance of the Plaintiffs

20   and duly sworn, was taken in the above-styled and

21   numbered cause on the 14th day of December, 2018, from

22   10:13 a.m. to 6:44 p.m., before April Balcombe-Anderson,

23   Certified Shorthand Reporter in and for the State of

24   Texas, reported by computerized stenotype machine at the

25   Job No. 152595

Page 2

1

2   offices of Regus Littlefield Congress, 106 East 6th

3   Street, Suite 900, Austin, Texas 78701, pursuant to the

4   Federal Rules of Civil Procedure and the provisions

5   stated on the record or attached hereto.

6

7

8

9   Job No. 152595

10  Reported by April Balcombe, CSR, CRR, CRC

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1
 2                    APPEARANCES
 3   FOR PLAINTIFFS:
 4        MR. COLIN WATTERSON, ESQ.
          Susman Godfrey
 5        1000 Louisiana
          Houston, TX 77002
 6
 7
 8
 9   FOR DEFENDANTS, STUART A. FRASER, GAW MINERS, LLC AND
     ZENMINER, LLC, (D/B/A ZEN CLOUD):
10
          MS. SARAH CAVE, ESQ.
11        MS. HANNAH MILLER, ESQ.
          MS. SARA ECHENIQUE (via LiveLitigation and
12        teleconference)
          MS. ANNA SCHULER (via LiveLitigation and
13        teleconference)
          Hughes Hubbard & Reed
14        One Battery Park Plaza
          New York, New York 10004
15
16
17   ALSO PRESENT:
18        Mr. Homero Joshua Garza,
19        the Witness; and
20        Mr. Angelica Lavaguen,
21        the Videographer; and
22        Ms. April Balcombe-Anderson,
23        the Court Reporter.
24
25
```

Page 4

1                    Homero Joshua Garza
2
3                         INDEX
4                                            PAGE
5    HOMERO JOSHUA GARZA

6    Examination by Mr. Watterson .....................6
     Examination by Ms. Cave .......................147
7    Further Examination by Mr. Watterson ...........271
     Signature Page  ...............................290
8    Court Reporter's Certificate ..................292

9
10                       EXHIBITS
11

12   EXHIBIT              DESCRIPTION            PAGE
13   Exhibit 238    E-mail Chain                  36
14   Exhibit 239    E-mail                        42
15   Exhibit 240    E-mail with                   49
                    ManagementProfiles.doc
16
     Exhibit 241    Press release                106
17
     Exhibit 242    E-mail Chain                 141
18
     Exhibit 243    Agreement, 10/20/16          149
19
     Exhibit 244    Hash-Base document           208
20
     Exhibit 245    Geniuses at Work Corporate   210
21                  Structure Flowchart
22   Exhibit 246    Action by Written Consent of 212
                    the Sole Incorporator
23
     Exhibit 247    E-mail Chain                 216
24
     Exhibit 248    E-mail, 11/7/14              218
25

1                        Homero Joshua Garza
2                          EXHIBITS (cont.)

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 249 | Text Messages | 225 |
| Exhibit 250 | E-mail Chain between from Mr. Shinners to Mr. Garza, Joe Mordica dated November 30th | 233 |
| Exhibit 251 | E-mail Chain | 246 |
| Exhibit 252 | E-mail Chain | 264 |
| Exhibit 253 | Transcript of Change of Plea Hearing, 7/20/17 | 267 |
| Exhibit 254 | Transcript of Sentencing, 9/13/18 | 269 |
| Exhibit 255 | E-mail, 7/17/13 | 283 |

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1                   Homero Joshua Garza

2                   P-R-O-C-E-E-D-I-N-G-S

3                   THE VIDEOGRAPHER:  Today's date is

4    December 14th, 2018, and the time is approximately

5    10:13 a.m.  We are on the record beginning the

6    deposition of Homero Joshua Garza.

7                   Would all counsels please introduce

8    themselves and whom they represent.

9                   MR. WATTERSON:  Colin Watterson with

10   Susman Godfrey for the plaintiffs.

11                  MS. CAVE:  Sarah Cave from Hughes Hubbard

12   & Reed for defendant, Stuart Fraser.  And with me is

13   Hannah Miller.

14                  THE VIDEOGRAPHER:  The deponent may now be

15   sworn in.

16                  (Witness sworn.)

17                  HOMERO JOSHUA GARZA,

18   having been first duly sworn, testified as follows:

19                       EXAMINATION

20   QUESTIONS BY MR. WATTERSON:

21       Q.   Good morning, Mr. Garza.  Can you give your

22   full name for the record?

23       A.   It's Homero Joshua Garza.

24       Q.   Okay.  And have you ever been deposed before?

25       A.   Yes, sir.

1                      Homero Joshua Garza

2      Q.    Okay.  When?

3      A.    It was a few years back.

4      Q.    Okay.  And what was the -- the case?

5      A.    The SEC.

6      Q.    Okay.  Do you have a copy of your transcript

7   anywhere?

8      A.    I do not recall.

9      Q.    Okay.  And it was the SEC in connection with

10  GAW Miners, correct?

11     A.    Yes, sir.

12     Q.    Okay.  All right.  So I'm sure you know the

13  rules, but I'm just going to go over them briefly.  You

14  are under oath, so you have to give truthful answers.

15  Okay?

16     A.    Sure.

17     Q.    The court reporter is taking down what we say,

18  so we should try not to talk over one another.  Make

19  sense?

20     A.    Yes, sir.

21     Q.    Okay.  Try not to speak too quickly.  The court

22  reporter will appreciate that because it's harder for

23  her to get everything you say.  Okay?

24     A.    Yes, sir.

25     Q.    Verbal responses, you have to say "yes" or

                    Homero Joshua Garza

1   "no."  You can't shake your head or nod your head.  Make

2   sense?

3   A.   Yes, sir.

4   Q.   Okay.  You can take a break whenever you want

5   to.  Just nod when there's a question pending, so if you

6   want to take a break, finish answering a question, and

7   then we're free to take a break.  Okay?

8   A.   Yes, sir.

9   Q.   All right.  Let me know if I ask a question

10  that is unclear or you don't understand.  Okay?

11  A.   Yes, sir.

12  Q.   And Ms. Cave might object to some of the

13  questions that I ask, and it's kind of a placeholder

14  because there's no judge to rule on whether my question

15  is proper.  So if she objects, you still have to answer

16  the question.

17  A.   Yes, sir.

18  Q.   Does that make sense?

19  A.   Yes, sir.

20  Q.   Okay.  We have met before, correct?

21  A.   Yes, sir.

22  Q.   Okay.  And I asked you some questions about GAW

23  Miners and Stuart Fraser.  Does that sound right?

24  A.   That's correct.

1                  Homero Joshua Garza

2     Q.   And we have corresponded about this deposition

3  over e-mail, correct?

4     A.   Yes, sir.

5     Q.   And -- but we haven't discussed the substance

6  of the deposition; is that fair?

7     A.   Yes, sir.

8     Q.   So I haven't told you what questions I'm going

9  to ask you and you haven't given me answers you're going

10  to give or anything like that, right?

11     A.   Yes, sir.

12     Q.   Okay.  So, Mr. Garza, where are you from?

13     A.   Can you clarify that question, please.

14     Q.   Sure.  Where did you grow up?

15     A.   Outside the Houston area.

16     Q.   Okay.  And at some point, did you move to the

17  northeast?

18     A.   Yes, sir.

19     Q.   Okay.  To Vermont?

20     A.   Yes, sir.

21     Q.   Okay.  And how old were you when you moved to

22  Vermont?

23     A.   I believe 17.

24     Q.   Okay.  And so did you attend high school in

25  Vermont?

1                    Homero Joshua Garza

2       A.    Yes, sir.

3       Q.    Okay.  And did you graduate high school?

4       A.    Yes, sir.

5       Q.    Did you go to college?

6       A.    No, sir.

7       Q.    Do you have any professional certifications?

8       A.    Can you clarify?

9       Q.    Sure.

10                  Licenses.

11      A.    At that time?

12      Q.    At all.

13      A.    I have various technical certifications.

14      Q.    Okay.  Can you tell me what they are?

15      A.    I would -- I do not recall what all of them

16   are.

17      Q.    Do you remember any of them?

18      A.    They are specific to technical manufacturers,

19   so I do -- but I'd rather not speculate.  It's been a

20   long time.

21      Q.    Okay.  Is it anything having to do with

22   programming, anything like that?

23      A.    Pri- -- they're primarily IT and technical in

24   na- -- in nature.

25      Q.    Okay.  Software development kinds of

Homero Joshua Garza

1  certifications; is that what we're talking about?

2  certifications; is that what we're talking about?

3     A.    Primarily networking certifications.

4     Q.    Okay.  What does -- what does that mean,

5  "networking certifications"?

6     A.    Networking, building, you know, systems that

7  allow computers and servers and things to communicate

8  with each other.

9     Q.    Okay.  And after you graduated high school,

10  what did you do for work?

11     A.    I started a company called Optima Computers.

12     Q.    Okay.  So what was GAW Miners?

13     A.    Can you clarify that question?

14     Q.    Sure.

15            It's -- well, what was GAW Miners'

16  business?

17     A.    Can you clarify that a little bit more?

18     Q.    Sure.  What did GAW Miners do?

19     A.    GAW Miners sold mining hardware and cloud-based

20  mining software.

21     Q.    Okay.  And who is Stuart Fraser?

22     A.    Stuart Fraser -- can you clarify that, please?

23     Q.    Sure.

24            What was -- what's -- well, let's put

25  it -- how about this.  In 2014, what was your

1                    Homero Joshua Garza

2   relationship with Stuart Fraser?

3        A.    A business partner and friend.

4        Q.    Okay.  And GAW Miners, it -- it sold a product

5   called hashlets, correct?

6        A.    Correct.

7        Q.    And did it sell a product called PayCoins?

8        A.    Yes, sir.

9        Q.    And did it sell a product called HashPoints?

10        A.    Yes, sir.

11        Q.    Okay.  And did it sell a product -- well,

12   strike that.

13              Did GAW Miners sell a product called

14   HashStakers?

15        A.    Yes, sir.

16        Q.    Okay.  Did GAW Miners register any of those

17   products as securities?

18        A.    Not to my knowledge.

19        Q.    Okay.  Currently do you know anything about the

20   rules regarding registration of securities?

21        A.    A small amount.

22        Q.    Tell me what you know.

23        A.    There are certain types of products that

24   given -- there are certain kinds of products that need

25   to be registered as securities.  I'm not sure I can

Page 13

1                    Homero Joshua Garza

2    elaborate much more.

3        Q.   Okay.  Do you know whether -- okay.  Strike

4    that.

5                 Do you know whether Mr. Fraser was aware

6    of the rules regarding registration of securities in

7    2014?

8                 MS. CAVE:  Objection to the form.

9        A.   I can't -- cannot speculate whether he was or

10   wasn't.

11       Q.   (BY MR. WATTERSON)  Okay.  Do you think that he

12   should have been aware of the rules regarding

13   registration of securities?

14                 MS. CAVE:  Objection to the form.

15       A.   Again, I prefer not to speculate.

16       Q.   (BY MR. WATTERSON)  I'm just asking you if you

17   think he should have been aware?

18                 MS. CAVE:  Objection to the form.

19       A.   Yes, I believe he should have been aware.

20       Q.   (BY MR. WATTERSON)  Okay.  How did you meet

21   Mr. Fraser?

22       A.   Through -- through fulfilling a -- a need, you

23   know, that he had, you know, as an IT consultant.

24       Q.   Okay.  And was that through Optima Computers?

25       A.   Yes, sir.

1               Homero Joshua Garza

2        Q.    Okay.  And what need did Mr. Fraser have that
3    you fulfilled?

4        A.    Initially, he was looking to create a
5    wireless -- or an outdoor Wi-Fi-based network for his --
6    one of -- his campground.

7        Q.    Okay.  And approximately -- well, strike that.
8               So you had helped set up a wireless
9    network for the campground; is that right?

10       A.    Yes, sir.

11       Q.    Okay.  And approximately when was that?

12       A.    I do not recall.

13       Q.    Okay.  Was it -- well, it was after you
14   graduated high school, right?

15       A.    Yes, sir.

16       Q.    But would you have been younger than 25?

17       A.    Yes, sir.

18       Q.    Okay.  About 20, does that sound right?

19       A.    That sounds accurate.

20       Q.    Okay.  And how would you describe your
21   relationship with Mr. Fraser when you first met?

22       A.    Can you clarify that question?

23       Q.    How would you characterize your relationship
24   with Mr. Fraser when you initially met him?

25       A.    Pleasant.

1                    Homero Joshua Garza

2        Q.    Okay.  And did your relationship with

3    Mr. Fraser change over time?

4        A.    Yes, sir.

5        Q.    How did it change?

6        A.    We went from a pleasant, you know, business

7    relationship that -- where I was performing work for him

8    to becoming good friends --

9        Q.    Okay.

10       A.    -- and business partners.

11       Q.    Okay.  And did that relationship -- has that

12   relationship changed since then?

13       A.    Can you clarify, please?

14       Q.    Well, yeah, it's a little unclear.

15             So I take it you're no longer business

16   partners with Mr. Fraser?

17       A.    That's correct.

18       Q.    And when did that business-partner relationship

19   end?

20       A.    I do not recall the date, but it was somewhere

21   around the time the SEC started to make inquiries into

22   GAW Miners.

23       Q.    Okay.  Does February 2015 sound right?

24       A.    That sounds about right.

25       Q.    And do you still consider yourself friends with

1                    Homero Joshua Garza

2    Mr. Fraser?

3         A.    No.

4         Q.    So before the SEC inquiry, did you consider

5    Fraser to be a mentor?

6         A.    Absolutely.

7         Q.    Did you consider him to be a sort of father

8    figure?

9         A.    Yes, sir.

10        Q.    And would you describe Mr. Fraser as a typical

11   investor?

12        A.    No, sir.

13             MS. CAVE:  Objection to the form.

14        Q.    (BY MR. WATTERSON)  Okay.  Why wasn't

15   Mr. Fraser a typical investor?

16        A.    A typical investor primarily bases -- the basis

17   of the relationship is typically financial.

18        Q.    Uh-huh.

19        A.    Performance and things of that nature are, you

20   know, financial.  And that was not the basis of

21   measuring performance or the basis of, you know, the way

22   investments were made.

23        Q.    So what was the basis of measuring performance

24   with Mr. Fraser?

25             MS. CAVE:  Objection to the form.

Homero Joshua Garza

1

2        A.    His personal perspective or feeling about what

3   was happening at that time.

4        Q.    (BY MR. WATTERSON)   Can you give me an example?

5        A.    So, for example, if funds were allocated to

6   provide Internet to a town, a typical investor

7   relationship, the success or failure of the way those --

8   you know, that -- you know, that initiative and the way

9   those funds were used would be primarily based on the

10  completion of that objective.

11               In Mr. Fraser's case, it was based on how

12  much he enjoyed discussing it, talking about, you know,

13  the process.   It, you know, was really more -- a lot

14  more based around -- really, you know, he just

15  personally enjoyed what we were doing and what was going

16  on regardless of the -- most of the time regardless of

17  the outcome -- the financial outcome of a situation.

18               We'd spend, you know, hours almost every

19  day, you know, discussing things of that nature.   So

20  does that accurately answer the question?

21       Q.    Thank you.

22               So when you say you would discuss business

23  operations, would you be discussing -- well, strike

24  that.   It's a bad question.

25               When you would talk on the phone with

Homero Joshua Garza

1   Mr. Fraser, what sorts of things would you discuss?

2          MS. CAVE:  Objection to the form.

3      A.   Everything from personal, you know, matters to

4   business matters.  Primarily business matters.

5      Q.   (BY MR. WATTERSON)  Okay.  And did you ever

6   spend time with Mr. Fraser socially?

7      A.   Yes, sir.

8      Q.   Did you have dinner with him?

9      A.   Yes, sir.

10      Q.   What other kinds of social interactions did you

11   have with him?

12      A.   As you indicated earlier, talking on the phone,

13   texting, dinner, staying over at his house, going on

14   trips together, all kinds of different things.

15      Q.   What kind of trips?

16      A.   For example, trips to Boca Raton, where he had

17   an apartment.

18      Q.   Okay.

19      A.   As well as -- as his son's wedding, I believe.

20      Q.   Okay.

21      A.   Yes.

22      Q.   Sorry.

23      A.   Yes.

24      Q.   Were you finished?  I didn't mean to cut you

Homero Joshua Garza

1

2  off.

3     A.   No problem.

4     Q.   Okay.  Mr. Fraser, how many sons does he have?

5     A.   Two.

6     Q.   Okay.  And is it Scott and Thomas Fraser?

7     A.   Yes, sir.

8     Q.   Okay.  Which -- which son was the wedding that

9  you went to?

10     A.   Tommy's.

11     Q.   Okay.  Do you know approximately when that

12  wedding was?

13     A.   I do not recall.

14     Q.   Okay.  Did you ever go to a birthday party for

15  Mr. Fraser?

16     A.   Yes, sir.

17     Q.   Okay.  How many birthday parties do you

18  remember attending?

19     A.   I do not recall.

20     Q.   Do you remember any specific birthday parties

21  that you attended?

22     A.   The most specific I can remember is his 50th

23  birthday party.

24     Q.   Okay.  Tell me what you remember about the 50th

25  birthday party.

1          Homero Joshua Garza

2      A.   It was at his house.  It was quite large, a lot

3  of people, a lot of people from Cantor.  Introduced me

4  to a lot of people from Cantor.  I believe, to my best

5  recollection, it's when I met Stuart's partner/boss.

6  I'm having trouble remembering his name, but -- so I

7  remember that.  I remember, you know, speeches that were

8  given, things of that nature.  I met his parents.

9      Q.   Do you remember anything about a book of his

10  closest friends?

11      A.   Yes, sir.

12      Q.   Can you tell me about that?

13      A.   I believe it was a gift that Elise put together

14  for Stuart.  Can you clarify?

15      Q.   Sure.

16           Let me go back.  Who's Elise?

17      A.   Elise is Stuart's wife.

18      Q.   Okay.  Were you in his book of closest friends?

19      A.   Yes, sir.

20      Q.   And so did Mr. Fraser ever give you,

21  personally, money?

22      A.   Yes, sir, on many occasions.

23      Q.   For what purpose?

24      A.   All sorts of reasons.

25      Q.   Was it for salary?

1                   Homero Joshua Garza

2          A.   In some cases.   Some cases gifts.   You know,

3    all -- all kinds of reasons.   Helping me buy an

4    engagement ring.   Help, you know, buy appliances for

5    our -- our house.   All sorts of different reasons.

6          Q.   Okay.   Did he help you buy a house?

7          A.   I don't recall if he, initially, helped me buy

8    it.

9          Q.   So you added a qualifier there "initially."

10   Did he help you buy it at any time?

11         A.   I believe that the house -- we purchased the

12   house and it was a convertible note.   And he then helped

13   me convert that note from a third party, you know, so

14   the debt became his debt.

15         Q.   So it was a loan?

16         A.   Yes, sir.   But it took place after the purchase

17   of the house.

18         Q.   Okay.   I understand.

19              And was that a house in -- in Vermont?

20         A.   Yes, sir.

21         Q.   And do you remember approximately when -- when

22   you purchased the house?

23         A.   Not -- no, sir.

24         Q.   Okay.

25         A.   Not to my memory.

1        Homero Joshua Garza

2        Q.    Okay.   Would it have been before GAW Miners?

3        A.    Yes, sir.

4        Q.    And did you ever pay back the -- the note to

5   Mr. Fraser?

6        A.    No, sir.

7        Q.    Okay.   Have you spoken to Mr. Fraser since the

8   SEC began looking into GAW Miners?

9        A.    Not to my knowledge or memory.

10        Q.    Have you attempted to communicate with him

11   since the SEC's subpoena?

12        A.    I believe so.

13        Q.    By e-mail?

14        A.    E-mail and phone, I believe.

15        Q.    Okay.   Have -- who's Dave McLain?

16              THE REPORTER:   David who?

17              MR. WATTERSON:   Dave McLain.

18        A.    Dave was a friend of Stuart's.   Similar to me,

19   he was in Stuart's book, I believe, and so he was a

20   close friend.   And I believe he did legal work for

21   Stuart.

22        Q.    (BY MR. WATTERSON)   Okay.   Did -- have you

23   attempted to talk -- strike that.

24              Have you attempted to communicate to

25   Mr. Fraser through Dave McLain?

1                    Homero Joshua Garza

2       A.    Yes, sir.

3       Q.    How many times?

4       A.    I would not be able to remember.

5       Q.    Okay.  What did you attempt to communicate --

6   strike that.

7                    Since the SEC's subpoena, what have you

8   attempted to communicate to Mr. Fraser?

9       A.    To the best of my knowledge, because -- because

10  of Stuart -- the nature of how regularly we

11  communicated, I noticed that, you know, that

12  communication stopped when the SEC situation started.

13  So after not hearing back from him for a little while, I

14  believe that I had asked David, you know, if he knew,

15  you know, if there was a reason.  And I believe that he

16  had told me that he -- he wanted to communicate through

17  David versus communicating directly.

18      Q.    Okay.  So did Mr. McLain communicate anything

19  back to you from Mr. Fraser after the SEC started

20  looking into GAW?

21      A.    It's likely, but I do not remember.

22      Q.    Okay.  Would those communications have occurred

23  over the phone?

24      A.    I do not recall.

25      Q.    Would they have -- do you remember if they

Page 24

1                    Homero Joshua Garza

2    would have occurred by e-mail?

3        A.    E-mail would be the more likely way.

4        Q.    Okay.  Would you have any of those e-mails --

5    well, strike that.

6                    Do you know if you have any of those

7    e-mails?

8        A.    It's possible.

9        Q.    Okay.  Would you be willing to check?

10       A.    Would I be willing to check?

11       Q.    Yes.

12       A.    Yes, sir.

13       Q.    Okay.  I think a little bit earlier you

14   mentioned that, prior to the SEC looking to GAW Miners,

15   you had communicated regularly with Mr. Fraser; is that

16   fair?

17       A.    Absolutely.

18       Q.    Okay.  And did you communicate regularly with

19   him in 2014?

20       A.    Yes, sir.

21       Q.    Okay.  And was it typically by phone?

22       A.    Yes, sir.

23       Q.    Okay.  Did you ever meet in person in 2014?

24       A.    Yes, sir.

25       Q.    Do you know approximately how many times?

1                    Homero Joshua Garza

2       A.    Two to three times.

3       Q.    Okay.  Where -- where do you remember meeting

4  Mr. Fraser?

5       A.    Primarily at his house.

6       Q.    Okay.  When you say "house" -- strike that.

7             Does Mr. Fraser have more than one house?

8       A.    Yes, he does.  I'd have to clarify, his house

9  in Armonk.

10      Q.    Okay.  What do you remember about --

11            THE REPORTER:  His house in where?

12            THE WITNESS:  Armonk, New York.

13            THE REPORTER:  Thanks.

14      Q.    (BY MR. WATTERSON)   Sure.   Can you tell me

15  about what you remember from those meetings?

16      A.    I remember discussing the nature of -- you

17  know, general discussion about cryptocurrency, you know,

18  plans for GAW Miners, his involvement, things of that

19  nature.

20      Q.    What do you remember about discussions about

21  Mr. Fraser's involvement --

22            MS. CAVE:  Objection to the form.

23      Q.    (BY MR. WATTERSON)  -- in GAW Miners?

24            MS. CAVE:  Objection to the form.

25      A.    Can you repeat that question?

1                    Homero Joshua Garza

2        Q.   (BY MR. WATTERSON)   Sure.   You had said that

3    you remember discussing Mr. Fraser's involvement in GAW

4    Miners; is that fair?

5        A.   Yes, sir.

6        Q.   Okay.   What do you remember about those

7    discussions?

8        A.   Everything from him providing, you know,

9    investments, loans to the company, seeking advice,

10   things of that nature.

11       Q.   When you say -- strike that.

12            When you say "seeking advice," you mean

13   you were seeking advice from Mr. Fraser?

14       A.   Yes, sir.

15       Q.   And what kind of advice were you seeking from

16   him?

17       A.   Primarily how to -- how -- how to best

18   position, you know, the cryptocurrency products that we

19   were selling.   I assumed, based on his background, that

20   he was a good resource to know because it evolved over

21   time.   As I learned that it was less of a technical

22   product and more it was a financial product, then I, you

23   know, sought his advice about, you know, how it should

24   be sold and ideas I had about how it should be sold,

25   things like that.

1                    Homero Joshua Garza

2                I'm asking him to, you know -- him to ask

3    Cantor for help and things of that nature.

4        Q.    So you -- can you describe what you meant by

5    the products involving -- evolving from a technological

6    product to a financial product?

7        A.    Sure.  As I first -- when we started the

8    company, we primarily sold hardware.  Over time, we

9    sold -- the hardware evolved into selling -- you know,

10   selling -- it's been worded a bunch of different ways,

11   but I guess selling a hashlet, okay, as you said

12   earlier, a --

13              THE REPORTER:  Selling a?

14              THE WITNESS:  A hashlet.

15              THE REPORTER:  Thanks.

16       A.    -- and that that generated amounts of

17   cryptocurrency to people that purchased it, and so --

18   so -- so it evolved from hardware and became a lot more

19   financial based.

20              So I remember, let's say, meeting with him

21   about how we should go about, you know, selling it, you

22   know, were we breaking rules in the way we were doing

23   it.

24              I believe that's when he recommended Dave

25   McLain getting involved.  And that was primarily when I

1          Homero Joshua Garza

2   had asked him to, you know, reach out to people he knew

3   at Cantor to provide advice to us as well.

4       Q.   (BY MR. WATTERSON)   Okay.  Can you remember

5   anything more specific about the advice you sought from

6   Mr. Fraser regarding selling these financial products?

7               MS. CAVE:  Objection to the form.

8       Q.   (BY MR. WATTERSON)   Well, hold on.  Let me

9   reask it.

10              So earlier you -- you said that you sought

11  advice from Mr. Fraser about -- well, strike that.

12              Is it fair to say that you sought advice

13  from Mr. Fraser about selling hashlets?

14      A.   Many times, yes.

15      Q.   Okay.  Can you tell me what specific advice you

16  sought from him?

17      A.   It ranged from pricing to the, you know, origin

18  of hashlets, the concept of oversubscribing, you know,

19  the amount of people that purchased hashlets relative to

20  the amount of mining power and whether or not we were,

21  you know, legally able to do that or not.

22      Q.   Can you explain what you mean by "the concept

23  of oversubscribing"?

24      A.   Sure.

25              As the product evolved from hardware to

1                        Homero Joshua Garza

2      becoming software, a hashlet represented a unit of

3      power, mining power, cryptocurrency, you know, capacity,

4      so it was relative --

5                        MS. CAVE:  Please mute the line.

6           A.    It was relative to consider, as the hashlets

7      were being sold, how we would handle the hardware that

8      supported the payouts of those hashlets; and when the

9      concept of hashlets was first discussed, I became aware

10     that, because it was no longer hardware and it was

11     software, it would become possible for those to no

12     longer match each other.

13          Q.    (BY MR. WATTERSON)  So -- oh, go ahead.

14          A.    And -- and so I didn't know whether or not that

15     was going to be a problem if they matched each other or

16     not.

17          Q.    So you discussed that with Mr. Fraser?

18          A.    Yes, sir.

19          Q.    Okay.  And you -- you mentioned that Mr. Fraser

20     suggested that Dave McLain get involved; is that

21     correct?

22          A.    Yes, sir.

23          Q.    Did you discuss this oversubscribing issue with

24     Mr. McLain?

25          A.    Yes, sir.

Page 30

                    Homero Joshua Garza

1

2    Q.   Was -- was Mr. Fraser present during those

3    discussions with Mr. McLain?

4    A.   I do not recall.

5    Q.   Okay.  Can you describe your discussion with

6    Mr. McLain?

7    A.   Can you clarify, please?

8    Q.   Sure.

9         With respect to the oversubscribing issue,

10   can you describe your conversations with Mr. McLain on

11   that issue?

12   A.   I believe that we first met about it at our --

13   our offices in Connecticut.  And I was asked to take

14   Dave, Mr. McLain, through, you know, just everything

15   about the business, everything as far as it led up to

16   the point that we were at, to include, you know,

17   hashlets and the way that they were being sold.

18   Q.   Okay.  Earlier we were talking about the kind

19   of advice you sought from Mr. Fraser.  Is it fair to say

20   that you asked for advice about potential regulatory

21   issues?

22        MS. CAVE:  Objection to the form.

23   Q.   (BY MR. WATTERSON)  Strike that.  Let me -- let

24   me ask it a different way.

25        Did you seek advice from Mr. Fraser about

1       Homero Joshua Garza

2  regulatory issues that might affect hashlets?

3           MS. CAVE:  Objection to the form.

4       A.   Yes, sir.

5       Q.   (BY MR. WATTERSON)  Okay.  And what kind of

6  advice did you seek from Mr. Fraser?

7       A.   I asked him whether or not -- you know, whether

8  or not we were dealing with what could be considered

9  securities and whether or not we'd have to register

10 those security -- you know, if it was a security,

11 whether or not we'd have to register it as a security.

12 Whether or not -- if we created our own cryptocurrency,

13 whether or not a trading system could be created for it

14 because of Mr. Fraser's experience with eSpeed.  So it

15 was regulatory -- and, generally, if he was able to get

16 help or advice for things that he didn't know from

17 resources at Cantor.

18      Q.   And you mentioned eSpeed.  What is eSpeed?

19      A.   ESpeed, as I understand it, is a type of

20 trading system that I think became BGCP.

21      Q.   And Mr. Fraser had some involvement with

22 eSpeed; is that right?

23      A.   My understanding is he led the creation of

24 eSpeed.

25      Q.   So you considered him someone that would be

Page 32

Homero Joshua Garza

1    knowledgeable about exchanges; is that fair?

2    A.    Highly.

3    Q.    Okay.  Did you discuss -- strike that.

4          Do you remember any specific discussions

5    you had with Mr. Fraser about creating a cryptocurrency

6    exchange?

7    A.    Yes, sir.

8    Q.    Can you describe those conversations?

9    A.    It would be difficult to describe because there

10   were so many.  But we discussed them to the extent of me

11   visiting his offices in New York and meeting with Cantor

12   Fitzgerald staff about, you know, the thing -- you know,

13   that was one of the topics of discussion.

14   Q.    Okay.  So let's -- let's talk about that.  You

15   visited Cantor Fitzgerald's staff sometime in 2014; is

16   that right?

17   A.    Yes, sir.

18   Q.    Do you remember when?

19   A.    It was towards the end of the year.

20   Q.    Okay.  And was that a meeting that Mr. Fraser

21   facilitated?

22   A.    Yes, sir.

23   Q.    Okay.  And do you remember who you met with at

24   Cantor Fitzgerald?

1                    Homero Joshua Garza

2        A.    I do not re- -- the only person I specifically

3    remember is briefly meeting with Howard.

4        Q.    Okay.  And who is Howard?

5        A.    Howard is Stuart -- I believe Stuart's business

6    partner.

7        Q.    Okay.

8        A.    And he, you know, gave us advice while we were

9    there.

10        Q.    And earlier you had mentioned a meeting of

11    someone at Mr. Fraser's 50th birthday party.  Were you

12    referring to --

13        A.    Howard, yes, sir.

14        Q.    Okay.  And is his name Howard Lutnick?

15        A.    Yes, sir.

16        Q.    Okay.

17             THE REPORTER:  Howard?

18             THE WITNESS:  Lutnick, I think

19    L-U-T-N-I-K.

20             MS. CAVE:  C-K.

21             THE WITNESS:  C-K.

22        Q.    (BY MR. WATTERSON)  Okay.  And you mentioned

23    that you received some advice from Mr. Lutnick; is that

24    right?

25        A.    Yes, sir.

Page 34

1                    Homero Joshua Garza

2         Q.    What kind of advice did you receive?

3         A.    I remember Howard telling -- I remember Howard

4    telling both of us -- and that's why I remember it so

5    well, because he wasn't telling just me, he was telling

6    both of us -- to be careful about what we were trying to

7    do.

8         Q.    And when you say "what you were trying to do,"

9    what do you mean by that?

10        A.    Just, you know, watching PayCoin, watching

11   cryptocurrency, things like that.

12        Q.    And why -- why did he advise that you two be

13   careful?

14                    MS. CAVE:   Objection to the form.

15        Q.    (BY MR. WATTERSON)   Actually, strike that.

16                    You testified that Mr. Lutnick advised you

17   and Mr. Fraser to -- to be careful; is that right?

18        A.    Yes, sir.

19        Q.    Why did he advise you to be careful?

20                    MS. CAVE:   Objection to the form.

21        A.    I -- I would be speculating, so could you

22   clarify that question?

23        Q.    (BY MR. WATTERSON)   Sure.

24                    What advice did he give you about PayCoin?

25        A.    Are you asking me why -- you know, what my

1                    Homero Joshua Garza

2   opinion is on why he gave that?

3        Q.   Well, I just --

4                  Sure, what's your opinion?

5        A.   My opinion about why he gave that advice is

6   because he thought that we may not be taking the proper,

7   you know, protocols.  And the reason why I had that

8   opinion was because of the fact that he was telling

9   Stuart the same way he was telling me, and I remember

10  thinking that it was odd that he would give Stuart

11  instructions, you know, in front of me.  You know, the

12  advice wasn't just for me, it was for him, and I --

13                  Because I remember thinking that -- you

14  know, becoming concerned about whether or not Stuart

15  knew all the things that were necessary that I

16  previously thought he knew to make sure that we were

17  doing things properly.

18       Q.   Okay.

19       A.   Otherwise, he wouldn't have given that advice.

20       Q.   And do you remember, specifically, what

21  Mr. Lutnick said to you with respect to launching

22  PayCoin?

23       A.   I do not recall beyond what I've stated so far.

24       Q.   Okay.  So do you remember meeting with anybody

25  else at Cantor?

1                    Homero Joshua Garza

2        A.    Yes, sir.

3        Q.    Do you remember their names?

4        A.    No, sir.  I do not recall their names.

5        Q.    This is a document that was previously marked

6    as Exhibit 142.  And Exhibit 142 is a calendar invite

7    for the meeting at Cantor Fitzgerald, correct?

8        A.    Yes, sir.

9        Q.    And the document has some attendees, including

10   some folks with Cantor or BTC Partners e-mail addresses.

11   Do you see that?

12       A.    Yes.

13       Q.    Does this help you at all remembering who

14   attended the meeting?

15       A.    Well, I mean, Aukster and Stuart and Dan Kelley

16   worked for our company, and the Cantor & BTC

17   individuals, I cannot recall their names.  I mean, the

18   best I would be able to say is they were in senior-level

19   positions at the company.

20       Q.    Okay.

21             MR. WATTERSON:  Let's mark this as 238.

22             (Exhibit 238 marked.)

23             MR. WATTERSON:  There you go (indicating).

24       Q.    (BY MR. WATTERSON)  So this is an e-mail

25   from -- well, it's an e-mail thread.  The top one is

1                    Homero Joshua Garza

2    someone from -- named Samantha Beja, and it says that

3    "Jim Ficarro would like to meet with you while you are

4    in NYC this week."

5                    Do you see that?

6        A.    Yes, sir.

7        Q.    Does -- so does that help you recall who you

8    met with at Cantor?

9        A.    Well, it corresponds with the e-mail address

10   and the meeting invite, so it's likely that he was a

11   part of that meeting.

12       Q.    Okay.  But you just don't remember either way?

13       A.    No, sir, I don't.

14       Q.    Okay.  What's -- what sorts of -- strike that.

15               What was discussed with the -- strike

16   that.

17               What was discussed at the meeting with

18   Cantor?

19       A.    PayCoin, the white paper that was created for

20   it was primarily discussed.

21       Q.    Okay.  And what -- what did you discuss about

22   PayCoin?

23       A.    The primary reason, that isn't listed here,

24   that we met with them was because Stuart and I had --

25   had, you know, talked a few times about Cantor

1                    Homero Joshua Garza

2     potentially investing money into PayCoin.

3                    So while it's not in these e-mails, our --

4     the objective of setting up these meetings was to

5     show -- you know, white paper isn't discussed -- you

6     know, what PayCoin was for, how it would be used, et

7     cetera, so that way, it can be considered into investing

8     into PayCoin.

9                    Does that answer your question?

10    Q.    It does.

11                   You mentioned that you and Mr. Fraser had

12    some discussions about Cantor investing in PayCoin, I

13    guess prior to this meeting; is that fair?

14    A.    Yes, sir.

15    Q.    Can you tell me about those discussions?

16    A.    To make some clarifying remarks, prior to GAW

17    Miners, Stuart was always very adamant about keeping

18    the -- keeping all of his sort of side ventures, you

19    know, like, very separate from Cantor.

20                   I was going to say, I guess, but I know,

21    because I remember I -- you know, him telling me because

22    he was concerned that if something went wrong, it would

23    put him in a position of risk at Cantor.

24                   So PayCoin and GAW Miners was the first

25    time that he was open to that, and so we discussed a lot

Page 39

Homero Joshua Garza

1  of things that involved Cantor pretty regularly.  And

2  because I was, you know, often trying to get advice

3  about, you know, various things, I'd ask him, you know,

4  if he could consult, you know, Cantor or that -- whether

5  or not they would be useful, you know, to answer a

6  question or something like that.

7  So one of those discussions -- or one of

8  the topics of discussions was, you know, whether or not

9  Cantor Fitzgerald would be interested in participating

10  or becoming involved in cryptocurrency.

11  And if so, you know, would they do that,

12  you know, vis-a-vis PayCoin.  And I believe, you know,

13  Stuart thought that that was very possible, which is

14  why, you know, this meeting was set up.

15  So we had a number of discussions about

16  how they -- you know, how it might work, what kind of

17  invest- -- you know, just, you know, various discussions

18  about, you know, how they might make investments into

19  PayCoin.

20  Q.   And do you know whether, prior to this meeting,

21  Mr. Fraser had any discussions with anyone at Cantor

22  about investing in GAW Miners?

23  MS. CAVE:  Objection to the form.

24  A.   Yes, sir.

Page 40

1                    Homero Joshua Garza

2        Q.   (BY MR. WATTERSON)   Okay.   And how do you know

3   that he had those discussions?

4        A.   I remember an e-mail that -- being sent out

5   about it.

6                    THE REPORTER:   An e-mail?

7                    THE WITNESS:   An e-mail, yes, ma'am.

8        Q.   (BY MR. WATTERSON)   Okay.   What do you remember

9   about the e-mail?

10       A.   I remember him sending an e-mail to a bunch of

11  his, like, friends and people that he knew that, you

12  know, he, I guess, considered good prospects for

13  investing into PayCoin.   And I remember that one of

14  those -- and I don't recall who, but one of the

15  individuals was from Cantor.

16       Q.   Do you know if you still have a copy of that

17  e-mail?

18       A.   I don't know.   I don't recall.

19       Q.   Okay.   So other than -- well, strike that.

20            And I take it Cantor, ultimately, did not

21  invest in PayCoin?

22       A.   Yes, sir, that's correct.

23       Q.   Do you know why not?

24            MS. CAVE:   Objection to the form.

25       A.   There was a reason given, but I do not recall

1                 Homero Joshua Garza

2   what it was.  It -- I believe that it had something --

3   yeah, so I don't remember the exact wording, but I

4   believe the nature of the reason was related to risk.

5        Q.   (BY MR. WATTERSON)  Do you remember anything

6   more specific about this reason that was given?

7        A.   Other than the nature of it being more risk

8   than, you know, they -- I -- no, I would be speculating

9   that there was just risk.  But I remember it being too

10  risky, you know, for them.

11       Q.   Okay.  Other than discussions about investing

12  in PayCoin, did you discuss any other matters at this

13  meeting with Cantor?

14       A.   I do not recall.

15       Q.   Did you discuss any regulatory issues at this

16  meeting with Cantor?

17       A.   I -- that does jog -- ring a bell.

18       Q.   Okay.  Do you remember anything specific?

19       A.   I do not recall.

20            I do -- actually, I do know.

21       Q.   Oh.  What do you remember?

22       A.   I remember there being discussions about

23  whether or not what we were doing would be a security or

24  not a security and whether it needed to be registered as

25  a security, stuff like that.

Page 42

1                    Homero Joshua Garza

2              I remember, like, the Cantor people

3      discussing amongst each other whether or not -- like

4      what their opinion on whether or not they thought it was

5      a security.  I remember that.

6         Q.    Okay.

7                    MR. WATTERSON:  We will mark this as 239.

8                    (Exhibit 239 marked.)

9         Q.    (BY MR. WATTERSON)  And, Mr. Garza, do you

10     recall this e-mail?

11        A.    (Witness reviewing document.)

12                    Yes, sir, I do.

13        Q.    Okay.  And it's an e-mail that was forwarded to

14     you by Mr. Fraser, correct?

15        A.    Yes, sir.

16        Q.    And it was -- the e-mail to Mr. Fraser was sent

17     by someone named Harry Waizer?  May be saying that

18     wrong.  But does that help you recall who was present at

19     this meeting?

20        A.    I believe Harry Waizer was present at that

21     meeting.

22        Q.    Okay.  And he writes -- if you look at -- in

23     the e-mail that he sent to Mr. Fraser, the third line

24     down, he says, "I know I may have sounded like a

25     proverbial broken record last night, but I've attached a

Page 43

1                      Homero Joshua Garza

2    recent letter from FinCEN that demonstrates the kind of

3    issue I was expressing concern about."

4                    Do you see that?

5         A.    Yes, sir.

6         Q.    So I take it that he is expressing concern

7    about some kind of regulatory issue; is that fair?

8         A.    Yes, sir.

9         Q.    And this document -- this e-mail had a document

10   attached to it, and if you turn to the third page, you

11   can see what the document was.    But I take it from this

12   attached document that the issue that Mr. Waizer was

13   concerned about was whether potentially GAW would need

14   to register as a money transmitter.

15                  Does that sound right?

16        A.    Yes, sir.

17                MS. CAVE:   Objection to the form.

18        Q.    (BY MR. WATTERSON)  Okay.   Do you remember any

19   discussions about registering as a money transmitter?

20        A.    I remember we had discussions about it.

21        Q.    Okay.   And Mr. Fraser was present at this

22   meeting at Cantor Fitzgerald, correct?

23        A.    Yes, sir.

24        Q.    Okay.   I want to back up.  We -- we were --

25   earlier we discussed Mr. Fraser's children -- well,

Page 44

                        Homero Joshua Garza

1   strike that.

2           Mr. Fraser has two sons.  And does he have

4   any other children?

5       A.   One daughter.

6       Q.   Okay.  And how would you describe your -- well,

7   strike that.

8           How would you have described your

9   relationship with Mr. Fraser's son, Thomas, in 2014?

10      A.   Friendly.

11      Q.   Okay.  And what about his son, Scott Fraser?

12      A.   I didn't know Scott that well.

13      Q.   Did you ever -- strike that.

14          Did you or GAW Miners ever receive a loan

15   from Scott Fraser?

16      A.   It was Scott's money.  Stuart facilitated it.

17      Q.   Can you tell me more about the loan?

18      A.   Sure.  I had asked Stuart for a loan for a

19   purchase of inventory.  And at the time, he indicated

20   the only way to access the amount of money that we

21   needed was to use money that, you know, I guess was

22   Scott's.

23      Q.   Okay.  And how would you describe your

24   relationship with Samantha Fraser in 20 -- well, strike

25   that.

Homero Joshua Garza

2        Mr. Fraser's daughter is Samantha?

3     A.   Yes, sir.

4     Q.   And how would you describe your relationship

5  with Samantha Fraser in 2014?

6     A.   I didn't know her very well.

7     Q.   Okay.  What was Mr. Fraser's job at Cantor

8  Fitzgerald?

9     A.   Well, I think his title was the vice chairman,

10 so -- but I never knew exactly what he did in an office.

11 I visited, but I didn't know.  I mean, I...

12    Q.   Do you know whether he -- well, strike that.

13        In 2014, do you know whether he spent much

14 time working for Cantor?

15    A.   I don't -- to my memory, I don't think he spent

16 that much time working for Cantor.

17    Q.   Is it fair to say that he was semiretired from

18 Cantor?

19    A.   I think it would be fair to say that -- I think

20 it'd be fair to say that Howard made him really retired.

21    Q.   Can you tell me what you mean by that?

22        MS. CAVE:  Objection to the form.

23    A.   So Stuart and I talked a lot, and based on our

24 discussions and my -- you know, just our interactions in

25 our own business, Stuart's nature, the way he goes about

Homero Joshua Garza

1    doing business, put him in a position that allowed him

2    to retain the title of vice chairman but not have any,

3    you know, role inside the company.  And I believe that

4    Howard made that decision for him.

5    Q.   (BY MR. WATTERSON)  And that's based on

6    discussions you had with Mr. Fraser?

7    A.   Yes, sir.

8    Q.   Okay.  And you said because of the nature of

9    going about doing business that Mr. Fraser had.  What do

10   you mean by that?

11   A.   So it sort of pertains to the question you

12   asked me earlier about a typical investor.  Stuart often

13   did things for -- in my -- my interpretation, he often

14   did things for entertainment because he liked the -- you

15   know, sort of the drama or the, you know, feeling of

16   relevancy versus following, you know, rigorous business

17   objectives.

18           So it would often be in situations where

19   we'd be off task or doing something completely different

20   or things like that, and so what I mean by that is that

21   over time, as we became closer, I started to notice

22   that -- that those sorts of things had existed prior to

23   my relationship with him and -- started, you know, at

24   Cantor.

Page 47

Homero Joshua Garza

1        And, you know, when I -- indicated to me
2  that he was, you know, for a set position where he --
3  you know, Howard took over and Howard made it to where
4  he got to keep the title of vice chairman but -- you
5  know, but that he didn't really have an active role in
6  that company.
7        So -- so while he never, you know,
8  directly said, "Well, it's because of, you know, this,"
9  I mean, it was pretty easy, you know, again in my
10 opinion, to deduce that, you know, the reasons were
11 because of, you know, the way that he operates in a
12 business environment.
13       Q.   Did you consider Mr. Fraser to be knowledgeable
14 about financial products?
15            MS. CAVE:   Objection to the form.
16       A.   Very.   He would often, even prior to GAW
17 Miners, explain and tell me things that I never even got
18 close to understanding.   He was extremely knowledgeable
19 about it.
20       Q.   (BY MR. WATTERSON)   Things about financial
21 products?
22       A.   Yes, sir.
23       Q.   Did you consider Mr. Fraser to be knowledgeable
24 about securities?

1              Homero Joshua Garza

2        A.    Within the context of the time, not really

3    knowing what securities were but just knowing that they

4    were financial based and he knew a lot about financial

5    products, then that would -- you know, that would have

6    been how I would have...

7                    In other words, you know, I didn't

8    immediately know we were dealing with a security and

9    then say, "Oh, Stuart knows about securities."  I

10   assumed that it was a financial -- you know, there was a

11   financial component to what we were doing.  Later I

12   found it was a security, but I believe that, you know,

13   Stuart knew the ins and outs of that.

14       Q.    Okay.  So earlier we discussed Optima

15   Computers.  Did Mr. Fraser have any role in Optima?

16       A.    Can you clarify?

17       Q.    Sure.

18                    Was he involved in any way other than as a

19   customer?

20       A.    He became an investor into Optima.

21                    THE REPORTER:  An investor?

22                    THE WITNESS:  An investor into Optima.

23                    THE REPORTER:  Thanks.

24                    THE WITNESS:  I'm sorry.

25                    MR. WATTERSON:  Let's mark this as 240.

Page 49

1                   Homero Joshua Garza

2                   (Exhibit 240 marked.)

3        Q.    (BY MR. WATTERSON)   Exhibit 240 is an e-mail

4   from you to Mr. Fraser, and it's forwarding a document

5   called ManagementProfiles.doc.   Do you see that?

6        A.    Yes, sir.

7        Q.    And I gather that this document is related to

8   Optima; is that right?

9        A.    Yes, sir.

10        Q.    And under the management profiles, it says that

11   Stuart Fraser is board chairman of Optima Computers and

12   its subsidiary organizations.   Do you see that?

13        A.    Yes, sir.

14        Q.    Was Mr. Fraser the board chairman of Optima

15   Computers?

16        A.    Well, we didn't, you know, really have a board

17   at Optima, you know, in the nature of like what an

18   actual board is, you know, so this title was chosen

19   because Stuart was -- Stuart was in charge of, you know,

20   like, you know, all things.   So the most appropriate

21   title that Adrian thought of that encompassed, you know,

22   the amount of control and power Stuart had was chairman

23   of the board.

24        Q.    And --

25        A.    In other words, if I may clarify, for example,

Page 50

1                    Homero Joshua Garza

2     typical investor in a business, there are limitations

3     to -- generally, there are limitations to the control

4     that they have.

5                    In Stuart's case, he -- you know, that

6     control extended, you know, across everything to who he

7     hired, how he hired, everything, so...

8          Q.    First of all, who -- who's Adrian?

9          A.    Adrian was an employee of Optima Computers.

10         Q.    Do you know Adrian's last name?

11         A.    Eames.

12                    Adrian Eames.  It's on the first page.

13         Q.    Sorry, which page?

14         A.    Page 1.

15         Q.    Ah, Adrian Eames.  Okay.

16                    And you said that Mr. Fraser had control

17    over Optima; is that right?

18         A.    Over everything we did together.

19         Q.    Including GAW Miners?

20         A.    Yes, just not in the traditional sense, if you

21    ask me to clarify.

22         Q.    In what sense did Mr. Fraser have control of

23    GAW Miners?

24         A.    Between Stuart and I, never really -- things

25    were never really bound always to, you know, what was

1                      Homero Joshua Garza

2    written on a piece of paper, you know, because Stuart

3    became such a strong mentor and, you know, kind of

4    father figure, and I was fully financially reliant, you

5    know, on him, he -- he had, you know control because

6    he -- over everything we did because he had full control

7    over me.

8               So what I mean by "not in a traditional

9    sense" is that, you know, if he wanted something to work

10   a certain way, it was -- you know, it was possible and I

11   think a few times inferred, that, you know, he could

12   make decisions that, you know, would, you know, affect

13   me personally.

14       Q.   You said that he had full control over you.

15               What do you mean by that?

16       A.   If -- if it were Saturday and Stuart called me,

17   the first thing he would ask me in all -- in almost

18   every call is, "What are you doing?"  And if I didn't

19   say something work-related, he would, you know, sigh and

20   be upset and then pause and wait for me to tell him

21   something that I'm about to go do that has something to

22   do with work.

23               I remember him being upset that we had one

24   of -- I can't remember -- I think it was our first

25   child, but I remember him being upset that we chose to

Page 52

1                    Homero Joshua Garza

2  have a child because it might interfere with my work.

3                    I remember him literally being upset

4  because we decided to get a dog, and he thought that

5  would impact my work, and that he told me that I, you

6  know, shouldn't do that.  So...

7       Q.    Why didn't you just tell him no?

8       A.    Because at that point, you know, all -- the

9  whole company, all of staff, myself and everything were

10  fully financially relying on him.

11                   I mean, and it's fair to say, I mean, I

12  also felt like because of our role, you know, like he

13  was kind of like a father figure, like I didn't

14  really -- you know, it wasn't always -- it wouldn't be

15  fair to say it was always because I made the decision

16  based on whether or not he would, you know, give us our

17  next -- you know, that was always sort of in the back of

18  my mind, but I always felt like I would disappoint or

19  let him down or he'd be upset with me if -- if I didn't

20  do, you know, what he was asking.

21                   It's hard to describe.  I mean, it's --

22  the only way you can describe it is like a parent, you

23  know, like even if you're a grown adult and your mother

24  says to do something like --

25       Q.    I understand.

Page 53

Homero Joshua Garza

2    A.    Yeah.

3    Q.    You had said -- I think when you were -- you
4    mentioned something about "giving us our next."   What
5    did you mean by that?

6    A.    Our next, you know, investment into the
7    company.   Because a lot of the activities that we were
8    involved in, you know, required continuous --
9    Stuart's -- Stuart's -- one way Stuart maintained
10   control is that he would never give the company like --
11   so in a -- a traditional investor would -- you would go
12   to them and say, "I'm going to do X, Y, and Z
13   initiative.   Here's the financial model for it.   Here's
14   how much it would cost.   Do you want to invest in that?
15   And I'd say it's $100,000."

16   Stuart's case, Stuart would say -- this is
17   an example.   He would say, "Okay.   We'll do it, but I'll
18   give you $10,000 right now, and then you need to come
19   back and ask me for the next 10,000."   So Stuart
20   maintained control because he -- we always -- like we
21   only ever had enough money until the next time I had to
22   ask him again, and he -- I, you know, argued many times
23   against that, but he liked it that way because, you
24   know, it made it to where I had to come back and ask him
25   every time.

Page 54

1                          Homero Joshua Garza

2                    And -- and to just clarify, I know this to

3       be because one day he told me that, that that was his

4       way of maintaining control -- it was when I was working

5       at a company called Smart Tech -- that his way of

6       maintaining control was because he, you know, wasn't

7       willing to lose control by providing, you know, the

8       investing we needed once and just allow us to perform,

9       that I needed to come back and ask each time.

10          Q.    What was Smart Tech?

11          A.    Smart Tech was just a business -- a business

12      initiative that I -- I decided -- you know,

13      originally -- it started originally as an initiative

14      that I was hoping, you know, that I could sort of have

15      on my own.  And then after a few months, then Stuart

16      became involved in that as well, did IT services, phone

17      services, stuff like that.

18          Q.    Okay.  Can you tell me anything more about this

19      conversation you referenced with Mr. Fraser?

20          A.    Which conversation?

21          Q.    Sorry.

22                The conversations about sort of, I guess,

23      giving you payments in installments to maintain control,

24      can you tell me more about that conversation?

25          A.    In that specific conversation, by the time --

1                    Homero Joshua Garza

2    enough time had passed that I started to suspect that

3    there was something unnatural about the way that -- that

4    things financially worked like -- so I started to look

5    at other, you know, examples and ways and -- and learned

6    that that's, like, not how people normally invest into

7    things.

8              So I, you know, made a point to, like, say

9    some -- like, I'm like, "This -- these are the reasons

10   why, like, investing in this way is a problem.  You

11   know, no one knows if they're going to have a job

12   next -- like, no one -- like it scares everyone."  And

13   that's -- so that was the instigator of him telling me

14   that he -- okay, so I remember he specifically told me

15   that in the past, he had given other companies full

16   amounts of money they were asking for, and it didn't go

17   as planned and so -- I don't remember what they were,

18   whatever.

19             I just remember him telling me that, and

20   that it was his perspective that the way -- you know,

21   the appropriate amount of control to -- you know, that

22   needed to be maintained was to -- is that every time,

23   you know, the money he had given was exhausted, that I

24   would need to come back and ask him again.

25        Q.   So I'll hand you this document, which was

1                      Homero Joshua Garza

2    previously marked as 160, and this is something that you

3    haven't seen before, I assume, but I'll represent to you

4    what this document is is -- in this litigation, there

5    were a number of financial records produced by

6    Mr. Fraser.

7                      So what we did is we looked at all of

8    those records and tried to compile them into one

9    spreadsheet, and so this represents bank statements,

10   buyer, confirmations, things like that.

11                     But essentially they're payments from

12   Mr. Fraser to either you or, you know, companies that

13   you and Mr. Fraser operated together.  So that's what

14   this document is.

15                     But I guess I just wanted to ask you, it

16   seems like there are many transactions here; is that

17   fair?

18       A.   Right.  I mean, basically, like the -- I mean,

19   so, A, you're correct, I've never seen this.  And, B,

20   you can see the exact thing I was just describing in

21   this because not only can you see the amount of

22   transactions, but you can even see, like, how odd each

23   amount is.  Like they're just -- because they're -- like

24   that's the -- they're all different because it was

25   always enough money to the next time.

Page 57

Homero Joshua Garza

2       You know, that's why there's no
3   consistent- -- you know, there's little consistency in
4   the total amounts.  One's 25, one's 30, one's 10, and
5   one's -- you know, then it jumps up to 25.  These all
6   represent, you know, the requests that I made.
7       Q.   And so let me ask this:  When I was going
8   through these financial records, I would see that
9   sometimes it would look like the transfer was made to
10  you directly.  For example, I have one on 4/20/2006 on
11  the first page, where I -- I saw the recipient looked
12  like it was you as opposed to a company.
13              Do you see where I'm talking about on this
14  first page?
15      A.   I'm sorry, what was the number?
16      Q.   It's on April 20th, 2006, on the first page.
17      A.   Yes, sir.
18      Q.   Would -- so did Mr. Fraser ever send you money,
19  like a personal bank account?
20      A.   Yes, sir.
21      Q.   And would that be for your -- if he did that --
22  strike that.
23              If Mr. Fraser sent you money to a personal
24  bank account, would that mean the money was for your
25  personal use?

1                    Homero Joshua Garza

2      A.    I do not recall any times where he sent me

3  money personally that was for anything other than

4  personal use.

5      Q.    If he sent money to --

6      A.    Sorry, I know I said that a weird way.  I

7  just -- it's -- there's a possibility, but I don't

8  recall there -- there being a time that -- you know, it

9  being for any other use than my own use.

10     Q.    Okay.  And -- but if Mr. Fraser -- well, strike

11 that.

12              So, for example, if you see the -- the

13 third line from the top, it says, "September 16, 2005

14 transaction from Mr. Fraser to Optima Computers."

15              Do you see that?

16     A.    Yes, sir.

17     Q.    And so if Mr. Fraser sent money to Optima

18 Computers, would that mean that the money was for

19 business use?

20     A.    Yes, sir.

21     Q.    Okay.  And if money was sent to a -- a

22 business, would -- would you ever -- strike that.

23              If money was sent to a business, were you

24 ever allowed to use that money for personal reasons or

25 would it always be for the business?

1                   Homero Joshua Garza

2          MS. CAVE:   Objection to the form.

3     A.   Can you rephrase that question, please?

4     Q.   (BY MR. WATTERSON)   Sure.   What I'm trying to

5    understand is if Mr. Fraser sent money to a business

6    account, was that money solely for the purposes of the

7    business?

8     A.   I don't think there's a consistent answer.   I

9    think that in some cases, you know, that may have been

10   specifically specified.   In other cases, there may have

11   been -- you know, what I am struggling with the word

12   "allowed," you know, because, you know, there were times

13   where, you know, "Here's X amount of dollars and, like,

14   we had a planned use for it.   This is what it's supposed

15   to be."

16              And other times it was, you know, "Stuart,

17   we need, whatever, $10,000 to keep the business going."

18   And -- and so that would be for general use, and so it

19   would be possible to -- you know, that could be used to

20   pay my salary or something of that nature.

21    Q.   Okay.   That makes sense.   Thank you.

22              What is Livewire?

23    A.   I remember him talking to me about it, but I --

24   I feel like it was like a solar kind of base -- it had

25   something to do with solar or some stock that he had

1                    Homero Joshua Garza

2   bought at some solar -- something like that.

3        Q.   Okay.  You weren't involved with Livewire,

4   then?

5        A.   No, sir.

6        Q.   Okay.  What -- I saw a few references, if you

7   turn to the last page, some wires sent from Mr. Fraser

8   to HT.  Do you know what HT was?

9        A.   No, sir, not to my knowledge.

10       Q.   This is a -- I'll hand you this.  This was a

11  document that was previously marked as Exhibit 161.

12            And I'll represent to you that this

13  document is essentially transfers that have to do with

14  GAW Miners.  That's what this reflects, but I wanted --

15            What I wanted to ask about was on the last

16  page, there -- you can see some references to -- it's

17  kind of hard to read, but I think it's references to HT.

18  Do you see that?

19       A.   On the very last page?

20       Q.   The very last page.  It's handwritten.

21       A.   Yes, sir.

22       Q.   Does that help you at all with what those

23  payments might represent?

24       A.   Unfortunately, it doesn't.

25       Q.   Okay.  So if you turn to the second-to-last

1                    Homero Joshua Garza

2    page, there are some payments and "$10,000" and to the

3    right, it -- "JG" is -- is written there.

4                 Do you see that?

5        A.   Yes, sir.

6        Q.   Do you know whether this would represent

7    payments to you personally?

8        A.   Yes, sir.

9        Q.   Okay.  And why was Fraser -- Mr. Fraser making

10   these payments of $10,000 to you personally?

11       A.   Because we -- we -- we had a discussion, I

12   don't remember when, but, obviously, prior to this, but

13   where he wanted to create -- so he had this idea of how

14   I would be paid.  And like it would essentially cost the

15   money less -- the company less money if he gifted the

16   money to me rather than -- for tax reasons, rather than,

17   you know, me being on a normal salary or like -- you

18   know, something like that.

19                 So he gifted -- you know, would gift the

20   money to me so it ended up costing him less because, you

21   know -- you know, taxes are paid on both -- you know,

22   both sides, so it would cost him less and it would cost

23   me less, and I would end up with a net amount more than

24   if I just had a normal salary.

25                 So -- and by this, you know, point, it was

Page 62

1                    Homero Joshua Garza

2   sort of all-encompassing, you know, everything from

3   whatever companies we were running at the time to, you

4   know, going to his house and doing -- you know, setting

5   up his personal Wi-Fi, his computer.  I mean, it was

6   just all -- you know, whatever Stuart needed to have

7   done.

8       Q.   Sorry.  When you say "all-encompassing," can

9   you just clarify what you mean?

10      A.   In other words, at the time, you know, these

11  sorts of -- you know, these wires were made, that, you

12  know, they weren't relative to like a -- you know, like

13  a specific company or whatever.  It was just, you know,

14  any -- whatever Stuart wanted to have.

15                 I mean, I did all sorts of things for

16  Stuart that were business-related and

17  unbusiness-related.

18      Q.   So there really wasn't any separation amongst

19  the companies; is that fair?

20                 MS. CAVE:  Objection to the form.

21      A.   Yes.

22      Q.   (BY MR. WATTERSON)  And relative to these

23  specific payments and what the expectations were for

24  them, there was no separation.

25                 THE REPORTER:  For the?

Page 63

Homero Joshua Garza

1     THE WITNESS:  I'm sorry?

2     THE REPORTER:  For the services?

3   A.   For -- yeah, relative to the payments that were

4   made, there were no different -- you know, they -- it

5   was all -- the way you worded it, there was a separation

6   between the companies by this point.

7   Q.   (BY MR. WATTERSON)  You said that you did some

8   things for Stuart that were not business -- strike that.

9         You said that you did some things for

10  Mr. Fraser that were not business-related?

11  A.   Yes, sir.

12  Q.   What -- what kind of things were you talking

13  about?

14  A.   Everything from, like, picking up, you know, a

15  car for him, to, you know, setting up Internet, setting

16  up cameras.  He had me go to, you know, Boca, set up his

17  sound system, you know, all sorts of different things.

18  I mean, primarily technical in nature.

19         MR. WATTERSON:  Take a break?

20         THE VIDEOGRAPHER:  Off the record at

21  11:44.

22         (Recess from 11:44 a.m. to 11:54 a.m.)

23         THE VIDEOGRAPHER:  On the record at 11:54.

24  Q.   (BY MR. WATTERSON)  Mr. Garza, earlier we were

1                    Homero Joshua Garza

2  discussing Optima Computers, and we may have touched on

3  this, but how would you describe Mr. Fraser's role in

4  Optima Computers?

5      A.   Well, it would range from investor to adviser.

6  It's difficult to dis- -- because there's no -- there's

7  no normal that I can compare it to because he had direct

8  contact and -- and prior direction to my subordinates

9  sometimes as well, and so...

10     Q.   Can you tell me about him providing direction

11 to your subordinates?

12     A.   We would sometimes take a -- take overnight

13 trips to one of his houses and -- and -- and at that

14 time, I would take, you know, people that were in a

15 leadership position with the company with me, and so he

16 would speak, you know, to us collectively and to them

17 individually sometimes, you know, providing assignments

18 and tasks and things of that nature.

19     Q.   And we had -- earlier we looked at a document

20 describing Mr. Fraser as the chairman of the board of

21 Optima.  Do you remember that?

22     A.   Yes, sir.

23     Q.   And there was no formal board of directors,

24 correct?

25     A.   Yes, sir.

1                  Homero  Joshua  Garza

2         Q.    But is it fair to say that he sort of

3    informally acted as a board member?

4                   MS. CAVE:   Objection to the form.

5         A.    I -- based on my knowledge of the way a board

6    member operates, not really.

7         Q.    (BY MR. WATTERSON)   So tell me why not.

8         A.    Because board members generally are not

9    involved in the day-to-day activity of the company.   I

10   mean, the most accurate way I can think is a hands-off

11   CEO that's above the normal CEO.   I mean, I'm sorry, I

12   can't describe it better than that.   That's the best

13   description I can think of.

14        Q.    Does that describe Mr. Fraser's role in the

15   various companies generally?

16                  MS. CAVE:   Objection to the form.

17        A.    Yes, sir.   Generally.

18        Q.    (BY MR. WATTERSON)  Okay.  Did Mr. Fraser

19   invest in Optima Computers?

20        A.    Yes, sir.

21        Q.    And do you know how much?

22        A.    No, sir.  I'm -- I wouldn't recall the total

23   amounts.

24        Q.    Do you know approximately how much?

25        A.    I'd guess it's probably more than a million.

1                    Homero Joshua Garza

2     Q.   Okay.  At some point you became involved in a

3  company called Great Auk Wireless, right?

4     A.   Yes.

5     Q.   What was that?

6     A.   Great Auk Wireless provided wireless broadband

7  to, primarily, residents of Vermont.

8     Q.   Okay.  And do you know approximately when Great

9  Auk Wireless started?

10     A.   I do not recall.

11     Q.   Okay.  What was Mr. Fraser's role in Great Auk

12  Wireless?

13     A.   I mean, pretty much the same as it was in

14  Optima.  I mean, even the name Great Auk Wireless came

15  from him.

16                THE REPORTER:  I'm sorry?

17     A.   Even the name Great Auk Wireless came from him,

18  so, you know, he was the hands-off, you know, CEO, you

19  know, type title.

20     Q.   (BY MR. WATTERSON)  Why Great Auk?  Why the

21  name Great Auk?

22     A.   Because he really liked the -- an auk is a --

23  an extinct bird or a penguin, I think, and he really

24  liked them.

25     Q.   Do you know why?

1                    Homero Joshua Garza

2      A.   I believe he told me one time, but I don't

3  recall it.

4      Q.   And I forgot to ask this.  Did -- did

5  Mr. Fraser own any equity in Optima Computers?

6      A.   I believe that we had an informal, you know,

7  agreement of equity in the company.

8      Q.   What was that informal agreement?

9      A.   To the best of my memory, anything from 50/50

10 to maybe 50/75.  You know, like, he -- he owned either

11 50 to 75 percent.

12     Q.   Okay.  And did Mr. Fraser own any equity in

13 Great Auk Wireless?

14     A.   In -- informally, yes, sir.

15     Q.   Okay.  And would it be the same percentages you

16 mentioned with respect to Optima, would those apply to

17 Great Auk Wireless?

18     A.   Yes, sir.

19     Q.   Okay.  Did -- strike that.

20              I take it Mr. Fraser invested in Great Auk

21 Wireless as well?

22     A.   Yes, sir.

23     Q.   Do you know how much approximately?

24     A.   I don't.  It would -- does seem to be more than

25 Optima, but I don't know the total amount.

Page 68

Homero Joshua Garza

1

2    Q.    So does -- so more than a million?

3    A.    Yes, sir, that would definitely be, I would

4    think.

5    Q.    Less than 10 million?

6    A.    I'd only know this because I can see what the

7    total amount on here is, so -- so, yes, I believe it to

8    be less than 10 million.

9    Q.    Well, this may not be perfectly right, so

10   I'm -- I'm actually interested in, you know, to the best

11   of your recollection, just sort of about this document.

12   A.    To my recollection, yes, definitely -- well,

13   less than 10 million.

14   Q.    Okay.  Does about 5 million sound right?

15   A.    Actually, I was about to say that.

16   Q.    So there's also a company GAW High-Speed

17   Internet.  What is that company?

18   A.    So we originally started Great Auk Wireless as

19   an LLC company based out of Vermont, and then it became

20   a company based out of Massachusetts.  I think it was an

21   S corp, but it might have LLC as well.  Unfortunately, I

22   don't recall.  But -- and then the one company -- it was

23   such -- it was done in such a way that, like, one

24   company absorbed the assets of the other, and there was

25   some reason -- I can't remember what it was, but there

1                    Homero Joshua Garza

2  was some reason for re-establishing it in Massachusetts.

3              So essentially it was just the same

4  company, just a different name.

5      Q.   Based in Massachusetts?

6      A.   Yes, sir.

7      Q.   And did it still kind of operate in Vermont?

8      A.   Yes, sir.

9      Q.   The same business?

10     A.   Yes, sir.

11     Q.   The same ownership between you and Fraser?

12     A.   Yes, sir.

13     Q.   Mr. Fraser.

14              Strike that.

15              Was it the same ownership between you and

16 Mr. Fraser?

17     A.   The understanding was the same, yes.

18     Q.   Okay.  And is it fair to say that Mr. Fraser

19 had the same role in GAW High-Speed Internet?

20     A.   Yes, sir.

21     Q.   And when you -- you had earlier said that

22 Mr. Fraser -- it sounded right that Mr. Fraser invested

23 about $5 million.  Would that -- would that include

24 investments in both GAW -- Great Auk Wireless and GAW

25 High-Speed Internet?

Page 70

Homero Joshua Garza

1    A.    Yes, sir.

2    Q.    Okay.  What -- I think we -- we mentioned Smart

3    Tech earlier.  I believe you said that Mr. Fraser,

4    eventually, became involved in Smart Tech; is that

5    right?

6    A.    Yes.

7    Q.    What was his involvement in Smart Tech?

8    A.    At first, it was -- it started out as just, you

9    know, sort of the same mentorship advice and then it

10   became financial.

11   Q.    So he invested in Smart Tech as well?

12   A.    Yes, sir.

13   Q.    Do you know approximately how much?

14   A.    No, sir.

15   Q.    Did Smart Tech have its own bank account?

16   A.    I do not recall.  I feel like it did, but I do

17   not recall.

18   Q.    Okay.

19   A.    They got pretty convoluted then, having so many

20   companies at once, so...

21   Q.    I'm glad it's convoluted for you too.

22          There was also a company called

23   VoiceProdigy.  Does that sound right?

24   A.    Yes, sir.

1                    Homero Joshua Garza

2     Q.    What was VoiceProdigy?

3     A.    I think VoiceProdigy and Smart Tech were the

4   same thing.  Maybe that's-- maybe that's how it was

5   named because VoiceProdigy was the product that Smart

6   Tech primarily sold.

7     Q.    Okay.  And what was the product again?

8     A.    It was a Voice over IP-based system.

9     Q.    Okay.  What does "Voice over IP" mean?

10     A.    It's just -- it's likely being used now.  It's

11   just basically a way to have voice without using, you

12   know, PSD or land -- landlines.  It's IP-based.

13     Q.    What was GAW Labs?

14     A.    I believe GAW Labs was an attempt to start

15   structuring the businesses under -- that might have been

16   a different company.  I -- unfortunately, it -- I'd be

17   guessing.

18              I believe that it was an attempt to

19   structure -- you know, structure the businesses under

20   one company as well as use for funding initiatives that

21   were -- you know, things that were outside of -- outside

22   of just normal business operations, like, you know,

23   ideas, maybe things that might have involved patents,

24   things of that nature, to the best of my memory.

25     Q.    Okay.  And did Mr. Fraser have any involvement

1                    Homero Joshua Garza

2    in GAW Labs?

3        A.    To the best of my memory, it would have been

4    the same as all the other companies.

5        Q.    Okay.  And you and Mr. Fraser are both

6    inventors on a patent; correct?

7        A.    Yes, sir.

8        Q.    And can you tell me what the invention is?

9        A.    The basic idea is to inject advertisement into

10   web traffic from a web server.  So as you browse the

11   Internet, then we can inject advertisement into

12   different parts of your web browser.

13       Q.    Sounds terrible.

14       A.    To some people, yes.  To most people, yes.

15       Q.    And so what was Mr. Fraser's role in inventing

16   this injection system?

17       A.    He prime -- so he thought of a lot of really

18   good ideas for it.  He funded it and then, you know,

19   sort of helped work through the patent process.

20       Q.    Was the patent ever licensed?

21       A.    Not to my knowledge.

22       Q.    Is it -- do you know whether the patent is

23   still in force?

24       A.    Not to my knowledge.

25       Q.    Do you believe it's not -- no longer in force?

Page 73

Homero Joshua Garza

1    A.   My guess is it's no longer in force.

2    Q.   Do you know why?

3    A.   My guess is it would be expired by now.

4    Q.   Was it -- when was it -- when was the invention

5    patented; do you remember?

6    A.   No, sir.  I just -- the only reason that's my

7    guess is because I feel like I remember seeing in an

8    e-mail that we had to do something or pay something or

9    something like that to renew it or re-up it or

10   something, and I don't believe that whatever that was

11   was done, so...

12   Q.   Okay.  So tell me about how you got involved in

13   cryptocurrency.

14   A.   I got involved in cryptocurrency because --

15   well, I don't remember exactly how I found out about it.

16   Somehow I found out about it and then I found out about

17   mining, and so I purchased, you know, personally, my own

18   miner, and my interest just grew from there.

19   Q.   Okay.  Before we keep going, I want to ask

20   other than the companies that have to do with

21   cryptocurrency, were you and Mr. Fraser involved in any

22   other companies that I haven't talked about already?

23   A.   Not that I can recall.

24   Q.   Okay.  So you bought a miner and your interest

1                    Homero Joshua Garza

2   started -- your interest in cryptocurrency started to

3   grow.  What's the genesis of GAW Miners?

4        A.   Well, as I, you know, became more interested in

5   buying miners, then, you know, I initially found that I

6   could, you know, at scale, buy them, you know, for less

7   money, then retail them.  So, you know, one dot

8   connected to the other, and it seemed to make sense

9   to -- you know, to buy from that scale to -- and then

10  sell them in an online store.  And so we talked about it

11  and decided that it was a good idea and decided to do

12  it.

13       Q.   When you said "we decided to do it," who was

14  the "we"?

15       A.   I figured you were going to ask that.  The we's

16  that I can recall would be Dan Pease, a gentleman by the

17  name -- I can't remember his last name, but first name

18  was Rami, and Stuart, and possibly others, but those are

19  the ones I can remember.

20       Q.   Okay.  And so -- so initially -- well, strike

21  that.

22                 Is it fair to say that essentially GAW

23  Miners at first was a reseller of hardware?

24       A.   Oh, yes, sir.

25       Q.   Okay.  And did the business change --

Page 75

1                    Homero Joshua Garza

2      A.   Yes, sir.

3      Q.   -- in any way?

4           How did it change?

5      A.   Well, it changed from selling hardware to then,

6  you know, hosting hardware for people, and then it

7  changed from hosting hardware to hashlets.

8      Q.   Okay.  So can you explain what it means to host

9  hardware for people?

10     A.   Sure.

11          So it was basically, rather than shipping

12 someone a hardware miner, instead the hardware miner

13 would be plugged into, you know, a location that the

14 company, you know, facilitated, and then the user that

15 owned the hardware miner would have remote access to it.

16     Q.   How would the user have remote access to the

17 miner?

18     A.   We had -- we developed some kind of way -- some

19 kind of software.  Contrary to popular belief, there

20 were a lot more people involved in this than me, so

21 some -- I can't remember who it was, but someone in

22 their company had developed a whole system, which became

23 ZenMiner, but the original -- you know, initial version

24 of it just software that, you know, people could use to

25 access their miner.

1                       Homero Joshua Garza

2       Q.    Okay.  And you said the initial version was

3    ZenMiner.  What was ZenMiner?

4       A.    ZenMiner was the -- you know, evolved to become

5    a piece of software.  The goal of it was to be able to

6    become an operating system that could manage multiple

7    kinds of miners, all different kinds of miners, so it

8    was a cloud-based piece of software that could remotely

9    manage many miners.

10      Q.    Okay.  I'll come back to ZenMiner.  So you said

11   you went to hosted -- hosting miners and then to

12   hashlets.  What were hashlets?

13      A.    Essentially, hashlets were -- well, I guess at

14   first they were just -- we thought of them as just a

15   piece of software, like a -- like a license to software,

16   I guess, that represented a specific unit of power, of

17   mining power.

18      Q.    It -- and I guess it -- it sounds like you --

19   your conception of hashlets changed at some point; is

20   that right?

21      A.    Yes, sir.

22      Q.    How did it change?

23      A.    It changed because -- so internally in the

24   company, when this concept of hashlets was first

25   discussed with Shiraz and Stuart, it was --

1          Homero Joshua Garza

2          THE REPORTER:  Who?

3          THE WITNESS:  Shiraz, S-H-A-R-I-Z [sic].

4     A.   -- it was thought of as just like a unit of

5     power that could be represented by software.

6               And then over time, as I grew more

7     concerned that it really wasn't software, that what we

8     were dealing with was far more than sophisticated, that

9     it was a financial product, there was a lot more to it;

10    and I did a lot of my own research and asked, you know,

11    my opinions outside of, like, Stuart and Dave.  And I

12    found that it really wasn't software, that it really was

13    more of a financial product and needed to be treated as

14    such.

15              So generally that was how the perspective

16    changed.

17    Q.   (BY MR. WATTERSON)  Okay.  And why did you

18    conclude that it was more of a financial product?

19    A.   To be honest, just clues from -- you know, we

20    went to a conference and, you know, I was approached by

21    different people and they told -- I mean, it was just

22    different outside input, because by -- we were far

23    enough into the company that, you know, I believe that

24    it -- if it was purely a financial product, like, we

25    would have treated it as such, because that's, you know,

                          Homero Joshua Garza

1    Stuart's main business, but we didn't really at that

2    time think of it like that.

3                But after -- after I heard, you know, sort

4    of just -- it's hard to explain, but just like gathered

5    enough input from reading the news to talking to people,

6    it just started to seem like it was more of a financial

7    product.

8        Q.   Okay.  And you mentioned Shiraz.  Who's Shiraz?

9        A.   Shiraz was a business adviser to -- well, he

10   was a business adviser to multiple companies, but in

11   that capacity, he was a business adviser to GAW Miners.

12       Q.   Okay.  And what -- at some point -- well,

13   strike that.

14              What were HashPoints?

15       A.   HashPoints?

16       Q.   Yes.

17       A.   HashPoints was basically a -- almost like a --

18   so it was a way that people could earn, like, almost

19   like in-store credit, like sort of like an internal

20   value within GAW Miners to then eventually use to

21   purchase PayCoin.

22       Q.   Okay.  Let's say that I wanted to -- strike

23   that.

24              In order to use a hashlet, would I have to

1          Homero Joshua Garza

2   go onto Zen Cloud?

3       A.   Yes, sir.

4       Q.   And so is it -- would it be correct to say that

5   a hashlet only existed in Zen Cloud?

6       A.   Yes, sir.

7       Q.   And is it fair to say that a hashlet is not

8   representative of actual any hardware?

9       A.   At first it was.  Then it wasn't.  Then it was.

10      Q.   Can you explain that?

11      A.   Sure.  At first, it was, you know, thought of

12  the -- since it was represented as a unit of power, you

13  know, mining power, then the natural conclusion was

14  that, you know, there needed to be mining hardware for

15  that mining power.  And then after discussing it, first

16  with Shiraz and then with Stuart, then -- I don't

17  remember exactly how it happened, but it just kind of

18  evolved into it being viewed more as software.

19           And, I don't know, somehow this -- it was

20  awhile ago, but somehow just the software and the

21  hardware just got disconnected from each other.

22           And, you know, I remember specifically

23  talking to Dave McLain about that, and everyone, you

24  know, seemed to be on board with that.  And then that

25  went on for some amount of time.

1                    Homero Joshua Garza

2              And then I found another attorney, like,

3    non-Dave, and -- who told me that we couldn't do it that

4    way, and so I went out and started buying hardware

5    miners so I could try to match the amount of hashlets

6    that had been sold to the amount of hardware that we

7    had.  So that's what I mean by it wasn't, then it was,

8    then it wasn't.

9         Q.   And when you said everybody was on board, what

10   do you remember?

11        A.   Shiraz, Stuart, Dave McLain, Joe Mordica.

12   That's the list that comes to mind.

13        Q.   Okay.  I want to go back to Zen Cloud.  On Zen

14   Cloud, a user would see an image of a hashlet, correct?

15        A.   Yes, sir.

16        Q.   What did they look like?

17        A.   They would look like these little square

18   metallic-looking things.

19        Q.   So did they look like a device sort of?

20        A.   Yeah, they looked kind of like almost like a

21   processer or a little computer or something like that.

22        Q.   Okay.  And each hashlet -- well, strike that.

23              Is it correct to say that each hashlet had

24   an associated unit of mining power?

25        A.   Yes, sir.

1                    Homero Joshua Garza

2      Q.   And when you logged onto Zen Cloud, would --

3   would that mine power be reflected in Zen Cloud?

4      A.   I don't specifically recall, but it would be

5   likely that it would be.

6      Q.   Okay.  And did the hashlets' price correspond

7   to its associated mining power?

8      A.   To an extent.  You know, it correlated to the

9   mark- -- yes, I mean, I guess, it correlated to the, you

10  know, sort of open market value of what that power was

11  worth, so, yes.  I mean...

12     Q.   How did -- how did you make the determination

13  of how much mining power was worth on the open market?

14     A.   We just looked -- you know, generally, knew

15  what, you know, our competitors in similar products, you

16  know, were being -- charging and, you know, just priced

17  accordingly.

18     Q.   And so a hashlet could be directed at a pool;

19  is that correct?

20     A.   Yes, sir.

21     Q.   What does a "pool" mean in this context?

22     A.   So in this context, it means rather than a

23  person mining -- it's been awhile -- but there's some --

24  there's some kind of downside to mining on your own.  I

25  can't remember what it is.

Page 82

Homero Joshua Garza

2          But rather than mining on your own and

3   dealing with that downside, then you mine with a massive

4   pool of people, and that downside is eliminated or is

5   less of a problem, and so it sort of creates an

6   efficiency by having everyone mine together.

7       Q.   So if a user selected a particular pool, does

8   that mean that actual mining power was directed to that

9   pool?

10      A.   No, what -- what generally happened was that

11  the mining capacity the company did have was pointed to

12  various pools at times.  Sometimes it might be pointed

13  to the most profitable pool.  But, you know, it

14  didn't -- in other words, like, if you selected a pool,

15  there wasn't, like, a little machine that, like -- a

16  thing or -- you know, it -- it was just software

17  basically.

18      Q.   But the user would be paid out based on --

19      A.   Correct.

20      Q.   -- the -- well, hold on.

21      A.   What the value of that pool was at that time.

22      Q.   Okay.  How did you determine what the value of

23  the pool would be?

24      A.   Again, it's been awhile, but I think that it

25  was done like a certain time of day, maybe towards the

1                    Homero Joshua Garza

2    end of the day.  And then I don't know if it was maybe

3    an average or where that pool ended up.  It's something

4    to that effect, a number was derived from that pool, and

5    that's how, I guess, it would be paid out.

6        Q.    I want to go back to HashPoints real quick.

7              So HashPoints were eventually converted

8    into PayCoin; is that right?

9        A.    Yes, sir.

10       Q.    What was the -- do you know what the exchange

11   rate was?

12       A.    I believe, to the best of my memory, that it

13   was, I think, 400 HashPoints to one PayCoin.

14       Q.    Okay.  And how else -- well, strike that.

15             So somebody could -- well, strike that.

16             When -- do you remember when PayCoin

17   launched?

18       A.    I think it was -- I mean, it was definitely at

19   the end of the year.  I feel like it was some -- maybe

20   it was in December, like I said, it would have been.

21       Q.    So -- and is it true that somebody -- well,

22   strike that.

23             So somebody could acquire PayCoin by

24   exchanging HashPoints, correct?

25       A.    Yes, sir.

Page 84

Homero Joshua Garza

1

2      Q.    And at some point, somebody could also mine

3   PayCoin; is that correct?

4      A.    Yes, sir.

5      Q.    And was that -- that was only for a limited

6   amount of time that you could mine for PayCoin?

7      A.    Yes, sir.

8      Q.    Okay.  And then prior to the launch of PayCoin,

9   was there any other way to acquire it?

10     A.    I believe that individuals, you know, that had

11   been identified as, you know, having large purchasing

12   ability were offered to buy PayCoins directly at, I

13   guess, a discounted price.

14     Q.    Okay.  Was there any other way to acquire it?

15     A.    So HashPoints, just buy it directly from the

16   company and mine it.  Well, eventually, once it became

17   live, it became exchanges, but, no, I can't recall any

18   way before it was live.

19     Q.    Okay.  And there were plans for an ICO,

20   correct?

21     A.    Yes, sir.

22     Q.    And ICO means initial coin offering?

23     A.    Yes, sir.

24     Q.    And what is an ICO?

25     A.    Generally, an ICO is when coin -- like a

Page 85

1                    Homero Joshua Garza
2    cryptocurrency coin is presold at a specific amount or a
3    dynamic amount before it actually goes live.
4         Q.   Okay.  But there wasn't actually a PayCoin ICO;
5    is that right?
6         A.   Not in a traditional sense.
7         Q.   In what sense was there an ICO?
8         A.   Well, I mean, as I mentioned earlier, different
9    individuals were able to purchase PayCoin because you
10   could obtain HashPoints, and that was sort of another --
11   yeah, so it was just -- you know, if the essence of an
12   ICO is like, you know, to exchange something in exchange
13   for cryptocurrency value before it actually becomes
14   public, then there are a couple of ways that that can be
15   done so it wasn't in the traditional sense.
16        Q.   Okay.  And what were HashStakers?
17        A.   So after -- or, actually, right before PayCoin
18   was made publically available, HashStakers were like
19   digital wallets that -- because PayCoin was -- was a
20   proof of -- man, it's been awhile.
21             Okay.  There's like two ways you can have
22   cryptocoin -- or many more, but two ways I know of
23   are -- one is where it's primarily done through, like,
24   physical miners.
25             And then there's another way where it's

1                    Homero Joshua Garza

2    primarily done by -- like through software, like where

3    people have, like, these wallets and they store them on

4    their computer, and somehow that does the same thing as

5    if you have miners.  I think it -- it's called proof of

6    something.

7                    But PayCoin started as -- as you

8    indicated, like you could mine it.  But then after that

9    time was over, then it became, like, software-based.

10                   And so if I remember correctly, like

11   HashStakers were like these -- like digital wallets

12   that, you know, you could put your PayCoin into and then

13   it staked or, you know, did effectively what a physical

14   miner would do, but it did it somehow through software.

15       Q.   Does the term proof of work help?

16       A.   Yes, proof of work and proof of stake, I think.

17   I don't remember which one's which.

18       Q.   So proof of work would be the physical mining?

19       A.   I believe so.

20       Q.   And proof of stake would be sort of the

21   hashlets -- or strike that.

22                   Proof of stake would be sort of

23   HashStakers phase?

24       A.   I've made an intentional effort to not be

25   involved in any of this, so...

Page 87

Homero Joshua Garza

1

2  Q.   Fair enough.

3       So when GAW Miners was formed, do you

4  recall how it was capitalized?

5  A.   Could you rephrase that question, please?

6  Q.   Well, do you understand what I mean when I say

7  "capitalized"?

8  A.   That can mean a bunch of things.  That's why

9  I'm asking.

10  Q.   Well, okay.  So when the company is set up, it

11  needs money to do things, correct?

12  A.   Yes, sir.

13  Q.   So how did GAW Miners get its initial money?

14  A.   I believe that at first it was leveraging money

15  from other companies, like a -- for lack of a better

16  word, like, borrowing money, you know, to make purchases

17  and whatnot from Great Auk or other companies to sort of

18  get -- get it off the ground.

19  Q.   Okay.  And would any of those loans, would they

20  have been documented in some way?

21  A.   It's possible.

22  Q.   Okay.  Do you know whether GAW Miners paid

23  these other companies back?

24  A.   Unlikely.  I don't know for sure, but it's

25  unlikely.

Page 88

1          Homero Joshua Garza

2     Q.   Did GAW Miners have an LLC agreement or an

3 operating agreement?

4     A.   I be- -- I -- to the best of my memory, I

5 believe that it did.

6     Q.   Okay.  Do you recall any GAW Miners corporate

7 resolutions?

8     A.   Not to the best of my memory.

9     Q.   Okay.  And did -- did you invest any money

10 personally in GAW Miners?

11               Well, strike that.

12               Did you, in the early phases of the

13 company, invest personally in GAW Miners?

14     A.   It's likely.

15     Q.   Okay.  Did Mr. Fraser invest any money

16 personally in GAW Miners at the initial phase?

17               MS. CAVE:  Objection to the form.

18     A.   I -- I don't recall.

19     Q.   (BY MR. WATTERSON)  Okay.

20     A.   It's likely, but I don't recall.

21     Q.   Okay.  Did GAW Miners have a bank account?

22     A.   It did at some point.

23     Q.   Okay.  Did it have -- was there a GAW Miners

24 BitCoin wallet?

25     A.   Yes, sir.

Page 89

1                      Homero Joshua Garza

2      Q.   Were there multiple GAW Miners' BitCoin

3  wallets?

4      A.   I think so.  Most likely.

5      Q.   And if I was to invest money in -- strike that.

6           If I was to put BitCoin into Zen Cloud,

7  where would that BitCoin go?

8      A.   I believe it would go into a -- one of GAW

9  Miners' wallets.

10     Q.   Okay.  And would all of the customers' BitCoin

11 go into the same wallet or were there separate wallets

12 for customers or how did that work?

13     A.   I don't recall.  I know less than people think

14 I do about that.  I don't know exactly how the -- how

15 the -- I know we -- I'm pretty sure we had more than one

16 wallet, but I don't know how they worked together or --

17 I don't remember exactly.  I feel like -- Joe explained

18 it to me and then I kind of forgot it or didn't

19 understand or something, so...

20     Q.   You're referring to Joe Mordica?

21     A.   Yes.  Joe and others -- I don't remember all

22 the others -- were primarily the ones that -- because

23 even -- so for -- I remember to even get into the

24 wallets, you had to have like a -- some kind of key or

25 something like that, and I don't -- I had one, but it

Page 90

1                      Homero Joshua Garza

2      took multiple keys to get into the wallets, so even I

3      couldn't get into the wallets by myself.  So it was

4      electronically set up.

5           Q.   Okay.  We talked a little bit earlier about

6      ZenMiner, and did ZenMiner -- did it have its own bank

7      account?

8           A.   I don't recall.

9           Q.   Did ZenMiner have its own employees?

10          A.   I don't recall because I don't remember how

11     they were paid.  I feel like we had a separate payroll,

12     but I don't remember how it was set up.

13          Q.   Okay.  Did ZenMiner have separate office space

14     from GAW Miners?

15          A.   It had both shared office space and separate

16     office space.

17          Q.   So where -- do you remember the address of

18     shared office space?

19          A.   No, sir.

20          Q.   Do you remember the office -- the address of

21     the separate office space?

22          A.   Oh, the -- I'm sorry, you said shared office

23     space?

24          Q.   Uh-huh, correct.

25          A.   So the shared office space would have been our

1                    Homero Joshua Garza

2   main office in Connecticut.  The separate office space,

3   I wouldn't -- that's the one I wouldn't remember.

4        Q.   Do you know where the -- was the separate

5   office space in Connecticut?

6        A.   I don't -- I mean, I think the separate -- the

7   shared office space is the one that was in Connecticut.

8   And then the separate office space were people that were

9   hired -- were hired for ZenMiner that were, like, in

10  different parts of the country.

11       Q.   Okay.  I came across documentation about a

12  company called PayCoin, LLC.  What was the purpose of

13  that company?

14       A.   I don't recall.  Dan Kelley and Dave McLain

15  routinely met about how the company should be set up and

16  spun up a bunch of -- you know, like, that was spun up

17  and then another one called like B something.  I don't

18  know, they spun up a few companies, but PayCoin was one

19  of them.  And it's likely that I was explained -- you

20  know, someone told me why it was set up, but I don't

21  remember now why it was set up.

22       Q.   Okay.  This may help.

23            This is an exhibit that was previously

24  marked as 65, and it's a really big stack of documents

25  that I think were basically collected for the SEC.

Page 92

Homero Joshua Garza

1

2      But I wanted to direct your attention

3  towards the back of -- back of the document, and there's

4  an org chart for business technology for Cryptocurrency,

5  LLC.

6      A.   What page?

7      Q.   The very last page.

8      A.   Oh, the very last.

9      Q.   And so -- it's at the bottom, there's operating

10  companies and there's PayCoin, LLC; PayBase, LLC;

11  Business Technology for Cryptocurrency Ventures, LLC;

12  XPY Investments, LLC; and it's all under, I think, the

13  umbrella of Business Technology for Cryptocurrency, LLC.

14  Do you see that?

15      A.   Yes, sir.

16      Q.   And so, I guess, can you just explain how this

17  structure came about?

18      A.   I think that -- if I remember correctly, I

19  think that Dan Kelley had set up this, I think -- I

20  think he had set up this structure because I remember he

21  wanted, you know, Business Technology Cryptocurrency to

22  operate in a consulting capacity to other companies or

23  something like that, so I think that -- I think -- yeah,

24  I think that's how it came about.

25      Q.   Yes.

1                    Homero Joshua Garza

2              Do you know whether the structure was ever

3    finalized?

4        A.   I don't -- I don't believe so.  I mean, there's

5    specific instances where it doesn't look like the --

6    like I don't remember that being, like, finished or --

7    for example, in ZenMiner, LLC, I don't recall Jonah

8    Dorman being the general manager.  He may have been, but

9    I -- I just don't recall that.  So it doesn't seem like

10   that was finalized.

11              THE REPORTER:  Who being the general

12   manager?

13              THE WITNESS:  Jonah Dorman.

14              THE REPORTER:  Thank you.

15       Q.   (BY MR. WATTERSON)  I was going to get to

16   this -- might as well talk about it now.  So in this

17   stack of documents, there is an operating agreement for

18   Business Technology for Cryptocurrency, LLC, and the

19   operating agreement, if you flip backwards from the org

20   chart we are looking at, it starts on maybe three pages

21   from the back, but the document is -- starts a dozen

22   pages from the back, something like that?

23       A.   Is it the one that has the highlighted?

24       Q.   I didn't mean to specifically give you that

25   one.  That's fine.  That's my highlights.

Page 94

Homero Joshua Garza

2      So what this says is that it -- it has, I
3   guess, capital contributions and percentage interest of
4   you and Mr. Fraser.  Do you see that?

5      A.   (Nodding head.)

6      Q.   Did you ever make this a capital contribution
7   for Business Technology for Cryptocurrency, LLC?

8      A.   Not that I can recall.

9      Q.   Do you know whether Mr. Fraser did?

10     A.   Not that I can recall.

11     Q.   And if you -- if you flip to the previous -- or
12  the page, it's -- the operating agreement is not signed.
13  Do you see that?

14     A.   Yes, sir.

15     Q.   So do you know whether it was ever signed?

16     A.   Not that I can recall.  I can provide an
17  explanation as to why I believe that.

18     Q.   Please do.

19     A.   I'm sure you have the e-mail correspondence
20  between Stuart and I that -- you know, there was a
21  discussion that we had about how I -- I, I think,
22  initially, proposed the companies to be set up and who
23  owned what equity and so forth.

24           And Stuart was very upset and frustrated
25  with what I had proposed, and we went back and forth on

Page 95

1                      Homero Joshua Garza

2    it for a while.  We talked about it on the phone.  And

3    then eventually he -- I'll do my best to describe this,

4    but eventually he just said, "Fine," but it -- it was,

5    like, not like the -- it was like the "fine" that your

6    parents tell you that you're not -- like they don't

7    really agree.

8              So, but from that sort of, you know, as --

9    I remember he was on the phone, but from that, I think

10   that's why a lot of this got generated.  But I knew

11   that, like, he didn't want to -- like, he didn't want to

12   do that and that it would be a bad idea to.  Like he

13   just said it, "Okay, fine.  I asked enough times" or

14   whatever, you know, his reasons were.

15             But I knew that it wasn't going to be in

16   my -- in anyone's best interest to do it that way

17   because he always wanted to own the majority of

18   everything, you know, 51/49, so, most likely, I think

19   this was never really finalized because I don't think

20   Stuart really ever, like, actually agreed to it.

21   Q.   And I just want to be clear on this.  It is

22   your personal belief that Mr. Fraser never agreed to

23   this 85/15 structure?

24   A.   Yes.  It's my personal belief because, after

25   having known him for the amount of time I did, I knew

1                      Homero Joshua Garza

2   what -- there had been many other instances where not --

3   I mean, maybe a dozen or so where we debated something

4   long enough where he finally agreed, but then I found

5   out later that, like, he didn't act -- like that's not

6   what he wanted to do, and it backfired to do that.

7                So I spent enough time with him to know in

8   this situation that that's what was going on so -- so

9   while we proceeded to move forward sort of like as a

10  company, I knew that, you know, it wasn't really what he

11  wanted to do.  He was -- he was very angry about it,

12  so -- so I think it was more of those things where we

13  just left it alone.

14      Q.   Okay.

15      A.   He wanted it to fall under the sort of general

16  way we did things, which was to split things.

17      Q.   So I think we've touched on this, but explain

18  to me the general ways that you guys did things with

19  respect to equity.

20                Well, strike that.

21                When you say the general ways you did

22  things, are you referring to equity?

23                MS. CAVE:  Objection to the form.

24      A.   Yeah.  Yeah, he -- he generally -- in fact, we

25  had a specific discussion, I remember, because it was

Homero Joshua Garza

1

2  when I was at Smart Tech, where we had agreed that going

3  forward there would be a -- like, an equity split on all

4  new and existing ventures.  And I would be speculating

5  if I remembered the exact amount, but my best guess is

6  that it was either 50/50 or 49/51 or something like

7  that.

8      Q.   (BY MR. WATTERSON) So this is a document that

9  was previously marked as Exhibit 47.

10     A.   Yes, this is the -- this is what I was

11 referring to earlier.

12     Q.   Okay.  So does this document set out your

13 understanding -- well, strike that.

14          Does this document set out the -- the deal

15 that you and Mr. Fraser had with respect to GAW Miners?

16          MS. CAVE:  Objection to the form.

17     A.   No, or -- not in my understanding.

18     Q.   (BY MR. WATTERSON)  Okay.  Tell me -- tell me

19 your understanding.

20     A.   So, as I mentioned, when I was working with

21 Smart Tech, Stuart and I -- I don't remember if it was

22 over e-mail or the phone, but we made an agreement that

23 going forward all existing and new ventures would be,

24 like, split the same way every time.  And, again, I

25 don't remember.  The closest thing I can think of it

Page 98

Homero Joshua Garza

1    was -- it was likely 50/50 or 51/49.

2            And so when I proposed this, he -- like it

3    was in -- it was in conflict with that discussion, and

4    that's why he -- it was a point of tension in conflict

5    because it was in conflict with what we had already

6    agreed on.

7    Q.   So -- so your understanding is that this was

8    a -- a proposal that was, I guess, different than the

9    agreement that actually applied to GAW Miners; is that

10   right?

11   A.   Correct, correct.  Like Stuart felt like

12   that -- so when we agreed that we would split, you know,

13   all our existing and future ventures a certain way, that

14   he felt like -- that because GAW Miners was financially

15   gaining momentum, that I was trying to change that deal.

16           And so, like, when he asked earlier about,

17   like, my opinion about what he -- like, that's how I

18   know that when he finally said, like, yes, like, it

19   really was -- because he was -- he was really angry

20   that -- like, he thought I was, like, changing the deal

21   because GAW Miners was worth more money.

22           And so I proposed this and it created a

23   lot of conflict and tension between us, and so that's

24   sort of why there was some steam gained, and then it

25

1                    Homero Joshua Garza

2    sort of stopped because -- and it -- it's one of those

3    things where we -- I kind of think we -- I remember Dave

4    McLain telling me that if I force that issue, like, if I

5    force that -- if I was proposing here, if I kept forcing

6    it, that Stuart and I would -- could potentially end up

7    in a legal conflict, so we just -- the best of my

8    knowledge, we just left it alone.

9        Q.   Okay.  Let's -- if you don't mind, could we go

10   back to Exhibit 65 and just take a look at that org

11   chart again?

12       A.   Yes, sir.

13       Q.   With respect to PayCoin, LLC; PayBase, LLC,

14   Business Technology for Cryptocurrency Ventures, LLC;

15   XPY Investments, LLC; and Business Technology for

16   Cryptocurrency, LLC, all of those companies, did they

17   have separate office space?

18       A.   Not that I'm aware of.

19       Q.   Did they have separate employees?

20       A.   I believe, because you asked earlier about

21   ZenMiner's, I believe ZenMiner had some kind of a

22   separate payroll structure.  But outside of that, I

23   don't think that they had any kind of like separate -- I

24   think this was just like a concept of how it was going

25   to work.

1                     Homero Joshua Garza

2        Q.    Okay.  So no separate office space?

3        A.    Generally, for this line, I don't believe so.

4        Q.    Okay.  Would any of -- if I say "these

5   companies" for the next few questions, will you

6   understand that I'm referring to these com- -- the

7   companies other than GAW Miners or ZenMiner?

8              MS. CAVE:  Objection to the form.

9        A.    Okay.  Can you rephrase?

10       Q.    (BY MR. WATTERSON)  I'm just trying not to...

11             So PayCoin, LLC; PayBase, LLC; Business

12   Technology for Cryptocurrency Ventures, LLC; XPY

13   Investments, LLC; Business Technology for

14   Cryptocurrency, LLC, those companies were all formed

15   after GAW Miners and ZenMiner, right?

16       A.    I believe so, yes.

17       Q.    So if I refer to those companies as the new

18   companies, will you understand which companies I'm

19   referring to?

20       A.    Yes, sir.

21       Q.    All right.  So did the new companies have their

22   own phone numbers?

23       A.    I do not recall.

24       Q.    Okay.  Did the new companies have their own

25   equipment?

1                    Homero Joshua Garza

2        A.    Not that I can recall.

3        Q.    Okay.  And I might have already asked this, so

4    I apologize, but did the new companies have their own

5    bank accounts?

6        A.    It's possible, but I don't specifically

7    remember which account -- by that point, I wasn't

8    heavily involved in how that was set up, so...

9        Q.    Okay.

10                    THE REPORTER:  You were heavily?

11                    THE WITNESS:  I wasn't heavily involved in

12    how the bank accounts were set up.

13        Q.    (BY MR. WATTERSON)  Did the new companies have

14    any corporate resolutions, to the best of your

15    knowledge?

16        A.    To the best of my knowledge, I do not believe

17    so.

18        Q.    Okay.  Thanks.

19                    I am going to hand you a document that was

20    previously marked as Exhibit 19.

21                    What is Exhibit 19?

22        A.    You're asking me that, what is Exhibit 19?

23        Q.     Yes.

24        A.    (Witness reviews documents.)

25                    I think this was the -- I guess -- maybe

1                    Homero Joshua Garza

2    I'm wording it wrong, but I believe it's our plea

3    agreement between myself and the Attorney General, if

4    I'm saying that correct.

5        Q.    So you were charged with wire fraud in

6    connection with GAW Miners; is that right?

7        A.    Yes, sir.

8        Q.    And you pled guilty?

9        A.    Yes, sir.

10       Q.    Okay.  Can you turn to -- you see at the top,

11   there's something called file stamp, and it shows the

12   document's 11 pages.  Can you turn to page 9 of 11?

13       A.    Nine of eleven?

14       Q.    Yes.

15             And this is Stipulation of Offense

16   Conduct, which is basically an agreement between you and

17   the Government that this is what you did, fair?

18       A.    Yes, sir.

19       Q.    Okay.  So I wanted to direct you to

20   paragraph 4.  Paragraph 4 describes hashlets and I think

21   it also describes PayCoin as well.  Do you see that?

22       A.    Yes, sir.

23       Q.    Does paragraph 4 accurately describe what a

24   hashlet was?

25       A.    Yes, sir.

1          Homero Joshua Garza

2      Q.   Okay.   And if you take a look at paragraph 5,

3  there's a chart, and it says -- on the -- essentially,

4  on the left, it describes a statement that you made, and

5  then on the right, it describes what the truth is.   Do

6  you see that?

7      A.   Yes, sir.

8      Q.   Okay.   So it says that -- on the right-hand --

9  lower right-hand corner, it says, "The defendant's

10  companies sold more hashlets than were supported by the

11  computing power maintained in their data centers.

12  Stated differently, the defendant's companies sold the

13  customers the right to more virtual currency than the

14  companies' computing power could generate."

15          Do you see that?

16      A.   Yes, sir.

17      Q.   Is that accurate?

18      A.   Yes, sir.

19      Q.   Okay.   And then if you look at the top row,

20  there's a statement, "GAW Miners' parent company

21  purchased a controlling stake in ZenMiner for $8 million

22  and that ZenMiner became a division of GAW Miners."

23          Do you see that?

24      A.   Yes, sir.

25      Q.   Is that a statement that you made?

1                    Homero Joshua Garza

2        A.    The com- -- I mean, yes, I was a part of that
3    statement.

4        Q.    Who else was a part of that statement?

5        A.    I would be speculating on all of the
6    individuals involved, so...

7        Q.    Do you remember any without speculating?

8        A.    I believe Joe and Stuart are the ones that I
9    have a high level of confidence in.

10       Q.    Why do you believe Mr. Fraser was involved in
11   this statement?

12               MS. CAVE:   Objection to the form.

13       A.    Because we discussed -- we -- this concept, the
14   idea of ZenMiner being purchased by GAW Miners, came
15   from the concept that you talked about earlier when
16   Great Auk Wireless and GAW Miners are GAW High-Speed,
17   like, when those companies came together, that's where
18   this concept was born from.

19               And Stuart was the one who, you know, came
20   up with that original idea of one -- you know, start
21   spinning up a new company and then having that company
22   buy the assets of another company.  So I talked to
23   Stuart and said basically, "Can we do the same thing?"

24       Q.    (BY MR. WATTERSON)   So if I understand your
25   testimony, Mr. Fraser came up with the concept of GAW

1                    Homero Joshua Garza

2    Miners' parent company purchasing a stake in ZenMiner,

3    LLC?

4         A.    No.

5                    MS. CAVE:   Objection to the form.

6         A.    Stuart came up with the concept of Great Auk

7    Wireless and GAW Miner -- or, I'm getting the names

8    mixed up, Great Auk Wireless and GAW High-Speed

9    Internet -- remember how, like, one was Vermont and

10   one's Massachusetts?

11        Q.    (BY MR. WATTERSON)   Uh-huh.

12        A.    He came up with the concept of how, like, to

13   get the company out of Vermont, bring it to

14   Massachusetts so, essentially, have two companies that

15   we both have a vested interest in, like, one buys the

16   assets of another.

17                    So I remembered that and I brought up to

18   him, "Can we do the same thing with those companies,"

19   and that's how we -- you know, that was how this --

20   like, the whole concept, that's where it came from.

21                    So to be clear, he didn't approach me, I

22   approached him to ask him if that would work here.

23        Q.    But is it fair to say that you discussed the

24   statement in this top, left box with Mr. Fraser before

25   the statement was made?

Page 106

1                    Homero Joshua Garza

2              MS. CAVE:  Objection to the form.

3        A.    Yes, I -- what I am not as sure about is the --

4    the figure, total amount.  But the concept of having one

5    company buy another, yes, we did discuss that.

6              MR. WATTERSON:  Let's mark this as

7    Exhibit 241.

8              (Exhibit 241 marked.)

9        Q.    (BY MR. WATTERSON)  Here you go.

10             And Exhibit 241 is something I pulled off

11   the Internet, but my understanding is that this is,

12   essentially, a different website republishing a press

13   release that was made about ZenMiner.

14             Does this look like the press release that

15   was made regarding Geniuses at Work acquiring equity in

16   ZenMiner?

17       A.    Yes, sir.

18       Q.    Okay.  So -- so did you discuss the concepts in

19   this press release with Mr. Fraser before the press

20   release was issued?

21             MS. CAVE:  Objection to the form.

22       A.    Yes.  Yes, sir.

23       Q.    (BY MR. WATTERSON)  Tell me about those

24   discussions.

25       A.    Well, essentially -- and I can't be specific on

1                    Homero Joshua Garza

2    exact dates, but at some point, I concluded -- because

3    ZenMiner was truly meant to be a separate company.   In

4    fact, we even interviewed for CEOs.

5                   When it became clear that it wasn't in the

6    best interest of the company to make them that way, that

7    it would be, in fact, in the best interest of the

8    company to combine them together, that's when I asked

9    Stuart -- you know, and I'm just being high level, but,

10   essentially, that's when we had the conversation about

11   could we do, like, the same thing here as we did with

12   GAW High-Speed, and that's when I related the two ideas

13   together, and so that's how we discussed it, so...

14        Q.   And what did Mr. Fraser tell you about --

15   strike that.

16                   What did Mr. Fraser tell you in this

17   conversation?

18        A.   Well, I don't recall more than him agreeing to

19   the idea.

20                   THE REPORTER:   What -- I got it.   Thanks.

21        A.   We had a conversation extensively about,

22   generally, how he, like, brought prior experience about,

23   like, one company buying out another, like I remember, I

24   was talking about --

25                   I don't know if that was part of this

Page 108

1                    Homero Joshua Garza

2    specific discussion, so -- but I know it gave me the

3    idea for this, and then that -- you know, that, along

4    with the way we handled Great Auk Wireless, is why I

5    presented that concept, so...

6         Q.   (BY MR. WATTERSON) Do you remember, was this a

7    discussion over the phone?

8         A.   Most likely it's possible that we met in person

9    about it, but I think it was over the phone.

10        Q.   Do you know approximately when you had this

11   conversation with Mr. Fraser?

12        A.   It wouldn't have been long before this

13   happened.

14        Q.   Okay.  I want to switch back to Exhibit 19, the

15   fee agreement.

16        A.   Okay.

17        Q.   And so it says in the left-hand box, a

18   statement, "The market value of a single PayCoin would

19   not fall below $20 per unit because the defendant's

20   companies had a reserve of $100 million that the

21   companies would use to purchase PayCoins to drive up its

22   price."

23             Do you see that?

24        A.   Yes, sir.

25        Q.   And does that reflect a statement that you

1        Homero Joshua Garza

2   made?

3        A.   Yes, sir.

4        Q.   Okay.  I guess it's fair to say that the

5   companies -- GAW Miners made this statement as well; is

6   that right?

7             MS. CAVE:  Objection to the form.

8        A.   Yes.

9        Q.   (BY MR. WATTERSON)  Is it fair to say that GAW

10  Miners made this statement in this left-hand box?

11            MS. CAVE:  Objection to the form.

12       Q.   (BY MR. WATTERSON) Okay.  Strike that.  Hold on

13  a second.

14            Okay.  Let me try to -- I will try to fix

15  it.

16            So the -- do you see the statement in the

17  left-hand box?

18       A.   Yes, sir.

19       Q.   Did GAW Miners make that statement?

20       A.   I believe that the first instance that this

21  statement was made was in a Wall Street Journal article

22  that referenced this $100 million figure that was

23  generated from an interview that I did and Stuart and I

24  did.  I believe that was the first instance where that

25  was made.

Homero Joshua Garza

2    Q.    Okay.   And in the -- the right-hand box says
3    that The truth is that "The defendant's companies did
4    not have a reserve of $100 million and could not,
5    therefore, drive up the value of PayCoin."
6              Do you see that?
7    A.    Yes, sir.
8    Q.    Is that accurate?
9    A.    Yes, sir.
10   Q.    Okay.   And then I just want you to take a look
11   at the statement in paragraph 6.   "The defendant, along
12   with others, acting through his companies, applied money
13   his companies had made from new hashlet investors and
14   used it to pay older hashlet investors money the
15   companies owed them based on the purported GAW Miners
16   and ZenMiner had done on the investors' behalf."
17             Do you see that?
18   A.    Yes, sir.
19   Q.    Is that accurate?
20   A.    Yes, sir.
21   Q.    Okay.   I want to show you this document.   This
22   document was previously marked as Exhibit 232.   And this
23   is an e-mail thread from -- between you and, I take it
24   it's Dan Kelley, from Joe Mordica, and Jonah Dorman; is
25   that right?

1                    Homero Joshua Garza

2        A.    Yes, sir.

3        Q.    Who was Dan Kelley?

4        A.    Dan Kelley was the president of the company.

5        Q.    What was -- as president, what was Mr. Kelley's

6   role?

7        A.    Essentially, he was in charge of all, you know,

8   the operations of the company.  The staff, everyone

9   reported to him.

10       Q.    Okay.  And what was Mr. Mordica's role?

11       A.    The CTO.

12       Q.    And that's chief technology officer?

13       A.    Yes, sir.

14       Q.    And what did Mr. Mordica's responsibilities

15  entail?

16       A.    All of this software and everything we've --

17  are talking about here, and Joe was in charge of all of

18  that, wallets, everything.

19       Q.    Okay.  And what was Mr. Dorman's role with the

20  companies?

21       A.    I think he was the general manager of

22  something.

23             The only thing I can presently recall is

24  that when I was asked to step down from my role as CEO,

25  he took over for me.  That's the -- right now, the most

1                    Homero  Joshua  Garza

2    I  can  remember  about  his  role.

3        Q.    Tell  me  --  you  said  you  were  asked  to  step  down

4    as  CEO.    When  did  that  happen?

5        A.    I  believe  sometime  in  January.

6        Q.    Okay.    Who  asked  you  to  step  down?

7        A.    Dan  did  and  I  think  Dave  did.

8        Q.    Okay.    And  why  were  you  asked  to  step  down?

9        A.    Because  too  --  I  mean,  I'm  --  I  --  so  I'll  say

10   there  was  a  lot  of  reasons,  but  the  main  one  I  remember

11   is  because  too  many  statements  that  created  negative

12   press  for  the  company,  that  everyone  perceived  as  me

13   individually  writing,  were  attributed  to  me  as  an

14   individual,  and  they  wanted  to  take  the  --  like  an

15   individual,  like,  as  being  the  front-facing  part  of  the

16   company  so  it  would  just  be  like  the  company.    You  know,

17   not  like  a  --  when  you  think  of  a  company,  you  think  of

18   a  person.    When  you  thought  of  GAW  Miners,  people

19   thought  of  me.

20                    THE  REPORTER:    I'm  sorry.    When  you  think

21   of?

22       A.    A  company  --  when  people  thought  of  GAW  Miners,

23   they  thought  of  me,  and  so  too  many  negative  statements

24   and  things  had  been  made  that  were  attributed,  you  know,

25   to  me  directly,  and  they  thought  that  we  could  undo  some

1                  Homero Joshua Garza

2    of that bad press by, you know, me not being in the CEO

3    role anymore.

4        Q.   (BY MR. WATTERSON)   So less Elon Musk, more

5    Tesla?

6        A.   I was literally thinking of that example the

7    whole time, yeah.

8             MS. CAVE:   Objection to form.

9        A.   I just didn't say it first.

10       Q.   (BY MR. WATTERSON)   Okay.  Let's go back to

11   Exhibit 232.

12            I want you to turn to the second page of

13   the document, and there's numbers at the bottom that

14   says GAW00128714.

15       A.   Uh-huh.

16       Q.   And you write, "Our entire PayBase and XPY

17   model is flawed."  Do you see that?

18       A.   Yes, sir.

19       Q.   What do you -- why did you mean by that?

20       A.   I'll have to read this again.

21       Q.   Just take your time.

22       A.   (Witness reviewing document.)

23            THE REPORTER:   And, Counsel, I am going to

24   need a break pretty soon.

25            MR. WATTERSON:   Okay.  Yeah.  Yes, let's

Page 114

Homero Joshua Garza

1    finish up with this exhibit.

2                    THE REPORTER:  Okay.

3        A.    (Witness reviewing document.)

4                    Okay.  I remember.

5        Q.    (BY MR. WATTERSON)  Okay.  So you wrote, "Our

6    entire PayBase and XPY model is flawed."  What did you

7    mean by that?

8        A.    What I was talking about is that up, until this

9    point, I had genuinely not considered the fact that

10   PayCoin could be -- would -- like could be -- like could

11   be gained in the way I describe it here, that people

12   would, you know, intentionally buy it and just keep

13   selling it over and over.

14                    Because what this document doesn't

15   completely go into is that where the $100-million figure

16   came from was -- it equaled the amount of PayCoins that

17   we had left -- the like the white paper outlined a plan

18   where a certain amount of PayCoins were to be owned by

19   the company.

20                    And if you took those amount of PayCoins

21   and you multiplied them times 20, then -- so, in other

22   words, the company intended to generate the money that

23   it would need to help increase the floor by selling the

24   PayCoins that the company had on hand.

1                        Homero Joshua Garza

2              So that's where the $100 million came

3    from, because we took 20 and multiplied it times the

4    amount the company had on reserves, and you'd have

5    $100 million.

6              So what I was saying here is that because

7    someone can constantly gain the system, and it would

8    keep requiring us to sell PayCoins to sustain that gain,

9    that eventually it would dilute the market where that

10   would no longer be sustainable.

11   Q.   Okay.  And then let's turn to the first page.

12   You write, "The -- "The fundamental issue is this entire

13   currency was sold under the idea that there would be a

14   floor."

15   A.   Uh-huh.

16   Q.   And so what did you mean by that?

17   A.   Well, that -- so that's what I'm saying, is

18   that the idea was that we could maintain stability in

19   the price of PayCoin, you know, by leveraging the

20   reserve PayCoins the company had; selling them to

21   generate, you know, capital to then help sustain the

22   price of the coin.

23              So -- so the whole idea was that when

24   my -- like, that's what I mean by -- like, when I said,

25   like, the models fall.  It's been that way.  You know,

1                          Homero Joshua Garza

2    the crazy thing is no one has brought it up.

3        Q.   Uh-huh.

4        A.   -- like, that's what I meant by that, like --

5    because that was the entire plan to begin with, that the

6    reserve PayCoins would help sustain what was in the

7    market; but as you sold more PayCoins, it would create

8    more instability in the market.

9                So what I was saying here is that, you

10   know, we, initially, stated or advertised, however you

11   want to look at it is, you know, one of its values being

12   that it would have a floor.

13               And the floor is the issue because the

14   floor can't be maintained or sustained if the company is

15   constantly selling, you know, PayCoins to help maintain

16   it.

17       Q.   Okay.  But -- but you write here that the -- is

18   it right to say that you -- you are writing that the

19   floor was a core concept?

20       A.   Yes, sir.

21       Q.   And was the core concept for the entire

22   community?

23       A.   Yes, sir, to -- I believe so.

24       Q.   Okay.  And you say that if you were to remove

25   the floor, that entire community would -- community

1                    Homero Joshua Garza

2    would reject it.  Do you see that?

3        A.   Yes, sir.

4        Q.   Why did you believe that?

5        A.   Well, because we essentially got stuck.  You

6    know, we had -- you know, collectively, not just me on

7    our own, collectively, all had this idea of subsidizing,

8    you know, the consistency of the value of the coin with,

9    you know, inventory we had on hand, and that would, you

10   know, thus create a floor, and that was the whole reason

11   the community liked the idea of PayCoin to begin with.

12                  So if we take that away, it's like --

13   well, I was really about to say like a bait and switch,

14   but I wrote it here like it would be the equivalent of a

15   bait and switch.

16       Q.   And you write that "the community would burn us

17   at the stake"?

18       A.   Burn us at the stake, yes.

19                  THE REPORTER:  Burst the?

20                  MR. WATTERSON:  Would burn us at the

21   stake.

22       Q.   (BY MR. WATTERSON)  And is it correct that the

23   community figuratively did burn you at the stake?

24       A.   Yes, sir.

25                  MR. WATTERSON:  Okay.  Take a break for

Page 118

1                    Homero Joshua Garza

2    lunch.

3                    THE VIDEOGRAPHER:  Off the record at 1:23.

4                    (Lunch recess from 1:23 p.m. to 2:08 p.m.)

5                    THE VIDEOGRAPHER:  On the record at 2:08.

6        Q.   (BY MR. WATTERSON)  Mr. Garza, I'm handing you

7    a document that was previously marked as Exhibit

8    Number 69.  And this is -- I guess it's an article about

9    ZenMiner, and it suggests in the first sentence that

10   ZenMiner partnered with GAW Miners to bring a new miner

11   operating system, controlling unit, and ecosystem to the

12   marketplace.  Do you see that?

13       A.   Yes.

14       Q.   And was it accurate that ZenMiner had partnered

15   with GAW Miners?

16       A.   Not -- no, sir.

17       Q.   Okay.  And it discusses a phone conversation

18   with you, Thomas Fraser, and Rami Abramov.

19                    Do you see that?

20       A.   Yes, sir.

21       Q.   Do you remember that phone conversation?

22       A.   Yes, sir.

23       Q.   Can you tell me what you remember about it?

24       A.   This is in reference to the phone conversation

25   that the -- that Scott Fargo conducted.

1                   Homero Joshua Garza

2        Q.    Okay.  And who's Scott Fargo?

3        A.    He's the reporter that wrote this.

4        Q.    Okay.  And what did you discuss with Mr. Fargo

5    on this phone conversation?

6        A.    Well, basically, this article would be a result

7    of this discussion.

8        Q.    Sorry.  Go ahead.

9        A.    No, you go ahead.

10        Q.    Okay.  It says that Thomas -- in the first --

11    second full paragraph, where it says, "I spoke on the

12    phone," it refers to Thomas Fraser as Thomas Fraser of

13    ZenMiner.  Do you see that?

14        A.    Yes, sir.

15        Q.    And Thomas Fraser wasn't actually associated

16    with ZenMiner; is that true?

17        A.    No, sir, not up until probably the same day.

18    You know, prior to this interview being asked, I asked

19    Stuart if, you know, Thomas could represent ZenMiners.

20    Otherwise, there would be interview with no one, so

21    Tommy conducted this interview as if he was part of

22    ZenMiners.

23        Q.    Why did you choose, I guess, Thomas Fraser?

24        A.    Because prior to this article being written,

25    Stuart had asked me to -- to reach out to Tommy to see

1                    Homero Joshua Garza

2   if -- to -- to get -- you know, get him involved in the

3   business, see if there are -- to look for an opportunity

4   for him to contribute in some way.

5                    So when this was brought up, Tommy and I

6   had already had a previous discussion, you know, about,

7   you know, the -- sort of what was generally happening at

8   the company, so, you know, it just -- it made the most

9   sense to talk to him, so -- so I probably should have

10  ran it through Stuart first and then talked to Tommy.

11      Q.   Can you describe your conversation with

12  Mr. Fraser with respect to Thomas Fraser participating

13  in this interview?

14      A.   To the best of my memory, I just essentially

15  told him that, you know, we are having an interview that

16  was going to be performed and, you know, thought that

17  maybe, you know, Tommy could, you know, represent

18  ZenMiners, and that's up to the extent of what I can

19  recall.

20      Q.   Why -- I guess, why have -- have somebody not

21  associated with ZenMiner represent the company?

22      A.   Because the companies weren't -- and while it

23  was created as a separate LLC, they weren't truly two,

24  you know, different companies in the respect that they

25  shared too many resources.

1                    Homero Joshua Garza

2        Q.    So why did it matter that they shared

3    resources?

4                    THE REPORTER:  They shared --

5                    MR. WATTERSON:   Resources.

6                    THE REPORTER:  -- resources?  Thanks.

7        A.    That mattered, as well as the fact that, you

8    know, Stuart and I were both in control of both

9    companies, so -- and at the time this was written, the

10   only people that were under the ZenMiner umbrella were

11   developers and things like that.  So, in other words,

12   there would be no way to have this interview because

13   there was no one else to talk to.

14       Q.    (BY MR. WATTERSON)  But why not just say, you

15   know, "I represent a company called GAW Miners and a

16   company called ZenMiner, and here's what we're doing"?

17   I guess why -- what was the point of suggesting there

18   was separation?

19       A.    When ZenMiner was launched, we came, you know,

20   to the conclusion that it would -- that there were

21   benefits of separating the companies, ZenMiner and GAW

22   Miners.  The primary benefits that made the decision

23   were that GAW Miners worked with very specific vendors,

24   and ZenMiners was made to be an agnostic operating

25   system, and there was a concern that there was going to

1                        Homero Joshua Garza

2      be a conflict of interest between the two companies.  So

3      while, you know, they shared resources to launch and to

4      set up, it was, initially, you know, planned as being

5      two separate companies.

6          Q.   And I think you said that "we made that

7      decision."  Who is the "we" you're referring to?

8          A.   Stuart and Shiraz.

9          Q.   Okay.  Did you discuss this article that

10     Mr. Fargo wrote with Mr. Fraser?

11         A.   Yes, sir.  I think as soon as it was

12     published -- well, in addition to, you know, discussing

13     that it be done, you know, to make sure Tommy could do

14     it, I believe that we spoke on the phone afterwards.

15     And then when the article was published, we -- you know,

16     I sent him a link to it and we discussed it.

17         Q.   Okay.  Can you tell me about the discussion

18     after you sent him the link?

19         A.   To the best of my memory, you know, we were,

20     you know, just pleased that there was -- you know, that

21     there was press exposure and -- and, you know -- you

22     know, Stuart, I remember, "It was a good -- you know,

23     good job," and that was -- I mean, I don't remember, you

24     know, anything beyond just, you know, he was happy with

25     the way that the conversation went, the content of the

1                    Homero Joshua Garza

2    conver-" -- you know, of the article, and that we got

3    press exposure.

4         Q.    So you don't -- you don't remember Mr. Fraser

5    being upset with this article?

6         A.    Not that I can remember.

7         Q.    Would -- would Mr. Fraser have known there

8    was -- strike that.

9                    Do you know whether Mr. Fraser knew GAW

10   Miners and ZenMiner were two separate legal entities?

11        A.    To the best of my knowledge, I believe so.   But

12   I can't, you know, remember definitive -- you know, a

13   specific discussion about it, but it would fall in the

14   purview of something that, you know, we would have

15   discussed, but I...

16        Q.    Okay.   Do you recall whether Mr. Fraser would

17   have known that there was shared resources between GAW

18   Miners and ZenMiners?

19        A.    Yes, sir.

20             MS. CAVE:   Objection to the form.

21        A.    Yes, sir.

22        Q.    (BY MR. WATTERSON)   Okay.

23        A.    There were far too many shared resources.

24        Q.    So in the first sentence in Exhibit 69, it

25   says, "GAW Miner has partnered with ZenMiners to bring a

1              Homero Joshua Garza

2   new mining -- new miner operating system, controlling

3   unit, and ecosystem to the marketplace," so would --

4   Mr. Fraser knew that there was no such partnership,

5   correct?

6       A.   Definitely.

7                 MS. CAVE:   Objection to the form.

8       Q.   (BY MR. WATTERSON)   and how do you know that he

9   knew that?

10      A.   Because -- a few reasons.   One is that

11  ZenMiners fell into the sort of bucket of discussions

12  about how equity could be set up, that we had some

13  discussions about.

14              We, you know, generally talked about the

15  development of the operating system.   The assembly of

16  the controller for ZenMiners was done out of one of our

17  offices, so, you know, we talked about that.   And then,

18  obviously, you know, post-article, Tommy goes into great

19  detail about him, his background and so forth, so, you

20  know, that was -- obviously, would not have been

21  something that he would have done if, you know, his dad

22  wasn't on board with that.

23              Like I say, that's more speculation, but,

24  you know, between all those, you know, different things,

25  specifically the discussion we had about equity and

1          Homero Joshua Garza

2   finding a CEO to eventually, you know, run the company,

3   were things him and I discussed.

4      Q.   So let me -- let me ask this:  Do you know

5   whether -- well, strike that.

6          It seems like you testified that Thomas

7   Fraser and Stuart Fraser had a discussion about this

8   article.  Did I get that right?

9          MS. CAVE:  Objection to the form.

10     A.   That they had discussion between each other?

11     Q.   (BY MR. WATTERSON)  Right.

12     A.   To the best of my knowledge.  I can't, you

13  know, say for certain because obviously it happened, you

14  know, without me.  You know, but I knew Stuart for

15  eight, ten years and knew Tommy for quite a while, and,

16  you know, there's -- Stuart would not have let him be

17  involved in the company without those two -- so, you

18  know, I just knew the family dynamic at the time, so...

19     Q.   But, you know --

20     A.   But I didn't hear them talking with each other.

21     Q.   One of them didn't tell you, "Hey, I had this

22  discussion with, you know, my dad," something like that?

23     A.    I believe post this article coming out, Tommy

24  and I had spoken a week or two after this, and I

25  remember we -- I was talking about, you know -- you

1                    Homero Joshua Garza

2   know, just generally, you know, Stuart not being happy

3   with the way that went because we proceeded to talk

4   about other things that he might be involved in the

5   company with.  That was the -- the -- the purpose of the

6   conversation, you know, that we started by talking

7   about, you know, this -- this article.

8        Q.   Okay.

9        A.   So, obviously, he would know if his dad was

10  happy if they -- so I guess that would be the knowledge

11  I'd have.

12       Q.   Okay.  Thank you.

13            Did you have any further discussions with

14  Thomas Fraser about getting involved in GAW Miners or

15  ZenMiner following this article?

16       A.   Yes, that was the conversation I was just

17  referencing.

18       Q.   Okay.  And, obviously, Thomas Fraser never did

19  get involved with that, right?

20       A.   He -- he -- in that information, he confided in

21  me that he wasn't enjoying what he was doing, but he

22  didn't want to, you know, disappoint Stuart.

23            But at the same time, he knew that he

24  couldn't lead it, so there was just no way that we

25  could, you know, schedule-wise just make it work out.

1                    Homero Joshua Garza

2  So he had a desire to, but, no, there was no way to be

3  involved.

4       Q.   And what was he doing, was he working at Cantor

5  at the time?

6       A.   I believe so.

7       Q.   Let's -- I think earlier you had mentioned a

8  Wall Street Journal interview?

9       A.   Yes, sir.

10      Q.   Can -- can you tell me about that interview?

11      A.   I believe there were two.  One was, I think,

12 with myself and Dan Kelley, and another was with myself

13 and Stuart.  So if you could clarify to what you're

14 speaking of?

15      Q.   Sure.  Tell me about what you recall discussing

16 in the first interview.

17      A.   I don't recall much, you know, other than, you

18 know, the interview was just things about the company,

19 things the company was doing.  I think they were

20 announcement-related.  They were related to, I think,

21 BitCoin, but, unfortunately, I don't recall -- I haven't

22 seen that article in a few years, so...

23      Q.   Okay.  Here's -- I'm handing you what was

24 previously marked as Exhibit 93, which is a copy of the

25 article.

1                    Homero Joshua Garza

2              I'm just wondering if this will help you

3    remember what was discussed in the first interview.

4        A.   I'm sorry, could you clarify?  Because what was

5    discussed is what I see what was written on.  So when

6    you say "discussed," do you mean between myself and the

7    reporter or --

8        Q.   Correct.  That's what I mean.

9        A.   So, I mean, the -- the content of what we

10   discussed would be in this article.

11       Q.   So if you turn to the second page, there -- the

12   second full paragraph on that page, it starts with,

13   "When the coin opens," is that the announcement you were

14   referencing, what's contained in this second paragraph?

15       A.   Yes, sir, I believe so.

16       Q.   And this is essentially the reserve to prop up

17   the price of PayCoin; is that right?

18       A.   Yes, sir.

19       Q.   Okay.  And you mentioned that there was a

20   second interview between you, Mr. Fraser, and the

21   reporter, Michael Casey; is that right?

22       A.   I believe so.

23       Q.   When you believe so --

24       A.   I just -- what I'm not sure about is -- or not

25   clear enough about is who the interview was -- you know,

1                    Homero Joshua Garza

2     who was conducting the interview.  But I know Stuart and

3     I did another interview together.

4          Q.   Okay.  With somebody at the Wall Street

5     Journal?

6          A.   I believe, yes, sir.

7          Q.   Okay.  And --

8          A.   We had talked a great deal about both articles

9     because, you know, Stuart -- it took quite a while for

10    Stuart to give his permission to be mentioned in this

11    first article.

12         Q.   Why did it take awhile to get his permission?

13         A.   First, it took awhile, you know, because

14    Stuart, at least at the time that I -- I spent with him,

15    never liked being in a public environment or talking in

16    a public environment or -- he'd only ever really get on

17    the phone with, you know, just a handful of people.  So,

18    you know, for him to do anything public was -- was

19    always a big challenge.

20               So -- so they had to make sure that he was

21    okay with that.  But the biggest thing, it was the

22    mention here of Cantor Fitzgerald.  So, you know, to

23    mention Cantor Fitzgerald, you know, which I indicated

24    earlier, you know, Stuart had previously kept very

25    distant from the company, you know, so he had to be okay

1                  Homero Joshua Garza

2    with that.  And then if I recall, he also had to ask

3    Cantor Fitzgerald -- that's based on my memory, that he

4    had to ask them whether or not that he could even use

5    Cantor Fitzgerald in the article.  So it took quite

6    awhile to...

7        Q.    Okay.  And do you recall what was discussed the

8    second interview?

9        A.    I believe that the second interview -- I

10   believe that the second interview was actually done as a

11   reaction to the first interview because the first

12   interview -- this interview here created a backlash

13   of -- of what we call -- call trolls, but, basically, a

14   backlash of anonymous people on the Internet and so

15   forth making comments, et cetera.

16             So if I'm remembering it correctly, I

17   believe that we had to do a follow-up interview to

18   create credibility for the first interview.

19       Q.    Okay.  So let me hand you what was previously

20   marked as Exhibit 167.  So this is an e-mail thread

21   between you, Harrison Wise, Mr. Fraser, and Amber

22   Messer.  Do you see that?

23       A.    Yes.

24       Q.    Who is Harrison Wise?

25       A.    He was a -- he was a PR consultant that the

1                   Homero Joshua Garza

2   company hired.

3        Q.   Okay.  And who was Amber Messer?

4        A.   My assistant.

5        Q.   Okay.  And so you write here that -- well, I

6   guess this -- strike that.

7                 The subject line of the e-mail is "Stuart

8   will talk to him."  Is that a reference to the Wall

9   Street Journal reporter?

10       A.   That's correct.

11       Q.   Okay.  And --

12       A.   It was the first time Stuart ever agreed to

13  talk, that I can remember, talk publically, so...

14       Q.   And you write, "Off the record but to confirm

15  our stuff."  Do you see that?

16       A.   Yes, sir.

17       Q.   So what -- what did you mean by "to confirm our

18  stuff"?

19       A.   Let me look at the context.

20                 (Witness reviews document.)

21                 Unfortunately, I don't recall because the

22  context of the e-mail suggests that, you know, he would

23  be talking off the record.  But I remember he was

24  actually in the interview, so I think this refers to

25  something else or maybe he changed his mind later.  So,

1                    Homero Joshua Garza

2    unfortunately, I'm sorry, I don't remember.

3        Q.    So the interview -- strike that.

4              The second interview was on the record?

5        A.    I believe so.

6        Q.    What's your basis for that belief?

7        A.    Because I believe that -- that -- I believe

8    that the Wall Street Journal didn't -- didn't find it

9    acceptable to do an interview to have Stuart validate

10   information but have it off the record.  So there was, I

11   believe, an all or nothing.  Like either we do the

12   interview and -- and talk on the record or we don't do

13   it at all, to the best of my recollection.

14       Q.    When you say "validate the information," what

15   do you mean by that?

16       A.    The -- that information in this article, the

17   first one (indicating).

18       Q.    Okay.  And Mr. Fraser did validate the

19   information in the article?

20                    MS. CAVE:  Objection to the form.

21       A.    We -- he validated it by having the -- agreeing

22   to the second one.

23       Q.    (BY MR. WATTERSON)  And --

24       A.    Because, basically, what happened was when this

25   article got put out, there was so much backlash, I

Homero Joshua Garza

1   believe when Michael Casey got -- was concerned because

2   he had never seen anything like that.  And then he

3   contacted me to -- I believe, to do -- like "we have to

4   do something about this, this is causing a problem."

5   

6                So -- and I -- based on my memory, the

7   only thing that was going to be strong enough to, you

8   know, back this article would be to hear it from Stuart

9   himself, which is what, you know, caused me to ask him

10  whether or not he would agree to do it.

11               And I think, initially, he agreed.

12  Perhaps this is what "off the record" is talking about,

13  but I know that the Wall Street Journal wouldn't operate

14  that way.  That in order for Stuart to, you know,

15  validate and talk about, you know, the company, he'd

16  have to be on the record.

17     Q.   (BY MR. WATTERSON) And what basis did

18  Mr. Fraser have for talking about the company?

19               MS. CAVE:  Objection to the form.

20     A.   Can you rephrase?

21     Q.   (BY MR. WATTERSON)  Sure.

22               How did Mr. Fraser have knowledge about

23  the companies in order to speak to a reporter about

24  them?

25     A.   Stuart and I talked probably every two to three

1                   Homero Joshua Garza

2    days to keep him up to date on anything going on in the

3    company.  So previous companies, we talked almost every

4    day.  This company, we didn't talk quite as often, but

5    we talked -- texted probably almost every day, and we

6    talked every, you know, few days about everything going

7    on.  It was quite exciting, I mean, especially when this

8    started, so -- BitCoin was getting launched and, you

9    know, that's when he got most heavily involved, so...

10        Q.   You mean that Mr. Fraser was most heavily

11   involved when BitCoin was launched?

12        A.   He was most heavily involved when PayCoin and

13   then we talked to Cantor and, like, that was -- I mean,

14   I remember him sending me text messages every time the

15   PayCoin changed price in the market, you know.  You

16   know, like, "Hey, it's awesome, it's gone up or it's

17   gone down or whatever it is," so that was by far his --

18   his most involvement was at -- around that time.

19        Q.   Do you still have your text messages with

20   Mr. Fraser?

21        A.   It's unlikely.

22        Q.   Okay.  How -- do you know how Mr. Fraser had

23   information about the price of PayCoin?

24             MS. CAVE:  Objection to the form.

25        A.   Oh, because he was, I mean, watching it like a

1                   Homero Joshua Garza

2    hawk.  He had, like, every place -- market that PayCoin

3    was listed at, and he was all over it.

4         Q.   (BY MR. WATTERSON)   Do you know that because he

5    told you that?

6         A.   Oh, yes, sir.   Extensively.

7         Q.   Did Mr. Fraser have access to any other GAW

8    Miners sales that -- strike that.   It's a bad question.

9                   Did Mr. Fraser have access to GAW Miners

10   sales information at any point in time?

11                  MS. CAVE:   Objection to the form.

12        A.   He had access to our Shopify system, and I gave

13   him access to the administrative system that ran Zen

14   Cloud.

15        Q.   (BY MR. WATTERSON)   Okay.   And can you explain

16   what the administrative system to Zen Cloud, what that

17   meant?

18        A.   So they made an -- an account, especially, you

19   know, like -- that had different functionality than a

20   basic account so they could see, like, all of the

21   hashlets that existed.   They could see how many of each

22   nashlet existed.   They could see what the payouts were;

23   you know, what customers were owed.   It -- you know,

24   basically, it could see the aggregate of everything in

25   the system.

1                    Homero Joshua Garza

2        Q.   Do you know whether Mr. Fraser used that access

3    to view data on Zen Cloud?

4        A.   To the best of my memory, I believe so.  I

5    don't think he regularly used it because most systems,

6    he, you know, just didn't regularly use.  But I recall a

7    conversation we had that -- that went over -- you know,

8    where we talked about the -- the time, how many had been

9    sold and stuff like that.  And that day, it was only

10   available inside Zen Cloud, so I know he -- or at least

11   I believe that he used the -- the other -- Shopify a lot

12   more.

13       Q.   Okay.  Sorry about that.

14       A.   Okay.

15       Q.   Just what was Shopify?

16       A.   Shopify was how everything was sold.

17       Q.   Can you explain a little bit more?

18       A.   So Shopify is like a shopping cart system so it

19   shows, you know, like every customer purchase, how much

20   they purchase, what they purchase, things like that.

21       Q.   Okay.  And so Mr. Fraser had access to the

22   Shopify data; is that right?

23       A.   Yes, sir.

24       Q.   And how -- I guess how did he have access to

25   it?

1          Homero Joshua Garza

2      A.    It's possible I would have -- may have

3  instructed someone to provide it to him, but most likely

4  I probably gave it to him.

5      Q.    So over the phone you would relay information;

6  is that right?

7      A.    I feel like he most like -- likely, the way

8  Shopify works is when users are added, it sends an

9  invite to them so it most likely would have sent an

10 invite to him.  Stuart was very interested in, like,

11 numbers and -- growing numbers and talking about our

12 sales each day and stuff like that.

13     Q.   Did you ever show Mr. Fraser a press release

14 about GAW Miners before it going out?

15                MS. CAVE:  Objection to the form.

16     A.   It seems likely, but I do not remember.

17     Q.   (BY MR. WATTERSON) Okay.  Did you discuss --

18 ever discuss GAW Miners advertising with Mr. Fraser?

19     A.   At various times.  Sometimes, you know, I would

20 send him, like, images or, you know, things that --

21 artwork that had been created, stuff like that that I

22 thought he'd find interesting.

23                You know, usually if, like, we were

24 launching something new or a major product or something

25 like that, then we'd talk about that, and I'd send him,

1                    Homero Joshua Garza

2   like, a -- you know, an overview of how everything was

3   going to look.  You know, stuff of that nature.

4       Q.   Okay.  Did Mr. Fraser invest in GAW Miners?

5            MS. CAVE:  Objection to the form.

6       A.   Unfortunately, I don't really recall.  Money

7   that we indicated earlier was in the form of a loan from

8   Tommy, so the -- the only thing that could jog my memory

9   would be if -- you know, looking at transfers that were

10  made from him to the company.

11      Q.   (BY MR. WATTERSON)  Well, let's see if this

12  helps.  Can you turn to Exhibit 47, which is something

13  that we previously looked at.  It's -- it says

14  "Fraser-Garza Investment Deal."

15           And the front page is an e-mail, and it's

16  an e-mail that is -- has an attached Excel spreadsheet,

17  and, then, so in this document, the second page is the

18  Excel spreadsheet.

19           So I'm just wondering if this document

20  helps you with whether Mr. Fraser made any investments

21  in GAW Miners?

22      A.   Yeah, he would have made a $135,000 investment.

23      Q.   Okay.  And to the left, it says "Fraser to

24  Garza Payments."  What -- what does that represent?

25      A.   It was the money we talked about earlier that

1                    Homero Joshua Garza

2    he was gifting.

3        Q.    Okay.

4                    THE REPORTER:  Earlier?

5        A.    Earlier in the questioning, you'd asked me

6    about the transfers that were directly to me, so those

7    amounts were the money that he was -- you know, the

8    arrangement we had made where he was gifting them

9    directly to me.

10       Q.    (BY MR. WATTERSON)  Okay.  And did

11   Mr. Fraser -- well, strike that.

12                   Apart from the loan involving Scott

13   Fraser, did Mr. Fraser make any loans to GAW Miners?

14       A.    Besides that loan?

15       Q.    Yes.

16       A.    It's possible.  I don't recall.

17       Q.    Did Mr. Fraser let you use a Plum Card that he

18   had?

19       A.    Oh, yeah.  Right, his -- the American Express.

20                   Yes, so -- but I don't think that was

21   loaned because I believe that he paid those off.

22                   THE REPORTER:  What kind of card?

23                   MR. WATTERSON:  A Plum.

24                   THE WITNESS:  American Express Plum Card.

25       Q.    (BY MR. WATTERSON) And was the Plum Card in

1               Homero Joshua Garza

2   Mr. Fraser's name or in your name?

3        A.   I can't remember.

4             I feel like I had American Express -- I

5   had one in my name, but -- you know, but I'm not stating

6   whether or not I was the main account holder or not.  I

7   just remember having American Express of my own.  But I

8   also had an American Express -- or it may be the same

9   one I'm thinking of, but I -- I know I was on or had

10  access to his personal -- like his American Express for

11  himself.

12            Because there was a couple situations

13  where too much had been charged on his card for his

14  family, you know, like his own card and -- or more than

15  he knew about or thought that it was going to be there

16  or whatever and -- and -- and the card got turned off.

17  And then he got really mad because, you know, it was his

18  card and then had made it to where -- like Elise had

19  purchased things and stuff, so -- so I know I had at

20  least a company card, and then we had access to his

21  cards.

22       Q.   And did you use his personal card for GAW

23  Miners business expenses?

24       A.   I don't recall specifically.  It's very -- I

25  mean, if I had it, it's very likely, but I don't recall

                        Homero Joshua Garza

1 specifically.  It's mainly the dates that I'm not sure

2 of because there was a time where the card -- his card

3 got turned off because of lack of payment, and American

4 Express wouldn't allow it to be turned back on at all.

5 So he called Cantor and Cantor, you know, used their

6 leverage with American Express to get his card turned

7 back on again.  I just don't recall when that was.

8           MR. WATTERSON:  This -- we'll mark this as

9 Exhibit 242.

10           (Exhibit 242 marked.)

11      Q.   (BY MR. WATTERSON)  Here you go (indicating).

12           So this is an e-mail -- e-mail thread from

13 Mr. Fraser to you, and it references a $391,000 balance.

14 Do you see that?

15      A.   Yes, sir.

16      Q.   Is this a reference -- do you know what --

17 strike that.

18           Do you know whether this is a reference to

19 Mr. Fraser's personal card or the Plum Card?

20      A.   I, unfortunately, don't remember.  I -- the

21 only thing I would be able to know is that it would be

22 in reference to a card where he was the -- you know,

23 like, it was his credit or he was the main holder of the

24 card.  Otherwise, he wouldn't have cared about the

1                    Homero Joshua Garza

2    balance, so -- because I don't even remember if he was

3    the main person on the Plum Card or not.

4              So I know that doesn't completely answer

5    your question, but the -- the best I can remember is

6    that, you know, he was the -- the main account.  You

7    know, like, he formed the account to be in with.

8       Q.   How would you describe Mr. Fraser's role in GAW

9    Miners?

10             MS. CAVE:  Objection to the form.

11      A.   I would describe it, you know, similar to the

12   role that he had when we first, you know, got -- became

13   partners in Optima, where, you know, he and GAW Miners

14   and, like, other companies, he wasn't reaching around me

15   or -- and getting people to do things directly.  The --

16   you know, his role was a lot more from him to me.

17             You know -- you know, still, you know,

18   regularly, you know, talking and going through, you

19   know, because he essentially wanted to know what

20   happened every day, you know, but it was -- so it's

21   quite a bit more than a normal -- like a regular

22   investor, but not quite as, you know, much as the

23   previous companies.

24      Q.   (BY MR. WATTERSON) And is it fair to say that

25   this main difference was that he wasn't interacting as

1                    Homero Joshua Garza

2     much with the other employees?

3                    MS. CAVE:  Objection to the form.

4        A.    To be honest, the main difference was when --

5     when I came interested in cryptocurrency, unlike other

6     things, you know, I sort of explored more of it as a

7     side project -- you know, something I did on my own.

8     And then, you know, it got really big really fast, and

9     so my general perspective on GAW Miners was we were more

10    like equals, you know.

11                    And so I think the main reason that his

12    role was different is just more because I didn't, at

13    this company, you know -- you know, it wasn't a company

14    that he had dumped $5 million into and then I was

15    underneath, you know, like, you know, we -- I felt like

16    we were more, you know, actual partners in this company,

17    you know, versus in the previous companies.

18                    So, you know, I think it was more the --

19    the nature of our interactions were different.

20       Q.   (BY MR. WATTERSON)  Do you know whether

21    Mr. Fraser tried to solicit any investments in GAW

22    Miners?

23                    MS. CAVE:  Objection to the form.

24       A.    I believe so.  I believe I -- I thought I

25    saw -- it might have been in one of the -- no, maybe it

Page 144

1                    Homero Joshua Garza

2   wasn't here, but -- I mean, there was an e-mail chain I

3   was copied on where he had reached out to a bunch of

4   people he knew that -- you know, asking about, you know,

5   potential investment in the company.

6      Q.   (BY MR. WATTERSON) So the basis of your belief

7   is that e-mail?

8      A.   The basis of the belief is that e-mail.  That

9   he also mentioned that he'd talked to Howard about it,

10  about making an investment.  Potentially others, but

11  those are the ones I recall specifically.

12     Q.   Do you recall any discussions between you and

13  Mr. Fraser about PayCoin?

14     A.   Yes.

15     Q.   Can you tell me what you remember about those

16  conversations?

17               MS. CAVE:  Objection to the form.

18     A.   Everything from the name of the coin to the

19  content of how it would be distributed, the

20  difference -- then by that time, I would have known,

21  like, staking versus all that stuff.  Because, you know,

22  PayCoin protocol was, you know, discussed with Cantor

23  so, you know, he was a -- that's what I meant by he was

24  a lot more heavily involved in to help shape, you know,

25  what got brought in.

1              Homero Joshua Garza

2              I mean, the biggest thing to understand

3    was nothing would get brought in front of Cantor unless

4    he was -- like, he knew everything about it and had been

5    heavily involved.  So since PayCoin was the main thing,

6    he -- that was the main thing we, you know, worked with

7    each other on.

8         Q.   (BY MR. WATTERSON)  Did you discuss the $20

9    floor with Mr. Fraser?

10        A.   I don't specifically remember.

11             If it's in one of the articles, the Wall

12   Street Journal articles, then we would have because we

13   discussed those articles at length.  But if it's not in

14   any of the articles, I'm not sure.

15        Q.   Okay.  Did you discuss the reserve fund with

16   Mr. Fraser?

17        A.   It would have -- you know, in the -- I believe

18   in the article, it mentioned both the -- like the floor

19   price and the reserve funds, so, yes, it would have

20   been -- we would have discussed that as well because we

21   discussed the whole article.

22             MR. WATTERSON:  Can we just take a quick

23   break?

24             THE VIDEOGRAPHER:  Off the record at 2:53.

25             (Recess from 2:53 p.m. to 3:02 p.m.)

Page 146

Homero Joshua Garza

1                    THE VIDEOGRAPHER:  On the record at 3:02.

3       Q.    (BY MR. WATTERSON)  Mr. Garza, why should

4   anyone believe your testimony today?

5                    MS. CAVE:  Objection to the form.

6       A.    Because I have an obligation to try, you know,

7   to present and provide as accurate information as

8   possible relative to everything that's happened at GAW

9   Miners.  It hurt a lot of people.  I've, you know, read

10  letters from the people that it hurt, and so I have an

11  obligation to make sure that any responsibility is --

12  that I have in it is -- is as accurate as I -- it can

13  be.

14      Q.    (BY MR. WATTERSON)  You were at one point a

15  defendant in this lawsuit, correct?

16      A.    Yes, sir.

17      Q.    And the plaintiffs dismissed you as defendant,

18  correct?

19      A.    Yes, sir.

20      Q.    And are you beholding to the plaintiffs for

21  doing that?

22                   MS. CAVE:  Objection to the form.

23      A.    Could you rephrase?

24      Q.    (BY MR. WATTERSON)  Sure.

25                   You don't -- the fact that the plaintiffs

Page 147

1                    Homero Joshua Garza

2    dismissed you from this lawsuit didn't affect your

3    testimony in any way, correct?

4              MS. CAVE:  Objection to the form.

5         A.   I'm saying plaintiffs are involved in this

6    lawsuit.  It's public record.  I testified at my court

7    hearing.  And, you know, it's also public knowledge that

8    now I'm serving an incarceration sentence, so, no, I

9    mean, I -- I just have to be objective and, you know,

10   try to answer it, I mean, regardless of, you know, who's

11   done what.  You know, just, you know, do right by the

12   victims that suffered from all of this and try to be as

13   accurate as possible.

14        Q.   (BY MR. WATTERSON)  You testified earlier that

15   you were once friends with Mr. Fraser, but you aren't

16   any longer, right?

17        A.   Yes, sir.

18        Q.   That didn't affect your testimony, right?

19             MS. CAVE:  Objection to the form.

20        A.   No, sir.

21             MR. WATTERSON:  Thank you very much.  I

22   appreciate your time.  Pass the witness.

23                      EXAMINATION

24   QUESTIONS BY MS. CAVE:

25        Q.   Mr. Garza, my name is Sarah Cave and I'm with

1                         Homero Joshua Garza

2    Hughes Hubbard, and we represent Stuart Fraser, who's

3    the remaining defendant in this case.

4                    Mr. Watterson just asked you about your

5    being dismissed from this case.  So do you have a --

6    under -- was there an agreement with the plaintiffs for

7    you to be dismissed as a defendant from this case?

8        A.    Yes, ma'am.

9        Q.    Was that in writing?

10       A.    Yes, ma'am.

11       Q.    Do you have a copy of that agreement?

12       A.    I believe I have one in my possession.

13       Q.    Okay.  Would you be willing to provide that to

14   us?

15       A.    Yes, ma'am.

16       Q.    Okay.  Thank you.

17                    And what does that agreement provide?

18       A.    I don't remember the -- absolutely every word

19   of it, but essentially, you know, that the agreement was

20   that I made myself available for -- you know, to answer

21   questions, you know.  I'd be guessing if I said more

22   than that, but I know that in essence is that I need to,

23   you know, provide truthful and accurate information that

24   I'm being asked for.

25                    MR. WATTERSON:  Can we go off the record

Page 149

1                    Homero Joshua Garza

2    real quick?

3                    MS. CAVE:  Sure.

4                    THE VIDEOGRAPHER:  Off the record at 3:07.

5                    (Recess from 3:07 p.m. to 3:08 p.m.)

6                    THE VIDEOGRAPHER:  On the record at 3:08.

7                    (Exhibit 243 marked.)

8         Q.    (BY MS. CAVE)  So, Mr. Garza, I'm handing you

9    what's been marked as Exhibit 243.  Is this the

10   agreement that we were just discussing a moment ago?

11        A.    Yes, ma'am.

12        Q.    And on page 2 of that document, is that your

13   signature?

14        A.    Yes, ma'am.

15        Q.    And did you review this document before you

16   signed it?

17        A.    Yes, ma'am.

18        Q.    Did you review this with your -- with an

19   attorney?

20        A.    Yes, ma'am.

21        Q.    Did you make any changes to the agreement

22   before you signed it?

23        A.    I do not recall.  If they had been, they would

24   have been done by my attorney, but I don't recall.

25        Q.    And which attorney was that?  Ms. Peerce?

Page 150

1                    Homero  Joshua  Garza

2          A.     Yes, ma'am.

3          Q.     Okay.   And did you have any discussions

4    yourself with the plaintiffs about this agreement or was

5    it just through your attorney?

6          A.     I believe that it was through Ms. Peerce.

7          Q.     Okay.   Just bear with me one second.   I haven't

8    seen this document before.

9          A.     That's fine.

10         Q.     Do you know whether the -- the date of this

11   agreement is October 20th, 2016.   Do you know whether

12   this was before or after you met in person with

13   Mr. Watterson?

14         A.     This was before.

15         Q.     Had you yourself met with -- met with any of

16   the plaintiffs' counsel before you signed this

17   agreement?

18         A.     None.   Not that I can remember.

19         Q.     And in paragraph 1, it refers to -- it says,

20   "The plaintiffs will dismiss without prejudice all

21   claims asserted against Mr. Garza in the

22   above-referenced action."

23                Do you see that?

24         A.     Yes, ma'am.   Yes, ma'am.

25         Q.     Do you understand what "without prejudice"

1                    Homero Joshua Garza

2    means?

3        A.    Probably not as well as you do.

4        Q.    Well, the agreement, then, goes on to say, "If

5    the Court in Connecticut presiding over this action

6    determines there has been any such material breach or

7    that any representation by Mr. Garza is materially false

8    or misleading, Mr. Garza agrees that if the named

9    plaintiffs seek to reinstate him as the defendant," and

10   it goes on.

11                   So do you understand that the plaintiffs

12   have the ability to bring you back in as a defendant in

13   this case?

14       A.    Yes, ma'am.

15       Q.    So what cooperation have you provided to the

16   plaintiffs in exchange for this agreement?

17       A.    I've met with Mr. Watterson, you know, once

18   before this meeting here today, and provided all the

19   documentation that I had put together that related to

20   Stuart as it related to GAW Miners.

21       Q.    And what documentation did you provide to the

22   plaintiffs?

23       A.    Any -- any correspondence that I could find

24   that related to Stuart.

25       Q.    And where did you search for that

1                    Homero Joshua Garza

2  correspondence?

3       A.   E-mail, text, you know, any form of

4  communication.

5       Q.   And when did you provide that information?

6       A.   When we met.

7       Q.   And when was that meeting?

8       A.   I don't recall the exact date.

9       Q.   Was it some -- well, do you recall how long it

10  was after you entered this agreement?

11      A.   I feel like maybe a month or two or something

12  like that.

13      Q.   And when you met with Mr. Watterson, was anyone

14  else present?

15      A.   No.

16      Q.   Was there a transcript of that taken?

17      A.   I do not recall.

18      Q.   Did you take any notes of that meeting?

19      A.   No, I didn't personally.

20      Q.   Did you speak to anyone else about what you

21  discussed with Mr. Watterson?

22      A.   My attorney, yeah, Marjorie.

23      Q.   I'm not asking for any conversations that you

24  had with your -- with your attorney, but anybody other

25  than that?

Homero Joshua Garza

1   A.   That's all I can remember right now.

2   Q.   Did you send any e-mails or any text messages

3   after your meeting with Mr. Watterson about what you

4   discussed, other than with your attorney?

5   A.   Other than with my attorney, not that I can

6   remember.

7   Q.   And how long was your meeting with

8   Mr. Watterson?

9   A.   I feel like between -- I believe two to three

10  hours.

11  Q.   Do you recall what Mr. Watterson asked you?

12  A.   Some of the things.

13  Q.   Okay.  Can -- tell me what you remember about

14  what he asked you.

15  A.   A lot of the things he asked me, he asked me

16  today.  A lot of them were just things about how well

17  Stuart and I knew each other, how long -- you know, how

18  long we knew -- you know, just a lot of things about

19  the -- I guess the nature of our relationship.

20           I think that was the -- the bulk of it.

21  There was def- -- likely more, but that's what I

22  remember definitively, that it was just a lot about, you

23  know, how Stuart and I's relationship was at various

24  times and things like that.

1                    Homero Joshua Garza

2        Q.    And the -- the plaintiffs then did, in fact,

3    amend the complaint and drop their claims against you,

4    correct?

5        A.    I believe so, yes, ma'am.

6        Q.    Have you seen the first amended complaint in

7    this case?

8        A.    Yes, ma'am.

9        Q.    Did you --

10       A.    I believe so.

11       Q.    Did you review the new allegations that the

12   plaintiffs put in the complaint?

13       A.    Can you clarify, please?

14       Q.    Yeah.  So the plaintiffs amended their

15   complaint using information that you had provided --

16       A.    Yes, ma'am.

17       Q.    -- to Mr. Watterson?  Did you review those new

18   allegations in the complaint?

19       A.    Yes, ma'am.

20       Q.    And did you -- were those true and accurate, as

21   far as you know?

22       A.    Yes, ma'am.

23       Q.    Now, your -- you discussed -- I guess you

24   exchanged e-mails with Mr. Watterson about appearing

25   here today for your -- your deposition?

1                         Homero Joshua Garza

2         A.    Yes, ma'am.

3         Q.    And you're appearing voluntarily, correct?

4         A.    Yes, ma'am.

5         Q.    There's no court order or subpoena that

6    requires you to be here?

7         A.    No, ma'am.

8         Q.    Did plaintiffs' counsel promise you anything in

9    exchange for your appearing here today?

10        A.    No, ma'am.

11        Q.    Are they reimbursing you for any of your

12   expenses?

13        A.    No, ma'am, not that I know of.

14        Q.    What phone -- you referred earlier to a lot of

15   conversations you had with Stuart Fraser.  What phone

16   did you use to have those conversations?

17        A.    It would have been my old Vermont number

18   that -- which would have been through Google Voice, and

19   that's -- the question was asked earlier if I had access

20   to.  That's the one I think I -- I lost because, you

21   know, I don't use -- I don't have a Vermont number

22   anymore.

23        Q.    Okay.  And by your Vermont number, do you

24   remember what that number was?

25        A.    (802)579-8360.

1                    Homero Joshua Garza

2      Q.   Okay.  Thank you.

3                    Earlier today, you mentioned that you gave

4    testimony to the SEC.  Do you recall that?

5      A.   Yes, ma'am.

6      Q.   Was there a court reporter present taking a

7    transcript of that?

8      A.   Yes, ma'am.

9      Q.   And you said you don't have a copy?

10     A.   I do not believe so.

11     Q.   Does your attorney, do you know?

12     A.   Marjorie, it's possible.

13     Q.   If she has a copy, would you authorize her to

14   provide that to us?

15     A.   Yes, ma'am, I will.

16     Q.   Okay.  You mentioned that your first

17   interaction with Mr. Fraser was in connection with

18   installing Internet at his house in Vermont?

19     A.   It was his lake house.  Yes, ma'am, it was his

20   campground there.

21     Q.   And how did you learn to install Internet?

22     A.   Well, specifically, I was actually there to set

23   up a Wi-Fi system for the campground.  And in order for

24   that to work, then I would need Internet access so -- so

25   the Internet company was the one who installed the

Page 157

Homero Joshua Garza

1   Internet, and I was there to install Wi-Fi access

2   points.

3   Q.   Okay.  And how did you learn to install Wi-Fi

4   access points?

5   A.   Just informally.  You know, I've just been

6   doing technology and stuff for -- since I was a kid,

7   so...

8   Q.   Before your -- the project that you did at

9   Mr. Fraser's lake house, how long had you been involved

10  with the Wi-Fi installation business?

11  A.   Probably three or so years, three or more

12  years.

13  Q.   How long after you met Mr. Fraser did you set

14  up the -- the wireless -- sorry.

15          The Optima Computer business, did that

16  exist at the time you first met Mr. Fraser or --

17  A.   Yes, ma'am.

18  Q.   Okay.  And how long had that business been in

19  operation?

20  A.   I -- I don't recall specifically.  Probably

21  about a year and a half, maybe two years.

22  Q.   Okay.  And was that an LLC or some other

23  corporate entity?

24  A.   It was likely an LLC.

1                          Homero Joshua Garza

2       Q.    And did you set that up yourself?

3       A.    Yes, ma'am.

4       Q.    And how -- how did you go about setting up the

5  LLC?

6       A.    Unfortunately, I don't quite remember.  It's

7  too long ago.

8       Q.    Did you have an attorney assist you or did

9  you --

10      A.    Probably, yes, ma'am.

11      Q.    -- do it yourself?

12             Do you recall which -- who that would have

13  been?

14      A.    It likely would have been an attorney named

15  Chris Dugan.

16      Q.    What's that?

17      A.    Chris Dugan.

18      Q.    Okay.  And where is Chris located?

19      A.    In Brattleboro, Vermont.

20             THE REPORTER:  I'm sorry?

21             MS. CAVE:  Brattleboro, Vermont.

22             THE REPORTER:  Thanks.

23      Q.    (BY MS. CAVE)  And where did Optima Computers

24  operate out of?

25      A.    In Brattleboro, Vermont.

1                    Homero Joshua Garza

2        Q.    Did it have its office or was it out of your

3    home?

4        A.    At first, it started out at my home, and

5    then -- but it was -- then we had an office in

6    Brattleboro, and that's where we mainly operated out of.

7        Q.    Did you have -- were there employees other than

8    yourself?

9        A.    Yes, ma'am.

10       Q.    And how many employees were there?

11       A.    I think one -- one, possibly two.

12       Q.    And what did those employees do?

13       A.    Just technical support and -- type stuff.  We

14   repaired computers and built networks and things like

15   that.

16       Q.    How did those two employees come to work for

17   Optima Computers?

18       A.    I think back then it was just word of mouth.  I

19   met a friend who found out, you know, we needed help,

20   and he just told me about somebody.  You know, it was

21   just word of mouth.

22       Q.    How did you know -- how did you determine who

23   did what projects at Optima Computers?

24       A.    I don't know if we had a formal system, other

25   than whoever could do it.

1                    Homero Joshua Garza

2       Q.   And where did you get your business from?  In

3   other words, did you advertise --

4       A.   Oh, right.  It was mainly word of mouth.  I

5   think by then, we probably were able to afford some

6   amount of advertising, but it was mainly word of mouth.

7       Q.   And did you have a website for Optima

8   Computers?

9       A.   Yes, ma'am, I believe so.

10      Q.   And how did that come to exist?

11      A.   I think we built it in-house at first.

12      Q.   And when you say "we," who was that?

13      A.   Myself and the other employee I mentioned.

14      Q.   Okay.  And what was that employee's name, sir?

15      A.   Nick.

16      Q.   Nick?

17      A.   Yes, sir -- yes, ma'am.

18      Q.   And so you and Nick built a website?

19      A.   I believe so, yes, ma'am.

20      Q.   And did people call you or e-mail you with jobs

21  or how would they come in the door?

22      A.   Usually, back then, it was just mainly walk-in,

23  consumer walk-ins.  Like, people would have heard about

24  us, maybe from a friend or something like that, and

25  they'd bring their computer to us to repair.

Homero Joshua Garza

1  Q.   And how did you decide who did which jobs that

2  came in the door?

3  A.   I -- I don't know that we had a formal system.

4  I think it was just whoever was available to do it.

5  Q.   Were you doing the repairs yourself or were

6  the -- was Nick doing the repairs and you were kind of

7  overseeing the business?

8  A.   Oh, I was doing repairs myself.

9  Q.   Who maintains the website?

10  A.   Who maintained it at that time?

11  Q.   Uh-huh.

12  A.   It would have been us, either myself or Nick.

13  Q.   And did that change at some point?

14  A.   Oh, yes, ma'am.

15  Q.   And who -- what -- what change happened with

16  the maintenance of the website?

17  A.   Well, once, you know, Stuart got involved,

18  then, you know, the company, you know, we had a lot more

19  people, so -- so it changed.  I think Adrian was

20  responsible for the website for the majority of the time

21  afterwards.

22  Q.   And how did you meet Adrian?

23  A.   I feel like I knew him already.  I believe that

24  I -- we knew each other somehow before at a company --

1                    Homero Joshua Garza

2    the company, so -- but I don't recall, to be honest.

3        Q.   At what point in time did you grow from the

4    business being just you and Nick to Adrian joining?

5        A.   After Stuart got involved.

6        Q.   And when was that?

7        A.   I'm sorry, I don't remember the specific time.

8        Q.   And how many employees did Optima Computers

9    have total?

10       A.   When it was -- had the most employees?

11       Q.   Was bigger, yes.

12       A.   Probably somewhere being 15 to 20.

13       Q.   Okay.  And where did those employees come from?

14   How did they come to be employed with you?

15       A.   After that point, the company got larger.  Then

16   we would just use traditional hiring methods like

17   articles -- you know, things in the newspaper or

18   monster.com, things like that, so...

19       Q.   And who crafted the -- the job listings?

20       A.   I'm not sure -- most likely our COO, Gregg

21   Noble.

22       Q.   Did you interview people before they joined the

23   company, Optima Computers?

24       A.   It would depend on the position, but it's --

25   there's a good chance most people, I would have

                    Homero Joshua Garza

1    interviewed.

3    Q.   And when the company was -- when Optima

4    Computers was between 15 and 20 employees, was there a

5    more formal system for allocating projects?

6    A.   Most likely.

7    Q.   Did you have a title at Optima Computers?

8    A.   Yes, ma'am.

9    Q.   What?

10   A.   It was CEO.

11   Q.   CEO?

12   A.   Yes, ma'am.

13   Q.   So what was the more formal system for

14   allocating projects?

15   A.   It -- it -- I wouldn't have in-depth knowledge

16   because it would have been probably two or three layers

17   below me.  So it would have been the person who, like,

18   ran our tech center.  I think -- his name was Grant and

19   he would have probably been the person in charge of

20   that.

21   Q.   Okay.  So at -- you said there were two or

22   three layers.  What was the first layer below you?

23   A.   Officers, myself, CEO, CTO, and COO.  And then

24   we had like -- basically, like, managers of, like,

25   different things, you know, like on-site work, in-house

1                    Homero Joshua Garza

2    computer work, and then there was the people that worked

3    beneath them.

4        Q.   And everyone reported up to you?

5        A.   Well, I mean, they reported to their

6    supervisors, who reported to their managers, who

7    reported to either myself or Gregg.

8        Q.   I'm sorry, Gregg's title again was?

9        A.   COO.

10       Q.   COO?

11       A.   Yes, ma'am.

12       Q.   And how long did Optima Computers exist in the

13   state of having about 15 to 20 employees?

14       A.   I don't remember.  The -- the best guess is

15   around two years.

16       Q.   Does Optima Computers still exist?

17       A.   No.

18       Q.   What happened to it?

19       A.   I mean, there's a few reasons, but the main

20   reason is because by that point, you know, Great Auk had

21   been created, and so there was -- it just -- too much

22   focus -- you know, all the focus moved to Great Auk so

23   the business, you know, just kept getting smaller and

24   smaller and smaller, and so eventually it just became

25   nonsustainable.

1                    Homero Joshua Garza

2       Q.   Was Optima Computers dissolved at some point?

3       A.   I believe so, yes, ma'am.

4       Q.   And do you know how that was done?

5       A.   I think -- I think the same attorney did it, I

6    believe.

7       Q.   Okay.  Mr. Dugan?

8       A.   I believe so.

9       Q.   Do you recall when that was?

10      A.   I'm not sure.  I feel like it wasn't dissolved

11   the -- like, it wasn't dissolved as soon as it should

12   have been because I had to pay taxes or something

13   after -- like way after it should have been dissolved.

14   So after I paid it, then it got resolved then, so, I

15   mean, unfortunately, I don't remember.  Maybe like five

16   or six years ago.

17      Q.   Okay.  Why did you have to pay taxes?

18      A.   Because Optima, I believe -- you know, it was

19   Optima, that it would have had a quarterly sales and use

20   tax so -- and if you don't file anything, then they

21   estimate what your sales and use tax is, so...

22      Q.   And that's -- those were Federal taxes or state

23   taxes?

24      A.   I believe they're state taxes.

25      Q.   And so you were in charge of paying those

1                    Homero Joshua Garza

2   taxes?

3        A.   Unfortunately, yes.

4        Q.   And about how much was that, do you recall?

5        A.   I don't remember it because I remember they

6   put -- they put a lien on my house, but it was -- I

7   don't remember.  Probably between 5- and 10,000 maybe.

8        Q.   But, ultimately, you paid that?

9        A.   Yes, ma'am.

10       Q.   You mentioned your house.  So, personally, when

11  did you buy that house?

12       A.   I don't remember.

13       Q.   At some point, you said that Mr. Fraser gave

14  you a -- a loan -- or replaced the loan on that house;

15  is that right?

16       A.   Yes.  Yes, ma'am.

17       Q.   Is it just one house that we're talking about,

18  or were there different houses over time?

19       A.   So it was -- when I originally got it, it was

20  split into three different notes because it was

21  technically condo'd (phonetic) as three different

22  properties, so -- but it was still like one unit, just

23  three different properties.

24       Q.   Okay.

25       A.   So he was kind enough to lend me the money so I

1                    Homero Joshua Garza

2    could take the note away, so...

3        Q.   Do you still own that house now?

4        A.   No.

5        Q.   What happened to it?

6        A.   I had to sell it.

7        Q.   Did you earn money on the sale?

8        A.   Relative to what I originally paid, no, ma'am.

9        Q.   There was -- about how long was your -- was the

10   active part of the business involving the wireless?  In

11   other words, the -- the Great Auk, GAW HSI, GAW Labs,

12   VoiceProdigy, the period of time, about how long was

13   that?

14                    MR. WATTERSON:  Object to form.

15       A.   I believe -- I'm guessing five to seven years

16   maybe.

17       Q.   (BY MS. CAVE)  At some point did you become

18   disinvolved with the wireless business?

19       A.   Yes, ma'am.

20       Q.   And when was that?

21       A.    It was towards the -- well, I think the

22   business still exist -- Great Auk still existed in some

23   form, but I -- but it was probably about five, six

24   months, something like that, I'm guessing, before GAW

25   Miners started.

Page 168

Homero Joshua Garza

1     Q.    And what did you do in between that -- in that

3 five- or six-month period?

4     A.    That's when I was more involved with, like,

5 Smart Tech.  You know, that's kind of what I did on --

6 instead.

7     Q.    Okay.  And Smart Tech is which -- was that an

8 LLC or an S corp or some other form?

9     A.    I don't remember, unfortunately.

10     Q.    Did you set it up as a formal entity?

11     A.    I be -- I'm pretty sure it was a formal entity.

12     Q.    And what was your title at Smart Tech?

13     A.    I was the CEO, probably.

14     Q.    Were there other employees of Smart Tech?

15     A.    Yes, ma'am.

16     Q.    And how many employees were there?

17          MR. WATTERSON:  Objection.  Form.

18     A.    Three -- three to four.

19     Q.    (BY MS. CAVE) And how did they come to work for

20 Smart Tech?

21     A.    One, I already knew.  And I believe the others

22 came through normal -- like, putting ads up and things

23 like that.

24     Q.    And were those ads that you had placed?

25     A.    Either -- it's unlikely I would have personally

Homero Joshua Garza

1    placed them, so it would have been a resource from Great

2    Auk Wireless or somebody else that already worked there,

3    so...

4        Q.   And what were the different -- what were the

5    different employees -- did the employees each have

6    different responsibilities at Smart Tech?

7        A.   Yes, ma'am.  One was a technical person, like,

8    that went out and installed and built things, and then

9    two were salespeople.

10       Q.   And did you oversee what each of them did?

11       A.   Well, the same Dan Kelley was the COO there, so

12   he -- they likely would have reported to him, so...

13       Q.   So is the -- the line of reporting the -- two

14   employees to Dan Kelley and then Dan Kelley to you?

15       A.   Yes, ma'am, I believe so.

16       Q.   Okay.  When was GAW Miners first set up as an

17   entity?

18       A.   I believe that it was the beginning of 2014.

19       Q.   And it was set up as an LLC?

20       A.   I believe so.

21       Q.   And were you involved in that process?

22       A.   Can you clarify "involved"?

23       Q.   Sure.

24            The formation of GAW Miners as an entity,

1           Homero Joshua Garza

2   were you involved in that?

3       A.   Right.  But can you clarify, like, "involved"?

4   Like did I draft, like, the papers or...

5       Q.   Any type of involvement.

6       A.   Likely would have signed the papers for the

7   formation of the company.

8       Q.   Someone else drafted the papers for you?

9       A.   Yes, ma'am.

10      Q.   And who -- who was that?

11      A.   Probably Dan Pease would be my guess at the

12  time.  He did that kind of stuff.

13      Q.   And when did you first meet Dan Pease?

14      A.   Dan Pease was an employee of Optima.  Yeah, he

15  was one of the employees that we hired when we -- you

16  Stuart became involved when we expanded so probably --

17              THE REPORTER:  I'm sorry.

18              THE WITNESS:  I'm sorry.

19      A.   Dan Pease was an employee of Optima Computers,

20  and he would have started after Stuart was involved, so

21  maybe five or six years before then.

22              I'm sorry, I'm kind of guessing.

23      Q.   (BY MS. CAVE)  Okay.  And what was -- what was

24  Dan's role at Optima Computers?

25      A.   I believe that he was hired as a technician.

1             Homero Joshua Garza

2        Q.    And then did Dan Pease have some role at the

3    wireless companies, any of the wireless companies?

4        A.    A lot of people from Optima eventually moved

5    over, so, yes, ma'am, he moved over.

6        Q.    And then he moved over to GAW Miners as well?

7        A.    Yes, ma'am.

8        Q.    And what was Dan Pease's title at GAW Miners?

9        A.    I think he was the general manager.

10       Q.    And what was -- what were his responsibilities

11   as general manager?

12       A.    I think he mainly assisted in day-to-day

13   operations.  But he had -- he wore a lot of different

14   hats, though, he did a lot of different things.

15   Mainly -- mainly administrative, like bank accounts and,

16   you know -- I mean the administrative.

17       Q.    Did he report to you?

18       A.    He -- I believe that he would have reported to

19   Dan Kelley.

20       Q.    And did Dan Kelley report to you at GAW Miners?

21       A.    Yes, ma'am.

22       Q.    And your title at GAW Miners was CEO?

23       A.    Yes, ma'am.

24       Q.    Was it ever anything other than CEO?

25       A.    I do not think so.

1                     Homero Joshua Garza

2      Q.   So how did you first hear about mining?

3      A.   I do not recall.  Like most -- most likely I

4  would have read it in an article or something like that.

5      Q.   And what did you do in response to that

6  article?

7      A.   I would have researched it more, and then I

8  think I -- you know, that's how I became interested in

9  it, and then which led me to buy a miner.

10      Q.   What research did you do?

11      A.   Just -- I mean, just like -- just like Googling

12  it, you know, researching it all.

13      Q.   Did you speak to anybody involved in mining at

14  that time?

15      A.   At that time?

16      Q.   Yeah.

17      A.   I don't remember.  Maybe.  I'm not sure.  I

18  don't remember.

19      Q.   How did you determine which mining hardware to

20  purchase?

21      A.   Just research.

22      Q.   And you just bought one machine initially?

23      A.   I believe so, yes, ma'am.

24      Q.   And at some point, did you buy more?

25      A.   I -- yes, ma'am, I think so.

Homero Joshua Garza

1

2  Q.   How long after you bought your first machine
3  did you buy any more machines?

4  A.   It wasn't very long.  I feel like it was just a
5  few weeks, something like that.

6  Q.   And where did you have those mining machines?

7  A.   Originally, at my house.

8  Q.   And at some point did that change?

9  A.   Yes, ma'am.

10  Q.   And when did that change?

11  A.   Oh, I don't know how long it was, but,
12  eventually, I moved into the office because --

13  Q.   Which --

14  A.   -- it took so much power.

15  Q.   And which office was that?

16  A.   It was the office we originally set up for
17  Smart Tech.

18  Q.   And where's that office located?

19  A.   It was in -- I can't remember the name of the
20  town.  I'm sorry.

21  Q.   Which state was it in?

22  A.   It was Massachusetts.

23  Q.   Okay.  And were you living in Massachusetts at
24  that time?

25  A.   Yes, ma'am.

1        Homero Joshua Garza

2       Q.   In which town in Massachusetts did you used to

3   live in?

4       A.   That's what I was trying to remember because

5   they were, like, right next to each other.  I can't

6   remember, though.  If I heard the name, I would

7   remember, but...

8       Q.   That's okay.

9            When you installed the mining -- when the

10  mining -- when you bought the mining machine, did you

11  install it yourself or did you have someone do it for

12  you?

13      A.   Oh, I installed it myself.

14      Q.   Okay.  And when you moved it from the -- the --

15  your house to the office, did you do the installation?

16      A.   Most likely.

17      Q.   And is that the case, the same with the other

18  machines that you bought, you installed them yourself?

19      A.   It's more likely that as I got more machines, I

20  would have had someone technical get involved and help

21  install them.

22      Q.   But you knew generally how to install the

23  machines?

24      A.   Yes, ma'am.

25      Q.   And what about maintenance on the machines, did

1                     Homero Joshua Garza

2    you do that?

3        A.   I don't remember because I don't remember there

4    ever being maintenance.

5        Q.   I guess I should back up and ask:  Is there

6    maintenance that needs to be done on a hardware machine?

7        A.   I can't -- I don't remember anything like that

8    happening.  They just worked.  I mean, I don't think we

9    really had to do maintenance until we had way more

10   miners than that, so -- so at that time, I don't think

11   there -- there was maintenance.

12       Q.   Did you ever build a miner yourself?

13       A.   I don't know because I'm not sure if I can.

14   Not that I can recall.

15       Q.   Okay.  Do you know if Mister -- when did you

16   first discuss mining with Mr. Fraser?

17       A.   It would have been around -- the first

18   discussion would have been around the time I bought the

19   first miner.

20       Q.   Had he had any prior experience with mining?

21       A.   Not that I know of.

22       Q.   And did you do anything to educate him about

23   mining?

24       A.   I explained -- you know, I explained the basics

25   of what I knew at the time.  He did a lot of his own

1          Homero  Joshua  Garza

2  research  later  --  or  afterwards,  but,  you  know,  I

3  explained  the  --  you  know,  the  basics  of  what  I  knew  at

4  the  time.

5       Q.    How  many  employees  did  GAW  Miners  have,

6  initially,  when  it  was  first  formed?

7       A.    Maybe  around  four-ish.

8       Q.    And  who  were  those  four?

9       A.    Besides  myself.   So  Rami  would  have  been  one.

10  I  think  Dan  Pease  came  on  board  pretty  quickly.   Joe

11  came  on  board  pretty  quickly.   And  I  think  another

12  person  named  Bill  came  on.

13       Q.    And  Rami  is  Mr.  Abramov?

14       A.    I  believe  so,  yes.

15       Q.    And  how  --  how  did  you  know  Mr.  Abramov?

16       A.    Oh,  I  --  yeah,  I  had  met  him,  like,  somehow

17  through  the  cryptocurrency  community.   I  don't  remember

18  how.   He  was,  like,  trying  to  maybe  launch  his  own  coin

19  or  something  like  that.   Some  --  we  met  somehow  that

20  way.

21       Q.    And  he  joined  the  company  at  your  request?

22       A.    Yes,  ma'am.

23       Q.    And  what  was  his  role?

24       A.    It  was  he  was  there  for,  like,  a  marketing

25  capacity,  I  believe.

1                    Homero Joshua Garza

2        Q.    And Joe is Joe Mordica?

3        A.    Yes, ma'am.

4        Q.    And when did he begin working for the company?

5        A.    It would have been pretty quickly after -- I

6    don't remember the exact amount of time, but it would

7    have been pretty quickly because we both got

8    interested -- like very interested at the exact same --

9    you know, as soon as I started mine, then he bought his

10   own miner, so it would have been pretty -- pretty soon

11   after.

12       Q.    And how did you meet Mr. Mordica?

13       A.    Oh, I'd known Joe before that, so I met him

14   because the -- so Smart Tech primarily sold, like, a

15   Voice over IP system, and then the company that made it,

16   Joe was a customer of theirs, and they recommended that

17   we talk to each other because I was having some -- you

18   know, some issues that I wasn't able to resolve myself,

19   so -- so Joe, originally, was just someone I met just to

20   help, you know, like another customer just to help me

21   set things up.  And we got along really well, and he --

22   eventually, we joined, you know, our companies together.

23       Q.    And you actually bought Mr. Mordica's company

24   from him, right?

25       A.    Yes, ma'am.

1                     Homero Joshua Garza

2        Q.    And did you actually pay Mr. Mordica for his

3    company or was there some other agreement?

4        A.    I believe -- okay, I believe that there was a

5    portion of it that was a payment, and then a portion of

6    it was in stock.

7        Q.    And what happened to Mr. Mordica's company as a

8    result of that transaction?

9        A.    At that time, what happened to it?

10       Q.    Yes.

11       A.    I think he -- it just continued to run, if I'm

12   not mistaken, so...

13       Q.    And what was Mr. Mordica's role at GAW Miners

14   at that time?

15       A.    It would have been CTO.

16       Q.    CTO?

17       A.    Yes, ma'am.

18       Q.    And as CTO, what were his responsibilities?

19       A.    Basically, everything that -- all the software,

20   the miner, you know, he -- you know, once GAW Miners

21   started getting into the business of actually, you know,

22   hosting miners for other people, then he flew up and

23   helped start up the mining center, so main -- all of the

24   technology, basically.

25       Q.    You said he flew up and helped start -- set up

Homero Joshua Garza

1    a mining center.  When was that?

2    A.   I don't re- -- it would have been basically

3    after -- shortly after we enabled people to do hosted

4    mining.

5    Q.   And where was the mining center set up?

6    A.   I think it's this -- it was in this place

7    called STCC Community College.  They have a mining,

8    like, area that we could rent from them, and so...

9    Q.   How did you find that community college

10   location?

11   A.   I -- I -- I think I knew about them, like

12   they're -- I mean, it's just like a community college I

13   knew for years, so...

14   Q.   Okay.  But how did you know about the space

15   there?

16   A.   Oh, I think -- I think some -- I think what

17   happened was we were using way too much power at the

18   office, and we were constantly flipping breakers.

19            So then I probably asked someone to start

20   looking around for a place that had more power, and

21   they -- I don't remember who, probably Dan, I'm

22   guessing, and then he probably would have found that

23   place, so...

24   Q.   So was there some agreement to be able to use

1                    Homero Joshua Garza

2    that space?

3        A.   I believe so, yes.

4        Q.   And did you ever visit that space?

5        A.   Yes, ma'am, I did.

6        Q.   How often?

7        A.   I think I was there two or three times.

8        Q.   And were there people -- GAW Miners employees

9    who actually worked in that space?

10       A.   Originally, to set everything up, that's right.

11       Q.   Did GAW Miners have an office?

12            MR. WATTERSON:  Object to the form.

13       A.   Can you clarify?

14       Q.   (BY MS. CAVE)  Well, at the time it was formed,

15   did GAW Miners have an office?

16       A.   I don't think it had its own office.

17       Q.   Which office did it use?

18       A.   Either the office that Smart Tech used or at

19   one point -- I just can't remember which one came first,

20   but we -- I had a really large base -- you know,

21   basement area so people -- we used that space for a

22   while before we had our own -- you know, GAW Miners had

23   its own office.

24       Q.   The basement in your house?

25       A.   Yes, ma'am.

1                        Homero Joshua Garza

2        Q.    And how many people worked in your basement?

3        A.    By that time, maybe anywhere between six to ten

4    maybe.

5        Q.    And at some point, did GAW Miners acquire other

6    offices -- other office space?

7        A.    I believe the only next space it acquired was

8    the one that -- it was in Connecticut.

9        Q.    And what -- what office -- what work took place

10   there?

11       A.    Well -- so it was Enfield, Connecticut, and it

12   was its own building -- or it was a building with a few

13   other buildings next to it, but everyone moved there, so

14   basically everything that happened -- there was a few

15   places where we had miner servers set up, but all of the

16   staff and everyone worked out of there.

17       Q.    How many places were there miner servers set

18   up?

19       A.    Two, maybe.

20       Q.    And were those both in Connecticut?

21       A.    Yes.  And then, eventually, there's a big

22   mining setup that took place in Mississippi.

23       Q.    Right.  Okay.

24             The office in Massachusetts, did that

25   remain -- was -- did that become part of GAW Miners?

Page 182

1                          Homero Joshua Garza

2        A.   I don't recall honestly what happened to it.

3                 THE REPORTER:  I don't recall?

4        A.   Oh, no, I remember now.  ZenMiner started

5   happening out of that office.

6        Q.   (BY MS. CAVE)  Okay.  And who worked out of the

7   Massachusetts office?

8        A.   I don't remember, I'm sorry.

9        Q.   What became the main office of GAW Miners?

10       A.   The one in Enfield.

11       Q.   Enfield?

12       A.   Yes, ma'am.

13       Q.   And is that where -- you worked out of that

14   office?

15       A.   Yes, ma'am.

16       Q.   How much office space did you have there?

17       A.   Like square footage-wise?

18       Q.   Or -- or floors or --

19       A.   Oh, we just had one floor.  It was pretty big,

20   though.  I mean, there was enough for a call center.  I

21   mean, it's like six to ten individual offices and we had

22   a warehouse.  It was pretty big.

23       Q.   And you mentioned a call center.  At some

24   point, a call center was set up?

25       A.   Yes, ma'am.

1                    Homero Joshua Garza

2        Q.    What was that for?

3        A.    So when we sold a lot of things online and it

4   was for, like, tech support.

5        Q.    And how did you decide to set up a call center?

6        A.    I had already previously had them at, like,

7   Great Auk Wireless and stuff, so...

8        Q.    So it was an idea you brought from the others?

9        A.    Yes, ma'am.

10       Q.    Okay.   At some point was -- did Eric Capuano

11   start working for GAW Miners?

12       A.    Yes, ma'am.

13       Q.    And how did you know Eric?

14       A.    I knew him since we were kids.   Maybe 15, 16,

15   we met each other, something like that.

16       Q.    Did you reach out and ask him to join the

17   company?

18       A.    Originally, I think so.   I think I originally

19   was interested in sort of what he was doing.   But, yeah,

20   I mean, pretty quickly, I guess, yes, ma'am.

21       Q.    And what was he brought on to do?

22       A.    He was brought on to -- I believe that it was

23   like security-based.   It had to do with, like, our

24   security.   That's all I remember him doing.

25       Q.    Information security, you mean?

Page 184

1                    Homero Joshua Garza

2          A.   Yes, ma'am.

3          Q.   Did he have a specific title to him?

4          A.   He would have, but I'm not sure what it was.

5          Q.   Did he report to you?

6          A.   Eric would have probably reported to Joe.

7          Q.   To Joe Mordica?

8          A.   I believe so.

9          Q.   At some point did -- Amber Messer is also Amber

10   Capuano; is that right?

11         A.   Yes, ma'am.

12         Q.   And at some point she joined the company?

13         A.   Yes, ma'am.

14         Q.   And what was her job?

15         A.   She was my assistant.

16         Q.   At what point in time did you hire her?

17         A.   I don't remember exactly.  I remember it was --

18   there was a conference held in Las Vegas for mining, and

19   it was a week or two after that, I feel like, or before

20   that.  I can't remember.

21         Q.   But at some point in time, you needed a

22   personal assistant?

23         A.   Yes, ma'am.

24         Q.   And so she was there to -- what -- what were

25   her responsibilities?

Page 185

Homero Joshua Garza

1

2    A.   Just like set up appointments and answer the

3    phone if I wasn't available or, you know, just field the

4    questions that people might, you know, have so that way

5    I could concentrate and stuff like that.

6    Q.   At some point, did Jonah Dorman start working

7    for the company?

8    A.   Yes, ma'am.

9    Q.   And how did you know Jonah Dorman?

10   A.   He -- he and this other guy, Matt, that we

11   hired, had their own company that I think they rented

12   mining capacity online, so we hired them because we were

13   interested in the -- like, the system they had built.

14   So we acquired that system, and part of the deal was we

15   had to hire them too, so...

16   Q.   And did you actually purchase their company?

17   A.   I believe so.  I mean, we did.  I don't

18   remember how it worked exactly.

19   Q.   So how did you hear about their company?

20   A.   I think it was just part of the community.  I

21   mean, I don't remember a specific way.

22   Q.   Did you meet them in person or interview them

23   or anything?

24   A.   We had a video conference, I remember, before

25   we agreed on anything.

1                 Homero Joshua Garza

2        Q.    And who participated in that video conference?

3        A.    I think it was just the three of us:  Myself,

4    Jon- -- Jonah, and Matt.

5        Q.    And based on that, you hired them -- you

6    decided to buy --

7        A.    There was more conversations, but, yes, ma'am.

8        Q.    More conversations among the three of you?

9        A.    I believe so, yes, ma'am.

10       Q.    Who is Luke Rustin?

11       A.    Luke?  Luke was a -- originally was -- started

12   as an employee of Optima Computers.

13       Q.    And what did he do at Optima Computers?

14       A.    He was a -- originally hired as a technician,

15   and I think he, like, ended up being in charge of all of

16   the technicians.

17       Q.    And at -- but at some -- did he ever work for

18   the wireless businesses?

19       A.    I think so.  I just can't remember the

20   capacity.

21       Q.    And at some point, he joined GAW Miners?

22       A.    Yes, ma'am, I think so.  Yes, I'm pretty sure.

23       Q.    And did you recruit him to join?

24       A.    Yes -- most likely.

25       Q.    And what role did he have at GAW Miners?

Page 187

Homero Joshua Garza

1     A.   I think he was, like, in tech support, if I'm

2  not mistaken.

3     Q.   Who's Evan Lucas?

4     A.   Evan was a friend of Joe's and -- yes, he was a

5  friend of Joe's.  And he started as a -- I think a

6  freelance software developer, and then, eventually, I

7  think we hired him to do software full-time for the

8  company.

9     Q.   So at some point, GAW Miners needed to write

10  its own software; is that correct?

11     A.   Yes, ma'am.

12     Q.   And so who did the software -- the writing of

13  the software, the software coding?

14     A.   That would have been Joe, and then it --

15  probably Evan and the rest -- Evan, whoever else did the

16  software.

17     Q.   Okay.  So before Joe and Evan arrived, there

18  was -- there was no software coding that was going on

19  specifically at the company, at GAW Miners?

20     A.   Not that I can remember.

21     Q.   Did you do any coding yourself?

22     A.   Not that I can remember.

23     Q.   Were there -- at the Enfield office, were there

24  regular meetings of the employees?

25

Page 188

1                    Homero Joshua Garza

2     A.    I believe so.

3     Q.    Did you participate in those meetings?

4     A.    Some of them.

5     Q.    What -- what were those meetings focused on?

6     A.    Most of the time the meetings I participated in

7  would have been more like management, and so just -- I

8  think we -- usually, we try to meet weekly just to --

9  you know, updates, see what everyone was up to, you

10 know, checking in, stuff like that.

11    Q.    What did the management meetings focus on that

12 you participated on?

13    A.    That, like, be just updates and whatever -- you

14 know, assignments, things like that.

15    Q.    And did you request those meetings or did they

16 happen automatically?

17    A.    Most likely Dan would have been the one that

18 would have requested them.

19    Q.    Did you par- -- if there was a management

20 meeting, were you always there?

21    A.    Not always.

22    Q.    Was there --

23              THE REPORTER:  Did you say "not always"?

24              THE WITNESS:  Yes, ma'am.

25              THE REPORTER:  Okay.  Thank you.

1          Homero Joshua Garza

2          THE WITNESS:  Sorry.

3     Q.   (BY MS. CAVE)  Was there a process for

4     communicating new ideas at GAW Miners?

5     A.   No formal process.

6     Q.   What about a sales force, was there a sales

7     team or a sales force at GAW Miners?

8     A.   Eventually, yes, ma'am.

9     Q.   At what point in time did that arise?

10    A.   I feel like it was probably about halfway

11    through GAW Miners.  And it was established for

12    customers that, you know, spent larger amounts of money

13    that wanted to buy things in bulk, things like that,

14    so...

15    Q.   By "buy things in bulk," what do you mean?

16    The --

17    A.   The cash -- hashlets or miners and things like

18    that.

19         THE WITNESS:  And if I may, at some point,

20    I want to get like a bathroom break, so...

21         MS. CAVE:  We can take one right now.

22    That's just fine.

23         THE WITNESS:  Thank you.

24         THE VIDEOGRAPHER:  Off the record at 3:54.

25         (Recess from 3:54 p.m. to 4:02 p.m.)

1                    Homero Joshua Garza

2              THE VIDEOGRAPHER:  On the record at 4:02.

3        Q.   (BY MS. CAVE)  Just before the break, we were

4    talking about the sales force for customers that were a

5    step larger with lots of money that wanted to buy things

6    in bulk.  When did that start to arise?

7        A.   I believe about halfway through GAW Miners.

8        Q.   Do you recall if you look at a calendar?

9        A.   No, ma'am, I'm sorry, I can't be more specific.

10       Q.   Was it sometime in 2014?

11       A.   Yes, ma'am.

12       Q.   And what did -- how did that come about?

13       A.   I don't really remember.

14       Q.   What were those customers looking to do?

15              MR. WATTERSON:  Object to the form.

16       A.   I think generally buy products in bulk and

17   receive bulk discounts, but I don't remember how it was

18   formed or...

19       Q.   (BY MS. CAVE)  Did they -- were you contacted

20   or was someone else contacted?

21       A.   I'm sorry?

22       Q.   Did those customers contact you or how did it

23   come to your attention?

24       A.   That they wanted to buy something bulk?

25       Q.   Yes.

Page 191

1                    Homero Joshua Garza

2      A.   Most likely they would have contacted just the

3  general, you know, company line or support line or

4  whatever, so...

5      Q.   And so --

6      A.   I did get contacted sometimes, though.

7      Q.   And what -- so in response to that, setting up

8  a sales force focused on those customers was something

9  that you did?

10     A.   Most likely, yes, ma'am.

11     Q.   And was there someone who was in charge of

12 that?

13     A.   I know my brother, Tito, worked -- did sales,

14 but I feel like there was another person that was over

15 him.  I just can't remember.

16     Q.   Is Tito's name Carlos?

17     A.   Yes, ma'am.

18     Q.   Okay.  And Tito and Carlos are the same person?

19     A.   Yes, ma'am.

20     Q.   And what did Carlos do with respect to these

21 bulk purchase customers?

22     A.   He would have just -- usually, you know, they

23 contacted us.  He would have worked with them, worked

24 with Dan Kelley, try to negotiate pricing with them,

25 stuff like that.

1                    Homero Joshua Garza

2        Q.    Did you discuss pricing with Carlos for these

3   customers?

4        A.    Occasionally, if it were something that he was

5   trying to do that was extreme or out of the ordinary,

6   so...

7        Q.    And what -- what do you mean by "extreme or out

8   of the ordinary"?

9        A.    Like if someone wanted a specific discount that

10  was higher than, you know, something we'd done before

11  or -- basically, something, I guess, Dan may not feel

12  comfortable making a final decision on, and he might

13  come to me, so...

14       Q.    And then you would make the final decision?

15       A.    Yes, ma'am.

16       Q.    And these customers were purchasing hardware in

17  bulk or were they also purchasing hashlets or other

18  cloud-based products?

19       A.    No hashlets for sure, but I feel like it's

20  possible that they -- the bulk sales existed whenever we

21  did hardware as well, so I just -- I don't recall

22  specifically, but I -- I think it existed at that time

23  as well.

24       Q.    And how big -- are you able to quantify how big

25  a part of the GAW Miners business was the bulk

1                    Homero Joshua Garza

2  customers?

3       A.    It'd be 20 to 30 percent.

4       Q.    And did you yourself ever deal with any of

5  those customers?

6       A.    Occasionally.

7       Q.    And were there certain circumstances under

8  which you would deal with those customers?

9       A.    There would be times where they wanted, you

10 know, to talk with me and deal with me directly.  That

11 would be circum- -- you know, one circumstance -- well,

12 probably the only one I can think of.

13      Q.    Did you seek out bulk customers?

14      A.    I don't recall that, having the initiative for

15 that, because I don't -- I think if someone wanted to

16 purchase in bulk, they would have contacted us to let us

17 know.  So I don't recall, you know, like, you know, I

18 received, but I guess it's possible because, obviously,

19 I would have known every activity they did, so...

20      Q.    Earlier we were talking about Jonah Dorman and

21 Matt Eden.  Their company was called Lease Rig; is that

22 right?

23      A.    That sounds right.

24      Q.    Okay.  And the transaction where -- so was it

25 GAW Miners that acquired Lease Rig?

Page 194

1                     Homero Joshua Garza

2       A.    Yes, ma'am.

3       Q.    And was that it a cash transaction or an equity

4  transaction?

5       A.    I think it was a combination of both, if I

6  remember correctly.

7       Q.    Do you have any recollection about the split,

8  equity versus cash?

9       A.    No.

10      Q.    But Jonah Dorman and Matt Eden got equity in

11 GAW Miners as a result of that transaction?

12      A.    Yes, ma'am.

13      Q.    Do you recall how much?

14      A.    Not offhand.

15      Q.    What was D&J Miner?

16      A.    It just stands for Dan and Josh Miner.  We -- I

17 think it just -- I think it was just a -- a brief period

18 of time before -- you know, like, sometime in between

19 Smart Tech and GAW Miners, you know, when there was just

20 more of an idea -- you know, something that -- you know.

21 Dan and I talked about it and thought it would be cool

22 to, you know, sell miners and stuff.

23              So I think we just set it up, you know, at

24 the time thinking, you know, that that would be to the

25 extent of what -- and then it grew to GAW Miners, and

1                    Homero Joshua Garza

2    then it just became GAW Miners, so I think it was just

3    like an interim name.

4        Q.   Okay.  Was it ever set up as an entity,

5    D&J Miner?

6        A.   I don't remember.  I mean, it seems like it

7    might have been because I saw in the transfer that one

8    of the transfers was to D&J, which would have meant it

9    had its own bank account, which usually meant -- means

10   there would have to be a company, but that would be the

11   only way I would know, so...

12       Q.   And was D&J dissolved or acquired by GAW

13   Miners?

14       A.   I don't remember what happened to it.

15       Q.   But the -- the Dan who was involved in that was

16   Dan Pease?

17       A.   Yes, ma'am.

18       Q.   And was it -- sorry, was it Josh or Jonah?

19       A.   Josh.

20       Q.   Josh.  You, Josh --

21       A.   Yeah.

22       Q.   -- not -- okay.  Thank you.

23            What -- what was coin-swap?

24       A.   I feel I should know, but -- I know the name.

25   I just -- it had something to do with, I think, maybe

1                     Homero Joshua Garza

2    changing coins to different coins or something like

3    that.

4        Q.   Was that a part of GAW Miners at all?

5        A.   The name sounds familiar.  I don't remember,

6    though, what it is.

7        Q.   How about stake base, are you familiar with

8    that name?

9        A.   That sounds like something we would have had,

10   like maybe for, like, HashStakers or maybe, like, the

11   original way we were going to do HashStakers.  I'm not

12   sure, but I don't remember.

13       Q.   Was that a concept or was it an entity?

14       A.   It seems like it was a concept.

15       Q.   Do you know who came up with that?

16       A.   Maybe me.  I'm not sure.

17       Q.   Do you remember what it did?

18       A.   No.

19       Q.   Okay.  At some point, did GAW Miners do a

20   transaction with GoCoin?

21       A.   Yes, ma'am.

22       Q.   And what was that transaction?

23       A.   I feel like we bought -- wait, that -- that

24   wasn't that company.  I think we bought a -- like, they

25   were doing -- I think GoCoin was the company that was

1              Homero Joshua Garza

2    trying to raise money, and we -- you know, they offered

3    like a -- like, equity or stock or something like that,

4    you know, so...

5        Q.   How did that come to your attention?

6        A.   I don't remember.  Maybe they reached out to

7    me.  I'm not sure.

8        Q.   Was that transaction ever completed?

9        A.   I believe so.

10       Q.   And did -- did GAW Miners give them equity or

11   stock or how did -- how was that transaction --

12       A.   I think we -- if I remember, Stuart and I

13   talked a lot about it because I remember he didn't like

14   it at first.  But I think we had -- you know, we -- the

15   company gave him money and, in exchange, the company got

16   stock or something like that in their company.

17       Q.   Okay.  So Go -- as a result of that

18   transaction, GoCoin got an interest in GAW Miners?

19            MR. WATTERSON:  Object to form.

20       A.   The other -- I think it was the other way

21   around.

22       Q.   (BY MS. CAVE)  The other way around.  Okay.

23            When did that happen?

24       A.   I don't remember.

25       Q.   Was it during the hardware-mining stage or

1                       Homero Joshua Garza

2    during the cloud-mining stage?

3        A.   I thought it was during the cloud-mining stage,

4    I think.

5        Q.   Okay.  And was it before PayCoin or after

6    PayCoin?

7        A.   I think it was before PayCoin.

8        Q.   Okay.  What was Gridseed?

9        A.   Oh, Gridseed, they were a company -- a

10   manufacturer -- a hardware manufacturer that made

11   miners.

12       Q.   And were they a supplier to GAW Miners?

13       A.   Yes, ma'am.

14       Q.   And how did you come into contact with

15   Gridseed?

16       A.   It was -- it was really weird because I --

17   somehow I met -- somehow I got connected to a person who

18   was able to buy directly from Gridseed or something like

19   that.  I don't remember how we got in touch with each

20   other, but, you know, I would purchase through him -- or

21   he would facilitate a purchase, and then he would get

22   Gridseed equipment.

23       Q.   And where was Gridseed located?

24       A.   In China.

25       Q.   Did you ever go to China?

Page 199

1                    Homero Joshua Garza

2        A.    No, ma'am.

3        Q.    So did GAW Miners have other hardware vendors
4    aside from Gridseed?

5        A.    Yes, ma'am.

6        Q.    Sorry.  Vendors, yes.

7              And how many vendors were there?

8        A.    I believe about four -- four or five.

9        Q.    And was there someone responsible for the
10   vendor relationships?

11       A.    Usually, the -- so, usually, I would be
12   involved in the beginning of the vendor relationship
13   because I can't remember who it was, but, like, our
14   second vendor was one of the largest purchases we made,
15   which was why Stuart gave the company to begin with
16   so -- and, actually, I think he even had to talk to the
17   CEO of that company for him to be comfortable, but...

18              So I would form the initial relationship,
19   and then, usually, then whoever ordered stuff at the
20   company would order more stuff.

21       Q.    Was there someone responsible for placing
22   orders at GAW Miners?

23       A.    I be -- I feel -- I believe so.  I mean, yes,
24   there would have been.  I'm just trying to think of who
25   it was.  I don't remember who it was.

1                    Homero Joshua Garza

2        Q.    Do you remember the name -- the second vendor

3    that you were just talking about, the name of that

4    vendor?

5        A.    No.  If I heard it, I would remember, but...

6        Q.    Bit Name?

7        A.    No, Bit Name is a company we bought a bunch of

8    hardware from, like, to catch our mining capacity up,

9    but it wasn't that.  It was someone else.

10       Q.    Okay.  Zeus Miner?

11       A.    That sounds right.  Zeus Miner sounds right.

12                  THE REPORTER:  I'm sorry?

13                  MS. CAVE:  Zeus, Z-E-U-S.

14                  THE REPORTER:  Thank you.

15       Q.    (BY MS. CAVE)  And where were they located, do

16    you know?

17       A.    I think in China too.

18       Q.    Is that mainly where the vendors are located,

19    is China?

20       A.    Yes, ma'am.

21       Q.    Did Zeus Miner ever have an interest in GAW

22    Miners?

23       A.    No.  No, ma'am, I don't think so.

24       Q.    Did GAW Miners do a transaction with

25    cryptocoinsnews.com?

Homero Joshua Garza

1    A.   I believe GAW Miners purchased advertising from

cryptocoinnews.com.

    Q.   And who is responsible for advertising

purchases?

    A.   Mainly, Rami would have been responsible.

    Q.   At some point, did GAW Miners begin accepting

credit card payments?

    A.   Could you clarify?

    Q.   Sure.

        Did GAW Miners accept credit card payments

for purchases of hardware?

    A.   I believe we did since the beginning.

    Q.   Since the beginning?

    A.   I believe so.

    Q.   And did that cause any problems?

    A.   We -- it -- in a way, I mean, because we -- the

mining cryptocurrency world was a harboring ground for

charge-backs for people that would -- because they

already got the mining out of it, so then they could

just charge back, so even if they gave us the hardware

back, they still got the mine out of it, so...

    Q.   So they would reverse the charges?

    A.   That -- that -- that was a very common thing.

    Q.   So that meant that GAW Miners was out of pocket

Homero Joshua Garza

1  that amount?

2

3     A.   Yes, ma'am.

4     Q.   Did you ever quantify how much -- how often

5  that happened or the amount?

6     A.   I don't remember the amount, but I know that it

7  was bad enough that we have -- have another company

8  involved that provided insurance, so they took, like, a

9  piece of every deal, and then they would -- but then

10  they were on the hook for the charge-back when it

11  happened.

12    Q.   By "piece of every deal," what do you mean?

13    A.   They took a percentage of every purchase we

14  made.

15    Q.   Okay.  And how did you find that insurance

16  company?

17    A.   Oh, no, I think it was just a -- I think a

18  third party plug-in-type company that worked with

19  Shopify, if I remember correctly.  Because they have

20  Shopify as a whole marketplace, so I think they were on

21  there.

22    Q.   And when did the selling on Shopify begin?

23    A.   It wasn't at the beginning because the

24  beginning we used a system called BigCommerce or

25  something like that, so a third of the way through,

                    Homero Joshua Garza

1
2   maybe halfway through.

3       Q.   What's the difference between BigCommerce and

4   Shopify?

5       A.   They're both, you know, shopping cart systems.

6   There was some reason -- something about Shopify, you

7   know, was better for us, I think, technically, so I

8   think that's why we switched to Shopify.

9       Q.   And did GAW Miners have a formal contract with

10  Shopify?

11      A.   We would have just been like a customer of

12  theirs.

13      Q.   Was there a customer agreement or anything like

14  that with them?

15      A.   I mean, I'm sure there's probably something

16  like, you know, when you buy stuff, because, see, it's a

17  hosted system, so I'm sure they have some kind of

18  agreement.

19      Q.   Okay.  When -- at some point the hashlet forum

20  was set up?

21      A.   Yes.

22      Q.   When was that?

23      A.   I think it was pretty early on, maybe a third

24  of the way through the company.

25      Q.   Before that, was there another way to

                    Homero Joshua Garza

1

2   communicate?

3       A.   We had a -- yes, ma'am, we had a -- like a

4   thread thingy on, like, the -- I think it's called

5   Bitcointalk.  It's like a big BitCoin forum.  And then

6   GAW Miners had, like, its own thread or -- I don't know

7   how to describe it, but it's like its own section, and

8   then eventually we wanted our own forum so we moved off

9   of that.

10      Q.   So on Bitcointalk, the thread that you

11  mentioned, who posted on that thread?  Was that you?

12                  MR. WATTERSON:  Objection.  Form.

13      A.   Me and, I mean, others.  I mean, I think most

14  people would have had an account on that.  I mean, most

15  people have an account on both forums so everybody would

16  have posted in some way or another at some point, so...

17      Q.   (BY MS. CAVE)  And did you post as Josh Garza

18  or did you post as GAW Miners on Bitcointalk?

19      A.   I don't remember how that was set up,

20  unfortunately.

21      Q.   But did you -- did you yourself make posts on

22  Bitcointalk?

23      A.   Oh, yes.

24      Q.   And how often did you do that?

25      A.   I don't remember because -- maybe once a day,

Homero Joshua Garza

1  once every other day.  It was, I guess, fairly frequent,

2  but I don't know -- I can't -- I don't know.  I -- I

3  think that's the right...

4  

5  Q.   Did you have a username on Bitcointalk?

6  A.   I did.  That's why when you asked about if I

7  was posting as the company or me, I was trying to think

8  of which -- what I used.  So I just don't remember.  I

9  mean, I know I had a username and I don't remember what

10  it was now.  It was like GAW something, but I just don't

11  remember what I used, unfortunately.

12  Q.   And then you said at some point you set up the

13  HashTalk forum.

14  A.   Yes.

15  Q.   And the HashTalk forum was just GAW Miners

16  specifically or --

17  A.   Well, it was hosted by our company so -- so, I

18  mean, anybody could join, but it was hosted by our

19  company.

20  Q.   And why did you decide to do that?

21  A.   I don't remember.  I -- I feel like there was

22  an event that took place.  Something happened that was

23  frustrating or -- I only remember the emotions around it

24  at the time, but I remember something happened to -- to

25  make us not want to be on there anymore, so we were

1                     Homero Joshua Garza

2    like, "Fine, we'll make our own forum," but I can't

3    remember what it was.

4        Q.   And was the hashlet forum on GAW Miners website

5    or where was it located?

6        A.   The hashlet forum?  That would have been on

7    HashTalk.

8        Q.   HashTalk?

9        A.   Yes, ma'am.

10       Q.   And how did -- how did you post there?

11       A.   There I mainly posted -- I think I had my own

12   account that I mainly posted with.

13       Q.   And any posts under your name, did you do those

14   or did others do those for you?

15       A.   A combination.  I -- eventually, I let Amber

16   post for me, Jonah post for me, maybe more.  But,

17   eventually, a lot of other people would post for me.

18       Q.   Did you have a Twitter account?

19       A.   Yes, ma'am.

20       Q.   And what was your Twitter handle?

21       A.   I think it was GAWCEO.

22       Q.   Do you still have that?

23       A.   No.  Someone has it, but not me.

24       Q.   Okay.  What do you mean by "someone"?

25       A.   Someone else registered because I stopped using

1           Homero Joshua Garza

2   it, so it expired, so...

3       Q.   Okay.  Did GAW Miners have any intellectual

4   property?

5           MR. WATTERSON:  Object to the form.

6       A.   I guess the -- you know, I mean, I guess it

7   would be like Zen Cloud and hashlets because that was

8   all software the company developed, so...

9       Q.   (BY MS. CAVE)  And did you take any steps to

10  protect that intellectual property?

11      A.   In what --

12      Q.   Did you patent it or trademark it or anything

13  like that?

14      A.   We -- we trademarked the majority of all the

15  hash-whatever, like -- you know, like "hashlet,"

16  anything that was like unique to us, we trademarked.

17      Q.   And how did you go about trademarking?

18      A.   Dave McLain set that up for us.

19      Q.   Did you -- you requested him to do that?

20      A.   Most likely.

21      Q.   Okay.  Do you know how many trademarks you had

22  in total?

23      A.   I don't remember, but we had quite a few.

24  Maybe a dozen or so.

25           (Exhibit 244 marked.)

Page 208

1                    Homero Joshua Garza

2     Q.   (BY MS. CAVE)   This is Exhibit 244.

3               The top, it says "Hash-Base Corporation."

So my first question is:   What is Hash-Base Corporation?

5     A.    Well, Hash-Base was a piece of software that

6  our company made to -- you know, like, people could

7  store PayCoins on it.  I think at some point they were

8  able to use gift cards.

9               So I think Hash-Base Corporation was like,

10  with that -- was supposed to be underneath.  Like, it

11  was supposed to own that aspect of the company.

12     Q.   At what point in time was Hash-Base Corporation

13  set up?

14     A.    I don't remember, but I feel like Hash-Base

15  and, like, all of those companies were set up in a

16  similar time.

17     Q.   Was it sometime in 2014?

18     A.    I -- I believe so.

19     Q.   And you're -- so you were CEO of Hash-Base

20  Corporation, right?

21     A.    Yes, ma'am.

22     Q.   And next to the left of the box where it says

23  "Josh Garza, CEO," there's a list of items there:

24  Corporate services, innovation, R & D, wallet.  Are

25  those things that you were responsible for as CEO or --

1                    Homero Joshua Garza

2        A.   No, I think those are just -- probably just a

3   list of things -- I mean, because, for example, as eCard

4   codes, I mean, I don't know how to be responsible for

5   eCard codes.  So I think these are just a list of things

6   that the company did or maybe they were being stored

7   here to eventually allocate to different people or

8   something like that.

9        Q.   What were eCard codes?

10       A.   Electronic, like -- like gift card codes,

11  electronic -- I think it means -- it's like another way

12  of saying digital gift cards or something like that.

13       Q.   This has, down in the middle of the page,

14  Juliette Dunlevy as controller.  Who's Juliette Dunlevy?

15       A.   She was a controller, like, the person who did

16  our books and stuff.

17       Q.   How did she come to work for the company?

18       A.   I think she -- we identified that we needed

19  someone to handle our books probably about halfway

20  through, and Shiraz and Dan, I think, just solicited

21  just through normal means, so...

22       Q.   So when did she start working for the company?

23       A.   I think halfway through.

24       Q.   Have -- have you seen this document before

25  today?

Page 210

Homero Joshua Garza

1   A.   I can't -- to be honest, it doesn't look like

2   I -- all of the other documents, I feel like I remember

3   seeing them, but this doesn't look familiar, but it's

4   possible.

5   Q.   Do you recall having any -- focusing on the

6   bottom half of the page with the Hash-Base structure, do

7   you recall having conversations with the other officers

8   about this structure?  For example, did this come up in

9   any of the management meetings that you mentioned

10  earlier?

11  A.   I don't remember.  It doesn't.  Nothing about

12  it is ringing a bell.

13  Q.   Okay.  You can set that aside.

14           (Exhibit 245 marked.)

15  Q.   (BY MS. CAVE)  This is Exhibit 245.  So this is

16  something that -- a document that has a flowchart on it

17  and it says Corporate Structure at the top for Geniuses

18  at Work.  And below Geniuses at Work, it says "S" -- I

19  think it's meant to be Corp NA.

20           Does that refresh your recollection of

21  where Geniuses at Work was set up?

22  A.   I mean, it doesn't, but maybe just inferring

23  from what's here, it suggests that the corporation was

24  formed in Massachusetts.

25

1    Homero Joshua Garza

2    Q.   And from looking at this first page, can you

3    tell at what point in time this structure is referring

4    to?

5    A.   I don't really know.

6    Q.   Okay.

7    A.   This document isn't -- because you asked me

8    earlier about D&J Miners and whether it was dissolved,

9    so now I'm seeing that it -- I feel like if I'd seen or

10   remember this, at least I would have known the answer to

11   that question, so...

12   Q.   Okay.  In the middle of the page at the last

13   arrow there, it says, "Miners for Everyone."

14               What was that?

15   A.   Yeah, that's what I'm looking at.

16               I'm not sure.

17   Q.   Okay.  And then on the far right, it lists

18   corporate signatories for each of the entities.  So you

19   were a corporate signatory for each of the entities

20   other than Miners for Everyone; is that right?

21   A.   That's what it says here.

22   Q.   Is that consistent with your recollection, that

23   you were the corporate signatory?

24   A.   Could you define "corporate signatory"?

25   Q.   I'm going off of the -- the words on the page,

Page 212

1                   Homero Joshua Garza

2  but I assume that means that you signed -- you're able

3  to sign for the entity?

4      A.   Yeah, I mean -- in terms of signing power, I

5  mean, I would -- I'm sure I would have signing power

6  over every company.

7      Q.   Okay.  And if you turn to the next page, it

8  looks like it's a list of bank accounts, and then down

9  at the bottom, there's a list of debit cards.  Are there

10 any other bank accounts or debit cards that you're aware

11 of that are not listed here?

12     A.   This looks like debit card numbers, but, I

13 mean, I know the company had more than debit cards.

14 Like, I know we had -- because I had -- I mean, I got up

15 to like a $120,000 AMEX bill, so I had American Express,

16 maybe two American Express.  So I know I had more cards

17 than this.

18     Q.   Okay.  All right.  You can set that to the

19 side.

20          (Exhibit 246 marked.)

21     Q.   (BY MS. CAVE)  So this is Exhibit 246, and it

22 says it is an Action by Written Consent of the Sole

23 Incorporator.

24               Have you seen this before?

25     A.   Most likely.

1          Homero Joshua Garza

2     Q.   Okay.  And this is dated -- this is for

3  Geniuses at Work Corporation as of March 28, 2013.

4     A.   Yeah, I was going to say I think this was

5  before GAW Miners.

6     Q.   Okay.  Yes, and this -- and the first

7  "Resolved" paragraph on this page, it says that "Each

8  person named below is hereby elected to serve as a

9  director of the corporation until such time as his

10  successor is duly elected and qualified."

11          It's just -- that's your name there below

12  that, right?

13     A.   Yes, ma'am.

14     Q.   Do you know who prepared this?

15     A.   It looks like LegalZoom did, based on the...

16     Q.   Did you coordinate with LegalZoom to prepare

17  this?

18     A.   I'd be guessing.  I'm not sure.  Either me or

19  Dan Kelley or both.

20     Q.   Okay.  I'm going to show you what we marked at

21  another deposition as Exhibit 66.

22          This is an e-mail from Dave -- the first

23  e-mail is an e-mail from Dave McLain to you dated

24  December 5th, 2014.  Do you see that?

25     A.   Yes, ma'am.

Page 214

1                          Homero Joshua Garza

2          Q.     And he says:    Per my discussion with Dan K.,

3      I'm going to form a quote, new -- a new, quote, parent

4      entity next week, a Delaware limited liability company

5      to be 100 percent owner of our two operating entities.

6                      To which two operating entities are

7      referred to there?

8          A.     I'm not sure.    I mean, I can think of three but

9      not two.

10         Q.     Okay.   And then Dave McLain goes on to say, "I

11     assume you want the ownership of this new parent entity

12     to be 15 percent to Stuart and 85 percent to you.    I

13     just wanted to confirm before filing."

14                      Do you see that?

15         A.     Yes, ma'am.

16         Q.     So had you had discussions with Dave McLain

17     about the allocation of the ownership being 15 percent

18     to Stuart Fraser and 85 percent to you?

19         A.     Oh, for sure, because, I mean, the -- when he

20     was asking earlier about it, the discussion about is

21     what became so volatile that Dave McLain got in between

22     both of us.

23         Q.     Okay.   And then you responded -- there's an

24     e-mail down at the bottom that's from you back to Dave

25     McLain, and you say, "Well, that would make his

Page 215

Homero Joshua Garza

 1

 2     ownership extent PayBase now too.  I intend to hold to

 3     our agreement, so, yes."

 4                  Do you see that?

 5        A.   Yes, ma'am.

 6        Q.   Okay.  And did you mean all of that when you

 7     said it?

 8        A.   I believe so.  I mean, it seems like the way I

 9     would word something like that.

10        Q.   Okay.  Thank you.  You can set that to the

11     side.

12                  Who is Alex Huynh?

13        A.   He was the Gridseed guy that I mentioned

14     earlier.

15                  MS. CAVE:  It's H-U-Y-N-H.

16                  THE REPORTER:  Thanks.

17        Q.   (BY MS. CAVE)  So he -- Gridseed so -- that was

18     one of the vendors, so he -- he owned Gridseed?

19        A.   No, he was like the -- the conduit guy, like,

20     that set things up between us and Gridseed.

21        Q.   Okay.  Got it.  And how did you meet Alex

22     Huynh?

23        A.   He was the one I'm saying that we -- I don't

24     know how we got connected, through Skype or something,

25     you know.  Somehow we got connected through the forums

1                    Homero Joshua Garza

2    or something, so...

3        Q.   And did -- I'll use Alex because it's easier,

4    easier to pronounce.  Did he -- your relationship with

5    him expand at some point?

6        A.   Well, yes, ma'am, because I think that then --

7    first, like, I was just talking to him about our

8    Gridseeds I was buying --

9                    THE REPORTER:  About what?

10                   THE WITNESS:  Gridseeds that I was buying.

11                   THE REPORTER:  Okay.

12       A.   And then it expanded to, you know, like GAW

13   Miners became like an actual company and resold them,

14   then -- then he helped buy them in bulk for us.

15       Q.   (BY MS. CAVE)  And at some point, did he -- did

16   Alex acquire equity interest in GAW Miners?

17       A.   I feel like there was a discussion about that,

18   like there was some kind of discussion about something

19   to do with that.

20       Q.   I'll show you a document on that.  Just give me

21   one second.

22                   (Exhibit 247 marked.)

23       Q.   (BY MS. CAVE)  This is Exhibit 247.  Unlike the

24   last e-mail I showed you, this one starts on the back

25   page and goes in reverse order.  So starting with the

Homero Joshua Garza

1    e-mail on the back of Exhibit 247, Dave McLain is asking

2    you, "QUESTION:  You said that you were going to

3    transfer 50 percent of shares to Alex to merge the

4    companies."

5                What were the two -- what were the

6    companies that were going to merge?

7       A.   I'm sorry, I don't know.  I've been trying to

8    figure that out since I read this.

9       Q.   Okay.  Your e-mail back to Mr. McLain said --

10   says, "The other 50 will be owned by Geniuses at Work."

11               Does that help you narrow down what might

12   be the other company?

13      A.   Well, no, because 50 wouldn't make us make the

14   final decision, so I have no idea.  I mean, unless

15   someone else owned less than 50.  Yeah, I don't really

16   know what this is talking about.  49, maybe.

17      Q.   Do you remember anything else about your

18   discussions with Alex about either him or his company

19   getting equity interest in Geniuses at Work?

20      A.   No, I don't even know if Alex had a company.

21      Q.   Okay.  You can set that aside.

22               Did you ask Mr. Fraser to set up a Twitter

23   account?

24      A.   I don't remember.

Page 218

1                  Homero Joshua Garza

2              (Exhibit 248 marked.)

3     Q.   (BY MS. CAVE)  I'll show you what we are going

4  to mark as Exhibit 248.

5              So Exhibit 248 is a message from you to

6  Stuart Fraser dated November 7th, 2014.  From looking at

7  this, does this refresh your recollection?

8     A.   I don't remember this e-mail, but it -- based

9  on the e-mail, then, yeah, it would appear that I did

10  ask him.

11    Q.   And you say, "I have an idea."

12              What was your idea?

13    A.   I don't remember.  I remember he used to say a

14  bunch of funny things on Twitter.

15    Q.   Did Mr. Fraser, in fact, set up a Twitter

16  account in response to your request?

17    A.   Oh, he did, yeah.  I mean, yeah.

18    Q.   Okay.  You can set that to the side.

19              Earlier we spoke about Harrison Wise, a PR

20  consultant.  How did you first come into contact with

21  him?

22    A.   I think someone in the company -- it could have

23  been myself, but did research on the various PR

24  companies, and we narrowed it down to a handful, and I

25  think that was the one we decided on.

1                      Homero Joshua Garza

2       Q.    And why did you do research on PR companies?

3       A.    I -- if I remember, that was when we were

4  launching PayCoin and maybe some other stuff.  I think,

5  generally, it was just, you know -- I feel like

6  something happened to make us want to do it, but I think

7  it was more generally to get -- you know, promote the

8  company and stuff.

9       Q.    And did you deal -- you're e-mailing with

10 Mr. Wise here, so did you deal with him?

11      A.    Oh, yeah.

12      Q.    How often did you speak to him?

13      A.    Probably every -- I mean, when we were engaged,

14 probably every few days or so.

15      Q.    And what kind of things would you talk about

16 then?

17      A.    I remember he gave me a hard time a bunch of

18 times about watching what I said online.  And we'd talk

19 about just -- I don't know -- because they were doing

20 like social media, a couple of different things, so we

21 probably would talk to get updates about that kind of

22 stuff.

23      Q.    Why did he give you a hard time about watching

24 what you said online?

25      A.    Because one time we were doing -- like, they

1                    Homero Joshua Garza

2   had all these interviews set up with different news

3   outlets, and when he set it up, I thought it was

4   awesome, so I wrote, like, a thing online.  It was like,

5   "Hey, we have got a bunch of interviews," and he got

6   really upset.  I guess he didn't want me to -- like we

7   weren't supposed to announce that we were going to do

8   interviews with X, Y, and Z Company, so...

9        Q.   Why was that?

10       A.   Why?  He never told me.  He just said it was an

11  amateur move or something like that.

12       Q.   Did those interviews actually take place?

13       A.   Most of them, uh-huh.

14       Q.   Did you do those interviews?

15       A.   Dan -- Dan Kelley and I did.

16       Q.   You did them together or he did some and you

17  did some?

18       A.   I don't remember.  I mean, he was -- I remember

19  Dan was with me, but I feel like most of the quotes and

20  stuff like that -- I think I did most of them, yeah,

21  because I remember, yeah, a few of them, yes.

22       Q.   Did you ever do YouTube videos or online forum

23  videos or anything like that?

24       A.   We did YouTube videos.

25       Q.   Okay.  When did you do those?

1                        Homero Joshua Garza

2      A.    I'm not sure when they started.

3      Q.    What were those about?

4      A.    I think customers -- I think what they were

5  were people could submit questions, and then -- and then

6  like our YouTube had a few of our staff on it.  So

7  people would submit questions, and then someone at the

8  company would then, you know, do like a live answer kind

9  of thing.

10     Q.    Did you do any of those yourself?

11     A.    Oh, yeah.

12     Q.    How many?

13     A.    I don't remember how many we did.  Maybe a half

14  a dozen-ish.

15     Q.    What about any other live online forums did you

16  participate in?

17     A.    Video-based?

18     Q.    Yes.

19     A.    I don't know, maybe announcements.  I know when

20  I was at the Las Vegas Cryptocurrency Show that was on,

21  they recorded that and, I think, put it on YouTube.

22     Q.    What was the Las Vegas Cryptocurrency Show?

23     A.    It was like a conference for -- like, it was

24  cryptocurrency related, so...

25     Q.    And were you invited to go to that or did you

1                    Homero Joshua Garza

2    pay...

3        A.   I think we went as like a vendor, you know, so

4    like a vendor and stuff like that.

5        Q.   And did you speak at that conference?

6        A.   Yes, ma'am, I did.

7        Q.   And what did you speak about?

8        A.   I think I spoke on a panel that was -- I

9    feel -- I can't remember.  I felt like Bit -- like

10   general BitCoin stuff, but it also seemed like maybe we

11   talked about some stuff related to the company.  I can't

12   remember.

13       Q.   But there were other people on the panel?

14       A.   Yes, ma'am.

15       Q.   How many?

16       A.   One, two -- three.

17       Q.   Aside from the Las Vegas conference, were there

18   any other conferences at which you spoke?

19       A.   I was supposed to speak at a conference in

20   Miami, I think, but I didn't end up speaking there.

21       Q.   Why not?

22       A.   Memory serves, I think that we had some pretty

23   hostile crowds, some weird threats came in, and on top

24   of that, one of our kids got sick, like, really sick.

25       Q.   Why were there hostile crowds?

Page 223

Homero Joshua Garza

1   A.   I think that was -- I'm -- I'm pretty sure that

2   was in 2000 -- like, the beginning of 2015, I feel like.

3   And by then, PayCoin had launched and was not holding --

4   like the price had gone down.  And I think some

5   people -- I think that was the main catalyst.  Maybe

6   there were other things, but...

7   Q.   What were the weird threats?

8   A.   They were weird, like, I'm going to throw a pie

9   in your face or Punch you in the face, or just -- I

10  don't know.  Relative, I guess, to now, they're probably

11  not weird, but they were at the time.

12  Q.   Who was making the threats?

13  A.   Random trolls online and stuff.

14  Q.   Who was Rishab Jain?

15  A.   Rishab.   He was a customer of GAW Miners.

16  Q.   And was he a bulk customer or --

17  A.   You say bulk customer?

18  Q.   Bulk.

19  A.   Oh, yeah, he was a bulk customer.

20  Q.   How much did he purchase?

21  A.   I've been told he purchased over a million

22  dollars, is what I've been told.

23  Q.   Of hardware or cloud based in bulk?

24  A.   I think a combination of things.

1                  Homero Joshua Garza

2     Q.    Where's he located?

3     A.    In Dubai.

4     Q.    Dubai.

5            And did you become -- when -- when did you

6  first come into contact with him?

7     A.    I feel like it was -- I was going to say before

8  he bought PayCoins, but I don't -- it might have been

9  before that even -- or, no, you know what, I think he

10 visited our office, I feel like.  He came to our office,

11 and I think I met him for the first time then.  I don't

12 remember when that was.

13    Q.    Was that the Enfield office?

14    A.    Yes, ma'am.

15    Q.    Did your relationship with him become more than

16 just a customer relationship --

17    A.    Oh, yeah.

18    Q.    -- at some point?  You became friends?

19    A.    I thought so.

20    Q.    Okay.  Why do you say that?

21    A.    Because I ended up traveling to Dubai.  He was

22 supposed to help me set some things up to help PayCoin,

23 and then he took my passport and tried to trap me into

24 buying.

25    Q.    Why did he do that?

Page 225

1                    Homero Joshua Garza

2        A.    Because he, according to him -- the money he

3    had spent, he had borrowed some money from one of the

4    princes of Dubai, and now they were mad and, like, were

5    going to, like, kidnap me or something.

6                    MS. CAVE:   We'll mark this as Exhibit 249.

7                    (Exhibit 249 marked.)

8        Q.    (BY MS. CAVE)   So are these -- do you recognize

9    these texts with Rishab Jain?

10       A.    Yes, I do.

11       Q.    And which texts are from you, the ones on the

12   right or on -- the ones on the left?

13       A.    I think the left.

14       Q.    Okay.   And so at the top of -- well, first of

15   all, can you tell when these texts are from, what time

16   period?

17       A.    I'm not sure.   I mean, they were in -- I think

18   they were when I was already in Dubai.

19       Q.    And when was -- when did you go to Dubai?

20       A.    When?   Towards the beginning of 2015.

21       Q.    And why did you go there?

22       A.    Well, at first -- I mean, it was a combination

23   of things.   You know, Rishab told me he could help with

24   PayCoin stuff.   To be honest, you know, I was pretty

25   nervous about stuff that was going on here.   There were

1                    Homero Joshua Garza

2    a lot of threats and stuff being made.  There was a

3    bunch of different reasons, so...

4        Q.    What was the PayCoin stuff that he was going to

5    help with?

6        A.    He was supposed to -- he had said that he knew

7    someone that was -- I feel like it was -- like it was a

8    banking position that would help facilitate the ability

9    to convert cryptocurrency to use of, like, a debit card

10   or credit card or something like that.

11       Q.    And you say you had discussions with him about

12   getting that set up?

13       A.    Yes, ma'am.

14       Q.    Okay.  And did you actually meet with anybody

15   in Dubai about doing that?

16       A.    I don't feel like I did.

17       Q.    So at the top on the first page, it looks like

18   the second text down, "Also, I wired you around 100K."

19             So that's -- that's from you?

20       A.    Uh-huh.

21       Q.    Okay.  So --

22       A.    I wired him $100,000 and he kept it and never

23   gave it to me.

24       Q.    And a little bit further down, you say, "If I

25   do not get one in about two weeks, I need a place to

Page 227

1                    Homero Joshua Garza

2    keep about 27 million."

3                      What is that 27 million?

4        A.   Totally made it up.

5        Q.   You made it up?

6        A.   Uh-huh.

7                  THE REPORTER:   I'm sorry?

8        A.   Totally made it up.

9        Q.   (BY MS. CAVE)   Why do you say that, made it up?

10       A.   Because Rishab -- by this point, you know, I'd

11   spent almost all of the money I had, you know, trying to

12   keep GAW Miners floating.   This is the last bit of money

13   I had, and I was concerned that if he, you know, didn't

14   keep up the appearance of me having more money, he

15   wouldn't help me anymore.

16       Q.   So you were trying to make him feel like you

17   had more money than you did?

18       A.   Uh-huh.   So that way he would continue to help.

19       Q.   If you turn to the -- what's the third page,

20   the top text there says, "I've really got to find

21   someone to ship my cars before they take them."

22                  Who were you worried about taking your

23   cars?

24       A.   This is when I'm -- I think I -- I want to make

25   sure I'm looking at the same thing.

Page 228

1                    Homero Joshua Garza

2        Q.    Sorry, it's the -- maybe it's the fourth page.

3   It's 11:10 p.m. at the top.

4        A.    Okay.

5              Yeah, this is when I had a complete

6   misconception of how all this stuff actually worked, and

7   I legitimately thought the F.B.I. was going to, like,

8   raid our house and take all of our cars and everything.

9        Q.    And a little bit further down, you say -- I

10  think he asked you how many, and you say up to six.  So

11  at this point in time, you had six cars?

12       A.    Probably.  Good chance of that.

13       Q.    And what brand of cars were those?

14       A.    I had a Ferrari, a Lamborghini, a Tesla, a BMW,

15  and probably other things.

16       Q.    And were those purchased or leased?

17       A.    Mostly leased.

18       Q.    Do you still have those?

19       A.    (No response.)

20              THE REPORTER:  I didn't get an answer.

21       Q.    (BY MS. CAVE)  You need to answer verbally

22  for --

23       A.    No, ma'am, I do not have Ferraris.

24       Q.    If you flip a couple of further pages in to the

25  page that has 11:17 p.m. at the top, about midway down,

1                Homero Joshua Garza

2   it refers to the Crypto Private Investor Group.

3      A.   Okay.  This was --

4      Q.   What was the Crypto Private Investor Group?

5      A.   So this was -- I can't remember who had the

6   idea, but one of us had the idea of creating sort of

7   this group of people that still believed in -- because

8   at this point, I was still trying to make PayCoin and

9   PayBase work.  So this was a group that -- of people

10  who, like, were publically still, like, behind PayCoin

11  and PayBase and stuff to, like, try to make it work.

12      Q.   And who were the people who were behind --

13      A.   Rishab.  There were others, but I can't

14  remember all of them.

15      Q.   And were they employees or customers or --

16      A.   I think a com- -- I want to say a combination.

17  I think main -- like, probably mainly customers, but I

18  feel like maybe some employees too maybe.

19      Q.   Was Mr. Fraser a part of the Crypto Private

20  Investor Group?

21      A.   I don't know.  I think it -- I feel like at

22  this point we weren't talking, but I don't remember.

23      Q.   Did the Crypto ever -- Crypto Private Investor

24  Group ever continue past this point?

25      A.   Not really.  I made a website.

1                    Homero Joshua Garza

2      Q.   You made a website?

3      A.   Uh-huh.

4      Q.   And what was on the website?

5      A.   I think just stuff about still believe in

6   PayCoin and, you know, people that were --

7                 MR. WATTERSON:  Pause one second.

8                 (Pause.)

9      Q.   (BY MS. CAVE)  I think you said people that

10   still believe in PayCoin?

11      A.   Yeah, people that still believe in PayCoin and

12   why, you know, they did and stuff like that.

13      Q.   Was Allen Shinners part of the Crypto Private

14   Investor Group?

15      A.   I don't feel like it.  I feel like after he

16   tried to get a job with us and we wouldn't hire, you

17   know, I don't think I ever heard -- I feel like I never

18   heard, personally, from him again.  Other people did,

19   but I think that was -- and that would have been well

20   before this, so, no, I don't think so.

21      Q.   What about Michael Pfeiffer, was he part of

22   that group?

23      A.   The name doesn't ring a bell.

24      Q.   Denis Audet?

25      A.   Doesn't ring a bell.

                    Homero Joshua Garza

1

2      Q.    Jason Vargas?

3      A.    Vargas rings a bell.  I honestly won't be able

4  to give you any more people that were in it.  I'd be

5  guessing.

6      Q.   When did you first have any contact with Allen

7  Shinners?

8      A.    I don't remember.  Most likely through our

9  forum.  I'm sure he most likely sent me a message or

10  something like that.

11      Q.   And was that sometime during 2014?

12      A.    Yes, ma'am.

13      Q.   Was that on the HashTalk forum or the

14  Bitcointalk forum?

15      A.    I feel like it was the HashTalk forum, but I

16  don't remember.

17      Q.   And how often did you correspond with

18  Mr. Shinners?

19      A.    I think at one point, we had a reasonable

20  amount of exchanges.  I can't remember.

21      Q.   Did you ever speak to him on the phone?

22      A.    Yes, because he -- I think it was the time that

23  he was looking at for us to hire him.  I think then I

24  spoke to him on the phone after that inquiry.  I feel

25  like, yes -- sorry, I should talk louder, but, yes.

1                    Homero Joshua Garza

2      Q.   And what was he -- you said he was looking for

3   you to hire him.  What capacity?

4      A.   I don't remember.  He was trying to get us to

5   hire him for some -- I don't remember.  I just -- the

6   only thing I remember about him is he was trying to get

7   us to hire him.  We all talked about it as a group.

8             No one wanted to -- I shouldn't say no

9   one.  Most people didn't want to.  And he got really mad

10  when we didn't hire him.  Those are the only things I

11  remember, but I can't remember what the position was

12  for.

13     Q.   Who was in the group of people that you

14  discussed it with?

15     A.   Most likely Jonah.  I think maybe Dan.  I'd

16  be -- I'm guessing, so...

17     Q.   Did you ever meet him in person?

18     A.   Potentially, before I saw him in -- when I was

19  in court in Connecticut in September, so I know I saw

20  him then.  And I may have met him before that, but I

21  don't remember.

22     Q.   And fair to say that he sent you comments and

23  then advice pretty regularly?

24             MR. WATTERSON:  Objection.  Form.

25     A.   Potentially.  I do remember he sent his

1                    Homero Joshua Garza

2    perspective on things to the company in gen -- because I

3    remember -- I remember, like, Jonah and other people

4    talking about, you know, the thinking is some of his

5    assertions were out of line or something like that.

6              I remember it was something -- I remember

7    a negative sentiment about some stuff he was sending.

8    And then he may have sent something to me, but I don't

9    remember what it was about or for.

10   Q.   (BY MS. CAVE) So he spoke or corresponded with

11   other people at the company?

12   A.   Yes, ma'am, I'm pretty sure of that.

13              (Exhibit 250 marked.)

14   Q.   (BY MS. CAVE)  Let me show you what we will

15   mark as Exhibit 250.  So Exhibit 250 is an e-mail

16   from -- an e-mail chain from Mr. Shinners to you and Joe

17   Mordica dated November 30th.  Do you recall this

18   exchange?

19   A.   One second, please.

20   Q.   Sure.  Take your time.

21              So down -- I guess on the third page,

22   which is the middle of an e-mail from Mr. Shinner dated

23   November 30th, it says, "Hey, Josh and Joe," and then

24   there are a few paragraphs, and then he says, "Here are

25   today's yields on all of the hashlets except Zen's."

1                   Homero Joshua Garza

2               Where -- where did he get those yields, do

3    you know?

4        A.   Most likely my guess would be they would be

5    the -- whatever way the company derived the payouts of

6    these pools.  My guess is that whatever way the company

7    did it, it -- it would have been posted inside Zen

8    Cloud, and maybe that's where he got them from because

9    he doesn't say, you know, "Here are the yields for these

10   pools."  He says, "The yields for these hashlets," so it

11   means he probably got them from someplace else.

12       Q.   On the third page, so I guess it's the last

13   e-mail, the 9:57 p.m. e-mail, he says, "We need to get

14   away from these other cryptos, at least for a while.  If

15   we have all miners focusing on PayCoin, the liquidity is

16   more within reach."

17               First of all, what are the other cryptos

18   that he's referring to there?

19       A.   I guess it's the -- maybe these pools.

20       Q.   And what is the -- when he says "the liquidity

21   is more within reach," what did you understand that to

22   mean?

23       A.   I'm not sure.

24       Q.   Did Mr. Shinners have a nondisclosure

25   agreement, an NDA?

1                    Homero Joshua Garza

2      A.   It's possible.

3      Q.   Were there nondisclosure agreements -- did GAW

4  Miners have nondisclosure agreements with customers?

5      A.   I don't -- I don't have a specific memory of

6  one, but I know the company -- our previous companies

7  used them in the past, so that's why I said it's

8  possible.  It could have been that he would have been

9  familiar with using them before, but I don't have a

10 specific memory of one.

11     Q.   Do you know if what information about the

12 company Mr. Shinners got from -- well, let me rephrase

13 that.

14          Was there information about the company's

15 operations that you shared with Mr. Shinners?

16          MR. WATTERSON:  Objection.  Form.

17     A.   I'm not sure.

18     Q.   (BY MS. CAVE)  What about any other employees

19 at the company?

20          MR. WATTERSON:  Object to the form.

21     A.   Me sharing with those employees?

22     Q.   (BY MS. CAVE)  The other employees sharing with

23 Mr. Shinners?

24          MR. WATTERSON:  Object to the form.

25     A.   I'm not sure.

1                    Homero Joshua Garza

2        Q.    (BY MS. CAVE)  Did he -- do you recall

3    Mr. Shinners proposing an idea about PayBase that could

4    bring in $3 million a month?

5        A.    It sounds cool, but, no.

6        Q.    Was there ever a -- did you ever implement any

7    PayBase idea that Mr. Shinners suggested?

8        A.    No, I mean, bringing in 3 million a month would

9    have been awesome, so, no, I don't recall that.

10       Q.    Okay.  Do you recall being in contact with

11   Michael Pfeiffer, who's one of the plaintiffs in this

12   case?

13       A.    The name sounds familiar.

14       Q.    Did you ever speak to Mr. Pfeiffer on the

15   phone?

16       A.    Possibly.

17       Q.    Did Mr. Pfeiffer ever -- was he ever considered

18   for an employment position at GAW Miners?

19       A.    I don't specifically recall that.

20       Q.    Was Mr. Pfeiffer a moderator of the HashTalk

21   forum?

22       A.    Possibly.

23       Q.    What about Denis Audet, did you hear that name

24   before this lawsuit?

25       A.    It doesn't sound familiar to me.

1           Homero Joshua Garza

2      Q.    Have you ever met with Mr. Audet?

3      A.    Possibly.

4      Q.    Do you recall corresponding with him?

5      A.    Possibly.

6           MS. CAVE:  Why don't we take a short

7    break.

8           THE VIDEOGRAPHER:  Off the record at 5:12.

9           (Recess from 5:12 p.m. to 5:23 p.m.)

10          THE VIDEOGRAPHER:  On the record at 5:23.

11     Q.    (BY MS. CAVE)  Mr. Garza, did GAW Miners

12   acquire BTC.com at some point?

13     A.    Yes, ma'am.

14     Q.    And what was BTC.com?

15     A.    A domain name.

16     Q.    And why did you acquire that?

17     A.    I just thought it was awesome because it was a

18   three-letter domain name.

19     Q.    And how much did that cost?

20     A.    So the -- it was either a million or maybe

21   1.1 million paid out in installments.

22     Q.    And why is it -- being a three-letter domain

23   name awesome?

24     A.    Well, because, you know, Stuart liked GAW,

25   which we had done for a while, so, you know, I thought

1                Homero Joshua Garza

2   he'd like the BTC.com.

3        Q.   Did you --

4        A.   And there's nothing else into it.

5        Q.   Did you discuss it with him before you

6   purchased it?

7        A.   Yes, ma'am.

8        Q.   And did he agree with the purchase?

9        A.   He eventually did.  He wasn't happy at first,

10  but he eventually did.

11       Q.   And where did you get the money to buy it?

12       A.   It would -- the company would have, you know,

13  decided, like, in its accounts.

14       Q.   And did that -- buying the BTC.com domain bring

15  any value or benefit?

16       A.   A lot of market exposure, you know, like

17  marketing exposure, things like that.

18       Q.   Was there an announcement about the purchase or

19  anything like that?

20       A.   I believe so.  Yes, ma'am.

21       Q.   A press release?

22       A.   I think so.

23       Q.   You mentioned earlier that you thought

24  Mr. Fraser tried to bring in investors.  Do you recall

25  that?

1                    Homero Joshua Garza

2        A.    Yes, ma'am.

3        Q.    And were there any investors that Mr. Fraser

4   actually brought in who put money into the company?

5        A.    I don't believe so.

6        Q.    ZenMiner's -- ZenMiner as a software concept,

7   who thought of that?  Who created that?

8        A.    Well, Joe and his team created it.  I don't

9   know if any one person can take credit for the concept

10  of it.

11              I'm trying to think if I can remember.  I

12  think it -- I think it was a combination of -- you know,

13  it came -- it formed after multiple discussions between

14  Shiraz, Joe, Stuart, and myself.

15       Q.    You mentioned earlier that Mr. Fraser

16  disapproved of your getting a dog.  Do you recall that

17  testimony --

18       A.    Uh-huh.

19       Q.    -- earlier?  Did you keep the dog?

20       A.    At first.  And then, eventually, we had someone

21  adopt it.

22       Q.    Did you get another dog after that?

23       A.    Oh, yeah, Intel.  Yes, ma'am.

24              THE REPORTER:  I'm sorry.

25              THE WITNESS:  Intel.  Yes, ma'am.

1                         Homero Joshua Garza

2        Q.   (BY MS. CAVE)   That's the name of the dog?

3        A.   Uh-huh.

4        Q.   And do you still have Intel?

5        A.   No, unfortunately, not.

6        Q.   Did you ever meet Elon Musk?

7        A.   No, ma'am.  I mean, I corresponded with him

8    over e-mail, but not in person.

9        Q.   What did you correspond him -- with him over

10   e-mail about?

11       A.   I wasn't happy about my -- some things about my

12   Tesla, so...

13       Q.   So you reached out to him?

14       A.   Uh-huh.

15       Q.   And he responded to you?

16       A.   Yes, ma'am.

17       Q.   Did you ever talk to him about anything other

18   than your car?

19       A.   I do not recall.  I don't feel like it, but I

20   don't recall.

21       Q.   Was there a problem with fake or copycat

22   websites being set up?

23       A.   Yes, ma'am.

24       Q.   And tell me about that.

25       A.   I'm sure on one -- more than one occasion,

1                      Homero Joshua Garza

2  there were websites that were created that look exactly

3  like our website, so...

4      Q.   Do you know who did that?

5      A.   I don't know if we ever knew the person behind

6  it.  Maybe we did.  I don't know.

7      Q.   And what effect did that have, having websites

8  that looked exactly like GAW Miners?

9      A.   Well, mainly, Stuart being mad about it, but it

10  was a domain effect.  I don't know if it affected sales

11  or whatever.  I mean, I have no way of knowing how

12  that...

13      Q.   What about the impact on your brand?

14      A.   I mean, I'd assume it's not helpful.  I mean,

15  it's just difficult because there's no way to measure,

16  you know, other than I'm sure it's not good and he was

17  mad.

18      Q.   Do you recall people stealing BitCoin from the

19  company?

20      A.   Yes, ma'am.

21      Q.   Did that happen more than once?

22      A.   Yes, ma'am.

23      Q.   How many times?

24      A.   Off the top of my head, I can think of at least

25  twice.

1                    Homero Joshua Garza

2      Q.   And how much of the coin was stolen?

3      A.   Well, one time was -- one time was like some

4  unknown person, and I feel like maybe, like, 50,000,

5  30,000.

6                And then the other time I'm thinking was

7  by Matt Eden, and he took all of the company's BitCoins.

8      Q.   When was that?

9      A.   That was towards the beginning of 2015, maybe

10  the end of first quarter.

11     Q.   Did you get that back?

12     A.   No.

13     Q.   And how did he do that?

14     A.   Because, as I was saying earlier, the wallets

15  had keys.  It's kind of like -- like we have to turn

16  keys for launching missiles and stuff.  And if enough

17  keys came together, then you could get into the wallets,

18  so there were more people than me that had the keys.

19     Q.   And whose -- is that the coin that belonged to

20  GAW Miners or was that customers' BitCoin?

21     A.    At that point, I wouldn't really know because,

22  you know, I -- you know, I'd -- you'd have to do

23  reconciliation between the -- because by that point, the

24  mining had caught up.  You know, we had more mining

25  capacity actually than we even had customers, so a

1                    Homero Joshua Garza

2    reconciliation would have had to have been done to see

3    who it belonged to.

4        Q.   But it's possible that some of it could have

5    belonged to customers?

6        A.   Oh, for sure, yes, ma'am.

7        Q.   Was -- were there separate receptacles for

8    keeping customers' BitCoins separate from GAW Miners'

9    BitCoin?

10       A.   I -- I think so, but I don't know how that

11   stuff worked.

12       Q.   Did you have -- were there problems with coin

13   developers at any point in time?

14               MR. WATTERSON:  Object to the form.

15       A.   It's -- I think so.

16       Q.   (BY MR. WATTERSON)  Do you recall anything

17   about those problems?

18       A.   My memory's too vague, but I remember there

19   being some kind of conflict or problem.

20       Q.   Okay.  Did you feel that there was -- when

21   PayBase launched, that there was an organized effort to

22   crash the market?

23       A.   Oh, for sure.

24       Q.   And who was behind that effort, do you know?

25       A.   I don't know if I knew a single person.  You

1                    Homero Joshua Garza

2  know, we just could observe all the forums and people

3  communicating about it, so...

4      Q.   So it was people who were purchasing PayCoin

5  and trying to crash the market?

6      A.   Yes, ma'am.

7      Q.   And do you know by -- by much was that crash?

8      A.   Oh, I'm not sure.  I'm not -- I don't know how

9  that works exactly, if there's a way to measure that.

10     Q.   Did you ever consider forming any companies

11 outside the United States?

12     A.   Yes, ma'am.

13     Q.   Why was that?

14     A.   Because the -- at the time -- maybe things are

15 different now, but at the time, there was a lot of

16 uncertainty about how -- what -- that's how -- that's

17 how Stuart was involved in the money thing.

18              But a money processer or however it was

19 worded earlier -- but, basically, like, the concept of,

20 like, converting fiat to -- or cryptocurrency to fiat

21 required something.

22              And at the time, there was a lot of

23 uncertainty about exactly how that had to work, and so

24 companies would form outside of the U.S., ANZ, and a

25 whole bunch of companies that did that, because the

1          Homero Joshua Garza

2 reg- -- you know, the rules weren't, I guess, as clear.

3 I mean, they may be different nowadays, but -- so...

4     Q.   Okay.  Was -- was a foreign company ever set

5 up?

6     A.   I think a foreign company was set up, but the,

7 you know, company concept itself fell through, so...

8     Q.   Why did it fall through?

9     A.   That was like when Shiraz -- or Rishab, like,

10 took my passport and trapped me into buying, so that

11 didn't really work out.

12     Q.   After the meeting that you had with individuals

13 from Cantor Fitzgerald in November 2014, did you ever

14 speak to anybody else from Cantor about GAW Miners?

15     A.   Well, there is the e-mail earlier on the

16 exhibits that took place after the meeting, so that

17 would have been.  But I can't recall -- I don't have a

18 specific memory of meeting with anyone else.

19     Q.   Based on the meeting with Cantor Fitzgerald,

20 did you take any action or do anything different with

21 the companies?

22          MR. WATTERSON:  Objection to form.

23     A.   I'm not sure that really affected things.  I

24 mean, nothing stands out.

25     Q.   (BY MS. CAVE)  Okay.  I'm going to show you

1                    Homero Joshua Garza

2   what we're marking as Exhibit 251.

3                    (Exhibit 251 marked.)

4        Q.   (BY MS. CAVE)   This is an e-mail from -- e-mail

5   chain between you and Robert Gallagher dated

6   September 11th, 2014.  Who was Rob -- Robert Gallagher?

7        A.   He was a previous employee at GAW Wireless --

8        Q.   He was --

9        A.   -- or GAW, whatever, GAW HSI.

10       Q.   Okay.  And what was his job at GAW HSI?

11       A.   I believe that he was the CTO for -- for a

12   while.

13       Q.   And so is this -- take your time to read the

14   chain, but it looks like you're talking about getting

15   into a -- a business project with him?

16       A.   Yes, ma'am.

17       Q.   And that related to building -- building your

18   own chips?

19       A.   Yes, ma'am.

20       Q.   And by that, what do you mean by "chips" here?

21       A.   The chips -- I thought we would bring the price

22   of miners down by building the chips, which were one of

23   the most expensive components that go into the miners.

24       Q.   So how are you going to go about building your

25   own chips?

1                    Homero Joshua Garza

2      A.   I mean, like, you -- they don't have to be

3    invented.  They already exist so if you have your own

4    manufacturing process, then it's a lot less expensive.

5    If you just -- you know, if you buy it from another

6    company, you're just paying the markup, so...

7      Q.   So you were considering setting up your own

8    manufacturing operation?

9      A.   I was until I found out how, you know, much

10   time and money it cost, but, yes.

11     Q.   And the first line of this e-mail on the first

12   page, you say to Mr. Gallagher, "Oh, yeah, Stuart is not

13   involved."

14     A.   Uh-huh.

15     Q.   Is that correct?  So he wasn't involved in this

16   process --

17     A.   No.

18     Q.   -- of chips?

19     A.   That's not the context it was meant in.

20     Q.   Okay.  So what context is that referring to?

21     A.   What that meant is -- so Rob Gallagher was the

22   first person that really made me aware of the way that

23   Stuart managed the investments into the company, how

24   much damage that could -- how much big of a problem, how

25   much fear it put in employees, how much damage it caused

1                    Homero Joshua Garza

2   that he had that level of control, and how involved he

3   was with the employees.  He left.  He quit because of

4   that.

5              So when I say "Stuart is not involved,"

6   it's within the con- -- you know, it meant to him that

7   Stuart, like, didn't -- like you -- like, it would be

8   safe to work here because, you know, Stuart isn't out

9   giving assignments to every single person,

10  blah-blah-blah, like he was at previous companies.

11     Q.   So this initiative regarding the chips is

12  something that Mr. Fraser was not involved in?

13              MR. WATTERSON:  Object to the form.

14     Q.   (BY MS. CAVE)  Or was not going to be involved

15  in?

16     A.   No, I think that -- again, this is to the best

17  of my memory, but I believe that the context of this is

18  more about Stuart's management involvement because I

19  remember talking to Stuart about making these chips.  We

20  even looked at a company in California that was working

21  on these chips.  In fact, they sent us a proposal I

22  remember Stuart got a copy of.  So, no, it wouldn't have

23  meant he wasn't involved in the chips.  It meant -- it

24  just meant what I just explained to Robert.

25     Q.   You never quit any of the companies that you

1                    Homero Joshua Garza

2    worked?

3        A.   I'm sorry?

4        Q.   You never quit --

5        A.   No.

6        Q.   -- any of the companies that you worked with

7    Mr. Fraser on?

8        A.   No.

9        Q.   But Mr. Gallagher did?

10       A.   Yes, ma'am.

11       Q.   So this statement here, "Stuart is not

12   involved," is not true, right?

13       A.   Again, the context of this e-mail to this

14   specific person was the last thing Robert said to me, is

15   that, "Talk to me whenever, you know, when Stuart is not

16   controlling every aspect" -- I don't remember exactly

17   how he worded it.  So me saying "Stuart is not

18   involved," to him meant that, you know, Stuart is not

19   controlling every aspect of the company like he did when

20   you worked here.

21       Q.   Okay.

22       A.   And I'm only so confident because I -- this is

23   one e-mail I specifically remember writing, and I

24   specifically remember what I meant by that.

25       Q.   Can you pull up Exhibit 160, please?  It's the

Page 250

1                        Homero Joshua Garza

2      spreadsheet of all of the transfers.

3          A.   Okay.

4          Q.   And on the last page there, it's the -- there's

5      a total that's negative $11,950,181.89.

6                    Do you see that?

7          A.   Yes, ma'am.

8          Q.   So that's a total that Mr. Fraser contributed

9      to the two companies that you were involved in?

10                   MR. WATTERSON:   Object to the form.

11         A.   It would have been the -- it would have been

12     more than two, but yes.

13         Q.   (BY MS. CAVE)  More than two?

14         A.   Oh, there's GAW Labs, on the Internet, Geniuses

15     at Work.

16         Q.   I'm sorry, I didn't say two companies.

17         A.   I'm sorry.

18         Q.   My question didn't come out properly.

19                   I think I said the companies that you two

20     were involved in?

21         A.   You two, I'm sorry.  Yes, ma'am.

22         Q.   Not two companies --

23         A.   Yes, ma'am.

24         Q.   -- but you and Mr. Fraser were involved in,

25     this is the total amount that he put in?

Page 251

1                    Homero Joshua Garza

2        A.    Yes, ma'am.

3              MR. WATTERSON:   Object to the form.

4        Q.    (BY MS. CAVE)   And he isn't not getting any of

5   that back, right?

6        A.    No, I mean, the -- the only -- the only

7   scenarios that come to mind that were in the form of a

8   loan was the money that he gave us from Tommy and the

9   money that he -- that he used to help me with my house

10  within the context of him saying his money, but, no, so

11  that's no.

12       Q.    You can set that to the side.   Thank you.

13             Can you pull up Exhibit 241, which is one

14  that we looked at before.

15       A.    241.

16       Q.    Sorry, can you go back to 160 for just one more

17  second.   I realize it's getting dark -- it's getting

18  dark in here and it's getting hard to see, but the

19  last -- if you look on the last page, June 25th, 2014,

20  is the last transfer that Mr. Fraser made into GAW

21  Miners; is that correct?

22       A.    450,000?

23       Q.    It looks like --

24       A.    Oh, I'm sorry.

25       Q.    Sorry, I'm trying to see it too.

Page 252

1                    Homero Joshua Garza

2                    -- 200,000 --

3      A.   Okay.

4      Q.   -- on June 25 --

5      A.   Yes, ma'am.

6      Q.   -- do you see that?

7      A.   Yes, ma'am.

8      Q.   And in June of 2014, that was during the

9  hardware mining phase?

10     A.   I wouldn't -- I don't have the dates memorized.

11     Q.   Do you know whether hashlets had been launched

12 at that point?

13     A.   No, I -- no.  They were so close together.

14     Q.   Sorry.  You can -- you can now set that to the

15 side.

16          Exhibit 241, I think, is the one that we

17 were looking for a moment ago.

18          It's the one press release, Geniuses at

19 Work.

20          So was this -- this actually a press

21 release that the companies issued?

22     A.   Yes, ma'am.

23     Q.   Okay.  And did you review that before it was

24 published?

25     A.   Stuart and I?

Page 253

Homero Joshua Garza

1

2     Q.    No, you yourself.

3     A.    Yes, ma'am, very likely.

4     Q.    Did you draft it or have any drafting of it?

5     A.    No.  No, ma'am.

6     Q.    Who would have drafted it?

7     A.    Most likely Rami would have -- or Rami or

8  Chris.  You see "Christian" at the bottom.

9     Q.    Christian Gogol?

10    A.    Yes, ma'am.

11    Q.    And who is Christian Gogol?

12    A.    He was -- he was an employee of the company,

13  and he worked in marketing -- oh, he did like graphics

14  and stuff like that.  He used to be a writer.

15    Q.    Okay.  You can set that to the side.

16              If you can pull up 232, which is the "I

17  had a dream" e-mail.

18    A.    232.

19    Q.    Okay.  So this e-mail is dated December 19th,

20  2014.  So PayBase launched after this, correct?

21    A.    Yes, ma'am.

22    Q.    So despite the concerns that you express in

23  this e-mail, you went ahead with the PayBase launch?

24    A.    Yes, ma'am.  We met about this in -- actually,

25  the very next morning.  And I can't remember what the

1                    Homero Joshua Garza

2   conclusion of it was, but the -- whatever the conclusion

3   was, if I remember, we -- we made -- you know, we went

4   forward with it.

5       Q.   And who did you meet with the next morning?

6   Dan --

7       A.   Yes, it would have been who is on this e-mail

8   chain.

9       Q.   Thank you.  You can set that aside.

10              Exhibit 93, which is the BitBeat.

11              Earlier you testified about there being a

12  backlash to this post?

13      A.   Yes, ma'am.

14      Q.   What was the backlash?

15      A.   Some of it was because the people disagreed

16  with what the -- on the last -- on the second page of

17  the last paragraph, there's a lot of discrepancy over,

18  like, how much power we actually used, how large the

19  location was.  I remember that was, like, a big topic --

20  topic of discussion.

21              I'm positive there are other things.

22  That's just one of the things that jumps out.

23      Q.   And by "backlash," who was having that

24  reaction?

25      A.   Like trolls making comments on the...

1          Homero Joshua Garza

2     Q.   Do you recall the name Viet Lee?  V-I-E-T.

3     A.   Viet Lee?

4     Q.   Uh-huh.

5     A.   That's a cool name, but, no, I don't really

6  recall that that I can think of.

7     Q.   Okay.  Do you know who Phil Vadala is?

8     A.   Yes, that name --

9     Q.   V-A-D-A-L-A.  V-A-D-A-L-A.  And who's he?

10    A.   He -- okay.  I think he owned an exchange, like

11 a coin exchange, that the company bought from him, and

12 then we used them later in a freelance capacity.

13    Q.   Was he involved in organized crime?

14    A.   I don't know.  Maybe.

15    Q.   Did you ever have any suspicions that he might

16 be?

17    A.   Not until he took the rest of the PayCoins we

18 had left.

19    Q.   When did he do that?

20    A.   It would be three months-ish into 2015.

21    Q.   And he kept those for himself?

22    A.   I don't know what happened with them.  I mean,

23 I think he did it first, and then they came up with some

24 other plan to do something with them, so...

25    Q.   And the company -- the companies never got

1                    Homero Joshua Garza

2  those back?

3       A.   No, ma'am.  The company -- those were allocated

4  for the company, myself -- you know, one was for myself,

5  one was for Stuart, so -- and then they got bundled

6  together, and we never got them back.

7       Q.   Who's Ted Dowding?  Do you recall that name?

8       A.   That does -- sounds familiar.  I feel like he

9  was a CEO or something.  CEO of a cryptocurrency company

10 or something like that.

11      Q.   Okay.  So after you went to Dubai, what

12 happened to the companies?

13      A.   I think by the time I returned from Dubai, that

14 everything was just gone.  I'm pretty sure.  I think

15 that it was just -- I remember in the office, the

16 employees had, you know, taken all of the furniture.  It

17 was just -- I think it was just gone, I think.

18      Q.   Was there an e-mail leak at some point?

19      A.   Sort of.

20           I still don't know how it happened, but my

21 understanding is somehow people gained access to our

22 e-mails, so I guess that would be a leak, I don't know.

23      Q.   Do you know how people gained that access?

24      A.   There's a lot of, like, things that have been

25 thrown around from someone not setting the e-mails up

1                          Homero Joshua Garza

2      correctly to, you know, people actually hacking into our

3      e-mail account, so to this day I'm not really

4      100 percent sure.

5          Q.   Did you ever figure out who did it?

6          A.   No, not that I know of.  Maybe someone else

7      did.

8          Q.   Did anyone inform the F.B.I. about that?

9          A.   The F.B.I.?  I think so.  Maybe.  I feel --

10     well, maybe.  I'm not sure, but I feel like that's

11     possible.

12         Q.   Did Jonah Dorman become interim CEO while you

13     were gone?

14         A.   Yes, ma'am.

15         Q.   And when you came back, did you resume the CEO

16     role?

17         A.   I don't remember.  I mean, it was -- it was all

18     so close together.  I can't recall exactly.

19         Q.   So we talked earlier -- you testified earlier

20     about Dave McLain doing some legal services.  Were there

21     other law firms or lawyers that you worked with in

22     respect to GAW Miners?

23         A.   Yes, ma'am.

24         Q.   And do you remember what -- the names of any of

25     those?

1             Homero Joshua Garza

2      A.    So one was a guy named Andy something.

3      Q.    And what -- what did he do?

4      A.    He -- he was one of the people that -- I'd

5  indicated earlier that, you know, I started to just

6  independently reach out to different people to learn

7  more about, you know, what regulatory things we may not

8  be following, so he was a part of that effort.

9             So he -- I don't remember the specific

10  things he did for us, but -- okay, yeah, he wrote some

11  terms of service language for us.  I mean, he was trying

12  to help us become more compliant or -- I don't know the

13  best way of saying that, but -- and then there was

14  another firm, this guy Leo, who dealt -- you know, who

15  sold BitCoins to us -- he -- I assume you're asking what

16  he does, right?

17      Q.    Uh-huh.

18      A.    So he sold BitCoins to us, he bought a lot of

19  miners that we weren't using anymore from us, and

20  drafted documents for us, like, a couple of plans on how

21  to set up the companies.  And there might have been

22  another, but those are the ones that come to mind.

23      Q.    How did you come into contact with Andy?

24      A.    I think -- I think I reached out to Andy

25  because I think I saw something, like a news article or

1                    Homero Joshua Garza

2    something like that and -- yeah, because I knew Andy

3    before the conference, so -- so some -- I think I

4    reached out to him from when I saw him online.

5         Q.   What about Leo?

6         A.   Leo, I met at the BitCoin conference.

7         Q.   The one in Las Vegas?

8         A.   Yes, ma'am.

9         Q.   And does the -- the firm Manatt Phelps sound

10   familiar?

11        A.   Yes.

12        Q.   Was Andy or Leo at that firm?

13        A.   I don't think so.

14        Q.   What did the Manatt firm do?

15        A.   I think -- okay.  They were brought in

16   because -- to deal with the PayCoin floor situation, I'm

17   pretty sure, and what our -- you know, to assess what

18   our liability of that situation was, and then what we

19   would need to do to fix it.

20        Q.   And did you -- without going into what the

21   nature of that advice was, did you act on their advice?

22        A.   Yes, ma'am.

23        Q.   And what steps did you take based on that

24   advice?

25        A.   We built a -- built a pro- -- a platform and a

Homero Joshua Garza

1  program called the Payback, Buyback, something or

2  whatever.  So we built the soft -- we began building

3  software to be able to -- to act on that advice -- at

4  their advice.

5          And, you know, we got so far into

6  development, but by that time the company -- you know,

7  the SEC got involved and...

8      Q.   When did you first hear that the SEC was

9  involved?

10     A.   I don't remember.  I mean, it was, I feel, only

11 a few months into the year, but...

12     Q.   The year 2015?

13     A.   Yes, ma'am.

14     Q.   Did you get a subpoena from them at some point?

15     A.   We did, yes, ma'am.

16     Q.   Okay.  And at some point after that, you

17 produced documents to the SEC?

18     A.   Yes, ma'am.

19     Q.   And you gave testimony as well?

20     A.   Yes, ma'am.

21     Q.   Did you ever instruct any employees to buy

22 BitCoin -- BitCoin from outside mining services?

23     A.   Outside mining services?

24     Q.   Yes.  Let me rephrase that.

1         Homero Joshua Garza

2              Did you ever instruct any GAW Miners

3    employees to buy BitCoin from somewhere outside the

4    company?

5         A.   I'm sorry, I'm not sure I understand the

6    question.

7         Q.   You've heard of Coinbase, right?

8         A.   Yes, ma'am.

9         Q.   Did you ever instruct any employees to buy

10   BitCoin from Coinbase?

11        A.   Very likely because we needed BitCoins when we

12   launched PayCoin, so I think we bought BitCoins from a

13   few places.

14        Q.   And what was the purpose of that?

15        A.   Because we -- we, essentially, were using our

16   own cash to try to help stabilize PayCoin when we

17   launched it to, you know, shield it or keep the people

18   that were, you know, buying it and dumping it, buying

19   and dumping it, we were trying to prevent that from

20   happening.

21        Q.   So people were buying and dumping?

22        A.   Yes, ma'am.

23        Q.   And how often did that occur?

24        A.   When we launched.  I mean, all the time.

25        Q.   Every day?

1                    Homero Joshua Garza

2        A.    Oh, yes, ma'am.

3        Q.    Multiple times a day?

4        A.    Well, I think they had, like, bots and stuff

5    doing it all the time.

6        Q.    What do you mean by "bots"?

7        A.    They were -- they're like these -- like little

8    programs that just go and, like, buy it from one

9    exchange and then they dump it in another exchange and

10   so it's, like, computerized.

11       Q.    And what effect did that have?

12       A.    Well, it drained all of our cash flow.

13       Q.    Do you have an understanding of how

14   cryptocurrency exchange works?

15       A.    I believe so.

16       Q.    Okay.  Can you just describe to me what -- how

17   it works?

18       A.    Well, I think -- I mean, so someone sends a

19   certain amount of cryptocurrency to -- you know, and

20   then it goes in, like, another company's wallet that's

21   relative to whatever kind of curren- -- you know,

22   cryptocurrency they're sending, and then they would give

23   that person back from another wallet whatever coin

24   they're --

25                  You know, relative to the amount of that

1          Homero Joshua Garza

2  coin, whatever it's been trading for, they give that

3  back to them and put it in -- in their wallet.

4      Q.   Did Mr. Fraser go to the Las Vegas conference

5  with you?

6      A.   No, ma'am.

7      Q.   Could we look again at Exhibit 19, which

8  is --

9            And so my first question is:  Did you

10  review this with your attorney before you signed it?

11      A.   Yes, ma'am.

12      Q.   Did you have an opportunity to comment on it or

13  offer any changes?

14      A.   Yes, ma'am.

15      Q.   And so you saw a draft at -- at first?

16      A.   Okay.  Yes, ma'am.

17      Q.   Did you make any changes to the draft?

18      A.   Yes, ma'am.

19      Q.   Do you recall what those were?

20      A.   I do.  I just -- would that be privileged if...

21            I'll just tell you --

22      Q.   If -- if there are any changes to this that

23  have been implemented -- I guess if there are any

24  changes to this that have been implemented --

25      A.   A lot of the wording in the doc- -- this

                    Homero Joshua Garza

1

2    document state what's, like, focused on me doing

3    something --

4        Q.   Okay.

5        A.   -- and a lot of the things, I did not

6    personally do, me and a bunch of people did, and so a

7    lot of the changes I had were to change the language to

8    include, you know, more than me, so...

9        Q.   But, ultimately, the way that this is worded --

10       A.   Was what --

11       Q.   -- is what you accepted?

12       A.   Was what -- the focus most people would agree

13   to, so...

14       Q.   Okay.  But at the end of the day when you

15   signed this, you agreed with all of the statements that

16   are set forth here?

17       A.   Yes, ma'am.

18       Q.   You can set that aside.

19            (Exhibit 252 marked.)

20       Q.   (BY MS. CAVE) This is Exhibit 252.

21            This is an e-mail chain from you to

22   Mr. Fraser dated July 18th, 2014.  Do you recall this

23   back and forth?

24       A.   One moment so I can look at it, please.

25       Q.   Sure.

1                     Homero Joshua Garza

2       A.    (Witness reviews document.)

3                   Okay.

4       Q.    Do you recall this exchange with Mr. Fraser?

5       A.    Yes, ma'am.

6       Q.    And at the bottom of the first page, you say to

7    Mr. Fraser, "Should have all of your money and have you

8    out very soon."  What do you mean by "have you out"?

9       A.    He -- this pertains to the -- to the best of my

10   knowledge, the money that he loaned the company.  And

11   the reason why I believe that is because I asked about

12   interest because I told him we'd pay it back with

13   interest.

14      Q.    Did you, in fact, pay it back with interest or

15   did you just pay back the principal?

16      A.    I don't remember.  I don't remember any

17   interest so we probably didn't.

18      Q.    ,Did any of the loans that Mr. Stuart paid --

19   Mr. Fraser paid -- did any of the loans that Mr. Fraser

20   made to you or the companies get paid back with

21   interest?

22      A.    This would have been the only one that the

23   interest was discussed and he said, no, so I don't think

24   so.

25      Q.    And at the -- the top e-mail there on the first

1                    Homero Joshua Garza

2    page, you say, "Thought about what you said.  You're

3    right, this is my company and I'm the only one that

4    knows how to really run it."

5              The first part of that, "thought about

6    what you said," what had Mr. Fraser said to you?  What

7    are you referring to?

8    A.   I only have fragments of in- -- you know,

9    memory, so I will tell you what I remember.  This, I --

10   I know, pertains to the conflict between us about the --

11   how the equity and stuff was going to split up -- be

12   split up between us, I believe.  And at some point I

13   remember -- or I believe in that conversation, he -- he

14   said, "Fine, you know, just, you know, do it."

15             Then he kind of came back a bit with a

16   temper saying, "Well, why don't you just, you know, buy

17   me out, like, you can just have all of it," because

18   that's what I think this sentence means, "to offer the

19   remaining personal balance, blah-blah-blah-blah," so --

20   and then he said, "It'd be a bad deal for me."

21             So within the context of this e-mail, I

22   believe that what he was talking about was that, when we

23   were in that conflict, he did ultimately agree that --

24             The best way I can think to say it is,

25   like, I knew how to run it better than he knew how to

1              Homero Joshua Garza

2   run it and that, like, he wouldn't do the same things at

3   other companies, like, where he was intimately involved

4   with all of the employees, that he would, instead, like,

5   he'd be up here, I'd be right here, and the rest of the

6   company would be right here (indicating).  So that is my

7   memory of what this means.

8       Q.   And when you say "this is my company," are you

9   referring to GAW Miners, sir?

10      A.   Most likely.

11      Q.   You can set that to the side.

12              (Exhibit 253 marked.)

13      Q.   (BY MS. CAVE) This is Exhibit 253.

14              And this is the transcript of the change

15  of plea hearing July 20th, 2017, in your criminal case;

16  is that right?

17      A.   Yes, ma'am.

18      Q.   Have you seen a transcript of the change of

19  plea hearing before?

20      A.   No.

21      Q.   Okay.

22      A.   Interesting.

23      Q.   So first turning to page 7 of the document --

24  you're welcome to look at the whole thing, but I can

25  direct you, since it is kind of long, to specific pages.

Homero Joshua Garza

2          So turning to page 7, you were put under

3   oath --

4      A.   Yes, ma'am.

5      Q.   -- for this hearing?

6      A.   Yes, ma'am.

7      Q.   And swore to tell the truth; is that right?

8      A.   Yes, ma'am.

9      Q.   And starting on page 39, you make -- you make

10   some statements there yourself.  Do you see that?

11      A.   One second.

12              Yes, ma'am.

13      Q.   Okay.  So here you admitted under oath, midway

14   down the page, "I made a number of statements that were

15   not true at the time I made them."

16              Do you see that?

17      A.   Yes, ma'am.

18      Q.   And you believe that statement was true when

19   you made it -- the statement here on the transcript is

20   true?

21      A.   Yes, ma'am.

22      Q.   And then starting on page -- the bottom of

23   page 41, Mr. Pierpont is the attorney for the

24   Government, I believe?

25      A.   Yes, ma'am.

1                     Homero Joshua Garza

2        Q.    And starting on the bottom of page 41, he goes

3   on to describe a -- a number of elements of the offense

4   and the -- the facts that the Government had, and that

5   continues through the top of page 47, and take your time

6   to read through that if you'd like.

7        A.    Yes, ma'am.

8        Q.    Okay.   And then at the bottom page 46 and the

9   top of page 47, the Court asks you, "Do you agree or

10  disagree with the things he said," and you say, "I

11  agree, Your Honor."

12              And the judge asked again, "Do you agree

13  with everything he told me," and you say, "Yes,

14  Your Honor."

15              Do you see that?

16       A.    Yes, ma'am.

17       Q.    And that's still true?

18       A.    Yes, ma'am.

19       Q.    You can set that to the side.

20              (Exhibit 254 marked.)

21       Q.    (BY MS. CAVE) This is Exhibit 254, and this is

22  a transcript of your sentencing on September 13th, 2018.

23  Do you see that?

24       A.    Yes, ma'am.

25       Q.    Okay.   Have you seen a transcript of your

1                    Homero Joshua Garza

2  sentencing before?

3       A.   No, ma'am.

4       Q.   And do you recall being placed under oath for

5  this proceeding as well?

6       A.   Yes, ma'am.

7       Q.   Okay.  And on -- if you could turn to page 71.

8       A.   I don't know if you've asked the question or

9  not, but may I step out either now or after you've asked

10 your question for a moment, please?

11               MS. CAVE:  We can take a break right now.

12               THE WITNESS:  Okay.

13               THE VIDEOGRAPHER:  Off the record at 6:11.

14               (Recess from 6:11 p.m. to 6:19 p.m.)

15               THE VIDEOGRAPHER:  On the record at 6:19.

16      Q.   (BY MS. CAVE)  All right, Mr. Garza, turning

17 back to the sentencing transcript --

18      A.   Yes, ma'am.

19      Q.   -- if you could turn to page 77.  Down at the

20 bottom is where you begin making a statement to the

21 Court.  Do you see that?

22      A.   Yes, ma'am.

23      Q.   Okay.  And it says, "A lot of the things that

24 were said here today are true, and I accept that I

25 caused those things."

1       Homero Joshua Garza

2                    Do you see that?

3       A.    Yes, ma'am.

4       Q.    Was that a true statement when you made it?

5       A.    Yes, ma'am.

6       Q.    And going down to the -- two paragraphs below

7   that, it says, "And I feel like for me, it just -- I

8   don't know, it just -- it kind of just clicked, and no

9   matter what happened, you know, I was in charge and it

10  was my job to keep customers and investors safe and I

11  didn't."

12                   Do you see that?

13      A.    Yes, ma'am.

14      Q.    And that statement is true?

15      A.    Yes, ma'am.

16      Q.    Okay.  Set that to the side.

17            MS. CAVE:  Unless Colin brings up anything

18  further, I don't have any further questions at this

19  time.

20            MR. WATTERSON:  Okay.  And I just have a

21  couple of follow-up questions.

22            THE WITNESS:  Sure.

23                FURTHER EXAMINATION

24  Questions by MR. WATTERSON:

25      Q.    Earlier you testified about someone -- was it

1                    Homero Joshua Garza

2    Phil Vadala?

3        A.    Yes, sir.

4        Q.    And you mentioned that he took some PayCoins?

5        A.    Yes, sir.

6        Q.    And I think that you mentioned that some of the

7    PayCoins had been allocated for you and some had been

8    allocated for Stuart?

9        A.    Yes, sir.

10       Q.    What -- what do you mean when you say that some

11   of the PayCoins were allocated for Mr. Fraser?

12       A.    So the way that PayCoins were set up -- I'm --

13   I'm going to do my best to explain the -- how the

14   technology worked.

15             But there was some way that the majority

16   of the -- like, so the PayCoins are in these wallets,

17   and the majority of the wallets were somehow bonded

18   together and staked together or something like that.

19             And then there were a few -- I don't

20   remember how many, at least two -- that were set aside

21   with a certain amount of, like, predefined coins in

22   them, and they were to be given to myself and they were

23   to be given to Stuart.

24       Q.    You said "a few." Did you mean a few wallets?

25       A.    Few wallets, yes.

Page 273

1                        Homero Joshua Garza

2       Q.    Okay.  And have you discussed these set aside

3   wallets with Mr. Fraser?

4       A.    Yes, sir.

5       Q.    Okay.  Can you tell me about the discussions?

6       A.    The -- I remem- -- the main thing I remember

7   about the discussion was that he was -- he was clear

8   that he did not want either of us to take possession of

9   them at the time we discussed it, that there was too

10  much -- that we needed to wait.  I can't remem- -- if I

11  stated what I -- I'd be guessing at what I thought the

12  reason was.

13      Q.    You read my mind.

14                  Do you know when this conversation took

15  place?

16      A.    I believe sometime in January because it was

17  after it launched.

18      Q.    And forgive me, you -- I think you might have

19  said this, but do you remember how many PayCoins were

20  assessed to hide in these wallets?

21      A.    I don't.  I mean, it -- it was at their -- at a

22  $20 value, and as you know, the price ranged from 10 to

23  18-ish after, in January.  I believe that it worked out

24  to be anywhere between like 40- and 60 million or

25  something in that range, so whatever that math would be

1                        Homero Joshua Garza

2    backwards to the amount of PayCoins.

3        Q.   Why were these PayCoins set aside?

4        A.   Because we -- we had talked and we didn't

5    really --

6                    (Dog outside door and laughter.)

7        A.   We had talked and we didn't really have --

8    unlike other businesses, we had run an exit strategy

9    like a way to -- you know, like we wanted to leave, to

10   leave somehow, so we -- it was mutually beneficial for

11   us and the PayCoin owners for, you know, us to, you

12   know, get the price where it was because, you know, when

13   the time came, that would be sort of our exit.

14       Q.   (BY MR. WATTERSON)  Okay.

15       A.   In other words, like, the contributions that

16   had been made, you know, like  that would be something

17   we'd be able to end up having later.

18                    MR. WATTERSON:  Let the record reflect

19   there's a dog walking around outside the deposition

20   room.

21       Q.   (BY MR. WATTERSON) Earlier you testified

22   about -- well, strike that.

23                    You were talking about the Wall Street

24   Journal article, and do you recall that testimony?

25       A.   Yes, ma'am -- yes, sir.

1                  Homero Joshua Garza

2      Q.    And you mentioned trolls?

3      A.    Yes, sir.

4      Q.    What does -- what does it mean -- what does a

5   "troll" mean?

6      A.    Well, it's a term that -- essentially,

7   anonymous people that just make negative comments in an

8   effort to disrupt or create issues.

9      Q.    And when you say "anonymous," what do you mean

10   by that?

11      A.    So, say, for example -- say, for example, some

12   of the instances where you -- or feedback from people

13   earlier came up, that's not anonymous.  We knew who they

14   were and we knew who the feedback, you know, was from.

15            In the instance of trolls, you know, these

16   are people that don't step forward that we don't have

17   any idea, you know, who they are but make allegations or

18   statements that are usually not true, but we have no way

19   to refute them or do anything about it.

20      Q.    So this would be like someone commenting on a

21   YouTube video, something like that?

22      A.    Sure.  I mean, that would be an example.  I

23   mean, the most abundant example is there's a thread in

24   Bitcointalk about -- you know, with various threats and

25   things like that that have been made, you know, so --

1                    Homero Joshua Garza

2    you know, but they were basically --

3                    In the in -- instance of the Wall Street

4    Journal, they just hammered them with a bunch -- you

5    know, "There's -- there's no way they have that mining

6    center" or "I know they don't" or -- I mean, just all of

7    these things that the -- Mr. Casey looked at and said,

8    "Well, are these things true or not," you know, and

9    they -- you know, the things that were being stated

10   weren't true, and that -- and that's what made us to

11   have a follow-up, you know, discussion about it.

12                   I guess I've never been asked to define

13   "troll," so...

14       Q.   You testified earlier that some BitCoin was

15   stolen from the companies, and I think that you cited

16   50,000 as a figure?

17       A.   I think so.

18       Q.   Was that 50,000 BitCoins or 50 --

19       A.   I think worth -- worth USD, like worth of

20   money.

21       Q.   Okay.  Can you turn to Exhibit 250, which is an

22   e-mail chain between you and Mr. Shinners?

23                   I think you were asked some questions

24   about what Mr. Shinners is writing here.  Do you recall

25   that?

1              Homero Joshua Garza

2      A.   I'm sorry, say it again, please.

3      Q.   I think you were asked some questions about

4   your understanding of what Mr. Shinners was writing,

5   correct?

6      A.   Yes, sir.

7      Q.   And that's all that you could testify about,

8   what your understanding of what Mr. Shinners meant by

9   writing the e-mail, correct?

10     A.   That's accurate.

11     Q.   You can't see into Mr. Shinners' head?

12     A.   Correct.

13     Q.   If Mr. Fraser's attorneys wanted to ask

14  Mr. Shinners questions about this e-mail, they should

15  have asked him questions, right?

16          MS. CAVE:  Objection to the form.

17     A.   They could.

18     Q.   (BY MR. WATTERSON)  Okay.  I wanted to just

19  turn to Exhibit 246, which was a document related to

20  Geniuses at Work Corporation.

21          THE REPORTER:  Of what corporation?

22     Q.   (BY MR. WATTERSON)  Geniuses at Work

23  Corporation.

24          Can you turn to the third page?

25          This indicates, I guess, that you

Page 278

1                         Homero Joshua Garza

2    purchased 200,000 shares of Genius at Work --

3                         Sorry, it's -- it's the third page of the

4    document.

5         A.   Oh, sorry.  Okay.

6         Q.   And it indicates that -- that "Officers of the

7    corporation are hereby authorized to issue and sell

8    shares of the corporation at $4 par value."

9                         Do you see that?

10        A.   Yes, sir.

11        Q.   And it says, "The person named below, the

12   shareholder" -- well, actually, let me strike that.

13                        Can you just read what this section under

14   "stock issuance" says?

15        A.   This paragraph here?

16        Q.   Yeah.

17        A.   "Resolved, the officers of the corporation are

18   hereby authorized to issue and sell shares" --

19                        THE REPORTER:  Can you slow down, please.

20        A.   -- "to sell shares of common stock of the

21   corporation."

22        Q.   Actually, it's okay to -- you -- I just wanted

23   you to read it yourself.  You didn't have to read it on

24   the record.

25        A.   Oh, sorry.

1          Homero Joshua Garza

2     Q.   Because I just -- I just wanted to ask if you

3   under -- do you understand what this -- this --

4     A.   Yeah, essentially, it's saying that, you know,

5   if you're contributing cash amount or property amount

6   equal to, you can share some cash.

7     Q.   Did you -- did you do that?  Did you contribute

8   $500,000 to Geniuses at Work?

9     A.   At the time this was made, that was likely the

10  understanding.

11    Q.   What do you mean by that?

12    A.   I -- when this was being made, I remember

13  asking a lot of people's advice about how to properly

14  fill this out, you know, and -- you know -- you know,

15  but one dollar for one or whatever, and essentially the

16  best advice I got was that, you know, to make an

17  estimate about, you know, the value of what's being

18  brought into the company and assign a value to that and

19  put it into here.

20    Q.   And so what did -- what was brought into the

21  company?

22    A.   I'm thinking.  There's just been so many

23  companies.  This was before...

24              To my best memory, various pieces of

25  software.  I mean, there are a number of customers that

Page 280

1                    Homero Joshua Garza

2   were brought in.  That's probably about as specific as I

3   could be.

4       Q.   Okay.  Do you know whether there were -- strike

5   that.

6                    Where were the -- so there were -- strike

7   that again --

8                    Were the software -- was the software

9   brought over from a different company?

10      A.   Possibly.  Sorry, I just -- it's just not

11  something I want to guess at so -- if I don't remember

12  specifically.

13      Q.   Okay.  And if you turn to the last page of the

14  document, there is -- there's a Certificate of Secretary

15  of Geniuses at Work Corporation.  Do you see that?

16      A.   Yes.

17      Q.   And it's not signed?

18      A.   Yes, sir.

19      Q.   Do you know whether it was ever signed?

20      A.   I'm sorry?

21      Q.   So do you know if this certificate was ever

22  signed?

23      A.   If you have this document and it's not signed,

24  then it is most likely -- you know, the highest likely

25  is that it was not signed.

1                    Homero Joshua Garza

2       Q.    Okay.

3       A.    Because the only -- there would not -- any

4  document that our company would have signed, it would

5  have been scanned in, it would have been stored that

6  way.

7       Q.    And this is a document from LegalZoom, correct?

8       A.    Yes, it was generated like that.

9       Q.    And so it comes in sort of a folder, right?

10      A.    Uh-huh.

11      Q.    And at the -- if you turn to the last page,

12 there's Exhibit B, form of share certificate.  Do you

13 know -- do you remember whether the folder contained a

14 share certificate?

15      A.    Yes, it did.

16      Q.    Do you know whether it was filled out?

17      A.    No, I don't think it was filled out.

18      Q.    Okay.

19      A.    And if I could elaborate on the previous

20 question you asked.

21      Q.    Sure.

22      A.    So what I mean by that is that in order for

23 this to exist, it means that -- or to have been signed,

24 it means this would have had to have been -- a copy

25 would have had to have been made without the signature

1                    Homero Joshua Garza

2   first.  Then somebody would have had to have signed,

3   thus a copy existing with no signature.

4              And I can just tell you, given our

5   company, like, there's -- there's no scenario where,

6   like, we would just, like, randomly make copies of

7   things without signatures, you know, just for the sake

8   of doing it, then sign it later and put it back in.

9       Q.   Okay.  Did you ever have any discussions with

10  Mr. Fraser about Geniuses at Work Corporation?

11              MS. CAVE:  Objection.  Form.

12      A.   I don't recall any specific discussions -- I

13  mean, I don't know.  I can't remember.

14      Q.   (BY MR. WATTERSON)  Do you recall whether

15  Mr. Fraser had an ownership interest in Geniuses at Work

16  Corporation?

17      A.   It's difficult to answer that in the way it's

18  being asked because -- without the con- -- without

19  context.  Stuart never liked -- liked documenting that

20  kind of stuff.  I spent a long time trying to get him to

21  do it.

22              The closest thing that I remember that we

23  ever agreed on was how -- the 50/50 split of whatever we

24  had going forward that I indicated earlier.

25              The documents that are represented here

                    Homero Joshua Garza

1  about 15 percent/85, like that was in an effort to

2  formalize that in a document.  But really everything up

3  to that point, it was just a lot of discussions.  I know

4  that's not quite what you asked, but it's just the best

5  answer I can think to give because it just -- it always

6  changed, went back and forth, "You own this, I own

7  that," it just -- it was fluid and it never really felt

8  like it settled.

9             MR. WATTERSON:  Okay.  Let me just -- can

10  I grab an exhibit sticker?

11             MS. CAVE:  Yes.  (Indicating.)

12             MR. WATTERSON:  Mark this as 255.

13             (Exhibit 255 marked.)

14      Q.  (BY MR. WATTERSON)  Take a look at this

15  exhibit.

16      A.  Uh-huh.

17      Q.  This is a --

18      A.  Yeah, this is like what I'm talking about right

19  here.

20      Q.  Okay.  So this is a June 6th, 2000 -- well,

21  sorry, this is a -- it's a July 17, 2013, e-mail that

22  you forwarded to yourself on June 6, 2014; is that --

23      A.  Yes, sir.

24      Q.  And I guess you had said that -- just now this

1                    Homero Joshua Garza

2    is what you were talking about.  Can you explain what

3    you meant by that?

4        A.   Well, when I said -- I mean, I, obviously,

5    didn't remember and I -- I think about this e-mail.  But

6    when I said, "My -- my continuous effort of," and you

7    can see here on the second page, like, where I wrote, "I

8    literally sent you this three times asking," this is,

9    you know, representing the culmination of all of our

10   phone discussions and then trying to finally get it on

11   paper, so that way we would be in agreement going

12   forward.  I sent him this over and over and over again,

13   and then you can sort of see what the response was and

14   stuff.

15              But this was -- to -- to me, this was,

16   like, the last thing we agreed on and, thus, making when

17   this came up, why it became such a conflict between us.

18       Q.   And so would that be why you were forwarding

19   this to yourself --

20       A.   Yes.

21       Q.   -- on June 6, 2014?

22              And if you look down -- so the fifth

23   paragraph, it says, "Going" -- I think you mean going

24   forward -- "Here is what I'm thinking.  We'll create an

25   equal partnership 50/50 in our holding company, Geniuses

1                    Homero Joshua Garza

2    at Work Corporation.  You can have voting power(I don't

3    care).  I'll put everything I've built" and then there's

4    some bullet points.

5                    Do you see that?

6         A.   Yes.

7         Q.   And so, I guess, was that your understanding,

8    that there was an equal partnership 50/50 --

9         A.   Yes.

10        Q.   -- in Geniuses at Work Corporation?

11        A.   Yeah.

12        Q.   Okay.  What does "equity stake in CP" mean?

13                  THE REPORTER:  I'm sorry?

14                  MR. WATTERSON:  Sorry.

15        Q.   (BY MR. WATTERSON)  The first bullet point, it

16   says, "equity stake in CP."

17                  What does that mean?

18        A.   I know what it means.  I'm trying to remember

19   the name of it.

20                  This was created around the same time that

21   Smart Tech existed, a spin-off of Smart Tech because I

22   wanted to try to do something on my own.

23                  While I was working, me and this other guy

24   came up with an idea of creating advertisement within

25   ringtones while people called everyone.

Homero Joshua Garza

2        And when I told Stuart about that, then he

3   came right back into the -- so that's what CP stands

4   for, that.  I just can't remember why we called it CP,

5   but it stands for whatever the name was of our

6   advertising system.

7      Q.   Okay.  In the paragraph we looked -- the fifth

8   paragraph we looked at, it says, "You can have the

9   voting power (I don't care)."

10        Do you see that?

11     A.   Uh-huh.

12     Q.   Did -- and I take it that's referring to voting

13   power in Geniuses at Work Corporation; is that right?

14     A.   Well, right.  I'm saying we can put everything

15   we've done besides GAW High-Speed under this company,

16   and then he would have the voting power.

17     Q.   Did you consider Mr. Fraser to have the voting

18   power?

19     A.   Yeah.  I mean -- I mean, that's, I guess,

20   what's interesting about all of this, is, like, at the

21   end of the day, that, you know, I had an opinion, he had

22   an opinion, it was going to be his way, so...

23        And that's how -- you know, it didn't

24   start that way, but that's -- I mean, that's why I wrote

25   it out.  I mean, it was like kind of me like giving,

Page 287

1                Homero Joshua Garza

2   like "I don't care," because he told me a story once

3   that -- with him and Howard, that, you know, Howard

4   always made sure that he knew every -- everyone in the

5   room knew that he was in charge, and he said, "That's

6   how I am with my company," so -- you know.

7                And, you know, I understand, as lawyers,

8   you guys are looking at what's written on paper and

9   the -- I mean, but at the end of the day, it didn't

10  really matter, he was like the main guy, so...

11      Q.    Practically speaking, he was in charge?

12      A.    Yeah.   I mean --

13           MS. CAVE:   Objection to the form.

14      A.    -- that's -- GAW Miners, you know, represents

15  one of -- the first time that -- you know, that I can

16  actually, like, influence and put an opinion into

17  things.   But up to this point, as indicated by this

18  financial document and all, I mean, it -- I mean, you

19  can see -- you can see the transactions.   You can see

20  how close they are together.   I mean, when someone's

21  doing that, he's obviously incredibly kind, but at the

22  end of the day, like that's who's in charge.

23      Q.    (BY MR. WATTERSON)   So if you turn to the last

24  page, this is an e-mail that was sent on July 24th,

25  2013, and --

Homero Joshua Garza

1    A.   Right.

2    Q.   And...

3    A.   See, you can even see here it's the 10K per

4  month investment, you know, so that's the 10K that went

5  to me.  And then you even say this would be set up on

6  auto pay.  See how I underlined "auto pay," because that

7  was me, like, trying to make it to where I didn't have

8  to ask him every month.

9    Q.   Okay.  I was just wondering, it says -- in the

10 second paragraph, it says, "You hold veto rights."

11                 Do you see that?

12   A.   Correct.

13   Q.   Do you recall what you meant by "veto rights"?

14   A.   My understanding is that, like, veto rights

15 means that for -- you know, people can make decisions

16 and talk and do what they want, but the person who has

17 the final -- the veto right, basically, can -- makes the

18 final decision.  They can, in other words, veto

19 whatever -- whatever else was done, I guess, prior to

20 then.

21                 I knew no deal Stuart would agree with,

22 like he -- he would never agree if it didn't involve,

23 like, him being the fin- -- having the final say.

24   Q.   So your understanding of the agreement was that

1                    Homero Joshua Garza

2    Mr. Fraser had the final say?

3        A.    That's correct.

4              MS. CAVE:  Objection to the form.

5        A.    That is my understanding in the nature of our

6    relationship.

7              MR. WATTERSON:  Okay.  Thank you very

8    much.

9              MS. CAVE:  No further questions.

10             MR. WATTERSON:  All right.  You're done.

11             THE VIDEOGRAPHER:  Off the record at 6:44,

12   ending the deposition of Homero Joshua Garza.

13             (Proceedings concluded at 6:44 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

Page 290

1                        ERRATA SHEET

2    Case Name:

3    Deposition Date:

4    Deponent:

5    Pg.  No. Now Reads        Should Read   Reason

6    ____ ____ _____     _____   _____

7    ____ ____ _____     _____   _____

8    ____ ____ _____     _____   _____

9    ____ ____ _____     _____   _____

10   ____ ____ _____     _____   _____

11   ____ ____ _____     _____   _____

12   ____ ____ _____     _____   _____

13   ____ ____ _____     _____   _____

14   ____ ____ _____     _____   _____

15   ____ ____ _____     _____   _____

16   ____ ____ _____     _____   _____

17   ____ ____ _____     _____   _____

18   ____ ____ _____     _____   _____

19   ____ ____ _____     _____   _____

20

                              _____

21                            Signature of Deponent

22   SUBSCRIBED AND SWORN BEFORE ME

23   THIS ____ DAY OF _____, 2018.

24   _____

25   (Notary Public)  MY COMMISSION EXPIRES:_____

Page 291

1                    Homero Joshua Garza

2       I, HOMERO JOSHUA GARZA, have read the foregoing

3  deposition and hereby affix my signature that same is

4  true and correct, except as noted above.

5

6                      _____

7                      HOMERO JOSHUA GARZA

8  THE STATE OF _____)

9  COUNTY OF _____)

10

11       Before me, _____, on this

12  day personally appeared HOMERO JOSHUA GARZA, known to me

13  or proved to me on the oath of _____ or

14  through _____ (description of

15  identity card or other document) to be the person whose

16  name is subscribed to the foregoing instrument and

17  acknowledged to me that he/she executed the same for the

18  purpose and consideration therein expressed.

19       Given under my hand and seal of office on this

20  _____ day of _____, _____.

21

22                      _____

23                      NOTARY PUBLIC IN AND FOR

24                      THE STATE OF _____

25  My Commission Expires: _____

Page 292

```
 1                    Homero Joshua Garza
 2          IN THE UNITED STATES DISTRICT COURT
 3                    OF CONNECTICUT
 4
    DENIS MARC AUDET, MICHAEL )  Case 3:16-cv-00940
 5  PFEIFFER, DEAN ALLEN      )
    SHINNERS, and JASON       )  Hon. Michael P. Shea
 6  VARGAS, Individually and  )  Courtroom 2
    on Behalf of All Others   )
 7  Similarly Situated,       )  ECF Case
                              )
 8       Plaintiffs,          )  CLASS ACTION
                              )
 9  vs.                       )
                              )
10  STUART A. FRASER,         )
    GAW MINERS, LLC, AND      )
11  ZENMINER, LLC, (d/b/a     )
    ZEN CLOUD),               )
12                            )
         Defendants.          )
13
14         ********************************
15             REPORTER'S CERTIFICATE
16   ORAL VIDEOTAPED DEPOSITION OF HOMERO JOSHUA GARZA
17                  December 14, 2018
18         ********************************
19       I, April Balcombe-Anderson, Certified Shorthand
20  Reporter in and for the State of Texas, hereby certify
21  to the following:
22       That the witness, HOMERO JOSHUA GARZA, was duly
23  sworn and that the transcript of the deposition is a
24  true record of the testimony given by the witness;
25
```

1                       Homero Joshua Garza

2

3        That the original deposition was delivered to

4   Ms. Cave; the Custodial Attorney;

5

6        I further certify pursuant to FRCP Rule 30(f)(1)

7   that the signature of the deponent:

8        ___ was requested by the deponent or a party before

9   the completion of the deposition and that the signature

10  is to be before any notary public and returned within 30

11  days (or ___ days per agreement of counsel) from the

12  date of receipt of the transcript.

13       If returned, the attached Changes and Signature

14  Page contains any changes and the reasons therefore:

15       ___ was not requested by the deponent or a party

16  before the completion of the deposition.

17       That the amount of time used by each party at the

18  time of the deposition is as follows:

19       Mr. Watterson (4h6m)

             Attorney for Plaintiffs

20

         Ms. Cave (3h3m)

21           Attorney for Defendant

22

23       That pursuant to information given to the

24  deposition officer at the time said testimony was taken,

25  the following includes counsel for all parties of

Page 294

```
 1                    Homero Joshua Garza
 2   record:
 3   FOR PLAINTIFFS:
 4        MR. COLIN WATTERSON, ESQ.
          Susman Godfrey
 5        1000 Louisiana
          Houston, TX 77002
 6
 7
 8   FOR DEFENDANTS, STUART A. FRASER, GAW MINERS, LLC AND
     ZENMINER, LLC, (D/B/A ZEN CLOUD):
 9
          MS. SARAH CAVE, ESQ.
10        MS. HANNAH MILLER, ESQ.
          MS. SARA ECHENIQUE (via LiveLitigation and
11        teleconference)
          MS. ANNA SCHULER (via LiveLitigation and
12        teleconference)
          Hughes Hubbard & Reed
13        One Battery Park Plaza
          New York, New York 10004
14
15
16
17        That $_____ is the deposition officer's charges
18   to the Plaintiffs for preparing the original deposition
19   and any copies of exhibits;
20        I further certify that I am neither counsel for,
21   related to, nor employed by any of the parties in the
22   action in which this proceeding was taken, and further
23   that I am not financially or otherwise interested in the
24   outcome of this action.
25
```

Page 295

1      Homero Joshua Garza

2   Certified to by me on this 19th day of

3 December, 2018.

4

5

6       _____

7       April Balcombe, CSR, CRR, CRC

        Texas CSR 5752

8       Expiration:  12/31/2019

        TSG Reporting Worlwide

9       977.702.9580

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25