# EXHIBIT M

1            JONAH DORMAN

2        UNITED STATES DISTRICT COURT

3          DISTRICT OF CONNECTICUT

4

5  DENIS MARC AUDET, MICHAEL PFEIFFER,

6  DEAN ALLEN SHINNERS, AND JASON

7  VARGAS, INDIVIDUALLY AND ON BEHALF

8  OF ALL OTHER SIMILARLY SITUATED,

9               Plaintiffs,

10     vs.              Case No. 3:16-CV-00940

11

12  STUART A. FRASER, GAW MINERS, LLC,

13  AND ZENMINER, LLC (D/B/A ZEN CLOUD),

14               Defendants.

15  _____/

16

17

18     The Videotaped Deposition of JONAH DORMAN,

19     Taken at 99 Monroe Avenue NW, Suite 975,

20     Grand Rapids, Michigan,

21     Commencing at 9:22 a.m.,

22     Wednesday, August 1, 2018,

23     Before Cheri L. Poplin, CSR-5132, RPR, CRR.

24

25  Job No. 145641

1                         JONAH DORMAN

2     APPEARANCES:

3

4     EDGAR SARGENT, ESQ.

5     Susman Godfrey

6     1201 Third Avenue

7     Seattle, Washington 98101

8

9

10

11          Appearing on behalf of the Plaintiffs.

12

13    SARAH CAVE, ESQ.

14    HANNAH MILLER, ESQ.

15    Hughes Hubbard & Reed

16    One Battery Park Plaza

17    New York, New York 10004

18          Appearing on behalf of the Defendants.

19

20

21

22

23    ALSO PRESENT:

24    Devon Green - Video Technician

25

1                      JONAH DORMAN

2                    TABLE OF CONTENTS

3

4     WITNESS                              PAGE

5     JONAH DORMAN

6

7     EXAMINATION BY MR. SARGENT            7

8     EXAMINATION BY MS. CAVE              68

9     RE-EXAMINATION BY MR. SARGENT       102

10

11                      EXHIBITS

12

13    EXHIBIT                              PAGE

14

15

16    DEPOSITION EXHIBIT 3 - email exchange   30

17    between Mr. Dorman, Mr. Eden,

18    Mr. Gogol, Mr. Garza, Mr. Mordica in

19    October 2014

20    DEPOSITION EXHIBIT 10 - Paycoin white   40

21    paper

22    DEPOSITION EXHIBIT 30 - email exchange   54

23    subject "Re: Wire"

24    DEPOSITION EXHIBIT 8 - email exchange   57

      subject "HashStaker design

25    requirements"

1                    JONAH DORMAN

2

3    DEPOSITION EXHIBIT 132 - email exchange    60

4    subject "Re: Info"

5    DEPOSITION EXHIBIT 133 - email exchange    80

6    subject "Re: white paper draft"

7    DEPOSITION EXHIBIT 134 - email exchange    82

8    subject "Re: HashCoin White Paper"

9    DEPOSITION EXHIBIT 135 - email from        85

10   Jonah Dorman to Allen Shinners dated

11   11/21/14

12   DEPOSITION EXHIBIT 136 - email from        86

13   Jonah Dorman to Josh Garza with a cc to

14   Joe Mordica dated 12/12/14

15   DEPOSITION EXHIBIT 137 - email from        89

16   Josh Garza to Jonah Dorman dated

17   12/27/14

18   DEPOSITION EXHIBIT 138 - email from Dan    90

19   Kelley to David McLain dated 1/7/15

20   DEPOSITION EXHIBIT 139 - email from Dan    93

21   Pease to Mr. Garza and Jonah Dorman

22   dated 2/3/15

23   DEPOSITION EXHIBIT 140 - email from        95

24   Jonah Dorman to Mr. Garza with a cc to

25   Dan Pease dated 2/24/15

1                        JONAH DORMAN

2    DEPOSITION EXHIBIT 141 - email from        96

3    Jonah Dorman to Mr. Garza dated 3/13/15

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        JONAH DORMAN

2      Grand Rapids, Michigan

3      Wednesday, August 1, 2018

4      9:22 a.m.

5

6              VIDEO TECHNICIAN:  This is the start of

7      tape labeled Number 1 of the videotaped deposition of

8      Jonah Dorman in the matter Denis Marc Audet, et al.,

9      versus Stuart A. Fraser, GAW Miners, LLC, et al.  This

10     deposition is being held at 99 Monroe Avenue

11     Northwest, Grand Rapids, Michigan, on Wednesday,

12     August 1st, 2018, at approximately 9:22 a.m.

13              My name is Devon Green.  I am the legal

14     video specialist from TSG Reporting, Incorporated,

15     headquartered at 747 Third Avenue, New York, New York.

16     The court reporter is Cheri Poplin in association with

17     TSG Reporting.

18              Will counsel please introduce yourselves.

19              MR. SARGENT:  Edgar Sargent from Susman

20     Godfrey representing plaintiffs.

21              MS. CAVE:  Sarah Cave from Hughes,

22     Hubbard & Reed in New York representing defendant

23     Stuart A. Fraser.

24              MS. MILLER:  Hannah Miller from Hughes,

25     Hubbard & Reed representing Stuart Fraser.

1                          JONAH DORMAN

2                    VIDEO TECHNICIAN:  Will the court reporter

3           please swear in the witness.

4                          JONAH DORMAN,

5           was thereupon called as a witness herein, and after

6           having first been duly sworn to testify to the truth,

7           the whole truth and nothing but the truth, was

8           examined and testified as follows:

9                          EXAMINATION

10    BY MR. SARGENT:

11    Q.    Good morning, Mr. Dorman.  I am, again, Edgar Sargent.

12          I represent the investors who are the plaintiffs in

13          this case suing GAW Miners to try to recover some of

14          the losses they sustained on their investments.  Do

15          you understand that?

16    A.    Yes.

17    Q.    And have you ever had your deposition taken before?

18    A.    Yes.

19    Q.    How many times?

20    A.    Two or three.

21    Q.    Okay.  Was it a civil or criminal case; do you know?

22    A.    Civil.

23    Q.    Civil.  Okay.  So you're probably basically familiar

24          with the procedure.  I'm not going to go into a lot of

25          detail.  But the most important thing is that we let

                            JONAH DORMAN

2       each other finish our -- you know, you let me finish

3       my questions, I'll try to let you finish your answers

4       so that the court reporter can create a clean record.

5       And you need to answer audibly to everything, yes or

6       no.  And shaking your head, nodding doesn't get -- end

7       up on the record.  Is that clear?

8   A.  Yes.

9   Q.  Also, if I ask something and you don't understand it

10      or I use the terminology wrong, particularly because

11      this case involves some technical issues, I'd just ask

12      that you let me know that so that we can clean that

13      up.  Is that fair?

14  A.  Yes.

15  Q.  Okay.  So did you graduate from high school?

16  A.  No.

17  Q.  Where did you -- where did -- did you attend any high

18      school?

19  A.  I did.  I attended two.

20  Q.  Where?

21  A.  Wyoming Park High School and Dickinson High School in

22      Iron Mountain.

23  Q.  All right.  And this is in Michigan?

24  A.  Yes.

25  Q.  And what did you do for employment after you left high

1                        JONAH DORMAN

2          school?

3     A.   I did nothing for a while.  I had my own company and

4          then I was in the army.

5     Q.   Then you were in the army.  What was your -- what was

6          the company that you had for a while?

7     A.   I did some computer repairs.  I believe the company

8          was Storm Electronic Solutions at the time.

9     Q.   Okay.  Was that in Michigan?

10    A.   Yes.

11    Q.   And just -- I'm just going through your background

12         primarily interested in any experience you have or

13         training you have that would relate to the, you know,

14         technical or computer issues that are at stake in this

15         case.

16    A.   Okay.

17    Q.   That's why I'm asking these questions.  Did you --

18         when you were in the army did you get any, you know,

19         computer related training?

20    A.   I had a lot of computer related training prior to

21         being in the army, and some of the systems that we

22         worked on, aside from the classified stuff, was

23         systems that most people don't know about, Solaris

24         systems, and so I worked on them with some of the

25         contractors because they tended to be slow and not

1                        JONAH DORMAN

2           know enough about it.

3      Q.   So -- so your responsibilities in the army had to do

4           with working on computer systems?

5      A.   My responsibilities were working directly with

6           computer systems, but in order to actually be able to

7           do that and do the training, I helped the civilian

8           idiots repair the computers is how I put it.

9      Q.   What years were you in the army?

10     A.   2001 to 2005.

11     Q.   And what did you do after you left?

12     A.   After I left -- these are difficult history questions

13          here.  I didn't bring a resume with me.

14     Q.   Well, do the best you can.

15     A.   I ran another consulting firm doing computer repair,

16          business computer repair.  I ran an indoor paintball

17          shop as well.  Don't ask me how the two tied together,

18          but it worked out pretty well, so . . .

19     Q.   There you go.  And at some point you ended up with --

20          involved with a company called Lease Rig; is that

21          correct?

22     A.   Yes.  That was after I moved to Florida.  I was

23          working for an international training company that

24          deals primarily in oil and gas, and while I was there

25          I was doing the IT.  I was the director of IT, so I

1                          JONAH DORMAN

2       had a small inhouse data center.  And when

3       cryptocurrencies first came out, when Bitcoin first

4       came out, I started getting into mining, and I used

5       the free power and space that I had to put miners in

6       and realized that I could get an insurance policy on

7       these miners by buying two, using one for myself and

8       selling the other one with hosting so that I basically

9       did not pay for Bitcoin miners, and I made money and

10      the people purchasing from me made money, and that

11      turned into a company called Lease Rig.

12   Q.  And when was this?

13   A.  2013, '14.  Somewhere in that time frame.

14   Q.  And was that -- was -- initially was the company Lease

15      Rig just you?

16   A.  No.  It was myself and my business partner, Matthew

17      Eden.

18   Q.  And how did you meet Mr. Eden?

19   A.  There was some new equipment that came out that I did

20      a full dissection of, so I did a full teardown of it,

21      took pictures, posted all the details about it.

22      Nobody else had done it because if you take it apart,

23      obviously it doesn't make you any money, and back then

24      time was definitely money.  And people kept contacting

25      me about it and asking questions, various technical

1                          JONAH DORMAN

2          questions about the equipment.

3     Q.   This was a miner that you took apart?

4     A.   Yes.  Matthew was one of them and that got us into

5          talking and I said, you know what, I'm really looking

6          for somebody that can do front end development, back

7          end development to make this leasing thing that I have

8          into more than a spreadsheet, and so Matt was kind of

9          the one that bridged the gap and made it into

10         originally Unicorn Hashers and then Lease Rig.

11    Q.   And this was I think you said around 2013?

12    A.   Around then, yes.  I'll let you know, for the record,

13         I am terrible with dates, including years.

14    Q.   Well, I think the record's fairly clear that you first

15         became involved with GAW Miners in 2014 if that helps.

16    A.   Okay.

17    Q.   That will put a post in there.  So tell me how you

18         transitioned from Lease Rig to GAW Miners.

19    A.   Well, it's fairly easy.  I harassed Josh Garza online,

20         and by harassed I just mean I was basically, online

21         it's called trolling, so whenever he would post things

22         or his company would post things I would make fun of

23         them and tell them they weren't telling the truth, and

24         after a while he ended up calling and saying, you

25         know, we might want to work this out because it's all

JONAH DORMAN

2   legitimate, and I said great, you can prove it, I'll

3   come work for you.  I'm not sure if that's exactly how

4   the conversation happened, but that was kind of the

5   end result.

6   Q.   Okay.  What kinds of things was he posting online that

7        you thought were potentially not accurate or not true?

8   A.   Everyone knew that he wasn't technically mining.  He

9        had the four pools that he said he was mining to.  We

10       were in contact with all the pool owners, and when

11       people would shift a lot of equipment over, the pools

12       would not show it, which normally means that

13       somebody's just using a calculated method versus an

14       actual method, which is kind of common in similar

15       industries.  You aggregate equipment and then you feed

16       the results that someone picks.

17  Q.   So explain the difference if you can between

18       calculating and actual mining.

19  A.   Sure.  So if you -- if you have an investment that

20       pays out five percent, they're going to take and

21       they're going to put your money into whatever they

22       want.  They're going to pay you five percent.  As

23       opposed to if you have an investment in a certain

24       industry, stock sector, they're going to pay you

25       whatever the actual return is.  So if you're

1                         JONAH DORMAN

2          calculating it, you're just taking what it would

3          actually make and paying that out.  If you're doing

4          actual, then you would actually be either invested in

5          that or say mining to that pool.

6     Q.   And do you remember -- at this time you were what you

7          described as trolling Mr. Garza.  What product was he

8          selling or products?

9     A.   That would have been when he was originally selling

10         miners.  He had bought out the Chinese supplier of I

11         believe they were called Gridseeds and he was working

12         with another company.

13    Q.   So he was just selling hardware?

14    A.   Yes.

15    Q.   And what was -- what was he misrepresenting about the

16         hardware?

17    A.   They started hosting the hardware, and when they were

18         hosting the hardware they had the mining pools, and

19         that was when they were not mining to the actual

20         pools.  The pool operators kept contacting us because

21         we ran a similar service.

22    Q.   So hosted mining was you would buy a miner from

23         Mr. Garza's company, GAW, and Mr. Garza's company

24         would -- would host that miner, power the miner, and

25         just provide you with some portion of the returns?

1                          JONAH DORMAN

2          Was that the -- what was being sold?

3     A.   Yes.  It was very -- it was -- the model was described

4          to be the same as Lease Rig's model, which was I would

5          buy a miner, put it in the data center, and you could

6          choose where it would mine to and it would

7          automatically mine there.  The difference was mine was

8          actual; his was calculated.

9     Q.   Okay.  Did --

10    A.   Based on the pool operators.

11    Q.   Did he let his customers know that it was calculated?

12    A.   I don't know.

13    Q.   Okay.  But you were pointing out that it had to be

14         calculated in some of these online posts?

15    A.   I was the one making fun of him for it.

16    Q.   Okay.

17    A.   What I was saying wasn't necessarily a hundred percent

18         factual.  You gotta remember the pool operators and

19         everybody back at that time was just not trusting

20         anyone.

21    Q.   Okay.

22    A.   So there's no way for me to see the stats from the

23         pools and know whether they're telling the truth

24         either.

25    Q.   Okay.  I want to know a little bit more about Lease

                    JONAH DORMAN

2       Rig's business before we go on to GAW.  So you were

3       selling miners and then hosting them and then

4       providing people with the returns?  Is that a fair

5       description of your business?

6   A.  No.

7   Q.  How would you describe it?

8   A.  When I moved from -- it was seriously called Unicorn

9       Hasher, great company name -- moved from Unicorn

10      Hasher to Lease Rig, the idea was that anyone could

11      put their hash power onto a marketplace and anyone

12      else could come in and purchase that hour by hour and

13      they would choose where the funds went and where it

14      mined to so the money went directly to them, and then

15      the people who were providing the service, the people

16      with the miners, our system would automatically pay

17      out every hour.

18  Q.  So you were just a middleman?  You didn't actually own

19      the miners?

20  A.  Correct.  Unicorn Hasher owned miners, but I moved

21      that, all that equipment I moved into Lease Rig, so I

22      was one of the providers on Lease Rig.

23  Q.  So if I'm understanding you right, Lease Rig was sort

24      of a marketplace that would connect someone with a

25      miner with hashing power, connect that person to

                    JONAH DORMAN

1

2       somebody who wanted to acquire hashing power, and then

3       the person who acquired that hashing power could

4       choose to use that however they wanted on a sort of

5       hour-by-hour rental basis from the other -- from the

6       seller?

7   A.  Yes.  Airbnb for Bitcoin money.

8   Q.  And did -- did Lease Rig itself have miners that it

9       was leasing out or selling through this marketplace

10      that it provided?

11  A.  No.  We never did any physical hardware, and the

12      initial equipment was from my other company that was

13      just hosted, so my other company was basically a

14      provider.

15  Q.  Okay.  And so the other company, Unicorn, that stayed

16      a separate business and some of its miners were leased

17      through the Lease Rig system?

18  A.  Yes.

19  Q.  Did Lease Rig have the ability to allocate the

20      processing power of a single miner to different pools

21      at the same time?

22  A.  Different pools at the same time?

23  Q.  Yeah.  Like so if you had 500 mega hash, is that a

24      proper term, 500 mega hash of mining power, could you

25      allocate 200 of it to one pool and 300 of it to

1                        JONAH DORMAN

2         another pool?

3    A.   Yes.

4    Q.   Yes, you could?

5    A.   Yes.

6    Q.   And at the same time?

7    A.   There was -- I don't recall the specific

8         technicalities of it.  I do know that we worked on

9         something very similar to that, and I believe we had

10        it working at some point.  Most of the time when

11        someone is renting hash power, they're renting more

12        than one miner, so they're renting an amount of hash

13        power that's more than one miner.  I do recall at

14        least building a system that does exactly what you're

15        talking about where you can slice a miner up into

16        multiple pieces and move to multiple pools.  I don't

17        know right now and I don't recall if that was ever

18        implemented.

19   Q.   Was that implemented at GAW Miners; do you know?

20   A.   I don't recall that either.

21   Q.   Was it -- do you know what hashlets are?

22   A.   Yes.

23   Q.   And my understanding is that hashlets were selling a

24        fraction of the mining -- processing power of a single

25        processor or single miner to different individuals.

1                          JONAH DORMAN

2          Is that accurate?

3     A.   My current understanding is that they were supposed to

4          represent a portion of a miner based on the number of

5          mega hash, yes.

6     Q.   And is that something that GAW Miners had -- had the

7          ability to do, to allocate the processing power of a

8          single miner to different hashlets?

9     A.   Through the acquisition of Lease Rig they would have

10         had the intellectual property that would have allowed

11         them to do that, yes.

12    Q.   They didn't have it -- they didn't develop it

13         independently?

14    A.   Correct.

15    Q.   Okay.  Do you know if they ever -- well, who -- who at

16         GAW Miners would have been responsible for

17         implementing, you know, that kind of software; do you

18         know?

19    A.   That would have been between Matthew and Joe Mordica.

20    Q.   And do you -- do you know if they ever did, in fact,

21         implement that functionality for hashlets?

22    A.   I don't recall.

23    Q.   Okay.  You do recall that that's what hashlets were

24         sold as, though?

25    A.   They were -- I don't remember the marketing either.

1                        JONAH DORMAN

2          Your description sounds accurate, from my

3          recollection.

4    Q.    Okay.  You're just not sure?

5    A.    Correct.

6    Q.    So tell me -- so you were I think you said trolling

7          Josh Garza and his business.  That led him to contact

8          you, you know, and say why are you doing this or cut

9          that out or something?

10   A.    Yes.  There was one specific instance of I had bought

11         some equipment from him and it had never arrived,

12         something went wrong, and that was one of the things

13         that I was going after him about consistently.

14   Q.    And at that point he was selling cloud hosted mining?

15   A.    This was actually about a physical miner, and I

16         believe he had started selling cloud hosting -- hosted

17         mining at that time.

18   Q.    And then he -- what happened to convince you to come

19         join GAW Miners?

20   A.    My business partner made a really good argument.  I'm

21         not sure what it was or why it worked.  I don't think

22         it would today.

23   Q.    This is Matt Eden?

24   A.    Yes.

25   Q.    And he persuaded you to join GAW?

1                          JONAH DORMAN

2    A.    Yes.

3    Q.    Where were you living at the time?

4    A.    In Florida.

5    Q.    Okay.  Did you stay in Florida or did you move as part

6          of switching to GAW Miners?

7    A.    I moved as part of switching to GAW Miners.

8    Q.    Where did you move to?

9    A.    Bloomfield, Connecticut.  I actually moved to Canton,

10         Connecticut.

11   Q.    Okay.  And what -- when you went to work for GAW, do

12         you remember when that was?  I know you said you

13         weren't great with dates.  It was sometime in 2014 if

14         that's helpful.

15   A.    Yeah.  You said earlier it was 2014, so that sounds

16         right.  I'm going to say August, September time frame,

17         but that's --

18   Q.    Okay.

19   A.    -- just a guess.  That's not . . .

20   Q.    What -- and did -- did Matt Eden join GAW Miners at

21         the same time?

22   A.    Yes.  He joined and he stayed in Texas.

23   Q.    What happened with Lease Rig when you joined GAW

24         Miners?

25   A.    A part of the conversation was acquiring the

1                        JONAH DORMAN

2         technology behind Lease Rig, so Lease Rig was

3         purchased by GAW Miners.  There was an asset

4         acquisition agreement that came with.

5    Q.   So as part -- when you went to work for GAW, GAW also

6         acquired your business, Lease Rig?

7    A.   Correct.

8    Q.   And did you ever get paid for that?

9    A.   Yes.

10   Q.   How did you get paid?

11   A.   I believe it was bank transfer.

12   Q.   So it was cash?

13   A.   Yes.

14   Q.   Not GAW stock?

15   A.   We were promised, as was almost every employee, a

16        certain amount of GAW's stock in return.  But we also

17        insisted on some form of cash on the table.

18   Q.   Do you know -- do you remember how much that was?

19   A.   I don't recall.  There should be agreements floating

20        around that have it.

21   Q.   Okay.  But you did actually get paid?

22   A.   Yes.

23   Q.   So what were your responsibil -- what was your job

24        title when you first went to work for GAW Miners?

25   A.   Originally no one knew, and then I was put in an

Page 23

JONAH DORMAN

1

2      office and started running most of the day-to-day with

3      the employees in the Connecticut office, fixing the

4      call center, taking care of customer support a lot,

5      and trying to find out who was actually doing what

6      there because it was rather disorganized.  So my title

7      eventually became general manager.

8  Q.  So what kinds of things were you doing on a sort of

9      day-to-day or week-to-week basis?

10  A.  Mostly management organization and team organization.

11      One of the things that I've noticed with a lot of

12      small businesses is they have no idea what a team is

13      and how you actually set up a manager and people under

14      them and get reports and get tasks and actually have a

15      business function correctly.  It's usually one guy

16      running around saying he's an entrepreneur telling 18

17      people what to do with no organization.

18  Q.  Okay.

19  A.  So I was responsible for putting in the organization

20      and getting people to tell me what they were doing --

21  Q.  Can you give me some --

22  A.  -- so I could find out what the company was doing.

23  Q.  I'm sorry.

24  A.  Go ahead.

25  Q.  Can you give me some specific examples of the kinds of

Page 24

1                          JONAH DORMAN

2          steps you were taking to implement this kind of

3          organization?

4     A.   Yes.  I did weekly meetings with the entire staff and

5          then one-on-one meetings individually once a week with

6          each staff member that I would say was a manager.  I

7          actually did put a hierarchy in place, so I promoted a

8          few people to manager -- managers of their

9          departments.  Obviously we had Joe who was a CTO.  He

10         was down in Mississippi.  And then Madeline was in --

11         or sorry, Matthew was in QA, and then we had the

12         customer service department, the sales department, and

13         there was some people involved in marketing.  And so

14         it was kind of getting them, hey, you're the manager

15         of this role, your responsibility is to do these

16         things and then get me metrics on what you've done, so

17         the call center how many calls did you take, how many

18         tickets did you resolve, how long did it take, what's

19         the backlog look like, and then here's your next goal

20         and here's your goal for your people and go have a

21         meeting with your people and implement these goals

22         with them as well.

23    Q.   Okay.  And do you remember what product or products

24         GAW Miners was primarily selling at the time you

25         joined?

Page 25

JONAH DORMAN

1

2   A.   I believe when I got there it was either just

3        before -- it must have been just after or sometime

4        after the hashlet launch.

5   Q.   Okay.

6   A.   So they would have been getting out of the old hosted

7        mining system into the new one with hashlets.

8   Q.   And did you have an understanding of what the

9        difference was between hosted mining and hashlets?

10  A.   I had an idea, yes.  I did not have any idea what

11       their hosted mining really was, and to this day I

12       can't exactly tell you how that worked because it -- I

13       think it was just the one guy in the back room that

14       did all the coding for it.

15  Q.   Which guy is that?

16  A.   I believe Jeff.

17  Q.   Okay.  Not Joe Mordica?

18  A.   No.

19  Q.   And coding for it, you mean coding for the interface

20       between customers and the miner that they were

21       supposedly purchasing or leasing?

22  A.   Correct.

23  Q.   And how would you describe hashlets?

24  A.   I try not to.

25  Q.   Well, do your best.  If you would.

Page 26

JONAH DORMAN

1

2   A.   The marketing term for hashlets I would say or

3        description for hashlets would be that it is a fixed

4        amount of hashing power that can be dedicated to a set

5        of predetermined pools by a customer.

6   Q.   Okay.  Did -- for the -- pre hashlets, for the cloud

7        hosted mining phase, do you know if GAW Miners had

8        actual miners and processing power sufficient to

9        support the sales it was making?

10  A.   To this day I have no idea.

11  Q.   How about with hashlets?  Do you know if GAW Miners

12       had sufficient processing power to support the

13       hashlets it was selling?

14  A.   After speaking with the SEC and some of the other

15       employees post the time that I left GAW Miners, I do

16       not believe that they did.

17  Q.   Okay.  At the time you were working there, did you

18       know whether or not they did?

19  A.   No.  And one of the specific things that I did on my

20       weekly meetings was to ask for reports on hash power,

21       uptime equipment reports from Matthew and Joe and

22       Eric, and I had never received a report during the

23       time that I was there on what the actual hash power

24       was.

25  Q.   Matt, now Madeline, Eden testified that on one of her

1                          JONAH DORMAN

2          trips to Mississippi she -- it became clear to her

3          that there were problems matching the amount of

4          hashing power being sold as hashlets and the amount

5          that the company actually had and she was concerned

6          that there wasn't sufficient power to support the

7          hashlets being sold.  Do you remember her, Matt,

8          telling you anything about that at the time?

9     A.   I do recall that she went on a trip to Mississippi.

10         You -- this is -- the previous pronoun is what we're

11         using here, so . . .

12    Q.   Okay.  We'll go with he.

13    A.   He went to Mississippi and there was some conversation

14         about the hashing power and I believe that resulted in

15         a large order of mining equipment afterwards.

16    Q.   Okay.

17    A.   I believe that was actually discussed internally.  I

18         don't recall any of the conversations, but I do

19         believe that what you are saying happened, yes.

20    Q.   You have no -- but you have no reason to dispute as

21         you sit here today -- well, strike that.

22              Do you recall the introduction of GAW

23         Miners' own cryptocurrency which ultimately became

24         known as Paycoin?

25    A.   Yes.

Page 28

1                          JONAH DORMAN

2    Q.    What involvement did you have with the development of

3          Paycoin?

4    A.    I was involved in all of the initial meetings and

5          wrote a large portion of the white paper.

6    Q.    Did you have any involvement in the coding?

7    A.    I was involved in choosing the coders and I spoke to

8          them about various issues that had happened.  I was

9          not directly involved in any of the actual coding.

10   Q.    As I understand it, Paycoin was based on a fork from a

11         preexisting coin; is that true?

12   A.    Yes.

13   Q.    What was the other -- what was the prior coin?  Do you

14         remember?

15   A.    Peercoin.

16   Q.    Peercoin.  And was Peercoin a proof-of-stake coin?

17   A.    I don't recall.

18   Q.    Do you have an understanding how the consensus process

19         worked for Paycoin?

20   A.    I don't understand.

21   Q.    Proof-of-stake.  Proof-of-work.  How the process for

22         obtaining consensus about verifying the accuracy or

23         correctness of transactions.

24   A.    I believe it started as proof-of-work and then phased

25         into proof-of-stake.

                          JONAH DORMAN

1

2  Q.  Could you explain to me how the various types of nodes

3      involved in the Paycoin system verified transactions,

4      what process they went through?

5  A.  No.

6  Q.  Do you know the difference between an Orion node and a

7      prime node?

8  A.  I believe that was just on paper.

9  Q.  So in reality there was no difference between an Orion

10     node and a prime --

11 A.  I don't believe that portion of code was ever

12     implemented, but I don't know because I've never read

13     through the code for Paycoin.

14 Q.  Okay.  If you read through the code, would you be able

15     to understand what it's doing?  Do you -- are you

16     sufficiently familiar with whatever programming

17     language it's written in to be able to follow the

18     algorithms?

19 A.  No.  I would hire someone who was.

20 Q.  Who did that -- who did that coding work for GAW

21     Miners in creating Paycoin based on the Peercoin code

22     base?

23 A.  I don't recall.

24 Q.  Do you know if Joe Mordica was involved in that?

25 A.  He was not one of the coders, no.  It was a third

Page 30

                         JONAH DORMAN

1

2      party.

3  Q.  A contractor; right?

4  A.  Yes.

5  Q.  Yeah.  That's right.  I'm going to hand you, this has

6      already been marked as an exhibit, Exhibit 3.  This is

7      an email exchange involving you, Matt Eden, and

8      several others.  Do you remember this email exchange?

9  A.  I do not remember this email exchange, no.

10 Q.  Do you know what your role at GAW Miners was at this

11     time, late October 2014?

12 A.  Hold on one minute.  Let me read through this.

13 Q.  Sure.  Take your time.

14 A.  Do I read this in reverse order to get it in the right

15     thread order?

16 Q.  Yeah.  If you wanted to read the first email, you'd go

17     to the very end of the thread.

18 A.  Okay.

19 Q.  Do you -- what was your role at GAW at the time of

20     this email exchange?

21 A.  I don't know.  Prior to November or December I was in

22     between not officially having a title and general

23     manager and something having to do with finance.

24 Q.  So you were general manager initially as you described

25     earlier; is that right?

Page 31

                        JONAH DORMAN

1

2   A.   I did not have a job title for a while.

3   Q.   But then the first job title you had was general

4        manager --

5   A.   Correct.

6   Q.   -- and that's the way you saw your role?

7   A.   Correct.

8   Q.   And then is it -- am I understanding you correctly

9        that sometime around November, December you

10       transitioned to something else?

11  A.   No.  It was I'm not exactly sure when I became the

12       general manager.  I don't know when that title was

13       installed.

14  Q.   Oh, okay.  So the only title you ever had was general

15       manager?

16  A.   I was general manager for a portion of time.  I was

17       referred to as VP in press releases and I was

18       technically an interim CEO towards the end.

19  Q.   How did your responsibilities change after the -- your

20       initial job as you -- as I think you've described it

21       was sort of organizing the employees up in Connecticut

22       and I guess other employees.  What was the next thing

23       that you took responsibility for?

24  A.   I think that the next thing after that would have been

25       when Josh left and I started contacting for five of

1                          JONAH DORMAN

2          Stuart's other companies which then had no one in

3          charge of them to find out what they were, how they

4          were running, and how they could keep running.

5     Q.   When was this?

6     A.   This would have been prior to my departing GAW, and I

7          do not remember when that was, but I believe it was

8          2015, early, prior to summer.

9     Q.   Okay.  So your role was general manager and your

10         primary responsibility described in the most general

11         way would be to sort of organize the -- the work that

12         people were doing?

13    A.   Let's call it team management.

14    Q.   Team management.

15    A.   People need someone to get them in order and

16         organized.  Otherwise they just kind of go to an

17         office, drink coffee, and go home.

18    Q.   And that's the way you -- that's the way you

19         understood your job up until the time Josh Garza left?

20    A.   Correct.

21    Q.   And then you said -- who is Stuart?

22    A.   Stuart Fraser.

23    Q.   Did you have contact with Mr. Fraser as part of your

24         work for GAW Miners?

25    A.   No.

Page 33

JONAH DORMAN

2  Q.  Did you have contact with Mr. Fraser at the time Josh

3      Garza left, the sort of work you were just describing

4      with these other companies?

5  A.  No.

6  Q.  What -- what led you to take the steps that you did

7      with regard to these other companies?

8  A.  I believe this was through the attorney for GAW

9      Miners, David something, which I was told was actually

10     put there by Stuart to protect GAW and be an isolator.

11     I have no idea if any of that is true.

12  Q.  To protect -- you were told the lawyer was put in

13     place by Stuart to protect what's -- when you say

14     protect GAW, what do you mean by GAW?

15  A.  Protect Stuart's interests if anything happened with

16     GAW.

17  Q.  Stuart's interests in the other companies?

18  A.  Correct.

19  Q.  If anything happened with GAW Miners?

20  A.  Correct.

21  Q.  Some of the other companies were also --

22  A.  I see -- I see GAW as just a conglomerate of companies

23     here.

24  Q.  Okay.  Yeah.  When -- that's what I was going to ask.

25     When you say GAW, what do you mean?  Just the mining

Page 34

1                       JONAH DORMAN

2           company or . . .?

3    A.    No.  There was some conglomerate of companies that

4          happened that was all under the GAW label, and I don't

5          remember what a lot of them were.  There was something

6          in telecom and then there was actual GAW Miners and I

7          think ZenMiner turned out to be a part of the GAW

8          companies as well.  Again, I can't recall a lot of

9          this.  This is a while ago.

10   Q.    And what were you doing with regard to the other

11         companies as a result of these communications you had

12         with the attorney?

13   A.    Primarily just getting a hold of -- I believe the

14         telecom company was one that had a grant and a lease

15         that were having issues and some equipment that needed

16         to be upgraded, and I have a lot of telecom

17         background, so I made some calls to whoever was

18         working on and operating that company to try to

19         organize things.  Made a lot of follow-up calls.

20         Again, organizing, managing the company, seeing where

21         it's going, trying to get it to get better, ideas for

22         new customers, that sort of thing.

23   Q.    And how long did -- were you doing that work?

24   A.    I don't recall that either.  It must have only been a

25         short period of time, a month or two while Mr. Garza

1                          JONAH DORMAN

2          was gone.

3     Q.    Did Mr. Garza come back?

4     A.    Yes.  Eventually.

5     Q.    What led him to leave?

6     A.    I don't know.  I was told it was a family vacation and

7           then a subpoena showed up.

8     Q.    Subpoena from?

9     A.    I believe the SEC.

10    Q.    Okay.  Were you involved in responding to the SEC

11          subpoena?

12    A.    I was -- I'm sure I was in some capacity involved, but

13          I believe the lawyers were involved.  I'm not sure

14          which firms were hired or discussed.  I was involved

15          in some of the customer response when people found out

16          about it.

17    Q.    You mean responding to customers' questions about the

18          SEC investi --

19    A.    Yes.  Explaining to attorneys, that sort of thing.  I

20          don't remember any of the conversations, though.

21    Q.    And when you did this work for the telecom company and

22          potentially other GAW companies, did you sort of

23          leave -- were you trying to wind them down or leave

24          them in a position to move forward and continue doing

25          business?

1                          JONAH DORMAN

2    A.   At that time I was trying to move them forward and

3         grow them as businesses.

4    Q.   And did you consider the efforts successful?

5    A.   It was too short of a period of time.  I would have

6         considered the strategy successful.

7    Q.   They didn't close down while you were there?  They

8         didn't start winding things up, anything like that?

9    A.   No.

10   Q.   And did you have any direct communications with

11        Mr. Fraser as part of this work at all?

12   A.   No.

13   Q.   Only with the attorney?

14   A.   Correct.  I believe Dan Pease and Dan Kelley.

15   Q.   Okay.  What was Dan Pease's role at GAW, to your

16        understanding?

17   A.   He managed the finances from what I could tell.  He

18        had a lot to do with the banking.

19   Q.   And was that just for GAW Miners or for all the GAW --

20   A.   I believe that was for other companies as well.

21   Q.   How about Dan Kelley?

22   A.   Dan Kelley was titled as the COO, which would have

23        been responsible for day-to-day operations.  I can't

24        clearly define his role.  If I had to put him

25        somewhere, I believe it would be compliance because he

Page 37

JONAH DORMAN

1

2      liked to read a lot of paperwork and talk to lawyers

3      and try to make sure everything was in line and

4      compliant.

5  Q.  Did you have much day-to-day interaction with him in

6      your role as general manager given that he's the COO?

7  A.  Yes.  Not a lot of interaction, but we would meet

8      frequently to just discuss the state of things, and if

9      he had an issue with something or I had an issue with

10     something we would bring it up.

11 Q.  Okay.  And was he fairly actively involved in GAW

12     Miners' business throughout your tenure with the

13     company?

14 A.  I would say that he was active in it.  He was not

15     active in the day-to-day employee type things that I

16     was.  He was active on a different part of it.  Like I

17     said, I believe compliance would be the best

18     description for it.

19 Q.  Compliance with what?

20 A.  Trying to get the information on MSB laws, FinCEN

21     laws, all the financial things that every company

22     doing crypto has to do, working through new

23     opportunities with partnering with Ethereum with the

24     mining equipment.  I really can't give you a good

25     narrow description.  Just the broad category of

                          JONAH DORMAN

2        compliance.

3   Q.   Okay.  Is that AML/KYC?

4   A.   Sure.  Yes.  That's a part of it.

5   Q.   Okay.  Going back to Exhibit 3 for a second.  This is

6        talking about payout issues from customers.  Do you

7        understand what Mr. Mordica means in the -- it's the

8        sort of third email in the chain.  "We have not heard

9        of any other payout issues from customers."  Do you

10       know what that means?

11  A.   I do not because I don't know the context or which

12       payouts are being spoke of.

13  Q.   And you can't tell from looking at the rest of the

14       email chain?

15  A.   This could be one of many instances.

16  Q.   Of?

17  A.   Payout issues.

18  Q.   What is a payout issue?

19  A.   A payout issue would be any time that any system is

20       supposed to automatically pay someone or manually pay

21       someone and either everyone or some group of people

22       don't get paid.

23  Q.   And do you understand this to be talking about payouts

24       for hashlets?

25  A.   No.  I just understand this to be vaguely referencing

JONAH DORMAN

1

2      payouts.  It does not say what it's for.

3  Q.  Could be hashlets?

4  A.  Could be.

5  Q.  But it could be some -- could be cloud hosted mining

6      or some other product that GAW Miners was offering?

7      Am I understanding you correctly?

8  A.  Correct.

9  Q.  Okay.  And were payout issues common?

10 A.  It depends on your definition of common.  I have to be

11     honest here.

12 Q.  Well, was your sense -- were there more payout issues

13     than you would have expected coming into the business?

14 A.  There was less than I would have expected coming into

15     this.  There was more than I would have allowed if I

16     had more control over the entire IT network.

17 Q.  When you say there was less than you would have

18     expected coming in, why was that true?

19 A.  The methods that were being used and the systems that

20     were in place prior to putting a lot of the Lease Rig

21     technology in place and the way the development worked

22     were all very substandard I would say.  There wasn't

23     really a tight development in place to make sure the

24     systems ran smoothly and there wasn't a lot of QA that

25     went in, so a lot of changes were just made on the

                            JONAH DORMAN

1

2       fly.

3                    MR. SARGENT:  Let's go off the record for

4       just a minute.

5                    VIDEO TECHNICIAN:  Going off the record at

6       9:56 a.m.

7                    (Recess taken at 9:56 a.m.)

8                    (Back on the record at 9:58 a.m.)

9                    VIDEO TECHNICIAN:  We are back on the

10      record at 9:58 a.m.

11      BY MR. SARGENT:

12      Q.   I'm going to hand you a document that's already been

13           marked as Exhibit 10 in this case.  Do you recognize

14           this document, Mr. Dorman?

15      A.   I do.

16      Q.   What is it?

17      A.   This is the Paycoin white paper.

18      Q.   Is this the Paycoin white paper that you testified

19           earlier that you worked on?

20      A.   I do not know what version this is.  However, this

21           does appear to be the one that I worked on, yes.

22      Q.   And if while we're -- I'm going to ask you some

23           questions about it.  If there's anything you notice in

24           here that makes you think this is not the final draft,

25           this is not the one I worked on, I never saw this

                        JONAH DORMAN

2      before, please let me know.

3   A.   Okay.

4   Q.   Turn to the first page -- second page.  It says

5        "Abstract."

6   A.   Yes.

7   Q.   I just have some questions about some of the

8        terminology in here and whether the functionality was

9        actually implemented.  A little more than halfway

10       through the first paragraph it says, "Paycoin employs

11       a 'Smart Proof-of-Stake protocol . . .'"  Do you

12       understand what that means?

13  A.   That short bit of context, absolutely not.

14  Q.   Okay.  Do you know if Paycoin ever did employ a smart

15       proof-of-stake protocol?

16  A.   Without knowing what that means, I could not tell you.

17  Q.   Okay.  But you -- why -- why are you unable to tell

18       what that means when you worked on this document?

19  A.   Working on this document mostly means drawing up the

20       outline of the document, drawing up some of the

21       technical features, --

22  Q.   Okay.

23  A.   -- and then discussing different terminology and a lot

24       of marketing terms that would go into it.

25  Q.   Okay.  So how familiar are you with the technical

JONAH DORMAN

1

2      underpinnings of Paycoin?  Are you able to explain how

3      the proof-of-stake algorithm works, for example?

4              MS. CAVE:  Objection to the form.

5              But you can answer.  I may do that

6      periodically, but it doesn't mean --

7              THE WITNESS:  I'm sorry.  I did not hear --

8              MS. CAVE:  I just said objection to the

9      form and then you can answer.

10  BY MR. SARGENT:

11  Q.    You can still answer.

12  A.    I actually agree to have that rephrased.  So I'm --

13  Q.    You didn't understand the question?

14  A.    -- really not understanding the question.

15  Q.    How familiar -- you don't understand the question how

16        familiar are you with the technical underpinnings of

17        Paycoin?  Are you able to explain whether the -- how

18        the proof-of-stake algorithm worked?

19  A.    I have never read the code so I cannot tell you

20        exactly how it works.

21  Q.    Okay.

22  A.    I can tell you that my understanding is that it was a

23        standard, standard as in the majority of cryptos prior

24        to that time, proof-of-work and then proof-of-stake

25        swap for the algorithm, so anything in here would just

JONAH DORMAN

1

2     be a marketing buzz word, not an actual technological

3     underpinning.

4  Q.  Okay.

5  A.  However, again, I have not read the code so I cannot

6     say this factually.

7  Q.  Okay.  Do you know -- a little bit below what we were

8     just reading it says, "Prime Controllers automatically

9     adjust the creation rate of Paycoins . . ."  Do you

10    know if the Prime Controllers in the Paycoin system

11    automatically adjusted the creation rate?

12 A.  I don't believe that technology was ever implemented.

13    Again, I never read the code so I don't know.

14 Q.  Okay.  Do you know what HybridFlex blockchain means?

15 A.  I don't even remember who came up with it.  It was a

16    really good marketing term.  However, I don't remember

17    what it was supposed to represent.

18 Q.  Okay.  Can you go about five or six pages in?  There's

19    a page that's numbered 3.  "What is Proof of Stake?"

20    And towards the end of the second paragraph it says,

21    "Anyone with an ownership 'stake' in the

22    cryptocurrency has the ability to connect to the

23    network and contribute to securing and processing

24    transactions . . ."  Do you know if that was true for

25    Paycoin?

Page 44

                            JONAH DORMAN

1

2  A.   Yes.  That would have been true once the coin switched

3       from proof-of-work to proof-of-stake.

4  Q.   And did that happen?  Did the --

5  A.   Yes.

6  Q.   And so after the switch to proof-of-stake occurred,

7       anyone with an ownership stake in the cryptocurrency

8       had the ability to contribute to securing and

9       processing transactions?

10  A.   Yes.

11  Q.   How did that work?  If someone had a Paycoin, they

12       could choose to stake it; is that correct?

13  A.   No.

14  Q.   Okay.  How would you become a staker for Paycoin?

15  A.   The general overview here and even specific to

16       Paycoin, I do not know the exact numbers again, if you

17       own a set minimum number of coins and you run the

18       client software which processes transactions, having a

19       number of coins allows you to process transactions and

20       mint those coins into new coins, so when new coins are

21       created you take the amount of coins available on the

22       network that are actively participating in the

23       network, and however many new coins are created per

24       cycle are divvied among those people holding the

25       coins.

```
                           JONAH DORMAN
 1
 2    Q.   Holding the coins meaning those people who are holding
 3         the coins and participating in the process of
 4         verifying transactions?
 5    A.   Right.  Which as you hold the coins for a minimum --
 6         minimum number of coins for a minimum amount of time
 7         you continue processing transactions, and once you hit
 8         a certain amount of time that you've held stake in
 9         those coins, then you're considered staking, and so
10         you get rewards when you help process transactions.
11    Q.   Was that everyone who was doing that considered a
12         prime node or is that any -- you don't have to be a
13         prime node in order to participate --
14    A.   That is just proof-of-stake, so anything else is a
15         marketing term.
16    Q.   Wait.  That is just proof-of-stake.  Did Paycoin
17         actually have things called prime -- prime nodes?
18    A.   I do not recall if that was ever implemented.  There
19         may have been some of the master node style where you
20         have bigger nodes that were implemented.  There were
21         definitely nodes that were online that had a lot more
22         coin that would have staked a lot more, but, again, I
23         don't recall if those were ever turned on or used or
24         written to the code.
25    Q.   Was -- was there functionality actually implemented
```

                          JONAH DORMAN

1

2       pursuant to which certain nodes were prime nodes and

3       performed a different function in the transaction

4       verification process?

5   A.  I don't recall if that was ever implemented.

6   Q.  Was there a minimum stake that a node had to have in

7       order to participate in the network and -- and

8       contribute to securing and processing transactions as

9       described in the section we just read?  Is there a

10      minimum amount you needed to have to do that?

11  A.  I don't factually know the answer to that because,

12      again, I have not read the code.  As I said, with most

13      systems there's a minimum amount of coin and a minimum

14      age.

15  Q.  Okay.

16  A.  I would assume there was one and it's in the code

17      somewhere.

18  Q.  And the way -- when you say minimum age, that means

19      the coins that you're using to stake in order to sort

20      of buy your ticket into this transaction verification

21      process have to have resided in the same address for a

22      certain set period; is that -- is that correct?

23  A.  Yes.  That sounds accurate.

24  Q.  Just another just quick question I have on

25      terminology.  The second column towards the bottom it

JONAH DORMAN

1

2          refers to HashCoin.  Is that the same thing as

3          Paycoin?

4     A.   I believe Paycoin was initially named HashCoin before

5          the name was changed.

6     Q.   Okay.  Turn to the next page, please.  "Why release a

7          New Coin?"  And in the second column it's talking

8          about a Coin Adoption Fund which has -- serves three

9          separate functions.  Do you see where I'm reading?

10    A.   Yes.

11    Q.   Do you know was the Coin Adoption Fund ever created?

12    A.   I do not recall.

13    Q.   You don't know one way or the other?

14    A.   (Nodding.)

15    Q.   Let's turn a couple pages further to --

16    A.   That was a no.  Sorry.

17    Q.   You're doing pretty well with that.  Talking a little

18         fast, but so am I, so . . .

19    A.   Just matching your pace.  If you want to talk slower,

20         we can talk slower.

21    Q.   I probably should.  A couple pages ahead to Section 5,

22         "Technical Coin Specifications."  5.11, "Proof of Work

23         Time Period."  It says, "The Paycoin PoW," which is

24         proof-of-work, "mining phase will last until the

25         initial allotment of coins needed, are mined."  Do you

                        JONAH DORMAN

1

2       know if that is accurate?

3   A.  I don't know if that's accurate.  I don't believe that

4       statement can be accurate or inaccurate, though.  It's

5       very vague.  There is no initial amount listed,

6       so . . .

7   Q.  That's because there was -- that statement couldn't be

8       accurate because there was no initial allotment of

9       coins?

10  A.  It'll last until the initial allotment of coins needed

11      is actually just indicating that there is not a static

12      time as you and I would think of time, seconds on a

13      clock time for the phase.  It means that it will end

14      after an amount of coins instead of an amount of time.

15  Q.  Was there an amount of coins identified --

16  A.  I don't recall.

17  Q.  -- for the proof-of-work phase?

18  A.  I don't recall.

19  Q.  Do you know what -- I think you testified earlier that

20      Paycoin did at some point transition from a

21      proof-of-work model to a proof-of-stake model?

22  A.  Yes.

23  Q.  What led the company to, you know, engage in the

24      transition at that point?

25  A.  I don't actually understand the question.

Page 49

1                      JONAH DORMAN

2    Q.   Well, according to this -- I understand this, the

3         transition from proof-of-work to proof-of-stake will

4         be triggered by the mining of an initial preset amount

5         of coins; right?

6    A.   Correct.

7    Q.   That's what this means?

8    A.   Yes.

9    Q.   Is that what happened?  Did -- did -- in other words,

10        did GAW Miners maintain Paycoin as a proof-of-work

11        cryptocurrency until a certain number of coins were

12        mined and then transitioned it to proof-of-stake?

13   A.   I don't recall.  I believe so.

14   Q.   Okay.  Is it true -- the next sentence here.  "In the

15        proof-of-work phase, any miners wishing to participate

16        in mining Paycoin, will be allowed to commence

17        mining."  Was that true?

18   A.   I believe so, yes.

19   Q.   So anybody could download the software necessary to

20        mine Paycoin during the proof-of-work phase and do

21        work to verify transactions and create blocks on the

22        blockchain and receive a reward?

23   A.   I believe so, yes.

24   Q.   "During the proof-of-work phase the 'thermodynamic,

25        reverse corollary, difficulty algorithm' . . ."  Do

                         JONAH DORMAN

1

2       you -- pause for laughter.  Do you understand what

3       thermodynamic, reverse corollary, difficulty algorithm

4       means?

5   A.  I do not.  I believe I had something to do with coming

6       up with the term, but I have no idea what it means.

7   Q.  Okay.  Do you know if anybody at GAW Miners knew what

8       that meant?

9   A.  I do not know that.

10  Q.  So this --

11  A.  It's really good, though.

12  Q.  Sounds impressive certainly.  Sounds like it's right

13      out of the Avengers.  ". . . will dictate a $12.5

14      million coin mintage limit."  Was there a 12.5 million

15      coin mintage limit?

16  A.  Sorry.  You initially said $12.5 million, not 12.5

17      million coin.

18  Q.  Sorry.  12.5 million coin.  Thank you.

19  A.  Again, I have not read the code.  I don't know for

20      certain.  I have no reason to believe that it wasn't

21      implemented that way.

22  Q.  Okay.  Do you know if 5.5 million of the initial

23      12.5 million coins were distributed to the initial

24      prime node owners?

25  A.  I don't recall and don't have any evidence for or

                         JONAH DORMAN

1

2       against.  I have no reason to believe it wasn't.

3    Q.  Do you know who -- so this is talking about those --

4        "those who participated in an initial Paycoin

5        acquisition program."  Do you know who that's

6        describing?

7    A.  Nowadays in ICOs that's called a presale.  That would

8        have been people who bought the coin before it was

9        publicly available.

10   Q.  Were there such people for Paycoin?

11   A.  I believe so.  However, I don't recall.

12   Q.  Were they outside investors or was it all people

13       working for GAW Miners or affiliated with GAW Miners?

14   A.  I don't believe that employees were allowed to be in

15       the presale.

16   Q.  Okay.  There was a presale?

17   A.  I believe so.

18   Q.  Do you know when that occurred?

19   A.  Absolutely not.  I can't even be certain it did.

20   Q.  Okay.  Just one second.  A little bit -- halfway down

21       the second column it says, "Difficulty re-targets

22       every block, with a block time of 1 minute."  Do you

23       understand what that means?

24   A.  That would mean that the algorithm inside of the coin

25       will change how difficult it is to solve a block with

1                        JONAH DORMAN

2           every block in order to keep whatever the network time

3           is to stay at that rate, so as you add more equipment

4           generally, transactions would process faster.  It's

5           just saying that every block it'll get more difficult

6           so that that doesn't happen.

7   Q.   So -- well, so as you add more processing power,

8           blocks could get mined more rapidly because the puzzle

9           can be solved more quickly, so they would increase the

10          difficulty of the puzzle in order to generate an

11          average block time of about one minute?  Am I

12          understanding that correctly?

13  A.   Correct.  You could do ICO advisory now.

14  Q.   Oh, I do.  "In this phase the initial 50 Prime

15          Controllers will be deployed."  Was there an initial

16          50 Prime Controllers do you know?

17  A.   I don't recall.

18  Q.   Do you know what it means in the next sentence, "The

19          Paycoin network will utilize a

20          five-network-confirmation protocol"?  Do you know what

21          that means?  "Versus a 51 percent consensus."

22  A.   Absolutely not.

23  Q.   We have 51 percent consensus.  Is that -- is that how

24          you would describe the algorithm used in Bitcoin?

25  A.   Bitcoin is just majority consensus.  It can be lower

```
 1                       JONAH DORMAN
 2       than 51.  However, it is generally considered to be
 3       51.
 4   Q.  So it could be you mean 50.5?
 5   A.  (Nodding.)
 6   Q.  Okay.  Got it.
 7                  MS. CAVE:  Did you get that?
 8                  COURT REPORTER:  I just got a nod.
 9                  MR. SARGENT:  He said yes.
10   BY MR. SARGENT:
11   Q.  It's all background anyway.  Sorry.  I'm just taking a
12       look through this to see.  Do you understand how the
13       transaction fees worked for Paycoin?
14   A.  I don't recall how they worked.
15   Q.  Did you -- do you think you understood it at the time?
16   A.  I believe I understood it at the time, yes.
17   Q.  So can you turn a couple of pages forward to where
18       there's "5.2 PoS" and then "5.3 Transaction fees"?  Do
19       you see that page?
20   A.  Yes.
21   Q.  Okay.  And then a little more than halfway down in the
22       "Transaction fees" column it says, "Transaction fees
23       will initially be distributed to all of the Orion
24       Controllers exclusively."  Is that right?
25   A.  That's what it says.
```

                        JONAH DORMAN

1

2   Q.   But I think you testified earlier that there never

3        were any Orion Controllers for --

4   A.   I don't believe there were.

5   Q.   So this statement is false?

6   A.   I can't answer that question.

7   Q.   Because?

8   A.   It was more of a statement.

9   Q.   Well, is the statement false?

10  A.   I have not read the code and do not know for certain

11       whether Orion Controllers did or did not exist, so I

12       don't know if the statement's true or false.

13  Q.   Okay.  Your -- but your -- your -- understanding that

14       you testified about earlier -- based on earlier that

15       there were no Orion Controllers ever created, assuming

16       that's accurate, this statement's false, isn't it?

17  A.   Correct.

18  Q.   Okay.  That's all I've got for that for now.  I might

19       have an extra copy if you want one as a souvenir.  You

20       don't get to keep these.  I'm passing you what's been

21       marked as Exhibit 30.  This is another email chain,

22       another pretty long one.  Feel free to look over as

23       much of it as you like.  I'm going to ask you if you

24       recall the transactions being discussed in this chain.

25  A.   Normally when you print an email there's highlighted

1                        JONAH DORMAN

2          in blue people's email addresses so you can find

3          the -- this one you've actually got to read through

4          and find exactly who says what.

5     Q.   Costs like seven times as much money to print it in

6          color.  There's a lot of pages here.

7     A.   It saves seven times as much time.

8     Q.   Well, it's going to be short anyway.

9     A.   Okay.

10    Q.   Do you remember this -- there's a transaction being

11         discussed here in which Carlos Garza says about a

12         little less than halfway down the first page, "Now you

13         tell me after I sold the guy a hundred thousand in

14         Paycoin for cash."  Do you remember the transaction

15         that's being referred to in that email?

16    A.   I don't recall the email or the transaction.  I have

17         no reason not to believe that this conversation didn't

18         happen, though.

19    Q.   Do you remember that GAW Miners did sell $100,000 or

20         more of Paycoin to individual customers in a single

21         transaction?

22    A.   I would not have seen any receipt of funds or

23         confirmation of sale.

24    Q.   So what -- how would you describe your role in

25         addressing any issues that came up with regard to this

Page 56

JONAH DORMAN

1

2      transaction?

3  A.  This type of thing, if we already have his ID, then

4      we're good to go.  If not, we should go to legal.

5  Q.  When you say his ID, what do you mean?

6  A.  The customer.

7  Q.  And ID meaning some form of identification for know

8      your customer regulation purposes?

9  A.  Correct.

10 Q.  And what was your role with regard to implementing KYC

11     requirements?

12 A.  Mostly to discuss, because I believe Carlos was doing

13     sales at the time, and this was probably before there

14     was anything official put in place, so sales was just

15     selling.  I had no idea how it worked, where the

16     customers came from, where the money went to because I

17     was not in finance at the time.  So mostly talking to

18     the attorneys and getting advice and finding out about

19     things like this and then going back to the attorneys

20     and getting advice about what we were supposed to do.

21     This is not really a guidebook, it definitely was not

22     at the time, of what you can and can't do in crypto.

23 Q.  Right.  And so, again, I'm just -- I'm trying to make

24     sure that I understand your role with regard to these

25     kinds of things, and you were taking on this

                          JONAH DORMAN

1

2        responsibility as part of sort of supervising the

3        sales force?

4    A.  I would not say that I actually supervised the sales

5        force.  I was attempting to get the sales force more

6        organized and to make sure that they were doing things

7        by the book by getting them in contact with legal more

8        continuously.

9    Q.  Okay.  And particularly with regard to these AML/KYC

10       type requirements?

11   A.  Yes.  Those would come up.

12   Q.  Okay.  I hand you what's been marked as Exhibit 8.

13       This is another email chain.  Fortunately this one

14       only involves two emails, one from you to a number of

15       people and then one from Matt Eden forwarding your

16       email.  Focusing on the second email in the chain, the

17       one written by you.  Do you recall sending this email?

18   A.  I do not recall.

19   Q.  What are HashStakers or what's the Hash -- let me ask

20       it again.  What's the HashStaker system that you refer

21       to in the first sentence of your email?

22   A.  I don't recall.

23   Q.  Does seeing this email refresh your recollection at

24       all about HashStakers being some sort of wallet, an

25       online wallet related to Paycoin?

1                          JONAH DORMAN

2   A.   HashStakers from my recollection were to replace

3        hashlets, and instead of being miners they were to be

4        stakers, so instead of being hash power to mine, it

5        would be a stake in the coin that would actually stake

6        on the network, as discussed before, proof-of-stake.

7   Q.   Okay.  And do you know if HashStakers ever were

8        actually created, implemented?

9   A.   I don't recall.  I believe they were.

10  Q.   So when you wrote on December 22nd, 2014, "HashStakers

11       must have an associated wallet (public/private key),"

12       that indicates that at least at that time you didn't

13       understand HashStakers did have an associated wallet;

14       right?

15  A.   I don't know if it means that.  This might have been

16       an initial email after a meeting, a meeting to patch

17       the system and operate it and what would be required,

18       because this looks like really, really rough draft

19       items here.

20  Q.   And these are -- these are items that -- it's your

21       understanding when you wrote this email that these

22       items were not currently -- you know, the things being

23       described here weren't currently functional; correct?

24  A.   Correct.  Reading this now, it would actually appear

25       that this is just an overview from a meeting, so a lot

1                          JONAH DORMAN

2          of this is probably things that I was told or that

3          were come up with in a meeting that needed to be put

4          out to the team.

5     Q.   So what you're saying --

6     A.   It says "HashStaker design requirements," which to me

7          would indicate that none of this is anything that was

8          implemented.  It's rough draft things that we need to

9          work through.

10    Q.   Right.  And -- and this list would not have originated

11         with you?  It would have originated with others at the

12         meeting?  Am I understanding your testimony correctly?

13    A.   Generally, yes.

14    Q.   So why would you have had the responsibility for

15         writing up the list of -- of, you know, projects,

16         tasks that were coming out of this meeting?

17    A.   If there was a meeting or if there was a call -- it

18         says something about tonight's PayOut call and Patch

19         release.  It would have been my responsibility because

20         I would have been working with all of these people on

21         this team to inform them of what the requirements

22         would be so that we could build off of that, have

23         follow-ups, and actually scope out the project.

24    Q.   So do you look at your role as more of a sort of

25         project manager rather than a designer or engineer?

1                          JONAH DORMAN

2   A.   Yes.

3   Q.   Okay.

4             MR. SARGENT:  Let's go off the record one

5        more time.

6             VIDEO TECHNICIAN:  Going off the record at

7        10:25 a.m.

8             (Recess taken at 10:25 a.m.)

9             (Back on the record at 10:26 a.m.)

10            VIDEO TECHNICIAN:  We are back on the

11       record at 10:26 a.m.

12            MR. SARGENT:  Ask the court reporter to

13       mark this 135 and pass it to the witness.  I may skip

14       a couple of numbers.  I'm not really sure.

15            MS. CAVE:  We're at 132.

16            MR. SARGENT:  Are we at 132?  That may be

17       right.  It seems right.  I just wasn't positive after

18       yesterday.

19            MARKED FOR IDENTIFICATION:

20            DEPOSITION EXHIBIT 132

21            10:28 a.m.

22   BY MR. SARGENT:

23   Q.   Another email chain.  Look it over and let me know

24       when you're through.

25   A.   Okay.

1                         JONAH DORMAN

2   Q.   So this is an email chain from January 7th, 2015,

3        discussing a response to some sort of Internet post

4        concerning a potential class action against GAW.  Is

5        that how you understand this?

6   A.   Yes.

7   Q.   And do you recall --

8   A.   No.

9   Q.   -- this coming up?  And you see in the top email in

10       the chain Dan Kelley says, "Jonah, Eric and I are

11       hashing out the Program details and will set up a

12       telecon to review this afternoon."  Do you see that?

13  A.   Yes.

14  Q.   Do you recall being involved in discussions -- the

15       discussions being described here by Mr. Kelley?

16  A.   Not this specific discussion.  I do remember being

17       involved in similar discussions, yes.

18  Q.   What do you remember about that?

19  A.   I just know that when things like this happen there's

20       generally a company discussion and I was involved in

21       several of them.  Again, I don't recall the specific

22       instance.

23  Q.   Several -- things like this.  What do you mean by

24       things like this?

25  A.   The company culture was that if something happened

Page 62

JONAH DORMAN

2      that would make it into the media or have a negative

3      spin, then there was generally a meeting and a PR

4      meeting to find out how to best deal with it.  Any

5      fast-paced company or politician has the same issue.

6  Q.  Sure.  And so do you remember other instances of

7      people threatening legal action against GAW?

8  A.  It was a company with a lot of customers.  There was

9      always people threatening legal action.

10 Q.  Okay.  So that was not uncommon?

11 A.  No.

12 Q.  Okay.  If you look at the top email from Dan Kelley,

13     David McLain is the name on the cc line?

14 A.  Yes.

15 Q.  Is that the attorney you remembered as being David

16     before?

17 A.  Yes.

18 Q.  And Stuart Fraser is also on this line?

19 A.  Yes.

20 Q.  Do you remember seeing him involved in this kind of

21     correspondence when this sort of issue would come up?

22          MS. CAVE:  Objection to the form.

23 A.  Can you ask that again?

24 BY MR. SARGENT:

25 Q.  Sure.  Do you remember seeing his name on

Page 63

JONAH DORMAN

2    correspondence such as this when this kind of issue
3    would come up at GAW Miners?
4              MS. CAVE:  Objection to the form.
5    A.   My recollection is that lots of people get cc'd in
6         emails, and when David McLain is cc'd, sometimes
7         Stuart is cc'd.  I don't know if that's involved in
8         the discussion, but yes, the name gets cc'd sometimes.
9    BY MR. SARGENT:
10   Q.   So he would appear -- it's -- he would appear on email
11        chains such as this during your tenure at GAW?
12             MS. CAVE:  Objection to the form.
13   BY MR. SARGENT:
14   Q.   That's your recollection?
15   A.   Yes.
16   Q.   Okay.  Can you tell me about how you came to leave GAW
17        Miners?
18   A.   You mean --
19   Q.   Did you quit?  Were you fired?  Did the company wind
20        down and tell you that you had -- no longer had
21        employment there?  What happened?
22   A.   I believe Josh had come back, and when he came back I
23        was pretty much -- I had enough information that I did
24        not want to be there anymore because it seemed like a
25        lot of things that were going on were not aboveboard,

1              JONAH DORMAN

2     and I was hearing about some other people who had left

3     who were dealing with the SEC, and it seemed like a

4     better route to leave the company.  I believe I

5     voluntarily left.

6  Q.  And this was -- I believe you testified earlier that

7       Josh Garza was gone for approximately a month?

8  A.  Yes.  I believe it was a month or two.  Somewhere in

9       that time frame.

10  Q.  And you were temporarily CEO of GAW Miners during that

11      period?

12  A.  Interim CEO.

13  Q.  And one of the things you were dealing with was

14      requests from the SEC?

15  A.  Those were being handled technically outside.  I was

16      dealing with a lot of meetings involving that, a lot

17      of discussions with attorneys and law firms, and then

18      Dan Kelley and the actual attorneys were dealing a lot

19      more heavily with it all day long because there was

20      still a company to run at the time.

21  Q.  So you were taking care of the day-to-day business of

22      the company, things like Paycoin, while other people

23      were responding to requests for information from the

24      SEC and dealing with that stuff?  Is that my

25      understanding?

                            JONAH DORMAN

1
2  A.   Yeah.  As I recall, I was not in the really technical
3       deep meetings with the SEC stuff.  Just some of the
4       broad overview meetings.
5  Q.   Do you remember who the people were who left the
6       company that you mentioned earlier?
7  A.   I do not specifically recall.  I know Eric Capuano had
8       left.  I don't believe Joe Mordica had left at that
9       time.
10 Q.   And you said that that gave you -- something caused
11      you to have concerns that not everything was
12      aboveboard?  Am I remembering your testimony
13      correctly?
14 A.   I mean, when the CEO of the company flees the country
15      and the SEC comes in and starts asking questions,
16      you've really got to look in -- look a little bit
17      deeper.
18 Q.   Yeah.  What did you -- what did you find?  Did you --
19      did you determine that things had been misrepresented
20      or that there had been false statements made by the
21      company, for example?
22              MS. CAVE:  Objection to the form.
23 BY MR. SARGENT:
24 Q.   You can answer.
25 A.   Yeah.  I don't like it either.

Page 66

JONAH DORMAN

2    Q.    Because you don't understand it or you don't want to

3          answer it or . . .?   Did you determine that the

4          company had made false statements?

5    A.    I did not determine that, no.

6    Q.    Did you have concerns that that was true?

7    A.    Yes.

8    Q.    But you -- you -- but you never got to the bottom of

9          it one way or the other before you left?

10   A.    Correct.

11   Q.    Is that fair?   And just the concerns that that might

12         have been happening was one of your motivations for

13         deciding to leave the company?

14   A.    I believe so, yes.   Again, this is a few years ago, so

15         my recollection is going to be a little bit hazy on

16         emotions and what I did and didn't know.

17   Q.    Did you immediately go to another job after you left

18         GAW Miners?

19   A.    No.

20   Q.    What was your employment history after leaving?

21   A.    I played all of Halo 1, 2, and 3.

22   Q.    That's not employment.   Or maybe it was.   Were you

23         being paid for that?

24   A.    No.

25   Q.    What was your -- what was the next job you had or

1                        JONAH DORMAN

2        business you owned or ran?

3    A.  3D Printing I believe.

4    Q.  3D Printing?  And how long was that after -- after

5        when you left GAW Miners that you --

6    A.  I don't know.  It was several months to a year, maybe

7        more.

8    Q.  Okay.  And was that a business -- were you an employee

9        or did you -- was it a business that you started?

10   A.  Business I started.

11   Q.  Okay.  Is that business still operating today?

12   A.  Yes.

13   Q.  And . . .

14                MR. SARGENT:  That's all the questions I

15       have.

16                THE WITNESS:  Really?

17                MR. SARGENT:  Yeah.

18                MS. CAVE:  Why don't we take a short break.

19                MR. SARGENT:  Okay.

20                VIDEO TECHNICIAN:  Going off the record at

21       10:36 a.m.

22                (Recess taken at 10:36 a.m.)

23                (Back on the record at 10:42 a.m.)

24                VIDEO TECHNICIAN:  We are back on the

25       record at 10:42 a.m.

Page 68

1                         JONAH DORMAN

2                        EXAMINATION

3   BY MS. CAVE:

4   Q.   Good morning, Mr. Dorman.  As I mentioned before, I

5        represent Stuart Fraser, who's the defendant in this

6        case, and so we have a few more questions for you.

7                If you could turn to Exhibit 3, which I

8        think we gave you earlier.  It's in that stack in

9        front of you.  And if you could turn to the second

10       page, please.  And about a third of the way down

11       there's an email from Christian Gogol that refers to

12       the free genesis and referral program.  Do you recall

13       what that was?

14  A.   No.

15  Q.   Are you familiar with any programs where free GAW

16       Miners products were given out?

17  A.   Yes.

18  Q.   And what programs are you familiar with?

19  A.   Not anything specific.  I just know that there were

20       something with free hashlets and something with free

21       Paycoin.  It's very common to do referral programs of

22       that type, and I know that we had done some of them at

23       GAW.

24  Q.   Okay.  And what's meant by referral programs?

25  A.   If you bring a new customer in that makes a purchase,

1                    JONAH DORMAN

2        you get something for free for doing so.

3    Q.   Okay.  So sort of a preferred customer type program

4        basically?

5    A.   Preferred to me would mean that they're buying

6        multiple things.  Referral would just mean you

7        referred somebody into the program.

8    Q.   Okay.  Understood.  And how frequently were these free

9        products distributed?

10   A.   I don't recall.

11   Q.   Do you recall how many of these programs there were?

12   A.   I would recall that even less.

13   Q.   Okay.  More than one?

14   A.   Yes.

15   Q.   Okay.  Was it a weekly occurrence, a monthly

16       occurrence?

17   A.   I would think that the referral programs would have

18       been an ongoing thing.

19   Q.   Okay.

20   A.   Normally you -- this is -- I'm just -- under normal

21       business practice you would normally have a referral

22       program where you give something away to everyone.

23       Again, I don't recall the specifics, but I would

24       assume it was similar, a long-term program.

25   Q.   Understood.  Thank you.  Earlier you were

Page 70

```
 1                          JONAH DORMAN
 2           mentioning -- you were describing some weekly meetings
 3           that occurred in Connecticut.
 4      A.   Yes.
 5      Q.   Do you recall discussing that?  Did Mr. Fraser ever
 6           attend any of those meetings?
 7      A.   No.  Those meetings were for myself and my staff.
 8      Q.   Earlier you mentioned that it was your understanding
 9           that Mr. McLain was around to protect Mr. Fraser's
10           interest.  Do you recall saying that?
11      A.   I don't believe that was my understanding.  I believe
12           that is what I was told.
13      Q.   And who told you that?
14      A.   That would have been either Dan Pease or Dan Kelley.
15      Q.   And when -- do you recall when they told you that?
16      A.   I do not recall.
17      Q.   Approximately when was the last time you did any work
18           for any GAW entity, ballpark?
19      A.   Would have been whenever I left.  The day before I
20           left the company.
21      Q.   Okay.  Sometime mid 2015?
22      A.   Yes.
23      Q.   Okay.  Are you able to pinpoint a month approximately?
24      A.   No.
25      Q.   Okay.  Are you familiar with the name Shiraz Moosajee?
```

1                         JONAH DORMAN

2    A.   I have heard the name, yes.

3    Q.   Okay.  Did you ever meet Mr. Moosajee?

4    A.   I don't believe so.

5    Q.   Okay.  Do you know what his role was at GAW Miners?

6    A.   I do not.

7    Q.   Okay.  Did you ever correspond or speak to him?

8    A.   Not that I recall.

9    Q.   Okay.  Did GAW Miners ever sell hardware on Amazon do

10        you know?

11   A.   On Amazon?  I have no idea.

12   Q.   Okay.  Are you familiar with the name Zeus Miner?

13   A.   Yes.  I have heard that name before.

14   Q.   Do you know if GAW Miners ever did any business with

15        Zeus Miner?

16   A.   You know, my recollection was that that was a GAW

17        Miners product, so I'm going to have to go with I

18        don't know.

19   Q.   Okay.  That's fine.  Are you familiar with websites

20        that give instructions on how to mine cryptocurrency?

21   A.   That's a very vague question.  Yes.

22   Q.   There are such websites that --

23   A.   Yes.

24   Q.   -- kind of give you mining for dummies essentially;

25        right?

1                          JONAH DORMAN

2    A.    Yes.

3    Q.    Okay.  Did GAW Miners ever post advertising on

4          websites like that?

5    A.    I can't recall if it would have been on those specific

6          websites.

7    Q.    Okay.  What -- where -- were there websites on which

8          GAW Miners did post advertising?

9    A.    Yes.  There were advertising agreements made through

10         the marketing department for several different news

11         organizations and related sites.

12   Q.    Okay.  Do you recall any of those organizations?

13   A.    I believe CryptoCoinsNews is one of them.

14   Q.    Okay.

15   A.    It's the only one that I can specifically recall.

16   Q.    Okay.  We talked earlier about I guess hardware mining

17         was kind of underway at GAW Miners when you started at

18         the company; is that right?

19   A.    I believe so, yes.

20   Q.    Do you know who set the prices for the hardware that

21         GAW Miners sold?

22   A.    I don't recall.

23   Q.    Did GAW Miners ever set up country specific websites?

24         In other words, a website for the UK, a website for

25         South Africa, a website for China.  Anything like

```
 1                    JONAH DORMAN
 2       that?
 3   A.  I don't recall.  I don't believe so, though.
 4   Q.  Okay.  Did you ever hear about people reselling GAW
 5       Miners hardware on eBay?
 6   A.  I'm sure I have.  I may have resold some hardware on
 7       eBay.
 8   Q.  Okay.  So that was -- that was an occurrence at
 9       least -- you're familiar with it occurring at least
10       once?
11   A.  I'm familiar with it occurring.  I can't recall if I
12       specifically remember it happening while I was at GAW.
13   Q.  Okay.  And the occasion on which you might have
14       sold -- resold hardware on eBay, was that after you
15       left or while you were at the company?
16   A.  Before I was at the company.
17   Q.  Before you were at the company.  Okay.  GAW Miners --
18       did GAW Miners give out discounts on any of its
19       cryptocurrency products?
20   A.  As I recall, yes.
21   Q.  Okay.  What -- what can you tell me about those
22       discounts?
23   A.  I believe there was conversations involving tiered
24       discounts.  Again, there's the referral program.
25       There would have been bulk discounts.  This is all
```

JONAH DORMAN

1        standard.

3    Q.   Okay.  Sure.

4    A.   Standard marketing and business practice.

5    Q.   Were you aware of people trying to use their discounts

6        multiple times?  In other words, say, for example, you

7        had a code for a discount and then you'd enter the

8        code multiple times.  Are you aware of that kind of

9        occurrence?

10   A.   Again, I don't specifically recall.  I have no reason

11       to believe it didn't happen.  It always does.

12   Q.   Okay.  It always does?

13   A.   Yes.

14   Q.   Okay.  And what's the effect of people using their

15       discounts multiple times?

16   A.   Generally they're invalid and generally you have to

17       create systems to prevent abuse.

18   Q.   Okay.  Did GAW Miners have systems in place to prevent

19       that kind of abuse?

20   A.   I don't recall.  I do recall having a meeting where we

21       banned an entire country like India or something from

22       using the website.

23   Q.   Why did -- was India banned?

24   A.   I believe there was some Facebook group going around

25       where they were multiplying their free something for a

1                          JONAH DORMAN

2         referral program.

3    Q.   Okay.

4    A.   I remember laughing really hard and the decision was

5         made to ban a whole country, so . . .

6    Q.   Okay.  Are you aware of something like that --

7    A.   Yes.

8    Q.   -- occurring in -- on other occasions?

9    A.   I don't know if it occurred on other occasions.  It

10        may have.

11   Q.   Okay.  Are you familiar with something called Zen

12        Cloud codes?

13   A.   Zen Cloud codes?

14   Q.   Yeah.

15   A.   I am not.  I could extrapolate.

16   Q.   Okay.  And what do you extrapolate from my --

17   A.   Zen -- Zen Cloud was definitely the -- whatever Zen

18        Cloud hashing system, the thing.  So a Zen Cloud code

19        I'm assuming would be a discount code for Zen Cloud

20        that could be used.

21   Q.   Okay.  Did you ever hear of people selling their Zen

22        Cloud codes, their discount codes?

23   A.   I don't recall.  It wouldn't surprise me, though.

24   Q.   Okay.  Why wouldn't it surprise you?

25   A.   People sell codes all the time.  A coupon's worth one

1                            JONAH DORMAN

2         one hundredth of a cent.  But a discount code can

3         actually be worth something.

4    Q.   Okay.  We talked earlier about Lease Rig, which I

5         think you said you sold to GAW Miners when you joined

6         the company; is that right?

7    A.   Yes.

8    Q.   Okay.  And what happened to Lease Rig when GAW Miners

9         wound down?  Does Lease Rig still exist?

10   A.   Lease Rig as an entity was wound down.  I believe

11        there was a rescission of the original agreement that

12        was signed, so the intellectual property for Lease Rig

13        returned to Matthew and I.

14   Q.   Okay.  So you still hold the IP for that today?

15   A.   Correct.

16   Q.   And is it -- have you tried to restart it as a

17        business or you just own the IP?

18   A.   Yeah.  No.  The model and -- the model of that is --

19        doesn't seem like it would be applicable anymore, so

20        no.

21   Q.   Okay.  Did you have a patent on that IP?

22   A.   No.

23   Q.   You're familiar with the term ZenMiner?

24   A.   Yes.

25   Q.   Okay.  Do you know who came up with the idea for

1                      JONAH DORMAN

2       ZenMiner?

3  A.   I do not.

4  Q.   Did GAW Miners have a board of directors?

5  A.   I don't believe so.  I recall having conversations

6       with Dan Kelley about having an actual board of

7       directors.  I don't believe that ever happened.

8  Q.   Okay.  Are you familiar with the domain BTC.com?

9  A.   Yes.

10 Q.   Okay.  And did GAW Miners ever seek to acquire that

11      domain at some point?

12 A.   Yes.

13 Q.   Okay.  And whose -- do you know whose idea that was?

14 A.   I believe it was Josh Garza's.  I have no -- no

15      factual information behind that --

16 Q.   Okay.

17 A.   -- because I just believe he's the one that first

18      approached me with the idea.

19 Q.   Okay.  And so was there a process initiated to

20      actually buy that domain?

21 A.   Yes.  From my recollection there was something with

22      leasing it for a certain amount of money per month and

23      the domain was made active for the company.

24 Q.   Okay.  So just to clarify, you've actually met Josh

25      Garza in person I assume?

1                              JONAH DORMAN

2    A.   Yes.

3    Q.   Okay.  When you were in Connecticut did you see him on

4         a regular basis, then?

5    A.   Yes.

6    Q.   When was the last time you spoke to Josh Garza?

7    A.   I have no idea.  It would have been the last email I

8         sent to him.

9    Q.   Okay.  And do you remember the last email that you

10        sent approximately when that was?

11   A.   I do not recall.  I believe it was one that said I'm

12        not going to work there anymore and then I left.

13   Q.   Sometime back in 2015 probably, then?

14   A.   Yes.

15   Q.   Okay.  Has he tried to contact you at any point since

16        then?

17   A.   I believe he called me at some point after that

18        happened.  I don't believe I answered.  There was two

19        or three attempts to call and that was it.  Again,

20        this is like what did I have for breakfast four years

21        ago.  I have no idea.

22   Q.   Right.  Understood.  Let's see.  Are you familiar with

23        NDAs or non-disclosure agreements?  Do you know what

24        that is?

25   A.   I am familiar with the term, yes.

                          JONAH DORMAN

1

2   Q.   Okay.  Did you have an NDA with GAW Miners?

3   A.   I believe so.

4   Q.   Okay.  Do you know anybody else who did?

5   A.   I really don't recall.

6   Q.   Okay.  Do you know the name Allen Shinners?

7   A.   I've heard it, yes.

8   Q.   Okay.  Have you ever communicated with Mr. Shinners?

9   A.   Yes.

10  Q.   Okay.  And about what did you communicate with

11       Mr. Shinners?

12  A.   Life I believe.

13  Q.   Okay.  About GAW Miners?

14  A.   Yes.  There have been communications about GAW Miners.

15  Q.   Okay.

16  A.   I believe he was a customer of GAW and that's . . .

17  Q.   Yeah.  We were looking at Exhibit 10, which is in the

18       stack in front of you we were looking at earlier.  Did

19       you ever have any discussions with Mr. Shinners about

20       the Exhibit 10, the white -- the Paycoin white paper?

21  A.   I don't recall.  I have no reason to believe I didn't.

22  Q.   Okay.  Did you ever exchange drafts with him of the

23       Paycoin white paper?

24  A.   I don't recall.  I don't have any reason to believe I

25       didn't.

Page 80

JONAH DORMAN

1

2   Q.   Okay.  Are you familiar with the term "Darkcoin"?

3   A.   Yes.

4   Q.   What does Darkcoin mean?

5   A.   It's a different type of cryptocurrency.

6   Q.   It's a -- it's its own type of cryptocurrency?

7   A.   I believe so, yes.

8   Q.   Okay.  Is there something called Darkcoin information?

9   A.   I would not know what that means.

10  Q.   Okay.  I'll show you what we'll mark as Exhibit 133.

11                MARKED FOR IDENTIFICATION:

12                DEPOSITION EXHIBIT 133

13                10:56 a.m.

14  BY MS. CAVE:

15  Q.   If you could take a moment to look at Exhibit 133,

16       please.

17  A.   Oh, double-sided?

18  Q.   Sorry.  Saving trees.

19                MR. SARGENT:  It is printed in blue and

20       red, though.

21  A.   Jeez.  Well, yeah.  So now we got one half in all

22       black and white, one half in color but it's double

23       sided.  All right.  This is very long.  You can go

24       ahead.

25  BY MS. CAVE:

Page 81

1                           JONAH DORMAN

2   Q.   You don't need to read every line.  I just wanted you

3        to be familiar with what it was.  So this is an email

4        from you to Mr. Shinners dated November 16th, 2014.

5        Do you recall this email?

6   A.   Again, no.  But I have no reason to believe it wasn't

7        me sending it.

8   Q.   Okay.  And so the subject is white paper draft and so

9        I think you'll agree with me that in general this is

10       some back and forth about the draft -- a draft of the

11       white paper; correct?

12  A.   Yes.

13  Q.   Okay.  And so the first line it says, "Actually, I'd

14       like to keep your feedback unbiased by the dark coin

15       information."

16  A.   Okay.

17  Q.   So what do you mean by the dark coin information in

18       this context?

19  A.   It would be in response to whatever this previous

20       message was.

21  Q.   Okay.

22  A.   Ah.  Allen is saying that the people who know Darkcoin

23       would be the best people to understand what's being

24       outlined in -- he doesn't say, so I will assume is the

25       Paycoin white paper because the master nodes and Prime

Page 82

JONAH DORMAN

2       Controllers, whatever they're called, were very

3       similar --

4   Q.  Okay.

5   A.  -- in both networks, and it would appear that I'm

6       telling him to keep his feedback about the white paper

7       unbiased by any information about Darkcoin.

8   Q.  Okay.  Understood.  The next line says, "Once this

9       paper is out . . ."  So is it your understanding that

10      at least this draft that's being discussed in this

11      chain of correspondence is not a public -- not

12      published yet?

13  A.  That would make sense in context.

14  Q.  Okay.  Okay.  Okay.  You can put that to the side.

15      Thank you.  I'll show you what we'll mark as

16      Exhibit 134.

17              MARKED FOR IDENTIFICATION:

18              DEPOSITION EXHIBIT 134

19              10:59 a.m.

20  BY MS. CAVE:

21  Q.  Just take a moment to skim through that.  It's shorter

22      than the last one.

23  A.  Okay.

24  Q.  Okay.  This is an email from Mr. Shinners to you dated

25      November 17th, 2014.  Do you recall this email?

1                      JONAH DORMAN

2    A.   I don't recall.  I have no reason to believe I didn't

3         send it or receive it.

4    Q.   In the third paragraph it begins -- Mr. Shinners

5         begins, "On a side note, someone leaked that the coin

6         is called Paycoin."  And it goes on to talk a bit

7         about the leak.  Are you familiar with leaks happening

8         at GAW Miners?

9    A.   None specific.  I have no reason to believe they

10        didn't happen.

11   Q.   Okay.  Are you familiar with this particular leak that

12        he's discussing here?

13   A.   Not that I recall.

14   Q.   Okay.  Were there any steps taken at GAW Miners to

15        prevent leaks of information?

16   A.   I would believe the standard steps to prevent the

17        leakage of information, yes.  I don't recall anything

18        specific.

19   Q.   Okay.  You can put that to the side.  Thank you.

20                  Was -- do you recall any discussions about

21        setting up a Dubai data center?

22   A.   I do recall discussions, yes.

23   Q.   Okay.  And what -- what do you recall about those

24        discussions?

25   A.   Having discussions about setting up a data center in

                         JONAH DORMAN

1

2        Dubai.

3   Q.   What was -- what was the purpose of setting up a data

4        center in Dubai?

5   A.   Power's cheaper.

6   Q.   Okay.  And did that ever come to fruition?

7   A.   I don't believe so.  If it did, it was without my

8        involvement.

9   Q.   Okay.  We talked about Carlos Garza earlier.  Did you

10       ever meet Carlos Garza?

11  A.   Yes.

12  Q.   Okay.  And in general what was his role at GAW Miners?

13  A.   Sales.

14  Q.   And was that direct sales to customers or other --

15       other types of bulk sales or anything else?

16  A.   I believe he was just sales.

17  Q.   Okay.

18  A.   From what I understood, him and Josh were sales.

19  Q.   Okay.  So he and Josh worked closely together on sales

20       issues?

21  A.   I believe so, yes.

22  Q.   Okay.  Okay.  I'll show you what we'll mark as

23       Exhibit 135.  And you'll like this one.  It's very

24       short.

25                   MARKED FOR IDENTIFICATION:

```
 1                    JONAH DORMAN

 2               DEPOSITION EXHIBIT 135

 3               11:02 a.m.

 4   BY MS. CAVE:

 5   Q.   Okay.  So Exhibit 135 is an email from you to

 6        Mr. Shinners dated November 21st, 2014.  Do you recall

 7        this email?

 8   A.   I don't recall.

 9   Q.   Okay.  Do you know what the Paycoin community

10        questions were?

11   A.   I do not.

12   Q.   Okay.  Do you recall -- and it says "Invitation to

13        edit."  Do you recall why you were sending this to

14        Mr. Shinners to edit?

15   A.   I do not recall.

16   Q.   Did you ever meet Mr. Shinners in person?

17   A.   I don't know.  I don't believe so.

18   Q.   Okay.  Did you ever speak to him on the phone?

19   A.   Yes.

20   Q.   Okay.  How many times did you speak to him on the

21        phone?

22   A.   I don't recall.

23   Q.   Was it once a week, less than once a week?

24   A.   No idea.

25   Q.   Okay.
```

1               JONAH DORMAN

2    A.    I didn't even know I emailed him this much.

3    Q.    Okay.  Very good.  You can set that to the side.

4          Thank you.  We'll show you what we're marking as

5          Exhibit 136.

6                  MARKED FOR IDENTIFICATION:

7                  DEPOSITION EXHIBIT 136

8                  11:04 a.m.

9    A.    See, now this one's black and white and double-sided.

10         That is the worst of both worlds right there.

11   BY MS. CAVE:

12   Q.    But it's not that long.

13   A.    All right.  Okay.

14   Q.    Most of it's a chart, so . . .  This is an email from

15         you to Josh Garza with a cc to Joe Mordica dated

16         December 12th, 2014.  Do you recall this email?

17   A.    I do not recall.

18   Q.    Okay.  Do you recall discussions in general about the

19         allocation of initial Paycoin?

20   A.    I recall that those discussions happened, yes.

21   Q.    Okay.  And what do you recall about those discussions?

22   A.    Just that they happened.

23   Q.    Okay.  So was --

24   A.    Is this modified at all or is it --

25   Q.    No.  This is as it was produced to us by the

1                          JONAH DORMAN

2        plaintiffs.

3   A.   Okay.

4   Q.   So . . .  Looking at the chart there, the middle

5        column is "Owner" and there's a list of investor, 1,

6        2, 3, 4, 5, 6, 7.

7   A.   Um-hmm.

8   Q.   Do you know who investors 1 through 7 were?

9   A.   I do not.

10  Q.   Do you know who decided who would be designated as

11       investors 1 through 7 would be?

12  A.   I do not.

13  Q.   Okay.  Down at the bottom of the chart on the first

14       page, the stake rate -- I guess the middle of the

15       chart from Prime 11 all the way down to Prime 26 the

16       stake rate is 400 percent.  What does that mean?

17  A.   The stake rate is the rate of return over a period of

18       time that the coin's received when in proof-of-stake

19       mode.

20  Q.   Okay.  And if you turn to the bottom of the chart on

21       the second page.  There's a total allocation of eleven

22       million 625 -- 11,625,000 representing 93 percent, and

23       then the next row is total coins GAW for 12 million at

24       96 percent and then unassigned coins of 875 at seven

25       percent.  How -- how do you reconcile the three

                         JONAH DORMAN

1
2       different -- those three different percentages?

3   A.  I wouldn't even try.

4   Q.  Okay.

5   A.  Even with a calculator.  That doesn't make any sense.

6   Q.  Right.  Okay.  Did you prepare the chart that's in

7       this email?

8   A.  I have no reason to believe I didn't, but I don't

9       recall.

10  Q.  Okay.

11  A.  Today's me can say that back then me didn't do a good

12      job explaining those bottom three.

13  Q.  Okay.  I'm not being critical.  I'm just trying to

14      understand it.  But this chart was something that you

15      prepared at Josh Garza's request?

16  A.  He did ask for a detailed break-out, so I would assume

17      so.  However, again, I don't recall.

18  Q.  Okay.  Would there have been someone that you asked to

19      prepare this chart for you to then include in the

20      email?

21  A.  There could have been any of the technical people.

22  Q.  Okay.  And is there a data source from which these

23      numbers would have come or . . .?

24  A.  They would have either come from a conversation with

25      the developer or just a general conversation on where

Page 89

                        JONAH DORMAN

1

2       the coins would be going.  Since there's investors

3       involved, I would assume that I didn't create the

4       information.

5   Q.  Okay.  You can put that to the side.  We'll show you

6       what we'll mark as Exhibit 137.

7                   MARKED FOR IDENTIFICATION:

8                   DEPOSITION EXHIBIT 137

9                   11:08 a.m.

10  BY MS. CAVE:

11  Q.  Okay.  Exhibit 137 is an email from Josh Garza dated

12      December 27th, 2014, to you and several others and the

13      subject is "Here is my plan."  Do you recall this

14      email?

15  A.  I don't recall.

16  Q.  Okay.  Do you recall what this email was in response

17      to?

18  A.  I do not.

19  Q.  Okay.  So did you have any discussions with Josh about

20      his -- the plan that he's referring to here?

21  A.  The plan is too vague of a question.  The one that

22      he's referring to here I would assume you mean the

23      paybase launch and . . .

24  Q.  Okay.

25  A.  This is very vague, so . . .  There has been

1                          JONAH DORMAN

2          discussions about paybase launch, yes.

3    Q.    Okay.  About midway down he refers to creating buy

4          walls.  Do you know what those refer to?

5    A.    A buy wall on a market would be when you buy something

6          or put a very large buy order in, so when people sell,

7          the price doesn't go down.

8    Q.    And were those put in place at GAW Miners?

9    A.    I have no idea.

10   Q.    All right.  You can put that to the side.  We'll show

11         you what we'll mark as Exhibit 138.

12                     MARKED FOR IDENTIFICATION:

13                     DEPOSITION EXHIBIT 138

14                     11:10 a.m.

15   BY MS. CAVE:

16   Q.    Exhibit 138 is an email from Dan Kelley dated

17         January 7th, 2015, to David McLain and you're one of

18         the people who's copied on this email and the subject

19         is "Redemption Plan" and there's a discussion about a

20         PayBase Redemption Plan.  Do you recall discussions

21         about the PayBase Redemption Plan?

22   A.    I do recall discussions about it, yes.

23   Q.    Okay.  What was the PayBase Redemption Plan?

24   A.    I don't recall.

25   Q.    Do you recall what the need was for a PayBase

1                          JONAH DORMAN

2          Redemption Plan?

3     A.   What the need was for --

4     Q.   What was the purpose for the PayBase Redemption Plan?

5     A.   I don't recall.  I can look through here and find out.

6          I would have to say it was something to do with the

7          turning in of the coins selling -- there was something

8          about the coins being used at GAW or with GAW.

9     Q.   Okay.  Okay.  Was there an event that precipitated the

10         need for a redemption plan?

11    A.   It's too vague of a question that I can't answer.

12    Q.   Did something happen at GAW Miners that required the

13         discussion of having a redemption plan?

14    A.   My thought on redemption plan is that it's just a way

15         for people to use or spend a cryptocurrency at a

16         store, so . . .

17    Q.   Okay.  Okay.  Did you ever go to any cryptocurrency

18         conferences?

19    A.   Yes.

20    Q.   Which ones did you go to?

21    A.   I went to one in Vegas and one in Miami and possibly

22         others.

23    Q.   Okay.  So this email refers to a Miami conference

24         about partway down.  Is that the conference that you

25         attended?

1                          JONAH DORMAN

2   A.   I believe so.  The Miami conference.  Sounds correct.

3   Q.   Okay.  And Josh Garza attended that conference as

4        well?

5   A.   Yes.

6   Q.   Did you go together or were you there separately?

7   A.   There was several of us that went.

8   Q.   Okay.  Who else aside from you and Josh Garza attended

9        from GAW Miners?

10  A.   I don't recall.

11  Q.   Did GAW Miners give a presentation at that conference?

12  A.   No.  GAW Miners -- I believe Josh was slated to give a

13       speech and did not give it.

14  Q.   Okay.  Do you know --

15  A.   There was a booth at the conference for GAW Miners.

16  Q.   Okay.  Do you know why Mr. Garza did not give his

17       speech?

18  A.   I do not recall.

19  Q.   Do you recall what -- do you know what he was going to

20       give a speech about?

21  A.   I do not.

22  Q.   And the booth that you referred to that was at the

23       Miami conference, what -- what was in the booth?

24  A.   It was one of those general advertising booths with

25       the weird marketing giveaways that you do.

Page 93

JONAH DORMAN

1

2  Q.   Okay.  Did you sort of staff that booth, I guess,

3       during the conference?

4  A.   I believe I was around the booth, yes.

5  Q.   Okay.  And who else from GAW Miners participated in

6       that?

7  A.   Again, I don't recall.  There was at least one or two

8       people from customer service there.

9  Q.   Okay.  Okay.  You can put that aside.  We'll show you

10      what we're marking as Exhibit 139.

11                   MARKED FOR IDENTIFICATION:

12                   DEPOSITION EXHIBIT 139

13                   11:14 a.m.

14  BY MS. CAVE:

15  Q.   Exhibit 139 is an email from Dan Pease dated

16       February 3rd, 2015, to Mr. Garza and yourself.  Do you

17       recall this email?

18  A.   I do not.

19  Q.   Do you recall having discussions around this time with

20       Dan Pease and Josh Garza about the future of GAW

21       Miners?

22  A.   I would answer that with it's a company, so there's

23       always discussions about the future.

24  Q.   Okay.  Well, the first paragraph of this email refers

25       to a conversation between Mr. Pease and yourself that

                    JONAH DORMAN

1
2      morning.  Do you recall anything about that
3      conversation?
4   A.  I do not.
5   Q.  Did you participate in discussions about cutting staff
6      and making other structural changes at GAW Miners?
7   A.  I frequently had conversations regarding cutting staff
8      and making structural changes.
9   Q.  When did GAW Miners begin to cut staff?
10  A.  I believe within a month of me arriving I had let one
11      or two people go from GAW Miners.
12  Q.  Okay.  You can put that to the side.  Thank you.  At
13      some point you began to have discussions about winding
14      down GAW Miners?
15  A.  That sounds correct.
16  Q.  Okay.  And who did you have those discussions with?
17  A.  Would have been whoever was left at the company I
18      believe.
19  Q.  Okay.  And who was left at that point in time; do you
20      remember?
21  A.  I don't recall.
22  Q.  Mr. Kelley?
23  A.  Possibly.
24  Q.  Okay.  Or Mr. Pease?
25  A.  Also.

Page 95

1                        JONAH DORMAN

2   Q.   Okay.  Was Josh Garza abroad at that point in time or

3        did he participate in those conversations?

4   A.   I don't recall if the conversations continued or not

5        or if they happened while he was gone or when he was

6        back.

7   Q.   Okay.  This is Exhibit 140.

8                  MARKED FOR IDENTIFICATION:

9                  DEPOSITION EXHIBIT 140

10                 11:18 a.m.

11  A.   Okay.

12  BY MS. CAVE:

13  Q.   Okay.  So Exhibit 140 is an -- begins with an email

14       from yourself to Mr. Garza with a cc to Dan Pease

15       dated February 24th, 2015, and the subject is "Winding

16       Down."  And in the first paragraph you anticipate

17       lawsuits being filed and you say, "Most of them will

18       be dismissed or defended easily."  Why did you think

19       that?

20  A.   I'm sorry.  You're phrasing that it sounds like I sent

21       the initial email.  This was in response to an email

22       from Josh.

23  Q.   I'm just referring to the email at the top of the

24       document --

25  A.   Okay.

                         JONAH DORMAN

1

2    Q.   -- for identification purposes only.

3    A.   So what did I mean by what exactly?

4    Q.   Does your statement "Most" -- you're referring to the

5         possibility of lawsuits being filed and you say, "Most

6         of them will be dismissed or defended easily."  Why

7         did you believe that?

8    A.   I don't recall.

9    Q.   Okay.  You yourself have not been named in any

10        lawsuits related to GAW Miners, though; correct?

11   A.   Not that I know of.

12   Q.   Okay.  You can put that to the side.  In terms of GAW

13        Miners today, is it your understanding that the

14        company no longer exists?

15   A.   It is.

16   Q.   And same for ZenMiner?  It no longer exists?

17   A.   Yes.  I have no factual basis for that.  I just

18        assume.

19   Q.   Okay.  This is Exhibit 141.

20                  MARKED FOR IDENTIFICATION:

21                  DEPOSITION EXHIBIT 141

22                  11:21 a.m.

23   BY MS. CAVE:

24   Q.   Okay.  For identification purposes, Exhibit 141 is an

25        email from you to Mr. Garza copying several others

Page 97

JONAH DORMAN

2    dated March 13th, 2015, and the subject is the "State

3    of the company."  Do you recall this email?

4  A.   I do not.

5  Q.   At the bottom of the first page of the document the

6    second sentence says -- you describe Josh Garza as the

7    managing member of the LLC.  Was that your

8    understanding?

9  A.   Correct.

10  Q.   The -- if you turn to the second page, so the back of

11    the first page, so where your left hand is.  About

12    midway down you say, "I've copied Josh as the Managing

13    Member and Majority owner of B.T.C., LLC."  That's

14    your understanding that Josh was the managing member

15    and majority owner of B.T.C., LLC?

16  A.   Yes.

17  Q.   Okay.  You can put that to the side.

18  A.   To clarify that, it is my understanding of reading

19    this --

20  Q.   Okay.

21  A.   -- I --

22  Q.   Was it fair to say that that was your understanding at

23    the time as well?

24  A.   I have no idea what my understanding would have been

25    at the time.

1                          JONAH DORMAN

2   Q.   Well, you wrote -- you wrote those words at the time;

3        right?

4   A.   That's why I'm saying --

5   Q.   You have no reason to believe you didn't write those

6        words?

7   A.   Correct.

8   Q.   Okay.  Have you spoken to Mr. Sargent before today?

9   A.   Yes.

10  Q.   Okay.  How many times?

11  A.   I have no idea.

12  Q.   More than five?

13  A.   I have no idea.

14  Q.   Okay.  About what did you speak to Mr. Sargent?

15  A.   He wanted me to come to my deposition.

16  Q.   Okay.  Did you have any discussions about the

17       substance of your testimony here today?

18  A.   Substance?

19  Q.   Yes.

20  A.   I believe I asked him a question about what it was in

21       reference to and it came out that it was about the

22       lawsuit against GAW, so . . .

23  Q.   Okay.  Okay.  How long were those conversations?

24  A.   I don't recall.  Not long.

25  Q.   Okay.  What about any other individuals from the

                        JONAH DORMAN

1

2        Susman Godfrey firm?  Have you spoken to them?

3   A.   I don't recall.  There may have been someone else who

4        called about scheduling or something else.

5   Q.   Are you familiar with the name Michael Pfeiffer?

6   A.   Michael Pfeiffer.  I am familiar with the other

7        version of Michelle Pfeiffer, which I think is a

8        nickname for the person you're referring to.

9   Q.   In the context of GAW Miners, are you familiar with

10       the name Michael Pfeiffer?

11  A.   Yes.

12  Q.   Okay.  And have you met Mr. Pfeiffer?

13  A.   I don't know.

14  Q.   Okay.  Have you ever corresponded with Michael

15       Pfeiffer?

16  A.   I have no reason to believe I didn't, but I don't

17       recall.

18  Q.   What about Denis Audet?  Is that name familiar to you?

19  A.   No.

20  Q.   Okay.  And Jason Vargas?  Is that name familiar to

21       you?

22  A.   The name is familiar, yes.

23  Q.   Okay.  Did you ever correspond or speak to Mr. Vargas?

24  A.   I don't recall.

25  Q.   Okay.  Did you -- have you spoken to anyone else about

JONAH DORMAN

1
2    your deposition testimony here today?

3    A.    Yes.

4    Q.    Who -- and who's that?

5    A.    Several people.

6    Q.    Okay.  Tell me who they are.

7    A.    My last three dates.

8    Q.    Okay.

9    A.    The dates that --

10   Q.    You don't have to tell me those names.

11   A.    -- that I didn't have because I couldn't schedule.

12   Q.    Okay.

13   A.    Several of the people at GAW reached out to me,

14         several former employees reached out to me when the

15         depositions started happening because they had

16         questions about what to do.

17   Q.    Okay.

18   A.    So there has been discussions.

19   Q.    Okay.  And which former employees did you speak to?

20   A.    I believe I spoke to Joe and Madeline Eden, and I

21         don't recall if there was others.

22   Q.    Okay.  And how many times did you speak to Joe Mordica

23         about depositions?

24   A.    I don't recall.

25   Q.    Did you speak about the -- the substance of your

1                        JONAH DORMAN

2      testimony here today with Mr. Mordica?  Did you talk

3      to Mr. Mordica about what you were going to say here

4      today at your deposition?

5   A.  No.  I don't believe so.

6   Q.  Did Mr. Mordica tell you anything about his deposition

7      testimony?

8   A.  No.

9   Q.  Okay.  Ms. Eden, did she tell you anything about her

10     deposition testimony?

11  A.  I don't believe so.

12  Q.  Have you seen transcripts of either of their

13     depositions?

14  A.  No.

15  Q.  Eric Capuano, did you speak to him before your

16     deposition today?

17  A.  I don't recall.  I may have.

18  Q.  Okay.  Did you see Mr. Capuano's deposition transcript

19     before you came here today?

20  A.  No.  Can I?

21  Q.  You can, but then you need to tell me.

22              MS. CAVE:  If you will give us a short

23     five-minute break, we'll see if there's any few

24     remaining questions and then we'll wrap it up.

25              VIDEO TECHNICIAN:  Going off the record at

1                          JONAH DORMAN

2        11:26 a.m.

3                     (Recess taken at 11:26 a.m.)

4                     (Back on the record at 11:34 a.m.)

5                     VIDEO TECHNICIAN:  We are back on the

6        record at 11:34 a.m.

7                     MS. CAVE:  For Mr. Fraser we have no more

8        questions today.  Thank you very much for your time.

9                     MR. SARGENT:  I have one follow-up or one

10       or two.

11                         RE-EXAMINATION

12       BY MR. SARGENT:

13       Q.   Can you take a look at Exhibit 139 that opposing

14            counsel handed you?  It's an email from Dan Pease

15            dated Tuesday, February 3rd.  And at the end of the

16            third paragraph he says, "small Staff . . . to develop

17            a working system of blockchain technology that will be

18            able to be integrated into a company like Cantor."  Do

19            you see where I'm reading?

20       A.   Yes.

21       Q.   And do you know what he means by Cantor?

22       A.   He would be referring to Cantor Fitzgerald.

23       Q.   Do you recall discussions about integrating blockchain

24            technology into Cantor Fitzgerald --

25       A.   Yes.

1                         JONAH DORMAN

2   Q.   -- about this time?  What -- what did those

3        discussions entail?

4   A.   I don't recall the specifics.  I recall the overall

5        idea of Cantor being involved in an exchange like

6        system.  I would say nowadays the most similar thing

7        is the Gemini exchange from the Winklevoss twins.

8   Q.   Did -- was anyone from Cantor Fitzgerald itself

9        actually involved in those discussions?

10  A.   I was not involved in any of the discussions with

11       anyone from Cantor.  However, I had heard of

12       conversations and meeting notes from meetings with

13       Stuart and possibly advisors of Cantor.

14  Q.   When you say Stuart --

15  A.   Fraser.

16  Q.   Stuart Fraser.  And what's -- did you have an

17       understanding about Mr. Fraser's relationship with

18       Cantor Fitzgerald at the time?

19  A.   Yes.  I was told that he was one of the principals

20       there.

21  Q.   Okay.  Did you have any discussions with Mr. Fraser

22       present about Cantor's involvement in any blockchain

23       project?

24  A.   No.

25                    MR. SARGENT:  All the questions I have.

1                    JONAH DORMAN

2            MS. CAVE:  Nothing further.

3            VIDEO TECHNICIAN:  This concludes today's

4    videotaped deposition.  The time is 11:36 a.m.  We are

5    now off the record.

6            (Deposition concluded at 11:36 a.m.

7            Signature of the witness was requested.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    JONAH DORMAN

2   DENIS MARC AUDET, MICHAEL PFEIFFER,

3   DEAN ALLEN SHINNERS, AND JASON

4   VARGAS, INDIVIDUALLY AND ON BEHALF

5   OF ALL OTHER SIMILARLY SITUATED,

6                    Plaintiffs,

7      vs.         Case No. 3:16-CV-00940

8

9   STUART A. FRASER, GAW MINERS, LLC,

10  AND ZENMINER, LLC (D/B/A ZEN CLOUD),

11                   Defendants.

12  _____/

13

14               VERIFICATION OF DEPONENT

15

16          I, having read the foregoing deposition

17      consisting of my testimony at the aforementioned time

18      and place, do hereby attest to the correctness and

19      truthfulness of the transcript.

20

21

22             _____

23             JONAH DORMAN

24             Dated:

25

1                        JONAH DORMAN

2    UNITED STATES DISTRICT COURT            )

3    FOR THE DISTRICT OF CONNECTICUT         )

4              I, Cheri L. Poplin, CSR-5132, Certified

5    Shorthand Reporter, certify:

6              That the foregoing proceedings were taken before

7    me at the time and place therein set forth, at which time

8    the witness was put under oath by me;

9              That the testimony of the witness, the questions

10   propounded, and all objections and statements made at the

11   time of the examination were recorded stenographically by me

12   and were thereafter transcribed;

13             That a review of the transcript by the deponent

14   was requested;

15             That the foregoing is a true and correct

16   transcript of my shorthand notes so taken.

17             I further certify that I am not a relative or

18   employee of any attorney of the parties, nor financially

19   interested in the action.

20             I declare under penalty of perjury under the

21   laws of Michigan that the foregoing is true and correct.

22             Dated this 10th day of August, 2018.

23

24   _____

25   Cheri L. Poplin, CSR 5132, RPR, CRR

```
 1                       ERRATA SHEET

 2    Case Name:

 3    Deposition Date:

 4    Deponent:

 5    Pg.  No. Now Reads        Should Read   Reason

 6    ____ ____ _____     _____   _____

 7    ____ ____ _____     _____   _____

 8    ____ ____ _____     _____   _____

 9    ____ ____ _____     _____   _____

10    ____ ____ _____     _____   _____

11    ____ ____ _____     _____   _____

12    ____ ____ _____     _____   _____

13    ____ ____ _____     _____   _____

14    ____ ____ _____     _____   _____

15    ____ ____ _____     _____   _____

16    ____ ____ _____     _____   _____

17    ____ ____ _____     _____   _____

18    ____ ____ _____     _____   _____

19    ____ ____ _____     _____   _____

20

                              _____

21                            Signature of Deponent

22    SUBSCRIBED AND SWORN BEFORE ME

23    THIS ____ DAY OF _____, 2018.

24    _____

25    (Notary Public)   MY COMMISSION EXPIRES:_____
```