# EXHIBIT N

```
 1                        D. Pease

 2   UNITED STATES DISTRICT COURT

 3   DISTRICT OF CONNECTICUT

 4   -----------------------------x

 5   DENIS MARC AUDET, et al.,

 6             Plaintiffs,          Case No.

 7          v.                      3:16-cv-00940

 8   STUART A. FRASER, et al,

 9             Defendants.

10   -----------------------------x

11

12

13      VIDEOTAPED DEPOSITION OF DANIEL J. PEASE

14             Indianpolis, Indiana

15             Tuesday, July 31, 2018

16

17   Reported by:

18   Deborah C. Furey, RPR, CLR, CRI

19   JOB NO. 142899

20

21

22

23

24

25
```

```
1                         D. Pease

2

3

4

5                      July 31, 2018

6                      9:14 a.m.

7

8

9          Videotaped deposition of DANIEL J. PEASE,

10   held at the Regus, 333 North Alabama Street, Suite

11   350, Indianapolis, Indiana 46204, before Deborah C.

12   Furey, a Registered Professional Reporter, Certified

13   LiveNote Reporter, and Notary Public of the states of

14   Ohio and Kentucky.

15

16

17

18

19

20

21

22

23

24

25
```

1                          D. Pease

2    APPEARANCES:

3    SUSMAN GODFREY

4    Attorneys for Plaintiffs

5    1201 Third Avenue

6    Seattle, Washington  98101

7    BY:  EDGAR SARGENT, ESQUIRE

8

9

10   HUGHES HUBBARD & REED

11   Attorneys for Defendant Stuart Fraser

12   One Battery Park Plaza

13   New York, New York  10004

14   BY:  SARA ECHENIQUE, ESQUIRE

15        ANNA SCHULER, ESQUIRE

16

17   ALSO PRESENT:

18   William Thomas, Videographer

19

20

21

22

23

24

25

D. Pease

1

2          THE VIDEOGRAPHER:  This is the start of

3    media labeled Number 1 of the video recorded

4    deposition of Daniel Pease in the matter,

5    Denis Marc Audet versus -- et al, versus

6    Stuart A. Fraser, GAW Miners, LLC, et al.

7          This is in the United States District

8    Court, District of Connecticut, Number

9    3:16-cv-00940.

10          This deposition is being held at 333

11   North Alabama Street, Suite 350, Indianapolis,

12   Indiana, on July 31st, 2018 at approximately

13   9:16 a.m.

14          My name is William Thomas.  I'm the

15   legal video specialist from TSG Reporting,

16   Inc., headquartered at 747 Third Avenue,

17   New York, New York.

18          The court reporter is Deborah Furey, in

19   association with TSG Reporting.

20          Counsel, would you please identify

21   yourselves?

22          MR. SARGENT:  Edgar Sargent from the

23   firm Susman Godfrey, representing the

24   plaintiffs.

25          MS. ECHENIQUE:  Sarah Echenique from the

1                          D. Pease

2          firm Hughes, Hubbard & Reed, representing

3          defendant, Stuart Fraser.

4                MS. SCHULER:  Anna Schuler from the firm

5          Hughes, Hubbard & Reed, representing

6          defendant, Stuart Fraser.

7                THE VIDEOGRAPHER:  Will the court

8          reporter please swear in the witness.

9     D A N I E L  J. P E A S E,

10               called as a witness, having been first

11      duly sworn by a Notary Public, was

12      examined and testified as follows:

13    EXAMINATION

14    BY MR. SARGENT:

15         Q.   Good morning, Mr. Pease.  We met

16      earlier, but just to be clear on the record, I'm

17      Edgar Sargent, and I'm an attorney representing a

18      group of people who invested in products sold by

19      GAW Miners.

20               Do you understand that?

21         A.   Yes.

22         Q.   Can you -- did you graduate from high

23      school?

24         A.   Did I graduate from high school?  Yes.

25         Q.   And where?

1                          D. Pease

2      A.      Kempsville High School in Virginia

3   Beach, Virginia.

4      Q.      And can you walk us through -- I'm just

5   trying to get some basic background -- can you

6   walk us through your education after high school?

7      A.      So after high school, I went down to

8   Daytona Beach to go to college, ended up leaving

9   college, moved back to Virginia Beach and then up

10  to Connecticut.

11          From Connecticut, I went online

12  schooling for my associate's and my bachelor's.

13  And then I recently just graduated for my

14  master's.

15     Q.      And what are your degrees in, the

16  associate's, the bachelor's and the master's?

17     A.      The associate's was IT.  The associate's

18  -- I forget exactly.  I think it was web design.

19          My bachelor's was network

20  administration.

21          And my master's is actually a dual.  In

22  cyber security and network security.

23     Q.      And where did you get the master's?

24     A.      Currently, right now, it's called Purdue

25  Online on Purdue Global, but it was Kaplan.  When

1                          D. Pease

2    I signed up, it was Kaplan.  They sold it to

3    Purdue.

4        Q.    And when did you get the bachelor's?

5        A.    Bachelor's.  Somewhere around 2012,

6    2013-ish.

7        Q.    And can you walk us through the work

8    history between then and when you first went to

9    work for GAW?

10       A.    I don't understand the question.  Sorry.

11       Q.    Where did you work after getting your

12   bachelor's?

13       A.    I did it online.  So I was doing it

14   while I was --

15       Q.    You were already working?

16       A.    I was already working, yeah.

17       Q.    So where were you working?

18       A.    Originally I was working at a mortgage

19   company.  It's called Ascella Mortgage.

20       Q.    Doing computer work?

21       A.    I was doubling as an operations manager

22   and a little bit of computer work.

23              THE VIDEOGRAPHER:  We are going off

24       record at 9:19.

25                     (Recess taken from 9:18 a.m. to

1                            D. Pease

2          9:21 a.m.)

3                  THE VIDEOGRAPHER:  We're back on record

4          at 9:21.

5    BY MR. SARGENT:

6          Q.    And I'm sorry.  The mortgage company was

7    HRH Sale?

8          A.    No, Ascella, A-S-C-E-L-L-A, Mortgage.

9          Q.    And how long did you work for Ascella

10   Mortgage?

11         A.    Four years, give or take.

12         Q.    When did that terminate?

13         A.    2008, when the mortgage -- when the

14   mortgage crashed, beginning of 2008.

15         Q.    And where did you work after Ascella

16   Mortgage?

17         A.    I was unemployed for a little while, and

18   then I started working at GAW HSI.

19         Q.    So that would have been 2009.  When

20   was --

21         A.    No, it was the end of 2008-ish.

22         Q.    For GAW.

23               And what was GAW's business then?

24         A.    High speed internet.  It was wireless

25   internet for -- it's called Last Mile.  So places

                          D. Pease

1

2      where they didn't have DSL or cable or anything

3      like that.

4           Q.    And how did you identify that as a

5      potential job or did they contact you, or who

6      did --

7           A.    No.  I found them on -- I think it was

8      Career Builder or one of those job boards.  And I

9      was trying to get into the IT field kind of in the

10     lower level.  So I was looking for tech support

11     jobs.

12              I had tried Comcast, and I was about to

13     get a job there.  Then I saw a local company that

14     was actually right down the road from my house, so

15     I applied there and I got the job.

16          Q.    Do you call it G-A-W, not GAW?

17          A.    Yeah, G-A-W.  It stands for Great AUC

18     (phonetic)  Wireless.  That's what it stood for.

19          Q.    And after it became Miners, was it still

20     G-A-W Miners or was it GAW Miners?

21          A.    As far as I know, it was GAW Miners, or

22     G-A-W, however you want to say it.

23          Q.    So how many employees did G-A-W have

24     when you started working for them in late 2008?

25          A.    No, idea.  I was just the tech support

1                        D. Pease

2   guy.  I didn't know everybody.

3        Q.    Roughly, was it more than hundred?

4        A.    No, I don't believe so.  Not that I know

5   of.

6        Q.    Was there an office where you worked?

7        A.    Yes, it was Enfield.

8        Q.    And did G-A-W have other offices?

9        A.    I don't know at the time.  I didn't know

10  of any offices.

11       Q.    What kind of work were you doing for

12  them?

13       A.    Tech support.  Your internet goes down,

14  you call up.

15       Q.    Tech support for the internet service

16  used by G-A-W and its employees or tech support

17  for G-A-W'-s customers?

18       A.    For the high speed internet customers in

19  Vermont.

20       Q.    And was that tech support provided over

21  the phone or did you go in person?

22       A.    Over the phone.  Just like if you call

23  up Comcast and your internet is not working, they

24  don't come out unless they feel they need to.

25       Q.    Did you meet Josh Garza when you started

D. Pease

1
2     working for G-A-W?

3        A.     Yep.

4        Q.     You say you knew him pretty much from

5     the beginning?

6        A.     Yeah.   He was the one that interviewed

7     me.   Well, he was my second interview.

8        Q.     How long did you have that tech support

9     role at G-A-W?

10       A.     A while.  At least six, eight months.

11       Q.     So sometime in 2009, you shifted to a

12    different set of responsibilities?

13       A.     I mean, I still was in tech support, but

14    I was -- instead of just being a tech support

15    person, I was helping with tech engineer.  So not

16    working exactly with the customers, but working on

17    some of the infrastructure for the wifi -- the

18    wireless stuff.  Still working in a tech support

19    role.

20       Q.     That was starting sometime in 2009?

21       A.     Yeah.

22       Q.     And how long did you have that role?

23       A.     I don't really remember.  I mean, I was

24    always working on the infrastructure for -- either

25    it was our VOIP or it was our wireless internet.

1                              D. Pease

2              THE REPORTER:  I'm sorry.  It was our?

3              THE WITNESS:  VOIP, voice over internet

4        protocol.

5        Q.    At some point, did you start doing work

6   for GAW Miners or G-A-W Miners?

7        A.    The only thing I really did with them

8   was help out with day-to-day to-dos and stuff like

9   that.  I really wasn't part of GAW Miners.

10       Q.    Were you an employee of GAW Miners?

11       A.    I was -- like I said, I was helping, so

12  I was getting -- I was getting paid from GAW

13  Miners.  But I was also getting paid from GAW HSI

14  and I was getting paid from the third company,

15  too.  I forget what it was called.

16       Q.    Was the amount that you were paid

17  uniform during every pay period or was the amount

18  you were paid by these different entities

19  dependent on how much work you had done for that

20  entity?

21       A.    It was split.  My overall pay was split

22  between companies because I had individual duties

23  that I would help out with, like making sure

24  payroll was done.

25              I was working with the company that was

1                          D. Pease

2      doing the payroll for all three companies, so I

3      was getting paid a portion for that role.

4          Q.    How was the split determined?  In other

5      words, how much -- how was it determined how much

6      you were paid?

7          A.    You would have to ask Josh.  I have no

8      idea.

9          Q.    Did it stay the same every page period

10     or did it adjust pay period to pay period based on

11     the amount of --

12         A.    No.

13         Q.    You need to let me finish the questions,

14     sir, sorry.

15              Did it adjust pay period to pay period

16     based on how much work you had done for a

17     particular entity?

18         A.    It did not adjust pay period to pay

19     period, but it would adjust based on if there was

20     any projects that they had me do.

21              So if my time was over a certain amount

22     and I had to, say, for GAW HSI, if I had to bring

23     somebody in to help me with my work there, to do a

24     project, then I would've.

25         Q.    Do you remember approximately what

1                          D. Pease

2    portion of your pay was from GAW Miners?

3        A.    I don't remember.

4        Q.    Do you remember, in particular, over the

5    summer of 2014, what portion of your pay was from

6    GAW Miners?

7        A.    I don't remember.

8        Q.    Do you know if it was over half?

9        A.    No idea.

10       Q.    You can't -- you have no idea if it was

11   more or less than half of your money?

12       A.    I would have to go -- I'd have to go

13   back in my records and check my paystubs or W-2s

14   or anything like that.

15       Q.    Do you have an estimate for what portion

16   of your work you were doing for GAW Miners as

17   opposed to any of the other GAW entities?

18       A.    I don't remember exactly.

19       Q.    Is it more than 50 percent?

20       A.    I don't think it was more than 50

21   percent, no.

22       Q.    Okay.

23             MR. SARGENT:  I'll ask the court

24       reporter to mark this Exhibit 130, and pass it

25       to the witness.

```
 1                         D. Pease
 2                     (Exhibit 130, E-mail 6-4-14, Bates
 3                     stamped GAW00202153 through
 4                     00202154, was marked for the
 5                     purposes of identification.)
 6        Q.      This is an e-mail chain dated June 4th,
 7    2014.  I just have some questions for you about
 8    the signature block on your e-mail, which is the
 9    second one in the chain, but please look it over
10    and let me know when you're ready.
11        A.      Go ahead.
12        Q.      So this identifies you as the chief
13    operations officer or COO for GAW Miners; is that
14    right?
15        A.      No.
16        Q.      COO of what entity?
17        A.      Geniuses at Work.
18        Q.      What was your title at GAW Miners?
19        A.      I didn't have one at GAW Miners.  This
20    is just listing all the subsidiaries of Geniuses
21    at Work.
22        Q.      So you were the chief operations officer
23    of the parent company of GAW Miners?
24        A.      That's correct.
25        Q.      Okay.  And how would you describe -- at
```

1                           D. Pease

2     this point in time, how would you describe your

3     responsibilities for GAW Miners?

4          A.    I was just there to help out, working

5     for the parent company.

6          Q.    Doing what kinds of things?

7          A.    Like I said, I was making sure payroll

8     was paid.  I was on the bank accounts.  So if Josh

9     needed me to run to the bank to grab cash or

10    transfer money, that's some of the

11    responsibilities I would do.

12              If they had a project going on, I would

13    help out with -- you know, if anybody down in

14    Mississippi needed help with something, if they

15    were trying to purchase something, then I would

16    help the financial department take care of things.

17    Like I said, just there to help out.

18         Q.    Was it primarily financial-related work

19    that you were doing?

20         A.    No.  Every once in a while we'd have a

21    technical problem or something that I would be

22    called in on.

23         Q.    Primarily, financial, though?

24         A.    Yeah.  I mean, like I said, I was on the

25    bank accounts.  So that was the biggest thing that

1                         D. Pease

2      I would help out with.

3           Q.    Were you involved with preparing

4      financial statements --

5           A.    No.

6           Q.    -- for any of the GAW businesses?

7           A.    Any of the GAW businesses?

8           Q.    Yeah, any of them.

9           A.    Yeah.  GAW HSI, I helped out with the

10     taxes and stuff there.

11          Q.    How about GAW Miners?

12          A.    No.

13          Q.    Who did that work for GAW Miners?

14          A.    I forget who the finance lady was.

15     There was a couple of them.

16          Q.    Okay.  You remember it was a woman, but

17     you don't remember her name?

18          A.    Yeah.  There was a woman there.  And

19     then, later on there was also a guy named Chris,

20     but he was a temp worker.

21          Q.    Where were you living at this time, in

22     June of 2014, at this time of this e-mail?

23          A.    1 Belle Avenue, Enfield, Connecticut.

24          Q.    And so were you working, going into the

25     offices of Geniuses at Work --

1                                D. Pease

2        A.      Yeah.

3        Q.      -- to do your work?

4        A.      Uh-huh.

5        Q.      And was that true throughout your time

6    at GAW?

7        A.      Yeah.  I mean, occasionally I would work

8    from home, but --

9        Q.      How long did you work for Geniuses at

10   Work or GAW?

11       A.      Until the doors closed.

12       Q.      When was that?

13       A.      I think the last -- the last thing that

14   we did was in -- it was like March of '15, I want

15   to say, or maybe -- maybe I'm mistaken, but it's

16   somewhere around in.

17       Q.      Why did the doors close?

18       A.      Because there was no money left.

19       Q.      And who made the decision to close the

20   doors?

21       A.      Well, there was no money left, so we had

22   to lay off all of our employees, so.

23       Q.      You were laid off, then, yourself?

24       A.      Uh-huh.

25       Q.      And who told you that?  Who gave you

1                        D. Pease
2  that news?
3      A.    Josh and Jonah.   Jonah was a part of it,
4  as well.
5      Q.    Did they stay on at GAW after the day
6  that you were laid off?
7      A.    I have no idea.  I do know that GAW HSI
8  was transferred to Luke Bobian (phonetic).  That
9  was one of the companies.  So that the clients
10 didn't go without internet.
11     Q.    That was the portion of the business
12 that was providing high speed internet service
13 to --
14     A.    Customers.
15     Q.    -- certain customers?
16           Again, we have to both be very careful
17 to try not to talk on top of each other.  It's a
18 little bit artificial, but the court reporter
19 needs to be able to write down everything each of
20 us say, so -- to we have a clean record.
21           Actually, which -- have you ever had
22 your deposition taken before?
23     A.    No.  Well, except -- well, that's not
24 true.  The SEC had me come up to Boston.
25     Q.    You did an interview with the SEC?

Page 20

1                            D. Pease

2        A.      Yes.

3        Q.      And the circumstances were pretty much

4   like this, a court reporter in a conference room

5   kind of thing?

6        A.      They didn't have any electronics, that I

7   remember.

8        Q.      Were you under oath?

9        A.      Yes.

10        Q.      So at the time of Exhibit 130, early

11   June, 2014, did you have an understanding of what

12   the business of GAW Miners was?

13        A.      I knew it had to do with cryptocurrency.

14   That was it.   I had no idea what the actual

15   business model or anything was.

16        Q.      So you didn't understand what, at that

17   point in time, GAW Miners was selling or offering

18   to customers?

19        A.      Like I said, I knew it was

20   cryptocurrency.   I knew some of it had to do with

21   physical machines, just because I was helping

22   place orders and stuff like that.   But other than

23   that, I had no real idea of what the company was.

24   I was busy working on the other companies.

25        Q.      Did you know much yourself about

1               D. Pease

2    cryptocurrency at that time?

3        A.    No, sir.

4        Q.    Did you own any bit coin at that time?

5        A.    No, sir.

6        Q.    Did you know what bit coin mining was?

7        A.    No, sir.  I knew very little about what

8    that was.

9        Q.    You subsequently learned what it was,

10   though, didn't you?

11       A.    Yes, sir.

12       Q.    So you don't know if, at this point in

13   time, in June, if the company was selling bit coin

14   mining hardware?

15       A.    I honestly don't know.  I know that I

16   was on a couple of phone calls about some dealings

17   with Chinese manufacturing companies, but I didn't

18   know exactly what it was about.

19            Excuse me.

20            MR. SARGENT:  Mark this 131 and pass it

21        to the witness.

22            THE REPORTER:  This is being marked as

23        131.

24            (Exhibit 131, E-mail, 6-4-14, Bates

25            stamped GAW00202152, was marked for

Page 22

1                          D. Pease

2                    the purposes of identification.)

3         Q.      You see that this is an e-mail from Josh

4  Garza to you at Geniuses at Work, dated -- the

5  same date as the last one, actually, June 4, 2014?

6         A.      Sure.

7         Q.      Mr. Garza is forwarding you a request

8  from Stuart Fraser?

9         A.      I see that.

10        Q.      Do you know who Stuart Fraser is?

11        A.      I met him a couple times.

12        Q.      Who is he?

13        A.      A guy that lives in Vermont and

14  New York.  Also the guy that was a silent person

15  in GAW HSI.  That's all I know.

16        Q.      When you say GAW HSI, what does that

17  mean?

18        A.      High speed internet.

19        Q.      So he was a silent partner in the high

20  speed internet business?

21        A.      As far as I knew, yeah.

22        Q.      Did you know what level of involvement

23  he had in the GAW Miners business?

24        A.      No idea.

25        Q.      This e-mail is requesting wire info for

1                             D. Pease
2        GAW Miners, isn't it?
3             A.      That's what it looks like.   It says "for
4        GAW Miners" on it.
5             Q.      Did that surprise you when you received
6        it?
7             A.      Surprise me how?
8             Q.      That Stuart Fraser was apparently
9        involved not just in GAW HSI, but also in GAW
10       Miners.
11                    MS. ECHENIQUE:  Objection to the form.
12                    MR. SARGENT:  You can answer.
13                    MS. ECHENIQUE:  You can answer.
14                    THE WITNESS:  You're asking me how I
15            felt?
16            Q.      I mean, was it surprising to you that --
17       you've said -- you just testified that Stuart
18       Fraser was a silent partner in GAW HSI.  And this
19       document seems to suggest that he had at least
20       some involvement with GAW Miners.
21                    And I'm asking you if that was
22       surprising to you, if you remember being surprised
23       you received this, that Stuart Fraser was seeking
24       information related to GAW Miners?
25                    MS. ECHENIQUE:  Objection to the form.

1                        D. Pease

2            You may answer.

3            THE WITNESS:  I don't remember if it was

4       surprising or not.

5       Q.    Do you remember, one way or the other,

6  how much involvement Mr. Fraser had with the

7  various GAW businesses?

8       A.    I don't.

9       Q.    Do you remember how much involvement he

10  had with GAW Miners in particular?

11       A.    How would you like me to measure that?

12       Q.    Just describe it.

13            I mean, do you remember?

14       A.    I never saw him at the office.  I don't

15  know how many conversations he had with Josh.

16            The only time I ever saw him is when I

17  went up to one of his properties to fix the wifi

18  or something.  And there was one time in the

19  entire, what, four years or so that I was there,

20  three years, that I actually saw him at the

21  office, and that was in the old HSI office before

22  we moved to Bloomfield.

23       Q.    That didn't relate to GAW Miners?

24       A.    GAW Miners wasn't even around then.

25       Q.    So is it safe to say that you just don't

D. Pease

2    have any knowledge, one way or the other, about

3    his actual involvement in GAW Miners?

4         A.    That's correct.

5         Q.    Okay.  That's just what I was trying to

6    get at.

7              Do you recall having some responsibility

8    for a credit card account or credit card accounts

9    belonging to Stuart Fraser that were being used by

10   one or more of the GAW businesses?

11        A.    I don't recall, to be honest with you.

12        Q.    Were you aware of a company called

13   ZenMiner?

14        A.    The only thing I heard about ZenMiner

15   was when I heard that Josh was buying them.

16   That's the only thing I knew about that.

17        Q.    When do you remember hearing that Josh

18   was buying ZenMiner?

19        A.    It had to have been when we first moved

20   into the Bloomfield office.  So beginning of

21   2014-ish, or maybe in the spring or summer, I

22   don't know, somewhere around this time, I'm guess.

23        Q.    What did you hear about Josh buying

24   ZenMiner?

25        A.    Just at a staff meeting with everybody

1                         D. Pease

2    saying that he was buying it.

3         Q.    And at that time did you understand that

4    ZenMiner was an independent -- independently-owned

5    business from any of the GAW businesses?

6         A.    To what I understood, yes.

7         Q.    Do you know who it was owned by?

8         A.    I don't.

9         Q.    Did you later learn that, in fact,

10   ZenMiner was not an independent business and never

11   had been?

12        A.    When I went to the SEC, they told me,

13   yes.

14        Q.    But you didn't know that at the time, in

15   2014, when you heard this announcement?

16        A.    I did not.

17        Q.    And all you recall -- what do you recall

18   besides hearing it at the -- the announcement at

19   the employee meeting?

20        A.    Just that Josh said it was a good move

21   for GAW.  That was it.

22        Q.    Did you have an understanding about what

23   product or service ZenMiner provided?

24        A.    No, it wasn't my job.

25        Q.    Did you know Thomas Fraser?

1                          D. Pease

2       A.    No, I've actually never even heard that

3   name before.

4       Q.    I'm not sure I have either, but I should

5   check.

6             Do you recall ever requesting money from

7   Stuart Fraser on behalf GAW?

8             MS. ECHENIQUE:  Objection to the form.

9             You may answer.

10            THE WITNESS:  Okay.  I'm going to make a

11   statement.  I'm going to invoke my Fifth

12   Amendment right because I don't know what I

13   did or didn't say four years ago for the SEC.

14   So I'm going to start invoking my Fifth

15   Amendment right not to answer the question.

16      Q.    Okay.  So just to be clear, my question

17   was:  Do you recall requesting money from Stuart

18   Fraser on behalf of GAW.

19            And your answer is to invoke your Fifth

20   Amendment right to protect yourself from

21   self-incrimination, is that right?

22      A.    Right.

23      Q.    Do you recall Stuart Fraser informing

24   you that he would provide funds for GAW?

25            MS. ECHENIQUE:  Objection to the form.

1                              D. Pease

2              THE WITNESS:   I'm going to invoke my

3         Fifth Amendment right.

4         Q.    Do you recall any communications with

5    Stuart Fraser at all about GAW Miners' business?

6         A.    I'm going to invoke my Fifth Amendment

7    right.

8         Q.    Were you aware of GAW Miners' decision

9    to begin selling a product called hashlets?

10        A.    I'm going to invoke my Fifth Amendment

11   right.

12        Q.    Were you involved in the sale of

13   hashlets at all?

14        A.    Invoke.

15        Q.    Were you aware that hashlets purported

16   to be a fractional interest in the processing

17   power of a particular bit coin miner?

18        A.    Invoke.

19        Q.    Were you aware that GAW Miners' claim to

20   own and control bit coin and cryptocurrency miners

21   that were being allocated to these individual

22   hashlets?

23        A.    Invoke.

24        Q.    Were you aware that those statements

25   about owning miners supporting the hashlets were

1                          D. Pease

2    false?

3         A.      Invoke.

4         Q.      Were you aware that customers who

5    purchased hashlets were told that they could point

6    their Hashlet to a particular bit coin mining

7    pool?

8         A.      Invoke.

9         Q.      Were you aware that the company was, in

10   fact, unable to allocate processing power to

11   particular bit coin mining pools as promised?

12        A.      Invoke.

13        Q.      Were you aware that GAW Miners'

14   employees would manually calculate the return on

15   certain bit coin mining pools and allocate those

16   coins to their customers?

17        A.      Invoke.

18        Q.      Did Josh Garza ever explain to you that

19   he intended to sell hashlets that were not

20   supported by existing miners in order to raise

21   funds to buy mining equipment in the future?

22        A.      Invoke.

23        Q.      Were you aware, in 2014, that GAW Miners

24   did not acquire sufficient miners to support the

25   hashlets --

1                            D. Pease

2          A.       Invoke.

3          Q.       -- that it had sold?

4                   Were you aware that Josh Garza

5    determined at some point that GAW should create

6    its own cryptocurrency?

7          A.       Invoke.

8          Q.       And that cryptocurrency was ultimately

9    called Paycoin?

10         A.       Invoke.

11         Q.       Did you have job responsibilities with

12   regard to the marketing of Paycoin?

13         A.       Invoke.

14         Q.       Were you in change of the adoption of

15   the coin with merchants and exchanges?

16         A.       Invoke.

17         Q.       As part of those responsibilities, did

18   you make representations to merchants and

19   exchanges about Paycoin?

20         A.       Invoke.

21         Q.       Did you make representations to

22   potential purchasers of Paycoin?

23         A.       Invoke.

24         Q.       Were you aware that GAW Miners

25   represented that Paycoin was going to have a $20

1                            D. Pease

2      price floor?

3          A.      Invoke.

4          Q.      Were you aware that GAW Miners

5      represented to customers that the $20 price floor

6      was going to be supported by a $100 million cash

7      reserve that the company had?

8          A.      Invoke.

9          Q.      Were you aware that the company did not,

10     in fact, have $100 million cash reserve to support

11     the purported Paycoin cash floor?

12         A.      Invoke.

13                 MR. SARGENT:   Pass Exhibit 19, it's

14         already been marked, to the witness.

15                    (Exhibit 19 previously marked for

16                    identification was offered.)

17         Q.      Mr. Pease, have you seen this document

18     before?

19                 Just to make it clear, this is a copy of

20     the plea agreement that Josh Garza signed with the

21     U.S. Department of Justice.

22                 So my question is:   "Have you seen this

23     before?

24         A.      No.

25         Q.      Were you aware that Mr. Garza pled

1                          D. Pease

2    guilty to certain federal criminal offenses?

3         A.     I was told by my attorney that he pled

4    guilty to wire fraud.

5         Q.     I would ask you to turn to -- it says

6    Page 9 of 11 in the fax tell at the top.

7    "Stipulation of Offense Conduct."

8         A.     Okay.  I'm here.

9         Q.     Do you see the table at the bottom that

10   it says "Statement" and "Truth"?

11        A.     I see it.

12        Q.     And Paragraph 5 describing that table,

13   it says, "To generate business as well as attract

14   customers and investors, the defendant made

15   multiple statements related to the scheme,

16   including, among others," and then the table is

17   printed.

18               Do you see where I'm reading?

19        A.     Yes, sir.

20        Q.     The second statement is, "The hashlets

21   the defendants' companies sold engaged in the

22   mining of virtual currency."

23               Were you aware that GAW Miners was

24   making that statement to its customers in 2014?

25        A.     I invoke.

Page 33

1                               D. Pease

2       Q.      Were you aware that, in fact, the truth

3   is that the defendants' companies sold more

4   hashlets than were supported by the computing

5   power maintained in their data centers?  Were you

6   aware of that in 2014?

7       A.      Invoke.

8       Q.      Were you aware that the defendants'

9   companies sold the customers the right to more

10  virtual currency than the company's computing

11  power could generate?

12      A.      Invoke.

13      Q.      Please turn the page.  There's the third

14  statement in the table.  It says -- were you aware

15  that the company was telling its customers that

16  the market value of the single Paycoin would not

17  fall below $20 per unit because the defendants'

18  companies had a reserve of $100 million that the

19  companies would use to purchase Paycoins to drive

20  up its price?

21          Were you aware that statement was being

22  made to the public?

23      A.      Invoke.

24      Q.      Were you aware that the truth was that

25  the defendants' companies did not have a reserve

Page 34

1                          D. Pease

2      of $100 million and could not, therefore, drive up

3      the value of Paycoin?

4           A.      Invoke.

5           Q.      Do you know, as a result of your work on

6      behalf of GAW Miners, whether Stuart Fraser was

7      aware of these statements?

8                MS. ECHENIQUE:  Objection to the form.

9                THE WITNESS:  Invoke.

10               MR. SARGENT:  Let's take a short break.

11               THE VIDEOGRAPHER:  We're going off

12         record at 9:49.

13                    (Recess taken from 9:49 a.m. to

14         9:56 a.m.)

15               THE VIDEOGRAPHER:  We are back on record

16         at 9:56.

17     BY MR. SARGENT:

18          Q.    Mr. Pease, at what point did you assume

19     the responsibilities with regard to merchants and

20     exchanges for the new cryptocurrency?

21          A.      Invoke.

22          Q.      Was that the first time you had ongoing

23     responsibilities for GAW Miners?

24          A.      Invoke.

25          Q.      As part of that work, did you ever

1                          D. Pease

2    interact with purchasers of Paycoin?

3         A.    Invoke.

4         Q.    Did you ever interact with purchasers of

5    hashstakers?

6         A.    Invoke.

7         Q.    Were you aware that hashstakers were a

8    form of wallet used to -- at least allegedly

9    used -- to hold Paycoin that was also provided to

10   customers or sold to customers by GAW Miners?

11        A.    Invoke.

12        Q.    Were you involved in the sale or

13   distribution of hashstakers at all?

14        A.    Invoke.

15        Q.    Were you aware that misrepresentations

16   were made by GAW Miners about the capabilities of

17   hashstakers at the time that they were being sold?

18        A.    Invoke.

19        MR. SARGENT:  I don't have any further

20   questions.

21   (Continued to following page to include jurat.)

22

23

24

25

1                        D. Pease

2          MS. ECHENIQUE:  We have no questions.

3          MR. SARGENT:  Okay.

4          THE VIDEOGRAPHER:  We are going off

5     record at 9:57.  This completes Disk 1.

6          (Deposition concluded at 9:55 a.m.)

7

8

9       _____

10              DANIEL J. PEASE

11

12    SUBSCRIBED AND SWORN BEFORE ME

13    THIS _____ DAY OF _____, 2018.

14

15    _____

16    (Notary Public)   MY COMMISSION EXPIRES:_____

17

18

19

20

21

22

23

24

25

1                        D. Pease

2     --------------------I N D E X--------------------

3     WITNESS                 EXAMINATION BY          PAGE

4     DANIEL J. PEASE      MR. SARGENT                  5

5     --------------------EXHIBITS--------------------

6     EXHIBIT                                         PAGE

7     Exhibit 130

8     E-mail 6-4-14, Bates stamped

9     GAW00202153 through 00202154. . . . . . . . . . 15

10    Exhibit 131

11    E-mail, 6-4-14, Bates stamped

12    GAW00202152. . . . . . . . . . . . . . . . . . .21

13    -----------PREVIOUSLY MARKED EXHIBITS-------------

14    EXHIBIT                                      OFFERED

15    Exhibit 19. . . . . . . . . . . . . . . . . . . 31

16

17

18

19

20

21

22

23

24

25

1                        D. Pease

2                  C E R T I F I C A T E

3

4       I do hereby certify that I am a Notary Public

5  in good standing; that the aforesaid testimony was

6  taken before me at the time and place indicated;

7  that said deponent was by me duly sworn to tell

8  the truth, the whole truth and nothing but the

9  truth; that the testimony of said deponent was

10  correctly recorded in machine shorthand by me

11  and thereafter transcribed under my supervision

12  with computer-aided transcription; that the

13  deposition is a true and correct record of the

14  testimony given by the witness; and that I am

15  neither of counsel nor kin to any party in said

16  action, nor interested in the outcome thereof.

17       Witness my hand and official seal this 9th

18  day of August, 2018.

19

20       _____

21       Deborah C. Furey, Notary Public

22       My commission expires 1-11-2021

23

24

25

1    NAME OF CASE:

2    DATE OF DEPOSITION:

3    NAME OF WITNESS:

4    Reason Codes:

5         1.  To clarify the record.

6         2.  To conform to the facts.

7         3.  To correct transcription errors.

8    Page _____ Line _____ Reason _____

9    From _____ to _____

10   Page _____ Line _____ Reason _____

11   From _____ to _____

12   Page _____ Line _____ Reason _____

13   From _____ to _____

14   Page _____ Line _____ Reason _____

15   From _____ to _____

16   Page _____ Line _____ Reason _____

17   From _____ to _____

18   Page _____ Line _____ Reason _____

19   From _____ to _____

20   Page _____ Line _____ Reason _____

21   From _____ to _____

22   Page _____ Line _____ Reason _____

23   From _____ to _____

24

25                          _____