# Exhibit B

Page 1

```
 1
 2                IN THE UNITED STATES DISTRICT COURT
 3                       OF CONNECTICUT
 4
    DENIS MARC AUDET, MICHAEL )  Case 3:16-cv-00940
 5  PFEIFFER, DEAN ALLEN      )
    SHINNERS, and JASON       )  Hon. Michael P. Shea
 6  VARGAS, Individually and  )  Courtroom 2
    on Behalf of All Others   )
 7  Similarly Situated,       )  ECF Case
                              )
 8       Plaintiffs,          )  CLASS ACTION
                              )
 9  vs.                       )
                              )
10  STUART A. FRASER,         )
    GAW MINERS, LLC, AND      )
11  ZENMINER, LLC, (d/b/a     )
    ZEN CLOUD),               )
12                            )
         Defendants.          )
13
                *******************************
14                 ORAL VIDEOTAPED DEPOSITION
15                    HOMERO JOSHUA GARZA
16                      December 14, 2018
17              *******************************
18       ORAL VIDEOTAPED DEPOSITION OF HOMERO JOSHUA GARZA,
19  produced as a witness at the instance of the Plaintiffs
20  and duly sworn, was taken in the above-styled and
21  numbered cause on the 14th day of December, 2018, from
22  10:13 a.m. to 6:44 p.m., before April Balcombe-Anderson,
23  Certified Shorthand Reporter in and for the State of
24  Texas, reported by computerized stenotype machine at the
25  Job No. 152595
```

```
 1
 2   offices of Regus Littlefield Congress, 106 East 6th
 3   Street, Suite 900, Austin, Texas 78701, pursuant to the
 4   Federal Rules of Civil Procedure and the provisions
 5   stated on the record or attached hereto.
 6
 7
 8
 9   Job No. 152595
10   Reported by April Balcombe, CSR, CRR, CRC
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 11

1           Homero Joshua Garza
2   certifications; is that what we're talking about?
3       A.   Primarily networking certifications.
4       Q.   Okay.  What does -- what does that mean,
5   "networking certifications"?
6       A.   Networking, building, you know, systems that
7   allow computers and servers and things to communicate
8   with each other.
9       Q.   Okay.  And after you graduated high school,
10  what did you do for work?
11      A.   I started a company called Optima Computers.
12      Q.   Okay.  So what was GAW Miners?
13      A.   Can you clarify that question?
14      Q.   Sure.
15           It's -- well, what was GAW Miners'
16  business?
17      A.   Can you clarify that a little bit more?
18      Q.   Sure.  What did GAW Miners do?
19      A.   GAW Miners sold mining hardware and cloud-based
20  mining software.
21      Q.   Okay.  And who is Stuart Fraser?
22      A.   Stuart Fraser -- can you clarify that, please?
23      Q.   Sure.
24           What was -- what's -- well, let's put
25  it -- how about this.  In 2014, what was your

1                    Homero Joshua Garza
2    relationship with Stuart Fraser?
3         A.   A business partner and friend.
4         Q.   Okay.  And GAW Miners, it -- it sold a product
5    called hashlets, correct?
6         A.   Correct.
7         Q.   And did it sell a product called PayCoins?
8         A.   Yes, sir.
9         Q.   And did it sell a product called HashPoints?
10        A.   Yes, sir.
11        Q.   Okay.  And did it sell a product -- well,
12   strike that.
13             Did GAW Miners sell a product called
14   HashStakers?
15        A.   Yes, sir.
16        Q.   Okay.  Did GAW Miners register any of those
17   products as securities?
18        A.   Not to my knowledge.
19        Q.   Okay.  Currently do you know anything about the
20   rules regarding registration of securities?
21        A.   A small amount.
22        Q.   Tell me what you know.
23        A.   There are certain types of products that
24   given -- there are certain kinds of products that need
25   to be registered as securities.  I'm not sure I can

1                Homero Joshua Garza
2    Mr. Fraser?
3        A.   No.
4        Q.   So before the SEC inquiry, did you consider
5    Fraser to be a mentor?
6        A.   Absolutely.
7        Q.   Did you consider him to be a sort of father
8    figure?
9        A.   Yes, sir.
10       Q.   And would you describe Mr. Fraser as a typical
11   investor?
12       A.   No, sir.
13            MS. CAVE:  Objection to the form.
14       Q.   (BY MR. WATTERSON)  Okay.  Why wasn't
15   Mr. Fraser a typical investor?
16       A.   A typical investor primarily bases -- the basis
17   of the relationship is typically financial.
18       Q.   Uh-huh.
19       A.   Performance and things of that nature are, you
20   know, financial.  And that was not the basis of
21   measuring performance or the basis of, you know, the way
22   investments were made.
23       Q.   So what was the basis of measuring performance
24   with Mr. Fraser?
25            MS. CAVE:  Objection to the form.

Page 28

1  Homero Joshua Garza

2  had asked him to, you know, reach out to people he knew
3  at Cantor to provide advice to us as well.
4       Q.   (BY MR. WATTERSON)  Okay.  Can you remember
5  anything more specific about the advice you sought from
6  Mr. Fraser regarding selling these financial products?
7            MS. CAVE:  Objection to the form.
8       Q.   (BY MR. WATTERSON)  Well, hold on.  Let me
9  reask it.
10           So earlier you -- you said that you sought
11 advice from Mr. Fraser about -- well, strike that.
12           Is it fair to say that you sought advice
13 from Mr. Fraser about selling hashlets?
14      A.   Many times, yes.
15      Q.   Okay.  Can you tell me what specific advice you
16 sought from him?
17      A.   It ranged from pricing to the, you know, origin
18 of hashlets, the concept of oversubscribing, you know,
19 the amount of people that purchased hashlets relative to
20 the amount of mining power and whether or not we were,
21 you know, legally able to do that or not.
22      Q.   Can you explain what you mean by "the concept
23 of oversubscribing"?
24      A.   Sure.
25           As the product evolved from hardware to

1                    Homero Joshua Garza
2              And, you know, when I -- indicated to me
3    that he was, you know, for a set position where he --
4    you know, Howard took over and Howard made it to where
5    he got to keep the title of vice chairman but -- you
6    know, but that he didn't really have an active role in
7    that company.
8              So -- so while he never, you know,
9    directly said, "Well, it's because of, you know, this,"
10   I mean, it was pretty easy, you know, again in my
11   opinion, to deduce that, you know, the reasons were
12   because of, you know, the way that he operates in a
13   business environment.
14        Q.   Did you consider Mr. Fraser to be knowledgeable
15   about financial products?
16             MS. CAVE:   Objection to the form.
17        A.   Very.  He would often, even prior to GAW
18   Miners, explain and tell me things that I never even got
19   close to understanding.  He was extremely knowledgeable
20   about it.
21        Q.   (BY MR. WATTERSON)  Things about financial
22   products?
23        A.   Yes, sir.
24        Q.   Did you consider Mr. Fraser to be knowledgeable
25   about securities?

1        Homero Joshua Garza
2      A.   Within the context of the time, not really
3   knowing what securities were but just knowing that they
4   were financial based and he knew a lot about financial
5   products, then that would -- you know, that would have
6   been how I would have...
7             In other words, you know, I didn't
8   immediately know we were dealing with a security and
9   then say, "Oh, Stuart knows about securities."  I
10  assumed that it was a financial -- you know, there was a
11  financial component to what we were doing.  Later I
12  found it was a security, but I believe that, you know,
13  Stuart knew the ins and outs of that.
14     Q.   Okay.  So earlier we discussed Optima
15  Computers.  Did Mr. Fraser have any role in Optima?
16     A.   Can you clarify?
17     Q.   Sure.
18             Was he involved in any way other than as a
19  customer?
20     A.   He became an investor into Optima.
21             THE REPORTER:  An investor?
22             THE WITNESS:  An investor into Optima.
23             THE REPORTER:  Thanks.
24             THE WITNESS:  I'm sorry.
25             MR. WATTERSON:  Let's mark this as 240.