```
 1                     UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF CONNECTICUT
 2
     - - - - - - - - - - - - - - - - x
 3
     DENIS MARC AUDET, MICHAEL          No. 3:16-CV-940 (MPS)
 4   PFEIFFER, and DEAN ALLEN
     SHINNERS, Individually and on      OCTOBER 8, 2021
 5   Behalf of All Others Similarly
     Situated,                          1:00 P.M.
 6
     vs.                                PRETRIAL CONFERENCE
 7
     STUART A. FRASER, GAW MINERS,
 8   LLC, and ZENMINER, LLC, (d/b/a
     ZEN CLOUD)
 9
     - - - - - - - - - - - - - - - - x
10
11                       450 Main Street
                      Hartford, Connecticut
12
13         BEFORE:  THE HONORABLE MICHAEL P. SHEA, U.S.D.J.
14
15   APPEARANCES:
16   FOR THE PLAINTIFFS:
17           SUSMAN GODFREY, L.L.P.
                 1301 Avenue of the Americas, 32nd Floor
18               New York, New York 10019
             BY:  SETH D. ARD, ESQUIRE
19           BY:  JACOB W. BUCHDAHL, ESQUIRE
             BY:  RUSSELL F. RENNIE, ESQUIRE
20           BY:  GENG CHEN, ESQUIRE
21           IZARD, KINDALL & RAABE, LLP
                 29 South Main Street, Suite 305
22               West Hartford, Connecticut 06107
             BY:  MARK P. KINDALL, ESQUIRE
23
24   (Appearances continue ...)
25
```

```
1    APPEARANCES CONTINUED:

2    FOR THE DEFENDANTS:

3              HUGHES, HUBBARD & REED L.L.P.
                    One Battery Park Plaza, 12th Floor
4                   New York, New York 10004-1482
              BY:  MARC A. WEINSTEIN, ESQUIRE
5              BY:  AMINA HASSAN, ESQUIRE
              BY:  MAYA JACOB, ESQUIRE
6
              BRENNER, SALTZMAN & WALLMAN
7                   271 Whitney Avenue
                    New Haven, Connecticut 06511
8              BY:  ROWENA A. MOFFETT, ESQUIRE

9

10

11

12

13

14

15

16

17

18

19

20

21

22    COURT REPORTER:   Julie L. Monette, RMR, CRR, CCP
                           (860) 212-6937
23
      Proceedings recorded by mechanical stenography, transcript
24

25
```

```
1                        1:00 p.m.
2           THE COURT:  We're here for a pretrial conference in
3    Audet versus Fraser.  The case is 16-CV-940.
4           Let's begin by having counsel state appearances for
5    the record, starting with Plaintiffs' counsel.  Any one of you?
6           MR. ARD:  Good morning, Your Honor.  Seth Ard, Susman
7    Godfrey for Plaintiffs.
8           THE COURT:  All right.  Morning.
9           MR. BUCHDAHL:  Jacob Buchdahl, Susman Godfrey, also
10   for Plaintiffs.
11          MR. RENNIE:  Russell Rennie, Susman Godfrey for the
12   Plaintiffs.
13          THE COURT:  Good afternoon I should say.
14          MS. CHEN:  Geng Chen, Susman Godfrey for the
15   Plaintiffs.
16          THE COURT:  And when it's your turn to speak today, if
17   you're going to be presenting a motion, I'll have you come up
18   to the podium all right.
19          MR. KINDALL:  Mark Kindall, Izard, Kindall & Raabe
20   also for Plaintiffs.
21          THE COURT:  All right, Mr. Kindall.  Good afternoon.
22          MR. WEINSTEIN:  Marc Weinstein, Hughes, Hubbard & Reed
23   for Mr. Fraser.
24          MS. HASSAN:  Amina Hassan for Mr. Fraser also from
25   Hughes, Hubbard & Reed.
```

1          MS. JACOB:  Maya Jacob also from Hughes, Hubbard &

2    Reed for Mr. Fraser.

3          MS. MOFFETT:  Rowena Moffett from Brenner, Saltzman &

4    Wallman for the Defendant.

5          THE COURT:  Ms. Moffett, good afternoon.

6          MR. WEINSTEIN:  Your Honor, just with respect to

7    counsel who's here, we have two apologies to the Court at our

8    side.  One is Hannah Miller, who was going to be appear today

9    as well and handle one the motions, as of late yesterday

10   afternoon her and her son have been diagnosed with hand, foot,

11   and mouth disease.  Didn't sound too good.  We figured for

12   everyone's sake, including theirs, we'd not have her come

13   today.

14         And Dan Weiner, who's also trial counsel, was ordered

15   to appear for a preliminary injunction hearing suddenly today.

16   He came to Connecticut so he could get here when it's done.

17   I'm just not sure --

18         THE COURT:  Is his injunction hearing in Connecticut?

19         MR. WEINSTEIN:  No.  He's doing it virtually.

20         THE COURT:  So he may come in at some point.

21         MR. WEINSTEIN:  He may come in, although it's sounding

22   like on the later side.

23         THE COURT:  Okay, fair enough.  All right.  Well,

24   we'll see what we can get done today.  I know we are going to

25   talk about the motions in limine.  There's certainly a lot to

1  talk about, and we will certainly need the second day of the

2  pretrial conference for this case.

3         But I want to start actually, first of all, talk a

4  little bit about timing.  Then we're going to talk about some

5  rules for the trial, give you a sense of the trial day

6  schedule.  And we're going to talk about COVID and measures

7  related to COVID.  And then we'll get into the motions in

8  limine.

9         Actually, I think I also -- I know that it is

10  important to talk about the motions in limine, but I also think

11  it's important for you to understand how we'll pick the jury in

12  this case.  So we'll do all that now.

13         So to begin, jury selection's scheduled for October

14  20th at 8:45 a.m.  And trial will proceed immediately upon

15  selection of the jury.

16         So I've picked one civil jury so far during COVID.  I

17  picked two -- well, one criminal and one grand jury.  We've got

18  it down, although it's slower than normal, so that it moves

19  fairly quickly.  So it's a long way of saying my expectation

20  would be that we probably will have a jury probably around

21  1:30, two o'clock, maybe before.  And if that's the case, I'm

22  going to want you to give your opening statements right after

23  we pick and swear the jury.  We'll certainly give the jury a

24  lunch break and then for the Plaintiffs to call their first

25  witness actually, because I don't want to lose any time.

```
 1              I cannot be here on October 22nd, which is that
 2    Friday.  So we will have no court that Friday.  I certainly
 3    will tell the jurors that.  But every other day -- let me just
 4    check -- I believe every other day we will proceed.
 5              Right.  Every other day we will proceed.
 6              If for some reason we are not able to complete the
 7    case by November 2nd -- and I hope that's not the case -- but
 8    if for some reason that's the case, I have a criminal jury
 9    selection scheduled on Wednesday, November 3rd, in which case I
10    will proceed with my jury selection on Wednesday, November 3rd
11    in the criminal case; and we will -- hopefully evidence will be
12    done.  But if we have to continue with evidence, we'll continue
13    on Thursday, November 4th until we're done, and then I will
14    proceed with my criminal trial, if necessary, take a verdict in
15    this trial while at -- you know, during the same day or
16    whatever.
17              Okay?  So just to give you a sense.  My plan is, with
18    the exception of October 22nd, to go right through and with the
19    possible exception of November 3rd.  Okay?
20              All right.  Now, my trial day runs from 9:00 to 3:30
21    ordinarily.  Now, if for some reason I didn't think we were
22    going to finish, I would make us go from 9:00 to 4:30.  But
23    we'll come back to that at the end because it may be with some
24    of our discussion on the Motion in Limine, you'll have a
25    clearer idea of time estimates.
```

1          But if we go with a 9:00 to 3:30, which is my

2     expectation, we would go -- we would have a morning mask break

3     at 10:45, and that break would last 25 minutes until 11:10 a.m.

4     That gives jurors time to go outside and take their masks off.

5     Then we will go from 12:45 to 1:30 p.m. -- excuse me.  Then the

6     next break will be from 12:45 to 1:30 p.m.  That will be our

7     lunch break.  And then we will go straight through to 3:30.

8          I -- so you know, I'm a stickler about timeliness

9     during jury trials.  We start right when I say we're going to

10    start, which is at those times that I indicated.  I let the

11    jurors know that.  I tell them that you and I are all going to

12    work hard to make sure we stick to those times.  And at 3:30

13    every day I will send them home even if, you know, I might stop

14    you in the middle of a question to do that.  So just know that

15    those times are not estimates.  Okay?

16         All right.  I expect you folks to be seated in your

17    seats at ten minutes before 9:00 every day, earlier if I

18    indicate we need to, you know, discuss something, some

19    evidentiary issue.

20         Along these lines, each party is responsible for

21    ensuring that their next witness is available.  I've never had

22    to do this in a trial before, but if I found that a party had

23    failed to exercise diligence in ensuring that their next

24    witness was not available, I would tell the jury who was

25    responsible for the delay.  Again, I've never had to do that,

and I don't expect to have to do it here, but I would if I had
to.

Bring evidentiary and other issues to my attention as
soon as possible, at the latest at the beginning of a recess.
Don't bring it to my attention at the end of a recess, because
at the end of the recess, I'm bringing the jury out.  Okay?

I don't like sending juries out during the trial,
especially during COVID.  It's just cumbersome.  Once and a
while we do that.

We can hold sidebars during COVID.  I've held a couple
in the hallway outside.  But the idea of the pretrial
conference, obviously, and the next pretrial conference, is to
hash out as many of the evidentiary issues as we can so that we
can have as smooth as possible a presentation of evidence for
the jury.

When you state objections, I expect them to be stated
succinctly.  Most objections -- almost all objections -- can be
stated in one word:  objection, hearsay; objection, foundation;
objection, leading; objection, relevance; objection to 403,
that kind of thing.  I don't want argument on objections unless
I ask for it.

If you think I've short-circuited an argument and you
want me -- want to be heard further on the issue, we can take
it up at the beginning of a recess.  And if you convince me
that I was wrong, if necessary, I'll let you recall the

 1    witness.  But I don't want to take a lot of time during --
 2    while the jury's present to argue objections.
 3         So we can discuss timing of -- well, why don't we
 4    discuss the timing of opening statements now.  I indicated an
 5    estimate of 15 minutes apiece in the -- in the draft
 6    preliminary jury instructions that we sent out.  Anybody feel
 7    that that's not enough?
 8         MR. WEINSTEIN:  Mr. Weiner was sure to remind me
 9    before we came today that at a prior conference Your Honor had
10    granted, I think, a 20-minute opening.
11         THE COURT:  Did I?  I don't know why I did that, but
12    all right.  Huh.  I don't know why I did that, but I'll trust
13    him on that.  I'll give you 20 minutes apiece, but we're not
14    going over 20 minutes.
15         MR. WEINSTEIN:  I'll encourage him to make it more
16    like 15.
17         THE COURT:  Okay.  Twenty minutes is fine.  We'll set
18    the time for the closing arguments at the charge conference,
19    which we'll schedule later.
20         Now let's talk about COVID.  So first of all, we will
21    all be masked during the trial.  At this time it is my
22    expectation to require masks by counsel at all times, including
23    when examining the witness.  The only person that will not be
24    masked will be the witness, who will be in the box and who will
25    be behind some plexiglass.  The jurors will be able to observe

1    the witness's demeanor.

2          If the numbers in Connecticut get dramatically better

3    between now and October 20th, then I might revisit and allow

4    counsel to remove masks while examining the witness, for

5    example, or while arguing.  But that's not likely.  It's not

6    likely because I don't expect the numbers to get that much

7    better.

8          Just so you know, the number aren't -- if you've been

9    following it -- I'm sure you have -- the numbers in Connecticut

10   are among the best in the country.  And they're -- you know,

11   we've seen some encouraging signs over the last couple weeks.

12   Our percentage of cases has been below 2 percent most days in

13   the past week, which is all very encouraging.  But just to give

14   you a sense, I think on COVID Act Now, we're up around 10 or 11

15   cases per hundred thousand.  Back in June when I did my first

16   criminal trial, we were at 6 or 7.  And in July when I did the

17   civil trial, we were at 2 or 3.

18         I did let -- when we were at 2 or 3, based on -- in

19   fact, we were below 1 at one point.  Based on advice from our

20   science advisor, who's a professor at the University of

21   Massachusetts, I did allow counsel to remove masks at that time

22   when examining witnesses from the counsel table.  It was a

23   different setup than this courtroom.  But that's the only time

24   I did it, and I don't think I'm going to do it this time, just

25   so you know.

1          Okay.  That's masks.  So masks at all times.  I know,

2     Mr. Ard, I saw you putting the mask on.  Make sure it's on at

3     all times.

4          MR. ARD:  I apologize, Your Honor.  I changed my mask

5     as you walked in.  I apologize.

6          THE COURT:  Now, number of people in the courtroom.  I

7     know you folks have big teams.  I know lots of people have

8     worked on this.  It's hard for me to see how we're going to be

9     able to accommodate -- I know you have big teams.  I think we

10    could accommodate four apiece if one person at each team sat

11    over there.  I don't think we can accommodate more than four

12    apiece.

13         Now, we are going to have another room in the

14    building, I think.  We're going to do one of two things.  We're

15    checking on this.  Either we're going to have another room for

16    counsel and teams or -- and we'll Zoom, Zoom the proceeding

17    into that room -- or we're just going to put the whole

18    proceeding on Zoom, a public Zoom.

19         I'm loathe to do the latter.  Some of my colleagues

20    have done that in civil cases.  I'm a little loathe to do that.

21    We do have warnings about recordings and things like that.  I

22    just as soon, if someone's going to come and watch the trial,

23    that they come.

24         I will ask whether counsel expect if we do have --

25    well, if people come -- if the rule is you have to come to the

1    courthouse to watch the trial one way or the other, whether

2    you're here or whether you're in a separate room -- I know I've

3    seen articles about this case in Law360, so they may send a

4    reporter.  Maybe somebody else will send a reporter.  And

5    that's fine.  I will probably let at least one media rep sit in

6    the room.

7            Do counsel expect lots of class members are going to

8    show up or other members of the public?  Do you expect a large

9    crowd?  What's your sense?

10           MR. ARD:  Your Honor, we don't have any indication any

11   absent class members will be here or anyone from the public,

12   but I don't have any idea one way or the other.

13           THE COURT:  Do you have any sense of this?

14           MR. WEINSTEIN:  We do not, Your Honor.

15           We do have one question on that front.  Obviously,

16   we're going to have our client here.

17           THE COURT:  Right.

18           MR. WEINSTEIN:  I don't know if, amongst the public,

19   if anyone can view.  His wife was planning to attend if she can

20   come and watch.

21           THE COURT:  Yeah.  And you folks have three, three

22   class reps?  And they want their spouses.

23           MR. BUCHDAHL:  When you were talking about the

24   numbers, I just wasn't sure, when you said four, whether that

25   was intended to include people such as Mr. Fraser or people

1   such as class --

2          THE COURT:  It wasn't.  But now that I'm thinking

3   about it, so I don't -- I don't think really I can have them

4   and their spouses in the room.  I just -- it's just going to be

5   too many.

6          I'm going to put -- just so you know, the way the

7   jury's going to go here is I think we'll probably have eight or

8   nine -- I haven't decided yet -- jurors.  As you probably know,

9   we don't have alternates in civil cases, so they all

10  deliberate.

11         And the chairs are spread out that way for a reason.

12  They're not all going to be in the box.  Some of them -- this

13  half of the room over here is going to be for the jury.  I

14  think we'll probably put three of them there.  I guess there's

15  room for maybe six in the box.  So maybe that will cover it.

16         And I'm not going to want -- if I let anybody sit

17  behind them, it's going to be at the very back.  And I prefer

18  not to have anybody sitting on that side of the room except

19  jurors.  That means basically whoever's here besides lawyers

20  and, you know, IT professionals are going to be sitting there.

21  And there's just so much room in terms of sitting six feet

22  apart.

23         So I think counsel are probably going to need that

24  first bench for their IT professional or part of the group of

25  four.  And so what we're talking about is maybe another six,

1   seven people.  That's what we're talking about.  And so when

2   you take Mr. Fraser and you take the three class reps, all of

3   whom have a right to be here, we have maybe two seats left.  So

4   that's what I'm looking at.

5           So, yes, Mr. Fraser and the three class reps can be

6   here; I think the others not.  And I do want to reserve -- if

7   there is some media member, I do want to reserve one spot for

8   them.  So that's about where we are.

9           We're going to come up -- and we'll let you know as

10  soon as we can about whether it's going to be a separate room.

11  That's one reason I ask is depending on how large a crowd you

12  expect suggests how large a room I have to get, whether it's

13  another courtroom, whether it's a conference room, where --

14  because what I would prefer is to have the whole thing piped

15  into a separate room.  This is the way I did the two trials

16  over the summer, don't have to worry about Zoom bombing, things

17  like that.  I know who's here; it's all controlled.

18          That's my goal, but we may not be able to do that.  I

19  have to see -- we have to coordinate with our colleagues to see

20  what else is going on.  It's possible the whole thing may be

21  put on Zoom.  I just don't know yet.  But we will get back to

22  you on that.  Okay?

23          Right.  We need vaccine information from you by

24  October 18th.  We posted a notice about that.

25          Testing, okay.  It's possible -- and I think

1    desirable -- it's possible that we will have rapid tests,

2    enough to test all speakers during the trial, which is what our

3    science advisor has advised us are the most important people to

4    test for obvious reasons.  That would include me.  That would

5    include any counsel in speaking roles, and that would include

6    the witness.

7              If we're able to do that, we're going to have to come

8    up with a protocol where we provide you with the rapid tests,

9    and I'm going to have to figure out how to do that.  But it's

10   only a possibility right now.  We will give you as much notice

11   as we can.  As you know, rapid -- as you may know, rapid tests

12   are hard to come by these days.  But just so you know, that's a

13   possibility, that you will have to rapid test every day.

14             And if we have a positive, we're going to have to talk

15   about what happens.  So if we have a positive who's on one of

16   the teams, we're probably going to have to cancel the trial,

17   just so you know.  If we have a positive among the jury and

18   they're six feet apart, that's different.  But you folks won't

19   be six feet apart from each other when you're walking in and

20   out, so that's different.  But that's about where we are right

21   now.  Okay?

22             We talked about Zoom.  We talked about testing.  We

23   talked about rules of the road.  I'm ready to move on to jury

24   selection unless you folks have questions on any of that.

25             Okay.  Jury selection.  So the way we've been doing

1     this is we -- we first send out a questionnaire, and the

2     questionnaire has basically two sets of questions on it.  One

3     set are COVID-related questions, one of which is:  Have you

4     been vaccinated?  Now, on that question, just so you know, we

5     have in underlined type, "A no answer to this question will not

6     get you excused from jury service."  It's very, very clear.

7          But we want to know for public health reasons -- in

8     particular, where I seat the jurors -- as to whether they've

9     been vaccinated, and we ask for them to give us the date, etc.

10    So I should know and my courtroom deputy should know the

11    vaccine status of everyone in the room.  And that will help

12    with seating.

13         We also ask about vulnerabilities based on the CDC

14    website.  We ask about being a caretaker or living with someone

15    who has vulnerabilities.  We ask -- we certainly have a notice

16    in there about reporting to the jury clerk if within the 14

17    days leading up to trial you have symptoms or you test

18    positive.  I think those are the COVID questions.

19         We have a couple other questions in there which are

20    designed to get at what I would describe as commonly and

21    largely accepted excuses.  For example:  Are you the sole

22    caretaker of a minor child?  If so, provide details.  If so,

23    are you seeking to be excused on this basis?

24         If the person says, "Yes, I'm the sole caretaker of a

25    minor child," you know, "I have to pick up my daughter from day

1    care every day at noon or one o'clock; there's no one else to

2    do it" -- in fact, I think we actually ask, "Please indicate

3    whether there's anybody else that can do this."  But "there's

4    no one else to do it; I do it every day; you know, my wife

5    works full time, you know, downstate; there's just no way she

6    can cover and that's what I have to do and, yes, I'm seeking to

7    be excused on this basis," then I'll excuse that person.  And

8    you won't see that person come into the room.  And I do that

9    principally because, as a practical matter, if that person were

10   here and explained all that, then I don't think anybody would

11   object to my excusing that person.

12        So similarly, we ask -- we put the expected dates of

13   the trial in the summons.  We ask them if they have problems

14   with those dates.  Now, there we're a little stricter.  If

15   someone just says, "well, I have work obligations," that's not

16   an excuse; they're coming in.  If someone says, I have prepaid

17   tickets to go to Hawaii from this and this date and they fall

18   within the trial dates, we'll get proof of the prepaid tickets

19   and we'll excuse them.

20        Those are the common excuses that come up which always

21   lead to excusing the person.  The idea is to screen the person

22   out before they get in here so we can bring in smaller groups

23   and groups that are likely to yield jurors.  So when they get

24   here, they will be broken up into groups of about 15, and they

25   will come into the courtroom about 15 at a time.

1          Now, at that point I can't have anybody sitting in the

2     pews.  So all counsel -- so if we have to have an extra chair

3     behind you guys, that's fine.  But nobody will be sitting in

4     the pews because that's where the jurors will be, and they will

5     spread out in the pews.

6          And then I will go through three sets of questions for

7     them.  First I'll do a little bit of an intro.  Then I will --

8     then I will do the statement of the case.

9          Now, folks, you folks weren't able to agree on the

10    statement of the case.  Let me give you a few principles about

11    this because I'm going to send you back to the drawing board

12    because it's not for me to do all the work.  And I know you've

13    done a ton of work, but this is easy.

14         I just want a paragraph, a single paragraph.  I know

15    it's a complicated case.  I know there's lots of complication

16    involved.  I want a single paragraph that basically identifies

17    the names of the parties associated with the case, so three

18    named Plaintiffs, Mr. Fraser, I think -- don't worry about the

19    companies, including Garza in the statement.  We'll list them

20    later so they can do their conflict check.

21         But the statement should basically say, These are the

22    claims.  They don't -- don't identify statutes or anything.

23    Just say, you know, The Plaintiffs claim -- something like, The

24    Plaintiffs claim that, you know, they invested in this and

25    that; it was fraudulent, or whatever the claim is.  And the

1    Defense says, Mr. Fraser denies this claim and says, you know,

2    whatever he says.  In one sentence.  That's all I want.

3           And that's -- I'm leaning on you folks to get back

4    together and do that for me.  Okay?  I don't want a complicated

5    statement.  All right?

6           So I read that to them.  I will then ask counsel to

7    introduce themselves and simply to -- and that's not to talk

8    about the case.  That's just literally to introduce themselves,

9    their clients, and the people on their teams.

10          I don't think it's necessary to list all the lawyers

11   who are not in the courtroom who are on your teams.  I don't

12   think that's necessary.  You folks are both from out-of-state

13   firms.  I don't think it's necessary for you to list all your

14   partners.

15          I think the Brenner Saltzman firm probably should

16   provide a list of partners to defense counsel to be read off

17   simply because they're in Connecticut.  I think same with the

18   Izard firm, just because some of the jurors might know some of

19   those folks.  So those -- names of the lawyers at those firms,

20   partners and associates at those firms should be read off.

21          But for you folks, you can just read off the team

22   members who will be in the courtroom.  And then list the

23   witnesses.  So each side should list the witnesses that they're

24   going to call.  And that's -- you should list any witnesses who

25   you might call even if, you know, even if you don't expect to

1    call them.  Anybody who's listed in the JTM as a potential
2    witness should be named.  And each side should be responsible
3    for naming their folks from the JTM, their witnesses.  All
4    right?
5         And that's it.  Then you sit down.  I will probably
6    throw in -- if you haven't, I'll throw in the names of the two
7    companies, Mr. Garza, and, you know, anybody else I think you
8    haven't named.  And then, you know, I'll ask them if they
9    recognize any of those names.
10        And then I'll go through -- so there's three sets of
11   questions.  I'm still on the first set.  Then I'll ask them
12   things like, Can you follow the law?  Issues with the dates,
13   even though we've screened that, there still will be people who
14   will raise their hands.  So that's the first set of questions.
15        Second set of questions is I will ask each of them to
16   come to a microphone, which we will put right at the bar, and
17   to read off the answers to a questionnaire that asks the
18   following questions:  What town do you live in?  Where do you
19   work?  Are you employed?  And, if so, where and how?  Do you
20   have a significant other?  Is that person employed?  If so,
21   where and how?  Do you have adult children?  Same questions.
22   Have you ever been involved in litigation as a plaintiff,
23   defendant, or witness?  If so, you know, tell us about it.  And
24   have you ever served on a jury before?  So those are the
25   questions they'll read off.

1          I will -- when I hear the answers, I may follow up.

2     So if someone says, for example, obviously, you know, "I work

3     in the Fintech sector," I'll say, "Oh, tell us more about

4     that."  And I'll try to elicit as much information as I can

5     about that.  You folks are, obviously, busy taking notes during

6     this time.

7          The third set of questions will be questions that we

8     haven't already covered that touch upon the subjects in this

9     case.  I know you submitted some proposals in this regard.

10    I'll take a closer look at them, and I will develop my own

11    questions based in part on what you submitted.  And that will

12    be to the group as a whole rather than one by one.

13         So then at that point, after we've heard answers to

14    all those questions, I will have counsel either -- probably

15    come up here to sidebar, and we will discuss who we think we

16    should question more.  And I usually call this sidebars with

17    jurors because that's how I would do it in normal times.  We're

18    not going to do sidebars with jurors during COVID.

19         What we do instead is let's say there are 15 people

20    and let's say you identify six that we want -- Judge, I'd like

21    to hear more about X.  You have to tell me why you want to hear

22    more about them.

23         I'd like to hear more about X.  She said this.  I'm

24    just a little worried.

25         I say, All right.  We'll bring that person in.

1          So -- and I'm also going to want at that initial

2    sidebar your views as to any people whose answers you think are

3    grounds for -- already provide grounds for a challenge for

4    cause.  So if someone says, "Yeah, I think, you know, financial

5    companies are corrupt and I just don't think I can be fair,"

6    well, you know, I'm probably not going to need your help with

7    that one, but that kind of thing.  If there's things that are

8    grounds for cause challenge without us even asking further

9    questions of somebody, let me know at that initial sidebar.

10   Okay?

11         Then what I'll do is I'll have that group taken to a

12   different room except for those that we're going to call in for

13   additional questioning.  I'll have a law clerk line them up

14   outside.  We will bring them in one by one.

15         And then -- so I'll ask some follow-up questions based

16   on what you've told me.  I might -- if I'm not really sure what

17   I'm going to do with this person or I think I didn't really

18   understand what you wanted me to ask, I might then turn to you

19   to let you ask a question.  That will be the only time you'd be

20   allowed to ask a question.  Usually I do all the questioning

21   myself.

22         Then when that person -- I'll ask that person to step

23   out of the room.  I'll ask if there's a cause challenge.

24   That's the time to make the cause challenge as to that person.

25   Okay?

1          And based on whatever the ruling is on the cause

2     challenge, I'll either bring the person back -- and if I've

3     granted a cause challenge, I'll tell them to leave the

4     building.  They're excused.  If not, I will have them go to

5     that other room.  Okay?

6          Once that group's done, we'll bring in another group

7     and we'll do the same thing.  So it is a little bit

8     repetitious, unfortunately.  I think if we're able to set it up

9     right, we'll be able to -- and this is what we did during the

10    last two trials.  The group -- the second group will be able to

11    see, and possibly even a third group, although I don't promise

12    it, but certainly the second group will be able to see

13    everything that's happening in the courtroom over Zoom.

14    They'll be in another room.  It will be Zoomed in.  That means

15    I won't have to repeat the intro and we can get straight to the

16    questions.  So that saves us a little bit of time.

17         And then when we're done with the cause challenges --

18    oh, so this is important.  On jury selection day, you will get

19    two lists.  One is called the "Bio List."  The other is called

20    the "Judge's List."  The Bio List has minimal information about

21    the jurors, listed alphabetically.  Frankly, it's not that

22    useful to you because you're going to learn all that

23    information when they come up to give their answers to the

24    questionnaires.

25         The more important list is the Judge's List.  The

1    Judge's List will take these people and it will randomize them.
2    This will be done before the list is generated, obviously.  And
3    let's say there are 45 people, okay, on the Judge's List.  And
4    they're there randomly, but they will all have a number which
5    they will not know but you and I will know, which will be
6    listed from 1 to 45 in the left-hand column.

7         The jurors will consist of the people with the lowest
8    numbers in the left-hand column on the Judge's List who are not
9    stricken.  So what that means as a practical matter is after we
10   do the causes -- the challenges for cause and you cross their
11   names off and things like that, you're each going to get three
12   peremptories.  Don't waste your peremptories on people with
13   high numbers on the Judge's List because they're not going to
14   get on the jury anyway.  Okay?

15        So just if we go with nine jurors, the magic number
16   will be 15.  We need 15 qualified jurors, and once we have 15
17   qualified jurors, then I'm stopping the questioning.  You know,
18   we're not going any further.  I'm going to say, "Thank you very
19   much, folks.  Go to a separate room."  And we're not going to
20   bring in anymore groups.  And I'm going to have you folks sit
21   down.

22        Ms. Johnson, our courtroom deputy, will give you a
23   sheet.  The Plaintiff will start.  They will list one through
24   three for the Plaintiff, one through three for the Defendant.
25   Plaintiff will exercise their first peremptory.  They will hand

1    the sheet to Defense counsel.  They will exercise their

2    peremptory.  Defense counsel will hand it back.  Plaintiffs

3    will exercise their second peremptory, etc.

4           And I don't give you very long for that because I'm

5    expecting you -- you're taking notes all day.  You're

6    conferring with your client all day in terms of who's, you

7    know, who's somebody you don't want on this jury.  So I

8    expect -- I mean I'll let you confer with each other, but I

9    don't want the conference to take 10 minutes.  So I expect

10   basically the peremptory challenge process to be done in 20

11   minutes at most.

12          So then we will bring the jurors back.  I will tell

13   people who's excused, and we will announce the members of the

14   jury.  We will swear them in, hopefully send them to lunch, if

15   they haven't gone already, and we'll start the trial.

16          Any questions?

17          MR. WEINSTEIN:  Only, Your Honor, as to what will make

18   your decision on eight versus nine jurors?

19          THE COURT:  I'm a little concerned about timing.  You

20   know, the longer a trial goes, the more likely you are to lose

21   somebody.  This is sort of on the edge.  This case is sort of

22   on the edge.  Smaller is better for COVID, obviously.  But I

23   wouldn't want to get down to seven or six jurors.  That would

24   make me -- that -- I wouldn't be able to sleep.  So I haven't

25   decided yet, but I'm leaning towards nine.  So that's my sense.

1           Any other questions?  All right, good.

2           Okay.  So now let's get into -- let me just see if

3      I've covered everything.

4           Right.  Why don't we have the Brenner Saltzman firm

5      and Izard firm e-mail to my law clerk the lists of lawyers.

6      And that way we can hand them out to the jurors before they

7      come to the courtroom.  And also include on that list the names

8      of the team members who are going to be in the courtroom and

9      also the witnesses.  And that way they'll have an extra --

10     we'll read them off, but that way it will just be an extra

11     reminder.

12          If I could get just one sheet from each side.  If it's

13     two pages, that's fine, but from each side all the lawyers at

14     those two firms, all team members in the courtroom and all

15     witnesses.  That would be great.  And if you could e-mail that

16     to my law clerk, let's say, by a week from today, so the 15th.

17          One other thing, during the trial, so I'm expecting

18     counsel will use the podium, and you can use the podium.  There

19     won't be a problem.  That's for examining witnesses.  That's

20     for your closing arguments, etc., your opening statements,

21     that's fine.  You have a microphone there.  Always remember the

22     court reporter needs to hear you, so you need to speak into a

23     microphone.  So don't wander.

24          I think we're ready to move into the Motion in Limine

25     unless there were any questions about what I said.

1          Good.  Off we go.  Let's start with the Motion in

2    Limine Regarding the Class Representatives.

3          Yes, Mr. Ard.

4          MR. ARD:  One question about your last comment.  Did

5    you -- does that mean we're not allowed to walk away from the

6    podium during opening statements?

7          THE COURT:  I think it's best to stay put during

8    openings.

9          I'm also not -- I know you guys like PowerPoints and

10   stuff.  I'm not a big fan of PowerPoint during opening.  I

11   would need to see it ahead of time.

12         Remember, remember it's an opening statement.  I'm

13   going to tell the jury basically it means nothing and all

14   you're there to do is to give them -- I know this trial's, you

15   know, more complicated than what we originally see, not least

16   because it's a class action.  But it's not the time for

17   PowerPoints, honestly.  It really isn't.  Just tell the jury

18   about the evidence they're going to hear.

19         MR. ARD:  But we can use them if we show them to you

20   ahead of time?

21         THE COURT:  Show them two at a time?

22         MR. ARD:  You said we can use them if we show them to

23   you ahead of time?  No?

24         THE COURT:  Yeah, if you really want to show me

25   something ahead of time, you can.  I'll probably say no.  I

1    just don't like the idea.  So you know, some judges in this
2    district don't allow it.  It really is not a time to leave
3    impressions with the jury.  I know I'm saying things that go
4    against standard trial practice techniques and all that.
5            It's just, from my standpoint, all you're there to do
6    is to situate the jury a little bit, candidly, give them a big
7    picture of what the case is about, give them a little bit of a
8    roadmap.  That's why I don't know why I said to Mr. Weiner 20
9    minutes, but I will give you the 20 minutes.  I probably will
10   regret that, so ...
11           Are we ready to go talk about the Motions in Limine?
12   All right.  Let me take some water first.
13           Let me start by staying I want to talk about the
14   Motion in Limine Regarding the Class Representatives first.
15   Let me start by saying that with regard to this Motion in
16   Limine and others, it was helpful to attach the documents that
17   you did because it's always helpful for the Court to see
18   specifically what evidence that is at issue.  But some of the
19   concerns raised in the briefs don't address -- well, let me put
20   it this way:  There may be some of those exhibits that are
21   relevant potentially to more than one issue.  And so in case I
22   forget to mention this when we're going through them, if I make
23   a ruling on a particular point that suggests, well, you know,
24   I'm granting that motion, that doesn't necessarily mean that
25   all those exhibits are out forever because some exhibits may be

1  relevant, for example, to credibility issues.  Probably better
2  for us to dive right in.
3          Okay.  So I'm going to be very up front with you about
4  this, and we can argue it.  But I've thought about this.
5          And, yeah, please come up.  It's Ms. --?
6          MS. CHEN:  Ms. Chen, Your Honor.
7          THE COURT:  Ms. Chen.  I've thought about this.  And I
8  certainly -- the Defendants are certainly correct that I did
9  not make crystal clear what this trial would be about and what
10 the issues would be.  I'm not sure that the particular issue
11 raised by this motion was raised in the severance briefs in the
12 discussion of that, but let me cut to the chase.  I don't see
13 how this trial can be about anything except class-wide issues.
14 And let me explain why.
15         So the -- and to be clear about what I mean by that, I
16 think that means that we really can't have a trial about the
17 reliance or extent of reliance on the class representatives or
18 the defenses that might apply to the individual class
19 representatives.  And the reason is that I think this case is
20 going to be difficult enough for a jury to grasp.  And for them
21 to have to, on top of the level of abstraction that exists just
22 because of the nature of the case, to have to parse, for
23 example, reliance by class representatives, by the named
24 Plaintiffs, as opposed to reliance by the class as a whole, I
25 don't see how they're going to do that.  I'm not sure I could

1    do that.  But you tell me why I shouldn't worry about that.

2           MS. CHEN:  Well, Your Honor, if I could just ask a

3    clarifying question.  So as this is Plaintiffs' motion to

4    exclude the, I think, the evidence that you were just talking

5    about, these individual arguments that Mr. Fraser might have

6    with the individual class representatives.

7           THE COURT:  Right.  Yeah, so let me be a little more

8    specific.  It seems to me I'm aware -- you may know more -- I'm

9    aware of kind of two issues in this regard.  One is reliance by

10   named Plaintiffs.  And the second is there's a whole series of

11   defenses Mr. Fraser has raised, like in pari delicto, like -- I

12   can't remember the others, but unclean hands to the named

13   Plaintiffs based on their conduct, for example.  And I can

14   think of the exhibit Mr. Shinners being involved in drafting

15   the white paper, Mr. Shinners kind of going on these forums and

16   defending the companies and saying, oh, it actually isn't a

17   fraud, etc.

18           I don't see how the jury is going to be able to

19   determine class-wide reliance, which they clearly have to

20   determine -- and I don't think you disagree with that -- but

21   also decide, did these individual Plaintiffs rely and/or should

22   I -- even if they did, should I find that Mr. Shinners is in

23   pari delicto, I just don't see how they're going to be able to

24   keep that straight.  And I worry that some of the facts

25   pertaining to the named Plaintiffs would, frankly, prejudice

1     the jury against a class.  So those are my concerns.

2          MS. CHEN:  And I would say that we absolutely agree

3     with those concerns, Your Honor.  The focus of the trial should

4     be on whether Mr. Fraser is liable to the class for the claims

5     that are brought against him.  It should focus on common

6     evidence, as Your Honor has already mentioned.  And, you know,

7     the point of the motion was to try to --

8          THE COURT:  Wait.  You're with the Plaintiffs' team?

9          MS. CHEN:  Yes, sir.

10         THE COURT:  Sorry.  I don't need to hear from you on

11    this.  I'm like, wow, this is great.  This is easier than I

12    thought it would be.  Sorry.  No wonder you were trying to

13    stand up.

14         Go ahead.  You tell me why I don't need to be

15    concerned about these things.

16         MS. HASSAN:  So, Your Honor, I'll try to complicate

17    things a little bit.

18         THE COURT:  Yeah.

19         MS. HASSAN:  Let me address -- I kind of look at it as

20    two separate buckets really.  One is individualized knowledge

21    and reliance and then affirmative defenses, so if I can address

22    the first one first.

23         THE COURT:  Please.

24         MS. HASSAN:  So I think the issue here is even if Your

25    Honor decides at this point or you decide that this is supposed

1    to be a purely class-wide trial, even then the evidence of

2    individualized knowledge and reliance is relevant to issues of

3    class-wide reliance.

4         And I think there are three points here:  One, this

5    isn't a fraud on the market kind of case.  What Plaintiffs have

6    to do is -- and as Your Honor laid out in the ruling on

7    certification -- is they have to prove that there were uniform

8    misrepresentations and that those misrepresentations were

9    essential to the decisions of the class members in purchasing

10   the products; right?

11        There is no way -- the only option that the Defendant

12   has in order to challenge that evidence is individual evidence.

13   Before the jury decides that, oh, okay, we can draw a

14   reasonable inference that these misrepresentations were

15   essential, the only option we have is to show, for instance, it

16   wasn't essential to this class member or to this class member

17   or to this class member.  We don't have any non-individual

18   evidence that we can use.

19        THE COURT:  Well, let me -- let me ask about that

20   because -- and this goes to yet another motion that was raised,

21   which is the motion regarding internet discussions.  Okay?  And

22   they're you're on the other side.  You want that in.  And I --

23   I have some concerns about that.  But I would say -- and we can

24   talk about that separately.

25        But in theory, if a foundation were laid that lots of

1    people who purchased these products saw the internet
2    discussions and I gave an appropriate instruction that they
3    were not offered for their truth, then that would be a
4    non-individualized way for you to try to rebut reliance,
5    because you would be able to point to, look, there's these
6    forums where all these, you know, folks who were buying these
7    products are talking about it's a Ponzi or it's not a Ponzi.
8    And as long as there's some basis for me to infer that these
9    are pretty widely available forums, then that would be a basis,
10   would it not, for you to point to evidence that would
11   potentially rebut reliance but would not be individual to these
12   named Plaintiffs?
13          MS. HASSAN:   That's correct, Your Honor.  I think that
14   would be one kind of evidence that we could potentially use.
15   But, for instance, if we were to show that, let's say, Mr.
16   Shinners knew early in December that this $20 floor is not
17   going to happen, it's not realistic, I'm not going to justify
18   they rely on it, but he continued buying these products --
19          THE COURT:   Yeah.
20          MS. HASSAN:   -- I think even though that's an
21   individual issue to him, the reason it's relevant here is --
22   and I think part of the problem is that usually cases that we
23   have in this area are fraud-on-the-market cases.  So over there
24   all the plaintiff has to prove is we're entitled to a
25   rebuttable presumption of reliance, and all that they have to

1   show in order to get that presumption is impersonal market

2   data, you know, this is how the market moved.  And in that

3   situation, the defendant gets to attack again using market

4   data.  Individual data is not relevant.

5          But here we're saying, Plaintiffs, you prove that

6   there was uniform misrepresentations.  But let's say it turns

7   out that two of the class members didn't even see some of the

8   misrepresentations at a particular time or they didn't find

9   certain misrepresentations essential.  Then it's difficult for

10  me to see how the jury can reasonably still draw an inference

11  of class-wide reliance when there is concrete evidence.

12         And, again, I think for me the contrast is important

13  with fraud-on-the-market cases because so many of the cases

14  tend to be that.  And it's so easy to splice individual issues

15  from class-wide reliance in a fraud-on-the-market case.

16         Here the test or the two things that Plaintiffs have

17  to prove, they do implicate individual issues.  And if I might,

18  I found two cases which we did cite in our brief, if I could

19  point the Court to those.

20         THE COURT:  Sure.

21         MS. HASSAN:  So one of those is the Southern District

22  of California case.  It's *Krueger V. Wyeth*, 2016 WL 3981125,

23  and it's a decision from 2016.  And in that decision -- it is

24  pin site 9 -- the magistrate judge explained -- so this is

25  after certification and the class-wide determination on

1    reliance had already been made.

2          And here the judge clarifies plaintiff has always had

3    the burden of proving reliance for the claim.  Defendants have

4    always had the same defenses available to them that they have

5    now.  And then he lists a bunch of defenses, including making

6    sure this class representative did not rely on the

7    representation or that a reasonable person would not rely on

8    the representation.

9          THE COURT:  But -- I think I remember reading.  The

10    judge doesn't go on to explain why that conclusion's valid, as

11    I recall.  I mean he just says it -- or she.  I don't know.

12          MS. HASSAN:  I think he.  And that's correct.  He

13    doesn't go on to explain or flesh out what the issue is because

14    I think the issue there was more of a discovery issue.  But I

15    think the significance of this case and another case from the

16    Western District of New York that we cited, which was *Miami*

17    *Products*, um, that was a motion to dismiss case actually.  And

18    in that case the judge decided, because I know that these named

19    plaintiffs did not rely on these misrepresentations, there can

20    never be a class-wide inference of reliance; so I'm going to

21    dismiss their claims.

22          And I think what that indicates to me, both those

23    cases indicate to me is --

24          THE COURT:  Well, let me understand that one.  So that

25    was at a motion to dismiss stage or a motion for summary

```
1    judgment?

2              MS. HASSAN:  That is a motion to dismiss stage.  And I

3    can provide --

4              THE COURT:  And so there the judge assessed the

5    evidence regarding the class-wide plaintiffs and determined

6    what the class-wide plaintiffs had did not show reliance;

7    right?

8              MS. HASSAN:  Well, in that case the issue was that the

9    named plaintiffs, there was evidence --

10             THE COURT:  I'm sorry.  I said "class-wide

11   plaintiffs."  I meant "named plaintiffs."  The evidence with

12   regard to the named plaintiffs was not enough to show reliance;

13   is that right?

14             MS. HASSAN:  Correct.  So what the decision says is

15   that -- let me actually read the specific.  "While it is true,

16   as the Indirect Purchaser Plaintiffs point out, that in the In

17   re Tobacco II court held that 'a presumption, or at least an

18   inference, of reliance arises wherever there is a showing that

19   a misrepresentation was material,' any such presumption has

20   been rebutted in this case because, as noted above, the

21   Indirect Purchaser Plaintiffs concede that they did not rely on

22   any misrepresentations by Defendants deciding to purchase" --

23             THE COURT:  Okay.  They made that concession on behalf

24   of the class.

25             MS. HASSAN:  Well, they were making that concession
```

1    only about themselves, that we didn't rely.  And if at a motion
2    to dismiss stage that --
3            THE COURT:  So that was before a class was
4    certified.
5            MS. HASSAN:  Correct.
6            THE COURT:  Okay, so if it's before a class is
7    certified, there is no class.  And also, even if there had been
8    a class -- for example, if these plaintiffs had conceded, these
9    named plaintiffs, "yeah, we didn't rely," well, there would be
10   a huge problem with the case because the named plaintiffs are
11   supposed to represent the class and there might be -- there
12   would be typicality issues and the like.  Maybe there would be
13   a fundamental problem with the case.
14           But typically, for example, when there's an issue
15   with, after the court certified a class with a particular named
16   plaintiff, that named plaintiff can be replaced.  There are
17   other options available to the court because the party's
18   actually the class.
19           But let's come back to the point you made earlier
20   because this is one I do want to make sure I understand.  You
21   seem to be saying that, at the outset, there's just no way Mr.
22   Fraser can rebut reliance without pointing to individual
23   situations.  And so basically, "Judge, you're tying our hands
24   behind our back unless you let us get into the situations of
25   the named plaintiffs."

1          Now, I pointed out one set of evidence that I think

2     you agree with me that's not really true about; right?  The

3     internet posts?

4          MS. HASSAN:  Correct.  Maybe I should correct myself.

5     Maybe there might be certain types of evidence that we could

6     use, but the fact that certain individuals did not rely on the

7     misrepresentations --

8          THE COURT:  Yeah.

9          MS. HASSAN:  -- I'm not sure how then a jury could

10    reasonably infer the existence of a class-wide reliance.  And I

11    guess --

12         THE COURT:  Well, why can't the jury infer the

13    existence of class-wide reliance from statements that, as I

14    understand it, there's no dispute were widely disseminated, for

15    example -- you folks know the evidence better than I do, but

16    I'm going to do my best.  I think Mr. Garza gave an interview

17    to The Wall Street Journal.  I think -- is that where he talked

18    about a hundred million dollars to support Paycoin, you know,

19    $20 Paycoin floor.  And so those examples I think were widely

20    disseminated, available to the entire class, material, and the

21    kinds of things on which one would reasonably rely, I think, in

22    buying Paycoin.

23         Now, if you had evidence on the -- of these internet

24    discussions -- again, the problem with those may be the

25    foundation issues.  But assuming you can get past those issues,

1  that people were saying, yeah, but it's a scam, it's not --

2  there is no hundred dollar floor, that I think would go to

3  rebutting the evidence of reliance, and it would be class-wide.

4          What I'm not seeing, for example, is why an e-mail

5  between Mr. Shinners and Garza or an e-mail between Mr.

6  Pfeiffer and a reporter speaks to rebutting class-wide

7  reliance.  That's the trouble I'm having.

8          MS. HASSAN:  So I guess, Your Honor, and this might

9  just be a wording issue because I get tripped up on this.

10  Plaintiffs have to give -- present their evidence.

11          THE COURT:  Yeah.

12          MS. HASSAN:  And the jury has to draw an inference of

13  class-wide reliance.  We need to present all of the evidence

14  that rebuts or challenges that even before the jury can derive

15  that inference.

16          THE COURT:  Correct.

17          MS. HASSAN:  And I'm saying that some of this

18  individualized knowledge and reliance evidence is very

19  important for us to --

20          THE COURT:  Ah, so let's talk about that because we

21  may be getting at an issue which is quite important, which is

22  suppose I were to say, "I'm sorry, I just don't agree with you.

23  We're going to have a trial about class-wide issues, period."

24  And you were to say, "Well, wait a minute, Judge.  When do we

25  get to challenge Mr. Shinners' reliance?  We should be able to

1   challenge that."  And I would say, "I agree with you.  You

2   should."  But why shouldn't that be in a later proceeding?

3            And then we'll get into another question too, but I'd

4   like to hear your answer to this one.  Why shouldn't I say,

5   just like the judge in *WorldCom*, I think there was a Judge Wood

6   case from 1996 -- I can't remember the name of it -- where she

7   did something similar, where I said, "You're going to get to

8   challenge Mr. Shinners' reliance, just not in this trial.  You

9   can do that later"?

10           MS. HASSAN:  So I think our position, Your Honor, is

11  *WorldCom*, again, is a fraud-on-the-market case.  Over there in

12  order to -- just for Plaintiffs to get the presumption of

13  reliance, all they have to do is prove an impersonal efficient

14  market; right?  There at that point evidence of individualized

15  reliance is not even relevant because all of the fight is

16  whether or not the market is efficient.

17           THE COURT:  But that's not true that it's not

18  relevant; right?  Because basic just creates a presumption;

19  right?  You can rebut that presumption, and as I understand

20  what's going on there is you had some individual investors who

21  maybe had done more due diligence than others.  Some happened

22  to be named plaintiffs.  And what I think it was Judge Cote

23  said is, That's fine, but we're not going to have that in the

24  class-wide trial.  That's for a later trial regarding the

25  individual investors.

1            Why shouldn't I do the same thing?

2            MS. HASSAN:  So I think the distinction, Your Honor,

3      as I read the cases, is *In re WorldCom* case, in order to get

4      the presumption of reliance, all that a plaintiff has to do is

5      to prove an efficient market.

6            THE COURT:  That's true.  That's a distinction.  But

7      why is it a distinction that matters?

8            MS. HASSAN:  It's a distinction that matters because

9      if all that you have to do is prove an efficient market, the

10     way that I, as a defendant, would challenge is by showing that

11     the market, impersonal market, is inefficient again by taking

12     evidence of price changes; right?  These events happened.  The

13     prices never changed, which means the market is not responsive.

14     None of this is individualized evidence relevant; right?  For

15     that kind of situation, it's only market data that is

16     relevant --

17            THE COURT:  That's true.

18            MS. HASSAN:  -- not individual.  That's why I can take

19     the individual evidence and put it after the class-wide trial.

20            Here we're saying, "Jury, we're going to give you --

21     the Plaintiffs are going to show you some evidence of uniform

22     misrepresentations," and they are -- I guess I don't know what

23     is the evidence that they -- will they just argue that these

24     are so essential that, um, nobody could have bought them?

25            THE COURT:  I guess.  I think that's the theory.

1          MS. HASSAN:  Okay.  Then we're saying, but wait a

2     second.  We can show you that there are people who actually

3     didn't rely on these, and that makes their inference -- the

4     jury shouldn't even draw that inference.  I think that's what

5     I'm saying, that the nature of the presumption *In re WorldCom*

6     is very different from the -- from the inference that the jury

7     is supposed to draw over here.

8          THE COURT:  Yeah, you're right.  There's a distinction

9     between a presumption case and this case.  But I guess from the

10    standpoint of the Court trying to manage a trial, okay, I have

11    to think about, all right, how can we do this in a way that the

12    jury's not going to get more confused than they're already

13    going to be, given the nature of the evidence and the claims in

14    this case?

15         And it may be that the trial that we would have -- and

16    I hope this isn't the case -- but, candidly, isn't all that

17    useful; right?  Because we get a verdict.  Let's say it's a

18    Plaintiffs' verdict and it's a verdict that shows that the

19    class relied.  But we're not done yet, even as to liability --

20    right? -- because the named Plaintiffs and other class members

21    might not have relied.  But those are going to be

22    individualized inquires.

23         You may be saying, "Judge, this is your problem.  You

24    certified the class."  And maybe you're right to say that.  But

25    here we are.  I'm not going to decertify the class at this

1    point.

2           And so I guess I don't see -- you're right to draw the

3    distinction, but I guess I'm not following since it's not like

4    your hands are totally tied behind your back here.  You have

5    some evidence you can point to.  So maybe it isn't everything

6    you would like to point to, but it's -- you have some evidence

7    you can point to to contest reliance.  And I'm not sure what

8    you're saying persuades me ultimately that, yeah, due process,

9    for example, requires the Court to -- I'm not going to be

10   entering judgment in anybody's favor on this trial anyway.

11   We're not even going to have a liability verdict given -- and I

12   want to talk to the Plaintiffs about this.  But I'll give you

13   one more chance to talk, and then I want to ask some questions

14   of Plaintiff.

15           MS. HASSAN:  All right.  Your Honor, two points:  One,

16   I understand your point that we have to manage the trial or the

17   Court has to manage the trial and that our hands might not be

18   completely tied even if you were to take out the individualized

19   reliance evidence.  I think the problem is -- and, again, I'll

20   go to *In re Worldcom* because we're looking at that.  In that

21   case, by taking out the individualized evidence, the Court

22   wasn't tying defendant's hands to be able to challenge the

23   rebuttable presumption before it could even be drawn because

24   once it's drawn, the defendant is stuck with a class-wide --

25           THE COURT:  Yeah, but that's not true here; right?  In

1    other words, suppose you get a class-wide verdict against you

2    here at this trial and I don't allow any individualized

3    evidence in.  As you say, this isn't a presumption case.  So we

4    have another trial with Mr. Shinners alone or maybe we can do a

5    joint trial.  We have a trial about individualized reliance and

6    other issues.  They don't have a presumption.  They've got to

7    prove reliance now.

8            MS. HASSAN:  I think the issue -- the difference there

9    is, Your Honor, let's say we do get to present evidence of

10   individualized reliance and let's say because of that the jury

11   decides, okay, this isn't a reasonable inference that there was

12   class-wide reliance.  The Defendant doesn't have to go to those

13   other later trials; right?

14           THE COURT:  Yes, I know that.

15           MS. HASSAN:  Right.  So but there is that prejudice.

16   Once an inference is drawn, we are stuck with now defending --

17   now we have to go individual by individual by individual.  The

18   difference is --

19           THE COURT:  Well, you're going to have to do that

20   anyway here, though, because of the damages issues; right?  I

21   mean I haven't made any decisions about that, to be clear.  We

22   would try to come up with ways to be efficient.  But at some

23   level, we are going to need to do some individualized

24   proceedings here it's likely.

25           So I guess what I'm suggesting is, though I hadn't

1    thought of this before today and I think the Defendant's right

2    to point out, strictly speaking, this should have been part of

3    the severance discussion, but what I'm suggesting is, well,

4    maybe those individualized proceedings aren't just going to be

5    about damages.  They're also going to be about for individual

6    reliance; they're also going to be about individual defenses.

7    But --

8               MS. HASSAN:  Well, I guess, Your Honor, I'll throw in

9    just one last point.

10              THE COURT:  Okay.

11              MS. HASSAN:  I do think this is a unique situation in

12   terms of who these class representatives are.  So what they

13   will be exposed to, what they were doing, what they were

14   relying on, given, for instance -- again, Mr. Shinners was

15   extremely active during the class period on all of these

16   different forums.  He was interacting with, we believe,

17   unreported class members.

18              THE COURT:  Sorry.  This is Shinners?

19              MS. HASSAN:  Mr. Shinners.  In fact, that's true for

20   all three class representatives.  They were active participants

21   in these, and Mr. Shinners was also very active in other forums

22   as well.

23              So I think when they speak about what they heard, what

24   they did, what they thought about the $20 floor, for instance,

25   it does speak to what was being communicated, what was being

1    discussed, what was being considered material generally.

2            THE COURT:  Well, if you could show that, I would

3    agree.  In other words, if you were able to -- and this is why

4    I think some of those internet discussions -- again, there are

5    foundation issues which may be insurmountable.  I don't know.

6    But -- at least as to some of them.

7            But if you can show that, for example, Mr. Shinners

8    did a post on -- I don't know -- HashTalk and Mr. Shinners has

9    testified -- I think somebody pointed out that, somebody, he

10   testified how everybody looked at HashTalk and all that, I

11   might be -- I might be inclined to allow that, for example,

12   that evidence.  In fact, I would be inclined to allow the

13   evidence in of what he said on HashTalk, again, if that

14   foundation is laid.  I want to just emphasize that.

15           Whether it makes sense to have the jury aware that

16   it's Mr. Shinners who made that post is something I want to

17   talk about with Plaintiffs' counsel because I'm a little

18   worried about that because of, again, the jury focusing on the

19   individual situations of the named Plaintiffs as opposed to

20   what they're supposed to be doing, which is, from my

21   standpoint, looking at the class.

22           But I do think -- just to go to your point, I do think

23   if there were evidence that what Shinners or Audet or Pfeiffer

24   were saying was being broadcast widely such that their views,

25   in fact, were influencing the mix of information available to

1    investors, I think that that would be a basis for you to get

2    into that material.  I do want to hear from Plaintiffs' counsel

3    on this though.  So let me ask to hear from Plaintiffs' counsel

4    now.

5            All right.  Let me start out with a question, which

6    is:  So you heard what I was discussing with Defense counsel.

7    Suppose we had a trial.  Suppose I granted this motion.  We had

8    a trial about class-wide reliance alone but, you know, a class

9    trial but with regard to reliance only with respect to the

10   class, nothing about individual defenses -- okay? -- and you

11   got a verdict for your clients.

12           And then we moved to Mr. Shinners' trial, an

13   individual trial with respect to Mr. Shinners.  I'm just using

14   him as an example.  And the Defendants start cross-examining

15   Mr. Shinners about his reliance because I said that they could.

16   I said this was an individualized trial.

17           And you get up and you say, "Your Honor, you can't do

18   that because of the Seventh Amendment.  The Seventh Amendment

19   does not allow the second jury in Mr. Shinners' trial to

20   reexamine any findings made by the first jury.  The first jury

21   found reliance on a class-wide basis.  You cannot now allow

22   this jury to revisit that.  I'm sorry, Judge, but reliance has

23   been -- that issue's been resolved, and they cannot explore

24   reliance in this trial.  It's already been determined against

25   them."

1      What do I do then?

2          MS. CHEN:  So I think this is a good point to clarify

3   something about the motion, Your Honor.  There is -- there is a

4   difference between individual reliance and whether that rebuts

5   the presumption of reliance and individualized evidence that is

6   specific to a particular class member and that which, if Mr.

7   Shinners -- excuse me -- if Mr. Fraser were to be allowed to

8   question each of the named Plaintiffs on all of the

9   individualized exhibits on his exhibit list, that would, in our

10  view, derail the trial and, you know, create all these mini

11  trials on, for example, e-mails, like you said, between a named

12  Plaintiff and someone else at GAW, for instance, that none of

13  the other -- that would not be applicable to any other class

14  member.

15          THE COURT:  Okay.  But how do you answer my question?

16  In other words, if the -- if I say this trial is just a

17  class-wide trial and we're not going to get into those e-mails,

18  okay, between Mr. Shinners and Garza and that kind of thing

19  because it's a class-wide trial -- and, again, the jury comes

20  back for you -- what prevents you from saying at a later trial

21  involving Mr. Shinners alone, his damages issues, his

22  defenses -- they now want to get into these e-mails, say,

23  "Well, maybe the class as a whole in general relied, but Mr.

24  Shinners didn't rely.  Look at the e-mail with Garza."

25          And you say, "Objection, Judge.  They can't do that.

1　The jury already found reliance on a class-wide basis.  The

2　Seventh Amendment does not allow this second jury to reexamine

3　it."

4　　　　　What do I do about that?

5　　　　　MS. CHEN:  Well, so we would say first that Mr. Fraser

6　is still able to discuss with the class representatives common

7　evidence as to reliance and ask them whether they individually

8　did rely.  So exploring the issue of whether they relied --

9　　　　　THE COURT:  So you're saying Mr. Fraser can explore

10　the named Plaintiffs' own reliance in this trial.

11　　　　　MS. CHEN:  But using the common evidence.

12　　　　　THE COURT:  So -- yeah, but here's the problem with

13　that:  The problem with that is if that issue's on the table --

14　and by "that issue" I mean the named Plaintiffs' reliance,

15　period, not their reliance on behalf of the class but their

16　reliance on behalf of themselves.  If that issue is to be

17　decided by the jury in this trial, then subject -- maybe

18　there's a Rule 403 argument, but it's very difficult for me

19　then to justify preventing the Defendant from questioning them

20　about their e-mails because those e-mails may go to the heart

21　of whether these Plaintiffs rely.

22　　　　　And so you're saying, "Judge, don't let them do that."

23　I'm just wondering, how on earth could I justify that?

24　　　　　MS. CHEN:  So I think Your Honor's correct that a lot

25　of these exhibits also go to Rule 403 issues where the

1   probative value of them as to an individual named Plaintiff's

2   reliance is low.  They don't actually show, in our view, that

3   the named Plaintiff either had knowledge or did not rely on

4   misrepresentations.  In fact --

5          THE COURT:  Well, what about -- let me ask you this:

6   What about Mr. Shinners' lengthy negotiation with Mr. Garza

7   about coming to the company and some executive role and it's

8   got like seven paragraphs and it's on and on and on about -- I

9   mean I haven't read every word of that e-mail, but if I'm on

10  the jury and I see that e-mail, I'm like, wow, this guy was

11  like an insider.  You know, he knows a lot about the company.

12  He's negotiating with them.  He really knows a lot.  He knows

13  Garza personally.

14         If I'm on the jury, in my mind I'm thinking, he's not

15  just the average Joe in Australia who's buying this stuff on

16  the internet.  He knows these people.

17         Now, maybe he was duped too.  Maybe he was tricked

18  too.  He believes stuff.  But my thinking about him, about

19  whether he relied, is certainly different from my thinking

20  about the guy in Australia who's just doing this because he's

21  on the internet a lot.

22         I mean I would want to know, if I was on the jury, if

23  somebody was, you know, calling Mr. Garza "Josh" and, you know,

24  negotiating, you know, an employment deal with him.  That would

25  be important to me.  Would it be dispositive?  I don't know.

 1  But it would be important for me to know.

 2          So what do I -- so you're saying, just so I'm clear --

 3  I thought your position was, "No, Judge, this is about

 4  class-wide issues alone.  This is not about whether individual

 5  Plaintiffs rely," which is what I understood to happen in the

 6  *WorldCom* case, by the way.  The judge does not have a

 7  full-blown liability trial.

 8          The judge said, "This first trial is about class-wide

 9  reliance.  We'll deal with individual reliance later."  So it

10  was actually like an issue-specific trial.  It was not a

11  full-blown liability trial.

12          But now what I hear you saying is, "No, Judge, we want

13  a full-blown liability trial.  We just don't want you to

14  include certain evidence in that trial."  Is that your

15  position?

16          MS. CHEN:  So I'll have to look at the *WorldCom* case,

17  Your Honor, to see what kind of judgment came at the end of

18  that trial.  But I think our position is that there's a -- the

19  cumulative nature of all of the evidence that Mr. Fraser wants

20  to assert against the named Plaintiffs is -- and kind of the

21  very low probative value of much of that evidence --

22          THE COURT:  Okay.  Suppose I disagree with that

23  though.  I just want to be very clear on your position.

24          Is it your position that this trial should be a

25  liability trial in the full sense of the word, that is to say,

1    that it should cover all issues related to the class and all

2    issues of liability, including reliance and including

3    individual defenses related to the named Plaintiff?  Is that

4    what the trial -- should the jury decide all of those issues in

5    this trial?  It's really a yes-or-no question.

6             MS. CHEN:  So we absolutely believe that the jury

7    should decide class-wide liability as to Mr. Fraser.  As to the

8    named Plaintiffs personally, if Mr. Fraser is only asserting

9    affirmative defenses as to the named Plaintiffs, as he seems to

10   be, that that might be a different issue.  But we do believe

11   there should be a verdict and a judgment after that.

12            THE COURT:  There's not going to be a judgment, just

13   so we're clear.  There's not going to be a judgment because

14   there's no damages.

15            MS. CHEN:  Pardon me.  A verdict as to liability

16   against the class as a whole.

17            THE COURT:  Fine.  But that will include the jury's

18   determining as an individual matter that the three named

19   Plaintiffs relied.

20            MS. CHEN:  The jury -- I think our argument is if the

21   jury -- if Mr. Fraser's -- yes, I think that is true.

22            THE COURT:  Okay.  And so -- all right then.  So

23   basically the jury -- when the jury gets done with this case,

24   there aren't going to be any more issues of reliance, of this

25   trial.  That's it.  They're going to decide reliance not only

1    as to the class but as to the three named Plaintiffs; correct?

2              MS. CHEN:  Correct.

3              THE COURT:  That's how you see it, fine.

4              So then what about the individualized defenses, in

5    pari delicto, those defenses?  Should those be part of this

6    trial?

7              MS. CHEN:  I think our answer is no, because as Your

8    Honor wrote in your class cert order, for example, cases --

9    other cases have found that even if individualized affirmative

10   defenses are part of the defenses case, they can be tried

11   separately.

12             THE COURT:  Okay.  So your view is, fine, this should

13   be -- so that's -- this should be a full-blown liability trial.

14   Once this trial is over, there's no question about Mr. Fraser's

15   liability to the class or to any class member.  That's it to

16   the individual Plaintiffs.  That's it.  It's over.  We're not

17   going to explore reliance in a later trial.

18             But with regard to defenses, that's different; and

19   damages, that's different.  That's the Plaintiffs' position.

20   Yes?

21             MS. CHEN:  Yes.

22             THE COURT:  Okay, fine.  So let's talk about that then

23   before we get to the individual defenses.  So then let's hone

24   in on some of this evidence.  Okay?

25             So I'm trying to remember it all.  So you've got Mr.

```
1    Shinners negotiating this agreement with Garza.  You've got him
2    working on the white paper; right?  He's editing the white
3    paper.  You've got Pfeiffer sending the thing to the reporter
4    about the Wild West.  You've got these, you know, really pieces
5    of evidence to which only a couple people are privy, including
6    the named Plaintiffs.
7            But the Defense would argue -- and I don't think
8    unreasonably -- that these go to reliance because these show
9    these guys had a level of sophistication.  They had, in
10   Shinners' case, you know, they knew people at the company; they
11   actually were negotiating with the company.  Isn't that
12   critical to the jury's assessment of reliance?
13           MS. CHEN:  Well, I would just point out first that the
14   Pfeiffer e-mail that Your Honor just referenced is after the
15   close of the class period.
16           THE COURT:  Okay, fair enough.  Put that one aside.
17   What about the others?
18           MS. CHEN:  As to Mr. Shinners, if Mr. Fraser's theory
19   is that --
20           THE COURT:  Although, although -- sorry.  I don't want
21   to put that aside so quickly.  I mean the e-mail -- one of the
22   things the e-mail demonstrates is his knowledge, and I'm not
23   sure that an e-mail showing knowledge after the class period
24   wouldn't still be relevant because unless somebody could show,
25   well, he gained that knowledge after the class period -- in
```

1   other words, that e-mail could be reflective of things he knew

2   during the class period.

3        I don't know.  You folks know the evidence better than

4   I do.  So maybe there's another e-mail like it or there's some

5   other thing where he shows sophistication and taken together

6   they're consistent.

7        I would certainly listen to an argument by the Defense

8   that, "Judge, just because it falls a few days after the class

9   period doesn't mean it's not relevant.  It's suggestive of his

10  knowledge."  So I'm not going to give that one up so quickly.

11       But tell me, why are these things not critical to the

12  issue of reliance?

13       MS. CHEN:  So if Mr. Fraser's theory is that because

14  Mr. Shinners, for example, knew Mr. Garza personally and,

15  therefore, because of that relationship, just because of that

16  relationship and the fact that he negotiated a job, which

17  actually never materialized --

18       THE COURT:  And edited the white paper.

19       MS. CHEN:  And helped edit the white paper.  And if

20  Mr. Fraser's theory is because of that Mr. Shinners must have

21  somehow known of the fraud, that is actually a pretty large

22  inferential leap.

23       THE COURT:  It may be.  It may be without more that --

24  I agree that that doesn't by itself prove that he knew of the

25  fraud.  But if I were on the jury trying to figure out, did

1     these people rely on these statements? I would want to know

2     about Mr. Shinners' situation.

3          And this isn't to be critical of Mr. Shinners.  He may

4     be more of a victim here than anybody else.  I don't know.

5     Because he, in fact, trusted these folks more than other people

6     did.  I'm sure that will be what you tell the jury.  That will

7     be for the jury to decide.

8          But if I'm on the jury, I still want to know, wait a

9     minute, this guy isn't some -- somebody who -- you know, some

10    faceless class member who was just relying on what Mr. Garza

11    said in The Wall Street Journal, didn't know who Mr. Garza was,

12    didn't know really that much about the business.

13         This guy -- this guy is a smart guy.  He's negotiating

14    this deal with the company, trying to get a job.  Maybe he

15    didn't get the job, but he's e-mailing with Garza on a

16    day-to-day basis.  Maybe it's not day to day, but he e-mails

17    with Garza.  He's editing the company's white paper.

18         Gosh, I would want to know about that if I was on the

19    jury because I would say to myself, maybe he relied.  Maybe he

20    really was duped.  But I'm going to think about that in a very

21    different way from the way I think about somebody who just read

22    The Wall Street Journal and saw the article on Garza.

23         Wouldn't you?  If you were on the jury, wouldn't you

24    want to know that?

25         MS. CHEN:  But yet Mr. Fraser has something like 60

1    exhibits specific to Mr. Shinners on his exhibit list; so if

2    this were an information that is relevant to the jury,

3    nonetheless, they don't need to see, you know, 60 something

4    exhibits.

5         THE COURT:  Okay.  I haven't gone through all of them

6    yet, so maybe it would reach a point where it's cumulative.  I

7    can certainly agree with you there.  I'd like to keep the trial

8    efficient.

9         But I think as just as a matter of principle, I'm

10   going to be -- given what we've discussed, given what you said

11   your position is as to the scope of this trial, I'm going to be

12   inclined to let exhibits in that tend to show that these named

13   Plaintiffs were sophisticated; that they were -- that they knew

14   people at the company; that they were taking stands on behalf

15   of the company on the internet; that, no, no, this is a real

16   thing.

17        This is -- I think it's for the jury to decide

18   whether, as I imagine the Defense may suggest, that, "No,

19   Judge.  If anything, these people were in on it."  I don't know

20   how the trial's going to go.  But it wouldn't surprise me if

21   they took that position.  I don't know if it's one that's going

22   to be supported by the evidence.  But so, yeah --

23        MS. CHEN:  I think maybe what's -- maybe what is at

24   issue here is an exhibit-by-exhibit type of analysis of whether

25   that exhibit is sufficiently probative of the issues that Mr.

1  Fraser --

2          THE COURT:  Okay, fair enough.  And that's my job to

3  do that analysis, so I certainly will.

4          MS. CHEN:  And I think our overall point is just if

5  the issue is whether Mr. Fraser is liable to these individual

6  named Plaintiffs based on their individual knowledge that is

7  specific to them, then that is -- if that is -- if that --

8          THE COURT:  But you've told me that that's in this

9  trial already.

10         MS. CHEN:  Yes, Your Honor.

11         THE COURT:  So I don't see how you can take that back

12 now.

13         MS. CHEN:  Yes, Your Honor.  I think our overall

14 point, though, is that is one issue that if is needed -- if the

15 jury needs to explore that issue in order to render a liability

16 verdict in this trial, then, yes, we can explore those issues.

17 But that is not the only issue; and, in fact --

18         THE COURT:  I hear you.

19         MS. CHEN:  -- it is a small issue compared to the

20 broader issues.

21         THE COURT:  I hear you.  And I can certainly manage

22 it, but I don't think the way to manage it is to keep all those

23 exhibits out because I definitely think they're entitled to

24 explore -- given what you told me is involved in this trial,

25 they're entitled to explore individualized reliance with these

1     named Plaintiffs.  You've told me that's part of this trial.

2     So let me hear from Defense counsel about the issue of

3     defenses.  Then I'll give you the last word on that.

4              So I think despite my best efforts to combat you,

5     you've won on the first issue.  Anyway, obviously, you all are

6     smarter than I am because I did not think that was the way this

7     was going to go.  And it does help avoid the Seventh Amendment

8     problem; so that I'm very appreciative about.

9              Now let's talk about the defenses, okay?  So why

10    should in pari delicto, unclean hands, and things like that be

11    part of this trial given the potential that the more I allow

12    you to besmirch, attack, whatever you want to call it, the

13    named representatives, the bigger the risk becomes that the

14    jury finds against the class because of stuff the named

15    representatives did?  That's my concern about bringing some of

16    that stuff in.

17             That said, I will say I now have to rethink the

18    exhibits a little bit because some of the exhibits I may have

19    just discussed with Plaintiffs' counsel may go to multiple

20    issues.  But let me hear you on why the defenses should be part

21    of this trial.

22             MS. HASSAN:  So, Your Honor, especially where we are

23    now, if issues of individual reliance are on the table as well

24    for the three class representatives, I think one is an

25    efficiency point.  It doesn't make sense to have mini trials

|    |                                                                      |
|----|----------------------------------------------------------------------|
| 1  | for just these three class representatives afterwards in order       |
| 2  | to deal with the affirmative defenses, especially where -- and       |
| 3  | I think this is the second point.  As we showed in our brief,        |
| 4  | almost all of the exhibits that Plaintiffs cited in their brief      |
| 5  | as going to affirmative defenses against the three class             |
| 6  | representatives, they actually are relevant to other issues of       |
| 7  | liability as well, class-wide liability.                             |
| 8  |          THE COURT:  Right.                                           |
| 9  |          MS. HASSAN:  So it's the same evidence.  All three          |
| 10 | class representatives will be right there.                           |
| 11 |          And I think in terms of any concern about how that          |
| 12 | might color the jury's perceptions, I think the Court could          |
| 13 | instruct very clearly, you know, this is all -- this applies to      |
| 14 | the class as well, but now we're just talking about these four       |
| 15 | discrete very similar affirmative defenses which can be at the       |
| 16 | end of the jury instructions, can be at the end of the verdict       |
| 17 | form so it's very clear to them that this is a determination         |
| 18 | just of the three people that we heard from.  So I think that's      |
| 19 | how that could be managed.                                           |
| 20 |          THE COURT:  So let me ask you a question about that.        |
| 21 | Suppose the jury comes back with a Plaintiff's verdict with          |
| 22 | respect to the class, finds reliance and all that, but then          |
| 23 | finds against each of the three named Plaintiffs on the             |
| 24 | individual defenses.  I haven't looked at your verdict forms         |
| 25 | yet.  They must be extremely complicated.  What is the result        |

```
1   of that trial?
2              MS. HASSAN:  Well, Your Honor, in that case, it would
3   have already been determined that the three class
4   representatives have no surviving claims against Mr. Fraser.
5   Like, it's done with them; right?
6              THE COURT:  Correct, because the defenses would have
7   been sustained.
8              MS. HASSAN:  Exactly.  But we're still left with
9   having to deal with the class and any remaining issues that
10  pertain to the absent class members.
11             THE COURT:  And so Plaintiff's counsel would have to
12  find a new class representative basically.
13             MS. HASSAN:  That's correct, Your Honor, because I
14  don't think that -- if those three don't have any claims
15  against Mr. Fraser, they cannot represent the absent class
16  members anymore.
17             THE COURT:  That may be right, although one question
18  is whether it matters at that point -- I don't know -- since at
19  that point we might have individualized damage trials anyway.
20  I don't know.  But I just wanted to get your sense of that.
21             Your position is -- just so I'm clear, your position
22  is there would be -- in my hypothetical and just to lay it out
23  again, jury finds, before they reach defenses, they find
24  liability against Mr. Fraser, period.  But then when they reach
25  the individual defenses, they find against each of the three
```

1   named Plaintiffs as to one or more of the defenses, complete

2   defenses.

3          At that point, you agree with me that the named

4   Plaintiffs will have lost their case.  They will be, in effect,

5   done.  They will not be entitled to any damages, etc.

6          But the class will have won its -- the liability

7   phase, and the class will move on to whatever the Court

8   determines is necessary for damages; is that correct?

9          MS. HASSAN:  That's correct, Your Honor.  I mean I

10  haven't looked at exactly what happens in this kind of

11  situation, but that seems to be the practical next step to me.

12          THE COURT:  Okay.

13          MS. HASSAN:  If I may, just we referred to two of the

14  cases which Plaintiffs have, *In re WorldCom* and *ICN*.  Again,

15  just to emphasize the efficiency point, as far as I recall,

16  plaintiffs were not trying to call any of their cross

17  representatives in the class-wide trial.

18          This is very different.  All three of them will be

19  right here.  So if we're dealing with everything, it seems to

20  me that we can also deal with and get done with the affirmative

21  defenses.

22          THE COURT:  Let me hear from Plaintiffs' counsel.

23          MR. ARD:  Yes, Your Honor.  Seth Ard for the

24  Plaintiffs.  Just one point there, I think we can agree on

25  that.

1          THE COURT:  Agree on what?

2          MR. ARD:  On the last point she has raised.  If for

3     efficiency purposes it would make sense if this stuff about

4     individualized evidence is coming in, might as well try the

5     affirmative defenses.

6          THE COURT:  Okay.  So we should try it all together.

7          MR. ARD:  I would say.  Though since some of these

8     issues weren't briefed, it may make sense for us to talk about

9     it.

10          THE COURT:  Just to be clear, given my discussion with

11     your colleague and given what we've kind of sussed through, you

12     no longer take the position that we should have a separate

13     trial with regard to affirmative defenses?

14          MR. ARD:  Correct, Your Honor.  And our position will

15     be that, you know, if they fail on these affirmative defenses,

16     there's nothing left for them to do for the other class

17     members.  They've taken their best shot, and there's nothing

18     left to do.  That will be our position.  There will be no more

19     affirmative defenses.  Otherwise, this will go on forever.

20          THE COURT:  But in my scenario you could still find

21     another class representative -- you don't need one.

22          MR. ARD:  I don't think you need one.

23          THE COURT:  If it's individual trials, right.

24          MR. ARD:  If they lose on those individualized

25     defenses, then, yeah, each individual class rep would come up;

1    and they could try the individualized defenses, reach one of

2    those.  But if we win this trial, then it's done.

3            THE COURT:  Yeah.  The Defense might want to say,

4    "Judge, we didn't assert individualized defenses as to class

5    members as well."  What would prevent them from doing that?

6    "Because it's a class action" I heard your colleague say.

7            MR. ARD:  Yes, because it's a class action, and they

8    would have taken their best shot at this trial.  If they can't

9    win now --

10           THE COURT:  What about that?  Let me hear from you on

11   that.  Essentially what they're saying is, look, what's good

12   for the goose is good for the gander.  We're having individual

13   issues decided about the three named Plaintiffs, and we're

14   having class issues decided in this trial.  Defense should be

15   stuck with that.  They shouldn't be allowed to assert

16   affirmative defenses as to individualized class members later.

17   What about that?

18           MS. HASSAN:  Your Honor, we're not suggesting -- we

19   were very careful in framing our affirmative defenses against

20   the three class representatives only.

21           THE COURT:  Yeah.

22           MS. HASSAN:  We only know about their conduct.  So

23   whatever decision the jury makes about their conduct, it

24   doesn't extinguish our right to then in the individualized

25   stages be able to say, okay, give us evidence to be able to

1   assess whether we have any affirmative defenses.

2          Just as an example, if --

3          THE COURT:  Yeah, I hear you.  I think -- I think --

4   Mr. Ard, let me ask you about that.  Suppose they come up with

5   a member of the class -- suppose, just the hypothetical is jury

6   finds in favor of the class and rejects the -- sorry.  Jury

7   finds in favor of the class, and jury finds that the defenses

8   were not sustained at the trial.  In other words, you win

9   across the board at this trial.

10         And then we get to an individual -- we have some

11  proceeding, later yet-to-be-defined proceeding, and we have a

12  class member who turns out to be an employee or former employee

13  of Garza at GAW -- although I guess that's defined out of the

14  class, so maybe I can't do that.

15         MR. ARD:  Correct.

16         THE COURT:  Okay.  But turns out to have, okay,

17  resold -- more than any other class member resold these

18  products and done really well; and, of course, they weren't

19  registered securities.  You're saying, "They can't get into

20  that, Judge"?

21         MR. ARD:  Well, two things, Your Honor.  First,

22  speculation about potential individualized defenses is never

23  enough to decertify a class.  Second, and the main point, is

24  the way this would normally work, you get a classified verdict.

25  It's done except for damages, of course.

1           THE COURT:  Yeah.

2           MR. ARD:  And they then, if they wanted to, post

3  trial, could file a motion to decertify as to X, Y, or Z

4  because of A, B, or C issue.  That's how it works.  That's how

5  it normally works, and that's how it should work here.

6           So if they think again that there's some reason that

7  the class verdict was inappropriate and there's some

8  individualized issues that still need to be resolved, then they

9  can file a motion to decertify at that point.  That's the way

10  it normally works, and I think that's why it's premature at

11  this point to even deal with this.

12           THE COURT:  It does strike me as premature to try to

13  suss this all out now.  In other words, ultimately I'll have to

14  decide what the effect of a verdict's going to be.  So yeah.

15           Anyway, I think we've gotten past this one, which

16  surprises me, because I thought this would be even more

17  complicated than it was.  Let's move on to what I regard as an

18  easier one, but I could be mistaken again, which is the issue

19  of Mr. Garza's deposition testimony, because I know you wanted

20  me to resolve that.

21           So on this one, I think the language of the rules are

22  pretty clear.  I would start with the Defense here because I

23  think that the language of the rules are pretty clear.  I think

24  that it says basically that they can put in his testimony

25  because he's a hundred miles away.

1          But you tell me.  I didn't see any discretion in the

2     rule about this.  But maybe you'll tell me I'm wrong.  And I

3     looked at those cases that suggest I have discretion.  They

4     don't involve precisely this situation that I recall, but go

5     ahead.

6          MR. WEINSTEIN:  Marc Weinstein, Your Honor, for

7     Defendant.

8          THE COURT:  Yes.

9          MR. WEINSTEIN:  We are not asking the Court to build

10    in some kind of availability test or even that it's up to

11    Plaintiffs to have made the effort.  The question that we say

12    is, you do have discretion.  The rule says "may."  There are --

13         THE COURT:  It says the plaintiff may use -- sorry --

14    it says -- not the plaintiff.  It says a party may use a

15    deposition.  It doesn't say the court may allow a deposition,

16    which is the way you seem to be reading it.

17         MR. WEINSTEIN:  Well, it clearly doesn't say that, but

18    it also doesn't say that the court doesn't still have

19    discretion on an issue of evidence like this.

20         THE COURT:  But if a party may use a deposition,

21    doesn't that mean a party is entitled to use a deposition?

22    Isn't that what "may" means in that context?  It's not "might"

23    or "might not."  "May" means you're allowed to.

24         MR. WEINSTEIN:  It also doesn't say "entitled," so --

25         THE COURT:  Okay, that's fine.

1          MR. WEINSTEIN:  It's a possibility they have -- they

2     can bring to the Court that issue that they'd like to use

3     deposition testimony.

4          THE COURT:  Yeah.

5          MR. WEINSTEIN:  Your Honor, there are cases that say

6     it is within the Court's discretion, several cases --

7          THE COURT:  Even when the person is a hundred miles or

8     more away?  Of course, I'm aware there was one case you cited

9     -- I'm not sure if it was also Judge Cote maybe in the Southern

10    District where she said, well, basically the defendant was, as

11    I recall, trying to force the plaintiff to use deposition

12    excerpts when the defendant intended to call the witnesses

13    live.  And the judge said, no, no, no.  If the witnesses are

14    coming live, they're coming live for the plaintiff too.  Now,

15    that's just trial management.

16          And here, though, this guy's not coming live.  I mean

17    the Plaintiffs don't want to put him on live.  He's more than a

18    hundred miles away.  How can I prevent them -- what authority

19    would I have under these circumstances to prevent them from

20    using the deposition in this manner?

21          MR. WEINSTEIN:  Your Honor, first of all, I do

22    acknowledge that that *Moran* case, which was the Judge Cote

23    case, those facts are a bit different.  There seems to be

24    gamesmanship going on there.  Understand that's different,

25    although the case still essentially on a broader level stood

1    for the proposition that having live witnesses, especially key

2    witnesses, is something that the Court should take into

3    account.

4           The cases that say Your Honor has the discretion, and

5    they were cited I think by the Plaintiffs, *In re Decade*, which

6    also in Footnote 93 of that decision cites another opinion.

7    There's a decision by the First Circuit, I believe, *Fairfield

8    v. Dwek*.

9           Then there's two other cases, Your Honor, that we had

10   not cited but where the courts did, in circumstances where the

11   witness was beyond a hundred miles, prevented the plaintiff --

12   or the party from putting on deposition testimony.  One is the

13   *Skins and Leather Company* case.  I site that just to say it's

14   nice to say "Skins and Leather" in court.  It's 246 B.R. 743

15   from the Northern District of New York.

16          THE COURT:  B.R., bankruptcy?

17          MR. WEINSTEIN:  Yes.  And the decision is an

18   affirmance of the bankruptcy court's decision.

19          THE COURT:  246 sorry?

20          MR. WEINSTEIN:  Yeah, B.R. 743, Northern District of

21   New York from 2000.  And the Court said that given that the

22   trial court's concerns, particularly on the issue of

23   credibility, it cannot be said that the court abused its

24   discretion in denying defendant's request to use videotaped

25   testimony at trial.

1    There's also *Latson*, L-a-t-s-o-n, *v. Clark*.  It's 2018

2    Westlaw 2293197, 2018, case from Western District of Virginia.

3    Similar issues there where the Court was quite concerned with

4    credibility.

5    The point here I think for this particular case --

6    every case is different on its facts.  There is essentially

7    going to be no live testimony for this jury on the issue of Mr.

8    Fraser's liability on control, other than his own testimony as

9    the Defendant.  They're not putting forward a single witness to

10   testify live.  There really is only one witness.

11        THE COURT:  And you could certainly argue that point

12   to the jury.

13        MR. WEINSTEIN:  Understood.  We can make the argument,

14   but what they can't do is assess the credibility, the demeanor

15   of the one person who's going to point the finger at Mr.

16   Fraser.

17        THE COURT:  Isn't it going to be video depo?

18        MR. WEINSTEIN:  It is videotaped, I think which is

19   better than reading a transcript for sure.  It's not a

20   substitute for live testimony.

21        THE COURT:  I agree.  Don't get me wrong.  Live

22   testimony's always better.

23        MR. WEINSTEIN:  A witness in a vacuum in a conference

24   room with not having to testify in front of a federal district

25   court judge and a jury and then observing the witness's

```
1    demeanor and credibility in that setting.  So it's just a
2    different case than most of the cases they cite.
3          In fact, just for comparison sake, Your Honor, they
4    site Aristocrat Leisure.  There the judge, you know, was also
5    mindful of the jury's role assessing witness credibility,
6    allowed the use of the depositions anyway over the objection
7    but specifically said because the deposition designations were
8    limited editions to the live testimony that will be presented.
9          THE COURT:  Yeah, personally, I wouldn't have done
10   that.  If the witness was alive, he testifies live.
11         MR. WEINSTEIN:  No, I think what that meant was there
12   was a lot of live testimony, and these were just additional
13   some short deposition designations so we're going to let that
14   go in as well.
15         THE COURT:  I wouldn't do that.  I would say the
16   witness testifies, one or the other.
17         MR. WEINSTEIN:  My understanding was it wasn't a live
18   witness and their deposition testimony.  I think it was
19   different witnesses.  There were live witnesses and then
20   allowing --
21         THE COURT:  I misunderstood.
22         MR. WEINSTEIN:  -- allowing a little bit of the
23   designation.  Here it's the complete opposite.
24         THE COURT:  Skins and Latson are the two additional
25   cases you had for me?
```

1          MR. WEINSTEIN:  Yes, Your Honor.

2          THE COURT:  I will look at them and get a ruling out

3    probably by Monday.  Okay?

4          MR. BUCHDAHL:  Your Honor, can I speak on this?

5          THE COURT:  Sure, briefly.

6          MR. BUCHDAHL:  Thank you, Your Honor.  Can I hand up a

7    couple slides?

8          THE COURT:  It's a simple issue really.  Just tell me

9    what you want to tell me.

10         MR. BUCHDAHL:  Okay.  First of all, they -- I haven't

11   looked at the cases they cited.  Obviously, I don't know what

12   it is; but if you look at the cases cited in their brief, they

13   didn't cite a single case where a court disallows somebody from

14   testifying.

15         THE COURT:  I'm aware.  That's why I asked about these

16   two cases.

17         MR. BUCHDAHL:  Okay.  And then, you know, he was

18   deposed after he pled guilty before his criminal sentence.  At

19   the time of the deposition, everybody expected that that was

20   going to be the trial deposition.  The original setting for

21   trial was in August 5th, 2020, when he was still in the custody

22   of the BOP.  Everybody expected that his deposition was going

23   to be the deposition, was going to be videotaped and used at

24   trial.  That was the expectation at the time.

25         THE COURT:  You guys took a deposition while he was at

1    the BOP?

2            MR. BUCHDAHL:  No, before.  After he pled guilty.  So

3    we knew he was going to be going to prison but before he was

4    sentenced.  So everybody expected that he was going to be

5    unavailable.

6            THE COURT:  He was examined and cross-examined by both

7    sides?

8            MR. BUCHDAHL:  Examined and cross-examined by both

9    sides.  And, again, this was the expectation.  This was going

10   to be the trial testimony.

11           But the most important point is that he's in

12   supervised release right now.  And Defendants should know that

13   because if you look at the criminal docket -- this is actually

14   on the slide.  Let me put it on the ELMO.

15           THE COURT:  There's a travel restriction.

16           MR. BUCHDAHL:  Travel restriction.  He's in the

17   Western District of Texas.  He is on supervised release period

18   of three years.  They should know this because it's on the

19   criminal docket.  They actually drew some defense exhibits from

20   saying he's on supervised release.  They know he is in Texas.

21   He is in Texas.

22           I spoke with his criminal counsel.  She said he's

23   under restrictions.  He's not allowed to leave the Western

24   District of Texas.  And that I think should put the end to it.

25           THE COURT:  He probably could get permission, but I

1    hear you.  It would require another judge to allow him.

2              MR. BUCHDAHL:  Judge Chatigny, exactly, Your Honor.

3              THE COURT:  Yup.

4              MR. BUCHDAHL:  That's another problem here.

5              THE COURT:  He's still under supervision here?  The

6    whole case hasn't been transferred?

7              MR. BUCHDAHL:  I don't know that.

8              THE COURT:  It's probably a judge in the Western

9    District of Texas.

10             MR. BUCHDAHL:  Maybe.

11             The other thing I want to say, they misinterpret what

12   our agreement with Mr. Garza says.  They seem to think that we

13   could force him to come.  Obviously, we can't force him to come

14   because he's under supervised release.

15             And more to the point, if you look at the actual

16   agreement, it doesn't say that we can -- that he has to come if

17   we reasonably request him to.  It says he can only come if we

18   reasonably require him to.  The language "reasonably requested"

19   is used twice beforehand for other things.  So if we reasonably

20   request him to do a witness interview, he has to do it.  He --

21             THE COURT:  I gotcha.  I get the point.  I'm going to

22   take a look at these two cases.  Then I'll get a ruling out.

23             Let's move on to the next one.  So and this is sort of

24   hopefully a short one too, so I'll cover it.

25             There's this Motion in Limine to Preclude Evidence

1    Regarding the Honors Program.  And the Plaintiffs point out, at

2    least from what I could see, I only saw one exhibit about this,

3    although I confess I haven't been through all the exhibits even

4    those you sent to chambers yet because you, quite rightly,

5    directed me to focus on the motions in limine.

6            So the only one that comes to mind, I'm sure there may

7    be others, but is this set of Tweets and I guess Retweets by

8    Mr. Fraser, of which the last in a series from, I believe,

9    January 2015 is his Retweeting "Pay" -- excuse me -- "PayBase

10   Honors $20 Paycoin."

11           First of all, let me ask Defense counsel, is there

12   some other evidence that you're contemplating here with this

13   motion or is that it?  What about that?

14           MR. WEINSTEIN:  Not that we know of, Your Honor.

15   There had been another exhibit on an initial list that was much

16   more extensive about --

17           THE COURT:  The Honors Program.

18           MR. WEINSTEIN:  I think it was withdrawn.

19           THE COURT:  Okay.  So this is what we're talking about

20   then.  So the Tweets that I saw are a series of Tweets where,

21   you know, I guess I would describe it colloquially as Fraser's

22   kind of cheerleading for GAW and Garza saying, Hey, it's great.

23   2021 -- or not 2021.  2015 is the new year.  Watch Paycoin in

24   2015 and pay -- GAW's doing great, that kind of thing.  Maybe

25   not even that much.  And this seems to be the last in a series

1    kind of.

2           I guess my question, candidly, is:  What's the big

3    deal?  I mean the other stuff is going to come in -- right? --

4    the other Tweets.  Is this last Tweet you're really worried

5    about?

6           MR. WEINSTEIN:  Well, it would depend -- excuse me --

7    if they were going to make arguments on it, depending on what

8    those arguments were, I think we had a suggestion.

9           THE COURT:  Sure.

10          MR. WEINSTEIN:  In the brief to just redact out that

11   piece, which we're fine with.  If there are --

12          THE COURT:  And your argument is the Honors Program

13   post dates the class program so it's not relevant.

14          MR. WEINSTEIN:  Correct.

15          THE COURT:  Okay.  Mr. Ard, are you going to speak?

16          MR. ARD:  I'm sorry, Your Honor.

17          THE COURT:  Do you want to address this issue?

18          MR. ARD:  If you don't mind, Your Honor.

19          THE COURT:  Sure, yeah.

20          MR. ARD:  May I approach?

21          THE COURT:  All right.  All right.

22          MR. ARD:  I spent so much time on these slides.

23          THE COURT:  I know you guys like these slides.

24          MR. ARD:  Hopefully they're helpful, Your Honor.

25          First of all, Your Honor, to correct this last

1    statement, this Tweet happened during a class period.

2            THE COURT:  Oh, it did.

3            MR. ARD:  Yeah.  It is -- this slide is a little hard

4    because --

5            THE COURT:  It's hard to see.

6            MR. ARD:  Let me see if I can make this bigger.

7            THE COURT:  January 19th?

8            MR. ARD:  Exactly.  And this Tweet is on January 12th,

9    2019; so it's during the class period.  The idea that they want

10   to get rid of any mention of the Honors Program is far-fetched

11   because the Honors Program was simply a continuation of the

12   same lie that's essentially in this case, which is that the

13   companies that were jointly owned by Mr. Fraser and Mr. Garza

14   were going to put a floor of $20 for Paycoin.  That's the lie.

15   That's one of the essential lies of this case.

16           And what this Tweet shows -- and mind you, I don't

17   think they produced this Tweet in discovery -- is that Mr.

18   Fraser was promoting that lie, that $20 lie, all the way to the

19   bitter end, all the way to the bitter end of this case.

20           THE COURT:  Yeah.  Let me stop you.

21           MR. ARD:  Yeah.

22           THE COURT:  It's Mr. Weinstein; right?

23           MR. WEINSTEIN:  Yes, Your Honor.

24           THE COURT:  So I guess I was wrong to suggest it was

25   outside the class period.  What's the basis for not allowing

1    this?  I mean Mr. Ard has kind of laid out succinctly the case

2    for it.  What's the case -- if it's within -- first of all, do

3    you dispute it's within the class period?

4              MR. WEINSTEIN:  No, Your Honor.  And I apologize.

5              THE COURT:  Okay.

6              MR. WEINSTEIN:  I agreed with Your Honor.

7              THE COURT:  That was my fault then.  So why isn't this

8    otherwise relevant?

9              MR. WEINSTEIN:  So as explained in our brief, Your

10   Honor, you know, the ruling that Your Honor made on class

11   certification, you declined to extend the class period based on

12   the Honor Program.

13             THE COURT:  Yeah.

14             MR. WEINSTEIN:  And you explained that the program is

15   not mentioned in the Complaint or the briefs.

16             THE COURT:  But this doesn't actually -- this uses the

17   word "Honors."  But if I'm on the jury and I see this, I'm not

18   going to think there's something called the Honors Program

19   because that's not what this says.  This just says, "PayBase

20   Honors $20 Paycoin."

21             I'm going to use "honors" in the sense of we'll

22   support promises to keep, etc.  I'm not going to think there's

23   some program about this.  I guess I don't see -- given what you

24   said, why I would think, if I'm on the jury, I'd be thinking

25   Honors Program, I wouldn't even know what that was based on

1    that.

2          MR. WEINSTEIN:  Correct, if there's no argument or

3    other evidence about that.  That's why I said before I think

4    that statement, whether that piece of that exhibit comes in or

5    not is partly dependent on --

6          THE COURT:  Okay.  So, Mr. Ard, tell us, are you

7    intending to put on other evidence about the Honors Program in

8    this case?

9          MR. ARD:  Well, Your Honor, it's certainly not

10   featured in this case, and I would think Mr. Fraser may explain

11   that's what he was referring to when he was asked about this

12   Tweet.  I don't know.

13         Their counsel thinks he is.  And so the question is

14   asked, what were we referring to.  I guess he would tell the

15   truth about it.

16         THE COURT:  I'm not sure you need it, though, given

17   what you just -- the way you interpreted this, which is --

18         MR. ARD:  Right.

19         THE COURT:  In other words, I think it gets across the

20   point you want to make without getting into there's the

21   program, etc.  But keep going.

22         MR. ARD:  Yeah, sure.  So on your class certification

23   motion, you didn't hold that the Honors Program was irrelevant.

24   All you held was that it wasn't a reason to extend the class

25   period past January 19th.

1          THE COURT:  Yeah, that's my recollection.

2          MR. ARD:  Right?  And so there's never a holdings it's

3    irrelevant.  How would it be irrelevant?  It's the same lie,

4    the lie they're going to honor this $20 Paycoin.  It's the same

5    lie that comes up during the case.

6          THE COURT:  Mr. Weinstein, what about that?  That is

7    my recollection of the ruling.  I remember discussing with my

8    law clerk whether -- she came to me and said, "Well, what about

9    this Honors Program, Judge?  Do we need to extend the class

10   period?"

11         I think we were close to done with the ruling.  And I

12   said, "Well, where was this raised?"  And it wasn't really

13   raised except by the fellow, nice young fellow who's no longer

14   with your firm.

15         MR. ARD:  Mr. Watterson.

16         THE COURT:  Yes, at the argument.  And there was some

17   other reason I think in a footnote.

18         But in theory, isn't it part of the Plaintiffs' case

19   that, look, they continued to sell this story about supporting

20   a $20 floor, and they called it the Honors Program?  I mean why

21   shouldn't they be allowed to get that fact in?

22         MR. WEINSTEIN:  Well, for two reasons.  One is it's

23   not alleged in the Complaint.  And secondly, they conceded

24   during the class cert period that they did not think that

25   announcement of the program boosted the price of Paycoin.

1          THE COURT:  Yeah, but just because -- I mean what Mr.

2     Ard would say, just because the lie failed doesn't mean it's

3     not evidence of a lie; right?

4          MR. ARD:  Yes, Your Honor, and of Mr. Fraser's

5     knowledge of the lie.

6          THE COURT:  Right.

7          So I guess I don't see why I should preclude evidence

8     of the Honors Program per se.  Now, if we start getting too far

9     down a rabbit hole of how it worked and all that, I might say,

10    well, we don't need that.  But to the extent it's tied to the

11    Plaintiffs' core theory of the case -- well, one of the core

12    theories of the case, which is this $20 floor was a fiction and

13    they perpetuated this fiction into early January and they

14    called that the Honors Program, I don't see why I shouldn't

15    allow that.  I mean it's just part of the case.

16         MR. WEINSTEIN:  It may depend, Your Honor, on whether

17    there's a limiting instruction.  I mean if it's not something

18    that they alleged to be part of the --

19         THE COURT:  But did they have to?  I mean they don't

20    have to, in their Complaint, describe all the evidence in the

21    case.  They just have to give you notice of what the case is

22    about basically, about the theories, about some of the facts

23    supporting the theories.  They have to allege plausible claims

24    and the like, but they don't have to describe all the evidence

25    in the case.

1          MR. WEINSTEIN:  Right, but if they conceded it had no

2    material impact because it didn't move the price, then what is

3    the relevance at that point?

4          THE COURT:  The relevance is that they perpetuated

5    this lie.  It didn't work, but they tried.  And it also is

6    relevant to Mr. Fraser's participation.

7          MR. WEINSTEIN:  Right.  So the reason why I'm

8    suggesting a limiting instruction is they can't find liability

9    based on a misstatement associated with the Honors Program.  I

10   understand you're saying it could go to credibility, which a

11   lot of issues --

12         THE COURT:  No, more than credibility.  It could go to

13   Mr. Fraser's knowledge of a scheme -- knowledge that the

14   statement that there's a $20 floor was a false statement.

15   That's more than credibility.  Now, the fact it didn't work is

16   something you would point out, sure.  But I don't see that

17   makes it irrelevant.

18         Okay.  I think I've got enough on that one.  I'm going

19   to deny the Motion in Limine on the -- to Preclude Evidence

20   Regarding the Honor Program.

21         And then let's move on to -- let's take like an

22   eight-minute break, use the facility, that kind of thing.  And

23   then we'll -- next up, just so you can get ready, why don't we

24   do the Motion in Limine to Preclude Plaintiffs from Arguing

25   Fraser's Liability Based on Hardware and Cloud-hosted Mining.

1    Okay?  So that's next up.  All right, eight minutes.

2        (Recess from 2:54 p.m. to 3:02 p.m.)

3            THE COURT:  So this is No. 258 on the docket, Motion

4    in Limine to Preclude Plaintiffs from Arguing Fraser's

5    Liability on Hardware and Cloud-hosted Mining.

6            First, it appears to me there's some common ground on

7    this one:  first, that hardware and cloud-hosted mining do not

8    form part of the claims in this case.  They're not -- those

9    products are not at issue.  They're not included in the class

10   definition.  And so Mr. Fraser cannot be held liable based

11   on -- based on statements concerning those products or at least

12   as concerns those products.

13           But I guess what I'm wondering is why that should mean

14   that all evidence concerning hardware and cloud-hosted mining

15   is irrelevant.  I mean so my understanding of the sequence of

16   events is Garza starts this company in Bloomfield.  He -- you

17   know, and maybe the timeline goes back even further because

18   Plaintiffs are going to want to try to introduce evidence of

19   Fraser.

20           MR. WEINSTEIN:  Can I interrupt just a minute?

21           THE COURT:  Sure.

22           MR. WEINSTEIN:  Just because I don't think there's any

23   disagreement.

24           THE COURT:  Fine.

25           MR. WEINSTEIN:  The argument was just that -- or the

1  motion was to prevent them from arguing liability based on
2  cloud-hosted or hardware mining.
3          THE COURT.  Right, but I think it's clear you're not
4  going to do that; is that right?
5          MR. RENNIE:  That's correct.  We're not intending to
6  argue that Mr. Fraser's liability for actionable
7  misrepresentations is sort of based on, you know, those two
8  statements, being the misrepresentation at issue and the, you
9  know, our sets of fraud claims.
10         MR. WEINSTEIN:  That's it.
11         THE COURT:  That's it?  Just so we're clear though,
12 some of that evidence -- and I'm trying to remember what that
13 evidence is -- oh, no, that's the other one.  That's the other
14 one.  Okay.  All right.
15         Well, if we're clear on that -- if you guys all get
16 that, that's good.  I'll grant that motion then, yeah, because
17 the way the motion's phrased, I think it's perfectly fine from
18 arguing Fraser's liability based on hardware and cloud-hosted
19 mining.  That will be granted.
20         Let's move to the next one on my list, Motion in
21 Limine to Preclude Plaintiffs from Arguing Fraser's Liability
22 Based on GAW Miner's Alleged Partnership with, and Acquisition
23 of, ZenMiner.
24         Now, this involves, I guess, principally two
25 statements --

1          MR. RENNIE:  I'm so sorry, Your Honor.  I thought that
2     was what you were just referring to in the previous.
3          THE COURT:  Oh, they were separated on mine, okay.
4     You're right, they are the same actually, aren't they?
5          MR. RENNIE:  Well, our answer is -- I don't know if
6     Defense counsel's answer is the same.  Our position is the
7     same as --
8          THE COURT:  But let's get to the statements themselves
9     just so I'm clear.  There's a statement about there's, I think,
10    a press release about the acquisition of ZenMiners by GAW, and
11    I guess there's some suggestion that this press release is
12    misleading because it suggests that they really are independent
13    companies, when, in fact, if I'm to understand the Plaintiffs'
14    brief correctly, they were both controlled by Garza and/or
15    Fraser, according to the Plaintiffs.
16         And are you -- on behalf of the Plaintiffs, are
17    you saying, "We're not going to try to introduce those
18    statements"?
19         MR. RENNIE:  No, Your Honor.  So there are two
20    statements at issue.  There's one in from May, which is an
21    article, and there's one from August 2014, which is the press
22    release.
23         THE COURT:  Okay.
24         MR. RENNIE:  So what we understood, you know,
25    Defendants' motion to be is, you know, element of a securities

1    fraud claim is you have a false representation.

2            THE COURT:  Right.

3            MR. RENNIE:  And so we are not intending to use these

4    two as sort of the misrepresentations at issue in our cause of

5    action.

6            THE COURT:  Right.

7            MR. RENNIE:  We have different misrepresentation we're

8    focusing on.  But I think, like Your Honor said, it doesn't

9    follow that that means any evidence relating to those

10   statements is relevant.

11           THE COURT:  Right, right.  So your intention is to try

12   to put in those statements for other purposes.

13           MR. RENNIE:  Correct.

14           THE COURT:  That's what I thought, okay.  So let me

15   ask Defense counsel then.  I think I understand the statements.

16   Is one of them is -- there's a quote from Mr. Fraser's son

17   Thomas; is that right?

18           MR. RENNIE:  Yes.  That's part of the article --

19           THE COURT:  Yes.

20           MR. RENNIE:  -- from May 24th.

21           THE COURT:  Okay.

22           MR. RENNIE:  Same cluster -- same document.

23           THE COURT:  Okay, good.  And so -- and you seek to

24   keep those statements out; is that right?

25           MR. WEINSTEIN:  Correct, Your Honor.

 1          THE COURT:  Okay.  So let's talk about that.  So why
 2    aren't those statements relevant to showing Mr. Fraser's
 3    control?  I mean one aspect of control can be family
 4    relationships.  Another aspect of control can be, you know --
 5    well, let me ask.  Let's start with that.
 6          Why aren't those statements of some relevance to
 7    Fraser's relationship with Garza, his control over the
 8    companies part of the secondary liability issue?
 9          MR. WEINSTEIN:  If you're talking about the
10    relationship with Garza, that may be the one where it's closest
11    to having some relevance.
12          THE COURT:  Yeah.
13          MR. WEINSTEIN:  There's going to be a lot about his
14    relationship with Garza.  If the point, though, is -- which it
15    seems to be.  I mean they could say it's for other reasons.  If
16    the point is to get before the jury that this was a
17    misstatement --
18          THE COURT:  Right.
19          MR. WEINSTEIN:  -- that's really what they're trying
20    to do here and confuse the jury.
21          THE COURT:  Let's turn to that.  Fair enough.  So in
22    other words, what you're saying is, "Judge, they've got other
23    evidence of that.  Based on Rule 403, this raises different
24    issues."
25          MR. WEINSTEIN:  It does.

```
1          THE COURT:  Okay.  So, now, let me ask this question,
2    because my understanding from the evidence is that either at
3    his deposition or else where Fraser said, when he read the
4    statement, he recognized that it wasn't true or some of these
5    statements weren't true.  And he told Garza, "You've got to
6    make this right."  Am I remembering this right?
7          MR. WEINSTEIN:  That's pretty close.
8          THE COURT:  So I guess here's the question:  Why isn't
9    that relevant to his -- I mean certainly relevant to control
10   because he feels like he has that relationship with Garza.  But
11   putting that aside, why isn't that relevant to Fraser's
12   knowledge that Garza was willing to make false statements about
13   potentially material matters that would affect investors'
14   willingness to buy these products?  Why isn't it relevant to
15   that?
16         MR. WEINSTEIN:  So first you mentioned control and
17   then that.  So I'll start with control and then get to that,
18   Your Honor.
19         THE COURT:  Yeah.
20         MR. WEINSTEIN:  With respect to control, the fact that
21   he says to him, "Fix it or make it right," if Allen Shinners
22   saw that there was a misstatement and he says to Garza, "Fix
23   that or make it right," doesn't mean he has control over the
24   company.
25         THE COURT:  Well, if Allen Shinners said that, I would
```

1    let you bring that out given where we are now.

2            MR. WEINSTEIN:  I appreciate that.  But it could be

3    true of anybody out there who sees a misstatement and says "fix

4    it."  In fact, it wasn't fixed.  So to argue it shows his

5    control because he was able to mouth the words, to me because

6    it wasn't fixed, it might be a different issue if something

7    happened as a result of that and you could say, look, he

8    follows his directions.  And that's the example we have because

9    they don't have other examples, but that would be the one.

10           THE COURT:  I hear you.  And I think you would

11   certainly be able to point out, yeah, he didn't follow these

12   instructions.  Fraser thought he did, and that's going to be

13   part of your defense here.

14           But the fact that he's got enough of a relationship

15   with Garza that he can say "make this right," I mean I don't

16   know if Shinners would ever -- maybe he would.  Again, you'd be

17   able to point that out if he did.  "Make it right" as if it's

18   an imperative; it's not a request, you know, does suggest some

19   level of at least closeness, if not control.

20           But let me hear you on the second point.  Because I

21   think you would -- if I found -- I think if I found that really

22   had nothing to do with his knowledge of Garza, I might be able

23   to sort of get with you on the question of, well, if they've

24   got enough other evidence of control, this starts to look

25   cumulative and it has a prejudicial impact on him and it would

1   be unfairly prejudicial if it's really not relevant for any

2   other purpose.  I might be with you on that.  So let's talk

3   about the second issue.

4        MR. WEINSTEIN:  It's unfairly prejudicial because the

5   jury has to understand they're not finding liability on that if

6   it's a misstatement.

7        THE COURT:  And I can certainly give a limiting

8   instruction as to the limited purpose for which you could

9   consider this evidence.  That's not terribly difficult.

10       MR. WEINSTEIN:  I think, obviously, it becomes a

11  balancing point as to whether it's really necessary.

12       As to the second issue, which I think Your Honor said

13  was his knowledge --

14       THE COURT:  Yeah.

15       MR. WEINSTEIN:  -- that Garza essentially might have

16  lied --

17       THE COURT:  Yeah.

18       MR. WEINSTEIN:  -- at some point in time, look --

19       THE COURT:  About something pretty important.  In

20  other words, in a way -- in a public forum, make inaccurate

21  statements about matters that many investors would find

22  material that his knowledge that Garza -- you might dispute

23  that.

24       MR. WEINSTEIN:  Well, I'm not sure what the evidence

25  of that is.  That's one of the points.  It's not something that

1    they are basing their, you know, class claims on perhaps

2    because it's not material.  They never found evidence that it

3    was possibly material to class --

4              THE COURT:  Well, I guess I say --

5              MR. WEINSTEIN:  Whether these two companies were

6    related or not.  The fact is what's important here is they've

7    got a product, and that's different issues.  They've got claims

8    about whether the products are what they said they would be.

9    But whether a company's related or not --

10             THE COURT:  Well, I mean Garza -- the press release, I

11   didn't study it closely, but it seemed to suggest that, hey,

12   we're so excited we're going to be joining forces with this

13   ZenMiner and they do this and we do this and they're going to

14   be synergies and we want to get involved in that; we saw them.

15             And that really is -- if it's true that Garza's

16   controlling that company, that's really conveying a false

17   impression to the world that somehow it's organically growing

18   the business, when, in fact, he already controls it.  If I were

19   an investor, I think I'd want to know that.  Whether it's

20   material to the person's particular product, maybe not.

21             But I think I would want to know if I'm being told,

22   wow, they're growing.  And it turns out there's somebody behind

23   the scenes who controls the strings of both companies, I would

24   want to know that about the guy.  I would want to know that

25   he's telling investors -- he's lying to investors about the

1    growth of his company.

2           Now, again, I'm not suggesting that's material to the

3    purchase of a particular product here.  So maybe "material" is

4    the wrong word but about an important matter concerning the

5    growth of his company.

6           MR. WEINSTEIN:  Well, I mean I think materiality is an

7    issue because if it's not -- I mean at some point, again, how

8    relevant is it?  Is he trying to create some buzz?  It seems

9    like he's trying to create some buzz.  But whether creating

10   buzz by getting your name in the news is different than whether

11   the statement is really material to a cryptocurrency investor.

12   Whether these are related or not-related companies, there's

13   just no evidence of that.

14          THE COURT:  Right.  So are you basically saying, Look,

15   Judge, it's just too unimportant.  Even if it shows that, you

16   know, Fraser was aware that Garza lied once.  It's just too far

17   unimportant, too trivial of a matter that Fraser should be

18   tarred with the brush the Plaintiffs are going to tar him with

19   saying, "He knew Garza was a liar."

20          Is that your argument?

21          MR. WEINSTEIN:  I think it's a number of issues --

22          THE COURT:  Okay.

23          MR. WEINSTEIN:  -- as to why it's prejudicial.  One is

24   because it's presumably an alleged misstatement that isn't a

25   misstatement that's an issue in the case, so it causes

1    confusion.  Secondly, it has to do with Mr. Fraser's son, so

2    it's more potentially being tarred with -- the argument's going

3    to be his son decided to go along with a charade in this one

4    particular instance.

5            And his son's not on trial.  His son's deposition

6    testimony apparently wasn't important enough to put in with the

7    case, but now he's going to be tarred potentially with

8    something his son did.  There's no evidence in advance of that

9    he had knowledge it was going to happen.

10           And so now we've got the jury saying, Oh, look, his

11   son did something bad; so we ought to find him liable.

12           There's a number of prejudicial issues here.  I

13   understand there's some probative value.  I don't think that's

14   the argument.  But the tipping point here, there's other

15   stuff -- the evidence shouldn't be pointed to whether his son

16   did something wrong.

17           THE COURT:  I wonder -- who's going to be addressing

18   this for the Plaintiffs?

19           Why do we need to include his son in the mix?  I know

20   there's an argument about control.  Judge, his son's his

21   family, control, etc.

22           But you are going to have other evidence on that

23   point.  Isn't the -- so why do we need to include his son in

24   the mix?

25           MR. RENNIE:  Well, Your Honor, I guess there's a few

1   different things in there.  One is that his son's statement is

2   not the entirety of this May 23rd statement.  It's sort of

3   about this partnership between two purportedly distinct

4   companies that are not distinct.

5          THE COURT:  Right.

6          MR. RENNIE:  So I mean --

7          THE COURT:  That suggests you don't need the son;

8   right?  You can prove that without including the son.  No?

9          MR. RENNIE:  We could talk about the statement.  I

10   mean his son -- his son is named in the article.

11          THE COURT:  I know he is, but the article can be

12   redacted.  No?

13          MR. RENNIE:  You're right, Your Honor, it could be

14   redacted.  We do think his son is relevant to issues of

15   control.  I can talk a little bit after that about why we don't

16   think it's cumulative.

17        But his son's relationship with Mr. Garza was brought

18   about as a result of Mr. Fraser's relationship with Mr. Garza.

19   And there's evidence that Mr. Fraser asked Mr. Garza to involve

20   his son in the business.  There's testimony from Mr. Garza that

21   Mr. Fraser was aware of any of his son's activities in relation

22   to the company.

23        So it is probative, not just his son's involvement but

24   also about his involvement with the companies, his control of

25   Garza in the companies, and also, frankly, his culpable

1    participation or his knowledge of these falsehoods and false
2    conduct what's going on.
3            THE COURT:  Before the statements were made?  You have
4    evidence of that?
5            MR. RENNIE:  So Mr. Garza's testimony on this point is
6    general in that it sort of says that he discussed
7    it (inaudible) --
8            THE COURT:  Sorry?
9            MR. RENNIE:  His son Thomas Fraser would not have, you
10   know -- he -- Mr. Fraser would have known about it if his son
11   did it.
12           And I think they'll point to evidence that that's not
13   the case, but I think that just goes to show this is a
14   question -- these factual disputes are questions for the jury.
15   But --
16           THE COURT:  Although -- although I mean if Fraser says
17   to Garza afterwards, "make this right" --
18           MR. RENNIE:  Right.
19           THE COURT:  -- then --
20           MR. RENNIE:  If I may address that one?
21           THE COURT:  Yeah, go ahead.
22           MR. RENNIE:  So they focus on Mr. Fraser's son's
23   involvement as sort of the angle here, but the evidence
24   relating to these statements is much more probative of control
25   for other reasons as well.

1          THE COURT:  Okay.

2          MR. RENNIE:  So Mr. Fraser told the SEC under oath

3  that he was angry about these statements.  He told his son to

4  not get involved; that he told Mr. Garza to make it right.

5  After each statement, he said, you know, "I did these things.

6  I began to distance myself from the company.  I began to put

7  distance between myself and Mr. Garza."  And that is central to

8  the question of whether Mr. Fraser is involved in the

9  companies, how much, you know, how much -- what kind of

10  relationship he had with Mr. Garza.

11          And so, frankly, we don't see how you tell the story

12  of Mr. Fraser's relationship with Mr. Garza or with the

13  companies without sort of talking about his reactions to these

14  statements.  So that's one point on control that we would like

15  to emphasize.

16          And also just in terms of relevance, you know, it goes

17  to his credibility.  He told the SEC, you know, I -- "It was

18  really a breaking point for us, and I began again to distance

19  myself from the company."

20          THE COURT:  And you have evidence that that's not the

21  case?

22          MR. RENNIE:  Yes, we have evidence that he continued

23  to invest money in the companies and he brokered a meeting

24  between Cantor Fitzgerald and GAW Miners.

25          THE COURT:  All this suggests that some portion of the

1    statements can come in.  I'm not sure all of this suggests that

2    it's necessary -- certainly it would be helpful for you to have

3    the son in the mix, no question.  And I think it's probative of

4    something.  The question I think is does its -- does the

5    potential for unfair prejudice outweigh the probative value

6    with regard to the son's involvement?  That's sort of what I'm

7    focused on.

8            MR. RENNIE:  Well, I think, if I'm reading Defense

9    counsel correctly and if, you know, based on my knowledge of

10   the record, if Mr. Fraser is going to say, you know, "When this

11   happened, I was shocked; I told Tommy not to get involved; I

12   told him to stay away; Garza played my son" and so it's not

13   like there's going to be a vacuum of evidence about Mr.

14   Fraser's, you know, his version of what happened with his son.

15   If their concern is this prejudices that the jury might

16   speculate about, you know, oh, well, did he really -- you know,

17   maybe he must have done that.  You know, maybe his son must

18   have done that because he told him to or maybe he's guilty by

19   association, I think that will be addressed at the trial.  I

20   don't know that it's really grounds for keeping the evidence

21   out.

22           THE COURT:  And what would the Court limiting

23   instruction look like on this?  I'm going to have to explain to

24   them, "Even if you find that Fraser, you know, was involved in

25   this lie" or whatever -- and I'd like to do it more briefly

1   than this -- "that's not a basis for finding liability by

2   itself."  So what would the Court's limiting instruction look

3   like on this?  I mean I'll end up drafting it but wouldn't mind

4   a little assistance.

5          MR. RENNIE:  Well, so I guess our -- putting our foot

6   out in front, we don't think you need a limiting instruction.

7   But if you'd like one, I mean if the issue is that the primary

8   issue what their motion goes to is this idea that the jury will

9   think, well, these are false statements that are at issue in

10  the case, I think a fairly narrow limiting instruction is

11  appropriate where --

12         THE COURT:  I mean if this were a criminal case, the

13  parties would be calling this 404(b) evidence.  That's really

14  what it is.  It goes to Fraser's knowledge.  It doesn't -- it's

15  not evidence of the crime per se; right?  It goes to Fraser's

16  knowledge and the relationship.

17         Now, if you've ever watched criminal trials, you know

18  all kinds of nasty stuff come out under 404(b) evidence.  So it

19  may be a good thing.  But the Court gives an instruction and

20  says, Ladies and Gentlemen, this -- you know, Mr. Fraser's not

21  on trial for these statements.  You know, Mr. Fraser's on trial

22  for the later statements.  This is simply -- you may consider

23  this evidence for the sole purpose of assessing to what extent

24  Mr. Fraser had a relationship with the companies and Mr. Garza

25  and to what extent he had knowledge of Mr. Garza's activities,

1    something -- it would be something along those lines.  But ...
2          MR. RENNIE:  Well, I mean as we -- as we pointed out,
3    we think it goes to control.  It goes to Mr. -- you know, to
4    the sort of culpable participation prong, to, you know, the
5    control prong itself so Mr. Fraser's credibility.  So I think
6    that's why I think --
7          THE COURT:  Your colleague wants to help.
8          MR. RENNIE:  I'm going to defer to my colleague.
9          MR. BUCHDAHL:  In terms of potential limiting
10   instruction, there are a lot of different ways to handle it.
11   What we would recommend is at the end of the case you say to
12   the jury:  Now, this involves specific claims about specific
13   representations.  You may have heard evidence about other
14   statements that were false, and that is not -- but you are to
15   determine whether the Plaintiff has sustained its burden of
16   proof as to these particular misrepresentations.
17         And that's going to clear it all up for the jury at
18   the most important time.
19         I think that, if I may --
20         THE COURT:  Yeah.
21         MR. BUCHDAHL:  One -- couple things important here.
22   There's no dispute that this was a false statement, none
23   whatsoever.  And part of what my colleague was getting at is
24   that in discussing these false statements with the SEC, Mr.
25   Fraser lied repeatedly; right?  He tried to put the best spin

1    on the fact that he was admittedly aware in the middle of 2014

2    that his business partner was lying about their company

3    publicly.  And he said, "Well, that made me very distressed,

4    made me very angry."  And then he tells a bunch of untrue

5    things to the SEC about what he did as a consequence.  We'll

6    prove those are false.

7            Going back to the son for a minute, I don't think

8    there's any rule of evidence that says, if this might be unfair

9    to someone who's not in a courtroom --

10           THE COURT:  No, that wasn't the basis for it.  It

11   really was the basis -- my concern was -- the basis for my

12   concern was that because the son was involved in this mini

13   fraud, the father was too.

14           MR. BUCHDAHL:  Well --

15           THE COURT:  That's the concern.

16           MR. BUCHDAHL:  That's certainly we would -- we think

17   it is probative on that point.  We think the fact -- the only

18   way Mr. Fraser's son is involved is through Mr. Fraser.

19   There's no evidence of any kind of independent way that Mr.

20   Garza could be connected with Mr. Fraser's children.  So we

21   think it's highly probative on that, and we don't think there's

22   any unfair prejudice.  There might be a little prejudice

23   because it's going to make the jury understand that he was so

24   far into this he was trotting his son out to make false

25   statements.

1          THE COURT:  I hear you.

2          MR. BUCHDAHL:  But we don't think there's anything

3     unfair at that.

4          THE COURT:  Mr. Weinstein, you get the last word.

5          MR. WEINSTEIN:  Yeah, well, that's a lot of

6     unnecessary argument that's going to be put before the jury to

7     try to prove SEC statements were false on this, that, you know,

8     this issue about the son.  It's one thing to say a father

9     wanted to see his son -- introduce him to someone who might get

10    him a job.  It has nothing to do with whether he knew in

11    advance, to be getting into the son making false statements.

12         The jury's going look at that and say, oh, the son did

13    it.  He must know everything else --

14         THE COURT:  How old was the son at this time?  Do you

15    know?  How old was the son at this time?  Was he an

16    18-year-old?  Was he a 30-year-old?  Do you have some idea?

17         MR. WEINSTEIN:  Well, we think early twenties.  I

18    can't confirm that yet.  But he's an adult.  He's not a kid.  I

19    mean he's not a kid, 15-year-old going to get an ice cream job.

20    He's an adult making decisions.  And his trial should not be

21    about --

22         THE COURT:  Why would the jury be unwarranted in

23    drawing an inference that, well, a kid in his early twenties

24    involved in this company, sophisticated technology and all

25    that, and his father also happens to be -- have a relationship

1    with the other guy, to the corporate marriage, why wouldn't the

2    jury -- why shouldn't the jury consider that on a number of

3    issues, including whether Mr. Fraser's father knew that the

4    statements were untrue?  Why is that irrelevant to that issue?

5         I agree it's not -- it's not the only proof the jury

6    should consider.  Mr. Garza -- and I think you're going to be

7    able to say, "I told him to make it right" and all that.  But

8    does that mean the jury shouldn't even consider the possibility

9    that, well, but the -- this was a 22-year-old kid, and why

10   otherwise was he doing this if his father didn't know about it,

11   his father having introduced him and the like?  Why isn't that

12   probative on whether Fraser knew ahead of time that this was --

13   these statements were false?

14        MR. WEINSTEIN:  There is -- other than the fact that

15   he's his father, there's no evidence that we understand they're

16   admitting that's going to say that Stuart Fraser knew ahead of

17   that that that was going to happen.  And so they've got an

18   alleged misstatement that's not at issue in the case, made not

19   by Mr. Fraser, and without evidence that he knew in advance but

20   stated, at least in part perhaps, by his son.

21        The issues that that raises are far beyond what this

22   jury needs to consider to determine --

23        THE COURT:  Isn't -- the level of scienter for some of

24   these control person theories -- you know this better than I

25   do.  I haven't focused on the jury instructions yet.  Do they

1    have to prove that he knew -- as to the actionable statements

2    now, I'm talking the Paycoin, $20, that kind of thing, do they

3    have to prove that Fraser actually knew those statements were

4    false, or is recklessness or something short of actual

5    knowledge sufficient?

6         MR. WEINSTEIN:  Well, there's a culpable participation

7    element.

8         THE COURT:  Sorry?

9         MR. WEINSTEIN:  There's --

10        THE COURT:  Right, but how does that answer my

11   question?  One could be culpable by being reckless; right?  I

12   don't know.  I'm asking you to tell me what the law is.

13        MR. WEINSTEIN:  I don't think they have to prove

14   knowledge.

15        THE COURT:  Okay.  So if that's the case, then why

16   isn't the fact that -- putting aside his alleged involvement

17   in, you know, knowing ahead of time that statements about GAW

18   and ZenMiners being independent were false, putting that aside

19   for a minute, assume -- you know, I could even give a limiting

20   instruction about that.  He's not on trial for these

21   statements.  You're not to assume, etc.

22        But isn't it also probative of some state of mind less

23   than knowledge as to the actionable statements that following

24   this statement, which he knew was false, he said "make it

25   right"?

```
1            I think if I were on the jury, I would want to say,
2   okay, well, what steps did you take at that point either to
3   completely extricate yourself from this thing -- I am not doing
4   business with this guy again; he's a crook -- or to say, Look,
5   if we're in business together, I need to dig in.  I need to
6   make sure that you put out statements like this, you run them
7   by me because this is embarrassing and you're going to get me
8   in trouble.
9            I mean why isn't that line of thinking something the
10  jury could consider; and, if so, why isn't this evidence
11  relevant to that?
12           MR. WEINSTEIN:  First of all, the issue of control,
13  obviously, it's their argument that he had going forward, the
14  ability to somehow do something with the company because he
15  learned that there was a lie.  I think the evidence of him
16  saying "fix it, it didn't happen" is contrary to that.  But --
17           THE COURT:  I'm sorry.  I didn't follow that.  Could
18  you say that again?  I just didn't follow it.
19           MR. WEINSTEIN:  Yeah.  Your Honor raised, I think, the
20  argument that they're going to make that, you know, going
21  forward, this is a guy who, one, had control and chose not to
22  relinquish it even though he knew there was this lie.
23           THE COURT:  Yeah, Garza was maybe played fast and
24  loose with the truth.
25           MR. WEINSTEIN:  Right.  So all I'm saying is those are
```

1    arguments on their side.  Those aren't facts.  So our position

2    is he's just an investor like many others who doesn't have --

3              THE COURT:  Correct.  They're arguments, but the

4    question is:  Isn't this evidence relevant to that issue?

5    That's the question.

6              MR. WEINSTEIN:  So I think there's two pieces here.

7    One is the son piece, which I still think is -- creates more

8    prejudicial issues and gets to whether he should have taken

9    himself out of the company as a result of knowledge of a lie,

10   regardless of who said it.  So that doesn't really get to that

11   issue --

12             THE COURT:  Yes, that's true.

13             MR. WEINSTEIN:  -- and I think raises more prejudicial

14   concerns than the probative value.

15             With respect to the first part, it's -- we're not

16   arguing it's not at all probative.  I mean I can't sit here and

17   tell you you can't make that argument.

18             THE COURT:  Yeah.

19             MR. WEINSTEIN:  The question is whether the jury

20   hearing evidence about this alleged misstatement that's not at

21   issue in the case is going to create more issues than the

22   probative value.

23             THE COURT:  All right.  I am inclined to allow this

24   evidence.  I will take another look at -- closer look at the

25   statements and see if there's something I can do about the

1   possibility of, you know, because the son was involved, the

2   father necessarily was.  It may be that I have to wait till I

3   actually hear some of the evidence in this case before I can

4   finalize that.  But I think the basic evidence of the

5   misstatements comes in with a limiting instruction.  It would

6   be more than the limiting instruction that you suggested.  I

7   think it needs to be given at the time it comes in.  But I will

8   reserve on the issue of the son.

9            MR. BUCHDAHL:  Just on the issue of the son, Your

10  Honor --

11           THE COURT:  Yeah.

12           MR. BUCHDAHL:  It's not -- it's not a single piece of

13  evidence.  If you look at this document --

14           THE COURT:  Saw that.

15           MR. BUCHDAHL:  -- this is now from August; right?  And

16  just to -- just to put it in context, May there is a public

17  statement made by his son, May of 2014 a public statement made

18  by his son that Mr. Fraser acknowledges was false.  Now, here's

19  the next statement three months later in August.  You can

20  see --

21           THE COURT:  What is the date of the August statement?

22           MR. BUCHDAHL:  This is August 14th.

23           THE COURT:  No, I know the e-mail is.  But isn't there

24  a public statement in August as well?

25           MR. BUCHDAHL:  Oh, there's one a little bit later

1    even.  So here on August 14th he forwards to his son an article

2    about ZenMiner, the same acquisition.

3            THE COURT:  I see.

4            MR. BUCHDAHL:  His son's reaction is, "Yeah, I already

5    saw this.  What's my cut?"  And then Stuart says, "That's what

6    I was thinking."  Right?

7            The notion that somehow his son wasn't kind of like

8    all in the middle of this, at least at this period of time, you

9    can't just take a scissors and cut him out of it, Your Honor.

10           But the other thing just to know in terms of who his

11   son is, his son works for a division of Cantor Fitzgerald.

12   He's at a real estate arm of the company.  So he's not like

13   just some kid with a summer internship; right?  You see here

14   he's got his office -- you know, he's got -- the ccre.com is --

15           THE COURT:  Cantor Fitzgerald.

16           MR. BUCHDAHL:  -- is a family business in a lot of

17   way.  The Defendant's uncle founded Cantor Fitzgerald.  So

18   their whole family is bound up in the kind of success of that

19   company.  But anyway, it's --

20           THE COURT:  I hear you, okay.  All right.

21           As I say, I'm going to let the bulk of this evidence

22   in.  If there's something that I can find about the son that --

23   I'll think about it more.  I'll reserve as to the son, but --

24   and I'll try to let you know before trial.  It may be I can't

25   really rule on it before the evidence comes in, but the

1    statements can come in.

2          Okay.  Let's go, then, to -- oh, let's go to the

3    Motion in Limine regarding Stuart Fraser.  Let me go to the

4    last part.  Let's actually go take those in reverse order.  If

5    I'm not mistaken, there are three issues.  One is evidence that

6    Mr. Fraser suffered losses from his involvement in GAW.  Then

7    going backwards, two is his financial hardship of Fraser and

8    family; and the last is September 11 attack.

9          MR. BUCHDAHL:  Your Honor, if I may, so starting with

10   the third one --

11         MR. WEINSTEIN:  Can I?  I'm sorry to interrupt.

12         MR. BUCHDAHL:  Oh, sure.

13         MR. WEINSTEIN:  I just want to ask Your Honor as far

14   as scheduling, Mr. Weiner was going to argue this motion.

15         THE COURT:  Do you want me to put it off?

16         MR. WEINSTEIN:  Apart he will be here around 4:40.

17         THE COURT:  Yeah, we're going to be done by then.

18   I've got something at 4:15.

19         MR. WEINSTEIN:  So we can do one of two ways.

20   Obviously, it's completely up to Your Honor.  We can either

21   skip this one, put it on next week.  I can argue it today if

22   necessary.

23         MR. BUCHDAHL:  I think I can narrow it for the Court,

24   which will make Mr. Weiner's job easier as well as the Court's

25   job.  We were thinking -- we read their excellent papers, and

1    so we were thinking about the motion.  I don't think it's

2    practical to try to exclude the evidence of the kind of flow of

3    funds between Mr. Fraser and the company.

4              THE COURT:  Okay.

5              MR. BUCHDAHL:  So --

6              THE COURT:  The fact he lost 12 million --

7              MR. BUCHDAHL:  Whether he lost 12 million is going to

8    be in dispute.  They're going to say he did; we're going to

9    suggest it's not so clear.  But I think there's no way to

10   really kind of cut that evidence out.

11             THE COURT:  So that's coming in.

12             MR. BUCHDAHL:  We withdraw that part of the motion.

13             THE COURT:  So then we'll deal with the other two when

14   Mr. Weiner's available.

15             MR. WEINSTEIN:  And I'm going to tell Mr. Weiner I

16   argued that one.

17             MR. BUCHDAHL:  I'll back him up on that.

18             One other thing just to perhaps narrow it even

19   further.

20             THE COURT:  Yeah.

21             MR. BUCHDAHL:  They raised what is an entirely fair

22   point in response to the first one, that if we're going to talk

23   about this "Remember Hashlets," we're not going to mention --

24   obviously, this would bind both sides.  So we would not suggest

25   that we can accuse him of, you know, trading on it and then

1   have them not be able to mention.

2          Our view is, you know, the anniversary -- the

3   twentieth anniversary just happened.  Even though it was a long

4   time ago, it's kind of fresh in people's minds.  And the less

5   anyone talks about that we think the better.

6          THE COURT:  So you're not going to introduce evidence

7   about the "Remember Hashlet."

8          MR. BUCHDAHL:  Correct.  And as far as how to handle

9   it, if we want --

10         THE COURT:  How to handle what?

11         MR. BUCHDAHL:  I don't think we have to do this before

12  next week, but it's -- but it depends on how other people feel.

13         THE COURT:  Handle what?

14         MR. BUCHDAHL:  I'm sorry.  If we put the motion over

15  for a week, I don't think it's going to prejudice anyone in

16  terms of --

17         THE COURT:  Fine.  We'll put the motion over

18  otherwise.

19         All right.  Let's see, oh, internet discussions, let's

20  do that.

21         MR. WEINSTEIN:  So that was the second one.

22         THE COURT:  Oh, he was going to argue that?

23         MR. WEINSTEIN:  Ms. Miller was deep into the weeds in

24  this.

25         THE COURT:  Okay.  All right.  Let me see what else we

1    got.  Isn't that -- haven't I otherwise -- oh, Motion as to

2    Scope of the Class Trial?

3             MR. RENNIE:  That's correct, Your Honor.

4             THE COURT:  All right.  So let's talk about that one.

5             So I wasn't quite sure what you were asking for here.

6    What exactly are you asking for?

7             MR. RENNIE:  Well, Your Honor, the first half of the

8    motion is sort of Plaintiffs would like to exclude any

9    documents that go only to damages in reality.  So, for example,

10   I'll use one of the two that we discussed, DX 654 is this post

11   or, you know, webpage with something that they say is by

12   Shinners about how to get a chargeback.  And, you know, our

13   view is that that is --

14            THE COURT:  Damages.

15            MR. RENNIE:  -- irrelevant and also, you know, for the

16   purposes that they're discussing, both irrelevant and

17   prejudicial.  So --

18            THE COURT:  Right.

19            MR. RENNIE:  -- I'm happy to march through their --

20            THE COURT:  Yeah, let's actually talk about that one.

21   Given that we're not going to be doing damages in this trial,

22   what is the relevance of that?  That's a document I actually

23   remember.

24            MS. HASSAN:  So, Your Honor, we weren't actually

25   thinking of damages with this one at all, and it's probative of

|    |                                                                        |
|----|------------------------------------------------------------------------|
| 1  | other issues of liability, one of them being -- well, it's a           |
| 2  | couple of different issues.  One of them -- one of the                  |
| 3  | questions is whether the securities -- whether the products at         |
| 4  | issue were actually securities.  And one of Mr. Fraser's               |
| 5  | defenses with regard to the CUSA, Connecticut Uniform                   |
| 6  | Securities Act, is he could not have known that these                   |
| 7  | products -- that the companies were selling unregistered               |
| 8  | securities.                                                             |
| 9  |         THE COURT:  Right, I saw that in the brief.  I'm so             |
| 10 | glad you raised that because I'm very puzzled by that.                  |
| 11 |         I'm aware of the Connecticut statute that says unless          |
| 12 | the defendant can show that he's not aware -- or wasn't aware          |
| 13 | of the existence of particular facts -- isn't that what the           |
| 14 | statute says?                                                           |
| 15 |         So isn't this just like a mistake of law defense that         |
| 16 | you're raising?  In other words, aren't you just saying, well,        |
| 17 | look, this was a new product.  You know, Shinners wasn't sure.        |
| 18 | See this e-mail about whether it was a commodity or a security.       |
| 19 | And so, therefore, there's no reason that, you know, Mr. Fraser       |
| 20 | should have known.                                                     |
| 21 |         But I guess what I'm wondering about is, does the law          |
| 22 | acknowledge that type of a defense here?                                |
| 23 |         MS. HASSAN:  So, Your Honor, we are not trying to make        |
| 24 | an ignorance of the law or mistake of law defense; right?             |
| 25 | We're not saying Mr. Fraser did not know that there was a law         |

1    that required registration of securities.  That's not our

2    argument.

3         The statute says that he could not have known the

4    facts giving rise to the liability; right?  And the liability

5    here is based on the sale of unregistered securities.

6         What we're saying is, as a factual matter, if we step

7    back into fall of 2014 -- right? -- just as a factual matter,

8    the regulatory landscape was such that no one could have known

9    that these kinds of crypto products or crypto-related products

10   were securities.

11        And just to kind of give you a bit of color around

12   that, the SEC hadn't taken a position on it.  In fact, the SEC

13   took a position, kind of grayish watery position in April 2019,

14   which is many years after 2014.  At the same time, in November

15   2014 during the class period, the SEC had come out and said,

16   oh, bitcoins are commodities, not securities.

17        So what we're saying is as a factual matter, nobody

18   could have known or understood that the SEC at some point would

19   start deciding to regulate these as securities or as investment

20   fund contracts.  That's our factual argument.

21        THE COURT:  But I guess I'm not seeing how -- you're

22   using the word "fact" and "factual," but I'm not seeing how

23   that's not an argument ultimately about he could not reasonably

24   have known that they were securities.

25        You folks are securities lawyers.  You know this a lot

1   better than I do.  But I'd be really surprised if the law were

2   that it was a defense to selling unregistered securities that

3   you didn't know that the items in question were securities in

4   the first place.

5           I'm aware of what this -- and maybe you're saying,

6   yeah, Judge, under federal law that's fine, but this statute

7   says "existence of facts."

8           And what I'm questioning about is:  Is this

9   really a fact?  Whether the Hashlets, Paycoin -- we'll stick

10  with those -- were securities is something the jury's going to

11  have to decide.  But ultimately they're going to apply law that

12  I give to them to the facts to decide that issue.  Isn't the

13  question whether these products were securities at least partly

14  a legal question?

15          MS. HASSAN:  Your Honor, I do agree, of course, at the

16  end of the day, it's something that the jury has to decide

17  based on here's the Howey Test, one, two, three.

18          Two points, one is the policy point that you just

19  raised that we can't imagine.  We can just say, oh, I'm sorry.

20  I sold unregistered securities.  I just didn't think.

21          I think generally that would be true.  This is a

22  very -- this is a very different case.  We're talking about a

23  new technology, new kinds of products.  Nobody knew what to do

24  with them.  So I think that -- that's what makes it a little

25  different.

1         It's not like he was selling or involved in the

2    selling of promissory notes and he said, "Oh, you know, I

3    didn't really think that these would be regulated as

4    securities."  We're talking about a complete new animal which

5    nobody knew how to deal with.  So how could somebody like Mr.

6    Fraser know how to deal with it?  That's our defense.

7         THE COURT:  Doesn't that get in -- doesn't that then

8    become a subjective type of test; right?  Because suppose Mr.

9    Fraser had worked at the SEC and was -- had been in the

10   division of regulating, determining what's a security and the

11   like and was just at the highest level of knowledge.  You know,

12   would that all come into evidence and the jury would have to

13   think about, well, you know, he must have known.  I mean I

14   don't think the jury's allowed to consider any of that; right?

15        MS. HASSAN:  Your Honor, I guess what we're more

16   focused on, and that kind of relates to this exhibit too, is

17   just the reality on the ground.  So, for instance, the example

18   that I gave, the CFTC came out with an announcement that these

19   kinds of things are commodities.  That's a fact.  That's what

20   they did.

21        In this example it seems to me that there were

22   financial institutes, banks that were breeding Hashlets as

23   products and services and, therefore, giving chargebacks.  So

24   the entire environment, there are institutions, there are

25   regulators which are treating these things as other than

1    securities.  That's what we're talking about, those kind of

2    facts that build up the regulatory landscape.  We're not saying

3    subjectively --

4         THE COURT:  You're saying no reasonable person could

5    have thought they were securities based on the regulatory

6    landscape at the time; right?

7         MS. HASSAN:  Correct.  It's external, what is out

8    there.

9         THE COURT:  Fair enough.  So I was wrong to talk about

10   subjective.  To me, there's still a question of when the

11   Connecticut statute -- you're a securities lawyer, I take it.

12   Yes?  You do a lot of securities litigation?

13        MS. HASSAN:  I do do securities litigation.

14        THE COURT:  Tell me, under federal law -- now, I know

15   that's not what we're dealing with, but let's start with

16   federal law.  Would it be a defense to either an SEC action or

17   a criminal prosecution that one was selling unregistered

18   securities that -- put aside criminal for a minute.  There are

19   areas of criminal law that, in fact, ignorance of the law is a

20   defense, for example, certain tax cases.  But put aside

21   criminal.

22        But would it be a defense to an SEC enforcement

23   proceeding that you were selling unregistered securities, the

24   fact that these were novel products and there hadn't been much

25   regulation and no reasonable person could have known that they

1   were securities?  Would that actually be a valid defense?

2           MS. HASSAN:  So, Your Honor, I will be very honest.

3   I'm more used to Section 10b cases, and I don't believe that

4   kind of defense goes there.

5           THE COURT:  Right, this doesn't come up a lot.

6           MS. HASSAN:  There's a similar line of defense, I

7   think, on this action 12, which I'm not that familiar with; so

8   I wouldn't want to say how it happens.  But also, SEC

9   enforcement action is slightly different from the civil

10  context --

11          THE COURT:  Yeah.

12          MS. HASSAN:  -- where we're saying, here's this

13  individual.  If nobody could have an idea, including the class

14  representative, of, you know, he's very involved in bringing in

15  this cryptocurrency world.  He's saying the SEC is completely

16  unfair.  Nobody knows what's happening.  And I think that's

17  what's relevant.  That's the factual background and landscape

18  that we're working in.  And that's what we're pointing to.

19  We're not suggesting somehow --

20          THE COURT:  Yeah, but your pointing to it suggests

21  that it's an argument the jury may entertain under the law, and

22  I'm not there yet.  I mean the -- are you aware of any

23  authority under the Connecticut statute that would -- where

24  this type of defense has been recognized?

25          MS. HASSAN:  Your Honor, there is very little case law

1    on this provision.

2            THE COURT:  That's not really a fair question

3    because --

4            MS. HASSAN:  We've looked.  We've looked thoroughly,

5    and this is -- you know, there's very little case law

6    generally; but I think just thinking logically, if I'm a juror,

7    would I want to know that nobody actually knew what these

8    products were?  Shall I be able to hold this guy responsible

9    for something because he didn't know?

10           I think that's a fair thing for a jury to consider.

11   And that's all that we are arguing.

12           THE COURT:  Well, but let me ask you about the

13   equities a little bit.  So there's a common law fraud claim

14   here too.  And his lack of knowledge that these were securities

15   wouldn't help him with the common law fraud claim.  And so

16   the -- and the common law fraud claim is based on more or less

17   the same evidence as the securities.  They just don't have to

18   prove that they were securities.

19           So it's not like he wasn't on notice that lying about

20   stuff you're selling is illegal or bad.  Whether he knew, it

21   also happened to be a securities violation is the issue you're

22   raising.  But just from an equitable standpoint, it's not --

23   this isn't a situation where like, oh, my gosh, it's a trap for

24   the unwary.  Nobody could reasonably have thought what he was

25   doing there was anything wrong with.  That's not this case;

1   right?

2          I mean if he knows the stuff -- you know, if he knows

3   Garza is lying, maybe it's not a securities violation, but he

4   knows it's not something he's supposed to be doing.  So it's a

5   little hard to feel sorry for him or think it's a trap for the

6   unwary that he didn't know it was a security as well.  That's

7   the part I'm struggling with.

8          MS. HASSAN:  I think, Your Honor, you're actually

9   focusing on the important distinction.  It's not that somebody

10  doesn't have relief, that Plaintiffs won't have any relief if

11  it turns out that these aren't securities.  They still have the

12  common law fraud claim; right?  The other three claims, for

13  better or worse, are tied to these products being securities.

14  And if you can meet that threshold, I think it's fair to say,

15  okay, they don't get these claims.  They have some recourse to

16  another claim.

17         THE COURT:  So you're thinking I should instruct the

18  jury -- and I haven't looked at all the instructions yet.  I

19  actually fell asleep last night reading them.  But you're

20  thinking I should instruct the jury that if you find that no

21  reasonable person in 2014/2015 would have known that Hashlets

22  and Paycoin were securities, then you must find in favor of Mr.

23  Fraser as to the Connecticut securities law claim.  That's what

24  you're likely to tell the jury?

25         MS. HASSAN:  Your Honor, I think that would be the

1  correct result.

2          THE COURT:  Okay.  Okay.  Let me hear from the

3  Plaintiffs on this issue.

4          MR. RENNIE:  Just a few points in response, Your

5  Honor.  The first one is just sort of about the claim of a sale

6  of unregistered securities.  So co-counsel's correct that

7  Connecticut law is somewhat sparse about what knowledge, you

8  know, of the facts giving rise to liability means.  But there's

9  plenty of case law on the primary violation itself.  And it's

10  clear that selling unregistered securities is a strict

11  liability offense.  It does not matter if you know that they're

12  securities or not.  The elements are they weren't registered

13  and you didn't have an exemption or whatever and that you sold

14  them.

15          THE COURT:  Well, but there is that "unless" clause --

16  or I can't remember how it exactly is phrased.  But it's if the

17  defendant shows that he didn't know of the facts.  What about

18  that?

19          MR. RENNIE:  So to that point, the facts giving rise,

20  it says unless the defendant can show that he did not know or

21  in the exercise of reasonable care could not have known of the

22  facts giving rise to liability.

23          THE COURT:  Right.

24          MR. RENNIE:  So our point here is the facts giving

25  rise to liability is that there are things operators sold and

1    that, you know, they were securities.  But, you know, if

2    there's no state of mind requirement in the primary violation,

3    it follows to us that, you know, there's no state of mind

4    requirement for the secondary violator as well.  The facts

5    giving rising to liability --

6         THE COURT:  What about "knew or should have known"

7    though?  Isn't that state of mind?

8         MR. RENNIE:  I think we want to avoid sort of

9    transposing, you know, the word "know" onto the wrong thing.

10   You're supposed -- it's about not knowing of the facts giving

11   rise to liability.  And among the facts giving rise to

12   liability is not that somebody involved knew that the product

13   was a security.  That just doesn't enter into the picture

14   anywhere.

15        THE COURT:  Well, so is the requirement that these

16   products be registered, is that a fact giving rise to

17   liability?

18        MR. RENNIE:  That they weren't registered is a fact.

19        THE COURT:  No, no, no.  The question is:  Is the --

20   because as I understand the evidence they want to introduce,

21   they want to introduce evidence suggesting no one could

22   reasonably have known that -- I mean I guess there are two

23   potential facts about registration.  One is:  Were they, in

24   fact, registered; right?  That's a simple one.  And then the

25   next one is:  Well, putting aside the "if," were they required

1    to be registered?  I think the discussion I was having with

2    Defense counsel goes to the second issue.

3            MR. RENNIE:  Um-hmm.

4            THE COURT:  And her pointing to Shinners thinking

5    they're commodities, the whole bit about that was, right, no

6    reasonable person would have known in 2014 that they were

7    required to be registered.

8            So I'm asking you:  Is the fact that they -- I used

9    the wrong word.  Is the requirement that they be registered, is

10   that a fact giving rise to liability?  Because if it is, it

11   seems to me they should be allowed to put in this evidence.  So

12   is the requirement that these products be registered with the

13   Connecticut Banking Department a fact giving rise to liability?

14   Because if it is, then they have a right to get into, should he

15   have known that?  And it seems to me it's relevant to should he

16   have known that that nobody else knew.

17           MR. RENNIE:  So if we look at primary violations for

18   the moment, it's not an element of the claim.  You know,

19   Plaintiffs are not required to prove --

20           THE COURT:  No, no, I get that.  We're talking about

21   this "unless" clause.

22           MR. RENNIE:  Sure, sure.  My point there, Your Honor,

23   if I may, is simply that it's -- it's an element of a defense

24   to prove -- they bear the burden of proving that something was

25   exempt from registration or that it was a covered security.

```
1    But I think to your question --
2              THE COURT:  Yeah.
3              MR. RENNIE:  -- it does not seem like if --
4              THE COURT:  You weren't buying my mistake of law
5    argument apparently.  This was the place I thought you'd go on
6    this.
7              MR. BUCHDAHL:  You're exactly right.  The question of
8    whether something is a security and, therefore, whether it has
9    to be registered is a legal question.  Those are not the facts
10   contemplated by this clause.
11             THE COURT:  That's what I thought.
12             You agree with that?  I'm not sure you do.
13             MR. RENNIE:  No, no, I do.  It's further down my list,
14   Your Honor.
15             THE COURT:  Okay.  All right.
16             MR. RENNIE:  No, and I think one thing that we'd also
17   like to touch on is just co-counsel discussed sort of policy
18   implications.  I mean at some point the SEC decided to bring an
19   action.  It might be either the first person they do it against
20   or the second person or the third person.  But, you know, it's
21   not like the first person is not liable because there's a
22   get-out-of-jail-free card for the first person who issues a
23   product that turns out to be security.  I mean whether
24   something is a security or not, that's a question of law.  And
25   I mean in a cosmic sense maybe you think it's a little unfair
```

1    that the first person they had never enforced it before, but

2    that's not relevant to the instructions that go to the jury.

3        I'd also like to mention really briefly the 403

4    element in all of this.  We don't think it has any probative

5    value because it's legally irrelevant.  But to the extent Your

6    Honor disagrees or it does, we think some of these documents

7    are wildly prejudicial relative to this probative --

8        THE COURT:  Other than the -- other than the document

9    you described earlier, the chargeback document with Shinners

10   where he happens to talk about an investment and all of that,

11   other than that document which I had in my mind, what other

12   documents are we talking about here?

13       MR. RENNIE:  Well, one of the other exhibits is an

14   e-mail from class representative Michael Pfeiffer.  It's the

15   Wild West document.

16       THE COURT:  Oh, the Wild West document.

17       MR. RENNIE:  I believe they also put forward as sort

18   of a relevance argument for that document the same, you know,

19   would a reasonable person have known?  And, you know, we think

20   the same arguments obviously apply.

21       You know, we also point out that, you know, to go sort

22   of -- you get pretty far afield sort of farming for individual

23   people's views written, private, you know, for unknown

24   motivations or purposes to determine a general objective

25   standard.

1          THE COURT:  Okay.  Okay.  All right.  I'll tell you

2    what on that one.  I'm going to -- we'll do a little more

3    studying on the law if -- I'll give folks until Tuesday if they

4    want to e-mail to my law clerk any new authority -- I don't

5    want another brief.  If you have new relevant authority on the

6    question whether -- the question whether a security or a

7    product is a security and, therefore, has to be registered is a

8    fact or can be treated as a fact or, to put it differently, a

9    defense that a reasonable person would not have known that it

10   was a security is, in fact, a recognizable offense even under

11   federal law, I'll take a look at it.  But only cases that speak

12   to that issue.  I don't really want 15 cases.  If you can find

13   a few key cases that speak to that issue, you can submit them.

14   Let's have that by Tuesday at noon.

15          MR. ARD:  For clarity, Your Honor, you want zero cover

16   pleading?

17          THE COURT:  No cover pleading.  Just e-mail her the

18   cases.

19          Okay.  I've got some folks waiting outside, but we

20   have a couple more minutes.  They can come in if they want.

21          Shawn, just let them know they can come in if they

22   want.

23          Right.  So I think that was all that I had since we

24   can't do the internet.  I guess, I mean, you heard my comments

25   on the internet discussions earlier.  I guess let me give you

1  some thoughts on that, and then we can have a more fulsome

2  argument.

3          My sense is that if a foundation is laid -- well,

4  actually, let me come back for a minute.

5          So some of them may come in simply with respect to

6  cross-examining the Plaintiff, the named Plaintiffs I mean,

7  because some of them are by the named Plaintiffs and they're

8  going to be admissible on reliance by the Plaintiffs.  So I

9  think some of them are going to come in for that.

10         But with regard to the other discussions, the

11 anonymous posts about, uh-oh, it's a Ponzi or it's not a Ponzi,

12 so I think if a foundation is laid that these posts were

13 publicly accessible and seen by some substantial group of

14 investors -- and how would you prove that?  Well, the Defendant

15 put in its brief, quoted some deposition testimony from Mr.

16 Shinners, I think, or one of the named Plaintiffs, oh,

17 everybody was on HashTalk, for example.  Well, that's some

18 evidence that if somebody -- there's a post on HashTalk, a

19 significant number of class members would have seen it.  Maybe

20 there's some rebutting evidence.  I don't know.

21         But if a foundation can be laid that these posts are

22 in that category, then these posts certainly can't be

23 considered for their truth, and I would tell the jury that.

24 But I think they could be considered on the issue whether class

25 members had notice that there were questions being raised about

1     whether these -- one or more of these products were fraudulent.

2            I'm not too concerned about the rule of completeness

3     and the best evidence and all that.  I mean at the end of the

4     day, you're going to be able to cross-examine and/or to examine

5     on that.  And the Defendants state in their brief other reasons

6     why those particular objections shouldn't be a concern.

7            I will say you're going to need to lay the foundation

8     because if there's not much evidence -- I mean some of these,

9     like, I wasn't even sure what the forum was.  I don't know --

10    the guy, the one with the little image of somebody using a, you

11    know, one of those mining hammers, I don't even know what that

12    was.  It didn't have an internet line on it.  I mean I don't

13    even know what that is.

14           So there's going to be need to lay a foundation by

15    somebody that what these are; that, in fact, they were posted

16    publicly; that, in fact, this was a forum that was widely read

17    by investors of the company and the like.  I think if all

18    that's done, then I think they can come in for the limited

19    purpose of showing whether class members had some notice that

20    the company products were -- at least there were questions

21    being raised about the company's products.

22           Now, the Plaintiffs are going to be able to say to the

23    jury, you know, Ladies and Gentlemen, just because you've got a

24    few trolls out there, you know, what does that -- what does

25    that prove?

1      But I don't think that means the evidence is not

2  admissible.  I just think that that will go to its weight.  But

3  I won't make a ruling on that now.  I'll wait until we have a

4  chance to argue.  But those are my preliminary thoughts on

5  them.  But go ahead.

6      MR. BUCHDAHL:  I was just as far as that goes, I think

7  if it all comes down to foundation, I would just ask the Court

8  proceed very carefully.  And maybe that's one of the examples

9  in the exhibit that gets raised at the beginning of the break

10  before it gets raised in front of the jury because there are

11  going to be some real foundational issues there.

12      We had one other issue we wanted to raise today.  It

13  goes to order of witnesses.

14      THE COURT:  Right, you had raised it.

15      MR. BUCHDAHL:  We had some questions about it.  It

16  really is just one of the big issues --

17      THE COURT:  Mr. Fraser?

18      MR. BUCHDAHL:  -- with Mr. Fraser, right.  So our --

19  obviously, we're calling him adverse in our case-in-chief.

20      THE COURT:  Yes.

21      MR. BUCHDAHL:  And so as far as I can see, it gives us

22  two possibilities.  One is, you know --

23      THE COURT:  Let me cut you off.  Here's what I like to

24  do in those situations.  Then if somebody tells me that's

25  really prejudicial against us, I'll listen to you.

1          I like to have a witness testify at one sitting.  So

2    what that would mean is there essentially would be four

3    examinations of Mr. Fraser.

4          So let me back up for a minute.  I don't ordinarily --

5    I don't ordinarily allow recross.  Unless something new comes

6    up on the redirect, which shouldn't be happening anyway because

7    redirect is supposed to be limited to the scope of the cross.

8    I don't -- I'm not a judge who's like, oh, the lawyers go until

9    they're done.  No.

10         You get to do some redirect.  The redirect's limited

11   to the cross.  Then you sit down.  There's no more questions.

12         Now, this is different because each side would get the

13   opportunity to do a direct -- well, let me walk through it.  So

14   the Plaintiffs will call Mr. Fraser.  They will do a direct

15   examination.  Obviously, they can lead him because he's

16   adverse.  Defense counsel will get up, and they will do a

17   cross-examination -- or they may do a cross-examination as to

18   the Plaintiffs' direct of Mr. Fraser.  And by the way, when I

19   say this, it doesn't have to proceed in this order.  But they

20   will be allowed to do two things at the second step:  a

21   cross-examination, which will be limited to the scope of the

22   direct, and a direct examination of Mr. Fraser.

23         Now, then the Plaintiffs will be able to get up, and

24   they will be allowed to do two things:  a redirect related to

25   their original direct and the cross on that direct and also a

1    cross-examination.   And then finally Defense counsel -- this

2    is the fourth examination -- will stand up and do a redirect as

3    to the Plaintiffs' cross.

4            Any problem with that?

5            MR. BUCHDAHL:   I do think it is a little unfair to us

6    to not let us have the last word with one of our witnesses in

7    our case-in-chief.   You're not the first judge -- I think most

8    judges probably prefer to have a witness testify a single time.

9    I do think that the most fair way to handle it would be to let

10   us have the last word in our witness on our case-in-chief.   But

11   it is not something that I'm going to trouble you with a long

12   argument on.

13           THE COURT:   What's your view, Mr. Weinstein?   Or --

14           MS. HASSAN:   So, Your Honor, we want Mr. Fraser to

15   testify once as well.

16           THE COURT:   That's what I'm going to do.

17           MS. HASSAN:   That's the ideal situation for us.

18           THE COURT:   That's what I'm going to do.

19           MS. HASSAN:   I guess there are two questions for us.

20   One is we don't know when Plaintiffs plan to call Mr. Fraser in

21   the sequence of witnesses.   If there are witnesses who come

22   after him or, for instance, Plaintiffs plan to play Mr. Garza's

23   testimony after that, I think just as a matter of fairness, the

24   Defendant should be able to explain and put context as you

25   would in a usual, you know, if Mr. Fraser was just testifying

1    in our section of the case.  So that's one concern.

2            THE COURT:  So in other words, you are -- you would

3    want to recall Mr. Fraser if that happened.

4            MS. HASSAN:  We would want to reserve the right to

5    recall him.

6            THE COURT:  Well, I'm not going to do that.  I mean

7    it's one or the other.

8            MS. HASSAN:  But, Your Honor, the other option is

9    that -- and we did find some case law related to this -- we

10   realize he's a common witness on both witness lists, but the

11   Court has discretion to only permit Mr. Fraser to testify once

12   in the Defendants' case.

13           THE COURT:  I know.  Oh, in the Defendants' case?

14           MS. HASSAN:  Yes.

15           THE COURT:  No.  They get to call him in their case.

16   If they have evidence -- they have the burden of proof here.

17   So if they have evidence that from him, apparently, that they

18   think is important to meeting their burden, they're allowed to

19   do that so.

20           MS. HASSAN:  Your Honor, I can point --

21           THE COURT:  You can point to me whatever you want.

22   That's how it's going to be.

23           The issue you raise --

24           MS. HASSAN:  One option could be Mr. Fraser, if he's

25   coming in their case-in-chief, if he's the last witness after

1    all of their evidence --

2          THE COURT:  No, they don't want to do that.  I can see

3    him shaking his head.

4          So I hate to do this, but I could let him testify

5    twice.  I mean this is what you both are asking for.  I could

6    allow him to testify twice.

7          MR. BUCHDAHL:  We're not both asking for it, but I do

8    think Defense should have to elect.  Either they get a limited

9    direct -- I mean I'm used to calling it a cross, but if you

10   want to call it my direct, they should get a limited cross,

11   limited to the issues that I raised.  And then they can, if

12   they want to, do a full-blown thing in their case.  They can do

13   it or they do everything they want to do but they do it when we

14   put him up.

15         THE COURT:  No, I agree with you.  It's one or the

16   other.  So, yeah, I'll let you each call him in your case,

17   that's fine.  That way this issue should not come up.

18         Now you don't like that either.

19         MR. WEINSTEIN:  Well, Your Honor, if we understand, it

20   sounds like there's two options.

21         THE COURT:  Yeah, there definitely are only those two

22   options, that's clear.

23         MR. WEINSTEIN:  If we could just reserve, we'll let

24   everyone know as soon as we can on which of those.  But the

25   issue is if he goes one time, it was a suggestion -- I don't

1    think it was adopted, but I want to make sure it's not

2    adopted -- that they would somehow get a fifth.

3           THE COURT:  No, no, no, no, no.  I laid out what

4    happens if he goes one time, and that's what will happen if he

5    goes one time, period.  If he testifies in each case, we'll

6    just do the normal direct, cross, and redirect.  And that's how

7    we'll do it.

8           Let me ask you this though:  You know what Garza's

9    going to say.  It's all -- it's not -- I mean that's the

10   benefit of having the deposition testimony.  Why don't you,

11   during your direct of Mr. Fraser, just deal with that?  You

12   know, "The jury's going to hear some testimony later in this

13   case from Mr. Garza, and he may be suggesting X, Y, Z."  I

14   wouldn't have a problem with that because as long as I already

15   admitted it and you were talking about stuff that was going to

16   come in, I wouldn't have a problem with that.  "Mr. Fraser,

17   what do you think about that?"

18          Why don't we do it that way and then he testifies at

19   one sitting?  I just don't see -- it's another way of saying,

20   given, you know, what's going to come in, it's hard to see the

21   prejudice.  I mean everybody likes to have the last word, but

22   just assume nobody's going to have their last word.  In other

23   words, I'm not going to make any ruling just to give somebody

24   the last word.

25          I don't see how you're prejudiced given that you

1  pretty much know what Mr. Garza's going to say.  Not "pretty
2  much."  You know exactly what he's going to say, what he has
3  said.  Why don't we just have them call in your case and use
4  the sequence I outlined?
5       MR. WEINSTEIN:  It makes eminent sense if we can
6  confirm our choice when we next appear on Friday.
7       THE COURT:  All right.  We can discuss it again on
8  Friday when Mr. Weiner's here, that's fine.
9       MR. WEINSTEIN:  No, no, no.  It may not require
10  discussion.  Just tell you.
11       THE COURT:  I hope not.  All right.  I won't put it in
12  stone just yet, okay.
13       I do have a rule.  I'll leave you with this.  You need
14  to disclose your witnesses that you're going to call by close
15  of business on the business day before the next day of trial.
16  So each side needs to tell the other no later than the business
17  day before the next trial day what their lineup for that next
18  trial day's going to be.
19       MR. BUCHDAHL:  Can you also make that the schedule for
20  demonstratives to plan to use the next day?
21       THE COURT:  Fine.  I think that's reasonable.  Because
22  if we have demos and fights over them, I would just as soon as
23  have them in the morning.  So let's do that.
24       Okay, so I think we're done for the day, folks.  I do
25  have some other folks lined up.  We'll be back here.

1          What time is our proceeding next Friday?  Two o'clock

2    again?  Okay.  So we'll do this all over again.  We will not do

3    it all over again.  We will cover other issues.  And I'll see

4    you next Friday.

5        (Proceedings concluded at 4:12 p.m.)

1

2

3                    C E R T I F I C A T E

4

5

6

7              I, Julie L. Monette, RMR, CRR, CRC, Official

8    Court Reporter for the United States District Court for the

9    District of Connecticut, do hereby certify that the foregoing

10   pages are a true and accurate transcription of my shorthand

11   notes taken in the aforementioned matter to the best of my

12   skill and ability.

13

14

15                    /S/ JULIE L. MONETTE
                 _____
16               Julie L. Monette, RMR, CRR, CRC
                      Official Court Reporter
17                        450 Main Street
                     Hartford, Connecticut 06103
18                        (860) 212-6937

19

20

21

22

23

24

25