```
 1              UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF CONNECTICUT
 2
    - - - - - - - - - - - - - - - - x
 3
    DENIS MARC AUDET, MICHAEL          No. 3:16-CV-940 (MPS)
 4  PFEIFFER, and DEAN ALLEN
    SHINNERS, Individually and on      OCTOBER 15, 2021
 5  Behalf of All Others Similarly
    Situated,                          2:03 P.M.
 6
    vs.                                PRETRIAL CONFERENCE
 7
    STUART A. FRASER, GAW MINERS,
 8  LLC, and ZENMINER, LLC, (d/b/a
    ZEN CLOUD)
 9
    - - - - - - - - - - - - - - - - x
10
11                    450 Main Street
                   Hartford, Connecticut
12
13      BEFORE:  THE HONORABLE MICHAEL P. SHEA, U.S.D.J.
14
15  APPEARANCES:
16  FOR THE PLAINTIFFS:
17          SUSMAN GODFREY, L.L.P.
                1301 Avenue of the Americas, 32nd Floor
18              New York, New York 10019
            BY:  SETH D. ARD, ESQUIRE
19          BY:  JACOB W. BUCHDAHL, ESQUIRE
            BY:  RUSSELL F. RENNIE, ESQUIRE
20          BY:  GENG CHEN, ESQUIRE
21          IZARD, KINDALL & RAABE, LLP
                29 South Main Street, Suite 305
22              West Hartford, Connecticut 06107
            BY:  MARK P. KINDALL, ESQUIRE
23
24  (Appearances continue ...)
25
```

```
 1   APPEARANCES CONTINUED:

 2   FOR THE DEFENDANTS:

 3           HUGHES, HUBBARD & REED L.L.P.
                 One Battery Park Plaza, 12th Floor
 4               New York, New York 10004-1482
             BY:  DANIEL WEINER, ESQUIRE
 5           BY:  MARC A. WEINSTEIN, ESQUIRE
             BY:  AMINA HASSAN, ESQUIRE
 6
             BRENNER, SALTZMAN & WALLMAN
 7               271 Whitney Avenue
                 New Haven, Connecticut 06511
 8           BY:  ROWENA A. MOFFETT, ESQUIRE

 9

10

11

12

13

14

15

16

17

18

19

20

21

22   COURT REPORTER:  Julie L. Monette, RMR, CRR, CCP
                         (860) 212-6937
23
     Proceedings recorded by mechanical stenography, transcript
24

25
```

```
 1                        2:03 P.M.
 2           THE COURT:  All right, we're here in Audet versus
 3   Fraser, 16-CV-940.  Let's please have counsel start by stating
 4   appearances, starting with Plaintiffs' counsel.
 5           MR. ARD:  Good afternoon, Your Honor.  Mr. Seth Ard
 6   for Plaintiffs.
 7           MR. BUCHDAHL:  Jacob Buchdahl for the Plaintiffs.  The
 8   only thing I'll point out for Your Honor, our only newcomer
 9   today is Mr. Boles, who's the furthest back in the courtroom.
10   He's going to be doing our exhibits during the trial.  Other
11   than that, I think everyone you've met before.
12           THE COURT:  Thank you.
13           MS. CHEN:  Geng Chen, Susman Godfrey, for the
14   Plaintiffs.
15           MR. WEINSTEIN:  Russell Rennie, Susman Godfrey.
16           MR. KINDALL:  Mark Kindall, Izard Kindall.
17           MR. WEINER:  Good afternoon, Your Honor.  Dan Weiner
18   from Hughes Hubbard for Defendant Stuart Fraser.  With me are
19   my colleagues, who I think you know well from last time, Amina
20   Hassan and Marc Weinstein and our paralegal Nicole Garton.
21           MS. MOFFETT:  And also present, Your Honor, is Rowena
22   Moffett, local counsel for the Defendants.
23           THE COURT:  Ms. Moffett, good afternoon.
24           All right.  So before we pick up where we left off on
25   the Motions in Limine last time, I did want to go over a couple
```

1    things.  I'll begin on kind of a negative note, honestly.

2            I found counsel in this case out to be highly

3    professional and competent and really have had very few

4    complaints.  It's an interesting case.  I think counsel have

5    represented their clients very well.

6            But this set of -- this list of objections to exhibits

7    and to deposition testimony, although I haven't gotten to the

8    deposition testimony that the Plaintiffs filed with regard to

9    the Defendants' exhibits, so for me to rule on those

10   objections, I actually have to look at least three documents

11   each time to understand the basis for the objection.  This bit

12   about categorical objections and specific objections and --

13   sometimes I can tell because it's a specific rule of evidence.

14   But you've got 402A and 402B and 402C.

15           It's incredibly burdensome, number one.  Number two,

16   it's not a proper way to make trial objections; and these

17   objections should be stated as they would be at trial, which

18   means succinctly.  At trial you wouldn't stand up and say -- I

19   wouldn't allow you to stand up and say, I have categorical

20   objection 402A, which carries all my categorical objections for

21   every -- if there were categories of documents that you needed

22   to object to, you should have filed a motion in limine, which

23   you did properly.  But that was really not helpful.

24           Okay, I'll leave it there.  There's nothing to be done

25   about it now.  There's no time.  Not a helpful way to proceed

1    for the trial judge, just so you know for future reference.

2           MR. BUCHDAHL:  Just let me apologize for that, Your

3    Honor.  We obviously were not trying to make anything unhelpful

4    or more work.  And if there's anything we can do now to submit

5    it in a different form.  Hopefully some of the Motions in

6    Limine will peel it off.  But we apologize to the extent we

7    taxed the Court without being helpful.

8           THE COURT:  Thank you.  All right, we can move on from

9    that.

10           Some details before we go further:  Just a reminder,

11    we need all the vaccine information for all participants in the

12    trial, anybody who's going to be in the room, by Monday.  I

13    believe we've received the Plaintiffs' information.  I don't

14    think we've received the Defendants' information yet.

15           Ms. Johnson, is that right?  So we do have it or we

16    don't have it?  No.

17           So we need that by Monday.  And, again, that's

18    important for the Court to be able to understand spacing, just

19    to assess the overall risk in the room, that kind of thing.  So

20    that's that.

21           I don't think -- I had mentioned the possibility that

22    we may have rapid tests.  I don't think that's in the cards, so

23    you don't have to worry about that.

24           Let's see.  I did want to let you know -- it looks

25    like we're going to be able to have -- I expect that we will

1    have -- first of all, we're going to be picking the jury in

2    Courtroom 1, which is at the opposite side of this floor, same

3    part of the building, the annex part of the building, all the

4    other way at the end of the hall, a mirror image except the

5    setup is different.  It's not this side table setup.

6         We actually have -- we made it our COVID trial

7    courtroom, and I tried two cases in there over the summer.  And

8    we had the jurors set up on both sides.  The important part is

9    your tables are set up in a more conventional format because

10   during jury selection all of the jurors will be sitting in the

11   pews; and so everybody will be equi-distant from them.  It will

12   be a better way to pick the jury.  The evidence portion of the

13   trial we'll do in here, opening statements and everything else.

14   So want you to know that.

15        We will have -- so during jury selection, if there is

16   or are members of the media or members of the public, we will

17   have very limited seating for them, and this would include any

18   members of your team beyond the four that I discussed last time

19   that can be in the courtroom, extremely limited seating, like

20   eight seats.  So if you each want to pick one and then I can

21   have six seats for the public.  Then beyond that, I'm going to

22   have to tell the members of the public, who don't usually

23   attend jury selection, which is why I'm thinking it's not going

24   to be a problem, I will put them in what is our sort of dual

25   jury box for that, for the jury selection, and they can look

1   out.  That's where they'll be.  We'll not have a separate room

2   for them because we're going to be using so many other rooms in

3   the courtroom for other jurors -- in the courthouse for other

4   jurors.

5           During the trial, we will have a separate room for the

6   public, for your other team members, and it will be one of two

7   rooms.  In other words, it will switch at one point.  And we'll

8   let you know exactly which room and where it's going to be

9   closer to the trial.  But we will have a room for you where the

10  proceedings will be piped into.  The trial will not be put on

11  Zoom for the public.  That's that.

12          MR. BUCHDAHL:  Your Honor, one question about room

13  logistics, are there any rooms for kind of Plaintiffs' team and

14  Defense team for breakout purposes, conferences?

15          THE COURT:  Yeah, that's going to be tough, honestly.

16  We will look into that.  Spacing is going to be at a premium,

17  honestly, but I'll see what I can do.  They may be small rooms.

18  I'll see what I can do about conference rooms.

19          Okay.  All right.  Why don't we pick up -- well,

20  actually, why don't we handle the timeliness objection with

21  respect to Plaintiffs' Exhibits 159 through I think it's -- I

22  just got something today -- through 167 it looks like.  Pull

23  those up.

24          So I know there are other timeliness objections, and

25  I'll give you my general sense of that.  I think for documents

1    that are things like -- that were exchanged in accordance with

2    the timing deadlines set forth in the joint trial memorandum

3    instructions and that are things that I think it's reasonable

4    to anticipate would have been available to both sides and

5    something that would likely have been a trial exhibit, and I

6    have in mind things like archived versions of the company's

7    websites, the corporate certificates from Massachusetts, for

8    example.  I think -- I think I would overrule the timeliness

9    objections, and you'll see I'm going to overrule the timeliness

10   objections as to those.

11          If I'm understanding it correctly -- I'm not sure I

12   am -- the timeliness objection to 159 through 167 is a little

13   bit different from that.

14          Mr. Weiner, is your team going to explain that?

15          MR. WEINER:  Yes, Your Honor.  Ms. Hassan will be.

16          THE COURT:  Okay, Ms. Hassan.

17          MS. HASSAN:  Yes, Your Honor, the timeliness objection

18   is different.  These were provided to us last week, which is

19   almost a month since the Joint Trial Memorandum filing was

20   done.

21          THE COURT:  Provided by whom?

22          MS. HASSAN:  By Defense counsel -- by Plaintiffs'

23   counsel.

24          THE COURT:  Oh.  So you just got these documents.

25          MS. HASSAN:  Correct.  They're total nine documents in

1    the certificates, and we got seven of them on October 4th and I
2    believe two more this past Saturday.
3         THE COURT:  So let me hear from Plaintiffs' counsel as
4    to why these were not exchanged in accordance with the
5    deadlines set forth in my instructions.
6         MR. BUCHDAHL:  Your Honor, we -- there's no -- there's
7    no ability for us to explain it other than they were overlooked
8    and then found.  I think our view of this is that the Court
9    should permit these exhibits because they are relevant and
10   probative exhibits, and none of them is in the nature of undue
11   surprise.  For example, they're documents that were exhibits at
12   depositions.  They're documents that were produced at
13   discovery.  The only exception I can think is a document that
14   was from the Defendants' own social media posts.
15        So none of this can be viewed as somehow creating some
16   sort of prejudice; and we can deal with these, as we're dealing
17   with all the exhibits, sort of in the natural course of things.
18   And given that there's no prejudice to the other side, we made
19   every effort to get these as far in advance of trial as we can,
20   we think in the interest of justice, they should be permitted
21   to be in.
22        THE COURT:  All right.  Let me hear from Ms. Hassan.
23   Mr. Buchdahl mentioned that these documents were either
24   produced in discovery or used as deposition exhibits.  A, is
25   that true; and, B -- A, do you agree with that?  And B, if so,

1   how is your side prejudiced by the Court's allowing these

2   exhibits?

3        MS. HASSAN:  So, Your Honor, I generally agree I think

4   most of them -- I can't confirm each one of them was used as a

5   deposition exhibit or otherwise produced, but I think a lot of

6   them were produced documents.  But I think the prejudice is in

7   two ways.  One is it impacts our trial preparation and we're a

8   week away from trial.

9        But in addition to that, at least the way we

10  approached selecting our exhibits in August was in part looking

11  at what Plaintiffs had designated.  These are now seven -- nine

12  new exhibits.  We would have to think about, is there anything

13  else that we need to, for instance, designate?  Is there

14  anything we need to change in our exhibits or in our deposition

15  designations?  So I think just so close to trial, it does

16  impact our trial preparation and puts a burden on us which we

17  are not putting on Plaintiffs.

18        THE COURT:  Well, let me ask you this:  You say you

19  got these exhibits seven days ago.  Is that what you said?

20        MS. HASSAN:  Well, we got seven of them on October 4th

21  and then two of them this Saturday, past Saturday.

22        THE COURT:  So are there any documents that you have

23  in mind, or deposition testimony that you have in mind, that

24  you think, well, now I'd like to designate that?

25        MS. HASSAN:  Your Honor, very honest answer, we didn't

1    want to spend the time kind of thinking about that extra thing

2    without knowing how the Court is going to rule.  So immediately

3    right now, I don't know if that's the case.  But I also haven't

4    gone through that exercise of kind of thinking through each of

5    them separately.

6            THE COURT:  Mr. Buchdahl, we are close to trial.  And

7    I really don't want to have a new round of deposition

8    designations or exhibits.  I'm just not going to have time at

9    this point.  I haven't even -- I'll be candid with you.  I

10   haven't even started on the deposition designations.

11           You know, I'm not complaining.  That's my job, and

12   I'll get it done.  But to add to it at this late time is

13   burdensome on the Court and the other side.  I can see what

14   she's saying.

15           MR. BUCHDAHL:  Your Honor, there may be some burden,

16   but we actually don't know if there is any.  As you point out,

17   we actually haven't even started in the process of dealing with

18   deposition designations.  I don't actually think that these are

19   kind of out -- there's no new subject matter here; right?

20           So, for example, we've got a document, proposed

21   Plaintiffs' Exhibit 166.  This was produced by Mr. Fraser in

22   the course of the -- in the course of the litigation.  And it

23   is a Facebook post in which he is referring to GAW Miners as

24   his new baby; right?  And this is in the same vein as the other

25   social media posts.  But what is -- what we hadn't appreciated

1     until more recently, which is why it was important that we get

2     this in, is the timing of this Facebook post compared to the

3     invention of Hashlets because this document was four days after

4     the text message exchange between the Defendant and Mr. Garza,

5     where the Defendant acknowledged in his deposition he had come

6     up with the idea of Hashlets.

7              So he comes up with the idea of Hashlets.  He texts

8     Mr. Garza about that.  And then four days later he says, "This

9     is my new baby, gawminers.com."  He says this on Facebook.

10    This is a very significant exhibit.

11             We apologize that we did not include it in our initial

12    round, but we produced this to them -- I'm sorry -- they

13    produced this to us years ago.  This is not a surprise to

14    anyone.  It's the Defendants' own social media account.  And

15    even October 9th, eleven days before -- I mean we expect the

16    Court would show some latitude to Defense counsel if they had

17    specific testimony or exhibits that directly -- that were

18    suddenly kind of relevant and useful for them that had not been

19    before or even if they decided --

20             THE COURT:  But that's not the case with that type of

21    exhibit.

22             MR. BUCHDAHL:  My point is, Your Honor, I don't think

23    there's going to be any burden.  It's a speculative suggestion

24    that there might be new testimony or new exhibits.  If there

25    are, I think they would have a lot of latitude to bring it in.

1        THE COURT:  Yeah, but it's not speculative from my

2   standpoint in the sense that if I have to deal with new

3   exhibits and new deposition testimony, I mean literally I'm

4   going to run out of time.

5        MR. BUCHDAHL:  There's no deposition testimony about

6   this document.  It is simply a social media post.  There's not

7   any question about its authenticity as produced by the

8   Defendant.  We should be permitted --

9        THE COURT:  All right.  I'll tell you what:  I'm going

10  to give you, Defense, until Tuesday at noon to set forth in an

11  e-mail to my law clerk no more than two pages what additional

12  exhibits or testimony you think you would need to designate.

13  You should attach those items to your e-mail, or at least the

14  designations.  I don't want the actual transcript.  And,

15  obviously, copy the other side.  But you should attach any

16  exhibits to your e-mail.  And I'll rule on it after I see your

17  e-mail.  Okay?  All right.  All right, so that's that one.

18        Okay.  Let's now return to the Motions in Limine.  So

19  one of the -- let's see.  So last time we discussed at a fair

20  amount of length the portion of Stuart Fraser's Motion in

21  Limine concerning statements about GAW Miners acquisition of

22  ZenMiners.  I re-read the transcript on that.  And it --

23  basically what I said was that I was prepared to deny that

24  motion but would -- but possibly for the issue of concerning

25  Thomas Fraser, concerning the son.

1          I've thought more about this.  And I guess I don't see

2     a reason why I should exclude the evidence concerning the son.

3     It may be somewhat prejudicial, but I think it's also probative

4     pretty much for the reasons I said last time.  It goes to the

5     issue of control.

6          Mr. Buchdahl or someone pointed out to me an e-mail

7     last time where Thomas Fraser says, "Where's my cut?"  And

8     Stuart Fraser says, according to the e-mail, "I was thinking

9     the same thing," suggesting that they're kind of both in on

10    something about this.  They have some knowledge.

11         I would certainly give a limiting instruction when all

12    of this evidence came in that the jury may consider this

13    evidence only for the limited purpose of deciding what

14    relationship, if any, Stuart Fraser had with Mr. Garza and the

15    companies and also for the limited issue of what, if any,

16    knowledge Stuart Fraser had of Mr. Garza's activities.  And

17    further, I would be happy to instruct the jury that Mr.

18    Fraser's son, Thomas, is not a defendant in this case and the

19    jury's not to speculate about what, if anything, he might have

20    done right or wrong.

21         I'd be happy to give those kinds of limiting

22    instructions, but I don't see why the evidence shouldn't come

23    in.  But I'll give you -- I'll give Defense counsel one more

24    chance to address that issue.

25         MR. WEINSTEIN:  One moment, Your Honor.

1    (Pause.)

2    MR. WEINSTEIN:  Your Honor, there's really -- I don't

3    want to repeat the arguments from last time.  The main issue is

4    that it's sort of a side issue with respect to a misstatement

5    that's not at issue in the case.  And so the further along you

6    get of going away from Stu Fraser and whether he participated

7    or was a control person with respect to the misstatements that

8    are at issue in this case, there's more and more side show

9    involved.  And I think when it comes to family issues, of

10    course, that starts to raise more prejudicial concerns over

11    probative.

12    I think we acknowledged last time we understand,

13    although we, obviously, completely disagree with the inferences

14    that the Plaintiffs want to draw, but that there may be some

15    probative value.  But the issue here is once you get to the

16    family member who's not a defendant with respect to a

17    misstatement that's not at issue in this case, the prejudicial

18    value starts to outweigh that probative value.

19    THE COURT:  All right.  I heard you on that.  I am

20    going to deny the motion and give the limiting instruction that

21    I describe.  If counsel would like to submit a proposed

22    limiting instruction on this, I invite them to do that.

23    Okay.  Let's move now to the Plaintiffs' Motion in

24    Limine regarding Stuart Fraser, which is ECF 261.  I believe

25    the state of play last time was the Plaintiff agreed that the

1    amount that Stuart Fraser lost, although there is a dispute as

2    to that amount, can come in; and so I'm prepared to deny that

3    portion of the motion.

4           The Plaintiff also agreed not to introduce any

5    evidence regarding the "Remember Hashlets" or any other

6    evidence that would open the door about 9/11 evidence.  So I

7    would grant that motion, the Motion in Limine on that based on

8    the Plaintiffs' representation.

9           I think what was still at issue was the -- any

10   evidence concerning financial hardship to Mr. Fraser and his

11   family.  So I think I'd like to start with Defense counsel on

12   this.

13          MR. WEINER:  Your Honor, I don't think that's -- do

14   you want me at the podium?

15          THE COURT:  Sure, wherever you feel most

16   comfortable.

17          MR. WEINER:  I don't think that's quite right on the

18   9/11 point.  I think on the 9/11 point, September 11th, we had

19   three arguments.  And one of them was:  Well, they've injected

20   9/11 into the case by citing "Remember Hashlets" and saying Stu

21   Fraser committed fraud with regard to those.  They've now taken

22   that out, so that's out of the picture.  I think they agreed

23   neither side will mention 9/11 Hashlets.

24          THE COURT:  Okay.

25          MR. WEINER:  What we still have is our need and our

1     position which is so central to understanding Mr. Fraser's

2     relationship with Mr. Garza and with these companies that you

3     can't understand why he was involved with a guy like this,

4     businesses like this, unless you understand what happened to

5     him in his company, Cantor Fitzgerald, on 9/11.

6            They're going to offer the jury a picture of Stu

7     Fraser involved as a scheming fraudster.  The picture that you

8     get and you need to know where 9/11 fits into that is he worked

9     for 20 years at Cantor Fitzgerald.  9/11 happened.  Most of his

10    colleagues were killed.  He worked night and day to resurrect

11    the company, and then he stepped away from it in 2003 or '4.

12    He stepped away from it and said, I'm going to get involved in

13    hockey club in Texas, college prep program, a snowboarding

14    program, and with Josh Garza and these companies that became

15    high-speed internet and voice prodigy and then GAW Miners.

16           If you don't understand why his life changed, the

17    jury's going to be left wondering, why on earth are these two

18    people together?  So 9/11 is central to Stu Fraser's life and

19    to understanding, as I said, his relationship with Mr. Garza

20    and with these companies.

21           Second and last point is they are -- say that Stu

22    Fraser used the imprimatur of Cantor Fitzgerald to give

23    validation to these companies, GAW Miners and ZenMiner, and

24    that he introduces Garza and his team to the Cantor Fitzgerald

25    people during the class period as a way of trying to get them

1  involved.

2       If you hear and understand what Cantor Fitzgerald

3  means to Stu Fraser and how he spent his life working there and

4  his life trying to build it back up after 75 percent of the

5  people were killed on 9/11, you'll understand that there's no

6  way on earth that Stu Fraser would have known there was a fraud

7  and tried to involve the only company that he ever worked with,

8  that he had a family relationship with, that he cared the most

9  about, second to his wife.  So those two reasons are reasons

10  why the jury needs to understand the context of Stu Fraser and

11  the 9/11 involvement.

12       We're not going to wallow in, you know, extensive

13  examination as to what he did on 9/11, what he did afterwards.

14  But they have to understand why his life changed; it went 90

15  degrees in a different direction.

16       THE COURT:  So let me ask about the first point.  You

17  know, every case involves a story.  And lawyers want to tell

18  their story to a jury, and obviously that's important.  But --

19  and every story can -- you can take the beginning point of

20  every story back further and further.

21       We could have evidence of -- and I don't mean to be

22  anything but respectful about his experience, but just the

23  example comes to mind, I mean if he grew up and he was an Eagle

24  Scout and did great things because of that and, you know, Josh

25  Garza also happened to be an Eagle Scout, I'm not sure I'd let

1   that in.

2          But it's true -- I mean I don't know -- my

3   understanding of the case is that there was a history between

4   these two before the GAW Miners.  Didn't just come out of the

5   blue.  There was Great Auk Wireless, I guess.  And I think

6   maybe because of the complaint they met because Josh Garza

7   installed the internet at Mr. Fraser's Vermont house, something

8   like that.

9          MR. WEINER:  That's correct, Your Honor.

10         THE COURT:  And -- but we are talking about 12 years

11  before the -- well, really doesn't this company get up and

12  going in 2014, you know, GAW Miners?  So that's 13 years

13  before -- before the company gets going.  And I just -- I'm not

14  sure it's -- I'm not sure the probative value of going back

15  that far is warranted.  And, you know, I understand why you

16  would like to do it.

17         But the second point is an interesting one.  I think

18  I'd like to hear from the Plaintiffs on the second point, which

19  is, as I understand it, you're going to be arguing, hey, look,

20  Stuart Fraser knew what was going on.  He had control.

21         And as I understand Mr. Weiner's point, it makes it

22  less likely that those things are true, that Stuart Fraser

23  would drag Cantor Fitzgerald into this given his feelings about

24  Cantor Fitzgerald; and those feelings are wrapped up, at least

25  in part, with 9/11.  What's your response to that?

1          MR. BUCHDAHL:  Your Honor, first of all, everything

2     you said is right about the desire to tell a story and all of

3     that.  They can still tell their story.  If you think about

4     what Defense counsel just said, he said a company founded by

5     his uncle, a company he worked for his entire life, a company

6     that he had, you know, spent 20 years at before his retirement.

7     They want to say all that, that's fine.

8          But the very specific kind of triggering evocation of

9     9/11 right after the twentieth anniversary of this event with

10    all the kind of attendant publicity and press and all that, we

11    don't know what each individual juror brings to the jury box

12    with regard to that event.  They can still -- listen, this is

13    going to be a hotly contested issue.

14         We say, look at the audacity of this man to kind of

15    bring someone in and introduce him to the top executives at

16    Cantor Fitzgerald.  And they're going to say, well, that's

17    evidence that he didn't think there was anything wrong about

18    it.  They can still tell that story, the family connections,

19    and the history every place he ever worked.  All of that is

20    fair game.

21         There's one thing the mention of which we submit is

22    far more prejudicial and probative, and that's 9/11.  He does

23    not need to say colleagues were killed; our bank was decimated.

24    The bank recovered.  They're still in business.  They're

25    still -- you know, that part of it is not necessary to the

```
 1    story.
 2              And do you want me to address this middle point as
 3    well or no?
 4              THE COURT:  What was the middle point?
 5              MR. BUCHDAHL:  I'm sorry.  The second argument he
 6    made.  I think the Court already said that's going back a long
 7    way.
 8              THE COURT:  Well, I did want to ask you about that.
 9              MR. BUCHDAHL:  Yes.
10              THE COURT:  Where do you intend to start the story in
11    terms of their relationship?  I mean I don't know -- I haven't
12    read -- I haven't got to the Garza depositions yet, so I
13    don't --
14              MR. BUCHDAHL:  So it's a good question.  We definitely
15    intend to start with the fact that they met when -- with a
16    25-year age difference in 2003 and that Mr. Garza -- and, by
17    the way, if depending on the Court's ruling here, we may change
18    our mind.  But Mr. Garza was an 18-year-old installing the
19    internet at Mr. Fraser's lake-front property and campground;
20    right?  That's what happened in 2003.  That's how they met.
21              Everything -- they talk about everything in Mr.
22    Fraser's life being connected to Cantor Fitzgerald.  Everything
23    in Mr. Garza's entire professional life was dependent on Mr.
24    Fraser.  And that part of their relationship, we submit, is
25    essential to the question of control.  Mr. Garza literally
```

1   never had a company, a business, a project, an endeavor that

2   wasn't backed by, funded by, controlled by Mr. Fraser.

3          Now, even Mr. Fraser, even his story says:  Well, I

4   was in charge of everything up until GAW Miners.  Then it all

5   changed.  All of a sudden I was not involved.

6          But we submit that you can't really understand, given

7   the nature of control, personal liability.  And the Court has

8   already said on its Order to the Motion to Dismiss the kind of

9   nature of their personal relationship is important.

10         Now, I understand Defense counsel to say, you can't

11  understand his relationship with Mr. Garza without telling the

12  story of 9/11?  Frankly, I think that's a non sequitur.  I

13  don't think it's the case that you -- that the only way to

14  explain that he had someone install internet at his house is to

15  say, "And two years prior to that there's this horrible tragedy

16  in which hundreds of my colleagues burned to death."  Like that

17  just doesn't follow.  And, again, the amount of voir dire that

18  I think would be absolutely necessary to screen out potential

19  issues in this jury box as a result of mentioning 9/11 would be

20  a significant burden in terms of trying to find a fair jury.

21         THE COURT:  All right.

22         MR. WEINER:  Your Honor, if I may?

23         THE COURT:  Yes, please.

24         MR. WEINER:  Mr. Buchdahl has his facts slightly

25  wrong.  Mr. Fraser met Mr. Garza before September 11th, 2001.

1   He'll put it in late 1998 or 1999.

2           THE COURT:  So how old was Garza then, about 14?

3           MR. WEINER:  No, 18.  18.

4           THE COURT:  He was 18 in '98?

5           MR. WEINER:  Yeah, '88 (sic) or '99 and when he was

6   installing internet.  But they didn't really begin to have

7   their relationship build and work together until Mr. Fraser, as

8   you put it, he retired.  He didn't retire out of the blue.  He

9   retired because of what happened with Cantor Fitzgerald and he

10  looked for other businesses to get involved and other things to

11  distract him from -- he'll say he was in a dark place -- to

12  distract him, and he got together with Josh Garza and built the

13  internet companies and the voice company, and then it became

14  GAW Miners.  It wasn't like when he was an Eagle Scout when he

15  was, you know, 16.

16          THE COURT:  But I do want to get the timing right.

17          Mr. Buchdahl, you said that he's installing internet

18  as an 18-year-old in 2003.  Mr. Weiner says it's in 1998.

19          MR. BUCHDAHL:  So he was 13 years old in 1998.  That's

20  just a matter of public record.

21          THE COURT:  So Mr. Weiner.

22          MR. WEINER:  Well, I know Mr. Fraser, when I asked

23  him, "When did you first meet Mr. Garza?" he said it was before

24  9/11.  So maybe his recollection is faulty.

25          THE COURT:  When was Mr. Garza born?  I think I can

1    figure out from the Presentence Report.

2              MR. BUCHDAHL:  Yeah.  He was born in 1985.  That we

3    know.

4              THE COURT:  I can find that out.  So he was 16 on 9/11

5    or thereabouts.  So Mr. Fraser met him?

6              MR. WEINER:  Mr. Fraser thought he met him when he was

7    18 or 17.

8              THE COURT:  Okay.

9              MR. WEINER:  But, again, to tell a story to the jury

10   about why Mr. Fraser did that complete pivot and changed his

11   life and why he would be involved with a guy like Josh Garza, a

12   young guy who did work at his house, you can't understand that.

13   The jury's going to be left scratching their heads.  What

14   happened at Cantor Fitzgerald?  Why did he leave?

15             We're not going to wallow in it.  We're not going to

16   show pictures of him wearing medals.  It's going to be, What

17   happened in your life?

18             And look, it's also part of his life now.  He's a

19   founding director of the Memorial Fund.  He spends a lot of his

20   time working on that.  Am I going to be prevented from telling

21   the jury that he does that kind of charitable work so they can

22   paint him as daddy rich bucks and people not know what he does

23   with his time?

24             THE COURT:  Well, I'm not sure why the jury, in

25   deciding the issues in the case, needs to know that he's

1    involved in charitable work.

2         MR. WEINER:  Well, I think they're going to paint him

3    as an avaricious, greedy Wall Street moneybags person, and

4    there's a side to him I think people need to know.

5         THE COURT:  Well, if they -- if that came out in the

6    questioning, maybe they would open the door to some of those

7    things on redirect, maybe not 9/11, but the bit about the

8    charitable stuff.  I would imagine I would be dealing with

9    objections before we got there.  I sort of hope I would be.  I

10   don't really want the jury to be deciding this case, frankly,

11   on things like 9/11 and Mr. Fraser's charitable efforts any

12   more than I want them to be deciding things about this case

13   about Mr. Fraser being portrayed as an avaricious Wall Street

14   moneybag, as you put it.

15        So I'm not going to allow the 9/11 evidence, although

16   doors can be opened during the trial.  That would be -- I'll be

17   candid and say I think that would be a hard one to open from my

18   standpoint, but they could open it.  Certainly if they got into

19   the "Remember Hashlets," it would open.

20        MR. WEINER:  Your Honor, if I may on that?

21        THE COURT:  Yeah.

22        MR. WEINER:  When I have him on direct and I'm asking

23   him, Why did you leave Cantor Fitzgerald? what is he supposed

24   to say?  Is he not supposed to mention the events of 9/11 that

25   changed his life completely?

1          THE COURT:  So let me back up for a minute because I

2    fully want to understand the Cantor Fitzgerald stuff.  I've

3    seen documents here dated 2013, 2014 -- well, I think 2014

4    where Cantor Fitzgerald is mentioned, where he's -- I don't

5    know -- involving the lawyers from Cantor Fitzgerald or at

6    least Garza says he is.

7          MR. WEINER:  Sure.

8          THE COURT:  So when you say he left Cantor Fitzgerald,

9    he still had a relationship?  What was going on there?

10         MR. WEINER:  In 2003 or '4 he retired as an active

11   member at Cantor Fitzgerald.  He remains a retired partner in

12   Cantor Fitzgerald.  So he has relationships with people there.

13   He listens in on -- they have quarterly phone calls, so he

14   listens in.  He's a member of the Memorial Fund, so he

15   maintains a relationship with the company which really gives

16   meaning to his life today.

17         THE COURT:  Why does the jury need to know he's

18   semi-retired -- is that the word you used? -- he's semi-retired

19   from Cantor Fitzgerald?  Why would they need to know that?

20         MR. WEINER:  I think in part, Your Honor, because

21   they're going to say the reason he tried to involve Cantor

22   Fitzgerald and get them involved in this was to wrap himself in

23   the companies, in Mr. Garza's companies, with the Cantor

24   Fitzgerald name.  And if you know what Cantor Fitzgerald means

25   to him, you know, how important, he would never, ever do that

1    because, you know, second to his wife, it means the world to

2    him.  So you can't understand --

3          THE COURT:  But he can say, I suppose, that much.  In

4    other words, Mr. Buchdahl described, I guess, there's a family

5    relationship with the company.  He worked there for a long

6    time.  Companies can mean something -- you know perhaps better

7    than anyone that it means more than anything in the world for

8    him in large part because of what happened on 9/11.  Fair

9    enough.

10         I just -- in light of the concerns that Mr. Buchdahl

11   identified, which I think are legitimate concerns about us not

12   knowing individual jurors' experiences about 9/11, I am

13   concerned that that will cause unfair prejudice in the sense

14   that I just don't know where that's going to go in their minds.

15   And it's quite divorced from the merits of the case.  But I'll

16   give you 30 seconds to change my mind.

17         MR. WEINER:  Your Honor, he's there in the stand.  And

18   the jury is wondering, why did you get involved with Josh Garza

19   in these businesses?  The only answer is:  I left my job and my

20   career at Cantor Fitzgerald because of what happened on 9/11,

21   and I turned to these other businesses about involving those.

22         You can't understand why he did get involved with Josh

23   Garza and the companies without knowing that.

24         And the question would be simple:  Why did you leave

25   Cantor Fitzgerald?  He would say, The events of 9/11 changed my

1   mind.

2          It's not going to be sounds and lights and all.  What
3   did you do?  Aren't you a hero? and all of that.  It's none of
4   that.  Just have to explain why his life moved in a completely
5   opposite direction.

6          THE COURT:  Well, aren't you going to need to ask
7   him -- when he says "the events of 9/11 changed my mind,"
8   aren't you going to need to ask him at that point:  Well, what
9   do you mean by that?

10         MR. WEINER:  With Your Honor's direction, I won't say
11  that.  He will say, The events of 9/11 had me have a change in
12  my life view.  After trying to resurrect the company, I took a
13  step back and reassessed and got involved in some other things,
14  including the business with Josh Garza.

15         Doesn't have to be a follow on of, What did you do,
16  and how did you help out? and all that.  I don't need to do
17  that.  But I need to let the jury --

18         THE COURT:  I tell you what.  I'll reserve on that
19  kind of an answer, something that brief.  I haven't -- you
20  might persuade me that during the direct there needs -- there's
21  something missing.  I'm not sure you'll persuade me of that.
22  But it would have to be extremely limited.

23         Mr. Buchdahl?

24         MR. BUCHDAHL:  Your Honor, honestly, my response to
25  this is that it takes away all the probative value and doesn't

```
 1    really help the prejudice issue because it's the -- it's
 2    invoking 9/11 that gets the jurors minds spinning.  And the
 3    bigger problem here is not that they're going to say, gosh, why
 4    did he go into business with this young man?  That's not --
 5    it's not even relevant.
 6            Like, the question is:  He's in business with him.
 7    What happens in 2014?
 8            This is the same party that didn't want us to talk
 9    about ZenMiners because it was a month before the class period;
10    right?  So the notion they're going to be not able to
11    understand the case because they're going to say, Why did you
12    leave Cantor Fitzgerald? that seems strange.
13            THE COURT:  I hear you.  I'm going to reserve.  It
14    would be extremely limited, and I'm not saying I'm going to do
15    it.  Okay?  That's my ruling.  But otherwise, no 9/11.
16            MR. WEINER:  Your Honor, I think there's one more part
17    of their motion which was kind of the middle prong, which is
18    they didn't want any mention of the effect that a verdict would
19    have on Mr. Fraser.
20            THE COURT:  Yes, that's the other issue.
21            MR. WEINER:  If I can address?
22            THE COURT:  Please.
23            MR. WEINER:  I think you saw in our opposition we said
24    we're not going to argue to the jury that they shouldn't find
25    against Mr. Fraser because it will cause a hardship.  But,
```

1    again, they're going to paint a picture of him as a wealthy

2    Wall Streeter.  And we have to be able to paint the picture

3    that with his reputation important to him, he wouldn't want to

4    associate with a fraud.  You know, you can't have one side of

5    the coin --

6         THE COURT:  I think you can do that.  I think you can

7    do that.  The question then becomes, you know, whether -- I

8    think the question -- I understood the motion to deal with the

9    financial consequences of a verdict, to be honest.  Are you

10   suggesting, no, that's not what I'm interested?

11        MR. WEINER:  Maybe I misunderstood the motion.  I

12   think if it's just make sure you don't say, Will this be a

13   hardship for you if you lost the case?  We're not going to ask

14   that.  He's not going to answer that.

15        But I will ask him, Is your reputation important to

16   you, and would you associate with a fraud?  He'll say, No.  I'm

17   a person of substance.  I built my life --

18        THE COURT:  I don't see a problem with that.

19        MR. BUCHDAHL:  Your Honor, we will be happy to cross

20   him on that point.  I think what's important to keep in mind

21   here is that there's no damages in this trial.

22        THE COURT:  No, no, I agree.

23        Just so we're clear, I think we have an agreement.  I

24   think we have an agreement that we're not going to get into the

25   financial consequences of an adverse verdict to Mr. Fraser at

```
1     all.  Okay?  That's my ruling on that.
2              MR. WEINER:  Understood.
3              THE COURT:  Certainly I think you can get into, now,
4     you know, you were asked on -- by the way, have you folks made
5     a decision about the issue of --
6              MR. WEINER:  We chose Option No. 1, Your Honor.
7              THE COURT:  Testify in one sitting?
8              MR. WEINER:  Yes.
9              THE COURT:  So, for example, you're going to -- you're
10    going to beat him up somewhat when you start with him.  And,
11    you know, by then a lot of these things will be out there
12    already.  And I think Mr. Weiner can say:  Mr. Buchdahl asked
13    you or whoever asked you about, you know, lending your
14    financial -- lending, you know, the name of Cantor Fitzgerald
15    to this or lending the name of Stuart Fraser to this and, you
16    know, is that something you do commonly when you think there's
17    a fraud going on?
18             And I think, you know, Mr. Fraser could say,
19    Absolutely not.  My reputation's important to me.  It's not
20    something I would ever do.  I worked hard at my company, etc.
21             That's the kind of thing I think is fine.
22             MR. WEINER:  Understood, Your Honor.
23             MR. BUCHDAHL:  It is.  And I think just to be -- I
24    don't think we need to --
25             THE COURT:  Neither do I.  Okay, so I think we've
```

1    resolved that one.  So what I'll do with that portion is, I
2    guess, grant in part and deny in part and specify what I just
3    did.
4         All right.  Now let's move on to the Motion in Limine
5    regarding Internet Discussions.
6         MR. WEINER:  And that's Ms. Hassan.
7         THE COURT:  I thought Ms. Miller was going to be here
8    for that.
9         MR. WEINER:  She's still recuperating.
10        THE COURT:  Okay.  Sorry to hear it.
11        MS. CHEN:  Your Honor, would you like to hear from
12   Plaintiff counsel or Defense counsel?
13        THE COURT:  Well, I'll give you both a chance to
14   speak.  Let me just review the bidding on this.  I think I
15   outlined my thoughts last time.
16        My thoughts were -- and I didn't have the specific
17   documents in front of me at the time.  But my thoughts were
18   that there were going to be some foundational and
19   authentication type issues that some of these documents I
20   actually couldn't tell where they came from.  There wasn't even
21   a -- I called it an internet line last time, a website address,
22   that kind of thing at the top for some of them.  And so until I
23   have some sense of what this document is and where it comes
24   from, I wouldn't be able to allow it into evidence.
25        Furthermore, there would also need to be some

1    foundation that a lot of people saw this, a lot of the

2    potential class -- no, not "potential" -- of the class members

3    saw this.

4            I recall in the briefs that the Defendant quoted some

5    testimony from one of the named Plaintiffs that -- and I'm sure

6    I'm not going to get this right, but something to the effect

7    everything was on HashTalk.  Everybody was looking at HashTalk.

8    I think that would be the kind of foundational evidence I would

9    have in mind that would make some of, for example, the posts on

10   HashTalk relevant.

11           I would certainly give an instruction that these

12   statements could not be considered for their truth.  I would

13   tell the jury in some cases we don't even know who the speaker

14   is but that the only purpose for which they're to consider

15   these documents is the extent to which information was

16   available to class members.  I would probably say this

17   differently, but information was available to class members

18   regarding the products, something vague like that to make it

19   clear that:  A, they're not to consider it for truth; and, B,

20   that they're simply to look at, you know, what was being said

21   publicly about these products.  That's something probably along

22   the lines I would say.  That's, I think, sort of a recap of

23   what I said last time, but I did say we would discuss it more

24   today.

25           So it may make sense to start with Plaintiffs' counsel

1    on this since I've sort of -- I'm leaning towards allowing

2    these, some of these, provided that those requirements can be

3    satisfied.

4            So Ms. Chen.

5            MS. CHEN:  Your Honor, I'll address both points, but

6    I'll start with the foundation point, and then I'll speak a

7    little bit more just to the substance of these internet posts.

8            THE COURT:  Okay.

9            MS. CHEN:  So on foundation, first, I just wanted

10   to -- Your Honor said last time, as you said that we need to

11   lay a foundation, a large portion of the class saw this, that a

12   lot of people saw this.  And I do want to make sure there's a

13   distinction between whether a class member -- or there's any

14   evidence a class member might be on a particular website and

15   whether class members actually saw specific posts.  And because

16   Mr. Fraser is offering specific posts, I think there is a

17   distinction to be made between people who were on HashTalk or

18   people who were on Bitcointalk.

19           I looked at a way back machine archive of Bitcointalk,

20   for instance, from September 1, 2014.  There are millions of

21   posts on Bitcointalk, for instance.  So I think that -- I

22   understand --

23           THE COURT:  Bitcointalk one of the sort of generic

24   industry-wide ones?

25           MS. CHEN:  Yes, Your Honor.  So HashTalk was the GAW

1    Miners' operated website, and then Bitcointalk and Reddit --

2    for instance, Reddit actually isn't even specific

3    cryptocurrency.  It can be about anything.  And so I think, you

4    know --

5            THE COURT:  Is there any indication about the number

6    of people on line at the time on these cites, on the number of

7    hits they were getting, anything like that?

8            MS. CHEN:  I have not seen that from Mr. Fraser.

9            THE COURT:  Okay.

10           MS. CHEN:  I don't know if that might be out there

11   somewhere.

12           The one thing I would say just with respect to

13   HashTalk, because Your Honor mentioned Mr. Shinners'

14   testimony --

15           THE COURT:  Right.

16           MS. CHEN:  -- understand that Mr. Shinners, you know,

17   said everybody was on HashTalk.  He also said, for example,

18   that he was -- he said that, I would say, the vast majority of

19   the people that were customers of GAW were reliant on us

20   completely and exclusively on HashTalk.  That's another piece

21   of testimony that Mr. Fraser quoted.

22           I think that we would say, Your Honor, is that there's

23   no -- Mr. Shinners is one person.  He might have been on

24   HashTalk.  He has no way of knowing, quote, unquote, what

25   everybody was doing, and he certainly has no way of knowing

1     what people were relying on.  That's pure speculation, and we

2     don't think that lays a specific evidentiary basis to then

3     admit all of these HashTalk posts that have no real connection

4     between, you know, the absent class members that we don't even

5     know, you know, who Mr. Shinners was talking about.

6          And I will also just mention that at the class cert

7     stage, Plaintiffs put in a declaration from our expert,

8     Dr. Mills, and that declaration mentioned that he had looked at

9     the ZenCloud database as well as the Paybase database.  I

10    understand that the number of user IDs in these databases may

11    or may not be, you know, the same as the number of class

12    members.  But just to put some of these in perspective, Mr.

13    Mills said that he found 212,455 user IDs in the ZenCloud

14    database that had at least one transaction, something over

15    200,000 user IDs, and then in Paybase he said he had found

16    six -- sorry -- 8,679 user IDs.

17         THE COURT:  But how does that help you?  I don't

18    understand.

19         MS. CHEN:  So the idea, Your Honor, is that there were

20    a lot of user IDs in these GAW databases.

21         THE COURT:  Right.

22         MS. CHEN:  It suggests there are thousands of class

23    members certainly at least.  And what Mr. Fraser has laid the

24    foundation that he has attempted to lay in his brief is a quote

25    from Mr. Shinners, which we contend is pure speculation.  He

1     has one -- one deposition of a class member -- that's Mr.

2     Phegu.  And if we look at the testimony from Mr. Phegu, he

3     doesn't talk about HashTalk.  He talks about Bitcointalk.

4             And all that Mr. Phegu agrees to is that he had at

5     some point written or looked at Bitcointalk for just anything

6     related to GAW Miners, not necessarily about the products, not

7     necessarily about Hashlets, not necessarily about any of these

8     allegations.  It was just a generalized statement, yes, he had

9     looked at one point at Bitcointalk.

10            THE COURT:  But let me ask you a question.  If I was

11    around in 2014 and I was interested in cryptocurrency -- maybe

12    I heard of GAW or Josh Garza -- how would I find out about

13    these products?  I would go to the website.  That would be one

14    place; right?

15            I mean -- and I mean assuming I don't, you know, know

16    Mr. Garza.  I don't work at the company.  I don't have any

17    relationship with them.  But I'm just, you know, some guy in

18    California or wherever, Australia, and I see Mr. Garza's name

19    at some point.  How would I find out about him?  I would go to

20    the website.  Where else would I go to find out about these

21    products?  Wouldn't I go to some of these sites, the

22    Bitcointalk and Reddit?

23            MS. CHEN:  Your Honor, I -- frankly, I don't know.

24    And I think the more salient point --

25            THE COURT:  Well, isn't it reasonable to infer, given

1    there were 212,000 accounts and investors, somehow people were

2    finding out about this company and these products enough that

3    they wanted to buy them.  And so then one raises the question:

4    Well, how were they finding out?

5         MS. CHEN:  I think that is the critical question for

6    Mr. Fraser, Your Honor, since he is attempting to get these in

7    evidence.

8         THE COURT:  I agree with that.  I agree, it's his

9    burden.  He's the proponent of the evidence.  He has to come up

10   with some evidence to meet these foundational requirements.  I

11   agree with all that.

12        I guess what I'm wondering:  Is it not a reasonable

13   inference, given that the company doesn't have SEC filings,

14   doesn't have -- hasn't been around for very long, you know,

15   certainly is far from being a blue chip company or a household

16   name.  Where else would they find the information?  That's what

17   I'm wondering.  Why isn't a reasonable information that, well,

18   they must have been looking at these?

19        Now, is that enough to get it in?  No.  But it's

20   something.  It's a link in the chain.  No?

21        MS. CHEN:  I mean I think certainly you could -- there

22   should be some sort of -- we know that class members found out

23   about GAW somehow.  But the point is we don't know how.  The

24   internet is very large.  And Mr. Fraser is trying to get in

25   very specific evidence from the internet.

1            And we just think that kind of inferential leap

2    between class members must have found out about GAW somehow to

3    class members must have seen these specific posts and messages,

4    articles on the internet is just too wide to allow this kind of

5    evidence.  And I can get into the substance as well, Your

6    Honor, because we also --

7            THE COURT:  Which substance?  Sorry.

8            MS. CHEN:  Excuse me.  So other than foundation, I can

9    also get into why we just don't think this evidence is relevant

10   and also why certainly it's more -- much more prejudicial?

11           THE COURT:  Okay.  Go ahead.

12           MS. CHEN:  And so I think one thing to consider here

13   is that while Mr. Fraser says that he is not offering these

14   internet messages for their truth, he's only offering them for

15   notice, what he's basically saying is:  While the jury should

16   not take them for their truth, the class members absolutely

17   should have at the time; right?  That is essentially what he is

18   saying, that the class members should have saw this information

19   as true and then changed their behavior or somehow changed

20   their reliance on misrepresentations from the company as a

21   result of these statements that they're seeing on the internet.

22           And so the point I wanted to make, Your Honor, is just

23   the line between the hearsay purpose and the nonhearsay purpose

24   of these exhibits is very fine, almost nonexistent.  And as a

25   result, I would argue that the kind of traditional concerns we

1    have about the admission of hearsay evidence are particularly
2    acute in this instance.
3             THE COURT:  But isn't ultimately -- isn't -- I take
4    the purpose of the offer to be:  Look, people were raising --
5    people were saying things -- who knows whether they were
6    true -- but a lot of people were saying things like this, which
7    to some investors should have at least raised a yellow flag, if
8    not a red flag, of, "Hey, you know what?  Maybe I should check
9    further.  Maybe I shouldn't rely on statements Mr. Garza's
10   making or at least I should inquire further," not that, "Oh,
11   he's running a Ponzi" is a true statement but that someone said
12   he's running a Ponzi.  And maybe it's not just one; maybe it's
13   several.  Maybe you start to take a closer look at it and not
14   that you believe the statements, but you say, "Well, why are
15   all of these statements out there?"  I think that's why they
16   want this evidence.
17            MS. CHEN:  So I guess my question would be if the
18   class members were supposed to look at these statements just as
19   a flag, as "I should investigate further," then what were they
20   supposed to do?  The allegations that --
21            THE COURT:  I think the Defense would say is they
22   shouldn't accept what was being said at face value.  And maybe
23   they didn't accept what was said at face value.  Maybe they
24   bought despite the fact that there were red flags being, you
25   know, thrown around the field and, therefore, you know, we

1   don't think they did rely.

2          I don't -- I don't know what their argument is going

3   to be, but I imagine it's going to be something along those

4   lines.

5          MS. CHEN:  I think our response would be the

6   information that, for example, that Hashlets were not backed by

7   sufficient mining power or that Hashlets were a Ponzi scheme

8   or, for example, Paycoin's hundred million reserve fund did not

9   actually exist, that was not public information.  And while

10  there might be people on the internet speculating as to whether

11  those statements were true, the class members don't actually

12  have a way to verify that.

13         THE COURT:  Well, when you say it's not public

14  information, what exactly do you mean?  I mean these days

15  something in the newspaper article, for example, would be

16  considered public information, or at least back in the old days

17  it would have been.  Now it's all on the internet.

18         And so if for some people what used to be, you know,

19  the back page of *The Wall Street Journal* if you're in a

20  particular sector, maybe now it's -- it's HashTalk or

21  something.  I mean, again, I have no idea whether they can lay

22  that foundation.  I'm not suggesting it's going to be easy to

23  do that.  I do think with HashTalk, given some of the quotes

24  from Mr. Shinners, they're in the game.  But I don't know about

25  these other sites.  I don't know what they're going to be able

1     to show with regard to who was looking at Reddit, for example,

2     because I'm not simply going to let it in because it's Reddit

3     or something.

4           But when you say it's not public information, I'm not

5     sure -- are you meaning something other than we have no idea

6     how widely distributed it was?

7           MS. CHEN:  No, Your Honor.  What I meant was if the

8     point of the internet posts is to give class members notice

9     that they should investigate further as to the statements that

10    are being said online, then the question is:  What kind of

11    investigation were they supposed to do?  What could they have

12    actually found out?

13          And absent, you know, going to Josh Garza and saying,

14    Are you running a Ponzi scheme --

15          THE COURT:  But do they need to worry about that?  At

16    the end of the day, they're just trying to rebut the inference

17    of reliance.  Do they need to worry about what else could they

18    have done?

19          MS. CHEN:  I think it goes to the probative nature of

20    the notice, Your Honor.  So I can --

21          MR. BUCHDAHL:  Your Honor, if I may interject just one

22    thing, one of the things I'm going to do, if I may, today

23    before we wrap up is to ask you to take a look at certain of

24    your evidentiary decisions on Plaintiffs' exhibits.  But the

25    one thing I would just like to toss into the mix here is Your

1    Honor was particularly strict about hearsay when it came to
2    statements about this in the other direction.
3            In other words, Your Honor's ruling said, Look, the
4    fact that Josh Garza said to *The Wall Street Journal* or to a
5    press release, "Hey, we got Stuart Fraser from Cantor
6    Fitzgerald here.  Would he be" -- you know, stuff like that.
7            This is -- this is in the same category.  It's
8    certainly not more probative than that.  If we're just talking
9    about what is on the internet that a class member might have
10   seen, I think that Your Honor looked at a lot of the evidence
11   we were submitting as it bore on Mr. Fraser and his control.
12   But if you're going to let in all the stuff on the issue of
13   reliance, then it seems to me that public statements on the
14   internet, whether they're press releases, *Wall Street Journal*
15   articles, or anything else are in the exact same category.
16           THE COURT:  But they're not because the issue of
17   whether they're hearsay go to whether they're offered for the
18   truth of the statement, a statement that, for example, Mr.
19   Garza's saying "it's my company" or "I control marketing."
20   That's offered for truth.  You can say it's not offered for
21   truth, but it's going to be considered by the jury for truth
22   because there's going to be a big fight about control in this
23   case.
24           MR. BUCHDAHL:  I think we have a number.  You can look
25   at them specifically.  I just think this should be a goose

1    gander question.

2           THE COURT:  I agree, but I don't agree that's an apt

3    comparison.

4           But go ahead.  What were you telling me?

5           MS. CHEN:  So I was going to quote Second Circuit case

6    on justifiable release, *Brown vs. EF Hutton Group*.

7           THE COURT:  Sorry.  Can you say the case again?

8           MS. CHEN:  Sorry.  It's *Brown vs. EF Hutton Group*,

9    H-u-t-t-o-n.  This is 991 F.2d 1020, a Second Circuit 1993.

10          And in this case the Court states that the question on

11   justifiable reliance is recklessness.  It's whether investors

12   should have -- should have discovered the truth through minimal

13   diligence.  That's what that case states.  And some of the

14   factors that the Court considers are the plaintiff's

15   opportunity to detect the fraud, for instance.

16          And so what we would argue is these internet posts,

17   they don't give Plaintiffs an opportunity to detect the fraud.

18   There is no way for Plaintiffs to -- or the class, excuse me,

19   to look at internet posts, you know, about whether or not

20   Paycoin might have a hundred million dollar reserve and then

21   have an opportunity to really do anything with that

22   information.  It's not actionable information.

23          THE COURT:  So are you suggesting that case stands for

24   the proposition that there's reasonable reliance, regardless of

25   the information that's out there, unless the Plaintiffs can, in

1   fact, through minimal effort, discover the fraud behind the

2   statements?  Is that what that case is standing for?

3       MS. CHEN:  So the case -- the case does list a number

4   of different factors to consider, such as the sophistication of

5   the plaintiff in a particular case.  They discuss the

6   plaintiff's representation by counsel.  I think that was a case

7   involving maybe certain kind of statements regarding litigation

8   or kind of legal liability, the plaintiff's opportunity to

9   detect the fraud, whether the fraud was concealed, the nature

10  of the fraud.

11      And so there are factors that are considered, but I

12  think what the take-away from *Brown* is, it's not everything in

13  the world comes in -- right? -- just because it might, might

14  affect reliance; that there has to be some consideration --

15  right? -- of whether the evidence is actually probative of that

16  issue.  And when the issue is internet discussions that are

17  anonymous, they're unverified, unverifiable, and then the

18  statements that -- excuse me -- the kind of the truth --

19  right? -- that Mr. Fraser contends that the Plaintiffs should

20  have been able to discover on the basis of those discussions

21  was nonpublic.  It was unknown to Mr. Garza.  We allege it was

22  known to Mr. Fraser.  But it's not something Plaintiffs could

23  sort of investigate on their own and sort of discover.

24      So I would point out a lot of reliance cases they

25  involve -- there's a statement by defendants, you know, in a

1    particular, you know, securities filing.  There might be

2    another statement in another filing.  There might be a

3    statement in a prospectus.  But those are all statements by

4    defendants.  And you put them together, and you say whether or

5    not the plaintiffs justifiably rely.  And the idea would be if

6    there's something misleading in a proxy statement but there's,

7    you know, something that kind of puts that in context --

8            THE COURT:  So are you saying that the third-party

9    statements are not part of the reliance?

10           MS. CHEN:  Yeah, I wouldn't make a bright line rule,

11   Your Honor.  I think *Brown* is pretty clear that, you know,

12   there are factors to be considered.  Um, but I think there has

13   to be a limiting principle.

14           And in this case, the limiting principle, I think, has

15   to stop before we get to the entire internet or, you know,

16   posts on these message boards that might have thousands or

17   millions of posts -- right?  We don't really know who saw them;

18   and, frankly, the back-and-forth on some of these threads of,

19   you know, people kind of just going back and forth arguing

20   about speculation, we just don't think there's enough probative

21   value to justify what we think is the prejudicial effect.

22           THE COURT:  I would like to hear from Defense

23   counsel.

24           MS. CHEN:  Thank you, Your Honor.

25           THE COURT:  Ms. Hassan.

1          MS. HASSAN:  Okay, so maybe I'll start with just the

2     relevance of these posts.  I think the test for figuring out

3     what should come in to prove or disprove justifiable reliance

4     is:  What was the total mix of information available to the

5     customers?  Right?  What are they looking at?

6          THE COURT:  Why do you think that's the test?  Is

7     there some authority you can cite for me?

8          MS. HASSAN:  Yes, Your Honor.  So I have -- we cited

9     this case in our brief too.  It's *In re Crystallex*.

10          THE COURT:  Can you just spell that?  In re?

11          MS. HASSAN:  C-r-y-s-t-a-l-l-e-x *International Corp.*

12     securities clause action litigation.

13          THE COURT:  Can you give me a citation for that?  I'm

14     sure it's in your brief.

15          MS. HASSAN:  No, no, no.  Westlaw citation, 1999 WL

16     787655.  It's a decision from the Southern District of New

17     York.

18          THE COURT:  Okay.  And that case talks about the total

19     mix of information available?

20          MS. HASSAN:  Correct, correct.  And I think in this

21     case, having read some of these back-and-forths on these

22     various forums, it seems very clear that a lot of people who

23     were very passionate about buying cryptocurrency or about the

24     cryptocurrency world were looking to these kinds of forums.

25     And many of them would --

```
1              THE COURT:  How are you going to prove that?

2              MS. HASSAN:  Well, Your Honor, so what we did based on

3    the posts last time was we kind of bucketed the internet posts

4    or internet discussions that we had in different forums, and we

5    also identified within those which ones have at least one of

6    the class representatives on them.

7              THE COURT:  Okay.

8              MS. HASSAN:  So I guess maybe I can put aside the ones

9    which have a class representative on them.

10             THE COURT:  Tell me which ones those are, though, so I

11   know.  HashTalk is one, I take it?

12             MS. HASSAN:  That is correct.  So we ended up with

13   HashTalk, Bitcointalk, GetHashing, and gethashing.com.  And I

14   can go through the foundational aspects of each of them.

15             THE COURT:  Before we do that, though, those three you

16   said have -- those three have posts by the named Plaintiffs?

17             MS. HASSAN:  Well, Your Honor, let me add a fourth

18   one, Reddit.

19             THE COURT:  Reddit, okay.  And so you're going to

20   have, in effect, a witness here who's going to be able to say

21   yes or no, what are these, and to what extent do you have any

22   knowledge about how widely these were seen or distributed?

23             And what do you think they're going to say?  I mean

24   did you ask them in their depositions about that?  I mean there

25   is a question about what their personal knowledge is as to the
```

```
 1   statement, "Everybody's on HashTalk."  What are they going to

 2   say about that?  What do you think the foundation's going to

 3   be?

 4            MS. HASSAN:  So, Your Honor, to answer the first part

 5   of the question --

 6            THE COURT:  Sure.

 7            MS. HASSAN:  -- for each of the four buckets, I think

 8   at least one of the class representatives has posted, and we've

 9   included at least one post from them.

10            THE COURT:  I'm sorry.  Say that again.

11            MS. HASSAN:  At least one of the class representatives

12   has posted on each of the forums.

13            THE COURT:  Has posted on, okay.

14            MS. HASSAN:  So let's start with HashTalk, Your Honor.

15   You already noted Mr. Shinners' deposition testimony about how

16   the vast majority of people that were customers of GAW were

17   completely and exclusively reliant on HashTalk.  And I think --

18            THE COURT:  Did he say in the deposition how he knew

19   that?

20            MS. HASSAN:  He -- I don't believe, but I think just

21   knowing Mr. Shinners' role with this entire enterprise and the

22   fact that he then proceeded to kind of collect the names of the

23   class members for the litigation, he would -- if anybody knows

24   who is around and who are the repeat players --

25            THE COURT:  It would be him.
```

1              MS. HASSAN:  Right, exactly.  And just to give another

2      example, one of the other forums that I mentioned, GetHashing,

3      that was used or that was one of the things that Mr. Shinners

4      appears to have used to identify purported class members.

5              So again, I think if he knows who are the people he's

6      talking to, he's also mentioned some of the people that he

7      probably sees on the various forums in a number of his e-mails;

8      right?  I believe he suggested at one point that Mr. Garza

9      should hire somebody who goes by the handle Daffy.  So he

10     apparently knows something about Daffy and how Daffy keeps on

11     appearing on these various forums.

12             THE COURT:  Yeah, I don't think that part's going to

13     be helpful, but the first two things he said might be.

14             MS. HASSAN:  Right.  So for HashTalk, again, we have

15     testimony from Mr. Pfeiffer, which we included in our papers,

16     and from Mr. Audet that they both visited that forum very

17     regularly.  We also have testimony from two other class members

18     that we deposed in this case, Mr. Simpson and Mr. Grimes.  And,

19     again, they identified HashTalk as a place where everybody -- I

20     shouldn't say everybody -- where at least they have visited and

21     looked to for information about the GAW products.  So I think

22     that would be our foundation.

23             THE COURT:  Okay.  With regard to HashTalk, okay.

24             MS. HASSAN:  Right.  For Bitcointalk, again, we

25     believe -- we have Mr. Shinners' posts on Bitcointalk, and we

```
1   believe that, one, we can lay any further foundation that is
2   required through Mr. Shinners.  But we also have --
3              THE COURT:  Why do you believe that?  Why do you
4   believe that he's -- what do you expect him to testify about
5   Bitcointalk, and what's the basis for your belief about that?
6              MS. HASSAN:  So, Your Honor, one thing I noticed is a
7   lot of the names repeat between HashTalk and Bitcointalk.  And,
8   in fact, all the -- a lot of the handles repeat.
9              THE COURT:  Okay.
10             MS. HASSAN:  So I think we could ask Mr. Shinners, and
11  if he had to lay the foundation before we used a particular
12  document with him, we could do that.
13             THE COURT:  You would.
14             MS. HASSAN:  We could ask him:  You forced it on
15  Bitcointalk.  How often did do you that?  How familiar were you
16  with it?  Did you know any of the other players who were
17  posting?
18             THE COURT:  Your can certainly ask those questions.
19  What I'm asking is:  Do you already know the answers to those
20  questions based on his deposition testimony?  It sounds like
21  you do with regard to HashTalk.  But do you with regard to
22  Bitcointalk?
23             MS. HASSAN:  I do not know the answers.
24             THE COURT:  I'm not going to shut you -- prevent you
25  from asking those questions of him, but the answers are going
```

1    to have to satisfy me before the document's come in.

2              MS. HASSAN:  Understood.

3              THE COURT:  Are you in the same boat on

4    gethashing.com?  Sorry, I think you told me about

5    gethashing.com was used for purported class members.

6              MS. HASSAN:  Correct.

7              THE COURT:  And he's going say that?  Somebody's going

8    to say that on the stand?

9              MS. HASSAN:  Yes.

10             THE COURT:  At least you expect?

11             MS. HASSAN:  Yes.  Mr. Shinners' also testified about

12   GetHashing, that a lot of people who apparently were banned

13   from HashTalk ended up in GetHashing.  So, again, he has

14   knowledge about the forum.

15             THE COURT:  Okay.

16             MS. HASSAN:  And I would say that with Reddit, the

17   fourth bucket, we're kind of in the position of Bitcointalk.

18             THE COURT:  Okay.  So I think that that's all fine.  I

19   think I would be inclined to go -- I know it will slow things

20   down, but given how important this issue is to both sides, I do

21   think you're going to need to lay the foundation in front of a

22   jury with respect to each of them.  And I'll make the calls as

23   we go through.

24             I do think that it is pertinent to foundation that if

25   one or more of these forums was used in effect to recruit class

1    members, I think that's pertinent to how widely they were used.

2    I think the statements that Mr. Shinners made in his deposition

3    are pertinent.

4         I agree with Plaintiffs' counsel that they don't get

5    all the way there.  There still has to be some basis to show

6    that he has that knowledge.  But -- so I'm not making rulings.

7    Just to be clear, I'm not saying -- I haven't admitted any of

8    these exhibits.

9         But I think that I can craft a jury instruction that

10   will deal with the hearsay problem, and I really think it is a

11   matter of showing that, A, there's essentially authenticity.

12   What are these documents?  And, B, in effect, relevance,

13   foundation to establish relevance.  Because I don't think

14   they're relevant if we don't know anything about who saw them,

15   how many people saw them, and it's just a handful of posts.  I

16   don't think they would be relevant.  So that's my ruling on

17   that.  Okay?

18        MS. HASSAN:  Thank you, Your Honor.

19        THE COURT:  All right.  I think we're on to the Motion

20   in Limine Regarding the Scope of the Class Trial.  This is No.

21   256.  I issued a ruling earlier in the week after allowing the

22   parties further -- sort of to send us further authorities on

23   the question of whether Mr. Fraser's knowledge or a reasonable

24   person's knowledge or constructive knowledge about whether the

25   products were securities was relevant.  I concluded that it was

1   not.  And I know that was one issue that was raised in
2   connection with this motion.
3        The other -- the motion otherwise seeks to keep out
4   evidence relating to damages and evidence, I think, that goes
5   beyond the class period; is that right?
6        MS. CHEN:  That's correct.
7        THE COURT:  Yes?  Were you going to argue this one?
8        MR. RENNIE:  Yes.
9        THE COURT:  So obviously I don't intend to get into
10  issues of damages in this case.  What I tell the jury about
11  damages I'm still thinking about in terms of the final charge,
12  other than telling them, "This case is not about damages;
13  you're not to worry about damages," I probably wouldn't say
14  much more than that.
15       Was there something -- and I think we discussed last
16  time that there may be documents that postdate the class period
17  that may be relevant for other purposes; they may speak to
18  things that occurred during the class period.  So I'm not
19  inclined to issue a broad ruling saying that nothing outside
20  the class period can be admitted into evidence.
21       Is there anything more I need to do on this motion?
22  Is there something -- some specific piece of evidence you had
23  in mind?
24       MR. RENNIE:  No, Your Honor.  I think your instincts
25  are right in that.  And I believe Defense counsel agreed last

1    time that issues solely related to damages are just not

2    relevant.

3            I'm happy to talk about the documents.  There are a

4    few more we talked about in our memo.  Apologies, as I adjust

5    my mask.  And we'd be happy to talk about those to the extent

6    they're illustrative.  But we, obviously, defer to Your Honor.

7            THE COURT:  I don't know.  Does Defense counsel think

8    there's much more to discuss on this one?

9            MS. HASSAN:  No, Your Honor.  I think this is a very

10   document-specific kind of motion.

11           THE COURT:  All right.  So I think it probably makes

12   sense, as you know, I'm trying to go through the exhibits and

13   make rulings.  And I assume that you've heated things up for me

14   there.  I'm sure you have.

15           MR. RENNIE:  There is one issue.

16           THE COURT:  Okay.

17           MR. RENNIE:  It's sort of --

18           THE COURT:  Related to this motion?

19           MR. RENNIE:  Yes, relating to this motion.  And it has

20   to do with the post class period conduct.  So there was one

21   document we discussed about DX 674, which is a series of

22   e-mails from Mr. Shinners.  And they purportedly relate to Mr.

23   Garza's sort of trip to the, you know, the Gulf, Dubai, after

24   the class period.

25           And I just wanted to briefly make a point on that

1    document.  The Defense counsel's brief says that it's relevant
2    to Mr. Garza's credibility.
3          THE COURT:  Just so I'm clear, what does the document
4    show?  It shows that Garza went to Dubai after the class period
5    and was sued over there or something like that?
6          MR. RENNIE:  Possibly.  I mean it's an e-mail
7    between -- it appears to be between Mr. Shinners and an FBI
8    agent, and there are screenshots included in the e-mail and
9    there's commentary about it.  But to us, I mean all of this
10   sort of post dates the class period, obviously.  It doesn't
11   have anything to do with class members' knowledge during the
12   class period.  And in fact -- I'm so sorry.
13         THE COURT:  That's all right.
14         MR. RENNIE:  The only thing they raise in their brief
15   is the issue of Mr. Garza's credibility.  But I guess one thing
16   we'd like to point out is Mr. Garza was deposed in this case,
17   and he was, in fact, questioned about this.
18         THE COURT:  Let me -- let me -- so I can understand,
19   let me start with Defense.  Is this a document you claim -- you
20   seek to introduce this document, this e-mail between Mr.
21   Shinners and the FBI agent that refers to Mr. Garza being in
22   Dubai and being sued?  What would be the purpose of that?
23         MS. HASSAN:  Your Honor, the purpose of this e-mail
24   would be to attack Mr. Garza's credibility.  And I think just
25   to put into context, this is an e-mail from October/November

1     2015 which Mr. Shinners sends to the FBI kind of making fun of
2     the fact that it looks like Mr. Garza had run off to Dubai and
3     pretended to have a heart attack and was trying to get a note
4     from the doctor in order to avoid the SEC deposition.
5             And in addition to that, it does appear that he got
6     into trouble in the UAE.  I'm not sure what that trouble was,
7     but I think the idea is we have Mr. Garza, who's going to be
8     testifying remotely in this case, the only person who will be
9     pointing a finger at Mr. Fraser.  And we feel that we're
10    entitled to attack his credibility.
11            THE COURT:  Sure, you're entitled to attack his
12    credibility.  I guess what I'm wondering, though, what you're
13    describing is Mr. Shinners sounding -- I don't have the
14    document in front of me, but maybe I should take a look at.  Do
15    you have it?
16            MR. RENNIE:  Just I think probably for your purposes
17    take my copy, if I may approach?
18            THE COURT:  Sure, yeah.
19            Thank you.  Let me take a quick look at it.
20            So I have this document that looks like it has a
21    picture of Mr. Garza's passport and then there's something
22    written on it.  "Josh, sending pics to Adam showing him
23    attempting to get a Dubai doctor to sign a note saying he had a
24    heart attack, which the doctor refused to do, all to get out of
25    deposition with SEC after fleeing to Dubai.  Notice the Teddy

1    bears, Band-Aids.  So appropriate."

2              That might be referring to a different pic.

3              Certainly those things are related to Mr. Garza's

4    credibility.  The issue is:  How does Mr. Shinners know those

5    things?  Is that an opinion?  Is that based on his personal

6    knowledge?  What's the predicate for --

7              MS. HASSAN:  Your Honor, I'm not -- I believe this

8    kind of information was sent to him by another class member who

9    does live in Dubai, but that's what I believe -- that's what I

10   think.  But he apparently thought it was credible enough to

11   send it off to the FBI.

12             THE COURT:  Well, I mean his own opinions, though,

13   these aren't proper lay opinions.  This isn't, you know, he

14   looked drunk; he was driving fast.  This is, you know, he's got

15   some scheme to avoid a deposition with the SEC.

16             Now, maybe if Mr. Garza told him that, I mean there

17   would be hearsay issues.  But I'm wondering how he knows that

18   is what I'm wondering.  Ordinarily we let witnesses testify

19   based on their personal knowledge.  And I'm kind of wondering

20   what that foundation is.

21             MS. HASSAN:  Your Honor, I don't know the answer to

22   that, but I think Mr. Shinners, who is a plaintiff in this

23   case, a class representative, he is definitely questioning in

24   this e-mail the credibility of Mr. Garza, who he then --

25             THE COURT:  What difference does it make that he

1  doesn't think that Garza's credible in 2015?

2         MS. HASSAN:  Well, Your Honor, what the Plaintiff

3  thinks about the credibility of their own witness is probative

4  of what the jury -- how they should assess the credibility of

5  this witness that they'll be hearing from.  But I feel that

6  it -- I believe that it --

7         THE COURT:  I'm not sure I agree with that.  In other

8  words, if the Plaintiff has an opinion about someone's

9  credibility, we wouldn't even allow them to tell the jury that.

10 So I'm not sure I follow you there.  But the opinion here

11 reflects Mr. Shinners' view in 2015.

12        Mr. Shinners may well be correct.  Don't get me wrong.

13 I just want to know how he knows this, because -- well, you

14 know why.

15        MS. HASSAN:  Well, Your Honor, we could -- my answer

16 to that is we could ask him.

17        THE COURT:  Yes, you can.  You can ask him about -- I

18 think you're going to have to take it step by step and be

19 careful and not just put it out there.  But you're going to --

20 you need to lay a foundation along the lines of:  Did you have

21 dealings?

22        I would let you -- since I know there's this exhibit

23 at issue, I would let you say, you know:  Did you have

24 conversations with Mr. Garza in 2015?  Were you aware of his

25 location at that time?  You'd have to take it step by step.

1          Mr. Buchdahl, yes.

2          MR. BUCHDAHL:  So, Your Honor, I think one of the

3    problems here with this specific document is there's a

4    reference to $28 million, and it implicates a bigger question

5    here, which is we think that the improper purpose is that

6    Defendants are trying to let the jury somehow understand that

7    Mr. Garza socked away some money somewhere.

8          I mean the reality of it is that he was deposed by the

9    SEC.  He was charged with a crime, and he went to jail.  And

10   all of that, like, was covered at his deposition.

11         THE COURT:  And I take it it's going to come out at

12   trial.

13         MR. BUCHDAHL:  Oh, sure.  But one thing --

14         THE COURT:  Where's the 28 mill?  I'm looking for

15   that.

16         MR. BUCHDAHL:  It's in a different document Defendants

17   want to introduce.

18         THE COURT:  I was just dealing with this one, but

19   anyway.

20         MR. BUCHDAHL:  Properly said, Your Honor.  But I think

21   there's like an umbrella issue here, which is:  What should the

22   jury know in general about Mr. Garza?  For example, there's

23   been questions about his, like, agreement to settle the case

24   and whether he was a defendant and whether he's still a

25   defendant.  Our position is none of that should come in.

1          THE COURT:  Yeah, but that's not really before me

2     right now, Mr. Buchdahl.  Where was the motion in limine on

3     that?  Let me deal with one thing at a time.  Okay?

4          So I don't see that the exhibit comes in now.  But,

5     again, I will give you a little leeway.  I know that Garza's

6     credibility is an important issue in the case.  So I give you a

7     little leeway with Mr. Shinners on that, but you're going to

8     have to take it step by step.

9          You're not going to be allowed to ask a question like:

10    Isn't it true that you -- you knew that or you said something

11    to the FBI about him lying to doctors?  You're not going to be

12    allowed to ask that.  I'll say, "Ladies and Gentlemen, ignore

13    that question."  Don't do that.

14          If you want to try to get this in step by step by

15    laying a foundation, I will give you an opportunity to do that.

16          MS. HASSAN:  Understood, Your Honor.

17          MR. RENNIE:  Your Honor, just one more.

18          THE COURT:  Yes.

19          MR. RENNIE:  One more point about this exhibit is

20    that, as I mentioned, Mr. Garza was deposed in this action and

21    questioned by Defense counsel, including about this particular

22    sort of event or episode where he purportedly traveled to

23    Dubai.  If what they're doing is attacking his credibility or

24    his character for truthfulness, it's not clear to me why they

25    should be able to do that through Mr. Shinners as opposed to

1     sort of having done it through the witness himself when they

2     had the opportunity to.

3          And they cite Rule 806 in their motion, which says you

4     can sort of impeach the statement on a hearsay declarant.  But

5     the case law on that subject is pretty clear that -- and I'm

6     quoting here -- "Rule 806 applies, of course, when the

7     declarant has not testified and there has by definition been no

8     cross-examination and resort to extrinsic evidence may be the

9     only means of presenting such evidence to the jury."

10         So I guess I would just flag, you know, there was a

11    witness to ask questions about these documents, and it was Mr.

12    Garza.  So that's just one extra wart on, you know, why are we

13    talking about this sort of extraneous jet set conspiracy stuff

14    that happened after the class period that we don't think is

15    proper?

16         THE COURT:  Give me one sec.

17         So I think this is actually a situation that comes

18    under Rule 608(b), which deals with specific instances of

19    conduct to impeach the witness.  The rule says:  Except for a

20    federal conviction under Rule 609, extrinsic evidence is not

21    admissible to prove specific instances of a witness's conduct

22    in order to attack or support the witness's character for

23    truthfulness.  But the court may, on cross-examination, allow

24    them -- "them" referring to, I think, specific instances of a

25    witness's conduct -- to be inquired into if they are probative

1  of the character for truthfulness or untruthfulness of, among

2  others, the witness.

3           So I think -- I think it's fairly clear that that

4  information that we were just looking at goes to credibility,

5  that is to say, character for truthfulness or untruthfulness.

6  So I think the real issue is the foundation issue.  I think

7  it's really, how does Mr. Shinners know this?  Is this just an

8  opinion that he's offering?  I think that's the issue.

9           MR. RENNIE:  Okay.  And we agree that there's

10  definitely -- sorry.

11          MR. BUCHDAHL:  With regard to 806, it's only -- the

12  only way that comes in with another witness is if he testifies

13  about that witness's character, which he's not going to do.

14          THE COURT:  Right.  But 608 -- I think it is

15  admissible under 608(b) if there's a foundation for it.

16          MR. BUCHDAHL:  Respectfully, I think 608(b)(2), which

17  is what we're talking about --

18          THE COURT:  I thought it was 608(b)(1), but anyway, go

19  ahead.

20          MR. BUCHDAHL:  Well, I think -- I think the witness

21  here is Mr. Shinners.

22          THE COURT:  No -- oh, I'm sorry.  You're right.  I

23  think you're right.  I think it is 608(b)(2).  Go ahead.

24          MR. BUCHDAHL:  So the witness's conduct -- so we're

25  talking about Mr. Garza's conduct --

1      THE COURT:  Yup.

2      MR. BUCHDAHL:  -- through another witness -- that's

3  Mr. Shinners -- if that witness, Mr. Shinners, has testified

4  about Garza's character, which he's not going to do.

5      In other words, it would be totally improper for us to

6  say, "Mr. Shinners, what do you think about Mr. Fraser's

7  credibility."  Right?  You would never allow that.

8      Similarly, Mr. Shinners can't be asked to just comment

9  broadly on Mr. Garza's credibility unless we had called him as

10  a character witness for Mr. Garza.  If we said, hey --

11      THE COURT:  I hear you.

12      What's your response to that?

13      MR. WEINSTEIN:  Your Honor, there are a number of

14  issues that they're raising with respect to Mr. Garza and his

15  credibility which couldn't be a more central issue in this

16  case.

17      THE COURT:  There's no doubt about its centrality.

18  The issue is the method by which it's explored.  And I was

19  thinking initially that 608(b) might be an avenue to explore

20  it, but I think Mr. Buchdahl has corrected me, rightly so, by

21  pointing out that under the rule, the issue is governed by Rule

22  608(b)(2).  That seems to fit here.  And so the issue is

23  whether on direct the witness, Mr. Shinners in this case, has

24  testified about the character of Mr. Garza.

25      They say they're not going to elicit that.  I wouldn't

1   either if I were them.  And if they don't elicit it, why would
2   this be a proper -- no doubt his credibility's relevant, no
3   doubt.  There's no dispute about that.  But why would this be a
4   proper way to bring out evidence going to character for
5   truthfulness?
6           MR. WEINSTEIN:  Your Honor, what we're proposing is
7   not to ask Mr. Shinners, Is it your opinion that Mr. Garza was
8   a liar?
9           THE COURT:  No, I understand.
10          MR. WEINSTEIN:  What we're seeking to do is to have
11  Mr. Shinners acknowledge, if he can -- and we understand the
12  foundational issue -- if he is aware of evidence of flight in
13  an attempt to evade --
14          THE COURT:  But that's a specific instance of conduct,
15  it seems to me.  In other words, you're trying to show that Mr.
16  Garza's not credible through a specific instance of conduct
17  that he engaged in flight and that he lied to a doctor in
18  Dubai.  That does go to his credibility.  But it's also a
19  specific instance of conduct.  And the rules set forth the
20  manner in which specific instances of conduct can be used.  So
21  I'm wondering how you get around Rule 608(b) here.
22          MR. WEINSTEIN:  I guess I just want to understand,
23  because I'm not sure I do, to point --
24          THE COURT:  It doesn't come up a great deal in civil
25  cases, and actually it doesn't come up that much in criminal

1    cases, which is why I wasn't all that conversant with you, to

2    be honest with you.  But it rang a bell there's something with

3    608(b) that applies here.  That's why I raised it.

4         MR. WEINSTEIN:  But the question of why this would be

5    inconsistent with the manner in which you get that out, I just

6    want to understand.

7         THE COURT:  Because, A, I think this is -- so the rule

8    governs the use of specific instances of conduct -- sorry.  It

9    governs the use of extrinsic evidence, meaning not from the

10   witness, to prove specific instances of a witness's conduct,

11   which I think would describe the evidence we're talking about

12   here, in order to attack or support the witness's character for

13   truthfulness.

14         But then it says, "But the court may, on cross, allow

15   such specific instances to be inquired into if they are

16   probative of character for truthfulness or untruthfulness of

17   the witness" -- as Mr. Buchdahl points out, in this situation

18   the witness is not Mr. Garza but, instead, Mr. Shinners -- "or

19   to another witness whose character the witness being

20   cross-examined has testified about."  So that fits; right?  But

21   it says, "whose character the witness" -- Mr. Shinners -- "has

22   testified about."

23         And so what Mr. Buchdahl has told me is that he's not

24   going to -- or his team is not going to ask Mr. Shinners about

25   Mr. Garza's character for truthfulness.  And if that's so, then

1    I'm wondering how you do this.

2           MR. WEINSTEIN:  Well, that's taking, in my view, a

3    very narrow what we can do to cross-examine Mr. Shinners, who

4    it's not just whether he believes Mr. Garza is credible or not.

5    He entered into an agreement.  It's not just saying, Do you

6    think the witness that your side called in the case is

7    credible?  It's you entered into an agreement.  You sued this

8    man.  You then entered into an agreement to drop him from the

9    case for zero dollars --

10          THE COURT:  Right, but that's not the document -- I

11   agree.  That's a different issue.  That's not the document

12   we're just looking at.

13          MR. WEINSTEIN:  No, but that gets to this issue.  So

14   this is -- obviously, we want to cross-examine Mr. Shinners

15   about that.  "And why, sir, would you possibly enter into such

16   an agreement?" -- so that he could testify against Mr.

17   Fraser -- "when you know it's the same guy?  What did he do?

18   He ran off to Dubai.  He tried to hide your money.  He lied to

19   -- he tried to evade the SEC's deposition.  That's the guy that

20   you entered into an agreement with."

21          THE COURT:  I hear you.  But, of course, I still think

22   I'm governed by Rule 608(b) on that because I think it fits the

23   parameters of the rule.

24          MR. WEINSTEIN:  So they're doing two things here.  One

25   is we're not going to call Mr. Garza when we can -- when we

```
1    have the opportunity to do it; right?  And not having him
2    alive, we're not going to let him cross --
3            THE COURT:  Let me ask you this:  Did you have this
4    information about the passport and all that at Mr. Garza's
5    deposition?
6            MR. WEINSTEIN:  Well, with respect to --
7            THE COURT:  Did you?
8            MR. WEINSTEIN:  I don't know the answer to that, but
9    may I address that issue?
10           THE COURT:  Sure.
11           MR. WEINSTEIN:  Because we're two completely different
12   extremes that they're doing here.  They asked Your Honor to
13   allow nine late exhibits that they knew about -- right? -- in
14   2021 when Your Honor's rule is you have to put in your trial
15   evidence in this pretrial memo as of a certain date in
16   September.  "Sorry, Judge, we overlooked a few."  And they want
17   leeway for that.  But with respect to Mr. Garza, the main
18   person in this case --
19           THE COURT:  Folks, let me stop you.  I'm going to stop
20   you.  I'm going to stop you.
21           With all respect -- and this goes for both sides -- I
22   don't take kindly to arguments about that somehow I did
23   something unfair to you on day one, and so now I have to do
24   something unfair to the other side on day two.
25           MR. WEINSTEIN:  No, no.
```

1          THE COURT:  Believe it or not, I try to call it like I

2     see it.  I try to be objective.  So I don't see what the late

3     notice of exhibits has anything to do with this issue.

4          MR. WEINSTEIN:  My point, Your Honor, was not at all

5     about the Court's ruling.  I think it's an inconsistent

6     position that they are taking, which is with respect to our

7     trial evidence --

8          THE COURT:  Yeah.

9          MR. WEINSTEIN:  -- we've been leading up to trial for

10    years.  We overlooked some exhibits; we'd like to get them in.

11    We understand that; right?  But that's inconsistent when then

12    Mr. Garza, who's like the key witness, he testified four years

13    ago --

14         THE COURT:  The deposition was four years ago?

15         MR. WEINSTEIN:  Yeah.  Four years before a trial.  I

16    mean this gets back to whether he should be allowed to, you

17    know, go by deposition.  This is not like, oh, we got to depose

18    him a year or six months ago close to trial and can do anything

19    we wanted for trial purposes.  Four years ago, December of

20    2018.  And if we happen to not ask him about an exhibit four

21    years ago, because they're not bringing him live, we're done.

22         THE COURT:  I see what you're saying.  Now I

23    understand.

24         But did you have the Plea Agreement at that time and

25    the conviction at that time?

```
1              MR. WEINSTEIN:  Oh, yeah, and he was --
2              THE COURT:  I mean the jury -- let's be candid here.
3    The jury's not going to fall in love with Mr. Garza here.  I
4    mean I don't know the guy.  Maybe he's as charming as can be.
5    But, you know, it's going to come out that he was convicted for
6    wire fraud and did time and all that and that he's, you know --
7    I don't see -- I mean maybe the Plaintiff's going to argue that
8    Mr. Fraser's more to blame for what happened.  You know the
9    case better than I do.  From what I've seen, this is Mr.
10   Garza's show, and the issue is whether Mr. Fraser's liable as a
11   control person.
12             But the jury -- there's no doubt that the jury's going
13   to get that Mr. Garza is a liar.  I mean if you guys -- you
14   guys are way too good lawyers to not be able to do that.
15   They're going to know he's a liar.  I don't think there's any
16   doubt about that.
17             So I get you want -- you're saying, "Yeah, but, Judge,
18   the stakes are high.  We want to introduce every" -- I
19   understand.  But it's not like you're not going to have a lot
20   of ammunition on his credibility.
21             I mean you're going to be -- I assume you did beat him
22   up at the deposition; right?  I mean will you agree with me
23   that you've got a lot to talk about with regard to his lack of
24   credibility already?
25             MR. WEINSTEIN:  There is certainly no lack of things
```

1  on which Mr. Garza is not credible, and we will establish that

2  with the jury.

3          THE COURT:  Right.

4          MR. WEINSTEIN:  We want in some way to be able to

5  demonstrate it for a witness who's not here, who testified four

6  years ago.

7          THE COURT:  I understand.

8          MR. WEINSTEIN:  There are going to be some issues

9  where we appreciate leeway on being able to attack his

10 credibility without him being here to testify.

11         THE COURT:  I understand.  I'll try to give leeway,

12 but I'm bound by the rules of evidence.  And as I see it, the

13 document we were discussing there's a problem under Rule

14 608(b).  So that's my ruling.

15         Okay.  Let's go on.  Why don't we talk about, since

16 we're in the midst of all the evidence, I did issue some

17 rulings on the Defendants' exhibit -- the Defendants' objection

18 to Plaintiffs' exhibit.

19         Now, let me be clear.  I am not going to go through

20 all those rulings with you.  I am not going to revisit all

21 those rulings.  There were a few times when I reserved because

22 I, frankly, just didn't understand the purpose of the exhibit.

23 I'm happy to talk about those.

24         If you think that there's one where I completely

25 missed -- well, let's not use that standard.  If you think

1    there's one where I just didn't understand the exhibit -- and

2    you got, you know, maybe four or five chances at that, even if

3    you think it's more like 50 -- then I'll go through some of

4    them.  But we're not going to spend a lot of time on it.

5            MR. BUCHDAHL:  Your Honor, I do think it's in the

6    nature of four or five exhibits that I think are pretty

7    important; and, for example, Your Honor relied on many of these

8    in your Motion to Dismiss.  They're clearly like very probative

9    on the issues.

10           And what I'd like to persuade the Court of is that

11   hearsay does not apply here because these actually aren't

12   hearsay statements.  There is a -- even if they were, there's a

13   nonhearsay purpose that we think should have been enough.  But

14   we think fundamentally they're not hearsay, and I want to

15   explain why if you give me a moment.

16           So I want to start with Exhibit 29.  Exhibit 29 -- and

17   all of these should be familiar to people.  But Exhibit 29 is

18   the e-mail from the then acting CFO.

19           THE COURT:  Right.

20           MR. BUCHDAHL:  And it obviously is important because

21   he identifies in an e-mail to Mr. Fraser some fundamental

22   problems with the company; right?

23           THE COURT:  Right.

24           MR. BUCHDAHL:  Now, what I believe the Court said -- I

25   want to try to get the language right.

1       The Court said something along the lines of -- I can

2  tell you exactly what you said.  You said, "Even with a

3  limiting instruction, the jury will consider these statements

4  for the truth."

5       THE COURT:  Right.

6       MR. BUCHDAHL:  First of all, why that's not a problem:

7  Nobody debates the truth of these statements.  Mr. Fraser was

8  deposed about this document and acknowledged the truth of these

9  statements.  And we submit that under the federal rules, that

10  is exactly the purpose of the definition of hearsay.

11  801(d)(2)(B), which is statements that are not hearsay because

12  the opposing party manifested, adopted, believed it was true.

13       And let me show you exactly how he did that because he

14  did it under oath.  I don't think he can walk it back now.  So

15  we'll start with his SEC testimony.

16       THE COURT:  Okay.

17       MR. BUCHDAHL:  All right, so here's what he said, the

18  second paragraph:

19            "Fair to say it explains Mr. Moosajee's concerns about

20            having no operational system for inventory accounting?

21            "Yes.

22            "Is that something that concerned you about GAW

23            Miners?

24            "Yes.

25            "What did do you about that?

1          "I kept asking for information.  And I think that's

2          why he brought in Shiraz.

3          "And as a result of him being brought in, was there an

4          inventory accounting system created for GAW Miners?

5          "Not that I'm aware of."

6          In other words, the fundamental truth of this is not

7     in dispute, not for one moment.

8          THE COURT:  Let me ask Defense counsel.

9          MR. BUCHDAHL:  I was just getting a head of steam.

10          THE COURT:  I know you were, but I'd like to at least

11    understand that.  I don't know who is going to address this for

12    the Defense side.

13          You got five seconds to stand up; otherwise, I'm going

14    to admit the exhibit.

15          Ms. Hassan, what do you say?  I don't want -- is it

16    correct that your client adopted the truth of this statement at

17    the deposition?

18          MS. HASSAN:  Your Honor, I don't believe that's what

19    he said.  I believe it said he does reflect Mr. Moosajee's

20    concern; and separately whether or not Mr. Fraser was concerned

21    about that, that's something separate.  He's not adopting the

22    statements here.  And the question is whether these statements

23    were adopted by him, and they were not.

24          THE COURT:  Do you think the truth of these -- put

25    aside what I thought.  Do you think the truth of these

1  statements are at issue in the trial?

2          MS. HASSAN:  Your Honor, I believe so.  So this is

3  before the class period.

4          MR. WEINSTEIN:  May I just add in, Your Honor?  I

5  think the issue is Mr. Fraser's position would be:  I don't

6  have insight into the company.  I'm on the outside.

7          THE COURT:  Right.

8          MR. WEINSTEIN:  I've been asking for numbers.  It

9  would be nice to get numbers.  I haven't gotten them.  But what

10  he knows about what actually is there, he doesn't.

11          THE COURT:  Sorry.  Say that part again.  What he

12  knows about what is actually there, he doesn't know.

13          MR. WEINSTEIN:  What he actually has, he doesn't know.

14  He knows --

15          THE COURT:  But that really isn't contesting -- that

16  isn't making an issue out of the truth of the statements.

17          MR. WEINSTEIN:  But it's not adopting it.

18          THE COURT:  No, fair enough.

19          But the hearsay, as all you know, is when a statement

20  is offered for its truth.  The reason I thought that some of

21  these statements were offered for their truth is I thought that

22  the Plaintiffs wanted to show during the trial that, in fact,

23  the company was a mess and that there was no operational

24  system, which, of course, they also want to show that Mr.

25  Fraser knew that.  That's not the nonhearsay purpose of the

1   document.

2         But I thought part of -- before they get to whether

3   Mr. Fraser knew that, part of it is was proving, in fact, the

4   company was a mess; there was no operational system for

5   accounting.  That's why I concluded that, well, Mr. Moosajee's

6   not on the stand.  He's not being cross-examined.  There's no

7   cross-examination of these statements.  And so that's why

8   they're being offered for their truth.

9         MR. WEINSTEIN:  Right.

10        THE COURT:  But I'm not -- I wasn't hearing that from

11   you a minute ago.

12        MR. WEINSTEIN:  Well, no, no.  The issue, then, with

13   that is, yeah, if they want to establish that the company's

14   operations are a mess, they have to prove it.  You can't prove

15   it by this hearsay statement.

16        THE COURT:  That I think is correct.

17        MR. WEINSTEIN:  And my point was, if their way around

18   that is, well, Mr. Fraser adopted it as the truth, that's not

19   what happened.

20        MR. BUCHDAHL:  So first of all, I think it's exactly

21   what happened.

22        THE COURT:  Can you show me his deposition?

23        MR. BUCHDAHL:  So this is his second deposition.  This

24   is his civil deposition.  Look what he says here.

25        "Did it concern you that GAW Miners had no ability to

1          account for its interview?

2          "Answer:  Yes."

3          If you look at the last paragraph, it says:

4          "It's worth restating that without supply chain,"

5     etc., etc.  "Do you see that?

6          "Yes.

7          "Did it worry you that GAW Miners lacked supply chain

8          operational controls?"

9          It gets better.

10          He says, "Do you know what financial controls mean?"

11          He says, "Yes."

12          He essentially defines it.  It's on page 231.

13          "And GAW Miners didn't have that?

14          "Correct.

15          "And did that concern you?

16          "Yes."

17          And this is when he's being cross-examined on this

18     exact document.

19          So, Your Honor, here's what I'm trying to understand:

20     We certainly can admit these admissions in the deposition;

21     right?  That is just an admission of a party opponent

22     straightforward for its truth.

23          THE COURT:  True.

24          MR. BUCHDAHL:  So we now have a situation where he was

25     deposed on this document, not once but twice under oath, by SEC

1    examiners and by civil -- by civil lawyers.  He essentially

2    says -- his response to this document is not, "Well, I didn't

3    know if that was true.  That's what they're saying now."  His

4    response at the deposition was, "Absolutely I knew it, and I

5    was upset."

6            THE COURT:  Hold on.  It's Mr. Weinstein?

7            No, no.  Leave that there.  There's what I wanted to

8    ask him about.  All the way up.

9            So he does -- he is asked -- well, he says:

10           "Do you know what 'financial controls' means?

11           "Answer:  I'm sure every business has different ones,"

12           etc., handle on what you're buying, what you're

13           selling.

14           "Question:  And GAW Miners didn't have that?

15           "Answer:  Correct."

16           So he's acknowledged the truth of the proposition that

17   I described it as the company being a mess but, more precisely,

18   that they didn't have inventory controls, which seems to be

19   what the e-mail's about.

20           In light of that, why are the statements in the e-mail

21   offered for their truth?

22           MR. WEINSTEIN:  Sorry, Your Honor.  I'm just trying to

23   go back and forth through the testimony and the document.

24           THE COURT:  Sure.  Take your time.

25           MR. BUCHDAHL:  May I, in the interim, say one more

1    sentence?

2          THE COURT:  No, because I want to look up.  We'll get

3    to you.  Don't worry.  I just want to look up something.

4       (Pause.)

5          MR. WEINSTEIN:  Yeah, Your Honor, one of the issues

6    with this document is it's not quite as narrow as what's being

7    posed to Mr. Fraser there.  There is a lot of stuff in there.

8          THE COURT:  Like what?  Like what that you care about?

9    I mean is it -- I take the purpose of this document from the

10   Plaintiffs' standpoint to be, look, Fraser was on notice that

11   the inventory -- there was no inventory accounting, which, more

12   broadly, had something to do with whether there were, in fact,

13   machines to back up Hashlets.  That's what I take the purpose

14   of the offer to be.

15         MR. WEINSTEIN:  Well, but that -- I think that that

16   may be the concern that they're trying to make that leap

17   there --

18         THE COURT:  But that's --

19         MR. WEINSTEIN:  -- by not having --

20         THE COURT:  Go ahead.

21         MR. WEINSTEIN:  -- certain controls that there's no

22   machine power to do what they're saying --

23         THE COURT:  Right, but that's going to be an inference

24   that they're going to ask the jury to draw from it.  The issue

25   is:  What about the document -- I mean counsel correctly

1  pointed out that the rule does say, "The statement is offered

2  against an opposing party and is one the party manifested that

3  it adopted or believed to be true."

4           I read you that portion of the deposition that counsel

5  pointed out to me.  I'm having trouble seeing why that

6  provision wouldn't allow this document in.

7           MR. WEINSTEIN:  Yeah, look, as I said, there's more in

8  that document.  There's things about organizational issues.  If

9  there's a specific thing that they say he adopted and they want

10 it in for, you know, perhaps it could be redacted to limit it

11 to that.

12          THE COURT:  Yeah.  I don't see that the other -- I

13 mean, "We have great people highly motivated but with limited

14 business and financial management experience."  I'm not really

15 sure that statement's offered for its truth.  Who cares about

16 that?

17          I think what matters is, you know, "The key element is

18 inventory accounting for which no operational system exists and

19 which none appears planned," etc.  "No reliance should be

20 placed on any financial statements," which is in the same

21 paragraph that your client was asked about at his deposition.

22          MR. WEINSTEIN:  Well, we understand the position, Your

23 Honor.

24          THE COURT:  All right.  I'm going to change my ruling

25 on this one.  I will allow it in.  I will give a limiting

1    instruction.  This is Exhibit No. 29.

2         MR. BUCHDAHL:  Your Honor, I'm not sure what limiting

3    instruction you had in mind.

4         THE COURT:  You're right, because he did adopt it.  I

5    agree, you're right.  Exhibit 29.

6         MR. BUCHDAHL:  We have a couple more instances, very

7    similar documents.

8         THE COURT:  All right.  39?

9         MR. BUCHDAHL:  39, right?  And I think what you said

10   about 39 was something almost identical.  You said that there

11   are parts of these that were hearsay.

12        THE COURT:  Right.  I think one concern the Defendants

13   raise was, "I know I speak for Stuart."

14        MR. BUCHDAHL:  No.  I think --

15        THE COURT:  I thought they raised that concern.

16        MR. BUCHDAHL:  So "I know I speak for Stuart" is not

17   what I want to focus you on because we'll live with that.  "I

18   know I speak for Stuart" it comes in later.

19        THE COURT:  Okay.  Comes in later because of testimony

20   or something?

21        MR. BUCHDAHL:  I'm sorry.  The part I want to focus

22   on --

23        THE COURT:  Go ahead.

24        MR. BUCHDAHL:  What I meant by that was Mr. Fraser

25   wasn't copied on that e-mail.  We don't have similar arguments

```
1   about it.  He gets brought into the discussion a little later
2   on.
3               THE COURT:  Okay.
4               MR. BUCHDAHL:  We could make an argument about that,
5   that he's adopted it, when he's brought into the conversation.
6               But leaving that aside, the part that we are concerned
7   about is the red flag e-mail, the 11/21 e-mail from Mr. Kelley.
8               THE COURT:  Okay.  I've got it in front of me.
9               MR. BUCHDAHL:  So it is, again, the same issue.  "We
10  do not currently have financials or inventory systems in
11  place."  It is the same issue as Mr. Moosajee's e-mail, that
12  that -- that actually wasn't true.  He doesn't debate the truth
13  of it.
14              THE COURT:  Well, he also says -- he takes it further
15  though; right?  He says not only that "we do not have current
16  financials or inventory systems in place," he says, "The red
17  flag, in soliciting investment right now, is that we do not
18  have financials or inventory systems currently in place," which
19  is an opinion, the first part, but in any event --
20              MR. BUCHDAHL:  But the question is Your Honor engaged
21  in a balancing test.  You said, "I'm concerned that the risk of
22  this nonhearsay part."  And I think that what we're
23  establishing is that the balance tips in the other direction
24  because he looks here --
25              THE COURT:  This is more?  This is from Mr. Garza?
```

```
1              MR. BUCHDAHL:  This is SEC again.

2              THE COURT:  Mr. Fraser's deposition.

3              MR. BUCHDAHL:  SEC.  I guess the first question:

4         "Was it true that GAW Miners, despite having been

5         operational for roughly six months at this time,

6         didn't have financial or inventory systems in place?

7         "Answer:  Yeah."

8              So, again, this is like -- we're not debating the

9    truth of this.  So there's no kind of nonhearsay risk.  This is

10   not hearsay.  This is a statement that he's acknowledged is

11   true.  It should come in.

12             And if you think --

13             THE COURT:  Well, let me ask.  You're right as to part

14   of the statement.  But the first part?  The red flag and

15   soliciting?  You might say, well, Judge that's obvious.

16             MR. BUCHDAHL:  Judge, here's what I want you to

17   consider with regard to that:  Both of the statutes at issue in

18   this case have these good faith exceptions.

19             THE COURT:  Right.

20             MR. BUCHDAHL:  Right?  So there's this burden is going

21   to be on the Defendant in terms of the Connecticut statute.

22   They have to sustain a burden of proof that they did not know

23   and in the exercise of reasonable care could not have known;

24   right?  And similarly, there is in the federal statute it says,

25   The controlling person acted in good faith and did not directly
```

1    or indirectly induce.

2         And if you look at the case law in this, it's full of,

3    well, what would be good faith?  Good faith would be having

4    systems in place, inventory controls, that kind of thing.

5         So I guess our point -- and this is -- I know that the

6    Court didn't appreciate my goose gander line earlier, but this

7    is where the analogy takes hold.  If we're talking about

8    whether a class member should be -- there should be some reason

9    why a class member should see an internet post -- right? -- and

10   then say, oh, gosh, maybe I should go make some inquiries about

11   this, there is an issue in this case, an affirmative defense

12   pleaded by the defendant that he acted in good faith.

13        And here we have he's talking all the top people in

14   the company and they say, look, buddy, we've got a big flag

15   when it comes to raising money.  Well, I mean you can see why

16   that is -- why that is very probative on the question of his

17   good faith, because this is what he was told.

18        THE COURT:  Mr. Buchdahl, I understand you're making a

19   powerful argument for the relevance.  I don't think I said it

20   was irrelevant.  I think the question -- and I think you've

21   convinced me based on the last discussion that the portion of

22   the sentence that says, "We do not currently have financials or

23   inventory systems in place" has been adopted.  So we're really

24   down to the first clause in the sentence and why it's not being

25   offered for truth.  That's really all I'm interested in right

1   now.  It's not all I'm interested in.  I think that's the only

2   obstacle to getting that -- and you could -- we could have it

3   redacted.  But you want it all in.

4          So tell me why the first part's not being offered for

5   its truth or that it was adopted.

6          MR. BUCHDAHL:  The first part I concede is offered for

7   the knowledge, hearsay purpose of knowledge, knowledge and the

8   kind of motivation of Mr. Fraser at the time.

9          THE COURT:  Right.

10          MR. BUCHDAHL:  So it's a balancing test.  I understand

11   that.  And the Court has already talked about that.  We're just

12   saying given the presence of the good faith affirmative

13   defense, we think this is highly relevant to this that the

14   phrase "red flag" was used by one of the other executives of

15   the company to talk to him about raising money in this context.

16          And what the evidence will show, Your Honor, is that

17   despite this, he walks the company right into Cantor Fitzgerald

18   despite this.  He acknowledges it was never addressed.  And his

19   lies to the SEC, Your Honor, are that, I was so mad when I

20   heard about this.  Like I was so mad I stopped talking to them.

21   I started distancing myself from them.

22          Somehow the SEC bought that.  But this jury shouldn't

23   be asked to buy that when he gets e-mails like this.

24          THE COURT:  Okay.  Let me -- who's going to address

25   this on your team?  Ms. Hassan?

1    So I take it that Plaintiffs' side could, in

2    cross-examining, or actually the direct exam of Mr. Fraser,

3    they could ask him, could they not, you know:  Isn't it true

4    that people at the company were raising red flags about the

5    lack of inventory control?

6    They could ask him that question; right?  That

7    wouldn't elicit a hearsay objection, would it?

8    MS. HASSAN:  No, Your Honor.  They could ask, which is

9    why they don't --

10    MR. WEINSTEIN:  Well, I guess I would just say they

11    can ask him whether people are raising issues with the

12    inventory.  To say whether they were raising red flags, that's

13    a characterization in the question itself which is

14    objectionable, other than to set up --

15    THE COURT:  I'd probably allow the word "red flag."

16    MR. WEINSTEIN:  So I think it goes back to Your

17    Honor's instinct, which is you can get in the facts that he was

18    put on notice of but not some -- this other guy's opinion.

19    THE COURT:  Right.  But let's keep going on this line

20    then.  So let's say I allow the question in and Mr. Fraser

21    says, "Well, I'm not sure about that.  I wouldn't describe them

22    as red flags" or "I don't remember" or -- certainly counsel

23    could use this exhibit to refresh recollection; right?  And --

24    am I right?  He could --

25    MR. WEINSTEIN:  Well, you've asked a number of

1    potential questions there, none of which I think get to red

2    flag.  So can they ask him:  Is it your opinion, when you learn

3    that, that's a red flag to you?  Yeah, I think they can ask him

4    that.

5          THE COURT:  No, no, no, no.  The question would be:

6    Isn't it true that people at GAW were raising red flags around

7    this time about the financials or inventory systems, or lack of

8    financials -- I forget what it's called.  "We do not currently

9    have financials or inventory systems."  Isn't it true people

10   were raising red flags at this time in August of 2014 about

11   GAW?

12         MR. WEINSTEIN:  "Objection.  What do you mean by red

13   flags?"

14         "Well, were people telling you there were no inventory

15   controls?"

16         We're back to the facts.  Why do they need to go

17   beyond the factual question to incorporate someone -- it's

18   hearsay.  He's not coming in to testify.  None of his

19   testimony -- I don't even know that he was deposed, frankly; so

20   this guy's opinion on what's a red flag is irrelevant and it's

21   hearsay.

22         MR. BUCHDAHL:  Your Honor --

23         MR. WEINSTEIN:  They can ask him the facts as I think

24   Your Honor has ruled and --

25         MR. BUCHDAHL:  Your Honor, if I can take us back ten

1    minutes, we were going to allow an anonymous internet post that

2    used the phrase "Ponzi scheme" on the theory that that might

3    have, in your words, raised a yellow flag that would make an

4    investor want to go and ask some questions.  Here this is not

5    anonymous.  This is not an internet post.

6            THE COURT:  But the point is that there I'm going to

7    be telling the jury, in some detail, that these are not to be

8    considered for their truth.  Many of these are anonymous.  We

9    don't know who said them.

10           MR. BUCHDAHL:  So --

11           THE COURT:  And so the only purpose for which you may

12   consider them is notice, etc.  Here I --

13           MR. BUCHDAHL:  We would certainly accept a limiting

14   instruction on the phrase "red flag."  "You can only take that

15   not as whether it's truly a red flag, Members of the Jury, but

16   whether he was told and had knowledge that someone at the

17   company told him it was a red flag."

18           I mean, Your Honor, I -- I just think that we have --

19           THE COURT:  I hear you.

20           MR. BUCHDAHL:  Remember the story line of the SEC was:

21   I was mad.  I was so mad that they did this, and I was running

22   in the other direction.

23           MR. WEINSTEIN:  Well, hopefully Mr. Buchdahl's going

24   to be a lot more careful in his arguments to the jury on this,

25   because he knows the issue about being mad has nothing to do

1   with this topic.  So let's -- let's slow down.

2        THE COURT:  Okay.

3        MR. WEINSTEIN:  And really if that's the argument

4   that's going to be made to the jury, it needs to be watched

5   carefully.

6        The issue here is:  Can they ask him about the facts

7   if he knew them?  We've acknowledged yes.  Your Honor's ruled

8   yes.

9        Should they be able to ask him:  Did you know it was

10  someone else's opinion that those facts are a red flag?  For

11  what purpose?

12       THE COURT:  Well, could they ask him:  Weren't others

13  expressing concerns about soliciting investment in light of the

14  fact that there weren't a current financial or inventory

15  system?  Could they ask him that question?

16       MR. WEINSTEIN:  I think they can ask him if someone

17  expressed concern.  I think the e-mail, the facts are

18  expressing some concern about the lack of inventory controls --

19       THE COURT:  Now, if he hedges on that --

20       MR. WEINSTEIN:  He seemed to acknowledge it,

21  absolutely.

22       THE COURT:  Okay, so let's assume he says yes to that.

23  Your point is that's it.

24       MR. WEINSTEIN:  Yeah.  Now they can argue whether it's

25  a red flag.  But they don't need Dan Kelley's opinion that this

1   constitutes a red flag in trying to solicit investments, who

2   he's not even testifying.  It's beyond -- they've got what they

3   need, the facts.

4           THE COURT:  Go ahead.

5           MR. BUCHDAHL:  I'm going to start repeating myself,

6   Your Honor.  We think this -- first of all, we think there is a

7   very obvious and justifiable nonhearsay purpose, which is his

8   knowledge, his knowledge that internally senior folks at GAW

9   Miners were raising red flags, not implicitly, explicitly in

10  terms of the context of raising money.  And the fact that he

11  was told that goes substantially to undermine any suggestion

12  that he was acting in good faith when he then proceeded to --

13          THE COURT:  Can I ask you this:  Was Dan Kelley

14  deposed?

15          MR. BUCHDAHL:  I don't know.

16          THE COURT:  In any event, it's not part of the trial.

17  So there's nobody to kind of talk about this.  And was this

18  used at anybody's deposition?

19          MR. BUCHDAHL:  Yes, the SEC -- that is what I showed

20  you.

21          THE COURT:  Oh.  Oh, I didn't -- okay.

22          MR. BUCHDAHL:  So, again, you know, if we were --

23          THE COURT:  Okay, I've heard you on this.  It's a

24  close call.  I think I am ultimately persuaded by Mr. Buchdahl

25  on this.  I think that if I didn't know when I made the rulings

1    about the adoption of the statements about, yeah, you knew, you

2    know, there weren't financial or inventory systems, that's the

3    critical point.

4           I get "red flag" has -- I get why I'd be concerned

5    about that if I were the Defendant.  On the other hand, I also

6    get what the probative value of that is.  So that's really a

7    Rule 403 issue, I think.  And ultimately I think I'm going to

8    allow it in.  So all right.  That's Exhibit 39?

9           MR. BUCHDAHL:  39.

10          Your Honor, I'm going to sound like a broken record,

11   but I've got another example.

12          THE COURT:  That's just like that.  Okay, go ahead.

13          MR. BUCHDAHL:  So this is Exhibit 64.  And in an

14   e-mail copying Mr. Fraser, Mr. Garza says -- he's trying to get

15   a million dollars; right?  And this is in October.  This is

16   really now.

17          THE COURT:  Look at the top, the very top?

18          MR. BUCHDAHL:  Yes.  Very crucial time, very crucial

19   time.  This is October of 2014.  He says, "I need that million

20   in order to buy the hardware necessary to fulfill the orders."

21          And we submit this goes directly to the -- one of the

22   central lies at the heart of GAW Miners, which is they didn't

23   have the hardware to back up the Hashlets.

24          Now, he was asked about this in his civil deposition.

25   And so that's what I'm going to put up here now.  So on page

1  243 you can see introduces the e-mail.  You look at the top

2  e-mail.  It says, "I need that million in order to buy the

3  hardware necessary to fulfill the orders."

4        There's a bunch of back-and-forth about this in terms

5  of what was going on with the orders, but we think the key

6  admission where he kind of acknowledges that this is true was

7  on the bottom of page 245.

8        "As of October 11, 2014, you knew GAW Miners could

9        potentially face issues for fulfilling orders.  Is

10        that fair?"

11        The answer is:  "Give them back their money, yeah."

12        THE COURT:  What does "give them back their money"

13  mean?

14        MR. BUCHDAHL:  It means if you can't fill the order,

15  you have to send back the money to the person who made the

16  order.

17        So our position is once again like this isn't an issue

18  of:  Is it true?  Is it not true?  Is there some danger?

19        Mr. Fraser knew, in October of 2014, and he

20  acknowledges at his deposition under oath.  And, again, the

21  deposition testimony comes in.  That's not -- that comes in for

22  its truth.  So we believe, again under 801(d), this is not

23  hearsay.  This is a statement the truth of which he has stated

24  that he accepts.

25        THE COURT:  So maybe I should have waited to do the

1    evidentiary rulings after I went through the depositions.  But

2    because I think that you could -- it's also arguably necessary

3    to understand his testimony in the deposition.  You designated

4    that testimony?

5         MR. BUCHDAHL:  We did not designate any testimony for

6    Mr. Fraser.

7         THE COURT:  Oh, because he's going to be here.

8         MR. BUCHDAHL:  Yeah.

9         And, Your Honor, I apologize.  We didn't brief the

10   evidentiary questions, and so it was -- and I know that you

11   were not happy with some of the ways we presented them.  So I

12   apologize.

13        THE COURT:  Look, I have to start somewhere, so I

14   started on the exhibits.

15        So I'll hear you on this if you'd like.  Do you want

16   to -- I guess I'm perfectly inclined to change my ruling on

17   this one, but I want to give you a chance to speak first.

18        MR. WEINSTEIN:  The difficulty is to try to read

19   through all this testimony and figure out exactly what was

20   said.  The last answer he gave it wasn't even clear what that

21   meant, to be honest.

22        THE COURT:  But is the issue of -- again, I think when

23   I issued the ruling on this, my recollection is I assumed that

24   part of what the Plaintiffs' proof would be was that they were

25   desperate for money to buy hardware, that and that that would

1    be something the Plaintiffs wanted to prove at trial and,

2    therefore, that the document was offered for its truth.

3        But it doesn't look like your client contested that.

4    And so I'm wondering really whether it is offered for truth.

5    What do you say to that?  Mr. Buchdahl goes further.  He says

6    that that's an adoption when he says "give them back their

7    money, yeah."

8        But I guess I have a preliminary question.  Is the

9    statement -- is there really any issue in this trial about that

10   in October 2014, October 11, 2014, the company needed a million

11   dollars or a lot of money to buy hardware to fulfill the

12   orders?

13       MR. WEINSTEIN:  So if you look at the bottom of 244,

14   the bottom of 244 to the top of 245 --

15       THE COURT:  Yup.

16       MR. WEINSTEIN:  They asked:

17       "Did you discuss this issue with Mr. Garza not having

18       money to fulfill orders with him in October of 2014?

19       "Answer:  I don't remember having a distinct order --

20       discussion like that.  And the fact that he would send

21       this out to a group, sounds like he was trying to

22       entice me to get -- to loan more money."

23       So I don't think he acknowledged that he knew -- he

24   acknowledged, obviously, getting the e-mail but not that Mr.

25   Garza was necessarily truthful and that he knew that.  I mean I

1    think the issue is --

2              THE COURT:  So how do you interpret this, "As of

3    October 11, 2014, you knew that GAW Miners could potentially

4    face issues for filling orders.  Is that fair?  Answer:  Give

5    them back their money, yeah"?  What do you think that means?

6              MR. WEINSTEIN:  I think what he's saying is, if

7    there's an issue with not being able to fill an order, then

8    they'll have to give them back their money.

9              THE COURT:  But the question was:  You knew that GAW

10   Miners could potentially face issues for filling orders.  Part

11   of his answer is "yeah."

12             MR. WEINSTEIN:  Yeah, so, look, it's not a very

13   precise question and not a very precise answer.

14             THE COURT:  That's true.  That's true.

15             MR. WEINSTEIN:  And if the question is, Could they

16   potentially face issues, such as if you can't fill the order,

17   people are going to want their money back?  And he says, yeah,

18   you're going to have to give them their money back.  But he's

19   not necessarily acknowledging that he knows they can't fill

20   orders.

21             MR. BUCHDAHL:  Your Honor, I think it's in the same

22   vein.  Again, if I'm limited to crossing him with this

23   transcript, I will do that because I think -- but I think given

24   the existence of this transcript, I think it takes away that

25   issue as to the truth of the matter that you were concerned

1    about in your order, and I think that it makes it nonhearsay

2    under 801(d).  And so I think that this document should come

3    in.

4            THE COURT:  So, again, I think this is close, but for

5    me I go the other way on this.  I don't think that's a clear

6    adoption, and I think you'll need to just use the transcript on

7    this.  So I'll maintain my ruling on 64.

8            What's next?

9            MR. BUCHDAHL:  Your Honor, the next one is 145.  And

10   this is a document where -- this goes back to the ZenMiner --

11   now, part of this I think Your Honor had suggested that there

12   was a little bit of an issue with the Motion in Limine.  I

13   think what you said about 145 was, "See Court's ruling as to PX

14   126.  The current e-mail may be admitted."

15           But -- and I'm just -- I think the state of play is a

16   little unclear.

17           THE COURT:  Right.

18           MR. BUCHDAHL:  And so what --

19           THE COURT:  Okay, so let's talk about that.  This

20   was -- I don't remember exactly the ruling, but I probably said

21   part of this is going to be subject to my ruling on the motion

22   concerning statements about the acquisition of ZenMiners by GAW

23   Miners.  Hopefully I said something like that?

24           MR. BUCHDAHL:  Yes.

25           THE COURT:  So this is an e-mail from Garza to Tommy

1    Fraser and Stuart Fraser.  Congrats, May 23, 2014.

2           MR. BUCHDAHL:  Right.  And then if we -- when the

3    jury's allowed to see some of this -- right? -- what you'll see

4    is that the author of the article says, "I spoke on the phone

5    with Thomas Fraser, and I spoke with Josh Garza."  And then

6    later --

7           THE COURT:  All right.  So I do remember this now.  So

8    there was -- there were some hearsay concerns, I think.  So

9    Thomas is quoted as saying, "I've known Josh for several

10   years."  And then he says, "This is why our first partnership

11   is with them."

12          So clearly, those statements go to the control issue.

13   And I was concerned -- now, the technical stuff -- I mean I

14   don't think that's offered for truth.  There's no disputes

15   about the technical stuff.

16          MR. BUCHDAHL:  No.

17          THE COURT:  But the statements I just read from Thomas

18   Fraser seem to me to be at issue.

19          MR. BUCHDAHL:  Again, no one disputes that they've

20   known each other for years.  But it is -- it really is all of

21   this.  I think here we would focus on the nonhearsay purpose of

22   knowledge.  And part of it is to tell -- so the jury can

23   understand the nature of his admissions to the SEC.

24          And if I can show you a page --

25          THE COURT:  Well, just to be clear, just to be clear,

1   so as I say, I think -- again, I don't have the ruling in front

2   of me, but my recollection is I cited a couple examples.  And I

3   think those may have been the only two.  There might have been

4   a statement from Garza as well that I considered to raise

5   hearsay issues.  I don't think the rest of it does though.  The

6   cover e-mail is fine.

7          So I don't -- I mean if what you're saying is, "No,

8   Judge, I want those statements too," then we can talk about

9   that.  But I'm not really disputing -- I'm not disputing that

10  some of this other stuff, if it's relevant, if you want it

11  in --

12         MR. BUCHDAHL:  So we do -- yeah, I do want the

13  statements about "I've known him for years."  And, again, this

14  goes to establishing overall the control that Stuart Fraser

15  had; right?

16         THE COURT:  Right.

17         MR. BUCHDAHL:  So he basically offers up -- I mean we

18  will propose this -- we will put this in the following light.

19  He essentially offers up his son as a front executive for a

20  fake company; right?

21         So ZenMiners isn't an independent entity.  And, quite

22  frankly, Thomas Fraser isn't an executive at ZenMiners.  Thomas

23  Fraser works for a Cantor Fitzgerald subsidiary; right?

24         THE COURT:  You guys are going to prove that at the

25  trial?

1            MR. BUCHDAHL:  We're going to prove that.

2            So what we have now -- right? -- is we have a

3    situation where they have now said to the public -- right? --

4    this is such a great growing company that is now gobbling up

5    other companies in order to extend its reach.  How does it do

6    that?  Well, it uses the Defendant's son as kind of the

7    mouthpiece.

8            But now look at what the Defendant said to the SEC

9    about this.  At the time -- and again no hearsay objections to

10   this, no evidentiary objections to this, these admissions from

11   his SEC depo.

12            "The time being May 23, 2014, you knew that GAW Miners

13            was holding out ZenMiner as an independent entity; is

14            that fair?

15            "Yes.

16            "Okay.  Did you say anything to Josh about you

17            shouldn't do that; that's not true?

18            "Yes

19            "What was his reaction?

20            "He didn't seem to care.

21            "Did that cause you concern?

22            "Oh, yeah.  I was really pissed off.

23            "So what did you do about it?

24            "I started dealing with him less, talking to him less.

25            It really started driving us apart."

1          Now, this is, all due respect, utter nonsense.  It is

2     exactly the opposite of what Mr. Fraser did in real life

3     because it was following that that he arranged the meeting in

4     Cantor Fitzgerald, that he was Tweeting about the company, that

5     he was basically saying this is the best thing since sliced

6     bread.

7          So the SEC deposition, just so you understand, has

8     kind of two aspects to it, and in a way they're mirror images.

9     On the one hand, we want to use it as a confession because he

10    went in there and he acknowledged that he knew all these lies;

11    he knew all of these problems with the company.  But at the

12    same time that it's half confession, it's also half nonsense

13    and self-serving minimization.  And we want to hit him with

14    that too, and we should be entitled to have the benefit of both

15    of those.

16         THE COURT:  And you need Thomas Fraser's statements,

17    "I've known Josh for several years" and "this is why our first

18    partnership is with them," to do that?

19         MR. BUCHDAHL:  Yes.

20         THE COURT:  Why?

21         MR. BUCHDAHL:  Because the extent to which the

22    Defendant's son was induced to go and kind of spin a yard

23    publicly indicates the amount of control that Stuart Fraser had

24    over all of these players, in our view.  That's what we submit

25    the probative value of it is.

1            THE COURT:  Right.  But I guess -- I understand, I

2     think, all of that.  I guess the part I don't see -- I mean if

3     I made you redact those statements, what would you lose in

4     terms of that story here?

5            MR. BUCHDAHL:  I think we'd lose some color, Your

6     Honor; and it's certainly within your discretion to make that

7     decision.  We just think the balance tips in our favor.

8            THE COURT:  Okay.  Let me hear from Defense on this.

9            MR. WEINSTEIN:  Your Honor, if the -- well, I

10    appreciate hearing the jury address us on these issues and the

11    dramatic read of the SEC testimony.

12            But for starters, if the argument they're going to

13    make, which they obviously want to make, is like Stuart Fraser

14    brought his son to the mountaintop and sacrificed him and said,

15    "Here have him; go use him as a fraud," and we can't put in --

16    this is just to revisit really before -- stuff about his

17    personal life to show what kind of person he actually is, not

18    the kind of guy who would do what Mr. Buchdahl just did with

19    that dramatic reading, we'd ask that if they're going to be

20    allowed to do that, that you revisit that issue.

21            THE COURT:  Like with respect to, like, let in the

22    9/11 stuff?  Is that what you're saying, because they're going

23    to attack his credibility really?

24            MR. WEINSTEIN:  Not just -- I mean I think saying

25    throwing your son out there and putting him up as a shield for

1    this is beyond credibility.  It's complete character

2    assassination, happens to be completely untrue; but that's the

3    argument they want to make, that this guy is like evil

4    incarnate.

5            But with respect to the statements that Your Honor's

6    asked about --

7            THE COURT:  Yeah --

8            MR. WEINSTEIN:  "I have known Josh for years," and

9    when I --

10           THE COURT:  The other one is "this is why our first

11   partnership is with them."

12           MR. WEINSTEIN:  I mean I guess --

13           THE COURT:  I mean maybe you don't care about that.  I

14   thought you would.

15           MR. WEINSTEIN:  It's hearsay.

16           THE COURT:  Yeah.

17           MR. WEINSTEIN:  Thomas Fraser's not a witness, and

18   they're not offering his testimony.  And I think Mr. Buchdahl

19   said they're going to prove that Mr. Stuart Fraser knew all

20   this was going to happen in advance.  Other than by his

21   dramatic readings, I don't understand where that proof's coming

22   from.

23           THE COURT:  Where what's coming from?  Sorry?

24           MR. WEINSTEIN:  That Mr. Fraser, Stuart Fraser, knew

25   in advance that this was going to happen and he put his son up

1   for that.

2           THE COURT:  Yeah.  Again, my focus is a little

3   narrower really on these statements.  And I do think they

4   should be redacted.  But I'm talking about two statements.

5           MR. BUCHDAHL:  Your Honor, I'm willing -- I'm willing

6   to let them go because I just think we have other -- we have

7   higher priorities.

8           THE COURT:  Okay.  Was there a third statement that

9   I'd identified in the ruling?  Was there something --

10          MR. BUCHDAHL:  So in your ruling you identified these

11  statements in the context of Plaintiffs' Exhibit 126.

12          THE COURT:  Okay.  Let's go back to that.

13          MR. BUCHDAHL:  And so what you said in your ruling

14  was, "I have known Josh for several years" and "our first

15  partnership is with them."  But to be fair, Your Honor, you

16  said, these are by way of example.  And so --

17          THE COURT:  Okay.  So let me see if I can find any

18  others.  None of the others -- those are the ones that jumped

19  out at me.  I thought there was also a statement by Garza here.

20          MR. BUCHDAHL:  At the very end there's a statement by

21  Garza.  Josh then told me -- his first question to Thomas was,

22  "Why didn't you bring this to me sooner?  It is brilliant."  I

23  think that's the statement by Garza in there.

24          THE COURT:  I don't think that's hearsay.

25          MR. BUCHDAHL:  All right.

1          THE COURT:  Okay.  So I guess it's just those two
2     statements then.  Okay?
3          What's next?
4          MR. BUCHDAHL:  Your Honor, we're now changing gears
5     because this is no longer kind of in the same bucket.
6          THE COURT:  Okay.
7          MR. BUCHDAHL:  But I think this is a pretty
8     significant --
9          THE COURT:  Which number are we talking about?
10         MR. BUCHDAHL:  Sorry.  Plaintiffs' Exhibit 84.
11         THE COURT:  84?
12         MR. BUCHDAHL:  Yup.  So Plaintiffs' Exhibit 84 is an
13    e-mail from *The Wall Street Journal* reporter.
14         THE COURT:  Okay.
15         MR. BUCHDAHL:  And he writes to Josh Garza and to
16    Stuart Fraser and to a couple others, but those are kind of,
17    you know, Mr. Kelley, so kind of the people that we've been
18    talking about.
19         THE COURT:  Yup.
20         MR. BUCHDAHL:  And really what's, I think, essential
21    here is the questions that he asks.  And, again, I kind of go
22    back to this issue of the affirmative defenses and the good
23    faith because what we have here --
24         THE COURT:  Just so we're clear, my ruling was that
25    there were a few hearsay statements in here; is that right?

1          MR. BUCHDAHL:  No, Your Honor.  You just sustained the

2     objection without comment.  So I can't --

3          THE COURT:  You don't know what my ruling was?

4          MR. BUCHDAHL:  I can't help you more than that.

5          THE COURT:  All right.  So questions ordinarily aren't

6     hearsay --

7          MR. BUCHDAHL:  Right.

8          THE COURT:  -- because they're not offered for

9     truth.

10          MR. BUCHDAHL:  So --

11          THE COURT:  But there were some statements in here

12     along the lines of, let's just see ...

13          Well, before I try to guess at it, let me ask the

14     Defendant to try to identify.  I know one of the objections was

15     hearsay.  I should have brought the objections out with me.

16     That was -- wait, they're here.

17          MR. WEINER:  Your Honor, start with number one.  It

18     says, "the big one."  Again, the reporter, he's saying, "There

19     are comments out there, and the big one, this is a Ponzi

20     scheme."  That, you know --

21          THE COURT:  I'm sorry.  "The big one"?

22          MR. WEINER:  No. 1 there.

23          THE COURT:  Ah, "the big one."

24          MR. WEINER:  This is a Ponzi scheme.  So he's not

25     asking, is this a Ponzi scheme?  He's saying there are people

1    out there saying this is a Ponzi scheme.  So that's the hearsay

2    objection.

3           THE COURT:  Although that's going to come in through

4    your internet exhibits; right?

5           MR. BUCHDAHL:  Your Honor, it's actually --

6           THE COURT:  Wait.  Let me ask Mr. Weiner.  In other

7    words, that's evidence -- you're going to introduce evidence of

8    people -- if you laid a foundation --

9           MR. WEINER:  Mr. Buchdahl's going to try to stop me;

10   so I can't tell you whether that's going to come in.

11          THE COURT:  Well, okay.  But if I let -- some of that

12   does come in, then the jury's going to be made aware that there

13   were, quote, people out there that were saying this is a Ponzi

14   scheme.

15          MR. WEINER:  It's the imprimatur of *The Wall Street

16   Journal* asking -- *The Wall Street Journal*'s basically saying

17   that there are people out there saying this, as opposed to, you

18   know, what they'll try and dismiss as random comments by

19   anonymous people all on crazy websites, here's *The Wall Street

20   Journal* doing this.

21          THE COURT:  I do think that is in a

22   good-for-the-goose, good-for-the-gander situation.  Keep

23   going.

24          MR. WEINER:  When we saw Your Honor's opinion, we

25   thought it was for that reason, that they're incredibly

1    inflammatory statements presented as fact by *The Wall Street*

2    *Journal* and being asked to comment on those as opposed to some,

3    again, internet comments by, you know --

4            THE COURT:  Let me just look at the objections again.

5            So the objection is the article has hearsay and also

6    objects for the reasons specified in Mr. Fraser's Motion in

7    Limine.  Motion in Limine concerning ...

8            All right, well, sounds like you're at a loss on that

9    one as well as me.  But why don't we talk about the hearsay

10   issue then.

11           MR. WEINER:  Again, it's *The Wall Street Journal*

12   imprimatur not of questions but of statements, like Point No. 1

13   or Point No. 5 where they're statements.  This is a Ponzi

14   scheme; they are payment or Hashlets for trading revenues, etc.

15           So, again, collecting these comments and presenting

16   them as facts under *The Wall Street Journal* heading we thought

17   that 403 balancing led you to sustain the objection.

18           THE COURT:  And the purpose of this exhibit is?

19           MR. BUCHDAHL:  Is to show that Mr. Garza -- to counter

20   his good faith affirmative defense to show he was aware.

21           THE COURT:  Mr. Fraser.

22           MR. BUCHDAHL:  I apologize.

23           THE COURT:  That's all right.

24           MR. BUCHDAHL:  Mr. Fraser, yeah, to show Mr. Fraser

25   was aware in November of 2014 that a *Wall Street Journal*

1    reporter was asking these questions is exactly the sort of

2    thing in terms of no risk and inquiry notice and what could you

3    do about it and what did you do about it?  It's exactly the

4    sort of thing we're talking about in terms of class member

5    reliance.

6          So, Your Honor, remember, this is round two.  Round

7    one is he speaks to *The Wall Street Journal* reporter --

8          THE COURT:  Garza does; right?

9          MR. BUCHDAHL:  Fraser does.  Mr. Fraser agrees to

10   speak to *The Wall Street Journal* reporter, kind of huddles with

11   Garza ahead of time.  "Anything I should be aware of?"  He

12   speaks to him.  He is identified as a backer of the company in

13   the article.

14         Then, I think, we can see this, that *The Wall Street

15   Journal* reporter feels a little burned because as soon as the

16   article comes out, he's like, Hold on a second.  There's all

17   this stuff I kind of didn't know about.

18         Now, talk about lay a foundation, we're not saying

19   here:  Were you aware on some message board somebody called it

20   a Ponzi scheme?  You were asked to your face, Mr. Fraser.

21   People are saying this is a Ponzi scheme.  And what did you do

22   about it?

23         And for him to present a good faith defense to this

24   jury and not have to be cross-examined on the facts he got

25   questions like this, the fact it's a *Wall Street Journal* cuts

1  in favor --

2          THE COURT:  I hear you.  I hear you.  I am going to

3  change --

4          MR. WEINER:  And, Your Honor, he can ask those

5  questions of Mr. Fraser.  He doesn't need *The Wall Street*

6  *Journal* saying, I've gotten this; this is true; this is true;

7  this is true.  Let him ask the questions.

8          THE COURT:  Yeah, I think he's persuaded me, though,

9  that if I'm going to be allowing in -- if I'm finding relevant

10  evidence that there are allegations out there in the ether, I

11  could certainly give a limiting instruction that any of the

12  statements in this document should not be taken for their

13  truth.  Mr. Casey's not here to be cross-examined, so you're

14  not to take anything he says as true.  But I think that I am

15  going to allow them to put the document in with the limiting

16  instruction.

17          So I'm going to change my ruling on -- this is No. 84.

18  Okay, so this will be allowed in, with a limiting instruction.

19          MR. BUCHDAHL:  Just a couple more, Your Honor.

20          THE COURT:  All right.  All right.

21          MR. BUCHDAHL:  Plaintiffs' Exhibit 14.

22          THE COURT:  You're batting about 900, so I can't blame

23  you for trying.

24          MR. BUCHDAHL:  Your Honor, it's our fault we didn't

25  explain some of these sufficiently.  And I apologize for that.

1          THE COURT:  We're up to 14?

2          MR. BUCHDAHL:  I wasn't taking them in order because I

3   was trying to prioritize.  So Exhibit 14.

4          THE COURT:  Let me look at it.

5          MR. BUCHDAHL:  And the ruling here was that you were

6   going to permit, for example, Mr. Fraser's e-mail but you were

7   going to omit and strike Mr. Garza's earlier e-mail.

8          And we want Mr. Garza's earlier e-mail because Mr.

9   Garza affirmatively holds out Mr. Fraser as his business

10  partner, the vice chairman of Cantor Fitzgerald.

11         THE COURT:  So that's a truth.  That's offered for its

12  truth; right?

13         MR. BUCHDAHL:  We don't believe that it is being

14  offered for its truth.  We believe that it is being -- well,

15  first of all, we believe it's being offered for the effect on

16  the listener.  In other words, what's really happening here is

17  he's trying to gain credibility with a potential business

18  partner.

19         THE COURT:  That may be so, but that matters -- that's

20  going to matter to the jury a lot less than his

21  characterization that Stuart Fraser's his business partner.  I

22  mean the jury isn't really going to care --

23         MR. BUCHDAHL:  So let me go back to my old friend, the

24  adopted, the adopted statement.  Because a few minutes later

25  Mr. Fraser responds to this.

1          And he says, and he says, "Thank you.  We are very

2     excited to be working for you.  This is a crucial moment for

3     both of our companies."

4          So essentially he's responding to Mr. Garza's e-mail,

5     and he's not saying, "Whoa, slow down.  This isn't anything

6     that I am involved with.  This is Mr. Garza's business."  He's

7     saying, "I'm part of this."

8          And so I think the full context of this e-mail the

9     jury deserves to understand the conversation that immediately

10    preceded it.

11         THE COURT:  It's a valiant effort, Mr. Buchdahl, but

12    I'm not going to change my ruling.

13         What's next?

14         MR. BUCHDAHL:  The next one is kind of more of a

15    question.  We've got -- it's a conflict between an exhibit that

16    they tried to keep out and an exhibit they're trying to put in.

17    In other words, they offered Defense Exhibit 602.

18         THE COURT:  I thought I was dealing with Defendants'

19    objections to Plaintiffs.  I'm working through the others.

20         MR. BUCHDAHL:  I apologize.  I think it might help to

21    put them in the same category, but let me explain our argument

22    for this one and you'll see they have some favorites too.  63.

23         THE COURT:  Plaintiffs' 63?

24         MR. BUCHDAHL:  49 is from a depo.

25         THE COURT:  Got it.  All right.  Go ahead.

1           MR. BUCHDAHL:  So this is -- this is a document
2     between two lawyers.
3           THE COURT:  Yup.
4           MR. BUCHDAHL:  Lawyer for the company, lawyer for --
5     personal lawyer for Mr. Fraser.
6           THE COURT:  Got it.  And it says, "Stuart is
7     50-percent owner of GAW Miners."
8           MR. BUCHDAHL:  Correct.  So we believe these are --
9     first of all, it's admission of the company, and the company is
10    relevant here because they're the primary violator that we need
11    to demonstrate that it was where the offense happened.  Before
12    there's even a control person question, there has to be
13    a primary violation.
14          THE COURT:  It's an admission of the company because?
15          MR. BUCHDAHL:  Their lawyer said it, so it's a hearsay
16    exception for a statement of a representative.
17          THE COURT:  Okay.  And it was authorized by the
18    company?
19          MR. BUCHDAHL:  So I think that we can presume that an
20    attorney preparing -- that this engagement letter is authorized
21    by the company --
22          THE COURT:  It's really the statement "Stuart is
23    50-percent owner at GAW Miners" --
24          MR. BUCHDAHL:  That's at issue.
25          THE COURT:  And whether that's authorized by the

1  company.

2        MR. BUCHDAHL:  Correct.  But it also shows that the

3  people who are preparing the legal documents, this is what they

4  understood the relationship to be.  And the reason I brought up

5  the defense exhibit is because they want to do a similar thing

6  with one that says 85/15 for later in time.  So if that's why

7  if we're going to start putting in what the lawyers are saying,

8  it should be all of them or none of them.

9        THE COURT:  Which defense exhibit is that?

10        MR. BUCHDAHL:  Well, as an example, I have Defense

11  Exhibit 602.  It says, I assume you want the ownership of this

12  new parent entity 15/85.

13        That's from December of 2014.  So it's our position

14  that was a change.

15        THE COURT:  I hear you.  Let me hear from Defense

16  counsel on this.  I kept it out.  You heard why I kept it out.

17  But if you're -- I haven't started to -- I haven't gotten that

18  far in your exhibits yet.  But I'm wondering why I would allow

19  that if I wasn't going to allow this one.

20        MS. HASSAN:  Your Honor, so one difference is I don't

21  even know who Mr. Trowbridge is.  I realize that this document

22  says that he's preparing an engagement agreement for GAW

23  Miners.  But I don't know, like, was it a part -- is he

24  preparing his own engagement letter with GAW Miners?  I don't

25  even know if he was retained.  So --

```
1          THE COURT:  You're suggesting there's no foundation
2    for this exhibit.
3          MS. HASSAN:  Correct.
4          MR. WEINSTEIN:  Can I add to that, Your Honor?
5          THE COURT:  Sure.
6          MR. WEINSTEIN:  It's not an admission of a party
7    opponent.  Mr. Fraser's the defendant here.  This is being used
8    against him.
9          THE COURT:  I was going to ask about that.  His
10   position is, from the Plaintiffs' perspective, GAW also is a
11   party opponent, and he's arguing that Trowbridge is an agent of
12   GAW.  I sort of skipped over the first part.
13         MR. WEINSTEIN:  Even assuming that was the case, if
14   GAW Miners was here as a defendant, it could be used against
15   them only as a party admission.  They're not here.  It can't be
16   used as an admission as to Mr. Fraser.  It's hearsay as a
17   result.  It could only be used as an admission by a party
18   opponent --
19         THE COURT:  Okay.  I'm not going to change my ruling
20   on this.  But I will -- I haven't had a chance to study Exhibit
21   66, so I will keep that in mind.
22         Last one.
23         MR. BUCHDAHL:  Great.  I'd like to -- it's Plaintiffs'
24   Exhibit 7.  And this was one in which you sustained it in part.
25   And what you struck was Mr. Garza's e-mail that's highlit in
```

1  part here from 1:41 p.m.

2          THE COURT:  1:41, right, so ...

3          MR. BUCHDAHL:  So --

4          THE COURT:  "You've been a mentor," all that good

5  stuff.

6          MR. BUCHDAHL:  Yes.  So first of all, we're getting

7  Stuart Fraser's e-mail in there.  And he says, "Sure, as the

8  400,000 friends and family are strategic."  That's a direct

9  reference to the e-mail that you struck.  "I'm thinking about

10 400,000 plus what you want to get back out."

11         At a minimum, I think we need to be more careful about

12 what we redact.  But we respectfully submit you should let in

13 the entirety of that e-mail because this is illustrative,

14 whether or not it's true, the way that he is speaking to Mr.

15 Fraser and the tone of their communications is indic -- even

16 if Mr. -- in other words, it doesn't really matter --

17         THE COURT:  Well, but it does.  It's a good argument

18 or it's a clever argument, but it doesn't matter if it's

19 true -- right? -- years of training in mentorship, example you

20 set, deep appreciation and admiration for you.  If the jury

21 buys all that as true, you've got a long way toward showing

22 control.  So it does matter if it's true.

23         But what's your point on, "sure, is the 400,000

24 friends and family" --

25         MR. BUCHDAHL:  The 400,000 is just a reference to the

1    Bullet No. 3 in Mr. Garza's e-mail where he says, "I am working

2    on narrowing this down."  In other words, this is a longer

3    discussion about fundraising.

4            THE COURT:  Right.

5            MR. BUCHDAHL:  And there are kind of -- there's a lot

6    of personal back-and-forth.

7            THE COURT:  Yeah.

8            MR. BUCHDAHL:  But at the heart of all the personal

9    back-and-forth, there's kind of a numbered sequence of call and

10   response.

11           THE COURT:  This is what I'm trying to get at:  Are

12   you -- I mean so it's a question, strictly speaking.  It's not

13   hearsay.  But are you saying, Judge, if you're going to allow

14   that in, you've got to allow the other part in?

15           Because I think my response would be, I won't allow

16   the second statement either.  I don't want to be fighting

17   battles that Defendant doesn't want me to fight.  But I assume

18   the Defendant does not want in statements taken for their truth

19   that there was years of training and membership when it can't

20   cross-examine.

21           MR. WEINER:  Correct, Your Honor.

22           MR. BUCHDAHL:  If I could have a fallback position on

23   that --

24           THE COURT:  Yes.

25           MR. BUCHDAHL:  -- what we would propose is instead of

1    losing the entire e-mail, you redact just from the "I am sorry"

2    to the "admiration for you."  I don't think there's anything

3    else in there that's prejudicial or that is other than kind of

4    just the back-and-forth necessary for this 400 --

5            THE COURT:  So in other words, just the four bullet

6    points, just the "hey" and then the four bullet points?

7            MR. BUCHDAHL:  Yes.

8            THE COURT:  Let me just read them.

9            What's the Defense position on that?

10           MR. WEINER:  If this will move things along, that's

11   fine.  Get those four pints and redact the rest.

12           THE COURT:  That's fine.  Let's do that.

13           Let's move on to a different topic.

14           MR. WEINER:  Your Honor, on that topic, we have

15   some -- a couple we take issue with.  Actually, not issue.  We

16   just need clarification.  It will be very quick.

17           THE COURT:  Yeah.  I'm thinking we may need a phone

18   call follow-up for that because you haven't seen my rulings

19   on -- neither of you have seen my rulings on the other stuff

20   yet, and I do want to give everybody the same opportunity.  So

21   I'm thinking -- well, okay.  It's 4:41.  Let me do the

22   preliminary jury instructions first and see.

23           So I believe we sent you a revised version of them.  I

24   tell you what.  What might be more efficient is for you to send

25   us a markup of those if you have issues.  Understand that I use

1    some version of those instructions in just about every case

2    that's a civil case.  That said, if you find something wrong

3    and I agree with it, I'll change it.

4            Obviously, the class stuff is not stuff I use in every

5    case.  I took it from *Newberg on Class Actions*, although I

6    adopted it a little bit.

7            So why don't you send us by Monday at noon a markup of

8    those, if you have any proposed changes to the preliminary

9    instructions that we sent you.  That way we won't have to spend

10   time now.

11           Oh, just to help me out, I know -- I do need to get

12   some idea of who the Plaintiffs -- whose deposition testimony

13   you're most likely -- say the first two you're most likely to

14   present first because those are the two I'm going to turn to

15   first and do the objections.

16           In other words, I'm going to do everything I can to

17   finish all these objections.  It's going to be a long weekend.

18   But in case I can't, I'd like to go in order.  In other words,

19   I don't want to leave for last the person you're like, "Well,

20   Judge, that's the first one we're putting on."  So if I can get

21   some idea who's first and second.

22           MR. BUCHDAHL:  Your Honor, can we advise the Court?

23   It's a conversation that we just started, and I don't -- there

24   is a substantial chance that we would play all of the

25   deposition testimony on Thursday morning.  But it's really

```
 1    there's a question.
 2              THE COURT:  Oh.
 3              MR. BUCHDAHL:  So I don't -- I think that there is --
 4    I would not want to tell you that with certainty that anyone
 5    would follow.
 6              THE COURT:  Is it all going to fit on Thursday
 7    morning?
 8              MR. BUCHDAHL:  It's pretty short.
 9              THE COURT:  It's just a lot of witnesses?
10              MR. BUCHDAHL:  Yeah, we have three -- I apologize,
11    Your Honor.
12              THE COURT:  That's all right.
13              MR. BUCHDAHL:  We have three videotaped depositions.
14    The longest, I believe, is Garza.  And that's in the
15    neighborhood of, I think, under 90 minutes; but the other two
16    are shorter.  And so I think that we may well try to fill that
17    in.
18              THE COURT:  You've got just three?
19              MS. CHEN:  That's correct.
20              THE COURT:  I can do that.  I'll take care of it.
21              Then, Mr. Weiner, you can use the last few minutes to
22    raise the points you wanted to raise on my evidentiary rulings
23    on the exhibits.
24              MS. HASSAN:  Your Honor, could we actually discuss
25    just some logistics for Wednesday, especially technology?  It
```

1    seems to me both sides are going to be using either some kind

2    of, you know, exhibits or maybe slides.  How do we go about

3    arranging to make sure that we have all the technology set up?

4            THE COURT:  Yeah, I would suggest that you get in

5    touch with Ms. Johnson, my courtroom deputy.  It might make

6    sense for you actually to send somebody on Tuesday or Monday,

7    if you like, to kind of test it out.  In fact, I think it would

8    make sense for you to do that.

9            THE CLERK:  Tuesday.

10           THE COURT:  Tuesday?  Okay, let's do it Tuesday.

11           MS. HASSAN:  And then a related question, how would we

12   publish documents to the witness?  Do we give the --

13           THE COURT:  So if you have the document either on the

14   ELMO, which, as you can see, is lit up now, or if you have the

15   document on the technology, the laptop, the witness has a

16   screen.  The witness will see it.  Assume -- in fact, the

17   witness will see it before it's admitted.  And then if I admit

18   it, Ms. Johnson will press a button and the jurors will see it.

19           They have -- they have screens there.  They also --

20   you'll see the three chairs.  They have a screen there.  There

21   are screens all over the place.

22           MS. HASSAN:  So there's no hard copy documents?

23           THE COURT:  I think we should limit that as much as

24   possible.  You know, sometimes technology breaks down.  We've

25   had situations, so that's why we've got the ELMO as a backup.

1     So then you're going to need -- so you will need paper as a

2     backup.  Otherwise, we're going to be in trouble.

3            But I think you should plan on doing everything

4     through your laptop.  Hopefully you've got somebody who's adept

5     and who can pull these things up fast and can do the focus and

6     all that.  I hope so.  That helps move things along.

7            MS. HASSAN:  Yes, Your Honor.  That's just what we're

8     trying to figure out, how to kind of put everything together.

9     Thank you.

10            THE COURT:  Okay.  Mr. Weiner, did you want to raise

11     some -- we got about ten minutes.

12            MR. WEINSTEIN:  While they're looking, Your Honor, may

13     I, just with respect to deposition designations, it sounds

14     like, just so we understand scheduling with respect to

15     Plaintiffs' depositions, Your Honor may make rulings on that

16     before openings.

17            THE COURT:  I think so.  I'm going to try.  I'm going

18     to try, and I may get to yours.  I have a lot of these exhibits

19     to go through.

20            MR. WEINSTEIN:  Understood.

21            There were two small snippets from two witnesses we

22     were hoping to get rulings on.  These are short.  We could do

23     them in two minutes or at least point Your Honor to what the

24     issue is.

25            MR. BUCHDAHL:  May I ask if this is -- if the Court

1    could find out if they want to play that in their opening?

2            THE COURT:  Is that the issue, you want to play it in

3    your opening?

4            MR. WEINSTEIN:  Or refer to it.

5            THE COURT:  I see.  Tell me what the --

6            MR. WEINSTEIN:  Yeah.  So with respect to our proposed

7    designation, it's in the -- does Your Honor have the joint

8    memo?

9            THE COURT:  I have it here.  Just tell me the witness.

10           MR. WEINSTEIN:  Yeah, the witness is Daniel Pease.

11           THE COURT:  P-e-a-s-e?

12           MR. WEINSTEIN:  Yes, Your Honor.  There are two pages.

13   The first one it starts at page 22.  We had designated lines 10

14   to 24.

15           THE COURT:  Okay.

16           MR. WEINSTEIN:  Basically Mr. Pease is saying, as far

17   as he knows, Mr. Fraser had nothing to do with GAW Miners.

18           THE COURT:  Mr. Pease is saying Mr. Fraser had nothing

19   to do with GAW Miners?

20           MR. WEINSTEIN:  Yeah, as far as what his level is.  He

21   had no idea what Mr. Fraser, you know, what his level of

22   involvement was.

23           THE COURT:  Okay, and Pease is somebody who worked for

24   GAW Miner?

25           MR. WEINSTEIN:  Correct.  And then we have a similar

1    designation at page 24 starting at line 9 through line 4 of the

2    next page.

3         I believe the objection -- the only objection stated

4    was for completeness.  And the issue that's raised there is

5    there are, I believe, counter-designations I assume for

6    completeness -- it's not clear to me -- is later in his

7    deposition Mr. Pease started taking the Fifth with respect to

8    questioning on anything.

9         THE COURT:  Oh, my.  Okay.

10        MR. BUCHDAHL:  So --

11        THE COURT:  You want to be heard?

12        MR. BUCHDAHL:  Yes.  I think that in light of the

13   complete -- the nature of the completeness deposition, it's

14   particularly prejudicial to let them do this in the opening.

15   And so I think that we can either have a more fulsome

16   discussions of all the problems with Mr. Pease's testimony.

17   But basically he says a couple things.  Then he starts getting

18   crossed by our counsel and he takes the Fifth.  And so there's

19   not really a cross-examination here in the way it would

20   traditionally happen for a witness which turns what otherwise

21   would be sworn testimony into just hearsay.

22        THE COURT:  This would have been a good thing to write

23   a motion in limine, folks, because I had no idea somebody had

24   taken the Fifth.  Is it going to be apparent -- is all the

25   transcript in there he's taking the Fifth and can I --

```
 1              MR. WEINSTEIN:  Yeah, it's all in there.  But, again,
 2    with respect to the actual facts here, I think Mr. Buchdahl
 3    said when it came to their counsel asking all of a sudden he's
 4    taking the Fifth, it was their counsel doing the question all
 5    along which elicited the testimony we're trying to play.  So
 6    I'm not sure what the suggestion was there.  It's Mr. Sargent
 7    starts from the very opening, and that was Plaintiffs'
 8    counsel.
 9              MR. BUCHDAHL:  I misspoke, Your Honor.  It was
10    certainly our counsel who asked the questions where he took the
11    Fifth.
12              THE COURT:  Oh.  So it's not that there was no
13    cross-examination then.
14              MR. WEINSTEIN:  Correct.
15              THE COURT:  Your lawyer started asking questions.  He
16    gave this testimony that defense team wants in, and then later
17    on in the deposition, while your colleague was still
18    questioning, he starts to invoke the Fifth.
19              MR. BUCHDAHL:  Correct.  But it's on the same subject
20    of Mr. Fraser's role.  So it is -- if you think about like we
21    did not get the chance to explore Mr. Fraser's role with this
22    witness fully.
23              THE COURT:  I need to look at the testimony before I
24    can rule.  I can't give you a ruling right now.  I'll view it
25    as a priority.
```

1          MR. WEINSTEIN:  I wanted to bring it to Your Honor's

2     attention.  I appreciate that.

3          THE COURT:  All right, folks, I think we really are

4     out of time at this point.  If there's some reason that I think

5     it's important to speak before Wednesday, I'll get you on the

6     phone.  And I think that's all I have.

7          Anything urgent before we call it a day?

8          MS. CHEN:  Your Honor, I have just a very minor point.

9          THE COURT:  Doesn't sound like it's urgent, but go

10    ahead.

11         MS. CHEN:  It's PX 103.  I think this is -- we're

12    not -- we're not -- Your Honor's sustained the objection.  We

13    just wanted to point out that there were -- it's the same

14    exhibit as Defendants' Exhibit DX 637, which we hadn't objected

15    to because the same exhibit was in our exhibit list.  In light

16    of Your Honor's sustaining Defendants' objection, we --

17         THE COURT:  Exhibit 637 you said?

18         MS. CHEN:  It was PX 103, then DX 637.

19         THE COURT:  Very good.  Thank you all.  We'll be in

20    recess.

21      (Proceedings concluded at 4:52 p.m.)

22

23

24

25

```
1

2

3                    C E R T I F I C A T E

4

5

6

7              I, Julie L. Monette, RMR, CRR, CRC, Official

8    Court Reporter for the United States District Court for the

9    District of Connecticut, do hereby certify that the foregoing

10   pages are a true and accurate transcription of my shorthand

11   notes taken in the aforementioned matter to the best of my

12   skill and ability.

13

14

15                    /S/ JULIE L. MONETTE

16              _____
                Julie L. Monette, RMR, CRR, CRC
17                    Official Court Reporter
                          450 Main Street
                    Hartford, Connecticut 06103
18                      (860) 212-6937

19

20

21

22

23

24

25
```