# EXHIBIT A

1

2          IN THE UNITED STATES DISTRICT COURT

3                OF CONNECTICUT

4

DENIS MARC AUDET, MICHAEL ) Case 3:16-cv-00940
5   PFEIFFER, DEAN ALLEN      )
    SHINNERS, and JASON       ) Hon. Michael P. Shea
6   VARGAS, Individually and  ) Courtroom 2
    on Behalf of All Others   )
7   Similarly Situated,       ) ECF Case
                              )
8       Plaintiffs,           ) CLASS ACTION
                              )
9   vs.                       )
                              )
10  STUART A. FRASER,         )
    GAW MINERS, LLC, AND      )
11  ZENMINER, LLC, (d/b/a     )
    ZEN CLOUD),               )
12                            )
        Defendants.           )
13

14        ********************************

14          ORAL VIDEOTAPED DEPOSITION

15             HOMERO JOSHUA GARZA

16            December 14, 2018

17        ********************************

18      ORAL VIDEOTAPED DEPOSITION OF HOMERO JOSHUA GARZA,

19  produced as a witness at the instance of the Plaintiffs

20  and duly sworn, was taken in the above-styled and

21  numbered cause on the 14th day of December, 2018, from

22  10:13 a.m. to 6:44 p.m., before April Balcombe-Anderson,

23  Certified Shorthand Reporter in and for the State of

24  Texas, reported by computerized stenotype machine at the

25  Job No. 152595

1              Homero Joshua Garza

2    would have occurred by e-mail?

3        A.   E-mail would be the more likely way.

4        Q.   Okay.  Would you have any of those e-mails --

5    well, strike that.

6              Do you know if you have any of those

7    e-mails?

8        A.   It's possible.

9        Q.   Okay.  Would you be willing to check?

10       A.   Would I be willing to check?

11       Q.   Yes.

12       A.   Yes, sir.

13       Q.   Okay.  I think a little bit earlier you

14   mentioned that, prior to the SEC looking to GAW Miners,

15   you had communicated regularly with Mr. Fraser; is that

16   fair?

17       A.   Absolutely.

18       Q.   Okay.  And did you communicate regularly with

19   him in 2014?

20       A.   Yes, sir.

21       Q.   Okay.  And was it typically by phone?

22       A.   Yes, sir.

23       Q.   Okay.  Did you ever meet in person in 2014?

24       A.   Yes, sir.

25       Q.   Do you know approximately how many times?

1                    Homero Joshua Garza

2        A.    Two to three times.

3        Q.    Okay.   Where -- where do you remember meeting

4    Mr. Fraser?

5        A.    Primarily at his house.

6        Q.    Okay.   When you say "house" -- strike that.

7              Does Mr. Fraser have more than one house?

8        A.    Yes, he does.   I'd have to clarify, his house

9    in Armonk.

10       Q.    Okay.   What do you remember about --

11             THE REPORTER:   His house in where?

12             THE WITNESS:   Armonk, New York.

13             THE REPORTER:   Thanks.

14       Q.    (BY MR. WATTERSON)   Sure.   Can you tell me

15   about what you remember from those meetings?

16       A.    I remember discussing the nature of -- you

17   know, general discussion about cryptocurrency, you know,

18   plans for GAW Miners, his involvement, things of that

19   nature.

20       Q.    What do you remember about discussions about

21   Mr. Fraser's involvement --

22             MS. CAVE:   Objection to the form.

23       Q.    (BY MR. WATTERSON)   -- in GAW Miners?

24             MS. CAVE:   Objection to the form.

25       A.    Can you repeat that question?

1                    Homero Joshua Garza

2        Q.    (BY MR. WATTERSON)   Sure.   You had said that

3    you remember discussing Mr. Fraser's involvement in GAW

4    Miners; is that fair?

5        A.    Yes, sir.

6        Q.    Okay.   What do you remember about those

7    discussions?

8        A.    Everything from him providing, you know,

9    investments, loans to the company, seeking advice,

10    things of that nature.

11        Q.    When you say -- strike that.

12              When you say "seeking advice," you mean

13    you were seeking advice from Mr. Fraser?

14        A.    Yes, sir.

15        Q.    And what kind of advice were you seeking from

16    him?

17        A.    Primarily how to -- how -- how to best

18    position, you know, the cryptocurrency products that we

19    were selling.   I assumed, based on his background, that

20    he was a good resource to know because it evolved over

21    time.   As I learned that it was less of a technical

22    product and more it was a financial product, then I, you

23    know, sought his advice about, you know, how it should

24    be sold and ideas I had about how it should be sold,

25    things like that.

1                    Homero Joshua Garza

2              I'm asking him to, you know -- him to ask

3    Cantor for help and things of that nature.

4        Q.   So you -- can you describe what you meant by

5    the products involving -- evolving from a technological

6    product to a financial product?

7        A.   Sure.  As I first -- when we started the

8    company, we primarily sold hardware.  Over time, we

9    sold -- the hardware evolved into selling -- you know,

10   selling -- it's been worded a bunch of different ways,

11   but I guess selling a hashlet, okay, as you said

12   earlier, a --

13              THE REPORTER:  Selling a?

14              THE WITNESS:  A hashlet.

15              THE REPORTER:  Thanks.

16       A.   -- and that that generated amounts of

17   cryptocurrency to people that purchased it, and so --

18   so -- so it evolved from hardware and became a lot more

19   financial based.

20              So I remember, let's say, meeting with him

21   about how we should go about, you know, selling it, you

22   know, were we breaking rules in the way we were doing

23   it.

24              I believe that's when he recommended Dave

25   McLain getting involved.  And that was primarily when I

Page 28

1                 Homero Joshua Garza

2   had asked him to, you know, reach out to people he knew

3   at Cantor to provide advice to us as well.

4       Q.    (BY MR. WATTERSON)   Okay.   Can you remember

5   anything more specific about the advice you sought from

6   Mr. Fraser regarding selling these financial products?

7                 MS. CAVE:   Objection to the form.

8       Q.    (BY MR. WATTERSON)   Well, hold on.   Let me

9   reask it.

10                So earlier you -- you said that you sought

11  advice from Mr. Fraser about -- well, strike that.

12                Is it fair to say that you sought advice

13  from Mr. Fraser about selling hashlets?

14      A.    Many times, yes.

15      Q.    Okay.   Can you tell me what specific advice you

16  sought from him?

17      A.    It ranged from pricing to the, you know, origin

18  of hashlets, the concept of oversubscribing, you know,

19  the amount of people that purchased hashlets relative to

20  the amount of mining power and whether or not we were,

21  you know, legally able to do that or not.

22      Q.    Can you explain what you mean by "the concept

23  of oversubscribing"?

24      A.    Sure.

25                As the product evolved from hardware to

1                    Homero Joshua Garza

2    typical investor in a business, there are limitations

3    to -- generally, there are limitations to the control

4    that they have.

5              In Stuart's case, he -- you know, that

6    control extended, you know, across everything to who he

7    hired, how he hired, everything, so...

8        Q.   First of all, who -- who's Adrian?

9        A.   Adrian was an employee of Optima Computers.

10       Q.   Do you know Adrian's last name?

11       A.   Eames.

12              Adrian Eames.  It's on the first page.

13       Q.   Sorry, which page?

14       A.   Page 1.

15       Q.   Ah, Adrian Eames.  Okay.

16              And you said that Mr. Fraser had control

17   over Optima; is that right?

18       A.   Over everything we did together.

19       Q.   Including GAW Miners?

20       A.   Yes, just not in the traditional sense, if you

21   ask me to clarify.

22       Q.   In what sense did Mr. Fraser have control of

23   GAW Miners?

24       A.   Between Stuart and I, never really -- things

25   were never really bound always to, you know, what was

1                    Homero Joshua Garza

2    written on a piece of paper, you know, because Stuart

3    became such a strong mentor and, you know, kind of

4    father figure, and I was fully financially reliant, you

5    know, on him, he -- he had, you know control because

6    he -- over everything we did because he had full control

7    over me.

8                      So what I mean by "not in a traditional

9    sense" is that, you know, if he wanted something to work

10   a certain way, it was -- you know, it was possible and I

11   think a few times inferred, that, you know, he could

12   make decisions that, you know, would, you know, affect

13   me personally.

14       Q.    You said that he had full control over you.

15                    What do you mean by that?

16       A.    If -- if it were Saturday and Stuart called me,

17   the first thing he would ask me in all -- in almost

18   every call is, "What are you doing?"   And if I didn't

19   say something work-related, he would, you know, sigh and

20   be upset and then pause and wait for me to tell him

21   something that I'm about to go do that has something to

22   do with work.

23                      I remember him being upset that we had one

24   of -- I can't remember -- I think it was our first

25   child, but I remember him being upset that we chose to

1                    Homero Joshua Garza

2    have a child because it might interfere with my work.

3                    I remember him literally being upset

4    because we decided to get a dog, and he thought that

5    would impact my work, and that he told me that I, you

6    know, shouldn't do that.  So...

7        Q.    Why didn't you just tell him no?

8        A.    Because at that point, you know, all -- the

9    whole company, all of staff, myself and everything were

10   fully financially relying on him.

11                   I mean, and it's fair to say, I mean, I

12   also felt like because of our role, you know, like he

13   was kind of like a father figure, like I didn't

14   really -- you know, it wasn't always -- it wouldn't be

15   fair to say it was always because I made the decision

16   based on whether or not he would, you know, give us our

17   next -- you know, that was always sort of in the back of

18   my mind, but I always felt like I would disappoint or

19   let him down or he'd be upset with me if -- if I didn't

20   do, you know, what he was asking.

21                   It's hard to describe.  I mean, it's --

22   the only way you can describe it is like a parent, you

23   know, like even if you're a grown adult and your mother

24   says to do something like --

25       Q.    I understand.

1                    Homero Joshua Garza

2        A.    Yeah.

3        Q.    You had said -- I think when you were -- you

4    mentioned something about "giving us our next."   What

5    did you mean by that?

6        A.    Our next, you know, investment into the

7    company.  Because a lot of the activities that we were

8    involved in, you know, required continuous --

9    Stuart's -- Stuart's -- one way Stuart maintained

10   control is that he would never give the company like --

11   so in a -- a traditional investor would -- you would go

12   to them and say, "I'm going to do X, Y, and Z

13   initiative.  Here's the financial model for it.  Here's

14   how much it would cost.  Do you want to invest in that?

15   And I'd say it's $100,000."

16              Stuart's case, Stuart would say -- this is

17   an example.  He would say, "Okay.  We'll do it, but I'll

18   give you $10,000 right now, and then you need to come

19   back and ask me for the next 10,000."  So Stuart

20   maintained control because he -- we always -- like we

21   only ever had enough money until the next time I had to

22   ask him again, and he -- I, you know, argued many times

23   against that, but he liked it that way because, you

24   know, it made it to where I had to come back and ask him

25   every time.

Page 54

1                     Homero Joshua Garza

2                     And -- and to just clarify, I know this to

3   be because one day he told me that, that that was his

4   way of maintaining control -- it was when I was working

5   at a company called Smart Tech -- that his way of

6   maintaining control was because he, you know, wasn't

7   willing to lose control by providing, you know, the

8   investing we needed once and just allow us to perform,

9   that I needed to come back and ask each time.

10      Q.    What was Smart Tech?

11      A.    Smart Tech was just a business -- a business

12  initiative that I -- I decided -- you know,

13  originally -- it started originally as an initiative

14  that I was hoping, you know, that I could sort of have

15  on my own.  And then after a few months, then Stuart

16  became involved in that as well, did IT services, phone

17  services, stuff like that.

18      Q.    Okay.  Can you tell me anything more about this

19  conversation you referenced with Mr. Fraser?

20      A.    Which conversation?

21      Q.    Sorry.

22                    The conversations about sort of, I guess,

23  giving you payments in installments to maintain control,

24  can you tell me more about that conversation?

25      A.    In that specific conversation, by the time --

1                    Homero Joshua Garza

2    enough time had passed that I started to suspect that

3    there was something unnatural about the way that -- that

4    things financially worked like -- so I started to look

5    at other, you know, examples and ways and -- and learned

6    that that's, like, not how people normally invest into

7    things.

8              So I, you know, made a point to, like, say

9    some -- like, I'm like, "This -- these are the reasons

10   why, like, investing in this way is a problem.  You

11   know, no one knows if they're going to have a job

12   next -- like, no one -- like it scares everyone."  And

13   that's -- so that was the instigator of him telling me

14   that he -- okay, so I remember he specifically told me

15   that in the past, he had given other companies full

16   amounts of money they were asking for, and it didn't go

17   as planned and so -- I don't remember what they were,

18   whatever.

19             I just remember him telling me that, and

20   that it was his perspective that the way -- you know,

21   the appropriate amount of control to -- you know, that

22   needed to be maintained was to -- is that every time,

23   you know, the money he had given was exhausted, that I

24   would need to come back and ask him again.

25       Q.   So I'll hand you this document, which was

1                    Homero Joshua Garza

2    discussing Optima Computers, and we may have touched on

3    this, but how would you describe Mr. Fraser's role in

4    Optima Computers?

5        A.   Well, it would range from investor to adviser.

6    It's difficult to dis- -- because there's no -- there's

7    no normal that I can compare it to because he had direct

8    contact and -- and prior direction to my subordinates

9    sometimes as well, and so...

10       Q.   Can you tell me about him providing direction

11   to your subordinates?

12       A.   We would sometimes take a -- take overnight

13   trips to one of his houses and -- and -- and at that

14   time, I would take, you know, people that were in a

15   leadership position with the company with me, and so he

16   would speak, you know, to us collectively and to them

17   individually sometimes, you know, providing assignments

18   and tasks and things of that nature.

19       Q.   And we had -- earlier we looked at a document

20   describing Mr. Fraser as the chairman of the board of

21   Optima.  Do you remember that?

22       A.   Yes, sir.

23       Q.   And there was no formal board of directors,

24   correct?

25       A.   Yes, sir.

1          Homero Joshua Garza

2     Q.   But is it fair to say that he sort of

3   informally acted as a board member?

4               MS. CAVE:  Objection to the form.

5     A.   I -- based on my knowledge of the way a board

6   member operates, not really.

7     Q.   (BY MR. WATTERSON)  So tell me why not.

8     A.   Because board members generally are not

9   involved in the day-to-day activity of the company.  I

10  mean, the most accurate way I can think is a hands-off

11  CEO that's above the normal CEO.  I mean, I'm sorry, I

12  can't describe it better than that.  That's the best

13  description I can think of.

14    Q.   Does that describe Mr. Fraser's role in the

15  various companies generally?

16              MS. CAVE:  Objection to the form.

17    A.   Yes, sir.  Generally.

18    Q.   (BY MR. WATTERSON)  Okay.  Did Mr. Fraser

19  invest in Optima Computers?

20    A.   Yes, sir.

21    Q.   And do you know how much?

22    A.   No, sir.  I'm -- I wouldn't recall the total

23  amounts.

24    Q.   Do you know approximately how much?

25    A.   I'd guess it's probably more than a million.

1                    Homero Joshua Garza

2    balance, so -- because I don't even remember if he was

3    the main person on the Plum Card or not.

4              So I know that doesn't completely answer

5    your question, but the -- the best I can remember is

6    that, you know, he was the -- the main account.  You

7    know, like, he formed the account to be in with.

8       Q.   How would you describe Mr. Fraser's role in GAW

9    Miners?

10             MS. CAVE:  Objection to the form.

11      A.   I would describe it, you know, similar to the

12   role that he had when we first, you know, got -- became

13   partners in Optima, where, you know, he and GAW Miners

14   and, like, other companies, he wasn't reaching around me

15   or -- and getting people to do things directly.  The --

16   you know, his role was a lot more from him to me.

17             You know -- you know, still, you know,

18   regularly, you know, talking and going through, you

19   know, because he essentially wanted to know what

20   happened every day, you know, but it was -- so it's

21   quite a bit more than a normal -- like a regular

22   investor, but not quite as, you know, much as the

23   previous companies.

24      Q.   (BY MR. WATTERSON) And is it fair to say that

25   this main difference was that he wasn't interacting as

1                    Homero Joshua Garza

2    much with the other employees?

3                    MS. CAVE:  Objection to the form.

4         A.    To be honest, the main difference was when --

5    when I came interested in cryptocurrency, unlike other

6    things, you know, I sort of explored more of it as a

7    side project -- you know, something I did on my own.

8    And then, you know, it got really big really fast, and

9    so my general perspective on GAW Miners was we were more

10   like equals, you know.

11                   And so I think the main reason that his

12   role was different is just more because I didn't, at

13   this company, you know -- you know, it wasn't a company

14   that he had dumped $5 million into and then I was

15   underneath, you know, like, you know, we -- I felt like

16   we were more, you know, actual partners in this company,

17   you know, versus in the previous companies.

18                   So, you know, I think it was more the --

19   the nature of our interactions were different.

20        Q.   (BY MR. WATTERSON)   Do you know whether

21   Mr. Fraser tried to solicit any investments in GAW

22   Miners?

23                   MS. CAVE:  Objection to the form.

24        A.    I believe so.  I believe I -- I thought I

25   saw -- it might have been in one of the -- no, maybe it

Page 144

1                    Homero Joshua Garza

2    wasn't here, but -- I mean, there was an e-mail chain I

3    was copied on where he had reached out to a bunch of

4    people he knew that -- you know, asking about, you know,

5    potential investment in the company.

6        Q.   (BY MR. WATTERSON) So the basis of your belief

7    is that e-mail?

8        A.   The basis of the belief is that e-mail.  That

9    he also mentioned that he'd talked to Howard about it,

10   about making an investment.  Potentially others, but

11   those are the ones I recall specifically.

12       Q.   Do you recall any discussions between you and

13   Mr. Fraser about PayCoin?

14       A.   Yes.

15       Q.   Can you tell me what you remember about those

16   conversations?

17                 MS. CAVE:  Objection to the form.

18       A.   Everything from the name of the coin to the

19   content of how it would be distributed, the

20   difference -- then by that time, I would have known,

21   like, staking versus all that stuff.  Because, you know,

22   PayCoin protocol was, you know, discussed with Cantor

23   so, you know, he was a -- that's what I meant by he was

24   a lot more heavily involved in to help shape, you know,

25   what got brought in.

1                    Homero Joshua Garza

2              I mean, the biggest thing to understand

3     was nothing would get brought in front of Cantor unless

4     he was -- like, he knew everything about it and had been

5     heavily involved.  So since PayCoin was the main thing,

6     he -- that was the main thing we, you know, worked on

7     each other on.

8        Q.   (BY MR. WATTERSON)  Did you discuss the $20

9     floor with Mr. Fraser?

10       A.   I don't specifically remember.

11              If it's in one of the articles, the Wall

12    Street Journal articles, then we would have because we

13    discussed those articles at length.  But if it's not in

14    any of the articles, I'm not sure.

15       Q.   Okay.  Did you discuss the reserve fund with

16    Mr. Fraser?

17       A.   It would have -- you know, in the -- I believe

18    in the article, it mentioned both the -- like the floor

19    price and the reserve funds, so, yes, it would have

20    been -- we would have discussed that as well because we

21    discussed the whole article.

22              MR. WATTERSON:  Can we just take a quick

23    break?

24              THE VIDEOGRAPHER:  Off the record at 2:53.

25              (Recess from 2:53 p.m. to 3:02 p.m.)

1                 Homero Joshua Garza

2    what we're marking as Exhibit 251.

3                 (Exhibit 251 marked.)

4         Q.    (BY MS. CAVE)   This is an e-mail from -- e-mail

5    chain between you and Robert Gallagher dated

6    September 11th, 2014.   Who was Rob -- Robert Gallagher?

7         A.    He was a previous employee at GAW Wireless --

8         Q.    He was --

9         A.    -- or GAW, whatever, GAW HSI.

10        Q.    Okay.   And what was his job at GAW HSI?

11        A.    I believe that he was the CTO for -- for a

12   while.

13        Q.    And so is this -- take your time to read the

14   chain, but it looks like you're talking about getting

15   into a -- a business project with him?

16        A.    Yes, ma'am.

17        Q.    And that related to building -- building your

18   own chips?

19        A.    Yes, ma'am.

20        Q.    And by that, what do you mean by "chips" here?

21        A.    The chips -- I thought we would bring the price

22   of miners down by building the chips, which were one of

23   the most expensive components that go into the miners.

24        Q.    So how are you going to go about building your

25   own chips?

1                    Homero Joshua Garza

2      A.   I mean, like, you -- they don't have to be

3 invented.  They already exist so if you have your own

4 manufacturing process, then it's a lot less expensive.

5 If you just -- you know, if you buy it from another

6 company, you're just paying the markup, so...

7      Q.   So you were considering setting up your own

8 manufacturing operation?

9      A.   I was until I found out how, you know, much

10 time and money it cost, but, yes.

11     Q.   And the first line of this e-mail on the first

12 page, you say to Mr. Gallagher, "Oh, yeah, Stuart is not

13 involved."

14     A.   Uh-huh.

15     Q.   Is that correct?  So he wasn't involved in this

16 process --

17     A.   No.

18     Q.   -- of chips?

19     A.   That's not the context it was meant in.

20     Q.   Okay.  So what context is that referring to?

21     A.   What that meant is -- so Rob Gallagher was the

22 first person that really made me aware of the way that

23 Stuart managed the investments into the company, how

24 much damage that could -- how much big of a problem, how

25 much fear it put in employees, how much damage it caused

1                    Homero Joshua Garza

2    that he had that level of control, and how involved he

3    was with the employees.  He left.  He quit because of

4    that.

5               So when I say "Stuart is not involved,"

6    it's within the con- -- you know, it meant to him that

7    Stuart, like, didn't -- like you -- like, it would be

8    safe to work here because, you know, Stuart isn't out

9    giving assignments to every single person,

10   blah-blah-blah, like he was at previous companies.

11      Q.   So this initiative regarding the chips is

12   something that Mr. Fraser was not involved in?

13               MR. WATTERSON:  Object to the form.

14      Q.   (BY MS. CAVE)  Or was not going to be involved

15   in?

16      A.   No, I think that -- again, this is to the best

17   of my memory, but I believe that the context of this is

18   more about Stuart's management involvement because I

19   remember talking to Stuart about making these chips.  We

20   even looked at a company in California that was working

21   on these chips.  In fact, they sent us a proposal I

22   remember Stuart got a copy of.  So, no, it wouldn't have

23   meant he wasn't involved in the chips.  It meant -- it

24   just meant what I just explained to Robert.

25      Q.   You never quit any of the companies that you

```
1                    Homero Joshua Garza
2   worked?
3        A.   I'm sorry?
4        Q.   You never quit --
5        A.   No.
6        Q.   -- any of the companies that you worked with
7   Mr. Fraser on?
8        A.   No.
9        Q.   But Mr. Gallagher did?
10       A.   Yes, ma'am.
11       Q.   So this statement here, "Stuart is not
12  involved," is not true, right?
13       A.   Again, the context of this e-mail to this
14  specific person was the last thing Robert said to me, is
15  that, "Talk to me whenever, you know, when Stuart is not
16  controlling every aspect" -- I don't remember exactly
17  how he worded it.  So me saying "Stuart is not
18  involved," to him meant that, you know, Stuart is not
19  controlling every aspect of the company like he did when
20  you worked here.
21       Q.   Okay.
22       A.   And I'm only so confident because I -- this is
23  one e-mail I specifically remember writing, and I
24  specifically remember what I meant by that.
25       Q.   Can you pull up Exhibit 160, please?  It's the
```

1                  Homero Joshua Garza

2    spreadsheet of all of the transfers.

3        A.   Okay.

4        Q.   And on the last page there, it's the -- there's

5    a total that's negative $11,950,181.89.

6                  Do you see that?

7        A.   Yes, ma'am.

8        Q.   So that's a total that Mr. Fraser contributed

9    to the two companies that you were involved in?

10                 MR. WATTERSON:  Object to the form.

11       A.   It would have been the -- it would have been

12   more than two, but yes.

13       Q.   (BY MS. CAVE)  More than two?

14       A.   Oh, there's GAW Labs, on the Internet, Geniuses

15   at Work.

16       Q.   I'm sorry, I didn't say two companies.

17       A.   I'm sorry.

18       Q.   My question didn't come out properly.

19                 I think I said the companies that you two

20   were involved in?

21       A.   You two, I'm sorry.  Yes, ma'am.

22       Q.   Not two companies --

23       A.   Yes, ma'am.

24       Q.   -- but you and Mr. Fraser were involved in,

25   this is the total amount that he put in?

1                    Homero Joshua Garza

2      A.    Yes, ma'am.

3            MR. WATTERSON:   Object to the form.

4      Q.    (BY MS. CAVE)   And he isn't not getting any of

5  that back, right?

6      A.    No, I mean, the -- the only -- the only

7  scenarios that come to mind that were in the form of a

8  loan was the money that he gave us from Tommy and the

9  money that he -- that he used to help me with my house

10  within the context of him saying his money, but, no, so

11  that's no.

12     Q.    You can set that to the side.   Thank you.

13           Can you pull up Exhibit 241, which is one

14  that we looked at before.

15     A.    241.

16     Q.    Sorry, can you go back to 160 for just one more

17  second.   I realize it's getting dark -- it's getting

18  dark in here and it's getting hard to see, but the

19  last -- if you look on the last page, June 25th, 2014,

20  is the last transfer that Mr. Fraser made into GAW

21  Miners; is that correct?

22     A.    450,000?

23     Q.    It looks like --

24     A.    Oh, I'm sorry.

25     Q.    Sorry, I'm trying to see it too.

1                   Homero Joshua Garza

2    document state what's, like, focused on me doing

3    something --

4        Q.   Okay.

5        A.   -- and a lot of the things, I did not

6    personally do, me and a bunch of people did, and so a

7    lot of the changes I had were to change the language to

8    include, you know, more than me, so...

9        Q.   But, ultimately, the way that this is worded --

10       A.   Was what --

11       Q.   -- is what you accepted?

12       A.   Was what -- the focus most people would agree

13   to, so...

14       Q.   Okay.  But at the end of the day when you

15   signed this, you agreed with all of the statements that

16   are set forth here?

17       A.   Yes, ma'am.

18       Q.   You can set that aside.

19            (Exhibit 252 marked.)

20       Q.   (BY MS. CAVE) This is Exhibit 252.

21            This is an e-mail chain from you to

22   Mr. Fraser dated July 18th, 2014.  Do you recall this

23   back and forth?

24       A.   One moment so I can look at it, please.

25       Q.   Sure.

1          Homero Joshua Garza

2     A.    (Witness reviews document.)

3           Okay.

4     Q.    Do you recall this exchange with Mr. Fraser?

5     A.    Yes, ma'am.

6     Q.    And at the bottom of the first page, you say to

7     Mr. Fraser, "Should have all of your money and have you

8     out very soon."  What do you mean by "have you out"?

9     A.    He -- this pertains to the -- to the best of my

10    knowledge, the money that he loaned the company.  And

11    the reason why I believe that is because I asked about

12    interest because I told him we'd pay it back with

13    interest.

14    Q.    Did you, in fact, pay it back with interest or

15    did you just pay back the principal?

16    A.    I don't remember.  I don't remember any

17    interest so we probably didn't.

18    Q.    ,Did any of the loans that Mr. Stuart paid --

19    Mr. Fraser paid -- did any of the loans that Mr. Fraser

20    made to you or the companies get paid back with

21    interest?

22    A.    This would have been the only one that the

23    interest was discussed and he said, no, so I don't think

24    so.

25    Q.    And at the -- the top e-mail there on the first

1                    Homero Joshua Garza

2    page, you say, "Thought about what you said.  You're

3    right, this is my company and I'm the only one that

4    knows how to really run it."

5                    The first part of that, "thought about

6    what you said," what had Mr. Fraser said to you?  What

7    are you referring to?

8       A.    I only have fragments of in- -- you know,

9    memory, so I will tell you what I remember.  This, I --

10   I know, pertains to the conflict between us about the --

11   how the equity and stuff was going to split up -- be

12   split up between us, I believe.  And at some point I

13   remember -- or I believe in that conversation, he -- he

14   said, "Fine, you know, just, you know, do it."

15                   Then he kind of came back a bit with a

16   temper saying, "Well, why don't you just, you know, buy

17   me out, like, you can just have all of it," because

18   that's what I think this sentence means, "to offer the

19   remaining personal balance, blah-blah-blah-blah," so --

20   and then he said, "It'd be a bad deal for me."

21                   So within the context of this e-mail, I

22   believe that what he was talking about was that, when we

23   were in that conflict, he did ultimately agree that --

24                   The best way I can think to say it is,

25   like, I knew how to run it better than he knew how to

1                    Homero Joshua Garza

2    run it and that, like, he wouldn't do the same things at

3    other companies, like, where he was intimately involved

4    with all of the employees, that he would, instead, like,

5    he'd be up here, I'd be right here, and the rest of the

6    company would be right here (indicating).  So that is my

7    memory of what this means.

8        Q.   And when you say "this is my company," are you

9    referring to GAW Miners, sir?

10       A.   Most likely.

11       Q.   You can set that to the side.

12                 (Exhibit 253 marked.)

13       Q.   (BY MS. CAVE) This is Exhibit 253.

14                 And this is the transcript of the change

15   of plea hearing July 20th, 2017, in your criminal case;

16   is that right?

17       A.   Yes, ma'am.

18       Q.   Have you seen a transcript of the change of

19   plea hearing before?

20       A.   No.

21       Q.   Okay.

22       A.   Interesting.

23       Q.   So first turning to page 7 of the document --

24   you're welcome to look at the whole thing, but I can

25   direct you, since it is kind of long, to specific pages.