```
 1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF CONNECTICUT
 2
       - - - - - - - - - - - - - - - - - x
 3
       DENIS MARC AUDET, MICHAEL          No. 3:16-CV-940 (MPS)
 4     PFEIFFER, and DEAN ALLEN
       SHINNERS, Individually and on      OCTOBER 20, 2021
 5     Behalf of All Others Similarly
       Situated,                          1:45 P.M.
 6
       vs.                                JURY TRIAL
 7
       STUART A. FRASER, GAW MINERS,
 8     LLC, and ZENMINER, LLC, (d/b/a
       ZEN CLOUD)
 9
       - - - - - - - - - - - - - - - - - x
10
11                     Volume I - Pages 1 - 80
12
13                       450 Main Street
                         Hartford, Connecticut
14
15          BEFORE:  THE HONORABLE MICHAEL P. SHEA, U.S.D.J.
16                       AND A JURY OF NINE
17
18     APPEARANCES:
19     FOR THE PLAINTIFFS:
20             SUSMAN GODFREY, L.L.P.
                   1301 Avenue of the Americas, 32nd Floor
21                 New York, New York 10019
             BY:  SETH D. ARD, ESQUIRE
22           BY:  JACOB W. BUCHDAHL, ESQUIRE
             BY:  GENG CHEN, ESQUIRE
23
       (Appearances Continue ...)
24
25
```

```
1   APPEARANCES CONTINUED:

2   FOR THE DEFENDANT:

3              HUGHES, HUBBARD & REED L.L.P.
                   One Battery Park Plaza, 12th Floor
4                  New York, New York 10004-1482
           BY:  DANIEL WEINER, ESQUIRE
5          BY:  MARC A. WEINSTEIN, ESQUIRE
           BY:  AMINA HASSAN, ESQUIRE
6          BY:  HANNAH MILLER, ESQUIRE

7

8

9

10

11

12

13

14

15

16

17

18

19

20  COURT REPORTER:  Julie L. Monette, RMR, CRR, CCP
                        (860) 212-6937
21
    Proceedings recorded by mechanical stenography, transcript
22  produced by computer.

23

24

25
```

1          (The jury entered the courtroom at 1:45 p.m.)

2          THE COURT:  Welcome folks.  Please take your seats

3   everyone.  All right.  We're ready to get settled.

4          Now that you've been sworn in as jurors, we're going

5   to launch right in.  To begin, I will give you some preliminary

6   instructions to guide you in your important function as jurors

7   in this case.

8          What I say now will not be a substitute -- what I say

9   now will not be a substitute for the instruction on the law

10  that I will give to you at the conclusion of the case but is

11  simply designed to give you an overview before you begin

12  hearing the evidence.

13         It will be your duty to listen to and consider the

14  evidence and to decide what the evidence shows.  You, and you

15  alone, are the judges of the facts in this case.  You will then

16  have to apply to those facts the law as I will give it to you

17  at the end of the case.  You must follow that law whether you

18  agree with it or not.

19         You must not take anything I may say or do during the

20  trial as indicating what your verdict should be.  Don't be

21  influenced by my taking notes or anything else I might do.  You

22  will make your judgment based solely on the evidence that you

23  see or hear in court.

24         You may hear references during the trial to "the

25  Court."  When someone refers to the Court, they generally mean

1   the judge presiding over the case -- in this case me.

2           You will also hear the words "instruct" or

3   "instruction."  This is a direction or order from me that you

4   must follow.

5           It is your duty to find the facts having considered

6   all of the evidence in the case.  The evidence from which you

7   are to determine what the facts are consists of the following

8   things:  the sworn testimony of witnesses on both direct and

9   cross-examination; any exhibits received into evidence; and any

10  facts to which the attorneys have agreed or stipulated.

11          Certain things are not evidence and must not be

12  treated as evidence by you.  I will list them for you now.  All

13  statements, arguments, and questions by lawyers and any

14  questions that I might ask are not evidence.  Obviously,

15  answers to questions by witnesses are evidence.

16          Objections to questions are not evidence.  You should

17  not be influenced by the objection or by the Court's ruling on

18  it.  You should not show any prejudice against an attorney or

19  his or her client because the attorney objected to the

20  admission of evidence or the phrasing of a question or asked

21  the Court to rule on an objection or the propriety of a

22  question.

23          If an objection is sustained, this means the objection

24  is correct, and you must ignore the question that was asked and

25  any answer that may have been given.

1          If the objection is overruled or I say "the question

2     is allowed" or "I'll allow it," this means the objection is not

3     correct, and you should treat the answer to the question like

4     any other answer.

5          If you are instructed by me that some item of evidence

6     is received for a limited purpose only, you must follow that

7     instruction and consider that evidence only for the specified

8     purpose.  If I rule that an answer is stricken or that you are

9     to ignore something, that means that you should ignore the

10    answer because it is not evidence.

11         On occasion -- and I believe these occasions will be

12    rare -- when the lawyers object, I may ask you to leave the

13    courtroom so they can give me their reasons for their

14    objections outside your hearing.  We're all going to work hard

15    to try to keep your departures to a minimum by taking up such

16    objections during your breaks or at sidebar, but you should

17    understand that some interruptions may be necessary.

18         Testimony that the Court has excluded or told you to

19    disregard or ignore is not evidence and must not be considered.

20    Anything you may have seen or heard outside the courtroom is

21    not evidence and must be disregarded.  You are to decide the

22    case solely on the evidence presented here in the courtroom.

23         There are two kinds of evidence:  direct and

24    circumstantial.  Direct evidence is direct proof of a fact,

25    such as testimony of a witness about what the witness saw or

heard or did.  Circumstantial evidence is proof of facts from which you may infer or conclude that other facts exist, even though there was no direct proof of those other facts.

The word "infer" or the expression "to draw an inference" means to find a fact exists even though it has not been proven directly.  By way of example, if a witness testifies that he woke up in the morning and saw that the street and sidewalks were wet, you may find that it rained during the night even if no one testified that he saw the rain. In other words, the fact of rain is an inference that could be drawn from circumstantial evidence, the testimony of the presence of water on the street and sidewalk.  Direct evidence of rain, on the other hand, would be someone testifying that she actually observed raindrops coming down from the sky.

I will give you further instructions on these matters at the end of the case, but keep in mind that you may consider circumstantial evidence as well as direct evidence.  And it is for you to decide how much weight, if any, to give to either.

You may hear references to "inferences" or to "inferring certain facts."  An inference may be drawn only if it is reasonable and logical, not if it is speculative.  You are allowed to draw logical inferences from facts that you find to have been proven, but you may not go outside of the evidence to find the facts, nor may you resort to guesswork or conjecture.

1          To aid you in better understanding this, in the rain

2     example I used a moment ago, although you could infer from

3     evidence of the wet ground that it had rained, you could not

4     also infer that there was a thunderstorm without additional

5     evidence.  In other words, you must avoid resorting to

6     speculation, conjecture, or guesswork to determine critical

7     facts in this case.

8          The jury alone decides the credibility of witnesses

9     and the weight to be given their testimony.  In considering the

10    weight and value of the testimony of any witness, you may take

11    into consideration the appearance, attitude, and behavior of

12    the witness; the interest of the witness in the outcome of the

13    case, if any; the inclination of the witness to speak

14    truthfully or not; the probability or improbability of the

15    witness's statements; and all other facts and circumstances in

16    evidence.

17          In short, you are to assess a witness's testimony

18    using the same considerations and the same sound judgments and

19    common sense you apply to the questions of truth and veracity

20    that present themselves in your own daily lives.

21          It will be up to you to decide which witnesses to

22    believe, which witnesses not to believe, and how much of any

23    witness's testimony to accept or reject.  I will give you

24    further guidelines for determining the credibility of witnesses

25    at the end of the case.

1          As I mentioned to you during jury selection, this case

2     is proceeding as a class action.  The law allows a single

3     individual or a few individuals to bring a lawsuit as

4     representatives of a whole group of individuals who have a

5     similar claim.

6          Here the representatives, who are also called the

7     named Plaintiffs, are:  Mr. Audet, Mr. Pfeiffer, and Mr.

8     Shinners.  They are suing on behalf of a class, which is

9     comprised of all persons or entities who, between August 1,

10    2014, and January 9th -- excuse me -- between August 1, 2014,

11    and January 19, 2015, purchased Hashlets, Hashpoints,

12    HashStakers, or Paycoin from GAW Miners, LLC and/or ZenMiner,

13    LLC or acquired Hashlets, Hashpoints, HashStakers, or Paycoin

14    from GAW Miners, LLC and/or ZenMiner, LLC by converting,

15    upgrading, or exchanging other products sold by GAW Miners, LLC

16    and/or ZenMiner, LLC.

17         Excluded from the class are any defendants, any

18    parent, subsidiary, or affiliate or employee of any defendant,

19    any co-conspirator, and any governmental agency.

20         Although all members of the class are Plaintiffs in

21    this lawsuit, you may not see any class members other than the

22    named Plaintiffs themselves at the trial.  You should not hold

23    the physical absence of any class members against the

24    Plaintiffs.  Your verdict here will be binding on all class

25    members, that is to say, all Plaintiffs.

1          The purpose of this trial is to determine whether --

2     excuse me.  The purpose of this trial is for you to determine

3     whether the Plaintiffs have proved that Mr. Fraser is liable

4     for the claims asserted against him.  You will not be asked to

5     determine the amount of damages, if any, that are owed to

6     anyone if you find Mr. Fraser liable.  If necessary, damages

7     will be determined at a later stage of this case.

8          Because this is a civil action, the Plaintiffs have

9     the burden of proving their claims by a preponderance of the

10    credible evidence.  Those of you who have sat on criminal cases

11    will have heard of proof beyond a reasonable doubt.  That

12    requirement does not apply to a civil case, and you should put

13    it entirely out of your mind.

14         In civil cases, the burden is different, and it is

15    called "proof by the preponderance of the evidence."  The

16    preponderance of the evidence standard applies to all claims in

17    this case except one.  As to that claim, a different standard

18    called "clear and convincing evidence" applies.  I will give

19    you further instructions about what clear and convincing

20    evidence means later.

21         "A preponderance of the evidence" means that the

22    Plaintiffs have to produce evidence that leads you to believe

23    that their claims are more likely true than not.  For them to

24    prevail in a civil case such as this one, they must prove all

25    the elements of their claims by the greater weight of the

evidence.  This does not mean that the party who calls the most witnesses or offers the most exhibits prevails.  Rather, it means that the party who offers the evidence that you find most persuasive prevails.

It might be helpful to visualize a pair of scales. Imagine that you put on one scale the evidence you find credible, relevant, and supportive of the Plaintiffs on a particular issue as to which they have the burden of proof, and place on the other scale the evidence you find credible, relevant, and supportive of the Defendant.  If the scales tip in favor of the Plaintiffs on that issue even a little bit, then on that issue, they will have sustained their burden of proof.  But if the scales tip in favor of the Defendant on that issue even a little bit, or if the scales are evenly balanced, then the Plaintiffs have not sustained their burden of proof on the issue.

Now I will outline some of the responsibilities that attend your being a juror in this case.  It is important that you obey these instructions.  First, do not communicate with each other about this case or about anyone who has anything to do with it until the end of the case when you go to the jury room to decide on your verdict.  You may certainly talk among yourselves during breaks and the like.  Just be sure your conversations are not about anything having to do with the case.

1          Second, do not communicate with anyone else about this

2     case or about anyone who has anything to do with it until the

3     trial is ended and you have been discharged as jurors.  "Anyone

4     else" includes members of your family and your friends, among

5     others.  You may tell them that you are a juror in a case, but

6     don't tell them anything else about it until after you have

7     been discharged by me.

8          Additionally, do not communicate electronically or

9     post on the internet any information about your service as a

10    juror or any information about this case -- for example, on

11    Facebook, Instagram, Snapchat, Twitter, a blog, or any other

12    web service.

13         Third, do not let anyone talk to you or communicate

14    with you about the case or about anyone who has anything to do

15    with it.  If someone should try to communicate with you, please

16    report it to me immediately.

17         While serving on this jury, please do not communicate

18    with any of the parties or their attorneys or any witness or

19    even with me either about the case or about any other subject.

20    The attorneys are similarly instructed not to communicate with

21    any of you.

22         So if you run into any of the parties, the attorneys,

23    or me inside or outside the courthouse, please do not construe

24    our behavior as rudeness or discourteousness.  We are just

25    following the rules, and that is the only way that all the

1    parties can be assured of the absolute impartiality they are

2    entitled to expect from you as jurors.

3            If, however, you have a question to pose to me or any

4    other message, please write out the question or message, give

5    it to the clerk or to a court security officer, and that person

6    will bring it to my attention.  I will try to respond promptly.

7            Fourth, do not read any news stories, articles, blogs,

8    posts, or other internet material, and do not listen to any

9    radio or television reports about the case, if there are any,

10   or about anyone who has anything to do with the case.

11           Fifth, do not do any research or any investigation

12   about the case on your own.  Do not do any internet research.

13   Even running a simple search on Google or any other search

14   engine about this case or about anyone involved with the case

15   would violate this duty and the oath you took when you were

16   sworn a little while ago.

17           All the information you should consider during the

18   course of this case will be presented to you here in this

19   courtroom.  Do not look elsewhere for any other information.

20           Sixth, although you may bring your cell phones with

21   you into the courthouse, they must be turned off while you are

22   in the courtroom.  Also, be forewarned that you will not be

23   allowed to have your cell phone with you during actual

24   deliberations of the jury.  Deliberations will not take place

25   until all the evidence has been presented and I have instructed

you on the law.  And at that time we will have someone collect

your cell phones and then, of course, return them to you at any

breaks.

          Finally, you may take notes during the course of the

trial.  If you do, these notes must be left in the courtroom

during all recesses and should not be brought home at night or

at the conclusion of the case.  Any notes that you take should

be used only as memory aids.  Do not rely on your notes if they

conflict with your own independent recollection of the

evidence.

          If you do not take notes, you should rely on your own

recollection of the proceedings and should not be unduly

influenced by the notes of other jurors.

          The reason for these rules is fairly simple.  The

parties are entitled to have you personally render a verdict in

this case solely on the basis of your independent evaluation of

the evidence presented here in the courtroom after your

deliberations with the other jurors.  Obviously, communicating

with others, including your family and friends, outside of the

deliberation process or exposing yourself to evidence or

information outside the courtroom would compromise your service

and fairness to the parties.

          Finally, I would like to summarize the stages of the

trial for you.  First, each party may, but does not have to,

make an opening statement.  An opening statement is neither

1   evidence nor argument.  It is simply an outline of what that

2   party intends to prove, and it is offered to help you follow

3   the evidence.  Each side will have 20 minutes.

4           Next, the Plaintiffs will present witnesses, and the

5   Defendant may cross-examine them.  Then, if desired, the

6   Defendant may present witnesses and Plaintiffs may

7   cross-examine them.  Possibly I will permit the Plaintiffs to

8   present additional witnesses to rebut the Defendant's evidence.

9   Then I will give you instruction on the law; and after that,

10  the attorneys will make their closing arguments to summarize

11  and give you their interpretations of the evidence.  Like

12  opening statements, the closing arguments are not evidence.

13          After closings, I will give you some final

14  instructions, and then you will retire to deliberate on your

15  verdict.  Do not make up your mind about what the verdict

16  should be until after I have instructed you on the law and you

17  have heard the parties' closing arguments at the end of the

18  case and you have gone to the jury room and you and your fellow

19  jurors have discussed the evidence.  Keep an open mind until

20  then.  All parties deserve -- and the law requires -- that you

21  give them an opportunity to be heard fully.

22          Now, at every break in the trial, every time you go

23  home, I'm going to sound like a broken record.  I'm going to

24  repeat a much shorter version of those instructions.  I'm

25  simply going to say:  Don't discuss the case.  Don't let anyone

1    discuss it with you, and keep an open mind.

2          Now, when I say that, I mean everything I said about

3    no outside research, no internet communications, no other

4    communications, etc.  But I'm not going to go back through it.

5    You'll remember, when I use that shorthand, that I'm referring

6    to this entire instruction.

7          So these preliminary instructions, as I previously

8    said, are simply intended to help orient you to hear the

9    evidence.  Later, before you begin your deliberations, I will

10   instruct you again in greater detail.  I'm sure you'll keep

11   these principles in mind and will keep an open mind until you

12   have heard all the evidence and my formal instructions on the

13   law.

14         At this point we're going to hear opening statements.

15   As I said, what the lawyers say in their openings is not

16   evidence.  Rather, it's a prediction or roadmap of what the

17   lawyer expects the evidence will be.  You should not decide

18   anything about this case on the basis of the opening

19   statements, which, like these preliminary instructions, are

20   intended merely to orient you to the case.

21         Thank you for your attention.

22         Mr. Ard.

23         MR. ARD:  Yes, Your Honor.  Thank you, Your Honor.

24         This is a case about power and fraud, the power of a

25   senior Wall Street executive, this man, the Defendant, Stuart

1    Fraser, and the massive fraud carried out by the companies he

2    co-owned and co-founded.  The Defendant's business partner went

3    to jail for this fraud.

4            The Defendant could have used his power, expertise,

5    and knowledge to stop the fraud.  Instead, he decided to enable

6    and promote it and use all his power to try to avoid

7    responsibility.  Real people got hurt, and that's why we're

8    here.

9            My name is Seth Ard, and I, along with my colleagues,

10   represent the class of Plaintiffs in this case.  First, this

11   case is about power.

12           The evidence will show the Defendant met Josh Garza,

13   his business partner, around 2003.  At the time, Josh Garza was

14   18 years old, fresh out of high school.  The Defendant was 42

15   years old, almost 25 years older than Josh Garza.  And he'd

16   already become the vice chairman of Cantor Fitzgerald, a

17   prominent New York City bank.

18           The Defendant hired Josh Garza to install an internet

19   connection at his vacation home and lake compound in Vermont.

20   They hit it off and eventually started a series of businesses

21   together under the name GAW, G-A-W.

22           Their relationship was far closer than just a business

23   relationship.  The evidence will show they became close

24   friends, that Josh Garza viewed the Defendant as a mentor and

25   father figure.  The Defendant lavished Josh Garza with cash and

1    even paid for his mortgage on his house.

2         The evidence will show that in 2014 the Defendant and

3    Josh Garza were business partners and co-owners in a company

4    called GAW Miners.  Their basic arrangement was this:  The

5    Defendant provided nearly all the money, and Josh Garza ran the

6    company's day-to-day.  The Defendant wasn't involved in the

7    day-to-day operation of the businesses.  That was Josh Garza's

8    job.

9         Most GAW Miners' employees never interacted with the

10   Defendant.  And that is because he stayed active behind the

11   scenes, communicating at least several times a week with Josh

12   Garza.

13        The evidence will show the Defendant poured millions

14   of dollars into these businesses over the years and provided

15   hundreds of thousands of dollars of loans to GAW Miners in

16   2014.  Other than the Defendant and Josh Garza, there is not a

17   single outside investor in the company until the end of the

18   fraud.  The Defendant even approved and co-signed for a credit

19   card that GAW Miners used to run its fraudulent business

20   throughout 2014.

21        At every critical moment, the Defendant used his

22   power, his status, his wealth, and his credibility to promote

23   these fraudulent businesses.

24        Second, this case is about fraud.  The fraud in this

25   case occurred at GAW Miners.  The mining involved wasn't for

1   coal or precious metals.  It was for Bitcoin, and it was done

2   by computers.

3       Bitcoin is complicated, but the key point is simple:

4   The more computing power you have, the more Bitcoin you can

5   get.

6       The fraud involved GAW Miners telling lies in order to

7   sell two different products called Hashlets and Paycoin.  What

8   were the lies?  The evidence will show that GAW Miners told the

9   public that Hashlets would earn money from the computers mining

10  for Bitcoin in the GAW Miners' warehouses, but the truth was

11  GAW Miners didn't have computing power to support the Hashlets

12  it was selling.  In other words, GAW Miners sold its customers

13  the right to more Bitcoin than its computers could generate.

14      Next, GAW Miners invented Paycoin, an alternative to

15  Bitcoin, to try to prop up the fraudulent business.  And in

16  order to get people to buy and trust Paycoin, GAW Miners told

17  more lies.  Most important, GAW Miners told the public that the

18  value of Paycoin was supported by a hundred million dollars in

19  cold hard cash.  That was another lie.  GAW Miners spread these

20  lies to the public in false press statements, on its website,

21  and in an article published by *The Wall Street Journal*.

22      The evidence will show the Defendant knew that GAW

23  Miners was lying in order to sell these products, and he went

24  right along with it, even volunteering to speak to *The Wall*

25  *Street Journal* reporter in advance of the false story.

1      Now, why would this prominent and successful

2  businessman lend his name and Cantor Fitzgerald's name to GAW

3  Miners?  The evidence will show the Defendant confessed to his

4  motive.  It was in his best interest to do so because if he

5  played nice and it panned out, he could get some of his money

6  back, the millions he'd invested in these companies over the

7  years.

8      It didn't work.  The whole house of cards came

9  tumbling down.  Josh Garza pled guilty for his role in the

10  Hashlet and Paycoin fraud and went to jail.  But this isn't a

11  criminal case.  This isn't about punishing the Defendant for a

12  crime.  This is a civil case, and we're here on behalf of the

13  people who spent their hard-earned money on the fraudulent

14  products sold by the company that the Defendant co-owned,

15  co-founded, and controlled along with Josh Garza.

16      Now, what type of evidence will we use to prove the

17  Defendant is liable for what GAW Miners did?  First, you're

18  going to hear from the witnesses, including Josh Garza himself,

19  who was questioned under oath after he pled guilty but before

20  he went to jail.  And you will see a videotape of that

21  testimony.

22      The Plaintiffs agreed to dismiss Josh Garza from this

23  case in exchange for his agreement to testify under oath about

24  what he knew.  You will hear that testimony, which he gave

25  years after he was dismissed from this case.

1        But you shouldn't take what Josh Garza says at face

2   value.  He frequently exaggerated his role and tried to

3   minimize the Defendant's, except when he was speaking in the

4   press or trying to raise money.  Always consider what Josh

5   Garza says in light of all the evidence.

6        You will also hear from three different victims of GAW

7   Miners:  Mr. Allen Shinners, Mr. Marc Audet, and Mr. Michael

8   Pfeiffer.  They are here, as the Judge told you, on behalf of

9   the entire class of victims, and you will hear from an expert

10  witness, Professor Narayanan from Princeton University, who

11  will explain what cryptocurrencies like Bitcoin are all about

12  and how Defendant's products were supposed to work if there had

13  been no fraud.

14        Second, you're going to see what we call exhibits,

15  which are real, historical documents that will reveal the fraud

16  and the Defendant's role in it.

17        Third, you will hear from the Defendant himself.  We

18  will call the Defendant as a witness at this trial.  And you

19  will have a chance to judge his credibility by comparing what

20  he says with what the historical documents prove really

21  happened.

22        What will this evidence prove?  It will prove three

23  things.  It will prove the Defendant knew about the fraud.  It

24  will prove the Defendant had the power to influence GAW Miners

25  through his personal and financial relationship with Josh

1   Garza.  And it will prove that at every turn the Defendant

2   enabled and promoted the fraud to anyone who would listen.

3          Let's look at some of the specific documents and

4   testimony that will show the Defendant's role in the fraud over

5   the course of crucial months in 2014.  You will see that in

6   early 2014, GAW Miners was selling actual mining computers, but

7   the Defendant wanted more.  You will see a text message from

8   May 2014 where the Defendant himself dreamt up the idea of a

9   Hashlet.  You will see Defendant's Facebook post four days

10  later saying, "GAW Miners is my new baby."  You will see the

11  Defendant's e-mail to Josh Garza shortly afterwards saying, "I

12  know I'm lucky to have you as a partner, and I'll do everything

13  I can to help develop this concept to delivery."

14         You will hear the Defendant's testimony admitting that

15  he and Josh Garza were partners in GAW Miners.  You will hear

16  the Defendant's testimony admitting that in the summer of 2014,

17  just three days before Hashlets launched, the Defendant knew

18  that Josh Garza was lying to the press about GAW Miners.  The

19  public didn't know that, and the Defendant kept quiet.

20         You will see e-mails where senior employees of GAW

21  Miners told the Defendant in the summer of 2014 that GAW Miners

22  had no inventory systems in place to track how much computing

23  power it had and called this a red flag.

24         You will see text messages from Defendant praising the

25  crazy sales of Hashlets when they were announced on August

1  16th, 2014, and e-mails telling him these high sales continued

2  to grow for months.

3       You will hear testimony from the Defendant admitting

4  that GAW Miners needed to be able to track how much Hashlets it

5  was selling compared to the computing power it had.  And the

6  evidence will show the Defendant knew that GAW Miners was not

7  able to track that information because, as he admits, GAW

8  Miners had no financial controls.

9       The evidence will show that in November 2014, when the

10 Defendant knew that GAW Miners had been struggling to fund its

11 business, GAW Miners invented its own visual currency.  And the

12 evidence will show the Defendant directly promoted the Paycoin

13 fraud.

14      In November 2014 the Defendant agreed to speak with

15 *The Wall Street Journal* reporter off the record about GAW

16 Miners.  You will see *The Wall Street Journal* article that came

17 out after that interview, which published the two core lies in

18 this case:  first, that Paycoin will be backed by a hundred

19 million dollar fund; and, second, that GAW Miners had massive

20 computing power.

21      The evidence will show the Defendant knew the claim of

22 a hundred million dollar backing was false.  And the press

23 release at the same time, GAW Miners even highlighted the fact

24 that this phony company had the backing of the Defendant, the

25 vice chairman of a big fancy Wall Street bank.

1          The evidence will show that although he was
2     semi-retired from that bank, the Defendant continued to use
3     connections at the bank to promote this phony company.  He did
4     this after the Defendant admits he knew that Josh Garza was
5     lying publicly about the company.
6          And you will see Twitter posts where Defendant kept
7     promoting GAW Miners and the fraudulent products until the
8     bitter end.  One of his Tweets showed a picture of a wrinkled
9     hand holding a credit card saying, "Paycoin makes money fair."
10         The fraudulent scheme finally came crashing down on
11    January 19th, 2015, when the SEC, the federal agency in charge
12    of regulating securities, announced it was investigating GAW
13    Miners.
14         In an effort to cover his tracks, the evidence will
15    show the Defendant repeatedly made false statements to the SEC
16    under oath in order to minimize his role in GAW Miners and the
17    fraud.  Here's one example:  The Defendant told the SEC under
18    oath that Josh Garza came up with the idea of a Hashlet and
19    that he never sent text messages with Josh Garza.  The
20    historical documents will prove that the Defendant came up with
21    the idea of a Hashlet in a text message he sent to Josh Garza.
22         There are four claims in this case, each of which is
23    slightly different, and they relate to fraud in the sale and
24    securities and the unregistered sale of securities.  The Judge
25    will explain what those claims are at the end of the evidence.

1          The evidence will show that GAW Miners broke the law;

2     that the Defendant is one of the control persons of GAW Miners;

3     and that the class of victims bought the fraudulent products

4     based on the lies that GAW Miners was telling about them.

5          Ladies and Gentlemen, this is an important case.  It's

6     important to the class of victims that we represent.  They were

7     victims of a fraud, and this is their chance to get some

8     measure of justice.

9          So I'd like to ask you to do three things as this case

10    unfolds.  The first is to pay attention to the evidence, and I

11    can already tell, based on the attention you've been kind

12    enough to give me, you will do that.

13         The second is to listen carefully to the legal

14    instructions that Judge Shea will give you.  He will tell you

15    exactly how to apply the law to the facts of this case as you

16    find them.

17         And third and most important, I'm going to ask you to

18    use your common sense because your common sense, the same

19    common sense you use in making decisions in your everyday

20    lives, is the most important tool you bring into this jury box.

21    And it's what makes the jury system work.

22         And we're confident if you do those three things, you

23    will return a verdict against the Defendant and in favor of the

24    class of victims.  Because at the end of the day, the Defendant

25    had everything, expertise from years at Cantor Fitzgerald,

1  power from his high ranking position and financial

2  contributions, and a close personal relationship with Josh

3  Garza, his business partner, in a fraudulent business.  The

4  evidence will show the Defendant chose not to do what was

5  right.  Instead of putting a stop to this fraud, he decided to

6  enable it.  And now you have the power to do something about

7  it.  Thank you.

8          THE COURT:  Thank you, Mr. Ard.

9          Mr. Weiner.

10          MR. WEINER:  Thank you, Judge.

11          Mr. Ard spoke to you about Hashpoints and HashStakers

12  and Hashcoin and Paycoin and Bitcoin and virtual currency.

13  Those are complicated and confusing terms.  But there's one

14  plain and simple way to spot a fraud, and that's when the

15  person who was running the fraud uses complicated, confusing

16  terms to get people to give him their money.

17          The evidence in this case will also show you there's

18  one plain and simple way to spot who masterminded this fraud.

19  The one who masterminded the fraud is a fellow named Homero

20  Garza, also known as Josh Garza, who masterminded the fraud

21  that Mr. Ard spent time talking to you about.

22          The evidence will show that Mr. Garza, not Mr. Fraser,

23  was convicted of fraud, the very conduct at issue in this case,

24  and he was sentenced to 21 months in federal prison for the

25  fraud involving the very conduct again at issue in this case

1    and that he was ordered to pay millions of dollars in

2    restitution or money back to his victims.

3           Now, who is it that says that Josh Garza was the

4    mastermind of this?  You'd be surprised.  I'll take you

5    through.

6           The first people who said that Josh Garza, not Mr.

7    Fraser, that Josh Garza was the mastermind were the three

8    Plaintiffs themselves in the back.  That's right.  When they

9    filed their Complaint in this case, after months and months and

10   months of studying the documents and talking to people, they

11   filed the Complaint.  The lead Defendant was Josh Garza.

12          And the Complaint says -- and you'll see the

13   Complaint.  It says -- the Plaintiffs said that it was Josh

14   Garza who controlled the companies, Josh Garza who controlled

15   their strategies, Josh Garza who made all the financial

16   decisions, Josh Garza who had ultimate control over their

17   operations.  That's what the Plaintiffs themselves said.

18          And then you'll see the evidence that a few months

19   later, they struck a secret deal with Josh Garza because Josh

20   Garza told them he doesn't have enough money to pay the

21   judgment.

22          They said, Well, we'll strike a deal with you.  We'll

23   drop you from the case if you rat against Stu Fraser.  If you

24   testify against him, you won't have to be in the case anymore.

25   You won't have to worry about the case if you do that.  So they

1    struck a deal.

2         And you'll see the secret deal they did.  And lo and

3    behold, they file a new Complaint, and all that allegation, all

4    those claims that Mr. Garza controlled the company, ran the

5    company, and made all the ultimate decisions, they dropped that

6    from the case.  Now they said, We got a new story.  We got a

7    new story that Stu Fraser did it.

8         You'll see this deal they struck with the devil, Mr.

9    Garza.  You'll see that in writing and that Mr. Garza did it

10   for one reason:  to save his own neck to get out of this case.

11        And the Plaintiffs did it for one reason too, because

12   they know that Stu Fraser is a deep pocket, that through years

13   of hard work, that he's built up a comfortable life and that he

14   has money.  And we won't make any bones about that.  That's why

15   the Plaintiffs turned their sights away from the guy who went

16   to prison and said, Well, let's try and get Mr. Fraser to pay

17   us some money.

18        Now, who else besides the three Plaintiffs said that

19   it was Josh Garza who was the only person controlling the

20   fraud?  Well, you'll hear it from Mr. Garza himself.  I'm not

21   talking about his deposition testimony that the Plaintiffs are

22   going to play for you that he did after he struck a secret deal

23   with them.  You're going to see the actual documents and

24   statements made at the time that confirm that Josh Garza and no

25   one else ran GAW Miners and ZenMiner, the only two companies at

1    issue here.

2          You'll see a slide -- you'll see -- sorry -- an e-mail

3    from the summer of 2014 where Mr. Garza says, "This is my

4    company, and I am the only one who knows how to really run it."

5          There's an e-mail from the next month, August of 2014.

6    And again you'll remember Judge Shea told you that's when the

7    class period begins.  It begins August 1, 2014.  It goes to

8    mid-January 2015.  You'll see an e-mail from Mr. Garza saying

9    that, "I run the market."

10         Another e-mail the same month -- that's August of

11    2014 -- it says, "This is my house."  And he shows a picture of

12    the data center where they were mining cryptocurrency.

13         And the next month in September of 2014, Mr. Garza

14    writes, "There is no senior management in this company.  I am

15    literally doing this all on my own.  Stuart" -- meaning Stuart

16    Fraser -- "is not involved."  That's what he said at the time

17    because that was the truth before he struck his deal with the

18    Plaintiffs.

19         You'll see in August Mr. Garza writes an e-mail.  He

20    says, "Stuart Fraser adds no value as an investor, and his

21    emotions keep him from being a partner to the company, a

22    valuable partner to the company."

23         And then he writes -- in another e-mail he says, "The

24    only actual officer in this company is me, Josh Garza.  Stuart,

25    he's a silent partner, and he provides no financial support."

1    And you'll see -- my mask keeps slipping -- you'll see

2    the organizational charts of GAW Miners, and at the top is Josh

3    Garza.  And it says -- under his name it says "CEO," chief

4    executive officer.

5          And Mr. Garza, after he struck a deal with the

6    Plaintiffs, he said, Well, Stuart was actually -- he was

7    actually above me.  You know, you don't see him on the chart,

8    but he's actually above me.  No one can see him, but he's

9    actually there.

10          That's the deal he struck to get out of this case, to

11   tell a lie like that.

12          Now, who else besides Plaintiffs and Mr. Garza would

13   tell you that it was Josh Garza himself who masterminded the

14   fraud?  You'll hear that the SEC, the Securities and Exchange

15   Commission, investigated GAW Miners and ZenMiner, and they

16   charged Mr. Garza, not Mr. Fraser, with securities fraud.

17   You'll hear that the FBI also investigated GAW Miners and

18   ZenMiner and determined that it was Mr. Garza, not Mr. Fraser,

19   the only individual who should be charged.

20          You'll hear that Mr. Garza pled guilty to committing

21   fraud, and he stood up in court -- and you'll see what he said

22   in open court where he took responsibility.  He didn't mention

23   Mr. Fraser at all.  He stood up in court and said, I am

24   responsible for what happened at these companies.

25          And you'll see his written Plea Agreement where he

1    signs it and goes in detail.  Each time it says "I did it," "I

2    did it," "I did it," not Mr. Fraser.

3         But who else besides the Plaintiffs and Mr. Garza and

4    the SEC and the FBI and the Department of Justice?  Who else

5    says it was Josh Garza who controlled the companies?  You'll

6    hear the testimony from deposition -- that is, we'll play you

7    video -- from half a dozen executives at GAW Miners and

8    ZenMiner; and their testimony, although it's by deposition, is

9    no less powerful.  You'll learn from them that Mr. Garza ran

10   every aspect, every detail, every decision at these two

11   companies, GAW Miner and ZenMiner.

12        You'll see the company's press releases.  Each of them

13   come from Mr. Garza, and they describe Mr. Garza as the

14   company's CEO, which he was.  These people, the executives,

15   will say they never once saw Mr. Fraser in the offices or

16   anywhere else.  They never heard of Mr. Fraser on the phone;

17   they never got any directions or orders from him; they never

18   got a single e-mail or a phone call or a memo or a letter or a

19   note from Mr. Fraser telling them what to do.

20        These are people who had technical expertise in

21   cryptocurrency, who worked closely with Mr. Garza, and they

22   didn't know of Mr. Garza's fraud.  So how was Stuart Fraser,

23   who was on the outside, who never mined cryptocurrency in his

24   whole life, who doesn't know anything about it, how could he

25   have known about the fraud?

1          Finally, after hearing, as I said, from the Plaintiffs

2    and from Mr. Garza and the SEC and the FBI and the Department

3    of Justice and all these employees that it was Mr. Garza, not

4    Mr. Fraser, you'll hear from Mr. Fraser himself, who's here in

5    the courtroom.

6          Who is Stuart Fraser?  He's a family man with three

7    grown children and a wife who's sitting right here.  He's a

8    generous man who worked to help young people his whole adult

9    life.  He's a trusting man who's never once been on the wrong

10   side of the law.

11         You'll hear, and it's undisputed, that Mr. Fraser was

12   a minority -- that is, less than 50 percent -- minority

13   investor in these two companies; that Mr. Garza ran the show on

14   his own.  In fact, one of the Plaintiffs -- you'll hear one of

15   the Plaintiffs testify.  I think it's Mr. Shinners.  Mr.

16   Shinners said that Mr. Garza was a man obsessed with his own

17   power.  He wanted to run his companies, and he did run them.

18         Now, you will hear that Mr. Fraser, he is guilty of

19   something.  He's guilty of trusting Mr. Garza, a man he treated

20   as a surrogate son, a protege, and who he worked for many years

21   in legitimate businesses involving computer repair and

22   high-speed internet to remote areas of Vermont.  Those are

23   legitimate businesses, and no one disputes that.

24         He worked for years with Mr. Garza, as Mr. Garza grew

25   up.  He gave him a helping hand.  He was his mentor, and Mr.

1    Garza betrayed him.

2           When Mr. Fraser started asking questions about the

3    companies to Mr. Garza, Mr. Garza outright lied to him.  And

4    when Mr. Fraser took him to Cantor Fitzgerald -- you know, you

5    heard Mr. Ard call it the fancy bank.  Mr. Fraser took him to

6    Cantor Fitzgerald -- you'll see it in the e-mails -- I want to

7    do this business right.  I want to do it above board.  I want

8    to do it in compliance with the law.  I'm taking you to this

9    company I care about the most, not a company I want to defraud,

10   because next to his wife and children, Cantor Fitzgerald is the

11   thing that Mr. Fraser cares about the most.  He took them in to

12   say, Listen to them and their lawyers and follow the rules.

13   And Mr. Garza ignored it.

14          You'll see the evidence that, like a lot of people,

15   Mr. Fraser became a victim of Mr. Garza's fraud.  And that's

16   one of the most interesting cases -- documents in this case.

17   And Plaintiffs produced it in this case.  It shows you that his

18   time with Mr. Garza, including these two companies, this

19   supposed mastermind, Stuart Fraser, lost millions of dollars

20   because of Mr. Garza's fraud.

21          What kind of mastermind of a fraud is that who loses

22   millions of dollars?  What kind of secret omnipresent super

23   CEO, what kind of guy who controls the whole thing so tightly

24   loses millions of dollars?  Mr. Fraser was a victim of Mr.

25   Garza who, as I said, betrayed him.  Mr. Fraser gave Mr. Garza

1   his trust, his mentorship and his money.

2         You'll see in early 2014, before that class period

3   began in August, Mr. Fraser had been loaning money to the

4   company.  He said finally, Josh, I don't understand this new

5   business you're picking up, cryptocurrency.  It's enough.  No

6   more money.  The last money we lend the company is in June, and

7   in July the last money is repaid.

8         There's no power of the purse.  There's no ability to

9   control because Mr. Fraser had been paid back by the time the

10  class period started.

11        Mr. Garza said, "Look" -- you'll see the e-mails -- "I

12  want you out of it.  I run the company.  This is my company.

13  These are my ideas."

14        Now, we ask you, as you listen to the testimony and

15  review the exhibits in this case, to focus on the lack of

16  control that Mr. Fraser supposedly had.  You'll see him say --

17  Mr. Garza said, "I think it's a good idea.  We should spend a

18  million dollars buying this domain name."

19        Mr. Fraser says, "I think it's a huge waste of money.

20  It's my advice.  I'm a minority investor.  I think that's a

21  huge waste of money."

22        Mr. Garza says, "I don't care," and he spends a

23  million dollars to buy it.

24        Mr. Fraser wasn't in control.  Mr. Garza, as everyone

25  you will hear from says, Mr. Garza ran the show.

1       And when we get to the law, Judge Shea will tell you

2  about control person liability.  We're not talking about friend

3  liability or mentor liability or even investor or advisor

4  liability.  It's got to be control.  And Mr. Ard said it:  We

5  will prove control.

6       Look at the evidence.  They don't prove control.  Mr.

7  Fraser was a patsy for a man he trusted for many years.  You'll

8  see the evidence that Mr. Fraser was not an officer, not a

9  director, not a board member, not an executive, not an employee

10  of either GAW Miners or ZenMiner.

11       And you'll hear that the chief technical officer --

12  and you can imagine the cryptocurrency chief technical officer

13  is a high role.  The chief technical officer of GAW Miner said,

14  "I never once met or spoke with Stu Fraser.  I didn't even know

15  that he existed.  Is he a real person?"

16       That's the truth.  Josh Garza ran the show.  Stu

17  Fraser sat in the background and hoped that Garza would tell

18  him the truth, just like a lot of people hope and were

19  disappointed.

20       Now, did Mr. Fraser ask questions?  Sure.  Did he

21  occasionally offer advice?  Absolutely.  Did he follow his

22  minority investment?  Without a doubt.  Did he take pride in

23  what he thought was a legitimate company?  No question.  Did he

24  Retweet things to his friends and family that Mr. Garza sent

25  him about Paycoin?  Sure.

1          Do you think he's going to try -- he's got about 75
2    followers on Twitter.  Do you think he's going to try to fool
3    his friends and his family?  Yeah, I know it's a fraud.  I'm
4    going to try to cheat you.
5          No.  He believed what Mr. Garza was telling the world,
6    that this was a legitimate company.
7          And as the evidence comes in, ask yourself as you hear
8    it:  Have the Plaintiffs proven, have they met their burden of
9    proof that Mr. Fraser was the unseen, all knowing, puppet
10   master of Josh Garza and GAW Miners, ZenMiner?  Or, rather, as
11   the evidence and the credible testimony will show you, it was
12   really Josh Garza, the man who pled guilty to being the
13   criminal mastermind, who stood up in court and took full
14   responsibility for the fraud.  It is him who controlled and
15   directed a fraud.  At the end of the day, it's plain and
16   simple.  Plaintiffs have the wrong man.
17         Ladies and Gentlemen, let me excuse myself.  I should
18   have introduced myself at the outset or reintroduce myself.
19   I'm Dan Weiner with my colleagues Marc Weinstein, Amina Hassan,
20   Hannah Miller, and I don't know if Rowena Moffett is here.  We
21   represent Mr. Fraser, and his years of unblemished business
22   reputation lie in your hands at the end of this trial.  Thank
23   you for your time and what I know will be close attention to
24   the evidence.  Thank you.
25         THE COURT:  Thank you, Mr. Weiner.

1          All right.  We're now going to have our first witness.

2          MS. CHEN:  Plaintiffs call --

3          THE COURT:  Yes, so we're going hand out notebooks in

4    case you want to take notes.

5          MS. CHEN:  Plaintiffs call Dr. Arvind Narayanan.

6          THE COURT:  All right, sir, if you could come right up

7    to the witness box for us here, please.

8          Good afternoon.  If you would stand and face our

9    courtroom deputy.

10

11              A R V I N D   N A R A Y A N A N,

12          having been duly affirmed by the Clerk, testified

13                     under oath as follows:

14

15          THE CLERK:  Please be seated.  State your name, city,

16    and state you work.  Spell your last name.

17          THE COURT:  You may take your mask off, sir.  Is that

18    HEPA filter on?  I just want to make sure.  It should be.

19    Yeah, turn it on for me.  There we go.  Perfect.  Thank you so

20    much.

21          MR. WEINER:  And, Your Honor, my colleague Mr.

22    Weinstein will be handling the cross-examination.

23          THE WITNESS:  My name is Arvind Narayanan.  I

24    apologize for my voice, by the way.  I'm getting over a cold.

25          Hello.  My name is Arvind Narayanan.  I work in

1    Princeton, New Jersey.

2              THE COURT:  And your last name is spelled?

3              THE WITNESS:  N-a-r-r-a-y-a-n-a-n.

4              THE COURT:  And your first name is spelled?

5              THE WITNESS:  A-r-v-i-n-d.

6              THE COURT:  Great.

7              Ms. Chen, whenever you're ready, if you could turn the

8    podium around for us.

9              MS. CHEN:  Yes, Your Honor.

10             Would you like us to face forward?

11             THE COURT:  You're good.  Just like that.

12             MS. CHEN:  I have some binders.

13             THE COURT:  Want to hand that to me?  Thanks very

14   much.

15                          DIRECT EXAMINATION

16   BY MS. CHEN:

17   Q   Good afternoon.

18   A   Good afternoon.

19   Q   Can you please restate your name for the jury?

20   A   Sure.  My name's Arvind Narayanan.

21   Q   What do you do for a living?

22   A   I am an associate professor of computer science at

23   Princeton University.

24   Q   And, Professor Narayanan, what do you do at Princeton?

25   A   I teach computer science, and I do research as well.

1    Q    Have you published your research?

2    A    I've published over 60 peer review articles.  Several of

3    those have been on cryptocurrency.  I also led the creation of

4    an online course and textbook on cryptocurrency technology.

5    Q    Professor, are there any other names for cryptocurrency?

6    A    Sure.  It's sometimes called digital currency or virtual

7    currency.

8    Q    And you mentioned a textbook.  Is this a textbook that you

9    wrote, Professor?

10   A    Yes, that's the one.

11   Q    Why did you write this textbook?

12   A    Back in 2014 or so, whenever I was planning to teach a

13   course at Princeton on cryptocurrency and my colleagues and I

14   were also planning to teach an online course on the same topic,

15   we realized that there was a real need for a rigorous analysis

16   of the computer science behind cryptocurrencies.  And we

17   thought that a book like this would be useful not just for

18   ourselves but for the broader community as well.

19   Q    You mentioned an online course.  How many students have

20   taken that online course?

21   A    Uh, over 300,000 students have engaged with that course

22   online.

23   Q    And in addition to that online course, has your book been

24   used in other courses?

25   A    It has.  It's been used in over 150 courses around the

1   world.

2   Q   And just taking a step back, Professor, can you describe

3   your educational background?

4   A   Sure.  I obtained my Ph.D. in 2009 from the University of

5   Texas at Austin in computer science.  Before that, I got my

6   bachelor's and master's degrees in 2004 from the Indian

7   Institute of Technology Madras, also in computer science.

8   Q   And can you tell us about the academic reputation of the

9   Indian Institute of Technology?

10  A   It's considered to be the top engineering school in

11  India.

12  Q   Professor, what did you do after receiving your Ph.D.?

13  A   I was a post-doctoral researcher also in computer science

14  at Stamford for three years.  And then starting in 2012, I've

15  been on the faculty at Princeton.  Starting in 2018, I've been

16  tenured at Princeton University.

17  Q   Have you won any honors or awards for your academic work?

18  A   Several of my pieces of scholarship have won awards or

19  recognitions.  The one that's the most relevant to this case is

20  the book that we just mentioned.  In 2017 it was a runner-up

21  for the PROSE Award in computing and information sciences.

22  That's an award given by the American Association of

23  Publishers.

24          In 2019 I was a recipient of the Presidential Early

25  Career Award for Scientists and Engineers.

1    Q   Can you explain what that is?

2    A   Sure.  It's the top honor given by the U.S. Government for

3    early career scientists and engineers.  The White House gives

4    it out every year.  I was recommended for that award by the

5    National Science Foundation.

6    Q   Have you received any awards or honors or recognition for

7    your teaching?

8    A   I've received several teaching awards, including for each

9    of the last three courses that I taught at Princeton.

10   Q   Professor Narayanan, what were you asked to do in this

11   case?

12   A   I was asked to give a general description of cryptocurrency

13   mining.  I was also asked to analyze several specific products

14   released by the Defendants and to provide my analysis.

15   Q   Are you paid for your work on this case?

16   A   I'm paid an hourly rate.  I'm also reimbursed for expenses

17   like travel.

18   Q   Is your compensation contingent on the outcome of this

19   case?

20   A   No, it's not.  Win or lose, I get paid the same.

21   Q   And, Professor, what did you do to reach the opinions

22   you'll be discussing today?

23   A   I reviewed several documents related to the case, including

24   deposition testimonies.  I also looked at publicly available

25   materials, including the source code for Paycoin, which was one

1    of the products released by the Defendants.

2    Q    Did you rely on anything else to reach your opinions?

3    A    I certainly relied on my general knowledge and education

4    and expertise in computer science generally but also

5    specifically in cryptocurrency.

6    Q    Do you consider yourself an expert in cryptocurrency?

7    A    I do.

8            MS. CHEN:  Your Honor, at this time --

9            THE COURT:  No need to petition the Court.  It will be

10   for the ladies and gentlemen of the jury to decide the

11   witness's qualifications.  You can proceed with your

12   examination.

13           MS. CHEN:  Thank you, Your Honor.

14   Q    (By Ms. Chen) Professor Narayanan, can you tell us what is

15   cryptocurrency?

16   A    Sure.  Cryptocurrency is a type of digital asset that's

17   used as a medium of exchange.

18   Q    Can you tell us what do you mean by "digital asset"?

19   A    An asset is simply something that holds value.  A dollar

20   bill is a physical asset.  It's tangible.  You can hold it in

21   your hand, but a digital asset is one that exists in electronic

22   form.

23   Q    Is a digital asset real if it only exists in electronic

24   form?

25   A    It certainly is.  These days when we buy stocks, we usually

1   don't get paper certificates.  Our shares exist in an

2   electronic form as a record in a database somewhere.  We can't

3   hold it in our hands.  We can look it up in an online account

4   perhaps, and yet we consider that real.

5   Q   In addition, you used the term "medium of exchange."  Can

6   you explain what that means?

7   A   A medium of exchange is any item that's widely agreed upon

8   to be something that you can transfer in exchange for something

9   else of value.

10  Q   Would it be fair to call cryptocurrency electronic money?

11  A   Yes and no.  There is one important difference between

12  cryptocurrency and what we think of as money.  Generally what

13  we think of as money is something that's issued by a government

14  or by another central authority.

15  Q   Who issues a cryptocurrency then?

16  A   One of the key innovations behind cryptocurrency is that

17  there is, in fact, no central issuing or controlling authority.

18  Instead, it's a way for ordinary people to come together and

19  agree, mutually agree, on the rules for how the system would

20  work.

21  Q   Will you give us an example of a cryptocurrency that exists

22  today?

23  A   Bitcoin is the most well-known example of a cryptocurrency.

24  It's also the oldest.  It's been in existence for a little over

25  a decade at this point.

1    Q    Can you buy Bitcoin today?

2    A    You certainly can.  You can go to an online exchange and

3    you can buy Bitcoin in exchange for something like dollars.   In

4    fact, one Bitcoin today trades for a little bit more than

5    $60,000.

6    Q    So does that mean the value of a cryptocurrency changes

7    over time?

8    A    It certainly changes over time, and I believe there is a

9    slide for this on this slide.  The price of Bitcoin has tended

10   to go up and down over a time scale of years, but the long-term

11   trend has been up.

12            In fact, one of the amusing anecdotes from the very

13   early days of Bitcoin was that a cryptocurrency enthusiast

14   spent 10,000 Bitcoins for two pizzas.  If someone had held onto

15   those 10,000 Bitcoins at the price of $60,000 today, that would

16   be worth more than half a million dollars.

17   Q    Professor, did you say million or billion?

18   A    That would be worth more than half a billion dollars.

19   Apologies if I was not clear.

20   Q    Are there cryptocurrencies other than Bitcoin?

21   A    There are certainly hundreds of cryptocurrencies other than

22   Bitcoin.

23   Q    Can you explain to the jury how a transaction that would

24   work using a cryptocurrency?

25   A    Sure.  Let's start with an ordinary debit card transaction

1    and contrast that with a cryptocurrency transaction.

2            Let's say I go to a coffee shop and I want to pay for

3    my coffee with a debit card.  I would insert that card into a

4    machine.  That machine would contact my bank, and my bank would

5    verify that I had enough funds to cover the cost of the coffee.

6    Once that verification is done, the amount would be debited

7    from my account, credited to the coffee shop's account, as you

8    can see on the slide, and then I would get my cup of coffee.

9    Q   How would that work, then, with Bitcoin instead?

10   A   With Bitcoin, it would be broadly the same, but there are a

11   couple of important differences.  I would use an app on my

12   phone rather than a piece of plastic.  This app on my phone

13   would need to know the Bitcoin address of the coffee shop.  An

14   address is like an account identifier.  Once it knows that

15   address, my Bitcoin app will create a transaction, sending a

16   certain amount of value from my Bitcoin address to the coffee

17   shop's Bitcoin address.  But instead of sending that

18   transaction to a bank, what the app would do is broadcast that

19   transaction to the entire network of thousands of Bitcoin nodes

20   or Bitcoin computers that are out there.

21           And that network would get to work verifying if the

22   transaction's legitimate.  And once the transaction's verified,

23   the coffee shop gets my Bitcoins and I get my cup of coffee.

24   Q   What does it mean, then, to verify a Bitcoin transaction?

25   A   Verifying a transaction is simply making sure that the

1    Bitcoin address that's sending the Bitcoins has a sufficient

2    balance for the value that's being transferred.  And once a

3    Bitcoin transaction is verified, it's added to something called

4    a Bitcoin blockchain.

5    Q    Can you tell us what the Bitcoin blockchain is?

6    A    The Bitcoin blockchain is a public electronic ledger.  It

7    records all of the Bitcoin transactions that have been made.

8    Bitcoin has its blockchain, but each cryptocurrency has its own

9    blockchain as well.

10   Q    And can you speak a little bit more what you mean by public

11   electronic ledger?

12   A    Let's start with the traditional ledgers.  A ledger is a

13   book where we write down transactions in terms of debits and

14   credits so that we can figure out the balance associated with

15   an account.

16          An electronic ledger is similar except -- except

17   instead of paper form, it exists in electronic form.  Most

18   ledgers these days are electronic.  Blockchains are certainly

19   electronic.  They're also public.  Anyone can go look up

20   Bitcoin's blockchain or any other blockchain and look at every

21   transaction that's ever been added to that blockchain.

22   Q    So using the coffee shop example again, can you just walk

23   us through how the blockchain would fit into that transaction?

24   A    Sure.  As you see in this picture, suppose I'm paying for

25   my coffee with one Bitcoin.  Now, in real life I wouldn't pay

1   $60,000 for a cup of coffee.  But let's go with that for this

2   example.

3           And what would happen is that the Bitcoin network

4   would verify that my Bitcoin address has at least one Bitcoin.

5   And in this case it does.  It has nine Bitcoins.

6           Once that's verified and that transaction is added to

7   the blockchain, what it means is that everybody, in particular

8   all Bitcoin users, agree that that one Bitcoin lives at the

9   coffee shop's address instead of my Bitcoin address.

10  Q   If the coffee shop then wanted to use that Bitcoin, what

11  would happen then?

12  A   Looking at this picture again, let's say the coffee shop

13  wants to pay for some coffee beans with two Bitcoins.  The

14  coffee shop in turn would create a Bitcoin transaction and send

15  it to this entire network of Bitcoin nodes.  Now, those nodes

16  would need to verify that the coffee shop's address is good for

17  at least two Bitcoins.  But they can do this because they can

18  look at this public blockchain and they can see all the

19  transactions that have ever been sent to the coffee shop's

20  address, including the one Bitcoin transaction that I just

21  sent.

22  Q   Professor, can you tell us what Bitcoin mining is?

23  A   Sure.  Bitcoin mining is just a term used in cryptocurrency

24  technology to refer to this process of verifying transactions

25  and adding them to these blockchains.  Someone who carries out

1    mining is called a miner.  It could be a person or a company.

2    And I should mention that transaction variation is just only

3    one of the steps that's involved in Bitcoin mining.

4    Q    What else, then, is involved in the Bitcoin mining process?

5    A    Let's look at this picture.  People are constantly sending

6    transactions out to the entire network of Bitcoin miners out

7    there, whether that's coffee transactions or anything else.

8    These miners are collecting these transactions into what are

9    called blocks.

10           Once these miners have blocked of transactions, the

11   question then is:  Which of these miners gets to add the next

12   block of transactions to the blockchain, to this chain of

13   blocks?

14           The rules of Bitcoin dictate that miners need to solve

15   a computational puzzle in order to be legible to add a block to

16   the blockchain.

17   Q    What is a computational puzzle?

18   A    You can think of a computational puzzle as a math problem

19   that requires a lot of trial and error to solve.  In that sense

20   it's a bit like Rubik's Cubes, as you can see in the picture;

21   but unlike Rubik's Cubes, there are no shortcuts.  Bitcoin's

22   mining puzzle is designed that way.  In fact, it's designed so

23   that it takes trillions of attempts at a solution, trillions of

24   guesses before one of these miners can be successful.

25           So to do that, these miners have to purchase powerful

1   hardware as well as supply the electricity for that hardware in

2   order to be able to do these trillions of guesses of

3   mathematical operations.  You can't predict in advance which

4   miner is going to be the next one to solve that puzzle; but

5   once a miner does solve the puzzle, then a couple of things

6   happen.  As we can see in the slide, the miner gets to add a

7   new block of transactions to the blockchain; and in exchange,

8   the miner receives a reward, a certain number of Bitcoins.

9   Q   Why do the rules of Bitcoin require a miner to buy hardware

10  and use up electricity before they can add a new block to the

11  Bitcoin blockchain?

12  A   Bitcoin needs some way to make sure that these miners who

13  are verifying transactions are doing so correctly, some way to

14  ensure that a miner, for example, can't create a fake

15  transaction that sends all of your Bitcoins to the miner

16  himself.  And so the way that's done is to force these miners

17  to have some skin in the game by making them purchase the

18  powerful kind of hardware that you see on the slide and to

19  expend electricity in running that hardware.

20          After all that, if a miner were to cheat in creating a

21  block of transactions, other miners won't accept that block,

22  and the miner is going to have lost all the money that they put

23  into the hardware and electricity.  But if the miner does their

24  job correctly, they get a reward and they can hope to make a

25  profit.

1    Q    Is there a term that's used in the field for this process?

2    A    Right.  This process that I've just described is called

3    proof of work, proof of work.

4    Q    Now, why does the miner get a reward just for adding

5    transactions to blockchain?

6    A    Miners are basically volunteers.  There's no company that

7    makes -- that pays them a salary.  They have no other way to

8    make money from mining except through this Bitcoin reward.

9          And the Bitcoin system needs these miners, needs

10   someone to do this role of verifying the legitimacy of Bitcoin

11   transactions.  So to incentivize miners to play this role, they

12   get rewarded in terms of Bitcoins.

13   Q    What reward does the miner receive for stumbling upon --

14   answer the computational puzzle and then adding the block to

15   the blockchain?

16   A    That reward varies over time.  As of today, that reward is

17   six and a quarter Bitcoins per block.  In 2014 when the events

18   in this case took place, that number was 25 Bitcoins per

19   block.

20   Q    You can probably do the math.  How much is 6.25 Bitcoin in

21   today's exchange?

22   A    One Bitcoin is over $60,000.  So this would be over

23   $350,000.  It would be more than third of a million dollars.

24   Q    Can you mine Bitcoin using your home computer?

25   A    Theoretically, yes, you can buy Bitcoins on your home

1   computer, even your mobile phone.  However, a home computer or

2   a mobile phone is not going to be fast enough in doing these

3   trillions of calculations.  And so the reward that you can

4   expect to get by doing so is going to be minuscule.

5          And, therefore, what miners do and what they did back

6   in 2014, what most miners did, is to use specially designed

7   computers whose only purpose is Bitcoin mining.  These Bitcoin

8   mining computers can try a vastly higher number of calculations

9   per second.

10  Q   So does that mean that if a miner has a faster, better

11  computer, they have advantages over miners who don't?

12  A   That's right.  And, in fact, newer, faster, and better

13  Bitcoin computers are regularly entering the market; and so

14  what most miners will do is they'll regularly upgrade their

15  Bitcoin mining equipment so they can stay competitive with all

16  the other miners out there.

17  Q   In addition to mining hardware, you mentioned electricity.

18  How significant is electricity costs of Bitcoin mining?

19  A   It's quite significant.  If we're talking about the Bitcoin

20  network as a whole, then it consumes more electricity than some

21  entire countries.

22  Q   Professor Narayanan, you also reviewed some of Defendant's

23  products in this case; right?

24  A   I did.

25  Q   Are you familiar with GAW Miners' Hashlet product?

A    I am.  Hashlets are a product that was released by GAW
Miners back in August 2014.

Q    What did GAW represent to its customers they were actually
buying when they purchased a Hashlet?

A    Hashlets were a product related to mining Bitcoins as well
as other cryptocurrencies.  But rather than shipping a physical
mining computer to customers, GAW represented that what
customers were buying is a certain quantity, a certain number
of calculations per second of the mining power that GAW itself
owned and operated.

Q    What were customers to receive in exchange?

A    GAW represented that customers would receive a portion of
the payouts that GAW itself would receive by using its own
Bitcoin mining equipment to mine for Bitcoin and for other
cryptocurrencies.  In effect, what customers were told is they
were purchasing, as you can see on the slide, is the right to
profit from a slice of computing power or mining power owned by
GAW.

Q    Were Hashlets in reality consistent with these
representations?

A    They were not.

Q    How so?

A    Hashlets were not backed by physical mining in reality.  In
fact, GAW Miners did not have the quantity of physical mining
power that it would need to back the virtual mining power that

1   it sold.

2   Q    I would like to introduce Plaintiff's Exhibit 47.

3            MS. CHEN:  Mr. Boles, can you show it to the witness?

4            THE COURT:  Is there a stipulation as to this, or did

5   the Court rule on it previously?  Let me just find it.

6   Plaintiffs' Exhibit 47; is that right?

7            MS. CHEN:  That's right, Your Honor.

8            MR. WEINSTEIN:  No objection, Your Honor.

9            THE COURT:  All right.  That will come in as a full

10  exhibit, 47.

11       (Plaintiffs' Exhibit 47, received in evidence.)

12  Q    (By Ms. Chen) Professor Narayanan, do you recognize this

13  exhibit?

14  A    I do.

15  Q    Can you tell us what it is?

16  A    It is an archived version of the Hashlet webpage on the GAW

17  Miners' website from back in 2014.

18  Q    And do you see where it says "Datacenter" at the bottom of

19  the first page?

20  A    I do.

21  Q    What is a data center?

22  A    A data center is just a warehouse for computers.  In this

23  case, it would be Bitcoin mining computers.

24  Q    Why would Bitcoin mining be done with data centers?

25  A    One can certainly operate one's Bitcoin mining equipment

1   from home, but it requires a lot of know-how and it's a messy,

2   technical process.  Generally it's a lot of heat.  And because

3   of that, it is common today, and it was common in 2014, to

4   consolidate mining equipment in these massive warehouses called

5   data centers.

6   Q    Does someone operate the data center?

7   A    Right.  There would be a data center operator, and that

8   operator would provide the space for all of these machines,

9   provide the electricity for the machines, provide the know-how

10  for operating and perhaps upgrading the machines.  And in

11  exchange for that, they would be paid a fee by their

12  customers.

13  Q    So what did GAW's website on Hashlets say about where

14  Hashlets were hosted?

15  A    If we look at this paragraph on data centers, the last

16  sentence of the paragraph says, "All Hashlets are hosted in the

17  most robust mining data center in the world."

18  Q    If a Hashlet is not backed by physical real mining, can it

19  be hosted in a mining data center?

20  A    No.  That would not make any sense.  If a Hashlet is not

21  backed by real mining, there is nothing to put in a data

22  center.

23  Q    Professor, how do you know that GAW Miners sold more

24  Hashlets than its mining power could support?

25  A    I know this from the deposition testimonies of Joe Mordica

1    and Madeline Eden, who were former employees of GAW; and I also

2    know this from the criminal Plea Agreement of Josh Garza.

3    Q   Professor, did you review Mr. Garza's Plea Agreement in the

4    criminal case against him?

5    A   I did review the Plea Agreement; and Garza, of course, was

6    the CEO of GAW Miners at the time.

7             MS. CHEN:  Mr. Boles, if you could go back to the

8    slides.

9             THE COURT:  So you wanted to introduce PX 119 as a

10   full exhibit then; is that right?

11            MS. CHEN:  Yes, that is right.

12            THE COURT:  All right.  That will be full.

13       (Plaintiffs' Exhibit 119, received in evidence.)

14   Q   (By Ms. Chen) Professor, did you review the statements

15   shown on this slide?

16   A   I did.

17   Q   So what did the Plea Agreement indicate to you about

18   Hashlets?

19   A   One of the sections here is called "Stipulation of Offense

20   Conduct."  It contained a description of events at the time, as

21   well as a list of statements that both Garza and the Government

22   agreed were made by GAW but turned out to be false and also

23   listed what was the actual truth behind them.

24            Now, if we look at paragraph 4, what it says here

25   describes how Hashlets were sold to investors.  And starting

1   from the second sentence it says, "A hashlet entitled an

2   investor to a share of the profits that GAW Miners and/or

3   ZenMiner would purportedly earn by mining virtual currencies

4   using the computers that were maintained in their data centers.

5   In other words, hashlet customers, or investors, were buying

6   the rights to profit from a slice of the computing power owned

7   by GAW Miners and ZenMiner."

8   Q   And did you learn anything else about Hashlets from the

9   Plea Agreement?

10  A   I looked at paragraph 5, where it describes, in contrast to

11  the statement on the left summarizing how Hashlets were sold to

12  customers, what actually happened was, if we look at the second

13  sentence:  "Stated differently, the defendant's companies sold

14  the customers the right to more virtual currency than the

15  companies'" mining -- pardon -- "than the companies' computing

16  power could generate."

17  Q   Are mining power and computer power synonyms?

18  A   In this context, they are synonyms, yes.

19  Q   Professor, did GAW Miners come to sell or provide other

20  products in addition to Hashlets?

21  A   Yes.  GAW Miners sold several other products.  These were

22  all related to Paycoin, which was a cryptocurrency that GAW

23  Miners launched in late 2014.  So this was a few months after

24  the launch of Hashlets.

25  Q   Did Paycoin ever have a different name?

1  A   Yes.  I believe it was called Hashcoin early on, but by the

2  time it was released to the public, it was called Paycoin.

3  Q   Now, is Paycoin a cryptocurrency of Bitcoin?

4  A   Paycoin is a cryptocurrency, but it has some important

5  differences from Bitcoin.

6  Q   Excuse me, Professor.  Did you say Paycoin or Bitcoin?

7  A   Paycoin is a cryptocurrency, but it has some important

8  differences from Bitcoin.

9  Q   Thank you.  I'm sorry.  I might not have heard correctly.

10          So what were the differences between the two?

11  A   There were two important differences.  One is, if you may

12  recall, we called Bitcoin a proof of work cryptocurrency

13  involving these computational puzzles.  Paycoin used a

14  different technology called proof of stake.  And the second

15  major difference was that Paycoin involved a lot more

16  centralization and central control than Bitcoin did.

17  Q   Can you bring us through that one at a time.  What is proof

18  of stake?

19  A   Sure.  Proof of stake and proof of work are both methods to

20  determine which entity or miner gets to add blocks to the

21  blockchain.

22          The way that proof of work works is that miners who

23  have a lot of computational power have more of a chance to add

24  blocks to the blockchain and get a reward in exchange.

25          The way that proof of stake works is that miners or

1    entities who own a lot of coins in the system, that is, a lot

2    of units of the cryptocurrency, that is, entities who have a

3    lot of stake in the system, are going to be the ones who have a

4    higher chance to put in blocks into the blockchain and earn

5    rewards as a result.

6    Q   In addition to being proof of stake, what was the other

7    difference that you mentioned between Paycoin and Bitcoin?

8    A   The other main difference was that Paycoin had a much

9    greater element of central control than Bitcoin did.

10   Q   Professor, what do you consider when evaluating a

11   cryptocurrency's level of central control?

12   A   Sure.  In computer science, there is not one single factor

13   that determines whether a cryptocurrency is centralized or

14   decentralized.  Instead, the way that we look at it is we look

15   at each of the major components of a cryptocurrency.

16        We look at the software itself that encodes the rules

17   of the cryptocurrency; that's number one.  Next, we look at the

18   currency ownership, that is, the coins of the cryptocurrency.

19   Next, we look at the mining power behind the cryptocurrency;

20   that's Factor No. 3.  And the last factor that we look at is

21   all of the services that are necessary in order to make this

22   cryptocurrency useful for trading and payments and so on.

23        So for each of these factors, we look at:  Is there

24   some entity in control?  Is it distributed among a lot of

25   people or a small number of entities?  And if there is an

1  entity in control, how much control do they actually exert?

2  Q   Did you analyze Paycoin using these factors we just

3  discussed?

4  A   I did.

5  Q   Will you walk the jury through your analysis?

6  A   Sure.  Let's start with the software.  The software behind

7  a cryptocurrency is available for anyone to look at.  And

8  anyone can propose changes to the software.  Now, in a

9  cryptocurrency like Bitcoin, there is usually a process based

10 on careful deliberation and consensus for determining which of

11 those changes will make it into the next version of the

12 cryptocurrency.

13         In Paycoin, in contrast, what I found is that GAW

14 Miners released the software under its own online account.  GAW

15 Miners exercised unilateral control over updates to the

16 software and was able to make changes to the cryptocurrency, to

17 the rules of the cryptocurrency, without any notice or advanced

18 deliberation.

19 Q   In addition to software, what did you consider next?

20 A   The second factor that I considered is the concentration of

21 currency ownership.  Now, that is particularly important in a

22 proof of stake cryptocurrency like Paycoin because the way

23 proof of stake works is whoever controls a lot of stake in the

24 system has a lot of control over the mining process and, in

25 turn, over the blockchain.  They would have control over what

1  is considered a legitimate or illegitimate cryptocurrency

2  transaction.

3  Q   And what did you find about the concentration of ownership

4  for Paycoin?

5  A   GAW Miners announced that it was creating an initial

6  allotment of 12.5 million units of the cryptocurrency, 12.5

7  million units of Paycoin, and that of these 12.5 million units,

8  it had allotted 12 million units to itself to do as it saw fit.

9  So that's 96 percent.  That's an extremely high level of

10 concentration around currency ownership.

11 Q   What did GAW say was going to happen to these 12 million

12 Paycoin?

13 A   GAW said that a portion of those 12 million would be used

14 for paying investors, and a portion of it would be used for

15 paying previous customers in exchange for something called

16 Hashpoints.

17 Q   What were Hashpoints?

18 A   Hashpoints were a new product that GAW Miners introduced

19 shortly before the launch of Paycoin.  Now, if you may recall,

20 GAW Miners had a lot of customers mining using something called

21 Hashlets.  They were mining for cryptocurrency.

22         When Hashpoints was introduces, GAW Miners gave those

23 customers the option of mining for this new thing called

24 Hashpoints instead of Bitcoin or another cryptocurrency, and

25 GAW Miners said that these Hashpoints could later be converted

1    to Paycoin when Paycoin launched.

2    Q    In addition to concentration of currency ownership, what

3    else did you consider?

4    A    Sure.  Let's get to the third factor, which is the

5    concentration of mining power.  GAW started with a lot of

6    control over the initial allotment of Paycoin.  But in addition

7    to that, what I found through deposition testimonies and

8    through my analysis of the source code is that GAW had created

9    a number of special Paycoin accounts, 50 Paycoin accounts,

10   which had a much higher degree of returns to stake compared to

11   normal Paycoin accounts -- in fact, 70 times higher returns to

12   stake.

13        And because they had so much control over -- over the

14   stake in the system, these 50 accounts, by the way, were

15   primarily controlled by GAW itself.  And because of that, they

16   were set up to have the majority of control over Paycoin mining

17   and, in turn, over the Paycoin blockchain.

18   Q    And will you walk through the jury through the last factor

19   you considered.

20   A    Certainly.  The final factor I considered is the trading

21   and payment ecosystem.  Let's talk for a second about what that

22   is.  For a cryptocurrency to be useful, customers have to be

23   able to purchase it and trade it, such as on an exchange.

24   Customers also have to be able to make payments using the

25   cryptocurrency, for example, on a retailer's website.  So

1   that's the fourth factor that I considered.

2   Q    What did GAW control or promise to control regarding the

3   Paycoin trading ecosystem?

4   A    One of the things that I found is that GAW promised that it

5   had a hundred million dollar reserve called a Coin Adoption

6   Fund, and this would be used to promote the adoption of

7   Paycoin.  One of the things that GAW said it would do with this

8   fund is to purchase Paycoin on exchanges as necessary so that

9   the price of Paycoin would stay at or above $20 for everyone.

10  Q    Did Mr. Garza's Plea Agreement that you reviewed mention

11  Paycoin?

12  A    It did.

13  Q    And what did the Plea Agreement indicate to you about

14  Paycoin?

15  A    The Plea Agreement confirmed that GAW Miners and associated

16  companies did not, in fact, have a reserve of a hundred million

17  dollars that they could use to drive up the price of Paycoin,

18  contrary to their statement that they did have such a fund and

19  that it would be used to ensure that the value of Paycoin did

20  not fall below $20.

21  Q    What did you find regarding the payment ecosystem for

22  Paycoin?

23  A    Sure.  GAW Miners released a payment platform called

24  Paybase.  Now, in general, a payment platform is an

25  intermediary that sits between users and merchants in order to

 1   make transactions easier in Paycoin or whatever other

 2   cryptocurrency.

 3            Specifically, with Paybase, GAW Miners promised that

 4   Paybase could be used to be able to make purchases at retailers

 5   like Target and Walmarts.  And this would be one potential way

 6   to increase the usefulness and potentially the value of Paycoin

 7   for all of its users.

 8   Q   So after walking through these factors, what did you

 9   conclude, Professor, about Paycoin's level of centralization?

10   A   In summary what I concluded is that, looking at each of the

11   major factors of the cryptocurrency, is that along each of

12   these dimensions GAW Miners did exercise or claims to be able

13   to exercise a very significant degree of control in stark

14   contrast to a decentralized cryptocurrency like Bitcoin.

15            MS. CHEN:  Thank you very much, Professor Narayanan.

16   Pass the witness.

17            THE COURT:  Cross-examination?

18                         CROSS-EXAMINATION

19   BY MR. WEINSTEIN:

20   Q   Afternoon, Professor Narayanan.

21   A   Good afternoon.

22   Q   You mentioned at the outset of your testimony that you are

23   paid by the hour for your work; is that right?

24   A   That's correct.

25   Q   And was that true -- well, withdrawn.

1           You prepared an expert report in this case; is that

2   right?

3   A    That's correct.

4   Q    And you're obviously testifying here today?

5   A    Yes.

6   Q    And with respect to each of those, you were paid by the

7   hour?

8   A    That's correct.

9   Q    Do you recall -- you didn't mention what the hourly rate

10  was during your testimony; right?

11  A    I did not.

12  Q    And you're paid $800 an hour for your work; is that right?

13  A    That's correct.

14  Q    And that remains true through today?

15  A    That's correct.

16  Q    It's the Plaintiffs who are paying your hourly rate to

17  appear as an expert; is that right?

18  A    I'm paid through Plaintiffs' counsel as far as I know.

19  Q    Sir, you mentioned that you were able to determine certain

20  features of Paycoin by reviewing the source code; is that

21  right?

22  A    Yes.

23  Q    Can you explain for the jury what source code is?

24  A    Sure.  Source code is computer code.  Computer code can

25  exist in two forms.  Source code is the initial form in which

1    it is created by programmers.  It can also exist in a different

2    form, sometimes called a machine executable form.

3    Q    So for a feature to be part of the source code of this

4    product, it would require some kind of computer programmers to

5    enter that into the source code; correct?

6    A    Generally, yes.

7    Q    And it took you, a computer science expert, to determine,

8    based on a review of the source code, that it had certain of

9    the features that you just talked about with the jury; correct?

10   A    That was one way in which I analyzed the features of

11   Paycoin.

12   Q    Right.  I understand you also looked at certain other

13   information.  But with respect to the source code, it required

14   a computer science expert to figure out the features that were

15   embedded within that source code; correct?

16   A    I consider myself a computer science expert.  I don't know

17   that it requires a computer science expert to be able to read

18   source code.

19   Q    Fair to say that the average Joe on the street are not

20   going to be able to figure out the features that are embedded

21   within the source code if they were to look at it?

22   A    I would agree that, um, it requires a certain degree of

23   technical expertise to be able to read source code.

24   Q    Expertise in what?

25   A    It could be many things.  It could be computer science.  It

1    could be programming.

2    Q    Some kind of technical expertise?

3    A    I think that's fair to say.

4    Q    Sir, you first started researching cryptocurrencies back in

5    2013; is that right?

6    A    Roughly 2012 or 2013, around that time frame.

7    Q    Fair to say that cryptocurrency was a relatively new

8    phenomenon back then?

9    A    It was only a few years old at that time.

10   Q    It was certainly a different animal than stocks and bonds?

11   A    I'm not sure what you mean by "different animal."

12   Q    Well, cryptocurrency involves mining, as you've explained

13   to the jury; correct?

14   A    Yes.

15   Q    Different than if you wanted to own a stock or a bond --

16   right? -- in that sense?

17   A    Just to clarify, owning a cryptocurrency does not require

18   mining; but mining is involved in cryptocurrency.

19   Q    You could also buy cryptocurrency on an exchange.

20   A    That's correct.

21   Q    The way cryptocurrency is generated is through mining;

22   correct?

23   A    Yes.

24   Q    In that sense, it's quite different than stocks and bonds.

25   A    That's fair to say.

1  Q   It also involved what you described as blockchains?

2  A   That's correct.

3  Q   These electronic ledgers that capture every transaction?

4  A   Yes.

5  Q   Quite different than stocks and bonds as well; correct?

6  A   Certainly stocks and bonds can and often are stored in

7  ledgers.  I would agree that different types of ledgers are

8  used in cryptocurrency blockchains.

9  Q   The -- at the time that you first started looking and

10 researching -- withdrawn.

11        At the time you first started researching

12 cryptocurrencies, Bitcoin was the main player; is that right?

13 A   It was the most well-known one.  If memory serves, it was

14 the largest by market capitalization.

15 Q   And it was your view at the time that Bitcoin had no

16 societal impact; correct?

17 A   I'm not sure that I agree with that.  It depends on --

18 there's a difference between whether there's a societal impact

19 at a certain point in time or whether there can ever be a

20 societal impact.

21 Q   Well, as of that point in time, you felt it had no societal

22 impact?

23 A   I cannot quite recollect how I felt at that point in

24 time.

25 Q   It was your view back in 2013 that the most prominent use

1    for Bitcoin was targeting fringed elements; correct?

2    A    Could you repeat that, please?

3    Q    Sure.  It was your view, back in 2013, that the most

4    prominent use of Bitcoin was targeting fringe elements?

5    A    I don't fully understand that without the context, and I

6    don't have a specific recollection of that quote.

7    Q    Was it your view at the time that Bitcoin was used in

8    criminal operations?

9    A    Bitcoin was used at the time in criminal operations, that's

10   correct.

11   Q    One of the criminal operations you refer to, back in the

12   time, was Silk Road as an example of the criminal operations;

13   correct?

14   A    I don't know that I referred to it at the time, but

15   certainly Silk Road was an entity that facilitated criminal

16   operations that was operating in that rough time frame.

17   Q    It was your view as well that mining for Bitcoin was

18   analogous to buying a lottery ticket; correct?

19   A    I have difficulty recollecting what exactly my views were

20   at that time; but if you want my views now on that question, I

21   can tell you that.

22   Q    You don't recall your views at the time?

23             THE COURT:  It's a yes-or-no question, sir.  Do you

24   recall your views at the time on the subject?

25             THE WITNESS:  I don't recall my views at the time on

1    that specific question.

2    Q   (By Mr. Weinstein) Do you recall ever having written in an

3    article that mining for Bitcoin is analogous to buying a

4    lottery ticket?

5    A   Yes.

6    Q   Sir, you're aware of a study that, in 2013, 18 of the 40

7    Bitcoin exchanges had closed?

8    A   Eighteen of the 40 Bitcoin exchanges that were studied in

9    that paper, that's correct.

10   Q   That was because those exchanges couldn't pay out the money

11   that they had promised to pay out; correct?

12   A   I do not recollect if that was the case or not.

13   Q   Is it true that since their inception, cryptocurrencies

14   have been associated with illegal activity, including

15   investment fraud and schemes?

16   A   Depends on what you mean by "associated."  Certainly there

17   have been stories in the media about illegal activities using

18   cryptocurrencies.

19   Q   Including investment frauds and schemes; correct?

20   A   I think that's fair to say.

21   Q   You've testified earlier that you wrote a book on

22   cryptocurrency because you felt there was a need in the

23   community; is that right?

24   A   That's correct.

25   Q   There was a need in the community because it was difficult

1    for most people to understand what cryptocurrency was if they

2    were not a computer scientist like yourself; is that right?

3    A    It was difficult for most people to understand

4    cryptocurrency technology.

5    Q    I'm sorry.  Technology, is that what you said?

6    A    Cryptocurrency technology, yes.  My apologies.

7              THE COURT:  So, Mr. Weinstein, we're going to have to

8    leave it there for today.

9              We've reached our 3:30 ending point, Ladies and

10   Gentlemen.  So we're going to send you home for the day.

11             Again, leave your notebooks in the courtroom on your

12   chairs.  No one's going to look at them.  No one's going to

13   touch them.

14             Do they take them to the jury room?  Okay, so you can

15   take them to the jury room and leave them there and then pick

16   them up in the morning.

17             As I said before, my shorthand, don't discuss the

18   case.  Don't let anyone discuss it with you.  Keep an open mind

19   and everything that goes with that, no outside research, no

20   electronic posting, no Google searching about the case.  All

21   the evidence that you will need to consider for this case will

22   be presented to you here in this courtroom.

23             I want to thank you for your attention today.  Thank

24   you for arriving early for jury selection.  We'll see you

25   tomorrow at 8:45 in the room Ms. Johnson showed you.  We'll

```
 1   have you in here at 9:00 sharp, and we'll end the day at 3:30

 2   just like today.  No court on Friday.  We'll see you tomorrow.

 3   Thank you very much.

 4        (The jury left the courtroom at 3:30 p.m.)

 5             THE COURT:  Sir, you may step out of the room.  Thank

 6   you.

 7             You can all take your seats, folks.

 8             All right.  So another half hour, 40 minutes on the

 9   cross, something like that?

10             MR. WEINSTEIN:  Yeah, I don't expect it to be more

11   than that.

12             THE COURT:  Fine.  Then we'll have a little redirect

13   and that will be that.

14             And then tomorrow what do we have?

15             MR. BUCHDAHL:  Right now, Your Honor, subject to a

16   review, but our anticipated plan is to play Mr. Garza's

17   videotaped testimony.  That is approximately two hours in

18   length.

19             THE COURT:  Okay.

20             MR. BUCHDAHL:  And so I would expect that that would

21   take us into or a little past the lunch break.  That will be

22   broken up in a couple breaks, which will probably be a good

23   thing.

24             And then depending on the time, I think our plan is to

25   call Mr. Fraser adverse.
```

```
 1                THE COURT:  Okay, fine.  Very well.

 2                MR. BUCHDAHL:  And one word on that, Your Honor.

 3                THE COURT:  Yes.

 4                MR. BUCHDAHL:  I don't expect that we will finish Mr.

 5      Fraser's testimony tomorrow.

 6                THE COURT:  No, I wouldn't think so.

 7                MR. BUCHDAHL:  I assume that he will be instructed

 8      over the course of the weekend not to confer with counsel?

 9                THE COURT:  About his testimony?

10                MR. BUCHDAHL:  Correct.

11                THE COURT:  Yes.

12                So I think that's all we -- that's all I have.

13                MR. BUCHDAHL:  May I raise one evidentiary issue?

14                THE COURT:  Yes.

15                MR. WEINER:  Your Honor, if I can address the talking

16      to Mr. Fraser issue?

17                THE COURT:  About his testimony?

18                MR. WEINER:  Remember, we're going to do him all in

19      one group.  I'm certainly not going to talk to him about

20      cross-examination, but we're doing to put him on direct.

21                THE COURT:  It is true they will have to prepare him

22      for his direct.

23                MR. BUCHDAHL:  Your Honor, that's --

24                MR. WEINER:  But we won't touch the subject of his

25      cross-examination at all, but on direct we're allowed to.
```

1          THE COURT:  I don't see, Mr. Buchdahl, an option.

2          MR. BUCHDAHL:  I have an idea.

3          THE COURT:  All right.

4          MR. BUCHDAHL:  First of all, this was not difficult to

5     anticipate, but second of all, they had an option at the start,

6     which was if they wanted, they could call him separately.  If

7     they think that what they want is the chance to prepare him for

8     that, other than tonight -- because they can have all night

9     tonight.  If they think they want something other than that, I

10    think the Court should require them to elect Door No. 2, which

11    would give them that opportunity.

12          Because I think allowing them -- there's -- the notion

13    that there's some kind of separation between the subject matter

14    of his cross and of his direct testimony is a fiction.

15          THE COURT:  Okay.  I'll think about it overnight, and

16    I'll give you my ruling in the morning.  Anything else?

17          MR. BUCHDAHL:  Yes.  So evidentiary point.  It's going

18    to sound maybe a little more complicated than it is.  But

19    you're aware of *The Wall Street Journal* story from November of

20    2014 -- I'm sorry.

21          THE COURT:  Some of the alleged false statements.

22          MR. BUCHDAHL:  Correct.

23          THE COURT:  This is the Garza interview?

24          MR. BUCHDAHL:  Correct.  So Michael Casey is the

25    writer.  He asked permission to speak with Stuart Fraser ahead

1    of time.  Mr. Fraser consents to have an off-the-record

2    discussion with him.  In the article itself, it says, "Backing

3    Mr. Garza is Stuart Fraser," etc., etc.

4              This article we placed on our exhibit list, no

5    objection; they placed on their exhibit list, no objection.  So

6    we thought that article was in.

7              But in the context of potentially using it in the

8    opening, Defense counsel pointed out accurately that there is a

9    second exhibit, a compilation exhibit, that was on Plaintiffs'

10   exhibit list that included that article.  And in the course of

11   reviewing Defendant's objection to that article to a different

12   part of the exhibit, Your Honor struck and said that sentence,

13   "Backing Mr. Garza," you said that that sentence was hearsay.

14   You didn't want it to be taken for its truth, and so you said

15   that that should be taken out of that exhibit.

16             THE COURT:  Yes.

17             MR. BUCHDAHL:  Now, our view is Defense counsel said

18   that should apply across the board to every appearance of this

19   exhibit.  Our view is that's not the case.  We and Defense both

20   offered this exhibit.  No one objected.  That article should be

21   in.  I'm prepared to argue why it should come in even over an

22   objection, but we think the fact that they put it on their

23   exhibit list and we didn't object should be the end of the

24   matter.

25             THE COURT:  Let me hear why it should come in over

1    objection.  Let me hear from Mr. Buchdahl why.

2         MR. BUCHDAHL:  So the reason it should come over the

3    objection, I think, is probably like three parts to it.  First

4    is it's not in dispute.  This is, again, one of those things

5    that it's not a danger that it's going to come in for its truth

6    because no one disputes that Mr. Fraser was backing this

7    company in October of 2014.

8         THE COURT:  Okay.

9         MR. BUCHDAHL:  So, second, there is the notion that he

10   adopted it.  And I would say that happens in two ways.  There's

11   the implicit way in which he never kind of took any steps to

12   kind of distance himself from it after the article appeared;

13   but more affirmatively, there's a press release that comes out

14   that same day where he said -- where he gives a quote and he

15   himself edits the press release to describe himself as a

16   co-founder and early investor and uses his title "Vice Chairman

17   of Cantor Fitzgerald."

18        THE COURT:  Is that document marked in evidence?

19        MR. BUCHDAHL:  That is marked in evidence.  That's

20   coming in no objection.  That's a press release.  I think it's

21   Exhibit 81.  It's in that vicinity.  I may have that wrong.

22        THE COURT:  *The Wall Street Journal* article is which

23   exhibit number?

24        MR. BUCHDAHL:  That's Plaintiffs' Exhibit 82, and it

25   is also Defense Exhibit 1 -- I'm sorry -- Defense Exhibit -- I

1    don't have it.  It's 66 something.  But the exhibit that was

2    the subject of the back-and-forth was 153, Plaintiffs' 153 that

3    had the compilation including *The Wall Street Journal* article.

4            Anyway, we submit that, first of all, in terms of the

5    for its truth, we think that there's no real disagreement it's

6    true.

7            But second of all, even if there's a disagreement,

8    here's why it should come in even if it is hearsay:  The Court

9    has allowed the idea that certain statements being made about

10   the company are going to come in for the general mix of

11   information available to investors.  And we think that if a

12   Reddit post of kind of uncertain providence can come in as part

13   of the general mix of what's available to investors, then

14   certainly what is published in kind of the financial paper of

15   record about the company should come in for the general mix of

16   information available to investors.  So that we think should

17   come in for that nonhearsay purpose of just the effect on kind

18   of the community of listeners and financial markets generally.

19           But we do think that because Mr. Fraser was a

20   participant in the process that led to the article, the

21   follow-up, the coincidental press release, we don't think that

22   he can stand here and say that it's somehow prejudicial for him

23   to describe -- describe his backing.

24           And furthermore, Your Honor, that's why they had it on

25   their exhibit list, as did we, with no objections, because

1    there really wasn't any issue about this until really, quite

2    frankly, what happened is they objected to something else in

3    153.  Your eye caught that.  It rang the hearsay bell for you.

4    But that wasn't really the parties' position.  And now I think

5    they're trying to take advantage of it.

6              THE COURT:  In other words, I missed it.

7              MR. BUCHDAHL:  Not in an unfair way but just because

8    they have it.

9              THE COURT:  And that exhibit that you said they had

10   identified that had the article was which exhibit?

11             MR. BUCHDAHL:  153.  And if you look at their written

12   objections to it, that was not what they were objecting to.

13   But 82 is our exhibit that they had no objection to.

14             THE COURT:  No.  I meant you said they listed it as an

15   exhibit.

16             MR. BUCHDAHL:  588, Defense 588.

17             THE COURT:  All right.  Thank you.

18             Mr. Weiner.

19             MR. WEINER:  Your Honor, the two pillars on which Mr.

20   Buchdahl says his argument rests are not true.  He says first

21   no one disputes that in November 2014 Mr. Fraser was backing

22   GAW Miners.  Well, we dispute it because he stopped funding

23   them in July of 2014.  So that's just not right.

24             THE COURT:  What about that press release he referred

25   to?

1           MR. WEINER:  That's a different exhibit, and it's a

2     different quote.  So we're not fighting about that press

3     release.  What we're doing is looking at Your Honor's ruling on

4     Exhibit 153 which says, yeah, this article and the exact

5     statement that he's talking about, "Backing Mr. Garza is Stuart

6     Fraser," you correctly recognized that it was hearsay.  You're

7     right, we should have recognized that before.  But that

8     objection comes ill-suited from the mouth of someone who put in

9     nine exhibits in an untimely fashion.

10          The second pillar he said, well, if a Reddit post

11    comes in, *The Wall Street Journal* comes in.  That's the same

12    people who say the Reddit post shouldn't come in.  You can't

13    have it both ways.

14          THE COURT:  I have made the ruling -- well, to the

15    extent there's a foundation laid, we've talked about that; but

16    if there was a foundation laid, I would let it in for the

17    nonhearsay purpose, again if a foundation's laid, of showing

18    what was out there in the ether.  It may have been available to

19    class members on the question of reliance, this general mix of

20    information that Mr. Buchdahl mentioned.

21          Why -- what about his point on that?  What about

22    letting it in for the general mix of information?  As he says,

23    *The Wall Street Journal* is the financial paper of record.  What

24    about that?

25          MR. WEINER:  Well, you know, again, it's -- the

1    problem is, as they said in their opening, you heard Mr. Ard

2    say it's *The Wall Street Journal*.  The imprimatur of *Wall*

3    *Street Journal* is a little different than Reddit or Coinbit.

4    Again, it's a 403 question.  It's unfairly prejudicial to say

5    *The Wall Street Journal* speaks authoritatively on the subject.

6            THE COURT:  I'll look at these issues tonight.  That's

7    it.  I don't want to hear any more discussion.

8            MR. WEINER:  Thank you.

9            THE COURT:  With regard to Mr. Fraser, I will think

10   about the issue again further tonight.  But I do think Defense

11   counsel should assume they should prepare Mr. Fraser tonight.

12   Okay?

13           MR. WEINER:  Understood.

14           THE COURT:  Very well.  We'll be in recess.  Thank

15   you.

16        (Proceedings concluded at 3:41 p.m.)

17

18

19

20

21

22

23

24

25

1                          **I N D E X**

2

3       **WITNESS NAME**                                           **Page**

4       Called by the Plaintiffs:

5       Arvind Narayanan

6          Direct By Ms. Chen........................................... 37
           Cross By Mr. Weinstein...................................... 62
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                          C E R T I F I C A T E

4

5

6

7                   I, Julie L. Monette, RMR, CRR, CRC, Official

8    Court Reporter for the United States District Court for the

9    District of Connecticut, do hereby certify that the foregoing

10   pages are a true and accurate transcription of my shorthand

11   notes taken in the aforementioned matter to the best of my

12   skill and ability.

13

14

15                     /S/ JULIE L. MONETTE
                    _____
16                  Julie L. Monette, RMR, CRR, CRC
                         Official Court Reporter
17                        450 Main Street
                     Hartford, Connecticut 06103
18                        (860) 212-6937

19

20

21

22

23

24

25