```
 1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF CONNECTICUT
 2
     - - - - - - - - - - - - - - - - x
 3
     DENIS MARC AUDET, MICHAEL          No. 3:16-CV-940 (MPS)
 4   PFEIFFER, and DEAN ALLEN
     SHINNERS, Individually and on      OCTOBER 21, 2021
 5   Behalf of All Others Similarly
     Situated,                          8:59 A.M.
 6
     vs.                                JURY TRIAL
 7
     STUART A. FRASER, GAW MINERS,
 8   LLC, and ZENMINER, LLC, (d/b/a
     ZEN CLOUD)
 9
     - - - - - - - - - - - - - - - - x
10

11                 Volume II - Pages 81 - 226

12
                        450 Main Street
13                     Hartford, Connecticut

14

15        BEFORE:  THE HONORABLE MICHAEL P. SHEA, U.S.D.J.

16                       AND A JURY OF NINE

17

18   APPEARANCES:

19   FOR THE PLAINTIFFS:

20           SUSMAN GODFREY, L.L.P.
                 1301 Avenue of the Americas, 32nd Floor
21               New York, New York 10019
             BY:  SETH D. ARD, ESQUIRE
22           BY:  JACOB W. BUCHDAHL, ESQUIRE
             BY:  GENG CHEN, ESQUIRE
23
     (Appearances Continue ...)
24

25
```

```
 1    APPEARANCES CONTINUED:

 2    FOR THE DEFENDANT:

 3              HUGHES, HUBBARD & REED L.L.P.
                     One Battery Park Plaza, 12th Floor
 4                   New York, New York 10004-1482
              BY:  DANIEL WEINER, ESQUIRE
 5            BY:  MARC A. WEINSTEIN, ESQUIRE
              BY:  AMINA HASSAN, ESQUIRE
 6            BY:  HANNAH MILLER, ESQUIRE

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20    COURT REPORTER:  Julie L. Monette, RMR, CRR, CCP
                          (860) 212-6937
21
      Proceedings recorded by mechanical stenography, transcript
22    produced by computer.

23

24

25
```

```
1                           8:59 A.M.
2             THE COURT:  On the record in Audet versus Fraser.  The
3   case is 16-CV-940.  Let's have counsel state appearances for
4   the record.
5             MR. BUCHDAHL:  Good morning, Your Honor.  Jacob
6   Buchdahl from Susman Godfrey with Seth Ard and Geng Chen in the
7   courtroom.
8             THE COURT:  Very well.
9             MR. WEINER:  Good morning, Your Honor.  Dan Weiner
10  from Hughes Hubbard.  With me is my colleague Marc Weinstein,
11  Amina Hassan, and Hannah Miller.
12            THE COURT:  Okay, very well.  And I think I made a
13  mistake yesterday.  You folks had asked to have one more
14  person.  I realized now that I got confused between the jury
15  selection.  I thought you were asking to have five lawyers.
16  You can certainly have a fourth person come in.  That's no
17  problem.
18            MR. BUCHDAHL:  Your Honor, but it is a -- it is a
19  lawyer.
20            THE COURT:  Yeah, that's fine.
21            MR. BUCHDAHL:  Okay.
22            THE COURT:  That's fine.  No, each side has four, so
23  that's fine.
24            MR. ARD:  Can I take one minute to run and grab him?
25            THE COURT:  Sure.
```

1          MR. ARD:  Thank you, Your Honor.

2          THE COURT:  And then, Mr. Weinstein, I think you

3    wanted to raise something.

4          MR. WEINSTEIN:  Yes.  Just logistically, Your Honor,

5    we may show the witness this morning an exhibit that has not

6    yet been admitted.  We don't have the ability to only show it

7    to the witness and not the jury.  Is that something --

8          THE COURT:  You should have that ability.  Ms. Johnson

9    should be able to help you with that.  Hold on one second.

10         He wants to be able to show the exhibit on the screen

11   to the witness before he shows it.

12         So when I said yesterday don't bring it up, I meant

13   don't bring it up in front of the jury --

14         MR. WEINSTEIN:  Yes.

15         THE COURT:  -- before I ensure that it's a full

16   exhibit.

17         MR. WEINSTEIN:  Of course.

18         THE COURT:  You just let us know.  And she'll -- just

19   say it's not in evidence, and she'll take care of it.

20         Right.  And, Ms. Chen, is our witness outside?

21         MS. CHEN:  Yes.

22         THE COURT:  Would you mind bringing him in?

23         We're ready.

24      (The jury entered the courtroom at 9:03 a.m.)

25         THE COURT:  Come on in, folks.  Welcome back.  Please

1    take your seats from yesterday.

2             Great.  Welcome back everyone.  Please take your

3    seats.

4             Great, very well.  And we'll continue with the

5    cross-examination at this time.  And the witness remains under

6    the same affirmation he took yesterday.

7             THE WITNESS:  Yes, Your Honor.

8                      CONTINUED CROSS-EXAMINATION

9    BY MR. WEINSTEIN:

10   Q    Professor, we were discussing yesterday that back in 2013

11   cryptocurrency was a relatively new phenomenon.  Do you recall

12   that?

13   A    Yes, I recall that.

14   Q    Fair to say that the big financial institutions were not

15   players in the cryptocurrency market at that time?

16   A    I don't have a specific recollection of whether or not they

17   had at that time entered the cryptocurrency market.

18   Q    Well, let's take Cantor Fitzgerald for an example.  Have

19   you heard of Cantor Fitzgerald?

20   A    Tangentially, yes.

21   Q    You don't know what that entity does?

22   A    I don't have a good knowledge of what Cantor Fitzgerald

23   does.

24   Q    Has any of your research turned up any evidence that Cantor

25   Fitzgerald was in the cryptocurrency markets back in 2013 or

1   '14?

2   A    No, sir.

3   Q    Has your research turned up any evidence that Cantor

4   Fitzgerald had any cryptocurrency expertise back in 2013 or

5   2014?

6   A    No, sir.

7   Q    You would agree with me that someone who worked at Cantor

8   Fitzgerald from 1983 to 2005 could not have been in the

9   cryptocurrency markets; correct?

10  A    To clarify the question, do you mean as of 2005?

11  Q    Yup.  At any time between 1983 and 2005, would you agree

12  with me that someone working at Cantor Fitzgerald could not

13  have been in the cryptocurrency market?

14  A    During that time, yes.

15  Q    Because cryptocurrency didn't even exist during that

16  period; is that right?

17  A    As I've defined it for this case, that's correct.

18  Q    Your knowledge about cryptocurrency is based primarily on

19  research that you've done over the years; right?

20  A     It's based on my research.  It's based on my general

21  expertise in computer science.

22  Q    Is it fair to say that you have limited practical

23  experience with cryptocurrency?

24  A    Could you define what you mean by "practical experience"?

25  Q    You've never mined for cryptocurrency; is that right?

1    A    That's correct.

2    Q    You've never purchased any cryptocurrency for investment

3    purposes?

4    A    Not for investment purposes, no.

5    Q    You've never sold any cryptocurrency?

6    A    I have not.

7    Q    You've never invoiced in a cryptocurrency-related business?

8    A    I have not.

9    Q    You've never purchased a miner?

10   A    I have not purchased a mining machine, no.

11   Q    You've never participated in cloud-hosted mining?

12   A    I have not.

13   Q    Yesterday you were asked by Plaintiffs' counsel what you

14   did to reach your opinions, and you stated that in addition to

15   using your general knowledge and computer science expertise,

16   you reviewed some documents, including deposition testimony and

17   the source code for Paycoin; is that right?

18   A    Yes, sir.

19   Q    The deposition testimony that you reviewed, that's the

20   testimony of three people?

21   A    That's correct.

22   Q    And those were Madeline Eden?

23   A    Yes, and Joe Mordica and Michael Pfeiffer.

24   Q    And Ms. Eden, Mr. Mordica, they were former employees of

25   GAW Miners?

1   A    That's correct.

2   Q    Mr. Pfeiffer, he was -- he is one of the named Plaintiffs;

3   correct?

4   A    Yes, sir.

5   Q    You did not review any books and records of GAW Miners; is

6   that right?

7   A    If by books you mean accounting records, I did not.

8   Q    You did not review any books and records of ZenMiners; is

9   that right?

10  A    That's correct.

11  Q    You did not review any other documents or data from the

12  companies at issue in this case; is that right?

13  A    I have to think about that for a minute.

14        I certainly reviewed publicly available data, such as

15  exchange rates for Paycoin; but at the moment, I don't recall

16  reviewing any private documents related to the companies.

17  Q    Meaning you didn't review or analyze documents from the

18  companies themselves; is that right?

19  A    As far as I can recall, yes.

20  Q    Let's talk about cloud mining for a moment.  When someone

21  is cloud mining, it means that there is shared mining capacity

22  that's kept in data centers; is that right?

23  A    Cloud mining is a fuzzy term.  There are a variety of

24  meanings, but it generally does involve data centers, yes.

25  Q    The mining is kept in data centers so the customers who

1   want to mine at home don't have to have the equipment in their

2   house.  Is that true?

3   A   That is one benefit of cloud mining, yes.

4   Q   There's usually a company that owns and maintains the

5   machines for the customers?

6   A   In general, that is correct.  But it -- the machines in

7   cloud mining could also be owned by the customers.

8   Q   The customers in cloud mining pay -- if the -- withdrawn.

9         If the company maintains the machines, the customers

10  pay a fee for either a miner itself or some portion of the

11  mining power of the mining equipment; is that right?

12  A   Customers do generally pay a fee in cloud mining, that's

13  correct.

14  Q   The operator of the miners, the company that maintains

15  them, does not profit from the coins generated by the miners;

16  correct?

17  A   I think there are a variety of ways in which cloud mining

18  can be set up, and I'm not sure at the moment that that

19  characterization is true of all of them.

20  Q   So one type of scenario is that a company that operates the

21  machines does not profit from the coins that are generated by

22  the mining power?

23  A   That is one way in which cloud mining could be set up,

24  yes.

25  Q   In that scenario, the operator of the machines earns fees

1    for maintaining the machines; correct?

2    A    That would be one way to set it up for sure.

3    Q    They can also earn fees when the customers acquire their

4    portion of the mining power?

5    A    Yes, sir.

6    Q    Those are typically fixed fees; is that right?

7    A    I can't speak to whether it's typical or not.  I believe

8    there have been a variety of related but distinct revenue

9    models involved in cloud mining.

10   Q    In that scenario, the mining operator, the company that's

11   maintaining the machines, is insulated from the financial risks

12   of being part of a mining pool; is that right?

13   A    That is one way it is set up, yes, sir.

14   Q    That means that to the extent that the cryptocurrency

15   that's being mined by the machines can either rise or fall in

16   value, the company that maintains the machines is not taking

17   the risk of that market fluctuation; correct?

18   A    That's correct.

19   Q    Similarly, to the extent that the pool that's generating

20   the coins generates less coins over time because the mining

21   becomes more difficult, the operating company also is not

22   taking that risk; correct?

23   A    Pardon me.  Are you talking about the pool operator or the

24   cloud mining operator?

25   Q    The pool operator.

1   A    There are different ways to set up payout structures for

2   pool, and so it really depends on how that's set up.  Sometimes

3   the pool operator does take a risk, and sometimes they do

4   not.

5   Q    In this case, GAW Miners' role was to be the operator of

6   the machines; correct?

7   A    One role that GAW Miners had is to be the operator of the

8   machines.

9   Q    GAW Miner was going to make money from being the operator

10  by charging fees; correct?

11  A    Yes, sir.

12  Q    One of the fees that GAW Miners charged was to maintain the

13  machines on behalf of the customers.

14  A    That's how it was represented, yes.

15  Q    Another way that GAW Miners was going to make money was to

16  charge an up-front, fixed fee to the customer to acquire a

17  portion of the mining power.

18  A    Yes.

19  Q    It was the customer that acquired the mining power that

20  stood to gain a profit from the mining that the machines were

21  doing; correct?

22  A    I'd have to think about that for a minute.

23       This would really depend on a lot of details behind --

24  I apologize for my voice again.

25       Certainly the customer did stand to make a profit

1    potentially, but whether or not GAW Miners could also profit

2    from the rewards that the mining generated would really depend

3    on a lot of behind-the-scenes details.

4    Q    Do you have detailed knowledge of those behind-the-scenes

5    details?

6    A    One piece of knowledge that I have, as I discussed

7    yesterday, was that there was not, in fact, a lot of physical

8    mining backing up the virtual mining power that had been

9    sold.

10   Q    The question was whether -- with respect to the details of

11   whether GAW Miners would receive some of the profit from the

12   mining that was being done.

13   A    Considering that there was not a lot of physical mining

14   going on behind the Hashlets, I think it would have been

15   difficult for GAW Miners to generate a lot of profit from

16   actual cryptocurrency mining.

17   Q    You understand that in this case what was being represented

18   to customers was that they could be part of a mining pool;

19   correct?

20   A    I believe that was generally the case, yes.

21   Q    Putting aside whether there was actually mining power

22   sufficient to generate the mining, GAW Miners itself was not

23   part of the mining pool to make profits from the actual mining,

24   was it?

25   A    I'm trying to better understand the question.  Is the

1    question whether GAW Miners had separate mining capacity going

2    to the pools other than what it sold to customers?

3    Q    The question is:  If a customer was part of a mining pool,

4    was GAW Miners the company part of the pool that profited from

5    any coins generated by the mining power of that pool?

6    A    I don't know that one way or another.  I think it's

7    certainly possible for GAW Miners, with some of the mining

8    power that it did have, to participate in mining pools separate

9    from the mining power that customers had requested.

10   Q    So conceptually it's possible that GAW Miners could have

11   been a participant in a pool, but you don't know if that was

12   the case; correct?

13   A    That's correct.

14   Q    Is it also the case that, with respect to Hashlets,

15   customers could choose from different pools?

16   A    I believe -- my understanding is that there was a limited

17   ability to choose pools.

18   Q    Each pool could be -- withdrawn.

19         The mining power from each different pool could be

20   targeted to something different than another pool; correct?

21   A    Different pools could mine for different cryptocurrencies.

22   It could be Bitcoin; it could be a different cryptocurrency.

23   Q    So one customer of GAW Miners could choose to direct the

24   mining power to one type of cryptocurrency while another

25   customer might direct its mining power to a different

1   cryptocurrency; correct?

2   A    I believe that was possible, yes.

3   Q    The customer in that way had the ability to determine how

4   his or her money would be used; correct?

5   A    That's how it was represented, yes.

6   Q    Is it also your understanding, sir, that customers could

7   change the allocation of their mining power on a daily basis?

8   A    I don't know if it was on a daily basis, but my

9   understanding is that there was some ability to change the

10  allocation of mining power, yes.

11  Q    So after you purchase your mining power, if you do that on

12  a Thursday and decide to point it towards one type of

13  cryptocurrency, the next Monday the customer could choose to

14  change the focus of that mining power to a different

15  cryptocurrency; correct?

16  A    That specifically, I don't know if that was possible

17  because my recollection is that each Hashlet was sold specific

18  to a type of cryptocurrency.

19  Q    In performing your review for this case, did you

20  familiarize yourself with the different pools associated with

21  the different Hashlets?

22  A    I did look into the pools associated with different

23  Hashlets, but I don't know if I can recall them from memory at

24  this moment.

25  Q    From your review, are you familiar with the Clevermining

1    pool?

2    A    It is a name that came up in my -- in my review.

3    Q    Do you know what the focus of the mining power was in that

4    particular pool?

5    A    I cannot recall that at this moment.

6    Q    Are you familiar with the Multipool?

7    A    That is also a name that came up.

8    Q    Can you tell us what the focus of the mining power was for

9    the Multipool?

10   A    I'm unable to recall the focus of any of the mining pools

11   at this moment.

12   Q    Are you familiar with the NiceHash pool?

13   A    That also came up in my review.

14   Q    How about the TradeMyBit pool?

15   A    I'm not sure if I recall that name at this moment.

16   Q    Do you recall the WafflePool?

17   A    Yes, sir.

18   Q    With respect to either the NiceHash pool or the WafflePool,

19   can you tell us what the focus of the mining power was for

20   those pools?

21   A    Not from memory, no, sir.

22   Q    Was it your understanding that the pools to which people

23   could focus their mining power included customers outside of

24   GAW Miners?

25   A    I believe that was the case for at least some of the pools,

1   yes.

2   Q   So if a customer buys a Hashlet and focuses its mining

3   power into a specific pool, there could be people around the

4   world in that pool who are not customers of GAW Miners.

5   A   Yes, sir.

6   Q   Professor, in your testimony yesterday, you were shown two

7   documents that have been admitted in this case, PX 47 and PX

8   119.  So I want to take a look at each of those for a moment.

9           If we could pull up PX 47.

10          I believe you identified this as a screenshot from GAW

11  Miners' website?

12  A   Yes.

13  Q   When you discussed this document yesterday, you referred to

14  a portion of the website that discusses the data center.  Do

15  you recall that?

16  A   Yes.

17  Q   We can scroll down.  It's on the screen now.  And you read

18  for us yesterday some really small print which said, All

19  Hashlets are hosted in the most optimal mining data center in

20  the world.  Do you recall that?

21  A   I believe it says "robust" rather than "optimal," but

22  yes.

23  Q   You are correct.  Thank you.

24          You testified, after reading that yesterday, that --

25  well, do you recall answering the following question and giving

1  the following answer:

2        "If a Hashlet is not backed by physical real mining,

3  can it be hosted in a mining data center?

4        "Answer:  No, that would not make any sense.  If a

5  Hashlet is not backed by real mining, there's nothing to put in

6  a data center."

7        Do you recall that?

8  A   Yes, sir.

9  Q   With that testimony, sir, were you suggesting that GAW

10 Miners did not have a data mining center?

11 A   No, sir.

12 Q   You're aware that GAW Miners did have a large data mining

13 center in a warehouse in Mississippi; correct?

14 A   I am aware of a data center in Mississippi, yes.

15 Q   You've seen pictures of Josh Garza in that warehouse in

16 front of mining equipment calling it "my house"?

17 A   I cannot recall that at the moment.

18 Q   Do you recall just seeing pictures of Mr. Garza in front of

19 the mining equipment?

20 A   I vaguely recall that, but I cannot recall specific

21 details.

22 Q   That was real mining hardware; correct?

23 A   Yes, sir.

24 Q   You didn't use any computer science expertise to test the

25 hardware to see if it was able to mine for cryptocurrency, did

1  you?

2  A   I did not.

3  Q   The second and last document that you referred to yesterday

4  was Josh Garza's federal criminal Plea Agreement.  Do you

5  recall that?

6  A   Yes.

7  Q   That was an agreement between Mr. Garza and the United

8  States Department of Justice?

9  A   Yes.

10  Q   You're aware Mr. Garza, pursuant to that agreement, pled

11  guilty to fraud charges?

12  A   Yes.

13  Q   And that he was the only defendant in that case; correct?

14  A   As far as I know, yes.

15  Q   So I want to turn to the page that you looked at yesterday.

16  It's the ninth page.

17          THE COURT:  Probably want to scroll down on that.

18  Q   (By Mr. Weinstein) Yeah.  So just for starters, sir, in

19  your testimony, you referred to paragraph 5 of this page.  Do

20  you recall that?

21  A   Yes.

22  Q   And you noted that this whole part of the document was a

23  Stipulation of Offense Conduct; correct?

24  A   Yes.

25  Q   You testified yesterday that it was a list of statements

1  that Garza and the Federal Government agreed were made by GAW

2  but turned out to be false.  Do you remember that testimony?

3  A    Yes.

4  Q    That's not exactly what it says, is it?

5  A    It says, "The defendant made multiple statements."

6  Q    "The defendant" being Josh Garza; correct?

7  A    Yes.

8  Q    So paragraph 5 of this statement of -- or Stipulation of

9  Offense Conduct says that Mr. Garza agrees with the Federal

10 Government that he made the following false statements;

11 correct?

12 A    Yes.

13 Q    Then it lists in the box below some of the statements that

14 were those that Mr. Garza admitted he made; correct?

15 A    Yes.

16 Q    In the second box down on the right, the very bottom right

17 box that you see on the screen, the first sentence of that

18 says:  "The defendant's companies sold more Hashlets than were

19 supported by the computing power maintained in their data

20 centers"; correct?

21 A    Yes.

22 Q    You understand that when it's referencing the defendant's

23 companies, that's Mr. Garza's companies; correct?

24 A    Yes.

25 Q    The next sentence says, "Stated differently, the

```
1   defendant's companies sold the customers the right to more

2   virtual currency than the companies' computing power could

3   generate"; correct?

4   A   Yes.

5   Q   Again, with respect to the defendant's companies, that's

6   referring to Mr. Garza; right?

7   A   Yes.

8   Q   If you turn to the next page at the top, there's one more

9   false statement and truth.  And in the truth box, it says, "The

10  defendant's companies did not have a reserve of $100 million

11  and could not therefore drive up the value of Paycoin."  Do you

12  see that?

13  A   Yes.

14  Q   The defendant's company there is a reference to Mr. Garza's

15  companies; correct?

16  A   Correct.

17  Q   If you turn --

18          MR. WEINSTEIN:  I'm sorry -- back to the prior page,

19  Ms. Hassan.

20  Q   (By Mr. Weinstein) You agree that the truth statement in

21  the second box about the mining power doesn't say that GAW

22  Miners had no mining power; correct?

23  A   Correct.

24  Q   It's that GAW Miners did not have sufficient mining power

25  to back the Hashlets that it was selling; correct?
```

1    A    Correct.

2    Q    And if you turn just up to paragraph -- withdrawn.

3         Well, if you look at paragraph 4, you see it starts by

4    saying, "The defendants'" company and there's an apostrophe

5    after the "s"?

6    A    Yes, sir.

7    Q    Your understanding is that's a typo if there's one

8    defendant being referenced in this document; correct?

9    A    That seems like a reasonable inference.

10   Q    I want to ask you about the -- Paycoin's trading floor.  It

11   was the last -- on the next page, it was that last box in the

12   chart.

13   A    Yes.

14   Q    You said that you reviewed publicly available price data

15   for Paycoin; correct?

16   A    Yes.

17   Q    You obtained that data from something called

18   coinmarketcap.com?

19   A    Yes.

20   Q    And you reviewed it in forming your opinions?

21   A    Yes.

22   Q    That's a reliable source of data for historical

23   cryptocurrency prices?

24   A    In my work, I found it reliable.

25   Q    You determined, based on your review of Paycoin's price

1   data, that from the time it launched in mid-2014 through the

2   end of the year 2014, Paycoin traded in the public markets at

3   prices between $6 and $16; correct?

4   A   I just want to clarify.  I believe you said when it

5   launched in mid-2014.  What I may have said in my report was

6   mid-December of 2014.

7   Q   Yes.  And that's what I intended to say if I didn't.  So

8   thank you for that correction.

9          You determined, from your viewing Paycoin's price

10  data, that from the time of its launch in mid-December 2014

11  through the end of that year, Paycoin traded at prices between

12  6 and $16?

13  A   Yes.

14  Q   It did not reach $20 at any point during that time;

15  correct?

16  A   Correct.

17  Q   To the extent that there was a concept of a $20 price floor

18  for Paycoin, it didn't work out that way in practice according

19  to the data; correct?

20  A   For certain exchanges that were aggregated by

21  coinmarketcap.com.

22  Q   So let's see if we understand that.  What you're saying is

23  the data in coinmarketcap.com aggregates all the buying and

24  selling data from different exchanges.

25  A   It aggregates data from public exchanges.  I have seen

1   references to GAW's own exchanges.  I do not believe -- if

2   those exchanges existed, I do not believe that those were

3   aggregated by coinmarketcap.com.

4   Q   With respect to the price data that you reviewed, your

5   understanding is that information came from what exchanges?

6   A   I cannot recall the specific exchanges from memory, but I

7   do know that CoinMarketCap is able to aggregate a lot of

8   exchanges, specifically public exchanges; but I believe that it

9   would not be able to aggregate GAW exchanges if those were not

10  public exchanges.

11  Q   Understood.  Okay.  So what you're saying is that the data

12  that you reviewed from coinmarketcap.com comes from public

13  exchanges but may not include GAW Miners' exchange.

14  A   Correct.

15  Q   Understood.

16      With respect to the public exchanges from which that

17  data came, there was no trading on those public exchanges at or

18  above $20 at any point in time; correct?

19  A   For the period that I reviewed, yes.  I believe the

20  specific dates are mentioned in my report.

21  Q   You would agree that you don't need to be a computer

22  science expert to figure out that at no time during that period

23  you reviewed, the price point was at or above $20?

24  A   It would really depend on what source of data one is

25  looking at.

1   Q   If you wanted to purchase Paycoin at the time, you would go

2   to one of the public exchanges; correct?

3   A   I believe that one could also have acquired it in different

4   ways, through GAW itself.

5   Q   Okay.  If you were to, at the time, purchase it on a public

6   exchange, you would agree with me that the purchaser would know

7   that the price point was not at or above $20?

8   A   Yes, sir.

9   Q   Anyone purchasing on a public exchange during that period

10  of time who was counting on a $20 price floor would know at the

11  time of the purchase that wasn't happening; correct?

12  A   I can't speak to what somebody would infer about the $20

13  price floor.

14  Q   Well, if you're purchasing it for $16, you must know that

15  there's not a price floor of $20; correct?

16  A   I think it's a reasonable inference that -- pardon me.  Let

17  me rephrase.

18          If someone were purchasing it for $16 at that moment,

19  then I think it is straightforward to conclude that there is

20  not a $20 price floor at that moment.

21  Q   Similarly, if you're buying it at $6, it's reasonable to

22  conclude that at the time you're buying it, there's not a price

23  floor of $20 in place?

24  A   I can't speak to what someone hypothetically may or may not

25  have concluded, but I agree that it doesn't take special

1    expertise to make that inference.

2             MR. WEINSTEIN:  Your Honor, can we -- it hasn't been

3    admitted yet -- pull up Defense Exhibit 719 for the witness?

4             THE COURT:  Just for the witness then, 719.

5    Q   (By Mr. Weinstein) Sir, Defense Exhibit 719 is Paycoin

6    price and volume data from coinmarketcap.com; correct?

7    A   Yes.

8    Q   This is the type of information that you reviewed and

9    relied upon in forming your opinions?

10   A   It's the type of information, yes.

11   Q   You found it to be a reliable source in order to come to

12   your conclusions; correct?

13   A   In my work so far, yes.

14            MR. WEINSTEIN:  The Defense offers Exhibit 719.

15            THE COURT:  All right.  That will be admitted as full.

16   719 will be a full exhibit.  You can publish it to the jury.

17       (Defendant's Exhibit 719, received in evidence.)

18   Q   (By Mr. Weinstein) Sir, if we can turn to page 13 of 17.

19   And just to orient everybody, the dates start at the earliest.

20   And then when you go up the page, it's going on in time;

21   correct?

22   A   Yes, sir.

23   Q   So the first date of data in this document is the December

24   16, 2014, date at the bottom of the chart; correct?

25   A   Correct.

1    Q   That's the first date that's after the launch of Paycoin;

2    is that right?

3    A   That's a reasonable inference based on this exchange rate

4    data.  Yeah, I'll stop there.

5    Q   So on the day that Paycoin was launched, December 16, 2014,

6    it traded on the public markets at prices as low as $7 -- well,

7    7.70 and as high as 13.37; correct?

8    A   If you wouldn't mind scrolling up so I can see the titles?

9    Q   Oh, sure.

10   A   Yes, sir.

11   Q   Would you like a hard copy?

12           MR. WEINSTEIN:  Your Honor, should I --

13           THE COURT:  Sure.  You can give him a hard copy if

14   that would be helpful.

15           MR. WEINSTEIN:  May I approach, Your Honor?

16           THE COURT:  You may.

17           THE WITNESS:  Thank you.

18   Q   (By Mr. Weinstein) We were on page 13, sir.

19   A   I have it.

20   Q   So if you look at December 16, 2014, Paycoin traded on the

21   public markets at prices from 7.70 up to 13.37; correct?

22   A   Correct.

23   Q   In the second column to the right says "Volume"?

24   A   Yes.

25   Q   That's the amount of Paycoin traded on a given day; is that

 1  right?

 2  A    I believe that is correct.

 3  Q    So on that date, 231,477 Paycoin were traded on public

 4  markets.

 5  A    Yes, sir.

 6  Q    If you go up to the last day of that year, December 31,

 7  2014 --

 8  A    Yes.

 9  Q    -- the volume that day was 1,706,730?

10  A    Yes.

11  Q    On that day on the public markets, about 1.7 million

12  Paycoin were sold; correct?

13  A    Yes.

14  Q    That also means that 1.7 million Paycoin were purchased;

15  correct?

16  A    Yes.

17  Q    And the price point during that day was as low as 7.13 and

18  as high as 15.04; correct?

19  A    Yes.

20  Q    So when the public purchased 1.7 million Paycoin that day,

21  it did so knowing that the price point was not at $20 or above

22  at any time; correct?

23  A    From these markets, yes.  And they would know the price

24  point for that date, but I can't speak to whether they would

25  know the price for a previous or future dates.

1   Q    Obviously, you can't know the price for future dates;

2   right?

3   A    Correct.

4   Q    For previous dates, if they had checked, they would find

5   that it was never at or above $20 on any of these public

6   markets; correct?

7   A    Correct.

8   Q    Paycoin continued to trade into the next year; correct?

9   A    Yes, sir.

10  Q    You understand that an investigation of GAW Miners by the

11  SEC was announced publicly in mid-January 2015?

12  A    I don't recall the exact date, but that sounds about

13  right.

14  Q    Paycoin continued to trade in the public markets after the

15  announcement of that investigation?

16  A    Yes.

17          MR. WEINSTEIN:  We can take that one down.  Thank you.

18  Q    (By Mr. Weinstein) Sir, is it true that at their core, all

19  cryptocurrencies are essentially decentralized ledgers?

20  A    Could you repeat the statement, please?

21  Q    Sure.  Is it true that at their core, all cryptocurrencies

22  are essentially decentralized ledgers?

23  A    That is generally true.  Um, one exception, as I pointed

24  out yesterday, was that Bitcoin -- excuse me -- Paycoin's

25  ledger involved a very significant degree of centralization.

```
1    So I believe it's generally true, but I don't know that it's

2    absolutely true of all cryptocurrencies.

3    Q    Paycoin -- excuse me.  I think I'm catching what you got.

4         Paycoin --

5         MR. BUCHDAHL:  Not okay.

6    Q    (By Mr. Weinstein) Paycoin was a cryptocurrency; correct?

7    A    It -- yes, sir.

8    Q    Still is?

9    A    Paycoin, um -- what Paycoin was at the time would still be

10   called a cryptocurrency.  I don't know to what extent it is

11   still trading on the markets.

12   Q    And you analyzed, as you've just discussed, whether Paycoin

13   was centralized or decentralized; correct?

14   A    Yes.

15   Q    You did that analysis from a computer science perspective?

16   A    Yes.

17   Q    You're not a securities expert; correct?

18   A    Correct.

19   Q    You're not a securities regulation expert?

20   A    Correct.

21   Q    You never taught a class on securities or securities

22   regulation?

23   A    Correct.

24   Q    Never wrote a book on securities or securities

25   regulation?
```

1   A   No, sir.

2   Q   Never testified as an expert on securities or securities

3   regulation; correct?

4   A   Correct.

5   Q   The ledger for Paycoin was decentralized; correct?

6   A   This starts to get into definitional murky waters.  It was,

7   um -- let me put it this way:  Paycoin -- Paycoin's design had

8   many similarities to other decentralized ledgers, but what

9   happened in practice was that there was one entity that ended

10  up having a lot of control over that ledger.

11  Q   You -- in forming your opinion, you told us before that one

12  of the three depositions you read was Madeline Eden?

13  A   Yes, sir.

14  Q   Do you recall reviewing her testimony that Paycoin was

15  decentralized?

16  A   I don't remember the specific words in her testimony.

17  Q   It sounds about right?

18  A   I don't recall at this moment.

19  Q   Is it true that the entire network for Paycoin was involved

20  in the consensus process for verifying transactions before they

21  became part of the blockchain?

22  A   That was very difficult for me to ascertain.  One of the

23  representations that was made around Bitcoin was that there

24  would be so-called prime nodes, which would have an elevated

25  role in determining the transactions.  That became part of the

1    blockchain.

2    Q    All right.  Do you recall reviewing Ms. Eden's testimony

3    that the entire network for Paycoin was involved in the

4    consensus process for verifying transactions before they became

5    part of the blockchain?

6    A    I don't recall that specific statement, but if you're

7    reading out from that testimony, I'm happy to take your word

8    for it.

9    Q    Would you agree that Paycoin was open source?

10   A    Yes, sir.

11   Q    Anybody could see the source code?

12   A    Yes.

13   Q    That's how you got access?

14   A    Yes.

15   Q    Anybody could interact with it?  Withdrawn.  Not sure what

16   I even mean by interact.

17           Anybody could suggest improvements to the source code?

18   A    Yes.

19   Q    They could suggest fixes to the source code.

20   A    Yes.

21   Q    I think you told us before, but is it true that Paycoin

22   traded on public exchanges?

23   A    Yes.

24   Q    Traded on Cryptsy?

25   A    I can't recall that specific detail at this moment.

1    Q    That is a public exchange for cryptocurrency?

2    A    Yes.

3    Q    Paycoin traded on Bittrex?

4    A    I did not recall the specific exchanges where it traded.

5    Q    Bittrex is a public exchange for cryptocurrency?

6    A    I believe so.

7    Q    Is ShapeShift also a public exchange for cryptocurrency?

8    A    I'm not one hundred percent certain.

9    Q    GAW Miners does not control the prices on the public

10   exchanges; correct?

11   A    GAW Miners did promise to control them, but I have not seen

12   evidence that they actually did.

13   Q    GAW Miners does not control the actual public exchanges;

14   correct?

15   A    Control the operation of them, no, sir, GAW Miners does

16   not.

17   Q    ZenMiner, similarly, does not control the public exchanges?

18   A    Correct.

19   Q    When a currency is traded on an exchange, a public

20   exchange, its price is determined by market forces; correct?

21   A    Correct.

22   Q    Is it your opinion that after the class period in this

23   case, after January 19th, 2015, Paycoin became more

24   decentralized?

25   A    Yes, sir.

1    Q    There was an increase in the number of contributors to the

2    source code?

3    A    Yes.

4    Q    And January 19, 2015, that's only about a month after

5    Paycoin launched; correct?

6    A    Correct.

7    Q    You gave yesterday an anecdote, if you recall, about the

8    early days of bitcoin?

9    A    I did.

10   Q    I believe you said that in the early days of Bitcoin,

11   someone used 10,000 bitcoins to buy two slices of pizza.

12   A    I don't know if it was two slices of pizza or two pizzas,

13   but that's about right.

14   Q    Ah, it could have been two full pizzas.  How much would you

15   say two pizzas cost back then?

16   A    Well, this transaction involved 10,000 Bitcoins.

17   Q    So based on an approximate price for pizza back then, how

18   much was a Bitcoin worth if you had to use 10,000 to buy two

19   pizzas?

20   A    I believe it would have been a fraction of a cent.

21   Q    So in the early days of Bitcoin, it was trading at a

22   fraction of a penny; correct?

23   A    Yes.

24   Q    If you held onto that today, you told us it would be worth

25   more than $60,000 per Bitcoin; correct?

1    A    Correct.

2    Q    Took some time for that to develop in the markets; right?

3    A    Yes.

4    Q    You had in your demonstrative slides yesterday the prices

5    of Bitcoin.  Do you remember that?

6    A    Yes.

7              MR. WEINSTEIN:  Can we pull that up, please?

8              THE COURT:  I think we need your help with that.

9              MR. WEINSTEIN:  Yes.  Thank you.

10   Q    (By Mr. Weinstein) This slide was -- this is based on real

11   data; correct?  This is not just an illustration.

12   A    Correct.

13   Q    In the last seven years, the low point for Bitcoin was

14   right at the end of 2014, early 2015; correct?

15   A    There appears to be a dip in early 2014.

16   Q    Right.  I asked about in the last seven years, which would

17   take us back --

18   A    My apologies.  Yes.

19   Q    And you would agree with me that it looks like in the

20   latter half of 2014, Bitcoin was in a bit of a free fall;

21   correct?

22   A    Free fall is a term that doesn't have a good definition,

23   but I agree that the price was decreasing generally at that

24   time.

25   Q    So fair to say that launching a cryptocurrency in December

1   2014 was not the best market time to do so?

2   A   I can't speak to that.

3   Q   Sir, you're familiar with premining?

4   A   Yes.

5   Q   Premining of a coin or a cryptocurrency by the developer is

6   not uncommon; correct?

7   A   I think it's fair to say that it's not uncommon.

8   Q   What that means is that the developer of the coin does some

9   mining of the coin before the public can and, therefore,

10  obtains the coin; correct?

11  A   That's one way to do it.  Another way to do it is to

12  program the rules of the cryptocurrency to create an initial

13  allocation and allocate it to the developer.

14  Q   In either way, a developer gets some of the coin first

15  before the public; correct?

16  A   Yes.

17  Q   Sir, if GAW Miners was selling Paycoin that it had into the

18  market, is it fair to say that its ownership concentration

19  would decrease as a result?

20  A   If GAW Miners sold Paycoin, then its ownership

21  concentration would decrease, keeping other things constant.

22  However, if GAW Miners also had these extremely valuable nodes

23  that generated large amounts of stake, then it may not

24  necessarily decrease.

25  Q   Its amount of Paycoin as a percentage of what's available

1   would obviously decrease; correct?

2   A   It really depends.  At the same time that GAW Miners in

3   your hypothetical question was selling Bitcoin, it would also

4   be generating Paycoins for itself through what were called high

5   staking nodes.

6           THE COURT:  High staking nodes?

7           THE WITNESS:  Yes, Your Honor.

8   Q   (By Mr. Weinstein) It's certainly the fact that it's

9   selling, though its ownership share is decreasing, although it

10  can also be obtaining some at the same time in other ways.  Is

11  that what you're saying?

12  A   Yes.

13          MR. WEINSTEIN:  One moment, Your Honor?

14          THE COURT:  Yes.

15      (Pause.)

16          MR. WEINSTEIN:  No further questions, Your Honor.

17          THE COURT:  All right.  Redirect.

18                        REDIRECT EXAMINATION

19  BY MS. CHEN:

20  Q   Hello again, Professor.

21  A   Hello.

22  Q   Do you recall being asked yesterday whether mining for

23  Bitcoin was analogous to buying a lottery ticket?

24  A   Yes, I do.

25  Q   You have used that analogy in the past?

1    A    I have used that analogy.

2    Q    Why did you use that analogy?

3    A    Sure.  Mining for Bitcoin is theoretically like a lottery

4    because if you're using a single Bitcoin computer to mine, it

5    might take a long time before you earn a reward.  But when you

6    do, that amount is really high.

7            But in practice, it's not at all like that because the

8    vast majority of miners join these mining pools, which we were

9    just discussing.  And what mining pools do is allow many

10   miners, potentially millions of mining devices to join their

11   mining forces together and split the reward as well in

12   proportion.  So this almost completely eliminates the

13   unpredictability of mining rewards and ensures a steady revenue

14   stream.

15           So ironically, the whole reason that I mentioned in

16   some of my articles that Bitcoin mining is like a lottery is so

17   that I could then go on to explain typically in the very next

18   sentence that it's not at all like that in practice for the

19   reason that I just described.

20   Q    And, Professor, you were also asked about a picture of a

21   mining data center from Mississippi.  Do you recall that?

22   A    Yes.

23   Q    Can you tell from a picture of a data center what the

24   machines in that data center actually are mining?

25   A    Not in general, no.

1   Q    And if you wanted to verify that GAW had enough mining

2   power, could you tell that from just looking at the picture?

3   A    Not in general, no.

4   Q    Professor, you were also asked about certain testimony

5   concerning the entire Paycoin network?

6   A    Could you describe more detail to jog my memory?

7   Q    Yes, of course.  Just now you were asked about Ms. Eden's

8   testimony concerning the entire Paycoin network.

9   A    Yes.

10  Q    And the testimony was that the entire Paycoin network

11  participated in the mining process.

12  A    That's what I heard from opposing counsel, but I don't have

13  a specific memory of that at the moment.

14  Q    What, if any, control did GAW have over the entire Paycoin

15  network?

16  A    Sure.  GAW represented that it had special nodes called

17  prime nodes, which would do the majority of the work of

18  verifying transactions and putting them into the blockchain.

19  So that would give GAW a high degree of control over the

20  Paycoin network.

21  Q    And you were also asked about whether Paycoin became more

22  decentralized after the class period.

23  A    Correct.

24  Q    Why did Paycoin -- or did GAW continue to exert control

25  over Paycoin after the end of the class period?

1    A    Not as far as I know.  For example, the source code

2    transitioned to another entity called the Paycoin Foundation.

3    Q    Do you know approximately when that was?

4    A    I believe that this was after the class period, and I

5    believe that it was in early 2015.

6              MS. CHEN:  No more questions.  Thank you, Professor.

7              THE COURT:  All right, sir, you may step down.  Thank

8    you very much.

9              THE WITNESS:  Thank you, Your Honor.

10         (Witness excused.)

11             THE COURT:  All right.  What's next?

12             MR. BUCHDAHL:  Your Honor, next Plaintiffs would like

13   to play Mr. Garza's testimony.

14             THE COURT:  That would be fine.

15             MR. BUCHDAHL:  Would the Court like us to offer

16   exhibits at the beginning or at the end of evidence?

17             THE COURT:  It might be helpful to do it at the

18   beginning just to have them all available.

19             MR. BUCHDAHL:  Plaintiffs offer the following

20   exhibits, the admissibility of which has all been ruled upon:

21   Plaintiffs' Exhibit 1, Plaintiffs' Exhibit 28, Plaintiffs'

22   Exhibit 43, Plaintiffs' Exhibit 75, Plaintiffs' Exhibit 77,

23   Plaintiffs' Exhibit 125, also Defense Exhibit 521, Defense

24   Exhibit 538, Defense Exhibit 602, Defense Exhibit 684, and

25   Defense Exhibit 689.

1          THE COURT:  Okay.  Give me one second, please.

2      (Pause.)

3          MR. WEINER:  No objection, Your Honor.

4          THE COURT:  Okay.  Very well.  One second.

5          MR. BUCHDAHL:  Your Honor, may we proceed to play the

6  videotape?

7          THE COURT:  You may.  Actually, give me one second,

8  please.

9      (Pause.)

10          THE COURT:  Okay.  PX 1, PX 28, PX 43, PX 75, PX 77,

11  PX 125, and the following Defendant's Exhibits:  DX 521, 538,

12  602, 684, and 689 are all admitted as full exhibits.  And you

13  can proceed with the video.

14      (Plaintiffs' Exhibits 1, 28, 43, 75, 77, 125 and

15  Defendant's Exhibits 521, 538, 602, 684, and 689, received in

16  evidence.)

17      (Plays deposition video of Josh Garza.)

18          THE COURT:  Okay.  We need to stop it there.  Folks,

19  we're going to take our morning break.  We'll have till 11:10.

20          A couple things before you break:  First of all, of

21  course, this witness is testifying deposition, by deposition.

22  He's not here live.  Nonetheless, he took the same oath to tell

23  the truth that every other witness takes, and you are to treat

24  his testimony just the same as you would that of any other

25  witness.

1          Second, you saw some references to exhibit numbers,

2     and sometimes there are two stickers on the exhibit.  Don't

3     worry about that.  As a practical matter, what happened was for

4     depositions they used one series of numbers; for the trial,

5     another series are being used.  You just need to worry about

6     the trial exhibit numbers, and we're going make that clear for

7     you as the trial goes on.  So don't worry about exhibit numbers

8     right now.

9          Lastly, don't discuss the case.  Don't let anyone

10    discuss it with you.  Keep an open mind and all that goes with

11    that.  We'll see you back at 11:10.  Thank you very much.

12        (The jury left the courtroom at 10:46 a.m.)

13        THE COURT:  Please be seated.  One thing real quick.

14    So I know that we had discussed my giving a limiting

15    instruction during this very testimony, although Thomas

16    Fraser's name hasn't been mentioned yet as far as I can tell.

17    I'm going to check my notes on that.  I know you submitted

18    proposals on that, and I will come up with something.

19          Anything else we should discuss before we recess

20    briefly?

21        MR. BUCHDAHL:  Not from Plaintiff.

22        MR. WEINER:  Not from the Defense.

23        THE COURT:  Great.  We'll be in recess.

24      (Recess from 10:47 a.m. to 11:08 a.m.)

25        THE COURT:  Let's bring in the jurors.

 1              MR. BUCHDAHL:  Your Honor?

 2              THE COURT:  Yes.

 3              MR. BUCHDAHL:  Would you like us to rewind the tape a

 4    single question?

 5              THE COURT:  Yeah, rewind a single question.  That

 6    would be good.

 7         (The jury entered the courtroom at 11:09 a.m.)

 8              THE COURT:  All right.  Welcome back, folks.  Please

 9    take your seats.

10              Great.  Thank you, folks.  Please take your seats

11    everyone and we'll continue.  I did ask counsel to just go back

12    to the previous question just to refresh your memory.

13         (Plays deposition video of Josh Garza.)

14              MR. WEINER:  Your Honor?

15              THE COURT:  Yes, sir.

16              MR. WEINER:  Limiting instruction.

17              THE COURT:  Yes, sir.

18              So, folks, you just heard mention of Thomas Fraser.

19    You may hear a little bit more about him.  This is Mr. Fraser's

20    son.

21              Mr. Fraser, the Defendant, is not on trial here, and

22    you may not hold him liable for anything his son may have said

23    or done.  You may consider this evidence only for the limited

24    purpose of deciding whether Mr. Fraser had control over Mr.

25    Garza and the companies and whether Mr. Fraser had knowledge of

1   Mr. Garza's activities.  You may not consider this evidence for

2   any other purpose.  Thank you.

3            Go ahead.

4            MR. WEINER:  Thank you, Your Honor.

5       (Plays deposition video of Josh Garza.)

6            MR. WEINER:  Your Honor, can we get the Plaintiffs'

7   counsel to put this exhibit up, Defense Exhibit 657?

8            MR. BUCHDAHL:  Court sustained our objection to this

9   exhibit.

10            THE COURT:  I think I did.  I think I did sustain the

11   objection to the exhibit.

12            MR. WEINER:  Okay.  Thank you.

13       (Plays deposition video of Josh Garza.)

14            MR. WEINER:  Your Honor, can we have a pause while the

15   transcript reappears?

16            THE COURT:  Sure, if folks feel that's necessary.  Is

17   the transcript going to reappear?

18            MR. WEINER:  I'm hoping it will.

19            MS. CHEN:  Seems to be some sort of glitch, Your

20   Honor.

21            THE COURT:  I'm sorry?

22            MS. CHEN:  Seems to be some sort of technical glitch.

23            THE COURT:  Can you resolve this?  Yeah, I'll give you

24   a sec.

25       (Plays deposition video of Josh Garza.)

```
 1              THE COURT:  All right.  Does that complete the
 2     testimony of Mr. Garza?  Very well.
 3              So what do we have next?
 4              MR. BUCHDAHL:  Your Honor, next Plaintiffs will call
 5     Mr. Stuart Fraser.
 6              THE COURT:  Okay, very well.  Sir.
 7              MR. BUCHDAHL:  I'd like to hand out binders of
 8     exhibits and a binder with his SEC testimony and prior
 9     testimony.
10              THE COURT:  That would be fine.
11              MR. BUCHDAHL:  Your Honor, is it possible for Mr.
12     Fraser to take a quick bathroom break?
13              THE COURT:  Sure.  Why don't we do this -- actually,
14     I'll tell you what.  I don't like to leave the jury sitting for
15     a long time in the afternoon.  So why don't we do this:  Why
16     don't we take ten minutes now.  We will come back, and then we
17     will go till one o'clock.  And then we will take our lunch
18     break at one o'clock.  Okay, folks?
19              All right.  So we'll be in recess for ten minutes.  Go
20     back to the other room.  Don't discuss the case.  Don't let
21     anyone discuss it with you.  Keep an open mind.  All right?
22          (The jury left the courtroom at 12:06 p.m.)
23              THE COURT:  So ten minutes we'll be in recess.  You
24     can put the binders up on the witness stand.  You can certainly
25     leave one on my bench and we'll be ready to go.  Ten minutes.
```

 1        (Recess from 12:07 p.m. to 12:16 p.m.)

 2            THE COURT:  All right.  Let's get the jurors.  Be

 3   seated, sir.

 4            THE WITNESS:  Thank you.

 5            MR. WEINER:  Sir, you may remove your mask.

 6        (The jury entered the courtroom at 12:17 p.m.)

 7            THE COURT:  Welcome back, folks.  Please come in and

 8   take your seats.

 9            All right.  Please be seated everyone.  Except for Mr.

10   Fraser, if you would stand, face our courtroom deputy, and

11   raise your right hand.

12            THE CLERK:  I'm over here.

13

14                 S T U A R T   F R A S E R,

15        having been duly sworn by the Clerk, testified

16                    under oath as follows:

17

18            THE CLERK:  Please be seated.  State your name, city,

19   and state you work.  Spell your last name.

20            THE WITNESS:  My name is Stuart Fraser.

21            THE COURT:  Spell your last name for us, sir.

22            THE WITNESS:  Oh, F-r-a-s-e-r.

23            THE COURT:  And if you are currently employed, please

24   tell us the city where you are employed.

25            THE WITNESS:  I am currently retired.  I live in

```
 1   Armonk, New York.
 2                        DIRECT EXAMINATION
 3   BY MR. BUCHDAHL:
 4   Q    Good afternoon, Mr. Fraser.  My name is Jacob Buchdahl.
 5   You understand I'm one of the lawyers representing the
 6   Plaintiffs; correct?
 7   A    Yes, sir.
 8   Q    And you started working on Wall Street back in 1983; is
 9   that right?
10   A    Correct.
11   Q    That was almost 40 years ago?
12   A    Right out of college, yes.
13   Q    And around that time you were about 22 years old?
14   A    Approximately, yes.
15   Q    And back in 1983, you went to work for a firm called Cantor
16   Fitzgerald; right?
17   A    Correct.
18   Q    Now, among other things, Cantor Fitzgerald is a licensed
19   broker-dealer; correct?
20   A    Correct.
21   Q    And a broker-dealer is in the business of buying and
22   selling securities; is that right?
23   A    Buying and selling for their customers, so they don't take
24   positions.  We make our money through the commissions we charge
25   on every buy and sell.
```

1  Q   And that's the purchase and sale of securities; correct?

2  A   Correct.

3  Q   When you were hired by Cantor Fitzgerald back in 1983, your

4  uncle was still running the firm; is that correct?

5  A   Bernard Cantor founded the firm in 1945, and he ran the

6  firm until he passed away roughly around 1995.

7  Q   So that's a yes; right?

8  A   That's a yes.  I'm sorry.

9  Q   Your uncle, Bernard Cantor, was one of the founders of

10  Cantor Fitzgerald?

11  A   Yes.

12  Q   Now, your first job at your uncle's firm was as a trainee;

13  correct?

14  A   Yes.  I was one of the first of two trainees ever to go

15  through the Cantor Fitzgerald trainee program.

16  Q   And you had a supervisor as a trainee; correct?

17  A   Excuse me?

18  Q   You had a supervisor in that position as a trainee;

19  correct?

20  A   No.

21  Q   You reported to nobody?

22  A   Basically I got sent to a different department every month

23  or so.  Depending on the, you know, how hard the department

24  might be, I might be there a little longer.  Basically over a

25  two-year period, I got to try out every department and

1    everything the firm did and, I mean, I believe at the direction

2    of Bernie Cantor and maybe Jim Avena, the president of the firm

3    at the time.  There was no -- there was no training program.

4    Later on when we were running the firm, we did have a training

5    program prior to the early 2000.

6    Q    Mr. Fraser, did your colleagues know that Bernard Cantor

7    was your uncle?

8    A    Oh, yeah.  Yeah, it was pretty hard to hide.  I mean, yeah.

9    Being the nephew --

10   Q    That's a yes; right?

11   A    Yeah, that's a big yes.

12   Q    After you finished as a trainee, you joined the U.S.

13   Treasury's Department at Cantor Fitzgerald; correct?

14   A    Yes, the department I picked was U.S. Treasury.

15   Q    And you had your pick of every department?

16   A    Pretty much.

17   Q    Mr. Fraser, the U.S. Treasury's Department was a

18   broker-dealer for Treasuries; correct?

19   A    Correct.  We were a broker for fixed income.

20   Q    Treasuries are United States Treasury bonds, which are

21   securities issued by the U.S. Government; correct?

22   A    Yeah.  I mean there's other things underneath fixed income,

23   but the beginning of my career when I was a broker it was

24   strictly U.S. Treasuries, most liquid thing in the world

25   really.

1          THE COURT:  And was his description of U.S. Treasuries

2    accurate, sir, or not?

3          THE WITNESS:  I'm sorry.  What was the description?

4    Q    (By Mr. Buchdahl) My description of Treasuries was that

5    they are United States Treasury bonds, securities issued by the

6    United States Government.

7    A    I would only add bond -- bonds, notes, and bills, yes,

8    issued by the U.S. Government.

9    Q    Now, in order for you to sell government securities

10   directly to customers, you had to take exams and become

11   licensed yourself; correct?

12   A    That's correct.

13   Q    One of the tests you took was called the Series 7

14   Securities Representative Exam; correct?

15   A    Yes, I took the Series 7.

16   Q    And after you were licensed after a couple of years, you

17   became a securities broker yourself; correct?

18   A    You could support, but until you passed your Series 7, you

19   weren't allowed to pick up a phone and actually talk to a

20   customer.

21   Q    And there came a time, sir, when you did earn the right to

22   speak directly to customers.  And at that point you were a

23   broker yourself; correct?

24   A    I was an assistant broker, and then I -- eventually I had

25   my own accounts, yes.

1  Q   And at that time, you were licensed to sell securities to

2  the public?

3  A   To the who?

4  Q   To anyone, sir.

5  A   No.  Only to the other primary dealers.  I couldn't be

6  like, you know, some guy off the street saying I want to buy a

7  U.S. Treasury note.

8  Q   Is there a different test besides the Series 7 for selling

9  securities to the public, sir?

10  A   I mean there's a whole -- I mean when you say securities, I

11  have -- I mean you could be talking stocks.  I mean I took -- I

12  had a 103 to manage the futures business.  I had a 63.  You

13  know, so I had like five different licenses at one point to

14  cover the various, in my case, supervisory roles for the people

15  underneath me.  But the Series 7 was -- everybody needed a 63

16  and a 7 to do their job, you know; and then you fell under, you

17  know, SEC, the FINRA, you know, all those.

18  Q   And as part of studying and passing the tests that you had

19  to take to receive those licenses, sir, you had to study and

20  learn about the securities industry.  Fair to say?

21  A   I would say if I had to take the test today, I probably

22  couldn't pass it but, um --

23  Q   Sir, that wasn't --

24  A   Yes, yes, you have to study -- you have to study.  You have

25  to know, you know, what their answers.  I went to a class.

1   Q   Sir --

2   A   I took practice classes.  I took practice tests.

3           THE COURT:  Mr. Fraser, sir.

4           THE WITNESS:  I'm sorry.

5           THE COURT:  That's all right.  So listen to the

6   question.

7           THE WITNESS:  Yeah.

8           THE COURT:  And just answer the question.  Okay?

9           THE WITNESS:  I'm sorry.

10          THE COURT:  That's no problem.

11          Go ahead.

12  Q   (By Mr. Buchdahl) Mr. Fraser, all of these questions are

13  going to be intended to be answered yes or no.

14  A   I'll do my best.

15  Q   Thank you.  In 1996 control of Cantor Fitzgerald

16  transferred from your uncle, Bernard Cantor, to Howard Lutnick;

17  correct?

18  A   Yes.

19  Q   And there was a lawsuit over control of the firm with

20  Bernie Cantor's wife, your aunt, on one side and Mr. Lutnick

21  representing the other side; correct?

22  A   No.

23  Q   You would describe Mr. Lutnick as one of your best friends.

24  Is that fair?

25  A   Yes.

1    Q    You had worked with Mr. Lutnick since near the beginning of

2    when you started at Cantor Fitzgerald in 1983; correct?

3    A    In different forms, yeah.

4    Q    Now, around the time that Mr. Lutnick took over control of

5    Cantor Fitzgerald, you were put in charge of the entire

6    government security business at Cantor Fitzgerald; correct?

7    A    Not immediately, but at some point after the partnership --

8    the lawsuit was settled.  The partnership won.  Under the

9    partnership, Howard became the CEO and president of -- I think

10   over the next year, I became the head of fixed income.

11   Q    This was in the mid-nineties; correct?

12   A    Yeah.  Um, early -- you know what?  I'd be guessing.  Early

13   nineties.

14   Q    Mr. Fraser, while you were running the government

15   security --

16   A    Late nineties.  I'm sorry.  I'm sorry.

17   Q    Did you catch that?

18          THE COURT:  I wasn't sure what -- you said late

19   nineties?

20          THE WITNESS:  Yeah, late nineties.  Late nineties.

21   Q    (By Mr. Buchdahl) Mr. Fraser, while you were running the

22   government securities business, you led the transition of that

23   business to an electronic system for trading those securities;

24   is that correct?

25   A    Yes.

1    Q    And that was one of the significant accomplishments of your

2    tenure in charge of that department.  Is that fair to say?

3    A    One of the biggest I think.  It was really cool.

4    Q    And in connection with that transition, you applied for and

5    received certain patents for inventions that you came up with

6    related to that electronic trading system; correct?

7    A    I didn't come up with all of them, but yes -- yes.

8    Q    You were certainly one of the inventors named on these

9    patents; correct?

10   A    I was certainly one of the listed inventors named on the

11   listed patents, yes.

12   Q    And one of those patents was for a data processing system

13   for implementing transaction management of auction-based

14   trading.  Does that ring a bell, sir?

15   A    It sounds familiar.

16   Q    And you were one of the named inventors on that patent;

17   right?

18   A    I -- if you say so.  I'm not --

19   Q    And all of these patents that you applied for and received

20   while you were working at Cantor Fitzgerald were then assigned

21   to Cantor Fitzgerald; correct?

22   A    Correct.

23   Q    And then they were licensed to a company called eSpeed that

24   Mr. Garza mentioned in his testimony that we saw by videotape;

25   correct?

1    A    ESpeed or its next iteration, you know.

2    Q    But just so the jury understands what eSpeed is, eSpeed was

3    a business created by Cantor Fitzgerald related to this

4    electronic security trading business; correct?

5    A    Can I explain?

6         THE COURT:  Well, I'll tell you what, sir:  So your

7    lawyer's going to get a chance to examine you --

8         THE WITNESS:  Okay.

9         THE COURT:  -- and may want to cover some similar

10   ground and may ask the question differently in a way that

11   allows you to explain.  If you're able to answer the question

12   "yes" or "no," do that.  If not, just say, "I can't answer that

13   question yes or no."  All right?

14        THE WITNESS:  I'm sorry.  Could you repeat that?

15   Q    (By Mr. Buchdahl) Yes.  Actually, no.  I'm going to

16   withdraw that question, and I'm going to ask you a different

17   question.

18        ESpeed was a business set up by Cantor Fitzgerald in

19   connection with this electronic system for trading securities;

20   correct?

21   A    It was the electronic system.

22   Q    ESpeed was a system itself?

23   A    Yes.

24   Q    And there was actually a business called eSpeed; correct?

25   A    Correct.

1    Q    ESpeed, Inc.?

2    A    Yes.

3    Q    And, sir, as one of the inventors of the patents held by

4    Cantor Fitzgerald and assigned to eSpeed, licensed to eSpeed,

5    you had to submit sworn declarations to the United States

6    Patent Office describing your invention; correct?

7    A    Yes.

8    Q    And, Mr. Fraser, in 2006 a federal judge ruled that you had

9    intentionally misled the patent office with material

10   misrepresentations about your patent; and it was, therefore,

11   unenforceable.  Do you recall that?

12   A    I recall that one of our patents didn't pass muster.  I

13   mean a lot of them don't.

14   Q    Sir, do you recall that in 2006 a federal judge ruled that

15   that patent was unenforceable because you personally submitted

16   a false declaration to the U.S. Patent Office with material

17   misrepresentations about that patent?

18            MR. WEINER:  Objection, relevance.

19            MR. BUCHDAHL:  Your Honor, it goes to credibility.

20            THE COURT:  Okay.  So your response to that?

21            Wait, sir.  Wait.  I'm still dealing with the

22   objection.

23            THE WITNESS:  Sorry.

24            THE COURT:  That's no problem.

25            What's your response to that, briefly?

1               MR. WEINER:  403.

2               THE COURT:  I'm going to allow the line of

3    questioning, but we're not going to get too far into it.  We're

4    not going to get into extrinsic evidence or anything like that.

5    So I'll allow the question.

6    Q   (By Mr. Buchdahl) Sir, the fact that the reason for that

7    lawsuit was your own false declaration -- the reason that you

8    failed to win that lawsuit was because your own materially

9    false declaration rendered the patent unenforceable.  That's

10   not ringing a bell?

11   A   No.

12              MR. BUCHDAHL:  Your Honor, may I refresh his

13   recollection with extrinsic evidence?

14              THE COURT:  You may.  You may refresh his

15   recollection.

16              MR. BUCHDAHL:  So I'd like to put on the screen, not

17   for the jury but only for the Court and the witness --

18              THE COURT:  All right.

19              MR. BUCHDAHL:  -- a document that we have marked for

20   identification as Plaintiffs' Exhibit 176.

21              THE COURT:  You can also just hand it -- that's fine.

22   It's on his screen now.

23              THE WITNESS:  Is it in here?

24              THE COURT:  You don't see it on your screen, sir?

25              THE WITNESS:  Oh, I'm sorry.

```
1              THE COURT:  There you go.
2    Q   (By Mr. Buchdahl) Now, if you look at the top of the page
3    here, you see this is a lawsuit in Delaware between eSpeed and
4    Brokertec.
5              Do you see that?
6    A   Yes.
7    Q   Now, if you look at the holdings, the very first holdings
8    listed on the first page is that the patent is unenforceable.
9    Do you see that?
10   A   Yes, that was the ruling.
11   Q   All right.  And if we turn to what is page 13 of this
12   document, you see that in paragraph 32 --
13             MR. WEINER:  Your Honor, I have an objection to
14   reading from a document that's not in evidence.
15             THE COURT:  Yeah, you need to -- it's about refreshing
16   recollection.  I'm going to sustain that.
17             MR. BUCHDAHL:  That's fine, Your Honor.
18             THE COURT:  Sustained.
19             MR. BUCHDAHL:  Okay.  Let me find a suitable paragraph
20   to ask the Defendant to read.
21   Q   (By Mr. Buchdahl) Would you mind, on page 13, reading
22   paragraph 38?
23             MR. WEINER:  I don't think he means reading it out
24   loud.  To yourself.
25             THE COURT:  Just read it to yourself, sir.
```

1          THE WITNESS:  Oh.  38?

2          THE COURT:  Yes.

3          THE WITNESS:  Okay.

4          Okay.

5     Q   (By Mr. Buchdahl) And now will you back up to page 10 and

6     read paragraphs -- to yourself -- paragraph 20 and 21.

7     A   20 and 21?

8          Yes, I read it.

9     Q   Mr. Fraser, does that refresh your recollection that in

10    2006 a federal judge found that you intentionally misled the

11    United States Patent Office with material misrepresentations in

12    your declaration?

13    A   I mean you reminded me we lost the case.

14    Q   Is that a yes or a no, sir?

15    A   I don't know.

16    Q   In 2007 an appeals judge affirmed -- three different

17    appeals judges together affirmed that district judge's finding

18    that you had submitted a materially false declaration.

19         Do you remember that?

20         MR. WEINER:  Objection, relevance.

21         THE COURT:  Sustained.  Let's move on.

22    Q   (By Mr. Buchdahl) All right.  One of the other applicants

23    on that patent was Mr. Lutnick; correct?

24    A   Correct.

25    Q   And he also was found to have submitted a materially false

1    declaration?

2            MR. WEINER:  Objection, relevance.

3            THE COURT:  Sustained.

4    Q   (By Mr. Buchdahl) You were asked by the SEC about your

5    involvement in litigation and in being deposed prior to when

6    you spoke to the SEC.  Do you recall that?

7    A   Yes.  I filled out a form.

8    Q   Yeah, you didn't mention this eSpeed litigation, did you?

9    A   I don't recall.

10   Q   Now, around 2003, or at least in the first decade of the

11   21st Century, you essentially retired from your job at Cantor

12   Fitzgerald; correct?

13   A   No.

14   Q   So you would say that you never retired from Cantor

15   Fitzgerald?

16   A   No.

17   Q   All right.  Did there come a time when you essentially

18   retired from your job at Cantor Fitzgerald?

19   A   Pretty much, yes.

20   Q   Approximately what year was that?

21   A   '04, '05, 2004, 2005.

22   Q   And at that point you had been in the securities industry

23   for around 20 years; correct?

24   A   Almost 25, yeah.

25   Q   After you retired, you maintained the title of partner in

1    Cantor Fitzgerald; correct?

2    A    No.

3    Q    Are you telling this jury that you never used the title of

4    partner after you retired from Cantor Fitzgerald?

5    A    Of course I did.

6    Q    And, in fact, after you retired, you even continued to use

7    the title of vice chairman of Cantor Fitzgerald, didn't you?

8    A    I was given the title of vice chairman, yes.

9    Q    For life?

10   A    Sorry?

11   Q    For life?

12   A    How do you answer yes or no to that?  I don't know.

13   Q    Do you think there will come a time, sir, where you are no

14   longer permitted to identify yourself as the vice chairman of

15   Cantor Fitzgerald even though you are retired?

16   A    Yes.

17   Q    But that time hasn't come yet; correct?

18   A    Correct.

19   Q    Now, after you started to retire from Cantor Fitzgerald,

20   you started to get involved in business outside of the bank;

21   correct?

22   A    I made some invest -- yes.  Sorry.

23   Q    And one of the things you did around that time was you

24   purchased a campground and a marina in Vermont; is that right?

25   A    Yes.

1   Q   And that campground consisted of about 140 acres near a

2   lake.  Fair?

3   A   Yes.

4   Q   And you wanted to have internet service at that campground

5   and in those lake houses; right?

6   A   Correct, yes.

7   Q   And it's in connection with that that you came to be

8   introduced to Mr. Josh Garza; is that right?

9   A   Correct, yes.

10  Q   You understood that Mr. Garza could help you set up

11  internet service at the campground.

12  A   Yes.

13  Q   Now, Josh Garza was only a teenager when you met him;

14  right?

15  A   Yes.

16  Q   And you're about 25 years older than he is?

17  A   Something like that, yeah.

18  Q   And your relationship started out relatively businesslike,

19  but over time you and Josh became very close; right?

20  A   Yes.

21  Q   And Josh Garza mentioned to you more than once that he

22  considered you a father figure.

23          Correct?

24  A   Yes.  Sorry.  I didn't hear a question there.

25  Q   And he told you that he didn't really have a relationship

1   with his own biological father; correct?

2   A    Yeah.

3   Q    Now, you and Josh's first business together was called

4   Great Auk Wireless; correct?

5   A    Yes.

6   Q    And the purpose of that business was to provide wireless

7   access to rural or remote areas.  Fair?

8   A    Yes.

9   Q    And you and Josh created Great Auk Wireless in

10  approximately 2005; correct?

11  A    Yes.

12  Q    And the two of you together came up with this idea of this

13  business; right?

14  A    Together, correct.

15  Q    Now, let's pause for a minute on the name.  Great auk is an

16  extinct, flightless bird.  It's kind of like a penguin; right?

17  A    Yes.

18  Q    And you actually had a statue of a great auk at your camp;

19  right?

20  A    Yes.

21  Q    And you would describe a great auk as a bird that's very

22  docile and easily manipulated; right?

23  A    I never have.

24  Q    Can I ask you to take a look at your deposition in the

25  civil case that's in front of you in a binder.  And I want you

1    to turn to page 49 of your civil deposition.

2    A    I'm sorry.  What page?

3         THE COURT:  49.

4    Q    (By Mr. Buchdahl) Page 49 of your civil deposition.

5    A    Okay, yes, sir.

6    Q    Sir, does that testimony refresh your recollection that

7    you, in fact, did describe the great auk as docile and easily

8    manipulated?

9    A    Yes, it does.

10   Q    Now, the initials for Great Auk Wireless are G-A-W or GAW;

11   right?

12   A    Yes.

13   Q    Now, in 2005 when you and Josh created Great Auk Wireless,

14   you personally didn't have any prior experience or expertise in

15   the business of providing wireless internet service; correct?

16   A    Yes.

17   Q    It is correct that you lacked that expertise; right?

18   A    Yes.

19   Q    And you didn't have day-to-day responsibility for the

20   operation of Great Auk Wireless; correct?

21   A    Yes.

22   Q    That was Josh's job; right?

23   A    Yes.

24   Q    Now, over the years, Mr. Fraser, you invested millions of

25   dollars in Great Auk Wireless; correct?

```
 1   A    Yes.
 2   Q    And you never got any of that money back prior to 2014;
 3   correct?
 4   A    Prior to '14, correct, yeah.
 5   Q    And sitting here today, you've never been able to get back
 6   the millions of dollars you put into that business; right?
 7   A    Correct, yes.
 8   Q    Now, at the outset, you and Josh didn't have any paperwork
 9   setting out formally the ownership of this Great Auk Wireless
10   company -- right? -- the beginning?
11   A    Yes.
12   Q    But you understood that you and Josh were 50/50 partners in
13   Great Auk Wireless; right?
14   A    Yes.
15   Q    And the basis for that belief was that there were no other
16   partners.  You were putting in the money, and he had the
17   expertise.  So it was 50/50; right?
18   A    Basically, yes.
19   Q    And you and Josh kept starting new businesses under the
20   overall umbrella of GAW Wireless; right?
21   A    Yes.
22   Q    One example was VoiceProdigy which related to providing
23   voice service over the internet?
24   A    Yes.
25   Q    And another example was GAW Labs which related to providing
```

1   computer coding services to customers; correct?

2   A   I'm sorry.  How does that relate to Great Auk Wireless?

3   Q   Sir, do you recall a company named GAW Labs?

4   A   Yes.

5   Q   And that was one of the businesses that you started with

6   Josh; correct?

7   A   Yeah.  It spun out of things, yes.

8   Q   And just like with Great Auk Wireless, you personally

9   didn't have any experience or expertise in the businesses of

10  phone services over the internet or providing computer coding

11  services; correct?

12  A   I'm sorry.  Could you repeat that?  I missed it.

13  Q   Once again with these businesses, Mr. Fraser, you

14  personally didn't have any prior expertise or experience in

15  these businesses; correct?

16  A   Oh, correct, yeah.

17  Q   But you had the money to help get them started; right?

18  A   I had the money, yes.

19  Q   All right.  I'd like to start with a couple of exhibits,

20  and I want to start with Plaintiffs' Exhibit 28.  And I believe

21  this one does not have any objection.

22          THE COURT:  Plaintiffs' 28, is that right?  Yes, that

23  will be a full exhibit, PX 28.

24      (Plaintiffs' Exhibit 28, received in evidence.)

25  Q   (By Mr. Buchdahl) So, Mr. Fraser, with all of these

```
 1    exhibits, we're going to display them on the screen, but I've
 2    also provided you with a binder of exhibits.  And if at any
 3    time you think it's easier to look at the binder, you can do
 4    that.  We should be able to show you on the screen what you
 5    need to see, but I don't want you to think I'm preventing you
 6    from seeing the entire exhibit.  Okay?
 7    A    Okay.  Thank you.
 8    Q    All right.  Plaintiffs' Exhibit 28 is an e-mail exchange
 9    with Josh Garza.  And there's a 2014 date at the top, but I
10    want to focus your attention on the e-mail from Josh to you
11    below that that's dated July 17th, 2013.  Do you see that?
12    A    Yes.
13    Q    And Mr. Garza writes to you, "We should figure out how we
14    want to handle things between us going forward."
15              Do you see that sentence?
16    A    I do.
17    Q    If we skip down two paragraphs, Mr. Garza writes, "I
18    propose a simple solution, we split every system and company in
19    half."
20              Do you see that?
21    A    Yes.
22    Q    And you told the SEC that you agreed with Mr. Garza that
23    you would split every deal and every system in half; correct?
24    A    Yes.
25    Q    And he writes to you, "Going forward, here is what I'm
```

1   thinking.  We will create an equal partnership (50/50) in our

2   holding company, Geniuses at Work Corporation, you can have the

3   voting power (I don't care)."

4          And then he says -- and if you skip down a little

5   further, it says, "I would split every deal and every system I

6   have developed with you."

7          Do you see that?

8   A   Yes.

9   Q   And then he has a list of requests.  He says, "Here is what

10  I would like" and he lists a bunch of requests at the bottom of

11  the page.  Are you still with me, Mr. Fraser?

12  A   I'm sorry.

13  Q   Are you still with me?  Are you following?

14  A   I'm trying, yes.

15  Q   If I need to go slower or if there's something that you're

16  missing, please tell me.  Okay?

17  A   Thank you.

18  Q   So at the bottom of the page, it says, "Here is what I

19  would like," and he's got four bullets.  Do you see that?

20  A   Yes.

21  Q   And the first bullet it says:  A 10,000 per month

22  investment paid to Geniuses at Work Corporation for 24 months

23  (to pay myself with).

24          Do you see that?

25  A   Yes.

1  Q   And you agreed to that; correct?

2  A   I'd have to see more.

3  Q   All right.  I'd like to ask you --

4  A   What page is this on?  I'm sorry.  I need to look at the

5  whole thing.

6  Q   All right.  This is Plaintiffs' Exhibit 28.

7  A   Sorry.

8      Okay, go ahead.  I'm sorry.

9  Q   My question for you, sir, we see that Josh requests $10,000

10 per month to pay himself with.  You agreed to give him that

11 $10,000 per month; correct?

12 A   I'm confused.  I'm sorry.

13     THE COURT:  Do you want to try to phrase it

14 differently?

15     MR. BUCHDAHL:  Why don't we try to refresh his

16 recollection with his SEC testimony.

17 Q   (By Mr. Buchdahl) Sir, you've got in front of you a binder

18 that includes sworn testimony you provided to the SEC.  Would

19 you turn to page 65 of your SEC testimony.

20     And I'd like you to --

21     THE WITNESS:  Can't answer yes or no to this.

22     THE COURT:  It's all right, sir.  Wait for a question.

23 It's all right.  He's going to walk you through it.  Okay?

24     THE WITNESS:  65, yes, sir.

25 Q   (By Mr. Buchdahl) Page 65, I'd like you to look at lines 15

1   through 22.  I'm sorry, it's earlier than that.  It's -- it is

2   page 64, pages -- lines 15 to 22.

3   A    Okay, yeah.

4   Q    Does that --

5   A    I just thought it was something a different deal.  I'm

6   sorry.

7   Q    Mr. Fraser, after having a chance to review your sworn SEC

8   testimony, does that refresh your recollection that you agreed

9   to pay Mr. Garza $10,000 a month to pay himself with?

10  A    Yes.

11  Q    You agreed to do that for 24 months; correct?

12  A    Yes.

13  Q    And I'd like to look at Plaintiffs' Exhibit 3.  I also

14  don't believe there's any objection to this exhibit.

15          THE COURT:  All right.  As long as that item was

16  redacted, there was a --

17          MR. BUCHDAHL:  It's heavily redacted.

18          THE COURT:  Very well.  PX 3 is full.

19      (Plaintiff's Exhibit 3, received in evidence.)

20  Q    (By Mr. Buchdahl) So if we look at the top of this page --

21  this is records from your joint checking account; correct?

22  A    Yes.

23  Q    And turn to page 4 of this exhibit with me, please.  You

24  can see that there are only two transactions that are not

25  blotted out; correct?

1    A    Yes.

2    Q    And one of these is from February 20th of 2014.  And that's

3    a $25,000 wire to GAW High-Speed Internet; correct?

4    A    Correct.

5    Q    And the other one is February 28th of 2014, and that's

6    $10,000 paid directly to Josh Garza; correct?

7    A    Correct.

8    Q    So the $10,000 that he asked you to pay to Great Auk

9    Wireless or Geniuses at Work Corporation, you, in fact, paid

10   that directly to his own account; correct?

11   A    Yes.

12   Q    And the reason for that, sir, was because you wanted to get

13   favorable tax treatment for those payments; correct?

14   A    No.

15   Q    Why did you do it that way then, sir?

16   A    Because he asked me to send it to him direct.

17   Q    And that's all it took.

18   A    His taxes are his problem.

19   Q    Okay.  Let's talk about your taxes.  You did this for a

20   period of months; correct?

21   A    Correct.

22   Q    Did you ever fill out a gift tax return relating to the

23   money that you gave in cash directly to Josh?

24           MR. WEINER:  Objection, relevance.

25           THE COURT:  I'll allow a yes or no on this.

1          THE WITNESS:  No.

2     Q    (By Mr. Buchdahl) Mr. Fraser, did you ever talk to the

3     co-owner of this account, your wife, about these payments that

4     you were making to Mr. Garza?

5     A    I'm sorry.  To who?

6     Q    To your wife, the co-owner of the account.

7     A    No.

8     Q    In fact, you took steps to conceal the money you were

9     giving to Josh from her; correct?

10    A    No.

11    Q    All right.  I'd like to show, not the jury but just the

12    Court and the witness for impeachment purposes, what we've

13    marked for identification as Plaintiffs' Exhibit 178.

14          And I'd like you to look -- can you see it on your

15    screen, sir?

16    A    I'm sorry, yeah.

17    Q    I'd like you to look at the last e-mail on that page, and

18    I'd like you to read that to yourself.

19    A    Okay.  What's the question?

20    Q    Does this refresh your recollection, sir, that you actually

21    took steps to try to conceal the payments you were giving to

22    Josh from your wife?

23    A    Does this refresh my memory?  Yes, it does refresh my

24    memory.

25    Q    And the answer is, sir, the true answer is that you did

1  take steps to conceal the payments you were making to Josh and

2  these businesses from your wife; correct?

3  A   At times, I did, yes.

4  Q   Let's go back to Plaintiffs' Exhibit 28.  If we look at the

5  second bullet in that list of four down at the bottom of the

6  page, Mr. Garza's second request to you is to forgive the

7  Hillcrest debt, which he describes at around $230,000.  Do you

8  see that?

9  A   Yes.

10 Q   And to be clear, the Hillcrest debt was actually the

11 mortgage on Josh's house; right?

12 A   Correct.

13 Q   And this was a mortgage that you had acquired from the

14 original lender; correct?

15 A   I don't know.

16 Q   So, Mr. Fraser, you don't recall how it is that you came to

17 be the owner of the mortgage on Josh's house?

18 A   I thought I just gave him a check for 325,000.  I didn't

19 know.  I didn't -- I wasn't aware there was an actual mortgage

20 written up.

21 Q   Now, if you turn to page 3 of Plaintiffs' Exhibit 28, Josh

22 repeats these requests on July 24 of 2013.  Do you see that?

23 He says, "I wanted to get this out of the way, so let's confirm

24 everything."  He goes through his requests again.

25 A   Yes, I see this.

1    Q    And then if we turn to the top of page 3, Josh writes you

2    again.  He says, "We are on the same page?"

3             Do you see that?

4    A    Yes.

5    Q    And now if we go to bottom of page 2, you respond on July

6    30th of 2013, and you say, "Everything but the hillcrest note."

7             Meaning you agreed to his terms except for the

8    Hillcrest note; correct?

9    A    Yes.

10   Q    Mr. Fraser, if you add up -- hang on a second.  Sorry.

11            Ultimately, you did agree to forgive the mortgage on

12   his house; correct?

13   A    Yes.

14   Q    Now, if you add up just that $230,000 for the mortgage and

15   $10,000 a month for 24 months, that's almost half a million

16   dollars; correct?

17   A    Yeah, correct.

18   Q    That's half a million dollars that you're agreeing here

19   just to give Josh personally; correct?

20   A    Correct.

21   Q    And around this time in 2013, he was maybe -- what? -- 28

22   years old?

23   A    Who?

24   Q    Josh.

25   A    If you say so, yes.

1          MR. BUCHDAHL:  Your Honor, I'm going to start asking

2     about GAW Miners.  It's a minute before 1:00.

3          THE COURT:  Why don't we take our lunch break now,

4     folks.  So we'll have you back in the courtroom at 1:45.

5          Thank you very much for your careful attention today.

6     And, of course, don't discuss the case.  Don't let anyone

7     discuss it with you.  Keep an open mind and all that goes with

8     that that I told you yesterday.  Thank you very much.

9        (The jury left the courtroom at 12:58 p.m.)

10         THE COURT:  All right, sir.  You may step down.

11         A couple things before we break.  I had issued a

12    ruling yesterday on the issue of Defense counsel conferring

13    with Mr. Fraser over the weekend, and I've said that I needed

14    to know what the election was going to be.  I said I needed to

15    know before we started.  But in any event, what's the election

16    going to be?

17         MR. WEINER:  Your Honor, we read your note in saying

18    if we want to change course, we're to let you know.  We didn't

19    let you know, which means we're staying the course.

20         THE COURT:  Very good.  So I understand, clear for the

21    record, that means he's going to testify at one sitting.

22    Everybody's going to examine -- we'll actually have four

23    examinations.

24         MR. WEINER:  Correct, Your Honor.

25         THE COURT:  Mr. Buchdahl.

1              MR. BUCHDAHL:  Your Honor, I would like to offer as

2      exhibits the two federal decisions relating to the SEC

3      litigation that we marked as Plaintiffs' Exhibit 176 and 177.

4              THE COURT:  Isn't that governed by Rule 608(b)?

5      Aren't we getting into extrinsic evidence?  He gave you his

6      answer.  Those aren't statements by him, so you can't impeach

7      him that way.  We're getting into conduct that has nothing to

8      do with the case.  So why is that admissible?

9              MR. BUCHDAHL:  Your Honor, I'd have to look at the

10     rule.  But I did not believe that you couldn't use specific

11     extrinsic evidence of specific conduct with the witness

12     himself --

13             THE COURT:  You may be right.  Let me look at it.  You

14     corrected me last time.  Let me just check.  I thought you had

15     to take the witness's answer, but let me just check on that.

16             MR. WEINER:  Your Honor, our understanding is the same

17     as yours.

18             MR. BUCHDAHL:  Your Honor, I withdraw the proffer.

19             THE COURT:  Sorry?

20             MR. BUCHDAHL:  I withdraw the proffer.

21             THE COURT:  Very well.  We'll be in recess.  Why

22     don't -- we will be back here at 1:40.

23             Sorry, one other thing.  I have to leave today at

24     3:30.  I'll probably leave at 3:35.  So don't save any issues

25     for later.  If there are any issues, raise them now.

1          MR. BUCHDAHL:  One thing we want to clarify before the

2    weekend, what your practice is on Rule 50(a) motions, whether

3    you want written submissions.

4          THE COURT:  No.  So here's what we'll do:  Folks can

5    make their Rule 50 motion.  We'll do it outside the presence of

6    the jury.  Someone can make a Rule 50 motion.  I'll have

7    probably pretty brief argument on it, both sides.  And I don't

8    know what I'll do yet.

9          I will tell you, just as a matter of historical

10   practice, I usually reserve on those, so -- but I don't know.

11   We'll see.  There was one time when I didn't, but that's about

12   it.

13         MR. BUCHDAHL:  Given that, not seeking written

14   submissions is a blessing, so thank you.

15         THE COURT:  All right.  Anything Defense wanted to

16   raise?

17         MR. WEINER:  No, Your Honor.

18         THE COURT:  We're good?  Thank you.  We'll have lunch.

19   Thank you.  We'll be back at 1:40.

20      (A luncheon recess was taken from 1:02 p.m. to 1:39 p.m.)

21         MR. WEINSTEIN:  Your Honor, just because I know you're

22   running out at 3:30, so perhaps we can learn who the next

23   witnesses will be on Monday before you run out.

24         THE COURT:  Who do we think is going to testify

25   Monday?

1              MR. BUCHDAHL:  We have not made that decision yet.  I

2    mean I don't know if we're going to get past Mr. Fraser, but we

3    don't --

4              THE COURT:  You need to let him know at close of

5    business today, five o'clock today.

6              MR. BUCHDAHL:  Oh, the business day before, not the

7    day before?

8              THE COURT:  Correct, the business day before, that's

9    what I said.

10             MR. BUCHDAHL:  We'll make a decision by 5:00.

11             THE COURT:  Okay.  Where's Devorah?  Is she with the

12   jurors you think?  We'll wait a second.  We're a little bit

13   early.

14        (The jury entered the courtroom at 1:44 p.m.)

15             THE COURT:  Welcome back, folks.  Come on in.

16             Great.  Welcome back.  Please take your seats.  All

17   right.  Take your seats everyone.

18             Mr. Buchdahl, whenever you're ready.

19             MR. BUCHDAHL:  Thank you, Your Honor.

20   Q   (By Mr. Buchdahl) Mr. Fraser, at some point in 2012, you

21   and Josh first talked about a business idea called GAW Miners;

22   correct?

23   A   Don't recall the date.

24   Q   Would you mind turning to page 69 of your civil deposition,

25   sir?

```
 1    A    Sure.
 2    Q    I'm going to ask you to review 69, lines 21 to 24.
 3    A    This is in the PX book?
 4    Q    No, sir.  It would be in the book that has your deposition
 5    transcripts.
 6    A    Oh, I'm sorry.
 7    Q    And it is the civil transcript, page 69, lines 21 to 24.
 8    A    First one.  Right?
 9              THE COURT:  I think it's the second -- in my binder
10    it's the second transcript.
11              MR. BUCHDAHL:  It's the one with the smaller print.
12              THE WITNESS:  I'm sorry.  What line?
13              MR. BUCHDAHL:  Page 69, lines 21 to 24 near the bottom
14    of the page.
15    Q    (By Mr. Buchdahl) Sir, I --
16    A    Okay, yes.
17    Q    Now, you understood that GAW Miners related to the idea of
18    mining for cryptocurrency; correct?
19    A    Yes.
20    Q    Now, you didn't have any expertise or experience whatsoever
21    in mining before this company; correct?
22    A    True, yes.
23    Q    And you understood that the original idea for GAW Miners
24    was to build a better machine to mine these digital
25    cryptocurrencies; correct?
```

1    A    To build our own machine to sell to do this, yes.

2    Q    And you understood, at least at a basic level, that these

3    mining machines were computers; correct?

4    A    Yes.

5    Q    And you understood that these computers ran algorithms and

6    calculations in order to produce a virtual coin of some

7    currency; correct?

8    A    Yes.

9    Q    And you're aware that these mining machines generated a lot

10   of heat; correct?

11   A    Yes, a lot.

12   Q    And you're aware that they use an enormous amount of

13   electricity; correct?

14   A    Correct.

15   Q    Now, in March of 2014, GAW Miners sold its very first

16   machine; correct?

17   A    I'm sorry.  What was the date again?

18   Q    March of 2014.

19   A    Sounds correct, yes.

20   Q    And that was an exciting moment for you; correct?

21   A    Very, yes.

22   Q    And you had your own -- sorry.  You had your own login and

23   password that you could use to go into the purchasing system

24   for GAW Miners to see how many miners were being bought;

25   correct?

1    A    Spotify in the beginning, yes.

2    Q    I think you said Spotify, but that's the music one.  It

3    actually should be Shopify.

4    A    My bad, sorry, yes.

5    Q    And you had your own login and password for Shopify; right?

6    A    It was given to me by Josh, yes.

7    Q    And in March 2014, you were excited enough about the

8    business that you went into that online system all the time

9    every day; correct?

10   A    Correct.

11   Q    And you were excited enough about your new business that

12   you told your connections at Cantor Fitzgerald about it; right?

13   A    I did.

14   Q    Let's pull up Plaintiffs' Exhibit 4, which is --

15            MR. BUCHDAHL:  Should be no objection, Your Honor.

16            THE COURT:  Okay.  Plaintiffs' 4 will be full.

17   Plaintiffs' Exhibit 4 is full.

18        (Plaintiffs' Exhibit 4, received in evidence.)

19            MR. BUCHDAHL:  All right.  So if we can display

20   Plaintiffs' Exhibit 4, Mr. Boles.

21            THE COURT:  Just one second.

22        (Pause.)

23            MR. BUCHDAHL:  We're waiting for the system.

24            THE WITNESS:  Oh, I'm sorry.  I thought --

25            MR. BUCHDAHL:  No.  I apologize.  The system goes back

```
1   and forth from who's controlling it, and so we just want to get

2   that set up properly.

3           THE WITNESS:  No problem.

4      (Pause.)

5           THE COURT:  Want to try to use the ELMO?  Let's see if

6   we can do that.

7           Mr. Buchdahl, do you have a hard copy of the exhibit

8   you can put on the ELMO?

9           MR. BUCHDAHL:  I do.  I think it's -- you know, let me

10  make sure I have one that's not marked.

11          All right.  So bear with me here.  It's not going to

12  be as pretty.

13          THE COURT:  That's our backup system, folks.

14          MR. BUCHDAHL:  Not too bad.  Not too bad.

15          THE COURT:  Sorry about that.

16  Q   (By Mr. Buchdahl) All right.  So if you see this -- all

17  right.  Now, we're not going to have the assistance of Mr.

18  Boles' highlighting, so I'm going to just try to do it myself.

19          You sent this e-mail to Mr. Jed Kleckner on March 18,

20  2014.  Do you see that?

21  A   Yes.

22  Q   All right.  And you can see that Mr. Kleckner then forwards

23  it to a different JKleckner address.  Do you see that at the

24  top?

25  A   Yes.
```

1    Q   Okay.  And Mr. Kleckner, there's a signature at the bottom

2    of his e-mail that says "Cantor Ventures"; right?

3    A   Yes.

4    Q   And 499 Park Avenue is where the headquarters of Cantor

5    Fitzgerald are at; right?

6    A   Yes.

7    Q   Can you explain to the jury what Cantor Ventures is?

8    A   Yeah.  I guess, over the years, we collected some kind of

9    weird little businesses.  You know, one of them was

10   delivery.com.  The other was Intani (sic) -- delivery.com, kind

11   of like a Grubhub thing we were trying to establish.  And

12   Ritani was where you could buy --

13   Q   Mr. Fraser, I'm sorry.  I know it's my fault because I

14   asked for a long answer.  But Cantor Ventures essentially was a

15   place that unusual sorts of businesses --

16   A   Unusual businesses that Cantor would not normally be in.

17   Q   And Jed Kleckner was one of the senior executives of Cantor

18   Ventures; correct?

19   A   Yes.  He was the guy that ran it.

20   Q   All right.  And the subject line of your e-mail to him on

21   March 18, 2014, is "Gawminers.com"; correct?

22   A   Correct.

23   Q   And that was the website of your new business; right?

24   A   Yeah, and the name of it.

25   Q   And you write to him:  "Jed."  You obviously knew him

1    pretty well; correct?

2    A    Enough to call him Jed.

3    Q    You say, "Hope all is good with you.  I'll be with HWL next

4    week."

5              That's a reference to Howard W. Lutnick; correct?

6    A    Correct.

7    Q    And he's the person we spoke about before, your best friend

8    and the head of the entire bank; right?

9    A    Correct.

10   Q    And you say to Jed --

11   A    Not a bank, by the way.

12   Q    I'm sorry.  The business.

13             It does do investment banking; correct, sir?

14   A    Yeah, but we're not a traditional bank.

15   Q    Now, Mr. Fraser, you encourage Mr. Kleckner to check out

16   the website for GAW Miners; correct?  You say, "You might want

17   to check out www.gawminers.com."

18             Do you see that?

19   A    Yes.

20   Q    And you say, "It's something we just started."

21             Do you see that?

22   A    Yeah.

23   Q    And the "we" refers to you and Josh; right?

24   A    Yeah, the company, yeah, sure.

25   Q    But I'm saying you used the word "we" to refer to that

1    company.

2    A    We just started.  Whoever's involved in GAW Miners, Josh

3    included, yeah.

4    Q    Who else was involved in March of 2014, Mr. Fraser?

5    A    I mean, all the guys that worked there.  I mean, I don't

6    know.  I don't know them, but yeah.  I mean, I do things

7    together.  I'm sorry.

8    Q    So you tell Mr. Kleckner that you already have 300 orders

9    and you're working on a deal with suppliers to represent North

10   America; correct?

11   A    That's what was my understanding, yes.

12   Q    And you knew the number of orders because you had access to

13   that Shopify dashboard so you could see for yourself; correct?

14   A    Correct.

15   Q    And the reason you sent this e-mail is because -- or one of

16   the reasons you sent this e-mail is because you wanted to keep

17   Cantor Fitzgerald in the loop as to your business activities;

18   correct?

19   A    Correct.

20   Q    Now, at this time, in March of 2014, when the GAW Miners'

21   website opened, it was your understanding that you were a half

22   owner of the business; correct?

23   A    Yes.

24   Q    And --

25   A    No, no, no.  41 percent.  I'm sorry.

1   Q    All right.

2   A    Because we made a deal at the end of '13, and so I was a

3   minority holder, 41 percent.

4   Q    Mr. Fraser, I'd like you to turn to page 72 of your SEC

5   testimony.

6        MR. BUCHDAHL:  And, Your Honor, I would like to offer

7   in evidence page 72, lines 7 to 25 of Mr. Fraser's SEC

8   deposition.

9        THE COURT:  Why don't you have him read it first,

10  acknowledge it, do the traditional process, and then --

11       MR. BUCHDAHL:  Sure, that's fine.

12  Q    (By Mr. Buchdahl) Mr. Fraser --

13  A    Yes.

14  Q    -- you remember being interviewed by the SEC; correct?

15  A    Oh, yeah.

16  Q    And you understood --

17  A    Yes, I do.

18  Q    -- that you were giving testimony under oath; correct?

19  A    Absolutely, yes.

20  Q    And you understood that you were giving testimony under

21  oath in the context of an investigation that the SEC was doing

22  into possible violations of the security laws around GAW

23  Miners; correct?

24  A    Yes.

25  Q    And you appeared for your deposition on the date of June

1  2nd, 2015; correct?

2  A   I'm sorry?

3  Q   You appeared for your deposition with the SEC on June 2nd,

4  2015; correct?

5  A   Yes, I did.

6      MR. BUCHDAHL:  We would like to offer, pursuant to

7  Rule 32, Your Honor, page 72, lines 8 through 25 of Mr.

8  Garza's -- I'm sorry -- of Mr. Fraser's SEC deposition.

9      THE COURT:  Yeah.  As a practical matter -- well, let

10 me ask, is there any objection?

11     MR. WEINER:  No objection, Your Honor.

12     THE COURT:  That's fine.  That will be admitted full.

13 Did you just want to offer those lines?  I mean do we have to

14 redact the top?

15     MR. BUCHDAHL:  No, we don't have to redact the top.

16     THE COURT:  Why don't you just offer the page.

17     MR. BUCHDAHL:  Page 72.

18     THE COURT:  We'll mark that as a full exhibit.  That

19 will be Plaintiffs' 160.  170 maybe?  What are we up to?

20     MR. BUCHDAHL:  170.

21     THE COURT:  So PX 170 will be page 72 of the SEC

22 deposition, and that will be admitted as a full exhibit.

23     (Plaintiffs' Exhibit 170, received in evidence.)

24     THE COURT:  Want to try it again?  Give it a shot.

25 Doesn't look like we're in business.  But you can put the

1    page -- let's go back to the ELMO.

2              Let's get IT down here.

3              MR. BUCHDAHL:  Your Honor, may I for these purposes

4    just read this deposition?

5              THE COURT:  Yeah, go ahead.  You can read it.

6    Q   (By Mr. Buchdahl) Mr. Fraser, why don't you just follow

7    along and make sure I read it correctly.  So the SEC examiner

8    asks you when it started.

9              You said, "It started in either late 2013 or early

10             2014.

11             "Answer:  The first day we sold was March 24th.  That

12             was the day the website opened, I believe, 2014.

13             "Question:  And so at that time, at the time roughly

14             in the March of 2014 time frame, was it still covered

15             by your understanding that you owned half of that

16             business?

17             "Answer:  Yes."

18             Do you see that, Mr. Fraser?

19   A   Yes, I do.

20   Q   All right.  Now, in fact, at one time, when Josh suggested

21   that you buy a piece of mining equipment from GAW Miners, you

22   pointed out that you already owned all of the equipment because

23   it was your business; right?

24   A   I may have made a joke like that, yeah.

25   Q   Let's look at Plaintiffs' Exhibit 5.  It should be in

1   evidence with no objection.

2          THE COURT:  All right.  PX 5 will be full.

3      (Plaintiffs' Exhibit 5, received in evidence.)

4          THE COURT:  I'm sorry, folks.  Usually the backup

5   doesn't fail when the first system fails.  Today we've had

6   double failure, so I apologize.

7          Mr. Buchdahl, I hate to interfere with your

8   examination.  Are there things we can do while we get IT down

9   here, or do we need to take a recess from your standpoint?

10  I'll defer to you on that.

11         MR. BUCHDAHL:  I apologize, Your Honor.

12         THE COURT:  That's fine.  What I'm going to do, folks,

13  is I'm going to take a recess.  We're going to get this fixed.

14  Okay?  So I'm going to ask you to go back to the A-146 room,

15  and we'll be as quick as we can.  I apologize for this.  Don't

16  discuss the case.  Don't let anyone discuss it with you.  Keep

17  an open mind.

18     (The jury left the courtroom at 2:04 p.m.)

19     (Recess from 2:04 p.m. to 2:12 p.m.)

20     (The jury entered the courtroom at 2:12 p.m.)

21         THE COURT:  All right, take your seats.  Welcome back,

22  folks, and thanks for your patience.

23         Mr. Buchdahl, when you're ready.

24  Q   (By Mr. Buchdahl) Mr. Fraser, we were talking about your

25  ownership of GAW Miners.  And I asked you, Wasn't there a time

```
 1    when Mr. Garza suggested that you buy a piece of mining
 2    equipment?  And your response was you already owned all of the
 3    mining equipment; correct?
 4    A    Yes, sir.
 5    Q    All right.  Let's look at Plaintiffs' Exhibit 5, which I'll
 6    offer into evidence.
 7            THE COURT:  I already admitted that full.
 8            MR. BUCHDAHL:  I'm sorry, Your Honor.
 9            THE COURT:  That's all right.  No problem.
10    Q    (By Mr. Buchdahl) All right.  So if we look at this e-mail
11    exchange from March of 2014, and if we start with Mr. Garza's
12    4:29 p.m. e-mail to you, he responds, "You should buy one."
13            Do you see that?
14    A    Yes.
15    Q    And your response to him at 4:34 p.m., just five minutes
16    later was, "I already own all of them"?
17            MR. WEINER:  Your Honor, objection.  Misstates the
18    document.  He missed the response, which is right above that.
19            THE COURT:  Why don't you go back over it, Mr.
20    Buchdahl.  We can --
21            MR. BUCHDAHL:  So I didn't miss the response, Your
22    Honor, because I'm going in order and I just didn't include the
23    first one.
24            THE COURT:  All right.  Then I'll overrule the
25    objection, but maybe we can clear it up for the jury.
```

1    Q    (By Mr. Buchdahl) All right.  So there's a 4:29 e-mail that

2    says, "You should buy one."  Then there's a 4:34 response just

3    five minutes later where you say, "I already own all of them,"

4    smiley face emoji; correct?

5    A    Correct.

6    Q    And that colon parenthesis smiley face, is that something

7    that you did in the course of business, or is that something

8    more what you would do with a friend?

9    A    Any time I wanted to make a joke regardless business or

10   friend.

11   Q    And the joke was that, why would you buy a piece of

12   equipment when you own the entire store already; correct?

13   A    Yeah.  And if you read the last page of this whole stream,

14   he says, "Ha ha, well played."  So he got my joke.

15   Q    And your joke was that if you owned a supermarket, you

16   wouldn't walk into a supermarket that you owned and buy one of

17   the products; correct?  That was how you characterized it;

18   right, Mr. Fraser?

19   A    I wouldn't characterize it that way, no.  I made a joke

20   about it.

21   Q    Well, let's see how you did characterize it.  I want you to

22   look at your civil deposition.  And if you'd go to page 212.

23   A    Is that the first?

24          THE COURT:  212, I think it's the second one, sir.

25   Q    (By Mr. Buchdahl) Yes.  When I say the civil deposition,

1    that's the second half of the book, the small print.

2    A    Okay, sorry.  Okay, 212.

3    Q    And you see -- you see a series of questions beginning on

4    line 20 that goes on to page 213, line 6?

5              THE WITNESS:  Okay, I get it.

6              MR. BUCHDAHL:  Your Honor, I would like to offer that

7    video clip into evidence for the jury.

8              THE COURT:  I'm sorry.  Which part -- which page and

9    which lines?

10             MR. BUCHDAHL:  Page 212, line 20 to page 213, line 7.

11             THE COURT:  All right.

12             MR. WEINER:  Your Honor, in fairness, it should start

13   at page 212, line 8.

14             MR. BUCHDAHL:  So that's not what I'm offering.

15             THE COURT:  Hold on one second.  Let me read it.

16      (Pause.)

17             THE COURT:  Yeah, I agree with Mr. Weiner.  If you

18   want your part in, you're going to have to put in the rest of

19   it.

20             MR. BUCHDAHL:  Okay, Mr. Boles, please play from 212,

21   line 8 to 213, line 6.

22             THE COURT:  Just one second.  So this will be marked

23   as PX 171.  It will be admitted as a full exhibit, and you can

24   go ahead.

25      (Plaintiffs' Exhibit 171, received in evidence.)

1          MR. BUCHDAHL:  Sorry.  We didn't have this exact clip

2    prepared.

3          THE COURT:  It's okay.

4      (Plays video.)

5    Q   (By Mr. Buchdahl) Mr. Fraser, you considered yourself a

6    partner in GAW Miners; correct?

7    A   Yes.

8    Q   Mr. Fraser, you understood that GAW Miners was

9    merchandising some of the components for its machines in China;

10   correct?

11   A   Like everybody, yes.

12   Q   And on one occasion, you personally spoke to a supplier of

13   components who was trying to back out of a deal it had made

14   with GAW Miners; correct?

15   A   Yes.

16   Q   And you also spoke on behalf of the company to a supplier

17   at a company called ZeusMiner; correct?

18   A   Yes.

19   Q   Let's look at Plaintiffs' Exhibit 14.

20         MR. BUCHDAHL:  I don't believe there's any objection,

21   Your Honor.

22         THE COURT:  Before you do that, there was a ruling.

23         MR. BUCHDAHL:  There's a redaction --

24         THE COURT:  Okay, fine.

25         MR. BUCHDAHL:  -- on the first page.  So we'll start

1   on page 2.

2            THE COURT:  So PX 14 will be a full exhibit.

3        (Plaintiffs' Exhibit 14, received in evidence.)

4            MR. WEINER:  In redacted form.

5            THE COURT:  It was redacted?  Good.

6   Q   (By Mr. Buchdahl) So if we look at Mr. Fraser's e-mail on

7   the bottom of page 2.

8            Now, the subject line -- we can't see it on this one,

9   but the subject line says "OEN Sales of Miners."  OEN is

10  Original Equipment Manufacturer; correct?  You don't know?

11  A   I don't know, but sure.

12  Q   You write at the bottom of page 2, "We are very excited to

13  be working with you and the Zeus team."

14           And, again, you use the word "we" to refer to GAW

15  Miners; correct?

16  A   Correct.

17  Q   And you say, This is a crucial time for both our companies.

18           And for both your companies you mean ZeusMiner on one

19  hand and GAW Miners on the other hand; correct?

20  A   Yes.

21           MR. WEINER:  I think Mr. Buchdahl read that slightly

22  different.  "It's a crucial moment."

23           THE COURT:  Okay.  I think the jury can see it, but

24  thank you.

25  Q   (By Mr. Buchdahl) And you sign this e-mail, "Stuart Fraser,

1    Vice Chairman, Cantor.com"; correct?

2    A    I did.

3    Q    And this was in 2014, long after you had at least

4    semi-retired; correct?

5    A    Correct.

6    Q    And this was part of your vice chairman for life title?

7    A    Yes.

8    Q    Now, you included that title and the reference to

9    cantor.com because you knew it was impressive and it would make

10   GAW Miners look good; right?

11            THE COURT:  Sir, I can't help you.

12            THE WITNESS:  Um, yes.

13   Q    (By Mr. Buchdahl) And when Josh introduces you to potential

14   business partners, he used your vice chairman title also,

15   didn't he?

16   A    I don't know that.

17            MR. BUCHDAHL:  Okay.  May I show to refresh his

18   recollection an unredacted copy of this document?

19            THE COURT:  Yes, you may refresh his recollection.

20   Q    (By Mr. Buchdahl) All right.  I'm going to hand to you, Mr.

21   Fraser, an unredacted copy of this document.

22            MR. BUCHDAHL:  I don't have an unredacted copy.  I'm

23   going to come back to that.  I'll come back to that.

24   Q    (By Mr. Buchdahl) All right.  So sitting here today, you

25   don't recall whether Josh used the title "Vice Chairman" to

1    introduce you to people?

2             MR. WEINER:  Your Honor --

3             THE WITNESS:  He may have.

4             MR. WEINER:  Can I get you another copy?

5             THE COURT:  Mr. Buchdahl, he's got one for you.

6             MR. BUCHDAHL:  May I approach, Your Honor?  I

7    apologize.

8             THE COURT:  No, no problem.

9    Q   (By Mr. Buchdahl) Mr. Fraser, I want you to look at the

10   second e-mail here, the one Sunday, May 4th from Josh Garza.

11   Do you see that?

12            THE COURT:  Don't read it out loud, sir.  Just read it

13   to yourself.

14            THE WITNESS:  I got it.  I got it.  Sorry.  Thank you.

15            Okay, I see this.

16   Q   (By Mr. Buchdahl) And in particular, did you read the

17   paragraph that was started three lines above the signature

18   "Josh"?

19   A   The third -- that one sentence?

20   Q   You see that starts with, "I have"?

21   A   Oh, I'll read it.

22            Yes, I see that.

23   Q   And does this refresh your recollection, sir, that when

24   your partner Josh introduces you to potential business

25   associates, he introduces you using the title "Vice Chairman of

1    Cantor Fitzgerald"?  Does it refresh your recollection, sir?

2    A   In this case, he used my name, yes.

3    Q   That's not the question.  I asked if it refreshed your

4    recollection that when he introduced you to people, he used

5    your title, Vice Chairman of Cantor Fitzgerald?  Does this

6    refresh your recollection that that is, in fact, what Josh did?

7    A   He did in this case but not every time.

8    Q   Now, after it began selling machines, GAW Miners started

9    selling hosting services for those machines; correct?

10   A   Hosting?  Oh, hosting, hosting.  I'm sorry.  It's hard to

11   hear in here.

12   Q   There are a lot of barriers.

13   A   I'm in a hole.  Hosting, yes, yes.

14   Q   And you told the SEC that GAW Miners was one of the first

15   mining companies to offer these hosting services; correct?

16   A   To -- to my understanding, yes.

17   Q   And that's what you told the SEC; right?

18   A   I believe so, yes.

19   Q   And GAW Miners started selling these hosting services only

20   about a month after GAW Miners started selling machines;

21   correct?

22   A   I'm not aware of the timing.

23   Q   Will you accept my representation of that, or would you

24   like me to refresh your recollection about it?

25   A   We could have been hosting soon after we were selling.  We

```
 1  sold machines first, and then we started -- and then they

 2  started hosting, yes.

 3  Q   Pretty quickly after; correct?

 4  A   Within the same year.

 5  Q   All right.  I want to refresh your recollection on this,

 6  sir.  So why don't we turn to your SEC deposition --

 7  A   Okay.

 8  Q   -- page 95.

 9          I'm sorry, page 140.

10          THE COURT:  One four zero?

11          MR. BUCHDAHL:  One four zero.

12          THE WITNESS:  Okay.

13  Q   (By Mr. Buchdahl) And, again, you gave this testimony in

14  June of 2015; correct?

15  A   Yes, sir.

16  Q   And you'll agree with me that that was a lot closer to the

17  events in question than we are here today; right?

18  A   Yes.

19  Q   All right.  So if you look at page 140 starting on line

20  18 --

21  A   104?

22          THE COURT:  No.  140.

23          THE WITNESS:  Oh, sorry.

24          THE COURT:  That's okay.

25          Ladies and Gentlemen, I do want to explain something.
```

1   There's a reason that Mr. Fraser's having trouble hearing, and

2   that's because there's a HEPA filter in there cleaning the air

3   and it blows.  So to be fair, I did want to explain that to

4   you.  So it's important that me and Mr. Buchdahl keep our

5   voices up.

6              THE WITNESS:  I'm on 140.  Sorry.

7              MR. BUCHDAHL:  You'll forgive me if it sounds like I'm

8   shouting sometimes to be heard.  I apologize.

9   Q   (By Mr. Buchdahl) So page 140, if you look at the question

10  beginning on line 18 and going up to the top line of the next

11  page, does that refresh your recollection that GAW Miners began

12  selling these hosting services about a month or a month and a

13  half after GAW started selling the machines?

14  A   Okay, yeah, sure.  Around May I guess.  It does help.

15  Thank you.

16  Q   You understood that GAW Miners' hosting services involved

17  selling a machine to a customer but storing it in a facility

18  that GAW Miners built to hold the machines; correct?

19  A   Correct.

20  Q   And then GAW Miners would charge the customers fees for

21  electricity and for rent, but it would send back to the

22  customer the results of that mining; correct?

23  A   Correct, yes.

24  Q   And you understood that the first data center that GAW

25  Miners owned was near the company's headquarters in Bloomfield,

1    Connecticut; correct?

2    A    Yes.

3    Q    You never visited that data center; right?

4    A    No.

5    Q    And after a time, you came to learn that the data center

6    was moved from Connecticut to Mississippi; is that right?

7    A    Yes.

8    Q    Now, GAW Miners also had offices in Connecticut; correct?

9    A    Yes.

10   Q    And it had an office in Bloomfield, and then later it had

11   an office in Enfield?

12   A    Sure, yeah.

13   Q    And at least at one point you visited the office in

14   Enfield; right?

15   A    I may have once, yeah.

16   Q    Let's go to Plaintiffs' Exhibit 145.  It's a May 23, 2014,

17   e-mail from Josh --

18            THE COURT:  Before we put it up, there was a ruling on

19   this, I believe.

20            MR. BUCHDAHL:  I think all the rulings -- all of the

21   rulings of the exhibit came in.

22            THE COURT:  Well, I have sustained in part as to

23   145.

24            MR. WEINER:  Your Honor's correct.  There were

25   redactions.

1          THE COURT:  There were redactions?  Okay, very well.

2          MR. BUCHDAHL:  Fair.

3          THE COURT:  As long as it's been redacted.  For

4     example, 145 will be full.

5      (Plaintiffs' Exhibit 145, received in evidence.)

6  Q    (By Mr. Buchdahl) All right.  Okay.  So you see here, Mr.

7     Fraser, that this is an e-mail that Josh sent to two

8     recipients, you and someone called Tommy Fraser; correct?

9  A    Yes.

10 Q    All right.  And Tommy Fraser is your son Thomas; right?

11 A    My oldest son, correct.

12 Q    And in 2014 he was about 27 years old?

13 A    2014?  Um, 1987.  I don't know.  I guess so.

14 Q    You told the SEC in 2015 he was 28.  Does that help refresh

15    your recollection that he was 27 in 2014?

16 A    I'm so bad with this.  He was born in '87, so '87, '97,

17    2007.  He was 20 whatever, 24?

18 Q    Okay.  He was just a couple years younger than Josh; right?

19 A    Yeah, he's like two and a half years younger than Josh

20    Garza.

21 Q    And if you look at the headline -- and we can actually see

22    it right in this e-mail.  It says, "Groundbreaking Deal - GAW

23    Miners - ZenMiner - Will Revolutionize Mining."

24         Did I read that correctly?

25 A    Correct.

Q   Again you see the headline "Groundbreaking Deal Between GAW
Miners and ZenMiner Will Revolutionize Mining."  Now, let's go
back to that cover envelope for one second.

          There's a subject line there; right?

A   Yeah.

Q   And the subject that Josh writes to you is:  Congrats,
smiley face.  Right?

A   Yes.

Q   Okay, so let's look at what he was congratulating you on.

          The basic idea of ZenMiner was that it was going to be
an interface that would allow customers of GAW Miners to
control their mining equipment remotely; right?

A   Oh, yeah, yeah.

Q   And it was supposed to be simple to use.  In fact, it was
advertised as grandma proof; right?

A   That was the tag line, yes.

Q   So, again, if we look down below this first picture, it
says, "I spoke on the phone with Thomas Fraser of ZenMiner."

          Do you see that?

A   Yes, I do.

Q   Now, the truth is your son Tommy had no role whatsoever in
ZenMiner; correct?

A   Correct.

Q   In fact, in 2014 your son was working for Cantor
Fitzgerald; right?

```
1    A    Absolutely.

2    Q    He was working for Cantor Commercial Real Estate, which is

3    a division of the company your uncle started; right?

4    A    Yes.

5    Q    But despite the fact that Tommy had no genuine role at

6    ZenMiner, you understood that he, nevertheless, was interviewed

7    by the person who wrote this article as if he worked at

8    ZenMiner; correct?

9    A    I'm sorry.  Can you repeat that?

10   Q    Sure.  Despite the fact that your son Tommy Fraser had no

11   genuine role whatsoever at ZenMiner, you understood that Tommy

12   was interviewed by the reporter that wrote this article;

13   correct?

14            MR. WEINER:  Your Honor, can we have that limiting

15   instruction as to Thomas Fraser?

16            THE COURT:  Sure.

17            So, Ladies and Gentlemen, as I informed you this

18   morning, Mr. Fraser, who's here with us today, is not on trial

19   for anything his son said or did.  You may consider this

20   evidence only for the limited purpose of deciding what, if any,

21   level of control Mr. Fraser had over Josh Garza in the company

22   and also what, if any, knowledge Mr. Fraser had regarding Mr.

23   Garza's activities.  You can't consider this evidence for any

24   other purpose.

25            Go ahead, Counsel.
```

```
 1            MR. BUCHDAHL:  Your Honor, I can't remember if I got
 2   an answer to my last question.
 3            THE COURT:  You didn't.  So I'll repeat it just for
 4   Mr. Buchdahl's sake and to move us along.
 5            Sir, the question was:  "Despite the fact that your
 6   son Tommy Fraser had no genuine role whatsoever at ZenMiner,
 7   you understood that Tommy was interviewed by the reporter that
 8   wrote this article; correct?"
 9            That was the question.
10            THE WITNESS:  Once I read the article, yes.
11   Q   (By Mr. Buchdahl) So at least as of the time you read this
12   article, you knew that your son Tommy Fraser was falsely
13   holding himself out as a representative of ZenMiner; correct?
14   A   Correct.
15   Q   And at the time of this article, you also understood that
16   it was untrue that GAW Miners and ZenMiner were independent
17   companies at all; correct?
18   A   Correct.
19   Q   So you understood, when you received this article, and when
20   Josh congratulated you and Tommy, you understood that this
21   article was full of lies.  Fair?
22   A   Fair.
23   Q   And you understood that this article was part of GAW
24   Miners' effort to publicize its business; correct?
25   A   It was Josh Garza.
```

1          MR. BUCHDAHL:  Your Honor, I'd like to offer SEC

2   deposition testimony, page 155, line 16 to 19.

3          THE COURT:  Okay.  So, again, when you impeach, you

4   ordinarily ask him if he's seen this.  You walk him through

5   the --

6          MR. BUCHDAHL:  So, Your Honor --

7          THE COURT:  Oh, because he's a party.  Oh, fair

8   enough.

9          155, line 16 through?  Sorry?  Say it again.

10         MR. BUCHDAHL:  16 through 19.

11         THE COURT:  Okay.  Any objection to that?

12         MR. WEINER:  Your Honor, in fairness, it should begin

13   at line 12.

14         MR. BUCHDAHL:  I think the whole page is probably

15   going to come in, but it's --

16         THE COURT:  Yeah, why don't we just have the page come

17   in.

18         MR. BUCHDAHL:  Great.

19         MR. WEINER:  Fine.

20         THE COURT:  Page 155 of this deposition.  What are we

21   be up to, 172?  PX 172.

22         MR. BUCHDAHL:  Your Honor, I do want to say, just so

23   none of us forgets, that 175 through 179 we have used as

24   identification in some other ways.  So we might want to skip

25   over those at some point, but we're okay still.

1          THE COURT:  I'm going to ask you to meet with my

2    courtroom deputy after we recess today to go over the numbers

3    to make sure we're not duplicating things.

4          MR. BUCHDAHL:  If you want to skip to 180 now.

5          THE COURT:  We'll call this 180.  Then we need to fix

6    what we did earlier.

7          MR. BUCHDAHL:  I don't think we have any overlap.  I

8    just want to prevent overlap.

9          THE COURT:  This will be PX 180, page 155 of the

10   deposition.  Thank you.

11      (Plaintiffs' Exhibit 180, received in evidence.)

12         MR. BUCHDAHL:  "Question:  When you saw this article,

13   you understood that" --

14         MR. WEINER:  We asked to start at line 12 in

15   fairness.

16         MR. BUCHDAHL:  No, I don't --

17         THE COURT:  No, you can read the rest when it's your

18   turn.  So I'm not going to make him read the whole thing.

19   Q   (By Mr. Buchdahl)

20         "Question:  When you saw this article, you understood

21         that it was part of GAW Miners' effort to publicize

22         its business; is that right?

23         "Answer:  Yes."

24         That was the testimony you gave the SEC at your

25   deposition in June of 2015; correct?

1   A    Yes.

2   Q    That was what you told them under oath?

3   A    Sorry?

4   Q    Under oath, sir?

5   A    Yes, under oath.

6   Q    And you also told the SEC that you made no attempt to

7   correct the false statements that were made in this article;

8   correct?

9   A    I told the SEC I told Josh to fix it and to get Tommy out

10  of it.  And I told Tommy to never speak to Josh again and

11  distance himself.

12  Q    That's not my question, sir.  And I'd like to now offer

13  into evidence page 156 lines 20 to 23.

14             THE COURT:  Page 156, lines 20 to 23?

15             Any objection to that?

16             MR. WEINER:  No objection.

17             THE COURT:  Okay.

18             MR. BUCHDAHL:  "Question" --

19             THE COURT:  That will be admitted as a full exhibit.

20  That will be PX 181.

21  Q    (By Mr. Buchdahl)

22             "Question:  When you learned that these false

23             statements had been made, did you make any attempt to

24             correct them?

25             "Answer:  No."

1          Do you recall giving that testimony, sir?

2     A   Yes.

3     Q   In fact, you told the SEC that your son, your 27-year-old

4     son who worked at Cantor Fitzgerald, made these statements

5     because he was, quote, too naive to understand, closed quote.

6     Isn't that what you told them?

7     A   I believe so, yes.  He was.

8     Q   And you told them that you spoke to Josh and told him not

9     to do this sort of thing and that you were really pissed off

10    about it; right?  Those were your words, "I was really pissed

11    off."

12    A   I was really pissed off.

13    Q   That's what you told the SEC; right?

14    A   Yes.

15    Q   And you told the SEC that you started dealing with Josh

16    Garza less and that this incident started driving you apart.

17    That's what you told them; right?

18    A   That's correct.

19    Q   Did you believe that was true when you told the SEC that in

20    2015?

21    A   Yes.

22    Q   Let's look at what you actually said to Mr. Garza.  Put up

23    Plaintiffs' Exhibit 23.

24          THE COURT:  All right.  So Plaintiffs' 23 will be

25    full.

1        (Plaintiffs' Exhibit 23, received in evidence.)

2    Q    (By Mr. Buchdahl) If you look at Plaintiffs' Exhibit 23, it

3    starts with Mr. Garza's e-mail to you at 11:57 a.m. -- right?

4    -- where he says, "Congrats."  Do you see that?

5    A    Where?

6    Q    If you look at the first e-mail chronologically, sir, the

7    one from 11:57 a.m. --

8    A    Okay.

9    Q    -- that is an e-mail that Josh Garza sends to you.

10   A    I don't see "Congrats" on there.  I'm sorry.  Am I missing

11   it?

12   Q    I'm going to help you see it because the subject line is at

13   the top.

14   A    Oh, yeah, yeah, yeah, with the smiley face.  Sorry.

15   Q    And this is the same e-mail that we looked at as part of

16   Plaintiffs' Exhibit 145; correct?

17   A    Okay.

18   Q    Now let's look at your response to him.  You write back to

19   him about 24 minutes later.  And tell me if I'm reading this

20   correctly.  You write, "Wow.  Awesome"; correct?

21   A    Correct.

22   Q    You would agree with me, sir, that you don't appear to be

23   all that disturbed by Josh's e-mail; correct?

24   A    I'm driving.  I saw the headline.

25   Q    And what was the headline, sir?  Read the headline, please.

1    A    Headline, I don't know.  What's the headline?

2    "Groundbreaking Deal - GAW Miners - ZenMiner - Will

3    Revolutionize Mining."

4    Q    There was no deal between GAW Miners and ZenMiner; correct,

5    sir?  That was a phony deal; right?

6    A    When I read this first thing, I was excited.  I sent him an

7    e-mail while I was driving because I don't e-mail or do things

8    when I'm driving.

9    Q    Okay.  All right.

10   A    You know, when I got home and I read it, I dealt with it.

11   Q    Your first reaction -- your first reaction to the deal was,

12   "Wow.  Awesome."

13   A    Yeah.

14   Q    All right.  Let's look at your next e-mail.  PX 22.

15            THE COURT:  PX 22 will be a full exhibit.

16       (Plaintiff's Exhibit 22, received in evidence.)

17   Q    (By Mr. Buchdahl) Now, this is another e-mail the very same

18   day but about six hours later; correct?

19   A    Okay.

20   Q    So this is six hours, maybe five and a half hours after you

21   said, "Wow.  Awesome"; right?

22   A    Yeah.

23   Q    Presumably by 6:00 p.m. you're no longer driving.  Fair?

24   A    Fair.

25   Q    Okay.  And now you write, "Love the name.  Should be ZEN

1   Miner."  And you capitalize Z-E-N M, which is the same way GAW

2   Miners is capitalized; correct?

3   A    Yeah.

4   Q    And you write, "See if you can also get ZENM.com"; correct?

5   A    Yeah.

6   Q    And then you write, "Are you able to make it real ASAP?"

7           Is that what you wrote?

8   A    Yeah, the interface.

9   Q    And then --

10  A    That's what was exciting.

11  Q    Your last word -- sorry, Mr. Fraser.  And then your last

12  words to him after receiving this phony article with the fake

13  interview with your son says "GREAT IDEA" in all capital

14  letters; correct?

15  A    Correct.

16  Q    There's nothing in here about being pissed off, is there?

17  A    No.

18  Q    There's nothing in here about chastising Josh for lying to

19  the public, is there?

20  A    No.

21  Q    There's nothing in here discouraging him from holding your

22  son out as a fake employee of ZenMiner; correct?

23  A    Not in this e-mail, no.

24  Q    And, in fact, there's absolutely nothing in here that could

25  possibly give Josh any idea that you were anything other than

1    an enthusiastic business partner; correct?

2    A    Unless he hadn't got the phone call from me earlier.

3    Q    Oh, so there's a phone call.  We just can't tell from the

4    e-mail.  Is that your testimony?

5    A    I called him right after I read it --

6    Q    Okay.

7    A    -- and I asked him to fix it --

8    Q    I didn't --

9            MR. WEINER:  Your Honor --

10           THE WITNESS:  You asked me a question.  I'm answering

11   it.

12   Q    (By Mr. Buchdahl) That was a yes or a no.

13   A    No, that wasn't a yes or a no.  You asked me --

14           THE COURT:  So the question was:  "So there's a phone

15   call.  We just can't tell from the e-mail.  Is that your

16   testimony?"

17           So you did say there was a phone call.  And -- but I

18   think I'm going to let Mr. Weiner or somebody on the Defense

19   team ask you questions about the substance of the call.

20           THE WITNESS:  Okay.  I'm sorry.  I'm sorry, Judge.

21           THE COURT:  That's all right.

22           Go ahead, Mr. Buchdahl.

23   Q    (By Mr. Buchdahl) There's no reference to a phone call in

24   the e-mail; right?

25   A    No.

 1   Q    The e-mail is pretty enthusiastic, isn't it?

 2   A    Your definition.

 3   Q    Recall, Mr. Fraser, you told the SEC that you were so

 4   pissed off you started trying to distance yourself from the

 5   company.  Is there anything you can point to in this e-mail

 6   where you're distancing yourself from the company?

 7           MR. WEINER:  Objection, argumentative.

 8           THE COURT:  It is getting a little bit argumentative

 9   at this point.

10           MR. BUCHDAHL:  I'll withdraw it, Your Honor.

11   Q    (By Mr. Buchdahl) In fact, less than two weeks later, you

12   sent GAW Miners another $200,000, didn't you?

13   A    In a loan.

14   Q    Is that a way to distance yourself from the company?

15   A    I got it done in the end.

16   Q    Oh, yes, you did.

17           All right.  Let's look at PX 27.

18           THE COURT:  All right.  PX 27 is a full exhibit.

19       (Plaintiffs' Exhibit 27, received in evidence.)

20   Q    (By Mr. Buchdahl) I want to start on the second page of

21   this exhibit, Mr. Fraser, because that's the first one

22   chronologically.

23           Tell me when you're on page 2 of Plaintiffs' Exhibit

24   27.

25   A    Okay, I'm on page 2.

1   Q   Do you see that you send Josh Garza an e-mail on Wednesday,

2   June 4th.  The subject is:  "Wire."  And it says, "Send me the

3   exact info to wire."

4            Do you see that?

5   A   Yes.

6   Q   And now, just so we're clear, this is just a couple of

7   weeks after that whole business with the phony press release;

8   correct?

9   A   Yes.

10  Q   Now, if you look at what Josh does with your e-mail, he

11  forwards it, and at the bottom of page 1 of Exhibit 27, he

12  writes, "For GAW Miners."

13           Do you see that?

14  A   For GAW Miners.

15  Q   Right below --

16  A   Okay.  Yeah, I see that.

17  Q   And then at the top of the page, someone named Dan Pease

18  provides wire instructions for an account at DNJ Miner

19  Corporation.  Do you see that?

20  A   Yes.

21  Q   Now let's turn to Plaintiffs' Exhibit 26.

22           Do you see Plaintiffs' Exhibit 26, sir?

23  A   Yes, I have it.

24  Q   And this is, again, a wire from your joint account at

25  Chase; correct?

1              THE COURT:  Is that in?  Sorry.  This is PX 26; right?

2              MR. BUCHDAHL:  Yes.

3              THE COURT:  So I believe there was -- there were

4    redactions on this.  Yes?

5              MR. BUCHDAHL:  They are -- a lot of --

6              THE COURT:  All right.

7              MR. BUCHDAHL:  -- personal information's been

8    redacted.

9              THE COURT:  Yes.  All right, so PX 26 is full.

10       (Plaintiffs' Exhibit 26, received in evidence.)

11   Q   (By Mr. Buchdahl) And you see that in the wire transfer

12   information, the wire amount is for $200,000; correct?

13   A   Yes.

14   Q   You can see that the recipient is DNJ Miner Corporation;

15   correct?

16   A   Yes.

17   Q   And DNJ Miner Corporation was a business account set up for

18   GAW Miners to take delivery of mining equipment; correct?

19   A   I didn't know that.

20   Q   All right.  Let's go to your civil deposition, please, page

21   171.  This is the second deposition in your binder.

22              I'd like you to read the lines on page 171, lines 23

23   to 25.

24   A   Okay.  Then it was.

25              MR. BUCHDAHL:  I'd like to offer that testimony into

1    evidence, Your Honor.

2            THE COURT:  All right.  Page 171 of the deposition

3    will be 182 at this point?  Is that where we are?  Yes, 182, PX

4    182 will be page 171 from the civil deposition.

5        (Plaintiffs' Exhibit 182, received in evidence.)

6            MR. BUCHDAHL:  I'd like to play lines 23 to 25.

7            THE COURT:  All right.

8        (Plays video.)

9    Q   (By Mr. Buchdahl) You would agree with me, Mr. Fraser, that

10   sending someone $200,000 does not convey disapproval of their

11   behavior; correct?

12   A   I was fulfilling the obligation I made to him.

13   Q   What obligation is that, sir?

14   A   To loan -- to make him those three loans.

15   Q   When did you make that obligation?

16   A   At the beginning when he was buying real equipment and I

17   said I will -- and he came to me and so I let them based on a

18   conversation we had earlier.

19   Q   And the fact that Mr. Garza issued false information to the

20   public, including through the use of your son, that didn't make

21   you feel like you should stop honoring your obligations to your

22   partnership; correct?

23   A   I can't answer that question.

24   Q   I'll withdraw it then.

25           You actually loaned GAW Miners around $800,000;

1  correct?

2  A   I thought it was closer to six, but ...

3  Q   Let's -- I'm going to offer from your civil deposition page

4  172, lines 18 to 21.

5  A   I got all my loans paid back.

6        THE COURT:  Wait one second, sir.  Okay.  Yeah, I'll

7  allow that.  We can mark that as 183.  Page 172 of the civil

8  deposition will be PX 183.

9      (Plaintiffs' Exhibit 183, received in evidence.)

10      (Plays video.)

11  Q   (By Mr. Buchdahl) Now, in addition to these loans, you also

12  gave GAW Miners the use of a credit card; correct?

13  A   I didn't give.  The only way to get a credit card when you

14  own a company is to have it under --

15  Q   I'm sorry, sir.  You're saying the answer's no?

16  A   I gave them a credit card.

17  Q   Thank you.  You provided them with an American Express

18  card; correct?

19  A   It was my obligation in the end, yes.

20  Q   You provided, in fact, a Plum Card issued by American

21  Express to GAW Miners; correct?

22  A   Yes.

23  Q   And that Plum Card was actually in the name of GAW Miners;

24  correct?

25  A   Yes.

1    Q   And I want to look at an e-mail exchange that we've marked

2    as Plaintiffs' Exhibit 31.

3            THE COURT:  All right.  31, PX 31 is full.

4        (Plaintiffs' Exhibit 31, received in evidence.)

5    Q   (By Mr. Buchdahl) All right.  We need to start with the

6    first e-mail in time, which is the one that starts at the

7    bottom of the page.  So let's look together at the bottom of

8    page 1 of Plaintiffs' Exhibit 31.  We can see there that

9    there's a message from an e-mail address called

10   disputes@braintreepayments.com.

11           Do you see that?

12   A   At the bottom, yeah, Braintree Disputes team, is that what

13   you're talking about?

14   Q   That's what I'm talking about.

15   A   I see that.

16   Q   You understood that Braintree was an online payment system

17   that was a division of PayPal; correct?

18   A   Do I know that?

19   Q   I'm asking, sir, if you did understand that Braintree was

20   an online payment system that was a division of PayPal?

21   A   Sure.

22   Q   And it says, the following transaction has been charged

23   back by the cardholder and that your account has been debited

24   for the chargeback amount.

25           Do you see that?

1          MR. WEINER:  Objection, incomplete reading of the

2     text.

3          THE COURT:  You want him to say "including a

4     nonrefundable chargeback fee"?

5          MR. WEINER:  "Or the card issuing bank."

6          THE COURT:  Okay, fine.

7     Q    (By Mr. Buchdahl) Do you see that, Mr. Fraser, what the

8     document says?

9     A    Okay.

10    Q    And if we look at the next page on the second line, it's

11    got a reason.  It says, "Canceled products or services."  Do

12    you see that?

13         Very top of the second page of the exhibit.  You can

14    look at the screen, sir, and it will help you see what we're

15    talking about.

16    A    Yes, I see that.

17    Q    And the transaction amount here is $699.95; right?

18    A    Yes.

19    Q    And so when Josh receives this e-mail on June 20th of 2014,

20    he immediately, within the next few minutes, just forwards it

21    to you with no explanation; correct?

22    A    I guess.  I don't know.

23    Q    Well, I'm not asking you to guess, sir.

24    A    Then I don't know.  I can't answer that question.  He sent

25    it to me.  If he sent it to me, he sent it to me.

1   Q   Let's look together -- I'm sorry this is -- we have to go

2   step by step.  So let's look at the first e-mail.  That's at

3   4:30 p.m.; correct?

4   A   Yes.

5   Q   And then his e-mail to you is at 16:34, which equates to

6   4:34 p.m.; correct?

7   A   Okay.

8   Q   So within a few minutes, Mr. Garza forwards this e-mail

9   about the dispute at PayPal to you; correct?

10  A   Correct.

11  Q   And you respond to him 12 minutes later; correct?

12  A   Yeah, I sent that, I guess.

13  Q   All right.  Let's look at what you sent.  You said, "They

14  said there was $391,000 on the balance.  This true?"

15          Do you recall this exchange with Mr. Garza in 2014

16  when you found out that there was a $400,000 balance on your

17  credit card?

18  A   I recall the situation, absolutely.

19  Q   Now, you'll agree with me, sir, that there's nothing in the

20  e-mail, anywhere in this exhibit before you, that says anything

21  about $391,000; correct?

22  A   In that e-mail thing, yeah.

23  Q   So,  in other words --

24  A   Correct.

25  Q   -- you had to have spoken to your bank or your credit card

1    company in order to find out what the balance was; right?

2    A   My cards got canceled because he wasn't paying his bill, so

3    I called up to find out what was happening.

4    Q   Mr. Fraser --

5    A   And that's what they told me.

6    Q   Mr. Fraser, that's not what the e-mail says, but we're

7    going to go through it.  And then if you don't like the way the

8    testimony comes out, your counsel will have a chance to ask you

9    questions.  So let's just try to stick to my questions for now,

10   sir.

11           There's nothing here that says $391,000; so the only

12   way you could find that out was by calling up the credit card

13   yourself; correct?

14   A   Correct.

15   Q   And you did that; correct, sir?

16   A   I did.

17   Q   And what you write is, "I canceled all 3 cards"; right?

18   A   Yes.

19   Q   And then you say you told your credit card to send him a

20   new credit card to Josh's address; right?

21   A   That's what it says.

22   Q   In fact, sir, your response to finding out that he's run up

23   $400,000 on your credit card is to send him a new credit card;

24   right?

25   A   I -- I don't recall exactly the situation here, but yes.  I

1   mean I canceled three cards because he had them to people all
2   over the company.  And they put it into one card, and it was
3   getting sent to his address.
4   Q   Right.  Because in June 20th of 2014, you still wanted to
5   provide GAW Miners with a credit card; correct?
6   A   GAW Miners wouldn't have a credit card unless I supplied
7   it.
8   Q   I think we can agree on that, sir.
9           Let's look at Plaintiffs' Exhibit 32.
10          THE COURT:  32 is full.
11      (Plaintiffs' Exhibit 32, received in evidence.)
12          MR. BUCHDAHL:  Yes, Your Honor.
13  Q   (By Mr. Buchdahl) Now, this is from a couple days later.
14  And Mr. -- and Josh sends you an e-mail dated June 22nd, 2014,
15  and he copies an address named dmclain3377@comcast.net.  Do you
16  see that?
17  A   Yes.
18  Q   And that's Dave or David McLain; correct?
19  A   Yes.
20  Q   David McLain, at this time, was your personal lawyer;
21  correct?
22  A   He did a lot of law work for me, yeah.
23  Q   For you personally; correct, sir?
24  A   Yeah, for me personally.
25  Q   You viewed yourself as having an attorney-client

1  relationship with him?

2  A    Absolutely.

3  Q    And you viewed yourself as having an attorney-client

4  relationship with him in connection with GAW Miners; correct?

5  A    I don't understand what you mean by that.

6           MR. BUCHDAHL:  I'd like to offer from Mr. Fraser's

7  civil deposition page 61, lines 11 to 15.

8           THE COURT:  Yeah, that looks admissible at this point.

9  Any objection?

10          MR. WEINER:  I'm just checking that.  I'm sorry.  The

11 civil deposition?

12          MR. BUCHDAHL:  Correct.  Page 61, 11, 15.

13          THE WITNESS:  161?

14          THE COURT:  It's page 61 from the civil deposition.

15          MR. WEINER:  Your Honor, I ask down to line 17 be

16 included in fairness.

17          THE COURT:  All right.  Well, I think --

18          THE WITNESS:  Yes, I see it.

19          THE COURT:  -- we'll put in the whole page.

20          MR. WEINER:  That's fine.  That's fine.

21          THE COURT:  But I'll let Mr. Buchdahl focus on the

22 points.

23          MR. BUCHDAHL:  I didn't say 16.  I just said 15.  I

24 didn't want half a question.

25          THE COURT:  But we're going to put in the whole page.

1          Okay, so page 61 will be PX 184.  That's admitted as a

2     full exhibit.

3          (Plaintiffs' Exhibit 184, received in evidence.)

4          (Plays video.)

5          MR. BUCHDAHL:  Sorry, I lost my place.  I apologize.

6     Q   (By Mr. Buchdahl) Okay.  Now, Josh writes in this e-mail,

7     the subject of which is:  "Fraser/Garza investment deal";

8     correct?

9     A   Correct.

10    Q   Now, Josh writes to you that his goal is to get the

11    $200,000 loan repaid to you by July 4th and the $210,000 loan

12    to Scott by July 18th.

13         Do you see that?

14    A   Yes.

15    Q   And this is a reference to the $200,000 loan that you had

16    made to him pretty recently; correct?

17    A   Correct.

18    Q   So he was hoping to get that paid off to you within a

19    couple of weeks; right?

20    A   That was a guarantee.

21    Q   It was a guarantee, okay.

22         Now, the "Scott" here is actually your other son,

23    Scott Fraser; right?

24    A   Yes.

25    Q   So you actually had Scott Fraser loan money to the company

1    also.

2    A    Scott loaned money to me, and I loaned it to him, yes.

3    Q    So you borrowed money from one of your sons to loan money

4    to the company?

5    A    I did.

6    Q    You didn't need to borrow from your son, did you?  You had

7    money, didn't you?

8    A    It wasn't as liquid.  And he had some cash available, and I

9    offered to pay him some interest on it.  And he said it was

10   fine.

11   Q    So it was important enough for you to fund this business

12   that you were willing to borrow cash from your son?

13   A    I had the cash to cover it, and I was -- I was excited he

14   was selling a real product, like you could touch it, you know.

15   To get Josh to that point was an amazing moment.  It was a

16   really good thing at the time.

17   Q    And this is about a month after that phony article with the

18   fake deal and the fake job for your other son?

19   A    It was about a month after that, yes.

20   Q    Okay.  Now, Josh says that there is about a $50,000

21   difference in your equity investments in the company.  He says,

22   I've invested 85,000.  You have invested 135,000 outside, of

23   course, of the $400,000 in loans paid back to you.

24         Do you see that?

25   A    I see that.

1    Q   And he proposes that you equalize the investments, and he

2    says you can do this one of two ways:  Either he'll put in

3    another 50 or you can take 50 out; right?

4    A   Okay.

5    Q   No, not okay.  Is that what he said?

6    A   That's what he said right there.  Yes, sir.  I'm sorry.

7    Q   Okay.  Now, any money that Josh was putting into this

8    company came from you originally anyway; right?

9    A   I don't know.

10   Q   Are you aware of any other source of money besides the cash

11   that you gave him, sir?

12   A   I'm not aware of any other source of money, no.  But I

13   can't say that, you know, where it came from.

14   Q   Now, then --

15   A   He didn't tell me it came from money I gave him, if that's

16   what you mean.

17   Q   Well, it's not -- withdrawn.

18       Then Josh proposes that, going forward, each of you

19   would own 41 percent of the equity in GAW Miners.  Do you see

20   that?

21   A   Yes, 41 percent.

22   Q   Each.

23   A   Each.

24   Q   No one would have more than 41, and no one would have less;

25   correct?

1    A    Correct.

2    Q    And then he says that you would leave 18 percent to be used

3    to raise additional money or employees, etc.

4         Do you see that?

5    A    I see that.

6    Q    Sir, you're not aware of GAW Miners ever giving anyone else

7    any portion of that 18 percent; correct?

8    A    No.

9    Q    Let's go to Plaintiffs' Exhibit 34.

10        THE COURT:  34 is full.

11   (Plaintiffs' Exhibit 34, received in evidence.)

12   Q    (By Mr. Buchdahl) All right.  This is about a month after

13   the last credit card e-mail we looked at.  This is dated July

14   22, 2014.  Do you see that?

15   A    Yes, I see this.

16   Q    And this says, AMEX payments from my bank account; correct?

17   A    Yes.

18   Q    And it says, "I show payments to AMEX totaling almost

19   $182,000 directly from my bank account."

20        Do you see that?

21   A    Yes.

22   Q    And then you write, "If this is not you, let me know

23   because I have to call my bank"; correct?

24   A    Correct.

25   Q    So if it was Josh, it was fine.

1   A    No.  I would have to deal with it if it was Josh then, but

2   I didn't want to call the bank unless I knew for sure.

3   Q    Turns out it was Josh; right?

4   A    Yeah.

5   Q    Now, you claim that you did an investigation that revealed

6   that someone somehow, without your authority, set up these

7   automatic deduction from your bank account; correct?

8   A    That's what I believed.

9   Q    So as of July of 2014, you believed that Josh Garza had

10  taken $180,000 out of your bank account without your knowledge,

11  without your permission, and without your authorization;

12  correct?

13  A    I was trying to find out whether he did or someone else

14  did.

15  Q    But what did you find out, sir?  You found out it was him;

16  right?

17  A    In the end, I found out, yeah, it was a thing set up and

18  they were taking out a certain amount of cash every month out

19  of my account.  I just saw it going to AMEX and checked it.

20  Q    When you say in the end, this is what you figured out in

21  July of 2014; correct?

22  A    I'm not sure exactly the date I found it out, but, yeah,

23  July/August, sure.  I mean it might have been a little later,

24  but yes, around that time.  I don't want to argue with you.

25  Q    So as of that time, you believed Josh was taking money from

1    your account without your permission, consent, or

2    authorization; correct?

3    A    I thought somebody at -- somebody had signed it up because

4    I didn't.

5    Q    Did you think it was Josh or not, sir?

6    A    I figured -- I mean it had to be either Josh or Dan or one

7    of those guys.  Yeah, Josh had to be knowledgeable of it.

8    Q    So just to be clear, you thought, in the summer of 2014,

9    that Josh or someone at GAW Miners was taking money from your

10   bank account without your authorization; correct?

11   A    Yes.

12   Q    Now, you asked for that money back, didn't you?

13   A    I did.

14   Q    You didn't get it back, did you?

15   A    No.

16   Q    But even after this, sir, you stuck with Josh, didn't you?

17   A    No.

18   Q    So your testimony here under oath is that after the summer

19   of 2014, you did not stick with Josh?

20   A    My last -- my last loan was I gave him in June of '14.  I

21   was paid back on the 23rd of July.

22   Q    Sir --

23   A    My last loan after that I gave him another penny, and I let

24   him know -- I hurt him the worst way I could, not giving him

25   another dime, another loan, no nothing for the rest.

```
 1    Q   Mr. Fraser, the truth is you stuck with Josh Garza because
 2    you were still hoping to get some of your money back if you
 3    played nice; correct?
 4    A   Played nice, I don't know how to answer that question.
 5    Q   All right.  I'm going to offer from the civil deposition
 6    page 178, line 21 to page 179, line 9.
 7            MR. WEINER:  Your Honor, if we include both pages, no
 8    objection, all 178 and 179 in fairness.
 9            THE COURT:  All right.  All right, so that will be
10    PX -- I think we're up to 183 or 184 maybe?  185, sorry.  PX
11    185 will be pages 178 to 179 of the civil deposition.
12        (Plaintiffs' Exhibit 185, received in evidence.)
13        (Plays video.)
14    Q   (By Mr. Buchdahl) Mr. Fraser, let's look at Plaintiffs'
15    Exhibit 42.
16            THE COURT:  42?  Okay, so that will be full.
17        (Plaintiffs' Exhibit 42, received in evidence.)
18    Q   (By Mr. Buchdahl) Now, this is an e-mail another month
19    later in August of 2014.  Actually, this is a text message that
20    you sent to Mr. Garza -- correct? -- an SMS?
21    A   Yes, it's a text, sure.
22    Q   And you texted him, "AMEX problems plum is overdue 11 days
23    over $104,000."
24            Do you see that?
25    A   Yes.
```

1   Q   So as of August of 2014, GAW Miner still has the use of the

2   credit card that you provided for them; correct?

3   A   As I mentioned before.  You know the answer.  They wouldn't

4   have a credit card unless I had it.  I mean a company needs a

5   credit card, so yes.  I'm sorry, yes.

6   Q   Mr. Fraser, GAW Miners continued to have the use of your

7   credit card where you were the cosigner until November or

8   December of 2014; correct?

9   A   I believe so.

10  Q   And you didn't pay off that balance until May of 2015,

11  right before your SEC deposition; right?

12  A   I paid it off when I paid it off.

13  Q   Sir, you didn't pay off that balance until within a couple

14  of weeks of when the SEC had sent you a subpoena and asked you

15  to come in for an interview; correct?

16  A   I paid it off when I paid it off.  I didn't pay it off for

17  any other reason.

18          THE COURT:  Sir, do you remember approximately when

19  you paid it off?

20          THE WITNESS:  I don't remember it precisely when I

21  paid it off, no, sir.

22  Q   (By Mr. Buchdahl) I'd like you to look at page 125 of your

23  SEC deposition.

24          THE WITNESS:  Sorry.  125 in which one?

25  Q   (By Mr. Buchdahl) Your SEC.  That's your first one in your

1    binder, page 125.

2              MR. BUCHDAHL:  I'd like to offer the full page in

3    evidence, Your Honor.

4              THE COURT:  All right.

5              THE WITNESS:  What line?

6              MR. WEINER:  No objection.

7              THE COURT:  All right.  So he's going to -- you're

8    going to see it in a minute.

9              THE WITNESS:  Oh, I'm sorry.

10             THE COURT:  This will be PX 186, and it's page 125

11   from the SEC deposition.  You can play it.

12        (Plaintiff's Exhibit 186, received in evidence.)

13             MR. BUCHDAHL:  So I'm just going to read this one.

14             "Question:  During what period of time did GAW Miners

15             have a Plum Card on which you were a cosigner?

16             "Answer:  It ended in either November or December of

17             2014.  That's when the account was closed or an

18             account was closed.

19             "And is that the balance you just recently paid off

20             three weeks ago?

21             "Yes, yes."

22             MR. WEINER:  Your Honor, I would ask the next question

23   and answer be read in fairness?

24             THE COURT:  I'll let you do that on the redirect.

25   Q   (By Mr. Buchdahl) Mr. Fraser, I'd like to turn to the

1    subject of fundraising.  Aside from your credit cards and the

2    loans that you and your son provided to the company, GAW Miners

3    was also interested in trying to raise money from other

4    investors; correct?

5    A   Josh was interested.

6    Q   And you were interested in helping him; right?

7    A   When the time was right.

8    Q   When the time was right, okay.  Let's look at Plaintiffs'

9    Exhibit 7.

10           THE COURT:  Okay.  I had sustained in part an

11   objection as to this.  I assume it's been redacted?

12           MR. BUCHDAHL:  Yes, Your Honor.  We redacted the

13   portions of Mr. Garza's e-mail on page 3.

14           THE COURT:  Got it.  So PX 7 will be full then.

15      (Plaintiff's Exhibit 7, received in evidence.)

16   Q   (By Mr. Buchdahl) All right.  Now, this is a series of

17   e-mail exchanges between you and Josh Garza on April 10th or

18   beginning April 10th of 2014.  Do you see that?

19   A   Yes.

20   Q   All right.  And let's look at the first e-mail from Josh

21   Garza.  And what you'll see as we go along is there's these

22   four bullet points, and the questions and answers kind of go

23   along in that style.

24           So Josh asks you -- and this is April 10th.  This is

25   shortly after GAW Miners started selling its equipment;

1    correct?

2    A    Yes.

3    Q    Josh writes, "Hey, I just want to be clear for planning

4    purposes."

5         And his first question is:  "What are your intentions

6    on participating in helping raise funds from your connections"?

7         Do you see that?

8    A    Yeah, he asked that a lot.

9    Q    Right.  And you answered him about 51 minutes later, sir.

10   If you look at your e-mail, you say, "I have reached out to one

11   guy and I'm working on some others"; right?

12   A    That's really correct.

13   Q    That's what?

14   A    That's correct.  I'm sorry.

15   Q    And then you ask him a question.  You say, "How much are

16   you looking for at this stage?"

17        And if you look at his next e-mail, he comes back to

18   you -- and this is below the redactions.  He says, "I'm working

19   on narrowing this down, but I'm thinking about $400,000 plus

20   whatever you want to get back out."

21        And you understood that Josh was asking you if you

22   wanted to take some of your cash back from your initial

23   investment; correct?

24   A    I guess, yeah.  Yes.

25   Q    And then you respond to him with another question.  You

1    say, "Is the $400,000 in 'friends and family' or strategic

2    (i.e. someone that's done it.)?"

3          And what you mean is you were wondering whether Josh

4    was trying to raise money from people that have knowledge about

5    this business or whether he was just going to raise money from

6    people like you who were interested in funding the business but

7    didn't have expertise; correct?

8    A   Yes.

9    Q   But you understood, Mr. Fraser, that it would be difficult

10   to raise money from outside investors without a financial plan

11   or financial statements; correct?

12   A   Financial statements would be great, yeah.

13   Q   And you understood, sir, that it would be difficult to

14   raise money from outside investors without a financial plan or

15   financial statements; correct?

16   A   Absolutely, yes.

17   Q   All right.  Let's look at Plaintiffs' Exhibit 39.  I

18   believe there's -- objection's overruled.

19          THE COURT:  Yes.  PX 39 is full.

20       (Plaintiffs' Exhibit 39, received in evidence.)

21   Q   (By Mr. Buchdahl) All right.  If we look at the first

22   e-mail on this page, Josh Garza writes to Shiraz Moosajee and

23   Dan Kelley.  Do you see that?

24   A   Yes.

25   Q   Now, first of all, let's try to identify these persons.

1  Dan Kelley, as it says at the bottom of the page, was using the

2  title of "Chief Operating Officer of GAW Miners"; correct?

3  A    Yes, that's what it says there.

4  Q    And did you understand that that was Mr. Kelley's job?

5  A    I never knew Dan -- what Dan Kelley really did, but it says

6  he's COO.  That's what he is.

7  Q    And Shiraz Moosajee you understood was involved in the

8  capacity as a chief financial advisor; correct?

9  A    Yeah, Josh met him somewhere and brought him in.

10 Q    You understand that Shiraz had a background in accounting.

11 Fair?

12 A    ISPs, accounting, yeah, a lot of the stuff that Josh was

13 kind of living in, that world --

14 Q    All right.

15 A    -- in accounting.

16 Q    Josh says to Shiraz, "I know I speak for Stuart and I when

17 I ask if you plan to help us talk to investors."

18            But now I want to look at what Dan Kelley writes about

19 40 minutes later on page 3.

20            And I just want to be clear, Mr. Fraser,

21 aukster@msn.com is your e-mail address; right?

22 A    It still is.

23 Q    So you would expect to receive e-mails that are sent to

24 this address?

25 A    Yeah, this is when the chain got sent to me.  But I'm in

1    this discussion, and that is my e-mail.

2    Q    And the date here is August 5th, 2014; correct?

3    A    It is.

4    Q    And what Dan Kelley writes is, "My two cents?  The red flag

5    in soliciting investment right now is that we do not currently

6    have financials or inventory systems in place."

7            Do you see that?

8    A    I see it very clearly.

9    Q    Incidentally, if you look down below Dan's signature block,

10   if you can just pull that -- yeah, extend that a little bit,

11   Dan Kelley writes, "Advancing the public adoption of digital

12   currency through integrity and professionalism"; correct?

13           All right.  Now, he goes on and he tells you that --

14   or he tells a number of people -- he tells Josh; he copies

15   you -- that there's a red flag in that you don't have

16   financials or inventory systems in place.

17           Do you see that?

18   A    Yeah.  You pointed it out twice.

19   Q    Now, this wasn't the first time you heard about GAW Miners

20   not having any inventory system in place; correct?

21   A    I've been asking -- my whole time there I was asking for

22   reports and papers and things, and we never got them.  Yes.

23   Q    So we talked earlier about how, back in March, you were

24   logged into the system and watching all the sales and it was

25   really exciting; correct?

1    A    Yeah.  It was like this little page.  It showed the numbers

2    turning; but, yes, I was very excited he was selling real

3    product.

4    Q    But there was no inventory system; correct?

5    A    Sorry?

6    Q    But there was no inventory system; correct?

7    A    I don't know if there was no.  What's interesting about the

8    things you're pointing out, it says right after that last --

9    Q    Mr. Fraser, Mr. Fraser, Mr. Fraser --

10          MR. WEINER:  Can the witness be allowed to finish the

11    question?

12          THE WITNESS:  You asked me.  He asked me.

13          THE COURT:  Wait, sir.  The question was -- just to be

14    clear, the question was:  "But there was no inventory system;

15    correct?"

16          And you said, "I don't know if there was no."  And

17    then you started to talk about what was interesting.  So,

18    again, Mr. Weiner's going to have a chance to ask you

19    questions.

20          THE WITNESS:  I'm sorry, Judge.

21          THE COURT:  It's no problem.  No problem.

22          Go ahead, Mr. Buchdahl.

23    Q    (By Mr. Buchdahl) Let's turn temporarily to Plaintiffs'

24    Exhibit 29.

25          THE COURT:  Okay.  29 is full?

1          MR. BUCHDAHL:  Yes.

2      (Plaintiffs' Exhibit 29, received in evidence.)

3  Q   (By Mr. Buchdahl) All right.  Now, this e-mail is from

4  earlier; correct?  It's from June of 2014.  Do you see that?

5  A   Yes.

6  Q   And this is an e-mail that Shiraz Moosajee writes to Josh

7  Garza and copies you.  And the title is "Financial Plan."

8          Do you see that?

9  A   Yes.

10 Q   All right.  And if you look at the e-mail itself, he

11 writes, "Dear Stuart and Josh"; correct?

12 A   Correct.

13 Q   The CFO of the company, when he wanted to give a report on

14 the financials, addressed his e-mail to Stuart and Josh.  Fair?

15 A   What?  That's the way he wrote it.  I don't know why.

16 Q   Now, if we start with the first e-mail in time, there's an

17 e-mail on June 9th from Mr. Garza.  It says, "Hey, Shiraz, I

18 figured I would loop Stuart in.  What's the timing look like to

19 have the financial prepared?"

20         Do you see that?

21 A   Yes.

22 Q   Now let's look at Mr. Moosajee's response.  And, again,

23 this is two months before Dan Kelley's red flag e-mail; right?

24 A   Correct, yes.

25 Q   Now, he says he attaches -- if you look at No. 1, historic

1    financials, he says he attaches draft financial statements, but

2    he says that there are many things missing and many things

3    wrong.

4            Do you see that?

5    A   Yes.

6    Q   And he says that no operational system exists for inventory

7    accounting.

8            Do you see that?

9    A   Yes.

10   Q   I'm sorry.  It's the top of the second paragraph.  I

11   apologize.

12           It says, "To elaborate, the key element is inventory

13   accounting for which no operational system exists and which

14   none appears planned."

15           Do you see that?

16   A   Yes.

17   Q   And he says -- at the end of that same paragraph, he says

18   that without supply chain operational controls, meaning

19   purchases orders, goods received, and dispatched notes and

20   inventory.  He writes, your own chief financial officer, "No

21   reliance should be placed on any financial statements."

22           Do you see that?

23   A   Yes.

24   Q   All right.  Now, let's look down at No. 3.  He says, "With

25   regard to financial control and budgets, all of this needs to

1    happen, but I cannot see this in place till 2015, the critical

2    path being dictated by the availability -- I'm sorry -- by the

3    availability of good numbers per (1).  Otherwise it's garbage

4    in/garbage out."

5           Do you see that?

6    A   Yes.

7    Q   So what the chief financial officer at the time was saying

8    was that there was no way you could get to financial controls

9    without an inventory system in place.  Fair?

10   A   Yes.

11   Q   Mr. Fraser, you understood that GAW Miners did not have

12   financial controls that would allow it to keep a handle on what

13   it was buying or selling or had in inventory; correct?

14   A   I knew there was issues, but Josh said they were going to

15   be taken care of.

16          MR. BUCHDAHL:  All right.  I'm going to offer from the

17   civil deposition, page 231, lines 12 to 21.

18          THE COURT:  All right.  Any objection?

19          MR. BUCHDAHL:  We can offer the full page here, Your

20   Honor.

21          THE COURT:  That's fine.

22          Mr. Weiner, any objection?  Page 231?

23          MR. WEINER:  No objection to page 231.

24          THE COURT:  231.  This will be PX 187, page 231 from

25   the civil deposition.

1          (Plaintiffs' Exhibit 187, received in evidence.)

2          (Plays video.)

3     Q    (By Mr. Buchdahl) The truth is, Mr. Fraser, you were never

4     aware of any inventory system ever being created for GAW

5     Miners; correct?

6     A    I was never shown one, correct.

7     Q    You were never aware that any existed; correct?

8     A    Personally, I mean outside of what Mr. Garza told me, no.

9          MR. BUCHDAHL:  I'm going to offer page 94 of your SEC

10    testimony, lines 1 to 7.

11         THE COURT:  One second.  Okay, so 94 of the SEC

12    testimony's being offered as an exhibit.

13         MR. BUCHDAHL:  It's probably easier if I offer the two

14    pages 93 and 94.

15         THE COURT:  93 and 94?

16         MR. BUCHDAHL:  Yes.

17         MR. WEINER:  Mr. Buchdahl beat me to the punch.  I was

18    going to say, for fairness, 93 and 94.

19         THE COURT:  Very well.  93 and 94 will be PX 188.

20    This is 93 and 94 from the civil deposition.

21         MR. BUCHDAHL:  Sorry, from the SEC.

22         THE COURT:  Sorry, I misspoke, from the SEC

23    deposition.

24         (Plaintiffs' Exhibit 188, received in evidence.)

25         MR. BUCHDAHL:  We start on page 93, Mr. Boles.

```
1    Q    (By Mr. Buchdahl) So at the bottom of 93 says:
2              "Fair to explain that explains Mr. Moosajee's concerns
3              about having no operational system for inventory
4              accounting?
5              "Answer yes.
6              "Is that something that concerned you about GAW
7              Miners?
8              "Answer:  Yes.
9              "Question:  Okay, what did you do about that?
10             "Answer:  I kept asking for information.  And I think
11             that's why he brought in Shiraz.
12             "Question:  And as a result of Mr. -- of Shiraz being
13             brought in, was there an inventory accounting system
14             created for GAW Miners?
15             "Answer:  Not that I'm aware of."
16             MR. BUCHDAHL:  Just one or two more questions, Your
17   Honor, and then I can break.
18             THE COURT:  All right.  That's fine.
19   Q    (By Mr. Buchdahl) So if we go back to Plaintiffs' Exhibit
20   39, later that day on page 4 of the exhibit at 5:59 p.m., Mr.
21   Moosajee writes to you, he says he's no longer going to serve
22   as the operational CFO.  Do you see that?
23   A    Yeah.
24   Q    And you're copied on this e-mail; correct?
25   A    Yeah, I'm a final CC on it.
```

1   Q   And he says, "So regretfully that is a no."

2           And by "no" he means he's not going to help you go try

3   to raise money from investors; correct?

4   A   He can't raise -- I mean --

5   Q   That's a yes or no.

6   A   Get in trouble.

7   Q   That's a yes-or-no question.

8   A   I'm sorry.  What?

9   Q   He was not going to help; correct?

10  A   Not without -- yes, he was not going to help.

11  Q   And, in fact, Mr. Moosajee walked away from the company

12  right then and there, didn't he?

13  A   Sure.  I don't know.  I don't know if that's when he walked

14  away, but it could have been.

15  Q   But, sir, you didn't walk away then, did you?

16  A   What's that?

17  Q   You didn't walk away then, did you?

18  A   I didn't walk away.  I don't walk away from my friends.

19          THE COURT:  All right.  So I think we're going to call

20  it a day and a week, Ladies and Gentlemen, because, as I said,

21  we won't have any court tomorrow.  So you'll get a three-day

22  weekend at least from us.  Probably you have to go to work

23  tomorrow.

24          So in all seriousness, I wish you the best of

25  weekends.  Remember everything I said.  Don't discuss the case.

1    Don't let anyone discuss it with you.  Keep an open mind.

2          This is especially important over the long weekend.  I

3    know, you know, it may come Sunday afternoon and you might

4    think, oh, what am I doing tomorrow?  I'm tempted to look

5    something up.  Don't do that.  Don't do any outside research.

6    All the evidence you need for the case will be presented here

7    in the courtroom.  Don't look elsewhere for other information.

8          Have a great weekend, and thank you very much.  You

9    can go.

10       (The jury left the courtroom at 3:32 p.m.)

11       THE COURT:  All right, folks, so we're going to call

12   that a day.  I just give -- you can sit down.

13       Just give me some sense, Mr. Buchdahl, of how long you

14   expect to be on Monday with this examination, continuing with

15   this examination.

16       MR. BUCHDAHL:  Your Honor, I'm about halfway through.

17       THE COURT:  Okay.  Very well.

18       All right.  So we will be in recess.  Have a nice

19   weekend everyone.

20       (Proceedings concluded at 3:33 p.m.)

21

22

23

24

25

1                            **I N D E X**

2

3     **WITNESS NAME**                                          **Page**

4     Called by the Plaintiffs:

5     Arvind Narayanan
         Continued Cross By Mr. Weinstein........................... 85
6        Redirect By Ms. Chen ....................................... 116

7     Homero Joshua Garza
         Video Deposition ........................................... 120
8
      Stuart Fraser
9        Direct By Mr. Buchdahl...................................... 125

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                    C E R T I F I C A T E

4

5

6

7            I, Julie L. Monette, RMR, CRR, CRC, Official

8  Court Reporter for the United States District Court for the

9  District of Connecticut, do hereby certify that the foregoing

10  pages are a true and accurate transcription of my shorthand

11  notes taken in the aforementioned matter to the best of my

12  skill and ability.

13

14

15                 /S/ JULIE L. MONETTE
   _____
16         Julie L. Monette, RMR, CRR, CRC
              Official Court Reporter
17              450 Main Street
           Hartford, Connecticut 06103
18              (860) 212-6937

19

20

21

22

23

24

25