1                UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF CONNECTICUT

2

  - - - - - - - - - - - - - - - - - x

3

DENIS MARC AUDET, MICHAEL       No. 3:16-CV-940 (MPS)

4  PFEIFFER, and DEAN ALLEN
  SHINNERS, Individually and on   OCTOBER 25, 2021

5  Behalf of All Others Similarly
  Situated,                9:00 A.M.

6

  vs.                    JURY TRIAL

7

  STUART A. FRASER, GAW MINERS,

8  LLC, and ZENMINER, LLC, (d/b/a
  ZEN CLOUD)

9

  - - - - - - - - - - - - - - - - - x

10

11             Volume III - Pages 227 - 506

12

13              450 Main Street
             Hartford, Connecticut

14

15      BEFORE:  THE HONORABLE MICHAEL P. SHEA, U.S.D.J.

16               AND A JURY OF NINE

17

18  APPEARANCES:

19  FOR THE PLAINTIFFS:

20         SUSMAN GODFREY, L.L.P.
           1301 Avenue of the Americas, 32nd Floor

21           New York, New York 10019
        BY:  SETH D. ARD, ESQUIRE

22        BY:  JACOB W. BUCHDAHL, ESQUIRE
        BY:  GENG CHEN, ESQUIRE

23        BY:  RUSSELL RENNIE, ESQUIRE
        BY:  HANNAH MILLER, ESQUIRE

24

  (Appearances Continue ...)

25

```
1    APPEARANCES CONTINUED:

2    FOR THE DEFENDANT:

3              HUGHES, HUBBARD & REED L.L.P.
                   One Battery Park Plaza, 12th Floor
4                  New York, New York 10004-1482
              BY:  DANIEL WEINER, ESQUIRE
5              BY:  MARC A. WEINSTEIN, ESQUIRE
              BY:  AMINA HASSAN, ESQUIRE
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20   COURT REPORTER:  Julie L. Monette, RMR, CRR, CCP
                        (860) 212-6937
21
     Proceedings recorded by mechanical stenography, transcript
22   produced by computer.

23

24

25
```

```
 1                          9:00 A.M.
 2              THE COURT:  Morning everyone.  Please take your seats.
 3    Why don't we have Mr. Fraser return to the witness box.
 4              Is there anything before we bring the jury out
 5    briefly, very, very, very briefly?
 6              MR. ARD:  No, Your Honor, there are letters --
 7              THE COURT:  I'm aware of that.  I don't think it's
 8    going to come up with this witness.
 9              MR. WEINER:  Nothing, Your Honor.
10              THE COURT:  Great.  Let's get the jurors.
11        (The jury entered the courtroom at 9:01 a.m.)
12              THE COURT:  Welcome back, folks.  Please take your
13    seats.
14              All right, please take your seats everyone.
15              Mr. Buchdahl, whenever you're ready.
16              MR. BUCHDAHL:  Thank you, Your Honor.
17                      CONTINUED DIRECT EXAMINATION
18    BY MR. BUCHDAHL:
19    Q   Good morning, Mr. Fraser.  We left off last Thursday
20    talking about Plaintiffs' Exhibit 39, which was dated August
21    4th.  And I want to put that back up just so that we can
22    re-orient ourselves as to timing.
23              Thank you.
24              So, Mr. Fraser, you recall we were talking about this
25    August 5th e-mail from Mr. Kelley; correct?
```

1   A    Yeah, I was CCed on.

2   Q    And Mr. Kelley was the chief operating officer, and he

3   wrote to you that there was a red flag in soliciting investment

4   because the company did not currently have financials or

5   inventory systems in place; correct?

6   A    Correct.

7   Q    And the only inventory that GAW Miners had was its

8   computers; correct?

9   A    I'm sorry?

10  Q    The only inventory that GAW Miners had was its computers;

11  correct?

12  A    I -- I don't know.  I didn't run the company.

13  Q    Were you aware of anything else that GAW Miners had in its

14  inventory other than computers?

15  A    I'd be speculating.

16  Q    So sitting here today, sir, you can't identify any other

17  products that GAW Miners would have in inventory other than its

18  mining computers; correct?

19  A    Correct.  I wouldn't know.

20  Q    All right.  And after this e-mail, the chief financial

21  officer of the company indicated he was leaving the company;

22  correct?

23  A    Not in this e-mail.

24  Q    I didn't say --

25  A    Not correct.

1   Q   Okay.  Can we display the e-mail from Shiraz Moosajee?

2              THE COURT:  And that would be exhibit number?

3              MR. BUCHDAHL:  This is all part of Exhibit 39, Your

4   Honor.

5              THE COURT:  Okay.  Thank you.

6              MR. BUCHDAHL:  I believe it's the last page.  Right

7   there, yup, August 5, 2014, at 5:59.

8   Q   (By Mr. Buchdahl) So this same day, a little later on, the

9   person who was your chief financial officer informed you that

10  he would be leaving the company and would not help you raise

11  money for investors.  Do you recall that now, sir?

12  A   I see that he left the firm.

13  Q   Okay.  Now I want to go to what we've marked as Plaintiffs'

14  Exhibit 43, nine days later, August 13th.  I don't think

15  there's a pending objection to this exhibit, Your Honor.

16             THE COURT:  Is that right, Defense counsel, Exhibit

17  43?

18             MR. WEINER:  Correct, Your Honor.

19             THE COURT:  Okay.  43's full.

20      (Plaintiffs' Exhibit 43, received in evidence.)

21             MR. BUCHDAHL:  Let's just look at the heading and

22  subheading.

23  Q   (By Mr. Buchdahl) Mr. Fraser, I want you to tell me if I've

24  read this headline and subheadline correct.  "Geniuses at Work

25  Corp. Acquires Controlling Equity in ZenMiner for $8 million.

1   The Geniuses at Work Corporation has acquired an $8 million

2   controlling stake in ZenMiner to develop it into a next

3   generation platform to make Bitcoin mainstream."

4           Did I read that correctly, sir?

5   A   Yes, sir.

6   Q   And the date is August 13, 2014.  This is nine days later;

7   correct?

8   A   Yeah, that's correct.

9   Q   And the source of this is Geniuses at Work Corporation;

10  correct?

11  A   That's what it says, correct.

12  Q   Do you recognize this press release?

13  A   I -- I saw it after the fact, yeah.

14  Q   But after the fact meaning in August of 2014; correct?

15  A   In August, yes.  I saw it at some point, yes, in August.

16  Q   Mr. Fraser, you knew this press release was false; correct?

17  A   I had a big problem with this press release, yes.

18          MR. BUCHDAHL:  Your Honor, I'd like to offer pages 157

19  and 158 of the Defendant's SEC deposition.  And we're up to

20  Plaintiffs' Exhibit 189.

21  Q   (By Mr. Buchdahl) And, sir --

22          THE COURT:  Wait one second, please.

23      (Pause.)

24          THE COURT:  Yes, 157 and you said 158?

25          MR. BUCHDAHL:  Yes, sir.

1              THE WITNESS:  Is that something I can see here?

2              THE COURT:  Yes.  It should be in the binder there,

3    sir.  The SEC deposition is the first deposition in the book.

4              Certainly 157 is admissible at this point.  I'm not

5    sure we've gotten to 158 yet, but if you want to keep asking

6    questions.  It's up to you.  157 -- can you tell me what the

7    latest Plaintiffs' Exhibit?

8              MR. BUCHDAHL:  We're up to Plaintiffs' Exhibit 189.

9              THE COURT:  Plaintiffs' Exhibit 189 will be page 157

10   from the SEC deposition.

11      (Plaintiffs' Exhibit 189, received in evidence.)

12   Q   (By Mr. Buchdahl) Sir, do you recall you were deposed under

13   oath by the Securities and Exchange Commission in June of 2015?

14   A   Yes, sir.

15   Q   And that was closer to these events than we are right now;

16   correct?

17   A   Correct.

18   Q   And at the time you were asked:

19              "Question:  Okay.  Is it fair to say that you knew at

20              the time in August of 2014 that Geniuses at Work

21              Corporation had not acquired a controlling equity

22              interest in ZenMiner for $8 million?

23              "Answer:  Yes."

24              And the SEC examiner then asked you:

25              "So you knew that this press announcement was false?

1            "Answer:  Yeah."

2            Do you recall giving that testimony to the SEC, sir?

3    A    Yes, sir, I do.

4    Q    And you understood that it was false because GAW Miners was

5    trying to make the public believe that ZenMiner and GAW Miners

6    were two separate companies; correct?

7    A    Yes.

8            MR. BUCHDAHL:  Your Honor, now I'd like to offer page

9    158.

10           MR. WEINER:  No objection.

11           THE COURT:  Wait a minute though.

12       (Pause.)

13           THE COURT:  All right.  Well, if there's no objection,

14   I'll allow it as page 158.  This will be PX 190.

15       (Plaintiffs' Exhibit 190, received in evidence.)

16           MR. BUCHDAHL:  I don't need to display it now, Mr.

17   Boles.  Thank you though.

18   Q    (By Mr. Buchdahl) You understood in the big picture, you,

19   Mr. Fraser, already owned half of ZenMiner because it already

20   was part of the GAW businesses that you owned half of; correct?

21   A    In August of '14, I owned 41 percent.

22           MR. BUCHDAHL:  Your Honor, I'd like to offer SEC

23   testimony, page 148, line 21 to page 149, line 2.

24           THE COURT:  All right.  That can come in as PX 191.

25   As a practical matter, I think we're going to have to include

1   the entire two pages, pages 148 and 149 of the SEC

2   deposition.

3        (Plaintiffs' Exhibit 191, received in evidence.)

4   Q   (By Mr. Buchdahl) So I'm going to read, sir, that

5   testimony.  And, again, this is from your SEC deposition.

6             And the examiner asked you:

7             "Did you have any ownership interest in ZenMiner?

8             "Answer:  Only in the big picture.

9             "Question:  So in the big picture, was it one of the

10            GAW businesses that prior to later in 2014 that you

11            owned half of?

12            "Answer:  To my understanding, yes."

13            Now, sir, at a more granular level, you knew that one

14  of the reasons that this press release was false is because it

15  made up that $8 million number out of thin air; correct?

16  A   I don't know where that number came from, no, sir.

17  Q   Sir, that wasn't my question.  My question was:  You knew

18  that one of the reasons this press release was false was

19  because it had simply made up that $8 million number; correct?

20  A   Josh came up with that number.  I have no idea.

21  Q   Sir, I'm going to try one more time.  You understood that

22  one of the reasons that this press release was false, in other

23  words, one of the lies in this press release was that the $8

24  million number was all made up; correct?

25  A   It wasn't true.

1              MR. BUCHDAHL:  I'd like to offer in evidence from

2    his -- from the Defendant's civil deposition lines 139, 8 to

3    10.

4              THE COURT:  Page 139, lines 8 to 10?

5              MR. BUCHDAHL:  Yes.

6              THE COURT:  All right.  That's fine.  Page 139 will

7    be -- from the civil deposition will be PX 192.

8         (Plaintiffs' Exhibit 192, received in evidence.)

9         (Plays video.)

10   Q    (By Mr. Buchdahl) Now, once again you were asked by the SEC

11   whether you did anything about this false press release;

12   correct?

13   A    Correct.  I don't see it, but yeah.

14   Q    Well, if you look at what is now Exhibits -- Plaintiffs'

15   Exhibits 189 and 190 --

16   A    189 and 190?

17             THE COURT:  You're not going to find it that way, sir.

18   It's pages 157 and 158 of the SEC deposition.

19             THE WITNESS:  Okay.

20   Q    (By Mr. Buchdahl) So if we look at lines 4 to 7 -- sorry.

21   Pull out 4 to 9 all the way.

22             When the SEC asked you what you did about this false

23   press release, you told the SEC that you started to distance

24   yourself from the company as much as you could; correct?

25   A    Correct.

1    Q    That wasn't true, was it?

2    A    It was true.

3    Q    You also told the SEC that you tried to bring Dave in "to

4    get our arms around it."  Now, that's a reference to Dave

5    McLain; correct?

6    A    Yeah, my -- my lawyer.

7    Q    And you also said to the SEC that you told Josh he couldn't

8    do this type of stuff; correct?

9    A    I suggested that -- I told Josh, I said, you know, this

10   kind of stuff is wrong.  You should change.

11   Q    Maybe my question wasn't clear.

12            MR. WEINER:  Your Honor, will the witness be allowed

13   to answer the question?

14            THE COURT:  All right.  Yeah, that's fine.  But why

15   don't you ask the question again.

16            MR. BUCHDAHL:  Sure.

17   Q    (By Mr. Buchdahl) Sir, I'm asking if you told the SEC that

18   you told Josh he couldn't do this type of stuff.  I'm not

19   asking what you did.  I'm asking what you told the SEC.  You

20   told the SEC that you told Josh he couldn't do this type of

21   stuff; correct?

22   A    If that's what I told the SEC, yes.

23   Q    Now, sir, August wasn't the first time that Josh had issued

24   a false press release; correct?

25   A    Probably not but, you know.

Fraser - Direct                                                    238

1   Q   You told the SEC that way back in May you had been really

2   pissed off because Josh had arranged a fake interview with your

3   son; correct?

4   A   That's correct.

5   Q   But it happened again a few months later, didn't it?

6   A   I guess so.

7   Q   All right.  So you told the SEC that you started to

8   distance yourself from the company as much as you could.

9   A   Correct.

10  Q   Let's look at Plaintiffs' Exhibit 44.

11          THE COURT:  All right.  PX 44 is full.

12      (Plaintiffs' Exhibit 44, received in evidence.)

13          THE WITNESS:  Yes, sir.

14  Q   (By Mr. Buchdahl) Now, if we start with the bottom e-mail,

15  this is an e-mail from you to your son Tommy Fraser on August

16  14th; correct?

17  A   Correct.

18  Q   And that is the morning after the false press release that

19  we just looked at; correct?

20  A   True.

21  Q   And you were forwarding that false press release to your

22  son; correct?

23  A   Yes, sir.

24  Q   And Mr. Thomas Fraser, Tommy, your son, responds two

25  minutes later.  Do you see that?

1   A   Yes, sir.

2   Q   And he says, "I saw this from Josh.  What's my cut?

3   Haha"?

4           MR. WEINER:  Your Honor, can we get that limiting

5   instruction on Thomas Fraser?

6           THE COURT:  Yeah, so, Ladies and Gentlemen, same

7   instruction I gave you last week about Tommy Fraser:  Not a

8   part of this lawsuit.  Certainly Mr. Fraser's not on trial for

9   anything he's done, said, or did.  Same instruction as last

10  time.

11  Q   (By Mr. Buchdahl) You received an e-mail from your son the

12  morning after this false press release, and he asked, "What's

13  my cut?  Haha"; correct?

14  A   That's what it says, yes, sir.

15  Q   And you understood he was joking that he should be paid a

16  commission on this phony transaction because of the work he had

17  pretended to do for ZenMiner earlier in the year; correct?

18  A   I agree he was joking, yes, sir.

19  Q   That's not my question, sir.  You understood what the joke

20  was; right?

21  A   I totally understood, sir.

22  Q   And my statement of the joke was accurate; correct?

23  A   I have no idea what he was thinking.

24  Q   Well, let me try again.  You understood the joke he was

25  making; right?

1    A    I understood my son was making a joke, yes, sir.

2    Q    And you understood that the joke was that he should be paid

3    a commission on the phony ZenMiner transaction because of the

4    work he had pretended to do for ZenMiner a few months earlier;

5    correct?

6    A    You are so mean.  That is not correct.

7    Q    Mr. Fraser, you respond, "That's what I was thinking";

8    right?  I need you to look at the document, sir.

9         Later that afternoon, you write back to your son --

10   A    I was thinking what my son said --

11   Q    Right.

12   A    -- as a joke.

13   Q    And the joke was that your son deserved a commission for

14   the fake work he had done for ZenMiner.

15   A    It was a joke --

16   Q    Sir, this is the same thing --

17   A    -- between a son and his father.

18   Q    Sir --

19   A    I mean how far are you going to go with this?

20   Q    You told the SEC that when --

21   A    I told the SEC the truth.

22        THE COURT:  Wait, Mr. Fraser.  Just wait.  Just take a

23   step back.  Let's listen for a question.

24        Go ahead, Mr. Buchdahl.

25        MR. BUCHDAHL:  Thank you, Your Honor.

1   Q   (By Mr. Buchdahl) You told the SEC that when you saw your

2   son's name pretending to be an employee of ZenMiner, you were

3   pissed off; correct?

4   A   Correct.

5   Q   But three months later you and your son are joking about

6   it; correct?

7   A   He made a reference to it.  That's all.

8   Q   That's not my question, sir.  Three months after -- three

9   months after --

10  A   I tried to play it lightly.  I wasn't happy about it.  I

11  tried to play it lightly.  It's my son.

12  Q   Did you think that your response, "That's what I was

13  thinking," conveyed to Tommy that you thought there was

14  anything wrong with what was going on at GAW Miners?

15  A   I don't understand the question.

16  Q   Let me ask a different one.

17          When you became aware of this false press release,

18  which was at least by the morning after, did you tell anyone

19  outside the company that it was false?

20  A   Not that I'm aware of.

21  Q   Would you agree with me, sir, that nothing in this e-mail

22  exchange would convey to your son that you believed GAW Miners

23  was doing anything wrong?

24  A   I -- I don't know what you mean by that.

25  Q   Did you tell your son Tommy that he should not get involved

1    with this fraudulent ZenMiner transaction?

2    A    This particular one?  I told Tommy to stay away from Josh

3    and not have any more contact after the initial situation, to

4    go to work and focus on his job.

5    Q    And you understood, because he was your son, he would

6    listen to you; correct?

7    A    Because he was my son he was what?

8    Q    You expected that because Tommy was your son, he would

9    listen to you when you told him not to do this sort of thing;

10   correct?

11   A    You always hope your children listen to you.

12   Q    And you try to get them to do the right thing; right?

13   A    Yes, sir.

14   Q    Now, you started to question your own involvement in GAW

15   Miners after this phony August 13 press release; correct?

16   A    Correct.

17            MR. BUCHDAHL:  I'd like to offer in evidence from the

18   Defendant's civil deposition page 111, lines 2 to 13.

19            THE COURT:  Page -- oh, the civil deposition, sorry.

20            Okay.  Is there any objection to that offer?

21            MR. WEINER:  No objection.

22            THE COURT:  Okay.  So this will be -- page 11 from the

23   civil deposition will be PX 193.

24        (Plaintiffs' Exhibit 193, received in evidence.)

25        (Plays video.)

1   Q   (By Mr. Buchdahl) Mr. Fraser, this time when you started to

2   question your involvement was the middle of August; correct?

3   A   Yes, sir.

4   Q   And the reason you questioned your involvement is because

5   you knew by then that GAW Miners was repeatedly lying to the

6   public about its business; correct?

7   A   That's not true.

8   Q   You didn't know they were lying to the public?

9   A   You said repeatedly.  I mean, you know, he made a couple

10  mistakes.  Josh was in a hurry.  He was a young kid.  He was

11  inexperienced.  You know, it was getting me nervous.  But, you

12  know, it's easy to look back after you play the tape of the guy

13  saying I'm a liar and then ask me right now, you know, oh, you

14  know, you believed him.

15          At the time, yeah.  I mean, he was a good guy for a

16  long time, and he was honest to me for a long time.  And you

17  know what?  He was in a hurry.  He made mistakes.  And, you

18  know, I started to worry about him moving too fast, being

19  inexperienced --

20  Q   Sir --

21  A   -- not taking advice.

22  Q   -- is your testimony that the reason that GAW Miners issued

23  a phony press release about a phony transaction with a phony

24  employee that was your son was just because he was moving too

25  fast?

1   A    Josh was -- he was in a hurry.  That's all I can tell you.

2   You know, he made some mistakes.  At the time, I didn't see it

3   as lies, like you put it.  I thought he was just trying to move

4   too fast.

5   Q    You didn't believe that a press release announcing a

6   transaction that never happened was a lie?

7   A    I thought he made a big mistake, and I asked him to try to

8   change it.

9   Q    That wasn't the first time, though, was it?  You had said

10  the same thing to him back in May?

11  A    Well --

12  Q    Your testimony is you kept telling him to stop doing it,

13  and he kept doing it?

14  A    He did something in May, and then he did something in

15  August.  I mean in between, the five years before, he was a

16  pretty good guy.  I mean --

17  Q    Nevertheless --

18  A    I wish should I could say -- I wish I could change things.

19  But at the time, that's the way I felt about him.  I mean,

20  yeah, he was -- I still cared about him.  I mean it's hard to

21  say I cared about a guy that totally ripped me off, but I did.

22  I mean I cared a lot about him.

23        I care about people.  I don't throw my friends under

24  the bus.  You know, when I make a pledge, I follow up on it.

25  Sometimes they disappoint me, and then in the long run they

1  won't be my friends as much as they were.  But, you know, I'm

2  not a hater.

3  Q   Mr. Fraser, you started to have questions about your own

4  involvement at least as early as August of 2014; correct?

5       MR. WEINER:  Objection, asked and answered.

6       THE COURT:  I'm not sure he did answer that specific

7  question, but just answer that yes or no, sir.

8       THE WITNESS:  Yes, sir.

9  Q   (By Mr. Buchdahl) And even though you had questions, your

10  answer was that you were going to keep playing nice; correct?

11  A   My answer was what, sir?

12  Q   Your answer to your own questions was that you were going

13  to keep playing nice?

14  A   That I was going to keep playing nice?

15  Q   That's what you told -- that's what you said under oath --

16  right, sir? -- that you were going to keep playing nice and try

17  to get some of your money back; correct?

18  A   I was going to help him as much as I can and, you know,

19  within reason; and hopefully if things turned out, yeah, maybe

20  I'd get something.

21  Q   Now, Mr. Fraser, in August of 2014 you understood that GAW

22  Miners began selling a product called a Hashlet; correct?

23  A   I'm sure I became aware of it sometime, yes, sir.

24       MR. BUCHDAHL:  I'd like to display Defense Exhibit

25  528.  We didn't have any objection to it.

1                  THE COURT:  I'm sorry.  What was the -- there's no

2      objection to that.  DX 528 will be full.

3          (Defendant's Exhibit 528, received in evidence.)

4      Q    (By Mr. Buchdahl) If we can look at this press release,

5      this is August 21, 2014.  Do you see that?

6      A    Yes, sir.

7      Q    And it says, "GAW Miners Announces World's First

8      Cryptocurrency Miner for the Masses for $16."

9              Do you see that?

10     A    Yes, sir.  It's in the headline.

11     Q    And if you look at the paragraph in the middle of the page,

12     Josh Garza says, "We knew the response was going to be big, but

13     we didn't know just how big it'd get.  We were selling

14     thousands of units per second"; correct?

15     A    That's -- you're correct, that's what it says.

16     Q    And according to this announcement, each Hashlet was at

17     least $16; correct?

18     A    Yeah.  That's what it says right there, yes, sir.

19     Q    So, Mr. Fraser, in this press release, Mr. Garza told the

20     public that GAW Miners was earning thousands and thousands of

21     dollars every second; correct?

22     A    That's what it says, yes, sir.

23     Q    And you understood, as Professor Narayanan explained on the

24     first day, that a Hashlet allowed a customer to own a piece of

25     the mining output of a GAW Miners' machine instead of having to

1   purchase an entire machine; correct?

2   A   Correct.

3   Q   And the purchaser of a Hashlet would, therefore, be

4   entitled to a portion of whatever Bitcoin was mined by that

5   machine; correct?

6   A   I believe that's what he said, yes, sir.

7   Q   Can we turn to page 83 of your civil deposition?

8   A   83?

9   Q   Yes, 83, lines 15 to 25.

10  A   83?

11       THE COURT:  Of the civil deposition, the second

12  deposition.  It's okay.

13       MR. WEINER:  You might have the lines wrong, Jacob.

14  Q   (By Mr. Buchdahl) Now you're in your exhibit, sir, we're

15  going to go to the second deposition.

16       THE COURT:  Sir, that's not what you want.  So there

17  are two depositions in one of the binders.  And it is the

18  second deposition in the binder with the depositions in it.

19       THE WITNESS:  I see.

20       THE COURT:  Take your time.

21       MR. WEINER:  You might have misspoken.  15 starts in

22  the middle of an answer.

23       MR. BUCHDAHL:  That's okay.

24       THE WITNESS:  Okay.

25  Q   (By Mr. Buchdahl) I want you to look at lines 15 to 25.

1          MR. WEINER:  Your Honor, if we can have the question

2    that line 15 responded to in fairness?

3          THE COURT:  Why don't we start at line 12 there, Mr.

4    Buchdahl.

5          MR. BUCHDAHL:  Sure.  12 through 25 we'd like to mark.

6          THE COURT:  Okay.  And you'd like to admit that; is

7    that right?

8          MR. BUCHDAHL:  Yes, sir.

9          THE COURT:  So that will be -- I take it there's no

10   objection?

11         MR. WEINER:  No objection.

12         THE COURT:  That will be 194.  PX 194 will be page 83

13   from the civil deposition.

14      (Plaintiffs' Exhibit 194, received in evidence.)

15      (Plays video.)

16   Q   (By Mr. Buchdahl) Mr. Fraser, the machine was making

17   Bitcoin; correct?

18   A   Bitcoin?

19   Q   Yes.

20   A   I don't know what the machines were making.

21   Q   You don't know what the GAW Miners' machines were actually

22   mining?

23   A   My understanding, they could mine anything.

24   Q   All right.  But they were mining for cryptocurrency;

25   correct?

1    A    That -- yes.

2    Q    And you understood, therefore, that the purchaser of a

3    Hashlet would be entitled to a portion of the cryptocurrency

4    that was being mined by GAW Miners; correct?

5    A    That's my understanding, yes, sir.

6    Q    And you understood that the idea behind a Hashlet was that

7    a customer who purchased a Hashlet could engage in

8    cryptocurrency mining in order to make a profit; correct?

9    A    I think that's why people did it, yes, sir.

10   Q    I want to turn to page 177 of the SEC deposition.

11           That's the first one --

12           THE COURT:  Excuse me.  Can I see counsel just for a

13   moment in the hallway?  Just Mr. Weiner and Mr. Buchdahl, just

14   real quick.

15       (At sidebar off the record.)

16           MR. BUCHDAHL:  I'm going to withdraw the offer of that

17   last testimony.  And I'm going to ask a different question, Mr.

18   Fraser.

19   Q    (By Mr. Buchdahl) Hashlet customers were relying on GAW

20   Miners' expertise to own and operate the mining equipment that

21   would support the Hashlets; correct?

22   A    Yes.

23   Q    And you understood that in order to sell Hashlets as a

24   slice of GAW's mining capability, GAW Miners would have to know

25   how much mining capability it had; correct?

1    A    Makes sense, yes, sir.

2    Q    And GAW Miners would have to have realtime documentation

3    and data of how much mining capability it actually had;

4    correct?

5    A    Makes sense, yes, sir.

6    Q    And you understood it was necessary to track how much

7    Hashlet power was sold versus how much Hashlet power GAW Miners

8    had to prevent GAW from selling more Hashlets than it had the

9    mining power to back up; correct?

10   A    Did you say that had to know what it had so it knew not to

11   oversell?

12   Q    Yes, sir.

13   A    Yes, I agree with that.

14   Q    Now, Mr. Fraser, these Hashlets were actually your idea;

15   correct?

16   A    I don't think so.

17        MR. BUCHDAHL:  I'd like to offer Plaintiffs' Exhibit

18   11, which is a series of text messages.  I don't think there's

19   a pending objection, Your Honor.

20        THE COURT:  Okay.  PX 11 will be full.

21   (Plaintiffs' Exhibit 11, received in evidence.)

22   Q    (By Mr. Buchdahl) Mr. Fraser, do you recognize PX 11 as a

23   series of text messages that you sent to Josh Garza?

24   A    Yes, I do, sir.

25   Q    Let's start with the first one.  You write to him on May

1   2nd of 2014:  What about selling percentages of hosted

2   machines?

3           Do you recall texting that to Josh Garza in early May

4   of 2014?

5   A   Yes, I do, sir.

6   Q   And you thought that was a cool idea; right?

7   A   I just -- Josh said -- Josh called me, you know, at some

8   point and said he had an issue with things and he gave me a

9   description of what he was going through.  And that's the --

10  that's the question I came up for him because I don't know

11  enough about it to actually, you know; so I said, Hey, is this

12  something you could do?

13  Q   Sir, you thought this was a cool idea; correct?

14  A   Yeah, sure, it was cool.

15  Q   And this is the idea that turned into Hashlets; correct?

16  A   This is the question that may have turned into Hashlets,

17  sure.

18  Q   You agree with me, sir, that it did turn into Hashlets;

19  right?

20  A   You'd have to talk to Josh to say if this gave him the

21  impetus to create Hashlets.

22          MR. BUCHDAHL:  I'd like to offer from the civil

23  deposition page 220, lines 2 to 9.

24          THE COURT:  220, sorry?

25          MR. BUCHDAHL:  Page 220, the question and answer,

1    lines 2 to 9.  If you -- the context begins on page 218, line

2    24.

3            MR. WEINER:  And, Your Honor, objection placed on the

4    hallway conversation.

5            THE COURT:  I mean I think he's given you that answer

6    that I'm looking at.

7            MR. BUCHDAHL:  On the top of page 220?

8            THE COURT:  Yeah, it says -- he's given you that

9    answer.

10           MR. BUCHDAHL:  All right.

11           THE COURT:  So let's move on.

12   Q    (By Mr. Buchdahl) Mr. Fraser, you told the SEC that it was

13   Josh that came up with the idea of the Hashlet; correct?

14   A    Yeah.  Josh ran the company.

15   Q    Sir, you told the SEC that it was Josh who came up with the

16   idea of a Hashlet; correct?

17   A    If -- I assume that that's what I said to them, yes.  If

18   that's true, then, yes, I said that to them.

19   Q    And, in fact, you told the SEC that you never texted Josh;

20   correct?

21   A    I misspoke to the SEC and corrected everything.

22   Q    Sir, how did you correct your testimony to the SEC when you

23   told them that you never texted Josh?

24   A    I mean it's pretty simple.  I mean I've always had a Cantor

25   phone, so I was never worried that they wouldn't have every bit

1    of data I had.

2    Q    That's not my question.

3    A    They asked me what an SMS was.  I thought they meant direct

4    messaging.  I said, "I don't do that," because I don't.  They

5    said, "But we have these texts."  And I said, "Oh, a text" and

6    so ...

7    Q    Sir, you told the SEC under oath that you never texted Josh

8    Garza; correct?

9    A    I misspoke.

10   Q    Is that what you told them?

11   A    Yeah, I misspoke and told them that, and I cleared it up

12   with them.  And obviously they didn't have a problem with it.

13   Q    And you also told the SEC under oath that it was very

14   seldom that you even e-mailed with Josh; correct?

15   A    I believe we were talking about -- again, I thought we were

16   talking about --

17          THE COURT:  Sir, it is a yes-or-no question.  It's a

18   yes-or-no question.

19          THE WITNESS:  I'm sorry.  What's the question again?

20   Q    (By Mr. Buchdahl) You told the SEC under oath that it was

21   very seldom that you even e-mailed with Josh; correct?

22   A    I answered one question like that, yes.

23   Q    And you also told the SEC that you never communicated with

24   Josh using any SMS messages; correct?

25   A    I misspoke, and I said that, that's correct.

1   Q   And, in fact, you never produced your text messages to the

2   SEC, did you?

3   A   As far as I know, my lawyers gave them everything they

4   asked for.

5   Q   Sir, my question was:  You are not aware of ever producing

6   your text messages to the SEC because you got a new phone, and

7   you said you didn't have them anymore; correct?

8   A   No.  I believe -- the SEC got everything they asked for.  I

9   mean obviously if they didn't, there'd be a bigger problem than

10  you.

11         MR. BUCHDAHL:  I'd like to look at Plaintiffs' Exhibit

12  166.  No pending objection to this, Your Honor.

13         THE COURT:  Okay, 166 will be full.

14  (Plaintiff's Exhibit 166, received in evidence.)

15  Q   (By Mr. Buchdahl) I'd like to focus on your statement at

16  the bottom of the page.  Now, this is four days after you

17  texted Josh the idea for the Hashlet; correct?

18  A   The dates sound correct, yes, sir.

19  Q   And you write, "Gawminers.com is my new baby!  It's REAL

20  and this business is not going away.  Check it out"; correct?

21  A   On my Facebook page, all my 22 friends, yes, sir.

22  Q   Now, let's look at Exhibit 19.

23         THE COURT:  Yes, 19 will be full, PX 19.

24  (Plaintiffs' Exhibit 19, received in evidence.)

25  Q   (By Mr. Buchdahl) Now, if we look at that top e-mail, you

1   write this on May 18th; correct?

2   A    May 18th?  Yes, sir.

3   Q    And in this e-mail, you write to Josh, "Your (sic) doing a

4   great job and you impress me every day with what you do.  I

5   know I'm lucky to have you as a partner."

6          Do you see that, sir?

7   A    Yes.

8   Q    This accurately described your feelings at the time;

9   correct?

10  A    Yeah.  Yes, sir.

11  Q    I'd like to turn to Plaintiffs' Exhibit 37.

12         THE COURT:  Okay.  37 will be full.

13     (Plaintiffs' Exhibit 37, received in evidence.)

14  Q    (By Mr. Buchdahl) And just to orient the timeline, sir,

15  this was after you had found out that there was $180,000 of

16  unexplained payments to AMEX from your bank account; correct?

17  A    Yeah, they were checking up on it to figure it out, yes,

18  sir.

19  Q    And you testified before this jury under oath that you came

20  to understand that Josh had taken that money without

21  authorization; correct?

22  A    Found that out after the fact, yes, sir.

23  Q    You found that out in the summer of 2014 you testified;

24  correct?

25  A    I found out there was money there then.  I didn't find out

1    the whole story till much later.

2    Q   As of July 29th, a week later, is it your recollection that

3    you didn't know yet who had taken that money out of your bank

4    account?

5    A   I'm sorry?

6    Q   As of July 29, sir, a week after you found out about those

7    charges, is it your testimony that you did not yet know who was

8    responsible for those unauthorized debits from your checking

9    account?

10   A   I don't recall the timing on seven years -- that long ago,

11   no, sir.

12   Q   So you write to Mr. -- to Josh on July 29th 2014, "Let me

13   know if your (sic) coming in and maybe we can meet up with

14   HWL."

15          HWL, of course, is Mr. Lutnick, the head of Cantor

16   Fitzgerald; correct?

17   A   Yes, sir.

18   Q   And what you say is, I will need to let the company know

19   that we're getting into the banking slash brokerage, etc.,

20   business.  Correct?

21   A   Yes.

22   Q   And when you say "we're getting into that business," you

23   meant you and Josh and GAW Miners; correct?

24   A   Yes.

25   Q   And by banking slash brokerage, you meant that you

1    understood that GAW Miners wasn't just in the business of

2    selling equipment anymore; correct?

3    A    No.

4    Q    You understood, sir, that the direction that you and Josh

5    were going with GAW Miners was more financial in nature;

6    correct?

7    A    Josh was talking about expanding, you know, down the line,

8    that's all.  I mean nothing that second.

9    Q    The plan was to get into the banking slash brokerage

10   business; correct, sir?

11   A    Josh wanted people that -- Josh wanted his customers to be

12   able to do transactions between themselves -- between

13   themselves, yeah.  I mean that's what he was looking -- in the

14   long run when the thing matured, yeah.

15   Q    And you wanted to let Cantor Fitzgerald know what you were

16   doing; correct?

17   A    It was important that I always let them know because that's

18   where my licenses were.

19   Q    Sir, you had no obligation to tell Cantor Fitzgerald what

20   Josh Garza was doing; right?

21   A    Well, I had investment in that company, and he could

22   explain it better than me, so ...

23   Q    Sir, that's not my question.  There was no obligation on

24   your part to keep Cantor Fitzgerald informed as to what Josh

25   Garza was doing.  You only had to keep Cantor Fitzgerald

1   informed as to what you were doing; correct?

2   A   Well, if I had an investment in the company, then I don't

3   understand how you could disassociate the two, but whatever you

4   want to do.

5   Q   Were there any other companies besides what you were doing

6   with Josh Garza that you felt that you had to tell Cantor

7   Fitzgerald about?

8   A   They knew about the Brahmas.  They knew about the

9   snowboarding company that I invested in.  They knew about

10  LiveWire, which was a kind of internet kiosk company for when

11  you went skiing and stuff.  They knew about Union Street Media,

12  which was -- which grew out of Collegextra, which made websites

13  for college towns so kids, when they came to college, could

14  kind of like figure out what they could, you know, what to do

15  and how to do things.

16          So Cantor -- yeah, they knew -- they knew every little

17  stupid business -- and the campground that I was in.  It was

18  important for them to know that.

19  Q   Mr. Fraser, none of those other businesses could be

20  described as banking or brokerage businesses; correct?

21  A   Um, I mean, you know, you could expand the kiosk business

22  into something different, you know, so -- I don't know.  I

23  don't think that made the difference about the brokerage versus

24  or not.

25  Q   Sir, the brokerage business is buying and selling

1  securities on behalf of customers; correct?

2  A   Brokerage is buying and selling on behalf of customers,

3  that's correct.

4  Q   Buying and selling securities on behalf of customers;

5  correct?

6  A   Securities, stocks, bonds, yeah, fruit.

7  Q   Mr. Fraser, were you aware of GAW Miners taking any steps

8  to register any of its securities or anything at all with the

9  State of Connecticut?

10            MR. WEINER:  Objection to the form of the question.

11            THE COURT:  It's overruled.

12            THE WITNESS:  I was an investor.  I wasn't part of any

13  of that.

14  Q   (By Mr. Buchdahl) Sir, that's a yes-or-no question.  Were

15  you aware of GAW Miners taking any steps to register any

16  securities with the State of Connecticut?

17  A   I was aware that Josh told me he had everything under

18  control and he had hired people and a law firm on retainer and

19  so forth.

20  Q   Sir, did you believe that GAW Miners had registered

21  securities with the State of Connecticut?

22  A   I have no idea.

23            MR. BUCHDAHL:  I'd like to offer Plaintiffs' Exhibit

24  124.

25            THE COURT:  124 is full.

1        (Plaintiffs' Exhibit 124, received in evidence.)

2   Q   (By Mr. Buchdahl) You see, sir, that this is a

3   certification from the State of Connecticut Department of

4   Banking.  Do you see that?

5   A   Yeah, I see it.

6   Q   And if we look further down the page, do you see that

7   there's a certification from the Commissioner that there was a

8   search done of securities registrations and securities filings,

9   and there was no reference found to GAW Miners, ZenMiner, or

10  ZenCloud.  Do you see that?

11  A   Yeah, I see it.

12  Q   Sir, did you personally take any steps to register any

13  securities with the State of Connecticut?

14  A   No.

15  Q   I'd like to turn to Plaintiffs' Exhibit 45.

16          THE COURT:  All right.  PX 45 will be full.

17      (Plaintiffs' Exhibit 45, received in evidence.)

18  Q   (By Mr. Buchdahl) This is an e-mail that you sent on August

19  16th, 2014; correct?  Do I have the date right, sir?

20  A   August 16, 2014, that's correct, sir.

21  Q   This is three days after the phony press release about

22  ZenMiner; correct?

23  A   This was August 16th, 2014, yes, sir.

24  Q   It's three days after the event about which you told the

25  SEC that you started to distance yourself from the company as

1    much as you could; correct?

2    A   It was three days after that date, yes, sir.

3    Q   And you write this e-mail to HWL and to Jed Kleckner;

4    correct?

5    A   Yes, sir.

6    Q   And, again, HWL is your best friend and the chair of Cantor

7    Fitzgerald; correct?

8    A   Correct.

9    Q   And Jed Kleckner is in charge of Cantor Fitzgerald's

10   special ventures; correct?

11   A   Correct.

12   Q   And the subject line is, "Crazy opening to our new product!

13   Gawminers.com"?

14   A   Correct.

15   Q   The new product was Hashlets; right?

16   A   Yes, sir.

17   Q   And you write, We should gross over $400,000 today alone.

18   Demand has been crazy.

19           Did you write that?

20   A   I did.

21   Q   And that money was coming from customers that GAW Miners

22   had persuaded to purchase Hashlets; correct?

23   A   That's -- Josh told me we made that gross, so that's where

24   I got that information, yes, sir.

25   Q   And the "we" in that sentence is you and GAW Miners;

1   correct?

2   A    Yeah, my investment in GAW Miners, yes, sir.

3   Q    And you sent this in part because you wanted to keep Cantor

4   Fitzgerald in the loop about what you were doing; correct?

5   A    Correct.

6   Q    And after sending this e-mail to Howard Lutnick on August

7   16th about the Hashlets business, you had a discussion with him

8   about that business; correct?

9   A    I may have.  I don't recall this second, but ...

10              MR. BUCHDAHL:  We'd like to offer Plaintiffs' Exhibit

11   46.

12              THE COURT:  Okay, 46 will be full.

13       (Plaintiffs' Exhibit 46, received in evidence.)

14   Q    (By Mr. Buchdahl) You send this e-mail to Josh the very

15   next day; correct?

16   A    Yes, sir.

17   Q    And you write, Howard was interested in what currency we're

18   getting paid in.

19              Do you see that?

20   A    I see that.

21   Q    And you understood that "Howard" was Howard Lutnick; right?

22   A    Yeah.

23   Q    And you knew he was interested in your Hashlet transactions

24   because you had discussed it with him; correct?

25   A    He was interested because he was interested in me, but,

1   yeah, sure.

2   Q   Sir, my question was:  The only reason you knew he was

3   interested is because you had a conversation with him; right?

4   A   Yeah.  Talked to him all the time.

5           MR. BUCHDAHL:  I'd like to offer Plaintiffs' Exhibit

6   50.

7           THE COURT:  Okay.  Plaintiffs' 50 will be full.

8       (Plaintiffs' Exhibit 50, received in evidence.)

9           THE WITNESS:  What number?

10          THE COURT:  50.  Five-zero.

11  Q   (By Mr. Buchdahl) You write this e-mail to David McLain on

12  August 21st; correct?  I'm sorry.  August 20th is your e-mail.

13  Do you see that?

14  A   Yeah.

15  Q   And, again, Dave McLain is your lawyer; right?

16  A   Yes, sir.

17  Q   And you write to him, "Do everything Josh needs ASAP, it's

18  a big deal and we're already talking to guys about huge

19  investments, etc."

20          Do you see that?

21  A   Yes, sir.

22  Q   And "Josh" obviously is Josh Garza; right?

23  A   Yes.

24  Q   And you say, "We're talking to guys about huge

25  investments."  And that's you and Josh; right?

1  A    Not me.  I never talked to anybody about investment.

2  Q    So who's the "we"?

3  A    Josh and the company.

4  Q    Can you remember who any of the people were that you were

5  talking to about huge investments?

6            MR. WEINER:  Objection to the form of the question.

7            MR. BUCHDAHL:  I'll rephrase it.

8            THE COURT:  Okay.  I'll sustain it.

9  Q    (By Mr. Buchdahl) Can you recall any of the people that GAW

10 Miners was talking to about huge investments?

11 A    I'm not aware of anyone.

12 Q    So you wrote this to your lawyer without being aware of

13 anyone, or do you think you were aware at the time?

14 A    No.  Josh said that he had people interested.  I -- I never

15 tried to raise any money.

16 Q    So your testimony is the only reason you thought people

17 were interested in investing was because Josh told you that.

18 That's your testimony?

19 A    Yeah.

20            MR. BUCHDAHL:  I'd like to offer Plaintiffs' Exhibit

21 52.

22            THE COURT:  Okay.  52 will be full.

23       (Plaintiffs' Exhibit 52, received in evidence.)

24 Q    (By Mr. Buchdahl) I'd like to start -- no, sorry.

25            Let's start with the August 29 e-mail.  Do you see

1   Josh sends you an e-mail on August 29th at 3:30 p.m.  Do you

2   see that?

3   A    Yeah.

4   Q    And he just sends you the website gawminers.com; correct?

5   A    Yes.

6   Q    And when he sent that to you, you went to that website;

7   right?

8   A    Okay.

9   Q    And your response to him was, "You dog"; correct?

10  A    That's what I wrote.

11  Q    What did you mean by that, sir?

12  A    As I sit here today, I don't remember.

13  Q    And he writes, "Damn good marketing."  And you reply, "Make

14  sure you have this backed up."

15           Do you see that?

16  A    Yes.

17  Q    You understood by August of 2014, sir, that GAW Miners was

18  already making claims it couldn't back up; correct?

19  A    He made an outrageous claim in the beginning of August,

20  yes, sir.

21  Q    Sir, what did you do to make sure that your company, your

22  "new baby" as you described it, wasn't saying anything on its

23  website that wasn't true?

24  A    All I could tell Josh is to do things right.  I have no

25  control over anything.

1    Q    So the answer is you did nothing; correct, sir?

2    A    I had no ability to do anything.

3    Q    Let's look at Plaintiffs' Exhibit 53.

4              THE COURT:   Okay, 53 will be full.

5         (Plaintiffs' Exhibit 53, received in evidence.)

6    Q    (By Mr. Buchdahl) These are more text messages between you

7    and Josh; correct?

8    A    Yes, sir.

9    Q    The SEC didn't have this text message, did they?

10   A    They had everything we gave them.

11   Q    Sir, Josh writes to you on August 30th, "About to break

12   500K."  And you respond, "Crazy"; right?

13   A    Yeah, because it sounded crazy.

14   Q    Crazy as in you didn't believe him or crazy as in, wow,

15   that's great?

16   A    Yeah, I mean I had no reason not to believe him.

17   Q    No reason.

18             So you write, "Should do another million by" -- I'm

19   sorry.  Josh writes, "Should do another million by Tuesday."

20   And you write, "Margin," question mark?  What did you mean by

21   "Margin," question mark?

22   A    Well, just like anything, I mean you go to the supermarket

23   and they make two or three percent off margins.  So if you sell

24   something for a dollar and you make 50 cents, it's 50-percent

25   margin.  So I was asking what he thought the profit level on

1    each transaction might be, if he knew.

2    Q   You were interested in the profit level because some of

3    those profits would be yours; correct, sir?

4    A   Well, I had been putting so much money in for so long, it's

5    nice to see maybe the company would actually make money, you

6    know, and maybe down the line I'd get paid, I mean.

7    Q   And Josh writes, "30 blended."  And you understood that to

8    mean at a blended level, the margin was about 30 percent;

9    correct?

10   A   Yeah, that's what I would understand, right.  So if you did

11   a million, we'd expect profit of about $300,000.

12          MR. BUCHDAHL:  Your Honor, we'd like to offer

13   Plaintiffs' Exhibit 67.  This should be redacted.

14          THE COURT:  Okay.  What's the response from Defense?

15          MR. WEINER:  No objection.

16          THE COURT:  PX 67.

17          MR. WEINER:  As long as it's redacted.

18          THE COURT:  PX 67 will be full.  I'll take your

19   representation it's been redacted.

20       (Plaintiff's Exhibit 67, received in evidence.)

21   Q   (By Mr. Buchdahl) So this is another series of text

22   messages from October 31st; correct?

23   A   Yes, sir.

24   Q   And you write to Josh, "Howard is supportive.  Only wants

25   us to make a shitload.  But not be involved."

1          Do you see that?

2    A    Yes.

3    Q    And "Howard," again, is Howard Lutnick; correct?

4    A    Correct.

5    Q    And you meant that he was supportive of the GAW Miners'

6    business; correct?

7    A    He's supportive of me, yeah.  And so, yes, he was excited

8    for -- for us.

9    Q    And when you write, "Wants us to make a shitload," you

10   meant a large amount of money; correct?

11   A    He wished us well.  He hoped we did really well and said he

12   had no interest.

13   Q    And when you say he had no interest, that's the "not be

14   involved"; correct?

15   A    Correct.

16   Q    Now, did you ask Mr. Lutnick to get involved?

17   A    No.

18   Q    Then why would he say he didn't want to be involved?

19   A    Because he told me.

20   Q    He just volunteered that?

21   A    He thought Bitcoin was the Wild West and this thing was

22   crazy and the people at Cantor wouldn't touch it with a

23   ten-foot pole at the time and even now.

24   Q    Josh responds, "His loss.  Watch me prove that."

25          And you respond, "I'm with you"; correct?

1    A    Correct.  I wanted him to prove it.

2    Q    Now, Mr. Fraser, in the fall of 2014, do you recall that

3    GAW Miners was having an issue where credit processors were

4    delaying the release of funds from GAW Miners' customer

5    purchases?

6    A    When was this?

7    Q    In the fall of 2014.

8    A    I don't recall.

9    Q    I'd like to show you in your civil deposition page 197.

10   That's the smaller print deposition.

11   A    That's the first one?

12          THE COURT:  I think it's the second.  It's the civil

13   deposition.

14          THE WITNESS:  197?

15          THE COURT:  197.  Just read it to yourself, sir.

16          MR. BUCHDAHL:  You can begin on line 11.

17          THE WITNESS:  Okay.

18   Q    (By Mr. Buchdahl) Sir, does that refresh your recollection?

19   A    Yeah.  I thought you were talking later in 2014.  This was

20   in early '14; correct?

21   Q    No.  This was in later 2014.

22   A    This is talking about early '14.

23   Q    That's your understanding of this testimony?

24   A    Yes.

25          MR. BUCHDAHL:  I'd like to try to refresh the

1    witness's recollection with Defense Exhibit 728.  So don't show

2    it to the jury, but you can show it to the rest of us, Defense

3    Exhibit 728.

4    Q   (By Mr. Buchdahl) Sir, does that refresh your recollection

5    that the issue with credit card processors was happening in

6    October of 2014?

7    A   I ...

8            I -- I don't recall this.

9            MR. BUCHDAHL:  Your Honor, I'd like to offer from the

10   civil deposition pages 197, line 11 to 198, line 13.  I'd also

11   like --

12           THE COURT:  I'll allow that, page 197 -- why don't we

13   just have pages 197 and 198.  And we'll mark that -- lost

14   track -- PX 195, I believe.  PX 195 will be pages 197 to 198

15   of the civil deposition.

16       (Plaintiffs' Exhibit 195, received in evidence.)

17           THE COURT:  Yes, you can play that.

18       (Plays video.)

19           MR. BUCHDAHL:  Your Honor, I would also offer -- I

20   don't know if there's a Defense objection, but I would offer

21   Defense Exhibit 728.

22           THE COURT:  728?  Is there an objection?

23           MR. WEINER:  728?  No objection, Your Honor.

24           THE COURT:  All right.  728 will be a full exhibit.

25       (Plaintiffs' Exhibit 728, received in evidence.)

1           THE COURT:  PX 728.

2           MR. BUCHDAHL:  Let's go ahead and display 728.

3    Q   (By Mr. Buchdahl) And why don't we focus on the top half of

4    that down to below "Braintree."

5           You see this is an e-mail from Dan Pease to Josh Garza

6    from October of 2014; correct?

7    A   That's what it looks like, yes, sir.

8    Q   And we discussed last week that Braintree is a division of

9    PayPal; correct?

10   A   Okay.  Maybe we did, but sure, yes.

11   Q   And it says that Braintree is holding $968,000; correct?

12   A   Yeah.

13   Q   And you understood that Josh needed -- that's almost a

14   million dollars; right?

15   A   Was I on this e-mail?

16   Q   No, sir.

17   A   Then how would I know this?

18   Q   We're going to get there, sir.

19   A   Well, I'm confused already.  But go ahead.

20   Q   Okay.  What I'm asking you is whether you were aware in

21   October of 2014 that PayPal was holding back this much money

22   from GAW Miners.

23   A   I knew they were holding money from earlier in the year,

24   but I -- I don't recall whether I knew this.

25   Q   Sir, you understood that one of the reasons that Josh Garza

1   was looking to borrow money or raise money was because he

2   couldn't get this money from PayPal; right?

3   A   I don't know that.

4   Q   There came a time in October of 2014 where Josh asked you

5   for as much as a million dollars to keep running the business;

6   correct?

7   A   He could have asked me for a dollar, but I was done in

8   August -- I was done July 23rd.  I wasn't putting another dime

9   in that company or a loan.

10  Q   Sir, that's not my question.

11  A   Well, I wouldn't even think about it.  So I don't recall

12  him asking me for a million dollars, but I would have laughed.

13  I didn't even have a million dollars to give him then.

14  Q   I'm going to try to refresh your recollection with

15  Plaintiffs' Exhibit 64, sir.  I'd like you to read the top of

16  Plaintiffs' Exhibit 64.

17  A   Which one?

18          THE COURT:  64.  It's not on his screen.

19          MR. BUCHDAHL:  Not yet.  Not yet.  This is not being

20  offered.

21          THE COURT:  I know.  You're just refreshing.

22          THE WITNESS:  Okay.

23  Q   (By Mr. Buchdahl) Did you have a chance to review that

24  first e-mail?

25  A   I see an e-mail I was copied on, yeah.  I was CCed.

```
 1    Q    Don't describe it.  Don't describe it.

 2    A    Not CCed.  It was sent.  Yeah, okay.

 3    Q    Does that refresh your recollection --

 4    A    Not really, no.

 5          THE COURT:  Wait for the question.  Let him get the

 6    question.

 7          THE WITNESS:  I'm sorry.

 8          THE COURT:  It's okay.

 9    Q    (By Mr. Buchdahl) Does that refresh your recollection that

10    in October of 2014 Josh thought he needed as much as a million

11    dollars in order to keep buying the hardware he needed to run

12    the business?  Do you see that?  I'm sorry.

13    A    I see it, yes, sir.

14    Q    Does it refresh your recollection?

15    A    It does not refresh my recollection at all.

16    Q    All right.  You understood that in October of 2014 GAW

17    Miners was facing issues in filling orders and it might be in a

18    position where it would have to refund customers their money;

19    correct?

20    A    I wasn't -- no.

21    Q    All right.  Let's go to page 245 of your civil deposition.

22          MR. BUCHDAHL:  I'd like to offer just lines 18 to 22.

23          THE WITNESS:  244 you said?

24          THE COURT:  Page 245, sir.

25          THE WITNESS:  I'm sorry.  Line what?
```

1          THE COURT:  Lines 18 through 22.  He's asking me if

2     they can offer that.

3          Is there objection?

4          MR. WEINER:  Mr. Fraser might as well have the whole

5     page.  No objection to 245.

6          THE COURT:  245 from the civil deposition will come in

7     as PX 196, full exhibit.

8          MR. BUCHDAHL:  Your Honor, may I suggest we do 44 and

9     45, 244 and 245?

10          THE COURT:  That would be fine, PX -- sorry, PX 196

11     will be pages 244 through 45 of the civil deposition.

12     (Plaintiffs' Exhibit 196, received in evidence.)

13     (Plays video.)

14     Q    (By Mr. Buchdahl) In November of 2014, you arranged for you

15     and Josh to go and have a meeting in person with some people at

16     Cantor Fitzgerald; correct?

17     A    I think Josh brought some people with him.  But, yeah,

18     sure, I did that.

19          MR. BUCHDAHL:  I'd like to offer Plaintiffs' Exhibit

20     73.

21          THE COURT:  Okay.  73 will be full.

22     (Plaintiffs' Exhibit 73, received in evidence.)

23     Q    (By Mr. Buchdahl) Let's start on page 2.  Now, you were

24     introducing Josh to a person named James Ficarro; correct?

25     A    Yes.

1   Q   And Mr. Ficarro is a senior executive at Cantor Fitzgerald?

2   A   Yeah, he's one of the -- yeah.  I've known Jim almost since

3   the time I started working at Cantor.  Was a long-time

4   survivors.

5   Q   All right.  Now, this is November of 2014.  And you say, "I

6   have been working with my friend Josh Garza for the last

7   several years."

8           Do you see that?

9   A   Yeah.  It was true.

10  Q   And you write, "Currently, we've started gaw.com and

11  gawminers.com, a very big player in the virtual coinage

12  business/bitcoin."

13          Do you see that?

14  A   I was trying to give Jim a little background so he had

15  knowledge --

16  Q   Did I read your e-mail accurately, sir?

17  A   Sorry?

18  Q   Did I read your e-mail accurately, sir?

19  A   You're really good at reading.

20  Q   Mr. Fraser, you write to James Ficarro, "We are one of the

21  largest sellers of mining power."

22          Do you see that?

23  A   That's what I was told at the time, yes, sir.

24  Q   So when you told one of the senior executives at Cantor

25  Fitzgerald that GAW Miners, your company, was one of the

1   largest sellers of mining power, did you take any steps to

2   investigate whether that was true?

3   A    No.

4   Q    You understood by November of 2014 that GAW Miners had no

5   way to keep track of its computer inventory; correct?

6   A    No.

7   Q    Mr. Fraser, you write, "There are several investors willing

8   to put up millions."

9          Do you see that?

10  A    That's what Josh told me.

11  Q    And, again, you repeated this to a senior executive at

12  Cantor Fitzgerald without taking any steps to determine if it

13  was true.  Fair?

14  A    Correct.

15  Q    And then you write, "GAW Miners is totally above board and

16  we only want to do it right."

17         Do you see that?

18  A    That's what I believed at the time.

19  Q    And you were aware that GAW Miners had repeatedly made

20  false statements in public; correct?

21  A    I was aware Josh made a couple of stupid statements, yes,

22  sir.

23  Q    And then you write, "We have plans for an ICO."

24         Do you see that?

25  A    Josh mentioned it down the line, yes, sir.

1   Q   And you described that as plans that you and he had; right?

2   A   What?

3   Q   You described that as plans that you had; right?

4   A   That the company has.  I mean I'm talking to a friend of

5   mine I've known for 25 years.  I'm trying to give him some

6   background because he's doing a favor to even meet with me.

7   Q   It's fair to say that there's no way Josh could have met

8   with Jim Ficarro without your introduction; correct?

9   A   You're giving Jim a lot of credit, but, yeah, there's no --

10  it's unlikely that Josh would have met with Jim and Harry and a

11  very excellent law firm without my help.

12  Q   ICO is an initial coin offering; correct?

13  A   That's what I understood that to mean, yes, sir.

14  Q   And the ICO that you're talking about here is ultimately

15  the ICO for Paycoin; right?

16  A   Yeah.  Josh was talking about taking ICO sometime in

17  early '15.

18          MR. BUCHDAHL:  I'd like to offer Plaintiffs' Exhibit

19  66.

20          THE COURT:  Okay.  66 will be full.

21      (Plaintiffs' Exhibit 66, received in evidence.)

22  Q   (By Mr. Buchdahl) And if we start with your e-mail in the

23  middle, this is an e-mail that you sent on October 29, 2014;

24  correct?

25  A   Yes, sir.

1   Q   And you send this to your son Tommy?

2   A   I did.

3   Q   And to Jed Kleckner, who's the head of Cantor Ventures;

4   correct?

5   A   Yup.

6   Q   And you write in all capital letters:  "FYI.  NEW WORLD

7   COMING.  ICO"; correct?

8   A   That's correct.

9   Q   You were excited about that; right?

10  A   Yeah, it sounded really cool.

11  Q   And the subject line says that the next steps in Project

12  Prime are HashPool and HashCoin; correct?

13  A   Yes.

14  Q   And you understood that HashCoin was eventually renamed

15  Paycoin; right?

16  A   Sure, yeah.

17  Q   And if you look at the top of page 2, it says, "HashPool is

18  here, HashCoin is coming"; right?

19  A   Yes.

20  Q   Do you believe that you read this before you forwarded it

21  to your son and Mr. Kleckner?

22  A   I might have scanned it.  I don't know how closely I read

23  it.  I'm just letting them know what's going on.

24  Q   If you look at the fifth paragraph down, it says, there's

25  something called a HashPool, which pays out in Hashpoints.  Do

1    you see that?

2          If you look at the next paragraph, Mr. Boles.  There

3    you go.

4          Do you see that?

5    A   Yes, I see that.

6    Q   And you understood that with Hashlets GAW Miners' customers

7    could choose different pools, and the idea was that different

8    pools would mine different kinds of cryptocurrency; right?

9    A   Yeah.  I understood it in a general term, not like that

10   professor guy.

11   Q   And you had a general understanding from this announcement

12   that now a GAW Miners' customer could select to receive

13   Hashpoints instead of Bitcoin; correct?

14   A   Well, I thought these things could do -- I don't know,

15   Dogecoins, WolfCoins.  I mean I thought they could do any

16   coins, so yes.

17   Q   And the notion here was that Hashpoints would be better

18   because, unlike Bitcoin, they wouldn't be subject to

19   fluctuation in the price of Bitcoin; correct?

20   A   I didn't really understand it.  Josh had this whole idea

21   about how to somehow create a level floor, which I didn't

22   understand.  So Josh was telling me at the time that's what

23   people thought, that the problem with Bitcoin was it was too --

24   it went up and down too much.  It was, you know, too erratic.

25   And he thought that if he could create a coin that was more

1    constant, then it would be easier to use.  You know, you knew

2    that two coins equaled a loaf of bread rather than today it's

3    ten, tomorrow it's one.  That's what I understood.

4    Q   Now let's look at page 4.  It says, "HashCoin is coming."

5           Do you see that?  Do you see that, sir, "HashCoin is

6    coming"?

7    A   Yes, I see that.

8    Q   And it says, "Guess what?  The HashPool will allow you to

9    participate in the ICO for the world's greatest coin:

10   HashCoin."

11          Do you see that, sir?

12   A   Yeah.

13   Q   And you understood the general idea that a GAW Miners'

14   customer could use the Hashpoints that they received from their

15   Hashlets to participate in the ICO for what became Paycoin;

16   correct?

17   A   Can you say it one more time?  It's hard in here.

18   Q   Sure.  I apologize.

19          The general idea, sir, as described in this e-mail

20   that you forwarded to Jed Kleckner and your son was that GAW

21   Miners' customers would be able to use their Hashpoints to

22   participate in the ICO for what became Paycoin; correct?

23   A   Seems reasonable to believe, yes, sir.

24   Q   If you look a little further down, it says that HashCoins

25   can be used to buy products at places like Target, Walmart,

1    Amazon, and Macy's; correct?

2    A    Yeah.

3    Q    And this was part of the new world that you were describing

4    in your e-mail; correct?

5    A    Part of the new world I was describing in my e-mail?  I

6    mean --

7    Q    Let's go back to your e-mail at the front.  You write --

8    A    Oh, okay, yeah, it was a forward-thinking comment I, you

9    know -- statement.

10   Q    Let's look at Plaintiffs' Exhibit 81.

11          MR. BUCHDAHL:  I don't think there's an objection to

12   this one, Your Honor.

13          THE COURT:  81?  Sorry.

14          MR. WEINER:  No objection.

15          THE COURT:  Okay.  81 will be full.  My bad.

16     (Plaintiffs' Exhibit 81, received in evidence.)

17   Q    (By Mr. Buchdahl) Let's just start here at the top and look

18   at the headline.  "GAW Miners Announces Plans for Initial Coin

19   Offering.  The ICO introduces Paycoin, a new cryptocurrency

20   with significant investor backing."  And the date of this press

21   release is November 24, 2014.

22          Now, this is within a week of the meeting you were

23   setting up at Cantor; correct?

24   A    Yeah, I believe -- yeah, we met at Cantor, and then they

25   went to, like, the biggest law firm in New York City the next

1    day.

2    Q    Now, if we look down, there's a quote from you in the press

3    release.  And you write, "Although relatively new,

4    cryptocurrency is shifting the economic paradigm and that is

5    reason enough for traditional financial organizations to start

6    taking this seriously, said co-founder and early investor,

7    Stuart Fraser, Vice Chairman and Partner, Cantor Fitzgerald,

8    L.P."

9             You agreed to provide that quote to this press

10   release; correct?

11   A    I don't recall, but I could have.  I don't recall.  But

12   that's what I said.

13   Q    Sir, one of the reasons you agreed to provide this quote

14   was because you believed it was in your best interests to keep

15   playing nice with Josh so if the company panned out, you would

16   get something back; correct?

17   A    I wanted to help Josh as much as I can without hurting

18   myself.  And, yeah, I mean -- yes, yeah.  I was hoping it would

19   pan out.

20            MR. BUCHDAHL:  Your Honor, I'd like to offer the

21   testimony from the civil deposition at the bottom of page 196.

22   We already have page 197 in evidence, but I would like to add

23   page 196, beginning on line 21.

24            THE COURT:  All right.  I'll allow it.  PX 196 will be

25   PX 197.

1          (Plaintiffs' Exhibit 196, received in evidence.)

2          (Plays video.)

3     Q    (By Mr. Buchdahl) Let's turn to Plaintiffs' Exhibit 80.

4     A    80?

5               THE COURT:  Okay, 80 will be a full exhibit.

6          (Plaintiffs' Exhibit 80, received in evidence.)

7     Q    (By Mr. Buchdahl) And I would like to start with the e-mail

8     at the bottom of the first page.

9               Sir, this is an e-mail from Harrison Wise whose e-mail

10    address is harrison@wisepublicrelations.com.  He sends this

11    e-mail on Friday, November 21st.  He says here, "Let's not

12    forget that we also need blessing on Stuart's quote as noted in

13    the latest draft."

14              Do you see that?

15    A    Yes.

16    Q    All right.  And, sir, do you recall that Harrison Wise was

17    a public relations professional who was retained to work on

18    behalf of GAW Miners?

19    A    Harry Wise?

20    Q    Yes.

21    A    Harry Wise also works for Cantor Fitzgerald.  He was a

22    lawyer, and he was terribly injured in the 9/11 event.  And he

23    took time off, and he got better.  And he's now back working

24    for us full time.

25    Q    So Harry Wise was someone that you introduced to Josh to

1    help with press; correct?

2    A    I've known Harry for 30 years.

3    Q    That's not my question, sir.  Harry Wise is someone you

4    introduced to Josh to help with the press; correct?

5    A    To help with the press?

6    Q    Yes, to --

7    A    Harry was a lawyer at the firm.  I didn't even notice this

8    thing.  But I didn't hire Harry.  Harry wasn't hired.  He was a

9    friend at Cantor.  Again, he was working --

10             THE COURT:  Sir, sir, the question was --

11             THE WITNESS:  I'm sorry.  I'm trying to explain.

12             THE COURT:  I know that, but the question was really:

13   Harry Wise is someone you introduced to Josh to help with the

14   press.  Is the answer "yes"?  Is it "no"?  Or is it "I don't

15   know"?

16             THE WITNESS:  Harry Wise was someone I introduced to

17   Josh to deal with the press?

18   Q    (By Mr. Buchdahl) Let's start there.  Is Harry Wise someone

19   that you introduced to Josh?

20   A    Yes.

21   Q    And he was helping put together this press release;

22   correct?

23   A    I think he was only concerned with my part in it; but, I

24   mean, I really don't recall Harry being involved in this.  But

25   I see this now and, you know.

1    Q    So Josh then forwards --

2    A    But it was after their discussion, you know.

3    Q    So Josh forwards this e-mail to you.  And he asks, "Are you

4    cool with this?"  Correct?

5    A    Yes, it says that, sir.

6    Q    And then you write, "Sure."

7              Do you see that?

8    A    Yeah, it says -- it says, "Are you good with this?"  It

9    doesn't mention Cantor.  And I said, "Sure."

10   Q    Right.  But then you actually decided you wanted to make

11   some changes to how you were described; right?

12   A    I don't know.

13   Q    Well, sir, let's look at the exhibit together.  Plaintiffs'

14   Exhibit 81.  You write, on November 21st, "Maybe I should be

15   identified as a founding investor?"  And then you say -- you

16   write, "Said Stuart Fraser, Co-founder/Early Investor and Vice

17   Chairman, etc."

18              Do you see that?

19   A    Yeah, I see it.

20   Q    And if you look down at the bottom of the page, you were

21   not identified as a co-founder or early investor in that draft

22   of the language; correct?

23   A    Correct.

24   Q    It was important to you that you be identified as someone

25   who had a stake in the company; right?

1   A    Yeah, I did have a stake in the company.  And I was there
2   in the beginning, so in a weird way I was a co-founder.
3   Q    And you also wanted to be identified as a vice chairman of
4   Cantor Fitzgerald; correct?
5   A    That's who I was.
6   Q    Well, sir, this was approximately almost ten years after
7   you retired; right?
8   A    I was still doing things for Cantor Fitzgerald as vice
9   chairman.
10  Q    Sir, there's no indication here that you even were in
11  semi-retirement; correct?
12  A    Do you want to know what I did as vice chairman?
13  Q    No, sir.
14  A    Okay.
15  Q    I asked you a question.  There's no indication here that
16  you were even in semi-retirement; correct?
17  A    I mean it doesn't say I wasn't a hockey player also; but,
18  yes, you're right.
19  Q    Let's go back to the press release, Plaintiffs' Exhibit 81.
20  If you look at the top, it says that this new cryptocurrency
21  has significant investor backing.
22          Sir, who are the significant investors backing
23  Paycoin?
24  A    I don't know.
25  Q    Were there any that you can identify other than you, sir?

```
1    A    I wasn't aware of any other investors unless Josh had

2    somebody out there, which now we know he might have.  But no.

3    Q    So once again, GAW Miners was issuing a misleading press

4    release; correct?

5    A    Josh might have had.  I didn't write this.  So maybe he

6    did.  I mean, you should talk to him, get him in here.

7    Q    Sir, you agreed to put your name and your title in a quote

8    in this press release; correct?

9    A    Everything I said in there was true.

10   Q    Sir, did you take any steps whatever to determine whether

11   anything outside your own quote was also true?

12   A    No.

13   Q    At the end of the second paragraph, this press release says

14   that the superior features of Paycoin will allow for, quote,

15   widespread consumer and merchant adoption.  Do you see that?

16   A    That's what -- that's what they hoped, yeah.

17   Q    And what that meant, "widespread consumer and merchant

18   adoption" meant, was that people would be able to use Paycoins

19   to go buy things at places like Amazon and Walmart; correct?

20   A    Yeah, correct.

21   Q    And if we look at your quote, you say that you believe that

22   cryptocurrency has the real possibility of being a viable

23   mainstream currency accepted by masses around the globe.

24        Do you see that?

25   A    Did you know Ecuador adopted it for its natural currency?
```

1  Q    Sir, I'm sorry, but I don't think that answered my

2  question.

3  A    I'm sorry.

4  Q    You wrote here that you believe that cryptocurrency has the

5  real possibility of being a viable mainstream currency accepted

6  by the masses around the globe.

7         Do you see that?

8  A    I see that.

9  Q    Did you believe that to be true in 2014?

10 A    I believed it to be a real possibility.

11 Q    What was the basis for that belief, sir?

12 A    Gut instinct.

13 Q    Now, other than Ecuador, it certainly is not true as of

14 today; right?

15 A    No.  The -- the country actually, the president declared

16 Bitcoin their official --

17 Q    Sir, I said "other."

18 A    Oh, I'm sorry.

19 Q    I appreciate that Ecuador did something.  Aside from

20 Ecuador, are there other places around the globe where

21 cryptocurrency has become a viable mainstream currency?

22 A    You should have asked the professor that.  I don't know.

23 Q    You're not aware of any, are you, sir?

24 A    I -- I, frankly, don't follow it anymore.  It's the last

25 thing I want to think of.

1    Q    Now, the very same day as this press release there was an

2    article in *The Wall Street Journal* about GAW Miners and

3    Paycoin; correct?

4    A    Sure.

5    Q    And you agreed to be interviewed by *The Wall Street Journal*

6    reporter in connection with that article; correct?

7    A    I agreed to do background information.

8    Q    And that background information you were going to provide

9    in an interview with *The Wall Street Journal* reporter; correct?

10   A    With the what?

11   Q    With *The Wall Street Journal* reporter; correct?

12   A    Yeah, I talked off the record to a *Wall Street Journal*

13   reporter.

14          MR. BUCHDAHL:  I'd like to offer Plaintiffs' Exhibit

15   152.

16          THE COURT:  Okay, 152 will be full.

17       (Plaintiffs' Exhibit 152, received in evidence.)

18   Q    (By Mr. Buchdahl) I would like to start at the back of this

19   exhibit with an e-mail from Amber Messer.  This e-mail is dated

20   November 20th, so a few days before that press release.

21          And Amber sends you this e-mail and she writes, "Hello

22   Stuart, it was a pleasure meeting you this week."

23          Now, Amber Messer is the personal assistant to Josh;

24   correct?

25   A    Yeah.  He -- she came with Josh and a couple of guys when

1  they met at Cantor and then the law firm.

2  Q   And then after that meeting, you took them all out to

3  dinner at Le Cirque; correct?

4  A   Yeah.

5  Q   Le Cirque is closed now, but it was a very expensive French

6  restaurant on The East Side; right?

7  A   A lot of expensive restaurants in New York, but yeah, yeah,

8  good depiction.

9  Q   And you paid for the dinner; correct?

10 A   Of course I did.

11 Q   And you invited Tommy to the dinner?

12 A   I may have.

13 Q   Would you take my word for it, sir, or would you like me --

14 A   Yeah, yeah, if you said it, I'm not going to dispute it.

15 Q   And you took Amber and Josh out to dinner?

16 A   Whoever was in New York that day, yes, sir.  Maybe Dan and

17 I think some other people were there, but go ahead.

18 Q   If we're looking now still at Plaintiffs' Exhibit 152,

19 Amber asks what time you'd be available to speak with Michael

20 Casey from *The Wall Street Journal*.  Do you see that?

21 A   Yes, sir.

22 Q   And if we go back a page, you respond, "Tomorrow sometime.

23 That okay?"

24          Do you see that?

25 A   Yes.

1    Q    And then Harry Wise writes an e-mail.  And, again, he's the

2    person that you introduced to Josh; right?

3    A    Yeah.

4    Q    Now --

5    A    He's employed at Cantor as well.

6    Q    Now, he writes here, "Nice to meet you."

7         And what I'm wondering is whether you are still

8    convinced that this Harrison Wise is the same as the Harry Wise

9    that you were talking about before?

10   A    I mean I could have been confused.  I didn't think there

11   were two Harry Wises but --

12   Q    All right.  So Harry Wise you introduced from Cantor

13   Fitzgerald chimes in, and he says, "Let me know if you'd like

14   me to sit in on this call with you.  I trust you're an old hand

15   at this" --

16   A    You know, it must have been a different Harry Wise.  I'm

17   sorry.  It confused me.

18   Q    So this Harrison Wise writes that Mr. Casey wants to talk

19   with you and it would be off the record and background only;

20   correct?

21   A    Entirely off the record, background only, correct.

22   Q    And that's the way that you wanted it; right?

23   A    That's what they asked for.  Yeah, I'd rather not have my

24   name in it.  But that's what they asked.  They asked for

25   background because the guy wanted to know that Josh was, like,

1    you know, a real person.  He didn't just show up out of nowhere

2    on Tuesday.

3    Q   Sir, you had no problem putting your name in the press

4    release; right?

5    A   I mean it showed up there.

6    Q   No.  You gave permission and edited the description of

7    yourself in that press release; correct?

8    A   Which one?

9    Q   The one we looked at five minutes ago, Plaintiffs'

10   Exhibit --

11   A   Yes, sir.

12   Q   That just didn't happen.  You gave explicit permission for

13   that; correct?

14   A   I -- I can't remember if I did.  Using the Cantor name was

15   not a usual thing.  I mean I would rather not; but, I mean, I

16   may have.  Like, I'm not trying to get out of it or in it.  I'm

17   just saying --

18         MR. BUCHDAHL:  Can we display Plaintiffs' Exhibit 81

19   one more time?

20         THE WITNESS:  It was a point that happened on its

21   own.

22   Q   (By Mr. Buchdahl) Sir --

23   A   Sorry.

24   Q   This text that identifies you as a vice chairman and

25   partner of Cantor Fitzgerald --

1    A    Yeah, that's fine, yes.  I agree with you.

2    Q    You explicitly gave permission for the company to identify

3    you exactly like this in its press release; correct?

4    A    I mean I don't remember, but, you know -- I don't -- you

5    know, I could have.  I could have.  I'm not saying I didn't.

6    Q    Do you --

7    A    I'm saying I can't remember at this moment exact this

8    thing.  I probably did, but, you know, I don't know why you're

9    beating me up over it.

10   Q    Sir, do you remember five minutes ago we looked at the

11   e-mail where you, yourself, edited the description and gave

12   permission?

13   A    Okay, then I did.  Then why are you asking me again?

14   Q    Because you said you didn't remember, sir.

15   A    Okay.

16   Q    Let's go back to 152.

17        This Harrison Wise says that Mr. Casey wants to get

18   your confirmation of what's going on per the interview

19   yesterday with Josh.

20        Do you see that?

21   A    He just wants to get permission of what's going on per

22   interview with Josh, okay, yeah.

23   Q    And so you understood that the reason that *The Wall Street*

24   *Journal* reporter wanted to talk to you was to get your

25   confirmation of what was going on at the company; correct?

1   A    No.

2           MR. BUCHDAHL:  Your Honor, I'd like to offer from the

3   SEC deposition page 231 --

4           THE WITNESS:  I gave background.

5           THE COURT:  230?

6           MR. BUCHDAHL:  231, lines 11 to 14.

7           THE WITNESS:  Is this the first or second?

8           THE COURT:  This would be the first deposition, sir.

9           THE WITNESS:  Two what?

10          MR. BUCHDAHL:  231.

11          THE COURT:  Yes.  Page 231 can come in as a full

12  exhibit.  That will be PX 197 -- no, 198, pX 198.

13      (Plaintiffs' Exhibit 198, received in evidence.)

14  Q    (By Mr. Buchdahl) Sir, at your SEC deposition, the SEC

15  examiner asked you, "So you understood that the reason Mr.

16  Casey wanted to talk to you was to get your confirmation of

17  what's going on at the company?"

18          And you answered, "Correct."

19          Do you see that?

20  A    Yes.

21  Q    That's what you told the SEC under oath, that you

22  understood that; right?

23  A    Yeah, correct, that's what I said, exactly that.

24          MR. BUCHDAHL:  Let's go back to Plaintiffs' Exhibit

25  152, Mr. Boles.

1    Q   (By Mr. Buchdahl) And if we look toward the top of the

2    exhibit now, you send an e-mail to Josh, and you say, "Any

3    questions I need to be ahead of?"

4            Do you see that, sir?

5    A   Right.

6    Q   And you understood that you were asking Josh for

7    information about the company so that you'd be able to confirm

8    it to *The Wall Street Journal* reporter; right?

9    A   Yeah.  I mean if there's anything specific that he thought

10   he would ask that I should -- that I would -- that I should

11   know.

12   Q   And Josh gives you some specifics then in response;

13   correct?

14   A   Yeah.  I wasn't looking for numbers, but, you know.

15   Q   And he says, We're adding over 10,000 customers a day.

16   We'll be at around 500,000 by the end of the year and a million

17   in eight months or so.

18           And then he says, We have analyzed income of $120

19   million.  We think that will double in under a year.  And then

20   he writes, We have collected over a million e-mail addresses

21   for the ICO invite.

22           Do you see that?

23   A   Yes, sir.

24   Q   Sir, would you please tell the jury what you did to

25   validate or verify any of that information before you spoke to

1    *The Wall Street Journal* reporter?

2    A    No.  I ignored it because it was all forward thinking.

3    Like, how am I going to know where we're going to be in a year?

4    And why would I take -- I mean, so I had to talk to the guy the

5    next day, and so I ignored it.  I wasn't going to talk about it

6    anyway.

7    Q    The answer is, sir, you did nothing to validate any of

8    these numbers; correct?

9              MR. WEINER:  Objection.  Argumentative.

10             THE COURT:  Well, I think he can ask the question, so

11   I'll overrule that.

12   Q    (By Mr. Buchdahl) Sir, the question is:  You did nothing to

13   verify any of this information; correct?

14   A    I just explained to the jury like you asked me to, and

15   that's what I did.  So whatever you think.

16   Q    So your answer was, I ignored it; right?

17   A    I -- I wasn't there to fulfill these kind of things, and

18   these were forward-thinking thoughts about people's predictions

19   over the next year or year and a half.  And so I wasn't even

20   going to go there.  So why would I even try to figure that out?

21   Q    Sir, are analyzed income --

22   A    And if you read the last thing, it says, "as you don't know

23   any of these numbers."  So he knows I don't even know them, so

24   I don't know what you're talking about.

25   Q    The last sentence says you don't know the ICO financial

1    numbers; correct?

2    A    I don't know any of it.  This is all forward-thinking stuff

3    that I have -- I got no reports on, no knowledge.

4            THE COURT:  Sir, sorry to interrupt you, but it was a

5    simple question.  He was --

6            THE WITNESS:  But he keeps asking --

7            THE COURT:  Wait, sir.  Don't interrupt me, please.

8            All he said was, was he reading correctly when it said

9    you say you don't know the ICO financial numbers?  That's a

10   yes-or-no question.  Did he read it correctly or not?

11           THE WITNESS:  I did not know them.

12   Q    (By Mr. Buchdahl) Sir, you understood, in speaking with *The*

13   *Wall Street Journal*, that you were lending your credibility to

14   GAW Miners; correct?

15   A    I thought I was lending my credibility to the writer who

16   was writing the article to look for background.  I did not ask

17   for my name to be in that article.

18           THE COURT:  All right.  We're going to take a break.

19   We're going to take our morning break, Ladies and Gentlemen.

20           Thank you for your attention this morning.  Don't

21   discuss the case.  Don't let anyone discuss it with you.  Keep

22   an open mind and all my instructions that go with that.  We'll

23   have you back in the courtroom at ten minutes after 11:00.

24   Thank you very much.

25       (The jury left the courtroom at 10:46 a.m.)

```
 1              THE COURT:  All right, you can step down, sir.
 2              All right, we'll be in recess.  I want to consider
 3    your letters.  Mr. Weiner.
 4              MR. WEINER:  Your Honor, I'm not sure how much longer
 5    Mr. Buchdahl's going to go.  If I'm going to get to examine Mr.
 6    Fraser before the next break, I have a couple of issues to
 7    raise with you.  If not, then I can wait.
 8              MR. BUCHDAHL:  It seems unlikely.
 9              THE COURT:  It seems unlikely is what he says.  All
10    right.  We'll be in recess.  Thank you.
11         (Recess from 10:47 a.m. to 11:09 a.m.)
12              THE COURT:  Let's have Mr. Fraser take his seat.
13              MR. BUCHDAHL:  Respectfully, Your Honor, Plaintiffs
14    request that the Court instruct this witness not to say "9/11"
15    again.
16              THE COURT:  Not to what?
17              MR. BUCHDAHL:  Not to say "9/11" again.  This witness
18    invented a person who was not related to the events -- I'm not
19    saying invented as in brought in a person not related to the
20    events.  It appeared solely to tell this story.  I think that
21    crossed the line that we had discussed, and I think that should
22    be the last of it.
23              MR. WEINER:  Part of my application I mentioned before
24    was you remember Your Honor had reserved decision on whether
25    Mr. Fraser could mention, when he answered the question, why
```

1    did you retire from Cantor Fitzgerald? events of 9/11.

2              And I think Your Honor, as you expressed it, you said,

3    Well, what do events ten years or earlier have to do with these

4    events?

5              Now, you've seen the Plaintiff's examination go all

6    the way through his history at Cantor Fitzgerald since 1983,

7    who he talked to, what products he sold, what positions he had,

8    who reported to him.  And then they even asked him:  When did

9    you retire?

10             So when we get to our part, he should be allowed to

11   mention that, in answer to the question that Your Honor

12   reserved ruling on, which is:  Why did you retire?  The events

13   of 9/11.

14             THE COURT:  I haven't yet decided that issue, but it

15   is true the testimony that came up all of a sudden really

16   wasn't quite related to that.

17             So, Mr. Fraser, sir, I think you do need to refrain

18   from mentioning 9/11.  I'm telling you you need to refrain from

19   mentioning 9/11.  Until we get to Mr. Weiner's examination,

20   I've reserved on an issue regarding that, and I'm still

21   reserving.

22             MR. BUCHDAHL:  One other thing so we can line up ahead

23   of time.  I'd like to offer page 232 of the SEC deposition of

24   the last question and answer, lines 14 through 18.

25             MR. WEINER:  And on the topic before that, Your Honor,

1    can I be heard on that topic before?

2         THE COURT:  I'm sorry.  You want to be heard on the

3    topic of offering page 232?

4         MR. WEINER:  No.  On the topic we just left.

5         THE COURT:  Just one second.

6         MR. WEINER:  What page is that?

7         THE COURT:  Page 232 of the SEC deposition.

8         MR. BUCHDAHL:  Lines 13 to 14.

9         THE COURT:  Yeah, that seems to be in line.

10        MR. WEINER:  No objection.

11        THE COURT:  Okay, so page 232 of the SEC deposition

12   will be PX 199.

13        Now, while we're on that, so just so we're clear, all

14   of these exhibits from deposition testimony that have been

15   offered and now admitted by me as full exhibits will need to be

16   copied and loaded onto the Juris system.  That's really up to

17   Plaintiffs' counsel to make sure that's done.

18        MR. BUCHDAHL:  We are stickering them as we go.

19        THE COURT:  Got it.

20        Then, Mr. Weiner, you get the last word.  What was the

21   other matter?

22        MR. WEINER:  Your Honor, as long as we know we're

23   tabling the discussion of 9/11 and his rule there, I'm going to

24   bring it up again at an appropriate time.

25        THE COURT:  Yes, that's fine.  Let's get the jurors.

1      (The jury entered the courtroom at 11:13 a.m.)

2           THE COURT:  Come on in, folks.  Come take your seats.

3           All right, welcome back.  Please take your seats.

4      Everyone else can be seated.

5           Mr. Buchdahl, whenever you're ready.

6           MR. BUCHDAHL:  Yes, Your Honor.  I'd start by

7      displaying what has come in as Plaintiffs' Exhibit 199.  I'd

8      like to show lines 14 through 18 of page 232 of the SEC

9      exhibit.

10     Q   (By Mr. Buchdahl) Sir, you were asked under oath by the

11     SEC, "So did you understand that in speaking with *The Wall*

12     *Street Journal* reporter you were essentially lending your

13     credibility to GAW Miners?"

14          And your answer, sir, was, "Lending my credibility at

15     GAW Miners.  Sure."

16          Do you remember giving that testimony to the SEC?

17     A   Yes.

18     Q   The truth is, sir, you didn't really care if the

19     information in *The Wall Street Journal* story was accurate or

20     not, did you?

21     A   No.

22     Q   You were speaking off the record, so you thought you could

23     keep your fingerprints off of the story; right?

24     A   No.

25     Q   Now, after you spoke with Mr. Casey, *The Wall Street*

1   *Journal* did, in fact, publish a story about GAW Miners;

2   correct?

3   A    Correct.

4   Q    And you read that story when it came out, didn't you, sir?

5   A    Correct, yes.

6        MR. BUCHDAHL:  The Plaintiffs offer Plaintiffs'

7   Exhibit 82, Your Honor.

8        THE COURT:  That will be a full exhibit, PX 82.

9        (Plaintiffs' Exhibit 82, received in evidence.)

10  Q    (By Mr. Buchdahl) Now, this story is dated November 25,

11  2014, the same day as the press release, and the headline is,

12  "BitBeat:  GAW Miners to Launch Bitcoin Challenger, Paycoin."

13       And you can see it identifies the author of the story

14  here as Michael Casey, the reporter that you spoke to; correct?

15  A    Yes, sir.

16  Q    Because you did, in fact, have an interview with Mr. Casey

17  before this story came out; right?

18  A    Yes, sir.

19  Q    And you talked to him about the company; correct?

20  A    Yes, sir.

21  Q    Now, you'll agree with me that *The Wall Street Journal* is

22  one of the most important financial newspapers in the world;

23  correct?

24  A    I think so, if that helps you.

25  Q    If you look at the bottom of the first page, the newspaper

1    actually quotes from the press statement that you helped edit,

2    the one about the ICO for Paycoin; correct?

3    A   I don't -- I don't think I helped edit anything.

4    Q   You certainly helped edit the description of yourself.

5    A   Oh, I described myself in it.  But you were asking about

6    something specific; so, no, I didn't do that.  But, yes, I

7    described myself in the article.

8    Q   You concede that the press statement that you issued the

9    same day was quoted in this story; correct, sir?

10   A   The quote that you were reading the bottom of the line here

11   that Josh gave?  I'm sorry.  I can read it, yes, sir.

12   Q   I'll withdraw that.

13           If you look at the top paragraph on the second page,

14   the newspaper says that Paycoin was previously code named

15   HashCoin; correct?

16   A   That's what it says, yes, sir.

17   Q   Now, let's look at the second paragraph on the second page.

18   It says, "When the coin opens to the public on January 2 with

19   what Mr. Garza says will be an anticipated market

20   capitalization of $250 million, the company will partly back

21   that with a store of fiat currency worth around $100 million."

22           Do you see that?

23   A   Yes, sir.

24   Q   Fiat currency is currency like United States dollars that

25   is issued by a government; correct?

1   A    Maybe on a multiple choice I could get that answer right.

2   But, yeah, if that's what you say it is, I agree.

3   Q    Sir, will you agree with me that Bitcoin is not a fiat

4   currency?

5   A    I don't --

6   Q    You don't know what fiat currency is?

7   A    I don't, sir.

8   Q    You would have no way of knowing what that means when you

9   read this sentence in *The Wall Street Journal*?

10  A    I would just read that to understand that they had -- that

11  they set aside a hundred million to whatever they wanted to do,

12  to capitalize it.  I don't know.

13  Q    It says, "While those funds won't function as a 100 percent

14  reserve, they will combine with added features within the

15  Paycoin protocol, including a supply schedule that fluctuates

16  depending on the level of minor demand, to reduce exchange-rate

17  volatility and thus seek to resolve one of Bitcoin's biggest

18  barriers to mass adoption."

19          Do you see that?

20  A    Yes, sir.

21  Q    And what this is talking about is that Paycoin's price

22  would be more stable than Bitcoin's price; correct?

23  A    That's what Josh was trying to accomplish, I believe,

24  yes.

25  Q    And part of the way that GAW Miners would keep the price

```
 1    stable is by using a reserve of a hundred million dollars in
 2    cash; correct?
 3    A    That's what this says, yes, sir.
 4    Q    Sir, when you read it, were you surprised to see the claim
 5    that Paycoin would be backed by a hundred million dollars?
 6    A    No.
 7    Q    This was a significant claim; correct?
 8    A    This is what Josh said all along; so, I mean, it wasn't my
 9    coin.
10    Q    And you would agree that a hundred million dollars would
11    provide a significant amount of protection for Paycoin
12    purchasers; correct?
13    A    I had no idea whether that was enough or not enough or ...
14    Q    Sir, did you take any steps to confirm the existence of
15    that $100 million store of reserves?
16    A    Well, it would be kind of hard to because this is dated in
17    November, and he wasn't going to start it till January.  So,
18    no, I did not.
19    Q    So did you confirm to Mr. Casey the $100 million reserve
20    fund?
21    A    Did I confirm with Mr. Casey?
22    Q    Do you recall that Mr. Casey is The Wall Street Journal
23    reporter?
24    A    Yes, sir.  I know who he is.  Thank you.  But I did not --
25    I was there to provide background information, and that's what
```

1    I did.

2    Q    You understood that you were there to give confirmation

3    about what was going on; correct?

4    A    That Josh was a real person and that, you know, he just

5    wasn't just invented.  That's -- I was there for background,

6    not knowledge on the inner workings of a coin that I could not

7    possibly understand.

8    Q    So your position here under oath is that when Mr. Casey

9    called you to get your confirmation of what's going on, the

10   part about the $100 million just never came up?

11   A    Yes.

12   Q    The article states that backing Mr. Garza is Stuart Fraser,

13   vice chairman and partner at Wall Street inter-dealer broker

14   Cantor Fitzgerald LP, a long-time backer of Mr. Garza's

15   projects.

16          That was true; right, sir?

17   A    Absolutely.

18   Q    And you understood that people would see your name there

19   and your impressive title and pedigree and, as a result, they

20   would have more confidence in GAW Miners; correct, sir?

21          MR. WEINER:  Objection.  Speculation.

22          THE COURT:  Well, he's asking about what he

23   understood, so I'll overrule it.

24          THE WITNESS:  I'm sure it didn't hurt to have me on

25   there, but I wasn't trying to influence anybody.

1    Q    (By Mr. Buchdahl) It not only didn't hurt --

2    A    And it's true.  I was a backer for a long time.  So, I

3    mean, it's not a lie.

4    Q    The article also talks about the Hashlet product and how

5    customers would be able to trade Hashlets on an exchange;

6    correct?

7    A    I believe that was in the article, yes, sir.

8    Q    All right.  Let's look at -- I'd like to offer Plaintiffs'

9    Exhibit 84.

10        THE COURT:  Okay.  Plaintiffs' 84 is a full exhibit.

11        (Plaintiffs' Exhibit 84, received in evidence.)

12   Q    (By Mr. Buchdahl) Mr. Fraser --

13   A    Yes, sir.

14   Q    -- if you look at the top of Plaintiffs' Exhibit 84, you

15   can see that this is an e-mail from Michael Casey the day after

16   the article came out; correct?

17        MR. WEINER:  And, Your Honor, there is a limiting

18   instruction on this.

19        THE COURT:  Yes.  So, Ladies and Gentlemen, you're

20   about to be shown this e-mail.  There are various statements in

21   the e-mail.  You may not consider the statements for the truth

22   of what the statements actually say.  Instead, you should

23   consider the e-mail as to questions of what Mr. Fraser was

24   aware of or not aware of regarding Mr. Garza's activity and for

25   that limited purpose.  You may not consider the truth of what

1    the statements are saying because the author of the statements

2    is not here to be cross-examined.  All right?

3            Go ahead, Mr. Buchdahl.

4            MR. BUCHDAHL:  Thank you, Your Honor.

5    Q   (By Mr. Buchdahl) All right.  Michael Casey is the same

6    *Wall Street Journal* reporter that you spoke to and who wrote

7    the article; correct?

8    A   Yes.

9    Q   He writes this e-mail, and he sends it to four people.  One

10   is Josh Garza.  One is you; correct?

11   A   Yes.  I was CCed.

12   Q   And he sends it actually to your Cantor Fitzgerald e-mail

13   address; correct?

14   A   Yes, sir.

15   Q   And then he also copies Dan Kelley.  And that's the COO of

16   GAW Miners; correct?

17   A   I'm sure he was at the time.  He had a lot of titles, I

18   think, but yes.

19   Q   And then there's also someone with an e-mail address

20   mjlindenberger@gmail.com.  Do you see that?

21   A   Yes, sir.

22   Q   Do you know who mjlindenberger is?

23   A   There's actually two of them -- or maybe there's one.  But,

24   no, I don't recall who that person is.

25   Q   Mr. Casey sent this e-mail to the most senior people

1   associated with GAW Miners; correct?

2   A    Josh and Dan, sure.

3   Q    And you; correct, sir?

4   A    As an investor, yes, sir.  I mean I was in the article.  So

5   I assumed he sent it to everybody.

6   Q    Let's start at the bottom of page 2.  You can see that Mr.

7   Casey had sent an earlier e-mail.  And if you look at the top

8   of page 3, he writes, "Josh, I'm really quite stunned by the

9   comments that have poured into the story.  It is an elephant in

10  the room that demands a follow-up story.  We are now compelled

11  to address the charges that GAW is a fraudulent operation."

12          And, Mr. Fraser, you were aware of some of these

13  comments that came in after the story was published; correct?

14  A    Yes.

15  Q    Now, if you go back to the front page, in Mr. Casey's

16  e-mail, you can see at the bottom, he says, "So here are the

17  questions."  And he says, "the big one."

18          And he writes, "What can you provide to show that

19  there are actual coins being mined and payments being made from

20  them?"

21          Do you see that?

22  A    Yes, sir.

23  Q    And then if you look at page 2, No. 8, he says, "Most

24  importantly, if trade and/or investments in a pool of assets is

25  part of the business model, is it regulated by the SEC,"

1    question mark?

2           Do you see that?

3    A   Yes, sir.

4    Q   Mr. Fraser, after you received these questions from *The*

5    *Wall Street Journal* reporter, what did you do to answer them?

6    A   It was up to Josh to answer them.

7    Q   Sir, is the answer you did nothing?

8    A   I left it to Josh to do -- I knew -- I have no in-depth

9    knowledge of any of these systems or things.  I mean he had --

10   he was paying a bunch of people, so, I mean, this was all -- I

11   mean I was concerned, but it was on him to come up with these

12   answers.  I had no ability to access anything.

13   Q   Sir, did you take any steps to satisfy yourself that this

14   company that you had described as your new baby was operating

15   on the level?

16   A   Yeah.  I asked Josh if any of this was true.

17   Q   Other than asking Josh, did you take any other steps --

18   A   Not that I'm aware of.

19   Q   So you didn't attempt to visit the mining operations?

20   A   In Mississippi?

21   Q   Yes.

22   A   No.

23   Q   Did you request any information about the data center in

24   Mississippi?

25   A   I requested information in the past when I had more power.

```
 1    Now I had no power.  So what was the point?  It was up to him
 2    to figure it out.
 3    Q    Sir, is that a no?
 4    A    Yes, sir.  That was a no.  I'm sorry.
 5    Q    Did you seek any additional financial records relating to
 6    the data center in Mississippi?
 7    A    No.
 8    Q    Did you follow up to find out if the inventory system that
 9    was not present in July had ever been addressed?
10    A    No.
11    Q    Did you ask to speak to anyone involved in the company
12    other than Josh?
13    A    I didn't know anyone else in the company but Josh.
14    Q    Well, there were other people copied on this e-mail.  Did
15    you seek to have any conversation with Mr. Kelley?
16    A    No.
17    Q    Sir, did it concern you that you had been identified as
18    backing a company that was being accused of fraud?
19    A    Absolutely.
20    Q    And you understood that the article made a lot of claims
21    about the business; correct?
22    A    The article said what he intended to do with the business,
23    yes, sir.
24    Q    And you understood that a lot of people would read this
25    article because it was appearing in The Wall Street Journal;
```

1   correct?

2   A    Correct.

3   Q    Did you ever respond to Mr. Casey in connection with his

4   questions?

5   A    Direct from me?

6   Q    Mr. Casey --

7   A    No, I did not.

8   Q    -- sent you this e-mail, sir.  Did you ever respond to him?

9   A    I never responded, no, sir.

10  Q    So you stayed out of it.  Is that fair?

11  A    These were answers I couldn't answer, so I mean of course

12  I --

13  Q    You didn't know the answers to any of these questions, did

14  you?

15  A    No.

16  Q    You didn't know if this company was a fraud or not, did

17  you?

18  A    I mean, looking back -- I mean, you know, 20/20, yeah, you

19  could look back and say that.  But, you know, at the time, you

20  know, I mean, a bunch of crazy people on the internet crying.

21  It happens every day.  I mean, it was like the start of the

22  cancel culture people.  Half of these people are nuts.

23  Q    Sir --

24  A    So, you know, I took it seriously to a degree, but Josh

25  said, you know, "I got" -- "I got this."  So, no, I did not --

1    I did not know where to look.  I didn't know who to talk to and

2    ultimately, no, I did not.

3    Q   Sir, your response to this e-mail was to close your eyes

4    and hope for the best.  Fair?

5    A   Close my eyes -- no.

6    Q   In fact, Mr. Casey then wrote a follow-up story for *The*

7    *Wall Street Journal* that reported on these allegations about

8    GAW Miners; correct?

9    A   I believe he did, yes, sir.

10   Q   And you read that article too; right?

11   A   I read it at the time.  I haven't read it since.

12   Q   And in that article, Josh specifically said, how could this

13   be a fraud with Stuart Fraser --

14            MR. WEINER:  Objection, Your Honor, objection.

15   Reading from a document not in evidence.

16            MR. BUCHDAHL:  Your Honor, there -- if he recalls that

17   this happened, he can testify about it.

18            THE COURT:  I'll let him finish the question.  Go

19   ahead and finish your question because I didn't hear the whole

20   question.

21   Q   (By Mr. Buchdahl) The second article -- in the second

22   article, Josh specifically said, how can this be a fraud if

23   Stuart Fraser is involved; correct?

24   A   He made a quote similar to that, yes, very -- very similar

25   to that.

1    Q   And, sir, you understood that, just like the first article,

2    Mr. Garza's statement would be read by millions of people;

3    correct?

4    A   Yes, sir.

5    Q   And you didn't take any steps to find out what was really

6    going on at the company even after that second article;

7    correct?

8    A   After the second article, I did not take any more steps.

9    Q   You continued to be supportive of GAW Miners even after

10   these articles; correct?

11   A   In very subtle ways, yes.

12        MR. BUCHDAHL:  I'd like to offer Plaintiffs' Exhibit

13   91.

14        THE COURT:  Okay.  91 will be full.

15       (Plaintiffs' Exhibit 91, received in evidence.)

16   Q   (By Mr. Buchdahl) You start from the bottom.  David McLain

17   writes, "Stuart sent me questions about a pending investment in

18   GoCoin."

19        "Stuart" is obviously you; correct, sir?

20   A   Sorry?

21   Q   "Stuart" is obviously you; correct, sir?

22   A   Yes, sir.

23   Q   All right.  And David McLain is sending this e-mail to Josh

24   about this investment that GAW Miners was going to make in

25   GoCoin; correct?

1   A   I guess so, yes, sir.

2   Q   If you look at the next e-mail up, Josh Garza writes back,

3   "We are loaning them $75,000.  It will be in the form of a

4   note."

5          And then he writes, "I'm having trouble with some

6   personal paperwork.  So in the interest of time, I sent it to

7   Stu to have him make it.  I'll send him the $75,000, but it

8   will be coming from him.  He just needs to sign."

9          Do you see that?

10  A   Yes.

11  Q   And then Mr. McLain writes back, "Why don't you just have

12  the company loan it to them?"

13         Do you see that?

14  A   Yes, sir.

15  Q   And if you extend down to the signature there, Mr. Boles,

16  at this point Mr. McLain is identifying himself as the general

17  counsel of GAW Miners; correct?

18  A   That's what it says there, yes, sir.

19  Q   Your personal lawyer, who had been working for you for

20  years, was now acting as the company's general counsel; right?

21  A   That's what it says right there.

22  Q   When did Mr. McLain go from being your personal lawyer to

23  the general counsel of the company?

24  A   I -- I don't recall.  I know that he was -- at times he did

25  works for the hockey team, I mean, when we had to get guys back

1    from Canada.

2    Q   So your answer --

3    A   I don't know, sir.

4    Q   So then Josh writes, "I feel like there was something in

5    there that made the company ineligible.  Can you take a look?"

6            And then you finally respond, and you write, "Let me

7    know.  I will do whatever we need."

8            Do you see that?

9    A   Yes, sir.

10   Q   And this is months after you started having questions about

11   your involvement; right?

12   A   Yeah.

13           MR. BUCHDAHL:  I'd like to offer Plaintiffs' Exhibit

14   92.

15           THE COURT:  Okay.  What's the Defendant's position

16   with regard to Plaintiffs' Exhibit 92?

17           MR. WEINER:  Your Honor, you reserved ruling on this.

18           THE COURT:  I did.  Is there objection?

19           MR. WEINER:  Yes.

20           THE COURT:  Okay.  Can you just pull it up for me,

21   then, and for the witness, just for me and for the witness?

22           MR. BUCHDAHL:  May I inquire?

23           THE COURT:  You may inquire.

24   Q   (By Mr. Buchdahl) This is marked for identification as

25   Plaintiffs' Exhibit 92.  Do you see at the top it says, "GoCoin

1    LLC Convertible Promissory Note Purchase Agreement, Bridge

2    Financing."

3              Do you see that, sir?

4    A    Yes, sir.

5    Q    And GoCoin is the company that General Counsel Dave McLain

6    referred to at the bottom of the previous exhibit; correct?

7    A    I guess so, yes, sir.

8    Q    And the date here, December 11th, is two days after the

9    series of e-mails that we had just reviewed; correct?

10   A    Yes, sir.

11   Q    And if you could turn to the back of the exhibit, you

12   signed this document on behalf of a company identified as

13   Business Technology for Cryptocurrency Ventures, LLC.  Do you

14   see that?

15   A    It's not my signature.

16   Q    That's not your signature.

17   A    No, sir.

18   Q    Okay.  But it does appear over your name.  Fair?

19   A    Fair.

20   Q    And you had acknowledged in the previous exhibit that you

21   would be willing to do whatever you were asked to do in

22   connection with this transaction; correct?

23   A    Yes, sir.

24              MR. BUCHDAHL:  We'll offer Plaintiffs' Exhibit 92.

25              MR. WEINER:  Objection, Your Honor.

```
 1              THE COURT:  Okay.  Relevance objection?
 2              MR. WEINER:  Relevance.
 3              THE COURT:  Can I see the first page?
 4              MR. BUCHDAHL:  Sure.
 5              THE COURT:  So given that the amount is different and
 6    given what the witness said about his signature --
 7              MR. BUCHDAHL:  May I ask a couple more questions?
 8              THE COURT:  But you may inquire, yes.
 9    Q   (By Mr. Buchdahl) Okay.  Can we turn to the back again?
10    A   Yes, sir.
11    Q   Mr. Fraser, do you have any knowledge of the -- what the
12    entity Business Technology for Cryptocurrency Ventures, LLC is?
13    A   No.
14    Q   Are you familiar with the address, DHM Legal at 1405 Stone
15    Ridge Road?
16    A   Yeah, that's Dave's address.
17    Q   Dave McLain's address, your personal lawyer's address?
18    A   Yeah.  He acts as my personal lawyer at times, yes, sir.
19    Q   And at this time he was responsible for preparing documents
20    on behalf of GAW Miners; correct?
21    A   Apparently.
22              MR. BUCHDAHL:  Your Honor, we think this goes to his
23    degree of acting as a control person for this constellation of
24    business.
25              THE COURT:  Right, but I don't think you laid a
```

1   foundation for that yet.

2            MR. BUCHDAHL:  I don't know -- I'll withdraw the

3   question.

4            THE COURT:  I'll sustain the objection.

5            MR. BUCHDAHL:  All right.  I'm going to offer

6   Plaintiffs' Exhibit 93.

7            THE COURT:  All right.  PX 93 will be full.

8        (Plaintiffs' Exhibit 93, received in evidence.)

9   Q    (By Mr. Buchdahl) One again, Mr. Fraser, this is an e-mail

10  you sent on December 15th of 2014; correct?

11  A    Yes, sir.

12  Q    This is a couple weeks after *The Wall Street Journal*

13  appeared; correct?

14  A    Yes, sir.

15  Q    And the subject line is:  "Paycoin trading ahead of ICO";

16  right?

17  A    Yes, sir.

18  Q    And you sent this e-mail to Jed Kleckner, Thomas Fraser,

19  Scott Fraser, and Howard Lutnick; correct?

20  A    I did, yes, sir.

21  Q    And, again, this is the head of Cantor Fitzgerald --

22  A    My best friend.

23  Q    The head of Cantor Fitzgerald, Special Ventures, and your

24  two sons; correct?

25  A    Correct.

1    Q    And you write, "Guys, check out this site."

2              And it says -- it's got a website to a place chainz,

3    with a "z," .cryptoid.info, "and see where we are in market

4    cap."

5              And the "we" there was a reference to GAW Miners' coin

6    Paycoin; right?

7    A    Yeah, of course.

8    Q    And you were checking the trading activity around Paycoin

9    quite frequently at this period of time; correct?

10   A    It was very exciting, yes, sir.

11   Q    You were checking on lots of different websites lots of

12   time during the day; correct?

13   A    Yeah.  There was no one place to look.  So it was hard, but

14   yes.  Yeah, I looked around.  I didn't spend my day on it, but

15   I did notice it.

16   Q    You write, "I think Paycoin is now the 3rd most valuable

17   virtual coin and it's (sic) trading volume is the highest next

18   to Bitcoin."

19              Do you see that?

20   A    That's what I understood it to sign.

21   Q    So what you understood was the virtual currency that had

22   been invented and promoted by GAW Miners -- that is, Paycoin --

23   was being traded by lots of people; correct?

24   A    I don't know how many people, but I know it was getting

25   more valuable, if that's what you mean.  People liked it.

1   Q   But trading volume, in particular, sir, is a measurement of

2   how many different transactions are occurring in a currency;

3   correct?

4   A   No.

5   Q   Okay.  Trading volume captures how much currency and how

6   much quantities and how many transactions are happening in a

7   given day; correct?

8   A   I mean you're putting a lot of things together there,

9   but --

10  Q   Let me do it this way:  What is trading volume, sir?

11  A   Trading volume is the total volume that's traded that

12  day.

13  Q   And total volume is a function of the number of

14  transactions and the size of the transactions; correct?

15  A   Correct.

16  Q   And so what you saw here was that other than Bitcoin,

17  Paycoin had the highest trading volume of any cryptocurrency on

18  this date in mid-December 2014; correct?

19  A   It looked that way, yes, sir.

20  Q   And you were boasting about that to your best friends and

21  family; correct?

22  A   I wanted them to check it out to see if they could find out

23  more, yes.

24  Q   To see if they could find out more about what, sir?

25  A   Well, that's why I added my sons on a lot of the e-mails,

1   because, you know, I'm a 60-year-old guy, 55 at the time or --

2   you know, I'm an old guy.  I don't get it.  So I would send it

3   to people that understood it so they would look at it and then,

4   you know, maybe they'd come back and say, you know, this works,

5   this doesn't work, you know, my friends do it this way.  'Cuz

6   this isn't really my world.

7   Q    When you said Paycoin trading ahead of ICO, what you meant

8   by that is the ICO hadn't happened yet, but there was already a

9   market for Paycoin; correct?

10  A    I think it's called an ICO, not an IPO.  I think you said

11  IPO, but it's an ICO.  It's initial coin --

12         THE COURT:  Yup, I think that's what he said, sir.  I

13  understand maybe you might not have heard it.

14         The question was:  Does Paycoin trading ahead of ICO,

15  in your understanding, means that there's a market before the

16  ICO?  That was the question.

17         THE WITNESS:  Yeah, yeah, yeah, that's kind of the way

18  it works from my understanding.

19         MR. BUCHDAHL:  I'd like to offer Plaintiffs' Exhibit

20  94.

21         THE COURT:  94 will be full.

22      (Plaintiffs' Exhibit 94, received in evidence.)

23  Q    (By Mr. Buchdahl) This is an e-mail from December 16, 2014.

24  Do you see that, sir?

25  A    Yes, December 16th.

1   Q    And you write, "How do you want me to let my buddies know

2   about Paycoin?"

3         Do you see that?

4   A    Yes, I do, sir.

5   Q    You were still interested in promoting Paycoin despite the

6   questions that were raised around *The Wall Street Journal*

7   article; correct?

8   A    Yes.

9   Q    And one of the ways that you promoted GAW Miners and

10  Paycoin was on Twitter; correct?

11  A    Yeah, I went on Twitter.

12        MR. BUCHDAHL:  I would like to offer Plaintiffs'

13  Exhibit 68.

14        THE COURT:  68 will be a full exhibit.

15        THE WITNESS:  Sorry.  What number?

16        THE COURT:  PX 68.

17     (Plaintiffs' Exhibit 68, received in evidence.)

18        THE WITNESS:  Thank you.

19        MR. BUCHDAHL:  It's on your screen, sir.

20        THE WITNESS:  Yeah, I know.  I like to see the whole

21  thing.  Yes, sir.

22  Q    (By Mr. Buchdahl) Sir, you recognize this as an e-mail that

23  Josh Garza sent you on November 7th?

24  A    Yes, sir.

25  Q    And you write -- and he writes to you with a subject line

1   "Twitter," Hey make an account on there.  I have an idea,

2   smiley face.

3           Do you see that?

4   A   Yes.

5   Q   And this was after you said you had done everything you can

6   to distance yourself from the company; right?

7   A   Yeah.

8   Q   And you did make an account on Twitter; correct?

9   A   I actually did, yeah.

10  Q   And the idea that Josh refers to in this e-mail was that

11  you could use a Twitter account to help promote GAW Miners and

12  Paycoin; correct?

13  A   Yes.

14  Q   And you did that; right, sir?

15  A   I opened up an account, yes, sir.

16          MR. BUCHDAHL:  I'd like to offer Plaintiffs' Exhibit

17  143.

18          THE COURT:  Okay, 143.  I believe there was a

19  redaction; is that right?

20          MR. BUCHDAHL:  On the sidebar?

21          THE COURT:  Yes.

22          MR. BUCHDAHL:  Correct.

23          THE COURT:  That will be a full exhibit then, 143.

24      (Plaintiffs' Exhibit 143, received in evidence.)

25  Q   (By Mr. Buchdahl) Plaintiffs' Exhibit 143 is a record of

1    your Twitter account.  And each one of these is called a Tweet;

2    correct?

3    A   Yes, sir.

4    Q   So if we look at the second page, your very first Tweet,

5    you write:  Hashtag HashCoin ICO GAW Miners.  Here we come.

6           And then you provide links to websites for HashCoin

7    and a HashCoin white paper; correct?

8    A   Yes, sir.

9    Q   And on this November 7th date, had you read the HashCoin

10   white paper before you Tweeted it out?

11   A   I don't think I ever read it.  I couldn't read it.

12   Q   You couldn't read it why, sir?

13   A   I couldn't understand it.

14   Q   But you were comfortable Tweeting about it even though you

15   didn't understand it?

16   A   Yes.

17   Q   And that's because you wanted to promote your business;

18   right?

19   A   Well, the whole point of a white paper is you send it out

20   and people read it and it's like open source; and then people

21   help you make sure it worked, it kind of works.  I mean that's

22   my impression of it.

23   Q   Now, on December 16th, you Tweeted, "buy XPY"; correct?

24          It's on the first page.

25   A   What dates?  I'm sorry.

1   Q    December 16th, sir.

2   A    Yes.  "Sell Ruble," is that the one?

3   Q    Yes.

4   A    "Sell the Ruble, buy XPY," yeah.

5   Q    You understood that XPY was the symbol for Paycoin;

6   correct?

7   A    Yes.

8   Q    But you told the SEC that you never urged your buddies,

9   your friends, or your colleagues to buy Paycoin; correct?

10  A    True.  I mean, I never went out and urged my people -- my

11  friends to do anything, no.  I just -- I put things out there,

12  and if they wanted to get involved, it was up to them.

13  Q    Mr. Fraser, you told the SEC under oath that you never

14  urged your buddies or friends or colleagues to buy Paycoin;

15  correct?

16  A    Correct.

17  Q    And as late as December 31, you have another Tweet that

18  said, "Keep an eye on Paycoin in 2015.  It's going to be a

19  great year"; correct?

20  A    Yeah, sure.

21  Q    And now let's look at your Tweet from January 12th.

22       Do you understand what it means to Retweet something?

23  A    I do now.  I wasn't quite understanding of Twitter at the

24  time.

25  Q    Well, you understood that if you clicked to Retweet a

1    Tweet, that Tweet would then become a part of your Twitter

2    feed; correct?

3    A    Yeah, like sharing a comment on Facebook, yeah, sure.

4    Q    And what you shared here was a Tweet from GAW Miners that

5    said it was going to be honoring a $20 Paycoin; correct?

6    A    Yeah, that's what Josh said.

7    Q    And you understood that GAW Miners had been advertising

8    that it would use its $100 million fund to keep the price of

9    Paycoin over $20; correct?

10   A    More or less, yes.

11   Q    Sir, for Christmas in 2014, Josh Garza gave you a Tesla;

12   correct?

13   A    Yeah, yes, sir.

14   Q    And, in fact, he had it delivered to your garage with a

15   huge bow on it; correct?

16   A    Without me knowing, yes, sir.

17   Q    And you told the SEC that you thought that was weird and

18   that from the moment he gave it to you, you asked him to get it

19   out of there; correct?

20   A    Totally true.

21   Q    That wasn't true, sir.  The truth was you were happy to get

22   the car; correct?

23   A    No.

24        MR. BUCHDAHL:  All right.  I'd like to offer

25   Plaintiffs' Exhibit 98.

```
 1          THE COURT:  Right.  So 98 will be full.

 2      (Plaintiffs' Exhibit 98, received in evidence.)

 3   Q   (By Mr. Buchdahl) Sir, this is the text message you sent

 4   Josh when you got the car; right?

 5   A   That is correct.

 6   Q   And you write, "Too nice.  Thanks buddy"; right?

 7   A   Yes, sir.

 8   Q   There's nothing in here about, this is weird, get rid of

 9   it; correct?

10   A   It was a polite thank you.

11   Q   And there's nothing here rejecting a car; right?

12   A   Not on Christmas Eve, no, sir.

13   Q   Well, but you told the SEC that from the moment he gave it

14   to you, you said, Get it out of here right away; right?

15   A   I told him to take it away, yeah, almost immediately.

16   Q   No.  You told the SEC that from the moment he gave it to

17   you, you said, Get it out of there; right?

18   A   I may have said that, yes, sir.

19          MR. BUCHDAHL:  Your Honor, I'd like to offer in the

20   SEC deposition pages 49 and 50.

21          THE COURT:  Yes, okay, 49 and 50.  This will be PX

22   200.

23      (Plaintiffs' Exhibit 200, received in evidence.)

24          MR. BUCHDAHL:  Can we display --

25          THE COURT:  49 and 50 from the SEC deposition.
```

1  Q   (By Mr. Buchdahl) And so this is the question and answer

2  that you gave the SEC examiner under oath.

3           "Did he give you a car last year?

4           "Answer:  He gave a car.  He gave me a car -- well,

5           yes, he gave me a car for Christmas.

6           "Question:  And tell me about that.

7           "Answer:  We came home from dinner for my birthday,

8           and I opened the garage and there was a car in my

9           space with a bow on it.  And my wife -- and I looked

10          at my wife and saw the car and it was kind of weird

11          and gave it back.

12          "Question:  You gave it back to him?

13          "Answer:  Absolutely.

14          "Question:  When did do you that?

15          "Answer:  From the moment he gave it to me, I asked

16          him to come pick it up or get it out of there, and he

17          eventually -- a month ago, I think about a month ago

18          somebody picked it up, maybe two months ago."

19          Now, sir, the truth is you only got rid of the Tesla

20  after you received a subpoena from the SEC; correct?

21  A   No.

22          MR. BUCHDAHL:  I'd like to offer Plaintiffs' Exhibit

23  148.

24          THE COURT:  There was a redaction, I believe; is that

25  right?

1            MR. BUCHDAHL:  Yes.

2            THE COURT:  All right.  That will be full.

3      (Plaintiffs' Exhibit 148, received in evidence.)

4   Q   (By Mr. Buchdahl) I'd like to go to page 2.  You received a

5   subpoena from the SEC dated March 5, 2015; correct?

6   A   Yes, sir.

7   Q   And you understood that the subpoena had been sent to you

8   in the matter of GAW Miners; correct?

9   A   Yes, sir.

10  Q   And it was only after you got this subpoena that you tried

11  to give the car back; correct?

12  A   No, sir.

13           MR. BUCHDAHL:  I'm going to offer Plaintiffs' Exhibit

14  110.

15           THE COURT:  Okay.  110 will be a full exhibit.

16     (Plaintiffs' Exhibit 110, received in evidence.)

17  Q   (By Mr. Buchdahl) If we can look at the e-mail exchange.

18  Josh Garza sends an e-mail to Dave McLain dated April 9th,

19  2015.  And the subject line is:  "Stu car."

20           And he says to Dave McLain, "Ask him if the

21  transporter can come in the morning please."

22           And then if you look up at the top, you write to Dave

23  McLain, "I'll leave it out with the keys in it."

24           Do you see that?

25  A   Yes, sir.

1    Q    And this is when you gave the car back; right?

2    A    That's when they picked it up.

3              MR. BUCHDAHL:  I want to show -- offer Defense Exhibit

4    622.

5              THE COURT:  Okay.  622, DX 622 will be full.

6         (Defendant's Exhibit 622, received in evidence.)

7    Q    (By Mr. Buchdahl) This is the note that Josh sent you

8    around the time he gave you the car; correct?

9    A    I believe so, yes, sir.

10   Q    And he writes, "Just wanted to thank you for all you have

11   done.  Much of who I have become today is because of you.  I

12   did not have much of a father growing up, and you have very

13   much been that for me throughout much of my life.  Love you

14   buddy, Josh."

15             Did I read that accurately?

16   A    Yes, sir.

17   Q    And, in fact, the text where you said, "Too nice.  Thanks

18   buddy," that was in response to this; correct?

19   A    I'm sorry?

20   Q    The text when you said, "Too nice.  Thanks buddy," you

21   actually sent after this; right?

22   A    I mean if you say so.

23   Q    Sir, you understand that as a result of GAW Miners'

24   fraudulent business, people lost a lot of money -- correct? --

25   people other than you.

1   A    I believe people lost money, yes, sir.

2   Q    And as your lawyer alluded to in his opening statement, the

3   SEC sued Josh Garza and GAW Miners but not you for committing

4   securities fraud; correct?

5   A    Yes, sir.

6   Q    And as your lawyer also noted, the Department of Justice

7   charged Josh Garza but not you with federal crimes; right?

8   A    That's correct, sir.

9   Q    And that's what you mean when you said Thursday that you

10  got it done in the end; right?

11  A    I'm sorry?

12  Q    Withdrawn.

13       Sir, you're aware that Josh pled guilty to federal

14  crimes in connection with the GAW Miners' fraud; correct?

15  A    Yes, sir.

16  Q    Let's look at Plaintiffs' Exhibit 119, which is in

17  evidence.

18       Sir, you're aware that Josh actually went to jail for

19  these crimes; right?

20  A    Oh, yeah.  Yes, sir, yes.  119?

21  Q    Did you ever review Josh's Plea Agreement with the

22  Government?

23  A    Personally?

24  Q    Did you ever look at this document, sir?

25  A    I've seen it; but, you know, it's not like I studied it.

Fraser - Direct                                                                 333

1   Q   All right.  I want to show you one thing in particular on

2   page 9 of this document, paragraph 5 and continues over to page

3   10.

4           So as part of Josh's plea deal with the Federal

5   Government, they signed this document.  Do you understand that,

6   sir?

7   A   Yes, I do, sir.

8   Q   And it says, "To generate business as well as attract

9   customers and investors, the defendant made multiple statements

10  related to the scheme, including, among others" -- and it

11  actually identifies three statements.  Do you see that?

12  A   Yes, sir.

13  Q   And the first statement is that there was this phony $8

14  million transaction.

15          Do you see that?

16  A   Yes, sir.

17  Q   And that's the one that was the press release that you and

18  your son were joking about; right?

19  A   That was the press release, yes, sir.

20  Q   And the second one is talking about that the Hashlets were

21  actually not backed by real computing power.  Do you see that?

22  A   Yeah, he sold more things than he had power for, I saw

23  that.

24  Q   And this is what we were talking about in October of 2014,

25  that the danger of not buying enough customers is he could

1    oversell the Hashlets; right?

2    A    It's a -- yes.

3    Q    And then the last one was that there was a false statement

4    made that there was a hundred million dollars that could be

5    used to help control the value of Paycoin; correct?

6    A    Yes, sir.

7    Q    Mr. Fraser, you were aware of all of these lies at the time

8    they were made, weren't you?

9    A    I was there during the whole time, yes, sir.

10   Q    That wasn't exactly my question.

11   A    I'm sorry.

12   Q    You were aware that GAW Miners was making these false

13   statements at the time GAW Miners was making them; correct?

14   A    The only false statement I knew for sure was the stupid

15   thing about GAW Miners buying Zen or whatever that was.

16   Q    So that --

17   A    I had no idea that any of these other things until after

18   the fact.

19   Q    Well, the hundred million dollars lie was included in *The*

20   *Wall Street Journal* article that you were interviewed for;

21   correct, sir?

22   A    Yeah, it was in there.  Yeah, Josh made that comment.

23   Q    So you were aware that the company was claiming to have a

24   $100 million reserve; correct?

25   A    The plan was to have a hundred million.  You're saying that

1  he didn't have it.  Well, I didn't know he didn't have it after

2  the fact.  I knew he had a plan to want it, so ...

3  Q   Sir, did you ever --

4  A   I didn't know.

5  Q   Did you ever take a single step to try to alert the public

6  and potential GAW Miners' customers about the false information

7  that was being spread by GAW Miners?

8  A   I can't answer that question.

9          MR. BUCHDAHL:  Your Honor, this moved a little faster

10  than I thought.  I'm ready to pass the witness.

11          THE COURT:  All right.  Did you want to take a short

12  recess now?

13          MR. WEINER:  Just to rearrange ourselves.  Thank you.

14          THE COURT:  Ladies and Gentlemen, you know what?

15  We'll take our lunch break early.  We'll take a very brief

16  break in the afternoon, but I want to keep moving, have things

17  efficient, not have you watch lawyers change places, get their

18  documents in order.  So we'll take 45 minutes for lunch now.

19          Don't discuss the case.  Don't let anyone discuss it

20  with you.  Keep an open mind and all that goes with that.

21  Thank you very much for your attention this morning.  You can

22  go to the jury room now.

23      (The jury left the courtroom at 12:01 p.m.)

24          THE COURT:  Mr. Fraser, you can step down for the

25  moment.  You can step down.

1          THE WITNESS:  Okay, thank you, sir.

2          THE COURT:  Mr. Weiner, you wanted to raise a couple

3    of issues?

4          MR. WEINER:  Yes, Your Honor.  The first is the one I

5    alluded to before, which is Your Honor had reserved decision on

6    the question about whether, when I asked Mr. Fraser, Why did

7    you retire from Cantor Fitzgerald? that he be allowed to tell

8    the truth and reference the events of 9/11.

9          THE COURT:  But why does the jury need to know why he

10   retired from Cantor Fitzgerald?

11         MR. WEINER:  Well, Your Honor, they made Cantor

12   Fitzgerald the centerpiece of their case, including his whole

13   career at Cantor Fitzgerald.  So he meets Josh Garza right

14   around that time.  So there's a gaping hole.  And the jury is

15   wondering, why does a 43-year-old guy retire and suddenly

16   change his life?

17         So without being able to explain why he retired and

18   changed his life completely, why he walked away from Cantor

19   Fitzgerald, I think they're wondering, what the heck happened?

20   Was there some sexual escapade?  He's got to be able to explain

21   on a fact and an issue they've made a centerpiece, which is his

22   whole career at Cantor Fitzgerald.  And we're going to argue

23   that he would not have even involved Cantor Fitzgerald because

24   he loved the company.  Well, why would he have retired from a

25   company that he loved?  He should be able to tell the truth

1     about why he retired because it shows his connection with the

2     company.

3             THE COURT:  So what's already come out, as I

4     understand it, is I think he said he loved the company.

5     Actually, you said in the opening statement he loved the

6     company more than anything except his family, I think.

7             And he's also testified, if I'm not mistaken, that he

8     had close family connections to the company.  His uncle was a

9     founder, as I understand it.  He began, you know, as an intern

10    or whatever, trainee, worked his way up, so all the

11    departments.

12            And there's been discussion that, well, he didn't

13    really fully retire.  He semi-retired, still involved with them

14    in some ways.

15            I'm not seeing why it's on the jury's mind, that, oh,

16    my God, what happened?  Why did he leave?  I don't see that's a

17    question in their minds at this point.

18            MR. WEINER:  Your Honor, you made the point to the

19    jury, quite correctly, what I say in argument is not evidence.

20            THE COURT:  That's true.

21            MR. WEINER:  I said it because the evidence should

22    come out that the truth is the reason he walked away from a

23    company that he loved and continues to love and wouldn't

24    involve in a fraud is because of the events of 9/11.  He should

25    be allowed to tell the truth about that, not in a way that gets

1   us ten minutes of 9/11 but just that says, One of the reasons I

2   returned is what happened on 9/11.

3          THE COURT:  But, of course, there's other reasons I

4   think are apparent he loves the company.  His best friend is

5   the head of the company.  He said that a couple times.  He's

6   known this other fellow for many, many years, Jim, many years.

7   The implication is that they're friends.  And it's quite clear

8   that he feels fondly toward the company, that he viewed it as

9   part of his company, that he was proud of it, etc.

10         So, again, I'm not -- it's not like the jury's going

11  to be like, geez, why does he love the company?  That doesn't

12  make any sense to me.  It's clear why he loves the company.

13         There's another reason too, but I'm just not sure that

14  I see its probative value.  I can see why it could be unfairly

15  prejudicial, but I'm not seeing, given what the jury already

16  has, what great probative value it has.

17         MR. WEINER:  Well, again, Your Honor, the jury is

18  going to wonder why a 42-year-old guy walked away from a

19  company that his lawyer now claims that he loved.  Well, if he

20  loved it so much, why did he walk away from there?  The answer

21  to the question is the events of 9/11 and his friends were

22  killed.

23         THE COURT:  I'm not going to allow it.  There's been

24  no testimony that he walked away from the company.  To the

25  contrary, the suggestion has been he's very much still involved

1    in the company, semi-retired.

2           I think there's lots of reasons for him to love the

3    company.  I think it's quite natural for him to love the

4    company.  He was -- his uncle founded it.  He's made clear that

5    he had very close personal connections there.  So I'm not going

6    to allow the 9/11.

7           MR. WEINER:  Let me make the second point.  It's a

8    different issue, the issue of Plaintiffs' counsel raised

9    repeatedly about the vice chairman title.  He should be allowed

10   to answer the question:  Why does Cantor Fitzgerald allow you

11   to retain the vice chairman title?  Because they keep saying --

12          THE COURT:  What is the answer to that?

13          MR. WEINER:  The answer is:  I'm the vice chairman of

14   Cantor because of my continuing participation in the 9/11

15   Memorial Fund established by Cantor Fitzgerald.  That's why

16   they let me keep the title.  And he should be allowed --

17          THE COURT:  Why shouldn't he be allowed to say that

18   much?

19          MR. BUCHDAHL:  Your Honor, first of all, I've never

20   heard that before; right?  So that's a surprise to me.  And I

21   wish that had been raised before trial because then perhaps we

22   would say things differently along the way.  Because at no

23   moment did I think that the words "vice chairman" opened the

24   door to this.  So I think that that is just a back-door way

25   around the Court's entirely correct 403 ruling on 9/11 in

1    general.

2            THE COURT:  But if that's the answer to the question,

3    it has been raised that he's vice chairman, that he's using

4    that title, that he's getting it into *The Wall Street Journal*

5    article --

6            MR. BUCHDAHL:  There's nothing here that says he's

7    vice chairman of a relief fund.  Everything here says vice

8    chairman Cantor Fitzgerald.  And the notion that this is like

9    some special 9/11 honorific, first of all, I don't see a basis

10   for it in evidence.  But second of all, it creates all of the

11   prejudice and undoes everything of the ruling.

12           THE COURT:  So let's talk about that.  So I wouldn't

13   allow the answer to go beyond Mr. Weiner's sentence.  I

14   wouldn't say, why did -- I wouldn't allow him to answer the

15   question, Why did they name you chair of the 9/11 Relief Fund?

16   Did Cantor Fitzgerald have something to do with 9/11?  No.

17           If the honest answer is -- and I presume it is -- that

18   he's being continued to allow -- sorry, that the company is

19   continuing to allow him to use this title, which has been a

20   subject of the testimony, because he's chairman or whatever the

21   position is of the Cantor Fitzgerald 9/11 Relief Fund, I think

22   he should be allowed to say that.  I don't think he should be

23   allowed to say anything more than that.

24           MR. BUCHDAHL:  Your Honor?

25           THE COURT:  Yes.

```
 1              MR. BUCHDAHL:  There's nothing about that title that
 2   would not -- that we wouldn't -- we would be able to accomplish
 3   all of it without the word 9/11.  In other words, he can say, I
 4   am the vice chairman of the Cantor Fitzgerald Relief Fund or
 5   Charitable Relief Fund.  And he can say, Because of the
 6   significance of that, I'm allowed to -- but 9/11 doesn't add to
 7   that.
 8              THE COURT:  What about that, Mr. Weiner?
 9              MR. WEINER:  That's fine, Your Honor.
10              THE COURT:  So a charitable relief fund.
11              MR. WEINER:  The name of it is Cantor Fitzgerald
12   Charitable Relief Fund.
13              THE COURT:  So the words "9/11," not coming in.
14              MR. WEINER:  And, Your Honor, if you could instruct
15   him -- I don't know --
16              THE COURT:  He's here.
17              MR. WEINER:  So he can say the reason that I -- when I
18   ask him, What are the reasons why -- why are you allowed to
19   keep the title of vice chairman?  Because he's made fun of
20   him --
21              THE COURT:  Yeah, I agree.
22              MR. WEINER:  My continuing participation as vice
23   chairman of the Cantor Fitzgerald Relief Fund.
24              THE COURT:  Yes.  That he can say.
25              MR. WEINER:  Thank you.
```

```
1            MR. BUCHDAHL:  No objection to that.  But as long as
2    the witness understands that neither at that time or other
3    times, like with Harry Wise --
4            THE COURT:  Mr. Fraser's here, and I've made that
5    clear to him.  So I think he understands.  And if for some
6    reason there would be a mistake in that regard, then I would
7    have to make that clear in front of the jury, which would not
8    go well.  So just so we're all clear.  Okay?  What else?
9            MR. WEINER:  There are three exhibits that you
10   reserved ruling on.  I'd like to take them up.
11           THE COURT:  Yes.  DXs or PXs?
12           MR. WEINER:  Defendant's Exhibit 509 is the first one.
13           THE COURT:  Let me just get it in front of me.
14           MR. WEINER:  And I think Your Honor said you don't
15   understand the relevance of it.
16           THE COURT:  Let me pull it up.
17           MR. WEINER:  Tell me when you're ready.
18           THE COURT:  GAW Miners to double all customers' mining
19   hashing power?
20           MR. WEINER:  The point we want to make is that April
21   of 2014 josh Garza was holding himself out to the public as the
22   CEO and face of the company.  That's the only point we're
23   trying to make there.
24           There is, in the third paragraph down, Josh Garza CEO
25   talking about the hashing power.
```

1          THE COURT:  What's the Plaintiffs' position on that?

2          MR. BUCHDAHL:  It's hearsay, Your Honor, but we can

3   withdraw our objection.

4          THE COURT:  Okay, so we'll allow in 509.

5          MR. WEINER:  And then the same issue with 510 issue

6   Your Honor reserved because we're unsure about the relevance,

7   again, the same month, Mr. Garza holding himself out in public

8   as the CEO and the person in charge of GAW Miners.  So the

9   same -- the same question.  Can we use that now?

10          THE COURT:  Mr. Buchdahl?

11          MR. BUCHDAHL:  We withdraw our motion.

12          THE COURT:  510, same ruling, it will come in.

13          MR. WEINER:  543 is the next one and last one, so give

14   people hope that they can get out.

15          THE COURT:  543, pull that up.  Okay.

16          MR. WEINER:  543 Your Honor said, if I see some record

17   that -- some evidence this is a business record, I'll let it

18   in.  Now we know who Mr. Pease is and Mr. Shiraz Moosajee.  So

19   we're going to -- again, we would like to offer 543 as a

20   business record of the company.

21          THE COURT:  What about that?

22          MR. BUCHDAHL:  Your Honor, we do object.  If you look

23   at the attachments to this, there are a lot of corporate

24   structure documents that are not kind of adopted or explained

25   or kind of authorized by any witness here.  And this is not a

 1   document that even I think Mr. Fraser is kind of -- he's not --

 2   in other words, there's no evidence he received it, and so we

 3   think this is likely to be taken for its truth.  We don't think

 4   it satisfies a business record given the kind of ways that this

 5   was happening.  And so we object as hearsay.

 6         THE COURT:  So I guess I would say we've heard that

 7   David McLain is -- was both Mr. Fraser's personal lawyer and

 8   then became general counsel.  I'm not sure I remember testimony

 9   about Dan Pease.  There were some questions about Dan Kelley.

10   There is certainly testimony about Shiraz being the CFO.  I

11   think it's -- it's enough I think.  I'm going to allow it as a

12   business record.

13         MR. BUCHDAHL:  Your Honor?

14         THE COURT:  Yes, sir.

15         MR. BUCHDAHL:  In that event, there are some similar

16   documents that were excluded involving kind of back-and-forth

17   between GAW Miners' employees that are similar to this.  And we

18   would like the opportunity to at least suggest a revisiting of

19   those.

20         THE COURT:  That's fair.  But we'll have to do it one

21   by one.

22         MR. BUCHDAHL:  Understood.

23         MR. WEINER:  If we can respond on an

24   exhibit-by-exhibit basis.

25         THE COURT:  So 509, 510, and 543 DX will all be full

1    exhibits.

2              MR. BUCHDAHL:  Your Honor, what I propose, if we find

3    any, we will show them to you at the afternoon break.

4              THE COURT:  Okay, that's fine.  We'll be in recess.

5    Thank you.

6              Actually, wait.  I'm sorry.  So I do want to discuss

7    these letters a little bit.  I won't have a ruling for you yet.

8    I know this is really going to come up, I think, principally

9    when you cross-examine the Plaintiffs; is that right?

10             MR. WEINER:  Correct.

11             THE COURT:  So let's talk about it a little bit.  So I

12   have the agreement in front of me, and I have the letters.

13             So I think I allowed in the agreement because, while

14   it's true someone pointed out that it's not quite like a 5K

15   agreement in a criminal case, because, of course, the

16   Government has certain powers there that the parties don't

17   here, it does strike me that the agreement, which is that the

18   Plaintiffs will dismiss without prejudice the claims against

19   Garza, gives Garza something and gives him some reason to give

20   the Plaintiffs something.

21             Now, what he's agreeing to give the Plaintiffs, as I

22   understand it, it says, "Cooperation shall commence upon the

23   filing of the notice of dismissal."  It says he'll provide

24   reasonable and timely discovery cooperation to Plaintiffs.  And

25   then it lists certain things presumably without getting a

1   subpoena.  So he's doing something that an ordinary person or

2   ordinary witness wouldn't ordinarily do, making himself

3   available, etc.  So he's certainly giving something back to the

4   Plaintiffs for that in exchange for presumably that the -- that

5   the agreement -- or excuse me -- that the claims would be

6   dropped.

7          That's certainly -- I think that fact goes to Mr.

8   Garza's credibility.  At least that's the ruling I've made.

9   I'm not really inclined to revisit that ruling, Mr. Ard.  But

10  that's just the first step.  Did you want to talk about that?

11         MR. ARD:  However you please, Your Honor.

12         THE COURT:  All right.  So I think that's sort of my

13  first step.

14         And then the second step is, all right, there's this

15  provision that says, unless there's a material breach by Mr.

16  Garza or warranties turn out to be untrue, Plaintiffs will not

17  assert any claims that have been or could have been asserted

18  against Mr. Garza, etc.

19         And so that does suggest that if the Plaintiffs find

20  that he's made materially false or misleading statements or

21  that he's breached the terms of the agreement, they will regard

22  themselves as free to assert claims that have been or could

23  have been asserted against Garza.

24         The next sentence says, If the Court finds that

25  there's been a breach, presumably upon motion, then Mr. Garza

1   further agrees that if the Plaintiffs seek to reinstate, then

2   the statute of limitations will be tolled.

3           So in terms of how this can be used with the

4   Plaintiffs, so as -- I've sort of drawn a blank there.  I'm

5   wondering how this --

6           MR. ARD:  So, Your Honor, a few things.

7           THE COURT:  Go ahead, Mr. Ard.

8           MR. ARD:  First of all, the way that this was

9   characterized in opening was that it gave Mr. Garza an

10  incentive to rat against the Plaintiffs.

11          THE COURT:  Right.

12          MR. ARD:  It says nothing of the sort.  It says that

13  if the Court determines there's been a material breach, then

14  the Plaintiffs -- then the statute of limitations will be

15  tolled.

16          THE COURT:  Correct.

17          MR. ARD:  That's what it says.

18          THE COURT:  But, of course, before that it does say

19  that if there's a material breach.

20          MR. ARD:  Correct, Your Honor, but --

21          THE COURT:  Then the Plaintiffs may assert claims.

22          MR. ARD:  Right.  It doesn't say if the Plaintiffs

23  believe there's a material breach.

24          THE COURT:  Well, but who else is supposed to make

25  that determination?

 1          MR. ARD:  The Court, Your Honor.  And it says that in

 2     the next sentence.

 3          THE COURT:  No.  Because that's a separate -- there

 4     are two distinct, it seems to me, concessions here:  First, the

 5     Plaintiffs are conceding in the second sentence of paragraph 1

 6     that, in effect, as long as Mr. Garza complies with the

 7     agreement, doesn't make material misstatements, the Plaintiffs

 8     will not assert a claim.

 9          Then there's a different sentence which says, If the

10     Court determines that there's a material breach, the Plaintiffs

11     may go beyond that and basically -- well, Garza makes a

12     concession that the statute of limitations won't be a bar.  So

13     I'm not sure that just for pure reinstatement, just asserting

14     claims that they're dropping, I'm not sure that that even

15     involves the Court, as I read this.  It seems to be that if

16     there's a material breach.  Now, ultimately, Garza could say,

17     well, there is no breach so the Court's going to have to

18     adjudicate that.

19          MR. ARD:  That's my point, Your Honor.

20          THE COURT:  Sure.  Sure.  But what I would be

21     adjudicating on that one is simply whether there was a breach

22     or a misrepresentation.  Both sides would make arguments to me.

23     And it would seem to me that at least Mr. Garza would have some

24     incentive to avoid the Plaintiffs' having some perception that

25     he breached the agreement.

1          MR. ARD:  And I agree entirely with that.  I'm just

2    trying to make a small point, which the Court made, which is

3    you would adjudicate it.

4          But the main point is twofold.  I think Your Honor was

5    going to get to the question:  What does the Plaintiffs' view

6    have to do with this?  Nothing.  It's black letter law in most

7    states in the union and certainly in Connecticut that if you

8    have an unambiguous agreement, the subjective understanding of

9    the parties, especially when it's uncommunicated, is a hundred

10   percent irrelevant.

11         THE COURT:  When you say it's uncommunicated, what do

12   you mean?

13         MR. ARD:  When they don't express it to either party.

14   But even if it were communicated, it doesn't matter.  We cited

15   the Second Circuit cases saying -- and the Connecticut Supreme

16   Court cases -- saying that when you have an unambiguous

17   agreement, no extrinsic evidence is relevant to what the

18   agreement means.  So it doesn't matter how Mr. Shinners has

19   interpreted this agreement.  It doesn't matter how Mr. Garza

20   has interpreted this agreement.  If you have a plain language

21   meaning of the contract, it is up to the Court and not the jury

22   to determine what it means.

23         THE COURT:  I agree with that principle.  I guess what

24   I'm wondering is the -- so, Mr. Weiner, I am wondering how --

25   how you would use this with the Plaintiffs?

1          MR. WEINER:  And, Your Honor, the point that Mr. Ard

2     just made and the question you asked, of course, the subjective

3     understanding is important because Mr. Garza testified, as you

4     know, because we put it in the letter, that he understood the

5     agreement to mean that if he didn't satisfy them, he could be

6     pulled back in.

7          MR. ARD:  That's false.

8          THE COURT:  That was raised -- I think that came out

9     during his deposition for the jury.  And that went to his

10    credibility, and that was fine.  Certainly he signed the -- no

11    problem with that.

12         My question is:  How would you then use this with the

13    Plaintiffs?

14         MR. WEINER:  With the Plaintiff, Your Honor, I just

15    don't want them to walk away from it.  Again, they signed this

16    agreement through their attorney.  I don't want them to say,

17    geez, I didn't know about this.  I didn't know anything about

18    the cooperation agreement.  I don't know what it meant.

19         THE COURT:  But what would be the point of any of

20    that?  Why is that -- why is their understanding of the

21    agreement relevant?

22         MR. WEINER:  Sorry.  It confirms Mr. Garza's

23    understanding; right?  They had the same understanding.  Both

24    sides had the same understanding that if he doesn't satisfy the

25    Plaintiffs and their attorney drag back in.

1      THE COURT:  Ultimately -- the reason it was relevant

2  during the examination of Mr. Garza is for his own credibility;

3  right?  So you put this in.  You say:  In effect, you've got an

4  incentive to keep the Plaintiffs happy.  That's why you're

5  testifying as you are.

6      Now, they can point out these other provisions saying

7  the Court is going to get involved, and that's what you argue

8  to the jury.

9      But what I'm wondering is, fine.  What's that got to

10  do with the Plaintiffs themself?

11      MR. WEINER:  But when they say Mr. Garza got it wrong,

12  the agreement doesn't actually say that.  It didn't require it.

13  It's nice for us to be able to show the other side of the

14  equation, that Mr. Shinners thought exactly the same thing as

15  Mr. Garza did.

16      THE COURT:  But I don't know Mr. Shinners'

17  understanding of the agreement.

18      MR. WEINER:  It confirms Mr. Garza.

19      THE COURT:  Well, you've got the agreement.  You can

20  certainly put -- the agreement, I think I've already admitted

21  it.  You can put it up in your closing argument.  You can say,

22  This is it.  He knew.  You know, Garza knew if he gets dragged

23  in.

24      You know, it does start to look like a situation where

25  you're having others comment on Garza's credibility, which gets

1    us into Rule 608(b) and the like.  And then before that, I

2    guess there's the issue of, well, are we going to have the

3    Plaintiffs interpret the agreement?  I mean the agreement says

4    what it says.  I don't see that it's ambiguous at all.

5            MR. WEINER:  Your Honor, it also goes to explain why

6    the Plaintiffs did a complete about-face and instead of saying

7    Mr. Garza controlled the companies, now it's Mr. Fraser.

8            THE COURT:  Okay, so let's talk about that.  Those are

9    the complaints; right?

10           MR. WEINER:  But this is part of that.  Why did it

11   happen?  It didn't just happen out of nowhere.

12           THE COURT:  I think you could ask -- I don't see why

13   Mr. Weiner couldn't ask the Plaintiffs, so, puts -- I don't

14   know how he wants to do it, but he might put the original

15   Complaint in front of them, say, Now, this is your original

16   Complaint, and, you know, you were happy with it.  You signed

17   it.  You authorized it, blah, blah, blah.  And it says Mr.

18   Garza controls.  And then at some point you were aware that you

19   reached an agreement with Mr. Garza to drop him from the case.

20           Now, that they can ask him.  That's -- it's already

21   come out.

22           And then -- now, if they say, I'm not aware of any

23   such agreement, he can certainly refresh their recollection.

24   And then he could ask:  Now, after the agreement, you amended

25   the Complaint and you said Mr. Fraser was in control.  The

1    Complaints obviously are admissions of the Plaintiffs, and they

2    can be used to -- they can use the substantive evidence and

3    they can be used also to attack the Plaintiffs' own credibility

4    to impeach.  But I'm not sure how that gets you to getting the

5    Plaintiffs' interpretation of the agreement into evidence.

6          MR. WEINER:  On that question, it's only as long as

7    they don't say, Mr. Garza's, his interpretation was crazy.

8    Nobody could possibly interpret it that way because it doesn't

9    say that.

10         Well, their own client interpreted it that way.

11         THE COURT:  Yeah, but I don't see why you'd be

12   asking -- I don't see why I would allow a question along the

13   lines of:  What did you think of Mr. Garza's interpretation of

14   the agreement?  You wouldn't ask it that way.  But Mr. Garza

15   said this was his interpretation.  Do you have any reason to

16   disagree?  I think I would sustain a relevancy objection.

17         MR. WEINER:  But, Your Honor, as long as they're not

18   going to attack Mr. Garza's interpretation then I don't have to

19   ask him.  But if they're --

20         THE COURT:  If the Plaintiffs go into this on direct,

21   that changes things.  I didn't think -- Mr. Buchdahl's shaking

22   his head.  I didn't think the Plaintiffs would go into this on

23   direct.  If they go into this on direct, I'm going to be

24   listening very carefully to see if doors are opened.  That's a

25   whole different ball game.  But on cross the first time, if you

1  seek to get into Mr. Fraser's understanding of Mr. Garza's

2  interpretation, then I'm going to sustain a relvance

3  objection.

4         MR. WEINER:  I'm not asking for Plaintiffs'

5  understanding of Garza.  I'm asking PlaintiffS' interpretation,

6  which matches Mr. Garza's, defeats their claim that Mr. Garza

7  was crazy to think that.  As long as they don't argue that and

8  raise it, then I don't have to bring it out.  But if they're

9  going to stand up in closing and say, Mr. Garza couldn't have

10 really believed that because it doesn't say that.

11        Their own client believed that.  He had to satisfy

12 them or he --

13        THE COURT:  How do you square that with the parole

14 evidence rule, which is what Mr. Garza's relying on?  I mean do

15 you contend that the agreement's ambiguous in some way?

16        MR. WEINER:  No.  But the subjective understanding of

17 Mr. Garza is important; right?  We all can agree on that.

18        THE COURT:  Yes, because it goes to his credibility.

19 His understanding of the agreement is important because it goes

20 to his credibility.

21        MR. WEINER:  And if they argue that he didn't really

22 understand that, he couldn't have possibly understood that,

23 their own client understood exactly the same thing.

24        THE COURT:  Right.  But I don't see what their own

25 client's belief has to do with whether his understanding --

1    what his understanding -- he may -- let's -- let's suppose for

2    a moment that Garza actually had a misunderstanding with the

3    agreement; right?  He was clear, but he just didn't get it.  He

4    understood it meant something else.

5           What they understood does not make more or less likely

6    what his understanding is.  His understanding is important

7    because it goes to his credibility, but their understanding of

8    the agreement isn't important for any reason that I can see.

9           MR. BUCHDAHL:  Your Honor, I apologize.

10          THE COURT:  I'm talking to Mr. Weiner now.

11          MR. WEINER:  I think what they're going to do is

12   challenge Mr. Garza's interpretation.  He didn't think that he

13   couldn't have possibly --

14          THE COURT:  Why isn't the answer to that just hold up

15   the text of the agreement to the jury, put it on the screen and

16   say, Ladies and Gentlemen, it's very clear what the agreement

17   is?

18          MR. ARD:  Your Honor, this is an important issue.

19   There's more to say about it.  We have only 15 minutes left for

20   lunch.  Is it possible -- earlier today Defense counsel

21   anticipated that Mr. Fraser would last the rest of the day.

22   And so if that happens, I don't think we need to address this

23   until, you know, 3:30 or tomorrow morning.

24          MR. WEINER:  That's fine.

25          THE COURT:  Yeah, but I'm glad we got started.  I'm

```
1   glad we got started.  We'll pick this up.

2       (Recess from to 12:27 p.m. to 12:50 p.m.)

3           THE COURT:  Let's have Mr. Fraser take the stand and

4   get the jury.

5           I'm just going to give them a short instruction about

6   the fact he's going to testify at one sitting, direct and

7   cross.

8       (The jury entered the courtroom at 12:51 p.m.)

9           THE COURT:  Come on in, folks.

10          Welcome back, folks.  Please take your seats.  Please

11  take your seats everyone.

12          Now, before we start, Ladies and gentlemen, just two

13  things.  First, I want to apologize about the shifting

14  schedule.  Sometimes that's necessary.  I also took a little

15  bit longer than 45 minutes.  There was a matter I had to

16  discuss with the lawyers.  But we are doing our best to keep

17  things moving.

18          Second, I just want to tell you, so Mr. Fraser was

19  listed as a witness by both sides in this case.  And so

20  ordinarily what that would mean is the Plaintiffs could call

21  Mr. Fraser in their case, and then they would complete their

22  evidence and then what we call rest.  And then the Defendants

23  would be allowed to call Mr. Fraser in their case.  So he

24  actually would have to come back to the stand twice.  We're not

25  going to do that because we want to keep things efficient.
```

1          What we're going to do is have Mr. Weiner, on behalf

2     of the Defendants, conduct both a cross-examination from the

3     original direct that you just heard and his own direct

4     examination of Mr. Fraser.  And then Mr. Buchdahl will be able

5     to go and conduct a redirect and a cross on Mr. Weiner's

6     direct.  And then finally, Mr. Weiner will get the last word.

7     He'll get a redirect.

8          You don't need to worry about redirect and cross.  You

9     just need to know he's going to testify at one sitting.  All

10    right?

11         Go ahead, Mr. Weiner.

12         MR. WEINER:  Thank you, Your Honor.

13                    CROSS-EXAMINATION

14    BY MR. WEINER:

15    Q    Mr. Fraser, if you can't hear my questions, will you let

16    me know and I'll try to speak up?

17    A    Yes, sir.

18    Q    You were here during the opening statements by both sides;

19    is that right?

20    A    Yes, sir.

21    Q    And you heard Mr. Ard, for the Plaintiffs' counsel, say

22    that the jurors should use their common sense.  Remember when

23    he said that?

24    A    Yes, sir.

25    Q    Told them that their common sense was the most important

1   tool that they bring?

2          MR. BUCHDAHL:  Objection, Your Honor.

3          THE COURT:  Grounds?

4          MR. BUCHDAHL:  Argumentative.

5          THE COURT:  I'm kind of wondering where we're going

6   with this.

7          MR. WEINER:  I can do it in the next question, Your

8   Honor.

9          THE COURT:  All right.

10  Q   (By Mr. Weiner) Is it common sense, Mr. Fraser, that you

11  would have provided and involved your two sons, Scott and

12  Tommy, in a company you knew to be a fraud?  Does that make

13  sense?

14         MR. BUCHDAHL:  Objection, Your Honor.

15         THE WITNESS:  No.

16         THE COURT:  I'll allow it.

17  Q   (By Mr. Weiner) Is it common sense that you would

18  involve --

19         THE COURT:  Okay, sorry.  That is an argumentative

20  phrasing.  Let's change the phrasing.

21  Q   (By Mr. Weiner) Would you have involved Howard Lutnick,

22  your best friend and godfather to your children, in a company

23  that you knew to be a fraud?

24         MR. BUCHDAHL:  Objection, Your Honor.

25         THE COURT:  That's overruled because he's allowed to

1   do a cross on your direct, so that's overruled.

2   Q    (By Mr. Weiner) Would you have involved Cantor Fitzgerald,

3   the only company you ever worked at that your uncle started,

4   would you have involved them in a company you knew to be a

5   fraud?

6   A    Never.

7   Q    Would you have tried to convince your friends to invest in

8   a company you knew to be a fraud?

9   A    No.

10  Q    Does it make sense that if you were the criminal mastermind

11  behind GAW Miners and ZenMiner, you would have lost $12

12  million?

13  A    No.

14  Q    Mr. Buchdahl asked you all about a car that Mr. Garza gave

15  you at Christmas in 2014.  Remember those questions?

16  A    Yes, sir.

17  Q    Tell the jury what happened with that car, how you got it

18  and how it went back.

19  A    Yeah, so we came back from dinner, and the garage door

20  opened where I had pulled my car out with my wife and daughter

21  and maybe a couple other family members.  And there was a car

22  there.

23         And my wife was excited because she had surprised --

24  had worked it out.  And I just looked at her, and I said, "It's

25  going back."  And, um, I thanked Josh for the gift.  And the

1   next day I called him and said, "Take it away."  And I put it

2   in the driveway, and it never moved.

3   Q   Let me ask you about that last part.  If Mr. Buchdahl is

4   right that you didn't give the car back until the SEC came

5   knocking in March of 2015, then I assume you drove that car

6   around merrily in late December and January and February; is

7   that right?

8   A   I did not -- no, sir, I did not drive the car around at

9   all.  I drove it out of the garage, parked it in a parking area

10  on my driveway, and I left it right there with the keys in it.

11  Q   And why didn't you want to accept this gift from Mr. Garza?

12  A   I mean, Howard never bought me a gift like this, and here's

13  a guy like him who -- we're not making money, and he's giving

14  me a car?  It just seemed really inappropriate and odd.  I

15  wouldn't accept a gift like that from any of my friends.  It's

16  overboard.

17  Q   Now, you asked Mr. Garza to pick it up in December or

18  January or February.  Where was Mr. Garza in late December,

19  January, and February of 2015?

20  A   I heard he was in Dubai.

21  Q   So he wasn't around to come pick up the car, was he?

22  A   Eventually some guy came and picked it up.

23  Q   Now, you remember that last week Mr. Buchdahl showed you

24  some documents and some more today, and he asked you about

25  particular portions of the documents.  Do you remember that?

1   A    Correct.

2   Q    And I'm going to ask you some about things that Mr.

3   Buchdahl didn't ask you in those very same documents.

4         Let's start with Plaintiffs' Exhibit 28.  And you

5   should have that in the binder in front of you, Plaintiffs'

6   Exhibit 28.  It's an e-mail to -- it says "June 6, 2014"?

7   A    Yes, sir.

8   Q    We could go down to the points at the bottom, which is,

9   "Here is what I would like."  That's Mr. Garza telling you,

10  "Here is what I would like."  If we go down to the bottom of

11  the first page.

12        Your Honor, is that reverb coming from me?

13        THE COURT:  I'm not sure why.  I think you're doing

14  fine.

15  Q    (By Mr. Weiner) So you see the points where Mr. Garza says,

16  "Here is what I would like."  And this is in June of 2014.  And

17  why don't we highlight from "Here's what I would like" down to

18  all the bullet points.

19  A    Yes, sir.

20  Q    And this was his proposal regarding Geniuses at Work

21  Corporation.  You see that in the first line?

22  A    Yes, sir.

23  Q    Okay.  And Mr. Buchdahl asked you about those bullet

24  points.  And let me ask you about an e-mail that Mr. Buchdahl

25  skipped over.  Go to that same page.

1            Mr. Garza says -- and, again, it's the e-mail of June

2    22nd in the middle of the second page.  So we're going to the

3    second page in the middle.  There's an e-mail that says June

4    22nd on the right side from Josh Garza to Stuart Fraser.  Maybe

5    we can pull that out?

6            You see the date, June 22nd.  Are you with me, Mr.

7    Fraser?

8    A   Yes, sir.

9            MR. BUCHDAHL:  Objection, Your Honor.  This says

10   "Draft."

11           THE COURT:  I'm sorry?

12           MR. BUCHDAHL:  It says "Draft" right next to this

13   e-mail.

14           MR. WEINER:  Mr. Buchdahl's right.

15           THE COURT:  You can bring that out later.  Let's not

16   make objections like that.  Go ahead.

17   Q   (By Mr. Weiner) And you see Mr. Garza says in the last

18   paragraph begins "With."  Do you see that?

19   A   Yes, sir.

20   Q   "With every bit of respect, this is not going to work.  You

21   can see it how you choose."  Let's hold that whole last

22   paragraph.  "But much of what I have developed I have done with

23   little to none of your" -- and that's either "involvement" or

24   "investment."

25           Do you see that?

Fraser - Cross                                                      363

 1   A    Yes, sir.

 2   Q    And do you know what Mr. Garza was intending to communicate

 3   when he said, Much of what I have developed I have done with

 4   little to none of your involvement or investment?  Do you know

 5   what he meant?

 6   A    Yeah.  I mean basically everything after I stopped giving

 7   him -- I stopped investing in Great Auk Wireless.  So he's

 8   saying that I put all my money into the internet company and

 9   all that, and then he came up with all these new ideas.  And so

10   he's really responsible; so, you know, he should get all that

11   credit.  He should have a higher percentage of these new

12   businesses.

13   Q    And the internet company, that was Great Auk Wireless;

14   right?

15   A    Correct, Great Auk Wireless.

16   Q    Just remind the jury, what did Great Auk Wireless do in

17   terms of internet in Vermont?

18   A    So we were like a -- they call it last mile.  Like, you

19   know, if you've ever -- if you have a house up in the country,

20   you know what that's like.  It's impossible to get internet.

21          And, um, and so we started a business to service

22   places like Lake Dunmore, like, you know, further north in

23   Vermont.  We even handled places in New Hampshire.  We had

24   places in Springfield.  We were doing condos.

25          So, yeah, expanding that footprint so we can get to a

1   certain level, which is about 10,000 customers.  And then

2   you're attractive to the bigger players, and that kind of like

3   jumps you to either sell or, you know, your valuation goes

4   up.

5   Q   And that business, the Great Auk Wireless internet

6   business, was one that you had done for almost a decade with

7   Mr. Garza prior to 2014?

8   A   I mean that's the one that started it all.  And that's the

9   one -- I mean, because of the campground and, you know -- and

10  we actually needed it.  So that's the one I really cared about

11  and I thought was really cool; but, you know, it was maybe too

12  boring for him.

13  Q   And the new companies you were talking about, that was

14  cryptocurrency; is that right?

15  A   Yeah.  Like once Josh got interested into, like, Bitcoin

16  and things, he just -- he bought a machine and he did it.  He

17  didn't like the machine, so he built his own.  And that's all

18  he wanted to talk about.

19  Q   Going back to Plaintiffs' Exhibit 28, Mr. Buchdahl asked

20  you about this $10,000 a month.  Do you remember his questions

21  generally about --

22  A   Yes, sir.

23  Q   -- $10,000 a month?  And he asked you to look at your SEC

24  testimony, your testimony before the SEC, and page 64, lines 15

25  to 22.  So get out your SEC testimony.  It's the first one of

1    those two in the transcript book.

2    A    I think I lost it.

3           MR. BUCHDAHL:  Your Honor, I don't believe this is in

4    evidence.

5           THE COURT:  Okay.  Let's take it off the screen,

6    please.

7           THE WITNESS:  Okay, I got it.  I think so.

8    Q    (By Mr. Weiner) And Mr. Buchdahl asked you about lines --

9    page 64, lines 15 to 22.  So just look at that, if you don't

10   mind.

11          And then I said "in fairness" -- and Judge Shea said,

12   "Well, when it's your turn, you can ask him about the lines

13   right after that."  Do you remember that?

14   A    Yes.

15   Q    Well, it's my turn.  Do you see the lines after that where

16   the SEC asked you:

17          "Question:  So you agree to pay 10,000?"

18          MR. BUCHDAHL:  Objection, Your Honor.

19          THE COURT:  Yes, sir.

20          MR. BUCHDAHL:  He's reading something not in evidence

21   to the jury.  It's hearsay, and we object.

22          THE COURT:  Yeah, but this is a rule of completeness,

23   so I'll allow it.

24   Q    (By Mr. Weiner) And you could put it up.  If we just put up

25   lines -- page 64 immediately after what Mr. Buchdahl read, page

1   64, line 23 to page 65, line 4.  And, again, I'm following

2   immediately then.  You see where it says, "So you agreed" --

3   we're going to go down to line 23.

4           "So you agreed to pay $10,000 a month to Geniuses at

5           Work Corporation?

6           "Yes.

7           "Question:  And did you actually do that?

8           "Answer:  Up until May of '15 when -- I think May

9           of '15 -- '14, May of '14 and then he told me I didn't

10          have to anymore."

11          Do you see that?

12  A   Yes, sir.

13  Q   Who is the "he" that told you in May 2014 that you didn't

14  have to keep paying $10,000 a month to Geniuses at Work

15  Corporation?

16  A   Josh Garza.

17  Q   Did you follow his instruction?

18  A   Yes.

19  Q   Okay.  And let's go to Plaintiffs' Exhibit 180, which you

20  have.  It's page 155 from your SEC testimony.

21  A   Yes, sir.

22  Q   That's the first one of the two.  So page 155.

23          Are you there?

24  A   Yes, sir.

25  Q   And Mr. Buchdahl showed lines 16 through 19 to the jury.

1   And, again, Judge Shea said when it was my turn I could get to

2   read you the lines immediately above that.  So here we are

3   doing that.

4           Start at page 154, line 24, carry on all the way to

5   the questions that Mr. Buchdahl asked you about.  So start at

6   line 24.

7           "Question:  And you knew at the time that it" --

8           THE COURT:  Sorry, Mr. Weiner.  Can we wait one second

9   while the juror turns off her cell phone?

10          MR. WEINER:  I thought I was hearing music.

11      (Pause.)

12          THE COURT:  That's all right.

13  Q   (By Mr. Weiner) And this was the subject about the quote

14  attributed to your son Tommy about ZenMiner in May.

15          THE COURT:  I'm sorry again.  Ma'am, I do need you to

16  put your cell phone away.  Sorry.

17          Go ahead, Mr. Weiner.

18  Q   (By Mr. Weiner) And, again, just to orient you, Mr. Fraser,

19  Mr. Buchdahl was asking you about the quote that your son Tommy

20  put in that article in May of 2014.  So see in line 24, the SEC

21  asked you:

22          "And you knew at the time that it was being attributed

23          to your son and that it was false?

24          "Answer:  Yes.  When I read this, yes.

25          "Question:  What was your reaction?

1        "Answer:  I was really upset.

2        "Question:  Why did your son make these statements to

3        the reporter?

4        "Answer:  He and Josh were friends at -- when he was

5        in college, I had him intern at -- well, it was GAW

6        Wireless at that point.  They did talk from time to

7        time.  But not as much as I talked to Josh.  I guess

8        that Josh asked him for -- to help him with something.

9        My son was too naive to understand."

10       See that?

11   A   Yes, sir.

12   Q   Tell the jury what you meant by your son was too naive to

13   understand and what you meant at the time.

14   A    Well, basically my son was just out of college.  He had

15   known Josh for quite a long time because of me, and they were

16   friendly on their own.  And so I just -- I just felt he was a

17   bit played on that one.

18   Q   When you say "played," tell the jury what you mean by that,

19   "he was a bit played."

20   A    I mean I don't think -- I don't believe Tommy really

21   understood what he was getting involved in.  And I think Josh

22   took advantage of him a little there.  I think Josh was being

23   foolish too.  And at the time I kind of saw them both as two

24   irresponsible idiots.  Um, so that's the way I felt about it.

25   Q    And you told Mr. Buchdahl that you had a phone call with

 1  Josh Garza about this subject.  And Mr. Buchdahl said, "Well,

 2  you can let your lawyer tell the jury about that phone call."

 3              So tell the jury about the phone call you had with Mr.

 4  Garza --

 5  A   So after I read the article and I -- I called Josh up and I

 6  said, you know, this is not right.  This is -- first of all,

 7  get my son out of that.  Tommy has nothing to do with this.

 8  This is ridiculous.  He has a job and, you know, you need to

 9  talk with your people and make this right because you're going

10  to have a problem with this.

11  Q   And is that a phone call that you're making up or did it

12  actually happen?

13  A   It actually happened.

14  Q   And now stick with that same page, page 155.  I'm going to

15  go to the lines right after the ones that Mr. Buchdahl read to

16  the jury, line 20 on page 155, starting with line 20.

17              "Question:  And you knew that it was important to GAW

18              Miners that ZenMiner be seen as an independent and

19              unaffiliated company; is that right?"

20              And you answered, "It wasn't important to me.

21              "Question:  But you knew it was important to GAW

22              Miners?"

23              You said no.  "Answer:  No.

24              "Question:  You didn't?"

25              You answered no.

1          "Question:  You didn't know that it was important to

2     GAW Miners that ZenMiner be seen as not connected to

3     it?

4          "Answer:  No.

5          "Question:  Why else would they lie about ZenMiner?

6          "Answer:  It was important to Josh.  I didn't think it

7     was -- I didn't think it made a difference.

8          "Question:  But you knew it was important to Mr. Garza

9     that ZenMiner be seen as independent of GAW Miners?

10         "Answer:  Correct.

11         "And did you think that that was because Mr. Garza

12    thought that customers would be more likely to buy the

13    products and services from two independent entities?"

14         THE COURT:  Sorry.  Where are we?

15         MR. BUCHDAHL:  Objection.

16         MR. WEINER:  Page 156, and the last line is answer to

17    No. 19, "I can't speak for Josh."

18         THE COURT:  Sorry.  There's an objection.

19         MR. BUCHDAHL:  I think this goes well beyond.

20         THE COURT:  I do too, so I'm going to sustain it.

21    Q    (By Mr. Weiner) Now, the whole GAW Miner/ZenMiner deal --

22         THE COURT:  Let him finish the question.  Can you

23    remove that from the screen?  Thank you.

24    Q    (By Mr. Weiner) The whole GAW/ZenMiner's deal, that

25    announcement, that wasn't your idea, was it?

1    A    I had no involvement in any announcements.

2    Q    It's not something that you told Mr. Garza to do; right?

3    A    No.

4    Q    It's something -- it's not something that you asked Mr.

5    Garza to do; right?

6    A    Yes, I never asked him to do it.

7    Q    It's not something that Mr. Garza even checked with you

8    before he did it; is that right?

9    A    No.  He would just do things on his own.

10   Q    Because he was the chief executive officer of GAW Miners;

11   correct?

12   A    He had the -- he had the control.

13   Q    Let's look at Plaintiffs' Exhibit 29.  It's the next one in

14   the Plaintiffs' book.

15          And Mr. Buchdahl spent a fair amount of time on this

16   document.  I'm not going to cover the same ground, but I do

17   want to talk about something that he didn't read.

18          You have Plaintiffs' Exhibit 29 in front of you?

19   A    Yes.

20   Q    Pull up the top -- let's see, it's to and from.  It's from

21   Shiraz Moosajee to Mr. Garza, copying you.  Do you see that?

22   A    Yes, sir.

23   Q    And it's dated June 10th of 2014?

24   A    Yes.

25   Q    Okay.  And then let's look at the first paragraph.  Mr.

1    Moosajee says that he's getting observations from his first 30

2    days.  Do you see that?

3    A    Yes.

4    Q    So he just started working, and he's giving you his

5    thoughts after the first month there; right?

6    A    Yes.

7    Q    Okay.  And in paragraph numbered 1, historic financials,

8    Mr. Moosajee says, on the historic financials -- and that's the

9    last three lines.  He says, "To fix these" -- and he's talking

10   about financial statements.  "To fix these and be able to

11   report to normal level of confidence will take at least 3 month

12   end closes i.e. till October."

13             Do you see that?

14   A    Yes, sir.

15   Q    So you understood that to be October of 2014; right?

16   A    Yeah, that's what -- I mean that's what Josh brought Shiraz

17   in to do.

18   Q    And then if you go to the next paragraph in that block, Mr.

19   Buchdahl read you the first part of that first sentence.  I

20   want to read the whole sentence where it says "to elaborate" to

21   the end of the sentence.

22             "To elaborate, the key element is inventory accounting

23   for which no operational system exists and which none appears

24   planned for the change over to the new front end Magenta

25   system."

1           Do you see that?

2    A    Yes, sir.

3    Q    Okay.  And Magenta's an accounting system.  Accept my

4    representation of that.

5           He was saying in that paragraph that there was going

6    to be a changeover to a new system that did inventory.  Do you

7    see that?

8    A    Yes, sir.

9           MR. BUCHDAHL:  Objection.

10          THE COURT:  What's the objection?

11          MR. BUCHDAHL:  The objection is that the new system

12   says nothing about inventory.

13          THE COURT:  Okay.  That's a matter for redirect.

14   Q    (By Mr. Weiner) And you understood that -- from Mr.

15   Moosajee's e-mail, you understood from the outside you

16   understood they were going to be putting in a new inventory

17   system, the Magenta system; correct?

18   A    Yes, sir.

19   Q    Okay.  And then if you go down a little bit in that

20   paragraph, in that same paragraph it says, "It should be

21   cleaned up by September month end is a tough schedule but

22   realistic."

23          Do you see that?

24   A    Yes, sir.

25   Q    That's Mr. Moosajee saying that he thought that by

1    September 2014 month end, it's tough but it could be realistic

2    the whole accounting thing could be cleaned up; right?

3    A    Yes, sir.

4    Q    Okay.  And then if you go to paragraph 3, this is the one

5    that Mr. Buchdahl spent a lot of time on, the normal financial

6    management.  And you see that Mr. Moosajee says that all this

7    needs to happen, but I cannot see this in place till fall 2015.

8          Do you see that?

9    A    Yes, sir.

10   Q    And then on the next page -- let's turn the page.  And the

11   first sentence of the last paragraph where it says "we are less

12   than," let's blow that up.

13         Mr. Moosajee says -- and I'll just look at the first

14   sentence.  "We are less than 3 months into the miners business

15   and these are of course good problems to have, dictated by the

16   success of the business."

17         And that was what you understood Mr. Moosajee's view

18   to be; correct?

19   A    Correct.

20   Q    And at the end of that paragraph, Mr. Moosajee says, "These

21   are issues," the last sentence, "These are issues that have to

22   be addressed both strategically and tactically and require your

23   input and direction."

24         Do you see that?

25   A    Yes, sir.

1   Q   After this, did Mr. Garza tell you that he would be

2   providing input and direction as the CEO to his chief financial

3   officer?

4   A   Yeah, absolutely, yes.

5   Q   Did you have any reason to disbelieve Mr. Garza when he

6   told you that?

7   A   No.

8   Q   Let's go forward two months to Plaintiffs' Exhibit 39.

9   This is another one Mr. Buchdahl asked you about.

10          Tell me when you have -- do you have Plaintiffs'

11  Exhibit 39 in front of you?  In that first e-mail you can

12  see -- do you have that, Mr. Fraser?  Do you have that in front

13  of you?

14  A   Yes, sir.

15  Q   The first e-mail is from Josh Garza.  You're not copied on

16  it.  It's to Mr. Moosajee copying Dan Kelley.  Do you see that?

17  A   Yes, sir.

18  Q   In August of -- August 5th of 2014.  Do you see that?

19  A   Yes, sir.

20  Q   And let's go down to the first sentence.  "Shiraz, I know I

21  speak for Stuart and I" -- do you see that?

22  A   Yes.

23  Q   Mr. Garza did a lot of that with people; right?  He spoke

24  for you without you being involved; is that right?

25  A   I believe he did.

1   Q   Okay.  And then if you go down, Mr. Kelley -- the next

2   one -- he responds to that e-mail because he responds to Mr.

3   Garza.  And he said, "It should be an interesting response."

4   He's talking about how Shiraz is going to respond.  See that?

5   A   Right.

6   Q   He says, "Should be an interesting response."  Let's just

7   highlight that whole text.  "I suspect he" -- it's Mr.

8   Moosajee -- "will say we need financials first.  We do need

9   them.  But we would never disclose them until deal-time and we

10  should have them by then."

11           Do you see that?

12  A   Yes, sir.

13  Q   And then if you go to the next page, you see at the top,

14  August 5th still, Mr. Garza says to Mr. Kelley, "In your own

15  way, respond and say all that.  Plus Stuart will like."

16           And you see Mr. Kelley right below that says, "You

17  didn't copy Stuart."  Do you see that?

18  A   Yes, sir.

19  Q   Then let's go to the one Mr. Buchdahl asked you about.  But

20  he only asked you about the first sentence, and I want to talk

21  about the whole e-mail.  That's the e-mail the top of the next

22  page from Mr. Kelley to Dan.  He's copying Mr. -- sorry -- to

23  Josh Garza and copying Mr. Moosajee and you.

24           Do you see that?

25  A   Yes, sir.

1    Q   Mr. Kelley says, "My 2 cents?"

2            Why don't we highlight that whole e-mail.

3            "My 2 cents?  The red flag in soliciting investment

4    right now is that we do not currently have financials or

5    inventory systems in place."

6            And then he says -- and this is the sentence that Mr.

7    Buchdahl didn't ask you about.  And let's highlight the last

8    sentence.  "We will though" -- he's talking about financials or

9    inventory systems; is that right?

10   A   Yes, sir.

11   Q   He says, "We will though, in the very short term, one to

12   two weeks," question mark?  "And much sooner than when

13   financials will be required (deal close)."

14           So is it right on August 5, 2014, you understand that

15   the chief operating officer, Mr. Kelley, was saying that we

16   should have financials and inventory systems in place in the

17   next one to two weeks?

18   A   Yes.

19   Q   Did you have any ability to say, no, no, I don't think

20   that's true.  I know the details of what's going on, and that's

21   not true?

22           MR. BUCHDAHL:  Objection, Your Honor, argument.

23           THE COURT:  I'll allow it.  I'll allow it.

24           THE WITNESS:  I had no ability to know.

25   Q   (By Mr. Weiner) Who did Mr. Kelley report to?

1    A    Uh, Josh Garza.

2    Q    And did Mr. Garza assure you that he was taking care of

3    this financial inventory systems issue?

4    A    Yes.

5    Q    And then finally, if you look at the last page, Mr.

6    Buchdahl said -- the last e-mail, he said to the jury, the

7    e-mail in the middle where it says "Shiraz," it says August

8    5th.  "As discussed and mutually agreed" -- and you remember

9    Mr. Buchdahl said, Well, that was it.  Mr. Shiraz Moosajee had

10   enough, and he walked right out.  Remember he said that to you?

11   A    Yes, sir.

12   Q    What Mr. Moosajee actually said is, although he's not going

13   to serve as the operational CFO, he is happy to keep advising

14   in a to-be-determined manner.  Do you see that?

15   A    Yes, sir.

16   Q    So he wasn't walking out and saying, I know this is a fraud

17   and I'm out of here.  He was saying, I'm happy to stay

18   involved; is that right?

19   A    Shiraz and Josh were old friends, so they knew each other

20   long term; so yeah, he was sticking around.

21   Q    And he didn't walk out.  He stuck around, didn't he?

22   A    He stuck around.

23   Q    You can set that one aside.

24        Now, Mr. Buchdahl asked you about a house you owned by

25   the lake and a campground in Vermont.  Do you remember that

1   generally?

2   A   Yes, sir.

3   Q   And in his opening, Mr. Ard called it a lake compound.  Do

4   you remember that?

5   A   Yes, sir.

6   Q   Let me ask you how big your lake compound is.  How many

7   acres does your house sit on?

8   A   It's a quarter of an acre with a road that goes -- a main

9   road that cuts it in half.  So we can only use one half of a

10  quarter of an acre.

11  Q   And what's the square footage of your lake compound house?

12  A   It's about 20-by-30.  So I would say about a thousand

13  square feet, if you count the garage.

14  Q   The whole house?

15  A   One-car garage we don't really use but we store crap in,

16  stuff in there.  So yeah, a thousand square feet.

17  Q   That's not some palatial mansion lake compound?

18  A   Vermont's not that really place to do that kind of thing.

19  Q   Now, the campground that you talked about, do you own that

20  by yourself?

21  A   I bought the campground with -- with two of my buddies that

22  I went to camp with on that lake.  So it's owned by an LLC that

23  has four or five members.

24  Q   And what was the camp that you went to with the people that

25  helped you buy it?

Fraser - Cross                                                          380

1    A    I went to this camp called Keewaydin, and it's the oldest

2    camp in North America.

3    Q    What's the name?

4    A    Keewaydin, K-e-e-w-a-y-d-i-n.  It's started in 1893.  The

5    camp on Lake Dunmore started in 1907.

6    Q    Have you ever heard of something called the Keewaydin

7    Foundation?

8    A    Yes.

9    Q    Tell the jury what that is and your role in it.

10   A    Yes, so what happened was I was a camper and a staff, and

11   then eventually the camp turned into a nonprofit because we

12   wanted it to stay the same and not develop on it.  So they

13   started the foundation.  In late mid to late nineties, I joined

14   the board and, um, I helped -- and I worked my way up.  At one

15   point I was president of the board.

16          And basically we run a camp from eight years old to

17   seventeen.  It's a tripping camp, and 25 percent of our campers

18   are, um, are kids that can't afford it for various reasons, you

19   know, financially, hardships, and things like that.

20   Q    And how long have you been involved with the Keewaydin

21   Foundation?

22   A    I've been there several years since 1972.

23   Q    Now, you're married; correct?

24   A    Yes, sir.

25   Q    Your wife has been with us every day since jury selection?

1   A    Yeah, married 35 years.

2   Q    And you heard Mr. Buchdahl ask you about a transfer of

3   funds in the summer of 2014 to Mr. Garza that you didn't want

4   your wife Elise to know about.  Do you remember he asked you

5   about that?

6   A    Yes, Elise and I --

7   Q    Tell the jury why it is that you didn't want her to know

8   about that.

9   A    Well, it's not like I didn't want her to know about it, you

10  know.  It's just, um, we have the same credit -- we have the

11  same -- we've had the same bank account, the same savings and

12  checking account since the day we married in '87.  There is no

13  other account we write checks on.  She has total access to that

14  electronically as well as we get mail.  So she sees everything

15  going through.

16       Um, she's not -- you know, she was never happy about

17  money going to these other enterprises.  So, um, you know, I

18  mean the truth is, yeah, she wasn't thrilled about it.  She saw

19  money going out the door.

20       Um, you know, at the same time, I sent that e-mail to

21  Josh to give him -- to give him a little -- what's the word? --

22  you know, to give him some motivation to make sure to pay back

23  my loan.

24  Q    Now, did your wife have a particular view about Josh Garza

25  that she expressed to you?

```
 1   A    I would say --

 2              MR. BUCHDAHL:  Objection.

 3              THE COURT:  Wait.  Wait.  Wait.  There's an

 4   objection.

 5              MR. BUCHDAHL:  Calls for hearsay.

 6              THE COURT:  Well, that's sustained.

 7   Q    (By Mr. Weiner) Did you have an understanding that your

 8   wife Elise was not fond of Mr. Garza from the get-go?

 9   A    Yes.

10   Q    And perhaps if you listened to your wife, we wouldn't all

11   be here today; is that right?

12   A    I do now.  At the time.

13   Q    Mr. Buchdahl also asked you about your two sons, Tommy and

14   Scott?

15   A    Yes.

16   Q    When they were about 30 years old -- well, how old are they

17   now, give or take?

18   A    Tommy's like -- going to be 34, and Scott's going to be

19   31.

20   Q    Okay.  When they were approaching age 30, right around 30,

21   did you have full control over them?

22   A    Never.

23   Q    Neither of them?

24   A    Sorry?

25   Q    Neither of them?  You didn't control your 30-year-old sons?
```

1    A    No, no, no.

2    Q    Do you have any other children?

3    A    Yeah, I have a daughter Samantha.

4    Q    How old is she?

5    A    Samantha just turned 30.  She has two boys.

6    Q    And do you have full control over her at age 30?

7    A    No.  She's married, and she's her own person like her

8    brothers.

9    Q    Do you have any grandchildren, Mr. Fraser?

10   A    I have seven.  Very lucky.

11   Q    You heard Mr. Buchdahl say that you told Garza you didn't

12   want him to have a child.  Do you remember Mr. Buchdahl told

13   you that?

14             MR. BUCHDAHL:  Objection, Your Honor.

15             THE COURT:  Wait.  Wait.  Sorry?

16             MR. BUCHDAHL:  I mean this one, this is Mr. Garza's

17   testimony.  I said nothing about this.

18             THE COURT:  Okay.  I think -- Ladies and Gentlemen,

19   this is your recollection of the evidence that matters, not the

20   lawyers', not even the witness's, and not mine.  So it's your

21   recollection of the evidence that matters.

22             Go ahead, Mr. Weiner.

23   Q    (By Mr. Weiner) Did you ever tell Mr. Garza -- are you some

24   kind of child hater, you don't want Mr. Garza to have children?

25   A    I had three -- we had three kids in diapers at one time;

1   so, you know, who am I to tell people to have kids?  As long as

2   you do your job and get things done.

3   Q   And if you were in full control of Mr. Garza and you didn't

4   want him to have a kid, I guess he wouldn't have a kid; right?

5   A   I guess so.

6   Q   How many kids does Mr. Garza have?

7   A   Four?  Five?

8   Q   Mr. Garza also said you didn't want him to have a dog.

9   Remember he said that in his testimony?

10  A   I heard that.

11  Q   Are you some kind of dog hater?

12  A   I was surprised because I had two dogs at the time that --

13  the whole time I knew Josh, and we only lost our last dog about

14  five years ago.

15  Q   And if you had been in full control of Mr. Garza and say, I

16  don't want you to have a dog, I guess he wouldn't have one;

17  right?

18  A   You'd think so.

19  Q   Did he have a dog?

20  A   He had a dog.

21  Q   Now, where did you go to college?  Where did you go to

22  college?

23  A   I went to the University of Missouri in Columbia,

24  Missouri.

25  Q   What year did you graduate?

1    A    I graduated 1983.

2    Q    What was your degree?  You got a bachelor's?

3    A    I think so.  History.

4    Q    History, okay.

5              And you're not a lawyer; right?

6    A    No.

7    Q    Never been a lawyer?

8    A    Never.

9    Q    You're a lucky man.

10   A    Sorry?

11   Q    Nothing.

12        If Mr. Garza said that you personally gave him legal

13   advice, does that make any sense?

14   A    No.

15   Q    Okay.  You're not an expert on securities regulation or

16   securities law, are you?

17   A    No.

18   Q    If Mr. Garza testified at his deposition that he got advice

19   from you personally on those subjects, does that make any

20   sense?

21   A    It makes no sense.

22   Q    After you graduated from college in 1983, you started at

23   Cantor Fitzgerald; is that right?

24   A    That's correct.

25   Q    Have you ever held any other full-time job anywhere other

1  than Cantor Fitzgerald?

2  A    It's the only place I've ever worked.

3  Q    Now, in the time period that the jury's concerned with,

4  August of 2014 to mid-January of 2015, did you have any job

5  responsibilities at Cantor Fitzgerald?

6  A    Yes.  Yeah.

7  Q    What were your job responsibilities?

8  A    Um, well, vice chairman.  Um, you know, I had some minor

9  functions and things.  Um, and also I was on the board of

10  CFGM.

11  Q    Let me ask you about that.  The vice chairman title, you

12  recall Mr. Buchdahl was making fun of you.  Vice chairman for

13  life he said.  Remember he said that?

14  A    Yes, sir.

15  Q    Tell the jury the reason that you are allowed to retain the

16  title of vice chairman of Cantor Fitzgerald.

17  A    Well, I mean, obviously, I've been there a long time.

18  Everybody knew me.  Um, and -- and one of the important reasons

19  was that I -- I was one of the founders, and I was helping

20  direct the Cantor Fitzgerald Relief Fund.

21  Q    Now, in his opening statement Mr. Ard for Plaintiffs

22  referred to you as a senior Wall Street executive.  Do you

23  remember when he said that?

24  A    Yes.

25  Q    Okay.  Would it be more accurate to say that in 2014 you

1    were a Wall Street executive who had been retired for more than

2    ten years?

3    A    Pretty much.

4    Q    You retired around 2004?

5    A    2005, yeah.

6    Q    So --

7    A    Four I started thinking about it, and five I executed on

8    it.

9    Q    And what did Cantor Fitzgerald mean to you in 2014?

10   A    I mean, everything.  I mean, every one of my kids worked

11   there.  Um, I worked there all my life, my uncle, what we

12   accomplished, the things we did.  We even changed the way

13   business was done.  I mean -- and we weren't a Solomon Brothers

14   or a Goldman Sachs.  We were a small private boutique firm that

15   survived all those mergers.  And we were still -- we were like

16   one of the only real partnerships on Wall Street.

17          So, I mean, it's -- to be part of something like that

18   is, like, I don't know, it's just -- I don't know.  It's the

19   reason who I am.

20   Q    And in 2014, when you were vice chairman and still a

21   retired partner, did you still feel that close connection to

22   Cantor Fitzgerald?

23   A    I -- you know, I still visit the office.  Um, you know, we

24   all meet up once a year.  And, um, yeah, I'm very close.  And

25   not only to the, um, guys that work there but their families

1   I'm very close to.  A lot of them are my friends.

2   Q   Now, during the entire 20 plus years that you worked at

3   Cantor Fitzgerald, let's say from 1983 to 2004 or '5, so that's

4   21 or 22 years, did you ever have any dealings with

5   cryptocurrency?

6   A   Never.

7   Q   Was Cantor Fitzgerald even in the cryptocurrency business

8   at the time you left in 2004 or 2005?

9   A   No.  We weren't even close to then.  Our focus was doing

10  really good at what we knew.

11  Q   And does that include cryptocurrency?

12  A   We knew nothing about it.  No one wanted to touch it on

13  Wall Street.  I mean unless they regulate it, you're not going

14  to touch it.

15  Q   You were here when the Princeton professor that Plaintiffs

16  hired came and testified.  You heard him?

17  A   I was here, yes, sir.

18  Q   You heard him testify there's a world of difference between

19  cryptocurrency and Treasury bills, the things you worked on at

20  Cantor Fitzgerald.  You heard him say that?

21  A   Yes, sir.

22  Q   Did you agree with that?

23  A   I did.

24  Q   Now, Mr. Ard, in his opening, said that you had expertise

25  from your years at Cantor Fitzgerald.  Do you remember when he

1  said that?

2  A   Yes, sir.

3  Q   Was any of your expertise even the slightest tiniest little

4  bit in cryptocurrency?

5  A   No.

6  Q   In 2014 had you ever personally mined cryptocurrency?

7  A   To this day I haven't.

8  Q   Had you ever personally sold cryptocurrency?

9  A   No, sir.

10 Q   Did Cantor Fitzgerald have any role in the design, the

11 funding, or the running of GAW Miners or ZenMiner?

12 A   No, sir.

13 Q   Did Cantor Fitzgerald ever have any involvement of any kind

14 in the ownership, the business, or the operations of those two

15 companies?

16 A   No, sir.

17 Q   Mr. Buchdahl showed you a few e-mails where you were

18 keeping Cantor Fitzgerald in the loop.  Do you remember you

19 talked about that?

20 A   Yes, sir.

21 Q   Tell us again what's your obligation, if any, to keep

22 Cantor Fitzgerald in the loop about what you're doing.

23 A   Well, I still had a number of licenses, you know, because

24 of my past work at Cantor.  And I kept them up just in -- I

25 don't know.  I kept them up for a reason, but anyway.

1          I kept them up, and because of that, I was under

2    FINRA.  You know, I was under all these agencies that if I did

3    anything, you know, sketchy in any way, that they can come

4    after me six weeks to Sunday, so ...

5    Q   So you keep Cantor Fitzgerald posted?

6    A   Yeah.  So it's important for me to let Cantor know -- also

7    there's a U5, which is like you have to refill out every year

8    in the securities business.  That just says that there's no new

9    material things that the firm doesn't know, that you're not

10   trading weird stuff and, you know, that you're doing things

11   right.  So you have to fill that out every year.  So, yeah, it

12   was important to me to let Cantor know what I was up to, so to

13   speak.

14   Q   That included your investment, your minority investment in

15   GAW Miners and ZenMiner; is that right?

16   A   Yes, sir.

17   Q   Now, you first met Josh Garza around 2003 or so?

18   A   Yeah, around then, 2003, '4.

19   Q   It's when he installed internet at the campground in

20   Vermont?

21   A   Yeah, I -- yes.  What happened is we -- we had a satellite

22   dish to run our little campground office.  But then people in

23   the campground wanted to start getting their e-mails and

24   things, so we had to figure out how to do that.  And so the guy

25   that installed my security system at the lake house and also at

1  the marina, at the campground, suggested Josh.  So that's how I

2  met him.

3  Q   And Mr. Buchdahl asked you, he said, when you met him, he

4  was just a teenager.  Do you remember Mr. Buchdahl asked you

5  that?

6  A   Yes, sir.

7  Q   He was actually 18 years old.  He's born in February 1985?

8  A   Yeah, I think it was the fall, big deal, 18 and a half.

9  But I remember he showed me this article he was in, and it was

10  like a Brattleboro front page.  And, like, you know, and it was

11  a big deal about an 18-year-old running his own business, and

12  there was a whole front page article about it that he showed

13  me, so ...

14  Q   Okay.  And do you have any history of helping people out

15  who are younger than you, Mr. Fraser?

16  A   Well, I mean, at Cantor we had -- we had a substantial

17  training program.  So we'd start out in -- we would take kids

18  that were sophomores to juniors in college.  Um, you know, we

19  had kids that were 18 years old working at Cantor in

20  nonregistered jobs.  Um, the campground -- I mean the

21  Keewaydin, not to mention the staff but the, you know, we

22  worked with the kids and the underprivileged kids and, you

23  know, so I was around that all the time.

24          And also one of my favorite charities I was involved

25  in for 25 years, it started out as Harlem RBI.  Now it's called

Fraser - Cross                                                        392

1   Dream.  We started off cleaning dirty, um, lots in Harlem.  And

2   we started a Little League.  And so we did Little League -- we

3   did baseball and softball, and we had about 500 kids.

4           And from that we actually developed -- we actually

5   were able to raise enough money and work with the New York City

6   and the DOT or whatever educational group, and we built our own

7   city -- like a school.  So now we have 12 -- K through 12.  It

8   also has some low-income housing in it.  It houses our

9   administration offices.  And we're just finishing now in the

10  Mott's, um, Muss Point -- in The Bronx, a high school.  And so

11  presently put about 1300 kids in the school.  Last year we had

12  about 17 -- 19 kids graduate high school, and 96 percent of

13  them went to college in an area where 63 percent of the kids

14  don't even graduate high school.

15          So, yeah, I mean it's amazing and, um, yeah, so ...

16  Q   Is that --

17  A   I do a lot of that.

18  Q   And is that something that you're proud of personally, Mr.

19  Fraser?

20  A   I'm still on the board, you know.  Yes, I'm very proud of

21  it.

22  Q   During the time period that the jury has been asked to

23  focus on, August of 2014 to mid-January 2015, Josh Garza wasn't

24  a teenager anymore, was he?

25  A   No, no.  He was --

1    Q    Born in February 1985, so he would have been pushing 30

2    years old; right?

3    A    Yeah.  I mean -- yeah.  Young thirties with four kids.

4    Q    A grown man?

5    A    Grown man, running a business.  I mean, he had an

6    assistant.  I didn't have an assistant.

7    Q    He was old enough to buy himself a Lamborghini; right?

8    A    Apparently.

9    Q    Bought himself a Ferrari?

10   A    That's what I understand.

11   Q    Bought himself a Tesla?

12   A    Yup.

13   Q    Bought himself a BMW?

14   A    Had one of those.

15   Q    And he bought so many cars he couldn't even remember on the

16   deposition what cars he owned; right?

17   A    Interesting fellow.

18   Q    He wasn't a kid anymore in 2014, was he?

19   A    No, sir.

20   Q    You heard of a company called Optima, O-p-t-i-m-a,

21   Computers?

22   A    Yes, sir.

23   Q    You remember Mr. Buchdahl asked you some questions about

24   that?

25   A    Yes.

Fraser - Cross                                                          394

1    Q    And whose company was Optima Computers?

2    A    So when Josh did the first install for me, Optima Computer

3    was his business in Brattleboro, Vermont; and so he did

4    computer fixing but also various computer stuff with that.  So

5    that was his main business when I met him.

6    Q    Okay.  And if you look at Plaintiffs' Exhibit 1 -- it's a

7    document that Mr. Buchdahl showed you, Plaintiffs' Exhibit 1.

8    A    Yes, sir.

9    Q    And you can see this is from February --

10            MR. BUCHDAHL:  Objection, Your Honor.  I don't think I

11   put this in evidence, and I don't think it is in evidence.

12            THE COURT:  Let's take it down.

13            MR. WEINER:  I think it is in evidence.  I think he

14   did both.

15            THE COURT:  It's in?  So that's a full exhibit.

16   Q    (By Mr. Weiner) You see that Mr. Garza writes you -- and

17   this is eight years before the period that the jury's focused

18   on; right?  2006; correct?

19   A    Yes, sir.

20   Q    And if you turn the next page, you'll see what Mr. Buchdahl

21   pointed you toward.  See it says, "Stuart Fraser - Chairman of

22   the Board"; right?

23   A    Yes, sir.

24   Q    And this is talking about Optima Computers; right?

25   A    Yes.

1   Q    You see it says Stuart Fraser is board chairman of Optima

2   Computers; right?

3   A    Yes, sir.

4   Q    And you heard Mr. Garza testify on tape at his deposition

5   that really Optima didn't have a formal board of directors

6   after all.  Did you hear him say that?

7   A    Yes, sir.

8   Q    And he also said, when he was asked by Plaintiffs' counsel

9   on tape, that you didn't even act informally as a member of a

10  board of directors.  Remember when he said that?

11  A    Yes, sir.

12  Q    Was Optima Computers even in business by the time 2014

13  rolled around?

14  A    No, sir.

15  Q    And Optima Computers isn't one of the computers at issue in

16  this lawsuit, is it?

17  A    No, sir, it is not.

18  Q    Let me ask you about something that Mr. Buchdahl didn't ask

19  you about on that very same page.  Go down to that thing that

20  says, "Mr. Fraser served on the board."

21          Again, without going into great detail, or as much

22  detail as we can all stand, tell us what the company LiveWire

23  Kiosk International was, what your involvement was.

24  A    I kind of mentioned it before.  Yeah, it's -- it was more

25  out West, but if you're driving to go skiing and stopping at a

1    gas station, there would be this kiosk there.  Because of the

2    internet, we could like -- and this couldn't happen before.

3    They'd have to go to each one and load them and put all the

4    information in.  You could, say, like Vail, $50 off the Vail

5    ticket.  Because a lot of people in those days would -- you

6    know, they don't do it now because we have our phones, but

7    that's the way people did it.

8            This company was a kiosk company that was doing

9    various -- that could do over-the-internet changes to what the

10   kiosks were offering for tickets, whether it was skiing or

11   maybe even Six Flags or things like that.  It was a friend from

12   Keewaydin that started this company.

13   Q   Then it says you serve on the board of directors of

14   something called Collegextra Inc.  Do you see that?

15   A   Yes.

16   Q   Again, briefly tell the jury what that company was.

17   A   These are friends of mine.  Actually, the son -- the sons

18   went to camp with me.  The mother was on the board with me at

19   Keewaydin.  And he had come up with this idea when he was at

20   Middlebury College to create a website so the students in

21   Middlebury College could communicate with each other, talk

22   about which teachers are better, compare notes and understand

23   the town.  So he expanded that into a -- other college towns,

24   and then eventually it kind of wrapped up in this thing called

25   Union Street Media, which is kind of like an internet hosting

1   company.

2   Q    And, Mr. Fraser, speaking on behalf of the court reporter,

3   slow down a little bit because it's hard to take down

4   everything you say.

5   A    I'm sorry.

6   Q    You also were something -- the majority owner of something

7   called the Fort Worth Brahmas Hockey Team.  Tell the jury what

8   that was and your involvement with that group.

9   A    Yeah, I grew up in St. Louis, Missouri; and my oldest

10  friend Mike wanted to be a hockey announcer.  In the end he

11  ended up in Dallas, and he was announcing for a team.  And he

12  found out that there was these Fort Worth Brahmas.  It was a

13  minor league hockey team.  It's kind of like two rungs below

14  the NHL.

15          And originally I was a limited owner, limited partner.

16  And then, you know, eight years later the other guys kind of

17  walked off, and I ended up inheriting the team.  And so, yeah,

18  they were in the Central Hockey League, and they played various

19  teams.  And that's what Dave helped us on.  You know, Dave was

20  a friend of Mike's, and so he would help us with some of the

21  issues with getting Canadians over the border and anything else

22  we needed.

23  Q    And Dave is Dave McLain?

24  A    Dave McLain, I'm sorry.

25  Q    And those three businesses -- LiveWire Kiosk International,

Fraser - Cross                                                      398

1    Collegextra Inc., and the Fort Worth Brahmas Hockey Team --

2    were those businesses that you were involved in with Josh

3    Garza?

4    A    No, no.  These are just things -- you know, when I decided

5    to retire, I wanted to do something different.  I didn't want

6    to be the guy that, like, gets the call because the internet's

7    down.  I didn't want to be that guy.  So I just wanted to

8    invest in some businesses that I thought were cool with people

9    that I liked that maybe thought that, in a weird way, I might

10   be able to add something to it.

11   Q    Then Plaintiffs' Exhibit 1 goes on to list some of your --

12   see it says "philanthropic endeavors."  Do you see that?

13   A    Yeah.

14   Q    And that's a reference to your volunteer work, your charity

15   work; right?

16   A    Volunteer to what?

17   Q    Reference to your volunteer work, your charity work; right?

18   A    Yes.

19   Q    Taking them one by one, I think we've heard about the

20   Keewaydin Foundation?

21   A    Correct.

22   Q    And we've heard about Harlem RBI?

23   A    Which is now Dream, yes.

24   Q    Harlem RBI is now called Dream; right?

25   A    Yeah.

1  Q   And tell the jury about the one that we haven't heard yet

2  about.  What did you do for the Strategic Planning Board for

3  the University of Missouri?

4        THE COURT:  Subject to my earlier instruction, you can

5  answer my question, subject to my earlier instruction.

6  Q   (By Mr. Weiner) You understand the Court's instruction;

7  correct?

8  A   I do.

9  Q   What kind of things -- speak generally without specifics.

10 A   I graduated from the University of Missouri; and, um, I

11 always, you know, I'm a serial giver, so to speak.  So, you

12 know, I give to my fraternity.  I give to my school.  And so,

13 you know, and I'm not shy about it.

14       So, um, you know, they asked me to join, um, the

15 Strategic Planning Board for the University of Missouri.  And

16 so I was on -- so I would go and we'd have meetings twice a

17 year.  And, um, and I gave a few speeches to the school, and I

18 won the most distinguished alumni award with the guy that

19 invented the jump shot.  Sorry, just had to say that.  But I

20 mean it was pretty fun.  Anyway, so, yeah, so I got to help out

21 my college.

22 Q   Okay.  And Mr. Buchdahl will -- can ask you who he was that

23 invented the jump shot.  Let me keep going and ask you:  These

24 businesses, LiveWire, Kiosk, Fort Worth Brahmas, Collegextra,

25 and these charitable endeavors, the Keewaydin Foundation and

1  Harlem RBI and University of Missouri, did that mean that you

2  didn't spend every waking moment of every waking day thinking

3  about GAW Miners and ZenMiner?

4  A   I mean, I really care about the campground more than

5  anything.  So, yeah, I did not -- my first thought in the

6  morning was not, you know, what's Great Auk doing?

7  Q   You had other things to keep your mind --

8  A   Or GAW.

9  Q   You --

10 A   Yes, I had plenty of things to do.

11 Q   And the last line refers to your wife Elise living in

12 Westchester, New York with your three children.  Was that also

13 something that occupied your time?

14 A   Yeah.  Her mother lives down in Florida.  You know, we

15 helped out her parents.  We helped out my parents.  I moved my

16 parents, when they got older, to Missouri near me.  So it was

17 very important to, you know, take care of family and keep

18 everybody around.  And we spent a lot of times with my in-laws

19 and my parents.

20 Q   Now, you heard Mr. Buchdahl ask you all about giving Mr.

21 Garza money to buy a house.  Do you remember that?

22 A   Yes, sir.

23 Q   Whether you bought a mortgage or forgave a note.  Do you

24 remember those questions generally?

25 A   Generally, yes.

1  Q   Did you give Mr. Garza money to buy a house?

2  A   Yeah.  Well, he had all these kids.  He was living in this

3  thing and he wanted -- he wanted to, you know, he's like,

4  listen, you know, I need more room.  And so I loaned him the

5  money for the down payment to buy his house.

6  Q   And did you end up forgiving that loan?

7  A   Yes.

8  Q   Okay.  Is that the only person you've ever given money to

9  to buy a house?

10  A   No.

11  Q   Tell the jury a little bit about that.

12  A   Well, I bought half my parents' house.  I loaned my

13  in-laws -- I mean because they wanted to have a real mortgage,

14  so they got like a 1-percent mortgage, you know.  So I loaned

15  my in-laws and my parents money.  I've had a few friends from

16  St. Louis that I've lent a few dollars to, nothing like --

17  maybe a few thousand here or there, not --

18  Q   You heard Mr. Garza testify at his deposition that you also

19  helped him buy an engagement ring.  Remember when he said that?

20  A   Yes.

21  Q   Why were you so generous to Josh Garza?

22  A   I mean, I really cared about him.  I mean, we -- you know,

23  he was -- he was a respectful, smart, hard-working person for a

24  long time.  And I cared about him.  And I cared about his

25  family.  And I thought his wife Jessica was lovely.  And just

1   felt like the right thing to do.

2   Q   Mr. Buchdahl asked you last week about an extinct bird

3   called the great auk, a-u-k.  Remember that?

4   A   Yes.

5   Q   And you described it as a bird that was easily manipulated.

6   Remember that?

7   A   Well, he had actually asked me if it was, and I kind of

8   said no, because --

9   Q   And then you -- he showed you your SEC testimony where you

10  told the SEC that it was a bird that was easily manipulated.

11  Remember that?

12  A   Correct.

13  Q   Okay.  And looking back at things in hindsight, do you

14  think Mr. Garza manipulated you?

15  A   I mean that's the hardest thing about this trial for me and

16  trying to explain myself is that, yeah, I mean, you know, the

17  guy went to jail.  I mean yeah.  But, you know, it's -- it took

18  me a long time to kind of admit to myself that he took

19  advantage of me.  And I don't know how to describe it.

20         You know, when someone that close to you does that,

21  you know, you don't see it coming.  It's like that stupid show,

22  I Married a Murderer, like everyone thinks you should have

23  known.  Everyone thinks you should have known.

24  Q   You recall that Mr. Buchdahl asked you about the

25  ZenMiner/GAW Miners' announcement in May of 2001.  And he asked

1  you, Why didn't you just walk away right then?  Do you remember

2  he asked you that?

3  A    Yes.

4  Q    And I think you told the jury at the end of last week, You

5  don't walk away from your friends.  Remember that?

6  A    Yeah.

7  Q    Tell the jury what you were feeling.  Why didn't you just

8  walk away even though you were ten years plus with this guy?

9  Why don't you just cut him dead and say, you're dead to me?

10  A    Again looking back, you know, with everything piled on,

11  yeah, I should have done that.  But at the time, I still cared

12  about him.  And I -- and it just seemed like if I just, like,

13  dumped him publicly, he would never have had a shot to find out

14  if any of this is really true.  And I thought he had a shot.

15          I mean everything I heard that professor say, if you

16  had more power, he would have been able to host everything.  I

17  mean I never heard him say that the $20 thing was the

18  impediment, just that the whole thing crashed before that.

19          So, you know, I was really caught in a tough spot.  I

20  mean, you know, I didn't really understand that he was a liar.

21  Q    Now, Mr. Buchdahl asked you about lending money to Josh

22  Garza in June 2014, the following month.  Remember he asked you

23  about that?

24  A    Yes.

25  Q    Was June of 2014 -- again, it's two months before the

1    period the jury's been asked to focus on.  Was June of 2014,

2    was that the last time you lent money to Josh Garza?

3    A    Yes, sir.

4    Q    And when were all your loans to Garza and GAW Miners fully

5    and finally repaid?

6    A    Yeah, so he had asked me in the early spring, he said,

7    "Listen, I'm having problems with the credit cards.  The flow's

8    off.  So I'm going to need about three loans, like 150, 200,000

9    each."

10           And I said, "Okay, as long as you keep paying me back,

11   I'll give you the three loans."

12           The one in June was the last loan.  I stuck by my

13   word.  He paid me back around the 23rd of August.

14   Q    23rd of August?

15   A    23rd of July, because Elise's birthday is the 24th.  And

16   that was the last time I -- I gave him a penny.

17   Q    So your loans to Mr. Garza in GAW Miners were finally and

18   fully repaid before the period the jury's been asked to focus

19   on; right?

20   A    Correct.

21   Q    Do you consider yourself, Mr. Fraser, to be a victim of

22   Josh Garza?

23   A    I mean, it certainly turned out that way, multiple

24   victim.

25   Q    Victim is someone who loses money; is that right?

1    A    Yes, sir.

2    Q    Did you lose money with Josh Garza?

3    A    I lost money, yes, sir.

4    Q    Okay.  Let's look at Defendant's Exhibit 501, DX 501.

5         I'll take you through it.  DX 501 on first blush looks

6    like a bunch of numbers.

7              THE COURT:  So you're offering DX 501?

8              MR. WEINER:  Yes, sir.

9              THE COURT:  DX 501 will be full.

10             MR. WEINER:  Thank you.

11       (Defendant's Exhibit 501, received in evidence.)

12   Q    (By Mr. Weiner) This I'll represent to you, Mr. Fraser,

13   that the Plaintiffs themselves and their counsel prepared.

14   Okay?

15   A    Yes, sir.

16   Q    And let's look at the first page.  It's a list of

17   transactions with you and the GAW entities and Mr. Garza.  And

18   you see the first one begins in July of 2004, ten years before

19   the period we're talking about; right?

20   A    Yes, sir.

21   Q    And just so the jury understands, that minus sign means

22   that's money that came out of your pocket.  That's money that

23   you're giving to Great Auk Wireless here.  Do you see that?

24   A    Correct.

25   Q    And, you know, if you go down two more, in September of

1   2005 you gave money to Optima Computers; right?

2   A   Correct.

3   Q   And down to April of 2006, you gave $10,000 to Josh Garza.

4   A   Correct.

5   Q   Do you see that?

6          So just these are pages, and the first -- turn the

7   page.  The first three pages are all these transactions.  The

8   first three pages are all money going out.  You don't have to

9   look at it.  Every one is a minus; right?  That's all the money

10  you put in; is that right?

11  A   Yes, sir.

12  Q   And let's go down to the last page.  And we'll look at --

13  let's start with the transaction in June of -- we can below up

14  the last page and start with the June transaction of June 25th.

15  And there's $200,000.  That's from you to GAW Miners.  Do you

16  see that?

17  A   Yes, sir.

18  Q   Was that the last loan you were talking about in June of

19  2014?  Or one of the loans.  That's a loan you made in 2014;

20  right?

21  A   Yes, sir.  Yeah, those are the loans I made in 2014.

22  Q   That's the last time there's money going from you out in

23  that direction; right?

24  A   Correct.

25  Q   And then the next three we see is GAW Miners paying you

1   back your loans, the three loans.  Do you see that?

2   A   Yes, sir.

3   Q   So is that right, that as of July 24, 2014, before the

4   period the jury's been asked to focus on, you were fully and

5   finally repaid; right?

6   A   Yes, those loans were repaid.

7   Q   So if you ever had any power because you loaned money to

8   someone, you certainly didn't have it when the loans were done;

9   correct?

10  A   Correct.

11  Q    Now -- and there's a total there.  That's the total of the

12  five pages.  That's nearly $12 million that you lost over the

13  years, including with GAW Miners and entities involving Mr.

14  Garza.  Do you see that?

15  A   Yes, sir.

16  Q   And how do you feel about the fact that after you lost

17  almost $12 million to Mr. Garza, the Plaintiffs want this jury

18  to also make you pay for their losses?

19  A   Not right.

20  Q   Why is that?

21  A   I should be on their side against him.

22  Q   You can put aside 501.

23       You heard Mr. Buchdahl ask you all sorts of questions

24  about something called Geniuses at Work Corporation; right?

25  A   Yes, sir.

1   Q   And -- do you need a water or something?

2   A   No, I'm good.  I'm good.  I need more water when you get a

3   minute.  I got some.  I got some.  I'm good.

4           MR. WEINER:  Your Honor, if I might, I'm projecting.

5   May I take a sip of water?  Is that okay?

6           THE COURT:  Go ahead.

7           MR. BUCHDAHL:  Your Honor, what was your intention for

8   the afternoon break?

9           THE COURT:  So I think we'll continue for another, oh,

10  17 minutes or so, take a ten-minute break and then finish up

11  for the day.

12          MR. WEINER:  Thank you.  Your Honor, may I proceed?

13          THE COURT:  You may.

14  Q   (By Mr. Weiner) Now, Geniuses at Work Corporation, that's

15  the same three letters, but that's G-A-W.  That's different

16  than Great Auk Wireless; right?

17  A   Totally, yes, different worlds, different businesses

18  anyway.

19  Q   Did you ever hold any share certificates or stock

20  certificates in Geniuses at Work Corporation?

21  A   No, sir.

22  Q   Let's take a look and let's put it up again just for the

23  witness and the Court, 502.

24          MR. WEINER:  And we'll offer 502.  I think there's no

25  objection.

1          THE COURT:  502 will be full.

2          MR. WEINER:  Then we can pop it up for everyone.

3     (Defendant's Exhibit 502, received in evidence.)

4  Q   (By Mr. Weiner) This is articles of organization.  On the

5  front page you can see it says Geniuses at Work Corporation,

6  Article I?

7  A   Yes, sir.

8  Q   So these are the articles of organization for Geniuses at

9  Work.

10         Turn to the next page and actually go one more page

11  after that, and you'll see the date of this document.  You see

12  it says -- this is on the third page.  It says -- sorry --

13  March 15th, 2013.  Do you see that?

14  A   Yes, sir.

15  Q   Then we go back one page.  And let's look at who are the

16  officers and directors at Geniuses at Work Corporation?  The

17  president was Josh Garza; right?

18  A   Correct.

19  Q   The treasurer was Daniel Kelley?

20  A   Yes, sir.

21  Q   The secretary was Daniel Kelley?

22  A   Yes, sir.

23  Q   The only director of the company was Josh Garza; right?

24  A   Yes.  That's his official name.

25  Q   His official name is Homero Garza.  That's the same person;

1    right?

2    A    Yes.

3    Q    Did you hire Dan Kelley for GAW Miners for anything?

4    A    No.

5    Q    Did you hire -- did you interview Dan Kelley?

6    A    No.

7    Q    Okay.  Let's turn the page in the same document.  We go a

8    few months more, and we can see that the next page, let's go to

9    the one that says July 31st, 2013.

10             Next page.  There is the date.  See the date at the

11   top?  Let's highlight that.  The next one's July 31st.

12             You're with me, Mr. Fraser?

13   A    Yes, I am.

14   Q    Let's go to the page before that again.  Here are the

15   officers and directors of Geniuses at Work.  Do you see that?

16   A    Yes, sir.

17   Q    Mr. Garza is the president; Mr. Kelley is the treasurer and

18   secretary; and he's the only director.

19   A    Correct.

20   Q    Let's go forward a few more months to the document to

21   October of 2013.

22             See on October 29th, 2013?

23   A    Yes, sir.

24   Q    And let's go back one more page.  And there's the officers

25   and directors as of October 2013.  You see Mr. Garza's the

1    president?

2    A    Yes, sir.

3    Q    There's someone named Dan Pease is the treasurer,

4    secretary, and chief operating officer.  Do you see that?

5    A    Yes, sir.

6    Q    Did you interview Dan Pease for these jobs or positions?

7    A    No.

8    Q    Even though you're the secret mastermind behind the whole

9    operation?

10   A    I did not interview Dan Pease.

11   Q    And Mr. Garza's the only director; right?

12   A    Yes, sir.

13   Q    Did those people Dan Pease or Dan Kelley, did they report

14   to you?

15   A    No.

16   Q    Who'd they report to?

17   A    Mr. Garza.

18   Q    Were you ever -- and we don't have the ones in 2014.  But

19   were you ever an officer or director of GAW Corporation or GAW

20   Miners or ZenMiner?

21   A    No, sir.

22   Q    Who did the hiring at Geniuses at Work or GAW Corporation?

23   A    Josh Garza.

24   Q    Let's look at Exhibit 541.

25                MR. WEINER:  Your Honor, we'll offer, and I think

1    there's no objection.

2           THE COURT:   541, okay, that's a full exhibit.

3       (Defendant's Exhibit 541, received in evidence.)

4    Q   (By Mr. Weiner) 541, if we can pop out the two from Josh

5    Garza to someone named Matthew Eden?

6    A   Yes.

7    Q   The jury will hear from Madeline Eden.  Matthew Eden became

8    Madeline Eden.

9    A   Okay.

10   Q   Josh Garza is writing to Matthew Eden in September of 2014,

11   offer of employment.  He says, "I genuinely enjoyed our time

12   together a few weeks ago.  I think we got a good sense of what

13   we want to do."

14          Do you see that?

15   A   Yes, sir.

16   Q   It's signed Josh Garza, CEO of GAW Corporation; right?

17   A   Yes, sir.

18   Q   And if you turn to the next page, you see the job that he

19   was offering then Mr. Eden, he was offering the job of platform

20   integration manager.  That's in the re line?

21   A   Yes, sir.

22   Q   And you see the first paragraph he says, "Thank you for

23   taking the time to talk with me about the platform integration"

24   -- let's shrink that a little bit -- "platform integration

25   position.  I found you to be very direct and engaging."  Do you

1  see that?

2  A   Yes, sir.

3  Q   And if you go down a little bit you see the salary Mr.

4  Garza's offering, $65,000.  Do you see that?

5  A   Yes, sir.

6  Q   If you go down to Point 3, the same page, he's offering Mr.

7  Eden -- let's scroll down to Point 3 -- additional $75,000 of

8  GAW Miners equity plan.  Do you see that?

9  A   Yeah.

10 Q   Let's look at that, highlight that.

11         Now, equity is ownership in a company; right?

12 A   Correct.

13 Q   Remember Mr. Buchdahl asked you, what about that

14 18-percent?  You know, you own 41 percent and Garza owns 41

15 percent, and what happened to the 18 percent?  Remember Mr.

16 Buchdahl asked you that?

17 A   Yes, sir.

18 Q   This is Mr. Garza offering these employees equity, that is,

19 ownership in the company; right?

20 A   It appears that way, yes, sir.

21 Q   Okay.  He was offering them part of the 18 percent;

22 correct?

23 A   Or part of his, but yeah.

24 Q   Okay.  And who controlled that 18 percent?  Who had the

25 ability to offer it to these people for their jobs?

1    A    Only Josh.

2    Q    Okay.  Now, did these people, Mr. Eden or -- let's look --

3    there's another one.  Let's go to 542.

4              MR. WEINER:  We'll offer that, Your Honor.

5              THE COURT:  542 is full.

6        (Defendant's Exhibit 542, received in evidence.)

7    Q    (By Mr. Weiner) There's Mr. Garza, same day, September

8    14th, to someone named Jonah Dorman.  Do you see that?

9    A    Yes, sir.

10   Q    And Jonah Dorman is someone the jury will hear from later

11   in the case, offering him employment.  He says, "Good afternoon

12   Jonah.  I have genuinely enjoyed our time together.  I believe

13   we could do some great things together."

14             Do you see that?

15   A    I do.

16   Q    Did you interview Jonah Dorman for this job?

17   A    No, sir.

18   Q    Did you hire him for this job?

19   A    No, sir.

20   Q    Did Mr. Garza consult with you beforehand about hiring

21   him?

22   A    No, sir.

23   Q    Did he consult with you beforehand about hiring Mr. Eden?

24   A    No, sir.

25   Q    Did he consult with you beforehand before hiring anybody at

1   GAW Miners?

2   A   No, sir.

3   Q   Okay.  And do you see he's offering Mr. Dorman -- turn the

4   next page.  He says, Offer of employment, general manager of

5   something called HashRigs/HashLender.  Do you see that?

6   A   Yes, sir.

7   Q   Do you know what HashRigs/HashLender was?

8   A   No.

9   Q   He's offering $85,000 a year?  Do you see that?

10  A   I do.

11  Q   There's the 85,000 right in the middle.

12          And then on Point No. 4, he's offering Mr. Dorman --

13  and let's go down to Point No. 4 -- an additional 55,000 of GAW

14  Miners' equity plan.  Do you see that?

15  A   Yes, sir.

16  Q   Again, that's the stock ownership, the 18 percent that Mr.

17  Garza was offering to these employees as part of their job;

18  right?

19  A   I believe so.

20  Q   I asked you about interviewing and hiring.  Were you

21  involved in firing anyone at GAW Miners or ZenMiner?

22  A   No, sir.

23  Q   Did you have any position in GAW Corporation's

24  organizational structure, any position at all from the top to

25  the bottom?

1   A    No, sir.

2   Q    Let's look at Defendant's Exhibit 646.

3         THE COURT:  Okay, 646 will be full.

4   Q    (By Mr. Weiner) It's a different book there.  Do you have

5   that, Mr. Fraser, 646?

6   A    Yes, I have that.

7   Q    And it's a document the front page you see it says from

8   Dave McLain to Josh Garza.  And it's February of 2015.  Do you

9   see that?

10  A    Yes, sir.

11  Q    And it says SEC's requested documents?

12  A    Yes, sir.

13  Q    There's a bunch of attachments, and the last line refers to

14  two org charts.  That means organizational charts?

15  A    Yes, sir.

16  Q    Don't get ahead of me, Mr. Fraser.  I'll help you find it.

17  They're kind of jumbled in there.

18         But if you look at the capital letters on the first

19  page, the last sentence says, "The last two attachments are two

20  org charts, one representing the company in 2014 and one

21  created to reflect the restructured company going forward in

22  2015."  Do you see that?

23  A    Yes, sir.

24  Q    The last two attachments kind of got mixed up in there, so

25  let me help you find them.  First, the org chart representing

1    company 2014.  Go into the document from the end and count

2    eight pages forward until you get one that looks like that, GAW

3    Corporation.  Tell me when you're there.

4    A    The first one?

5    Q    Go to the back and count eight pages forward.

6    A    Oh, I'm sorry.

7    Q    They're not numbered, so it's not easy.

8    A    I got it.

9    Q    You see it says "GAW Corporation" at the top?

10   A    Yes, sir.

11   Q    And in the box it says "Josh Garza, Chief Executive

12   Officer."  Do you see that?

13   A    Yes.

14   Q    Let's highlight that one.

15            There isn't a box that talks about the CEO above the

16   CEO, is there; right?  You don't see that on that document?

17   A    I don't see that, no, sir.

18   Q    Because it didn't exist; correct?

19   A    Correct, it didn't exist.

20   Q    You see Amber Messer is Mr. Garza's personal assistant.

21   See that?

22   A    Yes, sir.

23   Q    Amber Messer became Amber Capuano I'll represent to you,

24   and the jury will hear from her in the case.

25   A    Okay.

```
 1   Q   Chief operating officer, COO, is Dan Kelley.  See that?

 2   A   Yes, sir.

 3   Q   Go down, the operating companies.  There's something called

 4   GAW Miners.  Do you see that?

 5   A   Yes, sir.

 6   Q   And it says under that "cryptocurrency."  Do you see that?

 7   A   Yes.

 8   Q   There are some corporate services there, and it says

 9   vacant, chief financial officer?

10   A   Yes.

11   Q   That was Mr. Moosajee later filled that position for a

12   short time; right?

13   A   Yes.

14   Q   Then it says, "Juliette Dunlevy, Controller."  You see

15   that?

16   A   Yes.

17   Q   "David McLain, Interim General Counsel"?

18   A   Correct.

19   Q   Your name isn't anywhere on there; right?

20   A   Correct.

21   Q   You were never part of the corporate organizational

22   structure of GAW Miners or GAW Corporation or ZenMiner, were

23   you?

24   A   Never.

25   Q   Let's go in the same document to the org chart for the
```

1  restructured company going forward to 2015 and ask if you go to

2  the first page of the document and count in 13 pages till you

3  get to something that looks like this, that Business Technology

4  for Cryptocurrency, LLC.  And you can highlight -- you see

5  "Josh Garza, Chief Executive Officer."

6  A   Yes.

7  Q   Okay.  And the bottom left -- I think you told the jury, in

8  response to Mr. Buchdahl's question, you didn't even know what

9  Business Technology for Cryptocurrency, you didn't remember

10 that name; right?

11 A   That's correct.

12 Q   Okay.  Look at the bottom left.  It says Geniuses at Work

13 Corporation, operating companies.  It says GAW Miners and

14 ZenMiner, GAW Miners, LLC, ZenMiner, LLC.  Let's blow up that

15 box.

16 A   Yes.

17 Q   Okay.  And there's Jonah Dorman, General Manager of

18 Cryptocurrency Mining and General Manager of Hosted Mining;

19 right?  Do you see that?

20 A   I do.

21 Q   Okay.  You can go back to the whole page.  I would look in

22 vain to find your name anywhere on this chart; right?  It isn't

23 there.

24 A   Correct, you will not find my name in any of these.

25 Q   Because you didn't have any position in the corporate

1   organization of either of those companies.  Isn't that right?

2   A    Correct.

3   Q    Did you have signatory authority on any banking account for

4   GAW Miners or GAW Corporation or for ZenMiner?

5   A    I didn't have a credit card.  I didn't have signature

6   rights, no.

7   Q    We'll get to -- the credit card was the one that they used

8   without you knowing; right?

9   A    Well, no, no.  They used it me knowing it, but they -- it

10  ended up in the long run that somebody had direct withdrawn

11  from my bank to pay for it.

12  Q    And that's something that you didn't know; right?

13  A    That's something I didn't know.  But I knew they had it.

14  Q    But if you're the mastermind, you're the person in control,

15  wouldn't you know that?  Wouldn't you know all these things if

16  you're the criminal mastermind?

17          MR. BUCHDAHL:  Objection, Your Honor.

18          THE COURT:  Sustained.

19  Q    (By Mr. Weiner) Now, Mr. Fraser, listen to my question

20  about signature authority on bank accounts, the person that

21  could write the check.  Did you ever have signatory authority

22  on any checking accounts or other accounts for GAW Miners or

23  ZenMiner or GAW Corporation?

24  A    No, sir.

25          MR. WEINER:  Your Honor, I'll offer 543.  I think you

1   overruled an objection.  543.

2              THE COURT:  I think I reserved on 543.

3              MR. WEINER:  Your Honor, you reserved.

4              THE COURT:  Sorry.  We did that previously today?

5              MR. WEINER:  Yes.

6              THE COURT:  Exhibit 543 is already in.

7          (Defendant's Exhibit 543, received in evidence.)

8              MR. WEINER:  So 543, let's pop that up there.  This

9   will be the last one before the break, Your Honor.

10  Q   (By Mr. Weiner)  543.  You see it says, August 13th -- I'm

11  looking at the bottom there, August 13th, 2014, Mr. Pease.  And

12  we saw Mr. Pease again on those listing of the corporations.

13  He was the COO and treasurer and secretary of GAW Corporation.

14             Do you see that?

15  A   Yes.

16  Q   And then he says, "Hello Dan."  He's talking to Dan Kelley.

17  See it says, "To:  Dan Kelley."  Let's highlight that, "To:

18  Dan Kelley"?

19  A   Yes.

20  Q   This was filled out for, "Shiraz, figured it would help you

21  as well."

22             Then if you turn to the next page, or two pages

23  actually, there he sketched out the corporate structure of

24  these companies in August of 2014, the first month that the

25  jury's been asked to look at.  Look at the one -- two companies

1   we're focused on, GAW Miners, LLC and ZenMiners, LLC.

2          And then on the right it says who the corporate

3   signatories.  See that column at the top, corporate

4   signatories.  Let's highlight that at the top.

5          Who are the corporate signatories on the accounts for

6   GAW Miners, LLC?

7   A   Who are they?

8   Q   What are the names that you can read?

9   A   Josh, Dan Pease, Joe Mordica.

10  Q   Under GAW Miners, see it going cross?

11  A   Josh, Shiraz, Dan Pease.

12  Q   Right.

13  A   And then on ZenMiners, Josh, Shiraz, Dan Pease.

14  Q   And you were reading for Geniuses at Work the holding

15  company was Josh, Dan Pease, and Joe Mordica; right?

16  A   Correct, I was reading that.

17  Q   I would look in vain if I tried to find Stuart Fraser's

18  name on there; correct?

19  A   Correct.

20  Q   Because you didn't have signatory authority on any of the

21  accounts at the two companies or at GAW Corporation, did you?

22  A   I did not.

23          THE COURT:  All right.  We'll take our break, our

24  afternoon break, Ladies and Gentlemen.  We don't usually take

25  an afternoon break, so we're going to keep it short, just ten

1    minutes.

2            Don't discuss the case.  Don't let anyone discuss it

3    with you.  Keep an open mind.  We'll see you back here in ten

4    minutes.

5        (The jury left the courtroom at 2:15 p.m.)

6            THE COURT:  We'll be in recess.  Thank you.

7        (Recess from 2:16 p.m. to 2:24 p.m.)

8            MR. BUCHDAHL:  Your Honor?

9            THE COURT:  Mr. Buchdahl.

10           MR. BUCHDAHL:  I understand that the Court is giving

11   Mr. Weiner some latitude in terms of crossing on documents that

12   I had introduced, but more recently counsel is turning to

13   documents that were never presented to Mr. Fraser on cross.

14           Because that is simply a direct examination, I would

15   ask the Court to require counsel to go through these documents

16   in a nonleading fashion.  He is simply arguing his way through

17   these documents, Your Honor, and I think that is not proper,

18   especially for documents that have been shown to this witness

19   for the first time.

20           THE COURT:  I agree with the principle, but you'll

21   have to object to a particular question.  I agree with the

22   principle.  Certainly it's sometimes difficult to separate

23   between direct and cross when we're in this situation, but

24   there have been a few leading questions that I would have

25   sustained objections to.  So I didn't mean to mislead you in

 1   that regard, but I will need to deal with particular

 2   questions.

 3             MR. BUCHDAHL:  Okay.  Thank you, Your Honor.

 4             THE COURT:  Okay?

 5             MR. BUCHDAHL:  The reason that I --

 6             THE COURT:  I understand why you make the objection.

 7   We're going to get the jurors now.  Go ahead, Devorah.

 8             MR. BUCHDAHL:  Can we get a sense from counsel how

 9   much time we have left?

10             THE COURT:  Mr. Weiner, what do you think?

11             MR. WEINER:  Through to the end of the afternoon.

12             THE COURT:  Okay.

13        (The jury entered the courtroom at 2:27 p.m.)

14             THE COURT:  Great.  Please take your seats.  Please

15   have a seat everyone.

16             All right.  Mr. Weiner.

17             MR. WEINER:  Thank you, Judge.

18   Q   (By Mr. Weiner) Mr. Fraser, in the spring of 2014, what did

19   you know -- are you looking for something?

20   A   I don't have my glasses.

21             THE COURT:  Is it possible --

22             THE WITNESS:  I might have left them in the other

23   room.

24             MR. WEINER:  If I might take a look?

25             THE WITNESS:  My wife will get them if it's all right.

1   Sorry.

2          MR. WEINER:  I'm going to ask questions that don't

3   involve glasses.

4          THE COURT:  Great.  Great.

5   Q   (By Mr. Weiner) In the spring of 2014, what did you know,

6   if anything, about the ins and outs of cryptocurrency?

7   A   Basics, that it was out there, that people were buying and

8   selling it.  I didn't really understand it greatly to any

9   extent.  I still don't, but ...

10         MR. WEINER:  Your Honor, may I give him his glasses?

11         THE COURT:  Yes.  You may.

12         MR. WEINER:  Thank you.

13         THE WITNESS:  Thank you.

14  Q   (By Mr. Weiner) So am I right that beyond the basics, you

15  didn't know about cryptocurrency; correct?

16  A   Correct, I didn't know anything.

17  Q   Okay.  And whose idea was it to take your businesses and

18  move them into the cryptocurrency direction?

19  A   Mr. -- it was Josh Garza's.

20  Q   Let's look at Defense Exhibit 552B.

21         MR. WEINER:  Your Honor, I think that there's no

22  objection.

23         THE COURT:  Correct.  DX 552 is a full exhibit.

24      (Defendant's Exhibit 552, received in evidence.)

25  Q   (By Mr. Weiner) 552B, there are two versions of the same

1    article, and I'll explain why we have two versions.

2              MR. WEINER:  Can I proceed, Your Honor?

3              THE COURT:  You may.  You may.

4    Q   (By Mr. Weiner) Mr. Fraser, if you look at the first page

5    of this article, it says last updated on January 2, 2018.  Do

6    you see that?

7    A   Yes, sir.

8    Q   And that isn't the date.  That's just when it was updated.

9    So we don't need to highlight that.

10             Let's go to the last page and that gives you a clue of

11   when the real date of this was.  You see there's a comment on

12   that, it says, "Nice interview."  And the comment is dated July

13   28, 2014.

14             Do you see that?

15   A   Yes, sir.

16   Q   Someone's commented, "Nice interview."  Do you see that?

17             Do you see that?

18   A   Yes, sir.

19   Q   And that tells us that this interview with Josh Garza

20   happens July 28th or sometime before that.  Fair enough?

21   A   Yes, sir.

22   Q   Let's go back to the first page.  Again, the date is now

23   we're talking about sometime in 2014, not 2018.  And it's

24   "Interview with Josh Garza, Founder and CEO of GAW Miners."

25             Do you see that?

1  A    Yes, sir.

2  Q    And if you go to the second page, it says, To start off

3  with -- "To start off, who is Josh Garza?  What separates you

4  from other CEOs in the industry?"

5          Do you see that?

6  A    Yes, sir.

7  Q    And above that, you don't have to highlight.  Just above

8  that, you see it's an interview with Josh Garza.  Let's go

9  above that line.

10  A    Correct.

11  Q    "Interview with Josh Garza, the Founder and CEO of GAW

12  Miners."  So are you with me?

13  A    Yes, sir.

14  Q    And now let's go to the next page where the interviewer

15  asked the question, "GAW existed before GAW Miners.  What is

16  GAW, the brand, and what caused you to create GAW Miners?  It

17  seems as if you just exploded on the scene, and started taking

18  over."

19          Let's go to the second paragraph of Mr. Garza's

20  answer.  He says, "I wasn't even thinking about entering the

21  industry.  It wasn't until I started buying large mining units

22  that I conceived of GAW Miners."

23          He says, "I don't want to name any names, but every

24  single ASIC" -- an ASIC is a cryptocurrency mining machine.

25  I'll represent that to you.  That's what ASIC is.  It's a

1    machine.

2    A    Yes, sir.

3    Q    "Every single ASIC distributor I dealt with had an utter

4    lack of honesty and business ethics.  It was clear they didn't

5    know how to run a business -- but there were no other options,

6    really."

7              Then he says -- let's highlight the next line.  "So I

8    made a few calls, had several key meetings with my ops" -- or

9    operations crew -- "and out of that came GAW Miners."

10             Do you see that?

11   A    Yes, sir.

12   Q    That square with your recollection that it was Mr. Garza's

13   idea to go into the cryptocurrency?

14             MR. BUCHDAHL:  Objection.

15             THE COURT:  Sustained.

16   Q    (By Mr. Weiner) You told Mr. Buchdahl, I think, that you

17   were the co-founder and an early investor in GAW Miners.

18   A    Correct.

19   Q    Were you the co-founder of GAW Miners?

20   A    I mean I -- GAW Miners grew out of all the businesses that

21   we started.  So, I mean, I considered myself a co-founder.

22   Q    At the beginning you were a co-founder; right?

23   A    Oh, yeah.

24   Q    And were you an early investor in GAW Miners?

25   A    I don't think --

 1   Q    If you had -- withdrawn.

 2   A    I don't know.

 3   Q    If you had called yourself an early investor of GAW Miners,

 4   would that be accurate early on?

 5   A    Yes.

 6   Q    Now, were you ever vice chairman of GAW Miners or

 7   ZenMiner?

 8   A    No, sir.

 9   Q    Were you ever an officer or director?  We went through

10   that; right?

11   A    Never had a title, never had a position, never got paid

12   anything.

13   Q    Okay.  And what was Mr. Garza's role at GAW Miners?

14   A    He ran it.  He was the CEO.

15   Q    Okay.  And --

16   A    I mean, whatever it means, but he was in charge.

17   Q    If you'd look at DX 509.

18        MR. WEINER:  Your Honor, there was a reserved ruling,

19   and then you admitted it, I believe.

20        THE COURT:  I did admit it?

21        MR. WEINER:  I believe so, 509 during the last break.

22        THE COURT:  Yes, 509 is full.

23        (Defendant's Exhibit 509, received in evidence.)

24   Q    (By MR. WEINER) You see here announcement from April 26,

25   2014, GAW Miners to double all customers' mining hashing power

1   for a week on April 26th, 2014.  And you see there's the date,

2   if we go down a little bit.  It says East Longmeadow, Mass.,

3   April 18, 2014.

4   A   Yes, sir.

5   Q   What's in East Longmeadow, Mass. that has anything to do

6   with GAW Miners?

7   A   I think that's where the Garzas were living.  That was his

8   home.

9   Q   Before he moved to Connecticut?

10  A   Before he moved to Connecticut, yeah.

11  Q   So this press release out of Mr. Garza's home, if you count

12  down three paragraphs, where he says, "We're running this

13  promotion because we have the most loyal customers who've

14  supported us every step of the way.  Said Josh Garza, CEO."

15  A   Yes, sir.

16  Q   From the very beginning and through the end, he held

17  himself out as the public face of GAW Miners; is that right?

18          MR. BUCHDAHL:  Objection, Your Honor.

19          THE COURT:  Sustained.

20  Q   (By Mr. Weiner) Who held himself out as the public face of

21  GAW Miners?

22  A   GAW -- Josh Garza.

23  Q   Had you ever seen a press release in this entire period

24  that had quoted anyone as the CEO other than Josh Garza?

25  A   No, sir.

1   Q   If you look at 510 --

2           MR. WEINER:  Your Honor, I think you reserved.

3           THE COURT:  Yes, 510 is full.

4   (Defendant's Exhibit 510, received in evidence.)

5   Q   (By Mr. Weiner) This is an article from April 22, 2014.

6   Mr. Fraser, do you see the headline and date?

7   A   Yes, sir.

8   Q   "GAW Miners Launches GAW Loyalty Rewards and Refer-a-Friend

9   Programs"?

10  A   Yes, sir.

11  Q   Turn again to the date line, says East Longmeadow, Mass.

12  It's on the page before that.  Again, there's Mr. Garza's

13  house; right?

14  A   Correct.

15  Q   And then the next page it says, "Many of our customers have

16  been asking for a way to earn miners or equipment for referring

17  their friends.  We think this is a great system where everyone

18  wins, said Josh Garza, CEO."

19          Do you see that?

20  A   Yes, sir.

21  Q   Who was in charge at GAW Miners during the period August 1,

22  2014, through January 19, 2015?

23  A   Josh Garza.

24          MR. WEINER:  Okay.  You can take that down.  Thank

25  you.

1   Q   (By Mr. Weiner) Now, you heard Mr. Garza testify that in

2   all of 2014, he only met with you in person two or three times.

3   Did you hear him testify about that?

4   A   Yes, sir.

5   Q   Does that sound about right?

6   A   Yeah, pretty much.

7   Q   Now, you did loan money to GAW Miners to help buy

8   cryptocurrency mining equipment, actual physical mining

9   equipment; is that right?

10          MR. BUCHDAHL:  Objection.

11          THE COURT:  Sustained.

12  Q   (By Mr. Weiner) Did you loan money to GAW Miners to buy

13  actual cryptocurrency mining machines?

14  A   Yes.  He was selling actual boxes.  They were mailing them

15  to people, or computers.  And that's why I felt comfortable

16  loaning him the money during that moment.

17  Q   Okay.  And when did you finally and fully get repaid all

18  the money you had loaned to GAW Miners?

19  A   July 23rd, 2014.

20  Q   Okay.  Let's look at DX 522.

21          MR. WEINER:  Your Honor overruled an objection.

22          THE COURT:  Yes, DX 522 will be a full exhibit.

23      (Defendant's Exhibit 522, received in evidence.)

24  Q   (By Mr. Weiner) In July -- let's look at the first e-mail

25  in July.  Josh Garza says to you late July of 2014, "Good

1    morning.  I should be in a position to send the last bit of

2    cash by tomorrow."

3            Do you see that?

4    A   Yes, I do, sir.

5    Q   If you turn the page to the next, next e-mail, it's on the

6    next page, the top it says -- wait, maybe we can blow that up,

7    where it says last to 210K.

8            Last 210K is thousand; right?  I should ask:  Does K

9    refer to thousand?

10   A   Yeah, that's $210,000.

11   Q   Okay.  And it says, The last 210,000 is coming today.  And

12   it says it's being paid early, assume we would prorate the

13   interest.  And then at the end he says, "This would square you

14   up with GAW Miners."  Do you see that?

15   A   Yes, sir.

16   Q   What does that mean that on July 24th this would square you

17   up with GAW Miners?  What did you understand that to mean?

18   A   That I have no -- no further loans outstanding, nothing

19   else -- yeah, I'm all square.  So what they -- what I let them

20   -- what I lent to them they returned to me.

21   Q   And --

22   A   And there's nothing left.  Well, nothing else is left.

23   Q   Okay.  And if we go back and look at the DX 501, which is

24   the page of numbers you paid in and out, it was on July 24th

25   that you were finally paid up; correct?

1   A    Yes, sir.

2   Q    Of 2014; correct?

3   A    Yes, sir.

4   Q    Okay.  Now, I think with Mr. Buchdahl last week, we saw

5   that your ownership interest at one point in GAW Miners was 41

6   percent?

7   A    Yes, sir.

8   Q    Is that right?

9           Let's look at Exhibit P, as the Plaintiff, PX 32.

10          THE COURT:  I think that's probably already in; is

11   that right?

12          MR. WEINER:  Yes, sir.

13   Q   (By Mr. Weiner) From Josh Garza to your address at Aukster

14   MSN.  That's you, aukster MSN.com?

15   A    Yes, sir, that's me.

16   Q   And if you count down one, two, three, four, five, there's

17   a paragraph it says, "I've invested 85k.  I have" -- this is

18   Mr. Garza saying, "I have invested" -- that's Mr. Garza --

19   "85,000 of my cash into GAW Miners to date.  Our records show

20   you have invested 135,000 outside of the 400,000 in loans being

21   paid back to you."

22          Do you see that?

23   A    Yes, sir.

24   Q    That was accurate; correct?

25   A    Correct.

1   Q   And you saw before Mr. Garza offering $75,000 worth of

2   equity to Mr. Dorman and $55,000 of equity to Mr. Eden.  Do you

3   remember that?

4   A   Yes, sir.

5   Q   He's giving away equity in amounts similar to what you guys

6   have put in; correct?

7   A   Yes, sir.

8   Q   Okay.  And then go down to the line that says, second from

9   the bottom, "Our equity at GAW Miners."  And this is June 22,

10  2014.  "Our equity of GAW Miners would stand at 41 percent

11  each."

12          Do you see that?

13  A   Yes, sir.

14  Q   Were you ever once a majority owner of GAW Miners?

15  A   No, sir.

16  Q   Now, a few months after this, this June 2014, Mr. Garza

17  discussed with you that he wanted to reduce your ownership

18  stake in GAW Miners from 41 percent down to 15 percent.

19  Remember that?

20          MR. BUCHDAHL:  Objection.

21          THE COURT:  Sustained.

22  Q   (By Mr. Weiner) Did Mr. Garza tell you a few months later

23  that he wanted to reduce your ownership stake from 41 percent

24  to 15?

25  A   Yes, sir.

1    Q   And when did he first tell you that, give or take?  Again,

2    don't guess if you don't know.

3    A   August?

4    Q   Of what year?

5    A   2014.

6    Q   And if you look at Defense Exhibit 549 --

7           THE COURT:  Okay, DX 549 is full.

8        (Defendant's Exhibit 549, received in evidence.)

9    Q   (By Mr. Weiner) Mr. Buchdahl asked you some questions about

10   this last week.  If you look at the bottom of the first page,

11   there's an e-mail, Wednesday, October 1, 2014.  Mr. McLain

12   says, Point No. 2, "Stuart - he called me last night and we

13   spoke for about an hour.  He confirmed that he basically agreed

14   with your proposal."

15          Is that Mr. Garza's proposal?

16   A   Yes, sir.

17   Q   Okay.  And then Mr. Garza proposed reducing you to 20

18   percent across the board or to 15 percent across the board with

19   a $500,000 payment.  Do you see that?

20   A   Yes, sir.

21   Q   Now, did you agree to drop your ownership percentage in GAW

22   Miners from 41 percent down to 15 percent?

23   A   Yes, sir.

24   Q   And if you take a look at Exhibit 550 -- you know, stay

25   with this document for a moment.  Let's go up a little higher

1    to the point that says -- it's October 1st, right in the

2    middle, October 1st, by the word "honestly."  Mr. Garza says,

3    "Honestly"?  You see that where it says, "Honestly," and he

4    says, "Hey I don't feel it's reasonable."

5              Can we highlight the words "honestly" in line A?

6    A    Yes, sir.

7    Q    I don't feel it's reasonable and it's not enough.  He's

8    talking to you.  It's not enough that he got 41 percent of the

9    company worth nearly 100 million for 450k.  Do you see that?

10   A    Yes, sir.

11   Q    Go down to C.  This is what Mr. Garza says to Mr. McLain.

12   He's talking about you; right?

13   A    Yes.

14   Q    "Despite the fact that he adds no value as an investor."

15   Who is he talking about?

16   A    That's Mr. Garza talking about me.

17   Q    He says, "I am still trying to do things I don't need to

18   but that point's important.  His emotions keep him from being a

19   valuable partner to the company."

20             Do you see that?

21   A    Yes, sir.

22   Q    Did you know that Mr. Garza was saying that in October of

23   2014 to your lawyer?

24   A    I wasn't quite aware of it, no, sir.

25   Q    And if we go to Exhibit 550?

1          MR. WEINER:  Your Honor, there's no objection.

2          THE COURT:  That will be full.  DX 550 is full.

3      (Defendant's Exhibit 550, received in evidence.)

4  Q   (By Mr. Weiner) Under the bottom of that 550 Point 2,

5  Stuart -- let's bring out that whole point, the whole thing to

6  the bottom of the page.

7          And that's the same thing we saw before and the two

8  structures that he was proposing; is that right?

9  A   Yes, sir.

10  Q   And at the top, the very top of the page, the one below

11  that, you know, reduces the 15 percent, you can highlight that

12  one too.

13          Okay.  And at the top of the page, this is your

14  response.  Let's go to the very top.  And you say -- this is

15  October 1st of 2014.  "I'm not up to it.  I told Dave to do

16  whatever you want done.  I'll be fine."

17          Do you see that?

18  A   Yes, sir.

19  Q   Is that right, that you were okay with having your

20  ownership reduction -- ownership in GAW Miners reduced from 41

21  percent down to 15 percent?

22  A   Totally.

23  Q   Why?  Tell the jury why that was.

24  A   Um, I just felt that let Josh do what he wants to do.  And

25  if he's anywhere right on this, then I'll get -- you know, I'll

1  get some kind of return in the future.

2          But I realized that I wasn't going to be able to save

3  the internet company that I cared about.  And I -- you know, I

4  was getting tired, and I wanted to reduce my -- I want to

5  reduce my position, you know, my situation with Josh.  I wanted

6  to reduce it as much as I can.

7  Q   Why -- if you were the criminal mastermind of the whole

8  thing, why didn't you just exert your control?

9          MR. BUCHDAHL:  Objection, Your Honor.

10         THE COURT:  Sustained.  Objection sustained.

11 Q   (By Mr. Weiner) We talked about the fact that you never

12 held any kind of executive position at GAW Miners or ZenMiner;

13 correct?

14 A   Correct.

15 Q   Did you ever receive a salary at GAW Miners or ZenMiner?

16 A   No, sir.

17 Q   Did you ever get any money or compensation from GAW Miners

18 or ZenMiner?

19 A   Not only that, did I not get any payment, but when I used

20 the services at the campground or personally, I always paid,

21 because I wanted to know what a customer felt like.

22 Q   Did you --

23 A   I wanted to, you know -- I wanted to see how they treated

24 people.

25 Q   Did you have a business card anywhere that said you're an

Fraser - Cross                                                     440

1    executive at GAW Miners or ZenMiner?

2    A    No, sir.

3    Q    Did you control the day-to-day operations of GAW Miner or

4    ZenMiner?

5    A    No, sir.

6    Q    Did you control the business strategies of GAW Miner or

7    ZenMiner?

8    A    No, sir.

9    Q    As far as you understood, who did control the day-to-day

10   operations at GAW Miners?

11   A    Josh Garza.

12   Q    And as far as you understood, who did control the business

13   strategies of GAW Miners and ZenMiner?

14   A    Josh Garza.

15   Q    Now, Mr. Buchdahl asked you about a shift in GAW Miners'

16   business in the late spring of 2014, again, months before the

17   period we're talking about.

18        But he asked you about a shift from GAW Miners selling

19   physical mining hardware that would be delivered to customers

20   to selling hardware that would be hosted in a data center owned

21   by GAW Miners.  Remember he talked to you about that?

22   A    Yes, I do.

23   Q    Were you consulted in that decision to shift the business

24   of GAW Miners in that direction?

25   A    No.

1    Q    Who made that decision?

2    A    Josh Garza.

3    Q    Where was the GAW Miners' -- GAW Miners' data center

4    originally located?

5    A    I believe near the office in Connecticut, Enfield.  I don't

6    know.  I'm sorry.  Somewhere, somewhere in the east.  But it

7    was close to the office.  I had never seen it.

8    Q    Okay.  And, again, don't guess if you don't know.  The

9    jury's only interested in what you know.

10   A    Okay.

11   Q    Did you ever go to the data center when it was somewhere in

12   the Eastern United States?

13   A    No.

14   Q    How about -- I think you testified when Mr. Buchdahl asked

15   you that Mr. Garza moved the data center down to Mississippi.

16   Remember testifying about that?

17   A    Yes, sir.

18   Q    Were you consulted in that decision to move the data center

19   with the computers down to Mississippi?

20   A    No, sir.

21   Q    Were you involved in any way in that decision?

22   A    No, sir.

23   Q    Let's take a look at Defendant's Exhibit 530.

24        THE COURT:  Okay.  530 will be full.

25        (Defendant's Exhibit 530, received in evidence.)

```
 1    Q    (By Mr. Weiner) Let's look at it's an e-mail from Josh
 2    Garza, dated August 22.  To:  Team.
 3              Do you see that?
 4    A    Yes, sir.
 5    Q    And it says, with an exclamation point, "This is my house!"
 6    Do you see that?
 7    A    Yes, sir.
 8    Q    It doesn't say, This is Stu Fraser's house; right?
 9              MR. BUCHDAHL:  Objection.
10              THE COURT:  Sustained.
11    Q    (By Mr. Weiner) It says, "Sneak peek of next press
12    release."  Do you see that?
13    A    Yes, sir.
14    Q    And then if you turn the page, what Josh Garza was sending
15    to his team in August of 2014, there's a picture of a bunch of
16    computers -- right? -- and two people standing there.  Do you
17    have that first page available to you?
18    A    Yes, yes, I'm looking at it.
19    Q    We'll show you a close-up of those two people.  Let's go to
20    the next picture.  And I'll represent to you that that's Mr.
21    Mordica on the left.
22              Do you see that?
23    A    Yes, sir.
24    Q    Did you ever meet Mr. Mordica?
25    A    No.
```

1   Q    The chief technical officer of GAW Miners, you never met

2   him?

3   A    Never met him.

4   Q    Okay.  And do you recognize the fellow on the right?

5   A    Homero, Josh Garza.

6   Q    And this is a picture that he sent to his team showing the

7   data center he had established for GAW Miners in Mississippi;

8   is that right?

9   A    Sent to the team, yes, sir.

10  Q    And then if you look, turn the next page, Exhibit 531, Mr.

11  Garza.

12            THE COURT:  531 will be a full exhibit.

13            MR. WEINER:  Thank you, Your Honor.

14       (Defendant's Exhibit 531, received in evidence.)

15  Q    (By Mr. Weiner) Mr. Garza -- since you weren't on the GAW

16  Miners team, he had to sent it to you separately; right?

17            MR. BUCHDAHL:  Objection.

18            THE COURT:  Sustained.

19  Q    (By Mr. Weiner) Do you see Mr. Garza sent it to you

20  separately, Stuart Fraser, and again "This is my house!"

21  A    Yes, sir.

22  Q    And if you turn the page, it's black and white this time,

23  but it's the same two photographs; right?

24  A    Yes, sir.

25  Q    Did you ever visit GAW Miners' date center in Mississippi?

1    A    I don't think I've ever been to Mississippi.

2    Q    For any reason?

3    A    For any reason.

4    Q    Did you ever see a lease for GAW Miners' Mississippi data

5    center?

6    A    No, sir.

7    Q    Did you ever see any bills for the electricity or the

8    build-out of that data center?

9    A    No.

10   Q    Do you have any idea when it became operational?

11   A    No.

12   Q    Do you know even if it did become operational?

13   A    Like the professor said, you can't tell from a picture, so

14   no.

15   Q    Did you ever see any records identifying which GAW Miners'

16   customers owned which GAW Miners' mining equipment?

17   A    No.

18   Q    And Mr. Buchdahl asked you last week -- actually, could be

19   today.  It all runs together.  Mr. Buchdahl asked you about

20   ZenMiner.

21   A    Yes, sir.

22   Q    Okay.  And I think you testified that it was supposed to be

23   something grandma proof; is that right?

24   A    Yes, sir.

25   Q    And whose idea was this grandma proof thing called

1  ZenMiner?

2  A   I mean, it had to be Josh.  I believe it was Josh Garza.

3  Q   Was it your idea?

4  A   No, sir.

5  Q   You sat there and you dreamed up the idea of ZenMiner?

6          MR. BUCHDAHL:  Objection.

7          THE COURT:  Sustained.

8          THE WITNESS:  I'm sorry.

9  Q   (By Mr. Weiner) Don't answer.  If the Judge sustains, don't

10 answer.

11         Who was in charge of ZenMiner?

12 A   Josh Garza.

13 Q   If you look at Exhibit 520.

14         THE COURT:  Okay, 520 will be full.

15     (Defendant's Exhibit 520, received in evidence.)

16 Q   (By Mr. Weiner) 520 is dated July of 2014.  It says

17 Certificate of Formation of ZenMiner, LLC and EIN, which is

18 employer identification number for ZenMiner, LLC.  Do you see

19 that?

20 A   Yes, sir.

21 Q   And if you turn the page, the second page, we'll go to the

22 next page, it says Application for Employer Identification

23 Number.  And the applicant, if you look at number one, Box No.

24 1, the applicant is ZenMiner, LLC.  That's one of the

25 companies, two companies the jury's been asked to focus on.

Fraser - Cross                                                        446

1   Are you with me?

2   A    Yes.

3   Q    Okay, and then 7a it says Geniuses at Work Corporation.  Do

4   you see that?

5   A    Yes, I do.

6   Q    Now, go down to the very bottom and tell us, who was the

7   applicant who swore under penalties of perjury for this

8   employer identification number for ZenMiner, LLC.

9   A    Josh Garza.

10  Q    And it says D-I-R of Geniuses at Work Corporation.  Does

11  that mean he was the director of it; is that right?

12  A    Yes.

13  Q    Did there come a point later in 2014 -- you can put this

14  one away.

15         Later in 2014 when GAW Miners switched customers over

16  to something called cloud-hosted mining.  Remember that?

17  A    Yes.

18  Q    Were you involved in that decision to change that business

19  strategy of GAW Miners?

20  A    No, sir.

21  Q    Were you consulted?

22  A    No, sir.

23  Q    Whose idea was it?

24  A    Josh Garza.

25  Q    Now, were you given access to the cloud-activated mining

1    customer base?

2    A    No, sir.

3    Q    You told Mr. Buchdahl last week about something called

4    Spotify or Shopify earlier in 2014.

5    A    Correct.

6    Q    Okay.  Was that different than ZenMiner and ZenCloud and

7    all that stuff?

8              MR. BUCHDAHL:  Objection.

9              THE COURT:  Sustained.

10   Q    (By Mr. Weiner) Tell the jury what the Shopify thing was in

11   early 2014.

12   A    Well, from my understanding, like, if you have a company --

13   you know, you start a business, you're selling -- I don't

14   know -- bird houses, you know, this is like the easiest way to

15   set it up.  And you could -- it's almost like an accounting

16   system where you could -- you can see how many you're selling

17   at a time off your website.  That's what I understood it to

18   be.

19   Q    Okay.  And you were able to use that in the early part of

20   2014?

21   A    When they first started selling the machines that they had

22   a Shopify account or whatever you call it, you know, hooked up

23   to the website they were selling off.  And so I was able to

24   kind of -- I was able to see, apparently, like tick, tick,

25   tick, we sold 12, we sold 14, you know, that kind of thing.

1   Q   Okay.  And when GAW Miners moved directions into

2   cloud-hosted mining later in the summer of 2014, could you use

3   that old system to look at that?

4   A   The first system was outdated within three weeks.  And then

5   after that, I got some kind -- I mean he sent me something, but

6   I could never connect.

7   Q   Were you ever able to log onto the website to see what was

8   happening with ZenMiner or ZenCloud?

9   A   No, sir.

10  Q   Did Josh Garza ever describe it to you and tell you about

11  it?

12  A   Yeah.  I mean, you know, he'd do the happy calls, you know,

13  everything's great.  We're kicking butt.  We're making money,

14  that kind of thing.

15  Q   And did you believe him at the time?

16  A   Yeah.  It sounded exciting.  I was -- you know, yes.  I

17  mean, I thought he was -- I thought it was real.

18  Q   And during the period from August 1, 2014, through January

19  19th, 2015, were you interested in seeing hard financial data

20  from GAW Miners?

21  A   You know, I was always interested in seeing it, and I had

22  asked for, like, things for years.  So I didn't expect to.

23  Q   But you were the great mastermind.

24          MR. BUCHDAHL:  Objection, Your Honor.

25          THE COURT:  Sustained.

1   Q   (By Mr. Weiner) Did you ask Mr. Garza for the hard

2   financial numbers behind GAW Miners?

3   A   I mean after he took total control, you know, after he had

4   the sense that he, you know, I was a minority guy, I mean, I

5   got called for a happy call or if he needed money.  But that

6   was about it.

7   Q   Let's look at a few e-mails that Mr. Garza sent you during

8   the period we're focused on, the summer, fall, and winter of

9   2014.  The first one is Exhibit 521, Your Honor.  That's

10  already in evidence.

11          THE COURT:  All right.

12  Q   (By Mr. Weiner) DX 521.  Let's start at the bottom.  Tell

13  me when you have DX 521 in front of you.

14  A   Yes, I have it.

15  Q   July 18, 2014.  You can go down one, the one below that.

16          Mr. Garza says, at the bottom, "Should have all you

17  money" is the last line.  "Should have all you money and have

18  you out very soon."  Do you see that?

19  A   Yes, sir.

20  Q   What's that a reference to a week before he paid off the

21  final loan?  What does that mean, "have you out very soon"?

22  A   Well, I mean, Josh didn't think I was contributing, and,

23  you know, and I was a drag.  And because I asked about stuff,

24  it was like a pain in the ass -- a pain -- sorry.  So he was

25  very excited to get to this point and just say, you know, I

1    don't have to look -- you know, I'm not forced to have to hear

2    you, not that he listened to me, but he didn't have to hear me

3    anymore.  So he was saying, you get your money and you can go

4    do whatever you want, I assume, from my point of view.

5    Q   And at the top of the page, you see the e-mail, July 18th,

6    2014.  This is about two weeks -- two weeks before the period

7    that the jury's been asked to focus on.  It's Mr. Garza tells

8    you, "I thought about what you said.  Your (sic) right, this is

9    my company, and I am the only one that knows how to really run

10   it."

11           Do you see that?

12   A   Yes, sir.

13   Q   What company is he talking about?

14   A   GAW Miner.  I mean, the whole thing.  I mean, you know,

15   like I said, we had that discussion, and I was, you know,

16   honest with him.  So this is him coming back and saying, you

17   know, you're right.  I'm in charge.  It's my company.

18   Q   Okay.  Let's go to Exhibit DX 524.

19           MR. WEINER:  Your Honor, there's no objection.

20           THE COURT:  All right.  524 will be full.

21       (Defendant's Exhibit 524, received in evidence.)

22   Q   (By Mr. Weiner) Let's go to the back of 524.  This is back

23   to front.  Again, on the last page, there's an e-mail dated

24   August 1.  Again, it's the beginning of the period in question

25   here.  Let's go down to the second line all the way at the

1   bottom.  There's someone Mike Robertson, see at the bottom,

2   co-founder of Domain Guardians.  Do you see that?

3   A   Yes, sir.

4   Q   And let's highlight the date, August 1, 2014.  "Hi Josh.  I

5   hope this e-mail finds you well."  He says, "I'm reaching out

6   to you, as I am currently representing the owners of the

7   premium domain name BTC.com."

8        Do you see that?

9   A   Yes, sir.

10  Q   Then go down two more, it says, "If you have any interest

11  in BTC.com and would like to discuss further, let me know."

12        He was offering to sell the domain name BTC.com; is

13  that right?

14  A   That's what it appears to say, yes, sir.

15  Q   And Josh Garza, if you go up to the top of the screen, he

16  just asks, "How much?"

17        Do you see that?

18  A   Yes, sir.

19  Q   Okay.  And then let's go to the page before that.  We're

20  going forward in time.  And there Mr. Robertson provides some

21  prices.  He says, "Buy it now" -- this is the BTC.com name.

22  See it says, "Buy it now" in the middle of the page "for US 1.5

23  million"?

24  A   Yes, sir.

25  Q   Or there's a payment plan.  Do you see that?  It says

1   "payment plan"?

2   A   Yes, sir.

3   Q   Now, Mr. Garza -- turn forward to the next e-mail in the

4   chain.  The bottom, Friday August 1st, the second one up, Mr.

5   Garza says -- and it brings you in and Dan.  That's either Dan

6   Pease or Dan Kelley; right?

7   A   Yes, sir.

8   Q   He says, "It's actually not bad, I might buy this."

9          So then you're copied there too under aukster@msn.com.

10  A   Correct.

11  Q   And it's August 1st; right?

12  A   Yes.

13  Q   And you had a strong reaction to this; right?  Look at the

14  e-mail above that.  Did you have a strong reaction?

15  A   Yes, sir.

16  Q   And what did you say?

17  A   I want to vomit.

18  Q   You can say that August 1st you say, I want to throw up.

19  A   The stupidest idea I ever heard, but anyway.

20  Q   And Mr. Garza says, "Yeah, a domain name that can increase

21  our business 5 times, and we make that profit in a week.

22  Terrible."

23          He's being sarcastic; is that right?

24  A   He was being sarcastic to me that I was wrong.

25  Q   And go up one higher in that chain, the one that you say on

1   August 1st, "Do what you want."

2   A   It's his company.

3   Q   You say, "Do what you want.  Seems like a huge waste of

4   money to me."

5        Do you see that?

6   A   Yes, sir.

7   Q   Okay, and then he responds to you, the top of the page,

8   "Running our marketing has worked out pretty well."

9        Do you see that?

10  A   Yes, sir.

11  Q   So you were -- at least according to these e-mails, you

12  were dead set against the idea of paying a lot of money for the

13  domain name BTC.com?

14        MR. BUCHDAHL:  Objection.

15        THE COURT:  Sustained.

16  Q   (By Mr. Weiner) Mr. Fraser, am I reading correctly, were

17  you in favor of buying BTC.com or against it?

18  A   In my opinion, it was a waste of money.  I was against

19  it.

20  Q   All right.  You said it was a huge waste of money, and you

21  told Mr. Garza that; right?

22  A   I mean he just -- he just paid me back money he borrowed

23  from me and now he's going to spend a million dollars on this?

24  I mean ...

25  Q   And you told Mr. Garza that; right?

1   A    Yes.

2   Q    Okay.  And if you look at DX 523, the one before that in

3   the book.

4        THE COURT:  I'm not sure if that's in yet, but it's a

5   full exhibit.

6        MR. WEINER:  No objection.  523 is in?

7        THE COURT:  Yes.

8        (Defendant's Exhibit 523, received in evidence.)

9   Q    (By Mr. Weiner) You see the same chain for part of it.  You

10  see at the bottom it says, "Buy it now, 1.5 million"?

11  A    Yes, sir.

12  Q    And then you go up and there's that same e-mail, Mr. Garza

13  says to you, "It's actually not bad, I might buy this"?

14  A    Correct.

15  Q    And then go up one more, you say, I want to throw up.  And

16  he says the same thing.  And then the last e-mail, it turns out

17  he's sending your chain of e-mail to Dan Kelley.

18       Do you see that?

19  A    Yes, sir.

20  Q    Let's look at that top one, what he sells Dan Kelley on

21  August 1st.  He says, "Outside of this showing how bitter he

22  is.  Funny how he responds.  No what are you planning here or

23  what revenue will it drive.  All that considering I run the

24  marketing."

25       Do you see that?

1  A    Yes, sir.

2  Q    Who ran the marketing starting August 1, 2014, and even

3  before?  Who ran the marketing?

4  A    He always ran the marketing.

5  Q    Who's that?

6  A    Josh Garza.

7  Q    And what happened?  Did they take your command and buy

8  this -- and not buy this BTC.com, or did they ignore you

9  completely?

10  A    They ignored me, and he bought it.

11  Q    Okay.  If you look at DX 526.

12        MR. WEINER:  Your Honor, there's no objection to that.

13        THE COURT:  All right.  526 will be a full exhibit.

14     (Defendant's Exhibit 526, received in evidence.)

15  Q    (By Mr. Weiner) Let's highlight that first block and the

16  date.  "Josh Garza of GAW Miners buys BTC.com for 1 million."

17  He got the price down at least; right?

18        And let's go down to look at the date in English.

19  That's the date in French.

20  A    That's true.

21  Q    The first line of the next line.  And we'll keep that

22  heading there.  It says, "In a bold move, CEO Josh Garza of GAW

23  Labs purchased BTC.com for 1 million US dollars in preparation

24  for Project Prime, the code name of the company's

25  next-generation Bitcoin platform."

1          Remember when Mr. Buchdahl asked you about voting

2    power and veto power?  Remember when he asked you about those

3    things?

4    A   Yes, sir.

5    Q   Did Mr. Garza hold a vote?  Let's all vote and see who

6    wants to buy BTC.com?

7          MR. BUCHDAHL:  Objection, Your Honor.

8          THE COURT:  Sustained.

9    Q   (By Mr. Weiner) Did Mr. Garza hold a vote on acquiring

10   BTC.com for a million dollars?

11   A   No.

12   Q   Did Mr. Garza give you a veto power over this decision to

13   spend a million dollars to buy BTC.com?

14   A   No, sir.

15   Q   But, Mr. Fraser, if you controlled the company --

16         MR. BUCHDAHL:  Objection, Your Honor.  I shouldn't

17   have to do this every time.

18         THE COURT:  Sustained.  Don't do that again.

19   Q   (By Mr. Weiner) He bought BTC.com?

20   A   Correct.

21   Q   Let's look at Exhibit 538.

22         THE COURT:  538 will be a full exhibit.

23         MR. WEINER:  I think it's in already.

24         THE COURT:  That's fine.

25         MR. WEINER:  I think it came in on Plaintiffs' case.

1   Q   (By Mr. Weiner) You see at the top of page 538 is that

2   e-mail that moved up to mid-September, September 11, 2014.

3   Josh Garza writes to someone named Robert Gallagher; right?

4   A   Yes, sir.

5   Q   And let's go through.  We'll start at the back end because

6   that's where the e-mails start.  Third page, let's take that

7   first e-mail from Mr. Garza who writes to Mr. Gallagher, "What

8   do you know about GAW Miners?  Can you over see (sic) the

9   process of building a chip?  If you don't know how, can you

10  learn?  Do some research in us," happy face.

11          Do you see that?

12  A   Yes, sir.

13  Q   And if you do roll up one, you see Mr. Gallagher say, "I

14  have done this many times ..."

15          Okay, and then above that -- it's on the -- starts on

16  the top of the page before that.  Mr. Garza says, "I thought

17  so."

18          You see that?

19  A   Yes, sir.

20  Q   "I thought so."  And he says at the end -- see "September

21  11, 2014," and he says, "I thought so," happy face.  Let's

22  highlight that, the date and "I thought so."

23          And then he says at the end, I -- second paragraph

24  right above where it says, "What say you?"  He says, "I will

25  need someone to lead chip development and the data centers";

1  right?

2  A   Yes, sir.

3  Q   Okay.  And then if you go one up from that e-mail, Mr.

4  Gallagher responds.  He says, "sounds like a lot of fun."

5  Again, still September 11th.  He says, "Josh, that sounds like

6  a lot of fun."  Let's pop that one out.

7         Mr. Gallagher says, "Sounds like a lot of fun.  I

8  would really like to be a part of it.  However, I believe in

9  straight talk as you know."

10         And let's look at Mr. Garza's response to Mr.

11  Gallagher who asked him for some straight talk.

12         September 11th, Mr. Garza writes, first line says,

13  "Well ... last time we talked, this was a project, an idea I

14  was thinking about."

15         And then go down two more paragraphs.  It begins, "I

16  just turned down."  It says, "While I have an awesome team,"

17  let's do that.

18         "While I have an awesome team, there is no senior

19  management.  I am, literally, doing all" of this -- doing all

20  this on my own."

21         See that?

22  A   Yes, sir.

23  Q   Was that accurate, in September 2014 that Mr. Garza was the

24  only senior management at GAW Miners?

25  A   I thought he had Dan and -- I thought he had a whole group

1    of people.

2    Q    You weren't one of the people helping him do this; right?

3    A    No, sir.

4    Q    And if you turn to the page before that, and you see Mr.

5    Gallagher says, second line from the bottom, "I would have

6    thought Stuart would be involved.  Do you still work with him?"

7         Do you see that?

8    A    Yes, sir.

9    Q    Do you remember -- do you know Rob Gallagher?

10   A    No.

11   Q    Okay.  So at the top, Mr. -- the very top, let's look at

12   the top e-mail.  Mr. Garza responds to Mr. Gallagher's

13   question, and that's the top block.  He says, in response to

14   Mr. Gallagher saying, "I would have thought Stuart would be

15   involved," he says, "Oh, yeah, Stuart is not involved.  I think

16   that was one of the keys.  I love him to death, but I needed to

17   figure out who I wanted to be."

18        Do you see that?

19   A    Yes, sir.

20   Q    Was it right that as of September 11, 2014, you were not

21   involved in the day-to-day decision making or strategies of GAW

22   Miners?

23   A    Even before that, yes.

24   Q    Let's turn to Exhibit --

25   A    Especially that day.

1    Q    -- DX 549.

2         MR. WEINER:  Offer that, Your Honor.  No, I think

3    that's already in.

4         THE COURT:  Okay.

5         MR. WEINER:  We can skip that one.  I think we already

6    did that one.  I'll save a little time.  Let's go to 555.

7         THE COURT:  DX 555 will be full.

8    (Defendant's Exhibit 555, received in evidence.)

9    Q    (By Mr. Weiner) So let's go to DX 555.

10   A    Yes, sir.

11   Q    It's October -- in the middle you see there's a date

12   October 23, 2014.  So we're -- right another one below that.

13   A    Yup.

14   Q    Let's pull out a little bit.  And you see an e-mail from

15   Juliette Dunlevy.  Remember we saw her on that org chart for

16   GAW Corp.?  She was a corporate controller?

17   A    I believe so, yes.

18   Q    Did you hire Juliette Dunlevy?

19   A    Did I?  No, I never hired anybody.

20   Q    And go up a little bit.  And she attaches -- actually,

21   sorry, go to the next page.  And then the next page there's a

22   list of names.  Juliette Dunlevy, let's go back and look at her

23   signature block.

24        The corporate controller Geniuses at Work and GAW

25   Miners, do you see that?

1    A    Yes, sir.

2    Q    Now, let's look at a list of names of GAW Miners'

3    employees.  They're there.  Going from A, Abel to Hussey.  Do

4    you see that?

5    A    Yes, sir.

6    Q    We see Capuano, Eric.  That's someone the jury will hear

7    from.  See that?

8    A    Yes, sir.

9    Q    Then you see Josh Garza; right?

10   A    Yes.

11   Q    He's the only one listed as Tier, T-i-e-r, 1; right?

12   A    Correct.

13   Q    Then there's someone named Carlos Garza.  Do you see that?

14   A    Yes, sir.

15   Q    Who's Carlos Garza?

16   A    He had like five or six brothers or sisters.  That's his

17   brother, I believe.

18   Q    Who's the "he"?  Who had five?

19   A    Mr. Garza -- Josh Garza had a bunch of brothers and

20   sisters.  He was, I think, the oldest.  And Carlos is one of

21   his half brothers.

22   Q    And who hired Carlos Garza to work at GAW Miners?

23   A    Josh Garza.

24   Q    You go down the list, you'll see some other names that we

25   recognize.  Dan Kelley, Daniel Kelley?

1   A    I recognize Dan Kelley.

2   Q    He's a Tier 1 as well.  You see that?

3   A    Who?

4   Q    Dan Kelley is also Tier 1; right?

5   A    Yes.

6   Q    And then there are three names or people we'll hear from.

7   The jury will hear from Amber Messer?

8   A    Yes.

9   Q    She's the one who became Amber Capuano, Joseph Mordica, and

10  Daniel Pease.  Do you see those?

11  A    Yes.

12  Q    Then there's Jonah Dorman?

13  A    Don't know him.

14  Q    You see that?

15  A    Yes, sir.

16  Q    And Matthew Eden?

17  A    Yup.

18  Q    Okay.  Those are all -- or several of whom people the

19  jury's already heard from, Mr. Garza, and they'll hear from

20  others.  Your name doesn't appear on that list, Mr. Fraser; is

21  that correct?

22  A    Correct.

23  Q    Let's look at the first page of the e-mail and see what Mr.

24  Garza said when he got this list from Juliette Dunlevy, his

25  corporate controller.

1          He says, in the middle of the page, "I'm glad I

2    checked this."

3          Let's pop that one out.  October 23rd, "I'm glad I

4    checked this."  And he says, "The only actual officer in this

5    company is me."

6          Do you see that?

7    A   Yes, sir.

8    Q   Is that accurate?

9    A   I believe so.

10   Q   He says, "Everyone else is either a manager or staff."

11         Do you see that?

12   A   Yes, sir.

13   Q   This was Mr. Garza's show, GAW Miners; correct?

14         MR. BUCHDAHL:  Objection.

15         THE COURT:  Sustained.

16   Q   (By Mr. Weiner) Whose show was this?

17         MR. BUCHDAHL:  Objection, Your Honor.

18         THE COURT:  I will allow it, but you need --

19         THE WITNESS:  It was --

20         MR. WEINER:  Wait for the Judge to rule.

21         THE WITNESS:  I'm sorry.

22         THE COURT:  You did it again, and you need to ask

23   questions like a trial lawyer.  I don't want this again.

24         MR. WEINER:  Understood.

25   Q   (By Mr. Weiner) Let's look at Exhibit 613.

 1          THE COURT:  613 will be a full exhibit.

 2       (Defendant's Exhibit 613, received in evidence.)

 3  Q   (By Mr. Weiner) And at the bottom -- the e-mail is December

 4  16, 2014, so right at the end of 2014.  Give the context, let's

 5  start on the page before that.  It's the next page of the

 6  exhibit.  It reads back to front.  December 16th Mr. Garza

 7  says, "What's the status there?"  You see that?

 8  A   Yes, sir.

 9  Q   Let's pop that out a little bit.  And then Mr. Kelley

10  responds at the top of the page, spoke at length yesterday.

11  And he's talking about someone who's interested in an

12  opportunity.  Let's make that smaller so the jury can see that.

13  Pop it out a little bit more.

14          He's talking about someone who's interested in

15  opportunity, wants to meet again with us and possibly Sullivan

16  & Cromwell.  What is Sullivan & Cromwell?

17  A   They're one of the top law firms in New York -- in the

18  world -- in the nation in New York, highly respected in

19  finance.

20  Q   And then go on the page before that, Mr. Garza says, the

21  very bottom is "I doubt Stuart will meet with him."

22          And then we'll go to one right above that, Mr. Garza

23  adds on, "What's the next step?"  And then he says, "Stuart is

24  a silent partner and provides no financial support."

25          This is December 16, 2014?

1    A    Correct.

2    Q    Was that accurate, Mr. Fraser?

3    A    Yes, it was.

4    Q    You can put that away.

5         Let's look at Exhibit P -- this is Plaintiffs' Exhibit

6    119.

7         THE COURT:  That's already in.

8         MR. WEINER:  That's in, Your Honor, correct.

9    Q    (By Mr. Weiner) This is Mr. Garza's Plea Agreement dated

10   July 20, 2017.  Do you see that?

11   A    Yes, sir.

12   Q    The jury's looked at this quite a bit, so we're not going

13   to do it all.  Let's just look -- let's go -- let's pull out a

14   little bit, and we'll see the heading there.  It's United

15   States Department of Justice.  And the first paragraph says --

16   let's go to the first paragraph.

17        It says, "This letter confirms the plea agreement

18   between your client, Homero Joshua Garza and the United States

19   Attorney's Office for the District of Connecticut."

20        Do you see that?

21   A    Yes, sir.

22   Q    Let's go to the part the jury's seen a great deal of, and

23   that's the specifics of Mr. Garza's plea agreement on page 9 of

24   11 at the top.  And I'm not going to go through what we've

25   already gone through here.

1          Do you have page 9?

2    A    Yes, sir.

3    Q    It talks about statements that Mr. Garza made.  I want to

4    ask you about a paragraph we haven't talked about.  It's

5    paragraph 6.  And the defendant is Josh Garza.

6          Do you have paragraph 6?

7    A    I'm sorry?

8    Q    Do you have paragraph 6?

9    A    I do.  I do.  I'm looking right at it.  Thank you.

10   Q    I want to ask you about the phrase along with others.  I'm

11   going to read this.  It says, "The defendant" -- that's Mr.

12   Garza -- "The defendant along with others, acting through his

13   companies, applied money his companies had made from new

14   Hashlet investors and used it to pay older Hashlet investors

15   money that the companies owed them based on the purported

16   mining GAW Miners and ZenMiner had done on the investors'

17   behalf."

18         Have I read that correctly?

19   A    Yes, you did.

20   Q    Now, were you one of the people who applied money and used

21   it to pay investors?

22   A    No, sir.

23   Q    So whoever those others were, do you know whether that's

24   you included in there?

25   A    I was not included in -- I had no ability to pay anybody

1    out.

2    Q    Now, if you look at Defendant's DX 689, which is already in

3    Your Honor.

4           THE COURT:  All right.

5    Q    (By Mr. Weiner) That's the same day as his written Plea

6    Agreement.  Mr. Garza went in front of the court here in

7    Connecticut and it says "Change of Plea Hearing."  Do you see

8    that?

9           Let's go down a little bit here.  He changed his plea

10   from not guilty to guilty.  Do you see that?

11   A    Yes, sir.

12   Q    And if the jury wanted to look at what Mr. Garza admitted

13   to, go to page 38, starting with line 23.

14          And the Court says, "All right.  Tell me in your own

15   words what you did that shows you're guilty to the charge of

16   mail fraud."

17   A    Yes, sir.

18   Q    Then let's look at page 39.  Mr. Garza says -- we can get

19   the whole -- a little more of the text.

20          "While I was working at GAW Miners --"

21          The Court says, "At what?"

22          Mr. Garza says, "GAW Miners."

23          The Court says, "Um-hum.  What is GAW Miners?"

24          Mr. Garza says, "The company that this is all about."

25          The Court says, "Um-hum."

 1          And Mr. Garza says, "I made a number of statements

 2          that were not true at the time that I made them.  For

 3          example --"

 4          And the Court says, "Did you know they weren't true

 5          when you made the statements?"

 6          Mr. Garza says, "Yes, ma'am."

 7          The Court says, "Go ahead."

 8          Here's what Mr. Garza says:

 9          "For example, I made a statement about our company

10          acquiring another company that was not true.  And in

11          addition to that, after the launch of Hashlets, a

12          product that the company sold, and up until the

13          beginning of December I made statements about our

14          overall mining capacity that was also not true.  And I

15          also understand that individuals used the statements I

16          made as a basis for purchasing from the company in

17          cryptocurrency or U.S. dollars."

18          The Court said, "And why did you make these false

19          statements?"

20          And Mr. Garza says, "To induce further sales for the

21          company."

22          And the Court says, "To make money?"

23          And Mr. Garza says, "Yes, ma'am."

24          Then he goes on.  The jury's free to review it.  Did

25   you know at the time that the statements about the hundred

1   million dollar Coin Adoption Fund were false?

2   A    No, I did not.

3   Q    Did you know the statements about maintaining a $20 price

4   floor were false?

5   A    No.

6   Q    Did you know about not having enough mining capacity?  Did

7   you know in 2014 that that was false too?

8   A    I had no idea.

9   Q    So when Mr. Buchdahl asked you at the end of examination,

10  Why didn't you go out and tell everybody? what's your answer to

11  the jury?  2014, why didn't you go out and tell people things

12  that you didn't know were true or not?  What's your answer to

13  the jury?  Why didn't you tell people?

14  A    I only had a -- a piece of the truth.  He lied to me.  He

15  told me things were better than they were and that things were

16  being taken care of.  And I believed it.

17  Q    Now, you heard Mr. Garza on his deposition on tape say, at

18  his sentencing hearing, he said to the Court, No matter what

19  happened, you know I, Josh Garza, was in charge.  Do you

20  remember when he said that?

21  A    Yes, sir.

22  Q    Was that accurate?  During the period that the jury is

23  focused on, August 2014 to mid-January 2015, was Mr. Garza in

24  charge at GAW Miners and ZenMiner?

25  A    Totally in control.

1   Q   During 2014 and 2015, did you have any accounts in which

2   you purchased and held cryptocurrency?

3   A   No.

4   Q   Did you ever have any such accounts?

5   A   No.

6   Q   Did you ever purchase any cryptocurrency?

7   A   No.

8   Q   Did you ever receive payment in any cryptocurrency?

9   A   No.

10  Q   In 2014 who was it, if any, who told you how GAW Miners was

11  doing?

12  A   Josh Garza.

13  Q   Did you ever ask Mr. Garza to see some proof of that?

14  Remember Mr. Buchdahl asked, Did you ever investigate?  Did you

15  ever ask for some proof?

16          So did you ever ask to see any numbers from Mr. Garza?

17  A   In the -- in what period?

18  Q   Let's look at Plaintiffs' Exhibit 24.

19  A   Yes.

20  Q   You're quicker than I am.  Hang on one second.

21          THE COURT:  I don't know if this has come in yet, but

22  it will be a full exhibit.

23          MR. WEINER:  Thank you, Your Honor.

24      (Plaintiffs' Exhibit 24, received in evidence.)

25  Q   (By Mr. Weiner) And 24 it's dated June 1, 2014.  Let's look

1    at the top e-mail.  And you say to Mr. Garza, "I won't bother

2    you again."  Do you see that at the top?

3    A   Yes, sir.

4    Q   And you say, "Whenever you have some accounting numbers, it

5    would be nice to see how we're doing."  Let's highlight that

6    first lines.  "Congrats on doing over $3 million in business,

7    but it would be helpful (after 3 months) to see numbers.  I

8    know you're busy so when you have the time it would be helpful.

9    Maybe some type of report?  I know that what I see is only

10   part, but the numbers are great."

11        Tell the jury what you were doing here.  Why were you

12   saying, "I won't bother you again?"  What were you looking for?

13   A   I was looking for any -- I mean the guy tells me he's doing

14   all this $3 million worth of business, and he's still borrowing

15   money from me.  So I wanted to kind of understand, like at

16   least see it, understand it.  You know, give me a report.

17   Q   And did you ever get the full accounting and internal

18   numbers from GAW Miners?

19   A   I never had.

20   Q   If Mr. Garza testified at his deposition that you had full

21   access to all information and all data concerning GAW Miners,

22   would that be true?

23   A   No.

24   Q   Now, you heard the term "Hashlets" in this case; right?

25   That's Hashlets?

1    A    Hashlets?  Yeah, kind of know the term.

2    Q    Okay.  And who came up with the idea of Hashlets?

3    A    Everything was Josh, so -- Josh came up with everything, I

4    mean, you know.

5    Q    Let's look at Defendant's Exhibit 528.

6         THE COURT:  All right.  528 will be full.

7    (Defendant's Exhibit 528, received in evidence.)

8    Q    (By Mr. Weiner) You have 528 in front of you.  I think Mr.

9    Buchdahl might have shown you this one.

10        You see that GAW Miners announces world's first

11   cryptocurrency miner for the masses for $16?

12   A    Yes, sir.

13   Q    Okay.  And at the bottom, the last line, Mr. Garza says,

14   "Hashlets are different.  If you can open an e-mail, you can

15   operate a Hashlet.  Says CEO Josh Garza.  Hashlet is

16   grandma-approved."

17        Do you see that?

18   A    Yeah.

19   Q    Mr. Ard said in the opening you were the person who dreamt

20   up the idea of a Hashlet; is that right?  Did you dream up the

21   idea of a Hashlet?

22   A    I did not.

23   Q    But Mr. Buchdahl showed you something where you said

24   percentage of some machine.  What were you referring to there?

25   A    Yeah, if I remember correctly, they were talking about --

1    Josh found that the bigger machines were -- well, he told me

2    the bigger -- the more expensive machines would make more money

3    for us, dollar, right.  But people didn't -- couldn't afford

4    the big machines.  So, I mean, basically what I was saying is,

5    well, why don't you let five guys buy 20 percent of each

6    machine?

7              I mean, you know, I was looking at it very square, you

8    know, very obvious.  But, you know, if he took that and then

9    whatever these Hashlets -- you know, created the Hashlet, then,

10   yeah, okay.  I gave him the idea.  But basically I was just

11   saying, you build a machine for 10,000.  Why don't you build a

12   machine for a hundred thousand and sell it, you know -- and

13   sell 20 pieces of it?  That was my -- you know, that was my

14   contribution at the time.

15   Q   And that was back months -- months before August of 2014;

16   correct?

17   A   I mean, I think I've seen that e-mail.  So May 2nd?

18   Q   Of 2014?

19   A   Yeah.

20   Q   Now, let's go to Plaintiffs' Exhibit 194.  You'll have it

21   as page 83 of your civil deposition testimony.  This is a

22   document that Mr. Buchdahl read some lines of.  It's the second

23   one in the book, your civil deposition, and page 83.  And Mr.

24   Buchdahl read lines 12 to the bottom.

25              MR. WEINER:  And, Your Honor, with your permission I

 1  will just for completeness read part of the next page.

 2          MR. BUCHDAHL:  Objection.  I thought you kept this

 3  out.

 4          THE COURT:  You know, I don't remember.  But I'll tell

 5  you what.  We're close enough to the end of the day that I'm

 6  going to let the jurors go.

 7          So, Ladies and Gentlemen, don't discuss the case.

 8  Don't let anyone discuss it with you.  Keep an open mind and

 9  all that goes with that.  I won't repeat my instruction.  I

10  know you remember it.  No research and thinking about the case

11  really outside the courtroom.

12          I want to thank you all for your close attention

13  today.  And we will see you tomorrow in the jury room at

14  quarter of 9:00.  Thank you.

15      (The jury left the courtroom at 3:29 p.m.)

16          THE COURT:  All right, sir, you may step down.

17          MR. BUCHDAHL:  Your Honor, actually what I was

18  thinking of, I was seeking to introduce the portion of his

19  deposition where he conceded that his text led to the idea of

20  the Hashlet.  And he essentially acknowledges that his text was

21  the Hashlet idea that he sent to Mr. Garza.  And I believe the

22  Court at that time did not let me put the testimony in because

23  you believed it was consistent with the testimony that he was

24  giving on the stand.  But I think the witness has now just

25  walked back from that and said that this was all Josh's idea.

```
1    And I would like to -- I seek permission to put in that civil

2    deposition testimony about the text and how that became the

3    idea of the Hashlet on redirect or recross.

4              THE COURT:  I somehow thought we did go over this bit.

5    It represents a piece of machine.  Didn't I see him on the

6    screen saying --

7              MR. BUCHDAHL:  Yes, this part -- that's why I said I

8    was wrong.  I was talking about this other piece.

9              MR. WEINER:  Ms. Hassan has cleared up.  This is when

10   you took us back there and said --

11             THE COURT:  Okay, but this page 83 did get played for

12   the jury as I recall; is that right?

13             MR. WEINER:  That's my recollection, but I could be

14   wrong.  We marked it, and I thought it got played.

15             THE COURT:  I thought it got played as well.

16             MR. WEINER:  And I'm only asking to continue it on

17   from lines 2 on the next page to the bottom of the page to that

18   answer, "When did you first hear the term Hashlet?" in the next

19   Q and A to page 85, line 2.

20             THE COURT:  To page 85, line 2.  Oh, I see.

21             MR. BUCHDAHL:  Your Honor, I don't have an objection

22   to that; but, again, if you would look at page 220 --

23             THE COURT:  Okay, so I'm going to allow Mr. Weiner to

24   do that, just to be clear.  And you'll mark that, if it's not

25   in, as a new defense exhibit with a new number.
```

1            So you want me to turn to page 220.

2            MR. BUCHDAHL:  And if you start at page 218, you'll

3    see that at the bottom half of 218, line 18, he starts talking

4    about the series of text messages.  And the part that I'm --

5    that I'm interested in, Your Honor, is at the top of page

6    220 -- because after asking about these texts, he says, isn't

7    that essentially what a Hashlet was?  And he acknowledges that

8    this text was the idea of a Hashlet.

9            THE COURT:  Yeah, I think I'm going to allow him to go

10   into that on the redirect.

11           MR. WEINER:  That's fine, Your Honor.  That's fine.

12           THE COURT:  Okay.  It may make sense to resume our

13   discussion of these letters.

14           So I think where we left off is that, if I'm not

15   mistaken, I had made clear that the agreement itself, which I

16   already admitted, can be used certainly by the Defendants in

17   closing argument or the Plaintiffs in closing argument.  And I

18   thought the issue we were discussing is:  To what extent can

19   the Defendants elicit the Plaintiffs' understanding of the

20   meaning of the agreement?  And as I said earlier, I think that

21   the agreement is clear.  And so I don't think that the

22   Plaintiffs' understanding of the agreement has any relevance.

23           MR. WEINER:  And as I understood Your Honor's at least

24   tentative ruling was you can ask him about the fact of the

25   agreement that it was entered into, but don't go into the

1    texts.

2         THE COURT:  Yeah, I think that's fair because what --

3    one of the things, I think, Mr. Weiner really wants to suggest

4    is before the agreement they've got this original complaint.

5    Then there's a settlement agreement.  Then they changed the

6    complaint.  The complaint is their document.  It's their

7    version of events.  And changes in their version of events can

8    go to their credibility.  I don't see why they can't be

9    examined about that.

10        MR. ARD:  Well, I guess I don't understand what --

11   well --

12        THE COURT:  So in other words, I would certainly let

13   him ask.  You had -- we kind of went through this earlier

14   today, but you had this original complaint.  Here's what it

15   said about -- I guess it said Mr. Garza controlled things.

16   Then you entered into a settlement agreement with Mr. Garza.

17   You agreed to drop your claims.  He was -- agreed to cooperate

18   with you; right?  Yes.  That's my understanding or I don't

19   remember.  He refreshes the recollection.  The agreement's in

20   evidence or it's going to be in evidence.

21        I would sustain objections to, what's your

22   understanding of the agreement? or do you agree with Mr.

23   Garza's interpretation of the agreement? or don't you think his

24   interpretation's correct?  I would sustain an objection to

25   that.  But if then you said:  And after the agreement was

1    signed you filed a new complaint.  Isn't that true?  And here's

2    what the new complaint says.  It says, I assume, Mr. Fraser

3    controls things; right?  So you changed your version of events;

4    is that right?

5               I think he's allowed to do that.

6               MR. ARD:  Well, Your Honor, if the only question is

7    just the temporal question of whether the agreement was signed

8    between the first complaint and the second complaint --

9               THE COURT:  I think that's the relevance of it.

10              MR. ARD:  If there's no question about what the

11   agreement means and he's not asking to testify what it means,

12   then I think that is probably okay.

13              THE COURT:  Yeah.  I mean, to be clear, he can put up

14   the agreement, and he can have the witness read the agreement

15   like he and you folks have done with the e-mails throughout.  I

16   mean, that's fair game.

17              MR. ARD:  Right.  That's never been suggested to be

18   the reason why this agreement was coming in before.  Before the

19   only suggestion that they were saying was that it goes to

20   Garza's credibility.  And that is a very different issue.

21              THE COURT:  That's true.

22              MR. ARD:  I've never heard this point before.  And,

23   frankly, I would like to think about it.  It sounds okay when

24   it comes from your mouth, Your Honor.

25              THE COURT:  You're right.

1          MR. ARD:  But I've never heard that argument before.

2     I've always heard the only thing they've ever said about this

3     agreement and why it's coming in is because it goes to Mr.

4     Garza's credibility.  And that is a very different issue.

5          THE COURT:  It's a fair point.  I think that the line

6     of questioning I outlined, though, is fair.  Now, if it started

7     to get into questions about -- again, if we started to dwell on

8     the text of the agreement, I might tell Mr. Weiner to move on.

9     I would probably give an instruction to avoid confusion, say,

10    Ladies and Gentlemen, ultimately the agreement can be

11    considered on the issue of Mr. Garza's credibility.  It

12    shouldn't be considered for any other purposes except for

13    timing.

14         MR. ARD:  Let me take a shot at why I think that's

15    still not relevant.

16         THE COURT:  All right.

17         MR. ARD:  The -- first of all, well, a few things.

18    First of all, everybody agrees this agreement is unambiguous.

19    Everybody agrees that the meaning of the agreement is relevant

20    to Mr. Garza's credibility, allegedly relevant to Mr. Garza's

21    credibility.

22         THE COURT:  Right.

23         MR. ARD:  Under black letter Second Circuit and

24    Connecticut law, it, therefore, is this Court's obligation to

25    construe the agreement.  Second Circuit says construing an

```
 1   unambiguous contract provision is a function of the Court

 2   rather than a jury and matters extrinsic to the agreement may

 3   not be considered.

 4           The Connecticut it's black --

 5           THE COURT:  Yeah, I agree with you.  Mr. Ard, I agree

 6   with you.  You don't have to go over ground we agree about,

 7   so ...

 8           MR. ARD:  So from that it follows --

 9           THE COURT:  Yes.

10           MR. ARD:  -- to the extent the jury's going to hear

11   this agreement, this Court needs to instruct the jury on what

12   the agreement means.  And we proposed an instruction on the

13   relevant part of this agreement.

14           THE COURT:  Well, let's talk about -- let's talk about

15   that.  No question the principle you laid out is correct.  But

16   there's also an evidentiary question of:  Why is the agreement

17   relevant at all?  First of all, it's relevant to Mr. Garza's

18   credibility.

19           MR. ARD:  Yes.

20           THE COURT:  Then in the scheme that I sort of

21   outlined, it's part of the story that Defendants would like to

22   present about why the complaint -- why the Plaintiffs' story

23   changed is the way they might say it.

24           I do think it is part of that story --

25           MR. ARD:  I'll push back on that in a minute, Your
```

1    Honor.

2            THE COURT:  Okay.  But beyond that, at which point for

3    neither of which we really have construed the agreement.  I

4    don't know why it's necessary for me to get into instructing

5    the jury about the agreement and what it means, because if I

6    were on the jury, I would think, well, obviously, the judge

7    must think it's important for something beyond what he told us;

8    right?  Why do I need to know what the agreement means?

9            MR. ARD:  Because the only reason it touches,

10   allegedly touches, on Mr. Garza's credibility is because of

11   what it says.  And so what they said in opening is that the

12   agreement required Mr. Garza to rat against Mr. Fraser.

13           THE COURT:  Yeah.

14           MR. ARD:  Now, that's not true.  It's not what the

15   agreement says.  And that's a critical point.

16           So, you know, what the agreement says is that if Garza

17   breaches the agreement, then the named Plaintiffs can, you

18   know, assert claims against them.  Then the question is:  Well,

19   how can he breach the agreement?  That's the question that's

20   relevant.  That's what goes to his credibility.

21           What the agreement says, clearly, is the only thing he

22   could breach is his obligation to give a full account of the

23   facts.  That's what -- that's his obligation under the

24   agreement.

25           THE COURT:  Correct.  And he has to furnish all

1    documents.

2          MR. ARD:  Exactly.  So the jury can be told that he

3    had a reasonable cooperation agreement.  And the only way he

4    could be brought back into the case is if he didn't give a full

5    account of the facts or if he didn't show up for deposition, I

6    guess.  But the critical point is:  It does not say that if Mr.

7    Garza fails to rat against Mr. Fraser, he can be brought back

8    in the case.

9          And that's critical, Your Honor, because imagine this

10   scenario:  Imagine Mr. Garza gives his testimony --

11         THE COURT:  Yeah.

12         MR. ARD:  -- and he says, um, Mr. Fraser never heard

13   about the idea of a Hashlet.  He had no involvement in the

14   company.  Okay?  And let's assume that's all a hundred percent

15   true.  We know it's not, but assume it's all a hundred percent

16   true.

17         This agreement would give no ground to bring Mr. Garza

18   back in the case.  His failure to rat against Mr. Fraser is not

19   a ground to bring him back into the case.

20         THE COURT:  Let me push back on that.  Because

21   suppose, as you say, he said that; and you, the Plaintiffs,

22   believe that wasn't true, that, in fact, saying what he said,

23   that Mr. Fraser didn't know what Hashlets were, was not

24   providing a full account of the facts.  You could then take the

25   position, could you not, that there, in effect, had been a

 1   material breach of the agreement and, therefore, you were no

 2   longer obligated to refrain from asserting claims that have

 3   been or could have been asserted against Mr. Garza.  Isn't that

 4   the case?

 5           MR. ARD:  Of course, we could have taken that

 6   position, Your Honor; but the point is there's no breach unless

 7   he doesn't tell the facts.  They have suggested already to the

 8   jury, and they've told this Court in several letters, the false

 9   statement that if he didn't rat against Mr. Fraser, he could be

10   brought back in the case for that reason.

11           The agreement does not say that.  The agreement could

12   have said that.  The agreement could have said:  If you don't

13   give testimony against Mr. Fraser and inculpate him in some

14   way, we can bring you back in the case.  It does not say that.

15           THE COURT:  I agree.  But they may argue that from the

16   standpoint of the Plaintiffs providing a full account of the

17   facts means testifying in a manner consistent with the

18   Plaintiffs' theory of the case.  And so the -- I mean you would

19   agree with that much, would you not?  They could -- they could

20   ask the jury to draw that inference, could they not, from this

21   language?

22           MR. ARD:  The only thing -- this is the exact way Your

23   Honor needs to instruct the jury on what it says and what it

24   means.  The only thing it says is that if he fails to give a

25   full account of the facts --

 1          THE COURT:  Yes.

 2          MR. ARD:  -- then he can be brought back in the case.

 3   Whether those facts are in favor of us or against us, that's

 4   what the agreement says, plain and simple.

 5          THE COURT:  Actually, it doesn't say that.  It says

 6   that you would -- to bring him back in the case, and I thought

 7   this was where you were going, ultimately you would need the

 8   Court to be involved.

 9          MR. ARD:  Well, that too, yeah.

10          THE COURT:  All right.  So really -- if from your

11   standpoint he failed to provide a full account of the facts --

12   now, they may disagree.  They may think, in fact, in the

13   scenario you outlined, he was telling the truth.

14          MR. ARD:  Right.

15          THE COURT:  You might take the position:  No.  In that

16   scenario, he did not provide a full account of facts.

17   Therefore, we can assert claims against him now.

18          Now --

19          MR. ARD:  No.

20          THE COURT:  Yeah, isn't that what it says?

21          MR. ARD:  No.  I thought where you were going I was

22   going to nod my head in vigorous agreement because I thought

23   where you were going was, no, the fact that we say he breached

24   the agreement doesn't give us the right to come back in the

25   case.

1          THE COURT:  Just to be clear, it allows you to assert

2     claims.  Now --

3          MR. ARD:  No.

4          THE COURT:  Wait.  Let me finish.

5          MR. ARD:  Sorry.

6          THE COURT:  It clearly allows you to assert claims.

7     The question then is:  Would you be able to get around a

8     statute of limitations problem?  And unless the Court

9     determined that -- agreed with you that there was a breach, you

10    would not.  But you clearly could assert claims.  I can't

11    control whether you assert claims.

12         MR. ARD:  Not under the terms of this agreement, Your

13    Honor, and this is what you explained earlier this afternoon.

14    What you explained this afternoon was, we could say there's a

15    breach, but if he disagreed with us, it would be up to the

16    Court to adjudicate that.

17         So it's not the fact that we think there's a breach

18    that allows us to assert claims.  There has to be a breach for

19    us to assert claims.  And that would be something the Court

20    itself would have to adjudicate.

21         THE COURT:  But the Court wouldn't adjudicate that

22    unless, in fact, you asserted claims.  In other words, the way

23    this would come to the Court's attention ultimately --

24         MR. ARD:  Yeah.

25         THE COURT:  I mean I suppose you could file a motion

1    for determination, sort of like a declaratory judgment, but

2    another way it could come to the Court's attention is you

3    simply move to amend the complaint adding Mr. Garza, file a

4    motion to amend, say to the judge he materially breached under

5    the agreement.  They oppose it.  They say he did not materially

6    breach.  I have to adjudicate, did he materially breach?  But

7    you're asserting claims in that scenario.

8           MR. ARD:  But, Your Honor, we can always assert a

9    claim.

10          THE COURT:  That's my point.

11          MR. ARD:  But the agreement doesn't allow me to do

12   that.  We can breach the agreement and assert a claim even if

13   everything was released and we had no right to assert a claim

14   on an agreement.

15          THE COURT:  I'm not sure I agree with that.

16          Wait a minute.  The agreement -- obviously, every

17   agreement carries an obligation in good faith.  So you -- if

18   you didn't believe in good faith that there had been a material

19   breach, you would not be allowed to assert a claim.  And, in

20   fact, you could be found to be in breach of the agreement if

21   you did.  But if you believed in good faith that there had been

22   material breach, then you could, in fact, assert claims.

23   Whether those claims would get past a statute of limitations

24   problem or, um, whether I would even allow them into the case

25   at that point, given my own discretion about amendments, that

1    would be for me to decide.  And I would decide it, you're

2    right, based on whether it would be a material breach.

3             I mean, let's come back to the chase.  What you're

4    asking me to do is to simply explain what those two sentences

5    mean.

6             MR. ARD:  Yes, Your Honor.

7             THE COURT:  Then I can do that.

8             MR. ARD:  But it is critically important that the

9    agreement doesn't say, if we have a good faith belief that

10   you've breached the agreement, then we can assert claims.

11            THE COURT:  Well, then how else do you read that

12   sentence that -- it says, before the sentence, "if the Court."

13   Clearly, there's two different things going on.  One is

14   assertion of claims.  The next is tolling of the statute of

15   limitations.  The Court's involved in the latter.  It's not

16   involved in the former until the Court has to adjudicate.

17            MR. ARD:  Well, Your Honor, it's also the point

18   that -- I've explained enough how I think those sentences work.

19   I mean, it's only if there's a breach we can bring him back in.

20   The only way there's a breach is if he didn't get a full

21   account of the facts.

22            THE COURT:  Mr. Ard, we're going round and round.

23   That's subject to interpretation, whether he gave a full

24   account of the facts.  You might have a different view of that

25   than the Defendant.  And so at the end of the day, obviously,

1    Mr. Garza has an incentive, some incentive, to make sure you

2    don't have the perception that he didn't provide a full account

3    of the facts.

4            I mean, you can't seriously dispute that.  He has a

5    perception that, look, I've got to make sure I testify in a way

6    that provides a full account of the facts, but also I want to

7    make sure that the gate -- the first gatekeeper, which would be

8    Plaintiffs' counsel, thinks I gave a full account of the facts.

9            MR. ARD:  But let me explain it this way then, Your

10   Honor:  The only issue here is whether he could be brought back

11   in the case.  It's not about whether we can assert.  If we can

12   assert frivolous claims, who cares?  What he cares about is

13   whether he can actually be brought back in the case.

14           This agreement was signed in 2016.  His deposition was

15   2018?

16           THE COURT:  Two thousand what?

17           MR. ARD:  2018.  In 2018, by the time he took his

18   deposition, statute of limitations would have tolled, would

19   have already been expired.  And that's a critical point.  And

20   that's why he signed the agreement like this is because at the

21   time he needed there to be a termination -- sorry -- we needed

22   there to be a termination of statute of limitations tolled and

23   that would actually bring him back in the case.  His deposition

24   was not, like, right after this or before this.  It was far

25   later.

```
 1                THE COURT:  Fair point.

 2                MR. ARD:  That's another thing the jury would have to

 3   be instructed on.

 4                THE COURT:  Fair point.  So what you're saying is by

 5   the time he gave his testimony, in fact, the only way that he

 6   could have been brought back into the case is if the Court

 7   determined that there was a material breach.  And, in fact,

 8   really the previous sentence is beside the point.

 9                MR. ARD:  Correct.

10                THE COURT:  Because by the time he testified, the

11   statute of limitations had run.

12                MR. ARD:  Correct, Your Honor.

13                THE COURT:  All right.  So let me hear from the

14   Defendant.  I didn't realize that second point, which I agree

15   is important.

16                MR. WEINER:  Two things, Your Honor.  One, on that

17   point, I think that the sentence that says, "If the Court,"

18   begins that, that says, no, you can't assert a tolling.  The

19   statute of limitations won't have run if, in fact, I'm -- I,

20   Josh Garza, materially breached the agreement.

21                So I don't think their comment that he knew in 2018 he

22   was beyond the reach of this agreement because if he materially

23   breached it, the Court determined that he did.

24                THE COURT:  If the Court determined that he did.

25   Right, so I think -- maybe I misunderstood Mr. Ard, but I think
```

1   what Mr. Ard wants me to say to the jury is that, in effect,

2   the only way that Mr. Garza, by the time he testified, could be

3   brought into the case, in effect because there would be a

4   statute of limitations problem, is if the Court, meaning

5   ultimately me, determined that he had, in fact, breached the

6   agreement.

7          And I think that's correct.  I think it's correct

8   because the statute of limitations at that point had already

9   run.  So there's no realistic prospect of him being brought in.

10  And, frankly, there's no realistic prospect of claims being

11  asserted against him unless the Court determines that he

12  breached in the way that's described in the sentence beginning,

13  "if the Court."

14         MR. WEINER:  And the preceding sentence is key because

15  if he didn't give the Plaintiffs what they wanted, they could

16  say, well, you materially breached.  You breached this

17  agreement; and so, therefore, we're going to sue you under this

18  agreement and bring claims against you.

19         And, Your Honor, they ignore the language of paragraph

20  2.  Mr. Ard keeps saying there's only three things he's

21  required to do.  Paragraph 2 says the word "cooperation."  It

22  says, "including but not limited to the following."  So he was

23  required to cooperate.  He knew that he had to cooperate or

24  risk breaching this agreement.  If he risked breaching this

25  agreement, they could bring claims against him.

1          THE COURT:  Fair enough.  It's true that they could

2     try, but the -- I guess -- and that's sort of where I was

3     arguing with Mr. Ard earlier.  I didn't realize that the

4     statute of limitations had run by the time he started

5     testifying.  So while I suppose in theory they could try, it

6     would be pointless for them to try unless they could persuade

7     me that there had been a material breach.

8          And so I guess I think what the question on the table

9     is, should the Court instruct the jury that the -- under the

10    agreement, the only way that Mr. Garza could be brought into

11    the case at the time he testified was if the Court, meaning the

12    judge presiding over the case, meaning me, had determined that

13    there'd been a material breach or that any representation by

14    Mr. Garza in the agreement is materially false or misleading?

15         Why shouldn't I give that instruction?

16         MR. WEINER:  Your Honor, I don't even think it's right

17    that the statute of limitations for securities fraud would have

18    run in 2018 for actions that occurred in late 2014 and '15.

19         THE COURT:  Well, that I need to know.

20         MR. WEINER:  That's the first time I've heard that

21    from them.  So why don't we look at the books.

22         THE COURT:  That's fine.  I do need to know that

23    because I do think that matters.

24         That said, that said, I think supposing it hadn't run,

25    as a practical matter, if it hadn't run, although I made a big

1    deal of arguing with Mr. Ard about it, now I'm rethinking this.

2    I'm wondering whether there's any practical difference.

3            Because at the end of the day, if I'm Mr. Garza's

4    lawyer, I'm going to say, Judge, when they moved to amend their

5    complaint -- this is how this is going to happen -- I'm going

6    to move to intervene for whatever he's going to do.  I'm going

7    to say, Judge, you should -- they should not be allowed to

8    assert these claims against Mr. Garza.  You should not allow

9    the amendment because there has been no material breach.  And

10   here's why, and we want you to decide that.

11           And it's true that we'd have to -- I'd have to make

12   that determination in any event.  Isn't that true?

13           MR. WEINER:  Right.  So Mr. Garza would be at risk of

14   having that whole process play out.  They say he breached; he'd

15   say he didn't.  There would be a whole trial on that issue.

16           THE COURT:  That's true.

17           MR. WEINER:  To avoid that, he cooperated with them

18   and gave them what they wanted.

19           THE COURT:  So I think -- all right.  I think in light

20   of the opening statement, I am inclined to give a limiting

21   instruction that makes clear that the only way that Mr. Garza

22   actually could have been brought back in at the time he

23   testified was for the Court to make -- to actually decide that

24   he had, in fact, breached or made a material misrepresentation.

25   Other than that, I think the parties can argue from inferences.

1    That would be my instruction.  But the parties certainly can

2    make arguments.

3            I mean what Mr. Weiner says, you know, there still

4    could have been a concern in Mr. Garza's mind that he didn't,

5    you know, the Plaintiffs would think he breached.  And so we'd

6    have to fight off a motion with the Court, and he might not

7    win; right?

8            But the truth is some of that might be speculative as

9    well at this point.  Because I don't know how -- we have the

10   language of the agreement.  The agreement's going to be in.

11   I'm not going to let the Plaintiffs testify about what the

12   agreements mean or confirm Mr. Garza's interpretation.  Mr.

13   Garza's already testified to his interpretation.

14           So I'm not sure, other than the -- the limiting

15   instruction or the instruction that I just described, what more

16   pertinence this has.  In other words, when is this ever going

17   to come up again other than -- I can give the limiting

18   instruction you described.  I can give it as part of the final

19   instructions.

20           MR. ARD:  Sure, that would be fine.

21           THE COURT:  Or if the agreement gets used at some

22   point, I can give it then.  But beyond that, I'm not sure what

23   anybody wants me to do.  I think I've made my views clear.

24   Okay.

25           MR. WEINER:  Thank you, Your Honor.

1          MR. ARD:  And so -- and it won't come up during the

2     Plaintiffs' --

3          THE COURT:  I don't know if it will.  I think, as I

4     said, I do think there's a way for him to use it fairly.

5          MR. ARD:  Can I address that?

6          THE COURT:  Yes, you may.

7          MR. ARD:  I never heard it before, so I'm just trying

8     to think about --

9          THE COURT:  Sure.

10         MR. ARD:  -- response to it.  I think it's important

11    here to look at the very limited probative value of it as

12    compared to the potential prejudice.  So the probative value is

13    incredibly small.  I mean, we are talking about a PSLR case.

14    There was no discovery before these complaints were filed.  So

15    the idea that it's somehow pivotally important for the jury to

16    understand what the pleadings were five years ago before Mr.

17    Fraser had been deposed, before he had his SEC deposition,

18    before they got discovery from him at all, in their complaint,

19    is to me very slight.  That's point one.

20         Point two is there wasn't a change.  They've been

21    misrepresenting what happened between the first and second

22    complaint.  The one paragraph they're focusing on that we

23    deleted was the paragraph in the complaint that listed the two

24    parties.  So there's -- it says "parties."  The first paragraph

25    is Garza.  The second paragraph is Fraser.  We struck out the

1   first paragraph.  That's what they're focusing on.

2           The jury would need to understand, first of all,

3   there's nothing unusual about dropping a plaintiff -- sorry --

4   a defendant in a multi-defendant case.  There's nothing unusual

5   about it.  It happens all the time.  It also happens all the

6   time that you have cooperation agreements.  It's standard.

7   You're required to tell the truth and produce documents.

8   That's what the agreement says.

9           THE COURT:  It's also standard that defendants get

10  cross-examined about them, but go ahead.

11          MR. ARD:  Well, I'm not sure I agree with that, but

12  with --

13          THE COURT:  I shouldn't say that.  I shouldn't say it

14  that way.  That the witness gets cross-examined by it.

15          MR. ARD:  And when that happens, when you drop a

16  party, of course you delete the paragraph and complaint that

17  lists that person as a party.  For them to argue to the jury

18  that that somehow impugns the credibility of our class

19  representatives because he -- we deleted the paragraph in the

20  complaint that lists him as a party is --

21          THE COURT:  What --

22          MR. ARD:  -- very misleading.

23          THE COURT:  What are these exhibit numbers again?

24          MR. BUCHDAHL:  682 is the original.  Which one's the

25  redline ones?

1          THE COURT:  Yeah, the redline.

2          MR. WEINER:  686 on the redline.

3          THE COURT:  686 is the redline?  Is it 685 or 686?

4          MR. WEINER:  686 is the redline.

5          THE COURT:  Very well.  Mr. Ard, which paragraph did

6     you want me to focus on?

7          MR. ARD:  I think it's 18, but I'm just trying to pull

8     it out.

9          MR. WEINER:  I think it's 17.

10          THE COURT:  It looks like 18 in the --

11          MR. ARD:  It's 18 in the redline.

12          THE COURT:  Defendant Garza is 30.  He's from Texas

13     although he lived in -- during all of 2014 he was the founder

14     and CEO of GAW Miners and he held control of ZenMiner.  It was

15     his position since these companies were founded.  He directed

16     their strategies and had ultimate control over their day-to-day

17     operations.

18          So it does say a little bit more than he's a party.

19          MR. ARD:  Correct.  But the point is there's nothing

20     unusual about deleting a the paragraph in the complaint.  If

21     they want to point to something else, okay.  But to tell the

22     jury that, you know, when you amend a complaint, you delete a

23     paragraph and list them as a party.  I guess they could be

24     instructed on that, but it seems to me --

25          THE COURT:  I think I would be inclined to instruct

1   them on, just because I am a little bit concerned about

2   something else that we haven't discussed, which is paragraph 3

3   of the agreement, is something along the lines that, Ladies and

4   Gentlemen, you've heard evidence that Mr. Garza was originally

5   a party and was dropped as a party.  You're not to speculate

6   about why that was.  You're not to consider Mr. Garza's status

7   as someone who is no longer a party in deciding -- in your

8   deliberations in this case.  This case -- this case is brought

9   against Mr. Fraser alone, and you should not speculate about

10  the liability or nonliability of any nonparty -- sorry -- of

11  any other persons.

12          MR. ARD:  Thank you, Your Honor.

13          THE COURT:  Something like that.

14          MR. ARD:  That sounds right to me, Your Honor.  And

15  then with respect to paragraph 3, I think you were going to

16  say?

17          THE COURT:  That's the purpose of that instruction.  I

18  don't really want to draw their attention to paragraph 3, so I

19  wouldn't say anything specifically about paragraph 3.  But the

20  reason for giving that instruction is primarily paragraph 3.

21          MR. ARD:  They're not going to be permitted to argue

22  they somehow have assets here and should be brought back into

23  the case.

24          THE COURT:  Mr. Weiner.

25          MR. WEINER:  And, Your Honor, the argument, of course,

1  goes to Mr. Garza's credibility that he's dropped from the

2  case.

3            THE COURT:  That much can come in, and I would

4  instruct them on that.

5            MR. WEINER:  And his point about they just dropped the

6  language because he was not a party anymore, what they should

7  have done, if they still thought it was true, was put the same

8  language somewhere else.  Because it says that Garza had the

9  ultimate control, right, ultimate control over the company's

10  day-to-day operations doesn't have to be in the party section.

11  It disappeared from the corners of the complaint.

12            THE COURT:  Folks, I don't think -- I think I made

13  myself clear.  I think that Mr. Weiner can examine on those

14  factual assertions that used to be in paragraph 17 about

15  control and that they're no longer there.

16            I can also instruct the jury at that time the fact

17  that Mr. Garza's not a party, it's not something you should

18  consider in your deliberations in this case.  You shouldn't

19  consider why he's not a party.  This case being brought against

20  Mr. Fraser alone, etc.

21            But I think as to the facts asserted there, or that

22  used to be asserted there, I think it's fair game to let Mr.

23  Weiner examine the Plaintiffs on that, because it's true there

24  hadn't been any discovery, but ultimately these are the

25  Plaintiffs' admissions.  So they can be examined on their

1   version of events with regard to who was in control.

2           MR. ARD:  I'll let it go, Your Honor, but let me just

3   give my 20-second thing about why I think the probative value

4   is so slight.  What they don't quote is all of the other

5   allegations in the original complaint, where if you look at

6   6 -- well, 682, is that where you're on?

7           THE COURT:  I'm currently looking at 686.

8           MR. ARD:  What is 682?  Is that the redline?

9           So if you turn to paragraph 49, does it say Fraser and

10  Garza had equal control over GAW Miners in their original

11  complaint?

12          THE COURT:  I see that, yes, thus possess equal

13  control over GAW Miners and ZenMiners.

14          MR. ARD:  And you see in paragraph 19, during all

15  relevant times, Garza and Fraser have controlled GAW Miners in

16  his day-to-day activities?

17          THE COURT:  Yes, I do.

18          MR. ARD:  20 says the same thing about ZenMiner.  78

19  says Garza, Fraser --

20          THE COURT:  Again, you're free to point this out.

21          MR. ARD:  That's why I'm saying the probative value is

22  so slight because we say explicitly in their original complaint

23  that they had equal control, and that hasn't changed.

24          THE COURT:  Fair enough.  And that you can point

25  out.

 1            MR. ARD:  Thank you, Your Honor.

 2            THE COURT:  So I'm going to -- I will come up with --

 3    I know you submitted things to me.  I will try to come up with

 4    limiting instructions on the point about the agreement and the

 5    point about the settlement with Mr. Garza, the fact that Mr.

 6    Garza's no longer a party.

 7            MR. ARD:  Thank you, Your Honor.

 8            MR. BUCHDAHL:  Your Honor, looking forward, we don't

 9    expect to have that much recross, but I am curious as to how --

10    when I should expect to begin tomorrow so we can think about

11    what witnesses we're going to call tomorrow.

12            THE COURT:  What do you think, Mr. Weiner?

13            MR. WEINER:  We'll be finished with Mr. Fraser on my

14    examination at the morning break.

15            THE COURT:  So about 10:45?

16            MR. BUCHDAHL:  All right.  So we'll probably get to

17    call witnesses then, my guess, after lunch.  Just so the Court

18    is aware, we have dropped the two other videos that we had

19    initially put on our witness list.

20            THE COURT:  Which ones were they?

21            MR. BUCHDAHL:  They were Eden and Mordica.

22            THE COURT:  That's coming out of the Plaintiffs' case?

23            MR. BUCHDAHL:  It's coming out of the Plaintiffs'

24    case.  We informed Defense counsel of this over the weekend.

25    And we said if they're going to add them to their case or still

```
1    put them in their case, we'd have counters, but we're no longer

2    going to designate ourself any deposition testimony.

3              THE COURT:  Okay.

4              MR. BUCHDAHL:  What that means is we are going to have

5    three more witnesses, the three named Plaintiffs, and that's

6    it.  We don't expect the direct examinations of those three

7    witnesses to last more than a total of two hours for the three

8    of them together.

9              THE COURT:  Okay.

10             MR. BUCHDAHL:  So our case will move relatively

11   quickly as soon as Mr. Fraser --

12             THE COURT:  So you don't have any more video depo.

13             MR. BUCHDAHL:  Correct.  Correct.  So this is -- so I

14   do think all of this is to say the pace after today is going to

15   pick up pretty substantially.

16             THE COURT:  Good.

17             MR. BUCHDAHL:  Which leads to the following question,

18   which is I don't think we ever had a conversation about the

19   length of time you permit for closings as we start to think

20   about it.

21             THE COURT:  I usually will discuss it at the charge

22   conference.  I don't mind discussing it now.

23             So I'm pretty stingy about that, but I could be

24   somewhat flexible.  I mean, I'd like to see -- I'd like to see

25   them no more than 45 minutes.  If you're dying for an hour, I
```

1   would give you an hour; but I will not give you more than an

2   hour for your closings.

3           MR. BUCHDAHL:  I think that time range, I'll try to

4   keep it to 45 minutes with an absolutely outside of an hour.

5           THE COURT:  I'll give you a firm decision at the

6   closing -- sorry -- at the charge conference.  But just so you

7   know, that's -- ordinarily for a civil case, I give a half an

8   hour.  Now, if it's a long complicated civil case -- this is

9   not terribly long but somewhat complicated -- I might allow a

10  little bit more time.  There's a lot of exhibits to weave

11  together.

12          MR. BUCHDAHL:  Some of the complexity comes from the

13  nature of the claims, which we didn't have a chance to talk

14  about at all.

15          THE COURT:  That's true.  Remember, I charge before

16  the closing argument -- let me be clear.  I give the

17  substantive part of the charge before the closing argument.  I

18  just save the last part after closing argument just for rules

19  for deliberations, the standard stuff.

20          So they're going to hear a long instruction before

21  your closings.  I'm going to go through every single claim with

22  them, as you know, and every single defense and all that.  So

23  they will have heard all that from me.

24          You will actually have the charge.  You can kind of

25  target stuff and do -- but I do get that there are -- what?

1   Five claims.  So I do get that.  So that would push me toward,

2   you know, the 45 minutes to an hour.

3          MR. BUCHDAHL:  Two other questions about this.  I've

4   been assuming that the order would be Defense closing, then

5   Plaintiffs' closing because we have the burden of proof?

6          THE COURT:  Well, no.  In this district the way we do

7   things is the party with the burden of proof goes first.  The

8   party who doesn't have the burden of proof goes second, but the

9   party who goes first can reserve time for rebuttal.

10         MR. BUCHDAHL:  Okay.

11         THE COURT:  So when you stand up, you'll say -- let's

12  say I give you 45 minutes each.  You would say Judge, I'd like

13  to save ten minutes, for example, for rebuttal, and then I will

14  keep the time.  And I will cut you off after 35 minutes.  All

15  right?

16         Yes, Mr. Weiner.

17         MR. WEINER:  Your Honor, we're happy with either 45 or

18  an hour.  So either one's fine.  But not like a kind of general

19  time range.  So if you tell us 45, it's 45.

20         THE COURT:  Let's make it forty -- let's -- I tell you

21  what:  Let's make it 50 minutes, 50 just to give a little extra

22  time.

23         MR. WEINER:  And you won't be mad about slides?

24         THE COURT:  No.  Slides in closing are okay.  But you

25  do need to show each other slides the night before.  Slides in

1    closing is okay.  Just opening it was a problem.

2            We'll be in recess.

3            MR. WEINSTEIN:  May we just hear the order of

4    witnesses for tomorrow?

5            MR. BUCHDAHL:  We'll get that by five o'clock.

6            THE COURT:  That's fine.  We'll be in recess.

7        (Proceedings concluded at 4:06 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **I N D E X**

2

3   **WITNESS NAME**                                        **Page**

4   Called by the Plaintiffs:

5   Stuart Fraser
        Continued Direct By Mr. Buchdahl...........................229
6        Cross By Mr. Weiner .......................................357

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Fraser - Cross                                                              506

```
1
2
3                         C E R T I F I C A T E
4
5
6
7              I, Julie L. Monette, RMR, CRR, CRC, Official
8    Court Reporter for the United States District Court for the
9    District of Connecticut, do hereby certify that the foregoing
10   pages are a true and accurate transcription of my shorthand
11   notes taken in the aforementioned matter to the best of my
12   skill and ability.
13
14
15                    /S/ JULIE L. MONETTE
                  _____
16                Julie L. Monette, RMR, CRR, CRC
                       Official Court Reporter
17                        450 Main Street
                     Hartford, Connecticut 06103
18                        (860) 212-6937
19
20
21
22
23
24
25
```