```
 1                  UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF CONNECTICUT
 2
   - - - - - - - - - - - - - - - - x
 3
   DENIS MARC AUDET, MICHAEL          No. 3:16-CV-940 (MPS)
 4 PFEIFFER, and DEAN ALLEN
   SHINNERS, Individually and on      OCTOBER 26, 2021
 5 Behalf of All Others Similarly
   Situated,                          8:55 A.M.
 6
   vs.                                JURY TRIAL
 7
   STUART A. FRASER, GAW MINERS,
 8 LLC, and ZENMINER, LLC, (d/b/a
   ZEN CLOUD)
 9
   - - - - - - - - - - - - - - - - x
10

11                  Volume IV - Pages 507 - 750

12
                       450 Main Street
13                   Hartford, Connecticut

14

15        BEFORE:  THE HONORABLE MICHAEL P. SHEA, U.S.D.J.

16                      AND A JURY OF NINE

17

18 APPEARANCES:

19 FOR THE PLAINTIFFS:

20         SUSMAN GODFREY, L.L.P.
                1301 Avenue of the Americas, 32nd Floor
21              New York, New York 10019
           BY:  SETH D. ARD, ESQUIRE
22         BY:  JACOB W. BUCHDAHL, ESQUIRE
           BY:  GENG CHEN, ESQUIRE
23         BY:  RUSSELL RENNIE, ESQUIRE
           BY:  HANNAH MILLER, ESQUIRE
24
   (Appearances Continue ...)
25
```

```
 1    APPEARANCES CONTINUED:

 2    FOR THE DEFENDANT:

 3              HUGHES, HUBBARD & REED L.L.P.
                   One Battery Park Plaza, 12th Floor
 4                 New York, New York 10004-1482
              BY:  DANIEL WEINER, ESQUIRE
 5            BY:  MARC A. WEINSTEIN, ESQUIRE
              BY:  AMINA HASSAN, ESQUIRE
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20    COURT REPORTER:  Julie L. Monette, RMR, CRR, CCP
                        (860) 212-6937
21
      Proceedings recorded by mechanical stenography, transcript
22    produced by computer.

23

24

25
```

1           8:55 A.M.

2           THE COURT:  First you'll notice it's going to be

3     cooler today because I have been bringing out more outside air.

4     Our carbon dioxide level got a little bit high yesterday.  That

5     shouldn't happen today.

6           Second, I did want to run by you I did draft a

7     limiting instruction following our discussion yesterday.  So

8     here it is:

9           Ladies and Gentlemen, you heard some evidence about

10    the settlement agreement between the Plaintiffs and Mr. Garza.

11    You may consider that agreement only for the limited purpose --

12    excuse me.  You may consider that agreement only for the

13    limited purposes of deciding Mr. Garza's credibility and

14    understanding the sequence of events between the Plaintiffs'

15    original Complaint and their Amended Complaint.  You may not

16    consider the settlement agreement for any other purpose.  In

17    particular, you may not consider the terms of the agreement or

18    the fact that Mr. Garza was once, but is no longer, a defendant

19    in deciding on the liability of Mr. Fraser.  Finally, when

20    considering how the settlement agreement affects Mr. Garza's

21    credibility, you must keep in mind that the agreement states,

22    in effect, that the Plaintiffs may reinstate their claims

23    against Mr. Garza only if the Court decides that he has

24    breached the agreement or made a materially false or misleading

25    statement in the agreement.

1          Now, two things -- one other thing, I will not let

2     Defense counsel ask questions about Paragraph 3 of the

3     agreement under any circumstances, whether -- that's the

4     paragraph that says Mr. Garza represents that he is

5     impecunious.  That is off limits because that's going to

6     confuse the jury and potentially introduce to them improper

7     consideration.

8          MR. WEINER:  We had no intent --

9          THE COURT:  Okay, that's fine.  So --

10          MR. WEINER:  Your Honor, can we speak to that?

11          THE COURT:  One second.  I did want to make one other

12     comment; then I'm happy to let you speak.

13          I would, obviously, not give this instruction this way

14     unless and until certain evidence came in about the agreement.

15     I'm not going to be telling them about things that they haven't

16     heard.

17          Yes, Mr. Weiner.

18          MR. WEINER:  The only thing I ask Your Honor to change

19     is if you look at the agreement itself, it doesn't say

20     "settlement agreement."  The only word that appears there is

21     "cooperation agreement," and Your Honor, yourself, described it

22     in your last ruling, it's an agreement -- it says

23     "cooperation."  So every time --

24          THE COURT:  You know what?  Fair enough.  I think I'm

25     just going to say "agreement" because that's what it says.  It

1    says "agreement."  I'll say "agreement."

2         (Pause.)

3         (The jury entered the courtroom at 9:04 a.m.)

4              THE COURT:  Mr. Weiner, whenever you're ready.

5              MR. WEINER:  Thank you, Your Honor.

6                        S T U A R T   F R A S E R,

7         having been previously duly sworn, resumed his testimony

8                        under oath as follows:

9                   CONTINUED CROSS-EXAMINATION

10   BY. MR. WEINER:

11   Q   Mr. Fraser, I'd like to start by clearing up a little

12   confusion that was entirely my fault with Exhibit DX 501.

13             MR. WEINER:  If we can put up DX 501, Your Honor, it's

14   already --

15             THE COURT:  Yes, it is.

16   Q   (By Mr. Weiner) And if we can pull that up and take a look

17   at -- that's the list of the $12 million in losses.

18   A   Yes, sir.

19   Q   Wait for it to appear.

20             MR. WEINER:  Madam Deputy --

21             THE COURT:  There we go.

22             MR. WEINER:  There we go.

23   Q   (By Mr. Weiner) Let's go to the last page of DX 501, the

24   list of losses, blow up that bottom part.

25   A   Yes, sir.

1  Q   And we talked about the last repayment to you on July 24,

2  2014.  Do you see that?

3  A   Yes, sir.

4  Q   Tell the jury -- you can see some payments for Great Auk

5  Wireless and GAW High-Speed Internet in 2015 and 2017.  Those

6  are different companies than GAW Miners; correct?

7  A   Correct.  That's the original, um, internet company that we

8  started.

9  Q   Okay.  And just tell the jury, what are those payments in

10 2015 and 2017 for, generally speaking?

11 A   Yeah, so after -- after the SEC thing came out, I mean,

12 everything's frozen.  I mean, I couldn't contact anybody.  I

13 mean, it was -- so, you know, obviously I saw nothing.  Um,

14 after, I guess, in May of June, I got a call from Luke who --

15 Q   May or June of what year?

16 A   Sorry?

17 Q   May or June of what year?

18 A   I'm sorry.  Um, May or June of 2015 I got a call from Luke

19 Beaubien and Bob Jordan.  And they -- they're the ones that ran

20 that business.  And they said they were trying to -- they were

21 trying to take it over, um, out of bankruptcy or whatever it

22 was happening because nobody was looking after the firms when

23 everything was happening.  And they wanted to save it.

24         And there was a few payments that needed -- they

25 didn't have any money to pay it off to try to take it out of

 1  bankruptcy.  I don't exactly know how it all works, but that's

 2  what they were trying to do.

 3        So there was a grant that the company had gotten to do

 4  an installation in some town of Vermont that was never done.

 5  So I paid that back.  And I paid off the rest of their bills so

 6  they could take over the company themselves, and I have nothing

 7  to do with it.

 8        They do manage the internet up at the campground and

 9  around there, which I pay for.  But, um, I helped them out so

10  they could take over the company.

11  Q   And when you say the company and the business that Mr.

12  Beaubien and the other fellow was involved in, what business

13  are you talking about?

14  A   The Great Auk Wireless, the actual last mile installation

15  business, you know, the one that was really the most important

16  to me.

17  Q   So those last four payments in 2015 and the last one in

18  2017, do they have anything to do with GAW Miners or ZenMiner?

19  A   I don't believe so.  They were all written to Great Auk

20  Wireless for Luke, so, you know, for that business.

21  Q   You could set aside 501.

22        You recall that Mr. Buchdahl asked you about an AMEX

23  Plum Card that you were a cosigner for.  Do you remember that

24  he asked you all about that, the credit card?

25  A   Yes, sir.

1    Q    Okay.  And he asked you some questions and read from your

2    SEC testimony about when you paid off the balance.  Do you

3    remember that generally?

4    A    Yes, sir.

5    Q    Okay.  And then Judge Shea said that when it came to be my

6    turn, I could read you the immediately following lines, so I'm

7    going to do that now.

8    A    Okay.

9    Q    Plaintiffs' Exhibit 186, which is your SEC testimony, page

10   125.  And starting in line 3 and going down to line 19.

11              "Question:  During what period of time did GAW Miners

12              have a Plum Card on which you were a cosigner?"

13              You answered, "It ended in either November or December

14              of '14.  That's when the account was closed or an

15              account was closed.

16              "Question:  Is that the balance you just recently paid

17              off three weeks ago?

18              "Answer:  Yes, yes."

19              And the following lines that I'd like to read is 11 to

20   17:

21              "Question:  So the account was closed in November or

22              December?"

23              That's 2014; correct?

24   A    Yes.

25   Q    The answer:

1              "Right, with an amount owed.  And he said they were

2              going to pay it off and I assumed they did because I

3              didn't get hassled again until three weeks ago when I

4              went to pay my bill and it said my account was

5              suspended."

6         Do you see that?

7    A    Yes, sir.

8    Q    Who is the "he" who said, "he said they were going to pay

9    it off"?

10   A    Josh Garza.

11   Q    And who was the "they" that was going to pay it off?

12   A    Josh Garza going to pay off.

13   Q    You can set that aside.

14        Did he pay it off?

15   A    No.

16   Q    In the end, who had to pay that?

17   A    I did.

18   Q    You recall Mr. Buchdahl asked you questions about something

19   called Hashlets; correct?

20   A    Yes, sir.

21   Q    Let's go to lines -- you know, actually, we can play this.

22   These are the lines immediately after the questions that Mr.

23   Buchdahl asked you, and Judge Shea said I could ask you about

24   them when it was my turn.  So we're going to go to Plaintiffs'

25   Exhibit 194, which is page 84 of your civil deposition.  That's

 1    the second one in the book.  Page 84, from lines 2, on page 84,

 2    to line 2 on page 85.  We'll just play that testimony.

 3            MR. WEINSTEIN:  I don't think he has that book any

 4    longer, Mr. Weiner.

 5            THE COURT:  Sorry?

 6        (Plays video.)

 7            MR. WEINER:  Take that down off the screen.

 8    Q    (By Mr. Weiner) Mr. Fraser, who was it -- who developed the

 9    Hashlets technology for GAW Miners?

10    A    Josh Garza and his team, I guess.

11    Q    Did you ever meet with the team of developers who actually

12    wrote the computer code for the Hashlets for GAW Miners?

13    A    Never.  Never met them.

14    Q    Did you ever talk to any of them?

15    A    No, sir.

16    Q    Did you ever see an accounting of how much mining power GAW

17    Miners had versus how many Hashlets had already been sold?

18    A    No, sir.

19    Q    Did you, yourself, ever purchase a Hashlet?

20    A    No, sir.

21    Q    Did you ever see a demonstration of here's what it looks

22    like when you buy a Hashlet; here's how you activate it; here's

23    how you operate it?

24            MR. BUCHDAHL:  Objection, Your Honor, leading.

25            THE COURT:  I'll allow that question.

1              THE WITNESS:  No, no, sir.

2     Q    (By Mr. Weiner) Did you ever see an accounting that showed

3     whether it was true that Mr. Garza had sold millions of dollars

4     of Hashlets?

5     A    No, sir.

6     Q    Do you know how much computing or hashing power worth of

7     Hashlets GAW Miners sold?

8     A    No idea.

9     Q    And if Mr. Garza testified in his deposition that you

10    advised him on the pricing of Hashlets and the concept of

11    oversubscribing to Hashlets, was he telling the truth?

12    A    No, sir.

13    Q    Now, did you ever hear, in the fall of 2014, discussion of

14    this white paper regarding HashCoin prepared for GAW Miners?

15    A    Yes, sir.

16    Q    And what is a white paper, as you understand it?

17    A    Um, I think -- I've heard the term before, so it wasn't new

18    to me.  So a white paper is like if you have an idea, you write

19    it all up and you send it out and it kind of explains exactly

20    what whatever you're doing does and how it does it.  And you

21    send it out, and people look at it to see, you know, and

22    they -- they go through it and you get back feedback and find

23    out, you know, what people think really works and doesn't

24    work.

25    Q    Did you, Mr. Fraser, did you write the white paper for

1  HashCoin which became Paycoin?

2  A   No, sir.

3  Q   Did you know at the time that Plaintiff Allen Shinners had

4  deep involvement in writing the white paper for HashCoin?

5         MR. BUCHDAHL:  Objection, Your Honor.

6         THE COURT:  Sustained.

7  Q   (By Mr. Weiner) Take a look at Defense Exhibit 726.

8         THE COURT:  726 will be a full exhibit.

9      (Defendant's Exhibit 726, received in evidence.)

10        THE WITNESS:  Yes, sir.

11 Q   (By Mr. Weiner) Get to it in my binder.  726, you see at

12 the bottom -- this is an e-mail in November 17th, 2014.  Amber

13 Messer -- you see Amber Messer?

14 A   I believe that's Josh Garza's assistant.

15 Q   Right.  And that's the woman who became Amber Capuano;

16 correct?

17 A   Yes, sir.

18 Q   And Amber Messer says, "How is the white paper coming?"

19        And then if you go up, there's a -- there's a note

20 from Jonah Dorman, the general manager of GAW Miners, just an

21 e-mail forwarding something.  And then at the top Amber Messer

22 says to Mr. Garza -- that's the top e-mail.  It's Amber Messer

23 to Josh Garza, November 17th, white paper.  It says, "Stuart

24 requested the white paper, can I send this to him?"

25 A   Yes, I see that.

1  Q   Why didn't you just command Ms. Messer to give you the

2  white paper?

3  A   She didn't work for me.

4  Q   We can set that aside.

5       In 2014 were you familiar with how something called

6  HashPool operated?

7  A   Vaguely.

8  Q   And tell the jury what you knew in 2014 about HashPool, if

9  anything.

10  A   I mean, obviously, there's a lot of different coins.  It's

11  not just Bitcoin.  You know, you're hearing about this Paycoin

12  thing that Josh thought of.  But there's other coins out there.

13  And from my understanding, if you mine for a particular coin,

14  they consider you in that pool.

15       So my idea -- I mean, so the way I understand it is

16  that you could be in a pool for Bitcoin; you could be in a pool

17  for Dogecoin.  I think there's something called that.  You

18  know, you could be in different pools.

19       And depending on the coin, I think it's harder or

20  easier to actually mine it, you know, because everyone's doing

21  Bitcoin.  So it's harder to mine Bitcoin.  It takes more

22  whatever than a coin that less people are going after.  I mean,

23  that's my understanding.

24  Q   And who at GAW Miners created the HashPool?

25  A   Josh Garza.

```
 1   Q   Did you have input into the creation of HashPool?
 2   A   No, sir.
 3   Q   How about Hashpoints?  In 2014 did you have any idea how
 4   the Hashpoints operated?
 5   A   Only what Mr. Garza told me.
 6   Q   And what did he tell you about Hashpoints?
 7           MR. BUCHDAHL:  Objection, Your Honor.  Calls for
 8   hearsay.
 9           THE COURT:  That's sustained.
10   Q   (By Mr. Weiner) Did you know anything about something
11   called HashStakers?
12   A   Hash what?
13   Q   Stakers, S-t-a-k-e-r-s.  Do you know what HashStakers were?
14   A   No.
15   Q   How about hashbrown potatoes?  Do you know what those are?
16   A   Yes.
17   Q   Now, in 2014 did you ever hear of Paycoin?
18   A   Yeah.
19   Q   Okay.  And who did you hear about Paycoin from?
20   A   Yeah, Mr. Garza.
21   Q   Okay.  And did you ever purchase any Paycoin?
22   A   No, sir.
23   Q   Mr. Buchdahl asked you about a Twitter account that Mr.
24   Garza suggested that you opened.  Remember he asked you those
25   questions?
```

1   A    Yes, sir.

2   Q    And I think you told us you opened it in late 2014?

3   A    Yeah, I believe.  Sometime in November?

4   Q    2014?

5   A    That was 2014, correct, sir.

6   Q    And how long -- how long, approximately, did you have a

7   Twitter account?

8   A    Maybe two months, a little less.

9   Q    Okay.  And how many followers did you have on your Twitter

10  account?

11  A    Seven -- I mean I guess 70.  That's what I saw on my thing.

12  I ...

13  Q    That's seven zero about?

14  A    Seven zero or seven five, around 70.

15  Q    Seventy, 75?

16  A    Sure.

17  Q    Who were those 75 followers, generally speaking?

18  A    I mean, I don't know who would follow me, but, you know,

19  probably friends.  I mean I know my kids probably did it, you

20  know.  Um, I mean, only people that knew me.  It's not like I'm

21  out there.  So I imagine more friends.

22  Q    And the family members and the friends, the people that

23  knew you, are those people that you were looking to defraud?

24  A    No, sir, never.

25  Q    Did anyone ever respond to your Tweets that you sent out on

1   your Twitter account?

2   A   I never got anything back from anybody on that or Facebook.

3   No interest.

4   Q   Let's take a look at Defendant's Exhibit 606.

5           THE COURT:   606 will be a full exhibit.

6       (Defendant's Exhibit 606, received in evidence.)

7   Q   (By Mr. Weiner) At the top, you can look at the top box,

8   you can see -- let's blow up the top.  Josh Garza on December

9   10, 2014, writes to Jonah Dorman, who is the general manager of

10  GAW Miners and someone named Rami Abramov.  Do you see that?

11  A   Yes, sir.

12  Q   It says marketing report for the period December 8th,

13  December 9th.  Do you see that?

14  A   Yes, sir.

15  Q   If you pull out again, you see the next two pages are -- it

16  says "Daily Summary."  On the page before that, it says, "Daily

17  Summary."  Let's highlight that.  Let's highlight "Daily

18  Summary."  There we go.  And "Week-over-Week."  And the next

19  page it says "Affiliate Daily and Weekly Report"?

20  A   Yes, sir.

21  Q   During the period August 1, 2014, to January 19th of 2015,

22  did you get these regular marketing reports?

23  A   I've never seen these before.

24  Q   You can set aside --

25  A   No, I didn't.

```
 1   Q   You can set aside 606.
 2           Mr. Buchdahl asked you questions about a meeting in
 3   November 2014 that you arranged at Cantor Fitzgerald.  Do you
 4   remember those questions?
 5   A   Yes, sir.
 6   Q   Okay.  And you reached out to one of your friends at Cantor
 7   Fitzgerald to let him know about GAW Miners; is that right?
 8           MR. BUCHDAHL:  Objection, Your Honor.
 9           THE COURT:  Grounds?
10           MR. BUCHDAHL:  Leading.
11           THE COURT:  Well, this is sort of background.  I'll
12   allow it for that question.
13           THE WITNESS:  Yes, sir.
14   Q   (By Mr. Weiner) And tell the jury, the jury, who did you
15   contact at Cantor Fitzgerald?
16   A   So, um, at the time we had a lot of new people.  So, you
17   know, I only had a long history with about 20 percent of the
18   firm.
19           Jim Ficarro and I go back a long way.  He did a series
20   of jobs from all -- all about back offices settlement issues,
21   because, I mean, that's -- if you broker a trade and you can't
22   deliver it and you can't collect the money, you lose money, you
23   know.  So he's incredibly knowledgeable about back office and
24   statements and how things work as far as reconciliation from
25   that kind of stuff.
```

1            And I also hooked him up -- I also brought in Harry

2    Waizer, who is a tax lawyer and regulator lawyer.

3    Q   Let me just ask you about.  Harry Waizer, is that a fellow

4    that you confused -- Mr. Buchdahl was asking about Harrison

5    Wise --

6    A   Yeah.  I got confused.

7    Q   Let me finish my question.  When he was asking about

8    Harrison Wise, is that the person you confused with Harry

9    Waizer?

10   A   Yes.

11   Q   So tell us again who Harry Waizer is.

12   A   Again, Harry is someone I knew at the firm for 25 years.

13   He's a tax lawyer.  He's also a lawyer that meets with our --

14   with regulators because, you know, whether it's in -- things

15   changed all the time on Wall Street, and you need to be up on

16   all these things.

17           So my concern was that Josh, you know, in his

18   eagerness and speed to do things, that he would, you know, he

19   would miss some points that were really important.  And to me,

20   the back office is really important.  So I suggested they come

21   in and meet with them and they'll give you some ideas about

22   regulatory, who to talk to, um, those kind of things.

23   Q   And you said that Mr. Ficarro and Mr. Waizer were -- one

24   was a tax lawyer, and one was a compliance regulatory person;

25   is that right?

1   A   Jim was more involved with the actual, you know, function

2   of -- of doing it, you know, logging the trades, making sure

3   the statements are right, sending out confirms, all that kind

4   of thing; where Harry was more -- he was talking to regulators.

5   Are we doing it right?  That kind of thing.

6   Q   Okay.  So, Mr. Ficarro and Mr. Waizer, the people you set

7   up the meeting with, are either of them involved in the

8   investment decisions at Cantor Fitzgerald?

9   A   No, sir.  These were total back office people, you know.

10  Q   Let's look at Defendant's Exhibit 569.

11          THE COURT:  Okay.  That will be full.  DX 569.

12      (Defendant's Exhibit 569, received in evidence.)

13  Q   (By Mr. Weiner) Let's go to the second page.  Mr. Buchdahl

14  asked you about this e-mail.  It starts at the bottom of the

15  second page, from Stuart Fraser.  Let's blow up the bottom.

16  Stuart Fraser to Jim Ficarro on November 14th.  Let's highlight

17  that at the top.

18          Okay, and Mr. Ficarro is the person you just described

19  as the kind of back office person at Cantor Fitzgerald?

20  A   Yes, sir.

21  Q   Okay.  And then you say, "I've been working with my friend

22  Josh Garza for the last several years on internet related

23  businesses.  Currently, we're started gaw.com and gawminers.com

24  who is a very big player in the virtual coinage business slash

25  Bitcoin."  You can highlight that whole first paragraph.  "We

1   are one of the largest sellers of mining power and even have

2   our own members buying and selling their power to each other."

3          Who was it that told you that GAW Miners is one of the

4   largest sellers of mining power and you have members buying and

5   selling their power to each other?  Where did you get that info

6   from?

7   A   Mr. Garza.

8   Q   And then it says, "We also facilitate a couple of thousand

9   Bitcoin exchanges within our system."  Do you see that?

10  A   Yes, sir.

11  Q   Who told you that?

12  A   Mr. Garza.

13  Q   It says, "Josh is also in the middle of creating a new coin

14  and has several investors willing to put up millions."

15         Who told you that?

16  A   Mr. Garza.

17  Q   Now, is Mr. Ficarro someone you would want to defraud

18  knowingly?

19  A   No, sir.

20  Q   How about unknowingly?

21  A   Never.

22  Q   Then you go on to say, "I would appreciate you talking to

23  Josh, letting him explain things better to you and then any

24  advice you can give him on how to move forward with financials,

25  settlements/clearing, rules and regs and maybe someone at the

1   SEC we can have an open dialogue with, as we figure out the

2   best way forward."

3           Tell the jury what you were trying to accomplish by

4   bringing Garza and the GAW Miners people and having them talk

5   to the back office and tax lawyer at Cantor Fitzgerald.

6   A   Well, again, I mean, you know, Josh was like so in the

7   middle of it and so determined.  And, you know, I come from a

8   different world, so I was looking at the bigger picture.  And

9   it seemed like at the time, and even today, this whole crypto

10  coin thing, like if they only worked with the regulators and

11  developed like a functional system, it would be so much better

12  and so much wired -- widely accepted.

13          So my point was, let's get in there -- you know, you

14  should get in there now and start talking with the SEC, with

15  the regulators, and build it with them.  And you'll be the

16  first, you know, and it will win.  You know, they won't be

17  fighting you like they still are fighting today.  I mean I

18  don't think they've even got it right yet.

19  Q   And then in the next paragraph you write, "GAW Miners is

20  totally above board and we only want to do it right.  We have

21  plans for a ICO" -- that's an initial coin offering; is that

22  right?

23  A   That's what I understood it to be, yes, sir.  It's kind of

24  a new term in those days.

25  Q   "And need to make sure we're set up right before it gets

1    too crazy."  Do you see that?

2    A    Yes, sir.

3    Q    Did you believe on November 14, 2014, that GAW Miners was

4    totally above board?

5    A    Yes, sir.

6    Q    Would you have lied to your long-time colleague, Mr.

7    Ficarro, if you thought otherwise?

8    A    Never.

9    Q    And then you say, "We only want to do it right.  We need to

10   make sure we're set up right."  Tell the jury what you meant by

11   that.

12   A    Well, you know, I had -- I had -- I had talked to Jim and

13   Harry before about other things, and I just wanted them to -- I

14   guess I wanted them to take that I was really -- you know, that

15   it was important that we do this really right and work with the

16   regulators.  And I just didn't see a lot of room for error as

17   far as the, you know -- as far as any of the back office stuff

18   and how all this stuff works.

19            So, yeah, the point was, you know, be -- be blunt.

20   Don't be -- you know, tell us -- you know, give us the best

21   advice you can.

22   Q    On what subject?

23   A    On the subject of, you know, of how we can -- how we can

24   create a back office function, functionality to do -- to do

25   these things and have it be accepted by the regulators.

1  Q   Now, was there a meeting at Cantor Fitzgerald in

2  mid-November 2014?

3  A   Yeah.  I mean, I think Josh was coming through town with

4  his team, and so I was able to set up that meeting, yes, sir.

5  Q   Okay.  And did you -- did you, yourself, attend the

6  meeting?

7  A   Um, I -- I attended the meeting at Cantor, um --

8  Q   Tell the jury, what did you do?  Were you speaking on

9  behalf of GAW Miners?  What did you do?

10 A   No.  Basically I set up the meeting.  I, um, you know, made

11 sure lunch was ready.  I got a place for us to talk.  And, I

12 mean, really what I did all my life is I put people together to

13 help each other figure out what needed to be done.  So I just

14 sat back and let Josh explain it.  Um, I had been able to get

15 the white paper to Jim and Harry ahead of time, and I asked

16 them to do their best looking at it.  And I let them all talk.

17 Q   And if Mr. Garza testified in his deposition that, I think

18 he said, although it's nowhere in any of the e-mails, the

19 primary reason for the meeting was Cantor Fitzgerald investing

20 money into Paycoin, would that be true?

21 A   It would be impossible.  I mean, you know, I mean we

22 couldn't -- even if we wanted to, there's no -- the firm would

23 need accounting.  They would go through it.  They would do due

24 diligence.  I mean, nothing happens overnight, but no.  This

25 was strictly me trying to kind of warn him that -- that this

1  back office stuff, this settlement stuff, the regulators are

2  important and you better think about it.

3  Q   Did you push Cantor Fitzgerald to invest in GAW Miners?

4  A   Never.

5  Q   And after this meeting, did Cantor Fitzgerald get involved

6  with GAW Miners in any way, shape, or form?

7  A   No, sir.

8  Q   Now, did the Cantor Fitzgerald people, Mr. Waizer and Mr.

9  Ficarro, did they give any advice at the meeting or afterwards?

10 A   Yes.

11 Q   Let's take a look at Plaintiffs' Exhibit 77.

12          THE COURT:  All right.  That's fine, will be full, PX

13 77, full.

14          MR. WEINER:  I think it may have already been in, Your

15 Honor.

16          THE COURT:  Okay.

17 Q   (By Mr. Weiner) Pull up Plaintiffs' Exhibit 77.  In the

18 middle you see an e-mail.  Let's pull out that middle e-mail

19 from Harry Waizer -- is it Waizer or Waizer?

20 A   Waizer.  That's why Wise, we were talking about Jim.

21 That's why I got messed up yesterday.

22 Q   Mr. Waizer writes you and copies James Ficarro.

23          "Hi Stu.  An interesting meeting last night.  It's

24 fascinating to see people operating in a new virtual world that

25 I understand only in the most general way and of course always

1   great to see you."

2          This is the sentence Mr. Buchdahl read to you:  "I

3   know I may have sounded like the proverbial broken record last

4   night, but I've attached a recent letter from FinCEN."

5          What's FinCEN?

6   A   I believe it's just one of the many regulatory agencies

7   that oversee various businesses on Wall Street and other

8   places.

9   Q   "That demonstrates the kind of issue I was expressing

10  concern about, the foot fault -- and their need to get a strong

11  regulatory advisor."

12         Do you see that?

13  A   Yes, sir.

14  Q   And then at the top you see the e-mail you passed this on.

15  It says, "From Harry."  You passed this on to Mr. Garza.  Do

16  you see that?

17  A   Correct.

18  Q   The same day you got it.

19  A   Yes, sir.

20  Q   It says, Stuart Fraser, Josh Garza from Harry.

21         Did Mr. Garza take Mr. Waizer's recommendation to get

22  a strong regulatory advisor on board at GAW's?

23  A   I don't believe so.  I don't know.

24  Q   Do you know any regulatory advisor that GAW Miners hired

25  after this meeting advising Cantor Fitzgerald?

1   A    No, sir.

2   Q    We can take this down.

3              Are you aware that Cantor Fitzgerald suggested to Mr.

4   Garza that he get legal advice from Sullivan & Cromwell, the

5   firm you mentioned before?

6   A    Yes.  I mean I had actually worked in the past with the

7   head of their division there, Ken, and, um, who was a former

8   head -- head I think? -- of the CFDC.  So he was a high-placed,

9   respected regulator in the business, and then he got hired by

10  the law firm.  You know, they do that all the time.  And he ran

11  the regulatory side of Crom -- Sullivan & Cromwell, which is

12  like the largest firm in the nation.

13             And because we did business with at Cantor and I had

14  worked with him in the past on some of the issues we had at

15  Cantor, he agreed to meet with them as well.  And so --

16  Q    Do you know was there a meeting at Sullivan & Cromwell with

17  the GAW Miners people?

18  A    I understand there was a meeting there, yes, sir.

19  Q    And let's take a look at Defendant's Exhibit 599.

20             THE COURT:  Okay.  That will be a full exhibit.

21      (Defendant's Exhibit 599, received in evidence.)

22  Q    (By Mr. Weiner) Mr. Weinstein suggests I pull back that

23  last exhibit before we leave it.  Let's go back to the one just

24  before that, Mr. Waizer's letter to you that you forward to Mr.

25  Garza.  Will you take a look at that?

1    A    Sure.

2    Q    And let's blow up that document again.  And let's look at

3    the paragraph at the bottom where it says, "Josh may already be

4    aware."  He's talking about -- is he talking about that letter

5    from FinCEN?

6    A    Yes, sir, I believe so.

7    Q    "Josh may already be aware of this letter.  He sounds smart

8    and focused, but the regulatory world, much like the tax world

9    I spend so much time in, is one in which a seemingly

10   unimportant difference in how you do something can make all the

11   difference in how the government treats it and I thought that

12   worth re-emphasizing."  Do you see that?

13   A    Yes, sir.

14   Q    Was that consistent with the advice that Mr. Waizer gave at

15   the meeting at Cantor Fitzgerald?

16        MR. BUCHDAHL:  Objection, Your Honor.

17        THE COURT:  Sustained.

18   Q    (By Mr. Weiner) And did Mr. Waizer give that similar advice

19   at the meeting?

20        MR. BUCHDAHL:  Objection, Your Honor.

21        THE COURT:  That's sustained.

22   Q    (By Mr. Weiner) Did Mr. Waizer say anything like this at

23   the meeting?

24        MR. BUCHDAHL:  Objection, Your Honor.

25        THE COURT:  I'll allow it.

1            THE WITNESS:  I mean not only that, but that's --

2   that's exactly why I -- I set this up, because I didn't think

3   he appreciated the nuances of the stupid little things that

4   make a big deal in the end in business.

5   Q   (By Mr. Weiner) Who's the "he" that didn't --

6   A   Mr. Garza.

7   Q   Let's go to Defendant's Exhibit 599.

8   A   Yes.

9   Q   And see from the first page of that, it's an e-mail from

10  Amber --

11            MR. WEINER:  Your Honor, we offer 599.

12            THE COURT:  Yeah, I already let it in.

13            MR. WEINER:  Sorry about that.

14  Q   (By Mr. Weiner) 599 is a note from Amber Messer -- that's

15  Mr. Garza's assistant -- to Dan Kelley and Josh Garza, and it

16  says, "Minutes."  "Good morning, I have attached the minutes

17  from yesterdays (sic) meeting."

18            Do you see that?

19  A   Yes, I see.

20  Q   Let's go to the next page, GAW Miners' minutes of the first

21  meeting of Sullivan & Cromwell from December 4, 2014.  It says,

22  "Present at the meeting."  Let's see.

23            Present at the meeting, Josh Garza, Amber Messer, Dan

24  Kelley, Kenneth Raisler, and some other folks.

25            Who is Kenneth Raisler?  Is that the person you

1  mentioned before?

2  A   Yeah, he's the one who runs that whole division at Sullivan

3  & Cromwell, and he was the one that was the, like, the

4  biggest -- he had the job as like the number one regulator in

5  America at one point, or close to it.

6  Q   Okay.  And you didn't attend this meeting; correct?

7  A   I did not attend this meeting.

8  Q   What was your understanding of why Cantor Fitzgerald sent

9  them to GAW Miners people to meet with Sullivan & Cromwell?

10        MR. BUCHDAHL:  Objection, Your Honor.

11        THE COURT:  I'll allow it.

12        THE WITNESS:  Yeah, again, I was trying -- you know, I

13  was trying to get him to understand, um, that there was a lot

14  of nuances here that he had to make sure he was on top of, as

15  smart as he thought he was, and that, um, Sullivan Cromwell was

16  just getting into this business.  So it seemed like a really

17  good opportunity for them to learn about it and also help --

18  help -- help get, you know, figure out how all this works.

19  Um --

20  Q   If you look at Point No. 4 in these minutes, it says -- and

21  there's a carryover.  It says, "What legal complication do you

22  know of?"  And there's Mr. Raisler from the Sullivan & Cromwell

23  law firm; correct?

24  A   Yes, sir.

25  Q   And then if you look at the next page under 4, there's a

1   number of bullet points.  And the third one down says -- let's

2   blow up those.  From the top of the page -- no, we're going to

3   go from the top of the page where it says "Regulators have all

4   acknowledged."  So let's go to the top of that page.

5            Let's pull that out and look at the third line.  "What

6   are some of the legal issues that you're aware of?"  Do you see

7   that?

8   A   Yes, sir.

9   Q   Was that your understanding of what was discussed, among

10  the items discussed at the meeting?

11  A   Certainly.  I mean, you know, any issues they had, any

12  issues they saw coming up.  And also it was important for

13  Cromwell, you know, for those guys to kind of to learn what

14  they were doing already.

15  Q   And do you know whether Mr. Garza took the advice that he

16  received from Sullivan & Cromwell and focused on the legal

17  complications in selling Paycoin?  Do you know whether he did

18  that?

19  A   Um, he -- at the time he told me it was a really good

20  meeting and it was really fascinating and, um, he was

21  interested about going forward.  I can't remember the timing,

22  but a few weeks later he told me that, um, they were too

23  expensive, you know, he couldn't afford them and he didn't need

24  them.

25  Q   You can set that aside.

1              During the period August 1, 2014, to January 19, 2015,

2     did you ever tell Mr. Garza or instruct anyone at GAW Miners or

3     ZenMiner to issue any press release?

4     A    No, sir.

5     Q    On any subject?

6     A    Not that -- no, sir, no.

7     Q    And any time in 2001 or 2015 did you tell Mr. Garza or

8     instruct anyone at GAW Miners or ZenMiner to reach out to *The*

9     *Wall Street Journal*?

10    A    No, sir.

11    Q    Or to reach out to any other press outlet?  Did you tell

12    them that or instruct them that?

13    A    No, sir, I did not.

14    Q    Mr. Buchdahl asked you about a *Wall Street Journal* article

15    that came out in late November 2014 and some follow-up

16    questions that the reporter had.  Do you remember he asked you

17    about that?

18    A    Yes, sir.

19    Q    And let's look at Defendant's Exhibit 589.

20              THE COURT:  Okay.  589 will be a full exhibit.

21       (Defendant's Exhibit 589, received in evidence.)

22    Q    (By Mr. Weiner) If we go to the bottom of the first page of

23    Defendant's 589, the very last line, it has a date Wednesday,

24    November 26, Michael Casey.  And Mr. Casey was the reporter.

25    A    Yes, sir.

1   Q   And then that's the e-mail that Mr. Buchdahl took you

2   through, the questions that Mr. Casey had.  Do you see that?

3   A   Yes, sir.

4   Q   You go down a little bit, you see Mr. Buchdahl asked you

5   about, he says, "So here are the questions."  Let's go down a

6   little further.  So at the bottom -- yeah, and the first one

7   is, "The big one:  that this is a Ponzi scheme."

8           Do you see that?

9   A   Yes, sir.

10  Q   Mr. Buchdahl asked you about that.  Do you remember those

11  questions?

12  A   Yes, sir.

13  Q   And now let's look back at the next e-mail that same day

14  from Mr. Garza to the reporter.  Let's go to the first page and

15  look at -- highlight the block at the top.  Mr. Garza back to

16  the reporter.  And you're among the people copied there.  Do

17  you see that?

18  A   Yes, sir.

19  Q   Okay.  And then Mr. Garza goes through and answers some of

20  the questions posed by Mr. Casey; is that right?

21  A   Yes, sir.

22  Q   You go down, he says, "My tech guys gave me this for you."

23  And that's in the first line.

24          And then if you go down to the next line, it says, "We

25  have signed it for you as confirmation."

1    A    Yes, sir.

2    Q    You can just pull out -- you can pull out that whole block.

3         And then go down a little bit further.  It says, "As

4    you can see, with just one of our addresses" -- we'll go down a

5    little bit further.  Let's go down a little further on the

6    page.  Thank you, Mr. Jackson.

7         "As you can see, with just one of our addresses, we've

8    already moved over 26k Bitcoins in just the last few months.

9    Here's a bit main confirming a recent order.  Here's the

10   address of our main data center (and the lease)."

11        So am I right, Mr. Fraser, that when you recovered

12   this e-mail, you saw Mr. Garza responding to the reporter's

13   questions; is that right?

14   A    Yes, sir.

15   Q    Did you believe Mr. Garza was handling the reporter's

16   questions?

17   A    It appeared so, yes, sir.

18   Q    You can set that aside.

19        Now, Mr. Buchdahl asked you about a subpoena that you

20   received in early March of 2015 from the Securities and

21   Exchange Commission, the SEC.  Do you remember he asked you

22   about that?

23   A    Yes, sir.

24   Q    And did you provide documents in response to the SEC's

25   subpoena, you and your lawyers?

1   A    Yes, sir.

2   Q    Okay.  And in May of 2015, you got a subpoena from the SEC

3   to testify; correct?

4   A    Correct.

5   Q    And as far as you know, was that part of the SEC's

6   investigation of the whole GAW Miners' situation?

7   A    To my understanding, yes.

8   Q    And at the end of their investigation, did the SEC charge

9   you with any violation?

10  A    No, sir.

11  Q    Who did the SEC charge with violations of the law?

12  A    Josh Garza.

13  Q    Let's look at Defense Exhibit 677.

14           THE COURT:  All right, 677 will be full.

15       (Defendant's Exhibit 677, received in evidence.)

16  Q    (By Mr. Weiner) Let's look at the caption of this.  It's

17  dated December 1, 2015.  And then the title of it, the caption

18  and the title, let's go to title down below where it says

19  "Complaint."  Can we pull up that part of the block, just the

20  complaint.

21           This was the SEC complaint against Homero Joshua

22  Garza, GAW Miners, LLC and ZenMiner, LLC doing business as

23  ZenCloud.  Do you see that?

24  A    Yes, sir.

25  Q    And if you turn to page 4 and the carryover to page 5,

1    let's look at paragraph 14.  We can do them one by one.  Look

2    at paragraph 14.  Pull out the whole paragraph, Mr. Jackson, if

3    you don't mind.

4            It says, SEC said Homero Josh Garza presently lives in

5    Brattleboro.  During all of 2014 he was the founder and CEO of

6    GAW Miners, LLC, and he owned and controlled ZenMiner.  In

7    those positions, which he held since those companies were

8    founded, he directed their strategy, their financial decisions,

9    and had ultimate control over their day-to-day operations.

10           Do you see that, Mr. Fraser?

11   A    Yes, sir.

12   Q    And look at paragraph 15 right after that.  The SEC says,

13   GAW Miners, LLC is a Delaware limited liability company in

14   Bloomfield.  GAW Miners was formed in May 2014.  Garza is the

15   managing member and majority owner of GAW Miners.  During all

16   relevant times, Garza has controlled GAW Miners and directed

17   its day-to-day activities.

18           That's what the SEC said, isn't it?

19   A    And that's true, yes, sir.

20   Q    And let's look at paragraph 16.  The SEC said ZenMiner is a

21   Delaware limited liability company, the Bloomfield,

22   Connecticut, formed in July 2014, does business under the name

23   ZenCloud and used the website.  And then the SEC said, in that

24   last two sentences, Garza is the managing member and majority

25   owner of ZenMiner.  During all relevant times, Garza controlled

1    ZenMiner and directed its day-to-day activities.

2             That's what the SEC said, isn't it?

3    A    Yes, sir.

4    Q    And was it true?

5    A    It was true.

6    Q    You can set that aside.

7             Do you know whether the Department of Justice and the

8    FBI also investigated Garza and the companies GAW Miners and

9    ZenMiner?

10   A    I believe they did.

11   Q    And did the Department of Justice charge you with having

12   committed any crimes with regard to anything, including GAW

13   Miners or ZenMiner?

14   A    No, sir.

15   Q    Who did the Department of Justice charge with a crime?

16   A    Josh Garza.

17   Q    And what happened to Mr. Garza as a result?

18   A    He went to jail, had a judgment against him.

19   Q    Okay.  And the judgment against him, did it include his

20   obligation to do something called restitution to pay back to

21   his victims some of the money that he stole?

22   A    Yes, from my understanding.

23             MR. BUCHDAHL:  Objection, relevance and 403.

24             THE COURT:  Right.  So let me see counsel for a moment

25   just in the hallway.

```
 1        (At sidebar off the record.)

 2           THE COURT:  You may proceed, Mr. Weiner.

 3           MR. WEINER:  Madam Court Reporter, can I get the last

 4   question?

 5           THE COURT:  I'll do it for you.  I think the question

 6   was:  "And the judgment against him, did it include his

 7   obligation to do something called restitution to pay back to

 8   his victims some of the money that he stole?"

 9           Mr. Fraser answered, "Yes, from my understanding."

10   Q   (By Mr. Weiner) And if we look at Exhibit 692, let's put up

11   DX 692.  Your Honor previously reserved ruling.

12           THE COURT:  Yes, I'll allow -- this is the judgment.

13           MR. WEINER:  Yes.

14           THE COURT:  DX 692 will be admitted as a full exhibit.

15           Ladies and Gentlemen, I did want to tell you, this is

16   the judgment in the criminal case against Mr. Garza.  There's

17   only one --

18           MR. WEINER:  Your Honor, this is the judgment in the

19   SEC case, and then we're going to go to the restitution order.

20           THE COURT:  Okay.  So then let me ask, what's the

21   relevance of the judgment in the SEC?

22           MR. WEINER:  It refers to restitution.

23           MR. BUCHDAHL:  I'm sorry.  I thought he was talking

24   about the criminal.

25           THE COURT:  I did too.
```

1          MR. BUCHDAHL:  I have an objection to the final

2   judgment.

3          MR. WEINER:  I can go right to the restitution.

4          THE COURT:  Let's go to the criminal judgment.  So I'm

5   not going to let 692 in.

6          MR. WEINER:  Understood.

7   Q   (By Mr. Weiner) Let's go to DX 703 then.

8          THE COURT:  That's the criminal judgment?

9          MR. WEINER:  Yes.

10         THE COURT:  All right.  So that will be full.

11      (Defendant's Exhibit 703, received in evidence.)

12         Now, Ladies and Gentlemen, the only reason for which

13   I'm allowing you to consider -- that you may consider the

14   criminal judgment against Mr. Garza is this:  Mr. Fraser's

15   going to bring -- excuse me.  Mr. Weiner's going to bring this

16   out.  But with regard to the restitution obligation, there's a

17   provision about an adjustment.  That provision has some

18   relevance, if you find it has some relevance, to Mr. Garza's

19   credibility as a witness.  That is the only purpose for which

20   you may consider this document.  You may not consider it for

21   any other purpose.  Mr. Weiner will bring that out.

22         MR. WEINER:  Your Honor, may I proceed?

23         THE COURT:  You may.

24   Q   (By Mr. Weiner) And you have Defendant's Exhibit 703, the

25   restitution order, and at the top you can see the date,

1    December 18, 2018.  Let's highlight just the paragraph that the

2    Judge -- Judge Shea referenced, paragraph A.  Let's pull that,

3    restitution liability, restitution amount.

4          Do you see there it says, The Defendant, Homero Josh

5    Garza, shall pay restitution in the amount of a little over

6    $3.4 million.  Do you see that?

7    A    Yes, sir.

8    Q    Okay.  And then it says, "This amount shall be reduced by

9    any future recovery received by victims as compensation."  And

10   then the last sentence says, "This amount is also subject to

11   reduction by the Court if it is subsequently determined that a

12   victim has received compensation from another source of the

13   loss, exclusive of insurance company."

14         Do you see that?

15   A    Yes, sir.

16   Q    And did you understand this to mean that if the jury awards

17   money to the Plaintiffs here against you, that means Mr. Garza

18   doesn't have to pay that amount, dollar for dollar?

19         MR. BUCHDAHL:  Objection, Your Honor.

20         THE COURT:  I'll allow that question.

21         MR. BUCHDAHL:  Your Honor --

22         THE COURT:  It's a yes-or-no answer.

23         THE WITNESS:  Yes.

24         MR. BUCHDAHL:  This jury has not been asked to award

25   money.

```
1              THE COURT:  I understand that.

2              But, Ladies and Gentlemen, once again, the point of

3     the question, the point -- the only point of this exhibit, just

4     so we're clear, because as counsel just pointed out, this is

5     not a damages case.  You're only being asked to determine

6     liability.  The only point of this exhibit and that language

7     that's highlighted is for you to determine what effect, if any,

8     in your judgment, it has on the credibility of Mr. Garza.

9     Thank you.

10    Q   (By Mr. Weiner) You can set that aside.

11             Mr. Fraser, did you ever have an office at GAW Miners

12    or ZenMiner?

13    A   No.

14    Q   Did you ever call the GAW Miners or ZenMiner offices and

15    give directions or orders to the employees?

16    A   No, sir.

17    Q   Did you ever write to them or e-mail them to do that?

18    A   No.

19    Q   Did you ever send a text or a chat to give them directions

20    or orders?

21    A   No.

22    Q   Did you ever send a private message to give them orders?

23    A   No.

24    Q   How about smoke signals?  Did you ever send them smoke

25    signals to give them orders?
```

1  A    No, sir.

2  Q    Did you control GAW Miners and ZenMiner during the period

3  August 1, 2014, to January 19, 2015?

4  A    No, sir.

5  Q    When Mr. Garza testified in his deposition in 2018

6  that back in 2014 you had full control over him, was that

7  true?

8  A    No, sir.

9  Q    When Mr. Garza testified in 2018 at his deposition that you

10  were a CEO that's above the normal CEO, was that true?

11  A    I never heard of anything like that, no, sir.

12  Q    When Mr. Garza testified at his deposition in 2018 that you

13  were in charge at GAW Miners and ZenMiner, was that true?

14  A    No, sir.

15  Q    Did you knowingly aid and abet Mr. Garza in defrauding the

16  public?

17  A    Never, no, sir.

18  Q    Looking back on it, with hindsight, do you think you made a

19  mistake trusting Mr. Garza?

20  A    Absolutely.

21  Q    Tell the jury -- tell the jury, why did you trust Mr. Garza

22  in 2014 and the first part of 2015?

23  A    We worked together for so long.  I mean I, you know -- I

24  mean I knew him in the beginning, like I said yesterday.  And,

25  you know, he was -- he was an incredible force in his own

1   right.  You know, it hurts to play him up at this moment; but,

2   you know, at the time, I really cared a lot about him.  And,

3   um, we had been through, you know -- we'd worked together a

4   long time.  And, um, there was no reason for him to lie to me.

5   So, you know, I was blind.  I just, you know ...

6   Q   On a personal level, Mr. Fraser, how did Mr. --

7   A   Well, you know, I think, yes, on a personal -- you know,

8   obviously, we worked together.  But, I mean, you know, he kind

9   of grew up a little bit in front of me, um, and, you know, I

10  mean, I -- I really cared about him.  I cared about his family.

11  I cared -- you know, I liked his mother.  I mean, you know, you

12  know, he was one of my good friends.  And it's, you know,

13  difficult to be betrayed by a good friend.

14  Q   And how did Mr. Garza repay the trust you put him in -- you

15  put in him in 2014?

16  A   He gutted me.

17  Q   What do you mean that he gutted you?

18  A   I've given up all my other businesses.  I mean I can't even

19  be involved because with this thing hanging over my head.  I

20  mean nobody wants -- you know, I can't get into any business.

21  You know, I don't buy stocks anyway.  I don't do anything.  I

22  got rid of -- I got out of every business I was in, you know.

23  And I even reorganized the campground, so all I am is the

24  manager now.

25          I lost 45 pounds.  Um, I mean obviously, personally

1   it's affected me a great deal.  Thank God, I have a beautiful,

2   loving wife that understands.

3           Um, you know, and even going through like the normal

4   things of life, you know, my father passing or this or that,

5   it's -- I find my -- I just fall deeper in those holes, you

6   know, that we all kind of fall in and bounce out of.  So I'm --

7   I'm not the same person, and it hurts me.

8   Q   In his opening statement, Mr. Ard described you as a,

9   quote, a prominent and successful businessman, closed quote.

10  Do you remember that?

11  A   Yes, sir.

12  Q   And prior to the whole GAW Miners thing coming crumbling

13  down, did you have a reputation in the business world?

14  A    Well, you know, I mean, Wall Street's a big place and it's

15  a small place.  It's like, you know, it's big, but everybody

16  kind of, you know, in your own industry, people know you.  So,

17  yeah, I mean I had -- I had a very solid, decent reputation.  I

18  still kind of do.  You know, I'm not out there anymore, so ...

19  Q   Did you value your reputation in 2014?

20  A   Absolutely.  I mean, it's -- the whole idea that I can -- I

21  had friends that do various things that I could ask for advice,

22  I mean, they only answered the phone because they respect

23  you.

24  Q   Given the reputation that you had built up over the years

25  and that you valued, would you have risked it all on a business

1    that you knew was a fraud?

2    A    Never, never.  You know, I just -- there's no amount of

3    anything I would risk it for.  There's nothing valuable -- more

4    valuable than that right -- you know, I'm doing fine.  I live

5    my life.  But, yeah, it's important to me.  It's important to

6    show my kids that I'm a decent guy, that I follow the rules and

7    I do things right.

8    Q    And finally, Mr. Fraser, in 2015, did Mr. Garza send you an

9    apology for what he had gotten you involved in?

10   A    Yes, sir.

11   Q    Let's look at Defendant's Exhibit 667.

12            THE COURT:  Okay.  That will be a full exhibit, 667.

13       (Defendant's Exhibit 667, received in evidence.)

14   Q    (By Mr. Weiner) You see at the top it's from Josh to you,

15   dated May 25.  "Subject:  Hey."

16            Mr. Garza writes:  "Hope your (sic) doing well.

17   Things are not so good here.  The technical guys made off with

18   every asset the company had, that's why those things were not

19   getting paid.  Like an idiot I used all the money I had for the

20   company thinking I could turn things around.  We now have

21   nothing, sold the cars" -- do you see that?

22   A    Yes, sir.

23   Q    I guess that's a reference -- well, do you know whether

24   it's a reference to the Lamborghini, the Tesla, the BMW, and

25   the other cars --

1   A   I wasn't aware that the companies had any cars; so, yeah, I

2   assume it was his.

3   Q   "Used every credit card, kids college account, jewelry,

4   even now selling cell phones so we can buy groceries.  Our only

5   hope is financial aid at this point."

6           Then let's look at the last two paragraphs that Mr.

7   Garza told you.  "For what it is worth, I was just a technical

8   guy trying to build some cool systems.  I was obviously playing

9   with people much smarter than me in an area I should not have

10  been.  I am truly sorry for all you got pulled in to.  Take

11  care."

12          Do you see that, Mr. Fraser?

13  A   Yes, sir.

14  Q   Did you get this in May of 2015?

15  A   I did, sir.

16  Q   Did you write back and communicate with Mr. Garza?

17  A   I've never communicated with Mr. Garza since, you know,

18  December of '15 -- of '14.

19  Q   Since -- when was the last time you spoke to Mr. Garza?

20  A   May?  I mean it could have been early February in '15.  I

21  don't know if he talked to me or my wife that, you know -- that

22  was it.

23  Q   Do you remember why he was calling in February of 2015?

24  A   Oh, I mean, he was saying he couldn't come to my birthday

25  party on February 28th.

1           MR. WEINER:  Your Honor, nothing further.

2           THE COURT:  All right.  Redirect.  Cross.

3                     REDIRECT EXAMINATION

4    BY MR. BUCHDAHL:

5    Q   Mr. Fraser, you just told your lawyer you valued your

6    reputation; correct?

7    A   Yes, sir.

8    Q   And you said that you had a good reputation on Wall Street;

9    correct?

10   A   Yeah, I had a good reputation.

11   Q   And you put that entire reputation at the service of GAW

12   Miners both in a press release and in *The Wall Street Journal*

13   in November of 2014, didn't you, sir?

14   A   Sorry?

15   Q   You put your entire reputation on the line for GAW Miners

16   in a press release and in a *Wall Street Journal* article in

17   November of 2014, didn't you?

18   A   I didn't, no, sir.

19   Q   You told your lawyer that you never e-mailed a company and

20   told people what to do; correct?

21   A   I didn't control anyone at -- at the -- so ...

22   Q   Let's look at Plaintiffs' Exhibit 50, please.

23           THE COURT:  This is in evidence already?

24           MR. BUCHDAHL:  It is, Your Honor.

25           THE COURT:  Okay.  Very well.

1   Q   (By Mr. Buchdahl) This is an e-mail from you to Dave

2   McLain; correct?

3   A   Yes, sir.

4   Q   Dave McLain was the general counsel of the company;

5   correct?

6   A   I don't know that, no, sir.

7   Q   You told Dave McLain, "Do everything Josh needs ASAP";

8   correct?

9   A   That's what it says there in August of 2014.

10  Q   Dave McLain was your lawyer; right?

11  A   Yeah.

12  Q   And he was acting as lawyer for the company also; right?

13  A   I don't know.  I -- I know that he was hired on occasion to

14  do odd jobs for Josh.

15  Q   You understood --

16  A   And company.

17  Q   -- here, sir, that you were instructing your personal

18  lawyer to do everything Josh needed at GAW Miners; correct?

19  A   Yeah, I was telling Dave -- yes, in this -- this I'm saying

20  if -- if he wants -- I mean, I guess reading this, it says if

21  he wanted to do some work for Josh, I was -- I was okay with it

22  and he could do whatever he wanted for him.  He was going to

23  pay him, not me.

24  Q   Okay.  The jury can come to its own conclusion about what

25  you wrote here, sir.

```
 1              MR. WEINER:  Your Honor --
 2              THE COURT:  I'll sustain.  No comment.  No comment.
 3    Q    (By Mr. Buchdahl) Please put up Plaintiffs' Exhibit 29.
 4              Now, your lawyer gave some testimony about what the
 5    Magenta system is?
 6              MR. WEINER:  Your Honor, object to the preface of that
 7    question.
 8              THE COURT:  I think you misspoke.
 9              MR. BUCHDAHL:  I didn't, Your Honor.  Yesterday --
10              THE COURT:  No, no, no.  I'm not going to have an
11    argument with you about it.  Rephrase the question.
12    Q    (By Mr. Buchdahl) Yesterday you were asked some questions
13    about the Magenta system; correct?
14    A    About the what?
15    Q    Magenta system; correct?
16    A    Yeah, I think it was mentioned once or twice.
17    Q    You don't know what the Magenta system is though, do you,
18    sir?
19    A    I just know it's an accounting system, that's all.
20    Q    Let's scroll down a little bit.
21              All right.  If we look at -- if we look at paragraph
22    1, historic financials, Mr. Moosajee told you, in June of 2014,
23    that there were many things missing and wrong; correct?
24    A    I was CCed on it, so I think he told Josh, and I was CCed
25    on it.  So he didn't tell me directly, no, sir.
```

1   Q   Let's look at how he addressed the letter, Mr. Fraser.  Who

2   does he address it to?  "Dear Stuart and Josh"; correct?

3   A   Correct.

4   Q   Mr. Moosajee was sending this to the two owners of the

5   company; correct?

6   A   He was sending it to me and Josh.

7   Q   Sir, were you the two owners of the company or not?

8   A   Yes, we had the holdings, yes, sir.

9   Q   So he writes in paragraph 1 that the draft financial

10   statements have many things missing and many things wrong;

11   correct?

12   A   Yeah, that's what it says, yes, sir.

13   Q   And your lawyer pointed out that he said it might be able

14   to be fixed in three months; correct?

15   A   That's my understanding, yes, sir.

16   Q   But Mr. Moosajee left the company before those three months

17   even happened, didn't he?

18   A   I don't know the exact date he left.

19   Q   Now, if you look down further, it says, No. 3, it says

20   that, "Normal financial management:  Financial control,

21   budgets, and variance reporting accountability, all this needs

22   to happen but I cannot see this in place till 2015"; correct?

23   A   That's what it says, yes, sir.

24   Q   And the truth is there were never any financial controls

25   put in place at GAW Miners; correct?

1    A    I have no idea.

2    Q    You certainly told the SEC that you were not aware of any

3    inventory system ever being in place at GAW Miners; correct?

4    A    Yeah, that's just what I said.  I was not aware of any of

5    it.

6    Q    And you understood that without an inventory system, GAW

7    Miners could never know how many computers they had; correct?

8    A    I -- I know it's important to have an inventory system.

9    Q    And you know --

10   A    But I didn't know if they had it or not.

11   Q    And you knew that if GAW Miners didn't have an inventory

12   system for its computers, it would never be able to keep track

13   of whether it was selling too many Hashlets; correct?

14   A    It's important to have a robust inventory system in any

15   business you have.

16   Q    Did you tell anyone at Cantor Fitzgerald that you were not

17   aware that GAW Miners had any functioning inventory system?

18   A    No.

19   Q    Did you tell *The Wall Street Journal* reporter that you were

20   not aware that GAW Miners had any functioning inventory system?

21   A    I was there for backup -- background.  I'm sorry.  I was

22   there for background information.  I didn't even know that.  So

23   how could I?

24   Q    Let's look at Plaintiffs' Exhibit 39.  And let's go to Dan

25   Kelley's August 5th e-mail.

1          Dan Kelley writes that there's a red flag because you

2     don't have financials or inventory systems in place.  And your

3     lawyer pointed out that he said that he speculated that he

4     might have it in place in the next one to two weeks.

5          Do you see that?

6     A    Yes, sir.

7     Q    But that never happened, did it?

8     A    Apparently not.

9     Q    Now, your lawyer put into evidence Defense Exhibit 501.

10    And I'd like to take a look at that document and focus at the

11    end.

12         Now, this has a total of nearly $12 million; correct?

13    A    Unfortunately, you're right.

14    Q    That's not money that you lost in GAW Miners, is it?

15    A    Money I lost all along the way.  I mean --

16    Q    Correct.  This is money that related to all of the business

17    that you and Josh were in together; right?

18    A    Yes, sir.

19    Q    Now, the truth is you didn't really keep track of what Josh

20    was doing with this money; correct?

21    A    I -- I agree with that.

22    Q    And you didn't really make any effort to control what

23    business he used any particular payment for; correct?

24    A    I'm sorry?  Can you repeat that?

25    Q    Sir, you didn't make any effort to control what business

1   Josh used any particular payment for; correct?

2   A    Because I didn't run the business, yes, sir, correct.

3   Q    Now, your lawyer made a big deal of saying that you had

4   gotten all of your money back from Josh by July of 2014;

5   correct?

6   A    The money that I loaned him in that year, yes, sir.

7   Q    The truth is even after he repaid those loans, you were

8   still over $11 million in the hole, weren't you?

9   A    Yes, sir.  When everything went out of business, everything

10  went to zero, so yeah.

11  Q    Now, you told this jury that you were one of Josh's

12  financial victims, didn't you?

13  A    Absolutely.  Me and a bunch of other people, I think.

14  Q    You were asked some questions today about these last

15  payments that you made to Great Auk Wireless.  Do you see that?

16  A    Yes, sir.

17  Q    You actually told the SEC that you had ceased all

18  involvement with Great Auk Wireless after you got their

19  subpoena; correct?

20  A    Yes.

21  Q    And Josh still had control over the bank accounts at Great

22  Auk Wireless, didn't he?

23  A    I -- I don't know.

24  Q    And you sent this money to Great Auk Wireless in the middle

25  of the SEC investigation, didn't you?

1   A    I sent it to Luke.

2   Q    Well, you sent it to Great Auk Wireless, didn't you, sir?

3   A    That Luke was running, yeah, that he -- he took over and he

4   was trying to save, yes, sir.

5   Q    Sir, did you take any steps to determine who had control

6   over the Great Auk Wireless bank account?

7   A    No, sir.

8   Q    You sent this last payment to Great Auk Wireless for

9   $150,000 just a short period before Josh's guilty plea

10  agreement, didn't you?

11  A    I had no idea the timing of any of this; but it appears so,

12  yes, sir.

13  Q    Sir, you understood as recently as 2018 that you were still

14  a 41-percent owner of GAW Miners; correct?

15  A    I -- I don't know.

16          MR. BUCHDAHL:  Your Honor, I'd like to offer from the

17  civil deposition page 208, line 21 to page 209, line 5.

18          MR. WEINER:  No objection.

19          THE COURT:  Okay.  So that will come in as

20  Plaintiffs' -- what are we, 200 now?

21          MR. BUCHDAHL:  I think that's right, Your Honor.

22          THE COURT:  Plaintiffs' 200.

23          THE CLERK:  201.

24          THE COURT:  201.  So PX 201 will be pages 208 and 209

25  of the civil deposition.

1          (Plaintiffs' Exhibit 201, received in evidence.)

2          (Plays video.)

3    Q    (By Mr. Buchdahl) That was in 2018; correct?

4    A    Yes, it was.

5    Q    And you understood that you had 41 percent and Josh also

6    had 41 percent; correct?

7    A    Of a defunct company, yes, sir.

8    Q    And that's an equal share; right?

9    A    No.

10   Q    And you understood --

11   A    Minority holds.  He had control of the other -- he had

12   control of the other 18 percent, which means he could do what

13   he wanted.

14   Q    When you said control, that was -- he said that he had 41

15   percent.  He was going to set aside 18 percent to potentially

16   use for others; correct?

17   A    He said a lot of things.  It's funny what you believe.

18   Q    You were asked questions about offers of equity to other

19   potential employees yesterday; right?

20   A    I did see that.

21   Q    Let's look at DX 41.

22         Now, your lawyer asked you questions about this offer

23   of employment to a potential employee at GAW Miners; correct?

24   A    Yes, sir.

25   Q    And if we look at page 2 in the offer, No. 3 refers to

1    equity; right?

2    A    Yes.

3    Q    And this says that the equity would only be awarded upon

4    the completion of the twelfth month after the date of

5    employment; correct?

6    A    Yes, sir.

7    Q    So under the terms of this letter, no one would receive any

8    equity at all until, at the earliest, September of 2015;

9    correct?

10   A    Yeah, correct.

11   Q    And the company never made it to September 2015; correct?

12   A    To what date?

13   Q    To September of 2015; right?

14   A    I guess not.

15   Q    So any suggestion that this letter gave away equity in GAW

16   Miners would be misleading; correct?

17   A    I mean until it happens, it -- there's no equity

18   distributed so --

19   Q    Correct?

20   A    If that's what you mean, yeah.

21   Q    So what I mean is this letter did not give away any equity

22   in the company?

23   A    Well, that's my point.  Josh owned -- I mean Josh had

24   control of the other 18 percent.  So if he gave it to someone

25   else, then that guy would have that kind of vote.  But he had

1    the votes of the other 18.  That was my point.

2    Q   Can you point the jury to any document giving Josh control

3    over that 18 percent?

4    A   It's common sense.  He ran the firm.  He had control.  I

5    mean, he was offering it out to people.

6    Q   Let's look at --

7    A   If he can offer it to someone as an incentive, then he has,

8    in essence, by my view, he has control because he didn't ask

9    me.

10   Q   So the answer is no, you can't point to any document

11   indicating --

12   A   I can't point to any document just actual execution of what

13   he's done.  So, yes, actually, I can point to a document, the

14   document you just showed me.

15   Q   Let's look at another document.

16   A   Because it shows he offered it out to people.  So he must

17   have had control --

18   Q   Okay, Mr. Fraser.

19   A   -- to give it to somebody because I didn't.

20          MR. WEINER:  Your Honor, if the witness would be

21   allowed to answer the question posed?

22          THE COURT:  I'll sustain the objection.

23          THE WITNESS:  I'm done.

24          THE COURT:  You're done?  Next question.

25   Q   (By Mr. Buchdahl) Defense Exhibit 542, the other offer of

1  employment; correct?

2  A    Jonah somebody, yes, sir.

3  Q    And if we look at the next page, again, the equity would

4  only be awarded after 12 months following the date of

5  employment; correct?

6  A    Totally correct.

7  Q    So as of 2014, the only people who had equity in this

8  company were you and Mr. Garza; correct?

9  A    Correct.

10 Q    Now, let's look at Plaintiffs' Exhibit 11.  In this e-mail

11 you suggested to Josh that the company, GAW Miners, could sell

12 percentages of hosted machines; correct?

13 A    Yes, sir.  We went through this, but yes, sir.

14 Q    And this is the idea that became the Hashlet; correct?

15 A    It could have.  I mean I --

16 Q    As we discussed --

17 A    I've love to have credit for it, but -- I think it's a

18 great idea.  But I don't know.

19         MR. BUCHDAHL:  As we discussed yesterday, Your Honor,

20 I'd like to offer pages 218 to 220 of the Defendant's civil

21 deposition.  And I'd like to play from page 220, lines 2 to 9.

22         THE COURT:  218 to 220 you said?

23         MR. BUCHDAHL:  Yes, sir.

24         THE COURT:  Yeah, all right, I'll allow it.  So this

25 will be -- sorry -- 202, PX 202.

1          (Plaintiffs' Exhibit 202, received in evidence.)

2     Q    (By Mr. Buchdahl) So you were asked questions at the civil

3     deposition about your text to Mr. Garza suggesting this

4     percentages of machines; correct?

5     A    Yeah, asking that question.  Can this happen?  Yes, sir.

6          (Plays video.)

7     Q    (By Mr. Buchdahl) At the end of 2014, you started having

8     discussions with Josh about your reducing your ownership

9     percentages in certain companies; correct?

10    A    What date?

11    Q    The end of 2014.

12    A    I mean, if you call the fall, yeah, yeah.

13    Q    Those discussions were --

14    A    It was discussions from, yes.

15    Q    The discussions were not resolved yet.  They were still

16    continuing into even December of 2014; correct?

17    A    Yes.

18    Q    And, in fact, no action was taken to reduce any of your

19    percentages in the companies even into early 2015; right?

20    A    Correct.  We had agreed, but I -- I think he was out of the

21    country.

22    Q    But no steps were taken to actually reduce your ownership

23    stake before January 19th of 2015; correct?

24    A    Nothing was signed, but we had a lot -- you know, I didn't.

25    Dave had a lot of discussions with him.  I thought we reached a

1   point of agreement, but it was never solidified or whatever.

2   Q   You recall that your lawyer showed you some organizational

3   charts yesterday; right?

4   A   Yesterday, yes, sir.

5   Q   I want to look at one of the charts in Defense Exhibit 646.

6   I think it's on page 23.

7           Mr. Fraser, Business Technology for Cryptocurrency,

8   LLC was part of the proposed reorganization; correct?

9   A   Apparently, yes, sir.

10  Q   And that was the part you were only going to have 15

11  percent of; correct?

12  A   I don't know.

13  Q   And if you look down at the bottom --

14  A   I didn't have any of these discussions so -- and this was

15  the first time I really saw this so I ...

16  Q   So if you look at the bottom, though, you'll agree with me,

17  sir, that GAW Miners was not included as one of the operating

18  companies that was going to be put into Business Technology for

19  Cryptocurrency, LLC; correct?

20  A   I mean, you could be right, but I have no idea about this

21  chart.

22  Q   And that's because GAW Miners was never going to be a

23  company where you reduced your equity share; right?

24  A   I have no idea what you're talking about.

25  Q   Well, let's look at the first page of 646 for a moment.

1   And if you look at the caps in the middle -- first of all, this

2   is from Dave McLain; correct?

3   A   It looks like it, yes, sir.

4   Q   And he's writing this to Josh Garza.  And the subject line

5   is, "The SEC's requested documents."  Do you see that?

6   A   I do.

7   Q   And this was after the SEC investigation had begun; right?

8   A   Apparently.  I've never seen this.

9   Q   And what Mr. McLain writes is that, "We need to discuss

10  this info before you forward because the company is in the

11  middle of undergoing a restructuring" .... "And some of the

12  attached operating agreements are not yet signed."

13          Do you see that?

14  A   Yeah.

15  Q   And it's true that even at the end of February of 2015,

16  none of this reorganization and none of this reduction of your

17  equity share had ever happened; correct?

18  A   You mean to the 15-percent level?

19  Q   Yes, sir.

20  A   From my understanding, yes.  But I never saw this.

21  Q   And, in fact, you never signed the operating agreement that

22  reduced your holdings of certain companies to 15 percent;

23  correct?

24  A   I -- I don't believe I did.

25  Q   Now, this e-mail was from your lawyer, Dave McLain; right?

1   A    Dave did work for me on occasion, yes.  I would hire him

2   for specific jobs.  He wasn't my lawyer every day.

3   Q    Well, he certainly represented you in connection with the

4   SEC investigation; correct, sir?

5   A    Well, it made sense for the guy that was involved with me

6   to be in that position because I wanted to give them the truth

7   in everything that happened.

8   Q    He attended your deposition; right?

9   A    Oh, yeah.

10  Q    And you also were represented at your SEC deposition by

11  another lawyer, Juan Marcelino; correct?

12  A    Yes, sir.

13  Q    And, in fact, those lawyers started out representing a

14  company, but then they stopped their representation of the

15  company and decided to only represent you; correct?

16        MR. WEINER:  Objection, relevance, beyond the scope.

17        THE COURT:  I'm wondering -- well, what's your

18  response to both those objections?

19        MR. BUCHDAHL:  So it is cross on a document that he

20  introduced.  So this is not -- this is not part of redirect for

21  me.  This is cross on documents introduced by the Defendants.

22        THE COURT:  I know, but we're getting away from the

23  document to representation.  What about relevance?

24        MR. BUCHDAHL:  The relevance, Your Honor, is that Mr.

25  Fraser told a story about not walking away from his friends,

1    but he actually took away key financial support from the

2    company and Mr. Garza right when they needed a lawyer in the

3    SEC investigation.

4              THE COURT:  I'm going to sustain the objection.

5    Q   (By Mr. Buchdahl) Sir, you didn't pay Josh -- Josh's

6    attorneys fees, did you?

7              MR. WEINER:  Objection, relevance, beyond the scope.

8              THE COURT:  Sustained.

9    Q   (By Mr. Buchdahl) Let's look at DX 677.  Your lawyer showed

10   you this.  This is the SEC complaint against Josh Garza and GAW

11   Miners; correct?

12   A   I'm sorry.

13             THE COURT:  Is this the SEC complaint?

14             THE WITNESS:  Yes, sir.

15   Q   (By Mr. Buchdahl) And you understood that the SEC was

16   charging GAW Miners with violations of the securities laws;

17   correct?

18   A   Yes, sir.

19   Q   Let's look at paragraph 79.  The first claim for relief

20   indicates the SEC's position that Hashlets are securities under

21   the securities laws; correct?

22   A   Yes, sir.

23   Q   Now, yesterday, when you were discussing with your counsel

24   how you kept Cantor Fitzgerald up to date on your activities,

25   you explained that one of the reasons you had to do so was

1    because you had maintained your licenses; correct, sir?

2    A    Yeah.

3    Q    And so the jury understands, you were referring to the

4    licenses that permitted you to sell securities; correct?

5    A    Um, yeah.  Some of them were for, you know, for the

6    business that I did in transaction securities, I think.

7    Q    And throughout the entire time of this period from August

8    through -- August 2014 through January of 2015, you were a

9    licensed securities broker; correct, sir?

10   A    Yes, sir.

11   Q    And you told your lawyer earlier today that one of the

12   reasons you arranged the meeting at Cantor Fitzgerald was

13   because you wanted to make sure the business was being operated

14   correctly; right?

15   A    Yeah.  I was trying to help them run it the best of their

16   ability in the right way.

17   Q    Now, yesterday you said that Cantor Fitzgerald had no

18   experience with cryptocurrency; right?

19   A    I wasn't aware of any that did but certainly not Cantor

20   Fitzgerald, yes, sir.

21   Q    But despite not having any background in cryptocurrency,

22   you certainly believe that Cantor Fitzgerald still had

23   important advice to offer GAW Miners; right?

24   A    Well, it's like saying a stock and bond.  They settle in

25   similar ways.  There's nuances to it.  So, yeah, I mean, I

1   thought there was things that they could offer to help explain

2   and then -- that's why you needed the lawyers involved and the

3   regulators, because these are all new things, and you had to

4   figure out how to do it.

5   Q    Hashlets were different from stocks, but they still had to

6   have back office treatment for their settlement; right?

7   A    Well, I mean, your bank needs a back office when you make a

8   deposit, when you take money out, so anything you do, your

9   cable guy gives you a statement, so yeah.

10  Q    And the reason that you brought a GAW Miners people to

11  Cantor Fitzgerald is the same reason that Josh turned to you;

12  right?

13  A    What's that?

14  Q    For advice about how to run a business, sir.

15  A    When did Josh turn to me?  I'm confused.

16  Q    Let's look at DX 589 that your counsel asked you about

17  earlier.

18  A    Yes, sir.

19  Q    Now, do you have this document in front of you in a

20  physical copy?  It wasn't in my binder.

21  A    What number is it?

22  Q    589.

23       THE COURT:  DX 589.  It might be in the binder that's

24  entitled "Examination of Stuart Fraser," it might be.

25       MR. WEINSTEIN:  It's not in that binder.

```
 1              THE COURT:  It's not?  Very well.  He doesn't have it
 2     then.
 3              MR. BUCHDAHL:  Is there a way to get this witness a
 4     physical copy of this document?
 5              MR. WEINER:  We're hunting for one.
 6              MR. BUCHDAHL:  May I approach, Your Honor?
 7              THE COURT:  You may.
 8              MR. BUCHDAHL:  I just handed the witness a physical
 9     copy of Defendant's Exhibit 589.  And I'd like to put on the
10     screen for a moment the questions that Mr. Casey asked you and
11     Josh on November 26.
12     Q   (By Mr. Buchdahl) All right.  And do you have in front of
13     you, sir, the DX 589?
14     A   Yes, sir, I believe so.
15     Q   Now, your lawyer characterized that document as an attempt
16     to answer the questions from Mr. Casey.  Do you recall agreeing
17     with that characterization earlier?
18     A   If you say so.
19     Q   So I want you to look at DX 589 and tell me if it contains
20     the answer to these questions.
21     A   What?
22     Q   So -- so if you look at this, it says, "The big question is
23     that this is a Ponzi scheme.  What can you provide to show that
24     there are actual coins being mined and payments being made from
25     them?  Are there mining addresses you can reveal that show
```

1  significant Bitcoin mining activity to match the claim that you

2  account for 50 percent of new online mining capacity? (or 90

3  percent of Litcoin)?"

4          Does Josh Garza's e-mail answer that question?

5  A   I have no idea.  I don't fully understand the question,

6  obviously.

7  Q   All right.  Let's look back at Josh Garza's e-mail.  And

8  let's display the entire e-mail.

9          Sir, did this e-mail from Josh Garza satisfy you that

10 GAW Miners was not a Ponzi scheme?

11 A   I didn't think it was a Ponzi scheme, no.

12 Q   Did this e-mail satisfy you that GAW Miners had sufficient

13 mining operations to back up its sales of Hashlets?

14 A   I don't know.

15 Q   Did this e-mail satisfy you --

16 A   I didn't get enough -- I didn't get information to know.  I

17 assumed it was because Josh sent it back.

18 Q   Did this e-mail satisfy you that the company was complying

19 with its regulatory obligations?

20 A   It was his response, I mean.

21 Q   Did this e-mail satisfy you that the data center in

22 Mississippi was actually operational at a level to support the

23 millions and millions of dollars of Hashlets that were being

24 sold?

25 A   I knew what everybody else knew, and I knew it from Josh

1    Garza.

2    Q    Let's turn to Defense Exhibit 569.  And if you could look

3    at Mr. Fraser's e-mail to Jim Ficarro.

4    A    Okay.

5    Q    Mr. Fraser, this is the e-mail you sent to Jim Ficarro on

6    November 14th of 2014; correct?

7    A    Yes, sir.

8    Q    And this was months after you started to have your doubts

9    about being involved with GAW Miners; correct?

10   A    I was having doubts about Josh being, you know, a little

11   too eager and a little too fast.

12   Q    So --

13   A    And careless.

14   Q    -- you told the jury earlier that you didn't know if the

15   claims in this first paragraph were true; correct?  Let's

16   highlight --

17   A    Well, I mean, at the time -- at the time I thought they

18   were true.

19   Q    So -- but you didn't take steps to verify that they were

20   true; correct?

21   A    I asked Josh about them.  I don't know.  I don't know what

22   steps that I could have done, but I asked for everything.  I

23   got the information I got from the top guy.  And, you know, it

24   is what it is.

25   Q    Sir, you were confident enough in these statements to

1    repeat them to Cantor Fitzgerald; correct?

2    A    Confident what?

3    Q    You were confident enough in these statements to repeat

4    them to Cantor Fitzgerald; correct?

5    A    This is what -- yeah.  I mean, Josh told me this, and I

6    wanted them to realize that this was not a -- you know, that

7    this looks like it was going to be a real business.  You know,

8    I wanted them to take it seriously and not just some kind of,

9    you know -- and not think it was a weird thing.

10   Q    Sir, on November 14th, 2014, you wrote the sentence, "GAW

11   Miners is totally above board."  Do you see that?

12   A    And that's what I believed.

13   Q    And you believed that, sir, after the fake interview with

14   your son posing as a ZenMiner's employee; correct?

15   A    I said that after -- yeah, I mean that happened in May, but

16   yes.

17   Q    And you believed GAW Miners was totally above board after a

18   fake press release announcing a phony $8 million acquisition;

19   correct?

20   A    I mean, at the time, I -- I just thought that Josh was

21   being an overzealous person.

22   Q    You called him yesterday an irresponsible idiot; correct?

23   A    Again, you know, let's talk about when.  Yeah, right today?

24   I believe he is an irresponsible idiot.  At the time I just --

25   I -- I thought he was doing well.  I thought he was doing

1  pretty good.  I thought, yeah, he was a little --

2  Q   Mr. Fraser --

3  A   -- rough around the edges, but ...

4  Q   You wrote, "GAW Miners is totally above board" even

5  though --

6  A   And that's what I believed.

7  Q   Even though -- sir, let me finish my question, please.

8       You wrote, "GAW Miners is totally above board" even

9  though just a couple of months earlier you found out it was

10  taking money from your bank account without authorization;

11  correct?

12  A   I found that out later.

13  Q   You knew --

14  A   I didn't know that till after the fact.  Then we started

15  looking through things.

16  Q   Jury's recollection will control, sir.

17       MR. WEINER:  Your Honor?  Object to that kind of --

18       THE COURT:  Yeah, no comments.

19       And, Ladies and Gentlemen, ignore the last comment by

20  counsel.

21  Q   (By Mr. Buchdahl) You wrote, "GAW Miners is totally above

22  board" despite the lies that you knew Josh was telling; right?

23  A   That's what I believed at the time.

24       MR. BUCHDAHL:  No further questions.

25       THE COURT:  All right.  Why don't we take our morning

1   break.

2           MR. WEINER:  Your Honor, I've only got one question.

3           THE COURT:  Then go ahead.

4           MR. WEINER:  We can get rid of this witness to

5   everyone's great relief.

6                           RECROSS EXAMINATION

7   BY MR. WEINER:

8   Q   Mr. Fraser, Mr. Buchdahl said you put your reputation on

9   the line.

10  A   Yes, sir.

11  Q   November of 2014.  Would you have done that if you knew

12  that GAW Miners and ZenMiner were a fraud?

13  A   Never.

14          MR. WEINER:  Nothing further.

15          THE COURT:  All right.  Very well.  Mr. Fraser, sir,

16  you may step down.

17          Actually, wait one second.  I'm going to send the

18  jurors out first.

19          Ladies and Gentlemen, so we have reached our morning

20  break.  My usual instruction, I know I sound like a broken

21  record, but don't talk about the case.  Don't let anyone talk

22  about it with you or communicate with you about it.  Keep an

23  open mind.  We'll have you back in the courtroom at ten after

24  11:00.  Thank you.

25      (The jury left the courtroom at 10:44 a.m.)

```
 1              THE COURT:  All right, Mr. Fraser, you can step down.
 2         (Witness excused.)
 3              THE COURT:  Everybody can be seated.  So after the
 4    break, who do we have, please?
 5              MR. ARD:  Mr. Audet, Your Honor.
 6              THE COURT:  Mr. Audet, very well.  All right, we'll be
 7    in recess.  Thank you.
 8         (Recess from 10:45 a.m. to 11:06 a.m.)
 9              MR. ARD:  Your Honor, I put a binder on your desk.
10              THE COURT:  Very good.  Sir, you can have a seat for
11    now.  Thank you.
12              Let's get the jurors.
13              MR. WEINER:  Your Honor, with your permission,
14    Ms. Hassan is going to conduct the cross-examination.
15              THE COURT:  Sorry?
16              MR. WEINER:  Ms. Hassan will be conducting the
17    cross-examination.
18              THE COURT:  That's fine.
19              MR. WEINER:  If there's any objection --
20              THE COURT:  She'll handle it, got it.
21              MR. ARD:  May I approach the podium here?
22              THE COURT:  You may.
23              MR. ARD:  Can he take off his mask?
24              THE COURT:  Can't hear you.
25              MR. ARD:  Can he take off his mask?
```

 1           THE COURT:  You can.

 2           MR. ARD:  Thank you, Your Honor.

 3       (The jury entered the courtroom at 11:08 a.m.)

 4           THE COURT:  We have a new witness, so I'll ask you to

 5   stand, raise his right hand, and face our courtroom deputy so

 6   that she can give him the oath.

 7

 8                D E N I S   M A R C   A U D E T,

 9           having been duly sworn by the Clerk, testified

10                     under oath as follows:

11

12           THE CLERK:  Please be seated.  State your name, city,

13   and state you work.  Spell your last name.

14           THE COURT:  You can have a seat first.  There you

15   go.

16           THE WITNESS:  My name is Denis Marc Audet.  Second

17   question?

18           THE COURT:  Spell your last name.

19           THE WITNESS:  A-u-d-e-t.

20           THE COURT:  And then city and state where you work.

21           THE WITNESS:  Hamden, Connecticut.

22           THE COURT:  Great.  You can proceed, Mr. Ard.

23           MR. ARD:  Thank you, Your Honor.

24                        DIRECT EXAMINATION

25   BY MR. ARD:

1   Q    What name do you go by, Mr. Audet?

2   A    Marc Audet.

3   Q    And what do you understand your role to be in this case,

4   Mr. Audet?

5   A    I'm one of the lead Plaintiffs in this action.

6   Q    And what do you understand that to mean?

7   A    I represent myself and people like myself who bought

8   products from GAW Miners.

9   Q    It may help if you slow down just a little bit so the court

10  reporter can catch what you say.

11           Where do you live, Mr. Audet?

12  A    Hamden, Connecticut.

13  Q    Do you live there with anyone?

14  A    I live with my wife.

15  Q    And how long have you been married?

16  A    Twenty-eight years.

17  Q    And how long have you lived in Hamden, Connecticut?

18  A    Twenty-one years.

19  Q    What do you do for a living, Mr. Audet?

20  A    I'm a computer programmer.  Specifically, I design and

21  build websites and web applications that use databases to

22  manage information and data.

23  Q    And where is your office?

24  A    I have a home office.  I work from home.

25  Q    Are you self-employed?

```
 1   A   Yes, I am.

 2   Q   Does anyone work for you?

 3   A   No.

 4   Q   And how long have you had your own business?

 5   A   Since 2004.

 6   Q   When did you first hear about GAW Miners?

 7   A   In September 2014.

 8   Q   And how did you learn about the company?

 9   A   I read a short article in a trade journal that I subscribe

10   to.

11   Q   At some point did you buy any products from GAW Miners?

12   A   Yes, I did.

13   Q   What was it about GAW Miners that appealed to you?

14   A   I -- when I looked into GAW Miners, I went to their

15   website.  I discovered that they were based in the United

16   States in Connecticut, so that gave me some assurance it was a

17   legitimate company.  In addition, they, um, they had a very

18   clean, professional looking website.

19   Q   I'm showing you what has been marked as PX 47.  I believe

20   it's already in evidence.

21          THE COURT:  Okay.

22   Q   (By Mr. Ard) Do you -- does this look familiar to you, Mr.

23   Audet?

24   A   Yes, it does.

25   Q   What is it?
```

1   A   It looks like one of the pages from the GAW Miners' website

2   from about that period.

3   Q   Why do you think this looked professionally done?

4   A   First of all, if you notice that there's some very wide

5   margins to the left and the right.  That's called white space.

6   So it gives the website an uncluttered, easy-to-read,

7   easy-to-view layout.  Also, the -- if you notice, all the

8   headers are consistent in their font sizes.

9           And in addition, um, there's, um -- the copy was well

10  written.  There were no typos, no grammatical errors that I

11  could see, and the graphics are high quality.  So, obviously,

12  this was done by a trained graphic designer.  And in order to

13  get this look and feel, because I've built websites myself, you

14  have to know what you're doing with the HTML and CSS.  So you

15  don't get this look and feel by accident.  This was

16  professionally done.

17  Q   When did you first buy a GAW Miners' product?

18  A   That would have been in October 2014.

19  Q   What was the first product you bought from GAW Miners?

20  A   Excuse me.  Say it again.

21  Q   What was the first product you bought from GAW Miners?

22  A   Hashlets.

23  Q   What did you understand Hashlets to be?

24  A   I understood Hashlets to be a slice of the total computing

25  power that was in the -- by the equipment in a GAW Miners' data

1    center.

2    Q    Were you interested in Bitcoin mining at the time?

3    A    Yes, I was.

4    Q    And what was it about Hashlets that appealed to you?

5    A    They're ease.  They were very convenient to set up.  You

6    just basically bought them, and they were ready to go.  They

7    started mining Bitcoins immediately once you activated them.

8    Q    Had you ever done Bitcoin mining before that?

9    A    No, I haven't.

10   Q    Do you have any expertise in cryptocurrency mining?

11   A    No, I don't.

12   Q    Do you have any expertise in cryptocurrencies?

13   A    No.

14   Q    Did you receive payouts from your Hashlets?

15   A    Yes, I did.

16   Q    What type of payouts did you receive?

17   A    I was getting Bitcoins.

18   Q    Where did you believe the payouts were coming from?

19   A    From the mining that was taking place in the GAW Miners'

20   web -- data center.

21   Q    And why did you believe that?

22   A    Because they sold me the miners, you know, that's what it

23   said on the website.  That's what they did.

24   Q    At the time did it appear to you that your Hashlets were

25   performing as GAW had promised?

1   A   Yes.

2   Q   And why is that?

3   A   Oh, because I was getting, um, daily payouts in Bitcoins.

4   Q   How did you monitor your Hashlets?

5   A   When I bought my Hashlets from GAW Miners, the website had

6   an account on the website, and this led to a dashboard that

7   listed everything I bought, all the Hashlets, in addition to

8   listing all the daily payouts I got from the Hashlets.

9   Q   Approximately how much money did you spend in total on

10  Hashlets?

11  A   Approximately $17,000.

12  Q   At some point did your Hashlets pay out in something other

13  than Bitcoin?

14  A   Yes, they did.

15  Q   What was that?

16  A   It was called Hashpoints.

17  Q   Approximately when did they start paying out in Hashpoints?

18  A   I think it was towards the end of October, early November

19  2014.

20  Q   And what were Hashpoints?

21  A   Hashpoints were like an in-house credit from GAW Miners

22  where if you accumulate these points, eventually you would be

23  able to trade them in to buy -- rather, you could convert them

24  to what was called HashCoin, but that later became Paycoin.

25  Q   Did you ever buy a product called HashStakers from GAW

1    Miners?

2    A    Excuse me.  Yes, I did.

3    Q    When did you buy these HashStakers?

4    A    At the last -- in the last week of November and the first

5    week of December 2014.

6    Q    And why did you buy HashStakers?

7    A    Because they're a payout system, it allowed me to earn more

8    Paycoins.

9    Q    So at the time, then, you were interested in acquiring more

10   Paycoin?

11   A    Yes, I was.

12   Q    Approximately how much money did you spend on HashStakers?

13   A    It was between nine and ten thousand dollars.

14   Q    You mentioned Paycoin, Mr. Audet.  When did you first hear

15   about Paycoin?

16   A    That would have been about the same period, November

17   2014.

18   Q    Did you acquire any Paycoin?

19   A    Yes, I did.

20   Q    Did you acquire Paycoin from Hashpoint conversions?

21   A    Yes, I did.

22   Q    Did you acquire Paycoin from HashStakers?

23   A    Yes, I did.

24   Q    Did you buy Paycoin?

25   A    Yes, I did.

1    Q    Approximately how much did you spend on buying Paycoin?

2    A    It was approximately $4,500, maybe a little bit more.

3              THE COURT:  I'm sorry.  Did you say --

4              THE WITNESS:  $4,500.

5              THE COURT:  Four thousand?

6    Q    (By Mr. Ard) Where did you buy the Paycoin from?

7    A    A third-party exchange called bitrix.com.

8    Q    When did you first acquire Paycoin?

9    A    This would be December 2014.

10   Q    What did you find attractive about Paycoin?

11   A    It was a stable cryptocurrency.  It had a price point that

12   was going to be stabilized.  Also, it had a hundred million

13   dollar cash reserve fund support it.  As a result, it would be

14   a stable currency that would be very attractive to retailers

15   like Amazon.com or Best Buy, which was as stated on their

16   website.

17   Q    Did you have an understanding -- strike that.

18              Why did you believe that GAW Miners had raised a

19   hundred million dollar fund?

20   A    Well, they said so.  I forget exactly where I read it, but

21   they made an announcement to that effect.  In addition, about

22   the same time, they announced that they had the backing of, um,

23   Cantor Fitzgerald; and they named Stuart Fraser as the, um, a

24   senior executive who was behind the venture.

25   Q    Why was it important to you that Stuart Fraser and Cantor

1    Fitzgerald were involved?

2    A    Well, I discovered that Cantor Fitzgerald was a highly

3    reputable financial company on Wall Street and, in my

4    understanding, that, you know, the people on Wall Street know

5    how to make money.  They know how to manage money.  And,

6    therefore, if they were backing the GAW Miners venture, they

7    must have understood it was a viable business and give me

8    assurance it was going to work out.

9    Q    Have you heard of HashTalk, Mr. Audet?

10   A    HashTalk, yes.

11   Q    What is it?

12   A    HashTalk --

13            THE COURT:  Hash Hawk or HashTalk?

14            MR. ARD:  Sorry, HashTalk, T-a-l-k.

15            THE WITNESS:  With a "T," HashTalk.  That was the name

16   of the forum on the GAW Miners' website.

17   Q    (By Mr. Ard) Did you read any posts from HashTalk?

18   A    Yes, I did.

19   Q    Did you read all the posts from HashTalk?

20   A    No, I didn't.

21   Q    Why not?

22   A    There were too many of them, so I was selective in the

23   topics I followed.

24   Q    What types of posts did you read?

25   A    Um, I looked at everything that Josh Garza posted in

1   addition to anything related to the products like Hashlets,

2   Paycoin, Paybase, any of the announcements.

3   Q    The product announcements for those products?

4   A    Product announcements, yes.

5   Q    How did you know Josh Garza had made a post?

6   A    Um, first of all, I recognized.  Um, he had his head shot

7   next to his account name.  And the way the forum was designed,

8   you -- you could actually, not you, but the point of posts, I

9   would call it bookmarks.  So they appeared on top of the page.

10  That way you always knew when Josh says something.  You would

11  go to the forum, and there it would be top of the page.

12  Q    Did you ever communicate directly with Josh Garza?

13  A    No.  Excuse me.  No, I didn't.

14  Q    Did you ever post on HashTalk yourself?

15  A    Yes, I did.

16         MR. ARD:  Your Honor, I would like to show DX 597.  I

17  don't believe there's any objection to it.

18         THE COURT:  Okay.  DX 597, is that right?

19         MS. HASSAN:  No objection, Your Honor.

20         THE COURT:  DX 597 will be full.

21     (Defendant's Exhibit 597, received in evidence.)

22  Q    (By Mr. Ard) Do you recognize this document, Mr. Audet?

23  A    Yes, I do.

24  Q    What is it?

25  A    This is a source code of HTML for a webpage, the HashTalk

1    forum.

2    Q    And this is Defense Exhibit DX 597; correct?

3         597, do you see that?

4    A    Yes.

5    Q    If you turn to page 9, it says "PandaCoin."  Do you see

6    that?

7    A    PandaCoin, yes, I do.

8    Q    What is PandaCoin?

9    A    That was my user name on the forum.

10   Q    On HashTalk?

11   A    Sorry, on HashTalk, yes.

12   Q    Why did you choose the name PandaCoin?

13   A    Um, my wife likes panda bears.

14   Q    If you turn -- on page 9 right here, it says, "There are a

15   few reasons why I am staying the course with GAW and Paycoin."

16        Do you see that?

17   A    Yes, I do.

18   Q    And it should be on your screen in front of you.

19   A    Yes.

20   Q    Did you write that?

21   A    Yes, I did.

22   Q    Were you responding to criticism about GAW Miners at the

23   time?

24   A    Um, I was at least, um -- first of all, um, this is part --

25   my comment's part of a thread in the forum.  And the other

```
 1  posts aren't here, but it looks like I was responding to some
 2  previous comments that might have been perhaps even critical of
 3  GAW.
 4  Q   It says, "First, they are based in the USA, so I feel that
 5  the company is legitimate."  Did you write that?
 6  A   Yes, I did.
 7  Q   It also said, "Second, the company has major investors with
 8  millions at stake, so I think that GAW has a good chance of
 9  being successful."  Did you write that?
10  A   Yes, I did.
11  Q   What were you referring to when you referred to major
12  investors with millions at stake?
13  A   Oh, I was referring to the previous announcement that there
14  was, um, a hundred million dollar backup fund or reserve fund
15  for Paycoin.
16  Q   When did you last purchase a GAW Miners' product?
17  A   This would have been December 2014.
18  Q   Why did you stop -- strike that.
19          When in December 2014?
20  A   Just before Christmas.  I think it was December 23rd.
21  Q   Why did you stop buying GAW Miners' products?
22  A   Basically I ran out of cash.
23  Q   What was your cash savings being used for that you were
24  spending on the GAW Miners' products?
25  A   The cash that I'm talking about was from -- it was kept in
```

1    my business, um, checking account; and the cash was used for

2    running my business.  For example, if a computer broke down, I

3    would go out and buy a new one and also household emergencies.

4    If the car broke down, then I had cash on hand to take care of

5    these things.

6    Q    And how much did you spend in total on GAW Miners'

7    products?

8    A    I think overall it was a little bit over $30,000.

9    Q    Did you get any of that money back?

10   A    Very little.

11   Q    How much?

12   A    Um, I think after everything was said and done, I was left

13   with currently $26.

14           THE COURT:  Sorry.  You said you got $26 back?

15           MR. ARD:  Yes, Your Honor.

16           THE COURT:  Is that right, sir?

17           THE WITNESS:  Yes, 26, two-six.

18           THE COURT:  Got it.

19   Q    (By Mr. Ard) How long did it take you to save the $30,000?

20   A    That represents about a year of savings.

21   Q    In 2014 what was your approximate income?

22   A    It was between 73 and $74,000.

23   Q    How did it make you feel when you found out you lost all

24   that money?

25   A    Uh, I was taken aback.  I was shocked.  I was fearful.  Um,

```
 1   also I felt ashamed about it because I felt, um, you know,
 2   we're in a culture where status is very much related to your
 3   ability to make money.  And when you feel you've been cheated
 4   like that, somehow you feel you've been violated.  So I felt,
 5   you know, I was ashamed of what happened to me.
 6   Q    Have you been attending this trial, Mr. Audet?
 7   A    Yes, I have.
 8   Q    Have you been here every day?
 9   A    Yes, I have.
10   Q    Are you getting paid anything for your time in being here,
11   Mr. Audet?
12   A    No, I'm not.
13   Q    Have you ever gotten paid anything for your work on this
14   case?
15   A    No.
16   Q    Are you able to run your business while you're here, Mr.
17   Audet?
18   A    No, I'm not.
19   Q    Why are you doing this, Mr. Audet?
20   A    First of all, I'd like to be able to recover some of my
21   losses.  I also represent other people who cannot be here, you
22   know, to represent themselves.  So I represent a lot of other
23   people who lost money like myself.  So it's basically the right
24   thing to do, I think, out of a sense of fair play and justice.
25   There has to be some reckoning in this.
```

1    Q    Will you be here for the rest of the trial, Mr. Audet?

2    A    No, I won't.

3    Q    And why is that?

4    A    I have an emergency, a medical emergency, and I'm going to

5    surgery on Friday.

6    Q    I wish you the best of health, Mr. Audet.  And thank you

7    for your service to the class.

8             MR. ARD:  I pass the witness.

9             THE COURT:  All right.  Cross-examination.

10                        CROSS-EXAMINATION

11   BY MS. HASSAN:

12   Q    Good morning, Mr. Audet.  If you can't hear me clearly,

13   please just let me know.

14   A    You're -- the volume's a bit soft, so ...

15   Q    Okay.  I will try to speak loud.

16   A    That's better.

17   Q    Is that better?

18   A    That's better.  Thank you.

19   Q    If I start fading, just let me know.

20   A    I'll raise my hand.

21   Q    Great.

22             THE COURT:  Ms. Hassan, if you need help, you can pull

23   the microphone closer.

24             MS. HASSAN:  Oh, oh, there.

25             THE COURT:  There you go.

1    Q    (By Ms. Hassan) Is that better?

2    A    Yes, it is.  Thank you.

3    Q    So, Mr. Audet, during your testimony right now with Mr.

4    Ard, you mentioned Mr. Fraser; correct?

5    A    Yes, I did.

6    Q    So let's talk about that a little bit.  Mr. Fraser never

7    made any representations to you regarding the products at

8    issue; correct?

9    A    That's correct.

10   Q    In fact, you have never had any interaction with Mr.

11   Fraser.  Yes?

12   A    That's correct.

13   Q    You've never met him; correct?

14   A    That's correct.

15   Q    Never spoken with him; correct?

16   A    That's correct.

17   Q    Never e-mailed with him?

18   A    That's correct.

19   Q    And never received any kind of communication or

20   correspondence from him; is that correct?

21   A    Say it again.

22   Q    And never received any kind of communication or

23   correspondence from him; is that correct?

24   A    That's correct.

25   Q    Thank you.

1              Now, Mr. Audet, you were not Facebook friends with Mr.

2    Fraser, were you?

3    A   No, I'm not.

4    Q   And you are not a Twitter follower of Mr. Fraser.

5    A   No, I'm not.

6    Q   We just talked about HashTalk, which is the forum that GAW

7    Miners maintained for its customers.  Do you recall that

8    testimony?

9    A   Yes.

10   Q   And you mentioned that you had an account on HashTalk as

11   well; correct?

12   A   That's correct.

13   Q   Is it fair to say that HashTalk was your primary source of

14   information about the GAW Miner products?

15   A   Not -- not exactly.  I -- the source was basically the GAW

16   Miners' website.

17   Q   Okay.  So the GAW Miners' website and HashTalk together,

18   you used them to get information about the GAW Miners'

19   products.  Is that fair?

20   A   That's fair enough, yes.

21   Q   And you checked HashTalk pretty regularly; correct?

22   A   Sorry.  Slow down, please.

23   Q   Sorry about that.  And thank you for stopping me.

24              You checked HashTalk very regularly; correct?

25   A   Yes, I did.

1   Q    You checked it almost on a daily basis?

2   A    Yes, I did.

3   Q    You never saw any posts on HashTalk by Mr. Fraser, did you?

4   A    I don't think so.

5   Q    Now, you mentioned earlier that you did see posts by Josh

6   Garza on HashTalk; correct?

7   A    Yes, I did.

8   Q    And you also read some of those posts?

9   A    Yes, I did.

10  Q    When you first heard about Hashlets back in September of

11  2014, you did some research on the companies; right?  You

12  Googled GAW Miners.  Is that fair?

13  A    Um, I might have.  I -- specifically I remember going to

14  their website.

15  Q    Okay.  Well, when you did your initial research, the name

16  that you found and that popped up was Josh Garza's name;

17  correct?

18  A    Yes.

19  Q    You also participated in one, perhaps two, Q and A online

20  sessions in which Josh Garza participated; correct?

21  A    I -- yes, I did at least one, yes.

22  Q    Okay.  And these were online Q and A sessions in which

23  representatives of GAW Miners answered questions from

24  customers; correct?

25  A    Yes, questions were asked, yes, they were.  Yes, that's

1    correct.  Yes, I remember that.

2    Q    And Josh Garza was there as a representative of GAW Miners.

3    A    Yes, he was.

4    Q    Mr. Fraser was not present in any of these Q and A

5    sessions; correct?

6    A    Not that I remember.

7    Q    Mr. Audet, you understood that Josh Garza was the chief

8    executive officer of GAW Miners; correct?

9    A    I understood that was his title, yes.

10   Q    And you understood that he was the executive officer of the

11   company?

12   A    Like I said, that was his title, yes.

13   Q    Now, Mr. Audet, let me step back to you made a reference to

14   Cantor Fitzgerald and Stuart Fraser, the fact that you saw a

15   reference to Cantor Fitzgerald and Mr. Fraser somewhere;

16   correct?

17   A    That's correct, yes.

18   Q    And where did you see that reference?

19   A    It might have been -- it's a little bit vague.  It's like

20   six, seven years, six years ago, I think.  It might have been

21   in either late October or November of 2014.

22   Q    And was it a press release that you saw in which there was

23   a reference to Mr. Fraser and Cantor Fitzgerald?

24   A    I can't remember exactly where I saw it.

25            MS. HASSAN:  Your Honor, may I refresh the witness's

1    recollection with extrinsic evidence?

2          THE COURT:  You may.

3          MS. HASSAN:  Your Honor --

4          THE COURT:  You can approach, yes.

5          Sir, just take a look at that document.  And you can

6    direct him to any pages you need him to look at.

7          MS. HASSAN:  Should I describe the document for the

8    record?

9          THE COURT:  No.  Just ask him to look it over and what

10   pages you want him to look at to refresh his recollection about

11   the question you ask.

12         MS. HASSAN:  Okay.

13   Q   (By Ms. Hassan) So, Mr. Audet, what you have is an excerpt

14   of a document, and I'll give you the page number in the top

15   right-hand corner, page No. 53.  And if you could just read to

16   yourself line numbers 18 through 23.

17   A   How far do you want me to read?

18   Q   Oh, if you would just read lines 18 to 23 on page 53.

19   A   Okay.  On page 53?  Oh, I'm on page 54.  Sorry.

20         Okay, I re-read this, yes.  I read this.

21   Q   And does this refresh your recollection that you saw a

22   reference to Cantor Fitzgerald and Mr. Fraser in a press

23   release?

24   A   Yes, it does.

25   Q   Thank you.  You can put that aside.

1          And, Mr. Audet, you mentioned that you recall seeing

2    that reference in late October or November.  Is that -- is that

3    what you just testified to?

4    A    In 2014, yes.

5    Q    In 2014, okay.

6          Now, we have seen, and the jury has seen, one press

7    release in this case dated November 24th, 2014.  Is that the

8    press release that you -- that you read which made a reference

9    to Cantor Fitzgerald and Mr. Fraser?

10   A    I can't remember if that's exactly the one I looked at.

11         MS. HASSAN:  Could we -- Mr. Jackson, could we just

12   have the shot of the press release on just to refresh.

13         THE COURT:  This would be Exhibit No.?

14         MS. HASSAN:  81.  PX 81.

15         THE COURT:  And that's already in evidence.  Yes?

16         MS. HASSAN:  Yes.

17         THE COURT:  Okay.

18         THE WITNESS:  Is this in my binder?

19         THE COURT:  No.  He's going to bring it up for you.

20         MS. HASSAN:  It is not.  I'm sorry.

21         THE WITNESS:  Sorry.

22   Q    (By Ms. Hassan) So if we could go to the first page and

23   maybe just pop out the headline and the date, November 24,

24   2014.

25         So, Mr. Audet, this is the press release that we have

1  all seen, which has a reference to Cantor Fitzgerald and Mr.

2  Fraser.  Are you aware of any other press release that makes a

3  reference to Cantor Fitzgerald or Mr. Fraser?

4  A   I don't remember this press release as formatted, but some

5  of the content looks familiar.  So it might be reprinted in

6  some other news outlet.

7  Q   Understood.  So other than this press release, you're not

8  aware of any other press release that mentions Cantor

9  Fitzgerald or Mr. Fraser?

10  A   Not that I can remember.

11  Q   So is it reasonable to assume that this is the press

12  release that you were thinking of when you were just testifying

13  about the references to Cantor Fitzgerald and Mr. Fraser?

14  A   Sorry.  You're talking a bit fast.  Could you slow down,

15  please?

16  Q   Sir, is it reasonable to conclude that this is the press

17  release that we have been talking about?

18  A   Yes.

19  Q   Thank you.

20        Now, Mr. Audet, how regularly did you read the press

21  releases that GAW Miners issued?

22  A   I think I -- when I saw them referred to on the HashTalk,

23  then I would take a look at them.

24  Q   Okay.

25  A   I can't remember exactly.

1  Q   So is it safe to assume that the earliest that you would

2  have read this November 24, 2014, press release is on November

3  24th?

4  A   That sounds reasonable.

5  Q   Okay.  Now, Mr. Audet, you testified that you started

6  buying Hashlets in early October 2014.  Is that fair?

7  A   That's correct.  That's what I said.

8  Q   And you continued purchasing Hashlets pretty regularly

9  throughout October and November of 2014; is that correct?

10 A   I think that's pretty accurate, yes.

11 Q   And then you continued purchasing Hashlets and also

12 HashStakers at one point through about mid-December; correct?

13 A   Early December.

14 Q   Okay, early December.  And somewhere close to the end of

15 that period, so early October to early December, somewhere

16 close to the end is when this press release gets issued;

17 correct?

18 A   Yes.

19        MS. HASSAN:  Your Honor, I would like to offer into

20 evidence Defense Exhibit 683.

21        THE COURT:  683, is that what you said?

22        MS. HASSAN:  I don't believe there are any objections

23 to it.

24        THE COURT:  683 will be a full exhibit.

25     (Defendant's Exhibit 683, received in evidence.)

1              MS. HASSAN:  Your Honor, may I give the witness a

2     copy?

3              THE COURT:  Yes, you may.

4     Q   (By Ms. Hassan) So, Mr. Audet, the document in front of

5     you, you recognize this document; correct?

6     A   Yeah, I think I've seen this before.  Like I said, it's

7     been a while, so I don't -- it's not fresh in my memory,

8     but ...

9     Q   Okay.  Well, let me orient everyone here.  These are

10    Plaintiffs' certifications, as it says on the document;

11    correct?  That's what it says?

12    A   Yes.

13    Q   And these were filed with Plaintiffs' Complaint?

14    A   Sorry.  Say again.

15    Q   And these were filed with Plaintiffs' Complaint in this

16    case?

17    A   I think so, yes.

18    Q   And if we look at Item No. 1, it says, "Sworn Certification

19    of Denis Marc Audet," dated June 13, 2016?

20    A   That's what it says, yes.

21    Q   And it references Exhibit 1?

22    A   Yes, it does.

23    Q   So if we flip, I believe, to the third page, that's the

24    start of Exhibit 1.  And then on the fourth page, it says,

25    "Sworn Certification of Denis Marc Audet."

```
 1   A    I -- yes, I'm on the page.  Thank you.  Oh, sorry.  Um, I'm

 2   on Michael Pfeiffer's page.  Sorry.

 3   Q    So I think if you count just four pages --

 4   A    Hold on.  I'm not on the same page yet.  Oh, I see.  It's

 5   double sided.  Sorry.

 6   Q    I was trying to save paper.

 7   A    Okay.  I'm on the page.  Thank you.

 8   Q    Okay.  So the page that you're looking at now is your sworn

 9   certification; correct?

10   A    Yes, it is.

11   Q    And it says:  "I, Denis Marc Audet, certify as follows:  I

12   am a named plaintiff in the attached complaint and I have

13   received the complaint and authorized its filing."

14            Do you see that?

15   A    Yes, I do.

16   Q    And your certification attaches an Exhibit A?

17   A    Yes, it does.

18   Q    Now, Exhibit A, again, just so you familiarize yourself or

19   refresh your recollection, it's about four to five pages long?

20   A    Yes, it is.

21   Q    Now, Exhibit A is intended to be a list of all of your

22   purchases of GAW Miners' products at issue in this case;

23   correct?

24   A    Yes, it is.

25   Q    And is it your representation that this is a complete and
```

1   accurate list of those products?

2   A    Uh, yes, those are all the ones I -- yes.  Yes, it is.

3   Q    So just taking a look and walking through your purchases,

4   as you testified, you started buying Hashlets on October 7th?

5   A    That's correct, yes.

6   Q    And then you bought a few more Hashlets the next day on

7   October 8th?

8   A    Yes, I did, yes.

9   Q    And then you continued buying Hashlets pretty regularly

10  either every few days or in some cases on consecutive days

11  throughout October, if we kind of flip through the first page.

12  Do you see that?

13  A    Yes, I do, that's right, yes.

14  Q    And then you continued purchasing Hashlets in November;

15  correct?  And this is if we go right to the end of page 1.

16  A    Yes.

17  Q    So you bought some Hashlets on November 8th and then, if we

18  flip onto the next page, on November 10th, 13th, and so on.  Do

19  you see that?

20  A    Yes.

21  Q    And, again, you continued purchasing Hashlets on a pretty

22  regular basis every few days or even on consecutive days in

23  some cases; correct?

24  A    Yes.

25           MR. HASSAN:  So, Mr. Jackson, if we go down to -- if

1    we go kind of in the middle of the second page, can we draw a

2    marker between November 21 and November 24th?

3    Q    (By Ms. Hassan) So, Mr. Audet, you would agree with me that

4    all of the purchases of Hashlets that you made in October of

5    2014 and November of 2014, before November 24th, which is the

6    date of the press release, those were made before you saw a

7    press release referencing Cantor Fitzgerald or Mr. Fraser;

8    correct?

9    A    That's correct, yes.

10   Q    And then after that press release came out, you continued

11   purchasing Hashlets, and then you started pushing HashStakers

12   too; correct?

13   A    That's correct.

14   Q    Just to take an example, you bought some on November 26,

15   some Hashlets.  You bought a few more Hashlets on December 1,

16   um, December 4, and you continued purchasing?

17   A    Sorry.  You're going a bit fast here.  Um --

18   Q    I will slow down.

19   A    Are you talking about HashStakers or Hashlets?

20   Q    I'm talking just generally about your purchases of either

21   Hashlets or HashStakers.

22   A    Right.

23   Q    So you bought some Hashlets on December 1?

24   A    Yes, I did.

25   Q    You bought some HashStakers also on December 1.

1   A   That's correct.

2   Q   And then you continued buying Hashlets on December 4th,

3   December 7th, and again pretty regularly every few days, or in

4   some cases on consecutive days, through December 13th; is that

5   correct?

6   A   That's correct.

7   Q   Mr. Audet, you've mentioned Josh Garza during your

8   testimony with Mr. Ard.

9   A   That's right, yes.

10  Q   You were aware Josh Garza pleaded guilty to fraud in

11  connection with GAW Miners in a case brought against him by the

12  Department of Justice?

13  A   Yes, I am.

14  Q   And you also understand that he was sentenced to 21 months

15  in prison?

16  A   Yes, I am.

17  Q   You were actually present at his sentencing hearing;

18  correct?

19  A   Yes, I was.

20  Q   And you were present during the entire hearing?

21  A   Say again.

22  Q   You were present during the entire hearing?

23          THE COURT:  The entire.  Were you there during the

24  entire hearing?

25          THE WITNESS:  Does that -- you mean --

1           THE COURT:  The whole thing.

2           THE WITNESS:  No.  Just the sentencing.

3    Q   (By Ms. Hassan) Okay, understood.  Let me try --

4    A   I'm sorry.  I'm -- I'm a little bit lost on the jargon.  I

5    was there for the day for the sentencing.

6    Q   Thank you.  That's all I was asking.  You were there for

7    the entire day.

8    A   Yes.

9    Q   Thank you.

10          You, in fact, testified at the sentencing hearing;

11   correct?

12   A   Um, I won't call it testify.  I made, um, a victim

13   statement.

14   Q   So you gave a statement at --

15   A   Is that testifying?

16   Q   We'll go with statement.  So you made a statement?

17   A   It was a victim statement, yes.

18   Q   Okay.  Thank you.

19          And you were also present when Josh Garza gave his

20   statement to the Court.

21   A   Yes, I was.

22   Q   Now, we heard some of those statements that Mr. Garza made

23   to the sentencing judge, in fact, in this very courthouse last

24   week when we heard Mr. Garza's deposition testimony.  Do you

25   recall that?

1   A    Uh, I wasn't aware that was his sentencing.  No, I don't

2   exactly remember that.

3   Q    Okay.  Well, can we pull up the clip report of Mr. Garza's

4   deposition testimony from last week?  And if we go to it's PDF

5   page 30 of 32, which is the easiest way I can describe it, to

6   Items 115 and 116.

7          So, Mr. Audet, what you have on the screen is the text

8   of what was played of Mr. Garza's deposition testimony last

9   week.  Do you recall that Mr. Garza's --

10  A    Sorry.  You confused me.  Is this what he said during the

11  sentencing?

12  Q    Well, I'll go step by step.

13         So do you remember that last week Mr. Garza's

14  deposition testimony was played in court?

15  A    Yes.

16  Q    Okay.  And as part of that deposition testimony, he was

17  asked about the sentencing hearing.  And that's what I'm going

18  to direct you to.

19  A    Okay.  Thank you.

20  Q    So when we heard Mr. Garza's deposition testimony, he said

21  that he testified during his sentencing hearing that a lot of

22  the things that was said here today -- and, Mr. Jackson, if you

23  could -- a lot of the things that was said here today, i.e., at

24  Mr. Garza's sentencing hearing, are true and I accept that I

25  caused those things.

```
1              Do you see that?
2    A    Yes, I do.
3    Q    So this is Mr. Garza -- this is what he said at the
4    sentencing hearing.  Would you have been present when Mr. Garza
5    made that admission at his sentencing hearing?
6    A    Most likely.  I can't remember what he said.
7    Q    Okay.  And you would have also been present at Mr. Garza's
8    sentencing hearing when he told the sentencing judge, "I was in
9    charge and it was my job to keep customers and investors safe.
10   I didn't."
11             Do you see that?
12   A    Yes, I do see it, yes.
13   Q    Mr. Audet, in both of these statements, there is no
14   reference to Mr. Fraser controlling Mr. Garza, is there?
15   A    That's correct.
16   Q    And there's no reference to Mr. Fraser assisting Mr. Garza.
17   A    That's correct.
18             MS. HASSAN:  We can take that off.  Thank you, Mr.
19   Jackson.
20   Q    (By Ms. Hassan) Mr. Audet, you told us about the money that
21   you invested --
22   A    Sorry.  You're talking fast again.
23   Q    Mr. Audet, you told us about the money that you invested in
24   the various GAW products, like the Hashlets and the
25   HashStakers.
```

1    A    Yes, I did.

2    Q    Right?

3         Now, you understood that GAW Miners was a start-up

4    company.  It was a new company; right?

5    A    Yes, it was.

6    Q    And you actually work with a lot of start-ups in your work

7    as a web interface designer?

8    A    Say again, please.

9    Q    You work with a lot of start-ups in your current work,

10   don't you?

11   A    Let me think for a moment.  Um, I think about a third of my

12   clients were, like -- well, actually, a lot of them were small

13   businesses like self-employed people.  I -- no, I don't think I

14   actually -- not formally, not a start-up company, no.

15   Q    Okay.  Well, you understand that GAW Miners was a start-up.

16   It was a new company.

17   A    Yes.

18   Q    We can agree --

19   A    That's accurate.  I agree with that.

20   Q    And you understood that investing in a start-up is risky?

21   A    Yes, investing in a start-up is risky.  Yes, I agree with

22   that.

23   Q    And you also understood that back in 2014 investing in

24   cryptocurrency was risky; correct?

25   A    In 2014, oh, yes, it is risky, yes.

1    Q    And that was because cryptocurrency was a new thing.  It

2    was a new phenomenon; correct?

3    A    Um, I hesitate to say yes to that.  Um, it would have been

4    risky if it was old perhaps, but I -- it's risky.  I'll concede

5    it's risky, yes.

6    Q    Okay.  And that's sufficient.  We can agree that investing

7    in cryptocurrency was risky at that time; correct?

8    A    Yes.

9    Q    Okay.  Now, you understood all of these risks --

10   A    Yes.

11   Q    -- investing in a start-up, investing in cryptocurrency.

12   However, you did decide to invest in GAW Miners' products;

13   correct?

14   A    Yeah, I think -- um, I would say -- yes, I -- I bought the

15   products, yes.

16   Q    Now, Mr. Audet, you also invest in mutual funds; right?

17   A    Yes, I do.

18   Q    And you make those investments through a financial planner?

19   A    Um, no.  Actually, um, one of the large national brokerage

20   firms.

21   Q    Okay.  So you use a brokerage firm to make and manage those

22   investments.  Is that fair?

23   A    That's right, yes.

24   Q    I'm assuming you trust this brokerage house?

25   A    Yes, I do.

1  Q    And you consider them competent?

2  A    Sorry.  Say again.

3  Q    You consider them competent?

4  A    Yes, they're competent, yes.

5  Q    But you never mentioned to them the purchases of GAW

6  Miners' products that you were making; right?

7  A    That's correct.

8  Q    And you never sought their advice before buying these

9  products and investing in them.  Is that fair?

10 A    That's correct.

11 Q    So you saw your investments in GAW Miners' products

12 differently from your traditional investments in the mutual

13 funds.  Is that fair?

14 A    That's correct.

15 Q    And the reason that you did not ask this very competent,

16 trustworthy brokerage house about your investments in GAW

17 Miners, because you were not sure they would know what to do

18 about this stuff?

19 A    I didn't -- I didn't think that way.

20 Q    Oh.  And what did you think?

21 A    I can't remember.

22 Q    Well, may I refresh your recollection with your deposition

23 testimony?

24 A    Please do.

25          MS. HASSAN:  Mr. Jackson, could we --

```
 1              THE COURT:  No, no, no, no.  Take it off the screen,
 2    please.  Take it off the screen.
 3              Okay, so you can show it to the witness.  If you're
 4    just refreshing recollection, you can show it to the witness,
 5    but you can't publish it to the jury.
 6              MS. HASSAN:  Understood, Your Honor.
 7              Could it just be published to the witness?
 8    Q   (By Ms. Hassan) Mr. Audet, can you see your deposition
 9    testimony transcript from August 10th?
10    A   Yes, I see page 1, yes.
11    Q   Okay.  Maybe go to page 140.
12              THE COURT:  And you'd like him to read that page?
13              MS. HASSAN:  Your Honor, may I offer into evidence
14    page 140, line 19 to 141, page (sic) 8?
15              THE COURT:  I thought you were refreshing recollection
16    at this point.  Yeah, I don't think there's a basis to offer
17    just yet, but you can ask him some more questions.
18    Q   (By Ms. Hassan) Mr. Audet, would you mind reading lines 19,
19    starting on page 140, and going on to page 141.
20              THE COURT:  To yourself.  Read it to yourself.
21              THE WITNESS:  Thank you.
22              I'm up to line 3 of the bottom part.
23    Q   (By Ms. Hassan) Okay.  And have you read through page 141,
24    line 8?
25    A   That's right.  Yes, I've read it, yup.
```

1   Q   So after reading that, Mr. Audet, does it refresh your

2   recollection that the reason you did not mention your

3   investments in GAW Miners' products to this brokerage firm was

4   because they wouldn't have known what to do about these

5   investments?

6   A   That's correct, yes.

7   Q   Thank you.

8           Now, Mr. Audet, you also talked about Paycoin with Mr.

9   Ard?

10  A   Yes, I did.

11  Q   Now, you knew that Paycoin was trading on public exchanges

12  in December --

13  A   Sorry.  You're talking fast again.  Please again.

14  Q   Okay.  I will try -- I will try to be much better about

15  this.

16          You knew in December 2014 that Paycoin was trading on

17  external public exchanges; is that correct?

18  A   Yes.

19  Q   And you bought Paycoin from some of these exchanges

20  yourself; correct?

21  A   That's right.

22  Q   In December of 2014?

23  A   Yes.

24  Q   And you knew that Paycoin was trading for under $20.  Is

25  that fair?

1    A    That's correct.

2    Q    You knew that because you bought Paycoin for less than $20

3    at the public exchanges.

4    A    That's correct.

5            MS. HASSAN:  Your Honor, may I offer into -- actually,

6    it's already been offered into evidence.

7    Q    (By Ms. Hassan) But, Mr. Audet, could you turn to Exhibit

8    597 in the binder?

9    A    Okay, 597, yes.

10   Q    And you will see in the bottom there's page numbering.

11   A    Yes.

12   Q    Could you go to page 8.

13   A    Here it is, yes.

14   Q    So just as a reminder, Mr. Audet, this is -- this is a set

15   of HashTalk posts; right?

16   A    That's right, yes.

17   Q    I'm going to focus on the bottom part of this page.

18   A    Yes.

19   Q    And correct me if I'm wrong, but I believe I need to read

20   from bottom up for the date.

21           MR. WEINSTEIN:  Your Honor, may we publish it to the

22   jury as well?

23           THE COURT:  It's not?  It should be on the jurors'

24   screens as well.

25           MR. ARD:  Your Honor, may I approach the podium?  I

1    left my --

2               THE COURT:  Yes.

3    Q   (By Ms. Hassan) So, Mr. Audet, do you see the highlighted

4    date December 14, 2014?

5    A   Yes, I do.

6    Q   And up there Mr. Jackson has magically highlighted

7    "PandaCoin."  That's your handle?

8    A   Yes, that's my username.

9    Q   Your username?  And a couple lines under the username, it

10   says, "We both got similar deals, I got 27.5 XPY."

11              That's Paycoin; right?

12   A   That's correct, yes.

13   Q   At about $8.82 each.  Do you see that?

14   A   Yes, I do.

15   Q   Is that a comment you posted on HashTalk?

16   A   Yes, I did post this.

17   Q   Then what you say is, "What worked in my favor was the

18   BTC."  Is that Bitcoin?

19   A   That's Bitcoin, yes.

20   Q   "Was dropping faster in price before any price adjustments

21   on CoinSwap."

22              And CoinSwap is one of the public exchanges where

23   Paycoin could be bought and sold?

24   A   Yes.  I used it, yes.

25   Q   So, Mr. Audet, on December 16, you bought Paycoin for

1   $8.82; correct?

2   A   That's correct, yes.

3   Q   That's less than $20.

4   A   Yes, it is.

5   Q   And you knew that when you were buying Paycoin for a little

6   under $9, at least at that time, GAW Miners was not maintaining

7   a floor of $20.  Is that fair?

8   A   That's correct, yes.

9   Q   But you went ahead and you bought the Paycoin; correct?

10  A   Yes, I did.

11  Q   Putting that aside for just a second, we just discussed

12  that there is uncertainty around cryptocurrency; correct?

13  A   That's correct, yes.

14  Q   And there's also some risk involved in start-ups?

15  A   That's correct, yes.

16  Q   Now, you were present here when Professor Narayanan told us

17  that when Bitcoin started, it was, in fact, trading at

18  essentially a fraction of a percent; correct?

19  A   Yes, I remember that, yes.

20  Q   I believe he gave us the anecdote of somebody using 10,000

21  Bitcoins to buy two pizzas.  Do you remember that?

22  A   Yeah, he told that story, yes.

23  Q   Paycoin had just been launched.  This is mid-December;

24  right?  So it had just launched in December 2014?

25  A   Sorry.  Did you say Bitcoin or Paycoin?

1   Q   I apologize.  Paycoin had just launched in December 2014;

2   correct?

3   A   Yes, it did.  That's why -- I think that's right, yes.

4   Q   So $9 for a start-up cryptocurrency wasn't really bad, was

5   it?

6   A   I can't comment on that.

7   Q   Well, compared to the Bitcoin, which was trading at a

8   fraction of a percent when it was launched?

9   A   Yes, I would agree with that, yes.

10  Q   Mr. Jackson, could we switch back to DX 683?  And it's the

11  paper copy of the document of the Plaintiffs' certification

12  that I provided you, Mr. Audet.  Could you go back to that?

13  A   Give me a moment, please.

14  Q   Sure.

15          And if you could turn to page 9.  At the very top, it

16  has the page numbering.

17  A   Hold on.  What page?  Excuse me.  I'm just leafing through

18  it.

19  Q   Sure.  So it's page 9, and the page numbering is right at

20  the top of the document.

21  A   I'm there.  Thank you.

22  Q   And this is the last page of the exhibit that lists all of

23  your transactions in Hashlets and HashStakers; right?

24  A   That's correct.

25  Q   So the very little table at that last page --

1  A    Yes.

2  Q    -- that shows the conversions, the conversions that you

3  were talking about from Hashpoint to Paycoin; correct?

4  A    That's correct, yes.

5  Q    So let's see.  There were conversions on December 18.  On

6  December 18, 2014, your Hashpoints got converted to about 1,288

7  Paycoins; correct?

8  A    That's correct, yes.

9  Q    And then there was another conversion on December 22nd.

10 Some of your leftover Hashpoints, I suppose, got converted to

11 about 95 Paycoins, give or take.

12 A    Yes, that's correct, yes.

13 Q    So in all, by December 22nd, you had about 1,380 or so

14 Paycoins?

15 A    At least that, yes.

16 Q    Yeah.  Mr. Audet, do you recall us going through a chart of

17 Paycoin prices from CoinMarketCap with Professor Narayanan?

18 A    Yes, I remember you went through it, yes.

19       MS. HASSAN:  Mr. Jackson, could we put up DX 719,

20 which I believe is already in evidence?

21       THE COURT:  Okay.

22       MS. HASSAN:  And could we go to page 13 of these

23 prices.

24 Q    (By Ms. Hassan) So, Mr. Audet, just to remind ourselves,

25 this is a list of the prices and the volume of Paycoin

1   transactions on external exchanges.

2   A    That's correct.

3   Q    And are you familiar with the website CoinMarketCap?

4   A    I heard about it when -- during the expert testimony last

5   week.

6   Q    Okay, great.

7          So if we look, um, on page 13 and we go to December

8   22nd -- so December 22, 2014, is the day when you'd gotten all

9   your Hashpoints converted to Paycoin; correct?

10  A    That's right, yes.

11  Q    So if we look at December 22nd, the price of Paycoin ranged

12  from $8.47 to $15.92.  Do you see that?

13  A    Yes, I do.

14  Q    And then Paycoin closed at a price of $8.47.  Do you see

15  that?

16  A    I do, yes.

17  Q    If you were to sell your 1,380 Paycoins, or thereabouts, at

18  these prices you would have gotten approximately 10,000 to

19  $20,000?

20  A    Um, if I had my calculator -- yeah, if you did the sums,

21  yeah, sounds about right.

22  Q    So I did the math.  Selling about 1,380 Paycoins at $8.47,

23  it's a little over 11,500; and I'll represent to you that

24  selling the same amount of Paycoin for $15.92 is a little over

25  $21,000.

1    A    Okay, that sounds fair, yes.

2    Q    So, Mr. Audet, by this time -- this is December 22, 2014;

3    correct?

4    A    Yes.

5    Q    By this time, is it fair to say you had understood that

6    Hashlets hadn't really worked out?  GAW Miners was phasing them

7    out; correct?

8    A    Sorry.  Say again, please?

9    Q    That Hashlets weren't really working out.  GAW Miners was

10   phasing that product out; correct?

11   A    I believe that's what they were doing, yes.

12   Q    Okay.  And it had been almost -- if we look at this chart,

13   the trading starts on December 16th.  That's the first date on

14   this chart.  So it had been about a week of trading of Paycoin

15   on public exchanges; correct?

16   A    Yes.

17   Q    And it was clear that Paycoin was not selling for $20;

18   correct?

19   A    That's correct.

20   Q    And that GAW Miners was not maintaining a floor of $20;

21   correct?

22   A    I don't -- no.  Not on this exchange, no.

23   Q    Okay.  You decided, however, to hold onto your Paycoin;

24   correct?

25   A    That's correct, yes.

1    Q    Rather than sell it.

2    A    That's correct.

3    Q    Okay.

4             MS. HASSAN:  Thank you, Mr. Jackson.  We can take that

5    down.

6    Q    (By Ms. Hassan) Mr. Audet, I want to speak a little bit

7    about Hashlets and how they worked.

8             So when you did your research and you went to GAW

9    Miners' website or to HashTalk and you saw what Hashlets were,

10   was it your understanding that when you were buying a Hashlet,

11   you were buying either a physical machine or part of a machine?

12   A    Um, I understood I was buying a slice of the computing

13   power, which is technically a bit different from part of the

14   machine.

15   Q    Well, may I take you to your deposition transcript?

16   A    Yes.

17   Q    Could you go to page 21.

18            THE COURT:  Does he have his transcript up there?

19            MS. HASSAN:  Oh.  Could we just publish it to Mr.

20   Audet?

21            THE COURT:  Yeah, just Mr. Audet.

22            MS. HASSAN:  And if we could go to page 21.

23   Q    (By Ms. Hassan) And, Mr. Audet, if you could read starting

24   from line 12 on page 21 to line 20.

25   A    That's right, yes, I see it.

1    Q    Have you read it?

2    A    Yes, um-hmm.

3    Q    So, Mr. Audet, in light of your deposition testimony, I'll

4    ask you the question again.  Was it your understanding that

5    when you were buying a Hashlet, you were buying either a

6    stand-alone physical machine or part of a physical machine that

7    was mining for cryptocurrency?

8    A    Yes.

9    Q    Thank you.

10             And you understood that what the companies would be

11   doing, GAW Miners and ZenMiner, is hosting those machines,

12   those miners, and running them and maintaining them; is that

13   correct?

14   A    That's correct, yes.

15   Q    Now, each day you mentioned that your Hashlets earned

16   payouts; correct?

17   A    That's correct.

18   Q    And those payouts were credited to your account?

19   A    Yes, they were.

20   Q    Now, when you bought the Hashlets, the companies charged

21   you an initial up-front cost for buying the Hashlet; correct?

22   A    That's correct, yes.

23   Q    And then they also charged you a maintenance fee for

24   operating the miners; correct?

25   A    They called it a service fee.  It was proportional to the

1  payout.

2  Q   So they charged you a service fee.  And your testimony here

3  today is that it was proportional to your payout?

4  A   I -- like I said, it was six years ago.  I think it was

5  proportional -- you know, yes, I think it was related to -- it

6  was a fixed fee.  I think it was proportional to the payout you

7  got that day.

8  Q   Would you be surprised, Mr. Audet, to learn that three

9  years ago when you testified, you testified that it was a fixed

10 fee?

11 A   No, I wouldn't be surprised, no.

12        MS. HASSAN:  Your Honor, may we enter into evidence

13 the relevant deposition testimony?

14        THE COURT:  You need to show it to me first.

15        MS. HASSAN:  Okay.  So, Your Honor, I would like to

16 enter into evidence it's page 79, starting on line 2 to line

17 20.

18        THE COURT:  Yeah, you can admit that.  We'll call

19 that -- what DX number are we up to here?

20        MS. HASSAN:  I believe it would be 731.

21        THE COURT:  So this will be DX 731.  And this will be

22 page -- can you tell me what page it is again?

23        MS. HASSAN:  79.

24        THE COURT:  79 from Mr. Audet's deposition transcript.

25     (Defendant's Exhibit 731, received in evidence.)

1          MS. HASSAN:  May I read that into evidence?

2          THE COURT:  You may or we can publish to it the jury

3    as well.

4          MS. HASSAN:  Can we publish it?

5    Q   (By Ms. Hassan) Mr. Audet, do you see your deposition

6    testimony on page 79?

7    A   Yes, I do.

8    Q   And you see that you mentioned -- you described the fee as

9    a fixed cost that was based on the cost of electricity and

10   running?

11   A   Yes, I see that, um-hmm.

12   Q   And then in the next paragraph, you testified it was a sort

13   of like a fixed cost.  So the percentage doesn't -- you know,

14   one day if you had a big payout, the fee was relatively small.

15   If you had a small payout, then it was large.

16   A   Yes.

17   Q   So you agree with me, Mr. Audet, that the service fee that

18   GAW Miners charged for running and operating the miners was a

19   fixed fee?

20   A   That's what I believed back then, yes.

21   Q   Now, Mr. Audet, you bought different kinds of Hashlets;

22   right?

23   A   Yes, I did.

24   Q   Some of them were prime Hashlets.  Others were Genesis

25   Hashlets; correct?

1    A    That's correct, yes.

2    Q    And different Hashlets could mine for different types of

3    cryptocurrency; is that correct?

4    A    Yes, it is.

5    Q    So, for instance, Genesis Hashlets mined Bitcoin; correct?

6    A    Yes.

7    Q    Which means that they would be mining in pools that gave

8    payouts in Bitcoin; correct?

9    A    That's correct, yes.

10   Q    Whereas, prime Hashlets, they mined for all coins; correct?

11   A    I think that's what they were doing, yes.

12   Q    And all coins is just another way of saying something

13   alternate to or other than Bitcoin; correct?

14   A    I think that's what they meant, yes.

15   Q    And it could be multiple different types of coins, but

16   they're all grouped into one category, all coins; correct?

17   A    I don't remember the details, but that could be it.

18   Q    Okay.  Now, you could pick the pool -- you, as a customer

19   of GAW Miners and a Hashlet owner, could pick the pool in which

20   you were mining your Hashlets; is that correct?

21   A    That's correct, yes.

22   Q    So if you and I both owned the same kind of Hashlet, let's

23   say you chose to mine it in the Clevermining pool and I decided

24   to mine it in the Waffle mining pool, we could have very

25   different payouts; correct?

1    A    That's correct, yes.

2    Q    You could do really well one day, and I could do really

3    poorly; correct?

4    A    In theory, yes.

5    Q    Now, you could also change your pools with your Hashlets;

6    is that correct?

7    A    That's correct, yes.

8    Q    So the idea was that you could get up in the morning; you

9    could check the payout rates for different pools and just

10   switch the pool that your Hashlet was mining in; correct?

11   A    That's correct, yes.

12   Q    And you, in fact, did that; right?  You would check your

13   payouts daily; is that correct?

14   A    That's right, yes.

15   Q    And you, in fact, kept track of the payouts and you did

16   change --

17   A    Sorry.  Say again.

18   Q    You, in fact, did keep track of the payouts and switched

19   the pools that you were mining in; correct?

20   A    That's correct, yes.

21   Q    So, again, taking the example, if you and I owned the same

22   Hashlet, you check what rates each pool is paying and you keep

23   switching the pools, you could make a lot more in payouts than

24   me if I just stick to one pool regardless of how well or how

25   poorly it is doing; correct?

1    A    Statistically I'm not sure that's correct.

2    Q    Well, theoretically, is it possible that by switching your

3    pools, you could control the amount of payout you were getting?

4    A    I don't think I agree with that.

5    Q    Okay.  Let's try it this way:  By switching the pools, did

6    you have some control over the payouts that you were making?

7    A    Some, yes.

8    Q    Now, another way that you could impact your payouts was by

9    something known as boosting; correct?

10   A    Yes.

11   Q    Okay.  So the idea was that every day you could log onto

12   the GAW Miners' website, click a button, and boost your

13   Hashlet; correct?

14   A    That's right, yes.

15   Q    And it would pay out more than if you don't boost your

16   Hashlet; correct?

17   A    That's correct, yes.

18   Q    Okay.  So, again, taking the same example, if you and I

19   owned the same Hashlet, which is mining in the same pool but

20   you boost your Hashlets every day, you could make more in

21   payouts than I would; correct?

22   A    Probably, yes.

23          THE COURT:  I'm sorry.  I just didn't follow that.  Do

24   you mean if you and he owned the same type of Hashlet or the

25   same Hashlet?

1          MS. HASSAN:  Thank you, Your Honor.  That's a very

2    helpful clarification.  What I meant was we both own the same

3    type of Hashlet.

4          THE COURT:  Okay.

5          MS. HASSAN:  Mr. Audet owns one; I own the other.

6          THE COURT:  Got it.

7    Q   (By Ms. Hassan) Mr. Audet, you also mentioned HashStakers?

8    A   That's correct, yes.

9    Q   And HashStakers, they were something in which you had to

10   stake or put your Paycoin; correct?

11   A   That's correct, yes.

12   Q   And the time duration during which you put your coin in

13   was -- it could be 30 days, 60 days, or 90 days; correct?

14   A   I'm trying to remember that far back.  It was -- I remember

15   90 days for sure.  I don't remember if it was 30 or 60, but it

16   was at least 90.  There was 90 days.

17   Q   Okay.  Was it at least 90, or is that the maximum --

18   A   I think 90 days was the maximum.  Again, I think -- yes, I

19   think three months, 90 days.

20   Q   Okay.  Thank you.  So I just want to touch on one last

21   topic with you, Mr. Audet.

22          During the relevant time period -- so this is fall and

23   winter of 2014 -- you were aware that people were posting on

24   HashTalk that they had concerns and suspicions about GAW

25   Miners' operations; correct?

1    A    Sorry.  Say it again.

2    Q    Were you aware of the fact that there were people who were

3    expressing concern and suspicions about GAW Miners' products

4    and GAW Miners' operations on HashTalk?

5    A    Possibly.  I can't remember all of that.  I can't remember

6    everything like that.

7    Q    Okay.  Well, if I may refresh your recollection, could we

8    just publish Mr. Audet's deposition testimony to him?  And this

9    is page 54.

10            Mr. Audet, if you could just read to yourself lines 11

11   to 17.

12   A    Okay.  I read that, yes.

13   Q    Does that refresh your recollection that in the fall and

14   winter of 2014, there were people who were expressing concern

15   about skepticism about GAW Miners on HashTalk forums?

16   A    Yes, it does.

17   Q    And did those concerns include, for instance, concerns

18   about --

19            MS. HASSAN:  We can take that off.

20   Q    (By Ms. Hassan) Did those concerns include concerns about

21   whether GAW Miners was running a Ponzi scheme?

22   A    I don't remember that.

23   Q    Were there any concerns about whether or not GAW Miners was

24   actually mining for Hashlets?

25   A    I don't remember reading that.

1  Q   Were there concerns about how the $20 floor for Paycoin

2  would work?

3  A   There were questions about it, yes.

4  Q   And you believed -- when you saw these questions, you

5  believed that these were legitimate questions; correct?

6  A   I can't remember exactly.

7  Q   Okay.  If we may publish, just to Mr. Audet, his deposition

8  testimony again to refresh his recollection.  Again, it's page

9  54, and if you could read lines 18 to 21.

10         THE COURT:  Maybe you could let him see what's right

11 above that.

12         MS. HASSAN:  Sure.  Could we actually show lines 11 to

13 25?

14         THE WITNESS:  Yeah, I read that, yes.

15 Q   (By Ms. Hassan) So having read that, does it refresh your

16 recollection that when all these questions were being raised

17 about concerns about GAW Miners, you thought that they were

18 legitimate questions?

19 A   Yes.

20 Q   Mr. Audet, what did you do to investigate those legitimate

21 questions?

22 A   There was nothing -- no, I didn't do anything.

23 Q   Did you raise your own questions, for instance?

24 A   I don't remember if I did.

25 Q   Did you try to get in touch with anyone at GAW Miners to

1    ask them about those things?

2    A    Not about those things, no.

3    Q    Now, various GAW Miners people that answered those

4    questions; correct?

5    A    I think so, yes.

6    Q    And this would all be in the HashTalk forum.  People would

7    raise questions, and somebody from GAW Miners would answer

8    those questions; correct?

9    A    Sometimes, yes.

10   Q    And one of the people who was answering those questions was

11   Josh Garza; is that correct?

12   A    Yes.

13   Q    Now, Mr. Audet, you just gave us some of your background

14   when you were being examined by Mr. Ard.  You are a very smart

15   person.  Is that fair to say?

16   A    Some people think so.

17   Q    Well, let me -- let me point out a few things why I think

18   so.

19          You have a Ph.D. in chemical engineering from Cornell

20   University?

21   A    That's correct.

22   Q    You have ten years of academic experience during which you

23   did mathematical and computational modeling?

24   A    That's correct.

25   Q    Then you had six years of industrial experience working for

1    various employers right here in Connecticut doing engineering

2    software development?

3    A    That's correct.

4    Q    You have your own web interface business?

5    A    Say my what?

6    Q    Web interface business?

7    A    Sorry.  It's web design, not interface.

8    Q    You have your own -- there you go.  You have your own web

9    design business?

10   A    Yes, I do.

11   Q    You have expertise in several computer programming

12   languages?

13   A    That's correct.

14   Q    And you regularly review technology trade magazines;

15   correct?

16   A    Yeah, off and on, yes.

17   Q    I mean it was one of those trade magazines in which you saw

18   the mention of Hashlets and GAW Miners; correct?

19   A    That's correct, yes.

20   Q    Now, you also read the Paycoin white paper; is that

21   correct?

22   A    Yes.

23        MS. HASSAN:  May we please publish PX 125?  And I

24   believe it's already entered into evidence.

25        THE COURT:  All right.

1  Q   (By Ms. Hassan) Mr. Audet, this is the document that we

2  have been referencing, we have been referring to as the white

3  paper.  Is that the document that you reviewed?

4  A   It looks familiar, yes.

5  Q   Okay.  If we could just walk through some of the headings,

6  if we could look at the first page, the table of contents.

7           So this talks about:  What is cryptocurrency?  What is

8  Proof-of-Work?  What is Proof-of-Stake?  And then Section 5 has

9  Technical Specs Coin.

10          If we could flip to Section 5.  I believe it's page 9

11 of the document.  It's not numbered.  Okay.

12          So, again, just walking through Section 5 talks about

13 proof of work time period.  The next page talks about

14 growth-protected reward scheduling.  The next page talks about

15 proof of stake and so on.

16          Mr. Audet, you would agree with me that this is a

17 pretty technical document; correct?

18 A   Yeah, I'll concede that, yes.

19 Q   And you did read this document back in the fall/winter of

20 2014?

21 A   Yes, I looked at it, yes.

22 Q   And when you read it, it made sense to you?

23 A   It seemed to make sense, yes.

24 Q   So, Mr. Audet, I think it's pretty evident that you are a

25 pretty smart person with a lot of technical expertise; is that

1    correct?

2    A    Well, I guess some people think so.

3    Q    Fair.  Now, when all of these concerns and questions about

4    GAW Miners were raised, you thought they were legitimate

5    questions, and the people, including Josh Garza, answered those

6    questions; correct?

7    A    That's correct, yes.

8    Q    And you were satisfied with the answers that Josh Garza and

9    others gave to those questions; correct?

10   A    I think I was, yes.

11   Q    You found Josh Garza -- Josh Garza to be a straight talker;

12   correct?

13   A    A what?

14   Q    A straight talker.

15   A    I never used those words.

16        MS. HASSAN:  So, Your Honor, may I admit into evidence

17   page 55 of Mr. Audet's deposition testimony?

18        THE COURT:  Why don't you bring it up for me and him

19   first.

20        MS. HASSAN:  And it is lines 12 to 18.

21        THE COURT:  Yes.

22        THE WITNESS:  Yup.

23        THE COURT:  Admit that.

24        THE WITNESS:  I see that, yes.

25        THE COURT:  This will be DX?

1              MS. HASSAN:  732.

2              THE COURT:  732.  And this will be page 55 of Mr.

3    Audet's deposition.

4         (Defendant's Exhibit 732, received in evidence.)

5    Q    (By Ms. Hassan) So, Mr. Audet, you see there you were asked

6    about what your impression of Josh Garza was.  Do you see that?

7    A    Yes.

8              THE COURT:  Do you wish to publish this for the jury?

9              MS. HASSAN:  Yes, please.  May we?

10             THE COURT:  Yes.

11   Q    (By Ms. Hassan) So you were asked what your impression was

12   of Mr. Garza.  Do you see that?

13   A    Yes, I do.

14   Q    And your response was, "He seemed okay.  He seemed to be a

15   straight talker."  And then you continue and say, "He seemed

16   like a visionary"?

17   A    That's right, I did say that.

18   Q    So looking back now, Mr. Audet, would you agree that you,

19   like many other people, were fooled by Mr. Garza?

20   A    I would agree with that, yes.

21             MS. HASSAN:  Your Honor, may I have just 15 seconds?

22             THE COURT:  Yes, you may.

23             MS. HASSAN:  Thank you, Mr. Audet.  I have no other

24   questions.

25             THE COURT:  Is there redirect?

1           MR. ARD:  Thank you, Your Honor.

2                     REDIRECT EXAMINATION

3    BY MR. ARD:

4    Q   Mr. Audet, have you ever heard the phrase "put your money

5    where your mouth is"?

6    A   Excuse me.  Excuse me.  Yes, I have.

7    Q   You heard a lot of questions about the price of Paycoin

8    dropping below $20 in December 2014.  Do you recall that?

9    A   Yes, I do.

10   Q   After December 12, 2014, did you continue to put money into

11   Paycoin?

12   A   Yes, I did.

13   Q   Did you continue buying Paycoin?

14   A   Yes, I did.

15   Q   In the second half of December 2014?

16   A   Yes.

17   Q   How much money did you spend on Paycoin, approximately, in

18   the second half of December 2014?

19   A   It was about $4,500.

20   Q   Did you continue to believe in Paycoin at the time?

21   A   Yes, I did.

22   Q   But the price of Paycoin was less than $20 during that

23   time; is that right?

24   A   That's correct, yes.

25   Q   And why did you continue to buy Paycoin in -- at that time?

1    A    Sorry.  Say it again, please.

2    Q    And why did you continue to buy Paycoin at the time you

3    knew it was below $20?

4    A    Because in December, that was before the initial coin

5    offering; and, therefore, the price was not supported yet.  It

6    was going to be supported when this thing called Paybase was

7    going to be launched, and that was in January.  And, therefore,

8    everything I bought in December would have been at a discounted

9    price compared to the $20 floor that they were going to provide

10   in whenever they had the initial coin offering or Paybase.

11   Q    Did you purchase your Paycoin in the second half of two

12   thousand -- strike that.

13            Did you purchase Paycoin in the second half of

14   December 2014 from third-party exchanges?

15   A    Yes, I did.

16   Q    Can you turn back to DX 683, which is your certifications?

17   A    Yes, I see it.

18   Q    You don't list there the Paycoin purchases you made in the

19   second half of 2014; correct?

20   A    That's correct, yes.

21   Q    Why is that?

22   A    Because they were not part of the original lawsuit.

23   Q    And why is that, because of third-party exchange?

24   A    I believe that was it, yes.

25   Q    So you weren't listing anything that was bought from a

1    third-party exchange; is that right?

2    A    Sorry.  Say it again.

3    Q    You weren't listing anything in your certification that was

4    bought from a third-party exchange?

5    A    That's correct, yes.

6    Q    Did you ever sell any of your Paycoins?

7    A    No, I didn't.

8    Q    And what are they worth today?

9    A    They're worth approximately $26.

10   Q    You were shown testimony saying that it seemed to you that

11   Stuart Fraser was a straight talker in 2014; is that right?

12   A    Sorry.

13        THE COURT:  Did you say Stuart Fraser?  Did you say --

14        MR. ARD:  I misspoke.

15   Q    (By Mr. Ard) You were just asked whether you said that in

16   2014 it seemed like Josh Garza was a straight talker.

17   A    That's right, yes.

18   Q    At the time in 2014, did you know that Josh Garza was

19   stealing money from Stuart Fraser?

20   A    No, I didn't.

21   Q    Did you know, at the time, that Josh Garza was publicly

22   lying about ZenMiner in the press?

23   A    No, I didn't.

24        MR. ARD:  Thank you, Your Honor.  No further

25   questions.

```
 1              THE COURT:  Sir, you may step down.  Thank you very
 2    much.
 3        (Witness excused.)
 4              THE COURT:  All right.  Mr. Rennie?
 5              MR. RENNIE:  Next Plaintiffs will call Dean Allen
 6    Shinners.
 7              THE COURT:  Okay.
 8              MR. RENNIE:  I'm going to grab the binder for the
 9    Court.
10              THE COURT:  Sir, you may come up.
11              MR. RENNIE:  May I approach, Your Honor?
12              THE COURT:  You may.
13              Thank you.
14              Good afternoon, sir.  Before you take a seat, if you
15    wouldn't mind standing and raising your right hand.
16
17               D E A N   A L L E N   S H I N N E R S,
18            having been duly sworn by the Clerk, testified
19                        under oath as follows:
20
21              THE CLERK:  Please be seated.  State your name, city,
22    and state you work.  Spell your last name.
23              THE WITNESS:  Yes.  It's Dean Allen Shinners.  I live
24    in Lancaster, Ohio.
25              THE COURT:  And just spell your last name for us.
```

```
 1              THE WITNESS:  S-h-i-n-n-e-r-s.

 2              THE COURT:  Mr. Rennie, whenever you're ready.

 3              MR. RENNIE:  Thank you.  Mr. Shinners.

 4                        DIRECT EXAMINATION

 5  BY MR. RENNIE:

 6  Q    Mr. Shinners, can you -- can you hear me all right?

 7  A    I can hear you fine.  Yes.

 8  Q    In what capacity are you testifying today, Mr. Shinners?

 9  A    I'm sorry.  You're going to have to speak up.  I did not

10  hear that.

11  Q    My apologies.  In what capacity are you testifying today,

12  Mr. Shinners?

13  A    I am a class representative.  I represent, uh, all the

14  people who prospectively have claims in this case.

15  Q    How old are you, Mr. Shinners?

16  A    I will be 60 years old on November 9th.

17  Q    And where do you live?

18  A    I live in Lancaster, Ohio, which is just outside of

19  Columbus.

20  Q    How long have you lived in Lancaster?

21  A    Since 1999.

22  Q    What do you do for a living, Mr. Shinners?

23  A    I own a telecommunications auditing firm.

24  Q    Can you please tell the jury what's telecom auditing?

25  A    Telecom auditing is I go into large corporations, and I go
```

1    through all of their -- their telecom assets, their invoicing,

2    their contracts.  And then I identify where, um, savings can be

3    generated, where they can save money.

4    Q    Did you do anything before you were a telecom auditor?

5    A    Yes.  After I graduated high school, I took a quick trip

6    back to Europe to visit my family.  And then when I came back,

7    I entered the U.S. Air Force.

8    Q    What did you do in the Air Force?

9    A    I was what they called a cryptologic voice processing

10   specialist, otherly known as a Russian translator.

11   Q    What did that job entail?

12   A    The -- unclassified version of that is I intercepted

13   Russian telecommunications or communications, and I translated

14   them.

15   Q    How long were you in the Air Force?

16   A    I was in the Air Force for about six and a half years.

17   Q    What did you do after you left the Air Force?

18   A    I came back to the United States, um, and enrolled at Ohio

19   State University.

20   Q    Did you earn a degree from Ohio State?

21   A    Yes.  I have a Bachelor of Science in business

22   administration and international business and finance.

23   Q    And what did you do after you graduated from Ohio State?

24   A    I returned to Europe, and I worked on several projects as a

25   business consultant.

1    Q    Now, how long have you been working in telecom auditing?

2    A    In auditing since 1995.

3    Q    And apart from your bachelor's degree, do you have any

4    other degrees, Mr. Shinners?

5    A    I have a master's in business administration from the

6    University of Maryland.

7    Q    When did you first hear about cryptocurrency, Mr.

8    Shinners?

9    A    Uh, the first time I heard about cryptocurrency was in

10   late, uh, 2012, around Christmas.

11   Q    And how'd you hear about it?

12   A    I was on eBay.  I was looking for a battery for my laptop

13   and a graphics card, and I ran across a listing for what -- it

14   was being called a GPU miner or a GPU mining rig.

15   Q    Is that a type of mining equipment?

16   A    It's a -- yes.  It's mining equipment that is constructed

17   out of graphics cards.

18   Q    Did you buy that mining rig you saw on eBay?

19   A    After a few weeks I did, yes.

20   Q    And what did you do with it after that?

21   A    It took a while for it to be built.  And then when it

22   showed up in early 2013, I started mining with it in the

23   house.

24   Q    When did you first hear about GAW Miners?

25   A    Uh, probably toward the end of spring, maybe summer, um, in

1    2001, yeah.

2    Q    Where did you hear about it?

3    A    Uh, a number of cryptocurrency websites had banner ads from

4    GAW Miners selling hardware.

5    Q    At some point did you hear about a product called

6    Hashlets?

7    A    Uh, yes.  I -- eventually I'd seen banner ads for Hashlets,

8    yes.

9    Q    And what was a Hashlet?

10   A    A Hashlet was described to be cloud mining products.

11   Q    And did you buy any Hashlets?

12   A    I did.

13   Q    When did you first buy them?

14   A    August 17th of 2014.

15   Q    And what was it about Hashlets that appealed to you?

16   A    Well, the way they were advertised was that they would be

17   continually upgraded over time; the maintenance fees would fall

18   and that they would always be profitable.

19   Q    How did that set Hashlets apart from other cloud mining

20   products?

21   A    I'm sorry.  Can you repeat the question?

22   Q    Yes.  How did those features set Hashlets apart from other

23   cloud mining products?

24   A    Right.  I had looked into something similar with another

25   company.  The differences were the other company -- it was a

```
1   cloud mining contract that was set for a specific period of
2   time.  Um, but unfortunately, it has clauses in the contract
3   that stipulated if it ever became unprofitable to continue,
4   they would just terminate the contract with no refunds, no
5   recoveries.
6   Q    Did you receive payouts from your Hashlets?
7   A    I did.
8   Q    And what form did those take?
9   A    Bitcoin.
10  Q    And where did you believe these Bitcoin payouts were coming
11  from?
12  A    I understood them to be coming from mining farm, GAW's
13  mining farm.
14  Q    What led you to think GAW was doing mining in a mining
15  farm?
16  A    Well, they were advertised that way on their website,
17  stated that they had a robust mining farm and that these were
18  mining, so ...
19  Q    Now, around the time that you bought Hashlets, did you see
20  any accusations online that GAW Miners was a scam?
21  A    Uh, yes, I did.
22  Q    And did you lend any weight to these accusations?
23  A    I did not.
24  Q    Why not?
25  A    Well, the places I saw these types of accusations, these
```

1    were all being made by anonymous individuals.  And there was

2    never -- at least I had never seen any proof that had been

3    shown in any of these posts, nor any links to the proof that

4    would justify believing them.

5    Q    And at the time, were your Hashlets performing as promised?

6    A    Yes.

7    Q    How did you monitor their performance?  How did you monitor

8    their performance?

9    A    Uh, I had to sign in to my ZenCloud account; and, of

10   course, it would show the daily payouts and cumulative

11   payouts.

12   Q    Was there any way to confirm, through your ZenCloud

13   account, that the Bitcoin payouts were or were not coming from

14   actual cryptocurrency mining?

15   A    There was no way to do that through a ZenCloud account.

16   Q    At some point did your Hashlets stop paying out in Bitcoin?

17   A    Yes.  Yes, they did.

18   Q    When was that?

19   A    It was when I had to switch them over to Hashpoint

20   mining.

21   Q    And do you remember around what time that was?

22   A    I want to say it was in November.

23   Q    November of what year?

24   A    Oh, 2014.  Sorry.

25   Q    And why did you switch to mining Hashpoints?

1  A    It was part of an ICO or the initial coin offering for

2  Paycoin.  So subsequently at some point in the future they

3  would convert to Paycoin, to Hashpoints.

4  Q    And when you switched over to mining Hashpoints with your

5  Hashlets, were you still receiving Bitcoin rewards?

6  A    No, I was not.

7  Q    You mentioned Paycoin.  When was the first time that you

8  heard about Paycoin?

9  A    I had heard about Paycoin, I believe, in the latter part of

10  October, early November when it was called HashCoin.

11  Q    Did you acquire any Paycoin?

12  A    Yes, I did.

13  Q    And when was that?

14  A    In December.  There were two dates when the Hashpoints

15  converted to Paycoin.

16  Q    And what was it that you found appealing about Paycoin?

17  A    Uh, Paycoin was advertised as having -- or coming with, you

18  know, large retailer adoption, um, that it was backed by a $100

19  million reserve fund.  Um, and that's mainly it.

20  Q    And what about those features made Paycoin special?

21  A    Uh, it made it unique actually from the viewpoint that, at

22  the time, I was not aware of any cryptocurrencies that were

23  backed by anything, let alone a reserve fund.  And at the time,

24  again, there were no cryptocurrencies that were directly

25  accepted by any retailers out there as payment without some

1    in-between interface.

2    Q   At the time why did you believe that GAW Miners managed to

3    raise $100 million?

4    A   Mr. Garza had posted quite a number of times that this

5    would be the case.  There were some graphics that were created.

6    But also, it was stated in a *Wall Street Journal* article, you

7    know, where Mr. Garza and Mr. Fraser were both interviewed and

8    there was a $100 million reserve fund.

9    Q   And how did that *Wall Street Journal* article affect how you

10   viewed GAW's claims about the $100 million fund?

11   A   It definitely increased the credibility of what was being

12   said on HashTalk.  And, um, I mean, when you see what I thought

13   was a major Wall Street firm being named in an article like

14   that, I mean, it just advanced the credibility

15   astronomically.

16           MR. RENNIE:  I'd like to show the witness Plaintiffs'

17   Exhibit 160.  I don't believe it's in evidence yet.

18           THE COURT:  Okay.

19           THE WITNESS:  Okay.  Go ahead.

20           MR. RENNIE:  May we publish it to the witness?  Any

21   objections?

22           THE COURT:  He's got it on his screen.

23           THE WITNESS:  I have it on my screen.

24           MR. RENNIE:  I apologize, Your Honor.

25           THE COURT:  You wanted to offer it?

1              MR. RENNIE:  I wanted to offer it.

2              THE COURT:  160 will be a full exhibit.  PX 160 will

3    be full.  It can be published to the jury.

4        (Plaintiffs' Exhibit 160, received in evidence.)

5    Q   (By Mr. Rennie) Mr. Shinners, I'm now showing you a GAW

6    Miners' webpage for HashCoin, HashCoin ICO.  And this is dated

7    November 4, 2014.  Do you recognize this document?

8    A   Yes, I do.

9    Q   Do you recall seeing this webpage in November 2014?

10   A   I recall seeing it in November 2014, yes.

11             MR. RENNIE:  Mr. Boles, could you scroll down to the

12   diagram towards the end of the document?  Yes, that one.  Could

13   you please blow up that?  Thank you.  Way ahead of me.

14   Q   (By Mr. Rennie) Do you recall seeing this particular

15   diagram in November 2014, Mr. Shinners?

16   A   Yes, it's very familiar.

17   Q   And does this document depict Hashpoints converting to

18   Paycoin?

19   A   Uh, yes.  On the top row, second from the left, there's --

20   it says "ICO Round 2."  "Hashpoint customers."  And then below

21   it says "400 Hashpoints."

22   Q   So did you expect that when your Hashpoints converted to

23   Paycoin, that you would have the option of selling them?

24   A   Yes.

25   Q   And based on this document we're looking at, did you expect

1    that you'd be able to earn a profit if you sold them?

2    A    Yes, absolutely.

3    Q    And do you see that somewhere in this diagram?

4    A    Yes.  The public launch was for $20.  And the -- we were

5    told that 400 Hashpoints was actually $4.  So the difference

6    between 20 and 4, 16.

7    Q    Does the timeline suggest that the price of Paycoin could

8    go above $20?

9    A    Yes, it does.  It says, on the bottom row, all the way to

10   the right where it says 8 to 12 months, it says, "increased

11   market value."

12   Q    So following major retailer adoption and credit card

13   purchasing capabilities, there would be increased market value.

14   A    Correct.

15         MR. RENNIE:  Thank you, Mr. Boles.  You can take that

16   down.

17   Q    (By Mr. Rennie) Did GAW release a product called

18   HashStakers?

19   A    Yes.

20   Q    What was a HashStaker?

21   A    The best way I can describe it, a HashStaker is similar to

22   what you would see from a bank, like a certificate of deposits,

23   where you are depositing, in this case, Paycoin.  And then it's

24   locked up for a period of time.  And for that, you get paid an

25   inherent rate of return or interest.

1   Q    What would that return or interest be paid out in?

2   A    I'm sorry.  Say that again.

3   Q    What would you be paid out interest in?

4   A    Oh, in Paycoin, either fractional amounts, depending on how

5   much is deposited, or whole amounts, a big one.

6   Q    Did you buy any HashStakers, Mr. Shinners?

7   A    Yes, I did.

8   Q    And when did you buy them?

9   A    In December of 2014.

10  Q    So, Mr. Shinners, did there ever come a time when you

11  interacted directly with anyone at GAW Miners?

12  A    Yes.  I had interacted with several of the employees and

13  Mr. Garza, yes, for the -- for the white paper.

14  Q    My apologies.  When did those interactions begin?

15  A    October and November mostly.

16  Q    And why did those interactions come about?

17  A    Um, I had been asked to work on or help work on the white

18  paper -- or which at the time was labeled for HashCoin.  That's

19  pretty much it.

20  Q    And by the white paper, are you referring to a similar type

21  of white paper that you've heard testimony about?

22  A    Yes, exactly.

23  Q    But you mentioned a HashCoin white paper.

24       Were there multiple versions of the white paper that

25  came out?

1    A    Yes, there were.  There was HashCoin, and then eventually

2    there was a Paycoin white paper.

3    Q    And so what was your understanding of why they reached out

4    to you to help out with this white paper?

5    A    I had been very -- very vocal in the community, in the

6    HashTalk community.  Um, and one of the things that I had

7    noticed was there were an enormous number of questions that

8    were often asked when any of these types of documents had been

9    released.  And it was a major problem.  And I had vocalized

10   that both on HashTalk and to GAW Miners.

11   Q    Now, you mentioned the HashTalk community.  Was that a

12   community of people who purchased GAW products and used

13   HashTalk?

14   A    Yes, there was.

15   Q    And did you have any kind of positioning within the

16   HashTalk community?

17   A    Um, there was -- Mr. Garza had put forward a large list of

18   names.  He wanted the HashTalk community to basically select or

19   vote for representatives that would represent the community to

20   GAW.  Um, and I was on the -- well, I was on the list all the

21   way until there was just a few of us left, a few names on the

22   end list.  And I was the one -- one of 12 or 11 others who were

23   voted by the community to be leaders of the community.

24   Q    Now, turning back to the white paper, did you work on the

25   white paper with anyone at GAW or elsewhere?

1    A    Uh, yes.  There were -- it was a small group.  There were

2    two employees from GAW Miners, and then there were three of us

3    from the HashTalk community.

4    Q    Were you ever paid for your work on the white paper?

5    A    No, I was not.

6    Q    Now, did there come a time when you discussed a paid job at

7    GAW Miners?

8    A    Yes.

9    Q    How did those discussions come about?

10   A    Um, Mr. Garza had posted in HashTalk a list of positions

11   that they were trying to fill at the company.  And one of these

12   positions was CFO, or chief financial officer, which peaked my

13   interest.  So I reached out to him on private messaging on

14   HashTalk, told him I was interested in the position.  He said,

15   "Send me a resume," and so I did.

16   Q    What happened after that?

17   A    Uh, well, it took a while to get any response.  But then

18   the COO of the company, Dan Kelley, had reached out to me on

19   the phone when he was driving one day.  And he went over the

20   resume a little bit.  He then proposed a position,

21   communications and public relations.  After that, you know, we

22   had gone back and forth, Josh Garza or Mr. Garza and I.  And

23   then he said, "Send me a job description."  And so I did.  And

24   then it just didn't amount to anything.

25            THE COURT:  I'm sorry, sir.  Did you say that he

1    proposed a position in communications and public relations or

2    that you did?

3            THE WITNESS:  He did.  Mr. Kelley did.

4            THE COURT:  Mr. Kelley did.  Thank you.

5            THE WITNESS:  I'm sorry.  Go ahead.

6    Q   (By Mr. Rennie) So nothing ever came of these discussions?

7    A   Nothing ever came of it, correct.

8    Q   And you didn't end up getting a job at GAW Miners?

9    A   I'm sorry?

10   Q   You did not end up getting a job at GAW Miners?

11   A   No, no.

12   Q   Did you ever discuss with Mr. Garza the $100 million

13   reserve fund that was going to be used to support the floor?

14   A   Uh, yes, I had.

15           THE COURT:  Mr. Rennie, I'm sorry.  I'm going to

16   interrupt you.  We're going to take our lunch break now.

17           Ladies and Gentlemen, time for lunch.  Don't discuss

18   the case.  Don't let anyone discuss it with you.  Keep an open

19   mind.  Go to the jury room now.  We'll have you back in here at

20   1:30.  Thank you very much.

21       (The jury left the courtroom at 12:45 p.m.)

22           THE COURT:  The witness may step down.  You can be

23   seated.

24           Is there anything to discuss before we go for lunch?

25           MR. BUCHDAHL:  Your Honor, we've been going back and

 1   forth on our team about whether the intention was to have the

 2   charge conference after court on Wednesday or Thursday.

 3          THE COURT:  I think it was Thursday, but it sounds

 4   like you're suggesting you might want to move it up?

 5          MR. BUCHDAHL:  Thursday would probably work.  But I

 6   think if we could do it Wednesday, it might be to everyone's

 7   advantage.

 8          THE COURT:  Well, I'll do what I can.

 9          MR. BUCHDAHL:  Thursday will be soon enough.

10          THE COURT:  Mr. Rennie, you're not even halfway done

11   with his direct?

12          MR. RENNIE:  No.  I've only got about 15 more minutes.

13          THE COURT:  Then somebody's going to do the cross.  I

14   think it will be a fairly substantial cross.  Is that fair to

15   say?

16          MR. WEINER:  That's fair to say.

17          THE COURT:  Probably till the end of the afternoon?

18   Yes, that's what I thought.  Okay.  And then we have one more

19   witness tomorrow for the Plaintiffs; is that right?

20          MR. BUCHDAHL:  Correct.  That will be about a

21   15-minute direct examination.

22          THE COURT:  And I would think the cross would be short

23   as well, hopefully.  We'll see this afternoon.  Okay.  And then

24   the Plaintiffs will rest at that point.

25          And the Defense will rest as well; is that right?  Oh,

 1    no.

 2              MR. WEINSTEIN:  No, Your Honor.  The Defense --

 3              THE COURT:  Oh, your video evidence.

 4              MR. WEINSTEIN:  Yes, Your Honor.

 5              THE COURT:  And that's fairly -- in other words,

 6    that's going to be a fairly long time; right?

 7              MR. WEINSTEIN:  I'd say it's --

 8              THE COURT:  Probably takes us through Wednesday

 9    anyways.

10              MR. WEINSTEIN:  It's probably three hours.  I'm trying

11    to estimate.  I know we have six tapes.  Four of them combined

12    are about an hour and 20 minutes.  The other two I'm not

13    totally sure.  Two hours?  We're trying to cut a little bit,

14    but I think it would be about three hours.

15              THE COURT:  So we may conclude the evidence on

16    Wednesday, meaning tomorrow.

17              MR. WEINSTEIN:  Sounds like it's possible.

18              THE COURT:  And it's fine if we don't.  If we go into

19    Thursday, we've got time.  Let me check.  Let me think about it

20    over lunch, and I'll give you a sense of if we're getting

21    there.

22              The question is whether I can send it to you tonight.

23    I'm not sure I can, but we may be able to.  If we can, then we

24    could do the charge conference at the end of the day tomorrow.

25    And we could -- you know, if everything went well, we could

1    close on Thursday.

2           There is a little bit of an issue with tomorrow

3    because of the weather.  I don't know, for example, if there

4    will be power outages where these folks live.  So I need to

5    talk to them about that at the end of the day and make sure

6    they know how to contact the court and that kind of thing.

7    That's a potential fly in the ointment.

8           But all right.  I think that's all I have for now.

9    We'll be in recess.

10       (Recess from 12:48 p.m. to 1:26 p.m.)

11       THE COURT:  So we will send you the -- a draft of the

12   charge and the verdict form tonight.  It might not be until a

13   little bit later tonight, but we will send it to you and we

14   will plan to have the charge conference tomorrow at 3:45.  You

15   know, I'm going to cut it off at 6:00, hopefully before.

16          But -- and what you'll see is I think I've been

17   through your proposals pretty thoroughly.  There's a couple of

18   questions I still have, one or two of which might get answered

19   this afternoon.  But we can certainly -- we're going to go

20   through every page, so you're going to have your opportunity to

21   speak.

22          In light of how late, don't feel compelled to send us

23   a redline.  If you want to send us a redline, you can, but do

24   language only.  You've already preserved what you want.  You've

25   requested.  In some cases I've given them; in some cases I

1    haven't.  In some cases I've given something different than

2    what the parties requested.  You're already preserved.

3           If you wasn't to make language requests, that's fine.

4    But you'll have to do it before midnight; otherwise, I won't

5    see it.  Or if you want to do it before eight in the morning

6    and I'll try to spend a half hour or at lunch tomorrow looking

7    at your proposal.  So that's how we'll proceed.  Yes, we're

8    ready.

9       (The jury entered the courtroom at 1:29 p.m.)

10          THE COURT:  Mr. Rennie, give me one moment, please.

11          All right, folks, a couple of announcements before we

12   start.  First, I know Ms. Johnson asked you to take everything

13   with you because we're not going to have use of that room this

14   afternoon.  You can leave straight from the courtroom.

15          Second, timewise we're making good progress.  So I

16   won't give you the details, but we're a little bit ahead of

17   schedule.  So that's good.

18          And then lastly, with regard to the weather, so I've

19   been checking weather updates.  It looks like the worst of it

20   is actually going to be this afternoon and this evening.  It

21   looks like by early tomorrow there's just going to be wind.

22   The Courant is reporting now there have been about 2500 power

23   outages in the northern half of the state and about 3500 in the

24   southern half of the state.  Of course, that could get worse.

25          You have Ms. Johnson's cell phone number.  So if

1    tomorrow morning there's a problem, make sure to call her.

2    We're going to proceed as normal.  Never been here a day this

3    building's lost power, so I presume we'll be able to proceed.

4    But call her if there's any problem.  But we'll proceed at the

5    regular time.

6            Mr. Rennie, go ahead.

7    Q   (By Mr. Rennie) Good afternoon again, Mr. Shinners.

8    A   Good afternoon.

9    Q   I was asking you a few questions about Mr. Garza and your

10   communications with him.  Did you ever discuss with Mr. Garza

11   the $100 million reserve fund that was going to be used to

12   support the price of Paycoin?

13   A   Yes, multiple times.

14   Q   When did those conversations happen?

15   A   Uh, November and December of 2014.

16           MR. RENNIE:  Your Honor, Plaintiffs offer Defense

17   Exhibit 617.

18           THE COURT:  Okay.  Give me one sec, please.

19           Yes, that will come in as a full exhibit, DX 617.

20       (Defendant's Exhibit 617, received in evidence.)

21   Q   (By Mr. Rennie) Mr. Shinners, do you recognize this

22   e-mail?

23   A   Uh, yes, I do.  It's an e-mail between Mr. Garza and myself

24   dated the 19th of December 2014.

25   Q   If you just look at that last page of this document, page

1    3.   Is this the original e-mail from Mr. Garza to you in this

2    thread?

3    A    Yes, it is.

4    Q    I'm going read the first paragraph.

5              "Was up early reading through comments and a thought

6    hit me.   I think these guys believe we will pay them on a

7    minimum amount of $20 for a XPY forever.   Obviously there is no

8    way we can pay $20 for something if the market was paying $1

9    for it forever."

10             Did I read that right?

11   A    Uh, yes.

12   Q    Now, Mr. Shinners, what is XPY?

13   A    XPY is like a Tickerson symbol for Paycoin.

14   Q    Now, do you read this e-mail and think that there was no

15   $20 floor?

16   A    No, I did not.

17   Q    Why not?

18   A    Well, there's the $100 million fund that's supposed to be

19   backing this.   So, I mean, it didn't really give me any

20   concern.

21   Q    And how did you respond to Mr. Garza's e-mail?

22   A    How did I what now?

23   Q    How did you respond to Mr. Garza's e-mail?

24   A    Yeah, I mean, my whole response, it's two pages long.   And

25   it focuses on how you would use a $100 million fund to bolster

1    the minimum four -- floor price, rather, of $20 in the

2    markets.

3    Q   And why did you offer Mr. Garza advice about GAW Miners'

4    business?

5    A   Well, I was invested in the products, so I wanted the

6    company -- obviously, I wanted the company to succeed.  Um, I

7    mean we all -- we don't invest money without that hope.

8           But also, I have -- in my background with my

9    education, the focus was national small business development.

10   So it was a small business.  It just started.  It was less than

11   a year ago.  It was an interest.

12   Q   Thank you.

13          MR. RENNIE:  Mr. Boles, you can take that down?

14          Plaintiffs now offer Defense Exhibit 626.

15          THE COURT:  Okay.  That will be a full exhibit, DX

16   626.

17      (Defendant's Exhibit 626, received in evidence.)

18   Q   (By Mr. Rennie) Mr. Shinners, can you please identify this

19   document for us?

20   A   This is an e-mail between myself and Mr. Garza, and it's

21   dated December 29th, 2014.

22   Q   Now, Mr. Garza writes, in his first e-mail, I can move just

23   about all the Paycoin out there for less than half the Bitcoin

24   we have in reserve.  Should work out just fine, smiley face.

25          Do you see that?

1   A    Yes, I do.

2   Q    And what did you understand Mr. Garza to mean by that?

3   A    To me it meant that he was going to run the test run with,

4   you know, Bitcoin from GAW Miners' own reserves.

5   Q    You mentioned a test run.  There was -- was there going to

6   be some type of test run to support the floor?

7   A    Yes, he had mentioned eventually they would be doing a test

8   run.

9   Q    Now, Mr. Shinners, you responded to Mr. Garza's e-mail,

10  "And remember:  Ignorance is bliss.  I will be very blissful to

11  take advantage of other people's ignorance, in this case."

12          Now, what ignorance were you talking about?

13  A    The ignorance is bliss parts had to do with this particular

14  statement that he made.  If he had -- if he had posted this in

15  public, it could have precipitated a huge avalanche of

16  questions and concerns and potential even accusations that were

17  unwarranted.

18  Q    And so why was that an issue for you particularly, Mr.

19  Shinners?

20  A    I'm sorry.  Repeat the question.

21  Q    Why would that have been an issue for you in particular,

22  Mr. Shinners?

23  A    Well, I'd been voted one of the leaders of the community.

24  So I was one of 12 people who basically it was our

25  responsibility to act as in-between between the community and

1   GAW Miners.  And this would have fallen pretty much on our

2   shoulders.  And I really did not want to deal with that.

3   Q   So was the fact that you're -- withdrawn.

4         Why didn't you think it was important for the

5   community to know this fact?

6   A   Well, it would have caused a lot of concern, and I think

7   that there would have been a knee-jerk reaction, there's no

8   doubt, in the HashTalk community.  And it would have fallen

9   partially on my shoulders to help kind of answer people's

10  questions and try to get clarity from GAW.

11  Q   And why would -- why are you not concerned by Mr. Garza's

12  e-mail?

13  A   I'm not concerned by it because, uh, I understood that

14  there was over -- or a hundred million dollars in reserve fund

15  that was supposed to back the coin.  So that -- this statement

16  just means to me that they're using Bitcoin from their own

17  reserves.

18  Q   To support the floor or for another purpose?

19  A   I'm sorry?  For the floor?  Uh, yes.

20  Q   As part of a test run or not?

21  A   As part of the test run.

22  Q   Thank you.

23        Did you buy or sell any GAW products after learning

24  this information?

25  A   Uh, no, I did not.

1    Q    Did you gain any kind of commercial advantage after

2    learning this information?

3    A    There was not much to be taken from this, no.

4    Q    So what kind of advantage were you gaining?

5    A    I would have had no advantage from this.

6    Q    Mr. Shinners, how often did you communicate with Josh Garza

7    in December 2014?

8    A    Uh, often.

9    Q    And how often did you discuss Paycoin with Mr. Garza?

10   A    Uh, often.

11   Q    Did you discuss the $100 million reserve fund?

12   A    Yes.

13   Q    Did Mr. Garza ever tell you there was no $100 million

14   reserve fund?

15   A    No.

16   Q    And did there come a time when you finally learned that

17   there was, in fact, no reserve fund?

18   A    Yes.  In 2015, probably the beginning of summer.

19   Q    At some point did you begin to lose faith in what GAW

20   Miners was telling you?

21   A    Could you repeat the question, please?

22   Q    At some point did you begin to lose faith in what GAW

23   Miners was telling you?

24   A    Yes, I did.

25   Q    When did that happen?

1   A    Uh, after the new year in 2015, when Paybase was supposed

2   to be deployed.

3   Q    And what was it about the deployment of Paybase that caused

4   you to stop trust them?

5   A    It was -- it was promised that over the holidays they would

6   take the time to finish Paybase.  And then after the first of

7   the year, they would deploy it.  So when they deployed it,

8   there was no merchant adoption.  There was no exchange at all.

9   And, yeah, it was -- fundamentally it was just an online wallet

10  basically.

11  Q    And were those features something you had been expecting?

12  A    Those features we all were expecting, yes.

13  Q    Would you have been interested in Paycoin at all without

14  those features?

15  A    Without these features being deployed with Paybase, no.

16  Q    Now, in the fall of 2014, did you know who the Defendant

17  was?

18  A    Uh, yes, I did.

19  Q    What was your understanding of his role and relationship

20  with GAW Miners?

21  A    Uh, I knew from Josh's posts, uh, that he was a partner in

22  the firm; um, that they had a long relationship, long-running

23  relationship that went back in history.  And then because of

24  The Wall Street Journal article, I kind of got the impression

25  that there was a lot more to it than just a casual

1    relationship, business relationship.

2    Q    Now, you just testified that he was a partner in the firm.

3    What firm or enterprise are you talking about?

4    A    That he was a partner in GAW Miners.

5    Q    And you mentioned *The Wall Street Journal* article.  What

6    about that was important to your understanding of Mr. Fraser's

7    role?

8    A    Well, it solidified, you know, the information Mr. Garza

9    had been giving everybody up until this point, that he was

10   involved with GAW Miners.  And then when *The Wall Street*

11   *Journal* article came out, um, it stated they're -- you know,

12   Stuart Fraser, vice chairman of Cantor Fitzgerald, and then

13   Garza's name as well and that the -- you know, it was a firm or

14   the company he was supporting and in addition to Paycoin

15   references and the $100 million fund.

16          MR. RENNIE:  I'd like to show the witness and the jury

17   PX 82, which has previously been admitted, I believe.

18          THE COURT:  Okay.

19   Q    (By Mr. Rennie) Mr. Shinners, is this *The Wall Street*

20   *Journal* article that you're referring to?

21   A    Uh, yes, it is.

22   Q    When did you first read this article?

23   A    Uh, I believe it came out on the 25th.  It came out

24   November 25, 2014.

25   Q    Did you read it when it came out?

```
 1   A    Uh, yes.  Mr. Garza had pre-announced that this would be

 2   coming out.

 3   Q    Were you a regular reader of The Wall Street Journal at the

 4   time?

 5   A    No, I was not.

 6   Q    Would you have seen it or read it without Mr. Garza's

 7   announcement?

 8   A    I would not have, no.

 9   Q    Now, Mr. Shinners --

10        MR. RENNIE:  You can take that down, Mr. Boles.  Thank

11   you.

12   Q    (By Mr. Rennie) How much, all told, did you spend on GAW

13   Miners' products?

14   A    Uh, initially a little over $50,000.

15   Q    At the end of the day, did you come out ahead or behind?

16   A    I definitely came out behind.

17   Q    Were you able to get any of your money back?

18   A    I was.  I managed to charge back some large unused

19   HashStakers in 2015, and I also had sold somewhere between

20   2,000 and $3,000 worth of HashStakers.

21   Q    So all in all, how much did you lose?

22   A    Uh, I -- I lost between 17,000 and $18,000.

23   Q    What did that money that you lost represent to you?

24   A    Well --

25        MR. WEINER:  Objection.  Relevance.
```

1          THE COURT:  Well, I've sort of allowed this during

2     this trial, so a brief answer's okay.

3          THE WITNESS:  It was money that I could have put

4     towards my business, obviously.  It was also money that I could

5     have put towards my outstanding student loans at the time.  It

6     was money that I could have used to buy a much more upgraded

7     version of my health insurance from the marketplace.

8     Q    (By Mr. Rennie) Mr. Shinners, how long have you been

9     serving as a class representative?

10    A    Uh, since -- officially since 2016, but I worked on --

11    obviously, I had worked on this in 2015.

12    Q    Have you ever received any compensation for the work you've

13    done on behalf of the class?

14    A    No.

15    Q    So why are you doing it?

16    A    Uh, there are -- there were a lot of people spread out all

17    over the world that were victims of this fraud.  Um, most of

18    them will not be able to pursue this on their own, just it's

19    impossible.  And so for me, nobody else was really stepping up

20    to the plate.  So I felt that it was morally important to do

21    so, and I did.

22         MR. RENNIE:  Thank you.  Pass the witness.

23         THE COURT:  Okay.  Cross-examination.

24                         CROSS-EXAMINATION

25    BY MR. WEINER:

1    Q    Good afternoon, Mr. Shinners.

2    A    Good afternoon.

3    Q    You and I have met before, haven't we?

4    A    Yes, we have.

5    Q    We spent the day together in July of 2018.  I took your

6    deposition.

7    A    Yes.

8    Q    You swore to tell the truth and took an oath and testified

9    to the truth; is that right?

10   A    That's correct.

11   Q    Now, I may have misheard.  I thought when Mr. Rennie asked

12   you a question, you said -- he asked you, what are --

13   A    Can you speak up a little louder?  I do have a hearing

14   impairment, so ...

15   Q    Any time you need to, just tap on it or raise your hand.

16             THE COURT:  Excuse me one second.

17        (Pause.)

18             THE COURT:  Go ahead, Mr. Weiner.

19   Q    (By Mr. Weiner) I thought Mr. Rennie asked you, What made

20   Hashlets attractive to you?  Do you remember he asked you that

21   question?

22   A    Um, could you -- I don't know.  Could you read it back?

23   Basically --

24   Q    Did -- do you remember he asked you that question?

25   A    Yes.

1  Q   And one of the things you said was that you believed that

2  Hashlets would always be profitable.  Did I hear that

3  correctly?

4  A   Yes, you did.

5  Q   You believed that you were investing in something that

6  would always be profitable?

7  A   It was stated so, yes.

8  Q   So it was stated so.  If it was stated that Hashlets were

9  made out of green cheese, would you believe that?

10 A   Uh, obviously not.

11 Q   So when -- was it Mr. Garza who said that Hashlets would

12 always be profitable?

13 A   Uh, the website said that, yes.

14 Q   You have an MBA I think you told us; right?

15 A   That's correct, sir.

16 Q   That's a master's of business administration?

17 A   Correct.

18 Q   And you read on the website:  Invest in this.  This will

19 always be profitable?  Is that what you read?

20 A   That's what I read.

21 Q   And you believed it; right?

22 A   I did.

23 Q   And Paycoin too, did you believe Paycoin would always be

24 profitable no matter what?

25 A   That it would always be profitable?

1   Q    Yes.

2   A    Could you define that?  I'm not understanding that

3   question.

4   Q    Remember we talked about you thought Hashlets would always

5   be profitable; right?

6   A    Correct.

7   Q    So I'm going to take the same word, and I'm going to put it

8   behind Paycoin.  Did you believe that Paycoin would always be

9   profitable?

10  A    I don't understand the application of that word to the

11  question and Paycoin.

12  Q    Let's go back to Hashlets.  Your belief that it would

13  always be profitable; right?

14  A    Correct.

15  Q    So that's a no-risk investment; right?

16  A    Well, there's no such thing as no-risk investment.

17  Q    I guess I'm missing it.  You thought that Hashlets would

18  always be profitable.

19  A    That's correct.

20  Q    So if you own them, you would always make a profit; right?

21  A    Correct.

22  Q    Okay.  And I'm saying, then there's no risk of losing money

23  if you'd always make a profit; right?

24  A    That's the way it was marketed, yes.

25  Q    And it was marketed -- and you, with an MBA in your

1  background, you believed it lock, stock, and barrel.  You

2  believed it would always make a profit.  I'm just trying to get

3  that right because I thought I heard you say that; is that

4  right?

5  A   First of all, that is correct.  Second of all, can you slow

6  the speech down a little bit?  Because I'm still not catching

7  everything.

8  Q   Sure.  I will try, okay.

9        You understood or you believed that Hashlets would

10 always be a profitable investment?

11 A   Hashlets, yes.

12 Q   Okay.  Now, you also told Mr. Rennie, I think, that when

13 you read *The Wall Street Journal* article, which came out on

14 November 25th, 2014, and you saw the name Cantor Fitzgerald,

15 that really made a big difference to you in terms of the

16 confidence you had in the GAW Miners' products.  Did I hear

17 that correctly too?

18 A   Yes.

19 Q   Okay.  So if we went to look at your buying history of GAW

20 Miners' products, we -- we would see that you bought a lot more

21 after November 25th; is that right?

22 A   Of what specifically?

23 Q   GAW Miners' products.

24 A   Products?  Yes.

25 Q   Okay.  So if we went there, we'd see that you bought a lot

1    more after *The Wall Street Journal* article came out.  That's

2    what you're telling the jury?

3    A   You would see that I bought products.  I don't know about a

4    lot more.  What does that mean specifically?

5    Q   Do you know the terms "more" and "less"?

6    A   Yes, I do, sir.

7    Q   Isn't it true, sir, that you actually bought way more

8    product before the article in *The Wall Street Journal* came out

9    than you bought after it?

10   A   It's possible.  I don't know.

11   Q   Let's take a look at Defendant's Exhibit 683, which is your

12   sworn certification in this case.

13           MR. WEINER:  Can we get, Mr. Jackson, 683 up?

14           And, Your Honor, this is already in.

15           THE COURT:  Yes, I know.

16   Q   (By Mr. Weiner) Let's go to 683 and see the first page of

17   that.

18   A   No, I don't yet.

19   Q   I'm stalling for time while Mr. Jackson --

20   A   It's not on.

21           THE COURT:  You can take mine for now.  There you go.

22           THE WITNESS:  Okay, yes.

23           THE COURT:  There we go.

24   Q   (By Mr. Weiner) So that's the first page, and I think we

25   saw with Mr. Audet his certification.  No. 2 is Mr. Pfeiffer.

1    No. 3 is Mr. Shinners; right?

2    A    That's correct.

3    Q    Now, No. 4 is someone named Jason Vargas.  He dropped out.

4    He's not a plaintiff anymore; right?

5    A    Yes, we had to let him go.  He had a number of issues.

6    Q    He's not a plaintiff anymore; right?

7    A    I don't believe he's -- he's part of the class.

8    Q    Right, but he dropped out as a plaintiff.

9         THE COURT:  As a named plaintiff.

10   Q    (By Mr. Weiner) A named plaintiff?

11   A    A named plaintiff, yes.

12   Q    So your sworn certification is Exhibit 3.  So let's go to

13   Exhibit 3.  It's at page No. 55 at the top.

14        And starting on page No. 5, there's your signature;

15   correct, Mr. Shinners?

16   A    I see the document in front of me.  And that's my

17   signature, yes.

18   Q    So on page 57 is the -- starts your history of buying and

19   selling GAW Miners' products; right?

20   A    Uh, correct.

21   Q    Okay.  And so the first one was a Hashlet you bought on

22   September 9, 2014.  And you go down the page.  At the bottom of

23   the page, it's September 21st.  Those are all your purchases.

24   And then we turn to the next page.  It starts September 21st,

25   goes down to October 19th on the next page.

1         And then -- am I right, those are your purchases in

2    October; correct?  September and October?

3    A    I believe so, yes.

4    Q    And then go to the third page.  The whole page starts at

5    the top, October 19, 2014, and goes down to November 11, 2014.

6         And then let's go to -- we're getting closer to the

7    magic date of November 25th, *The Wall Street Journal* article.

8    A    Stop.  We just passed it almost.

9    Q    So let's stay at the top there.

10        MR. WEINER:  Mr. Jackson, go up to 11/24 or go down to

11   11/24.  Let's get all those purchases in there at the top of

12   page 60.  And let's draw a line right above the 24th.  We'll

13   put 24th on the post side of the line.

14   Q    (By Mr. Weiner) Do you see where I've drawn the line?

15   A    Yes.

16   Q    And actually there's some -- if you turn to the next

17   page -- we'll come back, but if you turn to the next page, page

18   No. 62, you'll see some purchases there, kind of out of order

19   for something called Hashlet Prime and ZenHashlet.  This is at

20   page 62.  Now let's go to the ones -- the fifth line down on

21   page 62.  Go to page 62, Mr. Jackson.  At the top it will say

22   page 62.

23        And you see there are some that were out of date.

24   We're starting the one that says Hashlet 100, August 17th,

25   going down to ZenHashlet, October 14th.  There are some more

1    that happen.

2           Again, I'm looking to separate the ones that you

3    bought before *The Wall Street Journal* came out and the ones

4    after that.  So I've included those.  Is that fair?

5    A    Yeah, these seem to be not in chronological order so --

6    Q    Other than the ones I just pointed out, they are in

7    chronological order.

8    A    All right, so they are.

9    Q    Let's go back to that line that Mr. Jackson hopefully drew

10   on the page, page 60.  And that's the one that goes -- just put

11   it right above November 24th.  I know the article came out on

12   the 25th, but we'll give you the 24th.  So right above the

13   24th.

14          Mr. Shinners, will you accept my representation that

15   prior to November 24, 2014, you purchased $17,198.26 of GAW

16   Miners' products; and after that date, you purchased roughly

17   one-third of that amount, $6,892.47.  That's the math.  Will

18   you accept that when you see the list of what you certified to?

19   A    I can't say one way or another without looking at my own

20   work actually.

21   Q    Your counsel will have a chance to add these numbers up.

22          But it looks like, if my team's math is correct, that

23   you bought nearly three times as much product before *The Wall*

24   *Street Journal* came out than you bought after that.  Do you see

25   that?

1    A    Would I say that?

2    Q    Do you see that?

3    A    Oh, do I see it.  You need to step in front of the

4    microphone, sir, because I'm not picking you up.

5          I see -- again, I don't know.  I mean I'd have to add

6    all this up on my own and look at my own spreadsheets.

7    Q    Will you accept my representation, sir, that we added them

8    up --

9    A    Okay.

10   Q    -- and you bought three times nearly as much before *The*

11   *Wall Street Journal* article, Journal article came out, as

12   after?

13   A    I'll go ahead and accept that for this purpose, yes.

14   Q    Okay.  Now --

15         MR. WEINER:  You can put that down, Mr. Jackson.

16   Thank you.

17   Q    (By Mr. Weiner) You are the person who organized this

18   lawsuit; correct?

19   A    That's correct.

20   Q    In April of 2015, you started to try to put together a

21   class action lawsuit against GAW Miners; correct?

22   A    Correct.

23   Q    And you spent a large part of 2015 looking for and locating

24   documents relating to Mr. Garza and GAW Miners; right?

25   A    Uh, correct.

1    Q    You spoke also with former executives at GAW Miners as part

2    of your investigation; correct?

3    A    Uh, as part of it, yes.

4    Q    You spoke with Matthew Eden, now Madeline Eden?

5    A    Yes, I did.

6    Q    You spoke with Jonah Dorman?

7    A    Yes.

8    Q    You spoke with Eric Capuano?

9    A    No, I don't believe I spoke with him directly.

10   Q    How about you spoke with Joseph Mordica?

11   A    Yes.

12   Q    And Mr. Mordica and Ms. Eden and Mr. Dorman and Mr. Capuano

13   are all people the jury will hear from in the next day or so.

14          Now, you then, after you did this investigation, you

15   sought out your fellow class members; correct?

16   A    Did you say sought out?

17   Q    Yeah.  It's my accent.  Sorry about that.  You sought them

18   out using the GetHashing forum; correct?

19   A    I was invited to the GetHashing forum, correct.

20   Q    You're the one person -- you as the leader and captain of

21   this lawsuit, you're the one who went looking for fellow

22   Plaintiffs; right?

23   A    Yes, I had made several posts to that effect, yes.

24   Q    And, in fact, you were the person who selected the other

25   named Plaintiffs, Mr. Audet, Mr. Pfeiffer, and Mr. Vargas, who

Shinners - Cross                                                    678

1    had some other issues.

2    A    Correct.

3    Q    Then you went out to find a law firm that would be willing

4    to take up a class action lawsuit in this case; right?

5    A    Correct.

6    Q    You went to look for law firms in California and Ohio and

7    Massachusetts; right?

8    A    Correct.

9    Q    And finally, you found Mr. Ard and Mr. Buchdahl's firm, the

10   Susman Godfrey firm.  They agreed to take you on as a client;

11   right?

12   A    Correct.

13   Q    You gave them all the documents, all the information, and

14   all the interview notes you had acquired over the three years

15   from 2015 to 2018 you had acquired in your investigation;

16   right?

17   A    Correct.

18   Q    It's fair to say you're pretty familiar with the facts in

19   this case?

20   A    I would say I'm -- I'm fairly familiar with most of the

21   material.  Without reviewing it firsthand, yes.

22   Q    Okay.  And you're familiar with what you considered to be

23   the important documents; right?

24   A    Uh, I would say so, yes.

25   Q    And you gave the important documents or what you thought

1    were the documents to the Federal Bureau of Investigation, the

2    FBI; right?

3    A    Uh, they had requested them, yes.

4    Q    You gave the FBI everything you had given your lawyers;

5    right?

6    A    Um -- yes, I would assume so.  It was the same hard

7    drive.

8    Q    You gave them every document, every bit of research,

9    anything you had come across or had obtained during the process

10   for the last three years prior to 2018.  The FBI had everything

11   from you; right?

12   A    Uh, I would assume they had everything.

13   Q    Because you gave it to them.

14   A    Pardon me?

15   Q    Because you gave it to them.

16   A    I did give it to them, yes.

17   Q    It was a safe assumption that they had it; correct?

18   A    They had the same documents that the law firm had,

19   correct.

20   Q    Right.  And you had over 100 telephone calls with the FBI

21   regarding Mr. Garza and GAW Miners; correct?

22   A    Uh, I don't know the numbers specifically, but today.

23   Q    Let me refresh your recollection with your deposition.

24   I'll walk it up there for you.

25           MR. WEINER:  Your Honor, may I approach?

1           THE COURT:  You may.

2    Q    (By Mr. Weiner) And if you go to page 160, one six zero.

3    A    One six zero.

4    Q    One six zero?

5    A    Do you mean of the deposition or the bottom page?

6    Q    The numbered pages of the deposition.

7    A    Okay.

8    Q    And starting on line 18, just read to yourself line 18 down

9    to line 25.  And tell us when you're ready.

10   A    Yes, I've read it.

11   Q    Right.  And you had a contact at the FBI, Special Agent

12   Mark Munster?

13   A    He was one of them.

14   Q    And you had over 100 telephone calls with people in the FBI

15   regarding Mr. Garza and GAW Miners; correct?

16           MR. RENNIE:  Objection, relevance.

17           THE COURT:  No, I'll overrule it.

18   Q    (By Mr. Weiner) You can answer.

19           THE COURT:  You can answer, sir.

20           THE WITNESS:  I can?

21           THE COURT:  You can answer, sir.

22           THE WITNESS:  I'm sorry.  Repeat the question.

23   Q    (By Mr. Weiner) You had over 100 telephone calls with the

24   FBI as you gave them information regarding Garza and GAW

25   Miners; is that correct?

1    A    That's correct.

2    Q    And your hope was that the FBI would put Mr. Garza behind

3    bars and look for any assets that he had; right?

4    A    Correct.

5    Q    Your goal was to help the FBI build their criminal case

6    against Mr. Garza; right?

7    A    That's correct.

8    Q    And you recall telling the FBI that Mr. Garza had fled to

9    Dubai in 2015; right?

10              MR. RENNIE:  Objection, relevance.

11              THE COURT:  Yeah.  What about that?

12              MR. WEINER:  Well, Your Honor, there was testimony

13   from Mr. Garza about his going to Dubai, and then the Plaintiff

14   said, well, there's the issue of the Tesla that wasn't picked

15   up because Mr. Garza was actually in Dubai.

16              THE COURT:  Right, but that doesn't make this question

17   relevant.  I'm going to sustain the objection.

18   Q    (By Mr. Weiner) Mr. Shinners, you've been sitting in back

19   the entire time; right?

20   A    Yes, I've been in the courtroom the entire time.

21   Q    Did you hear Mr. Garza's testimony that he traveled to

22   Dubai in early 2015?

23              MR. RENNIE:  Objection, Your Honor, relevance.

24              THE COURT:  Yeah, I did.

25              MR. WEINER:  Your Honor --

```
 1           THE COURT:  Wait a minute.  I did allow that
 2    testimony.  I'm, frankly, not sure why.  But since I allowed
 3    it, I'm required to let him ask about it; so I'll overrule it.
 4           You can answer the question.
 5           THE WITNESS:  Okay.  Thank you.  And what was the
 6    question again?
 7    Q   (By Mr. Weiner) You heard Mr. Garza's testimony that in
 8    early 2015 he traveled to Dubai in the United Arab Emirates;
 9    correct?
10    A   I believe I saw it on the deposition, the video.
11    Q   Right.  Because he knew that the heat was on here in the
12    States; right?
13    A   I couldn't say one way or the other.
14    Q   Now, you knew that Mr. Garza, back at the time, you knew he
15    had fled to Dubai because you tracked him by using his IP
16    address; correct?
17           MR. RENNIE:  Objection.
18           THE COURT:  That's sustained.  Move on.
19    Q   (By Mr. Weiner) Now, you told the FBI that Mr. Garza had
20    lied so he wouldn't have to testify before the SEC; right?
21           MR. RENNIE:  Objection, Your Honor.
22           MR. WEINER:  Credibility, Your Honor.
23           THE COURT:  Sorry?
24           Mr. Weiner:  Credibility of Mr. Garza.
25           THE COURT:  No, that's sustained.
```

1    Q    (By Mr. Weiner) Did you send photos to the FBI of Mr. Garza

2    in Dubai?

3            MR. RENNIE:  Same objection, Your Honor.

4            THE COURT:  I'll allow this question, but then you've

5    got to move on.

6            THE WITNESS:  I'm not sure if I sent photos or not to

7    be honest.  If they were on the hard drive, then they went to

8    the FBI.

9    Q    (By Mr. Weiner) And you heard Mr. Garza testify that while

10   he was in Dubai, he told a fellow named Rishab Jain that he had

11   $27 million?

12           MR. RENNIE:  Objection.

13           THE COURT:  Sustained.  It is time to move on.

14   Q    (By Mr. Weiner) The FBI ended up charging Mr. Garza with

15   criminal fraud; right?

16   A    Correct.

17   Q    And he went to prison for nearly two years?

18   A    I believe so, yes.

19   Q    And part of the -- in addition to the sentence, there was a

20   requirement that he pay what's called restitution, paid back

21   money to his victims.  Do you remember that?

22   A    Yes, I do.

23   Q    Let's take a look at Defense Exhibit DX 703.

24           THE COURT:  Okay, Ladies and gentlemen, same

25   instruction I gave you before about this exhibit.  It's only

1    relevant.  It's for you in assessing Mr. Garza's credibility,

2    and it has whatever importance in that regard that you find

3    that it has.

4    Q   (By Mr. Weiner) And, Mr. Shinners, we'll blow up that, just

5    the one paragraph that says restitution amount.  And you see

6    there restitution amount of about 3.4 plus million dollars;

7    right?

8    A   I see that.

9    Q   Okay.  And then there are a couple of sentences, and they

10   talk about possible reduction in the amount that Mr. Garza

11   would have to pay.  Do you see that?

12   A   Uh, yes, I do.

13   Q   Okay.  And there's the sentence above that it says that as

14   well.

15        And you understand that if the victims, including you

16   and the other members of the class, if they get money from Mr.

17   Fraser, then Mr. Garza won't have to pay that money.  You

18   understand that; right?

19   A   Uh, I do not understand that.  I don't understand what laws

20   apply to this.

21   Q   Okay.  Then you can set that aside if that's something you

22   don't understand.

23        You were present at the sentencing hearing where Mr.

24   Garza was sentenced to prison?

25   A   Uh, that's correct.

1   Q    You heard him testify at a sentencing.  He told the Court

2   that, quote, no matter what happened, I was in charge, closed

3   quote, at GAW Miners and ZenMiner.  You heard him say that at

4   the time; right?

5   A    I'm not really sure that I did because he was facing away

6   from me towards the judge, and so most of the -- anything that

7   was said, um, I caught parts of everything and kind of pasted

8   them all together in my head.

9   Q    Now, here in court this week or maybe last week, you heard

10  Mr. Garza say on the videotape, you heard him say that, at the

11  sentencing, he said no matter what happened, I was in charge,

12  meaning Josh Garza was in charge.  You heard him say that this

13  week, last week; right?

14  A    Oh, that was from?

15  Q    From the deposition.

16  A    Oh, from the deposition.  I would have to see the video

17  again.  I don't recall that statement.

18  Q    Okay.  Now, you know the FBI didn't charge Stuart Fraser

19  with any crime.  You know that; right?

20  A    Yes.

21  Q    Now, you and the fellow class members filed this lawsuit in

22  June of 2016; correct?

23  A    I believe so, yeah.

24  Q    And you started work on the case in April of 2015, and you

25  filed it June of the following year; correct?

1   A    I started working on it in April of 2015, yes, correct.

2   Q    So that's over a year that you had worked on it yourself in

3   investigating and looking at documents and interviewing people;

4   correct?

5   A    Uh, among other things, yes.

6   Q    Okay.  And you worked hard to make sure that the

7   allegations in your Complaint filed in this court would be

8   correct; is that right?

9   A    I worked together and organized the material that I

10  became -- that came to me, yes.

11  Q    And you worked together with -- do you need some water?

12  A    Go ahead.

13  Q    You need some water?

14  A    Here's some.

15  Q    You worked together with whom to make sure that the

16  Complaint was right?

17  A    I worked -- wherever the -- the information that had come

18  to me required a lot of work to break out because most of it

19  was compressed.  So I had to spend a lot of time uncompressing

20  this, and a lot of the software that they had used that

21  generated these, I had to acquire the software.

22  Q    And when you say you worked together, were there other

23  people that you worked together with to make sure that the

24  allegations in your Complaint were accurate?

25  A    Well, as far as other victims, yes.  I mean, that was all

1  during the same period.  So there was a lot of documentation

2  coming to me not just from what I already had received but also

3  from other, um, you know, other victims in the fraud, yes.

4  Q    And you worked to make sure the Complaint was right, and

5  you reviewed it before it was filed; right?

6  A    Well, I'm not an attorney, so there's no way I can apply

7  the laws.  That's what -- that was why I was looking for a law

8  firm.

9  Q    And you reviewed the Complaint before it was filed, sir?

10 A    Oh, the Complaint from the law firm?  Yes, I did.

11 Q    The Complaint in which you're the Plaintiff; right?

12 A    I'm sorry.

13 Q    You or the class members, you reviewed that Complaint

14 before it was filed; correct?

15 A    From the law firm?  Yes.

16 Q    You keep saying "the law firm."  Do you mean your law firm?

17 A    From Susman and Godfrey, yes.

18 Q    And you personally authorized the filing of the Complaint

19 in this court.

20 A    Correct.

21 Q    And, in general, you're familiar with the allegations in

22 the Complaint?

23 A    Uh, yes.

24 Q    And you named Josh Garza as the lead defendant in that

25 Complaint, didn't you?  Mr. Shinners?

1    A    I'm sorry.  Did you ask me a question?

2    Q    You named Josh Garza as the lead defendant in the lawsuit

3    you brought in June of 2016 after your year plus of

4    investigation.  Isn't that true?

5    A    Not exactly, no.  There's two named defendants in the -- in

6    the document, in the filing.

7    Q    And the lead -- do you understand the word "lead," like

8    first?

9    A    I didn't say lead, but --

10   Q    I'm asking you.  Do you understand what the word "lead"

11   means, like the lead horse in a race?

12   A    Lead horse in a race.

13        THE COURT:  I tell you what.  I tell you what.  I'm

14   sorry.  We got to move this along.

15        What he's asking you is:  Do you know whether the

16   Complaint identified Mr. Garza as the first-listed defendant?

17   Yes or no?

18        THE WITNESS:  First-listed defendant, yes, he was

19   first on the document.

20   Q    (By Mr. Weiner) Okay.  And if we go to DX 682 -- and let's

21   pull up the caption of that, if we can.

22        MR. WEINER:  Your Honor, we'll offer the first page of

23   682, I think.

24        THE COURT:  Yup, the first page can come in.  We'll

25   call that 682A.

1        (Defendant's Exhibit 682A, received in evidence.)

2   Q    (By Mr. Weiner) And this is the first page of your

3   Complaint in this case.  You see it's dated June 15th?

4        MR. WEINER:  Mr. Jackson, can we highlight that June

5   15th.

6   Q    (By Mr. Weiner) And there's Mr. Garza as the first

7   defendant listed?

8   A    I only see -- oh, there it is, yes.

9   Q    Now, if we go to paragraph 17 of this Complaint that you

10  filed --

11       THE COURT:  So you want to offer paragraph 17?

12       Mr. Weiner:  Yes, offer paragraph 17.  And, Your

13  Honor, she only has that so you don't get any other paragraph.

14       THE COURT:  So we'll have DX 682B as the paragraph 17.

15  So for right now, just to be clear, I've not let 682 in as a

16  whole, but I've admitted 682A the first page and 682B,

17  paragraph 17.

18       (Defendant's Exhibit 682B, received in evidence.)

19       MR. WEINER:  Mr. Jackson, if we can just put up

20  paragraph 17 of the Complaint.

21  Q    (By Mr. Weiner) And these are your allegations sir; right?

22       Defendant Garza, age 30, lives in Friendswood, Texas,

23  although he lived in Somers, Connecticut during 2014.  During

24  all of 2014, he was the founder and CEO of GAW Miners, and he

25  owned and controlled ZenMiner.  In those positions, which he

1  held since those companies were founded, he directed their

2  strategy, their financial decisions, and had ultimate control

3  over their day-to-day operations.

4         Do you see that?

5  A   Yes, I do.

6  Q   And did you believe it to be true at the time you filed

7  this Complaint here in court here in Connecticut?

8  A   That he, um -- that he -- or that he commanded the

9  day-to-day operations, yes, I believed that that was the

10 case.

11 Q   Fine.  And that he directed their strategy and their

12 financial decisions and had ultimate control over their

13 day-to-day operations, you believed that was true; right?

14 A   I believed that, as far as the operational aspect, he had

15 ultimate control, that's true.

16 Q   And also that he directed their strategy; right?  You

17 believed that to be true when you filed this in federal court,

18 sir?

19 A   I -- yes.

20 Q   And you believed that he, Mr. Garza, directed the company's

21 financial decisions as well when you filed this in court?

22 A   Yes.  It says so.

23 Q   And you believed that -- well, it's not that it says so.

24 This is you that said so; correct, Mr. Shinners?

25 A   It is what?

1   Q   This is you.  You're the Plaintiff.  This is your

2   Complaint.  This is what you believed to be true; correct?

3   A   Correct.

4   Q   And you believed that Mr. Garza owned and controlled

5   ZenMiner; correct?

6   A   At the time, yes.

7   Q   Okay.  And when I asked you about this specifically at your

8   deposition in 2018, you testified that you still believed it to

9   be true.  Isn't that right?

10  A   I would have to look at the deposition, but yes.

11  Q   You can look at page 346, starting at line 8.

12  A   I'm sorry.  Did you say page 346?

13          THE COURT:  Page 346, line 8.

14          Mr. Weiner:  And, Your Honor, we'll offer -- but not

15  to the jury yet.

16          THE COURT:  Take it down on the screen, please.

17          MR. WEINER:  We'll just put it up on your screen, Your

18  Honor, and mine.

19          THE COURT:  Yes.

20          MR. WEINER:  And the witness's.  Page 346, we'll offer

21  line 8 to -- 346, line 8 to page 347, line 13.

22          MR. RENNIE:  Objection, Your Honor.  There's no

23  inconsistency between the testimony.

24          THE COURT:  Yeah, I don't see one either.  It seems

25  like that's what he said, I think.

1  Q   (By Mr. Weiner) Have you had a chance to read that, read

2  that to yourself, Mr. Shinners?

3  A   I'm still finishing it.

4        Right, okay.

5  Q   And does that refresh your recollection that when you --

6  A   Yes, I agreed that he was the CEO of the company, yes, and

7  that he did have operational control.

8  Q   Right.  And that in 2018, when your deposition was taken,

9  you still believed it to be true that he was CEO of the company

10 and gave orders and directed the company.  You still believed

11 that to be true; correct?

12 A   Uh, yes.

13 Q   You can set that aside.

14       Now, let's go back to 2016.  You filed your Complaint

15 in June of 2016; right?

16 A   Correct.

17 Q   Now, then five months later, only five months, you and the

18 fellow Plaintiffs, your named Plaintiffs, Mr. Audet and Mr.

19 Pfeiffer, filed something called an Amended Complaint; right?

20 A   Correct.

21 Q   And you know the term "amended"; right?

22 A   Yes.

23 Q   You changed the Complaint; right?

24 A   Yes.

25 Q   And you dropped Mr. Garza as defendant.  Isn't that

1    right?

2    A    Correct.

3    Q    He wasn't the lead defendant anymore; right?

4    A    Correct.

5    Q    He wasn't any defendant anymore; right?

6    A    Correct.

7    Q    And let's, if we can, look at the case caption of the

8    revised Complaint.  That's 685, just the first page.

9         MR. WEINER:  We'd offer the first page, Your Honor, of

10   685.

11        THE COURT:  We'll call the first page 685A, and that

12   can be admitted as a full exhibit.

13        (Defendant's Exhibit 685A, received in evidence.)

14   Q    (By Mr. Weiner) And there's the caption.  Look at the

15   defendants there.  It's like magic; right?  Mr. Garza is gone.

16   A    I'm sorry.  Can you repeat the question?

17   Q    Mr. Garza is not a defendant anymore, is he?

18   A    No, he's not.

19   Q    Okay.  And let's look at what happened to that paragraph 17

20   that we talked about.

21        MR. WEINER:  And, Your Honor, if we can look at --

22   this is DX 686 is the redline that shows the changes from one

23   Complaint to the other.  DX 686 on page 7, we'd offer that as

24   well.  And we have a demonstrative just focused on paragraph 7.

25        THE COURT:  If the demonstrative looks like the last

1    one, that's fine.  So we'll call the demonstratives DX 686A,

2    capital A, and that will be admitted as a full exhibit.

3              Mr. Weiner:  And can we have the first page of DX 686

4    as well?

5              THE COURT:  Which is the --

6              MR. WEINER:  Just the cover page.

7              THE COURT:  I'm sorry.  So the cover page should be DX

8    686A -- sorry -- DX 686 capital B will be this demo.

9              Mr. Weiner:  Thank you, Your Honor.  And, Mr. Jackson,

10   we can go to the first page of 686, which is now in as 686A.

11   Let's do that first.

12       (Plaintiffs' Exhibits DX 686A and B, received in evidence.)

13   Q   (By Mr. Weiner) You're familiar with this what's called

14   redlining or strike-through?  It shows changes from one

15   document to another.  You're familiar with that?

16   A   Yes, of course.

17   Q   So this shows changes from the first Complaint you filed in

18   June of 2016 to the one you filed just five months later in

19   November.  Fair enough?

20   A   Yes.

21   Q   And there's Mr. Garza gone from the defense caption, no

22   longer defendant; right?

23   A   Correct.

24   Q   And let's look -- we were looking at before paragraph 17.

25             MR. WEINER:  Mr. Jackson, if we can pull up the slide

1    we were looking at before.

2    Q    (By Mr. Weiner) Paragraph 17 just disappeared from the

3    Complaint, didn't it?

4    A    I don't know.  I assume that this has been taken out of --

5    what do you mean by it disappeared?

6    Q    You assumed correctly, Mr. Shinners.  If you look at the

7    Amended Complaint, paragraph 17 isn't there anymore; right?

8    A    The Amended Complaint.

9    Q    Right.  The allegation that you made that Mr. Garza was in

10   control of ZenMiner and had control over the operations of GAW

11   Miners disappeared.  Is that fair?

12   A    Yes.

13             MR. WEINER:  If Mr. Jackson could take that down off

14   the screen.

15   Q    (By Mr. Weiner) Now, in between the Amended Complaint --

16   sorry.  In between the original Complaint and the Amended

17   Complaint, you struck a deal with Mr. Garza to cooperate with

18   the Plaintiffs; correct?

19   A    Uh, there was an agreement that was made, yes.

20   Q    There was an agreement that was made.  The agreement -- you

21   were one of the people who made the agreement; right?

22   A    I didn't write it, no.

23   Q    You agreed to drop Mr. Garza as defendant in return for his

24   cooperation with the Plaintiffs; correct?

25   A    Yes.

1    Q   And you were personally involved in the decision to drop

2    Mr. Garza as defendant; right?

3    A   Correct.

4    Q   Your law firm, Susman Godfrey, presented it, and you

5    approved that decision to drop Mr. Garza in return for his

6    cooperation; correct?

7    A   Correct.

8    Q   And you approved that deal even though you knew Mr. Garza

9    was a conman, a cheat, and a liar.

10   A   Is that your question, sir?

11   Q   It is.

12   A   I -- we -- I agreed that we should drop him, that's

13   correct.

14   Q   It wasn't that you suddenly realized, oh, it wasn't Mr.

15   Garza at all.  You continued to believe that he was a liar and

16   a cheat; correct?

17          MR. RENNIE:  Objection, argumentative.

18          THE COURT:  Yeah, I'll sustain that.  It is

19   argumentative.

20   Q   (By Mr. Weiner) You didn't drop Mr. Garza because you

21   thought he was innocent, did you?

22   A   No, I did not.

23   Q   You continued to believe that he had committed fraud;

24   correct?

25   A   That's correct.

1   Q   You continued to believe that, as you sit here today;

2   right?

3   A   Correct.

4   Q   Now, your law firm entered into a written agreement with

5   Mr. Garza to let him out of the case if he cooperated; right?

6   A   I'm -- could you repeat the last part of your question?

7   Q   Your law firm entered into an agreement that you signed

8   that agreed to let Mr. Garza out if he cooperated with the

9   Plaintiffs.

10  A   If he cooperated with us, correct.

11  Q   Okay.  And let's look at Defendant's Exhibit 684.

12          MR. WEINER:  Your Honor, 684 is already in.

13          THE COURT:  All right.  So 684 will be a full exhibit.

14          Ladies and Gentlemen, you're about to hear testimony

15  or questions about the agreement.  Let me give you a little bit

16  of an instruction about that.

17          You may consider the agreement only for the limited

18  purposes of deciding Mr. Garza's credibility and understanding

19  the sequence of events between the Plaintiffs' original

20  Complaint and their Amended Complaint.  You may not consider

21  this agreement for any other purpose.  In particular, you may

22  not consider the terms of the agreement or the fact that Mr.

23  Garza was once, but is no longer, a defendant when deciding on

24  the liability of Mr. Fraser.

25          Finally, when considering how the agreement affects

```
 1  Mr. Garza's credibility, if at all, you must keep in mind that

 2  the agreement states, in effect, that the Plaintiffs may

 3  reinstate their claims against Mr. Garza only if the Court

 4  decides that he has breached the agreement or made a materially

 5  false or misleading statement in the agreement.  Thank you.

 6        Go ahead, Mr. Weiner.

 7  Q   (By Mr. Weiner) You have Defendant's Exhibit 684 in front

 8  of you; right?

 9  A   Part of it, yes.

10  Q   And you see in the first line it says "Agreement" and has

11  the name of the case when Mr. Garza was a defendant; right?

12  That's that top line?

13  A   Yes.

14  Q   And then it says, Made as of October 20, 2016; right?

15  A   October 20, 2016.

16  Q   So that's a date after you filed your original Complaint in

17  June of 2016 but before you filed your Amended Complaint in

18  November; correct?

19  A   Uh, correct.

20  Q   Okay.  And the first line talks about a dismissal without

21  prejudice.  Do you see that?

22  A   Well, let me read --

23  Q   It's the highlighted line.

24  A   Oh, the highlighted line, yeah, dismissal without

25  prejudice.
```

1   Q   And you understand "without prejudice" means that the

2   Plaintiffs, and you included, you had the right to bring Mr.

3   Garza back in?

4           MR. RENNIE:  Objection.

5           THE COURT:  I'll sustain that given the way it was

6   phrased.

7   Q   (By Mr. Weiner) So do you understand the term "without

8   prejudice" to mean that Mr. Garza could be still be brought

9   into the case?

10          MR. RENNIE:  Objection.

11          THE COURT:  I'll allow that.

12          THE WITNESS:  I understand that the agreement allows

13  us to bring him back, yes.

14  Q   (By Mr. Weiner) And paragraph 2, let's look at paragraph 2,

15  and the first word says "Cooperation."  That's Mr. Garza's

16  cooperation; right?

17  A   Correct.

18  Q   And then it says, "Mr. Garza will provide reasonable and

19  timely discovery cooperation to Plaintiffs with respect to

20  their continued prosecution of the action against the remaining

21  defendants."  Do you see that?

22  A   Yeah, I see it.

23  Q   The only remaining defendant was Mr. Fraser; right?

24  A   Yes.

25  Q   And then your lawyer signed this agreement on your behalf;

Shinners - Cross                                                    700

1    right?

2    A    Can I see the rest of the --

3    Q    Sure.

4    A    -- document, please?

5    Q    Let's flip the page and look at paragraph 6, and we'll get

6    to Mr. Ard's signature in a second.  Let's look at paragraph 6.

7    Let's blow up 6.

8         "The parties acknowledge that they have consulted, and

9    reviewed, the terms of this agreement, with an attorney of

10   their choosing prior to signing this agreement."

11        So you understand the parties were Mr. Garza and the

12   Plaintiffs; right?

13   A    Correct.

14   Q    And you're one of the Plaintiffs; right?

15   A    Pardon me?

16   Q    You, Mr. Shinners, are one of the Plaintiffs; correct?

17   A    Yes, I am.

18   Q    And you -- that means you consulted and reviewed the terms

19   of the agreement with your attorneys; correct?

20   A    Uh, correct.

21   Q    Okay.  And the next page you see under the heading

22   "Plaintiffs," you see Mr. Ard signing on your behalf; correct?

23   A    I believe that's Mr. Ard's signature, yes.

24   Q    Okay.  And this cooperation agreement, did you, sir, think

25   it was appropriate to enter into a cooperation agreement with

1    someone you believed and knew to be a fraudster?

2    A    Did I believe that it was appropriate to do so?

3    Q    Correct.

4    A    We entered into the agreement.

5    Q    And you approved the agreement.

6    A    I approved the agreement.

7    Q    And did you believe it was appropriate to do so even though

8    you knew Mr. Garza was a conman, a cheat, and a liar?

9    A    I approved the agreement, yes.

10   Q    Okay.  And that's because Mr. Garza would cooperate and

11   help you go after Mr. Fraser; correct?

12           MR. RENNIE:  Objection.

13           THE COURT:  I'll allow the question.

14           THE WITNESS:  That is not exactly the wording I would

15   choose, but yes.

16   Q    (By Mr. Weiner) And so you changed the Complaint and

17   dropped Mr. Garza; right?

18   A    Correct.

19   Q    And you -- you didn't add as defendants any of the other

20   people at GAW Miners, like the chief operating officer, Mr.

21   Kelley; right?

22   A    Uh, no, I didn't know him very well.

23   Q    You had dealt with Mr. Kelley; right?

24   A    Dealt, no.

25   Q    You had communicated with Mr. Kelley?

1    A    Uh, we had communicated once, yes.

2    Q    Okay.  You had communicated with others at GAW Miners;

3    right?

4    A    At GAW Miners?

5    Q    Yes.

6    A    At GAW Miners?

7    Q    Yes.

8    A    Uh, a few, yes.

9    Q    Name the people you had communicated with at GAW Miners.

10   A    You want me to name them?

11   Q    Well, I could name them, but it probably would be quicker

12   if you do.

13   A    I'm not so sure.  Jonah Dorman, um, Joe Mordica.  Oh, I'm

14   trying to remember the -- Amber Messer, Messer.

15   Q    And Dan Pease, was he one?

16   A    I have never spoken to Dan Pease.

17   Q    So the people that you listed, Mr. Mordica, Mr. Kelley,

18   Ms. Messer, Mr. Dorman, you didn't name them as defendants, did

19   you?

20   A    Uh, no.

21   Q    Because they don't have deep pockets?

22   A    Because they don't what?

23   Q    Have money in their pockets to pay a judgment.

24   A    Uh, that's your wording.

25   Q    And you agree with it; right?

1   A    And they what?

2   Q    You agree with it; right?  You wanted to follow the

3   money -- right? -- and name someone who had money in his

4   pockets because he's built it up over his lifetime.  That's who

5   you were going to name as defendant; correct?

6   A    We named Mr. Fraser a defendant in the lawsuit, correct.

7   Q    And not the other folks; correct?

8   A    No, not the other employees, no.

9   Q    And you know that Mr. Fraser was never an officer of GAW

10  Miners or ZenMiner.  You know that from your review; right?

11  A    No, I did not at the time.

12  Q    Do you know that he was not a executive of any kind at GAW

13  Miners or ZenMiner; right?  You knew that.

14  A    I did not know that at the time.

15  Q    Okay, and you knew that he was never a director of either

16  GAW Miners or ZenMiner?

17  A    There was no way for me to know that at the time, no.

18  Q    And you knew that he was not an employee of GAW Miners or

19  ZenMiner?

20  A    Again, at the time there was no way for me to know that.

21  Q    And now that you sit here today and you know that Mr.

22  Fraser was never an officer or an executive or a director or an

23  employee of GAW Miners or ZenMiner's, you still think it's

24  appropriate to go after him in this lawsuit.

25  A    Yes.

1   Q   Now, in your view, Mr. Fraser is a deep pocket; correct?

2   A   I'm sorry.  Repeat the question?

3   Q   Do you know the phrase "deep pocket" indicating someone who

4   has money?  Have you ever heard of that?

5   A   Oh, I've heard the statement before, but ...

6   Q   And in your view, Mr. Fraser is a deep pocket; right?

7   A   I would not use those words, no.

8   Q   Let me shift gears a bit, Mr. Shinners, and ask you about

9   your expertise.

10          You consider yourself an expert in the

11  telecommunications industry; correct?

12  A   In my sector of the telecommunications industry, that's

13  correct.

14  Q   And what's your sector of the telecommunications industry?

15  A   I am a local exchange carrier auditor by expertise, yes.

16  Q   And I think you told us you got your MBA, your master's of

17  business administration, in 2012; is that right?  You got your

18  MBA in 2012?

19  A   No, I was just thinking of what year it was.  Um, I believe

20  I received it physically in 2012, yes.

21  Q   Okay.  In August of 2014, you were already a member of what

22  you've called the crypto community?

23  A   Uh, it's not a formal entity.

24  Q   Okay.  But crypto community is a general term for the

25  people that operate within the cryptocurrency world.  Fair

1   enough?

2   A   That's fair.

3   Q   You were a member of that crypto community?

4   A   To some degree.

5   Q   You began mining cryptocurrency back in December of 2013?

6   A   Correct.

7   Q   You mined something called Dogecoin?

8   A   Correct.

9   Q   I think Mr. Fraser called it "Dogcoin," but it's Dogecoin?

10  A   Correct.

11  Q   You mined something called Litecoin?

12  A   Yes, I did.

13  Q   You started mining cryptocurrency in 2013.  You did a lot

14  of internet research on the subject; correct?

15  A   I did a lot of what again?

16  Q   Internet research on the subject.

17  A   In 2012?  No, not really.  I just noticed the mining rig

18  being sold on eBay in late 2012.  So, no, I did not do any

19  research on it.

20  Q   Did you do research on the cryptocurrency industry before

21  starting mining in 2013?

22  A   I did some research.

23  Q   Okay.  And you did research in part through the internet;

24  right?

25  A   Via the internet, correct.

Shinners - Cross                                                706

1    Q    Right.  And tell the jury how you researched the

2    cryptocurrency business in 2013, internet and otherwise.

3    A    This could be very long.

4    Q    Well, you can summarize it.

5    A    Okay.

6    Q    Take a moment.  Take as long as you want.

7    A    I'll summarize.  Basically, I just used, like most people

8    would, I did Google searches, and then the links -- yeah, the

9    links, that's the hits that showed up, I scanned through them.

10   And then ones that seemed credible enough, I checked on those.

11   And then they kind of lead you down many, many different rabbit

12   holes to further deep -- the deeper you go, the more rabbit

13   holes show up.  So that's how it basically blossomed from

14   there.

15   Q    Okay.  And you used the internet, and you also used

16   YouTube; right?  You watched a lot of how-to videos on YouTube?

17   A    Not at the time.  There wasn't really a lot of YouTube

18   videos out there, at least for what I had purchased.

19   Q    Okay.  You want to take a look at page 34 of your

20   deposition?  And just refresh yourself by reading page 34 and

21   tell us when you're set, lines 1 to 23.

22   A    Through what number?

23   Q    Through 23 on page 34.

24   A    23.

25        Okay.  What's your question?

1   Q   Did that refresh your recollection that in addition to

2   doing internet research, you also watched a lot of YouTube

3   videos, how-to videos?

4   A   I would say that a lot is relative.  I mean, whatever was

5   there, I watched, yes.  Oh, not all of them, but some of them,

6   yes.

7   Q   And how many videos did you watch do you think?  Give or

8   take.

9   A   I'm not even going to speculate on that.  I don't know.

10  Q   Okay.  And in 2013 and going into 2014, cryptocurrency and

11  blockchain and the digital assets, that was kind of a brave new

12  world; right?

13  A   Well, I wouldn't call it that, but it was definitely new.

14  Q   And you're a person who likes to do their research; right?

15  A   That's correct.

16  Q   And you did your research before embarking into the crypto

17  world; right?

18  A   I'm sorry.  I did my research?

19  Q   Before you embarked in cryptocurrency mining; right?

20  A   I mean, I started mining, and then I continued more

21  realistic research after I started mining, correct.

22  Q   And the reason that you went into the cryptocurrency world

23  was to make money; right?

24  A   Yes.

25  Q   And you didn't want to miss the boat I think you told me

1    Do you remember that?

2    A   Well, I can go look for it, but, I mean, that's generally

3    true.

4    Q   And at your deposition you couldn't think of anyone in the

5    cryptocurrency world who knew more than you did about the

6    subject of cryptocurrency.  Remember telling me that?

7    A   Uh, yes, as a general statement, true.

8    Q   Right.  And when you testified to that, that you couldn't

9    think of anyone in the cryptocurrency world who knew more than

10   you did about cryptocurrency --

11   A   I would say that that's a misrepresentation, sir.

12   Q   Well, let's take a look at page 36, line 7 to 10.

13   A   Pages?

14         THE COURT:  36, line 7 to 10.

15         MR. WEINER:  And, Your Honor, we would offer page 36,

16   line 7 to 10.

17         THE COURT:  Yeah, I'll allow that to be marked as an

18   exhibit.  We're up to DX?

19         MS. HASSAN:  733.

20         THE COURT:  733.  And this will be page 36 from Mr.

21   Shinners' deposition.

22       (Defendant's Exhibit 733, received in evidence.)

23         MR. WEINER:  Your Honor, if we can publish that to the

24   jury?

25         THE COURT:  Yes, that should be published to the

Shinners - Cross                                                        709

1    jury.

2    Q    (By Mr. Weiner) And you recall, Mr. Shinners, I asked you

3    at your deposition:  Is there anyone you can think of in the

4    cryptocurrency world who -- who you know knows more than you

5    about the subject?  And you said, "Not really."

6    A    That's true.  I said "not really" because I didn't know a

7    lot of people in the cryptocurrency world.

8    Q    In 2018?

9    A    Oh, in 2018?

10   Q    When you gave this deposition in 2018, this was truthful

11   testimony; correct?

12   A    At the time, yes.  I mean, I still don't know a lot of

13   people, I mean professionals, in the cryptocurrency world.

14   Q    You, yourself, have advised people across the world on the

15   fundamentals of Bitcoin and what cryptocurrency is; correct?

16   A    I've advised friends and acquaintances of mine across --

17   who live across the world who have asked me about

18   cryptocurrency, that is correct.

19   Q    Okay.  And with all your knowledge and with all your

20   expertise in the cryptocurrency world, Josh Garza was still

21   able to con you, wasn't he, sir?

22   A    I guess he was.

23   Q    Now, we can take that down.

24        You first got involved with GAW Miners in August of

25   2014; correct?

1  A    I bought my first Hashlets in August of 2014, that's

2  correct.

3  Q    Okay.  And before you bought your first Hashlets and got

4  involved with GAW Miners, you researched it as much as you

5  could through the internet; correct?

6  A    That's correct.

7  Q    And from August of 2014 through early October of 2014, you

8  primarily got your information regarding GAW Miners from the

9  HashTalk forum; right?

10 A    Not entirely, because I didn't know about HashTalk until

11 later after I had purchased my Hashlets.

12 Q    Do you want to take a look at page 46 of your deposition?

13 A    Okay.  Go ahead.

14       THE COURT:  Just want you to read it.

15 Q    (By Mr. Weiner) Read page 46.  We'll let you start it at

16 line 19 and read down to the bottom.  And you can read to 47 if

17 you want as well.

18 A    Okay.  And your question?

19 Q    And does that refresh your recollection that from August of

20 2014 through early October 2014, your primary source of

21 information regarding GAW Miners was through the HashTalk

22 forum?

23 A    Uh, and as I stated here, in the beginning, I didn't know

24 HashTalk existed.  It says here that there's the beginning, the

25 middle, and end; and you have to distinguish or separate them

1    all because I didn't get to HashTalk until almost -- I want to

2    say it was at least weeks after I purchased.  I just happen to

3    run across somebody that said HashTalk existed.

4    Q    Right.  And I think what you told us or at your deposition

5    was up until November.  So up until November could include

6    October; right?  You say up until November your primary

7    information flow was coming from the HashTalk forum.

8    A    That's true.

9    Q    And tell the jury what the HashTalk forum is again.

10   A    HashTalk was a, um, a website that GAW Miners owned

11   exclusively.  It was also a private website.  There were

12   numerous forums on this website by subjects and -- well,

13   basically by subject, including announcement section, um,

14   things that were strictly GAW Corporation oriented.  That's

15   basically it in a nutshell.

16   Q    And you, yourself, would post on HashTalk, the forum?

17   A    Yes, I was -- eventually I became one of the leaders of the

18   community.

19   Q    Okay.  And you would read the posts on the HashTalk forum?

20   A    I would agree to do what?

21   Q    You would read the posts?

22   A    I would read, uh, some of the posts, not -- nobody could

23   possibly read all those posts.  There were thousands of people

24   posting in this area, so it was impossible.

25   Q    And now starting in mid to late October of 2014, you

1    started to have direct one-on-one communications with the

2    senior people at GAW Miners; right?

3    A    Uh, I had -- yes.

4    Q    And you did that as a way of finding out what was going on

5    behind the scenes at GAW Miners; correct?

6    A    Uh, no.

7    Q    Take a look at page 45.  Of your deposition.  Sorry.

8              And if you look at 9 -- starting on line 9, going down

9    to the bottom, do you see your reference to communications so

10   that you could find out what was going on behind the scenes?

11             Do you see that, Mr. Shinners?

12   A    I see -- I see exactly what I said, yes.

13   Q    And so as part of finding out what was going on behind the

14   scenes, you communicated directly with Josh Garza; right?

15   A    Yes.  And as I stated in the deposition -- and I asked you

16   to clarify this question then because it wasn't just behind the

17   scenes.  It was in front, out in the public realm.  I connected

18   to GAW Miners directly to basically find out what was going

19   on.

20   Q    Right.  And I didn't mean to say you weren't just behind

21   the scenes.  You had all the information that was out there in

22   the public; right?

23   A    Everything that was out in public, yes.

24   Q    And you also had direct communications with Mr. Garza to

25   find out what was going on behind the scenes; correct?

1  A   I had direct communication with Mr. Garza not specifically

2  to find out what was going on behind the scenes.  They were

3  general public questions really from myself and from the

4  HashTalk community, yes.

5  Q   But when you spoke on the phone one on one with Mr.

6  Garza -- and you did do that; right?

7  A   Yes, I did.

8  Q   There wasn't -- the general public wasn't on the telephone;

9  right?  It was you on one end and him on the other end?

10  A   Yes, that's correct.

11  Q   And you also e-mailed Mr. Garza; is that right?

12  A   Um, yes, but I don't know when the first one was.

13  Q   You didn't copy everybody in the world.  It was an e-mail

14  from you to Mr. Garza; right?

15  A   That's correct.

16  Q   Okay.  And when you texted -- did you text Mr. Garza too?

17  A   I don't believe I ever had his -- I don't believe I ever

18  texted him, no.

19  Q   You sure?

20  A   I'm not going to be positive after seven years, no, sir.

21  Q   Okay.  It's hard to remember sometimes whether you send

22  texts or not if it's after the event; right?

23  A   Uh, yeah.  Well, it's long after -- it could have happened,

24  I suppose.  I haven't texted him since.

25  Q   And you communicated with Mr. Garza through something

1    called private messaging; right?

2    A    That's correct.

3    Q    Okay.  And private messaging you don't copy everybody in

4    the public; right?  It's just you to Mr. Garza and him to you.

5    A    It's private messaging, yes.

6    Q    Let's talk first about your phone conversations with Mr.

7    Garza.  Between October of 2014 and the end of December 2014,

8    you had at least six to ten one-on-one conversations with Mr.

9    Garza by telephone; correct?

10   A    It's very probable.

11   Q    Do you recall telling me that in your deposition; right?

12   A    Well, I'm sure I also said -- well, pull up the deposition.

13   But I'm sure I said I didn't know exactly how many phone calls

14   I had with him, but yes.

15   Q    And you estimated six to ten.  Is that fair?

16   A    It's fair.  It's fair.

17   Q    Could be more; could be less.

18   A    Could be less; it could be more.

19   Q    Okay.  You and Mr. Garza communicated frequently through

20   the private messaging function on the HashTalk forum; right?

21   A    Uh, you'll have to repeat that again slowly.

22   Q    You and Mr. Garza communicated through the private

23   messaging function on the HashTalk forum.

24   A    That's correct.

25   Q    Will you tell the jury how the private messaging system

1  works on the HashTalk forum.

2  A   Private messaging is just like any other private messaging.

3  Like on your phones, you assume it's private.  You're not

4  carbon copying a million people on it.  So, yeah, that's it in

5  a nutshell.

6  Q   And you communicated with Mr. Garza through that medium;

7  right?

8  A   Yes, on HashTalk.

9  Q   You also communicated privately with GAW Miners' president

10  and chief operating officer Mr. Kelley; correct?

11  A   Oh, was he president?  I didn't know.  Yeah, yes, I did,

12  once.

13  Q   And you communicated with GAW's general -- GAW Miner's

14  general manager, Mr. Jonah Dorman; right?  You communicated

15  with him privately?

16  A   I don't know if I -- yes.  I'm not sure it was privately

17  though.  Um, I think -- there were always like CCs and such on

18  the e-mails.

19  Q   Okay.  So you communicated with him directly, Mr. Dorman --

20  you and Mr. Dorman at GAW Miners; right?

21  A   Yes, I had -- well, I had communicated with him directly,

22  whether it was public -- I mean in a group or whatever, yes, I

23  did send him e-mails.

24  Q   He was the general manager of GAW Miners?

25  A   Um, I really don't know what his title officially was.

1    Q    And you communicated directly with the chief technical

2    officer, Mr. Joe Mordica, as well?

3    A    Um, toward the end of the year, I believe, is when we first

4    communicated.  There was some technical issue or something.

5    Q    Okay.  And you communicated with Mr. Eric Capuano at GAW

6    Miners as well?

7    A    Mm, nah, I'm not sure I ever communicated with him

8    actually.  There wouldn't have been a reason to.

9    Q    Want to try page 48 of your deposition?  Just read page 48,

10   line 4 to yourself and tell us when you're ready.

11   A    Line 4, okay.

12         Exactly.

13   Q    Does that refresh your memory that you communicated --

14   A    Well, it doesn't refresh my memory what the --

15   Q    Let me finish.

16         THE COURT:  Let him finish the question.

17   Q    (By Mr. Weiner) It refreshes your memory that you

18   communicated with Eric Capuano at GAW Miners; correct?

19   A    Yes, it does.

20   Q    So you communicated with Mr. Garza, Mr. Kelley, Mr.

21   Dorman, Mr. Mordica, Mr. Capuano.  Anyone else at GAW Miners

22   executive that I left out that you communicated with?

23   A    Are these all executives?  I -- I don't think so.

24   Q    Okay.  You can't think of anyone else; right?

25   A    Not off the top of my head here, no, sir.

1  Q    Okay.  Now, in 2014 and '15, you never once met Stuart

2  Fraser; correct?

3  A    Physically?  No.

4  Q    You never once spoke with him on the phone; correct?

5  A    No.

6  Q    You never once e-mailed him; correct?

7  A    No.

8  Q    Never once got an e-mail from him; correct?

9  A    Not that I'm aware of.

10 Q    You never once communicated with Mr. Fraser by text or by

11 SMS; correct?

12 A    No.

13 Q    That is, you never did it.  Isn't that right?

14 A    No.

15 Q    It's the way I'm framing my question.  You didn't

16 communicate with Mr. Fraser by phone, by e-mail, by text, or by

17 SMS; right?

18 A    No.

19 Q    I'm going to try one more time.

20       THE COURT:  He wants to know if what he's saying is

21 correct.

22       THE WITNESS:  Yes, that's correct.

23       MR. WEINER:  Thank you, Your Honor.

24 Q    (By Mr. Weiner) And am I also correct you didn't

25 communicate with Mr. Fraser by the private messaging act on the

1   HashTalk forum?

2   A    There's no way for me to know that.

3   Q    As far as you know, you didn't.

4   A    Yes, there's no way for me to know that.

5   Q    No one saying "I'm Stuart Fraser" communicated with you on

6   private messaging.

7   A    Thanks for clarifying that.  That's correct.  Nobody

8   claiming to be Stuart Fraser ever contacted me on PM.

9   Q    Okay.  And you heard the testimony about Mr. Fraser's

10  Twitter feed that he had up for a couple of months.  Do you

11  remember that?  You heard the testimony; right?

12  A    First of all, I didn't hear the whole question at all.

13  Q    Let me cut to it then.  You weren't a follower of Mr.

14  Fraser's Twitter feed; right?

15  A    The Twitter account?

16  Q    Right.

17  A    I was.

18  Q    You were one of the 75 people --

19  A    Apparently, yes.

20  Q    Okay.  How do you know that?

21  A    Because I saw the accounts on Twitter, and I followed

22  him.

23  Q    Okay.

24  A    That's it.

25  Q    And were you also Facebook friends with Mr. Fraser?

1   A    No, I was not.

2   Q    You said you never met -- I asked you.  You never met Mr.

3   Fraser back in 2014 or 2015; correct?

4   A    That's correct.

5   Q    Have you met him since?

6   A    Here.

7   Q    Other --

8   A    But not --

9   Q    Other than in this courthouse.

10  A    Uh, no.

11  Q    In 2014 you weren't relying on news or press articles about

12  GAW Miners and its products to make your investments in those

13  products; correct?

14  A    News?  Yes.  Press -- I don't remember any press articles

15  per se.  I'm not subscribed to any of those types of

16  websites.

17  Q    Okay.  You don't believe everything you read in the press;

18  correct?

19  A    In the press?  As in the news?

20  Q    Like the news, yeah.

21  A    Uh, no, I do not believe everything I read in the news.

22  Q    Okay.  And I'm kind of old school.  I mean press I mean,

23  you know, cable and newspaper and the media.  Do you believe

24  what you read in the media?

25  A    Some of it I do; some of it I do not.

1   Q    And I think you told me in your deposition you really

2   distrust the media to a great extent.  Is that still true?

3   A    That is still true.

4   Q    Okay.  So when you hear things in the media, your

5   inclination is to distrust it to a great extent; correct?

6   A    Until proven otherwise.

7   Q    Now, in late 2014, you negotiated with Josh Garza to get a

8   job at GAW Miners; right?

9   A    I wouldn't call it specifically a negotiation, but yes.

10  Q    How about generally?  Would you call it generally a

11  negotiation?

12  A    He asked for a resume; I sent him a resume.

13  Q    Right.  And you sent him requests for salary and benefits,

14  and you talked about what kind of job you wanted and there was

15  a back-and-forth?

16  A    It definitely was a back-and-forth.

17  Q    So if I called it negotiation, you would understand what I

18  was talking about; right?

19  A    Well, we never really got that far, so ...

20  Q    Okay, but you sent Mr. Garza your resume; right?

21  A    Correct.

22  Q    Let's look at Defendant's Exhibit 560.

23         THE COURT:  All right, 560 can be admitted as a full

24  exhibit.  It can be shown to the jury.

25         (Defendant's Exhibit 560, received in evidence.)

1    Q   (By Mr. Weiner) Let's blow up 560.  At the top of the page

2    you see your header.  We blocked your address, but it says, "D.

3    Allen Shinners."  That's you; right?

4    A   Yes, it is.

5    Q   It says November 10, 2014.  It's addressed to Josh Garza.

6    And you say in the first paragraph, thank you -- Mr. Garza, you

7    say, "Thank you for requesting my resume.  It is a unique

8    opportunity to be involved" -- let's highlight the first

9    line -- "in the massive expansion of the innovative technology

10   company"; right?

11   A   Correct.

12   Q   And the innovative technology company you were talking

13   about was GAW Miners; correct?

14   A   Yes.

15   Q   Okay.  And let's go down two paragraphs.  And you talk

16   about your background; right?  Let's highlight that whole

17   paragraph, "I have provided."

18         You say, "I have provided consulting and project

19   management services to many Fortune 1000 companies, county and

20   municipal government entities across the United States and

21   internationally."

22         That was true; right?

23   A   That's correct.

24   Q   "I have provided forensic, financial and tariff-based,

25   local exchange carrier auditing to some of the largest

1    companies in the world."

2          That was true; right?

3    A    That's true.

4    Q    "I have been the 'go to' expert on many levels, involving

5    many financially oriented issues, including regulatory

6    matters."

7          Do you see that?

8    A    Yes.

9    Q    That was true?

10   A    Yes, that's true.

11   Q    "My reputation achieved the only telecommunications audit

12   ever performed for a Tier 1 telecommunications service

13   provider:  Global Crossing."

14         That was accurate?

15   A    That is true.

16   Q    And finally, you say, "My expertise and insight have been

17   employed to help other auditors acquire, or retain, their

18   clients.  I am the auditor's auditor, which is the reason I

19   consult on projects that are often not my own."

20         Do you see that?

21   A    Yes, I see it.

22   Q    You describe yourself as the auditor's auditor; is that

23   right?

24   A    That's correct.

25   Q    And Mr. Garza was still able to con you, wasn't he?

1    A    Apparently.

2    Q    Now, you also sent Mr. Garza your request for a salary and

3    for location and for traveling expenses; correct?

4    A    Um, I'm sorry.  Can you repeat the whole?

5    Q    You sent a request for Mr. -- to Mr. Garza, which included

6    the salary you wanted to work at GAW Miners, what kind of

7    travel expenses would be paid, and where you'd be located.

8    Remember that?

9    A    Correct.

10   Q    And you were interested in being the chief financial

11   officer I think you told Mr. Rennie; right?

12   A    In the very beginning, yes.  That's what I had reached out

13   to him for.

14   Q    And I think you told Mr. Rennie that you had seen an

15   advertisement for the chief financial officer at GAW Miners on

16   the HashTalk forum or somewhere else?

17   A    That's where he listed them, yes.

18   Q    That's the public forum; right?

19   A    Correct.

20   Q    So anyone who read that public forum and saw GAW Miners was

21   looking for a chief financial officer, they would have figured

22   out they don't have one; right?

23   A    I can't jump to that conclusion, no.

24   Q    Okay.  Did you know when you were applying for the position

25   of CFO that that position was vacant?

 1   A    I did not know that.

 2   Q    Okay.  Now, you were more focused also -- sorry, withdrawn.

 3        The GAW Miners' people, Josh Garza and his team, were

 4   focused on you becoming something called a communications

 5   director; is that right?

 6   A    Communications and public relations.

 7   Q    Right.  And you discussed the possibility of a job as

 8   either CFO, chief financial officer, or communications director

 9   or some melding of the two.  You discussed that with people at

10   GAW Miners; right?

11   A    With Josh Garza, yes.

12   Q    Okay.  And Mr. Garza told you, in late 2014, that GAW

13   Miners did not have a CFO -- correct? -- a chief financial

14   officer?

15   A    I'm not exactly sure if he actually told me that it was a

16   vacant position, no.

17   Q    Do you want to take a look at page 58 of your deposition?

18        MR. WEINER:  Your Honor, we'd offer page 58, line 18

19   through page 59, line 6.

20        THE COURT:  If they can bring it up just for me and

21   the witness, please.

22        MR. WEINER:  Mr. Jackson, if you could.  Page 58, line

23   18 to page 58, line 6.

24        THE COURT:  Off the screen.  Off the other screen.

25   That's great.  Okay, thank you.

```
 1              THE WITNESS:  What lines?
 2              MR. WEINER:  Starting at page 58, line 18 and going to
 3    page 59, line 6.
 4              THE COURT:  So that can come in.  That page can come
 5    in as a full exhibit.  That's page 58 -- why don't we let both
 6    pages in as full exhibits.
 7              Mr. Weiner:  That's fine, Your Honor.
 8              THE COURT:  Pages 58 to 59 of Mr. Shinners' deposition
 9    will be DX 234?
10              MS. HASSAN:  734.
11              THE COURT:  734, I misspoke.  Sorry, DX 734.  That
12    will be full.
13        (Defendant's Exhibit 734, received in evidence.)
14    Q   (By Mr. Weiner) And, Mr. Shinners, you can see I asked you:
15              "Okay.  In their earlier discussion about you
16              potentially becoming the chief financial officer, tell
17              us about that."
18              Your answer was:  "That was pretty much it.  They --
19              he stated that they did not have a CFO.  That was a
20              problem that they had.
21              "Question:  Who was the 'he' there?  Is that --
22              "Answer:  Josh Garza.  That the position was open, and
23              he had not had my resume yet.  So I said, well, I -- I
24              would be interested in that, but I'm not sure that I
25              fully qualify for the position.  And he said, Send me
```

1              your resume."

2              Right?

3    A    That's correct.

4    Q    Does that refresh your memory that there was no CFO at GAW

5    Miners in October or November of 2014?

6    A    Uh, yes, it does.

7    Q    And did that concern you, sir?  Knowing that there was no

8    chief financial officer, did that signal to you that there was

9    a real problem at GAW Miners, that you shouldn't invest in that

10   company?

11   A    I would have no way of knowing that.

12   Q    Well, Mr. Garza told you there's no CFO; right?

13   A    Correct.

14   Q    Did that make you say, that's not a company I want anything

15   to do with; they don't have any kind of financial controls or

16   accounting?

17   A    There are a lot of companies that don't have CFOs right

18   now.

19   Q    So it didn't bother you in the slightest?

20   A    It did not even strike any interest in my head that there

21   was an empty -- or a vacancy, no.

22   Q    You knew by then GAW Miners was a start-up business; right?

23   A    I knew that it was still a young business, yes.

24   Q    Okay.  And it was -- I think you called it a start-up

25   business.  Does that ring any bells?

1   A    Start-up it has -- it's got a very broad definition, but

2   yes.  It's under three years old.

3   Q    So GAW Miners was a start-up; right?

4   A    If it was under three years old, yes.

5   Q    Do you remember telling me at your deposition that it was a

6   start-up company, Mr. Shinners?

7   A    I may have just used that as a term, yes.

8   Q    Okay.  Now, you told Josh Garza and Dan Kelley, who was the

9   chief operating officer, that you were interested in the

10  position of communications director melded with international

11  business development; correct?

12  A    Uh, you'll have to refresh my memory on that too because I

13  do not believe I ever included the communications and public

14  relations part of that.

15  Q    Want to take a look at page 59?

16       THE COURT:  So that can be put up for him.  That's

17  already in.

18       MR. WEINER:  We're going to start now at the bottom.

19  So page 59 line 25.

20       THE COURT:  I'll let the whole page in.

21       MR. WEINER:  Going to page 60, line 17.

22       THE COURT:  So page 60 can come in as well.

23  Q    (By Mr. Weiner) All right.  Do you see at the bottom of

24  page 59 I asked you:

25       "Okay, and did the -- then that conversation about

1           your potential employment at GAW Miners, did that

2           morph into the discussion that you talked a bit about,

3           a communications director role?

4           "Answer:  That was Dan Kelley's proposition, or that's

5           what he was offering.  I never really heard more from

6           Garza about it, actually.  I -- I told them -- or I

7           told Dan Kelley and I did forward -- or did send an

8           e-mail to Garza saying this is what he offered,

9           basically recapping what I just said, which is I was

10          more interested in international, you know, business

11          development role, and -- and I could see, you know,

12          melting -- melding the two together where the

13          communications director and some position that had to

14          do with international business development could be

15          one in the same."

16          Do you see that?

17   A   Yes, I do.

18          THE COURT:  Just for the record, the exhibit DX 734

19   will be pages 58 and 60 -- 58 through 60, 58 through 60.

20          MR. WEINER:  Thank you.

21   Q   (By Mr. Weiner) Now, you were interested in international

22   business development aspect because you have a lot of

23   international experience; correct?

24   A   You mean in this particular instance?

25   Q   In general.  Not every question I ask is a trick question.

1    Some of them are.
2              You're a person of the world; right?
3    A    I hope to be someday anyway.  What's your question again,
4    please?
5    Q    You speak four different languages; right?
6    A    Well, yes.
7    Q    You speak English, Russian, German, and French; right?
8    A    In varying degrees anymore, yes, sir.
9    Q    French is your first language?
10   A    French was my first language, yes.
11   Q    Let's go to Defense Exhibit 603.
12             THE COURT:  All right.  603 will be a full exhibit.
13        (Defendant's Exhibit 603, received in evidence.)
14   Q    (By Mr. Weiner) Let's blow that up a little bit.  That's an
15   e-mail from you, Mr. Shinners; correct?
16   A    Yes, this is my e-mail.
17   Q    And that's December 7th of 2014; right?
18   A    Uh, yes, it is.
19   Q    And you're writing to dan@btc.com?
20   A    Correct.
21   Q    Who is dan@btc.com?
22   A    I can't see the rest of the e-mail, but I would say this is
23   probably Dan Kelley.
24   Q    Okay.  Dan Kelley was the COO of GAW Miners; correct?
25   A    I don't have any idea.  His titles changed regularly.

1   Q   Sitting here in the courtroom, have you seen the documents

2   put up on the screen where it says Dan Kelley, Chief Operating

3   Officer, GAW Miners?

4   A   Yeah, I can't see these monitors from back there.

5   Q   Okay.  Okay.  Fair enough.

6           And you talk about you're interested in the position.

7   We discussed it over the phone and that was the position of

8   communication director and international business development;

9   correct?

10  A   Thank you whoever did that.

11  Q   That's the position we were talking about.  You were

12  looking for a position at GAW Miners --

13  A   I believe this is -- yes, this is the one that he had

14  offered on the phone.

15  Q   Okay.  And if you go down to a sentence or two more, you

16  say, "Over 60 percent of the current active members are outside

17  the U.S."  Do you see that?

18  A   Yes.

19  Q   And then -- and right above that you talk about something

20  called XPY.  Let's do the sentence above that.

21          "My first degree was in international business and my

22  MBA research focused on global small business development.  I

23  would feel highly underused in the long term should I not have

24  the ability to work internationally, developing the new XPY

25  infrastructure and market expansion opportunities."

1              Do you see that?  Going to highlight that whole

2    sentence.

3    A    It's up there, okay.  I was looking below.

4    Q    And XPY, XPY is Paycoin; right?

5    A    That's correct.

6    Q    You wanted the ability to develop the new Paycoin

7    infrastructure and market expansion opportunity; correct?

8    A    There was a specific project in mind, yes.

9    Q    Okay.  And let's go to Defense Exhibit 628.

10              THE COURT:  Okay, DX 628 will be a full exhibit.

11        (Defendant's Exhibit 628, received in evidence.)

12    Q    (By Mr. Weiner) Okay.  Defense Exhibit 628 is you writing

13    directly to Mr. Garza on the last day of the year; right?

14    December 31st?  Do you see that, Mr. Shinners?

15    A    Uh, yes, I do.

16    Q    Okay.  And then you say three paragraphs down, "I am

17    definitely game for the challenge/position, combined with the

18    following."

19              And then I think you have 18 points that you want

20    before you come to work for GAW Miners; right?  We can keep

21    that first page.  Let's go back to where we were, Mr. Jackson.

22              We're not going to read all of them, mercifully.  So

23    this was your -- let's bring it down where we had it before,

24    Mr. Jackson.

25              This was your list of what you wanted to come work at

1    GAW Miners; right?

2    A    This was my dream sheet, that's correct.

3    Q    Let's go up -- let's bring up the address.

4         So as of December 31st, 2014, you were still on board

5    with the idea of working for GAW Miners; right?

6    A    Uh, tentatively, yes.

7    Q    But it doesn't say, I am tentatively game for the position.

8    It says, I am definitely game for the challenge or position.

9         So you were on board for working with GAW Miners as of

10   December 31, 2014; right?

11   A    Yes.

12   Q    And you say -- if you look down at paragraph 1, you say, "I

13   need to be an extension of both the CEO and the COO, as well as

14   having input range on financial outflow decisions"; right?

15   That's something that you wanted.

16   A    That's correct.

17   Q    No. 2, you wanted travel expenses, around the globe; right?

18   A    That's correct.

19   Q    No. 3, you periodically will need to bring in people with

20   real vision and creativeness in all aspects of business

21   molding.  Do you see that?

22   A    Correct.

23   Q    No. 4, you say translators must be your domain?

24   A    Yes.

25   Q    No. 5, you wanted the development of the global

1    consultant/contractor market?

2    A    Yes.

3    Q    And No. 6, you wanted to wrap the communications director

4    into the position as well?

5    A    Yes.

6    Q    No. 7, you wanted heavy input into all proposed GAW product

7    lines?

8    A    Yes.

9    Q    And on the next page, No. 8, you wanted a three-year

10   contract?

11   A    I assume so.

12   Q    And No. 9 -- let's blow up No. 8 so the witness can see it.

13   No. 8 is the three-year contract.  No. 9, you had your request

14   for salary and bonus.  Do you see that?

15   A    Yes.

16   Q    Okay.  And the list goes on from there.

17        That's a pretty detailed list of things you wanted.

18   You agree with me on that?

19   A    Yes, I do agree.

20   Q    Okay.  And you were -- as I said, you were on board.  If

21   these demands were met, then you would come on board to help

22   out GAW Miners in selling its products; right?

23   A    That's not necessarily correct.

24   Q    But you would come on board in the position of

25   communications director, international business development,

1    and financial arrangement; right?

2    A    Uh, this -- as is stated in the beginning, this was for the

3    CBDO position that he'd asked me to describe to him.

4              THE COURT:  Can I ask what CBDO stands for?

5              THE WITNESS:  Yes.  It's the chief business

6    development officer.

7              THE COURT:  Thank you.

8              THE WITNESS:  I'm sorry.  It's the chief business

9    development officer.

10   Q    (By Mr. Weiner) And if we go back to that first page and

11   you talk about No. 1 -- let's go back to No. 1.  Pop that out.

12   When you talk about you need to be an extension of both the CEO

13   and the COO, as well as having input range on financial outflow

14   decisions, especially related to due diligence; right?

15   A    I'm sorry?

16   Q    You see the sentence I'm talking about?

17   A    Oh, that they're underlining now or highlighting?

18   Q    Yup.  Yes.

19   A    That's correct.

20   Q    Okay.  And by the time you had this kind of demand list for

21   Mr. Garza, you had already signed a nondisclosure agreement

22   with GAW Miners; right?

23   A    That's correct.

24   Q    You know what a nondisclosure agreement is; right?

25   A    Yes, I do.

1   Q    And tell the jury what a nondisclosure agreement is.

2   A    A nondisclosure agreement is a document that states that

3   neither party will divulge information that is privileged.

4   That's my understanding of it.  I am not an attorney, so that's

5   my version of it.

6   Q    And you knew what GAW Miners was looking for was -- and got

7   from you -- was your agreement that you wouldn't disclose

8   nonpublic information; right?

9   A    In principle, yes.  It wasn't that descript, the

10  nondisclosure agreement I received.

11  Q    But that's the sense of what they call NDAs, nondisclosure

12  agreements.  That's their sense, that you'll be inside the tent

13  and you won't disclose public information; correct?

14  A    Generally I agree with that statement.

15  Q    And you understood that there would be some information

16  from GAW Miners that you would get access to that Mr. Garza and

17  GAW Miners didn't want made public; correct?  You understood

18  that?

19  A    Um, yes, correct.

20  Q    Let's take a look at Exhibit DX 592.

21        THE COURT:  Okay, that will be a full exhibit, DX 592.

22      (Defendant's Exhibit 592, received in evidence.)

23  Q    (By Mr. Weiner) And that's -- the first e-mail starts at

24  the very back.  So, Mr. Shinners, if you want to go to the last

25  page and then move forward till you get to the first e-mail.

1   It's from you.  It starts at the bottom of the page, November

2   26, 2014, so we're going back in time to the end of November.

3   Let's highlight that one at the bottom and then the carry-over

4   to the top of the next page.

5           Let's bring that up and bring in the carry-over.  And

6   it's November 26.

7           I'll just read the top one.  We'll scroll down.

8   November 26 -- thank you, Mr. Jackson.

9           You write -- I'm sorry.  Mr. Garza writes to you in

10  response:  "I think your (sic) right."  And what he's

11  responding to you is your e-mail.

12          At the bottom you say, "Josh, I do not think I can

13  post to the bounty contest."  That's highlighting the first

14  line on the bottom.  "I know too much about all this from the

15  collaboration on the Q and A."  Maybe Mr. Jackson can highlight

16  that line at the top of the page, "I do not think."

17          "I know too much about all this from the collaboration

18  on the Q and A.  Nobody knows anything about Primes."

19          Primes are Hashlets; right?  Primes are Hashlets, Mr.

20  Shinners?

21  A   I'm not sure which Primes.  There were multiple -- well,

22  there were two different types of Primes.  So I'm not sure

23  which this actually refers to.

24  Q   "Nobody knows anything about Primes switching to

25  HashStakers and HashStakers hosting a wallet on Prime

1    Controllers.  It is too much of an advantage.  I can post on

2    everything else that has nothing to do with the NDA we have

3    between us, but really not much more than that."

4          Do you see that?

5    A   Yes.

6    Q   And this is one example where you were telling Mr. Garza

7    that you are privy to -- that you have nonpublic information

8    from being on the inside at GAW Miners that you shouldn't

9    participate in some contest; right?

10   A   Uh, that was part of the reason, yes.

11   Q   And you said you had -- it's too much of an advantage

12   because you didn't want to take advantage of people in the

13   public who didn't have the inside information that you had;

14   correct?

15   A   That is not correct.

16   Q   Right.  You thought you had -- would have a leg up on

17   others; correct?

18   A   Uh, no, that is not specifically correct.

19   Q   You want to take a look at page 291 of your deposition?

20          MR. WEINER:  And, Your Honor, we're going to offer

21   page 291, line 16 to page 292, line 7.

22          THE COURT:  So if somebody could bring that up for me

23   and for the witness.

24          MR. WEINER:  Mr. Jackson, just for the Court, page

25   291.

1              THE WITNESS:  What were the lines?

2              MR. WEINER:  Page -- Your Honor, we're offering 291,

3    line 16 to 292, line 7.

4              THE COURT:  Yeah, I'll allow that as Defense Exhibit

5    735.  DX 735 will be pages 291 and 292 of the deposition of Mr.

6    Shinners' deposition.

7         (Defendant's Exhibit 735, received in evidence.)

8    Q    (By Mr. Weiner) And line -- I'm reading line -- page 291.

9    I ask:

10             "Question:  Is that because you -- you -- you didn't

11             feel comfortable participating in a contest or doing

12             something where you would have a leg up on other

13             people?"

14             And you answered:  "Where I would have a leg up on

15             other -- especially when I knew these were not public

16             posts.  These business ideas were going to, I assume,

17             directly to Josh Garza, and -- and he was discussing

18             these with me.

19             "So I couldn't very well be part of a competition

20             where I knew where the competition -- what the

21             competition was submitting and why it would never be

22             accepted by GAW.  So that was the bulkhead of the -- I

23             have to recuse myself from this -- this computation

24             because it would be completely unfair under the

25             circumstances."

1           Do you see that?

2    A    Yes.

3    Q    And you thought it would be unfair because you would have a

4    leg up on people in the public because you knew inside

5    information at GAW Miners; correct?

6    A    Uh, no.

7    Q    You -- you edited HashTalk posts for Mr. Garza before they

8    went public with it; right?

9    A    Edited two posts he had sent to me, yes.  I believe they

10   were sent to me, yes.

11   Q    As Mr. Buchdahl says, that would be a yes?

12   A    Then yes.

13   Q    And we go back to the exhibit we were looking at, Exhibit

14   592.  We were on the first page.  We're going to move a little

15   forward.

16          Mr. Jackson, if we can get 592 back.  And let's go to

17   the page before the one we were looking at.  It starts at the

18   back.  So let's go to the page where at the bottom there's an

19   e-mail Friday, November 28th from you at 1:45 a.m.

20          It's the next page.

21          Right.  And that's the e-mail, November 28th.  You

22   write, "I just finished working the Shopify edits for the

23   HashStaker (GAW Miners)"; right?  And you're telling this

24   directly to Mr. Garza; right?

25   A    Um, it appears it might be, yes.

1    Q   You and Mr. Garza are having an e-mail exchange.  It's just

2    the two of you; right?

3    A   I don't think the original e-mail was not with Mr. Garza.

4    This was me sending an e-mail to Mr. Garza that I had just

5    finished working on the Shopify ads.

6    Q   And then he responded to you right above that?

7    A   Oh, I did not know.

8    Q   And you and Mr. Garza were one on one communicating via

9    e-mail; correct?

10   A   Correct.

11   Q   You were on a first-name basis with Josh Garza; right?

12   A   Uh, yes.

13   Q   He called you Allen, and you called him Josh; right?

14   A   Yes, I would believe so, yeah.

15   Q   And you -- when you had finished working the Shopify edits,

16   that's an example of some of the edits you were doing here for

17   the HashStaker product; correct?

18   A   For the -- on the GAW -- on the Shopify, I believe that was

19   Shopify edits.  Yes, it states right there it was for

20   HashStaker.

21   Q   Right.  And if we go a couple pages more, it's still the

22   same day.  Let's go to November 28th.  In the middle it's

23   November 28th at 11:21 a.m.  So let's go up to a couple of

24   pages, right in the middle, 11:21 a.m. on November 28th.

25           MR. WEINER:  Mr. Jackson, it's on the third page of

1    the exhibit.

2    Q    (By Mr. Weiner) And you see that e-mail, you write to Mr.

3    Garza, "Help me out" -- it says "her," but I think you meant to

4    say "here"; right?

5    A    Sorry?

6    Q    You meant to say, Help me out here boss; right?

7    A    Oh, It says "her," yeah.  Yes.

8    Q    And the boss that you were talking about was a fellow named

9    Homero Josh Garza; correct?

10   A    I believe that's his name, yes.

11   Q    And if we go to the first page on exhibit, you see in the

12   middle you say to Mr. Garza, "Want to jump on the phone?"  And

13   you say, "I'm in Toledo.  I don't have your number here.  Can

14   you resend it?"  And he gives you his phone number.

15         Do you see that?

16   A    Yes.

17   Q    That was one of the phone conversations you had one on one

18   with Mr. Garza; right?

19   A    Yes.

20   Q    Now, your interest in editing the posts that GAW Miners was

21   going to do before they put them out was to improve

22   communications between GAW Miners and the public, including

23   clients and potential customers; correct?

24   A    There were two posts that were sent to me from Mr. Garza,

25   neither of which I believe -- I'm not sure, but I don't believe

1    both of them were actually posted.

2    Q    One of the ones you edited for Mr. Garza he posted; right?

3    You edited it; right?

4    A    It's possible, yes.

5    Q    And your purpose in editing them was to improve GAW Miners'

6    communications with the public, including potential customers

7    and clients; right?

8    A    Uh, it was for HashTalk; and, yes, it was to make sure that

9    the English was understood.

10   Q    Okay.  And if you look at Exhibit -- let's look at Exhibit

11   561, DX 561.

12          THE COURT:  Okay, that will be a full exhibit, DX 561.

13       (Defendant's Exhibit 561, received in evidence.)

14   Q    (By Mr. Weiner) It states from you to Mr. Garza, November

15   11th.  Subject:  Edited text Decision to Mine from Allen1980s.

16          That's your handle; correct?

17   A    That was my HashTalk name, yes.

18   Q    And you said, "Still working on the resume to send.  In the

19   meantime, I edited your post (attached) posted as Decision to

20   Mine."

21          Do you see that?

22   A    Yes, I do.

23   Q    The next pages we would see a two-page post that Mr. Garza

24   sent out after you helped him work on it; correct?

25   A    I'm sorry.  What was the question?

1    Q   You were in there helping Mr. Garza communicate with the

2    public about the products of GAW Miners.  Isn't that true?

3    A   I'm not sure whether this was a product or not.  I have to

4    read this.

5    Q   Okay.  Why don't you turn the page, and the first line

6    might give you a clue.  It says, "Let's try this again.  As

7    some of you know, I have decided not to premier HashCoin."  And

8    the bottom of that page refers to Hashpoint.  That's at the

9    bottom, our Hashpoint customer.

10             You're familiar with the terms "HashCoin."  That

11   became Paycoin; right?

12   A   Correct.

13   Q   And you know Hashpoint.  That's one of the products at

14   issue in this case; right?

15   A   Correct.

16   Q   So having reviewed the post, is it fair to say you were

17   helping Mr. Garza edit text before it went to the public

18   regarding HashCoin and Hashpoint?

19   A   Correct, yes.

20   Q   Now --

21             MR. WEINER:  We can take that down, Mr. Jackson.

22   Thank you.

23   Q   (By Mr. Weiner) Your private communications with Mr. Garza

24   in 2014 were not limited to your attempt to get a job or to

25   editing the English in posts; right?

1   A    No.

2   Q    I'm going to need the Judge's help here again.

3        Am I correct that your communications went beyond just

4   editing English and looking for a job?  Am I correct?

5   A    Correct.

6   Q    And on at least one occasion, you specifically called Mr.

7   Garza to discuss Paycoin's $20 price floor?

8   A    I'm sorry.  The latter part of that?

9   Q    You called Mr. Garza to discuss the $20 floor for Paycoin;

10  correct?

11  A    That I called him?

12  Q    Yes.

13  A    Possibly.

14  Q    Take a look at page 138 of your deposition.

15       At line 9, going down to -- well, going on to page

16  139.  Just read that to yourself.

17  A    Just line 9?

18  Q    Starting on line 9, on page 138, and you can read that to

19  the page on the next one, down to line 19.

20       And my question is going to be --

21  A    I have not completed.

22  Q    Go ahead.  Go ahead.  Mr. Shinners, I'm sorry.  Tell me

23  when you're done.

24  A    Okay.

25       THE COURT:  You wanted him to read onto the next page?

1              MR. WEINER:  Right, page 139, line 13.  Thank you,

2       Your Honor.

3              THE WITNESS:  Stop.  Move that down a little bit,

4       please, whoever's doing this.  Stop.  Okay.

5              MR. WEINER:  You also have a hard copy if you want.

6              THE WITNESS:  Yeah, it's a little small print though.

7       This is good.

8              MR. WEINER:  Whichever one you're more comfortable

9       with.

10             THE WITNESS:  Okay.

11      Q   (By Mr. Weiner) Does that refresh your memory that at least

12      on one occasion you picked up the phone and called Garza to

13      talk to him about the $20 floor for Paycoin; right?

14      A   Uh, yes.

15      Q   And you called him to talk to him about the hundred million

16      dollar Coin Adoption Fund too; right?

17      A   Correct.

18      Q   And your concern was that Mr. Garza and GAW Miners weren't

19      really putting enough assets toward the proper management of

20      the price floor; correct?

21      A   That GAW Miners wasn't -- and the rest I didn't quite catch

22      all of that.

23      Q   That they weren't putting enough assets toward the proper

24      management of the price floor.

25      A   That's correct.

1    Q    So you had a private conversation with Mr. Garza where you

2    told him your views; correct?

3    A    That's correct.

4    Q    Concerning Paycoin; correct?

5    A    Concerning the CAF.

6    Q    And the CAF, C-A-F, is the Coin Adoption Fund.  That's the

7    hundred million dollar reserve fund to support the price floor?

8    A    That's part of it, yes.

9    Q    Right.  And Mr. Garza told you on some aspects he'd have to

10   get back to you personally; correct?

11   A    Yes, I believe so.

12   Q    You had a close relationship, at least on a working level,

13   with Mr. Garza; correct?

14   A    Uh, I wouldn't go that far, no.

15   Q    I can understand why.

16         In 2014 Mr. Garza would occasionally call and ask for

17   your help in fixing what he considered emergencies at GAW

18   Miners; correct?

19   A    Uh, you'd have to be more specific.  I can't answer a

20   question like that.

21   Q    Well, take a look at page 142 of your deposition, at line

22   14.  And if you read just to yourself line 14.

23   A    Line 14 through?

24   Q    Through the top of page 144.  And then tell us when you're

25   set.

1            THE COURT:  I'll tell you what.  I'm afraid this is

2    taking too long.  We've reached the end of our day.  We'll have

3    to pick this up tomorrow.  I realize we're in the middle of the

4    question, but I do want to keep my promise to the jurors and

5    send them home at 3:30.

6            So, Ladies and Gentlemen, as usual, don't discuss the

7    case.  Don't let anyone discuss it with you.  Keep an open mind

8    and everything I said that goes with that, no outside research,

9    no checking on names.  Everything you need will be presented

10   here for you.

11           Be safe tomorrow driving in.  As I said, call

12   Ms. Johnson if there's any problem.  Otherwise, we'll see you

13   at the usual time, quarter of 9:00 in the room over next door.

14   Thank you very much for your attention today.

15       (The jury left the courtroom at 3:31 p.m.)

16           THE COURT:  Great.  You can step down, sir.  So, Mr.

17   Weiner, an estimate on how much more time?

18           MR. WEINER:  To the morning break, Your Honor.

19           THE COURT:  All right.  Then there will be some

20   redirect, I take it?  And then we'll have Mr. Pfeiffer, who I

21   think you said is going to be a short witness.

22           MR. BUCHDAHL:  Correct, Your Honor.  It's about a

23   15-minute direct examination.

24           THE COURT:  Very well.  Okay.  Great.  We'll be in

25   recess.  I'll get to work on completing the draft of the

1    charge, and we'll get it out to you tonight.  Thank you.

2         (Proceedings concluded at 3:33 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                            **I N D E X**

2

3      **WITNESS NAME**                                        **Page**

4      Called by the Plaintiffs:

5      Stuart Fraser

         Continued Cross By Mr. Weiner ............................. 511
6        Redirect By Mr. Buchdahl .................................. 552
         Recross By Mr. Weiner ..................................... 576

7

8      Denis Marc Audet

         Direct By Mr. Ard.......................................... 578
         Cross By Ms. Hassan ....................................... 592
9        Redirect By Mr. Ard ....................................... 636

10     Dean Allen Shinners

         Direct By Mr. Rennie ...................................... 640
11       Cross By Mr. Weiner ....................................... 667

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                     C E R T I F I C A T E

4

5

6

7               I, Julie L. Monette, RMR, CRR, CRC, Official

8       Court Reporter for the United States District Court for the

9       District of Connecticut, do hereby certify that the foregoing

10      pages are a true and accurate transcription of my shorthand

11      notes taken in the aforementioned matter to the best of my

12      skill and ability.

13

14

15                     /S/ JULIE L. MONETTE
                  _____
16                  Julie L. Monette, RMR, CRR, CRC
                         Official Court Reporter
17                          450 Main Street
                       Hartford, Connecticut 06103
18                          (860) 212-6937

19

20

21

22

23

24

25