```
 1                     UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF CONNECTICUT
 2
      - - - - - - - - - - - - - - - - x
 3
      DENIS MARC AUDET, MICHAEL           No. 3:16-CV-940 (MPS)
 4    PFEIFFER, and DEAN ALLEN
      SHINNERS, Individually and on       OCTOBER 27, 2021
 5    Behalf of All Others Similarly
      Situated,                           8:57 A.M.
 6
      vs.                                 JURY TRIAL
 7
      STUART A. FRASER, GAW MINERS,
 8    LLC, and ZENMINER, LLC, (d/b/a
      ZEN CLOUD)
 9
      - - - - - - - - - - - - - - - - x
10

11                    Volume V - Pages 751 - 917

12
                           450 Main Street
13                       Hartford, Connecticut

14

15         BEFORE:  THE HONORABLE MICHAEL P. SHEA, U.S.D.J.

16                        AND A JURY OF NINE

17

18    APPEARANCES:

19    FOR THE PLAINTIFFS:

20            SUSMAN GODFREY, L.L.P.
                   1301 Avenue of the Americas, 32nd Floor
21                 New York, New York 10019
              BY:  SETH D. ARD, ESQUIRE
22            BY:  JACOB W. BUCHDAHL, ESQUIRE
              BY:  GENG CHEN, ESQUIRE
23            BY:  RUSSELL RENNIE, ESQUIRE
              BY:  HANNAH MILLER, ESQUIRE
24
      (Appearances Continue ...)
25
```

```
1    APPEARANCES CONTINUED:

2    FOR THE DEFENDANT:

3            HUGHES, HUBBARD & REED L.L.P.
                One Battery Park Plaza, 12th Floor
4                New York, New York 10004-1482
             BY:  DANIEL WEINER, ESQUIRE
5            BY:  MARC A. WEINSTEIN, ESQUIRE
             BY:  AMINA HASSAN, ESQUIRE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20   COURT REPORTER:  Julie L. Monette, RMR, CRR, CCP
                        (860) 212-6937
21
     Proceedings recorded by mechanical stenography, transcript
22   produced by computer.

23

24

25
```

```
1                              8:57 A.M.
2              THE COURT:  Let's have Mr. Shinners resume the
3     stand.
4              MR. ARD:  Your Honor, when Mr. Pfeiffer takes the
5     stand, he would also like the nonreligious oath.
6              THE COURT:  That would be fine.  Let's get the jurors.
7         (The jury entered the courtroom at 8:59 a.m.)
8              THE COURT:  Folks, just to give you a brief sense of
9     timing, we're making good progress.  It is possible -- I hate
10    to say things like this because sometimes it doesn't happen.
11    I'll say it's unlikely but there's a small possibility we will
12    complete the evidence today.  I think we will get mostly done
13    with the evidence today.
14             It doesn't mean we're done with the trial.  There are
15    still a couple phases to go.  There's my instructions on the
16    law.  There's the parties' closing arguments.  But we're making
17    good progress is the short of it.  We probably will go into
18    tomorrow with the evidence, but we're certainly expecting to
19    make good progress today.
20             All right, Mr. Weiner, whenever you're ready.
21             MR. WEINER:  Thank you, Your Honor.
22                     CONTINUED CROSS EXAMINATION
23    BY MR. WEINER:
24    Q   Good morning, Mr. Shinners.
25    A   Good morning.
```

1   Q   When we broke last time, I had asked you:  Did you recall

2   that on occasion Josh Garza would call you to get your help

3   fixing what he considered emergencies at GAW Miners?

4   A   Um, I recall once where he would give me that sense of

5   urgency, yes.

6   Q   And that was in November of 2014; correct?

7   A   I believe.  I don't know.

8   Q   Want to take a look at page 143 of your deposition, at line

9   13, and just read it to yourself and tell us when you're set.

10  A   143 or 133?

11  Q   143.  You can start -- well, you can start at 142 at the

12  bottom, line 23 and go into 143.

13  A   Yes, I recall this.

14  Q   And does that refresh your recollection that during the

15  Thanksgiving holiday in November of 2014, Mr. Garza called you

16  and said, I need your help to fix an emergency at GAW Miners?

17  A   That's -- what was the last line that you wanted -- up to

18  what line?

19  Q   You can read that at the top of 144.

20  A   Oh, 144.

21  Q   It references the Thanksgiving holiday in November.

22  Read --

23  A   Well, it would be November then, so yes.  Yeah, there it

24  is.  I found it.  Down the bottom of 143?

25  Q   You can read whatever you want.  You can read onto 144,

1    but --

2    A   Oh, okay.

3    Q   My question really is:  It was Thanksgiving holiday

4    November 2014 you got a phone call from Josh Garza and he said,

5    I need your help fixing an emergency at GAW Miners; right?

6    A   I'm not seeing where it says it's an emergency, but that's

7    okay.  Yeah, sure, yes.

8    Q   At the bottom of page 142, do you see the word "emergency"?

9    142, line 25.

10   A   Yes.  Usually when he called me it was because of some

11   pseudo emergency.

12   Q   He thought it was an emergency; right?  That's what you

13   mean by pseudo emergency?

14   A   It was a condition.  He never stated it was an emergency,

15   but I assumed that it was some pseudo emergency, yes.

16   Q   And when you say "pseudo emergency," it means you might not

17   have thought it was an emergency, but Mr. Garza certainly

18   thought it was; right?

19   A   Well, I wouldn't say it that way.  I would say there was a

20   sense of urgency.

21   Q   Fair enough.

22           Now, in this in Thanksgiving of 2014, he called you,

23   and it was because the chief technical officer, Joe Mordica,

24   wasn't available.  That's why he called you, to get some

25   emergency help; right?

1   A    Um, I -- I guess so, yes.

2   Q    And he wand you to go into the Shopify website, the back

3   end for HashStakers, and fix things?  That's what Mr. Garza

4   wanted you to do?

5   A    Uh-huh.  He wanted me to go to the front end of Shopify.

6   Did you say the back end?

7   Q    I did say the back end.

8   A    It's the front end.

9   Q    Okay.  Do you see on page 143, line --

10  A    I see it.  It says -- it says back end, but it was front

11  end.  It's the part that people see when they go to the

12  website.

13  Q    When you say it says that --

14  A    Pardon me?

15  Q    When you say it says that, that's you.  That's you saying

16  that?

17  A    Yeah.  I'm not a programmer, sir, and I'm not a web

18  designer.  So front end, back end, I understand the difference

19  between the front end and the back end.  And the front end is

20  what the prospective clients or customers, I guess, would

21  see.

22  Q    So front end, back end, Mr. Garza called you and said, I

23  need your help.  I can't get hold of the chief technical

24  officer, so I need you to help me; right?

25  A    I wouldn't put it that way.  He asked for help.  He didn't

1  say he needed me.  He knew I was not a programmer, that's

2  correct.

3  Q    And he asked you for help, and you gave him the help.

4  A    I attempted to give him help.

5  Q    You went into the front end or the back end of Shopify and

6  tried to fix things; right?

7  A    Yes.  And I remember the instance, yes.

8  Q    Mr. Garza had your personal cell phone number; right?

9  A    I believe he did, yes, obviously, because I was home or at

10 my father's house.  Sorry.

11 Q    Right.  And you had his personal cell phone number;

12 correct?

13 A    I believe I had asked for it, yes.

14 Q    Right.  And you got it; right?

15 A    Yes, I got it.

16 Q    You also had Mr. Garza's direct phone line at the company;

17 right?

18 A    Not that I'm aware of, no.

19 Q    Okay.  Take a look at page 152 of your deposition.

20        At the top of page 153, just read that to yourself,

21 the bottom of page 152, top of 153.  It's lines 24 on 152 down

22 to line 6 on 153.

23        My question is:  You had Mr. Garza's direct phone line

24 to the company; right?  You didn't have to go through a

25 switchboard?

1   A    Yes, it does say that.

2   Q    And when you say "it says that," that's you saying it under

3   oath?

4   A    Pardon me?

5   Q    That's you saying it under oath in your deposition; right?

6   A    I'm saying that it says here, sir, that I did have his

7   direct phone line to their office, yes.

8   Q    Okay.  And when you say "it says that," that's your

9   testimony under oath; correct?

10  A    Yes.

11  Q    Now, from October through December of 2014, you also

12  regularly communicated with Mr. Garza and the folks at GAW

13  Miners by e-mail; correct?

14  A    Uh, one of the methods, yes.

15  Q    Okay.  And during the three-month period, October,

16  November, December 2014, you had 675 e-mails back and forth

17  with Mr. Garza and the folks at GAW Miners; right?

18  A    No, I don't believe that number is correct.

19  Q    Okay.  Take a look at Defendant's Exhibit 693.

20            THE COURT:  Okay.  DX 693 will be a full exhibit.

21       (Defendant's Exhibit 693, received in evidence.)

22            MR. WEINER:  Mr. Jackson, if you just put up the block

23  at the top, you see the title.  It says, "Allen Shinners'

24  Responses and Objections to Defendant's First Interrogatories

25  to Plaintiffs."

1    Q    (By Mr. Weiner) Do you recall this document, Mr. Shinners?

2    A    I don't have a copy of it here.  So all I see is what's on

3    this little screen.

4    Q    Okay.  And we can give you a copy.

5              MR. WEINER:  Can we get a copy of 693?  Your Honor,

6    just a moment.

7              THE COURT:  Sorry?

8              MR. WEINER:  Just a moment.

9              THE COURT:  Yes, that's fine.  That's fine.

10             MR. WEINER:  Your Honor, may I approach the witness?

11             THE COURT:  You may.

12   Q    (By Mr. Weiner) Defendant's Exhibit 693 is your responses

13   to certain interrogatories or certain questions that we asked

14   you before the trial; is that right?

15   A    I believe so, yes.

16   Q    Turn to the page number at the bottom, No. 12.  It says:

17   You declare under penalty of perjury the foregoing is true and

18   correct.  You've read the foregoing interrogatory responses.

19   You know the contents thereof to the best of your knowledge,

20   information and belief.  The facts stated in the response are

21   true and correct, June 27th.

22             And that's your electronic signature; right?

23   A    That's my what, sir?

24   Q    Your electronic signature.

25   A    I believe it is, yes, sir.

1   Q   And so you did read the interrogatory responses, and you

2   believe them to be true and correct; correct?

3   A   That's correct.

4   Q   And if you go to -- the response to Interrogatory No. 5,

5   that's on page 4, the question, which is the interrogatory and

6   your answer.

7           We ask you to identify each telephone conversation,

8   in-person meeting or other communications you had with Mr.

9   Garza -- and that's, Mr. Jackson, we can highlight the question

10  at the top -- you had with Mr. Garza concerning the companies,

11  GAW cryptocurrency products, or your investments by setting

12  forth for each such conversation, meeting or communication each

13  person who participated or was present and the date or time

14  period during which it took place.

15          And then your response, you objected to the

16  interrogatory as overbroad and unduly burdensome because it

17  purports to require you to identify each individual

18  communication you had with Garza.  And then you said, subject

19  to that objection, you respond as follows:  You had six to ten

20  telephone conversations with Mr. Garza between August of 2014

21  and early 2015.  And then you said, "I also communicated with

22  Mr. Garza by e-mail including the communications identified on

23  Schedule 1."

24          Have I read that correctly?

25  A   Uh, yes.

1   Q    If we turn to Schedule 1 -- that's the page right after the

2   page numbered 13 right after your signature, Schedule 1.  Those

3   numbers -- I'll represent to you those are production numbers.

4   Like, the first one says GAW00038861.  Each one identifies an

5   individual document or e-mail.  Fair enough?

6   A    I believe so, yes.

7   Q    Okay.  And if we scroll down, we would go through -- and,

8   Mr. Jackson, just keep scrolling down.

9            If we go through -- just keep scrolling -- we would

10  get to 18 pages of these e-mails to the people at GAW Miners

11  from you during the period August to December 2014.

12           Just keep scrolling, Mr. Jackson.

13           Am I right?

14  A    No, sir, you are not right.  I do not -- I do not recall

15  ever sending 675 e-mails to anybody in my life.  These -- I

16  would like to see these documents if you want to pursue it that

17  way, but I've never -- I do not believe I've ever sent anybody

18  675 e-mails before.

19  Q    So maybe when you swore that it was true under penalty of

20  perjury, you got it wrong?

21  A    That I got it wrong?  No, sir, I did not get it wrong.  Did

22  I say here that I sent a hundred -- or 675 e-mails?  I do not

23  believe so, sir.

24  Q    Well, there are 18 pages, and I'll represent to you that if

25  you count up each of them, you get to total 675.  It could be

1    673.  I could be off --

2    A   I won't hold you to the number exactly, sir.

3    Q   Okay.  You said -- how about this:  You sent a whole lot of

4    e-mails to the people at GAW Miners during the period August to

5    December 2014.  Is that fair?

6    A   I would say that I sent a good number of e-mails, yes,

7    sir.

8    Q   Okay.  And you sent Mr. Garza a lot of -- we can put this

9    down, Mr. Jackson.  Thank you.

10           You sent Mr. Garza a lot of your ideas via e-mail;

11   correct?

12   A   I didn't have that many ideas to send Mr. Garza; but, yes,

13   I did send him my ideas.

14   Q   Okay.  Mr. Garza read your ideas and showed them to other

15   GAW Miners' employees; correct?

16   A   I don't know that, sir.

17   Q   Look at page 144 of your deposition.

18   A   What line?

19   Q   Starting at line 8 and going to line 24.

20           MR. WEINER:  Your Honor, we'll offer line -- page 144,

21   line 8 to line 24.

22           THE COURT:  Yeah, I'll allow that.  Page -- what

23   again?

24           MR. WEINER:  Page 144, line 8 to 24.

25           THE COURT:  Someone remind me what DX number we're at

1    now.

2              MS. HASSAN:  736.

3              THE COURT:  PX 736 will be page 144 of Mr. Shinners'

4    deposition.

5         (Plaintiffs' Exhibit 736, received in evidence.)

6    Q    (By Mr. Weiner) And I asked you, Mr. Shinners, "Were there

7    occasions where Mr. Garza would call you and tell you things as

8    opposed to asking whether you could help?"

9              THE COURT:  Sorry to interrupt, but we can publish

10   this to the jury if you like.

11             MR. WEINER:  Thank you, Your Honor.

12   Q    (By Mr. Weiner) "Question:  Were there occasions where Mr.

13   Garza would call you and tell you things as opposed to asking

14   whether you could help?"

15   A    It says here that he called and stated that other

16   employees -- he showed them to other employees.

17   Q    Just keep reading.

18   A    Pardon me?

19             THE COURT:  Mr. Shinners, just let him read.

20             THE WITNESS:  Oh, he's reading?

21             THE COURT:  He's going to read it.

22   Q    (By Mr. Weiner) I'm trying my best.

23             He says, "Would he -- would he tell you?"

24             And you answered, "He never called me directly to

25             have -- we never had a conversation longer than five

1          minutes.  They were always very brief.  He never used

2          me as a sounding board.

3              "I sent a lot of notion -- or ideas to him via e-mail

4          over, you know, a short period -- over a period of

5          time, couple of months, maybe a month and a half.  And

6          I know this, that he read them, because other

7          employees -- he showed them to other employees.  So

8          there was some feedback from that from later, much

9          later, from Eric Capuano.  He said, yeah, a lot of the

10         employees had seen the e-mails, so ..."

11             Have I read that correctly?

12   A   Yes, sir, but the timing -- the timeline is different.

13   Q   And in addition to the e-mails that you sent over the time

14   period listed on Schedule 1 to your interrogatory response, you

15   also communicated, I think you told us, using a private

16   messaging function on the HashTalk forum; right?

17   A   I'm sorry.  What page are you on, sir?

18             THE COURT:  He's just asking you a question now.

19             THE WITNESS:  Oh, okay.

20             Could you repeat the question, please?

21   Q   (By Mr. Weiner) In addition to all the e-mails you sent to

22   Mr. Garza and the people at GAW Miners, you also communicated

23   with Mr. Garza using the private messaging function on the

24   HashTalk forum; correct?

25   A   Yes, I answered that yesterday.  Yes.

```
 1   Q   In fact, you used that even more than you e-mailed or spoke

 2   with Mr. Garza on the phone; right?

 3   A   Not that I'm aware of.

 4   Q   Take a look at page 151 of your deposition.

 5           MR. WEINER:  Your Honor, we'll offer lines 4 through

 6   12 on page 151.  And if we could publish that just to the

 7   Court.

 8           THE COURT:  You can just bring it for me and the

 9   witness only.

10           MR. WEINER:  It's lines 4 through 12.

11           THE COURT:  All right.  And that can be admitted as a

12   full exhibit, so that would be DX 737.  Sorry.  Which page

13   again?

14           MR. WEINER:  Page 151, lines 4 through 12.

15           THE COURT:  Of Mr. Shinners' deposition will be DX

16   737.

17       (Defendant's Exhibit 737, received in evidence.)

18           THE COURT:  So we can publish that to the jury.

19           THE WITNESS:  Yes, it does say that, sir.

20   Q   (By Mr. Weiner) I asked you -- well, but taking it back to

21   that time period, we're talking October to December 2014 --

22   taking it back to that time period, what were your primary

23   means of communication with Mr. Garza:  phone? e-mail? text?

24   smoke signals? or something else?

25   A   Yes, sir, I don't do smoke signals well.
```

```
 1    Q    That's my poor attempt --
 2    A    I'm sorry.  You asked me a question, sir?
 3              THE COURT:  No.  He's just reading now.
 4              THE WITNESS:  Oh, he's reading.
 5    Q    (By Mr. Weiner) You answered:
 6              "Yeah, that, too, yes.
 7              "Question:  Which is the primary means?
 8              "Answer:  Actually, I would say that I communicated
 9    with Garza via PM" -- that's private messaging; correct?
10    A    That's correct.
11    Q    -- "in HashTalk more than e-mails and more than
12    telephonically."
13              Is that accurate when you gave that testimony, sir?
14    A    That might be a very fair assessment, yes.
15    Q    And Mr. Garza actually --
16              MR. WEINER:  You can take that down, Mr. Jackson.
17    Thank you.
18    Q    Mr. Garza actually responded to some of your private
19    messages; correct?
20    A    I could not answer that.  Some of them, yes.
21    Q    Okay.  And so during the period October through December of
22    2014, you communicated with Mr. Garza directly via telephone,
23    via e-mail, and via private messaging; correct?
24    A    Uh, that's what it says, yes, sir.
25    Q    Okay.  In all your communications with Mr. Garza in 2014,
```

1  by phone, by e-mail, by private messaging, he never once told

2  you that he had to go back and check with Stuart Fraser before

3  he could give you an answer.

4  A    No.

5  Q    He never told you that; correct?

6  A    No.

7  Q    It's correct that he never told you that?

8  A    It's correct.

9  Q    Mr. Garza wasn't big on taking other people's advice, was

10  he?

11  A    I'm sorry.  I didn't understand a word you just said.

12  Q    Mr. Garza wasn't big on taking other people's advice, was

13  he?

14  A    I can't speak to that, sir.

15  Q    You told me that you think that Mr. Garza was his own

16  person and that he wanted to stay that way.  Remember telling

17  me that?

18  A    I don't think those are my words, but do you have an

19  example of this?  Yes.

20  Q    You know me by now; right?  Let's look at page 145.

21       Direct you to page 145, lines 11 and 12.  Just read

22  those to yourself.

23  A    What lines are they?

24       THE COURT:  11 and 12.

25       THE WITNESS:  11 and 12.

1              THE COURT:  Yup.

2              THE WITNESS:  Okay, it does say that.

3    Q   (By Mr. Weiner) And, now, you recall that you told me that

4    you thought Mr. Garza was his own person and he wanted to stay

5    that way; correct?

6    A   That's what I said, yes.

7    Q   Now, you're familiar with the term "white paper" as a

8    technical document that outlines the fundamental structure of

9    whatever's being proposed; is that right?

10   A   The white paper?  Which white paper, sir?

11   Q   Just generally the term "white paper," it's a technical

12   document that outlines the fundamental structure of whatever's

13   being proposed.  Is that fair?

14   A   It is a document that, um -- in this sense, it is a

15   document that outlines the operational or -- the operations and

16   functionality, in this case, of Paycoin or HashCoin,

17   whatever.

18   Q   And it's got to be -- it's an in-depth piece that's

19   designed to go out to the public; correct?

20   A   It is a technical document with technical terms, yes, that

21   goes out to the public.

22   Q   And in November of 2014 you personally worked on GAW

23   Miners' white paper for HashCoin which became Paycoin; correct?

24   A   I worked on only the Paycoin white paper that -- it was the

25   result of the HashCoin white paper, yes.  I worked in a group

1    of individuals that worked on or re-edited the HashCoin paper

2    for the white paper for Paycoin.

3    Q    Okay.  And Mr. Garza asked you to help; right?

4    A    Uh, yes.

5    Q    And you did help; correct?

6    A    That's correct.

7    Q    You had to revamp the white paper when you saw it; right?

8    A    I mean I probably -- I'm sorry.  Go ahead.

9    Q    The draft you saw, you said, was a red hot mess and you had

10   to revamp it; correct?

11   A    It -- the HashCoin people wasn't a draft.  But it was

12   released to the public.  But, yes, I said it was a red hot

13   mess.

14   Q    And you had to roll up your sleeves and revamp and redo it

15   so it could go out to the public; correct?

16   A    I helped edit the document so that it wouldn't be -- so it

17   could be understood and read, yes.

18   Q    Okay.  Let's look at Defendant's Exhibit 564, DX 564.

19           THE COURT:  All right.  564, DX 564 will be full.

20       (Defendant's Exhibit 564, received in evidence.)

21   Q    (By Mr. Weiner) And these are e-mails -- the earliest one

22   is the back.  So let's go to the back page and then come back,

23   and you'll see the first e-mail is Saturday, November 15th,

24   2014.

25           Are you with me, Mr. Shinners?

1    A    Yes.  It's on my screen, sir.

2    Q    It's Mr. Garza says to you, on Saturday, November 15th --

3    and that's to you, Allen Shinners at columbus.rr.com.  That's

4    your e-mail address or one of them?

5    A    It is my personal e-mail address, yes.

6    Q    Mr. Garza writes to you at your personal e-mail address:

7    "Thank you, sir, here it is.  Naturally it's not for

8    distribution," happy face emoji; correct?

9    A    That's correct.

10   Q    Then you go up to the top.  Just go up one.  You say:  "No,

11   there's no attachment, Josh."  Just that one line.  You say:

12   "There's no attachment"; right?

13        THE COURT:  He just wants to know if that's what you

14   said.

15        THE WITNESS:  Yes, I said there was no attachment.

16   Q    (By Mr. Weiner) Then if we go to the next e-mail on the

17   next page -- again, we're flipping forward to the document

18   because it goes back and front.

19        Mr. Garza says, "Try now."

20        Then your response at the top of the page is, "I have

21   created a Word doc out of this, as well as turned on tracking.

22   Is it okay if I cut this up and rebuild it, without changing

23   any of the technical points or meanings?  I can easily convert

24   it back to Adobe PDF, shooting both files back to you, when I

25   finish."

1              Is that right?

2    A    That's correct.

3    Q    This is part of your work on the white paper for Paycoin;

4    correct?

5    A    For Paycoin.

6    Q    Then if you go to the page -- the next page, in the middle

7    of the page on Sunday, the next day, November 16th, you say,

8    "Stupid HashTalk is down again.  When do you need this by?  Is

9    Sunday still good, or do you need it tonight?"

10             And Mr. Garza tells you, "We have to have the last

11   revisions in by the morning," happy face emoji; right?

12   A    Correct, yes.

13   Q    And you rolled up your sleeves, and you did the work;

14   correct?

15   A    Uh, I assume so, sir.

16   Q    And if you look at the very first page of the document,

17   there's your long description of what you've done.  Let's look

18   at the very first page, Sunday, November 16th, 2014.  You're

19   writing to someone -- look at the top -- someone named

20   Christian Gogol copying Mr. Garza?

21   A    Correct.

22   Q    Regarding the white paper draft?

23   A    Correct.

24   Q    And you say:  "Here you go.  I probably have missed a few

25   things myself, but since there are others looking at it, the

1    cake mix will probably be complete"; correct?

2    A    Correct.

3    Q    Then you say, "Not to be a curmudgeon about it" --

4    "curmudgeon" is like a grumpy old person?

5    A    Pretty much, sir.

6    Q    "Not to be a curmudgeon about it, I wanted to add some

7    observations and notes, which I thought would be important to

8    consider."

9          And then the rest of the page is eight different notes

10   that you had about what could be fixed with the white paper

11   before it went out to the public; correct?

12   A    Yes.  The edits were mostly grammatical and spelling and

13   punctuation and such, yes.

14   Q    And No. 2 says, "There are technical aspects missing that

15   do not quantify expectations relating to speed of transaction

16   expectations (merchants)"; correct?

17   A    Correct.

18   Q    That's a substantive comment.  That's not changing a period

19   or a comma.  That's a substantive comment.

20   A    If you say so, sir.

21   Q    Let's look at Defendant's Exhibit 567.

22         THE COURT:  Okay, DX 567 will be full.

23   (Defendant's Exhibit 567, received in evidence.)

24   Q    (By Mr. Weiner) That's later that same day.  You look at

25   that e-mail, the front page.  It's from you to Jonah Dorman on

```
1   Sunday, November 16th; right?

2   A    Correct.

3   Q    Mr. Dorman was one of the people who worked at GAW Miners;

4   correct?

5   A    Yes.

6   Q    He was the general manager of GAW Miners; correct?

7   A    I don't know what his title was at the time.

8   Q    Okay.  And the subject is:  "Re:  HashCoin Draft Round No.

9   7."  Again, this is about the white paper; correct?

10  A    Yes.

11  Q    And then if you go down to your e-mail where it says

12  "Notes."  Right, and there it says "Notes."  And it says,

13  "re-written a chunk of the abstract."

14            Do you see that?

15  A    Yes.

16  Q    You weren't just doing punctuation and spelling.  You were

17  rewriting the substantive comments in this white paper;

18  correct?

19  A    That is not correct.

20  Q    When you rewrote a chunk of the abstract, the abstract was

21  part of the white paper; correct?

22  A    Yes, it was.

23  Q    Let's look at Defendant's Exhibit 570.

24            THE COURT:  DX 570 also will be full.

25       (Defendant's Exhibit 570, received in evidence.)
```

1   Q   (By Mr. Weiner)  This is the next day, November 17, 2014.

2   Do you see there at the top?  You with me, Mr. Shinners?

3   A   It's on my screen, sir.

4   Q   Okay.  And you write:  "Send it all here, yes."

5           You're telling Mr. Dorman to send you material about

6   the HashCoin white paper; correct?

7   A   Uh, I don't know specifically what this means, but I assume

8   it's the HashCoin white paper.

9   Q   And it says in the re line "HashCoin White Paper"?

10  A   Yes, sir, it does say that.

11  Q   And you write, "Collaborative work tends to yield more

12  confusion than clarity.  I want to address a number of the

13  issues raised by the public since its posting to HashCoin.com";

14  right?

15  A   Correct.

16  Q   "I will be asking you questions throughout the afternoon

17  and evening to resolve ambiguities in document."  See that?

18  A   Yes, I do sir.

19  Q   You weren't going to ask questions about, where do I put

20  the comma?  Where do I put the period?  You were asking

21  substantive questions; correct?

22  A   I would -- from this document, I don't know.  But I would

23  assume so, yes.

24  Q   And then if you go down to two paragraphs down there --

25  let's go one more.  You see, "On a side note, someone leaked

1  that the coin is called Paycoin."  Do you see that?

2  A    Yes, I do.

3  Q    So you were on the inside at GAW Miners, and you were

4  telling Mr. Dorman that someone has leaked information out to

5  the public; correct?

6  A    Could you repeat the statement again, please?

7  Q    You were telling Mr. Dorman that you heard that someone had

8  leaked information to the public; correct?

9  A    That's correct.

10  Q    The information they leaked was known inside at GAW Miners,

11  but somehow it had gotten out into the public; correct?

12  A    I don't know how it had gotten out.

13  Q    Somehow it got out; correct?

14  A    Someone what?

15  Q    Somehow it got out; right?

16  A    Somebody had let -- let it out in public that it was

17  actually Paycoin, yes.

18  Q    Right.  And you were telling Mr. Dorman that within your

19  group at GAW Miners, somehow it had gotten to the outside

20  world; right?

21  A    I don't know if it was from the group.  I have no way of

22  knowing who, you know, had identified that the name of the coin

23  was going to be Paycoin.

24  Q    Let's look at Defendant's Exhibit 573.

25            THE COURT:  Okay, DX 573 also will be full.

1       (Defendant's Exhibit 573, received in evidence.)

2   Q   (By Mr. Weiner) This is small print, so we're definitely

3   going to blow this up for both me and you, Mr. Shinners.  Let's

4   go to the bottom one first.

5   A   Yeah, it's very small.

6   Q   At the top it's November 17, 2014.  And you see you write:

7   "Right.  Also, do you have text written that addresses, or

8   defines well, the role of Primes"; right?

9           And tell the jury what Primes were at GAW Miners.

10  A   I'm not sure which Primes these are.  There were two

11  Primes.

12  Q   Tell them about both.

13  A   Okay.  I can briefly tell them.  Primes, I assume, were

14  Prime Hashlets, which were sold before anybody knew about this

15  ICO thing being developed within GAW.  So it was a Hashlet that

16  was Prime Hashlet or Hashlet Prime.

17          And then there were these things called Prime

18  Controllers.  The function -- I didn't really understand the

19  function very well.  So it had to do with post ICO in the

20  individual coin offering.  So -- or the initial coin offering,

21  rather, sorry.  And their functionality was something

22  internalized to Paycoin, meaning it was on what they call the

23  blockchain.  And that's all I really understand from it.

24  Q   Okay.  And then you go on in this document, you say, "This

25  should be incorporated into the new version" -- that's the new

1    version of the white paper; correct?

2    A    I'm not seeing where you're reading this.

3    Q    The next sentence after -- you say also, "Do you have text

4    written that addresses, or defines well, the role of Primes?"

5              This is the Prime Hashlets?

6    A    Yes.

7    Q    "This should be incorporated into the new version, as it is

8    a majorly important aspect of the current regime in which

9    miners are operating."  Do you see that?

10   A    Yes.

11   Q    Again, you were giving your ideas to the people at GAW

12   Miners about what the white paper should say that would be sent

13   to the public; correct?

14   A    I'm sorry.  Could you ask that question again?

15   Q    You were giving Mr. Dorman at GAW Miners your ideas of what

16   should be included?

17   A    Um, well, the information is there; so I assume that I was

18   telling him that it should be included in the new white

19   paper.

20   Q    And if you go to the top, to the first e-mail at the top of

21   the page -- blow up that first e-mail.  And you tell Mr. Dorman

22   on November 17th, regarding a HashCoin white paper -- and,

23   again, HashCoin turned into Paycoin; correct?

24   A    Correct.

25   Q    "There will be some really ticked off Prime owners when

1   they see anything Zen involved in this.  However, my take is

2   who cares if they're ticked off."  There's, I think, a happy

3   face emoji, some kind of emoji.

4           Have I read that correctly?

5   A   Yes.

6   Q   Look at Defendant's Exhibit 581.

7           THE COURT:  DX 581.  Right, that will come in as a

8   full exhibit.

9       (Defendant's Exhibit 581, received in evidence.)

10  Q   (By Mr. Weiner) Top of Defendant's Exhibit 581, it's an

11  e-mail you sent a few days later, November 21st to Mr. Dorman,

12  copied Mr. Garza; correct?

13  A   Correct.

14  Q   Okay.  And you were saying:  "Hey guys.  Obviously some

15  things are not releasable yet."

16          That's releasable to the public; correct?

17  A   Correct.

18          MR. RENNIE:  Objection, Your Honor, cumulative.

19          THE COURT:  It's not there yet, but -- so I'll

20  overrule it.  You can do a little more.

21  Q   (By Mr. Weiner) "Obviously some things are not releasable

22  yet, so you'll have to point those out"; right?

23  A   Yes.

24  Q   And if you go down, scroll down, you'll see a question in

25  red.  Let's go down to red text.  And there someone's asking

1    the question:  "How will Zen's function in the new

2    infrastructure at the two to one rate?"  Do you see that?

3    A    Yes, I see that.

4    Q    That's reference to the form of a new Hashlet?  That's the

5    next line down where it says "new Hashlet."  See that?

6    A    I see it, sir.

7    Q    And then you gave your advice to Mr. Dorman and Mr. Garza

8    on this issue.  "Should we hold off disclosing this (in bold

9    above)?  My thoughts are mixed and I will tell you why."

10            It's kind of a collaboration; right?  You and Mr.

11   Garza and Mr. Dorman were working together to create the white

12   paper.  Fair enough?

13   A    Uh, to create the white paper?  It was a rewrite of the

14   HashCoin paper.

15   Q    To rewrite the HashCoin white paper.  Is that fair?

16   A    What was the last part?

17   Q    It was a joint effort, you, Mr. Garza, and Mr. Dorman

18   working together to rewrite the HashCoin white paper.  Fair

19   enough?

20   A    No, sir, I wouldn't -- I wouldn't really describe it that

21   way because there were a number of community people who were

22   also involved in this process, meaning non-GAW employees.

23   Q    Right.  I didn't mean to say it was just the three of you.

24   A    Okay.  Thank you for clarifying that.

25   Q    You're right in there with it.  You're part of the team,

1    the GAW Miners' team; correct?

2    A    I'm part of the team that GAW Miners -- what was the last

3    statement, part of that?  What was the last part of the

4    question?

5    Q    You were part of the GAW Miners' team on the white paper?

6    A    I was part of the team, both from employees and community

7    members, who were working on what was to become the Paycoin

8    white paper, correct.

9    Q    And if you look at -- let's look at 584.

10              THE COURT:  Okay.

11              MR. WEINER:  DX 584.

12              THE COURT:  That can come in as a full exhibit.

13         (Defendant's Exhibit 584, received in evidence.)

14              MR. WEINER:  Again, it's small, so we'll blow up all

15   the text above the box.  Make it even bigger if we can.  And

16   highlight the date, November 23rd.

17   Q    (By Mr. Weiner) That's you writing to Mr. Dorman, copying

18   Mr. Garza again.  And the re line is:  From Allen.

19              And that's you, Allen Shinners; right?

20   A    Yes, sir.

21   Q    "Here's what I worked out."  Do you see that?

22   A    In the subject line?  Yes, sir.

23   Q    And the second paragraph says:  "Yes, if the coin does hit

24   any level above $4 and people cash out (the bad actors) then

25   the cost is much higher obviously, based on whatever the market

1   rate ends up being when people swarm the market."

2           Do you see that?

3   A   Yes, I do.

4   Q   That's talking about the price floor, the $20 price floor

5   for Paycoin; correct?

6   A   It's talking about the $4 conversion price from Hashpoints

7   to Paycoin.

8   Q   Okay.  And the last line where it says:  "First the coins

9   are actually coming from GAW, not a separate source, and;

10  second, the CAF cash" -- that's C-A-F.

11          And CAF, you know what that stands for?

12  A   Yes, sir.

13  Q   Why don't you tell the jury what that stands for.

14  A   It's the Coin Adoption Fund.

15  Q   And the Coin Adoption Fund is another term for the hundred

16  million dollar reserve that Mr. Garza was telling people was

17  backing Paycoin; right?

18  A   Not -- that's not correct, sir.  That's only part of it.

19  The CAF was supposed to be a $200 million total fund that was

20  part of which was divided or separated for supporting the $20

21  Paycoin floor.

22  Q   And here you are on November 23rd right in the thick of

23  things giving your idea about the Coin Adoption Fund and the

24  price of the coin; correct?

25  A   Yes, I'm referring to the conversion price of the coin --

```
 1   or, you know, Hashpoints to Paycoin and the -- what would be
 2   the CAF reserve fund, correct.
 3   Q    Let's look at Defendant's Exhibit 587, 587.
 4            THE COURT:  Okay, 587 will be full.
 5        (Defendant's Exhibit 587, received in evidence.)
 6   Q    (By Mr. Weiner) That's you writing to Mr. Dorman on
 7   November 25th.  And you see it says, "white paper plus Q&As."
 8            That's questions and answers; correct?
 9            MR. RENNIE:  Objection.  Are we there on the white
10   paper?
11            THE COURT:  We're getting very close.
12            MR. WEINER:  I only have a couple more.
13            THE COURT:  All right.  I'll allow this.
14   Q    (By Mr. Weiner) You see at the -- it says, "white paper
15   plus Q&As."  That's questions and answers; correct?
16   A    Yes, I see that.
17   Q    And then the last sentence before the last paragraph, the
18   last sentence says, "On that note" -- going to highlight that
19   last sentence.
20            "On that note, all of this has to be accomplished
21   before the payout of Paycoins, otherwise we will have a
22   crap-tonne of unhappy miners who cashed out their coins, only
23   to find out that they needed them to continue to mine in the
24   new ecosystem."  Do you see that?
25   A    Yes, I do.
```

1   Q   And when you say "we have a crap-tonne of unhappy miners,"

2   the "we" was part of the GAW Miners team; correct?

3   A   That's what it says.

4   Q   And you were the author of what it says; correct?

5   A   That's correct, sir.  But I don't understand exactly what

6   it's referring to unless I go back to the rest of the e-mail.

7   Q   You can set that aside.

8          Mr. Shinners, you know that Josh Garza pleaded guilty

9   to fraud involving the very facts in this case, the sale of his

10  cryptocurrency products through GAW Miners and ZenMiners;

11  right?

12  A   Correct.

13  Q   You've seen Mr. Garza's plea agreement with the Department

14  of Justice; correct?

15  A   Um, I can't recall it all right now, but I did see the plea

16  agreement.

17  Q   And you were actually present in court when Mr. Garza pled

18  guilty to wire fraud; correct?

19  A   Uh, correct.

20  Q   And you were also present at Mr. Garza's sentencing where

21  he said, No matter what happened, I was in charge?  You were

22  present at the sentencing; correct?

23  A   I believe I was.

24  Q   Okay.  Now, as of the date of your deposition in July of

25  2018, you told me that you considered Mr. Garza absolutely not

1    trustworthy when it came to GAW Miners or ZenMiner.  Do you

2    remember that?

3    A    Uh, I said he was absolutely not trustworthy regardless of

4    what the subject was, yes.

5    Q    And Mr. Garza testified that same year in his deposition

6    that the jury has seen; right?

7    A    Could you -- can you repeat that again, please?

8    Q    Also in 2018 Mr. Garza testified in his deposition.  That's

9    the tape that the jury has seen; right?

10   A    I didn't --

11            THE WITNESS:  Sir, did you catch the last part?

12            THE COURT:  Yes.  So he's asking if Mr. Garza

13   testified in 2018 in the video that the jury saw.  That's the

14   question.

15            THE WITNESS:  From this?

16            THE COURT:  Right.  He wants to know if the video the

17   jury saw was Mr. Garza testifying in 2018.

18            THE WITNESS:  Oh, thank you, sir.

19            Yes, that was Mr. Garza testifying in 2018.

20   Q    (By Mr. Weiner) Okay.  And the testimony of the, as you

21   call him, the absolutely untrustworthy Mr. Garza, that's the

22   deposition that you want the jurors to believe; is that right?

23   A    That he's untrustworthy?  I don't understand your question,

24   sir.  Could you reword it?

25   Q    You told me in July of 2018 that you considered Mr. Garza

1   absolutely untrustworthy.  Remember that?

2   A   I don't know if I used "absolutely," but I did say he was

3   untrustworthy, yes.

4   Q   And if you want to look at just page 12 of your deposition

5   and read it to yourself.  Page 12, line 17.  You can start at

6   line 17 and go to the top of page 13.

7           Page 12, line 17 to page 13, line 3.  Just read that

8   to yourself.

9   A   Yes, I did use the word "absolutely not."

10  Q   Absolutely -- I asked you, "Do you regard him currently as

11  trustworthy?"  And you say, "In the present day, absolutely

12  not."  Fair enough?

13  A   Yes, that's fair enough.

14  Q   That same year he testified, Mr. Garza testified, and you

15  want the jury to believe Mr. Absolutely Untrustworthy Mr.

16  Garza; right?

17  A   That he's absolutely not trustworthy, yes.

18  Q   Now, the conclusion that Mr. Garza was absolutely

19  untrustworthy, that wasn't something that you thought for the

20  first time when I took your deposition in July of 2018; right?

21  A   That is not something that I saw or said?

22  Q   My fault.  It was a bad question.

23          You thought Mr. Garza was absolutely untrustworthy way

24  back in 2014; correct?

25  A   No, I did not feel that way back in 2014.

1    Q   Okay.  Take a look at page 21 of your deposition.

2            MR. WEINER:  Your Honor, we'll offer page 21, line 13

3    to 22.

4            THE COURT:  Okay.  So --

5            MR. WEINER:  Sorry, line 22 -- line 22.

6            THE COURT:  Okay.  So this will be DX 738, and this

7    will be page 21 of Mr. Shinners' deposition.

8        (Defendant's Exhibit 738, received in evidence.)

9            MR. WEINER:  And rather than me -- having me read it,

10   Your Honor, can we display the video?

11           THE COURT:  Sure, we can publish it.  Oh, you want to

12   play the video?

13           MR. WEINER:  Right.

14           THE COURT:  That's fine.

15           MR. WEINER:  And, Mr. Jackson, if we can have again

16   page 21, line 12 to page 22, line 22.

17           THE COURT:  Mr. Rennie?

18           MR. RENNIE:  There's another piece of his deposition

19   about when he had this belief that I think, in fairness, should

20   be included.

21           THE COURT:  I tell you what.  I'll let you do that

22   during the redirect.

23           MR. RENNIE:  Thank you, Your Honor.

24           THE COURT:  Is someone going to play the deposition?

25   He's working on it.  He's working on it.

1          (Plays video.)

2                MR. WEINER:  Sorry.  The answer is --

3          (Plays video.)

4                MR. WEINER:  And, Your Honor, the tape played a few

5     more lines than I indicated.  That's fine, if that's okay with

6     you.  It went actually to page 23, line 10.

7                THE COURT:  That's fine.

8                MR. WEINER:  You can take that down, Mr. Jackson.

9                THE COURT:  21 through 23 then.

10    Q    (By Mr. Weiner) Now, Mr. Shinners, I think you told us that

11    you were the elected face -- the representative of the

12    community with regard to GAW Miners.  Did I mishear that

13    yesterday?

14    A    Could you repeat the first part of your question?

15    Q    Tell the jury about this where you were an elected

16    representative to be the person dealing on behalf of the crypto

17    community with regard to GAW Miners.

18    A    Not the crypto community, sir.  HashTalk.

19    Q    Who elected you and to what role?

20    A    I didn't hear the question, but I assume you want me to

21    explain what this means.

22                THE COURT:  Who elected you and to what role?

23                THE WITNESS:  Oh, thank you.

24                There was a large list of names from the HashTalk

25    community, uh, that Mr. Garza had posted.  He wanted to have

1    the community, the HashTalk community -- that means the people

2    that were investors in GAW or whatever, in the products.  He

3    wanted them to identify those that they felt were the most

4    helpful to them, and there was several rounds.  And then I

5    ended up in the last batch of 12 individuals, and we were

6    designated as basically the community leaders.

7    Q    (By Mr. Weiner) And so you were one of the community

8    leaders with regard to GAW Miners; is that right?

9    A    That's correct.

10   Q    Okay.  Now, when you came to the view in mid to late

11   December 2014 that Mr. Garza was absolutely untrustworthy, you

12   didn't do anything with that information, did you?

13   A    Uh, at the time it wasn't actionable information.  My

14   personal opinion was not to go out there and make statements

15   without any kind of proof.  Feeling trust in somebody has

16   nothing to do with having proof that they're actually

17   criminal.

18   Q    So, for example, say if someone was starting to lose trust

19   in somebody else and they didn't go and tell the world.  You

20   would understand that; right?

21   A    I'm sorry.  Repeat that statement again.

22   Q    Mr. Shinners, you distrusted Mr. Garza, and yet you didn't

23   tell anyone outside of GAW Miners or anywhere else.  You didn't

24   tell anyone; correct?

25   A    Um, I couldn't say one way or the other whether I told

1    anyone outside of GAW Miners the company or not because I don't

2    really recall.  It's many years ago.

3              MR. WEINER:  Your Honor, we'd offer page 61, line 25

4    to page 62, line 23.

5              Mr. Jackson, could you pull that up just for the

6    Court?

7              THE WITNESS:  Is he talking about --

8              THE COURT:  He's talking about your deposition.  He's

9    going to pull it up on the screen.

10             THE WITNESS:  Oh, he's going to pull it up.

11             MR. WEINER:  And it's page 61, starting at line 25,

12   going to page 62, line 23.

13             And, Your Honor, we're going to offer that.

14             THE COURT:  All right.  So pages -- pages 61 and 62

15   will be DX 739.

16        (Defendant's Exhibit 739, received in evidence.)

17             THE COURT:  And that can be published.

18             MR. WEINER:  And, Your Honor, can we just publish the

19   videos?

20             THE COURT:  Sure, that's fine.

21             MR. WEINER:  Mr. Jackson, will you roll page 61, lines

22   25 through 62, lines 23.

23        (Plays video.)

24             MR. WEINER:  And, Mr. Jackson, do we have the tape for

25   the next lines, 20 to 23, or do you want me to read those?

1          Your Honor, I'll just continue reading.

2          THE COURT:  Okay.

3   Q   (By Mr. Weiner) I asked you, Mr. Shinners --

4          THE COURT:  He can't see this.  Why don't we bring it

5   up.

6          MR. WEINER:  If we can.  Mr. Jackson, let's bring up

7   page 62, lines 13 through 25.

8          THE COURT:  And we can publish that to the jury.

9          MR. WEINER:  Mr. Jackson, make it a little bigger so

10  the witness and I can see it.

11  Q   (By Mr. Weiner) I asked you, right after that, I said:

12          "Did you go on the HashTalk forum and tell the

13          community -- the GAW Miners community that they

14          shouldn't trust him and --"

15          And you answered, "No.

16          " -- be careful?"

17          You said, "I was already banned from Hash Talk by

18          then.

19          "Question:  Okay.  Did you attempt to communicate with

20          others who held GAW Miners' products and say, be

21          careful, don't trust Garza and his company?

22          "Answer:  No, not proactively."

23          Was that accurate testimony when you gave it in July

24  of 2018?

25  A   That's correct.

1          MR. WEINER:  You can take that down, Mr. Jackson

2    now.

3    Q    (By Mr. Weiner) Now, you submitted something called a

4    victim impact statement in December of 2017 in advance of Mr.

5    Garza's criminal sentencing; correct?

6    A    I believe so.

7    Q    Okay.  In that statement, you describe Mr. Garza's what you

8    call megalomaniacal nature?

9    A    Was that a question, sir?

10   Q    You used the word "megalomaniacal"; right?

11   A    It's a tough word to say, yes, sir.

12   Q    It's kind of a long word.  I had to look it up.  And you

13   agree with me, sir, that, as the Oxford Languages Dictionary

14   says, megalomaniacal means:  A person who is obsessed with

15   their own power.  Is that fair?

16   A    That's fair.

17   Q    That's what you intended to tell the Court when you used

18   that term; right?

19   A    That's correct, sir.

20   Q    And you continued to hold that view of Mr. Garza, that he

21   was a megalomaniac when you gave your deposition in July 2018;

22   correct?

23   A    Correct.

24   Q    Now, in 2014 wasn't exactly like Treasury bills or Apple

25   stock; right?  It wasn't a safe bet?

1   A    No, it definitely was not a safe bet, no.

2   Q    When you invested in GAW Miners' products starting in

3   August 2014, you knew you were taking a risk in making that

4   investment; correct?

5   A    Yes, sir.

6   Q    And you felt that the risk suddenly jumped up in November

7   of 2014; correct?

8   A    I would have to review the statement.  Is this a statement

9   I made during the deposition?

10  Q    What do you think, Mr. Shinners?

11  A    I'm sure that it probably was.

12  Q    Take a look at page 122 of your deposition, page 122, line

13  5.

14  A    Page 22?

15  Q    Page 122, line 5.  Look at lines 10 and 11, and then my

16  question is:  Did you feel that the risk in GAW Miners'

17  products jumped up in November 2014?

18  A    Okay, I understand the question now.  So the question is,

19  did I believe that it jumped up in December of 2014?

20  Q    November of 2014, as you say in line 10.  The risk jumped

21  up in November 2014, the risk of investing in GAW Miners'

22  products; right?

23  A    Uh, correct.

24  Q    And you continued to take that risk into December of 2014;

25  right?

1   A    Um, I believe you did the accounting, so it was less, so

2   correct.

3   Q    And you agree that the cryptocurrency world is one in which

4   it's much easier to facilitate fraud; correct?

5   A    I'm not really qualified to make that judgment, no.

6   Q    If you look at page 114 of your deposition.

7            MR. WEINER:  And, Your Honor, we'd offer lines -- page

8   114, line 17 to 115, line 4.  Let's blow up 115, line 4 too,

9   Mr. Jackson, so the Court can see it.  So it's page 114, line

10  17 to 115, line 4.

11           THE COURT:  Those can be marked as a full exhibit, DX

12  740, pages 114 and 115 of Mr. Shinners' deposition.

13      (Defendant's Exhibit 740, received in evidence.)

14  Q    (By Mr. Weiner) And I asked you starting on line 17 --

15  maybe we can pop those out, Mr. Jackson, or highlight them.

16  There you go.

17           "Question:  Is the cryptocurrency world one that's,

18           particularly in your experience and knowledge, is

19           particularly susceptible fraud?"

20           And you answered:  "I would say that anything that

21           relies on internet is going to be highly susceptible

22           to fraud, regardless of whether it's cryptocurrency or

23           selling medical policies or selling life insurance

24           policy.  I've seen fraud anywhere -- everywhere,

25           actually not just in the cryptocurrency world.  But,

1              yes, it's much easier to facilitate fraud, that I will

2              agree with."

3              That was true when you gave that testimony in July of

4    2018; correct?

5    A   Ah, that's correct.

6    Q   Now, from August 2014 to the end of 2014, you were on

7    HashTalk every day, many, many times a day; correct?

8    A   Uh, yes, I was.

9    Q   And by November 2014 you had seen posts on HashTalk

10   expressing serious doubts about Mr. Garza and GAW Miners;

11   right?

12   A   On HashTalk?

13   Q   Correct.

14   A   I don't recall.

15   Q   Okay.  You had seen them on something called Reddit; is

16   that right?

17   A   That's not HashTalk.  HashTalk is -- was the company's

18   own --

19   Q   Right.

20   A   -- forum, website, whatever.

21   Q   Now I'm asking about a different forum called Reddit.  Are

22   you familiar with Reddit?

23   A   I'm familiar with it, yes.

24   Q   Tell the jury what Reddit is, R-e-d-d-i-t.

25   A   I don't really know that much about what it is, but it's

1    like a forum.  I should probably speak this way.  It's like a

2    large collection of many different forums, mostly texts, I

3    think, and it went by subject.

4    Q    And in 2014 you would look at the Reddit forum on occasion;

5    correct?

6    A    On occasion?  I probably would search -- Google search

7    something and end up there, correct.

8    Q    Let's look at Exhibit DX 529.

9         THE COURT:  Let's bring that up for the witness for

10   now and for me.

11        MR. WEINER:  And, Your Honor, you'll recall

12   discussion.  We'll offer Defendant's Exhibit 529, Mr. Shinners'

13   statements in.

14        MR. RENNIE:  Your Honor sustained objection as to

15   everything except Mr. Shinners.

16        THE COURT:  I did.  So how are we going to do that?

17        MR. WEINER:  We're just going to go to Mr. Shinners'

18   comments.

19        THE COURT:  Okay, and you're just going to publish

20   that portion?

21        MR. WEINER:  Okay.

22        THE COURT:  Because --

23        MR. WEINER:  Yup.

24        THE COURT:  We can do that, and then you'll have to

25   redact the rest for the jury when it goes back to them.

 1              MR. WEINER:  Fair enough.

 2              THE COURT:  So let's bring that up so I can see it

 3   first.

 4              MR. WEINER:  Apologize, Your Honor.

 5              THE COURT:  That's all right.

 6              What I've got now, I've got what I think is his

 7   statement and some others.

 8              MR. WEINER:  Right.  And, Mr. Jackson, before we

 9   publish to the jury, let's just start in with his statement at

10   the bottom.  That's right.

11              THE COURT:  So what's on the screen now can be

12   published to the jury, and I'll admit the portion of DX 529

13   reflecting Mr. Shinners' statements and only that portion as a

14   full exhibit.

15        (Defendant's Exhibit 529, received in evidence.)

16   Q   (By Mr. Weiner) And, Mr. Shinners, that's you,

17   "Allen1980s"; right?

18   A   That's correct.

19   Q   And in that first block let's go down where it says,

20   "Although I understand."

21              "Although I understand that people may think this to

22   be a Ponzi scheme" -- you're talking about -- excuse me.

23   You're talking about GAW Miners and Hashlets; correct?

24   A   Whatever the subject of this thread is.  So I would assume

25   it's Hashlets, yeah, Hashlets.

1    Q    And tell the jury what you understand a Ponzi scheme to be.

2    A    Uh, Charles Ponzi, back in the early part of the 20th

3    Century, um, from what I recall from history anyway, he was --

4    he had created a kind of like a pyramid scheme of sorts.  I

5    think everybody's familiar with Charles Ponzi.  So, um,

6    basically he took new money that was coming in to pay the older

7    investors that had already been in the scheme.  Why do I think

8    it was postage stamps or something of that nature?  It was

9    something weird.

10   Q    Mr. Shinners, I'll represent to you that the date of this

11   post is August 25th, 2014.  August 25th, 2014.  Do you accept

12   that representation?

13   A    I thought it said August 21st, but that's okay.

14   Q    August 21st, you may be right.  But we're right in that

15   time frame of late August of 2014; right?

16   A    We're four days after I invested, yes.

17        MR. WEINER:  Your Honor, can I just take a break to

18   get a sip of water?

19        THE COURT:  Sure.  Sure.

20       (Pause.)

21        MR. WEINER:  Thank you.

22   Q    (By Mr. Weiner) So at this point in August 2014, you

23   already knew that some people thought that GAW Miners and

24   Hashlets were a Ponzi scheme; correct?

25   A    Correct.

1   Q   Okay.  And you didn't think so, though; right?

2   A   I'd only been invested in the product for four days; and

3   so, no, I did not think it was a Ponzi.

4   Q   Right.  And if we go to the continued post, I'm going to

5   look for the lines that say, "I could not" -- "I could not care

6   less."

7         MR. WEINER:  It's about ten lines down from the top,

8   Mr. Jackson, if you can --

9         THE WITNESS:  Are you talking about the one on the

10  right or the left?

11        MR. WEINER:  Yes, we'll make it bigger.

12        THE COURT:  He's going to blow it up for you.

13  Q   (By Mr. Weiner) And you wrote:  "I could not care less

14  whether there is a machine with my name on it out there

15  somewhere.  If they are selling me a crypto version of a time

16  share, who cares?  If my rate of return is positive and I make

17  my investment back, in a reasonable time period, and with a

18  reasonable long term continued rate of return, why should I

19  care?"

20        You wrote that in August of 2014; correct?

21  A   That's correct.

22  Q   And then just a few lines down from that you write:  "Plus,

23  how many times have you received the hardware so late that the

24  break-even was infinity?  I have a rig in a room of my house

25  that cost me $4100 to be built, only to be shut off 4 months

```
 1    later, because the costs to run the GPU-based rig were more

 2    than what the mining produced."

 3            Do you see that?

 4  A   Yes, I do.

 5  Q   Do you actually have mining machines in your house in 2014?

 6  A   I had stated that earlier, yes.

 7  Q   Okay.  And tell the jury what kind of mining machines you

 8    had in your house to mine cryptocurrency in 2014.

 9  A   Um, after I purchased my first one in 2012 and it arrived

10    in 2013, I used it as a blueprint to build more of these.  So I

11    had to source the components from various locations, mostly in

12    the United States, like the motherboard -- it's like building a

13    computer.  I mean what you're doing is you're building the

14    computer.  So all the components you would think of, that's

15    what I had to go out and source.  And so I was duplicating the

16    original only with more upgraded software and technology.

17  Q   And at the end of your post, right at the end, there's a

18    statement.  You say, "Your alarm to the public."  I think it's

19    the very end the last portion of the post.

20            MR. WEINER:  You may have to go to the next page, Mr.

21    Jackson.

22            THE COURT:  Can we take out the --

23            MR. WEINER:  Right.  Only Mr. Shinners' posts.

24  Q   (By Mr. Weiner) You see that at the top, Mr. Shinners, you

25    write:  "Your alarm to the public is more or less, somehow
```

1    self-serving, and anyone who reads this rubbish keep that in

2    mind"; right?

3    A    That's correct.

4    Q    There was talk on Reddit that some people thought GAW

5    Miners was a Ponzi scheme and you thought it wasn't?

6    A    There was no back-and-forth.  I believe there was only one

7    comment, one long one.  So I did not have an actual either -- I

8    did not have any communications with these people on an ongoing

9    basis, no.

10   Q    Well, there was some people in the cryptocurrency who

11   thought GAW Miners was a scam even back in August of 2014, but

12   you weren't one of those people; correct?

13   A    That's correct.

14   Q    You can set that aside.

15        Did you see reports throughout September, October,

16   November, December 2014 in the cryptocurrency that people

17   thought that GAW Miners was a scam?

18   A    You said reports?

19   Q    Posts or reports, comments.

20   A    There's a difference -- there's a difference between

21   reports and a comment or an opinion, yes.

22   Q    And what sort of comments or opinions did you see that GAW

23   Miners was a scam or a Ponzi scheme in that period?

24   A    I had seen anonymous posts to that effect, correct.

25   Q    So there were people out there saying it's not on the

1  level; correct?

2  A    There were individuals out there that were making these

3  claims, correct.

4  Q    Right.  And, now, by the time November and December 2014

5  rolled around and you had signed an NDA with GAW Miners, you

6  had all sorts of information about GAW Miners from the inside;

7  correct?

8  A    Could you specify which information that might be?

9  Q    I don't know.  You probably know better than I do.  You had

10  all sorts of information from GAW Miners on the inside;

11  correct?

12  A    I had some information pertaining to the white paper and

13  competition, yes, sir.

14  Q    And with all that information that you had from the inside

15  and all the experience you had in cryptocurrency, you still

16  were fooled by Mr. Garza.

17  A    That's correct.

18  Q    Now, you continued to give Mr. Garza advice in late

19  December 2014 into January 2015; correct?

20  A    Did you say in January 2016 -- or 2015?

21  Q    Correct, I did.

22  A    You did not?

23  Q    I did.

24          THE WITNESS:  He --

25          THE COURT:  The question was:  Now, you continued to

```
 1    give Mr. Garza advice in late December 2014 into January 2015;

 2    is that correct?

 3              THE WITNESS:   Into -- there was a big falling out in

 4    January.  So I don't know what specific dates you're referring

 5    to.

 6    Q    (By Mr. Weiner) The early part of January you continued to

 7    give Mr. Garza advice, the early part of January 2015; correct?

 8    A    I'm not sure what that advice would be.  Could you refresh

 9    my, you know, recollection of this?

10    Q    Take a look at Defendant's Exhibit 730 to start, and we'll

11    start in late 2013, 730.

12              THE COURT:   You're just refreshing at this point, Mr.

13    Weiner?  Yes?

14              MR. WEINER:   I'm offering 730.

15              THE COURT:   Is there objection to 730?  I don't

16    actually have 730 on my list, so ...

17              MR. WEINER:   It was the one we added at the end.

18              THE COURT:   Then, all right, 730 will be full, DX 730.

19         (Defendant's Exhibit 730, received in evidence.)

20    Q    (By Mr. Weiner) Do you see Defendant's Exhibit 730, Mr.

21    Shinners, in front of you?  It's an e-mail from you to Mr.

22    Garza, and it's dated December -- sorry -- December 29th, right

23    at the end of the month, 2014.  Do you see that?

24    A    Yes, it is.  December 29, 2014.

25    Q    Right.  And you're saying to Mr. Garza -- it's to Mr.
```

1    Garza, Mr. Jackson.  Let's highlight that.

2           It's regarding you're invited to Paybase.  Tell the

3    jury what Paybase was.

4    A   Uh, Pay -- Paybase was another platform that was integral

5    in order for all of these promises GAW Miners had made to, you

6    know, come to fruition, meaning that they would be delivered

7    after the first of the year in 2015.  Um, they would all be

8    delivered at the same time.  And this is what the whole

9    backbone was for things like merchant, adoption, for an

10   exchange, an active exchange, the Paycoin $20 floor, etc., etc.

11   Q   And then you tell Mr. Garza in this e-mail, "Another idea

12   I'm probably give you for free ... ugh."  You see that?

13   A   I see that.

14   Q   You say, "You need to start advertising Paycoin as the

15   method through which Bitcoin users can maintain BTC ownership

16   and patronage."

17          What's BTC?

18   A   Bitcoin.

19   Q   "Which Bitcoin users can maintain Bitcoin ownership and

20   patronage, but utilize the Paycoin network's near-instant

21   transmission speeds to transfer the coins."  Do you see that?

22   A   Yes, I do.

23   Q   So fair to say that as of December 29th, 2014, you were

24   still giving Mr. Garza your advice about GAW Miners' products,

25   including Paycoin?

1   A    Correct.

2   Q    Okay, and let's look at Defendant's Exhibit 626.

3        THE COURT:  All right.  DX 626 will be full.

4   (Defendant's Exhibit 626, received in evidence.)

5   Q    (By Mr. Weiner) Mr. Rennie asked you some questions about

6   this yesterday.  Remember that?

7   A    Uh, yesterday.

8   Q    Let's start with the e-mail at the bottom, December 29th,

9   9:09 p.m., from Mr. Garza to you.

10       "Hello."  Do you see that?

11  A    I see it.

12  Q    And let's highlight the whole block.

13       The subject line is:  "Think we got it"; right?

14       Do you see that, "Think we got it"?

15  A    I see the entire section here, sir.

16  Q    And Mr. Garza says, "I can move just about all the" -- and

17  XPY is Paycoin; right?

18       THE COURT:  Is XPY Paycoin?

19       THE WITNESS:  Oh, is XPY Paycoin?  Yes.

20  Q    (By Mr. Weiner) Mr. Garza tells you:  "I can move just

21  about all the Paycoin out there for less than half the Bitcoin,

22  BTC, we have in reserve."  Do you see that?

23  A    I see the -- I see it.

24  Q    He says, "Should work out just fine," happy face emoji;

25  right?

1              Do you see that?

2    A    Yes, I see it.

3    Q    And let's go to your response at the top.  And December

4    29th, 2014 from you to Mr. Garza.  Again, the re line:  "Think

5    we got it."

6              And your response is:  "And remember:  Ignorance is

7    bliss.  I will be very blissful to take advantage of other

8    people's ignorance, in this case."  Do you see that?

9    A    Yes, I do.

10   Q    That wasn't very nice, was it?

11   A    Sorry?

12   Q    That wasn't very nice, was it?

13   A    Did we not already cover this yesterday?

14             THE COURT:  Well, he gets to ask about it too.  So the

15   question is:  That wasn't very nice, was it?

16             THE WITNESS:  It wasn't -- it wasn't bad.  I mean,

17   context of what this meant or what this was stated, in which it

18   was stated, it had nothing to do with whether it was bad or

19   good.

20   Q    (By Mr. Weiner) Okay.  Do you think it's a good thing to

21   take advantage of other people's ignorance?  Just generally

22   speaking, do you think that's a good thing?

23   A    Just generally speaking?  It depends on the situation.

24   Q    So there's some situations where it's okay, in your mind,

25   to take advantage of other people's ignorance; is that right?

1    Yes or no, sir?

2    A    Repeat the statement again.

3    Q    In your view, it's sometimes okay to take advantage of

4    other people's ignorance.  Is that --

5    A    During -- I'm sorry.  Go ahead.

6    Q    Is that right?

7    A    In this case, yes.

8    Q    Let's look at Exhibit 634.

9         THE COURT:  Okay.  DX 634 will be full.

10        (Defendant's Exhibit 634, received in evidence.)

11   Q    (By Mr. Weiner) And if we start -- this is again one of

12   those that go back to front.  Let's start at the second page at

13   the bottom.  Your e-mail of January 3rd, 2015.  You write --

14   you're writing to Mr. Garza.  You write, "Read this and think."

15        Let's go on to the next page.  Another page, right

16   there, it says, "Your biggest mistake."  Let's blow that up so

17   the witness can see it.

18        You tell Mr. Garza in January of 2015:  "Your biggest

19   mistake thus far has been allowing outsiders to" -- PoW is

20   proof of work; is that right?

21   A    That is correct.

22   Q    "Your biggest mistake thus far has been allowing outsiders

23   to Proof-of-Work mine Paycoin"; correct?

24   A    That's correct.

25   Q    "You armed our enemies with the means to destroy the value

1  of the coin"; right?

2  A    That's correct.

3  Q    "And the coin of the people will have to become more

4  privately oriented if this mess/problem is to be diminished.

5  Coin-swap is not the answer unless you are willing to privatize

6  the Paycoin market in the exchange."  Do you see that?

7  A    Yes, I do.

8  Q    These were comments that you were telling Mr. Garza in

9  early January of 2015; correct?

10 A    I didn't even look at the date, but, yes, probably, if this

11 was in January.

12 Q    Yeah, let's go to -- we were just on the page before that

13 with the date of this e-mail, Mr. Jackson, if you can show that

14 date, Saturday, January 3rd.  Let's blow that up.

15         Does that refresh your memory that --

16 A    Yes.

17 Q    -- on January 3, 2015, you were giving this advice to Mr.

18 Garza; is that correct?

19 A    That's correct.

20 Q    And then if we go to the first page of the document,

21 Defendant's Exhibit 634, at the bottom you see an e-mail from

22 you later that day.  Let's go down one, the January 3rd.

23         You say:  "Hate to be brutal about it, but:  Don't

24 cock it up."  You see that?

25 A    Yes, I do.

Shinners - Cross                                                      808

1    Q    And at the top of the page, you add your thought, you say,

2    "Do you think this helpful?"

3           And you write, "We will have to use coin aging as part

4    of the qualification for trading.  Example:  Only coins aged

5    for two weeks (or more) can be traded in the exchange.  This

6    also forces people into either Hashbase or Paybase to hold

7    balances longer to be able to trade them."

8           At the end of the e-mail you say, "This is not my

9    complete list.  I am just sending additional ideas along as I

10   figure this all out."  Do you see that?

11   A    I see it.

12   Q    And at the top you see the date, January 3, 2015?

13   A    Correct.

14   Q    So as of January 3, 2015, you were still giving advice to

15   Mr. Garza about GAW Miners' products; correct?

16   A    Paycoin, correct.

17   Q    Okay.  And let's look at Defense Exhibit 638.

18           THE COURT:  Okay, DX 638 will be a full exhibit.

19       (Defendant's Exhibit 638, received in evidence.)

20   Q    (By Mr. Weiner) And that's the date on that at the top to

21   Mr. Garza.  It says January 12, 2015.  Do you see that?  Do you

22   see that?

23   A    I see the document, sir.

24   Q    That's only a week before the period that the jury's been

25   asked to focus on?

1   A    I believe so.

2   Q    You're still in there advising Mr. Garza; right?

3   A    I don't think at this point I'm advising him on anything.

4   I think we've had pretty much the falling out already.

5   Q    Let's look at the second paragraph.  And you say -- the

6   sentence that begins, "You can claim misunderstanding."  Let's

7   do the rest of that whole paragraph.

8            "You can claim misunderstanding or miscommunication

9   all you like, but I have warned you about this before, you just

10  chose not to listen.  You make these posts with the worst

11  English.  You have already stated to me on the phone that you

12  play psychological marketing.  I have told you before that it

13  will only work a few times, tossing beads to the natives, and

14  that eventually they will just get into their canoes and float

15  away.  You can search your e-mail for this last statement,

16  should you want verification."

17           Right?  You see that?

18  A    I see the document, sir.

19  Q    And you were telling Mr. Garza January 12th that he could

20  only try his trickery on GAW Miners' investors so many times

21  before they would become immune to it; right?

22  A    I don't think I used the word "trickery" anywhere in the

23  document, sir.

24  Q    Let's look at your deposition, page 322.

25  A    What's the page number?

Shinners - Cross                                                    810

```
 1   Q   322.

 2   A   And the lines?

 3           MR. WEINER:  Your Honor, we're going to offer lines 9,

 4   322, line 9 to 323, line 9.

 5           THE COURT:  Can you just go over for me?

 6           Yeah, that will be a full exhibit.  322 and 323 will

 7   be full.  And that will be DX 240?

 8           MS. HASSAN:  741.

 9           THE COURT:  Sorry, 741.  Sorry.  Yeah, 741.

10       (Defendant's Exhibit 741, received in evidence.)

11           THE COURT:  And that can be published.

12           MR. WEINER:  Thank you.  I think we have a tape of

13   this.

14           Mr. Jackson, can you roll the tape on that one, 322?

15       (Plays video.)

16           MR. WEINER:  And, Your Honor, if I can just read the

17   lines 5 to 9?

18           THE COURT:  Sure.

19           MR. WEINER:  Your Honor, if I may?

20           THE COURT:  You may.

21   Q   (By Mr. Weiner) And I asked you, at the end of that e-mail,

22   you say that:  "Your (sic) damn lucky I did not post this

23   response to HashTalk in my thread there."

24           And then you say:  "You owe me big for this favor, and

25   I mean BIG."  Capital B-I-G.  Do you see that?
```

1           THE COURT:  He actually can't see it.  Is this the

2    exhibit you're reading from?

3           MR. WEINER:  Yeah.  Let's look at the exhibit.

4    Defendant's Exhibit 638 at the very bottom, if we can pull that

5    up, Mr. Jackson, 638, the exhibit itself.

6           Take down the testimony.  Just put up 638.  Thank you.

7           Blow up that last paragraph of that e-mail.

8    Q   (By Mr. Weiner) And at the very end you say -- just have

9    the e-mail, the blue text.

10          You say:  You are damn lucky I did not post this

11   response to -- HT is HashTalk; right?

12          Mr. Shinners, is HT HashTalk?

13   A   Uh, yes, HT is short for HashTalk.

14   Q   And you write:  You are damn lucky I did not post this

15   response to HashTalk in my thread there.  Do not think I have

16   not already been asked what Cryptsy came back with, as I have.

17   You owe me big for this favor ... and I mean BIG.

18          In all capitals; right?  I have read that correctly?

19   A   Yes, you did.

20   Q   That's what you told Mr. Garza on January 12 of 2015;

21   correct?

22   A   Yes, January 12th.

23          MR. WEINER:  Nothing further, Your Honor.

24          THE COURT:  Okay.  Redirect?

25          MR. RENNIE:  Just a moment, Your Honor.

1          THE COURT:  Okay.

2                     REDIRECT EXAMINATION

3   BY MR. RENNIE:

4   Q    Good morning, Mr. Shinners.

5   A    Good morning.

6   Q    So -- bring this closer so you can hear me.

7          Defense counsel has asked you about some of your phone

8   calls and e-mails and private messages with Mr. Garza; correct?

9   A    I'm sorry.  What's the question again?

10  Q    Mr. -- Defense counsel has asked you about some of your

11  e-mails and phone calls and text messages with Josh Garza;

12  right?

13  A    Correct.

14  Q    And he's asked you some questions about how you were conned

15  by Mr. Garza anyway; correct?

16  A    You're going to have to speak up a little bit louder into

17  that microphone.

18  Q    Sorry about that.

19          And he asked you some questions about how you were

20  conned by Mr. Garza.

21  A    Correct.

22  Q    When you talked to Mr. Garza, did you know that Mr. Garza

23  had been lying to the public about GAW Miners and ZenMiner and

24  its press releases?

25  A    No, I did not.

1   Q   When you talked to Mr. Garza, did you know that Mr. Garza

2   had been stealing from Mr. Fraser's bank account?

3          THE COURT:  When you talked to Mr. Garza, did you know

4   that Mr. Garza had been stealing from Mr. Fraser's bank

5   account?

6          THE WITNESS:  Oh, no, I did not.

7   Q   (By Mr. Rennie) When you talked to Mr. Garza, did you know

8   that GAW Miners had no financial controls and no inventory

9   accounting?

10  A   Uh, no, I did not.

11  Q   And when you talked to Mr. Garza, had you been asking for

12  but not receiving financial information for months?

13  A   Uh, that's correct.

14  Q   Now, I'd like to just return to something that you spoke

15  about with Defense counsel this morning, which is when you

16  began to stop trusting Mr. Garza.  So page 61 of Mr. Shinners'

17  deposition.

18         THE WITNESS:  Your Honor --

19         THE COURT:  He's asked if I could let you remove your

20  mask.  Mr. Rennie, I'm going to have to ask you to speak up.

21  Okay?

22         MR. RENNIE:  Sure.

23         THE COURT:  Yell if you have to.  I'm good at that.

24         MR. RENNIE:  Bring this closer.

25  Q   (By Mr. Rennie) Mr. Shinners, Mr. Garza -- Defense counsel

1   asked you a few questions about when you began to stop trusting

2   Josh Garza this morning.  Do you remember that?

3   A   Yes, I do.

4   Q   I believe page 61 of Mr. Shinners' deposition is already in

5   evidence.  I'd just like to read another portion of it.

6          THE COURT:  All right.  You can bring that up for the

7   jury.

8          MR. RENNIE:  Mr. Boles, can we bring up page 61 of Mr.

9   Shinners' deposition.

10         THE COURT:  There we go.

11  Q   (By Mr. Rennie) So I'm starting at line 18.

12         "Question:  Okay.  When you told us that in December

13         or late 2014, you decided that Mr. Garza was

14         untrustworthy, what did you do with that information?

15         "Answer:  It would not have been late 2014.  It would

16         have been basically early 2015."

17         Can you go to the next page, Mr. Boles, please?

18         That conclusion that Mr. Garza was untrustworthy -- my

19  apologies.

20         So can you -- did I read that correctly?

21  A   Yes, you did.

22  Q   So can you just remind the jury, when was it that you --

23  when exactly was this it you began to distrust Josh Garza?

24  A   Okay.  So during the holidays, the Christmas holidays in

25  2014, Mr. Garza had contacted me and stated that Paybase, which

1    I think I already just defined what that was, was not coming

2    out in December; that it would have to be after the holiday.

3    It wasn't ready yet.

4           So I asked him, is everything going to be there?  And

5    his response was, yes, everything will be there, merchant

6    adoption, the exchange, the $20 floor, all of it.

7           And then came, after the new year in 2015, the only

8    thing that was there was an online wallet, a place to store

9    your Paycoin and nothing else.  And that caused me great

10   aggravation.

11   Q   So, Mr. Shinners, when you were exchanging some of those

12   e-mails we just saw in late December, had you yet stopped

13   trusting Josh Garza?

14   A   Uh, no.  I -- my personal opinion at the time was is I was

15   agitated because he had established publicly a timeline and he

16   wasn't exactly keeping up with that very well.

17   Q   And when you say that, when was it that you finally knew

18   that he wasn't meeting the timeline that he had promised you?

19   A   When he had called me -- I want to say it was Christmas

20   Eve, for some reason.  He had called me and basically wanted to

21   know how I thought the HashTalk community would react if he

22   posted that it would not be coming out, the Paybase would not

23   be coming out in December but would actually be coming out

24   after the new year.

25   Q   And so was it after the new year when it wasn't delivered

1    that you began to mistrust him finally?

2          MR. WEINER:  Objection, leading.

3          THE COURT:  That's sustained.

4    Q   (By Mr. Rennie) Mr. Shinners, you just testified that he

5    called you over the Christmas holiday?

6    A   That he called me over the Christmas holiday?  Yes.

7    Q   And when was it that Paybase was finally delivered?

8    A   I don't have a specific date.  I -- it was after the first

9    of January of 2015, within a few days of that.

10   Q   Was that when you realized Mr. Garza had not followed

11   through with his promise?

12   A   Yes.  It was obvious he had not followed through with his

13   statements he had made just a few weeks before to me on the

14   phone.

15   Q   Thank you.

16         So Defense counsel asked you about a Reddit post that

17   you wrote.  Do you remember that?

18   A   Uh, yes.

19         MR. RENNIE:  Mr. Boles, would it be possible to show

20   just the part of DX 529 that is Mr. Shinners' post?

21         So if you could blow up on the second page where Mr.

22   Shinners discusses a timeshare.

23         My apologies.  It's toward the top.

24   Q   (By Mr. Rennie) So, Mr. Shinners, do you see a line where

25   you say, "I could not care less whether there is a machine with

1    my name on it out there somewhere"?

2    A    Correct.

3    Q    "If they are selling me a crypto version of a time share,

4    who cares?"

5    A    Correct.

6    Q    So when you said, "If they're selling me a crypto version

7    of a time share," were you referring to Hashlets?

8    A    Uh, yes, I was.

9    Q    And does this statement reflect that you didn't think you

10   were receiving a piece of a physical miner?

11              MR. WEINER:  Objection, leading.

12              THE COURT:  Sustained.  Sustained.

13              MR. RENNIE:  Okay.

14   Q    (By Mr. Rennie) Do you understand that you were receiving a

15   piece of a physical -- a specific physical miner?

16   A    I understood that I was receiving a share of a physical

17   miner at their mining farm.

18   Q    Did you think that there was a specific piece of equipment

19   with a specific serial number that you were receiving?

20   A    I didn't really understand it at the time.  Uh, I just

21   assumed that I owned a share of a mining machine somewhere in

22   a -- on a mining farm.

23   Q    Did you purchase a specific -- was there a specific machine

24   assigned to you when you purchased your Hashlets?

25   A    Uh, I mean the way I understand the way -- the way I

understand Hashlets functioned, there was no specific machine that was allocated directly to me. It was a share of the mining power, um, that -- these Hashlets are denominated in ratings of power. So that's what I understood at the time.

Q So were you buying a share of the total hashing power that GAW Miners had?

A I was definitely buying a specific quantifiable share of mining power that was at the mining farm.

Q Thank you.

MR. RENNIE: Your Honor, I'm going to switch gears. I don't know if you want to take the break now.

THE COURT: No, let's not take the break now. We have a few more minutes. Let's use the time.

MR. RENNIE: Okay. Thank you.

Q (By Mr. Rennie) So, Mr. Shinners, yesterday Defense counsel asked you a few questions about your purchases before and after you bought *The Wall Street Journal* -- excuse me -- before and after you read *The Wall Street Journal* article on November 24th. Do you remember that?

A Uh, yes.

MR. RENNIE: Mr. Boles, would we be able to show I believe it's Defense Exhibit 683? Are these Mr. Shinners' purchases? Thank you.

Q (By Mr. Rennie) Mr. Shinners, yesterday Defense counsel represented that you had spent roughly $17,000 on GAW products

```
 1    before November 24th and $7,000 or so after November 24th.  Do

 2    you remember that?

 3    A   Vaguely, yes.

 4    Q   Well, we checked his math, and it turns out those numbers

 5    are correct.  But I have a few more questions on that.

 6         Do you know when you made your first GAW Miners'

 7    purchase?

 8    A   Uh, yes.  I made it August -- yeah, August 17th of 2014.

 9    Q   And do you know how many days there are between August 17th

10    and November 24th?

11         THE COURT:  You're going to make him count?

12         MR. RENNIE:  No, I'm not.

13    Q   (By Mr. Rennie) Will you accept --

14    A   I'll just go on your word.

15    Q   Will you accept my representation that it's 99 days?

16    A   Yes.

17    Q   Okay.  Would you accept my representation that you spent

18    roughly $173 per day on average before you read The Wall Street

19    Journal article?

20    A   I would accept that.

21    Q   Okay.  And would you accept my representation that there

22    were only 21 days between November 24th and December 14th when

23    you made your last purchase of GAW Miners' products?

24    A   Yes.

25    Q   Would you accept my representation that it's roughly --
```

```
 1              MR. WEINER:  Your Honor, this is argument.

 2              THE COURT:  Well, no.  I allowed something similar

 3   before so -- during your examination.  Go ahead.  You can

 4   proceed.  I'll overrule that.

 5   Q   (By Mr. Rennie) Would you accept my representation that's

 6   roughly $328 per day?

 7   A   Yes.

 8   Q   So, Mr. Shinners, did you spend roughly --

 9              THE COURT:  Let me just say, Ladies and Gentlemen,

10   obviously, you'll have this exhibit with you in the jury room.

11   You can check Mr. Weiner's math, Mr. Rennie's math, and Mr.

12   Shinners' math.  Okay?

13              Go ahead, Mr. Rennie.

14   Q   (By Mr. Rennie) So, Mr. Shinners, is it correct to say --

15   withdrawn.

16              Mr. Shinners, did you spend roughly twice as much per

17   day on average on GAW Miners' products after you read The Wall

18   Street Journal article?

19   A   Based on the math, yes.

20   Q   And was that The Wall Street Journal article that included

21   the $100 million claim about GAW Miners?

22   A   Uh, yes.

23   Q   And did you testify about that Wall Street Journal article

24   yesterday?

25   A   Uh, I believe it was yesterday, yes.
```

1   Q    Thank you.

2         Mr. Shinners, do you remember Defense counsel asking

3   about your MBA and your experience with cryptocurrency mining?

4   A    I caught the part about the NDA.

5         THE COURT:  No.  He said:  "Do you remember Defense

6   counsel asking about your MBA and your experience with

7   cryptocurrency mining?"

8         THE WITNESS:  Yes, I do.

9   Q    (By Mr. Rennie) Would your MBA have allowed you to see that

10  GAW Miners did not have enough hashing power to support its

11  Hashlets?

12  A    No, it would not.

13  Q    Would your MBA have allowed you to see that there was no

14  $100 million reserve fund?

15  A    Uh, no, it would not.

16  Q    Would your MBA have allowed you to see that there were no

17  agreements with major retailers?

18  A    Uh, definitely not.

19  Q    Would your experience mining cryptocurrency at home have

20  allowed you to know that there was no $100 million reserve

21  fund?

22        MR. WEINER:  Objection, argument.

23        THE COURT:  Overruled.

24        THE WITNESS:  No, it would not.

25  Q    (By Mr. Rennie) Would your experience mining cryptocurrency

1   at home have showed you that GAW Miners had reached no

2   agreements with major retailers to accept Paycoin as payment?

3   A    No.

4   Q    Defense counsel asked you yesterday if you were concerned

5   that GAW Miners had a vacant CFO position.  Do you remember

6   that?

7   A    Uh, yes, I do.

8   Q    At the time, were you aware that GAW Miners' CFO had left

9   the company because it had no financial controls or inventory

10  accounting?

11              MR. WEINER:  Objection.

12              THE COURT:  Sustained.

13  Q    (By Mr. Rennie) Mr. Shinners, Defense counsel asked you a

14  few questions about a nondisclosure agreement, an NDA.  Do you

15  remember that?

16              THE COURT:  Now he's asking:  Do you recall questions

17  about an NDA?

18              THE WITNESS:  Yes.

19  Q    (By Mr. Rennie) Did someone at GAW Miners ask you to sign

20  an NDA?

21  A    Uh, eventually Mr. Garza had asked me, yes, to sign.

22              THE COURT:  Mr. Rennie, now we'll take our break.

23              Ladies and Gentlemen, thank you for your attention

24  this morning.  Don't discuss the case.  Don't let anyone

25  discuss it with you.  Keep an open mind.  We'll have you back

1    at ten after.  Thank you very much.

2         (The jury left the courtroom at 10:45 a.m.)

3              THE COURT:  Sir, you may step down.  Mr. Shinners, you

4    may step down.

5              MR. BUCHDAHL:  Your Honor, you said there were a few.

6              THE COURT:  Yes, thank you.  Exhibits, three points.

7              So before the exhibits go to the jury, so before

8    deliberations can begin, counsel must, on both sides, must

9    review them with Ms. Johnson.  Make sure she has exactly what

10   she's supposed to have, and then I will ask you to stipulate

11   that that is the case.  No deliberations will begin until

12   you've done that, so make sure you make arrangements to do that

13   as the trial winds down.  Okay?

14             And, second, right.  Make sure -- so we're continuing

15   to add to the exhibits.  Make sure that these transcript

16   pages -- and in each case I've let in the pages I've mentioned,

17   not just the lines that you've read, are, in fact, downloaded

18   correctly, copied to the electronic media, whatever, that we're

19   going to be providing to the jury.  Make sure that's done

20   timely.

21             And then lastly, at the beginning of the trial, I

22   asked counsel to prepare an index jointly.  And, again, it

23   should be very generic, but it's very helpful for them to have

24   a hard copy.  If I look at it and I think it's adequate, I

25   might even have nine copies made so they're not passing a

1  document between them.

2           So are counsel working on the index?  That's my

3  question.

4           MR. BUCHDAHL:  We've been compiling an internal index,

5  but we have not yet engaged Defense counsel as far as I'm

6  aware.

7           THE COURT:  I think it's time to start that process.

8  We'll be in recess.  Thank you.

9      (Recess from 10:47 a.m. to 11:08 a.m.)

10          THE COURT:  All right, folks.  Please take your seats.

11 We'll get the jurors.

12          MR. WEINSTEIN:  Your Honor, I think perhaps for the

13 first time in this case I can speak for all.  Is there any

14 chance to bring the temperature up a degree or two?

15          THE COURT:  I hate to do that because we're doing

16 really well -- the reason it's cold is because outside air is

17 being blown in at my request, and the reason for that is right

18 there.  There's why we keep the carbon dioxide meter, so I can

19 see it.  We're at 467, which is an excellent level given how

20 many people are in the room.  So the short answer's no.

21      (Pause.)

22      (The jury entered the courtroom at 11:10 a.m.)

23          THE COURT:  Folks, take your seats.  I guess we're

24 missing one person.

25          Folks, I do want to apologize for the temperature.

1    The lawyers mentioned it, and it's a fair point.  We're not

2    keeping the temperature so low to keep you awake.  Rather,

3    we're keeping it low because what it really means is outside

4    air -- a lot of outside air is being blown into the courtroom.

5    The purpose of that, as you might imagine, is for safety in

6    light of the pandemic.

7              I have a carbon dioxide meter that I can see.  It's at

8    a very good level; and that's because, at my request, the

9    outside air is being blown in.  So you can blame me for the

10   fact that it's freezing, but it's keeping you safe.

11             Everybody be seated.  We'll resume with the redirect

12   examination.

13             MR. RENNIE:  Plaintiffs would like to offer three

14   paragraphs from DX 682, which is the original Complaint in this

15   action.  I have paper copies that I can bring up to Your Honor

16   and the witness.

17             THE COURT:  Okay, yes, sure.  I guess why don't you

18   pull it up on the screen just for me or the witness as well

19   just so I can see which paragraphs we're talking about.

20             MR. RENNIE:  Certainly.

21             May I approach, Your Honor?

22             THE COURT:  You may.

23             MR. RENNIE:  May I approach the witness?

24             THE COURT:  You may.

25             You can proceed.

1          MR. RENNIE:  Thank you.

2    Q    (By Mr. Rennie) Mr. Shinners, do you recall the Defense

3    counsel asked you some questions about the original Complaint

4    in this lawsuit?

5    A    Yes.

6    Q    Do you recall that he suggested that you had changed your

7    story?

8    A    Uh, yes.

9    Q    Now, Defense counsel only showed you one paragraph from the

10   original Complaint; right?

11   A    Uh, correct.

12   Q    Are you aware that there are 165 paragraphs in the original

13   Complaint?

14   A    Yes, I am actually.

15   Q    Now, you have a few paragraphs in front of you; correct?

16   A    Correct.

17   Q    Now, can you open the first one, please?

18          MR. RENNIE:  And Plaintiffs are offering these

19   paragraphs.  Can we show them to the jury?

20          THE COURT:  Okay.  Hold on one second.

21          Yes, those can be admitted.  Let's call them -- I

22   think we had DX 682A and B before.  So why don't we call these

23   682C, D, and E.  682C will be the one with paragraph 11.  DX

24   682D will be the one with paragraph 18.  And DX 682E will be

25   the one with paragraph 39.  And those will be full.  They can

1  be shown to the jury.

2      (Defendant's Exhibits 682C, 682D, 682E, received in

3      evidence.)

4  Q  (By Mr. Rennie) Mr. Shinners, can you look at paragraph 11?

5  A  Yes.

6  Q  Now, I'm going to start reading about halfway down where it

7  says:  "Defendants Garza, GAW Miners and ZenMiner have also

8  engaged in the offer and sale of unregistered securities, in

9  violation of Section 36b-29(a)(1) of CUSA.  Fraser functioned

10 as a controlling person of GAW Miners and ZenMiner and is

11 liable for Garza, GAW Miners' and ZenMiner's primary violations

12 of federal and state securities laws."  Do you see that?

13 A  Uh, yes, I do.

14 Q  Did Defense counsel read that paragraph to you yesterday?

15 A  No, he did not.

16 Q  Can you please take a look at paragraph 18 of the

17 Complaint.

18      Do you see it, Mr. Shinners?

19 A  I didn't realize this was like a multi-part document; but,

20 yes, I see it now.

21 Q  Now, it says, "Defendant Fraser, age 55, lives in Armonk,

22 New York.  Fraser has served as vice chairman at Cantor

23 Fitzgerald, L.P., and he invested in GAW Miners and ZenMiner in

24 2014.  Fraser has served as a mentor and business associate of

25 Garza for over a decade.  Through Fraser's ownership of GAW

1   Miners and ZenMiner and his long-standing personal and business

2   relationship with Garza, Fraser had the power to direct or

3   cause the direction of the management and policies of Garza,

4   GAW Miners and ZenMiner."  Do you see that, Mr. Shinners?

5   A   Yes, I do.

6   Q   And this is a paragraph from the original Complaint, Mr.

7   Shinners; is that right?

8   A   Uh, correct.

9   Q   Thank you.

10          Mr. Shinners, can you please turn to the last

11  document, paragraph 9 of the original Complaint.

12          Are you there, Mr. Shinners?

13  A   I am.

14  Q   Paragraph 39 reads, "Garza and Fraser thus possessed equal

15  control over GAW Miners and Garza regularly referred to Fraser

16  as his partner."  Do you see that, Mr. Shinners?

17  A   Yes, I do.

18  Q   Did Defense counsel read that paragraph to you yesterday?

19  A   No, he did not.

20  Q   Thank you, Mr. Shinners.

21          In 2014, did you have any idea at any point that there

22  was no $100 million fund to support Paycoin?

23  A   No, I did not.

24  Q   In 2014, did you have any idea at any point that GAW Miners

25  did not have enough computing power to support the Hashlets it

1   sold?

2   A   No, I did not.

3           MR. RENNIE:  Thank you.  That's all.

4           THE COURT:  Sir, you may step down.  Thank you.

5           You can just leave it there.  Not your problem.  When

6   you have a chance, just put your mask on for me.

7       (Witness excused.)

8           THE COURT:  Ms. Chen, are you next up?

9           MS. CHEN:  May I approach?

10          THE COURT:  You may come up.  Are you going to be

11  examining the next witness?  Who do you wish to call?

12          MS. CHEN:  Plaintiffs called Michael Pfeiffer.

13          THE COURT:  All right, sir, come on up.

14          MR. WEINER:  Your Honor, with your permission, Mr.

15  Weinstein will be conducting the cross-examination.

16          THE COURT:  That will be fine.  And if you would face

17  our courtroom deputy, and she will give you the affirmation.

18

19               M I C H A E L   P F E I F F E R,

20          having been duly affirmed by the Clerk, testified

21                      under oath as follows:

22

23          THE CLERK:  Please be seated.  State your name, city,

24  and state you work.  Spell your last name, please.

25          THE WITNESS:  My name is Michael Pfeiffer,

1    P-f-e-i-f-f-e-r, Philadelphia, Pennsylvania.

2             THE COURT:  You may proceed, Ms. Chen.

3                      DIRECT EXAMINATION

4    BY MS. CHEN:

5    Q    Good morning, Mr. Pfeiffer.

6    A    Good morning.

7    Q    Can you hear me okay?

8    A    I can.

9    Q    What is your role in this case?

10   A    I'm a class representative.

11   Q    And why have you chosen to be a class representative?

12   A    Well, GAW was a massive fraud.  It affected a lot of

13   people; and unless people come forward and speak about their

14   experiences, justice would not be served.

15   Q    Mr. Pfeiffer, are you being paid to be a class

16   representative?

17   A    No.

18   Q    Have you ever received any compensation for being a class

19   representative?

20   A    No.

21   Q    Will you tell the jury a little bit about yourself and your

22   background?

23   A    Sure.  Um, so I grew up in Florida.  I went to Pennsylvania

24   for college.  I pretty much stayed there since.  It's been

25   about 30 years.

1              After college, I entered social work and practiced for

2    a couple years before I went to a graduate program to get a

3    master's in social work.  From that point, I went in practice

4    in individual, couples, and family therapy for about ten years.

5    And then I went back to a doctoral program also in social work

6    to get a Ph.D.

7    Q   Mr. Pfeiffer, what drew you to social work?

8    A   A lot of my family members are social workers:  my mother,

9    my aunt, my cousin.  And those were all people who were very

10   important to me growing up, and I admired the kind of work they

11   did.

12   Q   Mr. Pfeiffer, how did you first become interested in

13   cryptocurrency?

14   A   Well, I had heard about cryptocurrency -- well, I think

15   Bitcoin was sort of invented in 2009.  I first heard about it

16   in 2011.  I didn't really, um, realize what a big deal it was

17   until about 2014.  And that was the time when I was working on

18   my dissertation, sort of the final steps of my doctoral program

19   to get the Ph.D.

20             At that point I started getting really more interested

21   in and appreciated the technical ingenuity, the ways that the

22   developers had used it to solve really interesting problems.

23   Q   At some point did you become interested in cryptocurrency

24   mining?

25   A   I did.

1    Q    What did you -- did you research cryptocurrency mining?

2    A    Yes.  So I started researching cryptocurrency mining, and I

3    found there were a number of different ways to do it.  One was

4    to buy miners and have them in your own home.  Another was to,

5    um, let's see, you could buy miners and then have them shipped

6    to another facility, and that data center could host them for

7    you.  Or you could rent miners from somebody else that were

8    hosted at another facility.  And then a fourth way was to, um,

9    buy Hashlets, which was a product that GAW Miners offered.

10   Q    Now, when you found out about the Hashlets product, had you

11   already heard of GAW Miners?

12   A    Yes.  GAW Miners had a very favorable reputation for

13   selling mining hardware, and they begun to get into the hosted

14   mining service providers as well.  Their reputation was mainly

15   for the good customer service that they provided but also for

16   their technical support.

17   Q    Now, did you buy any Hashlets from GAW Miners?

18   A    Yes, I did.

19   Q    And what did you understand Hashlets to be?

20   A    Well, I understood Hashlets to be a contract to own a

21   certain percentage or amount of, um, the mining power of the

22   mining machines that they held, that GAW Miners held, in their

23   data centers.

24   Q    And when you were researching the various mining options

25   that you just discussed, did you have any thoughts on Hashlets

1   versus the other options?

2   A   Yeah, I had a couple thoughts about that.

3        Um, Hashlets seemed a little bit better than some of

4   the other, like, buying contracts for, um, using some --

5   renting somebody else's mining power.  When you rented somebody

6   else's mining power, you got to rent a particular machine in

7   their data center.  And if that machine went down at any point,

8   like for a day or so, then you just wouldn't get any mining

9   rewards for that day.

10        With the GAW Miners' contract, it was different.  You

11   had a contract for a certain amount of hashing power.  So even

12   if one of those machines went down, if they had a data center

13   full of machines, you would still get the percentage and the

14   appropriate rewards that were associated with that, um, with

15   that Hashlet power.

16   Q   Were there any other differences that you found between

17   Hashlets and some of the other mining options?

18   A   Um, yes.  Uh, when you bought a contract from the other --

19   from the other competitors to GAW Miners, they -- it might be a

20   six-month term contract or a three-month term contract.  But if

21   at any given day the price of Bitcoin went down too low, they

22   could terminate your contract early so you could lose your

23   entire investment.  That seemed really risky to me, so I liked

24   the way that the GAW Miners' Hashlet product would protect me

25   from that risk.

1   Q   Now, did your research into Hashlets affect your view of

2   GAW Miners as a company?

3   A   Yes.  Um, Hashlets were easy to use.  They called it

4   grandma proof or grandma friendly.  And what that meant is it

5   didn't require a lot of technical expertise.  You could manage

6   them from a user-friendly interface.  What struck me about that

7   is GAW Miners sort of seemed to have their finger on the pulse

8   of something that was keeping mining only to the domain of the

9   people who were, like, technicians and, um, sort of geeks

10  rather than the general public.  So it seemed to me they had --

11  they recognized the limitation and they were trying to solve

12  that.

13  Q   Now, did you believe that there was actual mining hardware

14  behind Hashlets?

15  A   Yes.

16  Q   And would you have bought Hashlets if you had known that

17  GAW did not actually have sufficient mining power to support

18  the Hashlets it sold?

19  A   No.  Mining was the whole point.

20  Q   Now, was there any indication that Hashlets were not backed

21  by enough mining power?

22  A   No.  I got the payouts that I expected, and other people

23  reported that they got the payouts that they expected as

24  well.

25  Q   Now, what did you do with the payouts that you did receive?

Pfeiffer - Direct                                                    835

1   A    For the most part, the payouts that I got in Bitcoin I

2   reinvested into GAW Miners' Hashlets products.

3   Q    Did that change at some point?

4   A    Yes, it did.  Um, at some point I switched to mining

5   Hash -- Hashpoints instead of Bitcoin.

6   Q    And what were Hashpoints?

7   A    So Hashpoints were an offering by GAW that was supposed to

8   be their sort of company token that would represent a right to

9   buy Paycoin or a right to be converted to Paycoin.

10  Q    And so did you switch your Hashlets to mine Hashpoints?

11  A    I did.

12  Q    And was your plan then to convert -- excuse me --

13  Hashpoints into Paycoin?

14  A    Yes.

15  Q    Why were you interested in Paycoin?

16  A    Well, Paycoin struck me as having, um, an interesting set

17  of ambitions and, um, promise and potential.  The ambition --

18  well, GAW's ambition for Paycoin, as I said, was to develop an

19  ecosystem that would add value.  And one of the ways they were

20  going to do this was to develop a product that would have

21  faster transaction times.  Bitcoin at the time, for instance,

22  had ten-minute transaction time.

23        If you're trying to buy something at, say, a grocery

24  store or coffee shop and you have to wait ten minutes before

25  your transaction is confirmed, you're going to hold up the line

1  and your coffee's going to be cold.  So it's not that useful.

2  GAW was trying to solve that problem, and they said they had a

3  technical way to do that.

4  Q   Now, were there other cryptocurrencies at the time trying

5  to solve this transaction speed problem?

6  A   Yes, I think there were; but the main difference was that

7  GAW said that they had a $100 million fund to back up this coin

8  to promote the development and to promote the ecosystem that

9  would make Paycoin valuable.

10 Q   Now, at some point did your Hashpoints get converted into

11 Paycoin?

12 A   Yes, they did.

13 Q   Did you also acquire Paycoin through any other means?

14 A   Yes.  There was another GAW product called HashStakers, and

15 this was a specialized Paycoin wallet.  And you could basically

16 put your coins in this and lock them up for a period of time.

17 Maybe it was one month or three months or six months.  But at

18 the end of that time period, you would not get not only the

19 original principal you put in but also interest on top of that.

20 So you would get more Paycoin at the end.

21 Q   And why were you interested in HashStakers?

22 A   I viewed Paycoin as a long-term investment.  I wasn't in a

23 hurry.  So the idea of getting more Paycoin a little bit later

24 sounded good to me.

25 Q   Mr. Pfeiffer, prior to this lawsuit, did you know who

1    Stuart Fraser was?

2    A    I had heard his name discussed, um, in reference to GAW

3    Miners and his partnership with Josh Garza.

4    Q    When did you first hear of Mr. Fraser?

5    A    I believe it was in 2014.  I'm not exactly sure when, but

6    the most prominent memory I have is when I read an article in

7    *The Wall Street Journal*.

8         MS. CHEN:  Mr. Boles, can we have Plaintiffs' Exhibit

9    82?

10        I think this exhibit has been shown multiple times,

11   Your Honor.

12        THE COURT:  Sure.

13   Q    (By Ms. Chen) Mr. Pfeiffer, if you take a look at your

14   screen, you'll see an exhibit marked PX 82.  Is this *The Wall*

15   *Street Journal* article that you referenced just now?

16   A    Yes, it is.

17   Q    And when did you first read this article?

18   A    When it came out.

19   Q    And what was your reaction to it?

20   A    Well, I had a couple of different reactions to it.  I was

21   impressed by maybe several different things about it.  One was

22   it confirmed the $100 million Coin Adoption Fund.  Another was

23   that it referenced Stuart Fraser and his connections to Wall

24   Street.  And, um, the other was just that *The Wall Street*

25   *Journal* itself was covering cryptocurrency and Paycoin in

1   particular.

2   Q   So let's walk through these one at a time.  Can you just

3   tell us more about what struck you about the article's coverage

4   of the $100 million reserve.

5   A   Well, sure.  One thing about that was that, um, you know,

6   there was -- it said in this article that it was a fiat fund.

7   What that meant to me was that it was held in cash reserves,

8   not cryptocurrency.

9          I don't know if you know this, but the price of

10  Bitcoin at this time was maybe around 600, but it could easily

11  fluctuate, say, 300.  You know, if you bought it yesterday, it

12  would be $60,000 per Bitcoin.  So the price of Bitcoin can

13  fluctuate a whole lot.  But a hundred million dollars today

14  would be a hundred million dollars next year.  And so that

15  struck me as very, um, much in keeping with how Wall Street

16  would work.  They would want to invest in a very volatile

17  currency.  They would want to have savings and reserves in U.S.

18  dollars.

19  Q   And you just mentioned Wall Street and Mr. Fraser.  Can you

20  just tell us more about what struck you about the article's

21  coverage of Mr. Fraser.

22  A   Sure.  Um, I believe it said that he was a partner at

23  Cantor Fitzgerald, a senior executive at a lead Wall Street

24  investment bank, um, and that he had a long-term partnership

25  with Josh Garza.  Um, the fact that they had vetted each other

1   and known each other and worked together struck me as a very

2   good sign.  But also, Stuart Fraser had been an important

3   player in Wall Street.  I figured he would have the kinds of

4   connections with merchants that would, um, facilitate merchant

5   adoption agreements; so that struck me also as very positive.

6   Q   And finally, you mentioned the fact that cryptocurrency and

7   Paycoin were covered in *The Wall Street Journal*.  Can you

8   explain that a little bit more?

9   A   Yeah.  I mean, it struck me as a moment that, you know,

10  sort of break-through moment at this time that Wall Street, um,

11  you know, conservative, stodgy Wall Street was getting

12  interested in cryptocurrency and that *The Wall Street Journal*

13  was covering it and vetting the participants in it.  So that

14  gave me a lot of confidence that this would be something that

15  would be backed and would be taken seriously.

16  Q   Now, would you have invested in Paycoin if you had known

17  that GAW was lying about the hundred million dollar reserve?

18  A   No.

19  Q   And, Mr. Pfeiffer, how did this experience impact you

20  overall?

21  A   I would say it was devastating.  Um, I lost a lot of my

22  savings.  I lost, um, money that I'd inherited from my

23  grandmother.  Um, and on top of that, I was -- at the time that

24  everything began to unravel, I was just about to finish my

25  dissertation.  I had applied for a faculty position, um, and

1   been accepted in that, but the condition of the long-term

2   employment there was that I complete my dissertation in a

3   timely fashion.  They had set a particular deadline for that.

4   Because I was so distracted and disgusted about all this, I

5   wasn't able to focus on my dissertation and complete it at that

6   time, so I lost that position.

7   Q    And, Mr. Pfeiffer, does the fraud still affect you today?

8   A    Yes.  Um, having lost my career and my savings basically at

9   the same time, I, um, had to live on credit cards for a while.

10  That affected my credit rating.  So to this day if I wanted to

11  buy a house, I wouldn't be able to get a mortgage.

12  Q    Now, do you still believe in cryptocurrency?

13  A    I'm very excited about cryptocurrency, how it's evolved,

14  how much it's grown, how much more widespread adoption and

15  discovery it is across the world.  And, you know, I take some

16  heart that it wasn't my investment in cryptocurrency that

17  caused the troubles that I experienced.  It was my investment

18  in a company that lied to me.

19            MS. CHEN:  Thank you.  Pass the witness.

20            THE COURT:  Okay.  Cross-examination.

21                       CROSS-EXAMINATION

22  BY MR. WEINSTEIN:

23  Q    Mr. Pfeiffer, you've never met Stuart Fraser; is that

24  right?

25  A    That's correct.

1    Q    Never spoken to him?

2    A    That's correct.

3    Q    You've never e-mailed with him?

4    A    No.

5    Q    You've not communicated with him directly in any way; is

6    that right?

7    A    That's correct.

8    Q    You were a participant in various online forums about

9    cryptocurrency; correct?

10   A    Yes.

11   Q    Including HashTalk?

12   A    Yes.

13   Q    And that's -- HashTalk is the forum for people who were GAW

14   customers?

15   A    Yes.

16   Q    Or others interested in GAW Miners.

17   A    Correct.

18   Q    You didn't need to be a customer; correct?

19   A    Right.

20   Q    But you had to get an account in order to access HashTalk?

21   A    I think that's right.

22   Q    And you had such an account.

23   A    Yes.

24   Q    Fair to say you never saw a post in HashTalk by Mr. Fraser?

25   A    Not using that name that I recall.

1    Q    Are you aware of any post in HashTalk by Mr. Fraser using

2    some kind of other name?

3    A    No.

4    Q    You mentioned that you started getting interested in

5    cryptocurrency back in 2012?

6    A    2011.

7    Q    2011.

8          And you did a lot of reading on cryptocurrency to do

9    some research; correct?

10   A    I did some research, yes.

11   Q    You also listened to podcasts about cryptocurrency?

12   A    Yes, that's correct.

13   Q    You talked to others who knew about it so you could become

14   more informed.

15   A    Yes, that's correct.

16   Q    You have done consulting work for cryptocurrency

17   businesses; is that right?

18   A    Yes.

19   Q    You've worked --

20   A    I'm not sure if that's correct.  I've done consulting work

21   with people who are interested in cryptocurrency.

22   Q    Have you worked on cryptocurrency projects?

23   A    Yes.

24   Q    You've done work on open-source software; correct?

25   A    Yes.

1  Q   And open-source software is where the software code that's

2  used for a product is available to the public openly; correct?

3  A   Yes.  I want to clarify.  The work I do is consulting with

4  other people who are working in open-source projects.  I'm not

5  a coder.  I'm not a developer.

6  Q   You understand that open-source software code is where the

7  public can review the code?

8  A   Yes.

9  Q   They can analyze it and find problems with it; correct?

10  A   Yes.

11  Q   They can suggest improvements to the code.

12  A   Yes.

13  Q   Did you -- you understood that Paycoin was an open-source

14  code?

15  A   I'm not sure if I know about whether Paycoin was

16  open-source code at the time or not.

17  Q   Do you understand it now -- now that it's an open-source

18  code?

19  A   Yes.

20  Q   Did you ever review the code that was open to the public?

21  A   Uh, I don't believe so, no.

22  Q   Sir, you're familiar with what a cryptocurrency white paper

23  is?

24  A   Yes.

25  Q   The white -- a white paper for cryptocurrency is one that

1    features the technical dimensions of how the cryptocurrency

2    function; correct?

3    A    That's one possible approach to a white paper, yes.

4    Q    You co-authored a cryptocurrency white paper; correct?

5    A    Yes.

6              MS. CHEN:  Objection, relevance.

7              THE COURT:  I'll allow it.

8    Q    (By Mr. Weinstein) And the cryptocurrency white paper that

9    you co-authored was called Ion; is that right?

10   A    Yes.

11   Q    You had to have some knowledge of the cryptocurrency

12   functioning in order to be a co-author of the white paper.  Is

13   that fair?

14   A    Um, I was primarily an editor on that and sort of a

15   translator of what the developers had done; um, so I would say

16   no.

17   Q    In order to be an editor, you didn't have to understand any

18   of the words that you were editing?

19   A    I had to understand some of the words that I was editing,

20   yes.

21   Q    You were trying to make them into simpler English for

22   others to understand?

23   A    That's correct.  You're referring to the Ion white paper in

24   2016?

25   Q    Correct.

1              There was an initial -- you're familiar with the term

2     "initial coin offering"?

3     A    I am.

4     Q    There was an initial coin offering for Ion; correct?

5     A    I believe so.

6     Q    And you understand that Ion was not registered as a

7     security before the initial coin offering for that coin; right?

8              MS. CHEN:  Objection.

9              THE COURT:  Sustained.

10    Q    (By Mr. Weinstein) Sir, was Ion similar in concept to

11    Paycoin?

12             MS. CHEN:  Objection.

13             THE COURT:  Kind of wondering when was -- when was the

14    ICO for Ion?

15    Q    (By Mr. Weinstein) Do you know, sir?

16    A    I don't know.  I'm actually not entirely sure that there

17    was an ICO for Ion.  I was working on the white paper.

18             THE COURT:  I would need a time frame, Mr. Weinstein,

19    to understand the element.  So I'll sustain the objection to

20    that question, and then you can work on it.

21    Q    (By Mr. Weinstein) I believe you testified, Mr. Pfeiffer,

22    that you co-authored that white paper in 2016; correct?

23    A    I think that's correct, sir, yes.

24    Q    It's fair to say that Ion did not have a price floor

25    attached as part of its concept; correct?

1              MS. CHEN:  Objection.

2              THE COURT:  Sustained.  Again, I need a time frame

3    about Ion to understand whether that's a relevant question.

4    Q   (By Mr. Weinstein) When you co-authored the white paper for

5    Ion in 2016, you understood that it had no price floor as part

6    of the concept; correct?

7              MS. CHEN:  Objection.

8              THE COURT:  Sustained.

9    Q   (By Mr. Weinstein) Were you interested in Ion as a concept?

10   A   Yes.

11   Q   And you were interested in it as a concept despite the fact

12   that it had no price floor; correct?

13             MS. CHEN:  Objection.

14             THE COURT:  In 2016?  Who cares?  It's sustained.

15   Q   (By Mr. Weinstein) Sir, you referred to cryptocurrency as

16   the Wild West; is that right?

17   A   Yes.

18   Q   You referred to it as the Wild West as late as March of

19   2015?

20   A   Uh, yes.

21   Q   You posted an article or a note that you had written in

22   which you called cryptocurrency the Wild West; correct?

23   A   That sounds right, yes.

24   Q   You posted it to HashTalk?

25   A   That sounds right, yes.

1   Q   You -- you mentioned that you ultimately purchased some

2   products from GAW Miners.

3   A   Yes.

4   Q   2014?

5   A   (Nodding head up and down.)

6   Q   Is that right?

7   A   Yes, that's right.

8   Q   The purchase of GAW Miners' products was not the first

9   purchase you had made in the cryptocurrency market; correct?

10  A   I'm sorry.  Could you ask the question again?

11  Q   Sure.  The purchase -- your first purchase of a GAW Miners'

12  product was not your first purchase in the cryptocurrency

13  market; correct?

14  A   It may not have been.

15  Q   You recall you purchased some Bitcoin before that?

16  A   That is not a cryptocurrency product I don't think.  I mean

17  it's not a commercial -- I'm not sure if I would characterize

18  it as a commercial product.

19       THE COURT:  I didn't hear the last thing you said,

20  sure.  "I'm not sure" --

21       THE WITNESS:  If I would characterize it as a

22  commercial product.

23       THE COURT:  Thank you.

24  Q   (By Mr. Weinstein) Is the hardware that one would use to

25  mine a cryptocurrency product?

1    A    Your question again, is the hardware?

2    Q    That one would use to mine the coin, would you consider

3    that a cryptocurrency product?

4    A    It is a product related to cryptocurrency.

5    Q    Okay.  And before you bought anything from GAW Miners, you

6    had purchased hardware to mine your own cryptocurrency;

7    correct?

8    A    I'm not sure the sequence, but I've -- but, um, I

9    definitely did at some point merchandise physical hardware

10   miners to mine cryptocurrency.

11   Q    You purchased something called an AntMiner?

12   A    That's correct.

13   Q    You purchased that from a company called ZoomHash; correct?

14   A    That's correct.

15   Q    And you did that prior to purchasing any product from GAW

16   Miners; right?

17   A    I don't recall exactly, but if you, um -- but if you have

18   documentation about that, I'll accept your representation.

19   Q    And you also purchased Bitcoin as a cryptocurrency?

20   A    Yes.

21   Q    You did that prior to buying anything from GAW Miners;

22   correct?

23   A    That sounds right, yes.

24   Q    The -- when you bought -- it was in 2014 that you purchased

25   some Bitcoin?

Pfeiffer - Cross                                                        849

1   A   Yes.

2   Q   And you recall, um, you've been here throughout the trial;

3   is that right, sir?

4   A   Yes, sir.

5   Q   You recall Professor Narayanan showed a chart of Bitcoin

6   prices?  Do you recall that?

7   A   Vaguely, yes, sir.

8   Q   You recall Bitcoin prices were dropping in 2014?

9   A   I think that the Bitcoin prices fluctuated in 2014, so

10  yes.

11  Q   You recall seeing that certainly for the latter half of

12  2014.  The price was dropping quite a bit?

13  A   Yes.

14  Q   And you understood that as an investor because you had

15  purchased it?

16  A   Yes.

17  Q   So you understood that purchasing --

18  A   Excuse me.  I want to say, you said as an investor?  Um,

19  I'm not sure that I would characterize a purchase of Bitcoin as

20  an investment.

21  Q   Fair enough.  It was a currency; correct?

22  A   It was an asset.  It was -- I don't think that the IRS, for

23  instance, regards Bitcoin as --

24          THE COURT:  Yes, sir, you don't need to tell us that.

25  That's fine.  You consider it an asset.  Go ahead.

1  Q   (By Mr. Weinstein) You understood, based on your purchase

2  of that asset, it was a risky asset to have; correct?

3  A   Yes.

4  Q   You mentioned before that one of the features you liked

5  about Hashlets was that it would protect you in some way from

6  the drop in prices of Bitcoin; right?

7  A   That's right.

8  Q   And what you meant by that is that GAW Miners was saying

9  they wouldn't turn off the mining machines just because the

10 price was dropping; correct?

11 A   It's not quite right.

12 Q   Well, why don't you explain to us what you meant by the

13 protection that you understood GAW Miners was giving you from

14 Bitcoin.

15 A   What I meant was that the contract that they -- that I had

16 with them wouldn't terminate just because the price of Bitcoin

17 went down.  So if the price of Bitcoin rose again the next day,

18 I could continue mining on that same contract.

19 Q   All right.  So the protection was that if Bitcoin prices

20 fell, GAW Miners would not just say "we're done."

21 A   That's correct.

22 Q   All right.  But you still bore the risk of the price

23 dropping; correct?

24 A   Yes, sir.

25 Q   The lower the price went, the less you had; right?

1   A    The less -- the lower the mining rewards might be.

2   Q    And GAW Miners can protect you from that risk of price

3   fluctuation; correct?

4   A    That's correct.

5          Actually, there's -- there's a somewhat more

6   complicated answer to that.  Um --

7          THE COURT:  Do you want him to give the more

8   complicated answer to that?

9          MR. WEINSTEIN:  No, Your Honor, I think we're good

10  with the answer he gave.

11  Q   (By Mr. Weinstein) Sir, you -- with respect to the HashTalk

12  forum, you accessed that room regularly; correct?

13  A    I, um -- sorry.  Before what?

14  Q    The HashTalk forum, you accessed that regularly; correct?

15  A    There were times when I accessed the HashTalk forum

16  regularly, yes.

17  Q    You saw in HashTalk posts by Mr. Garza regularly; correct?

18  A    Yes.

19  Q    You thought that Mr. Garza had interesting ideas in the

20  cryptocurrency market.

21  A    I thought that there were interesting ideas being

22  represented in HashTalk, yes.

23  Q    Sir, you also used Bitcointalk as a source of information

24  on cryptocurrency; is that right?

25  A    At times, yes.

1    Q    That's another internet forum?

2    A    That's right, yes.

3    Q    And it concerns cryptocurrency; correct?

4    A    Yes.

5    Q    You used additional forums as well; correct?

6    A    I may have.

7    Q    Sir, when you were accessing the various forums on

8    cryptocurrency, you saw people posting their views about GAW

9    Miners; correct?

10   A    Yes.

11   Q    You saw people saying that GAW Miners was a Ponzi scheme.

12   A    Yes.

13   Q    You saw people saying that GAW Miners didn't have the

14   mining power that they were claiming to have; correct?

15   A    Yes.

16   Q    You saw people saying that GAW Miners didn't have enough

17   mining power to back all the Hashlets that they were selling;

18   correct?

19   A    Yes.

20   Q    Is it fair to say that Josh Garza was the face of the

21   company to respond to those kind of accusations in the forums?

22   A    Yes.

23   Q    And he would debunk those accusations; correct?

24   A    Yes.

25   Q    You believed his responses to those various accusations

1    that were out there on the internet; correct?

2    A    I considered his, um, responses as -- as a response.  Um, I

3    also didn't see evidence.  So I weighed the evidence of what

4    people were saying.  Basically it was sort of a he said, she

5    said kind of thing.

6    Q    And you believed the "he said" in Josh Garza versus the

7    "she said" in the rest of the public; correct?

8    A    I didn't have any evidence otherwise.

9    Q    Sir, people -- people were saying in these forums that --

10   well, withdrawn.

11        You saw a picture that Josh Garza had sent around of

12   him in the warehouse with all the mining equipment; correct?

13   A    Yes.

14   Q    And there were people in these forums saying, There's not

15   enough mining power in that warehouse to support what he is

16   supposedly selling; correct?

17   A    I don't recall people saying that exactly.

18   Q    Sir, GAW Miners charged fees when you acquired a Hashlet;

19   is that right?

20   A    After you acquired a Hashlet, they charged a maintenance

21   fee.

22   Q    So they charged -- up front they were charging acquisition

23   fee; is that right?

24   A    That's my understanding.

25   Q    So when you purchased the Hashlet, they would take out a

1  piece as a fee for the acquisition; right?

2  A   Take out of what?

3  Q   They would charge you a fee for the purchase; correct?  An

4  acquisition fee.

5  A   I guess you could call it that.  I would say they

6  contractually paid for a portion --

7          THE COURT:  Just for clarity, do you mean that they --

8  just for the jury, do you mean that they charged a fee on top

9  of the price of the Hashlet?  Is that what you were getting at,

10 Mr. Weinstein?

11          MR. WEINSTEIN:  No, Your Honor.

12 Q   (By Mr. Weinstein) The price of the Hashlet was the fee to

13 GAW Miners for the acquisition; correct?

14 A   I think so, yes.

15          THE COURT:  Thank you.

16 Q   (By Mr. Weinstein) On top of that, they would charge an

17 ongoing maintenance fee in order to maintain and operate the

18 equipment; is that right?

19 A   That's correct.

20 Q   Each of those fees were fixed fees; correct?

21 A   So I'm not sure if that's quite right.

22 Q   The maintenance fee that was charged over time was a fixed

23 fee; correct?

24 A   I'm not sure that's quite right.

25 Q   It didn't -- the maintenance fee didn't change based on the

1    value of the coin that was being mined by --

2    A    That's correct.

3    Q    GAW Miners would get those fees regardless of how well or

4    poorly the mining was doing on behalf of someone like you;

5    correct?

6    A    That's not quite right.

7    Q    So if -- if the Hashlet that you purchased was not

8    generating a lot of the coin that you had wanted it to

9    generate, the fee wouldn't change; correct?

10   A    That's not quite right.

11   Q    Well, what's your understanding, sir, of how the fees

12   operated?

13   A    My understanding was that if there was a -- when there was

14   mining and the mining was successful, that there would be a

15   reward that was generated from the mining.  And the portion of

16   the -- of the mining would -- that the company got from mining,

17   a portion of that would go to the people who had bought

18   Hashlets less the amount of their daily maintenance fee.

19   Q    So you understood that, when you purchased a Hashlet, it

20   would be generating some amount of coin; correct?  That was the

21   point of it?

22   A    It would be generating mining rewards.

23   Q    The rewards -- the rewards are some kind of cryptocurrency

24   coin; correct?

25   A    That's correct.

1  Q   It could be Bitcoin or it could be an altcoin; correct?

2  A   That's correct.

3  Q   Altcoin is essentially anything other than Bitcoin that's a

4  cryptocurrency.

5  A   Yes.

6  Q   So that machine would generate some kind of cryptocurrency

7  coin, and the return that you got would be that coin minus your

8  maintenance fee; correct?

9  A   That's correct.

10  Q   The maintenance fee wouldn't change depending on how much

11  coin the machine had generated; correct?

12  A   That's almost right.

13  Q   And where is the -- where's the little bit that stops you

14  from saying it's completely accurate?

15  A   GAW had a policy and practice that when there was mining --

16  and so say the mining revenues were a dollar and they charged a

17  revenue of -- sorry -- a maintenance fee of 15 cents.  You

18  would get the difference, 85 cents.  But if the mining revenue

19  were, say, you know, 15 cents, um, they would still charge you

20  15 cents.  You would just get like the smallest fraction, which

21  was like one ten million of a Bitcoin.  And that's the amount

22  you would get as your daily payout for that Hashlet would be

23  one one ten million, I think, of a Bitcoin.

24  Q   So -- and when you explained, the fee itself didn't change;

25  correct?  As you said, it would still be the 15 would be the

1    fee.  But if the fee happened to cover everything that had been

2    generated, they would give you a fraction of a penny

3    essentially as a return.

4    A    That's right.

5    Q    But the fee itself didn't change; right?

6    A    I guess that's right.

7    Q    You mentioned that you purchased Hashpoints, which was

8    something that was going to allow you to get converted from

9    those to Paycoin; is that right?

10   A    That's not quite right.

11   Q    Okay.  You understood that when you bought Hashpoints, that

12   they would ultimately be converted to Paycoin?

13   A    I did not buy Hashpoints.

14   Q    You had Hashlets that you converted to Hashpoints; is that

15   right?

16   A    That's not quite right.

17   Q    Okay.  You mentioned Hashpoints and your acquisition of

18   them in your direct testimony.  How did you get Hashpoints?

19   A    Hashlets mined Hashpoints.  So Hashlets generated

20   Hashpoints.

21   Q    So you acquired Hashpoints through mining from Hashlets.

22   A    That's right.

23   Q    Oh.  And your understanding was once the Hashlets generated

24   the Hashpoints, the point of the Hashpoints was to get

25   converted over to Paycoin; right?

Pfeiffer - Cross                                                    858

1    A   Yes, sir.

2    Q   And that happened; correct?

3    A   Yes.

4    Q   Hashpoints were converted over to Paycoin.

5    A   Yes.

6    Q   Sir, was it your belief back in 2014 that there were a lot

7    of scam artists in the crypto world?

8    A   I would say that there were -- I was aware that there had

9    been some scams in cryptocurrency.

10   Q   But you believe there were people that owned Hashlets that

11   were scam artists; correct?

12   A   I believe that there were people -- hmm.  Um, I believe

13   there may have been people who owned Hashlets who were -- who

14   attempted scams.  That's possible, yes.

15   Q   You, yourself, encountered some people who were trying to

16   sell you their GAW Miner products; correct?

17   A   Um, what I'm trying -- I'm not certain if they actually had

18   the GAW Miners' products or that they represented that they

19   were trying to sell them.

20   Q   Pull up DX 539.

21          THE COURT:  Okay.  DX 539 will be a full exhibit.

22       (Defendant's Exhibit 539, received in evidence.)

23          THE WITNESS:  Do you have a paper version of this?

24          MR. WEINSTEIN:  Yeah, sure.

25          May I approach, Your Honor?

Pfeiffer - Cross                                                    859

1          THE COURT:  You may.

2    Q    (By Mr. Weinstein) Sir, this is an e-mail chain between you

3    and a gentleman named John; is that right?

4    A    Yes, sir.

5    Q    And if you look on the first page, right in the middle,

6    there's an e-mail from you to John on September 11, 2014.  Do

7    you see that?

8    A    Yes.

9    Q    And you say to John:  "In light of the scams apparently

10   pulled, I suspect that the seller in this 'deal1' that through

11   was not a trustworthy character"; correct?

12   A    Yes.

13   Q    And you were trying to buy an account from a seller of GAW

14   Miner products; is that right?

15   A    Again, I don't know for sure that this person had the GAW

16   Miner products, but at least he represented that he did.

17   Q    And --

18          MR. WEINER:  Your Honor, can we publish this to the

19   jury?

20          THE COURT:  Yes.  Sorry, Ladies and Gentlemen.  This

21   should be admitted as full and can be published.

22   Q    (By Mr. Weinstein) And if you go up the page a bit, John

23   indicated to you that he actually thinks he knows who it is;

24   right?

25   A    Yes.

Pfeiffer - Cross                                                    860

1   Q    And John was essentially a middleman in transactions; is

2   that correct?

3   A    Yes.

4   Q    So when you went to try to buy things from other GAW

5   Miners' customers, you would sometimes go through someone like

6   John to help execute the transaction.

7   A    Yes.

8   Q    And you say, in response to his e-mail, "Would be nice if

9   there were a way to hold scammers accountable"; right?

10  A    Yes.

11  Q    Sir, you brought this issue directly to the attention of

12  Josh Garza?

13  A    I believe that I thought that this may have come to Josh

14  Garza's attention.

15          MR. WEINSTEIN:  Can we pull up Defense Exhibit 545?

16          THE COURT:  Okay.  Just bring that up for the witness

17  and for me for now, 545.

18          THE WITNESS:  If that's a separate exhibit, is there

19  also a paper copy of that?

20          MR. WEINSTEIN:  Oh, yes, sir.

21          May I, Your Honor?

22          THE COURT:  You may approach, yes.

23          You can inquire.

24  Q    (By Mr. Weinstein) Sir, have you reviewed the e-mail?

25  A    I've looked it over.

1    Q    And you understood that the situation that you had

2    believing that the seller was a scam artist was brought to Mr.

3    Garza's attention?

4    A    Um, I see that I wrote that here, yes.

5    Q    And Mr. Garza was, as far as you understood it, the CEO of

6    GAW Miners and ZenMiners; correct?

7    A    That's what it says here.

8    Q    You didn't bring this issue to the attention of Stuart

9    Fraser; is that right?

10   A    I did not.

11           THE COURT:  Did you want to offer DX --

12           MR. WEINSTEIN:  Yes, Your Honor.

13           THE COURT:  That will be admitted as a full exhibit.

14   You can publish it to the jury.

15       (Defendant's Exhibit 545, received in evidence.)

16   Q    (By Mr. Weinstein) And you see in your e-mail, September

17   24th, that you say this person who you were trying to buy from,

18   he would likely scan someone else unless someone challenges

19   this; right?

20   A    Yes.

21   Q    And he's still trying to actively sell his account at a

22   certain post; right?

23   A    Yes.

24   Q    So you understood this was someone who actually owned a GAW

25   Miners' account; right?

1    A    Again, I'm not sure that I can verify that he did own the

2    GAW Miners' account.  I can attest that he was trying to

3    represent that he was trying to sell a GAW Miners' account.

4    Q    Sir, you started to purchase Hashlets --

5         MR. WEINSTEIN:  We can bring that down, Mr. Jackson.

6    Thank you.

7    Q    (By Mr. Weinstein) You started to purchase Hashlets in

8    August of 2014; is that right?

9    A    Yes.

10   Q    And you continued to purchase through September?

11   A    Yes.

12   Q    You purchased both from GAW Miners directly as well as from

13   other GAW Miner customers; is that right?

14   A    That's correct.

15   Q    And it was your view at the time that there were only a few

16   reputable companies in the business; is that right?

17   A    In what business?

18   Q    In cryptocurrency.

19   A    I -- I'm not sure about that.

20   Q    Okay.  Well, one of those that you thought was reputable at

21   the time was ZoomHash, the company that you had purchased your

22   Antminers from; is that right?

23   A    I did purchase Antminers from ZoomHash.

24   Q    And by September of 2014, you were, in fact, embarrassed by

25   the fact that you were in a situation where you had purchased

1   these products from ZoomHash; is that right?

2            MS. CHEN:  Objection, relevance.

3            THE COURT:  Yeah.  What's the relevance?

4            MR. WEINSTEIN:  I'll get to the next document, Your

5   Honor.

6            THE COURT:  Well, I'll sustain the objection.  But

7   then if you want to pursue it with other questions, you can.

8   Q    (By Mr. Weinstein) You had concerns that many of the

9   companies that were in the cryptocurrency world were not

10  reputable; is that right?

11  A    I'm not sure if I would say that.

12           MR. WEINSTEIN:  Can we pull up DX 547?

13           THE COURT:  Okay, DX 547 will be full.

14       (Defendant's Exhibit 547, received in evidence.)

15           MR. WEINSTEIN:  May I provide the witness a copy?

16           THE COURT:  You may.

17  Q    (By Mr. Weinstein) Sir, if you -- this is an e-mail from

18  you to Craig at ZoomHash on September 25, 2014?

19  A    Yes.

20  Q    And if you look at the second paragraph of your e-mail, the

21  second -- the third sentence you say, "Everything I have

22  experienced before as a customer, with your customer service

23  and sales support staff, led me to believe that ZoomHash was

24  one of the few reputable companies in the business"; correct?

25  A    I see that.

1   Q    So it was your view at the time that there were only a few

2   reputable companies in this business?

3   A    That's what I wrote in this letter.

4   Q    And if you look down towards the bottom, the second to last

5   paragraph towards the end, you wrote that by September of 2014

6   you are embarrassed to be in this situation of being a customer

7   at ZoomHash; right?

8   A    That's what I wrote, sir.

9   Q    That didn't -- that experience didn't deter you from

10  continuing to purchase cryptocurrency products; correct?

11  A    No.

12  Q    Sir, you testified earlier that you took comfort in *The*

13  *Wall Street Journal* article that you read in late November

14  2015; is that right?

15  A    Yes.

16          MR. WEINER:  '14.

17          MR. WEINSTEIN:  '14, thank you, Mr. Weiner.

18  Q    (By Mr. Weinstein) It was in 2014?

19  A    That's correct.

20  Q    Now, prior to that article coming up, you had purchased

21  Hashlets; right?

22  A    Yes.

23  Q    You had purchased quite a few Hashlets; right?

24  A    Yes.

25  Q    You had purchased Hashlets knowing the risks involved in

1    cryptocurrency; right?

2    A    Yes.

3    Q    You had purchased Hashlets knowing the risk that you had

4    experienced with ZoomHash; correct?

5    A    Yes.

6    Q    You had purchased Hashlets knowing the risks of your

7    Bitcoin purchase that you had made earlier in the year.

8    A    Yes.

9            MR. WEINSTEIN:  Can we pull up Defense Exhibit 683?

10           THE COURT:  DX 683 will be admitted as a full exhibit.

11           MR. WEINSTEIN:  That's already in, Your Honor.

12           THE COURT:  Oh, it is?  Sorry, yes.  Thank you.

13           You want one of these?

14           MR. WEINSTEIN:  Thank you, Your Honor, given my

15   stapling experience at trial.

16           THE COURT:  No trips to the emergency room during

17   trial.

18   Q    (By Mr. Weinstein) Mr. Pfeiffer, Defense Exhibit 683, that

19   includes a certification that you made in this case; is that

20   right?

21   A    Yes, sir.

22   Q    And if you turn to page 11 of that exhibit --

23   A    Yes.

24   Q    -- that's your sworn certification?

25   A    Yes.

1    Q    Regarding, among other things, the list of transactions

2    that are attached; is that right?

3    A    Yes.

4    Q    And so if you turn to the next page, page 12, that's the

5    start of your list of purchases that you made from GAW Miners;

6    is that right?

7    A    Yes.

8    Q    And your purchases go on for quite a few pages; is that

9    right?

10   A    That's right.

11   Q    And one of the things you mentioned before is that you also

12   purchased accounts from other customers?

13   A    Yes, sir.

14   Q    And the accounts would already have GAW Miners' products

15   within the accounts?

16   A    Yes.

17   Q    Could be Hashlets of different types; right?

18   A    Yes.

19   Q    For example, if you turn ahead to page, I believe, 30 --

20   A    Yes.

21   Q    So everything from page 12 that we started with through

22   page 30, those are your purchases of GAW Miners' products;

23   correct?

24   A    Yes.

25   Q    And on page 30, that's a list of accounts that you had

1   purchased from others?

2   A    Yes.

3   Q    So, for example, if we just pull up the mining Thailand

4   account?  It's right in the middle of the page.  That's an

5   account that you purchased from somebody in Thailand; is that

6   right?

7   A    Um, I -- I guess that's right, yes.  I think there were two

8   German expatriates who shared that account, and they were

9   living in Thailand at the time.

10  Q    I'm sorry, sir.  I couldn't hear you.

11  A    I think that the people who sold it to me were living in

12  Thailand at the time.

13  Q    And the account has 113 Hashlets already in it when you

14  purchased it.

15  A    Yes.

16  Q    And you'll see, if you look on this page, each of the full

17  accounts that you purchased were purchased sometime between

18  August 26, 2014, into October of 2014; correct?

19  A    Yes.

20  Q    Okay.  We can pull that page down.

21       So to the extent you bought full accounts from others,

22  you did so well before you ever read *The Wall Street Journal*

23  article; is that right?

24  A    Yes.

25  Q    Sir, when you purchased the different Hashlets -- well,

1   withdrawn.

2              There were different types of Hashlets to purchase;

3   right?

4   A    Yes.

5   Q    And depending on which one you purchased, you could direct

6   your mining power to different coins; is that right?

7   A    Not quite.

8   Q    Okay.  You had the choice to direct your mining power in

9   certain ways?

10  A    Ostensibly.

11  Q    And you could change your allocation on a daily basis if

12  you so chose; right?

13  A    I believe so.

14  Q    Now, sir, you monitored Hashlet prices closely; is that

15  right?

16  A    I probably did.  I would say I probably did.

17  Q    And you were -- you were not just an active buyer of

18  Hashlets.  You were also an active seller; correct?

19  A    Yes.

20  Q    You sold Hashlets frequently?

21  A    Yes.

22  Q    So if you'd go back to page 30 of Defense Exhibit 683 --

23  A    Yes.

24  Q    -- at the bottom of the page, that's the beginning of your

25  sale transactions; is that right?

1    A    Yes.

2    Q    And you -- if you go all the way to the end of your list of

3    transactions -- you have to go all the way to page 53 of this

4    document; correct?  Or actually, 54.  But if you're looking

5    just for the sales, you'd have to go all the way to page 53; is

6    that right?

7    A    Yes.

8    Q    So there's 23 pages worth of sales of Hashlets or other GAW

9    Miners' products listed for you; is that right?

10   A    I'll accept your reference, yes.

11   Q    And so by being an active buyer and seller of the same

12   products, were you essentially doing day trading in these

13   products?

14   A    I'm not sure exactly the definition of that, but I was an

15   active trader.

16   Q    And there were days where you would both buy Hashlets on

17   one end but also sell Hashlets to others; correct?

18   A    Probably, yes.

19   Q    So you were even out on the market on both sides of the

20   market on a daily basis?

21   A    Some days, yes.

22   Q    Now, after you saw that *Wall Street Journal* article, you

23   didn't just stop selling Hashlets that you owned; right?

24   A    That's right.

25   Q    You didn't hang onto all the Hashlets that you had; right?

Pfeiffer - Cross                                                        870

1    A    Probably not.

2    Q    You sold quite a bit.

3    A    Yes.

4    Q    After reading that article.

5    A    Yes.

6    Q    The day the article came out, you were selling Hashlets;

7    right?

8    A    I guess so, yes.

9    Q    Let's turn to page 49 of the chart.  If you look at the

10   bottom portion on page 49, you see you have eight entries that

11   list sales of a certain kind of Hashlets on November 25th,

12   2014?

13   A    Yes.

14   Q    And if you turn to the next page, do you see there's

15   another, approximately, 24 entries of sales that you made on

16   November 25th alone; correct?

17   A    Yes.

18   Q    And the selling continued the next day, November 26; right?

19   A    Yes.

20   Q    And you'd have to go all the way to the bottom of that

21   page, page 50, all the way through page 51, and onto the top

22   portion of page 52 to find all the sales that you made of

23   Hashlets on November 26; is that right?

24   A    Uh, yes.

25   Q    And the selling continued after that date; right?

Pfeiffer - Cross                                              871

1   A   Yes.

2   Q   Sir, you became aware in around mid-January 2015 that the

3   SEC started an investigation into Mr. Garza and GAW Miners?

4   A   I'm not sure the date when I became aware of the SEC

5   investigation.

6   Q   And without trying to get a particular date, you understood

7   that at some point in January of 2015, that there was such an

8   investigation?

9   A   I'm not sure when I came to understand that there was an

10  SEC investigation.

11  Q   There was certainly talk about an SEC investigation in the

12  internet forums that you frequented; right?

13  A   Yes.

14  Q   Once you heard that there was an SEC investigation, did you

15  stop buying any GAW Miners' product?

16  A   I don't -- um, I did not, no.

17  Q   And you continued to access HashTalk?

18  A   Yes.

19  Q   You continued to interact with Josh Garza; correct?

20  A   Yes.

21  Q   Sir --

22  A   Well, I think that was probably when I -- when you say

23  continued, I don't think that I had an established pattern of

24  being in communication with Josh Garza prior to that.

25  Q   Okay.  So it was only after the SEC investigation became

1    known that you had more frequent contacts with Mr. Garza?

2    A    I would not characterize my contacts with Mr. Garza as

3    frequent.

4    Q    More frequent than they had been in the prior time period?

5    A    I think that I had maybe no interactions with Mr. Garza in

6    the prior time period; so any, yes.

7    Q    So you only started to interact directly with Mr. Garza

8    after it had become known that there was an SEC investigation?

9    A    After it had become, um, asserted or after I saw references

10   to it sometime after that, yes.

11   Q    You -- after that point, you tried to become an investment

12   partner with Mr. Garza; correct?

13   A    No.

14   Q    You tried to become a partner with Mr. Garza in business

15   ventures?  Yes?

16   A    I don't think that's how I would characterize it, no.

17              MR. WEINSTEIN:  Can we pull up Defense Exhibit 658?

18              THE COURT:  Okay, DX 658 will be full.

19        (Defendant's Exhibit 658, received in evidence.)

20              MR. WEINSTEIN:  May I approach, Your Honor?

21              THE COURT:  You may.

22   Q    (By Mr. Weinstein) Mr. Pfeiffer, this is an e-mail exchange

23   between you and Josh Garza in late April 2015; is that right?

24   A    Yes.

25   Q    So if we turn to the second page, the first e-mail in the

1    chain at the bottom dated April 26, 2015, and it's from you to

2    Mr. Garza; correct?

3    A   I see it, yes.

4    Q   All right.  And the first thing you told Mr. Garza right in

5    the first paragraph was that you had tried to log into your

6    Hash account -- I'm sorry -- HashTalk account, but you got a

7    user banned message; is that right?

8    A   I'm sorry.  What I see just says a user message.

9            MR. WEINSTEIN:  If it's helpful, can we also pull up

10   Defendant's Exhibit 656?

11           THE COURT:  DX 656 will be full.

12           MR. WEINSTEIN:  His first e-mail is also in 656.  The

13   way they were produced to us, some words get caught off.  So

14   it's important I want you to be able to see it so you can see

15   what the word is.

16       (Defendant's Exhibit 656, received in evidence.)

17           THE WITNESS:  Yes, "user banned message," I see it.

18   Q   (By Mr. Weinstein) So you were telling Mr. Garza that you

19   had gotten this user banned message when you tried to get onto

20   HashTalk; is that right?

21   A   Yes.

22   Q   And in the next paragraph of your e-mail, you state, "I

23   also noticed that my account was banned just after you assigned

24   me moderator privileges."  Do you see that?

25   A   Yes.

Pfeiffer - Cross                                                  874

1              THE COURT:  Again -- oh, you do see it.  Because I

2     don't.  I see "me privileges."

3              THE WITNESS:  "After you assigned me privileges."

4     Q   (By Mr. Weinstein) If you look back to -- I'm sorry --

5     Exhibit 658 --

6              THE COURT:  Got it.

7     Q   (By Mr. Weinstein) Unfortunately, we got to switch back and

8     forth if you want to see each word.  But I want you to be

9     assured that that's what you said.

10             You told him that the account ban on HashTalk happened

11    just hours after Mr. Garza assigned you moderator privileges;

12    is that right?

13    A   That's what it says.

14    Q   Can you tell the jury what moderator privileges were?

15    A   I think that moderator privileges on HashTalk might have

16    allowed you to have more influence over the forum, but I don't

17    really remember what those privileges enabled you to do.

18    Q   So it was an additional form of access that Mr. Garza could

19    give to certain people that gave them privileges above what

20    most people had; is that right?

21    A   I guess so.

22    Q   And then at the top of the next -- well, depending on which

23    one you're looking at, do you have 658 in front of you?

24    A   Let me see how it's labeled.  Yeah, 658, yes, I do.

25    Q   At the top of the last page, you write, "As I said the

1   other day, I'm heavily invested in Paycoin's success."

2   A    Yes.

3   Q    And when you say, "As I said the other day," is that you

4   had spoken to Mr. Garza?

5   A    I don't recall.

6   Q    In some way you communicated to him previously that you

7   were heavily invested in Paycoin's success; is that right?

8   A    That seems to be what it said, yes.

9   Q    And then you offered him ways in which the Paycoin white

10  paper's concepts could still be fulfilled; right?

11  A    Let me review that, please.

12  Q    Sure.

13  A    Yes.

14  Q    And you note, underneath the two ideas that you had, that

15  your approach to Paycoin could be seen in the think-pieces that

16  you had posted.  And what did you mean by that, when you would

17  refer to the think-pieces that you had posted?

18  A    As I recall, I had written some longer posts on the

19  HashTalk forum, but I don't recall more than that.

20  Q    Okay.  And the posts -- the posts that you provided on the

21  HashTalk forum gave your ideas for Paycoin.  Is that what the

22  "think-pieces" meant?

23  A    I'm not sure.

24  Q    And then in the next paragraph -- and I apologize.  You may

25  have to go back to the 656 version to see all the words.  You

1  say, "I can appreciate that with so much unbalanced aggression

2  in security attacks and hostile words, it would be hard to know

3  who to trust."  Do you see that?

4  A    Yes.

5  Q    And what you meant by that was people on the internet

6  forums had been saying a lot of bad stuff about Mr. Garza;

7  right?

8  A    That's part of what I meant, yes.

9  Q    But you maintained your trust in him at that point?

10 A    That's not what it says.

11 Q    Well, it doesn't say that, but you are telling -- you are

12 conveying to him that you are still on his side; correct?  You

13 have trust in him.

14 A    That's not what I'm saying, no.  I was speaking about my

15 trustworthiness to him, whether or not I had a hostile intent

16 toward him rather than whether I regarded him as trustworthy.

17 Q    Did -- at that point in time, did you consider him to be

18 trustworthy?

19 A    Um, I think that I had, um, doubts about Josh Garza's

20 trustworthiness.

21 Q    When did those doubts start, sir?

22 A    Probably, um, my doubts really started in early January

23 when Paybase, um, was released.

24 Q    Is it fair to say that after those doubts about his

25 trustworthiness started in January 2015, you continued to

1   purchase Hashlets?

2   A    Yes.

3   Q    You purchased Hashlets into February?

4   A    Yes.

5   Q    In the next paragraph, you write that Mr. Garza entrusted

6   you with access to the CPIG site; correct?

7   A    Um, could I just -- oh, I see.  I believe he had given me

8   credentials to maybe a site.  I don't recall ever seeing that

9   site.  I'm not sure there's also a reference somewhere that the

10  site was down or not accessible.

11  Q    Okay.  The reference to CPIG is to a Crypto Private

12  Investor Group; correct?

13  A    I think it was Crypto Private Investors Group.

14  Q    And he was giving you access to the site for the Crypto

15  Private Investors Group.

16  A    Apparently.

17  Q    In the next paragraph, you tell him that you see all sorts

18  of good things that can come out of Paycoin, including a system

19  of great value to the nonprofit world, researchers and

20  scholars, developing countries, and disenfranchised people

21  internationally; correct?

22  A    Yes.

23  Q    So you still thought as of late April 2015 that Paycoin

24  could do a lot of good; correct?

25  A    If it were properly developed and supported, yes.

1    Q    And then at the very end, sir, you wrote to him -- and

2    again I apologize.  Why don't you turn to 656 so that the words

3    aren't missing on this one.

4           "I am invested in Paycoin's success.  I think if

5    Paycoin is successful and we do it right, Paycoin could be good

6    for the world"; correct?

7    A    I see that there, yes.

8    Q    And the "we" that you're referring to there is yourself and

9    Mr. Garza and the others at GAW Miners?

10   A    I'm not sure who I meant there.

11   Q    Certainly when you said "we," including yourself; right?

12   A    Yes.

13   Q    And Mr. Garza?

14   A    I guess so, yes.

15   Q    And you still felt that you and Mr. Garza and others could

16   make Paycoin a success despite the fact that you understood

17   there was an SEC investigation; right?

18   A    I don't recall when -- what I knew about the SEC

19   investigation at that time.

20   Q    You certainly knew at that point that Paycoin did not have

21   a $20 floor backing it up; correct?

22   A    That's right.

23   Q    Fair to say that you understood at that point it wasn't a

24   hundred million dollar reserve fund to support any kind of $20

25   price floor?

1   A   If there were such a fund, it certainly wasn't being used

2   to support a $20 price floor.

3   Q   And it hadn't been used certainly since the start of the

4   year; correct?

5   A   That's right.

6   Q   So if you turn back to Exhibit 658, Mr. Garza responds to

7   your e-mail on the second page; right?  Right in the middle?

8           And he says that he'd love to pick your brain and get

9   feedback on the site.  And that's that Crypto Private Investor

10  Group site; right?

11  A   Hold on a second.  I mean, it looks like it references a

12  crowd funding site, and I think that maybe Mr. Garza had

13  represented that he was trying to, um, develop a crowd funding

14  project that would encourage people to propose projects and

15  have them funded in Paycoin.

16  Q   Well, that's a project, a kick-starter project; right?  And

17  he refers to that in the next paragraph; right?

18  A   Oh, okay, yes.

19          Sorry.  Your question then is?

20  Q   So the site that he's talking about in the first paragraph

21  is that site that he had given you access to, the CPIG site?

22  A   In what statement?  Sorry.  Could you read the lines that

23  you're saying he's referring to?

24  Q   Sure.  When he says he would love to get feedback on the

25  copy of the site.

1   A    I'm not sure what he's referring to there.

2   Q    But in the next paragraph, he talks about this project of a

3   kick-starter type of site for Paycoin; right?

4   A    Yes.

5   Q    And that's the one you were just referring to?

6   A    Yes.

7   Q    And you got involved in that; right?

8   A    Um, minimally.  I helped him with one part of that

9   project.

10  Q    And then in the last paragraph of that e-mail, Mr. Garza

11  says, "Finally, I talked to me other partners and we would like

12  you to join the investment" -- let me just check on 656.

13  Apologies.  No, that one's not on there.

14       "We'd like you to join the investment" -- and then it

15  cuts off on that sentence; right?  And then it talks about the

16  investment?  Do you see that?

17       He was inviting you to join this investment group;

18  right?

19  A    It appears, yes.

20  Q    You wanted to join; is that right?

21  A    I was curious what he was inviting me into.  I wasn't sure.

22  This is about the -- this is the extent of the conversation, I

23  think.  So I didn't know what he was talking about, but I was

24  curious if there was, um, such a group to know more about it.

25  Q    Okay.  Well, if you go to the first page, Exhibit 658, at

Pfeiffer - Cross                                               881

1   the bottom you respond to Mr. Garza; correct?

2   A    Right.

3   Q    We can pull up the first paragraph says, "I am honored to

4   be invited to join the investment group, and would love to

5   join"; right?

6   A    Right.

7   Q    This was an investment group being proposed by Mr. Garza;

8   right?

9   A    Right.

10  Q    In the second paragraph you state, "It's greet to see you

11  are moving forward with the kickstarter-type site for Paycoin."

12  You would be happy to be involved in that as well; right?

13  A    Yes.

14  Q    And then in the next paragraph at the very bottom, you

15  actually express interest in employment with Mr. Garza; right?

16  A    Yes.

17  Q    It says, "If there are opportunities for" -- then if you go

18  to the next page -- "employment, I could make a case with the

19  dean to teach fewer courses to better allocate my time to

20  Paycoin projects"; correct?

21  A    Yes.

22  Q    So over three months after you started to have doubts about

23  Mr. Garza's trustworthiness, sir, you were willing to take some

24  of your teaching responsibilities away in order to become

25  employed with Mr. Garza.  Is that what you're telling him?

Pfeiffer - Cross                                                  882

1   A    That looks right.

2   Q    Then if you turn back to the first page, at the top, Mr.

3   Garza sends you an e-mail, tells you to check out a website;

4   right?

5   A    Yes.

6   Q    And then he says in the next paragraph in the middle, "If

7   you can, please make an account and try to make a project so

8   that you will see what people are going to need."

9        And he's referring to that kick-starter project for

10  Paycoin; correct?

11  A    I guess so, yes.

12  Q    You had expressed a willingness to get involved in

13  developing projects to help grow the Paycoin business; right?

14  A    That's not my understanding, no.

15  Q    Oh.  What was your understanding of what you were trying to

16  get involved with here?

17  A    My understanding was that he was talking about developing a

18  charity, charitable wing of Paycoin, um, and that this might be

19  a project that would help fund other people's projects.

20  Q    So at this point in time you thought that Paycoin would

21  have the ability to have a charitable wing?

22  A    To be honest, I didn't know; but, um, the fact that he was

23  representing this made me wonder whether he had resources that

24  he had not yet applied and whether those still had any

25  viability.

Pfeiffer - Cross                                              883

1    Q    His representations to you in the past had already been

2    shown to not be true; correct?

3    A    That's right.

4    Q    Did you have any real reason to believe at that time that

5    while the business itself didn't work out, he would have enough

6    money to fund a charitable wing?

7    A    I guess I wouldn't say I had reason to believe, but I had

8    reason to be -- to wonder whether he did.  And this was one way

9    to find out whether or not he did.

10   Q    Sir, that same day that you had these e-mail exchanges, Mr.

11   Garza did provide you administrative privileges for the CPIG

12   site; correct?

13   A    I'm not sure if it was for the CPIG site or for the

14   kick-starter type project.

15   Q    Okay.  Let's turn to Exhibit, Defense Exhibit 660.

16            THE COURT:  Okay, DX 660 will be full.

17       (Defendant's Exhibit 660, received in evidence.)

18   Q    (By Mr. Weinstein) And this is some kind of a -- is this a

19   text message exchange with you and Mr. Garza?

20   A    It looks some kind of messaging system, yes.

21   Q    And this is the same day, April 28, 2015, just a little

22   later in the afternoon?

23   A    Yes.

24   Q    And he tells you that you are an admin now; right?

25   A    Yes.

Pfeiffer - Cross                                                      884

1    Q    Meaning he had provided you at this point with the

2    administrative privileges.

3    A    To the -- I believe to the site that he maybe referenced in

4    this other one.

5    Q    So that's to the kick-starter site.

6    A    That's my guess.

7    Q    And you told him that you had already started to work on

8    your first project; correct?

9    A    That's what it says, yes.

10             MR. WEINSTEIN:  We can pull that down.

11   Q    (By Mr. Weinstein) Sir, is it fair to say that during the

12   entire time period that you had purchased GAW Miners' products,

13   so August 2014 into the spring of 2015, you put your trust in

14   Josh Garza?

15   A    I put my trust for the most part in GAW Miners and

16   ZenMiners and the representations they made.

17   Q    But you told Josh Garza, didn't you, that it was him

18   personally you put your trust in; right?

19   A    I may have told him that, yes.

20   Q    In fact, you sent him a letter to that effect, did you not?

21   A    I believe I did, yes.

22   Q    You told him that you trusted him, Josh Garza, for your

23   purchases of Hashlets?

24   A    When you say I told him personally, I think I told him as a

25   representative, as you pointed out, as the face of GAW Miners

1    or ZenMiners.

2    Q    Right.  So you were expressing your feelings not just for

3    you but on behalf of the GAW Miners' consumer community;

4    correct?

5    A    I may have been -- I think I was expressing my own, but I

6    don't recall whether or not I was representing anybody else.  I

7    don't think anybody else asked me to represent them.

8    Q    Okay.  But what you told him was that you put your trust in

9    him, Josh Garza; right?

10   A    I -- I'll accept your representation of that.

11   Q    Okay.  And you told him that you put your trust in him,

12   Josh Garza, for your purchases of Paycoin?

13   A    Um, again, I don't have the document in front of me.  Do

14   you have the document you're referencing?

15          MR. WEINSTEIN:  Can we pull up, Your Honor, just to

16   refresh Mr. Pfeiffer's recollection, Defense Exhibit 664?

17          THE COURT:  Yes, just for the witness and me.

18          MR. WEINSTEIN:  I'll get you a copy, Mr. Pfeiffer.

19          THE COURT:  This will be for ID for now.

20          MR. WEINSTEIN:  May I approach, Your Honor?

21          THE COURT:  You may.

22   Q    (By Mr. Weinstein) Sir, you recall that you wrote a long

23   note to Mr. Garza?

24   A    Yes.

25   Q    On May 6, 2015?

Pfeiffer - Cross                                                      886

1   A   Yes.

2   Q   And you recall that you wrote to Mr. Garza that you wanted

3   him to advocate for the people who trusted in him and invested

4   in his products; right?

5   A   Yes.

6   Q   You recall writing to Mr. Garza that because you believed

7   in him, you stuck -- you bought Hashlets; right?

8   A   That's what I wrote.

9   Q   And you repeated it over and over; right?  You recall

10  writing that because you believed in him, Josh Garza, you stuck

11  with buying Primes; right?

12  A   I guess so.

13  Q   Look down towards the bottom on the first page.

14  A   Okay.

15          I did write that.

16  Q   You recall that you told him you believed in him, Josh

17  Garza, when he said things would happen soon; right?

18  A   Yes.

19  Q   You recall that you told him that you believed in him, Josh

20  Garza, when he said he would do the Honors Program, meaning he

21  would honor the $20 floor; right?

22  A   Yes.

23  Q   And you told him again that you believed in him, Josh

24  Garza, when he said that dumping coins would be a bad thing;

25  right?

1    A    Yes.  Well, right, close enough.

2    Q    And you recall that Mr. Garza was saying that he, himself,

3    wanted to be paid back the money that he had lost; right?  Do

4    you recall that?  He told you that?

5    A    I'm sorry.  Say that again.

6    Q    Do you recall that Mr. Garza had expressed to you at that

7    point that he, himself, wanted to be paid back for all the

8    money that he had lost?

9    A    Um, I don't recall that.  Um --

10   Q    Well, let me just draw your attention to the second page.

11   A    Okay.

12   Q    The first big paragraph, three lines from the bottom.  Read

13   to yourself where it says, "While I appreciate."

14   A    I see that.

15          THE COURT:  So we've reached our lunch break.  Were

16   you about to wrap up?

17          MR. WEINSTEIN:  Yes, Your Honor.

18          THE COURT:  Go ahead.

19   Q    (By Mr. Weinstein) So Mr. Garza was expressing to you in

20   late April -- I'm sorry -- early May that he wanted to get his

21   money back; right?

22   A    I guess so.

23   Q    And you told him it seemed -- you recall telling him, it

24   seems unfair to ask the community of holders, who've placed

25   their trust in him, Josh Garza, to be the ones to pay him back.

1    Do you remember that?

2    A   I see that.  Well --

3    Q   Sir, it's Mr. Garza that violated the trust that you and

4    the other people in the community put in him; correct?

5    A   I believe that GAW Miners and ZenMiner violated the trust

6    by -- well, they failed to fulfill the commitments and meet the

7    representations that they made.

8    Q   When you expressed that to Mr. Garza, you said it was him,

9    that everyone had put their trust in him; correct?

10   A   That's what I wrote.

11   Q   And he violated that trust; right?

12   A   That's what I wrote.

13         MR. WEINSTEIN:  Nothing further, Your Honor.

14         THE COURT:  All right.  So, Ladies and Gentlemen,

15   we're going to take our lunch break.  Thank you for your

16   attention today so far.

17         Don't discuss the case.  Don't let anyone discuss it

18   with you.  Keep an open mind and all that goes with that.

19   We'll have you back a little after 1:30.  Thank you very much.

20      (The jury left the courtroom at 12:48 p.m.)

21         THE COURT:  Will there be some redirect after lunch?

22         MS. CHEN:  Yes, Your Honor.

23         THE COURT:  Fair enough.  Then Plaintiffs will rest,

24   as I understand it?

25         MR. BUCHDAHL:  That's correct, Your Honor.

```
1            THE COURT:  All right.  And then do you expect you
2    would want to make a motion to the Court?  You do.  Okay.
3            MR. BUCHDAHL:  We also would have a motion.
4            THE COURT:  Fine.  I think what we'll do is -- I'd
5    rather not excuse the jury for that.  I'd rather keep going.
6    So what I'll do is I'll simply say both side motions are
7    preserved, and then at the next break or at the charge
8    conference or whatever, we'll have our motions.  Nobody's going
9    to waive their right or anything like that.  All your motions
10   will be preserved, and I will hear your motions and then, you
11   know, do what I ordinarily do probably.
12           So all right.  And then do you have an estimate, Mr.
13   Weiner, Mr. Weinstein, at this time, on how long the video
14   presentation's going to be?
15           MR. WEINSTEIN:  Yeah, Your Honor.  I guess around
16   between two, two and a half hours.
17           THE COURT:  All right.  So we won't finish today.
18   That's okay.
19           MR. BUCHDAHL:  Your Honor?
20           THE COURT:  Yes.
21           MR. BUCHDAHL:  Based on the e-mail traffic I saw, I
22   think there were a couple of outstanding issues with
23   designations.  I think that Defense counsel had objected to a
24   couple of our counters in their --
25           THE COURT:  Did I not resolve them?
```

1    MR. BUCHDAHL:  As of the last thing I saw, they were
2    unresolved.  I don't know if I'm out of date.
3    MR. ARD:  So what happened is they deleted some of
4    their designations last night, and we were just saying they
5    should be back in.
6    THE COURT:  So this is a new issue.
7    MR. ARD:  Correct, Your Honor.  I believe that's
8    right.  Is that right?
9    THE COURT:  And, of course, they can withdraw
10   testimony just like you can withdraw the video.  So what's the
11   issue about?
12   MR. BUCHDAHL:  So I think the issue is that had we
13   known they were not going to designate certain things, that
14   would have been part of our counters to other things.
15   THE COURT:  I see.
16   MR. BUCHDAHL:  And so as they withdrew some, it
17   created a need for us to amend our counters.
18   MS. CHEN:  And the other issue, Your Honor, is there
19   were some counters that we already had that were responsive to
20   a portion of the Defendant's designations.  They partially
21   withdrew that portion and then also did not put in any of our
22   counters.
23   THE COURT:  Put in any what?
24   MS. CHEN:  Any of the counter-designations Plaintiffs
25   had had.

```
 1              THE COURT:  Right.  But, of course --
 2              MR. WEINSTEIN:  Your Honor, may I just address it
 3     quickly?
 4              THE COURT:  Go ahead.
 5              MR. WEINSTEIN:  I think the last I was up to date,
 6     although I don't know if anything happened this morning.  There
 7     were really two issues, pretty simple.  One is they had
 8     counter-designated a piece of testimony with an exhibit.
 9              THE COURT:  Okay.
10              MR. WEINSTEIN:  The exhibit is not referenced in the
11     piece of testimony.  The testimony is just asking the witness:
12     Who's Stu Fraser?
13              THE COURT:  Which witness are we talking about here?
14              MR. WEINSTEIN:  I believe this is Mr. Pease.
15              THE COURT:  Okay.
16              MR. WEINSTEIN:  They want an exhibit to be up on the
17     screen while that's happening of an e-mail where Mr. Fraser is
18     getting wire instructions from Mr. Garza and, I think, Mr.
19     Garza has Mr. Pease send it.  That document is not referenced
20     at all.  They're just asking in the snippet who Mr. Fraser is.
21              THE COURT:  Okay.
22              MR. WEINSTEIN:  They want to just show the document on
23     the screen.  The jury will be baffled, frankly.  And it's in
24     evidence.
25              THE COURT:  So let me ask them to address that.  Go
```

1    ahead.  Can you address it?

2            MS. CHEN:  So the issue, Your Honor, is that the

3    Defendant has kind of expressed to the jury during this trial

4    that Mr. Fraser is not involved, that the employees at GAW did

5    not know who he was or were not really aware of him.  And so in

6    that particular piece of testimony, that witness is being --

7    was -- the exhibit was introduced.  The exhibit includes Mr.

8    Fraser's name.  And then the witness was asked about what he

9    knew about Mr. Fraser.  And I will note that Plaintiffs did

10   counter-designate the exhibit in our objections to that

11   designation.  Your Honor sustained our objection.

12           THE COURT:  Is the exhibit in evidence?

13           MS. CHEN:  Yes, Your Honor.

14           THE COURT:  So I'm not going to have the exhibit put

15   up again.  So that's that one.

16           MR. WEINSTEIN:  The second one is in Amber Capuano's

17   designations, we cut a bunch of her designations.  Um, I think

18   everything that referencing a meeting with Cantor Fitzgerald,

19   which we already heard about from both sides, the trip to New

20   York, and basically anything having to do with Cantor

21   Fitzgerald, we just cut all that testimony out.

22           THE COURT:  Okay.

23           MR. WEINSTEIN:  There was a counter-designation to a

24   piece of that having to do with that very issue, the stuff

25   about Cantor Fitzgerald and *The Wall Street Journal* article.

1    It comes out with the fact that we cut our portion.  They want

2    to just play it.  It doesn't attach itself to any of the

3    testimony we are going to play.

4           THE COURT:  So let me hear the Plaintiffs on that

5    one.

6           MS. CHEN:  So, Your Honor, again, with Ms. Capuano,

7    the designated testimony that Defendants do plan to play

8    reference her closeness to Josh Garza, reference that she will

9    know about the meetings that he had, and there is a little bit

10   of testimony about what she knew about Stuart Fraser.  And

11   Defendant has represented to the jury -- again, they will ahead

12   from employees that they didn't really know Stuart Fraser or

13   that they didn't have interactions with him.  And so we think

14   for fairness it's important for that testimony --

15          THE COURT:  Wait a minute.  Wait a minute.  So, of

16   course, if Ms. Capuano is here live testifying and they asked,

17   or whoever was doing the direct asked -- what's the question

18   you designated?  Do you know Stuart Fraser?

19          MR. WEINSTEIN:  Well, there's a bunch of pieces.  I

20   would need to find that one.  But I think the point here is

21   they could have put Amber Capuano on their list and designated

22   stuff, just because they want to put her testimony in.  It

23   needs to be a counter-designation.

24          THE COURT:  No, I agree with that.  I agree.

25          MR. WEINSTEIN:  It's not.  It doesn't have anything to

1      do with the testimony.

2              THE COURT:  I agree with that, because really it's

3      sort of like doing trial testimony.  It would have to be within

4      the scope of the examination.  And, actually, it's even a

5      little bit more -- actually, that's not -- strike that.  That's

6      not a good reference.  Really this is a rule of completeness

7      issue.

8              And so I think the testimony that is sought to be

9      counter-designated has to speak to the -- I mean, you folks

10     know.  I'm not telling you anything you don't know.  I guess I

11     need to understand -- I don't have the particular testimony in

12     front of me, so I'm not really able to make a call here.

13             MS. CHEN:  I think we can offer that for Your Honor to

14     review.

15             THE COURT:  I think that's probably what needs to

16     happen, yeah.  So what lines, pages should I look at on this?

17             MS. CHEN:  Excuse me.  My notes are in the back.

18             THE COURT:  You can go get them.

19             MR. ARD:  And just to summarize --

20             THE COURT:  Mr. Ard.

21             MR. ARD:  Just to summarize, Your Honor, the simple

22     point is they designated testimony about her knowledge of

23     meeting with Fraser.  We're countering with testimony she gave

24     about a meeting with Fraser at Cantor Fitzgerald.

25             THE COURT:  I understand.

```
1              MS. CHEN:  So the testimony is at --
2              THE COURT:  This is Amber Capuano?
3              MS. CHEN:  Amber Capuano, Your Honor.
4              THE COURT:  Yes.
5              MS. CHEN:  This is 35, 15 through 37, 3.
6              THE COURT:  35, 15, through 37, 3.  That's the
7     designation?
8              MR. WEINSTEIN:  No, no.  That's what we took out.
9     That's what it was attached to.  We took that out.
10             THE COURT:  Okay.  So that's no longer going to be
11    played.
12             MR. WEINSTEIN:  If I may, Your Honor, just to --
13             THE COURT:  Go ahead.
14             MR. WEINSTEIN:  We had originally designated page 31,
15    line 5 through page 37, line 3.
16             THE COURT:  Okay.
17             MR. WEINSTEIN:  We've cut out everything now between
18    page 33, line 23 to the end of that.  So what remains of this
19    piece, to which they put in that counter-designation, are
20    simply questions like:  What's the background of how Stuart met
21    Mr. Garza?
22             THE COURT:  So Amber Capuano does --
23             MR. WEINSTEIN:  Right.  And it just -- the
24    relationship of how they met and what Josh would say about him
25    generally.  What they want to counter-designate to that
```

1    testimony is page 57, 2 to 6, which starts -- and so this is an

2    e-mail thread.

3           THE COURT:  Tell you what.  Just give me the page.  So

4    my understanding is now what we have on the table is Defendants

5    have designated page 31, line 5 to page 33, line 3.

6           MR. WEINSTEIN:  Correct.

7           THE COURT:  And the proposed counter-designations is

8    page 57, lines?

9           MR. WEINSTEIN:  2 to 6.

10          THE COURT:  2 to 6.

11          MR. WEINSTEIN:  Page 57, 15 to 21 and page 59, line 7

12   to 60, line 3.  And I believe that's all about *The Wall Street*

13   *Journal* article.

14          THE COURT:  So those are the proposed

15   counter-designations; is that right?

16          MS. CHEN:  And page 107, 4 through 6.

17          MR. WEINSTEIN:  No.  That was sustained.  An objection

18   was sustained on that, so that was already out.

19          THE COURT:  Is that right, Ms. Chen?

20          MS. CHEN:  I'll have to check, but I accept.

21          THE COURT:  Let me look at these over lunch then, and

22   I will give you a ruling after lunch.  We'll be in recess.

23   Thank you.

24       (A luncheon recess was taken from 12:58 p.m. to 1:30 p.m.)

25          THE COURT:  With regard to the matter we were

1    discussing before lunch, I did review the designations and

2    counter-designations.  So here's my view on this:  I think that

3    it's correct, Defense is correct that the counter-designation,

4    pages 57, lines 2 through 16 and lines 15 through 21 and page

5    59, line 7 through page 60, line 3 is not, strictly speaking,

6    rule of completeness material for the designation, the existing

7    designation, amended designation, page 31, line 5 through page

8    33, line 3.

9         However, however, thinking about just sort of basic

10   fairness of this, my view -- I think my initial instinct about

11   thinking about direct and cross was actually the right

12   instinct.  The fact is that if Ms. Capuano is here, the

13   designated testimony would be within the scope of the direct.

14   And if she was here, therefore, the Plaintiffs could elicit at

15   least most of that testimony.  And so they didn't designate it

16   affirmatively because, of course, they assumed it would come in

17   because you were reading it, the Defense was reading it.  But

18   I'm thinking I should allow it.

19        I mean, now you've withdrawn it.  They had reason to

20   expect that it would be included in the case.  They had no

21   reason to designate it since you had.  Isn't that true?

22        MR. WEINSTEIN:  No, Your Honor.

23        THE COURT:  Oh, okay.

24        MR. WEINSTEIN:  In fact, both sides had to designate

25   at the same time.  We had quite a few designations where we

1    both decided affirmatively we would put those in and --

2           THE COURT:  But didn't they see your designations

3    before they did counter-designations?

4           MR. WEINSTEIN:  No.

5           THE COURT:  Must have; right?

6           MR. WEINSTEIN:  I'm sorry.  Before our

7    counter-designation?

8           THE COURT:  Yeah, before they did

9    counter-designations.

10          MR. WEINSTEIN:  But we both had to decide what we

11   wanted to affirmatively put in our case.  And they chose not to

12   play anything --

13          THE COURT:  I understand that.  But what I'm getting

14   at is this:  If she was here live and she testified that this

15   is how they met, this is what Josh told me the story was

16   with -- and the relationship with him and Mr. Fraser, father

17   figure, etc., the -- I would allow exploration on cross, if she

18   were here again live, of why did *The Wall Street Journal*

19   reporter want to talk to Mr. Fraser?  I mean one could say that

20   that question was objectionable, but it wasn't objected to,

21   so ...

22          I would allow that.  And so I'm wondering why, in

23   fairness, I wouldn't allow it here, because they, in effect,

24   have relied on your designations as being the direct

25   examination of Amber Capuano.  And so, as a practical matter,

1    why do they need -- they didn't need to counter -- to

2    designate, not counter, to designate it in the first instance

3    because they saw you were designating it.

4           And I'm just -- this is why designations is a pain in

5    the neck, honestly, because, you know, they can be put in; they

6    can be withdrawn.  Nothing prevents you from doing that.  But

7    people may rely on them and say, okay, this is going to be part

8    of the case.  I'm going to build my closing argument around

9    that.

10          And I'm just wondering why I shouldn't, in light of

11   that, allow these counter-designations, though I agree that

12   they are -- they would not, in the first instance, be rule of

13   completeness designations.

14          So if in the first instance all that had been

15   designated was 31 to line 5 to 33 to line 3, and they

16   counter-designated these other, these items from page 57, I

17   would sustain the objection saying it's not rule of

18   completeness because it's not.  But you also designated

19   originally other material, which included a reference to an

20   interview and meetings at Cantor Fitzgerald.

21          And so at that point they counter-designated that

22   other material and I overruled the objections to it.  This is

23   going back to the original, before you withdrew it.  And so now

24   they're in the position of, all right, we assume all that's

25   coming in now.  So why shouldn't I allow it, given that?  Given

1    that it would be within the scope of the direct if she were

2    here live.

3            MR. WEINSTEIN:  Because I don't -- the reliance that

4    they put on it, there's no harm.  They did not initially

5    designate any of her testimony.  They didn't think it was

6    important enough to put in front of the jury.  The only reason

7    they ever said "let's put it in front of the jury," is to

8    counter-designate a specific thing we had put in.  We're not

9    putting it in.  So how are they harmed in their trial

10   presentation that they never wanted to put her in in the first

11   place?

12           THE COURT:  Because if she was here live and they set

13   up their cross and maybe they didn't think of -- they didn't

14   know what you were going to ask on direct.  And they -- you

15   asked the questions on direct that are on 31, line 5 to 33,

16   line 3.  I would allow them to bring out on cross the material

17   they counter-designated because I think it would be within the

18   scope.  I mean I sort of -- there haven't been a lot of

19   within-the-scope objections within this trial; so it's been

20   sort of a liberal application of scope.  And so certainly this

21   would be within the scope.

22           I guess I'm wondering, at the end of the day, if

23   that's true, then why should they be disadvantaged since simply

24   because she's not here live?

25           MR. WEINSTEIN:  Well, two things, Your Honor.  Yes, I

1   don't disagree you've been liberal with the scope issues,

2   although not when it came to the deposition stuff.

3           THE COURT:  Right, because that is subject to a

4   different rule in the first instance.  That's not just about

5   scope.  That's about rule of completeness.

6           But, again, now we're in a situation where

7   designations have been withdrawn.  So evidence that they

8   thought was coming in isn't coming in.  Evidence that you were

9   going to offer that they thought was coming in isn't going to

10  come in.  So that's kind of what I'm wondering about.

11          MR. WEINSTEIN:  When you talk about the scope --

12          THE COURT:  Yeah.

13          MR. WEINSTEIN:  -- the designations that this was

14  counter to --

15          THE COURT:  Yup.

16          MR. WEINSTEIN:  -- 31 to 33 are just about how Mr.

17  Fraser and Mr. Garza know each other.

18          THE COURT:  I know.  But --

19          MR. WEINSTEIN:  Getting to *The Wall Street Journal*

20  article is -- it's not even close to being related --

21          THE COURT:  Well, I don't know about that.  I mean

22  they talk about -- I think he used the word mentor -- right? --

23  in this section, good stories, good feeling.

24          MR. WEINSTEIN:  And I would just add that it's not as

25  though the story about *The Wall Street Journal* hasn't come out

```
 1    and been repeated.
 2             THE COURT:  That's true.
 3             MR. WEINSTEIN:  It just has nothing to do with this
 4    witness right now based on what her testimony's going to be.
 5    It's not like they were relying on somehow getting something in
 6    about The Wall Street Journal article.  It's been every day.
 7    We tried to cut a lot of testimony out from two witnesses to
 8    streamline it.
 9             THE COURT:  Okay.
10             MR. WEINSTEIN:  And they would like to put in
11    something that they never designated in their case.
12             THE COURT:  So, Ms. Chen, I've been making the case
13    for you on reliance.  Maybe I'm wrong.  Maybe -- what do you
14    have to say about the fact that if you really wanted this in,
15    then you should have designated in the first instance?
16             MR. BUCHDAHL:  I'm going to step in.
17             THE COURT:  She was doing a good job.
18             MR. BUCHDAHL:  She asked me to step in so she could
19    focus on something else.  I'm not going to do as good job.
20             But I think everything you said at the outset was well
21    taken, because as we start moving through this trial, we have a
22    sense of what is going on.  That is why we gave Defendants a
23    lot of notice.  When we said we're not going to play these two
24    videos, we gave them a lot of notice about that so they could
25    build that into their decisions about what videos they wanted
```

1    to put in their case.

2          I mean if we -- nothing would have stopped us at the

3    outset from designating it.  We didn't.  But as Your Honor

4    points out, we've all known what these designations are as

5    we've gone through our entire case.  We're about to rest on our

6    last witness with a certain understanding about what was coming

7    in.  And that was our understanding was that this was a witness

8    who was going to talk about these things.  It does feel a

9    little bit like a bait and switch, and I think Your Honor's

10   analogy about the proper scope of cross is entirely apt.

11         THE COURT:  You get the last word.

12         MR. WEINSTEIN:  As far as a bait and switch goes, both

13   sides have, while the trial has gone on has --

14         THE COURT:  I understand.

15         MR. WEINSTEIN:  -- changed the course.  They withdrew

16   their deposition designations for two witnesses entirely while

17   their case was still on.  We haven't even started yet.

18         THE COURT:  True.

19         MR. WEINSTEIN:  And we've cut some out to streamline

20   before we start.  So this isn't a bait-and-switch issue.

21         They knew her testimony.  If they wanted it to support

22   some version of *The Wall Street Journal* issue, they should have

23   put it in in their case.  They didn't.

24         THE COURT:  Okay.  Here's my ruling:  I'm going to --

25   for the reasons I've indicated, I'm not going to allow page 57,

Pfeiffer - Redirect                                              904

```
 1   lines 2 through 6 or page 57, lines 15 through 21.  But I will
 2   allow page 59, line 7 through page 60, line 3.  That's my
 3   ruling.
 4            Okay.  Let's get the jurors.
 5            MS. CHEN:  Can Mr. Pfeiffer come to the stand?
 6            THE COURT:  Yes, Mr. Pfeiffer should resume the stand.
 7            MR. WEINSTEIN:  Your Honor, can I point out not an
 8   argument just logistically?
 9            THE COURT:  Because now you've got to fix the video?
10            MR. WEINER:  She's the first video.
11            THE COURT:  Can you make her the last?  Would that be
12   a problem?  I don't want to interfere with the case.
13            MR. WEINSTEIN:  I think the only issue is if we can
14   fix it while we're playing other videos.  I don't know that we
15   can do it.  We may need to carry it over till tomorrow morning.
16            THE COURT:  That's all right.  I told them we probably
17   wouldn't finish today.  That's fine.
18       (The jury entered the courtroom at 1:42 p.m.)
19            THE COURT:  Sorry about the slight delay, folks, but
20   we will resume with the redirect examination when Ms. Chen is
21   ready.
22                      REDIRECT EXAMINATION
23   BY MS. CHEN:
24   Q   Welcome back, Mr. Pfeiffer.
25   A   Thank you.
```

1    Q    Do you recall being asked some questions about purchasing

2    GAW products after the end of the class period in this case?

3    A    Yes.

4    Q    Why did you continue to buy GAW products in the spring of

5    2015?

6    A    So there were, um -- even after, uh, information had come

7    out that there were allegations against GAW Miners and

8    ZenMiners, the community of people who had invested in Paycoin

9    and in GAW Miners essentially started to take over the Paycoin

10   project themselves and, um, to try to -- with the intention of

11   fulfilling some of the features and the value, um, that the

12   original Paycoin had said it wanted to develop.  Um, I thought

13   that might be -- create a chance for me to recover some of the

14   losses from my investment in Paycoin.

15   Q    And, Mr. Pfeiffer, you recall being asked some questions

16   about maintenance fees for Hashlets?

17   A    Yes.

18   Q    And you used a couple examples such as one with a payout of

19   one dollar that day and 15 cents of maintenance fee.  You also

20   used another -- I'm sorry.  I think you have to answer audibly.

21   A    Oh, yes.

22   Q    And you also used an example of a payout of 15 cents and a

23   maintenance fee of 15 cents as well on the same day; correct?

24   A    Yes.

25   Q    And you testified that you would actually still receive a

1    tiny payout from GAW.

2    A    A tiny payout, yes.

3    Q    Would you similarly get a tiny payout if the maintenance

4    fee were 15 cents and your original reward were zero?

5    A    That's my understanding, yes.

6    Q    So if you did not make a profit from a Hashlet on a

7    particular day, GAW would not receive anything from you either?

8    A    That's correct.

9    Q    And, therefore -- so if you did not make a profit from a

10   Hashlet on a particular day, GAW would not profit that day

11   either.

12   A    That's correct.

13   Q    Do you recall being asked about some e-mails with Mr. Garza

14   in late April 2015?

15   A    Yes.

16   Q    And you were asked whether you still trusted Mr. Garza at

17   that time?

18   A    Yes.

19   Q    And you said that you had some concerns at that time.

20   A    Yes.

21   Q    So why were you e-mailing with Mr. Garza if you had some

22   concerns about his statements?

23   A    Well, um, he seemed to be indicating that he had funds to

24   invest in ongoing development, um, and to be perpetuating

25   additional projects related to Paycoin.  So, um, I was very

1  interested in understanding what kinds of funding and resources

2  he had because if he had funds for that, you know, I was still

3  trying to understand what the nature of his situation was and

4  what his relationship was to Paycoin and the promises that he

5  had made.

6  Q   And you recall being asked about a Crypto Private Investor

7  Group?

8  A   Yes.

9  Q   As far as you know, did that investor group turn out to

10 actually exist?

11 A   I'm not sure there were any other people in that -- in such

12 a group.  I'm not sure that the group ever actually existed in

13 the first place.

14 Q   And did the projects that you discussed in those e-mails

15 with Mr. Garza ever move forward?

16 A   No, they did not.

17 Q   Finally, Mr. Pfeiffer, you were asked about an e-mail that

18 you had sent to Mr. Garza in early May of 2015.

19 A   Yes.

20 Q   And that e-mail you told Mr. Garza you could no longer pay

21 your bills; right?

22 A   Yes.

23 Q   So financially what were you --

24          MR. WEINSTEIN:  Objection.

25          THE COURT:  I'm sorry.  There's an objection to?

1              MR. WEINSTEIN:  There was an objection to the last

2    question.

3              THE COURT:  To the question that e-mail told Mr. Garza

4    you could no longer pay your bills?

5              MR. WEINSTEIN:  Correct, Your Honor.

6              THE COURT:  And the objection's what, that's not what

7    the e-mail said?

8              MR. WEINSTEIN:  Well, it's hearsay for one.

9              THE COURT:  Well, the e-mail's in evidence, isn't it?

10             MR. WEINSTEIN:  No.

11             THE COURT:  I'll sustain that.

12             Ladies and Gentlemen, disregard the answer to that

13   question.

14   Q    (By Ms. Chen) Financially what were you going through at

15   the time you wrote to Mr. Garza in May of 2015?

16   A    Well, I think I was, um -- having lost my investment, I was

17   scared and uncertain about how I would pay bills --

18        (Court reporter asked for clarification.)

19             THE COURT:  Repeat what you last said, sir.

20             THE WITNESS:  How I would pay my bills going forward,

21   and I wasn't sure about my employment prospects.  Um, so I was,

22   I guess I would say, scared and anxious; and, um, I was still

23   trying to complete my dissertation so that I could complete my

24   Ph.D.

25             MS. CHEN:  Thank you, Mr. Pfeiffer.  Nothing more.

```
 1              THE COURT:  All right, sir, you may step down.
 2         (Witness excused.)
 3              THE COURT:  All right.
 4              MR. BUCHDAHL:  Your Honor, the Plaintiffs rest.
 5                          PLAINTIFFS REST
 6              THE COURT:  All right.  And I believe both sides had
 7    motions to present to the Court; is that correct?
 8              MR. WEINER:  That's correct, Your Honor.
 9              THE COURT:  All right.  So I'm going to preserve your
10    opportunity to argue those motions, both sides.
11              Mr. Buchdahl, you had a motion to present to the Court
12    as well?
13              MR. BUCHDAHL:  Yes, Your Honor.
14              THE COURT:  Okay.  So we'll deal with those later.
15    But this time I will ask the Defendants to begin their case.
16              MR. WEINSTEIN:  Your Honor, the Defense calls, through
17    videotape deposition, Eric Capuano.
18              THE COURT:  Okay, folks.  So we're going to see some
19    more deposition testimony.  Remember my instruction:  You're to
20    treat this testimony in the same manner that you treat all
21    testimony, even -- in the same manner that you treat testimony
22    where the witness is physically here testifying live.  I'll
23    give you more instructions about that later.
24         (Plays video deposition of Eric Capuano.)
25              MR. WEINSTEIN:  Your Honor, that's it for Mr.
```

1   Capuano's testimony.

2        THE COURT:  Okay.  And who's next?

3        MR. WEINSTEIN:  We'll offer -- just because I know the

4   court reporter doesn't to take down, we'll offer that video and

5   a transcript of it as exhibits.

6        THE COURT:  We don't ordinarily do that, but we can

7   discuss that later.

8        MR. WEINSTEIN:  Sure.

9        THE COURT:  So who's the next witness?

10       MR. WEINSTEIN:  Your Honor, Amber Capuano we'll call

11  through video deposition.

12       THE COURT:  Okay.

13     (Plays video deposition of Amber Capuano.)

14       MR. WEINSTEIN:  Your Honor, that concludes

15  Ms. Capuano's deposition.

16       THE COURT:  All right.  Do we have another or --

17       MR. WEINSTEIN:  Yes, Your Honor.

18       Your Honor, we call Jonah Dorman for a videotaped

19  deposition.

20       THE COURT:  Okay.  Very well.

21     (Plays video deposition of Jonah Dorman.)

22       MR. WEINSTEIN:  Your Honor, I'm sorry, if we could

23  stop for one moment.  There are three exhibits that will be

24  mentioned --

25       THE COURT:  Okay.  You can put them up.  Have I

1    admitted them?

2              MR. WEINSTEIN:  I don't think so.

3              THE COURT:  What are the numbers?

4              MR. WEINSTEIN:  DX 566, DX 570, no objection on those.

5    And actually, the last one has been admitted.

6              THE COURT:  All right.  So 566, 570.  And what's the

7    last one?

8              MR. WEINSTEIN:  Well, PX 125, but that's been admitted

9    already.

10             THE COURT:  So DX 566 and 570 you say there's no

11   objection?

12             MR. WEINSTEIN:  Correct.

13             THE COURT:  So those will be full exhibits, 566 and

14   570.  They can be published.

15        (Defendant's Exhibits 566 and 570, received in evidence.)

16        (Plays video deposition of Jonah Dorman.)

17             MR. WEINSTEIN:  That concludes Mr. Dorman, Your Honor.

18             THE COURT:  Okay.

19             MR. WEINSTEIN:  Next the Defense calls Madeline Eden

20   through deposition.

21             THE COURT:  Okay.

22             MR. WEINSTEIN:  Your Honor, yes, there are, I believe,

23   three exhibits, one already admitted, which is DX 541.

24             THE COURT:  Okay.

25             MR. WEINSTEIN:  And then two which are being offered,

```
 1    DX 652 and DX 663.  Your Honor had dealt with the objections

 2    earlier.

 3              THE COURT:  652 is admitted as a full exhibit, and 663

 4    is also admitted as full exhibits.

 5         (Defendant's Exhibits 652 and 663, received in evidence.)

 6         (Plays video deposition of Madeline Eden.)

 7              MR. WEINSTEIN:  Your Honor, I apologize for the

 8    interruption.  We think there may be a technical issue with

 9    respect to the tape.  Is there any way to take a very quick

10    break?

11              THE COURT:  Sure.  Well, let me actually see counsel

12    for a moment outside.  It may be that we can do this a little

13    bit more efficiently.  Let me see.  I can just see one of you.

14         (At sidebar off the record.)

15              THE COURT:  All right, Ladies and Gentlemen, to keep

16    things moving, we're actually going to switch to a different

17    video witness.  That way we use the time and they'll fix the

18    technical issue and you'll be able to see the rest of this

19    witness tomorrow.

20              MR. WEINSTEIN:  Thank you.  So we will interrupt the

21    video portion of Ms. Eden, and we will call, Your Honor, Daniel

22    Pease through deposition.

23              THE COURT:  Very well.  Thank you.

24         (Plays video deposition of Daniel Pease.)

25              MR. WEINSTEIN:  That's it for Mr. Pease, Your Honor.
```

```
1              THE COURT:  Do we have anything else that you could
2    start?  Your colleague's nodding.
3              MR. WEINSTEIN:  It wouldn't be short.
4              THE COURT:  Oh.  We could continue and then break at
5    3:30, I mean if we're able to.
6              MR. WEINSTEIN:  Sure.
7              THE COURT:  Use the time for the jury, I'd like to do
8    that.
9              MR. WEINSTEIN:  Your Honor, we'll start the -- we'll
10   call Joseph Mordica through videotape.
11             THE COURT:  Thank you.
12        (Plays video deposition of Joseph Mordica.)
13             THE COURT:  All right, let's stop right there.  Great.
14             Ladies and Gentlemen, give me one minute.  I just want
15   to meet with counsel, give you some instructions about
16   tomorrow.  Can I see counsel?
17        (At sidebar off the record.)
18             THE COURT:  All right, folks, thanks for your
19   patience.  We'll get you out of here in just one second.  I
20   just want to give you a slightly modified schedule for
21   tomorrow.
22             So we'll have you come in for 10:00 a.m.  We'll start
23   at 10:00 a.m. tomorrow.  So be in the jury room by 9:45 a.m.,
24   so basically an hour after you usually are.  The reason for
25   that is I expect -- we're going to finish the evidence in the
```

1    morning tomorrow.  And then I'm going to give you my charge.

2    The charge will take a while.  We'll go through.  You'll have a

3    copy.  I'll read it to you.  And then tomorrow I will probably

4    let you go home early.

5         And then on Friday we will have -- Friday morning we

6    will have the closing arguments.  Probably around lunchtime,

7    probably a little before lunchtime on Friday, you will get the

8    case to deliberate on.  So once again, we actually are a little

9    bit ahead of schedule here.  I didn't actually expect you to

10   get the case till Monday, Monday afternoon at the earliest; so

11   we're doing pretty well.  So I just wanted to tell you that.

12        So we'll have you come in an hour later tomorrow.

13   There's a reason for that.  It has to do with some work I have

14   to do with the lawyers.  So we'll see you in the jury room

15   tomorrow at 9:45.

16        Of course, don't discuss the case.  Don't let anyone

17   discuss it with you.  Keep an open mind and all that goes with

18   that.  Thank you very much for your attention today.

19        Remember, 9:45 a.m. in the jury room tomorrow.

20     (The jury left the courtroom at 3:34 p.m.)

21        All right, folks, let's do this:  Let's recess now.

22   Let's plan to come back at -- why don't we start at about five

23   minutes to 4:00.  So we'll take about ten minutes now.  We'll

24   start with the motions, and then we'll go right through.  And

25   we need to finish the charge conference no later than 6:00.

1    But I think that will give us adequate time.  All right?  We'll

2    be in recess.

3              MR. ARD:  Your Honor, we have some very short

4    redlines.  Would you like us to send it to you or go through

5    it?

6              THE COURT:  Why don't we go through it.

7              One thing for clients, for others you're welcome to

8    stay for the charge conference, I mean that if you'd like to.

9    In my experience, it can be really boring to hear lawyers

10   discuss the law; but if you find it interesting, more power to

11   you.

12        (Proceeding concluded at 3:36 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

916

```
1                    I N D E X

2

3    WITNESS NAME                                      Page

4    Called by the Plaintiffs:

5    Dean Allen Shinners

6       Continued Cross By Mr. Weiner ............................. 753
        Redirect By Mr. Rennie...................................... 812
7
     Michael Pfeiffer
8
        Direct By Ms. Chen.......................................... 830
9       Cross By Mr. Weinstein..................................... 840
        Redirect By Ms. Chen ...................................... 904
10

11   Called by the Defendant:

12   Eric Capuano
        Video Deposition ........................................... 909
13
     Amber Capuano
14      Video Deposition ........................................... 910

15   Jonah Dorman
        Video Deposition ........................................... 910
16
     Madeline Eden
17      Video Deposition ........................................... 912

18   Daniel Pease
        Video Deposition .......................................... 912
19
     Joseph Mordica
20      Video Deposition .......................................... 913

21

22

23

24

25
```

1

2

3                        C E R T I F I C A T E

4

5

6

7                    I, Julie L. Monette, RMR, CRR, CRC, Official

8     Court Reporter for the United States District Court for the

9     District of Connecticut, do hereby certify that the foregoing

10    pages are a true and accurate transcription of my shorthand

11    notes taken in the aforementioned matter to the best of my

12    skill and ability.

13

14

15                    /S/ JULIE L. MONETTE
                  _____
16                Julie L. Monette, RMR, CRR, CRC
                       Official Court Reporter
17                        450 Main Street
                   Hartford, Connecticut 06103
18                        (860) 212-6937

19

20

21

22

23

24

25