<pre>
 1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF CONNECTICUT
 2
       - - - - - - - - - - - - - - - - x
 3
       DENIS MARC AUDET, MICHAEL          No. 3:16-CV-940 (MPS)
 4     PFEIFFER, and DEAN ALLEN
       SHINNERS, Individually and on      OCTOBER 28, 2021
 5     Behalf of All Others Similarly
       Situated,                          9:00 A.M.
 6
       vs.                                JURY TRIAL
 7
       STUART A. FRASER, GAW MINERS,
 8     LLC, and ZENMINER, LLC, (d/b/a
       ZEN CLOUD)
 9
       - - - - - - - - - - - - - - - - x
10

11                    Volume VI - Pages 918 - 1016

12
                          450 Main Street
13                     Hartford, Connecticut

14

15        BEFORE:  THE HONORABLE MICHAEL P. SHEA, U.S.D.J.

16                      AND A JURY OF NINE

17

18     APPEARANCES:

19     FOR THE PLAINTIFFS:

20             SUSMAN GODFREY, L.L.P.
                    1301 Avenue of the Americas, 32nd Floor
21                  New York, New York 10019
               BY:  SETH D. ARD, ESQUIRE
22             BY:  JACOB W. BUCHDAHL, ESQUIRE
               BY:  GENG CHEN, ESQUIRE
23             BY:  RUSSELL RENNIE, ESQUIRE
               BY:  HANNAH MILLER, ESQUIRE
24
       (Appearances Continue ...)
25
</pre>

```
1    APPEARANCES CONTINUED:

2    FOR THE DEFENDANT:

3             HUGHES, HUBBARD & REED L.L.P.
                  One Battery Park Plaza, 12th Floor
4                 New York, New York 10004-1482
             BY:  DANIEL WEINER, ESQUIRE
5             BY:  MARC A. WEINSTEIN, ESQUIRE
             BY:  AMINA HASSAN, ESQUIRE
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20   COURT REPORTER:  Julie L. Monette, RMR, CRR, CCP
                       (860) 212-6937
21
     Proceedings recorded by mechanical stenography, transcript
22   produced by computer.

23

24

25
```

1                        9:00 A.M.

2              THE COURT:  All right, just to get started, we're here

3      for a continuation of the charge conference.  However, a couple

4      things:  First, just for the record, the parties in this case

5      submitted a lengthy and detailed proposed charges and

6      objections, very thorough objections supported by case

7      authority, to the proposals, for and against the proposals.  As

8      I said yesterday, I've reviewed all those materials, including

9      the authorities, and we sent -- we prepared a draft of the

10     charge after considering your proposals and objections and sent

11     it to you by e-mail just a little bit after 8:30 on Tuesday

12     evening.

13             Yesterday at five minutes to 4:00, we began a charge

14     conference after a break at the end of the trial day, and we

15     were at it for about two hours.  We also did hear motions, Rule

16     50 motions, although many of those motions inter -- were

17     intertwined with issues related to the charge.

18             So that's a long way of saying I've heard you on the

19     charge.  We are not going to discuss the charge anymore.  We

20     are done with the charge.

21             We were discussing the Verdict Form when we left off

22     yesterday.  We had discussed one issue, and I've resolved that

23     issue and I'll tell you how I've resolved it.  But we were

24     discussing a second issue raised by Mr. Weinstein, which we

25     will continue discussing in a moment.  I think I have a

1    resolution to that, but I will hear you on that.

2         Lastly, two other things:  One of the issues we

3    discussed at length yesterday was the affirmative defenses.

4    I've decided what I'm going to do upon that, and this is what

5    I'm going to do:  I'm going to instruct the jury and I'm going

6    to include on the Verdict Form only the affirmative defense of

7    in pari delicto and only as to the securities claims and only

8    as to Mr. Shinners.  I don't believe, pretty much for reasons I

9    stated yesterday, that there is a basis in the evidence to

10   support instructing the jurors on any other affirmative

11   defenses.

12        Unclean hands, based on the language I read to you

13   from *Thompson vs. Orcutt*, I don't believe there's any

14   evidentiary predicate for that defense here.

15        Ratification was not pled.  It was not raised in the

16   briefing on class certification.  Further, I have not found any

17   Connecticut case that has recognized a defense of ratification

18   and a case remotely like this one.

19        I note that Mr. Shinners apparently stopped purchasing

20   products in December before really there was the substantial

21   loss causation, at least as to the Paycoin.  I don't believe

22   that Mr. Pfeiffer's 2013 purchases can reasonably be equated,

23   for example, with the example that Ms. Hassan gave yesterday,

24   an employee's waiver of rights to bring a wrongful termination

25   claim in a severance agreement.  So I don't think there's a

1    basis for a ratification defense, and I'm not going to charge

2    the jury on that.

3           With regard to in pari delicto, I did read the *Pinter*

4    case that Ms. Chen brought to my attention.  I think that was a

5    helpful case.  Thank you.

6           And I think that it's clear from that case that I

7    should not instruct the jury with regard to Mr. -- in pari

8    delicto with regard to Mr. Pfeiffer.  First of all, Mr.

9    Pfeiffer's sale of unregistered securities was to third

10    parties.  It's not actually the subject of this action.  But

11    more importantly, I did not hear any evidence that Mr. Pfeiffer

12    was involved at all in the company -- in any way, shape, or

13    form in the company sale of unregistered securities to the

14    class.

15           I think it's a closer question as to Mr. -- whether

16    Mr. Shinners was.  To be clear, just for Mr. Shinners' benefit,

17    I say that not because I'm taking a particular view of the

18    evidence.  The standard for instructing a jury on a claim or

19    defense is relatively low.  There has to be some evidence.  And

20    I think that studying the language of the *Pinter* decision

21    closely, given his involvement in many e-mails that Mr. Weiner

22    pulled up for us, I think -- I think it's a close question.

23    But I'm going to instruct the jury on in pari delicto as to him

24    with respect to the securities claims.

25           That said, the Plaintiffs have made a Rule 50 motion

1    on that, and if that defense is sustained, they, of course, may

2    renew that motion, just as Defendants may renew their Rule 50

3    motion.  If they do, we would, of course, have full briefing,

4    and I would have a more fulsome opportunity to dig into that

5    issue.  So that's how I've handled that.

6         Second point before we return to the one issue we were

7    discussing yesterday, Mr. Weinstein raised during the trial the

8    possibility of marking depositions as exhibits.  We don't do

9    that, but there's still a way for you to preserve.  So we'll

10   just talk through that.  The reason we don't mark depositions

11   as exhibits is that I instruct the jurors that depositions are

12   testimony and they're to be treated just like the testimony of

13   a live witness.  Having them go back into the jury room as

14   exhibits would not be consistent with that treatment.

15        We do instruct the jury, as you know, that they can

16   request read-backs of live testimony.  And if they want, in

17   effect, a read-back of a deposition, we'll just come back, have

18   them back to the courtroom and play that for them.

19        For preservation purposes, you can certainly mark

20   exhibits for ID.  And I think it would make -- sorry.  You can

21   certainly mark deposition transcripts, or whatever they are,

22   whether they're the transcripts or the disk, for ID.  I would

23   encourage you to do that.

24        We should probably make a record of that now actually.

25   I'm happy to spend a few minutes to do that so that it's very

1    clear, you know, if the case gets to the Court of Appeals,

2    "Judge, you know, we marked this for ID."  You can submit it as

3    part of your joint appendix, etc.

4           MR. WEINSTEIN:  That's the issue I was raising with

5    the post-trial issue.

6           THE COURT:  Yup.  So how do you want to do that?  Do

7    you folks have -- tell you what.  Why don't you folks confer

8    with each other, come up with a list.  You might as well mark

9    all of them for ID.  We'll just call them -- we can call

10   them -- you know what?  So you don't have to start with new

11   exhibit numbers, we'll just call them court exhibits, and we'll

12   list them 1 through whatever number you tell me.

13          MR. BUCHDAHL:  6 or 7.

14          THE COURT:  Fine.  After you've conferred before the

15   jury retires, maybe before we come out at just before ten

16   o'clock, we'll have you just read off the list.  Somebody will

17   just read off this list and say this one is this one and we'll

18   mark them all as Court ID.

19          MR. WEINSTEIN:  We can do, and then we'll confer and

20   make the actual exhibit so we each agree on it after the fact.

21          THE COURT:  Sure.

22          MR. WEINSTEIN:  Just to make sure the transcript --

23          THE COURT:  That's fine.  That's fine.  Actually, we

24   won't mark them as court exhibits.  We'll mark them as ID.  I

25   think we have to use new exhibits because court exhibits

1    actually do go back to the jury.

2         I'm ready to go back to the --

3         MR. BUCHDAHL:  Your Honor, may I just relating to the

4    issue of the transcript?  And I apologize.

5         THE COURT:  Yes.

6         MR. BUCHDAHL:  Yesterday the Defense started playing a

7    video from Madeline Eden.

8         THE COURT:  Yes.

9         MR. BUCHDAHL:  They stopped in the middle of that, and

10   I think we were given to understand it was a technical

11   difficulty.  But what we found out late last night was that the

12   technical difficulty was that they were trying to take out a

13   bunch of the testimony of hers that they had previously

14   designated and which we had counter-designated.  And so late

15   last night we received a new set of information about Ms. Eden

16   that was substantially reduced from what we had expected to be

17   played and what they told us the night before at 5:00 p.m. was

18   going to be played.

19        This matters because we made certain decisions

20   about --

21        THE COURT:  I get it.  Let me hear from Mr. Weinstein.

22        MR. WEINSTEIN:  Yes.  So two different issues.  The

23   reason we stopped the tape was I was informed that the tape

24   that was being played might have included excerpts that had

25   previously been cut --

1                THE COURT:  Okay.

2                MR. WEINSTEIN:  -- that had been --

3                THE COURT:  Previously, not --

4                MR. WEINSTEIN:  Previously.  But the tape had not --

5     it still had it.  That's the only reason we stopped the tape.

6                THE COURT:  Okay.

7                MR. WEINSTEIN:  Last night, late last night I'm

8     going -- I went back through the things that are still to be

9     played today and decided to cut more of Ms. Eden.  I don't

10    believe it includes -- we didn't take out any

11    counter-designations.  It was only our designations to which

12    there were no counter-designations.  So we just pared down our

13    presentation of Ms. Eden's testimony more without any impact on

14    anything that they had wanted to counter-designate.

15               It's no different, Your Honor, than if we had Ms. Eden

16    live and we broke for the day and decided, you know what?

17    We're just not going to ask the following set of questions.

18               THE COURT:  Except it's a headache for me, but go

19    ahead.

20               MR. BUCHDAHL:  That's not consistent with how we

21    understand.  We do understand there were counters of ours that

22    were removed.  Look --

23               THE COURT:  I think you folks need to confer about

24    that.

25               MR. WEINSTEIN:  Yeah.

1          THE COURT:  Because you just don't agree on the facts.

2          MR. WEINSTEIN:  Can we just see that?  When we're done

3     with the charge issues, Your Honor, we can just confer with

4     them on that.

5          THE COURT:  We are done with the charge issues

6     already.  When we're done with the last issue on the Verdict

7     Form, you can confer.

8          MR. WEINSTEIN:  Okay.

9          THE COURT:  Okay?  So let's have you do that.

10         MR. ARD:  Your Honor, just on the charge issue, I

11    thought yesterday you had suggested that because you hadn't

12    looked at the *Pinter* case yet, that we could see what your

13    proposed charge --

14         THE COURT:  No, I didn't suggest that.  If I did, I

15    misspoke.  We're not going back on the charge, that's it.  I'm

16    not going to hear further argument on the charge.

17         MR. ARD:  Okay.  Thank you, Your Honor.

18         THE COURT:  Folks, we've had ample time to discuss the

19    charge.  I've never spent so much time discussing a charge.

20         Now, Mr. Weinstein raised an issue yesterday.  My

21    understanding of the issue is this:  that -- oh, and so

22    actually he raised two issues, one of which I've resolved.

23         So one of the issues was, Judge, you need to -- you

24    need to include checkoffs or boxes on the form so that the jury

25    can make findings with respect to each of the claims as for

1    each product.  I agree, and I've done it, with one exception.

2    The only one that I've not done that for is Section 2, Question

3    1:  With respect to the Plaintiffs' claim alleging the sale of

4    unregistered securities, did Plaintiffs prove that Defendant

5    Stuart Fraser was liable as a controlling person of GAW Miners

6    under the CUSA?  I'm leaving it as that because I don't believe

7    there's any evidence the jury could make deferential issues as

8    to specific questions.

9         MR. WEINSTEIN:  No objection.

10        THE COURT:  But as to the Defense, I did break it out.

11   So for each product you found to be an investment contract in

12   response to Question 1, Section 1, did Mr. Fraser prove that he

13   did not know and, in the exercise of reasonable care, could not

14   have known that:  one, that product was being sold; or, two,

15   that product was not registered with respect to:  A, Hashlets;

16   B, Hashpoints; C, HashStakers; D, Paycoin?  Yes, no, etc.  And

17   then it proceeds that way throughout.  So that's how I handled

18   that one.

19        The last issue that Mr. Weinstein raised was, well,

20   statements were made at various times, and we're not going to

21   know from the jury's verdict which statements they found to be

22   fraudulent, which statements they found that the Plaintiffs had

23   relied on, should they find liability; and, therefore, we won't

24   be able to accurately calculate damages down the road.

25        That was my understanding of the issue you raised; is

1    that right?

2            MR. WEINSTEIN:  Yeah.

3            THE COURT:  Okay.  I think I have a resolution to it,

4    but I will hear from the parties on this.  First, Mr.

5    Weinstein, what do you propose?

6            MR. WEINSTEIN:  So, Your Honor, the -- what we would

7    propose -- and I think this really comes up more with the

8    Hashlets part of the case because there was testimony I think

9    the jury's now heard that, from Mr. Capuano, that, you know, we

10   had a lot of mining power.  He was concerned at some point we

11   might get over the threshold, but he didn't know if it happened

12   or when.

13           So we would propose the following question for the

14   jury:  If you find that GAW Miners made an untrue statement of

15   material fact concerning whether GAW Miners had enough mining

16   power to support the Hashlets sold, identify the first date

17   upon which that representation was false.

18           THE COURT:  Identify the first date on which it was

19   false.  That's what you want?

20           MR. WEINSTEIN:  Right.

21           THE COURT:  And where would that question go, just so

22   I ...

23           MR. WEINSTEIN:  Trying to figure that out, Your Honor.

24   We think it impacts three of the four claims.  So we could have

25   it really after the common law fraud question.

1        THE COURT:  Once again, the question would be:  If you

2  find that GAW Miners made untrue statements of material fact

3  concerning Hashlets --

4        MR. WEINSTEIN:  So it was --

5        THE COURT:  Sorry.

6        MR. WEINSTEIN:  Whether GAW Miners had enough mining

7  power to support the Hashlets sold.

8        THE COURT:  Why don't you read the whole thing to me

9  again slowly.

10       MR. WEINSTEIN:  Sure.

11       If you find --

12       THE COURT:  Yup.

13       MR. WEINSTEIN:  -- that GAW Miners --

14       THE COURT:  Okay.

15       MR. WEINSTEIN:  -- made an untrue statement of

16  material fact --

17       THE COURT:  Yup.

18       MR. WEINSTEIN:  -- concerning whether GAW Miners

19  had -- maybe "enough" is not good -- sufficient mining power to

20  support the Hashlets sold, identify the first date upon which

21  that representation was false.

22       THE COURT:  Okay.  And your proposal is in terms of a

23  place for that, where that would go, would be after Section 4,

24  common law fraud claim.  It would really be a new section,

25  independent section.

1          MR. WEINSTEIN:  Right.

2          THE COURT:  Okay.  Thank you.

3          Mr. Buchdahl.

4          MR. BUCHDAHL:  Your Honor, I think the fundamental

5    reason why we oppose that question is because it kind of wildly

6    understates the allegation of fraud in connection with

7    Hashlets.  Because what we are alleging is that the fundamental

8    misrepresentation is that GAW Miners had any idea how much

9    mining power they had relative to the amount of Hashlets they

10   were selling.  That was false from the outset.

11         In other words, they knew when they started making --

12   the fundamental representation about a Hashlet is this

13   represents a portion of our actual mining power.  From the

14   moment they started saying that, they knew they didn't have the

15   financial controls, including inventory accounting, sufficient

16   to ever represent that that was true.

17         And the fact that they might have lucked into that

18   being true does not get them out of securities fraud,

19   particularly when it's a material omission not to tell

20   investors that there was no way for them to ever know if it was

21   true.

22         And so the notion that we would put a burden on this

23   jury to answer something that the evidence is unknowable -- it

24   is unknown.  And that's why the Defense is asking for this;

25   right?

1          What the witnesses have said is, we don't know how

2    much power we had.  We don't know when we oversold.  We don't

3    know when this happened or when this didn't happen.

4          Part of what they deleted from Ms. Eden's testimony

5    was testimony about how when she went down there, the machines

6    weren't even plugged in.

7          So the point is that the fundamental fraud is:  You

8    are buying a part of our mining power.  That was simply never

9    the case.  And to boil that down to a very specific false

10   statement that as of X moment we have insufficient mining power

11   to back up the Hashlets we sold really does a disservice to the

12   Plaintiffs' allegation.

13         MR. WEINSTEIN:  Your Honor, this has never been a

14   financial controls case.  This is the first we're hearing that

15   investors were buying product or relying on the fact that they

16   might have -- they're not buying GAW Miner stock.  This is

17   never an allegation or anything that anyone's testified they

18   relied on whether they had a good inventory system.  The issue

19   has always been --

20         THE COURT:  But we did see that.  There was some

21   evidence along those lines.  No?  There's that e-mail

22   from Mr. -- I can't pronounce his last name.

23         MR. BUCHDAHL:  Moosajee.

24         THE COURT:  Moosajee.

25         MR. WEINSTEIN:  There's -- there's evidence that

1  there's discussion within GAW Miners about their system of

2  inventory controls.  That's -- and whether they should go out

3  and try to find invest -- not product buyers but investors for

4  the company.  But the class is not a class of investors in GAW

5  Miners.  It's a class of buyers of this product, the Hashlet.

6  There's never been an allegation that the reason why these

7  people were buying was because they thought GAW Miners had

8  great inventory systems and they were misled.  The

9  allegation -- and it's what Mr. Garza --

10         THE COURT:  That may be so, but the issue is when the

11  statement was first false and falsity can be made with -- can

12  be satisfied with proof of reckless disregard of the truth, and

13  so there is evidence that, from which the jury could find, that

14  really they never had -- they never knew what -- whether there

15  was sufficient mining power to support the Hashlets.  They just

16  sold Hashlets on a wing and a prayer.  And the jury could find

17  that's reckless.

18         I mean, I'm not saying that's my interpretation of the

19  evidence.  I'm just saying it seems to me there's enough

20  evidence from which the jury could draw that conclusion.

21         MR. WEINSTEIN:  But here's why that doesn't work.

22         THE COURT:  Okay.

23         MR. WEINSTEIN:  Mr. Buchdahl said, "Well, they can't

24  just luck into it."  Yes they can.  If they had enough hashing

25  power for the Hashlets they sold, there's -- couldn't possibly

1   be harm to the person who purchased at that point.

2          THE COURT:  Is there evidence in the case from which

3   the jury could conclude that there was a time when they had

4   sufficient mining power to support the Hashlets they were

5   selling?

6          MR. WEINSTEIN:  Yes.  Mr. Capuano's deposition

7   testimony played yesterday went through that.  He went through

8   that.

9          THE COURT:  He did say it wasn't always a scam.  He

10  did say that.

11         MR. WEINSTEIN:  In fact, what he said was:  I -- I

12  looked at all the stuff.  We had a lot of mining power.

13         He was actually impressed they had hundreds of these

14  gigantic machines, a tremendous amount of power.  And it was

15  only later into late fall or early winter where he started

16  raising the question, well, are we getting to a point where

17  we're getting over the threshold of being able to support what

18  we're selling?  And he wasn't getting answers.  He didn't

19  necessarily conclude one way or the other.

20         But the point is his testimony certainly supports that

21  for a decent period of time, they did have sufficient mining

22  power.  So if anyone was buying Hashlets during that period of

23  time, they are not being harmed in their purchase.

24         MR. BUCHDAHL:  Your Honor, may I?

25         THE COURT:  But there's no -- just a minute.  There's

 1   no -- there was no specification by him of the date beyond

 2   which that was no longer the case.

 3        MR. WEINSTEIN:  Absolutely right.  But it's their

 4   burden to prove that there was actually a material misstatement

 5   that harmed a Plaintiff who purchased during any period of

 6   time.

 7        THE COURT:  But their -- their case is -- these

 8   statements were untrue throughout.  Nobody ever bought a

 9   Hashlet when the statement "there's enough mining power to

10   support Hashlets" was true in the sense that it's required to

11   be true in the securities law, both nonrecklessly true and

12   absolutely true.

13        So from their standpoint, if you specify a date, then

14   you're asking the jury to try to find something that isn't

15   there, not because they haven't met some burden but because

16   their theory of the case is that all of these Hashlets were

17   sold by fraud.

18        And so if I then said to the jury, yeah, but go ahead

19   and find the date at which that happened, then, in a sense,

20   I'm -- I'm saying -- I'm saying no to their theory of the case.

21        MR. WEINSTEIN:  No.  No.  I agree with you, that is

22   their theory of the case.  That is a permitted theory of the

23   case.

24        THE COURT:  Right.

25        MR. WEINSTEIN:  The question is -- and we don't

1    dispute that Mr. Fraser could be liable.  He's a control

2    person.

3              THE COURT:  Yeah.

4              MR. WEINSTEIN:  If there was a misstatement, a

5    material misstatement, at any point during that period.  But

6    when you get to what the jury's verdict is going to mean for a

7    damages phase, if there is one, if it is true that, let's say,

8    Mr. Pfeiffer bought starting in late August 2014, that when he

9    purchased those Hashlets on the representation that the company

10   had sufficient mining power to support what he just bought and,

11   in fact, they did, he did not buy in reliance on a

12   misstatement.  So he can't get damages for what he bought in

13   August.

14             Maybe when he continued to buy in October or November,

15   if they no longer had the power when he bought those, he was

16   buying -- relying on a misstatement and he can get damages for

17   those.

18             MR. BUCHDAHL:  Your Honor --

19             THE COURT:  Mr. Buchdahl, let me ask you this

20   question:  I know your view of the case is for the reasons I

21   articulated.  Let's say I agree with you on this point and I

22   don't give this and then we get to a damages phase and the

23   Defendant wants to argue:  Well, Judge, they've got to show --

24   Mr. Pfeiffer, for example, has to show that these Hashlets, you

25   know, were purchased at a time when the statement wasn't true,

1   and we get to put on evidence about that.

2           And you say:  No, no, no.  The first jury found that

3   they were untrue, and revisiting that now would violate the

4   Seventh Amendment.

5           And I say, Well, okay, then my hands are tied.  So I

6   happen to agree with you on that.

7           Judgment enters.  They appeal.  And then you're before

8   the Circuit, and the Circuit says to you, All you had to do was

9   to let the jury answer a question on the Verdict Form as to the

10  timing.

11          MR. BUCHDAHL:  Your Honor --

12          THE COURT:  That's all you had to do, but you didn't

13  want to do it.

14          MR. BUCHDAHL:  Your Honor --

15          THE COURT:  Wait until I finish the thought.  You

16  didn't want to do it, and now we're stuck telling Judge Shea he

17  has to retry this case.

18          MR. BUCHDAHL:  As much as a pleasure it would be --

19          THE COURT:  It's not mutual.

20          MR. BUCHDAHL:  I certainly don't want you to try the

21  exact same case.  The date part is the less fundamental problem

22  with their request.  The most fundamental problem with their

23  request is that they are describing the false statement in a

24  way that is highly favorable to the Defense and an absolutely

25  restrictive version of the case we are trying to try.

1          THE COURT:  I think I know where you're going.  Is

2     your position is:  Look, we don't have to point to a particular

3     statement.  This was -- it's also based on fraudulent conduct.

4     The product itself was a fraud.  That's your --

5          MR. BUCHDAHL:  Yes.  So if you want me to say to the

6     jury, in the course of my closing, "Answer the question, when

7     this fraud started, and I'll give you a date on which to do

8     it," I'm happy to ask them to do that.  But the question can't

9     be a phrasing of it that takes out most of our theory of what

10    was wrong with this product.

11         Because think about what they're asking here for.

12    What they're asking is for us to get to a damages phase where

13    we can never answer any of the questions in the damages phase.

14         THE COURT:  What if I change Mr. Weinstein's question

15    to be:  If you find that GAW Miners committed a fraud

16    concerning whether GM, GAW Miners, had sufficient mining power

17    to support the Hashlets sold, identify the first -- identify

18    the date on which such fraud began?

19         MR. BUCHDAHL:  If they want a date, then I think the

20    question is:  If you believed that they committed a fraud,

21    comma, identify the date.  I don't see why --

22         THE COURT:  That's sort of what my question was.

23         MR. BUCHDAHL:  Right, but you -- but even Your Honor's

24    description of it tied it specifically to mining power.  And

25    it's actually broader than that.

1          THE COURT:  Well, how is it broader than mining power
2     if it's just about Hashlets?
3          MR. BUCHDAHL:  Well, for Hashlets, that's fair, Your
4     Honor.
5          THE COURT:  But I don't want to broaden this beyond
6     what Mr. Weinstein's suggested.  He's asked for a question
7     about Hashlets.
8          So what about that, Mr. Weinstein?  Instead of saying
9     an untrue statement, committed a fraud?
10         MR. WEINSTEIN:  Just generally committed a fraud?
11         THE COURT:  Yeah.
12         MR. WEINSTEIN:  The problem with that is it's one
13    thing to have a theory of the case.  It's another one to have
14    proven one when you get to trial.
15         THE COURT:  Yeah, but I'm instructing the jury, at
16    least for the federal securities claim for sure, that they
17    don't even have to find an untrue statement.  They can find a
18    fraudulent act.  So it's not just scheme, artifice.
19         MR. WEINSTEIN:  The problem I have with it, Your
20    Honor, is saying, when did they commit a fraud?  It sounds like
21    they could decide -- and it might be true -- that Mr. Garza's
22    just generally a crook.  But that's not enough.  Because the
23    only evidence they put on of a fraud, a little strange in this
24    case --
25         THE COURT:  No, I get you on that.  I get you that

1    it's not enough.  But this is a specific question.  This is

2    basically a jury interrogatory that you're asking me to frame.

3    And so I'm not trying to cover the entire case here.  I've

4    already given them findings on this.

5             I think if we're going to do this, the appropriate

6    place to do it is at the end for that.  I don't want to color

7    what they're doing earlier.

8             MR. WEINSTEIN:  Right.

9             THE COURT:  But I'm just wondering, given the breadth

10   of the federal securities claim especially, made an untrue

11   statement -- and this could also be omissions.  And the theory,

12   arguably, is broader with regard to Hashlets than just a single

13   statement about mining power.  It's the whole concept was

14   fraudulent.

15            MR. WEINSTEIN:  But -- well, here's the issue I have

16   with that:  It may be the theory; but, again, once we get to

17   what their trial proof was, they put on one witness from GAW,

18   one only, to establish what fraud there might have been here.

19   It was Mr. Garza.  He actually said very little in his

20   testimony about what the fraud was as opposed to just saying

21   Stu Fraser, Stu Fraser.

22            THE COURT:  Well, no.  He put on their clients though.

23   And their clients testified what their understanding of what

24   Hashlets were was.  They heard, as you say, from Capuano

25   certain thing.  Um, they heard from Dorman certain things.

1   They could -- they heard -- they got an overall impression from

2   Mr. Garza -- and I'm shaking my head because I have no idea

3   what it is, but I know what it would be if I were them, which

4   is I wouldn't trust a word he's saying and, further, that I

5   wouldn't put it past him to have, yeah, the whole thing was a

6   scam from the outset.  So none of the products he sold were on

7   the up and up regardless of what Capuano said.

8          If I was on the jury, to be honest, that was probably

9   my impression.  I'm not sure how that would play out for Mr.

10  Fraser.  I'm not going to talk about that.  All I'm saying is

11  that's a reasonable impression the jury could have.

12         MR. WEINSTEIN:  Absolutely.  That's my concern.  I

13  think that's a reasonable impression for anyone to have about

14  Mr. Garza.  The concern is, in order to prove their case, they

15  have to have a untrue statement of material fact.  And thinking

16  he's a bad guy --

17         THE COURT:  That's not true with regard to the federal

18  securities claim.  They don't have to have an untrue statement

19  of material fact.  I'm instructing them that they can find it

20  fraud based on a fraudulent act, based on a scheme or artifice

21  to defraud, and also separately based on a statement of

22  material fact that's fraudulent.  That's just one of the ways

23  though.

24         MR. WEINSTEIN:  Right.  But the evidence they

25  presented on this issue on Hashlets was -- it's essentially

1    limited because there's no other evidence other than Garza's a

2    bad guy, that they didn't have enough mining power to support

3    the Hashlets.

4         THE COURT:  Yeah, but that -- that's right and that

5    that was fraudulent from the outset.  That was a scheme to

6    defraud, regardless of whether there was any statement to the

7    effect that Hashlets are supported by adequate mining power,

8    that basically that was implicit in the product.  And by

9    selling a product that -- we saw the pictures of Hashlets, what

10   they were, the little "Here Comes the Hashlet," that kind of

11   thing, that that was simply -- that was what was being

12   conveyed.  Whether there was a particular statement that they

13   could put their finger on, they don't need to do that, at least

14   under the federal securities.  They don't even need to do it

15   under the state, which has omissions.

16        So I don't agree that the only way they can do this,

17   even in light of the evidence presented, was by pointing to a

18   statement.  I don't think that's right.  I part ways from you

19   on that.

20        So let me ask you this:  Assuming I part ways with you

21   on that, which I do, do you want me -- since I'm not going to

22   give the particular question that you want, do you want me to

23   ask this jury to determine, in the place that you indicated:

24   If you find that GAW Miners committed a fraud, or just say

25   committed fraud, concerning whether GAW Miners had sufficient

1   mining power to support the Hashlets sold, identify the first

2   date on which the fraud was committed?

3          MR. WEINSTEIN:  Yes, that's fine, Your Honor.

4          MR. BUCHDAHL:  Your Honor, what we would request is

5   that the description be:  If you believe that GAW Miners

6   committed fraud, with regard to Hashlets, comma, identify the

7   first statement.  I think that is the fairest characterization

8   because it doesn't kind of cabin the Plaintiffs' allegations to

9   a specific statement.

10          THE COURT:  Okay.  I will do that.  I will make it

11   more general.

12          So what we'll say is after -- just to be clear, on the

13   Verdict Form, after Section 4 -- we have to change the charge

14   now because we said five sections.  Now it's going to be six.

15          After Section 4, comma, Fraud, we'll have a Section 5.

16   It says, if -- it's going to say:  If you found that GAW Miners

17   committed fraud concerning Hashlets, identify the first date on

18   which you find that fraud was committed.

19          And we will call that "Date Concerning Hashlets."

20   That's what the heading will be.

21          MR. WEINSTEIN:  Your Honor, I'll ask two cents on

22   that.  That seems to be putting it as a general concept of

23   fraud.  That is not really the case here.

24          THE COURT:  Okay.  You've been heard on that, but

25   that's what I'm going to do.  Okay.

1          That's all I have.  So we'll go ahead.  We need a

2     little time to quality check everything and adapt the

3     instructions and the Verdict Form.

4          You folks are going to confer about Eden.  Yes?

5          MR. BUCHDAHL:  Your Honor, we will confer; but I don't

6     expect we're going to agree.

7          THE COURT:  Oh, okay.  What do you expect you're not

8     going to agree on?

9          MR. BUCHDAHL:  I don't think that we're going to agree

10    that they should be permitted.

11         THE COURT:  To withdraw even there?

12         MR. BUCHDAHL:  To pull back what they gave us on

13    Tuesday night.  Because, again, part of what she was talking --

14    look, we have this whole conversation about HashStakers and

15    what the security is.  Eden is talking about HashStakers.  You

16    know, there's part of that testimony that, before we call Mr.

17    Pfeiffer and ask him questions about what he knows about this,

18    we thought we knew what the testimony was for the rest of the

19    case.  And the reason we thought that is because the Court's

20    instructions were that this all had to be ironed out by 5:00

21    p.m. the prior night.

22         And respectfully, I don't think it's true that they

23    had a video that had additional material that they even needed

24    to stop it, because I'm informed by Mr. Boles that the length

25    of time --

1          THE COURT:  There's no point in getting into whether

2     it was a technical dispute or not.  The only issue should be

3     whether they should be allowed to withdraw their own

4     designations.  The hard part, of course, of this is that if

5     witnesses were here live, we wouldn't have any of these

6     problems; right?  Because you'd know what the testimony was or

7     you wouldn't be able to -- he actually wouldn't be able to

8     frame Mr. Pfeiffer's testimony based on what you thought some

9     other witness was going to say.

10          That said, they have a right to adapt their case as it

11     goes along too.  So I'm -- I don't think I can prevent them

12     from withdrawing parts of their case and say, oh -- it would

13     sort of be like forcing them to introduce an exhibit.

14          MR. BUCHDAHL:  That's --

15          MR. WEINSTEIN:  He could have put on Mr. Pfeiffer and

16     then rested and we could have said, you know, we rest.

17          MR. BUCHDAHL:  Your Honor, we're entitled to rebuttal

18     testimony, and I think in rebuttal we would like to play

19     certain -- because you're right --

20          THE COURT:  I think the time for me to address

21     rebuttal is after I've heard the evidence.  Believe me, I don't

22     want to take lots of more breaks, but I think it's premature.

23          MR. BUCHDAHL:  I think very specifically given the

24     testimony that they introduced by Mr. Capuano and are now

25     relying on and making arguments to the Court about that they

1    had some mining power, we are definitely going to designate in

2    rebuttal Ms. Eden's testimony that she -- the machines were

3    unplugged; right?  That seems like just an obvious fair

4    rebuttal.  We can do this the easy way or the hard way.

5            THE COURT:  What about that?

6            MR. WEINSTEIN:  What about it is they think they have

7    a hole in their case and they're trying to even use the defense

8    case to fill it in rebuttal.  They should have known this ahead

9    of time.

10           THE COURT:  No.  The way rebuttal is you react to what

11   the defense does.  So you don't know exactly what the defense

12   is going to do until the defense does it.  And so the Court, of

13   course, has discretion.  It doesn't seem like outrageous

14   rebuttal testimony.

15           MR. WEINSTEIN:  Again, Your Honor, we could have made

16   this argument that they have a hole in their case by resting

17   without putting anything on.  They don't get rebuttal.  They

18   just feel like they have a hole and they're trying to back-fill

19   it.  Their time for presenting their case and proving their

20   case is over.

21           THE COURT:  Well, unless I allow them to have

22   rebuttal, so it sort of begs the question.  I mean, they

23   have -- nobody has a right to put on rebuttal.  The Court has

24   discretion to allow rebuttal.  This -- I mean, my own rules

25   about rebuttal are keep it really short and, um, it needs to

```
 1   respond to something in the defense case.  And if it's simply
 2   more of the same that you already put on, then it wouldn't be
 3   allowed.  We certainly don't allow it in every case.  But it
 4   seems like a fairly narrow request here.
 5            And there was some -- I recognize the whole situation
 6   with designating deposition testimony.  Let's be honest, it's a
 7   pain.  It's ambiguous because, okay, people think it's done.
 8   Shea's ruled on the designations.  We know we're locked in.
 9   Then people start withdrawing things, which, as I said, you
10   have some right to do.  You have a right to react as well.
11            But I'm wondering why the request for rebuttal isn't,
12   in this particular -- as I understand it, the request for
13   rebuttal is here, look, they're going to argue there was some
14   mining power at some point.  You know, Eden's testimony, which
15   we thought was going to be in, because they designated it,
16   weighed against that.  They're pulling it, fine.  But we'd like
17   to put it on in rebuttal.  It doesn't seem unreasonable to me.
18            MR. WEINSTEIN:  Well, first of all, Eden's testimony
19   is the second time she went down to the warehouse, she figured
20   something out, and she doesn't know if that's sometime between
21   September and November.  So -- which gets to this issue of when
22   was there an actual misstatement?  That's sort of the point.
23   But ...
24            THE COURT:  Okay.  But you folks can argue about what
25   her testimony means to the jury.  That's not for me to decide.
```

1          MR. BUCHDAHL:  In terms of our request, our request is
2    play the tape as it was disclosed on Tuesday night and we have
3    no need to ask the Court for rebuttal, that it would all just
4    be part of the tape.
5          THE COURT:  Is this the only substantive issue though?
6          MR. BUCHDAHL:  In what sense?
7          THE COURT:  In other words, the issue of basically you
8    want the testimony about her saying, I went down there the
9    second time and --
10         MR. BUCHDAHL:  And we want the part about HashStakers.
11   We just want everything that was in the Tuesday --
12         THE COURT:  But tell me what the other substantive
13   pieces are.
14         MR. BUCHDAHL:  Your Honor, I wish --
15         THE COURT:  What's the HashStakers piece?
16         MR. BUCHDAHL:  The HashStakers is that she's
17   explaining why that -- so basically at a high level, she pulls
18   back the curtain from the case and says, It was -- basically
19   none of it was real.  Like, we didn't really have anything
20   going.  The Hashlets, we just kind of threw some Bitcoins at
21   them, and it didn't really relate to any particular mining
22   power.
23         The HashStakers, which were those certificates of
24   deposit for Paycoin, we just kind of figured out what to give
25   them, but it was -- none of this was connected to reality was

1    her point.  It was all basically just a show for the customers,

2    and it was -- I mean, she uses terms like all you were really

3    buying was a JPEG, like you didn't really have more of that,

4    and we just kind of back-filled it in.

5           So the notion that what is emerging, which I did not

6    expect, was emerging in the Defense case was, well, it was kind

7    of real, it wasn't always a fraud, that's not consistent with

8    our theory of the case.  Our theory of the case was this is

9    nonsense and everybody knew or should have known it was

10   nonsense.  And Eden, I think, really goes to show that.

11          THE COURT:  You would think you would have designated

12   that.

13          MR. BUCHDAHL:  So we did originally, and then we

14   withdrew it based on -- because we did not think this was in

15   dispute.  We did not foresee that the defense here was going to

16   be this was not actually a fraud for some unspecified period of

17   time.  That's new to me.  That was not in the opening.

18          THE COURT:  Even though Capuano's testimony had been

19   designated?

20          MR. BUCHDAHL:  Capuano's testimony had been

21   designated, but Capuano -- that's not what I understood the

22   gravamen of Eric Capuano's testimony to be or what the purpose

23   that they were introducing it.  I just didn't see that.  But

24   having said that, this is what I would like to do in rebuttal.

25          THE COURT:  Okay, Mr. Weinstein, you get the last

1   word.

2           MR. WEINSTEIN:  I think it's as Your Honor noted.

3   They had Capuano's designations in advance.  The fact they

4   would like to know what our arguments would be at the end of

5   the day and then reacted to that in order to designate their

6   case, that's their move.

7           THE COURT:  I'm afraid we're going to have to do this

8   the hard way.  So you pull what you want to pull, and I will

9   deal with the rebuttal.

10          I will say right now I'm inclined to allow rebuttal on

11  the first point, on the plugs coming out, because that seems to

12  go right against the point you're making.  I'm a little less

13  certain about the HashStakers, but we'll deal with that --

14  we'll have argument on it later.  Sorry, we're going to have to

15  handle it that way.  We're done.  Thank you.

16      (Recess from 9:44 a.m. to 10:01 a.m.)

17      (The jury entered the courtroom at 10:03 a.m.)

18          THE COURT:  So we're going to continue now with the

19  testimony of witness Eden.

20      (Plays video deposition of Madeline Eden.)

21          MR. WEINSTEIN:  Your Honor, that concludes Ms. Eden's

22  testimony.

23          THE COURT:  That concludes the testimony?

24          MR. WEINSTEIN:  Yes, Your Honor.

25          THE COURT:  Back to Mr. Mordica then?

1          MR. WEINSTEIN:  Yes.  Just before we start or resume

2   Mr. Mordica's testimony, there's one exhibit that comes up.

3   It's Defense Exhibit 591.  Your Honor ruled on objections.

4          THE COURT:  Okay.  DX 591, is that the number?

5          MR. WEINSTEIN:  Yes, Your Honor.

6          THE COURT:  That will be a full exhibit.  You can show

7   the jury at the relevant time.

8      (Defendant's Exhibit 591, received in evidence.)

9      (Plays video deposition of Joseph Mordica)

10         THE COURT:  You're having some issues over there?

11         MR. WEINSTEIN:  Yeah, it looks like the video froze,

12  Your Honor.

13     (Plays video deposition of Joseph Mordica.)

14         MR. WEINSTEIN:  Your Honor, we think we may need to

15  restart the computer.

16         THE COURT:  All right.  That's going to take how long?

17         MR. WEINSTEIN:  Two minutes, Your Honor.

18         THE COURT:  All right.  Go ahead.

19         MR. WEINSTEIN:  The good news is it's the last one.

20         THE COURT:  Good.

21     (Pause.)

22     (Plays video deposition of Joe Mordica.)

23         MR. WEINSTEIN:  Your Honor, can we just take it down

24  from the screens for a moment?

25         THE COURT:  Yes, absolutely.  Please do that.

1        (Pause.)

2        (Plays video deposition of Joe Mordica.)

3              THE COURT:  Maybe you need more time to sort this out?

4              MR. WEINSTEIN:  Yeah, we're going to see if we can

5     transfer to Mr. Boles.

6              MR. ARD:  Yes, of course, Your Honor.

7              THE COURT:  Are you ready to go?

8              MR. ARD:  No.  We offered if they want to send it to

9     him.

10             THE COURT:  So that will take how long to transfer it

11    over?  I don't want to leave the jurors here, if we need five,

12    ten minutes.  Are we ready to go?

13             MR. BUCHDAHL:  Five-, ten-minute break.

14             THE COURT:  Fine.  We're going to take a break.

15             Don't discuss the case.  Don't let anyone discuss it

16    with you.  Keep an open mind.  If you can go to the room next

17    door.

18        (The jury left the courtroom at 10:26 a.m.)

19             THE COURT:  All right, folks, so let's have this

20    transferred.  Let's test it, run it out, test it.  Let's not

21    have this again.  We'll be in recess.  Ten minutes.

22             MR. ARD:  Thank you, Your Honor.

23        (Recess from 10:27 a.m. to 10:42 a.m.)

24             MR. BUCHDAHL:  May I hand up the 3 minutes, 41 seconds

25    of rebuttal testimony?

```
1              THE COURT:  Sure, yes.  And are we ready with the
2    video?  Let's get the jurors.
3              MR. BUCHDAHL:  We tested it and everything.
4              THE COURT:  Okay, great.  Thank you.
5         (The jury entered the courtroom at 10:44 a.m.)
6              THE COURT:  Welcome back, folks.  Thank you for your
7    patience.  We think we have it fixed.  All right.  Please take
8    your seats, and let's continue with the playing of the
9    deposition of Mr. Mordica.
10        (Plays video deposition of Joseph Mordica.)
11             THE COURT:  Mr. Weinstein?
12             MR. WEINSTEIN:  Yes, Your Honor.  That concludes Mr.
13   Mordica's testimony.
14             THE COURT:  Okay.
15             MR. WEINSTEIN:  Before we conclude, Your Honor, we
16   were going to offer for identification purposes certain
17   transcripts.  Would you like us to do that now?
18             THE COURT:  I don't know that it's necessary to do
19   that now.
20             MR. WEINSTEIN:  Fine.
21             THE COURT:  That's for other purposes we discussed.
22             MR. WEINSTEIN:  Defense rests, Your Honor.
23                            DEFENSE RESTS
24             THE COURT:  All right.  So we did have a discussion
25   earlier.  Based on our discussion, based on what was presented
```

1    to me as the only rebuttal evidence, I am going to allow very

2    limited rebuttal evidence which concerns witness Eden, Madeline

3    Eden, who you saw testifying.  So we can play that now.

4          MR. BUCHDAHL:  Thank you, Your Honor.

5                  PLAINTIFFS' REBUTTAL TESTIMONY

6       (Plays video deposition of Madeline Eden.)

7          MR. BUCHDAHL:  Plaintiffs rest their rebuttal case,

8    Your Honor.

9                  PLAINTIFFS REST REBUTTAL

10         THE COURT:  All right, very well.  So, Ladies and

11   Gentlemen, that concludes the presentation of the evidence in

12   the case.  The next phase of the case is for me to instruct you

13   on the law.  I'm about ready to do that, but we need to make

14   some copies and things and the like.

15         So here's what we're going to do:  We're going to take

16   an early lunch break.  It's 11:36 now.  So we'll take -- let's

17   see, why don't we plan to be back in your chairs at 12:20.  So

18   it's about a 44-minute lunch break.

19         And so we'll have you back in the room next door at

20   12:15.  We'll start the charge at 12:20.  It will take

21   probably -- I'm just going to give you an estimate.  It will

22   probably take me an hour and a half to go through the charge

23   with you, or that portion of the charge.

24         And then what we're going to do is we're going to let

25   you go for the day after that.  And the reason for that is I

1    want the lawyers to be able to give you their closing arguments

2    at the same time.  I don't want one to go and then you to go

3    overnight and then another to go.  So then we'll have closing

4    arguments in the morning tomorrow, and then you're going to get

5    the case.  So that's how we'll handle it.

6          I know the evidence is all in.  You still cannot

7    discuss it.  You can't let anyone discuss it with you.  You

8    can't communicate about it.  You can't do any research,

9    anything like that.  You can't even discuss it with each other

10   yet, and that's because you haven't heard my instructions on

11   the law yet.  You haven't heard the parties' closing arguments

12   yet.  So refrain from discussing anything until I instruct you

13   to do so.

14         Thank you very much for your attention.  We'll have

15   you back in the courtroom at 12:20.  Thank you very much.

16       (The jury left the courtroom at 11:37 a.m.)

17         THE COURT:  Folks can be seated.

18         All right, Mr. Weinstein, did you want to re-offer for

19   the record the ID exhibit numbers?

20         MR. WEINSTEIN:  Yes, Your Honor.

21         THE COURT:  Okay.

22         MR. WEINSTEIN:  So the ID, it would be DX 742 for Eric

23   Capuano's testimony.

24         THE COURT:  So that will be DX 742 for identification,

25   that will be Mr. Capuano's deposition.  And that's the portions

1    that were read, obviously, to the jury.

2              MR. WEINSTEIN:  Correct.

3              THE COURT:  Okay.

4              MR. WEINSTEIN:  DX 743 for identification for Amber

5    Capuano's testimony played in court.

6              THE COURT:  Very well.  Thank you.

7              MR. WEINSTEIN:  DX 744 for identification for Jonah

8    Dorman's testimony played in court.

9              THE COURT:  Mr. Dorman, yes.

10             MR. WEINSTEIN:  DX 745 for identification for Madeline

11   Eden's testimony played in court.

12             THE COURT:  Okay.  And that will include all of it,

13   including the rebuttal?  We're not going to separate it out?

14             MR. WEINSTEIN:  That's fine.

15             THE COURT:  Okay, that's fine, for all of each

16   witness.  What's next?

17             MR. WEINSTEIN:  DX 746 for identification for Dan

18   Pease's testimony played in court.  Finally DX 747 for

19   identification for Joe Mordica's testimony played in court.

20             THE COURT:  Okay.  So as I understand it, each of

21   these exhibits will include all of the testimony that was

22   played in court, designations, counter-designations, including

23   the rebuttal testimony for each of these witnesses.

24             MR. WEINSTEIN:  Correct.

25             MR. BUCHDAHL:  Your Honor?  I think it might make

1   sense for us to mark Eden's rebuttal testimony separately just
2   because there was an argument about it.
3           THE COURT:  That's fine.  We can do that.  So what
4   number would you like?
5           MR. BUCHDAHL:  So Plaintiffs' Exhibit 203 will be a
6   transcript of Josh Garza's testimony as played.
7           THE COURT:  Right, Garza.
8           MR. BUCHDAHL:  And then Plaintiffs' Exhibit 204 I
9   think it makes sense for the record to mark that, those two
10  pages that we played in rebuttal for Ms. Eden.  I think if the
11  jury were to request Ms. Eden's testimony, it would make sense
12  to play back both.  But it -- I think for the record, it makes
13  sense to mark it separately.
14          THE COURT:  Fine.  I don't have a problem with that.
15  Just for the record, Plaintiffs 203 for ID will be the entirety
16  of Mr. Garza's testimony.
17          MR. BUCHDAHL:  As played.
18          THE COURT:  As played, right.  PX 204 will be just the
19  rebuttal portion of Eden's testimony, PX 204 for ID.
20          MR. BUCHDAHL:  Yes, Your Honor.
21          THE COURT:  Very well.  Very well.  We'll be in
22  recess.  We'll see everybody in the courtroom at 12:15.
23      (A luncheon recess was taken from 11:41 a.m. to 12:27 p.m.)
24      (The jury entered the courtroom at 12:29 p.m.)
25          THE COURT:  So, Members of the Jury, you have now

1   heard all of the evidence in this case.  I shall now instruct

2   you concerning the law applicable to the case.  After that, you

3   will hear the arguments of counsel and then I will give you

4   some final instructions.  You will then return to the jury room

5   to deliberate in accordance with these instructions.  Before I

6   give you these instructions, however, I want to again express

7   my thanks to you for the time and energy you have devoted to

8   this trial.  Jury service is rarely convenient, but without

9   you, justice could not be done in this case.

10          It will take some time for me to read these

11   instructions to you.  But it is important that you listen

12   carefully and pay close attention.  You have been provided with

13   a copy so that you can read along as we go.  I'm currently on

14   page 4.

15          My instructions will be in three parts:  first, I will

16   discuss general rules concerning the role of the court and the

17   duty of the jury; second, I will go over the issues in this

18   case and set out the specific elements that you must find based

19   on the evidence at trial; and third, I will give you some rules

20   for your deliberations.  The third part I will do tomorrow

21   after the closing arguments.

22          After I have given these instructions, you will go

23   back into the jury room to deliberate.  You will have with you

24   the following:  the original Verdict Form (all of your

25   individual copies will be collected before you deliberate), the

1  original exhibits, your individual copies of these instructions

2  and any personal notes that you may have taken.  At the

3  conclusion of your deliberations, you will use the Verdict Form

4  to report your verdict to the Court and the parties.

5        As judge, I perform basically two functions during the

6  trial.  First, I decide what evidence you may consider.  You

7  have heard me doing that throughout the trial.  Second, I

8  instruct you on the law that you are to apply to the facts in

9  this case.  I gave you some preliminary instructions before

10  trial began, but it is now -- at the close of evidence -- that

11  the final instructions governing your deliberations are given,

12  so please be patient and listen closely.  I believe that

13  everything I am going to tell you is consistent with the

14  preliminary instructions I gave you at the start of the trial,

15  but if you have any doubt, you should not rely on anything

16  different I may have said in the preliminary instructions.  The

17  instructions I am now giving you must guide your deliberations

18  in this case.

19        It is your duty to take the law as I will give it to

20  you and to apply it to the facts as you determine them.  You

21  must take the law as I give it to you; and if any attorney or

22  any witness or exhibit has stated a legal principle different

23  from any that I state to you in my instructions, it is my

24  instructions that you must follow.  Also, you must not

25  substitute your own notions or opinions of what the law is or

1    ought to be for what I tell you the law is in my instructions.

2          I may repeat certain parts of these instructions.

3    That does not mean that those parts should be emphasized.  You

4    should not single out any one part of my instructions and

5    ignore the rest.  Instead, you should consider all of the

6    instructions as a whole and consider each instruction in light

7    of all the others.

8          The order in which I give you instructions does not

9    indicate their relative importance.  Do not read into these

10    instructions, or into anything I have said or done, as any

11    suggestion from me about what verdict you should return -- that

12    is a matter for you alone to decide.

13          I should also point out to you that, although you have

14    been given a copy of the instructions to follow as I deliver

15    them, if I say aloud anything at all different from what is

16    written, you must follow what I say here in court.

17          Regardless of your ultimate decision about the

18    parties' claims, all parties in this case are entitled to a

19    full and fair hearing.  The parties are entitled to a trial

20    free from prejudice or bias.  Our justice system cannot work

21    unless you reach your verdict through a fair and impartial

22    consideration of the evidence, regardless of the final outcome

23    of the case.

24          It is your duty, therefore, to give careful thought to

25    every issue set forth by these instructions, regardless of any

1   general feeling that you may have about which party is right.

2   In deciding the facts or applying the law as I have given it to

3   you, you must not be swayed by bias or prejudice for or against

4   any party.  You must not be swayed by your personal opinions

5   about any of the issues raised in this trial.  You should not

6   be swayed by sympathy.  You should be guided solely by the

7   evidence presented during trial and the law that I give you,

8   without regard to the consequences of your verdict.  If you let

9   your sympathy for one side or another interfere with your clear

10   thinking, there is a risk that you will not arrive at a just

11   verdict.

12        Our courts operate under an adversary system in which

13   we believe that the truth will emerge through the competing

14   presentations of adverse parties.  It is the role of the

15   attorneys to press as hard as they can for their respective

16   positions.  In fulfilling that role, they have not only the

17   right, but the obligation to make objections to the

18   introduction of evidence they feel is improper.  You should not

19   show any prejudice against an attorney or his or her client

20   because the attorney objected to the admission of evidence or

21   the phrasing of a question, or asked the Court to rule on an

22   objection or the propriety of a question.  The application of

23   the rules of evidence is not always clear, and lawyers often

24   disagree about them.  It has been my job as the judge to

25   resolve these disputes during the course of the trial.

1          It is important for you to realize, however, that my

2     rulings on evidentiary matters have nothing to do with the

3     ultimate merits of the case and are not to be considered as

4     points scored for one side or the other.  You are not to

5     consider why a lawyer made an objection or why I ruled on it in

6     the manner that I did.  You should draw no inference from the

7     fact that a lawyer objected to evidence.  Nor should you draw

8     any inference from the fact that I might have sustained or

9     overruled an objection.  My rulings on objections have nothing

10    to do with the merits of the case or with the credibility of

11    the witnesses.

12          If I have sustained an objection to a question asked

13    of a witness, you must disregard the question entirely and may

14    draw no inference from the question, nor speculate about what

15    the witness would have said if he or she had been permitted to

16    answer the question.  If I have stricken or told you to

17    disregard or ignore an answer, you must not rely on that

18    answer, because it is not evidence.  If I have given you a

19    limiting instruction that certain evidence was to be considered

20    by you for a limited purpose only, then you must follow that

21    limiting instruction and use the evidence only for the limited

22    purpose for which it was admitted.

23          For example, I instructed you during the trial and

24    instruct you now again as follows:

25          You heard evidence about the acquisition of ZenMiner

by GAW Miners and the involvement of Mr. Fraser's son, Thomas

Fraser, in that matter.  You may consider that evidence only

for the limited purpose of deciding what, if any, control

Stuart Fraser had over GAW Miners and ZenMiner and what, if

anything, Stuart Fraser knew about Mr. Garza's activities.  You

may not consider that evidence for any other purpose.  I remind

you that Stuart Fraser is not on trial for what his son might

have said or done.  I also instruct you that the statements

made in relation to the acquisition of ZenMiner by GAW Miners

are not the false statements the Plaintiffs allege they relied

on when merchandising the products at issue in this case, that

is, Hashlets, Hashpoints, HashStakers, and Paycoin.

You heard evidence about an agreement between the

Plaintiffs and Mr. Garza.  You may consider that agreement only

for the limited purpose of deciding Mr. Garza's credibility and

understanding the sequence of events between the Plaintiffs'

original Complaint and their Amended Complaint.  You may not

consider the agreement for any other purpose.  In particular,

you may not consider the terms of the agreement or the fact

that Mr. Garza was once but is no longer a defendant in

deciding on the liability of Mr. Fraser.  Finally, when

considering how the agreement affects Mr. Garza's credibility,

if at all, you must keep in mind that the agreement states in

effect that the Plaintiffs may reinstate their claims against

Mr. Garza only if the Court decides that he has breached the

1    agreement or made a materially false or misleading statement in

2    the agreement.

3         One further note about attorneys:  During the course

4    of the trial -- or of a trial, one cannot help but recognize

5    the various personalities and styles of the attorneys.  But it

6    is important for you as jurors to recognize that this is not a

7    contest between attorneys.  Whatever you may think about the

8    conduct of the lawyers during this trial, you must remember

9    that this dispute is about the parties, not the lawyers, and

10   you must decide this case solely on the basis of the evidence.

11   Remember, statements and characterizations of the evidence by

12   the attorneys are not evidence.  Insofar as you find their

13   closing arguments to be helpful, take advantage of them, but it

14   is your memory and your evaluation of the evidence and my

15   instructions on the law that count in this case.

16        As members of the jury, you are the sole and exclusive

17   judges of the facts.  You pass upon the evidence.  You

18   determine the credibility of witnesses.  You resolve any

19   conflicts that may exist in the testimony.  You draw whatever

20   reasonable inferences you decide should be drawn from the facts

21   you determine, and you weigh the evidence.  No one may invade

22   your province or function as jurors.  Because you are the sole

23   and exclusive judges of the facts, I do not mean to indicate,

24   in this charge or at any time during the trial, any opinion as

25   to the facts or as to what your verdict should be.  The rulings

1    I have made during the trial are not any indication of a view

2    of what your decision should be or which party should prevail

3    in this case, because I have no view on those matters.

4           In order for you to determine the facts, you must rely

5    upon your own recollection of the evidence.  In reaching a

6    verdict, you must carefully and impartially consider all of the

7    evidence in the case and then apply the law as I have explained

8    it to you.  Regardless of any opinion you may have as to what

9    the law is or ought to be, it would be a violation of your

10   sworn duty to base a verdict upon any understanding or

11   interpretation of the law other than the one I give you.

12          The verdict you reach must be unanimous, that is,

13   agreed upon by each of you.  Each of you must decide the case

14   for yourself, but do so only after impartial consideration of

15   the evidence in the case with your fellow jurors.

16          Throughout the remainder of my instructions to you, I

17   will use the word "prove" when talking about what the

18   Plaintiffs must do in order to establish the liability of the

19   Defendant and what the Defendant must do to establish his

20   affirmative defenses, as I will explain later.  Unless I

21   instruct you otherwise, and for one of the claims I will

22   instruct you otherwise, my use of the word "prove" means "prove

23   by the preponderance of the evidence," even if I do not always

24   repeat those words.  Similarly, when I speak of your "finding"

25   various facts, you must find those facts to have been proven by

1    the preponderance of the evidence, even if I simply use the

2    word "find."  Likewise, I will speak of the parties

3    "establishing" various facts.  Even if I simply use the word

4    "establish," you must find that fact has been established by

5    the preponderance of the evidence.

6         Because this is a civil case, the Plaintiffs have the

7    burden of proving every disputed element of their claims by a

8    preponderance of the evidence.  There is one claim that the

9    Plaintiffs must prove by a different standard -- called "clear

10   and convincing evidence" -- about which I will instruct you

11   later; but all other claims in this case must be proved by a

12   preponderance of the evidence.

13        To establish a fact by a preponderance of the

14   evidence, the Plaintiffs must prove that the fact is more

15   likely true than not true.  In other words, if you find that

16   the credible evidence on a given issue either favors the

17   Defendant or is evenly divided between the Plaintiffs and the

18   Defendant, then you must decide that issue for the Defendant.

19   However, if the Plaintiffs prove that a fact is more likely

20   true than not, even if only slightly more true than not, then

21   you are to find that they have proven the fact by a

22   preponderance of the evidence.

23        It might be helpful to visualize a pair of scales.

24   Imagine that you put on one scale the evidence you find

25   credible, relevant and supportive of the Plaintiffs on a

 1    particular issue on which they bear the burden of proof, and
 2    place on the other scale the evidence you find credible,
 3    relevant and supportive of the Defendant.  If the scales tip in
 4    favor of the Defendant on that issue, even a little bit, or if
 5    the scales are evenly balanced, the Plaintiffs have not
 6    sustained their burden of proof on the issue.  But if the
 7    scales tip in favor of the Plaintiffs on that issue, even a
 8    little bit, then on that issue they will have sustained their
 9    burden of proof.

10         In determining whether a claim has been proven by a
11    preponderance of the evidence, you may consider the testimony
12    of all witnesses, regardless of who may have called them, and
13    all the exhibits received in evidence, regardless of who may
14    have presented them.  You may not speculate or guess.  A
15    preponderance of the evidence means the greater weight of the
16    evidence; it refers to the quality and persuasiveness of the
17    evidence, not the number of witnesses or exhibits.

18         In addition to denying the Plaintiffs' claims, the
19    Defendant has alleged what are called affirmative defenses,
20    which are a set of facts that, if proven, would mean that the
21    Defendant is not liable to the Plaintiffs even if the
22    Plaintiffs prove the elements of their claims.  The burden of
23    proving each affirmative defense rests on the Defendant.  The
24    Defendant must prove each element of each affirmative defense
25    by a preponderance of the evidence.  I will instruct you more

1    regarding the affirmative defenses later.

2           Some of you may have heard of proof beyond a

3    reasonable doubt, which is the proper standard of proof in a

4    criminal trial.  That requirement does not apply to a civil

5    case such as this, and you should not consider or discuss that

6    standard in your deliberations.

7           Next, I want to discuss with you generally what we

8    mean by evidence and how you should consider it.  The evidence

9    from which you are to decide what the facts are comes in one of

10   two forms:

11          First, there is the sworn testimony of witnesses, both

12   on direct examination and cross-examination, and regardless of

13   who called the witness.

14          Second, there are the exhibits that have been received

15   into the trial record.  All of the exhibits that have been

16   admitted into evidence will be with you in the jury room.  If

17   an exhibit has been admitted into evidence, it is evidence that

18   can be considered by you regardless of whether any witness

19   referred to the exhibit or testified about it during the trial.

20          One word about the exhibits that you will have in the

21   jury room.  You may notice that certain exhibit numbers have

22   not been used.  For example, you may find Exhibit No. 5 and No.

23   7 but not find No. 6.  Please do not be concerned about the

24   numerical sequencing of exhibits and do not think that an

25   exhibit is missing.  The reason for what would otherwise seem

1    like gaps is that we assigned all of the potential trial

2    exhibits numbers long before trial, and then before or during

3    trial, counsel decided not to introduce certain exhibits or

4    certain exhibits were simply marked for identification purposes

5    and then not made full exhibits.  We have checked the exhibits

6    and made sure that you will have all of the exhibits that you

7    should have, so once again do not pay any attention to the

8    numbering or sequencing of the exhibits.

9          You will see that on some of the parties' exhibits,

10   text or other information has been blacked out.  Those

11   redactions were ordered by me so that the exhibits would not

12   contain irrelevant evidence that has no bearing on the issues

13   you are to decide.  Neither the Plaintiffs, nor the Defendant,

14   nor their lawyers, chose what information to redact.  You

15   should not speculate about what the redacted information might

16   be or what meaning it may at one time have had.  The fact that

17   redactions were made, and speculation about the redacted

18   information, must play no role in your deliberations.

19         It is the witnesses' answers, and not the lawyers'

20   questions, that are evidence.  At times, a lawyer may have

21   incorporated into a question a statement that assumed certain

22   facts to be true and asked the witness if the statement was

23   true.  If the witness denied the truth of a statement, and

24   there is no evidence in the record proving that assumed fact to

25   be true, then you may not consider it to be true simply because

the assumed fact was contained in the lawyer's question.
Testimony that I have ordered stricken, testimony that I have
instructed you to disregard or ignore, and testimony that I
have excluded are not evidence and may not be considered by you
in rendering your verdict.

What the lawyers say in their opening statements and
closing arguments, in their comments, objections, and even in
their questions is not evidence.  What they say in their
closing arguments is intended to help you understand the
evidence and to reach your verdict.  However, if your
recollection of the facts differs from the lawyers' statements,
you should rely on your memory.

Moreover, what I may have said during the trial or
what I may say in these instructions is not evidence, and my
rulings on the admissibility of evidence do not indicate any
opinion about the weight or effect of such evidence.

It is for you -- and you alone -- to decide the
weight, if any, to be given to the testimony you have heard and
to the exhibits you have seen.

There are two types of evidence that you may properly
use in reaching your verdict.  One type of evidence is direct
evidence.  Direct evidence includes a witness's testimony about
something the witness knows by virtue of his or her own
senses -- something he or she has seen, felt, touched or heard.
For example, if a witness testified that when she left her

1    house this morning, it was raining, that would be direct

2    evidence about the weather.

3           Circumstantial evidence is evidence that tends to

4    prove a disputed fact by proof of other facts.  For example,

5    assume that when you came into the courthouse this morning the

6    sun was shining and it was a nice day.  Also assume that as you

7    were sitting here, someone walked in with an umbrella that was

8    dripping wet.  Then a few minutes later another person also

9    entered with a wet umbrella.  Now, you cannot look outside of

10   the courtroom and you cannot see whether or not it is raining,

11   so you have no direct evidence of that fact.  But on the

12   combination of facts that I asked you to assume, it would be

13   reasonable and logical for you to infer that it had been

14   raining.

15          That is all there is to circumstantial evidence.  On

16   the basis of your reason, experience, and common sense, you

17   infer from one established fact the existence or nonexistence

18   of some other fact.

19          Circumstantial evidence is of no less value than

20   direct evidence.  It is a general rule that the law makes no

21   distinction between direct and circumstantial evidence but

22   simply requires that your verdict be based on a preponderance

23   of all of the evidence presented.

24          During the trial you may have heard the attorneys use

25   the term "inference"; and in their arguments, they may ask you

1   to infer, on the basis of your reason, experience and common

2   sense, from one or more established facts, the existence of

3   some other fact.

4        An inference is not a suspicion or a guess.  It is a

5   reasoned, logical conclusion that a disputed fact exists

6   because another fact has been shown to exist.

7        There are times when different inferences may be drawn

8   from the same facts, whether proven by direct or circumstantial

9   evidence.  One party may ask you to draw one set of inferences,

10  while the other party asks you to draw another.  It is for you,

11  and you alone, to decide which inferences you will draw.

12       The process of drawing inferences from facts in

13  evidence is not a matter of guesswork or speculation.  An

14  inference is a deduction or conclusion that you are permitted,

15  but not required, to draw from the facts that have been

16  established by either direct or circumstantial evidence.  In

17  drawing inferences, you should use your common sense.  The mere

18  process of drawing an inference from the evidence does not

19  change the burden of proof, which remains with the Plaintiffs

20  throughout the case.  Finally, you may not draw any inferences

21  from the mere fact that the Plaintiffs filed this lawsuit or

22  that the Defendant has chosen to defend it.

23       You have had the opportunity to observe all of the

24  witnesses.  It is now your job to decide how believable each

25  witness was in his or her testimony.  You are the sole judges

1    of the credibility of each witness and of the importance of his

2    or her testimony.

3        In making these judgments, you should carefully

4    scrutinize all of the testimony of each witness, the

5    circumstances under which each witness testified, and any other

6    matter in evidence that may help you decide the truth and the

7    importance of each witness's testimony.

8        How do you determine truthfulness?  You base it on

9    what you have seen and heard.  You watched the witness testify.

10   Everything a witness said or did while testifying counts in

11   your determination.  How did the witness impress you?  Was he

12   or she frank, forthright and candid, or evasive and edgy as if

13   hiding something?  How did the witness appear?  What was his or

14   her demeanor -- that is, his or her behavior, manner, and

15   appearance while testifying?  Often it is not what a person

16   says but how he or she says it that convinces us.

17       You should use all the tests for truthfulness that you

18   would use in determining matters of credibility in your

19   everyday lives.  You should consider any bias or hostility the

20   witness may have shown for or against any party, as well as any

21   interest the witness has in the outcome of the case.  You

22   should consider the opportunity the witness had to see, hear,

23   and know the things about which he or she testified; the

24   accuracy of the witness's memory, the witness's candor or lack

25   of candor and intelligence; the reasonableness and probability

of the witness's testimony; its consistency or lack of consistency; and its corroboration or lack of corroboration with other credible evidence.

Always remember that in assessing any witness's testimony, you should use your common sense, your good judgment, and your own life experience.

A witness may be discredited or impeached by contradictory evidence, by a showing that the witness testified falsely about a material matter, by evidence that the witness has been convicted of a felony, or by evidence that at some other time the witness said or did something inconsistent with the witness's present testimony.  A felony is a crime punishable by more than one year in prison.  It is your exclusive province to give the testimony of each witness such credibility or weight, if any, as you think it deserves.

If you find that a witness testified untruthfully in some respect, you may consider that fact in deciding the weight you will give to that witness's testimony.  Considering that fact and all other relevant evidence, you may accept or reject the testimony of each witness either in whole or in part.

You are not required to believe testimony even though the testimony is uncontradicted and the witness is not discredited or impeached.  You may decide, because of the witness's manner and demeanor or because of the improbability of his or her testimony or for other reasons, that the

1    witness's testimony is not worthy of belief.

2          On the other hand, the testimony of a single witness

3    may be enough to convince you of a fact in dispute, if you

4    believe that the witness has truthfully and accurately related

5    what, in fact, occurred.

6          While several of the witnesses whose testimony has

7    been presented to you were here to testify in person, the

8    testimony of other witnesses was presented to you by playing a

9    video recording of questions asked and answers given by that

10    witness under oath at an earlier time.  Testimony that is

11    presented in this manner may be accepted or rejected by you in

12    the same way as the testimony of witnesses who have been

13    physically present in court.

14          We have had in this case the testimony of an expert

15    witness.  Expert witnesses are people who, because of their

16    training, education, and experience, have knowledge beyond that

17    of the ordinary person.  Because of that expertise in whatever

18    field they happen to be in, expert witnesses are allowed to

19    give their opinions.  Ordinarily, a witness cannot give an

20    opinion, but rather is limited to testimony as to the facts in

21    that witness's personal knowledge.  The expert in this case has

22    given opinions.  However, the fact that this witness may

23    qualify as an expert does not mean that you have to accept his

24    opinions.  You can accept or reject his opinions.

25          In making your decision whether to believe an expert's

1    opinion, you should consider the expert's education, training

2    and experience in the particular field; the information

3    available to the expert, including the facts the expert had and

4    the documents available to the expert; the expert's opportunity

5    and ability to examine those things; the expert's ability to

6    recollect the activity and facts that form the basis for the

7    opinion; and the expert's ability to tell you accurately about

8    the facts, activity, and the basis for the opinion.

9           You should ask yourselves about the methods employed

10   by the expert and the reliability of the result.  You should

11   further consider whether the opinions stated by the expert have

12   a rational and reasonable basis in the evidence.  Based on all

13   of those things, together with your general observation and

14   assessment of the witness, it is then up to you to decide

15   whether or not to accept -- whether or not to accept the

16   opinions.  You may believe all, some, or none of the testimony

17   of an expert witness.  In other words, an expert's testimony is

18   subject to your review like that of any other witness.

19          As I explained to you at the beginning of this trial,

20   this case is proceeding as a class action.  The law allows a

21   few individuals to bring a lawsuit as representatives of a

22   whole group of individuals or entities who have similar claims.

23   That whole group of individuals is referred to as the class.

24   The class in this case consists of persons and entities who

25   purchased or acquired the cryptocurrency-related products

1  called Hashlets, Hashpoints, Paycoin, or HashStakers from GAW

2  Miners, LLC and/or ZenMiner, LLC between August 1, 2014, and

3  January 19, 2015.  These persons or entities are known as class

4  members or plaintiffs.  When I refer to "plaintiffs" in these

5  instructions, I mean all members of the class.

6          You will also hear me refer to the four

7  cryptocurrency-related products I just listed as the products.

8          Three of the Plaintiffs are known as the "named

9  Plaintiffs" or the "lead Plaintiffs."  They are:  Denis Marc

10  Audet, Michael Pfeiffer, and Dean Allen Shinners.  These named

11  Plaintiffs bring this case on behalf of themselves and all

12  other class members.  When referring to Messrs. Audet,

13  Pfeiffer, and Shinners, I will use the term "named Plaintiffs"

14  or "lead Plaintiffs."

15          The claims you are considering are brought only

16  against Stuart Fraser.  The Plaintiffs allege that others

17  (including GAW Miners, ZenMiner, and Josh Garza) made false

18  statements or were otherwise involved in the alleged fraud.  In

19  deciding the claims brought against Mr. Fraser, you will need

20  to consider whether GAW Miners, ZenMiner, and/or Mr. Garza did

21  make false statements or were otherwise involved in the alleged

22  fraud.  But your verdict in this case will be for or against

23  Mr. Fraser alone.  You are not to speculate as to why any other

24  persons are not defendants in this trial, and you are not to

25  consider the absence of other defendants when deciding whether

1   or not Mr. Fraser is liable.

2        In this trial you are deciding only whether Mr. Fraser

3   is liable to the Plaintiffs for one or more of the claims

4   brought against him.  If you were to find Mr. Fraser liable,

5   the issue of what, if any, damages the Plaintiffs incurred

6   would be decided in a later proceeding not involving you.  You

7   are not to consider or discuss the issue of damages in your

8   deliberations.

9        I will now summarize the Plaintiffs' claims.  Later I

10  will explain to you what the elements of the claims are that

11  the Plaintiffs must prove.

12       Plaintiffs allege that GAW Miners, LLC (which I will

13  also refer to as the "Company") -- sometimes I'll just say "GAW

14  Miners" -- Plaintiffs allege that GAW Miners, LLC violated

15  certain federal and state laws.  I will sometimes refer to the

16  alleged violations by the Company as "primary violations."

17  With regard to Mr. Fraser, Plaintiffs claim that he --

18  Plaintiffs claim that he is secondarily liable to Plaintiffs

19  for the Company's primary violations because he allegedly had

20  control over the Company, or because he allegedly materially

21  assisted the Company's alleged fraud.  I will sometimes refer

22  to any liability of Mr. Fraser as "secondary."

23       In particular, the Plaintiffs assert five claims

24  against Mr. Fraser:  1, control person liability for the

25  Company's sale of unregistered securities in violation of the

1    Connecticut Uniform Securities Act; 2, control person liability

2    for the Company's fraud in the offer or sale of securities in

3    violation of the Connecticut Uniform Securities Act; 3,

4    liability for aiding and abetting the Company's fraud in the

5    offer or sale of securities in violation of the Connecticut

6    Uniform Securities Act; 4, control person liability for the

7    Company's fraud in the offer or sale of securities in violation

8    of the Federal Securities Exchange Act; and 5, liability for

9    aiding and abetting the Company's common law fraud.

10         Mr. Fraser denies these allegations.  He asserts that

11   he did not control the Company and that he did not participate

12   or assist in any fraud that the Plaintiffs allege that the

13   Company committed.

14         I will now instruct you on each of the Plaintiffs'

15   claims.  Each claim has elements that the Plaintiffs must

16   prove.  If the Plaintiffs do not satisfy their burden of proof

17   with respect to each element of a claim, you must find for Mr.

18   Fraser on that claim.  If they do satisfy their burden of proof

19   with respect to each element of a claim, you must find for the

20   Plaintiffs and against Mr. Fraser on that claim unless he has

21   satisfied his burden of proof as to an affirmative defense to

22   that claim.  In that situation, even if the Plaintiffs satisfy

23   their burden of proof on each element of a claim, if Mr. Fraser

24   then satisfies his burden of proof on an affirmative defense to

25   that claim, you must find in favor of Mr. Fraser with respect

1  to that claim.

2       Four of the Plaintiffs' five claims against Mr. Fraser

3  require the Plaintiffs to prove -- require the Plaintiffs to

4  prove that one or more of the products were securities.  The

5  only claim that does not require such proof is the fifth claim

6  listed above, that is, liability for aiding and abetting common

7  law fraud.  Therefore, a suitable place for you to begin is to

8  determine whether the Plaintiffs have proved that one or more

9  of the four products at issue -- Hashlets, Hashpoints, Paycoin,

10  and HashStakers -- are securities.

11       The Plaintiffs allege that the products are investment

12  contracts, which are a type of security.  To establish that a

13  product is an investment contract, the Plaintiffs must prove

14  that there was, with regard to that product:  1, an investment

15  of money; 2, in a common enterprise; and 3, with profits to be

16  derived solely from the efforts of others.

17       For each of these elements, you must focus on what the

18  buyers of the products were led to expect about the nature of

19  the products.

20       For the second element, common enterprise, Plaintiffs

21  must prove with respect to a specific product, either:  1, that

22  each individual buyer's fortunes were tied to the fortunes of

23  the other buyers by the pooling of their assets, usually

24  combined with the pro rata distribution of profits, that is,

25  distribution proportionate to the buyer's investments; or 2,

1    that the individual buyer's fortunes were tied to the fortunes

2    of GAW Miners, that is, that the fortunes of the buyers and the

3    Company were linked so that they would rise and fall together.

4            For the third element, that profits be derived solely

5    from the efforts of others, the word "solely" should not be

6    taken literally.  Rather, you should consider whether the

7    product was being promoted primarily as an investment, in which

8    case it would be an investment contract, or whether the product

9    was being promoted as a means whereby participants could pool

10   their activities, money, and the promoter's contribution in a

11   meaningful way, in which case it would not be an investment

12   contract.  If there was a reasonable expectation of significant

13   investor control, then profits would not be considered derived

14   solely from the efforts of others.  But if the expectation was

15   that the participants would be passive investors, then profits

16   would be considered derived solely from the efforts of others.

17   The touchstone is the presence of an investment in a common

18   venture premised on a reasonable expectation of profits to be

19   derived from the entrepreneurial or managerial efforts of

20   others.

21           If you find that the Plaintiffs have proved that a

22   particular product satisfies the three above-listed elements

23   for an investment contract, then the product is a security and

24   you should proceed to consider the Plaintiffs' four securities

25   claims with respect to that product, except there is an

1    additional consideration you will have to take into account for

2    the fourth securities claim, that is, the federal securities

3    claim, which I will explain below.  If you do not find that a

4    particular product satisfies the three above-listed criteria

5    for an investment contract, then that product is not a security

6    and you should find for Mr. Fraser on the four securities

7    claims with respect to that product.

8            First, I will instruct you on the Plaintiffs'

9    unregistered securities claim.  Plaintiffs allege that GAW

10   Miners violated the Connecticut Uniform Securities Act (which I

11   will refer to as the "CUSA") by offering or selling four

12   products -- Hashlets, HashStakers, Hashpoints, and Paycoin --

13   that the Plaintiffs allege are unregistered securities.  And

14   they allege that Mr. Fraser is liable under the CUSA for the

15   Company's offer or sale of unregistered securities because he

16   was a control person of the Company.

17           To prevail on this claim against Mr. Fraser,

18   Plaintiffs must prove each of the following elements:  first,

19   that GAW Miners offered or sold unregistered securities;

20   second, that Mr. Fraser acted as a control person of GAW

21   Miners, as I will explain that term to you.

22           With respect to the first element, the CUSA makes it

23   unlawful for a person to offer or sell a security in this state

24   unless the security has been registered with the Connecticut

25   Department of Banking.  To establish this first element, the

1    Plaintiffs must prove each of the following two sub-elements:

2    first, that GAW Miners offered or sold a security in this

3    state; second, that that security was not registered with the

4    Connecticut Department of Banking.

5           With respect to the second element of their

6    unregistered securities claim, the Plaintiff must prove that

7    Mr. Fraser was a control person of GAW Miners.  To do so, the

8    Plaintiffs must prove any one of the following three

9    things:  1, Mr. Fraser directly or indirectly controlled GAW

10   Miner; or 2, Mr. Fraser was an officer or director of GAW

11   Miners; or 3, Mr. Fraser occupied a similar status to a

12   partner, officer, director of GAW Miners, or he performed

13   similar functions to a partner, officer, or director of GAW

14   Miners.

15          A company may have more than one control person.

16          The first way the Plaintiffs may establish that Mr.

17   Fraser was a control person of GAW Miners is by proving that

18   Mr. Fraser directly or indirectly controlled GAW Miners.

19   "Control" means the power to direct or cause the direction of

20   the management or policies of a company, whether through the

21   ownership of voting securities, by contract, or otherwise.

22   Some examples of factors that bear on the issue of control

23   are:  whether Mr. Fraser had the ability to exert influence

24   over the strategic decisions and daily operations of GAW

25   Miners; the extent to which he owned an interest in GAW Miners;

1    whether he had financial leverage over GAW Miners through

2    lending arrangements or other means; and whether any personal

3    relationships he had with people holding positions of authority

4    or control at GAW Miners were of such a nature as to give him

5    direct or indirect control over the Company.  These are just

6    examples and no one factor is determinative.  To prove that Mr.

7    Fraser directly or indirectly controlled the Company, the

8    Plaintiffs need not prove that he actually directed the

9    management and policies of the Company.  But they do need to

10   prove that he actually possessed the ability to direct the

11   management and policies of the Company.

12          Alternatively, the second way that the Plaintiffs may

13   establish that Mr. Fraser was a control person of GAW Miners is

14   by proving that he was an officer or director of GAW Miners.

15          Finally, the third way that the Plaintiffs may

16   establish that Mr. Fraser was a control person of GAW Miners is

17   by proving that he occupied a similar status to that of a

18   partner, officer, or director of GAW Miners, or that that he

19   performed similar functions to a partner, officer, or director

20   of GAW Miners.  This means that you do not need to decide that

21   Mr. Fraser actually held the title of partner, officer, or

22   director of GAW Miners to find that he was a control person.

23   The focus here is on the substance of Mr. Fraser's role in the

24   Company, not on the formal job titles or labels.

25          In sum, to prevail on their unregistered securities

1    claim against Mr. Fraser, the Plaintiffs must prove by a

2    preponderance of the evidence that:  1, GAW Miners sold or

3    offered to sell unregistered securities in Connecticut; and 2,

4    Mr. Fraser was a control person of GAW Miners in one or more of

5    the three ways that I just described.

6         If Mr. Fraser proves that he did not know or in the

7    exercise of reasonable care -- or in the exercise of reasonable

8    care could not have known that the products were being sold or

9    that the products were not registered, then you must find for

10   Mr. Fraser on the claim for sale of unregistered securities.

11        Now I will address the Plaintiffs' two Connecticut

12   securities fraud claims.

13        The Plaintiffs allege that GAW Miners committed fraud

14   in the offer or sale of securities.  The CUSA makes it unlawful

15   for a person to offer or sell a security by means of either an

16   untrue statement of a material fact or an omission to state a

17   material fact necessary to make the statements made, in light

18   of the circumstances under which they are made, not misleading.

19   Here, the Plaintiffs allege that GAW Miners offered and sold

20   securities by means of untrue statements and omissions.

21        The Plaintiffs claim that Mr. Fraser is liable for the

22   company's securities fraud in either or both of the following

23   ways:  first, because he was a control person of GAW Miners;

24   and, second, because he materially assisted GAW Miners in

25   offering or selling a security by means of a material untrue

1  statement or omission to state a material fact necessary to

2  make the statements made, in light of the circumstances under

3  which -- it should say under which they were made, not

4  misleading.

5       To prevail on their "control person" claim against Mr.

6  Fraser for securities fraud under the CUSA, the Plaintiffs must

7  prove each of the following two elements:  first, that GAW

8  Miners is liable for the offer or sale of securities by means

9  of an untrue statement of a material fact or an omission to

10  state a material fact necessary to make the statements made, in

11  light of the circumstances under which they were made, not

12  misleading; second, that Mr. Fraser was a control person of GAW

13  Miners in one or more of the three ways I explained to you

14  earlier in my discussion of the unregistered securities claim.

15       With respect to the first element, the CUSA makes it

16  unlawful for a person to offer or sell a security by means of a

17  material untrue statement or omission.  To establish this first

18  element, the Plaintiffs must prove each of the following two

19  sub-elements:  first, that GAW Miners offered or sold a

20  security by means of either an untrue statement of material

21  fact or an omission to state a material fact necessary to make

22  any statements made, in the circumstances under which they were

23  made, not misleading; second, that the Plaintiffs did not know

24  either of the untruth of any such statement or of any such

25  material omission.

1          Regarding the first sub-element, a fact is considered

2    material if there is a substantial likelihood that a reasonable

3    investor would have considered the fact significant in making

4    the investment decisions at issue.  Offering or selling a

5    security by means of an untrue statement of a material fact or

6    an omission means that there is some causal connection between

7    the allegedly untrue statement or omission and the investor's

8    purchase of the securities.  Under this standard, the untrue

9    statements or omissions need not have had a decisive effect on

10   the investor's purchasing decision.  Rather, the standard is

11   whether a reasonable investor would have considered the

12   statements or omissions significant when making investment

13   decisions.

14          Regarding the second sub-element, the Plaintiffs must

15   prove that they did not know of the untruth of the statements

16   the Plaintiffs allege were misstatements of a material fact or

17   of the Company's alleged omissions to state a material fact.

18   This means that the Plaintiffs did not have actual knowledge

19   that the statements made by GAW Miners were untrue or did not

20   have actual knowledge of the omission.

21          For the second element of the Plaintiffs' "control

22   person" claim against Mr. Fraser for the Company's alleged

23   securities fraud under the CUSA, the Plaintiffs must prove by a

24   preponderance of the evidence that Mr. Fraser was a control

25   person of GAW Miners in one or more of the three ways I

1    described to you in discussing the unregistered securities

2    claim.  Please refer to my earlier instructions regarding

3    "control person" when considering this issue.

4         In sum, to prevail on their claim that Mr. Fraser is

5    liable as a control person for the Company's alleged securities

6    fraud under the CUSA, the Plaintiffs must prove by a

7    preponderance of the evidence:  first, that GAW Miners offered

8    or sold securities by means of an untrue statement or an

9    omission to state a material fact necessary to make the

10   statements made not misleading, and that Plaintiffs had no

11   actual knowledge of the untruth of the statement or of the

12   omission; and second, that Mr. Fraser was a control person of

13   GAW Miners in one or more of the three ways that I previously

14   described.

15        Even if you find that the Plaintiffs have proven all

16   of the elements of their claim that Mr. Fraser was a "control

17   person" with respect to the Company's alleged securities fraud

18   under the CUSA, you must consider the following affirmative

19   defenses, for which the burden of proof is on Mr. Fraser:  A

20   person is not liable as a control person under the CUSA if he

21   proves by a preponderance of the evidence that he did not know,

22   and in the exercise of reasonable care could not have known, of

23   the existence of the facts by reason of which the liability is

24   alleged to exist.  Thus, Mr. Fraser is not liable if he proves

25   by a preponderance of the evidence that he did not know, and in

1 the exercise of reasonable care could not have known, of the

2 Company's allegedly untrue statements of material fact.

3   For the Plaintiffs' second claim against Mr. Fraser

4 for the Company's alleged securities fraud under the CUSA, the

5 aiding and abetting claim, the Plaintiffs must prove that Mr.

6 Fraser aided and abetted the Company's alleged primary

7 violations.  This claim is independent from the claim that Mr.

8 Fraser was a control person with respect to the company's

9 alleged securities fraud.  A person can be liable as an aider

10 and abettor for violations of the CUSA even if he or she is not

11 liable as a control person, and vice versa.

12   In order for the Plaintiffs to establish that Mr.

13 Fraser is liable for aiding and abetting GAW Miners' alleged

14 fraud in the offer or sale of a security, the Plaintiffs must

15 prove each of the following three elements:  first, that GAW

16 Miners committed a primary violation of the CUSA by offering or

17 selling securities by means of an untrue statement of a

18 material fact or any omission to state a material fact

19 necessary to make the statements made, in the light of the

20 circumstances under which they are made, not misleading;

21 second, that Mr. Fraser materially assisted the Company in the

22 offer or sale of the alleged securities; third, that Mr. Fraser

23 materially assisted the Company in their primary violation of

24 the act.

25   For the first element, the Plaintiffs must prove that

1  GAW Miners committed a primary violation of the CUSA.  This is

2  the same determination that I asked you to make for the last

3  claim.  Accordingly, your finding on the previous claim about

4  whether GAW Miners violated the CUSA by committing securities

5  fraud will apply equally here.

6       To prove the second element of their aiding and

7  abetting claim, the Plaintiffs must prove that Mr. Fraser

8  materially assisted GAW Miners in the offer or sale of the

9  alleged securities, that is, Hashlets, Hashpoints, Paycoin, and

10 HashStakers.  Assistance is material if it has a natural

11 tendency to influence, or is capable of influencing, the

12 decision by the purchaser.

13      Finally, to prove the third element of their aiding

14 and abetting claim, the Plaintiffs must prove that Mr. Fraser

15 materially assisted GAW Miners in offering or selling the

16 alleged securities by means of an untrue statement of a

17 material fact or an omission to state a material fact necessary

18 to make the statements made, in light of the circumstances

19 under which they were made, not misleading.  In other words,

20 this third element concerns whether Mr. Fraser materially

21 assisted the Company in committing securities fraud, while the

22 second element concerned whether Mr. Fraser materially assisted

23 the Company with the offer or sale of the alleged securities at

24 issue.  "Material assistance" has the same meaning I explained

25 to you with respect to the second element.  Such assistance may

1   consist of conduct or statements.  It is not necessary to find

2   that Mr. Fraser himself made an untrue statement or an omission

3   in order for him to have materially assisted the Company's

4   alleged offer or sale of securities by means of an untrue

5   statement or omission.

6        In sum, to prevail on their claim that Mr. Fraser is

7   liable for aiding and abetting the Company's alleged securities

8   fraud under the CUSA, the Plaintiffs must prove by a

9   preponderance of the evidence:  first, that GAW Miners is

10  liable under the CUSA for the offer or sale of securities by

11  means of an untrue statement or omission to state a material

12  fact necessary in order to make the statements made, in light

13  of the circumstances under which they were made, not

14  misleading; second, that Mr. Fraser materially assisted the

15  Company in the offer or sale of securities; and third, that Mr.

16  Fraser materially assisted the Company in offering or selling

17  securities by means of an untrue statement of material fact or

18  an omission to state a material fact necessary in order to make

19  the statements made, in light of the circumstances under which

20  they were made, not misleading.

21        Even if you find that Plaintiffs have proven by a

22  preponderance of the evidence all three elements of aiding and

23  abetting fraud under the CUSA, you must find in favor of Mr.

24  Fraser if you find that he has proved the following defense.

25  This defense requires Mr. Fraser to prove by a preponderance of

1   the evidence that he did not know, and in the exercise of

2   reasonable care could not have known, that any untrue

3   statements of a material fact by the Company were untrue or

4   that the Company made omissions of a material fact.

5           The Plaintiffs' next claim against Mr. Fraser arises

6   under a federal statute and a rule that accompanies that

7   statute.  The statute is -- the statute is the Securities

8   Exchange Act of 1934, which I will refer to as the "Exchange

9   Act."  The federal rule is Rule 10b-5.  For simplicity, I will

10  refer to Section 10(b) of the Exchange Act and Rule 10b-5

11  together as the "Exchange Act."

12          The Plaintiffs allege that GAW Miners violated the

13  Exchange Act and that Mr. Fraser is liable under the Exchange

14  Act for the Company's primary violations of the Exchange Act

15  because he was a control person of the company.

16          As a reminder, to determine whether the Plaintiffs

17  have satisfied their burden of proof on this claim and the CUSA

18  claims, you must first determine whether the Plaintiffs have

19  proved that the products are securities using the test that I

20  described to you earlier.  As I instructed you earlier, if you

21  determine that the products are not securities (that is,

22  investment contracts) under that test, then you should find for

23  Mr. Fraser on all of the securities claims -- the CUSA claims

24  and the Exchange Act claim.

25          As I mentioned earlier, however, there is an exception

1    to the definition of "securities" available under the Exchange

2    Act that is not available under the CUSA.  Specifically, the

3    Exchange Act provides that a currency is not a security.  That

4    means that, for the Exchange Act claim only, even if a product

5    meets the definition of an "investment contract," it is not a

6    security if it is a currency.  A currency is an item (such as a

7    coin, government note, or banknote) that is generally accepted

8    as payment in a transaction and recognized as a standard of

9    value.  The Defendant has asserted as an affirmative defense

10   that Paycoin is a currency.  But it is important to note that

11   merely describing a product as a currency does not make it one.

12   You should focus on the substance and economic reality of

13   Paycoin, not its name or label.  The Defendant has the burden

14   of proving that Paycoin is a currency.

15           So, if you determine that Paycoin is a security when

16   you are assessing the CUSA claims, that determination will

17   apply equally here unless you determine that Paycoin is a

18   currency, in which case it is not a security and you may not

19   find for -- you may not find Mr. Fraser liable on the Exchange

20   Act claim with respect to Paycoin.

21           I will now set out the elements of this claim.  You

22   will notice that this "control person" claim under the Exchange

23   Act has three elements, while the "control person" claims under

24   the CUSA had two elements.  For the Exchange Act claim, the

25   Plaintiffs must prove each of the following three elements:

1   first, that GAW Miners committed a primary violation of the

2   Exchange Act; second, that Mr. Fraser directly or indirectly

3   controlled GAW Miners; third, that Mr. Fraser was in some

4   meaningful sense a culpable participant in the securities fraud

5   violations committed by the Company.

6       First, the Plaintiffs must prove that GAW Miners

7   violated the Exchange Act.  In order to do so, the Plaintiffs

8   must prove each of the following five sub-elements:  first, GAW

9   Miners committed a fraudulent act in connection with the

10  Plaintiffs' purchase of a security; second, the Plaintiffs

11  justifiably relied on GAW Miners' fraudulent act; third, GAW

12  Miners acted knowingly and with the intent to defraud or with

13  reckless disregard for the truth; fourth, GAW Miners' conduct

14  was the proximate cause of the injury the Plaintiffs claimed to

15  have suffered; and fifth, GAW Miners used or caused to be used

16  means or instrumentalities of interstate commerce.

17      I will now explain each of these five sub-elements in

18  detail.

19      In order to prove that GAW Miners committed a primary

20  violation of the Exchange Act, the first sub-element that

21  Plaintiffs must prove by a preponderance of the evidence is

22  that, in connection with Plaintiffs' purchase of a security,

23  GAW Miners committed a fraudulent act.  Plaintiffs can satisfy

24  this sub-element by proving that the Company did one of the

25  following three things:  first, employed a device, scheme, or

1   artifice to defraud; or, second, made an untrue statement of

2   material fact, or omitted to state a material fact, which made

3   what was said, under the circumstances, misleading; or, third,

4   engaged in an act, practice, or course of business that

5   operated as a fraud or deceit upon a purchaser or seller.

6         The first way the Plaintiffs can prove a fraudulent

7   act is by proving that the Company employed a device, scheme,

8   or artifice to defraud.  A device, scheme, or artifice to

9   defraud is a plan for the accomplishment of a fraudulent

10   objective.  "Fraud" is a general term that covers efforts that

11   individuals may devise to take advantage of others by

12   deception.  It may involve false or fraudulent pretenses,

13   untrue statements or omissions of material facts, or promises

14   and patterns of conduct calculated to deceive.

15         The second way Plaintiffs can prove a fraudulent act

16   is by proving that the Company made an untrue statement of a

17   material fact or omitted to state a material fact, which made

18   what was said, under the circumstances, misleading.  With

19   regard to the alleged misrepresentations (and omissions), you

20   must determine whether the statement was true or false at the

21   time that it was made (and, in the case of alleged omissions,

22   whether the omission was misleading).  If you find that

23   Plaintiffs have satisfied their burden to prove that a

24   statement was false at the time it was made, or that an

25   omission was misleading, you must next determine whether the

1    fact misstated or omitted was material under the circumstances.

2    I instructed you on materiality earlier.  The same instructions

3    regarding materiality apply here.

4         The third way Plaintiffs can prove a fraudulent act is

5    by proving that the Company engaged in an act, practice, or

6    course of business that operated as a fraud or deceit upon a

7    purchaser or seller.  An "act" is a thing that is done, and a

8    "practice" is an action or deed.

9         Plaintiffs must also prove that the fraudulent

10   action -- act, excuse me.  Plaintiffs must also prove that the

11   fraudulent act was done in connection with the purchase of a

12   security.  The "in connection with" aspect of the fraudulent

13   act sub-element is satisfied if you find that there was some

14   nexus or relation between the allegedly fraudulent conduct and

15   the purchase of securities.  Fraudulent conduct may be in

16   connection with the purchase of securities if you find that the

17   Company's allegedly fraudulent conduct touched upon Plaintiffs'

18   purchase of securities from the Company.

19        In order to prove that GAW Miners violated the

20   Exchange Act, the second sub-element the Plaintiffs must prove

21   is that they justifiably relied on GAW Miners' statements,

22   omissions, or conduct.

23        In order to satisfy this element, the Plaintiffs must

24   prove two things:  first, that they relied on the Company's

25   untrue statements of a material fact, omissions to state a

1    material fact necessary to make a statement made, in light of

2    the circumstances under which it was made, not misleading, or

3    fraudulent conduct in deciding to buy or sell each product that

4    they bought -- in other words, that Plaintiffs saw -- excuse

5    me -- that Plaintiffs read or saw the false statements and

6    relied on them; second, that their reliance on the statements

7    or conduct at issue was reasonable and justified.

8            Direct proof of reliance may be difficult to produce,

9    but it is not required.  Reliance may be proved by

10   circumstantial evidence.  Such circumstantial evidence may

11   include:  the nature of the allegedly false statements and the

12   fact that Plaintiffs made the purchasers -- purchases, excuse

13   me.  Put another way, if you find that a reasonable person

14   would not have purchased the products if GAW Miners and

15   ZenMiner had disclosed the true facts underlying the alleged

16   misrepresentations, you may draw an inference that the

17   Plaintiffs relied on the Company's representations --

18   misrepresentations in making their purchases.  But if you find

19   that the Plaintiffs would have engaged in the transactions

20   anyway, such that the misrepresentations, omissions, or conduct

21   did not affect their discussions to purchase the products, then

22   there was no reliance.

23           In addition, the Plaintiffs' reliance must be

24   justified.  The Plaintiffs cannot satisfy this element if they

25   acted unjustifiably.  In determining whether Plaintiffs'

1    reliance on GAW Miners' alleged misstatements was justified,

2    you may consider Plaintiffs' sophistication as investors and in

3    the subject matter of the transactions, their opportunity to

4    detect the fraud, whether the fraud was concealed, and the

5    nature of the fraud.

6         The third sub-element that the Plaintiffs must

7    establish by a preponderance of the evidence is that GAW Miners

8    knowingly participated in the scheme to defraud with intent to

9    defraud or with reckless disregard for the truth.

10        To act "knowingly" means to act intentionally and

11   deliberately, rather than mistakenly or inadvertently.  To act

12   with "intent to defraud" means to act with the intent to

13   deceive.  To act with "reckless disregard for the truth" means

14   to engage in conduct that involves an extreme departure from

15   the standard of ordinary care.  A person acts in reckless

16   disregard if the risk is known to him or if it is obvious that

17   an ordinary person under the circumstances would have realized

18   the danger and taken care to avert the harm likely to follow.

19   Recklessness is more than mere negligence.  Reckless conduct

20   represents grossly unreasonable, rash, or intemperate behavior.

21        In the context of securities law, a person may act

22   recklessly if he makes a false statement with a reckless

23   disregard for whether it is true or false.  A person does not

24   need to have the intent to injure a person in order to act

25   recklessly.  It is enough that the person acts in reckless

1    disregard of a risk of whether there was a truthful basis in

2    the representations or, in the case of an omission, that the

3    person recklessly disregarded the material nature of those

4    omissions.

5            In order to prove a primary violation, the fourth

6    sub-element that Plaintiffs must prove by a preponderance of

7    the evidence is that GAW Miners' conduct was the proximate

8    cause of the injury Plaintiffs claim to have suffered.

9            At the outset, I remind you that you are not being

10   asked to consider the Plaintiffs' alleged damages.

11   Nevertheless, I am asking you to determine -- assuming that

12   Plaintiffs did suffer losses -- whether those losses were

13   proximately caused by the Company's conduct.  In order for an

14   act or omission to be considered a proximate cause of the

15   injury, it must be a substantial factor in causing the damage,

16   and the injury must have been either a direct result or

17   reasonably probable consequence of the act or omission.  A

18   misrepresentation is the proximate cause of an investor's loss

19   if the loss was foreseeable to the person making the

20   misrepresentation or it was caused when the specific risk or

21   risks concealed by the misrepresentation actually materialized.

22           In order to satisfy this element, it is not enough for

23   the Plaintiffs to show that the Company's actions caused them

24   to engage in a particular securities transaction or that the

25   Plaintiffs would have acted differently had they known the

truth.  The Plaintiffs must prove that the alleged fraudulent

actions of GAW Miners were a substantial and significant

contributing cause of the injury the Plaintiffs claim to have

suffered.

In order to prove a primary violation, the fifth

sub-element that the Plaintiffs must prove is that GAW Miners

knowingly used, or caused to be used, the mails or interstate

wires in furtherance of the scheme to defraud or fraudulent

conduct.  The terms "mails" and "wires" include communications

and transactions made using the internet or interstate wire

transfers.

It is not necessary that GAW Miners be directly or

personally involved in any mailing or wire communication.  If

the Company was an active participant in the scheme and took

steps or engaged in conduct that it knew or could reasonably

foresee would naturally and probably result in the use of the

mails or wires, then you may find that it caused the mails or

wires to be used.

When one does an act with the knowledge that the use

of interstate means of communication will follow in the

ordinary course of business, or where such use can reasonably

be foreseen, even though not actually intended, then he causes

such means to be used.

Nor is it necessary that the items sent through the

mails or wires contain the fraudulent material, or anything

1    objectionable.  The matter mailed or wired may be entirely

2    innocent.  Similarly, the use of the mails or interstate wires

3    need not be central to the execution of the scheme and may even

4    be incidental to it.  All that is required is that the use of

5    the mails or wires bears some relation to the object of the

6    scheme or fraudulent conduct.

7        In summary, to find that Plaintiffs have satisfied

8    their burden of proof on the first element of their control

9    person claim against Mr. Fraser under the Exchange Act, they

10   must prove by a preponderance of the evidence each of the

11   following five sub-elements:  1, GAW Miners employed a device,

12   scheme, or artifice to defraud; or made an untrue statement of

13   a material fact or omitted to state a material fact, which made

14   what was said, under the circumstances, misleading; or engaged

15   in a fraudulent act, practice, or course of business; 2, the

16   Plaintiffs justifiably relied on GAW Miners' statements,

17   omissions, or conduct; 3, GAW Miners acted knowingly and with

18   the intent to defraud or with reckless disregard for the truth;

19   4, GAW Miners' conduct was the proximate cause of the injury

20   the Plaintiffs claim to have suffered; and 5, GAW Miners used,

21   or caused to be used, means and instrumentalities of interstate

22   commerce.

23       Now I will move on to the second element of the

24   Plaintiffs' control person claim under the Exchange Act -- that

25   Mr. Fraser directly or indirectly controlled GAW Miners.  I

1  instructed you earlier on the meaning of "control" in the
2  context of the Plaintiffs' control person claims under the
3  CUSA.  There I instructed you that Plaintiffs could prove
4  control in one of three ways.  That is not the case under the
5  Exchange Act.
6       Under the Exchange Act, the Plaintiffs must prove
7  control in the first way that I described in the context of the
8  CUSA claims; that is, they must prove that Mr. Fraser had the
9  power, either direct or indirect, to direct or cause the
10 direction of the management and policies of the Company.  The
11 other two ways of showing a "control person" do not apply to
12 the Exchange Act claim.  For more detail on the first way,
13 please refer to my earlier instructions regarding directly or
14 indirectly controlling the Company.
15      Finally, in order to establish that Mr. Fraser is
16 liable under the Exchange Act as a control person, the third
17 element the Plaintiffs must prove is that Mr. Fraser was, in
18 some meaningful sense, a culpable participant in the alleged
19 fraud.  To prove that Mr. Fraser was a culpable participant in
20 the alleged fraud, the Plaintiffs must prove that Mr. Fraser
21 acted with conscious misbehavior or recklessness.  Conscious
22 misbehavior is intentional misconduct.  As I have explained to
23 you already, recklessness is conduct that is highly
24 unreasonable and which represents an extreme departure from the
25 standard of ordinary care, where the risk was either known to

1    the person or he must have been aware of it.

2         In sum, to prevail on their claim that Mr. Fraser is

3    liable as a control person for the Company's alleged acts of

4    federal securities fraud, the Plaintiffs must prove by a

5    preponderance of the evidence that:  1, GAW Miners violated the

6    Exchange Act; 2, Mr. Fraser directly or indirectly controlled

7    GAW Miners; and 3, Mr. Fraser was a culpable participant in the

8    Company's alleged fraudulent conduct.

9         Even if you determine that the Plaintiffs proved the

10   elements of their control person claim under the Exchange Act,

11   Mr. Fraser is not liable if he proves by a preponderance of the

12   evidence that he did not directly or indirectly induce the

13   violations at issue and that he acted in good faith.  To meet

14   the burden of establishing good faith, Mr. Fraser must prove

15   that he exercised due care in his supervision of the activities

16   of GAW Miner in that he maintained and enforced a reasonable

17   and proper system of supervision and internal controls.  If Mr.

18   Fraser satisfies his burden of proof on this defense, then you

19   must decide this claim in Mr. Fraser's favor.

20        If you decide in favor of the Plaintiffs on the

21   Exchange Act claim, you must next determine whether they have

22   proven by a preponderance of the evidence that Mr. Fraser

23   knowingly violated the Exchange Act.

24        If you determine that the Plaintiffs have not proven

25   that Mr. Fraser knowingly violated the Exchange Act, you must

then determine the percentage of Mr. Fraser's responsibility measured as a percentage of the total fault of all persons who caused or contributed to the loss Plaintiffs claim to have suffered, including the primary violators -- Mr. Garza, GAW Miners, and/or ZenMiner.

The percentage of responsibility of a person may range from 0 percent to 100 percent.  In determining that percentage in this case, you should consider:  1, the nature of that conduct of that person that is found to have caused or contributed to the loss the Plaintiffs incurred; and, 2, the nature and extent of the causal relationship between the conduct of that person and the damages the Plaintiffs incurred.

The apportionment of responsibility applies only to the Plaintiffs' Exchange Act claim.  It does not apply to the Plaintiffs' other claims against Mr. Fraser.

Now I will address the Plaintiffs' claim against Mr. Fraser for aiding and abetting common law fraud.  The Plaintiffs allege that GAW Miners committed fraud under the common law of Connecticut by making false statements upon which the Plaintiffs relied and that Mr. Fraser is liable for aiding the common law fraud allegedly committed by the Company.

In order to prove that Mr. Fraser is liable for aiding and abetting the Company's common law fraud, the Plaintiffs must prove each of the following three elements:  first, GAW mines committed common law fraud; second, Mr. Fraser generally

1    was aware of his role as part of the fraudulent activity at the

2    time he provided assistance; and third, Mr. Fraser knowingly

3    and substantially assisted that activity.

4            In order to prove that Mr. Fraser aided and abetted a

5    common law fraud committed by GAW Miners, the Plaintiffs must

6    first prove by a preponderance of the evidence that GAW Miners

7    committed fraud.  To do so, the Plaintiffs must prove each of

8    the following four sub-elements:  first, that GAW Miners made a

9    false representation as a statement of fact; second, that the

10   statement was untrue and known to be untrue by GAW Miners or

11   that GAW Miners made the statement with reckless disregard for

12   the truth of the matter; third, that GAW Miners made the

13   statement to induce the Plaintiffs to act on it; fourth, that

14   the Plaintiffs did act on the statement to their injury.

15           The Plaintiffs must prove the first three of these

16   sub-elements by clear and convincing evidence, which is a more

17   demanding standard than proof by a preponderance of the

18   evidence, which applies to all other claims in this case.

19   Thus, the Plaintiffs cannot meet their burden of proving the

20   first three sub-elements by simply producing evidence that is

21   slightly more persuasive than that opposed to it, which would

22   meet the burden of proof under the preponderance of the

23   evidence standard.  Instead, the Plaintiffs must prove by clear

24   and convincing evidence, which is evidence that is substantial

25   and that unequivocally establishes the first three sub-elements

1  as I explained them to you.  Clear and convincing evidence is

2  evidence that establishes for you a very high probability that

3  the facts asserted are true or exist.  For the fourth

4  sub-element, that the Plaintiffs acted on the alleged statement

5  at issue to their injury, the Plaintiffs need to prove that by

6  a preponderance of the evidence.

7       For the second element of the Plaintiffs' aiding and

8  abetting common law fraud -- excuse me.  For the second element

9  of the Plaintiffs' aiding and abetting common law fraud claim,

10  the Plaintiffs must prove by a preponderance of the evidence

11  that Mr. Fraser was generally aware of his role as part of the

12  Company's fraudulent activity at the time he allegedly provided

13  the assistance.  In order to prove that Mr. Fraser was

14  generally aware of his role in GAW Miners' alleged fraud, the

15  Plaintiffs must prove that Mr. Fraser had actual knowledge of

16  the underlying fraud or that he acted with reckless

17  indifference to the possibility that the fraud was happening.

18  The definition of recklessness that applies here is the same

19  one that I have already given you.

20       For the third element of the Plaintiffs' aiding and

21  abetting common law fraud claim, the Plaintiffs must prove --

22  for the third element of the Plaintiffs' aiding and abetting

23  common law fraud claim, the Plaintiffs must prove by a

24  preponderance of the evidence that Mr. Fraser gave knowing and

25  substantial assistance to GAW Miners in the Company's alleged

1   fraud.  To do so, the Plaintiffs must prove that Mr. Fraser's

2   alleged assistance was a substantial factor in bringing about

3   the fraud.

4           In sum, to prevail on their claim that Mr. Fraser is

5   liable for aiding and abetting the Company's alleged common law

6   fraud, the Plaintiffs must prove by a preponderance of the

7   evidence:  first, that GAW Miners committed common law fraud;

8   second, that Mr. Fraser generally was aware of his role as part

9   of the fraudulent activity at the time he provided the alleged

10  assistance to GAW Miners; and third, that Mr. Fraser knowingly

11  and substantially assisted GAW Miners in the alleged fraud.

12          Mr. Fraser also asserts an affirmative defense against

13  named Plaintiff Shinners.  Mr. Fraser has the burden of proof

14  on this defense.  Unlike the claims and affirmative defenses I

15  have instructed you on up to this point, this affirmative

16  defense does not relate to the entire class.  By this I mean

17  that if you conclude that the Plaintiffs have established all

18  elements of one of their claims by a preponderance of the

19  evidence, a finding on your part that Mr. Fraser has met his

20  burden of proof on the affirmative defense I will now instruct

21  you on will not negate Mr. Fraser's liability to the class of

22  Plaintiffs on that claim.  It would negate Mr. Fraser's

23  liability only as to Mr. Shinners and only with respect to the

24  securities claims.

25          This defense is called "in pari delicto," which means

1  "in equal fault."  This defense applies if Mr. Fraser proves

2  that:  1, as a direct result of Mr. Shinners' own actions, he

3  bears at least substantially equal responsibility for the

4  violations he now seeks to redress; and 2, the preclusion of

5  his claims would not significantly interfere with the effective

6  enforcement of the securities laws and protection of the

7  investing public.  This defense applies only to Mr. Shinners'

8  securities claims.  It does not apply to the common law fraud

9  claim.

10        All right, folks, so the rest is my final

11  instructions, which I will not read to you now but, instead,

12  after the parties provide their closing arguments, which, as

13  you can probably see from the remaining pages, they're much

14  shorter, I promise you.

15        So we are going to send you home now.  As much as I

16  know that the jury instructions would make great light bedtime

17  reading, please do not bring them home with you.  Instead,

18  please leave them on your chair.  They will be there for you

19  tomorrow, along with the verdict forms.  Leave all of it here.

20  Leave your notes here.

21        And once again, same instruction as usual.  I know

22  we're in a new phase of the trial, but the same instructions

23  still apply because I haven't instructed you to begin your

24  deliberations yet.  So don't discuss the case.  Don't let

25  anyone discuss it with you.  Keep an open mind.  Refrain from

1   discussing these scintillating jury instructions we were just

2   going through with your family and friends.  Seriously, same

3   instructions as always applies.

4        We'll see you at the usual time tomorrow, quarter of

5   9:00 in the room next door.  Thank you very much for your

6   attention today.  Have a pleasant afternoon.

7      (The jury left the courtroom at 1:56 p.m.)

8        THE COURT:  All right, folks, just be seated.  A

9   couple things.  So when Ms. Johnson comes back, after I recess,

10  I'd like you to stay and go over the exhibits with her.

11  Tomorrow morning I'm going to ask the parties to stipulate that

12  Ms. Johnson has everything she should have that should go to

13  the jury.  We will not begin the deliberations until that's

14  done.  So this afternoon is the time to meet with her.

15       Second, what about this index to the exhibits?

16       MR. BUCHDAHL:  Your Honor, I think we sent over a

17  proposed kind of neutral description of the index last night,

18  and I --

19       THE COURT:  So what about that, folks?

20       MS. HASSAN:  Your Honor, we're verifying and going

21  over it.

22       THE COURT:  When will you have that for me?

23       MS. HASSAN:  Your Honor, I think we should be able to

24  coordinate on it by this evening.

25       THE COURT:  All right.  It's two o'clock now.  I think

1    you should be able to get it to chambers by 5:00.  Okay?

2          MS. HASSAN:  Sure, Your Honor.  We just have to go

3    over everything with Ms. Johnson.

4          THE COURT:  That means you look -- that's true, you're

5    going to meet with Ms. Johnson, but she's not going to give you

6    that much time.

7          MS. HASSAN:  Fair enough.

8          THE COURT:  Her patience is less -- I'm kidding.

9    She's more realistic sometimes than I am.  So you're not going

10   to be here till 5:00, I can tell you that.  So, yeah, let's get

11   that to chambers by five o'clock.  And hopefully I can give it

12   to the jury tomorrow.  Let's see, that's all.

13         MR. WEINSTEIN:  If I may, Your Honor, two things.

14   Just with respect to objections, the instructions is now given.

15   I assume --

16         THE COURT:  Sure.  You're welcome to state them.  The

17   truth is you're fully preserved on everything you've said so

18   far.  For example, you submit a request to charge, objections

19   as I said, we go through it.  If you want to issue a laundry

20   list, go ahead.

21         MR. WEINSTEIN:  I don't want to give a laundry list.

22   I just want to state generally the objections we made during

23   the charge yesterday and what we did provide.

24         THE COURT:  And your written request to charge, yes.

25   As I say, you're fully preserved on all of those.  If I screwed

1    up by not giving one of your charges, then that's probably

2    going to be reversible error.  That will be for the Circuit to

3    decide.

4             MR. WEINSTEIN:  Secondly, I notice in the Verdict Form

5    on page 4 --

6             THE COURT:  Okay.

7             MR. WEINSTEIN:  -- at the end of the paragraph, it

8    says "or (2) that Product was not registered."  I thought it

9    should say as a security.  It doesn't otherwise.

10            THE COURT:  I'm going to leave -- I'm not going to --

11   I'm going to leave it.  Yes.

12            MR. BUCHDAHL:  Two matters with regard to closings,

13   Your Honor.  First, I would just ask you to check one more time

14   to see if the levels have come down so we can take these masks

15   off for closing.  It will be great.

16            THE COURT:  I will check.  Don't count on it.

17            MR. BUCHDAHL:  I'm certainly not going to.

18            The second thing is that we were -- you had instructed

19   us to exchange demonstratives.

20            THE COURT:  Yes, yes.

21            MR. BUCHDAHL:  And Defendants made a proposal that we

22   exchange them by late this evening, which I think is probably

23   consistent with the preparation time.  The one --

24            THE COURT:  So that means we should probably be here

25   by 20 till 9:00 tomorrow because I'm sure you folks won't agree

1    on everything.

2              MR. BUCHDAHL:  I'm not sure.

3              THE COURT:  I hope I'm not being too pessimistic.

4              MR. BUCHDAHL:  I'm unlikely to object to any

5    demonstratives.  The one thing I would say about that the

6    lion's share of certainly the slides I am preparing are either

7    simply a call of testimony or a highlighted exhibit --

8              THE COURT:  What, not pieces of the charge?  I did --

9    whatever you want.

10             MR. BUCHDAHL:  Certainly pieces of the charge, but

11   with respect to all three of those categories --

12             THE COURT:  Yeah.

13             MR. BUCHDAHL:  -- it would be essentially handing my

14   summation to the other side to give that.  I would ask that

15   we -- any demonstratives, any kind of charts, graphs, pictures,

16   you know, argumentative, phrases, whatever that kind of thing

17   that we exchange but if it's simply an exhibit or pull-out --

18             THE COURT:  As long as everything you show them is a

19   piece of evidence that has been admitted by me, then, no, you

20   wouldn't have to exchange that.  But it can't have other stuff

21   on.  So if you got a PowerPoint that says this is why we win

22   and then it has -- no, you've got to show that to them.

23             MR. BUCHDAHL:  Okay.  I think what we'll do is we will

24   show a template so that they understand kind of what would

25   appear on that, and then if there's any issue, we'll clear it

1   up.

2          THE COURT:  All right.  Very good.  We'll be in

3   recess.  So 50 minutes each.  At the beginning I'll ask how

4   much time you want to reserve for rebuttal.  I will keep the

5   time, and we'll probably take a break -- let's see, no.

6   Actually, they can sit and listen to arguments in a row because

7   a hundred minutes they've been sitting for that.  So -- and

8   then the rest of my charge will take another five.

9          So I asked them to meet with you about the exhibits.

10  I told them that you would not give them that much of your

11  time.

12         THE CLERK:  Yeah, we're ready.

13         MR. BUCHDAHL:  Just one last question about that

14  reservation for rebuttal.

15         THE COURT:  Yes.

16         MR. BUCHDAHL:  If I initially reserve 15 minutes, I

17  would have 35 minutes.

18         THE COURT:  Yeah.

19         MR. BUCHDAHL:  Could I decide after 30 minutes?

20         THE COURT:  You can keep going.  What I'll do is I'll

21  say you've got -- and I'll probably say you've got five minutes

22  or four minutes left on your original 30.  And you can say,

23  "Thank you, Your Honor" and keep going.  But I'm not going to

24  warn you again.  If you cut into the 38 minute, that cuts into

25  your time.

1    MR. BUCHDAHL:  And I can go the other way too.  I can

2  stop.

3    THE COURT:  Yes, and you will get more time for

4  rebuttal, yeah.  I'll give you the full 50 minutes either

5  way.

6    MR. WEINER:  Your Honor, on that last point, my only

7  request is that he not go for 10 minutes and then reserve 40

8  minutes for rebuttal.

9    MR. BUCHDAHL:  I'm not going to do that.

10    THE COURT:  Yeah, I don't think there's much risk of

11  that.  We're in recess.

12   (Proceedings concluded at 2:03 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1       **I N D E X**

2

3   **WITNESS NAME**                                              **Page**

4   Called by the Defendant:

5   Madeline Eden
        Continued Video Deposition ................................. 950
6
    Joseph Mordica
7       Continued Video Deposition ................................. 951

8
    Rebuttal by the Plaintiffs:
9
    Madeline Eden
10      Video Deposition .......................................... 954

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                  C E R T I F I C A T E

4

5

6

7                  I, Julie L. Monette, RMR, CRR, CRC, Official

8     Court Reporter for the United States District Court for the

9     District of Connecticut, do hereby certify that the foregoing

10    pages are a true and accurate transcription of my shorthand

11    notes taken in the aforementioned matter to the best of my

12    skill and ability.

13

14

15                       /S/ JULIE L. MONETTE
                  _____
16                  Julie L. Monette, RMR, CRR, CRC
                        Official Court Reporter
17                         450 Main Street
                      Hartford, Connecticut 06103
18                          (860) 212-6937

19

20

21

22

23

24

25