```
 1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF CONNECTICUT
 2
     - - - - - - - - - - - - - - - - x
 3
     DENIS MARC AUDET, MICHAEL          No. 3:16-CV-940 (MPS)
 4   PFEIFFER, and DEAN ALLEN
     SHINNERS, Individually and on      OCTOBER 29, 2021
 5   Behalf of All Others Similarly
     Situated,                          8:50 A.M.
 6
     vs.                                JURY TRIAL
 7
     STUART A. FRASER, GAW MINERS,
 8   LLC, and ZENMINER, LLC, (d/b/a
     ZEN CLOUD)
 9
     - - - - - - - - - - - - - - - - x
10

11              Volume VII - Pages 1017 - 1098

12
                      450 Main Street
13                 Hartford, Connecticut

14

15      BEFORE:  THE HONORABLE MICHAEL P. SHEA, U.S.D.J.

16                    AND A JURY OF NINE

17

18   APPEARANCES:

19   FOR THE PLAINTIFFS:

20           SUSMAN GODFREY, L.L.P.
                 1301 Avenue of the Americas, 32nd Floor
21               New York, New York 10019
             BY:  SETH D. ARD, ESQUIRE
22           BY:  JACOB W. BUCHDAHL, ESQUIRE
             BY:  GENG CHEN, ESQUIRE
23           BY:  RUSSELL RENNIE, ESQUIRE
             BY:  HANNAH MILLER, ESQUIRE
24
     (Appearances Continue ...)
25
```

```
1    APPEARANCES CONTINUED:

2    FOR THE DEFENDANT:

3            HUGHES, HUBBARD & REED L.L.P.
                One Battery Park Plaza, 12th Floor
4               New York, New York 10004-1482
            BY:  DANIEL WEINER, ESQUIRE
5           BY:  MARC A. WEINSTEIN, ESQUIRE
            BY:  AMINA HASSAN, ESQUIRE
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20   COURT REPORTER:  Julie L. Monette, RMR, CRR, CCP
                          (860) 212-6937
21
     Proceedings recorded by mechanical stenography, transcript
22   produced by computer.

23

24

25
```

```
1                        8:50 A.M.

2           THE COURT:  A couple of things, Mr. Rennie, would you

3    get the door for me?  Thank you.

4           First of all, I received this morning a -- what I

5    think is the index that counsel prepared.  It is seven pages.

6    The first exhibit listed is PX 1, and the last exhibit listed

7    is DX 741.  Am I right that this is the index that counsel have

8    prepared and agreed to?

9           MS. CHEN:  Yes, Your Honor.

10          MS. HASSAN:  Yes, Your Honor.

11          THE COURT:  Very well.  I appreciate that.  And make

12   sure Ms. Johnson -- I'll make sure Ms. Johnson has a copy.

13          Second, I did check the metrics.  I have good news for

14   you.  I just checked the metrics.  In fact, I just got off the

15   call, still going on, with our science advisor.  And as long as

16   counsel stay at the podium, you may remove your masks at the

17   closing.  You have to put them back on otherwise and all that,

18   but you may remove just for the closing.  And I'll explain that

19   to the jury, what that's based on and all that.

20          Okay, let's see.  And counsel have checked the

21   exhibits, I take it?  And I know you were here yesterday

22   afternoon and are prepared to stipulate that Ms. Johnson has

23   the correct set of the exhibits; is that right?

24          MS. CHEN:  Yes, Your Honor.

25          THE COURT:  So you'll so stipulate right now?
```

1          MS. CHEN:  Yes.

2          MS. HASSAN:  Same here, Your Honor.

3          THE COURT:  Very well.  Thank you.  All right.  I

4   appreciate that.

5          And I believe we're ready.  And I understand counsel

6   have exchanged the demonstratives and there are no objections

7   to demonstratives.

8          MR. BUCHDAHL:  Correct, Your Honor.

9          MR. WEINER:  That's correct.

10         THE COURT:  So she's going to have you -- give you her

11  own list, which will reflect your list, and you folks should

12  sign that.

13         MR. WEINSTEIN:  Your Honor, we also have the exhibits

14  that are just for identification, which are the deposition --

15         THE COURT:  Right.  So the way that works is -- so for

16  purposes of the record, all exhibits, original exhibits,

17  counsel actually retain.  So that's why I had you list them

18  yesterday so it's certainly in the transcript of the case, what

19  the exhibits are.  That's why I say "full" every time.  And

20  you've now identified the ID exhibits.

21         But in terms of physical custody, counsel retain the

22  original exhibits.  And then when, you know, time for the

23  appeal, you do your joint appendix, you submit your original

24  exhibits you have them.

25         MR. WEINSTEIN:  So the Court doesn't need --

1          THE COURT:  We don't need them, no.

2          MR. BUCHDAHL:  Your Honor?

3          THE COURT:  Yes.

4          MR. BUCHDAHL:  I would like to retain 15 minutes for

5    rebuttal, please.

6          THE COURT:  Fine.  That would be fine.

7          And then the only other thing is counsel needs to stay

8    at the podium during the closing.  I think we're ready.

9          Do you want to check your audio?  Sure.

10          Thumbs up, okay.

11       (The jury entered the courtroom at 8:55 a.m.)

12          THE COURT:  Welcome back.  We're now going to have the

13    closing arguments of counsel.  Each side has been allocated 50

14    minutes.  Because the Plaintiffs have the burden of proof as to

15    their claims, they have the right to rebuttal, and they can

16    save time, reserve part of their time for rebuttal.  Mr.

17    Buchdahl has chosen to reserve 15 minutes for rebuttal.  So

18    he'll go 35 and then 15, I expect.  In between I believe Mr.

19    Weiner will be delivering the closing for the -- for the

20    Defendant.

21          So at this time I'll ask Mr. Buchdahl to give his

22    closing argument.

23          MR. WEINER:  Your Honor?  The mask thing.

24          THE COURT:  Yes, sorry.  One thing.  So throughout the

25    case, I've been checking the metrics concerning COVID in our

1    community.  I also every Friday morning have a call with the

2    court science advisor.  In fact, just got off the call.

3    Because Connecticut's doing so well, and I just confirmed with

4    our science advisor, I am going to allow both lawyers to remove

5    their masks just for the closing arguments alone.  I've been

6    blessed by our science advisor Dr. Bromage.  We're actually

7    below 10 cases per 100,000 in Connecticut for the first time

8    since July.  That's a good thing.  Just for the closing

9    argument, I'm going to allow them to remove their mask.

10             Mr. Buchdahl.

11             MR. BUCHDAHL:  Thank you, Your Honor.  May it please

12   the Court.

13             Good morning, Ladies and Gentlemen.  On behalf of our

14   whole team, Mr. Audet, Mr. Shinners, and Mr. Pfeiffer, and all

15   of the other class members who could not be here, I want to

16   thank you for your service in this case.  We know that our

17   justice system asks a lot of jurors, and we appreciate your

18   care, your attention, and your diligence.

19             As Mr. Ard told you right at the beginning, this is a

20   case about power and fraud, the power of a senior Wall Street

21   executive and the fraudulent business that he promoted and

22   enabled.  And there's no real dispute here that GAW Miners was

23   a massive fraud.  As you've seen, the SEC charged it with

24   securities fraud, and the Department of Justice sent Josh Garza

25   to jail for a fraud built on the very lies at the center of

1    this case, the false promise that GAW Miners' Hashlets were

2    backed by real mining power, the false promise that GAW Miners

3    Paycoin would be backed by a hundred million dollars, and the

4    false promise of a $20 floor for Paycoin.

5           Now, all three of the class Plaintiffs took this

6    witness stand and testified about how they relied on those

7    false promises when they spent tens of thousands of dollars of

8    their hard-earned savings on GAW Miners' securities.  And as

9    the Judge explained, they brought this case on behalf of a

10   class, and their stories are representative of all of the other

11   victims of GAW Miners' fraud.

12          So the Defendant doesn't dispute that GAW Miners was a

13   fraud.  Instead, he claims that he was powerless to stop it.

14   But the evidence that you saw here in this courtroom tells a

15   different story.  It proved exactly what Mr. Ard told you that

16   it would.  The Defendant did have the influence and the power

17   to change what GAW Miners was doing.  And instead of doing the

18   right thing, he went along for the ride hoping that he could

19   get some of his money back.

20          So I'm now going to go through some of the evidence

21   that proves the power that the Defendant had over GAW Miners

22   and over Josh Garza.  But before I do that, I want to say what

23   this case is not about.

24          Over the course of this trial, you heard the Defense

25   ask repeatedly whether this Defendant could be the mastermind

of this fraud.  But as you now know, there is nothing in the
Court's instructions about being a mastermind.  Instead, as the
Court instructed, what you have to decide is whether this
Defendant was a control person.  And as the Judge instructed
you yesterday, a company may have more than one control person.
You don't have to choose between the Defendant and Josh Garza.
When you hear the Defense say that we have the wrong man,
remind yourself, that's not what the law is.

So how do you know that the Defendant was a control
person at GAW Miners?  Well, first, look at the business
relationship between this Defendant and Josh Garza, because the
evidence demonstrated beyond any question that these two men
were 50/50 partners.  They both saw it this way.  Josh Garza
said it.  He said they became business partners.

But, again, as Mr. Ard told you at the beginning,
we're not going to ask you to take Josh Garza's word for
anything, because the Defendant said it also.  He described
himself as being lucky to be Josh Garza's partner.  This is May
18th of 2014.

And I asked him on the stand:  You considered yourself
a partner at GAW Miners?  And he acknowledged under oath, yes,
he was a partner in the business of GAW Miners.

And Defendant's partnership with GAW Miners followed
the pattern that they had been following for years.  They had
the same 50/50 partner relationship from the very start, from

1    their very first business, Great Auk Wireless.

2           Look at what the Defendant told you about that

3    relationship.  Josh brought the expertise; the Defendant

4    brought the money.  That's how their partnership worked.

5    That's how they became 50/50 partners.  And they agreed that

6    this was how their relationship would continue to work.

7           In July of 2013, Josh Garza proposed that they

8    continue to act as 50/50 partners, splitting every company in

9    half.  And the Defendant's response?  He agreed.  He told the

10   SEC he would split every company in half with Josh Garza.  GAW

11   Miners was no different.

12          And so when they started GAW Miners in 2014, there was

13   no question that the Defendant owned half the business.  He was

14   a 50/50 partner.  He admitted it to the SEC.  "In the March of

15   2014 time frame, you still owned half of that business?"

16   "Yes."

17          And look at how excited the Defendant was to tell his

18   friends about his new business; right?  March 18, 2014, "Look

19   at this company that we just started."

20          Now, during the trial, the Defense team pretended that

21   this was a business that only Josh Garza was interested in.

22   But the historical documents, the evidence shows you the truth.

23   This was every bit as much the Defendant's business as Josh

24   Garza's.

25          Now, every time we put a slide up here, we're going to

have the exhibit number at the top in case you're interested at where you can look at that later.

Now, in the summer of 2014, Josh Garza proposed they both reduce their interest to 41 percent so they'd have some equity to share with others.  But the evidence showed that they never gave that 18 percent away.  So in practice, the Defendant remained a 50/50 partner with Josh.  Why do I say that? Because they still had an equal share.

Now, another way that you know the Defendant was a control person is because both GAW Miners and Josh Garza were financially dependent on this Defendant.  Not only was the Defendant the single biggest investor in GAW Miners and one of only two co-owners, he was also the company's biggest lender. He loaned hundreds of thousands of dollars to the company in 2014.  That's the only way it was able to get off the ground. There was even evidence that he had one of his sons loan the company money.

And in addition to investing money and giving direct loans, the entire business was run on this Defendant's credit cards.  He extended hundreds of thousands of dollars of credit to GAW Miners through the credit cards.  And as he admitted under oath, without the Defendant, the company wouldn't even have a credit card.  And without a credit card, the company couldn't even function.  Look at his words:  "I mean, a company needs a credit card."  That, Ladies and Gentlemen, is control.

1    Now, in addition to his financial control of the

2    company, the Defendant had direct financial control over Josh

3    Garza personally.  You heard Mr. Garza tell you this, that he

4    was fully financially reliant on the Defendant and that the

5    Defendant could make decisions that would affect him

6    personally.

7    But, again, we're not asking you to take Josh Garza's

8    word for anything.  What did the evidence show?  The evidence

9    showed that the Defendant was paying him $10,000 a month,

10   deposits directly from the Defendant's personal bank account

11   into Josh Garza's personal bank account.

12   The Defendant -- and I asked him -- couldn't identify

13   any other source of money that Josh Garza had.  But even more

14   dramatically, the Defendant owned the mortgage on Josh's house.

15   Take a moment and think about how vulnerable, how obligated,

16   how dependent you would feel if your boss owned the mortgage on

17   your home.  What the evidence proved is that everything Josh

18   Garza had in his life -- his job, his financial security, even

19   his house -- was provided by the Defendant.  That is control.

20   But their relationship wasn't just financial.  The

21   Defendant also exercised control over GAW Miners through his

22   personal relationship with Josh.  They were close, personal

23   friends.  You can see the way they spoke to one another.

24   But, again, you don't have to take Josh's word for it.

25   Listen to what Amber Capuano said about it.  She said that he

1   looked to him as kind of a father figure.  She talked about how

2   Josh spoke about him, how he looked up to him since the time

3   Josh Garza was 18 years old.  The Defendant had the sort of

4   influence over Josh Garza that every parent has over a child.

5           And in addition to that, in addition to the financial

6   dependence, in addition to the personal relationship, the

7   Defendant exercised his control over GAW Miners through the

8   power of the access and network that he built over the course

9   of 20 years on Wall Street, because the corporate credit card

10  wasn't the only thing that the Defendant provided to GAW

11  Miners.  He also controlled the company lawyer, the general

12  counsel of GAW Miners, David McLain.  That was the Defendant's

13  personal lawyer.  When the Defendant said "Jump," Mr. McLain

14  said, "How high?"

15          Now, lawyers can't do everything.  We all know that.

16  But one thing lawyers are good at, if they want to do it, is to

17  make sure a company is following the rules.  And the general

18  counsel of this company answered only to the Defendant.

19          Now, the Defendant also wasn't afraid to take

20  advantage of his position at Cantor Fitzgerald either.  When he

21  wrote this e-mail on behalf of the company, GAW Miners, in May

22  of 2014, look how he signs his name:  Vice Chairman,

23  Cantor.com.  And he admitted under oath that he knew that he

24  was doing this because it would make GAW Miners look good to

25  other companies.  And it was also the Defendant's reputation

1   and his introduction that opened the door for GAW Miners to

2   advisors at Cantor Fitzgerald.

3        Look at the e-mail he sends in bringing Josh into

4   Cantor Fitzgerald.  "We are one of the largest sellers of

5   mining power.  We've started this business."

6        Remember, he had told you he had no idea whether this

7   was true.  But it was the Defendant's credibility that allowed

8   GAW Miners to get the benefit and publicity of a feature story

9   in *The Wall Street Journal*.  Josh Garza could never have been

10  on the phone with *The Wall Street* reporter without the

11  Defendant's assistance.  That's control.

12        And why did the Defendant's assistance matter?  Well,

13  you heard from the victims of the fraud about how influential

14  that article was in making GAW Miners seem legitimate.

15        So those are some of the different ways that the

16  Defendant exercised control, both over the company GAW Miners

17  and over Josh Garza himself, through financial support and

18  ownership, through his personal relationship, and with the web

19  of access that he provided to GAW Miners that never would have

20  been available without his help.

21        Now, I'd like to go through some of the timeline of

22  the case with you, starting just a few months before GAW Miners

23  started selling its first fraudulent security, the Hashlet.

24  And what you'll see is a series of red flags that revealed,

25  without any doubt to the Defendant, that this company was a

1  fraud.  I'm going to move quickly because I don't have that
2  much time.
3          Let's start at the end of May with this phony press
4  release.  This was the phony news article with a phony
5  transaction, including a phony employee, the Defendant's own
6  son.
7          The Defendant admitted under oath that he knew this
8  article was full of lies, and the Defendant told a lie of his
9  own.  Remember when the SEC was investigating this fraud, the
10  Defendant said that when he saw this phony story, he was pissed
11  off.  But in reality, what was the Defendant's reaction?  Wow.
12  Awesome.  Love the name.  Great idea.
13          And this is a perfect example of how the Defendant at
14  every opportunity did the wrong thing.  He didn't make a single
15  effort to correct these lies that his company was making in
16  public.  What did he do instead?  He sent him $200,000 more.
17  Instead of turning off the spigot, he turned it on hard.
18          What was the next obvious sign?  Plaintiffs' Exhibit
19  29 is the June 10th e-mail from the then chief financial
20  officer, Shiraz Moosajee.  Shiraz is trying to prepare
21  financial statements.  He can't do it.  Things are missing.
22  Things are wrong.
23          He sent a report to two people, the two owners, Stuart
24  Fraser and Josh Garza.  What were the biggest problems?  No
25  operational system for inventory accounting, no financial

1    controls.  And with the Defendant's background in finance, he

2    knew exactly what that e-mail meant.  He knew no later than

3    June that the company had no financial controls.

4            Again, what did he do about it?  What did this GAW

5    Miners' owner, investor, lender do?  Nothing.

6            Show the next slide, please.

7            He didn't take any steps to figure out if this

8    inventory system had ever been addressed.  And once again, he

9    immediately had the chance to do the right thing.  Just a few

10   days later, he finds out there's $400,000 run-up on his credit

11   card, the credit card he provided.  What does he do?  Does he

12   take advantage of this opportunity to exert some influence and

13   say, If you don't get this company in shape, I'm not going to

14   give you any more credit?  No.  Instead, he simply sends them a

15   new card.

16           What was the next warning that the Defendant had that

17   his business partner and close friend couldn't be trusted?

18   Look at this July 22 e-mail.  The Defendant finds out that

19   almost $200,000 has been withdrawn from his checking account

20   over the last 18 months.  He admitted under oath that he

21   believed in the summer of 2014 that someone was literally

22   stealing from him at GAW Miners.  So what's his reaction?  Did

23   this give him the slightest pause?  Of course not.

24           And that brings us to what might be the Defendant's

25   most revealing confession of all, because he was asked:  Why

1   didn't you walk away right then and there?  Let's see what he

2   said.

3        (Plays video of Stuart Fraser's deposition testimony.)

4            You heard him loud and clear.  He tried to play nice,

5   tried to get his money back.  Where would that money come from?

6   The victims of GAW Miners' security fraud.

7            The warning signals didn't stop there.  On August 5th

8   he gets another e-mail.  This one literally has the words "red

9   flag" in it.  And it's the exact same problem that had been

10  identified in that e-mail back in June.  Two months later,

11  still no financials, no inventory systems in place.  And just a

12  few hours later he finds out that the chief financial officer

13  is quitting because of this issue and that he will not

14  participate in trying to help the company raise money.

15           But it didn't stop there.  Plaintiffs' Exhibit 43.

16  Now, here in the middle of August, GAW Miners goes back to the

17  well and issues another false press release about a phony

18  acquisition of ZenMiner.  The Defendant tried to downplay this

19  as just irresponsibility.  But this is a real whopper.  Josh

20  Garza went to jail for telling this lie, among others.

21           And in his interview, under oath, during the SEC's

22  securities fraud investigation of GAW Miners, the Defendant

23  admitted he knew this press announcement was false.  But then

24  he told the SEC one of his most consequential lies.  He told

25  the SEC that he tried to distance himself, that he tried to

1    bring in a lawyer to fix things.

2           But you all know what happened in real life.  He

3    didn't try to distance himself at all.  Instead, he's telling

4    jokes with his son about it.  And we know his lawyer didn't do

5    anything at all.

6           Once again, he has a choice.  He could blow the

7    whistle.  He could come clean.  He could tell people what was

8    really going on.  Or he can keep playing nice.

9           Now, it wasn't a coincidence that GAW Miners picked

10   August 13th for this phony press release.  They wanted to gin

11   up publicity and enthusiasm because they were about to launch

12   their first fraudulent security, the Hashlet.

13          And remember, the Hashlet all started with the

14   Defendant's own idea to sell percentages of hosted machines.

15   He admitted on the stand that this was the idea that turned

16   into Hashlets.  And you can see how excited he is about this

17   new Hashlet idea because he goes right on Facebook and brags

18   about how Gawminers.com is his new baby.  This is just four

19   days after that text.  And he says, "It's real."  And by the

20   way, has anyone ever said it's real about a company that's

21   actually real?  And has anybody ever said "my new baby" about

22   something they didn't really care a lot about?

23          Now, this Hashlet idea would take GAW Miners in a

24   fundamentally different direction away from just selling

25   hardware and into the banking and brokerage business, the

1  business that this Defendant had been making his living in for

2  decades.  Because, remember, at this time, the Defendant was a

3  licensed securities broker, and he knew that brokerage business

4  inside and out.

5        And on August 16th of 2014, GAW Miners officially

6  entered the securities business, starting to sell securities

7  called Hashlets.  And you heard from victims who explained that

8  they thought these Hashlets were backed by real mining power.

9  They thought they were buying a slice of the computing power,

10 just as Professor Narayanan explained.  But as you heard from

11 the GAW Miners' employees, that was all a fiction.  The

12 Hashlets were just a phony interface.  There was no real

13 computing power behind them at all.

14       But what does the Defendant do?  Well, he just starts

15 bragging to his friends about how amazing it is they're selling

16 so many Hashlets.  This is the first day, the day of the

17 release.  "Crazy opening."  "Look at this crazy demand."

18       Ask yourself, does this sound like someone who was

19 trying to distance himself from the company or someone who is

20 proud of the company that he founded, he funded, and owned?  He

21 says, "This is what I'm doing."  And he was.

22       And you can see that he and Josh kept in close contact

23 about the sales and the profits.  But while he's excited about

24 the sales, the Defendant knew exactly what danger the company

25 was in.  He admitted on the stand that he knew that if you

1  didn't track how much Hashlet power was sold compared to how

2  much computing power you had, you were in danger of

3  overselling.

4          What else did the Defendant know?  He knew by October

5  that the company didn't have sufficient hardware.  He knew also

6  that credit cards and PayPal were holding back funds so the

7  company couldn't pay for any new hardware.

8          Well, what did GAW Miners do next?  They were already

9  in too deep.  They had sold so many Hashlets they couldn't

10  possibly pay out on them.  So instead of continuing to give

11  people Bitcoin, the evidence showed they convinced their

12  Hashlet victims to start taking a new security called

13  Hashpoints, basically a certificate that would allow them to

14  get in line for the next fraudulent GAW Miners security,

15  Paycoin.  And once again, the Defendant is out there leading

16  the cheers, bragging about the new world coming with this

17  initial coin offering.

18          But this scheme was only going to save GAW Miners if

19  they had a ton of buyers for Paycoin.  So the company decides

20  what they need is publicity.  And what better source of

21  publicity than *The Wall Street Journal*, the most significant

22  financial newspaper in the world.

23          And what the evidence showed you, Ladies and

24  Gentlemen, is that Michael Casey, *The Wall Street Journal*

25  writer, wanted to talk to the Defendant.  He wasn't willing to

1    do the story if he had to rely just on Josh Garza, a nobody, a

2    no name.  But if the Defendant spoke to him, that would be a

3    different story.

4           So now I asked the Defendant if he understood that Mr.

5    Casey wanted to talk to him to get his confirmation about what

6    was going on at the company.  And he denied it.  But the

7    problem for this Defendant is that he can't remember when he

8    lied to the SEC and when he told the truth, because this

9    Defendant will say whatever he thinks is most helpful to him at

10   the moment he's answering the question.

11          Now, at the same time that GAW Miners is preparing for

12   *The Wall Street Journal* story, GAW is also furiously working on

13   a press release.  And the Defendant, who remember, again, told

14   the SEC he was trying to distance himself from the company,

15   says, "Maybe I should be identified as a founding investor?"

16   It wasn't enough for him to be quoted as just the vice chairman

17   of Cantor Fitzgerald.  He wanted to take public credit for his

18   role in getting GAW Miners into the public realm.

19          And if you look at the press release, that's exactly

20   what it did.  It describes him exactly as he insisted on being

21   described, co-founder and early investor.  Look at the title of

22   the press release.  It says they're announcing their ICO with

23   significant investor backing.  And I asked him, "Who are these

24   investors?"  He said, "I don't have any idea."

25          Now, remember, the Defendant has known for months that

1  GAW Miners regularly, routinely generates false publicity.  It

2  happened in May.  It happened in August.  And it's happening

3  here again with the Defendant right in the middle of it.

4        And what steps did he take to make sure that it

5  wouldn't happen?  None.  But, again, the Defendant confessed

6  what he was up to.  We asked him, Why did you agree to be in

7  this press release?  He said it was in his best interests.  So

8  we asked him why?

9     (Plays video of Stuart Fraser's deposition testimony.)

10       Here's *The Wall Street Journal* story itself, which

11  announced that GAW Miners was being backed by the Defendant,

12  and GAW Miners took full advantage of this opportunity to

13  publicize its key false promise about Paycoin, the $100 million

14  reserve -- again, another lie that sent Josh Garza to prison.

15  And this lie was a huge part of the attractiveness of Paycoin

16  because it was supposed to help guarantee that these securities

17  would go up in value and not down.

18       And the Defendant admitted that it was true.  He was

19  backing Mr. Garza even in late November.  That's a very

20  different story than he told the SEC.  He claimed he wasn't

21  trying to influence people, but he had to know exactly what

22  would happen.  Millions of people would read this article; they

23  would see his name; and they would, therefore, have trust in

24  GAW Miners, the company he knew could not be trusted.

25       And I asked him about this hundred million dollar

1    reserve.  What's his answer?  He said, "Well, I knew he had a

2    plan to want it."

3           I don't know exactly what that means, but I'll tell

4    you what it doesn't mean.  It certainly doesn't mean that the

5    Defendant thought they had it.  He knew they didn't have it.

6    He knew they didn't have any other investors.  Ladies and

7    Gentlemen, he knew that $100 million reserve story was a

8    complete lie.

9           Now, the only problem for GAW Miners is that with a

10   lot of publicity comes a lot of scrutiny.  And in this November

11   26 e-mail from *The Wall Street Journal* reporter, he writes

12   directly to the Defendant and others and says, "I've got to

13   address these charges that GAW is a fraud.  Is it a Ponzi

14   scheme?  Is it regulated by the SEC?"

15          And once again the Defendant has an opportunity to do

16   the right thing.  He knows Josh Garza is untrustworthy.  All he

17   has to do, all he has to do right now to save the victims is

18   say the truth to Mr. Casey, which is, I don't trust Mr. Garza;

19   he lies to me; he lies to reporters; he lies to the public.

20   But what did the Defendant do?  Again, nothing.

21          And you even heard the Defendant talk about a second

22   article where Josh Garza even more explicitly tied the

23   Defendant's credibility to GAW Miners.  Once again, the

24   Defendant did absolutely nothing.  Well, actually, that's not

25   entirely true that he did nothing.  He actually kept promoting

1  GAW Miners' fraudulent securities.

2          Take a look at the Defendant's Twitter feed.  From

3  November 19th all the way to January 12th, he's out there on

4  Twitter where investors like Allen Shinners can follow his

5  every word, and he simply repeats all of the key GAW Miners

6  lies, even as late as January 12th.  This $20 Paycoin lie,

7  remember, is one of the lies that sent Josh Garza to jail.  And

8  it wasn't just limited to Twitter.  He was promoting Paycoin to

9  his friends.

10          And maybe this next one sums it up even better.  He's

11  discussing a potential transaction for GAW Miners.  He's

12  talking to his personal lawyer and Josh.  What does he say?  "I

13  will do whatever we need."

14          We all know what happened next.  The SEC swooped in,

15  shut everything down, and the people who lost their hard-earned

16  savings put together this lawsuit.  And now this case is going

17  to be in your hands.  So what would the Plaintiffs ask you to

18  find here?  I'd like to go through the jury Verdict Form with

19  you and respectfully ask that you fill it out in the following

20  manner.

21          THE COURT:  Mr. Buchdahl, you have six minutes on your

22  original.

23          MR. BUCHDAHL:  Now, we'll move quickly.

24          Question No. 1:  Did Plaintiffs prove any of the

25  following are investment contracts?  Absolutely the Plaintiffs

1   did, because as the Judge will tell you, the touchstone of a

2   security is that the investors would have an expectation of

3   profits to be derived from the efforts of others.  That's what

4   they did here.  They gave GAW Miners their money and hoped that

5   GAW Miners' mining efforts would lead to their money or, in the

6   case of Paycoin, that their promotional efforts would make

7   money for people.

8           What's the next question?  Next question is:  With

9   respect to the Plaintiffs' claim alleging unregistered

10  securities, did we prove that Defendant Stuart Fraser was

11  liable as a controlling person?  Answer:  Yes.  That's all the

12  evidence we looked at earlier, that he was a control person.

13          And you can see that -- all right.  And look at the

14  factors that the Judge will tell you to look at for control:

15  the ability to exert influence.  Did he own any interest?  Did

16  he have financial leverage?  Did he have personal

17  relationships?  Across the board, every single example, the

18  Defendant checks every box.

19          Next question.  The third way -- oh, sorry.  For each

20  product you found to be an investment contract, did Mr. Fraser

21  prove that he could not have known that these Hash products

22  were being sold?  Now, it says that he had to not be able to

23  know even with the exercise of reasonable care.  And it's plain

24  as day that if this Defendant had exercised reasonable care, he

25  could have known exactly what was going on.  So we ask you to

1    mark this question -- for the affirmative defense, we ask you

2    to mark this question "no," Question 1(a).

3         Now, Question No. 2, Did Plaintiffs prove that Stuart

4    Fraser is liable as a controlling person of GAW Miners?  Yes.

5    That's the same controlling person issue that we talked about

6    earlier.

7         Next question:  Did Mr. Fraser prove that he could not

8    possibly have known that they were committing this fraud?

9    Answer:  No.  Mr. Fraser did not prove that.

10        Next question:  With respect to the Plaintiffs' claims

11   for fraud in the offer of sale of security, did the Plaintiffs

12   prove that Stuart Fraser aided and abetted GAW Miners in

13   committing securities fraud?  Absolutely yes.  And you saw how

14   he did it.  He did it with access, with financial assistance,

15   and by promoting the products himself.

16        Next question:  Again, did Mr. Fraser prove that he

17   couldn't possibly have known that the company was doing this?

18   No.  Look at that language about the exercise of reasonable

19   care.  There's one thing we know:  The Defendant did not do

20   that.

21        Next question.  This is a question about whether

22   Paycoin is a currency.  And while it sounds like a coin, the

23   answer here is no.  And why?  The Judge will tell you that a

24   currency is something generally accepted as payment and

25   recognized as a standard of value.

1       Ladies and Gentlemen, if you walk down the street with

2  a handful of Paycoins, no one would accept that as payment, and

3  no one would recognize that as value.  That's why Paycoin is

4  not a currency.

5       Next question.  This is another control person

6  question.  Did we prove that under the Federal Exchange Act?

7  Respectfully, yes, the Plaintiffs did.

8       And you can see here that the Court will instruct you

9  on the issue of recklessness.  You can see here that it's

10  enough if a person acts in reckless disregard of a risk of

11  whether there was a truthful basis to what the company was

12  saying.  This is a terrific description of how the Defendant

13  behaved.

14       Next question.  Did Mr. Fraser prove that he acted in

15  good faith?  No.  Good faith would have required him coming

16  clean and telling people what was going on.

17       Next question.  Did the Plaintiffs prove that Mr.

18  Fraser knowingly violated the Exchange Act?  That's the

19  question of, did he know what was going on?  The Judge will

20  instruct you, or did instruct you, about what "knowingly"

21  means.  But the answer is yes.

22       And so if you answer this question "yes," when you get

23  to the next question, you don't actually have to answer it.

24  But if you disagree with us, if you don't think he did this

25  knowingly, then it will ask you for a percentage; and we

respectfully ask that if you do answer this, that you give Mr.
Fraser the same responsibility that he took all along, 50/50.

Next question.  This is the common law fraud claim.
Did Plaintiffs prove that Stuart Fraser aided and abetted a
fraud?  Answer, absolutely yes.

And we saw how he did that.  He did that by opening
doors when he should have been closing them.  He did that by
extending money when he should have been refusing it.  And,
again, you'll hear this instruction about reckless indifference
to the possibility that the fraud was happening.  That
describes this Defendant to a T.

Now, you'll be asked to say the date, the first date
on which the Hashlet fraud was committed.  Ladies and
Gentlemen, this is an easy one.  This began the day they
started selling them.  The evidence shows that is August 16,
2014.

Now, finally, the Defendant has asserted what the
Judge described to you as an "in pari delicto" defense.

THE COURT:  Mr. Buchdahl, sorry to interrupt.  You are
at the 35 minutes.  Of course, you can continue, but it will
eat into your time.

MR. BUCHDAHL:  One more minute.

Did the Defendant prove his "in pari delicto" defense
with respect to Mr. Shinners?  The answer to this is obviously
no, and here's why.  This requires that you find Mr. Shinners

1  bears substantially equal responsibility for this violation.

2  There is no planet on which Mr. Shinners, a victim of this

3  fraud, bears substantially equal responsibility to the

4  Defendant.  That's why we ask you to answer "no" to that

5  question.

6          I believe that's the last question in the Verdict

7  Form?  So I'm going to reserve the balance of my time for

8  rebuttal.  Thank you for your attention.

9          THE COURT:  All right.  Mr. Weiner, before we begin,

10 we're going to just take ten minutes.  I want to clear the

11 courtroom.  I want to let the -- I'm watching the CO2 monitor.

12 I want it to come down a little.  It's fine, but I want it to

13 come down a little more.

14         You can feel it's warmer in here today.  Well, it's

15 warmer because we're sharing more air.  Just about reached 800,

16 which is sort of a red line, but it didn't.  Now it's coming

17 down because I've been mailing frantically with the GSA.  I

18 want to give it ten minutes, let it come down a bit.  We'll all

19 come back.

20         Please go to the jury room at this time.  I'm going to

21 clear the courtroom after you leave, give it about ten minutes.

22 It will be fine.

23         Don't discuss the case.  I know you're starting to

24 hear the arguments.  Don't discuss the case.  Don't let anyone

25 discuss it with you.  Keep an open mind.

1    (The jury left the courtroom at 9:34 a.m.)

2        THE COURT:  All right.  I apologize for that.  I've

3    just been watching it frantically.  It's about at 812 right

4    now.  It dropped below, but now it's back up.  We're going to

5    take about ten minutes.  I want everybody to clear the

6    courtroom for about ten minutes and we'll be back.  Thank you.

7        (Recess from 9:34 a.m. to 9:56 a.m.)

8        THE COURT:  We can bring the jurors back.

9        (The jury entered the courtroom at 9:58 a.m.)

10       THE COURT:  Thank you for your patience.  The CO

11   level's now good now.  I thank you for your patience.  Now it's

12   Mr. Weiner's turn.  Everyone can be seated.

13       MR. WEINER:  Your Honor, may I unmask?

14       THE COURT:  You may.

15       MR. WEINER:  Ladies and Gentlemen, Mr. Buchdahl saw

16   this one coming because he's absolutely right.  The Plaintiffs

17   have the wrong man in this case.  They should be suing Josh

18   Garza, the person they sued originally.

19       This is a movie that came out a couple years before I

20   was born, but it's one of my favorites.  I commend it to you

21   when you have a chance.

22       The wrong man.  They know they have the wrong man.

23   And Mr. Buchdahl said the key is -- and we agree with it -- the

24   key is control.  Who controlled GAW Miners and ZenMiner?

25       Plaintiffs know they have the wrong man.  You saw how

 1    their story line changed completely from the original Complaint

 2    to their Amended Complaint.  Mr. Shinners started work on the

 3    Complaint in April of 2015.  He worked for 14 months looking at

 4    documents, looking at e-mails, looking at all sorts of evidence

 5    and talking to -- even talking to former GAW Miners' employees,

 6    Ms. Eden, Mr. Mordica, Mr. Dorman.  He interviewed them.  After

 7    those 14 months of a review and analysis, this is what

 8    Plaintiffs told the Court:  The lead defendant is Josh Garza.

 9         And this is what they said about him.  This is the

10    Plaintiffs' own case.  This is not some offhand barroom remark

11    where they were speaking loosely.  This is a Complaint which

12    under the rules they have to believe to be true in good faith

13    before they file it.  And they said, Mr. Garza, during all of

14    2014, he was the founder and CEO of GAW Miners, and he owned

15    and controlled ZenMiner.  In those positions, which he held

16    since those companies were founded -- so both companies, GAW

17    Miners and ZenMiner -- he directed their strategy, their

18    financial decisions, and had ultimate control over their

19    day-to-day operations.  That's right out of the Plaintiffs' own

20    mouths.

21         Then you saw what happened.  Plaintiffs realized that

22    they'd never get any money from Josh Garza.  He spent it on

23    that Lamborghini and that BMW and that Tesla and that Ferrari

24    and the three cars he couldn't even remember.  So they hatched

25    a secret plan with Mr. Garza, Josh, as Mr. Buchdahl called him

1  during the trial.  The secret plan they hatched was they would

2  let him out of the case.  They would drop him as the lead

3  defendant, and they would make Stuart Fraser the new control

4  person, the person who was behind the scenes controlling

5  everything.

6       You don't have to guess about the Plaintiffs' secret

7  deal with the devil, the deal with Mr. Garza.  Take a look at

8  the cooperation agreement, and you'll see the exhibit numbers

9  are in the lower left hand of the slide.  They made a deal with

10  the devil in October of 2016.  They would dismiss without

11  prejudice -- that means they could always bring it back.  And

12  you heard Mr. Garza testify at his deposition that he

13  understood that he could be brought back into the case.  They

14  would dismiss without prejudice all claims asserted against him

15  in this action if they gave him cooperation.  Cooperation

16  agreement, this deal with the devil, it speaks for itself.

17       Only two weeks later Plaintiffs changed their story.

18  Here's their Amended Complaint.  And remember I said like magic

19  Mr. Garza disappears.  He's not the lead defendant anymore.

20  He's not the one that controls it.  They changed their story.

21  Look what happened to that paragraph.  Remember they said that

22  he was the one who controlled it?  Like magic.  They took it

23  out of their Complaint as if it never existed, as if people

24  like you wouldn't remember what they said at the beginning,

25  after all their investigation, after all their work, it was

1   Josh Garza who controlled GAW Miners and ZenMiner.

2           Now, why did the Plaintiffs do that?  That's easy.

3   They're in it for the money.  And Stuart Fraser is a deep

4   pocket.  He's a man who over the years has built a comfortable

5   life for himself and his family.  He has money.

6           Why did Mr. Garza do it?  Why did he decide to flip

7   and point the finger at his former mentor, his former father

8   figure?  That's an easy one too.  Mr. Garza did it to get out

9   of this lawsuit and the enormous expense of defending against

10  Plaintiffs' team of lawyers.  He avoided the possibility, or

11  probability in this case, of getting whacked with millions of

12  damages for the money that he stole from the victims.

13          And here's the killer:  Mr. Garza's restitution order

14  gives him another motive to lie.  It requires him to pay over

15  $3.4 million to the victims, but if he can get a jury to award

16  money against Mr. Fraser, then his restitution amount is

17  reduced dollar for dollar.  He is there lying to save himself

18  and his money, the only things he ever cared about.

19          So when the Plaintiffs tell you, and Mr. Buchdahl

20  said -- showed a picture of Mr. Garza at his deposition, they

21  said, Believe what Mr. Garza said at his deposition in 2018.

22  Remember that Mr. Garza is a convicted felon and a proven liar,

23  a fraudster and a cheat.

24          You saw him on tape pausing and squirming and looking

25  at the ceiling and thinking, How can I give the Plaintiffs what

1    they want so they won't pull me back into the case?  Every time

2    Mr. Garza said "Stuart Fraser controlled me," he satisfied his

3    part of the deal with the devil that he struck with the

4    Plaintiffs.  Mr. Garza would have said that Stu Fraser

5    controlled the NASA space program if the Plaintiffs had asked

6    him.  He was in there singing for his supper.

7          And the sad truth is even if the Plaintiffs don't

8    believe Mr. Garza.  Look at what Mr. Shinners said.  You see

9    the reference to the trial testimony in this case.  I asked Mr.

10   Shinners what he thought of Mr. Garza.  "Absolutely not

11   trustworthy."  That's the Plaintiffs' view of their key

12   witness, the only witness you saw who blamed Stu Fraser, who

13   said Stu Fraser controlled them.  Their own witness says

14   "absolutely not trustworthy."

15         And Mr. Shinners was not the only one.  Look at what

16   Plaintiffs' counsel said, Mr. Ard said in his opening, "Don't

17   take what Josh Garza says at face value."  That's the

18   understatement of the year.

19         Now, who else besides Plaintiffs told you that they

20   had the wrong man, that Plaintiffs have the wrong man, that it

21   should be Josh Garza, not Stuart Fraser?  Well, Josh Garza

22   himself told you that before he struck his deal with the

23   Plaintiffs to save himself.  You remember the evidence of what

24   Mr. Garza actually said at the time of the events in issue?

25         Here he is in July 2014 talking to Mr. Fraser.  You're

right, this is my company.  I am the only one that knows how to

really run it.  That's DX 521.  You'll have that back in the

jury room with you.

August 1st, the first day of the period that you've

been asked to focus on, Mr. Garza says, I run the marketing,

the promoting.  That's DX 523.

Mr. Garza in August of 2014 -- he's the one on the

right.  Joe Mordica's the one on the left.  Mr. Garza says,

"This is my house," not this is Stuart Fraser's house, this is

our shared house.  "This is my house."  This was his company.

He was the CEO.

And he told Mr. Gallagher, who was thinking about

working with him in September of 2014, There is no senior

management.  I am, literally, doing all this on my own.

And when Mr. Gallagher said, "Is Stuart Fraser

involved?"  Mr. Garza said, "No, Stuart is not involved."  I

think that was one of the keys.

Mr. Garza said in October, talking about Stuart

Fraser, "He adds no value as an investor.  His emotions keep

him from being a valuable partner to the company."

Mr. Garza said later in October, "The only actual

officer in the company is me, Josh Garza."  And if you look at

DX 555, you'll remember there's a whole list of the executives,

employees at GAW Miners.  And guess whose name isn't on it.

You know:  Stuart Fraser.

1    Mr. Garza ran this show from top to bottom.  And there
2  he is at the top.  GAW Corporation.  Josh Garza, chief
3  executive officer.
4    You see Amber Messer, who became Amber Capuano, was
5  his personal assistant there under the operating companies
6  under the heading of GAW Corporation.  There's GAW Miners with
7  Jonah Dorman, who you heard from as the vice president of
8  cryptocurrency arm of the company.
9    Now, they tell you in opening, or Mr. Garza told you,
10  if you look on that sheet, maybe up above there's another CEO
11  above the CEO.  That's baloney.  Mr. Garza -- you saw the
12  evidence and you heard from the people that worked there, that
13  Mr. Garza ran the company.
14    In December of 2014 Mr. Garza said Stuart is a silent
15  partner.  He provides no financial support.  So the idea that
16  Mr. Buchdahl told you today that it was Mr. Fraser pulling the
17  financial strings, listen to Mr. Garza at the time before he
18  struck his secret deal.  All the loans that Stuart Fraser made
19  to the company were paid back in July of 2014 before the period
20  started that you're asked to focus on.  From August 1, 2014,
21  through January 19, 2015, GAW Miners and ZenMiner were Mr.
22  Garza's cryptocurrency show, and he ran them.
23    And here's one perfect example.  Mr. Garza said, "I'm
24  thinking of buying the domain name btc.com."  Do you see that
25  in the upper right?  "It's actually not bad" Mr. Garza says.

1  "I might buy this."  Stuart Fraser says, "I want to throw up."

2  "It seems like a huge waste of money to me."

3          If he had been in control, guess what would have

4  happened.  There would have been no BTC deal.  In fact, you

5  know what happened.  Six date later, Mr. Garza bought btc.com,

6  the domain, for a million dollars.  There was no vote.  Mr.

7  Fraser had no veto power.  He had no ability to control Mr.

8  Garza and GAW Miners.  This is the evidence.  This is just

9  another example.

10         You can't point, and they can't find, a single example

11  where Mr. Fraser said "I want something done" and it got done.

12  What happened is things like this.  Mr. Fraser said, "It's a

13  huge waste of money.  Don't do it."  Mr. Garza's in control.

14  He runs the show.  He says, "I don't care.  I'm going to spend

15  a million dollars on this."

16         Until he struck his secret deal with the Plaintiffs,

17  Mr. Garza said the same thing time after time after time:  I,

18  Josh Garza, I'm in charge.

19         Now, who besides Plaintiffs themselves and Mr. Garza's

20  own statements at the time tell you that the Plaintiffs have

21  the wrong man?  United States Securities and Exchange

22  Commission, the SEC.  You heard that in 2015 the SEC issued

23  subpoenas and took testimony.  You heard that Mr. Garza was so

24  worried that in early 2015 he fled to Dubai.  The SEC performed

25  a thorough investigation with all the resources of the United

1  States Government.  And you know the result.  The SEC in

2  December of 2015 charged Josh Garza and the two companies.

3  They did not charge Stuart Fraser.

4         And this is what the SEC, the United States

5  Government, concluded after conducting its stem-to-stern

6  investigation.  Look at paragraph 14.  SEC:  Josh Garza, during

7  all of 2014, he was the founder and CEO of GAW Miners.  He

8  owned and controlled ZenMiner.  In those positions which he

9  held since those companies were founded, he directed their

10 strategy, their financial decisions, and had ultimate control

11 over their day-to-day operations.

12        That language should look familiar to you because

13 that's the language that Plaintiffs used six months later when

14 they filed their Complaint.  They believed the SEC at the time

15 because they knew that was true.  The SEC went on to say about

16 GAW Miners, Mr. Garza is the managing member and majority owner

17 of GAW Miners.  During all relevant times, Garza has controlled

18 GAW Miners and directed its day-to-day activities.

19        The same with ZenMiner.  The SEC charged that Garza is

20 the managing member and majority owner of ZenMiner.  During all

21 relevant times, Garza controlled ZenMiner and directed its

22 day-to-day activities.

23        The Plaintiffs, Garza's statements at the time, and

24 the United States Securities Exchange Commission tells you that

25 Garza was the one who controlled these companies.

1      Now, who else beside the Plaintiff and Garza's

2  statements and the SEC told you that Mr. Garza, not Stuart

3  Fraser, was in control of GAW Miners and ZenMiner?  The FBI and

4  the Department of Justice.

5      You heard that the Department of Justice charged Mr.

6  Garza, not Stuart Fraser.  They charged him with criminal

7  fraud, that he pled guilty and took full responsibility for his

8  actions.  You have PX 119.  It's a Plaintiffs' exhibit, but I

9  suggest that you look at it closely.  That's the Plea Agreement

10  where Mr. Garza pleaded guilty to fraud and said over and over

11  and over again, "I did it", "I did it," "I did it" and didn't

12  mention Stuart Fraser in the slightest.

13      You heard Mr. Garza tell you -- or you saw his

14  statement in open court, in this court.  He said, "I made a

15  number of statements that were not true at the time that I made

16  them" -- no story about Stuart Fraser controlled me like a

17  puppeteer, that Stuart Fraser was on top.  He was the CEO above

18  the CEO.  That story didn't come out until this trial, until

19  his deposition where he sang for his supper.

20      Mr. Garza was sentenced to 21 months in prison,

21  ordered to pay $3.4 million in restitution to his victims.  And

22  you heard what Mr. Garza said at his sentencing.  He took full

23  responsibility for his actions.  What he said in his

24  sentencing, and you heard him say on tape, he said, "No matter

25  what happened, I was in charge," not Stu Fraser was in charge,

1  "I was in charge," because that was the truth.  And he had to

2  say that at his criminal sentencing.

3          Now, who else besides Plaintiffs and Mr. Garza's

4  statements at the time and the SEC and the FBI and the

5  Department of Justice?  Who else tells you that Mr. Garza, not

6  Mr. Fraser, controlled the companies?  The employees of those

7  companies themselves.

8          The Plaintiffs didn't call a single employee of GAW

9  Miners or ZenMiner because they knew you would find out what

10  actually happened at those companies.  They relied totally on

11  Mr. Garza, a man the lead Plaintiff said was entirely

12  untrustworthy.  That's the man they're relying on to have you

13  come back with a verdict against Mr. Fraser.

14          Those six employees that you saw, Mr. Capuano and his

15  wife, Mr. Dorman, Mr. Pease, Ms. Eden, and Mr. Mordica, we

16  called them.  None of these people testified that they ever saw

17  Mr. Fraser at the GAW Miner or ZenMiner offices or plants.

18  They never heard Mr. Fraser on the phone.  They never got any

19  direction or orders from him.  They never got a single e-mail

20  or a memo or a letter or a note from Mr. Fraser telling them

21  what to do.

22          My personal favorite is Joe Mordica, the fellow who

23  testified.  He was the one down in Mississippi running the

24  computer plants and where all the machines were.  He was asked,

25  "Did you ever meet or speak with Stuart Fraser?"  His answer --

1  you remember his answer.  He said, I didn't even know he

2  existed until recently, you know, in 2018.  He thought Josh

3  made him up.  "Is he real?  Is he a real person?"

4          That's the guy -- they're telling you to believe that

5  Stu Fraser was behind the scenes telling everyone what to do;

6  you just can't see him.  He's invisible.

7          Now, the idea -- and if you want to hear testimony

8  back, I suggest you hear Mr. Mordica's testimony.  The idea

9  that Stuart Fraser conceived of and developed Hashlets is

10  ridiculous.

11          Listen to Mr. Mordica walk you through each step from

12  the hardware-hosted mining to the cloud-hosted mining, the

13  Hashlets.  He tells you each time, this was Josh Garza's idea,

14  to put money in Josh Garza's pocket.  But when they tell you

15  that Mr. Fraser was the evil genius behind Hashlets, don't

16  believe them.  Listen to Mr. Mordica.  He tells you what

17  actually happened.

18          Even Plaintiffs have to concede that Mr. Fraser wasn't

19  involved in the operations of the business.  This is Mr. Ard in

20  the opening saying that Stuart Fraser wasn't involved in the

21  day-to-day operations.  That was Josh Garza's job.

22          Of course, it was Josh Garza, the chief executive

23  officer, who ran the show, who made every single strategic

24  decision at GAW Miner and ZenMiner.  And you heard from the

25  employees that Mr. Garza thought there was no one higher or

1   more important than him.

2          Eric Capuano said that Garza's the self-proclaimed

3   Hash king.  He described him as the Donald Trump of CEOs.  Now,

4   you may not like Donald Trump or you may like him, but nobody

5   thinks there's someone above Donald Trump secretly controlling

6   him.

7          Amber Capuano sums up Garza as a superhero, and the

8   lead Plaintiff, Mr. Shinners, used that long work

9   "megalomaniac," which means a person obsessed by his own power,

10  to describe Mr. Shinners (sic).

11         Now, Mr. Buchdahl told you, well, you don't have to

12  have just one.  You control -- there can be a bunch of control

13  people.  I mean, don't be fooled by that.

14         When you drove to the courthouse today, how many

15  people were controlling your car?  How many people were at the

16  wheel driving your car?  Mr. Garza drove the companies; he

17  drove their every decision.

18         That's what the GAW Miners, the six people we called

19  by video, that told you that Mr. Garza kept each person in

20  their own little silo so they wouldn't know the big picture

21  what was going on.  Each person -- I think Mr. Mordica said

22  that each person was contained.  Mr. Capuano said they were in

23  a silo.  And Mr. Garza was the only one who knew everything

24  that was going on with the business.

25         Stuart Fraser's silo, his silo was Mr. Garza, give me

1  money, give me, give me money.  And when in June of 2014 when

2  Mr. Fraser said, That's it, the loans are over, there will be

3  no more money, Mr. Garza had no more use for him other than to

4  hijack his name and reputation.

5          Now, who besides the Plaintiffs, Mr. Garza's own

6  statements, the SEC, the FBI, the Department of Justice, and

7  the GAW Miners' employees, who else told you that Garza

8  controlled GAW Miners?  Well, Mr. Fraser told you that himself.

9  You heard him testify over two days.  You got an opportunity to

10 hear what actually happened.  And we all heard how Mr. Garza

11 played Stuart Fraser, played him for his name, his reputation,

12 and most of all his money.

13         Remember that on the first day of trial, Mr. Ard told

14 you in his opening, he said that Stuart Fraser poured millions

15 of dollars into the business over the years and provided

16 hundreds of thousands of dollars of loans to GAW Miners.

17 That's absolutely true.  But what Mr. Ard didn't tell you was

18 that in June 2014 Mr. Fraser stopped loaning any more money to

19 the company and that Mr. Garza repaid the last loan in July of

20 2014, July 24th.  It's on Exhibit 501, the list of transactions

21 and Mr. Fraser's losses.

22         The last payment was before the period that you've

23 been asked to focus on, which begins on August 1st.  Any

24 supposed control that Mr. Fraser would have had because of

25 those loans was gone when the last loan was repaid.  Done and

1   dusted.  If he ever had any financial control, he didn't have

2   it when the loans were repaid.

3          Plaintiffs' counsel also didn't tell you that Mr.

4   Garza's biggest victim was Stuart Fraser, that Stuart Fraser

5   lost nearly $12 million, including his entire investment in GAW

6   Miners.  And that's Exhibit 501.

7          If you need hard evidence that Mr. Garza played Stuart

8   Fraser, this is it, that he used him, this is it, $12 million

9   in losses Plaintiffs can't even argue with.  They're the ones

10  who put this document together.

11         Now, Plaintiffs' counsel will tell you, what about

12  that credit card?  And Mr. Buchdahl mentioned it.  He said,

13  What about that credit card?

14         The credit card isn't evidence that Stuart Fraser

15  controlled Mr. Garza or those companies or that he knew that

16  Mr. Garza was committing fraud.  It's the exact opposite.  Mr.

17  Garza used that card running up hundreds of thousands of

18  dollars without consulting Stuart Fraser.  And when Mr. Fraser

19  found out, because his own cards got canceled, Mr. Garza said,

20  "Don't worry.  I've got this covered.  I'll pay you back."

21  That's more evidence Garza used Stuart Fraser.

22         And you saw the e-mail where Mr. Fraser was asking for

23  the figures, the data and the numbers.  If Mr. Fraser had been

24  in on the fraud as part of the fraud, he wouldn't be asking for

25  the data and numbers because Mr. Garza would write back, "Stu,

1  you know these numbers are all fake and phony.  Why are you

2  asking me that for?"  There's no e-mails like that.

3       Mr. Fraser wanted to know what was going on, and like

4  he did to everyone else in his company, Mr. Garza just put him

5  off and said, Don't worry about it.  I got this covered.

6       Mr. Fraser was fooled by Mr. Garza, a man he

7  considered almost another son, a man who he mentored and who he

8  trusted.

9       Ladies and Gentlemen, there's plenty of evidence that

10  Stuart Fraser was too loyal to his friend.  There's no evidence

11  that Mr. Fraser was the unseen, unheard puppet master behind

12  the scenes.

13       You heard Mr. Buchdahl ask him, Well, why didn't you

14  just walk away?  And Mr. Fraser's answer came from the heart.

15  I don't walk away from my friends, someone I knew for more than

16  ten years, someone I thought of as a surrogate son, someone I

17  trusted, someone who had run legitimate businesses for me, no,

18  I don't walk away from my friends.

19       Now let's talk about Plaintiffs' argument to you that

20  in 2014 Mr. Fraser knew Mr. Garza was a criminal fraudster,

21  that he materially assisted in the fraud all the while knowing

22  that it was a fraud.  Ladies and Gentlemen, that defies common

23  sense.  To think that Mr. Fraser would have knowingly involved

24  in a fraud his family members, the best friend he had in his

25  life, Howard Lutnick, and the company Cantor Fitzgerald, the

only company he ever worked with, his family company that he
loved, that doesn't make any sense.  Those are the people he's
going to pull into a fraud?

Use your common sense.  As Mr. Ard told you, that's a
weapon you bring you into the jury room.

Now, someone once famously said that hindsight is
20/20.  Looking back on it, of course Mr. Fraser realized he
trusted Mr. Garza too long and believed too many of the lies
that Mr. Garza told him.  But that's the thing about betrayal
by someone really close to you; until you finally realize
what's happening, you miss the signs.

And how dare Plaintiffs claim that from August 1,
2014, on Mr. Fraser knew it was a fraud.  You heard from the
half dozen GAW Miners' employees and executives.  These are
people with technical knowledge, including knowledge of
cryptocurrency who worked at GAW Miners or ZenMiner every
single day.

And, of course, you heard from Mr. Capuano that when
the business started, they actually had mining capacity.  They
actually had equipment that they shipped to people.  They
actually had computers down in Florida, in two places, in
Hattiesburg and I can't remember what the other one was.  But
they had the equipment, and they had the hardware-hosted mining
and the cloud-hosted mining.  And that was real, lots of mining
equipment from the picture.  There it is in Mississippi.

1    And Mr. Capuano said back then we wouldn't oversell

2    capacity.  At the outset, all the GAW Miners employees were

3    excited by the prospect.  They left their job.  Mr. Mordica

4    sold his business for nothing.  They were all excited about

5    this business, and so was Mr. Fraser.

6    So when he writes in March or May or April that "I'm

7    excited" and "this is my new baby," yeah, they were all

8    excited.  This was a real business until Mr. Garza took it in a

9    different direction later in the year.

10   You heard Mr. Capuano say later, much later in 2014,

11   he raised questions about the adequacy of GAW Miners'

12   equipment; and Mr. Garza told him, "Don't worry about it.  I've

13   got it covered."  That's the very same kind of assurance that

14   Mr. Garza gave Mr. Fraser and everyone else.

15   Look at Mr. Shinners, the lead Plaintiff.  He was

16   deeply involved in GAW Miners from late October and November

17   and December, into early January of 2015.  He communicated --

18   you heard he communicated with Mr. Garza directly by phone, by

19   text, by private messaging, by e-mail.

20   He sent 675 e-mails back and forth to Mr. Garza and

21   the people at GAW Miners.  And, you know, Mr. Shinners couldn't

22   remember that.  You know, like Mr. Fraser, like probably most

23   of us, people's memories are imperfect; right?

24   You saw Mr. Shinners struggle to remember what he said

25   in his deposition.  It gives you some understanding that

1    sometimes when you testify, you forget what you said.  It's not

2    that you're evil, and I'm not saying Mr. Shinners is evil or

3    Mr. Fraser deliberately forgot things.  Sometimes people

4    forget.  You saw that with Mr. Shinners and some of the other

5    witnesses as well.

6            Mr. Shinners, he was on the inside of GAW Miners.  He

7    helped create the detailed white paper for Paycoin.  He was

8    part of the inside gang.  He even signed a nondisclosure

9    agreement, an NDA, that he wouldn't reveal the confidential

10   information that he had.

11           You heard that he was such an insider, that Mr.

12   Shinners was such an insider from Mr. Mordica, Mr. Mordica

13   said, Shinners got invited to these internal meetings at GAW

14   Miners.  You never heard any evidence that Stu Fraser was

15   invited to any internal meeting at GAW Miners.

16           Mr. Shinners told you he was, and considered himself,

17   an auditor's auditor; right?  He told you that in 2014 no one

18   had more expertise than him about cryptocurrency, but even Mr.

19   Shinners got conned by Mr. Garza, all the way through early

20   2015.  It makes perfect sense that Mr. Garza could have also

21   conned Mr. Fraser, who didn't know jack about cryptocurrency.

22           There's the white paper that Mr. Shinners wrote or

23   helped write.  Look at the other Plaintiff.  Look, the

24   Plaintiffs, you saw them from the stand.  These are smart,

25   intelligent, educated, sophisticated business people.  And Mr.

1    Garza conned all of them.

2          Mr. Pfeiffer, Mr. Pfeiffer even thought Mr. Garza was

3    legitimate into April and May 2015, three months after the SEC

4    investigation was announced when he was still trying to do

5    business with Mr. Garza.

6          Now, Mr. Ard told you in his opening, Mr. Ard said,

7    "Stuart Fraser had expertise from his years at Cantor

8    Fitzgerald."  But Mr. Buchdahl proved the exact opposite.

9    Here's Mr. Buchdahl.  He asked Mr. Fraser -- that's not me

10   asking.  That's Mr. Buchdahl saying, "You didn't have any

11   expertise or experience whatsoever in mining before this

12   company; correct?"  Answer:  "Yes."

13         Now, the Plaintiffs brought in an $800-an-hour

14   professor from Princeton to show how simple cryptocurrency is.

15   He spoke to you about digital assets and digital currency and

16   virtual currency and pool mining.  I got lost -- I got lost

17   about halfway through when he was talking about the difference

18   between proof of stake and proof of work.  These are

19   complicated, confusing terms.  It's no wonder that Mr. Fraser

20   didn't know the ins and outs of cryptocurrency, especially when

21   it was back in its infancy in 2014.

22         Now, the Princeton professor did tell you

23   cryptocurrency is very different than the T bills that Mr.

24   Fraser traded at Cantor Fitzgerald and that there was no such

25   thing as cryptocurrency during the entire time that Mr. Fraser

1    worked at Cantor Fitzgerald.  So when you hear them claim that

2    Mr. Fraser had the expertise to spot Mr. Garza's high-tech

3    fraud, a fraud that no one else spotted inside or outside the

4    company, when Mr. Audet, who has a Ph.D., and Mr. Shinners, who

5    is on the inside and has an MBA and was a cryptocurrency

6    expert, and Mr. Pfeiffer, who wrote a white paper on

7    cryptocurrency, when they were fooled, it's just baloney to

8    think that Mr. Fraser wasn't also fooled.

9           Now let's talk about a few things that Plaintiffs

10   claim show that Mr. Fraser actually controlled GAW Miners.

11   None of them actually does.  In fact, they proved the opposite.

12   As the SEC concluded, and as the Plaintiffs said in their

13   original Complaint, it was Josh Garza who controlled both of

14   those companies throughout the period in question.

15          Now, the first item that they talk about, Plaintiffs

16   talk about this combination between GAW Miners and ZenMiner

17   announced in May of 2014.  That's two and a half months before

18   the period you've been asked to look at.

19          Listen, there's no question it was a deal dreamed up

20   by Josh Garza, who roped in Mr. Fraser's son Tommy.  But even

21   Mr. Garza told you that this deal wasn't Stuart Fraser's idea.

22   Mr. Watterson, one of the Plaintiffs lawyers, asked him, "Mr.

23   Fraser came up with the concept of GAW Miners' parent company

24   purchasing a stake in ZenMiner?"  Mr. Garza said, "No."

25          There's no evidence whatsoever that Mr. Fraser thought

1  it up, this idea of this deal, and directed that it happened.

2  There is no evidence that he knew about it beforehand, before

3  the announcement.  If you actually look at the May article

4  below the headline they like to show you, the article talks all

5  about the ZenMiner product, which was a user-friendly interface

6  for these kind of clunky, hard-to-use mining machines.

7       And Plaintiffs' counsel criticized.  Mr. Buchdahl

8  showed an e-mail that said Stu Fraser thought it was a great

9  idea.  Well, Stu Fraser wasn't the only one who thought it was

10  a good idea.  You heard Eric Capuano, the first one to testify,

11  he knows a lot about cryptocurrency mining, and he said, "I

12  thought it was a fantastic idea, the ZenMiner concept."  And

13  Joe Mordica called it a really cool idea that excited him.  So

14  they shouldn't make fun of Mr. Fraser for thinking the exact

15  same thing.

16       Now, why did Mr. Garza want to add on top of this

17  great idea the notion that GAW Miner and ZenMiner started up as

18  separate companies?  Who knows what he's thinking.  First he

19  used Thomas Fraser.  Then when it came out again in August, he

20  used Eric Capuano, his childhood friend.  This guy will use

21  anybody to get what he wanted.

22       Mr. Fraser explained to you that he didn't know why

23  Garza wanted it that way, but he was focused on the fantastic

24  idea of this product, which would make it easier for regular

25  people to mine cryptocurrency.

1    There's also absolutely no evidence that any of the

2    Plaintiffs, Mr. Audet, Mr. Pfeiffer, or Mr. Shinners, relied on

3    this deal announcing in May 2014.  None of them mentioned it

4    from the stand when they talked about what they relied on.

5    They mentioned one thing:  *The Wall Street Journal* article.

6    You didn't hear a word of this ZenMiner deal.

7          If that weren't enough, you'll hear in the

8    instructions that Judge Shea gave you -- and this is the jury

9    instructions.  Judge Shea says, Remember, I also instruct you

10   that the statements made in relation to the acquisition of

11   ZenMiner by GAW Miners are not the false statements the

12   Plaintiffs allege they relied on when purchasing the products

13   at issue.

14         So don't get fooled.  Don't get distracted by that

15   sideshow about the ZenMiner deal.

16         You heard Mr. Buchdahl ask Mr. Fraser, "Why didn't you

17   walk away from Mr. Garza when you discovered this phony deal?"

18   Now, in May of 2014 Stuart Fraser had known Josh Garza for more

19   than a decade.  He mentored him.  He worked with him on several

20   companies, including the high-speed internet business in

21   Vermont.  Should Stuart Fraser have said, after those ten years

22   in that relationship, should he have said, well, one mistake of

23   judgment and you're dead to me?  That's not the kind of person

24   Stuart Fraser is.

25         Sometimes people make mistakes in judgment, and you

1   caution them and you warn them and you move on.  As the Bible

2   tells us, "Let he who is without sin cast the first stone."

3          Now, the second item the Plaintiffs like to talk about

4   is *The Wall Street Journal* article in late November of 2014.

5   And you heard Mr. Buchdahl talk about it quite a bit.  But

6   there's no evidence, Ladies and Gentlemen, whatsoever that Mr.

7   Fraser directed or controlled or even suggested that Mr. Garza

8   speak to *The Wall Street Journal*.  All the evidence shows that

9   it was Mr. Garza's idea, that Mr. Garza's request is that

10  Stuart Fraser speak to the reporter.

11         And even Mr. Ard conceded in his opening that when Mr.

12  Fraser spoke to *The Wall Street Journal*, it was supposed to be

13  all off the record.  You saw Mr. Buchdahl put up that screen,

14  and he didn't highlight that part.  The understanding was

15  entirely off the record that Stuart Fraser's name wouldn't be

16  mentioned.  He didn't want to be quoted.  He didn't want to be

17  mentioned.

18         And the one sentence in the article that mentions him,

19  take a look at it.  It's all completely true.  He was a backer

20  of Mr. Garza in these Great Auk Wireless businesses.  That's

21  true.  And he did work at Cantor Fitzgerald, that's true.

22  There's nothing false in Mr. Fraser's statement as quoted or

23  mentioned in that article.

24         Now, Plaintiffs claim that they rely on the $20 price

25  floor and the hundred million dollar reserve described in that

1  article.  You saw the proof.  Talk about a $20 pay floor,
2  Paycoin never once in its entire existence -- and it's still
3  traded to this day -- it's never traded higher than $9.22.  So
4  to say they believed there was a $20 price floor is like when
5  Mr. Shinners told you, "I believed it was always going to be
6  profitable"; right?  That's baloney.  That's his investment.
7  He believes it's always going to be profitable?
8          These are high-risk, high-exposure currencies; right?
9  People don't get into cryptocurrency because instead of like a
10  really safe investment.  So when they say they relied on a $20
11  price floor, there never was one even during the period in
12  question.  You can't reasonably rely on a promise that never
13  existed, that was never true.  It's just nonsense.
14          Now, you also have to look at Plaintiffs' buying
15  behavior and selling behavior.  They told you, Well, we relied
16  on this *Wall Street Journal* article.  We still have Mr.
17  Fraser's name in it, and that made all the difference in the
18  world.
19          Well, you know what?  Facts don't lie.  And look at
20  the Plaintiffs' certifications, DX 687.  They'll tell you Mr.
21  Shinners bought three times as much GAW Miners' products before
22  *The Wall Street Journal* article than he did after it, that Mr.
23  Audet's buying pattern remained completely unchanged, and that
24  for months before the article, Mr. Pfeiffer had been buying
25  tons and tons of GAW Miners' products.  How could he rely on

1   something that hadn't happened yet?

2           And after it happened, look at Mr. Pfeiffer's pattern

3   of behavior.  He sold bunches and bunches and bunches of assets

4   right after the article came out.  These people didn't rely on

5   that article.  There's no reason to believe the Plaintiffs

6   would have acted any differently if *The Wall Street Journal* had

7   never come out or if it had never mentioned Stuart Fraser.

8           Mr. Buchdahl also mentioned that November 2014 press

9   release.  Don't be fooled by that either.  None of the

10  Plaintiffs said they relied on that press release; right?  They

11  didn't mention it because they didn't know about it, hear about

12  it, see it, or rely on it.

13          Now, the third item that Mr. Buchdahl likes to talk

14  about is the meeting at Cantor Fitzgerald in mid-November 2014

15  when Mr. Fraser brought in Mr. Garza.  It said, Come in.  I

16  want you to meet the tax compliance guy and the back office

17  guy.  And, now, Mr. Garza said, No, no, we were really there

18  for investment, even though it's not in any of the e-mails.

19          What the e-mails actually say, Mr. Garza -- I mean,

20  sorry, Mr. Fraser telling his friend Jim Ficarro, his long-time

21  friend, GAW Miners was totally above board, which he believed.

22  He wouldn't involve his friends in his company in something he

23  though was fake.  "We only want to do it right.  We want to

24  make sure we're set up right."

25          The people they met with, you heard from Mr. Fraser,

1    those weren't investment decision makers at Cantor Fitzgerald.

2    Those are people who give advice on how to comply with the law.

3    He gave advice, and Mr. Garza ignored it.

4            Mr. Fraser even suggested that Mr. Garza meet with

5    Sullivan & Cromwell, one of the country's top law firms.

6    That's not materially assisting a fraud.  That's trying to

7    prevent one.  He was telling Josh Garza:  Do it right.  Talk to

8    the one of the best lawyers in the country.  And Mr. Garza

9    ignored him.

10           Now, the fourth item you heard Mr. Buchdahl like to

11   throw around the word "partner."  Now, the truth is Stuart

12   Fraser was a silent partner with no financial support to the

13   companies, and it's also true that these companies weren't

14   partnerships -- right? -- that they're not real.  You can't be

15   a partner in a corporation that -- Mr. Fraser used the term

16   "partner" like you talk about your, you know, when you're back

17   in ninth grade and you have a lab partner in science.  He

18   wasn't saying that "he's my partner" because these aren't

19   partnerships.  These are corporations.

20           Mr. Buchdahl likes to talk about the Twitter account

21   and Mr. Fraser's Retweet of a few of GAW Miners' statements.

22   Here's where your common sense comes in.  Plaintiffs' argument

23   doesn't make any sense.  Mr. Fraser had about 75 followers, his

24   friends and his family.

25           Now, Mr. Shinners says, "I was also a follower"?  You

1  got to take that with a grain of salt.  You know, Mr. Shinners,

2  if he had really been a follower of the Twitter account and

3  really relied on what was in that Twitter account, you can be

4  darn sure that Plaintiffs' lawyers would have brought that out

5  when they examined him.  They didn't touch it with a ten-foot

6  pole.  He made that up as he sat there.

7        The people who were on Mr. Fraser's Twitter account,

8  the friends and family, are those the people he wants to suck

9  into something he knows is a fraud?  That doesn't make any

10 common sense.  And certainly the evidence is undisputed that no

11 one, no one, responded to Mr. Fraser's few Tweets and that Mr.

12 Fraser didn't bring a single investor into the company.

13       Now, Mr. Fraser spent -- sorry.  Judge Shea spent a

14 lot of time talking about the law, and I'm not going to go over

15 that at all.  You're going to be asked about Hashpoints and

16 HashStakers.

17       Look, it's easy.  These are not securities.  You look

18 at the definition of securities.  Hashpoint was an in-store

19 credit.  HashStaker was an electronic wallet.  Paycoin's also

20 not a security.  It's a coin.  It's a currency.  And you can

21 see the Judge's jury instructions at page 30 even said

22 currency; it's not a security.

23       And you can have the Department of Justice Plea

24 Agreement with Mr. Garza where they describe Paycoin as a

25 currency, and even the Princeton professor said it was a type

1    of digital asset.  It's used as a medium of exchange.  Look at

2    the definition in the instructions.  You can see Paycoin is a

3    currency and, therefore, not a security.

4         Hashlets also were not securities.  The Judge's

5    instructions tell you, look at three things.  Two of them

6    Hashlets fail the test.  You have to have a common enterprise,

7    and that isn't true with Hashlets.

8         Hashlets, each customer's fortunes were not tied to

9    the fortunes of other customers because each different customer

10   could choose to be in a different mining pool.  One could make

11   money one day -- that's the happy fellow -- and one could lose

12   money mining Hashlets the same day -- that's the unhappy

13   fellow.  And each person's fortunes are not tied to the

14   fortunes of GAW Miners because Mr. Audet and Mr. Pfeiffer told

15   you that GAW Miners made a fixed fee on every customer

16   regardless whether the customer's pool made money that day or

17   not.  The customer could make zero dollars or make five dollars

18   or lose money.  GAW Miners made the same fee.

19        And the other factor the Judge instructed you on --

20   again, these are on page 21 of the instructions -- where the

21   profits are not derived solely from the efforts of others, it's

22   not going to be an investment contract and, therefore, not a

23   security.

24        You heard Mr. Audet say, We had control.  I could go

25   and I could boost a particular mining pool.  I could change the

1  direction.  I could go in and decide to mine in a different

2  pool.

3          Choosing and choice and direction remained with the

4  customer.

5          THE COURT:  Mr. Weiner, you have five minutes.

6          MR. WEINER:  Thank you, Judge.

7          You heard the term "control person liability" and some

8  of these other terms are in the instructions.  Remember,

9  "control" is a word that we can all recognize.  Control person

10  liability, it's not friend liability.  It's not mentor

11  liability.  It's not occasional advice liability.  It's not

12  even minority investor liability.

13          Mr. Buchdahl told you about, well, they were equal

14  owners.  You didn't hear a word from Mr. Buchdahl about how Mr.

15  Garza controlled the other 18 percent.  He was giving it out

16  when he offered Mr. Eden, then Mr. Eden, and Mr. Dorman

17  employment.  You didn't hear a word from Mr. Buchdahl about how

18  during 2014, Mr. Fraser said, "Well, Mr. Garza said, 'I want

19  you to drop down from 41 percent to 15 percent.'"  Mr. Fraser

20  said, "Okay, I'll do it.  It's your company."  Never got

21  signed.  But that was indicative of the control that Mr. Garza

22  had.  He wanted Mr. Fraser to be a 15-percent owner and he

23  would own the rest and some of the employees might own a little

24  stock too.

25          "Materially assist in a fraud" you'll see in the

1    instructions requires that they have to prove that Mr. Fraser

2    assisted in committing securities fraud and that culpable

3    participation means that he had to act with intentional

4    misconduct or conduct that was highly unreasonable.  Mr. Fraser

5    didn't do that.  The proof doesn't show that.

6         Ladies and Gentlemen, the testimony and the evidence

7    show that Mr. Fraser was a good hearted and overly trusting

8    person, a man who spent his life helping those in need who

9    doesn't walk away from his friends.  And he couldn't believe

10   that his business colleague of over a decade would play him.

11   This is a man who helped Mr. Garza buy his house, helped him

12   buy an engagement ring.  He mentored him, he cared about him.

13   That's what he got in return.

14        Plaintiffs haven't proven that Mr. Fraser was the

15   unseen puppet master, the CEO above the CEO, as Mr. Garza

16   claimed, who directed and dictated and controlled Mr. Garza at

17   GAW Miners and ZenMiner.  Instead, all the evidence is that Mr.

18   Garza, the CEO, played Mr. Fraser, used him, manipulated him

19   like he did to every other person who testified in this case,

20   including his childhood friend Eric Capuano and poor Mr.

21   Mordica, who lost his business.

22        Did Mr. Fraser ask questions?  Sure.  Did he

23   occasionally offer advice?  Absolutely.  Did he excitedly

24   follow his minority investment?  Without a doubt.

25        Did Mr. Fraser take pride in what had been a

1   legitimate hardware mining company back in May of 2014 when he

2   called it his "new baby" and when he and everyone else at GAW

3   Miners thought it continued to be a legitimate company?  No

4   question.

5          Ladies and Gentlemen, it's a heck of a thing to bring

6   down, crashing down, Mr. Fraser's hard-earned reputation,

7   something that he spent a whole lifetime building, but that's

8   what the Plaintiffs urge you to do based on the lying king Josh

9   Garza's claim that Mr. Fraser had full control over him.  Mr.

10  Garza conned his customers.  He conned his business colleagues;

11  he conned his banks; and he conned Mr. Fraser.  Don't let him

12  con you.

13         There's no question that people lost money as a result

14  of Mr. Garza's lies.  That group includes Stuart Fraser.  He

15  should not be made to pay any further for Mr. Garza's crimes.

16         At the end of the day, Ladies and Gentlemen,

17  Plaintiffs simply have the wrong man.  We ask that you find Mr.

18  Fraser not liable for the fraud that Mr. Garza committed, a

19  fraud for which Mr. Garza stood up in this very court and took

20  full responsibility for.

21         Thank you, Ladies and Gentlemen.

22         THE COURT:  Thank you, Mr. Weiner.

23         Now we're going to hear rebuttal from Mr. Buchdahl.

24  He will have 14 minutes.

25         MR. BUCHDAHL:  Defense counsel just stood up here and

 1    told you that the Defendant spoke from his heart when he said,

 2    "I don't walk away from my friends."  But that's the opposite

 3    of what he told the SEC.  What he told the SEC is that he did

 4    walk away.  And what he told you under oath at his deposition

 5    was that he stayed in and tried to play nice to try to get some

 6    of his money back.

 7          See, the Defendant can't get his story straight.  Was

 8    he being loyal?  Was he walking away?  On whatever day, he

 9    picks whatever story he thinks is going to sound best, and

10    you've now seen three different versions of that.

11          Now, for some reason the Defense keeps saying that the

12    Plaintiffs changed their story.  I'd like to put up DX 682D.

13    Remember, Defense counsel showed you paragraph 17 from the

14    original Complaint.  Ladies and Gentlemen, this is paragraph 18

15    from the original Complaint, the very next paragraph.

16          Defense counsel described that careful investigation

17    that Mr. Shinners led and how they spent time really looking at

18    the evidence to figure out what had happened.  And what was the

19    conclusion at the very beginning of this lawsuit?  The original

20    Complaint, the very next paragraph.

21          Through Fraser's ownership of GAW Miners and his

22    long-standing personal and business relationship with Garza,

23    Fraser had the power to direct or cause the direction of the

24    management and policies of GAW Miners.  Fraser was a culpable

25    participant in Garza and GAW Miners' violations of federal and

1    state securities laws.

2         I ask you, Ladies and Gentlemen, is there a single

3    thing that the Plaintiffs have said at this trial that is

4    inconsistent with what they said at the very outset, or have

5    they been making the same exact case against Mr. Fraser this

6    entire time?

7         Now, the Defense agrees the key question is one of

8    control.  And you'll see on your Verdict Form that there are a

9    lot of questions asking you whether the Defendant is liable as

10   a control person.  And in each one of those instances, the

11   Plaintiffs submit that the answer is yes.

12        As the Court told you, there can be more than one

13   control person.  The Defense asked you not to be fooled by that

14   instruction.  There's nothing to be fooled by.  It's very

15   straightforward.  It's not like driving a car.  When you have a

16   business, there can be more than one person in control.

17        And if you look at the Court's instructions, it

18   specifically says that if the person occupied a similar status

19   to that of a partner, a business partner, you can conclude that

20   person was a control person.

21        MR. WEINER:  Your Honor, I'm going to object to that

22   last statement as going beyond the instruction.  It don't say

23   business --

24        THE COURT:  It's overruled.  You can continue.

25        MR. BUCHDAHL:  And it asked Mr. Fraser under oath:

1    "You considered yourself a partner in GAW Miners; correct?"

2    Answer:  "Yes."

3         And, again, he told -- you can take this one out.

4         All right.  So you heard Defense counsel also talk

5    about securities.  Now, we submit the evidence shows that each

6    one of those products were securities.  Hashlets were

7    securities.  And Hashpoints and HashStakers and Paycoin were

8    really all the same currency.  That's really -- sorry -- really

9    all the same security.  That's really all just Paycoin.

10        So if you look now at what the definition of an

11   investment contract, which is the definition of a security --

12   oh, sorry, start here.

13        This is what the United States Government concluded

14   about Hashlets.  This is a quote from the SEC's complaint in

15   this very case against GAW Miners.  And what the United States

16   Government concluded, and the Defense is happy for you to

17   follow their lead, United States Government concluded that

18   Hashlets constitute investment contracts and thus are

19   securities.  And the reason for that is because of the

20   expectation of profits to be derived from the efforts of

21   others.

22        If you think about how that works, the efforts of

23   others was all the efforts that GAW Miners was making, or was

24   supposed to be making, mining.  We know that wasn't really how

25   it ended up.  But what people thought is that they were going

1  to receive a share of the mining profits that were happening in

2  the data center.  So that's exactly what Hashlets were.

3        You can see that even Mr. Fraser understood that the

4  Hashlet customers were relying on GAW Miners' expertise.  And

5  for each one of those individual buyers' fortunes, they were

6  tied to the fortunes of other buyers.

7        Now, the Defense points out that you could be in

8  different pools and that some would have a different result

9  from another.  But those are just different kinds of Hashlets.

10 They were all securities all tied to the other people in the

11 same pool.

12       And you can see how the Government described it.

13 People were buying the rights to profit from a slice of the

14 computer power owned by GAW Miners.  That was Plaintiffs'

15 Exhibit 119.

16       Now, as for Paycoin, right, we've already gone over

17 why that's not a currency, because you can't use it to buy

18 anything.

19       The Defense said that the Government -- that it was

20 described as a currency.  It's actually described as a virtual

21 currency.  That's really different; right?  You don't have an

22 initial offering for dollars and cents.  You don't have

23 investors kind of lining up:  Hey, we're going to bring out a

24 new quarter.  Does everybody want to get involved and buy this?

25       The whole point about Paycoin was that GAW Miners

1   controlled it, and they allowed people to buy it at a lower

2   price, all of whom were hoping to get to $20, because that's

3   the promise that was being made.

4           And GAW Miners exercised centralized control over

5   Paycoin.  That's one of the things Professor Narayanan

6   described.  That's one of the thing that made it a security.

7           Now, again, Hashpoints, that's really just another way

8   of getting the security that was Paycoin.  HashStakers, the

9   same thing.  HashStakers was just a certificate that would get

10  you more Paycoin, and that's why all of these things are

11  securities.

12          All right.  Now, the Defendant attacked the Plaintiffs

13  for somehow making a secret deal with Josh Garza.  Now, I don't

14  understand what was supposed to be a secret about it.  They

15  filed a new Complaint.  They were all questioned about it at

16  their depositions.  Nothing about this deal was a secret.

17          But as to why they did it, remember what the evidence

18  tells you.  The Department of Justice convicted Josh Garza of a

19  crime and entered a restitution order against him and required

20  him to pay back what little money he had to the victims.

21          Given that restitution order, what's the point in

22  suing Josh Garza?  He can't give the same money up twice.  So

23  it made perfect sense to focus the Plaintiffs' attention on the

24  other control person at the company, Stuart Fraser.  The

25  agreement that Josh Garza signed didn't require him to rat on

1   the Defendant.  Read it yourself, and remember what the Judge
2   told you.  The only way he could come back into the case is if
3   this Judge thought that Josh Garza had breached the agreement.

4        And they made it sound like Josh Garza would say
5   whatever the Plaintiffs wanted.  But then they showed you
6   testimony.  They said, Well, did Stuart Fraser come up with the
7   idea about the ZenMiner transaction?  If Josh Garza was just
8   there to get Stuart Fraser in trouble, he would have said, "Of
9   course he did.  That was all his idea."

10       But, no, Josh Garza told you when it was his idea and
11  when it wasn't.  And that's what we told you at the outset.
12  Don't take Josh Garza's testimony for granted.  See if it's
13  supported by the rest of the evidence.

14       Now, as for Josh Garza's character, certainly the
15  class of victims in this case certainly wish that all of their
16  witnesses could have been perfect choir boys.  But the reality
17  is that this case is a securities fraud.  And if you're going
18  to have to find out what happened in a securities fraud, you
19  need to speak to the people involved in the fraud.

20       And, remember, the Plaintiffs didn't choose Josh
21  Garza.  This Defendant chose him.  This Defendant took an
22  18-year-old boy, who looked at him as a mentor and father
23  figure, and he gave him way too much money and he gave him way
24  too much responsibility.  He put Josh Garza in charge of every
25  single business they ran together in the same pattern.

1   Defendant gave him the money, and Josh Garza ran the business.

2           And even after this Defendant knew, absolutely knew

3   beyond any question that Josh Garza could not be trusted, he

4   still allowed him to keep running this business that they had

5   started together.  Everything Josh Garza did in his life,

6   including the massive fraud at GAW Miners, he was only able to

7   do because this Defendant enabled him to do it.

8           And the reason that the securities laws of the United

9   States and Connecticut have control person liability is so the

10  people with responsibility can't just walk away.

11          The Defendant had every opportunity to choose a

12  different path.  But unlike Eric Capuano, unlike Shiraz

13  Moosajee, unlike all the other employees who saw something was

14  wrong and walked away, this Defendant chose to stick with GAW

15  Miners right to the very end.  He chose not to walk away then,

16  and he can't just walk away now because the law says he can't.

17  And you, Ladies and Gentlemen, should not let him.

18          Thank you.

19          THE COURT:  Thank you, Mr. Buchdahl.

20          Ladies and Gentlemen, you've now heard my instructions

21  on the law and the parties' closing arguments.  I remind you

22  that the parties' arguments are not evidence.  I will now give

23  you some final instructions before you begin your

24  deliberations.  And I'm on page 42 of the instructions if you'd

25  like to follow along.

1    You were permitted to take notes during the course of

2  the trial.  Any notes you have taken should be used only as

3  memory aids; do not give your notes more importance than your

4  independent recollection of the evidence.  If you did not take

5  notes, you should rely on your own memory of the proceedings

6  and should not be unduly influenced by the notes of other

7  jurors.  Your notes are not evidence and should not be shared.

8    Your verdict must be unanimous and represent the

9  considered judgment of each juror.  Each of you must make your

10  own decision, but you must consider impartially all of the

11  evidence and the views of your fellow jurors.  It is your duty

12  to consult with one another and to deliberate with a view

13  toward reaching an agreement, if you can do so consistent with

14  the individual judgment of each juror.  Until the verdict is

15  agreed to by each juror, it is not a unanimous verdict.

16    In the course of your discussion, do not hesitate to

17  re-examine your own individual views, or to change your

18  opinions, if the deliberations and the views of your fellow

19  jurors convince you to do so.  However, you should not

20  surrender your honest convictions about the facts or about the

21  weight or effect of the evidence solely because of the opinion

22  of your fellow jurors or merely to bring an end to

23  deliberations.

24    Remember at all times that you are not a partisan.

25  Rather, you are the judges of the facts, and your sole interest

1   is to seek the truth from the evidence in this case.

2           Before you begin your deliberations, you will be

3   required to give your cell phones, tablets, and any other forms

4   of electronic communication to the courtroom deputy.  The

5   courtroom deputy will ensure that these items are stored in a

6   safe place, and we will return them to you after you finish

7   your deliberations for the day or, if necessary, at a break if

8   you'd like to take a break.

9           When you return to the jury room, you should first

10  elect one person to act as your foreperson.  The foreperson

11  does not have any more power or authority than any other juror,

12  and his or her opinion does not count for any more than any

13  other juror's vote or opinion.  The foreperson merely presides

14  over your deliberations and is your spokesperson to the Court.

15  She or he will send out any notes, and when the jury has

16  reached its verdict, she or he will notify the marshal that the

17  jury has reached its verdict and you will come out into open

18  court and give the verdict.

19          After you have retired to begin your deliberations,

20  you are not to leave your jury room without first notifying the

21  marshal, who will escort you.  No deliberations may take place

22  without all jurors being present.  If at any time a juror is in

23  the bathroom facilities, the other jurors must cease

24  deliberations and not resume deliberations until all jurors are

25  present.

1        Finally, you are prohibited from conducting any

2   outside research on the case.

3        A Verdict Form has been prepared for your convenience.

4   Focusing on the questions set forth in the Verdict Form will

5   assist you in your deliberations.  I want to caution you --

6   sorry.  I want to caution you now to take your time when

7   completing the Verdict Form.  Let me ask you to look at the

8   Verdict Form now, and I will walk through it briefly with you.

9   As you can see, the form consists of a series of questions that

10  are grouped into a total of six sections.  And I'll just take a

11  moment just to identify the sections for you just so you have

12  it.

13       Section I, Whether the Products Are Investment

14  Contracts; Section II is the Connecticut Uniform Securities Act

15  Claims; Section III is the Federal Exchange Act Claim; Section

16  IV is the Common Law Fraud claim; Section V is Date Concerning

17  Hashlets -- there's a question about that; and Section VI is

18  the Affirmative Defense Applicable to Named Plaintiff Shinners

19  Only followed by the signature block.

20       Each question calls on you either to check "yes" or

21  "no" or to write in a percentage.  Answer each question as it

22  appears and only those questions on the form.  As you review

23  the form, you will see that there are instructions in

24  bold-faced type.  Please read these instructions and follow

25  them carefully.  Depending on your answer to a particular

1    question, it may not be necessary to answer a later question.

2    Finally, be consistent in your responses.

3            You must complete and return the Verdict Form in court

4    when you have reached a unanimous agreement as to your verdict.

5    You will have the original Verdict Form in the deliberation

6    room, and I will ask the courtroom deputy now to collect your

7    copies.  So please -- just for the Verdict Form.  Keep your

8    copies of the instructions.  Just the Verdict Form.  If you

9    please hand your verdict Forms to Ms. Johnson so she'll make

10   sure you only have one, the original, in the jury room.  Keep

11   your copies of the instructions themselves.

12           Thank you.

13           You will be asked to answer the questions in the order

14   in which they appear on the form, and each answer must be

15   unanimous.  When you have reached unanimous agreement as to

16   your verdict, you will have your foreperson fill in your

17   answers, date and sign the Verdict Form.  If the foreperson

18   makes any error in completing the Verdict Form, please do not

19   strike out the error and add a correct response.  Instead,

20   please request a new Verdict Form so that the Verdict Form that

21   is submitted is error-free.  Then inform the court marshal or

22   clerk that you have reached your verdict.  The Verdict Form

23   must be used only in connection with the charge I have just

24   given to.  The terms used in the Verdict Form are discussed in

25   my instructions, and these instructions must govern your

1    deliberations.

2           Shortly after you go into the jury room, the courtroom

3    deputy will bring you the exhibits in this case.  We will also

4    have for you an index to the exhibits that the lawyers have

5    agreed on and that I have approved.  Do not begin your

6    deliberations until she has brought you the exhibits.  Do not

7    even elect a foreperson until she has brought you the exhibits,

8    as it is very important that your deliberations remain entirely

9    private and without interruption.

10          In the jury room, you will have exhibits with you, but

11   you will not have a transcript of the testimony.  If you need

12   to have testimony read back to you, we will do so.  And that

13   includes deposition testimony.  And the way we'll do that is

14   we'll have you come back into the courtroom to hear the

15   testimony read back.  However, please understand that it is

16   difficult and time-consuming to locate and read back testimony.

17   If you, nevertheless, require a read-back, please be as

18   specific as possible about the portions of the testimony you

19   want to hear.

20          Your requests for a read-back of testimony and, in

21   fact, any communication with the Court, must be made to me in

22   writing, signed by your foreperson, and given to the marshal or

23   clerk.  So if you're going to send me a note, make sure the

24   foreperson signs it.  I will respond to your request as

25   promptly as possible either in writing or by having you return

1   to the courtroom so that I can address you orally.

2          I also must caution you that in your communications

3   with the Court, you should never reveal your numerical division

4   at any time.  If you are divided, do not report how the vote

5   stands, and if you have reached your verdict, do not report

6   what it is until you are asked in open court.

7          It is proper to add a final caution.  Nothing that I

8   have said in these instructions -- and nothing that I have said

9   or done during the trial -- has been said or done to suggest to

10  you what I think your verdict should be.  What the verdict

11  shall be is your exclusive duty and responsibility.

12         Members of the Jury, that concludes my instructions to

13  you.  Thank you for your patience and attention.  You may now

14  retire, meaning you may follow Ms. Johnson to the jury room.

15  Take your instructions and your notes with you.  And she's

16  going to arrange for the marshal to make sure you have what you

17  need to.  Great.  If you could follow Ms. Johnson.

18      (The jury left the courtroom at 11:09 a.m.)

19         THE COURT:  You folks can be seated.

20         So I have the exhibit list here the way that she

21  printed it, so I would like one lawyer for each side to sign

22  under Plaintiff and Defendant.

23         Okay, a couple things.  So, first of all, you're

24  welcome to stay in the courtroom.  The $CO_2$ level is good.  It

25  has been throughout.  They clearly made an adjustment.  We're

1  in the 550s, so we're in good shape.  And it was in the 560s

2  throughout the final two arguments, so we're in good shape on

3  that.  You're welcome to stay in the courtroom.

4       If you leave the courtroom, that's fine.  Just make

5  sure Ms. Johnson or my law clerk has your cell phone numbers.

6  Just one cell phone number for each side would suffice.  And

7  don't go to such a place that you'd be more than 20 minutes

8  away in case we need to summon you back for a note or a

9  verdict.  That's about all I can think of.

10       I think that's all I have.  Any questions about any of

11  that?

12       MR. BUCHDAHL:  Your Honor, so it sounded like you

13  don't have a rule we have to stay in the courthouse.  Twenty

14  minutes --

15       THE COURT:  Yeah.  You know, if you go across the

16  street for lunch or whatever, fine.  Just make sure we can

17  reach you.

18       MR. BUCHDAHL:  The only thing that -- and I apologize.

19  It only occurred to me now.  You said -- I don't think it's a

20  big deal.  You said every question is "yes" or "no" or a

21  percentage.  There was that additional question about a date.

22       THE COURT:  And I forgot that.  I added that

23  beforehand.  I'm not going to correct that.

24       MR. BUCHDAHL:  I think it's clear.

25       THE COURT:  You're right.  I forgot to change the

1    instructions on it.  Thank you for pointing that out.  All
2    right.  Okay.  Anything else before we go?
3            MR. WEINER:  Not from the Defense side.
4            THE CLERK:  They're taking a break now.
5            THE COURT:  So we'll be in recess.  So we get lunch
6    for them on deliberations day.  I have no idea what is going to
7    happen, but it would be unusual for them to come back before
8    lunch for anything.  I think you're safe to go to lunch.
9            MR. BUCHDAHL:  Your Honor, did you give them any
10   instructions about the end of today?
11           THE COURT:  No, I didn't, and I probably should have.
12   What I'll do is probably -- what I'll do is at 2:30, unless
13   counsel disagrees -- Devorah, just give me one second.  At 2:30
14   I think I will send in a note, and the note will say the
15   following:  Ladies and Gentlemen, we've been recessing every
16   day at 3:30.  If you all want to go home -- if you want to go
17   home at 3:30, we'll have you recess at 3:30.  If all of you,
18   and I'd like it to be unanimous, wish to stay past 3:30, you're
19   welcome to do that.  Just please indicate that to us in a note.
20           Is there any problem if I do that?
21           MR. BUCHDAHL:  No.
22           MR. WEINER:  We're fine with it.
23           THE COURT:  Okay.  So I'll send in such a note.  We'll
24   make it a court exhibit so you can see it.  Very good.  All
25   right.  Thank you.

1        (Recess from 11:13 a.m. to 2:08 p.m.)

2            THE COURT:  All right.  We've received a note from the

3    jury.  This is what it says:  "Dear, Your Honor, as regards

4    Question No. 1 and further questions, is it necessary for each

5    juror to agree unanimously to each subset question before

6    continuing to the next question, or is one lone adverse opinion

7    sufficient for a no answer from the jury to that question?"

8            It's not signed by the foreperson, which it should

9    have been.  But we've marked it as Court Exhibit No. 1.

10           I think I know what the answer to this question is,

11   and so I'm going to write it out and read it to you and get

12   your comments on it.

13           Okay.  So I'll say:  We've received your note.  In the

14   future please have the foreperson sign the note.  The answer to

15   your question is that it is necessary for each juror to agree,

16   that is, for the decision to be unanimous as to each answer to

17   each question on the Verdict Form.  As for the order in which

18   you answer the questions, the instructions on the form provide

19   guidance about the proper sequence and when it is okay to skip

20   a question.  But each answer to each question must be

21   unanimous.

22           I then also intend to tell them, instead of sending in

23   a note, that while we've been ending our trial day at 3:30,

24   that's not a constraint on their deliberations.  If they all

25   wish to continue deliberating after 3:30, that's fine, we will

1    be here.  But I'd like that decision to be unanimous.

2              If they wish to go home at 3:30 and return Monday,

3    that's fine too.  I would just ask them to let us know either

4    way by around 3:15 because I will need to address them in the

5    courtroom before they leave.

6              Any objections to any of that?

7              MR. BUCHDAHL:  Your Honor, no objection.  I do think

8    it might make sense to remind them they're not supposed to tell

9    us about numerical --

10             THE COURT:  Yes, good point.

11             MR. WEINER:  Your Honor, our only comment is it

12   shouldn't be 3:30 or bust.  You could say that they could

13   decided, you know, to go to 5:00 or 4:30 or 3:15.  If they

14   decide unanimously, they could go.  But it shouldn't be if you

15   all decide you don't want to go beyond, it has to be 3:30.

16             THE COURT:  I'm sorry?

17             MR. WEINER:  I'm saying they should have the

18   alternative.  They can say, well, we all want to go to five

19   o'clock.

20             THE COURT:  I thought -- well, I'll make that clear.

21   In other words, they can go for however long as they want as

22   far as I'm concerned.  As you see, they turn off the lights at

23   6:00.

24             MR. WEINER:  After 6:00 I don't think it works.

25             THE COURT:  Very good.  Let's get the jury.

1    (The jury entered the courtroom at 2:16 p.m.)

2         THE COURT:  So, Ladies and Gentlemen, we have received

3    your note, and I've discussed it with the lawyers.  I'm going

4    to read the note first.

5         It says:  "Dear, Your Honor, as regards Question No. 1

6    and further questions, is it necessary for each juror to agree

7    unanimously to each subset question before continuing to the

8    next question, or is it one lone adverse opinion sufficient for

9    a no answer from the jury to that question?"

10        So the answer -- oh, two things before I give you the

11   answer.

12        First, in the future, please have the foreperson sign

13   the note; and second, in the future, if you're going to send

14   notes -- and you did it properly.  You're welcome to send us

15   notes.  But don't say anything that might reveal your numerical

16   division if the vote stands divided.

17        The answer to your question is that it is necessary

18   for each juror to agree, that is, for the decision to be

19   unanimous as to each answer to each question on the Verdict

20   Form.

21        As for the order in which you answer the questions,

22   the instructions on the form provide guidance about the proper

23   sequence and when it is okay to skip a question.  But each

24   answer to each question must be unanimous one way or the other.

25        Now, one last instruction.  Every day we've been

1    delib -- excuse me.  We've been having trial until 3:30.  But

2    that's not a constraint on your deliberations if you don't want

3    it to be.  Here's what I'm getting at:  If all of you decide --

4    and I do request that this decision be unanimous as well.  If

5    all of you decide that you would like to continue deliberating

6    today after 3:30, that's fine.  We will be here.  We would need

7    to clear the building by six o'clock; but apart from that, that

8    would be the only constraint.

9            On the other hand, if you all decide that, no, no --

10   or even if -- I tell you what:  Even if one of you decides,

11   simply because I made a promise about 3:30, that, look, I'd

12   really like to go and do what the Judge said we could do, which

13   is leave the building by 3:30, then I would say that's fine

14   too.  You can come back an Monday and continue.

15           We're actually ahead of schedule in this trial.  We

16   originally intended to go through Tuesday, so that's no

17   problem.  Either way, we will be here.  It's up to you to

18   decide how long you want to deliberate on a particular day if

19   up to 3:30 or past 3:30.  We'll be here either way.

20           We make one request:  If you could simply send us a

21   note by 3:15 or so letting us know.  If you say, Judge, we're

22   going to continue past 3:30, that's fine.  We're not going to

23   bring you into the courtroom for that.  If you say, Judge, we

24   want to go home at 3:30, I will bring you into the courtroom

25   because I do need to speak to you before I dismiss you for the

1   day one way or the other.

2          So thank you very much for your attention to my

3   instructions.  I will ask you to return to the jury room at

4   this time.

5      (The jury left the courtroom at 2:19 p.m.)

6          THE COURT:  All right, so we'll mark that note as

7   Court Exhibit 1.  I'm going to leave it on Ms. Johnson's desk,

8   and we'll be in recess.

9      (Recess from 2:20 p.m. to 3:18 p.m.)

10         THE COURT:  So we have a note.  The jurors want to go

11  home for the weekend.  It says, "Dear Your Honor, the jury has

12  decided to adjourn at 3:30 today."  It's signed by the

13  foreperson.  We've marked it as Court's Exhibit 2.

14         So candidly, no surprise to me.  It's a long Verdict

15  Form.  I'm not at all surprised.  I think it shows they're

16  taking their job seriously, which is a good thing.  So why

17  don't we get the jurors and bring them in.

18         MR. BUCHDAHL:  Your Honor, do we have a name for the

19  foreperson?

20         THE COURT:  Allan something.  I couldn't read the last

21  name.

22     (The jury entered the courtroom at 3:21 p.m.)

23         THE COURT:  Folks, we received your note that you're

24  going to adjourn for the day and return on Monday.  That's

25  perfectly fine also perfectly normal, no problem.

1        So I know that you've been working hard and discussing

2   the case, and it's probably very much on your mind.  But I do

3   need to tell you that a modified version of my previous

4   instruction applies.  The only place and time that you may

5   discuss the case is when you are all together with each other

6   in the jury room.  You may not discuss the case at any other

7   time with anyone.  You may not let anyone discuss it with you.

8   No outside research even though you might be tempted.  Don't do

9   any outside research on the case whatsoever, no internet

10  searches, no anything like that.  It's very important that your

11  deliberations be together, that your consideration of the

12  evidence be together in the jury room.

13       So enjoy the weekend.  Don't think about the case.  It

14  looks like we're going to have one nice day this weekend,

15  chilly but nice.  We'll see you back in Room 146, the room

16  where you've been 8:45 on Monday.

17       What we'll do is as soon as all nine of you are there,

18  just begin your deliberations.  Don't begin until all nine of

19  you are there.  Just begin your deliberations.  I won't have

20  you back in the courtroom to get further instructions until we

21  hear from you.

22       Have a good weekend.  Thank you very much for your

23  hard work today.

24     (The jury left the courtroom at 3:22 p.m.)

25       THE COURT:  And same to you all, have a nice weekend.

1    We'll see -- obviously, open the courtroom.  We'll see you all

2    at quarter of nine or thereabouts on Monday.  Thank you.

3        (Proceedings concluded at 3:23 p.m.)

4

5

6

7

8

9                    C E R T I F I C A T E

10

11

12

13            I, Julie L. Monette, RMR, CRR, CRC, Official

14   Court Reporter for the United States District Court for the

15   District of Connecticut, do hereby certify that the foregoing

16   pages are a true and accurate transcription of my shorthand

17   notes taken in the aforementioned matter to the best of my

18   skill and ability.

19

20

21                    /S/ JULIE L. MONETTE

22            _____
                  Julie L. Monette, RMR, CRR, CRC
23                     Official Court Reporter
                          450 Main Street
24                    Hartford, Connecticut 06103
                         (860) 212-6937

25