UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| DENIS MARC AUDET, MICHAEL PFEIFFER, and DEAN ALLEN SHINNERS, Individually and on Behalf of All Others Similarly Situated, | Case 3:16-cv-00940 |
| | Hon. Michael P. Shea Courtroom 2 |
| Plaintiffs, | ECF Case |
| vs. | CLASS ACTION |
| STUART A. FRASER, GAW MINERS, LLC, and ZENMINER, LLC (d/b/a ZEN CLOUD), | DECEMBER 3, 2021 |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR JUDGMENT AS A MATTER OF LAW AND FOR A NEW TRIAL**

# Table of Contents

Page

I.    Introduction ................................................................................................... 1

II.   Background .................................................................................................... 3

III.  Legal Standards ............................................................................................ 9

    A.   Motion for Judgment as a Matter of Law ............................................ 9

    B.   Motion for a New Trial ...................................................................... 10

    C.   Investment Contracts ........................................................................ 10

IV.   Argument .................................................................................................... 11

    A.   Plaintiffs are entitled to judgment as a matter of law on the issue of whether Hashlets are securities. ....................................................... 11

        1.   Investment of money ................................................................ 12

        2.   Common enterprise. .................................................................. 12

        3.   Profits from the efforts of others. .............................................. 18

    B.   Plaintiffs are entitled to judgment as a matter of law on the issue of whether Paycoin, Hashpoints, and HashStakers are securities. ........... 24

        1.   Investment of money ................................................................ 25

        2.   Common enterprise. .................................................................. 26

        3.   Profits from the efforts of others. .............................................. 33

    C.   Alternatively, Plaintiffs are entitled to a new trial because the jury's finding that Hashlets, Hashpoints, Hashstakers, and Paycoin were not securities was against the weight of the evidence. ................................ 38

V.    Conclusion .................................................................................................. 40

## <u>Table of Authorities</u>

**Page(s)**

**Cases**

*Arlio v. Lively*,
    474 F.3d 46 (2d Cir. 2007)..........................................................................9, 12, 18

*Balestra v. ATBCOIN LLC*,
    380 F. Supp. 3d 340 (S.D.N.Y. 2019).............................................................. *passim*

*Bender v. Cont'l Towers Ltd. P'ship*,
    632 F. Supp. 497 (S.D.N.Y. 1986).........................................................................23

*Diesel v. Town of Lewisboro*,
    232 F.3d 92 (2d Cir. 2000).......................................................................................9

*DLC Mgmt. Corp. v. Town of Hyde Park*,
    163 F.3d 124 (2d Cir. 1998)...................................................................................10

*Dubin v. E.F. Hutton Grp. Inc.*,
    695 F. Supp. 138 (S.D.N.Y. 1988).........................................................................26

*In re J.P. Jeanneret Assocs., Inc.*,
    769 F. Supp. 2d 340 (S.D.N.Y. 2011).............................................................. *passim*

*Jarozewski v. Gamble*,
    2013 WL 5496535 (Conn. Super. Ct. Sept. 12, 2013)...........................................10

*Justice v. Gardner*,
    2002 WL 31169773 (Conn. Super. Ct. Aug. 23, 2002).........................................10

*Long v. Shultz Cattle Co.*,
    881 F.2d 129 (5th Cir. 1989) .................................................................................23

*Manley v. AmBase Corp.*,
    121 F. Supp. 2d 758 (S.D.N.Y. 2000), *aff'd*, 337 F.3d 237 (2d Cir. 2003) ...........39

*Manley v. AmBase Corp.*,
    337 F.3d 237 (2d Cir. 2003)...................................................................................10

*Raedle v. Credit Agricole Indosuez*,
    670 F.3d 411 (2d Cir. 2012)..............................................................................10, 38

*Revak v. SEC Realty Corp.*,
    18 F.3d 81 (2d Cir. 1994) .........................................................10, 13, 15, 30

*Ruffin v. Fuller*,
    125 F. Supp. 2d 105 (S.D.N.Y. 2000) (Chin, J.)...................................................................39

*SEC v. Aqua-Sonic Prod. Corp.*,
    687 F.2d 577 (2d Cir. 1982).................................................................................11, 18, 23

*SEC v. Kik Interactive Inc.*,
    492 F. Supp. 3d 169 (S.D.N.Y. 2020)........................................................................ *passim*

*SEC v. Telegram Group, Inc.*,
    448 F. Supp. 3d 352 (S.D.N.Y. 2020)........................................................................ *passim*

*SEC v. W.J. Howey Co.*,
    328 U.S. 293 (1946)................................................................................................ *passim*

*United Hous. Found., Inc. v. Forman*,
    421 U.S. 837 (1975)...................................................................................................11, 18

*United States v. Landau*,
    155 F.3d 93 (2d Cir. 1998)...............................................................................................40

*Uselton v. Com. Lovelace Motor Freight, Inc.*,
    940 F.2d 564 (10th Cir. 1991) .........................................................................................26

*Walther v. Maricopa Int'l Inv. Corp.*,
    No. 97 CIV. 4816 (HB), 1998 WL 186736 (S.D.N.Y. Apr. 17, 1998)............................17, 18

**Statutes**

15 U.S.C. § 77b(a)(1).............................................................................................................10

15 U.S.C. § 78a.....................................................................................................................38

Conn. Gen. Stat. § 36b-3(19) ................................................................................................10

**Rules**

Fed. R. Civ. P. 23 ...................................................................................................................3

Fed. R. Civ. P. 50 .......................................................................................................... *passim*

Fed. R. Civ. P. 59 ...............................................................................................3, 10, 38, 40

## I.     Introduction

The jury found that GAW Miners commenced a fraud on August 13, 2014, but that it was not a *securities* fraud because Hashlets, Paycoin, Hashpoints, and Hashstakers were not securities. As a result, the jury never answered the central question presented at trial, the question to which both parties devoted nearly all of their efforts: whether Stuart Fraser was a control person at GAW Miners as that role is defined by the securities laws. The Court should order a new trial to resolve that question, because no reasonable juror could reach the conclusion that GAW's products were not securities.

The underlying facts concerning whether these products were securities were essentially undisputed at trial, and the key concepts were confirmed by Defendant Stuart Fraser's own testimony. Hashlets were marketed as investments that entitled each owner to a share of the cryptocurrency profits earned by the mining computers in GAW's warehouse. The value of Hashlets was premised on GAW's skill, effort, and expertise in buying, hosting, and operating high-performing mining computers. The investors were not expected to contribute meaningfully to the success of the mining operation. In fact, GAW assured investors that Hashlets were "grandma proof"—investors needed to have no skill whatsoever for their Hashlets to generate profits. Rather, GAW did all the mining itself, and *its* efforts were the ones generating profits for Hashlet owners. It is black-letter law that Hashlets are securities based on this evidence, and no reasonable juror could find otherwise. *See* ECF No. 326 at 22 (jury instructions) ("The touchstone is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others.").

Similarly, no reasonable juror could find that Paycoin was not a security based on the largely undisputed evidence at trial. GAW's pitch for Paycoin was compelling: GAW would

commit unprecedented capital and resources to Paycoin's development, both before and after its launch, and make Paycoin the first cryptocurrency to achieve mainstream success. The company's commitment included a Coin Adoption Fund to build a robust ecosystem to support Paycoin, with a $100 million reserve to prop up its value in the market, and ongoing efforts to secure and maintain widespread merchant adoption. These efforts were to be funded by Paycoin's investors—GAW promised to put 100% of the proceeds from Paycoin's initial coin offering ("ICO") back into development efforts—while the work would be performed by GAW, and success, in the form of higher Paycoin prices, would be shared by all. That is a security under the Supreme Court's test from *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946). Further, cryptocurrency expert Dr. Arvind Narayanan gave unrebutted expert testimony detailing the many ways that Paycoin was a highly centralized cryptocurrency controlled by GAW, and Paycoin is just as or even more centralized than the other cryptocurrencies or cryptocurrency transactions that numerous courts in this Circuit have recently concluded were securities under *Howey*.

Plaintiffs are not alone in their contentions. The Securities and Exchange Commission (SEC) sued GAW Miners for securities fraud relating to Hashlets. In its default judgment motion against GAW Miners, the SEC walked through why Hashlets easily qualify as securities under the *Howey* test. It did that after eliciting sworn testimony from Stuart Fraser admitting all the relevant *Howey* facts with respect to Hashlets—facts that Fraser again admitted at trial. Another judge in this District reviewed the facts alleged by the SEC—the same facts that went undisputed in this trial—and found that they demonstrated that Hashlets were securities, granting default judgment against GAW Miners for securities fraud relating to Hashlets.

Accordingly, the jury's verdict has no basis in the trial record and was substantially against the weight of the evidence. For that reason, the Court should (a) grant Plaintiffs judgment as a

matter of law on the issue of whether the products in this case were securities, pursuant to Federal Rule of Civil Procedure 50(b), and retry the rest of the case with respect to securities fraud and the unregistered sale of securities; or (b) in the alternative, order a new trial on all issues, including the securities issue, pursuant to Rule 59.

## II.    Background

Plaintiffs are a class of investors who purchased or acquired four cryptocurrency-related products—Hashlets, Paycoin, Hashpoints, and Hashstakers—from GAW Miners, LLC or ZenMiner, LLC (together, "GAW Miners," "GAW," or "the company") between August 1, 2014 and January 19, 2015. ECF No. 144. On June 15, 2016, Plaintiffs filed suit against GAW Miners, alleging that its fraudulent conduct in selling and offering for sale its cryptocurrency products violated the Securities Exchange Act of 1934 and the Connecticut Uniform Securities Act, and constituted both common-law fraud and the sale of unregistered securities. Plaintiffs also named Stuart A. Fraser ("Defendant") as a defendant, alleging that he was secondarily liable for GAW's fraud as a control person and aider-and-abettor of the company's fraud and its sale of unregistered securities. *See* ECF No. 1, 57. This action followed an enforcement lawsuit by the SEC against GAW Miners and its CEO, Homero "Josh" Garza, in which the SEC alleged that GAW Miners committed securities fraud and sold unregistered securities in connection with its Hashlet product. *See* Ex. 1 (DX 677) (Complaint, *SEC v. Garza*, No. 15-cv-1760 (JAM), ECF No. 1 (hereinafter "SEC Complaint")) at ¶¶ 78-94.

In the ensuing time, the Court certified a class of Plaintiffs pursuant to Federal Rule of Civil Procedure 23 (ECF No. 141), bifurcated the issues of liability and damages (ECF No. 206), and set the case down for trial on the issue of Defendant's liability. The parties tried the case to a jury between October 20 and November 1, 2021.

At trial, the jury learned the following facts.[1] Beginning in approximately 2005, Defendant Stuart Fraser and Josh Garza started a series of telecommunications- and technology-related business ventures. *See* Ex. 2 (Trial Tr. at 142:3-146:24) (testimony of Stuart Fraser). In or around early 2014, Mr. Garza and Mr. Fraser co-founded GAW Miners. *See* Ex. 2 (Trial Tr. at 428:16-18) (testimony of Stuart Fraser). At first, GAW Miners sold cryptocurrency mining hardware to its customers. *See* Ex. 3 (Garza Tr. at 27:04-12).[2] The company also sold "cloud-hosted mining services." Instead of shipping a piece of mining hardware to a customer, GAW Miners would "host" the customer's assigned piece of hardware in its own facilities and manage its operation on behalf of, and at the direction of, the customer. *See* Ex. 4 (E. Capuano Tr. at 39:4-40:16); Ex. 5 (Mordica Tr. at 32:22-33:23, 34:14-36:21). During this period, Mr. Garza lied publicly in interviews and press releases about GAW Miners, including about GAW's relationship with ZenMiner, LLC. *See* Ex. 6 (PX 119) at 9 ¶ 5. Mr. Fraser was aware of Garza's lies at the time they were made; in fact, one lie Mr. Garza told was that Mr. Fraser's own son—who was in on the lie—was affiliated with ZenMiner. *See* Ex. 2 (Trial Tr. at 180:5-183:22) (testimony of Stuart Fraser). Mr. Fraser responded to Mr. Garza's lie with encouragement. *See* Ex. 2 (Trial Tr. at 188:15-21); Ex. 7 (PX 23).

In August 2014, GAW Miners released a new product called a "Hashlet." *See* Ex. 8 (DX 528). When an investor purchased a Hashlet, she was buying the right to "receive a portion of the payouts that GAW [Miners] itself would receive by using its own bitcoin mining equipment to mine for bitcoin and for other cryptocurrencies." In effect, investors were buying "the right to

---

[1] GAW Miners, LLC and ZenMiner, LLC never filed an answer or otherwise appeared in this action and are in default. ECF No. 71. The trial concerned the liability of Stuart Fraser only.

[2] Citations to "[Witness] Tr." (*e.g.*, "Garza Tr.") are to transcripts of deposition testimony that was played at trial.

profit from a slice of computing power or mining power owned by GAW." Ex. 2 (Trial Tr. at 51:11-18) (testimony of Dr. Arvind Narayanan); *see also* Ex. 6 (PX 119) at 9 ¶ 4. The deal for investors was, in exchange for their capital, GAW Miners would do the cryptocurrency mining and supply the technical know-how required for it to be profitable. Ex. 2 (Trial Tr. at 52:25-53:12) (testimony of Dr. Arvind Narayanan) (describing crypto mining as a "messy, technical process" and explaining that mining operators like GAW Miners "provide the space for all of these machines, provide the electricity for the machines, provide the know-how for operating and perhaps upgrading the machines"). For example, the company would purchase, host, operate, and maintain the mining equipment that would mine for cryptocurrency. *See* Ex. 9 (PX 47) at 3 (GAW's website boasting that "[a]ll Hashlets are hosted in the most robust mining data center in the world").[3] For their part, investors had to do little: Hashlets were marketed as "grandma-approved!" and GAW Miners told investors, "If you can open an email you can operate a Hashlet." *See* Ex. 8 (DX 528); Ex. 2 (Trial Tr. 181:14-16) (testimony of Stuart Fraser) (confirming that similar ZenMiner product was "advertised as grandma proof").

Hashlets were a fraud, however. GAW Miners did not have enough mining power to support all of the Hashlets it sold to investors. *See* Ex. 6 (PX 119) at 9 ¶ 5; Ex. 10 (Eden Tr. at 27:21-29:18, 47:14-16). In order to pay investors the mining rewards they were expecting, but which GAW Miners lacked the mining power to generate, the company used proceeds from new investors to pay the older ones—a classic Ponzi scheme. *See* Ex. 6 (PX 119) at 10 ¶ 6.

---

[3] *See also* Ex. 2 (Trial Tr. at 622:10-14) (testimony of Denis Marc Audet) (Q: "And you understood that what the companies would be doing, GAW Miners and ZenMiner, is hosting those machines, those miners, and running them and maintaining them; is that correct?" A: "That's correct, yes.").

GAW Miners also sought to escape its obligation to pay mining rewards for Hashlets by phasing them out in favor of a new investment: Paycoin. Initially known as Hashcoin, Paycoin was a new cryptocurrency that GAW Miners developed and launched in late 2014 as the company's next big initiative. *See* Ex. 2 (Trial Tr. at 55:21-56:2) (testimony of Dr. Arvind Narayanan); Ex. 11 (PX 82) (article in *The Wall Street Journal* describing Paycoin as the "cryptocurrency of the future" that will be "even bigger" than GAW's mining business). When it announced Paycoin's initial coin offering ("ICO") in November 2014, GAW Miners stressed that a "decentralized currency" normally "leaves behind no parties with a financial incentive to do the work needed in order to promote global adoption," but that "Paycoin's ICO fills in the missing piece by supporting continual adoption efforts allowing [GAW Miners] to be the first to both legitimize and bring cryptocurrency to the mass market." Ex. 12 (PX 81) at 2.

For instance, GAW Miners promised customers that it would support Paycoin by "creat[ing] the world's first Coin Adoption Fund (CAF)," which would be used to fund the development of software and hardware for Paycoin and its blockchain, as well as supply a financial reserve to maintain its price. Ex. 13 (PX 125) at 8 (Paycoin whitepaper describing benefits of GAW's "multi-tier, organized strategy" for promoting Paycoin). According to GAW Miners, that $100 million cash reserve would be used to buy Paycoin as needed so that "[t]he market value of a single paycoin would not fall below $20 per unit." Ex. 6 (PX 119) at 10. GAW Miners would also build out the Paycoin ecosystem, including the Paybase platform for buying, selling, and using Paycoin. *See* Ex. 2 (Trial Tr. at 803:2-10) (testimony of Dean Allen Shinners); Ex. 14 (PX 160) at 2 (GAW's website for Hashcoin describing the forthcoming ICO). Indeed, GAW Miners promised that it would put "100%" of the proceeds from Paycoin's ICO into "grow[ing] the currency." Ex. 14 (PX 160) at 2.

At trial, Plaintiffs' expert explained how Paycoin, unlike decentralized cryptocurrencies such as Bitcoin, was significantly centralized and under the control of GAW Miners. *See* Ex. 2 (Trial Tr. at 56:14-16, 57:6-9) (testimony of Dr. Arvind Narayanan). Dr. Narayanan evaluated Paycoin's level of centralization by examining four key factors—*i.e.*, implementation software, ownership, mining power, and supporting services—and concluded that GAW Miners exerted a significant amount of control over the product:

- **Software:** GAW Miners had "unilateral control over updates to the software" implementing Paycoin and could "make changes . . . without any notice or advanced deliberation."

- **Ownership:** GAW Miners allocated 96% of the initial 12.5 million units of Paycoin created to itself.

- **Mining Power:** GAW Miners had overwhelming control over the Paycoin blockchain as Paycoin was a "proof of stake" cryptocurrency that linked control to ownership. In addition, GAW Miners included in Paycoin's source code a number of "special Paycoin accounts" that would receive far higher Paycoin returns for participating in mining than normal accounts would, and assigned those special accounts primarily to itself.

- **Supporting Services:** GAW Miners promised to support Paycoin's development, including through the Coin Adoption Fund and the Paybase platform.

*See* Ex. 2 (Trial Tr. at 57:12-59:16, 60:2-62:14) (testimony of Dr. Arvind Narayanan). Defendant did not offer any expert testimony in response to Dr. Narayanan's analysis.

GAW Miners also sold two other investments related to Paycoin, both aimed at allowing investors to acquire Paycoin. First, prior to the launch of Paycoin, GAW Miners offered Hashlet customers the ability to acquire something called "Hashpoints," which were essentially "in-house credit" that could be traded in later for Paycoin. Ex. 2 (Trial Tr. at 583:21-24) (testimony of Denis Marc Audet). To obtain Hashpoints, Hashlet customers had to forego their normal mining rewards. *See* Ex. 2 (Trial Tr. at 59:18-60:1) (testimony of Dr. Arvind Narayanan) (testifying that GAW Miners gave Hashlets customers "the option of mining for this new thing called Hashpoints instead of bitcoin or another cryptocurrency, and GAW Miners said that these Hashpoints could later be

converted to Paycoin when Paycoin launched."). In fact, all three class representatives obtained Hashpoints in lieu of normal mining rewards through this method, and their Hashpoints accordingly converted to Paycoin in December 2014. *See, e.g.*, Ex. 2 (Trial Tr. at 583:12-16, 584:20-21, 617:25-618:12) (testimony of Denis Marc Audet); Ex. 2 (Trial Tr. at 645:16-646:6) (testimony of Dean Allen Shinners); Ex. 2 (Trial Tr. at 834:25-835:14) (testimony of Michael Pfeiffer); Ex. 15 (DX 683) at 9, 53-54, 64.

Second, GAW Miners offered a product called Hashstakers, which allowed investors to "lock[] up" their existing Paycoin for a certain amount of time in exchange for more Paycoin. Ex. 2 (Trial Tr. at 649:20-25, 650:4-5) (testimony of Dean Allen Shinners) ("The best way I can describe it, a HashStaker is similar to what you would see from a bank, like a certificate of deposits, where you are depositing, in this case, Paycoin. And then it's locked up for a period of time. And for that, you get paid an inherent rate of return or interest."); *see also* Ex. 2 (Trial Tr. at 836:13-14) (testimony of Michael Pfeiffer) (describing Hashstakers as "a specialized Paycoin wallet" that gave "interest" in exchange for "lock[ing] up" Paycoin for "one month or three months or six months"). In other words, the purpose of Hashstakers, like Hashpoints, was the acquisition of more Paycoin. *See* Ex. 2 (Trial Tr. at 583:25-584:11) (testimony of Denis Marc Audet) (reason for buying Hashstakers is "they're a payout system [that] allowed me to earn more Paycoins").

After the close of evidence, the jury deliberated for one and a half days. On the first day of deliberations (October 29, 2021), the jury sent a note to the Court suggesting that a single juror believed the answer to a subpart of Question 1 ("Did Plaintiffs prove that any of the following were investment contracts?", *see* ECF No. 330 at 2) should be "No": "Dear, Your Honor, as regards Question No. 1 and further questions, is it necessary for each juror to agree unanimously to each subset question before continuing to the next question, or is one lone adverse opinion sufficient

for a no answer from the jury to that question?" *See* Ex. 2 (Trial Tr. at 1092:2-7). On the second

day of deliberations (November 1, 2021), the jury requested a new blank verdict form. *See* Ex. 2

(Trial Tr. at 1101:2-7).

At the end of the second day, the jury returned an about-face verdict, switching from 8-1

in Plaintiffs' favor to 9-0 in Defendant's favor on the securities question. Regarding "Question No.

1," the jury found that none of the four GAW Miners products at issue were investment contracts.

*See* ECF No. 330 at 2. Because it answered "No" to that threshold question, the jury skipped the

remaining questions regarding Plaintiffs' securities claims, making no findings as to whether

Defendant was liable as a control person or aider-and-abettor under the Securities Exchange Act

of 1934 or the Connecticut Uniform Securities Act. The jury also found that Mr. Fraser was not

liable for aiding and abetting common-law fraud with respect to any of the four GAW Miners

products. *See id.* at 13. At the Court's direction, the parties conferred about a briefing schedule for

post-trial motions, *see* ECF No. 342, and this motion follows.

### III.   Legal Standards

####    A.   Motion for Judgment as a Matter of Law

Following a jury verdict, a court may grant judgment as a matter of law if the evidence at

trial, "viewed in the light most favorable to the nonmoving party, is insufficient to permit a

reasonable juror to find in his favor." *Arlio v. Lively*, 474 F.3d 46, 51 (2d Cir. 2007); *see also* Fed.

R. Civ. P. 50(a)(1), (b). This standard is met where there was "such an overwhelming amount of

evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict

against the moving party" or "if there is such a complete absence of evidence supporting the verdict

that the jury's findings could only have been the result of sheer surmise and conjecture." *Diesel v.

Town of Lewisboro*, 232 F.3d 92, 103 (2d Cir. 2000) (brackets, citations, and internal quotation

marks omitted).

B.      Motion for a New Trial

"A court may grant a new trial 'for any reason for which a new trial has heretofore been granted in an action at law in federal court,' including if the verdict is against the weight of the evidence." *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 417 (2d Cir. 2012) (citation omitted) (quoting Fed. R. Civ. P. 59(a)(1)(A)). A verdict is against the weight of the evidence if the jury's determination is "seriously erroneous" or "a miscarriage of justice." *Id.* at 417. A motion for a new trial is governed by "a less stringent standard than Rule 50 in two significant respects: (1) a new trial under Rule 59(a) 'may be granted even if there is substantial evidence supporting the jury's verdict,' and (2) 'a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner.'" *Manley v. AmBase Corp.*, 337 F.3d 237, 244-45 (2d Cir. 2003) (*quoting DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 133-34 (2d Cir. 1998)).

C.      Investment Contracts

An instrument constitutes a "security" if it is an "investment contract." *See* 15 U.S.C. § 77b(a)(1); Conn. Gen. Stat. § 36b-3(19). An investment contract is a contract, transaction, or scheme "where individuals were led to invest money in a common enterprise with the expectation that they would earn a profit solely through the efforts of the promoter." *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298 (1946).[4] A common enterprise may be established by showing "horizontal commonality," *i.e.*, "the tying of each individual investor's fortunes to the fortunes of the other investors by the pooling of assets, usually combined with the pro-rata distribution of profits." *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994). Alternatively, a party may prove a

---

[4] Connecticut courts have looked to the *Howey* test for purposes of interpreting the phrase "investment contract" in Section 36b-3(19) of the Connecticut Uniform Securities Act. *See, e.g.*, *Jarozewski v. Gamble*, 2013 WL 5496535, at *3 (Conn. Super. Ct. Sept. 12, 2013); *Justice v. Gardner*, 2002 WL 31169773, at *3 (Conn. Super. Ct. Aug. 23, 2002).

common enterprise through "strict vertical commonality," where "the fortunes of the investor are tied to the fortunes of the promoter." *In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340, 359 (S.D.N.Y. 2011). With regard to the third element—profits through the efforts of a promoter—the word "solely" should not be taken literally, *SEC v. Aqua-Sonic Prod. Corp.*, 687 F.2d 577, 582 (2d Cir. 1982). Rather, the inquiry is whether an investor expected to earn profits "to be derived from the entrepreneurial or managerial efforts of others." *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 852 (1975). *See also* ECF No. 326 at 20-22 (jury instructions).

**IV.    Argument**

    A.    Plaintiffs are entitled to judgment as a matter of law on the issue of whether Hashlets are securities.

At trial, the jury learned three unrebutted facts that prove Hashlets are investment contracts—and therefore securities—as a matter of law. *First*, class members invested money in exchange for Hashlets. *Second*, a Hashlet represented an investment in a cryptocurrency mining operation run by GAW Miners, the profits of which were shared with Hashlet owners. If GAW Miners successfully operated the enterprise, that success was shared by all Hashlet owners. If it failed to do so, all Hashlet owners suffered the cost. *Third*, Hashlet owners expected GAW Miners would make their Hashlets profitable. Hashlets investors contributed money, and in return, GAW Miners promised to use its resources and expertise to purchase, house, own, operate, and maintain the mining hardware and thereby earn mining rewards for Hashlet owners. Hashlets were so easy to use—because GAW Miners promised to do all of the work—that GAW marketed them as "grandma-approved!"

Taken together, these facts—which were not disputed by Defendant at trial—show that Hashlets involved (1) an investment of money (2) in a common enterprise (3) with profits to be derived solely from the efforts of others. ECF No. 326 (jury instructions) at 20-22; *Howey*, 328

U.S. at 298. Moreover, another judge of this Court found that these very same facts—as alleged by the SEC—were sufficient to establish that Hashlets were securities. *See* Ex. 16 (Final Judgment, *SEC v. Garza*, 3:15-cv-1760 (JAM), ECF No. 41 (hereinafter "SEC Judgment")), at 1 (May 31, 2017) (granting default judgment against GAW Miners and ZenMiner for securities laws violations because the allegations in the complaint were sufficient to establish their liability).[5]

Because no reasonable jury could have concluded that Hashlets were not investment contracts based on the undisputed facts in the trial record, the Court should grant Plaintiffs judgment as a matter of law on this issue.

        1.      Investment of money.

The first element of *Howey*—an "investment of money," *see Howey*, 328 U.S. at 301—is satisfied beyond dispute. *See, e.g.*, Ex. 9 (PX 47) at 4 (archived GAW Miners website showing Hashlets for sale for $15.99 per megahash per second); Ex. 15 (DX 683) (class representatives' certifications documenting their purchases of Hashlets, including the purchase price); Ex. 2 (Trial Tr. at 643:11-14) (testimony of Dean Allen Shinners that he bought Hashlets). No reasonable jury could find otherwise. *See Arlio*, 474 F.3d at 51; Fed. R. Civ. P. 50(b).

        2.      Common enterprise.

The second element of an investment contract under *Howey* is a "common enterprise." *See Howey*, 328 U.S. at 301; ECF No. 326 at 21. This element may be proved in two different ways: "horizontal commonality" and "strict vertical commonality." *See* ECF No. 326 at 21; *In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d at 360. As set out below, Defendant did not and cannot

---

[5] *See also* Ex. 1 (DX 677) (SEC Complaint) at ¶¶ 22, 38-44, 47, 59, 61, 69-70 (factual allegations regarding Hashlets); Ex. 17 (SEC's Memorandum in Support of Its Motion for Default Judgment Against GAW Miners, LLC and ZenMiner, LLC, *SEC v. Garza*, No. 15-cv-1760 (JAM), ECF No. 15-1 (hereinafter "SEC Memorandum")), at 10-15 (SEC's argument regarding why these facts, as alleged, established that Hashlets were investment contracts).

dispute the facts Plaintiffs proved at trial that establish Hashlets were a common enterprise under either horizontal or vertical commonality.

a) *Horizontal commonality*.

Horizontal commonality involves "the tying of each individual investor's fortunes to the fortunes of the other investors by the pooling of assets, usually combined with the pro-rata distribution of profits." *Revak*, 18 F.3d at 87; ECF No. 326 at 21. The undisputed facts proved to the jury met this standard. At trial, Plaintiffs proved that Hashlets were marketed as a slice of profits from GAW's cryptocurrency mining enterprise. In other words, GAW Miners told investors it was pooling their money to purchase, operate, and maintain "the most robust mining data center in the world," the profits of which would be shared with investors. As is clear from the evidence at trial, and as the SEC demonstrated in its own case, investors' fortunes were thus tied together in GAW's mining operation, and would rise or fall together depending on GAW's success in running it. *See* Ex. 17 (SEC Memorandum) at 12-13; Ex. 1 (DX 677) (SEC Complaint) at ¶¶ 22, 38-40.

The evidence presented at trial—and uncontradicted by Defendant—showed that Hashlet purchasers were led to believe they were investing in a shared crypto mining enterprise run by GAW Miners. As stated in Mr. Garza's plea agreement:

> A hashlet entitled an investor to a share of the profits that GAW Miners and/or or [*sic*] ZenMiner would purportedly earn by mining virtual currencies using the computers that were maintained in their data centers. In other words, hashlet customers, or investors, were buying the rights to profit from a slice of the computing power owned by GAW Miners and ZenMiner.

Ex. 6 (PX 119) at 9 ¶ 4. The company's website told Hashlet purchasers the same story—they were investing in GAW's cutting-edge mining operation: "Hashlet is the world's first Digital Cloud Miner (DCM), perfectly optimized to thrive in large, controlled datacenters and achieve massive economies of scale. All Hashlets are hosted in the most robust mining data center in the

world[.]" Ex. 9 (PX 47) at 3. In addition to these documents, the jury heard testimony from numerous witnesses—including Plaintiffs' expert, the class representatives, and Mr. Fraser himself, among others—that Hashlet owners understood they were buying interests in GAW's undifferentiated computing power in exchange for a slice of the profits.[6]

By its nature, this arrangement meant that every Hashlet owner's fortunes were tied to every other Hashlet owner's fortunes based on GAW's success or failure in running its crypto mining data centers. As Plaintiffs' expert testified, "GAW represented that customers would receive a portion of the payouts that GAW itself would receive by using its own bitcoin mining equipment to mine for Bitcoin and for other cryptocurrencies." Ex. 2 (Trial Tr. at 51:12-15) (testimony of Dr. Arvind Narayanan). But GAW's mining equipment would not earn rewards— and therefore Hashlet owners would not receive payouts—if GAW Miners did not properly operate and maintain the equipment and ensure that crypto mining could happen. *See id.* at 52:25-53:10 (describing crypto mining as a "messy, technical process" that requires technical know-how along with necessary inputs like space and electricity). The better GAW Miners managed its mining operation, and maintained and operated its mining equipment, the more profitable its mining would

---

[6] *See, e.g.*, Ex. 2 (Trial Tr. at 249:2-5) (testimony of Stuart Fraser) (Q: "And you understood, therefore, that the purchaser of a Hashlet would be entitled to a portion of the cryptocurrency that was being mined by GAW Miners; correct?" A: "That's my understanding, yes, sir."); Ex. 2 (Trial Tr. at 51:7-18) (testimony of Dr. Arvind Narayanan) ("GAW represented that what customers were buying is a certain quantity, a certain number of calculations per second of the mining power that GAW itself owned and operated."; "GAW represented that customers would receive a portion of the payouts that GAW itself would receive by using its own bitcoin mining equipment to mine for bitcoin and for other cryptocurrencies. In effect, what customers were told is they were purchasing . . . is the right to profit from a slice of computing power or mining power owned by GAW."); Ex. 2 (Trial Tr. at 832:20-23) (testimony of Michael Pfeiffer) ("I understood Hashlets to be a contract to own a certain percentage or amount of . . . the mining power of the mining machines that they held, that GAW Miners held, in their data centers."); Ex. 2 (Trial Tr. at 818:7-8) (testimony of Dean Allen Shinners) ("I was definitely buying a specific quantifiable share of mining power that was at the mining farm.").

be. Conversely, the poorer GAW Miners did at its task, the lower its rewards would be. In this way, every Hashlet investor's fortunes depended on how well GAW Miners ran the mining operation that Hashlet owners had invested in—*i.e.*, "the fortunes of each investor depend[ed] upon the profitability of the enterprise as a whole," *Revak*, 18 F.3d at 87; *see also* SEC Memorandum at 13 ("[I]nvestors bought into GAW Miners and ZenMiner's scheme believing that they were relying on GAW Miners' and ZenMiner to run a successful virtual currency mining operation that would generate profits in which they shared.").

This conclusion is not altered by the fact that two Hashlet investors could, in theory, earn different payouts on a given day if their Hashlets had mined in different pools.[7] "With respect to horizontal commonality, the key feature is . . . that investors' profits at any given time are tied to the success of the enterprise," not that all investors would profit at the same time or in the same amount. *See SEC v. Kik Interactive Inc.*, 492 F. Supp. 3d 169, 179 (S.D.N.Y. 2020) (finding that investors' ability to sell their digital tokens "whenever they pleased" did not undercut horizontal commonality because the tokens' value was ultimately dependent on the promoter's success in developing a digital infrastructure for the tokens). Whatever the respective pool payout rates on a given day, the ability of each investor—regardless of the pool her Hashlets mined in—to earn any profit depended on GAW's performance in managing the mining enterprise. If GAW Miners failed to properly run its mining center (*e.g.*, by failing to maintain the mining hardware or ensure reliable electricity), every Hashlet investor would suffer the consequences. On the other hand, if GAW Miners ran the mining operation well, ensuring that its equipment was well-maintained and

---

[7] *See, e.g.*, Ex. 2 (Trial Tr. at 625:22-626:1) (testimony of Denis Marc Audet) (Q: "So if you and I both owned the same kind of Hashlet, let's say you chose to mine it in the Clevermining pool and I decided to mine it in the Waffle mining pool, we could have very different payouts; correct?" A: "That's correct, yes.").

optimized for mining, every investor would benefit. In both cases, however, investors' returns depended on GAW's success or failure in running the mining enterprise. *See Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 354-55 (S.D.N.Y. 2019) (finding horizontal commonality where "the value of the [digital asset investment] was dictated by the success of the . . . enterprise as a whole," even though investors might not enjoy pro rata profits in their digital assets, and could sell them when and at what price they wanted).

b)      *Vertical commonality.*

Vertical commonality exists "when the fortunes of the investor are tied to the fortunes of the promoter," that is, where their fortunes "rise and fall together." *In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d at 359 (internal quotation marks omitted); *see also* ECF No. 326 at 21. At trial, the unrebutted evidence was that GAW Miners did not earn profits from a Hashlet on a given day unless the owner of the Hashlet earned a profit that day; accordingly, the fortunes of GAW Miners and the Hashlet investor rose and fell together. That fact—which Defendant elicited at trial and did not rebut—demonstrates vertical commonality with respect to Hashlets.

The trial record shows that the fortunes of Hashlet investors and GAW Miners were intertwined, as both investors and GAW Miners shared in the upside reward and downside risk of Hashlets. For example, when a Hashlet investor earned no profit from her Hashlet on a given day, GAW Miners made no profit from that Hashlet, either. As class representative Michael Pfeiffer explained, Hashlet investors paid a daily maintenance fee to GAW Miners. Ex. 2 (Trial Tr. at 854:16-19). However, on days when a Hashlet's mining payout was equal to or less than the maintenance fee, GAW Miners would give the investor a small payout so that the investor had a small net profit, rather than charging the full maintenance fee. On cross-examination, Mr. Pfeiffer gave this example: if his payout from mining on a given day were 15 cents, and the maintenance

fee were 15 cents, GAW Miners would give him "the smallest fraction" of a Bitcoin on top of his 15 cents so that, even factoring in the maintenance fee, he made a net profit. Ex. 2 (Trial Tr. at 856:10-857:4). During re-direct examination, Mr. Pfeiffer explained that GAW Miners would ensure a small net profit <u>even when the miner's payout was less than the maintenance fee</u>:

> Q:   Would you similarly get a tiny payout if the maintenance fee were 15 cents and your original reward were zero?
> **A:   That's my understanding, yes.**
>
> Q:   So if you did not make a profit from a Hashlet on a particular day, GAW would not receive anything from you either?
> **A:   That's correct.**
>
> Q:   And, therefore — so if you did not make a profit from a Hashlet on a particular day, GAW would not profit that day either.
> **A:   That's correct.**

Ex. 2 (Trial Tr. at 906:3-12) (testimony of Michael Pfeiffer); *id.* at 856:13-857:4 (testifying that GAW Miners had a "policy and practice" of making these payouts). In other words, GAW Miners did not charge a maintenance fee to the extent that a Hashlet investor's reward on a given day was less than the maintenance fee. When the investor did not profit, GAW Miners did not profit, either.

This interdependence of profits and losses between GAW Miners and Hashlet investors establishes strict vertical commonality. *See, e.g.*, *In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d at 360 (finding strict vertical commonality where an investment manager's compensation "was dependent on the successful performance of the investment account" because "[i]f profits were not generated in a calendar year, or if the profits did not exceed the preferred return, then [defendant] did not receive a performance fee"); *Walther v. Maricopa Int'l Inv. Corp.*, No. 97 CIV. 4816 (HB), 1998 WL 186736, at *7 (S.D.N.Y. Apr. 17, 1998) (concluding vertical commonality was adequately pled because "if [the plaintiff's] funds appreciated in value, the defendants were financially compensated," whereas "if [the plaintiff's] investment did not perform well, the

17

defendants were not paid," thereby creating "a link between the successfulness of the plaintiff's investment and the financial compensation" of the promoter). That is the precise arrangement GAW Miners had with Hashlet investors: if "profits were not generated" for Hashlets or they "did not perform well," GAW Miners "w[as] not paid." *In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d at 360; *Walther*, 1998 WL 186736, at *7.

The evidence that GAW Miners and Hashlet investors shared in the upside of Hashlet returns, as well as the downside when there were no returns—including by foregoing any maintenance fees when those fees exceeded the mining rewards for a Hashlet—was not disputed at trial. Accordingly, there was no evidence that would have permitted a reasonable juror to find that vertical commonality was not satisfied for Hashlets. *See Arlio*, 474 F.3d at 51.

>     3.     Profits from the efforts of others.

The final element of the investment contract inquiry is "profits to be derived from the entrepreneurial or managerial efforts of others." ECF No. 326 at 22; *see Forman*, 421 U.S. at 852. The question is "whether the product was being promoted primarily as an investment . . . or as a means whereby participants could pool their activities, money, and the promoter's contribution in a meaningful way"—put otherwise, whether there was a "reasonable expectation of significant investor control" over the enterprise. ECF No. 326 at 21 (emphasis added); *see Aqua-Sonic Prod. Corp.*, 687 F.2d at 582.

At trial, the jury learned that GAW Miners promised investors it would undertake all of the work necessary to mine the cryptocurrency that would make their Hashlets profitable: finding warehouse space; securing electricity for the mining equipment; purchasing, operating, and maintaining the mining equipment; and providing the technical know-how necessary to

18

accomplish it all. Defendant did not and cannot dispute these facts which, taken together, establish as a matter of law that Hashlets owners expected profits to be derived from GAW's efforts.

At the outset, there can be no dispute that investors expected to earn profits from their Hashlets. *See, e.g.*, Ex. 9 (PX 47 at 3) (archived GAW Miners website touting "payouts" and features that would "keep[] your Hashlet profitable"); Ex. 2 (Trial Tr. at 249:6-9) (testimony of Stuart Fraser) (Q: "And you understood that the idea behind a Hashlet was that a customer who purchased a Hashlet could engage in cryptocurrency mining in order to make a profit; correct?" A: "I think that's why people did it, yes, sir."); Ex. 6 (PX 119) at 9 ¶ 4 ("A hashlet entitled an investor to a share of the profits that  GAW Miners . . . would purportedly earn by mining virtual currencies using the computers that were maintained in their data centers.").

From start to finish, the evidence at trial showed that Hashlet investors reasonably expected that these profits would come from GAW's work and expertise—*i.e.*, its "entrepreneurial or managerial efforts"—not from their own. Defendant admitted this:

> Q: Hashlet customers were relying on GAW Miners' expertise to own and operate the mining equipment that would support the Hashlets; correct?
>
> **A: Yes.**

Ex. 2 (Trial Tr. at 249:19-22) (testimony of Stuart Fraser). The primary sales pitch for Hashlets— repeated in press releases and marketing materials—was they were so easy to use they were "grandma-approved!", requiring zero equipment or technical knowledge and minimal effort on the part of investors. *See* Ex. 8 (DX 528) (GAW Miners press release regarding Hashlets):

The Hashlet's incredible popularity is due to both it's aggressive $16 starting price - lower than any other miner - and that it is largely accepted as the most powerful cryptocurrency miner in the world. More importantly, however, Hashlet is widely considered the most user-friendly product in the industry, allowing people without technical know-how to work with and create Bitcoins. Previous cryptocurrency miners have never been known for their ease of use, always requiring some degree of technical knowledge in order to operate.

"Hashlets are different. If you can open an email you can operate a Hashlet." says CEO Josh Garza. "Hashlet is grandma-approved!"

Earning profits from Hashlets would be as simple as opening an email. *See id.* ("If you can open an email you can operate a Hashlet."); Ex. 9 (PX 47) at 3 ("If you can open an email, you can setup and operate a Hashlet."). Investors got the message. As class representative Marc Audet testified, Hashlets were appealing because "they were very convenient to set up. You just basically bought them, and they were ready to go. They started mining Bitcoins immediately once you activated them." Ex. 2 (Trial Tr. at 582:4-7). Whereas crypto mining had previously been the domain of "technicians" and "geeks," Hashlets were marketed as "easy to use," "grandma proof or grandma friendly," and accessible to the general public. Ex. 2 (Trial Tr. at 834:3-12) (testimony of Michael Pfeiffer).

The reason Hashlets were "grandma-approved!"—as the jury heard repeatedly at trial— was that GAW would do all the work necessary to make Hashlets profitable. As Plaintiffs' expert explained, mining cryptocurrency "requires a lot of know-how and it's a messy, technical process." Ex. 2 (Trial Tr. at 53:1-2). Instead of doing their own mining at home, Hashlet owners would pay GAW to "provide the space for all of these [mining] machines, provide the electricity for the machines, provide the know-how for operating and perhaps upgrading the machines." *Id.* at 53:7-12. That is precisely the deal GAW was offering: "Datacenters cut power costs in half, maximize uptime, and save you from having noisy miners in your home. Hashlet is . . . perfectly optimized to thrive in large, controlled datacenters and achieve massive economies of scale. All Hashlets are

hosted in the most robust mining data center in the world and come with a 99.9% uptime guarantee." Ex. 9 (PX 47) at 3; Ex. 17 (SEC Memorandum) at 15 ("GAW's representations that it would expertly and profitably manage all of its responsibilities with regard to its mining operations was marketed as a reason why investors would choose to invest in Hashlets rather than in buying and maintaining mining equipment on their own.").

As numerous witnesses (including Mr. Fraser) testified, and as the SEC explained in its case, Hashlet investors "were relying on GAW Miners' expertise to own and operate the mining equipment that would support the Hashlets." Ex. 2 (Trial Tr. at 249:19-22) (testimony of Stuart Fraser); Ex. 2 (Trial Tr. at 622:10-14) (testimony of Denis Marc Audet) (Q: "And you understood that what the companies would be doing, GAW Miners and ZenMiner, is hosting those machines, those miners, and running them and maintaining them; is that correct?" A: "That's correct, yes."). *See also* Ex. 17 (SEC Memorandum) at 15 (itemizing the efforts GAW was responsible for, including purchasing and operating mining equipment, keeping the equipment connected to the internet, establishing mining pool accounts and customer accounts, and calculating and making payouts).

In short, the undisputed testimony and documents presented at trial all pointed one way: investors expected GAW's mining operation, and therefore their Hashlets, would be profitable (or not) because of GAW's technical expertise and GAW's efforts to purchase, install, operate, maintain, and upgrade its mining equipment and otherwise run the mining operation. No reasonable jury could have found otherwise. *See Kik Interactive Inc.*, 492 F. Supp. 3d at 180 (holding that promoter's promised entrepreneurial and managerial efforts to create a "digital ecosystem," without which investors' crypto investments would be "worthless," established the "efforts of others" prong as a matter of law); *ATBCOIN*, 380 F. Supp. 3d at 356 (concluding that

investors' lack of control over "whether [the promoter's] [b]lockchain technology worked"—the success or failure of which would determine the value of investors' digital assets—demonstrated *Howey*'s third prong at the pleading stage); *Howey*, 328 U.S. at 299-300 (explaining that necessity of relying on "third parties with adequate personnel and equipment" due to investors' geographic remoteness and "lack [of] equipment and experience" in operating a citrus enterprise was hallmark of an investment contract).[8]

At trial, Defendant elicited testimony that Hashlet investors could exert some effect on their Hashlets' mining activity by (i) "boosting" the Hashlets or (ii) switching the pools in which their Hashlets were mining. *See* Ex. 2 (Trial Tr. at 627:8-628:6) (testimony of Denis Marc Audet) (boosting); *id.* at 626:5-627:7 (switching mining pools). But even if Hashlet owners could influence their Hashlets in some fashion through "boosting" or switching pools, the success and profitability of Hashlets was still ultimately determined by GAW, not by investors. A Hashlet represented the returns from a slice of GAW's crypto mining operation. *See* Ex. 6 (PX 119) at 9 ¶ 4. Investors understood that whether a Hashlet was profitable—or, indeed, had any value at all— depended on GAW's ability to successfully run that mining operation: to purchase miners; find a suitable location; ensure a reliable and cost-effective supply of electricity; install the miners properly; operate, maintain, and service the miners; respond to technical issues; and calculate and distribute payouts. *See supra* at 20-21. If GAW succeeded in these tasks, Hashlet investors might

---

[8] *Compare id.* at 300 ("Such persons have no desire to occupy the land or to develop it themselves; they are attracted solely by the prospects of a return on their investment. Indeed, individual development of the plots of land that are offered and sold would seldom be economically feasible due to their small size. Such tracts gain utility as citrus groves only when cultivated and developed as component parts of a larger area."), *with* Ex. 9 (PX 47 at 3) ("The future of profitability is in the cloud. Datacenters cut power costs in half, maximize uptime, and save you from having noisy miners in your home. Hashlet is . . . perfectly optimized to thrive in large, controlled datacenters and achieve massive economies of scale.").

earn profits. If not, no one would profit. *See Kik Interactive Inc.*, 492 F. Supp. 3d at 180 (investors relied on promoter's entrepreneurial and managerial skills where their investments would be "worthless" without the promoter's efforts); *Bender v. Cont'l Towers Ltd. P'ship*, 632 F. Supp. 497, 501 (S.D.N.Y. 1986) (noting that *Howey*'s third prong contemplates arrangements where "without the efforts of the promoters, the investments would be virtually worthless").

For their part, Hashlets investors had no say over these key aspects of the Hashlet enterprise. Viewed in that light, investors' ability to temporarily "boost" their Hashlets' profitability, or to switch their Hashlets from one mining pool to another, does not amount to "significant investor control," *Aqua-Sonic Prod. Corp.*, 687 F.2d at 585, that negates the investors' expectation that their Hashlets would earn profits through GAW's efforts. In *Long v. Shultz Cattle Co.*, the Fifth Circuit explained that *Howey*'s third prong is satisfied "even [where] the efforts of individual investors were relevant to the profitability of their investment" if the promoter "provide[s] the entire framework within which an individual investor's efforts would succeed or fail." 881 F.2d 129, 137 (5th Cir. 1989) (directing entry of judgment as a matter of law on the investment contract issue and remanding for a new trial). Here, GAW provided the "entire framework" and "the essential infrastructure of the venture"—its crypto mining operation—upon which the value of Hashlets rested. *Id.*; *see also Aqua-Sonic Prod. Corp.*, 687 F.2d at 584 (noting it would be an "affront to the policies of [the securities] laws to exempt schemes that preserved the mere right to provide some effort" on the part of an investor); *SEC v. Telegram Group, Inc.*, 448 F. Supp. 3d 352, 370 n.9 (S.D.N.Y. 2020) ("The Initial Purchasers' ability to time their potential sales of Grams or control other aspects of their ownership of Grams are insufficient to negate a finding that a common enterprise exists." (citing *Aqua-Sonic Prod. Corp.*, 687 F.2d at 578-79, for the proposition that "a common enterprise existed though the relevant investment

contract 'was optional' and provided investors with control over aspects of the enterprise that affected their profits")); *ATBCOIN*, 380 F. Supp. 3d at 355-56 (rejecting argument that investors' ability to exercise some control over digital assets—whose value depended on the promoter's development and operation of a blockchain over which investors had "no control"—failed the *Howey* test).

*          *          *          *          *

At trial, Plaintiffs proved key facts that compel the conclusion that Hashlets were investment contracts under *Howey*. Defendant did not and cannot dispute that Hashlet investors were bound together, and to GAW, in a common enterprise. They bought into GAW's crypto mining operation, the success or failure of which—an outcome that hinged on GAW's efforts to mine for cryptocurrency, not the investors' efforts—would affect them all. And if an investor did not profit from her Hashlet, GAW earned no profit from that Hashlet, either. Because the evidence at trial shows that Hashlets are investment contracts as a matter of law, the Court should (i) enter judgment for Plaintiffs on the question of whether Hashlets were investment contracts; and (ii) order a new trial to determine whether Defendant is liable, with respect to Hashlets, for Plaintiffs' claims under federal and state securities law. *See* Fed. R. Civ. P. 50(b).

B.    Plaintiffs are entitled to judgment as a matter of law on the issue of whether Paycoin, Hashpoints, and HashStakers are securities.

As with Hashlets, the facts elicited at trial establishing that Paycoin, Hashpoints, and Hashstakers are securities are conclusive and unrebutted. *First*, class members invested money—whether in the form of cash or other valuable consideration—in exchange for Paycoin, Hashpoints, and Hashstakers. *Second*, these were investments in a new cryptocurrency created, developed, and controlled by GAW. If GAW had successfully launched Paycoin and grew it into the "cryptocurrency of the future" that it promised, that success would have translated into an increase

in the value of Paycoin that would have been shared among everyone who invested in the coin, whether directly or through Hashpoints and/or Hashstakers. If GAW had failed in this venture, all Paycoin owners would suffer—and in fact, that is exactly what happened. *Third*, Paycoin's success or failure lay in the hands of GAW. Indeed, Paycoin's key selling point, which the company used to differentiate it from the other cryptocurrencies in the market, was GAW's commitment to developing it. As the company told investors, "No cryptocurrency in history has had the financial backing of a company with the capital and resources of HashCoin, ever." Ex. 14 (PX 160) at 1. GAW sold Paycoin as an investment that would become more valuable over time, and investors bought in.

Taken together, these facts—which were not disputed by Defendant at trial—show that Paycoin, Hashpoints, and Hashstakers involved (1) an investment of money (2) in a common enterprise (3) with profits to be derived solely from the efforts of others. ECF No. 326 (jury instructions) at 20-22. *Howey*, 328 U.S. at 298. Because no reasonable jury could have concluded otherwise, the Court should grant Plaintiffs judgment as a matter of law on this issue.

1.      Investment of money.

At trial, Defendant did not dispute that GAW's customers made an "investment of money" to obtain Paycoin, Hashpoints, and Hashstakers. Not only did Defendant introduce into evidence Plaintiffs' sworn certifications listing their transactions in GAW's products, *see* Ex. 15 (DX 683), but counsel for Defendant also elicited substantial testimony about each class representative's purchases, *see, e.g.*, Ex. 2 (Trial Tr. at 600:19-605:6, 617:10-618:15) (testimony of Denis Marc Audet).

It makes no difference that some of these products could be acquired by means other than direct cash payment; *Howey*'s "investment of money" requirement is not limited to "direct

monetary contributions" and has often been satisfied by other "exchange[s] of value." *Uselton v. Com. Lovelace Motor Freight, Inc.*, 940 F.2d 564, 574–75 (10th Cir. 1991) ("First, the district court's definition of 'contributory' assumes that only direct monetary contributions will satisfy the requirement. In fact, and in spite of *Howey*'s reference to an 'investment of money,' ***it is well established that cash is not the only form of contribution or investment that will create an investment contract***. Instead, the 'investment' may take the form of 'goods and services,' or some other 'exchange of value.'" (citations omitted) (emphasis added)). For instance, employees' agreement to waive their right to receive the full wage established by their governing collective bargaining agreement in exchange for the right to participate in a program offering an interest in an employee stock ownership plan and profit-sharing plan "constitute[d] sufficient tangible and definable consideration to serve as an 'investment' . . . for the purposes of the *Howey* test." *Id.* at 575; *see also Dubin v. E.F. Hutton Grp. Inc.*, 695 F. Supp. 138, 145 (S.D.N.Y. 1988) (holding that plaintiff stated a claim for securities fraud because plaintiff, by accepting a job with defendant company, "in a very concrete sense, did exchange something of tangible value—he changed his way of life and his job—in return for the stock and stock options available through the Plan"). As such, when GAW's customers gave up their right to receive their normal Hashlet mining rewards for Hashpoints, and later, when they converted those Hashpoints to Paycoin, they made an "exchange of value" sufficient to serve as an "investment of money" under *Howey*.

2.    Common enterprise.

As with Hashlets, the evidence establishing that Paycoin, Hashpoints, and Hashstakers formed a "common enterprise," whether through horizontal commonality or strict vertical commonality, was conclusive and unrebutted at trial. All three products were part of the same common enterprise: GAW's Paycoin. Several courts in this Circuit have found cryptocurrency

projects to satisfy *Howey*'s "common enterprise" requirement, often based on strikingly similar facts as those presented to the jury in this case.

In *SEC v. Telegram Group, Inc.*, 448 F. Supp. 3d 352 (S.D.N.Y. 2020), for instance, the district court found that the SEC had shown a substantial likelihood of success in proving that a new cryptocurrency offering ("Gram") was a security and enjoined Gram's developer, Telegram, from further distributing the coin. *Id.* at 358-59. Like Paycoin, Gram was a proof of stake cryptocurrency that was supposed to finally achieve the holy grail of mainstream adoption. *See id.* at 361 ("Telegram could learn from the mistakes of existing blockchains and, by correcting their flaws, enable Telegram's new cryptocurrency to be the first to achieve truly widespread adoption."). The entire initial allotment of Gram would belong to Telegram, which would use the funds raised by selling this allotment to further develop and grow the coin. *See id.* at 360 ("[A]t least initially, the supply of Grams would be limited to five billion, which would be held by Telegram."); *id.* at 362-63 (describing how Telegram's promotional materials promised that at least some of the "proceeds raised" from these initial distributions would go toward "the development of the [Telegram Open Network] Blockchain"). Telegram even indicated that it might repurchase Grams on the open market as needed to keep the price from falling too low. *See id.* at 361 ("If the market price of Grams fell below half of the Reference Price, Telegram . . . would have discretion to repurchase Grams and, by reducing the number of Grams in circulation, potentially prevent the market price from falling further."). Finally, Telegram promised to promote and grow Gram by integrating it into its existing messaging app, which would provide a platform for customers to buy Gram and use it in transactions. *See id.* at 362 (describing various strategies that Telegram would deploy to drive adoption). On these facts, the district court found both horizontal commonality and strict vertical commonality. *See id.* at 369-71.

The district courts in *SEC v. Kik Interactive Inc.*, 492 F. Supp. 3d 169 (S.D.N.Y. 2020), and *Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340 (S.D.N.Y. 2019), came to similar conclusions with respect to *Howey*'s "common enterprise" requirement and its application to cryptocurrencies. As in *Telegram* and this case, both *Kik* and *ATBCOIN* involved new cryptocurrency projects launched with promises of ongoing development and support, which would increase the value of the coins and thereby return profits to their investors. *See, e.g.*, *Kik*, 492 F. Supp. 3d at 178 (noting that Kik planned construct a "digital ecosystem" for its new cryptocurrency that would drive up its value); *ATBCOIN*, 380 F. Supp. 3d at 353 ("Thus, the funds raised through the ICO were pooled together to facilitate the launch of the ATB Blockchain, the success of which, in turn, would increase the value of Plaintiff's ATB Coins."). Both the *Kik* and *ATBCOIN* courts found horizontal commonality under these circumstances. *See Kik*, 492 F. Supp. 3d at 178-79; *ATBCOIN*, 380 F. Supp. 3d at 353-54; *see also Kik*, 492 F. Supp. 3d at 178 n.5 (declining to address strict vertical commonality given this conclusion).

In light of the substantial factual similarities between this case and these three authorities,[9] there can be no doubt Paycoin is also a common enterprise, and no reasonable jury could have concluded otherwise.

---

[9] The ATB Coin even shared a tagline with Paycoin—"the cryptocurrency of the future"—and, in an eerie echo of Paycoin's eventual decline, suffered significant losses in value when the coin promoter failed to deliver the feature-rich platform it had promised to support the coin's adoption. *Compare ATBCOIN*, 380 F. Supp. 3d at 347 ("A review of the ATB ICO commented that it had 'yielded nothing but a cheap reskinned [Bitcoin] wallet which is still in beta' and noted that the ATB Coin software failed to deliver many of the features Defendants had promised. As a result of the subpar performance of the ATB Blockchain, 'adoption of ATB Coin and the ATB Blockchain has been essentially nonexistent, and the value of ATB Coins has continuously fallen.'" (citation omitted)), *with* Ex. 2 (Trial Tr. at 814:24-815:10) (testimony of Dean Allen Shinners describing how Paybase launched "after the new year in 2015" as only "an online wallet, a place to store your Paycoin and nothing else," with none of the features that GAW Miners had promised to drive widespread adoption), *and* Ex. 18 (DX 719) at 13 (chart of Paycoin market prices showing a significant and permanent decline at the start of 2015).

a)      *Horizontal commonality.*

The basis for Paycoin's horizontal commonality is simple: GAW intended to pool the money received from investors in Paycoin's ICO to develop the Paycoin ecosystem and ensure its success, and the success of each Paycoin investor (*e.g.*, the ability to sell Paycoin at a profit) was entirely dependent on the success of Paycoin (as reflected, *e.g.*, in higher market prices). *See, e.g.*, Ex. 12 (PX 81) at 2 (touting Paycoin's ICO as "supporting continual adoption efforts allowing [GAW] to be the first to both legitimize and bring cryptocurrency to the mass market"); Ex. 14 (PX 160) at 2 (promising to put "100%" of the proceeds from Paycoin's ICO into "grow[ing] the currency"); Ex. 14 (PX 160) at 3 (showing a projected timeline for Paycoin's ICO and further development ending with "Increased Market Value"); Ex. 2 (Trial Tr. at 803:4-10) (testimony of Dean Allen Shinners that "Paybase was another platform that was integral of in order for all of these promises GAW Miners had made to, you know, come to fruition . . . ."). To put it another way, if Paycoin failed, then all Paycoin owners "would be equally affected as all would lose their opportunity to profit" from their investment. *Telegram*, 448 F. Supp. 3d at 369.

The *Telegram*, *Kik*, and *ATBCOIN* courts easily found horizontal commonality under substantially similar circumstances. *See, e.g.*, *Telegram*, 448 F. Supp. 3d at 369 ("The SEC has shown horizontal commonality. After the 2018 Sales, Telegram pooled the money received from the Initial Purchasers and used it to develop the TON Blockchain as well as to maintain and expand Messenger. The ability of each Initial Purchaser to profit was entirely dependent on the successful launch of the TON Blockchain." (citation omitted)); *Kik*, 492 F. Supp. 3d at 178 ("Kik used the funds for its operations, including the construction of the digital ecosystem it promoted. This ecosystem was crucial. The success of the ecosystem drove demand for Kin and thus dictated investors' profits." (citation omitted)); *ATBCOIN*, 380 F. Supp. 3d at 353 ("[T]he Complaint also

alleges that the primary goal of the ATB ICO 'was to raise capital to create and launch a new blockchain that would "deliver blazing fast, secure and near-zero cost payments to anyone in the world."' Thus, the funds raised through the ICO were pooled together to facilitate the launch of the ATB Blockchain, the success of which, in turn, would increase the value of Plaintiff's ATB Coins." (citation omitted)). Focusing on "economic reality," the *Kik* court observed that "[t]his is the nature of a common enterprise, to pool invested proceeds to increase the range of goods and services from which income and profits could be earned . . . . The stronger the ecosystem that Kik built, the greater the demand for Kin, and thus the greater the value of each purchaser's investment." 492 F. Supp. 3d at 179 (citation omitted). GAW made the exact same value proposition to Paycoin investors, who took the company at its word. *See, e.g.*, Ex. 19 (DX 597) at 11 ("All is well, ***we are all positioned to do well if GAW succeeds***, so cheer on the team and enjoy the show!" (emphasis added)); *see also, e.g.*, Ex. 2 (Trial Tr. at 835:16-836:9) (testimony of Michael Pfeiffer that Paycoin was an attractive investment over other cryptocurrency projects that offered similar technical innovations because "GAW said that they had a $100 million fund to back up this coin to ***promote the development and to promote the ecosystem that would make Paycoin valuable***" (emphasis added)).

b)      *Vertical commonality.*

The basis for Paycoin's strict vertical commonality is likewise simple: The fortunes of each Paycoin investor were tied to the fortunes of GAW Miners because both were dependent on Paycoin's success. *See Telegram*, 448 F. Supp. 3d at 369 ("[S]trict vertical commonality 'requires that the fortunes of investors be tied to the fortunes of the promoter.'" (quoting *Revak*, 18 F.3d at 88)). That the fortunes of Paycoin's investors were tied to the success of Paycoin is obvious and was well established at trial. *See supra* section IV.B.2.a.

It is similarly clear from the record that Paycoin represented a pivot for GAW from cryptocurrency mining to cryptocurrency development, and the company's own financial and reputational position were linked to Paycoin's success. *See, e.g.*, Ex. 11 (PX 82) (article in *The Wall Street Journal* describing Paycoin as the "cryptocurrency of the future" that will be "even bigger" than GAW's mining business); Ex. 12 (PX 81) (GAW Miners press release promising that Paycoin would be different from "all existing cryptocurrencies [that] have failed to achieve an adoption path leading to mainstream use" as GAW would use Paycoin's ICO to "fill[] in the missing piece by supporting continual adoption efforts allowing us to be the first to both legitimate and bring cryptocurrency to the mass market"); Ex. 20 (PX 66) (email from Defendant equating Paycoin's ICO with "NEW WORLD COMING!"). GAW owned 96% of the initial allotment of Paycoin, *see* Ex. 2 (Trial Tr. at 59:3-16) (testimony of Dr. Arvind Narayanan), and would suffer financially from any decrease in Paycoin's value, *see Telegram*, 448 F. Supp. 3d at 370 (describing how the "financial fortunes" of Telegram, which continued to own 28% of all Grams after the ICO, were linked "to the price of Grams and the success of the [Telegram Online Network] Blockchain"). Tellingly, when GAW failed to deliver on its plans for Paycoin's development— *e.g.*, when it became clear that Paybase would *not* have all of the features promised by GAW— Paycoin's price dropped and never recovered, a financial hit to everyone with an interest in it, including its promoter. *See* Ex. 2 (Trial Tr. at 814:24-815:10) (testimony of Dean Allen Shinners describing how Paybase launched "after the new year in 2015" as only "an online wallet, a place to store your Paycoin and nothing else," with none of the features that GAW had promised to drive widespread adoption); Ex. 18 (DX 719) at 13 (chart of Paycoin market prices showing a significant and permanent decline after Paybase's release).

GAW's fortunes were even further dependent on Paycoin's success due to the company's promise that it would buy back Paycoin at $20—a promise it continued to make even as late as January 12, 2015. *See, e.g.*, Ex. 21 (PX 143) at 1 (retweet from Defendant of GAW's promise to honor the $20 Paycoin price); Ex. 2 (Trial Tr. at 326:21-327:10) (testimony of Stuart Fraser confirming "that's what Josh said"). By then, Paycoin was trading below $4, *see* Ex. 18 (DX 719) at 12-13, and honoring its financial commitment would not only have cost the company $16 per token, but also would have impaired GAW's ability to develop and grow Paycoin.

The jury also heard evidence that GAW intended to use Paycoin to prop up its struggling mining business. *See* Ex. 5 (Mordica Tr. at 79:16-24) ("It started when Josh came up with the idea to build an additional source of revenue to help offset some of the mining equipment that he was not able to purchase because of whatever reason, you know, he didn't have enough money or whatever. So he literally – I believe he came up with Paycoin to raise more money in a seed round in a ICO . . . ."). In other words, Paycoin's success would not merely affect GAW's fortunes as to *Paycoin* but rather the company's fortunes as a whole. *See Telegram*, 448 F. Supp. 3d at 370 (explaining that Telegram's fortunes depended on Gram's success in part because the company planned to use some of the proceeds from Gram's ICO to support its messaging app, and thus, failure to launch Gram would "damage the fortunes of the company as a whole").

It was not merely GAW's financial fortunes that were linked to Paycoin's success. Perhaps equally importantly, GAW staked its reputation on Paycoin and failure to deliver on its promises would critically harm the company's standing and ability to operate its business. *See Telegram*, 448 F. Supp. 3d at 370-71 (noting that "Telegram would also suffer critical reputational damage if the [Telegram Open Network] Blockchain failed prior to after launch" in finding strict vertical commonality). Indeed, GAW's failure to deliver the Paybase platform it promised was a turning

point for the company's credibility within its customer community. *See* Ex. 2 (Trial Tr. at 663:22-664:15) (testimony of Dean Allen Shinners explaining that he began to "lose faith" in GAW after the underwhelming deployment of Paybase); *see also, e.g.*, Ex. 22 (DX 638) at 3 (email informing GAW after the launch of Paybase that "[y]ou now have a large collective of highly visible people . . . who you have pissed off" and that "if you continue to proceed with this hilarious show, as it stands today, there is no business person out there who will ever trust you in any future enterprise"). Conversely, successfully launching Paybase would have further stoked interest in Paycoin, potentially leading to even more investment and more resources to continue developing it for mainstream adoption. GAW's fortunes were directly tied to the fortunes of Paycoin owners, both of which would rise and fall with the success or failure of the Paycoin project. *See Telegram*, 448 F. Supp. 3d at 371 (finding strict vertical commonality under similar circumstances).

### 3. Profits from the efforts of others

The evidence presented to the jury unequivocally showed that customers of Paycoin, Hashpoints, and Hashstakers invested in those products with the expectation of profits from the efforts of GAW in promoting and developing Paycoin. *See Kik*, 492 F. Supp. 3d at 179 ("To qualify as an investment contract, the investment must come with 'a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others.'"). That was GAW's value proposition to investors, as reflected in its marketing materials:



Ex. 14 (PX 160) at 3 (excerpt of the "ICO" page on GAW's website for Paycoin). GAW would fund the Coin Adoption Fund, develop and launch Hashbase (later known as Paybase), and continue supporting Paycoin after launch by pursuing "Major Retailor Adoption" and "Credit Card Purchasing." *Id.* Then, according to GAW's offering materials, these efforts would result in "Increased Market Value"—*i.e.*, a more valuable Paycoin that investors could sell for a profit on the open market. *Id.*; *see also Telegram*, 448 F. Supp. 3d at 373-74 (noting that offering materials which highlighted an "anticipated market price" higher than what initial investors would need to pay and which discussed a "price floor for Grams in the case of market turmoil . . . fueled the expectation that" investors could later sell their investments for a profit).

At trial, the jury heard testimony confirming that is exactly what investors expected. *See, e.g.*, Ex. 2 (Trial Tr. at 648:22-649:2) (testimony of Dean Allen Shinners) ("Q So did you expect that when your Hashpoints converted to Paycoin, that you would have the option of selling them? A Yes. Q And based on [PX 160], did you expect that you'd be able to earn a profit if you sold them? A Yes, absolutely."). The jury also saw contemporaneous evidence further confirming that investors had had these same expectations when they invested in Paycoin in late 2014. *See* Ex. 19 (DX 597) at 11 ("The cryptocurrency sector is getting a lot of attention and investment. This stuff is not going away and we have a chance with GAW to be on the leading/bleeding edge of something big. I am willing to risk 3 months income to have a share in something that will give me a 5-fold increase on my investment in a few years."). Notably, at no point did Defendant ever suggest or present any evidence that the class did *not* seek to profit from their investments in Paycoin.

That GAW had promised investors it would maintain a $20 price floor for Paycoin only further supports their reasonable expectation of profiting from their investment. *See Telegram*, 448 F. Supp. 3d at 372 ("This provision created the reasonable expectation among Initial Purchasers that, even if the market price of Grams fell, the TON Foundation would support a market price that would enable the Initial Purchasers to sell their Grams at a considerable profit."). Defendant did not dispute that this promise was made, and one of the class representatives even testified that he relied on the $20 price floor when purchasing Paycoin at a lower price on public exchanges. *See* Ex. 2 (Trial Tr. at 637:2-10) (explaining that "everything I bought in December would have been at a discounted price compared to the $20 floor that they were going to provide"); *see also* Ex. 6 (PX 119) at 9-10 (plea agreement of Josh Garza admitting that "[t]o generate business as

well as attract customers and investors," he represented that GAW would use a $100 million reserve to "drive up" the price of Paycoin).

Nor was there any dispute at trial that Paycoin's success depended largely on the managerial and entrepreneurial efforts of GAW. *See, e.g.*, Ex. 13 (PX 125) at 8 (Paycoin whitepaper describing benefits of GAW's "multi-tier, organized strategy" for promoting Paycoin); Ex. 12 (PX 81) (GAW press release explaining that the "continual adoption efforts" that GAW would undertake to support Paycoin would allow the coin to escape the fate of "all existing cryptocurrencies [that] have failed to achieve an adoption path leading to mainstream use"). Indeed, GAW's webpage for the Paycoin ICO made a point of emphasizing the company's commitment to the project:

> **No cryptocurrency in history has had the financial backing of a company with the capital and resources of HashCoin, ever.**
>
> Driving adoption has always been the most difficult task facing any new technology, including cryptocurrency. We will be placing industry-changing resources behind this effort and committed to making HashCoin a success. 100% of the revenue derived from HashCoin's release and continued use go directly to an Coin Adoption Fund to further back the efforts of dedicated, full-time staff to ensure that HashCoin enjoys the type of wide-spread visibility and use that other cryptocurrencies, including bitcoin, have lacked

Ex. 14 (PX 160) at 1 (excerpt). Moreover, as Plaintiffs' expert Dr. Narayanan also explained to the jury that GAW had significant control over Paycoin's software, blockchain, and surrounding ecosystem, *see* Ex. 2 (Trial Tr. at 57:12-59:16, 60:2-62:14), the record was clear that the tools to make Paycoin successful were in the company's hands. *See Kik*, 492 F. Supp. 3d at 180 ("These efforts by Kik were crucial because without the promised digital ecosystem, Kin would be worthless."); *see also* Ex. 2 (Trial Tr. at 836:4-9) (testimony of Michael Pfeiffer that Paycoin was different from other cryptocurrencies because "GAW said that they had a $100 million fund to back up this coin to promote the development and to promote the ecosystem that would ***make Paycoin valuable***" (emphasis added)).

Finally, the fact that GAW advertised Paycoin as a cryptocurrency that would eventually break into the mainstream does not mean that its initial investors had consumptive—as opposed to investment—intent. None of the evidence presented at trial suggested that investors purchased Paycoin for the *purpose* of using it as a currency; in fact, merchant adoption was seen as desirable because it would make Paycoin more valuable as an *investment*. *See, e.g.*, Ex. 19 (DX 597) at 9 ("GAW is addressing the big issue of price stability of the new coin, and this may be enough to get the coin widely accepted, ***and in such a case, the whole Paycoin/Paybase would yield good returns***. Investing in GAW is risky because it is a start-up venture, however, I am also not investing more than I an [sic] afford to lose." (emphasis added)); *see also Kik*, 492 F. 3d at 180 ("Kik characterized Kin also as a medium for consumptive use . . . . However, none of this "consumptive use" was available at the time of the distribution. It would materialize only if the enterprise advertised by Kik turned out to be successful."); Ex. 2 (Trial Tr. at 836:21-24) (testimony of Michael Pfeiffer that he purchased Hashstakers because he "viewed Paycoin as a long-term investment"). In *Howey* itself, while the transactions at issue involved land to be *used* for growing fruit, the transactions themselves were considered investments, as they were entered into by investors who had "no desire to occupy the land or to develop it themselves" and simply sought to "share in the profits of a large citrus fruit enterprise." *Howey*, 328 U.S. at 299-300. The same reasoning applies to the class's investments in Paycoin, Hashpoints, and Hashstakers.

\*          \*          \*          \*          \*

Defendant did not contest any of the relevant facts concerning Paycoin, Hashpoints, and Hashstakers at trial, and even in closing, failed to offer any argument for why Paycoin fails the *Howey* test. Instead, when arguing that Paycoin is not a security, counsel for Defendant relied exclusively on the so-called currency exception contained in the federal securities laws:

37

> Paycoin's also not a security. It's a coin. It's a currency. And you can see the Judge's jury instructions at page 30 even said currency, it's not a security. And you can have the Department of Justice Plea Agreement with Mr. Garza where they describe Paycoin as a currency and even the Princeton professor said it was a type of digital asset. It's used as a medium of exchange. Look at the definition in the instructions. You can see Paycoin is a currency and, therefore, not a security.

Ex. 2 (Trial Tr. at 1072:19-1073:3); *see also* ECF No. 326 at 30 (instructing jury that "[a] currency is an item (such as a coin, government note, or banknote) that is generally accepted as payment in a transaction and recognized as a standard of value"). Notably, counsel for Defendant did not even mention investment contracts or the *Howey* requirements. But the jury did *not* decide that Paycoin is a currency within the meaning of 15 U.S.C. § 78a, *see* ECF No. 330 at 9 (verdict form), which in any event would have applied only to the federal securities claim; instead, the jury unaccountably decided that Paycoin is not an investment contract at all, *see id.* at 2. In light of the uncontroverted facts presented at trial, there was no basis in the record to support such a conclusion.

      C.     <u>Alternatively, Plaintiffs are entitled to a new trial because the jury's finding that Hashlets, Hashpoints, Hashstakers, and Paycoin were not securities was against the weight of the evidence.</u>

Alternatively, should the Court decline to grant Plaintiffs' motion under Rule 50(b), Plaintiffs submit that a new trial pursuant to Rule 59 is more than warranted because the jury's verdict as to Section I, Question No. 1—whether Hashlets, Paycoin, Hashpoints, and Hashstakers were investment contracts, *see* ECF No. 330 at 2—is against the weight of the evidence.[10] *See* Fed. R. Civ. P. 59(b); *Raedle*, 670 F.3d at 417. As detailed above, the evidence at trial showed that all four products involved an "investment of money" in a "common enterprise"—under both the horizontal and strict vertical commonality approaches—and that investors expected profits through

---

[10] Plaintiffs do not request a new trial as to Section IV, "Common Law Fraud." *See* ECF No. 330 at 13.

the efforts of GAW. Because the trial record regarding Hashlets, Paycoin, Hashpoints, and Hashstakers unambiguously showed they were investment contracts, the jury's verdict was seriously erroneous and should be set aside.

Defendant did not meaningfully dispute the facts demonstrating that the products at issue were an investment in a common enterprise and that investors expected to earn profits through GAW's managerial efforts, not their own. Defendant offered no evidence rebutting Plaintiffs' evidence as to Paycoin, Hashpoints, and Hashstakers, and as for Hashlets, Defendant either failed to answer Plaintiffs' proof or offered evidence too marginal to sustain the verdict. In view of the evidence as a whole, the jury "reached a seriously erroneous result" which will—if permitted to stand—result in a "miscarriage of justice" for the investors who lost millions of dollars purchasing them.[11] *See Manley v. AmBase Corp.*, 121 F. Supp. 2d 758, 772-73 (S.D.N.Y. 2000) (granting motion for a new trial where the jury verdict conflicted with undisputed evidence that the plaintiff was not entitled to indemnification), *aff'd*, 337 F.3d 237 (2d Cir. 2003); *Ruffin v. Fuller*, 125 F. Supp. 2d 105, 109-10 (S.D.N.Y. 2000) (Chin, J.) (granting a new trial *sua sponte* where evidence at trial overwhelmingly showed that plaintiff's constitutional rights were violated and therefore "no reasonable jury . . . could have concluded otherwise").

Moreover, this is not a case "[w]here the resolution of the issue[]" regarding whether these products were securities "depended on assessment of the credibility of the witnesses, and in

---

[11] Plaintiffs note the jury's communications to the Court on this point. On October 29, 2021, the jury sent a note reading: "Dear, Your Honor, as regards Question No. 1 and further questions, is it necessary for each juror to agree unanimously to each subset question before continuing to the next question, or is *one lone adverse opinion sufficient for a no answer* from the jury to that question?" *See* Ex. 2 (Trial Tr. at 1092:2-7) (emphasis added). That "one [lone] adverse opinion . . . for a no answer" on Question No. 1 (whether the securities were investment contracts, *see* ECF No. 330 at 2) became a unanimous "no answer," coupled with the jury's request for a new verdict form on November 1, 2021, at the very least raises questions about the basis for the jury's finding regarding whether the products constituted investment contracts.

particular, on resolving conflicting witness accounts," when a court should generally "refrain" from setting aside a jury's verdict. *See United States v. Landau*, 155 F.3d 93, 104-05 (2d Cir. 1998). Here, the undisputed facts regarding Hashlets, Paycoin, Hashpoints, and Hashstakers came from company marketing materials and the testimony of multiple witnesses from both parties, including a cryptocurrency expert. The jury did not listen to competing accounts about the *relevant* facts; nor were they asked to weigh the credibility of any witness regarding this issue.[12] Instead, the jury made a serious error regarding the significance of the evidence it saw and heard, which established that Hashlets, Paycoin, Hashpoints, and Hashstakers were investment contracts. Accordingly, granting a new trial will not require the Court to disregard the special role of the jury in making credibility determinations. For the reasons above, if the Court does not grant Plaintiffs' motion for judgment as a matter of law, it should order a new trial pursuant to Rule 59.

## V.     Conclusion

By including investment contracts in the definition of "security," Congress sought to ensure that the securities laws were "capable of adaptation to meet the countless and variable schemes devised by those who seek the use the money of others on the promise of profits." *Howey*, 328 U.S. at 299. In light of this "statutory policy of affording broad protection to investors," *id.* at 301, the undisputed evidence presented at trial, and the overwhelming weight of authority endorsing Plaintiffs' position, Plaintiffs respectfully request that the Court hold as a matter of law that Hashlets, Paycoin, Hashpoints, and Hashstakers are investment contracts under the *Howey* test, or in the alternative, grant a new trial on this issue and on all other questions not resolved by the jury's verdict.

---

[12] For example, Defendant referred to the testimony of class representatives Michael Pfeiffer and Marc Audet in support of his argument that Hashlets were not investment contracts. *See* Ex. 2 (Trial Tr. at 1073:4-1074:4) (closing statements).

Dated: December 3, 2021

Respectfully submitted,

*/s/ Seth Ard*
Jacob Buchdahl
Seth Ard
Geng Chen
Russell Rennie
Susman Godfrey L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019
Tel: (212) 336-8330
Fax: (212) 336-8340
jbuchdahl@susmangodfrey.com
sard@susmangodfrey.com
gchen@susmangodfrey.com
rrennie@susmanfodfrey.com

*Counsel for Plaintiffs*

### CERTIFICATE OF SERVICE

I hereby certify that on December 3, 2021, a copy of foregoing document was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing  system  or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

*/s/ Russell Rennie*