UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| DENIS MARC AUDET, MICHAEL PFEIFFER, and DEAN ALLEN SHINNERS, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>vs.<br><br>STUART A. FRASER, GAW MINERS, LLC, and ZENMINER, LLC (d/b/a ZEN CLOUD),<br><br>Defendants. | Case 3:16-cv-00940<br><br>Hon. Michael P. Shea<br>Courtroom 2<br><br>ECF Case<br><br><u>CLASS ACTION</u><br><br>DECEMBER 3, 2021 |

**<u>MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT AGAINST GAW MINERS, LLC AND ZENMINER, LLC</u>**

**Table of Contents**

                                               **Page**

I. Introduction ..................................................................................................................1

II. Background ...................................................................................................................1

      A. Factual Background ..........................................................................................1

           1. Cryptocurrencies ...................................................................................1

           2. Hashlets .................................................................................................2

           3. Hashpoints, Paycoin, and Hashstakers ..................................................5

      B. Procedural History .............................................................................................7

III. Legal Standard ..............................................................................................................8

IV. Argument ......................................................................................................................9

      A. If the Court orders a new trial, it should permit Plaintiffs to withdraw this motion or deny it without prejudice to renew. ........................................9

      B. If the Court denies Plaintiffs' other motions, it should grant default judgment against the Companies as to their claim for common-law fraud. ..................................................................................................................9

           1. Hashlets .................................................................................................9

           2. Paycoin ................................................................................................12

V. Conclusion ..................................................................................................................14

## Table of Authorities

Page(s)

**Cases**

*Allstate Indem. Co. v. Iberico-Lozada*,
  No. 3:14-CV-00454 MPS, 2015 WL 4168982 (D. Conn. Feb. 11, 2015) ................................. 8

*Audet v. Fraser*,
  332 F.R.D. 53 (D. Conn. 2019) ..................................................................................... 11, 13

*Bricklayers & Allied Craftworkers Loc. 2, Albany, N.Y. Pension Fund v. Moulton
  Masonry & Const., LLC*,
  779 F.3d 182 (2d Cir. 2015) (per curiam) ....................................................................... 1, 8, 9

*Finkel v. Romanowicz*,
  577 F.3d 79 (2d Cir. 2009) ................................................................................................. 8

*Hunter v. Shanghai Huangzhou Elec. Appliance Mfg. Co.*,
  505 F. Supp. 3d 137 (N.D.N.Y. 2020) ............................................................................. 2, 8

*Kilduff v. Adams, Inc.*,
  219 Conn. 314 (1991) ........................................................................................................ 8

*SACS Glob. Tr. & Mortg., LLC v. Thomas*,
  478 F. Supp. 2d 285 (D. Conn. 2007) ........................................................................... 11, 14

**Statutes**

Connecticut Uniform Securities Act, Conn. Gen. Stat. §§ 36b-16, 36b-29(a)(1), (a)(2) ............... 9

Securities Exchange Act, 15 U.S.C. § 78j(b) ............................................................................ 9

**Other Authorities**

17 C.F.R. §240.10b-5 ............................................................................................................. 9

Fed. R. Civ. P. 23 .................................................................................................................. 7

Fed. R. Civ. P. 41 .............................................................................................................. 1, 9

Fed. R. Civ. P. 50 .......................................................................................................... 1, 9, 14

Fed. R. Civ. P. 55 ............................................................................................................. 7, 8

Fed. R. Civ. P. 59 ............................................................................................................ 1, 9

**I.     Introduction**

On November 15, 2021, the Court ordered Plaintiffs to either move for default judgment against Defendants GAW Miners, LLC ("GAW Miners" or "GAW") and ZenMiner, LLC ("ZenMiner," and with GAW Miners, "the Companies" or "Defendants") or dismiss their claims against the Companies pursuant to Rule 41 of the Federal Rules of Civil Procedure by December 3, 2021. ECF No. 342. In the same order, the Court directed Plaintiffs to file any motions for judgment as a matter of law and/or for a new trial by the same date. *Id.*

In accordance with the Court's order, Plaintiffs hereby move for default judgment against the Companies as to one of their claims. However, because this motion and Plaintiffs' concurrent post-trial motions present interrelated requests for relief, Plaintiffs' motion for default judgment is conditional. If the Court grants Plaintiffs' primary request for relief—for judgment as a matter of law and/or for a new trial pursuant to Rules 50 and 59—Plaintiffs respectfully request permission to withdraw this motion or ask that it be denied without prejudice to renewal after the conclusion of the new trial. *See* ECF No. 71. If the Court denies the Rule 50 and 59 motions, however, Plaintiffs ask the Court to grant default judgment against the Companies as to Plaintiffs' claim for common-law fraud.

**II.    Background**

      A.     <u>Factual Background</u>[1]

           1.     Cryptocurrencies

GAW Miners and ZenMiner used a shifting array of cryptocurrency-related investment contracts to defraud investors. A cryptocurrency (*e.g.*, Bitcoin) is a digital representation of value

---

[1] The facts recited are drawn from the factual allegations in the complaint and documentary evidence that Plaintiffs do not anticipate will be controverted. *See Bricklayers & Allied Craftworkers Loc. 2, Albany, N.Y. Pension Fund v. Moulton Masonry & Const., LLC*, 779 F.3d

that can be traded and functions as a medium of exchange, a unit of account, and/or a store of value. *See* ECF No. 57 ("FAC") ¶ 25. Each unit of cryptocurrency has an electronic public ledger known as a "blockchain." *Id.* ¶ 27. The blockchain verifies that a transferor in fact transferred the amount of cryptocurrency received by a transferee.

Users of cryptocurrencies generate new cryptocurrency through a process known as "mining." *Id.* ¶ 28. Mining involves using computing power to solve complex algorithms that, among other things, verify blockchains. *Id.* The first "miner," *i.e.*, the individual or entity and her computer equipment, to solve the equation receives cryptocurrency in exchange for completing the calculations. *Id.* ¶¶ 26, 28. As interest in cryptocurrencies grew, competition among miners increased. *Id.* ¶ 29. Miners in turn required more computer processing power to have a chance of solving algorithms first and to receive cryptocurrency as a reward. *Id.* Given the increasing competition to solve the equations that confirm blockchain transactions, miners frequently combine their computing power into mining "pools." *Id.* ¶ 30. Generally, the more computing power directed to a particular mining pool, the better the chance that pool will be the first to confirm a block of transactions and receive the payout for mining. *Id.*

2.  Hashlets

GAW Miners and ZenMiner are affiliated companies that offered cryptocurrency-related products or services. *Id.* ¶¶ 2, 19, 20. GAW Miners was incorporated in March 2014, with Homero

---

182, 189 (2d Cir. 2015) (per curiam) (holding that "the factual allegations in the complaint, combined with uncontroverted documentary evidence submitted by plaintiffs" were sufficient to affirm a finding of liability on default); *Hunter v. Shanghai Huangzhou Elec. Appliance Mfg. Co.*, 505 F. Supp. 3d 137, 150-51 (N.D.N.Y. 2020) (looking to "the well-pled allegations in the Amended Complaint, as well as the documentary evidence submitted by Plaintiffs" to resolve motion for default judgment, and collecting authorities).

"Josh" Garza as its CEO. *Id.* ¶ 46.[2] In the spring of 2014, GAW's primary business was to purchase virtual currency mining equipment from overseas manufacturers and resell it to customers. *Id.* ¶ 75. ZenMiner was created by Garza in May 2014. *Id.* ¶ 78. Although Garza and the Companies held out ZenMiner as independent of GAW Miners, Garza and Defendant Stuart Fraser owned and controlled ZenMiner at all times, *id.*, and GAW Miners and ZenMiner acted in concert with respect to the fraud alleged. *E.g. id.* ¶¶ 78, 79, 86, 87, 90, 95, 97, 107, 109.

In August 2014, GAW Miners and ZenMiner began to sell a product called "Hashlets." *Id.* ¶ 95. Customers buying Hashlets believed they were purchasing computational power from GAW's and ZenMiner's data center. *Id.* Hashlets purportedly earned a return based on the number of cryptocurrency units generated when the pools to which their computing power was directed succeeded in processing and confirming cryptocurrency transactions. *Id.* Through its terms of service, ZenMiner told Hashlet purchasers that they were buying "a divisible and assignable allocation of hashing power from GAW-owned and hosted mining hardware." *Id.* Effectively, Hashlet customers were buying the rights to profit from a slice of computing power owned by Defendants. *Id.* ¶ 97.

Hashlet investors were required to do very little for their Hashlets to purportedly earn money from mining. *Id.* ¶ 98. Investors believed that when Defendants received payouts from their purported mining activities, each investor's share would be calculated and deposited into his or her ZenCloud account. *Id.*

In reality, Defendants dramatically oversold Hashlets. Defendants lacked anything close to the computing capacity that they would need to conduct mining activities commensurate with the

---

[2] This motion concerns only the liability, on default, of GAW Miners and ZenMiner. This recitation of facts and its inclusion or non-inclusion of facts or allegations regarding Defendant Stuart Fraser should not be construed as relevant in any way to Mr. Fraser's liability or non-liability.

3

number of Hashlets they sold. *Id.* ¶¶ 107-08, 112. Defendants thus misled investors into thinking that Hashlets were associated with actual mining activities. *Id.* ¶ 117. In this way, Hashlets operated as a classic Ponzi scheme. *Id.* ¶ 125; *see also* Ex. 1 (PX 119) (July 20, 2017 plea agreement of Josh Garza) at 9 ¶ 5, 10 ¶ 6.

In connection with the sale of Hashlets, GAW Miners and ZenMiner told class members a host of misrepresentations. *See* FAC ¶ 117. Most fundamentally, the Companies told investors their Hashlets were earning money from cryptocurrency mining. Investors were told they could direct their Hashlets to mine in one of the mining pools available through the Companies' ZenCloud database. *Id.* ¶¶ 100, 122. Hashlets were sold by the "megahash" or "gigahash," a unit of mining power, *id.* ¶ 106, and GAW Miners referred to the Hashlet as the "world's most advanced miner," *id.* ¶ 118, and as a "miner" and "digital cloud miner" on its website and in its press releases, *id.* ¶ 103. *See also* Ex. 1 (PX 119) at 9 ¶ 5 (Garza made the statement to investors that "[t]he hashlets the defendant's companies sold engaged in the mining of virtual currency"); Ex. 2 (PX 47) at 2-3 (August 18, 2014 archived version of GAW Miners Hashlet website) (advertising for "the world's first digital cloud miner," which is "hosted in the most robust mining data center in the world and come[s] with a 99.9% uptime guarantee" and which allows owners to "[s]tart mining immediately").

These representations were false. Hashlets were not mining in the pools to which Hashlet owners directed them, and GAW Miners had nowhere near the amount of computing power necessary to support the amount of Hashlets it had sold. *Id.* ¶¶ 122-24.[3] When confronted with

---

[3] *See also* Ex. 1 (PX 119) at 9 ¶ 5 ("Truth": "The defendant's companies sold more hashlets than were supported by the computing power maintained in their data centers. Stated differently, the defendant's companies sold the customers the right to more virtual currency than the companies' computing power could generate.").

4

investors' suspicions that Hashlets were not mining in the pools that customers selected, CEO Josh Garza claimed that the Companies were directing investors' mining power to their own "private pools." This statement was also false, however, because GAW Miners simply did not have the mining power to support the Hashlets it sold. *Id.* ¶ 124. GAW Miners and Garza knew these representations about Hashlets were false. *See* Ex. 1 (PX 119) at 9 ¶¶ 1, 5 (through his companies, Garza "operated a scheme to defraud" victims, which he did through the false statement in question, which was made "[t]o generate business as well as attract customers and investors"). Ultimately, the Companies covered up for the lack of mining profits by (i) paying investors the payouts that purportedly came from mining with revenues from ongoing Hashlets sales; and (ii) converting some of the Companies' own funds into bitcoin (the currency in which investors were paid their supposed mining payouts) and paying investors with those funds. *Id.* ¶¶ 125, 127.

Investors relied on the Companies' false statements in deciding to purchase their Hashlets. *Id.* ¶¶ 95, 120, 203. In total, investors purchased almost $19 million worth of Hashlets. *Id.* ¶ 7.

### 3. Hashpoints, Paycoin, and Hashstakers

In November 2014, Defendants announced that they planned to launch a new form of cryptocurrency, called "Paycoin." *Id.* ¶ 136. In advance of Paycoin's launch, Defendants offered "Hashpoints" to investors. *Id.* Hashpoints were convertible promissory notes that investors could purchase or mine and exchange for Paycoin once Paycoin launched. *Id.* Defendants' main motivation in offering Hashpoints was to shift customers' mining focus from bitcoin and other cryptocurrencies to Hashpoints and Paycoin in an effort to stave off bitcoin payments to Hashlet owners that GAW Miners increasingly could not afford to make. *Id.*

Defendants convinced customers to acquire Hashpoints and Paycoin by means of two major misrepresentations.

*First*, the Companies told investors that GAW Miners had a $100 million reserve fund, held in fiat currency, that it would use to support a $20 price floor for Paycoin. *See* Ex. 1 (PX 119) at 10 ¶ 5 (Garza told investors "[t]he market value of a single paycoin would not fall below $20 per unit because the defendant's companies had a reserve of $100 million that the companies would use to purchase paycoins to drive up its price."); Ex. 3 (PX 82) (November 25, 2014 *Wall Street Journal* article quoting Mr. Garza: "When the coin opens to the public on Jan. 2 with what Mr. Garza says will be an anticipated market capitalization of $250 million, the company will partly back that with a store of fiat currency worth around $100 million."); FAC ¶¶ 140, 141. In reality, Garza and GAW Miners knew that the Companies did not have a $100 million reserve fund and could not support the $20 price floor for Paycoin. *See* Ex. 1 (PX 119) at 10 ¶ 5.

*Second*, GAW Miners represented that it had agreements with major retailers like Amazon, Wal-Mart, and Target to accept Paycoin for payment. Garza stated that retailers had agreed to accept Paycoin because of GAW's promised $20 pricing support. FAC ¶ 141. In January 2015, Garza posted on GAW's online forum that "over 10,000 merchants worldwide will suddenly accept Paycoin." *Id.* At the time they made these statements, GAW Miners and Garza knew they were false: no major retailers had entered into agreements to accept Paycoin. *Id.* ¶ 144.

GAW Miners and Garza marketed these features—the $100 million reserve fund, the $20 price floor, and merchant adoption—in order to attract investors to acquire Hashpoints and Paycoin. *See id.* ¶ 140-42 ("Merchant adoption was the main marketing push to entice miners to switch from bitcoin or altcoin mining to Hashpoints (and therefore Paycoin) mining."); Ex. 1 (PX 119) at 9 ¶ 5 (Garza made the misrepresentations relating to the $100 million reserve fund and $20 floor "[t]o generate business as well as attract customers and investors").

Around this time, GAW Miners sold another product related to Paycoin called a "Hashstaker." A Hashstaker was a digital interest-bearing wallet. A HashStaker owner would "deposit" Paycoins into the Hashstaker for a fixed period (30, 90, or 180 days) and earn a percentage return in Paycoins on their principal after the lockup period ended. FAC ¶¶ 151, 152.

Customers who purchased or mined Hashpoints had those Hashpoints converted to Paycoin in December 2014. *Id.* ¶ 149. In the weeks that followed, GAW's fraudulent scheme collapsed and the value of investors' Paycoin and Hashstakers plummeted. *Id.* ¶¶ 155-57.

B.     Procedural History

On June 15, 2016, Plaintiffs filed suit against GAW Miners and ZenMiner, alleging that their conduct in selling and offering for sale their cryptocurrency products constituted common-law fraud, the sale of unregistered securities, and securities fraud under the Securities Exchange Act of 1934 and the Connecticut Uniform Securities Act.[4]

The Companies were properly served but failed to answer or otherwise appear in the action. *See* ECF No. 59, 68; *see* ECF No. 68-2 (declaration of Colin M. Watterson evidencing proper service on Defendants). On March 24, 2017, the Court granted entry of default against the Companies pursuant to Rule 55(a). ECF No. 71. By the same order, the Court denied Plaintiffs' motion for default judgment without prejudice to renewal. *Id.*

In the ensuing time, the Court certified a class of Plaintiffs pursuant to Federal Rule of Civil Procedure 23 (ECF No. 141), bifurcated the issues of liability and damages (ECF No. 206), and set the case down for trial on the issue of Defendant Stuart Fraser's liability. The parties tried the case to a jury, which returned a verdict for Mr. Fraser on November 1, 2021. ECF No. 330.

---

[4] Plaintiffs also named Garza as a defendant in the original complaint, *see* ECF No. 1, and Stuart A. Fraser as a defendant in both the original complaint and the First Amended Complaint, *see* ECF No. 1, 57.

7

Following the verdict, the Court directed Plaintiffs to either move for default judgment against the Companies or move to dismiss their claims against the Companies so that the Court may enter final judgment in the case. *See* ECF No. 334, 342.

### III.     Legal Standard

"When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." Fed. R. Civ. P. 55(a). After entry of default, a plaintiff seeking default judgment must apply to the court for such a judgment if the plaintiff's claim is not "for a sum certain or a sum that can be made certain by computation." Fed. R. Civ. P. 55(a), (b).

In reviewing a motion for default judgment, a court must "determine whether the plaintiff's allegations establish liability as a matter of law." *Allstate Indem. Co. v. Iberico-Lozada*, No. 3:14-CV-00454 MPS, 2015 WL 4168982, at *1 (D. Conn. Feb. 11, 2015) (alterations and internal quotation marks omitted) (citing *Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009)). In doing so, it is "required to accept all of the [plaintiff's] factual allegations as true and draw all reasonable inferences in its favor." *Id.* (internal quotation marks omitted). The court may also consider documentary evidence submitted by a plaintiff with the motion. *See Bricklayers & Allied Craftworkers Loc. 2*, 779 F.3d at 189; *Hunter*, 505 F. Supp. 3d at 150-51.

The elements of common-law fraud under Connecticut law are "(1) that a false representation was made as a statement of fact; (2) that it was untrue and known to be untrue by the party making it; (3) that it was made to induce the other party to act on it; and (4) that the latter did so act on it to his injury." *Kilduff v. Adams, Inc.*, 219 Conn. 314, 329 (1991) (footnote omitted). In addition to knowingly untrue statements, "a misrepresentation made without belief in its truth or recklessly made can also provide the basis for a fraud claim." *Id.* at 329 n.15.

8

IV. **Argument**

A. <u>If the Court orders a new trial, it should permit Plaintiffs to withdraw this motion or deny it without prejudice to renew.</u>

As noted, Plaintiffs are filing concurrent motions pursuant to Rules 50(b) and 59 for judgment as a matter of law and, in the alternative, for a new trial. The grant of either such motion would result in a new trial as to some or all issues relating to Defendant Stuart Fraser's liability for violations of the Securities Exchange Act of 1934 and the Connecticut Uniform Securities Act.

If the Court orders a new trial, Plaintiffs respectfully submit that any motion for default judgment against the Companies can and should be deferred until after that trial. In that eventuality, Plaintiffs request permission to withdraw this motion or ask that the Court deny it without prejudice to renewal after the new trial has concluded. *See* ECF No. 71.

B. <u>If the Court denies Plaintiffs' other motions, it should grant default judgment against the Companies as to their claim for common-law fraud.</u>

In the event that the Court declines to order a new trial, it should grant default judgment against GAW Miners and ZenMiner as to Plaintiffs' claim for common-law fraud.[5] The well-pleaded allegations in the complaint, together with the documentary evidence attached to this motion, *see Bricklayers & Allied Craftworkers Loc. 2*, 779 F.3d at 189, establish that GAW Miners and ZenMiner are liable for fraud.

  1. Hashlets

GAW Miners and ZenMiner committed common-law fraud by falsely telling investors that their Hashlets were engaged in cryptocurrency mining that would yield them profits.

---

[5] If the Court declines to order a new trial and instead considers Plaintiffs' motion for default judgment, Plaintiffs move to dismiss their claims under the Securities Exchange Act, 15 U.S.C. § 78j(b); 17 C.F.R. §240.10b-5, and the Connecticut Uniform Securities Act, Conn. Gen. Stat. §§ 36b-16, 36b-29(a)(1), (a)(2), as against GAW Miners and ZenMiner. *See* Fed. R. Civ. P. 41(a); ECF No. 334, 342.

9

*First*, the Companies—through their websites and marketing materials, as well as through statements of CEO Josh Garza—made untrue statements of fact indicating that investors' Hashlets were doing real mining in mining pools and that payouts to investors were based on real cryptocurrency mining. *See, e.g.*, FAC ¶¶ 100, 122 ("Investors were told that they could . . . direct their Hashlets to engage in mining in one of the mining pools available through ZenCloud."); Ex. 1 (PX 119) at 9 ¶ 5 (Garza represented to investors that "[t]he hashlets the defendant's companies sold engaged in the mining of virtual currency"); Ex. 2 (PX 47) at 2-3 (advertisement indicating that a Hashlet engaged in crypto mining); *see also supra* at 3-4 (listing false statements regarding the mining activity of Hashlets). In reality, investors' Hashlets were not mining in the pools to which investors purportedly directed them; the Companies had nowhere near the amount of hashing power necessary to support the Hashlets they sold; and payouts to investors did not come from crypto mining. *See* FAC ¶¶ 122-27; Ex. 1 (PX 119) at 9 ¶ 5; *supra* at 4-5.

*Second*, GAW Miners and ZenMiner knew (or were reckless in not knowing) that these statements were false, *see* Ex. 1 (PX 119) at 9 ¶¶ 1, 5 (through the Companies, Garza "operated a scheme to defraud" victims, which he did through the false statement regarding Hashlets, which was made "[t]o generate business as well as attract customers and investors"), which was demonstrated in part by their knowing use of revenue from new Hashlet sales, and the Companies' own funds, to fund payouts to investors. *See* FAC ¶¶ 125, 127.

*Third*, the Companies made these representations to induce investors to act on them, *i.e.*, to purchase Hashlets. *See* Ex. 1 (PX 119) at 9 ¶¶ 1, 5 (Garza told investors the Hashlets lie, among others, "[t]o generate business as well as attract customers and investors"); FAC ¶¶ 95-101 (alleging that the basic sales pitch to Hashlet investors, including through the Companies' websites and in marketing materials, was that Hashlets generated payouts through cryptocurrency mining).

*Finally*, investors did act on the misrepresentations—by purchasing Hashlets—to their injury. *See id.* ¶¶ 107-09 ("Between mid-August and December 2014, GAW Miners and ZenMiner sold at least $19 million of Hashlets to more than 10,000 investors."); Ex. 1 (PX 119) at 10 ¶ 7 (noting losses from scheme involving the Hashlets misrepresentation); *see also* FAC ¶ 203 (alleging that "Plaintiffs relied on defendants' false statements in deciding to purchase . . . Hashlets"). The entire premise and value proposition of Hashlets was that they generated payouts to investors based on cryptocurrency mining performed by the Companies. No reasonable investor would have purchased a Hashlet had she known that the Companies lacked the mining power to support the number of Hashlets that they sold; that the payouts did not come from crypto mining, but from revenue from Hashlet sales and other sources; and that Hashlets were therefore, in effect, a Ponzi scheme. *See Audet v. Fraser*, 332 F.R.D. 53, 81 (D. Conn. 2019) (finding that the nature of the alleged misrepresentations regarding Hashlets permitted an inference of reliance because "no reasonable investor would have purchased [Hashlets] if the Companies disclosed the fact they were being sold as part of a Ponzi scheme" (internal quotation marks omitted)). *See also SACS Glob. Tr. & Mortg., LLC v. Thomas*, 478 F. Supp. 2d 285, 288 (D. Conn. 2007) (granting default judgment on common-law fraud claim where plaintiff alleged that it "reasonably relied upon [the defendant's] representations and omissions of material fact to its detriment").[6]

In sum, the Plaintiffs' well-pleaded allegations and evidentiary material establish every element of common-law fraud against GAW Miners and ZenMiner with respect to the Hashlets misrepresentation.

---

[6] *See also* Complaint, *SACS Glob. Tr. & Mortg., LLC*, No. 3:06-cv-01228 (Aug. 4, 2006), ECF No. 1, 2006 WL 2710795 ("40. The plaintiff reasonably relied upon such representations and omissions of material fact to its detriment.").

      2.      Paycoin

GAW Miners and ZenMiner are also liable to Plaintiffs for their fraudulent misrepresentations about Paycoin.

*First*, the Companies represented to investors that (1) GAW Miners had a $100 million reserve fund to support a price floor for Paycoin and (2) Paycoin would be accepted by major merchants. Neither of these representations were true, and the Companies knew it. *See* FAC ¶¶ 140, 141 (misrepresentations regarding merchant adoption, including a post from Garza that "over 10,000 merchants worldwide will suddenly accept Paycoin"); *id.* ¶ 144 ("Garza and Fraser knew that no major retailers had entered into agreements to accept Paycoin[.]"); Ex. 3 (PX 82) (November 25, 2014 *Wall Street Journal* article quoting Mr. Garza: "When the coin opens to the public on Jan. 2 with what Mr. Garza says will be an anticipated market capitalization of $250 million, the company will partly back that with a store of fiat currency worth around $100 million."); Ex. 1 (PX 119) at 9-10 ¶ 5 (Garza made the statement to investors that GAW Miners had a $100 million reserve fund that would allow it to keep the price of Paycoin at or above $20); *id.* at 9 ¶¶ 1, 5 (through the Companies, Garza "operated a scheme to defraud" victims, which he did through the false statement regarding the $100 million reserve fund, a statement which was made knowingly "[t]o generate business as well as attract customers and investors").

*Second*, the purpose of these statements was to induce GAW Miners customers to mine or otherwise acquire Hashpoints (which would later convert to Paycoin), Paycoin, and Hashstakers. The promises of merchant adoption and a $20 floor (supported by GAW's supposed $100 million reserve fund) were part of a marketing push for Paycoin and its affiliated products, Hashpoints and Hashstakers. *See* FAC ¶ 136 ("Defendants' main motivation in offering Hashpoints was to shift customers' mining focus from bitcoin and altcoin"—*i.e.*, what customers' Hashlets were mining—

"to Hashpoints and Paycoin and to stave off bitcoin payments to Hashlet-holders that GAW Miners could not make."); *id.* ¶ 140 (GAW Miners promoted the "Proof of Reserve" (the reserve fund) in marketing Paycoin to investors); *id.* ¶ 141 ("Merchant adoption was the main marketing push to entice miners to switch . . . to Hashpoints (and therefore Paycoin) mining."); *id.* ¶ 142 (the $20 floor for Paycoin was an effort to appeal to potential customers, who would believe that the floor would encourage retailer adoption).

*Finally*, investors did act on the misrepresentations to their detriment by mining or otherwise acquiring Hashpoints, Paycoin, and Hashstakers. *See id.* ¶ 138 (noting that "[t]he majority of GAW's customers" stopped mining in bitcoin or altcoin pools, and switched to mining Hashpoints); *id.* ¶ 157 (when the fraud collapsed, "customers watched the value of their . . . Paycoins and HashStakers plummet"); Ex. 1 (PX 119) at 10 ¶ 7 (noting losses from scheme involving the $100 million reserve fund misrepresentation); *see also* FAC ¶ 203 (alleging that "Plaintiffs relied on defendants' false statements in deciding to purchase . . . Hashpoints, Hashstakers, and Paycoin and suffered damages as a result").

The $100 million reserve, the $20 price floor, and merchant adoption were essential features of Paycoin and its related products. *Id.* ¶¶ 140-42. No reasonable investor would have acquired Paycoin, Hashpoints, or Hashstakers if they knew, in reality, that the Companies did not have $100 million to support a price floor and that not a single merchant had agreed to accept Paycoin. *See Audet*, 332 F.R.D. at 81 ("The Companies products were financial investments 'that Plaintiffs made in hopes that they would prove profitable.' In addition, they were novel financial investments being sold by a start-up company with no established track record. It is thus reasonable to infer that the representations by the Companies that Paycoin would be supported by a hundred-million-dollar reserve fund and that major, established retailers like Amazon and Target had agreed

to accept it were critical to any investor's decision to purchase such untested products." (citation omitted)). *See also SACS Glob. Tr. & Mortg., LLC*, 478 F. Supp. 2d at 288.

Accordingly, the Plaintiffs have adequately demonstrated through their Complaint and through record evidence that GAW Miners and ZenMiner are liable for fraud under Connecticut law with respect to the Companies' misrepresentations about Paycoin. *See id.* (finding plaintiff adequately established liability for fraud on default by identifying specific misrepresentations and alleging that [1] "'Defendants made such representations and omissions of material fact with the actual intent of that [sic] the plaintiff would rely upon them'" and [2] that the plaintiff "'reasonably relied upon such representations and omissions of material fact to its detriment'"); *see also* 2006 WL 2710795 at ¶¶ 39, 40 (Westlaw transcription of complaint).

## V.  Conclusion

If the Court grants Plaintiffs' motions pursuant to Rule 50 or 59, it should permit Plaintiffs to withdraw this motion or should deny it without prejudice to renewal later. If the Court considers this motion, however, it should enter judgment against GAW Miners and ZenMiner on Plaintiffs' common-law fraud clam for the reasons set forth above.

Dated: December 3, 2021

Respectfully submitted,

*/s/ Seth Ard*
Jacob Buchdahl
Seth Ard
Geng Chen
Russell Rennie
Susman Godfrey L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019
Tel: (212) 336-8330
Fax: (212) 336-8340
jbuchdahl@susmangodfrey.com
sard@susmangodfrey.com
gchen@susmangodfrey.com
rrennie@susmanfodfrey.com

*Counsel for Plaintiffs*

2

## CERTIFICATE OF SERVICE

    I hereby certify that on December 3, 2021, a copy of foregoing document was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

                                       */s/ Russell Rennie*