```
 1                   UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF CONNECTICUT
 2
      - - - - - - - - - - - - - - - - x
 3
      DENIS MARC AUDET, MICHAEL          No. 3:16-CV-940 (MPS)
 4    PFEIFFER, and DEAN ALLEN
      SHINNERS, Individually and on      OCTOBER 27, 2021
 5    Behalf of All Others Similarly
      Situated,                          3:54 P.M.
 6
      vs.                                JURY CHARGE CONFERENCE
 7
      STUART A. FRASER, GAW MINERS,
 8    LLC, and ZENMINER, LLC, (d/b/a
      ZEN CLOUD)
 9
      - - - - - - - - - - - - - - - - x
10

11                      450 Main Street
                      Hartford, Connecticut
12

13        BEFORE:  THE HONORABLE MICHAEL P. SHEA, U.S.D.J.

14

15    APPEARANCES:

16    FOR THE PLAINTIFFS:

17            SUSMAN GODFREY, L.L.P.
                  1301 Avenue of the Americas, 32nd Floor
18                New York, New York 10019
              BY:  SETH D. ARD, ESQUIRE
19            BY:  JACOB W. BUCHDAHL, ESQUIRE
              BY:  GENG CHEN, ESQUIRE
20            BY:  RUSSELL RENNIE, ESQUIRE

21            IZARD, KINDALL & RAABE, LLP
                  29 South Main Street, Suite 305
22                West Hartford, Connecticut 06107
              BY:  MARK P. KINDALL, ESQUIRE
23

24    (Appearances continue ...)

25
```

```
 1    APPEARANCES CONTINUED:

 2    FOR THE DEFENDANT:

 3            HUGHES, HUBBARD & REED L.L.P.
                 One Battery Park Plaza, 12th Floor
 4               New York, New York 10004-1482
            BY:  DANIEL WEINER, ESQUIRE
 5          BY:  MARC A. WEINSTEIN, ESQUIRE
            BY:  AMINA HASSAN, ESQUIRE

 6
            BRENNER, SALTZMAN & WALLMAN
 7               271 Whitney Avenue
                 New Haven, Connecticut 06511
 8          BY:  ROWENA A. MOFFETT, ESQUIRE

 9

10

11

12

13

14

15

16

17

18

19

20    COURT REPORTER:  Julie L. Monette, RMR, CRR, CCP
                        (860) 212-6937
21
      Proceedings recorded by mechanical stenography, transcript
22    produced by computer.

23

24

25
```

```
1                            3:54 P.M.
2           THE COURT:  All right, so we're here for the charge
3    conference, and why don't we just have counsel state
4    appearances.  We are on the record, starting with Plaintiffs'
5    counsel.
6           MR. BUCHDAHL:  Your Honor, from Susman Godfrey, Jacob
7    Buchdahl, Seth Ard, Geng Chen, Russell Rennie, and we're also
8    joined by Mark Kindall.
9           THE COURT:  Okay, very well.
10          MS. HASSAN:  Your Honor, for Defendants, Amina Hassan,
11   Daniel Weiner, and Marc Weinstein.
12          THE COURT:  And Ms. Moffett is here as well.
13          MS. HASSAN:  And Ms. Rowena Moffett.
14          THE COURT:  And obviously there were a lot of issues
15   in this charge; you folks raised a lot of issues.  We're going
16   to go through it page by page literally.  But before we do
17   that, I just wanted to make a couple of comments.
18          You folks raised a slew of issues.  I carefully
19   considered your proposals.  I read the cases.  My law clerk and
20   I read the cases that you cited.  We also did some of our own
21   research.  So I think you can assume that we resolved every
22   issue that was raised, although if you think we missed one,
23   please point it out.
24          I will give you a few comments on how I resolved some
25   of the major issues.  I won't go through every single one
```

1   because we wouldn't be able to have the charge conference if I

2   did that.

3          Okay.  So just to start -- and this is in no

4   particular order.  So with regard to investment contract, I

5   went with the notion of both horizontal and I forget whether

6   they call it strict vertical, the narrower vertical version,

7   the one that says you can show it, that element, if your

8   fortunes are tied to the fortunes of other investors or to the

9   fortunes of the promoter, but not the one that goes -- that

10  your fortunes are tied to the effort of the promoter.  That was

11  rejected by the Second Circuit.

12         Although I recognize there isn't governing authority

13  on it within the Second Circuit, that appeared to me to not

14  suffer from the flaw identified in the decision by Judge

15  Jacobs, the name of which I can't remember, in that it didn't

16  lump the second and third elements together, that is to say,

17  the elements about pooling and sole efforts of others, because,

18  again, it's just tied to the fortunes of the promoter, not the

19  efforts of the promoter.  And I thought it was also -- doing

20  that was also consistent with the broad, flexible definition of

21  security that the Supreme Court, I believe, has suggested

22  Congress intended.  So that's how I resolved that one.

23         Let's see.  So I ultimately agreed with the

24  Plaintiffs, and not Defendants, as to the reading of CUSA in

25  *Jacobi*, the Connecticut Supreme Court decision.  I don't

1   believe -- the *Jacobi* decision talks about a burden of

2   production with regard to -- that the plaintiff has a burden of

3   production to show the knowledge or constructive knowledge of

4   the defendant.

5          I think it's fairly clear in general but also

6   specifically from *Jacobi* itself that a burden of production is

7   something that operates at a level before a trial, before the

8   case goes to the trier of fact.  Typically, a burden of

9   production operates on summary judgment.  In other words, one

10  party has to come forward with some evidence, and then they do

11  that.  The other side has to come forward and bear the burden

12  of proof.

13         So I think that at trial what's relevant is who has

14  the burden of proof on that issue, and it's clear to me, at

15  least from the language of the statute and from *Jacobi*, that

16  the defendant has the burden of proving either that he didn't

17  know or that in exercise -- and in the exercise of freedom of

18  care could not have known.  So that's how I resolved that

19  issue.

20         The issue of partner and similar function, I actually

21  think I ended up agreeing with the Defendant on this.  I

22  think -- it's hard to make sense of the statute unless, when it

23  first refers to "partner" it's using the formal legal

24  definition of partner.  And then later in the functionality --

25  I can't remember the other languages -- functionality or

1    similar function or position is using a sort of operative

2    practical de facto concept of partner.  I guess I'll call it

3    one would be de jure; the other would be de facto.  There's no

4    evidence that the companies here were partnerships, that I'm

5    aware of.

6           I know there's been some evidence that Mr. Fraser was

7    Mr. Garza's partner, but there's simply no evidence that that

8    was formally the case.  I think that it was a partnership.  And

9    so that's how I resolved -- that's why I resolved that issue

10   the way I did; namely, I did not instruct the jury that they

11   could find control based on the title of partner or the legal

12   position of partner.  But I did find that they could find

13   control based upon the functional concept of partner.  That's

14   how I resolved that one.  That's why I resolved that one in

15   that particular way.

16          So currency, this one I struggled with, I will be

17   candid.  There didn't seem -- the parties didn't really cite

18   that much case law on this, and I presume because there isn't

19   much.

20          There were a couple Southern District cases that,

21   though not, strictly speaking, inconsistent with the way I've

22   set up this charge, are arguably inconsistent.  But I -- to me,

23   the statute is hard to make sense of unless currency has some

24   independent meaning, meaning I think I would conclude that if

25   currency was not effectively an affirmative defense, then I

1   think the currency language would be superfluous.  That's how I

2   read the statute.

3        I think it has to suggest that if the product fits

4   something, in this case investment contract, something in the

5   part that comes before they get to the word "not" or "no," but

6   it also fits something that comes afterward, after the "not" or

7   "no," then my conclusion is, then, it's not a security.

8   Because, again, I'm not sure why they would include the "no" if

9   it could be -- if you could have an investment contract that

10  was also a currency that was a security, you wouldn't need to

11  include "no currency" in that case.  Hopefully that was clear.

12       But in any event, that's how I resolved that issue,

13  although I did -- and we can talk -- we will talk about this.

14  I didn't think there was any evidence to support the notion

15  that any other of the products, other than Paycoin, was a

16  currency.  So that's why I made -- I set that up the way I did.

17       Let's see.  I do want to talk about forward-looking

18  statements.  I have some questions about that.  And then

19  finally -- and this is where I'll end and we can start going

20  through -- then hear the motions.  I have some real questions

21  about the affirmative defenses as to the named Plaintiffs.  And

22  I'll just outline that for you.

23       So, first of all, for Mr. Audet, I don't think any of

24  those defenses apply.  I didn't see any evidence that, at all,

25  that any of those defenses, no matter how they're construed,

1   would apply to Mr. Audet.

2          With regard to the others, so I did a fair amount of

3   research on in pari delicto and unclean hands in Connecticut.

4   I'm aware, of course, of the Supreme Court decision discussing

5   in pari delicto in the context of a securities claim.

6          But in Connecticut, in pari delicto, as far as I can

7   see, has only been recognized in one context, and that is in a

8   breach of contract claim.  In particular, courts have held that

9   it's effectively a synonym or really another label for the

10  illegality doctrine that the courts won't enforce an illegal

11  contract.  And some of the older cases say because the parties

12  are in pari delicto, for example, a contract to engage in

13  prostitution, the Court wouldn't enforce that because the

14  parties are in pari delicto.  That's the only context in

15  Connecticut that I was able to find -- I don't know -- after 40

16  minutes or so of looking at cases where in pari delicto has

17  actually been recognized.

18         There is a Connecticut Supreme Court case from a few

19  years back by Justice McDonald that recognizes in the tort

20  context something called wrongful -- a wrongful conduct type

21  doctrine.  That case the plaintiff sued -- the plaintiff had

22  looked at child pornography and sued somebody who wanted to be

23  his mental health therapist for not treating him.  He then was

24  arrested.  And he sued the therapist claiming that, well, if

25  this guy had treated him, he wouldn't have -- you know, he

```
1    wouldn't have continued looking at child pornography; he
2    wouldn't have been caught by the police.
3           The Court said no, as a matter of public policy, we're
4    not going to allow that.  They didn't use the words "in pari
5    delicto," but they also made clear that, under the
6    circumstances of this case, whatever you want to call that
7    doctrine that they recognized would not be satisfied because
8    they said that it was critical -- they talked about -- sorry --
9    case law from other jurisdictions which also applied to the
10   factual situation in that case.  I think the case is called
11   Greenwald.  And they made clear that the -- this was a
12   situation where the plaintiff was trying to profit from his own
13   wrong.
14          So this would be akin to if Plaintiff in this case
15   suing Mr. Fraser because the Plaintiff -- I don't know -- had
16   fraudulently sold securities to Mr. Fraser.  So in any event,
17   I'm having trouble seeing how in pari delicto would apply
18   outside that context.  That said, I do recognize that
19   Connecticut securities law is very sparse and that the
20   Connecticut courts would often look to federal courts on that.
21          So the way I handled that for the moment -- now, this
22   is subject -- very much subject to discussion, would be to
23   instruct the jury on in pari delicto with respect to the
24   securities claims only.  I'm quite confident that in pari
25   delicto would not apply to the fraud in this case.
```

1          Unclean hands, also real trouble seeing how that

2     applies in Connecticut.  Unclean hands has two requirements

3     that I don't see being satisfied here.  The first is it has to

4     involve the same transaction about which the Plaintiffs are

5     suing.  So this comes up a lot in mortgage cases in

6     Connecticut.  There's a case called *Thompson vs. Orcutt* that

7     discusses it.  And I can get into that requirement.  We can

8     talk about it.

9          But the more significant requirement that I think

10    really I think forecloses its recognition here is that the

11    unclean hands defense has to be directed at conduct that is

12    itself directed at the Defendant.  In other words, it would

13    have to be the case that Mr. Shinners or Mr. Audet or Mr.

14    Pfeiffer did something bad to Mr. Fraser or at least to GAW or

15    Zen and that would be what would prevent -- that would be the

16    unclean hands.  It has to be directed to the Defendant.  It

17    can't be directed to a third party.

18          So that I think is fairly -- and the case is called

19    *Thompson vs. Orcutt*.  It's a 2001 Connecticut Supreme Court

20    case.  I think that would foreclose it here, but I'm willing to

21    discuss it.

22          Then I'll be honest on ratification.  I don't really

23    understand that one.  I haven't heard of ratification outside

24    as a general matter.  I've never seen it asserted as an

25    affirmative case I've been involved in.  But I know the Defense

1  cited a case for it.  I'm familiar with the concept in

2  principal agent relations, but I'm not familiar with it outside

3  that concept, and I don't see how that would apply here.

4      So anyway, those are -- those are some concerns about

5  affirmative defenses, and I'm willing to talk about them.  So

6  those are my comments.  Here's what I propose we do:  Why don't

7  we have brief discussions of the motions.  Then we'll go page

8  by page through the charge.  Okay?

9      All right.  So did Defense want to go first with their

10  motion, with this motion?

11      MS. HASSAN:  Sure, Your Honor.

12      THE COURT:  Okay.

13      MS. HASSAN:  So, Your Honor --

14      THE COURT:  I can hear you.

15      MS. HASSAN:  Okay, good.  I was hearing myself.  Okay,

16  so, Your Honor, Defendant is going to move for directed verdict

17  as to each of Plaintiffs' claims against Mr. Fraser.  We

18  believe that Plaintiffs have not presented sufficient evidence

19  for a jury to find for them on one or more elements of each of

20  those claims.

21      In particular, Plaintiffs have not presented

22  sufficient evidence for a jury to find that Mr. Fraser was a

23  control person or materially assisted the fraud at issue.  But

24  in light of the Court's instruction to generally keep the

25  argument brief, instead of walking through each element, there

1    are three or four main points that we want to focus on for

2    argument purposes.

3          THE COURT:  Thank you.  Thank you.

4          MS. HASSAN:  And we're happy to discuss anything else

5    that the Court wishes to address.

6          So Point No. 1, Your Honor, Hashpoints and

7    HashStakers, two of the products at issue, all of Plaintiffs'

8    evidence is in, and we have not -- I don't think we have seen

9    any evidence that identifies what the material misstatements or

10   omissions were with regard to these two products.

11         So just as an example, with Hashpoints, the only

12   representation that we have heard about is that it was

13   represented Hashpoints would be converted to Paycoin, but the

14   evidence also shows that that's exactly what happened.  So

15   we're not aware of any misrepresentation or omission that was

16   made as to Hashpoints.

17         THE COURT:  Okay.

18         MS. HASSAN:  And as to HashStakers, Your Honor, we

19   don't know what the misrepresentation is.  We don't believe any

20   has been identified.

21         THE COURT:  Okay.

22         MS. HASSAN:  So, you know, all of Plaintiffs' claims

23   which relate to material misrepresentations or omissions we

24   believe --

25         THE COURT:  For Hashpoints and HashStakers?

1          MS. HASSAN:  Correct.

2          THE COURT:  Got it.  Because from your standpoint,

3    there's no evidence of a material misstatement or material

4    omission with respect to those two products.

5          MS. HASSAN:  Correct.

6          THE COURT:  Got it next.

7          MS. HASSAN:  So second point, we don't believe that

8    any of the core products or investment contracts adequately

9    address Hashpoints and HashStakers, but I think where I want to

10   spend most of my time is Hashlets.  As far as Hashpoints and

11   HashStakers is concerned, all we have heard about them is they

12   were a kind of in-house credit and you could accumulate them to

13   exchange for Paycoin.  And we haven't really heard anything

14   about HashStakers other than the fact they were some kind of

15   wallet.  So we just don't believe that there's sufficient

16   evidence for the jury to actually assess the three Howey

17   factors.

18         THE COURT:  I thought Mr. Pfeiffer testified today

19   that HashStakers were like a CD.  You put in your whatever it

20   is, your Hashpoints or your Paycoin or your Hashlets -- I can't

21   remember which -- into the HashStakers wallet and you get it

22   back in 90 days or something like that.  I don't know if he

23   said with interest or not, but that was my impression.  Am I

24   wrong about that?

25         MS. HASSAN:  No, Your Honor, you're actually correct.

1   I believe there is testimony they are like CDs, but that

2   doesn't make something an investment contract.  That would be

3   like saying something is like a bond and, therefore, it's an

4   investment contract.  And that just isn't the case.  You have

5   to still check off those three requirements of Howey, and the

6   only allegation in this case is that these products are

7   investment contracts and, therefore, securities.

8           So I do -- I do correct myself, but I think the point

9   is that there isn't sufficient evidence or any evidence for the

10  jury to assess the three factors of Howey for both Hashpoints

11  and HashStakers.

12          THE COURT:  So if the company's doing well in mining

13  and the, you know, striking it rich, all right, and they're

14  mining lots of Bitcoin, don't -- I mean I'm asking this:  Is

15  there evidence to suggest that the value of Hashpoints and

16  HashStakers goes up if that happens?

17          MS. HASSAN:  Your Honor, as I understood from the

18  evidence that was presented was Hashpoints was something that

19  would be mined; right?  I believe Mr. Pfeiffer or Mr. Audet

20  said that Hashlets at some point would start mining Hashpoints.

21          THE COURT:  I think there were -- so there was a

22  suggestion that I thought you could invest or buy Hashpoints,

23  but you could definitely mine them as well -- that's certainly

24  what Mr. Pfeiffer said today -- and that you could convert

25  Hashpoints into ultimately Paycoin at the relevant time.

1          But I thought what you -- how you got Hashpoints --

2     oh, another way to get Hashpoints, I thought there was evidence

3     of this, was you could convert your Hashlets into Hashpoints.

4     Wasn't there some evidence along those lines?

5          MS. HASSAN:  Well, Your Honor, even let's say you

6     could convert your Hashlets into Hashpoints or you could buy

7     Hashpoints.

8          THE COURT:  Yeah.

9          MS. HASSAN:  Again, I'm not sure whether pooling of

10    assets comes in, whether kind of the Hashpoint owner's

11    fortunes -- like, we have no evidence of the actual factors

12    that feed into the investment contract.  Like, where is the

13    pooling of assets for a Hashpoint?

14         THE COURT:  Well, isn't the -- as I say, if you buy a

15    Hashpoint or -- sorry -- you convert your Hashlet to a

16    Hashpoint, I mean, I will confess I don't remember a lot of

17    specific evidence on this.  So you can say, "Judge, there just

18    was no evidence on that," and you might be right.  But I had

19    the impression that if you convert your Hashlet to a

20    Hashpoint -- and as I say, you know, the company's supposedly

21    mining all along and they're making money hand over fist.  Now,

22    it's not like they're striking it rich in the pools.

23         I would have thought your Hashpoints increase in value

24    because of the underlying Hashlet increased in value, although

25    I admit I may be speculating here.  I'm not quite sure how

1   that ...

2           MS. HASSAN:  Your Honor, I don't believe we have that

3   evidence.

4           THE COURT:  Okay.

5           MS. HASSAN:  And that's what I'm going by.  And

6   eventually if the idea is that Hashpoints are converting into

7   Paycoin, then I get that the class members have claims as to

8   Paycoin, but I still don't get that interim step.  How does a

9   coupon or an in-store credit really become a security?

10          THE COURT:  Got it.  Okay.

11          MS. HASSAN:  So Hashlets -- that's what I want to

12  focus on, Your Honor.  So Howey has three elements.  We want to

13  focus on the second two, which is common enterprise and whether

14  there was an expectation of profits derived solely from the

15  efforts of others.

16          So on the common enterprise issue, it is our position

17  that Hashlets do not satisfy either of the two tests, the

18  horizontal commonality or the strict vertical commonality

19  tests.

20          I'll start with -- well, I'll just take the horizontal

21  commonality test.  So for horizontal commonality, each of the

22  Hashlet owners' fortunes had to be tied to the fortunes of the

23  other Hashlet owners.  We've had very consistent and clear

24  testimony from the class representatives that was not the case.

25  We've had testimony that two Hashlet owners could own the same

1    type of Hashlet and one could do really well and the other

2    could do really poorly depending on which pools they had chosen

3    to mine in.

4            THE COURT:  True.

5            MS. HASSAN:  So that tying of fortunes it just doesn't

6    exist based on the evidence that has come in.

7            THE COURT:  Got it.  Go ahead.

8            MS. HASSAN:  As to vertical commonality, Your Honor,

9    again, we have very clear and consistent evidence that GAW

10    Miners and ZenMiner, which take a fixed fee for Hashlets --

11            THE COURT:  That being the maintenance fee.

12            MS. HASSAN:  Correct, the fixed service or maintenance

13    fee, and that means the fortunes of GAW Miners and the Hashlet

14    owners were not tied together.

15            THE COURT:  Does it?  I mean, if my broker charges me

16    a fee, transaction fee, whatever it is, does that mean what the

17    broker's selling is not a security?

18            MS. HASSAN:  Um --

19            THE COURT:  The mere fact that charging a maintenance

20    fee don't make it not an investment contract; right?  Does that

21    foreclose it from being an investment contract?

22            MS. HASSAN:  Well, it doesn't satisfy the vertical

23    commonality test.  And I think when we're transacting through a

24    broker, we're buying and selling securities, it's not that the

25    broker service becomes a security.  Over here we're saying that

1  the product that the company was selling is a security.  But I

2  think the broker example is slightly different.

3         If it's helpful, we did find some cases which

4  basically say that if the promoter or the defendant, all that

5  they're doing is they're charging you a fixed maintenance fee,

6  which does not change with how much profit the actual plaintiff

7  is making, then that does not satisfy.

8         THE COURT:  Yeah, but I had the impression -- I

9  thought there was some testimony about -- again, this is what

10  was represented.  I know the whole thing didn't turn out this

11  way.  But that company's mining; they're mining Bitcoin.

12  They've got these machines.  They're selling a piece -- in

13  effect, a piece of a machine.  I know it's not.  It's a

14  timeshare, whatever.  You can slice the machine to others;

15  those are called Hashlets.

16         So if the company is, as I say, doing really well in

17  the mining, they're, you know, knocking it out of the park,

18  then the Hashlet payout -- so that's the company's fortune.

19  Company's doing well; right?  And then the Hashlet payout goes

20  up too; right?

21         MS. HASSAN:  Well, Your Honor, okay, so the reason

22  that the company would do well in that situation is that maybe

23  more people would come and buy more Hashlets; right?

24         THE COURT:  Well, no.  Because I thought that -- I

25  thought early on -- and I don't remember which witness

1   testified that, well, the company's doing mining their

2   machines, and they're selling pieces of these machines.  But

3   they're the ones doing the mining.  I don't know if somebody

4   said this.  I had the impression that what they're doing is the

5   company's sharing profits with you.  They're not paying out

6   every -- in other words, let's say the company makes a hundred

7   dollars on a particular day on a particular machine and there

8   were ten Hashlets and that machine was represented by ten

9   Hashlets.  I didn't have the impression they were paying ten

10  apiece.  I had the impression they were paying nine apiece and

11  keeping something on the top.

12          MS. HASSAN:  You might be thinking of Professor

13  Narayanan's testimony --

14          THE COURT:  Maybe.

15          MS. HASSAN:  -- in which he said there are different

16  ways in which this kind of operation could be set up.  There

17  could be the example that you gave is one way of setting it up.

18  But what the testimony is about Hashlets is that you were

19  buying either a physical miner or basically its power or a

20  piece of the physical miner so a portion of its power.  And

21  then you were deciding which pool, including external pools,

22  that it was mining in.  And all that the company is doing,

23  vis-a-vis the Hashlet, is operating the miners and maintaining

24  them.

25          The fact that the company might have been -- and I

1   don't know if that's the case or if -- I don't believe there's

2   evidence of that.  The fact that the company might be mining

3   for its own purposes, then I don't think that that's relevant.

4          THE COURT:  Even if they're not just sharing the

5   profits?  Even if the Hashlet is ultimately not just there

6   sharing the mining profits with you?

7          MS. HASSAN:  Well, our position would be that based on

8   the evidence, what the representation of what a Hashlet was was

9   not that.  It wasn't that we are going to mine and then share a

10  slice of our profits.  It was we will -- we will give you a

11  physical miner or a piece of the physical miner.  And that's

12  what two of the three class representatives also represented,

13  that it was the machine or part of the machine.  I understand

14  it's actually the power of the machine, but it's not that we're

15  getting a slice of the overall profit.

16         THE COURT:  Okay.  I had the impression there was some

17  testimony like that, but I'm not at all certain of that.  So

18  you could be right.  But keep going.  Okay.

19         MS. HASSAN:  So, Your Honor, then it takes us to the

20  third element, which is profits to be derived solely from the

21  efforts of others.  And, again, as to Hashlets, we don't

22  believe that that requirement is satisfied.  The reason

23  being --

24         THE COURT:  Because you were pointing your thing to

25  the pool, and that was the testimony you brought out; right?

1          MS. HASSAN:  Correct.  And, you know, you could be

2     boosting your Hashlets.  If somebody's boosting their Hashlets,

3     being interactive with their Hashlets, they get more profits.

4          THE COURT:  But, of course, you're not doing the

5     mining; right?  The company is.  Isn't the company the one

6     doing all the algorithms and the fancy math and all that stuff?

7          MS. HASSAN:  Your Honor, I'm not sure whether the

8     company is doing the algorithms.  It has the machines, and the

9     machines are being pointed to different pools which could be

10    external pools.  So the machine is doing the algorithms.

11         THE COURT:  I know, but the company owns the machines.

12    So, I mean, it amounts to the same thing, doesn't it?  I mean,

13    if the company owns the machine, it's not like they -- that

14    shouldn't matter for purposes of this.  They own the machine,

15    so they say, Look, this is what we're doing.  We happen to use

16    the machine instead of somebody from MIT.

17         MS. HASSAN:  They sold you the machine or power of the

18    machine; right?  They sold you the power of the machine, so you

19    own the piece of the power of that machine.

20         THE COURT:  Yeah, but you're not doing a thing; right?

21    You're not doing any math.  You're just saying, oh, I'll aim it

22    at the Clever pool or the this pool or the that pool.  So

23    you're having that say.

24         MS. HASSAN:  Correct.

25         THE COURT:  But you're not then, you know, okay, let's

1   solve that blockchain.  You're not doing that.  The machine is.

2          MS. HASSAN:  Well, Your Honor, I think it's a unique

3   kind of situation because here nobody really is doing much

4   other than switching -- the machine is doing --

5          THE COURT:  I mean, in reality, yeah, but -- well,

6   okay.

7          MS. HASSAN:  So I guess, for instance, let's say there

8   was no GAW Miners or ZenMiner; right?  You could buy a miner or

9   a smaller miner.  You could plug it at home, and it would do

10  all the calculations; right?  Again, all you'll be doing is I

11  want to --

12         THE COURT:  Yeah, but you own the machine at that

13  point.  You're housing the machine at that point.  You're

14  maintaining the machine at that point.  And so in that sense

15  those are your efforts.  Here the company's housing the

16  machine.  It's maintaining the machine.  It's paying for the

17  electricity for the machine.  So those are its efforts.

18         MS. HASSAN:  Well, that's fair.  So it's almost like

19  the company's contributing something and you're contributing

20  your strategy.

21         THE COURT:  So it's not solely from the efforts of

22  others is your point.

23         MS. HASSAN:  Correct.  And I think, Your Honor, your

24  proposed instruction on this is instructive because in the

25  instruction it says the question is whether the product was

1  being promoted primarily as an investment, in which case it

2  would be an investment contract, or whether the product was

3  being promoted as a means whereby participants would pool their

4  activities, money, and the promoter's contributions in a

5  meaningful way.

6        So here it seems like both of them are putting

7  together their efforts and their strategy.  Both are

8  contributing something.

9        THE COURT:  I got it.  What's next?

10       MS. HASSAN:  Okay.  So, Your Honor, I'll touch lightly

11  on Paycoin.  Again, from our perspective, it's not an

12  investment contract.  It's a currency.  We don't need to go

13  into much detail about that.

14       THE COURT:  Can I ask you this:  Do you agree with me

15  that -- I mean, I'm sure the Plaintiffs disagree that it's a

16  currency at all.  But you didn't say about any of the others

17  that you thought they were currency.  So would you agree that

18  if -- that if any product is currency, it's just Paycoin?

19       MS. HASSAN:  Yes, Your Honor.

20       THE COURT:  Fair enough.

21       MS. HASSAN:  And, again, Your Honor, with Paycoin, we

22  don't believe the evidence is in which would satisfy all three

23  elements of Howey in terms of the pooling of assets.  We've

24  heard evidence that, you know, people were buying and selling

25  Paycoin on the open market.  GAW Miners, ZenMiner had no

1    control over that.  So it was -- it was sold as a medium of

2    exchange.  It was being created on the open market.  It

3    doesn't -- there isn't necessarily the same type of the Paycoin

4    holder's fortunes as you would need.

5              THE COURT:  So if Paycoin, contrary to fact, had shot

6    up in value, wouldn't GAW have been more valuable?

7              MS. HASSAN:  To the extent that GAW was also holding

8    Paycoin?

9              THE COURT:  Yeah.  That would be one reason.  Also,

10   there wouldn't have had to -- well, again, I know we're

11   supposed to deal with this.  It's a little strange because we

12   have to live in a fictional world.  They also wouldn't have had

13   to put in the hundred million dollar coin fund.  I mean, in

14   theory, they said they were going to back it.  That was

15   fiction.  But they said they were going to back it.  And so

16   they certainly had a financial interest in Paycoin's success

17   and so that they didn't have to throw in the hundred million

18   dollars to back it; right?

19             MS. HASSAN:  That's fair, Your Honor.  I think with

20   Paycoin we could argue that there was some type of fortunes

21   between the companies and the Paycoin holders, if things had

22   actually worked out that way.  But it seems that, you know --

23             THE COURT:  But as I understand it, we're to consider

24   the question of whether something's a security based on what it

25   was represented to be.

1          MS. HASSAN:  Correct.

2          THE COURT:  Okay.

3          MS. HASSAN:  And what it was represented to be was

4   essentially a medium of exchange.  And, again, the fact that

5   all -- that at least a couple of the class representatives, I

6   believe they were open -- they were buying and selling it on

7   the open market, that seems completely divorced from what was

8   happening to the company; right?  The company hadn't even

9   launched the coin at that point.

10         So, again, you know, it's our position that --

11         THE COURT:  Okay.  But it's true that it hadn't

12  launched, but arguably those are -- those are based on -- based

13  on people's expectations about what's going to happen during a

14  launch.  And, again, if Paycoin -- it's true that those -- I

15  will ask them about that, because you're saying basically those

16  initial transactions didn't involve the company at all.

17         MS. HASSAN:  Correct.  And it seems to me that by the

18  time the company does launch Paybase, there's already enough

19  transactions of Paycoin -- for instance, Mr. Audet had already

20  bought Paycoin in December long before Paybase was launched.

21         THE COURT:  Yup.  Fair point.  All right.  Let's move

22  on.  So just to be clear, your position is Paycoin's not an

23  investment contract in the first instance.

24         MS. HASSAN:  Correct.

25         THE COURT:  Okay, got it.

1          MS. HASSAN:  And then, Your Honor, just touching on

2    the last point, we don't believe that there is sufficient

3    evidence for a finding that Mr. Fraser was a control person.

4    I'll just address a couple of big points here.

5          THE COURT:  Okay.

6          MS. HASSAN:  Under the CUSA, one of the ways that you

7    can prove control is if the Defendant was a partner, officer,

8    or director.  We've already taken the partner issue out.

9          THE COURT:  Correct.

10         MS. HASSAN:  There is no evidence and Plaintiffs have

11   -- they have presented no evidence that Mr. Fraser was an

12   officer or director of the company.

13         THE COURT:  Yeah, but there's lots of testimony about

14   that some people thought he was a partner or silent partner or

15   this partner or that partner.  Now, he wasn't, in fact, a

16   partner or in law a partner.  But the fact that people thought

17   he was a partner suggests that maybe he had a similar function

18   to a partner.  No?

19         MS. HASSAN:  Well, Your Honor, if I may -- I guess I

20   was actually addressing whether the jury should be asked to

21   determine whether he was actually an officer or director.

22         THE COURT:  Oh, I see, just that part of it.

23         MS. HASSAN:  Correct.  So that's step one.

24         THE COURT:  Didn't Mr. Garza say he was the CEO above

25   the CEO?

1          MS. HASSAN:  Well, I think he said that -- well, he

2   said that he wasn't a board member.  He was like an informal

3   CEO above the CEO.

4          THE COURT:  It may not be fantastic testimony for the

5   Plaintiffs, but it's probably enough to charge a jury on.  But

6   anyway, so is that your final point?  I think I got the control

7   person thing under control.  In other words, I think I

8   understand the evidence.  That's one I really listened to the

9   evidence carefully on.

10          MS. HASSAN:  And that's why, Your Honor, I didn't have

11   too many points there.

12          THE COURT:  Very good.  All right.  I want to hear

13   from the other side, and then I'll let each side wrap up very

14   quickly.  I want to get done with this by quarter of.

15          Mr. Buchdahl.

16          MR. BUCHDAHL:  Where would you like me to start?

17          THE COURT:  You also had a motion to present; is that

18   right?

19          MR. BUCHDAHL:  So we did want to make a motion on the

20   affirmative defenses, but I'm not sure it's the right time to

21   do it.

22          THE COURT:  So let's not do that yet.  So why don't we

23   start with the investment contract issue.

24          MR. BUCHDAHL:  Sure.  So just taking it in order --

25          THE COURT:  Yup.

1          MR. BUCHDAHL:  -- first of all, with Hashpoints and

2    HashStakers, we believe that there was testimony from Professor

3    Narayanan, as well as I think all three of the Plaintiffs,

4    describing the relationships with -- between Hashpoints and

5    Hashlets, between Hashpoints and Paycoin, and between

6    HashStakers and Paycoin.  And in our view, Hashpoints and

7    HashStakers were both ways that the company essentially sold

8    Paycoin, because that was the sole purpose of acquiring a

9    Hashpoint or a HashStaker was to get Paycoin eventually.  And

10   so it was a way of selling the Paycoin security through --

11         THE COURT:  Okay, so it's a way of selling Paycoin.

12   Why does that make Hashpoints and HashStakers themselves a

13   security?

14         MR. BUCHDAHL:  Because they would have the same

15   characteristics; in other words, their value depended on the

16   same -- in the same way that Paycoin depended on the

17   expectation of profits from Paycoin was based on the efforts of

18   others, the expectation of profit in a Hashpoint or a

19   HashStaker was based on the same expectation of those same

20   efforts of others.

21         THE COURT:  But wasn't -- weren't the Hashpoints and

22   HashStakers basically just contracts around Paycoin?

23         MR. BUCHDAHL:  So HashStaker I think that's accurate.

24         THE COURT:  Okay.

25         MR. BUCHDAHL:  I think with Hashpoint it's a little

1  more complicated.

2          THE COURT:  Okay.

3          MR. BUCHDAHL:  Because Hashpoint was also the kind of

4  output or return on a Hashlet --

5          THE COURT:  Right.

6          MR. BUCHDAHL:  -- and, therefore, had that kind of

7  intermediary role.

8          THE COURT:  Okay.  So let's take HashStakers then.  So

9  if I have a contract to buy a stock or a bond or I have a

10  contract with the bank to hold a stock or a bond for a certain

11  amount of time, a stock or a bond is a security for sure.  But

12  is the contract a security?

13          MR. BUCHDAHL:  I think depending on how it was set up,

14  it would be.  And I think that there is, as the Court pointed

15  out, a paucity of evidence on the precise nature of these two

16  products.  And I think there's enough in there to describe them

17  as investment contracts based on their relationship to the

18  other products.  But if the Court has any question about that,

19  we'd like to go scrub the record a little more carefully.

20          THE COURT:  All right.  Let's keep going.

21          MR. BUCHDAHL:  So with regard to Paycoin, a couple

22  different things to consider.  First of all, the very nature of

23  an ICO is -- makes something a security because the kind of

24  putting together of an ICO, the kind of promotion of it, all of

25  that are ways in which the investors are relying on the efforts

1    of the company to kind of generate profits through the ICO

2    itself.  And here the way that everyone was expecting this is

3    that they would have this kind of cheap entry point into

4    Paycoin, but it would result in these profits being generated

5    between the $4 that was kind of the Hashpoint exchange rate and

6    the $20 that was represented to be the floor.  All of those

7    profits were going to be generated by the efforts of GAW Miners

8    on their behalf.

9         THE COURT:  But what do you do with the trading in

10   Paycoin on other exchanges before it launches?  That has

11   nothing to do with the company, does it?

12        MR. BUCHDAHL:  To that end, we would point the Court

13   to the testimony of Professor Narayanan.  My colleague,

14   Ms. Chen, spent some time going over the centralization

15   features of Paycoin; and each one of those questions was

16   designed to elicit testimony about the ways in which it was a

17   security.

18        THE COURT:  I know.  I assumed that was the purpose of

19   the testimony, but to this day I don't understand why.  Tell me

20   why centralization has to do with this.

21        MR. BUCHDAHL:  So the reason for that has to do with

22   the efforts of others, because what you see there is that GAW

23   Miners was responsible for issuing the coins.  GAW Miners was

24   much more responsible than some kind of cryptocurrency for

25   controlling the blockchain, and that is a way in which you

1    depended on the efforts of GAW Miners for the value of the

2    Paycoin.  The fact that they were going to buttress the value

3    of it with the investment fund, the Coin Adoption Fund was

4    another way that they were going to rely on GAW Miners.  And so

5    each of those centralization factors is what takes Paycoin away

6    from something like a decentralized Bitcoin that I think no

7    one's arguing is a security right now into something that is a

8    security.

9            THE COURT:  So in other words, your position is

10   because of the centralized control of GAW, that suggests --

11   that helps satisfy the efforts solely by other's requirement.

12           MR. BUCHDAHL:  Yes, Your Honor.

13           THE COURT:  Okay, got it.

14           MR. BUCHDAHL:  We skipped past Hashlets.  I think

15   Hashlets in some ways is the easiest one.  I think that's the

16   reason why the SEC charged a security.  There is evidence from

17   our expert, as well as the Plaintiffs, that what they

18   understood to be sold them, what they understood they were

19   buying, was a slice of the total mining power that was

20   maintained, operated, controlled, and optimized by GAW Miners

21   itself.

22           So, in other words, I think the Court's questions hit

23   the nail on the head.  GAW Miners is mining Bitcoin.  That is

24   the efforts of others.  And the Hashlets would be profitable or

25   not, or less so or more so based on how successful GAW Miners

1   was at mining Bitcoin in its so-called data center.

2           THE COURT:  Okay.

3           MR. BUCHDAHL:  I'm not going to give any argument

4   about control person.  I think there's --

5           THE COURT:  Yeah.

6           MR. BUCHDAHL:  Would you like to hear from us on an

7   affirmative argument about --

8           THE COURT:  In a moment.  I am going to rule on the

9   Defense's Rule 50 motion.  I'm sure we could argue for a long,

10  long time on these, but I'm going to reserve.  I'm going to

11  submit it to the jury.  You know what the rules are.  You can

12  renew after there's a verdict.

13          So why don't you go ahead.  If you'd like to make the

14  argument on the affirmative defenses, that's fine.  So this is

15  your Rule 50 motion with respect to the affirmative defenses.

16          MR. BUCHDAHL:  Ms. Chen's going to present it as to

17  Mr. Pfeiffer, and I think she may hand the baton to Mr. Rennie

18  as to Mr. Shinners'.

19          THE COURT:  Sounds good.

20          So let me jump in and get -- cut to the chase.  Wasn't

21  Mr. Pfeiffer selling unregistered securities?

22          MS. CHEN:  So, Your Honor, are you speaking of --

23  which defense are you speaking of?

24          THE COURT:  So I would say that would probably go

25  to -- I mean, entertaining the notion that in pari delicto

1   applies here at all for a moment, wouldn't that go to an in

2   pari delicto defense?

3          MS. CHEN:  So I would point, Your Honor, to *Pinter v.*

4   *Dahl*.  That's 486 U.S. 622.  And in that case the actual -- the

5   claim was that the Plaintiff had also sold unregistered

6   securities.  And the Court held that even where a plaintiff

7   actively participates in the distribution of unregistered

8   securities, his suit should not be barred or his promotional

9   efforts are incidental to his role as an investor.  And in that

10  case the plaintiff had actually been part of the distribution.

11  So in that case it would be as if Mr. Pfeiffer had been part of

12  kind of the marketing and the promotion of Hashlets.  And that

13  is not -- absolutely not the case.

14         THE COURT:  Do you have a page number on that for me?

15         MS. CHEN:  Sorry?

16         THE COURT:  Do you have a pin site on that?  I have

17  the case up.  Do you have a page number I could look at or a

18  couple page numbers?

19         MS. CHEN:  It's 638 to 639.

20         THE COURT:  All right.  If you give me a second,

21  please.

22      (Pause.)

23         THE COURT:  What did it mean in that case that his

24  promotional efforts were incidental to his role as an investor?

25  What were the facts underlying that statement?  Do you know?

1      MS. CHEN:  You have to -- I'd have to look it up, Your

2  Honor, just to be more precise.  I don't want to say anything

3  that's incorrect.  But my understanding, if my recollection

4  serves, is that in that particular case there was something in

5  addition just to the selling of unregistered securities against

6  the plaintiff.  In this case Mr. Pfeiffer is absolutely not.

7      THE COURT:  But there's a last sentence in that

8  paragraph that says, Thus the in pari delicto defense may

9  defeat recovery in a Section 12(1) action only where the

10  plaintiff's role in the offering or sale of non-exempted

11  unregistered security -- securities is more as a promoter than

12  as an investor.

13      So let me ask you this:  When Mr. Pfeiffer sells

14  unregistered securities to other people, how is that not more

15  as a promoter than as an investor?

16      MS. CHEN:  I would argue, Your Honor, that it was GAW

17  and the companies that promoted, right, these investments.  Mr.

18  Pfeiffer, just like any investor, may buy or sell his

19  investments but does not make him a promoter.

20      THE COURT:  Shouldn't I let the jury determine that?

21  I could add this language, though, to the charge.  That would

22  seem to make some sense actually because I wasn't aware of this

23  case.  I wish this case had been brought to my attention

24  before.  Maybe it was, so I apologize.

25      But shouldn't I let the jury determine what his

1   specific role was?

2          MS. CHEN:  I don't know there's been any evidence,

3   Your Honor, regarding his role, other than the fair allegation

4   that he sold securities.

5          THE COURT:  There was some e-mails put up, I think.

6   There was also Mr. Weinstein put up a long list of his sales.

7   I agree with you, not a lot to go on on whether he's more a

8   promoter than an investor.  But usually when it's not crystal

9   clear, I let the jury decide in the first instance.

10         So your position is, "No, Judge, don't submit it to

11  the jury.  Knock out the defense"; right?

12         MS. CHEN:  Right.  And I have maybe two more points on

13  that, Your Honor.  One is the e-mails I believe Your Honor's

14  thinking about were from, I think, well after the end of the

15  class period.

16         THE COURT:  Okay.

17         MS. CHEN:  I think those were from April 2015.

18         And the second thing is just -- I just want to kind

19  of -- in *Pinter v. Dahl*, the actual claim that was being

20  brought against the defendant, the person who invoked the in

21  pari delicto defense, was a sale of unregistered securities

22  claim under the, I think, federal law.  And so, I mean, even in

23  that case where kind of the alleged wrong that was being

24  charged against a defendant was just the sale of unregistered

25  securities, here the wrong that is being charged is securities

1    fraud.

2         THE COURT:  Well, the -- so that's a good question.

3    I'll certainly ask the defendants about this.  I'm not aware of

4    any evidence that Mr. Pfeiffer engaged in anything close to

5    securities fraud here.  So the -- I think -- and so this is a

6    good point.  The only -- I think the only basis -- although

7    they may tell me I'm wrong and I'll listen to them, but I think

8    the only basis, possible basis for an in pari delicto defense

9    would be his sale of unregistered securities.  So maybe you and

10   I are on the same page as that one.

11        In other words, I, from his testimony, don't think

12   there's any evidence to suggest he engaged in securities fraud.

13   But there is evidence to suggest that he sold unregistered

14   securities.  So if the Court were to give a in pari delicto

15   defense, it would probably need -- with respect to Mr.

16   Pfeiffer -- it would probably need to be limited to that issue.

17        What else do you want to tell me now on that?

18        MS. CHEN:  So as -- Your Honor, do you want to hear

19   more about that defense?

20        THE COURT:  Let's move on.

21        MS. CHEN:  Okay.  So I think with unclean hands I

22   think we agree with Your Honor that there's just no allegation

23   that Mr. Pfeiffer, you know, any of his conduct had any sort of

24   impact or negative impact or was directed to the interests of

25   Mr. Fraser.

1          THE COURT:  Okay.

2          MS. CHEN:  And then as for ratification, similarly,

3   Your Honor, I couldn't find any cases where this defense was

4   used in a security fraud context other than what had to do with

5   the ratification of a broker's action on behalf of an investor

6   and whether that initially unauthorized action by the broker

7   had been ratified by a investor.

8          THE COURT:  Was that a breach of contract case?  What

9   was the context?

10          MS. CHEN:  I remember it was related to securities

11   fraud.

12          MR. BUCHDAHL:  Sounds like a suitability claim.

13          THE COURT:  Okay, maybe.

14          MS. CHEN:  Regardless, and, of course, Your Honor, I

15   certainly agree this is the defense that comes in breach of

16   contract claims.

17          THE COURT:  Very well.  Mr. Rennie, did you want to go

18   next?

19          MR. RENNIE:  Certainly.

20          THE COURT:  Succinct, please.

21          So we're talking about Mr. Shinners, so why don't I

22   cut to the chase.

23          So on the -- I suppose the argument with Mr. Shinners

24   would be, well, it's in pari delicto.  You know, the e-mails

25   suggest, you know -- this would be what the Defendants would

1    argue -- the e-mails would suggest, you know, he's an insider;

2    he's involved with Garza very closely.  He's actually drafting

3    stuff like including the white paper that gets put out to the

4    public.  So they might go so far as to say he's actually

5    participating in the fraud.

6         Now, you can talk about whether there's enough

7    evidence of that, but I think that's probably a lot of things

8    they would say.  So what's your response to that?

9         MR. RENNIE:  I think you're right, Your Honor, that's

10   sort of the direction that any argument would go.  I think it

11   sort of stretches circumstantial evidence to the breaking point

12   though.  You saw a lot of e-mails about, you know, "ignorance

13   is bliss" and, you know, "isn't that a mean thing to say" and a

14   lot of e-mails about the white paper, including that he, you

15   know, fixed some commas but may also have rewritten a chunk of

16   the abstract.  So, you know, I think there is evidence in the

17   record that Mr. Shinners provided assistance to GAW Miners in

18   some respect.

19        THE COURT:  There was the "taking advantage of

20   ignorance" comment.  What about that?

21        MR. RENNIE:  Certainly.  So I think Mr. Shinners

22   testified on yesterday -- the days are mixing together -- that,

23   you know, he was talking about wanting to avoid a sort of

24   blowback from the HashTalk community.  The jury can draw

25   whatever inferences it wants to, you know, from his direct

```
 1   testimony and -- or interpretations of the e-mail.  But I think
 2   the only sort of testimony that was elicited on cross was that
 3   Mr. Shinners thought it was sometimes -- in some circumstances
 4   it could be okay to take advantage of someone in some context.
 5   There was absolutely no connection between that e-mail and any
 6   of the fraud at issue in this case.
 7           So, you know, we would argue that the sort of
 8   constellation of, you know, dubious e-mails taken out of
 9   context and Mr. Shinners', you know, assistance with the white
10   paper simply don't add up to -- sorry, Your Honor --
11   participation in the underlying fraud.
12           THE COURT:  Okay.  Great.  Thank you.
13           MR. ARD:  Your Honor, can I make a couple global
14   points?
15           THE COURT:  All right.  All right.
16           MR. ARD:  First, there's 21 affirmative defenses pled
17   in the answer.  None of these are pled.  We think that's a
18   threshold issue.
19           THE COURT:  Right.  That was sort of litigated in the
20   papers though, and I will ask them about that, yeah.
21           MR. ARD:  That's one point.
22           THE COURT:  Just to be clear, my understanding is --
23   so I know part of their argument is, yeah, but at least in pari
24   delicto and unclean hands were raised in the class
25   certification.  My understanding, my recollection is
```

1    ratification wasn't.

2         Their position is, yeah, but ratification's close to

3    estoppel, so it's close enough.  And they did plead estoppel in

4    the answer apparently.  I haven't read the answer recently.

5         MR. ARD:  Yeah, they pled estoppel.

6         Our position is you'd have to move to amend to plead

7    the answer to one plea, and they didn't do it.

8         THE COURT:  Got it.

9         MR. ARD:  The second point is --

10        THE COURT:  So in pari delicto and unclean hands are

11   not pled in the answers.

12        MR. ARD:  Correct, Your Honor.

13        THE COURT:  Got it.

14        MR. ARD:  The second point is that, you know, they've

15   never identified any CUSA authority, Connecticut authority for

16   in pari delicto applying.  If you look -- I can give you a

17   couple sites.  Does your monitor work or not?  I can put

18   something on there to make it faster.

19        THE COURT:  Sure.

20        MR. ARD:  Can you put up slide 13?

21        THE COURT:  You have a CUSA case?

22        MR. ARD:  No.  What I have is cases from other

23   jurisdictions with blue sky statutes --

24        THE COURT:  That say no in pari delicto?

25        MR. ARD:  Yeah.  For example, I have a substantial

1   body of mostly state case law exists holding that the equitable

2   defenses have no place when construing statutory claims on the

3   security acts.  And that's quoting Joseph C. Law and Blue Sky

4   Law treatise 9100.  The cite for that case is -- a Utah case --

5   is 922 P.3d 683.

6            THE COURT:  So let me ask you this --

7            MR. ARD:  I gave you the wrong number.

8            THE COURT:  Let me cut to the chase on that.  So

9   Connecticut has a lot of statutes but not much case law on

10  virtually anything, so that's no offense.

11           MR. ARD:  Is that off the record, Judge?

12           THE COURT:  It makes it a fun jurisdiction to practice

13  in.

14           So I don't know whether there's case law in

15  Connecticut that talk specifically about, well, we look to the

16  federal securities laws in construing the CUSA.  There

17  definitely is in the antitrust context.  But I wouldn't be

18  surprised at all if there were for the very reason I just

19  cited, which is they look for guidance.  The definition of

20  "security" in the statutes is not the same, but it's very

21  close.

22           And I think *Jacobi*, for example, cites the Second

23  Circuit on some issues, federal securities interpretations of

24  the Second Circuit -- by the Second Circuit.

25           So there is that Supreme Court case that the Defense

1    cites that seems to at least recognize the possibility that in

2    pari delicto could apply.  It doesn't actually apply in pari

3    delicto in the insider trading context.

4         MR. ARD:  Right.  That's why I was trying to point to

5    other blue sky state statutes that are similar to Connecticut,

6    so it's two cases that we had.  Another one is 680 S.W.2d 304.

7    And that's a Missouri case saying the equitable offense of

8    estoppel and in pari delicto are not offenses to liability and

9    nonregistration claims are Missouri Blue Sky law.  And the

10   first cite, which I think I gave you the wrong number for, was

11   322 P.3d 683.

12        THE COURT:  322 P.3d 683.

13        MR. ARD:  Correct, Your Honor.  The point is just that

14   it's not being applied in similar statutes in other states, so

15   that's what we should look to.

16        THE COURT:  I got it.

17        MR. ARD:  And then the third point quickly, Your

18   Honor, which may sort of should have been the first point I

19   suppose, is these are equitable offenses.  There's no reason

20   for them to be going to the jury.

21        THE COURT:  Well, what about the rescission claim?

22   Doesn't the -- hasn't the CUSA claim been described as an

23   equitable remedy of rescission?  In general, not in this case.

24   But hasn't -- I think there's some case law that the Defense

25   cited that describe one of the remedies under CUSA as the

1   equitable remedy of rescission.

2          MR. ARD:  Okay.  We're not seeking an equitable remedy

3   of rescission I don't think.

4          THE COURT:  Aren't part of the damages -- you can

5   either seek damages or you can seek the price of the security

6   they paid for plus interest, as I understand it.

7          MR. ARD:  Well, I stand corrected on that.  So I'm not

8   sure because that's in the damages part of the case.  I just

9   haven't saw it initially.

10          THE COURT:  Thank you.  I want to hear from Defense

11   now.

12          Let's march through these.  Let's start with unclean

13   hands.  You heard my comments at the outset.  Tell me why

14   unclean hands should apply at all here.

15          MS. HASSAN:  So, Your Honor, just the one

16   clarification, unclean hands was actually pleaded in the onset.

17          THE COURT:  Okay.

18          MS. HASSAN:  But I think the idea behind just

19   generally unclean hands is an equitable defense that you come

20   in, you know, if you have dirty hands, you can't be asking for

21   relief if your actions were somehow connected to the matters

22   that are at issue.

23          And taking, for instance, Mr. Shinners, he was very

24   closely involved with what was happening with Paycoin.  There

25   are e-mails that show he had indications that something might

1    be going wrong, that he might have been helping Mr. Garza hide

2    things and saying, you know, you should be thankful to me I

3    didn't go and post this on HashTalk.  So I think there's enough

4    there to show that he was involved in the development and in

5    the promotion of Paycoin and everything that ended up

6    happening.

7            THE COURT:  This is from *Thompson vs. Orcutt*, which is

8    a Connecticut Supreme Court case.  It's talking on -- this is

9    257 Conn. 301.  It starts at page 310 where they start

10   describing the unclean hands doctrine, has some of the language

11   that you wanted, has some of the language that I included.

12   Then it goes on and it says -- first it says the wrong must be

13   in regard to the matter in litigation.  Though an obligation be

14   indirectly connected with an illegal transaction, it will not

15   thereby be barred from enforcement if the plaintiff does not

16   require the aid of the illegal transaction to make out his

17   case.  "In addition" -- and then it's got some citations.  Then

18   it says, "In addition, the conduct alleged to be unclean must

19   have been done directly against the interests of the party

20   seeking to invoke the doctrine rather than the interests of a

21   third party."

22           Let's take that last sentence.  What was done here by

23   any Plaintiff directly against the interests of Stuart Fraser?

24           MS. HASSAN:  So, Your Honor, I would have to review

25   the case, but I think generally this case is slightly different

1  from the usual primary violation cases because here we have a

2  secondary liable defendant.  Plaintiffs are seeking relief from

3  him.  So the fact that --

4          THE COURT:  Okay.  So take -- I hear you.  So take it

5  this way:  What is the conduct that the Plaintiffs engaged in

6  that is contrary against the interest of GAW Miners or

7  ZenMiners, the primary violators?

8          MS. HASSAN:  Your Honor, to the extent that Mr.

9  Shinners had some indication of what Mr. Garza was doing and

10  was part of the fraud, that he was hurting GAW Miners just as

11  much as Mr. Garza was.

12          THE COURT:  He was hurting GAW Miners?

13          MS. HASSAN:  The companies, right?  Like, he was

14  facilitating the companies' commission of fraud.

15          THE COURT:  Right.  But how is that hurting the

16  company?  The company presumably was committing fraud to enrich

17  themselves.

18          MS. HASSAN:  Mr. Garza was definitely doing that.  I

19  think the idea is, Your Honor, again, if Mr. Shinners had an

20  indication that there was something going on, then all of this

21  could have been stopped earlier than what happened.  And then

22  maybe the companies wouldn't have been in the state that they

23  are.  I would have to review the case.  I'm not sure exactly.

24          THE COURT:  Okay.  So tell me what the evidence is

25  that Mr. -- from which a reasonable jury could infer that Mr.

1   Shinners was in on the fraud.

2           MS. HASSAN:  Your Honor, I think it would be a bunch

3   of the e-mails that we saw today, including the e-mails about

4   ignorance is bliss, and I believe there was another e-mail

5   which I'm forgetting the exact wording.  But he was suggesting

6   he knew something was going wrong but he was enforcing it on

7   HashTalk and Mr. Garza should be very thankful to him for that.

8           THE COURT:  Now, that was January of 2015, I think,

9   after he finished investing.  Am I right about that?

10          MS. HASSAN:  I will turn to Mr. Weiner.

11          MR. WEINER:  January 12th.

12          THE COURT:  Yeah, that's what I meant.

13          MS. HASSAN:  So still, I guess, within the class

14  period.

15          THE COURT:  It was within the class period, you're

16  right.  Okay.  Okay.  All right.  So why -- so let's move on to

17  in pari delicto.  Let me hear you on -- well, actually, before

18  we do that, you don't -- do you contend that Mr. Audet is

19  subject to any of these defenses?

20          MS. HASSAN:  No, Your Honor.

21          THE COURT:  Okay.  How about Mr. Pfeiffer?  Which

22  defenses is he subject to?

23          MS. HASSAN:  Your Honor, I think you're -- I think you

24  were correct in saying that the in pari delicto defense for Mr.

25  Pfeiffer would be on the basis of the sale of unregistered

1    securities.

2              THE COURT:  That's the only one.  Am I correct?

3              MS. HASSAN:  Correct.

4              THE COURT:  Okay.  And then -- okay.  And then so then

5    switching for in pari delicto, in what sense is Mr. Shinners in

6    pari delicto?

7              MS. HASSAN:  Your Honor, I believe it's the same kind

8    of evidence -- right? -- that he was --

9              THE COURT:  That's what I thought.  That's fine.

10             MS. HASSAN:  I don't think it's different evidence.

11             THE COURT:  And then ratification, how does

12   ratification apply?

13             MS. HASSAN:  So, Your Honor, one, it is true that

14   ratification usually comes up in the agency context.  We did

15   look -- and I apologize.  I do not have that cite with me.  We

16   did find at least a case where it was outside of the agency

17   relationship, and we can provide the cite later today.

18             THE COURT:  I think it's in your comments, if I'm not

19   mistaken.

20             MS. HASSAN:  That one actually isn't.

21             THE COURT:  Oh, okay.

22             MS. HASSAN:  And I believe it was a Second Circuit.

23   It might have been a district court case in which a former

24   employee brought a wrongful termination case.

25             THE COURT:  Okay.

1          MS. HASSAN:  But the company was able to use the
2     ratification defense because he had already taken or benefited
3     from the severance agreement that had been signed, and that was
4     considered a ratification defense.  So that was in the agency
5     principle --
6          THE COURT:  Right.  That's sort of like a waiver;
7     right?
8          MS. HASSAN:  Correct.
9          THE COURT:  So how's that apply here?
10          MS. HASSAN:  Your Honor, for instance, the fact that
11     by July -- by January 19th everyone knew or everybody
12     reasonably should have known that the SEC was investigating GAW
13     Miners and ZenMiner, the fact that some of the Plaintiffs, some
14     of the class representatives, might have continued buying GAW
15     Miners' products, it ratifies their earlier purchases.  And
16     that's the sense in which we're using that defense.
17          THE COURT:  So I think with Mr. Shinners, didn't he
18     stop in mid-December purchasing?  12/14 was his last purchase,
19     I think, based on the --
20          MS. HASSAN:  We could check, Your Honor.
21          THE COURT:  I'm pretty sure that's right.
22          MS. HASSAN:  I will go with that.
23          THE COURT:  I think Mr. Pfeiffer there was some
24     later --
25          MS. HASSAN:  Correct.

1        THE COURT:  So your view is Mr. Pfeiffer ratified the

2    fraud by continuing to purchase.

3        Now, of course, his testimony was that he's just

4    trying to get something out of this.  He lost a lot of money.

5    They put up the e-mail, you know --

6        MS. HASSAN:  And, Your Honor --

7        THE COURT:  It was kind of sad.  They put up the

8    e-mail he lost money and he was trying to do what he could to

9    get it back.  That's ratification you say?

10       MS. HASSAN:  I believe so, Your Honor.  And then his

11   actions in terms of continuing to try to collaborate with Mr.

12   Garza, so on and so forth, I believe that all goes into the

13   ratification.

14       THE COURT:  I got it.  I'll reserve.

15       MR. ARD:  Sorry.  I just want to correct the record.

16   So they did plead the unclean hands offense, not in pari

17   delicto.  I apologize.

18       THE COURT:  Got it.  Let's walk through the charge.

19       So turning to page 4, which would be the first page of

20   the introduction, comments on page 4?  Plaintiffs have any

21   comments on page 4?  No, okay.

22       Page 5, any comments on page 5?  Speak up any time.

23   Mr. Weinstein, no?

24       MR. WEINSTEIN:  It's going to be Ms. Hassan.

25       THE COURT:  Ms. Hassan, comments?

1              MR. ARD:  Our first comment is on page -- is it 13?

2              THE COURT:  Where's your first comment?

3              MS. HASSAN:  Page 7.

4              THE COURT:  Let's go to page 7.  What's your comment,

5      Ms. Hassan?

6              MS. HASSAN:  So, Your Honor, at the very end of page

7      7, you remind the jury about some of your limiting

8      instructions.

9              THE COURT:  Yes.

10             MS. HASSAN:  So we would request that another limiting

11     instruction be added.

12             THE COURT:  Okay.

13             MS. HASSAN:  We want to clarify that the jury may not

14     consider the statements concerning the partnership between the

15     companies and GAW Miners' acquisition of ZenMiner as a basis

16     for finding any liability against Mr. Fraser.  We understand

17     the Plaintiffs have not alleged that these statements from May

18     2014 and August 2014 caused them any injury.

19             THE COURT:  All right.  Hold on one second.  Right.

20     So I think -- what's your position on that?

21             MR. ARD:  Haven't you already given an instruction?

22             THE COURT:  I think they want something a little more

23     explicit about the statements, and I think that's fair.  So

24     what I could do is in that first bullet point, what if I did

25     this --

1    MR. ARD:  I think it's already there, but ...

2    THE COURT:  Hold on a second.

3    What if I added a sentence at the end of that bullet

4    point that says as follows:  I also instruct you that the

5    statements made in relation to the acquisition of ZenMiners by

6    GAW Miners are not the statements the Plaintiffs allege were

7    materially false in connection with the sale of the four

8    products?

9    MS. HASSAN:  Your Honor, that works for us.

10    MR. BUCHDAHL:  I think it's a little different than

11    that, Your Honor.  I think it's those statements are not the

12    false statements the Plaintiffs relied on, because we certainly

13    believe those were false statements made.

14    THE COURT:  Not the statements alleged -- but they're

15    not the statements the Plaintiffs alleged were false in

16    connection with the sale of the products because this is before

17    the products existed.

18    MR. BUCHDAHL:  Your Honor, the Hashlets were at least

19    within days of that false August press release.

20    THE COURT:  Okay.  But those statements didn't have

21    anything to do with the Hashlets.

22    MR. BUCHDAHL:  Well, the reason I think that's not

23    entirely true is that those statements about that company were

24    all about how it was expanding GAW's ability to conduct its

25    mining operations.

1       THE COURT:  Okay.  What if I did this then:  Okay, so
2  you want "are not the false statements the Plaintiffs allege
3  they relied on"?
4       MR. ARD:  Yes.
5       THE COURT:  What about that, Ms. Hassan?
6       MR. WEINSTEIN:  I think our concern, Your Honor, is
7  Question 2(a) on the Verdict Form --
8       THE COURT:  Yeah.
9       MR. WEINSTEIN:  -- asks the following:  Did Mr. Fraser
10 prove that he did not know, and in the exercise of reasonable
11 care could not have known, that the company offered or sold
12 securities by means of an untrue statement of material fact?
13      And the issue there is that's --
14      THE COURT:  I got it.  So I'm going to do a
15 compromise.
16      "Are not the false statements the Plaintiffs alleged."
17 I also instruct you that the statements made in relation to the
18 acquisition of Zen by GAWs are not the false statements the
19 Plaintiffs allege they relied on when purchasing the products.
20      MR. WEINSTEIN:  I think the problem with that is it
21 sounds like it only goes to the issue of reliance because of
22 this relied upon.  And that's just one element ultimately.
23      THE COURT:  I know, but -- yeah, I'm going to go with
24 that because I think it divorces it from the others, unless you
25 don't want me to give anything.

1            MR. WEINSTEIN:  No, no, that is enough for sure.

2            THE COURT:  Anything on page 8?  When's the

3    Defendant's next comment?  What page?

4            MS. HASSAN:  Your Honor, page 10.

5            THE COURT:  10, let's go to page 10.

6            MS. HASSAN:  So it's the paragraph starting "It might

7    be helpful."

8            THE COURT:  Yeah, I know you don't like the scales.

9            MS. HASSAN:  No, no, Your Honor, no.  We don't want

10   them, but we're not going to raise that issue again.  The third

11   line, this is just an edit.  "He" should be "they."

12           THE COURT:  Sorry.  Third line from the top on page

13   10?

14           MR. ARD:  Yup.  We have the same edit.  I missed it.

15           THE COURT:  Sorry.  I missed that.

16           MS. HASSAN:  And then I guess it would be "they" bear

17   the burden of proof.

18           Your Honor, it's the paragraph close to the bottom

19   which starts, "It might be helpful to visualize."

20           THE COURT:  Yes, on which they bear the burden of

21   proof.  Good catch.  And sorry, what's the other one you said?

22           MS. HASSAN:  I think you got it.

23           THE COURT:  Okay.  So the change on page 10 is -- and

24   I'll ask my law clerk to make this change on which -- so in,

25   let's see, one, two, third full paragraph on the page, third

 1  line, Supportive of the Plaintiffs on a particular issue on

 2  which "they" bear the burden of proof.  That's the change.

 3  Okay?

 4          All right.  Moving on, any comments on page -- or

 5  when's the Defendant's next comment?

 6          MS. HASSAN:  On page 14.

 7          THE COURT:  All right.  So let's do the Plaintiffs'

 8  first one is on 13 I think?

 9          MR. ARD:  Yeah.  It's a quick one.  You give this

10  example of someone walking with an umbrella.

11          THE COURT:  Yeah.

12          MR. ARD:  Then you say a few minutes later another

13  person comes in with an umbrella.  We don't think you need two.

14  The suggestion is you need two pieces of circumstantial

15  evidence to draw conclusions.

16          THE COURT:  Yeah, I'm going to leave that.  But 14,

17  what's the Defendant's comment?

18          MS. HASSAN:  Your Honor, just one second.  Oh, it's

19  actually on page 15.

20          THE COURT:  Page 15.

21          MS. HASSAN:  Yes.

22          THE COURT:  Go ahead.

23          MS. HASSAN:  So first line and second line I think the

24  "Plaintiff" should be changed to plural.

25          THE COURT:  Good catch, which remains with the

1  Plaintiffs throughout the case.  The Plaintiffs filed this

2  lawsuit, yes, or the Defendants, right, so those two first

3  lines the word at the end should be "Plaintiffs," not

4  "Plaintiff."  Okay?

5           When is the -- okay.  Any comments on page 15?

6           MS. HASSAN:  No, Your Honor.

7           THE COURT:  Page 16?

8           MS. HASSAN:  No, Your Honor.

9           MR. ARD:  My next one's 21.

10          THE COURT:  Do you have anything before 21?

11          MS. HASSAN:  So on page 17.

12          THE COURT:  17.

13          MS. HASSAN:  The first line I believe it should be

14 under oath at an "earlier" time.

15          THE COURT:  I'm sorry.  The first testimony under oath

16 at an early time.  Okay, I think you're right.  Earlier time, I

17 agree.  That change will be made.  That's -- Madeline, that's

18 the first line, top of page 17, change "early" to "earlier,"

19 "earlier time."

20          Anything else on 17?

21          MS. HASSAN:  No, Your Honor.

22          THE COURT:  18?

23          MS. HASSAN:  Our next one is page 20.

24          THE COURT:  All right.  So let's go to page 20 because

25 I think Plaintiffs' next one is 21.

1          MR. ARD:  You said 24?

2          MS. HASSAN:  24.

3          THE COURT:  21 then.

4          MR. ARD:  Well, it's actually 22.

5          THE COURT:  Wow.

6          MR. ARD:  You can place it where you want, but we have

7   a suggestion for a new sentence.

8          THE COURT:  Okay.

9          MR. ARD:  And the sentence is, in some -- this

10  sentence comes straight from the Supreme Court if I could

11  put -- do you know how I turn on the screen?

12         THE COURT:  Just raise it.

13         MR. ARD:  The sentence from the Supreme Court --

14         MR. WEINSTEIN:  Where is he proposing?

15         MR. ARD:  I was proposing right above the paragraph

16  that starts, "If you find that the Plaintiffs have proved that

17  a particular product."  I have redlines on my copies, so my

18  page numbers may not line up.

19         THE COURT:  Before you do that, I want to see where we

20  are here.  So we're under investment contracts; right?

21         MR. ARD:  Yeah.  I'm proposing a new penultimate

22  paragraph so right before the last paragraph.

23         THE COURT:  "In sum."

24         MR. ARD:  In determining whether the product was an

25  investment contract, the touchstone is the presence of an

1    investment in a common venture premised on a reasonable

2    expectation of profits to be derived from the entrepreneurial

3    or managerial efforts of others.

4            THE COURT:  Maybe we should try to put this up on the

5    screen.  Let's see if we're able to do that.

6            MR. WEINSTEIN:  Your Honor, just before we try to get

7    that on the screen, it sounds very repetitive of --

8            THE COURT:  Let me read it first.

9            MR. ARD:  The "in sum" part is not from the Supreme

10   Court, but starting "in determining" is directly from the

11   Supreme Court.  I guess it starts with "touchstone" is the

12   Supreme Court quote.

13           THE COURT:  And you think it's redundant?

14           MR. WEINSTEIN:  It's essentially what they're trying

15   to do is recast the three elements that you have at the top of

16   21.  And as Your Honor said, not only is the jury charge

17   conference not that exciting, the charge is not that exciting

18   for the jury.

19           THE COURT:  That's fair.  I agree.

20           MR. ARD:  Unless I'm missing it, and I may be, I don't

21   want to misrepresent anything, but unless I'm missing it, "from

22   the entrepreneurial or managerial efforts of others" is not

23   here anywhere.  It's not repetitive at all.

24           MS. HASSAN:  Your Honor, I believe it was already

25   included in our proposed instructions, and the third element

1    actually covers like the entrepreneurial or managerial efforts

2    is just a fleshing out in some cases of the third element of

3    Howey.

4            MR. ARD:  Right, but it's the Supreme Court authority.

5            THE COURT:  Okay, folks, folks, I'll tell you what.

6    Here's what I would be inclined to do:  I think this would

7    make -- it goes to the third element.  Do we agree on that?

8            MR. ARD:  Right.  It's the sum of all three of them,

9    but the part I care about is the third.

10           THE COURT:  What if we did this:  In the paragraph

11   that begins on the previous page, for the third element,

12   second, third, insert a new sentence after the third sentence.

13   The third sentence says, "If there was a reasonable expectation

14   of investor control, then profits wouldn't be considered to

15   rise solely from the efforts of others."  What if we say

16   instead of "in sum" simply "the touchstone is the presence of

17   an investment in a common venture premised on a reasonable

18   expectation of profits to be derived from the entrepreneurial

19   or managerial efforts of others."  And then we continue, "but

20   if the expectation was that the participants would be passive

21   investors, then" -- oh, wait a minute.

22           No, I think -- I think that's not the place to put it.

23   I think the place to put it would be --

24           MR. ARD:  The last sentence.

25           THE COURT:  And say "the touchstone."

1          MR. ARD:  Yup.

2          THE COURT:  All right.  I'm going to make that

3   decision.  I'll add it, but I'm not going to use "in sum in

4   determining."  I'll just say "the touchstone is the presence,"

5   etc., at the end of that paragraph, so before the paragraph

6   beginning "If you find that the Plaintiffs have proved."

7          MR. ARD:  Okay.

8          THE COURT:  We'll add that.  Anything else on that

9   page, 22?  Are you able to get that?

10         Anything on page 23?

11         MS. HASSAN:  Your Honor --

12         THE COURT:  Sorry.  Did you have something on 22,

13  Ms. Hassan?

14         MS. HASSAN:  No.  On 23, going on 24.

15         THE COURT:  Okay.

16         MS. HASSAN:  So, Your Honor, on page 23 the

17  instructions give a lot of examples of what control, how it

18  could be --

19         THE COURT:  I know you don't like that.

20         MS. HASSAN:  We don't like that, but I think we had

21  one more sentence we were proposing.  So where it says "these

22  are just examples" and "no one factor is determinable" --

23         THE COURT:  Yeah.

24         MS. HASSAN:  -- we think we need to clarify, even if

25  you find one of these examples, that might not be sufficient in

1   light of all the evidence; right?  None of these are sufficient

2   or exhaustive.

3          THE COURT:  How's that different from saying "no one

4   factor is determined"?

5          MS. HASSAN:  Your Honor, we thought we could clarify

6   by saying, "The fact that one or more of these factors might

7   exist is also not determinative."  So it's also not just if you

8   find one of these or two of these.  It's possible that you

9   decide there isn't control given all of the facts together.

10          THE COURT:  Again, I'm not seeing how that's different

11   from saying "no one factor is determinable."  If I really

12   thought it was, I would do it, but I don't really think it is.

13   All right.  So I'm not going to do that.  Move on.

14          MR. ARD:  Sorry, Your Honor.  I do have one there.

15          THE COURT:  On 23?

16          MR. ARD:  When you list -- and I apologize because my

17   page numbers aren't corresponding with yours because I'm in

18   redline.

19          THE COURT:  That's okay.  Give me the first

20   paragraph.

21          MR. ARD:  I think it's the first paragraph, but it

22   says, "The way the Plaintiffs."

23          THE COURT:  Yup.

24          MR. ARD:  So when you list the factors, one of them is

25   whether he owned a controlling interest in GAW Miners.  We

1    think that should be whether he owned half of the interest in

2    GAW Miners.  And the reason for that is that if you look at

3    your Motion to Dismiss Order, you said -- it says the Amended

4    Complaint plausibly pleads that Fraser controlled the companies

5    and Garza.

6            THE COURT:  I tell you what.  I'm not going to do

7    that.  I'm going to make it different.  I'm going to say

8    instead of whether he owned a controlling interest in GAW

9    Miners and ZenMiners, I'm going to say, the extent to which --

10   the extent to which he owned an interest in GAW Miners and

11   ZenMiner.

12           MR. ARD:  Can I just --

13           THE COURT:  You can push back, but that's probably

14   what I'm going to do.

15           MR. ARD:  Sure, Your Honor.  What you said in your

16   Motion to Dismiss was it does so first by alleging that Fraser

17   owned half of the equity in each of the companies, a

18   well-recognized indicator of control.

19           THE COURT:  Right, but that's an allegation, Mr. Ard,

20   that was based on the Complaint.

21           MR. ARD:  Okay.

22           THE COURT:  It's up to the jury to decide what the

23   evidence shows about how much.

24           MR. ARD:  Yes, Your Honor.

25           THE COURT:  The extent to which he owned an interest

1    in GAW Miners and ZenMiner.  I'm going to make that change from

2    whether he owned a controlling interest in.

3          MR. ARD:  Yes, Your Honor.

4          MR. WEINER:  Your Honor, I think you need the word

5    "controlling" in there; right?  Because if he owned one half of

6    one percent, that would be an interest in it.  So the key is

7    controlling.  You need the word "controlling."

8          THE COURT:  Right, but these are different factors,

9    Mr. Weiner.  So the point is -- I don't agree.  The point is

10    that a minority investor could control if, together with other

11    factors, for example, he had lent the company a ton of money,

12    he had security interests in all its assets, he had a close

13    personal relationship.  So, no, I disagree.  On to page 24.

14          MS. HASSAN:  Your Honor, page 24, so for the sale of

15    unregistered securities claim, we already discussed that

16    Defendants won't get the affirmative defense that we had

17    initially asked for.  But we would still --

18          THE COURT:  Let's be clear.  I'm glad you raised that.

19    Just to be clear, what you asked for was an affirmative defense

20    that Mr. Fraser did not know and could not reasonably have

21    known that these were securities required to be registered.

22    That was the affirmative request defense you requested.  Based

23    on my rulings before trial, I determined not to give that.

24    That was the only affirmative request you requested, just to be

25    clear.

1          MS. HASSAN:  Correct, Your Honor.

2          THE COURT:  Okay.

3          MS. HASSAN:  That's completely accurate.  But in light

4    of that, we wanted to request an affirmative defense to the

5    unregistered securities claim.  I can read it out, and I

6    believe that this is just following basically the case law that

7    Plaintiff shared with you.

8          THE COURT:  Basically whether he knew that they were

9    registered or not.

10          MS. HASSAN:  Correct, whether or not he knew that the

11    companies were offering or selling the product and doing so

12    without registering it as a security.

13          THE COURT:  Right.  I mean, on the first one, is there

14    really any dispute about that?

15          MS. HASSAN:  Your Honor, I guess I could see if you

16    give the jury Hashpoints, HashStakers.  I don't know.  It's not

17    clear to me that Mr. Fraser knew that there was even something

18    called Hashpoints.

19          THE COURT:  Okay.  What's the Plaintiffs' position on

20    that?

21          MR. ARD:  Sorry.  What's the proposal?

22          THE COURT:  The proposal is to add an affirmative

23    defense to the unregistered securities claim that would say:

24    If Mr. Fraser proves that he did not know or, in the exercise

25    of reasonable care, could not have known that the products --

1  I'm making this up, but this is what I assume it says -- were

2  not registered -- oh, sorry -- that the products were being

3  sold or did not know or exercise reasonable care, could not

4  have known that the products were not registered, then you have

5  to find for Mr. Fraser.  Right?  Is that basically it?

6       MS. HASSAN:  Correct, Your Honor.

7       MR. BUCHDAHL:  They want an instruction that it

8  wouldn't have been possible for him to find out that GAW Miners

9  was selling these?  That's the factual predicate that they're

10  asking the jury to find?

11       THE COURT:  Well, I think the factual predicate would

12  be at least she mentioned Hashpoints and HashStakers, that, you

13  know, their position is there may not be evidence that Mr.

14  Fraser was aware the company was selling those two products.

15       MR. BUCHDAHL:  No, I get it.  But doesn't it require

16  that, in the exercise of reasonable care, they're asking for an

17  instruction --

18       THE COURT:  I get you.  I get you.  But, you know, I

19  mean, I wouldn't not give the instruction on that basis.

20  Reasonable care is really a question for the jury.

21       MR. BUCHDAHL:  Here's the state of the evidence.

22  There's no evidence -- as far as I'm aware, I didn't ask him a

23  single question about HashStakers or Hashpoints.  That's a

24  fair -- that's a fair point on their point.  So if they want to

25  say he never could have found out about them.

1          As to the other one, I did ask him, did you have any

2     idea whether anything at all had ever been registered?  He said

3     nope.  I mean that's the state of the evidence on that.

4          THE COURT:  Right.  So that suggests I should give the

5     defense.

6          MR. BUCHDAHL:  Well, no, because, again, like the

7     notion that he -- that he -- that there's no way for him to

8     find out.

9          THE COURT:  No, I get that.  That's an issue for the

10    jury.

11         MR. BUCHDAHL:  Okay.  All right.

12         THE COURT:  I will include that defense.  So that

13    means, just so we're clear, just in terms of where that's going

14    to go, so that will go --

15         MS. HASSAN:  Could that go right before Section B

16    starts?

17         THE COURT:  Yes, it will.  On page 24 we will say,

18    affirmative defense -- or unregistered securities, affirmative

19    defense.  And we will draft that based on what I just said.

20         And then on the Verdict Form, Madeline, that needs to

21    be inserted as well.  And that will go -- that will be question

22    1(a) under Section II of the Verdict Form.  Okay?  All right

23    moving on.  Page 25.

24         MR. ARD:  Sorry, Your Honor, there was one thing I

25    wanted.

1          THE COURT:  Okay.

2          MR. ARD:  If you go back -- the paragraph on my page

3    24 above where it says, "Alternatively, the second way the

4    Plaintiffs."

5          THE COURT:  Yes.

6          MR. ARD:  The sentence before that, we think that

7    sentence is misleading because it says -- it restates the

8    standard of what Plaintiffs need to prove.

9          THE COURT:  Yeah.

10          MR. ARD:  But it's actually not the right standard.

11    The right standard is the first.

12          THE COURT:  The management and policies.

13          MR. ARD:  Yeah.

14          THE COURT:  Fine.  I'll change the actions to the

15    management and policies.

16          MR. ARD:  So what it should say, we think, is that

17    they do need to prove that the action possessed the power to

18    direct or caused the direction of the management or policies of

19    the company whether through --

20          THE COURT:  Yeah, I'm not going to repeat that whole

21    thing.  It just gets -- this charge is to unwieldy already.

22    I'm just going to say --

23          MR. ARD:  That's why we would strike the entire

24    sentence, but if it's going to be repeated, it shouldn't say --

25          THE COURT:  But why don't we just say, but they need

1    to prove that he actually possessed the ability to direct the

2    management and policies of the company.

3              I'm not going to distinguish between those two things.

4              MR. BUCHDAHL:  Your Honor, at some point --

5              THE COURT:  Just to be clear for the record, I will

6    change "actions" to "management and policies."

7              MR. ARD:  Power to direct or cause the direction of --

8              THE COURT:  Yeah, I'm going to use "direct" as a

9    shorthand for that.  Again, I told them that earlier.  I'm not

10   worried about them being confused.  Go ahead.

11             MR. BUCHDAHL:  Your Honor, before -- just for

12   guidance, are we allowed -- does the Court object to us

13   displaying during a closing portions of the charge?

14             THE COURT:  No, not at all.  You're welcome to do

15   that.  Put up any part you want.  In fact -- well, I won't say

16   I encourage it, but lawyers do it all the time.  I much rather

17   have you do that than get it wrong.

18             MR. BUCHDAHL:  Your Honor, one sentence that I think

19   belongs somewhere in the instruction on control person, there's

20   been -- is the notion that there could be more than one control

21   person for a company.

22             THE COURT:  You got to give me a place to put that

23   though.  We've got to go through it.

24             THE CLERK:  I missed the last.

25             THE COURT:  So the last one was page 24, based on my

1 discussion with Mr. Ard, this isn't everything he wanted, but

2 this is what I was willing to do.  I'm on the top of page 24.

3 The sentence that begins, To prove that Mr. Fraser directly or

4 indirectly controlled, Plaintiffs need to prove he actually

5 directed the management and policies of the company -- sorry --

6 need not prove that he actually directed the management and

7 policies of the company, but they do need to prove that he

8 possessed the ability to direct the management and policies of

9 the company.

10          We're done with that, Mr. Ard.

11          MR. BUCHDAHL:  Page 23, "Second Element:  Control."

12          THE COURT:  Okay.

13          MR. BUCHDAHL:  I think it would be appropriate to tell

14 the jury after that first sentence, a company can have more

15 than one control person.

16          THE COURT:  So in other words, right after the three

17 element, listed elements, and before the words "the first way,"

18 that's where you want it?

19          MR. BUCHDAHL:  That would be fine.  We're not picky

20 about the location.

21          THE COURT:  What's the Defendant's position on that?

22 I think that's accurate.

23          MR. WEINSTEIN:  Yeah, although I think it probably

24 says a number of times that the allegation is he was a control

25 person, not the control person.  I think it's obvious.

1    THE COURT:  Well, okay.  I'll include it.  I'll
2    include it.  So in terms of where it goes, page 23, after the
3    listing of the three elements under control -- sorry.  It's not
4    really the three elements.  Prove any one of the following
5    three things.  Then it lists those three.  We'll have a
6    separate stand-alone paragraph that says, "A company may have
7    more than one control person" and then new paragraph, "the
8    first way," etc.
9        Okay.  25.
10       MS. HASSAN:  Your Honor, sixth line from the top I
11   think we need to add an "or" between "untrue statement" and
12   "omission."
13       THE COURT:  Untrue statement or omission, yes, I
14   agree.  So that's one, two, three, four, five, six, "or"
15   between "statement" and "omission."
16       THE CLERK:  What's the paragraph?
17       THE COURT:  So it's the paragraph that begins, "The
18   Plaintiffs claim that Mr. Fraser is liable for the company's
19   securities fraud in either or both of the following ways."  You
20   see it?
21       THE CLERK:  Yeah.
22       THE COURT:  Okay?
23       MR. ARD:  Your Honor, this also reminds me of
24   something.  It's kind of a global issue.  Sometimes you talk
25   about, you know, whether he had financial leverage over GAW

 1   Miners or ZenMiner, whether he had control of GAW Miners or

 2   ZenMiner.  Sometimes you use "and."

 3            THE COURT:  And it should be "or"?

 4            MR. ARD:  It should be "or" globally again.

 5            THE COURT:  So let me just think about that for a

 6   minute.

 7            How about -- when you globally -- so, for example, on

 8   page 25 under control, must prove each of the following two

 9   elements.  And by the way, I think those have to be renumbered

10   so they don't say 4 and 5.  Say 1 and 2 so it says first that

11   GAW Miners and ZenMiner are liable for the sale of securities

12   that should be "or".

13            MR. ARD:  Yes, if they find it.

14            THE COURT:  I think that's right.  What's Mr.

15   Weinstein's position?

16            MR. WEINSTEIN:  Your Honor, I think on that point and

17   also the one he has to be a control person of the entity that's

18   relevant to the security that you're dealing with; right?  It's

19   not that if they just find at some point he's a control person

20   in one or the other, he's now liable for all claims.

21            THE COURT:  So is there any evidence that ZenMiner

22   sold these securities?

23            MR. ARD:  Well, I think there's evidence that they

24   obeyed no corporate form and they kind of did all the stuff

25   together.

1          THE COURT:  Query --

2          MR. ARD:  But I agree.

3          THE COURT:  Let me ask you a question.  Query what

4    difference would it make if we just dropped ZenMiner

5    altogether?  I'm not saying I'm going to do that.  But I'm

6    curious.  What difference does that make?  I'm a big fan of

7    simplicity.

8          MR. BUCHDAHL:  I certainly can't identify a

9    difference.

10         THE COURT:  I think we just take ZenMiner out.

11         MR. WEINSTEIN:  I think the fact they can't identify

12   the security is enough.

13         THE COURT:  I don't see how you guys get hurt on that,

14   how anybody gets hurt on it.

15         MR. ARD:  It's all about GAW Miners.

16         THE COURT:  We're going to take out ZenMiner

17   altogether.

18         MR. BUCHDAHL:  Great.  Probably save two and a half

19   minutes.

20         THE COURT:  Great.  ZenMiner's gone, okay, great.  All

21   right?  Let's just think about that.  Is there any reason we

22   need ZenMiner at all?

23         MR. WEINSTEIN:  Only in the limiting instruction about

24   the ZenMiner.

25         THE COURT:  Yes, because the acquisition, fair enough.

1          MR. WEINSTEIN:  But when it comes to control

2    elements --

3          THE COURT:  I think Mr. Weinstein's correct.

4          MR. ARD:  I can't think of anything.

5          THE COURT:  That's good.

6          MR. ARD:  That's the heart of my issue.

7          THE COURT:  All right.  Moving to page 26, all right,

8    moving to page 27.

9          MS. HASSAN:  Your Honor, our next are on page 28.

10          THE COURT:  Okay, 28.

11          MS. HASSAN:  So first, Your Honor, I just wasn't -- I

12    think we just need to clarify the fourth, the last sentence of

13    the paragraph that starts, "But the first element the

14    Plaintiffs must prove," because right now it says, "according

15    to your finding of the previous claim about whether GAW Miners

16    and ZenMiner" --

17          THE COURT:  This is under aiding and abetting, first

18    element of primary violation?

19          MS. HASSAN:  Correct, Your Honor.

20          THE COURT:  Accordingly, your finding on the previous

21    claim?  Go ahead.

22          MS. HASSAN:  Whether GAW Miners and ZenMiner violated

23    the --

24          THE COURT:  Security fraud.  And that will just say,

25    GAW Miners violated the CUSA securities fraud.  Anything else

1    on 28?

2         MS. HASSAN:  Yes, Your Honor.  So this is a comment

3    for both the aiding and abetting claims, where there's a

4    requirement of material assistance.

5         THE COURT:  Okay.

6         MS. HASSAN:  Your Honor, there has been evidence or

7    questions asked during the trial about, you know, what Mr.

8    Fraser did or did not do, why he didn't take certain actions.

9         THE COURT:  Yes.

10        MS. HASSAN:  And we believe that in light of that,

11   it's necessary to instruct the jury that failure to act is not

12   material assistance.

13        THE COURT:  Well, I think this was debated in the

14   comments.  And I think you referred me to a Second Circuit case

15   that involved New York law assessing fiduciary duty,

16   assisting -- I'm sorry -- aiding and violating a duty of

17   fiduciary duty.  In other words, the question was:  Did he have

18   to take affirmative steps?  I think the case you cited was

19   under New York law but, second, I thought dealt with aiding and

20   abetting a condition of fiduciary duty.  That's why I didn't

21   give it.  But I'm happy to hear you on it.

22        MS. HASSAN:  As I read the case, the mere inaction

23   does not constitute aiding and abetting unless there's an

24   independent fiduciary duty to act.  Our position is there is no

25   evidence that Mr. Fraser had a fiduciary duty to the Plaintiffs

1    here, so --

2         THE COURT:  Again, that's maybe New York law, although

3    I don't -- but that wasn't even a fraud claim.  That was -- I

4    think the case -- I looked this up yesterday because I was --

5    maybe I got it wrong.  Can you just give me the case again?

6         MS. HASSAN:  *In Re:  Sharp*.  And the cite is 403 F.3d

7    43.

8         THE COURT:  Sorry.  Give me a second.

9         403 F.3d 43?

10        MS. HASSAN:  Yes.  Yes, Your Honor.

11        THE COURT:  Thank you.

12        MR. ARD:  Your Honor, we have nothing to add other

13   than that.  This is briefed pretty heavily in our comments.  We

14   think you got it right.

15        THE COURT:  Hold on.  Hold on.

16        So the discussion concerns aiding and abetting the

17   breaches of fiduciary duty under New York law, there are three

18   elements to a claim for aiding and abetting a breach of

19   fiduciary duty.  So I'm not sure, both because it's a different

20   claim and because it's under New York law, why this case is

21   informative here.

22        MS. HASSAN:  Your Honor, I agree this is under New

23   York law.  I think the idea being just the idea of material

24   assistance suggests something affirmative rather than a failure

25   to do something.

1          THE COURT:  I hear you, but I'm going to leave it as
2     is.  Let's move on.  Anything else on -- I think we were up to
3     28.
4          MR. RENNIE:  Your Honor, may I?
5          THE COURT:  Yes.
6          MR. RENNIE:  For the remainder of the charge
7     conference, may I bring a chair over?
8          THE COURT:  Sure, if you can fit it, yeah.
9          29.
10         MR. ARD:  When you get to currency, that's when I want
11    to pipe in.
12         THE COURT:  We're up to 30.  Ms. Hassan, anything on
13    29?
14         MS. HASSAN:  No, Your Honor.
15         THE COURT:  30.  Currency.  Go ahead, Mr. Ard.
16         MR. ARD:  All right.
17         THE COURT:  Okay.
18         MR. ARD:  So --
19         THE COURT:  So you know, the only place I -- where I
20    came up with this definition of currency is *Black's Law*
21    *Dictionary*.
22         MR. ARD:  I hear you.  Let me give you proposal No. 1.
23    Slide 2, please.  This is directly from the --
24         THE COURT:  CFR?
25         MR. ARD:  CFR.

```
1              THE COURT:  But under what?

2              MR. ARD:  This is not under the security laws.  This

3    is Treasury.

4              THE COURT:  Treasury.

5              MR. ARD:  Just looking for other definitions and the

6    CFR is the best I could find.  And, you know, if you look at

7    the statute, we think this is clearly what it's talking about.

8              I'll note that there have been many, many cases

9    recently holding that cryptocurrencies are securities, and not

10   a single one has ever, you know --

11             THE COURT:  Has the Second Circuit so held?

12             MR. ARD:  No.

13             THE COURT:  Please tell me if it has.

14             MR. ARD:  No.  No, yeah, no.  But FCY, there have been

15   several courts in FCY that have held cryptocurrencies are

16   securities.

17             THE COURT:  Have they used the definition you're

18   showing me?

19             MR. ARD:  It actually hasn't been litigated.  There's

20   only one case I'm aware of.

21             THE COURT:  It's cited in your papers.

22             MR. ARD:  It's sort of on point.  We're not saying

23   it's directly on point.

24             THE COURT:  Right.  But why is this definition the

25   right definition to use?
```

1           MR. ARD:  Well, it's a regulation.  It's how in other

2    statutes or other contexts the Government is defining currency.

3    And, you know, if you look at the statute -- what's that?

4           MS. CHEN:  I think it just adds that the currency has

5    to be legal tender, which I think is not currently in the

6    definition.

7           THE COURT:  It is not currently in the definition.

8    Very interesting.  So I shouldn't do this because I do want to

9    get through this.  So I was at home this weekend.  I didn't

10   have my modern *Black's*, so I pulled out my father's *Black's Law

11   Dictionary* from, like, 1948.  I'm not kidding you.  It actually

12   has his name in there, Yale station, all that good stuff.

13          And that definition of currency is closer to the one

14   Mr. Ard's showing me.  But under the tutelage of the great --

15   oh, God, I'm going to forget his name, the legal writing guru.

16   You guys know.

17          MR. BUCHDAHL:  Bryan Garner.

18          THE COURT:  Garner, right.  *Black's* has apparently

19   changed his definition of legal currency to take out the

20   references to legal tender.  It wasn't a reference to legal

21   tender, but it was very close and said "circulated by hand,"

22   which I'm sure you folks would love.

23          MR. ARD:  We'll go with that.

24          THE COURT:  But then I said, you know what?  I better

25   check the more modern definition, and I went with that.

1          MR. ARD:  So let me --

2          THE COURT:  Go ahead.  Go ahead.

3          MR. ARD:  So here's the logic of it.  If you look at

4    the statute, your definition here, you could have something

5    that's a security that could arguably count as this and fall

6    under this definition, and that's the problem with it.  If you

7    look at the context of --

8          THE COURT:  Well, why do you say that?  So a coin sort

9    of begs the question here; right?

10         MR. ARD:  Right.

11         THE COURT:  A banknote doesn't.  A banknote, as I

12   understand, is cash; right?

13         MR. ARD:  Yeah.

14         THE COURT:  A government note, now, for me I'm not --

15   I'll be honest.  I'm not exactly sure what a government note

16   is.  I would think if it was a T bill, they would say a

17   government bond, not a government note.  But I am not really

18   sure what a government note is.  I just used the definition.

19         So but why do you say that a security could qualify?

20         MR. ARD:  Well, you could use -- I mean, I think

21   cryptocurrencies are the right example.  It's what comes to

22   mind.

23         THE COURT:  Yup.

24         MR. ARD:  You could argue that some of these

25   cryptocurrencies may be our medium of exchange.

1      THE COURT:  Mr. Narayanan said so.

2      MR. ARD:  Exactly, Your Honor.  But that doesn't

3 mean -- that don't mean it can't be a security.  It would be a

4 security if it fit under the Howey Test.  If you look at the

5 statute, the examples are given in the statute.  Everything

6 else is like banknote under the statute.  These are all clearly

7 things that are not securities, and we think currencies should

8 be read in the context of the rest of the example.

9      THE COURT:  You just reminded me that 78u is it or --

10     MR. ARD:  I wish I could.

11     THE COURT:  15 USC 78?  It's in the papers.

12     MR. WEINSTEIN:  While that's being looked up, Your

13 Honor, Professor Narayanan also, in his demonstrative, compared

14 cryptocurrency, Bitcoin to a dollar bill.  And that's the

15 point.

16     MR. ARD:  Right, but --

17     MR. WEINSTEIN:  Bitcoin is not a security.

18     THE COURT:  I did want to follow-up on Mr. Ard's

19 point.  Judem (phonetic) whatever that thing, lists birds of a

20 feather flock together.

21     MS. HASSAN:  Your Honor, it's 15 USC 78c(a)(10).

22     THE COURT:  Great.

23     So No. 10 says, but shall not include currency or any

24 note, draft, bill of exchange or banker's acceptance which has

25 a maturity, blah, blah, blah.  So those don't all sound like

1   government-issued documents.  I mean, a note is a -- just an

2   evidence of indebtedness.  A draft I think refers to a check.

3   I didn't take secure transactions, at least this part of secure

4   transactions, in law school.

5          A bill of exchange I think is used in the commodities

6   world, but I'm not really sure.  And a banker's acceptance, I

7   don't know what that is, but it certainly doesn't sound like

8   it's government issued.

9          MR. ARD:  My point was not that these are government

10  issued.

11         THE COURT:  Oh.

12         MR. ARD:  My point was that these things are all

13  designed to be things that are clearly not securities.  And

14  your definition, the proposed definition in these instructions

15  doesn't fit that pattern.  You could have something that fits,

16  you know, arguably fits the definition you've given in the

17  instruction that's, you know, I mean, it's a Howey test.  None

18  of these things --

19         THE COURT:  Again, that's where I might part ways with

20  you because, as I said at the outset, I don't see the point of

21  this language "but shall not" if all they're doing is sort of

22  clarifying what's not a security.  Because those things --

23  depending on how you interpret them, I would have thought it

24  would be fairly clear in the draft those things wouldn't meet

25  the definition anyways.

```
 1            MR. ARD:  Well, let me move to the -- I respectfully
 2   disagree but --
 3            THE COURT:  You've made your point.
 4            MR. ARD:  Let me move to my second proposal, even
 5   better.
 6            Can you put up the next, yeah, proposal 2.  So your
 7   definition here says a currency is an item that circulates as a
 8   medium of exchange.
 9            THE COURT:  Yeah.
10            MR. ARD:  I think that's less clear than what
11   "currency" is.  I think a juror would know what "currency" is
12   more than "medium of exchange."  Black's Dictionary defines
13   "medium of exchange."  My second proposal is to put in the
14   definition.  May I approach?
15            THE COURT:  You may.  I got it right here.
16            MR. ARD:  This is actual definition of "medium of
17   exchange" from Black's.
18            THE COURT:  Let me ask the Defendants, what about
19   that?  What he's done is to take the word "medium of exchange"
20   and plug in the Black's definition for "medium of exchange."
21            MR. WEINSTEIN:  In the generally accepted as payment?
22            THE COURT:  Yeah.  According to this piece of paper
23   that Mr. Ard just handed me, "medium of exchange" in Mr.
24   Garner's world is defined as anything generally accepted as
25   payment in a transaction and recognized as a standard of value.
```

1      MR. WEINSTEIN:  The problem with that is at what point

2  in a currency's life does it become generally accepted to

3  become a currency?  It doesn't change its form once it becomes

4  something that's more generally accepted.  Bitcoin wasn't

5  accepted at all for a while, but it's a currency.  It

6  ultimately became somewhat accepted in some places.  It's a

7  currency.  It shouldn't be that in its early stages it's not

8  just because it's not generally accepted around the world.

9      THE COURT:  I think I agree with Mr. Ard on this one.

10  I'll go with proposal No. 2.

11      So we'll change it to a currency -- where was I?

12  "Currency is an item (such as a coin, government note, or bank

13  note) instead of" -- the rest we would say "that is generally

14  accepted as payment in a transaction and recognized as a

15  standard of value."  Because I do think, if I were on the jury,

16  I'm not sure I would know what a "medium of exchange" was.

17  Okay?

18      Let's move on.  Page 31 in my version.

19      MR. ARD:  Our next comment is not until the

20  forward-looking statement.

21      THE COURT:  Anything before that, Ms. Hassan?

22      MS. HASSAN:  I'm sorry.  Which page are we on?

23      THE COURT:  He said his next comment is on 33.

24      MR. ARD:  No.  I take it back.  Right below the

25  currency definition where you say, "The Defendant has asserted

1   an affirmative defense" --

2           THE COURT:  Yeah.

3           MR. ARD:  The next sentence we would like to take out

4   the word "necessarily."  It says, "But it is important to note

5   that merely describing a product as currency does not

6   necessarily."

7           THE COURT:  Yeah, I agree, because I used the word

8   "merely," I agree, take out the word "necessarily."  I agree,

9   make that change.

10          Now are we up to -- anything before forward-looking

11  statements?

12          Okay, so I have a question for the Defense on this.

13  What are the forward-looking statements in this case?

14          MS. HASSAN:  Your Honor, the statements would all be

15  the ones related to Paycoin, the fact that there would be a

16  hundred million dollar fund and that there would be a $20

17  floor.  So that's all future-related projects really for --

18          THE COURT:  Is that a project?

19          MS. HASSAN:  Well, it's forward looking; I'll correct

20  myself.  It's what will happen in the future.  This is the

21  expectation of what will happen.

22          THE COURT:  The statement of the plans and objectives

23  of management for the future operation of the company would be,

24  we're going to have a $100 million reserve fund and a trading

25  floor of $20.

1          MR. WEINSTEIN:  And merchants that will --

2          THE COURT:  And merchant adoption, okay.  All right.

3          Mr. Ard, go ahead.

4          MR. ARD:  I think Ms. Cheng is going to handle this

5     one.

6          THE COURT:  Ms. Cheng.

7          MS. CHEN:  Your Honor, we just don't think that this

8     safe harbor for forward-looking statements even applies in this

9     case.

10          THE COURT:  Why is that?

11          MS. CHEN:  15 USC 78u-5, the section Application of

12     Safe Harbor for Forward-looking Statements.  And there are a

13     couple of reasons, Your Honor.  I think maybe the simplest one

14     is just to look at subsection (b), Exclusions.

15          THE COURT:  Give me a second.  Exclusions, (b), yeah,

16     I'm with you.

17          MS. CHEN:  "Except to the extent otherwise

18     specifically provided by rule, regulation, or order of the

19     Commission, this section shall not apply to forward-looking

20     statement" -- we go to then subsection (2).

21          THE COURT:  "That is."

22          MS. CHEN:  "That is."  And then there is subsection

23     (E) is "made in connection with an offering by, or relating to

24     the operations of, a partnership, limited liability company,

25     or" -- I'll skip the rest.  But I think the allegation here is

1   that, you know, GAW Miners is a limited liability company, and

2   so there is an exclusion for forward-looking statements.

3           THE COURT:  Hold on a second.

4           MR. WEINSTEIN:  Ms. Cheng, can we get the statute

5   citation?

6           MS. CHEN:  It's 15 USC 78u-5.

7           THE COURT:  All right.  So actually, I have to take a

8   step back because I read this a little too quickly last night

9   or whenever I did this.

10          The safe harbor itself is subsection (a):  "This

11  section shall only apply to a forward-looking statement"?  Oh,

12  here the safe harbor, subsection (c).  I see.  I see.  So

13  that's the safe harbor.  So it says, "Except as provided in

14  subsection (b)," and that provides exclusions.  And the one

15  Ms. Chen is referring me to is, "This section shall not apply

16  to a forward-looking statement that is made in connection with

17  an offering by, or relating to the operations of, a

18  partnership, limited liability company, or a direct

19  participation investment program."

20          And so is -- I should know this -- GAW Miners and

21  ZenMiners are both LLCs?

22          MS. CHEN:  I'm not sure that ZenMiner is anything,

23  Your Honor.

24          THE COURT:  But GAW Miner is an LLC?  Yes?

25          MS. CHEN:  Yes.

1          THE COURT:  Okay.  So let me hear from Defense as to

2     why that -- this wasn't put in the very detailed set of

3     objections I got, but I'll listen to it.  What have we got on

4     that, Ms. Hassan?

5          MS. HASSAN:  Your Honor, we can't dispute with the

6     fact it says LLC, and we agree GAW was an LLC.

7          THE COURT:  Okay.

8          MR. WEINSTEIN:  And we haven't looked at it.  So --

9          THE COURT:  I ... hold on one second.

10         So I just did a quick search on forward statements 10

11    within 10 LLC in the Second Circuit.  I didn't come up with

12    anything, but that doesn't mean it's not there.  The language I

13    read to you does seem to support the Plaintiffs' reading.  Let

14    me know just pull it up again.

15         As I read the statute, safe harbor's in subsection

16    (c).  It says, "Except as provided in subsection (b), in any

17    private action arising under this chapter that is based on an

18    untrue statement of a material fact or omission of material

19    fact," etc., "a person referred to in subsection (a) shall not

20    be liable with respect to any forward-looking statement."  And

21    then it goes on to qualify that with types of forward-looking

22    statements.

23         Subsection (b), which is clearly carved out by that

24    language says, "Except to the extent otherwise provided by

25    rule, regulation, or order of the Commission, this section

1  shall not apply to a forward-looking statement."  And one of

2  them is that is subsection (2)(E), made in connection with an

3  offering by a limited liability company.

4          So based on that, I'm not going to give this

5  instruction.  That makes life a little bit easier actually.

6          Okay.  I think we're up to page 34.  Page 35.  Page

7  36.  Page 37.

8          MS. HASSAN:  Your Honor, if you could give one second,

9  I just need to --

10          THE COURT:  Yup.

11          MS. HASSAN:  So, Your Honor, this is -- I'm not sure

12  exactly.  I think it falls somewhere in the page 35 and 36

13  range where we're talking about reliance.

14          THE COURT:  Yeah.

15          MS. HASSAN:  We had asked for an instruction which

16  clarifies that reliance has to be found on a class-wide basis.

17          THE COURT:  I know.  And I said early on, when I refer

18  to Plaintiffs, I mean the entire class.  So that's how I dealt

19  with that.  You're preserved.

20          We're on to page 37.  Anything on 37?  38?  39?  40?

21  All right, so folks, I'm moving on.  Page 41?  42?  43?

22          All right.  Then we have the comments on the

23  affirmative defenses.  I think I've heard you on that.  I'm

24  going to come up with something.  I'll take that back.  I have

25  to come up with something.

```
 1              MS. HASSAN:  Your Honor, page 42, though you might
 2   have already passed it.
 3              THE COURT:  42, yeah, I did already pass it, but
 4   that's okay.
 5              MS. HASSAN:  So, Your Honor, five lines, so the last
 6   sentence of the first -- of the last full paragraph on that
 7   page where it says, "The Plaintiffs need to prove that only by
 8   preponderance of the evidence."
 9              THE COURT:  Okay, maybe my 42's different from yours.
10   My last paragraph on 42 begins, "For the second element."
11              MS. HASSAN:  Oh, Your Honor, so the paragraph above
12   that.
13              THE COURT:  Okay, the Plaintiffs -- go ahead.  Tell me
14   where.
15              MS. HASSAN:  So where it says, "The Plaintiffs need to
16   prove that only by preponderance of the evidence," this is the
17   last.
18              THE COURT:  For the fourth sub-element.
19              MS. HASSAN:  Exactly so, Your Honor.  We don't think
20   the "only" is necessary.
21              THE COURT:  Fine, I'll take it out.  I'll take out
22   "only," fine.
23              Okay, 43?  Okay, so then I'm going to deal with --
24   I've heard you on the defenses.  We're not going to do that
25   anymore, so we're into the final instructions now.
```

1          MS. HASSAN:  Your Honor, may I ask for one

2    clarification on the affirmative defenses?  We had four.  There

3    was also a separate affirmative defense for sale of

4    unregistered securities under the CUSA.

5          THE COURT:  Separate affirmative defense for sale of

6    unregistered securities.  Sorry.  What are you referring to

7    exactly?

8          MS. HASSAN:  Let me find what it was in the proposed

9    instructions.

10          MR. ARD:  There were a lot of comments back and forth;

11    and, I mean, our position was it doesn't apply.

12          THE COURT:  This is based on the sale by the

13    Defendants?

14          MR. ARD:  Exactly.

15          THE COURT:  The named Plaintiffs?  This was related to

16    the names Plaintiffs?

17          MS. HASSAN:  Correct, Your Honor.

18          THE COURT:  Okay, but isn't this covered by -- that's

19    what we've been discussing with the in pari delicto.  There is

20    an argument.  There is a nonfrivolous argument here along the

21    lines Mr. Ard was making that the statute's exclusive.  The

22    statute recognizes a defense.  You know, Defendant has to prove

23    burden, etc.  Not a frivolous argument to say if they wanted to

24    put other defense in the statute, they could have.  But there's

25    certainly no defense in the statute, other than that one, for,

1    hey, if you sell unregistered securities, you can't sue.  So

2    I've covered that with in pari delicto, unclean hands -- well,

3    I don't know.

4            MS. HASSAN:  Your Honor, that's fine.  I just wanted a

5    clarification.  If that concept is already covered in pari

6    delicto, that's fine with us.

7            THE COURT:  I assume that's what we talked about

8    before.

9            MS. HASSAN:  Yeah.

10           THE COURT:  We're into the final instructions.  Well,

11   are there any comments on the final instructions?  Part III.

12           All right, let's go to the Verdict Form.

13           Okay, so there is the one change that I said I would

14   make.  Earlier in Section II we'll add a Question 1(a)

15   regarding whether Mr. Fraser knew or, in the exercise of

16   reasonable care, could have known that the products were being

17   sold or that they were not registered.  So we will add that

18   language to Section II in Question 1(a).  And we will adjust

19   the instructions accordingly.

20           I looked at your proposals.  You'll see I didn't adopt

21   either proposal.  I came up with something that's sort of a

22   hybrid.

23           And Mr. Ard.

24           MR. ARD:  I was just going to say that if we're

25   removing ZenMiner, obviously --

1            THE COURT:  Yeah, we're removing ZenMiners,

2     absolutely.

3            So you're, obviously, preserved.  I know neither side

4     really likes this Verdict Form.  I can't say I'm that fond of

5     it.  I never had a Verdict Form that's this complicated, but I

6     do think it's consistent with the instructions.  Again, I

7     haven't figured out exactly what I'm going to do with the

8     affirmative defense, but I will figure that out after this.

9            Anything other than what you've already told me about

10    this or already put in and preserved on the Verdict Form?

11           Mr. Weinstein.

12           MR. WEINSTEIN:  Yeah, before I misstate it, Your

13    Honor, I know that the first question requires them to find

14    investment contract, essentially a security for each of the

15    four different products.  I'm just trying to remember --

16           THE COURT:  Correct, it does.

17           MR. WEINSTEIN:  Right.  So if -- let's assume the jury

18    finds all of those to be securities.  If, for example, they

19    find that there is no material misstatement as to Hashpoints

20    because it was only represented to be something that converts

21    into Paycoin and it was, there's no way for them to distinguish

22    between the products.

23           THE COURT:  Okay.  Well, if they find they're all

24    securities and then they think that, as you say, well, there

25    were no false statements with respect to Hashpoints but only

1   with respect to, say, Hashlets or Paycoin, and you're saying --

2   effectively you're saying to me, Judge, how is the jury -- not

3   this jury, but how is some other fact finder going to calculate

4   damages?  That's effectively what you're saying; right?

5         Because they can fill out the form still; right?  As

6   long as they find one is a security, they can answer the other

7   questions with respect to that one, which is what I'm telling

8   them to do.  But you're saying, Judge, when we get to some

9   other proceeding, who knows what they think is, and how do we

10  measure damages?  Is that what you're saying?

11        MR. WEINSTEIN:  Right, because we don't know for which

12  product he was actually held liable by the first jury.

13        THE COURT:  Right.  Fair enough.  Right.

14        What's your response to that, Mr. Ard?

15        MR. BUCHDAHL:  Say something.

16        MR. ARD:  I don't understand.

17        THE COURT:  So, I mean, to me, the only solution to

18  that would be -- so let's, for example, take Question 2.  What

19  we would have to do is say, with respect -- I'm on page 4.

20  With respect to -- this is Section II, Question 2.  With

21  respect to the Plaintiffs' claim for fraud, etc., did

22  Plaintiffs prove that Stuart Fraser is liable as a control

23  person at GAW Miners with respect to each of the following

24  products?  And then list them and put "yes," "no" next to each

25  one.  That's the only, I think, way to accommodate Mr.

1    Weinstein's comment, that I can think of.

2          MR. WEINSTEIN:  Yes.  And trust me, I hesitate to make

3    this a longer form, but I don't see how we avoid that.

4          MR. BUCHDAHL:  This is Seth's idea -- sorry -- Mr.

5    Ard's idea.  But what if the question said, you know, if you

6    found -- if you found any of these products to be securities,

7    for those that you found to be securities, etc.

8          THE COURT:  That's what it said.  I mean, that's what

9    the Verdict Form says.  In effect, for those you found to be

10   securities, go and answer these questions.  That's what it

11   already says.

12         MR. BUCHDAHL:  Ah.

13         THE COURT:  But he's saying, okay, suppose we get an

14   answer on that.  We don't know -- it's fine for liabilities so

15   far as it goes, but how the heck are we ever going to determine

16   damages for the class?  Which is a concern.

17         MR. ARD:  I guess I don't understand the question

18   because they've already checked for the first four which ones

19   they're answering the question about.

20         THE COURT:  Right.  But he's saying, for example,

21   let's say they say all four are investment contracts.

22         MR. ARD:  Yeah.

23         THE COURT:  But in their mind there were no false

24   statements with respect to Hashpoints because, as he said,

25   Hashpoints were stated they were going to convert to Paycoin

1   and they did.  And so the jury might want to express that -- if

2   the jury had that view, we would know -- again, you folks know

3   the numbers better than I do, much better than I do.  I don't

4   know, for example, if that would mean that somebody who -- part

5   of whose damages or if the class's if we did damages on a

6   class-wide basis.

7           That's a way of telling us we have to leave.  I never

8   had that happen before.  I hope you guys can get out of the

9   building.

10          All right.  Mr. Ard, I'll let you wrap it up.

11          MR. ARD:  I think we're having a conversation right

12  here.

13          MR. BUCHDAHL:  Yeah, I do think we probably need to

14  delineate the four.

15          THE COURT:  I think you're right.  I think that's how

16  we have to do it.  So we'll have to do it product by product.

17          MR. ARD:  Can I make one last pitch for in pari

18  delicto for the securities?

19          MR. WEINSTEIN:  I have one more issue right before we

20  rehash old issues.  The jury's also not being asked to

21  determine with respect to material misstatements at what point

22  in time were those made.  And I know that ultimately it becomes

23  a damages issue if they find it at all.  Again, not sure how

24  the damages jury would figure it out if -- quick example, I

25  think we've heard evidence from employees testifying by

1   deposition at some point it may have been the case that they

2   didn't have enough mining power to back what people were buying

3   but not necessarily from the beginning.  And so people could

4   have been buying and it wasn't a misrepresentation for some

5   period of time that they didn't have the power to back.

6         THE COURT:  Yeah, but, I mean, it seems to me that the

7   jury could draw a different inference too.

8         MR. WEINSTEIN:  No, they could.  There's no doubt that

9   they could draw a different inference, but we won't know what

10   they determine, and then ultimately we get to a damages -- if

11   we get to a damages phase, do we -- is he liable for damages

12   for things purchased in August when perhaps it wasn't a

13   material misstatement as of then?

14         MR. ARD:  We would accept an instruction that just

15   said:  Did you find that these false statements -- that the

16   purchases made during the class period were a reliance on the

17   false statements?

18         MR. WEINSTEIN:  The question is how that gets

19   translated at --

20         THE COURT:  Well, but it might be a fix to do it in

21   the instructions.  So in other words, you must -- wait a

22   minute.  Wait a minute.  Isn't the class definition simply

23   based on when they purchased?

24         MR. ARD:  Yeah.

25         THE COURT:  It's not when the statements were made.

1           MR. BUCHDAHL:  Correct.

2           THE COURT:  So why am I worrying about this?

3           MR. WEINSTEIN:  Because if they purchased something in

4  August and the statement upon which they're saying they were

5  induced to do it was they didn't have enough hashing power to

6  back the Hashlets and that was actually -- that's not a false

7  statement as of that period of time.  They didn't purchase

8  based on a misstatement.  It -- later, whenever it is -- and I

9  don't think there's any evidence as to when that actually

10 occurred, perhaps that was no longer true and people who bought

11 after that date might have a basis for damages on that kind of

12 misstatement.  But there's nothing in the record that says, at

13 what point in time did this company not have sufficient mining

14 power to support the Hashlets?

15          You heard from, I believe, Mr. Mordica today --

16          THE COURT:  Why couldn't they infer that Garza was a

17 crook from the outset?

18          MR. WEINSTEIN:  They could.  The issue isn't whether

19 they couldn't for one or the other.  I think they can be --

20 they can find liability for a misstatement during the period.

21          THE COURT:  Yeah.

22          MR. ARD:  The problem with it is once you get to a

23 damages phase, how is the damages jury going to decide, at what

24 point in time does it start?  The jury could infer he was a

25 crook from the beginning, although a crook doesn't mean a

1   material misstatement.  But that doesn't mean they did conclude

2   that.

3          THE COURT:  Okay.  We're going to have to reconvene on

4   this in the morning.  It's a fair point.  I want to think about

5   it overnight.  I'm not going to hear further on in pari

6   delicto.

7          MR. ARD:  Okay, Your Honor.

8          THE COURT:  So I'm going to think about this, and

9   we'll confer further in the morning.  Why don't we expect to be

10  here at 9:00 for that purpose.  Okay?  We'll be in recess.

11      (Proceedings concluded at 6:04 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1

 2

 3                   C E R T I F I C A T E

 4

 5

 6

 7              I, Julie L. Monette, RMR, CRR, CRC, Official

 8   Court Reporter for the United States District Court for the

 9   District of Connecticut, do hereby certify that the foregoing

10   pages are a true and accurate transcription of my shorthand

11   notes taken in the aforementioned matter to the best of my

12   skill and ability.

13

14

15                   /S/ JULIE L. MONETTE
                  _____
16                  Julie L. Monette, RMR, CRR, CRC
                        Official Court Reporter
17                         450 Main Street
                      Hartford, Connecticut 06103
18                         (860) 212-6937

19

20

21

22

23

24

25
```