```
 1                     UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF CONNECTICUT
 2
       - - - - - - - - - - - - - - - - x
 3
       DENIS MARC AUDET, MICHAEL          No. 3:16-CV-940 (MPS)
 4     PFEIFFER, and DEAN ALLEN
       SHINNERS, Individually and on      OCTOBER 20, 2021
 5     Behalf of All Others Similarly
       Situated,                          8:51 A.M.
 6
       vs.                                JURY SELECTION
 7
       STUART A. FRASER, GAW MINERS,
 8     LLC, and ZENMINER, LLC, (d/b/a
       ZEN CLOUD)
 9
       - - - - - - - - - - - - - - - - x
10
11                        450 Main Street
                        Hartford, Connecticut
12
13          BEFORE:  THE HONORABLE MICHAEL P. SHEA, U.S.D.J.
14

15     APPEARANCES:

16     FOR THE PLAINTIFFS:

17              SUSMAN GODFREY, L.L.P.
                   1301 Avenue of the Americas, 32nd Floor
18                 New York, New York 10019
                BY:  SETH D. ARD, ESQUIRE
19              BY:  JACOB W. BUCHDAHL, ESQUIRE
                BY:  GENG CHEN, ESQUIRE
20              BY:  RUSSELL RENNIE, ESQUIRE

21              IZARD, KINDALL & RAABE, LLP
                   29 South Main Street, Suite 305
22                 West Hartford, Connecticut 06107
                BY:  MARK P. KINDALL, ESQUIRE
23

24     (Appearances continue ...)

25
```

```
 1   APPEARANCES CONTINUED:

 2   FOR THE DEFENDANT:

 3             HUGHES, HUBBARD & REED L.L.P.
                   One Battery Park Plaza, 12th Floor
 4                 New York, New York 10004-1482
             BY:  DANIEL WEINER, ESQUIRE
 5           BY:  MARC A. WEINSTEIN, ESQUIRE
             BY:  AMINA HASSAN, ESQUIRE
 6
             BRENNER, SALTZMAN & WALLMAN
 7                 271 Whitney Avenue
                   New Haven, Connecticut 06511
 8           BY:  ROWENA A. MOFFETT, ESQUIRE

 9

10

11

12

13

14

15

16

17

18

19

20   COURT REPORTER:  Julie L. Monette, RMR, CRR, CCP
                        (860) 212-6937
21

22   Proceedings recorded by mechanical stenography, transcript
     produced by computer.

23

24

25
```

1                              8:51 A.M.

2              THE COURT:  So we're here for jury selection in Audet

3    versus Garza, 16-CV-940.  Why don't we begin -- the judge

4    turning on the microphone.  There we go.  And then if we could

5    have counsel state appearances for the record, please, starting

6    with Plaintiffs' counsel.

7              MR. BUCHDAHL:  Jacob Buchdahl, Susman Godfrey.

8              MR. ARD:  Seth Ard, Susman Godfrey.

9              MS. CHEN:  Geng Chen, Susman Godfrey.

10             MR. KINDALL:  Good morning, Your Honor.  Mark Kindall,

11   Izard, Kindall & Raabe.

12             MR. WEINER:  Morning, Your Honor.  Dan Weiner for

13   Defendant Stuart Fraser.  With me are my colleagues Marc

14   Weinstein, Hannah Miller, Amina Hassan.  And Mr. Fraser and his

15   wife is here.

16             As I understand from Mr. Buchdahl, none of their

17   spouses are coming today, so I don't know if there's room for

18   her to attend?

19             THE COURT:  I think it's fine.

20             I have a few things I want to cover with you folks.

21   First, I got your joint description of the case, which I'm

22   going to read.  I did want to add one sentence to it, though,

23   so I wanted to run it by you.

24             So this is what I have.  I think it's all yours except

25   for one sentence.  So I would say to them:  This case is a

1  class action, which means that it is brought by a group of

2  people.  The class, or the class Plaintiffs in this case, are

3  represented by three people called the class

4  representatives:  Allen Shinners, Michael Pfeiffer, and Marc

5  Audet.  The class Plaintiffs claim they were defrauded into

6  buying products that did not have the value they were sold as

7  having and that these products were sold unlawfully because

8  they were not registered as securities.  In this trial, the

9  class Plaintiffs claim that Defendant Stuart Fraser is liable

10  for their losses because he was one of the control persons of

11  the companies that sold the products to class Plaintiffs and he

12  participated in the fraud.

13       This is the new sentence:  The companies, which were

14  located in Bloomfield, Connecticut, are G-A-W, GAW Miners and

15  ZenMiners.  Mr. Fraser denies these allegations and asserts

16  that he was a minority investor in the companies from which the

17  class Plaintiffs purchased the products and that he did not

18  control the companies and did not participate in any such

19  fraud.

20       Any problem with that?

21       MR. WEINER:  Not from the Defense side, Your Honor.

22       MR. BUCHDAHL:  No, Your Honor.

23       THE COURT:  Okay.  So that's what I'll go with.  Thank

24  you.

25       Second thing I wanted to tell you, so I did receive

1    comments on the preliminary jury instructions.  I did not --

2    respectfully, I did not ultimately agree with some of them.  I

3    did not in particular agree with the Defendant's concern about

4    my description of the burden of proof.  I did take out the word

5    "balanced" before scales, but I think it's otherwise legally

6    correct.  And I actually think it's correct with the word

7    "balanced," although I did -- I did hesitate on that word.  So

8    I'm going leave that as is.

9         I did add a somewhat more abbreviated version of

10   something the Plaintiffs had recommended.  There will be a

11   paragraph in addition to the one that I -- this will go in the

12   part that says "Class Action."  And that I already had sent to

13   you.  The last sentence of that paragraph you will recall says,

14   "Your verdict here will be binding on all class members, that

15   is to say, all Plaintiffs."

16        And then I have a new paragraph that says:  "The

17   purpose of this trial is for you to determine whether the

18   Plaintiffs have proved that Mr. Fraser is liable for the claims

19   asserted against him.  You will not be asked to determine the

20   amount of damages that are owed to anyone if you find Mr.

21   Fraser liable.  If necessary, damages will be determined at a

22   later stage of this case."

23        Any problem with that particular addition?

24        MR. WEINER:  Your Honor, if I might, the last sentence

25   when you said any damages -- if you're talking about damages, I

1    thought the words "if any" might be inserted there.

2              THE COURT:  Okay, "amount of damages, if any."

3              MR. WEINER:  Right.  Thank you, Your Honor.

4              MR. BUCHDAHL:  Your Honor, I think you already said

5    "if necessary."

6              THE COURT:  Well, I say that in the next sentence.  So

7    you will not be asked to determine the amount of damages, if

8    any, that are owed to anyone if you find Mr. Fraser liable.  I

9    think it's fine.  If necessary, damages will be determined at a

10   later --

11             MR. WEINER:  Thank you.

12             THE COURT:  All right.  So we'll go with that.

13             And then one other thing, I think it would be

14   helpful -- this just comes from experience.  So the exhibits in

15   this case, as I understand it, are all going to be loaded onto

16   Juris, which is the Court's electronic evidence viewing system

17   for the jurors.  And that's fine.  And that's generally what

18   jurors like.

19             But in recent cases I've had them say to me, "Can we

20   get a hard copy index to the exhibits?"  And they'll say to me

21   after the trial typically, at which point it's too late.

22             So if that's something counsel could do, you would

23   need to cooperate on that.  And I don't need it right now.  I

24   would need it basically at the end of the case.  Really it's

25   just an exhibit list.

1    Now, it needs to reflect only the exhibits that got

2    into evidence, obviously.  So it's something that you're going

3    to have to update throughout the trial.  And it's going to have

4    to be -- have very generic descriptions, the kinds that are not

5    going to draw objections or allow -- here's what I don't want:

6    I don't want to be in a situation where the jury's ready to

7    deliberate and we are having an hour or an hour-and-a-half long

8    conference over the details in these -- on these lists.

9    So if that's the case, I'm just going to say, no, you

10   can't have one.  But I would appreciate if counsel could try to

11   work together to prepare something.  I think that the jurors

12   will find it helpful, so ...

13   MR. BUCHDAHL:  Your Honor, just so -- in other words,

14   if we just describe it as an e-mail such-and-such date.

15   THE COURT:  Yeah, I think that's fine.  I think that's

16   fine, yeah.  And the key thing is, of course, the exhibit

17   number.  So I'm glad I had that discussion.

18   Remember, you're going to get two lists, hopefully

19   momentarily.  One will be the bio list.  This will have, as I

20   said, I think I explained to you, limited, very limited

21   biographical information about the jurors.  I think that's in

22   alphabetical order.  It is in alphabetical order.  It will show

23   the town they're from.  If they've filled this part out, it

24   might show where they work.  But, candidly, it's not all that

25   helpful.

1           Then you're going to get the more important list,

2    which is the judge's list.  That list is randomly generated

3    from the people who are in the building, and it will go from --

4    actually, I think it will go from -- will it go from here or

5    the people also coming this afternoon?  It goes through the

6    whole thing?  Right.  So let's assume it does.  So we have

7    basically plan B.  In case we're not able to get a jury this

8    morning, we're bringing in more this afternoon.  This list, I

9    think, is going to have everybody on it, which means it will

10   probably have about 80 names or 75 names, something like that.

11          The jury will consist -- although I wonder how that's

12   going to work exactly -- well, I will check on this for you.  I

13   believe only because if some aren't here and we haven't

14   questioned them, I'm wondering how this is going to work.  Let

15   me give you these instructions first, and if I talk to the jury

16   clerk and it's changed, I will let you know.  The jury will

17   consist of the lowest numbers of people on that list who are

18   not stricken either for cause or peremptorily.

19          Another reminder:  After we do the questioning, the

20   group questioning, if we have what I call sidebars, we will --

21   I will have my law clerk line -- let's say in the group of 15,

22   let's say we need seven sidebars because somebody said

23   something, you know, they didn't want to discuss in front of

24   the group or one of you thinks follow-up is warranted and I

25   agree with you.  We'll line them up outside.  We'll bring them

1    in one by one to the microphone, and I will ask them the

2    follow-up questions.  And then I will have them step outside

3    one more time.  I will hear any challenges for cause.  I will

4    rule.  I will bring them back in.  If I've stricken them, I'll

5    send them home.  If not, they'll go to another room.  And

6    that's how we'll proceed.

7         So once we get done with that entire process, which

8    may require two or three groups, then you do your peremptories.

9    And, again, you're not going to have that much time.  I want to

10   emphasize that with you.  So all day you should be working on

11   your peremptories.  You should think -- if they've got a low

12   number on that list, so they have a chance of ending up on that

13   jury -- and I'm talking about in the left-hand column now, the

14   low number in the left-hand column.  You want to be thinking

15   about should we knock this person off if we have to.

16        We'll give you the sheet, and you'll go back and

17   forth.  You'll literally have 20 minutes to do the whole thing.

18   Plaintiffs will go first.  They'll exercise their first, then

19   Defense team, etc., back and forth.

20             MR. WEINER:  Your Honor, one question about that?

21             THE COURT:  Yes.

22             MR. WEINER:  Let's say, for example, Plaintiffs do a

23   peremptory, we do one, and then they pass.  Once they've

24   passed, have they used up their peremptories?

25             THE COURT:  Yeah.  I mean, if you pass, you lose.

1    Yeah, if you pass, you lose your peremptory.

2            MR. WEINER:  Thank you, Your Honor.

3            MR. BUCHDAHL:  Your Honor?

4            THE COURT:  Five minutes we'll have the list.

5            MR. BUCHDAHL:  I didn't quite understand one thing.

6    If we pass --

7            THE COURT:  So I've never had somebody pass before,

8    but I wouldn't see any good reason to pass.  But the idea is,

9    Plaintiffs exercise one, Defendants exercise one.  If it then

10   goes back to the Plaintiffs, then if Plaintiffs -- I wouldn't

11   expect you to do this, but if they said, "yeah, we're going to

12   pass this time because we want to see what you do," no, it

13   doesn't work that way.  You would lose your opportunity.  That

14   would be considered a loss of a strike if you did that.

15           MR. BUCHDAHL:  I understand that part.  We would still

16   get the next one.

17           THE COURT:  You would still get your third strike,

18   yeah, sure.

19           While I have you here, let me just look at what I'm

20   using for my case-specific questions.  I used a number of your

21   questions but not all of them.

22           MR. BUCHDAHL:  Your Honor, did you decide -- make a

23   final decision as to the number of jurors?

24           THE COURT:  Yeah.  I'm going with nine.  So it will

25   be -- so we need 15 qualified jurors.

1     Okay.  So I'm certainly going to be asking them if

2  they know of any of the company names they hear in this case,

3  including Cantor Fitzgerald.  I'm going to ask about have they

4  heard of any of the products involved in the case.  I'll also

5  ask about what I understand to be the previous companies Mr.

6  Garza had and perhaps with Mr. Fraser, perhaps not, Optima

7  Computers, Great Auk Wireless, GAW High-Speed Internet, GAW

8  Labs.

9     Are the witnesses going to say GAW or G-A-W?

10    MR. BUCHDAHL:  GAW we expect.

11    THE COURT:  Okay, GAW Labs, Smart Tech, or Prodigy.

12  So I'm going to ask about any knowledge of those companies.

13    I'm going to ask:  Are you knowledgeable about Bitcoin

14  or other so-called cryptocurrencies?  Then I'll follow up with

15  questions:  Do you go on forums? that kind of thing.  Are you

16  familiar with cryptocurrency mining?  Have you or someone close

17  to you ever worked for a business that sells cryptocurrency

18  mining? etc.

19    I'll ask:  Have you ever been the victim of a fraud?

20  Have you ever been accused of fraud that involved the purchase

21  of products or investments?

22    Any previous experience with class action lawsuits?

23  Gee, that's kind of general.  I'll see how it goes the first

24  time.  If it becomes just too much, I'll eliminate that

25  question.  I'll certainly ask about opinions or beliefs about

1  class action lawsuits that are either so negative or positive

2  that you could not be fair if you were asked to be a juror in

3  this case.  That's probably going to be pretty much it for the

4  individual questions.

5          What you're going to see a lot is going to come out

6  about these people on the six standard questions, at least in

7  terms of if I hear anything that I consider to be remotely

8  touching on the facts of the case, I'm going to say:  Oh, so

9  you said such -- you said -- I don't know -- your wife works at

10 Goldman Sachs.  What does she do?  Tell me.  That kind of

11 thing.  I'm going to dig into that kind of thing.  You learn a

12 lot during that section of the questioning.

13         MR. BUCHDAHL:  Your Honor, the one thing Plaintiffs

14 would request is follow-up -- first of all, we think anybody

15 who's familiar with Cantor Fitzgerald we would request

16 follow-up, but we think that follow-up should not occur in

17 front of other jurors because Cantor Fitzgerald --

18         THE COURT:  Because of 9/11?

19         MR. BUCHDAHL:  Because of 9/11.  Thank you.

20         THE COURT:  All right.  Let's see how it goes.  I'm

21 disinclined to do sidebars for everybody who say they heard of

22 Cantor Fitzgerald.  I'll tell you, I personally don't think I

23 heard of Cantor Fitzgerald before 9/11.  I'm just trying to

24 remember.  Maybe I had, but I don't think so.  So if a bunch of

25 people raise their hands on Cantor Fitzgerald, then I may --

1    we'll see how it goes.  But I understand the concern.  We'll

2    take a short recess then.

3         MR. BUCHDAHL:  We have one additional associate who I

4    would love to be able to watch this process given the numbers.

5         THE COURT:  You can bring him in.  Is the person here?

6         MR. BUCHDAHL:  Yeah.

7         THE COURT:  Folks, for your guidance, I'm told that

8    the 49 on the judge's list are only people who are in the

9    building right now.  So we are going to see these people unless

10   we pick the jury before we get to the -- unless we're really --

11   we do really well in the first two groups.

12        And so you know, when I have the jurors stand and

13   identify themselves, jurors don't -- often don't like to say

14   their last names.  So what I'll do is I'll say, Give us your

15   first name and your juror number.

16        And the number that -- they don't know the random

17   number on the left-hand side.  That's not the number they're

18   going to give.  They're going to give, I believe, the

19   participant number, although I always forget whether it's the

20   participant number or the pool sequence number.  We'll figure

21   it out soon enough.  I think it's the participant number that

22   they give.  No, sorry.  It's the pool sequence number that they

23   give because it's a shorter number than that.

24        So you're going to have to hunt around for them a

25   little bit.  I do too.  It takes time, but get used to it.

1          MR. WEINER:  Your Honor, when you say the participant

2    number, is that the thing that appears as pool number?

3          THE COURT:  So there's two -- there's three numbers.

4    There's the random number; there's the participant number; and

5    there's the pool sequence number.

6          They have a number that's on their chest with a little

7    sticker.  I'm pretty sure -- and that's the only number they

8    know of.  I'm pretty sure that's the pool sequence number.

9    I'll just check that with one of my staff in a minute, but I'm

10   pretty sure that's what that is.

11         MR. BUCHDAHL:  Your Honor, is there any chance you've

12   had occasion to revisit the question of whether lawyers can

13   take masks off when they're speaking in the courtroom?

14         THE COURT:  We're certainly not doing that today.  I

15   will check -- let me check the metrics right now.  It didn't

16   look good last night when I looked, but let me just check.

17         MR. BUCHDAHL:  I think only, you know, I think if the

18   lawyers could take them off for openings, that would be really

19   the only thing that we'd really ask.

20         THE COURT:  Yeah, I'm afraid we're going to have to

21   keep masks on.  The numbers actually bounced up slightly since

22   last week, which is too bad.  But I will continue to monitor.

23         So we have verified it is the pool sequence number

24   that the jurors will have.  They will probably only give the

25   last three digits.  So, for example, for Ms. Belden, who's No.

1 on the list, she's probably going to get up and say, I'm

Virginia, and my juror number is 582.

MR. WEINER:  Thank you, Your Honor.

THE COURT:  Folks, I should have told you this before.
If you want, you can pull your chairs around to the other side
of the table right now because that's where you're going to be
focusing.  You don't really care about looking at me.  You care
about the jurors.

So why don't you bring your chairs around to the other
side of the table, and you can move the computer so you can
see.  Careful moving the computers.  Don't pull out any plugs
or anything like that.  Make sure the mics are turned around so
the court reporter can hear what you're saying.

(Pause.)

(The jury panel entered the courtroom at 9:23 a.m.)

THE COURT:  Welcome, Ladies and Gentlemen.  Good
morning.  My name is Michael Shea, and I'm the judge who's
going to be presiding over this jury selection and this trial.

First I want to thank you all for being here.  Jury
service is one of the most important duties of citizenship.
Our system of justice depends on you.  And from the Court, from
the parties in this case, and from their lawyers, I want to
extend my thanks to you for being here today.

The case before us is a civil action.  And the trial
will start today, October 20th, and although I can never be

1    certain about the length of a trial, I estimate that it will

2    last until or through November 2nd, including deliberations.

3    There will be no court on Friday, October 22nd.  But the trial

4    will proceed all other business days of the week.  Trial is

5    normally held from 9:00 a.m. to 3:30 p.m.

6           Before we begin the process of selecting the jury this

7    morning, I want to speak to you about the COVID-19 pandemic and

8    the steps that we have taken to keep you and everyone in all of

9    our court spaces safe.

10          First, we require that you wear a mask at all times

11   while you are in the building, including not only courtrooms,

12   hallways, and jury assembly rooms, but also bathrooms and any

13   other space you find yourself in while in this building.

14          Our mask requirement is based on advice we have

15   received from a scientist at the University of Massachusetts,

16   who has been advising us and other courts, as well as schools

17   and other institutions across the country.

18          While we are aware of recent CDC guidance concerning

19   vaccinated persons and masks, we have, on the advice of our

20   science advisor, determined that the best way to keep everyone

21   safe is to require the wearing of masks throughout the jury

22   selection and trial in light of the particular demands of jury

23   trials.  Jury selections and jury trials are not like going to

24   the grocery store.  These proceedings require us to sit

25   together for long periods of time.

1      Second, we also require social distancing.  You should

2  be seated at least six feet apart from the person next to you,

3  in addition to wearing a mask.  And I'll say now that the group

4  on my left looks a little bit bunched up.  If you find yourself

5  not six feet apart from anybody, there's plenty of room on the

6  other side, and I would encourage you to move.  You can do that

7  now.

8      We have broken the jury into groups this morning -- or

9  I should say we've broken the jury into jury pools this

10  morning.  You're just one of several groups, and the reason for

11  that is so we can ensure that everyone remains properly

12  distanced.  Some of the other groups are viewing these

13  proceedings through linked hookups over Zoom from other rooms.

14  You, this group, is here with me, the lawyers, and the parties.

15      I ask that all of the groups, regardless of which room

16  you are in, pay close attention to the proceedings.  Later this

17  morning I will bring others who are not -- excuse me -- others

18  who are currently in other rooms into this courtroom, and you

19  will be asked the same questions I will be asking those who are

20  here with me now.  So please pay close attention to these

21  proceedings so that the entire process can move more quickly.

22      Now let's turn to why you're here.  Jurors serve a

23  vital function in our system of justice.  Jurors are asked to

24  accord parties in a litigation a fair trial.  To do so, jurors

25  must be free from any preconceived notions or any sympathies or

1    prejudices that might prevent them from returning a fair and

2    just verdict based solely on the evidence or lack of evidence.

3            To give the parties in this action some comfort that

4    you do not have anything in your background that might

5    improperly affect you as a juror, I will ask you questions

6    today.  Although some of my questions may appear personal, the

7    purpose of the questioning is not to pry or to embarrass anyone

8    but simply to develop enough information to determine whether

9    you are qualified to sit as a juror in this particular case.

10           After I ask my questions, some of you may be excused

11   because you are not qualified to sit as a juror as a matter of

12   law in this case.  Others of you may be excused peremptorily,

13   which just means that one of the attorneys will ask to have you

14   excused without giving you a reason.

15           As you must realize, responses to a few questions

16   given over the course of a morning cannot give a thorough or

17   fair picture of you as a person.  Therefore, you should not

18   view your being excused as any reflection on you as a citizen

19   or as a person.

20           At the outset, I want to make one additional comment.

21   We understand here at the court that jury service is never

22   convenient.  But we also know that we could not do justice in

23   this country without people like you who are drawn from the

24   community at random and who come together from different walks

25   of life to judge the facts of a case impartially.  For this

1    reason, jury service is a service our country requires of us.

2    And while it is not convenient, it pales in comparison to the

3    service rendered every day to our country by the men and women

4    who serve in our military in dangerous places overseas and

5    generations of soldiers before them who were drafted into

6    service.  Obviously, this is a small imposition compared to

7    something like that; and for what it's worth, I have found that

8    those who are chosen generally report that the experience was

9    more positive than they expected it would be.

10           There will be a time today to discuss genuine economic

11   and other hardships that would interfere with your ability to

12   serve.  But please understand that you have a responsibility to

13   serve if you are qualified to do so even if it is inconvenient.

14           In a moment I'm going to begin asking you questions.

15   Before I do that, however, I request that each of you now stand

16   and raise your right hands so that the Clerk of the Court can

17   give you the oath that you will respond truthfully and

18   completely to my questions today.

19       (Jury panel sworn.)

20           THE COURT:  All right.  Thank you.  Please be seated.

21   All right, that's fine.  Affirming's fine.  I should have said

22   that.

23           All right.  I'm going to begin with a very brief

24   description of the case.  This case is a class action.

25           MR. WEINER:  Your Honor, we have one of the jurors on

1   the right raising his hand.

2           A PROSPECTIVE JUROR:  May I approach the bench,

3   please?

4           THE COURT:  Not now, sir.  There will be a time for

5   that.  Okay?  Please have a seat.

6           This case is a class action, which means that it is

7   brought by a group of people.  The class, or the class

8   Plaintiffs in this case, are represented by three people called

9   the class representatives.  They are:  Allen Shinners, Michael

10  Pfeiffer, and Marc Audet.  The class Plaintiffs claim they were

11  defrauded into buying products that did not have the value they

12  were sold as having and that these products were sold

13  unlawfully because they were not registered as securities.  In

14  this trial, the class Plaintiffs claim that Defendant Stuart

15  Fraser is liable for their losses because he was one of the

16  control persons of the companies that sold the products to

17  class Plaintiffs and he participated in the fraud.

18          The companies, which were located in Bloomfield,

19  Connecticut, are:  GAW Miners -- that's G-A-W Miners -- and

20  ZenMiners.  Mr. Fraser denies these allegations and asserts

21  that he was a minority investor in the companies from which the

22  class Plaintiffs purchased the products and that he did not

23  control the companies and did not participate in any such

24  fraud.

25          So my first question for you is this:  And if the

1   answer is yes, raise your hand high, please.  Do any of you

2   have any personal knowledge of the allegations in the case as I

3   have described them?  If so, raise your hand.

4         Okay, I see no hands on that question.

5         Now, when -- there will be times when you will raise

6   your hands.  When you do so, what I'll ask you to do is stand,

7   state your first name and the juror number that is on your

8   chest on a sticker, just your first name and juror number.  You

9   don't need to give us your last name if you don't want to.  And

10  then you can give your answer.  Okay?

11        So I didn't see any hands on my first question, which

12  was:  Do you have any personal knowledge of the allegations in

13  the case?

14        Next question:  Have any of you seen or heard any

15  media reports about this case or any reports about this case on

16  the internet, if there have been any such reports?  If so,

17  raise your hand now.

18        Okay, I see no hands.

19        I'm now going to ask the Plaintiffs' attorneys to

20  introduce themselves, to identify their clients and their law

21  firms, and to list the witnesses they intend to call.  Now, you

22  should have received a list with all of these names already.

23  Nonetheless, I'm going to ask the lawyers to walk through the

24  names on the list just to be sure that nobody recognizes any of

25  those names.  At the end I'll ask you some questions about

```
 1   whether you recognize the names.  So we'll start with
 2   Plaintiffs' counsel.
 3          MR. BUCHDAHL:  Good morning.  My name is Jacob
 4   Buchdahl.
 5          MR. ARD:  Good morning.  My name is Seth Ard.
 6          MS. CHEN:  Good morning.  Geng Chen.
 7          MR. KINDALL:  Good morning.  I'm Mark Kindall from
 8   Izard, Kindall & Raabe in West Hartford.
 9          MR. RENNIE:  Good morning.  I'm Russell Rennie.
10          MR. BUCHDAHL:  The Plaintiffs in this case, Marc
11   Audet, Michael Pfeiffer, and Allen Shinners, are not present
12   here for jury selection, although they will be present for the
13   trial.  In addition to those three witnesses, we will be
14   playing testimony from Josh Garza, from Joe Mordica, and
15   Madeline Eden.  We will call a witness named Arvind Narayanan
16   and another witness named Stuart Fraser.
17          THE COURT:  Okay.  Thank you, Mr. Buchdahl.
18          And Mr. Buchdahl and many of his colleagues are from
19   the law firm of Susman Godfrey.  Okay?
20          At this time I'll ask Defense counsel to do the same.
21          MR. WEINER:  Thank you, Your Honor.  I'm Dan Weiner
22   from the firm of Hughes, Hubbard & Reed.  And with me are my
23   colleagues Marc Weinstein, Amina Hassan, and Hannah Miller.  We
24   also have the Defendant in this case, our client, Stuart
25   Fraser, and his wife Elise Fraser.
```

```
 1              We have local Connecticut counsel.  Because of space
 2     limitations, she's not in the room.  Her name is Rowena
 3     Moffett.  And the judge has asked me -- and I'm going read the
 4     names of the people in her firm because that's a local
 5     Connecticut firm.
 6              So I'm going to read the names of our Connecticut
 7     local counsel.  It's Donald Anderson, William Aniskovich,
 8     Danielle Bercury, George Brencher, Michael Cretella, Brian
 9     Daniels, Jennifer Deakin, Sean Fisher, Jacob Goldsmith, Kathryn
10     Holland, Samuel Hurwitz, Mitchell Jaffe, Carolyn Kone, Wayne
11     Martino, Amanda Oberg, Stephen Saltzman, David Schaefer, Ronald
12     Soccoli, John Strother, Marc Wallman, and Holly Winger.  As I
13     said, they won't play any role in the case, but they're the
14     local Connecticut lawyers.
15              The witnesses we will call in this case are the
16     Defendant Stuart Fraser; two other names that Mr. Buchdahl
17     mentioned, Joe Mordica and Madeline Eden, formerly known as
18     Matthew Eden; then Eric Capuano; Daniel Pease; Jonah Dorman;
19     and Andrew Capuano.  Thank you, Your Honor.
20              THE COURT:  Mr. Kindall, do you have the list of
21     lawyers from your firm?
22              MR. KINDALL:  Of course, Your Honor.  The other
23     lawyers in my firm are Robert Izard, Craig Raabe, Douglas
24     Needham, Seth Klein, Christopher Barrett, and Oren Faircloth.
25              THE COURT:  Thank you, Mr. Kindall.
```

1           All right.  So, folks, first I'm going to ask about

2     the lawyers' names you heard on both sides.

3           Have any of you, or to your knowledge has anyone close

4     to you, had any dealings with any of the lawyers or their law

5     firms?  So that includes all the lawyers' names you heard

6     today, as well as the various law firms involved.  You have the

7     Hughes Hubbard firm.  You have the Brenner Saltzman firm, the

8     Susman Godfrey firm, and the Izard Noble firm.  So if you know

9     any of those folks or have any dealings with those law firms,

10    please raise your hand now.

11          Okay, I see no hands in response to that question.

12          The next question is:  Have any of you had any

13    dealings with or do you know or even recognize the names of any

14    of the parties in this case?  That was Mr. Shinners, Mr.

15    Pfeiffer, Mr. Audet, and Mr. Fraser.  Do any of you know any of

16    those names, or do any of you know any of those people?  If so,

17    raise your hands now.

18          Okay, I see no hands in response to that question.

19          You heard a list of witnesses called.  I won't go back

20    through it with you.  You also have it before you.  Do any of

21    you recognize any of the names of those witnesses or know any

22    of those folks?  If so, raise your hand now.

23          I see no hands.

24          A couple of other names first of individuals.  If any

25    of you know the name Jessica Garza, please raise your hand.

```
1              Did you raise your hand, ma'am?  No.

2              Okay, I see no hands on that question.

3              Next one, if any of you know a Thomas Fraser, please

4      raise your hand.

5              Okay, I see no hands.

6              Also some names of companies you may hear during the

7      trial.  I mentioned two of them already.  I'll mention them

8      again.  Those two were GAW Miners, LLC and ZenMiner, LLC.  Do

9      any of you know those companies?  If so, raise your hand.

10             All right.  The next company, ZenCloud.  If you know

11     that company, raise your hand.

12             And the last company, Cantor Fitzgerald.  If you know

13     that company, raise your hand.  Okay, I see no hands on any of

14     those questions.  All right?

15             Do any of you know me or any of my staff that you see

16     in the courtroom today?  If so, raise your hand.

17             Okay, I see no hands.

18             Do any of you know others in the jury pool with you

19     that either are in the room with you or you might have seen in

20     the building?  If so, raise your hand.

21             Again, I see no hands.

22             Now, before we go further, just a word of caution.

23     And this goes for the folks in this room and the folks on Zoom.

24     Okay?  During this jury selection -- and if you're chosen for

25     the jury, until the trial is over, please do not discuss the
```

1    case or anyone associated with the case or any of the names

2    that you've heard today with anyone, including your fellow

3    jurors.  Do not do any outside research about the case.  Do not

4    Google the case or use some other search engine to find out

5    about the case.  Do not Google anyone whose name you've heard

6    who may be associated with the case.

7          Why?  The parties are entitled to have those of you

8    who are chosen for the jury personally render a verdict solely

9    on the basis of your independent evaluation of the evidence

10   that's actually presented in the courtroom.  Speaking to

11   others, including your family and friends, outside the

12   deliberation process or exposing yourself to evidence or

13   information outside the courtroom would compromise your service

14   as jurors and would compromise your obligation of fairness to

15   the parties.  So until you are dismissed by me, which will be

16   either today if you are not chosen or after the trial is over

17   if you are chosen, until you are dismissed by me, do not

18   communicate with others or do any research about the case,

19   please.

20         Okay.  Now, before turning to your questionnaires,

21   which I believe you have, I'm going to ask you some additional

22   questions.  As I said, these questions are not meant to

23   embarrass anyone.  The reason for these questions is to ensure

24   that all -- to ensure all parties that a fair and impartial

25   jury will be selected to hear their claims and defenses.  If

1    there is any question, though, which you would prefer not to

2    answer in front of the larger group, please let me know that,

3    and I will then allow you to answer that question later just

4    before me and the attorneys present here.

5            So my first question is, in this line of questioning

6    is:  Do any of you have any physical problems or take any

7    medications that would prevent you from serving in this case or

8    affect you during the trial?  Before you answer that question,

9    let me tell you a couple things about the trial and

10   accommodations we provide.

11           The trial schedule is from 9:00 a.m. to 3:30 p.m.  We

12   take two breaks.  We take a 25-minute break at 10:45 a.m.

13   That's long enough to permit you to go outside and take your

14   mask off.  So that break runs from 10:45 to 11:10 a.m.  And

15   then we take a 45-minute lunch break at 12:30 p.m.  The --

16   actually, sorry.  That's going to be actually 12:45 p.m.  So

17   lunch break will end at 1:30 p.m.

18           The results of that is that you're never sitting in

19   the courtroom for more than two hours at a time.  That's the

20   maximum time that you're actually sitting.

21           For those people who have back issues, what we

22   typically do is if you simply let us know, we'll put you in the

23   back row -- by the way, the trial will not actually be held in

24   this courtroom.  It will be held two courtrooms over.  The

25   setup is a little different.

1        But in any event, regardless, if you have back issues,

2   we'll put you in the back -- if you let us know, we'll put you

3   in the back row, and you can stand and sit as many times as you

4   want during the trial.  Standing and sitting doesn't prevent

5   you from listening, so you can stand and sit.  We'll put you in

6   the back row.  You're not going to be blocking anybody's view.

7   Okay?

8        Finally, for those of you who have issues with your

9   hearing, we have technology that could assist you with that,

10  and we could also sit you closer to the witness, social

11  distancing as well but closer than other jurors.

12       Let me ask the question again:  Do any of you have any

13  physical problems or take any medication that would prevent you

14  from serving in this case or affect you during the trial?  If

15  so, raise your hand.

16       Okay, I see no hands in response to that question.

17       Next question:  Do any of you have any difficulty with

18  your sight or hearing that could affect your perception of the

19  proceedings?  If so, raise your hand.

20       Okay, I see no hands in response to that question.

21       Do any of you have any difficulty understanding or

22  reading the English language?  If so, raise your hand now.

23       Again, I see no hands in response to that question.

24       Okay.  As I mentioned, while I can never be certain

25  about the length of a trial, this trial's expected to run from

1    today through November 2nd with no court this Friday, October

2    22nd.  Do any of you have a preexisting scheduling conflict

3    that prohibits you from serving on this jury?  If so, raise

4    your hand.

5              THE COURT:  Okay, I see one hand.  Okay, ma'am, if I

6    could ask you to walk up to the microphone for me, which is

7    right over there, and if you could give us your first name and

8    juror number, please.

9              A PROSPECTIVE JUROR:  Marilyn, 680.  I indicated on my

10   return form that I have a scheduled vacation for November 4th.

11   If the trial should run longer than scheduled, I might have a

12   problem with that.

13             THE COURT:  And what -- do you have a sense of -- it's

14   Marilyn 680; is that right?

15             A PROSPECTIVE JUROR:  Correct.

16             THE COURT:  Okay.  Are you leaving in the morning or

17   the afternoon?

18             A PROSPECTIVE JUROR:  Morning.

19             THE COURT:  Okay.  And that's a prepaid arrangement;

20   right?

21             A PROSPECTIVE JUROR:  Correct.

22             THE COURT:  Thank you for letting me know.  Please

23   take a seat.

24             A PROSPECTIVE JUROR:  Thank you.

25             THE COURT:  I didn't see any other hands on that

1  question.

2       All right.  Next question:  Will service on this jury

3  cause you a serious financial hardship?  If so, raise your

4  hand.

5       Okay, I see no hands in response to that question.

6       Under the law, the facts are for the jury to

7  determine, and the law is for the Court.  The two areas are

8  separate and distinct.  At the end of the case, if you are

9  chosen for the jury, I will instruct you on the law, and you

10 will be required to accept the law as it is explained to you by

11 me.  It will be your job to determine the facts under my

12 explanation of the law.

13      Do any of you believe that you could not follow the

14 law as I explained it to you?  If so, raise your hand.

15      Okay, I see no hands on that question.

16      Do any of you believe that you could follow the law as

17 I explained it to you only if you personally agreed with the

18 law?  If so, raise your hand.

19      Okay, I see no hands in response to that question.

20      The law requires jurors to base their verdict solely

21 on the evidence presented in the courtroom.  If you are chosen

22 for the jury, I will instruct you that you may not consider, in

23 deciding on your verdict, anything you may see or hear outside

24 the courtroom; that you may not do any outside research on the

25 case; and that you may not communicate about the case with

1   others while the trial is going on until I instruct you to

2   deliberate with your fellow jurors.

3         Those will be my instructions to you if you are

4   chosen.  Would any of you be unable to follow those

5   instructions?  If so, raise your hand.

6         Okay, I see no hands in response to that question.

7         I'm now going to ask you to stand up one by one at the

8   microphone, identify your first name and juror number, and read

9   off the answers to the questionnaire that was handed out

10  previously.  I may have some follow-up questions for some of

11  you; for others, I may not.

12        So why don't we start on my left-hand side of the

13  courtroom, your right-hand side, with the gentleman in the

14  plaid shirt there.  If you could stand up right there and get

15  us started, sir, I'd appreciate it.

16        A PROSPECTIVE JUROR:  Arthur, 623.

17        THE COURT:  Okay.

18        A PROSPECTIVE JUROR:  I live in New Britain for the

19  past 57 years.  I'm maintenance supervisor with a food

20  distribution company.  Prior to that I worked 22 years with a

21  municipality and retired.  I do have a spouse and children.

22  Spouse is a -- works in HR with Apple Rehab.  And my youngest

23  child is a student.  My oldest child lives out of state.  And

24  my middle child is -- lives in Marlborough, Connecticut, is

25  working as well.  I have not served on a jury.  No family

1    members have been party to anything.

2            THE COURT:  All right.  Just a couple follow-up

3    questions, sir, unless you had something else to tell me.

4            A PROSPECTIVE JUROR:  No, I think that's --

5            THE COURT:  You said your two elder children were, I

6    think, working or at least one of them was.  What does any of

7    them who are working, what do they do for a living?

8            A PROSPECTIVE JUROR:  Um, my son is a -- he works in a

9    foundry down in Portland.  My daughter lives out in Cape Cod, a

10   housewife.

11           THE COURT:  Okay.  And you said you worked for the

12   municipality for 22 years.  What did you do for the

13   municipality?

14           A PROSPECTIVE JUROR:  I was a mechanic on a golf

15   course for 18 years, and then I finished as a heavy equipment

16   operator for four years.

17           THE COURT:  Okay.  Thank you very much.  Please have a

18   seat.

19           Ma'am.

20           A PROSPECTIVE JUROR:  Marilyn, Juror 680.

21           THE COURT:  Okay.

22           A PROSPECTIVE JUROR:  I live in Vernon, Connecticut.

23   I have been there for 28 years.  I'm currently employed at

24   EMCOR in the accounting department.  I've been there for four

25   years.  Prior to that I worked for 30 years in health care.  I

1    have a husband and a stepson.  They are both in manufacturing.

2    I have never been involved in a lawsuit as a party or a

3    witness, and I have not been on a jury before.

4            THE COURT:  And what's your position in the accounting

5    area?

6            A PROSPECTIVE JUROR:  I'm in accounts receivable.

7            THE COURT:  Okay.  And what did you do in the health

8    care field?

9            A PROSPECTIVE JUROR:  I was a medical billing manager.

10           THE COURT:  Okay.  Thank you.  Please have a seat.

11   Person at the end of the row.

12           A PROSPECTIVE JUROR:  I'm Linda, Jury 665 -- "Juror" I

13   should say.  I live in East Hartland, Connecticut for the last

14   45 years.  I have three grown children.  I've worked for the

15   past just before COVID hit taking care of my three

16   grandchildren in Westfield, Mass.  I worked at Ski Sundown, and

17   I worked at Bob's Stores for ten years each.  I have a husband,

18   Richard, who is a retired mechanical engineer.  I was called to

19   be in jury duty twice in Litchfield but never chosen.  I've

20   never done anything else with the case.

21           THE COURT:  You've never been involved in a lawsuit as

22   a party or a witness?

23           A PROSPECTIVE JUROR:  No.

24           THE COURT:  All right, ma'am.  Please have a seat.

25           Okay, I think that's it for that row.  Maybe we could

```
 1    start the next row maybe.  We'll start on my far left with you,
 2    ma'am.
 3              Good morning.
 4              A PROSPECTIVE JUROR:  Good morning.  My name is
 5    Jessica, Juror 558.
 6              THE COURT:  Okay.
 7              A PROSPECTIVE JUROR:  I live in New Milford,
 8    Connecticut.  I've lived there for 61 years.  My occupation is
 9    patient services coordinator for MyEyeDr., and I have been
10    there for three and a half years.  Prior to that, I was 20
11    years as a, um, working for a local credit union.  And my
12    spouse is deceased.  I have four children, two natural, two are
13    stepchildren.  Two -- my two sons are tool makers.  My
14    stepdaughter is a science museum administrator down in the
15    Pittsburgh area.  I have a disabled son.  My -- I don't know if
16    you want my spouse and my kids' spouses.  They're a chemist, an
17    engineer, and a retail store manager.  And I have five
18    grandchildren who are little.
19              THE COURT:  Not quite in the work force yet.
20              A PROSPECTIVE JUROR:  Not quite, no.  But they try
21    hard.  And I have never been involved in a lawsuit or, um, as a
22    party or a witness, and I have never served on a jury.
23              THE COURT:  What did you do at the credit union?
24              A PROSPECTIVE JUROR:  Um, I started out as a teller,
25    like a bank teller.  And I worked my way up to the manager, and
```

1    I was the manager for the last 12 years there.

2            THE COURT:  Were you involved in borrowing and

3    lending?

4            A PROSPECTIVE JUROR:  Um, only when my, um, loan

5    officer was sick.  I did every -- I did every duty there,

6    but ...

7            THE COURT:  Did the bank have a trading desk like

8    trading securities, anything like that?

9            A PROSPECTIVE JUROR:  No.  We were a small-town credit

10   union.

11           THE COURT:  Thank you.

12           A PROSPECTIVE JUROR:  It was strictly --

13           THE COURT:  Thanks very much.  Please have a seat.

14           Good morning.

15           A PROSPECTIVE JUROR:  Good morning.  My name is

16   Deborah, Juror 576.  I list in East Hartford.  I've been there

17   for -- well, returned there for five years now.  And I've

18   worked for 24 and a half years for Meriden Medical Management

19   as a medical biller.

20           And what else?  I am married.  I have two daughters.

21   My husband was forced into retirement.  So he's retired right

22   now.  And my one daughter just graduated from Western

23   Connecticut State University, so she's in the process of

24   looking for a job.  And my other daughter is at Central

25   Connecticut State University, and she works at Target.

1          THE COURT:  Okay.

2          A PROSPECTIVE JUROR:  And I haven't ever been selected

3    for a jury before.  And as far as --

4          THE COURT:  Lawsuits?

5          A PROSPECTIVE JUROR:  -- lawsuits, well, the

6    Volkswagen diesel thing, we got a settlement from that.

7          THE COURT:  Okay.  So let's talk about that a little

8    bit.  Were you -- is that something you had to go to court for?

9          A PROSPECTIVE JUROR:  No.  That was just something

10   they had to pay out to people who owned diesel Volkswagens, so

11   we just got like $5,000 for our car.

12         THE COURT:  Do you know -- was that a class action?

13         A PROSPECTIVE JUROR:  Yeah, I believe it was.  We

14   didn't do anything for it.  We just received the money for

15   owning the car.

16         THE COURT:  And so you never met with any lawyers or

17   anything like that?

18         A PROSPECTIVE JUROR:  No.

19         THE COURT:  Okay.  And you had owned a car.  They sent

20   you a form and said, Did you own a car?  Put in the details.

21   Send it back.  And then one day you got a check.

22         A PROSPECTIVE JUROR:  Yeah.

23         THE COURT:  Okay.  All right.  And then you said

24   something about your husband -- I'm sorry to ask about this.

25   You said he was forced into retirement.  Where did he work?

1          A PROSPECTIVE JUROR:  He worked for The Hartford

2  Financial Services.  He was a senior financial analyst for

3  them.

4          THE COURT:  Okay.  And do you -- when you say senior

5  financial analyst, do you have a sense of what he did?

6          A PROSPECTIVE JUROR:  He was a programmer before that,

7  and they had outsourced his job.

8          THE COURT:  I see.

9          A PROSPECTIVE JUROR:  Then they moved him into being a

10  financial analyst --

11          THE COURT:  I see.

12          A PROSPECTIVE JUROR:  -- position, and I have no clue

13  what he did.

14          THE COURT:  Okay.  And when you say forced into

15  retirement, I don't mean to dig into details, but was there any

16  litigation, any lawsuit that came out of that?

17          A PROSPECTIVE JUROR:  No.  It was just, you know,

18  people are being let go now, so he was able to apply for his

19  pension because he'd been there for a lot of years.  So he's

20  just retired now.

21          THE COURT:  Very good.  Well, thank you very much,

22  ma'am.

23          A PROSPECTIVE JUROR:  Thank you.

24          THE COURT:  All right.  So let's have the row behind

25  that.

1          Morning.

2          A PROSPECTIVE JUROR:  Morning.  My name is Virginia,

3    Juror No. 582.  I've lived in Simsbury for the past 17 years.

4    I'm a dental hygienist at Saint Francis Hospital.  I've been

5    there since -- for 17 years.  I only have a spouse, no

6    children, and he's retired.  He was owner/operator of his own

7    carpet cleaning -- carpet and upholstery cleaning business.

8    And I've never been involved in a lawsuit as a party or

9    witness, and I've never served on a jury.

10          THE COURT:  Your husband's business, did he have

11    employees?

12          A PROSPECTIVE JUROR:  No.  It was just him.

13          THE COURT:  It was just him, all right.  Thank you

14    very much.

15          Good morning, sir.

16          A PROSPECTIVE JUROR:  Good morning.  My name is James,

17    540.  I live in New Milford, Connecticut, for the past 26

18    years.  I'm employed by PepsiCo.  I'm a tractor-trailer driver.

19    I've been there for nine years.  Prior to that I was 30 plus

20    years in the moving business, household moving.  My wife is

21    Christy.  She's a supervisor at Western Connecticut State

22    College.  My son is a HVAC fabricator.  My daughter Jessica is

23    a medical assistant, and my daughter Ashley is a bartender.

24    I've never been involved in a lawsuit, never been on a jury.

25          THE COURT:  Your wife who's a supervisor at Western

1    New England?

2           A PROSPECTIVE JUROR:  Western Connecticut State

3    University.

4           THE COURT:  I'm sorry.  And what does she do as a

5    supervisor there?

6           A PROSPECTIVE JUROR:  She's in charge of all asset

7    control, shipping and receiving.

8           THE COURT:  So like procurement, getting stuff for the

9    school?

10          A PROSPECTIVE JUROR:  Tagging the assets, yeah,

11   receiving the items and tagging the assets.

12          THE COURT:  Got it.  Thank you very much, sir.  I

13   think we're up to the back row.  Yes, sir.

14          Good morning.

15          A PROSPECTIVE JUROR:  Good morning.  Tom, Juror No.

16   615.  I live in Somers, Connecticut.  I've lived there for 19

17   years.  I work in manufacturing, and my employer is Eppendorf.

18   I've worked there for three years, about seven months.  I do

19   not have a significant other or children.  I've never been

20   involved in a lawsuit or anything like that.  I'm not sure --

21   it asked about a family member.  I'm not sure about that.

22          THE COURT:  I'm sorry.  Say what you just said

23   again.

24          A PROSPECTIVE JUROR:  It asks if a family member has.

25   I don't know anyone to my knowledge that has been, and I've

1  never served on a jury before.

2          THE COURT:  Let me go back.  You say you're involved

3  in manufacturing.  What exactly do you do?

4          A PROSPECTIVE JUROR:  So my company, Eppendorf, we

5  make medical equipment, like, for laboratories.  Specifically

6  where I work in Enfield is pipette tips for pipettors.  Some of

7  our tips are used for COVID-19 vaccines, so we've been pretty

8  busy there.

9          THE COURT:  Doing important work then.

10          A PROSPECTIVE JUROR:  Yeah.

11          THE COURT:  Good for you.  Thank you very much, sir.

12          Sir in the back.  Good morning.

13          A PROSPECTIVE JUROR:  Morning.  My name is Matthew,

14  and my juror number is 509.  I live in Plantsville,

15  Connecticut, lived there for about 33 years, employed by a

16  chain of nursing homes.  I work at one of them as physical

17  plant director and also regional physical plant director for

18  six others.  I've worked there for nine years at the facility

19  and for 33 years at the company total.

20          My spouse is a lab technician at the University of

21  Connecticut.  I have a daughter that's an accountant for a

22  manufacturing company in, I believe, Windsor.  And I have

23  another daughter that does, I believe, accounts receivable for

24  Macmillan Publishing in Boston.

25          Let's see.  I was involved with giving a deposition

1    for work for a personal injury lawsuit.  And I was selected for

2    a jury once, but it was settled out of court before I -- before

3    serving.

4              THE COURT:  Couple follow-up questions for you, sir.

5              A PROSPECTIVE JUROR:  Um-hmm.

6              THE COURT:  The personal injury lawsuit, how long ago

7    was that?

8              A PROSPECTIVE JUROR:  That was over -- that was

9    probably within the last year that it was settled.

10             THE COURT:  Okay, and were you a party in that case?

11             A PROSPECTIVE JUROR:  I did give a deposition for a

12   week for the case.

13             THE COURT:  Right.  But nobody was suing you, and you

14   weren't suing anybody?

15             A PROSPECTIVE JUROR:  I wasn't being sued, um,

16   directly.  It was the place was being sued.

17             THE COURT:  The company you worked for.

18             A PROSPECTIVE JUROR:  Right.  And I had to give a

19   deposition.

20             THE COURT:  Okay.  And what -- why were you being

21   asked -- why were you giving a deposition?  What had you seen

22   and -- I don't need to know all of it.  I just want to get a

23   sense of what your role was.

24             A PROSPECTIVE JUROR:  Well, there was an injury that

25   involved a window that was blown in during a high wind storm

1   and that the visitor got hurt with and was suing the facility

2   for that.

3           THE COURT:  Understood.  So you're -- if I understand

4   you correctly, you're the guy who, for these various nursing

5   homes, if there's any problem with the physical plant, if it's

6   too cold or too hot or the pipes break, you're the guy who's in

7   charge.

8           A PROSPECTIVE JUROR:  Yeah, I'm on call for

9   emergencies like 24 hours a day.

10          THE COURT:  I got it.  I got it.  All right.  And give

11  me your juror number for me again.

12          A PROSPECTIVE JUROR:  509.

13          THE COURT:  And when you say you're on call for

14  emergencies, what happens if you can't respond to the call?  Is

15  there somebody -- do you have a deputy or somebody --

16          A PROSPECTIVE JUROR:  There is somebody else, but

17  there's -- we have -- I have six other nursing homes too that I

18  try to oversee with the people that work there.  If there's

19  emergencies, I would have to call the State Department of

20  Health or other government agencies to help clarify what's

21  going on to buildings and --

22          THE COURT:  How often does one of these emergencies

23  come up in your experience on average?

24          A PROSPECTIVE JUROR:  Usually making calls once a

25  month or something like that for stuff like that.

1          THE COURT:  Thank you very much, sir.  Please have a

2     seat.

3          I'm sorry.  I'm sorry.  I did have one more question

4     for you.  I apologize to the other gentleman.  I'm sorry.

5          Sorry, I should have asked you this:  So in the

6     deposition, you were deposed in the last year or two?

7          A PROSPECTIVE JUROR:  I gave a deposition -- excuse

8     me -- sometime in the past year.  I'm trying to remember the

9     exact dates, yeah.

10         THE COURT:  Was there anything about your

11    experience -- I realize giving a deposition is not a walk in

12    the park, I get that.  But is there anything about your

13    experience in the -- as a witness in the case that left you

14    with strong feelings about our justice system one way or the

15    other?

16         A PROSPECTIVE JUROR:  It did get a bad taste in my

17    mouth.

18         THE COURT:  It left a bad taste in your mouth?

19         A PROSPECTIVE JUROR:  It did.

20         THE COURT:  Why's that?

21         A PROSPECTIVE JUROR:  Just from the type of

22    questioning the lawyers were giving and stuff like that.

23         THE COURT:  Thank you, sir.  Please have a seat.

24         Sorry about that, sir.  Please, good morning and

25    please go ahead.

```
 1           A PROSPECTIVE JUROR:  My name is Steve, No. 563.  I
 2   live in Bristol, Connecticut for the last 52 years.  I'm a
 3   machinist for the last 40 years.  I don't have a spouse or
 4   children.  As far as a lawsuit, no.  And I've never served as a
 5   juror before.
 6           THE COURT:  Okay.  Could you just tell me the name of
 7   the town you live in again, sir?
 8           A PROSPECTIVE JUROR:  Bristol.  I have a stuttering
 9   problem.
10           THE COURT:  It's no problem.  It's no problem.  I'm
11   sorry about that.  I just didn't hear it the first time.  Thank
12   you very much.  Please have a seat.
13           Okay.  Is there anyone on my left side of the
14   courtroom, from my left hand or your right side who has not
15   gone up to the microphone yet?  If so, raise your hand.
16           All right, I don't see any hands.
17           So, sir, we'll start with you, if you could just step
18   up to the microphone and walk us through your questionnaire.
19   Good morning.
20           A PROSPECTIVE JUROR:  Good morning.  My name is John.
21   It's Juror No. 648.  I live in Glastonbury, have been there for
22   the last 35 years or so.  I'm a retired consulting engineer.
23   I've worked with the firm of Haley & Aldrich for about 40 years
24   before I retired.
25           THE COURT:  Is that an engineering firm?
```

```
1              A PROSPECTIVE JUROR:  Yes.  That's a consulting firm.
2              THE COURT:  Okay.
3              A PROSPECTIVE JUROR:  My wife is a retired nurse.  And
4    I have three children.  My son works in advertising.  My older
5    daughter is an attorney with the Federal Government, and my
6    youngest daughter is a schoolteacher.
7              Let's see, I've been involved as an expert witness in
8    lawsuits when I was working.  I have served on a jury before.
9    I don't remember when.  It was a number of years ago.  It was a
10   civil case, and the -- we found the -- we had a guilty verdict.
11   And that was it.
12             THE COURT:  Okay.  Let's talk a little about that case
13   to the extent you can remember it.  First, do you remember
14   whether that case was in federal court or state court?
15             A PROSPECTIVE JUROR:  I'm thinking federal, but I
16   can't say for sure.
17             THE COURT:  Sounds like it was some time ago.  Ten,
18   twenty years, something like that?
19             A PROSPECTIVE JUROR:  Maybe ten years ago.
20             THE COURT:  Okay.  And were you the foreperson on the
21   jury?
22             A PROSPECTIVE JUROR:  No.
23             THE COURT:  Okay.  And you said you found somebody was
24   guilty but it was a civil case.  Does this mean that the jury
25   awarded money damages to somebody?  Actually, I'll tell you
```

1   this.  Let me ask a better question.  Do you remember anything

2   about the case, what the case was about?

3          A PROSPECTIVE JUROR:  Yes, I do.  Do you want me to

4   talk about it?

5          THE COURT:  Yeah.

6          A PROSPECTIVE JUROR:  All right.  This was about a --

7   a -- let's see.  It was a foot doctor.  I forget.

8          THE COURT:  Podiatrist?

9          A PROSPECTIVE JUROR:  Podiatrist, that's it.  And he

10  was doing -- he was charging people for a procedure

11  inappropriately.  In other words, he was claiming it was

12  something that it -- more than it was.  It was basically

13  fraudulent.

14         THE COURT:  Okay.  And do you remember who was

15  bringing the case?  Was it the person -- the patient or was it

16  the Government?  Do you remember?

17         A PROSPECTIVE JUROR:  No, I don't.

18         THE COURT:  Okay.  But in any event, the jury found

19  against him; is that right?

20         A PROSPECTIVE JUROR:  Yes, um-hmm.

21         THE COURT:  And do you remember how much the jury

22  awarded, if anything?

23         A PROSPECTIVE JUROR:  No, I don't.

24         THE COURT:  Okay.  And did anything about that

25  experience leave you with strong feelings about our justice

1   system one way or the other?

2          A PROSPECTIVE JUROR:  Um, no, I'd say not.

3          THE COURT:  Okay.  Next question:  You've been an

4   expert witness when you were working; is that right?

5          A PROSPECTIVE JUROR:  Yes.

6          THE COURT:  And do you have an estimate of how many

7   cases?

8          A PROSPECTIVE JUROR:  Not a lot.  But I -- I -- it was

9   not something that I did often.  It was just very occasional.

10  I don't know.  If I had to guess, I would say between five and

11  ten maybe.

12         THE COURT:  Okay.  And were you -- did you have to

13  testify in court sometimes?

14         A PROSPECTIVE JUROR:  Yes.

15         THE COURT:  And did you ever testify in front of a

16  jury?

17         A PROSPECTIVE JUROR:  Yes.

18         THE COURT:  If you can -- you did.

19         A PROSPECTIVE JUROR:  Yes.

20         THE COURT:  And this involved your expertise as an

21  engineer?

22         A PROSPECTIVE JUROR:  Yes.

23         THE COURT:  What kind of engineering did you do?

24         A PROSPECTIVE JUROR:  It's geotechnical engineering.

25         THE COURT:  Can you tell us a little bit about what

1    that means?

2              A PROSPECTIVE JUROR:  That involves -- relates to

3    soil, rock, ground water, understanding how the ground behaves.

4    It relates to -- our firm consulted on designing, on foundation

5    design, roadway support, bridges, that sort of thing.

6              THE COURT:  I see.  I can see why you would be called

7    on to be an expert witness for lots of cases, okay.

8              You also said -- oh, and by the way, did your

9    experience in those cases leave you -- as a witness leave you

10   with strong feelings about the justice system one way or the

11   other?

12             A PROSPECTIVE JUROR:  No.

13             THE COURT:  And you also said your daughter was an

14   attorney with the Federal Government.  Do you know which agency

15   she works for?

16             A PROSPECTIVE JUROR:  Let's see, she's -- she's in an

17   office in San Francisco but reports to D.C.

18             THE COURT:  Okay.

19             A PROSPECTIVE JUROR:  They do a lot of work with the

20   forest service or for the forest service.

21             THE COURT:  So maybe EPA or the U.S. Fish and Wildlife

22   Service or something like that?  If you don't remember, it's

23   fine.

24             A PROSPECTIVE JUROR:  I should know, but it's been a

25   while since we've had to think about it.

1          THE COURT:  And I know you asked to see me earlier.  I

2   will bring you in later just to talk to me.  The lawyers have

3   to be present, but nobody else will be present.  All right,

4   sir?

5          A PROSPECTIVE JUROR:  Okay.

6          THE COURT:  Have a seat.  Thank you very much.

7          Ma'am, good morning.

8          A PROSPECTIVE JUROR:  Good morning.  Linda, 534.  I'm

9   from Bolton.  I've been there for 26 years.  Employment, it's

10  long.  Right now I'm just part time for Bolton Public Schools.

11  I work on the district calendar for three years.  Prior to

12  that, I retired from Bolton Public Schools, 15 years in the

13  library.  I retired from Eastern Connecticut State University

14  in the library for 10 years.  I worked there weekends.  I just

15  retired from Manchester Community College.  I was a coordinator

16  for youth programs for 15 years.  I did that summers, so I

17  worked one job.

18         THE COURT:  Understood.

19         A PROSPECTIVE JUROR:  And prior to that, I was the ABP

20  of systems and programming for Connecticut Online Computer

21  Center, which is a data processing bureau for banks.  That's

22  me.

23         I do have a spouse.  He is a systems programmer for

24  banking for also Connecticut Online Computer Center.  It's a

25  family deal.

1          THE COURT:  I'm sorry.  You said he was a systems

2     programmer?

3          A PROSPECTIVE JUROR:  A systems programmer.  It's a

4     banking data processing bureau.  It's called Connecticut Online

5     Computer Center.

6          THE COURT:  Is this a state agency?

7          A PROSPECTIVE JUROR:  No.  It's a private company.

8     They process for probably 400 banks in New England.  When I

9     worked for them, it was very small.  We had a hundred banks in

10    New England.

11         THE COURT:  So you worked for the same outfit.

12         A PROSPECTIVE JUROR:  That's where I met him.

13         THE COURT:  And they clear financial transactions?

14         A PROSPECTIVE JUROR:  Yes.  We work on the deposit

15    side.  He does all the ACH and clearing, if you're familiar

16    with that.

17         THE COURT:  Yes, got it.

18         A PROSPECTIVE JUROR:  My son also works for

19    Connecticut Online Computer Center.  He's a systems developer.

20    He's been there three years.  He does the apps for phones.

21         THE COURT:  What?

22         A PROSPECTIVE JUROR:  The apps for phones.

23         THE COURT:  Apps for phones, yes, got it.

24         A PROSPECTIVE JUROR:  My daughter's a pharmacist.

25    How's that?  And she's a resident of the Hospital of Central

1    Connecticut in New Britain.

2         THE COURT:  Got it.

3         A PROSPECTIVE JUROR:  I have not been involved in a

4    lawsuit.  I have never been in a criminal case.  And I have not

5    served on a jury.

6         THE COURT:  You said you've never been in a criminal

7    case?

8         A PROSPECTIVE JUROR:  Whatever, civil.  "Have you ever

9    served on a jury?"  No.

10        THE COURT:  And you've never been involved in any kind

11   of litigation at all?

12        A PROSPECTIVE JUROR:  No.

13        THE COURT:  I see you shaking your head no.  So let me

14   just come back for a minute to the work processing financial

15   transactions.

16        A PROSPECTIVE JUROR:  Yes.

17        THE COURT:  Were you somebody who wrote code,

18   developed software?

19        A PROSPECTIVE JUROR:  I was the ABP of systems

20   programming.  I was a little unique in that I do not code, but

21   I was in charge of all the coders.

22        THE COURT:  Okay.  And are you familiar -- are you --

23   do you know programming languages and things like that?

24        A PROSPECTIVE JUROR:  I do, but they were NCR coding

25   languages.  So they are not current PC languages.

```
 1              THE COURT:  Okay.  All right.
 2              A PROSPECTIVE JUROR:  They were mainframe.
 3              THE COURT:  Got it.  All right.  Well, thank you very
 4    much.
 5              Good morning.
 6              A PROSPECTIVE JUROR:  Good morning.
 7              THE COURT:  You can pull that microphone down if you
 8    want.  There you go.
 9              A PROSPECTIVE JUROR:  My name's Julie.  I'm Juror 604.
10    I live in New Britain.  I've lived in New Britain off and on
11    about 30 years.  I'm an executive secretary with the State of
12    Connecticut Department of Developmental Services, been with the
13    State about 28 years.  I have no spouse, but I have three
14    children.  One is a senior underwriter.  One is IT systems
15    development, and one is a research analyst who works for a
16    pharmaceutical.  No family member or myself in a lawsuit, and
17    I've never served on a jury.
18              THE COURT:  Let's go back to you mentioned the first
19    child did what again?
20              A PROSPECTIVE JUROR:  Senior underwriter.
21              THE COURT:  For one of the insurance companies?
22              A PROSPECTIVE JUROR:  Yes.
23              THE COURT:  And the second child?
24              A PROSPECTIVE JUROR:  He works for IT.  I'm really not
25    sure what he does, something about systems development, I
```

1    think.

2             THE COURT:  Do you know which company he works for?

3             A PROSPECTIVE JUROR:  No.

4             THE COURT:  All right.  Well, thank you very much.

5             A PROSPECTIVE JUROR:  Thank you.

6             THE COURT:  Sir.  Good morning.

7             A PROSPECTIVE JUROR:  Good morning.  My name is

8    Curtis, No. 616, reside in Ellington, Connecticut.  73 years.

9             THE COURT:  Okay.

10            A PROSPECTIVE JUROR:  That means I'm happily married

11   for 51.  That means I have a spouse.  I have five lovely

12   children.  Son is an accountant.  Son is in construction.  Son

13   is in a building design business.  Son is a machinist and a

14   daughter who is a housewife.  And my wife is also a housewife.

15            I am retired, but I still work part time for Swiss

16   Uniform Services.  That's in Rockville slash Vernon for 30

17   years.

18            I have no family members have ever been a party in a

19   lawsuit.  I've been called to jury duty but not on a jury.

20   That's at least ten years ago with the State.

21            And I don't know if this is relevant to the Court

22   right now, but one of the jurors mentioned an employee that I

23   worked very closely with.  And I also have a son-in-law that

24   works there.  So I don't know if there's more should be

25   disclosed on that issue or not.

1           THE COURT:  I just want to make sure I understand.

2    You mean one of the people in the group with you today

3    mentioned an employee, and -- I'm sorry.

4           A PROSPECTIVE JUROR:  Their employer --

5           THE COURT:  Oh.

6           A PROSPECTIVE JUROR:  -- I deal very closely with, and

7    I also have a son-in-law that works at that same employer.

8           THE COURT:  What's the name of the employer?

9           A PROSPECTIVE JUROR:  EMCOR.  That's in Vernon,

10   Connecticut.

11          THE COURT:  Pretty big company as I understand it.

12          A PROSPECTIVE JUROR:  It is.

13          THE COURT:  Thank you for bringing that up.  There was

14   one thing.  Oh, what is your -- you said Swiss Uniform Service.

15   What do you do for a living?

16          A PROSPECTIVE JUROR:  I basically sell clothing.

17          THE COURT:  Okay, I got it.  Thank you very much.

18          A PROSPECTIVE JUROR:  You're welcome.

19          THE COURT:  Anybody who's here for jury service today

20   not yet come up to the microphone to go through the

21   questionnaire?  If so, raise your hand.

22          Great.  I'll move on to my next set of questions.

23          All right.  So this is for all of you.  Again, raise

24   your hand if the answer's yes.  Have any of you heard of the

25   following products:  Hashlets -- that's H-a-s-h-l-e-t-s --

```
1    Hashpoints, HashStakers, or Paycoin.
2              If so, raise your hand.
3              Okay, I see no hands.
4              Have any of you heard of services called
5    hardware-hosted mining?  If so, raise your hand.
6              All right, I see two hands.  And then I'm going to ask
7    this next question; then I'm going to have you come up to the
8    microphone.
9              Also, have any of you heard of services called
10   cloud-hosted mining?  If so, raise your hand.
11             All right.  So for the two who answered yes on that,
12   could you come up to the microphone.  And how did you hear --
13   in what context did you hear hardware-hosted mining?
14             A PROSPECTIVE JUROR:  On NNBC (sic).
15             THE COURT:  On NBC?
16             A PROSPECTIVE JUROR:  NNBC, the stock, the stock
17   channel.
18             THE COURT:  Oh, so this is like a financial news
19   network?
20             A PROSPECTIVE JUROR:  Yeah, with coins and all that.
21   I don't know anything about them.
22             THE COURT:  That was my next question.  But I'm glad
23   you raised your hand.  So you've never dealt with hardware --
24             A PROSPECTIVE JUROR:  No, no.  You know, my husband's
25   been talking, you know.  He has friends that have that, but I
```

1   don't know anything really about it.  But I've heard the names,

2   terminology.

3           THE COURT:  Would you be able to tell me what it

4   means?

5           A PROSPECTIVE JUROR:  No.

6           THE COURT:  Neither could I.

7           A PROSPECTIVE JUROR:  I know they do something with

8   mining, but I thought that was like computer stuff, but I ...

9           THE COURT:  Beyond that, do you know anything about

10  it?

11          A PROSPECTIVE JUROR:  Nope.

12          THE COURT:  Have a seat.

13          There was somebody in the back who raised their hand.

14  Good morning, sir.  And your name, first name and juror number?

15          A PROSPECTIVE JUROR:  Matt, 509.  Basically the same

16  type of deal.  I heard it in different news report here or

17  there but really don't know anything about it.

18          THE COURT:  Have you ever invested in anything like

19  this?

20          A PROSPECTIVE JUROR:  No, I haven't.

21          THE COURT:  Thanks.  Have a seat.

22          Have any of you ever been employed by, been a customer

23  of, been a supplier of, or otherwise done business with any of

24  the following companies:  Optima Computers; Great Auk

25  Wireless -- Auk is A-u-k, Great Auk Wireless; GAW, G-A-W, GAW

```
1    High-Speed Internet; GAW Labs; Smart Tech; or VoiceProdigy?

2    Any of you ever heard of any of those companies?  If so, raise

3    your hand.

4              Okay, I see no hands on either of those questions.

5              Do any of you consider yourselves knowledgeable about

6    Bitcoin or other so-called cryptocurrencies?  If so, raise your

7    hand.

8              All right, sir.  Why don't you come on up.  All right.

9              So how is it that you're familiar with Bitcoin or

10   other so-called cryptocurrencies?

11             A PROSPECTIVE JUROR:  So I don't know too, too much

12   about them; but I know there's, like, Bitcoin and then there's

13   that Dogecoin and all that stuff.  I know it's supposed to be

14   like a different way to pay for things and you can buy on the

15   market.  I just wanted to kind of say, like, I've known about

16   it a little bit.  I don't really -- I bought a little bit of

17   Dogecoin back a few months ago.

18             THE COURT:  You and many others.

19             A PROSPECTIVE JUROR:  I'm sure.  I do know things like

20   that.  I haven't really dealt with Bitcoin yet.  I haven't

21   jumped into it.

22             THE COURT:  Can I ask you -- and you don't have to

23   give details.  It's just important for the parties to

24   understand.  With regard to your investment in Dogecoin, I

25   don't want to know the details, but have you lost your shirt on
```

1    that?  Have you made a fortune?  If it's something in between,

2    I don't need to know.  If it's just a little bit here, a little

3    bit there, I don't need to know the details.  But if it's

4    something, "God, I wish I hadn't done that; I lost my shirt,"

5    or "I can buy a Ferrari now," I need to know that.

6                A PROSPECTIVE JUROR:  I lost money on it.

7                THE COURT:  Was it like a life-changing loss?

8                A PROSPECTIVE JUROR:  No.  I didn't put a whole lot in

9    so ...

10                THE COURT:  Other than that investment in Dogecoin,

11    have you otherwise ever invested in any of these products?

12                A PROSPECTIVE JUROR:  Nope.

13                THE COURT:  And other than what you've told us so far,

14    is there anything you can tell us what you know about these

15    products?

16                A PROSPECTIVE JUROR:  Not really.  I'm not too

17    in-depth knowledge.  I don't have too much in-depth knowledge

18    about it.  I just know a little bit about it.

19                THE COURT:  You've never worked for a company that

20    sells these products?

21                A PROSPECTIVE JUROR:  Nope.

22                THE COURT:  Were there any other hands on that

23    question, knowledge about Bitcoin or cryptocurrencies?  I don't

24    see any.

25                Any of you familiar with cryptocurrency mining?  If

1    so, raise your hand.  All right, same.

2            Why don't we have you come back up.  I'll just explore

3    that knowledge as well.  Sorry.  I should have asked you before

4    you sat down.  I should have thought of that.  So what do you

5    understand cryptocurrency mining to be?

6            A PROSPECTIVE JUROR:  So the only thing I really know

7    about it is I know back a few years ago, back when Bitcoin was

8    getting really big, a lot of people would buy graphics cards

9    and use it for like that, they have farms or something they set

10   up or something like that.  I knew of it because I was trying

11   to get one for my computer, and I was like, why is this so

12   expensive?  That's how I first heard of Bitcoin and

13   cryptocurrency and all that.

14           THE COURT:  When you say you knew it, because you were

15   trying to do it with your computer?

16           A PROSPECTIVE JUROR:  Not whatsoever.  I was trying to

17   buy a graphics card for gaming.

18           THE COURT:  So a graphics card can be used for

19   multiple things.

20           A PROSPECTIVE JUROR:  It can.

21           THE COURT:  I see.  So do you know what cryptocurrency

22   mining is?

23           A PROSPECTIVE JUROR:  It's something like they can,

24   like, run, like, an algorithm or something like that, and they

25   can basically create this currency.  And then they can, you

1    know, I would say, sell it.  That's my -- I don't know a whole

2    lot, but I do -- you mentioned it so ...

3         THE COURT:  No, I appreciate.  But fair to say you

4    don't consider yourself an expert in this area?

5         A PROSPECTIVE JUROR:  Not whatsoever.

6         THE COURT:  Have you or someone close to you ever

7    worked for a business that sells cryptocurrency, cryptocurrency

8    mining services, or any other cryptocurrency-related products

9    or services?  If so, raise your hand.

10        Okay, I see no hands.

11        Have you or anyone close to you been the victim of a

12   fraud that involved the purchase of products or investments?

13   If so, raise your hand.

14        Okay, I see no hands.

15        And just so we're clear, if you raised your hand, we

16   could talk about it in a closed session with fewer people here.

17   I don't want to embarrass anybody.  But I do need to know if

18   you or anyone close to you has been the victim of a fraud that

19   involved the purchase of products or services.  If so, raise

20   your hand.

21        Okay, I see no hands.

22        Have you or anyone close to you -- this is the flip

23   side.  Have you or anyone close to you ever been accused of --

24   now, remember, the question is just "accused of."  Have you or

25   anyone close to you ever been accused of a fraud that involved

1    the purchase or sale of products or investments or securities?

2          Okay, I see no hands on that question.

3          Other than the woman who told us about the Volkswagen

4    case, do any of you have any previous experience with class

5    action lawsuits?  If so, raise your hand.

6          All right, sir, if you would step up to the

7    microphone.  And just your name and juror number for us

8    again.

9          A PROSPECTIVE JUROR:  Arthur, 623.

10         THE COURT:  Okay.  Go ahead.

11         A PROSPECTIVE JUROR:  Um, I received a settlement from

12   a class action remedy from Toyota trucks on a frame recall.

13         THE COURT:  Okay.  And so you received some amount of

14   money?

15         A PROSPECTIVE JUROR:  Well, there was two -- two

16   available remedies.  One was to repair a frame or replace a

17   frame on a particular vehicle.

18         THE COURT:  Okay.  And how long ago was that?

19         A PROSPECTIVE JUROR:  About five years ago.

20         THE COURT:  And was this something you got in the

21   mail?

22         A PROSPECTIVE JUROR:  Yes.

23         THE COURT:  And did you deal with any lawyers?

24         A PROSPECTIVE JUROR:  No, sir.

25         THE COURT:  You just sent something back in and said I

1    either want the repair, replaced, or the other remedy.

2              A PROSPECTIVE JUROR:  Yes, sir.

3              THE COURT:  And you had no other dealings with anybody

4    in that class action?

5              A PROSPECTIVE JUROR:  No.

6              THE COURT:  Got it.  Thank you.  Any other hands on

7    that question?

8              I don't see any.

9              Do any of you hold opinions or beliefs about class

10   action lawsuits that -- sorry.  Let me say that again.

11             Do any of you hold opinions or beliefs about class

12   action lawsuits that are either so negative or so positive that

13   you could not be a fair and impartial juror if you were chosen

14   to serve in this case?  If so, raise your hand.

15             Okay, I see no hands on that question.

16             So I'm well aware we haven't told you a great deal

17   about the case.  But given what you've heard so far, is there

18   anything at all that I haven't asked about, anything from your

19   background, anything that you -- any beliefs you hold that you

20   believe would make it difficult for you to be a fair and

21   impartial juror if you were chosen to be a juror in this case?

22   Please raise your hand.

23             Okay, I see no hands.

24             And just one more sort of catch-all question like

25   that.  Do any of you have any doubt in your mind, for any

```
 1    reason, that, if chosen, you would be able to serve

 2    conscientiously, fairly, and impartially in this case and

 3    render a true and just verdict without fear, favor, sympathy,

 4    or prejudice and according to the law as it will be explained

 5    to you?  If you doubt that you can do that, please raise your

 6    hand now.

 7            Okay, I see no hands.

 8            Let me see counsel for a moment at sidebar.  I don't

 9    need the whole teams.  Maybe two each.  If I could just see

10    counsel at sidebar.

11        (At sidebar off the record.)

12            THE COURT:  All right, folks.  Thanks for your

13    patience.  We're not done, but we're done with the questioning

14    for now.  What I'm going to do now is if I call your juror

15    number -- and there will only be two -- I will ask you to stay

16    seated for a moment.  If you don't hear your juror number,

17    please follow my law clerk, and she's going to take you to a

18    different room where you'll wait, unfortunately, because I have

19    to do this with another group of folks, or at least I may.  And

20    then -- but we're going to try to move as quickly as we can.

21    So if you hear your juror number, stay seated.

22            Juror No. 648, please stay seated.

23            And, Juror No. 509, please stay seated.

24            All of the others, please accompany my law clerk, and

25    we'll put you in another room.
```

1      (The jury panel left the courtroom at 10:35 a.m.)

2          THE COURT:  All right.  So juror number -- juror

3  number again, sir?

4          A PROSPECTIVE JUROR:  648.

5          THE COURT:  Would you mind just stepping into the

6  hallway just outside those doors for a moment?  I'm going to

7  have you come back in, so don't follow the law clerk.  Just

8  step into the hallway just for one moment.

9          And, sir, if you would come up to the microphone.

10         Sir, you're Juror No. 509; is that right?

11         A PROSPECTIVE JUROR:  That's correct.

12         THE COURT:  After conferring with the lawyers, we've

13  decided to excuse you.  So you are excused from jury service.

14  Did you leave any of your belongings in any other rooms?

15         A PROSPECTIVE JUROR:  No, I haven't.

16         THE COURT:  So, sir, here's what I'm going to ask you

17  to do:  Take your things.  Leave the courthouse.  Once you're

18  out of the courthouse, you're out of my control, you can look

19  up the case and do whatever your want.  But don't speak to

20  anybody about anything of the case.  Leave right now.  And if

21  you could send the other gentleman in for me.

22         Thank you for your patience, sir.  If you could step

23  up to the microphone.  Now, first of all, you'd said you wanted

24  to approach me the first thing.  Would you mind telling me what

25  that's about?

1              A PROSPECTIVE JUROR:  Yes.  I had -- I was told to do

2    that when I -- I reported this morning, and my -- my concern is

3    that my wife has anemia, and she's -- the doctors are trying to

4    figure out the cause of it.  And she's got upcoming tests and

5    appointments that she has to go to.  She's not feeling that

6    well.  And I -- this kind of progressed recently since I had --

7              THE COURT:  Filled out the form?

8              A PROSPECTIVE JUROR:  Filled out the form.  And so I'm

9    asking to be excused so I can help her.

10             THE COURT:  Okay.  Why don't you step into the hallway

11   for a minute.

12             Does counsel have any objection if we excuse this

13   gentleman?

14             MR. WEINER:  No objection, Your Honor.

15             MR. BUCHDAHL:  None from Plaintiff.

16             THE COURT:  Very well.  He'll be excused.

17             Madeline, could you go get him?

18             All right, sir, I've conferred with the lawyers.

19   We've decided to excuse you.  Thank you for your patience this

20   morning.  I realize that's not the ideal way to do things from

21   your standpoint.  For lots of reasons -- I won't bore you

22   with -- it is the ideal way -- excuse me -- it is the ideal way

23   to do things from the Court's standpoint.  I appreciate your

24   patience.

25             Do me a favor.  Don't speak to anybody about the case

 1   while you're in the building.  After you leave the building, of

 2   course, you can do whatever you wish.  I wish your wife well.

 3   And thank you very much for coming today.

 4          A PROSPECTIVE JUROR:  Thank you very much.

 5          THE COURT:  All right.

 6          So, folks, as I calculate, we now have 12 qualified

 7   jurors, which means we need only three more.  So we're doing

 8   very well.  And I think we're going to probably get our jury

 9   with the next group.  So why don't we take, oh, no more than

10   ten minutes now.  So everybody be seated where they are in ten

11   minutes, and then we'll bring the next one in.

12      (Recess from 10:39 a.m. to 10:52 a.m.)

13      (Jury panel entered the courtroom.)

14          THE COURT:  First I want to welcome the ladies and

15   gentlemen who are here for jury service.  I believe that you

16   saw me on Zoom earlier this morning give a formal welcome, so I

17   won't go through all of that with you.

18          Was there anyone who could not see or hear me on Zoom

19   this morning?  If so, raise your hand.

20          Okay, I see no hands.

21          So I assume that you saw me and you heard the lawyers

22   introduce themselves.  And you also should have received the

23   lists of attorneys and witnesses.  So that's actually where

24   we're going to start.

25          Oh, I'm sorry.  I actually first am going to start by

1  asking all of you to stand and raise your right hand so that

2  the Clerk of the Court can obtain an oath from you that you

3  will answer my questions truthful today.

4      (Jury panel sworn.)

5          THE COURT:  Thank you.  Please take your seats.

6          All right.  So again, you heard the lawyers read off

7  the names of the lawyers with whom they practice, the names of

8  their law firms.  Just a reminder, the firms involved in this

9  case are, for the Plaintiffs, Susman and Godfrey and Izard

10 Noble; for the Defendants, Hughes Hubbard and Brenner Saltzman.

11 Have any of you had any dealings with any of those law firms?

12 If so, raise your hand.

13         Okay, I see no hands.

14         Now, you heard the lawyers introduce themselves.  You

15 heard them identify the lawyers in their firms.  Those names

16 are all also listed for you on those sheets that you have.  Do

17 you recognize any of those names?  If so, raise your hand.

18         Okay, I see no hands.

19         The lawyers also read off the names of the witnesses

20 that they intend to call.  Some of those witnesses will testify

21 live, and as the lawyers explained, some will testify via

22 deposition.  Do you recognize any of the names of any of the

23 witnesses?  If so, raise your hand.

24         I see no hands.

25         Also, I'd asked about two other names:  Jessica Garza

1   and Thomas Fraser.  Does anybody recognize those names?  I see

2   no hands.

3           The companies, GAW Miners, ZenMiner, ZenCloud, Cantor

4   Fitzgerald, does anybody recognize any of those company names?

5   If so, raise your hand.

6           Okay, ma'am, if you would step up to the microphone.

7   If you could just give us first your first name and your juror

8   number.

9           A PROSPECTIVE JUROR:  Cecilia, 524.

10          THE COURT:  Just tell us, without saying any more,

11  tell us which company name you recognize.

12          A PROSPECTIVE JUROR:  Just Cantor Fitzgerald.

13          THE COURT:  All right.  Have a seat, ma'am.  I'll have

14  some questions for you later.

15          Okay.  Does anybody else recognize any of the company

16  names?

17          Okay, I see no hands.

18          All right.  Do any of you know me or any of my staff

19  that you see in the courtroom?

20          Did any of you know any of the parties' names?  That

21  was Mr. Shinners, Mr. Audet, Mr. Pfeiffer, Mr. Fraser?

22          All right, sir, I'm glad I asked.  If you could come

23  up to the microphone and tell us your name and juror number,

24  first name and juror number.

25          A PROSPECTIVE JUROR:  My name is Joe, Juror No. 599.

I recognize the name Marc Audet.  I don't know if it's the same
Marc I know.

        THE COURT:  And how do you know the Marc that you
know?

        A PROSPECTIVE JUROR:  He's an electrical contractor
that I know.

        THE COURT:  Do you know where he lives, the Marc you
know?

        A PROSPECTIVE JUROR:  I don't.  Bridgewater area,
possibly.

        THE COURT:  So in Connecticut?

        A PROSPECTIVE JUROR:  In Connecticut.

        THE COURT:  And how is it that you know this person?

        A PROSPECTIVE JUROR:  I'm a building official, so I
know him on a professional basis.  He's an electrician.  I
would have inspected some of his work.

        THE COURT:  Do you know if he spells his first name
with a "c" or a "k"?

        A PROSPECTIVE JUROR:  I think it's with a "c."

        THE COURT:  Okay.  If counsel could just let me know
if they think I should inquire further?

        MR. BUCHDAHL:  (Shaking head side to side.)

        THE COURT:  No?  No need to inquire further.  Have a
seat.

        I saw no other hands on the questions about parties.

```
 1    Okay?  I asked about the companies.  Okay.  I think -- I'm not
 2    sure -- sorry if I'm repeating myself.  Do any of you know me
 3    or any of my staff?
 4             No hands on that, okay.
 5             Now, let's get to some other questions.  As I say, or
 6    as you heard me say before -- and again, not trying to pry into
 7    anybody's lives or embarrass anybody.  The purpose is to ensure
 8    the parties that a fair and impartial jury will decide their
 9    claims and defenses.  If there's a question I ask that you
10    prefer not to answer in front of others, let me know, and
11    you'll be able to answer that question later just before me and
12    the lawyers.
13             So the trial -- sorry.  Before we get to that, the
14    first question I'll ask you along this line is:  Do any of you
15    have any physical problems or take any medication that would
16    prevent you from serving in this case or affect you during the
17    trial?
18             Before you answer, remember what I said earlier.  For
19    those with back issues, we can accommodate you.  We put you --
20    we let you stand and sit whenever you want.  You're not going
21    to be disturbing anybody.  For those with hearing issues, we
22    have technology that can assist.
23             You heard the breaks we take.  I'll just repeat it one
24    more time.  We go from 9:00 to 3:30, break from 10:45 to 11:10,
25    let you get outside, remove your mask, and then 45-minute break
```

1   for lunch from 12:45 to 1:30.  So you're not sitting for more

2   than two hours at a time.

3           So the question was:  Do any of you have any physical

4   problems or take any medication that would prevent you from

5   serving in this case or affect you during the trial?  If so,

6   raise your hand now.

7           Okay, I see no hands.

8           Do any of you have any difficulty with your sight or

9   hearing that could affect your perception of the proceedings?

10  If so, raise your hand.

11          Okay, I see no hands.

12          Do any of you have any difficulty understanding or

13  reading the English language?  If so, raise your hand.

14          Okay, I see no hands.

15          Do any of you know any of the other people in the jury

16  pool with you today?  If so, raise your hand.

17          Do any of you recognize anyone you saw in the building

18  today?

19          I see no hands on that one either.

20          Good.  All right.  All right.  As I said, as you heard

21  me say this morning, although I can't be certain about the

22  length of the trial, this trial's expected to run from today

23  through November 2nd, including deliberations.  Do any of you

24  have a preexisting scheduling conflict that prohibits you from

25  serving on this jury?  And if so, raise your hand.

```
1              Okay, raise your hands high, please.  So I see four

2    hands.

3              So, sir, we'll start with you, if you could step up to

4    the microphone.

5              A PROSPECTIVE JUROR:  Kevin, 695.  My father-in-law's

6    wake is tomorrow.  That's the only problem I have.

7              THE COURT:  What time of day is it?

8              A PROSPECTIVE JUROR:  3:00 to 7:00.

9              THE COURT:  Okay.  If you got there -- what town is it

10   in?

11             A PROSPECTIVE JUROR:  Newington.

12             THE COURT:  If you got there for 4:00, 4:15, would

13   that be okay or not okay?

14             A PROSPECTIVE JUROR:  I might hear from my wife.

15             THE COURT:  Okay.  I understand.  I'll come back to

16   you on that.  It was Kevin and number?

17             A PROSPECTIVE JUROR:  695.

18             THE COURT:  Okay.  I think there was another hand in

19   this row, if you could come up?  Yes, ma'am, your name and

20   juror number.

21             A PROSPECTIVE JUROR:  Karen, 676.

22             THE COURT:  Okay.

23             A PROSPECTIVE JUROR:  I have an echocardiogram on the

24   25th.

25             THE COURT:  The 25th of October?
```

1          A PROSPECTIVE JUROR:  Yes.

2          THE COURT:  What time of day?

3          A PROSPECTIVE JUROR:  In the morning.

4          THE COURT:  Do you know when in the morning?

5          A PROSPECTIVE JUROR:  10:45.

6          THE COURT:  Okay.  I might come back to you on that.

7     It's Karen and it's number?

8          A PROSPECTIVE JUROR:  676.

9          THE COURT:  676.  Thanks.  Have a seat.

10         Give me one second.  Okay, there were two hands on

11    this side.  Sir, if you could come up to the microphone.

12         A PROSPECTIVE JUROR:  Ron, Juror 669.  I have jury

13    duty October 27th at Waterbury Superior Court.

14         THE COURT:  Okay.  This -- we're federal court, so we

15    take precedence.  And that would be a valid excuse.  If you had

16    the slightest problem and you were chosen for the jury, I would

17    personally get involved.  So that won't interfere with this I

18    can tell you.

19         Now, let me be clear.  That doesn't mean you won't

20    ever have to serve on a state jury.  I want to be

21    straightforward with you.  Unfortunately, we don't have a

22    reciprocity system with the state court, so that means -- but

23    what it does mean is you would be put off, and I would

24    personally get involved if there was the slightest problem.

25         A PROSPECTIVE JUROR:  Fair.  Fair enough.

```
1              THE COURT:  Yes, sir, in the back.
2              A PROSPECTIVE JUROR:  696.  I got the same issue as he
3   has, except I have mine tomorrow on Lafayette Street.
4              THE COURT:  Okay.
5              A PROSPECTIVE JUROR:  And they sent me theirs a week
6   before you guys did.
7              THE COURT:  Yeah.
8              A PROSPECTIVE JUROR:  So I called them, but they say
9   you take precedence but --
10             THE COURT:  I'm afraid that's not how it works.
11             A PROSPECTIVE JUROR:  I don't know what --
12             THE COURT:  I will tell you, sir, what the law is.
13  The law is attendance in federal court always takes precedence.
14  Again, I will personally get involved if it's a problem.  Can
15  you just tell me your first name and your juror number again?
16             A PROSPECTIVE JUROR:  Joseph, 696.
17             THE COURT:  Did you say 696?
18             A PROSPECTIVE JUROR:  Yup.
19             THE COURT:  Sorry about that, Joseph.  Got it.  All
20  right, sir.  Please have a seat.
21             So I didn't see any other hands on the question of
22  timing -- the schedule.
23             All right, moving on, will service on this jury cause
24  you a serious financial hardship?  If so, raise your hand.
25             Okay.  If you could come up to the microphone again.
```

1    It was Karen?

2              A PROSPECTIVE JUROR:  Yes.

3              THE COURT:  And the number?

4              A PROSPECTIVE JUROR:  676.

5              THE COURT:  676.  Go ahead.

6              A PROSPECTIVE JUROR:  We're opening in a restaurant;

7    so the longer I'm here, the longer we delay opening.

8              THE COURT:  So tell me -- so this is your restaurant?

9              A PROSPECTIVE JUROR:  Yes.

10             THE COURT:  And you own it by yourself or with

11   somebody else?

12             A PROSPECTIVE JUROR:  My husband and my two kids.

13             THE COURT:  Okay.  And the restaurant's not operating

14   now or it is operating now?

15             A PROSPECTIVE JUROR:  Scheduled to open the beginning

16   of November.

17             THE COURT:  Okay.  So November 1st.

18             A PROSPECTIVE JUROR:  Around that time, yeah.  We're

19   trying to get it open for then.

20             THE COURT:  Okay.  Again, the trial's supposed to last

21   through November 2nd.

22             A PROSPECTIVE JUROR:  But that means I'm not there

23   prepping, doing the painting and the equipment and things like

24   that.

25             THE COURT:  This is the family business?

1          A PROSPECTIVE JUROR:  Yes.

2          THE COURT:  Okay.  Where's the restaurant?

3          A PROSPECTIVE JUROR:  Watertown, Connecticut.

4          THE COURT:  Okay.  So I may have some questions for

5     you later.  And it's Karen.  It's 676; right?

6          A PROSPECTIVE JUROR:  Yes.

7          THE COURT:  Thank you.  Please have a seat.

8          All right.  Were there other hands on the question of

9     serious financial hardship?  I don't see any.

10          All right.  Next question:  Under the law, the facts

11     are for the jury to determine, and the law is for the Court or

12     the judge.  The two areas are separate and distinct.  At the

13     end of the case, if you are chosen for the jury, I will

14     instruct you on the law, and you are required to accept the law

15     as it is explained to you.  It will be your job to determine

16     the facts under my explanation of the law.

17          Do any of you believe that you could not follow the

18     law as I explained it to you?  If so, raise your hand.

19          Okay, I see no hands in response to that question.

20          Do any of you believe that you could -- that you could

21     follow the law as I explained it to you only if you personally

22     agreed with the law?  If so, raise your hand.

23          Okay, I see no hands on that one.

24          The law requires jurors to base their verdict solely

25     on the evidence presented in the courtroom.  If you are chosen

1   for the jury, I would instruct you that you may not consider,

2   in deciding on your verdict, anything that you may see or hear

3   outside the courtroom; that you may not do any outside research

4   on the case; and that you may not communicate about the case

5   with others while the trial is going on until such time as you

6   are with your fellow jurors in the jury room and I've

7   instructed you to begin deliberations.  Those are the

8   instructions I will give you if you are chosen for the jury.

9           Would any of you be unable to follow those

10  instructions?  If so, raise your hand.

11          Okay, I see no hands.

12          So we're now going to go through the questionnaires.

13  You've probably saw this on Zoom this morning.  Why don't we

14  start with my right side of the room, your left side of the

15  room.

16          You received the questionnaires.  So if you can just

17  get up, give us your first name and juror number, and then walk

18  through the answers to the questionnaire.

19          All right, sir?

20          A PROSPECTIVE JUROR:  My name is Ron, Juror No. 669.

21  I live in Watertown, Connecticut.  I've lived there for 11

22  years.  I'm employed as an operations manager for Siemens

23  Industry.  I've been there for 39 years.  I am married.  We

24  have one son.  My wife is a liability claim rep for a large

25  insurance company.  My son is an audio engineer currently

1  living in Philadelphia.

2          I am not involved or have not been involved in a

3  lawsuit.  My wife, due to the nature of her work, is often

4  involved in mediations and trials.  And I have never served on

5  a jury before.

6          THE COURT:  Tell me again about your wife's job.

7          A PROSPECTIVE JUROR:  She's a liability claim rep for

8  a large insurance company.

9          THE COURT:  Which insurance company?

10         A PROSPECTIVE JUROR:  The Hartford.

11         THE COURT:  Okay.  And so she oversees some litigation

12  for The Hartford?

13         A PROSPECTIVE JUROR:  Yes.

14         THE COURT:  I see.  And do you discuss the litigation

15  with her at all?

16         A PROSPECTIVE JUROR:  Yes.

17         THE COURT:  And what type of litigation does she

18  oversee?

19         A PROSPECTIVE JUROR:  Um -- what she will discuss with

20  me -- I have an engineering background, so she will ask me

21  product issues for me to explain to her, what I think might

22  have happened, that sort of -- so she gets involved in product

23  liability.

24         THE COURT:  Okay.

25         A PROSPECTIVE JUROR:  Different types of liabilities.

```
 1              THE COURT:  Okay.  Any financial services litigation:
 2    securities? bonds? stocks?
 3              A PROSPECTIVE JUROR:  Not that I can recall or recall
 4    discussing but perhaps.
 5              THE COURT:  And what kind of engineering background do
 6    you have?
 7              A PROSPECTIVE JUROR:  Electrical.
 8              THE COURT:  Okay.  And tell me a little bit more about
 9    your current job.
10              A PROSPECTIVE JUROR:  Operations manager for Siemens
11    Industry.  We do environmental controls for large commercial
12    facilities, such as laboratories, hospitals, um, research
13    facilities, data centers.  I get involved in overseeing
14    everything from HR, staffing, product delivery, project
15    management, subcontracts, financials, billings, collections.
16              THE COURT:  Got it.  I appreciate that.  And you said
17    no litigation and you had not served on a jury.
18              A PROSPECTIVE JUROR:  Correct.
19              THE COURT:  Got it.  Thank you.  Have a seat.
20              All right.  Next.  Thank you, sir.
21              THE COURT:  Good morning.
22              A PROSPECTIVE JUROR:  Good morning.  Allan, 537.
23    Eastford, Connecticut, 36 years.  Chief boiler inspector.  I'm
24    retired 31 years.
25              THE COURT:  Chief oil inspector?
```

```
1              A PROSPECTIVE JUROR:  Boiler inspector.

2              THE COURT:  Boiler.

3              A PROSPECTIVE JUROR:  Yeah, boiler.  Wife, children:

4    wife, librarian; children, mental health counselor and chemical

5    plant operator.  I was also first selectman of the town I'm

6    from, so I was involved in a lawsuit there just as a witness.

7    And back again as a boiler inspector I had done an accident

8    investigation, so I was deposed for that.

9              THE COURT:  Okay.

10             A PROSPECTIVE JUROR:  But otherwise, no other lawsuits

11   or anything.

12             THE COURT:  Okay.  Did you say you were involved when

13   you were first selectman for the Town of Eastford?

14             A PROSPECTIVE JUROR:  Yes.

15             THE COURT:  And what was that lawsuit about?

16             A PROSPECTIVE JUROR:  It was a serial litigator suing

17   many people in town.  But this particular case had to do with

18   Inlands Wetlands Commission.

19             THE COURT:  By any chance would this be

20   Ms. Chapdelaine?

21             A PROSPECTIVE JUROR:  Yes, it is.

22             THE COURT:  And were you sued personally?

23             A PROSPECTIVE JUROR:  No.  I was off of that

24   particular suit.  Thank you.

25             THE COURT:  Maybe one of five in the entire town who
```

```
 1   wasn't sued.  Sorry, I shouldn't do that.
 2           A PROSPECTIVE JUROR:  It was basically the entire
 3   town.  It was three years.
 4           THE COURT:  Sorry about that.  So did you get deposed
 5   in that case?
 6           A PROSPECTIVE JUROR:  As a witness.
 7           THE COURT:  Oh, you were deposed as a witness, okay.
 8   And so that was a situation, I think, where she didn't have
 9   counsel; right?
10           A PROSPECTIVE JUROR:  No.  And that -- no, she did
11   not.
12           THE COURT:  All right.  So you were deposed by her.
13           A PROSPECTIVE JUROR:  Yes.
14           THE COURT:  I understand.  All right.  Let's see, you
15   said you had been a chief boiler inspector.
16           A PROSPECTIVE JUROR:  Yes.
17           THE COURT:  For one of the insurance companies?
18           A PROSPECTIVE JUROR:  State of Connecticut.
19           THE COURT:  I see.  So you were inspecting boilers in
20   state-owned billings?
21           A PROSPECTIVE JUROR:  Yes.  And the people that
22   reported me, yes.
23           THE COURT:  And did you say there was another
24   litigation too that I missed?  Oh, yes, you had to testify as a
25   boiler inspector.
```

1          A PROSPECTIVE JUROR:  Yes.

2          THE COURT:  Tell us about that.

3          A PROSPECTIVE JUROR:  There was a boiler explosion.

4    The State of Connecticut had rented property.  It was a

5    property owner on one side, the State of Connecticut on the

6    other.  More -- I was more the technical, deposed as a

7    technical witness.  I did the investigation as to cause.  I was

8    deposed as to cause for the accident.

9          THE COURT:  I see.  Did your experience with, in

10   either of those litigations, leave you with strong feelings

11   about the justice system one way or the other?

12         A PROSPECTIVE JUROR:  Not specifically the justice

13   system, no.

14         THE COURT:  What do you mean by that?

15         A PROSPECTIVE JUROR:  Well, certainly it was a very

16   distressing time with the Town of Eastford with the litigation

17   I mentioned there, but that was an outlier and extremely rare

18   case.  And I don't think that's relevant to most things.

19         THE COURT:  So apart from your experience in that pro

20   se litigation, how about your experience as a witness?  Did

21   that leave you with strong feelings one way or another about

22   the system?

23         A PROSPECTIVE JUROR:  Not at all.

24         THE COURT:  Have a seat, sir.  Thank you.

25         A PROSPECTIVE JUROR:  Thank you.

1          THE COURT:  Okay, sir.

2          Good morning.

3          A PROSPECTIVE JUROR:  Good morning.  Donald, Juror

4    606.  I live in South Glastonbury.  I've lived there for 28

5    years.  I own a union interior contracting company called

6    Partitions Incorporated.  I'm married.  I have no children.  My

7    wife is retired.  She was a real estate appraiser.  I have not

8    been on a jury.  And I have been involved in two lawsuits.

9          THE COURT:  Okay.  Tell us about those cases.

10         A PROSPECTIVE JUROR:  I owned a non-union company, and

11   I was brought up -- the company was brought up on unfair labor

12   practices by the National Labor Relations Board.  So we won

13   that case, but ...

14         THE COURT:  How long ago was that?

15         A PROSPECTIVE JUROR:  About 20 years ago.

16         THE COURT:  And that's not your current company?

17         A PROSPECTIVE JUROR:  No, it's not.

18         THE COURT:  And what did you say the business of that

19   company was?

20         A PROSPECTIVE JUROR:  It was interior -- interior

21   construction.

22         THE COURT:  No.  The earlier company.  What --

23         A PROSPECTIVE JUROR:  That was interior construction

24   as well.  It was a non-union company.

25         THE COURT:  Non-union, I got it.

1              A PROSPECTIVE JUROR:  The one I own today is a union

2    company.

3              THE COURT:  I got it now.  Thank you.  So you went

4    through the NLRB proceedings.  Did you end up in a court at

5    some point or no?

6              A PROSPECTIVE JUROR:  It was so long ago I really

7    can't remember.

8              THE COURT:  Okay.  And I think you said there was a

9    second lawsuit?

10             A PROSPECTIVE JUROR:  Yeah.  It was a, um -- it was a

11   breach of a lease contract.  When I bought the union company,

12   um, the company had a lease for a building that was much too

13   large.  I was trying to make the business stay afloat.  I went

14   to the landlord and told him I couldn't afford the rent but

15   we'd stay there until they found a tenant.  And we negotiated

16   what I thought was a new term, but as he signed the checks

17   monthly, he signed in partial payment.  And once several years

18   later we were successful in keeping the company alive, he

19   brought the lawsuit against us for --

20             THE COURT:  Breach of contract?

21             A PROSPECTIVE JUROR:  -- breach of contract, and he

22   won that.

23             THE COURT:  He won that.

24             A PROSPECTIVE JUROR:  Yes, he did.

25             THE COURT:  So you went to court on that one.

1          A PROSPECTIVE JUROR:  Yeah.

2          THE COURT:  And were you in state court?  Or federal

3     court?

4          A PROSPECTIVE JUROR:  Yes.

5          THE COURT:  Did you have to testify?

6          A PROSPECTIVE JUROR:  Um --

7          THE COURT:  Either in a deposition --

8          A PROSPECTIVE JUROR:  Again, it was a long time ago.

9          THE COURT:  Okay.  So you don't remember.

10         A PROSPECTIVE JUROR:  I don't remember.

11         THE COURT:  And did you -- did the case go to trial?

12         A PROSPECTIVE JUROR:  It did not.

13         THE COURT:  Okay.  It settled.

14         A PROSPECTIVE JUROR:  Um-hmm.

15         THE COURT:  And did either of those experiences with

16    the NLRB -- I know you're not sure if you ended up in court --

17    or the case that didn't go so well for you, did either of those

18    experiences leave you with strong feelings that you have today

19    about the justice system one way or the other?

20         A PROSPECTIVE JUROR:  I guess no.

21         THE COURT:  You sure?

22         A PROSPECTIVE JUROR:  Yup.

23         THE COURT:  Okay.  Anything you've heard today that

24    leads you to believe you couldn't be a fair juror?

25         A PROSPECTIVE JUROR:  No.

```
1            THE COURT:  All right.  Have a seat, sir.  Thank you.
2       Next.  Morning.
3            A PROSPECTIVE JUROR:  Morning.  Anthony, Juror 541.
4   I'm from New Milford, Connecticut.  I've lived there for 36
5   years.  I'm a production planner/material coordinator in a
6   manufacturing company in Brewster, New York called Hipotronics,
7   Inc.  I've lived there for the last 14 years, give or take.  I
8   do not have a spouse or significant other, no children.
9            I have not and no family member has been involved in a
10  lawsuit, but I did receive e-mails and letters for the Google
11  Plus and Yahoo class action lawsuit.  I think I received about
12  $2 from Google Plus and received nothing from Yahoo so -- and
13  I've never been on a jury before.
14           THE COURT:  Tell us a little bit more about your job.
15           A PROSPECTIVE JUROR:  High voltage test equipment.  I
16  release in-house manufacturing work orders to our production
17  floor, and I work with some of our sister companies.  We're
18  owned by Hubbell, which is out of Shelton.
19           THE COURT:  And do you have an engineering background?
20           A PROSPECTIVE JUROR:  I do not.  I work with
21  engineers, but I do not.
22           THE COURT:  All right.  Good.  Thank you very much,
23  sir.
24           In the back.
25           Good morning.
```

1              A PROSPECTIVE JUROR:  Morning.  Joseph, 696.

2              THE COURT:  Okay.

3              A PROSPECTIVE JUROR:  I reside in East Hartford.  I've

4    lived there for 21 years.  I'm retired now.  I used to work for

5    a company called BCI, Inc.  It's a construction company.  I was

6    a heavy equipment operator, and I've been there for 36 years.

7    And my spouse is gone.  I have no children.  Never called for

8    jury duty.  I mean, I attended to go to jury duty, but they

9    never actual jury.

10             THE COURT:  Have you ever served on a jury before?

11             A PROSPECTIVE JUROR:  No.

12             THE COURT:  Okay.

13             A PROSPECTIVE JUROR:  They asked me questions like

14   this, you know, privately, but there was issues so ...

15             THE COURT:  Okay.  You said there was issues?

16             A PROSPECTIVE JUROR:  Yeah.  I was dismissed because

17   there was an issue, you know, just with the lawyers and me and,

18   you know, involving the incident of the case, same thing, you

19   know, I was judged on because something tragic happened in my

20   life.

21             THE COURT:  Okay.

22             A PROSPECTIVE JUROR:  And it pertained to that,

23   similar to that case.

24             THE COURT:  I see.  From what you've heard about this

25   case, do you think whatever that was is something that would

```
1    prevent you from being fair and impartial if you were chosen in
2    this case?
3              A PROSPECTIVE JUROR:  No.
4              THE COURT:  Okay.  And all right.  Have a seat, sir.
5    Thank you.
6              Okay, let's start on this side.  Sorry.  Is there
7    anybody on my right side, your left side of the courtroom, that
8    hasn't been to the microphone left?
9              I see no hands.  Let's start with this side.
10             A PROSPECTIVE JUROR:  Kevin, Juror 695.  I live in
11   Newington for 38 years.  I am retired accountant from
12   Eversource Energy.  My wife works at a needle point shop in
13   Wethersfield.  My son works at the University of Connecticut.
14   My daughter works for a mortgage company.
15             I've never been involved in a lawsuit.  I have served
16   on a civil and a criminal case for the State of Connecticut,
17   and we did render a verdict.  The civil court -- civil case was
18   we found for the defendant, and for the criminal case we found
19   for the State.
20             THE COURT:  Okay.  Let's talk about those cases first.
21   The civil case, first, how long ago was this?  Approximately.
22             A PROSPECTIVE JUROR:  I would say it was 10 or 12
23   years anyway.
24             THE COURT:  Okay.  What kind of case was it?
25             A PROSPECTIVE JUROR:  Automobile accident.
```

1    THE COURT:  And you said in that case the jury found
2    for the defendant.
3    A PROSPECTIVE JUROR:  Correct.
4    THE COURT:  Were you the foreperson on that jury?
5    A PROSPECTIVE JUROR:  No.
6    THE COURT:  Okay.  And the other case was a criminal
7    case?
8    A PROSPECTIVE JUROR:  Yes.
9    THE COURT:  What kind of case?
10   A PROSPECTIVE JUROR:  Murder.
11   THE COURT:  And that case the jury convicted the
12   defendant?
13   A PROSPECTIVE JUROR:  That's correct.
14   THE COURT:  Anything about your experience on either
15   of those two juries that left you with strong feelings about
16   our justice system one way or the other?
17   A PROSPECTIVE JUROR:  No.
18   THE COURT:  And then can I go back?  I heard what your
19   family members did, but I was either looking at my notes or
20   something.  I didn't catch what you had done for a living.
21   A PROSPECTIVE JUROR:  I was an accountant for
22   Eversource.
23   THE COURT:  And you're retired from that job?
24   A PROSPECTIVE JUROR:  Correct.
25   THE COURT:  And how long did you hold that job?

1              A PROSPECTIVE JUROR:  42 years.

2              THE COURT:  And what did you do -- what was your title

3     specifically in the accounting department when you left?

4              A PROSPECTIVE JUROR:  It was a senior staff accountant

5     in accounts payable.

6              THE COURT:  Okay.  So dealing with suppliers, things

7     like that?

8              A PROSPECTIVE JUROR:  Yes.

9              THE COURT:  Okay, got it.  Thank you, sir.

10             Ma'am?

11             Karen, No. 676?

12             A PROSPECTIVE JUROR:  Yes.

13             THE COURT:  Go ahead.

14             A PROSPECTIVE JUROR:  I live in Watertown,

15     Connecticut.  I've been there for 36 years.  Right now, as of

16     three months ago, we purchased what was the old Rock Garden in

17     Watertown, and we're opening it as a new restaurant.  Um, I

18     used to work for Aetna for 22 years.  I was a computer analyst.

19     Let's see, my children, my husband, my husband is in the

20     business -- in the restaurant business with me now.  He was

21     previously a quality assurance person for Honeywell Fire

22     Systems.  My one son is a computer programmer.  My other son is

23     a bar manager, also working for us.  And, um, two

24     daughter-in-laws and two grandchildren, which I baby-sit for

25     when I'm not at the restaurant.

1          THE COURT:  Okay.

2          A PROSPECTIVE JUROR:  Let's see.  We've never been

3    involved in a lawsuit.  We did get a couple of class action,

4    you know, dollar, $2 type things over the years for

5    different -- I couldn't even tell you for what.

6          THE COURT:  Okay.

7          A PROSPECTIVE JUROR:  We've never been involved in any

8    other lawsuit.

9          I did serve on a jury for a injury claim, civil case

10   as an alternate juror.  So I heard after the fact that they

11   voted for the defendant.

12         THE COURT:  Okay, and that was an accident case you

13   said?

14         A PROSPECTIVE JUROR:  Yes.  It was a delivery person

15   falling in the snow.

16         THE COURT:  Okay.  And did you agree with the verdict?

17         A PROSPECTIVE JUROR:  Yes.

18         THE COURT:  Okay.  And what kind of restaurant?

19         A PROSPECTIVE JUROR:  American cuisine, you know,

20   burgers, main entrees, that type of thing.

21         THE COURT:  And as I understand, you're just about to

22   launch it.

23         A PROSPECTIVE JUROR:  Yes.

24         THE COURT:  Got it.  And lastly, you said you'd been a

25   computer analyst at the Aetna.  What did that involve?

1          A PROSPECTIVE JUROR:  Um, I basically at that point

2    was more of an analyst than programmer.  And I worked up

3    projects, multi-million dollar projects, that were scheduled to

4    go down and be handed off to the programmers and to do their

5    work.

6          THE COURT:  And so you, yourself, were not a

7    programmer?

8          A PROSPECTIVE JUROR:  I was for 20 years, and then the

9    next 22 years I was an analyst.

10          THE COURT:  Okay.  All right.  Thank you.  Have a

11    seat.

12          A PROSPECTIVE JUROR:  Thank you.

13          A PROSPECTIVE JUROR:  Good morning.

14          THE COURT:  Morning.

15          A PROSPECTIVE JUROR:  My name is Joe, Juror No. 599.

16          THE COURT:  I'm sorry.  Can you say your first name

17    again?

18          A PROSPECTIVE JUROR:  Joe.

19          THE COURT:  Joe, thank you.

20          A PROSPECTIVE JUROR:  I live in Warren, been there

21    about 28 years.  I've presently employed as a building official

22    in three towns in Litchfield County, towns of Bridgewater,

23    Warren, and Kent.  I've been a building official for 17 years.

24    My wife is a teacher, and I have two sons.  One is a GIS

25    analyst living in Seattle.  And the other is living in San

1   Diego, and he's in the Navy, active military.  I've been

2   involved in two civil lawsuits and never served on a jury.

3          THE COURT:  What was your role in the two civil

4   lawsuits?

5          A PROSPECTIVE JUROR:  The first one was about 40 years

6   ago.  I was being sued.  I was a defendant.  I was one of four.

7   And I was an employee in a construction company, and the

8   employer was suing us.  We had a -- what do you call it?

9   Profit sharing agreement.

10          THE COURT:  Okay.

11          A PROSPECTIVE JUROR:  And the employer felt that since

12   we didn't have any profit, we should be sharing in the losses

13   as well so ...

14          THE COURT:  And how did that case end up?

15          A PROSPECTIVE JUROR:  It got settled out of court.

16          THE COURT:  Did you have to go to court for that?

17          A PROSPECTIVE JUROR:  We did, but it was settled right

18   before we actually went to trial.

19          THE COURT:  Okay.  Were you deposed for that case?

20          A PROSPECTIVE JUROR:  Uh, yes.

21          THE COURT:  And this is, you said, 40 years ago?

22          A PROSPECTIVE JUROR:  This was 40 years ago, yeah.

23          THE COURT:  All right.  Did you say you were involved

24   in a second lawsuit too?

25          A PROSPECTIVE JUROR:  Yes.

```
1              THE COURT:  Tell us about that.
2              A PROSPECTIVE JUROR:  As a building official I
3    represented the Town of Bridgewater in a case.  It was a
4    failure of a corrugated stainless steel tubing propane line.
5    It was struck by lightning, and it caused a fire in a house.
6    And the contractor was being sued and as well as the piping
7    company.  I think it was WARDFlex.  And I was deposed to
8    present whatever information I had.
9              THE COURT:  So you were not being sued.
10             A PROSPECTIVE JUROR:  No.
11             THE COURT:  And neither was the town.
12             A PROSPECTIVE JUROR:  Right.
13             THE COURT:  So you were there as a witness.
14             A PROSPECTIVE JUROR:  Correct.
15             THE COURT:  And did you have to testify in court?
16             A PROSPECTIVE JUROR:  No, I didn't have to go to
17   trial.  I was just deposed.
18             THE COURT:  Did either -- did your experience in
19   either of those two litigations leave you with strong feelings
20   about the justice system one way or the other?
21             A PROSPECTIVE JUROR:  No.
22             THE COURT:  Okay.  Did you tell us whether you'd been
23   on a jury?
24             A PROSPECTIVE JUROR:  I've not been on a jury.
25             THE COURT:  Got it.  Thanks.  Have a seat.
```

1          Good morning.

2          A PROSPECTIVE JUROR:  Morning.  Gerard, 554.

3          THE COURT:  Okay.

4          A PROSPECTIVE JUROR:  I live in Canterbury,

5   Connecticut, been there for 30 years.  I work for remote access

6   company, BLUROC.  I've been there for about nine years now.

7          THE COURT:  What's a remote -- what's the remote

8   access company?  What business is that?

9          A PROSPECTIVE JUROR:  Work with pipeline companies and

10  transmission line companies to gain access into remote areas, I

11  guess.

12         THE COURT:  Got it.

13         A PROSPECTIVE JUROR:  I do have a spouse and a

14  five-year-old daughter.  And my spouse is a stay-at-home mom.

15  My daughter's not employed.  I have not been involved in a

16  lawsuit or a party to a witness, and I have never served on a

17  jury before.

18         THE COURT:  And you're Juror No. 554; is that right,

19  sir?

20         A PROSPECTIVE JUROR:  Yes, sir.

21         THE COURT:  Thanks.  Have a seat.

22         Good morning.

23         A PROSPECTIVE JUROR:  My name's Cheryl.  I am 666.  I

24  lived in Brooklyn, been there for about three and a half years.

25  I'm not currently working.  I'm married with two kids.  My

1    husband works for Putnam Plastics.  My son works for Lowe's

2    Distribution.  And my daughter's a full-time student at

3    Fitchburg State University.  I've never been part of a lawsuit

4    or on a jury.

5            THE COURT:  And you said you're not currently working.

6    Did you work previously?

7            A PROSPECTIVE JUROR:  Yeah.

8            THE COURT:  What did you do?

9            A PROSPECTIVE JUROR:  I did in-home care for the

10   elderly.

11           THE COURT:  Got it.  Thank you very much.

12           Good morning.

13           A PROSPECTIVE JUROR:  Morning.  I'm Cele.  I'm Juror

14   524.  I live in Rocky Hill.  I've been there for 45 years.  I'm

15   married, have four children.  I work part time as a nursing

16   instructor.  I teach nursing to LPNs, and I've done that for

17   about 10, 12 years.  Prior to that I worked in hospitals, Saint

18   Francis.  I worked for dialysis corporations for 30 years.

19          THE COURT:  You were a dialysis nurse?

20          A PROSPECTIVE JUROR:  Yes, and then a manager and a

21   regional director.

22          THE COURT:  Which dialysis companies?

23          A PROSPECTIVE JUROR:  Gambro Healthcare and then

24   Davita Healthcare.

25          THE COURT:  Got it.

```
1              A PROSPECTIVE JUROR:  My husband is retired.  He was a
2    controller for a copier company.
3              I have four children.  Um, the oldest one is a retired
4    State Police, now works for town police of Prospect.  My
5    daughter works for United HealthCare.  Another daughter is an
6    accountant, works for a small firm in Portland, Connecticut.
7    And the youngest one is a HR VP in Simmons Corporation.  I
8    think it is in Ellington.
9              THE COURT:  Okay.
10             A PROSPECTIVE JUROR:  Lawsuits, um, there have been a
11   few that I've been involved in, some as an expert witness in
12   health care, two personal injury ones.  One was my daughter was
13   injured, and, um, that was settled out of court.  The other one
14   was I was the president of a woman's club, and they were sued
15   by one of the members.  And that was settled with the insurance
16   companies out of court.  And the other one was, um, a hearing
17   on EEOC.
18             THE COURT:  Okay.  And have you served on a jury
19   before?
20             A PROSPECTIVE JUROR:  No.
21             THE COURT:  Okay.  So let's talk a little bit about
22   the lawsuits.  When was the most recent one?
23             A PROSPECTIVE JUROR:  About 15 years ago.
24             THE COURT:  And which one was that?
25             A PROSPECTIVE JUROR:  That would have been the EEOC.
```

```
 1              THE COURT:  Okay.  And that was when you were in the
 2    role of --
 3              A PROSPECTIVE JUROR:  I was the litigant.
 4              THE COURT:  You were the one bringing the claim.
 5    Against?
 6              A PROSPECTIVE JUROR:  Against Davita Healthcare.
 7              THE COURT:  Okay.  So this was against your
 8    employer.
 9              A PROSPECTIVE JUROR:  Yeah.
10              THE COURT:  And how did that end up?
11              A PROSPECTIVE JUROR:  Um, it never went to court.
12    They settled.
13              THE COURT:  It settled.
14              A PROSPECTIVE JUROR:  Yeah.
15              THE COURT:  All right.  Did you -- did the EEOC become
16    involved in the case?
17              A PROSPECTIVE JUROR:  Yes.  It had to get cleared
18    through EEOC for it to get to court, so it never did.
19              THE COURT:  So it never got to court.
20              A PROSPECTIVE JUROR:  Correct.
21              THE COURT:  It was settled before that.
22              A PROSPECTIVE JUROR:  Correct.
23              THE COURT:  Got it.  And were you deposed in that
24    case?  You were.
25              A PROSPECTIVE JUROR:  Yes.
```

1          THE COURT:  And were you examined by someone in an

2     EEOC or CHRO proceeding?

3          A PROSPECTIVE JUROR:  No.

4          THE COURT:  Okay.  And you received a monetary

5     settlement?

6          A PROSPECTIVE JUROR:  No.

7          THE COURT:  No, you didn't.  You received nothing.

8          A PROSPECTIVE JUROR:  Nothing.

9          THE COURT:  Got it.  You had a lawyer.

10         A PROSPECTIVE JUROR:  Yes.

11         THE COURT:  All right.  And -- all right.  Let's go to

12    the next lawsuit that you can remember.

13         A PROSPECTIVE JUROR:  Um, so I was deposed for as an

14    expert witness for a case, a patient against a dialysis

15    facility.

16         THE COURT:  Okay.

17         A PROSPECTIVE JUROR:  And I don't remember the

18    specifics of the case.  Just I was the expert witness.

19         THE COURT:  Which side called you as the expert?

20         A PROSPECTIVE JUROR:  Um --

21         THE COURT:  The patient or --

22         A PROSPECTIVE JUROR:  That was for the dialysis -- it

23    wasn't the corporation then.  It was one of the hospitals.

24         THE COURT:  Okay.  That was not your employer or it

25    was your --

1          A PROSPECTIVE JUROR:  No.

2          THE COURT:  So they had contacted you because you had

3     expertise.  They paid you as an expert in the case.

4          A PROSPECTIVE JUROR:  I wasn't paid, but yes.

5          THE COURT:  Okay.  So why did you testify if you

6     weren't paid?

7          A PROSPECTIVE JUROR:  It's a good question.

8          THE COURT:  Okay.

9          A PROSPECTIVE JUROR:  Naivety.

10         THE COURT:  Okay, fair enough.  But did you testify in

11    a deposition?

12         A PROSPECTIVE JUROR:  No.  It was a preliminary

13    investigative hearing.  There was no swearing in or any of

14    that.

15         THE COURT:  Okay.  And did you have to go to court for

16    that?

17         A PROSPECTIVE JUROR:  No.

18         THE COURT:  And do you know how that case ended?

19         A PROSPECTIVE JUROR:  No.

20         THE COURT:  What about the next one?

21         A PROSPECTIVE JUROR:  The next one was -- that was

22    where I was the president of an organization that was sued by a

23    member because they had a personal injury at one of the events.

24         THE COURT:  Okay.

25         A PROSPECTIVE JUROR:  And it really was settled

1    through the insurance companies.

2         THE COURT:  Did you have to give testimony?

3         A PROSPECTIVE JUROR:  Um, I don't know if you consider

4    testimony.

5         THE COURT:  Well, were you --

6         A PROSPECTIVE JUROR:  I had to meet with lawyers.

7         THE COURT:  Were you placed under oath in court or in

8    a deposition and asked questions?

9         A PROSPECTIVE JUROR:  I was asked questions, but it

10   was not in court.

11        THE COURT:  Were you under oath at the time?

12        A PROSPECTIVE JUROR:  I honestly can't remember.

13        THE COURT:  Okay, fine.  Did you deal with lawyers in

14   that case?

15        A PROSPECTIVE JUROR:  Yes.

16        THE COURT:  What about the next one?

17        A PROSPECTIVE JUROR:  The next one, that's got to be

18   like 30, 25, 30 years ago.

19        THE COURT:  Okay.

20        A PROSPECTIVE JUROR:  And that's where my daughter had

21   an injury.

22        THE COURT:  All right.

23        A PROSPECTIVE JUROR:  Went to court for.

24        THE COURT:  Did you or did she get deposed or have to

25   testify in court?

```
1              A PROSPECTIVE JUROR:  No.

2              THE COURT:  Okay.  Any others?

3              A PROSPECTIVE JUROR:  Nope.

4              THE COURT:  Okay.  Did any of those lawsuits or

5    pre-lawsuits before, you know, getting to court, did any of

6    those experiences leave you with strong feelings about our

7    justice system one way or the other?

8              A PROSPECTIVE JUROR:  No.

9              THE COURT:  Okay.  And I think you said you'd never

10   served on a jury.

11             A PROSPECTIVE JUROR:  Correct.

12             THE COURT:  Thank you.  Have a seat.

13             Good morning.

14             A PROSPECTIVE JUROR:  Good morning.  My name is Karen,

15   Juror No. 531.  I reside in East Granby.  I've been there 28

16   years.  I'm a registered home health and hospice nurse for

17   Abogal (phonetic) Agency.

18             THE COURT:  Sorry.  Home health?

19             A PROSPECTIVE JUROR:  Home health and hospice nurse,

20   registered nurse.

21             THE COURT:  Okay.  Keep going.

22             A PROSPECTIVE JUROR:  My spouse is a materials manager

23   at a local aerospace company, and I have one daughter who's a

24   speech language pathologist in Pittsburgh for kids with

25   cochlear implants.  I have not served on a jury, and I have not
```

1    been a party to any legal proceedings.

2          THE COURT:  Can I just get your juror number one more

3    time?

4          A PROSPECTIVE JUROR:  531.

5          THE COURT:  Thank you very much.

6          A PROSPECTIVE JUROR:  Thank you.

7          MR. WEINSTEIN:  Your Honor, if I may, I just couldn't

8    hear what her husband did.

9          THE COURT:  Did you say he was a materials manager?

10         A PROSPECTIVE JUROR:  Yes.

11         THE COURT:  For?

12         A PROSPECTIVE JUROR:  A local aerospace company.

13         THE COURT:  Got it.  Thank you.

14         Come on up.

15         A PROSPECTIVE JUROR:  Jennifer, Juror 634.  I

16   currently live in Broad Brook, Connecticut.  I've been there

17   for 45 years.  I'm a senior pre-sale manager at The Hartford.

18   I've been at The Hartford for about three years.  Prior to

19   that, I was at Aetna for in the same role about 20 years.  I

20   have a spouse and two children.  My spouse is an estimator at

21   Eversource, and my children, they're not employed.  I have

22   never been involved in a lawsuit or party or a witness.  I did

23   serve on a federal trial about four years ago.

24         THE COURT:  Lucky you.

25         A PROSPECTIVE JUROR:  Yup.  It was right here in this

1   building.  It was a criminal case, and the verdict was guilty.

2          THE COURT:  What kind of criminal case?

3          A PROSPECTIVE JUROR:  It was, um -- it was related to

4   falsification of documents to secure a passport.

5          THE COURT:  Okay.  Do you remember who the judge was?

6          A PROSPECTIVE JUROR:  He was -- he was an older

7   gentleman.  I would say he was very nice.

8          THE COURT:  That could describe several of us but --

9          A PROSPECTIVE JUROR:  I don't remember.

10          THE COURT:  Okay.  I don't remember a trial like that

11   either, so I'm assuming it wasn't me.

12          Let's go back for a minute.  What does a pre-sale

13   manager do?

14          A PROSPECTIVE JUROR:  My team, we respond to requests

15   for proposals or bids.  So when someone -- a company is

16   shopping for insurance, the life insurance disability FLMA,

17   critical illness accident, we prepare the proposals for the

18   customer.

19          THE COURT:  Got it.  Got it.

20          And what did you say your spouse did again?  An

21   estimator for Eversource?  What does an estimator for

22   Eversource do?

23          A PROSPECTIVE JUROR:  I believe just the different

24   jobs that Eversource has.  So whether it's improvements or, you

25   know, new -- getting new equipment, things like that,

1    estimating the jobs.

2         THE COURT:  I got it.  I got it.  And you said the

3    jury that you were on came back with a guilty verdict.

4         A PROSPECTIVE JUROR:  Correct.

5         THE COURT:  And were you the foreperson on that jury?

6         A PROSPECTIVE JUROR:  No.

7         THE COURT:  Have a seat, please.

8         A PROSPECTIVE JUROR:  Thanks.

9         THE COURT:  Welcome, ma'am.  Morning.

10        A PROSPECTIVE JUROR:  Morning.  How are you?

11        THE COURT:  Good.

12        A PROSPECTIVE JUROR:  Laurie, 654.  I live in

13   Glastonbury, Connecticut, and I've lived there for about 25

14   years.  I work for The Hartford Insurance Company, and I'm a

15   senior IT data analyst with claims data warehouse.

16        THE COURT:  Okay.

17        A PROSPECTIVE JUROR:  My husband's a machinist for

18   Precision Punch down in Berlin.  I've never been involved in a

19   lawsuit or anything like that.  I did serve on a jury.  I was

20   an alternate on a jury.  It was a civil case.  We found for the

21   defendant.

22        THE COURT:  I'm sorry.  You found for the defendant?

23        A PROSPECTIVE JUROR:  Yeah, yeah, yeah.

24        THE COURT:  How long ago was that case?

25        A PROSPECTIVE JUROR:  2005, 2006.

1          THE COURT:  Okay.  And was it in state court or

2    federal court?

3          A PROSPECTIVE JUROR:  State.

4          THE COURT:  What kind of case?

5          A PROSPECTIVE JUROR:  It was a rear-ender.

6          THE COURT:  Car accident case?

7          A PROSPECTIVE JUROR:  Yeah.

8          THE COURT:  And you said you found for the?

9          A PROSPECTIVE JUROR:  For the defendant.

10         THE COURT:  For the defendant.  Were you the

11   foreperson on that jury?

12         A PROSPECTIVE JUROR:  No.

13         THE COURT:  And tell me a little bit more about what

14   you do at The Hartford.

15         A PROSPECTIVE JUROR:  So right now what I do is I

16   basically work with data all day.  It's just really taking a

17   lot of data.  Think about a data warehouse.  It's really just

18   enterprise data warehouse for all the claims that come in for

19   The Hartford.  I work with the business to turn around and,

20   say, mine through the data, do data profiling, things like that

21   and we, you know, performance analytics, looking for trends,

22   SIU, looking for fraud, stuff like that.

23         THE COURT:  I see.  And are you -- do you have a

24   background in computer programming?

25         A PROSPECTIVE JUROR:  I can code a little.  I code --

1    it's very rudimentary.  I can code in SQL.  I can code in

2    Python.

3            THE COURT:  I'm sorry.  I can't hear you.

4            A PROSPECTIVE JUROR:  I can code in a couple

5    languages.  It's not anything I would go get a job at.

6            THE COURT:  All right.  Thank you very much.

7            A PROSPECTIVE JUROR:  You're welcome.

8            THE COURT:  Have a seat.

9            A PROSPECTIVE JUROR:  Thanks.

10           THE COURT:  Is there anyone who's here for jury

11   service who has not yet gone up to the microphone and provided

12   answers to the questionnaire?  If so, raise your hand.

13           Okay, I see no hands.

14           So moving on, basically one more set of questions for

15   you.  Have any of you heard of the following products and, if

16   so, raise your hand:  Hashlets, H-a-s-h-l-e-t-s; Hashpoints,

17   HashStakers, or Paycoin?  If you've heard of any of those

18   products, please raise your hand now.

19           Okay, I see no hands.

20           Have any of you heard of services called

21   hardware-hosted mining or cloud-hosted mining?  If so, raise

22   your hand.

23           Okay, I see no hands.

24           Have any of you heard of, done business with, been

25   employed be, any of the following companies:  Optima Computers;

1    Great Auk Wireless -- Auk is spelled A-u-k; GAW High-Speed

2    Internet -- GAW is capital G-A-W -- GAW High-Speed Internet;

3    GAW Labs; Smart Tech; or VoiceProdigy?  If any of you have ever

4    heard of or had any dealings with any of those companies,

5    please raise your hand now.

6            I see no hands.

7            Do any of you consider yourselves knowledgeable about

8    Bitcoin or other so-called cryptocurrencies?  If so, raise your

9    hand.  Okay.  So I've got three hands.

10           Sir, I'll start with you, if you could come up to the

11   microphone.  How is it, sir, that you have -- and just give us

12   your first name and juror number.

13           A PROSPECTIVE JUROR:  Anthony, 541.  I purchased $25

14   worth of Bitcoin about two years ago, returned about 5X on the

15   investment.  I still have it in the Cash App account.  I have

16   some, like, $30 worth of Coinbase, so various random ones that

17   I can't tell you what they were at this point.  And then

18   whatever I've kind of seen in news, TV shows, movies and kind

19   of overviewed.

20           THE COURT:  Okay.  Have you ever been employed by a

21   company that's in the business of cryptocurrency?

22           A PROSPECTIVE JUROR:  No.

23           THE COURT:  And in terms of -- you mentioned Coinbase.

24   What's that?

25           A PROSPECTIVE JUROR:  It's an app.

1           THE COURT:  Okay.  And how does one use this app?

2           A PROSPECTIVE JUROR:  You sign up.  It's just

3    basically a financial app where you can buy, sell, trade

4    different cryptocurrencies.

5           THE COURT:  Okay.  And so it sounds to me -- correct

6    me if I'm wrong.  It sounds to me like you've maybe dabbled in

7    cryptocurrency as a personal investment.  Is that fair?

8           A PROSPECTIVE JUROR:  Not a lot.

9           THE COURT:  Okay.  And do you follow cryptocurrency

10   news?

11          A PROSPECTIVE JUROR:  Occasionally.

12          THE COURT:  Okay.  Do you visit online forums focused

13   on cryptocurrency?

14          A PROSPECTIVE JUROR:  Yeah.

15          THE COURT:  Do you know what cryptocurrency mining is?

16          A PROSPECTIVE JUROR:  Kind of a thousand-foot view of

17   it, a general knowledge of it, not any of the inner workings of

18   how it works.

19          THE COURT:  What's your 1,000-foot understanding?

20          A PROSPECTIVE JUROR:  Basically the computer doing a

21   mathematical equation to create a coin and ...

22          THE COURT:  All right.  Thank you.  Please have a

23   seat.

24          I think there were two other hands on this side maybe

25   or three.  Any one of you at once.  Go ahead, ma'am.  You can

1    come first.

2            All right.  So the original question was:  Do you

3    consider yourself knowledgeable about Bitcoin or other

4    so-called cryptocurrencies?  Tell us what you know and how you

5    came to know it.

6            A PROSPECTIVE JUROR:  Well, we own some, not a lot.

7    My husband also did mining for the logger rhythms and such.  So

8    we had a room full of graphic cards --

9            THE COURT:  You had a room full of?

10           A PROSPECTIVE JUROR:  Graphic cards and computer

11   processes that would do the logger rhythm rules and build the

12   coins, build the logger rhythms that would be the key,

13   decryptinize them so people could, you know, sell it or

14   whatever.

15           THE COURT:  Is this something that he continues to be

16   involved with?

17           A PROSPECTIVE JUROR:  No.  He did it for about six

18   months.

19           THE COURT:  And talk to me, how long ago was that?

20           A PROSPECTIVE JUROR:  Oh, two years ago.

21           THE COURT:  Okay.  Very good.  Have a seat.  And I

22   think -- yes.  Come on up.

23           All right, ma'am, your first name and juror number for

24   us again?

25           A PROSPECTIVE JUROR:  Jennifer, 634.

1          THE COURT:  Okay.

2          A PROSPECTIVE JUROR:  I've done some high-level

3     research.  My son, who lives with me, is very interested in

4     Bitcoin; so I did some research before I allowed him to

5     purchase a small amount, which was about two months ago.

6          THE COURT:  Okay.  So you did this research fairly

7     recently.

8          A PROSPECTIVE JUROR:  Yes.

9          THE COURT:  When you say high-level research, what do

10    you mean?

11         A PROSPECTIVE JUROR:  Very basic, so just Googling

12    what it is, what the transactions would look like, results of,

13    you know, what a transaction could look like, that sort of

14    thing.

15         THE COURT:  What did you learn from this high-level

16    research?

17         A PROSPECTIVE JUROR:  Just that it's just very new.

18    There's, you know, different -- it's very, to me, complicated.

19    So that's why I kept it very high level.  He did end up getting

20    a very small amount.

21         THE COURT:  Okay.  You've never worked for a company

22    that's in this business?

23         A PROSPECTIVE JUROR:  No.

24         THE COURT:  And do you follow cryptocurrency news

25    other than the research you did?

1          A PROSPECTIVE JUROR:  The only thing that happens to

2     me now is because I Googled it, articles will show up sometimes

3     in my news feed, but that's it.

4          THE COURT:  Okay.  And you read those articles?

5          A PROSPECTIVE JUROR:  I read the headlines.  If it's

6     something I think is concerning again going back to my son, I

7     might read it but --

8          THE COURT:  Is your son a minor?

9          A PROSPECTIVE JUROR:  He is.

10         THE COURT:  I see.  Minor I meant m-i-n-o-r, not

11    m-i-n-e-r.

12         A PROSPECTIVE JUROR:  Yes, yeah.

13         THE COURT:  By the way, do you know what

14    cryptocurrency mining is?

15         A PROSPECTIVE JUROR:  No.

16         THE COURT:  And do you visit online forums focused on

17    cryptocurrency?

18         A PROSPECTIVE JUROR:  No.

19         THE COURT:  Have a seat.  Thank you very much.

20         Welcome back.

21         A PROSPECTIVE JUROR:  Thank you.

22         THE COURT:  And it's Juror No.?

23         A PROSPECTIVE JUROR:  654.

24         THE COURT:  654.  Go ahead.  Tell us what you know and

25    how you know it.

```
1              A PROSPECTIVE JUROR:  I know it at a high level from
2     reading IT journals because if you read a lot in digital
3     journals, you know how it's done.  I've heard about the mining.
4     It's not really my field.  I also know because my husband reads
5     up on it all the time and is constantly asking to invest in it,
6     and I'm like no.
7              THE COURT:  Ma'am, could I ask you to pull that
8     microphone down a little bit because I'm having a little
9     trouble understanding you.  What I heard you say so far, you
10    know it because you read it in IT journals and that your
11    husband might be interested in investing in it.
12             A PROSPECTIVE JUROR:  Um-hmm.
13             THE COURT:  Okay.  And have you or your husband
14    invested at all?
15             A PROSPECTIVE JUROR:  No.
16             THE COURT:  And do you know what cryptocurrency mining
17    is?
18             A PROSPECTIVE JUROR:  I've heard of it.
19             THE COURT:  Do you have any understanding?
20             A PROSPECTIVE JUROR:  It's algorithms.  There's a
21    couple things when I think of mining.  I don't know -- I've
22    heard of the algorithms people talk about, and you read about
23    people making algorithms.  I've also heard about these people
24    that can go in to these loss -- they call it Bitcoins, and they
25    make money off of just finding these things by using
```

```
1    algorithms.
2              THE COURT:  Okay.  All right.
3              Have you ever done any of those things?
4              A PROSPECTIVE JUROR:  No.
5              THE COURT:  Do you visit online forums that discuss
6    cryptocurrency?
7              A PROSPECTIVE JUROR:  No, no, no.
8              THE COURT:  No?  Okay.  And I think I asked you this
9    already.  But you've never worked for any companies that are in
10   this business?
11             A PROSPECTIVE JUROR:  Not that I know of.  I don't
12   think The Hartford does that.  I don't think The Hartford's in
13   that business.
14             THE COURT:  Fair enough.  It's a big company.  By the
15   way, you mentioned The Hartford.  I believe there was someone
16   else here who was employed by The Hartford.  Do you know that
17   person?
18             A PROSPECTIVE JUROR:  We don't know each other.  I
19   work in the commercial side; she works in the group benefits
20   side.
21             THE COURT:  So you don't know her before.
22             A PROSPECTIVE JUROR:  No.
23             THE COURT:  Let me ask you this:  If you were both
24   selected to sit on the jury, would you be able to, when
25   deliberating, treat this other person from The Hartford's views
```

1    just like those of a stranger?

2              A PROSPECTIVE JUROR:  Yeah.

3              THE COURT:  How about you, ma'am?  You're nodding your

4    head yes; correct?  Very good.  Please have a seat.  Thank you.

5              Were there any other hands on the question of

6    knowledge about Bitcoin or cryptocurrency?  I didn't see any,

7    okay.  Or I don't see any.

8              We asked about cryptocurrency mining.  If there's

9    somebody who doesn't have knowledge about cryptocurrency but

10   has knowledge about cryptocurrency mining, please raise your

11   hand now unless you've already spoken at the microphone.

12             All right.  I don't see any hands.

13             I think I -- to the extent I haven't asked this, I'll

14   just cover it.  Have you or someone close to you ever worked

15   for a business that sells cryptocurrency, cryptocurrency mining

16   services, or any cryptocurrency-related products or services?

17   If so, raise your hand.

18             Okay, I see no hands.

19             Okay, next question:  Have you or anyone close to you

20   been the victim of a fraud that involved the purchase of

21   products or investments?  If so, raise your hand.

22             Okay.  I see no hands on that question.

23             So this is the flip side of that question.  Have you

24   or anyone close to you been accused of a fraud that involved

25   the purchase of products or investments or securities?  If so,

1    raise your hand.

2            I see no hands.

3            Other than receiving items in the mail announcing a

4    class action and filling out a postcard and maybe getting a

5    check after you fill out the postcard, other than that -- and

6    by "that" I mean no involvement with lawyers, not being

7    somebody who's a named plaintiff or being somebody who's

8    sued -- other than that, what I'll describe as minimal

9    involvement with the class action, do any of you have any other

10   experience with class actions?  If so, raise your hand.  Okay,

11   I see no hands.

12           Do any of you hold opinions or beliefs about class

13   action lawsuits that are either so negative or so positive that

14   you could not serve as a fair and impartial juror in this case

15   if you were chosen?  If so, raise your hand.

16           Okay, I see no hands.

17           So, folks, I know that you don't know a great deal

18   about this case yet.  But based on what you do know, based on

19   the questions I've asked, based on the very brief description I

20   gave you at the beginning, based on anything you've seen or

21   heard in the courtroom, do any of you believe it would be

22   difficult for you to serve as a fair and impartial juror if you

23   were chosen?  If so, raise your hand.

24           All right.  I see no hands.

25           And then another sort of catch-all question.  Do any

1    of you have any doubt in your mind, for any reason, that you,

2    if chosen, would be able to serve as a juror conscientiously,

3    fairly, and impartially and render a true and just verdict

4    without fear, favor, sympathy, or prejudice and according to

5    the law as it will be explained to you?  Do any of you doubt

6    that you can do that if you are chosen?  If so, raise your

7    hand.

8            I see no hands.

9            All right.  Give me one moment.  I'll see just a

10   couple of the lawyers for each side at sidebar.

11       (At sidebar off the record.)

12       (Pause.)

13           THE COURT:  All right, folks, thanks for your

14   patience.  We're very much getting there.  If you hear your

15   juror number, stay seated.  The rest of you, if you don't hear

16   your juror number, please follow my law clerk who will take you

17   to a different room.  We are making real progress.  I hope

18   we'll have a jury very soon.

19           So the following numbers please stay here:  No. 524,

20   please stay seated; No. 695, please stay seated; No. 606,

21   please stay seated; and No. 676, please stay seated.

22           Okay.  If the rest of you, whose numbers I did not

23   call, could accompany my law clerk, and we'll be with you as

24   soon as we can.  I believe it will be quite soon.

25           Okay.  If all but No. 676 could just step into the

1   hallway.  Don't follow my law clerk.  Just stay right outside

2   the door.

3         Ma'am, if you could step up to the microphone.  So,

4   ma'am, I've consulted with the lawyers.  We're going to let you

5   open your restaurant.

6         A PROSPECTIVE JUROR:  Thank you.  My children will

7   appreciate it.  Thank you.

8         THE COURT:  We're going to excuse you from jury

9   service.  Do me a favor.  Did you leave anything in any of the

10  other rooms?

11        A PROSPECTIVE JUROR:  No.

12        THE COURT:  Leave the building.  Don't speak to anyone

13  about the case on your way out.  Once you leave the building,

14  you're on your own.  And if you could send the next person in

15  line in.

16        Welcome back, ma'am, if you could step up to the

17  microphone.  So you mentioned that you'd heard about Cantor

18  Fitzgerald.  In what context?

19        A PROSPECTIVE JUROR:  Really only in relation to 9/11

20  and that they were decimated, the whole company.

21        THE COURT:  And beyond that, do you know anybody who

22  worked there?

23        A PROSPECTIVE JUROR:  No.  Somebody who died in 9/11

24  had worked there, that's it.

25        THE COURT:  You didn't know that person?

1          A PROSPECTIVE JUROR:  No.  Just knew the name from

2     town.

3          THE COURT:  And that's -- you knew it through the news

4     or through personal contacts or --

5          A PROSPECTIVE JUROR:  It was a person who lived in the

6     next town over.  They attended the same church I did.  So I

7     knew the name and that's it.

8          THE COURT:  You didn't know that person socially?

9          A PROSPECTIVE JUROR:  No.

10          THE COURT:  Okay.  All right.  Let me ask you this:

11     This case will involve someone who was associated with Cantor

12     Fitzgerald.  Would the fact -- would the knowledge that you had

13     about Cantor Fitzgerald, the association with 9/11, would that

14     make it difficult for you to be fair and impartial if one of

15     the parties involved in this case had been associated with

16     Cantor Fitzgerald?

17          A PROSPECTIVE JUROR:  No.  It's just a name to me.

18          THE COURT:  All right.  The next question is:  Some of

19     these lawsuits I wanted to ask you a few more questions about.

20     I'm sorry about that.

21          So the EEOC case, did that end up in federal court at

22     all?

23          A PROSPECTIVE JUROR:  No.

24          THE COURT:  Okay.  And did any of your cases ever make

25     it to federal court at all?

1          A PROSPECTIVE JUROR:  None of them ever that I know of

2    really went to court.

3          THE COURT:  Okay.

4          A PROSPECTIVE JUROR:  They were mediations or

5    settlements outside.

6          THE COURT:  Okay.  So if we found information on the

7    court's docket that had your name on it, that's -- it's a

8    different Ms. Meehan?  Sorry about that.  No one else is here.

9    So it's a different person?

10         A PROSPECTIVE JUROR:  I would think so.

11         THE COURT:  No nobody -- you never authorized anybody

12   to file a complaint on your behalf in the federal court?

13         A PROSPECTIVE JUROR:  No.

14         THE COURT:  All right.  And then for any of these

15   cases you've been involved in -- let's actually talk about the

16   EEOC case.

17         A PROSPECTIVE JUROR:  Okay.

18         THE COURT:  Let me ask you this:  I think you said you

19   settled but you didn't receive anything.

20         A PROSPECTIVE JUROR:  Yeah.  There was -- they felt it

21   was not justified.

22         THE COURT:  Okay.  When you say "they," do you mean

23   EEOC?

24         A PROSPECTIVE JUROR:  Yes.

25         THE COURT:  But even when the EEOC doesn't find cause,

```
1   somebody can go to court actually afterwards.  That didn't
2   happen in that case?
3                   A PROSPECTIVE JUROR:  No.
4                   THE COURT:  You had a lawyer in that case?
5                   A PROSPECTIVE JUROR:  Yes.
6                   THE COURT:  Who was your lawyer?
7                   A PROSPECTIVE JUROR:  His name was Paul McDonough, and
8   he was out of New York.
9                   THE COURT:  Okay.  And so at some point you decided
10  not to take it any further?
11                  A PROSPECTIVE JUROR:  Correct.
12                  THE COURT:  Okay.  Can I ask why?
13                  A PROSPECTIVE JUROR:  I just felt that it had done
14  enough of what I thought it had to do, you know.
15                  THE COURT:  And I'm sorry to delve.  I just -- just
16  because it was a lawsuit that I kind of have to.
17                  A PROSPECTIVE JUROR:  I get it.
18                  THE COURT:  What were the allegations you were making?
19                  A PROSPECTIVE JUROR:  I was, um, let go from my
20  position, and I felt that some of it may have been related to
21  ageism.  And that's why we went through EEOC.  I was 58 or
22  59 -- I can't remember at the time.  And I had been working in
23  that industry for 30 something years.  Part of it was, I guess,
24  emotional --
25                  THE COURT:  Sure.
```

1      A PROSPECTIVE JUROR:  -- and part of it realizing that
2  I had to reinvent myself at 58 or 59 and that that was going to
3  be difficult to do.
4      THE COURT:  Sure.  Sure.  And did that experience
5  leave you with a bad taste in your mouth about the court?
6      A PROSPECTIVE JUROR:  Not really.  Not really.
7  Because I felt that I had the opportunity to say the things
8  that I had to say.
9      THE COURT:  Okay.
10      A PROSPECTIVE JUROR:  And then there's a time where
11  you just have to move on.
12      THE COURT:  Okay.  Very well.
13      Anything that you've -- anything in your background
14  with these lawsuits or anything else that leads you to believe
15  that it would be difficult for you to be fair and objective to
16  both sides in this case?
17      A PROSPECTIVE JUROR:  I don't think so.  And I think
18  part of the reason is I worked in a profession and really an
19  industry where you had to set aside personal feelings in order
20  to provide for your patients.
21      THE COURT:  Okay.
22      A PROSPECTIVE JUROR:  You didn't have to ask why they
23  ended up where they did, if they were responsible, what their
24  financial status was, what their economic or socio background
25  was.  You had to provide with care and compassion, and I'm

1    still doing that.

2          THE COURT:  Okay.  Thank you.  And if you were chosen

3    for this jury, do you believe that you could decide the case

4    based solely on the evidence that's presented in the courtroom?

5          A PROSPECTIVE JUROR:  Yes.

6          THE COURT:  And do you believe you could follow my

7    instructions on the law?

8          A PROSPECTIVE JUROR:  Yes.

9          THE COURT:  All right, ma'am, will you step outside

10   for one minute?  I'll have you back in in a second.

11         Mr. Weiner?

12         MR. WEINER:  Your Honor --

13         THE COURT:  Sorry, sir, not yet.  If you could step

14   out for a second.  We'll get to you.  It won't take long, I

15   promise.

16         MR. WEINER:  Your Honor, it may be a failure of

17   memory, but 210 Westlaw 5211487, *Cecilia Meehan vs. Davita*

18   *Inc.*, represented by Mr. Paul McDonough, Judge Egington granted

19   motion for summary judgment against her 2010.  So I don't know

20   whether she's not being honest or she just can't remember, but

21   I think it's enough concern it may be that Mr. Buchdahl joins

22   me that we would like her dismissed for cause.

23         THE COURT:  Mr. Buchdahl?

24         MR. BUCHDAHL:  Your Honor, our research is suggesting

25   that this is a different person.  It's the same person?  I take

1   it back.

2          THE COURT:  So you join in Mr. Weiner's?

3          MR. BUCHDAHL:  We don't oppose that.

4          THE COURT:  You don't oppose that.  All right.

5          Thank you for your patience, ma'am.  Thank you for

6   bearing with us.  After conferring with the lawyers, I've

7   decided to excuse you for jury selection today.  I very much

8   appreciate you coming over today and your time.  Thank you very

9   much.  Make sure you gather all your belongings.  Then please

10  leave the courthouse without discussing the case with anyone.

11  Okay?

12         A PROSPECTIVE JUROR:  Okay.

13         THE COURT:  Thank you very much.  And if you could

14  send the next person in.

15         A PROSPECTIVE JUROR:  Okay.

16         THE COURT:  Welcome, sir.  Sorry about that.  If you

17  could just give us your first name and Juror number again.

18         A PROSPECTIVE JUROR:  Kevin, 695.

19         THE COURT:  Okay.  And I called you in because of the

20  wake tomorrow.  I want to be -- obviously, I said earlier, you

21  know, people have to serve even when it's not convenient, but I

22  understand an in-law's wake is a big deal.  It sounds -- just

23  so I'm clear, it sounds to me like you think you need to be

24  there when it starts.  Is that accurate or not?

25         A PROSPECTIVE JUROR:  Yes, that's entirely accurate.

1          THE COURT:  All right, sir.  I'm going to excuse you

2  from jury service at this time.  So please gather your

3  belongings.  Leave the building.  Don't speak to anyone else on

4  your way out.  Thank you very much for coming today.

5          A PROSPECTIVE JUROR:  Thank you.

6          THE COURT:  Sorry?

7          A PROSPECTIVE JUROR:  Next one in?

8          THE COURT:  Yeah.  It was No. 65; right?

9          A PROSPECTIVE JUROR:  Yes.

10         THE COURT:  Thank you.

11         Welcome, sir.  Just a couple of follow-up questions

12  about the litigation.  So as I recall, there was an NLRB

13  proceeding, and that involved a question of an unfair labor

14  practice regarding whether the employees could unionize?

15         A PROSPECTIVE JUROR:  No.  It was a hiring, unfair

16  labor hiring practices.

17         THE COURT:  I got it.  I got it.

18         A PROSPECTIVE JUROR:  Basically the union sent a dozen

19  guys over to apply for a job that we had put an ad in the paper

20  for.  And so a dozen people applied for the job, and none of

21  them got the job.  So the union hall contacted National Labor

22  Relations Board, and then they filed suit against us.

23         THE COURT:  Claiming that you weren't hiring because

24  they were union members?

25         A PROSPECTIVE JUROR:  Correct.

1            THE COURT:  And you prevailed in that case.

2            A PROSPECTIVE JUROR:  Yes, we did.

3            THE COURT:  And was there a hearing at the NLRB?

4            A PROSPECTIVE JUROR:  I don't recall if there was a

5       hearing at the NLRB.

6            THE COURT:  Was there some kind of proceeding?

7            A PROSPECTIVE JUROR:  There wasn't in a courtroom.  So

8       it was apparently settled.

9            THE COURT:  There was not in a courtroom?

10           A PROSPECTIVE JUROR:  Apparently, right.

11           THE COURT:  But did you have to testify?

12           A PROSPECTIVE JUROR:  Honestly, I can't remember.

13           THE COURT:  Okay.  This was how many years ago?

14           A PROSPECTIVE JUROR:  Twenty-five years ago.

15           THE COURT:  Five years ago?

16           A PROSPECTIVE JUROR:  Twenty-five.

17           THE COURT:  Sorry.  That makes sense.  And then there

18      was a second proceeding, a second lawsuit, if I'm not mistaken.

19      Remind me about that one again.

20           A PROSPECTIVE JUROR:  That was the lease.  We broke a

21      lease.

22           THE COURT:  So your company got sued for breach of

23      contract by the landlord.

24           A PROSPECTIVE JUROR:  Correct.

25           THE COURT:  And that ended up going against you.

1           A PROSPECTIVE JUROR:  Correct.

2           THE COURT:  And there was a trial?

3           A PROSPECTIVE JUROR:  No.

4           THE COURT:  Okay.  That was settled before it went to

5    trial?

6           A PROSPECTIVE JUROR:  Again, that was a long time ago

7    as well.  It was probably closer to 30 years ago that that one

8    happened.

9           THE COURT:  All right.  So I guess --

10          A PROSPECTIVE JUROR:  I just know that I ended up

11   reimbursing the landlord for all those months that we

12   shortchanged him basically on the rent.

13          THE COURT:  Okay.  Did you have to go -- do you

14   remember going in front of a judge at any time?

15          A PROSPECTIVE JUROR:  No, I don't.

16          THE COURT:  And no jury or anything like that?

17          A PROSPECTIVE JUROR:  No.

18          THE COURT:  And those were the only two lawsuits?

19          A PROSPECTIVE JUROR:  Correct.

20          THE COURT:  Okay.  Is there anything that -- about

21   those lawsuits that leads you to believe, about your experience

22   in those lawsuits -- I'll call them lawsuits even though one

23   was at the NLRB -- that leads you to believe it would be

24   difficult for you to be fair and impartial if you were chosen

25   to serve as a juror in this case?

1           A PROSPECTIVE JUROR:  No.

2           THE COURT:  Okay.  If you were chosen to serve as a

3    juror in this case, could you decide the case based solely on

4    the evidence that is presented in the courtroom?

5           A PROSPECTIVE JUROR:  Absolutely.

6           THE COURT:  And could you follow my instructions on

7    the law?

8           A PROSPECTIVE JUROR:  Yes.

9           THE COURT:  All right.  If you would step out for one

10   second.

11          Is there any challenge to this gentleman?

12          MR. BUCHDAHL:  Not for cause, Your Honor.

13          MR. WEINER:  No, Your Honor.

14          THE COURT:  Okay.  Great.  And then, Qing Wai, if you

15   could bring in the last person and then tell the other

16   gentleman.

17          LAW CLERK:  To come back in?

18          THE COURT:  She should go with the other group.  He's

19   going to be qualified so ...

20          Actually, I need to see the other person.  Oh, is that

21   it?

22          LAW CLERK:  There was nobody else out there.

23          A PROSPECTIVE JUROR:  No.  Last one.

24          THE COURT:  If you could follow my law clerk then.

25   Sorry.  I thought we had one more.  Am I wrong or is that it?

1   That was it?  Got it.

2          MR. WEINER:  Your Honor, we had talked about asking

3   No. 49 about his tragic experience.  Then we all agreed --

4          THE COURT:  He's never going to make it.

5          Right.  I don't excuse people piecemeal so -- okay,

6   let's just make sure now -- I'm sure we have more than 15

7   qualified jurors.  So let's just go through -- who are the

8   qualified jurors in this case so we're all clear?  Let me just

9   huddle with my law clerk for -- actually, we're going to take

10  about a ten-minute recess now.  We'll come back; I'll tell you

11  who the qualified 15 jurors are and then we'll start the

12  peremptory process.  Okay?  We'll be in recess for about ten

13  minutes.

14       (Recess from 12:11 p.m. to 12:23 p.m.)

15          THE COURT:  All right.  Welcome back, folks.  Please

16  take your seats.  So I'm going to read off the names and

17  numbers of the 15 qualified jurors.  As you can see, there were

18  jurors on this list of 49 who never made it to the courtroom.

19  They are waiting in another courtroom somewhere, and they're

20  not all in order.  For example, you didn't see No. 2, Hector

21  Soto.  He didn't show up here.

22          So I'm now going to read off the numbers, the random

23  number in the left-hand column and the name of each of the 15.

24  The first is Virginia Belden, No. 1; next is Linda Armstrong,

25  No. 8; next is Julie Bouchard, No. 9; next, Curtis Zahner, 11;

1    next, Gerard Morin, III, No. 12; next is Joseph Manley, No. 17;

2    next is Anthony Valentine, No. 19; next is Donald Cyr, No. 21;

3    next, Deborah Calano, No. 22; next, Cheryl Leveille, No. 23;

4    next, James Yoder, 24; next, Laurie Adams, 26; next, Karen

5    Furnari, No. 27; next is Jessica Keizer, 28; and the 15th is

6    Allan Platt, No. 30.

7            So don't waste your challenges on anyone else.  And

8    let's get started going back and forth.  I'm going to go

9    dismiss the jurors who didn't show up in the courtroom today.

10   And I'm hoping when I come back you guys are done, in about 20

11   minutes.

12           Before I go, any questions about the names I read off?

13   You good on that?

14           MR. BUCHDAHL:  Your Honor, we're not placing this on

15   record?  We're just talking to each other about this?

16           THE COURT:  She's going to -- after you're done, I'll

17   have you guys sign the list.  It will be filed and all that

18   good stuff.

19       (Recess from 12:26 p.m. to 12:37 p.m.)

20           THE COURT:  All right, folks, so first I'll announce

21   who's been stricken.  So the Plaintiffs used their first strike

22   to eliminate Curtis Zahner, No. 11.  Mr. Zahner is excused.

23   Defendants used their first strike to strike James Yoder, No.

24   24.  Mr. Yoder is excused.  Plaintiffs used their next strike

25   on No. 21, Donald Cyr.  Mr. Cyr is excused.  Defendants used

1  their next one on Cheryl Leveille, No. 23.  She is excused.

2  Next, last strike for the Plaintiffs was used on Anthony

3  Valentine, No. 19.  Mr. Valentine is excused.  And then lastly,

4  Defendants used their last strike on Deborah Calano, No. 22.

5  She is excused.

6           I'll hand the sheet to the Clerk of the Court.

7           And we'll now go and identify the jurors.  Juror No. 1

8  will be No. 1 on the judge's list, Virginia Belden.  Juror No.

9  2 will be No. 8 on the judge's list, Linda Armstrong.  Juror

10  No. 3 is Julie Bouchard, No. 9 on the judge's list.  Okay, next

11  is Juror No. 4, and that's Gerard Morin III, No. 12 on the

12  judge's list.  That's Juror 4.  Juror 5, Joseph Manley, No. 17

13  on the judge's list.  Juror 6 is I have Laurie Adams, No. 26,

14  as Juror 6; Juror 7, Karen Furnari, No. 27 on the judge's list.

15  Juror 8 is Jessica Keizer, No. 28 on the judge's list.  And

16  last but not least, Juror 9, Allan Platt, No. 30.

17           Does that reflect what counsel have as well?

18           MR. BUCHDAHL:  Yes, Your Honor.

19           MR. WEINER:  It does, Your Honor.

20           THE COURT:  Let's bring in the jurors, all of them.

21  Mr. and Mrs. Fraser, if you could move over to the bench, that

22  would be great.

23       (The jury entered the courtroom at 12:41 p.m.)

24           THE COURT:  Welcome back, folks.  Please come in, take

25  your seats.  There's a few more of you.  You'll have to squeeze

1    in a little more, but try to distance as best you can.

2           Thanks for your patience this morning, folks.

3           Please come in, find your seats.  If it's a little

4    crowded, I'm sorry, but it won't take long.  As soon as we get

5    everyone found and seated, this is going to be very short,

6    while you're sitting closer together.  I think there's some

7    room in the back, in the way back.  And I know you have to be a

8    little close together.  I apologize, but this is not going to

9    take long while you're close together.  Are we all set, Ladies?

10   Okay, very well.

11          So, Ladies and Gentlemen, the lawyers have exercised

12   their challenges, and the membership in the jury has been

13   determined.  Before we announce the jurors, I want to reiterate

14   two points:  First, again, I'm grateful to all of you for

15   coming today, participating in jury selection, and bearing with

16   us and being patient.  Jury selection is critical to ensuring

17   the fairness of our jury system, which is one of the

18   cornerstones of our democracy.  So we appreciate your

19   participation and patience today.

20          Second, if you are not selected, please don't view it

21   as a knock against you or as a citizen or as a person.  We had

22   limited time to ask questions, and then we had to decide.  So,

23   again, thank you.

24          At this time I'm going to ask the courtroom deputy to

25   read off the first name and the juror numbers of those who will

1    be on the jury.  If you hear your name and juror number, please

2    come up and sit in one of the seats on either side of me with

3    the white tables and -- if you hear your name and juror number.

4            THE CLERK:  Juror No. 582, Virginia; Juror No. 534,

5    Linda.

6            THE COURT:  Anywhere you like.

7            THE CLERK:  Juror No. 634, Julie; Juror No. 554,

8    Gerard; Juror No. 599, Joseph; Juror No. 654, Laurie; Juror No.

9    531, Karen; Juror No. 558, Jessica; and Juror No. 537, Allan.

10           THE COURT:  All right.  Are counsel satisfied with the

11   membership of the jury?

12           MR. BUCHDAHL:  Yes, Your Honor.  Thank you.

13           MR. WEINER:  Yes, Your Honor.

14           THE COURT:  All right.  Thank you.

15           Folks whose numbers were not called, you are excused

16   at this time.  Thank you very much for participating.  Please

17   gather your belongings, leave the building, and thank you again

18   for participating in jury selection today.

19           All right, folks, at this time I will ask you to

20   stand, raise your right hands so the Clerk of the Court can

21   administer the oath of jurors to you.

22       (Jury sworn.)

23           THE COURT:  All right.  Thank you.  Please be seated,

24   Ladies and Gentlemen.  A couple things and then I'm going to

25   let you go to lunch.  Okay?

1          First of all, I understand, court staff understand,

2     the lawyers understand that when you first hear that you've

3     been selected for a jury, it can feel a little bit

4     overwhelming.  So I understand that.  As I said, it has been my

5     experience, doing this for almost nine years now, that jurors

6     generally report the experience was better than they expected,

7     for what it's worth.

8          The other thing is I'm going make one promise to you,

9     which is that I will do everything in my power to make sure the

10    trains run on time.  That means that you will leave this

11    building every day at 3:30 p.m.  The only way that would not

12    happen is if for some reason I thought the trial was going

13    longer than expected, I would then confer with you and the

14    lawyers, and we would possibly extend the trial day to fit

15    everything in.  I don't expect that's going to be necessary.  I

16    expect I will be able to let you go at 3:30 sharp every day.

17         Now, we also -- to do that, of course, we need to

18    start on time.  And that means that the judge, judge's staff,

19    the lawyers, and the parties all need to be here on time, and,

20    of course, you need to be here on time.  So we start every day

21    at 9:00.  Make sure you're in the room Ms. Johnson's going to

22    show you at quarter to nine so we can be sure to start on time.

23    And I promise you we will start on time.  We will take the

24    breaks that I described to you earlier, and we will start at

25    the end of the break.  I make that promise to you.

1    If there's some reason that doesn't happen, that means

2    there's something I absolutely had to deal with.  It doesn't

3    happen often.  I can usually keep that promise throughout the

4    trial, and I make it my business to do so.  So I'm going to do

5    my best to keep the trains running on time.  I know the lawyers

6    are going to do their best to make a smooth presentation for

7    you, and we very much appreciate your service.

8    Now, in a moment I'm going to send you to lunch.  For

9    the moment, before I do that, I'm going to ask you to follow

10   Ms. Johnson.  She's going to show you what will be your jury

11   room, which is where you'll report in the morning.  Then you're

12   going to go to lunch.  We're going to be in a different

13   courtroom for the trial.  It's the one I think some of you were

14   sitting in down at the end of the hallway.  That's called

15   Courtroom 1.  That's where we're going to be for the evidence

16   portion of the trial, in other words, for the rest of the time.

17   Okay?

18   So when you are done with lunch -- and, actually, let

19   me be clear.  We're going to start up.  It is now 12:50 p.m.

20   We're going start up the opening statements -- I'm going to

21   give you some preliminary instructions and the opening

22   statements at 1:45 p.m.  So I'm going to give you a little

23   extra time for lunch.  Usually it's just 45 minutes.  That, of

24   course, include your following Ms. Johnson, so it will probably

25   end up being a 45-minute lunch.  But you need to be back in

1   that room really by 1:35 to make sure we can get you into the

2   courtroom at 1:45.  We start and then we end the day at 3:30.

3          So at this time I'm going to ask you to follow

4   Ms. Johnson out of the courtroom.  Thank you very much.

5          Oh, one other thing, and you're going to hear me say

6   this a lot, and I'll say it in more detail later.  For the

7   moment, don't discuss the case with each other.  Don't discuss

8   the case with anyone else.  Don't do any research about the

9   case.  Don't Google the case or the people involved with it.

10  That's for the reasons I explained earlier, and I'll go into

11  that in more detail after lunch.  Thank you.

12     (The jury left the courtroom at 12:51 p.m.)

13         THE COURT:  If you don't mind getting the door, that

14  would be great.  Take your seats, folks.  I'll detain you for

15  one more minute.

16         So as I say, we'll pick up, we'll actually get going

17  at 1:45 next door.  I will start with the preliminary jury

18  instructions.  That will take about 10 minutes, then 20 minutes

19  each for openings.  Then your first witness ready to go?

20         MR. BUCHDAHL:  Yes, Your Honor.

21         THE COURT:  All right, great.  Ms. Johnson has the

22  special instructions about how to oath him.  And I think that

23  covers it.  Anything else?

24         MR. WEINER:  Your Honor, bearing in mind your caution

25  about your general opinion of slides during the opening, both

1   sides have prepared sets of slides.  I'd like to offer ours for
2   review.  I think there's an objection to a couple of slides on
3   the other side and same going the other way.  So I don't know
4   how to handle that.
5           THE COURT:  I really would prefer not to have slides
6   during the opening.  Folks, just to be clear, it's an opening
7   statement.  It's really just a roadmap of the evidence.  This
8   is what the evidence is going to show; these are who the
9   witnesses are going to be.
10          I don't want to be reviewing slides, because it's not
11  evidence.  It's meaningless.  Honestly, opening statements -- I
12  won't say meaningless.  I know you folks are experienced trial
13  lawyers; you know it's not meaningless.  But it doesn't mean a
14  heck of a lot.  Again, many of my colleagues frown on allowing
15  slides in opening statements.
16          MR. ARD:  That's fine with us.
17          MR. WEINER:  That's fine with us.  We just wanted to
18  make sure, as you said, sauce for the goose.
19          THE COURT:  Yes, absolutely, both sides.
20          MR. WEINER:  Then, Your Honor, on a different note, if
21  you would just at an appropriate point just tell the jury that
22  the reason we can't see -- if we bump into them outside --
23          THE COURT:  Yeah, that's going to be in my preliminary
24  instructions.  Thank you.  We'll be in recess.
25          MR. WEINSTEIN:  Your Honor, may I ask, does Your Honor

1    prefer that counsel stand or sit when the jury's coming and

2    going?

3          THE COURT:  I think that counsel should stand when the

4    jurors comes and goes.

5       (The above proceedings concluded at 12:54 p.m.)

1

2

3                    C E R T I F I C A T E

4

5

6

7            I, Julie L. Monette, RMR, CRR, CRC, Official

8    Court Reporter for the United States District Court for the

9    District of Connecticut, do hereby certify that the foregoing

10   pages are a true and accurate transcription of my shorthand

11   notes taken in the aforementioned matter to the best of my

12   skill and ability.

13

14

15                    /S/ JULIE L. MONETTE
                     _____
16                    Julie L. Monette, RMR, CRR, CRC
                         Official Court Reporter
17                          450 Main Street
                      Hartford, Connecticut 06103
18                          (860) 212-6937

19

20

21

22

23

24

25