## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| DENIS MARC AUDET *et al.*, | : | |
| | : | |
| Plaintiffs, | : | Civil Action No. |
| | : | 3:16-cv-00940-MPS |
| v. | : | |
| | : | |
| STUART A. FRASER, GAW MINERS, | : | Hon. Michael P. Shea |
| LLC, and ZENMINER, LLC, (d/b/a/ ZEN | : | |
| CLOUD), | : | January 14, 2022 |
| | : | |
| Defendants. | : | |

## DEFENDANT STUART A. FRASER'S MEMORANDUM
## OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR
## JUDGMENT AS A MATTER OF LAW OR A NEW TRIAL

Daniel H. Weiner (ct12180)
Marc A. Weinstein (*pro hac vice*)
Amina Hassan (*pro hac vice*)
Hannah Miller (*pro hac vice*)
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, NY 10004-1482
Tel.: (212) 837-6000
Fax: (212) 422-4726
Email: daniel.weiner@hugheshubbard.com

David R. Schaefer (ct04334)
Sean M. Fisher (ct23087)
Rowena Moffett (ct414899)
Brenner, Saltzman & Wallman LLP
271 Whitney Avenue
New Haven, CT  06511
Tel.: (203) 772-2600
Fax: (203) 562-2098
Email: rmoffett@bswlaw.com

*Attorneys for Defendant Stuart A. Fraser*

## TABLE OF CONTENTS

**Page(s)**

Preliminary Statement..................................................................................................1

Standards of Review ....................................................................................................6

    Motion for Judgment as a Matter of Law ...........................................................6

    Motion for a New Trial ........................................................................................6

    Investment Contract ............................................................................................7

Argument .....................................................................................................................8

I.      PLAINTIFFS WAIVED A RULE 50(b) MOTION FOR JUDGMENT AS A
        MATTER OF LAW ON THE ISSUE OF WHETHER THE PRODUCTS WERE
        "INVESTMENT CONTRACTS".......................................................................8

II.    PLAINTIFFS ARE NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW
        OR A NEW TRIAL ON THE ISSUE OF WHETHER HASHLETS
        CONSTITUTED "INVESTMENT CONTRACTS" .........................................12

    A.    The Jury Properly Could Have Determined that Plaintiffs Failed to Prove a
          "Common Enterprise" as to Hashlets. ..................................................12

          1.    Horizontal Commonality.........................................................12

          2.    Vertical Commonality .............................................................17

    B.    The Jury Properly Could Have Determined that Plaintiffs Failed to Satisfy the
          "Efforts of Others" Requirement as to Hashlets. ..................................21

III.   PLAINTIFFS ARE NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW
        OR A NEW TRIAL ON THE ISSUE OF WHETHER PAYCOIN WAS AN
        "INVESTMENT CONTRACT".......................................................................25

    A.    The Jury Properly Could Have Determined that Plaintiffs Failed to Prove the
          Control They Alleged GAW Miners Exercised Over Paycoin...........................26

    B.    The Jury Properly Could Have Determined that Plaintiffs Failed to Prove that
          GAW Miners Promoted Paycoin Primarily as an Investment. .............................30

    C.    The Jury Properly Could Have Determined that Plaintiffs Failed to
          Prove a "Common Enterprise" with Regard to Paycoin.......................................33

## <u>TABLE OF CONTENTS</u> - continued

Page(s)

IV.    PLAINTIFFS ARE NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW
       OR A NEW TRIAL ON THE ISSUE OF WHETHER HASHPOINTS AND
       HASHSTAKERS WERE "INVESTMENT CONTRACTS"...........................................38

       A.    The Jury Properly Could Have Determined that Plaintiffs Failed to Prove
             Hashpoints Were "Investment Contracts." ...........................................39

       B.    The Jury Properly Could Have Determined that Plaintiffs Failed to Prove
             Hashstakers Were "Investment Contracts." ...........................................39

Conclusion ..............................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ali v. Kipp*, 891 F.3d 59 (2d Cir. 2018) ........................................................................7

*Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340 (S.D.N.Y. 2019) ...............................24, 34, 37

*Bender v. Continental Towers Ltd. Partnership*, 632 F. Supp. 497 (1986).................................25

*Blissett v. Eisensmidt*, 940 F. Supp. 449 (N.D.N.Y. 1996).............................................................8

*Braintree Lab'ys, Inc. v. Nephro-Tech, Inc.*, 81 F. Supp. 2d 1122 (D. Kan. 2000),
     *aff'd*, 15 F. App'x 799 (Fed. Cir. 2001)....................................................................................10

*Brennan v. City of Middletown*, No. 18 CIV. 6148 (PED), 2020 WL 3820195
     (S.D.N.Y. July 8, 2020) ............................................................................................................11

*Coan v. Dunne*, No. 3:15-CV-00050 (JAM), 2021 WL 3012678 (D. Conn. July
     15, 2021) .....................................................................................................................................7

*Cruz v. Loc. Union No. 3 of the Int'l Bhd. of Elec. Workers*, 34 F.3d 1148 (2d Cir.
     1994) ...........................................................................................................................................8

*DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124 (2d Cir. 1998) .....................................6, 7

*Fairbrother v. Morrison*, 412 F.3d 39 (2d Cir. 2005).................................................................27

*Farrior v. Waterford Bd. of Educ.*, 277 F.3d 633 (2d Cir. 2002) ...................................................7

*Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276 (2d Cir. 1998) ...........................6

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
     756 F.2d 230 (2d Cir. 1985)......................................................................................................37

*Graduation Sols., LLC v. Acadima, LLC*, No. 3:17-CV-1342 (VLB), 2020 WL
     1466204 (D. Conn. Mar. 26, 2020)............................................................................................6

*Heine v. Colton, Hartnick, Yamin & Sheresky*, 786 F. Supp. 360 (S.D.N.Y. 1992).....................39

*Henry v. Bristol Hosp., Inc.*, No. 3:13-CV-00826 (SRU), 2020 WL 4432907 (D.
     Conn. July 31, 2020)...............................................................................................................2, 6

*Huilever, S.A. Div. Huileries Du Congo Belge v. The Otho*, 139 F.2d 748 (2d Cir.
     1944) .........................................................................................................................................37

**Page(s)**

*ING Glob. v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92 (2d Cir. 2014) .................... 11

*In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340 (S.D.N.Y. 2011) .................................. 20

*Kaplan v. Shapiro*, 655 F. Supp. 336 (S.D.N.Y. 1987) ............................................... 17, 20, 21, 36

*Kefalas v. Bonnie Brae Farms, Inc.*, 630 F. Supp. 6 (E.D. Ky 1985) ....................................... 14

*Kroshnyi v. U.S. Pack Courier Servs., Inc.*, 771 F.3d 93 (2d Cir. 2014) ................................. 6

*Long v. Shultz Cattle Co.*, 881 F.2d 129 (5th Cir. 1989) ......................................................... 24, 25

*Lore v. City of Syracuse*, 670 F.3d 127 (2d Cir. 2012) ............................................................. 8

*Marini v. Adamo*, 812 F. Supp. 2d 243 (E.D.N.Y. 2011) ........................................................ 35

*Merrill Lynch Interfunding, Inc. v. Argenti*, 155 F.3d 113 (2d Cir. 1998) ............................. 6

*Milnarik v. M–S Commodities, Inc.*, 457 F.2d 274 (7th Cir. 1972) ....................................... 13, 14

*Munn v. Hotchkiss Sch.*, 24 F. Supp. 3d 155 (D. Conn. 2014), *aff'd*, 724 F. App'x
    25 (2d Cir. 2018) ............................................................................................................... 8

*of Wallace v. Flintco Inc.*, 143 F.3d 955 (5th Cir. 1998) ....................................................... 9

*Patsy's Italian Rest., Inc. v. Banas*, 575 F. Supp. 2d 427 (E.D.N.Y. 2008) ......................... 10

*Pereyra v. Fancy 57 Cleaners, Inc.*, 2013 U.S. Dist. LEXIS 49799 (S.D.N.Y.
    Mar. 20, 2013) ................................................................................................................... 10

*Protostorm, LLC v. Antonelli, Terry, Stout & Krauss, LLP*, No. 08-CV-931 PKC
    JO, 2015 WL 3605143 (E.D.N.Y. June 5, 2015), *aff'd sub nom. Protostorm,
    LLC v. Antonelli*, 673 F. App'x 107 (2d Cir. 2016) ........................................................ 11

*Raedle v. Credit Agricole Indosuez*, 670 F.3d 411 (2d Cir. 2012) ......................................... 7

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000) ..................................... 6

*Revak v. SEC Realty Corp.*, 18 F.3d 81 (2d Cir. 1994) ....................................................... *passim*

*Richmond v. Dart Indus., Inc.*, 196 Cal. App. 3d 869 (Ct. App. 1987) ................................. 27

*Savino v. E. F. Hutton & Co.*, 507 F. Supp. 1225 (S.D.N.Y. 1981) ..................................... 14, 16

*Schofield v. First Commodity Corp. of Bos.*, 638 F. Supp. 4 (D. Mass. 1985), *aff'd*,
    793 F.2d 28 (1st Cir. 1986) ............................................................................................... 18

*SEC v. Aqua-Sonic Prod. Corp.*, 687 F.2d 577 (2d Cir. 1982) ............................................ 23, 24

**Page(s)**

*SEC v. Kik Interactive Inc.*, 492 F. Supp. 3d 169 (S.D.N.Y. 2020).........................................*passim*

*SEC v. Telegram Grp., Inc.*, 448 F. Supp. 3d 352 (S.D.N.Y. 2020).......................................*passim*

*SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946).........................................................................*passim*

*Sequa Corp. v. GBJ Corp.*, 156 F.3d 136 (2d Cir. 1998) ...................................................................7

*Silverstein v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 618 F. Supp. 436
    (S.D.N.Y. 1985)...................................................................................................................18

*United Hous. Found., Inc. v. Forman*, 421 U.S. 837 (1975) ............................................................30

*United States v. Landau*, 155 F.3d 93 (2d Cir. 1998) .......................................................................7

*United States v. Leonard*, 529 F.3d 83 (2d Cir. 2008)....................................................................24

*United States v. Sun Myung Moon*, 718 F.2d 1210 (2d Cir. 1983)..................................................40

*United States v. Zaslavskiy*, No. 17 CR 647 (RJD), 2018 WL 4346339 (E.D.N.Y.
    Sept. 11, 2018) ...........................................................................................................7, 11, 37

*Walther v. Maricopa Int'l Inv. Corp.*, No. 97 CIV. 4816 (HB), 1998 WL 186736
    (S.D.N.Y. Apr. 17, 1998)....................................................................................................20

*Warfield v. Alaniz*, 569 F.3d 1015 (9th Cir. 2009) .........................................................................32

**Statutes and Rules**

Fed. R. Civ. P. 50(a) .............................................................................................1, 6, 8, 9, 10, 11

Fed. R. Civ. P. 50(b) ............................................................................................1, 6, 8, 9, 10, 11

Fed. R. Civ. P. 59.................................................................................................................6, 7

**Other Resources**

Hester M. Peirce, *Running on Empty: A Proposal to Fill the Gap Between
    Regulation and Decentralization* (Feb. 6, 2020) ..............................................................32, 37

Defendant Stuart A. Fraser submits this memorandum of law in opposition to Plaintiffs' Motion for Judgment as a Matter of Law and for a New Trial (ECF 351).

### **Preliminary Statement**

Plaintiffs ask the Court to nullify the considered verdict of a jury of nine of their peers, without adequate grounds to do so.  Plaintiffs had the full and fair opportunity to present their case to the jury, including whether Hashlets, Hashpoints, Hashstakers and Paycoin (collectively, the "Products") constituted "investment contracts."  Having heard the parties' evidence and closing arguments over the course of six days, the jury deliberated for almost two days and returned a unanimous verdict against Plaintiffs, including its determination that Plaintiffs failed to prove by a preponderance of the evidence that the Products constituted "investment contracts." The evidentiary record supports the jury's verdict, which should stand.

As a threshold matter, the Court should have no difficulty disposing of Plaintiffs' Rule 50(b) motion for judgment as a matter of law that the Products constituted investment contracts. Plaintiffs waived that motion because they did not make the necessary pre-verdict Rule 50(a) motion on this issue:  by its very terms, Rule 50(b) is a *renewal* motion only.  Plaintiffs certainly knew how to present a Rule 50(a) motion—they made one challenging Mr. Fraser's entitlement to maintain his affirmative defenses against the class representatives.  Plaintiffs deliberately chose not to ask the Court to decide, as a matter of law, that the Products were investment contracts, but rather let that question go to the jury.  Now unhappy with the jury's verdict, Plaintiffs cannot backtrack and argue that they are entitled to *judgment as a matter of law* that the Products constituted investment contracts.

Even if Plaintiffs had preserved their Rule 50(b) motion—which they did not—their motion must fail.  Plaintiffs cannot demonstrate that the "evidence [at trial was] such that …

there can be but one conclusion as to the verdict that reasonable persons could have reached,"[1] *i.e.*, that the Products constituted investment products.  Here, nine jurors reasonably and unanimously agreed that they were not.

The Court should also have no difficulty disposing of Plaintiffs' motion for a new trial on the issue of whether the Products constituted investment contracts because Plaintiffs cannot demonstrate that the jury's verdict was so egregiously against the weight of the evidence that it entitles them to the drastic remedy of a new trial.  That is especially true here, where the question—whether novel cryptocurrency related products constituted investment contracts—is a highly fact-specific one related to new technology.

To prove that any of the Products was an "investment contract," Plaintiffs had to demonstrate by a preponderance of the evidence each of three so-called *Howey* elements for that Product:  that there was (1) an investment of money; (2) in a "common enterprise"; (3) with an expectation of profits to be derived solely from the efforts of others.[2]

The jury did not err as to Hashlets.  A reasonable juror could have determined that Plaintiffs failed to sustain their burden of proof on either or both of the second and third *Howey* factors.  The jury heard uncontested testimony from Plaintiffs' class representative, Denis Audet, that two Hashlet owners owning the same type of Hashlet could receive "very different" payouts depending on the pool they chose to mine on a given day.  Properly looking beyond that miners were all to be housed in one data center, the jury reasonably could have inferred from the evidentiary record that Hashlets represented a unitary interest; that each Hashlet (deployed to a different pool based on the daily choice of the Hashlet owner) mined in and generated a different

---

1.  *Henry v. Bristol Hosp., Inc.*, No. 3:13-CV-00826 (SRU), 2020 WL 4432907, at *2 (D. Conn. July 31, 2020) (citation and quotation marks omitted).

2.  *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298 (1946).

payout based on that pool; and that GAW Miners passed that payout back to the Hashlet owner independent of payouts to other Hashlet owners.

Compared to the orange groves at issue in *Howey*, had the facts been similar to the ones here, a juror reasonably could have determined that Plaintiffs failed to prove that the oranges from all the tracts were pooled together by GAW Miners to generate one undifferentiated pool of profits to be split among all tract owners. Rather, a juror reasonably could have inferred from the evidence that each tract owner earned the profits from the sale of oranges selected by him from his own tract of land only. Accordingly, a juror reasonably could conclude here that Plaintiffs failed to prove horizontal commonality among Hashlet owners.

Similarly, Plaintiffs' own trial witnesses established that GAW Miners charged a fixed fee for maintaining and operating the miners. A reasonable juror could thus also have determined that Plaintiffs failed to prove vertical commonality between a Hashlet owner and GAW Miners.

A reasonable juror could also have determined that, as to Hashlets, Plaintiffs failed to satisfy *Howey's* "efforts of others" requirement. A juror could reasonably infer from the evidence presented at trial that, because Hashlet owners retained control over the crucial decision of how to deploy their Hashlets on a daily basis and affect their payouts as a result, Plaintiffs failed to prove that Hashlet owner were "passive investors," as opposed to investors with "significant control."

The jury also did not err as to Paycoin. At trial, Plaintiffs hinged their argument that Paycoin was an investment contract on a centralization-decentralization dichotomy that their "computer science" expert advocated to assess whether Paycoin was a "centralized" cryptocurrency under the control of GAW Miners or a "decentralized" cryptocurrency like

Bitcoin.  Yet Plaintiffs never asked the Court for a jury instruction to explain to the jury what, if anything, that dichotomy had to do with the three-part *Howey* test the jury had to apply.  Lacking any context, the jury reasonably could have discounted that evidence and concluded that Plaintiffs failed to satisfy their burden to prove that Paycoin was an investment contract.

Even if the jury considered Plaintiffs' centralization-decentralization framework, the jury had ample basis, including testimony from disinterested former GAW Miners employees and independent market data, to infer that GAW Miners' control over Paycoin was not as Plaintiffs portrayed.  Thus the jury reasonably could have determined that Plaintiffs failed to establish a reasonable expectation of profits from Paycoin based solely on GAW Miners' efforts.  That determination is buttressed by the undisputed evidence that Paycoin continued trading even after it was clear that GAW Miners failed to maintain the promised $20 price floor.  The jury also reasonably could have concluded—based on ample evidence that GAW Miners promoted Paycoin as a medium of exchange—that Plaintiffs failed to prove that Paycoin was primarily promoted as a profit-making investment, thus undermining that *Howey* factor.

Plaintiffs do not fare any better under *Howey's* "common enterprise" factor.  Plaintiffs admitted that they gave to GAW Miners only one thing in exchange for Paycoin:  they suspended mining other cryptocurrencies in order to mine Hashpoints, and then got paid in Paycoin for those Hashpoints.  But Plaintiffs presented no evidence how not mining other cryptocurrencies or Hashpoints (*i.e.*, GAW Miners' "in-store credit") were "pooled" or even capable of being "pooled" into a "Coin Adoption Fund" for the development of Paycoin—the only "pooling" of Paycoin for which Plaintiffs presented evidence at trial.

The evidence at trial similarly did not establish vertical commonality.  The generalized linking of GAW Miners and individual Paycoin owners—because they both owned Paycoin or

4

because GAW Miners, as a business, and Paycoin owners, as asset owners, would do well if the Paycoin project succeeded—overextends the concept of strict vertical commonality.  The jury reasonably could have concluded that Plaintiffs failed to prove the type of interdependence of profits and losses that vertical commonality requires under the law of this Circuit.

Finally, Plaintiffs' counsel admitted at trial that there was a "paucity of evidence on the precise nature" of Hashpoints and Hashstakers.  Plaintiffs cannot now complain that the jury got it wrong when it determined that Plaintiffs did not satisfy their burden of proof that these two Products were investment contracts.[3]

\*     \*     \*     \*     \*

The broader implication of Plaintiffs' motion should give the Court serious pause.  The jury not only determined that Plaintiffs failed to prove the Products constituted investment contracts, but entirely independent of that determination, it also unanimously held that Mr. Fraser did not aid and abet the Company Defendants' common law fraud.  (ECF 330 at 13.)  By asking the Court to overturn the jury's verdict on the investment contract question, Plaintiffs want yet another shot at Mr. Fraser in the guise of their aiding-and-abetting and control-person securities claims—claims with either very similar (aiding and abetting) or more rigorous (control person) requirements for culpability than the common law fraud claim that the jury rejected.  Because Plaintiffs here are not entitled to a "do-over", the Court should deny their motion in its entirety.

---

3.    While the jury properly may have given little weight to Plaintiffs' reliance on the argument that the SEC *alleged* in its action against Josh Garza that Hashlets were investment contracts, it is more striking that *even* the SEC did not allege in that action that Hashpoints, Hashstakers or Paycoin constituted investment contracts.  (*See* Pl. Ex. 1 (DX-677) (SEC Compl.) ¶ 85).)  "**Ex.**" refers to an exhibit attached to the declaration of Amina Hassan, filed in support of this opposition.  "**Pl. Ex.**" refers to an exhibit filed with Plaintiffs' motion.

## Standards of Review

### Motion for Judgment as a Matter of Law

Rule 50(b) of the Federal Rules of Civil Procedure permits the Court to enter judgment as a matter of law *only* where it finds "there is *no* legally sufficient evidentiary basis for a reasonable jury" to have returned the verdict that it did. *Merrill Lynch Interfunding, Inc. v. Argenti*, 155 F.3d 113, 120 (2d Cir. 1998) (citing Fed. R. Civ. P. 50(a)(1)) (emphasis supplied). Accordingly, the Court may not grant judgment as a matter of law *unless*: "(1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded persons could not arrive at a verdict against it." *Henry*, 2020 WL 4432907, at *2 (citing *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir. 1998)).

On a motion for judgment as a matter of law, the Court "must view the evidence in a light most favorable to the non-movant"—here, Mr. Fraser—"and grant that party every reasonable inference that the jury might have drawn in its favor." *Argenti*, 155 F.3d at 120–21 (citation omitted). In other words, the Court may not "assess the weight of conflicting evidence, pass on the credibility of witnesses, or substitute [its] judgment for that of the jury." *Kroshnyi v. U.S. Pack Courier Servs., Inc.*, 771 F.3d 93, 105 n.21 (2d Cir. 2014). On the other hand, the Court must "disregard all evidence favorable to the moving party that the jury is not required to believe." *Graduation Sols., LLC v. Acadima, LLC*, 2020 WL 1466204, at *16 (D. Conn. Mar. 26, 2020) (quoting *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150–51 (2000)).

### Motion for a New Trial

The Court may not grant a new trial under Rule 59 of the Federal Rules of Civil Procedure *unless* it determines that "the jury's verdict is against the weight of the evidence."

*DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 133 (2d Cir. 1998).  The Court cannot make that determination *except when* "it is convinced that the jury reached a seriously erroneous result or that the verdict is a miscarriage of justice."  *Ali v. Kipp*, 891 F.3d 59, 64 (2d Cir. 2018) (citations and quotation marks omitted).[4]

Moreover, the Court should only grant a motion for a new trial "when the jury's verdict is 'egregious.'"  *DLC Mgmt. Corp.*, 163 F.3d at 134 (citation omitted).  The Court must "exercise [its] ability to weigh credibility with caution and great restraint, as a judge should rarely disturb a jury's evaluation of a witness's credibility, and may not freely substitute his or her assessment of the credibility of witnesses for that of the jury simply because the judge disagrees with the jury."  *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418 (2d Cir. 2012) (citations and quotation marks omitted).[5]  Simply put, "Rule 59 is not a vehicle for relitigating old issues … or otherwise taking a 'second bite at the apple.'"  *Coan v. Dunne*, 2021 WL 3012678, at *9 (D. Conn. July 15, 2021) (quoting *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 144 (2d Cir. 1998)).

## Investment Contract

Whether an "instrument qualifies as an investment contract is a highly fact-specific inquiry," especially in the context of "new [] vehicles."  *United States v. Zaslavskiy*, No. 17 CR 647 (RJD), 2018 WL 4346339, at *4 (E.D.N.Y. Sept. 11, 2018).  As noted above, to establish that the Products were "investment contracts," Plaintiffs had to prove by a preponderance of the

---

4.   "'[S]eriously erroneous' and a 'miscarriage of justice' are just descriptions of the standard that courts apply in determining whether a verdict is 'against the weight of evidence.'"  *Farrior v. Waterford Bd. of Educ.*, 277 F.3d 633, 635 (2d Cir. 2002).  They are not independent reasons for vacating the jury's verdict, nor a means for the Court to make equitable determinations of whether the jury's verdict is just.

5.   Contrary to Plaintiffs' contention (Pls' Mem. at 39-40), as discussed *infra*, the jury had to assess credibility of several trial witnesses to reach its verdict in this case, including, *e.g.*, the credibility of class representative Pfeiffer on whether GAW Miners earned anything but fixed fees from Hashlet owners and the credibility of Plaintiffs' expert opining that Paycoin was a centralized cryptocurrency.  Thus, the Second Circuit's caution that trial courts should generally "refrain" from setting aside a jury's verdict where the verdict involves credibility assessments applies with full force here.  *United States v. Landau*, 155 F.3d 93, 105 (2d Cir. 1998).

evidence that, with regard to each specific Product, there was "(1) an investment of money; (2) in a common enterprise; (3) with profits to be derived solely from the efforts of others."  (ECF 326 (Jury Instructions) at 21 (relying on *Howey*, 328 U.S. at 301).)  Plaintiffs had the burden to prove all three elements of the *Howey* test.  *See* ECF 326 (Jury Instructions) at 21; *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994) (the "three elements of the *Howey* test must all be present").  Accordingly, it is sufficient for Mr. Fraser to show that, for any given Product, based on the weight of the evidence, the jury could have reasonably determined that Plaintiffs failed to prove any *one* of the *Howey* factors.

## Argument

## I.   PLAINTIFFS WAIVED A RULE 50(b) MOTION FOR JUDGMENT AS A MATTER OF LAW ON THE ISSUE OF WHETHER THE PRODUCTS WERE "INVESTMENT CONTRACTS"

The Court should deny Plaintiffs' Rule 50(b) motion for judgment as a matter of law because Plaintiffs failed to make the necessary Rule 50(a) motion prior to the Court submitting the case to the jury.  "A party may only assert a renewed claim for judgment as a matter of law under Rule 50(b) if it previously raised that specific issue during trial in a Rule 50(a) motion." *Munn v. Hotchkiss Sch.*, 24 F. Supp. 3d 155, 182 (D. Conn. 2014), *aff'd*, 724 F. App'x 25 (2d Cir. 2018); *see also* Fed. R. Civ. P. 50(b) (providing only for a "*renewed* [post-verdict] motion for judgment as a matter of law") (emphasis added); *Lore v. City of Syracuse*, 670 F.3d 127, 152–53 (2d Cir. 2012) ("A Rule 50(a) motion requesting judgment as a matter of law on one ground but omitting another is insufficient to preserve a [Rule 50(b)] argument based on the latter.").  The procedural requirement for preserving a post-verdict Rule 50(b) motion "may not be waived as a mere technicality."  *Cruz v. Loc. Union No. 3 of the Int'l Bhd. of Elec. Workers*, 34 F.3d 1148, 1155 (2d Cir. 1994).  The requirement applies regardless of which party had the burden of proof at trial.  *See, e.g.*, *Blissett v. Eisensmidt*, 940 F. Supp. 449, 455–56 (N.D.N.Y.

1996) (defendant waived its Rule 50(b) motion on an affirmative defense that it did not include in its Rule 50(a) motion); *see also United States for use of Wallace v. Flintco Inc.*, 143 F.3d 955, 968 (5th Cir. 1998) (the party with the burden of proof must move under Rule 50(a) "to preserve its [post-verdict] ability … to move for judgment as a matter of law under Rule 50(b)" if the jury decides against it).

Here, Plaintiffs' pre-verdict Rule 50(a) motion for a directed verdict addressed only a single issue:  whether Mr. Fraser was entitled to maintain his affirmative defenses against the class representatives.  (*See* Ex. B, Charge Conf. Tr. at 27:17–21.)  Plaintiffs did *not* make a pre-verdict motion for judgment as a matter of law that the Products were investment contracts.  (*See id.*)  Accordingly, Plaintiffs waived their right to bring a Rule 50(b) motion on that issue, and the Court should deny Plaintiffs' motion for that reason alone.

The circumstances here underscore why that is both the required and correct result. Plaintiffs' counsel—indisputably sophisticated attorneys—were considering Plaintiffs' Rule 50(a) motion from the early days of trial.  On October 21, 2021 (the second day of trial), Plaintiffs' counsel specifically inquired whether the Court would like written submissions on the parties' Rule 50(a) motions; the Court responded it would hear oral arguments from counsel only.  (Ex. A, Trial Tr. at 156:1–14.)  On October 27, before the commencement of the charge conference, and before Mr. Fraser rested his case the following day, the Court invited the parties to make their Rule 50(a) motions.  Following Mr. Fraser's comprehensive Rule 50(a) motion "for [a] directed verdict as to each of Plaintiffs' claims against Mr. Fraser," including his application that he was entitled, as a matter of law, to a determination *by the Court* that the Products were not investment contracts (Ex. B, Charge Conf. Tr. at 11:15–20, 13:7–25:25), Plaintiffs informed the Court that they wanted to make a motion for judgment as a matter of law

9

on *one issue only*:  Fraser's affirmative defenses.  (*See id.* at 27:17–21 (the Court [addressing Plaintiffs' counsel]:  "You also had a motion to present; is that right?  Mr. Buchdahl:  So we did want to make a motion *on the affirmative defenses*") (emphasis supplied).)  Plaintiffs' counsel then opposed Mr. Fraser's motion for a directed verdict regarding whether the Products were investment contracts.  (*Id*. at 27:16–32:1 (Plaintiffs' counsel).)  However, a party's opposition to a Rule 50(a) motion does not preserve that party's Rule 50(b) motion on the same issue.  *See Patsy's Italian Rest., Inc. v. Banas*, 575 F. Supp. 427, 448–49 (E.D.N.Y. 2008) (rejecting plaintiff's argument that its Rule 50(b) motion on the question of fraud was preserved because the Court previously considered defendant's Rule 50(a) motion on the same issue); *see also Braintree Lab'ys, Inc. v. Nephro-Tech, Inc.*, 81 F. Supp. 2d 1122, 1128 (D. Kan. 2000), *aff'd*, 15 F. App'x 799 (Fed. Cir. 2001) (plaintiff's motion for judgment as a matter of law at the close of evidence did not preserve defendants' motion for judgment as a matter of law on the same issues); *Pereyra v. Fancy 57 Cleaners, Inc.*, 2013 U.S. Dist. LEXIS 49799, at *7 (S.D.N.Y. Mar. 20, 2013) (that the other party was "aware" of the issues raised in an unpreserved Rule 50(b) did not help the movant; "Rule 50 requires a party seeking JMOL to take specific, affirmative steps before the jury receives the case.").

Here, faced squarely with Mr. Fraser's motion for judgment as a matter of law that the Products did not constitute investment contracts, Plaintiffs made a deliberate choice not to move on that issue.  Even in opposing Mr. Fraser's motion, Plaintiffs never once argued that the Court, rather than the jury, should decide that the Products *were* investment contracts.  As is clear from Plaintiffs' argument as to Hashpoints and Hashstakers—with regard to which they admitted there was a "paucity of evidence" for which they would need to "scrub the record a little more carefully" to respond to any further questions by the Court—Plaintiffs had no intent to do so.

(Ex. B, Charge Conf. Tr. at 29:13–19 (Plaintiffs' counsel).)

Plaintiffs similarly chose not to make a Rule 50(a) motion that the Products constituted investment contracts when the Court reminded the parties the following day (October 28), and before Mr. Fraser rested his case, that each party may renew after the verdict, if necessary, *their respective* Rule 50(a) motions.  (Ex. A, Trial Tr. at 922:25–923:5 (J. Shea) ("Plaintiffs have made a Rule 50(a) motion on [affirmative defenses], and if that defense is sustained, they, of course may renew *that* motion, just as Defendant[] may renew [his]  Rule 50(a) motion.") (emphasis supplied).)  Nor did Plaintiffs make a Rule 50(a) motion later that day, after Mr. Fraser rested his case and Plaintiffs rested their rebuttal case.  Plaintiffs had every opportunity to make a Rule 50(a) motion that the Products constituted investment contracts as a matter of law; they elected not to do so.

That is not surprising.  Plaintiffs did not ask the Court to determine that the Products constituted investment contracts as a matter of law because they likely recognized the evidence did not support that argument.  Plaintiffs instead made the strategic decision to argue that issue to the jury.  Now dissatisfied with the jury's determination, Plaintiffs cannot argue that they are entitled to this Court's judgment *as a matter of law* that the Products were investment contracts. Having made their bed, Plaintiffs must lie in it.[6]

---

6.  The only exception to the general rule requiring the Court to deny a party's Rule 50(b) motion absent that party's prior Rule 50(a) motion is to prevent "manifest injustice."  *ING Glob. v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 97 (2d Cir. 2014).  "Manifest injustice" exists only "where a jury's verdict is wholly without legal support."  *Id.*; *see also Protostorm, LLC v. Antonelli, Terry, Stout & Krauss, LLP*, 2015 WL 3605143, at *4 (E.D.N.Y. June 5, 2015), *aff'd sub nom. Protostorm, LLC v. Antonelli*, 673 F. App'x 107 (2d Cir. 2016) ("a defendant may not merely argue that the procedural bar should be waived because they should win on the underlying motion") (citation and quotation marks omitted).  There is no basis to conclude that the jury's determination that Plaintiffs failed to prove the Products were investment contracts—a "highly fact-specific inquiry," *Zaslavskiy*, 2018 WL 4346339, at *4—is "wholly without legal support."  Moreover, because Plaintiffs fail the test for a properly preserved Rule 50(b) motion (*see infra* Sections II–IV), Plaintiffs also fail the more "elevated," "manifest injustice" test for a waived Rule 50(b) motion.  *See Brennan v. City of Middletown*, 2020 WL 3820195, at *9 (S.D.N.Y. July 8, 2020).

Even if the Court considers Plaintiffs' Rule 50(b) motion for judgment as a matter of law, for the reasons set forth below in Sections II-IV, the motion lacks merit, as does Plaintiffs' motion for a new trial.  Accordingly, the Court should deny both motions in their entirety.

## II.    PLAINTIFFS ARE NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW OR A NEW TRIAL ON THE ISSUE OF WHETHER HASHLETS CONSTITUTED "INVESTMENT CONTRACTS"

The jury properly determined that Plaintiffs failed to prove by a preponderance of the evidence that Hashlets constituted investment contracts.  Based on the evidence at trial, a reasonable juror could have determined that Plaintiffs failed to prove:  (a) a "common enterprise" among Hashlet owners (Section II.A), (b) that there was an expectation of profits based "solely on the efforts" of GAW Miners (Section II.B), or (c) both.

### A.    The Jury Properly Could Have Determined that Plaintiffs Failed to Prove a "Common Enterprise" as to Hashlets.

Plaintiffs were required to prove a "common enterprise" among Hashlet owners by demonstrating horizontal commonality or vertical commonality.  (ECF 326 (Jury Instructions) at 21.)  The jury properly could have determined that Plaintiffs failed to prove either.

#### 1.    Horizontal Commonality

To establish "horizontal commonality," Plaintiffs had to prove "that each [Hashlet owner]'s fortunes were tied to the fortunes of the other [Hashlet owners] by the pooling of their assets, usually combined with the pro-rata distribution of profits, *i.e.*, distribution proportionate to the buyer's investment."  (*Id*.)  Here, the jury reasonably could have concluded that Plaintiffs failed to prove that the assets of Hashlet owners were pooled together, such that the fortune of each Hashlet owner was tied to that of all other Hashlet owners.  Instead, the jury reasonably could have inferred that a Hashlet, as promoted, represented a unitary mining interest (whether in a machine, a portion of a machine or a portion of hashing power of a machine) and each Hashlet

owner earned a payout based directly on what his or her mining interest earned, independent of, and not "directly impacted" by, overall payouts to other Hashlet owners.  *See Revak*, 18 F.3d at 87 (pooling requirement of horizontal commonality requires that "success or failure" of other buyers' contracts must have a "'direct impact on the profitability of plaintiff['s] contract'") (quoting *Milnarik v. M–S Commodities, Inc.*, 457 F.2d 274, 276 (7th Cir. 1972)).

There was ample evidence that a Hashlet, as represented to customers, was a machine, a portion of a machine, or a portion of the machine's mining power.  (*See, e.g.*, (Pls' Ex. 9 (PX-47) (Aug. 18, 2014 snapshot of GAW Miners' website describing a Hashlet as a "miner"); Ex. A, Trial Tr. at 622:3–8 (Audet), 818:7–8 (Shinners), 832:20–23 (Pfeiffer) (class representatives Audet, Shinners and Pfeiffer describing Hashlets as "either a stand-alone physical machine or part of a physical machine; a "specific quantifiable share of mining power;" and a "percentage" of mining power, respectively).)

There was also undisputed evidence that Hashlet owners could pick and choose daily the pools in which their Hashlets mined, and receive different payouts as a result.  Mr. Audet offered uncontroverted testimony that two Hashlet owners that both owned the same kind of Hashlet could direct their Hashlets to completely different pools, mine different cryptocurrencies, and receive "very different" payouts, depending on which pools those Hashlet owners selected and whether the Hashlet owners opted to "boost" their Hashlets[7]—as Mr. Audet agreed, one Hashlet owner could do "really well" and another owner of the same type of Hashlet could do "really poorly" on the same day.  (*See* Ex. A, Trial Tr. at 625:2–5, 625:18–626:20, 627:5–22 (Audet); *see also id*. at 93:14–17, 93:19–94:10, 95:22–96:1 (Plaintiffs' expert, Arvind Narayanan,

---

7.   "Boosting" meant increasing the payout rate of a Hashlet by visiting the GAW Miners' website and clicking on a certain button.  (Ex. A, Trial Tr. at 627:8–17 (Audet).)

admitting that a Hashlet owner could direct his or her Hashlet to different pools, including external pools that included customers outside of GAW Miners).)

Thus, the evidence indicated that, as promoted, a Hashlet owner earned a payout based on his Hashlet mining in a particular pool of his or her choice, and that two Hashlet owners owning the same type of Hashlet could receive very different payouts as a result.  That was sufficient for the jury to reasonably conclude that Plaintiffs failed to prove that the fortunes of Hashlet owners were tied together by a "pooling" of their assets.

Plaintiffs also did not offer evidence that those payouts were "directly impacted" by the payouts to all the other Hashlet owners, *e.g.*, by the pooling of all Hashlet owners' payouts into one undifferentiated pool, which would then be divided among Hashlet owners based on their investment.  Horizontal commonality requires a "direct impact." *See Revak*, 18 F.3d at 87.  Here, based on the evidentiary record, the jury reasonably could have concluded that each Hashlet earned a payout, which GAW Miners passed on to that Hashlet's owner, without "directly impacting" the payouts of other Hashlet owners.  *See, e.g.*, *Kefalas v. Bonnie Brae Farms, Inc.*, 630 F. Supp. 6, 8 (E.D. Ky 1985) (over a hundred fractional interests in three thoroughbreds stallions, which entitled an interest owner the right to breed a mare to the stallion, did not constitute a "common venture" because each fractional interest was "unitary in nature" and each interest holder would have its own "success or failure without regard to the others" in the form of the offspring resulting from his specific interest) (quoting *Milnarik*, 457 F.2d at 277); *see also Savino v. E. F. Hutton & Co.*, 507 F. Supp. 1225, 1236–37 (S.D.N.Y. 1981) (no "pooling" where the profitability of each plaintiff's account was a function of the transactions executed for that client, and not "causally related to the profitability of all of the accounts as a whole").

Plaintiffs' arguments to the contrary lack merit.  Plaintiffs first contend that they proved with "uncontradicted" evidence that "Hashlets were marketed as a slice of profits from GAW's cryptocurrency mining enterprise."  (Pls' Mem. at 13.)  That is untrue:  the only two contemporaneous marketing materials for Hashlets introduced at trial describe a Hashlet as a "miner" only; they make no reference whatsoever to any type of profit-sharing.  (*See* Pl. Ex. 8 (DX-528) (Aug. 21, 2014 press release); Pl. Ex. 9 (PX-47) (Aug. 18, 2014 screenshot from gawminers.com).)

Plaintiffs rely principally on three sources for their contention:  (1) the SEC's complaint against Garza, alleging that "a Hashlet entitled an investor to a share of the profits that GAW Miners and/or ZenMiner would purportedly earn by mining virtual currencies using the computers that were maintained in their data centers" (Pl. Ex. 1 (DX-677) ¶ 38); (2) Garza's plea agreement in the Department of Justice's wire fraud case against him repeating that same language (Pl. Ex. 6 (PX-119) at 9 ¶ 4); and (3) Plaintiffs' expert's testimony, apparently based on and repeating almost *verbatim* the language of Garza's plea agreement (Ex. A, Trial Tr. at 51:7–18, 54:13-55:7).  (*See* Pls' Mem. at 13–14.)  Yet, the jury reasonably could have assigned little or no weight to *allegations* contained in a complaint in another case; a single statement in a plea agreement prepared by the prosecution in a non-securities criminal case and agreed to by Garza (to whom the jury reasonably might have afforded zero credibility); and the testimony of Mr. Narayanan, an expert paid by Plaintiffs who apparently relied on the same plea agreement referenced above, and did not analyze any of the actual books and records of the Company Defendants.  (*See* Ex. A, Trial Tr. at 40:20–41:5, 88:5–19.)

Moreover, even if the jury had accepted Plaintiffs' arguments that Hashlets represented a "share" of GAW Miners' and ZenMiner's profits, based on the evidentiary record, the jury was

not required to infer that this was a share from an undifferentiated pool of profits tying together the payouts of all Hashlet owners, as opposed to an allocation of the share of those profits directly earned by a Hashlet owner's specific Hashlets.  The latter undermines the "pooling" requirement of horizontal commonality.[8]

Plaintiffs also argue that they established horizontal commonality by proving that Hashlet owners' fortunes were tied together "based on GAW's success or failure in running its crypto mining data centers."  (Pls' Mem. at 14–15.)  But there is no legal authority for Plaintiffs' sweeping proposition that a company's general performance in running its business creates horizontal commonality among its customers.  Any business that fails to run its operations well will impact the value its customers receive from that business, but that does not mean the fortunes of those customers are *tied together by a pooling of their assets*.  *See Savino*, 507 F. Supp. at 1236 ("pooling" is necessary for a finding of horizontal commonality).

In support of their misguided argument, Plaintiffs rely on a single statement, selectively quoted from *Revak*, that in horizontal commonality, "the fortunes of each investor depend upon the profitability of the enterprise."  (Pls' Mem. at 15 (citing *Revak*, 18 F.3d at 87).)  However, a careful reading of *Revak* makes clear that, as used in that sentence, "enterprise" is the "common enterprise" created by a pooling of the buyers' assets, not simply a reference to a business venture in general.  *See Revak*, 18 F.3d at 87.  *Revak* did *not* create a new test for horizontal commonality; rather, it explained that, in a "common enterprise," where the assets are pooled together thus tying the buyers' fortunes, the fortunes of each buyer depend on the profitability of that shared "common enterprise."  *See id*.  As discussed above, Plaintiffs did not prove that the

---

8.  Plaintiffs also cite Mr. Fraser's testimony that he understood "that the purchaser of a Hashlet would be entitled to a portion of the cryptocurrency that was being mined by GAW Miners."  (Pls' Mem. at 14 n.6.)  However, that testimony is entirely consistent with a purchaser being entitled to the "portion of the cryptocurrency" earned by *his own* Hashlets, separate and apart from what *other* Hashlet owners did or did not earn.

fortunes of all Hashlet owners were tied together in a "common enterprise" by a pooling of their assets.  (*See supra* 12-14.)

Finally, Plaintiffs argue that it does not matter whether two different Hashlet owners might have received dissimilar payouts on the same day from the same type of Hashlet because "'the key feature [of horizontal commonality] is … that investors' profits at any given time are tied to the success of the [common] enterprise.'"  (Pls' Mem. at 15 (quoting *SEC v. Kik Interactive Inc.*, 492 F. Supp. 3d 169, 179 (S.D.N.Y. 2020)).)  Not so.  It was reasonable for jurors to consider Mr. Audet's testimony that owners of the same type of Hashlet could have "very different" payouts depending on their choice of pool, including pools external to GAW Miners, as probative of whether the fortunes of all Hashlet owners were tied together.  As importantly, as discussed above, Plaintiffs failed to prove what they contend is the "key feature" of horizontal commonality, *i.e.*,  that the profits of each Hashlet owner were tied to the success of a common enterprise created by a *pooling* of all Hashlet owners' assets.  (*See supra* 12-14.)[9]

## 2.    Vertical Commonality

To establish vertical commonality, Plaintiffs had to prove "that the individual buyer's fortunes were tied to the fortunes of GAW Miners, *i.e.*, that the fortunes of the buyers and the Company were linked so that they would rise and fall together."  (ECF 326 (Jury Instructions) at 21.)  Vertical commonality requires an "interdependence of *both profits and losses*."  *Kaplan v. Shapiro*, 655 F. Supp. 336, 341 (S.D.N.Y. 1987) (emphasis in original).

Here, the jury reasonably could have concluded that Plaintiffs failed to prove vertical commonality because the weight of the evidence showed that GAW Miners earned a fixed fee

---

9.    Plaintiffs also cite *SEC v. Kik Interactive Inc.*, 492 F. Supp. 3d 169, 179 (S.D.N.Y. 2020) for the proposition that investors' ability to sell their digital tokens at different times does not undercut horizontal commonality. (Pls' Mem. at 15.)  However, Mr. Fraser never argued that any horizontal commonality was lacking among Hashlet owners based on their ability to sell Hashlets as and when they pleased.

from Hashlet owners, regardless of how their Hashlets performed.  *See, e.g.*, *Silverstein v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 618 F. Supp. 436, 439–40, 440 n.3 (S.D.N.Y. 1985) (no vertical commonality where defendant brokerage firm earned commissions based on frequency of transactions, not their profitability); *Schofield v. First Commodity Corp. of Bos.*, 638 F. Supp. 4, 7 (D. Mass. 1985), *aff'd*, 793 F.2d 28 (1st Cir. 1986) (no vertical commonality because the defendant "charged a fixed fee for each commodity position taken" and "the broker's profits were not influenced by the success or failure of the trading in the account").

The jury heard Mr. Audet's testimony in which he stated at deposition that GAW Miners charged Hashlet owners a fixed maintenance fee:

> … I think the  fee was a fixed cost thing based on the cost of electricity and running, you know, the -- to run the establishment -- no -- the server farm where all these machines were being used or stored and run.
>
> So it was sort of like a fixed cost. So the percentage doesn't – you  know, one day if you had a big payout, the fee was relatively small. If you had a small payout, then it was large. …

(Ex. C (DX-731); *see also* Ex. A, Trial Tr. at 624:17–20 ("Q.  So you agree with me, Mr. Audet, that the service fee that GAW Miners charged for running and operating the miners was a fixed fee?  A.  That's what I believed back then [when Mr. Audet was deposed], yes.").)[10]  Plaintiffs' expert also agreed that charging fixed fees is one way to run a cloud-mining operation.  (Ex. A, Trial Tr. at 89:20–90:18 (Narayanan).)  It was also undisputed at trial that GAW Miners charged a fixed up-front fee when a customer bought a Hashlet.  (*See id*. at 91:12–18 (Narayanan), 853:22–854:14 (Pfeiffer).)

---

10.  While at trial Mr. Audet initially testified that GAW Miners charged Hashlet owners a service fee proportional to their payouts, he subsequently admitted that this was all "six years ago," that he "thinks" the fee was proportional to the payout, but he would not be surprised that he testified at his deposition—which was much closer in time to the events of this case—that GAW Miners charged Hashlet owners a fixed service fee.  (*See* Ex. A, Trial Tr. at 623:2–11 (Audet).)

Because GAW Miners charged its customers fixed fees, the "fortunes" of individual Hashlet owners and GAW Miners did not "rise and fall together"—GAW Miners earned a fixed fee regardless of whether an individual Hashlet owner made $50 in daily payouts or $5,000. Plaintiffs entirely ignore Mr. Audet's testimony regarding GAW Miners' fees.  Instead, they rely only on the self-serving, unsupported testimony of another of their class representatives, Mr. Pfeiffer.  Mr. Pfeiffer's testimony, however, does not help Plaintiffs either.

Mr. Pfeiffer agreed that GAW Miners charged Hashlet owners a fixed maintenance fee, *except* that, if the daily payout for a Hashlet was the same or lower than the daily maintenance fee, GAW Miners had a "policy and practice" of paying the Hashlet owner the "smallest fraction … like one [] ten million[th] [] of a Bitcoin."  (Ex. A, Trial Tr. at 856:13–23.)  Mr. Pfeiffer agreed, however, that the daily maintenance fee itself did not change.  (*Id*. at 856:15–857:6 (Q. But the fee itself didn't change; right?  A.  I guess that's right.")).  On reexamination by his counsel, Mr. Pfeiffer testified that it was "his understanding" that GAW Miners would also pay Hashlet owners a "tiny payout" if the Hashlet owner had an original mining reward of zero dollars.  (*Id*. at 906:3–5.)  He then agreed with his counsel that, if "[he] did not make a profit from a Hashlet on a particular day, GAW would not profit that day either."  (*Id*. at 906:9–12.)  But, Mr. Pfeiffer's testimony does not establish strict vertical commonality.

*First*, to the extent Mr. Pfeiffer's testimony was that the daily maintenance fee for Hashlets was not fixed, it is disputed by Mr. Audet's testimony.  (Ex. A, Trial Tr. at 624:17–20.) It was entirely reasonable for the jury to give more weight to Mr. Audet's understanding of the Hashlet fee-arrangement from when he was deposed more than three years before trial than to Mr. Pfeiffer's "understanding" at trial of a fee arrangement—prompted in part by his counsel— more than seven years after the events of this case.  It was also reasonable for the jury to credit

Mr. Audet's testimony, which is adverse to Plaintiffs, more than Mr. Pfeiffer's testimony, which is favorable to Plaintiffs and otherwise unsupported in the record.

*Second*, even if the jury credited Mr. Pfeiffer's testimony, it reasonably could have determined that it was insufficient to establish vertical commonality between Hashlet owners and GAW Miners.  Even if credited, Mr. Pfeiffer's testimony stands only for the following proposition:  if a Hashlet owner's original mining reward on a given day was less than the daily maintenance fee (15 cents in Mr. Pfeiffer's example), GAW Miners suffered a small loss, but the Hashlet owner still profited by that same amount; and if the Hashlet owner made $50 or $50,000, GAW Miners earned a fixed fee of 15 cents.  The jury reasonably could have concluded that this fee arrangement does not tie together the fortunes of GAW Miners and individual Hashlet owners such that they "rise and fall together"—a Hashlet owner profited in every scenario even when GAW Miners did not (in the hypothetical scenario when a Hashlet owner's daily reward was less than 15 cents), and then, as the profits of the Hashlet owners kept rising, even in the tens of thousands of dollars and more, GAW Miners' "profit" remained stagnant at 15 cents. Likewise, this arrangement meant that Hashlet owners would continue to profit based on the amount their Hashlets generated, even if the fixed fees GAW Miners charged did not cover its costs of operation and ran at a loss.  Thus, Plaintiffs did not prove "the one-to-one … interdependence of both profits and losses" that vertical commonality requires.  *Kaplan*, 655 F. Supp. at 341 (emphasis in original removed).[11, 12]

---

11.  Plaintiffs rely on *In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340, 360 (S.D.N.Y. 2011).  However, that case is easily distinguishable because the investment manager's compensation there was based in part on a percentage of the profits in the investment account.  Plaintiffs also rely on *Walther v. Maricopa Int'l Inv. Corp.*, 1998 WL 186736, at *7 (S.D.N.Y. Apr. 17, 1998), but that decision stands only for the proposition that, at the *motion to dismiss* stage, allegations that the investment manager's fee was directly tied to the success of the investment was sufficient to survive dismissal.

12.  At the charge conference, the Court inquired whether, with regard to vertical commonality, there was an

**B.** **The Jury Properly Could Have Determined that Plaintiffs Failed to Satisfy the "Efforts of Others" Requirement as to Hashlets.**

To satisfy the third *Howey* prong, Plaintiffs had to prove that Hashlet owners had an expectation of "profits to be derived solely from the efforts of others," in this case GAW Miners. (ECF 326 (Jury Instructions) at 21.)  In this regard, the Court instructed the jury to:

> [C]onsider whether the product was being promoted primarily as an investment, in which case it would be an investment contract, or **whether the product was being promoted as a means whereby participants could pool their activities, money, and the promoter's contribution in a meaningful way, in which case it would not be an investment contract**.

(*Id.* (emphasis supplied).)  The Court also instructed the jury that, "[i]f there was a reasonable expectation of **significant investor control**, then profits would not be considered derived solely from the efforts of others," "[b]ut if the expectation was that the participants would be **passive investors** then profits would be considered derived solely from the efforts of others."  (*Id.* at 21–22 (emphasis supplied).)

The jury reasonably could have determined that Plaintiffs failed to satisfy the third *Howey* prong because the weight of the evidence did not show that Hashlet owners were "passive investors."  Rather, the evidence showed that Hashlet owners retained control over significant aspects of their Hashlets—those that directly impacted their payouts—so that Hashlets were not investments, but rather "a means whereby [Hashlet owners] could pool their activities [particularly in selecting and switching cryptocurrencies and pools], money, and [GAW Miners'] contribution [of hosting and maintaining the miners] in a meaningful way" to make a

---

argument that, if GAW Miners was doing really well in mining, then "Hashlet payouts" go up and benefit both the company and Hashlet owners.  (Ex. B, Charge Conf. Tr. at 18:16–22.)  However, there is no evidence that GAW Miners profit-shared in Hashlet payouts, as opposed to making money on Hashlets by charging certain fixed fees only.  (*See* Ex. A, Trial Tr. at 93:3–9 (Narayanan testifying that he did not know "one way or another" whether GAW Miners profited from the mining in pools to which its customers directed mining power); *see also id.* at 90:19–91:16 (Narayanan could not confirm whether GAW Miners shared in the profits from mining).)  To the contrary, based on Plaintiffs' expert's failure to confirm this crucial point, the jury reasonably could have inferred that no profit-sharing existed between GAW Miners and Hashlet owners.

profit.

The jury heard evidence that, while GAW Miners hosted and maintained Hashlets, Hashlet owners exercised control in managing their Hashlets by deciding how their Hashlets would be deployed to earn rewards.  The jury heard undisputed evidence that, on any given day, Hashlet owners controlled the key decisions of which cryptocurrency to mine and in which pool to mine their Hashlets, and that the payouts they received were directly dependent on that selection.  (*See supra* 13-14 (summarizing testimony from Messrs. Audet and Narayanan).) In this regard, Mr. Audet also testified on cross-examination as follows:

> Q.  Now, you could also change your pools with your Hashlets; is that correct?
>
> A.  That's correct, yes.
>
> Q.  So the idea was that you could get up in the morning; you could check the payout rates for different pools and just switch the pool that your Hashlet was mining in; correct?
>
> A.  That's correct, yes.
>
> Q.  And you, in fact, did that; right?  You would check your payouts daily; is that correct?
>
> A.  That's right, yes.
>
> … Q.  You, in fact did keep track of the payouts and switched the pools that you were mining in; correct?
>
> A.  That's correct, yes.

(Ex. A, Trial Tr. at 627:2–20.)  Mr. Audet also agreed that Hashlet owners could "impact [their] payouts" by choosing to "boost" their Hashlets on a daily basis.  (*Id*. at 627:8–22 (Audet).)

Like Mr. Audet, class representative Pfeiffer conceded that Hashlet owners could change the allocation of their mining power on a daily basis.  (*Id*. at 868:2–21 (Pfeiffer).)  And, as Plaintiffs' expert admitted, because a Hashlet owner could choose the pools in which his or her Hashlets mined, each Hashlet owner "had the ability to determine how his or her money would be used."  (*Id*. at 93:19–94:5 (Narayanan).)  Based on this evidence, the jury reasonably could

have determined that Hashlet owners were not "passive investors"; instead, they retained "significant control" over managing their Hashlets, thus undermining the "efforts of other" prong of *Howey*.[13]

Plaintiffs' attempt to minimize the undisputed testimony of their own witnesses lacks merit. Plaintiffs first argue that, because Hashlets were easy to use and marketed as "grandma approved," it must mean that "GAW would do all the work necessary to make Hashlets profitable." (Pls' Mem. at 20–21.) Plaintiffs' argument, however, ignores the control Hashlet owners retained over the deployment of their Hashlets and their daily payouts.[14]

Plaintiffs next argue that Hashlet owners' right to choose and switch the pools to mine and boost their Hashlets did not constitute "significant control." (Pls' Mem. at 22–23.) To the contrary, the right to choose and switch pools, if desired, directly affected a Hashlet owner's payouts. (*See* Ex. A, Trial Tr. at 625:22–626:1 (Audet) (choosing one pool versus another could result in "very different payouts").) The jury reasonably could have concluded that retaining and exercising this right, as Mr. Audet testified he did, demonstrated "significant investor control," and was not the "modicum of effort" or "trivial" effort that courts have held is not significant control. *SEC v. Aqua-Sonic Prod. Corp.*, 687 F.2d 577, 584–85 (2d Cir. 1982). This

---

13. The jury reasonably could also have considered evidence that Hashlet owners earned profits based on the number of miners in their chosen pool (as opposed to the purported "managerial or entrepreneurial efforts" of GAW Miners), and these miners could include people who were not even GAW Miners' customers. (Ex. A, Trial Tr. at 56:22–24, 95:22–96:5 (Narayanan).) This evidence undermined a finding of a reasonable expectation of profits solely from the managerial or entrepreneurial efforts of GAW Miners. (*See* ECF 326 (Jury Instructions) at 21–22.)

14. The same is true for Plaintiffs' reliance on Mr. Fraser's statement that Hashlet owners were relying on GAW Miners' expertise to own and operate the mining equipment that would support Hashlets. (Pls' Mem. at 20, 22.) Mr. Fraser's testimony does not preclude the possibility of Hashlet owners exercising significant control over Hashlets. Moreover, given Mr. Fraser's lack of experience with Hashlets, the jury reasonably could have placed less weight on Mr. Fraser's testimony regarding the operations of Hashlets as compared to the testimony of Messrs. Audet and Pfeiffer, who actually owned Hashlets. (*See, e.g.*, Ex. A, Trial Tr. at 388:2–8, 279:6–10, 516:21–517:1 (Fraser) (no experience with cryptocurrency, never mined or sold cryptocurrency, had only a "basic understanding" of Hashlets, never saw a demonstration on how to activate or operate a Hashlet).)

arrangement contrasts sharply with *Howey*, in which the "passive investors," "who reside[d] in distant locations" (as opposed to Hashlet owners with instant computer access to manage their Hashlets) provided only the capital, had no "right" to influence the management of the orchards (such as which oranges to cultivate, how or which markets to target) and were entirely dependent on the discretion of the defendant-company. *Howey*, 328 U.S. at 299–300. The *Howey* court expressly distinguished that scenario from ownership of "a farm or orchard coupled with management services," which did not constitute an investment contract, and is more akin to the Hashlet arrangement here. *Id.* at 299.[15]

Finally, relying on *Long v. Shultz Cattle Co.*, 881 F.2d 129, 134 (5th Cir. 1989), Plaintiffs argue that they satisfied the third *Howey* prong because "GAW provided the 'entire framework' and 'essential infrastructure of the venture'—its crypto mining operation—upon which the value of Hashlets rested." (Pls' Mem. at 23.) While *Long's* standard for assessing the significance of investor control—whether the promoter "provide[s] the entire framework within which an individual investor's efforts would succeed or fail," 881 F.2d at 137—might be instructive, it is not controlling. The standard relevant here is the one followed in the Second Circuit and on which the Court instructed the jury: "whether, under all the circumstances, the scheme was being promoted primarily as an investment or as a means whereby participants could pool their own activities, their money and the promoter's contribution in a meaningful way." *Aqua-Sonic*, 687 F.2d at 582; *see also United States v. Leonard*, 529 F.3d 83, 88 (2d Cir. 2008); ECF 326

---

15. The other cases Plaintiffs cite are similarly distinguishable. (Pls' Mem. at 21–26.) In *SEC v. Aqua-Sonic Prod. Corp.*, 687 F.2d 577, 584 (2d Cir. 1982), the court determined that it was "implausib[le]" that a buyer would exercise the retained right to take over distribution of the products at issue from the defendant. Here, there is nothing implausible about the exercise of the rights retained by Hashlet owners—Mr. Audet testified that he actually exercised those rights. (*See supra* 22.) While in *Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 356 (S.D.N.Y. 2019), the buyers' purported control over the digital assets consisted of the "decisions of when and for how much [of the coin] to sell;" that is not the "control" asserted here.

(Jury Instructions) at 21.[16]  Plaintiffs also rely on *Kik Interactive* and *Bender v. Continental Towers Ltd. Partnership*, 632 F. Supp. 497 (1986) (Pls' Mem. at 22–23), but those decisions similarly are not on point:  while they discuss the third *Howey* prong in terms of whether, without the efforts of a promoter, the buyers' investments would be "worthless" (*id*. at 23), whether investors retained any "significant control" was not at issue in either case.[17, 18]

## III.  PLAINTIFFS ARE NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW OR A NEW TRIAL ON THE ISSUE OF WHETHER PAYCOIN WAS AN "INVESTMENT CONTRACT"

The jury also properly determined that Plaintiffs failed to prove by a preponderance of the evidence that Paycoin constituted an investment contract.  Based on the evidence at trial, a reasonable juror could have determined that Plaintiffs failed to prove:  (a) a reasonable expectation of profits from Paycoin to be derived solely from the efforts of GAW Miners (Sections III.A and III.B), (b) a "common enterprise" as to Plaintiffs (as Paycoin owners) (Section III.C), or (c) both.

---

16.  *Long* is also easily distinguishable.  There, plaintiffs "had a substantial degree of *theoretical* control over their investments," but the evidence was undisputed that except for a single occasion, plaintiffs did not *actually* exercise that independent control, but rather they relied on defendant's recommendations.  *Long*, 881 F.2d at 134 (emphasis supplied).  Here, in contrast, there is nothing *theoretical* about the control Plaintiffs had over their Hashlets, which Mr. Audet testified he exercised.  (Ex. A, Trial Tr. at 625:18–627:7 (Audet).)  Nor is there any evidence that GAW Miners made recommendations to, or was otherwise involved with, Hashlet owners' decisions of which cryptocurrency or pool to mine on any given day.

17.  Plaintiffs also cite *SEC v. Telegram Grp., Inc.*, 448 F. Supp. 3d 352, 370 n.9 (S.D.N.Y. 2020), but the cited portion of that decision does not deal with *Howey's* "efforts of others" prong.  (Pls' Mem. at 23.)

18.  In arguing that the jury got it wrong as to Hashlets, Plaintiffs rely heavily on documents related to the SEC's case against Garza (the "SEC Action") and the SEC's *allegation* that Hashlets were investment contracts.  (*See, e.g.*, Pls' Mem. at 2, 3, 12, 13, 21.)  Of these documents, the only one in evidence at the trial was the SEC's complaint against Garza making that allegation.  (Pl. Ex. 1 (DX-677).)  However, the jury reasonably could have given little, if any, weight to uncontested allegations in another case and more weight to the evidence presented to it.  Plaintiffs also extensively cite the SEC's memorandum in the SEC Action seeking default judgment against GAW Miners and ZenMiner.  (*See* Pls' Ex. 17; Pls' Mem. at 12, 13, 15, 21.)  But the so-called SEC Memorandum is neither fact nor legal authority; it was also not introduced as evidence in this case and the Court should not consider it on this motion.  Finally, Plaintiffs argue that, on the SEC's default motion, the Court determined that the SEC had satisfied its burden to prove that Hashlets are investment contracts.  (Pls' Mem. at 12.)  But the Court in the SEC Action, which accepted the SEC's allegations as true on an uncontested default motion, did not have the benefit of a full, contested trial record which the jury had before it in this case.

### A. The Jury Properly Could Have Determined that Plaintiffs Failed to Prove the Control They Alleged GAW Miners Exercised Over Paycoin.

During the closing argument, Plaintiffs specifically directed the jury to the testimony of their expert, a computer science professor, in assessing whether Paycoin was a security. Plaintiffs' counsel told the jury that the "whole point about Paycoin was that GAW Miners controlled it … GAW Miners exercised centralized control over Paycoin.  That's one of the things Professor Narayanan described.  That's one of the things that made [Paycoin] a security." (Ex. A, Trial Tr. at 1079:25–1081:6 (Plaintiffs' counsel).)  Their expert's testimony on centralized and decentralized cryptocurrency is the *only* specific evidence Plaintiffs pointed to in arguing to the jury that Paycoin was an investment contract.  (*See id*. 1039:24–1040:7, 1081:4–6.)  Plaintiffs likewise rely on it in their motion papers.  (*See* Pls' Mem. at 2, 7, 36.)

However, despite Plaintiffs' substantial reliance on Mr. Narayanan's testimony at trial, they never asked the Court to instruct the jury how that testimony—about the centralization or decentralization of cryptocurrencies from a "computer science" perspective (Ex. A, Trial Tr. at 109:12–16 (Narayanan))—was at all relevant to the *Howey* factors.  During the parties' Rule 50(a) arguments, the Court cautioned Plaintiffs' counsel on this point:  "[T]o this day I don't understand why" Mr. Narayanan's testimony about centralization of cryptocurrencies was relevant; the Court then asked Plaintiffs' counsel to explain what "centralization has to do with this [whether Paycoin is an investment contract]."  (Ex. B, Charge Conf. Tr. at 30:12–20.)[19] Plaintiffs provided no such explanation to the jury and did not ask the Court to do so by way of the jury charge either.  As explained aptly by another court (albeit from outside this Circuit), it was not the jury's job to "ferret out [P]lainitff[s]' theory" from the evidentiary record. *Richmond*

---

19. Plaintiffs' counsel responded that the "centralization factors" Mr. Narayanan testified about satisfy the "efforts of others" requirement of *Howey*.  (*See id*. at 30:12–31:11.)

*v. Dart Indus., Inc.*, 196 Cal. App. 3d 869, 877–78 (Ct. App. 1987) (holding that plaintiff waived a theory of recovery which it failed to present to the jury with "reasonable clarity"). Understandably puzzled by the purported relevance of Mr. Narayanan's testimony, the jury reasonably could have discounted the only specific piece of evidence that Plaintiffs' counsel told the jury "made [Paycoin] a security" (*supra* 26), and determined that Plaintiffs did not satisfy their burden to prove Paycoin was an investment contract.  Plaintiffs cannot now ask the Court to rectify their error (or deliberate choice).  *See, e.g.*, *Fairbrother v. Morrison*, 412 F.3d 39, 55 n.7 (2d Cir. 2005) (the Court would not "rectify [a party's] error" where it failed to ask the Court to instruct the jury on one of its defenses).

Even if the jury considered the framework that Plaintiffs advocated, it reasonably could have determined that Plaintiffs failed to prove Paycoin was more like a centralized cryptocurrency under the control of GAW Miners and less like a decentralized coin (such as Bitcoin).  Therefore, Paycoin did not entail a reasonable "expectation of profits to be derived solely from the efforts of others."  Specifically, the jury heard testimony from former GAW Miners employees that Paycoin was decentralized:

- GAW Miners' former Director of Quality Assurance Madeline Eden testified that the ledger for Paycoin was "decentralized," so that, "just as with Bitcoin," "anyone with sufficient computing power connected to the Internet could become a Paycoin … miner."  (Ex. D (DX-745) at 71:12–20.)

- Ms. Eden also testified that "the entire network" was "involved in the consensus process for determining whether transactions would become part of the chain" and "anybody" could participate (*id*. at 80:9–25), and that, when Paycoin was released, "mining capacity was pointed out all over the world," which "created the [Paycoin] network."  (*Id*. at 71:21–72:4.)

- GAW Miners' former General Manager Jonah Dorman agreed that "anybody could download the software necessary to mine Paycoin during the proof-of-work phase and do work to verify transactions and create blocks on the blockchain and receive a reward" for doing that.  (Ex. E (DX-744) at 49:19–23.)

Plaintiffs' expert, who testified that an entity's control of the software underlying the cryptocurrency is an indicator of a centralized cryptocurrency, admitted on cross-examination that Paycoin used "open source" software and that anyone could see Paycoin's source code and suggest improvements and fixes to it.  (*See* Ex. A, Trial Tr. at 111:9–23 (Narayanan); *see also* 843:1–19 (class representative Pfeiffer admitting the same).)

In addition, the jury heard and saw extensive evidence that Paycoin was widely traded on public exchanges.  (*See id*. at 111:21–23 (Narayanan) (acknowledging that Paycoin traded on public exchanges), 585:6–7 & 615:3-616:10 (Audet) (acknowledging that he purchased Paycoin on external exchanges including Bittrix.com and CoinSwap); Pl. Ex. 18 (DX-719) (Coinmarketcap.com record showing that Paycoin traded on public exchanges from at least December 16, 2014, with daily volumes of transactions ranging up to the millions between December 16 and 31, 2014).  Plaintiffs' expert also admitted that GAW Miners had no control over these public exchanges, and that, when a currency is traded on a public exchange, its price is determined by market forces (*see* Ex. A, Trial Tr. at 112:13–21 (Narayanan))—all evidence that undermines Plaintiffs' argument that GAW Miners exerted centralized control over Paycoin.

Plaintiffs' expert also cited Bitcoin as an example of a decentralized cryptocurrency (*see, e.g.*, *id*. at 62:14 (Narayanan)), and the jury heard and saw evidence that Paycoin was similar to Bitcoin in many respects.  (*See, e.g.*, Ex. D (DX-745) (Eden) at 71:12–20 (Paycoin had a decentralized ledger like Bitcoin); Pl. Ex. 12 (PX-81) (press release explaining that Paycoin "carries with it the best features of bitcoin"); Pl. Ex. 13 (PX-125) (whitepaper explaining that "Paycoin . . . is expanding on the work of Satoshi Nakamoto [the creator of the Bitcoin blockchain]").  Accordingly, the jury reasonably could have concluded that this evidence, which indicated that Paycoin was like Bitcoin—and thus a decentralized coin—undermined Plaintiffs'

contention of GAW Miners' centralized control over Paycoin.

Finally, the jury reasonably could have credited undisputed evidence that Paycoin continued trading on public exchanges long after the SEC announced its investigation of GAW Miners on January 19, 2015 (the end of the class period), despite GAW Miners' inability to support the $20 price floor or honor its other promises concerning Paycoin.  (*See* Pl. Ex. 18 (DX-719) (Coinmarketcap.com record showing Paycoin traded between January 19, 2015 through early December 2015 at prices higher than or comparable to the price at which Bitcoin traded in its early days); *see also* Ex. A, Trial Tr. at 43:12–16 (Plaintiffs' expert testifying that, in Bitcoin's early days, 10,000 Bitcoin would buy only two pizzas).)  Thus, contrary to Plaintiffs' repeated assertion that Paycoin had no inherent value and was "worthless" without GAW Miners (thus dependent on the efforts of GAW Miners), the jury reasonably could have disagreed.

In the face of this evidence, Plaintiffs argue that, "Paycoin, unlike decentralized cryptocurrencies such as Bitcoin, was significantly centralized and under the control of GAW Miners" and cite their own expert's testimony.  (Pls' Mem. at 7.)  However, the jury reasonably could have weighed Mr. Narayanan's opinion against competing evidence in the record (including that discussed above) and concluded that Plaintiffs failed to demonstrate the type of control they asserted GAW Miners exercised over Paycoin.  In weighing this evidence, the jury could properly consider whether the evidence came from an expert paid by Plaintiffs or disinterested witnesses and market data (*see* Ex. A, Trial Tr. at 63:1–18 (Narayanan testifying that he is paid $800 per hour by Plaintiffs' counsel)); that Mr. Narayanan is a self-professed "computer science expert," not a securities law or regulation expert, and that he conducted the decentralization-centralization analysis from a "computer science" perspective (*id*. at 57:12–14; 109:15–16, 64:16, 109:17–110:4); that Mr. Narayanan did not recall reviewing any "books and

records" or other "private documents" of GAW Miners or ZenMiner (*id*. at 88:5–19); and that, when asked on cross-examination about Ms. Eden's testimony that contradicted his own trial testimony regarding GAW Miners' purported centralized control of Paycoin, Mr. Narayanan could not recall that testimony (*id*. at 110:11–18, 110:19–111:8 (Narayanan)).

### B.     The Jury Properly Could Have Determined that Plaintiffs Failed to Prove that GAW Miners Promoted Paycoin Primarily as an Investment.

Based on ample evidence at trial that GAW Miners marketed Paycoin as a medium of exchange—*i.e.*, as a product for consumption rather than for speculative profit-making—the jury reasonably could have determined that Plaintiffs failed to establish the third *Howey* factor.  *See* ECF 326 (Jury Instructions) at 21 (instructing the jury that, in assessing the third *Howey* factor, "you should consider whether the product was being promoted primarily as an investment …"); *see also United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 852–53 (1975) (comparing cases in which "the investor is attracted solely by the prospects of return on his investment" with cases in which "a purchaser is motivated by a desire to use or consume the item purchased," and holding that the latter do not give rise to an investment contract).

Plaintiffs themselves alleged that "[m]erchant adoption was the main marketing push to entice miners to switch from bitcoin or altcoin to Hashpoints (and therefore Paycoin) mining." (ECF 57 (Amended Compl.) ¶¶140-143.)  Consistent with those allegations, the evidence at trial showed that GAW Miners marketed Paycoin as a "[c]ryptocurrency fit for world adoption."  (*See* Pl. Ex. 13 (PX-125) (Paycoin whitepaper); *see also* Pl. Ex. 12 (PX-81) (press release stating that "GAW Miners is producing a digital currency"), Pl. Ex. 14 (PX-160) (excerpt from hashcoin.com stating that "HashCoin's long-term value will be pinned … [on] merchants adopting it as a consumer payment method"), Pl. Ex. 20 (PX-66) (Hashpool email-blast stating that "Hashbase will allow you to mine a coin … and buy on the spot" from Target, Walmart,

Amazon and Macy's).  The jury also saw evidence that GAW Miners promoted Paycoin as an alternative to Bitcoin, which Plaintiffs' expert testified extensively is used as a medium of exchange.  (*See, e.g.*, Pl. Ex. 11 (PX-82) (Wall Street Journal article titled, "GAW Miner to Launch Bitcoin Challenger, Paycoin," and explaining that the objective was to have "Paycoin transactions [] be confirmed and settled much faster than the 10-minute minimum that applies to bitcoin."); Pl. Ex. 12 (PX-81) (press release stating that, "Positioned as the cryptocurrency of the future, Paycoin addresses all of the inherent shortcomings that have prevented Bitcoin from achieving mainstream adoption"); *see also* Ex. A, Trial Tr. at 44 (Narayanan) (testifying about Bitcoin's consumptive retail use).)

The jury also saw evidence that the purpose of the "Coin Adoption Fund" and the $20 price floor was to facilitate Paycoin's adoption as a medium of exchange.  (*See, e.g.*, Pl. Ex. 11 (PX-82) (Wall Street Journal article published after interview with Garza and explaining that the CAF, combined with other features of Paycoin, were intended "to reduce exchange-rate volatility and thus seek to resolve one of bitcoin's biggest barriers to mass adoption"); Pl. Ex. 13 (PX-125) (Paycoin Whitepaper explaining that Paycoin is intended to solve the problems of "price stability, maintaining decentralization, and ensuring ease of use," all of which hinder adoption). Consistent with Paycoin's marketing, when class representative Pfeiffer was asked what interested him about Paycoin, he pointed not to potential profit-making, but to Paycoin's "faster transaction times" as compared to Bitcoin when Bitcoin was used "say, at a grocery store or coffee shop and you have to wait ten minutes before your transaction is confirmed."  (Ex. A, Trial Tr. at 835:15–836:3 (Pfeiffer).)  Similarly, class representative Shinners testified that one of the reasons he began losing faith in GAW Miners was because Paybase, when launched after the

new year in 2015, had "no merchant adoption" for Paycoin.  (*Id*. at 663:22–664:10.)[20]

Considering the totality of the evidence, the jury reasonably could have concluded that Paycoin was not an investment contract because Plaintiffs failed to prove that it was promoted primarily as a speculative investment (as opposed to a medium of exchange).

Plaintiffs point to evidence from their class representatives that they had an investment "intent" in purchasing Paycoin.  (Pls' Mem. at 35, 37.)  However, the subjective intent of a buyer is not controlling on whether a product constitutes an "investment contract."  *See Warfield v. Alaniz*, 569 F.3d 1015, 1021 (9th Cir. 2009) ("while the subjective intent of the purchasers may have some bearing on the issue of whether they entered into investment contracts, we must focus our inquiry on what the purchasers were offered or promised").  Moreover, the jury could have weighed this testimony against the other evidence in the record (including that summarized above) and concluded that what Paycoin purchasers were primarily offered and promised was a medium of exchange with wide retail adoption.  That some people (Plaintiffs included) might have had a subjective or secondary investment intent is not contrary to that conclusion.

Plaintiffs also cite *Kik Interactive*, which held that Kin (the token at issue in that case) did not have any "consumptive use" available at the time of its "distribution" and such use would materialize only if the enterprise advertised by Kik was successful.  (Pls' Memo at 37 (citing *Kik Interactive*, 492 F.Supp.3d at 180).)  While the district court's decision in *Kik* is not controlling and the question of the correct characterization of digital tokens is vigorously debated,[21] the

---

20.  While PX-160 (a November 4, 2014 screenshot from hashcoin.com, titled ICO), cited by Plaintiffs, refers to the "Increased market value" of Paycoin following its ICO, the same page also shows the goal of "Major Retailer Adoption" of Paycoin as a medium of exchange.  (Pl. Ex. 14 (PX-160) at p.3.)

21.  *See, e.g.*, Hester M. Peirce, *Running on Empty: A Proposal to Fill the Gap Between Regulation and Decentralization* (Feb. 6, 2020), available at https://www.sec.gov/news/speech/peirce-remarks-blockress-2020-02-06 (former SEC Commissioner Peirce expressing concern that there would be no end to the Commission's authority if the definition of an investment contract was applied too broadly to digital tokens.  Comparing

court there specifically noted evidence showing Kik's CEO promoting Kin's "profit-making potential" versus its use as a medium of exchange just days prior to the ICO.  *Kik Interactive*, 492 F.Supp.3d at 179–80.  Nor did the *Kik* court have before it the testimony of class representatives' excitement about Paycoin's "faster transaction rates" or their disappointment that Paycoin did not have merchant adoption.  (*See supra* 31-32.)  Based on the totality of the evidence, the jury here reasonably could have reached a different conclusion for Paycoin than the *Kik* court did for Kin.

### C.    The Jury Properly Could Have Determined that Plaintiffs Failed to Prove a "Common Enterprise" with Regard to Paycoin.

While Plaintiffs' failure to satisfy their burden of proof on the "efforts of others" *Howey* factor is sufficient for the Court to deny Plaintiffs' motion as to Paycoin, the Court has grounds to do so with regard to the "common enterprise" element of *Howey* as well.

To establish "horizontal commonality," Plaintiffs had to prove that there was a "pooling" of Paycoin owners' assets.  (*See* ECF 326 (Jury Instructions) at 21; *see also supra* 12-14 (citing authority).)  Plaintiffs argue that they demonstrated "horizontal commonality" because "GAW intended to pool the money received from investors in Paycoin's ICO to develop the Paycoin ecosystem and ensure … the success of each Paycoin investor[.]"  (Pls' Mem. at 29.)  However, Plaintiffs admitted that, to receive Paycoin from GAW Miners, they contributed only "their right to receive their normal Hashlet mining rewards for Hashpoints" and later, the Hashpoints themselves "when [GAW Miners] converted those Hashpoints to Paycoin."  (*Id*. at 26.)

Regardless of whether they could satisfy the "investment of money" prong of *Howey*,

---

marketing of digital tokens to marketing of other consumer products, she asked:  "How would that logic apply to a shoe company, which, as it sells you a pair of sneakers, promises to hire some prominent athletes to promote the brand, thus focusing your mind on how sky high the price will go on StockX rather than on how high your new kicks will enable you to jump on the basketball court?").

Plaintiffs presented no evidence how those contributions—suspending a right to mine other cryptocurrency for Hashpoints and those Hashpoints themselves (described by Plaintiffs as "in-house credit" only) (*see, e.g.*, Ex. A, Trial Tr. at 583:20–24 (Audet))—were or could actually be "pooled" together in the so-called "Coin Adoption Fund" (*see* Pl. Ex. 14 (PX-160) at p.3) to develop the "Paycoin ecosystem." That is the "pooling" for which Plaintiffs presented evidence at trial. (*See* Pls' Mem. at 34 (relying on Pl. Ex. 14 (PX-160), which shows a pooling of money in a "CAF Trust" through the planned Paycoin ICO).) However, evidence of "pooling" of the buyers' (here, Plaintiffs') assets, is critical to a finding of horizontal commonality, and Plaintiffs did not present such evidence to the jury. *See Balestra*, 380 F. Supp. at 353 ("'finding of horizontal commonality requires a sharing or pooling of funds.'") (citation omitted).

These facts contrast sharply with the three cases that Plaintiffs cite extensively in their papers for their Paycoin argument. (*See* Pls' Mem. at 26–33.) In each of those cases, plaintiffs were investors who, in return for the digital tokens at issue, invested money, Bitcoin, Ether or Litecoin, the very things that were and could be pooled for the purpose of developing a digital ecosystem for the underlying cryptocurrency.[22, 23]

The jury reasonably could also have concluded that Plaintiffs did not establish vertical commonality between Plaintiffs and GAW Miners because the evidence did not show that their fortunes were "tied" such that they "would rise and fall together." (ECF 326 (Jury Instructions)

---

22. *See Telegram*, 448 F. Supp. at 358 (money); *Balestra*, 380 F. Supp. at 346 (Bitcoin, Ether and Litecoin); *Kik Interactive*, 492 F.Supp.3d at 175, 179 (money).

23. This is not to say that there could never be a common enterprise among Paycoin owners, *e.g.*, Paycoin owners who bought Paycoin in exchange for money that would fund the Coin Adoption Fund. However, that does not mean Plaintiffs, who got paid in Paycoin in exchange for Hashpoints, were also part of that common enterprise. Every owner of the same type of asset is not necessarily part of a "common enterprise." For example, in *Howey*, it cannot be said that buyers who acquired tracts of land but did not sign agreements with the defendant-company to lease back those tracts and have them pooled with those of other buyers, were in a "common enterprise" with buyers who leased back their tracts of land to the defendant-company to cultivate.

at 21.)  The evidence undermined such a finding.

*First*, Plaintiffs point to the fact that GAW Miners and Plaintiffs both held Paycoin.  (Pls'
Mem. at 31.)  That, however, is insufficient to establish vertical commonality.  *See Marini v.
Adamo*, 812 F. Supp. 2d 243, 257–58 (E.D.N.Y. 2011) (rejecting plaintiffs' argument that
"ownership [by the purchaser and seller] of the same types of coins necessarily links their
fortunes together for purposes of the strict vertical commonality analysis"; because the seller and
purchaser were free to direct the sale of their coins or hold onto their coins to capitalize on any
long-term appreciations in value, their "portfolios were not intertwined such that [their] fortunes
*had* to rise and fall together.").  If—as Plaintiffs claim (Pls' Mem. at 31)—GAW Miners held a
large percentage of Paycoin, it had the ability to flood the market and make a big profit on such
sales, while causing a steep devaluation for other Paycoin owners. That undermines the
"intertwining" of the fortunes of GAW Miners and Paycoin owners that vertical commonality
requires; it is also precisely what Plaintiffs allege happened in this case.  (*See* ECF 57 (Amended
Compl.) ¶ 149 (Plaintiffs alleging that Garza sold pre-mined Paycoin "manipulating the price of
Paycoin and harming GAW Miners' customers" who were holding Paycoin).)

*Second*, relying on *Telegram*, a decision issued by a sister district court on a motion for
preliminary injunction, Plaintiffs also argue that they demonstrated vertical commonality
between GAW Miners and Paycoin owners by showing that "GAW's financial fortunes" and its
"reputation" were linked to the "success or failure of the Paycoin project."  (Pls' Mem. at 32-33.)
*Telegram* similarly held, without citing a single case, that the fortunes of the promoter and
investors in that case were sufficiently tied to satisfy strict vertical commonality because
"Telegram would also suffer critical reputational damage if the TON Blockchain failed prior to
or after launch."  *Telegram*, 448 F. Supp. at 370.  Plaintiffs' argument (as well as the *Telegram*

court's holding on which Plaintiffs rely) goes too far. Companies' financial or reputational success is almost always linked to the success of projects they undertake; that same success (or failure) may well impact their customers. That, however, does not place companies and their customers in a common enterprise, and create the "one-to-one … interdependence of *both profits and losses*" between them that is necessary for vertical commonality. *See Kaplan*, 655 F. Supp. at 341 (emphasis in original). As the jury reasonably could have inferred from the evidence, GAW Miners could have done very well financially and reputationally as a business if the "Paycoin project" worked out, but individual Paycoin owners could have suffered steep loss in value of their coins because of the market activities of other Paycoin owners. This would not tie together the fortunes of GAW Miners and Paycoin owners.[24]

*Finally*, the jury heard undisputed evidence that Paycoin continued to trade long after the SEC announced its investigation of GAW Miners in mid-January 2015, and despite GAW Miners' failure to launch many of the promised features of Paycoin or support the promised $20 price floor. (*See* Pl. Ex. 18 (DX-719) (Coinmarketcap.com records showing Paycoin traded for months after the SEC announced its investigation).) A jury reasonably could have inferred that the fortunes of Paycoin holders did not rise and fall with the fortunes of GAW Miners, since Paycoin continued to exist and trade (albeit at lower market value than the promised $20) independent of GAW Miners and GAW Miners' promises.

---

24. The *Telegram* court found vertical commonality in part because the initial purchasers' anticipated profits were directly dependent on "[the promoter's] success in developing and launching" the blockchain. *Telegram*, at 370. Here, Plaintiffs likewise argue that they demonstrated vertical commonality because the fortunes of GAW Miners and Paycoin owners both depended on GAW Miners' success or failure to deliver the Paycoin project. (Pls' Mem. at 32–33.) That argument, however, conflates the "fortunes" of the promoter (which characterizes strict vertical commonality) with the "efforts" of the promoter (which characterizes broad vertical commonality). In other words, it improperly merges *Howey*'s "common enterprise" requirement with its "efforts of others" requirement—an approach he Second Circuit has expressly rejected. *See Revak*, 18 F.3d at 88 (rejecting broad vertical commonality because it improperly merges *Howey's* second and third factors).

*     *     *     *     *

In arguing that that *no reasonable jury* could have determined that Paycoin was not an investment contract, Plaintiffs rely heavily on decisions in three recent cases.  However, the fact that some courts have held (albeit at very different procedural junctures) that certain digital tokens are investment contracts does not mean that Paycoin was *ipso facto* also an investment contract.[25]  Whether a product constitutes an investment contract is a "highly fact-specific inquiry" that requires a "case-by-case analysis into the economic realities of the underlying transaction[s]."  *Zaslavskiy*, 2018 WL 4346339, at *4.  Accordingly, decisions in other cases involving different facts and different procedural contexts have little relevance to whether the jury's verdict in *this* case was reasonable and consistent with the weight of the evidence presented to *this* jury.  Moreover, even if the facts here were identical to the facts in those cases—which they are not (*see supra* 32-33 (comparing the facts here to those in *Kik Interactive*))—as has long been recognized, it is entirely possible for different factfinders to reach different conclusions, both of which are reasonable.  *See Huilever, S.A. Div. Huileries Du Congo Belge v. The Otho*, 139 F.2d 748, 750 (2d Cir. 1944) (noting the "[i]nevitab[ility] that different trial judges, like different juries, may reach opposite results on facts which are similar or even apparently identical").[26]

---

25. All three decisions that Plaintiffs cite are in procedural contexts very distinct from the instant case:  *Kik Interactive Inc.*, 492 F.Supp.3d 169, issued on a motion for summary judgment; *Balestra*, 380 F. Supp. 3d at 356, involved a motion to dismiss; and *Telegram*, 448 F. Supp. 3d 352, involved a motion for a preliminary injunction.  None involved jury determinations or a full trial record.

26. Even assuming the sale of Paycoin through the ICO (or a particular round of Paycoin) might have constituted an investment contract, that does not make the underlying asset itself—here, Paycoin—an investment contract. *See, e.g.*, *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 756 F.2d 230 (2d Cir. 1985) (a brokerage firm created investment contracts because of the manner in which it identified, sold and managed CDs, even though the objects of the scheme, CDs, had been clearly excepted from the definition of "security" under prior case law).  Former SEC Commissioner Hester Peirce also noted recently that the "'contract, transaction or scheme' by which the token is sold may constitute an investment contract; but, the object of the investment contract—the token—may not bear the hallmarks of a security." Hester M. Peirce,

37

**IV.    PLAINTIFFS ARE NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW OR A NEW TRIAL ON THE ISSUE OF WHETHER HASHPOINTS AND HASHSTAKERS WERE "INVESTMENT CONTRACTS"**

During oral argument on Mr. Fraser's motion for a directed verdict, Plaintiffs' counsel admitted that there was a "paucity of evidence on the precise nature" of Hashpoints and Hashstakers.  (Charge Conf. Tr. at 29:13–19.)  That was Plaintiffs' fault, not Mr. Fraser's, and it is unsurprising that the jury concluded that Plaintiffs did not meet their burden to demonstrate that Hashpoints and Hashstakers were investment contracts.

Plaintiffs' only argument why Hashpoints and Hashstakers were "investment contracts" is that they were used to "acquire Paycoin."  (*See* Pls. Mem. at 7; *see also* Ex. A, Trial Tr. at 1081:7–11 (Plaintiffs' closing argument) (Hashpoints and Hashstakers were "just another way of getting" Paycoin, and "that's why all of these things are securities").)  However, the jury assessed the three *Howey* factors separately for each Product.  (*See* ECF 326 (Jury Instructions) at 21 ("To establish that a Product is an 'investment contract,' the plaintiffs must prove that there was, *with regard to that Product*," the presence of each of the three *Howey* elements) (emphasis supplied); *see also* ECF 253-16 (parties' joint proposed jury instructions) at 16 (similar language with no objection from Plaintiffs).)  Accordingly, Plaintiffs cannot escape the "paucity" of their evidence and satisfy the *Howey* requirements for Hashpoints and Hashstakers by jumbling them with Paycoin.  In any event, as discussed below, whether considered separately (as proper based on the jury instructions) or in relation to Paycoin, the evidence supports the jury's determination that Plaintiffs did not prove by a preponderance of the evidence that Hashpoints and Hashstakers

---

*Running on Empty: A Proposal to Fill the Gap Between Regulation and Decentralization* (Feb. 6, 2020), available at https://www.sec.gov/news/speech/peirce-remarks-blockress-2020-02-06.  Here, the jury was asked only whether Paycoin—the digital asset itself—constituted an investment contract, not whether a particular offering or investment scheme was a security.  (*See* ECF 326 (Jury Instructions) at 21.)  The jury reasonably could have determined that Paycoin itself—which people could buy or sell independent of GAW Miners—was not an investment contract, even if, under particular circumstances, its sale could constitute one.

were investment contracts.

**A.** **The Jury Properly Could Have Determined that Plaintiffs Failed to Prove Hashpoints Were "Investment Contracts."**

The jury heard little about Hashpoints except that they are like "in-store credit" that could later be converted to Paycoin.  (*See* Ex. F (PX-203) (Garza Dep. Tr.) at p. 11, clip 50 (Hashpoints were "a way that people could earn, like, almost like in-store credit, like sort of like an internal value within GAW Miners to then eventually use to purchase PayCoin."); Ex. A, Trial Tr. at 583:20–24 (Audet) "Hashpoints were like an in-house credit from GAW Miners").) Plaintiffs offered no evidence to demonstrate that Hashpoints themselves represented an investment of money in a "common enterprise," or that there was an expectation of making profits from Hashpoints.  Instead, as the record shows, GAW Miners represented to customers that Hashpoints had a fixed value with "400 Hashpoints [valued at] $4."  (Ex. A, Trial Tr. at 649:4–5 (Shinners).)  Even if Hashpoints are considered in relation to Paycoin, and assuming *arguendo* that Paycoin was an investment contract, that Hashpoints could be used to acquire Paycoin does not make Hashpoints an investment contract.  By that misguided logic, money used to buy stock or another security would itself also constitute a security.

**B.** **The Jury Properly Could Have Determined that Plaintiffs Failed to Prove Hashstakers Were "Investment Contracts."**

There similarly was little evidence in the record regarding Hashstakers.  Mr. Shinners testified that a Hashstaker was like a "certificate of deposit" for which you get "paid an inherent rate of return or interest."  (Ex. A, Trial Tr. at 649:20–25.)  And Mr. Pfeiffer testified that a Hashstaker was like a "Paycoin wallet" that offered "interest" in the form of Paycoin in exchange for "lock[ing] up" Paycoin.  (*Id*. at 836:13–20.)  That a product is similar to a "certificate of deposit" does not make it an "investment contract."  *See Heine v. Colton, Hartnick, Yamin & Sheresky*, 786 F. Supp. 360, 371 (S.D.N.Y. 1992) (although the scheme at

issue operated like a fixed-rate security, such as a bond or debenture, it did not satisfy the requirements of an "investment contract").  Here, Plaintiffs had to prove that Hashstakers satisfied each of the three *Howey* requirements.  They failed to do so.  To the contrary, evidence that Hashstakers were like interest-bearing wallets or certificates of deposit that paid an "inherent" amount of interest could reasonably cause a jury to conclude that Hashstakers did not represent any "common enterprise" or "expectation of profit."  Rather, based on how certificates of deposit normally work, a Hashstaker-owner would get the promised interest paid regardless of anything else.  Assuming *arguendo* that Paycoin was an investment contract, that does not render a Hashstaker an investment contract—in that scenario, Paycoin would involve a common enterprise and expectation of profit based on the efforts of others, not the wallet (here, Hashstakers) that holds the Paycoin and simply earns interest, no matter what.[27]

## Conclusion

For the reasons set forth above, Mr. Fraser respectfully requests that the Court deny Plaintiffs' motion in its entirety and permit the jury's considered verdict to stand.

---

27. Plaintiffs suggest they are entitled to a new trial on whether the Products constituted investment contracts because, on the first day of deliberations, the jury inquired of the Court, with regard to Question 1 of the verdict sheet (whether Plaintiffs had proven the Products were investment contracts), if one adverse opinion is sufficient for a "no answer" from the jury on that question, and on the second day the jurors responded with a unanimous "no" on that question.  (Pls' Mem. at 39, n.11.)  Plaintiffs' suggestion of juror misconduct is without basis and cannot provide grounds for a new trial.  *See United States v. Sun Myung Moon*, 718 F.2d 1210, 1234 (2d Cir. 1983) (in order to obtain a post-trial jury hearing, much less a new trial, there must be "clear, strong, substantial and incontrovertible evidence that a specific, nonspeculative impropriety has occurred.") (citation omitted).  Plaintiffs' sheer speculation does not satisfy that stringent test.  Moreover, when polled after delivering the verdict, each juror confirmed it was his or her verdict.  (Ex. A, Trial Tr. at 1108:15–1109:19.)  The sequence of events Plaintiffs cite easily could reflect that one juror had decided "no" as to one or more parts of Question 1 at the time the jury raised the question, and the others reached that same conclusion upon further deliberation.

Dated:  January 14, 2022

HUGHES HUBBARD & REED LLP

By:   /s/ *Daniel H. Weiner*_____

Daniel H. Weiner (ct12180)
Marc A. Weinstein (*pro hac vice*)
Amina Hassan (*pro hac vice*)
Hannah Miller (*pro hac vice*)
One Battery Park Plaza
New York, NY 10004-1482
Tel.: (212) 837-6000
Fax: (212) 422-4726
Email: daniel.weiner@hugheshubbard.com

David R. Schaefer (ct04334)
Sean M. Fisher (ct23087)
Rowena Moffett (ct414899)
Brenner, Saltzman & Wallman LLP
271 Whitney Avenue
New Haven, CT  06511
Tel.: (203) 772-2600
Fax: (203) 562-2098
Email: rmoffett@bswlaw.com

*Attorneys for Defendant Stuart A. Fraser*

41