# Exhibit B

```
1                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF CONNECTICUT
2
    - - - - - - - - - - - - - - - - x
3
    DENIS MARC AUDET, MICHAEL          No. 3:16-CV-940 (MPS)
4   PFEIFFER, and DEAN ALLEN
    SHINNERS, Individually and on      OCTOBER 27, 2021
5   Behalf of All Others Similarly
    Situated,                          3:54 P.M.
6
    vs.                                JURY CHARGE CONFERENCE
7
    STUART A. FRASER, GAW MINERS,
8   LLC, and ZENMINER, LLC, (d/b/a
    ZEN CLOUD)
9
    - - - - - - - - - - - - - - - - x
10

11                    450 Main Street
                    Hartford, Connecticut
12

13       BEFORE:  THE HONORABLE MICHAEL P. SHEA, U.S.D.J.

14

15  APPEARANCES:

16  FOR THE PLAINTIFFS:

17          SUSMAN GODFREY, L.L.P.
                1301 Avenue of the Americas, 32nd Floor
18              New York, New York 10019
            BY:  SETH D. ARD, ESQUIRE
19          BY:  JACOB W. BUCHDAHL, ESQUIRE
            BY:  GENG CHEN, ESQUIRE
20          BY:  RUSSELL RENNIE, ESQUIRE

21          IZARD, KINDALL & RAABE, LLP
                29 South Main Street, Suite 305
22              West Hartford, Connecticut 06107
            BY:  MARK P. KINDALL, ESQUIRE
23

24   (Appearances continue ...)

25
```

```
 1   APPEARANCES CONTINUED:

 2   FOR THE DEFENDANT:

 3           HUGHES, HUBBARD & REED L.L.P.
                   One Battery Park Plaza, 12th Floor
 4                 New York, New York 10004-1482
             BY:  DANIEL WEINER, ESQUIRE
 5           BY:  MARC A. WEINSTEIN, ESQUIRE
             BY:  AMINA HASSAN, ESQUIRE

 6
             BRENNER, SALTZMAN & WALLMAN
 7                 271 Whitney Avenue
                   New Haven, Connecticut 06511
 8           BY:  ROWENA A. MOFFETT, ESQUIRE

 9

10

11

12

13

14

15

16

17

18

19

20   COURT REPORTER:  Julie L. Monette, RMR, CRR, CCP
                          (860) 212-6937
21
     Proceedings recorded by mechanical stenography, transcript
22   produced by computer.

23

24

25
```

1   cited a case for it.  I'm familiar with the concept in

2   principal agent relations, but I'm not familiar with it outside

3   that concept, and I don't see how that would apply here.

4         So anyway, those are -- those are some concerns about

5   affirmative defenses, and I'm willing to talk about them.  So

6   those are my comments.  Here's what I propose we do:  Why don't

7   we have brief discussions of the motions.  Then we'll go page

8   by page through the charge.  Okay?

9         All right.  So did Defense want to go first with their

10   motion, with this motion?

11         MS. HASSAN:  Sure, Your Honor.

12         THE COURT:  Okay.

13         MS. HASSAN:  So, Your Honor --

14         THE COURT:  I can hear you.

15         MS. HASSAN:  Okay, good.  I was hearing myself.  Okay,

16   so, Your Honor, Defendant is going to move for directed verdict

17   as to each of Plaintiffs' claims against Mr. Fraser.  We

18   believe that Plaintiffs have not presented sufficient evidence

19   for a jury to find for them on one or more elements of each of

20   those claims.

21         In particular, Plaintiffs have not presented

22   sufficient evidence for a jury to find that Mr. Fraser was a

23   control person or materially assisted the fraud at issue.  But

24   in light of the Court's instruction to generally keep the

25   argument brief, instead of walking through each element, there

1          MS. HASSAN:  Correct.

2          THE COURT:  Got it.  Because from your standpoint,

3     there's no evidence of a material misstatement or material

4     omission with respect to those two products.

5          MS. HASSAN:  Correct.

6          THE COURT:  Got it next.

7          MS. HASSAN:  So second point, we don't believe that

8     any of the core products or investment contracts adequately

9     address Hashpoints and HashStakers, but I think where I want to

10    spend most of my time is Hashlets.  As far as Hashpoints and

11    HashStakers is concerned, all we have heard about them is they

12    were a kind of in-house credit and you could accumulate them to

13    exchange for Paycoin.  And we haven't really heard anything

14    about HashStakers other than the fact they were some kind of

15    wallet.  So we just don't believe that there's sufficient

16    evidence for the jury to actually assess the three Howey

17    factors.

18         THE COURT:  I thought Mr. Pfeiffer testified today

19    that HashStakers were like a CD.  You put in your whatever it

20    is, your Hashpoints or your Paycoin or your Hashlets -- I can't

21    remember which -- into the HashStakers wallet and you get it

22    back in 90 days or something like that.  I don't know if he

23    said with interest or not, but that was my impression.  Am I

24    wrong about that?

25         MS. HASSAN:  No, Your Honor, you're actually correct.

1    I believe there is testimony they are like CDs, but that

2    doesn't make something an investment contract.  That would be

3    like saying something is like a bond and, therefore, it's an

4    investment contract.  And that just isn't the case.  You have

5    to still check off those three requirements of Howey, and the

6    only allegation in this case is that these products are

7    investment contracts and, therefore, securities.

8              So I do -- I do correct myself, but I think the point

9    is that there isn't sufficient evidence or any evidence for the

10   jury to assess the three factors of Howey for both Hashpoints

11   and HashStakers.

12             THE COURT:  So if the company's doing well in mining

13   and the, you know, striking it rich, all right, and they're

14   mining lots of Bitcoin, don't -- I mean I'm asking this:  Is

15   there evidence to suggest that the value of Hashpoints and

16   HashStakers goes up if that happens?

17             MS. HASSAN:  Your Honor, as I understood from the

18   evidence that was presented was Hashpoints was something that

19   would be mined; right?  I believe Mr. Pfeiffer or Mr. Audet

20   said that Hashlets at some point would start mining Hashpoints.

21             THE COURT:  I think there were -- so there was a

22   suggestion that I thought you could invest or buy Hashpoints,

23   but you could definitely mine them as well -- that's certainly

24   what Mr. Pfeiffer said today -- and that you could convert

25   Hashpoints into ultimately Paycoin at the relevant time.

1          But I thought what you -- how you got Hashpoints --

2     oh, another way to get Hashpoints, I thought there was evidence

3     of this, was you could convert your Hashlets into Hashpoints.

4     Wasn't there some evidence along those lines?

5          MS. HASSAN:  Well, Your Honor, even let's say you

6     could convert your Hashlets into Hashpoints or you could buy

7     Hashpoints.

8          THE COURT:  Yeah.

9          MS. HASSAN:  Again, I'm not sure whether pooling of

10    assets comes in, whether kind of the Hashpoint owner's

11    fortunes -- like, we have no evidence of the actual factors

12    that feed into the investment contract.  Like, where is the

13    pooling of assets for a Hashpoint?

14         THE COURT:  Well, isn't the -- as I say, if you buy a

15    Hashpoint or -- sorry -- you convert your Hashlet to a

16    Hashpoint, I mean, I will confess I don't remember a lot of

17    specific evidence on this.  So you can say, "Judge, there just

18    was no evidence on that," and you might be right.  But I had

19    the impression that if you convert your Hashlet to a

20    Hashpoint -- and as I say, you know, the company's supposedly

21    mining all along and they're making money hand over fist.  Now,

22    it's not like they're striking it rich in the pools.

23         I would have thought your Hashpoints increase in value

24    because of the underlying Hashlet increased in value, although

25    I admit I may be speculating here.  I'm not quite sure how

1    that ...

2            MS. HASSAN:  Your Honor, I don't believe we have that

3    evidence.

4            THE COURT:  Okay.

5            MS. HASSAN:  And that's what I'm going by.  And

6    eventually if the idea is that Hashpoints are converting into

7    Paycoin, then I get that the class members have claims as to

8    Paycoin, but I still don't get that interim step.  How does a

9    coupon or an in-store credit really become a security?

10           THE COURT:  Got it.  Okay.

11           MS. HASSAN:  So Hashlets -- that's what I want to

12   focus on, Your Honor.  So Howey has three elements.  We want to

13   focus on the second two, which is common enterprise and whether

14   there was an expectation of profits derived solely from the

15   efforts of others.

16           So on the common enterprise issue, it is our position

17   that Hashlets do not satisfy either of the two tests, the

18   horizontal commonality or the strict vertical commonality

19   tests.

20           I'll start with -- well, I'll just take the horizontal

21   commonality test.  So for horizontal commonality, each of the

22   Hashlet owners' fortunes had to be tied to the fortunes of the

23   other Hashlet owners.  We've had very consistent and clear

24   testimony from the class representatives that was not the case.

25   We've had testimony that two Hashlet owners could own the same

1    type of Hashlet and one could do really well and the other

2    could do really poorly depending on which pools they had chosen

3    to mine in.

4              THE COURT:  True.

5              MS. HASSAN:  So that tying of fortunes it just doesn't

6    exist based on the evidence that has come in.

7              THE COURT:  Got it.  Go ahead.

8              MS. HASSAN:  As to vertical commonality, Your Honor,

9    again, we have very clear and consistent evidence that GAW

10   Miners and ZenMiner, which take a fixed fee for Hashlets --

11             THE COURT:  That being the maintenance fee.

12             MS. HASSAN:  Correct, the fixed service or maintenance

13   fee, and that means the fortunes of GAW Miners and the Hashlet

14   owners were not tied together.

15             THE COURT:  Does it?  I mean, if my broker charges me

16   a fee, transaction fee, whatever it is, does that mean what the

17   broker's selling is not a security?

18             MS. HASSAN:  Um --

19             THE COURT:  The mere fact that charging a maintenance

20   fee don't make it not an investment contract; right?  Does that

21   foreclose it from being an investment contract?

22             MS. HASSAN:  Well, it doesn't satisfy the vertical

23   commonality test.  And I think when we're transacting through a

24   broker, we're buying and selling securities, it's not that the

25   broker service becomes a security.  Over here we're saying that

1   the product that the company was selling is a security.  But I

2   think the broker example is slightly different.

3          If it's helpful, we did find some cases which

4   basically say that if the promoter or the defendant, all that

5   they're doing is they're charging you a fixed maintenance fee,

6   which does not change with how much profit the actual plaintiff

7   is making, then that does not satisfy.

8          THE COURT:  Yeah, but I had the impression -- I

9   thought there was some testimony about -- again, this is what

10  was represented.  I know the whole thing didn't turn out this

11  way.  But that company's mining; they're mining Bitcoin.

12  They've got these machines.  They're selling a piece -- in

13  effect, a piece of a machine.  I know it's not.  It's a

14  timeshare, whatever.  You can slice the machine to others;

15  those are called Hashlets.

16         So if the company is, as I say, doing really well in

17  the mining, they're, you know, knocking it out of the park,

18  then the Hashlet payout -- so that's the company's fortune.

19  Company's doing well; right?  And then the Hashlet payout goes

20  up too; right?

21         MS. HASSAN:  Well, Your Honor, okay, so the reason

22  that the company would do well in that situation is that maybe

23  more people would come and buy more Hashlets; right?

24         THE COURT:  Well, no.  Because I thought that -- I

25  thought early on -- and I don't remember which witness

1    testified that, well, the company's doing mining their

2    machines, and they're selling pieces of these machines.  But

3    they're the ones doing the mining.  I don't know if somebody

4    said this.  I had the impression that what they're doing is the

5    company's sharing profits with you.  They're not paying out

6    every -- in other words, let's say the company makes a hundred

7    dollars on a particular day on a particular machine and there

8    were ten Hashlets and that machine was represented by ten

9    Hashlets.  I didn't have the impression they were paying ten

10   apiece.  I had the impression they were paying nine apiece and

11   keeping something on the top.

12          MS. HASSAN:  You might be thinking of Professor

13   Narayanan's testimony --

14          THE COURT:  Maybe.

15          MS. HASSAN:  -- in which he said there are different

16   ways in which this kind of operation could be set up.  There

17   could be the example that you gave is one way of setting it up.

18   But what the testimony is about Hashlets is that you were

19   buying either a physical miner or basically its power or a

20   piece of the physical miner so a portion of its power.  And

21   then you were deciding which pool, including external pools,

22   that it was mining in.  And all that the company is doing,

23   vis-a-vis the Hashlet, is operating the miners and maintaining

24   them.

25          The fact that the company might have been -- and I

1　don't know if that's the case or if -- I don't believe there's

2　evidence of that.  The fact that the company might be mining

3　for its own purposes, then I don't think that that's relevant.

4　　　　　THE COURT:  Even if they're not just sharing the

5　profits?  Even if the Hashlet is ultimately not just there

6　sharing the mining profits with you?

7　　　　　MS. HASSAN:  Well, our position would be that based on

8　the evidence, what the representation of what a Hashlet was was

9　not that.  It wasn't that we are going to mine and then share a

10　slice of our profits.  It was we will -- we will give you a

11　physical miner or a piece of the physical miner.  And that's

12　what two of the three class representatives also represented,

13　that it was the machine or part of the machine.  I understand

14　it's actually the power of the machine, but it's not that we're

15　getting a slice of the overall profit.

16　　　　　THE COURT:  Okay.  I had the impression there was some

17　testimony like that, but I'm not at all certain of that.  So

18　you could be right.  But keep going.  Okay.

19　　　　　MS. HASSAN:  So, Your Honor, then it takes us to the

20　third element, which is profits to be derived solely from the

21　efforts of others.  And, again, as to Hashlets, we don't

22　believe that that requirement is satisfied.  The reason

23　being --

24　　　　　THE COURT:  Because you were pointing your thing to

25　the pool, and that was the testimony you brought out; right?

1          MS. HASSAN:  Correct.  And, you know, you could be

2    boosting your Hashlets.  If somebody's boosting their Hashlets,

3    being interactive with their Hashlets, they get more profits.

4          THE COURT:  But, of course, you're not doing the

5    mining; right?  The company is.  Isn't the company the one

6    doing all the algorithms and the fancy math and all that stuff?

7          MS. HASSAN:  Your Honor, I'm not sure whether the

8    company is doing the algorithms.  It has the machines, and the

9    machines are being pointed to different pools which could be

10   external pools.  So the machine is doing the algorithms.

11         THE COURT:  I know, but the company owns the machines.

12   So, I mean, it amounts to the same thing, doesn't it?  I mean,

13   if the company owns the machine, it's not like they -- that

14   shouldn't matter for purposes of this.  They own the machine,

15   so they say, Look, this is what we're doing.  We happen to use

16   the machine instead of somebody from MIT.

17         MS. HASSAN:  They sold you the machine or power of the

18   machine; right?  They sold you the power of the machine, so you

19   own the piece of the power of that machine.

20         THE COURT:  Yeah, but you're not doing a thing; right?

21   You're not doing any math.  You're just saying, oh, I'll aim it

22   at the Clever pool or the this pool or the that pool.  So

23   you're having that say.

24         MS. HASSAN:  Correct.

25         THE COURT:  But you're not then, you know, okay, let's

1    solve that blockchain.  You're not doing that.  The machine is.

2         MS. HASSAN:  Well, Your Honor, I think it's a unique

3    kind of situation because here nobody really is doing much

4    other than switching -- the machine is doing --

5         THE COURT:  I mean, in reality, yeah, but -- well,

6    okay.

7         MS. HASSAN:  So I guess, for instance, let's say there

8    was no GAW Miners or ZenMiner; right?  You could buy a miner or

9    a smaller miner.  You could plug it at home, and it would do

10   all the calculations; right?  Again, all you'll be doing is I

11   want to --

12        THE COURT:  Yeah, but you own the machine at that

13   point.  You're housing the machine at that point.  You're

14   maintaining the machine at that point.  And so in that sense

15   those are your efforts.  Here the company's housing the

16   machine.  It's maintaining the machine.  It's paying for the

17   electricity for the machine.  So those are its efforts.

18        MS. HASSAN:  Well, that's fair.  So it's almost like

19   the company's contributing something and you're contributing

20   your strategy.

21        THE COURT:  So it's not solely from the efforts of

22   others is your point.

23        MS. HASSAN:  Correct.  And I think, Your Honor, your

24   proposed instruction on this is instructive because in the

25   instruction it says the question is whether the product was

1  being promoted primarily as an investment, in which case it

2  would be an investment contract, or whether the product was

3  being promoted as a means whereby participants would pool their

4  activities, money, and the promoter's contributions in a

5  meaningful way.

6       So here it seems like both of them are putting

7  together their efforts and their strategy.  Both are

8  contributing something.

9       THE COURT:  I got it.  What's next?

10      MS. HASSAN:  Okay.  So, Your Honor, I'll touch lightly

11 on Paycoin.  Again, from our perspective, it's not an

12 investment contract.  It's a currency.  We don't need to go

13 into much detail about that.

14      THE COURT:  Can I ask you this:  Do you agree with me

15 that -- I mean, I'm sure the Plaintiffs disagree that it's a

16 currency at all.  But you didn't say about any of the others

17 that you thought they were currency.  So would you agree that

18 if -- that if any product is currency, it's just Paycoin?

19      MS. HASSAN:  Yes, Your Honor.

20      THE COURT:  Fair enough.

21      MS. HASSAN:  And, again, Your Honor, with Paycoin, we

22 don't believe the evidence is in which would satisfy all three

23 elements of Howey in terms of the pooling of assets.  We've

24 heard evidence that, you know, people were buying and selling

25 Paycoin on the open market.  GAW Miners, ZenMiner had no

1    control over that.  So it was -- it was sold as a medium of

2    exchange.  It was being created on the open market.  It

3    doesn't -- there isn't necessarily the same type of the Paycoin

4    holder's fortunes as you would need.

5            THE COURT:  So if Paycoin, contrary to fact, had shot

6    up in value, wouldn't GAW have been more valuable?

7            MS. HASSAN:  To the extent that GAW was also holding

8    Paycoin?

9            THE COURT:  Yeah.  That would be one reason.  Also,

10   there wouldn't have had to -- well, again, I know we're

11   supposed to deal with this.  It's a little strange because we

12   have to live in a fictional world.  They also wouldn't have had

13   to put in the hundred million dollar coin fund.  I mean, in

14   theory, they said they were going to back it.  That was

15   fiction.  But they said they were going to back it.  And so

16   they certainly had a financial interest in Paycoin's success

17   and so that they didn't have to throw in the hundred million

18   dollars to back it; right?

19           MS. HASSAN:  That's fair, Your Honor.  I think with

20   Paycoin we could argue that there was some type of fortunes

21   between the companies and the Paycoin holders, if things had

22   actually worked out that way.  But it seems that, you know --

23           THE COURT:  But as I understand it, we're to consider

24   the question of whether something's a security based on what it

25   was represented to be.

1          MS. HASSAN:  Correct.

2          THE COURT:  Okay.

3          MS. HASSAN:  And what it was represented to be was

4  essentially a medium of exchange.  And, again, the fact that

5  all -- that at least a couple of the class representatives, I

6  believe they were open -- they were buying and selling it on

7  the open market, that seems completely divorced from what was

8  happening to the company; right?  The company hadn't even

9  launched the coin at that point.

10          So, again, you know, it's our position that --

11          THE COURT:  Okay.  But it's true that it hadn't

12  launched, but arguably those are -- those are based on -- based

13  on people's expectations about what's going to happen during a

14  launch.  And, again, if Paycoin -- it's true that those -- I

15  will ask them about that, because you're saying basically those

16  initial transactions didn't involve the company at all.

17          MS. HASSAN:  Correct.  And it seems to me that by the

18  time the company does launch Paybase, there's already enough

19  transactions of Paycoin -- for instance, Mr. Audet had already

20  bought Paycoin in December long before Paybase was launched.

21          THE COURT:  Yup.  Fair point.  All right.  Let's move

22  on.  So just to be clear, your position is Paycoin's not an

23  investment contract in the first instance.

24          MS. HASSAN:  Correct.

25          THE COURT:  Okay, got it.

1          MS. HASSAN:  Well, I think he said that -- well, he

2    said that he wasn't a board member.  He was like an informal

3    CEO above the CEO.

4          THE COURT:  It may not be fantastic testimony for the

5    Plaintiffs, but it's probably enough to charge a jury on.  But

6    anyway, so is that your final point?  I think I got the control

7    person thing under control.  In other words, I think I

8    understand the evidence.  That's one I really listened to the

9    evidence carefully on.

10         MS. HASSAN:  And that's why, Your Honor, I didn't have

11   too many points there.

12         THE COURT:  Very good.  All right.  I want to hear

13   from the other side, and then I'll let each side wrap up very

14   quickly.  I want to get done with this by quarter of.

15         Mr. Buchdahl.

16         MR. BUCHDAHL:  Where would you like me to start?

17         THE COURT:  You also had a motion to present; is that

18   right?

19         MR. BUCHDAHL:  So we did want to make a motion on the

20   affirmative defenses, but I'm not sure it's the right time to

21   do it.

22         THE COURT:  So let's not do that yet.  So why don't we

23   start with the investment contract issue.

24         MR. BUCHDAHL:  Sure.  So just taking it in order --

25         THE COURT:  Yup.

1          MR. BUCHDAHL:  -- first of all, with Hashpoints and

2     HashStakers, we believe that there was testimony from Professor

3     Narayanan, as well as I think all three of the Plaintiffs,

4     describing the relationships with -- between Hashpoints and

5     Hashlets, between Hashpoints and Paycoin, and between

6     HashStakers and Paycoin.  And in our view, Hashpoints and

7     HashStakers were both ways that the company essentially sold

8     Paycoin, because that was the sole purpose of acquiring a

9     Hashpoint or a HashStaker was to get Paycoin eventually.  And

10    so it was a way of selling the Paycoin security through --

11         THE COURT:  Okay, so it's a way of selling Paycoin.

12    Why does that make Hashpoints and HashStakers themselves a

13    security?

14         MR. BUCHDAHL:  Because they would have the same

15    characteristics; in other words, their value depended on the

16    same -- in the same way that Paycoin depended on the

17    expectation of profits from Paycoin was based on the efforts of

18    others, the expectation of profit in a Hashpoint or a

19    HashStaker was based on the same expectation of those same

20    efforts of others.

21         THE COURT:  But wasn't -- weren't the Hashpoints and

22    HashStakers basically just contracts around Paycoin?

23         MR. BUCHDAHL:  So HashStaker I think that's accurate.

24         THE COURT:  Okay.

25         MR. BUCHDAHL:  I think with Hashpoint it's a little

1    more complicated.

2         THE COURT:  Okay.

3         MR. BUCHDAHL:  Because Hashpoint was also the kind of

4    output or return on a Hashlet --

5         THE COURT:  Right.

6         MR. BUCHDAHL:  -- and, therefore, had that kind of

7    intermediary role.

8         THE COURT:  Okay.  So let's take HashStakers then.  So

9    if I have a contract to buy a stock or a bond or I have a

10   contract with the bank to hold a stock or a bond for a certain

11   amount of time, a stock or a bond is a security for sure.  But

12   is the contract a security?

13        MR. BUCHDAHL:  I think depending on how it was set up,

14   it would be.  And I think that there is, as the Court pointed

15   out, a paucity of evidence on the precise nature of these two

16   products.  And I think there's enough in there to describe them

17   as investment contracts based on their relationship to the

18   other products.  But if the Court has any question about that,

19   we'd like to go scrub the record a little more carefully.

20        THE COURT:  All right.  Let's keep going.

21        MR. BUCHDAHL:  So with regard to Paycoin, a couple

22   different things to consider.  First of all, the very nature of

23   an ICO is -- makes something a security because the kind of

24   putting together of an ICO, the kind of promotion of it, all of

25   that are ways in which the investors are relying on the efforts

1   of the company to kind of generate profits through the ICO

2   itself.  And here the way that everyone was expecting this is

3   that they would have this kind of cheap entry point into

4   Paycoin, but it would result in these profits being generated

5   between the $4 that was kind of the Hashpoint exchange rate and

6   the $20 that was represented to be the floor.  All of those

7   profits were going to be generated by the efforts of GAW Miners

8   on their behalf.

9          THE COURT:  But what do you do with the trading in

10  Paycoin on other exchanges before it launches?  That has

11  nothing to do with the company, does it?

12         MR. BUCHDAHL:  To that end, we would point the Court

13  to the testimony of Professor Narayanan.  My colleague,

14  Ms. Chen, spent some time going over the centralization

15  features of Paycoin; and each one of those questions was

16  designed to elicit testimony about the ways in which it was a

17  security.

18         THE COURT:  I know.  I assumed that was the purpose of

19  the testimony, but to this day I don't understand why.  Tell me

20  why centralization has to do with this.

21         MR. BUCHDAHL:  So the reason for that has to do with

22  the efforts of others, because what you see there is that GAW

23  Miners was responsible for issuing the coins.  GAW Miners was

24  much more responsible than some kind of cryptocurrency for

25  controlling the blockchain, and that is a way in which you

1    depended on the efforts of GAW Miners for the value of the

2    Paycoin.  The fact that they were going to buttress the value

3    of it with the investment fund, the Coin Adoption Fund was

4    another way that they were going to rely on GAW Miners.  And so

5    each of those centralization factors is what takes Paycoin away

6    from something like a decentralized Bitcoin that I think no

7    one's arguing is a security right now into something that is a

8    security.

9            THE COURT:  So in other words, your position is

10   because of the centralized control of GAW, that suggests --

11   that helps satisfy the efforts solely by other's requirement.

12           MR. BUCHDAHL:  Yes, Your Honor.

13           THE COURT:  Okay, got it.

14           MR. BUCHDAHL:  We skipped past Hashlets.  I think

15   Hashlets in some ways is the easiest one.  I think that's the

16   reason why the SEC charged a security.  There is evidence from

17   our expert, as well as the Plaintiffs, that what they

18   understood to be sold them, what they understood they were

19   buying, was a slice of the total mining power that was

20   maintained, operated, controlled, and optimized by GAW Miners

21   itself.

22           So, in other words, I think the Court's questions hit

23   the nail on the head.  GAW Miners is mining Bitcoin.  That is

24   the efforts of others.  And the Hashlets would be profitable or

25   not, or less so or more so based on how successful GAW Miners

1    was at mining Bitcoin in its so-called data center.

2           THE COURT:  Okay.

3           MR. BUCHDAHL:  I'm not going to give any argument

4    about control person.  I think there's --

5           THE COURT:  Yeah.

6           MR. BUCHDAHL:  Would you like to hear from us on an

7    affirmative argument about --

8           THE COURT:  In a moment.  I am going to rule on the

9    Defense's Rule 50 motion.  I'm sure we could argue for a long,

10   long time on these, but I'm going to reserve.  I'm going to

11   submit it to the jury.  You know what the rules are.  You can

12   renew after there's a verdict.

13          So why don't you go ahead.  If you'd like to make the

14   argument on the affirmative defenses, that's fine.  So this is

15   your Rule 50 motion with respect to the affirmative defenses.

16          MR. BUCHDAHL:  Ms. Chen's going to present it as to

17   Mr. Pfeiffer, and I think she may hand the baton to Mr. Rennie

18   as to Mr. Shinners'.

19          THE COURT:  Sounds good.

20          So let me jump in and get -- cut to the chase.  Wasn't

21   Mr. Pfeiffer selling unregistered securities?

22          MS. CHEN:  So, Your Honor, are you speaking of --

23   which defense are you speaking of?

24          THE COURT:  So I would say that would probably go

25   to -- I mean, entertaining the notion that in pari delicto

1   more complicated.

2         THE COURT:  Okay.

3         MR. BUCHDAHL:  Because Hashpoint was also the kind of

4   output or return on a Hashlet --

5         THE COURT:  Right.

6         MR. BUCHDAHL:  -- and, therefore, had that kind of

7   intermediary role.

8         THE COURT:  Okay.  So let's take HashStakers then.  So

9   if I have a contract to buy a stock or a bond or I have a

10  contract with the bank to hold a stock or a bond for a certain

11  amount of time, a stock or a bond is a security for sure.  But

12  is the contract a security?

13        MR. BUCHDAHL:  I think depending on how it was set up,

14  it would be.  And I think that there is, as the Court pointed

15  out, a paucity of evidence on the precise nature of these two

16  products.  And I think there's enough in there to describe them

17  as investment contracts based on their relationship to the

18  other products.  But if the Court has any question about that,

19  we'd like to go scrub the record a little more carefully.

20        THE COURT:  All right.  Let's keep going.

21        MR. BUCHDAHL:  So with regard to Paycoin, a couple

22  different things to consider.  First of all, the very nature of

23  an ICO is -- makes something a security because the kind of

24  putting together of an ICO, the kind of promotion of it, all of

25  that are ways in which the investors are relying on the efforts

1   of the company to kind of generate profits through the ICO

2   itself.  And here the way that everyone was expecting this is

3   that they would have this kind of cheap entry point into

4   Paycoin, but it would result in these profits being generated

5   between the $4 that was kind of the Hashpoint exchange rate and

6   the $20 that was represented to be the floor.  All of those

7   profits were going to be generated by the efforts of GAW Miners

8   on their behalf.

9        THE COURT:  But what do you do with the trading in

10  Paycoin on other exchanges before it launches?  That has

11  nothing to do with the company, does it?

12       MR. BUCHDAHL:  To that end, we would point the Court

13  to the testimony of Professor Narayanan.  My colleague,

14  Ms. Chen, spent some time going over the centralization

15  features of Paycoin; and each one of those questions was

16  designed to elicit testimony about the ways in which it was a

17  security.

18       THE COURT:  I know.  I assumed that was the purpose of

19  the testimony, but to this day I don't understand why.  Tell me

20  why centralization has to do with this.

21       MR. BUCHDAHL:  So the reason for that has to do with

22  the efforts of others, because what you see there is that GAW

23  Miners was responsible for issuing the coins.  GAW Miners was

24  much more responsible than some kind of cryptocurrency for

25  controlling the blockchain, and that is a way in which you