# Exhibit F

**37032_Audet v Gaw Miners**

 **Garza, Homero J. (Vol. 01) - 12/14/2018**          1 CLIP  (RUNNING 01:33:56.965)

 COMBINED DESIGNATIONS



**JG-01**                    **123 SEGMENTS  (RUNNING 01:33:56.965)**

**1.  PAGE 6:21 TO 6:23  (RUNNING 00:00:04.721)**

        21    Q.   Good morning, Mr. Garza.  Can you give your
        22 full name for the record?
        23    A.   It's Homero Joshua Garza.

**2.  PAGE 11:18 TO 11:20  (RUNNING 00:00:08.021)**

        18    Q.   Sure.  What did GAW Miners do?
        19    A.   GAW Miners sold mining hardware and cloud-based
        20 mining software.

**3.  PAGE 11:25 TO 12:10  (RUNNING 00:00:46.448)**

        25 it -- how about this.  In 2014, what was your
     00012:01
        02 relationship with Stuart Fraser?
        03    A.   A business partner and friend.
        04    Q.   Okay.  And GAW Miners, it -- it sold a product
        05 called hashlets, correct?
        06    A.   Correct.
        07    Q.   And did it sell a product called PayCoins?
        08    A.   Yes, sir.
        09    Q.   And did it sell a product called HashPoints?
        10    A.   Yes, sir.

**4.  PAGE 12:13 TO 12:18  (RUNNING 00:00:12.231)**

        13         Did GAW Miners sell a product called
        14 HashStakers?
        15    A.   Yes, sir.
        16    Q.   Okay.  Did GAW Miners register any of those
        17 products as securities?
        18    A.   Not to my knowledge.

**5.  PAGE 13:20 TO 14:06  (RUNNING 00:00:50.306)**

        20    Q.   (BY MR. WATTERSON)  Okay.  How did you meet
        21 Mr. Fraser?
        22    A.   Through -- through fulfilling a -- a need, you
        23 know, that he had, you know, as an IT consultant.
        24    Q.   Okay.  And was that through Optima Computers?
        25    A.   Yes, sir.
     00014:01
        02    Q.   Okay.  And what need did Mr. Fraser have that
        03 you fulfilled?
        04    A.   Initially, he was looking to create a
        05 wireless -- or an outdoor Wi-Fi-based network for his --
        06 one of -- his campground.

**6.  PAGE 14:08 TO 14:10  (RUNNING 00:00:05.268)**

        08         So you had helped set up a wireless
        09 network for the campground; is that right?
        10    A.   Yes, sir.

**7.  PAGE 14:23 TO 15:10  (RUNNING 00:00:35.062)**

        23    Q.   How would you characterize your relationship
        24 with Mr. Fraser when you initially met him?

Exhibit
PX 203

Case Clip(s) Detailed Report
Wednesday, October 20, 2021, 9:04:50 AM

## 37032_Audet v Gaw Miners

```
        25     A.    Pleasant.
00015:01
        02     Q.    Okay.  And did your relationship with
        03  Mr. Fraser change over time?
        04     A.    Yes, sir.
        05     Q.    How did it change?
        06     A.    We went from a pleasant, you know, business
        07  relationship that -- where I was performing work for him
        08  to becoming good friends --
        09     Q.    Okay.
        10     A.    -- and business partners.
```

**8.  PAGE 15:15 TO 15:22  (RUNNING 00:00:22.874)**

```
        15           So I take it you're no longer business
        16  partners with Mr. Fraser?
        17     A.    That's correct.
        18     Q.    And when did that business-partner relationship
        19  end?
        20     A.    I do not recall the date, but it was somewhere
        21  around the time the SEC started to make inquiries into
        22  GAW Miners.
```

**9.  PAGE 16:04 TO 16:09  (RUNNING 00:00:11.857)**

```
        04     Q.    So before the SEC inquiry, did you consider
        05  Fraser to be a mentor?
        06     A.    Absolutely.
        07     Q.    Did you consider him to be a sort of father
        08  figure?
        09     A.    Yes, sir.
```

**10.  PAGE 18:06 TO 18:20  (RUNNING 00:00:56.218)**

```
        06     Q.    (BY MR. WATTERSON)  Okay.  And did you ever
        07  spend time with Mr. Fraser socially?
        08     A.    Yes, sir.
        09     Q.    Did you have dinner with him?
        10     A.    Yes, sir.
        11     Q.    What other kinds of social interactions did you
        12  have with him?
        13     A.    As you indicated earlier, talking on the phone,
        14  texting, dinner, staying over at his house, going on
        15  trips together, all kinds of different things.
        16     Q.    What kind of trips?
        17     A.    For example, trips to Boca Raton, where he had
        18  an apartment.
        19     Q.    Okay.
        20     A.    As well as -- as his son's wedding, I believe.
```

**11.  PAGE 20:20 TO 21:17  (RUNNING 00:01:15.199)**

```
        20     Q.    And so did Mr. Fraser ever give you,
        21  personally, money?
        22     A.    Yes, sir, on many occasions.
        23     Q.    For what purpose?
        24     A.    All sorts of reasons.
        25     Q.    Was it for salary?
00021:01
        02     A.    In some cases.  Some cases gifts.  You know,
        03  all -- all kinds of reasons.  Helping me buy an
        04  engagement ring.  Help, you know, buy appliances for
        05  our -- our house.  All sorts of different reasons.
        06     Q.    Okay.  Did he help you buy a house?
        07     A.    I don't recall if he, initially, helped me buy
        08  it.
        09     Q.    So you added a qualifier there "initially."
        10  Did he help you buy it at any time?
        11     A.    I believe that the house -- we purchased the
```

## 37032_Audet v Gaw Miners

```
12   house and it was a convertible note.  And he then helped
13   me convert that note from a third party, you know, so
14   the debt became his debt.
15        Q.   So it was a loan?
16        A.   Yes, sir.  But it took place after the purchase
17   of the house.
```

**12.  PAGE 21:21 TO 22:03  (RUNNING 00:00:17.778)**

```
21        Q.   And do you remember approximately when -- when
22   you purchased the house?
23        A.   Not -- no, sir.
24        Q.   Okay.
25        A.   Not to my memory.
00022:01
02        Q.   Okay.  Would it have been before GAW Miners?
03        A.   Yes, sir.
```

**13.  PAGE 22:04 TO 22:06  (RUNNING 00:00:06.613)**

```
04        Q.   And did you ever pay back the -- the note to
05   Mr. Fraser?
06        A.   No, sir.
```

**14.  PAGE 22:07 TO 22:14  (RUNNING 00:00:27.212)**

```
07        Q.   Okay.  Have you spoken to Mr. Fraser since the
08   SEC began looking into GAW Miners?
09        A.   Not to my knowledge or memory.
10        Q.   Have you attempted to communicate with him
11   since the SEC's subpoena?
12        A.   I believe so.
13        Q.   By e-mail?
14        A.   E-mail and phone, I believe.
```

**15.  PAGE 23:07 TO 23:12  (RUNNING 00:00:23.874)**

```
07             Since the SEC's subpoena, what have you
08   attempted to communicate to Mr. Fraser?
09        A.   To the best of my knowledge, because -- because
10   of Stuart -- the nature of how regularly we
11   communicated, I noticed that, you know, that
12   communication stopped when the SEC situation started.
```

**16.  PAGE 24:13 TO 25:02  (RUNNING 00:00:38.289)**

```
13        Q.   Okay.  I think a little bit earlier you
14   mentioned that, prior to the SEC looking to GAW Miners,
15   you had communicated regularly with Mr. Fraser; is that
16   fair?
17        A.   Absolutely.
18        Q.   Okay.  And did you communicate regularly with
19   him in 2014?
20        A.   Yes, sir.
21        Q.   Okay.  And was it typically by phone?
22        A.   Yes, sir.
23        Q.   Okay.  Did you ever meet in person in 2014?
24        A.   Yes, sir.
25        Q.   Do you know approximately how many times?
00025:01
02        A.   Two to three times.
```

**17.  PAGE 25:14 TO 25:19  (RUNNING 00:00:25.334)**

```
14        Q.   (BY MR. WATTERSON)  Sure.  Can you tell me
15   about what you remember from those meetings?
16        A.   I remember discussing the nature of -- you
17   know, general discussion about cryptocurrency, you know,
18   plans for GAW Miners, his involvement, things of that
19   nature.
```

Case Clip(s) Detailed Report
Wednesday, October 20, 2021, 9:04:50 AM

## 37032_Audet v Gaw Miners

**18.  PAGE 26:02 TO 26:10  (RUNNING 00:00:21.219)**

```
02     Q.   (BY MR. WATTERSON)   Sure.   You had said that
03 you remember discussing Mr. Fraser's involvement in GAW
04 Miners; is that fair?
05     A.   Yes, sir.
06     Q.   Okay.   What do you remember about those
07 discussions?
08     A.   Everything from him providing, you know,
09 investments, loans to the company, seeking advice,
10 things of that nature.
```

**19.  PAGE 26:12 TO 27:12  (RUNNING 00:01:31.708)**

```
12            When you say "seeking advice," you mean
13 you were seeking advice from Mr. Fraser?
14     A.   Yes, sir.
15     Q.   And what kind of advice were you seeking from
16 him?
17     A.   Primarily how to -- how -- how to best
18 position, you know, the cryptocurrency products that we
19 were selling.   I assumed, based on his background, that
20 he was a good resource to know because it evolved over
21 time.   As I learned that it was less of a technical
22 product and more it was a financial product, then I, you
23 know, sought his advice about, you know, how it should
24 be sold and ideas I had about how it should be sold,
25 things like that.
00027:01
02            I'm asking him to, you know -- him to ask
03 Cantor for help and things of that nature.
04     Q.   So you -- can you describe what you meant by
05 the products involving -- evolving from a technological
06 product to a financial product?
07     A.   Sure.   As I first -- when we started the
08 company, we primarily sold hardware.   Over time, we
09 sold -- the hardware evolved into selling -- you know,
10 selling -- it's been worded a bunch of different ways,
11 but I guess selling a hashlet, okay, as you said
12 earlier, a --
```

**20.  PAGE 27:16 TO 28:03  (RUNNING 00:00:55.081)**

```
16     A.   -- and that that generated amounts of
17 cryptocurrency to people that purchased it, and so --
18 so -- so it evolved from hardware and became a lot more
19 financial based.
20            So I remember, let's say, meeting with him
21 about how we should go about, you know, selling it, you
22 know, were we breaking rules in the way we were doing
23 it.
24            I believe that's when he recommended Dave
25 McLain getting involved.   And that was primarily when I
00028:01
02 had asked him to, you know, reach out to people he knew
03 at Cantor to provide advice to us as well.
```

**21.  PAGE 28:12 TO 29:04  (RUNNING 00:01:10.641)**

```
12            Is it fair to say that you sought advice
13 from Mr. Fraser about selling hashlets?
14     A.   Many times, yes.
15     Q.   Okay.   Can you tell me what specific advice you
16 sought from him?
17     A.   It ranged from pricing to the, you know, origin
18 of hashlets, the concept of oversubscribing, you know,
19 the amount of people that purchased hashlets relative to
20 the amount of mining power and whether or not we were,
```

## 37032_Audet v Gaw Miners

```
21  you know, legally able to do that or not.
22      Q.   Can you explain what you mean by "the concept
23  of oversubscribing"?
24      A.   Sure.
25               As the product evolved from hardware to
00029:01
02  becoming software, a hashlet represented a unit of
03  power, mining power, cryptocurrency, you know, capacity,
04  so it was relative --
```

**22. PAGE 29:06 TO 29:12  (RUNNING 00:00:44.314)**

```
06      A.   It was relative to consider, as the hashlets
07  were being sold, how we would handle the hardware that
08  supported the payouts of those hashlets; and when the
09  concept of hashlets was first discussed, I became aware
10  that, because it was no longer hardware and it was
11  software, it would become possible for those to no
12  longer match each other.
```

**23. PAGE 29:14 TO 29:25  (RUNNING 00:00:30.955)**

```
14      A.   And -- and so I didn't know whether or not that
15  was going to be a problem if they matched each other or
16  not.
17      Q.   So you discussed that with Mr. Fraser?
18      A.   Yes, sir.
19      Q.   Okay.  And you -- you mentioned that Mr. Fraser
20  suggested that Dave McLain get involved; is that
21  correct?
22      A.   Yes, sir.
23      Q.   Did you discuss this oversubscribing issue with
24  Mr. McLain?
25      A.   Yes, sir.
```

**24. PAGE 30:25 TO 31:02  (RUNNING 00:00:06.661)**

```
25               Did you seek advice from Mr. Fraser about
00031:01
02  regulatory issues that might affect hashlets?
```

**25. PAGE 31:04 TO 31:17  (RUNNING 00:01:38.202)**

```
04      A.   Yes, sir.
05      Q.   (BY MR. WATTERSON)  Okay.  And what kind of
06  advice did you seek from Mr. Fraser?
07      A.   I asked him whether or not -- you know, whether
08  or not we were dealing with what could be considered
09  securities and whether or not we'd have to register
10  those security -- you know, if it was a security,
11  whether or not we'd have to register it as a security.
12  Whether or not -- if we created our own cryptocurrency,
13  whether or not a trading system could be created for it
14  because of Mr. Fraser's experience with eSpeed.  So it
15  was regulatory -- and, generally, if he was able to get
16  help or advice for things that he didn't know from
17  resources at Cantor.
```

**26. PAGE 32:05 TO 33:15  (RUNNING 00:01:37.638)**

```
05               Do you remember any specific discussions
06  you had with Mr. Fraser about creating a cryptocurrency
07  exchange?
08      A.   Yes, sir.
09      Q.   Can you describe those conversations?
10      A.   It would be difficult to describe because there
11  were so many.  But we discussed them to the extent of me
12  visiting his offices in New York and meeting with Cantor
13  Fitzgerald staff about, you know, the thing -- you know,
```

## 37032_Audet v Gaw Miners

```
14   that was one of the topics of discussion.
15       Q.   Okay.  So let's -- let's talk about that.  You
16   visited Cantor Fitzgerald's staff sometime in 2014; is
17   that right?
18       A.   Yes, sir.
19       Q.   Do you remember when?
20       A.   It was towards the end of the year.
21       Q.   Okay.  And was that a meeting that Mr. Fraser
22   facilitated?
23       A.   Yes, sir.
24       Q.   Okay.  And do you remember who you met with at
25   Cantor Fitzgerald?
00033:01
02       A.   I do not re- -- the only person I specifically
03   remember is briefly meeting with Howard.
04       Q.   Okay.  And who is Howard?
05       A.   Howard is Stuart -- I believe Stuart's business
06   partner.
07       Q.   Okay.
08       A.   And he, you know, gave us advice while we were
09   there.
10       Q.   And earlier you had mentioned a meeting of
11   someone at Mr. Fraser's 50th birthday party.  Were you
12   referring to --
13       A.   Howard, yes, sir.
14       Q.   Okay.  And is his name Howard Lutnick?
15       A.   Yes, sir.
```

**27. PAGE 33:22 TO 34:07  (RUNNING 00:00:30.040)**

```
22       Q.   (BY MR. WATTERSON)  Okay.  And you mentioned
23   that you received some advice from Mr. Lutnick; is that
24   right?
25       A.   Yes, sir.
00034:01
02       Q.   What kind of advice did you receive?
03       A.   I remember Howard telling -- I remember Howard
04   telling both of us -- and that's why I remember it so
05   well, because he wasn't telling just me, he was telling
06   both of us -- to be careful about what we were trying to
07   do.
```

**28. PAGE 34:08 TO 34:11  (RUNNING 00:00:09.365)**

```
08       Q.   And when you say "what you were trying to do,"
09   what do you mean by that?
10       A.   Just, you know, watching PayCoin, watching
11   cryptocurrency, things like that.
```

**29. PAGE 36:05 TO 36:19  (RUNNING 00:01:17.019)**

```
05       Q.   This is a document that was previously marked
06   as Exhibit 142.  And Exhibit 142 is a calendar invite
07   for the meeting at Cantor Fitzgerald, correct?
08       A.   Yes, sir.
09       Q.   And the document has some attendees, including
10   some folks with Cantor or BTC Partners e-mail addresses.
11   Do you see that?
12       A.   Yes.
13       Q.   Does this help you at all remembering who
14   attended the meeting?
15       A.   Well, I mean, Aukster and Stuart and Dan Kelley
16   worked for our company, and the Cantor & BTC
17   individuals, I cannot recall their names.  I mean, the
18   best I would be able to say is they were in senior-level
19   positions at the company.
```

Case Clip(s) Detailed Report
Wednesday, October 20, 2021, 9:04:50 AM

## 37032_Audet v Gaw Miners

**30.  PAGE 37:17 TO 38:08  (RUNNING 00:01:16.540)**

```
        17              What was discussed at the meeting with
        18 Cantor?
        19    A.   PayCoin, the white paper that was created for
        20 it was primarily discussed.
        21    Q.   Okay.  And what -- what did you discuss about
        22 PayCoin?
        23    A.   The primary reason, that isn't listed here,
        24 that we met with them was because Stuart and I had --
        25 had, you know, talked a few times about Cantor
00038:01
        02 potentially investing money into PayCoin.
        03              So while it's not in these e-mails, our --
        04 the objective of setting up these meetings was to
        05 show -- you know, white paper isn't discussed -- you
        06 know, what PayCoin was for, how it would be used, et
        07 cetera, so that way, it can be considered into investing
        08 into PayCoin.
```

**31.  PAGE 39:21 TO 39:23  (RUNNING 00:00:11.045)**

```
        21    Q.   And do you know whether, prior to this meeting,
        22 Mr. Fraser had any discussions with anyone at Cantor
        23 about investing in GAW Miners?
```

**32.  PAGE 39:25 TO 40:05  (RUNNING 00:00:07.952)**

```
        25    A.   Yes, sir.
00040:01
        02    Q.   (BY MR. WATTERSON)  Okay.  And how do you know
        03 that he had those discussions?
        04    A.   I remember an e-mail that -- being sent out
        05 about it.
```

**33.  PAGE 40:08 TO 40:15  (RUNNING 00:00:27.304)**

```
        08    Q.   (BY MR. WATTERSON)  Okay.  What do you remember
        09 about the e-mail?
        10    A.   I remember him sending an e-mail to a bunch of
        11 his, like, friends and people that he knew that, you
        12 know, he, I guess, considered good prospects for
        13 investing into PayCoin.  And I remember that one of
        14 those -- and I don't recall who, but one of the
        15 individuals was from Cantor.
```

**34.  PAGE 41:15 TO 41:16  (RUNNING 00:00:04.348)**

```
        15    Q.   Did you discuss any regulatory issues at this
        16 meeting with Cantor?
```

**35.  PAGE 41:17 TO 41:21  (RUNNING 00:00:28.624)**

```
        17    A.   I -- that does jog -- ring a bell.
        18    Q.   Okay.  Do you remember anything specific?
        19    A.   I do not recall.
        20              I do -- actually, I do know.
        21    Q.   Oh.  What do you remember?
```

**36.  PAGE 41:22 TO 42:05  (RUNNING 00:00:28.175)**

```
        22    A.   I remember there being discussions about
        23 whether or not what we were doing would be a security or
        24 not a security and whether it needed to be registered as
        25 a security, stuff like that.
00042:01
        02              I remember, like, the Cantor people
        03 discussing amongst each other whether or not -- like
        04 what their opinion on whether or not they thought it was
        05 a security.  I remember that.
```

Case Clip(s) Detailed Report
Wednesday, October 20, 2021, 9:04:50 AM

## 37032_Audet v Gaw Miners

**37. PAGE 42:07 TO 42:08  (RUNNING 00:00:05.756)**

```
07              MR. WATTERSON:  We will mark this as 239.
08              (Exhibit 239 marked.)
```

**38. PAGE 42:09 TO 42:11  (RUNNING 00:00:04.232)**

```
09      Q.   (BY MR. WATTERSON)  And, Mr. Garza, do you
10 recall this e-mail?
11      A.   (Witness reviewing document.)
```

**39. PAGE 42:12 TO 43:16  (RUNNING 00:01:34.000)**

```
12              Yes, sir, I do.
13      Q.   Okay.  And it's an e-mail that was forwarded to
14 you by Mr. Fraser, correct?
15      A.   Yes, sir.
16      Q.   And it was -- the e-mail to Mr. Fraser was sent
17 by someone named Harry Waizer?  May be saying that
18 wrong.  But does that help you recall who was present at
19 this meeting?
20      A.   I believe Harry Waizer was present at that
21 meeting.
22      Q.   Okay.  And he writes -- if you look at -- in
23 the e-mail that he sent to Mr. Fraser, the third line
24 down, he says, "I know I may have sounded like a
25 proverbial broken record last night, but I've attached a
00043:01
02 recent letter from FinCEN that demonstrates the kind of
03 issue I was expressing concern about."
04              Do you see that?
05      A.   Yes, sir.
06      Q.   So I take it that he is expressing concern
07 about some kind of regulatory issue; is that fair?
08      A.   Yes, sir.
09      Q.   And this document -- this e-mail had a document
10 attached to it, and if you turn to the third page, you
11 can see what the document is.  But I take it from this
12 attached document that the issue that Mr. Waizer was
13 concerned about was whether potentially GAW would need
14 to register as a money transmitter.
15              Does that sound right?
16      A.   Yes, sir.
```

**40. PAGE 43:18 TO 43:20  (RUNNING 00:00:25.684)**

```
18      Q.   (BY MR. WATTERSON)  Okay.  Do you remember any
19 discussions about registering as a money transmitter?
20      A.   I remember we had discussions about it.
```

**41. PAGE 43:21 TO 43:23  (RUNNING 00:00:06.733)**

```
21      Q.   Okay.  And Mr. Fraser was present at this
22 meeting at Cantor Fitzgerald, correct?
23      A.   Yes, sir.
```

**42. PAGE 49:03 TO 49:13  (RUNNING 00:00:38.981)**

```
03      Q.   (BY MR. WATTERSON)  Exhibit 240 is an e-mail
04 from you to Mr. Fraser, and it's forwarding a document
05 called ManagementProfiles.doc.  Do you see that?
06      A.   Yes, sir.
07      Q.   And I gather that this document is related to
08 Optima; is that right?
09      A.   Yes, sir.
10      Q.   And under the management profiles, it says that
11 Stuart Fraser is board chairman of Optima Computers and
12 its subsidiary organizations.  Do you see that?
13      A.   Yes, sir.
```

## 37032_Audet v Gaw Miners

**43. PAGE 50:16 TO 52:24 (RUNNING 00:04:18.610)**

```
         16              And you said that Mr. Fraser had control
         17 over Optima; is that right?
         18      A.   Over everything we did together.
         19      Q.   Including GAW Miners?
         20      A.   Yes, just not in the traditional sense, if you
         21 ask me to clarify.
         22      Q.   In what sense did Mr. Fraser have control of
         23 GAW Miners?
         24      A.   Between Stuart and I, never really -- things
         25 were never really bound always to, you know, what was
00051:01
         02 written on a piece of paper, you know, because Stuart
         03 became such a strong mentor and, you know, kind of
         04 father figure, and I was fully financially reliant, you
         05 know, on him, he -- he had, you know control because
         06 he -- over everything we did because he had full control
         07 over me.
         08              So what I mean by "not in a traditional
         09 sense" is that, you know, if he wanted something to work
         10 a certain way, it was -- you know, it was possible and I
         11 think a few times inferred, that, you know, he could
         12 make decisions that, you know, would, you know, affect
         13 me personally.
         14      Q.   You said that he had full control over you.
         15              What do you mean by that?
         16      A.   If -- if it were Saturday and Stuart called me,
         17 the first thing he would ask me in all -- in almost
         18 every call is, "What are you doing?"  And if I didn't
         19 say something work-related, he would, you know, sigh and
         20 be upset and then pause and wait for me to tell him
         21 something that I'm about to go do that has something to
         22 do with work.
         23              I remember him being upset that we had one
         24 of -- I can't remember -- I think it was our first
         25 child, but I remember him being upset that we chose to
00052:01
         02 have a child because it might interfere with my work.
         03              I remember him literally being upset
         04 because we decided to get a dog, and he thought that
         05 would impact my work, and that he told me that I, you
         06 know, shouldn't do that.  So...
         07      Q.   Why didn't you just tell him no?
         08      A.   Because at that point, you know, all -- the
         09 whole company, all of staff, myself and everything were
         10 fully financially relying on him.
         11              I mean, and it's fair to say, I mean, I
         12 also felt like because of our role, you know, like he
         13 was kind of like a father figure, like I didn't
         14 really -- you know, it wasn't always -- it wouldn't be
         15 fair to say it was always because I made the decision
         16 based on whether or not he would, you know, give us our
         17 next -- you know, that was always sort of in the back of
         18 my mind, but I always felt like I would disappoint or
         19 let him down or he'd be upset with me if -- if I didn't
         20 do, you know, what he was asking.
         21              It's hard to describe.  I mean, it's --
         22 the only way you can describe it is like a parent, you
         23 know, like even if you're a grown adult and your mother
         24 says to do something like --
```

**44. PAGE 53:03 TO 54:09 (RUNNING 00:01:56.884)**

```
         03      Q.   You had said -- I think when you were -- you
         04 mentioned something about "giving us our next."  What
         05 did you mean by that?
```

## 37032_Audet v Gaw Miners

```
06      A.   Our next, you know, investment into the
07 company.  Because a lot of the activities that we were
08 involved in, you know, required continuous --
09 Stuart's -- Stuart's -- one way Stuart maintained
10 control is that he would never give the company like --
11 so in a -- a traditional investor would -- you would go
12 to them and say, "I'm going to do X, Y, and Z
13 initiative.  Here's the financial model for it.  Here's
14 how much it would cost.  Do you want to invest in that?
15 And I'd say it's $100,000."
16           Stuart's case, Stuart would say -- this is
17 an example.  He would say, "Okay.  We'll do it, but I'll
18 give you $10,000 right now, and then you need to come
19 back and ask me for the next 10,000."  So Stuart
20 maintained control because he -- we always -- like we
21 only ever had enough money until the next time I had to
22 ask him again, and he -- I, you know, argued many times
23 against that, but he liked it that way because, you
24 know, it made it to where I had to come back and ask him
25 every time.
00054:01
02           And -- and to just clarify, I know this to
03 be because one day he told me that, that that was his
04 way of maintaining control -- it was when I was working
05 at a company called Smart Tech -- that his way of
06 maintaining control was because he, you know, wasn't
07 willing to lose control by providing, you know, the
08 investing we needed once and just allow us to perform,
09 that I needed to come back and ask each time.
```

**45. PAGE 54:18 TO 55:24  (RUNNING 00:01:52.098)**

```
18      Q.   Okay.  Can you tell me anything more about this
19 conversation you referenced with Mr. Fraser?
20      A.   Which conversation?
21      Q.   Sorry.
22           The conversations about sort of, I guess,
23 giving you payments in installments to maintain control,
24 can you tell me more about that conversation?
25      A.   In that specific conversation, by the time --
00055:01
02 enough time had passed that I started to suspect that
03 there was something unnatural about the way that -- that
04 things financially worked like -- so I started to look
05 at other, you know, examples and ways and -- and learned
06 that that's, like, not how people normally invest into
07 things.
08           So I, you know, made a point to, like, say
09 some -- like, I'm like, "This -- these are the reasons
10 why, like, investing in this way is a problem.  You
11 know, no one knows if they're going to have a job
12 next -- like, no one -- like it scares everyone."  And
13 that's -- so that was the instigator of him telling me
14 that he -- okay, so I remember he specifically told me
15 that in the past, he had given other companies full
16 amounts of money they were asking for, and it didn't go
17 as planned and so -- I don't remember what they were,
18 whatever.
19           I just remember him telling me that, and
20 that it was his perspective that the way -- you know,
21 the appropriate amount of control to -- you know, that
22 needed to be maintained was to -- is that every time,
23 you know, the money he had given was exhausted, that I
24 would need to come back and ask him again.
```

Case Clip(s) Detailed Report
Wednesday, October 20, 2021, 9:04:50 AM

## 37032_Audet v Gaw Miners

**46. PAGE 61:09 TO 62:07 (RUNNING 00:01:36.765)**

```
09      Q.   Okay.  And why was Fraser -- Mr. Fraser making
10  these payments of $10,000 to you personally?
11      A.   Because we -- we -- we had a discussion, I
12  don't remember when, but, obviously, prior to this, but
13  where he wanted to create -- so he had this idea of how
14  I would be paid.  And like it would essentially cost the
15  money less -- the company less money if he gifted the
16  money to me rather than -- for tax reasons, rather than,
17  you know, me being on a normal salary or like -- you
18  know, something like that.
19           So he gifted -- you know, would gift the
20  money to me so it ended up costing him less because, you
21  know -- you know, taxes are paid on both -- you know,
22  both sides, so it would cost him less and it would cost
23  me less, and I would end up with a net amount more than
24  if I just had a normal salary.
25           So -- and by this, you know, point, it was
00062:01
02  sort of all-encompassing, you know, everything from
03  whatever companies we were running at the time to, you
04  know, going to his house and doing -- you know, setting
05  up his personal Wi-Fi, his computer.  I mean, it was
06  just all -- you know, whatever Stuart needed to have
07  done.
```

**47. PAGE 64:19 TO 65:03 (RUNNING 00:00:22.109)**

```
19      Q.   And we had -- earlier we looked at a document
20  describing Mr. Fraser as the chairman of the board of
21  Optima.  Do you remember that?
22      A.   Yes, sir.
23      Q.   And there was no formal board of directors,
24  correct?
25      A.   Yes, sir.
00065:01
02      Q.   But is it fair to say that he sort of
03  informally acted as a board member?
```

**48. PAGE 65:05 TO 65:15 (RUNNING 00:00:41.366)**

```
05      A.   I -- based on my knowledge of the way a board
06  member operates, not really.
07      Q.   (BY MR. WATTERSON)  So tell me why not.
08      A.   Because board members generally are not
09  involved in the day-to-day activity of the company.  I
10  mean, the most accurate way I can think is a hands-off
11  CEO that's above the normal CEO.  I mean, I'm sorry, I
12  can't describe it better than that.  That's the best
13  description I can think of.
14      Q.   Does that describe Mr. Fraser's role in the
15  various companies generally?
```

**49. PAGE 65:17 TO 65:17 (RUNNING 00:00:02.963)**

```
17      A.   Yes, sir.  Generally.
```

**50. PAGE 78:15 TO 78:22 (RUNNING 00:00:32.593)**

```
15           What were HashPoints?
16      A.   HashPoints?
17      Q.   Yes.
18      A.   HashPoints was basically a -- almost like a --
19  so it was a way that people could earn, like, almost
20  like in-store credit, like sort of like an internal
21  value within GAW Miners to then eventually use to
22  purchase PayCoin.
```

## 37032_Audet v Gaw Miners

**51.  PAGE 101:19 TO 101:24  (RUNNING 00:00:25.063)**

```
   19              I am going to hand you a document that was
   20  previously marked as Exhibit 19.
   21              What is Exhibit 19?
   22      A.   You're asking me that, what is Exhibit 19?
   23      Q.   Yes.
   24      A.   (Witness reviews documents.)
```

**52.  PAGE 101:25 TO 104:11  (RUNNING 00:04:31.902)**

```
   25              I think this was the -- I guess -- maybe
00102:01
   02  I'm wording it wrong, but I believe it's our plea
   03  agreement between myself and the Attorney General, if
   04  I'm saying that correct.
   05      Q.   So you were charged with wire fraud in
   06  connection with GAW Miners; is that right?
   07      A.   Yes, sir.
   08      Q.   And you pled guilty?
   09      A.   Yes, sir.
   10      Q.   Okay.  Can you turn to -- you see at the top,
   11  there's something called file stamp, and it shows the
   12  document's 11 pages.  Can you turn to page 9 of 11?
   13      A.   Nine of eleven?
   14      Q.   Yes.
   15              And this is Stipulation of Offense
   16  Conduct, which is basically an agreement between you and
   17  the Government that this is what you did, fair?
   18      A.   Yes, sir.
   19      Q.   Okay.  So I wanted to direct you to
   20  paragraph 4.  Paragraph 4 describes hashlets and I think
   21  it also describes PayCoin as well.  Do you see that?
   22      A.   Yes, sir.
   23      Q.   Does paragraph 4 accurately describe what a
   24  hashlet was?
   25      A.   Yes, sir.
00103:01
   02      Q.   Okay.  And if you take a look at paragraph 5,
   03  there's a chart, and it says -- on the -- essentially,
   04  on the left, it describes a statement that you made, and
   05  then on the right, it describes what the truth is.  Do
   06  you see that?
   07      A.   Yes, sir.
   08      Q.   Okay.  So it says that -- on the right-hand --
   09  lower right-hand corner, it says, "The defendant's
   10  companies sold more hashlets than were supported by the
   11  computing power maintained in their data centers.
   12  Stated differently, the defendant's companies sold the
   13  customers the right to more virtual currency than the
   14  companies' computing power could generate."
   15              Do you see that?
   16      A.   Yes, sir.
   17      Q.   Is that accurate?
   18      A.   Yes, sir.
   19      Q.   Okay.  And then if you look at the top row,
   20  there's a statement, "GAW Miners' parent company
   21  purchased a controlling stake in ZenMiner for $8 million
   22  and that ZenMiner became a division of GAW Miners."
   23              Do you see that?
   24      A.   Yes, sir.
   25      Q.   Is that a statement that you made?
00104:01
   02      A.   The com- -- I mean, yes, I was a part of that
   03  statement.
   04      Q.   Who else was a part of that statement?
   05      A.   I would be speculating on all of the
```

## 37032_Audet v Gaw Miners

```
06   individuals involved, so...
07      Q.   Do you remember any without speculating?
08      A.   I believe Joe and Stuart are the ones that I
09   have a high level of confidence in.
10      Q.   Why do you believe Mr. Fraser was involved in
11   this statement?
```

**53.  PAGE 104:13 TO 104:23  (RUNNING 00:00:49.386)**

```
13      A.   Because we discussed -- we -- this concept, the
14   idea of ZenMiner being purchased by GAW Miners, came
15   from the concept that you talked about earlier when
16   Great Auk Wireless and GAW Miners are GAW High-Speed,
17   like, when those companies came together, that's where
18   this concept was born from.
19           And Stuart was the one who, you know, came
20   up with that original idea of one -- you know, start
21   spinning up a new company and then having that company
22   buy the assets of another company.  So I talked to
23   Stuart and said basically, "Can we do the same thing?"
```

**54.  PAGE 104:24 TO 105:03  (RUNNING 00:00:11.912)**

```
24      Q.   (BY MR. WATTERSON)  So if I understand your
25   testimony, Mr. Fraser came up with the concept of GAW
00105:01
02   Miners' parent company purchasing a stake in ZenMiner,
03   LLC?
```

**55.  PAGE 105:04 TO 105:04  (RUNNING 00:00:00.466)**

```
04      A.   No.
```

**56.  PAGE 105:23 TO 105:25  (RUNNING 00:00:09.641)**

```
23      Q.   But is it fair to say that you discussed the
24   statement in this top, left box with Mr. Fraser before
25   the statement was made?
```

**57.  PAGE 106:03 TO 106:05  (RUNNING 00:00:14.504)**

```
03      A.   Yes, I -- what I am not as sure about is the --
04   the figure, total amount.  But the concept of having one
05   company buy another, yes, we did discuss that.
```

**58.  PAGE 106:10 TO 106:20  (RUNNING 00:00:46.730)**

```
10           And Exhibit 241 is something I pulled off
11   the Internet, but my understanding is that this is,
12   essentially, a different website republishing a press
13   release that was made about ZenMiner.
14           Does this look like the press release that
15   was made regarding Geniuses at Work acquiring equity in
16   ZenMiner?
17      A.   Yes, sir.
18      Q.   Okay.  So -- so did you discuss the concepts in
19   this press release with Mr. Fraser before the press
20   release was issued?
```

**59.  PAGE 106:22 TO 107:13  (RUNNING 00:01:03.397)**

```
22      A.   Yes.  Yes, sir.
23      Q.   (BY MR. WATTERSON)  Tell me about those
24   discussions.
25      A.   Well, essentially -- and I can't be specific on
00107:01
02   exact dates, but at some point, I concluded -- because
03   ZenMiner was truly meant to be a separate company.  In
04   fact, we even interviewed for CEOs.
05           When it became clear that it wasn't in the
```

### 37032_Audet v Gaw Miners

```
06   best interest of the company to make them that way, that
07   it would be, in fact, in the best interest of the
08   company to combine them together, that's when I asked
09   Stuart -- you know, and I'm just being high level, but,
10   essentially, that's when we had the conversation about
11   could we do, like, the same thing here as we did with
12   GAW High-Speed, and that's when I related the two ideas
13   together, and so that's how we discussed it, so...
```

**60.  PAGE 107:16 TO 107:19  (RUNNING 00:00:28.120)**

```
16                What did Mr. Fraser tell you in this
17   conversation?
18        A.  Well, I don't recall more than him agreeing to
19   the idea.
```

**61.  PAGE 107:21 TO 108:05  (RUNNING 00:00:29.339)**

```
21        A.  We had a conversation extensively about,
22   generally, how he, like, brought prior experience about,
23   like, one company buying out another, like I remember, I
24   was talking about --
25                I don't know if that was part of this
00108:01
02   specific discussion, so -- but I know it gave me the
03   idea for this, and then that -- you know, that, along
04   with the way we handled Great Auk Wireless, is why I
05   presented that concept, so...
```

**62.  PAGE 108:14 TO 109:03  (RUNNING 00:00:51.621)**

```
14        Q.  Okay.  I want to switch back to Exhibit 19,
15   the plea agreement.
16        A.  Okay.
17        Q.  And so it says in the left-hand box, a
18   statement, "The market value of a single PayCoin would
19   not fall below $20 per unit because the defendant's
20   companies had a reserve of $100 million that the
21   companies would use to purchase PayCoins to drive up its
22   price."
23                Do you see that?
24        A.  Yes, sir.
25        Q.  And does that reflect a statement that you
00109:01
02   made?
03        A.  Yes, sir.
```

**63.  PAGE 109:16 TO 110:20  (RUNNING 00:01:47.375)**

```
16                So the -- do you see the statement in the
17   left-hand box?
18        A.  Yes, sir.
19        Q.  Did GAW Miners make that statement?
20        A.  I believe that the first instance that this
21   statement was made was in a Wall Street Journal article
22   that referenced this $100 million figure that was
23   generated from an interview that I did and Stuart and I
24   did.  I believe that was the first instance where that
25   was made.
00110:01
02        Q.  Okay.  And in the -- the right-hand box says
03   that The truth is that "The defendant's companies did
04   not have a reserve of $100 million and could not,
05   therefore, drive up the value of PayCoin."
06                Do you see that?
07        A.  Yes, sir.
08        Q.  Is that accurate?
09        A.  Yes, sir.
10        Q.  Okay.  And then I just want you to take a look
```

### 37032_Audet v Gaw Miners

```
11   at the statement in paragraph 6.  "The defendant, along
12   with others, acting through his companies, applied money
13   his companies had made from new hashlet investors and
14   used it to pay older hashlet investors money the
15   companies owed them based on the purported GAW Miners
16   and ZenMiner had done on the investors' behalf."
17            Do you see that?
18   A.   Yes, sir.
19   Q.   Is that accurate?
20   A.   Yes, sir.
```

**64.  PAGE 118:06 TO 121:03  (RUNNING 00:04:37.376)**

```
06   Q.   (BY MR. WATTERSON)  Mr. Garza, I'm handing you
07   a document that was previously marked as Exhibit
08   Number 69.  And this is -- I guess it's an article about
09   ZenMiner, and it suggests in the first sentence that
10   ZenMiner partnered with GAW Miners to bring a new mining
11   operating system, controlling unit, and ecosystem to the
12   marketplace.  Do you see that?
13   A.   Yes.
14   Q.   And was it accurate that ZenMiner had partnered
15   with GAW Miners?
16   A.   Not -- no, sir.
17   Q.   Okay.  And it discusses a phone conversation
18   with you, Thomas Fraser, and Rami Abramov.
19            Do you see that?
20   A.   Yes, sir.
21   Q.   Do you remember that phone conversation?
22   A.   Yes, sir.
23   Q.   Can you tell me what you remember about it?
24   A.   This is in reference to the phone conversation
25   that the -- that Scott Fargo conducted.
00119:01
02   Q.   Okay.  And who's Scott Fargo?
03   A.   He's the reporter that wrote this.
04   Q.   Okay.  And what did you discuss with Mr. Fargo
05   on this phone conversation?
06   A.   Well, basically, this article would be a result
07   of this discussion.
08   Q.   Sorry.  Go ahead.
09   A.   No, you go ahead.
10   Q.   Okay.  It says that Thomas -- in the first --
11   second full paragraph, where it says, "I spoke on the
12   phone," it refers to Thomas Fraser as Thomas Fraser of
13   ZenMiner.  Do you see that?
14   A.   Yes, sir.
15   Q.   And Thomas Fraser wasn't actually associated
16   with ZenMiner; is that true?
17   A.   No, sir, not up until probably the same day.
18   You know, prior to this interview being asked, I asked
19   Stuart if, you know, Thomas could represent ZenMiners.
20   Otherwise, there would be interview with no one, so
21   Tommy conducted this interview as if he was part of
22   ZenMiners.
23   Q.   Why did you choose, I guess, Thomas Fraser?
24   A.   Because prior to this article being written,
25   Stuart had asked me to -- to reach out to Tommy to see
00120:01
02   if -- to -- to get -- you know, get him involved in the
03   business, see if there are -- to look for an opportunity
04   for him to contribute in some way.
05            So when this was brought up, Tommy and I
06   had already had a previous discussion, you know, about,
07   you know, the -- sort of what was generally happening at
08   the company, so, you know, it just -- it made the most
09   sense to talk to him, so -- so I probably should have
```

Case Clip(s) Detailed Report
Wednesday, October 20, 2021, 9:04:50 AM

## 37032_Audet v Gaw Miners

```
10   ran it through Stuart first and then talked to Tommy.
11        Q.   Can you describe your conversation with
12   Mr. Fraser with respect to Thomas Fraser participating
13   in this interview?
14        A.   To the best of my memory, I just essentially
15   told him that, you know, we are having an interview that
16   was going to be performed and, you know, thought that
17   maybe, you know, Tommy could, you know, represent
18   ZenMiners, and that's up to the extent of what I can
19   recall.
20        Q.   Why -- I guess, why have -- have somebody not
21   associated with ZenMiner represent the company?
22        A.   Because the companies weren't -- and while it
23   was created as a separate LLC, they weren't truly two,
24   you know, different companies in the respect that they
25   shared too many resources.
00121:01
02        Q.   So why did it matter that they shared
03   resources?
```

**65.  PAGE 121:07 TO 123:06  (RUNNING 00:03:06.628)**

```
07        A.   That mattered, as well as the fact that, you
08   know, Stuart and I were both in control of both
09   companies, so -- and at the time this was written, the
10   only people that were under the ZenMiner umbrella were
11   developers and things like that.  So, in other words,
12   there would be no way to have this interview because
13   there was no one else to talk to.
14        Q.   (BY MR. WATTERSON)  But why not just say, you
15   know, "I represent a company called GAW Miners and a
16   company called ZenMiner, and here's what we're doing"?
17   I guess why -- what was the point of suggesting there
18   was separation?
19        A.   When ZenMiner was launched, we came, you know,
20   to the conclusion that it would -- that there were
21   benefits of separating the companies, ZenMiner and GAW
22   Miners.  The primary benefits that made the decision
23   were that GAW Miners worked with very specific vendors,
24   and ZenMiners was made to be an agnostic operating
25   system, and there was a concern that there was going to
00122:01
02   be a conflict of interest between the two companies.  So
03   while, you know, they shared resources to launch and to
04   set up, it was, initially, you know, planned as being
05   two separate companies.
06        Q.   And I think you said that "we made that
07   decision."  Who is the "we" you're referring to?
08        A.   Stuart and Shiraz.
09        Q.   Okay.  Did you discuss this article that
10   Mr. Fargo wrote with Mr. Fraser?
11        A.   Yes, sir.  I think as soon as it was
12   published -- well, in addition to, you know, discussing
13   that it be done, you know, to make sure Tommy could do
14   it, I believe that we spoke on the phone afterwards.
15   And then when the article was published, we -- you know,
16   I sent him a link to it and we discussed it.
17        Q.   Okay.  Can you tell me about the discussion
18   after you sent him the link?
19        A.   To the best of my memory, you know, we were,
20   you know, just pleased that there was -- you know, that
21   there was press exposure and -- and, you know -- you
22   know, Stuart, I remember, "It was a good -- you know,
23   good job," and that was -- I mean, I don't remember, you
24   know, anything beyond just, you know, he was happy with
25   the way that the conversation went, the content of the
00123:01
```

## 37032_Audet v Gaw Miners

```
02  conver-" -- you know, of the article, and that we got
03  press exposure.
04       Q.   So you don't -- you don't remember Mr. Fraser
05  being upset with this article?
06       A.   Not that I can remember.
```

**66. PAGE 123:09 TO 123:15  (RUNNING 00:00:41.574)**

```
09            Do you know whether Mr. Fraser knew GAW
10  Miners and ZenMiner were two separate legal entities?
11       A.   To the best of my knowledge, I believe so.  But
12  I can't, you know, remember definitive -- you know, a
13  specific discussion about it, but it would fall in the
14  purview of something that, you know, we would have
15  discussed, but I...
```

**67. PAGE 124:08 TO 124:17  (RUNNING 00:00:44.602)**

```
08       Q.   (BY MR. WATTERSON)  and how do you know that he
09  knew that?
10       A.   Because -- a few reasons.  One is that
11  ZenMiners fell into the sort of bucket of discussions
12  about how equity could be set up, that we had some
13  discussions about.
14            We, you know, generally talked about the
15  development of the operating system.  The assembly of
16  the controller for ZenMiners was done out of one of our
17  offices, so, you know, we talked about that.
```

**68. PAGE 127:07 TO 127:14  (RUNNING 00:00:28.383)**

```
07       Q.   Let's -- I think earlier you had mentioned a
08  Wall Street Journal interview?
09       A.   Yes, sir.
10       Q.   Can -- can you tell me about that interview?
11       A.   I believe there were two.  One was, I think,
12  with myself and Dan Kelley, and another was with myself
13  and Stuart.  So if you could clarify to what you're
14  speaking of?
```

**69. PAGE 128:19 TO 130:06  (RUNNING 00:02:03.246)**

```
19       Q.   Okay.  And you mentioned that there was a
20  second interview between you, Mr. Fraser, and the
21  reporter, Michael Casey; is that right?
22       A.   I believe so.
23       Q.   When you believe so --
24       A.   I just -- what I'm not sure about is -- or not
25  clear enough about is who the interview was -- you know,
00129:01
02  who was conducting the interview.  But I know Stuart and
03  I did another interview together.
04       Q.   Okay.  With somebody at the Wall Street
05  Journal?
06       A.   I believe, yes, sir.
07       Q.   Okay.  And --
08       A.   We had talked a great deal about both articles
09  because, you know, Stuart -- it took quite a while for
10  Stuart to give his permission to be mentioned in this
11  first article.
12       Q.   Why did it take awhile to get his permission?
13       A.   First, it took awhile, you know, because
14  Stuart, at least at the time that I -- I spent with him,
15  never liked being in a public environment or talking in
16  a public environment or -- he'd only ever really get on
17  the phone with, you know, just a handful of people.  So,
18  you know, for him to do anything public was -- was
19  always a big challenge.
20            So -- so they had to make sure that he was
```

## 37032_Audet v Gaw Miners

```
        21   okay with that.  But the biggest thing, it was the
        22   mention here of Cantor Fitzgerald.  So, you know, to
        23   mention Cantor Fitzgerald, you know, which I indicated
        24   earlier, you know, Stuart had previously kept very
        25   distant from the company, you know, so he had to be okay
00130:01
        02   with that.  And then if I recall, he also had to ask
        03   Cantor Fitzgerald -- that's based on my memory, that he
        04   had to ask them whether or not that he could even use
        05   Cantor Fitzgerald in the article.  So it took quite
        06   awhile to...
```

**70. PAGE 132:04 TO 132:19  (RUNNING 00:01:03.301)**

```
        04            The second interview was on the record?
        05        A.  I believe so.
        06        Q.  What's your basis for that belief?
        07        A.  Because I believe that -- that -- I believe
        08   that the Wall Street Journal didn't -- didn't find it
        09   acceptable to do an interview to have Stuart validate
        10   information but have it off the record.  So there was, I
        11   believe, an all or nothing.  Like either we do the
        12   interview and -- and talk on the record or we don't do
        13   it at all, to the best of my recollection.
        14        Q.  When you say "validate the information," what
        15   do you mean by that?
        16        A.  The -- that information in this article, the
        17   first one (indicating).
        18        Q.  Okay.  And Mr. Fraser did validate the
        19   information in the article?
```

**71. PAGE 132:21 TO 132:22  (RUNNING 00:00:03.884)**

```
        21        A.  We -- he validated it by having the -- agreeing
        22   to the second one.
```

**72. PAGE 133:22 TO 134:18  (RUNNING 00:01:08.820)**

```
        22            How did Mr. Fraser have knowledge about
        23   the companies in order to speak to a reporter about
        24   them?
        25        A.  Stuart and I talked probably every two to three
00134:01
        02   days to keep him up to date on anything going on in the
        03   company.  So previous companies, we talked almost every
        04   day.  This company, we didn't talk quite as often, but
        05   we talked -- texted probably almost every day, and we
        06   talked every, you know, few days about everything going
        07   on.  It was quite exciting, I mean, especially when this
        08   started, so -- BitCoin was getting launched and, you
        09   know, that's when he got most heavily involved, so...
        10        Q.  You mean that Mr. Fraser was most heavily
        11   involved when BitCoin was launched?
        12        A.  He was most heavily involved when PayCoin and
        13   then we talked to Cantor and, like, that was -- I mean,
        14   I remember him sending me text messages every time the
        15   PayCoin changed price in the market, you know.  You
        16   know, like, "Hey, it's awesome, it's gone up or it's
        17   gone down or whatever it is," so that was by far his --
        18   his most involvement was at -- around that time.
```

**73. PAGE 134:22 TO 134:23  (RUNNING 00:00:06.003)**

```
        22        Q.  Okay.  How -- do you know how Mr. Fraser had
        23   information about the price of PayCoin?
```

**74. PAGE 134:25 TO 135:06  (RUNNING 00:00:15.725)**

```
        25        A.  Oh, because he was, I mean, watching it like a
```

## 37032_Audet v Gaw Miners

```
00135:01
      02  hawk.  He had, like, every place -- market that PayCoin
      03  was listed at, and he was all over it.
      04      Q.   (BY MR. WATTERSON)  Do you know that because he
      05  told you that?
      06      A.   Oh, yes, sir.  Extensively.
```

**75.  PAGE 135:09 TO 135:10  (RUNNING 00:00:07.135)**

```
      09              Did Mr. Fraser have access to GAW Miners
      10  sales information at any point in time?
```

**76.  PAGE 135:12 TO 135:14  (RUNNING 00:00:09.968)**

```
      12      A.   He had access to our Shopify system, and I gave
      13  him access to the administrative system that ran Zen
      14  Cloud.
```

**77.  PAGE 135:15 TO 135:25  (RUNNING 00:00:30.291)**

```
      15      Q.   (BY MR. WATTERSON)  Okay.  And can you explain
      16  what the administrative system to Zen Cloud, what that
      17  meant?
      18      A.   So they made an -- an account, especially, you
      19  know, like -- that had different functionality than a
      20  basic account so they could see, like, all of the
      21  hashlets that existed.  They could see how many of each
      22  hashlet existed.  They could see what the payouts were;
      23  you know, what customers were owed.  It -- you know,
      24  basically, it could see the aggregate of everything in
      25  the system.
```

**78.  PAGE 136:15 TO 137:12  (RUNNING 00:01:10.725)**

```
      15      Q.   Just what was Shopify?
      16      A.   Shopify was how everything was sold.
      17      Q.   Can you explain a little bit more?
      18      A.   So Shopify is like a shopping cart system so it
      19  shows, you know, like every customer purchase, how much
      20  they purchase, what they purchase, things like that.
      21      Q.   Okay.  And so Mr. Fraser had access to the
      22  Shopify data; is that right?
      23      A.   Yes, sir.
      24      Q.   And how -- I guess how did he have access to
      25  it?
00137:01
      02      A.   It's possible I would have -- may have
      03  instructed someone to provide it to him, but most likely
      04  I probably gave it to him.
      05      Q.   So over the phone you would relay information;
      06  is that right?
      07      A.   I feel like he most like -- likely, the way
      08  Shopify works is when users are added, it sends an
      09  invite to them so it most likely would have sent an
      10  invite to him.  Stuart was very interested in, like,
      11  numbers and -- growing numbers and talking about our
      12  sales each day and stuff like that.
```

**79.  PAGE 142:08 TO 142:09  (RUNNING 00:00:03.965)**

```
      08      Q.   How would you describe Mr. Fraser's role in GAW
      09  Miners?
```

**80.  PAGE 142:11 TO 143:02  (RUNNING 00:01:08.858)**

```
      11      A.   I would describe it, you know, similar to the
      12  role that he had when we first, you know, got -- became
      13  partners in Optima, where, you know, he and GAW Miners
      14  and, like, other companies, he wasn't reaching around me
      15  or -- and getting people to do things directly.  The --
```

Case Clip(s) Detailed Report
Wednesday, October 20, 2021, 9:04:50 AM

## 37032_Audet v Gaw Miners

```
16  you know, his role was a lot more from him to me.
17          You know -- you know, still, you know,
18  regularly, you know, talking and going through, you
19  know, because he essentially wanted to know what
20  happened every day, you know, but it was -- so it's
21  quite a bit more than a normal -- like a regular
22  investor, but not quite as, you know, much as the
23  previous companies.
24      Q.    (BY MR. WATTERSON) And is it fair to say that
25  this main difference was that he wasn't interacting as
00143:01
02  much with the other employees?
```

**81.  PAGE 143:04 TO 143:22  (RUNNING 00:01:19.743)**

```
04      A.    To be honest, the main difference was when --
05  when I came interested in cryptocurrency, unlike other
06  things, you know, I sort of explored more of it as a
07  side project -- you know, something I did on my own.
08  And then, you know, it got really big really fast, and
09  so my general perspective on GAW Miners was we were more
10  like equals, you know.
11          And so I think the main reason that his
12  role was different is just more because I didn't, at
13  this company, you know -- you know, it wasn't a company
14  that he had dumped $5 million into and then I was
15  underneath, you know, like, you know, we -- I felt like
16  we were more, you know, actual partners in this company,
17  you know, versus in the previous companies.
18          So, you know, I think it was more the --
19  the nature of our interactions were different.
20      Q.    (BY MR. WATTERSON)  Do you know whether
21  Mr. Fraser tried to solicit any investments in GAW
22  Miners?
```

**82.  PAGE 143:24 TO 144:16  (RUNNING 00:01:02.022)**

```
24      A.    I believe so.  I believe I -- I thought I
25  saw -- it might have been in one of the -- no, maybe it
00144:01
02  wasn't here, but -- I mean, there was an e-mail chain I
03  was copied on where he had reached out to a bunch of
04  people he knew that -- you know, asking about, you know,
05  potential investment in the company.
06      Q.    (BY MR. WATTERSON) So the basis of your belief
07  is that e-mail?
08      A.    The basis of the belief is that e-mail.  That
09  he also mentioned that he'd talked to Howard about it,
10  about making an investment.  Potentially others, but
11  those are the ones I recall specifically.
12      Q.    Do you recall any discussions between you and
13  Mr. Fraser about PayCoin?
14      A.    Yes.
15      Q.    Can you tell me what you remember about those
16  conversations?
```

**83.  PAGE 144:18 TO 145:21  (RUNNING 00:01:39.700)**

```
18      A.    Everything from the name of the coin to the
19  content of how it would be distributed, the
20  difference -- then by that time, I would have known,
21  like, staking versus all that stuff.  Because, you know,
22  PayCoin protocol was, you know, discussed with Cantor
23  so, you know, he was a -- that's what I meant by he was
24  a lot more heavily involved in to help shape, you know,
25  what got brought in.
00145:01
02          I mean, the biggest thing to understand
```

## 37032_Audet v Gaw Miners

```
03   was nothing would get brought in front of Cantor unless
04   he was -- like, he knew everything about it and had been
05   heavily involved.  So since PayCoin was the main thing,
06   he -- that was the main thing we, you know, worked with
07   each other on.
08        Q.   (BY MR. WATTERSON)  Did you discuss the $20
09   floor with Mr. Fraser?
10        A.   I don't specifically remember.
11             If it's in one of the articles, the Wall
12   Street Journal articles, then we would have because we
13   discussed those articles at length.  But if it's not in
14   any of the articles, I'm not sure.
15        Q.   Okay.  Did you discuss the reserve fund with
16   Mr. Fraser?
17        A.   It would have -- you know, in the -- I believe
18   in the article, it mentioned both the -- like the floor
19   price and the reserve funds, so, yes, it would have
20   been -- we would have discussed that as well because we
21   discussed the whole article.
```

**84. PAGE 146:03 TO 146:04  (RUNNING 00:00:04.907)**

```
03        Q.   (BY MR. WATTERSON)  Mr. Garza, why should
04   anyone believe your testimony today?
```

**85. PAGE 146:06 TO 146:13  (RUNNING 00:00:34.872)**

```
06        A.   Because I have an obligation to try, you know,
07   to present and provide as accurate information as
08   possible relative to everything that's happened at GAW
09   Miners.  It hurt a lot of people.  I've, you know, read
10   letters from the people that it hurt, and so I have an
11   obligation to make sure that any responsibility is --
12   that I have in it is -- is as accurate as I -- it can
13   be.
```

**86. PAGE 146:14 TO 146:21  (RUNNING 00:00:14.534)**

```
14        Q.   (BY MR. WATTERSON)  You were at one point a
15   defendant in this lawsuit, correct?
16        A.   Yes, sir.
17        Q.   And the plaintiffs dismissed you as defendant,
18   correct?
19        A.   Yes, sir.
20        Q.   And are you beholding to the plaintiffs for
21   doing that?
```

**87. PAGE 146:23 TO 147:03  (RUNNING 00:00:16.502)**

```
23        A.   Could you rephrase?
24        Q.   (BY MR. WATTERSON)  Sure.
25             You don't -- the fact that the plaintiffs
00147:01
02   dismissed you from this lawsuit didn't affect your
03   testimony in any way, correct?
```

**88. PAGE 147:05 TO 147:13  (RUNNING 00:00:46.334)**

```
05        A.   I'm saying plaintiffs are involved in this
06   lawsuit.  It's public record.  I testified at my court
07   hearing.  And, you know, it's also public knowledge that
08   now I'm serving an incarceration sentence, so, no, I
09   mean, I -- I just have to be objective and, you know,
10   try to answer it, I mean, regardless of, you know, who's
11   done what.  You know, just, you know, do right by the
12   victims that suffered from all of this and try to be as
13   accurate as possible.
```

**Case Clip(s) Detailed Report**
**Wednesday, October 20, 2021, 9:04:50 AM**

## 37032_Audet v Gaw Miners

---

**89. PAGE 149:08 TO 150:06  (RUNNING 00:01:07.915)**

```
08      Q.    (BY MS. CAVE)  So, Mr. Garza, I'm handing you
09  what's been marked as Exhibit 243.  Is this the
10  agreement that we were just discussing a moment ago?
11      A.    Yes, ma'am.
12      Q.    And on page 2 of that document, is that your
13  signature?
14      A.    Yes, ma'am.
15      Q.    And did you review this document before you
16  signed it?
17      A.    Yes, ma'am.
18      Q.    Did you review this with your -- with an
19  attorney?
20      A.    Yes, ma'am.
21      Q.    Did you make any changes to the agreement
22  before you signed it?
23      A.    I do not recall.  If they had been, they would
24  have been done by my attorney, but I don't recall.
25      Q.    And which attorney was that?  Ms. Peerce?
00150:01
02      A.    Yes, ma'am.
03      Q.    Okay.  And did you have any discussions
04  yourself with the plaintiffs about this agreement or was
05  it just through your attorney?
06      A.    I believe that it was through Ms. Peerce.
```

**90. PAGE 150:10 TO 150:14  (RUNNING 00:00:12.925)**

```
10      Q.    Do you know whether the -- the date of this
11  agreement is October 20th, 2016.  Do you know whether
12  this was before or after you met in person with
13  Mr. Watterson?
14      A.    This was before.
```

**91. PAGE 151:04 TO 151:14  (RUNNING 00:00:27.228)**

```
04      Q.    Well, the agreement, then, goes on to say, "If
05  the Court in Connecticut presiding over this action
06  determines there has been any such material breach or
07  that any representation by Mr. Garza is materially false
08  or misleading, Mr. Garza agrees that if the named
09  plaintiffs seek to reinstate him as the defendant," and
10  it goes on.
11            So do you understand that the plaintiffs
12  have the ability to bring you back in as a defendant in
13  this case?
14      A.    Yes, ma'am.
```

**92. PAGE 154:23 TO 155:07  (RUNNING 00:00:17.095)**

```
23      Q.    Now, your -- you discussed -- I guess you
24  exchanged e-mails with Mr. Watterson about appearing
25  here today for your -- your deposition?
00155:01
02      A.    Yes, ma'am.
03      Q.    And you're appearing voluntarily, correct?
04      A.    Yes, ma'am.
05      Q.    There's no court order or subpoena that
06  requires you to be here?
07      A.    No, ma'am.
```

**93. PAGE 199:03 TO 199:17  (RUNNING 00:00:50.334)**

```
03      Q.    So did GAW Miners have other hardware vendors
04  aside from Gridseed?
05      A.    Yes, ma'am.
06      Q.    Sorry.  Vendors, yes.
07            And how many vendors were there?
```

---

## 37032_Audet v Gaw Miners

```
08      A.   I believe about four -- four or five.
09      Q.   And was there someone responsible for the
10 vendor relationships?
11      A.   Usually, the -- so, usually, I would be
12 involved in the beginning of the vendor relationship
13 because I can't remember who it was, but, like, our
14 second vendor was one of the largest purchases we made,
15 which was why Stuart gave the company to begin with
16 so -- and, actually, I think he even had to talk to the
17 CEO of that company for him to be comfortable, but...
```

**94. PAGE 199:18 TO 199:20  (RUNNING 00:00:08.011)**

```
18              So I would form the initial relationship,
19 and then, usually, then whoever ordered stuff at the
20 company would order more stuff.
```

**95. PAGE 213:20 TO 213:21  (RUNNING 00:00:06.249)**

```
20      Q.   Okay.  I'm going to show you what we marked at
21 another deposition as Exhibit 66.
```

**96. PAGE 213:22 TO 215:09  (RUNNING 00:01:51.479)**

```
22              This is an e-mail from Dave -- the first
23 e-mail is an e-mail from Dave McLain to you dated
24 December 5th, 2014.  Do you see that?
25      A.   Yes, ma'am.
00214:01
02      Q.   And he says:  Per my discussion with Dan K.,
03 I'm going to form a quote, new -- a new, quote, parent
04 entity next week, a Delaware limited liability company
05 to be 100 percent owner of our two operating entities.
06              To which two operating entities are
07 referred to there?
08      A.   I'm not sure.  I mean, I can think of three but
09 not two.
10      Q.   Okay.  And then Dave McLain goes on to say, "I
11 assume you want the ownership of this new parent entity
12 to be 15 percent to Stuart and 85 percent to you.  I
13 just wanted to confirm before filing."
14              Do you see that?
15      A.   Yes, ma'am.
16      Q.   So had you had discussions with Dave McLain
17 about the allocation of the ownership being 15 percent
18 to Stuart Fraser and 85 percent to you?
19      A.   Oh, for sure, because, I mean, the -- when he
20 was asking earlier about it, the discussion about is
21 what became so volatile that Dave McLain got in between
22 both of us.
23      Q.   Okay.  And then you responded -- there's an
24 e-mail down at the bottom that's from you back to Dave
25 McLain, and you say, "Well, that would make his
00215:01
02 ownership extent PayBase now too.  I intend to hold to
03 our agreement, so, yes."
04              Do you see that?
05      A.   Yes, ma'am.
06      Q.   Okay.  And did you mean all of that when you
07 said it?
08      A.   I believe so.  I mean, it seems like the way I
09 would word something like that.
```

**97. PAGE 223:15 TO 223:16  (RUNNING 00:00:07.890)**

```
15      Q.   Who was Rishab Jain?
16      A.   Rishab.  He was a customer of GAW Miners.
```

## 37032_Audet v Gaw Miners

**98.  PAGE 225:06 TO 225:07  (RUNNING 00:00:03.683)**

```
06              MS. CAVE:  We'll mark this as Exhibit 249.
07              (Exhibit 249 marked.)
```

**99.  PAGE 225:08 TO 228:15  (RUNNING 00:03:51.891)**

```
08      Q.   (BY MS. CAVE)  So are these -- do you recognize
09 these texts with Rishab Jain?
10      A.   Yes, I do.
11      Q.   And which texts are from you, the ones on the
12 right or on -- the ones on the left?
13      A.   I think the left.
14      Q.   Okay.  And so at the top of -- well, first of
15 all, can you tell when these texts are from, what time
16 period?
17      A.   I'm not sure.  I mean, they were in -- I think
18 they were when I was already in Dubai.
19      Q.   And when was -- when did you go to Dubai?
20      A.   When?  Towards the beginning of 2015.
21      Q.   And why did you go there?
22      A.   Well, at first -- I mean, it was a combination
23 of things.  You know, Rishab told me he could help with
24 PayCoin stuff.  To be honest, you know, I was pretty
25 nervous about stuff that was going on here.  There were
00226:01
02 a lot of threats and stuff being made.  There was a
03 bunch of different reasons, so...
04      Q.   What was the PayCoin stuff that he was going to
05 help with?
06      A.   He was supposed to -- he had said that he knew
07 someone that was -- I feel like it was -- like it was a
08 banking position that would help facilitate the ability
09 to convert cryptocurrency to use of, like, a debit card
10 or credit card or something like that.
11      Q.   And you say you had discussions with him about
12 getting that set up?
13      A.   Yes, ma'am.
14      Q.   Okay.  And did you actually meet with anybody
15 in Dubai about doing that?
16      A.   I don't feel like I did.
17      Q.   So at the top on the first page, it looks like
18 the second text down, "Also, I wired you around 100K."
19              So that's -- that's from you?
20      A.   Uh-huh.
21      Q.   Okay.  So --
22      A.   I wired him $100,000 and he kept it and never
23 gave it to me.
24      Q.   And a little bit further down, you say, "If I
25 do not get one in about two weeks, I need a place to
00227:01
02 keep about 27 million."
03              What is that 27 million?
04      A.   Totally made it up.
05      Q.   You made it up?
06      A.   Uh-huh.
07              THE REPORTER:  I'm sorry?
08      A.   Totally made it up.
09      Q.   (BY MS. CAVE)  Why do you say that, made it up?
10      A.   Because Rishab -- by this point, you know, I'd
11 spent almost all of the money I had, you know, trying to
12 keep GAW Miners floating.  This is the last bit of money
13 I had, and I was concerned that if he, you know, didn't
14 keep up the appearance of me having more money, he
15 wouldn't help me anymore.
16      Q.   So you were trying to make him feel like you
17 had more money than you did?
```

## 37032_Audet v Gaw Miners

```
18      A.   Uh-huh.  So that way he would continue to help.
19      Q.   If you turn to the -- what's the third page,
20 the top text there says, "I've really got to find
21 someone to ship my cars before they take them."
22           Who were you worried about taking your
23 cars?
24      A.   This is when I'm -- I think I -- I want to make
25 sure I'm looking at the same thing.
00228:01
02      Q.   Sorry, it's the -- maybe it's the fourth page.
03 It's 11:10 p.m. at the top.
04      A.   Okay.
05           Yeah, this is when I had a complete
06 misconception of how all this stuff actually worked, and
07 I legitimately thought the F.B.I. was going to, like,
08 raid our house and take all of our cars and everything.
09      Q.   And a little bit further down, you say -- I
10 think he asked you how many, and you say up to six.  So
11 at this point in time, you had six cars?
12      A.   Probably.  Good chance of that.
13      Q.   And what brand of cars were those?
14      A.   I had a Ferrari, a Lamborghini, a Tesla, a BMW,
15 and probably other things.
```

**100.  PAGE 237:11 TO 238:07  (RUNNING 00:00:49.918)**

```
11      Q.   (BY MS. CAVE)  Mr. Garza, did GAW Miners
12 acquire BTC.com at some point?
13      A.   Yes, ma'am.
14      Q.   And what was BTC.com?
15      A.   A domain name.
16      Q.   And why did you acquire that?
17      A.   I just thought it was awesome because it was a
18 three-letter domain name.
19      Q.   And how much did that cost?
20      A.   So the -- it was either a million or maybe
21 1.1 million paid out in installments.
22      Q.   And why is it -- being a three-letter domain
23 name awesome?
24      A.   Well, because, you know, Stuart liked GAW,
25 which we had done for a while, so, you know, I thought
00238:01
02 he'd like the BTC.com.
03      Q.   Did you --
04      A.   And there's nothing else into it.
05      Q.   Did you discuss it with him before you
06 purchased it?
07      A.   Yes, ma'am.
```

**101.  PAGE 239:03 TO 239:05  (RUNNING 00:00:07.666)**

```
03      Q.   And were there any investors that Mr. Fraser
04 actually brought in who put money into the company?
05      A.   I don't believe so.
```

**102.  PAGE 239:06 TO 239:14  (RUNNING 00:00:43.989)**

```
06      Q.   ZenMiner's -- ZenMiner as a software concept,
07 who thought of that?  Who created that?
08      A.   Well, Joe and his team created it.  I don't
09 know if any one person can take credit for the concept
10 of it.
11           I'm trying to think if I can remember.  I
12 think it -- I think it was a combination of -- you know,
13 it came -- it formed after multiple discussions between
14 Shiraz, Joe, Stuart, and myself.
```

## 37032_Audet v Gaw Miners

**103.  PAGE 245:25 TO 246:03  (RUNNING 00:00:04.813)**

```
      25        Q.   (BY MS. CAVE)  Okay.  I'm going to show you
00246:01
      02   what we're marking as Exhibit 251.
      03                 (Exhibit 251 marked.)
```

**104.  PAGE 246:04 TO 248:12  (RUNNING 00:02:40.608)**

```
      04        Q.   (BY MS. CAVE)  This is an e-mail from -- e-mail
      05   chain between you and Robert Gallagher dated
      06   September 11th, 2014.  Who was Rob -- Robert Gallagher?
      07        A.   He was a previous employee at GAW Wireless --
      08        Q.   He was --
      09        A.   -- or GAW, whatever, GAW HSI.
      10        Q.   Okay.  And what was his job at GAW HSI?
      11        A.   I believe that he was the CTO for -- for a
      12   while.
      13        Q.   And so is this -- take your time to read the
      14   chain, but it looks like you're talking about getting
      15   into a -- a business project with him?
      16        A.   Yes, ma'am.
      17        Q.   And that related to building -- building your
      18   own chips?
      19        A.   Yes, ma'am.
      20        Q.   And by that, what do you mean by "chips" here?
      21        A.   The chips -- I thought we would bring the price
      22   of miners down by building the chips, which were one of
      23   the most expensive components that go into the miners.
      24        Q.   So how are you going to go about building your
      25   own chips?
00247:01
      02        A.   I mean, like, you -- they don't have to be
      03   invented.  They already exist so if you have your own
      04   manufacturing process, then it's a lot less expensive.
      05   If you just -- you know, if you buy it from another
      06   company, you're just paying the markup, so...
      07        Q.   So you were considering setting up your own
      08   manufacturing operation?
      09        A.   I was until I found out how, you know, much
      10   time and money it cost, but, yes.
      11        Q.   And the first line of this e-mail on the first
      12   page, you say to Mr. Gallagher, "Oh, yeah, Stuart is not
      13   involved."
      14        A.   Uh-huh.
      15        Q.   Is that correct?  So he wasn't involved in this
      16   process --
      17        A.   No.
      18        Q.   -- of chips?
      19        A.   That's not the context it was meant in.
      20        Q.   Okay.  So what context is that referring to?
      21        A.   What that meant is -- so Rob Gallagher was the
      22   first person that really made me aware of the way that
      23   Stuart managed the investments into the company, how
      24   much damage that could -- how much big of a problem, how
      25   much fear it put in employees, how much damage it caused
00248:01
      02   that he had that level of control, and how involved he
      03   was with the employees.  He left.  He quit because of
      04   that.
      05                 So when I say "Stuart is not involved,"
      06   it's within the con- -- you know, it meant to him that
      07   Stuart, like, didn't -- like you -- like, it would be
      08   safe to work here because, you know, Stuart isn't out
      09   giving assignments to every single person,
      10   blah-blah-blah, like he was at previous companies.
      11        Q.   So this initiative regarding the chips is
```

```
        12   something that Mr. Fraser was not involved in?
```

**105. PAGE 248:14 TO 248:24  (RUNNING 00:00:37.483)**

```
        14       Q.   (BY MS. CAVE)  Or was not going to be involved
        15   in?
        16       A.   No, I think that -- again, this is to the best
        17   of my memory, but I believe that the context of this is
        18   more about Stuart's management involvement because I
        19   remember talking to Stuart about making these chips.  We
        20   even looked at a company in California that was working
        21   on these chips.  In fact, they sent us a proposal I
        22   remember Stuart got a copy of.  So, no, it wouldn't have
        23   meant he wasn't involved in the chips.  It meant -- it
        24   just meant what I just explained to Robert.
```

**106. PAGE 264:19 TO 264:20  (RUNNING 00:00:20.110)**

```
        19            (Exhibit 252 marked.)
        20       Q.   (BY MS. CAVE) This is Exhibit 252.
```

**107. PAGE 264:21 TO 264:22  (RUNNING 00:00:06.618)**

```
        21            This is an e-mail chain from you to
        22   Mr. Fraser dated July 18th, 2014.
```

**108. PAGE 265:25 TO 266:07  (RUNNING 00:00:19.648)**

```
        25       Q.   And at the -- the top e-mail there on the first
00266:01
        02   page, you say, "Thought about what you said.  You're
        03   right, this is my company and I'm the only one that
        04   knows how to really run it."
        05            The first part of that, "thought about
        06   what you said," what had Mr. Fraser said to you?  What
        07   are you referring to?
```

**109. PAGE 266:08 TO 267:10  (RUNNING 00:01:46.037)**

```
        08       A.   I only have fragments of in- -- you know,
        09   memory, so I will tell you what I remember.  This, I --
        10   I know, pertains to the conflict between us about the --
        11   how the equity and stuff was going to split up -- be
        12   split up between us, I believe.  And at some point I
        13   remember -- or I believe in that conversation, he -- he
        14   said, "Fine, you know, just, you know, do it."
        15            Then he kind of came back a bit with a
        16   temper saying, "Well, why don't you just, you know, buy
        17   me out, like, you can just have all of it," because
        18   that's what I think this sentence means, "to offer the
        19   remaining personal balance, blah-blah-blah-blah," so --
        20   and then he said, "It'd be a bad deal for me."
        21            So within the context of this e-mail, I
        22   believe that what he was talking about was that, when we
        23   were in that conflict, he did ultimately agree that --
        24            The best way I can think to say it is,
        25   like, I knew how to run it better than he knew how to
00267:01
        02   run it and that, like, he wouldn't do the same things at
        03   other companies, like, where he was intimately involved
        04   with all of the employees, that he would, instead, like,
        05   he'd be up here, I'd be right here, and the rest of the
        06   company would be right here (indicating).  So that is my
        07   memory of what this means.
        08       Q.   And when you say "this is my company," are you
        09   referring to GAW Miners, sir?
        10       A.   Most likely.
```

**Case Clip(s) Detailed Report**
**Wednesday, October 20, 2021, 9:04:50 AM**

## 37032_Audet v Gaw Miners

**110. PAGE 267:14 TO 267:17 (RUNNING 00:00:12.188)**

```
14            And this is the transcript of the change
15 of plea hearing July 20th, 2017, in your criminal case;
16 is that right?
17     A.   Yes, ma'am.
```

**111. PAGE 268:09 TO 268:11 (RUNNING 00:00:12.713)**

```
09     Q.   And starting on page 39, you make -- you make
10 some statements there yourself.  Do you see that?
11     A.   One second.
```

**112. PAGE 268:12 TO 268:22 (RUNNING 00:00:38.885)**

```
12            Yes, ma'am.
13     Q.   Okay.  So here you admitted under oath, midway
14 down the page, "I made a number of statements that were
15 not true at the time I made them."
16            Do you see that?
17     A.   Yes, ma'am.
18     Q.   And you believe that statement was true when
19 you made it -- the statement here on the transcript is
20 true?
21     A.   Yes, ma'am.
22     Q.   And then starting on page -- the bottom of
```

**113. PAGE 268:23 TO 269:18 (RUNNING 00:00:52.322)**

```
23 page 41, Mr. Pierpont is the attorney for the
24 Government, I believe?
25     A.   Yes, ma'am.
00269:01
02     Q.   And starting on the bottom of page 41, he goes
03 on to describe a -- a number of elements of the offense
04 and the -- the facts that the Government had, and that
05 continues through the top of page 47, and take your time
06 to read through that if you'd like.
07     A.   Yes, ma'am.
08     Q.   Okay.  And then at the bottom page 46 and the
09 top of page 47, the Court asks you, "Do you agree or
10 disagree with the things he said," and you say, "I
11 agree, Your Honor."
12            And the judge asked again, "Do you agree
13 with everything he told me," and you say, "Yes,
14 Your Honor."
15            Do you see that?
16     A.   Yes, ma'am.
17     Q.   And that's still true?
18     A.   Yes, ma'am.
```

**114. PAGE 269:21 TO 269:21 (RUNNING 00:00:02.715)**

```
21     Q.   (BY MS. CAVE) This is Exhibit 254, and this is
```

**115. PAGE 269:22 TO 269:24 (RUNNING 00:00:08.156)**

```
22 a transcript of your sentencing on September 13th, 2018.
23 Do you see that?
24     A.   Yes, ma'am.
```

**116. PAGE 270:19 TO 270:21 (RUNNING 00:00:08.528)**

```
19     Q.   -- if you could turn to page 77.  Down at the
20 bottom is where you begin making a statement to the
21 Court.  Do you see that?
```

**117. PAGE 270:22 TO 271:15 (RUNNING 00:00:37.557)**

```
22     A.   Yes, ma'am.
23     Q.   Okay.  And it says, "A lot of the things that
```

**CONFIDENTIAL**

## 37032_Audet v Gaw Miners

```
          24   were said here today are true, and I accept that I
          25   caused those things."
00271:01
          02                  Do you see that?
          03   A.   Yes, ma'am.
          04   Q.   Was that a true statement when you made it?
          05   A.   Yes, ma'am.
          06   Q.   And going down to the -- two paragraphs below
          07   that, it says, "And I feel like for me, it just -- I
          08   don't know, it just -- it kind of just clicked, and no
          09   matter what happened, you know, I was in charge and it
          10   was my job to keep customers and investors safe and I
          11   didn't."
          12                  Do you see that?
          13   A.   Yes, ma'am.
          14   Q.   And that statement is true?
          15   A.   Yes, ma'am.
```

**118.  PAGE 283:13 TO 283:14 (RUNNING 00:00:05.606)**

```
          13                  MR. WATTERSON:  Mark this as 255.
          14                  (Exhibit 255 marked.)
```

**119.  PAGE 283:21 TO 283:24 (RUNNING 00:00:16.405)**

```
          21   Q.   Okay.  So this is a June 6th, 2000 -- well,
          22   sorry, this is a -- it's a July 17, 2013, e-mail that
          23   you forwarded to yourself on June 6, 2014; is that --
          24   A.   Yes, sir.
```

**120.  PAGE 284:22 TO 285:11 (RUNNING 00:00:34.832)**

```
          22                  And if you look down -- so the fifth
          23   paragraph, it says, "Going" -- I think you mean going
          24   forward -- "Here is what I'm thinking.  We'll create an
          25   equal partnership 50/50 in our holding company, Geniuses
00285:01
          02   at Work Corporation.  You can have voting power(I don't
          03   care).  I'll put everything I've built" and then there's
          04   some bullet points.
          05                  Do you see that?
          06   A.   Yes.
          07   Q.   And so, I guess, was that your understanding,
          08   that there was an equal partnership 50/50 --
          09   A.   Yes.
          10   Q.   -- in Geniuses at Work Corporation?
          11   A.   Yeah.
```

**121.  PAGE 286:07 TO 287:10 (RUNNING 00:01:24.994)**

```
          07   Q.   Okay.  In the paragraph we looked -- the fifth
          08   paragraph we looked at, it says, "You can have the
          09   voting power (I don't care)."
          10                  Do you see that?
          11   A.   Uh-huh.
          12   Q.   Did -- and I take it that it's referring to voting
          13   power in Geniuses at Work Corporation; is that right?
          14   A.   Well, right.  I'm saying we can put everything
          15   we've done besides GAW High-Speed under this company,
          16   and then he would have the voting power.
          17   Q.   Did you consider Mr. Fraser to have the voting
          18   power?
          19   A.   Yeah.  I mean -- I mean, that's, I guess,
          20   what's interesting about all of this, is, like, at the
          21   end of the day, that, you know, I had an opinion, he had
          22   an opinion, it was going to be his way, so...
          23                  And that's how -- you know, it didn't
          24   start that way, but that's -- I mean, that's why I wrote
          25   it out.  I mean, it was like kind of me like giving,
```

## 37032_Audet v Gaw Miners

```
00287:01
      02   like "I don't care," because he told me a story once
      03   that -- with him and Howard, that, you know, Howard
      04   always made sure that he knew every -- everyone in the
      05   room knew that he was in charge, and he said, "That's
      06   how I am with my company," so -- you know.
      07                And, you know, I understand, as lawyers,
      08   you guys are looking at what's written on paper and
      09   the -- I mean, but at the end of the day, it didn't
      10   really matter, he was like the main guy, so...
```

**122. PAGE 288:10 TO 289:03  (RUNNING 00:00:53.519)**

```
      10       Q.   Okay.  I was just wondering, it says -- in the
      11   second paragraph, it says, "You hold veto rights."
      12                Do you see that?
      13       A.   Correct.
      14       Q.   Do you recall what you meant by "veto rights"?
      15       A.   My understanding is that, like, veto rights
      16   means that for -- you know, people can make decisions
      17   and talk and do what they want, but the person who has
      18   the final -- the veto right, basically, can -- makes the
      19   final decision.  They can, in other words, veto
      20   whatever -- whatever else was done, I guess, prior to
      21   then.
      22                I knew no deal Stuart would agree with,
      23   like he -- he would never agree if it didn't involve,
      24   like, him being the fin- -- having the final say.
      25       Q.   So your understanding of the agreement was that
00289:01
      02   Mr. Fraser had the final say?
      03       A.   That's correct.
```

**123. PAGE 289:05 TO 289:06  (RUNNING 00:00:05.491)**

```
      05       A.   That is my understanding in the nature of our
      06   relationship.
```

**TOTAL: 1 CLIP FROM 1 DEPOSITION (RUNNING 01:33:56.965)**

CONFIDENTIAL