UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| DENIS MARC AUDET, MICHAEL PFEIFFER, and DEAN ALLEN SHINNERS, Individually and on Behalf of All Others Similarly Situated,<br><br>       Plaintiffs,<br><br>vs.<br><br>STUART A. FRASER, GAW MINERS, LLC, and ZENMINER, LLC (d/b/a ZEN CLOUD),<br><br>       Defendants. | Case 3:16-cv-00940<br><br>Hon. Michael P. Shea<br>Courtroom 2<br><br>ECF Case<br><br><u>CLASS ACTION</u><br><br>FEBRUARY 11, 2022 |

**<u>REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR JUDGMENT AS A MATTER OF LAW AND FOR A NEW TRIAL</u>**

## TABLE OF CONTENTS

                                                                                                        **Page**

I.    The Jury's Finding Regarding Hashlets Was Incorrect as a Matter of Law and Against the Great Weight of the Evidence .......................................................................... 1

       A.    Fraser fails to rebut that Hashlets were sold as a slice of GAW's profits. ............... 1

       B.    Fraser misstates the law on vertical commonality and distorts the evidence. ....................................................................................................................3

       C.    No reasonable juror could have found "significant investor control" over Hashlets. ...........................................................................................................5

II.   The Jury Was Incorrect as a Matter of Law Regarding the Other Products ........................ 6

       A.    Paycoin's value derived from an expectation of profits through GAW's efforts. ..................................................................................................................... 6

       B.    The "common enterprise" element was established for Paycoin. ............................ 9

III.  Conclusion .......................................................................................................................... 10

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Balestra v. ATBCOIN LLC*,
 380 F. Supp. 3d 340 (S.D.N.Y. 2019)..................................................................................5, 6

*Kaplan v. Shapiro*,
 655 F. Supp. 336 (S.D.N.Y. 1987).........................................................................................10

*Marini v. Adamo*,
 812 F. Supp. 2d 243 (E.D.N.Y. 2011) .....................................................................................9

*Revak v. SEC Realty Corp.*,
 18 F.3d 81 (2d Cir. 1994) ........................................................................................................3

*SEC v. Aqua-Sonic Prod. Corp.*,
 687 F.2d 577 (2d Cir. 1982).....................................................................................................6

*SEC v. Kik Interactive*,
 492 F. Supp. 3d 169 (S.D.N.Y. 2020).......................................................................................3

*SEC v. NAC Found., LLC*,
 512 F. Supp. 3d 988 (N.D. Cal. 2021) .....................................................................................8

*SEC v. Telegram Grp., Inc.*,
 448 F. Supp. 3d 352 (S.D.N.Y. 2020).........................................................................5, 6, 10

*SEC v. W.J. Howey Co.*,
 328 U.S. 293 (1946)........................................................................................................ passim

*United States v. Leonard*,
 529 F.3d 83 (2d Cir. 2008).......................................................................................................2

*Walther v. Maricopa Int'l Inv. Corp.*,
 1998 WL 186736 (S.D.N.Y. Apr. 17, 1998)........................................................................4, 5

**Rules**

Fed. R. Civ P. 50(b) .........................................................................................................................1

Fed. R. Civ. P. 59............................................................................................................................1

The uncontroverted evidence established that the four GAW products at issue in this case were investment contracts under the *Howey* test and that no reasonable jury could find otherwise.[1] Defendant Fraser's opposition is wrong on the law and inconsistent with the trial record.

**I.      The Jury's Finding Regarding Hashlets Was Incorrect as a Matter of Law and Against the Great Weight of the Evidence**

   A.   <u>Fraser fails to rebut that Hashlets were sold as a slice of GAW's profits.</u>

According to Fraser, Hashlets were "unitary" products—and one Hashlet's payouts were divorced from another Hashlet's payouts—and therefore the "pooling of assets" and tying of investors' fortunes necessary for horizontal commonality is missing. ECF No. 359 at 12-17. But this argument ignores the overwhelming and uncontroverted evidence that Hashlet purchasers were investing in a <u>shared</u> cryptocurrency mining operation run by GAW, the success or failure of which affected them all. Proof that Hashlets were a slice of profits from GAW's mining center—which was not disputed—came from all corners, including from Stuart Fraser himself, the class representatives, Plaintiffs' expert, the SEC, the Department of Justice, Josh Garza's plea agreement, and GAW's own website. *See* ECF No. 351-1 at 13-14 & n.6. That is why the federal agency entrusted with administering the securities laws had no trouble characterizing Hashlets as a security, as the jury heard.[2] No reasonable juror could have concluded otherwise.

Fraser disputes this conclusion by pointing to evidence that a Hashlet was a "unitary mining interest," but the only evidence Fraser cites—that Hashlets were marketed as "miners"[3] and that Hashlet owners could point their Hashlets to mine in different pools, *id.* at 12-14—reinforces that

---

[1] Even if the Court were to agree with Fraser that Plaintiffs' motion under Rule 50(b) is procedurally foreclosed (which it is not), there is no dispute that relief under Rule 59 is procedurally proper.
[2] *See* ECF No. 351-3 (DX 677) (SEC Complaint) at ¶79 (alleging that Hashlets are investment contracts).
[3] Fraser asserts that Marc Audet testified that a Hashlet was "either a stand-alone physical machine or part of a physical machine" as evidence that a Hashlet was "a machine," ECF No. 359 at 13, but that is plainly wrong in light of Mr. Audet's testimony that a Hashlet was a "a slice of the computing power" of a Hashlet, *see* Ex. 1 (Trial Tr. at 621:12-14), and "a slice of the total computing power" GAW had, *id.* at 581:24-25, which is consistent with "part of a physical machine," but not a "stand-alone" machine.

Hashlets were sold as a slice of GAW's mining profits. In fact, Stuart Fraser himself testified—about a press release describing a Hashlet as a "miner"—that a Hashlet was "a piece of the mining output of a GAW Miners' machine." Ex. 1 (Trial Tr. at 246:7-247:2). "Miner" is thus shorthand for a Hashlet's mining power, not evidence that a Hashlet was a "unitary" product.[4]

Fraser's argument about choosing mining pools is a red herring. To begin, this argument is misdirected to the "common enterprise" element, as it really concerns whether there was "significant investor control," which is addressed below. The economic reality is that Hashlets were marketed to investors as a way to earn profits from GAW's efforts and skill in running an efficient mining operation.[5] The ability to choose mining pools was completely ancillary to that basic value proposition, which centered on GAW taking investors' money, pooling it together, and using it to run a crypto mining operation—a common enterprise.[6] Finally, the truth is that the mining pools were a fiction. The undisputed evidence is that GAW never actually allocated investors' hashing power to their selected mining pools; it only pretended to. *See* Ex. 2 (Mordica Tr. at 52:25-55:8, 58:17-59:20). Courts focus on the economic reality, and Defendants cannot evade the securities law by claiming they misrepresented to investors aspects of the investment.[7]

Next, Fraser claims that no horizontal commonality exists because payouts to a given

---

[4] Additionally, the witnesses who actually testified about the document Fraser cites as proof a Hashlet was a "miner" (ECF No. 351-11, PX 47) also testified that a Hashlet represented the right to returns from a portion of GAW's mining power. *See, e.g.*, ECF No. 351-4 at 52:2-17 (testimony of Dr. Narayanan about PX 47), 51:16-18 (describing Hashlets as "the right to profit from a slice of computing power or mining power owned by GAW"). Regardless, even if Fraser were correct that a miner was "unitary" because payouts and performance were individualized, horizontal commonality would still exist because investors' money was pooled to pay for, *e.g.*, the warehouse, the electricity to run the mining computers, the staff, and other common items whose performance affected every investor's return.
[5] *See* ECF No. 351-1 at 20-21; ECF No. 351-11 (PX 47) (archived GAW Miners website touting profitability of Hashlets that would be hosted in GAW's "large, controlled datacenters" which "achieve massive economies of scale"; GAW would provide a "99.9% uptime guarantee" for Hashlets); ECF No. 351-10 (DX 528) (press release touting Hashlets as "grandma-approved!" and requiring no "technical know-how").
[6] By way of analogy, a bond that allows its investor to choose payouts in cash or bitcoin each quarter is still a security, even though it might result in different investors receiving different returns, because their fortunes are still tied together based on the underlying performance of the borrower—if it fails, everyone's investment is lost.
[7] *See United States v. Leonard*, 529 F.3d 83, 89-91 (2d Cir. 2008) (holding that LLC interests were investment contracts based on the economic reality of the transaction despite the sham managerial rights offered to investors).

Hashlet owner were not "directly impacted" by payouts to other owners. ECF No. 359 at 14. But the correct standard is whether each investor's fortunes "depend upon the profitability of the enterprise as a whole"—here, GAW's crypto mining enterprise. *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994). The standard is easily met: the profitability of every Hashlet depended on GAW's ability to operate and maintain its mining operation. ECF No. 351-1 at 14-15.[8]

Unable to dispute this, Fraser argues that Plaintiffs are espousing a "misguided" theory that "a company's general performance in running its business creates horizontal commonality among its customers." ECF No. 359 at 16. But using Fraser's rubric, *Howey* itself would not pass the test. There, the profitability of the investments depended on the promoter's "cultivation, harvesting and marketing of . . . citrus products," *SEC v. W.J. Howey Co.*, 328 U.S. 293, 300 (1946)—or what Fraser terms its "general performance in running its business." ECF No. 359 at 16. Fraser's distinction between a "common enterprise" and a "business venture in general" is a meaningless label. Like the *Howey* investors, who invested capital "to share in the profits of a large citrus fruit enterprise managed and partly owned by" the promoter, 328 U.S. at 299, Hashlet investors bought the right to share in returns from a cryptocurrency mining operation owned and managed by GAW. In light of the evidence adduced at trial, the jury could not have reasonably found otherwise.

B.   Fraser misstates the law on vertical commonality and distorts the evidence.

Fraser argues vertical commonality is absent because (1) the jury could have concluded that GAW received a daily fixed fee for each Hashlet, which would defeat the necessary "interdependence" between GAW's and each investor's fortunes; and (2) even if GAW's fee varied with an investor's profits—as it did—this would not satisfy vertical commonality. ECF No.

---

[8] That is true regardless of whether investors "boosted" their Hashlets or mined in different pools. *See SEC v. Kik Interactive*, 492 F. Supp. 3d 169, 179 (S.D.N.Y. 2020); ECF No. 351-1 at 15. Fraser's attempt to distinguish *Kik*, ECF No. 359 at 17, fail in light of the overwhelming proof that Hashlet owners were investing in a pooled mining enterprise.

3

359 at 17-20. He is wrong on both counts.

First, Fraser contends the jury could reasonably have believed the testimony of Marc Audet, who (according to Fraser) testified that GAW received a daily fixed fee. But Mr. Audet did not say that, and he continually underscored that he was not sure how it worked.[9] By contrast, Michael Pfeiffer's testimony that the daily fee varied according to the Hashlet's performance on a given day was detailed, consistent across his examinations, and uncontroverted. *See* ECF No. 351-1 at 16-17; ECF No. 359-2 at 856:15-23. Accordingly, any conclusion that GAW charged a fixed daily fee for Hashlets would have been egregiously against the weight of the evidence.

Second, Fraser claims that GAW's variable maintenance fees did not establish vertical commonality because "a Hashlet owner profited in every scenario," even on a day when GAW lost money on that investor's Hashlet. ECF No. 359 at 20. That is misleading at best. On such a day—when the maintenance fee exceeded the Hashlet payout—GAW would pay "the smallest fraction, which was like one ten million[th] of a Bitcoin." ECF No. 359-2 at 856:20-21. In other words, the investor's so-called "profit" was zero: when an investor didn't profit, nor did GAW. Conversely, when an investor's Hashlet earned money, GAW earned its full daily fee. ECF No. 351-1 at 17. In sum, the evidence established that "if [the plaintiff's investment] appreciated in value, the defendants were financially compensated," whereas if it "did not perform well, the defendants were not paid." *Walther v. Maricopa Int'l Inv. Corp.*, 1998 WL 186736, at *6

---

[9] *See* ECF No. 359-4 at 79:2-6 (DX-731) (deposition testimony) (Q: "So you didn't know if the fee was 10 percent one day and then 50 percent another day?" A: "**I don't recall, no**. I **think** the fee was a fixed cost thing . . . ."); ECF No. 359-2 at 622:23-623:7 (trial testimony) (Q: "And then they also charged you a maintenance fee for operating the miners; correct?" A: "They called it a service fee. **It was proportional to the payout**." Q: "So they charged you a service fee. And your testimony here today is that it was proportional to your payout?" A: "I — like I said, it was six years ago. **I think it was proportional** — you know, yes, I think it was related to — it was a fixed fee. **I think it was proportional to the payout** you got that day."); *id.* at 624:17-20 (Q: "So you agree with me, Mr. Audet, that the service fee that GAW Miners charged for running and operating the miners was a fixed fee? A: **That's what I believed back then**, yes.") (emphasis added throughout).

4

(S.D.N.Y. Apr. 17, 1998).[10] A reasonable factfinder could not conclude otherwise.

      C.     <u>No reasonable juror could have found "significant investor control" over Hashlets.</u>

The third prong of *Howey* is an expectation of "profits to be derived solely from the efforts of others." ECF No. 326 at 21. Fraser argues that Hashlets do not satisfy this element because some investors had the option to "boost" their Hashlets or switch the pool their Hashlets were mining in. ECF No. 359 at 21-25. This argument fails for two reasons.

<u>First</u>, the uncontroverted evidence showed that it was <u>GAW's</u> efforts to run a crypto mining farm—and thereby generate mining rewards—that determined whether Hashlets would be profitable. Fraser notes in passing, as if it were an incidental background fact, that GAW "hosted and maintained Hashlets." *Id.* at 21-22. But this "hosting and maintaining" was the entire value proposition of a Hashlet: to let investors earn rewards from crypto mining <u>done by GAW</u>. Without this "contribution" by GAW, *id.* at 21—to purchase, install, operate, maintain, and upgrade its mining equipment, provide technical know-how, and otherwise run the mining operation, ECF No. 351-1 at 21—there could be no expectation of profits, period. In short, GAW's efforts were the fundamental determinant of Hashlet profitability, not an investor's option to "boost" her Hashlets or switch mining pools. These facts—which Fraser pointedly overlooks—compel the conclusion that Hashlet owners' expectations of profit depended on GAW's efforts—not their own.[11]

<u>Second</u>, Fraser argues that investors' ability to influence their Hashlets' performance

---

[10] Fraser attempts to distinguish *Walther* because that case was decided at the motion to dismiss stage, but the law regarding what constitutes vertical commonality does not change depending on the procedural posture of the case.

[11] *See Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 356-57 (S.D.N.Y. 2019) (third prong of *Howey* satisfied where investors "had no control over whether" underlying blockchain worked—the promoter did—"the performance of which largely dictated the value of" the investment, notwithstanding investors' partial control of the investment, including the right to sell it); ECF No. 351-1 at 21-24. As *ATBCOIN* demonstrates, what matters is that the <u>promoter's</u> efforts, not the investors', "largely dictated" the profits. Moreover, Fraser's suggestion that *Telegram* did not address this issue, *see* ECF 359 at 25 n.17, is wrong. There, the court rejected this argument, *see SEC v. Telegram Grp., Inc.*, 448 F. Supp. 3d 352, 375 (S.D.N.Y. 2020) (finding substantial likelihood that "efforts of others" prong satisfied where "Purchasers were entirely reliant on [the promoter's] efforts to develop, launch, and provide ongoing support for" the investment), notwithstanding defendant's argument that "any expectation of profits [would] depend upon buyers' affirmative actions." *See* No. 19 Civ. 9439, ECF No. 71 at 31 (S.D.N.Y. Jan. 15, 2020), 2020 WL 4282370.

amounted to "significant investor control"—and was therefore inconsistent with an expectation of profits through GAW's efforts—because it was more than a "modicum of effort" or a "trivial" effort. ECF No. 359 at 23. But Fraser misstates the law: *SEC v. Aqua-Sonic Prod. Corp.* does not hold that anything beyond a "trivial" effort by investors per se constitutes "**significant** investor control." 687 F.2d 577, 585-86 (2d Cir. 1982). Tellingly, Fraser cites no cases in which investors had as little ultimate control over the profitability of their investments as Hashlet owners did where the court found the "significant investor control" necessary to take an investment outside the reach of *Howey*. ECF No. 359 at 21-25. Nor could he, as courts have routinely held that some degree of influence by investors over an investment does not defeat the "efforts of others" prong where the profitability of the investment is "largely dictated" by the promoter's efforts or where investors will be "entirely reliant" on a promoter's ongoing efforts to manage or develop the investment. *See ATBCOIN*, 380 F. Supp. 3d at 356-57; *Telegram Grp.*, 448 F. Supp. 3d at 375.

That is the case here: Hashlet owners were fully reliant on GAW to purchase, house, maintain, and operate the computer that generated mining rewards—*i.e.*, Hashlet returns—and to provide the staffing and know-how necessary to do so. *See* ECF No. 351-1 at 18-24 (describing the undisputed evidence presented to the jury on this point). In light of that, a reasonable jury could not have found that Hashlet owners exercised "significant investor control" over Hashlets.

**II.     The Jury Was Incorrect as a Matter of Law Regarding the Other Products**

     A.     <u>Paycoin's value derived from an expectation of profits through GAW's efforts.</u>

With respect to Paycoin, Fraser's opposition devotes two sections to the third *Howey* element—"profits from the efforts of others"—and makes three primary arguments: (1) in closing, Plaintiff's counsel pointed only to Dr. Narayanan's testimony and failed to explain how this element was satisfied (ECF No. 359 at 26-27); (2) the jury heard conflicting evidence about the degree of control that GAW had over Paycoin (*id.* at 27-30); and (3) the evidence showed GAW

6

marketed Paycoin as a medium of exchange rather than as an investment (*id.* at 30-33).

Fraser's first point is belied by the record. Plaintiff's counsel explained to the jury how Paycoin investors expected "profits from the efforts of others":

> [T]he touchstone of a security is that investors would have an expectation of profits to be derived from the efforts of others. <u>That's what they did here.</u> They gave GAW Miners their money and hoped . . . **in the case of Paycoin, that their promotional efforts would make money for people**.[12]

Fraser is also wrong in arguing that counsel did not explain the relevance of Dr. Narayanan's testimony, ECF No. 359 at 26. Counsel explicitly referenced Dr. Narayanan's testimony on GAW's centralized control over Paycoin, which bears directly on whether Paycoin was profitable due to the efforts of others. ECF No. 351-4 at 1080:25-1081:3. Further, right before referencing his testimony, counsel highlighted Mr. Pfeiffer's testimony that "GAW said that they had a $100 million fund to back up this coin to promote the development and to promote the ecosystem that would make Paycoin valuable." Ex. 3 (closing demonstrative slide). In this context, Mr. Pfeiffer and Dr. Narayanan corroborated what GAW said and Plaintiffs believed: investments in Paycoin would be profitable due to GAW's efforts in promoting and developing it. *See, e.g.*, Ex. 1 (Trial Tr. at 62:5-7) (GAW's development of Paybase could potentially increase "the value of Paycoin").

Fraser next argues that the evidence actually showed Paycoin to be decentralized, but the best he can offer is marginal evidence suggesting that GAW did not have <u>100%</u> control over <u>all</u> aspects of Paycoin.[13] But the jury was instructed that *Howey*'s third element does not require the

---

[12] Ex. 1 (Trial Tr. at 1039:24-1040:7) (Plaintiffs' closing) (emphasis added). In fact, the only argument and only evidence presented during closing about Paycoin as an investment contract came from Plaintiffs. Counsel for Fraser declined to dispute this characterization of Paycoin and chose to rely exclusively on the "currency" exception in the federal securities laws. *S*ee ECF No. 351-1 at 37-38.

[13] Fraser cites testimony that there <u>could</u> theoretically have been non-GAW participants in the Paycoin network, ECF No. 359 at 27, but that does not diminish Dr. Narayanan's testimony that GAW nonetheless owned the overwhelming majority of the initial allotment of Paycoin and built into Paycoin's source code special GAW-owned nodes that would maintain GAW's control over the network, *see* Ex. 1 (Trial Tr. at 59:3-10, 60:2-17). Fraser also makes much of testimony that Paycoin's source code was available on the internet for anyone to access and suggest improvements to, ECF No. 359 at 28, but "access" and "suggest improvements" mean nothing without the authority to execute, which

7

promoter to exercise total control. ECF No. 326 at 21 ("For the third element, that profits be derived solely from the efforts of others, the word 'solely' should not be taken literally."). Fraser fails to identify anything to contradict the overwhelming evidence that GAW's customers were told that their investments would succeed because of GAW's efforts. *See* ECF No. 351-1 at 33-36.

Finally, Fraser argues that Paycoin was marketed for its potential for merchant adoption and thus for consumptive use, but this again misses the mark. The economic reality is that GAW touted Paycoin as a good investment because features like merchant adoption would make it more valuable. *See* ECF No. 359 at 34 (explaining that GAW's promotional materials highlighted efforts toward "Major Merchant Adoption" and "Credit Card Purchasing" as means toward the ultimate goal of "Increased Market Value"). The record clearly established that the core opportunity was investment. *See SEC v. NAC Found., LLC*, 512 F. Supp. 3d 988, 997 (N.D. Cal. 2021) (noting that "expectation of profit . . . does not require the investor to be motivated solely by profit" (emphasis added)). The focus of GAW's promotion was Paycoin as a profit-making opportunity, both immediately due to the promised $20 floor and over time as Paycoin's value appreciated. *See* ECF No. 351-1 at 35. Moreover, while the inquiry focuses on objective facts, it is telling that no Plaintiff who testified at trial was motivated by the desire to use Paycoin; every single one sought to

---

was left with GAW. Fraser then suggests that sales of Paycoin on cryptocurrency exchanges are somehow relevant to this inquiry, *see id.*, but Fraser cannot seriously argue that because a product can be sold to third parties through independent means, or because market forces might affect the product's resale price, that product cannot be a security. Fraser's next argument—that the jury could have leapt to the conclusion that Paycoin was not a security due to scattered references to Paycoin having certain irrelevant similarities to Bitcoin, *see id.* at 28-29—is similarly bizarre. If the jury ignored uncontroverted evidence of how Paycoin was different from Bitcoin with respect to the features that actually matter to the third *Howey* element—namely, GAW's control over the success of Paycoin through its managerial and entrepreneurial efforts, *see* ECF No. 351-1 at 36, which finds no analogy in the evidence presented on Bitcoin—that would certainly be grounds for overturning or vacating the verdict. Finally, Fraser draws a strained comparison between Paycoin's price after GAW's collapse and Bitcoin's price in its early days, and appears to make the astonishing argument that Paycoin was not "worthless" without GAW because Paycoin owners after January 2015 could still buy more with 10,000 Paycoin than the two pizzas an early Bitcoin adopter received for 10,000 Bitcoin. ECF No. 359 at 29. While Fraser might prefer to ignore the massive fraud that sent his business partner to prison and cost GAW's customers millions, a jury has the responsibility to actually consider the evidence, which showed that Paycoin owners suffered dramatic losses once GAW's fraud was exposed, and that Paycoin's potential for profitability vanished alongside GAW's promised efforts to make it successful. *See* ECF No. 351-1 at 36.

8

profit.[14] *See also* ECF No. 351-1 at 35, 37 (other investor expectations of profit). Fraser fails to rebut the overwhelming evidence that GAW led investors to expect to profit from GAW's efforts.

B.  The "common enterprise" element was established for Paycoin.

With respect to the second *Howey* element—common enterprise—Fraser disputes the weight of the evidence on horizontal commonality on only one ground: an alleged lack of evidence that the three Plaintiffs personally contributed to the pooling of assets represented by the Coin Adoption Fund because they acquired Paycoin through Hashpoints. ECF No. 359 at 34. But Fraser does not dispute Plaintiffs' position that GAW's promise to put money received from Paycoin's ICO into a Coin Adoption Fund <u>does</u> demonstrate a common enterprise. *See id.* at 34 n.23 (acknowledging a common enterprise "could" exist among those "who bought Paycoin in exchange for money that would fund the Coin Adoption Fund"). As Fraser cites no authority holding that the existence of a common enterprise depends on the identity of the investor-plaintiff, his attempt to distinguish between Paycoin owners by analogizing to the "buyers who acquired tracts of land but did not sign agreements" versus the "buyers who leased back their tracts of land to the defendant-company to cultivate" in *Howey* falls flat. ECF No. 359 at 34 n.23.[15]

Fraser's vertical commonality arguments fare no better. Fraser relies on *Marini v. Adamo*, 812 F. Supp. 2d 243 (E.D.N.Y. 2011), to discount the significance of the fact that GAW and its investors both owned Paycoin, *see* ECF No. 359 at 38, but the "coins" in that case were non-

---

[14] Fraser claims that Mr. Pfeiffer pointed to "faster transaction times" when asked what attracted him to Paycoin, ECF No. 359 at 31; Mr. Pfeiffer, however, went on to explain that this only mattered because GAW had the resources to develop it and "promote the ecosystem that would make Paycoin valuable," ECF No. 351-4 at 836:4-9. Similarly, Mr. Shinners did not "lose faith" in GAW because Paybase did not have merchant adoption, as Fraser suggests, *see* ECF No. 359 at 31-32; Paybase's disappointing launch caused Mr. Shinners to lose faith in GAW's ability to promote Paycoin and ensure its success, *see* Ex. 1 (Trial Tr. at 663:9-664:15) (testifying that he began to lose faith in GAW, including its promise of $100 million fund, when Paybase launched without the features GAW had promised).

[15] Indeed, *Howey* rejected such a distinction, noting that all elements of an investment contract exist even if "some purchasers choose not to accept the full offer . . . by declining to enter into a service contract." *Howey*, 328 U.S. at 301. In fact, as long as GAW <u>offered</u> a common enterprise in which investors could pool their money, that is enough for horizontal commonality. *See id.* ("[I]t is enough that the respondents merely <u>offer</u> the essential ingredients of an investment contract." (emphasis added)).

9

identical portfolios of rare (collectible) coins whose value might well diverge, not holdings in a single cryptocurrency traded on exchanges. Fraser then argues that GAW's ability to flood the market with Paycoin and thus drive down the price means that its fortunes were not intertwined with its investors, but unsurprisingly offers no authority that a promoter can escape liability for securities fraud through market manipulation. Nor does Fraser offer any meaningful distinction between this case and *Telegram*, which is on all fours. *Id.* at 35-36.[16] Finally, Fraser's suggestion that a jury could have understood Paycoin's trading at rock bottom prices after GAW's collapse to mean that "the fortunes of Paycoin holders did not rise and fall with the fortunes of GAW Miners," *id.* at 36, is mystifying; he fails utterly to explain how a reasonable jury could have arrived at that conclusion when a sharp decrease in Paycoin's price, from which it never recovered, occurred at the same time GAW began to publicly unravel, from which GAW likewise never recovered.[17, 18]

## III.   Conclusion

The Court should grant Plaintiffs judgment as a matter of law on the "security" issue and order a new trial on all other issues or, alternatively, grant Plaintiffs a new trial as to all issues.

---

[16] Fraser simply disagrees with *Telegram* that the "critical reputational damage" that would be suffered by a cryptocurrency promoter if its product fails (and thus causes its investors to lose money) is relevant to vertical commonality. ECF No. 359 at 36. But the specific facts presented in this case demonstrate exactly why this consideration is highly significant—GAW staked its reputation on Paycoin and when GAW failed, Paycoin (and its investors) failed too. This evidence rebuts Fraser's conclusory assertion that GAW's reputation and its customers' investments did not exhibit a "one-to-one . . . interdependence of *both profits and losses*." *Id.* (quoting *Kaplan v. Shapiro*, 655 F. Supp. 336, 341 (S.D.N.Y. 1987).

[17] Fraser's arguments concerning Hashpoints and HashStakers, *see* ECF No. 359 at 39-40, fare no better than for Paycoin. Fraser claims that Hashpoints can't be investment contracts because they had a "fixed value" of $4, but Hashpoint investors could not trade them in for dollars—the entire point was to trade in Hashpoints worth $4 in exchange for Paycoin worth $20. Thus, Fraser's analogy to "money used to buy stock or another security" falls apart, as Hashpoints were not money and could only be traded for Paycoin—they were, in essence, a contract between GAW and its customers in which customers' investments in Hashpoints would pay off in the form of the more profitable Paycoin. As for HashStakers, Fraser appears to argue that even if Paycoin were an investment contract, HashStakers are not because they are a "wallet . . . that holds Paycoin and simply earns interest, no matter what." But if that "interest" is Paycoin, then HashStakers were simply a vehicle for participating in the common enterprise of Paycoin and earning profits from the efforts of GAW to promote and develop Paycoin—*i.e.*, investment contracts in Paycoin.

[18] Fraser's opposition does not dispute that the first *Howey* element is met as to Paycoin, Hashpoints, and HashStakers. Furthermore, Fraser repeatedly attempts to justify the jury's verdict as to these products using factual allegations from the Amended Complaint that were *not* part of Plaintiffs' trial presentation. *See* ECF No. 359 at 30, 35. These arguments are clearly irrelevant to Plaintiffs' motion and should be wholly disregarded.

Dated: February 11, 2022                          Respectfully submitted,

*/s/ Seth Ard*
Jacob Buchdahl
Seth Ard
Geng Chen
Russell Rennie
Susman Godfrey L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019
Tel: (212) 336-8330
Fax: (212) 336-8340
jbuchdahl@susmangodfrey.com
sard@susmangodfrey.com
gchen@susmangodfrey.com
rrennie@susmangodfrey.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on February 11, 2022, a copy of the foregoing document was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

<em>/s/ Russell Rennie</em>