## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

DENIS MARC AUDET, MICHAEL PFEIFFER, and
DEAN ALLEN SHINNERS,
     Plaintiffs,

     v.

STUART A. FRASER,
     Defendant.

No. 3:16-cv-940 (MPS)

## RULING ON POST-VERDICT MOTIONS

### I.    Introduction

In this case alleging securities law violations and common law fraud arising out of

a cryptocurrency mining company's sale of various cryptocurrency-related products, the jury

returned a verdict for the defendant, Stuart Fraser, after eight days of evidence.  The plaintiffs

have filed a motion for judgment as a matter of law and, in the alternative, for a new trial on their

securities claims.  ECF No. 351.  For the reasons set forth below, I deny their motion for

judgment as a matter of law and grant in part and deny in part their motion for a new trial.

### II.    Procedural History

At trial, the plaintiffs asserted five claims against Fraser: (1) control person liability for

GAW Miners, LLC's (the "Company" or "GAW") sale of unregistered securities in violation of

the Connecticut Uniform Securities Act ("CUSA"); (2) control person liability for the

Company's fraud in the offer or sale of securities in violation of the CUSA; (3) liability for

aiding and abetting the Company's fraud in the offer or sale of securities in violation of the

CUSA; (4) control person liability for the Company's fraud in the offer or sale of securities in

violation of the Federal Securities Exchange Act; and (5) liability for aiding and abetting the

Company's common law fraud.  ECF No. 326 at 19-20.  To find for the plaintiffs on any of the

first four counts, the jury had to find first that one or more of four products sold by the

Company—Hashlets, Paycoin, HashStakers, and Hashpoints (the "Products")—were securities and, more specifically, that they were "investment contracts."

Both parties made motions for judgment as a matter of law under Rule 50(a) before Fraser rested his case.  ECF No. 354.  Plaintiffs' Rule 50(a) motion sought judgment as a matter of law on the affirmative defenses Fraser asserted against the class representatives.  *Id.* at 27, 32-43.  Fraser's motion sought judgment as a matter of law on each of the plaintiffs' claims against him.  *Id.* at 11.  I reserved ruling on both motions.  *Id.* at 32, 49.

The case was submitted to the jury, which returned a verdict for Fraser on all counts. With respect to the securities claims (the first four counts), the jury concluded that none of the four Products were investment contracts and thus none were securities.  ECF No. 330 at 2. Despite not making a Rule 50(a) motion arguing that the Products *were* investment contracts, the plaintiffs have now filed a Rule 50(b) motion that raises that argument, as well as a motion for a new trial under Rule 59 arguing that the jury's finding that the Products were not investment contracts was against the weight of the evidence.  ECF No. 351.[1]  I heard oral argument on the motions on May 26, 2022.

## III.    Evidence at Trial

To assess Plaintiffs' motions, it is necessary to discuss the trial evidence regarding each of the four Products in some detail.

### A.  Hashlets

At trial, the parties presented a variety of testimony and other evidence regarding what, exactly, Hashlets were.  For example, Audet agreed during his testimony that a Hashlet was "either a stand-alone physical machine or part of a physical machine that was mining for

---

[1] The plaintiffs do not seek judgment as a matter of law or a new trial on the common law fraud claim.

cryptocurrency," ECF No. 359-2 at 43.[2]  On its website on August 18, 2014, GAW described Hashlets as miners, i.e., computers that mine for cryptocurrency: "Hashlet is the world's first Digital Cloud Miner (DCM), perfectly optimized to thrive in large, controlled datacenters and achieve massive economies of scale.  All Hashlets are hosted in the most robust mining data center in the world . . . ."  ECF No. 351-11 at 4.  Likewise, an August 21, 2014 press release referred to a Hashlet as a "Bitcoin miner."  ECF No. 351-10 at 2.

Other witnesses testified that Hashlet purchasers were buying a "share of" or a "certain percentage or amount of" the mining power at GAW's mining farm.  ECF No. 359-2 at 54 (Shinners's testimony that he "was definitely buying a specific quantifiable share of mining power that was at the mining farm" when he purchased a Hashlet); *id.* at 55 (Pfeiffer's testimony that he "understood Hashlets to be a contract to own a certain percentage or amount of . . . the mining power of the mining machines . . . that GAW Miners held . . . in their data centers.).

Still other evidence suggested that Hashlet purchasers were buying a share of the profits of GAW's mining activities.  *See* ECF No. 351-4 at 8 (Plaintiffs' expert's testimony that Hashlet customers were told that they were purchasing the "right to profit from a slice of computing power or mining power owned by GAW.").  Fraser likewise agreed that a Hashlet owner "would be entitled to a portion of the cryptocurrency that was being mined by GAW Miners."  *Id.* at 33 (Q: "And you understood, therefore, that the purchaser of a Hashlet would be entitled to a portion of the cryptocurrency that was being mined by GAW Miners; correct?" A: "That's my understanding, yes, sir.").  The jury also learned that the plea agreement signed by GAW's CEO, Josh Garza, related to his federal conviction for wire fraud defined Hashlets as "the rights to

---

[2] Although Audet also testified on direct that he "understood Hashlets to be a slice of the total computing power that was in the – by the equipment in a GAW Miners' data center," ECF No. 363-2 at 9-10, and at the start of cross that he "understood [he] was buying a slice of the computing power," ECF No. 346 at 115, he agreed after reviewing his deposition testimony that a Hashlet was either a physical machine or a part of a physical machine.

profit from a slice of the computing power owned by GAW Miners," ECF No. 351-8 at 10, and

that the SEC complaint against Garza and GAW described Hashlets as follows:

> Buying a Hashlet entitled an investor to a share of the profits that GAW Miners . . . would purportedly earn by mining virtual currencies using the computers that were maintained in their data centers. Hashlets were purported to earn a return based on the number of virtual currency units generated when the pools to which their computing power was directed succeeded in processing and confirming virtual currency transactions . . . . [A] Hashlet was "a divisible and assignable allocation of hashing power from GAW-owned and hosted mining hardware" . . . . Unlike Cloud Hosted Mining customers, Hashlet customers were not buying computer hardware . . . Hashlet customers were buying the rights to profit from a slice of the computing power owned by GAW Miners . . .

ECF No. 351-3 at ¶¶ 38-39.

The jury also heard evidence regarding the Company's role in the mining process. Audet

testified that the Company was responsible for hosting, running, and maintaining the mining

machines. ECF No. 351-4 at 50 (Q: "And you understood that what the companies would be

doing . . . is hosting those machines, those miners, and running them and maintaining them; is

that correct?" A: "That's correct, yes."). Fraser agreed during his testimony that "Hashlet

customers were relying on GAW Miners' expertise to own and operate the mining equipment

that would support the Hashlets." *Id.* at 33. Dr. Narayanan, the plaintiffs' expert, testified that

operation of mining equipment from home "requires a lot of know-how" because "it's a messy,

technical process" and that, as a result, mining data centers like that purportedly run by GAW

offered a "data center operator" that "would provide the space for all of these machines, provide

the electricity for the machines, provide the know-how for operating and perhaps upgrading the

machines." *Id.* at 9-10. In August 2014, GAW advertised on its website that "[d]atacenters cut

power costs in half, maximize uptime, and save you from having noisy miners in your home . . . .

All Hashlets are hosted in the most robust data center in the world and come with a 99.9%

uptime guarantee." ECF No. 351-11 at 4.

The Company promoted Hashlets as easy to use, and both Audet and Pfeiffer testified that they were interested in purchasing Hashlets for that reason.  An August 21, 2014 GAW Miners press release included the following quote from Garza: "Hashlets are different.  If you can open an email you can operate a Hashlet . . . . Hashlet is grandma-approved!"  ECF No. 351-10 at 2; *see also* ECF No. 351-4 at 27 (Fraser's testimony that the Hashlet "tag line" was that it was "grandma proof"); ECF No. 351-11 at 3 (statement on GAW Miners' website that "If you can open an email you can setup and operate a Hashlet.").  Audet testified that Hashlets' "ease" appealed to him, stating "[t]hey were very convenient to set up.  You just basically bought them, and they were ready to go.  They started mining Bitcoins immediately once you activated them." ECF No. 351-4 at 39.  Pfeiffer also testified that Hashlets were "easy to use," described as "grandma proof or grandma friendly," and "didn't require a lot of technical expertise."  *Id.* at 72. He observed that "GAW Miners sort of seemed to have their finger on the pulse of something that was keeping mining only to the domain of the people who were, like technicians, and um, sort of geeks rather than the general public. . . . [T]hey recognized the limitation and they were trying to solve that."  *Id.*  The SEC complaint also emphasized the minimal effort required of Hashlet investors and the Companies' control over the mining process:

> Hashlet investors were required to do very little to purportedly mine virtual currency.  Investors only needed to log into their . . . accounts and click-and-drag their Hashlet icons over the icons of the mining pools in which they wished their Hashlets to mine.  From there, investors relied solely on the efforts of GAW Miners . . . to generate Hashlets' expected profits by owning, housing, operating, maintaining, and connecting the computer hardware that would engage in mining . . .

ECF No. 351-3 at ¶ 40.

The jury heard testimony from Audet, Pfeiffer, and Dr. Narayanan that Hashlet owners could select the pools in which their Hashlets mined.  Audet testified as follows:

Q  Okay.  Now you could pick the pool – you, as a customer of GAW Miners and a Hashlet owner, could pick the pool in which you were mining your Hashlets; is that correct?
A  That's correct, yes.
Q  So if you and I both owned the same kind of Hashlet, let's say you chose to mine it in the Clevermining pool and I decided to mine it in the Waffle mining pool, we could have very different payouts; correct?
A  That's correct, yes.
Q  You could do really well one day, and I could do really poorly; correct?
A  In theory, yes.
Q  Now, you could also change your pools with your Hashlets; is that correct?
A  That's correct, yes.
Q  So the idea was that you could get up in the morning, you could check the payout rates for different pools and just switch the pool that your Hashlet was mining in; correct?
A  That's correct, yes.
Q  And you, in fact, did that; right?  You would check your payouts daily; is that correct?
A  That's right, yes.
[. . .]
Q  You, in fact, did keep track of the payouts and switched the pools that you were mining in; correct?
A  That's correct, yes.

ECF No. 359-2 at 46-47.  Pfeiffer likewise acknowledged that Hashlet owners at least ostensibly

had some control over the mining power:

Q Okay. You had the choice to direct your mining power in certain ways?
A Ostensibly.
Q And you could change your allocation on a daily basis if you so chose; right?
A I believe so.

*Id.* at 63.  Dr. Narayanan also testified that Hashlet owners had some ability to select the pools in

which their Hashlets mined:

Q  Is it also the case that, with respect to Hashlets, customers could choose from different pools?
A  I believe – my understanding is that there was a limited ability to choose pools.
Q  Each pool could be – withdraw.  The mining power from each different pool could be targeted to something different than another pool; correct?
A  Different pools could mine for different cryptocurrencies.  It could be Bitcoin; it could be a different cryptocurrency.

6

Q  So one customer of GAW Miners could choose to direct the mining power to one type of cryptocurrency while another customer might direct its mining power to a different cryptocurrency; correct?
A  I believe that was possible, yes.
Q  The customer in that way had the ability to determine how his or her money would be used; correct?
A  That's how it was represented, yes.
Q  Is it also your understanding, sir, that customers could change the allocation of their mining power on a daily basis?
A  I don't know if it was on a daily basis, but my understanding is that there was some ability to change the allocation of the mining power, yes.

*Id.* at 22-23.  He also testified that these mining pools included people who were not customers

of GAW Miners:

Q  Was it your understanding that the pools to which people could focus their mining power included customers outside of GAW Miners?
A  I believe that was the case for at least some of the pools, yes.
Q  So if a customer buys a Hashlet and focuses its mining power into a specific pool, there could be people around the world in that pool who are not customers of GAW Miners.
A  Yes, sir.

*Id.* at 24-25.

The jury also heard testimony that Hashlet owners could "boost" their Hashlets to receive

a higher payout.  Audet testified regarding boosting as follows:

Q  Now, another way that you could impact your payouts was by something known as boosting; correct?
A  Yes.
Q  Okay.  So the idea was that every day you could log onto the GAW Miners' website, click a button, and boost your Hashlet; correct?
A  That's right, yes.
Q  And it would pay out more than if you don't boost your Hashlet; correct?
A  That's correct, yes.
Q  Okay.  So, again, taking the same example, if you and I owned the same Hashlet, which is mining in the same pool but you boost your Hashlets every day, you could make more in payouts than I would; correct?
A  Probably, yes.

*Id.* at 48.

Finally, the jury heard evidence regarding the fees GAW received from the Hashlet owners.  First, the customer would pay a fee to acquire the Hashlet.  *Id.* at 21 (Dr. Narayanan's testimony), 59-60 (Pfeiffer's testimony).  Then, GAW would charge Hashlet owners "an ongoing maintenance fee in order to maintain and operate the equipment."  ECF No. 351-4 at 75.  Pfeiffer testified as follows regarding that fee:

> Q So that machine would generate some kind of cryptocurrency coin, and the return that you got would be that coin minus your maintenance fee; correct?
> A That's correct.
> Q The maintenance fee wouldn't change depending on how much coin the machine had generated; correct?
> A That's almost right.
> Q And where is the -- where's the little bit that stops you from saying it's completely accurate?
> A GAW had a policy and practice that when there was mining --and so say the mining revenues were a dollar and they charged a revenue of -- sorry -- a maintenance fee of 15 cents. You would get the difference, 85 cents. But if the mining revenue were, say, you know, 15 cents, um, they would still charge you 15 cents. You would just get like the smallest fraction, which was like one ten million[th] of a Bitcoin. And that's the amount you would get as your daily payout for that Hashlet would be one . . . ten million[th], I think, of a Bitcoin.
> Q So -- and when you explained, the fee itself didn't change; correct? As you said, it would still be the 15 would be the fee. But if the fee happened to cover everything that had been generated, they would give you a fraction of a penny essentially as a return.
> A That's right.
> Q But the fee itself didn't change; right?
> A I guess that's right.

*Id.* at 76-77.  He further testified:

> Q Would you similarly get a tiny payout if the maintenance fee were 15 cents and your original reward were zero?
> A That's my understanding, yes.
> Q So if you did not make a profit from a Hashlet on a particular day, GAW would not receive anything from you either?
> A That's correct.
> Q And, therefore -- so if you did not make a profit from a Hashlet on a particular day, GAW would not profit that day either.
> A That's correct.

*Id.* at 78.  At his deposition, Audet also testified that the fee was fixed, although he did not testify

that the full fee was not charged if the cryptocurrency amount earned was less than the amount of

the fee:

> Q So you didn't know if the fee was 10 percent one day and then 50 percent
> another day?
> A I don't recall, no. I think the fee was a fixed cost thing based on the cost of
> electricity and running, you know, the -- to run the establishment -- no -- the server
> farm where all these machines were being used or stored and run. So it was sort
> like a fixed cost. So the percentage doesn't -- you know, one day if you had a big
> payout, the fee was relatively small. If you had a small payout, then it was large.
> But GAW always took their fee out first and then anything left over was your
> payout. I don't remember if they actually published the fee. I think they just gave
> you your payout.
> Q Did the fees vary based on the different types of Hashlets or Hashstakers or
> GAW products?
> A I don't know. I don't know how they priced it.

ECF No. 359-4 at 3.  *See also* ECF No. 359-2 at 45 (Audet's trial testimony that he "believed

back then [at his deposition]" that "the service fee that GAW Miners charged for running and

operating the miners was a fixed fee.").  At trial, before reviewing his deposition testimony,

Audet testified that he believed the fee was proportional to the amount of the payout the Hashlet

owner received:

> Q And then they also charged you a maintenance fee for operating the miners;
> correct?
> A They called it a service fee. It was proportional to the payout.
> Q So they charged you a service fee. And your testimony here today is that it was
> proportional to your payout?
> A I -- like I said, it was six years ago. I think it was proportional -- you know, yes,
> I think it was related to – it was a fixed fee. I think it was proportional to the
> payout you got that day.
> Q Would you be surprised, Mr. Audet, to learn that three years ago when you
> testified, you testified that it was a fixed fee?
> A No, I wouldn't be surprised, no.

*Id.* at 44.  When shown his deposition testimony, Audet testified that he believed at the time of

the deposition that the maintenance fee was a fixed amount.  *Id.* at 45.

The plaintiffs' expert testified at trial that he was not sure whether GAW earned any profits from mining separate from the Hashlet acquisition and service fees (by, for example, participating in the mining pools in which its customers ostensibly mined their Hashlets). *See* ECF No. 344 at 12-13.

      B.  <u>Paycoin</u>

            i.   <u>GAW's Promotion of Paycoin</u>

In the fall of 2014, GAW Miners announced the launch of a new cryptocurrency called Paycoin. *See* ECF No. 351-22 at 2 (October 29, 2014 email in which Fraser forwarded a GAW Miners' announcement that "HashCoin[3] [wa]s coming!" and wrote "NEW WORLD COMING! ICO!!"). The jury saw evidence of various efforts by the Company to promote Paycoin. On its website, GAW promoted Paycoin as follows:

> No cryptocurrency in history has had the financial backing of a company with the capital and resources of [Paycoin], ever. Driving adoption has always been the most difficult task facing any new technology, including cryptocurrency. We will be placing industry-changing resources behind this effort and committed to making [Paycoin] a success. 100% of the revenue from [Paycoin's] release and continued use go directly to [a] Coin Adoption Fund to further back the efforts of dedicated, full-time staff to ensure that [Paycoin] enjoys the type of wide-spread visibility and use that other cryptocurrencies, including bitcoin, have lacked.

ECF No. 351-16 at 2. GAW emphasized merchant adoption of Paycoin as key to Paycoin's long-term success:

> While grassroots campaigns have seen some limited success in the past, the missing piece of the puzzle is a truly professional, fully-funded effort to ensure that a new crypto payment technology reaches the widest range of merchants possible. [Paycoin]'s ICO fills in the missing piece by supporting continual adoption efforts . . . . Ultimately, [Paycoin]'s long-term value will be pinned on not only merchants adopting it as a consumer payment method, but also on transactions with suppliers and vendors with [Paycoin].

---

[3] Paycoin was initially referred to as Hashcoin. ECF No. 351-13 at 3 (noting that Paycoin was "previously codenamed 'Hashcoin'").

*Id.* It included a graphic illustrating how it planned to use funds accrued via the ICO to grow Paycoin:



*Id.* at 3. GAW issued a whitepaper that, like the graphic above, emphasized that Paycoin's creation of the Coin Adoption Fund ("CAF") via its Initial Coin Offering ("ICO") made it "unique among cryptocurrencies" and stated that the CAF funds would be used to promote adoption, maintain the fiat reserve, and develop hardware to distribute to Paycoin miners. ECF No. 351-15 at 8.

GAW also issued a timeline, beginning with the ICO and leading to a Paycoin public launch, the launch of the Hashbase (later, Paybase) platform, retailer adoption and, ultimately, "increased market value" for Paycoin:



351-16 at 3-4.  A November 24, 2014 GAW Miners press release similarly emphasized the way

in which GAW Miners would use the ICO funds to support Paycoin's adoption, quoting Garza:

> [A]ll existing cryptocurrencies have failed to achieve an adoption path leading to
> mainstream use . . . . [C]hanging the world economy from <u>fiat</u> to cryptocurrency
> required enormous effort.  A decentralized currency leaves behind no parties with
> a financial incentive to do the work needed in order to promote global adoption.
> Until now that is.  Paycoin's ICO fills in the missing piece by supporting continual
> adoption efforts allowing us to be the first to both legitimize and bring
> cryptocurrency to the mass market.

ECF No. 351-14 at 3-4.

The Company also stated that Paycoin was backed by a $100 million reserve, and that it

would maintain a $20 price floor for Paycoin after its public launch.  *See* ECF Nos. 351-16 at 4

(Paycoin launch timeline noting $20 price at public launch); 351-23 at 2 (Fraser retweet of GAW

Miners' January 12, 2015 tweet stating "PayBase Honors $20 Paycoin"); 351-13 at 3 (November

25, 2014 Wall Street Journal article stating that "[w]hen the coin opens to the public on Jan. 2 . .

. the company will partly back [it] with a store of fiat currency worth around $100 million.

While those funds won't function as a 100% reserve, they will combine with added features

within the Paycoin protocol, including a supply schedule that fluctuates depending on the level

of miner demand, to reduce exchange-rate volatility and thus seek to resolve one of bitcoin's

biggest barriers to mass adoption.")  At trial, Fraser testified that GAW advertised that it would

use its $100 million fund to keep the price of Paycoin over $20.  ECF No. 351-4 at 35 (agreeing

that it was "[m]ore or less" correct that "GAW Miners had been advertising that it would use its

$100 million fund to keep the price of Paycoin over $20").

ii.     The Launch of Paybase & Paycoin's Price Decline

GAW launched Paybase in January 2015.  *See* ECF No. 351-4 at 67 (Shinners's trial

testimony that "Paybase was another platform that was integral in order for all of these promises

GAW Miners had made to, you know, come to fruition, meaning that they would be delivered

after the first of the year in 2015"); *id.* at 56 (Audet's trial testimony that Paycoin's $20 price

floor "was going to be supported when this thing called Paybase was going to be launched, and

that was in January [2015]").  Shinners testified at trial that Paybase was intended to function as

"the whole backbone . . . for things like merchant adoption, for an exchange, an active exchange,

the Paycoin $20 floor, etc., etc."  *Id.* at 67.  Dr. Narayanan also testified that Paybase was

supposed to function as the mechanism that would allow merchant adoption to occur:

> GAW Miners released a payment platform called Paybase.  Now, in general, a
> payment platform is an intermediary that sits between users and merchants in order
> to make transactions easier in Paycoin or whatever other cryptocurrency.
> Specifically, with Paybase, GAW Miners promised that Paybase could be used to
> be able to make purchases at retailers like Target and Walmarts.  And this would
> be one potential way to increase the usefulness and potentially the value of
> Paycoin for all of its users.

ECF No. 343 at 61-62.  Shinners testified that, contrary to GAW's promises, when Paybase was

deployed "after the new year in 2015," "there was no merchant adoption.  There was no

exchange at all.  And, yeah, it was – fundamentally it was just an online wallet basically."  ECF

13

No. 351-4 at 64; *see id.* at 69 (Shinners's trial testimony that, "after the new year in 2015, the only thing that was there was an online wallet, a place to store your Paycoin and nothing else.")

After the new year, Paycoin continued to trade, but its price fell swiftly.  ECF No. 351-20 (Coinmarketcap.com record showing Paycoin's opening price at $12.39 on December 31, $9.97 on January 1, $4.34 on January 5, $3.05 on January 15, $2.22 on January 25, and $1.87 on January 31).  Paycoin's price opened below $1.00 on February 14.  *Id.* at 12.  By April, its price hovered at or below 50 cents, *id.* at 10-11, and by June it was at or below 10 cents, *id.* at 9.

       iii.    Evidence Regarding Whether Paycoin Was a "Centralized"
                Cryptocurrency

Dr. Narayanan opined that his consideration of four factors led him to conclude that Paycoin was a highly centralized cryptocurrency.  Those factors were: Paycoin's software, the concentration of currency ownership, the concentration of mining power, and the trading and payment ecosystem.

With respect to Paycoin's software, Dr. Narayanan testified:

> The software behind a cryptocurrency is available for anyone to look at.  And anyone can propose changes to the software.  Now, in a cryptocurrency like Bitcoin, there is usually a process based on careful deliberation and consensus for determining which of those changes will make it into the next version of the cryptocurrency.  In Paycoin, in contrast, what I found is that GAW Miners released the software under its own online account.  GAW Miners exercised unilateral control over updates to the software and was able to make changes to the cryptocurrency, to the rules of the cryptocurrency, without any notice or advance deliberation.

ECF No. 343 at 58.  He agreed on cross examination that Paycoin was "open source," that "[a]nybody could see the source code" and "suggest improvement to the source code" or "suggest fixes to the source code."  ECF No. 359-2 at 28.

With respect to the concentration of Paycoin ownership, Dr. Narayanan testified that GAW owned 96 percent of the initial allotment of Paycoin:

> GAW Miners announced that it was creating an initial allotment of 12.5 million units of the cryptocurrency, 12.5 million units of Paycoin, and that of these 12.5 million units, it had allotted 12 million units to itself to do as it saw fit.  So that's 96 percent.  That an extremely high level of concentration around currency ownership . . . .  GAW said that a portion of those 12 million would be used for paying investors, and a portion of it would be used for paying previous customers in exchange for something called Hashpoints.

ECF No. 343 at 59.  He noted that this factor was "particularly important in a proof of stake cryptocurrency . . . because . . . whoever controls a lot of stake in the system has a lot of control over the mining process and, in turn, over the blockchain.  They would have control over what is considered a legitimate or illegitimate cryptocurrency transaction."  *Id.* at 58-59.[4]

With respect to concentration of mining power, Dr. Narayanan testified:

> GAW had created a number of special Paycoin accounts, 50 Paycoin accounts, which had a much higher degree of returns to stake compared to normal Paycoin accounts—in fact, 70 times higher returns to stake.  And because they had so much control over – over the stake in the system, these 50 accounts, by the way, were primarily controlled by GAW itself.  And because of that, they were set up to have the majority of control over Paycoin mining, in turn, over the Paycoin blockchain.

*Id.* at 60.

---

[4] According to Dr. Narayanan, Paycoin was a "proof of stake" cryptocurrency (unlike Bitcoin, which is a "proof of work" cryptocurrency).  ECF No. 343 at 56.  With a proof of work cryptocurrency, "miners who have a lot of computational power have more of a chance to add blocks to the blockchain and get a reward in exchange."  *Id.*  In contrast, with a proof of stake currency, "miners or entities who own a lot of coins in the system, that is, a lot of units of the cryptocurrency, that is, entities who have a lot of stake in the system, are going to be the ones who have a higher chance to put in blocks into the blockchain and earn rewards as a result."  *Id.* at 56-57.

While Dr. Narayanan testified that Paycoin was a proof of stake cryptocurrency, the jury also heard testimony that Paycoin began as a proof of work cryptocurrency.  Two witnesses, both former employees of GAW, testified at their depositions that Paycoin began as a proof of work currency.  ECF No. 359-5 at 5 (deposition testimony of Madeline Eden that "[i]nitially, [Paycoin] was a work block chain . . . . I don't remember for how long exactly"); 359-6 at 11 (deposition testimony of Jonah Dorman confirming that Paycoin would "transition from proof-of-work to proof-of-stake . . . by the mining of an initial preset amount of coins," and that "anybody could download the software necessary to mine Paycoin during the proof-of-work phase").  According to Eden, the "ledger for Paycoin [was] decentralized" as a result.  ECF No. 359-5 at 5.

With respect to the trading and payment ecosystem, Dr. Narayanan testified that, "[f]or a cryptocurrency to be useful, customers have to be able to purchase it and trade it, such as on an exchange.  Customers also have to be able to make payments using the cryptocurrency, for example, on a retailer's website."  *Id*.  He testified further that "GAW promised that it had a hundred million dollar reserve called a Coin Adoption Fund, and this would be used to promote the adoption of Paycoin.  One of the things that GAW said it would do with this fund is to purchase Paycoin on exchanges as necessary so that the price of Paycoin would stay at or above $20 for everyone."  *Id.* at 61.  He acknowledged that while GAW promised to control the prices on the public exchanges, he "ha[d] not seen evidence that they actually did."  ECF No. 359-2 at 29.  He also pointed to the Paybase platform as a component of Paycoin's payment ecosystem that would be controlled by GAW.  ECF No. 343 at 61-62.

Paycoin traded on public exchanges not controlled by GAW Miners.  ECF Nos. 359-2 at 28-29 (Dr. Narayanan's trial testimony) and 40-41 (Audet's trial testimony); 351-20 (Coinmarketcap.com record tracking Paycoin trading on public exchanges).  It continued to trade on public exchanges after GAW Miners had demonstrated its inability to support the $20 price floor and after the SEC had announced its investigation of the Company (on January 19, 2015).  ECF No. 351-20 at 3-13.  Dr. Narayanan acknowledged at trial that "[w]hen a currency is traded on an exchange, a public exchange, its price is determined by market forces."  ECF No. 359-2 at 29.

        iv.    Evidence Regarding Purchasers' Motives in Purchasing Paycoin

The jury saw posts made on GAW's "Hashtalk" forum regarding Paycoin.  One poster wrote, "we are positioned to do well if GAW succeeds, so cheer on the team and enjoy the show!"  ECF No. 351-21 at 12.  Another explained, "the cryptocurrency sector is getting a lot of

attention and investment.  This stuff is not going away and we have a chance with GAW to be on

the leading/bleeding edge of something big.  I am willing to risk 3 months income to have a

share in something will give me a 5-fold increase on my investment in a few years." *Id*.  A third

wrote, "GAW is addressing the big issue of price stability of the new coin, and this may be

enough to get the coin widely accepted, and in such a case, the whole Paycoin/Paybase would

yield good returns.  Investing in GAW is risky because it is a start-up venture, however, I am

also not investing more than I [c]an afford to lose" *Id.* at 10.

In addition, the class representatives testified regarding their interest in purchasing

Paycoin.  For example, Audet testified that he purchased Paycoin while its price was below $20

based on GAW's promise of a $20 price floor when Paybase launched:

> Q  And why did you continue to buy Paycoin at the time you knew it was below
> $20?
> A  Because in December, that was before the initial coin offering; and, therefore,
> the price was not supported yet.  It was going to be supported when this thing
> called Paybase was going to be launched, and that was in January.  And, therefore,
> everything I bought in December would have been at a discounted price compared
> to the $20 floor that they were going to provide in whenever they had the initial
> coin offering or Paybase.

ECF No. 351-4 at 56.  Shinners testified that he expected to earn a profit on his Paycoin after

Paycoin's public launch:

> Q  And does this document depict Hashpoints converting to Paycoin?"
> A  Uh yes.  On the top row, second row from the left, there's – it says "ICO Round
> 2."  "Hashpoint customers."  And then below it says "400 Hashpoints."
> Q  So did you expect that when your Hashpoints converted to Paycoin, that you
> would have the option of selling them?
> A  Yes.
> Q  And based on this document we're looking at, did you expect that you'd be able
> to earn a profit if you sold them?
> A  Yes, absolutely.
> Q  And do you see that somewhere in this diagram?
> A  Yes.  The public launch was for $20.  And the – we were told that 400
> Hashpoints was actually $4.  So the difference between 20 and 4, 16.

*Id.* at 60-61.  Pfeiffer testified that he was interested in GAW's assertion that it "had a $100

million fund to back up [Paycoin] to promote the development and to promote the ecosystem that

would make Paycoin valuable."  *Id.* at 74.  According to Pfeiffer, that $100 million fund

distinguished GAW (and Paycoin) from other cryptocurrencies trying to solve the problem of

cryptocurrencies' slow transaction speeds.  *Id.*  He testified,

> The ambition – well, GAW's ambition for Paycoin, as I said, was to develop an
> ecosystem that would add value.  And one of the ways they were going to do this
> was to develop a product that would have faster transaction times . . . . If you're
> trying to buy something at, say, a grocery store or coffee shop and you have to wait
> ten minutes before your transaction is confirmed, you're going to hold up the line
> and you're going to be cold.  So it's not that useful.  GAW was trying to solve that
> problem, and they said they had a technical way to do that.

*Id.* at 73.

      C.  <u>Hashpoints</u>

At trial, the jury also heard evidence—in the form of testimony from the class

representatives, the plaintiff's expert, and Garza—regarding Hashpoints.  They heard that

Hashpoints were "like an in-house credit from GAW Miners" that Hashlet owners could receive

in exchange for their Hashlet mining, and which they could then trade in for Paycoin (at a price

of 400 Hashpoints for one Paycoin).  ECF Nos. 359-2 at 39 (Audet's testimony that "towards the

end of October, early November 2014," his Hashlets began paying out in Hashpoints rather than

Bitcoin, and that Hashpoints were "like an in-house credit from GAW Miners where . . .

eventually you would be able to trade them in to buy—rather, you could convert them to . . .

Paycoin"); 359-7 at 12 (Garza's deposition testimony that Hashpoints were "almost like an in-

store credit, like sort of like an internal value within GAW Miners to then eventually use to

purchase Paycoin"); 351-4 at 15-16 (Dr. Narayanan's testimony that "GAW Miners gave

[Hashlet] customers the option of mining this new thing called Hashpoints instead of Bitcoin or

another cryptocurrency, and GAW Miners said that these Hashpoints could later be converted to

Paycoin when Paycoin launched").

> ### D. HashStakers

The jury heard testimony from two of the class representatives that they were also able to

acquire Paycoin through another GAW product called HashStakers.  Pfeiffer testified at trial:

> Q  Did you also acquire Paycoin through any other means?
> A  Yes.  There was another GAW product called HashStakers, and this was a
> specialized Paycoin wallet.  And you could basically put your coins in this and
> lock them up for a period of time.  Maybe it was one month or three months or six
> months.  But at the end of that time period, you would . . . get not only the
> original principal you put in but also interest on top of that.  So you would get
> more Paycoin in the end.
> Q  And why were you interested in HashStakers?
> A  I viewed Paycoin as a long-term investment.  I wasn't in a hurry.  So the idea
> of getting more Paycoin a little bit later sounded good to me.

ECF No. 351-4 at 74.  Shinners, in turn, compared HashStakers to certificates of deposit:

> [A] Hashstaker is similar to what you would see from a bank, like a certificate of
> deposits, where you are depositing, in this case, Paycoin.  And then it's locked up
> for a period of time.  And for that, you get paid an inherent rate of return or
> interest.

ECF No. 359-2 at 49.

> ## IV.    Legal Standards

> ### A.  Rule 50 Motion

Rule 50(a) of the Federal Rules of Civil Procedure permits the entry of judgment as a matter of

law if a "party has been fully heard on an issue during a jury trial and the court finds that a

reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that

issue . . . ." If the court does not grant the motion made under Rule 50(a), "the movant may file a

renewed motion for judgment as a matter of law" within 28 days from the entry of judgment or, if

the motion concerns a matter not decided by a verdict, within 28 days after discharge of the jury.

Fed. R. Civ. P. 50(b).   A party who does not move for judgment as a matter of law under Rule 50(a) is barred from challenging the verdict under Rule 50(b).  *Lambert v. Genesee Hosp.*, 10 F.3d 46, 53-54 (2d Cir. 1993), *overruled on other grounds by Greathouse v. JHS Sec. Inc.*, 784 F.3d 105 (2d Cir. 2015) ("[B]ecause a j.n.o.v. motion made under Fed. R. Civ. P. 50(b) . . . is in reality a renewal of a motion for a directed verdict, it cannot assert new grounds for relief."); *Villara v. City of Yonkers Police Dep't*, No. 95 CIV. 1654(JSR), 1997 WL 399660, at *1 (S.D.N.Y. July 15, 1997) ("Failure to raise the relevant issue in a Rule 50(a) motion is therefore tantamount to waiver and a complete bar to 'renewing' it in a Rule 50(b) motion . . . ."). This procedural requirement "may not be waived by the parties or excused by the district court." *Bracey v. Bd. of Educ. of City of Bridgeport*, 368 F.3d 108, 117 (2d Cir. 2004). Nevertheless, a party who has failed to comply with the procedural requirements of Rule 50 is not foreclosed from challenging the verdict by means of a Rule 59 motion. *La France v. N.Y., N. H. & H. R. Co.*, 191 F. Supp. 164, 166 n.1 (D. Conn.), *aff'd*, 292 F.2d 649 (2d Cir. 1961) (treating defendant's motion as a motion made under Rule 59(a) because defendant was barred from bringing the motion under Rule 50(b)).

   B.  Rule 59 Motion

   Rule 59 of the Federal Rules of Civil Procedure allows a district court to grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a). The Second Circuit has held that a district court should grant a motion for a new trial when it finds that "the jury has reached a seriously erroneous result or the verdict is a miscarriage of justice." *Song v. Ives Laboratories, Inc.*, 957 F.2d 1041, 1047 (2d Cir. 1992). In assessing such a motion, the "trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner," and the court may grant such a motion "even if there is substantial evidence supporting the jury's verdict." *Manley v. AmBase*

*Corp.*, 337 F.3d 237, 244–45 (2d Cir. 2003).  "A new trial may be granted . . . when the jury's

verdict is against the weight of the evidence."  *DLC Mgmt. Corp. v. Town of Hyde Park*, 163

F.3d 124, 133 (2d Cir. 1998).  "A court considering a Rule 59 motion for a new trial must bear in

mind, however, that the court should only grant such a motion when the jury's verdict is

'egregious.'"  *Id.* at 134.

## V.    Discussion

### A.  Rule 50 Motion

The plaintiffs did not move for judgment as a matter of law on the issue of whether the

Products were securities before the case was submitted to the jury and thus are barred from

making a Rule 50 motion following the jury verdict.  While the plaintiffs made a Rule 50(a)

motion "on the affirmative defenses" before the case was submitted to the jury, ECF No. 354 at

27 and 32-43, a Rule 50(b) motion is "limited to those grounds that were specifically raised in

the prior motion for JMOL; the movant is not permitted to add new grounds after trial."  *Tolbert*

*v. Queens College*, 242 F.3d 58, 70 (2d Cir. 2001) (internal quotation marks and alteration

omitted).  The plaintiffs' Rule 50 motion is, therefore, denied.

### B.  Rule 59 Motion

The plaintiffs argue that they are entitled to a new trial because the jury's finding that

Hashlets, Paycoin, Hashpoints, and Hashstakers were not investment contracts was against the

weight of the evidence.  ECF No. 351-1 at 42.  I agree that the plaintiffs are entitled to a new trial

with respect to Paycoin only.

#### i.  Jury Instructions on Investment Contracts

I instructed the jury that, "[t]o establish that a Product [was] an 'investment contract,' the

plaintiffs [had to] prove that there was, with regard to that Product: (1) an investment of money,

(2) in a common enterprise; (3) with profits to be derived solely from the efforts of others."  ECF No. 326 at 21; *see also S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946).  I further instructed: "For each of these elements, you must focus on what the buyers of the Products were led to expect about the nature of the Product."  ECF No. 326 at 21; *see also S.E.C. v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 352-53 (1943) (courts consider the "character the instrument is given in commerce by terms of the offer, the plan of distribution, and the economic inducements held out to the prospect").

With respect to the second element, common enterprise, I instructed the jury that the plaintiffs had to

> prove with respect to a specific Product, either: (1) that each individual buyer's fortunes were tied to the fortunes of the other buyers by the pooling of their assets, usually combined with the pro-rata distribution of profits, *i.e.*, distribution proportionate to the buyer's investment; or (2) that the individual buyer's fortunes were tied to the fortunes of GAW Miners, *i.e.*, that the fortunes of the buyers and the Company were linked so that they would rise and fall together.

ECF No. 326 at 21; *see also Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994); *In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340, 359-360 (S.D.N.Y. 2011).

With respect to the third element, profits derived solely from the efforts of others, I instructed the jury that the word "solely" should not be taken literally and that they

> should consider whether the [P]roduct was being promoted primarily as an investment, in which case it would be an investment contract, or whether the product was being promoted as a means whereby participants could pool their activities, money, and the promoter's contribution in a meaningful way, in which case it would not be an investment contract. If there was a reasonable expectation of significant investor control, then profits would not be considered derived solely from the efforts of others.  But if the expectation was that the participants would be passive investors, then profits would be considered derived solely from the efforts of others.  The touchstone is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others.

ECF No. 326 at 21-22; *see also S.E.C. v. Aqua-Sonic Prods. Corp.*, 687 F.2d 577, 582 (2d Cir.

1982); *United Housing Found., Inc. v. Forman*, 421 U.S. 837, 852 (1975).

     ii.  <u>Hashlets</u>

     The plaintiffs argue that the jury's finding that they failed to show that Hashlets were

investment contracts was against the weight of the evidence. I disagree. The parties do not

dispute that the plaintiffs proved that the purchase of Hashlets involved an "investment of

money." Accordingly, I consider only whether a finding that either the second or third *Howey*

prongs were not satisfied would have been against the weight of the evidence.

     a.  <u>Common Enterprise: Horizontal Commonality</u>

     The jury could reasonably have found, based on the evidence presented at trial, that no

horizontal commonality existed because Hashlet owners "could make profits or sustain losses

independent of the fortunes of other purchasers." *Revak v. SEC Realty Corp.*, 18 F.3d 81, 88 (2d

Cir. 1994). Audet, Pfeiffer, and Dr. Narayanan all testified that Hashlet owners could select the

pools in which their Hashlets mined, and Dr. Narayanan testified that at least some of the people

mining in those pools were not GAW customers. ECF No. 359-2 at 22-25, 46-47, 63. Audet

testified that owners of the same kind of Hashlet could receive "very different payouts"

depending on the mining pool they selected. *Id.* at 46-47. He confirmed that, "[i]n theory," one

Hashlet owner "could do really well one day, and [another] could do really poorly." *Id.* at 47.

Audet further testified that Hashlet owners could "boost" their Hashlets in order to generate a

larger payout, and he agreed that it was "[p]robably" the case that, if two customers "owned the

same [type of] Hashlet, which is mining in the same pool but [one] boost[ed] [his] Hashlets

every day, [he] could make more in payouts than [the other customer] would." *Id.* at 48. Based

on this testimony from the class representatives and their expert, the jury could reasonably have

found that each individual Hashlet owner's fortunes were not tied to the fortunes of the other Hashlet owners, given each Hashlet owner's ability to select on any given day the pool in which the Hashlet mined and whether to boost the Hashlet.

The plaintiffs argue that "the fact that two Hashlet owners could, in theory, earn different payouts on a given day if their Hashlets had mined in different pools" does not undermine their argument that horizontal commonality was present because the "key feature" of horizontal commonality is that "investors' profits at any given time are tied to the success of the enterprise." ECF No. 351-1 at 19 (quoting *S.E.C. v. Kik Interactive, Inc.*, 492 F. Supp. 3d 169, 179 (S.D.N.Y. 2020)). But the Second Circuit has made clear that horizontal commonality requires "the tying of each individual investor's fortunes to the fortunes of the other investors," *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994), as I instructed the jury. And the evidence that different Hashlet owners could earn different payouts from their Hashlets based on the mining pools they selected and on whether they chose to "boost" their Hashlets could reasonably support a finding that the fortunes of a particular Hashlet owner were not tied to those of his or her fellow Hashlet owners. For this reason, the plaintiffs' additional argument that the evidence regarding selection of mining pools and boosting is relevant only to the third *Howey* prong is unavailing.

The plaintiffs also argue that GAW never actually allocated the hashing power to the selected mining pools—it only pretended to—and that courts appropriately focus on economic reality when determining whether a particular product is an investment contract. ECF No. 363 at 5. But as I instructed the jury, the *Howey* test "focus[es] on what the buyers of the Products were led to expect about the nature of the Product." ECF No. 326 at 21. "The enterprise and the described materials, by the very nature of the operation of the securities laws, must be examined

24

as of the time that the transaction took place, together with the knowledge and the objective intentions and expectations of the parties at that time." *S.E.C. v. Aqua-Sonic Prods. Corp.*, 524 F. Supp. 866, 876 (S.D.N.Y. 1981), *aff'd*, 687 F.2d 577 (2d Cir. 1982); *see also Joiner,* 320 U.S. at 352–53 ("The test [for determining whether an instrument is a security] ... is what character the instrument is given in commerce *by the terms of the offer,* the plan of distribution, and the economic inducements held out to the prospect." (emphasis added)).  As discussed, the jury heard evidence that the Company presented Hashlets as a product that would allow Hashlet owners to select the pools in which their Hashlets mined and to "boost" their Hashlets to receive higher payouts.  Accordingly, even if the jury found that GAW later failed to allocate the Hashlets' mining power based on the owners' selections or to boost the Hashlets when directed to do so, a finding that no horizontal commonality existed would still have been reasonable and supported by the evidence presented.

While the plaintiffs point to the Second Circuit's holding in *United States v. Leonard* as support for their argument that I should consider whether GAW actually allocated mining power and boosted Hashlets as directed, that case is distinguishable from this one.  In *Leonard*, the Second Circuit, discussing the third *Howey* prong, noted that while organizational documents prepared by the defendant "would lead [the court] to believe that [investors] were expected to play an active role in the management of the companies," in reality, investors "played an extremely passive role in the management and operation of the companies." 529 F.3d 83, 89 (2d Cir. 2008).  The Court emphasized, however, that this fact aligned with "[r]ecord evidence allow[ing] the jury to conclude that—notwithstanding the language in the organizational documents suggesting otherwise—from the start there could no 'reasonable expectation' of investor control."  *Id.* at 90; *see also id.* (noting that "under the organizational documents, the

25

members' managerial rights and obligations did not accrue until the LLCs were 'fully organized,'" and that "so-called 'interim managers' initially held legal control rights, and they decided almost every significant issue prior to the completion of fundraising.").  Here, in contrast, the plaintiffs have identified no evidence suggesting that "from the start" there was no reasonable expectation that GAW would allocate mining power and boost Hashlets in compliance with the Hashlet owners' directions.

b.  <u>Common Enterprise: Vertical Commonality</u>

A finding that there was no vertical commonality would also not have been against the weight of the evidence.  The evidence at trial supported the finding that GAW earned profits from Hashlets only via the Hashlet acquisition and service fees; there was no evidence that GAW profited directly from the mining by, for example, owning portions of the miners and directing that mining power to mine in the pools in which Hashlet owners ostensibly mined their Hashlets. *See* ECF No. 344 at 12-13 (testimony of Dr. Narayanan).  The fee a customer paid GAW to acquire a Hashlet was a flat, up-front free; accordingly, it did not link the fortunes of the Hashlet owner to those of GAW.  The plaintiffs argue, however, that "unrebutted evidence" regarding Hashlet service fees showed that GAW "did not earn profits from a Hashlet on a given day unless the owner of the Hashlet earned a profit that day; accordingly, the fortunes of GAW Miners and the Hashlet investor rose and fell together."  ECF No. 351-1 at 20.  I disagree.

The evidence that GAW Miners did not profit from a Hashlet on a particular day unless the owner did—Pfeiffer's testimony that, if the Hashlet owner's profit on a given day were less than or equal to the amount of the service fee, GAW Miners would still pay the customer "the smallest fraction . . . of a Bitcoin" above the amount of the fee, ECF No. 351-4 at 76—was not unrebutted, nor was the jury required to credit it.  Notably, Pfeiffer's fellow class representative,

26

Audet, testified at his deposition that the service fee was fixed, i.e., that it was "based on the cost of electricity and running . . . the server farm . . . ."  ECF No. 359-4 at 3.  Further, he never testified, as Pfeiffer did, that Hashlet owners were, in effect, not charged the full fixed fee if their payout was less than the fee amount.  *See id.*; ECF No. 359-2 at 44.  Confronted with this conflicting evidence, it would not have been unreasonable for the jury to decide not to credit Pfeiffer's testimony regarding the service fee structure.

Further, even if the jury did credit that testimony, it could still have found that the plaintiffs failed to prove vertical commonality.  If the fee structure operated as Pfeiffer described, then there was no "one-to-one relationship between [GAW] and [Hashlet owners] such that there [was] an interdependence of *both profits and losses*."  *Marini v. Adamo*, 812 F. Supp. 2d 243, 256 (E.D.N.Y. 2011) (emphasis in original) (internal quotations omitted).  While Pfeiffer's description suggested that GAW only profited if a Hashlet owner did, GAW's profit was not proportional to that of the Hashlet owner—it earned the same amount regardless of whether the Hashlet owner earned a huge profit or a small one.  Thus, the fee structure differed from the proportional fee arrangements at issue in many of the district court decisions within this Circuit finding strict vertical commonality.  *See, e.g.*, *In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340, 360 (S.D.N.Y. 2011) (holding at the motion to dismiss stage that the plaintiffs had alleged sufficient facts from which a trier could conclude that strict vertical commonality was present, where the plaintiffs alleged that "[t]he investment manager [was] paid (1) a basic quarterly fee in the amount of one-eighth of one percent (.00125) of the 'closing value' of the assets in the investment account, and (2) a performance fee equal to 20% of the profits in the investment account that exceed the preferred return and the basic quarterly fee" and distinguishing that fee arrangement from that of a "stockbroker, who collects a fee for every consummated

transaction"); *Marini*, 812 F. Supp. 2d at 259-60 (finding that "disputed issues of material fact exist[ed] as to whether [the defendant] earned commissions on the sale of [the plaintiff]'s coins" such that his "fortunes would rise and fall with the plaintiffs' fortunes").  Further, the fee structure Pfeiffer described would on days when a Hashlet owner earned no mining reward allow that owner to earn a small profit (the "smallest fraction . . . of a Bitcoin" paid out by GAW) while GAW sustained a loss (because it earned no fee but gave the owner a small fraction of a Bitcoin).  *See* ECF No. 351-4 at 78 (Q: "Would you . . . get a tiny payout if the maintenance fee were 15 cents and your original reward were zero?" A (Pfeiffer): "That's my understanding, yes."  A: "Q So if you did not make a profit from a Hashlet on a particular day, GAW would not receive anything from you either?"  A: "That's correct.")  Here, it would not have been against the weight of the evidence to find that the fee structure did not truly link the fortunes of the Hashlet owners and GAW so that they would rise and fall together.

c.   <u>Efforts of Others</u>

A finding that the plaintiffs failed to show that Hashlet purchasers had a reasonable expectation of profits to be derived primarily from the entrepreneurial or managerial efforts of GAW also would not have been against the weight of the evidence.  In particular, the jury could reasonably have found that Hashlets involved a pooling of the contributions of the Hashlet owners (money and decisions regarding selection of mining pools) with those of GAW (the physical mining equipment and the electricity and other resources required to maintain it) in a manner that allowed the Hashlet owners to exercise "significant investor control."  ECF No. 326 at 21.  It could have found that Hashlets enabled their owners to outsource the "messy, technical process" of operating physical mining equipment to GAW, while retaining the control over the selection of mining pools that they would have exercised had they operated mining equipment in

28

their own homes.  *See* ECF No. 351-4 at 9-10.  Fraser's acknowledgment that "Hashlet customers were relying on GAW Miners' expertise to own and operate the mining equipment that would support the Hashlets," *id.* at 33, supports the conclusion that GAW's contribution was its ability to operate the physical mining equipment rather than, for example, its expertise in selecting profitable mining pools.  Evidence that Hashlets were marketed as easy to use and "grandma approved" could similarly support the inference that GAW's handling of the physical aspects of the mining process would make it easier for people interested in cryptocurrency mining to participate in that process without having to operate mining equipment in their own homes; it does not, however, compel the conclusion that those people would not exercise significant control over the non-physical aspects of the mining process.  In addition, evidence that one Hashlet owner could "do really well" on a day when another Hashlet owner "d[id] really poorly" depending on the mining pools each selected, ECF No. 359-2 at 46-48, supports the conclusion that whether or not a Hashlet owner profited depended in large part on the decisions he or she made regarding how to allocate his or her Hashlet's mining power.

The authority plaintiffs cite does not compel a different result.  Hashlets, which were mechanisms for mining bitcoin and other established cryptocurrencies, are distinguishable from the cryptocurrency products involved in *Telegram*, *Kik*, and *ATBCOIN*, the profitability of which depended almost entirely on their promoters' success in launching promised blockchains or digital ecosystems.  *S.E.C. v. Telegram Grp., Inc.*, 448 F. Supp. 3d 352, 375 (S.D.N.Y. 2020) ("to realize a return on their investment, the [purchasers] were entirely reliant on Telegram's efforts to develop, launch, and provide ongoing support for the TON Blockchain and [the cryptocurrency]"); *Kik*, 492 F. Supp. 3d 169, 180 (S.D.N.Y. 2020) ("without the promised digital ecosystem, [the cryptocurrency] would be worthless . . . [it has] no inherent value and will

generate no profit absent an ecosystem that drives demand"); *Balestra v. ATBCOIN, LLC*, 380 F. Supp. 3d 340, 355-56 (S.D.N.Y. 2019) ("the success of ATB Coins was entirely dependent on Defendants' following through on their promise to launch and improve the ATB Blockchain . . . . purchasers had no control over whether the new ATB Blockchain technology worked").  Here, in contrast, the jury could reasonably have concluded that the value of the Hashlets depended both on GAW's competent operation of the physical mining equipment and on a particular Hashlet owner's decisions regarding where to direct his or her Hashlet's mining power.  *Howey* and *Aqua-Sonic* are also distinguishable in that the defendants in both cases offered investors the opportunity to profit with the expectation that they would exercise no direct control over their investments.  The plaintiffs have identified no evidence suggesting that a Hashlet purchaser's ability to select mining pools was merely a "legal right[]" he or she was not reasonably expected to exercise.  *Aqua-Sonic Prods. Corp.*, 687 F.2d at 585; *see also* ECF No. 359-2 at 47 (Audet testifying that he checked his payouts daily and switched the pools he was mining in).

iii.   Paycoin

The plaintiffs argue that any finding by the jury that they failed to satisfy the "common enterprise" and "efforts of others" prongs of the *Howey* test was against the weight of the evidence, and I agree.

a.   Common Enterprise: Horizontal Commonality[5]

A finding that the fortunes of the Paycoin owners were not tied together via a pooling of their assets would have been against the weight of the evidence.  GAW's own promotional materials described its plan to use funds raised via the various ICO stages to create a "Coin

---

[5] Because the second *Howey* prong requires a finding of horizontal commonality *or* strict vertical commonality, and because I conclude that any finding that there was no horizontal commonality among Paycoin purchasers would have been against the weight of the evidence, I do not address the parties' arguments regarding strict vertical commonality.

Adoption Fund" that it would use to guarantee a $20 price floor and facilitate widespread adoption, thereby increasing Paycoin's market value.  In exchange for their contribution of assets, the Paycoin purchasers received Paycoin, the price of which rose and fell across the board, so that its purchasers gained or lost in proportion to the amount of Paycoin they owned. Thus, "[r]ather than receiving a pro-rata distribution of profits, which is not required for a finding of horizontal commonality, [Paycoin purchasers] reaped their profits in the form of the increased value of [Paycoin]."  *Kik*, 492 F. Supp. 3d at 178.

Other district courts within this Circuit have concluded that facts comparable to these are indicative of horizontal commonality.  For example, in *Kik*, the court found horizontal commonality based on evidence that the defendant had used funds it earned by selling its new cryptocurrency to support the creation of a "digital ecosystem," the success of which the defendant emphasized would "dr[i]ve demand for [the cryptocurrency] and thus dictate[] investors' profits."  *Id.* (granting SEC's motion for summary judgment on securities claims). Similarly, in *Telegram*, the court concluded that the SEC had shown horizontal commonality where the defendant "pooled the money received from the Initial Purchasers [of its new cryptocurrency] and used it to develop the TON Blockchain" and "[t]he ability of each Initial Purchaser to profit was entirely dependent on the successful launch of the TON Blockchain." 448 F. Supp. 3d at 369 (granting SEC's motion for a preliminary injunction preventing defendant from selling its new cryptocurrency on the basis that such a sale would be an unregistered offering of securities).  Likewise, in *ATBCOIN*, the court concluded that the plaintiff had adequately alleged horizontal commonality where he alleged that "funds raised through the ICO [for the defendant's new cryptocurrency] were pooled together to facilitate the launch of the

31

ATB Blockchain, the success of which, in turn, would increase the value of Plaintiff's ATB Coins." 380 F. Supp. 3d at 353.

The defendant argues that there was no pooling of assets and, thus, no horizontal commonality with respect to Paycoin. The defendant points out that the named plaintiffs received Paycoin in exchange for "their right to receive their normal Hashlet mining rewards for Hashpoints" and, later, Hashpoints themselves. ECF No. 359 at 39. He argues that there is "no evidence how those contributions . . . were or could actually be 'pooled' together in the so-called 'Coin Adoption Fund,'" and he notes that the assets involved in the cryptocurrency schemes described in the other district court decisions from within this circuit all were either money or cryptocurrency. *Id.* at 40. The defendant has failed, however, to identify any authority suggesting that that the assets contributed to a common enterprise involving cryptocurrency must be either money or an existing cryptocurrency. Black's law dictionary defines an asset as "an item that is owned and has value," *Asset*, Black's Law Dictionary (10th ed. 2014), and the defendant has cited no authority indicating that a narrower definition applies in the context of the *Howey* test. As a result, I conclude that the weight of the evidence indicated that the Paycoin enterprise, as described by GAW Miners, involved the contribution of assets—whether money, cryptocurrency, or Hashpoints—that were then pooled together to create the CAF, which in turn supported the creation and promotion of Paycoin.[6]

---

[6] To the extent the defendant argues that there was no "investment of money" because the class representatives paid for their Paycoin in Hashpoints (rather than money or another cryptocurrency), that argument is unpersuasive. Other federal courts have held that some exchange of value is sufficient to satisfy this prong of the *Howey* test. *See, e.g.*, *Uselton v. Com. Lovelace Motor Freight, Inc.*, 940 F.2d 564 (10th Cir. 1991), *cert. denied sub. nom. Alcox v. Uselton*, 502 U.S. 983 (1991) (collecting cases in support of the conclusion that "cash is not the only form of contribution or investment that will create an investment contract . . . the 'investment' may take the form of 'goods and services' or some other 'exchange of value'") (citations omitted). Here, the plaintiffs gave up the right to receive mining payouts of Bitcoin or other cryptocurrency in exchange for Hashpoints (a kind of "in-house credit"), which they then used to acquire Paycoin. In turn, GAW retained the Bitcoin or other cryptocurrency it would have paid out to the plaintiffs and ultimately gave the plaintiffs Paycoin in exchange for Hashpoints. Thus, the exchange of Hashpoints for Paycoin constituted an "exchange of value" sufficient to satisfy the "investment of money" prong.

b.  Expectation of Profit from the Efforts of Others

A finding that Paycoin did not involve "a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts" of GAW would have been against the weight of the evidence.  *See* ECF No. 326 at 21; *Forman*, 421 U.S. at 852.  GAW's own promotional materials emphasized the role it would play in increasing Paycoin's "market value" after its public launch.  According to those materials, "[d]riving adoption has always been the most difficult task facing . . . cryptocurrency."  ECF No. 351-16 at 2 (GAW Miners' website on November 4, 2014); *see also* ECF No. 351-14 at 3-4 (November 24, 2014 press release stating that "all existing cryptocurrencies have failed to achieve an adoption path leading to mainstream use").  But, GAW Miners maintained, Paycoin differed from other cryptocurrencies because it had "the financial backing of a company with the capital and resources" that "[n]o cryptocurrency in history" had enjoyed, which GAW Miners would use to "support[] continual adoption efforts."  ECF No. 351-16 at 2.  It emphasized that Paycoin was "unique . . . in that its Initial Coin Offering (ICO) created the world's first Coin Adoption Fund (CAF), a multi-tier, organized strategy for increasing global adoption."  ECF No. 351-15 at 8.  Paycoin's "long-term value," would, GAW Miners advertised, depend on "merchants adopting it as a consumer payment method," as well as on "transactions with suppliers and vendors."  ECF No. 351-16 at 2.  And the pathway to creation of that value (as the Company advertised in a graphic on its website) was the creation of  the CAF via three ICO rounds, and GAW Miners' use of the CAF Funds to launch Paycoin at a $20 price point and facilitate "major retailer adoption" and credit card purchasing.  *Id.* at 4; *see also id.* at 3 (graphic demonstrating how ICO funds would be distributed to "[g]row[] adoption by building payment plugins, apps, meeting high-volume merchants, & producing training resources," "[b]uild datacenters to distribute at-cost hash power

33

to individual miners for [Paycoin]s," and "establish a large, fiat-backed exchange to provide a safe floor price & ease merchant acceptance").  None of the evidence presented at trial suggested that the average Paycoin purchaser unaffiliated with GAW would exercise significant control over this value-creation process.  Rather, the evidence indicated that GAW was promoting an enterprise in which Paycoin purchasers contributed funds to support work done by GAW.

The defendant offers a series of arguments in support of his position that plaintiffs failed to show that Paycoin entailed an "expectation of profits to be derived solely from the efforts of others."   He first argues that evidence that "anybody" could mine Paycoin indicates that Paycoin was not a "centralized" cryptocurrency and, therefore, not a product whose profits were expected to be derived solely from the efforts of GAW.  ECF No. 359 at 32-36; *see also* ECF Nos. 359-5 at 5 (Eden deposition testimony that, at least initially, "anybody" could participate in the "consensus process for determining whether transactions would become part of the [Paycoin blockchain]); 359-11 (Dorman deposition testimony that, at least during Paycoin's proof-of-work phase, "any miners wishing to participate in Paycoin [would] be allowed to commence mining").  Although this evidence could provide a basis for concluding that some aspects of Dr. Narayanan's testimony regarding centralization were not true (specifically, his testimony that Paycoin was a proof-of-stake currency), it does not indicate that GAW Miners did not promote Paycoin as a product whose value would depend almost entirely on GAW Miners' efforts to promote its adoption by merchants and others and to guarantee its $20 price floor.

Likewise, evidence that Paycoin used "open source" software, and that anyone could view its source code and suggest improvements to it, does not undermine the conclusion that Paycoin's growth in value would depend on GAW's entrepreneurial and managerial efforts.  In fact, such evidence does not even undermine Dr. Narayanan's analysis regarding the relative

"centralization" of Paycoin, as he testified that his conclusion that Paycoin was a centralized cryptocurrency was based in part on GAW's exercise of "unilateral control over updates to the software and [ability] to make changes to the cryptocurrency, to the rules of the cryptocurrency, without any notice or advance deliberation," in contrast to "a cryptocurrency like Bitcoin," whose software was changed "based on careful deliberation and consensus."  ECF No. 343 at 58. The distinguishing feature, according to Dr. Narayanan, was not that people unaffiliated with GAW were unable to view or propose changes to Paycoin's software, but rather that GAW alone controlled what changes were made to that software.

Similarly, while evidence that Paycoin was traded on public exchanges might indicate that it was less centralized than other cryptocurrencies, in light of Dr. Narayanan's testimony that one relevant factor when determining whether a currency is centralized is its trading ecosystem (ECF No. 343 at 60), it does not suggest that the profits to be derived from Paycoin would depend on the efforts of anyone other than GAW.  The defendant points to Dr. Narayanan's testimony that, when a cryptocurrency is traded on a public exchange, its price is determined by market forces (ECF No. 359-2 at 29) as evidence in support of its argument that the jury's finding was supported by the evidence presented at trial, but this argument "ignores the essential role of [GAW] in establishing the market."  *Kik*, 492 F. Supp. 3d at 180.

Further, the defendant argues that evidence that Paycoin continued to trade on public exchanges after GAW Miners failed to honor its promises regarding Paycoin and after the SEC announced its investigation on January 19, 2015 demonstrated that Paycoin's value was not dependent on the efforts of GAW Miners.  Defendant's argument ignores evidence that showed that Paycoin's price fell dramatically after GAW Miners failed to follow through on its promises regarding Paybase, merchant adoption, and the $20 price floor.  The mere fact that Paycoin

retained some slight value after this development is insufficient to support an inference that its value did not depend primarily on the efforts of GAW.

Finally, the defendant argues that the jury could reasonably have determined that the plaintiffs failed to prove that GAW Miners promoted Paycoin primarily as an investment. ECF No. 359 at 36-39. I disagree. The Supreme Court has held that there is no "reasonable expectation of profits" where "a purchaser is motivated by a desire to use or consume the item purchased." *Forman*, 421 U.S. at 852-53. The defendant argues that the jury reasonably could have concluded that the plaintiffs were motivated by a desire to use Paycoin as a medium of exchange to make purchases from merchants such as Target and Walmart. He points to evidence that GAW Miners emphasized the promise of widespread merchant adoption in its marketing materials, and that the CAF and the $20 price floor were intended to facilitate that adoption. But this argument overlooks the fact that GAW's marketing materials described merchant adoption as a pathway to "increased market value" for Paycoin. ECF No. 351-16 at 4; *see also id.* at 2 ("Ultimately, [Paycoin]'s long-term value will be pinned on not only merchants adopting it as a consumer payment method, but also on transactions with suppliers and vendors with [Paycoin].").

The defendant also points to testimony from Pfeiffer and Shinners regarding their interest in Paycoin's promised "faster transaction times" and "merchant adoption" as evidence that the named plaintiffs acted with consumptive intent, but this testimony does not indicate that the two wished to use their Paycoin to make purchases. In fact, Pfeiffer emphasized that the promised faster transaction times were "one of the ways" that GAW planned to "develop an ecosystem that would *add value*," ECF No. 351-4 at 73 (emphasis added), and that he "viewed Paycoin as a long-term investment," *id.* at 74. Shinners testified specifically that he "absolutely" expected to

36

earn a profit when he sold his Paycoin following the public launch. *Id.* at 61 (Q: "[D]id you expect that you'd be able to earn a profit if you sold [your Paycoin]?" A: "Yes, absolutely . . . . The public launch was for $20. And the—we were told that 400 Hashpoints [the amount Shinners spent to acquire a Paycoin] was actually $4. So the difference between 20 and 4, 16."). Audet also testified that he bought Paycoin in December at what he thought was "a discounted price compared to the $20 floor that they were going to provide in whenever they had the initial coin offering or Paybase." *Id.* at 56. The class representatives' testimony, viewed in context, made clear that they were interested in purchasing Paycoin because they stood to profit when it publicly launched for $20, not because they were excited at the prospect of using it to buy groceries.[7]

The jury also saw posts from the Hashtalk forum describing the purchase of Paycoin as an investment. ECF No. 351-21 at 10 ("GAW is addressing the big issue of price stability of the new coin, and this may be enough to get the coin widely accepted, and in such a case, the whole Paycoin/Paybase would yield good returns. Investing in GAW is risky because it is a start-up venture, however, I am also not investing more than I [c]an afford to lose"); *id.* at 12 ("I am willing to risk 3 months income to have a share in something will give me a 5-fold increase on my investment in a few years.").

---

[7] Because the *Howey* test is an objective one—based upon what purchasers were "led to expect" (ECF No. 326 at 21)—the subjective intent of individual plaintiffs in purchasing Paycoin is not determinative of the issue of whether Paycoin purchasers had a reasonable expectation of profit. Nevertheless, as the defendant acknowledges, this evidence is probative on the issue of what a reasonable purchaser would have expected. *See Warfieldd v. Alaniz*, 569 F.3d 1015, 1021 (9th Cir. 2009) (noting that "the subjective intent of the purchasers may have some bearing on the issue of whether they entered into investment contracts," even if the ultimate inquiry must focus "on what the purchasers were offered or promised"); *Telegram*, 448 F. Supp. 3d at 374 ("The Court's finding that the [cryptocurrency purchasers] had a reasonable expectation of profit is buttressed by [the purchasers'] subjective views . . . . The subjective intent of the [purchasers] does not necessarily establish the objective intent of the reasonable purchaser. However, the stated intent of prospective and actual purchasers, though not considered for the truth of their content, may be properly considered in the Court's evaluation of the motivations of the hypothetical reasonable purchaser.")

Further, at the time that the class representatives (and any other class members who purchased Paycoin prior to the launch of Paybase) acquired their Paycoin, there was no mechanism that allowed them to use that Paycoin in a consumptive fashion.  And the jury saw no evidence indicating that such a mechanism materialized after Paybase launched.  *See* ECF No. 351-4 at 64 (Shinners's trial testimony that Paybase was "fundamentally . . . just an online wallet basically").  Such evidence suggests that these Paycoin purchasers were not motivated by the desire to use Paycoin in a consumptive fashion.  *See Kik*, 492 F.Supp.3d at 180 (concluding that the fact that seller of cryptocurrency marketed it as a medium for consumptive use did not mean that the cryptocurrency could not constitute an investment contract, where "none of this 'consumptive use' was available at the time of distribution [and] would materialize only if the enterprise advertised by [the seller] turned out to be successful").

Taken together, the overwhelming weight of the trial evidence indicated that a reasonable purchaser of Paycoin was motivated by the expectation of profits to be generated by GAW's efforts to promote adoption and support a $20 price floor, and not by the desire to use Paycoin for a consumptive purpose.  Accordingly, any finding that Paycoin was not an investment contract because its purchasers did not have a "reasonable expectation of profits" from the efforts of GAW would have been against the weight of the evidence.

iv.   Hashpoints and Hashstakers

As plaintiffs' counsel acknowledged at the charge conference, the jury heard very little evidence regarding Hashpoints and HashStakers at trial.  The jury heard, via testimony from the class representatives, the plaintiffs' expert, and Garza, that Hashpoints were like an "in-house credit" that could be used to purchase (or be converted into) Paycoin, and that HashStakers were "specialized Paycoin wallet[s]" or "like . . . certificate[s] of deposits."  As the defendants point

out, I instructed the jurors that they had to determine, with respect to each product individually, whether that product was an investment contract.  The fact that both of these Products may have been used to acquire or hold Paycoin does not (assuming that Paycoin is an investment contract) render them investment contracts in their own right.  Accordingly, I conclude that, in light of the scant evidence presented regarding these Products, the jury's finding that neither was an investment contract was not against the weight of the evidence.

## VI.    Conclusion

For the reasons set forth above, I DENY the plaintiffs' Rule 50 motion for judgment as a matter of law.  I GRANT the plaintiffs' Rule 59 motion for a new trial with respect to Paycoin and DENY it with respect to Hashlets, Hashpoints, and HashStakers.

IT IS SO ORDERED.

_____/s/_____

Michael P. Shea, U.S.D.J.

Dated:        Hartford, Connecticut
              June 3, 2022