```
 1                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF CONNECTICUT
 2
      - - - - - - - - - - - - - - - - x
 3
      DENIS MARC AUDET, MICHAEL        No. 3:16-CV-940 (MPS)
 4    PFEIFFER, and DEAN ALLEN
      SHINNERS, Individually and on    MAY 26, 2022
 5    Behalf of All Others Similarly
      Situated,                        11:00 A.M.
 6
      vs.                              VIDEO MOTIONS HEARING
 7
      STUART A. FRASER, GAW MINERS,
 8    LLC, and ZENMINER, LLC, (d/b/a
      ZEN CLOUD)
 9
      - - - - - - - - - - - - - - - - x
10

11

12
                          450 Main Street
13                      Hartford, Connecticut

14

15        BEFORE:  THE HONORABLE MICHAEL P. SHEA, U.S.D.J.

16

17

18

19

20

21

22    COURT REPORTER:  Julie L. Monette, RMR, CRR, CCP
                          (860) 212-6937
23
      Proceedings recorded by mechanical stenography, transcript
24    produced by computer.

25
```

```
 1    APPEARANCES:

 2    FOR THE PLAINTIFFS:

 3            SUSMAN GODFREY, L.L.P.
                    1301 Avenue of the Americas, 32nd Floor
 4                  New York, New York 10019
              BY:  JACOB W. BUCHDAHL, ESQUIRE
 5            BY:  SETH D. ARD, ESQUIRE
              BY:  GENG CHEN, ESQUIRE
 6            BY:  RUSSELL RENNIE, ESQUIRE

 7            IZARD, KINDALL & RAABE, LLP
                    29 South Main St., Suite 305
 8                  West Hartford, Connecticut 06107
              BY:  DOUGLAS PATRICK NEEDHAM, ESQUIRE

 9
      FOR THE DEFENDANT:
10
              HUGHES HUBBARD & REED L.L.P.
11                  One Battery Park Plaza, 12th Floor
                    New York, New York 10004-1482
12            BY:  DANIEL WEINER, ESQUIRE
              BY:  MARC A. WEINSTEIN, ESQUIRE
13            BY:  AMINA HASSAN, ESQUIRE
              BY:  HANNAH MILLER, ESQUIRE
14
              BRENNER, SALTZMAN & WALLMAN
15                  271 Whitney Avenue
                    New Haven, Connecticut 06511-1746
16            BY:  ROWENA A. MOFFETT, ESQUIRE

17

18

19

20

21

22

23

24

25
```

```
1                          11:01 A.M.
2           THE COURT:  All right.  Good morning folks.  We are on
3      the record in Audet versus Fraser, 16-CV-940.
4           Let me just first verify that our court reporter,
5      Ms. Monette, is on the line and can hear me.
6           COURT REPORTER:  Yes, I can.
7           THE COURT:  Great.  Can I have appearances of counsel
8      starting with Plaintiffs' counsel.
9           MR. BUCHDAHL:  Good morning, Your Honor.  Susman
10     Godfrey for the Plaintiffs.  Jacob Buchdahl, Seth Ard, Geng
11     Chen, Russell Rennie all on the phone as well as our
12     Connecticut co-counsel, Doug Needham.
13          THE COURT:  Great.  Good morning.
14          MR. WEINER:  Good morning, Your Honor.  Marc Weinstein
15     from Hughes Hubbard & Reed.  Also from Hughes Hubbard this
16     morning, Amina Hassan, who will handle the argument, Hannah
17     Miller.  Mr. Weiner is currently at a medical appointment, but
18     he might join us a little later.
19          MR. BUCHDAHL:  I see Mr. Weiner.  I see him.
20          THE COURT:  So do I.  Hopefully he's not on the
21     operating table.
22          MR. WEINER:  No.  I'm in the waiting room, but I'm
23     good.
24          MS. MOFFETT:  Also Rowena Moffett for local counsel.
25          THE COURT:  All right everyone.  So I have reviewed
```

1    the briefs on the Motion for Judgment as a Matter of Law and

2    also Motion for New Trial by Plaintiffs, also Motion for

3    Default Judgment.  I don't know how much we'll talk about the

4    latter today, maybe a little bit at the end, but certainly I'm

5    prepared to hear argument on the first motion.  And so I think

6    it would make sense to start with Plaintiffs' counsel.

7              Who will be handling the argument for the Plaintiff?

8              MR. BUCHDAHL:  I will be, Your Honor.

9              THE COURT:  Great, Mr. Buchdahl, okay.  So let me

10   start with some questions, and then I'm happy to hear you.  We

11   can have a conversation.

12             So with regard -- let's talk about -- let's jump right

13   in and let's talk about -- well, actually, preliminary question

14   first.  On the issue of Motion for Judgment as a Matter of Law,

15   hasn't that been waived?

16             MR. BUCHDAHL:  Your Honor, I think we can't waive our

17   right to seek that just as -- to ask the Court to correct a

18   manifest injustice.  But we did not make that motion in

19   conclusion of the evidence; and certainly to the extent that

20   operates as a waiver, we concede that, to the extent it's

21   possible, there is a waiver there.

22             THE COURT:  All right.  And then let's jump into sort

23   of the merits.  So let's talk about Hashlets to start.  You're

24   obviously very familiar with the record, I'm sure more than I

25   am.  But to me there were kind of a couple critical parts from

1    the standpoint of your argument as to whether the jury reached

2    a seriously erroneous result as to their finding that Hashlets

3    were not investment contracts.

4         And it seemed to me that -- I just want to get the

5    testimony in front of me.  I'm now talking first about the --

6    first I'm talking about the testimony about choosing the mining

7    pools and the different payouts that one could get when one

8    chose the mining pools.  I don't know whether it was Mr.

9    Weinstein or someone else who was doing the examination, but

10   one of your clients acknowledged, as I recall, that you could

11   have -- you know, if me and you were trading and you chose one

12   mining pool, the Waffle mining pool, and I chose the

13   Clevermining pool, you could have a good day and I could have a

14   bad day, which sort of suggests some level of investor control,

15   selection, the like, investor involvement in determining the

16   level of profit.  And then there was similar testimony about

17   boosting.

18        So what's your response to the argument that, well,

19   look, the jury could have latched onto that testimony, and they

20   could have said, "Yeah, that shows significant investor control

21   which is not consistent with an investment contract"?

22        MR. BUCHDAHL:  All right.  So a few responses, Your

23   Honor.  First of all, I think the notion of what the jury could

24   latch onto is a Rule 50 question that we should put aside

25   because we are not going to try to persuade the Court that

1    there was absolutely no evidence that the jury could have

2    grabbed in order to reach what we think was a manifestly wrong

3    result; right?

4          So we think, first of all, the standard should not be:

5    Is there anything in the record?  This is not like a summary

6    judgment argument.  The question should not be:  Is there

7    anything in the record?  The question is:  What does the

8    overall weight of the evidence show?  And the Court is entitled

9    to use its own judgment in finding that.

10          And I think that if you look at what the overall

11    testimony was about Hashlets, it's clear that Hashlets and

12    their profitability depended on the efforts of GAW Miners,

13    which is the hallmark and the most important question in

14    determining what is a security; right?

15          So first of all, if we just start with the *Howey Test*

16    itself, and we just think about *Howey* and we think about what

17    was going on there; right?  *Howey* was an orange grove in

18    Florida, and people could buy their own strip of land.  They

19    could go and visit that strip of land.  They could make

20    suggestions about the care of that land.  They could make

21    suggestions about the cultivation of that land.  But generally

22    speaking, they were merely entirely dependent on the efforts of

23    the company that were tending the groves, growing the oranges,

24    selling the oranges, picking the oranges.

25          But even better than *Howey*, I think the other cases

1 that we've seen that we've cited, most of these other cases
2 were about the other cryptocurrencies.  But they indicate that
3 some ability for an investor to make some decision does not
4 somehow destroy the description of something as a security.
5 The *Kik* case in particular, *SEC vs. Kik*, had a line.  It said,
6 "The key feature is not that investors must reap their profits
7 at the same time.  It is that investors' profits at any given
8 time are tied to the success of the enterprise."  That was
9 unquestionably true for GAW Miners.

10       And I think if we think about the defense arguments
11 here, right, they require kind of cherry-picking examples where
12 if someone said one thing and another investor said another
13 thing, you know, they could have a different result or the
14 boosting that you referred to a moment ago.

15       I think it bears noting, Your Honor, that none of this
16 was real; right?  It was actually not the case that an investor
17 could kind of boost their performance by pushing a button or
18 that they could actually change mining pools.  They weren't
19 really doing that.  Like, this was all a fiction that was set
20 up by the company.

21       But even that aside, it is --

22       THE COURT:  But does that matter?  Didn't I instruct
23 the jury that what matters is how these were presented?

24       MR. BUCHDAHL:  So I think you're right, that it
25 matters how it's presented.  But in terms of the overall

1    question, like, Are you going to be successful in mining? --

2    right? -- that was almost entirely dependent on the mining

3    operation of GAW Miners; right?

4        THE COURT:  Wasn't there some evidence that you could

5    actually mine in pools that were -- I guess I wouldn't use the

6    word "public" but that were also being mined in?  You could

7    point your Hashlet to a pool that was also being mined by

8    people who were not investors at all, by people who were

9    investing in Bitcoin and things like that?  Wasn't there some

10   testimony about that?

11       MR. BUCHDAHL:  I don't think that's exactly right,

12   Your Honor.  As I recall, you could point at different mines,

13   but any of that mining operation would have to be conducted by

14   GAW Miners' computers that were being maintained in a data

15   center to allow efficiencies, to allow the ease for someone to

16   use so they didn't have to worry about maintaining a computer;

17   right?  I mean --

18       THE COURT:  Maybe I said it wrong.  I don't disagree

19   with what you just said.  I had the impression, though, that

20   there was some testimony that, as a Hashlet purchaser, I could

21   point my Hashlet to a pool that would not just be mined by GAW

22   Miners investors, or whatever you want to call them, but by

23   others as well.  Am I not mistaken?

24       MR. BUCHDAHL:  I'm not sure exactly what that would

25   mean because the process of mining -- right? -- just involves

1  running different algorithms on a computer.  So I'm not sure

2  what it would mean to say -- I mean, these algorithms are being

3  run by computers all over the world in the example of Bitcoin;

4  right?  Now, if they chose something else, if they chose

5  something like Hashpoints, then obviously that's a much more

6  limited number of people who were involved, and that was part

7  of GAW Miners' control of the operation.  But, again, we think

8  the *Howey* analogy is very, very apt because what you have

9  here -- right? -- it's obviously not physical mining.  It's

10 computer power.  But all of the computers are in a single

11 place.  They are being operated by GAW.

12          For example, if someone cut the power cord on GAW;

13 right?  Let's imagine that the fiction was real and they

14 actually had this data center.  If someone cut the power cord

15 at GAW -- right? -- all of that would stop.  Every single

16 investor would lose money.  It wouldn't matter whether they

17 boosted.  It wouldn't matter what pool they chose.  It wouldn't

18 matter what they did because all of them were commonly linked

19 with one another, and all of them were dependent on the efforts

20 of GAW to set up that mining center to store the computers, to

21 have them properly cooled, to have them running properly, to

22 have it efficiently going.  So no matter what precise mining

23 exercise you wanted to engage in that day or whatever boosting,

24 I don't even understand what a investor could have thought that

25 meant, but regardless of what they were doing, they were

1  dependent entirely on GAW Miners to do it.  And that's why --

2         THE COURT:  But that proves too much; right?  Because,

3  I mean, if the New York Stock Exchange lost power for a day, I

4  mean maybe that wouldn't change the value of securities across

5  the board, but it could have an effect on them.  But that

6  wouldn't put me -- that wouldn't make me a common investor with

7  somebody who invested in, you know, IBM if I don't own any

8  IBM.

9         MR. BUCHDAHL:  You're right, that it doesn't -- it

10  doesn't prove more than *Howey*, let's put it that way; right?

11  Because in *Howey* you had a single orange growing operation.

12  Here we have a single cryptocurrency mining operation.  And

13  both of those things are things that require specialized

14  equipment, specialized expertise, a lot of know-how.  All of

15  that was being done by the professional managers; right?

16         So the entrepreneurial and the managerial efforts are

17  on all fours with the *Howey* case, let alone the Howey Test.

18  And people were buying pieces either of the computing power, or

19  some of them might have thought they were buying pieces of the

20  actual machine, but they understood they were locked in a

21  common exercise with the other owners of that purchasing power

22  or of the machine itself.  And I think what's instructive here,

23  Your Honor, if I can back up a little bit, I think what's

24  instructive is to think about the Defendant's own testimony

25  about Hashlets; right?

1      Because one of the things that is noteworthy about

2 this case, Your Honor, is that the Defendant himself --

3 right? -- didn't offer any affirmative testimony about whether

4 these were securities.  He didn't -- the defense counsel didn't

5 mention securities in their opening statement other than to say

6 that the Securities and Exchange Commission charged Josh Garza

7 with securities fraud.  That's literally the only mention of

8 securities in the opening.  The closing argument -- right? --

9 spent maybe all of 45 seconds out of half an hour or so talking

10 about the securities issue.  The issue was not really contested

11 at trial.

12      And if you look at what just Stuart Fraser said about

13 it, his evidence makes it so clear that the Hashlet is a

14 securities.  So if you don't mind, I'd like to walk through a

15 little bit of that testimony.

16      I asked Mr. Fraser:  "You understood, as Professor

17 Narayanan explained on the first day, that a Hashlet allowed a

18 customer to own a piece of the mining output of a GAW Miners'

19 machine instead of having to purchase an entire machine;

20 correct?"

21      And he answered, "Correct."

22      Right?  And that essentially gives away 90 percent of

23 the game, Your Honor, in terms of it just wasn't contested.

24 All of these investors were sharing a machine.  They were

25 sharing the computing power, and that's why it doesn't prove

1    too much to say that they were dependent on the data center.

2    It's not -- the data center was the business that they were

3    relying on to make their joint profits; right?

4            And recall that the Defendant himself was the first

5    person who even suggested turning these Hashlets into

6    securities; right?  There was an exhibit, Plaintiffs' Exhibit

7    11, he sent a text to Josh Garza on May 2nd, 2014.  He said,

8    "What about selling percentages of hosted machines?"  He

9    acknowledged that's where this whole idea of Hashlets came

10   from.

11           And when we asked him in his deposition, and this was

12   admitted into evidence at trial, his deposition at pages 83 and

13   84, here's what the Defendant said:  He said he understood that

14   a Hashlet was a piece of machine, and while he didn't know the

15   ratio, he said, "Let's imagine ten Hashlets equal a machine.

16   If you bought a Hashlet, you had one tenth of whatever that

17   machine makes."  That is the Defendant's own description of a

18   Hashlet.

19           And there's no way, if you are buying one tenth of a

20   computer, that you can somehow separate yourself from the other

21   owners of that computer.  If you think about it, Judge, unlike

22   an orange grove, which is almost infinitely divisible into

23   little plots and trees, you can't chop up a computer and give

24   me a tenth of a computer, give you a tenth of a computer, give

25   defense counsel a tenth of the computer.  We are all in it

1   together.  So the common notion of a common enterprise with a

2   Hashlet is a lot stronger than an orange grove in *Howey*.

3          Go back to Mr. Fraser's testimony for a minute.  He

4   admitted at trial that he understood that a purchaser of a

5   Hashlet would be entitled to a portion of mine cryptocurrency.

6   He understood that customers bought Hashlets to make a profit.

7   He understood that Hashlet customers were relying on GAW

8   Miners' expertise to own and mine the mining equipment that

9   would support Hashlets.  That's all on page 249 of the trial

10  testimony.

11         And, Judge, those are the exact questions that the SEC

12  asked Mr. Fraser in his deposition that the SEC relied on to

13  say that Hashlets were securities.  That's why it really wasn't

14  contested by this Defendant that these were securities.  An

15  investment contract is investing money in a common enterprise

16  to earn profits derived from the efforts of others.  All of

17  that is present with the Hashlet.

18         And there's no question the Defendant understood that

19  GAW Miners was selling securities.  I asked him -- and recall

20  he is a licensed securities broker.  I asked him point blank:

21  "Were you aware of any effort by GAW Miners to register any

22  securities with the State of Connecticut?"  He didn't say, Why

23  would I do that?  These aren't securities.

24         What he said was:  Josh told me he had everything

25  under control, he had hired people, he had hired a law firm on

1   retainer and so forth.  That's page 259.

2           If this were really a contested issue at trial, Your

3   Honor, surely the Defendant would have himself said, These

4   aren't securities.  It was just not contested at this trial.

5   It was contested -- I acknowledge, it was contested at the

6   motion practice in the middle of trial.  This really wasn't

7   contested before the jury.

8           And I think that it is -- it is noteworthy that the

9   Defendant himself, who, you know, they don't have a burden to

10  do this, but this just wasn't the case that was tried.  And

11  that is why the Defendant -- the evidence showed that after

12  they invented Hashlets, the Defendant brings Josh Garza in to

13  meet with the people at Cantor Fitzgerald, and this was part of

14  his defense.  He said, "Well, I wanted to make sure we did this

15  right.  I wanted to make sure we didn't break any laws."  Where

16  did he bring the company?  He brought them in to meet with one

17  of the biggest security brokers on the planet.  And that's

18  because the Defendant was well aware that these were

19  securities.  This was just not part of what was asked to the

20  jury.

21          And what was frustrating about the case, Your Honor,

22  is we spent two weeks putting on evidence about whether or not

23  Stuart Fraser was a control person under the securities laws of

24  Connecticut and the United States, and we submit that the

25  evidence showed convincingly that he was, but the jury

1   literally never answered this question; right?  We spent all

2   this time on this beautiful jury form, and they leave ten pages

3   blank; right?  And instead, they avoid the question.

4       What they latched on to is the part that said, "If you

5   say 'no,' you get to skip to page 13."  So they skip all of

6   these questions, and they incorrectly answer a question that

7   was never really in dispute, whether these products were

8   investment contracts.

9       Now, of course, defense counsel preserved that

10  argument in their closing.  And look, if this were a criminal

11  case, they did their job.  It would be game over.  I

12  acknowledge that.  But this was a manifest injustice.

13      And why do I say that?  I say that because if you

14  think about the defense in this case, it was -- and I grant

15  highly effective.  But the defense in this case was essentially

16  three things:  Josh Garza was worse than our client Stuart

17  Fraser, Josh Garza was the one that was in control, and the

18  jury should not let Garza pin financial responsibility for this

19  fraud on Fraser.  That was essentially the defense.

20      Now, the first part of that defense we don't really

21  contest that Josh Garza was worse than Stuart Fraser.  The part

22  about who is in control, really there's a bit of a

23  nullification argument there because the defense all but argued

24  you can't have more than one person who's a control person even

25  though you instructed the jury very explicitly that they could.

1    But the worst part was really that last part because the

2    defense was permitted to introduce evidence about the plea that

3    Garza entered and the restitution order.

4         And really it was argued to this jury that every

5    dollar that Stuart Fraser had to pay was going to be one fewer

6    dollars that Josh Garza would have to pay.  We know that's not

7    true.  We know it's not actually true that the class is getting

8    any money from Josh Garza.

9         And so the notion that this -- that this trial really

10   was about, you know, allocating financial -- (Video froze.)

11      (Pause.)

12        MR. BUCHDAHL:  The notion that it was about allocating

13   financial responsibility from Josh Garza and Mr. Fraser wasn't

14   really the case at all.  Really this trial, in terms of the

15   financial impact, was about allocating responsibility between a

16   class of victim plaintiffs and Mr. Fraser.  And that's why we

17   say this was such a miscarriage of justice.  Because the jury,

18   we submit, believed that what they were doing was kind of

19   picking between Garza and Fraser.  And there's not really

20   another way to understand the way they approached this Verdict

21   Form, particularly in light of their questions at the beginning

22   and then the new Verdict Form and what they ultimately did.

23        THE COURT:  Well, I don't know about that.  I mean

24   they could have --

25        MR. BUCHDAHL:  And I shouldn't --

1       THE COURT:  They could have gone with that same logic

2  and still answered the securities questions differently; right?

3  The defendant's favor for another grounds.

4       But let me switch gears.  Let me ask you about

5  Hashpoints and HashStakers.

6       MR. BUCHDAHL:  Sure.

7       THE COURT:  I'll be honest.  My impression was there

8  really wasn't very much evidence presented at the trial about

9  those two products.

10       MR. BUCHDAHL:  That's certainly accurate.

11       THE COURT:  Given that you had the burden of showing

12  that they were securities, you know, if I had -- if I was in

13  the jury room and I'd been on the jury -- and I knew something

14  about them because I was familiar with the case.  But I might

15  have said, What were those again?  I mean --

16       MR. BUCHDAHL:  It's a fair -- it's a fair question,

17  Your Honor.  The reason that there wasn't a lot of evidence

18  about them is because they didn't play a particularly

19  significant role for any investor or in general.  Really the

20  way we tried the case and what the evidence showed was that

21  they were simply steppingstones to acquire Paycoin; right?  And

22  so that was our argument to the jury.

23       THE COURT:  But that was true.  And if the jury

24  accepted that, that wouldn't make them a security.

25       MR. BUCHDAHL:  Well, we submit that it would, Your

1    Honor, because a derivative of a securities is a security.  A

2    certificate of deposit for a security is a security.  All of

3    this is -- falls within the definition of a security under the

4    securities laws.  So we submit that it is enough, that if you

5    have basically a way to hold securities or something you can

6    exchange for securities, that itself --

7         THE COURT:  If I have a contract with you that you

8    will pay -- will sell me your securities to, you know, at a

9    particular price, you know, on December 31st each year, is that

10   contract a security?

11        MR. BUCHDAHL:  It may not be, Your Honor.  I don't

12   think that's what these were.

13        THE COURT:  No, but they have different kinds of

14   contracts.  They have contract -- one was about you get a

15   certain amount of interest of HashStakers if you lock up the

16   Paycoin for a while.  So I guess my point is just because it's

17   a contract pertaining to something that you contend is a

18   security I don't think by itself makes it a security.  I'm not

19   aware of any law that says that.

20        MR. BUCHDAHL:  Your Honor, we think that the

21   definition of securities and the Social Security laws is

22   sufficient to get us there.  But I will say that we don't -- we

23   cannot point -- unlike Hashlets, we cannot point to kind of,

24   you know, lots and lots of trial testimony that kind of

25   establishes by the great weight of the evidence that a

1   HashStaker or a Hashpoint is a security.  It really just wasn't

2   the focus of the trial.

3          THE COURT:  All right.  So let me go back to the

4   beginning for a minute.  You know, you raise a good point,

5   which is this isn't about whether there's sufficient evidence.

6   This is about whether a serious injustice was done, this

7   miscarriage of justice.

8          So I guess, you know -- and you sort of spoke in broad

9   themes about that.  I guess one of the themes that I think

10  would weigh in favor of the verdict with regard to Hashlets was

11  that at least I think if I was on the jury -- actually, I'll

12  tell you my impression was, you know, Mr. Audet, Mr. Pfeiffer,

13  Mr. Shinners, all good guys.  But they were -- they were

14  cryptocurrency nerds at some level.  They were folks who

15  understood this world, who were into it, who knew about mining.

16         And if you combined that impression -- now, I'm not

17  saying that that impression was overwhelming because at some

18  times one of them said, "Oh, I'm a social worker" or something

19  like that.  So I'm not saying there wasn't any other evidence.

20  But I think that was sort of the impression I got, maybe more

21  so with Shinners than the two others.  And this isn't being

22  pejorative.  In fact, I was sort of admiring their

23  intelligence.

24         But when you combine that with the notion that -- with

25  the evidence that, well, they could point their Hashlets in

1    particular directions and make different payouts and they could

2    boost and -- that's kind of like I sort of get this image of,

3    yeah, these are these guys in rooms and they think they're

4    really smart and they figure it out.  Okay, somebody else is

5    going to control the miner and the electricity.  But as your

6    expert testified, that's because it's really messy.  They don't

7    want it in their house.  But they're the smart guys.  They're

8    the ones figuring it out.  They're the ones who are going to

9    figure out what the best pools are.

10          So I guess -- what I was going to say is if you had

11   that impression, I think you'd come away with, well, no, there

12   was a reasonable argument here that there was significant

13   investor control; that these folks were, you know, the local

14   geniuses, and they were figuring it out.  They were the guy in

15   the room who, you know, trades to a billion dollars or

16   something like that, and they were going to get rich on this.

17   And that is how that was presented to them.  What about that?

18          MR. BUCHDAHL:  So, Your Honor, it's a great question,

19   but I think that what -- I don't -- I think the evidence is

20   overwhelmingly to the contrary.  And let me say I think part of

21   it is just the nature of having class representatives, that the

22   people who are most -- look, obviously Mr. Shinners was, you

23   know, dealing with this company on a lot more intimate level

24   than anyone else; right?  But even our other class

25   representatives, it's not surprising that the people who would

1  choose to spend the time to be a class representative would be

2  the people who were absolutely the most engaged.

3        But recall what the testimony was, first of all about

4  the number of victims, thousands -- right? -- and the number of

5  Hashlets that were being sold, thousands.  There's testimony

6  there were thousands a minute.

7        But remember that the entire marketing plan, Your

8  Honor, was that your grandma could do it.  It's grandma proof.

9  The Defendant himself, like, personally described it that way.

10  And that was what all the marketing said.  This is how Josh

11  Garza marketed it.

12        Remember that there was this kind of evolution; right?

13  First the company sold big machines to people.  Then they said,

14  We will cloud host it -- right? -- to make it easier.  Then

15  they said, No, no, no, no.  We're just going to sell you a $16

16  slice of our computer.

17        And the whole point of the marketing campaign was that

18  it was for everyone.  You didn't need to know a darn thing.

19  And, in fact, I believe one of the marketing materials said if

20  you can open an e-mail, you can now mine for Bitcoin.

21        And so, respectfully, I don't -- I think it would be a

22  real fallacy to kind of focus on these three representatives.

23  I mean, it's a class action, and there are thousands of victims

24  here who lost money.  And the fact that the people who were the

25  most, you know, invested in kind of coming forward are people

1  who knew a thing or two about it.  You're right, one of them

2  was a social worker.  One of them was a web designer.  One of

3  them was kind of a little bit of a cryptocurrency entrepreneur

4  themself.  But they are representative of the class in the

5  sense they bought Hashlets and lost money.  They were in common

6  enterprise with their fellow Hashlet owners.  But I don't think

7  that they are fairly representative of either who the purchases

8  were or who they were marketed too.

9      THE COURT:  Yeah, but the jury would never have that

10  impression.  You and I might know maybe, but the jury would

11  never have had that impression, would they?

12      MR. BUCHDAHL:  I think they absolutely would have had

13  the impression that there were thousands of victims.

14      THE COURT:  Yeah.

15      MR. BUCHDAHL:  And that it was marketed specifically

16  to people who didn't know anything about this.  I mean I think

17  that was inescapable that that was the marketing plan, that

18  that was how it was presented, that it was just presented as so

19  easy all you had to do is hit a button.

20      THE COURT:  The face of the investors were those three

21  guys.

22      MR. BUCHDAHL:  It's true, Your Honor.  But if you're

23  sitting, as you must, in judgment of whether this was

24  manifestly unfair, it's not appropriate for you to put yourself

25  in the mind of a jury.  You're entitled --

1          THE COURT:  But, I mean, it's a fair point.  It's

2     not -- I don't have to view the evidence in the light most

3     favorable to the verdict, but the notion that the Court has to

4     find that a miscarriage of justice or seriously erroneous

5     suggests something other than de novo review too.  It suggests

6     something other than, what would I have done had I been on the

7     jury?  Right?  Don't I owe some level of deference to the -- to

8     the jury verdict?  Even if I don't have to view in the light

9     most favorable to sustain the verdict, don't I have to at

10    least -- in finding that it was seriously erroneous as opposed

11    to just erroneous, for example, isn't there some level of

12    deference to the jury verdict?

13         MR. BUCHDAHL:  I think the answer is no, Your Honor.

14    I think the fair answer under the law is no, and the reason I

15    say that is because if you look at cases, and they are few and

16    far between where courts have set aside civil jury verdicts, is

17    because the court is persuaded, as the court itself in good

18    conscience believes, that it came out the wrong way.

19         And here, here the reason that this case is crying out

20    for it is because the jury didn't answer the question that it

21    was supposed to answer.  They were supposed to answer the

22    question of control person liability.  And we spent hours and

23    days and even close to weeks putting in evidence about that.

24    They skipped all of those questions.  So there's not really

25    something to defer to in that regard.

1          And I think that it's not appropriate for you to say,

2     well, you know, the securities answer just kind of represents

3     some -- you know, I'm going to try to divine the jury's intent

4     behind that.  They just got it wrong.  Respectfully, they just

5     got it wrong on securities.

6          And let me spend a moment, if you don't mind, on

7     Paycoin, because look --

8          THE COURT:  Well, let me talk to Ms. Hassan about

9     Paycoin first.

10         MR. BUCHDAHL:  Can I say one last thing about Hashlets

11    then?

12         THE COURT:  Yeah, sure.

13         MR. BUCHDAHL:  It is not a case that speaks well for

14    the proper administration of justice that we have someone

15    sitting in federal prison, or who was in federal prison, for a

16    securities fraud involving Hashlets and then have a jury, for

17    whatever reason, decide that they're not a security based on as

18    little as that was contested at trial.  It's just -- that is

19    not an outcome that should sit well with any of us.

20         THE COURT:  Remind me.  Did the count he actually pled

21    to was securities fraud as opposed to wire fraud?

22         MR. BUCHDAHL:  He was charged with securities fraud,

23    and I don't -- I want to be careful.  If you have a different

24    recollection --

25         THE COURT:  No, no, I don't have a recollection.  So

1    I'd go back and check.  The Government always uses wire fraud

2    because it's so easy, as you know.

3        MR. BUCHDAHL:  But I'll tell you that defense counsel

4    said in their opening that Josh Garza was put in jail for

5    securities fraud.  I mean it was -- again, this was a jarring,

6    jarring outcome.  And if the Court believes that we should kind

7    of, you know, that this -- that there should be a new trial

8    because it's unjust, the parties I'm sure will do a better job

9    of kind of explaining what securities are and putting evidence

10   before a jury.

11       But more importantly, we're actually going to get an

12   answer on the question that this jury was asked, which is:  Is

13   Stuart Fraser a control person?  You know, I think the best

14   explanation for this, they didn't want to have to answer that

15   question because they knew what the answer was and they had

16   determined for whatever reason to come out the other way.  And

17   all credit to the defense team for pointing the jury in that

18   direction.

19       But they got it wrong on the question of whether a

20   Hashlet is a security because you can't middle around the edge.

21   You can't say, well, I push this button or that button or this

22   pool or that pool or boost or not -- whatever "boost" means;

23   right?  They were all in the same orange grove.  I mean it was

24   *Howey* A to Z.

25       THE COURT:  All right.  All right.  Thank you, Mr.

1    Buchdahl.  Let me go with Ms. Hassan now.

2              You're going to do the argument; is that right?

3              MS. HASSAN:  Yes.  Yes, Your Honor.

4              THE COURT:  Let's start by talking about Paycoin.  So

5    I've been through the briefs, and I can't say I've read

6    every -- re-read the entire trial testimony.  But I got to tell

7    you, I'm scratching my head to see how Paycoin is not a

8    security or is not an investment contract.  I mean, so I

9    know -- I'm familiar with the arguments you raised in your

10   brief.  You said first of all, Well, Judge, it was marketed for

11   consumptive use because they said, you know, we're going to get

12   it so that Walgreens takes it and Target takes it.

13             I got to tell you though -- and you can find snippets

14   where the Plaintiffs are saying or where the class

15   representatives are saying, yeah, they were going to work on

16   getting it accepted.  But I think read in fair context, all of

17   that was about why this was a good investment.  I mean there

18   was no prospect when they bought the Paycoin that they could

19   immediately turn around and, you know, go to the store with it.

20   This was all something for the future.

21             And there's also -- it can't seriously be contested

22   that merchant adoption would, in fact, enhance the value of the

23   product, that is to say, that merchant adoption was relevant to

24   the question of the profitability of the investment.  I mean

25   you point out that merchant adoption might also be relevant to

1  consumptive use.  But, boy, it just didn't seem to be marketed

2  that way.  So that's the first argument you made.

3        And then you also point out that, you know, this whole

4  centralization thing, it was kind of a jump ball.  It was

5  confusing.  I tend to agree with that, but I don't think that

6  gets you home because the test isn't whether it was centralized

7  or not.  The test is whether the -- obviously there's

8  commonality, but I think centralization goes more to the third

9  point as to whether the profitability depends on the efforts of

10  others.

11        I mean to me the whole profitability of Paycoin, at

12  least the way it was presented, is we're going to have a Coin

13  Adoption Fund and we're going to have a hundred million dollar

14  reserve and to protect the floor here.  And that was -- I mean

15  that was a huge inducement; right?  And, of course, that was

16  all gone.

17        So speak to that a little bit because I have to tell

18  you, I am struggling to see, to be blunt, how not to grant the

19  Plaintiffs' motion with regard to Paycoin.

20        MS. HASSAN:  Sure, Your Honor.  So I do have some

21  responses to Mr. Buchdahl's argument.  I'll put them to the

22  side since they're Hashlet.

23        THE COURT:  I'm going to let you talk, but start out

24  with the answer to my question.

25        MS. HASSAN:  I will.  So, Your Honor, the one thing

1    that I will carry on from Mr. Buchdahl's argument is only

2    because it relates to the standard, and you asked the question,

3    you know:  What is the standard that we are looking at Paycoin

4    or Hashlets from?  We are talking about a motion for a new

5    trial.

6          And I found one case, which is a District of

7    Connecticut case which we cited in our brief, helpful on that.

8    And what it makes clear -- and this is *Coane v. Dunne*, 2021 WL

9    3012678.  It's a July 15, 2021, District of Connecticut case.

10   And what it explains is that the weighing of evidence that the

11   Court does on a new trial motion, it is not a de novo review

12   based on a preponderance of the evidence standard.  The weight

13   of the evidence is often equated across circuits with a de novo

14   review of preponderance of evidence.  That standard is plainly

15   incompatible with the deferential standard applied for Rule 59

16   motions for a new trial.

17          So the idea and the only thing I want to clarify is

18   that we are before you for a new trial.  The bed, so to speak,

19   is in the ground.  Defendant -- Plaintiffs made a choice.  They

20   made a choice not to have you as the fact-finder by not moving

21   for summary judgment on the question of securities.  They made

22   another choice not to have you as the fact-finder on the

23   question of whether these are investment contracts by not

24   moving for a directed verdict and, in fact, opposing our

25   verdict.  They said, We're going to send this to the jury.

1          The jury did what they do, which is fact finding,

2    which is in their province, and they came back with a verdict.

3    We all now have to live with that verdict.  And anything that

4    we do at this point, any weighing of evidence -- I realize the

5    Court has discretion on a new trial to weigh the evidence, but

6    it is with an eye towards, okay, did the jury get their

7    weighing of evidence on Paycoin so off that it is seriously

8    erroneous or manifestly injustice -- or manifestly unjust?  I

9    don't belief the manifestly unjust is so much an equitable

10   weighing by the Court as, okay, did they get it so wrong?  So I

11   just wanted to clarify that one point about how we were viewing

12   this.

13          So on Paycoin, I'll start with the expectation of

14   profits, which was our argument, you know.  We -- our argument

15   is, Your Honor, there is maybe competing evidence in the record

16   about whether this was a way to make money, so an investment,

17   or whether this was something that people were buying because

18   they were excited about, oh, we get to use this to buy coffee

19   and pizzas and so on and so forth.

20          And I believe that there is enough evidence in the

21   record for the jury to have reached the verdict that it did.

22   The questions asked were:  Did the Plaintiffs satisfy their

23   burden of proof that all of these elements are met, including

24   that this was primarily sold as an investment product by the

25   Plaintiffs?  And looking at the evidence, the jury very

1    reasonably, without being seriously in error, could have

2    decided, no, we're not convinced by a preponderance of evidence

3    that this was actually for investment only.

4            So I'll go through some of the evidence, Your Honor.

5    I concede that there is definitely evidence in the record which

6    says, oh, good investment -- right?  Like, we will increase the

7    value of Paycoin.  Though I have to say, again just common

8    sense, we all want our currencies to have good value; right?

9    Like, we want the dollar to have good value.  So that to me is

10   also linked with this is going to be mass adoption currency;

11   right?

12           But then we have DX 81, which is a November 2014 press

13   release, and it focuses only on the consumptive aspect of

14   Paycoin.  For instance, it talks about Paycoin being lost as a

15   new currency.  It talks about it being used instead of Bitcoin.

16   It has no reference to the investment value or the investment

17   prospect of Paycoin, not that I think that that would

18   necessarily negate.  A currency can have investment value but

19   also be for consumption; right?  So I don't think the fact

20   there is some evidence in the record, oh, this will have

21   increased value, I don't think that negates the consumptive

22   role of --

23           THE COURT:  I hear you, but shouldn't I be focusing on

24   the overall marketing theme?  Isn't that really what I should

25   be focusing on here?  And I -- it's hard for me to see that,

1     looked at holistically, this was presented as anything other

2     than an investment.  I mean everyone, literally everyone who

3     purchased Paycoin, did so at a time when it could not be used

4     as a medium of exchange.  Now, they may have done so on the

5     hope that in the future it could be used as a medium of

6     exchange.  But, I mean, the notion that someone would buy a

7     currency before it was recognized by anyone or adopted by

8     anyone solely because they were thinking, gosh, it would be

9     really cool to have that as a currency so I wouldn't have to

10    carry cash around, I mean it's hard to think, you know, how

11    that would not be anything other than a speculative investment.

12    And that's the part I'm really struggling with here.

13         MS. HASSAN:  Your Honor, I do dis -- I think if we

14    look at the overall marketing, and my focus in pointing out DX

15    81, DX 82, which is *The Wall Street Journal* article, again

16    focuses only on the consumptive aspect, DX 66, which talks

17    about how Hashbase will let you use Paycoin at Target or

18    Walmart.  My point is that I think the overall marketing, sure,

19    there was messaging in there about this could be a good

20    investment, but overall it was like this is going to be a

21    massly adopted currency.

22         Your point I think goes to more the temporal issue;

23    right?  Like, you're saying at the time that people were

24    buying.  But, Your Honor, I don't believe the record is clear

25    on that.

1          So what we do know is GAW Miners said that we will

2     launch Paybase like after Christmas, like early January.

3     That's what the evidence shows; right?  And Paybase was

4     supposed to have all of the merchant adoption stuff.  We have

5     testimony from Mr. Shinners saying he was disappointed it

6     didn't have it; right?

7          Now, I'm not going to peer behind what he meant, like

8     what was his mind, but that's what he said and the jury heard.

9     He was disappointed it didn't have merchant adoption.

10          What we also know is so that's like early January.

11     I've seen a January 2nd reference about Paybase being launched.

12     The fact it didn't have that stuff goes to the fraud or the

13     failure of meeting your customers' expectations.

14          We also know that people started buying or selling

15     Paycoin on exchanges, not GAW, maybe around mid-December and

16     that the three Plaintiffs who we heard from, their Hashpoints

17     got converted to Paycoin like December 22nd or December 23rd.

18     This is DX 638, their certifications; right?  So, Your Honor,

19     we're literally talking about right before Christmas I get

20     Paycoin, if I'm a Plaintiff, because my Hashpoints have

21     converted.  And the reason -- I'm going to have like within a

22     week or ten days after Christmas, I'm going to be able to start

23     using them on Paybase.  I'm going to start being able to use it

24     as credit at Target or Walmart.

25          So, Your Honor, I don't think this is a case like some

1   of the other ICO cases that the Plaintiffs have cited in which

2   what they were saying was:  We'll do the ICO.  Give us our

3   money, and then we'll develop in some time this coin.

4           Like in *Telegram*, in *Kik Interactive*, they weren't

5   even selling the coin when they did the ICOs.  They were

6   selling the right to buy the coin.  So they didn't even have

7   the blockchain.  They didn't even have the coin.  And then

8   there were plans.  I think *Kik Interactive* uses the terminology

9   there were prospective users somewhere in the ether for the

10  token.

11          I think the evidence here just doesn't support that.

12  We already know there was a blockchain that had been formed

13  with all the different nodes all over the world, different

14  people's computers working together to create the blockchain.

15  The coin was already there.  We know that -- so I -- all I know

16  is that the three Plaintiffs got their Paycoin like in late

17  December, and then there was going to be Paybase.  I don't know

18  when the other class people bought their Paycoin.  I'm assuming

19  they bought them either about the same time or later.  We're

20  literally talking about days or weeks here.

21          So I don't think it's such a speculative thought way

22  in the future that, oh, maybe one day we'll be able to use

23  Paycoin to shop at Target.  It was literally like January 2nd,

24  2014, um, I'll have Paybase and I'll be able to start using it

25  like I use Bitcoin or --

```
 1            THE COURT:  But doesn't your argument about use depend
 2   on essentially -- well, I guess what it hinges on is the
 3   Court's determining that the reason GAW was talking about use
 4   was not to suggest to prospective investors that this was a
 5   valuable investment but, instead, that it was going to be just
 6   a great currency to have, that that's why GAW was talking about
 7   use.
 8            I mean probably Mr. Buchdahl would point to all the
 9   same evidence you pointed to and say, yeah, that just shows
10   they were pumping up the value of this investment because,
11   obviously, if there's merchant adoption, then it's more
12   valuable.  That was, you know, the obstacle -- I mean there's
13   tons of evidence where Garza told the world, you know, that was
14   the obstacle with regard to Bitcoin and others.  They ran into
15   problems with adoption except, you know, but we've got a plan
16   for that.  We've got a plan to get around that, which is at
17   least as easily interpreted as saying, "and that's why you
18   should invest" as opposed to, yeah, and that means that, you
19   know, Paycoin's going to be a really good currency.
20            I mean query if really all it was being marketed as
21   was a currency, why market it before it's available at all?  In
22   other words, why not wait till it's recognized and say, Hey,
23   you can use this currency?  Because the whole idea was to
24   attract money ahead of time, to attract investment.  No?
25            MS. HASSAN:  So, Your Honor, to take your point, if it
```

1    is just as easy for us to interpret the totality of the

2    evidence here, which I agree it's mixed evidence -- and I also

3    don't think that there is anything wrong with a product or a

4    coin having both an investment attraction and a consumptive

5    use; right?  But if the best that the evidence can say is that

6    just as easily it can be interpreted to be -- to have

7    targeted -- like for Garza to have been targeting investment

8    rather than focusing on consumption, I think that says that

9    Plaintiffs have not met their burden by a preponderance of the

10   evidence.

11       THE COURT:  Well, I point only to the stuff about

12   adoption with particular retailers.  When you throw in the

13   other evidence, the Coin Adoption Fund and the Plaintiffs'

14   testimony -- now, I know the Plaintiffs' testimony is

15   subjective, but as you know, that can at least be considered as

16   some evidence of how the whole thing was presented.  When you

17   throw in the other evidence of the Coin Adoption Fund and the

18   like, the reserve, the hundred million, which I take to be all

19   the same thing honestly, maybe I'm missing something, but in

20   any event, when you throw that in, it starts to look like the

21   whole thing is one investment pitch and a lot less like -- it's

22   not just as easy then when you look at all of it to interpret

23   as, hey, this is just -- this is just about a coin.

24       MS. HASSAN:  So, Your Honor, again, I do think that

25   the fact that there might be an investment purpose as far as

1    GAW is concerned, it doesn't change how was it actually

2    marketed and why did people buy it; right?  And I think my

3    point is let's look at the evidence of why people bought it.

4    Sure, there is evidence that, oh, this could increase in value.

5    But the jury also heard evidence, oh, this is going to be --

6    this is Bitcoin.  This is -- we're replacing Bitcoin.  You can

7    use it as a credit card at Walmart or Target.

8           So I think that there is evidence there for them to

9    say, oh, okay, there could be some value.  There is investment

10   value in buying Bitcoin, Your Honor; right?  Like a lot of

11   people today buy and sell Bitcoin for the investment purpose,

12   but the SEC has said it's not a security.  Um, it's basically a

13   means of exchange, a medium of exchange; right?

14          THE COURT:  Is that what the SEC has said about

15   Bitcoin?  I didn't know that.

16          MS. HASSAN:  Their former chairman did say that at a

17   speech.

18          THE COURT:  What was that?

19          MS. HASSAN:  Their former chairmen did say it at a

20   speech.

21          THE COURT:  Okay.

22          MS. HASSAN:  I don't think the SEC issued an opinion

23   on it.

24          THE COURT:  Oh, okay.

25          MS. HASSAN:  I want to make sure I distinguish that.

1          But I think the overall idea, sure, we can look at the

2    overall pitch.  And our point is in the overall pitch this

3    jury, like, you know, this jury had enough to say, okay, people

4    could have been very interested in buying it to be able to use

5    it, and they could be very excited about it too, like, you

6    know.

7          THE COURT:  But where was the real evidence of that?

8    I know -- I know that you -- there is some testimony from one

9    or more of the class representatives about the merchant

10   adoption.  But, again, when I read that testimony as a whole, I

11   viewed it as, yeah, and this is why I thought it was a good

12   investment.

13         I mean where's the evidence -- I mean there just

14   wasn't -- other than discussions about we're going to get it

15   accepted by Amazon and Walmart and the like, was there much

16   evidence about, hey, this is -- how this is going to be used on

17   a day-to-day basis?  I know that the expert said, hey, you

18   could buy pizza with it or you could buy coffee with it, that

19   kind of thing.  Is that the evidence you're referring to?

20         MS. HASSAN:  So, Your Honor, that was Mr. Narayanan

21   talking about Bitcoin.  And, yes, because it kind of sets the

22   stage that cryptocurrencies can be used to buy pizza and

23   coffee; right?  And then we have the evidence I pointed to the

24   press release from 2014, November 2014, which is DX 81.  And

25   all that's talking about is, oh, we're going to -- we're

1    putting out Paycoin because we wanted to be mass adopted;

2    right?  Now, will that help?  Any time Bitcoin -- the more

3    Bitcoin is used, the more it helps anyone who's holding Bitcoin

4    as an investment; right?

5              So I think the two things -- the two pieces of

6    evidence can live together, and I think that that's really what

7    the issue is, that at the end of the day, we didn't have to

8    show that, oh, this was never meant for investment or that some

9    Plaintiffs might not have had an investment motivation.  But at

10   the same time, like, you know, Mr. Shinners, he was looking

11   forward to the Paycoin merchant adoption.  That's what the jury

12   heard.

13             THE COURT:  All right.  Suppose ultimately that I'm

14   not convinced by the argument that this was marketing really

15   for consumptive use at all.  What other arguments do you have

16   about why I should not grant a new trial as to Paycoin?

17             MS. HASSAN:  Sure, Your Honor.  So one last point that

18   I'll make on the consumptive/nonconsumptive use is if you

19   compare it to the other cases or maybe I should say make a

20   broader, um, point, which is we have a bunch of ICO cases out

21   there, ICO decisions, and Plaintiffs rely heavily on those.  At

22   the end of the day, we have to look at the facts in this case,

23   and my one concern is that we have to be weary of filling in

24   the gaps in this case with what happened or why there were ICOs

25   happening in other cases and kind of focus it and approach it

1    from the point of view of the jury who just had this set of

2    facts.

3            But if we look at, for instance, *Kik Interactive*, Your

4    Honor, it is very instructive -- now, again, I don't think *Kik*

5    *Interactive* really applies, and the reason it doesn't is

6    because the entire decision talks about how Kin was marketed as

7    an investment; right?  The CEO says, Hold on to this because

8    it's going to increase in value.  Oh, this is the way we're

9    going to help increase in value.  We're going to restrict the

10   supply, boost up the demand.

11           That was all the marketing was concerned about.  And

12   the only reference in all of the marketing materials in the

13   white paper was one statement about, oh, it might have some

14   prospective uses.

15           This case is so different, Your Honor.  At best, even

16   if there's competing evidence, there is a lot of evidence in

17   the record that the jury heard that this has a consumptive use,

18   and that consumptive use is not a year, two years, or three

19   years in the future.  It's kind of like right there.

20           THE COURT:  All right.

21           MS. HASSAN:  Okay.

22           THE COURT:  What else you got?

23           MS. HASSAN:  So you raised the centralization and

24   decentralization point, so I do want to address that.  So, Your

25   Honor, I agree with you the test is what it is; right?  The

1   test is efforts of others; right?

2          Plaintiffs did make a strategic choice in this case to

3   ask the jury to look at that test through the lens of the

4   centralization and decentralization dichotomy that they had

5   their expert testify about.  So, for instance, in the closing

6   what Plaintiffs told the jury was this about Paycoin:  And GAW

7   Miners exercised centralized control of a Paycoin.  That's one

8   of the things Professor Narayanan described.  That's one of the

9   things that made it a security.

10         So at the end of the day, the Plaintiffs repeatedly

11  asked the jury to assess the Howey Test, that third factor.  I

12  agree with you; this seems to go most closely to the third

13  factor.  But they asked the jury to look at it from the lens of

14  centralization and decentralization.  I don't think if the jury

15  was confused exactly about how to apply that

16  centralization/decentralization test, it's not their fault.  At

17  no point, even after the Court pointed out that lack of

18  clarity, did the Plaintiffs say, okay, Your Honor, we want a

19  clarifying instruction to tell the jury and help the jury how

20  to deal with this evidence.

21         But let's assume that the jury did look at the

22  evidence and that the level of control of Paycoin goes to the

23  third factor, which is efforts of others, then, Your Honor, the

24  jury heard evidence on centralization from Mr. Narayanan; but

25  they also heard competing testimony from former disinterested

1    parties, former GAW employees, who said, "Oh, this was

2    decentralized."  And I think it is perfectly reasonable --

3          THE COURT:  Because people could work on the code,

4    that kind of thing?

5          MS. HASSAN:  So Ms. Eden, who was the director of

6    quality assurance, and if you remember, like she came in, she

7    was actually supposed to make things work at the back end, so

8    on and so forth.  She testified that the ledger of Paycoin was

9    decentralized just as it is with Bitcoin.  When Mr. Weinstein

10   asked Mr. Narayanan, Do you recall that testimony? she said, I

11   don't recall that.

12         She also testified that the entire Paycoin network was

13   involved in the consensus process for determining --

14         THE COURT:  I got you on that, Ms. Hassan.  I think

15   you're right that there was some other evidence as to

16   decentralization, perhaps even a fair amount of it.  But at the

17   end of the day, I instructed the jury on the third point to

18   determine whether basically the profits would -- profitability

19   would depend on the efforts of others.  And, boy, it's hard to

20   see how they could have reached the conclusion that it didn't;

21   right?

22         I mean the evidence about Paycoin, apart from the

23   centralization/decentralization stuff, let's say the jury

24   reasonably decided, hey, it's really not that centralized; it's

25   decentralized.  But so what?  At the end of the day, where was

1    the profitability coming from at least as presented by GAW?  It

2    was coming from the hundred million dollar fund and the

3    merchant adoption.

4         Now, we debated what the merchant adoption means.  But

5    supposing that I decide, well, really the merchant adoption was

6    about investment value, then it's hard to see how -- I mean

7    certainly it wasn't the investors who were going to be going

8    out and getting, you know, merchants to accept it.  It was GAW.

9    And it wasn't the investors who were ponying up a hundred

10   million dollars.  It was GAW.  So in what sense were the

11   investors contributing to the profitability of Paycoin?

12        MS. HASSAN:  So, Your Honor, I think for the efforts

13   of other, um, factor, the fact that GAW was going to be playing

14   even a big role in Paycoin, it's not -- we cannot look at that

15   evidence without also looking at the fact that the jury heard

16   that Paycoin was creating an external exchanges, so completely

17   out of the control of GAW Miners and completely out of their

18   control on how the pricing of the exchanges would work because

19   both are external exchanges; right?  So the price of Paycoin

20   would be determined by the demand and supply in the market.

21   So --

22        THE COURT:  That's true of any security, isn't it?

23        MS. HASSAN:  That's correct, Your Honor.  But that was

24   happening even before, like, GAW Miners entered the picture.

25   There was buying and selling of Paycoin independent of GAW

1    Miners at the external exchanges.  Paycoin didn't do as well

2    once the SEC investigation started, but it did continue

3    creating, again, independent of any efforts by GAW Miners.  So

4    I think that there is enough there that it had some independent

5    value outside of GAW Miners.  Um, again --

6            THE COURT:  Because they traded -- because it

7    continued trading after the SEC investigation?  I mean why

8    wouldn't that -- why isn't the reasonable interpretation of

9    that is that, look, people bought a whole bunch of it and they

10   were stuck with it and they were kind of on a wing and a prayer

11   saying, well, maybe something will happen.  Maybe Josh Garza

12   will rise from the dead or something like that.  I don't have

13   any real good solution but to hold on to see if something

14   happens.

15           I mean, you know, most of these people bought, as I

16   understand it, when they thought, geez, they're going to back

17   this with a hundred million dollars.  They're talking about

18   Walmart accepting this stuff.  I'm in basically.

19           Wasn't that really the thrust of the evidence at the

20   trial?

21           MS. HASSAN:  Your Honor, I do think that most -- it is

22   a fair interpretation that most people probably bought it

23   because they were like, oh, $20 floor.

24           THE COURT:  Exactly.

25           MS. HASSAN:  But the fact that it continued trading,

1  and this is Exhibit 719, the coin market CAF, market rise and

2  sell, the fact that it continued trading in December, before

3  the $20 -- and, you know, it was very clear that the $20 limit

4  also had not been met, but people still continued trading it.

5  And then, sure, I mean I don't know what people thought, and

6  they were hoping something would happen.  But they continued

7  trading Paycoin, buying and selling it, you know, long after

8  the whole Josh Garza January 19 thing happened.

9        So it just suggests to me that there is something of

10  an independent value to Paycoin which isn't necessarily hinged

11  completely on GAW Miners.  That might have been the case that's

12  how it started; right?  Like, it's their product.  So I'm not

13  saying divorce the dough.  But there is something where the

14  jury could have said, okay, but they were trading before GAW

15  Miners launched Paycoin and they were trading it at $20, and it

16  continued trading afterwards.

17        THE COURT:  Right.  But, of course, you know, when

18  companies go into bankruptcy, for example, and even though, you

19  know, all the financial press is saying, you know, there's no

20  hope they're going to emerge from bankruptcy, the stock still

21  trades.  If it's a public company, the stock still trades.

22  It's traded for two bucks because hope springs eternal.  So

23  even though the company's not contributing much to

24  profitability, by definition they're not profitable, people are

25  still trading the security.  How is this different from that?

1          MS. HASSAN:  So, Your Honor, I think part of it is the

2     three Plaintiffs that we heard from at least and then, you

3     know, we saw all of these HashTalk points and whatnot, it does

4     suggest that there's a crypto community.  And I do think the

5     way coins trade is very different from how traditional IBM

6     stock trades.  A lot of it trades how enthusiasts want to make

7     it work.  So I don't think it's an apples-to-apples comparison.

8          THE COURT:  Anything else you want to tell me on

9     Paycoin before we switch to Hashlets?

10         MS. HASSAN:  I do, if I could just touch briefly on

11    the other *Howey* factors.  So, Your Honor, on the investment of

12    money, I'm not sure that Plaintiffs have shown that there was

13    an investment of money, at least based on the instructions that

14    were given and Plaintiffs' position that the investment of

15    money in this case by the Plaintiffs was in the form of money

16    for Hashpoints rather than other cryptocurrency and then

17    converting the --

18         THE COURT:  Does the investment money, is there a

19    requirement that it be cash?  I mean --

20         MS. HASSAN:  No, Your Honor.

21         THE COURT:  I wouldn't think so.

22         MS. HASSAN:  No, it isn't cash.  But it is an exchange

23    of value; right?

24         THE COURT:  Yeah.

25         MS. HASSAN:  So if it's an exchange of value and their

1    argument is that our Plaintiffs, they invested money by

2    choosing to mine Hashpoints rather than some other currencies,

3    how have they shown the exchange of value?  Was there any value

4    to the other cryptocurrencies?  We have no -- like how is the

5    jury supposed to access --

6         THE COURT:  But didn't they get Hashpoints by

7    originally purchasing Hashlets?  Isn't that how they got the

8    Hashpoints?  So ultimately they put money into the system.

9         MS. HASSAN:  Your Honor, but that would be investment

10   of money for Hashlets, and they were already getting like --

11        THE COURT:  But if the Hashlet was converted, it's

12   also the investment of money for Hashpoints; right?  I mean if

13   I -- if I, you know, put up a hundred dollars and I got two

14   Hashlets and at some point I agreed to have those Hashlets

15   converted to Hashpoints, are you saying I didn't put up money

16   for the Hashpoints at that point?  Is that what that means?

17        MS. HASSAN:  So, Your Honor, the Hashlets were being

18   used to mine like Bitcoin or some other coin, and then at some

19   point Plaintiffs, or some Plaintiffs, started mining

20   Hashpoints; right?

21        And my point is that, okay, what you invested in

22   Hashlets is your investment of money in Hashlets.  Um, but what

23   is -- what is the exchange of value that you did, um, at the

24   point that you started mining for -- what did you give up when

25   you started mining for Hashpoints; right?  Like how have you

1   shown to the jury that there was actually value given up?  I

2   don't know whether the value of the stuff that they gave up was

3   actually worth anything.

4        THE COURT:  So you're saying -- you're saying I could

5   get Hashpoints not simply by converting my Hashlets, which I

6   paid money for, but I could also get Hashpoints by

7   doing mining.  Is that what you're saying?

8        MS. HASSAN:  Your Honor, that's my only understanding,

9   that the way you got Hashpoints was by mining.

10        THE COURT:  Okay.

11        MS. HASSAN:  And that's the argument that Plaintiffs

12   make in their brief.  They say --

13        THE COURT:  Okay, but if ordinarily what I'm getting

14   from mining is, you know, in the broader world Bitcoin or --

15   then why isn't it appropriate to treat Hashpoints as money?  I

16   mean obviously the Plaintiff thought they were money in the

17   sense of value because otherwise they would have been totally

18   uninterested in getting Hashpoints in exchange for money;

19   right?  I mean I just don't see what the argument is here.

20        I mean the notion that Hashpoints were not value to

21   me, that doesn't make any sense.  How can that be?  Why would

22   you -- if you were a plaintiff or a buyer, why would you be

23   interested at all in accepting Hashpoints in exchange for

24   mining?

25        MS. HASSAN:  So Hashpoints might have had value, Your

1    Honor.  I think they were described in the record as in-house

2    credit.  So you could use it in-house within the GAW

3    environment.  My point, though, is I don't think that

4    Plaintiffs met their burden of proving that there was an

5    exchange of value, that they gave up something of value, um, in

6    order to start getting Hashpoints instead.  I think we are

7    surmising that, oh, you know, they could have gotten Bitcoin.

8    But I don't think there's --

9            THE COURT:  Let's go to your next.

10           MS. HASSAN:  So the next one on the commonality.  Your

11   Honor, I think the issue there is even if this is an investment

12   of money -- right? -- let's say the conversion of Hashpoints to

13   Paycoin is an investment of money.  The only two ways that

14   Plaintiffs have told us in their briefing that there was an

15   investment of money by the Plaintiffs was mining for Hashpoints

16   and then converting them to Paycoin.

17           But, Your Honor, neither of those things, me mining

18   for one thing and not something else and then converting them

19   to Paycoin, just as a practical matter I don't understand what

20   is getting pooled.  Because what was supposed to be getting

21   pooled, the Paycoin ICO was when you buy Paycoin, we will take

22   your money and we will put it to create the hundred million

23   dollar fund; right?  We will create the CAF.  But I don't

24   understand how Plaintiffs' contributions, if the only

25   contribution it was was mining for Hashpoints and converting

1    them to Paycoin, where is the pooling?

2            THE COURT:  Well, isn't the pooling -- I mean assuming

3    I don't accept your argument that Hashpoints aren't money, then

4    it's money, number one.  But it seems to me at a minimum a

5    Hashpoint is a basically an IOU; right?  It's basically the

6    company saying, yeah, we owe you in-store credit; right?  We

7    owe you something.  And essentially you're giving that up.  So

8    from the company's standpoint, it's money because they no

9    longer have that debt to you, and so you're pooling money.

10            MS. HASSAN:  Well, their only contribution -- so

11    Hashpoints got converted to Paycoin; right?

12            THE COURT:  Yeah.

13            MS. HASSAN:  So their only contribution is, one, we

14    mine for Hashpoints -- and I take your point.  It's like an

15    IOU.  It's credit; right?

16            THE COURT:  Yup.

17            MS. HASSAN:  Then in return for that credit, they get

18    Paycoin; right?

19            THE COURT:  Yeah.

20            MS. HASSAN:  But what's their contribution to actually

21    creating that CAF which is supposed to underlie this entire --

22            THE COURT:  Well, there's more money for the company

23    because the company doesn't owe you money at that point.  They

24    don't have that debt to you for the Hashpoints, so they can use

25    it to create the CAF.

1     MS. HASSAN:  Your Honor, my understanding is from --

2  and this is Exhibit 160B, 160, the CAF was supposed to be

3  created by the sale of Paycoin.  I don't think that it was --

4  sure --

5     THE COURT:  Well, I don't know how explicit that was

6  though.  They said, "Yeah, we'll reinvest."  But, you know, a

7  hundred million's a hundred million dollars.  So they're

8  probably going to get it from multiple sources.

9     I tell you what.  Move on to your next argument.

10  Let's move on to the next argument.

11     MS. HASSAN:  Okay.  So, Your Honor, that issue goes to

12  horizontal commonality.  I do think there is a lack of clarity

13  on that, and it would be entirely reasonable for a jury to be

14  like, what is getting --

15     THE COURT:  I hear you, but you're just repeating your

16  argument.  So let's move on.

17     MS. HASSAN:  So on the vertical commonality, Your

18  Honor, I don't think they've met that too.  I think generally

19  speaking the fact that how successful Paycoin was kind of ties

20  the fortunes of the Paycoin holders and GAW together.  That's

21  taking the vertical commonality argument too far, too broad;

22  right?  That's --

23     THE COURT:  All right.

24     MS. HASSAN:  -- for every company.  So any company

25  that launches any product to some extent, their fortune, they

1    will do better if the product does better, and their customers

2    will do better if their product does better.  But I don't think

3    that creates vertical commonality.

4              THE COURT:  But wasn't there a lot of evidence that

5    GAW owned a lot of Paycoin?

6              MS. HASSAN:  So, Your Honor, I don't think that the

7    holding of coins can really satisfy vertical commonality.  And

8    I realize that some of the recent -- I believe one of the

9    cases, maybe it's *Telegram*, it said, oh, this played vertical

10   commonality.  Again, I do think that goes too far because that

11   would be like saying because my investment manager buys the

12   same portfolio of stuff that he buys for me, now there's like

13   vertical commonality.  Just because I hold the same coin that

14   you hold --

15             THE COURT:  Well, by itself, I think alone I think I

16   would agree with you.  But there's -- I mean one way to look at

17   it is you earlier said that, well, they were going to raise the

18   Coin Adoption Fund through the purchase of Paycoin.  I mean

19   doesn't that tie the company's success?  The company's not

20   going to be able to do what it wants to do if it's not going to

21   be able to raise the Coin Adoption Fund unless they raise

22   Paycoin.  And the more valuable Paycoin is, the bigger the Coin

23   Adoption Fund will be.  So don't both sides have a common

24   interest there?

25             MS. HASSAN:  Sure, Your Honor.  I think we can

1    interpret certain relationships where their interests are

2    aligned.  But I think at the same time there isn't that

3    necessary interdependence between profits and losses, which

4    like the *Kaplan* case tells us, because let's say the Paycoin

5    enterprise had done really well; right?  It's very possible

6    that GAW Miners would have done great because they made huge

7    profits out of it.  But you and me as Paycoin holders might

8    have done really well depending how the other market parts were

9    dealing in Paycoin.  Or, you know, Paycoin could have done

10   really well, but let's say GAW Miners just did a terrible job

11   at managing and administrating things.  So I just think that

12   the general tying together of the success of a product with the

13   company's success, that takes the vertical commonality argument

14   too far.

15          THE COURT:  Right.  But, I mean, I hear you, but this

16   isn't laundry detergent they're selling.  They're selling --

17   their whole business is -- this is the climax of Garza's

18   business plan; right?  He's selling Paycoin now.  And the

19   whole -- he's going to change the world.  And there's no doubt

20   he gets rich increases if Paycoin succeeds -- right? -- because

21   they own a ton of it.  He gets more investors that way, or more

22   buyers, okay.  All right.  So I think I hear you.

23          Let's talk about Hashlets.  I'll let you begin by

24   responding to Mr. Buchdahl.  In particular, I'd like to hear

25   your response to his argument that this really is just a *Howey*

1    case.

2         MS. HASSAN:  It isn't.  I'm happy to talk about that.

3         I do want to note one thing.  Your Honor, Mr. Buchdahl

4    made a lot of equity and fairness arguments.  That's not their

5    motion here.  Their motion is whether the jury got it seriously

6    erroneous, a manifest injustice in weighing the evidence on

7    whether they carried the burden on their case to prove that

8    these are securities.  So all of that, I don't think that

9    should go into consideration for this motion.

10        They also mentioned -- he also mentioned that we

11   didn't spend time, Defendant didn't spend time contesting or

12   disputing.  The issue is whether these were securities.  It was

13   Plaintiffs' burden to prove that.  We did dispute and contest

14   from day one by asking their expert questions about how pooling

15   worked or doesn't work, about Paycoin, whether it was

16   centralized or decentralized.  And then we asked each of their

17   Plaintiffs who testified about, for instance, what happens when

18   you're in one pool and you're in another?  So I just think that

19   there needs to be a level setting on where the burden of proof

20   and who chose or did not choose to put time and effort into

21   presenting it to the jury.

22        So your point about *Howey*, Your Honor, this case

23   Hashlets are so different from *Howey*.  So the *Howey* case was a

24   big huge orange grove.  I'm going to divide it into rows.  You

25   own one row.  I own row one.  Everyone owns certain rows of

1     oranges.  The company said, We're going to cultivate and put

2     all the oranges together.

3              So it's not like you know which is your orange or

4     which is mine.  We're going to sell it altogether, and then

5     whatever I get, I'm going to give you a pro rata distribution

6     based on how many rows anyone owned; right?

7              And in that case, if you read the decision, it also

8     says that you and I who own rows of the orange grove couldn't

9     even enter them without permission of the company; right?  Very

10    different from Mr. Audet waking up every day and checking the

11    pools and deciding how his investment is going to get deployed.

12             THE COURT:  Although I think Mr. Audet didn't have a

13    right to enter the mining center.  That was GAW's.  And he made

14    the point earlier about (inaudible).

15             COURT REPORTER:  I'm sorry.  Can you repeat that,

16    Judge?  There was some static.

17             THE COURT:  Yes.  So I asked the question in response

18    to your point about, you know, the investors couldn't even

19    enter the orange grove.  Isn't the analogy here that Mr. Audet

20    and the buyers couldn't enter the -- I forget what they call

21    it -- the data center, the place where the miners were housed?

22             MS. HASSAN:  But, Your Honor, the control that -- in

23    *Howey* there is no indication of any investor control.  I think

24    there is a footnote which says they could make suggestions, but

25    the footnote also says there was no legal obligation to the

1    company to do anything per their suggestion.  Here Mr. Audet

2    wasn't making the suggestion.  He was actually deciding every

3    single day which pool I'm going to mine in and decide how his

4    money was going to be deployed.

5              THE COURT:  Right.  I agree with that.  But is that

6    the test?  I mean the test was how it was offered, and Mr.

7    Buchdahl points out that this was, you know, grandma proofed

8    and if you can open an e-mail.  So it certainly was conveyed as

9    maybe Mr. Audet, Mr. Pfeiffer, Mr. Shinners were really kind of

10   high-end cryptocurrency guys.  And they were able to kind of

11   take advantage of features of the offering.  But the way it was

12   presented, I think Mr. Buchdahl would argue, was it was

13   presented for the ordinary person, just buy the Hashlet and

14   watch it grow.  And that's -- go ahead.

15             MS. HASSAN:  So, Your Honor, the grandma proofed, I

16   think what it means is -- and the way it was advertised, it was

17   easy to use so you didn't have to lug the big miner home and

18   plug it in and make sure there isn't overheating, so on and so

19   forth.  And that's what Mr. Pfeiffer said.  Hashlets were easy

20   to use.  They were called grandma proof.  What that meant, it

21   didn't really require a lot of technical expertise.  You could

22   manage them from a user-friendly interface.  So it helped the

23   technical aspects.

24             What GAW was doing was it was making it easier for you

25   and me to kind of log on and do what I wanted to do with my

1   Hashlet without having to worry about the operational aspects

2   of a Hashlet.  But what you have in terms of the decision that

3   Mr. Audet or the other Hashlet owners would make, and they had

4   a right to make, and we know that at least one of the three

5   Plaintiffs who testified was exercising it very actively,

6   that's a different decision.  That's a decision about how my

7   investment would be deployed.

8          And usually, Your Honor, if you or I buy IBM stock, we

9   don't get a say in how the money that IBM is getting because of

10  the sale of the stocks had to be deployed.  Here that is

11  exactly what Mr. Audet was doing.  He gets to decide, "I'm

12  mining Cleverpool" or "I'm mining in WafflePool" or whatever

13  pool that he chooses.  It's a very different decision.  And

14  there's no grandma proofing that you need for that decision;

15  right?

16         A lot of people, they do stock trading on E-Trade;

17  right?  You didn't need the technical expertise for the

18  contribution that you were making to your Hashlet, which is

19  deciding exactly how it will be deployed, where it will be

20  pointed.  And depending on your decision -- so, for instance,

21  Your Honor, if GAW was doing a tremendous job with maintaining

22  the Hashlets and operating the miners; right?  Let's say I wake

23  up every single day and make the worst decision and the worst

24  pick of pools; right?  I'm deciding how my investment is going

25  to be deployed, and my losses that I'm suffering now are

1   entirely because of my decision of how to invest my money and

2   not anything operational that GAW did.

3          And, Your Honor, I also think it's instructive, the

4   instruction that you gave to the jury was that there has to be

5   a contribution.  So participants could pool their activities in

6   money and promote a contribution in a meaningful way.  It

7   doesn't mean that GAW shouldn't be doing anything; right?  It

8   just means GAW was doing the operational stuff.  Great, they

9   made it easy.  And then I still have control over the key issue

10  of how my money's going to be used and deployed, where it's

11  going to be put.

12         And, Your Honor, that's a big -- that's a big control

13  and decision to have.  None of the cases that Plaintiffs have

14  cited have that kind of control.  Some of them don't even talk

15  about control; right?  So I think --

16         THE COURT:  All right.  I got your argument on that.

17  What else did you want to say about what Mr. Buchdahl said

18  regarding Hashlets?

19         MS. HASSAN:  Okay.  If you could give me just a

20  minute.  I'm going to quickly look through my notes.

21         THE COURT:  All right.

22         MR. BUCHDAHL:  Your Honor, may I correct two things?

23         THE COURT:  Yeah, I'm going to give you a chance to

24  talk in a second.  It's not going to go much longer because I

25  don't have much longer.  But go ahead.

1          MS. HASSAN:  Your Honor, Mr. Buchdahl also referred to

2    Mr. Fraser's testimony.  One, Your Honor, Mr. Fraser, the

3    quoted testimony is, yeah, I understood it to be, um --

4    actually, let me see exactly what it was before I misstate it.

5          So Hashlets allowed a customer to own a piece of the

6    mining output; right?  And he also testified, oh, you know,

7    it's like a big machine and maybe you could make smaller

8    machines out of it.  That doesn't say anything about pooling of

9    my Hashlet money or my Hashlet computing power with your

10   computing power and kind of putting it all in one pool.  That

11   also says nothing about profit sharing.

12         All it's saying is that, oh, yeah, what I understood

13   was I have -- I mean it can be interpreted I was getting mining

14   output from the computing power that I owned.  That's all there

15   is.  There is no reason that it had to be necessarily pooled

16   with the computing power of everybody else.

17         In addition to that, Your Honor, I think the jury

18   would have also heard this wasn't Mr. Fraser's area; right?

19   Like he was just saying -- he never mined.  He never owned a

20   Hashlet.  So I think they would have assessed his testimony in

21   light of the whole record and also look then at Plaintiff's

22   testimony, Mr. Audet's testimony, where he very clearly said,

23   This is what I was doing every single day.

24         THE COURT:  All right.  Ms. Hassan, I'm going to give

25   you one minute to wrap up.

1          MS. HASSAN:  Okay.  So, Your Honor, I think on

2     Hashlets, unless you have any other questions, I do think that

3     they just didn't meet their burden, and I don't think there's

4     anything unreasonable in where the jury went.  You haven't

5     carried your burden of proof by a preponderance of the

6     evidence.

7          Your Honor, on Paycoin I'll just -- I'll take your

8     cue, but I do think there is enough in the record there that

9     you can't tell the jury you got it seriously erroneous or

10    manifestly unjust.

11         THE COURT:  Mr. Buchdahl, go ahead.

12         MR. BUCHDAHL:  So first off, let me begin where

13    opposing counsel ended, which is that one of the tests here for

14    whether a verdict is against the weight of the evidence is if

15    there was a miscarriage of justice, that one hundred percent

16    asked the Court to weigh the equities in its own view of the

17    evidence.  And so everything we said about that is important

18    for the Court to consider.

19         With regard --

20         THE COURT:  Although I do think she's correct in

21    saying that it can't be entirely de novo; right?

22         MR. BUCHDAHL:  Well, the case --

23         THE COURT:  A right to a jury trial really wouldn't

24    mean anything.

25         MR. BUCHDAHL:  Well, the case that was cited was about

1     the weighing of witness credibility.  That is the case that

2     Ms. Hassan quoted to you.  And in that instance where you're

3     talking about weighing evidence, the credibility, these aren't

4     really credibility questions, Your Honor.  I don't think

5     anyone's really saying that, you know, somebody lied about the

6     Hashlets -- well, we know they lied about the Hashlets.  But in

7     terms about the description of the Hashlets, we're all kind of

8     accepting what was said and trying to sort out if it was a

9     security.

10          So this is not a credibility determination.  It's not

11    the kind of question that you would want to, you know, kind of

12    respect a jury's determination.  This is just --

13          THE COURT:  Although there is one that -- I'm glad you

14    raised that.  There is, it seems to me, one issue of

15    credibility.  I guess I'd put it more precisely, the jury's

16    determining which piece of testimony to credit.  And I'm now

17    talking about, this goes to the whole vertical commonality

18    issue.  This deals with whether the fee was -- the maintenance

19    fee was fixed or not.

20          You recall that there was some different testimony on

21    that and one of which was -- I believe it was Mr. Audet

22    testified at the trial that the maintenance fee was

23    proportional to the payout.  And I don't know whether it was

24    Ms. Hassan or whoever was doing the cross-examining for the

25    Defense said:  But wait a minute.  At your deposition you

1    testified it was a fixed fee.

2           Now, with a party, as you know, you can use the

3    deposition testimony as substantive evidence.  So the jury

4    could have chosen to say, well, I think he was telling the

5    truth when he said it was a fixed fee.

6           MR. BUCHDAHL:  It's true.  I think that the

7    testimony's ambiguous.  I think when he was talking about

8    proportionality, he was talking about if you had a great day,

9    it would be smaller proportionate to your day than if you had a

10   lousy day, it would be bigger proportionate to your day.  I

11   don't think he was saying, like, it was always proportionate.

12   I do think, though, the vertical commonality is not where you

13   need to focus your attention with regard to Hashlet because we

14   think the horizontal commonality is so strong in the *Howey* like

15   way that I said before.

16          I just want to go through a few quick things.  I know

17   the Court is running out of time.  With regard to Paycoin, we

18   think the three cases of *ATBCoin*, *Kik*, and *Telegram* really are

19   controlling here.  We think there's no meaningful way to

20   distinguish the control that the companies had over the

21   currencies in those cases, the cryptocurrencies in those cases,

22   and the one here at GAW.

23          And in particular, for some reason counsel has been

24   emphasizing this idea that they changed -- that they traded on

25   another exchange and that was somehow outside GAW's control.

1   If you look at *ATBCoin*, Footnote 14, Judge Broderick said, The

2   purchaser's ability to resell ATB coins on other exchanges

3   supports the conclusion the coins are securities.  And he

4   quotes the chairman of the SEC identifying the ability to trade

5   on a secondary market as a key hallmark of a security.  So we

6   think, if anything, it makes it more security-like than less.

7        So there are a few things I want to correct.  As

8   usual, the Court was correct, Mr. Garza pleaded to a count of

9   wire fraud.  And so the finding that the SEC made about

10  securities and that was jurisdictional, it wasn't about the

11  substantive offense.  So I apologize for suggesting the

12  contrary.

13       THE COURT:  That's all right.

14       MR. BUCHDAHL:  It is the case that in defense

15  counsel's opening, he said that Josh Garza was charged with

16  securities fraud, but he and I were both incorrect there.

17       The other thing I wanted to correct is that you asked

18  if you had a contract to buy a security, would that be a

19  security?  The answer to that is emphatically yes.  That's just

20  an option.  That's just a call or a put.

21       So a contract to buy a security later -- and I want to

22  thank Ms. Chen for pointing that out to me while I was getting

23  it wrong.  So the notion that if you had just a contract to buy

24  Paycoin, and that's one of the things that we were relying on

25  with regard to HashStakers and Hashpoints.  Again, not

1    important -- not particularly important parts of the case.

2           We do think Paycoin is controlled by those three

3    cases.  We think the $20 floor and the $100 million fund and

4    the promise to all of these purchasers of Paycoin, that if they

5    bought Paycoin at $8, they were looking at a future Paycoin

6    value of $20, is obviously an expectation of profit.  I don't

7    think the Court accepted the notion that they didn't give

8    something of value to acquire Paycoin.

9           But first of all, there was testimony that some of

10   them paid for Paycoin directly.  But even if you used a

11   Hashpoint, Your Honor, you were relinquishing the right to get

12   Bitcoin from your mining in order to get the Hashpoint; and,

13   therefore, you were essentially purchasing Hashpoints with

14   Bitcoin for all intents and purposes.

15          THE COURT:  That part I don't quite follow.

16          MR. BUCHDAHL:  Okay.  So if I have a Hashlet, my

17   normal payout from a Hashlet is Bitcoin.

18          THE COURT:  Okay.

19          MR. BUCHDAHL:  I can choose to relinquish that payout

20   in favor of a different payout, Hashpoints.

21          THE COURT:  I see.

22          MR. BUCHDAHL:  So in a sense I've relinquished a

23   Bitcoin right for the HashCoin right.  Any Bitcoin that is

24   mined to the extent anything was happening would just revert to

25   GAW.  And that was one of the things.  One of the reasons that

1   the fraud involved telling people, Why don't you start asking

2   for Hashpoints instead? was because they didn't have to

3   actually give people Bitcoin.  They could give them something

4   that was entirely within their control.

5           And, again, you know, look, what the Court should ask

6   itself is:  What was -- when you bought a Hashlet, what was

7   really going on?  And if you look, like, for example, at I

8   believe it's Exhibit 11 was the kind of advertisement for this.

9   No, no, that's not correct.  It is Exhibit 9 is one of the ads

10  for this.  One of the things it emphasizes is economies of

11  scale.  It says, We are going to do this for you.  You're going

12  to be part of this big operation.

13          That was the whole point, Your Honor, was that they

14  wanted a piece of the whole.  And this was what GAW Miners was

15  selling.  They say:  You just hook up.  You buy your Hashlet.

16  And you're in business with all the other Hashlet owners, and

17  we will get you your Bitcoin as opposed to having to kind of do

18  all this yourself.  The very nature of it, Your Honor, was a

19  common enterprise.  And the fact that there are these fake

20  buttons people could push and say boost or not boost or this or

21  that pool, it's all -- that is all window dressing on the

22  fundamental common enterprise that they were asking for.

23          Your Honor, look, we didn't want to try this case

24  again.  It would be a pleasure -- it would be a pleasure,

25  though, to see you again.

1          THE COURT:  Very good company.

2          MR. BUCHDAHL:  The main thing here -- look, one thing

3    we know the Court will do is if the Court thinks it's the right

4    thing to do to try this case again, we know you'll do it

5    because you never shied away from any work in this case.  We

6    think that the jury, not as a matter of credibility to find,

7    not as a matter of kind of weighing evidence, just simply got

8    the question wrong on the securities question, preventing it

9    from getting to the actual important, challenging question of

10   control person authority.  We need to do it again, and we are

11   ready to do it again.  And we hope Your Honor will grant this

12   motion.

13         Just two words on the default thing.  That's really --

14   we don't really have much at stake there.  The class doesn't

15   have much at stake there.  We don't believe there's anything

16   for the class to be gained.  It's really just a procedural

17   question that has to do with kind of appeals and other things.

18         THE COURT:  Right.

19         MR. BUCHDAHL:  So we think if the Court rules on this

20   motion first, we can probably figure out what makes sense to do

21   there, and we don't know that the Court needs to look at it

22   beforehand.  But we urge the Court to grant our motion for a

23   new trial, and we thank you for all the time this morning.

24         THE COURT:  All right.  Very well.  Thank you both.

25   The argument was very well done.  I'm going to take it under

1    advisement.  I do expect -- it's not going to be another six

2    months though.  I'd like to be able to get a ruling out within

3    a month, so I'm going to do my best.

4            MR. BUCHDAHL:  Have a good holiday weekend.

5            THE COURT:  You too.

6        (Proceedings concluded at 12:29 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                              C E R T I F I C A T E

4

5

6

7                    I, Julie L. Monette, RMR, CRR, CRC, Official

8    Court Reporter for the United States District Court for the

9    District of Connecticut, do hereby certify that the foregoing

10   pages are a true and accurate transcription of my shorthand

11   notes taken in the aforementioned matter to the best of my

12   skill and ability.

13

14

15                       /S/ JULIE L. MONETTE
                     _____
16                   Julie L. Monette, RMR, CRR, CRC
                              Official Court Reporter
17                             450 Main Street
                         Hartford, Connecticut 06103
18                             (860) 212-6937

19

20

21

22

23

24

25