UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| DENIS MARC AUDET, MICHAEL PFEIFFER, DEAN ALLEN SHINNERS, and JASON VARGAS, Individually and on Behalf of All Others Similarly Situated, | Case 3:16-cv-00940 <br><br> Hon. Michael P. Shea |
| Plaintiffs, | ECF Case |
| vs. | <u>CLASS ACTION</u> |
| STUART A. FRASER, GAW MINERS, LLC, and ZENMINER, LLC, (d/b/a ZEN CLOUD), | May 10, 2023 |
| Defendants. | |

**CLASS COUNSEL'S MOTION FOR FEES, REIMBURSEMENT OF EXPENSES, <u>AND INCENTIVE AWARDS FOR THE NAMED PLAINTIFFS</u>**

**TABLE OF CONTENTS**

INTRODUCTION ....................................................................................................... 1

BACKGROUND ........................................................................................................ 4

I.     GAW's Fraudulent Scheme and Commencement of this Action Seeking Redress for Cryptocurrency-Related Fraud ................................. 4

II.    Early Successes on Significant Threshold Issues in this Action ............................. 7

III.   The Significant Challenge of Class Certification .................................... 10

IV.   Extensive and Hard-Fought Efforts to Obtain Necessary Discovery to Prosecute this Action ................................................................ 13

V.    Pretrial, Trial, and Post-Trial Submissions ....................................... 14

VI.   Settlement Negotiations and the Proposed Class Settlement with Fraser ............. 16

ARGUMENT ........................................................................................................... 18

I.     Class Counsel's Fee Request is Reasonable ...................................... 18

    A.    Class Counsel is Entitled to Fees From the Common Fund .................... 18

    B.    The Requested Fee is Fair and Reasonable Under the Percentage Method ................................................................... 19

        1.    Percentage Method is Favored ....................................... 19

        2.    A Fee of 28% of the Overall Settlement Value is Fair and Reasonable ........................................................... 19

    C.    The Requested Fee is Reasonable Under A Lodestar "Crosscheck" ............................................................. 22

II.    The *Goldberger* Factors Support the Requested Fee Award ................................. 25

    A.    Time And Labor Expended By Counsel (*Goldberger* Factor 1) .............. 25

    B.    Magnitude and Complexity of the Litigation (*Goldberger* Factor 2) ................................................................... 26

    C.    The Risk of the Litigation (*Goldberger* Factor 3) ..................... 28

    D.    The Quality of the Representation (*Goldberger* Factor 4) ...................... 31

i

E.  Requested Fee In Relation to the Settlements (*Goldberger* Factor 5) ................................................................................................ 33

F.  Public Policy Considerations (*Goldberger* Factor 6) ................................ 33

III.  Counsel's Expenses Should Be Reimbursed ........................................................ 33

IV.  Incentive Awards for the Named Plaintiffs Are Appropriate ............................... 35

CONCLUSION ...................................................................................................................... 39

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*37 Besen Parkway, LLC v. John Hancock Life Ins. Co.*,
No. 15 Civ. 9924 (PGG) (S.D.N.Y. Mar. 18, 2019) ............................................................25

*Amara v. Cigna Corp.*,
2018 WL 6242496 (D. Conn. Nov. 29, 2018) ........................................................................37

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013) ...............................................................................................................10

*Anwar v. Fairfield Greenwich Ltd.*,
2012 WL 1981505 (S.D.N.Y. June 1, 2012) ............................................................... *passim*

*Arbuthnot v. Pierson*,
607 F. App'x 73 (2d Cir. 2015) ..............................................................................................24

*Audet v. Fraser*,
332 F.R.D. 53 (D. Conn. 2019) ...............................................................................................27

*Audet v. Fraser*,
605 F. Supp. 3d 372 (D. Conn. 2022) ................................................................................1, 27

*Baffa v. Donaldson Lufkin & Jenrette Sec. Corp.*,
2002 WL 1315603 (S.D.N.Y. June 17, 2002) .......................................................................20

*Bd. of Trustees of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*,
2012 WL 2064907 (S.D.N.Y. June 7, 2012) ..........................................................................37

*Bellifemine v. Sanofi-Aventis U.S. LLC*,
2010 WL 3119374 (S.D.N.Y. Aug. 6, 2010) ..........................................................................36

*Boeing Co. v. Van Gemert*,
444 U.S. 472 (1980) ................................................................................................................18

*Bryant v. Potbelly Sandwich Works, LLC*,
2020 WL 563804 (S.D.N.Y. Feb. 4, 2020) ............................................................................24

*Caitflo, L.L.C. v. Sprint Commc'ns Co. L.P.*,
2013 WL 3243114 (D. Conn. June 26, 2013) ........................................................................20

*City of Providence v. Aeropostale, Inc.*,
2014 WL 1883494 (S.D.N.Y. May 9, 2014) ............................................................... *passim*

*Collins v. Olin Corp.*,
   2010 WL 1677764 (D. Conn. Apr. 21, 2010) .......................................................................20

*Detroit v. Grinnell Corp.*,
   495 F.2d 448 (2d Cir.1974)..................................................................................................29

*Dupler v. Costco Wholesale Corp.*,
   705 F. Supp. 2d 231 (E.D.N.Y. 2010) ...........................................................................33, 38

*Fleisher v. Phoenix Life Ins. Co.*,
   2015 WL 10847814 (S.D.N.Y. Sept. 9, 2015).........................................................21, 25, 38

*Gierlinger v. Gleason*,
   160 F.3d 858 (2d Cir. 1998)..................................................................................................23

*Gilliam v. Addicts Rehab. Ctr. Fund*,
   2008 WL 782596 (S.D.N.Y. Mar. 24, 2008) ........................................................................20

*Goldberger v. Integrated Res.*,
   209 F.3d 43 (2d Cir. 2000)............................................................................................ *passim*

*Guevoura Fund Ltd. v. Sillerman*,
   2019 WL 6889901 (S.D.N.Y. Dec. 18, 2019) ......................................................................24

*Hensley v. Eckerhart*,
   461 U.S. 424 (1983)..............................................................................................................31

*Hicks v. Stanley*,
   2005 WL 2757792 (S.D.N.Y. Oct. 24, 2005) ................................................................33, 35

*In re Am. Bank Note Holographics*,
   127 F. Supp. 2d 418 (S.D.N.Y. 2001)...................................................................................29

*In re Arakis Energy Corp. Sec. Litig.*,
   2001 WL 1590512 (E.D.N.Y. Oct. 31, 2001)........................................................................34

*In re Auto. Parts Antitrust Litig.*,
   2017 WL 3525415 (E.D. Mich. July 10, 2017) .....................................................................25

*In re Bibox Grp. Holdings Ltd. Sec. Litig.*,
   534 F. Supp. 3d 326 (S.D.N.Y. 2021), *reconsideration denied in part sub
   nom. In Re Bibox Grp. Holdings Ltd. Sec. Litig.*, 2021 WL 2188177 (S.D.N.Y.
   May 28, 2021).......................................................................................................................27

*In re Blech Sec. Litig.*,
   2000 WL 661680 (S.D.N.Y. May 19, 2000) .........................................................................24

*In re Currency Conversion Fee Antitrust Litig.*,
  2012 WL 3878825 (S.D.N.Y. Aug. 22, 2012) ....................................................................35

*In re Dreyfus Aggressive Growth Mut. Fund Litig.*,
  2001 WL 709262 (S.D.N.Y. June 22, 2001) ......................................................................29

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
  343 F. Supp. 3d 394 (S.D.N.Y. 2018), *aff'd sub nom. In re Facebook, Inc.*,
  822 F. App'x 40 (2d Cir. 2020)........................................................................................27

*In re Fine Host Corp. Sec. Litig.*,
  2000 WL 33116538 (D. Conn. Nov. 8, 2000) ...................................................................18

*In re Flag Telecom Holdings, Ltd. Secs. Litig.*,
  2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010) ...............................................................23, 29

*In re Frontier Commc'ns Corp.*,
  2022 WL 4080324 (D. Conn. May 20, 2022).....................................................................19

*In re Global Crossing Sec. & ERISA Litig.*,
  225 F.R.D. 436 (S.D.N.Y. 2004) ................................................................................23, 34

*In re Initial Pub. Offering Sec. Litig.*,
  671 F. Supp. ......................................................................................................................30

*In re Initial Pub. Offering Sec. Litig.*,
  671 F. Supp. 2d 467 (S.D.N.Y. 2009)................................................................................24

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
  2018 WL 3863445 (S.D.N.Y. Aug. 14, 2018)...................................................................38

*In re Lloyd's Am. Trust Fund Litig.*,
  2002 WL 31663577 (S.D.N.Y. Nov. 26, 2002)..................................................................22

*In re Marsh & McLennan Companies, Inc. Sec. Litig.*,
  2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009) ............................................................. *passim*

*In re Marsh ERISA Litig.*,
  265 F.R.D. 128 (S.D.N.Y. 2010) ......................................................................................32

*In re Merrill Lynch & Co., Inc. Rsch. Reps. Sec. Litig.*,
  2007 WL 313474 (S.D.N.Y. Feb. 1, 2007)........................................................................27

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
  991 F. Supp. 2d 437 (E.D.N.Y. 2014) ..........................................................................20, 21

*In re Philip Servs. Corp. Sec. Litig.*,
  2007 WL 959299 (S.D.N.Y. Mar. 28, 2007) .....................................................................18

*In re Sumitomo Copper Litig.*,
    189 F.R.D. 274 (S.D.N.Y. 1999) .......................................................................30

*In re Telik, Inc. Sec. Litig.*,
    576 F. Supp. 2d 570 (S.D.N.Y. 2008) .............................................................28

*In re U.S. Foodservice, Inc. Pricing Litig.*,
    2014 WL 12862264 (D. Conn. Dec. 9, 2014) ..................................................19

*In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.*,
    724 F. Supp. 160 (S.D.N.Y. 1989)...................................................................23

*In re Veeco Instruments Inc. Sec. Litig.*,
    2007 WL 4115808 (S.D.N.Y. Nov. 7, 2007) ............................................20, 24

*In re Visa Check/Mastermoney Antitrust Litig.*,
    297 F. Supp. 2d 503 (E.D.N.Y. 2003) .............................................................34

*In re Vitamin C Antitrust Litig.*,
    2012 WL 5289514 (E.D.N.Y. Oct. 23, 2012) ..................................................36

*In re WorldCom, Inc. Sec. Litig.*,
    388 F. Supp. 2d 319 (S.D.N.Y. 2005) .............................................................33

*Johnson v. City of New York*,
    2010 WL 5818290 (E.D.N.Y. Dec. 13, 2010) .................................................21

*Kemp-DeLisser v. Saint Francis Hosp. & Med. Ctr.*,
    2016 WL 6542707 (D. Conn. Nov. 3, 2016) ....................................................25

*LeBlanc-Sternberg v. Fletcher*,
    143 F.3d 748 (2d Cir. 1998).............................................................................23

*Leonard v. John Hancock Life Ins. Co. of N.Y.*,
    No. 1:18-cv-04994 (S.D.N.Y.)..........................................................................21

*Marroquin Alas v. Champlain Valley Specialty of New York, Inc.*,
    2016 WL 3406111 (N.D.N.Y. June 17, 2016)..................................................31

*McDaniel v. County of Schenectady*,
    595 F.3d 411 (2d Cir. 2010).......................................................................21, 22

*Menkes v. Stolt-Nielsen S.A.*,
    2011 WL 13234815 (D. Conn. Jan. 25, 2011)...................................4, 19, 20

*Missouri v. Jenkins*,
    491 U.S. 274 (1989).........................................................................................23

*Moloney v. Shelly's Prime Steak, Stone Crab & Oyster Bar*,
  2009 WL 5851465 (S.D.N.Y. Mar. 31, 2009) .......................................................................20

*Morris v. Affinity Health Plan, Inc.*,
  859 F. Supp. 2d 611 (S.D.N.Y. 2012) .........................................................................20, 23, 32

*Olivier Cheng Catering & Events, LLC*,
  2010 WL 2399328 (S.D.N.Y. Mar. 3, 2010) .......................................................................20

*Reichman v. Bonsignore, Brignati & Mazzotta, P.C.*,
  818 F.2d 278 (2d Cir. 1987) ...............................................................................................34

*Roberts v. Texaco, Inc.*,
  979 F. Supp. 185 (S.D.N.Y. 1997) ......................................................................................37

*SEC v. Kik Interactive Inc.*,
  492 F. Supp. 3d 169 (S.D.N.Y. 2020) ................................................................................27

*Simerlein v. Toyota Motor Corp.*,
  2019 WL 2417404 (D. Conn. June 10, 2019) .....................................................................19

*Varljen v. H.J. Meyers & Co.*,
  2000 WL 1683656 (S.D.N.Y. Nov. 8, 2000) .......................................................................35

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
  396 F.3d 96 (2d Cir. 2005) ...........................................................................................19, 25

## Rules

Fed. R. Civ. P. 23 ...................................................................................................10, 32

Fed. R. Civ. P. 50 ..................................................................................................15, 16

Fed. R. Civ. P. 59 ...............................................................................................3, 16, 26

## Other Authorities

Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their
  Fee Awards*, 7 J. Empirical Legal Stud. 811 (2010) ..............................................................22

7B Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and
  Procedure: Civil 2d §1803 (2d ed. 1986) ................................................................................18

Theodore Eisenberg & Geoffrey Miller, *Attorneys' Fees in Class Actions: 2009-
  2013*, 92 N.Y.U. L. Rev. 937 (2017) ...................................................................................22

**INTRODUCTION**

Court-appointed Class Counsel Susman Godfrey initiated, prosecuted, and successfully resolved this hard-fought case, recovering $3.5 million for victims of the GAW Miners cryptocurrency scam after all seemed lost. The case was extraordinarily expensive and time-consuming to litigate: Class Counsel spent over 8,000 hours and nearly $6 million in attorney time, and advanced over $900,000 in cash to bring this case to trial, all on a fully contingent basis with no guarantee of receiving anything in return. And Class Counsel's perseverance and success in post-trial motions paved the way for this extraordinary result after defeat at trial.

The result is extraordinary for two main reasons. *First*, in light of the zero-dollar recovery class members faced after the jury's verdict, a $3.5 million cash settlement is an exceptional result for the Class. The jury found that none of the GAW assets were securities, gutting all of Plaintiffs' securities claims. In a rare and hard-fought post-trial victory, Class Counsel persuaded the Court that no reasonable juror could have found that one of the assets, Paycoin, was not a security, bringing the case back to life after a full defense verdict. *See Audet v. Fraser*, 605 F. Supp. 3d 372, 399 (D. Conn. 2022) (finding that "the overwhelming weight of the trial evidence" showed that Paycoin was an investment contract). *Second*, there is no evidence in the trial record that cash was paid to GAW Miners for Paycoin. Rather, the record established that Paycoin was obtained *from GAW* by converting other GAW products, Hashlets and Hashpoints. *See* ECF No. 346 at 584:18-23, 585:6-7 (trial testimony from class representative Marc Audet that he obtained Paycoin from GAW by converting Hashpoints and using HashStakers); *id.* at 646:7-15 (trial testimony from Allen Shinners that he obtained Paycoin from GAW through Hashpoint conversions); ECF No. 347 at 836:10-20 (same for Michael Pfeiffer).[1] The only record of cash

---

[1] After Paycoin was released, it was also traded publicly online and could be purchased for cash, but the Class was defined to include only individuals who purchased or acquired products

payments to GAW was for the purchase of Hashlets, Hashpoint, and Hashstakers, *see id.*; ECF No. 1-1 (Plaintiffs' certifications)— all of which are out of the case as a result of the jury verdict. Proving damages for Paycoin would have been an even higher hurdle given that liability and damages had been bifurcated, meaning that two more trials may have been required to prove any damages for Paycoin. In light of that background, the $3.5 million recovered for the class is a truly outstanding result.

This result was achieved through Class Counsel's creative, meticulous, and persistent lawyering. While omnipresent now, at the time this case was brought in 2016, crypto was still emerging into public consciousness, and caselaw was scant on whether crypto was a security. Class Counsel defeated Defendant Stuart Fraser's attempts to dismiss the lawsuit and began developing the factual record necessary to prove up Plaintiffs' claims. After the complaint in this case was filed detailing the fraud, the CEO of GAW Miners, Josh Garza, was indicted and pled guilty to the same types of fraud outlined in the complaint. He became a cooperating witness in this case, which itself was a significant accomplishment given his parallel criminal jeopardy.

The discovery was massive and complex. Class Counsel took or defended 23 depositions, reviewed tens of thousands of documents, sought crucial evidence through Freedom of Information Act requests, examined sprawling company sales databases and the source code underlying GAW's crypto products, and worked with experts on challenging issues including, among other things, cloud mining contracts, mining pools, proof-of-work and proof-of-stake

---

directly from GAW, not who purchased from third parties on public trading markets. *See* ECF No. 144 ("The following class is certified: All persons or entities who, between August 1, 2014, and January 19, 2015, (1) purchased Hashlets, Hashpoints, HashStakers, or Paycoin *from GAW Miners, LLC and/or ZenMiner, LLC*; or (2) acquired Hashlets, Hashpoints, HashStakers, or Paycoin *from GAW Miners, LLC and/or ZenMiner, LLC*, by converting, upgrading, or exchanging other products sold by GAW Miners, LLC and/or ZenMiner, LLC.") (emphasis added).

mining, blockchain forks, the degree of control GAW exercised over the operation and profitability of its crypto products, and class-wide damages models for crypto products paid for with other non-fiat cryptocurrency products. Class Counsel successfully marshalled this evidence in a successful class certification motion and defended against a subsequent attempt by Fraser to decertify the class as to damages.

But unlike most class actions—which settle, if they do, before trial—Class Counsel and Plaintiffs took this case to verdict and beyond, and the result they obtained was greater than anything they could have obtained had the case not gone to trial. At trial, Class Counsel put on all three class representatives and a computer science expert, among other witnesses, and conducted a multi-day examination of Fraser as an adverse witness. Following six full trial days and two days of deliberations, the jury returned a defense verdict which, for the securities claims, rested on the finding that the products at issue were not "securities." Undeterred, Class Counsel drafted a motion for a new trial under Rule 59—which may be granted only if a jury's verdict is "egregious"—marshalling the extensive trial record Plaintiffs had developed through their expert and class representatives. And the Court agreed: it ordered a new trial as to one of the crypto products at issue and gave Plaintiffs another day in court. Following this order, Class Counsel re-engaged in settlement discussions with Fraser and, after months of negotiations, secured $3.5 million in cash for Class members.

The case was extremely risky from the outset, and that risk materialized when the jury returned a defense verdict. In order to succeed, Plaintiffs had to win certification of securities fraud claims without access to the *Basic* presumption, a highly difficult task that requires establishing common proof of individual reliance by class members, a rare accomplishment. *See* ECF No. 141 at 42 (noting that "the Supreme Court has observed in *dicta* that absent the fraud-

on-the-market theory, the requirement that Rule 10b-5 plaintiffs establish reliance would ***ordinarily preclude certification*** of a class action seeking money damages because individual reliance issues would overwhelm questions common to the class" (emphasis added, quotation omitted)). And of course, Plaintiffs' claims rested on proving control person liability, and proving that new, unique, and untested asset-classes were securities. The risk was not limited to liability risk or contingency risk because the Court had bifurcated the issue of damages. Even if Plaintiffs had won on liability at trial, the Court had not determined how to structure damages proceedings, and the class faced the real risk that the Court would decertify the class or order individualized, low-value damages adjudications that could have gone on for many years, leaving aside the years (and risk) that Fraser's likely appeals would have consumed.

Class Counsel's investment in this case dwarf what they seek in return. Class counsel invested $6.9 million in time and money into this case, on a fully contingent basis, with the real possibility of getting nothing in return. Class Counsel respectfully moves this Court for an award of attorneys' fees of 28% of the Settlement Fund ($980,000), a figure well within the range approved by courts in this Circuit. *See, e.g.*, *Menkes v. Stolt-Nielsen S.A.*, 2011 WL 13234815, at *5 (D. Conn. Jan. 25, 2011) ("Under the percentage method, compensation of one third of the total fund is consistent with the proportion of common funds awarded as fees in other securities class action settlements within the Second Circuit."). Class Counsel also seeks reimbursement for $957,283.40 in litigation expenses as well as incentive awards for the three class representatives to compensate them for their significant time, effort, and sacrifice in helping bring this case to a successful conclusion.

## BACKGROUND

**I.     GAW's Fraudulent Scheme and Commencement of this Action Seeking Redress for Cryptocurrency-Related Fraud**

4

As this Court observed in 2019, "[t]his case comes from the brave new world of cryptocurrency." ECF No. 141 at 1. Today, cryptocurrency has entered the mainstream: cryptocurrency-related products and services have been advertised during the Super Bowl (often featuring A-list spokespersons),[2] pedigreed financial institutions invest millions in cryptocurrency-related ventures,[3] and one of the splashiest financial scandals of the past year involved a cryptocurrency exchange that allegedly misplaced *$9 billion* of its customers' money.[4] Indeed, the recent FTX scandal immediately generated a class action complaint from FTX's investors against the failed exchange's celebrity promoters, which included football star Tom Brady and international supermodel Gisele Bundchen.[5]

The world was very different in 2014 and 2015, when the events underlying this action occurred. In mid-2014, GAW Miners, LLC and ZenMiner, LLC (collectively, "GAW") launched Hashlets, which GAW described as a share in the proceeds of GAW's cryptocurrency mining enterprise and which it sought to distinguish from competitors' offerings by marketing Hashlets specifically to non-technical people. ECF No. 57 (First Amended Complaint) ¶ 103 (alleging that GAW touted the product as "so easy to use that it is 'Grandma approved'"). Investors no longer needed to acquire, set up, and operate complicated mining equipment themselves; they could simply invest in a Hashlet, which, according to GAW, was "the world's first digital cloud miner." *Id.*; *see also* ECF No. 351-4 at 834:3-12 (trial testimony confirming that GAW "seemed to have their finger on the pulse" in expanding the audience for mining products from "technicians" and "geeks" to include "the general public"). Several months after launching

---

[2] https://money.com/super-bowl-crypto-ads-coinbase

[3] https://www.investopedia.com/goldman-sachs-spends-on-crypto-6836155

[4] https://gizmodo.com/ftx-sbf-sam-bankman-fried-crypto-1850183784

[5] https://www.cnn.com/2022/11/16/business/crypto-contagion-genesis-ftx-ctrp/index.html

Hashlets, GAW began offering its own cryptocurrency token called "Paycoin." Paycoin was offered to class members as a way to keep the fraud going: purchasers of GAW products were permitted to convert their Hashlets and Hashpoints to Paycoin, which was then tradeable on public markets. *See, e.g.*, ECF No. 346 at 584:18-23, 585:6-7 (trial testimony from class representative Marc Audet that he converted his Hashpoints to Paycoin and later purchased additional Paycoin on a third-party exchange).

In late 2014, cryptocurrency tokens—including Bitcoin, but particularly "altcoins" like Paycoin—were still considered by many to be a fringe product, and GAW was able to successfully promote Paycoin simply by, *inter alia*, obtaining positive coverage in a major news outlet like *The Wall Street Journal*.[6] ECF No. 352-5 (November 25, 2014 article submitted as trial exhibit PX 82). The company's collapse began in early 2015 after it was reported that the SEC was investigating GAW, *see* ECF No. 141 at 52 (citing ECF No. 107-1 at 223-27), and dragged on the greater part of the year as GAW tried (and failed) to restore investors' confidence and trust. As GAW unraveled, its customers were left with little recourse from the company. Led by Plaintiff Allen Shinners, a group of investors combined forces to document their losses and seek legal action against the perpetrators of the fraud. Shinners Decl. ¶¶ 3-6.

In short, at the time Plaintiffs filed ultimately this action on June 15, 2016, cryptocurrency enjoyed a far lower profile, and the legal landscape for lawsuits on behalf of investors in fraudulent cryptocurrency ventures was sparse. The law on treating crypto as securities—the key allegation in the securities claims—was even more sparse. Nevertheless, on behalf of and with the invaluable support of Shinners, as well as named plaintiffs Marc Audet and Michael Pfeiffer, Class Counsel dove into this "brave new world." After investigating

---

[6] By contrast, a Google search for "cryptocurrency" on the "wsj.com" website currently yields approximately 122,000 results.

GAW's conduct, including a large volume of GAW documents and communications that appeared on the internet in March 2015, Class Counsel prepared and filed a class complaint spanning 43 pages and 165 paragraphs asserting relatively novel and untested legal theories under the federal and Connecticut securities laws, as well as a common-law theory of fraud. ECF No. 1. On November 4, 2016, Class Counsel filed an amended complaint that expanded on those allegations to include information obtained from Josh Garza, GAW's former CEO. ECF No. 57. Both complaints also named Stuart Fraser as a Defendant in this action, alleging that he was liable as a control person and an aider-and-abettor of GAW's fraud based on his role in the scheme, financial and managerial involvement with GAW, and his relationship with Garza, among other things. *E.g.*, *id.* ¶¶ 18, 46-47, 50, 52, 54-55, 59, 62-63, 72.

## II.     Early Successes on Significant Threshold Issues in this Action

Within a few months of the commencement of the action, Plaintiffs achieved several notable early successes. For one, Plaintiffs concluded a settlement with Defendant Garza, who represented and warranted that he was impecunious and had no assets against which a judgment against him could be satisfied. Ard Decl. ¶ 6. However, Garza could provide valuable consideration to Plaintiffs and the Class in the form of "reasonable and timely discovery cooperation," including production of any relevant documents in his possession, furnishing "a full account of all facts" known to him via in-person interviews by Class Counsel, and agreement to testify at a deposition or trial. *Id.* ¶ 5. In addition, Plaintiffs ensured that they and the Class would have recourse against Garza if he did not honor his commitments, as the settlement agreement precluded Garza from dismissing any effort by Plaintiffs to reinstate him as a Defendant or assert a new action against him as untimely, in the event that Garza materially

breached the agreement or was shown to have made a materially false or misleading representation. *Id.* ¶ 6.

This early cooperation that Plaintiffs secured from Garza bore immediate fruit. After Defendant Fraser moved to dismiss Plaintiffs' initial complaint on September 27, 2016, ECF Nos. 41-43, Plaintiffs amended their complaint, as discussed above, to incorporate information obtained from Garza further supporting Plaintiffs' claims against Fraser, ECF No. 57. As Fraser's motion had been primarily directed at Plaintiffs' control-person and aiding-and-abetting allegations, *see* ECF No. 42, the amended complaint pleaded additional facts regarding Fraser's involvement with GAW and longstanding business partnership with Garza, *see, e.g.*, ECF No. 57 ¶ 38 (confirming that the 50-50 ownership structure agreed upon by Garza and Fraser in July 2013 with respect to Genius at Work Corporation, as previously described in the initial complaint, "would apply prospectively to new companies they created," including GAW); *id.* ¶ 40 (providing details about the "tight leash" Fraser maintained over his investments in the partnership's ventures, which allowed Fraser to direct Garza's decisions).

On December 6, 2016, Fraser filed a renewed motion to dismiss the amended complaint, again primarily directed at Plaintiffs' control-person and aiding-and-abetting allegations. ECF Nos. 61-62. Fraser again argued that the bulk of Plaintiffs' allegations concerning the alleged fraud implicated Garza, not Fraser, but Plaintiffs were able to successfully oppose the motion by pointing to the numerous indicia of Fraser's control pleaded in the amended complaint. ECF No. 63 at 6-7.  After Plaintiffs filed their opposition on January 9, 2017, and Fraser submitted a reply on January 23, 2017, the Court issued a decision on October 11, 2017 denying the motion. ECF No. 72. The Court held that that the amended complaint "plausibly pleads that Fraser controlled the Companies and Garza" and that he "knew or substantially assisted in the alleged fraud." *Id.* at

12. The opinion cited many of the new allegations in the amended complaint derived from information obtained by Class Counsel pursuant to the settlement with Garza. *See id.* at 3 (citing the allegation in ¶ 38 concerning Fraser and Garza's prospective 50-50 partnership); *id.* at 15 (noting that "Fraser appears to have been a major . . . creditor of GAW Miners and Garza, and one who used his financial leverage to oversee Garza" and citing the allegation in ¶ 40).

Furthermore, Plaintiffs successfully sought favorable early decisions on procedural issues that facilitated and streamlined their prosecution of this action. In early 2017, they secured an entry of default against the corporate defendant entities, GAW Miners and ZenMiner. ECF No. 68 (motion); ECF No. 71 (order granting motion). Plaintiffs also moved successfully under the Private Securities Litigation Reform Act of 1995 ("PSLRA") for their appointment as Lead Plaintiffs and for approval of their selection of Susman Godfrey L.L.P. as counsel for Lead Plaintiff and the Class. ECF No. 35 (motion); ECF No. 46 (order granting motion). This latter effort included a painstaking compilation of Plaintiffs' losses from their investments in GAW's offerings to show the extent of their financial stake in the success of the litigation, *see* ECF No. 35 at 5-6 (describing Plaintiff's calculations and arguing that their substantial combined losses demonstrated that Plaintiffs were "precisely the type of plaintiff Congress sought to encourage to come forward" when passing the PSLRA), and the submission of materials demonstrating that Plaintiffs had chosen skillful and knowledgeable counsel with extensive experience in securities litigation to represent them and the Class, *see* ECF No. 35-2, Ex. D. Notably, Plaintiffs claimed significant cash losses from payments made to GAW for Hashlets and HashStakers, but the trial record included no evidence of a plaintiff paying money to GAW for Paycoin, or reporting that as a cash loss. *See* ECF No. 1-1 (Plaintiffs' certifications) at 5-9, 12-54, 57-64. The Court granted Plaintiffs' motion on October 12, 2016. ECF No. 46.

### III.     The Significant Challenge of Class Certification

Having successfully shepherded this action through these early threshold challenges, Plaintiffs turned to the next major legal milestone: class certification. Their motion to certify a class under Federal Rule of Civil Procedure 23(a) and (b)(3), filed on September 13, 2018, was supported by 43 exhibits and 3 expert declarations. ECF Nos. 96-97. This expert testimony provided evidence to satisfy, *inter alia*, numerosity under Rule 23(a)(1), *see* ECF No. 97 at 13 (describing analysis of GAW databases performed by Plaintiffs' expert Robert Mills showing that the class likely numbered in the thousands), and the predominance of common questions over individualized issues with respect to damages under Rule 23(b)(3), *see id.* at 32-33 (describing how this analysis of GAW databases also permitted the calculation of damages on a classwide basis).

Plaintiffs' motion also addressed legal issues that often prevent class certification in fraud cases—most notably, the issue of predominance under Rule 23(b)(3) with respect to the element of reliance in claims brought under § 10(b) of the Securities Exchange Act of 1934. ECF No. 97 at 24-33. Unlike plaintiffs prosecuting garden-variety securities fraud class actions concerning losses suffered by investors who purchased a publicly traded defendant's stock on an exchange that was an "efficient market," and as the Court recognized in its certification decision, Plaintiffs could not rely on the fraud-on-the-market presumption to show classwide reliance on GAW's misrepresentations. *See* ECF No. 141 at 42 (noting that "the Supreme Court has observed in *dicta* that '[a]bsent the fraud-on-the-market theory, the requirement that Rule 10b-5 plaintiffs establish reliance would ***ordinarily preclude certification*** of a class action seeking money damages because individual reliance issues would overwhelm questions common to the class" (quoting *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 462-63 (2013))).

However, Plaintiffs persuasively argued that their federal securities fraud claim was nonetheless susceptible to classwide proof due to the "fundamental" nature of the misrepresentations at issue. *See, e.g.*, ECF No. 97 at 24, 28-31 (arguing that "no rational investor would have purchased the Companies' products if they knew the underlying business model was fundamentally fraudulent" and showing that this principle applied to Hashlets and Paycoin); *see also, e.g.*, ECF No. 96-2 (declaration of Dr. Arvind Narayanan explaining the technical aspects of cryptocurrency mining and GAW's statements about Hashlets, in support of Plaintiffs' argument that no rational investor would have purchased Hashlets had they known that Hashlets were not actually backed up by real mining capacity); ECF No. 96-3 (declaration of Lou Kerner on similar issues).

Plaintiffs successfully overcame these and other challenges to class certification. Fraser not only filed an opposition to Plaintiffs' motion on November 19, 2018, ECF No. 107, but also sought to strike two of the three expert declarations that Plaintiffs submitted in support of their motion, ECF No. 108-09. Plaintiffs submitted their reply to Fraser's opposition on December 21, 2018, ECF No. 113, and their opposition to Fraser's motion to strike on the same day, ECF No. 114. After conducting a hearing on April 12, 2019, ECF No. 135, the Court ordered supplemental submissions from the parties concerning class membership and damages with respect to a random sampling of 20 class members. ECF No. 136. The parties accordingly submitted those additional materials on May 3, 2019. ECF Nos. 138-40.

On July 8, 2019, the Court certified a litigation class defined as follows:

All persons or entities who, between August 1, 2014, and January 19, 2015, (1) purchased Hashlets, Hashpoints, HashStakers, or Paycoin from GAW Miners, LLC and/or ZenMiner, LLC; or (2) acquired Hashlets, Hashpoints, HashStakers, or Paycoin from GAW Miners, LLC and/or ZenMiner, LLC, by converting, upgrading, or exchanging other products sold by GAW Miners, LLC and/or ZenMiner, LLC. Excluded from the Class are any defendants, any parent, subsidiary, affiliate, or employee of any defendant, any co-conspirator, and any governmental agency.

ECF No. 144. In granting Plaintiffs' motion in large part (except with respect to the end date of Plaintiffs' proposed class period, which the Court adjusted to January 2015 from December 2015), the Court's decision devoted substantial attention to class membership and damages (the issues on which Plaintiffs had prepared an extensive supplemental submission) and the tricky legal issues surrounding classwide proof of reliance (one of the most challenging issues addressed in Plaintiffs' motion, as discussed above). *See generally* ECF No. 141. The Court also appointed Plaintiffs as class representatives and Susman Godfrey L.L.P. and Izard, Kindall & Raabe, LLP ("IKR") as Class Counsel. *Id.* Susman Godfrey and IKR are highly experienced in representing securities fraud class actions on behalf of injured investors. *See* ECF No. 97 at 18; ECF No. 96-1 at 979-92.

On August 16, 2019, the Court approved the parties' proposed manner of notice to the certified Class. ECF No. 164. Pursuant to the notice campaign, notice administrator Epiq Class Actions & Claims Solutions, Inc. ("Epiq") provided direct notice to class members via email; indirect notice via an online publication campaign in cryptocurrency-related websites, blogs, and news outlets, as well as ads targeted at individuals who search for cryptocurrency-related information and sponsored search listings on major internet search engines; and an informational release to traditional and online media outlets. ECF No. 162 at 8-9; ECF No. 162-3 at ¶¶ 11-18. During the 45-day opt-out period, seven class members filed timely notices to exclude themselves from the Class ("Opt Outs"). ECF No. 383-6 ¶ 15 (declaration from Epiq).

However, Plaintiffs' efforts on behalf of the Class regarding certification were not yet complete. After discovery closed, Fraser filed a motion to decertify the class as to damages. ECF No. 179. Plaintiffs vigorously opposed that motion in lengthy, fact-intensive briefing and in oral argument to the Court. ECF Nos. 191, 205. On May 4, 2020, the Court denied the motion to

decertify, while bifurcating the case between liability and damages, and sought supplemental briefing from the parties on certain damages-related issues. ECF No. 206. Plaintiffs accordingly filed their response to the Court's questions on September 25, 2020, ECF No. 218, and filed a further submission addressing Fraser's response on October 9, 2020, ECF No. 222.

## IV.   Extensive and Hard-Fought Efforts to Obtain Necessary Discovery to Prosecute this Action

Plaintiffs' efforts were not limited to the extensive briefing and argument on legal issues already described. In the almost 7 years that Plaintiffs have vigorously prosecuted this action, they, Class Counsel, and their experts reviewed tens of thousands of documents, which included company communications, advertising and marketing materials, transactions and sales databases, and the source code underlying GAW's cryptocurrency token. Ard Decl. ¶ 8. These documents included not only Defendant Stuart Fraser's records, but evidence obtained from extensive third-party discovery and investigation. *Id.* ¶ 9. Plaintiffs also obtained significant evidence through Freedom of Information Act requests to the Securities and Exchange Commission. *Id.* ¶ 9.

In addition to their substantial efforts regarding document discovery, Plaintiffs took and defended 23 depositions. Each of the three Plaintiffs—as well as six members of the class who were not named plaintiffs—were deposed. Plaintiffs also deposed Fraser, former GAW CEO and co-Defendant Joshua Garza, and numerous former employees of GAW. *Id.* ¶ 10.

Plaintiffs also undertook substantial and highly technical expert work. Robert Mills, Plaintiffs' damages expert, spent "well over 100 hours reviewing, analyzing, and exploring" GAW's sales database in order to build a damages model. ECF No. 179-2 at ¶ 29. Dr. Arvind Narayanan—an expert on cryptocurrency and blockchains—personally examined the source code used to build GAW's token, Paycoin. Both experts spent dozens of hours preparing opening

and rebuttal reports and being deposed, and in the case of Professor Narayanan, later testifying at trial.

## V.     Pretrial, Trial, and Post-Trial Submissions

The case proceeded toward trial in the midst of a global health emergency. In light of serious concerns with conducting an in-person trial during the height of the COVID-19 pandemic in 2020, trial was eventually rescheduled to October 2021. *See* ECF No. 238. In the leadup to that trial, Plaintiffs briefed and argued numerous motions *in limine*—specifically, four motions submitted by Plaintiffs and an omnibus motion concerning four separate issues submitted by Fraser. ECF Nos. 254-57, 259-62, 265. Plaintiffs also prepared and exchanged extensive pretrial disclosures with Fraser, *see* ECF No. 253 (Joint Trial Memorandum); ECF Nos. 253-1 to -20 (Exhibits A through T to the Joint Trial Memorandum, representing the parties' individual and joint submissions concerning anticipated expert testimony, trial exhibits (including objections and responses to objections), anticipated deposition testimony (including objections, counter-designations, and objections to counter-designations), proposed voir dire questions, proposed jury instructions, proposed verdict form, and case descriptions for voir dire).

At the pretrial conferences held on October 8, 2021, and October 15, 2021, Plaintiffs argued the motions *in limine* and addressed issues raised regarding the parties' proposed trial exhibits. ECF Nos. 283, 295. Plaintiffs were largely successful with respect to these evidentiary disputes. The Court granted-in-part and denied-in-part Fraser's omnibus motion *in limine*—significantly, it rejected Fraser's argument that Plaintiffs could not present Garza by videotaped deposition, foreclosing the possibility that Plaintiffs would be unable to rely on Garza's testimony at trial given his lack of mobility under the terms of his supervised release, ECF No. 281, declined to issue a blanket order precluding Plaintiffs from introducing any evidence dated

after the end of the class period, ECF No. 291, and disagreed with Fraser that Plaintiffs could not present evidence concerning ZenMiner, subject to a narrow limiting instruction, *id.* The Court also granted-in-part several of Plaintiffs' motions *in limine*. In particular, the Court agreed with Plaintiffs that Fraser could not offer an "ignorance of the law" defense with respect to Plaintiffs' claims alleging the sale of unregistered securities, ECF No. 284, and precluded Fraser from improperly biasing the jury by referencing his experiences during and after the September 11, 2001 terrorist attacks in New York City or by claiming financial hardship should the jury find against him, ECF No. 291. Furthermore, although the Court largely reserved ruling on Plaintiffs' motion with respect to internet discussions that Plaintiffs contended were prejudicial and unsubstantiated hearsay, indicating that such discussions would be addressed on a exhibit-by-exhibit basis when introduced at trial, it was persuaded that a limiting instruction would be appropriate should Fraser seek to use those discussions. ECF No. 291.

The parties tried the case to a jury between October 20 and November 1, 2021. In their affirmative case, Plaintiffs presented five live witnesses—expert Dr. Arvind Narayanan, the three class representatives, and Fraser himself (called adverse)—and three witnesses by deposition (Josh Garza, as well as former GAW employees Madeline Eden and Joe Mordica). After Fraser's trial presentation concluded with what Plaintiffs contended was untimely and misleading testimony concerning GAW's mining efforts, Plaintiffs successfully argued that they were entitled to present a short rebuttal case in the form of further testimony from Ms. Eden. ECF No. 348 at 945:17-950:15, 953:24-954:3 (trial transcript for October 28, 2021).

Plaintiffs also successfully moved under Rule 50(a) for judgment as a matter of law with respect to Fraser's affirmative defenses concerning class representative Michael Pfeiffer. ECF No. 347 at 32:16-37:16 (trial transcript of jury charge conference on October 27, 2021); ECF No.

348 at 921:2-922:14 (holding that the jury would not be instructed on the affirmative defenses of unclean hands, ratification, and *in pari delicto* with respect to Pfeiffer).

After two days of deliberating, the jury returned a verdict in favor of Fraser. Specifically, the jury found that the GAW Products were not securities, and accordingly, did not make further findings on Fraser's liability as to Plaintiffs' securities-related claims. ECF No. 330 at 2. The jury also found that Fraser was not liable for aiding and abetting common-law fraud against Plaintiffs. *Id.* at 13. However, the jury also rejected the one affirmative defense raised by Fraser that the Court had permitted to be presented to the jury, finding that Fraser had failed to prove his *in pari delicto* defense with respect to class representative Allen Shinners. *Id.* at 15.

Plaintiffs filed post-trial motions for judgment as a matter of law and for a new trial pursuant to Federal Rules of Civil Procedure 50(b) and 59. ECF No. 351. These motions were argued to the Court on May 26, 2022. ECF No. 369. Notwithstanding the substantial challenges and high burden associated with post-trial requests to set aside a jury verdict, Plaintiffs prevailed. On June 2, 2022, the Court granted Plaintiffs' motion for a new trial with respect to their securities claims relating to the Paycoin product and ordered the parties to meet and confer regarding a trial date. ECF No. 370.

## VI.   Settlement Negotiations and the Proposed Class Settlement with Fraser

At various points in this litigation, the parties discussed a possible pretrial resolution. After the Court denied Fraser's motion to decertify the class and set pretrial deadlines in May 2020, the parties agreed to mediate the case with the assistance of Jack P. Levin, a respected mediator and arbitrator. Ard Decl. ¶ 11. Although the parties continued discussions with each other and with the mediator for several months between July and October 2020, they were unable to reach agreement at that time. *Id.*

After the Court granted-in-part Plaintiffs' motion for a new trial, ECF No. 370, the parties resumed direct negotiations, engaging in protracted settlement discussions over the following months regarding substantive relief to the Class. Armed with knowledge gained from the many years in which this case has been pending, which included extensive discovery and a jury trial, Class Counsel analyzed all of the material legal and factual issues to thoroughly evaluate Defendants' contentions, advocated in the settlement negotiation process for a fair and reasonable settlement that serves the best interests of the Class, and made fair and reasonable settlement demands of Defendant. *Id.* ¶¶ 12-14.

The parties ultimately reached agreement on monetary terms with respect to class relief at the end of September 2022 and promptly informed the Court of the development. ECF No. 377. A Settlement Agreement was negotiated and agreed to thereafter. ECF No. 383-4. In light of the jury's verdict, as well as the limited nature of the Court's grant of Plaintiff's motion for new trial (which limited the second trial to Paycoin), the $3.5 million cash payment agreed to by Fraser represents an extraordinary recovery by Plaintiffs on behalf of the Class.

On December 16, 2022, Plaintiffs sought preliminary approval of the Settlement, ECF No. 383, which the Court granted on February 21, 2023, ECF No. 385. In accordance with the schedule set by the Court for notice and final approval of the Settlement, Class Counsel now moves for an award of attorneys' fees, reimbursement of expenses, and incentive awards for the three named Plaintiffs, consistent with the extraordinary efforts expended to develop, litigate, and settle this case. Not only did this case pose significant legal risks—as discussed, the issues of control-person liability and class certification were hard-fought—but it also delved into the "brave new world" of cryptocurrency at a time when litigation in this area was in its infancy.

## ARGUMENT

**I.  Class Counsel's Fee Request is Reasonable**

### A.  <u>Class Counsel is Entitled to Fees From the Common Fund</u>

The Supreme Court has long recognized that a lawyer who obtains a recovery "for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *see also In re Philip Servs. Corp. Sec. Litig.*, 2007 WL 959299, at *1 (S.D.N.Y. Mar. 28, 2007) ("Where . . . an attorney succeeds in creating a common fund from which members of a class are compensated for a common injury inflicted on the class, as happens when a judgment is entered in a securities class action litigation, the attorney is entitled to the reasonable value of the services performed in creating that class recovery, as set by the court." (citation omitted)). "The court's authority to reimburse the parties "stems from the fact that the class action [device] is a creature of equity and the allowance of attorney-related costs is considered part of the historic equity power of the federal courts." 7B Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure: Civil 2d §1803, at 493-94 (2d ed. 1986). The purposes of the doctrine are to fairly and adequately compensate class counsel for services rendered; and to ensure that all class members contribute equally towards the costs associated with litigation pursued on their behalf. *See In re Fine Host Corp. Sec. Litig.*, 2000 WL 33116538, at *2 (D. Conn. Nov. 8, 2000) (noting that "the purpose of the common fund doctrine [is] the compensation of the attorney for the reasonable value of services benefitting the claimant"); *Goldberger v. Integrated Res.*, 209 F.3d 43, 47 (2d Cir. 2000) ("The rationale for the doctrine is an equitable one: it prevents unjust enrichment of those benefitting from a lawsuit without contributing to its cost.").

**B.** **The Requested Fee is Fair and Reasonable Under the Percentage Method**

**1.** **Percentage Method is Favored**

Under the percentage method, the "court sets some percentage of the recovery as a fee." *Goldberger*, 209 F.3d at 47. While Courts may award attorneys' fees under either the "lodestar" method or the "percentage of the recovery" method, "[t]he general trend in this Circuit favors using the percentage method in common fund cases." *In re Frontier Commc'ns Corp.*, 2022 WL 4080324, at *14 (D. Conn. May 20, 2022). The percentage method is preferable because it "directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005) (quotations omitted).[7] "[T]he percentage method continues to be the trend of district courts in this Circuit and has been adopted in the vast majority of circuits." *In re Marsh & McLennan Companies, Inc. Sec. Litig.*, 2009 WL 5178546, at *14 (S.D.N.Y. Dec. 23, 2009); *accord Simerlein v. Toyota Motor Corp.*, 2019 WL 2417404, at *23 (D. Conn. June 10, 2019); *In re U.S. Foodservice, Inc. Pricing Litig.*, 2014 WL 12862264, at *3 (D. Conn. Dec. 9, 2014).

**2.** **A Fee of 28% of the Overall Settlement Value is Fair and Reasonable**

Class Counsel requests 28% of the Settlement Fund, which is squarely within the range of fees typically awarded in the District of Connecticut and Second Circuit in complex class actions, including securities class actions. "Under the percentage method, compensation of one third of the total fund is consistent with the proportion of common funds awarded as fees in other securities class action settlements within the Second Circuit." *Menkes*, 2011 WL 13234815, at

---

[7] The Second Circuit has also explained the disadvantages of the lodestar method: "In contrast, the lodestar [method] creates an unanticipated disincentive to early settlements, tempts lawyers to run up their hours, and compels district courts to engage in a gimlet-eyed review of line-item fee audits." *Id.* (citations and alterations removed).

\*5; *see also Collins v. Olin Corp.*, 2010 WL 1677764, at \*6 (D. Conn. Apr. 21, 2010) ("A compensation of one third of the total fund is in line with the percentage fees awarded in similar class action suits."); *Caitflo, L.L.C. v. Sprint Commc'ns Co. L.P.*, 2013 WL 3243114, at \*3 (D. Conn. June 26, 2013) ("At 28 percent of the value of the fund as a whole, the fee-and-expense award would be well within the range of reasonable percentage-fee awards in this Circuit."); *Olivier Cheng Catering & Events, LLC*, 2010 WL 2399328, at \*7 (S.D.N.Y. Mar. 3, 2010) (award of 33% is "consistent with the trend in this circuit" (quotation omitted)).[8]

This range is typical of settlements, like this one, where the settlement fund is less than $10 million. As one district court has noted, "it is very common to see 33% contingency fees in cases with funds of less than $10 million." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 991 F. Supp. 2d 437, 445 (E.D.N.Y. 2014). *See, e.g.*, *Menkes*, 2011 WL 13234815, at \*5 & n.7 (awarding 33-1/3% of $2 million common fund in securities fraud case and collecting cases awarding between 30 and 33-1/3% of the common fund); *In re Veeco Instruments Inc. Sec. Litig.*, 2007 WL 4115808, at \*4 (S.D.N.Y. Nov. 7, 2007) (awarding 30% of $5.5 million common fund in securities fraud case and noting that "[t]hirty percent of a larger settlement fund could constitute a windfall; however, a settlement fund of this size does not create such an issue" (internal quotation marks and citation omitted)); *Baffa v. Donaldson Lufkin & Jenrette Sec. Corp.*, 2002 WL 1315603, at \*2 (S.D.N.Y. June 17, 2002) (awarding 30% of $3 million common fund in securities fraud case).

---

[8] *See also Morris v. Affinity Health Plan, Inc.*, 859 F. Supp. 2d 611, 623-24 (S.D.N.Y. 2012) (a fee of one-third of the recovery "is reasonable and consistent with the norms of class litigation in this circuit." (quoting *Gilliam v. Addicts Rehabilitation Center Fund*, 2008 WL 782596, at \*5 (S.D.N.Y. Mar. 24, 2008)); *Moloney v. Shelly's Prime Steak, Stone Crab & Oyster Bar*, 2009 WL 5851465, at \*5 (S.D.N.Y. Mar. 31, 2009) (collecting cases awarding over 30% and noting that "Class Counsel's request for 33% of the Settlement Fund is typical in class action settlements in the Second Circuit.").

Courts have also observed that an award of up to 33% is appropriate in cases that have been litigated to the brink of trial, after extensive and hard-fought discovery. *See City of Providence v. Aeropostale, Inc.*, 2014 WL 1883494, *1 (S.D.N.Y. May 9, 2014), Oral Arg. Tr. (Dkt. 68, May 15, 2014) at 4 ("[T]his is the rare case where I have no problem with a 33 percent fee … because this case has actually been litigated. This is not a case where . . . there was a relatively quick settlement followed by confirmatory discovery. This was a case where you all were way, way down the pike in the litigation before Judge Weinstein came in and knocked your heads together and got you to settle it.").[9] This case was not only litigated to "the brink of trial"—the parties tried the case to verdict and only reached a settlement after Class Counsel succeeding in obtaining a new trial as to some of the class's claims. ECF No. 370. Finally, the $3.5 million settlement is an outstanding result for the Class, given the jury loss and the uncertain damages for Paycoin if any, as explained above. That too supports this award.

In further support of its fairness, the requested fee is far less than the 40% that Susman Godfrey would obtain on the open market under its standard contingency fee arrangement in which expenses are advanced. *See, e.g.*, *Leonard v. John Hancock Life Insurance Co. of N.Y.*, No. 1:18-cv-04994 (S.D.N.Y.), ECF No. 208 at ¶ 42 (Mar. 11, 2022) (declaration describing Susman Godfrey's standard 40% contingency arrangement). This fact is highly relevant to determining the appropriateness of the award because the Court's ultimate task is to "approximate the reasonable fee that a competitive market would bear." *Johnson v. City of New York*, 2010 WL 5818290, at *4 (E.D.N.Y. Dec. 13, 2010) (citing *McDaniel v. County of*

---

[9] *See also In re Payment Card Interchange Fee Lit.*, 991 F. Supp. 2d at 446 (award of $554.8 million was appropriate partly because "this case settled only after many years of hard-fought litigation. Privately negotiated fees in complex cases … often include a higher fee for cases that proceed past a motion to dismiss, discovery, summary judgment, or other benchmarks"); *Fleisher v. Phoenix Life Ins. Co.*, 2015 WL 10847814, at *17 (S.D.N.Y. Sept. 9, 2015).

*Schenectady*, 595 F.3d 411, 420 (2d Cir. 2010)); *see also McDaniel,* 595 F.3d at 422 (district court's focus should be "on mimicking a market"); *see also In re Lloyd's Am. Trust Fund Litig.*, 2002 WL 31663577, at *26 (S.D.N.Y. Nov. 26, 2002) ("[T]he percentage approach most closely approximates the manner in which private litigants compensate their attorneys in the marketplace contingency fee model.").

Finally, Class Counsel's request for 28% of the common fund is in line with empirical data regarding class counsel fees awarded for similar cases. One study from 2017 found that "[a]verage fee percentages range between 28% and 31% for cases with recoveries of less than $3.9 million." *See* Theodore Eisenberg & Geoffrey Miller, *Attorneys' Fees in Class Actions: 2009-2013*, 92 N.Y.U. L. Rev. 937, 948 & fig.5 (2017). *see also* Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical Legal Stud. 811, 839 tbl.10 (2010) (showing a mean fee award of 26.0% and a median fee award of 27.5% of the common fund in class action settlements with a fund between $2.85 and $4.45 million during 2006 and 2007). This scholarship further supports that Class Counsel's request here is reasonable.

### C.     The Requested Fee is Reasonable Under A Lodestar "Crosscheck"

The Second Circuit also permits courts to utilize a lodestar "crosscheck" to further test the reasonableness of a percentage-based fee. *See Goldberger*, 209 F.3d at 50. Based on the requested fee ($980,000), class counsel's aggregate lodestar yields a "***negative multiplier***" of 0.16. This strongly supports the requested award.

The "lodestar" is calculated by multiplying the number of hours expended on the litigation by each particular attorney or paraprofessional by their current hourly rate, and totaling the amounts for all timekeepers. Additionally, "[u]nder the lodestar method of fee computation, a

22

multiplier is typically applied to the lodestar." *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 468 (S.D.N.Y. 2004). "The multiplier represents the risk of the litigation, the complexity of the issues, the contingent nature of the engagement, the skill of the attorneys, and other factors." *Id.* (citing *Goldberger*, 209 F.3d at 47); *see also In re Flag Telecom Holdings, Ltd. Secs. Litig.*, 2010 WL 4537550, at *25-26 (S.D.N.Y. Nov. 8, 2010). Where the lodestar is used as a cross-check, "the hours documented by counsel need not be exhaustively scrutinized by the district court." *Goldberger*, 209 F.3d at 50.

In these entirely contingent actions, as of May 10, 2023, Class Counsel collectively spent over 8,000 hours, representing a lodestar of $5,965,941.25, and advanced $957,283.40 in expenses, in investigating, prosecuting, trying, and ultimately settling these claims. *See* Ard Decl. ¶¶ 16-20; Needham Decl. ¶¶ 4-7. This lodestar is calculated at current hourly rates, which has been endorsed repeatedly by the Supreme Court, the Second Circuit and district courts within the Second Circuit as a means of accounting for the delay in payment inherent in class actions and for inflation.[10] Based on the requested fee ($980,000), class counsel's aggregate lodestar yields a "***negative multiplier***" of 0.16. This is far below the range of positive lodestar multipliers typically awarded by courts in this Circuit and strongly supports the reasonableness of Class Counsel's fee request.

"Courts regularly award lodestar multipliers from 2 to 6 times lodestar" in this Circuit. *Morris*, 859 F. Supp. 2d at 623-24. For that reason, courts "have repeatedly recognized that the

---

[10] *See, e.g.*, *Missouri v. Jenkins*, 491 U.S. 274, 283-84 (1989) (endorsing "an appropriate adjustment for delay in payment" by applying "current" rate); *Gierlinger v. Gleason*, 160 F.3d 858, 882 (2d Cir. 1998) (rates "should be 'current rather than historic'") (citation and internal quotations omitted); *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 764 (2d Cir. 1998) (current rates "should be applied in order to compensate for the delay in payment"); *In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.*, 724 F. Supp. 160, 163 (S.D.N.Y. 1989) (citation omitted) (using current rates helps "compensate for the delay in receiving compensation, inflationary losses, and the loss of interest").

reasonableness of the fee request under the percentage method is reinforced where, as here, 'the percentage fee would represent a negative multiplier of the lodestar.'" *Guevoura Fund Ltd. v. Sillerman*, 2019 WL 6889901, at *18 (S.D.N.Y. Dec. 18, 2019) (quoting *In re Blech Sec. Litig.*, 2000 WL 661680, at *5 (S.D.N.Y. May 19, 2000)). *See also Bryant v. Potbelly Sandwich Works, LLC*, 2020 WL 563804, at *7 (S.D.N.Y. Feb. 4, 2020) ("Where a percentage fee is on the higher end of the range of reasonable fees but still represents a negative multiplier to the total lodestar, there is 'no real danger of overcompensation.'" (quoting *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 515 (S.D.N.Y. 2009)); *Marsh & McLennan*, 2009 WL 5178546, at *20 (noting that negative multiplier of 0.44 "amount[ed] to a deep discount from [counsel's] lodestar" and "therefore unquestionably support[ed] the requested fee percentage award").[11]

Here, the fee requested by Class Counsel amounts to a ***negative multiplier***—0.16—even lower than those in the cases cited above. In effect, the requested fee amounts to an 84% ***discount*** on Class Counsel's time in the case. This "deep discount" on Class Counsel's lodestar strongly supports the reasonableness of the requested fee. *City of Providence*, 2014 WL 1883494, at *13. Moreover, this multiplier will continue to decrease over time as Class Counsel continues to expend substantial time responding to Class member questions, preparing for final approval, and administering and distributing the Settlement Fund.

Class Counsel's hourly rates are also reasonable. The rates for Class Counsel who billed meaningful time to this case (ranging from $700 to $1950 per hour for Susman Godfrey and

---

[11] *See also City of Providence*, 2014 WL 1883494, at *13 (finding that award representing 0.70 multiplier was "well below the parameters used throughout district courts in the Second Circuit, which affords additional evidence that the requested fee is reasonable"), *aff'd sub nom. Arbuthnot v. Pierson*, 607 F. App'x 73 (2d Cir. 2015); *In re Veeco Instruments*, 2007 WL 4115808, at *5 (holding that 0.36 lodestar multiplier—as a result of which "Lead Counsel will receive no compensation for almost two-thirds of its time spent litigating this case"—supported the reasonableness of counsel's fee request).

$550 to $850 per hour for Izard, Kindall & Raabe) are comparable to peer plaintiffs- and defense-side law firms litigating matters of similar magnitude. *See* Ard Decl. ¶¶ 16-20; Needham Decl. ¶¶ 4-7 ; *see 37 Besen Parkway, LLC v. John Hancock Life Ins. Co.*, No. 15 Civ. 9924 (PGG) (S.D.N.Y. Mar. 18, 2019), ECF No. 164 at 19:6-13 (accepting Susman Godfrey's rates as reasonable, including rates of Seth Ard); *Fleisher v. Phoenix Life Ins. Co.*, 2015 WL 10847814, at *11, *13 (S.D.N.Y. Sept. 9, 2015), at *18 (finding Susman Godfrey's rates "reasonable" and "comparable to peer plaintiffs and defense-side law firms litigating matters of similar magnitude"); *In re Auto. Parts Antitrust Litig.*, 2017 WL 3525415, at *4 (E.D. Mich. July 10, 2017) (finding Susman Godfrey's rates "justified" and "well in line with market"); *Kemp-DeLisser v. Saint Francis Hosp. & Med. Ctr.*, 2016 WL 6542707, at *16 (D. Conn. Nov. 3, 2016) (describing Izard, Kindall & Raabe as "national leaders in class action litigation").

## II.  The *Goldberger* Factors Support the Requested Fee Award

Under either the percentage method or the lodestar multiplier approach, the "'*Goldberger* factors' ultimately determine the reasonableness of a common fund fee," *Wal-Mart*, 396 F.3d at 121. The *Goldberger* factors, which the Court weighs in its discretion, are:

> (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation . . . ; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.

*Goldberger*, 209 F.3d at 50 (citation omitted). Each of these factors confirms that the requested fee is reasonable on a percentage basis.

### A.    Time And Labor Expended By Counsel (*Goldberger* Factor 1)

The first *Goldberger* factor, which addresses the "the time and labor expended by counsel," strongly supports approval of the requested fee. Class Counsel spent over 8,000 hours prosecuting this case, trying it to a jury, and obtaining a new trial notwithstanding the verdict. As

discussed above, the lodestar multiplier is well within—indeed, far below—the range approved by Courts in this Circuit. The substantial time devoted to this litigation over seven years reflects the intensive effort Class Counsel exerted to bring this case to a favorable resolution, and was reasonable. Class Counsel among other things:

- Prepared and filed a complaint asserting novel and untested legal theories relating to cryptocurrency assets;
- Defeated Fraser's motion to dismiss based on additional facts incorporated into an amended complaint;
- Secured entry of default against GAW Miners and ZenMiner;
- Obtained certification of a class and, in the process, overcame difficult legal challenges posed by reliance, among other issues;
- Defeated Fraser's motion to decertify the class as to damages;
- Engaged in extensive fact discovery, including reviewing tens of thousands of documents, obtaining significant evidence from the Securities and Exchange Commission regarding Fraser's involvement in GAW, and taking or defending 23 depositions;
- Undertaking substantial work with expert witnesses, including review of GAW's sales databases and the source code underlying the Paycoin product, assisting with the preparation of multiple expert declarations and reports, and preparing and attending expert depositions;
- Obtaining significant pretrial evidentiary rulings;
- Trying the case to a jury over a 13-day period;
- Successfully moving for judgment as a matter of law as to several of Fraser's affirmative defenses;
- Winning a new trial as to Plaintiffs' Paycoin-related claims under the difficult Rule 59 standard; and
- Engaging in challenging but ultimately successful settlement efforts with Fraser.

*See supra* at 6-17.

In sum, Class Counsel committed substantial time and resources to achieve an excellent recovery in this case. The time and lodestar figures will increase as counsel prepare for final approval proceedings, handle claims administration issues, and continue to respond to class member inquiries.

### B.   Magnitude and Complexity of the Litigation (*Goldberger* Factor 2)

The second *Goldberger* factor, which addresses "the magnitude and complexities of the

litigation," also strongly supports approval of the requested fee.

"Courts have recognized that, in general, securities actions are highly complex." *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 343 F. Supp. 3d 394, 416 (S.D.N.Y. 2018) (internal quotation marks and citation omitted), *aff'd sub nom. In re Facebook, Inc.*, 822 F. App'x 40 (2d Cir. 2020); *see also In re Merrill Lynch & Co., Inc. Rsch. Reps. Sec. Litig.*, 2007 WL 313474, at *14 (S.D.N.Y. Feb. 1, 2007) ("Federal courts have long recognized that securities class litigation is notably difficult and notoriously uncertain.") (internal quotation marks omitted). This case was no exception. Plaintiffs alleged claims of securities fraud and the sale of unregistered securities in connection with novel, challenging-to-understand cryptocurrency products. The application of the securities laws and the *Howey* test to such products—in this Court's words, "the brave new world of cryptocurrency," *Audet v. Fraser*, 332 F.R.D. 53, 58 (D. Conn. 2019)—is an emerging and uncertain frontier of the law. *See SEC v. Kik Interactive Inc.*, 492 F. Supp. 3d 169, 177 (S.D.N.Y. 2020) (noting that "[f]ew courts in this Circuit have had the opportunity to apply *Howey* in the context of cryptocurrency" and "[t]he Second Circuit has not yet spoken on the issue"); *In re Bibox Grp. Holdings Ltd. Sec. Litig.*, 534 F. Supp. 3d 326, 336 (S.D.N.Y. 2021), *reconsideration denied in part sub nom. In Re Bibox Grp. Holdings Ltd. Sec. Litig.*, 2021 WL 2188177 (S.D.N.Y. May 28, 2021) (finding that "the issue of whether a particular token is in fact a security . . . is a fact intensive inquiry and will reach a result that depends on the unique characteristics of each token"). The complexity of this issue (and Plaintiffs' securities claims in general) is underscored by the fact that the jury found that Paycoin was ***not*** a security despite the "the overwhelming weight of the trial evidence," much of which consisted of the technical testimony of Plaintiffs' cryptocurrency expert, Dr. Arvind Narayanan. *See Audet*, 605 F. Supp. 3d at 394-99.

In addition to the legal complexity and novelty of Plaintiffs' claims, the case was sprawling and procedurally complex. Trial began after five years of discovery and motion practice, including a motion to dismiss, multiple rounds of class certification briefing, third-party discovery and atypical discovery of absent class members, and unsuccessful mediation. Even then, trial would resolve only liability because the Court had bifurcated liability and damages. ECF No. 206. Even if Plaintiffs had prevailed at trial, there was not a clear path forward for resolving individual class members' claims for damages. *See* ECF No. 206 at 16 ("The Court will determine how to structure the damages phase of this case—including whether individual damages issues predominate over all common issues, such that decertification as to damages is warranted—if and when the question of liability is resolved in the Plaintiffs' favor."); *id.* at 15-16 (noting that the Court could "utiliz[e] a formula to calculate damages, refer[] the damage issues to a special master or try[] these issues, perhaps after certifying appropriate subclasses" if Plaintiffs prevailed in a liability trial).

The complexity of both liability and damages issues and the magnitude of the case thus support Class Counsel's fee request.

### C.      The Risk of the Litigation (*Goldberger* Factor 3)

The third *Goldberger* factor, which addresses the "risk of the litigation," also strongly supports approval of the requested fee. The Second Circuit has identified "the risk of success as 'perhaps the foremost' factor to be considered in determining [a reasonable fee award]." *Goldberger*, 209 F.3d at 54 (citation omitted); *see also In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 592 (S.D.N.Y. 2008) ("Courts have repeatedly recognized that 'the risk of the litigation' is a pivotal factor in assessing the appropriate attorneys' fees to award to plaintiffs' counsel in class actions."). Class Counsel confronted and overcame myriad risks in reaching the Settlement.

a.  <u>Contingency Risk</u>

"The Second Circuit has recognized that the risk associated with a case undertaken on a contingent basis is an important factor in determining an appropriate fee award." *City of Providence*, 2014 WL 1883494, at *14. As the Second Circuit has observed:

> No one expects a lawyer whose compensation is contingent upon his success to charge, when successful, as little as he would charge a client who in advance had agreed to pay for his services, regardless of success. Nor, particularly in complicated cases producing large recoveries, is it just to make a fee depend solely on the reasonable amount of time expended.

*Detroit v. Grinnell Corp.*, 495 F.2d 448, 470 (2d Cir.1974).[12]

Unlike counsel for the Defendant, who were paid hourly rates and reimbursed for their expenses on a regular basis, Susman Godfrey and Izard, Kindall & Raabe have not been compensated for any of their time (more than 8,000 hours) with a lodestar value of over $5.9 million, or for any of their over $950,000 in litigation expenses incurred since the case commenced in June 2016. Moreover, Susman Godfrey and Izard, Kindall & Raabe would not have been compensated for its time or expenses at all had it been unsuccessful in this litigation— as they very nearly were not. *See Grinnell Corp.*, 495 F.2d at 471 ("[D]espite the most vigorous and competent of efforts, success is never guaranteed."); *Marsh & McLennan*, 2009 WL 5178546, at *18 ("In numerous class actions . . . plaintiffs' counsel have expended thousands of hours and advanced significant out-of-pocket expenses and received no remuneration whatsoever." (citing examples of cases dismissed)). The risk of no recovery in complex cases of

---

[12] *See also In re Dreyfus Aggressive Growth Mut. Fund Litig.*, 2001 WL 709262, at *6 (S.D.NY. June 22, 2001) ("Contingency risk is the principal, though not exclusive factor, courts should consider in their determination of attorneys' fees."); *Flag Telecom*, 2010 WL 4537550, at *27 ("Courts in the Second Circuit have recognized that the risk associated with a case undertaken on a contingent fee basis is an important factor in determining an appropriate fee award."); *In re Am. Bank Note Holographics*, 127 F. Supp. 2d 418, 433 (S.D.N.Y. 2001) (it is "appropriate to take this [contingent-fee] risk into account in determining the appropriate fee to award").

this type is real—as evidenced by this case—and is heightened when Class Counsel opt to take the case to trial, in order to achieve the very best result for the class, rather than reaching a less attractive settlement early in the litigation.

b. Risks to Establishing Liability

"Little about litigation is risk-free, and class actions confront even more substantial risks than other forms of litigation." *City of Providence*, 2014 WL 1883494, at *14 (quotations omitted). Indeed, the "Second Circuit has identified 'the risk of success as perhaps the foremost factor to be considered in determining [a reasonable award of attorneys' fees.]." *Marsh & McLennan*, 2009 WL 5178546, at *18 (citing *Goldberger*, 209 F.3d at 54).

There is no need to speculate about liability risk here: Plaintiffs made their case to a jury and lost. While one of the jury's findings was against the weight of the evidence, and Plaintiffs believe their liability arguments would be strong in a re-trial, they recognize that complex issues pose risk. A second jury could return a second defense verdict that would leave Plaintiffs empty-handed after seven years of litigation.[13] The risk of a no-liability finding weighs strongly in favor of Class Counsel's requested fee. *In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 282 (S.D.N.Y. 1999) ("[N]o matter how confident one may be in the outcome of litigation, such confidence is often misplaced.") (internal quotation marks and citation omitted).

c. Risks to Establishing Damages

Plaintiffs also faced risks in establishing damages from the outset of this case, especially after the Court bifurcated the damages portion of the case. ECF No. 206. The Court concluded that Plaintiffs had not demonstrated a method of measuring damages on a class-wide basis. ECF

---

[13] *See also In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. at 482 & n.119 (observing that "Plaintiffs . . . acknowledge that if history is any indication, their chances of success at trial is—at best—fifty percent" and citing a study "finding that of the twelve securities cases that were tried to jury verdict—six went to the defense and six went to the plaintiffs").

No. 206 at 14. Plaintiffs therefore faced a significant risk that, even if they won a trial on liability, the Court would decertify the class for damages proceedings or order individual damages trials or adversarial claims adjudications—many of which would involve low- or negative-value claims—that could take years to be resolved. *Id.* at 16 (reserving on the issue of "whether individual damages issues predominate over all common issues, such that decertification as to damages is warranted"). *See Marroquin Alas v. Champlain Valley Specialty of New York, Inc.*, 2016 WL 3406111, at *8 (N.D.N.Y. June 17, 2016) (weighing "the risk that Defendants would move for decertification of the Class" as relevant to the third *Goldberger* factor). The deep uncertainty over what damages proceedings would like—or if they could even proceed on a class-wide basis—further establish the damages risk to the class.

*       *       *

The Court is fully aware of the risks in this case. Plaintiffs put their claims to the test in front of a jury and lost. Those claims were novel, and Plaintiffs' control-person liability theory was hotly disputed and fact-intensive. Even if Plaintiffs had prevailed in front of a second jury, the road to recovering damages would have been long and uncertain.

### D.    The Quality of the Representation (*Goldberger* Factor 4)

The fourth *Goldberger* factor, which addresses the "the quality of representation," also supports approval of the requested fee. Courts have consistently recognized that the result achieved is a major factor to be considered in making a fee award and in assessing the quality of the representation. *See, e.g.*, *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983). Class counsel respectfully submit that the Settlement—achieved in the face of complex litigation and substantial risk that Plaintiffs would recover nothing at all—evidences the quality of Class Counsel's representation.

Regarding the skills of Class Counsel, the Court previously appointed Susman Godfrey and Izard, Kindall & Raabe as Class Counsel because the firms met all the requirements of Rule 23(g).[14] ECF No. 144. Susman Godfrey and Izard, Kindall & Raabe have significant experience with securities fraud litigation and class actions, including settlements thereof. *See* Ard Decl. ¶ 3; Needham Decl. ¶ 3. The lawyers working for the Class have substantial experience prosecuting large-scale class actions. *Id.* The work that Class Counsel has performed in litigating and settling this case, and the substantial resources they have committed to prosecuting the case, demonstrates their commitment to the Class and to representing the Class's interests. *See Morris*, 859 F. Supp. 2d at 622.

"The quality of opposing counsel is also important in evaluating the quality of Lead Counsel's work." *City of Providence*, 2014 WL 1883494, at *17.[15] Defendant Stuart Fraser is represented by skilled and highly regarded counsel from a prestigious firm, Hughes Hubbard & Reed, with a well-deserved reputation for vigorous advocacy in the defense of complex civil cases. Counsel who litigated against Class Counsel on this matter include the Chair of Hughes Hubbard's litigation department and a partner who has since been appointed as a United States Magistrate Judge in the Southern District of New York. In sum, all the customary metrics indicative of high quality of representation weigh in favor of the requested fee.

---

[14] *See Morris*, 859 F. Supp. 2d at 621-22 (noting that Rule 23(g) requires the court to consider "the work counsel has done in identifying or investigating potential claims in the action, . . . counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action, . . . counsel's knowledge of the applicable law, and . . . the resources counsel will commit to representing the class") (internal quotation marks omitted)).

[15] *See also  Anwar v. Fairfield Greenwich Ltd.*, 2012 WL 1981505, at *2 (S.D.N.Y. June 1, 2012) (considering "the quality and vigor of opposing counsel"); *Marsh & McLennan*, 2009 WL 5178546, at *19 (reasonableness of fee was supported by fact that defendants "were represented by first-rate attorneys who vigorously contested Lead Plaintiffs' claims and allegations"); *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 148 (S.D.N.Y. 2010) ("The high quality of defense counsel opposing Plaintiffs' efforts further proves the caliber of representation that was necessary to achieve the Settlement.").

### E.     Requested Fee In Relation to the Settlements (*Goldberger* Factor 5)

The fifth *Goldberger* factor, which addresses "the requested fee in relation to the settlement," also strongly supports approval of the requested fee. In *Costco*, the court held that "the fact that the requested fee is comparable to fees that courts have found reasonable . . . weighs in favor of the fee's reasonableness." *Dupler v. Costco Wholesale Corp.*, 705 F. Supp. 2d 231, 244 (E.D.N.Y. 2010). As discussed above, the proposed award is well within the range of fees awarded by courts under the percentage method.

### F.     Public Policy Considerations (Goldberger Factor 6)

Finally, the sixth *Goldberger* factor, which addresses "public policy considerations," supports approval of the request fee. Public policy considerations strongly favor incentivizing skilled private attorneys to undertake this type of litigation, especially since many Class members have small claims and would otherwise lack the financial incentive to obtain a recovery on their own behalf. *See In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 359 (S.D.N.Y. 2005) ("[T]o attract well-qualified plaintiffs' counsel who are able to take a case to trial, and who defendants understand are able and willing to do so, it is necessary to provide appropriate financial incentives"); *Hicks v. Stanley*, 2005 WL 2757792, at *9 (S.D.N.Y. Oct. 24, 2005) ("'To make certain that the public is represented by talented and experienced trial counsel, the remuneration should be both fair and rewarding'" (citation omitted)).

## III. Counsel's Expenses Should Be Reimbursed

Class Counsel also requests reimbursement in the amount of $957,283.40 for out-of-pocket expenses reasonably and necessarily incurred in connection with the prosecution of this Action. "Courts routinely note that counsel is entitled to reimbursement from the common fund for reasonable litigation expenses." *Anwar v. Fairfield Greenwich Ltd.*, 2012 WL 1981505, at *3

(S.D.N.Y. June 1, 2012) (citing *Reichman v. Bonsignore, Brignati & Mazzotta, P.C.*, 818 F.2d 278, 283 (2d Cir. 1987)).[16]

The expenses advanced in this litigation are described in the papers filed in support of this application. *See* Ard Decl. ¶ 20; Needham Decl. ¶ 7. These expenses were reasonable and necessary in this litigation, and have been expended for the direct benefit of the Class. *See id.* They are the type of expenses typically billed by attorneys to paying clients in the marketplace and include such costs as fees paid to experts, mediation fees, notice costs, legal research, document production and storage, court fees, reporting services, and trial-related costs such as hotels, transportation, and printing. *See Anwar*, 2012 WL 1981505, at *3 (reimbursing expenses such as "mediation fees, expert witness fees, electronic legal research, photocopying, postage, and travel expenses, each of which is the type 'the paying, arms' length market' reimburses attorneys" (quoting *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. at 468). The fact that Class Counsel was willing to expend their own money, where reimbursement was entirely contingent on the success of this litigation, is perhaps the best indicator that the expenditures were reasonable and necessary. *See, e.g.*, *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503, 525 (E.D.N.Y. 2003) (noting that it is common practice to grant expense request and awarding $18.7 million in expenses where the "lion's share of these expenses reflects the cost of experts and consultants, litigation and trial support services, document imaging and copying, deposition costs, on-line legal research, and travel expenses.").[17]

---

[16] *See also In re Arakis Energy Corp. Sec. Litig.*, 2001 WL 1590512, at *17 n.12 (E.D.N.Y. Oct. 31, 2001) ("Courts in the Second Circuit normally grant expense requests in common fund cases as a matter of course.").

[17] The Settlement also provides that Settlement Administration Expenses shall be paid from the Settlement Fund. ECF No. 383-4 at ¶ 26. Class Counsel seeks the Court's approval to reimburse the Settlement Administrator for Settlement Administration Expenses and unreimbursed notice costs incurred to date. Current amounts are set forth in the Declaration. Ard Decl. ¶ 21.

## IV. Incentive Awards for the Named Plaintiffs Are Appropriate

Class Counsel seeks an incentive award of $50,000 for named Plaintiff Dean Allen Shinners and awards of $25,000 each for named Plaintiffs Michael Pfeiffer and Denis Marc Audet. Courts "routinely award such costs and expenses to both reimburse named plaintiffs for expenses incurred through their involvement with the action and lost wages, as well as provide an incentive for such plaintiffs to remain involved in the litigation and incur such expenses in the first place." *Hicks*, 2005 WL 2757792, at *10.[18] "The amount of the incentive award is related to the personal risk incurred by the individual or any additional effort expended by the individual for the benefit of the lawsuit." *In re Currency Conversion Fee Antitrust Litig.*, 2012 WL 3878825, at *2 (S.D.N.Y. Aug. 22, 2012).

The named plaintiffs' work and sacrifice on behalf of other class members amply supports these awards. All three class representatives contributed significantly to the outcome, and they proved their dedication by attending trial even after their testimony concluded (with the exception of Audet, who was unable to attend the remainder of trial owing to an urgent medical procedure). Shinners Decl. ¶ 13; Pfeiffer Decl. ¶¶ 6-7; Audet Decl. ¶ 6. That is an extraordinarily rare feat for any class representative, who normally is asked at most to sit for one day of deposition. Here, by contrast, they took off an entire week from doing otherwise gainful activity to see that justice be done and to improve the chances of class recovery. They also sat for depositions, collected documents, attended numerous trial team calls over the years, and proved a dedication to this case that is rarely seen by class representatives. *See id.*

---

[18] *See also Anwar*, 2012 WL 1981505, at *3 ("Courts consistently approve awards in class action lawsuits to compensate named plaintiffs for the services they provide and burdens they endure during litigation."); *Varljen v. H.J. Meyers & Co.*, 2000 WL 1683656, at *4 (S.D.N.Y. Nov. 8, 2000) (reimbursement of such expenses should be allowed because it "encourages participation of plaintiffs in the active supervision of their counsel").

Shinners' contributions were even more exceptional. It is no exaggeration to say that this case would not have been brought without Shinners' efforts:

- **Organizing the lawsuit.** After GAW Miners collapsed, Shinners collected the names of victims of the fraud and, later on, gathered documentation from hundreds of potential class members in anticipation of a lawsuit. Since then—and indeed, to this day—Shinners has continued to serve as a resource for other class members and victims of the fraud. Shinners interviewed multiple law firms before selecting Susman Godfrey to file a class action in which he was the named plaintiff. Shinners Decl. ¶¶ 3-6, 9.
- **Monitoring counsel and assisting in the litigation.** Shinners assisted counsel at every step, including providing input on the complaint, teaching counsel about GAW Miners and cryptocurrency mining in general, providing damages summaries to counsel during mediation, and reviewing and commenting upon briefs. Shinners Decl. ¶ 10.
- **Discovery.** Shinners responded to written discovery requests, including collecting 27.6 gigabytes of data. Shinners also traveled from Ohio to New York for two days to prepare and sit for a deposition. Shinners Decl. ¶¶ 7, 11.
- **Trial.** Shinners traveled from Ohio to attend trial—spending 19 days away from home and work to do so—and to testify on behalf of the class. Shinners Decl. ¶ 13.

Shinners conservatively estimates that he spent 3,000 hours working on this lawsuit. Shinners' sacrifice and effort on behalf of the class—without which no case, much less no recovery, would have been possible—fully warrants the requested incentive award. Courts have approved similar incentive awards for significantly less work than Shinners has performed for the class. *See, e.g.*, *In re Vitamin C Antitrust Litig.*, 2012 WL 5289514, at *11 (E.D.N.Y. Oct. 23, 2012) (awarding $50,000 each to two class representatives for "their work responding to discovery requests, including collectively producing over 10,000 pages of documents, sitting for depositions, and agreeing to appear at trial"); *Bellifemine v. Sanofi-Aventis U.S. LLC*, 2010 WL 3119374, at *7 (S.D.N.Y. Aug. 6, 2010) (awarding 5 named plaintiffs $75,000 each and four other named plaintiffs awards of between $25,000 and $60,000 in recognition of "their willingness to devote their time and energy to this civil rights . . . action" and "in light of the

36

time and energy that they have devoted to this case, and the benefit conferred on the Class"); *Bd. of Trustees of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, 2012 WL 2064907, at *3 (S.D.N.Y. June 7, 2012) (awarding $50,000 each to three named plaintiffs who "diligently performed the tasks expected of them and reasonably incurred costs and expenses in responding to document requests and interrogatories, producing responsive documents, reviewing filings, attending depositions, and communicating regularly with plaintiffs' counsel"); *Amara v. Cigna Corp.*, 2018 WL 6242496, at *3 (D. Conn. Nov. 29, 2018) (awarding $50,000 each to three named plaintiffs who "have been very active in this litigation, including participating in mediation sessions, attending non-trial court hearings, and taking on heavy perceived risk while still employed by" the defendant).[19]

Pfeiffer and Audet similarly provided substantial assistance to Class Counsel and the Class and expended considerable time working on behalf of the Class:

- Reviewed motion papers and briefs and provided feedback to Class Counsel (Pfeiffer Decl. ¶ 3; Audet Decl. ¶ 3)
- Collected documents and communications in response to discovery requests from Defendant (Pfeiffer Decl. ¶ 4; Audet Decl. ¶ 4)
- Traveled to New York (from Pennsylvania and Connecticut, respectively), prepared for, and sat for depositions (Pfeiffer Decl. ¶ 5; Audet Decl. ¶ 5)
- Traveled to Hartford (from Pennsylvania and Hamden, Connecticut, respectively) and attended 8 days of trial (Pfeiffer Decl. ¶¶ 6-7; Audet Decl. ¶ 6)
- Testified at trial and actively participated in discussions of trial strategy and themes (Pfeiffer Decl. ¶¶ 6-7; Audet Decl. ¶ 6)
- Conferred extensively with Class Counsel during mediation and settlement negotiations regarding strategy and resolution of case (Pfeiffer Decl. ¶ 8; Audet Decl. ¶ 7)

In total, Pfeiffer estimates he devoted at least 650 hours to the case, Pfeiffer Decl. ¶ 9; Audet estimates he spent at least 180 hours on work relating to the case. Audet Decl. ¶ 8.

---

[19] *See also Roberts v. Texaco, Inc.*, 979 F. Supp. 185, 204 (S.D.N.Y. 1997) (awarding $85,000 to lead plaintiff who "was a driving force in the initiation of this litigation and in its prosecution to a successful conclusion").

Awards of $25,000 are in line with awards to named plaintiffs in other cases who have undertaken similar efforts (and, in certain cases, less substantial efforts) on behalf of a class. *See Fleisher*, 2015 WL 10847814, at *24 (awarding $25,000 incentive award to plaintiff who "spent at least 88 hours actively fulfilling his obligations as a Class representative, complying with all demands placed upon him during the prosecution and Settlement of this Action, and providing valuable assistance to Class Counsel for over three years," including sitting for deposition and "review[ing] pleadings and motions, review[ing] other court filings, communicat[ing] regularly with Class Counsel, and [being] continuously involved in the litigation process"); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2018 WL 3863445, at *2 (S.D.N.Y. Aug. 14, 2018) (awarding $25,000 each to five named plaintiffs based on their efforts on behalf of the class, including "providing evidence to assist in the development of the OTC Plaintiffs' claims, collecting thousands of documents in response to discovery requests, responding to scores of questions from counsel about the documents and data produced, and preparing and sitting for lengthy 30(b)(6) depositions by the defendants"); *Dupler*, 705 F. Supp. 2d at 245 (awarding $25,000 to a class representative who "discussed with class counsel the pleadings, discovery demands, discovery responses, and memoranda of law on class certification," sat for deposition, and conferred with class counsel during the settlement negotiations"); *Anwar*, 2012 WL 1981505, at *4 (awarding $25,000 to class representatives who "responded to discovery requests, including deposition . . . regularly communicated with Plaintiffs' Counsel concerning the prosecution of this Action, reviewed and commented on pleadings, consulted with Plaintiffs' Counsel regarding discovery, and traveled to the United States on multiple occasions for deposition and mediation").

Together, the three named Plaintiffs were exceptional representatives for the Class, monitoring Class Counsel, testifying on behalf of the Class at a lengthy trial, and actively participating in the five years of litigation that led up to trial. All three sacrificed considerable time and energy in a long and sometimes difficult case. These efforts—which resulted in the Settlement—should be recognized through the incentive awards requested.

## CONCLUSION

For the reasons set forth herein, SG respectfully requests that this Court award its requested fees in the amount of $980,000, expenses in the amount of $957,283.40, and service awards in the amounts proposed.

Respectfully submitted,

/s/ Russell Rennie
Marc Seltzer
Kathryn Hoek
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Tel: (310) 789-3100
mseltzer@susmangodfrey.com
khoek@susmangodfrey.com

Robert A. Izard
Craig A. Raabe
Douglas P. Needham
IZARD, KINDALL & RAABE, LLP
29 S. Main St., Suite 305
West Hartford, CT 06107
Tel: (860) 493-6292
rizard@ikrlaw.com
craabe@ikrlaw.com
dneedham@ikrlaw.com

Seth Ard
Russell F. Rennie
Jacob Buchdahl
Geng Chen
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019-6022
Tel: (212) 336-8330
sard@susmangodfrey.com
rrennie@susmangodfrey.com
jbuchdahl@susmangodfrey.com
gchen@susmangodfrey.com

Edgar Sargent
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101-3000
Tel: (202) 516-3880
esargent@susmangodfrey.com

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 10, 2023, a copy of the foregoing document filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

*/s/Russell Rennie*